## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

ALLIANCE FOR FAIR BOARD
RECRUITMENT,

*Petitioner*,

v.

SECURITIES AND EXCHANGE
COMMISSION,

*Respondent*.

No. _____

## PETITION FOR REVIEW

Pursuant to Section 25(a) of the Securities and Exchange Act of

1934, 15 U.S.C. § 78y(a), and Rule 15 of the Federal Rules of Appellate

Procedure, Petitioner Alliance for Fair Board Recruitment petitions this

Court for review of the final order of the Securities and Exchange

Commission entitled "*Self-Regulatory Organizations; The Nasdaq Stock*

*Market LLC; Order Approving Proposed Rule Changes, as Modified by*

*Amendments No. 1, to Adopt Listing Rules Related to Board Diversity*

*and to Offer Certain Listed Companies Access to a Complimentary*

*Board Recruiting Service*," Release No. 34-92590 (Aug. 6, 2021). A copy of the final order is attached as Attachment A.

Jurisdiction and venue are proper under Section 25(a) because Alliance for Fair Board Recruitment resides and has its principal place of business in Texas. 15 U.S.C. § 78y(a).

Dated: August 9, 2021                    Respectfully submitted,

                                        /s/ Jonathan Berry
                                        C. BOYDEN GRAY
                                        JONATHAN BERRY
                                           *Counsel of Record*
                                        R. TRENT MCCOTTER
                                        MICHAEL BUSCHBACHER
                                        JORDAN E. SMITH
                                        BOYDEN GRAY & ASSOCIATES
                                        801 17th St NW, #350
                                        Washington, DC 20006
                                        (202) 955-0620
                                        berry@boydengrayassociates.com

                                        *Counsel for Petitioner*

# CERTIFICATE OF SERVICE

I hereby certify that that on August 9, 2021, I caused a true and correct copy of the Petition for Review, and Exhibit A thereto, to be served on the following by First Class Mail.

Ms. Vanessa A. Countryman
Secretary
Securities & Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-5400
Secretarys-Office@sec.gov

Mr. Jeffrey S. Davis
Senior Vice President
Senior Deputy General Counsel
The Nasdaq Stock Market LLC
805 King Farm Boulevard
Rockville, MD 20850
(301) 978-8484
Jeffrey.davis@nasdaq.com

Dated: August 9, 2021

/s/ Jonathan Berry
Jonathan Berry
Boyden Gray & Associates
801 17th St NW, #350
Washington, DC 20006
(202) 955-0620

# ATTACHMENT A

SECURITIES AND EXCHANGE COMMISSION
(Release No. 34-92590; File Nos. SR-NASDAQ-2020-081; SR-NASDAQ-2020-082)

August 6, 2021

Self-Regulatory Organizations; The Nasdaq Stock Market LLC; Order Approving Proposed Rule
Changes, as Modified by Amendments No. 1, to Adopt Listing Rules Related to Board Diversity
and to Offer Certain Listed Companies Access to a Complimentary Board Recruiting Service

I.      Introduction and Overview

        A self-regulatory organization, or "SRO," may propose a change in its rules or propose a

new rule by filing the proposal with the Securities and Exchange Commission ("Commission")

pursuant to Section 19(b)(1) of the Securities Exchange Act of 1934 ("Act").[1]  This order

considers two separate proposed rule changes that The Nasdaq Stock Market LLC ("Nasdaq" or

"Exchange") filed with the Commission.

        On December 1, 2020, the Exchange filed with the Commission, pursuant to Section

19(b)(1) of the Act and Rule 19b-4 thereunder,[2] a proposed rule change to adopt listing rules

related to board diversity ("Board Diversity Proposal").  The proposed rule change was

published for comment in the Federal Register on December 11, 2020.[3]  On February 26, 2021,

---

[1]     15 U.S.C. 78s(b)(1).

[2]     17 CFR 240.19b-4.

[3]     See Securities Exchange Act Release No. 90574 (December 4, 2020), 85 FR 80472 (SR-
        NASDAQ-2020-081).  Comments received on the Board Diversity Proposal are available
        on the Commission's website at:  https://www.sec.gov/comments/sr-nasdaq-2020-
        081/srnasdaq2020081.htm.  On January 19, 2021, pursuant to Section 19(b)(2) of the Act,
        15 U.S.C. 78s(b)(2), the Division of Trading and Markets ("Division"), for the
        Commission pursuant to delegated authority, designated a longer period within which to
        approve the proposed rule change, disapprove the proposed rule change, or institute
        proceedings to determine whether to disapprove the proposed rule change.  See Securities
        Exchange Act Release No. 90951, 86 FR 7135 (January 26, 2021).  The Division, for the
        Commission pursuant to delegated authority, designated March 11, 2021 as the date by
        which the Commission shall approve or disapprove, or institute proceedings to determine
        whether to disapprove, the proposed rule change.  See also infra note 11 and

the Exchange filed Amendment No. 1 to the proposed rule change, which replaced and

superseded the proposed rule change as originally filed.[4]

On December 1, 2020, the Exchange also filed with the Commission, pursuant to Section

19(b)(1) of the Act[5] and Rule 19b-4 thereunder,[6] a proposed rule change to offer certain listed

companies access to a complimentary board recruiting service to help advance diversity on

company boards ("Board Recruiting Service Proposal"), which was published for comment in

the Federal Register on December 10, 2020.[7]  On February 26, 2021, the Exchange filed

Amendment No. 1 to the proposed rule change, which replaced and superseded the proposed rule

change as originally filed.[8]

---

accompanying text (providing additional procedural history for the Board Diversity
Proposal).

[4]    The full text of Amendment No. 1 to the Board Diversity Proposal is available on the
Commission's website at:  https://www.sec.gov/comments/sr-nasdaq-2020-
081/srnasdaq2020081-8425992-229601.pdf.

[5]    15 U.S.C. 78s(b)(1).

[6]    17 CFR 240.19b-4.

[7]    See Securities Exchange Act Release No. 90571 (December 4, 2020), 85 FR 79556 (SR-
NASDAQ-2020-082).  Comments received on the Board Recruiting Service Proposal are
available on the Commission's website at:  https://www.sec.gov/comments/sr-nasdaq-
2020-082/srnasdaq2020082.htm.  On January 19, 2021, pursuant to Section 19(b)(2) of
the Act, 15 U.S.C. 78s(b)(2), the Division, for the Commission pursuant to delegated
authority, designated a longer period within which to approve the proposed rule change,
disapprove the proposed rule change, or institute proceedings to determine whether to
disapprove the proposed rule change.  See Securities Exchange Act Release No. 90952,
86 FR 7148 (January 26, 2021).  The Division, for the Commission pursuant to delegated
authority, designated March 10, 2021 as the date by which the Commission shall approve
or disapprove, or institute proceedings to determine whether to disapprove, the proposed
rule change.  See also infra note 11 and accompanying text (providing additional
procedural history for the Board Recruiting Service Proposal).

[8]    The full text of Amendment No. 1 to the Board Recruiting Service Proposal is available
on the Commission's website at:  https://www.sec.gov/comments/sr-nasdaq-2020-
082/srnasdaq2020082-8425987-229599.pdf.

On March 10, 2021, the Division, for the Commission pursuant to delegated authority, published notice of Amendments No. 1[9] and instituted proceedings pursuant to Section 19(b)(2)(B) of the Act[10] to determine whether to approve or disapprove the proposed rule changes, as modified by Amendments No. 1.[11]

The Act governs the Commission's review of SRO-proposed rules. Section 19(b)(2)(C)(i) provides that the Commission "shall approve" a proposal if it finds that the rule is consistent with the requirements of the Act and the rules and regulations applicable to the SRO—including requirements in Section 6(b).[12] The statute does not give the Commission the ability to make any changes to the rule proposal as submitted, or to disapprove the rule proposal on the ground that the Commission would prefer some alternative rule on the same topic.

Under the Board Diversity Proposal, the Exchange proposes to require each Nasdaq-listed company, subject to certain exceptions, to publicly disclose in an aggregated form, to the extent permitted by applicable law, information on the voluntary self-identified gender and racial characteristics and LGBTQ+ status (all terms defined below) of the company's board of

---

[9]    Amendment No. 1 to the Board Diversity Proposal and Amendment No. 1 to the Board Recruiting Service Proposal are collectively referred to as "Amendments No. 1."

[10]    15 U.S.C. 78s(b)(2)(B).

[11]    See Securities Exchange Act Release No. 91286, 86 FR 14484 (March 16, 2021). On June 7, 2021, pursuant to Section 19(b)(2) of the Act, 15 U.S.C. 78s(b)(2), the Division, for the Commission pursuant to delegated authority, designated a longer period within which to issue an order approving or disapproving the proposed rule changes, as modified by Amendments No. 1. See Securities Exchange Act Release Nos. 92118, 86 FR 31355 (June 11, 2021) (SR-NASDAQ-2020-081); 92119, 86 FR 31355 (June 11, 2021) (SR-NASDAQ-2020-082). The Division, for the Commission pursuant to delegated authority, designated August 8, 2021 as the date by which the Commission shall approve or disapprove the Board Diversity Proposal, and August 7, 2021 as the date by which the Commission shall approve or disapprove the Board Recruiting Service Proposal.

[12]    15 U.S.C. 78s(b)(2)(C)(i).

directors.  The Exchange also proposes to require each Nasdaq-listed company, subject to certain

exceptions, to have, or explain why it does not have, at least two members of its board of

directors who are Diverse, including at least one director who self-identifies as female and at

least one director who self-identifies as an Underrepresented Minority or LGBTQ+.[13]  Under the

Board Recruiting Service Proposal, the Exchange proposes to provide certain Nasdaq-listed

companies with one year of complimentary access for two users to a board recruiting service,

which would provide access to a network of board-ready diverse candidates for companies to

identify and evaluate.

This order applies the governing standard under the Act and finds that the Board

Diversity Proposal, as modified by Amendment No. 1, is consistent with the requirements of the

Act and the rules and regulations thereunder applicable to a national securities exchange.

Separately, it finds that the Board Recruiting Service Proposal, as modified by Amendment No.

1, is also consistent with the requirements of the Act and the rules and regulations thereunder

applicable to a national securities exchange.  The proposed rule changes therefore are required to

be and are approved.[14]

In particular, the Commission finds that the Board Diversity Proposal and the Board

Recruiting Service Proposal are consistent with Section 6(b)(5) of the Act,[15] which requires that

---

[13]    While these Nasdaq-listed companies would have an objective of at least two Diverse directors, including at least one director who self-identifies as female and at least one director who self-identifies as an Underrepresented Minority or LGBTQ+, as described below, other Nasdaq-listed companies would have different board diversity objectives. See infra notes 25-27.

[14]    In approving these proposed rule changes, the Commission has considered the proposed rules' impact on efficiency, competition, and capital formation.  See 15 U.S.C. 78c(f). See also infra Section II.

[15]    15 U.S.C. 78f(b)(5).

the rules of a national securities exchange be designed, among other things, to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, to remove impediments to and perfect the mechanism of a free and open market and a national market system and, in general, to protect investors and the public interest, not be designed to permit unfair discrimination between customers, issuers, brokers, or dealers, and not be designed to regulate by virtue of any authority conferred by the Act matters not related to the purposes of the Act or the administration of the exchange; and Section 6(b)(8) of the Act,[16] which requires that the rules of a national securities exchange not impose any burden on competition that is not necessary or appropriate in furtherance of the purposes of the Act. The Commission also finds that the Board Recruiting Service Proposal, as modified by Amendment No. 1, is consistent with Section 6(b)(4) of the Act,[17] which requires that national securities exchange rules provide for the equitable allocation of reasonable dues, fees, and other charges among its members and issuers and other persons using its facilities. The proposals and Commission findings are discussed below.

## II.    Discussion and Commission Findings

The Board Diversity Proposal would establish a disclosure-based framework that would make consistent and comparable statistics widely available to investors regarding the number of Diverse directors serving on a Nasdaq-listed company's board.[18] Board-level diversity statistics

---

[16]    15 U.S.C. 78f(b)(8).

[17]    15 U.S.C. 78f(b)(4).

[18]    Pursuant to proposed Rule 5605(f)(1), "Diverse" would be defined to mean an individual who self-identifies in one or more of the following categories:  (i) Female, (ii) Underrepresented Minority, or (iii) LGBTQ+.  Also pursuant to proposed Rule 5605(f)(1), "Female" would be defined to mean an individual who self-identifies her gender as a woman, without regard to the individual's designated sex at birth;

are currently not widely available on a consistent and comparable basis, even though the Exchange and many commenters argue that this type of information is important to investors.[19] The Board Diversity Proposal would also provide increased transparency and require an explanation regarding why a Nasdaq-listed company does not meet the proposed board diversity objectives, for those companies that do not choose to meet such objectives.  It would augment existing Commission requirements that companies disclose whether, and how, their boards or board nominating committees consider diversity in nominating new directors.[20]  As noted by the Exchange and a number of commenters,[21] a better understanding of why a company does not meet the proposed objectives would contribute to investors' investment and voting decisions. Investors and companies have different views regarding board diversity and whether board diversity affects company performance and governance.[22]  As discussed below, commenters representing a broad array of investors have indicated an interest in board diversity information. And, regardless of their views on those issues, the Board Diversity Proposal would provide

---

"Underrepresented Minority" would be defined to mean an individual who self-identifies as one or more of the following:  Black or African American, Hispanic or Latinx, Asian, Native American or Alaska Native, Native Hawaiian or Pacific Islander, or Two or More Races or Ethnicities; and "LGBTQ+" would be defined to mean an individual who self-identifies as any of the following:  lesbian, gay, bisexual, transgender, or as a member of the queer community.  See Amendment No. 1 to the Board Diversity Proposal at 327; proposed Rule 5605(f)(1).

[19]     See infra Section II.A.2. (describing the Exchange's and commenters' arguments regarding the demand for board diversity information, including board-level diversity statistics).

[20]     See Regulation S-K, Item 407(c)(2)(vi).

[21]     See infra Section II.A.2. (describing the Exchange's and commenters' arguments regarding the demand for board diversity information, including explanations for why a company does not meet the proposed diversity objectives).

[22]     See infra Section II.B. (describing commenters' differing views regarding board diversity and whether board diversity affects company performance and governance).

investors with information to facilitate their evaluation of companies in which they might invest. The Board Diversity Proposal would therefore contribute to the maintenance of fair and orderly markets, which has previously been found by the Commission to support a finding that an exchange listing standard satisfied the requirements of Section 6(b)(5).[23]  Accordingly, as discussed below, the Commission finds that the Board Diversity Proposal is designed to promote just and equitable principles of trade, remove impediments to and perfect the mechanism of a free and open market and a national market system, and protect investors and the public interest. The Commission also finds that the Board Diversity Proposal is not designed to permit unfair discrimination between issuers or to regulate by virtue of any authority conferred by the Act matters not related to the purposes of the Act or the administration of the Exchange, and would not impose any burden on competition that is not necessary or appropriate in furtherance of the purposes of the Act.

The Board Recruiting Service Proposal would provide Eligible Companies,[24] which by definition do not have a specified number of Diverse directors, with access to a network of

---

[23]    See Securities Exchange Act Release No. 78223 (July 1, 2016), 81 FR 44400, 44403 (July 7, 2016) (order approving SR-NASDAQ-2016-013) ("2016 Approval Order") (finding that exchange disclosure-related listing standards contribute to the maintenance of fair and orderly markets).  The maintenance of "fair and orderly markets" is a statutory goal included throughout the Act, including components that apply to SROs such as Nasdaq.  See, e.g., Sections 6(f), 9(i), 11, 11A, 12(f), and 19(b)(3) of the Act.

[24]    The Board Recruiting Service Proposal in general defines "Eligible Company" as a listed company that represents to the Exchange that it does not have:  (i) at least one director who self-identifies as Female; and (ii) at least one director who self-identifies as one or more of the following:  an Underrepresented Minority or LGBTQ+.  See proposed IM-5900-9(a); Amendment No. 1 to the Board Recruiting Service Proposal at 11 n.20 (describing the treatment of a Company with a Smaller Board).  A Foreign Issuer would be an Eligible Company if it represents to the Exchange that it does not have:  (i) at least one director who self-identifies as Female; and (ii) at least one director who self-identifies as one or more of the following:  Female, an Underrepresented Individual, or LGBTQ+.  See proposed IM-5900-9(b).  A Smaller Reporting Company would be an

board-ready diverse candidates, allowing these companies to identify and evaluate such candidates if they choose to use the service to increase diverse representation on their boards. The Board Recruiting Service Proposal would also help Eligible Companies to meet (or exceed, in the case of a Company with a Smaller Board[25]) the diversity objectives under the separately approved Board Diversity Proposal, if they elect to meet those objectives rather than disclose why they have not met the objectives.  Further, the Board Recruiting Service Proposal could help the Exchange compete to attract and retain listings, particularly in light of the diversity objectives in the Board Diversity Proposal, which is also approved by this order and that will apply to Nasdaq-listed companies.  Accordingly, and as discussed below in Section II.I., the Commission finds that the Board Recruiting Service Proposal is designed to provide for the equitable allocation of reasonable dues, fees, and other charges among issuers, is not designed to permit unfair discrimination between issuers, and does not impose any burden on competition not necessary or appropriate in furtherance of the purposes of the Act.  The Commission further believes that the Board Recruiting Service Proposal would provide for the equitable allocation of complimentary services and reflects the current competitive environment for listings among national securities exchanges.

---

Eligible Company if it represents to the Exchange that it does not have:  (i) at least one director who self-identifies as Female, and (ii) at least one director who self-identifies as one or more of the following:  Female, an Underrepresented Minority, or LGBTQ+.  <u>See</u> proposed IM-5900-9(c).

[25]     Proposed Rule 5605(f)(2)(D) would require each company with a board of directors of five or fewer members ("Company with a Smaller Board") to have, or explain why it does not have, at least one member of its board of directors who is Diverse.

A.    Disclosures under the Board Diversity Proposal

1.    Disclosure-Based Framework

The Board Diversity Proposal's disclosure-based framework would be established by proposed Rules 5605(f) and 5606. The Exchange proposes to adopt new Rule 5605(f)(2), which would require each Nasdaq-listed company (other than a Foreign Issuer,[26] Smaller Reporting Company,[27] or Company with a Smaller Board) to have, or explain why it does not have, at least two members of its board of directors who are Diverse,[28] including at least one Diverse director who self-identifies as Female and at least one Diverse director who self-identifies as an

---

[26]    The Exchange proposes to define a Foreign Issuer as:  (a) a Foreign Private Issuer (as defined in Rule 5005(a)(19)); or (b) a company that (i) is considered a "foreign issuer" under Rule 3b-4(b) under the Act, 17 CFR 240.3b-4(b), and (ii) has its principal executive offices located outside of the United States.  See proposed Rule 5605(f)(1). For Foreign Issuers, the Exchange proposes to define "Diverse" to mean an individual who self-identifies as one or more of the following:  Female, LGBTQ+, or an underrepresented individual based on national, racial, ethnic, indigenous, cultural, religious, or linguistic identity in the country of the company's principal executive offices as reported on the company's Form F-1, 10-K, 20-F, or 40-F ("Underrepresented Individual").  See proposed Rule 5605(f)(2)(B)(i).  Proposed Rule 5605(f)(2)(B) would require each Foreign Issuer (other than a Company with a Smaller Board) to have, or explain why it does not have, at least two members of its board of directors who are Diverse, including at least one Diverse director who self-identifies as Female.  The second Diverse director may include an individual who self-identifies as one or more of the following:  Female, LGBTQ+, or an Underrepresented Individual.

