**No. 21-60626**

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

**ALLIANCE FOR FAIR BOARD RECRUITMENT,
NATIONAL CENTER FOR PUBLIC POLICY RESEARCH,**

*Petitioners,*

**v.**

**SECURITIES AND EXCHANGE COMMISSION,**

*Respondent.*

_____

On Petition for Review of an Order of the
United States Securities and Exchange Commission
No. 34-92590

_____

**OPENING BRIEF FOR PETITIONER
ALLIANCE FOR FAIR BOARD RECRUITMENT**

_____

C. Boyden Gray
Jonathan Berry
  *Counsel of Record*
R. Trent McCotter
Michael Buschbacher
Jordan E. Smith
BOYDEN GRAY & ASSOCIATES
801 17th Street NW., Suite 350
Washington, DC 20006
202-809-5613
berry@boydengrayassociates.com
*Counsel for Petitioner*

## CERTIFICATE OF INTERESTED PERSONS

### *Alliance for Fair Board Recruitment v. Securities and Exchange Commission*

No. 21-60626

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Local Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1. Petitioner Alliance for Fair Board Recruitment is a non-profit membership corporation and has no parent corporations or subsidiaries.

2. The Securities and Exchange Commission is a federal agency.

3. C. Boyden Gray, Jonathan Berry, R. Trent McCotter, Michael Buschbacher, and Jordan E. Smith of Boyden Gray & Associates—*Counsel for Petitioner Alliance for Fair Board Recruitment.*

4. Michael A. Conley, Daniel E. Matro, Vanessa Ann Countryman, and Tracy A. Hardin of the Securities and Exchange

i

Commission—*Counsel for Respondent Securities and Exchange Commission.*

5. Allyson N. Ho, Bradley G. Hubbard, Amir C. Tayrani, and Amalia E. Reiss of Gibson, Dunn & Crutcher LLP; John Zecca, Jeffrey S. Davis, John Yetter, and Joanne Pedone of The Nasdaq Stock Market L.L.C.; and Burt M. Rublin, Stephen J. Kastenberg, Paul Lantieri III, Peter F. Andrews, and Seth D. Berlin of Ballard Spahr LLP—*Counsel for Intervenor Nasdaq Stock Market, L.L.C.*

6. Aditya Dynar, Margaret A. Little, and Sheng Li of New Civil Liberties Alliance—*Counsel for Petitioner National Center for Public Policy Research.*

Dated: November 22, 2021

/s/ Jonathan Berry
Jonathan Berry
*Counsel of Record for Petitioner*

## REQUEST FOR ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34(a) and (f) and Fifth Circuit Rule 28.2.3, Petitioner Alliance for Fair Board Recruitment respectfully requests oral argument. This case involves novel and complex issues of constitutional and statutory interpretation and administrative law as well as a lengthy record. Oral argument would substantially aid the Court in its resolution of the case.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .........................................i

TABLE OF CONTENTS ...........................................................iv

TABLE OF AUTHORITIES.....................................................vi

JURISDICTIONAL STATEMENT ............................................x

STATEMENT OF THE ISSUES...............................................x

INTRODUCTION.....................................................................1

STATEMENT OF THE CASE ...............................................2

    I.    Statutory and Regulatory Background...................................2

    II.    Alliance for Fair Board Recruitment's Comment...................4

    III.    The SEC's Order Approving the Board Diversity Proposal...7

SUMMARY OF THE ARGUMENT ...........................................9

ARGUMENT .......................................................................11

    I.    Petitioner Has Standing. .....................................................11

        A.    Regulated Entity. .........................................................11

        B.    Shareholders And Current Directors. .........................12

        C.    Disadvantaged Director Candidates. ..........................17

        D.    Stigmatized Minority Director.....................................19

    II.    The Order and Rule Violate The Fifth Amendment To The United States Constitution. ..................................................20

        A.    The Order And Rule Are Subject To Constitutional Scrutiny. ......................................................................21

| | B. | The Order And Rule Violate The Fifth Amendment's Equal-Protection Principles. ................24 |
| III. | | The Order and Rule Violate The First Amendment To The United States Constitution. .................................................. 42 |
| | A. | The Quota-Or-Explain Rule Triggers Strict Scrutiny. ......................................................................44 |
| | B. | The Demographic Disclosure Rule Triggers Strict Scrutiny. ......................................................................48 |
| | C. | Neither Disclosure Rule Satisfies Strict Scrutiny.......50 |
| IV. | | Nasdaq's Rule Flunks The Exchange Act's Tests. ...............54 |
| | A. | The SEC Refused To Rely On Nasdaq's Social Science Surveys About Diversity.................................54 |
| | B. | None Of The SEC's Purported Justifications Is Supported By Substantial Evidence.............................58 |

CONCLUSION ......................................................................... 68

CERTIFICATE OF COMPLIANCE......................................... 69

CERTIFICATE OF SERVICE.................................................. 70

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adarand Constructors, Inc. v. Peña*, 515 U.S. 200 (1995) .......... 18, 25, 28

*American Meat Institute v. U.S. Department of Agriculture*, 760 F.3d 18 (D.C. Cir. 2014) ................................................................ 45, 52

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ......................................... 60

*Bolling v. Sharpe*, 347 U.S. 497 (1954) .................................................. 22

*Bras v. California Public Utilities Commission*, 59 F.3d 869 (9th Cir. 1995) .............................................................................................. 40

*Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288 (2001) ............................................................................. 23

*Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961) ............. 22

*Business Roundtable v. SEC*, 905 F.2d 406 (D.C. Cir. 1990) ..... 59, 61, 63

*Business Roundtable v. SEC*, 647 F.3d 1144 (D.C. Cir. 2011) ......... 58, 60

*Corrosion Proof Fittings v. EPA*, 947 F.2d 1201 (5th Cir. 1991) ............ 58

*Center for Biological Diversity v. EPA*, 937 F.3d 533 (5th Cir. 2019) .................................................................................................. 11

*Dean v. City of Shreveport*, 438 F.3d 448 (5th Cir. 2006) ...................... 32

*Department of Commerce v. New York*, 139 S. Ct. 2551 (2019) ........ 27, 34

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187 (2d Cir. 2009) ................................ 61

*Faculty, Alumni & Students Opposed to Racial Preferences v. N.Y. Univ.*, 11 F.4th 68 (2d Cir. 2021) ........................................................ 18

*Gratz v. Bollinger*, 539 U.S. 244 (2003) ................................................ 17

*Grutter v. Bollinger*, 539 U.S. 306 (2003) ............................................. 20

*Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241 (1964)........ 32

*Iancu v. Brunetti*, 139 S. Ct. 2294 (2019) ............................................. 48

*Intercontinental Industries, Inc. v. American Stock Exchange*, 452 F.2d 935 (5th Cir. 1971).............................................................. 21, 22

*International Dairy Foods Association v. Amestoy*, 92 F.3d 67 (2d Cir. 1996)........................................................................................ 52

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992).............................. 12

*Mayor of Baltimore v. Azar*, 973 F.3d 258, 292 (4th Cir. 2020) ............ 42

*Meland v. Weber*, 2 F.4th 838 (9th Cir. 2021)............................ 14, 15, 16

*Michigan v. EPA*, 576 U.S. 743 (2015).................................................... 66

*Monterey Mechanical Co. v. Wilson*, 125 F.3d 702 (9th Cir. 1997) .. 29, 39

*Moose Lodge No. 107 v. Irvis*, 407 U.S. 163 (1972)................................ 23

*NASDAQ OMX Grp., Inc. v. UBS Securities, LLC*, 770 F.3d 1010 (2d Cir. 2014) .................................................................................. 62

*National Association of Manufacturers v. SEC*, 800 F.3d 518 (D.C. Cir. 2015)........................................................................ 45, 47, 49, 53

*National Institute of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018)...................................................................... 43, 48, 50

*National Treasury Employees Union v. U.S. Department of Treasury*, 25 F.3d 237 (5th Cir. 1994) ................................................ 12

*Northeastern Fla. Chapter of Associated Gen. Contractors of America v. City of Jacksonville, Fla.*, 508 U.S. 656 (1993) .... 18, 27, 28

*Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701 (2007) ................................................................. 31

*Regents of University of California v. Bakke*, 438 U.S. 265 (1978) .. 18, 28

*Rice v. Cayetano*, 528 U.S. 495 (2000) ..................................................... 25

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47 (2006) ....................................................................................... 43

*SEC v. Koenig*, 469 F.2d 198 (2d Cir. 1972) .......................................... 60

*Sessions v. Morales-Santana*, 137 S. Ct. 1678 (2017) ................. 37, 38, 40

*Shaw v. Reno*, 509 U.S. 630 (1993) ......................................................... 25

*Shelley v. Kraemer*, 334 U.S. 1 (1948) ..................................................... 22

*SmithKline Beecham Corp. v. Abbott Laboratories*, 740 F.3d 471 (9th Cir. 2014) ...................................................................................... 37

*Torch Liquidating Trust ex rel. Bridge Associates L.L.C. v. Stockstill*, 561 F.3d 377 (5th Cir. 2009) ............................................. 50

*TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438 (1976) ................. 60

*United States v. Virginia*, 518 U.S. 515 (1996) ........................... 37, 38, 40

*W.H. Scott Construction Co. v. City of Jackson, Mississippi*, 199 F.3d 206 (5th Cir. 1999) ....................... 13, 16, 19, 28, 29, 30, 36, 37, 39

*Wygant v. Jackson Board of Education*, 476 U.S. 267 (1986) ............... 44

## U.S. CONSTITUTION

U.S. Const. amend. I .......................................... 1, 6, 10, 42, 45, 46, 47, 49

U.S. Const. amend. V ...................................................................... 20, 41

## PUBLIC LAWS AND U.S. CODE

15 U.S.C. § 78 ...............................................2, 6, 23, 54, 55, 57, 58, 63, 65

42 U.S.C. § 1981 ............................................................................ 6, 17, 36

## REGULATORY MATERIALS

85 Fed. Reg. 80,472 (Dec. 11, 2020) .................2, 13, 27, 51, 59, 61, 62, 64

86 Fed. Reg. 44,424 (Aug. 12, 2021)…....7, 8, 9, 13, 14, 15, 16, 21, 24, 26, 27, 29, 30, 32, 38, 39, 40, 41, 42, 46, 51, 52, 55, 56, 57, 58, 61, 62, 64, 65, 67

Alliance for Fair Board Recruitment, *Comment Letter on Proposed Rule Change to Adopt Listing Rules Related to Board Diversity* (Apr. 6, 2021)...................................................5, 6, 16, 24, 26, 36, 40, 41, 58, 67

Nasdaq, *Comments on Notice of Filing of Proposed Rule Change*, File No. SR-NASDAQ-2020-081 (Feb. 5, 2021)…....4, 14, 21, 30, 31, 33, 34, 35, 36, 38, 39, 41, 42, 45, 46, 50, 52, 53

Nasdaq, *Response to Comments and Notice of Filing of Amendment No. 1*, File No. SR-NASDAQ-2020-081 (Feb. 26, 2021)...................................................................3, 4, 12, 14, 27, 31, 32

## MISCELLANEOUS

Administrative Conference of the United States, *Severability in Agency Rulemaking* (June 29, 2019), https://www.acus.gov/recommendation/severability-agency-rulemaking.......................................................................................... 41

## JURISDICTIONAL STATEMENT

The Securities and Exchange Commission approved the Nasdaq Stock Market L.L.C.'s ("Nasdaq") rule change on August 6, 2021. 86 Fed. Reg. 44,424 (Aug. 12, 2021), JA1. The SEC acted under § 19(b)(2)(C) of the Securities Exchange Act ("Exchange Act"), 15 U.S.C. § 78s(b)(2)(C). 86 Fed. Reg. at 44,445, JA22. The Court has jurisdiction to review such an order pursuant to § 25(a) of the Exchange Act. 15 U.S.C. § 78y(a). The petition was filed timely on August 9, 2021.

