No. 21-60626

UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

ALLIANCE FOR FAIR BOARD RECRUITMENT,
NATIONAL CENTER FOR PUBLIC POLICY RESEARCH,
*Petitioners*,

v.

SECURITIES AND EXCHANGE COMMISSION,
*Respondent*.

On Petition for Review of an Order of the Securities and Exchange Commission

**BRIEF FOR RESPONDENT
SECURITIES AND EXCHANGE COMMISSION**

DAN M. BERKOVITZ
General Counsel

MICHAEL A. CONLEY
Solicitor

TRACEY A. HARDIN
Assistant General Counsel

DANIEL E. MATRO
Senior Litigation Counsel

JOHN R. RADY
Attorney

Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-8248 (Matro)

## CERTIFICATE OF INTERESTED PERSONS

Alliance for Fair Board Recruitment et al. v. SEC, No. 21-60626

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1. The Securities and Exchange Commission is a federal agency.

2. Dan M. Berkovitz, Michael A. Conley, Tracey A. Hardin, Daniel E. Matro, and John R. Rady of the Securities and Exchange Commission—*Counsel for Respondent Securities and Exchange Commission.*

3. Vanessa Ann Countryman of the Securities and Exchange Commission—*Secretary of the Securities and Exchange Commission.*

4. Petitioner Alliance for Fair Board Recruitment is a non-profit membership corporation and has no parent corporations or subsidiaries.

5. C. Boyden Gray, Jonathan Berry, R. Trent McCotter, Michael Buschbacher, and Jordan E. Smith of Boyden Gray & Associates—*Counsel for Petitioner Alliance for Fair Board Recruitment.*

6. Petitioner National Center for Public Policy Research is a non-profit corporation and has no parent corporations or subsidiaries.

7. Margaret A. Little and Sheng Li of The New Civil Liberties Alliance—*Counsel for Petitioner National Center for Public Policy Research.*

8. Allyson N. Ho, Bradley G. Hubbard, Amir C. Tayrani, Amalia E. Reiss, and Paulette Miniter of Gibson, Dunn & Crutcher LLP; John Zecca, Jeffrey S. Davis, John Yetter, and Joanne Pedone of The Nasdaq Stock Market, L.L.C.; and Burt M. Rublin, Stephen J. Kastenberg, Paul Lantieri III, Peter

F. Andrews, and Seth D. Berlin of Ballard Spahr LLP—*Counsel for Intervenor Nasdaq Stock Market, L.L.C.*

9. The States of Arizona, Alabama, Alaska, Arkansas, Florida, Indiana, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, Oklahoma, South Carolina, Texas, and Utah.

10. Drew C. Ensign, Joseph A. Kanefield, Brunn ("Beau") W. Roysden III, Wilson C. Freeman, and James Rogers—*Counsel for Amici States.*

/s/ Daniel E. Matro

*Attorney of Record for Respondent Securities and Exchange Commission*

## STATEMENT REGARDING ORAL ARGUMENT

The Commission believes that oral argument will assist the Court in resolving the petitions for review.

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS .................................................. i

STATEMENT REGARDING ORAL ARGUMENT ..................................................... iii

TABLE OF AUTHORITIES ....................................................... vii

INTRODUCTION .......................................................... 1

COUNTERSTATEMENT OF JURISDICTION ............................................... 4

COUNTERSTATEMENT OF THE ISSUES ................................................ 5

COUNTERSTATEMENT OF THE CASE .................................................. 5

A.     Statutory and Regulatory Background ........................................ 5

     1.     Exchanges are private entities that register with the Commission as self-regulatory organizations ................................. 5

     2.     Exchanges also enter contractual arrangements to provide a market for the securities of companies that abide by their listing standards ........ 8

B.     Proceedings Before the Commission ........................................ 11

     1.     Nasdaq's Proposed Rule Changes ................................. 11

         a.     Board Diversity Rules .................................... 11

         b.     Board Recruiting Service Rule ........................... 12

     2.     Support for the Proposed Rule Changes ..................... 12

         a.     Investor demand for board diversity information ........... 13

         b.     Evidence linking board diversity and improved company and board performance ................................... 14

     3.     The Commission's Order ................................... 15

STANDARD OF REVIEW ......................................................... 17

SUMMARY OF ARGUMENT ........................................................18

ARGUMENT ...............................................................................20

I.     NCPPR has failed to demonstrate that it has standing ........................................20

II.    The Commission reasonably concluded that Nasdaq's rules are consistent with the requirements of the Exchange Act ..........................................................21

        A.    The Commission reasonably concluded that the Board Diversity Rules are designed to further the Exchange Act's objectives and do not regulate matters unrelated to the Act's purposes .......................................22

                1.    The provision of information important to investment and voting decisions is a core premise of the Exchange Act, underpinning many of the criteria in Section 6(b)(5) .............................................22

                2.    Substantial evidence supports the Commission's findings that the Board Diversity Rules facilitate disclosure of information important to investor decision-making ..............................................23

                3.    Petitioners' contrary arguments lack merit .......................................26

        B.    The Commission reasonably concluded that the Board Diversity Rules do not unfairly discriminate against domestic issuers or impose inappropriate burdens on competition .........................................................32

        C.    NCPPR's non-delegation arguments are meritless ...................................36

        D.    NCPPR's challenge to the Board Recruiting Service Rule is meritless ...............................................................................................38

III.   Nasdaq's Board Diversity Rules do not constitute state action subject to constitutional scrutiny .....................................................................................39

        A.    Nasdaq is a private entity, not a part of the government ..........................39

B.     Nasdaq's Board Diversity Rules are not fairly attributable to the Commission ................................................................................. 42

C.     This Court is not bound by cursory dicta in *Intercontinental Industries, Inc. v. American Stock Exchange* ........................................................ 48

III.   In any event, Nasdaq's Board Diversity Rules withstand constitutional scrutiny ........................................................................................ 50

A.     The Board Diversity Rules do not violate the First Amendment ............ 50

B.     The Board Diversity Rules do not violate the Fifth Amendment............ 55

CONCLUSION ................................................................................................. 57

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Cases**                                                                                           **Page(s)**

*Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995) ..................................................... 56

*Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485 (2021) .................................................. 36-37

*Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18 (D.C. Cir. 2014) .............................. 55

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40 (1999) ............................................... *passim*

*Austin Mun. Sec., Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.*,
    757 F.2d 676 (5th Cir. 1985) ........................................................................................ 9

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ..................................................................... 28

*Bd. of Trs. v. Fox*, 492 U.S. 469 (1989) ............................................................................. 54

*Belenke v. SEC*, 606 F.2d 193 (7th Cir. 1979) .................................................................. 34

*Biestek v. Berryhill*, 139 S. Ct. 1148 (2019) ..................................................................... 18

*Big Time Vapes, Inc. v. FDA*, 963 F.3d 436 (5th Cir. 2020) ...................................... 37, 38

*Blankenship v. Buenger*, 653 F. App'x 330 (5th Cir. 2016) ............................................ 46

*Blum v. Yaretsky*, 457 U.S. 991 (1982) .................................................................. 42, 43, 45

*Boeta v. FAA*, 831 F.3d 636 (5th Cir. 2016) ..................................................................... 18

*Bradford Nat'l Clearing Corp. v. SEC*, 590 F.2d 1085 (D.C. Cir. 1978) ..................... 34, 35

*Brentwood Academy v. Tenn. Secondary Sch. Athletic Ass'n*,
    531 U.S. 288 (2001) ..................................................................................................... 46

*Burton v. Wilmington Parking Auth.*, 365 U.S. 715 (1961) .............................. 45, 46, 48, 49

*Bus. Roundtable v. SEC*, 905 F.2d 406 (D.C. Cir. 1990) .......................... 9, 30, 31, 32, 37

*Campaign for S. Equal. v. Bryant*, 791 F.3d 625 (5th Cir. 2015) ....................................... 49

*Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*,
    447 U.S. 557 (1980) ..................................................................................................... 54

*Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984) ........................................ 17, 29

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ......................................................... 20

*Corrosion Proof Fittings v. EPA*, 947 F.2d 1201 (5th Cir. 1991) ....................................... 21

*Cremin v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
   957 F. Supp. 1460 (N.D. Ill. 1997) ....................................................... 50

*Ctr. for Biological Diversity v. EPA*, 937 F.3d 533 (5th Cir. 2019) ..................................... 20

*Davis v. Prudential Sec., Inc.*, 59 F.3d 1186 (11th Cir. 1995) .............................................. 48

*Dep't of Transp. v. Ass'n of Am. R.Rs.*, 575 U.S. 43 (2015) ......................................... 39, 40

*Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc.,*
   191 F.3d 198 (2d Cir. 1999) ........................................................... 40, 49

*D.L. Cromwell Invs., Inc. v. NASD Regulation, Inc.,*
   279 F.3d 155 (2d Cir. 2002) ............................................................... 49

*Duffield v. Robertson Stephens & Co.*, 144 F.3d 1182 (9th Cir. 1998) ......................... 40, 49

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749 (1985) ............................ 51

*EEOC v. Luce, Forward, Hamilton & Scripps,*
   345 F.3d 742 (9th Cir. 2003) .............................................................. 40

*Epstein v. SEC*, 416 F. App'x 142 (3d Cir. 2010) ..................................................... 40

*First Jersey Sec., Inc. v. Bergen*, 605 F.2d 690 (3d Cir. 1979) ......................................... 41

*Flagg Bros., Inc. v. Brooks*, 436 U.S. 149 (1978) ..................................................... 44

*Frazier v. Bd. of Trs.*, 765 F.2d 1278 (5th Cir. 1985) ..................................... 43, 45, 46, 49

*Free Enter. Fund v. PCAOB*, 561 U.S. 477 (2010) ..................................................... 40

*Full Value Advisors, LLC v. SEC*, 633 F.3d 1101 (D.C. Cir. 2011) ................................... 51

*Graman v. Nat'l Ass'n of Sec. Dealers, Inc.,*
   1998 WL 294022 (D.D.C. 1998) ...................................................... 49-50

*Home Care Ass'n of Am. v. Weil*, 799 F.3d 1084 (D.C. Cir. 2015) ................................... 29

*Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421 (5th Cir. 2021) ............................... 21-22, 29

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston, Inc.,*
   515 U.S. 557 (1995) ....................................................................... 52

*Intercontinental Indus., Inc. v. Am. Stock Exch.,*
   452 F.2d 935 (5th Cir. 1971) ......................................................... 22, 48, 49

*Jackson v. Metro. Edison Co.*, 419 U.S. 345 (1974) ........................... 42, 43, 44, 46, 47-48

*John Doe No. 1 v. Reed*, 561 U.S. 186 (2010) ......................................................... 51

*Jones v. SEC*, 115 F.3d 1173 (4th Cir. 1997) .................................................... 40-41

*J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394 (1928) .................................. 37, 38

*Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286 (5th Cir. 2020) ..................................... 25

*Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374 (1995) ................................................ 40

*Lindeen v. SEC*, 825 F.3d 646 (D.C. Cir. 2016) .................................................................... 34

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ........................................................... 21

*Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921 (2019) ............................... 44, 45

*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011) ......................................... 28, 30

*McCullen v. Coakley*, 573 U.S. 464 (2014) .......................................................................... 54

*Meadows v. SEC*, 119 F.3d 1219 (5th Cir. 1997) ................................................................. 18

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.*,
   616 F.2d 1363 (5th Cir. 1980) ............................................................................................ 41

*Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241 (1974) ................................................ 52

*Monterey Mech. Co. v. Wilson*, 125 F.3d 702 (9th Cir. 1997) .............................................. 56

*Moose Lodge No. 107 v. Irvis*, 407 U.S. 163 (1972) ...................................................... 47, 48

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992) .............................................. 25

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*,
   463 U.S. 29 (1983) .............................................................................................................. 35