[27]    The Exchange proposes to define a Smaller Reporting Company as set forth in Rule 12b-2 under the Act.  See proposed Rule 5605(f)(1).  Proposed Rule 5605(f)(2)(C) would require each Smaller Reporting Company (other than a Company with a Smaller Board, as discussed below) to have, or explain why it does not have, at least two members of its board of directors who are Diverse, including at least one Diverse director who self-identifies as Female.  The second Diverse director may include an individual who self-identifies as one or more of the following:  Female, LGBTQ+, or an Underrepresented Minority.

[28]    As proposed, "two members of its board of directors who are Diverse" would exclude emeritus directors, retired directors, and members of an advisory board.  See Amendment No. 1 to the Board Diversity Proposal at 73 n.187.

Underrepresented Minority or LGBTQ+.[29]  If a company elects to satisfy the requirements of

proposed Rule 5605(f)(2) by disclosing why it does not meet the applicable diversity objectives,

the company would be required to:  (i) specify the requirements of proposed Rule 5605(f)(2) that

are applicable; and (ii) explain the reasons why it does not have two Diverse directors (or one

Diverse director for a Company with a Smaller Board).[30]  The Exchange would not evaluate the

substance or merits of a company's explanation.[31]

    As proposed, if a company fails to adhere to proposed Rule 5605(f), the Exchange's

Listing Qualifications Department would promptly notify the company and inform it that it has

until the later of its next annual shareholders meeting or 180 days from the event that caused the

deficiency to cure the deficiency.[32]  If a company does not regain compliance within the

---

[29]    See proposed Rule 5605(f)(2)(A).

[30]    See proposed Rule 5605(f)(3).  The disclosure must be provided in advance of the company's next annual meeting of shareholders:  (a) in any proxy statement or any information statement (or, if a company does not file a proxy, in its Form 10-K or 20-F); or (b) on the company's website.  See id.  If the company provides the disclosure on its website, the company must submit such disclosure concurrently with the filing made pursuant to (a) above and submit a URL link to the disclosure through the Nasdaq Listing Center, within one business day after such posting.  See id.

[31]    See Amendment No. 1 to the Board Diversity Proposal at 74-75 (emphasizing that an explanation must "satisfy subparagraphs (i) and (ii) of proposed Rule 5605(f)(3)"—the company must "explain the reasons why it does not have the applicable number of Diverse directors," it is not enough "merely to state that 'the Company does not comply with Nasdaq's diversity rule'").  See also letter from John A. Zecca, Executive Vice President, Chief Legal Officer, and Chief Regulatory Officer, Nasdaq, to Vanessa A. Countryman, Secretary, Commission, dated February 26, 2021 ("Nasdaq Response Letter II"), at 8 ("The company can choose to disclose as much, or as little, insight into the company's circumstances or diversity philosophy as the company determines, and shareholders may request additional information directly from the company if they need additional information to make an informed voting or investment decision.").  See id., for examples of specific disclosures the Exchange would consider sufficient to satisfy the requirements of proposed Rule 5605(f)(3).

[32]    See proposed Rule 5605(f)(6)(A).  Proposed Rule 5605(f)(6)(B) would provide a grace period for a company that has satisfied the diversity objectives within the applicable

applicable cure period, the Listings Qualifications Department would issue a Staff Delisting Determination Letter.[33]

Pursuant to proposed Rule 5606(a), each Nasdaq-listed company would be required to annually disclose its board-level diversity data in a substantially similar format as the "Board Diversity Matrix."  In the proposed Board Diversity Matrix, a company would be required to provide the total number of directors on its board, and the company (other than a Foreign Issuer) would be required to provide the following:  (1) the number of directors based on gender identity (female, male, or non-binary[34]) and the number of directors who did not disclose gender; (2) the number of directors based on race and ethnicity (African American or Black, Alaskan Native or Native American, Asian, Hispanic or Latinx, Native Hawaiian or Pacific Islander, White, or Two or More Races or Ethnicities[35]), disaggregated by gender identity (or did not disclose gender); (3) the number of directors who self-identify as LGBTQ+; and (4) the number of directors who did not disclose a demographic background under item (2) or (3) above.[36]

---

timeframes, but later ceases to meet the diversity objectives due to a vacancy on its board of directors.

[33]    See Rule 5810(c)(3).  A company that receives a Staff Delisting Determination can appeal the determination to the Hearings Panel through the process set forth in Rule 5815.  See Amendment No. 1 to the Board Diversity Proposal at 88.

[34]    See Amendment No. 1 to the Board Diversity Proposal at 327 (defining "non-binary").  Although non-binary is included as a category in the Board Diversity Matrix, a company would not satisfy the diversity objectives in proposed Rule 5605(f)(2) if a director self-identifies solely as non-binary.  See id. at 66 n.173.

[35]    If a director self-identifies in the "Two or More Races or Ethnicities" category, the director must also self-identify in each individual category, as appropriate.  See id. at 66 n.174.

[36]    See proposed Rule 5606(a).

A company that qualifies as a Foreign Issuer may elect to use an alternative Board Diversity Matrix format.[37]  A Foreign Issuer would be required to provide the total number of directors on its board, and would also be required to provide the following:  (1) its country of principal executive offices; (2) whether it is a Foreign Private Issuer; (3) whether disclosure is prohibited under its home country law; (4) the number of directors based on gender identity (female, male, or non-binary) and the number of directors who did not disclose gender; (5) the number of directors who self-identify as Underrepresented Individuals in its home country jurisdiction; (6) the number of directors who self-identify as LGBTQ+; and (7) the number of directors who did not disclose the demographic background under item (5) or (6) above.[38]

As proposed, if a company fails to adhere to proposed Rule 5606, the Exchange would notify the company that it is not in compliance with a listing standard and allow the company 45 calendar days to submit a plan to regain compliance and, upon review of such plan, the Exchange may provide the company with up to 180 days to regain compliance.[39]  If the company does not submit a plan or regain compliance within the applicable time periods, it would be issued a Staff Delisting Determination, which the company could appeal to a Hearings Panel.[40]

---

[37]  See id.

[38]  See id.  Proposed Rule 5606 would become operative one year after Commission approval of the proposal.  See proposed Rule 5606(e).  A company would be required to be in compliance with proposed Rule 5606 by the later of:  (i) one calendar year from the approval date ("Effective Date"); or (ii) the date the company files its proxy statement or its information statement for its annual meeting of shareholders (or, if the company does not file a proxy or information statement, the date it files its Form 10-K or 20-F) during the calendar year of the Effective Date.

[39]  See Rule 5810(c)(2).

[40]  See id.

The Exchange states that, with these provisions, it is proposing a disclosure-based framework and not a mandate.[41]  The Exchange also states that while some companies have made progress in diversifying their boardrooms, the national market system and the public interest would be well-served by a "disclosure-based, business driven" framework for companies to embrace meaningful and multi-dimensional diversification of their boards.[42]

Some commenters express support for a "flexible" "comply-or-disclose" approach.[43] Some commenters state that the proposal would not impose a quota for board diversity,[44] and

---

[41]    See Amendment No. 1 to the Board Diversity Proposal at 19.  See also id. at Section 3.a.VII.D (discussing the alternatives that the Exchange has considered, including a mandate versus a disclosure-based approach).

[42]    See id. at 8-9, 12, 41.  The Exchange states that, although gender diversity has improved among U.S. company boards in recent years, the pace of change has been gradual and the U.S. still lags behind jurisdictions that have focused on board diversity, and progress toward bringing underrepresented racial and ethnic groups into the boardroom has been slower.  See id. at 12, Section 3.a.IV.

[43]    See, e.g., letter from Kristi Mitchem, Chief Executive Officer, BMO Global Asset Management, to Vanessa Countryman, Secretary, Commission, dated January 11, 2021 ("BMO Letter"), at 2; letter from Brian V. Breheny, Skadden, Arps, Slate, Meagher & Flom LLP, to Vanessa Countryman, Secretary, Commission, dated January 4, 2021 ("Skadden Letter"), at 2; letter from Lisa M. Fairfax, Alexander Hamilton Professor of Business Law, George Washington University Law School, to Vanessa Countryman, Secretary, Commission, dated January 4, 2021 ("Fairfax Letter"), at 10; letter from Molly Gochman, Founder & President, Stardust, to Vanessa Countryman, Secretary, Commission, dated January 4, 2021 ("Stardust Letter"), at 2; letter from Brenda Chia and Sanjiv Shah, Co-Chairs, Association of Asian American Investment Managers, dated December 28, 2020 ("AAAIM Letter"), at 2; letter from Betty T. Yee, California State Controller, to Vanessa Countryman, Secretary, Commission, dated December 21, 2020, at 1-2; letter from Hershel Harper, Chief Investment Officer, UAW Retiree Medical Benefits Trust, to Vanessa Countryman, Secretary, Commission, dated December 22, 2020 ("UAW Letter"), at 2-3; letter from Jay Huish, Executive Director, and William J. Coaker Jr., Chief Investment Officer, San Francisco Employees' Retirement System, to Vanessa Countryman, Secretary, Commission, dated December 17, 2020, at 2.

[44]    See, e.g., letter from Kurt Schacht, Head of Advocacy, CFA Institute Advocacy and Karina Karakulova Sr. Manager, Capital Markets Policy – Americas, CFA institute, to Vanessa Countryman, Secretary, Commission, dated January 4, 2021 ("CFA Letter") at 6; letter from Scott M. Stringer, New York City Comptroller, to Vanessa Countryman,

emphasize that the Exchange does not plan to judge the merits of a company's explanation relating to board diversity.[45]  Other commenters express the concern that the Board Diversity Proposal would establish a quota for a minimum number of Diverse directors.[46]  Some

---

Secretary, Commission, dated January 4, 2021 ("New York City Comptroller Letter"), at 1 and 3; letter from William J. Stromberg, President and CEO, and David Oestreicher, General Counsel and Corporate Secretary, T. Rowe Price Group, Inc., to Vanessa Countryman, Secretary, Commission, dated December 29, 2020 ("T. Rowe Letter"), at 2; letter from Joseph M. Torsella, Pennsylvania State Treasurer, to Vanessa Countryman, Secretary, Commission, dated January 4, 2021, at 1-2; AAAIM Letter at 2; letter from Douglas K. Chia, Soundboard Governance LLC, to Vanessa Countryman, Secretary, Commission, dated December 29, 2020 ("Soundboard Letter"), at 2; letter from Amy L. Goodman and John F. Olson to Vanessa A. Countryman, Secretary, Commission, dated December 24, 2010 ("Goodman and Olson Letter"), at 2; letter from Patricia Gazda, Corporate Governance Officer, Ohio Public Employees Retirement System, to Vanessa Countryman, Secretary, Commission, dated December 23, 2020 ("OPERS Letter"), at 2; UAW Letter at 2-3; letter from Barb Smoot, President and CEO, Women for Economic and Leadership Development, to Vanessa Countryman, Secretary, Commission, dated December 21, 2020.

[45]    See, e.g., letter from John W. Rogers, Jr., Chairman and Co-CEO, and Mellody Hobson, President and Co-CEO, Ariel Investments, LLC, to Vanessa Countryman, Secretary, Commission, dated December 29, 2020 ("Ariel Letter"), at 1; letter from Aeisha Mastagni, Portfolio Manager, Sustainable Investment and Stewardship Strategies, California State Teachers' Retirement System, to Vanessa A. Countryman, Secretary, Commission, dated December 23, 2020, at 2.

[46]    See, e.g., letter from Publius Oeconomicis to Vanessa Countryman, Secretary, Commission, dated May 3, 2021 ("Publius Letter II"), at 1-2; letter from Peter Flaherty, Chair, and Paul D. Kamenar, Counsel, National Legal and Policy Center, to Vanessa Countryman, Secretary, Commission, dated January 14, 2021 ("NLPC Letter"); letter from Henry D. Wolfe, Chairman, De la Vega Occidental & Oriental Holdings L.L.C., to Vanessa Countryman, Secretary, Commission, dated January 4, 2021 ("De La Vega Letter"), at 2; letter from Dennis E. Nixon, President, International Bancshares Corporation, to Vanessa A. Countryman, Secretary, Commission, dated December 31, 2020 ("IBC Letter"), at 5; anonymous letter with pseudonym "Publius Oeconomicis" to Vanessa Countryman, Secretary, Commission, dated December 28, 2020 ("Publius Letter"), at 8-10; letter from Walter Donnellan dated December 14, 2020 ("Donnellan Letter"), at 3.  One commenter argues that the Exchange downplays the consequences of non-compliance, and that the proposed framework would require companies to either discriminate based on sex, race, or sexual orientation or assume a serious risk of reputational and litigation harm.  See letter from C. Boyden Gray and Jonathan Berry, Boyden Gray & Associates, submitted on behalf of the Alliance for Fair Board

commenters also argue that the proposal would substitute a regulator's judgment for that of shareholders' and companies' boards and management in choosing directors,[47] and that directors should be selected for their experience, competence, and skills.[48]

In response to comments, the Exchange notes that the Board Diversity Proposal would establish a disclosure-based framework and not a mandate or quota.[49] According to the Exchange, proposed Rule 5605(f) would set forth "aspirational diversity objectives" and not quotas, mandates, or set-asides, and companies that do not meet the objectives need only explain why they do not.[50] The Exchange also provides examples of what might be contained in such an explanation and reiterates that it would not assess the substance of the explanation, but would merely verify that the company has provided one.[51] The Exchange further states that the proposal would not require any particular board composition or require a company to select

---

Recruitment, dated April 6, 2021 ("Alliance for Fair Board Recruitment Letter"), at 31-33. Some commenters also argue that men and women do not choose or desire all professions equally. See letter from Richard Morrison, Research Fellow, Competitive Enterprise Institute, dated March 11, 2021 ("CEI Letter"), at 3-4; letter from Independent Women's Forum, dated December 24, 2020 ("Independent Women's Forum Letter"), at 2.

[47] See, e.g., letter from David R. Burton, Senior Fellow in Economic Policy, The Heritage Foundation, to J. Matthew DeLesDernier, Assistant Secretary, Commission, dated January 4, 2021 ("Heritage Foundation Letter"), at 6-7; IBC Letter at 2; Donnellan Letter at 2-3; Type A Letter.

[48] See, e.g., De La Vega Letter at 2-3; Heritage Foundation Letter at 16.

[49] See Nasdaq Response Letter II at 6-7. The Exchange also rejects the comments that claim that the proposal is a de facto quota, and states that the proposal is intended to provide shareholders with sufficient information to make an informed voting or investment decision, or to facilitate informed discussions with companies. See id. at 8.

[50] See letter from Stephen J. Kastenberg, Ballard Spahr LLP, to Vanessa Countryman, Secretary, Commission, dated February 5, 2021 (submitted on behalf of the Exchange by its counsel) ("Nasdaq Response Letter I"), at 2.

[51] See id. at 2-3. See also Nasdaq Response Letter II at 7.

directors based on any criteria other than an individual's qualifications for the position.[52]  The

Exchange believes that its proposal would balance the calls of investors for companies to

increase diverse representation on their boards with the need for companies to maintain

flexibility and decision-making authority over their board composition.[53]

      The Board Diversity Proposal would establish a disclosure-based framework for Nasdaq-

listed companies that would contribute to investors' investment and voting decisions.  While the

proposal may have the effect of encouraging some Nasdaq-listed companies to increase diversity

on their boards, the proposed rules do not mandate any particular board composition.  The

proposal would not require a company to select a director solely because that person falls within

the proposed definition of "Diverse," would not prevent companies and their shareholders from

selecting directors based on experience, competence, and skills, and would not substitute a

regulator's judgment for companies' or their shareholders' judgment in selecting directors.

Rather, a Nasdaq-listed company that does not meet the board diversity objectives may comply

with proposed Rule 5605(f) by identifying the requirements of Rule 5605(f)(2) that apply to the

company and explaining why it does not meet the objectives, and the Exchange would not assess

the substance of the company's explanation.[54]

---

[52]     See Nasdaq Response Letter I at 3.

[53]     See Nasdaq Response Letter II at 7.  See also infra Section II.D. (describing the Exchange's argument that companies are free to decide where to list and may switch listing markets).

[54]     One commenter states that, if the Exchange is truly interested in establishing only a disclosure framework, it should remove the diversity objectives and only require board-level statistical disclosure, or alternatively require all companies to disclose an explanation for the constitution of their boards.  See Publius Letter II at 2.  As discussed in Section II.C.2., it is not unreasonable to only require companies that do not meet the proposed diversity objectives to disclose why they have not done so, rather than to require all Nasdaq-listed companies to disclose their approach to board diversity.

Some companies may prefer not to explain their approach to board diversity for various reasons, such as concerns regarding perceived reputational, legal, or other harm. However, the proposal could mitigate potential concerns by giving companies substantial flexibility in crafting the required explanation – including how much detail to provide – and the Exchange would not evaluate the substance of the explanation. Moreover, while there would be costs to listing elsewhere,[55] companies that object to providing any explanation can choose instead to list on a different exchange. No company is required to list on Nasdaq. Rather, exchanges compete for listings, with four exchanges that currently list securities of operating companies[56] and nine exchanges that have rules for the listing of issuers on the exchange.[57] Listing exchanges compete with each other for listings in many ways, including listing fees, listing standards, and listing services.[58] In approving proposed rule changes relating to complimentary services that

---

Moreover, as discussed in Section II.A.2., explanations from companies that do not meet the proposed diversity objectives, in addition to board-level statistical disclosure, would contribute to investors' investment and voting decisions.

[55] These costs would include the fixed costs associated with listing on a different exchange (such as the exchange's application fee, and the legal and accounting expenses associated with ensuring that the issuer satisfies the listing standards of the new exchange), as well as the costs associated with communicating with investors about the transfer of listing. See Securities Act Release No. 10428 (October 24, 2017), 82 FR 50059, 50065 (October 30, 2017) ("Rule 146 Release").

[56] These exchanges are Nasdaq; New York Stock Exchange LLC ("NYSE"); Cboe BZX Exchange, Inc. ("BZX"); and NYSE American LLC ("NYSE American").

[57] These exchanges are Nasdaq; NYSE; BZX; NYSE American; Investors Exchange LLC ("IEX"); Long-Term Stock Exchange, Inc. ("LTSE"); Nasdaq BX, Inc.; NYSE Arca, Inc.; and NYSE Chicago, Inc. See also, e.g., LTSE Rule 14.425(a)(1)(C) (requiring LTSE-listed issuers to adopt and publish a policy on the company's approach to diversity and inclusion).

[58] See Rule 146 Release, supra note 55, at 50064. The Exchange, along with other exchanges, currently have a number of listing standards governing a listed company's board of directors. See, e.g., Nasdaq Rule 5600 Series; NYSE Listed Company Manual Section 303A.00.

exchanges offer to issuers, including issuers that switch listing markets, the Commission has also

explained that exchanges are responding to competitive market pressures.[59]  As discussed in

Section II.D. below, the current proposals may provide another way in which the exchanges

compete for listings.

    2.    <u>Demand for and Potential Benefits of the Proposed Disclosures</u>

In the Board Diversity Proposal, the Exchange states that its discussions with

organizational leaders representing a broad spectrum of market participants and stakeholders

(including members of the business, investor, governance, legal, and civil rights communities)

revealed strong support for disclosure requirements that would standardize the reporting of board

diversity statistics.[60]  The Exchange also states that current reporting of board diversity data is

not provided in a consistent manner or on a sufficiently widespread basis and, as such, investors

are not able to readily compare board diversity statistics across companies.[61]  In pointing out the

---

[59]    <u>See</u>, <u>e.g.</u>, Securities Exchange Act Release No. 90893 (January 11, 2021), 86 FR 4166 (January 15, 2021) (approving SR-NYSE-2020-94 relating to certain complimentary services); Securities Exchange Act Release No. 90729 (December 18, 2020), 85 FR 84434 (December 28, 2020) (approving SR-NASDAQ-2020-060 relating to certain complimentary services).