## STATEMENT OF THE ISSUES

(1)    Whether the SEC's order and Nasdaq's rule violate the Fifth Amendment's equal-protection principles.

(2)    Whether the SEC's order and Nasdaq's rule violate the First Amendment's free-speech clause.

(3)    Whether the SEC's order approving Nasdaq's rule is supported by substantial evidence and was issued in accordance with statutory authority.

## INTRODUCTION

Petitioner challenges the SEC's order approving a new rule requiring almost every Nasdaq-listed company to impose "diversity" quotas for certain minimum numbers of women, racial minorities, and sexual minorities on those companies' boards of directors. Any company that does not meet these quotas must file an "explanation" (really, an apology) for why it failed to meet them.

The SEC's order violates the constitutional right to equal protection, as it encourages discrimination against potential board members and also by current board members and shareholders; and it stigmatizes board members who identify as one of the preferred demographics. The order also violates the First Amendment by demanding disclosure of "controversial" information, which the Supreme Court has prohibited absent compelling justifications and narrow tailoring. Finally, the SEC lacked statutory authority to issue the order, which seeks to regulate demographics through the guise of "financial disclosures."

For these reasons, and more below, the Court should vacate the SEC's order and the Nasdaq rule.

## STATEMENT OF THE CASE

### I.   STATUTORY AND REGULATORY BACKGROUND.

A self-regulatory organization ("SRO") may propose a change in its rules by filing a proposal with the SEC pursuant to § 19(b)(1) of the Securities Exchange Act ("Exchange Act"). 15 U.S.C. § 78s(b)(1). Section 19(b)(2)(C)(i) of the Exchange Act provides that the SEC "shall approve" a proposal if it finds that the proposed rule is consistent with the requirements of the Exchange Act and the rules applicable to the SRO. 15 U.S.C. § 78s(b)(2)(C)(i).

On December 1, 2020, The Nasdaq Stock Market L.L.C. ("Nasdaq") filed a proposed rule change to adopt listing rules related to board "diversity." This proposal was published for comment in the Federal Register on December 11, 2020. *Self-Regulatory Organizations; The Nasdaq Stock Market LLC; Notice of Filing of Proposed Rule Change To Adopt Listing Rules Related to Board Diversity*, 85 Fed. Reg. 80,472 (Dec. 11, 2020), JA689.

On February 26, 2021, Nasdaq filed an amended proposal ("Board Diversity Proposal"), which superseded the December 1, 2020, version and required each Nasdaq-listed company, subject to exceptions for small

and foreign firms, (A) to have, or explain why it does not have, at least one director who "self-identifies her gender as a woman, without regard to the individual's designated sex at birth" (the "Female Director Rule"); and (B) to have, or explain why it does not have, at least one director who self-identifies as "Black or African American, Hispanic or Latinx [*sic*], Asian, Native American or Alaska Native, Native Hawaiian or Pacific Islander, or Two or More Races or Ethnicities," or as "LGBTQ+," defined as "lesbian, gay, bisexual, transgender, or as a member of the queer community" (the "Minority Director Rule"). Nasdaq, *Response to Comments and Notice of Filing of Amendment No. 1* at 118–19, File No. SR-NASDAQ-2020-081 (Feb. 26, 2021) ("Nasdaq Amendment Letter"), JA315–16. Foreign firms would have "flexibility" to meet the latter requirement by adding a second woman instead of a racial or sexual minority. *Id.* at 67, JA264.

Any firm that fails to comply would be delisted from the exchange. These requirements were embodied in proposed Rule 5605(f).

The Board Diversity Proposal also included a board diversity disclosure requirement in proposed Rule 5606, which would require each Nasdaq-listed company, subject to certain exceptions, to provide

3

statistical information on the directors' self-identified sex, race, and sexual-orientation status. *Id.*

In February 2021, Nasdaq also filed two letters responding to arguments that the Board Diversity Proposal would (*inter alia*) violate statutory anti-discrimination laws and the Constitution's protections for free speech and equal protection. Nasdaq, *Comments on Notice of Filing of Proposed Rule Change*, File No. SR-NASDAQ-2020-081 (Feb. 5, 2021) ("Nasdaq Response Letter"), JA610–37; Nasdaq Amendment Letter at 1–49, JA198–246.

## II. ALLIANCE FOR FAIR BOARD RECRUITMENT'S COMMENT.

Petitioner Alliance for Fair Board Recruitment is a non-profit membership organization incorporated under the Texas Business Organizations Code and located in Texas. The Alliance was formed to defend the civil rights of director candidates, including their right to equal protection under the law.

One of Petitioner's members is a Nasdaq-listed company subject to Nasdaq's rules. *See* Appendix Ex. 2 (filed simultaneously with this brief), Affidavit of Company Doe ¶¶ 4–5. Petitioner's members also include board candidates who do not meet Nasdaq's preferred sex, race, or sexual

4

orientation criteria—and thus will face an uneven playing field. *See* Exs. A–C (filed separately under seal by Court Order dated November 18, 2021). Petitioner's members also include shareholders and current directors who are entitled to and intend to vote for board members of Nasdaq-listed entities but object to being compelled or encouraged to discriminate on the basis of protected characteristics. Ex. A (under seal), ¶¶ 22–32; Ex. C (under seal), ¶¶ 25–37; Ex. D (under seal), ¶¶ 21–29. One of these directors identifies as one of Nasdaq's preferred demographics, but this member suffers stigma from Nasdaq's and the SEC's actions, which strongly imply that certain races "cannot meaningfully compete for board positions without Nasdaq's assistance" and thus "perpetuate[] harmful stereotypes." Ex. E (under seal), ¶ 17.

On April 6, 2021, Petitioner filed a comment in response to the Board Diversity Proposal. Alliance for Fair Board Recruitment, *Comment Letter on Proposed Rule Change to Adopt Listing Rules Related to Board Diversity* (Apr. 6, 2021) ("Alliance Comment"), JA45. Petitioner outlined legal shortcomings of the Board Diversity Proposal, including:

- *First*, the academic research cited by Nasdaq did not support its contention that board diversity benefitted company

performance or furthered the purposes of the Exchange Act. *Id.* at 7–30, JA55–78; 15 U.S.C. § 78f(b)(5).

- *Second*, the Proposal was not a mere aspirational target but in fact was a mandate, in light of the reputational harms that can result from being compelled to publicly explain why a company did not satisfy Nasdaq's diversity quotas. Alliance Comment 31–34, JA79–82. Petitioner supported this with an expert affidavit from James Copland, which went unrebutted in the record. *Id.* at 107–10, JA151–54.

- *Third*, the Proposal violated federal civil rights statutes, namely, Title VII of the Civil Rights Act and 42 U.S.C. § 1981. *Id.* at 56–57, JA104–05.

- *Fourth*, the Proposal violated the U.S. Constitution's equal-protection principles and the First Amendment. *Id.* at 59–77, JA107–25.

Despite these objections, the SEC approved Nasdaq's Board Diversity Proposal without modification, as summarized next.

## III.  THE SEC'S ORDER APPROVING THE BOARD DIVERSITY PROPOSAL.

On August 6, 2021, the SEC approved the Board Diversity Proposal, rendering it a formal Nasdaq "Rule." *Self-Regulatory Organizations; The Nasdaq Stock Market LLC; Order Approving Proposed Rule Changes, as Modified by Amendment No. 1, to Adopt Listing Rules Related to Board Diversity and to Offer Certain Listed Companies Access to a Complimentary Board Recruiting Service*, 86 Fed. Reg. 44,424 (Aug. 12, 2021) (hereinafter, "Order"), JA1–22.

In the Order, the SEC recounted some of the concerns and counterarguments presented to the Commission during the notice and comment period—then explained why the SEC was siding with Nasdaq.

In response to objections that the comply-or-explain framework functioned like a diversity mandate and imposed a sex- or race-based quota, Nasdaq asserted that the Board Diversity Proposal merely set forth "aspirational diversity objectives" that needed only to be explained rather than met. *Id.* at 44,428, JA5. The SEC concluded that, while the Board Diversity Proposal may "encourage" companies to increase their boards' diversity, it did "not mandate any particular board composition." *Id.*

In addition, some commenters objected that the required "explanation" could cause "reputational, legal, or other harm," and Nasdaq had responded that it would not evaluate the substance of any company's explanation. *Id.* The SEC agreed with Nasdaq's arguments and further noted that companies that disagreed could simply de-list themselves from Nasdaq altogether. *Id.* The SEC stated that Nasdaq is merely responding to demand from institutional investors and activists for companies to have increased diversity on their boards. *Id.*

Furthermore, some commenters decried the lack of data linking board diversity with enhanced company performance, and Nasdaq had responded that "the weight of empirical evidence" supports the position that various corporate benefits are linked to board diversity. *Id.* at 44,432, JA9. Nasdaq had also claimed that the Exchange Act did not require it to show that its listing rules enhanced financial performance of its listed companies and again emphasized that its proposed rule was not a diversity *mandate*. *Id.* The SEC acknowledged that the studies relied on by Nasdaq to demonstrate the benefits of board diversity were "inconclusive" and thus, at best, "mixed." *Id.* But the SEC echoed Nasdaq's argument that the Board Diversity Proposal did not mandate

any board composition and was therefore distinct from the mandates imposed in some of the referenced studies. *Id.*

In response to objections that the Board Diversity Proposal violated equal-protection and free-speech rights guaranteed by the Constitution, the SEC adopted Nasdaq's argument that the Proposal is not subject to constitutional scrutiny, even though it was approved by a federal agency (the SEC). *Id.* at 44,439–44,440, JA16–17. The SEC spent only one sentence explaining why the Proposal, if it were found subject to the Constitution, would survive heightened scrutiny. *Id.* at 44,440, JA17.