*NASDAQ OMX Group, Inc. v. UBS Sec., LLC*,
   770 F.3d 1010 (2d Cir. 2014) ............................................................................................. 22

*Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032 (D.C. Cir. 2012) ........................... 34

*Nat'l Ass'n of Mfrs. v. SEC*, 748 F.3d 359 (D.C. Cir. 2014) ............................................. 55

*Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518 (D.C. Cir. 2015) ............................................. 53

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
   138 S. Ct. 2361 (2018) ........................................................................... 51. 52, 53, 54

*Natural Res. Def. Council, Inc. v. SEC*, 606 F.2d 1031 (D.C. Cir. 1979) ........................ 30

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*,
   508 U.S. 656 (1993) ............................................................................................................ 56

*Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447 (1978) ...................................................... 51

*Paris Adult Theatre I v. Slaton*, 413 U.S. 49 (1973) ......................................................... 51

*Perpetual Sec., Inc. v. Tang*, 290 F.3d 132 (2d Cir. 2002) ..................................................... 49

*Rendell-Baker v. Kohn*, 457 U.S. 830 (1982) ........................................................... 45

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781 (1988) .................................... 52

*Rooms v. SEC*, 444 F.3d 1208 (10th Cir. 2006) ........................................................ 50

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47 (2006) ........................................................ 52

*San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522 (1987) .......................................................... 40

*Santa Fe Indus., Inc. v. Green*, 430 U.S. 462 (1977) ........................................................... 22

*SEC v. Chenery Corp.*, 318 U.S. 80 (1943) .............................................................. 32

*SEC v. Wall St. Publ'g Inst., Inc.*, 851 F.2d 365 (D.C. Cir. 1988) ..................................... 51

*SEC v. Zandford*, 535 U.S. 813 (2002) ................................................................. 17

*Shelley v. Kraemer*, 334 U.S. 1 (1948) .......................................................... 47, 48

*Shrimpers & Fishermen of RGV v. Tex. Comm'n on Envtl. Quality*, 968 F.3d 419 (5th Cir. 2020) .......................................................... 20

*Skinner v. Ry. Labor Executives Ass'n*, 489 U.S. 602 (1989) .................................. 43

*Skyline Corp. v. NLRB*, 613 F.2d 1328 (5th Cir. 1980) .............................................. 20-21

*Sorrell v. SEC*, 679 F.2d 1323 (9th Cir. 1982) ...................................................... 42

*State v. Rettig*, 987 F.3d 518 (5th Cir. 2021) ....................................................... 41

*Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381 (1940) ........................................... 41

*Susquehanna Int'l Group, LLP v. SEC*, 866 F.3d 442 (D.C. Cir. 2017) ........................... 31

*Timpinaro v. SEC*, 2 F.3d 453 (D.C. Cir. 1993) ..................................................... 33

*Twin Rivers Paper Co. v. SEC*, 934 F.3d 607 (D.C. Cir. 2019) ..................................... 21

*United States v. Jackson*, 549 F.3d 963 (5th Cir. 2008) .............................................. 45

*United States v. Phillip Morris USA Inc.*, 566 F.3d 1095 (D.C. Cir. 2009) ...................... 54

*United States v. Segura*, 747 F.3d 323 (5th Cir. 2014) .............................................. 49

*United States v. Solomon*, 509 F.2d 863 (2d Cir. 1975) ......................................... 41, 49

*United States v. Wenger*, 427 F.3d 840 (10th Cir. 2005) ........................................ 51, 55

*Vill. of Bensenville v. FAA*, 457 F.3d 52 (D.C. Cir. 2006) .................................. 43

*West Virginia Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) ........................... 52

*W.H. Scott Constr. Co. v. City of Jackson*, 199 F.3d 206 (5th Cir. 1999) ...................... 55-56

*Wooley v. Maynard*, 430 U.S. 705 (1977) ........................................ 52

*Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985) ................... 50-51, 52, 53, 54

*Zhang v. U.S. Dep't of Justice*, 362 F.3d 155 (2d Cir. 2004) ........................... 32

**Statutes**

5 U.S.C. 706(2)(A) ................................................................. 17

Securities Exchange Act of 1934,
    Pub. L. No. 73-291, 48 Stat. 881 (1934) ........................................ 8, 9

Securities Exchange Act of 1934, 15 U.S.C. 78a, *et seq*.

    Section 3(a)(1), 15 U.S.C. 78c(a)(1) .............................. 6
    Section 3(a)(26), 15 U.S.C. 78c(a)(26) .......................... 6
    Section 5, 15 U.S.C. 78e ........................................ 6
    Section 6(b), 15 U.S.C. 78f(b) .................................. 9
    Section 6(b)(4), 15 U.S.C. 78f(b)(4) ............................ 17
    Section 6(b)(5), 15 U.S.C. 78f(b)(5) ........................ *passim*
    Section 6(b)(8), 15 U.S.C. 78f(b)(8) .......................... 6-7, 34
    Section 11A(a)(1)(A), 15 U.S.C. 78k-1(a)(1)(A) ................. 55
    Section 12, 15 U.S.C. 78l ...................................... 8
    Section 19(a), 15 U.S.C. 78s(a) ................................ 7
    Section 19(b), 15 U.S.C. 78s(b) ............................. 7, 9, 37
    Section 19(b)(2)(C), 15 U.S.C. 78s(b)(2)(C) .................. 4, 37
    Section 19(b)(2)(C)(i), 15 U.S.C. 78s(b)(2)(C)(i) ............... 7
    Section 19(b)(2)(C)(ii), 15 U.S.C. 78s(b)(2)(C)(ii) ............. 7
    Section 19(c), 15 U.S.C. 78s(c) .............................. 7, 44
    Section 25(a), 15 U.S.C. 78y(a) ................................ 4
    Section 25(a)(4), 15 U.S.C. 78y(a)(4) ......................... 18

**Legislative Materials**

H.R. Rep. No. 73-1383 (1934) ...................................................... 6

S. Rep. No. 73-792 (1934) ......................................................... 9

S. Rep. No. 73-1455 (1934) ..................................................... 9, 22

S. Rep. No. 94-75 (1975) .............................................................. 6, 8, 9, 34-35, 41

**Commission Releases**

53 Fed. Reg. 39,565 (Oct. 7, 1988) ............................................................ 9

68 Fed. Reg. 64,154 (Nov. 12, 2003) ................................................... 10, 37

69 Fed. Reg. 71,256 (Dec. 8, 2004) .................................................. 8, 10, 11

71 Fed. Reg. 3,550 (Jan. 23, 2006) .......................................................... 39

81 Fed. Reg. 44,400 (July 7, 2016) ............................................. 10, 25, 37

81 Fed. Reg. 81,189 (Nov. 17, 2016) ...................................................... 23

82 Fed. Reg. 48,296 (Oct. 17, 2017) ...................................................... 10

82 Fed. Reg. 50,059 (Oct. 30, 2017) .................................................. 10, 11

84 Fed. Reg. 31,961 (July 3, 2019) ..................................................... 22-23

86 Fed. Reg. 14,484 (Mar. 16, 2021) ...................................................... 32

**Other Authorities**

Am. Bar Ass'n, *Special Study on Market Structure, Listing Standards and
    Corporate Governance*, 57 Bus. Law. 1487 (2002) ......................................... 8, 10, 33

First Annual Report of the Securities and Exchange Commission (1935) ............... 5-6

Louis Loss et al., FUNDAMENTALS OF SECURITIES REGULATION 6.A.5
    (7th ed. 2018) ....................................................................... 9, 36

No. 21-60626

UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

ALLIANCE FOR FAIR BOARD RECRUITMENT,
NATIONAL CENTER FOR PUBLIC POLICY RESEARCH,
*Petitioners*,

v.

SECURITIES AND EXCHANGE COMMISSION,
*Respondent.*

On Petition for Review of an Order of the Securities and Exchange Commission

**BRIEF FOR RESPONDENT
SECURITIES AND EXCHANGE COMMISSION**

**INTRODUCTION**

In the order under review, the Securities and Exchange Commission approved rules that the Nasdaq Stock Market, L.L.C. ("Nasdaq") proposed in response to significant and growing market demand for enhanced disclosures regarding diversity on public company boards. Nasdaq's rules would require that companies choosing to list on its exchange disclose aggregated board-level diversity data and provide an explanation if they do not have at least two diverse board members. The rules would also provide certain listed companies with one-year of free, optional access to a board recruiting service.

Exchanges have long had listing standards addressing disclosures and corporate governance. The first securities exchanges that emerged in the United States over two centuries ago were non-profit associations of brokers that operated trading markets and enforced their members' compliance with exchange rules. These associations entered contractual agreements with the companies that chose to list on the exchange. By the time the federal securities laws were enacted, exchanges often conditioned listing on compliance with disclosure and corporate governance requirements. Companies unwilling to comply could list elsewhere or not list at all.

The Securities Exchange Act of 1934 preserved that basic structure. Exchanges today are for-profit enterprises subject to Commission oversight both in their quasi-governmental role as regulators of their members and in their private, voluntary association with listed companies. Among other things, Congress has tasked the Commission with reviewing and approving each exchange's rules, including its listing standards. That review is limited to determining whether the rule is consistent with requirements specified in the Act. If the rule clears the statutory floor, the Commission must approve it regardless of the Commission's own policy views.

The Commission reasonably concluded that Nasdaq's rules meet that standard because they will facilitate more consistent and comparable disclosure of information important to investors' investment and voting decisions. In challenging that conclusion, petitioners Alliance for Fair Board Recruitment ("AFBR") and National

Center for Public Policy Research ("NCPPR") distort the rules and the Commission's statutory role in reviewing them.

Petitioners contend that Nasdaq's rules are not intended to facilitate disclosure but rather to coerce companies into satisfying a diversity quota.  But the rules do not mandate any particular board composition.  At most, they require companies that choose to list on Nasdaq and do not meet Nasdaq's board diversity goals to provide their shareholders an explanation—in their own words, in as much or as little detail as they choose.  This design reflects Nasdaq's recognition that companies may reasonably pursue a different approach to diversity, and that information about it can meaningfully contribute to investor decision-making.

Petitioners do not contest that disclosure is a central concern of the Exchange Act.  Instead, they argue that Nasdaq has not been delegated authority to address the specific issue of board diversity—failing to recognize that exchange listing standards do not involve the exercise of governmental authority.  The relevant question is whether the Commission reasonably concluded, based on substantial evidence, that Nasdaq's rules are consistent with the Act.  And neither petitioner identifies any basis to second-guess the Commission's considered judgment that they are.

Petitioners also incorrectly assert that Nasdaq's rules fall outside the Exchange Act's purview because board diversity has not been proven beyond empirical dispute to improve company performance.  But the Commission's approval was not, and did

3

not need to be, based on a proven causal link to company performance.  Rather, it was based on the Commission's conclusion that the rules will provide information important to investors' investment and voting decisions—thus advancing a fundamental goal of the Act.  And there is ample record evidence from a broad cross-section of investors, issuers, and other stakeholders supporting that conclusion.

Petitioners devote much of their briefs to arguing that the rules are inconsistent with the First and Fifth Amendments.  But exchange listing standards are not state action subject to constitutional scrutiny.  Petitioners breeze past that threshold bar by relying on cursory dicta in a fifty-year old decision that is inconsistent with decades of subsequent Supreme Court and Fifth Circuit precedent.  As every court to have considered the question in light of that more recent precedent has concluded, the Commission's mere approval of an exchange rule and regulation of exchanges does not convert their private conduct into state action.

## COUNTERSTATEMENT OF JURISDICTION

The Commission issued the challenged order on August 6, 2021, pursuant to Exchange Act Section 19(b)(2)(C), 15 U.S.C. 78s(b)(2)(C).  JA1.  Petitioners AFBR and NCPPR filed timely petitions for review on August 9, 2021, and October 5, 2021, respectively.  This Court has jurisdiction pursuant to Section 25(a) of the Exchange Act.  15 U.S.C. 78y(a).