[60]    <u>See</u> Amendment No. 1 to the Board Diversity Proposal at Section 3.a.V.  The Exchange also states that such discussions reinforced the notion that if companies recruit by skill set and experience rather than title, diverse talent would satisfy demand.  <u>See</u> <u>id.</u> at 19-20, 46.  According to the Exchange, studies suggest that the traditional director candidate selection process may create barriers to considering qualified diverse candidates for board positions.  <u>See</u> <u>id.</u> at 41-44, Section 3.b.II.A.

[61]    <u>See</u> <u>id.</u> at 9.  The Exchange also states that, while conducting research on the state of board diversity among its listed companies, it encountered multiple key challenges, such as:  (1) inconsistent disclosure and definitions of "diversity" across companies; (2) limited data on diverse characteristics outside of gender; (3) inconsistent or no disclosure of a director's race, ethnicity, or other diversity attributes (e.g., nationality); (4) difficult-to-extract data because statistics are often embedded in graphics; and (5) aggregation of information, making it difficult to separate gender from other categories of diversity.  <u>See</u> <u>id.</u> at 51.  <u>See also</u> <u>id.</u> at 59, 107.

"broad latitude" afforded to companies by Commission rules relating to board diversity and proxy disclosure, the Exchange states that the absence of a specific definition of "diversity" for such disclosures has resulted in current reporting of board-level diversity statistics being significantly unreliable and unusable to investors.[62] The Exchange notes that the lack of transparency creates barriers to investment analysis, due diligence, and academic study, and affects investors who are increasingly basing public advocacy, proxy voting, and direct shareholder-company engagement decisions on board diversity considerations.[63]

The Exchange asserts that the disclosure-based framework of proposed Rule 5605(f) may influence corporate conduct if a company chooses to meet the proposed diversity objectives,[64] and could help increase opportunities for Diverse candidates.[65] Moreover, the Exchange states that, if a company does not meet the proposed objectives, the disclosure under proposed Rule 5605(f)(3) would provide analysts and investors with a better understanding about a company's reasons for not doing so.[66] The Exchange believes that this disclosure would enable the investment community to conduct more informed analyses of, and have more informed

---

[62]    See id. at Sections 3.a.VI.A-B.

[63]    See id. at 51-52. See also id. at Section 3.a.VI.C. (describing examples of support for board diversity disclosures).

[64]    See id. at 121.

[65]    See id. The Exchange also states that proposed Rule 5605(f) would empower companies to maintain decision-making authority over the composition of their boards. See id. at 122. The Exchange recognizes that directors may bring diverse perspectives, skills, and experiences to the board, notwithstanding that they have similar attributes; therefore, the Exchange believes that it is in the public interest to permit a company to choose whether to meet the proposed diversity objectives or explain why it does not. See id. at 129-30.

[66]    See id. at 122.

conversations with, companies and improve the quality of information available to investors who rely on this information to make informed investment and voting decisions.[67]

In addition, the Exchange believes that the disclosure-based framework of proposed Rule 5606 would eliminate data collection inaccuracies, decrease investors' costs, enhance investors' ability to utilize the information disclosed, and make information available to investors who otherwise would not be able to obtain individualized disclosures.[68]  The Exchange also states that proposed Rule 5606 would protect investors that view information related to board diversity as material to their investment and voting decisions, and enhance investor confidence by assisting investors in making more informed decisions.[69]  Moreover, the Exchange believes that the disclosures would provide consistent information to the public and would enable investors to continually review the board composition of a company to track trends,[70] as well as simplify or eliminate the need for a company to respond to multiple investor requests for board diversity information.[71]

Many commenters who support the Board Diversity Proposal believe that investors currently do not have sufficient access to consistent, meaningful, or reliable board diversity information.[72]  Many commenters believe that board diversity information is important for

---

[67]     See id. at 122-23.

[68]     See id. at 110-13.

[69]     See id. at 110-11.

[70]     The Exchange also states that the disclosures under proposed Rule 5606 would provide a means for the Exchange to assess whether companies meet the diversity objectives under proposed Rule 5605(f).  See id. at 116.

[71]     See id. at 112.

[72]     See, e.g., letter from Aron Szapiro, Head of Policy Research, Morningstar, Inc., and Michael Jantzi, Chief Executive Officer, Sustainalytics, to Vanessa Countryman, Secretary, Commission, dated January 13, 2021 ("Morningstar Letter"), at 1-2; letter

from Ramiro A. Cavazos, President and CEO, United States Hispanic Chamber of Commerce, to Vanessa Countryman, Secretary, Commission, dated January 4, 2021 ("Hispanic Chamber of Commerce Letter"), at 3; New York City Comptroller Letter at 2-3; Fairfax Letter at 7; letter from Michael W. Frerichs, Illinois State Treasurer, to Vanessa Countryman, Secretary, Commission, dated December 31, 2020 ("Illinois State Treasurer Letter"), at 2; Constance F. Armstrong, Executive Director, The Boston Club, to Vanessa Countryman, Secretary, Commission, dated December 31, 2020 ("Boston Club Letter") at 1; letter from Roger W. Ferguson, Jr., President and CEO, Teachers Insurance and Annuity Association of America, and Jose Minaya, CEO, Nuveen, LLC, to Vanessa Countryman, Secretary, Commission, dated December 31, 2020 ("TIAA Letter"), at 2; letter from Esther Aguilera, President and CEO, Latino Corporate Directors Association, to Vanessa Countryman, Secretary, Commission, dated December 30, 2020 ("LCDA Letter"), at 9-11; letter from Robert W. Lovelace, Chief Executive Officer, Capital Research and Management Company, to Vanessa Countryman, Secretary, Commission, dated December 22, 2020 ("Capital Research and Management Company Letter"), at 2-3; letter from Rachel Stern, Executive Vice President, Chief Legal Officer and Global Head of Strategic Resources, FactSet Research Systems Inc., to Vanessa Countryman, Secretary, Commission, dated December 22, 2020 ("FactSet Letter"), at 1-2. Some commenters also note that not all investors currently have the same access to board diversity information. See, e.g., Fairfax Letter at 6 (stating that collection of board diversity data on a company-by-company basis creates informational asymmetries, particularly for investors without the time or resources to effectively engage in this manner); New York City Comptroller Letter at 3 (stating that the proposal would level the playing field for smaller institutional investors who may not have the resources available to do the research and engagement necessary to ascertain the racial and ethnic diversity of boards).

investment decision making,[73] investment strategies and analysis,[74] and voting decisions.[75] Some commenters also believe that the availability of board diversity information would facilitate studies on the impact of board diversity.[76]  In addition, many commenters believe that the proposed board diversity disclosures would be material to investors,[77] would improve access

---

[73]    See, e.g., BMO Letter at 1; letter from Olshan Frome Wolosky LLP to Vanessa A. Countryman, Secretary, Commission, dated January 6, 2021 ("Olshan Letter"), at 3-4; letter from Steve Nelson, Chief Executive Officer, Institutional Limited Partners Association, to Vanessa Countryman, Secretary, Commission, dated January 4, 2021 ("Institutional Limited Partners Association Letter"), at 2; TIAA Letter at 3; LCDA Letter at 6-10; letter from Mary Pryshlak, Head of Investment Research, Wellington Management Company LLP, to Vanessa Countryman, Secretary, Commission, dated December 30, 2020 at 1-2; Ariel Letter at 1.  Some commenters also specifically express support for the proposed disclosures of the reason why a company does not meet the board diversity objectives and believe that such disclosures would contribute to investment or voting decisions.  See, e.g., letter from Jeffrey P. Mahoney, General Counsel, Council of Institutional Investors, to Secretary, Commission, dated December 30, 2020, at 4-5; Ariel Letter at 1.

[74]    See, e.g., T. Rowe Letter at 1-2; UAW Letter at 6; FactSet Letter at 1-2.

[75]    See, e.g., letter from Dev Stahlkopf, Corporate Vice President, General Counsel and Secretary, Microsoft Corporation, to Vanessa Countryman, Secretary, Commission, dated January 4, 2021 ("Microsoft Letter"), at 2; New York City Comptroller Letter at 2-3.

[76]    See, e.g., letter from Olivia D. Morgan, Executive Director and Co-Founder, California Partners Project, to Vanessa Countryman, Secretary, Commission, dated January 3, 2020 [sic] ("California Partners Project Letter"), at 2; letter from Dieter Waizenegger, Executive Director, CtW Investment Group, to Vanessa Countryman, Secretary, Commission, dated December 31, 2020 ("CtW Letter"), at 2; Soundboard Letter at 2; UAW Letter at 6; letter from Sarah Keohane Williamson, Chief Executive Officer, Ariel Fromer Babcock, Managing Director, Head of Research, and Victoria Tellez Leal, Senior Associate, Research, FCLTGlobal, to Vanessa Countryman, Secretary, Commission, dated December 18, 2020, at 3.

[77]    See, e.g., letter from Fran Seegull, President, U.S. Impact Investing Alliance, to Vanessa Countryman, Secretary, Commission, dated March 5, 2021 ("Alliance Letter"), at 1; CFA Letter at 3; letter from Edgar Hernandez, Assistant Director, Capital Stewardship, Service Employees International Union, to Vanessa A. Countryman, Secretary, Commission, dated January 4, 2020 [sic] ("SEIU Letter"), at 2; Illinois State Treasurer Letter at 1-2.

to transparent and comparable board diversity disclosures across companies,[78] would allow more efficient and less costly access to and usage of board diversity information,[79] and would allow investors to monitor and assess companies' board diversity.[80] Moreover, some commenters believe that the proposal would enhance progress in increasing board diversity.[81]

Some commenters, by contrast, argue that the perceived investor demand for diverse boards and diversity information is overstated, and if diversity requirements increase returns, then boards, management, and shareholders would not require any regulatory mandate to adopt them.[82] Further, some commenters argue that the proposal is unnecessary and that company

---

[78]    See, e.g., BMO Letter at 1; SEIU Letter at 2; letter from Alfred P. Poor, Chief Executive Officer, Ideanomics, Inc., to Vanessa Countryman, Secretary, Commission, dated December 28, 2020 ("Ideanomics Letter"), at 1, 3; letter from Kimberly Jeffries Leonard, National President, The Links, Incorporated, to Vanessa A. Countryman, Secretary, Commission, dated December 17, 2020 ("Links Letter"), at 2.

[79]    See, e.g., letter from Paul M. Kinsella, Emily J. Oldshue, Jeremiah Williams, Partners, Ropes & Gray LLP, to Vanessa Countryman, Secretary, Commission, dated December 31, 2020 ("Ropes & Gray Letter"), at 4; UAW Letter at 6.

[80]    See, e.g., Fairfax Letter at 7; letter from Lisa Hayles, Investment Manager, Trillium Asset Management, to Vanessa Countryman, Secretary, Commission, dated January 4, 2021 ("Trillium Letter"), at 3; letter from Charlotte Laurent-Ottomane, Executive Director, and Toni Wolfman, Co-Chair, Public Policy Outreach Committee, Thirty Percent Coalition, to Vanessa Countryman, Secretary, Commission, dated January 1, 2021 ("Thirty Percent Coalition Letter"), at 1; CtW Letter at 2; OPERS Letter at 1-2.

[81]    See, e.g., FactSet Letter at 2; letter from Fiona Ma, California State Treasurer, to Vanessa Countryman, Secretary, Commission, dated December 15, 2020 ("California State Treasurer Letter").  See also, e.g., letter from Thomas Chow, Irene Liu, and Andrew Song, Co-Chairs, Bay Area Asian American General Counsel, to Vanessa Countryman, Secretary, Commission, dated January 4, 2021, at 2 (stating that the Board Diversity Proposal provides an appropriate impetus to depart from the traditional director search process and to diversify the candidate pool).

[82]    See, e.g., Alliance for Fair Board Recruitment Letter at 43; CEI Letter at 1-2; letter from John Quigley to Vanessa Countryman, Secretary, Commission, dated January 25, 2021 ("Quigley Letter"), at 1; Heritage Foundation Letter at 3, 5-6; letter from Boyden Gray & Associates PLLC, dated January 4, 2020 [sic] ("Project on Fair Representation Letter"), at 5; Publius Letter at 3.  See also NLPC Letter at 4 (stating that it is in a company's

boards are already becoming more diverse,[83] and some commenters argue that shareholders have the power to push for diversity changes in the boardroom.[84]

In response, the Exchange states that investors are increasingly interested in board diversity data, as investors view board diversity as a key indicator of corporate governance.[85] Moreover, the Exchange states that the wave of investors increasingly calling for companies to disclose diversity metrics and diversify their boards, and basing their voting decisions on whether companies do or do not, demonstrates that investors consider diversity disclosures material to their voting and investment decisions.[86] The Exchange explains that its goal is to facilitate the collection, reliability, and uniformity of board diversity data, while expanding access to the information.[87] The Exchange also states that its proposal would level the playing field for retail and institutional investors, and decrease the cost and time associated with data collection for all investors, by providing them with accessible, comparable, and transparent information by which they could critically evaluate a company's decisions with respect to how,

---

interest to promote and advertise the diversity of its board if it believes that such diversity would attract investors, regardless of, or in addition to, the economic performance of the company).

[83]   See, e.g., letter from Pat Toomey et al, U.S. Senators, to Allison Herren Lee, Acting Chair, Commission, dated February 12, 2021 ("Toomey Letter"), at 3; NLPC Letter at 3-4 (also arguing that information is available on a company's website with the biographical information of its board members and officers, and that investors are unlikely to access such information from the Commission); Publius Letter at 2-3.

[84]   See, e.g., Project on Fair Representation Letter at 5; letter from Jerry D. Guess, Founder, Chairman, and CEO, Guess & Co. Corporation, to Martha Miller, Director, Office of the Advocate for Small Business Formation, Commission, dated December 2, 2020 ("Guess Letter"), at 2.

[85]   See Nasdaq Response Letter II at 20.

[86]   See id. at 12.

[87]   See id. at 20.

24

whether, or when to pursue board diversity.[88]  And the Exchange reiterates that the proposal

provides flexibility for companies that do not wish to achieve the diversity objectives or wish to

do so on a different timeline.[89]

The Commission finds that the Board Diversity Proposal would provide widely available,

consistent, and comparable information that would contribute to investors' investment and voting

decisions.  Because the Exchange would define "Diverse" for purposes of the proposed

disclosures and would require consistent format and timing for the proposed disclosures,[90] the

proposal would make it more efficient and less costly for investors to collect, use, and compare

information on board diversity.  The reduced cost and improved efficiency in collecting, using,

and comparing such information could enhance investors' investment and voting decision-

making processes, and enhance investors' ability to make informed investment and voting

decisions.  Because the proposal would make such information widely available on the same

basis to all investors, the proposal would also mitigate any concerns regarding unequal access to

information that may currently exist between certain (likely larger and more resourceful)

---

[88]    See id. at 13, 25.

[89]    See id. at 25.  The Exchange also states that, absent encouragement, progress toward
increased board diversity has been demonstrably slow, and that regulatory action has
proven effective in removing barriers and increasing board diversity among those
traditionally underrepresented in other jurisdictions.  See id. at 15, 25-26.

[90]    In particular, companies would be required to:  make board-level diversity disclosures in
a substantially similar format as the Board Diversity Matrix; following the first year of
disclosure, disclose the current year and immediately prior year Board Diversity Matrix;
provide the Board Diversity Matrix in a searchable format; and provide the required
disclosures in a proxy statement or information statement (or if a company does not file a
proxy, in its Form 10-K or 20-F) in advance of the company's annual shareholders
meeting or provide the required disclosures on the company's website concurrently with
the filing of the company's proxy statement or information statement (or, if the company
does not file a proxy, its Form 10-K or 20-F).

investors who could obtain the information and other (likely smaller) investors who may not be able to do so. Accordingly, the Commission finds that the proposal is designed to promote just and equitable principles of trade, remove impediments to and perfect the mechanism of a free and open market and a national market system, and protect investors and the public interest.

The diverse collection of commenters who expressed interest in board diversity information, including institutional investors, investment managers, listed companies, and individual investors, as well as statements made by institutional investors, asset managers, and business organizations,[91] demonstrates the broad demand for this information.[92] Moreover, while investors may have differing views regarding whether companies should increase board diversity and whether and how board diversity affects company performance and governance, the proposed disclosures would contribute to investors' investment and voting decisions

---

[91]  See, e.g., Amendment No. 1 to the Board Diversity Proposal at 8 n.9, 54 n.142 (referencing statements from Vanguard, State Street Global Advisors, and BlackRock that call for companies to disclose board diversity information); id. at 54 nn.139-40 (referencing petitions for Commission rulemaking from groups of institutional investors that call for disclosures of board diversity information); id. at 54 n.143 (referencing an initiative by a state treasurer and group of institutional investors calling for Russell 3000 companies to disclose board diversity information); id. at 57 n.152 (referencing a letter from various business associations expressing support for the passage of a bill by the U.S. House of Representatives that would require board diversity disclosures).

[92]  Commenters who express support for the proposed disclosures include institutional investors, investment managers, listed companies, and individual investors. See, e.g., letter from Cynthia Overton to Vanessa Countryman, Secretary, Commission, dated January 3, 2021; letter from Dan Dees, Co-Head Investment Banking Division, Goldman Sachs Group, Inc., to Secretary, Commission, dated January 1, 2021 ("Goldman Sachs Letter"); letter from Marcie Frost, Chief Executive Officer, California Public Employees' Retirement System, to Vanessa Countryman, Secretary, Commission, dated December 31, 2020; TIAA Letter; letter from Jo Brickman, dated December 18, 2020. They also include listed companies. See, e.g., Microsoft Letter; letter from Sheryl Sandberg, Chief Operating Officer, Facebook Inc., to Vanessa Countryman, Secretary, Commission, dated January 3, 2021; letter from Jeff Ray, CEO, Brightcove, to Vanessa Countryman, dated December 23, 2020 ("Brightcove Letter").

regardless of their views on whether board diversity is desirable or beneficial. For example, for investors who support board diversity, the proposed disclosures could inform their decision on issues related to corporate governance, including director elections, and company explanations as to why they do not meet the diversity objectives could better inform those investors as to the risks and costs of increased board diversity. And for investors who do not believe that having additional "Diverse" directors would be beneficial for a company, the proposed disclosures could inform their decision to vote to preserve the existing board composition in a company. The disclosures' focus on providing greater transparency regarding existing board composition and companies' approaches to board diversity—rather than mandating any particular board composition or requiring Nasdaq-listed companies to change the composition of their boards— will provide investors with board-level diversity statistics and explanations for certain companies' approaches to board diversity, which would contribute to investors' investment and voting decisions, including decisions related to companies' board compositions.