The SEC therefore fully approved Nasdaq's Board Diversity Proposal, rendering it a final Nasdaq rule (the "Rule.") Shortly after the SEC's Order approving the Rule was released, Petitioner filed its petition in this Court.

## SUMMARY OF THE ARGUMENT

The Court should vacate the Order and the Rule in their entireties.

*First*, the Order and Rule violate the constitutional right to equal protection. Potential board members who are not among the government's preferred demographics will face an uneven playing field. Current board members and shareholders will be encouraged to

9

discriminate in their picks for directors. And board members who identify as one of the preferred demographics are stigmatized by the implication that they could not succeed absent the SEC and Nasdaq's help.

By encouraging discrimination on protected bases, the order triggers heightened scrutiny. Nasdaq insisted there is a compelling government interest in companies making more money—a risible basis for discrimination, but one also unsupported by the record given that the SEC declined to find that diversity improves bottom lines. There is also no tailoring whatsoever to this rule—it uses the bluntest mechanism available: the quota. For its part, the SEC offered only one sentence of explanation as to why the rule is narrowly tailored and furthers *any* government interest—an implicit recognition of its unconstitutionality.

*Second*, the Order and Rule violate the First Amendment by demanding disclosure of "controversial" information, which the Supreme Court has prohibited absent compelling justifications and narrow tailoring. Affirmative action is inherently controversial. The SEC and Nasdaq say they will not judge a company's "explanation" for failure to comply with the quotas. But if they do not care what the explanation is, the only reason to demand one is to shame those companies—and *only*

10

those companies—that do not agree with the government's and Nasdaq's views.

*Third*, the SEC lacked statutory authority to issue the Order because there is no valid financial reason to demand diversity disclosures or quotas when the SEC itself declined to find that board "diversity" actually improves companies' finances. Requiring controversial speech simply because a vocal portion of the moneyed class demands it is not an acceptable statutory basis for regulating.

## ARGUMENT

## I.    PETITIONER HAS STANDING.

At the outset, to avoid any doubts about the Court's jurisdiction, Petitioner establishes multiple, independent bases for its standing to bring this action, which undoubtedly is "germane" to Petitioner's purpose of ensuring fair and equal rights for board members and candidates. *See, e.g., Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 536 (5th Cir. 2019).

### A.    REGULATED ENTITY.

One of Petitioner's members is a public company traded on Nasdaq's exchange, is directly regulated by the Nasdaq Rule, and incurs financial costs for compliance, as well as the risk of penalties for non-compliance. Appendix Ex. 2 (filed simultaneously with this brief),

Affidavit of Company Doe ¶¶ 4–5[1]; *see* Nasdaq Amendment Letter at 30, JA227 (acknowledging "the costs" imposed on listed companies for completing disclosures, searching for candidates, and from disruption to board activities).

Where "the plaintiff is himself an object of the action (or forgone action) at issue …, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992).

Because Petitioner has standing to assert the standing of its members, this alone is sufficient to demonstrate Article III standing.

### B.    SHAREHOLDERS AND CURRENT DIRECTORS.

Petitioner also has members who own shares of Nasdaq-listed companies subject to the Rule and who intend to vote for board directors of those companies. Ex. A (under seal), ¶¶ 22–32; Ex. C (under seal),

---

[1] The Court's opinion in *National Treasury Employees Union v. U.S. Department of Treasury*, 25 F.3d 237, 242 (5th Cir. 1994), allows an organizational petitioner whose members fear identifying themselves to the government to demonstrate standing by submitting a "Jane Doe" affidavit from a member explaining how it would be injured by the government action at issue. Company Doe rightly fears that identifying itself to the SEC and Nasdaq would risk retaliation. Appendix Ex. 2, ¶ 3.

¶¶ 25–37; Ex. D (under seal), ¶¶ 21–29. The Rule causes those members an equal-protection injury by encouraging or requiring them to vote on the basis of protected categories like race and sex.

This Court has long held that, for purposes of establishing an equal-protection injury for standing, "the relevant question is not whether a [law] *requires* the use of [protected classifications], but whether it *authorizes or encourages* them." *W.H. Scott Const. Co. v. City of Jackson, Miss.*, 199 F.3d 206, 215 (5th Cir. 1999) (quotation marks omitted; emphases added). There can be no doubt that the Rule, at the very least, encourages shareholders to discriminate in their votes for board members. If it did not, then the Rule serves no purpose at all because otherwise it could never increase the number of minorities and women. Indeed, the SEC admitted as much: "the proposal may have the effect of *encouraging* some Nasdaq-listed companies to increase" the number of women and minorities on their boards. 86 Fed. Reg. at 44,428, JA5. Nasdaq likewise admitted that the Rule is "a regulatory impetus to drive meaningful and systemic change in board diversity," 85 Fed. Reg. at 80,496, JA713, and that "*absent encouragement*, progress toward increased board diversity has been demonstrably slow, and … regulatory

13

action has proven effective in removing barriers and increasing board diversity," 86 Fed. Reg. at 44,430 n.89, JA7 n.89; *see also* Nasdaq Amendment Letter at 11, 16, 26, 27, 28, JA208, 213, 223, 224, 225.

To be sure, in other places, Nasdaq insisted the Rule does not encourage discrimination based on race or sex, but instead merely "promotes" hiring decisions based on race or sex—as if that were a meaningful difference. Nasdaq Response Letter at 17, 18, 20, 22, 23, JA626, 627, 629, 631, 632. In the view of the SEC and Nasdaq, the Rule does not encourage discrimination *against* anyone—but rather encourages discrimination in *favor* of certain people, and the SEC and Nasdaq think nobody will realize that this means the Rule (at the very least) *encourages* discrimination *against* people who do not have the favored characteristics.

That discriminatory goal lands directly on shareholders, who are almost always the ones who elect board members. The Ninth Circuit recently addressed a similar California law calling for certain minimum numbers of women on boards, and the court unanimously held that standing exists for the voting shareholders of those companies subject to the law. *See Meland v. Weber*, 2 F.4th 838, 844–46 (9th Cir. 2021). "As a

14

general rule, shareholders are responsible for electing directors at their annual meetings." *Id.* For the quota law "to have any effect at all," it "must therefore compel shareholders to act," meaning shareholders were encouraged to make decisions on the basis of a protected category and therefore were proper parties to challenge the law. *Id.* at 845–46.

The same is true here. *See* <u>86 Fed. Reg. at 44,428</u>, JA5; <u>86 Fed. Reg. at 44,430</u> n.89, JA7 n.89. Moreover, it is irrelevant whether a single shareholder has enough shares to swing the outcome of a board election. A "reasonable shareholder deciding how to vote could not assume that other shareholders would vote to elect the requisite number of female [or minority] board members. Therefore, each shareholder would understand that a failure to vote for a female [or minority] would contribute to the risk of putting the corporation in violation of [law] and exposing it to sanctions." *Meland*, <u>2 F.4th at 846</u>. Indeed, that was the entire purpose of the law in *Meland*, as it is here: "if each individual shareholder felt free to vote for a male [or non-minority] board member, [the law] could not achieve its goal." *Id.*

The SEC and Nasdaq may claim that the Rule has a "quota-or-explain" feature that allegedly renders it an "aspirational diversity

objective[]" that does not require consideration of protected statuses. 86 Fed. Reg. at 44,428, 44,439, JA5, 16. But that would be sophistry. As a practical matter, the ability to "explain" why a firm did not satisfy Nasdaq's quotas is no option at all. No self-regarding company would raise its hand and single itself out for public shaming and moral opprobrium. *See* Alliance Comment 31–34, 107–10, JA79–82, 151–54; *see also* Part II.B.1, *infra*. In any event, *Meland* held it irrelevant whether a law truly "require[s]" "any individual shareholder to vote for" nominees based on a protected classification, because so long as the law even *encourages* such behavior, it creates an equal-protection injury for the shareholders. 2 F.4th at 846. And this Court's precedent is exactly the same. *Scott Const.*, 199 F.3d at 216. "Any one of these techniques induces an employer to hire with an eye toward meeting a numerical target. As such, they can and surely will result in individuals being granted a preference because of their race." *Id.* (alteration and quotation marks omitted).

A similar injury is inflicted on Petitioner's members who are *current board directors* from Nasdaq-listed companies, who will be compelled or encouraged to discriminate on the basis of protected

characteristics when choosing other board members (and thus have an equal-protection injury like the shareholders above), and who also fear legal liability under laws such as 42 U.S.C. § 1981 for engaging in racial discrimination in contracting. Ex. D (under seal), ¶¶ 19–20; Ex. E (under seal), ¶¶ 19–20.

For these reasons, Petitioner's shareholder members have suffered and will suffer injuries in the form of encouraging them to vote based on protected categories.

### C.    DISADVANTAGED DIRECTOR CANDIDATES.

Petitioner's members also include candidates for director positions who will be at a disadvantage because they do not identify as one of the SEC's and Nasdaq's preferred groups. *See* Exs. A–C (under seal). These candidates are "able and ready" to apply for such positions, but the Rule "prevents them from doing so on an equal basis." *Gratz v. Bollinger*, 539 U.S. 244, 262 (2003). They therefore have standing.

These candidates have backgrounds that qualify them for Nasdaq board positions (indeed, one previously served as a board member for a Nasdaq-listed company but was replaced by a woman as a result of pressure to increase the number of women on the board, *see* Ex. B (under

17

seal), ¶¶ 12–13), but that is not a requirement. They "need not allege that [they] would have obtained the benefit but for the barrier in order to establish standing." *Ne. Fla. Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993). Rather, the "injury in fact" in such a case "is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Id.*; *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 211 (1995) (holding that a barrier that favors one race over another "prevents the plaintiff from competing on an equal footing" and that unfair process alone is a Fourteenth Amendment violation); *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 281 n.14 (1978) (identifying "an injury, apart from failure to be admitted, in the University's decision not to permit Bakke to compete for all 100 places in the class, simply because of his race"); *see also Faculty, Alumni & Students Opposed to Racial Preferences v. N.Y. Univ.*, 11 F.4th 68, 78–79 (2d Cir. 2021) (Menashi, J., concurring) (summarizing and applying authorities).