## COUNTERSTATEMENT OF THE ISSUES

1.	Whether NCPPR has forfeited the issue of its standing.

2.	Whether the Commission reasonably concluded that Nasdaq's Board Diversity Rules are consistent with the requirements of the Exchange Act because they facilitate more consistent and comparable disclosure of information important to investors' investment and voting decisions.

3.	Whether petitioners' constitutional challenges fail at the outset because Nasdaq is a private entity and its Board Diversity Rules are not fairly attributable to the Commission.

4.	Whether, in any event, the Board Diversity Rules would satisfy the applicable level of constitutional scrutiny because they advance the government's substantial interest in facilitating disclosure of decision-useful information to investors while providing companies with substantial compliance flexibility.

## COUNTERSTATEMENT OF THE CASE

### A.	Statutory and Regulatory Background

#### 1.	Exchanges are private entities that register with the Commission as self-regulatory organizations.

When Congress passed the Exchange Act in 1934, at least twenty-one exchanges already operated as member-owned, not-for-profit associations of brokers that coordinated their member brokers' trading and enforced their compliance with industry norms.  *See* First Annual Report of the Securities and Exchange Commission

at 11-12 (1935).  The Act formalized exchanges' frontline responsibility to supervise their members, but subjected exchanges to Commission oversight.  *See generally* H.R. Rep. No. 73-1383 (1934).  Congress subsequently used the term "self-regulatory organization" ("SRO") to refer to such exchanges.  *See* S. Rep. No. 94-75 at 23 (1975).

Nasdaq, a subsidiary of the for-profit company Nasdaq, Inc., operates as an "exchange" as defined under the Exchange Act.  15 U.S.C. 78c(a)(1).  As a result, it was required to register with the Commission as a "national securities exchange"— thereby obtaining SRO status—or seek an exemption from registration.  *Id.* 78c(a)(26), 78e.  Nasdaq is one of twenty-four exchanges registered as a national securities exchange.

The Commission may grant registration only if it determines that an exchange meets the requirements in Section 6(b) of the Act, which requires that the exchange's rules be, among other things, "designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, . . . to remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect investors and the public interest." *Id.* 78f(b)(5).  An exchange's rules must not be "designed to permit unfair discrimination between customers, issuers, brokers, or dealers, or to regulate by virtue of any authority conferred by [the Exchange Act] matters not related to the purposes of [the Act] or the administration of the exchange."  *Id.*  And they must also "not

impose any burden on competition not necessary or appropriate in furtherance of the purposes of" the Act. *Id.* 78f(b)(8).

After initially registering, a national securities exchange must also file any proposed rule or rule change with the Commission. With exceptions not relevant here, the Commission must, after notice and comment, approve or disapprove the proposal by written order. *Id.* 78s(a)-(b). The Exchange Act provides that the Commission "shall approve a proposed rule change" if it finds that the proposal "is consistent with the requirements of" the Act and the rules and regulations thereunder. *Id.* 78s(b)(2)(C)(i). These "requirements" include the requirements of Section 6(b).

The Commission does not have discretion to modify an exchange's proposed rule—it must approve the proposed rule if it finds that it is consistent with the requirements of the Act or disapprove the rule if it does not. *Id.* 78s(b)(2)(C)(i)-(ii). Section 19(b) thus preserves the ability of individual exchanges to make judgments regarding their own operations and policies within the parameters set by the Act and Commission rules. Separately, under Section 19(c), the Commission may initiate its own rulemaking proceeding to "abrogate, add to, and delete from" existing exchange rules—thereby imposing its own policy preferences—but this case does not involve such a rulemaking. *Id.* 78s(c).

### 2. Exchanges also enter contractual arrangements to provide a market for the securities of companies that abide by their listing standards.

Generally, a stock must be "listed" on an exchange to be traded on any exchange. 15 U.S.C. 78l. Listing is a private, contractual agreement between an issuer and an exchange "in accordance with which the issuer assumes certain duties, and the exchange undertakes to provide a fair and orderly market for the securities." S. Rep. No. 94-75 at 18. Listing on an exchange is voluntary—securities also trade off-exchange—and exchanges compete vigorously to attract and retain listings, including through their choice of listing standards. 69 Fed. Reg. 71,256, 71,263 (Dec. 8, 2004).

Exchanges began to include standards in their listing agreements with issuers in the late 1800s in order to promote market stability and investor confidence and to differentiate themselves from competing exchanges. *See* Am. Bar Ass'n, *Special Study on Market Structure, Listing Standards and Corporate Governance*, 57 Bus. Law. 1487, 1496-1503 (2002). By the early 1900s, the New York Stock Exchange's listing agreements mandated, for example, annual reports and other financial disclosures, an annual stockholders' meeting, and a one share, one vote standard. *Id.* at 1498-99.

In enacting the Exchange Act in 1934, Congress granted the Commission authority to "alter or supplement" exchange rules with respect to twelve enumerated matters, including listing standards. § 19(b), 48 Stat. 881, 898-99 (1934). But Congress preserved exchanges' ability to maintain and adopt listing standards "not

inconsistent with [the Act]," *id.* § 6(c), 48 Stat. at 886, and stressed their continued

importance, *see* S. Rep. No. 73-1455 at 68-69 (1934), S. Rep. No. 73-792 at 4-5 (1934).

In 1975, Congress enacted the current affirmative requirements on exchange

rules and established the Commission review process described above. 15 U.S.C.

78f(b), 78s(b). Under these provisions, listing standards, like all exchange rules, are

generally subject to Commission approval for consistency with the Exchange Act.

*Bus. Roundtable v. SEC*, 905 F.2d 406, 409 (D.C. Cir. 1990). But this did not alter the

private character of listing standards. *See* Louis Loss et al., FUNDAMENTALS OF

SECURITIES REGULATION 6.A.5 (7th ed. 2018). As Congress explained, exchanges

exercise "delegated governmental power" when engaged in their traditional self-

regulatory functions—where they act as *regulators* of their broker-dealer members.

S. Rep. 94-75 at 22-23, 24, 32; *accord Bus. Roundtable*, 905 F.2d at 414; *Austin Mun. Sec.,*

*Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.,* 757 F.2d 676, 680 (5th Cir. 1985). But exchanges

do not perform a quasi-governmental function when they propose or enforce listing

standards, which arise from "contractual agreement" with the companies that list with

them. S. Rep. 94-75 at 18. In that capacity, they act as *regulated* entities—not *regulators*

of their listed companies.

While listing standards must be consistent with the Act, the statutory criteria

afford exchanges latitude to impose standards that reflect their own policy views and

competitive positioning. *See* 53 Fed. Reg. 39,565, 39,566 (Oct. 7, 1988). Listing

standards thus differ among exchanges, and it is not uncommon for one exchange to adopt a rule that others have not. *See, e.g.*, NYSE Listed Company Manual § 303A.09 (requiring issuers adopt and disclose corporate governance guidelines); LTSE Rule 14.425 (requiring issuers adopt and publish policies concerning their long-term strategies). Listing standards can and often do go beyond what is required by federal securities law and regulation. *See* 81 Fed. Reg. 44,400, 44,403 (July 7, 2016); 69 Fed. Reg. at 71,256-57.

Some listing standards impose minimum financial qualifications. 82 Fed. Reg. 48,296, 48,298 (Oct. 17, 2017). Others seek to ensure that listed companies "establish good governance practices and maintain effective oversight of the reliability of corporate financial information." 68 Fed. Reg. 64,154, 64,175 (Nov. 12, 2003). Exchanges have standards addressing core matters of corporate governance such as financial statements, disclosure requirements, director compensation, and board structure and independence. *See, e.g.*, *id.*; 81 Fed. Reg. at 44,403; 69 Fed. Reg. at 71,263; 57 Bus. Law at 1498-1500, 1510-14.

Moreover, listing standards remain an important way that exchanges distinguish themselves in the market for listing services. 82 Fed. Reg. 50,059, 50,064 (Oct. 30, 2017). The New York Stock Exchange, for example, touts that its standards ensure that its listed companies have "achieved maturity and front-rank status in its industry." NYSE Listed Company Manual § 101.00. And the Long-Term Stock

Exchange's rules are designed to attract companies that prioritize long-term decision-making.  *See* LTSE Rule 14.425.  Issuers also make decisions about where to list based in part on listing standards.  *See* 82 Fed. Reg. at 50,064; 69 Fed. Reg. at 71,263.

### B.    Proceedings Before the Commission

#### 1.    Nasdaq's Proposed Rule Changes

In December 2020, Nasdaq filed with the Commission proposals to adopt listing rules relating to board diversity ("Board Diversity Rules") and to offer certain listed companies one-year complimentary access to a board recruiting service ("Board Recruiting Service Rule").  JA689, 723.  In February 2021, Nasdaq filed superseding amendments containing modifications in response to comments.  JA162-97, 256-609.

#### a.    Board Diversity Rules

The Board Diversity Rules have two components.  *First*, Rule 5606 requires each Nasdaq-listed company to publicly disclose in an aggregated form, to the extent permitted by applicable law, information on the voluntary, self-identified gender and racial characteristics and LGBTQ+ status of the company's board of directors using a standardized Board Diversity Matrix.  JA603-04.

*Second*, Rule 5605(f) requires each Nasdaq-listed company to either have, or explain why it does not have, at least two members of its board of directors who are Diverse, including at least one director who self-identifies as Female and at least one director who self-identifies as an Underrepresented Minority or LGBTQ+.  JA598-99.

The rule provides additional flexibility for foreign and small companies.  JA599.  If a company elects to comply by disclosing why it does not meet the applicable diversity objectives, Nasdaq will verify that the company has provided an explanation but will not evaluate its substance or merits.  JA329-30, 599.

Nasdaq explained that the Board Diversity Rules establish a "disclosure-based framework, not a mandate or quota."  JA204.  Companies are "free to use their discretion as to how, whether, or when they pursue [Nasdaq's] diversity objectives."  JA222.  They "may choose to pursue different diversity objectives, or none at all."  JA225.  So long as they provide an explanation, such companies "will not face consequences or be delisted."  JA204.

### b.    Board Recruiting Service Rule

Nasdaq's Board Recruiting Service Rule offers certain Nasdaq-listed companies one year of voluntary, complimentary access to a board recruiting service to help them identify and evaluate diverse board candidates.  JA2-3.

### 2.    Support for the Proposed Rule Changes

Nasdaq asserted that a significant and growing number of investors seek consistent and comparable information regarding board diversity for use in making investment and voting decisions.  And it argued that an extensive body of empirical research supports the view of many investors that diverse boards are positively

associated with improved company performance and corporate governance.  Many commenters affirmed Nasdaq's conclusions.

### a. Investor demand for board diversity information

Nasdaq's research and market outreach revealed a consensus across investors and other stakeholders regarding the value of board diversity.  JA266-67, 271.  Numerous institutional investors—including Vanguard, Blackrock, and State Street Global Advisors—have called for companies to disclose board diversity information and have included board diversity expectations in their engagement and proxy voting guidelines.  JA269, 309.  Similarly, the largest proxy advisory firms have aligned their voting policies to encourage increased board diversity disclosure.  JA310-11.  And many other investors, market participants, and stakeholders have supported greater transparency with respect to board diversity.  JA261-63, 301-02, 311-13.

Despite investors' growing interest, Nasdaq found that current board diversity disclosures are "unreliable, unusable, and insufficient to inform investment and voting decisions."  JA306.  Nasdaq explained that current disclosures are limited and inconsistent in their content and format, making it difficult for all but the largest and most well-resourced investors to determine the state of diversity on company boards or companies' approach to board diversity.  JA267-68, 305-07, 314, 366.  Nasdaq found "broad-based support for uniform disclosure requirements regarding board

diversity" that would make it more efficient and less costly to access and compare diversity information. JA270, 301.