B.     Potential Effects of Board Diversity on Companies and Investors

In the Board Diversity Proposal, the Exchange states that it has reviewed dozens of empirical studies and found that an extensive body of empirical research demonstrates that diverse boards are positively associated with improved corporate governance and company performance.[93] While the Exchange states that the overwhelming majority of empirical studies it

---

[93]     See Amendment No. 1 to the Board Diversity Proposal at 13. The Exchange states that studies have identified positive relationships between board diversity and commonly used financial metrics, including higher returns on invested capital, returns on equity, earnings per share, earnings before interest and taxation margin, asset valuation multiples, and credit ratings. See id. at 13, Section 3.a.III.A. The Exchange also points to a report that suggests that the relationship between board gender diversity and corporate performance may extend to LGBTQ+ diversity. See id. at 25.

has reviewed indicate that board diversity is positively associated with company performance, it

acknowledges that the results of some studies on gender diversity are mixed.[94]  Nevertheless, the

Exchange believes that "there is a compelling body of credible research on the association

between company performance and board diversity" and, at a minimum, the academic and

empirical studies support the conclusion that board diversity does not have adverse effects on

company performance.[95]

     The Exchange also states that there is substantial evidence that board diversity promotes

investor protection, including by enhancing the quality of a company's financial reporting,

internal controls, public disclosures, and management oversight.[96]  According to the Exchange,

more than a dozen studies have found a positive association between gender diversity and

important investor protections,[97] and some academics assert that such findings may extend to

other forms of diversity, including racial and ethnic diversity.[98]  The Exchange also states that it

---

[94]    See id. at 25-28 (referencing Carter et al., infra note 119, and the U.S. Government Accountability Office's conclusion that the mixed nature of various academic and empirical studies may be due to differences in methodologies, data samples, and time periods).

[95]    See id. at 28.

[96]    See id. at 29.

[97]    See id. at 29, Section 3.a.III.B.  The Exchange states that studies have found that gender-diverse boards or audit committees are associated with:  more transparent public disclosures and less information asymmetry; better reporting discipline by management; a lower likelihood of manipulated earnings through earnings management; an increased likelihood of voluntarily disclosing forward-looking information; a lower likelihood of receiving audit qualifications due to errors, non-compliance, or omission of information; and a lower likelihood of securities fraud.  See id. at 13, Section 3.a.III.B.  In addition, the Exchange states that studies found that having at least one woman on the board is associated with a lower likelihood of material weaknesses in internal control over financial reporting and a lower likelihood of material financial restatements.  See id. at 13, Section 3.a.III.B, Section 3.b.II.B.

[98]    See id. at 29, Section 3.a.III.B.

has reviewed studies suggesting that board diversity could enhance a company's ability to monitor management by reducing "groupthink" and improving decision-making.[99]

Some commenters similarly believe that there are benefits associated with board diversity, such as improved board decision-making,[100] corporate governance,[101] financial

---

[99]    See id. at Section 3.a.III.C.

[100]    See, e.g., letter from Kewsong Lee, Chief Executive Officer, The Carlyle Group, to Vanessa Countryman, Secretary, Commission, dated March 16, 2021 ("Carlyle Letter"), at 1; letter from Joan Haffenreffer, President, Women's Forum of New York, to Vanessa Countryman, Secretary, Commission, dated January 4, 2021 ("Women's Forum Letter"), at 1-2; letter from Abraham Kim, Executive Director, Council of Korean Americans, to Vanessa Countryman, Secretary, Commission, dated January 3, 2021, at 1; Goldman Sachs Letter at 1; T. Rowe Letter at 1-2; Ideanomics Letter at 2, 4; letter from Aaron Meder, CEO, LGIM America, to Vanessa Countryman, Secretary, Commission, dated December 23, 2020 ("LGIM America Letter"), at 2; Goodman and Olson Letter at 1-2; letter from Mercy Investment Services, Inc., to Vanessa Countryman, Secretary, Commission, dated December 22, 2020 ("Mercy Investment Letter"), at 1; letter from Luan Jenifer, President, Miller/Howard Investments, Inc., to Vanessa Countryman, Secretary, Commission, dated December 22, 2020 ("Miller/Howard Letter"), at 1; letter from Kerrie Waring, Chief Executive Officer, International Corporate Governance Network, to Jay Clayton, Chairman, Commission, dated December 16, 2020, at 2.

[101]    See, e.g., Carlyle Letter at 1; letter from Dorri McWhorter, Chief Executive Officer, YWCA Metropolitan Chicago, to Vanessa Countryman, Secretary, Commission, dated January 4, 2021; Women's Forum Letter at 2; AAAIM Letter at 2; Miller/Howard Letter at 1; letter from Seth Brody, Partner and Global Head of the Operational Excellence Practice, Apax Partners, to Vanessa Countryman, Secretary, Commission, dated December 16, 2020.

performance or shareholder value,[102] risk mitigation,[103] innovation,[104] investor protection,[105]

investor confidence,[106] and corporate culture.[107]  By contrast, some commenters argue that the

Exchange has not demonstrated causation between board diversity and the benefits described in

the Board Diversity Proposal, and that the supporting studies cited by the Exchange do not show

that diversity on a company's board causes, rather than is merely correlated with, performance

enhancement.[108]  Commenters further assert that the peer-reviewed economics literature is

inconclusive, with most studies showing little or no discernable effect based on the sexual, racial,

or ethnic composition of corporate boards.[109]  In addition, some commenters state that some

---

[102]     See, e.g., Carlyle Letter at 1; letter from Kerry E. Berchem, Akin Gump Strauss Hauer & Feld LLP, to Vanessa Countryman, Secretary, dated January 4, 2021 ("Akin Gump Letter"), at 2; Goldman Sachs Letter at 1; Capital Research and Management Company Letter at 1; FactSet Letter at 1.

[103]     See, e.g., Akin Gump Letter at 4; letter from Michelle Dunstan, SVP, Global Head of Responsible Investing, and Diana Lee, AVP, Director of Corporate Governance, AllianceBernstein L.P., to Vanessa A. Countryman, Secretary, Commission, dated January 4, 2021 ("AllianceBernstein Letter"), at 1; Hispanic Chamber of Commerce Letter at 3.

[104]     See, e.g., LGIM America Letter at 2; Miller/Howard Letter at 1.

[105]     See, e.g., Women's Forum Letter at 2; Miller/Howard Letter at 1; Douglas B. Sieg, Managing Partner, Lord Abbett, to Vanessa Countryman, Secretary, Commission, dated December 18, 2020, at 1.

[106]     See, e.g., FactSet Letter at 2; Miller/Howard Letter at 1; UAW Letter at 3-4.

[107]     See, e.g., Akin Gump Letter at 4; California Partners Project Letter at 2; Capital Research and Management Company Letter at 1-2.

[108]     See, e.g., Publius Letter II at 2; Toomey Letter at 2; Heritage Foundation Letter at 7-10; Project on Fair Representation Letter at 3-4; letter from Scott Shepard, Free Enterprise Project, National Center for Public Policy Research, to Vanessa Countryman, Secretary, Commission, dated December 30, 2020 ("Free Enterprise Project Letter"), at 2-3; Publius Letter at 4-7; letter from John Richter dated December 12, 2020 ("Richter Letter"), at 1-2.

[109]     See Heritage Foundation Letter at 7-10.  See also, e.g., Alliance for Fair Board Recruitment Letter at 7-31; De La Vega Letter at 2; Richter Letter at 1.

studies have not found a positive correlation between board diversity and benefits, and point out the lack of research relating to LBGTQ+ board representation and diversity relating to Underrepresented Minorities.[110]  Moreover, some commenters argue that there is academic work reporting that diversifying boards can harm financial performance or shareholder value.[111] Another commenter argues that the proposal is not consistent with a free market because the proposed diversity requirement does not demonstrably improve corporate performance, and could sometimes harm it.[112]  This commenter further argues that the proposal may result in increases in the size of boards, potentially hindering corporate oversight and governance.[113]

With respect to comments that disagree that board diversity is linked to enhanced company performance, innovation, long-term sustainable returns, or investor protection, the Exchange states that "the weight of empirical evidence" supports its belief in the benefits of board diversity for companies that choose to meet the proposed diversity objectives.[114]  With respect to commenters' view that there is insufficient evidence to establish a positive relationship between LGBTQ+ diversity and board performance, the Exchange reiterates that it is reasonable

---

[110]     See, e.g., Toomey Letter at 2; Donnellan Letter at 1; Project on Fair Representation Letter at 6-7; Publius Letter at 6-7; Alliance for Fair Board Recruitment Letter at 26-28.

[111]     See, e.g., letter from Samuel S. Guzik, Guzik & Associates, to J. Matthew DeLesDernier, Assistant Secretary, Commission, dated April 5, 2021 ("Guzik Letter"), at 3-5; letter from Theo Vermaelen, dated December 29, 2020.

[112]     See Toomey Letter at 2.

[113]     See id. at 3.  Another commenter also predicts that the proposal will weaken corporate governance.  See De La Vega Letter at 2-3.

[114]     See Nasdaq Response Letter II at 8-10.

and in the public interest to treat LGBTQ+ status as "inextricably" intertwined with gender identity.[115]

The Exchange also states that Section 6(b)(5) of the Act does not require the Exchange to show that its listing rules enhance the financial performance of listed companies.[116] With respect to the comment that adding board members to satisfy the proposal could create less effective corporate oversight and governance due to a larger board, the Exchange states that the proposal would not require that companies add or remove any directors in order to increase diversity.[117]

The conclusions from the studies together referenced by the Exchange and commenters on the effects of changes in board diversity on investors are mixed.[118] Some of the results from the studies cited by the Exchange and commenters are consistent with the view that increases in board diversity cause increases in shareholder wealth.[119] One study concludes that greater board diversity leads to better firm performance, consistent with diversity fostering more efficient (real) risk-taking, firms with greater board diversity are found to invest persistently more in

---

[115]    See id. at 10.

[116]    See id.

[117]    See id. at 28.

[118]    The studies and their findings are also subject to the various caveat and limitations that are described in the studies.

[119]    See, e.g., Gennaro Bernile et al., Board Diversity, Firm Risk, and Corporate Policies, 127 J. Fin. Econ. 588, 605 (2018); David A. Carter et al., The Gender and Ethnic Diversity of US Boards and Board Committees and Firm Financial Performance, 18 Corporate Governance 396, 410 (2010); Jason M. Thomas & Megan Starr, The Carlyle Group, Global Insights: From Impact Investing to Investing for Impact 5 (2020). See also Olga Kuzmina & Valentina Melentyeva, Gender Diversity in Corporate Boards: Evidence from Quota-Implied Discontinuities (CEPR, Discussion Paper No. DP14942, 2021), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3638047; Muhammad Nadeem et al., Women on Boards, Firm Risk and the Profitability Nexus: Does Gender Diversity Moderate the Risk and Return Relationship?, 64 Int'l Rev. Econ. & Fin. 427 (2019).

research and development and have more efficient innovation processes.[120]  Other studies have

concluded that increases in board diversity may not be beneficial to investors.  For example, one

study concludes that the effect of gender diversity on firm performance is negative for some

companies.[121]  In addition, some studies of some board diversity mandates have concluded they

are not beneficial to investors.[122]  For example, studies of the effects of the board diversity

mandates in Norway have presented indications that the mandates caused a decline in company

performance and reduced shareholder wealth.[123]  According to one study, some companies chose

to go private rather than comply with the Norway board diversity mandate.[124]  A more recent

study, however, questions the statistical significance of these findings.[125]  Taken together, studies

---

[120]    See Bernile et al., supra note 119.

[121]    See Renée B. Adams & Daniel Ferreira, Women in the Boardroom and Their Impact on Governance and Performance, 94 J. Fin. Econ. 291 (2009).  This study observes that the effect of gender diversity on firm performance may be negative and in general depends on the specification of the analysis.

[122]    See Alliance for Fair Board Recruitment Letter at 2, 24.

[123]    See, e.g., Kenneth R. Ahern & Amy K. Dittmar, The Changing of the Boards: The Impact on Firm Valuation of Mandated Female Board Representation, 127 Q.J. Econ. 137 (2012); David A. Matsa & Amalia R. Miller, A Female Style in Corporate Leadership? Evidence from Quotas, 5 Am. Econ. J. Applied Econ. 136 (2013).  As an additional example, some studies of the effects of the 2018 California law requiring increased board gender diversity have reported indications of negative effects on shareholder wealth.  See, e.g., Daniel Greene et al., Do Board Gender Quotas Affect Firm Value? Evidence from California Senate Bill No. 826, J. Corp. Fin., (February 2020); Sunwoo Hwang et al., Mandating Women on Boards: Evidence from the United States (Kenan Institute of Private Enterprise, Research Paper No. 18-34, 2018), available at https://ssrn.com/abstract=3265783.

[124]    See Øyvind Bøhren & Siv Staubo, Does Mandatory Gender Balance Work? Changing Organizational Form to Avoid Board Upheaval, 28 J. Corp. Fin. 152 (2014).

[125]    See B. Espen Eckbo et al., Valuation Effects of Norway's Board Gender-Quota Law Revisited (ECGI, Finance Working Paper No. 463/2016, 2021), available at https://ssrn.com/abstract=2746786.

of the effects of board diversity are generally inconclusive, and suggest that the effects of even mandated changes remain the subject of reasonable debate.

Studies of board diversity mandates, in any event, do not provide a reliable basis for evaluating the likely overall effects of the Board Diversity Proposal, which does not mandate any particular board composition. Unlike companies in those studies, Nasdaq-listed companies would have the option of providing an explanation for their board composition under the new listing standard. This is distinct from facing a fine as an alternative to compliance or possibly facing the requirement to dissolve for non-compliance. Some of the mandates requiring increased board diversity do not present companies with the option of providing an explanation rather than facing a sanction, or any other option besides compliance with the mandate.[126] According to one study, comply-or-explain corporate governance reforms have been found to increase shareholder wealth more than corporate governance mandates, on average.[127] Further, under the Board Diversity Proposal, Nasdaq-listed companies would be required to disclose board-level diversity statistics, and those companies that do not meet the proposed diversity objectives would be required to choose between providing an explanation and increasing the diversity of their boards. In responding to the disclosure requirements, companies can consider the analyses and conclusions from academic and other studies on the effects of changes in board

---

[126]    See A.B. 979, 2019-2020 Leg., Reg. Sess. (Cal. 2020) (amending Cal. Corp. Code Section 301.3 and adding Cal. Corp. Code Sections 301.4 and 2115.6), available at http://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201920200AB979; S.B. 826, 2017-2018 Leg., Reg. Sess. (Cal. 2018) (adding Cal. Corp. Code Sections 301.3 and 2115.5), available at https://leginfo.legislature.ca.gov/faces/billNavClient.xhtml?bill_id=201720180SB826.

[127]    See Larry Fauver et al., Board Reforms and Firm Value: Worldwide Evidence, 125 J. Fin. Econ. 120 (2017) (providing evidence of a greater increase in firm value from comply-or-explain-based reforms than for rule-based reforms in a study of the impact of corporate board reforms on firm value across 41 countries).

composition on company performance and share value. And they may apply those conclusions to their own circumstances.

The Board Diversity Proposal is thus distinguishable from the board diversity mandates described above. Moreover, the Exchange's proposal would mitigate concerns regarding unequal access to information that may currently exist between certain (likely larger and more resourceful) investors who could obtain board diversity information and other (likely smaller) investors who may not be able to do the same. And, because the Board Diversity Proposal would not mandate any particular board composition, companies that choose to meet the diversity objectives are likely to be the ones who stand to benefit the most, or incur the least cost. Those companies which view the diversity objectives themselves as challenging are likely to choose to explain rather than incur the costs to them of meeting the objectives, and those companies for whom explaining would be challenging will have the option to list on a different exchange. For these reasons, the costs of the Board Diversity Proposal are likely to be relatively limited as compared to those regulatory regimes that have mandated board diversity and provided neither the option to explain or to opt-out of the regimes by listing elsewhere.

In light of the disclosure benefits that the Board Diversity Proposal would provide, and given that the studies of the effects of board diversity are generally inconclusive and the costs of the proposal are likely to be comparatively limited, the Commission finds that the Board Diversity Proposal is consistent with the requirements of the Act.

C.     Applicability of the Board Diversity Rules

1.     Definition of Diverse

In the Board Diversity Proposal, the Exchange states that current reporting of board-level diversity statistics is unreliable and unusable to investors and points to inconsistencies in the

definitions of diversity characteristics across companies.[128]  It notes that a transparent, consistent definition of Diverse would provide stakeholders with a better understanding of a company's current board composition and philosophy regarding diversity if the company does not meet the proposed diversity objectives.[129]  In addition, the Exchange believes that having a broader definition of "Diverse" would permit inconsistent, non-comparable disclosures, whereas a narrower definition of "Diverse" focused on race, ethnicity, sexual orientation, and gender identity will promote the public interest by improving transparency and comparability.[130]

Some commenters support the proposed definition of "Diverse" because it would improve the transparency, consistency, and comparability of disclosures across companies, whereas a broader definition would maintain the status quo of inconsistent, non-comparable data.[131]  One commenter points out that the proposal would not prevent companies from considering other attributes beyond the proposed definition of "Diverse," such as veteran or disability status.[132]  By contrast, other commenters object to the proposed definition of "Diverse"

---

[128]    See Amendment No. 1 to the Board Diversity Proposal at 50-51.

[129]    See id. at 107.

[130]    See id.  The Exchange also states that the categories it has proposed to comprise an Underrepresented Minority are consistent with the categories reported to the Equal Employment Opportunity Commission ("EEOC") through the Employer Information Report EEO-1 Form ("EEO-1").  See id. at 9-10, 61.  In addition, the Exchange states that, while the EEO-1 report refers to "Hispanic or Latino" rather than "Latinx," the Exchange proposes to use the term "Latinx" to apply broadly to all gendered and gender-neutral forms that may be used by individuals of Latin American heritage.  See id. at 61 n.160.  The Exchange further states that the terms in the proposed definition of LGBTQ+ are similar to the identities defined in California's A.B. 979, but have been expanded to include the queer community.  See id. at 61.

[131]    See, e.g., Women's Forum Letter at 2; Miller/Howard Letter at 2.  See also, e.g., Fairfax Letter at 8-9; CFA Letter at 4-5.

[132]    See Goodman and Olson Letter at 2.

as narrow and superficial.[133]  Moreover, some commenters request that the Exchange expand the

proposed definition of "Diverse" to include individuals with disabilities,[134] veterans, or others

who are not typically well-represented at the board level.[135]

---

[133]     See, e.g., Toomey Letter at 1-3; Heritage Foundation Letter at 16; Richter Letter at 2-3.

[134]     See, e.g., letter from National LGBT Chamber of Commerce (NGLCC), National
Veteran-Owned Business Association (NaVOBA), Out & Equal Workplace Advocates,
U.S. Black Chambers, Inc. (USBC), United States Hispanic Chamber of Commerce
(USHCC), US Pan Asian American Chamber of Commerce Education Foundation
(USPAACC), and Women Impacting Public Policy (WIPP), to Vanessa Countryman,
Secretary, Commission, dated April 2, 2021; letter from The Members of the National
Disability Alliance, to Adena T. Friedman, President and Chief Executive Officer,
Nasdaq, dated March 9, 2021; letter from Maria Town, President & CEO, American
Association of People with Disabilities, and Jill Houghton, President & CEO,
Disability:IN, to Allison Lee, Acting Chair, Commission, dated February 2, 2021; letter
from Janice S. Lintz, CEO, Hearing Access & Innovations, Inc., dated January 25, 2021;
letter from Jennifer Laszlo Mizrahi, President, RespectAbility, Carol Glazer, President,
National Organization on Disability, Katherine McCary, CEO, Disability: IN DC Metro,
William D. Goren, Attorney and Consultant, Americans with Disabilities, Thomas Foley,
President, National Disability Institute, and Sean Luechtefeld, Senior Director
Communications, ANCOR, to Vanessa Countryman, Secretary, dated January 25, 2021;
letter from Zainab Alkebsi, President, Board of Directors, Deaf and Hard of Hearing Bar
Association, to Vanessa Countryman, Secretary, Commission, dated January 25, 2021;
letter from Victor Calise, Commissioner, New York City Mayor's Office for People with
Disabilities, dated January 8, 2021; letter from Nicholas D. Lawson, J.D. Candidate,
Georgetown University Law Center, to Vanessa Countryman, Secretary, Commission,
dated January 15, 2021; letter from Robert Ludke, Founder, Ludke Consulting, LLC, and
Regina Kline, Founder and CEO, SmartJob, LLC, to Vanessa Countryman, Secretary,
Commission, dated December 31, 2020; CFA Letter at 5; Ideanomics Letter at 4; letter
from James Morgan dated December 22, 2020; letter from Carol Glazer, CEO, National
Organization on Disability, to Vanessa Countryman, Secretary, Commission, dated
December 9, 2020.