This Court has recognized the same rule: "In equal protection cases challenging affirmative action policies, 'injury in fact' is defined as the inability to compete on an equal footing in the bidding process. For

[plaintiff's] injury to be concrete and particularized, it need not prove that it lost contracts because of the Department's Policy; [plaintiff] need only prove that the Special Notice forces it to compete on an unequal basis." *Scott Const.*, 199 F.3d at 213. Because the plaintiff was willing and ready to seek contracts, the Court found standing. "[A]s long as [race and sex] preferences are used in the Department's Special Notice, [plaintiff] is threatened with imminent injury. In this way, standing's other prerequisites, causation and redressability, are also established, for removing the preferences that cause [plaintiff] to compete on an unequal basis will alleviate that 'injury in fact.'" *Id.* at 215.

These director candidates face an unequal playing field and therefore have standing.

## D. STIGMATIZED MINORITY DIRECTOR.

Petitioner's members also include a current board director of a Nasdaq-listed company who qualifies as "diverse" under the Rule. This director is injured because he believes he will be labeled an affirmative-action hire, rather than judged by the content of his character and experience. Ex. E (under seal), ¶ 17.

19

The Rule also plays on outdated stereotypes of people based on their sex and race—strongly implying that certain demographics cannot compete without the noble grace of Nasdaq and the SEC—which stigmatizes people like this board director member. *Id.*; *see, e.g., Grutter v. Bollinger*, 539 U.S. 306, 373 (2003) (Thomas, J., concurring) ("When blacks take positions in the highest places of government, industry, or academia, it is an open question today whether their skin color played a part in their advancement. The question itself is the stigma—because either racial discrimination did play a role, in which case the person may be deemed 'otherwise unqualified,' or it did not, in which case asking the question itself unfairly marks those blacks who would succeed without discrimination.").

## II.    THE ORDER AND RULE VIOLATE THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

The Order and Rule are illegal because they violate the Fifth Amendment by encouraging discrimination on the basis of protected classifications, without the slightest hint of a compelling government interest or narrow tailoring.

## A.    THE ORDER AND RULE ARE SUBJECT TO CONSTITUTIONAL SCRUTINY.

The SEC and Nasdaq insisted below that Nasdaq's Rule and SEC's Order approving it are simply not subject to constitutional scrutiny. 86 Fed. Reg. at 44,440, JA17; Nasdaq Response Letter at 9–13, JA618–22. That is wrong.

*First*, this Court has long held that SROs like Nasdaq are indeed bound by the Constitution when they act in conjunction with the SEC. In *Intercontinental Industries, Inc. v. American Stock Exchange*, 452 F.2d 935 (5th Cir. 1971), this Court addressed an order of the SEC granting the American Stock Exchange—an SRO—the right to strike the petitioner's common stock from listing and registration on the Exchange. The Exchange argued that "constitutional due process is not required since the Exchange is not a governmental agency," but this Court held that the Exchange's position "is clearly contrary to numerous court decisions." *Id.* at 941. "The intimate involvement of the [American Stock] Exchange with the Securities and Exchange Commission brings it within the purview of the Fifth Amendment controls over governmental due process." *Id.*

That binding precedent controls here. Nasdaq likewise took action with the SEC's blessing and is "intimate[ly]" involved with the SEC, as aptly demonstrated by the fact that Nasdaq required the SEC's approval just to finalize the Rule. *See id.* at 941 n.9; *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725 (1961) (attributing state action to a private entity when the state has "so far insinuated itself into a position of interdependence" with a private entity that "it must be recognized as a joint participant in the challenged activity"). The Rule is therefore subject to "the Fifth Amendment controls over governmental due process," 452 F.2d at 941, which of course include the equal-protection principles embodied in the Fifth Amendment's due process clause, *see Bolling v. Sharpe*, 347 U.S. 497, 500 (1954). And there is no logical reason why the Rule would likewise not be subject to the First Amendment.

*Second*, even if Nasdaq were not bound by the Constitution under these circumstances, the SEC undoubtedly is—and the SEC's approval of Nasdaq's rule is state action under longstanding precedent. *See* Alliance Comment 59–64, JA107–12 (gathering authorities). Nasdaq's Rule is not enforceable without an SEC order, so the Order qualifies as state action under *Shelley v. Kraemer*'s prohibition of state enforcement of "private"

racial covenants. <u>334 U.S. 1, 19</u> (1948). The "impetus for the forbidden discrimination need not originate with the State if it is state action that enforces privately originated discrimination." *Moose Lodge No. 107 v. Irvis*, <u>407 U.S. 163, 172</u> (1972).

Moreover, apart from needing SEC approval for the Rule to be effective at all, Nasdaq has an ongoing federal duty to enforce its exchange rules against listed companies, subject to SEC sanctions if it does not. <u>15 U.S.C. § 78s(e)</u>, <u>(f)</u>, <u>(g)</u>, <u>(h)</u>; *see In re The Nasdaq Stock Market, LLC and Nasdaq Execution Services, LLC*, Admin. Proceeding File No. 3-15339 (May 29, 2013) (imposing sanctions on Nasdaq in part for failing to follow its rules in connection with Facebook's initial public offering). Thus, in addition to issuance and approval of the Rule, the threatened subsequent *enforcement* is likewise government action. *See Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, <u>531 U.S. 288, 296</u> (2001).

For all these reasons, Nasdaq's Rule and the SEC's Order approving it are subject to constitutional scrutiny.

## B.    THE ORDER AND RULE VIOLATE THE FIFTH AMENDMENT'S EQUAL-PROTECTION PRINCIPLES.

As demonstrated above in the section on standing, *see* Part I.B, *supra*, Nasdaq's Rule, at the very least, encourages decisions to be made on the basis of protected classifications. This triggers strict scrutiny for the Minority Director Rule and triggers heightened review for the Female Director Rule. *See* Alliance Comment 64–70, JA112–18. Neither comes close to satisfying those high burdens. The SEC barely bothered to defend the Rule against these attacks, devoting only a *single sentence* to why the Rule supposedly satisfies heightened review. 86 Fed. Reg. at 44,440, JA17.

### 1.    THE MINORITY DIRECTOR RULE TRIGGERS STRICT SCRUTINY.

The Minority Director Rule requires certain numbers of racial or sexual minorities to be board members, or else the company must publicly explain in writing why it did not meet this quota. Because it includes favored and disfavored racial classifications, the Minority Director Rule triggers strict scrutiny, which it fails. Even if the inclusion of LGBTQ+ as a category somehow reduces the level of scrutiny, it would still fail.

24

"Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people." *Rice v. Cayetano*, 528 U.S. 495, 517 (2000). There are no "benign" racial classifications; sorting people by race always "stimulate[s] our society's latent race consciousness,' "delay[s] the time when race will become ... truly irrelevant," and "perpetuat[es] the very racial divisions the polity seeks to transcend." *Shaw v. Reno*, 509 U.S. 630, 643 (1993). For that reason, the Supreme Court has held that racial classifications "must be analyzed by a reviewing court under strict scrutiny. In other words, such classifications are constitutional only if they are narrowly tailored measures that further compelling governmental interests." *Adarand*, 515 U.S. at 227. And, as a result, "any person, of whatever race, has the right to demand that any governmental actor … justify any racial classification subjecting that person to unequal treatment under the strictest judicial scrutiny." *Id.* at 224.

By including an express racial classification, the Minority Director Rule triggers strict scrutiny, and the government must justify its actions "under the strictest judicial scrutiny." *Id.* The SEC's Order, however, provided only *one sentence* of justification: "the proposal would survive

25

constitutional scrutiny because the objectives set forth in the proposal are not mandates, and the disclosures that the proposal requires are factual in nature and advance important interests as described throughout this order." 86 Fed. Reg. at 44,440, JA17. This justification falls well short of satisfying strict scrutiny.

*First*, the SEC is wrong that the Rule does not impose a "mandate." Petitioner submitted expert evidence below—which the SEC never rebutted—that the "quota-or-explain" nature of the Rule operates as a quota, because there are tremendous harms attendant to not satisfying Nasdaq's quotas. Alliance Comment 107–10, JA151–54. Firms must generate a paper trail that makes them more likely to be targeted by negative media campaigns or shareholder lawsuits alleging misrepresentations or breach of fiduciary duties like ones brought against Gap, Oracle, Facebook, Micron, Monster, and Qualcomm. *Id.* Firms will need to spend resources on lawyers and communications consultants to assess the reputational and legal risks of a firm's explanation. The Rule is functionally a discriminate-or-else rule: discriminate based on sex, race, or sexual orientation, or else assume a serious risk of reputational and litigation harms. This was clearly the

purpose of the Rule. Judges "are not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Commerce v. New York*, <u>139 S. Ct. 2551, 2575</u>–76 (2019). Indeed, Nasdaq even cited evidence that "comply-or-explain" rules have driven increased hiring based on protected statuses *precisely because* compelled explanations deter non-compliance. <u>85 Fed. Reg. at 80,496</u>, JA713; Nasdaq Amendment Letter at 25–26, JA222–23.

*Second*, regardless of whether the Rule is classified as a "mandate," strict scrutiny still applies. The Supreme Court and this Court have long rejected the notion that the government can escape strict scrutiny by labeling its racial programs as "goals" or (in this case) "aspirational diversity objectives." <u>86 Fed. Reg. at 44,428</u>, 44,439, JA5, 16.

As discussed above in the standing section, so long as the government even *encourages* decisions to be made based on race, strict scrutiny is triggered. For example, in *Northeastern Florida Chapter of Associated General Contractors of America v. City of Jacksonville, Florida*, <u>508 U.S. 656</u> (1993), the city of Jacksonville had enacted an ordinance earmarking 10% of the city's contract dollars for minority-owned businesses, but the city was not required to meet that 10%

requirement. *Id.* at 658–59. The city argued the ordinance did not necessarily cause any discrimination. *Id.* at 664. The Supreme Court rejected that theory: "When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing." *Id.* at 666. The "'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Id.* Numerous other Supreme Court cases recognize this same theory of injury. *See Adarand*, 515 U.S. at 211; *Bakke*, 438 U.S. at 281 n.14.

This Court held the same in *W.H. Scott Construction Co.*, which involved a government "goal" of 5% (later increased to 15%) of minority- and women-owned contractors, which did not have to be satisfied so long as "good faith efforts" were made to do so. 199 F.3d at 208, 214. Even though the government policy did not mandate consideration of race, the Court still subjected the policy to strict scrutiny. *Id.* at 215. The city insisted that "strict scrutiny should not be applied to policies that merely

encourage participation 'goals,' rather than mandate strict 'quotas,'" but this Court emphatically rejected that sophistry: "[I]t is irrelevant whether the Special Notice establishes 'goals' or 'quotas.'" *Id.* The "distinction is immaterial because any one of these techniques induces an employer to hire with an eye toward meeting a numerical target. As such, they can and surely will result in individuals being granted a preference because of their race." *Id.* (quotation marks omitted). The Court concluded: "the relevant question is not whether a statute requires the use of such measures, but whether it authorizes or encourages them." *Id.* (quoting *Monterey Mechanical Co. v. Wilson*, 125 F.3d 702, 711 (9th Cir. 1997)). And as demonstrated above in the standing section, there is no doubt the Rule, at the very least, encourages hiring decisions to be made on the basis of race. *See* 86 Fed. Reg. at 44,428, 44,430 n.89, JA5, 7 n.89. That is the whole point—otherwise the Rule could not achieve its purpose.