The Commission received numerous comments corroborating Nasdaq's findings. Institutional and retail investors, pension funds, and issuers, among others, affirmed that board diversity information is important to the investment and voting decisions of many investors, and that existing disclosures are inadequate. JA6, 209-10, 217. And many commenters agreed that the Board Diversity Rules would provide investors with more accessible, comparable, and transparent information about board diversity. JA6, 209-10, 217.

### b. Evidence linking board diversity and improved company and board performance

Nasdaq discussed multiple studies finding a positive association between diverse boards and various measures of company performance. JA276-80. Nasdaq also identified more than a dozen studies finding a positive association between gender diversity and various investor protections, and it considered the assessment of some academics that these findings extend to other forms of diversity. JA284-90, 357, 380. In addition, Nasdaq cited several studies suggesting that diversity may improve board decision-making. JA290-293.

Nasdaq acknowledged that some studies have found little or no relationship between diversity and company performance. JA207, 280-82. But Nasdaq argued that the "overwhelming majority" of studies do show a positive association between

board diversity and these benefits.  JA205, 207, 280, 283.  At a minimum, Nasdaq

argued, the empirical research "support[s] the conclusion that board diversity does not

have adverse effects on company performance."  JA283; *see also* JA207.

Many commenters, including prominent institutional investors and members of

the issuer community, agreed that board diversity improves corporate governance and

board decision making.  JA8, 205-06, 210, 221-22; *see also* JA270-71 ("[O]rganizational

leaders representing every category of corporate stakeholders Nasdaq spoke with . . .

were overwhelmingly in favor of diversifying boardrooms.").  Some offered additional

evidence based on studies or their own experiences.  JA8, 205-06, 221-22.

### 3.    The Commission's Order

The Commission approved the proposed rule changes as consistent with the

requirements of the Exchange Act.  JA2.  The Commission began its analysis by

stressing that the Board Diversity Rules do not mandate any particular board

composition but instead establish a disclosure-based framework.  JA5.  A company

that cannot or chooses not to meet Nasdaq's diversity goals need only provide

investors an explanation.  And the rules seek to minimize that burden—companies

may craft the explanation in their own words, with as much or little detail as they

choose, and Nasdaq will not evaluate its substance.  JA5.  Moreover, "[n]o company is

required to list on Nasdaq," and thus a company that objects to providing any explanation at all may transfer its listing to a competing exchange.  JA5.

The Commission also found that although there is "broad demand" among investors for board diversity information, such information is "currently not widely available on a consistent and comparable basis."  JA2, 7.  It further determined that the disclosures required by the rules "would provide widely available, consistent, and comparable information that would contribute to investors' investment and voting decisions."  JA7-8.  And in doing so, the rules "would make it more efficient and less costly for investors to collect, use, and compare information on board diversity."  JA7; *see also* JA10, 15.

The Commission did not rest its approval on a finding that increases in board diversity have been empirically proven to improve company performance.  It concluded that the empirical evidence on that question is "mixed," and that the effects of board diversity are "the subject of reasonable debate."  JA9.  At the same time, the Commission concluded that any adverse effects of Nasdaq's rules are likely to be relatively limited as compared to regulatory regimes that *mandate* board diversity because of the options companies have to either provide an explanation or list on a competing exchange.  JA10.

The Commission thus determined that the rules were "designed to promote just and equitable principles of trade, remove impediments to and perfect the

mechanism of a free and open market and a national market system, and protect investors and the public interest." JA2, 7; *see also* JA15, 17. The Commission further found that the rules were "not designed to permit unfair discrimination between issuers or to regulate by virtue of any authority conferred by the Act matters not related to the purposes of the Act or the administration of the Exchange, and would not impose any burden on competition that is not necessary or appropriate in furtherance of the purposes of the Act." JA2. And the Commission found that the Board Recruiting Service Rule was designed to provide for the equitable allocation of reasonable dues, fees, and other charges as required by Section 6(b)(4). JA21.

The Commission rejected constitutional concerns raised by some commenters, explaining that the rules do not constitute state action and, in any event, require factual disclosures that advance important interests. JA17.

## STANDARD OF REVIEW

Under the Administrative Procedure Act ("APA"), the Commission's order may be set aside only if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. 706(2)(A). The Commission's reasonable interpretation of an ambiguous federal securities statute controls. *See SEC v. Zandford*, 535 U.S. 813, 819-20 (2002); *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 842-45 (1984).

"The findings of the Commission as to the facts, if supported by substantial evidence, are conclusive." 15 U.S.C. 78y(a)(4). This evidentiary threshold "is not high." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). Substantial evidence is "more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Boeta v. FAA*, 831 F.3d 636, 641 (5th Cir. 2016) (quotation omitted). Contrary to AFBR's suggestion (at 58), this test is not "applied" more "carefully" to the Commission than to other agencies. *See Meadows v. SEC*, 119 F.3d 1219, 1224 (5th Cir. 1997).

## SUMMARY OF ARGUMENT

NCPPR has not met its burden to establish standing in its opening brief, and thus only AFBR's arguments are properly before the Court. In any event, neither petitioners' challenges to the Commission's order withstand scrutiny.

1. Exchange rules that provide decision-useful information to investors advance the Exchange Act's core purpose and are consistent with Section 6(b)(5)'s requirements. Petitioners do not seriously dispute this. Instead, they argue that the real purpose of Nasdaq's Board Diversity Rules is not to facilitate disclosure but to coerce companies into satisfying a diversity quota. But that contention is inconsistent with the rules' design, and substantial evidence supports the Commission's contrary conclusion that the board-level diversity disclosures and company explanation

18

requirement will provide information important to investors' investment and voting decisions.

Petitioners also incorrectly assert that the Commission may only approve exchange disclosure rules that concern matters empirically proven to affect company performance and that meet the materiality standard that governs liability under the antifraud provisions of the securities laws.  There is no support for either proposition in the text, structure, or history of the Exchange Act—and their acceptance would call into question a vast array of longstanding Commission and exchange rules.

Here, the Commission made independent findings, based on substantial evidence, that there is a "reasonable debate" as to the benefits of board diversity, and that a diverse collection of institutional investors, individual investors, listed companies, and other stakeholders have concluded that board diversity is valuable and consider it important to investors' investment and voting decisions.  These findings amply justify the Commission's conclusion that Nasdaq's rules are designed to further the Exchange Act's objectives and do not regulate matters unrelated to its purposes. And the Commission's conclusions that the rules are not unfairly discriminatory, and do not impose inappropriate burdens on competition, are similarly reasonable and reasonably explained.

2.  Petitioners' constitutional arguments fail at the outset because Nasdaq is a private entity.  The mere fact that it is regulated by the Commission and that its listing

requirements are reviewed by the Commission for consistency with the Act does not convert those requirements into state action.  In arguing to the contrary, petitioners rely on non-binding dicta from a half-century old decision that is inconsistent with modern Supreme Court state-action doctrine and the decisions of multiple circuits.

3.  Even if state action were not a bar, petitioners' arguments that the rules are subject to strict scrutiny mischaracterize the rules and misread the relevant case law. The rules would be subject to lesser First and Fifth Amendment scrutiny, which they satisfy because they further the government's substantial interest in providing investors with information that contributes to their investment and voting decisions.

## ARGUMENT

### I.    NCPPR has failed to demonstrate that it has standing.

Petitioners "bear[] the burden of establishing standing" with "specific facts" supported by "affidavit or other evidence." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 412 (2013) (quotation omitted); *accord Shrimpers & Fishermen of RGV v. Tex. Comm'n on Envtl. Quality*, 968 F.3d 419, 423 (5th Cir. 2020).  And a petitioner is generally required to meet its burden to establish standing in its opening brief.  *See Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 542 (5th Cir. 2019).

NCPPR has not done so, asserting only that it "both holds stock and exercises its voting rights in Nasdaq-listed companies."  NCPPR Br. 7.  But "[s]tatements by counsel in briefs are not evidence."  *Skyline Corp. v. NLRB*, 613 F.2d 1328, 1337 (5th

Cir. 1980).  Nor can NCPPR's failure to establish standing in its opening brief be excused on the ground that it had "a good-faith (though mistaken) belief that standing would be both undisputed and easy to resolve."  *Ctr. for Biological Diversity*, 937 F.3d at 542 n.4; *see also Twin Rivers Paper Co. v. SEC*, 934 F.3d 607, 614 (D.C. Cir. 2019) (standing affidavits submitted with reply brief "came too late").  NCPPR is not a Nasdaq-listed company subject to the Board Diversity Rules, making its standing "substantially more difficult" to establish.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992) (quotation omitted).  And NCPPR does not state what Nasdaq-listed companies it owns stock in, whether those companies already meet Nasdaq's diversity objectives, or how they plan to respond to the rules.

Because NCPPR has forfeited the issue of its standing, only the arguments raised by AFBR are properly before the Court.  *See Corrosion Proof Fittings v. EPA*, 947 F.2d 1201, 1209-10 (5th Cir. 1991).  Nonetheless, out of an abundance of caution, this brief addresses the arguments raised by both petitioners.

## II.    The Commission reasonably concluded that Nasdaq's rules are consistent with the requirements of the Exchange Act.

The Commission's determination that Nasdaq's Board Diversity Rules and Board Recruiting Service Rule are consistent with the requirements of the Exchange Act readily satisfies the APA's "narrow and highly deferential" arbitrary-and-

capricious standard.  *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 449 (5th Cir. 2021)

(quotation omitted).

      **A.**    **The Commission reasonably concluded that the Board Diversity Rules are designed to further the Exchange Act's objectives and do not regulate matters unrelated to the Act's purposes.**

          **1.**    **The provision of information important to investment and voting decisions is a core premise of the Exchange Act, underpinning many of the criteria in Section 6(b)(5).**

    "[T]he animating goal of federal securities law" is the maintenance of fair and

orderly markets.  *NASDAQ OMX Group, Inc. v. UBS Sec., LLC*, 770 F.3d 1010, 1021

(2d Cir. 2014).  This goal is referenced "throughout the [Exchange] Act, including

components that apply to SROs such as Nasdaq."  JA2 & n.23.  And a key means by

which the Act pursues it is implementing a "philosophy of full disclosure."  *Santa Fe

Indus., Inc. v. Green*, 430 U.S. 462, 477-78 (1977) (quotation omitted); *see Intercontinental

Indus., Inc. v. Am. Stock Exch.*, 452 F.2d 935, 940 (5th Cir. 1971) ("The requirement of

full disclosure of all corporate information which might influence investment

decisions is the very heart of the federal securities regulations.").

    This philosophy underpins many of Section 6(b)(5)'s requirements.  *Cf.* S. Rep.

73-1455 at 55 ("One of the prime concerns of the exchanges should be to make

available to the public, honest, complete, and correct information regarding the

securities listed."); *NASDAQ OMX Group*, 770 F.3d at 1021 (noting that Section

6(b)(5)'s requirements aim to promote fair and orderly markets); 84 Fed. Reg. 31,961,

31,967 (July 3, 2019) (rule that "reduc[ed] information asymmetry among market participants" was designed to promote just and equitable principles of trade and remove impediments to a free and open market); 81 Fed. Reg. 81,189, 81,196 (Nov. 17, 2016) (rule requiring that certain market data "be made available to all market participants at the same time" was designed to promote just and equitable principles of trade and to protect investors and the public interest). Thus, exchange rules that facilitate the disclosure of, and reduce inequalities in access to, information that contributes to informed investment and voting decisions are designed to further the objectives of Section 6(b)(5). JA2, 16, 17.