[135]     See, e.g., CFA Letter at 5; Ideanomics Letter at 4-5.  See also, e.g., letter from Kevin R.
Eckert, Partner, Task Force X Capital, to Vanessa Countryman, Secretary, Commission,
dated April 20, 2021 (urging the inclusion of veterans in the definition of Diverse); letter
from David A. Morken, CEO and Chairman, Bandwidth Inc., to Vanessa Countryman,
Secretary, Commission, dated April 6, 2021.  One commenter states that the proposal
would fail to treat similarly situated categories alike, and that the proposal's distinctions
are arbitrary and capricious.  See Alliance for Fair Board Recruitment Letter at 53-54.

In response to comments,[136] the Exchange reiterates that the proposed definition of "Diverse" is suitable to improve transparency and comparability of disclosures across companies.[137]  The Exchange also states that companies are not precluded from using a broader definition of diversity, including persons with disabilities and other categories such as veteran status or age, provided that these companies disclose this under proposed Rule 5605(f)(3).[138]

The proposal would facilitate comparable board diversity disclosures by Nasdaq-listed companies, which would lead to more efficient collection and use of the information by investors.  In connection with facilitating comparable board diversity disclosures and for the reasons discussed below, the Exchange's proposed definition of "Diverse" is not unreasonable. It is not unreasonable for the Exchange to propose a definition of "Underrepresented Minority" that is consistent with the EEO-1 categories reported to the EEOC because, among other reasons, companies may already be familiar with the EEO-1 categories, which could promote efficiency for companies in complying with the proposed rules.  It is also not unreasonable for the Exchange to include LGBTQ+ in its proposed definition of "Diverse."  Moreover, as stated by the Exchange, companies are not precluded from considering director characteristics that do not

---

[136]   The Exchange also points to commenters who argue that the proposal would not promote diversity because, for example, it would not prohibit homogenous boards, and Diverse directors would bring similar perspectives to those of white male board members.  See Nasdaq Response Letter II at 10-11.  The Exchange states that companies are free to consider additional diverse attributes when identifying director nominees (e.g., nationality, disability, veteran status) and are free to disclose information relating to diverse attributes beyond those highlighted in the proposal.  See id. at 11.

[137]   See id. at 14.

[138]   See id.  The Exchange also encourages companies to disclose board diversity metrics beyond those categories identified in the proposal, to the extent a company considers it material to its investors' voting and investment decisions.  See id.

fall within the proposed definition of "Diverse" and providing the disclosures under proposed Rule 5605(f)(3) if the company does not satisfy the proposed board diversity objectives.

## 2.     Flexibility for Certain Companies

In the Board Diversity Proposal, the Exchange recognizes that the operations, size, and current board composition of each Nasdaq-listed company are unique, and states that it endeavors to provide a disclosure-based, business-driven framework to enhance board diversity that balances the need for flexibility with each company's particular circumstances.[139] According to the Exchange, the proposed disclosure framework and phase-in[140] and transition

---

[139]     See Amendment No. 1 to the Board Diversity Proposal at 16-17.

[140]     Proposed Rule 5605(f)(5) would specify the phase-in period for any company newly listing on the Exchange (including companies listing through an initial public offering, direct listing, transfer from another exchange or the over-the-counter market, in connection with a spin-off or carve-out from a company listed on the Exchange or another exchange, or through a merger with an acquisition company listed under IM-5101-2 ("acquisition company")) that was not previously subject to a substantially similar requirement of another national securities exchange, and any company that ceases to be a Foreign Issuer, a Smaller Reporting Company, or an Exempt Company.  In particular, any newly-listed company on the Nasdaq Global Select Market ("NGS") or Nasdaq Global Market ("NGM") would be permitted to satisfy the requirement to have, or explain why it does not have:  (i) at least one Diverse director by the later of (a) one year from the date of listing or (b) the date the company files its proxy statement or information statement (or, if the company does not file a proxy, its Form 10-K or 20-F) for the company's first annual meeting of shareholders subsequent to the company's listing; and (ii) at least two Diverse directors by the later of (a) two years from the date of listing or (b) the date the company files its proxy statement or information statement (or, if the company does not file a proxy, its Form 10-K or 20-F) for the company's second annual meeting of shareholders subsequent to the company's listing.  See proposed Rule 5605(f)(5)(A).  In addition, any newly-listed company on the Nasdaq Capital Market ("NCM") would be permitted to satisfy the requirement to have, or explain why it does not have, at least two Diverse directors by the later of:  (i) two years from the date of listing; or (ii) the date the company files its proxy statement or information statement (or, if the company does not file a proxy, its Form 10-K or 20-F) for the company's second annual meeting of shareholders subsequent to the company's listing.  See proposed Rule 5605(f)(5)(B).  Moreover, any newly listed Company with a Smaller Board would be permitted to satisfy the requirement to have, or explain why it does not have, at least one Diverse director by the later of:  (i) two years from the date of listing, or (ii) the date the

periods[141] under Rule 5605(f) recognize the differences (e.g., in demographics or resources)

among different types of companies and would not unfairly discriminate among companies. [142]

---

company files its proxy statement or information statement (or, if the company does not file a proxy, its Form 10-K or 20-F) for the company's second annual meeting of shareholders subsequent to the company's listing.  See proposed Rule 5605(f)(5)(D).  Any company that ceases to be a Foreign Issuer, Smaller Reporting Company, or Exempt Company would be permitted to satisfy the requirements of proposed Rule 5605(f) by the later of:  (i) one year from the date that the company no longer qualifies as a Foreign Issuer, Smaller Reporting Company, or Exempt Company; or (ii) the date the company files its proxy statement or information statement (or, if the company does not file a proxy, its Form 10-K or 20-F) for the company's first annual meeting of shareholders subsequent to such event.  See proposed Rule 5605(f)(5)(C).

[141]    Proposed Rule 5605(f)(7) would specify the transition period for the implementation of proposed Rule 5605(f).  As proposed, each company listed on the Exchange (including a Company with a Smaller Board) would be required to have, or explain why it does not have, at least one Diverse director by the later of:  (i) two calendar years after the approval date of the proposal ("First Effective Date"); or (ii) the date the company files its proxy statement or information statement (or, if the company does not file a proxy, its Form 10-K or 20-F) for the company's annual shareholders meeting during the calendar year of the First Effective Date.  See proposed Rule 5605(f)(7)(A).  In addition, each company listed on NGS or NGM must have, or explain why it does not have, at least two Diverse directors by the later of:  (i) four calendar years after the approval date of the proposal ("Second NGS/NGM Effective Date"); or (ii) the date the company files its proxy statement or information statement (or, if the company does not file a proxy, its Form 10-K or 20-F) for the company's annual shareholders meeting during the calendar year of the Second NGS/NGM Effective Date.  See proposed Rule 5605(f)(7)(B).  Moreover, each company listed on NCM must have, or explain why it does not have, at least two Diverse directors by the later of:  (i) five calendar years after the approval date of the proposal ("Second NCM Effective Date"); or (ii) the date the company files its proxy statement or information statement (or, if the company does not file a proxy, its Form 10-K or 20-F) for the company's annual shareholders meeting during the calendar year of the Second NCM Effective Date.  See proposed Rule 5605(f)(7)(C).

[142]    See Amendment No. 1 to the Board Diversity Proposal at Section 3.b.II.D.  According to the Exchange, the proposed transition and phase-in periods are intended to provide newly listed public companies with additional time to meet the diversity objectives of proposed Rule 5605(f)(2), as newly listed public companies may have unique governance structures, such as staggered boards or director seats held by venture capital firms, that require additional timing considerations when adjusting the board's composition.  See id. at 79.  The Exchange further states that the proposed transition and phase-in periods are intended to provide additional flexibility to companies listed on NCM, as such companies are typically smaller and may face additional challenges and resource constraints when

The Exchange states that the definition of Foreign Issuer is designed to recognize that companies that are not Foreign Private Issuers but are headquartered outside of the United States are foreign companies, notwithstanding the fact that they file domestic Commission reports, and is designed to exclude companies that are domiciled in a foreign jurisdiction without having a physical presence in that country.[143]  Further, according to the Exchange, because the EEOC categories of race and ethnicity may not extend to all countries globally since each country has its own unique demographic composition, and because on average women tend to be underrepresented in boardrooms across the globe, proposed Rule 5605(f)(2)(B) would allow Foreign Issuers to meet the diversity objectives by having one Female director and one Underrepresented Individual[144] (rather than Underrepresented Minority) or LGBTQ+ director, or two Female directors.[145]  With respect to Smaller Reporting Companies, the Exchange states that, because these companies may not have the resources necessary to compensate an additional director or engage a search firm to search outside of directors' networks, it proposes to provide these companies with additional flexibility in their approach.[146]  Moreover, in providing additional flexibility to Companies with a Smaller Board, the Exchange states that these companies may face similar resource constraints

---

       identifying additional director nominees who self-identify as Diverse.  <u>See</u> <u>id.</u>  The Exchange also states that its proposed phase-in periods are consistent with the phase-in periods it provides to companies for other board composition requirements.  <u>See</u> <u>id.</u> at 81.  <u>See</u> <u>also</u>, <u>e.g.</u>, Rules 5615(b)(1), 5615(b)(3), and 5620.

[143]    <u>See</u> Amendment No. 1 to the Board Diversity Proposal at 83.

[144]    The definition of Underrepresented Individual is based on the United Nations Declaration on the Rights of Persons Belonging to National or Ethnic, Religious and Linguistic Minorities and the United Nations Declaration on the Rights of Indigenous Peoples.  <u>See</u> <u>id.</u> at 69, 140-41.

[145]    <u>See</u> <u>id.</u> at 81-82.

[146]    <u>See</u> <u>id.</u> at 84-85.

to those of Smaller Reporting Companies, but not all Companies with a Smaller Board are

Smaller Reporting Companies, and therefore the alternative diversity objective that would be

provided to Smaller Reporting Companies may not be available to them.[147]  The Exchange

further states that Companies with a Smaller Board may be disproportionately impacted if they

plan to satisfy proposed Rule 5605(f)(2) by adding additional directors, which may impose

additional costs in the form of director compensation and D&O insurance.[148]  With respect to

Exempt Companies,[149] the Exchange states that they do not have boards, do not list equity

securities, list only securities with no voting rights towards the election of directors, or are not

operating companies, and that holders of the securities they issue do not expect to have a say in

the composition of their boards.[150]  And the Exchange states that proposed Rule 5606 would

---

[147]     See id. at 86.

[148]     See id.  The Exchange also states that proposed Rule 5605(f)(2)(D) would avoid
complexity for Companies with a Smaller Board that attempt to satisfy the diversity
objectives by adding a Diverse director to their board, and prevent such companies from
thereby being subject to a higher threshold (i.e., that of proposed Rule 5605(f)(2)(A), (B),
or (C)) as a result.  See id. at 86-87.

[149]     Proposed Rule 5605(f)(4) would exempt the following types of companies from the
requirements of proposed Rule 5605(f) ("Exempt Companies"):  (1) acquisition
companies; (2) asset-backed issuers and other passive issuers (as set forth in Rule
5615(a)(1)); (3) cooperatives (as set forth in Rule 5615(a)(2)); (4) limited partnerships (as
set forth in Rule 5615(a)(4)); (5) management investment companies (as set forth in Rule
5615(a)(5)); (6) issuers of non-voting preferred securities, debt securities, and derivative
securities (as set forth in Rule 5615(a)(6)) that do not have equity securities listed on the
Exchange; and (7) issuers of securities listed under the Rule 5700 series.

[150]     See Amendment No. 1 to the Board Diversity Proposal at 90, 150.  The Exchange states
that, although it is exempting acquisition companies from the requirements of proposed
Rule 5605(f), upon such a company's completion of a business combination with an
operating company, the post-business combination entity would be provided the same
phase-in period as other newly listed companies to satisfy the requirements of proposed
Rule 5605(f).  See id. at 90-91, 151.

provide appropriate flexibility for Foreign Issuers[151] and exceptions for certain types of Nasdaq-listed companies.[152]

Some commenters express support for the proposed additional flexibility for foreign or smaller companies, or "other groups of issuers that are more constrained for valid reasons."[153] Another commenter contends, however, that the proposal is inconsistent with Section 6(b)(5) of the Act because it appears to be designed to permit unfair discrimination between issuers and impose burdens on competition that are not necessary or appropriate in furtherance of the applicable provisions of the Act.[154] One commenter further asserts that the proposal is inconsistent with Section 6(b)(5) of the Act because it unfairly discriminates among issuers by giving foreign issuers flexibility that is not available to domestic issuers.[155] One commenter also argues that the proposal would unnecessarily burden competition and unfairly discriminate between issuers who meet the proposed diversity objectives and those who do not,[156] and one

---

[151]    See id. at 115-16.  The Exchange recognizes that some Foreign Issuers may have their principal executive offices located outside of the U.S. and in jurisdictions that may impose laws limiting or prohibiting self-identification questionnaires.  See id. at 68.  The Exchange also states that the proposed definition of Underrepresented Minority may be inapplicable to a Foreign Issuer and make the Board Diversity Matrix data less relevant for such companies and not useful for investors.  See id.

[152]    See id. at 117-18.

[153]    See AllianceBernstein Letter at 2.  See also, e.g., Stardust Letter at 2; letter from Gary A. LaBranche, FASAE, CAE, President & CEO, National Investor Relations Institute, to Vanessa Countryman, Secretary, Commission, dated December 30, 2020, at 4.

[154]    See Guzik Letter at 1, 7-10.

[155]    See Alliance for Fair Board Recruitment Letter at 47-49.

[156]    See Guzik Letter at 8.

43

commenter argues that the proposal would burden competition between exempt and non-exempt companies.[157]

In response to comments, the Exchange states that the Board Diversity Proposal would provide companies with a flexible, attainable approach to achieving a reasonable objective that is not overly burdensome or coercive.[158]  The Exchange also states that the Board Diversity Proposal would align investors' demands for increased diversity with companies' needs for a flexible approach that accommodates each company's unique circumstances.[159]

The Board Diversity Proposal is consistent with Sections 6(b)(5) and 6(b)(8) of the Act. As discussed below, the proposal is not designed to permit unfair discrimination between issuers and would not impose a burden on competition between issuers that is not necessary or appropriate in furtherance of the purposes of the Act.[160]  As an initial matter, even though the Board Diversity Proposal would establish different diversity objectives and disclosures for different types of Nasdaq-listed companies, it would not mandate any particular board composition for Nasdaq-listed companies, companies that do not meet the applicable diversity objectives would only need to explain their reason(s) for not meeting the objectives and would have substantial flexibility in crafting such an explanation, and directors would not be required to self-identify their Diverse characteristics for purposes of the Board Diversity Matrix.

---

[157]     See Project on Fair Representation Letter at 6.

[158]     See Nasdaq Response Letter II at 4.

[159]     See id.  The Exchange also states that companies are not precluded from striving to achieve higher or lower diversity objectives.  See id.

[160]     Exchanges currently provide flexibilities to certain issuers under their listing standards.  See, e.g., Nasdaq Rule 5615(a)(3) (providing certain flexibility to foreign private issuers); Nasdaq Rule 5605(d)(5) (providing certain flexibility to smaller reporting companies); NYSE Listed Company Manual Section 303A.00 (providing certain flexibility to foreign private issuers and smaller reporting companies).

Moreover, it is not unreasonable for the Exchange, in crafting board diversity disclosures, to recognize that the proposed definition of "Underrepresented Minority" for domestic companies may not be as effective in identifying underrepresented board members in foreign countries that have differing ethnic and racial compositions, and may therefore result in disclosures that are less useful for investors who seek board diversity information for Foreign Issuers. It is therefore not unreasonable for the Exchange to require Foreign Issuers to provide disclosures relating to underrepresented individuals based on national, racial, ethnic, indigenous, cultural, religious, or linguistic identity in the country of the issuer's principal executive offices. Similarly, to the extent Foreign Issuers choose to meet the proposed diversity objectives, it is not unreasonable for the Exchange to take into account the differing demographic compositions of foreign countries and to provide Foreign Issuers flexibility in recognition of the different circumstances associated with Foreign Issuers hiring Diverse directors. Moreover, investors would still have access to a Foreign Issuer's Board Diversity Matrix and any disclosures explaining why it does not meet the applicable diversity objective, and this information may still be important to investors' investment and voting decisions notwithstanding the flexibility provided to Foreign Issuers. Accordingly, it is not unfairly discriminatory, and does not impose an unnecessary or inappropriate burden on competition, for the Exchange to provide this flexibility to Foreign Issuers.

In addition, it is not unreasonable for the Exchange to recognize the unique challenges (including potential resource constraints) faced by Smaller Reporting Companies and Companies with a Smaller Board in meeting the proposed diversity objectives and to provide more flexibility to these companies to the extent they choose to meet the diversity objectives (i.e., two Diverse directors, which could be satisfied with two Female directors, for a Smaller Reporting Company

and one Diverse director for a Company with a Smaller Board).  And, as with Foreign Issuers,

investors would still have access to the Board Diversity Matrix from Smaller Reporting

Companies and Companies with a Smaller Board, as well as any disclosures explaining why

such companies do not meet their applicable board diversity objectives, and this information may

still be important to investors' investment and voting decisions even though these companies

have more flexible diversity objectives.  Accordingly, it is not unfairly discriminatory, and does

not impose an unnecessary or inappropriate burden on competition for the Exchange to provide

more flexible diversity objectives for Smaller Reporting Companies and Companies with a

Smaller Board.

Moreover, the Board Diversity Proposal would not unfairly discriminate against

companies that make disclosures under proposed Rule 5605(f)(3) or impose an unnecessary or

inappropriate burden on competition between companies that choose to meet the diversity

objectives and companies that make the disclosures under proposed Rule 5605(f)(3).

Specifically, as discussed below, the Board Diversity Proposal is designed to not unduly burden

Nasdaq-listed companies and would provide companies flexibility in formulating an explanation

for not meeting the diversity objectives,[161] thereby minimizing any potential burdens on

competition.  In addition, it is not unreasonable, and mitigates the impact of different

circumstances on how companies respond to the proposal, to only require companies that do not

meet the proposed diversity objectives to disclose why they have not met such objectives, rather

than to require all Nasdaq-listed companies (including those that already have Diverse directors

on their boards sufficient to satisfy the objectives) to more generally disclose their approaches to

board diversity.  In addition, the proposal would not mandate any particular board composition,

---

[161]    See infra Section II.D.

and there is competition among the exchanges for listings. A company may choose to meet the proposed diversity objectives or explain its reasons for not doing so, or the company may transfer its listing to another exchange if it does not wish to comply with the proposed listing rules.