## 2. THE MINORITY DIRECTOR RULE FAILS STRICT SCRUTINY.

The Minority Director Rule cannot survive strict scrutiny. The SEC and Nasdaq must "demonstrate that there was a compelling interest for

the plan and that the plan was narrowly tailored to serve that interest." *Scott Const.*, <u>199 F.3d at 217</u>.

But the SEC never expressly says what compelling interest is allegedly served here. Rather, it says only that "important interests" (note: not *compelling* interests) would be advanced, but then does not even specifically identify these interests, instead vaguely gesturing to the "interests as described throughout this order." <u>86 Fed. Reg. at 44,440</u>, JA17. The SEC might as well have admitted the Rule lacks a compelling interest.

For its part, Nasdaq submitted a letter arguing that "there are compelling government interests in perfecting the mechanisms of a free and open market and promoting investor confidence through the promotion of racially or ethnically diverse boards, or through increased transparency (achieved by explanation) about the diversity of a company's board." Nasdaq Response Letter at 17, JA626. But Nasdaq cites no case holding that improving corporate profits is a *compelling* interest that justifies *de jure* racial discrimination.[2] There is no such case,

---

[2] If it were, it would yield absurd results. States could order companies' boards to comprise exclusively white men so long as some specious study showed that companies with such boards performed better.

of course. If the constitutional right to equal treatment means anything, it means that private moneymaking is an unacceptable basis for dividing people by race.

Moreover, Nasdaq's clear desire for racial balancing on boards via minimum diversity numbers can *never* satisfy the compelling-interest requirement. "Accepting racial balancing as a compelling state interest would justify the imposition of racial proportionality throughout American society, contrary to our repeated recognition that at the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 730 (2007).

Especially puzzling is Nasdaq's claim below that popular "support for the rule" somehow demonstrates a compelling interest. Nasdaq Response Letter at 18, JA627; *id.* at 24 n.56, JA633 n.56; Nasdaq Amendment Letter at 12, JA209 (a "wave of investors" demand that companies "diversify their boards"). The notion that a "wave" of popular support could justify encouraging racial discrimination in the business

31

world has long since been rejected and is directly antithetical to the enshrinement of equal protection as a constitutional right not subject to the whims of the day. *See, e.g., Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 260 (1964). In any event, the supposed "popular support" here is, in reality, the support of the moneyed class that operates Nasdaq and its listed companies. Nasdaq Amendment Letter at 51–58 (appendix of "supportive comments"), 215–16 ("a significant body of issuers supports the proposal"), JA248–55, 412–13.

Nor is the Rule narrowly tailored. Courts consider factors such as (1) the availability of race-neutral alternative mechanisms, (2) whether the race-based program is time-limited, (3) the flexibility or rigidity of the program, and (4) over- or under-inclusiveness. *Dean v. City of Shreveport*, 438 F.3d 448, 458 (5th Cir. 2006). Once again, the SEC never even addressed these issues—apparently recognizing that no plausible argument could be made. 86 Fed. Reg. at 44,440, JA17.

The Rule is not narrowly tailored because the SEC itself admits four different times that the evidence of improved corporate performance as a result of increased minority board members is "generally inconclusive" and thus (at best) "mixed." 86 Fed. Reg. at 44,431, 44,432,

32

44,433, JA8, 9, 10. The government is encouraging choices to be made based on race but cannot even bring itself to say that this racialized inquiry actually *causes* any benefit.

Further, the Rule's own terms confirm that a race-neutral mechanism is available: companies can satisfy the quota by hiring LGBTQ+ individuals and thereby never consider race. Or companies can instead provide an explanation for not using race (the explanation portion is problematic on its own terms, of course, but the SEC still provides it as an option). So even the SEC and Nasdaq themselves do not believe it is necessary to use race to achieve their alleged goals here.

Nasdaq argued below that the Rule is "race-neutral," Nasdaq Response Letter at 18, JA627, but that is quite an odd claim given that the Rule expressly preferences certain races over other races. There is no minimum number of white, male, or non-LGBTQ members required or preferred. If a board consists exclusively of one racial minority's members, that would satisfy the Minority Director Rule even though the board would be entirely homogeneous and therefore not diverse at all; but a board consisting exclusively of whites would violate the Rule.

Nor did the SEC or Nasdaq seriously consider race-neutral alternatives like requiring directors with different educational backgrounds, political affiliations, or socioeconomic statuses. *See* Alliance Comment 66, JA114.

Nor is the Rule "flexible." It mandates a certain minimum number of people, to be counted off like commodities, with any violation resulting in public shaming and potential delisting. As noted above, it is unpersuasive to claim that the "quota-or-explain" nature of the Rule is anything but a fig leaf designed to give Nasdaq and the SEC deniability about the fact that the Rule imposes quotas backed up with threats of public shaming for any firm that does not meet those quotas. Alliance Comment 107–10 (Copland Affidavit), JA151–54. That cynical goal is clear as a matter of common sense. Again, judges "are not required to exhibit a naiveté from which ordinary citizens are free." *Commerce*, 139 S. Ct. at 2575–76.

Nor is there any temporal limitation on this discrimination. Nasdaq argued below that the Rule is narrowly tailored in this respect because there is "ample time to prepare for compliance." Nasdaq Response Letter at 19, JA628. But that is the opposite of a temporal limitation. It implies

this discrimination will continue for so long into the future that the government felt the need to impose a warning period. Under Nasdaq's view, the government can discriminate indefinitely—so long as it gives advance notice.

Nasdaq says there is tailoring because its separate act of providing "free access to a network of board-ready diverse candidates" will "reduce the burden" on companies. Nasdaq Response Letter at 20, JA629. Nasdaq failed to cite authority for the idea that reducing burdens on the *discriminators* is evidence of narrow tailoring. Under Nasdaq's view, discrimination is legal—so long as it is well funded.

The Rule is also wildly over-inclusive. It applies to nearly every Nasdaq-listed company, regardless of any history of discrimination or of its current board composition. Nasdaq argued below that the Rule is narrowly tailored because it applies "only to Nasdaq-listed companies, all of which are part of the national market that Nasdaq seeks to protect and enhance." Nasdaq Response Letter at 20, JA629. Left unexplained is how a Rule can be "narrowly tailored" when it applies to nearly every single entity within the regulator's grasp. That is like saying one county's racially discriminatory policies are narrowly tailored because they apply

35

only to this one county. And to the extent the Rule really does somehow further a compelling interest, it is under-inclusive because it does not apply to those companies that are perhaps the most likely to engage in discrimination: foreign corporations unbound by laws like Title VII and 42 U.S.C. § 1981. Nasdaq Response Letter at 21, JA630; Alliance Comment 48–49, JA96–97.

Finally, neither Nasdaq nor the SEC claimed that the Rule is justified to counter past illegal discrimination by any Nasdaq-listed companies or by Nasdaq or the SEC themselves. Accordingly, they cannot rely on that basis now. *See Scott Const.*, 199 F.3d at 217.

At bottom, the Minority Director Rule fails constitutional scrutiny because it relies on the most offensive of stereotypes: that all minorities are alike in some way and can be grouped together, then checked off like commodities.

### 3. EVEN IF HEIGHTENED SCRUTINY APPLIED, THE MINORITY DIRECTOR RULE STILL VIOLATES THE FIFTH AMENDMENT.

The inclusion of sexual minorities in the Minority Director Rule does not save it. It still *encourages* decisions to be made on the basis of race, even if those decisions could be made on other bases, as well—and

this is enough to trigger strict scrutiny, as discussed above. *See Scott Const.*, 199 F.3d at 215 (addressing a law that favored both minority- and women-owned businesses and holding that the precise framing was irrelevant because "any one of these techniques induces an employer to hire with an eye toward meeting a numerical target. As such, they can and surely will result in individuals being granted a preference because of their race"). For example, imagine a law requiring all board directors to be white *or* live in Beaumont, Texas. No one would seriously argue that such a law could escape constitutional scrutiny simply because it has an option to choose directors on a basis other than race.

The Court therefore need not reach the question of what level of review applies to sexual-orientation classifications. But if the Court did reach it, and assuming *arguendo* the same scrutiny applies as for sex-based classifications, *see SmithKline Beecham Corp. v. Abbott Labs.*, 740 F.3d 471, 481 (9th Cir. 2014), the SEC and Nasdaq must satisfy "heightened scrutiny," which "requires an exceedingly persuasive justification," *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1690 (2017) (quoting *United States v. Virginia*, 518 U.S. 515, 555–56 (1996)). Courts view with "suspicion laws that rely on 'overbroad generalizations about

the different talents, capacities, or preferences of males and females.'" *Id*. The classification must serve "important governmental objectives" through means "substantially related to" achieving those objectives. *Virginia*, 518 U.S. at 533.

Again, the SEC proffered no specific statement of what compelling interest is at issue, 86 Fed. Reg. at 44,440, JA17, and Nasdaq raised the same arguments about corporate performance and demographic balancing as it did for the racial aspect of the Minority Director Rule, Nasdaq Response Letter at 22, JA631. Those explanations fail to provide any justification—let alone an exceedingly persuasive one.

Nasdaq even conceded that it lacks *any* statistical support showing that LGBTQ+ directors cause improved corporate performance, Nasdaq Response Letter at 23, JA632, which means the government cannot allege (let alone prove) a link to a compelling government interest, even assuming corporate performance could be such an interest (which it cannot).[3]

---

[3] Nasdaq also argued that "sexual orientation and gender identity are 'inextricably' intertwined with sex." Nasdaq Response Letter at 23–24, JA632–33. But the Rule belies this assertion by combining LGBTQ+ with racial minorities, not with women.

Nasdaq argued below that the lack of data showing LGBTQ+ directors' effects on boards actually "illustrates the need for the Proposed Rules." Nasdaq Response Letter at 23 n.54, JA632 n.54. This turns heightened review on its head: the lack of compelling evidence would *itself* be a compelling justification. Discriminate first, justify later.

Just as with the racial aspect, the LGBTQ+ portion is not properly tailored. The SEC offered no defense here. 86 Fed. Reg. at 44,440, JA17. And Nasdaq simply referred back to the same analysis as for the racial aspects of the Minority Director Rule. Nasdaq Response Letter at 20–22, JA629–31. As demonstrated above, there were available neutral alternatives, there is no time limit on the discrimination, and the rule is both over- and under-inclusive.