### 2. Substantial evidence supports the Commission's findings that the Board Diversity Rules facilitate disclosure of information important to investor decision-making.

Because they require an explanation rather than any particular board composition, the Board Diversity Rules establish a "disclosure-based framework," not a diversity mandate. JA5, 12. And substantial record evidence shows that the rules both facilitate the disclosure of information important to investors' decision-making and promote more efficient and equal access to such information. JA2. Accordingly, the Commission reasonably concluded that the rules are "designed to promote just and equitable principles of trade, remove impediments to and perfect the mechanism

of a free and open market and a national market system, and protect investors and the public interest."  JA2.

As the Commission explained, comments from a "diverse collection" of "institutional investors, investment managers, listed companies, and individual investors," as well as "statements made by institutional investors, asset managers, and business organizations," establish that there is "broad demand" among investors for board diversity information for use in their investment and voting decisions.  JA7 & nn.85-86, 91-92; *see also* JA2, 6 & nn.73-75 (citing "many commenters" representing a "broad array" of investors who consider board diversity information important to investment and voting decisions).  The record showed that such information is "currently not widely available on a consistent and comparable basis."  JA2; *see also* JA6 n.72 (citing comments).

The Commission also reasonably found that the Board Diversity Rules will make "consistent and comparable" board diversity data "widely available to investors."  JA2, 7; *see also* JA6 nn.78-79 (citing comments).  In particular, by defining "Diverse" and standardizing the disclosure format and timing, the rules will "make it more efficient and less costly for investors to collect, use, and compare information on board diversity."  JA7; *see also* JA10, 15.  The rules will "also mitigate any concerns regarding unequal access to information" between larger and smaller investors.  JA7.

In addition, the record supports the Commission's finding that the company explanation requirement will promote "a better understanding" of why companies do not meet Nasdaq's objectives, which will both "facilitate [investors'] evaluation of companies in which they might invest" and help investors make more informed decisions "on issues related to corporate governance, including director elections," whether "to preserve the existing board composition," and "the risks and costs of increased board diversity." JA2, 5 n.54, 8; *see also* JA4 n.43, 6 & nn.73, 77-80 (citing comments).

Based on this evidence, the Commission also reasonably concluded that the Board Diversity Rules do not "regulate, by virtue of any authority conferred by the Act, matters not related to the purposes of the Act or the administration of the Exchange." JA2, 16; *cf. Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) ("The ordinary meaning of th[e] words ['relating to'] is a broad one."); *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 292 (5th Cir. 2020) (same). Facilitating disclosure of information important to investors is a core purpose of the Act and the Commission has long permitted exchange rules "designed to improve governance, as well as transparency and accountability into corporate decision making for listed issuers." JA2, 15-16 & n.202, 17; *see, e.g.*, 81 Fed. Reg. at 44,403 (approving rule requiring disclosure of third-party compensation to board directors and nominees).

Moreover, the Commission itself requires that companies disclose whether, and how, their boards consider diversity in nominating new directors.  JA2 & n.20.

### 3.    Petitioners' contrary arguments lack merit.

Petitioners fail to demonstrate that the Commission's analysis was arbitrary and capricious.

1.  Petitioners contend that the Board Diversity Rules regulate matters unrelated to the Exchange Act's purposes because their "actual and obvious goal" is not to facilitate disclosure but to "favor[] certain people because of their race, sex, or sexual orientation."  AFBR Br. 66; *see also* NCPPR Br. 29-30; States Amici Br. 16-17. But their argument that the company explanation requirement is intended to "shame" companies into satisfying a diversity "quota" is inconsistent with the rule's design, and substantial evidence supports the Commission's contrary conclusion that the requirement instead will contribute to investors' decision-making.

Far from compelling an "apology," the rules do not specify what a company must say—a company "can choose to disclose as much, or as little, insight into [its] circumstances or diversity philosophy as [it] determines" and Nasdaq will "not evaluate the substance or merits" of the explanation.  JA3 & n.31.  This approach accords with Nasdaq's recognition that there is more than one reasonable conception of diversity and companies may pursue a different approach or none at all—and that disclosure of such information "will improve the quality of information available to

investors who rely on [board diversity data] to make informed investment and voting decisions." JA204, 222, 225, 360.

Indeed, Nasdaq provided multiple examples of explanations that would inform investors' consideration of a company's board-level diversity data, such as that a company "has a board philosophy regarding diversity that differs from Nasdaq's diversity objectives," or does not believe Nasdaq's objectives are "feasible given [its] current circumstances." JA205, 274, 356, 359-60. The Commission was not obligated to accept petitioners' speculation that explanations like these will lead to "public shaming" and other "tremendous harms." AFBR Br. 26, 34. Moreover, contrary to AFBR's assertions (at 10-11, 47), even the minimal explanation some companies may opt to provide will give investors access to more information than they currently have and may inform investors about the company's approach.

2. Many of petitioners' other arguments stem from the mistaken premise that the Commission was required to find that the rules would improve corporate or board performance, and had to do so to an empirical certainty. AFBR Br. 60; NCPPR Br. 46-47. But the relevant provisions in Section 6(b)(5) are not solely focused on corporate performance. Rather, they also address market effects—such as "just and equitable principles of trade" and "remov[ing] impediments to and perfect[ing] the mechanism of a free and open market and a national market system"—and investor protection. Indeed, the Supreme Court has recognized the substantial investor-

protection interest in providing investors information important to their voting and investing decisions. *See Basic Inc. v. Levinson*, 485 U.S. 224, 246 (1988) ("[S]ecurities markets are affected by information . . . .  No investor, no speculator, can safely buy and sell securities upon the exchanges without having an intelligent basis for forming his judgment as to the value of the securities he buys or sells." (quotation omitted)).

Nor did the Commission's finding that the empirical evidence regarding the effects of board diversity is currently "inconclusive," JA10, render it impermissible to rely on the importance investors place on board diversity information.  AFBR Br. 60; NCPPR Br. 38, 40-41.  It is not "objectively unreasonable" for investors to make decisions based on this information just because the connection between board diversity and corporate performance is not proven conclusively.  Investors regularly make investment decisions based on judgments that have not been empirically validated.  *Cf. Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 43 (2011) (observing that "reasonable investors" may "act on the basis of evidence of causation that is not statistically significant").

And nothing in Section 6(b)(5) precludes the Commission from considering the "subjective" views of investors in determining whether a disclosure rule will contribute to investor decision-making.  NCPPR Br. 38-39.  Such consideration does not give exchanges "unfettered discretion" to require any disclosure that investors request.  Rather, real-world evidence that investors *do* consider particular information

when making investment and voting decisions can bolster a reasonable conclusion that a disclosure is consistent with the purposes of the Act.

Here, the Commission found that there was a "reasonable debate" among researchers about the value of board diversity, with a number of studies finding benefits. JA9. And it found that many market participants—including some of the country's largest and most sophisticated asset managers, who have a fiduciary duty to act in their clients' best interest—have concluded that board diversity benefits companies and so consider it when making investment and voting decisions. *Supra* 24-25. That evidence amply supports the Commission's conclusion that Nasdaq's rules are "designed to" further Section 6(b)(5)'s objectives. *See Home Care Ass'n of Am. v. Weil*, 799 F.3d 1084, 1096 (D.C. Cir. 2015) (agency "reasonably credited comments suggesting that the new rule would improve the quality of home care services").[1] And it belies NCPPR's claim (at 47) that only "bigoted individuals" would base decisions on board diversity.

Petitioners' argument that the Act limits exchange disclosure requirements to "material" information also lacks merit. AFBR Br. 60-61; NCPPR Br. 45-47. Petitioners rely solely on cases interpreting the antifraud provisions of the federal securities laws, which require materiality for the imposition of liability—*i.e.*, it must be

---

[1] Because the Commission's analysis is consistent with Section 6(b)(5)'s plain text, the Court need not address NCPPR's attack on *Chevron* deference (at 42-45). Regardless, *Chevron* remains a binding Supreme Court precedent. *See Huawei Techs.,* 2 F.4th at 433.

"substantially likely that a reasonable investor would have viewed" an alleged misstatement or omission "as having significantly altered the total mix of information made available." *Matrixx Initiatives*, 563 U.S. at 47 (quotation omitted). None of those cases purports to limit the scope of an exchange's authority to require corporate disclosures of information important to investors' investment and voting decisions.

On the contrary, the Act gives the Commission "very broad discretion to promulgate rules governing corporate disclosure." *Natural Res. Def. Council, Inc. v. SEC*, 606 F.2d 1031, 1050 (D.C. Cir. 1979) (citing provisions authorizing disclosure requirements as necessary or appropriate in the public interest or for the protection of investors). And in their listing rules, exchanges have historically required disclosures beyond those required by the Commission. JA15-16 & n.202. As just discussed, the Commission reasonably concluded based on the record before it that the Board Diversity Rules are "related to" the Act's core disclosure-related purposes and further Section 6(b)(5)'s objectives. *Supra* 29; *see also* JA6 & n.77 ("[M]any commenters believe that the proposed board diversity disclosures would be material to investors.").

3. The D.C. Circuit's decision in *Business Roundtable*, 905 F.2d 406, cited at AFBR Br. 61, 63; NCPPR Br. 30-31; States Amici Br. 2, 18, does not cast any doubt on the Commission's conclusions. *Business Roundtable* held that a *Commission* rule on shareholder voting rights exceeded the Commission's authority because it regulated

30

"an issue that is so far beyond matters of disclosure," and if accepted, would allow the Commission to "establish a federal corporate law." 905 F.2d at 408, 412.

Neither concern is implicated here. Nasdaq's rule is a disclosure rule that advances a "central" purpose of the Exchange Act. *Id.* at 410; *see supra* 22-23, 25-26. And it is a rule of an exchange, not the Commission. As the court explained in *Business Roundtable*, exchanges "may adopt listing rules on . . . corporate governance matters"—indeed, they may adopt the same type of rule the court held that the Commission could not impose. *Id.* at 414 (emphasis omitted). Commission approval of a disclosure-related listing standard voluntarily adopted by an exchange, which listed companies accept as a condition of listing, does not pose the same threat to "federalize" a "substantial portion" of state corporate law. *Id.* (quotation omitted).

Petitioners also err in asserting that the Commission "'merely accept[ed]'" Nasdaq's assertions that diversity information would facilitate informed investor decisions instead of making findings of its own. NCPPR Br. 41, 48 (citing *Susquehanna Int'l Group, LLP v. SEC*, 866 F.3d 442, 447 (D.C. Cir. 2017)); *see also* AFBR Br. 65. Here, unlike in *Susquehanna*, the Commission "critically reviewed [Nasdaq's] analysis." 866 F.3d at 447. It concluded that there was insufficient evidence to base approval on one of the two principal rationales Nasdaq had advanced—that board diversity improves corporate governance and performance. JA9-10. And the Commission's determination that approval was justified on Nasdaq's

disclosure-based rationale rested on its independent assessment of the statutory factors and record evidence, including studies Nasdaq had not cited and comments and statements from investors and other corporate stakeholders.  *See supra* 15-17, 23-26; JA2-16.

Finally, there is no merit to AFBR's argument (at 59) that the Commission erred in finding that the Board Diversity Rules promote just and equitable principles of trade because Nasdaq did not expressly rely on that objective.  Nothing in the Act or Commission rules limits the Commission to the statutory factors analyzed by the exchange.  AFBR had the opportunity to comment on all of the factors.  *See* 86 Fed. Reg. 14,484, 14,492-93 (Mar. 16, 2021).  And its reliance on *SEC v. Chenery Corp.*, 318 U.S. 80 (1943), through *Business Roundtable*, 905 F.2d at 417, is misplaced because *Chenery* applies to judicial review of agency action, not Commission review of exchange rules.  *Cf. Zhang v. U.S. Dep't of Justice*, 362 F.3d 155, 158 (2d Cir. 2004).