Finally, the proposal would not unfairly discriminate against companies that are not exempt from the proposal or impose an unnecessary or inappropriate burden on competition between Exempt Companies and companies that are not exempt. It is not unreasonable for the Exchange to recognize the differences between operating companies that issue equity securities with voting rights that are listed on the Exchange and Exempt Companies.[162]

D.    Burdens Associated with Complying with the Board Diversity Rules and Other Economic Impacts Associated with the Board Diversity Rules

In the Board Diversity Proposal, the Exchange states that collecting and disclosing the statistical data under proposed Rule 5606 would impose a minimal time and economic burden on listed companies,[163] and any such burden would be counterbalanced by the benefits that the information would provide to a company's investors.[164]

The Exchange also argues that because proposed Rule 5605(f) would allow a company to explain why it does not meet the proposed diversity objectives, it would mitigate any burdens on companies for which meeting those objectives is not cost effective, appropriate, feasible, or

---

[162]    The Exchange currently exempts certain types of issuers from certain corporate governance requirements. See Nasdaq Rule 5615.

[163]    See Amendment No. 1 to the Board Diversity Proposal at 159 (stating that, while the time and economic burden may vary based on a company's board size, the Exchange does not believe that there is any significant burden associated with gathering, preparing, and reporting this data).

[164]    See id. at 159-60.

desirable.[165]  Moreover, the Exchange states that the costs of identifying director candidates and total annual director compensation can range widely.[166]  The Exchange states, however, that most, if not all, of these costs would be borne in the search for new directors regardless of the proposed rule.[167]  The Exchange also notes that while the proposal may lead some companies to search for director candidates outside of already established networks, the incremental costs of doing so would be tied directly to the benefits of a broader search.[168]  Moreover, the Exchange states, the proposed compliance periods would allow companies to avoid incurring immediate costs, and the proposed flexibilities for certain types of companies would reduce their compliance burden.[169]

Some commenters believe that the Board Diversity Proposal would not be burdensome because companies are already familiar with the type of disclosures required,[170] disclosures are required on an aggregate basis, and the disclosures are based on voluntary self-identification.[171]

---

[165]     See id. at 160-61.

[166]     See id. at 161.

[167]     See id.

[168]     See id. at 161-62 (also stating that the Board Recruiting Service Proposal would reduce costs for companies that do not currently meet the separately proposed diversity objectives, that the Exchange has published FAQs on its Listing Center to provide guidance to companies on the application of the proposed rules in the Board Diversity Proposal, and that the Exchange will establish a dedicated mailbox for companies and their counsel to email additional questions to the Exchange regarding the application of such proposed rules).

[169]     See id. at 162.

[170]     Some commenters point out that the Board Diversity Proposal would require disclosure based on the same categories that companies already use to report workforce diversity data to the EEOC on the EEO-1 report.  See, e.g., Morningstar Letter at 1-2; Fairfax Letter at 7-8; Ideanomics Letter at 4; Goodman and Olson Letter at 2.

[171]     See, e.g., Olshan Letter at 3-4; CFA Letter at 5; Fairfax Letter at 7-8; Stardust Letter at 1-2; TIAA Letter at 3; Soundboard Letter at 2-3.  See also letter from Theresa Whitmarsh,

One commenter asserts that the proposal would not be burdensome, as companies could expand the size of their boards to add Diverse directors instead of replacing existing directors or could simply explain why they have not met the proposed diversity objectives.[172]  Some commenters also state that finding qualified Diverse directors would not be unduly difficult.[173]

Other commenters express concern with the economic impacts of proposed Rule 5605(f), however.[174]  One argues that the proposal could harm economic growth by imposing costs on public corporations, discouraging private corporations from going public, and enabling certain groups to initiate pressure campaigns against corporations with non-Diverse boards; the same commenter expresses concern that the Exchange has not undertaken a serious effort to quantify the proposal's costs and benefits.[175]

---

Executive Director, Washington State Investment Board, to Vanessa A. Countryman, Secretary, Commission, dated December 23, 2020 ("Washington State Investment Board Letter"), at 2.

[172]  See Akin Gump Letter at 5 (also stating that boards of directors of Nasdaq-listed companies will not be confronted with any undue hardship, other than the ordinary course onboarding hurdles or drafting of requisite disclosure).

[173]  See, e.g., letter from Rosie Bichard and Patricia Rodriguez Christian, Co-Presidents, WomenExecs on Boards, to Jay Clayton, Chairman, Commission, dated January 4, 2021 ("WomenExecs Letter"); Ariel Letter at 1.  See also Goodman and Olson Letter at 2-3.

[174]  See, e.g., CEI Letter at 4-5; Quigley Letter; IBC Letter at 1-4; letter from Matthew Glen dated December 31, 2020 (noting the need for additional services to seek Diverse candidates).

[175]  See Toomey Letter at 1, 5-6.  See also, e.g., Alliance for Fair Board Recruitment Letter at 31-32 (stating that failure to cure a deficiency would result in a staff delisting determination, that the proposal would create a target for activist divestment campaigns or shareholder lawsuits alleging misrepresentations and breach of fiduciary duties, and that companies will need to spend limited resources to hire communications consultants and attorneys to evaluate the marketing and legal risks of providing an explanation for not having the applicable number of Diverse directors); Guzik Letter at 8 (expressing concern regarding pressure from activist groups, as well as litigation, for issuers that are unwilling or unable to meet the proposed diversity objectives); letter from Art Ally, President and CEO, Timothy Plan, dated March 25, 2021 ("Timothy Plan Letter"), at 1-2

In response to such comments, the Exchange states that companies may decide where to list and that listings contracts and fees do not impede issuers from switching listing markets.[176] The Exchange also asserts that many long-term, newer, and potential public companies strongly support and value the objectives of the proposal and may affirm their choice or choose to list on Nasdaq because of it.[177] The Exchange further contends that private companies recognize the value of board diversity for public companies and would not have any misgivings about going public as a result of the proposal.[178] The Exchange additionally states that the proposal's framework would allow companies with non-Diverse boards to simply explain their approach, which would limit pressure campaigns.[179] Further, the Exchange states that it has carefully

---

(stating that the proposal may subject certain firms to harassment, including legal threats); letter from Tom Quaadman, Executive Vice President, U.S. Chamber of Commerce's Center for Capital Markets Competitiveness, to Vanessa Countryman, Secretary, Commission, dated January 4, 2021, at 2 (expressing support for the Board Diversity Proposal while suggesting ongoing careful assessment of how the proposal could affect Emerging Growth Companies, as well as the potential effect that the proposed new listing standards could have on the future of initial public offerings).

[176]   See Nasdaq Response Letter II at 28-29.

[177]   See id. at 29.

[178]   See id. The Exchange specifically states that, among the many elements companies consider when becoming public, board composition is growing in importance among pre-public company stakeholders. See id. (noting Goldman Sach's new standard for taking companies public (i.e., the company must have at least one diverse board member), and citing Washington State Investment Board Letter at 2, which states that many private equity general partners are already moving toward "new and improved" diversity standards, and Institutional Limited Partners Association Letter at 2, which states that, given the frequency of private equity and venture-backed companies exiting through an IPO, the proposal will likely result in positive movement on board diversity of portfolio companies owned by private funds). The Exchange also states that Amendment No. 1 to the Board Diversity Proposal would provide a newly listed company with a reasonable amount of time to publish its board disclosure and to have Diverse directors in alignment with the proposed diversity objectives after going public. See id.

[179]   See id. at 30.

considered the potential costs on listed companies (and those considering listing), including the costs of retaining a director search firm to conduct the search for new or replacement directors, the time employees spend conducting the search and completing and providing the required disclosures, and the potential disruption to the board from these activities.[180]  The Exchange states, however, because existing, new, and potential public companies would experience those costs in vastly different ways and combinations, those costs cannot be quantified with meaningful certainty.[181]

In approving the Board Diversity Proposal, the Commission has considered the proposal's impact on efficiency, competition, and capital formation and finds that it would not have a material impact on efficiency, that it is reasonably designed not to unduly burden Nasdaq-listed companies, and that it would not unduly deter capital formation (e.g., by affecting companies' decisions to go public and list on the Exchange).[182]  As proposed, companies that choose not to meet the diversity objectives would not be required to meet those objectives.  Any company that neither wishes to meet the diversity objectives nor disclose its reasons for not doing so may transfer its listing to a competing listing exchange.  Moreover, the Board Diversity Proposal would provide directors with the option to not self-identify.

Further, various aspects of the two proposals would mitigate any burdens associated with compliance, as well as any related impact on capital formation.  In particular, the Board

---

[180]    See id.

[181]    See id.  The Exchange states that it has taken multiple steps to mitigate the potential costs of the proposal (e.g., proposing to offer the complimentary recruiting service, proposing the alternative of an explanation if a company chooses to not meet the proposed diversity objectives).  See id.

[182]    See 15 U.S.C. 78c(f).  See also Section II.A.2. (discussing the efficiencies that could result from the Board Diversity Proposal).

Diversity Proposal would provide: flexibility in formulating an explanation for not meeting the diversity objectives; flexibility for Foreign Issuers, Smaller Reporting Companies, and Companies with a Smaller Board; flexibility with respect to the location of the required disclosures (i.e., in the company's proxy statement or information statement (or if the company does not file a proxy, in its Form 10-K or 20-F),[183] or on the company's website); phase-in periods for companies newly listing on the Exchange, companies switching listing tiers on the Exchange, and companies that cease to be Foreign Issuers, Smaller Reporting Companies, or Exempt Companies to comply with the proposed rules; a cure period for a company that previously satisfied proposed Rule 5605(f) but subsequently ceases to meet the diversity objective due to a vacancy on its board; and transition periods for companies to comply with the proposals after they are approved.[184]  Additionally, the Board Recruiting Service Proposal— which is separately approved by this order—would offer a one-year complimentary board

---

[183]    To account for the fact that not every company files a proxy statement, the Exchange amended the Board Diversity Proposal in Amendment No. 1 to allow such companies to provide the disclosures in a Form 10-K or 20-F.

[184]    In response to comments, the Exchange amended the Board Diversity Proposal to provide a grace period under proposed Rule 5605(f)(6)(B) for a company that satisfied the objectives of proposed Rule 5605(f)(2) but ceases to meet the objectives due to a vacancy on its board of directors, to provide additional time for newly listed companies to satisfy the requirements of proposed Rule 5605(f) and to better align the phase-in and transition periods with a company's proxy season.  See also letter from Stephen J. Kastenberg, Ballard Spahr LLP, to Vanessa Countryman, Secretary, Commission, dated January 14, 2021 ("Ballard Spahr Letter"), at 1-2 (submitted on behalf of the Exchange) (stating that the Exchange has received requests to: allow additional time for companies listed on the NGS, NGM, and NCM to comply with the diversity objectives of proposed Rule 5605(f)(2); provide a "cure" period for a listed company that does not comply with the diversity objectives of proposed Rule 5605(f)(2) as a result of an unanticipated departure of a Diverse director; and amend the effective date of the proposed rules to better align disclosure requirements with annual meetings and proxy requirements).

recruiting service that would mitigate costs associated with hiring additional Diverse directors.[185]

Moreover, the Board Diversity Proposal would provide reasonable time periods for companies

that fail to maintain compliance to regain compliance and avoid being delisted from the

Exchange:  a company that does not comply with proposed Rule 5605(f)(2) would be provided

until the later of its next annual shareholders meeting or 180 days from the event that caused the

deficiency to cure the deficiency, and a company that does not comply with proposed Rule 5606

would have 45 calendar days to submit a plan of compliance to the Exchange and upon review of

such plan, Exchange staff may provide the company with up to 180 days to regain compliance.

Finally, the proposals may promote competition for listings among exchanges by

allowing the Exchange to update its disclosure rules and related listing services in a way that

better attracts and retains the listings of companies that prefer to be listed on an exchange that

provides investors with the information required by the Board Diversity Proposal.  While some

companies that do not prefer the Board Diversity Proposal's required disclosures may choose to

not go public and list on the Exchange, or they may delist from the Exchange, the proposal

contains terms to mitigate adverse effects.  Moreover, some companies may shift their listings to

the Exchange, or may choose to go public on the Exchange rather than remain private, in

response to the Board Diversity Proposal's requirements because of the interest shown in

---

[185]   The Exchange proposes to provide certain Nasdaq-listed companies with one-year of complimentary access for two users to a board recruiting service, which would provide access to a network of board-ready diverse candidates, allowing companies to identify and evaluate Diverse board candidates.  See proposed IM-5900-9; Amendment No. 1 to the Board Recruiting Service Proposal at 10-11.  According to the Exchange, this service has an approximate retail value of $10,000 per year.  See proposed IM-5900-9.  As proposed, until December 1, 2022, any Eligible Company that requests access to this service through the Nasdaq Listing Center will receive complimentary access for one year from the initiation of the service.  See id.

comparable and consistent board diversity information, which could benefit investors by increasing the number of publicly listed companies.

E.     The Exchange's Authority for the Board Diversity Rules

Section 6(b)(5) of the Act requires, among other things, that the rules of a national securities exchange not be designed to regulate by virtue of any authority conferred by the Act matters not related to the purposes of the Act or the administration of the exchange.  In the Board Diversity Proposal, the Exchange argues that the proposal is related to corporate governance standards for listed companies and is therefore not designed to regulate by virtue of any authority conferred by the Act matters not related to the purposes of the Act or the administration of the Exchange.[186]  While the Exchange recognizes that U.S. states are increasingly proposing and adopting board diversity requirements, the Exchange states that certain of its current corporate governance listing rules relate to areas that are also regulated by states (e.g., quorums, shareholder approval of certain transactions).[187]  The Exchange states that adopting Exchange rules relating to such matters (and the proposed rule changes described herein) would ensure uniformity of such rules among its listed companies.[188]

The Exchange also states that it can establish practices that would assist in carrying out its mandate to protect investors and remove impediments from the market through the Board

---

[186]     See Amendment No. 1 to the Board Diversity Proposal at Section 3.b.II.E.

[187]     See id. at 155-56.  The Exchange recognizes that several states have enacted or proposed legislation relating to board diversity and that Congress is considering legislation to require Commission-registered companies to provide board diversity statistics and disclose whether they have a board diversity policy.  See id. at 16.

[188]     See id. at 156.

Diversity Proposal.[189]  The Exchange believes that it is within its delegated authority to propose listing rules designed to enhance transparency, provided that they do not conflict with existing federal securities laws.[190]  The Exchange states that, for example, it already requires its listed companies to publicly disclose compensation or other payments by third parties to a company's directors or nominees, notwithstanding that such disclosure is not required by federal securities laws.[191]  The Exchange further states that it has designed the proposal to avoid a conflict with existing disclosure requirements under Regulation S-K and to mitigate additional burdens for companies by providing them with flexibility to provide such disclosure on their website, in their proxy statement or information statement, or, if a company does not file a proxy, in its Form 10-K or 20-F, and by not requiring companies to adopt a diversity policy.[192]

Some commenters argue that the Board Diversity Proposal is impermissibly designed to address political and social issues and would redefine the purpose of businesses in a way that is unrelated to traditional business purposes (e.g., profitability, obligation to shareholders, satisfying customers, and treating workers and suppliers fairly).[193]  One commenter also asserts

---

[189]    See id. at 53.

[190]    See id. at 58.

[191]    See id. at 58-59.  Various provisions under the federal securities laws may require disclosure of third party compensation arrangements with or payments to nominees and/or board members.  See Securities Exchange Act Release No. 78223 (July 1, 2016), 81 FR 44400, 44403 (July 7, 2016).

[192]    See Amendment No. 1 to the Board Diversity Proposal at 60.

[193]    See, e.g., Timothy Plan Letter at 1-2 (also supporting Toomey Letter); CEI Letter at 1; Toomey Letter at 4; Heritage Foundation Letter at 3-5, 17-18; Guess Letter at 1.  Another commenter argues that the Board Diversity Proposal raises concerns about increasing costs and parallels to socialism.  See letter from Henryk A Kowalczyk dated January 6, 2021 ("Kowalczyk Letter") (reproducing a December 18, 2020 article published in Medium titled "Socialists Are Taking Over Wall Street").

that the proposal does not relate to any traditional corporate governance matter.[194]  Moreover, some commenters argue that the proposal is not within the purposes of the Act and exceeds the authority of national securities exchanges under the Act.[195]

In response, the Exchange states that the Act provides the standards for approval of rules proposed by SROs, which are different from rulemaking by the Commission.[196]  The Exchange states that it is performing its duties as an exchange to fashion listing rules that promote good corporate governance.[197]  The Exchange also notes that it is expected and required, in its role operating an exchange, to develop and enforce listing rules that, among other things, "remove impediments to and perfect the mechanisms of a free and open market" and "protect investors and the public interest."[198]  With respect to the comment that the proposal contributes to the federalization of corporate governance, the Exchange states that it develops listing rules regarding corporate governance standards to promote uniformity among its listed companies, even if the same areas are regulated by states.[199]  In addition, the Exchange states that companies voluntarily list on the Exchange, as a private entity, and choose to submit to the Exchange's listing rules.[200]  Moreover, national securities exchanges may adopt different approaches.[201]

---

[194]    See Alliance for Fair Board Recruitment Letter at 49-50.

[195]    See, e.g., Guzik Letter at 1; Alliance for Fair Board Recruitment Letter at 49-50; Heritage Foundation Letter at 2; Project on Fair Representation Letter at 7-11; letter from Christopher A. Iacovella, Chief Executive Officer, American Securities Association, to Vanessa Countryman, Secretary, Commission, dated December 31, 2020, at 1-2; Publius Letter at 4-5.

[196]    See Nasdaq Response Letter II at 22.

[197]    See id. at 23-24.

[198]    See id. at 24.

[199]    See id.

[200]    See id.

[201]    See id.

The Board Diversity Proposal would make consistent and comparable information

relating to the corporate governance of Nasdaq-listed companies (i.e., information regarding

board diversity) widely available on the same basis to investors, which would increase efficiency

for investors that gather and use this information.  In addition, the proposal would not redefine

the purpose of Nasdaq-listed companies' businesses in a way that is unrelated to traditional

business purposes, as claimed by certain commenters.  Rather, it could enhance investors'

investment and voting decisions and, as discussed throughout this order, is consistent with

Section 6 of the Act, which requires that the rules of an exchange be designed to, among other

things, remove impediments to and perfect the mechanism of a free and open market and a

national market system and protect investors and the public interest.

Exchanges have historically adopted listing rules that require disclosures in addition to

those required by Commission rules.[202]  National securities exchanges may choose to adopt

disclosure requirements in their listing rules that supplement or overlap with disclosure

requirements otherwise imposed under the federal securities laws, and disclosure-related listing

standards that provide investors with information that facilitates informed investment and voting

decisions contribute to the maintenance of fair and orderly markets.[203]  Accordingly, the proposal

would not cause the Exchange to regulate, by virtue of any authority conferred by the Act,

matters not related to the purposes of the Act or the administration of the Exchange.

---

[202]    See, e.g., Nasdaq IM-5250-2 (requiring Nasdaq-listed companies to publicly disclose the material terms of all agreements and arrangements between any director or nominee and any person or entity (other than the listed company) relating to compensation or other payment in connection with that person's candidacy or service as a director); LTSE Rule 14.425(a)(1)(C) (requiring LTSE-listed issuers to adopt and publish a policy on the company's approach to diversity and inclusion).

[203]    See 2016 Approval Order, supra note 23.