The Court should find that the Minority Director Rule violates the Fifth Amendment to the U.S. Constitution.

### 4. THE FEMALE DIRECTOR RULE TRIGGERS—AND FAILS—HEIGHTENED SCRUTINY.

As with the Minority Director Rule, the Female Director Rule likewise triggers constitutional scrutiny because it, at the very least, expressly *encourages* decisions to be made on the basis of a protected status—here, sex. *Scott Const.*, 199 F.3d at 215; *Monterey Mech.*, 125 F.3d

at 707–11 (holding that equal protection is violated where "the government requires or encourages" discrimination "against others based on their race *or sex*"); *Bras v. California Pub. Utilities Comm'n*, 59 F.3d 869, 873–75 (9th Cir. 1995).

As noted above, any classifications based on sex are subject to "heightened scrutiny," which "requires an exceedingly persuasive justification." *Morales-Santana*, 137 S. Ct. at 1690. The classification must serve "important governmental objectives" through means "substantially related to" achieving those objectives. *Virginia*, 518 U.S. at 533. But the SEC admits that the evidence that increased women on boards improved performance is "generally inconclusive" and thus (at best) "mixed." 86 Fed. Reg. at 44,431, 44,432, 44,433, JA8, 9, 10.

The Female Director Rule likewise fails the tailoring requirement. As with the racial classifications, there are neutral ways of promoting the cognitive diversity that Nasdaq allegedly seeks. *See* Alliance Comment 66, JA114; *Virginia*, 518 U.S. at 533. Nor is the Female Director Rule time limited. And it is over- and under-inclusive because it applies to nearly every listed company, except of course foreign companies, which ironically are probably the most likely to discriminate against women.

Nasdaq Response Letter at 21, JA630; Alliance Comment 48–49, JA96–97.

The Female Director Rule relies on the pernicious stereotypes that all women are alike, to be grouped together and checked off like commodities. Nasdaq claims that it "did not make assumptions about how women or men think," Nasdaq Response Letter at 23, JA632, but that is absurd: a rule designed to "reduc[e] 'groupthink,'" 86 Fed. Reg. at 44,431, JA8, by requiring the group to include at least one woman is necessarily based on "assumptions about how women or men think."

\* \* \*

The Minority Director Rule and the Female Director Rule both violate the Fifth Amendment. The Court should vacate the Order and Rule in their entireties.[4]

---

[4] Neither the Order nor the Rule contain a severance clause, nor would one be of any effect because even the SEC itself disclaims any statutory authority to change or strike any constituent part of the Rule. *See* 86 Fed. Reg. at 44,424, JA1. If the Court deems any part of the Rule or Order invalid, the entirety must be vacated. *See, e.g.*, Administrative Conference of the United States, *Severability in Agency Rulemaking* (June 29, 2019), https://www.acus.gov/recommendation/severability-agency-rulemaking ("If a court holds portions of a rule unlawful, and the agency has been silent about severability, then the default remedy is to vacate the entire rule, including those portions that the court did not hold

(*footnote continued on next page*)

41

## III.    THE ORDER AND RULE VIOLATE THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION.

The Order and Rule violate the First Amendment by compelling the disclosure of controversial information in a non-viewpoint-neutral manner. The Rule requires: (1) companies to comply with quotas or publicly explain (apologize for, really) why they failed to do so, but companies that *do* comply are not required to explain why they chose to do so (Rule 5605(f)); and (2) disclosure of controversial, personal matters like the racial and sexual-orientation breakdown of their board members (Rule 5606).

The SEC and Nasdaq argued below that the Constitution does not apply to Nasdaq's Rule or the SEC's Order approving it, 86 Fed. Reg. at 44,439–44,440, JA16–17; Nasdaq Response Letter at 25–26, JA634–35, but as demonstrated above, that is incorrect, and the Constitution— including the First Amendment—applies here, *see* Part II.A, *supra*.

---

unlawful."). Even if there were a severance clause, the entire Rule still must fail (and the Order vacated) because the quotas are the heart of the Rule, and there is "substantial doubt" to believe the fragmentary remains could coherently survive on their own. *Mayor of Baltimore v. Azar*, 973 F.3d 258, 292 (4th Cir. 2020) ("Despite the severability clause, the [Rule] is not severable because it is clear [the SEC and Nasdaq] intended the [Rule] to stand or fall as a whole, and the agency desired a single, coherent policy.").

"[F]reedom of speech prohibits the government from telling people what they must say." *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 61 (2006). In *National Institute of Family & Life Advocates v. Becerra ("NIFLA")*, 138 S. Ct. 2361 (2018), the Supreme Court held that a compelled disclosure is subject to strict scrutiny (as a content-based regulation) *unless* it falls into one of two categories: (1) "laws that require professionals to disclose factual, noncontroversial information in their 'commercial speech'"; or (2) regulation of "professional conduct, even though that conduct incidentally involves speech." *Id.* at 2372.

Rules 5605(f) and 5606 trigger strict scrutiny because they require disclosure of controversial information and also do not regulate professional conduct that incidentally involves speech (indeed, the SEC claims the Rules are *entirely* about compelled speech because it labels them as being "disclosures"). *Id.* They fail to satisfy strict scrutiny because there is no compelling (or even substantial) government interest at stake, nor are the rules narrowly tailored.

43

### A.    THE QUOTA-OR-EXPLAIN RULE TRIGGERS STRICT SCRUTINY.

Common sense confirms that the topics of race, sex, and sexual-orientation discrimination and affirmative action are, *under no circumstances*, "noncontroversial"—and thus compelling speech on those topics triggers strict scrutiny. *Id.*; *see, e.g., Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 312 (1986) (Marshall, J., dissenting) (acknowledging "the controversial issue of affirmative action"). This conclusion is confirmed by judicial guideposts established to determine whether compelled speech is on a controversial matter (and thus triggers strict scrutiny).

***Not Evenhanded.*** The discriminate-or-explain rule requires disclosure only from those companies that fail to satisfy the SEC's and Nasdaq's quota figures. Companies that comply are not required to explain why they did so (*e.g.*, was it because they believe decisions should be made on the basis of race? Or was it only because they were compelled by the Rule? Or perhaps some other reason?). As then-Judge Kavanaugh noted in a case about compelled country-of-origin labeling, one telltale sign of information being "controversial" for purposes of compelled speech is when the regulation is not "evenhanded" across different applications.

*Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 34 (D.C. Cir. 2014)

(Kavanaugh, J., concurring). The regime here applies to only one side (the

one the government disfavors) and therefore is certainly not

evenhanded—a clear sign that the information sought to be conveyed is

indeed controversial.

**Moral Opprobrium.** The explanation for this one-sided regime is

obvious: Nasdaq and the SEC hope to shame companies into satisfying

the quotas by making non-compliant companies—*and only those*

*companies*—raise their hands and draw public attention. Nasdaq

admitted this below. Nasdaq Response Letter at 22, JA631

(euphemistically referring to this as "empower[ing] shareholders or

potential shareholders to engage in conversations with companies that

do not meet the diversity objective to encourage and promote a more

diverse pipeline of qualified board candidates").

The D.C. Circuit has previously rejected an attempt by the SEC to

force apologies and pin moral blame on companies. In *National*

*Association of Manufacturers v. SEC*, 800 F.3d 518 (D.C. Cir. 2015), the

court held that the First Amendment prohibited an SEC regulation

requiring certain minerals to be labeled as "non-conflict free" or "conflict

free." The court recognized that the label of "non-conflict free" is "a metaphor that conveys moral responsibility," and thereby "interferes with th[e] exercise of the freedom of speech under the First Amendment." *Id.* at 530.

As with the labeling of diamonds as "non-conflict free," requiring companies to proffer an explanation for not meeting quotas is hardly "non-ideological"—it is designed to brand those companies as sinners for not believing enough in "diversity" or not "doing the work" of achieving it. Such a topic therefore must be considered "controversial" for purposes of whether speech can be compelled. *Id.* And that moral opprobrium is why this compelled disclosure is palpably different from the only examples Nasdaq could muster, which all involved disclosures of mundane pricing information. *See* Nasdaq Response Letter at 27, JA636.

***Flexibility in Explanation Does Not Save the Rule.*** The SEC and Nasdaq put great weight on the fact that companies can choose precisely how they will phrase their explanation for not satisfying the quotas. 86 Fed. Reg. at 44,428, 44,440, JA5, 17; Nasdaq Response Letter at 2–3, 27, JA611–12, 636.

But this does not save the Rule from heightened scrutiny. Quite the opposite, in fact, because allowing companies to provide *any* explanation whatsoever defeats the claim of a compelling interest. If the SEC and Nasdaq truly do not care what the explanation says, then why require one? The answer is obvious: the goal is to force such companies to raise their hands for public shaming. The SEC and Nasdaq do not require any specific explanation because they know their goal will be accomplished regardless of what the company says.

In the conflict-minerals case discussed above, the SEC similarly "argue[d] that issuers can explain the meaning of 'conflict free' in their own terms," and thus the regulation did not violate the First Amendment. *NAM*, 800 F.3d at 556. The D.C. Circuit rejected that view, holding that "the right to explain compelled speech is present in almost every such case and is inadequate to cure a First Amendment violation." *Id.*

Here, the mere fact that the SEC and Nasdaq make companies raise their hands and provide an explanation is itself the illegally compelled speech. Forcing an explanation from actors whom the government disfavors is more than enough to tag these companies with a moral failing

47

for not being sufficiently committed to "diversity" as defined by Nasdaq's and the SEC's quotas. In that sense, this rule is not just content-based but also viewpoint discrimination, forcing compelled apologies only by those companies that disagree in the slightest with the government's views on race and sex. "[V]iewpoint discrimination is an egregious form of content discrimination and is presumptively unconstitutional." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019).

For all these reasons, Rule 5605(f) triggers strict scrutiny. Petitioners next demonstrate that Rule 5606 likewise triggers strict scrutiny, and then they demonstrate that *neither* of these rules satisfies that scrutiny.

## B. THE DEMOGRAPHIC DISCLOSURE RULE TRIGGERS STRICT SCRUTINY.

Rule 5606 requires companies to provide detailed breakdowns of their board members' race, sex, and sexual orientation. Although the SEC frequently mandates disclosures from companies, this one is unique: it demands controversial information and thereby triggers strict scrutiny. *See NIFLA*, 138 S. Ct. at 2372.

48

There can be no doubt that matters like race, sex, and sexual orientation, especially in the context of forced diversity like here, are controversial matters, as demonstrated above.