**B.    The Commission reasonably concluded that the Board Diversity Rules do not unfairly discriminate against domestic issuers or impose inappropriate burdens on competition.**

AFBR's cursory arguments that the Board Diversity Rules unfairly discriminate against domestic issuers and unduly burden competition lack merit.

***No unfair discrimination.***  Under Nasdaq's rules, a domestic issuer's second diverse director must be either LGBTQ+ or an "Underrepresented Minority," a defined term reflecting the unique demographic composition of the United States.

JA2-3 & n.18. A foreign issuer's second diverse director, by contrast, may be female,

LGBTQ+, or "an underrepresented individual based on national, racial, ethnic,

indigenous, cultural, religious, or linguistic identity in [its] country." JA3 & n.26.

AFBR "ha[s] not shown that it is in any way unfair" to establish different

diversity objectives and disclosures for domestic and foreign issuers. *Timpinaro v.*

*SEC*, 2 F.3d 453, 456 (D.C. Cir. 1993) (The Exchange Act "prohibits unfair

discrimination, not discrimination *simpliciter*." (quotation omitted)); *see also* JA12 n.160

(citing exchange rules that treat foreign and domestic issuers differently); 57 Bus. Law

at 1514-15 (same). On the contrary, as the Commission concluded, it was not

unreasonable for Nasdaq, in setting aspirational diversity goals, "to take into account

the differing demographic compositions of foreign countries and to provide [foreign

issuers] flexibility in recognition of the different circumstances" they face. JA12. And

it was likewise appropriate for Nasdaq to recognize that its definition of

"Underrepresented Minority" for domestic purposes "may not be as effective in

identifying underrepresented board members in foreign countries" and "may

therefore result in disclosures that are less useful for investors who seek board

diversity information for [foreign issuers.]" JA12.

AFBR's assertions (at 64-65) that underrepresented minorities may be treated

"worse" in other countries, and that a second female director may not have the same

effect as an underrepresented minority, do not establish that it was unreasonable for

Nasdaq to adopt a more flexible goal for foreign issuers given the differing demographics among countries. And AFBR's observation (at 65) that the disclosures of domestic and foreign issuers will not be "uniform" does not refute the Commission's reasonable predictive judgment that the disclosures "may still be important to investors' investment and voting decisions." JA12; *see Belenke v. SEC*, 606 F.2d 193, 199 (7th Cir. 1979).

     ***No inappropriate burden on competition.*** AFBR similarly errs in asserting (at 66-67) that the Board Diversity Rules run afoul of Section 6(b)(8)'s requirement that exchange rules not impose a burden on competition not necessary or appropriate in furtherance of the purposes of the Act. That provision does not require a formal, quantitative cost-benefit analysis, as AFBR appears to contend. *See Lindeen v. SEC*, 825 F.3d 646, 658 (D.C. Cir. 2016) ("We do not require the Commission . . . to conduct a rigorous, quantitative economic analysis unless the statute explicitly directs it to do so." (quotation omitted)); *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1039 (D.C. Cir. 2012) (statutory duty to *consider* a rule's economic consequences does not require agency to demonstrate that a rule's benefits "outweigh" its costs). Rather, it requires the Commission to "balance" competitive considerations against other policy goals of the Exchange Act. *Bradford Nat'l Clearing Corp. v. SEC*, 590 F.2d 1085, 1105 (D.C. Cir. 1978); *Belenke*, 606 F.2d at 200. And this balancing is subject to the same deferential arbitrary-and-capricious review as other determinations. S. Rep. No.

94-75 at 13 (1975); *Bradford*, 590 F.2d at 1104.  The Commission's reasoned predictive

judgment here satisfied that standard.

AFBR incorrectly asserts that the rules have no benefits given the
The Commission explained that companies are not required to meet the

diversity objectives.  JA14.  It recognized that there may nonetheless be some adverse

effects on companies that choose not to make the required disclosures, but reasonably

determined that the rules contained measures to "mitigate" those effects.  JA14-15.  It

also reasonably found that the rules "may promote competition" by allowing Nasdaq

to compete for "the listings of companies that prefer to be listed on an exchange that

provides investors with" board diversity information.  JA14.

AFBR incorrectly asserts that the rules have no benefits given the

Commission's finding that the empirical evidence regarding board and company

performance is mixed, but this ignores the Commission's reasonable conclusion that

disclosure of board diversity information would nonetheless be beneficial to investors.

*Supra* 26-29.  And as discussed above, the Commission considered studies finding

potential adverse effects from board diversity mandates, reasonably determining that

any adverse effects of Nasdaq's disclosure-based rules are likely to be "comparatively

limited."  JA10.  The Commission thus met its obligation to "articulate a satisfactory

explanation for its action," including a "rational connection between the facts found

and the choice made."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463

U.S. 29, 43 (1983) (quotation omitted).

### C.  NCPPR's non-delegation arguments are meritless.

NCPPR erroneously contends that the Commission lacked the authority to approve the Board Diversity Rules because (1) under the "major questions doctrine," Congress has not clearly delegated to exchanges authority to impose board diversity "quota and disclosure requirements," (2) Congress has not authorized the exchanges to address matters of corporate governance traditionally regulated by the states, and (3) the Exchange Act does not include an "intelligible principle" to guide exchanges' exercise of such authority.  NCPPR Br. 28-37; *see also* States Amici Br. 8-14.

The premise of NCPPR's arguments is wrong—Nasdaq is a private entity, and therefore did not require an affirmative delegation from Congress to initiate a listing requirement.  Exchanges have included such requirements in their contracts with listed companies since long before Congress enacted the securities laws.  *See supra* 8-9. Their freedom to do so was "unaffected by the Exchange Act, except for a residual power in the Commission . . . to disapprove new rules or rule changes before they became effective."  Loss et al., FUNDAMENTALS OF SECURITIES REGULATION 6.A.5. NCPPR thus likewise errs (at 25) in characterizing Nasdaq's rules as part of a "pattern" of government agency overreach.

In any event, this case involves disclosures—a core goal of the Act—not mandatory quotas.  Moreover, the issues of "vast economic and political consequence," *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021) (quotation

omitted), regulated by the eviction and vaccine rules NCPPR points to are not comparable to the disclosures Nasdaq has required here.  Indeed, issuers are free to list on other exchanges and NCPPR is unable to cite any record evidence establishing such far-reaching effects.

Nor is corporate governance a "new" or impermissible subject matter for exchange listing rules.  NCPPR Br. 31-33.  Exchange rules addressing corporate governance have long coexisted with and supplemented state corporate law.  81 Fed. Reg. at 44,403 (highlighting "important role" played by exchange corporate governance listing standards); 68 Fed. Reg. at 64,175-76 (same); *see also Bus. Roundtable*, 905 F.2d at 409 ("[m]any" of the listing standards submitted for approval over the years have "dealt with matters of internal corporate governance").

And the Commission's review of the Board Diversity Rules for consistency with requirements specified in the Act—the only exercise of delegated authority in this case—was conducted pursuant to express authority in Section 19(b).  15 U.S.C. 78s(b)(2)(C).  It was also guided by the "intelligible principle[s]" outlined in that section and Section 6(b)(5).  *Big Time Vapes, Inc. v. FDA*, 963 F.3d 436, 441-42 (5th Cir. 2020) (quoting *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 409 (1928)).  This standard is "not demanding," and the Exchange Act—which requires the Commission to make findings, supported by substantial evidence, regarding

consistency with multiple criteria—"falls comfortably within the outer boundaries demarcated by the Supreme Court." *Id.* at 442, 444 (quotation omitted).

### D. NCPPR's challenge to the Board Recruiting Service Rule is meritless.

The Commission determined, based on substantial record evidence, that Nasdaq's Board Recruiting Service Rule is consistent with the requirements of the Exchange Act because it will help companies that choose to use the service by mitigating the costs associated with identifying and evaluating diverse candidates, and help Nasdaq compete to attract and retain listings. JA14, 21; *see* JA5 & n.59, 21 n.327 (citing previously approved complimentary services).

NCPPR does not identify any flaw in the Commission's reasoning. Rather, it faults the Commission for allegedly failing to answer a series of questions it poses (at 50-51). But the answers to several are readily apparent from the record: Nasdaq explained that Equilar, not it, will provide board recruitment services at Nasdaq's expense, and that Nasdaq will not generate any revenue from the service. JA21, 217-18.

In any event, NCPPR makes no attempt to establish that any of its questions are important—or even relevant—to determining whether Nasdaq's proposal is consistent with the Exchange Act. The service is optional, and no company that uses it is required to hire any of the candidates identified. JA21 (noting that "commenters have provided no reason for the Commission to doubt the Exchange's indication

about how the service will be run").  NCPPR may object ideologically to even *voluntary* efforts by companies merely to *consider* a more diverse pool of board candidates.  But nothing in the Exchange Act obligated the Commission to micromanage Nasdaq's choice of vendor or the vendor's practices.

## III.  Nasdaq's Board Diversity Rules do not constitute state action subject to constitutional scrutiny.

Nasdaq has never been, and is not now, a governmental entity, and its Board Diversity Rules are not fairly attributable to the Commission.  Thus, petitioners' constitutional claims fail at the outset.

### A.  Nasdaq is a private entity, not a part of the government.

Nasdaq is a private entity that was established in 1971 by the National Association of Securities Dealers ("NASD")—now the Financial Industry Regulatory Authority—a private association of broker-dealers that is registered with the Commission as an SRO.  NASD eventually sold its stake in Nasdaq, and today Nasdaq is part of a publicly traded company.  *See* 71 Fed. Reg. 3,550, 3,551-53 (Jan. 23, 2006).  Nasdaq's directors are chosen by its members and its parent company.  *See* By-laws of the Nasdaq Stock Market LLC, Arts. II-III, https://tinyurl.com/2p99k62s.

NCPPR analogizes Nasdaq to Amtrak, but Nasdaq does not share any of the "combination of . . . unique features" that led the Supreme Court to conclude that Amtrak is a "federal actor" in *Department of Transportation v. Association of American Railroads*, 575 U.S. 43, 51-55 (2015).  The government did not "create[]" Nasdaq and

does not own it.  *Id.* at 51-53.  And while fees and dues charged by Nasdaq, as well as

certain expenditures, are subject to Commission review, the government does not

"set" Nasdaq's budget or "supervise" its implementation.  *Id.* at 55.  Nor does the

government "control [Nasdaq's] Board," or "specify" its "day-to-day operations."  *Id.*

Nasdaq also lacks the attributes essential to the Court's earlier holding that

Amtrak is a part of the government in *Lebron v. National Railroad Passenger Corp.*, 513

U.S. 374 (1995):  Congress neither "create[d] [Nasdaq] by special law" to further

governmental objectives nor "retain[ed] for itself permanent authority to appoint a

majority of [its] directors."  *Id.* at 400; *see Free Enter. Fund v. PCAOB*, 561 U.S. 477,

484-85 (2010) (although SROs are "subject to Commission oversight," they are *not*

"Government-created, Government-appointed" entities).  These differences are

dispositive.  *See, e.g.*, *San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S.

522, 542-44 (1987) (holding that a federally chartered, regulated, and subsidized

corporation whose directors were not government-appointed was not a state actor).

For these reasons, courts have repeatedly recognized that SROs are not

government entities.  *See Epstein v. SEC*, 416 F. App'x 142, 148 (3d Cir. 2010);

*Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc.*, 191 F.3d 198, 206 (2d Cir. 1999); *Duffield v.*

*Robertson Stephens & Co.*, 144 F.3d 1182, 1200 (9th Cir. 1998), *overruled on other grounds by*

*EEOC v. Luce, Forward, Hamilton & Scripps*, 345 F.3d 742 (9th Cir. 2003); *Jones v. SEC*,

115 F.3d 1173, 1183 (4th Cir. 1997); *First Jersey Sec., Inc. v. Bergen*, 605 F.2d 690, 699 n.5 (3d Cir. 1979); *United States v. Solomon*, 509 F.2d 863, 867-71 (2d Cir. 1975).