F.     Comments on Constitutional Scrutiny of the Board Diversity Proposal

Some commenters argue that the Board Diversity Proposal, if approved by the Commission, would constitute impermissible government action,[204] is discriminatory as it is based on sex, race, ethnicity, and sexual orientation,[205] and would require Nasdaq-listed companies to discriminate in hiring and, if approved, would violate the Fifth Amendment to the U.S. Constitution.[206]  According to one commenter, all racial classifications, both disadvantaging and benefitting minorities, are subject to strict scrutiny, and the government must demonstrate that the racial classifications are narrowly tailored to further a compelling government interest.[207] This commenter asserts that "Diversity" itself and "outright racial balancing" are not compelling interests.[208]  In addition, this commenter argues that the proposed objective to have at least one director who self-identifies as a female is a gender quota that, like the racial quota, if adopted, would violate the Fifth Amendment.[209]  Other commenters argue that the Board Diversity

---

[204]     See, e.g., letter from Thomas J. Fitton, President, Judicial Watch, Inc., to Vanessa Countryman, Secretary, Commission, dated December 29, 2020 ("Judicial Watch Letter"), at 5-6; Project on Fair Representation Letter at 12-13.  One commenter argues that the proposal constitutes state action, and that even if the proposal of the board diversity rules is free from government coercion or encouragement, the enforcement of the rules is not.  See Alliance for Fair Board Recruitment Letter at 59-64.

[205]     See, e.g., letter from Colin Gallagher dated January 8, 2021; Heritage Foundation Letter at 12-16; letter from Eugene Kelly to Jay Clayton, Chairman, Commission, dated December 29, 2020; Richter Letter at 3.

[206]     See, e.g., NLPC Letter at 4-6; Project on Fair Representation Letter at 12-15; Judicial Watch Letter at 2-7.

[207]     See Judicial Watch Letter at 3-4.  See also, e.g., Free Enterprise Project Letter at 2 (arguing that the Board Diversity Proposal is impermissibly vague).

[208]     See Judicial Watch Letter at 3-4.  See also Alliance for Fair Board Recruitment Letter at 67-68.

[209]     See Judicial Watch Letter at 4.  See also Alliance for Fair Board Recruitment Letter at 64-66 (arguing that the proposal relating to female directors would not satisfy heightened scrutiny); NLPC Letter at 4-6.

Proposal is akin to affirmative action or is distinguishable from permissible affirmative action plans.[210]  Finally, some commenters argue that the Board Diversity Proposal would violate the First Amendment because it would require companies to engage in compelled disclosure.[211]

The Exchange states that it is not a state actor, and the proposal does not constitute state action subject to constitutional scrutiny.[212]  As support, the Exchange notes that courts have uniformly concluded that SROs like the Exchange are not state actors.[213]  The Exchange also argues that the Board Diversity Proposal does not satisfy the test for determining whether actions are fairly attributable to the government because there is no Commission rule or action requiring or encouraging the Exchange to adopt the proposed Exchange rules, and the Commission's approval of a private entity's action does not convert private action into state action.[214]

With respect to concerns expressed by commenters regarding Equal Protection under the Fifth Amendment to the U.S. Constitution, the Exchange states that, even if it were found to be a state actor, the proposal would not mandate any particular number of Diverse directors and would therefore survive scrutiny.[215]  The Exchange further notes that proposed Rule 5605(f) establishes aspirational diversity objectives, and proposed Rule 5606 is a disclosure requirement for demographic data on all directors serving on the boards of Nasdaq-listed companies.[216]  The

---

[210]      See, e.g., Richter Letter at 3; NLPC Letter at 5; Judicial Watch Letter at 3.

[211]      See Alliance for Fair Board Recruitment Letter at 70-72; Project on Fair Representation Letter at 15-16.

[212]      See Nasdaq Response Letter I at 2, 9-13.

[213]      See id. at 9-10.

[214]      See id. at 11-12.

[215]      See id. at 14.

[216]      See id. at 15.

Exchange states that, accordingly, the proposal does not impose a burden on or confer a benefit to the exclusion of others based on a suspect classification, and "rational basis" would be the appropriate standard of review.[217]  The Exchange also states that the proposal reflects several legitimate government interests, such as increasing transparency about board diversity so that investors can make investment decisions based on consistent and readily accessible data.[218]

The Exchange also argues that even if the proposal triggered heightened scrutiny, proposed Rule 5605(f) would survive strict scrutiny because it is necessary to achieve a compelling state interest[219] and is narrowly tailored to achieve that interest.[220]  The Exchange further contends that, with respect to gender and LGBTQ+ status, proposed Rule 5605(f) would satisfy intermediate scrutiny because it is necessary to achieve an important government interest,[221] and is substantially related to that important interest.[222]

The Exchange also argues that the proposal is not a form of affirmative action because proposed Rule 5605(f) would allow for explanation as a path to compliance.[223]  Even assuming the proposal constitutes affirmative action, the Exchange contends, comparable programs that do not include mandates are lawful.[224]

---

[217]    See id.

[218]    See id. at 15-16.

[219]    See id. at 17-18.

[220]    See id. at 18-22.

[221]    See id. at 22-24.

[222]    See id. at 24.

[223]    See id. at 8.

[224]    See id.

With respect to commenters' concerns that the proposal would violate the First Amendment because it would require companies to engage in compelled speech, the Exchange again argues that it is not a state actor.[225]  The Exchange also argues that the proposal does not result in compelled speech because it allows a voluntary association of private companies bound together by contract to engage in truthful and lawful speech on the subject of board diversity.[226] The Exchange also states that, even if it were a state actor and the proposal were interpreted as the government requiring speech, the particular speech at issue would not constitute compelled speech.[227]  According to the Exchange, proposed Rule 5606's disclosures about board composition are the kinds of disclosures that are routinely permitted,[228] and the proposed Rule 5605(f) disclosures containing a company's explanation for not meeting the proposed diversity objectives do not compel a company to convey any specific message.[229]  Moreover, the Exchange states that even if it were a state actor and the proposal implicated the compelled speech doctrine, the proposal would be constitutional in light of the substantial body of studies showing the benefits of diverse boards.[230]

Numerous courts (and the Commission) have repeatedly held that SROs generally are not state actors,[231] and commenters identify no persuasive basis for reaching a different conclusion

---

[225]    See id. at 25.

[226]    See id. at 25-26.

[227]    See id. at 27.

[228]    See id.

[229]    See id.

[230]    See id.

[231]    See, e.g., Charles C. Fawcett, IV, Securities Exchange Act Release No. 56770, 91 S.E.C. Docket 2594 (November 8, 2007); D.L. Cromwell Invs., Inc. v. NASD Regulation, Inc., 279 F.3d 155, 162 (2d Cir. 2002); Desiderio v. National Ass'n of Secs. Dealers, Inc., 191

with respect to the Exchange's Board Diversity Proposal.  The Commission's "[m]ere approval" of the proposal as consistent with the requirements of the Act is "not sufficient" to convert it into state action.[232]  Similarly, the fact that the Exchange is subject to "extensive and detailed" regulation by the Commission—including, for example, the Commission's role in reviewing the Exchange's enforcement of its listing standards—"does not convert [its] actions into those of the [Commission]."[233]  In any event, the proposal would survive constitutional scrutiny because the objectives set forth in the proposal are not mandates, and the disclosures that the proposal requires are factual in nature and advance important interests as described throughout this order.

      G.      Comments on the Applicability of Other Laws to the Board Diversity Proposal

          1.      Comments on the Materiality Standard

One commenter argues that the Board Diversity Proposal would violate materiality principles that the commenter believes govern securities disclosures because the disclosures would not help a reasonable investor evaluate a company's performance.[234]  Another commenter argues that the proposal would conflict with the Commission's existing regulatory framework for diversity disclosures.[235]  In response, the Exchange notes the Commission's statement that "it is within the purview of a national securities exchange to impose heightened governance requirements, consistent with the Act, that are designed to improve transparency and

---

        F.3d 198, 206-07 (2d Cir. 1999); Jones v. SEC, 115 F.3d 1173, 1183 (4th Cir. 1997); First Jersey Secs., Inc. v. Bergen, 605 F.2d 690, 698 (3d Cir. 1979).

[232]    Blum v. Yaretsky, 457 U.S. 991, 1004 (1982).  See also Desiderio, 191 F.3d at 207 (Commission's approval of FINRA's Form U-4).

[233]    Desiderio, 191 F.3d at 207 (quoting Jackson v. Metropolitan Edison Co., 419 U.S. 345, 350 (1974)).

[234]    See Toomey Letter at 1, 3-4.

[235]    See Alliance for Fair Board Recruitment at 54-56.

accountability into corporate decision making and promote investor confidence in the integrity of the securities markets."[236]  The Exchange also states its concern that the current lack of transparency and consistency in board diversity information makes it difficult for investors to determine the state of diversity among listed companies and boards' philosophy regarding diversity.[237]  The Exchange believes that it is within its authority to propose listing rules designed to enhance transparency, provided that they do not conflict with existing federal securities laws.[238]

As the Commission has previously stated, national securities exchanges may adopt disclosure requirements in their listing rules designed to improve governance, as well as transparency and accountability into corporate decision making for listed issuers, including imposing heightened standards over that which the Commission currently requires.[239] Disclosure-related listing standards that provide investors with information that facilitates informed investment and voting decisions contribute to the maintenance of fair and orderly markets.[240]  Accordingly, to the extent the proposal would result in disclosures that are not currently required by Commission rules, such disclosures would not conflict with the Commission's regulatory framework for diversity disclosures.

---

[236]     See Nasdaq Response Letter II at 13.

[237]     See id.

[238]     See id.

[239]     See 2016 Approval Order, supra note 23 at 44403.

[240]     See id.

2.      Comments on Reporting Fraud

One commenter argues that the proposal would be subject to reporting fraud,[241] and another commenter argues that reliance on self-identification for board diversity disclosures would pose unique liability concerns under the antifraud and reporting provisions of the federal securities laws.[242]  In response, the Exchange states that voluntary self-identification of personal characteristics is generally accepted as accurate without a "truth test" and that the Exchange would not judge the accuracy of a director's self-identification.[243]  The Exchange also states that some directors may feel that a "truth test" would violate their privacy rights and right to choose their self-identification.[244]  Moreover, the Exchange states that any legal risk that may arise from the proposed disclosures would be nominal and are outweighed by transparency benefits.[245]

The Board Diversity Proposal would not pose unique liability concerns as a result of its requirement for companies to disclose their directors' self-identified Diverse characteristics, and the proposed disclosures would not cause a company to be subject to reporting fraud any differently from other types of company disclosures required by an exchange rule.  Rather, a company would be obligated to accurately disclose the self-reported information it receives from its directors, and any failure to do so would be comparable to a failure to accurately disclose any other information the company is obligated to disclose.

---

[241]     See Richter Letter at 2.

[242]     See Toomey Letter at 4-5.

[243]     See Nasdaq Response Letter II at 19.

[244]     See id.

[245]     See id. at 19-20.

3.     Comments on Director Privacy

Some commenters believe that the proposed aggregated board-level diversity statistics disclosures would respect individual directors' privacy,[246] including in particular because no individual directors would be identified as members of an underrepresented minority group or as LGBTQ+.[247] Some commenters also point out that directors would not be required to disclose information about their diversity attributes and, in cases where they did not, companies would note their status as "undisclosed."[248] Other commenters, however, express concern that the proposed disclosures would violate directors' privacy.[249] Some also argue that individuals do not wish to be characterized by their ethnicity, gender, or sexual orientation[250] and suggest that requiring certain board seats to be filled by specific demographic groups could invite criticism of such board members' achievements and potentially worsen stereotypes and prejudices against these groups.[251]

---

[246]  See, e.g., Skadden Letter at 3; CFA Letter at 5; letter from Gary A. LaBranche, President & CEO, National Investor Relations Institute, to Vanessa Countryman, Secretary, Commission, dated December 30, 2020 ("NIRI Letter"), at 3; Ideanomics Letter at 3.

[247]  See NIRI Letter at 3.

[248]  See, e.g., Fairfax Letter at 7-8; Ideanomics Letter at 3; Goodman and Olson Letter at 2. See also letter from Heidi W. Hardin, MFS Investment Management, to Vanessa Countryman, Secretary, Commission, dated January 4, 2021.

[249]  See, e.g., CEI Letter at 4; Kowalczyk Letter at 3; IBC Letter at 5 (expressing particular concern for small boards where aggregated data would provide little protection); Publius Letter at 10; Richter Letter at 2.

[250]  See, e.g., Kowalczyk Letter at 3; Publius Letter at 10-11; letter from John P. Reddy to Adena Friedman, President and CEO, Nasdaq, dated December 5, 2020 ("Reddy Letter").

[251]  See CEI Letter at 2-3; Quigley Letter; Kowalczyk Letter at 3; Publius Letter at 10-11; Independent Women's Forum Letter at 1-2.

In response, the Exchange states that directors may choose not to disclose their race, gender, or LGBTQ+ status.[252]  The Exchange further notes that when directors choose to self-identify, the Board Diversity Matrix requires aggregated disclosures only.[253]

The proposed disclosures are reasonably designed to address potential privacy concerns. Specifically, the disclosures under proposed Rule 5606 would be based on directors' voluntary self-identification and would be provided on an aggregated basis.  Moreover, for domestic issuers, while the number of directors who fall under a specific race and ethnicity would be broken down by gender categories, information regarding the number of directors who self-identify as LGBTQ+ would not be broken down, which would further lower the likelihood that a specific director's Diverse characteristics could be identified from the Board Diversity Matrix and further mitigate privacy concerns.  Similarly, Foreign Issuers would not be required to break down the number of directors who are Underrepresented Individuals or who self-identify as LGBTQ+ by gender, which again would further mitigate privacy concerns.

### 4.    Other Comments

Some commenters argue that the Board Diversity Proposal would be inconsistent with the principles underpinning the Civil Rights Act of 1964, which makes it an unlawful employment practice for an employer to limit, segregate, or classify its employees because of such individual's race, color, religion, sex, or national origin.[254]  One commenter also states that even

---

[252]    See Nasdaq Response Letter II at 27.  See also Nasdaq Response Letter I at 13-14.

[253]    See Nasdaq Response Letter II at 27.

[254]    See, e.g., Alliance for Fair Board Recruitment Letter at 56-58; letter from A. Christians to Vanessa Countryman, Secretary, Commission, dated February 2, 2021 ("A. Christians Letter"); Heritage Foundation Letter at 12-15; letter from Concerned American Executives dated January 2, 2021.  Other commenters also generally assert discrimination

if independent directors are not covered by Title VII of the Civil Rights Act, directors selected from among the company's employees are covered; and a company employee who is denied a board position because he or she lacks a particular sex, race, or sexual orientation trait would have a cognizable Title VII claim.[255]  In response, the Exchange argues that Title VII does not apply to most directors of Nasdaq-listed companies because they are not employees and, even if Title VII applied, the proposal would not discriminate or encourage discrimination because the proposed board diversity objectives are not mandatory.[256]

Commenters' concerns that the proposal is inconsistent with the principles underlying Title VII are unwarranted in light of the proposal's framework.  Moreover, individual employment decisions would continue to be governed by Title VII to the extent they are covered by that statute.

Additionally, although some commenters also express concern that the Board Diversity Proposal may cause Nasdaq-listed companies to violate their legal fiduciary obligations to their shareholders[257] and argue that corporate governance is a matter of state law,[258] the proposal would not cause companies to violate their fiduciary obligations or violate state laws because, as discussed above, the proposal would not mandate any particular board composition and would

---

concerns.  See, e.g., Donnellan Letter at 2; letter from Samuel Sloniker, dated December 17, 2020 (comment letter submitted to File No. SR-NASDAQ-2020-082).

[255]     See Alliance for Fair Board Recruitment at 57-58.

[256]     See Nasdaq Response Letter I at 1, 6-8.  The Exchange states that only one of the comment letters that raises constitutional or discrimination concerns with the Board Diversity Proposal was submitted by a Nasdaq-listed company that would be subject to the proposal.  See id. at 4-5.

[257]     See, e.g., Toomey Letter at 1-3; Free Enterprise Project Letter at 3.

[258]     See NLPC Letter at 7-8; Heritage Foundation Letter at 20.

not require Nasdaq-listed companies to hire directors based solely on whether they fall within the proposed definition of "Diverse."  If a company believes that it cannot meet the proposed diversity objectives because it has concerns regarding compliance with other laws, rules, or obligations, then the company would only need to disclose its reasons for not meeting the objectives.[259]  In addition, companies that choose not to meet the diversity objectives and not explain their reasons for not meeting the objectives may transfer their listings to a different exchange.

One commenter argues that the Board Diversity Proposal violates the Paperwork Reduction Act.[260]  The Board Diversity Proposal, however, contains no "collection of information" requirements within the meaning of the Paperwork Reduction Act, because the disclosure contemplated under the Board Diversity Proposal is not being done "by or for an agency."[261] Other commenters believe that the proposal could violate various federal statutes, including the federal RICO statute, the Equal Pay Act, and the Genetic Information Nondiscrimination Act.[262]  Nothing contemplated in the Board Diversity Proposal constitutes impermissible activity under the federal RICO statute,[263] wage discrimination between

---

[259]    Similarly, the disclosures under proposed Rule 5606 would be required only "to the extent permitted by applicable law."

[260]    See NLPC Letter at 6-7.

[261]    44 U.S.C. 3502(3) and 5 CFR 1320.3(c).

[262]    See letter from Werner Lind to Vanessa Countryman, Secretary, Commission, dated February 6, 2021; A. Christians Letter.

[263]    18 U.S.C. 1961(1).

employees on the basis of sex under the Equal Pay Act,[264] or discrimination based on genetic information under the Genetic Information Nondiscrimination Act.[265]

One commenter argues that approval of the Board Diversity Proposal would be unconstitutional because the Commission's commissioners are unlawfully insulated from Presidential control.[266]  But the Commission's independent structure complies with constitutional requirements.[267]  Contrary to the views of one commenter, the Supreme Court's decision in Seila Law LLC v. CFPB, 140 S. Ct. 2183 (2020), does not alter that conclusion.  There, the Court—twice—expressly declined to "revisit" its earlier decisions affirming Congress's authority to "create expert agencies led by a group of principal officers removable by the President only for good cause."[268]  Instead, the Court made clear that it was "the CFPB's leadership by a single independent Director" that "violate[d] the separation of powers."[269]  And the Court invited Congress to remedy the "problem" by "converting the CFPB into a multimember agency" like the Commission.[270]

---

[264]  29 U.S.C. 206(d).

[265]  42 U.S.C. 2000ff-1(a).

[266]  See Alliance for Fair Board Recruitment Letter at 77-78.  This commenter also argues that by making certain public statements related to diversity, some Commissioners have prejudged the Board Diversity Proposal and must recuse themselves.  See id. at 75-77.  But recusal is unwarranted.  It is settled law that an official may take public positions like the statements cited by the commenter without diminishing the presumption that the official will act fairly and impartially in any particular matter.  See, e.g., Nuclear Info. & Res. Serv. v. NRC, 509 F.3d 562, 571 (D.C. Cir. 2007).

[267]  See, e.g., Free Enter. Fund v. Pub. Co. Accounting Oversight Bd., 561 U.S. 477, 487, 509 (2010).

[268]  Seila Law LLC, 140 S. Ct. at 2192, 2206.

[269]  Id. at 2207.

[270]  Id. at 2211.  The same commenter's challenge based on the supposition that the proposals would be approved by the acting director of the Commission's Division of Trading and

H.    Commenter Suggestions on the Board Diversity Proposal

The Exchange revised the Board Diversity Proposal in response to certain commenter suggestions and explained why it did not revise the proposal in response to others.  The Exchange's decision not to incorporate certain suggestions does not render the current proposal without a rational basis or inconsistent with the Act.  As described throughout this order, the Board Diversity Proposal satisfies the statutory and regulatory requirements for approval.  The comments the Exchange did not incorporate into its proposal are nonetheless briefly described below.