The D.C. Circuit has persuasively rejected the notion that the SEC can compel such disclosures. In the conflict-minerals case, the court held that the SEC is not entitled to any greater leeway merely because it invokes "'the federal government's broad powers to regulate the securities industry.'" *NAM*, 800 F.3d at 555. If that position were accepted, the SEC could "easily regulate otherwise protected speech using the guise of securities laws." *Id.* And, anticipating laws or regulations precisely like the one under review here, the Court continued: "Why, for example, could Congress not require issuers to disclose the labor conditions of their factories abroad or *the political ideologies of their board members*, as part of their annual reports? Those examples, *obviously repugnant to the First Amendment*, should not face relaxed review just because Congress used the 'securities' label." *Id.*

Given that requiring disclosure of "political ideologies" is "obviously repugnant to the First Amendment," the forced disclosure of even-more-controversial race, sex, and sexual-orientation information stands no

49

chance, especially when it is an executive agency—not Congress—that is commanding it.

The SEC will surely claim that it is not "forcing" any board member or company to disclose such information because they could always refuse to identify their demographics. But board members have a fiduciary obligation to their companies and their companies' stockholders, *Torch Liquidating Tr. ex rel. Bridge Assocs. L.L.C. v. Stockstill*, 561 F.3d 377, 389 (5th Cir. 2009), meaning women and minority board members likely *must* disclose their demographics because failing to do so may mean the company violates the government's quotas, triggering (at a minimum) public shaming via forced apology and (at a maximum) delisting from Nasdaq altogether. Thus, LGBT board directors have a fiduciary obligation to out themselves—while Nasdaq and the SEC pat themselves on the back for being "inclusive."

In all but name, Rule 5606 directly mandates revealing confidential and controversial information. It therefore triggers strict scrutiny.

## C. NEITHER DISCLOSURE RULE SATISFIES STRICT SCRUTINY.

Neither Rule 5605(f) nor Rule 5606 serves a compelling governmental interest, nor are they narrowly tailored. *See NIFLA*, 138

S. Ct. at 2371. Nasdaq offered only one brief paragraph on this topic below, essentially conceding the Rules would fail if the Court reaches this point. Nasdaq Response Letter at 27, JA636.

***No Sufficient Government Interest.*** That single paragraph asserted that "studies show[] the benefits of diverse corporate boards." Nasdaq Response Letter at 27, JA636. The SEC, however, refused to rely on that basis, finding that the supposed causal link between diversity and corporate performance was "generally inconclusive" and thus (at best) "mixed." 86 Fed. Reg. at 44,431, 44,432, 44,433, JA8, 9, 10.

But even if it were true, it does not explain why compelled *speech* is needed. That is, Nasdaq failed to claim—let alone prove—that compelling disclosures *itself* will benefit corporations' financial positions.

Nasdaq also claimed that explanations and diversity disclosures would "enable more informed analysis of, and conversations with, companies." 85 Fed. Reg. at 80,492, JA709. But, as then-Judge Kavanaugh aptly noted, the claim that providing more information is a compelling or even "substantial" government interest is a flawed and circular theory. "[T]he Government broadly contends that it has a substantial interest in 'providing consumers with information,'" but "it is

51

plainly not enough for the Government to say simply that it has a substantial interest in giving consumers information. After all, that would be true of any and all disclosure requirements." *AMI*, <u>760 F.3d at 31</u> (Kavanaugh, J., concurring).

The SEC and Nasdaq also suggested below that popular interest in such information is a sufficient government interest. <u>86 Fed. Reg. at 44,430</u>, JA7; Nasdaq Response Letter at 24 n.56, JA633 n.56. But again, then-Judge Kavanaugh, quoting a Second Circuit opinion, correctly concluded in *AMI* that "'consumer curiosity alone is not a strong enough state interest' to sustain a compelled commercial disclosure," even when it is of accurate, factual information. *AMI*, <u>760 F.3d at 32</u> (quoting *Int'l Dairy Foods Ass'n v. Amestoy*, <u>92 F.3d 67, 74</u> (2d Cir. 1996)).

Without a compelling government interest, the disclosure rules fail strict scrutiny.

***No Narrow Tailoring.*** There is also a lack of narrow tailoring. If Nasdaq and the SEC actually cared about "informed conversations," Rule 5605(f) would also require companies who *comply* with the diversity quotas to explain why they did so. But Nasdaq omitted such a

requirement, providing a stunning (and revealing) example of underinclusiveness.

Nasdaq also argued below that Rule 5605(f) is narrowly tailored because "there is no particular message prescribed by the Proposed Rules" when the company proffers its explanation. Nasdaq Response Letter at 27, JA636. As discussed above, that argument holds no water. "[T]he right to explain compelled speech is present in almost every such case and is inadequate to cure a First Amendment violation." *NAM*, <u>800 F.3d at 556</u>.

Rule 5606 also fails narrow tailoring. Even assuming that demographic balancing were an acceptable goal (which it is not), the SEC and Nasdaq did not ask for information about, say, disability or veteran status. To the extent they want to avoid "groupthink," the proper disclosure would require information about ideological diversity, not race, sex, and sexual orientation. And the carve-out for foreign corporations represents yet another example of underinclusiveness. When government action is subject to strict scrutiny, these flaws are fatal.

* * *

For all these reasons, the Order and Rule violate the First Amendment and should be vacated in their entireties.

## IV.    NASDAQ'S RULE FLUNKS THE EXCHANGE ACT'S TESTS.

To approve Nasdaq's Rule, the SEC first had to determine whether the Rule was consistent with a bevy of statutory requirements in the Exchange Act. Although Nasdaq insisted that diverse boards perform better than others, the SEC refused to rely on that basis for approving the Rule and instead concluded the Rule was justified only on the theory that it would provide beneficial disclosures to the public.

But, as demonstrated below, several of the SEC's proffered justifications are contrary to the text of the Exchange Act itself, and none is supported by substantial evidence in any event.

### A.    THE SEC REFUSED TO RELY ON NASDAQ'S SOCIAL SCIENCE SURVEYS ABOUT DIVERSITY.

Sections 6(b)(5) and 6(b)(8) of the Exchange Act, 15 U.S.C § 78f(b)(5), (b)(8), require that the rules of a national securities exchange (such as Nasdaq) be designed to achieve at least one of these goals:

- to prevent fraudulent and manipulative acts and practices,

- to promote just and equitable principles of trade,

- to remove impediments to and perfect the mechanism of a free and open market and a national market system, or

- to protect investors and the public interest,

*Id.*

> And the rules must *not*:

- permit unfair discrimination between customers, issuers, brokers, or dealers,

- regulate matters not related to the purposes of the Exchange Act or the administration of the exchange, or

- impose any burden on competition that is not necessary or appropriate in furtherance of the purposes of the Exchange Act.

*Id.*

As noted above, during the comment period, Nasdaq relied heavily on its assertion that companies with "diverse" boards perform better than those without, and thus more diversity would magically improve bottom lines without any negative consequences, thereby satisfying all the statutory requirements above. 86 Fed. Reg. at 44,431–44,433, JA8–10.

But the SEC refused to accept that theory. The SEC surveyed the evidence regarding diversity and company performance and held that

any suggested causal link was "inconclusive." *Id.* at 44,432. In fact, the SEC reiterated that conclusion over, *id.* at 44,433 ("inconclusive"), and over, *id.* at 44,431 ("mixed"), and over, *id.* 44,432 ("mixed"), JA8–10.

This left only one possible basis for how the Rule would satisfy the list of requirements in Sections 6(b)(5) and (8): requiring disclosure would itself cause benefits. The SEC insisted that even the part of the rule requiring certain numbers of women and minorities was in fact just a "disclosure" rule because companies could provide an explanation if they failed to satisfy that requirement. The SEC concluded that the Rule "would provide widely available, consistent, and comparable information that would contribute to investors' investment and voting decisions." 86 Fed. Reg. at 44,430, JA7. The Rule would impose one-size-fits-all definitions of "Diverse" and use standardized forms, which "would make it more efficient and less costly for investors to collect, use, and compare information on board diversity," which "could" enhance "investors' investment and voting decision-making processes." *Id.* "Because the proposal would make such information widely available on the same

56

basis to all investors, the proposal would also mitigate any concerns regarding unequal access to information." *Id.*[5]

The SEC then summarily relied on this disclosure justification to conclude (in rapid-fire succession, tracking Section 6(b)) that the Rule "is designed to promote just and equitable principles of trade, remove impediments to and perfect the mechanism of a free and open market and a national market system, and protect investors and the public interest." *Id.*

The SEC also concluded that the Rule did not unfairly discriminate between issuers even though foreign firms must satisfy much-less-stringent diversity quotas and disclosures, *id.* at 44,435, JA12, and that the Rule did not regulate matters outside the scope of the Exchange Act even though it seeks to achieve demographic balancing despite disclaiming any resultant improvement in firm performance, *id.* at 44,438–44,439, JA15–16. The SEC further concluded that the Rule did not unnecessarily burden competition between carriers, as they retained

---

[5] The SEC never asserted that the Rule would "prevent fraudulent and manipulative acts and practices," 15 U.S.C § 78f(b)(5), and thus Petitioners do not address that potential basis, *see* 86 Fed. Reg. at 44,431 n.97, JA8 n.97. Apparently, even the SEC did not believe substantial evidence supported that basis.

"flexibility" either to impose a quota or explain why they did not. *Id.* at 44,436. The SEC did not directly respond to Petitioner's expert affidavit stating that the "explanation" option is not a viable alternative and would lead to public shaming and financial injury. *See* Alliance Comment 31–34, 107–10, JA79–82, 151–54.

### B.   NONE OF THE SEC'S PURPORTED JUSTIFICATIONS IS SUPPORTED BY SUBSTANTIAL EVIDENCE.

The SEC's justifications for the Rule must be "supported by substantial evidence," 15 U.S.C. § 78y(a)(4), which requires "(1) that the agency's decision be based upon the entire record, taking into account whatever in the record detracts from the weight of the agency's decision; and (2) that the agency's decision be what a reasonable mind might accept as adequate to support [its] conclusion," *Corrosion Proof Fittings v. EPA*, 947 F.2d 1201, 1213 (5th Cir. 1991) (quotation marks omitted).

This test "imposes a considerable burden on the agency and limits its discretion in arriving at a factual predicate." *Id.* at 1214. And it is applied especially carefully to SEC action. The D.C. Circuit, for example, has not hesitated to reverse the SEC when it relied on "mixed" observational studies to formulate corporate governance rules. *See Bus. Roundtable v. SEC*, 647 F.3d 1144, 1151 (D.C. Cir. 2011) ("In view of the

admittedly (and at best) 'mixed' empirical evidence, we think the Commission has not sufficiently supported its conclusion that increasing the potential for election of directors nominated by shareholders will result in improved board and company performance and shareholder value.").