NCPPR's assertion (at 17-18) that Congress has "said" that SROs are governmental entities is wrong. The Senate report it cites simply rejected the misconception that the securities industry "is not regulated by the government." S. Rep. 94-75 at 22. And the report's reference to SROs as "quasi-public organizations" does not imply that they are subject to constitutional constraints. *Id.* at 29. On the contrary, such a holding would thwart Congress's repeated determination to retain the system of private self-regulation and "the flexibility and informality of [SRO] decision-making procedures." *Id.*; *see also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 616 F.2d 1363, 1370 (5th Cir. 1980).

Finally, NCPPR errs in contending (at 15-16) that SROs must be deemed governmental entities to avoid a violation of the private non-delegation doctrine. Exchanges do not exercise delegated governmental authority when they impose listing standards. *See supra* 9, 36. And even if they did, so long as private entities "'function subordinately to' the federal agency and the federal agency 'has authority and surveillance over [their] activities,'" there is no constitutional infirmity. *State v. Rettig*, 987 F.3d 518, 532 (5th Cir. 2021) (quoting *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940)). Because SROs are "subject to extensive oversight" by the Commission (NCPPR Br. 17), every circuit to have considered the issue has found no

violation of the non-delegation doctrine. *See Sorrell v. SEC*, 679 F.2d 1323, 1325-26 (9th Cir. 1982) (citing cases).

### B. Nasdaq's Board Diversity Rules are not fairly attributable to the Commission.

Because it is a private entity, Nasdaq's actions are subject to constitutional scrutiny only if those actions are "fairly attributable to the State." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999). The "mere fact" that Nasdaq is subject to Commission regulation "does not by itself convert its action into that of the State." *Id.* at 52 (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 350 (1974)). Rather, there must be "a sufficiently close nexus between the State and the challenged action of the regulated entity." *Id.* (quotation omitted).

The purpose of this "close nexus" requirement "is to assure that constitutional standards are invoked only when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). Here, petitioners "complain" that the operation of the Board Diversity Rules violates the First and Fifth Amendments. But there is no valid basis upon which to attribute the rules to the Commission.

Petitioners' primary contention is that the Commission's approval suffices to establish the requisite nexus. AFBR Br. 22; NCPPR Br. 19. But the Supreme Court has repeatedly held that "[a]ction taken by private entities with the mere approval or acquiescence of the State is not state action." *Sullivan*, 526 U.S. at 52; *accord Blum*, 457

U.S. at 1004-05. Rather, "'a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed that of the State.'" *Frazier v. Bd. of Trs.*, 765 F.2d 1278, 1284 (5th Cir. 1985) (quoting *Blum*, 457 U.S. at 1004); *accord Skinner v. Ry. Labor Executives Ass'n*, 489 U.S. 602, 615-16 (1989) (requiring government "encouragement, endorsement, and participation").

The Commission's independent finding that Nasdaq's rules are consistent with the Exchange Act does not meet this threshold. The critical distinction is not between "passive" and "active" approvals, as NCPPR suggests (at 19). It is between "acquiescence" *or* "approval," on the one hand, and "significant encouragement" or "coercive" influence, on the other. *Blum*, 457 U.S. at 1004; *see Vill. of Bensenville v. FAA*, 457 F.3d 52, 65 (D.C. Cir. 2006) ("The Supreme Court has never held that the government becomes responsible for the actions of a third party due to the length or intensity of its attention to the actions of the party before approval."). In *Jackson*, for example, the Court explained that a state utility commission's mere approval of a private utility's business practice, "where the commission has not put its own weight on the side of the proposed practice by ordering it," did not "transmute" the practice into state action. 419 U.S. at 357; *see Frazier*, 765 F.2d at 1286 (requiring an "affirmative role, albeit one of encouragement short of compulsion").

In the context of exchange-proposed rules, the Commission does not coerce or encourage the exchange's decision-making. It merely determines whether the exchange's choices are consistent with the requirements of the Exchange Act, and if so, it must approve them. The Commission's approval is thus the product of Congress's "legislative decision" not to interfere with exchange rules that meet certain statutory criteria. *Sullivan*, 526 U.S. at 53. "Such permission of a private choice cannot support a finding of state action." *Id.* at 54; *see also Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 165 (1978) (a state is not responsible for a private decision that state law "permits but does not compel"); *Jackson*, 419 U.S. at 357 (determination that a utility was "authorized to employ" a business practice did not make it state action).

Nor does the Commission's "extensive regulation" of exchanges justify attributing Nasdaq's rules to the Commission. *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1932 (2019) ("[T]he 'being heavily regulated makes you a state actor' theory of state action is entirely circular and would significantly endanger individual liberty and private enterprise."). NCPPR points (at 17) to the Commission's power to "abrogate, add to, and delete from" existing exchange rules, 15 U.S.C. 78s(c), but the Commission has no such authority in reviewing a proposed exchange rule. And the Exchange Act's requirement that exchanges enforce their rules (AFBR Br. 23) *after the fact* cannot supply the needed encouragement or coercion.

Petitioners attempt to invoke tests for state action that do not require government encouragement or coercion, but none of them is met here.[2]  The public function test does not apply because exchange listing standards are not "'traditionally the *exclusive* prerogative of the State.'"  *Frazier*, 765 F.2d at 1285 (quoting *Rendell-Baker v. Kohn*, 457 U.S. 830, 842 (1982)); *see also Halleck*, 139 S. Ct. at 1929 (noting that "very few functions fall into that category" (quotation omitted)).  Quite the contrary, they have historically been a matter of private contract.  *Supra* 8-9.

AFBR's cursory assertion (at 22) that the Commission is a "joint participant" in exchange rules under *Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961), is likewise meritless.  The Supreme Court has clarified that "privately owned enterprises providing services that the State would not necessarily provide, even though they are extensively regulated, do not fall within the ambit of *Burton*."  *Sullivan*, 526 U.S. at 57 (quoting *Blum*, 457 U.S. at 1011).  As this Court has explained, "*Burton* is now subject to the gloss of *Rendell-Baker* and *Blum*"—which generally require "affirmative" state "encouragement"—and stands only for the "core" proposition that joint participation exists where "the discriminatory practices of [a] lessee . . . not only contributed to, but also were indispensable elements in, the financial success of a governmental agency."

---

[2] AFBR attempts (at 22) to incorporate by reference arguments made in its comment to the Commission, but those not also presented in its opening brief have been waived.  *United States v. Jackson*, 549 F.3d 963, 972 n.6 (5th Cir. 2008).  The Commission nonetheless addresses those arguments for completeness.

*Frazier*, 765 F.2d at 1286-88 (quotation and alterations omitted); *see also Jackson*, 419 U.S. at 358 (limiting *Burton*'s holding to "lessees of public property").

Nor does *Brentwood Academy v. Tennessee Secondary School Athletic Association*, 531 U.S. 288 (2001), cited at AFBR Br. 23, help petitioners.  It holds that "the pervasive entwinement of public institutions and public officials in [a nominally private entity's] composition and workings" can support a finding that the entity's conduct is attributable to the state.  *Id.* at 298.  The Court found the Tennessee Secondary School Athletic Association to be a state actor under this theory because it was composed almost entirely of public schools; public school officials "overwhelmingly perform[ed] all but [its] purely ministerial acts"; its employees were treated as state employees; and it received most of its financial support from public schools.  *Id.* at 299-300.  This "pervasive entwinement to the point of largely overlapping identity" relieved the plaintiffs of the need to show that the state had "coerced [or] encouraged" the challenged conduct.  *Id.* at 303.  No such symbiotic relationship is present here:  Nasdaq's members are private broker-dealers; Nasdaq's employees (not the Commission's) perform all functions necessary to its operation; its employees are those of a private corporation; and it is funded through its market-derived profits.  *See Blankenship v. Buenger*, 653 F. App'x 330, 338 (5th Cir. 2016) (acts of a "highly regulated" water supply corporation with a state-conferred monopoly were not state action under *Brentwood*).

AFBR also attempts (at 22) to frame the relevant state action as "the SEC's approval of Nasdaq's rule." *See also* NCPPR Br. 18; States Amici Br. 3-4. But this "ignores [the Supreme Court's] repeated insistence that state action requires . . . [that] *the allegedly unconstitutional conduct* [be] fairly attributable to the State." *Sullivan*, <u>526 U.S. at 50</u> (emphasis added). Here, "the specific conduct"—Nasdaq's rules—is not attributable to the Commission, and that obstacle cannot be evaded by challenging the constitutionality of the Commission's approval. *Id.* at 50-52 (quotation omitted).

*Shelley v. Kraemer*, <u>334 U.S. 1</u> (1948), and *Moose Lodge No. 107 v. Irvis*, <u>407 U.S. 163</u> (1972), cited at AFBR Br. 22-23, do not alter this conclusion. *Shelley* held that state court enforcement of racially restrictive covenants is unconstitutional state action, stressing that the necessary effect of the challenged orders was to coerce acts of racial discrimination that would not have otherwise occurred. <u>334 U.S. at 19</u>.

In contrast, Nasdaq's rules simply require that its listed companies provide an explanation if they do not meet Nasdaq's board diversity objectives. And the Commission's order does not enforce those rules, but only determines that the Exchange Act permits Nasdaq to adopt them. AFBR's response (at 22) that the rules are "not enforceable" without a Commission order misses the point—the same could be said every time a regulated entity's conduct is subject to government approval. *See, e.g.*, *Jackson*, <u>419 U.S. at 358</u> (public utility's enforcement of a rule "in a manner which the [public utility commission] found permissible under state law" was "not sufficient

to connect the [State] with [the utility's] action so as to make the latter's conduct attributable to the State for purposes of the Fourteenth Amendment"); *cf. Davis v. Prudential Sec., Inc.*, 59 F.3d 1186, 1191-92 (11th Cir. 1995) ("[T]he concept of state action [in *Shelley*] has since been narrowed by the Supreme Court.").

Similarly, *Moose Lodge* involved a private club whose constitution and bylaws "required racial discrimination." 407 U.S. at 166, 178-79. The club was licensed to serve alcohol under a "detailed" state regulatory scheme that required licensees to comply with their constitutions and bylaws. *Id.* at 176-77. The Court explained that it would be unconstitutional under *Shelley* for the state to force the club to engage in discrimination—but (*contra* AFBR Br. 23) it rejected the argument that the club's government-imposed duty to enforce its discriminatory policies was sufficient to attribute those policies to the state. *Id.* at 176-77, 179.

### C. This Court is not bound by cursory dicta in *Intercontinental Industries, Inc. v. American Stock Exchange*.

Petitioners present only a perfunctory analysis of the state action issue based on their misapprehension that it was already resolved in their favor in *Intercontinental Industries, Inc. v. American Stock Exchange*, 452 F.2d 935 (5th Cir. 1971). There, INI sought review of a Commission order granting an exchange's application to delist INI's stock for rule violations, alleging it was deprived of due process. *Id.* at 937.

Briefly addressing the exchange's argument that it was not a state actor, the Court stated in dicta (relying on *Burton*) that the "intimate involvement of the

Exchange with the [Commission] brings it within the purview of the Fifth Amendment controls over governmental due process." *Id.* at 940-41. The Court did not "decide those points," however, because it determined that the hearing that INI received met "all the applicable procedural requirements." *Id.* at 941-43; *see Solomon*, 509 F.2d at 871 (Friendly, J.) (noting that the Court's two-sentence analysis was dicta); *United States v. Segura*, 747 F.3d 323, 328-29 (5th Cir. 2014) ("A statement is dictum if it could have been deleted without seriously impairing the analytical foundations of the holding and being peripheral, may not have received the full and careful consideration of the court that uttered it."); *Campaign for S. Equal. v. Bryant*, 791 F.3d 625, 627 n.1 (5th Cir. 2015) (circuit dicta is not binding).