Some commenters suggest that the Board Diversity Proposal should impose a diversity requirement rather than provide for a "comply-or-disclose" framework.[271]  As discussed above, the Exchange asserts that its proposal appropriately balances the calls of investors for companies to increase diverse representation on their boards with the need for companies to maintain flexibility and decision-making authority over their board composition.[272]

One commenter suggests that the concept of cognitive diversity (or diversity of thought) should be introduced into the proposed rules and disclosures.[273]  Another commenter states that the proposed definition of "Diverse" is pragmatic, and that it is important that the proposal

---

Markets, see Alliance for Fair Board Recruitment Letter at 74-75, is inapplicable because the Commission, not the Division of Trading and Markets pursuant to delegated authority, is approving the proposed rule change.

[271]    See, e.g., letter from Marc H. Morial, President and CEO, National Urban League, to Vanessa Countryman, Secretary, Commission, dated January 4, 2021 ("NUL Letter"), at 4-5; CtW Letter at 2.

[272]    See Nasdaq Response Letter II at 6-7.

[273]    See letter from Snowdon Beinn, Snowdon Beinn Ltd., to Vanessa Countryman, Secretary, Commission, dated January 4, 2021.

include the flexibility to modify or expand the set of included demographic groups.[274]  Another

commenter encourages the Exchange to assess whether the proposed definition of "Diverse"

should be expanded.[275]  The Exchange responds that companies would not be precluded from

using a broader definition of diversity, provided that the company discloses this under proposed

Rule 5605(f)(3).[276]  With respect to commenters' views that the definition of Diverse should be

expanded, the Exchange states that its proposal inherently recognizes the cognitive diversity and

broader range of experiences that diverse directors bring to the boardroom.[277]

One commenter argues that the Board Diversity Proposal would create structural

competition among minorities,[278] and some commenters request that the proposal explicitly

require two Black or African American directors[279] or require one African American (or another

racial/ethnic minority) director and a director who is a member of the LGBTQ community, one

of whom might also be female.[280]  One commenter suggests that the proposal be limited to

individuals of underrepresented racial minorities.[281]  Another commenter states that the proposal

would not address how a director of Central Asian descent would be classified and that the

proposal would potentially preclude them from being considered "Diverse," as it would with

---

[274]      See Carlyle Letter at 2.

[275]      See Alliance Letter at 2.

[276]      See Nasdaq Response Letter II at 14.

[277]      See id.

[278]      See NUL Letter at 2-5.

[279]      See letter from Aldrin K. Enis, President, One Hundred Black Men, Inc., dated January 4, 2021.

[280]      See NUL Letter at 4.

[281]      See letter from Omar A. Karim, President, Banneker Ventures, and Chairman, The Collective, to Vanessa Countryman, Secretary, Commission, dated January 4, 2021 ("Collective Letter").

persons of North African or Middle Eastern descent.[282]  In response, the Exchange states that it chose its definition of "Diverse" to ensure that more categories of historically underrepresented individuals are included and to allow companies the flexibility to diversify their boards in a manner that fits their unique circumstances and stakeholders.[283]  The Exchange states that companies may choose to meet the proposed diversity objectives by, for example, having two directors who self-identify as Black or African American, or by having two directors who self-identify in racial or ethnic categories beyond those included in the EEO-1 report (e.g., Middle Eastern, North African, Central Asian) and describing that the company considers diversity more broadly than the proposed definition of "Diverse."[284]

One commenter suggests that the Exchange expand the definition of "Diverse" to ensure that companies with operations in other countries do not simply use the availability of candidates in those countries to fill a director or officer role when the people within those countries could be considered a minority in the U.S.[285]  In response, the Exchange states that a company is not precluded from satisfying proposed Rule 5605(f)(2) with a director who is not a U.S. citizen or resident,[286] and that it is solely in the company's discretion to identify qualified director

---

[282]    See letter from David A. Bell, Co-Chair, Corporate Governance, Fenwick & West LLP, to Vanessa Countryman, Secretary, Commission, dated January 4, 2021, at 2.

[283]    See Nasdaq Response Letter II at 15-16 (also noting that the Exchange based its proposed definition of Underrepresented Minority on the categories reported to the EEOC through the EEO-1 report and that the Exchange included a category for LGBTQ+ status in recognition of the Supreme Court's decision in Bostock v. Clayton Cnty., Ga., 140 S. Ct. 1731, 1742 (2020), which held that sexual orientation and gender status are "inextricably" intertwined with sex).

[284]    See id. at 16.

[285]    See Ideanomics Letter at 4.

[286]    See Nasdaq Response Letter II at 16.

nominees who reflect diverse backgrounds that are reflective of the company's communities, employees, investors, or other stakeholders, regardless of the director's nationality.[287]

Some commenters suggest that more than two Diverse directors may be necessary to have a strong voice in the boardroom.[288]  Another commenter believes that two Diverse directors is a reasonable minimum standard to escalate market awareness of listed companies with limited diversity.[289]  In response, the Exchange states that the Board Diversity Proposal would provide companies with a flexible, attainable approach to achieving a reasonable objective that is not overly burdensome or coercive.[290]  The Exchange also states that the proposed objective of two Diverse directors would align investors' demands for increased board diversity with companies' needs for a flexible approach that accommodates each company's unique circumstances.[291]

Some commenters suggest that diversity statistics should be disclosed on a director-by-director basis,[292] or that companies should at least be permitted to disclose diversity statistics on a director-by-director basis.[293]  Some commenters encourage companies to also disclose a skills matrix for the board, aligned with the companies' strategic needs and succession planning, and a policy on board refreshment.[294]  One commenter also suggests that directors should be subject to

---

[287]  See id.

[288]  See, e.g., CtW Letter at 2; letter from Mark Ferguson and Miguel Nogales, Co-Chief Investment Officers, Global Equity Strategy, Generation Investment Management LLP, at 1.

[289]  See LGIM America Letter at 3.

[290]  See Nasdaq Response Letter II at 4.

[291]  See id.

[292]  See, e.g., New York City Controller Letter at 1.

[293]  See Ropes & Gray Letter at 2-3.  See also Skadden Letter at 3; Trillium Letter at 2.

[294]  See, e.g., WomenExecs Letter; New York City Comptroller Letter at 3; Ropes & Gray Letter at 3.  One commenter asserts that if the Commission "chooses to countenance

regular re-election based on satisfactory evaluation of their contribution to the board, and that a report from the nomination committee explaining how it considered the representation of women and/or other minorities in director selection and board evaluation would also be useful.[295]  One commenter encourages the Exchange and the Commission to consider whether the disclosure requirements should extend to board nominees.[296]  In response, the Exchange states that the proposal seeks a balance between obtaining key board diversity data and respecting the privacy of directors (with respect to the suggestions for director-by-director disclosures) and that limiting the disclosures to current directors optimizes the consistency and comparability of board diversity statistical information across companies (with respect to the suggestions for disclosures relating to board nominees).[297]  Moreover, the Exchange states that a company would not be prohibited from disclosing more detail than required by the Board Diversity Matrix.[298]

Some commenters suggest that the Board Diversity Matrix should be included in companies' annual shareholders meeting proxy or information statement filed with the Commission, rather than solely posted on the web.[299]  In response, the Exchange states that it is in the public interest to allow companies the flexibility to publish board diversity information through alternatives other than Commission filings, because it would avoid imposing additional

---

diversity statistical reporting, it should require reporting of types of diversity that are more relevant to business success than the immutable racial, ethnic or sexual characteristics of its directors."  See Heritage Foundation Letter, at 4, 20.

[295]    See WomenExecs Letter.

[296]    See CFA Letter at 5-6.

[297]    See Nasdaq Response Letter II at 18.

[298]    See id.

[299]    See, e.g., Thirty Percent Coalition Letter at 2; Boston Club Letter at 2; Ropes & Gray Letter at 2.

disclosure and filing obligations on companies while providing shareholders with access to information in a recognized channel of distribution.[300]

One commenter states that the phase-in periods under proposed Rule 5605(f) are too long.[301]  Another suggests that companies should have two Diverse directors within one calendar year after the approval date of proposed Rule 5605(f).[302]  A different commenter suggests reducing the proposed two-, four-, and five-year phase-in periods by one year each.[303]  Some commenters instead express support for the proposed phase-in and transition periods.[304]  In response, the Exchange notes that an accelerated timeframe may increase challenges for companies seeking to meet the objectives of proposed Rule 5605(f), particularly smaller companies.[305]

One commenter requests that the Exchange commit to publishing a study of the impact of the proposals on board diversity and the relationship between diversity and corporate governance and financial results.[306]  In response, the Exchange states that the greater benefit of publicly disclosing board diversity data would be that all interested parties can adequately conduct their

---

[300]     See Nasdaq Response Letter II at 17.

[301]     See NUL Letter at 5.

[302]     See Collective Letter at 2.

[303]     See Olshan Letter at 3.

[304]     See, e.g., Fairfax Letter at 13; Skadden Letter at 2-3; Microsoft Letter at 2; Ariel Letter at 2; T. Rowe Letter at 2; Brightcove Letter; Mercy Investment Letter at 2; letter from Faye Sahai, Partner, Mirai Global, to Vanessa Countryman, Secretary, Commission, dated December 14, 2020.

[305]     See Nasdaq Response Letter II at 5-6.

[306]     See letter from Suzanne Rothwell, Managing Member, Rothwell Consulting LLC, to Vanessa Countryman, Secretary, Commission, dated December 23, 2020, at 3.

own analyses of the impact of the proposal on board diversity and its relationship with company performance and that the Exchange welcomes these analyses.[307]

I.      Board Recruiting Service Proposal

As described above, the Board Recruiting Service Proposal would provide certain Nasdaq-listed companies with one year of complimentary access for two users to a board recruiting service, which would provide access to a network of board-ready diverse candidates for companies to identify and evaluate.  In the proposal, the Exchange states that offering a board recruiting service would assist listed companies with increasing diverse board representation, which the Exchange believes could result in improved corporate governance, strengthening of market integrity, and improved investor confidence.[308]  The Exchange further states that offering this service would help companies to achieve compliance with the Board Diversity Proposal, if it were approved.[309]  The Exchange states that utilization of the complimentary board recruiting service would be optional, and no company would be required to use the service.[310]

The Exchange further argues that it is reasonable and not unfairly discriminatory to offer the board recruiting service only to Eligible Companies because the Exchange believes these companies have the greatest need to identify diverse board candidates, particularly if these

---

[307]     See Nasdaq Response Letter II at 16.

[308]     See Amendment No. 1 to the Board Recruiting Service Proposal at 10.  The Exchange states that research demonstrates diverse boards are positively associated with improved corporate governance and company performance.  See id. at 6.  Moreover, the Exchange states that investors and investor groups are calling for diversification in the boardroom, and legislators at the federal and state level are increasingly taking action to respond to those calls.  See id. at 9-10.

[309]     See id. at 10.

[310]     See id. at 13, 15.

companies elect to meet the diversity objectives in the Board Diversity Proposal, if approved, rather than disclosing why they have not met the objectives.[311]  Additionally, the Exchange believes that companies that already have two Diverse directors have demonstrated by their current board composition that they do not need additional assistance provided by the Exchange to identify diverse candidates for their boards.[312]  Finally, the Exchange believes that offering this service would help it compete to attract and retain listings.[313]

Some commenters express general support for the Board Recruiting Service Proposal,[314] while others oppose the Board Recruiting Service Proposal.[315]  The commenters supporting the proposal state that the proposed service would assist companies that choose to diversify their boards[316] and would be of particular benefit to smaller companies.[317]  One commenter opposing the proposal argues that the Exchange does not identify how it would address the potential conflicts of interest between establishing a regulatory standard and concurrently promoting a

---

[311]    See id.

[312]    See id. at 13-14.  Although proposed Rule 5605(f)(2)(D) would require a Company with a Smaller Board to have, or explain why it does not have, at least one Diverse director on its board, such a company would be considered an Eligible Company if it does not have at least one director who self-identifies as Female and at least one director who self-identifies as an Underrepresented Minority or LGBTQ+, which the Exchange believes would help promote greater diversity on boards of all sizes.  See id. at 11 n.20.

[313]    See id. at 14.

[314]    See, e.g., Ideanomics Letter at 4; Goodman and Olson Letter at 2-3; Capital Research and Management Company Letter at 2; UAW Letter at 3.

[315]    See, e.g., Toomey Letter at 3; letter from Matthew Glen dated December 31, 2020 (comment letter submitted to File No. SR-NASDAQ-2020-082) ("Glen Letter"); letter from Eugene Kelly to Vanessa Countryman, Secretary, Commission, dated December 13, 2020 ("Kelly Letter").

[316]    See, e.g., Ideanomics Letter at 4; Goodman and Olson Letter at 2-3; Capital Research and Management Company Letter at 2; UAW Letter at 3; California State Treasurer Letter.

[317]    See UAW Letter at 3.

revenue-generating compliance solution.[318]  Another argues that the Board Recruiting Service

Proposal would divert funds from the efficient administration of the Exchange, reducing the

order and efficiency of markets that the Commission was created to promote.[319]  Finally, another

commenter opposing the proposal argues that the proposed complimentary recruiting service

would be an extension of the "unlawful" and "discriminatory" quota policy contained in the

Board Diversity Proposal by seeking to move Nasdaq-listed companies towards intentionally

implementing "discriminatory hiring practices."[320]

In response, the Exchange states that it is not generating any revenue from its partnership

with the proposed provider of the board recruiting service, Equilar, and instead is offering these

services to companies at its own expense.[321]  The Exchange also states that the complimentary

service does not introduce any conflict of interest because the Exchange is not in the board

recruitment services business.[322]  In addition, the Exchange states that there is no requirement

that listed companies take advantage of the complimentary service, and there is no requirement

that they pay for the service if they choose to utilize it.[323]  Moreover, the Exchange states that

whether a listed company takes advantage of the complimentary board recruiting service has no

relationship to how, or whether, the Exchange would enforce proposed Rule 5605(f), and there

---

[318]     See Toomey Letter at 3.

[319]     See Glen Letter.

[320]     See Kelly Letter.

[321]     See Nasdaq Response Letter II at 20-21.

[322]     See id. at 21.

[323]     See id. at 21-22.

are no circumstances under which the Exchange would penalize a company solely for its decision to not take advantage of a complimentary board recruiting service.[324]

The Board Recruiting Service Proposal is consistent with the requirements of Section 6 of the Act, including Sections 6(b)(4) and 6(b)(5).[325]  The proposal is designed to provide for the equitable allocation of reasonable dues, fees, and other charges among Exchange members, issuers, and other persons using the Exchange's facilities, and is not designed to permit unfair discrimination between customers, issuers, brokers, or dealers.  And the proposal is consistent with Section 6(b)(8)[326] because it does not impose any burden on competition not necessary or appropriate in furtherance of the purposes of the Act.

The Commission finds that it is consistent with the Act for the Exchange to provide a one-year complimentary board recruiting service to Eligible Companies.[327]  The board recruiting service would provide access to a network of board-ready diverse candidates, allowing companies to identify and evaluate such candidates.  The board recruiting service would also assist Eligible Companies that choose to use the service to increase diverse representation on

---

[324]    See id.

[325]    15 U.S.C. 78f, 78f(b)(4)-(5).  In approving the Board Recruiting Service Proposal, the Commission has considered the proposed rule's impact on efficiency, competition, and capital formation. See 15 U.S.C. 78c(f).

[326]    15 U.S.C. 78f(b)(8).

[327]    The Commission has previously approved the provision of complimentary services by the Exchange to varying categories of eligible listed companies.  See, e.g., Securities Exchange Act Release Nos. 65963 (December 15, 2011), 76 FR 79262 (December 21, 2011) (SR-NASDAQ-2011-122) and 72669 (July 24, 2014), 79 FR 44234 (July 30, 2014) (SR-NASDAQ-2014-058).

their boards and would help Eligible Companies to meet (or exceed, in the case of a Company with a Smaller Board) the proposed diversity objectives under the Board Diversity Proposal.[328]

It is also consistent with the Act for the Exchange to offer the complimentary board recruiting service only to Eligible Companies because, by definition, those companies do not have a specified number of Diverse directors and therefore may have a greater interest or feel a greater need to identify diverse board candidates by utilizing the board recruiting service than non-Eligible Companies.[329]  The provision of the service only to Eligible Companies is thus an equitable allocation of complimentary services and does not unfairly discriminate among issuers.[330]

Further, offering the one-year complimentary service would help the Exchange compete to attract and retain listings, particularly in light of the diversity objective in the separately approved Board Diversity Proposal.  The Exchange has indicated that individual listed companies would not be given specially negotiated packages of products or services to list, or remain listed; that no other company will be required to pay higher fees as a result of the proposal; and that providing the complimentary board recruiting service will have no impact on

---

[328]    See Amendment No. 1 to the Board Recruiting Service Proposal at 10.

[329]    See id. at 13-14.

[330]    The Commission has previously found that the specific needs of differently situated categories of listings (e.g., new listings, transfers, larger capitalized issuers) is a sufficient basis for providing additional services, or varying the types of services provided, to different categories of listings, and thereby does not raise unfair discrimination issues under the Act.  See, e.g., Securities Exchange Act Release Nos. 78806 (September 9, 2016), 81 FR 63523 (September 15, 2016) (order approving SR-NASDAQ-2016-098); 72669 (July 24, 2014), 79 FR 44234 (July 30, 2014) (order approving SR-NASDAQ-2014-058).

the resources available for its regulatory programs.[331]  No commenter has provided any reason to doubt these indications as to how the service will be run.  Accordingly, the proposal reflects the current competitive environment for listings among national securities exchanges,[332] does not impose any unnecessary or inappropriate burden on competition between individual listed companies, and is therefore appropriate and consistent with Section 6(b)(8) of the Act.[333]

In addition, describing in the Exchange's rules the products and services available to listed companies and their associated values also adds greater transparency to the rules and applicable fees and will ensure that individual listed companies are not given specially negotiated packages of products or services to list, or remain listed, that would raise unfair discrimination issues under the Act.

Finally, with respect to concerns that the Exchange's offering of the board recruiting service may create a conflict of interest or divert funds from the efficient administration of the Exchange, the Exchange has indicated that providing the proposed complimentary service would have no impact on the resources available for its regulatory programs and that it will not generate any revenue from the service, nor is it in the board recruitment services business.[334]  The Exchange further explains that utilization of the board recruiting service will not impact the manner in which it enforces compliance with the Board Diversity Proposal.[335]  With respect to a concern that the recruiting service may influence a Nasdaq-listed company's hiring practice, the

---

[331]     See Amendment No. 1 to the Board Recruiting Service Proposal at 12, 15.

[332]     See supra notes 56-59 (describing this competitive environment for exchange listings).

[333]     15 U.S.C. 78f(b)(8).

[334]     See supra notes 321-322 and 331 and accompanying text.

[335]     See supra note 324 and accompanying text.

Exchange has emphasized that utilization of the service would be optional, and no company would be required to use it.[336]  Here again, commenters have provided no reason for the Commission to doubt the Exchange's indication about how the service will be run.  Accordingly, the Exchange's representations and the optionality of the board recruiting service are sufficient to address commenters' concerns that the provision of the complimentary service may create a conflict of interest, divert funds from the efficient administration of the Exchange, or unduly influence listed companies.

III.     Conclusion

IT IS THEREFORE ORDERED, pursuant to Section 19(b)(2) of the Act,[337] that: (1) the proposed rule change (SR-NASDAQ-2020-081), as modified by Amendment No. 1, be, and hereby is, approved, and (2) the proposed rule change (SR-NASDAQ-2020-082), as modified by Amendment No. 1, be, and hereby is, approved.

By the Commission.

J. Matthew DeLesDernier
Assistant Secretary

---

[336]     See supra note 310 and accompanying text.

[337]     15 U.S.C. 78s(b)(2).