The SEC's proffered justifications fail this test.

***Nasdaq's Rule Is Not Designed to Promote Just and Equitable Principles of Trade.*** Nasdaq did not even bother to argue below that its Rule would "promote just and equitable principles of trade." Rather, Nasdaq argued only about principles of "social justice" and improving diversity—bases that (as noted above) the SEC subsequently declined to rely on. 85 Fed. Reg. at 80,482, JA699 ("[T]he social justice movement has underscored the importance of having diverse perspectives and representation at all levels of decision-making, including on public company boards."). It was error for the SEC to find that the Rule "promot[ed] just and equitable principles of trade" when that basis was not raised below for comment. *Cf. Bus. Roundtable v. SEC*, 905 F.2d 406, 417 (D.C. Cir. 1990).

In any event, given that the SEC itself concluded that there is no established causal relationship between diverse boards and corporate performance, it is illogical to mandate or encourage diverse boards or require disclosures about diversity. The SEC is requiring action to achieve a goal that the SEC itself has disclaimed as unsupported by substantial evidence. *See Bus. Roundtable II*, 647 F.3d at 1151.

With no substantial evidence to support the ultimate goal (diverse boards), it is also irrelevant whether some investors may want information about that goal. The SEC's authority to order disclosures under the Exchange Act is limited to *material* information,[6] meaning "there must be a *substantial likelihood* that the disclosure of the omitted fact would have been viewed by *the reasonable investor* as having *significantly altered* the 'total mix' of information made available."[7] The SEC itself has said the key inquiries for materiality focus on

---

[6] *See TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 447 (1976) (requiring materiality under § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)); *Basic Inc. v. Levinson*, 485 U.S. 224, 249 (1988) (same for § 10(b) of the Exchange Act, 15 U.S.C. § 78j); *SEC v. Koenig*, 469 F.2d 198, 200 (2d Cir. 1972) (same for § 13(a) of Exchange Act, 15 U.S.C. § 78m(a)).

[7] *TSC Indus.*, 426 U.S. at 449 (emphases added).

"quantitative considerations" like profit, loss, and revenue—things that the SEC just concluded have no demonstrable link to "diversity." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197–98, 204 (2d Cir. 2009). Ordering disclosures of something that the SEC cannot pin to materiality is therefore not just illogical but also beyond the SEC's statutory powers.

Stated another way: acquiescing to supposed public demand does not satisfy any of the Exchange Act's bases for approving an SRO's rules.

**_Nasdaq's Rule Does Not Protect Investors or the Public Interest._** Nasdaq asserted below that its diversity rule "promotes investor protection and is in the public interest" because "gender-diverse boards are associated with more transparent public disclosures and less information asymmetry, leading to stock prices that better reflect public information." 85 Fed. Reg. at 80,498, JA715. It is unclear whether the SEC adopted this theory. 86 Fed. Reg. at 44,430, JA7.

This "public interest" standard "concern[s] the administration and operation of the self-regulatory organizations themselves, *not the fairness of the issuers' corporate structures*." *Bus. Roundtable I*, 905 F.2d at 413. Accordingly, this prong provides no basis for imposing obligations on

corporations themselves. Even if the public-interest catch-all could apply to board composition, there still is no substantial evidence to support the SEC's conclusion, given that the SEC itself concluded there is "inconclusive" evidence of a causal relationship between board diversity and any corporate performance.

***Nasdaq's Rule Does Not Remove Impediments to or Perfect the Mechanism of a Free and Open Market and a National Market System.*** Nasdaq argued below that the Rule would force companies to consider candidates who "otherwise may be overlooked due to the impediments of the traditional director recruitment process, which will thereby remove impediments to a free and open market and a national market system." 85 Fed. Reg. at 80,496, JA713. It is unclear whether the SEC agreed with this rationale. 86 Fed. Reg. at 44,430, JA7.

The SEC's authority here is limited to removing impediments in *securities transactions*, not in the employment market for board directors. The statutory references to a "free and open market" and a "national market system" mean "a fair and orderly *exchange*," *NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*, 770 F.3d 1010, 1021 (2d Cir. 2014) (emphasis added), and Congress has stated that a fair and orderly exchange means

having rules "to assure" "economically efficient execution of securities transactions; fair competition among brokers and dealers, among exchange markets, and between exchange markets and markets other than exchange markets; the availability to brokers, dealers, and investors of information with respect to quotations for and transactions in securities; the practicability of brokers executing investors' orders in the best market; and an opportunity … for investors' orders to be executed without the participation of a dealer." 15 U.S.C. § 78k-1(a)(1)(A).

None of those goals deals with employment decisions for corporate boards. *See Bus. Roundtable I*, 905 F.2d at 416. There is no authority to solve perceived problems in a non-securities market like the market for corporate director recruitment.

Nor could the SEC justify the Rule on the theory that diversity improves performance and that this somehow results in a free and open market; again, the SEC found only "inconclusive" evidence of a causal link between diversity and performance.

\* \* \*

The Rule also violates several of the *prohibitions* on SRO rules:

63

***Nasdaq's Rule Permits Unfair Discrimination Among
Issuers.*** The Rule gives foreign issuers "flexibility" denied to domestic
issuers by allowing foreign issuers, regardless of size or country of origin,
to satisfy the Minority Director Rule by adding a woman instead of an
underrepresented minority. 86 Fed. Reg. at 44,426 n.26, JA3 n.26.
Nasdaq asserted that disparate treatment for foreign issuers is justified
because of "the unique demographic composition of the United States,
and its historical marginalization of Underrepresented Minorities and
the LGBTQ+ community … may not extend to all countries outside of the
United States." 85 Fed. Reg. 80,501, JA718. The SEC adopted the former
point but not the latter. 86 Fed. Reg. 44,435, JA12.

This justification is illogical and violates Section 6(b)(5)'s
prohibition of SRO rules that allow for unfair discrimination among
issuers. Nasdaq claimed "cognitive diversity" benefits that mystically
flow from having even one minority director, but there is no reason this
would not apply to foreign firms, as well. Moreover, the political and
economic marginalization of underrepresented minorities in many
foreign countries around the world is probably worse, not better, than in
the United States. It is unlikely that Nasdaq's Chinese issuers, for

example, have many non-Han Chinese minority directors on their boards. (Or *any* Uighurs.) This demands *more* stringent treatment of foreign issuers, not less.

And even if the only justification is the supposed benefits of additional uniform "disclosures," that goal is directly undercut by exempting foreign issuers from having to provide those uniform disclosures.

***Nasdaq's Rule Regulates Matters Unrelated to the Purposes of the Exchange Act.*** The Rule also regulates "matters not related to the purposes of [the Exchange Act] or the administration of the exchange." 15 U.S.C § 78f(b)(5). Although its rationale is not clear, it appears the SEC concluded that SROs like Nasdaq can decide for themselves which requirements will "provide investors with information that facilitates informed investment and voting decisions." 86 Fed. Reg. at 44,438–44,439, JA15–16.

The SEC erred by abdicating an independent review of Nasdaq's views about whether disclosures and quotas would be outside the purposes of the Exchange Act. *See* 15 U.S.C. § 78s(b)(2)(C)(i) (the

"Commission" must "find[] that such proposed rule change is consistent with the requirements of this chapter").

Moreover, the actual and obvious goal of the Rule—*i.e.*, favoring certain people because of their race, sex, or sexual orientation—is far removed from the purposes of the Exchange Act, especially when the SEC cannot bring itself to say that diverse boards actually cause any improved firm performance. All that remains is the SEC's and Nasdaq's desire to virtue signal.

### *Nasdaq's Rule Burdens Competition and Harms Investors.*

No SRO rule may "impose any burden on competition not necessary or appropriate" to advance the purposes of the Exchange Act. 15 U.S.C. § 78f(b)(8). When Congress uses words like "necessary or appropriate," such "broad and all-encompassing" language "naturally and traditionally includes consideration of all the relevant factors," including consideration of "cost." *Michigan v. EPA*, 576 U.S. 743, 752 (2015) (internal citation omitted). And "[n]o regulation is 'appropriate' if it does significantly more harm than good." *Id.*

For the same reasons it fails to show the diversity rule is in the public interest, Nasdaq and the SEC failed to show that the asserted

benefits of the diversity rule outweigh the costs. The SEC disclaimed any reliance on the theory that diversity improves firm performance. The only claimed benefit seems to be from the act of forcing disclosures about diversity and encouraging or mandating increased diversity, 86 Fed. Reg. at 44,436, JA13, but (as noted above) that makes no sense when those acts do not actually improve firm performance.

The SEC claims that firms can avoid any meaningful costs because there is "flexibility" in that firms can either comply with the SEC's preferred quotas or provide an explanation for their failure to do so. 86 Fed. Reg. at 44,436, JA13. But as explained above at length, there are tremendous costs for firms that dare to defy the quotas. Alliance Comment 31–33, 107–10, JA79–82, 151–54. The Rule is functionally a discriminate-or-else rule.

The Rule therefore imposes tremendous costs, with no benefits. It violates 15 U.S.C. § 78f(b)(8).

* * *

Because the Order and Rule lack statutory authority, they should be vacated in their entirety.

# CONCLUSION

For the foregoing reasons, the Court should declare that the SEC's Order and Nasdaq's Rule are unconstitutional and were issued without statutory authority or support. The Court should vacate the Order and the Rule in their entireties.

November 22, 2021                    Respectfully submitted,

/s/ Jonathan Berry
C. Boyden Gray
Jonathan Berry
  *Counsel of Record*
R. Trent McCotter
Michael Buschbacher
Jordan E. Smith
BOYDEN GRAY & ASSOCIATES
801 17th Street NW, Suite 350
Washington, DC 20006
202-809-5613
berry@boydengrayassociates.com

*Counsel for Petitioner*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief complies with the type-volume limitations of Fifth Circuit Rule 32 and <u>Federal Rule of Appellate Procedure 32(a)(7)(B)</u> because it contains 12,975 words, excluding the portions exempted by Rule 32(f). This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure Rule 32(a)(5)–(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook and 14-point font.

November 22, 2021                     <u>/s/ Jonathan Berry</u>
                                      BOYDEN GRAY & ASSOCIATES PLLC
                                      801 17th Street NW, Suite 350
                                      Washington, DC 20006
                                      202-809-5613

## **CERTIFICATE OF SERVICE**

I hereby certify that all counsel of record who have consented to electronic service are being served today with a copy of this document via the Court's CM/ECF. All parties in this case are represented by counsel consenting to electronic service.

November 22, 2021                    /s/ Jonathan Berry
                                     BOYDEN GRAY & ASSOCIATES PLLC
                                     801 17th Street NW, Suite 350
                                     Washington, DC 20006
                                     202-809-5613