As this Court has recognized, *Burton* has been substantially limited by subsequent decisions establishing that even "extensive and detailed" regulation of private conduct is "not enough to implicate state action." *Frazier*, 765 F.2d at 1285 (quotation omitted). Every court that has applied those later decisions to SRO actions has concluded that such actions were not fairly attributable to the Commission. *See, e.g.*, *Perpetual Sec., Inc. v. Tang*, 290 F.3d 132, 138-39 (2d Cir. 2002); *D.L. Cromwell Invs., Inc. v. NASD Regulation, Inc.*, 279 F.3d 155, 161-62 (2d Cir. 2002); *Desiderio*, 191 F.3d at 207; *Duffield*, 144 F.3d at 1202; *Graman v. Nat'l Ass'n of Sec.*

49

*Dealers, Inc.*, 1998 WL 294022, at *2-3 (D.D.C. 1998); *Cremin v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 957 F. Supp. 1460, 1467-68 (N.D. Ill. 1997).[3]

## III. In any event, Nasdaq's Board Diversity Rules withstand constitutional scrutiny.

Even if this Court were to disregard the clear precedent discussed above and find the Board Diversity Rules to be state action, they survive constitutional scrutiny. Petitioners' arguments that the rules run afoul of the First and Fifth Amendments misconstrue the cases on which they rely and misunderstand the rules themselves.

### A. The Board Diversity Rules do not violate the First Amendment.

Although no company is required to list on Nasdaq, petitioners argue that Nasdaq's rules impermissibly compel speech in violation of the First Amendment. AFBR Br. 42-53; NCPPR Br. 21-24. But their arguments rest solely on the incorrect assertion that strict scrutiny applies. The required disclosures would be subject to lesser scrutiny, which they satisfy. Indeed, petitioners make no argument that they would not satisfy such scrutiny.

The Supreme Court has recognized that there are "material differences between disclosure requirements and outright prohibitions on speech." *Zauderer v. Office of*

---

[3] The Tenth Circuit in *Rooms v. SEC*, 444 F.3d 1208, 1214 (10th Cir. 2006), stated in dicta, without analysis, that "[d]ue process requires that an NASD rule give fair warning of prohibited conduct before a person may be disciplined for that conduct." But the Commission there did not dispute that adequate process was required (nor had it done so in the case *Rooms* cited for that proposition).

*Disciplinary Counsel*, 471 U.S. 626, 650 (1985); *see also John Doe No. 1 v. Reed*, 561 U.S. 186, 196 (2010). In *Zauderer*, the Court held that the government may compel disclosure of factual and uncontroversial information in commercial speech so long as the disclosures "reasonably relate[]" to an adequate interest and are not "unduly burdensome." 471 U.S. at 651.

And courts have also long recognized that securities regulation "involves a different balance of concerns and calls for different applications of First Amendment principles." *Full Value Advisors, LLC v. SEC*, 633 F.3d 1101, 1109 (D.C. Cir. 2011) (quotation omitted). As the D.C. Circuit has explained, "[s]peech relating to the purchase and sale of securities . . . forms a distinct category of communications" that "is subject only to limited First Amendment scrutiny" akin to that applied to commercial speech. *SEC v. Wall St. Publ'g Inst., Inc.*, 851 F.2d 365, 373 (D.C. Cir. 1988); *see also Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 64 (1973); *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758 n.5 (1985); *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978); *United States v. Wenger*, 427 F.3d 840, 846-47 (10th Cir. 2005).

Under this precedent, Nasdaq's rules would be subject to lower scrutiny because they require disclosure of factual and uncontroversial information about board diversity. AFBR asserts (at 43) that, under *National Institute of Family and Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018) ("*NIFLA*"), a "compelled disclosure is

subject to strict scrutiny" unless it falls into one of two narrowly construed categories. But the Court's discussion in that case did not sweep nearly so broadly. The Court held that *Zauderer* did not apply to a regulation that required pregnancy clinics to deliver a "government-drafted" message that was unrelated to their services and fundamentally at odds with their mission. *Id.* at 2371-72. The Court did not purport to narrow or overrule prior cases "appl[ying] a lower level of scrutiny to laws that compel disclosures in certain contexts." *Id.* at 2372. Nor did it decide that disclosures that fall outside of *Zauderer*'s ambit are subject to strict scrutiny. *Id.* at 2375.

Petitioners' various other arguments for subjecting the disclosures here to strict scrutiny lack merit. Unlike *West Virginia Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) and *Wooley v. Maynard*, 430 U.S. 705 (1977), Nasdaq's Board Diversity Rules require factual disclosures, not "a Government-mandated pledge or motto that [companies] must endorse," *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 62 (2006) ("*FAIR*"). *Contra* NCPPR Br. 21. And unlike *Riley v. National Federation of the Blind of N.C., Inc.*, 487 U.S. 781 (1988), *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974), and *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 566 (1995), the Board Diversity Rules do not compel statements that are inextricably intertwined with, and alter, any speaker's pre-existing, fully-protected message, *FAIR*, 547 U.S. at 63-64. *Contra* NCPPR Br. 21-22.

Petitioners assert that the company explanation requirement compels "self-accusation" and forces companies to "infer their own shortcomings." NCPPR Br. 22-23; *see also* AFBR Br. 45-46.  But unlike *National Association of Manufacturers v. SEC*, 800 F.3d 518, 522 (D.C. Cir. 2015), companies subject to the explanation requirement are not required to utter *any* government-dictated language, much less language that conveys "moral responsibility" or an "ethical[] taint[]."  *Id.* at 530.  Companies craft the explanation themselves and are free to convey whatever position they wish on the value of board diversity, or no position at all.  *See* JA3 & n.31.[4]

Relying on *NIFLA*, AFBR appears to argue (at 44, 48) that the disclosures here are subject to strict scrutiny merely because they touch on topics of race, gender, and sexual orientation.  But *NIFLA* does not say that *every* factual statement about a potentially controversial issue is necessarily controversial.  The disclosure in that case was controversial within the meaning of *Zauderer* because it required clinics "devoted to opposing" abortion to tell women how to obtain one.  138 S. Ct. at 2371-72.  And the contention that, for example, any government requirement to report one's gender is subject to strict scrutiny strains credulity.  Moreover, nothing in Nasdaq's rules

---

[4] AFBR asserts (at 46-48) that this flexibility does not mitigate First Amendment concerns, relying on *National Association of Manufacturers*.  But there the court concluded that the ability to provide an explanation did not cure the constitutional violation it found in requiring the government-scripted language to begin with.

requires any company to opine on the topics of "discrimination" or "affirmative action." AFBR Br. 48.

AFBR also contends (at 44-45) that the explanation requirement is controversial because it applies to some companies and not others. But that distinction is drawn not because "the government" favors "one side" of a debate, but rather to tailor the explanation requirement to those circumstances in which the information would be most useful to investors. JA13; *see also McCullen v. Coakley*, 573 U.S. 464, 482 (2014) ("When selecting among various options for combating a particular problem, legislatures should be encouraged to choose the one that restricts less speech, not more."). Nor does the requirement "run the risk that the State has left unburdened those speakers whose messages are in accord with its own views." *NIFLA*, 138 S. Ct. at 2378 (quotation omitted). It is not "designed to brand" "non-compliant" companies (AFBR Br. 45-46); rather, it applies regardless of a company's position on the value of board diversity.

In any event, Nasdaq's rules withstand scrutiny under either *Zauderer* or the intermediate scrutiny for commercial speech described in *Central Hudson Gas & Electric Corporation v. Public Service Commission*, 447 U.S. 557, 566 (1980), because they "are 'narrowly tailored' to achieve a substantial government goal." *United States v. Phillip Morris USA Inc.*, 566 F.3d 1095, 1143 (D.C. Cir. 2009) (quoting *Bd. of Trs. v. Fox*, 492 U.S. 469, 480 (1989) (citing *Central Hudson* and *Zauderer*)). Congress has deemed the

securities markets "an important national asset which must be preserved and strengthened." 15 U.S.C. 78k-1(a)(1)(A). The government, therefore, "has a substantial interest through the securities laws in making capital markets more open and efficient" by giving "all investors equal access to all relevant information." *Wenger*, 427 F.3d at 850-51.[5] And, as the Commission reasonably found, Nasdaq's rules further those purposes by ensuring that investors have consistent, comparable access to information important to their voting and investing decisions.

## B. The Board Diversity Rules do not violate the Fifth Amendment.

AFBR argues (at 20) that the Board Diversity Rules are subject to heightened scrutiny under the Fifth Amendment because they "encourag[e]" discrimination on the basis of protected classifications. AFBR principally relies on this Court's holding that a racial hiring "goal" may trigger strict scrutiny when combined with an enforcement mechanism that "can and surely will result in individuals being granted a

---

[5] NCPPR asserts that the D.C. Circuit has rejected the proposition that the governmental interest underlying the securities laws is a compelling one. But the dicta on which it relies was not discussing the strength of the governmental interest and, in any event, appears in a portion of an opinion later overruled by the *en banc* court and revised on panel rehearing (in which it was reproduced in an appendix that NCPPR cites). NCPPR Br. 24 (citing *Nat'l Ass'n of Mfrs. v. SEC*, 748 F.3d 359, 372 (D.C. Cir. 2014), *overruled by Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 22-23 (D.C. Cir. 2014) (*en banc*)).

preference because of their race." *W.H. Scott Constr. Co. v. City of Jackson*, 199 F.3d 206, 215 (5th Cir. 1999) (quotation omitted).

But neither *W.H. Scott Construction* nor any other case that AFBR cites applied heightened scrutiny to a regulatory scheme that merely required a factual disclosure. *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 205-09 (1995) (federal financial incentives rewarding the hiring of minority contractors); *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 667 (1993) (set-aside program that "excluded [non-minority-owned businesses] from consideration for a certain portion of [municipal contracts]"); *W.H. Scott Constr. Co.*, 199 F.3d at 214 (city policy under which non-minority contractors "risk[ed] termination of [their] contracts" if they failed to meet a numeric goal for minority participation or demonstrate good faith efforts to do so); *Monterey Mech. Co. v. Wilson*, 125 F.3d 702 (9th Cir. 1997) (statute disadvantaging bids of contractors that did not meet minority or gender participation goals or demonstrate good faith efforts to do so). Unlike those policies, a rule that facilitates disclosure of information important to investors' decision-making—without dictating what a company may say or who it may hire—should not be subject to heightened scrutiny.

## CONCLUSION

The petitions for review should be denied.

Respectfully submitted,

/s/ Daniel E. Matro

DAN M. BERKOVITZ
General Counsel

MICHAEL A. CONLEY
Solicitor

TRACEY A. HARDIN
Assistant General Counsel

DANIEL E. MATRO
Senior Litigation Counsel

JOHN R. RADY
Attorney

Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
February 2022                    (202) 551-8248 (Matro)

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,917 words, excluding the parts exempted by Fed. R. App. P. 32(f) and 5th Cir. R. 32.2.

I also certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface—Garamond, 14 point—using Microsoft Word.

                                                    /s/ Daniel E. Matro

April 7, 2022                                       Daniel E. Matro

## CERTIFICATE OF SERVICE

I hereby certify that on April 7, 2022, I electronically filed the foregoing final Brief of the Securities and Exchange Commission, Respondent, with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system, which will send notice to all the parties.

/s/ *Daniel E. Matro*
Daniel E. Matro

April 7, 2022