No. 21-60626

# In the United States Court of Appeals
# For the Fifth Circuit

———————

ALLIANCE FOR FAIR BOARD RECRUITMENT,
NATIONAL CENTER FOR PUBLIC POLICY RESEARCH,
*Petitioners,*

v.

SECURITIES AND EXCHANGE COMMISSION,
*Respondent.*

———————

On Petition for Review of an Order of the
United States Securities and Exchange Commission
No. 34-92590

———————

## BRIEF OF NONPARTISAN GROUP OF ACADEMICS AND PRACTITIONERS IN THE FIELD OF CORPORATE GOVERNANCE AS AMICI CURIAE IN SUPPORT OF INTERVENOR NASDAQ STOCK MARKET, L.L.C.

Marc Wolinsky*
Elaine P. Golin
Carrie M. Reilly
Kevin S. Schwartz
Jeohn Salone Favors
Getzel Berger
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY  10019
(212) 403-1000
MWolinsky@wlrk.com
KSchwartz@wlrk.com
*Counsel of Record

Dated:  February 24, 2022

# SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS

*Alliance for Fair Board Recruitment et al.* v. *SEC,* No. 21-60626

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1. **Petitioners.** National Center for Public Policy Research; Alliance for Fair Board Recruitment.
2. **Counsel for Petitioners.** Margaret A. Little; Aditya Dynar; Sheng Li; The New Civil Liberties Alliance; C. Boyden Gray; Jonathan Berry; R. Trent McCotter; Michael Buschbacher; Jordan E. Smith; Boyden Gray & Associates.
3. **Respondent.** Securities and Exchange Commission.
4. **Counsel for Respondent.** Dan M. Berkovitz; Michael A. Conley; Vanessa Ann Countryman; Tracy A. Hardin; Daniel E. Matro; John R. Rady.
5. **Intervenor.** Nasdaq Stock Market, L.L.C.
6. **Counsel for Intervenor**. John Zecca; Jeffrey S. Davis; John Yetter; Joanne Pedone; Allyson N. Ho; Bradley G. Hubbard; Amir C. Tayrani; Amalia E. Reiss; Gibson, Dunn & Crutcher LLP; Burt M. Rublin; Stephen J. Kastenberg; Paul Lantieri III; Peter F. Andrews; Seth D. Berlin; Ballard Spahr LLP.

7. **State Amici Curiae in Support of Petitioners.** The States of Alabama, Alaska, Arizona, Arkansas, Florida, Indiana, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, Oklahoma, South Carolina, Texas, and Utah.

8. **Counsel for State Amici.** Drew C. Ensign; Joseph A. Kanefield; Brunn W. Roysden III; Wilson C. Freeman; James Rogers.

9. **Financial Industry Regulatory Authority, Inc., as Amicus Curiae.**

10. **Counsel for Financial Industry Regulatory Authority, Inc.** Aaron Michael Streett; Elisabeth C. Butler; Baker Botts L.L.P.

11. **Ad Hoc Coalition of Nasdaq-Listed Companies.**

12. **Counsel for Ad Hoc Coalition of Nasdaq-Listed Companies.** Pratik A. Shah; Juliana C. DeVries; Akin Gump Strauss Hauer & Feld LLP.

13. **Nonpartisan Group of Academics and Practitioners in the Field of Corporate Governance as Amici Curiae in Support of Nasdaq Stock Market, L.L.C.** See Appendix.

14. **Counsel for Nonpartisan Group of Academics and Practitioners in the Field of Corporate Governance as Amici Curiae in Support of Nasdaq Stock Market, L.L.C.** Marc Wolinsky; Elaine P. Golin; Carrie M. Reilly; Kevin S. Schwartz; Jeohn Salone Favors; Getzel Berger; Wachtell, Lipton, Rosen & Katz.

February 24, 2022

/s/ Marc Wolinsky
Marc Wolinsky
Kevin S. Schwartz
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY 10019
(212) 403-1000

*Counsel for Amici Curiae Nonpartisan Group of Academics and Practitioners in the Field of Corporate Governance*

## STATEMENT PURSUANT TO FED. R. APP. P. 29(a)(4)(E)

Undersigned counsel for amici curiae certify that this brief was not authored in whole or in part by counsel for any of the parties; that no party or party's counsel contributed money for the brief; and that no one other than amici and their counsel have contributed money for this brief. Wachtell, Lipton, Rosen & Katz serves as counsel for Nasdaq, Inc., the parent company of The Nasdaq Stock Market, L.L.C., on unrelated matters.

February 24, 2022

/s/ Marc Wolinsky
Marc Wolinsky
Kevin S. Schwartz
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY  10019
(212) 403-1000

*Counsel for Amici Curiae Nonpartisan Group of Academics and Practitioners in the Field of Corporate Governance*

# TABLE OF CONTENTS

SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS .........i

STATEMENT PURSUANT TO FED. R. APP. P. 29(a)(4)(E) ................iii

TABLE OF AUTHORITIES........................................................................ v

INTEREST OF AMICI CURIAE................................................................ 1

ARGUMENT ........................................................................................... 3

I.  Nasdaq's modest rule is a measured encouragement of diversity that does not impose a quota and facilitates disclosure from companies to their investors on a topic that investors consider important to good corporate governance........... 6

II.  Since the nation's founding, the stock exchanges have been free to set rigorous corporate governance rules for their listed companies that go beyond state and federal law, and the Exchange Act respects that freedom. ........................................ 9

III.  Nasdaq's rule is an act of private ordering encouraged by state corporate law. ........................................................................ 15

IV.  Petitioners misrepresent the SEC's limited role in reviewing voluntary listing requirements adopted by exchanges. ................ 21

V.  Nasdaq's rule has a reasoned basis in evidence and logic and is consistent with the Exchange Act. ............................................. 25

CONCLUSION ....................................................................................... 32

APPENDIX: LIST OF AMICI ................................................................ 34

CERTIFICATE OF SERVICE................................................................. 54

CERTIFICATE OF COMPLIANCE........................................................ 55

# TABLE OF AUTHORITIES

**CASES**                                                    **PAGE(S)**

*Blasius Indus., Inc.* v. *Atlas Corp.*,
    564 A.2d 651 (Del. Ch. 1988) ................................................................ 8

*Bus. Roundtable* v. *SEC*,
    905 F.2d 406 (D.C. Cir. 1990) ..................................................... *passim*

*D'Alessio* v. *N.Y. Stock Exch., Inc.*,
    258 F.3d 93 (2d Cir. 2001) ...................................................................... 8

*D.L. Cromwell Invs., Inc.* v. *NASD Regul., Inc.*,
    279 F.3d 155 (2d Cir. 2002) .................................................................... 7

*Hamilton* v. *Nozko*,
    1994 WL 413299 (Del. Ch. 1994) ......................................................... 19

*In re EZCORP Inc. Consulting Agreement Derivative Litig.*,
    2016 WL 301245 (Del. Ch. 2016) .......................................................... 17

*Lennane* v. *Ask Comput. Sys., Inc.*,
    1990 WL 154150 (Del. Ch. 1990) .......................................................... 17

*Lennane* v. *Ask Comput. Sys., Inc.*,
    1990 WL 161094 (Del. Ch. 1990) .................................................... 19, 20

*Manti Holdings, LLC* v. *Authentix Acquisition Co.*,
    261 A.3d 1199 (Del. 2021) ..................................................................... 16

*Negonsott* v. *Samuels*,
    507 U.S. 99 (1993) ................................................................................. 25

*Paramount Communications, Inc.* v. *Time Inc.*,
    571 A.2d 1140 (Del. 1989) ..................................................................... 19

*Susquehanna International Group* v. *SEC*,
    866 F.3d 442 (D.C. Cir. 2017) ......................................................... 23, 24

## STATUTES

15 U.S.C. § 78s(b)(2)(C)(i) .......................................................... 22

15 U.S.C. § 78s(b)(2)(D) ............................................................. 24

15 U.S.C. § 78s(b)(3)(A) ............................................................. 24

Securities Exchange Act of 1934, Pub. L. No. 291,
48 Stat. 881 (1934) ......................................................... 10, 11

## REGULATORY MATERIALS

National Market System Securities; Designation Criteria,
Exchange Act Release No. 34-22505, 50 Fed. Reg. 41,697
(Oct. 15, 1985) ..................................................................... 15

Notice of Filing of Proposed Rule Change to Adopt Listing
Rules Related to Board Diversity, Exchange Act Release
No. 34-90574, 85 Fed. Reg. 80,472 (Dec. 11, 2020) ...................... 29, 30

Order Approving Proposed Rule Change, Exchange Act
Release No. 34-13346, 11 SEC Docket 1945 (Mar. 9, 1977),
1977 WL 173602 ................................................................. 30

## OTHER AUTHORITIES

About Delaware's General Corporation Law, State of
Delaware, https://corplaw.delaware.gov/delawares-
general-corporation-law/ (last visited Feb. 22, 2022) ......................... 16

Andreas M. Fleckner, *Stock Exchanges at the Crossroads*,
74 Fordham L. Rev. 2541 (2006) ........................................... 25

Birl E. Shultz, *Stock Exchange Procedure* (1936) ................................... 9

Bob Pisani, *New Stock Exchanges Are Ready to Launch to Compete for Your Trading Dollar*, CNBC (Sept. 9, 2020 10:05 AM), https://tinyurl.com/2s3rce5c ............................................. 27

Brian D. Feinstein *et al.*, *Board Diversity Matters: An Empirical Assessment of Community Lending at Federal Reserve-Regulated Banks* (2022), https://ssrn.com/abstract=4000110 .................................................... 28

Chris Brummer & Leo E. Strine, Jr., *Duty and Diversity*, 75 Vand. L. Rev. 1 (2022) ........................................................... *passim*

David A. Carter *et al.*, *Corporate Governance, Board Diversity, and Firm Value*, 38 Fin. Rev. 33 (2003) ........................... 28

D'Vera Cohn & Andrea Caumont, *10 Demographic Trends Shaping the U.S. and the World in 2016*, Pew Rsch. Ctr. (Mar. 31, 2016), https://tinyurl.com/3kewyhar ................................. 27

Joann S. Lublin, *Smaller Boards Get Bigger Returns*, Wall St. Journal (Aug. 26, 2014), https://www.wsj.com/articles/smaller-boards-get-bigger-returns-1409078628 ................................... 7

John C. Coffee, Jr., *Racing Towards the Top: The Impact of Cross-Listing and Stock Market Competition on International Corporate Governance*, 102 Colum. L. Rev. 1757 (2002) ........................................................... 18

Leo E. Strine, Jr., *The Delaware Way: How We Do Corporate Law and Some of the New Challenges We (and Europe) Face*, 30 Del. J. Corp. L. 673 (2005) ..................................... 17

Lisa M. Fairfax, *The Model Business Corporation Act at Sixty: Shareholders and Their Influence*, 74 Law & Contemp. Probs. 19 (2011) ................................................. 16

Lisa M. Fairfax, *Some Reflections on the Diversity of Corporate Boards: Women, People of Color, and the Unique Issues Associated with Women of Color*, 79 St. John's L. Rev. 1105 (2005) ....................................................... 26

Louis Loss, Joel Seligman & Troy Paredes,
    *Fundamentals of Securities Regulation*
    1.D.3 (7th ed. 2022 Cum. Supp.) .................................................... 8, 13

Lynne L. Dallas, *The New Managerialism and Diversity on
    Corporate Boards of Directors*,
    76 Tul. L. Rev. 1363 (2002) ................................................................. 28

Marc I. Steinberg, *The Federalization of Corporate
    Governance* (2018) ............................................................................ 13

Niclas L. Erhardt *et al.*, *Board of Director Diversity and
    Firm Financial Performance*,
    11 Corp. Governance 102 (2003) .......................................................... 28

Paul Gompers & Silpa Kovvali, *The Other Diversity
    Dividend*, Harv. Bus. Rev. (July-Aug. 2018),
    https://tinyurl.com/ycxdun69 ............................................................. 28

*Quick Facts*, U.S. Census Bureau,
    https://www.census.gov/quickfacts/fact/table/US/PST0452
    21 (last visited Feb. 22, 2022) .............................................................. 7

Robert B. Thompson, *Collaborative Corporate Governance:
    Listing Standards, State Law, and Federal Regulation*,
    38 Wake Forest L. Rev. 961 (2003) .............................................. 14, 15

Roberta S. Karmel, *The Future of Corporate
    Governance Listing Requirements*,
    54 SMU L. Rev. 325 (2001) .................................................. 10, 15, 18

Roberta Romano, *The Genius of American
    Corporate Law* (1993) ....................................................................... 15

Roberta Romano, *The Sarbanes-Oxley Act
    and the Making of Quack Corporate Governance*,
    114 Yale L.J. 1521 (2005) .................................................................. 30

S. Subcomm. on Securities, S. Comm. on Banking, Housing
    and Urban Affairs, *Securities Industry Study*, S. Rep. No.
    93-13 (1973) ........................................................................................ 12

Virginia Harper Ho, *"Comply or Explain" and the*
  *Future of Nonfinancial Reporting*,
  21 Lewis & Clark L. Rev. 317 (2017)....................................................8

Yaron Nili, *Beyond the Numbers: Substantive Gender*
  *Diversity in Boardrooms*, 94 Ind. L.J. 145 (2019)................................9

## INTEREST OF AMICI CURIAE[1]

We are a nonpartisan group with corporate governance careers. Many of us research, teach, and write on that subject. Several of us have served on courts that decide corporate law cases or in senior positions at the Securities and Exchange Commission and numerous self-regulatory organizations. Others represent businesses in complying with corporate and securities laws. Many have led private-sector committees, such as the American Bar Association's Corporate Laws Committee, which crafts the Model Business Corporation Act; the Council of the Delaware State Bar Association's Corporation Law Section, which advises lawmakers on the Delaware General Corporation Law; the American Law Institute's projects on corporate governance; the Uniform Law Commission, which revises the Uniform Securities Act; the ABA's Business Law Section and Corporate Governance Committee; and the American College of Governance Counsel.

We bring to bear an understanding of corporate governance that we hope will be helpful to the Court. Although we have wide-ranging views on corporate law and politics, we all believe that the freedom for private

---

[1]     This brief is submitted under Fed. R. App. P. 29(a)(2) with all parties' consent.

actors like the stock exchanges to innovate in matters of corporate governance and disclosure is an intended feature of our system of corporate and securities laws, and an important reason for the success of our nation's capital markets.

## ARGUMENT

State corporate law has long encouraged and respected the ability of the exchanges and listed companies, as private actors, to agree to rules of corporate governance that they think will promote a trustworthy free-market system. The petitioners ask this Court to reduce this space granted to private actors to order their affairs and thus federalize areas of corporate governance long entrusted to the private sector. And they ask this Court to impose a government veto over a modest exchange rule that simply requires that companies that choose to list their securities with Nasdaq either have one female director and one director who is a member of a minority group, or explain why they do not.

The petitioners distort the reality of the rule and the commercial context in which it operates. They ignore that the required disclosures are not directed to Nasdaq, much less to the SEC, but to investors. The rule's focus on investors is consistent with the purposes of the Exchange Act to promote disclosure and to foster accountability of company fiduciaries to their stockholders. A ruling for the petitioners would represent federal intrusion of an unprecedented kind on the free market. It requires embracing the idea that a stock exchange cannot, when acting

in its capacity as a private commercial organization, require listed companies to disclose information that it views as helpful to stockholders in exercising their state-law rights and making investment decisions. Such a radical ruling would call into question bedrock provisions of corporate governance upon which investors have long relied.

The unremarkable nature of Nasdaq's rule is made clear by longstanding exchange-made rules that require that board members meet certain eligibility criteria (*e.g.*, that a majority of the board be independent) and other requirements (*e.g.*, that stockholders must vote to approve certain types of extraordinary transactions). These private arrangements impose substantive requirements of corporate governance above those required by state law. By contrast to these historically accepted exchange rules, the rule under challenge is far less burdensome. It facilitates, in a tailored way, disclosures by companies to investors on an issue that investors consider important.

The petitioners also misunderstand the SEC's role in approving Nasdaq's rule. The SEC was not acting as a rulemaking body when it approved the Nasdaq rule; rather, the SEC was exercising its narrower authority to review the decision of a private actor, Nasdaq, to determine

if the rule was consistent with the Exchange Act's broad purposes.  The SEC did not have to share Nasdaq's view about the benefits of diversity disclosures; all it had to do was conclude—as it did based on a thorough, independent review—that Nasdaq's rule did not conflict with the Exchange Act.

The stock exchanges have long adopted—and the SEC has long approved—rules that exchanges believe will improve the governance of listed companies and accountability to investors.  Under the Exchange Act, Nasdaq is entitled to act on the basis of its own reasoned view of evidence regarding the desirability of certain policies—even if that view is debatable.  Important innovations like audit-committee mandates were undertaken by the exchanges without empirical studies because the business world often must act without the benefit of such studies.  The efficacy of corporate governance enhancements cannot be measured in the way that the Food and Drug Administration assesses whether a pharmaceutical is efficacious.

Nevertheless, abundant evidence supports Nasdaq's business judgment that boardroom diversity helps corporate performance, and that diversity-based disclosures are important to investors' decisions in

an increasingly diverse domestic and global economy.  Although it is possible to reach a different decision than Nasdaq did, there is no doubt that a reasoned reader of the literature could agree with Nasdaq that the rule would foster better corporate governance, disclosure, and accountability.  Thus, there would have been no reasoned basis for the SEC to reject the rule as inconsistent with the Exchange Act, and the SEC's affirmative finding that the rule facilitates disclosure valuable to investors alone required it to approve the rule.

In short, the Court should decline the petitioners' invitation to have the federal government restrict the freedom of exchanges to take voluntary private action to require listed companies to adopt governance practices and disclosure policies that they believe valuable to issuers and investors.

## I.  Nasdaq's modest rule is a measured encouragement of diversity that does not impose a quota and facilitates disclosure from companies to their investors on a topic that investors consider important to good corporate governance.

We begin by making clear what the rule does and what it does not do.  For starters, the Nasdaq rule does not impose a mandatory quota, or require that boards be composed in any particular way.  The rule simply establishes a diversity objective that the boards of directors of listed

companies include one woman and one other person who is a member of an underrepresented group in our society—groups that have been the subject of discrimination for most of our nation's history—or that the listed company explain its reason for not meeting those minimal goals.

The typical public company board comprises around 9 to 14 members.[2]  At this level, one woman would constitute 7% to 11% of the board, in a nation where women are slightly over 50% of the population. Likewise, one minority director would constitute 7% to 11% of a board in a nation where nearly 40% of the population is non-white.[3]  Thus, boards meeting the minimal objectives of the rule would still have far fewer women and minorities than their prevalence in the population.[4]

---

[2]      Joann S. Lublin, *Smaller Boards Get Bigger Returns*, Wall St. Journal (Aug. 26, 2014), https://www.wsj.com/articles/smaller-boards-get-bigger-returns-1409078628.

[3]      In fact, because the rule includes white males of Latino origin and white males who are LGBT as minorities, the percentage of the nation's population that is not a woman or a minority as defined by the rule is likely less than 30%. *See Quick Facts*, U.S. Census Bureau, https://www.census.gov/quickfacts/fact/table/US/PST045221 (last visited Feb. 22, 2022).

[4]      Consistent with our demonstration that stock exchanges are private-sector actors, the petitioners' argument that the SEC's limited right to veto exchange-made rules transforms Nasdaq into a state actor is erroneous. *See D.L. Cromwell Invs., Inc.* v. *NASD Regul., Inc.*, 279 F.3d 155, 161-62 (2d Cir. 2002) (noting that "even heavily-regulated private entities generally are held not to be state actors" and "[i]t has been found, repeatedly," that NASD is not a state actor).  There are of course aspects of the operation of exchanges where they exercise delegated government

It bears repeating:  The rule does not require compliance with any numerical target, but simply calls for an explanation for the company's lack of minimal diversity.[5]  Nor does the rule prescribe the substance of the required explanation.  Nasdaq does not assess the substance of a company's explanation, but instead only verifies that one was provided. The adequacy of any response is a matter for stockholders to evaluate, as part of the overall accountability system under American corporate law.[6] Companies are free to choose their own words.  And they can draw on the

---

power, for example, when disciplining brokers who violate federal securities law.  *See D'Alessio* v. *N.Y. Stock Exch., Inc.*, 258 F.3d 93, 104-05 (2d Cir. 2001).  But as we show, the exchanges' power to impose listing rules is a historically private freedom subject to a limited government right of veto.

[5]      Studies of comply-or-explain rules demonstrate that many companies choose the explanation route, and thus that these rules do not act as mandates.  Virginia Harper Ho, *"Comply or Explain" and the Future of Nonfinancial Reporting*, 21 Lewis & Clark L. Rev. 317 app. A (2017) (summarizing studies showing substantial percentage of companies explain rather than comply).

[6]      Contrary to the petitioners' contention, company management is not free to manage without providing information to the stockholders whose capital they have taken.  Corporate and securities laws have therefore long required that corporate fiduciaries provide information to their investors.  To label corporate disclosure unconstitutional "compelled speech" is therefore risible, especially where, as here, it results from a voluntary compact between listed companies and a stock exchange. *See Blasius Indus.* v. *Atlas Corp.*, 564 A.2d 651, 659 (Del. Ch. 1988) ("The shareholder franchise is the ideological underpinning upon which the legitimacy of directorial power rests."); 1 Louis Loss, Joel Seligman & Troy Paredes, *Fundamentals of Securities Regulation* 1.D.3 (7th ed. 2022 Cum. Supp.) (investor disclosure is a "basic purpose[]" of the Exchange Act).

variety of approaches public companies have already taken in discussing board diversity with their investors.[7]

## II. Since the nation's founding, the stock exchanges have been free to set rigorous corporate governance rules for their listed companies that go beyond state and federal law, and the Exchange Act respects that freedom.

The non-intrusiveness of the rule is also demonstrated by situating it in the historical role of the stock exchanges in imposing corporate governance and disclosure obligations on their voluntarily listed companies that are far more stringent.

That role dates back to 1792, when a securities exchange governed by self-made rules sprang up under a buttonwood tree at 68 Wall Street.[8] Thus began the long American tradition of exchange-made rules, not only for issues like trading and commissions, but most germane for present purposes, for the corporate governance of the companies that choose to list on the exchange. In the 19th century, for example, the New York Stock Exchange appointed committees to "raise the standard of listing

---

[7]     *See* Yaron Nili, *Beyond the Numbers: Substantive Gender Diversity in Boardrooms*, 94 Ind. L.J. 145, 184-87 (2019).

[8]     Birl E. Shultz, *Stock Exchange Procedure* 7-8 (1936).

requirements" beyond state-law disclosure minimums.[9]   An applicant had to disclose "the history and nature of its business," "detailed information regarding management, capitalization structure, stock provisions and business financials," and "a description of its accounting policies."[10]

By the 20th century, the NYSE "successfully campaigned for more thorough disclosure from listing companies" to "provide certain safeguards for investors."[11]  It mandated annual reports to stockholders, quarterly earnings reports, independent audits of financial statements, and a one-share, one-vote policy, requiring that regardless of state law, all shares of a company listed on the exchange have equal voting power.[12]

The market crashes of the Great Depression led to the Securities Exchange Act of 1934, which was in part intended to ensure that stock markets did not engage in too lax a regulation of their listed companies,

---

[9]    *Id.* at 15.

[10]   Roberta S. Karmel, *The Future of Corporate Governance Listing Requirements*, 54 SMU L. Rev. 325, 327 (2001).

[11]   *Id.*

[12]   *Id.* at 328.

subjecting investors to risk from companies that lacked adequate governance safeguards or disclosure standards.[13]   For that reason, the Exchange Act gave the SEC a limited ability to review exchange-proposed rules to make sure they did not allow companies to engage in conduct injurious to the public.  But the Exchange Act left intact the ability of the exchanges, in their capacity as private actors, to adopt more rigorous self-governing rules beyond those imposed by state or federal law, stating that "[n]othing in this title shall be construed to prevent any exchange from adopting and enforcing any rule not inconsistent with [federal securities law] and the applicable laws of the State in which it is located."[14]

Thus, following the adoption of the Exchange Act, corporations with securities listed on a U.S. stock exchange were governed by three mechanisms:  (1) state corporate law, which set minimum requirements of governance; (2) federal securities laws, which set minimum requirements for corporate disclosure and created federal oversight of the

---

[13]   Securities Exchange Act of 1934, Pub. L. No. 291 § 2, 48 Stat. 881, 881-82 (1934).

[14]   *Id.* § 6(c), 48 Stat. 886.

rules governing the trading in securities on registered exchanges; and (3) the rules of the stock exchange on which the corporation was listed, which imposed additional substantive governance and disclosure requirements.

In the wake of a financial crisis in the early 1970s, a consensus emerged that the federal securities-law floor should be raised to better ensure that stock exchanges were not too lax in regulating their listed companies and broker-dealers. "The most important advantage of self-regulation" by the exchanges, a key Senate report found, "is its potential for establishing and enforcing . . . ethical standards beyond those any law can establish."[15]   A key weakness of self-regulation, on the other hand, was "the natural tendency of self-regulators to be less diligent than might be desired."[16]   So, although the 1975 amendments enlarged the SEC's "residual power" to review exchange-made rules, the power of the

---

[15]    S. Subcomm. on Securities, S. Comm. on Banking, Housing and Urban Affairs, *Securities Industry Study*, S. Rep. No. 93-13 149 (1973) (quoting former SEC Chairman and Supreme Court Justice William O. Douglas) (quotation marks omitted).

[16]    *Id.* at 149-50.

exchanges to adopt listing rules exceeding the requirements of federal and state law was left "unaffected."[17]

The exchanges continued to exercise that power. Case in point: Only two years after the 1975 amendments, the NYSE adopted a rule requiring its listed companies to have audit committees comprised of independent directors. This rule mandated how NYSE-listed companies governed their internal affairs and was found nowhere in state law. Rather, it was an exercise of a stock exchange's power to set governance standards *above* the state-law minimums for companies that chose to list on the NYSE. The SEC, applying its new oversight power, approved this new rule as consistent with the Exchange Act.[18]

Since then, the exchanges have continued to be important sources of innovation in corporate governance, for example, by adopting (with SEC approval) rules requiring that most listed companies (1) have boards comprised of a majority of independent directors; (2) have audit, compensation, and nominating governance committees that satisfy

---

[17]    Loss, *Fundamentals of Securities Regulation*, 6.A.5.

[18]    Marc I. Steinberg, *The Federalization of Corporate Governance* 241 (2018).

certain independence requirements; and (3) receive shareholder approval before engaging in certain stock issuance transactions and before adopting certain compensation plans.[19]

These acts of private ordering complement the requirements of state corporate law and have never been subject to a serious claim that the exchanges had exceeded their authority or that SEC approval of exchange-made rules represented federal intrusion into the power of the states. Exchanges could always adopt corporate governance requirements that the SEC has no general statutory power to impose on the exchanges and listed companies through its limited authority under the Exchange Act.

A prime example is the one-share, one-vote exchange rule that bars certain uses of stock with differential voting power—even though such differential voting power is authorized under state corporate law. After the *Business Roundtable* decision held that the SEC itself could not impose such a rule on the exchanges, Nasdaq and the NYSE—using their powers to set listing requirements—voluntarily barred dual-class voting

---

[19]    Robert B. Thompson, *Collaborative Corporate Governance: Listing Standards, State Law, and Federal Regulation*, 38 Wake Forest L. Rev. 961, 965-66, 975 (2003).

power.[20]   That is because, as the SEC wrote, "[t]he establishment of corporate governance standards continues to remain primarily the responsibility of [self-regulatory organizations]."[21]

These rules, as we next show, also complement the "essential skeleton for corporate governance" provided by state corporate law.[22]

## III.   Nasdaq's rule is an act of private ordering encouraged by state corporate law.

One of the petitioners' arguments that most miscomprehends American law is their contention that Nasdaq's rule intrudes on state corporate law.   This argument ignores how American corporate law works and seeks to stifle the private ordering and free-market choice that is the "genius" of American corporate law.[23]   The petitioners fail to cite any provision of state corporate law contradicted by the Nasdaq rule. Because there is none.

---

[20]     *Bus. Roundtable* v. *SEC*, 905 F.2d 406 (D.C. Cir. 1990); Karmel, *Corporate Governance Listing Requirements*, 54 SMU L. Rev. at 346-47.

[21]     National Market System Securities; Designation Criteria, Exchange Act Release No. 34-22505, 50 Fed. Reg. 41,697, 41,698 (Oct. 15, 1985).

[22]     Thompson, *Collaborative Corporate Governance*, 38 Wake Forest L. Rev. at 963.

[23]     *See* Roberta Romano, *The Genius of American Corporate Law* 1 (1993).

By long tradition, corporate codes in the United States, exemplified by the Delaware General Corporation Law ("DGCL") and the Model Business Corporation Act ("MBCA"), are enabling statutes providing companies with a wide range of choices within a broad governance framework.[24] These enabling statutes combine protective rights (like annual election of directors and stockholder votes on important transactions) with the vibrant enforcement of fiduciary duties through equitable principles of corporate law (like the entire fairness doctrine policing self-dealing). These laws establish foundational templates for companies to conduct business with flexibility while remaining accountable to stockholders.

---

[24]    *See Manti Holdings, LLC* v. *Authentix Acquisition Co.*, <u>261 A.3d 1199</u>, 1217 (Del. 2021) ("At its core, the DGCL is a broad enabling act that allows immense freedom for businesses to adopt the most appropriate terms for the organization, finance, and governance of their enterprise provided the statutory parameters and judicially imposed principles of fiduciary duty are honored.") (citation, quotation marks, and alterations omitted); *About Delaware's General Corporation Law*, State of Delaware, <u>https://corplaw.delaware.gov/delawares-general-corporation-law/</u> (last visited Feb. 22, 2022) ("[T]he DGCL is designed to be an enabling statute that permits and facilitates company-specific procedures."); Lisa M. Fairfax, *The Model Business Corporation Act at Sixty: Shareholders and Their Influence*, <u>74 Law & Contemp. Probs. 19</u>, 27 (2011) ("[T]he MBCA is designed to be an enabling statute . . . aimed at facilitating private ordering between directors and shareholders.").

Unlike civil code nations that impose mandatory national corporate governance rules, state corporate laws in the United States facilitate and encourage voluntary exercises in governance choice.[25] American corporate governance does not take a one-size-fits-all approach dictated by the national government. Companies may supplement the backbone state-law framework with voluntary undertakings that give investors more rights than the statutory minimums, that set more prescriptive rules for the composition of a company's board and committees, or that require more shareholder input before taking particular corporate actions.[26]

No provision of the DGCL or MBCA is compromised by the Nasdaq rule. The decision of a company to list its shares with Nasdaq—and to be subject to its listing rules—is a voluntary private decision of a company.[27] The fact that the DGCL and MBCA do not mandate board-

---

[25] Leo E. Strine, Jr., *The Delaware Way: How We Do Corporate Law and Some of the New Challenges We (and Europe) Face*, 30 Del. J. Corp. L. 673, 674 (2005).

[26] *In re EZCORP Inc. Consulting Agreement Derivative Litig.*, 2016 WL 301245, at *36 (Del. Ch. 2016) ("The independence standards established by stock exchanges and the requirements of Delaware law . . . are mutually reinforcing and seek to advance similar goals.").

[27] *Lennane* v. *Ask Comput. Sys., Inc.*, 1990 WL 154150, at *6 (Del. Ch. 1990) ("[T]he corporation may voluntarily delist its securities at any time.").

level diversity does not prohibit a company—using its own business judgment—from choosing to list on an exchange that requires disclosure intended to foster diversity. This is consistent with the freedom for private ordering accorded to companies under state corporate law. And with the growth of large international exchanges, the ability to re-domicile to other nations and list on foreign exchanges, and the explosion in the large private-company market, companies in the United States have wide options for accessing capital markets.

As part of the robust competition among stock markets, the exchanges use their listing rules to differentiate themselves and compete for listings.[28] Some companies might find exchanges with less stringent corporate governance policies attractive.[29] Conversely, companies seeking to attract investors that value rigorous governance standards might prefer listing on an exchange that imposes such requirements.[30] A

---

[28]     Karmel, *Corporate Governance Listing Requirements*, <u>54 SMU L. Rev. at 330</u>.

[29]     *Id.*

[30]     *See, e.g.*, John C. Coffee, Jr., *Racing Towards the Top: The Impact of Cross-Listing and Stock Market Competition on International Corporate Governance*, <u>102 Colum. L. Rev. 1757</u>, 1820 (2002) (finding a potential race to the top where exchanges compete for listings through better governance rules).

company that freely chooses to list with Nasdaq thus freely chooses to adopt its listing requirements.

That private ordering is consistent with state law was famously recognized in *Paramount Communications, Inc.* v. *Time Inc.*, where, in upholding the Time board's decision to restructure a major transaction to avoid a NYSE listing rule that would have required a shareholder vote, the Delaware Supreme Court accepted as a given that the NYSE could, as a matter of contract, require listed companies to put certain transactions to a shareholder vote even when the DGCL did not.[31]  And because there is no state-law duty to list shares on an exchange, courts have refused to import a state-law mandate to follow exchange rules or remain listed on a particular exchange into the body of state law governing directors' fiduciary duties.[32]  Rather, any board decision in conflict with exchange rules is protected by the business judgment rule

---

[31]    571 A.2d 1140, 1142-46 (Del. 1989).

[32]    *Hamilton* v. *Nozko*, 1994 WL 413299, at *6 (Del. Ch. 1994) (holding that "in a proper exercise of their business judgment, [directors may] cause the corporation to [delist]" even if delisting "might adversely impact the market for the corporation's securities"); *Lennane* v. *Ask Comput. Sys., Inc.*, 1990 WL 161094, at *1 (Del. Ch. 1990) (Allen, C.) ("Decisions [regarding listing or delisting] are not for courts but for businessmen and women.").

so long as it was taken for proper business reasons. Any consequence for noncompliance with an exchange rule (such as delisting) is left to the exchange for enforcement, and to the stockholders at the ballot box.[33]

At the federal level, the iconic *Business Roundtable* v. *SEC* decision distinguished the narrow role that the federal government, through the SEC, could play in regulating matters of corporate governance from the wide authority that exchanges themselves possess to adopt governance rules for their listed companies. The ruling cabined the SEC's ability to intrude on the flexibility of exchanges to adopt supplemental corporate governance policies, leaving those decisions to the exchanges themselves.[34]

The petitioners now claim for the federal judiciary the very license *Business Roundtable* denied the SEC, by seeking to have this Court substitute judicial second-guessing for private-sector decisionmaking. The business judgment rule central to American corporate law's success admonishes courts to avoid meddling in good-faith business decisions.

---

[33]     *Id.*

[34]     905 F.2d at 414 (characterizing the SEC's role in amending exchange-made rules to substitute its own view as "quite limited").

Longstanding principles of corporate and securities law require similar deference by this Court to Nasdaq's exercise of private-sector freedom.

## IV. Petitioners misrepresent the SEC's limited role in reviewing voluntary listing requirements adopted by exchanges.

The petitioners conflate the constrained role that the SEC plays in *reviewing* rules proposed by exchanges with the role the SEC plays in *promulgating* its own rules. The SEC's roles in these two contexts are fundamentally different, and for an important reason.

When exercising its governmental authority to impose on all public companies a mandatory rule under the Exchange Act, the SEC must make clear findings of its own about the policy utility of the rule and the manner in which it advances the specific purposes of the Exchange Act. As *Business Roundtable* makes clear, because the Exchange Act does not give the SEC the statutory authority to establish a general federal law of corporate governance, the SEC cannot use its rulemaking authority to substitute its own view of good corporate governance for that of state lawmakers, the exchanges, or companies. Thus, when a court reviews a rule mandated by the SEC to apply to all listed companies, it must examine whether the SEC remained within its proper boundaries as an

agency with limited authority over the corporate-governance freedom of private actors.

By contrast, the SEC plays a completely different role when reviewing a rule proposed by a private stock exchange that will bind only the companies that voluntarily list on that exchange.  In that situation, the SEC exercises a narrow review of exchange-proposed rules for consistency with the Exchange Act.  The requirement that the SEC approve exchange-proposed rules is not a broad SEC veto power over an exchange's ability to innovate new rules of corporate governance and disclosure in a fast-moving economy.  Holding otherwise would overrule *Business Roundtable*.

Instead, the SEC's role is confined solely to determining if the proposed rule is "consistent with the requirements of" the Exchange Act and SEC rules.[35]   This limited review's focus is ensuring that the exchange rule does not authorize conduct that would endanger the public purposes set forth in the Exchange Act.  In other words, the SEC must ensure that the exchanges are not *too lax* in regulating listed companies.

---

[35]    15 U.S.C. § 78s(b)(2)(C)(i).

But it is not for the SEC to decide whether it agrees with the wisdom of the rule or to interfere with the historical freedom of the exchanges, as private actors, to administer a market for shares in companies that voluntarily agree to adhere to their governance and disclosure rules. Nor, respectfully, is it for this Court to engage in its own consideration of the wisdom of Nasdaq's business judgment; rather, this Court must uphold the SEC's approval so long as the agency was not arbitrary and capricious when it concluded that the Nasdaq rule was consistent with the Exchange Act.

To be sure, the SEC must still make its own statutorily required findings when conducting this limited review—as it did here. In its 82-page decision, the SEC examined the strengths and weaknesses of Nasdaq's reasoning, and found that—notwithstanding the empirical debate—Nasdaq's rule "is consistent with" the Exchange Act because it provides hard-to-find and much-sought-after information to investors.[36] And because the SEC made the required findings here, *Susquehanna International Group* v. *SEC* is inapposite, as there the SEC "candidly

---

[36]     *Id.*

admit[ted]" that it accepted the self-regulated entity's analysis without making any findings of its own.[37]

The limited nature of the SEC review process is underscored by the fact that many proposed rules can be designated by exchanges as immediately effective without SEC approval.[38]  And even a rule that is not eligible for this designation may automatically become effective if the SEC fails to act within the time frame established by statute.[39]  That is, the statutory scheme provides that the SEC's failure to exercise its constrained veto results in deference to the exchange as a private actor.

The petitioners ignore settled requirements of statutory interpretation by failing to give weight to the words Congress used to define the SEC's limited role in approving exchange-proposed rules, in contrast to the requirements the SEC must meet in promulgating a

---

[37]   866 F.3d 442, 447 (D.C. Cir. 2017).

[38]   15 U.S.C. § 78s(b)(3)(A).

[39]   *Id.* § 78s(b)(2)(D).

government-imposed rule on all public companies.[40]  Not only that, they ask this Court to gut this key distinction, as set forth in *Business Roundtable*, reversing 30 years of settled understanding by corporations, exchanges, regulators, and courts.[41]

The SEC's appropriate discharge of its limited duty of review in approving Nasdaq's rule should be upheld.

## V.     Nasdaq's rule has a reasoned basis in evidence and logic and is consistent with the Exchange Act.

We also urge the Court to reject the petitioners' erroneous argument that Nasdaq had no reasoned basis for concluding that the rule would improve corporate governance.  Corporate governance developments do not take place in test tubes or controlled, double-blind studies.  They are rarely susceptible to the sort of empirical validation, for example, that is required in the food safety, pharmaceutical, and environmental policy areas.  The complexity of human behavior in

---

[40]     *Negonsott* v. *Samuels*, 507 U.S. 99, 104 (1993) ("Our task is to give effect to the will of Congress, and where its will has been expressed in reasonably plain terms, that language must ordinarily be regarded as conclusive.") (quotation marks omitted).

[41]     *See* Andreas M. Fleckner, *Stock Exchanges at the Crossroads*, 74 Fordham L. Rev. 2541, 2549 (2006) ("[P]owers [of exchanges] to regulate corporate governance issues reach significantly farther than the powers of the SEC, as held in the landmark *Business Roundtable* case.").

organizations is such that policymakers must act with less than scientific certainty.  Policymakers may take into account what empirical evidence exists as well as input from constituents with a real stake in the matter in making policy decisions.  That is what Nasdaq did here.

Although we may have different views on the strength of the evidence supporting Nasdaq's view that its rule would provide investors with information they want and improve the performance of Nasdaq-listed companies, we all agree that the evidence provides a more-than-sufficient basis for Nasdaq's modest rule.  Three key facts place Nasdaq's rule in the proper context.  First, the overwhelming evidence of a profound underrepresentation of historically discriminated-against groups on American corporate boards.[42]  Second, the domestic and international business landscape where companies must attract an increasingly diverse group of customers, employees, and business partners, and where there will soon be no racial group comprising a

---

[42]     For a summary of the stark underrepresentation of women and minorities on American public company boards, *see* Chris Brummer & Leo E. Strine, Jr., *Duty and Diversity*, 75 Vand. L. Rev. 1, 9-20 (2022); for scholarship discussing the barriers that confront women and minorities in securing board positions, *see, e.g.*, Lisa M. Fairfax, *Some Reflections on the Diversity of Corporate Boards: Women, People of Color, and the Unique Issues Associated with Women of Color*, 79 St. John's L. Rev. 1105 (2005).

majority of the American public.[43] And third, the international exchanges against which Nasdaq competes for listings are focused on diversity, and tout it in an attempt to obtain U.S. listings.[44]

Along with this important context, the weight of the collective evidence also provides a reasoned basis supporting Nasdaq's judgment that board-level diversity improves corporate decisionmaking and performance.[45] This evidence includes studies by respected scholars

---

[43] D'Vera Cohn & Andrea Caumont, *10 Demographic Trends Shaping the U.S. and the World in 2016*, Pew Rsch. Ctr. (Mar. 31, 2016), https://tinyurl.com/3kewyhar; Brummer & Strine, *Duty and Diversity*, 75 Vand. L. Rev. at 45.

[44] Bob Pisani, *New Stock Exchanges Are Ready to Launch to Compete for Your Trading Dollar*, CNBC (Sept. 9, 2020 10:05 AM), https://tinyurl.com/2s3rce5c.

[45] To this point, the petitioners have the null hypothesis upside down. In a nation that is half female, and where straight non-Latino white men likely comprise only around a quarter of the population, the real question is why it would improve corporate performance and integrity to have a board that has only straight non-Latino white males and that therefore contains no membership of groups comprising a supermajority of the American population. Why would such a homogenous board be more likely to make better decisions than a board with a minimal level of heterogeneity?

connecting diverse boards with improved corporate performance.[46]  And since this lawsuit was filed, a new empirical study about the effect of diversity on decisionmaking at the Federal Reserve's regional banks supports the inference that racial diversity improves the ability of regulatory institutions to serve all segments of the market.[47]  Another important body of organizational research finds that groups with diverse backgrounds and life experiences, working collaboratively, are better positioned to make sound judgments.[48]

---

[46]     Several studies buttress that conclusion.  *E.g.*, Paul Gompers & Silpa Kovvali, *The Other Diversity Dividend*, Harv. Bus. Rev. (July-Aug. 2018), https://tinyurl.com/ycxdun69; David A. Carter *et al., Corporate Governance, Board Diversity, and Firm Value*, 38 Fin. Rev. 33, 51 (2003); Niclas L. Erhardt *et al.*, *Board of Director Diversity and Firm Financial Performance*, 11 Corp. Governance 102, 107-08 (2003).  We do not take the position that all studies reach the same conclusions; they do not.  *See* Brummer & Strine, *Duty and Diversity*, 75 Vand. L. Rev. at 28-33.  What we say is that in an uncertain world, there is a reasoned basis in the academic research for Nasdaq to reach the conclusion that board diversity is valuable to effective corporate performance and that diversity-based disclosure is valuable to investors.  *Id.* at 33 ("whatever the literature's weaknesses, it shows that a business case for Diversity is present").

[47]     Brian D. Feinstein *et al.*, *Board Diversity Matters:  An Empirical Assessment of Community Lending at Federal Reserve-Regulated Banks* (2022), https://ssrn.com/abstract=4000110.

[48]     Brummer & Strine, *Duty and Diversity*, 75 Vand. L. Rev. at 33 n.101, 36 nn.117-24 (compiling academic literature supporting the value of heterogeneity and diversity in decisionmaking in complex organizations on outcomes like profitability, operating performance, and legal compliance); Lynne L. Dallas, *The New Managerialism and Diversity on Corporate Boards of Directors*, 76 Tul. L. Rev. 1363, 1399-1404 (2002).

Significantly, the evidence connecting gender and racial diversity to better corporate performance also includes studies and advice from private-sector experts in business management, like the Carlyle Group, Citi, McKinsey & Co., Moody's, Deloitte, Credit Suisse, and MSCI.[49] These firms profit from helping other businesses function more profitably.  A private business like Nasdaq is entitled to use its own business judgment and give heavy weight to these studies and recommendations supporting the value of diversity in optimizing corporate performance.

Nasdaq is a voluntary organization dependent on the assent of its listed companies and the trust of investors for its continued viability. Nasdaq adopted its rule after receiving broad and supportive input from those key stakeholders.[50]  The largest investors in Nasdaq-listed companies supported the rule as being helpful to corporate performance and as facilitating a flow of information from its listed companies to

---

[49]   *Id.* at 28-33 (describing empirical studies demonstrating a positive correlation between board diversity and improved profitability, credit ratings, and stock price).

[50]   Notice of Filing of Proposed Rule Change to Adopt Listing Rules Related to Board Diversity, Exchange Act Release No. 34-90574, 85 Fed. Reg. 80,472, 80,481-82 (Dec. 11, 2020).

investors about a subject they consider important.[51]    It would be inconsistent with the purposes of the Exchange Act if Nasdaq could not take seriously the input it received from investors that the subject of diversity is meaningful to their investment decisions.

Nasdaq's rule must also be viewed in historical context.    Many useful innovations in corporate governance—such as the requirement for audit committees and independent directors—were made by stock exchanges, and approved by the SEC, on an evidentiary basis far less substantial than was the case here.[52]    If private ordering is inhibited by the exercise of a judicial veto over the business judgment of stock exchanges and their constituents, our nation's ability to compete in an

---

[51]    *Id.*    Evidence of widespread support by major investors for more information about board diversity also includes petitions to the SEC in recent years to that effect on behalf of pension funds with trillions of dollars of assets, and public statements of the Big Three of American money management—State Street, Vanguard, and Blackrock, which collectively hold over $18 trillion in assets—to that same effect.  *See* Brummer & Strine, *Duty and Diversity*, 75 Vand. L. Rev. at 57-58.

[52]    For example, the 1977 SEC order approving an exchange-adopted rule requiring independent audit committees mentions no empirical research, relying instead on industry consensus that such independence is beneficial.  *See* Order Approving Proposed Rule Change, Exchange Act Release No. 34-13346, 11 SEC Docket 1945 (Mar. 9, 1977), 1977 WL 173602.  Indeed, one scholar criticized Congress for adopting mandatory rules of corporate governance on this subject because the evidentiary basis was unsettled.  *See* Roberta Romano, *The Sarbanes-Oxley Act and the Making of Quack Corporate Governance*, 114 Yale L.J. 1521, 1529-33 (2005).

increasingly diverse world would be compromised, and our markets may lose listings to those nations that continue to respect the role of private ordering in the competitive industry of securities exchanges.[53]

Unlike nations where innovation occurs primarily by national mandate, our corporate governance system encourages private experimentation by stock exchanges and companies, so that new approaches can be tested, refined, and either become the basis for broader market practices or abandoned as unwise. Ours is a system of free-market choice and competition. Judicial intrusion into this private space would require a ruling with no limiting principle and would trample on a space traditionally left to private ordering.

The SEC's review of the Nasdaq rule should be applauded. The SEC carefully scrutinized Nasdaq's evidence and noted the ongoing empirical debate. But the SEC also recognized that there was no need for it to take a position on a policy question that was for private actors to decide. It was sufficient for the SEC to find—as it did—that the rule

---

[53]    Brummer & Strine, *Duty and Diversity*, 75 Vand. L. Rev. at 33 ("Corporate leaders cannot wait for an academic consensus about a complex issue in a fast-changing world in which action is required in the here and now. They are expected to make the best judgment they can based on the information available to them, however imprecise and imperfect.").

facilitates valuable disclosure to investors on a topic that Nasdaq and investors considered important, which is unquestionably a purpose consistent with the Exchange Act.  The SEC's deference to the free market should be respected by an equal measure of judicial restraint by this Court.

## CONCLUSION

In the near century since the Exchange Act was adopted, the SEC and the courts have respected the right of stock exchanges, in their capacity as private actors, to impose on listed companies rules more stringent than the modest rule at issue here.  Setting aside this carefully crafted, disclosure-focused rule would put into play the reliability of all exchange-made rules that provide more substantial protections for investors than those required by state or federal law.  It would restrict the commercial freedom to innovate that has long been encouraged by state corporate laws and that is crucial to the preeminence of our nation's capital markets.  And it would upend the longstanding expectations of listed companies and their investors.

We urge the Court to follow established law and uphold the SEC's well-supported decision respecting the discretion that a private actor, Nasdaq, has to adopt rules for its voluntary members.

Dated:    February 24, 2022

                             Respectfully submitted,


                             By:   /s/ Marc Wolinsky                    

                                   Marc Wolinsky
                                   Elaine P. Golin
                                   Carrie M. Reilly
                                   Kevin S. Schwartz
                                   Jeohn Salone Favors
                                   Getzel Berger
                                   WACHTELL, LIPTON, ROSEN & KATZ
                                   51 West 52nd Street
                                   New York, NY  10019
                                   (212) 403-1000
                                   MWolinsky@wlrk.com
                                   KSchwartz@wlrk.com

                                   *Counsel for Amici Curiae*
                                   *Nonpartisan Group of Academics*
                                   *and Practitioners in the Field of*
                                   *Corporate Governance*

## APPENDIX: LIST OF AMICI

Amici are listed in alphabetical order below. Institutional affiliations are provided for identification purposes only. The views expressed in this brief are those of individual amici and do not represent the views or positions of their affiliated institutions.

1.    **Luis A. Aguilar**

Director, Donnelley Financial Solutions, Inc.; Director, Envestnet, Inc.; Partner, Falcon Cyber Investments LLC

*Former Commissioner, U.S. Securities and Exchange Commission*

2.    **Frederick H. Alexander**

CEO, The Shareholder Commons

*Former Partner, Morris, Nichols, Arsht & Tunnell LLP; Fellow, American College of Governance Counsel; Member and Former Chair, Council of the Delaware State Bar Association Corporation Law Section*

3.    **Harvey Anderson**

Chief Legal Officer and Corporate Secretary, HP Inc.

4.    **Michelle Banks**

Senior Advisor, BarkerGilmore

*Former Executive Vice President, Global General Counsel, Gap Inc.*

5.    **Michal Barzuza**

Professor of Law, University of Virginia School of Law

6. **Lucian A. Bebchuk**

> James Barr Ames Professor of Law, Economics, and Finance; Director, Program on Corporate Governance, Harvard Law School

7. **Carolyn Berger**

> *Former Justice, Delaware Supreme Court; Former Vice Chancellor, Delaware Court of Chancery*

8. **David J. Berger**

> Partner, Wilson Sonsini Goodrich & Rosati

> *Senior Fellow, NYU Institute of Corporate Governance and Finance; Fellow, American College of Corporate Governance*

9. **Margaret Mendenhall Blair**

> Professor of Law, Emerita, Vanderbilt University Law School, and Milton R. Underwood Chair in Free Enterprise, Emerita

10. **Matthew T. Bodie**

> Co-Director, William C. Wefel Center for Employment Law, Callis Family Professor of Law, Saint Louis University

11. **April Miller Boise**

> Executive Vice President and Chief Legal Officer, Eaton Corporation

12. **Amelia H. Boss**

> Trustee Professor of Law, Thomas R. Kline School of Law, Drexel University

> *Former Chair, American Bar Association, Business Law Section*

13.   **Andre G. Bouchard**

Partner, Paul, Weiss, Rifkind, Wharton & Garrison LLP

*Former Chancellor, Delaware Court of Chancery*

14.   **William Wilson Bratton**

Nicholas F. Gallicchio Professor of Law, Emeritus, University of Pennsylvania Carey Law School; de la Cruz/Mentschikoff Chair in Law and Economics and Senior Lecturer, University of Miami School of Law

15.   **Brian V. Breheny**

Partner, Skadden, Arps, Slate, Meagher & Flom LLP and Affiliates

*Former Deputy Director, Division of Corporation Finance, U.S. Securities and Exchange Commission; Former Member, Board of Directors, The Society for Corporate Governance*

16.   **Chris Brummer**

Agnes N. Williams Research Professor, Georgetown University Law Center; Faculty Director, Institute of International Economic Law

17.   **Mercer Bullard**

Butler Snow Lecturer and Professor of Law, The University of Mississippi School of Law

18.   **Mary Ann Carlson**

Co-Founder, DirectWomen

*Former Chair, Global Corporate Practice, Squire Patton Boggs; Former Chair, American Bar Association, Business Law Section, Corporate Laws Committee*

19.   **William B. Chandler, III**

Partner, Wilson Sonsini Goodrich & Rosati

*Former Chancellor, Delaware Court of Chancery*

20.   **Yen D. Chu**

Executive Vice President, Chief Legal Officer, Equinox Group

*Member of the Board of Directors, DirectWomen*

21.   **Robert C. Clark**

Austin Wakeman Scott Professor of Law, Emeritus, Harvard Law School

*Former Dean, Harvard Law School*

22.   **Patrick T. Clendenen**

Clendenen & Shea LLC

*Former Chair, American Bar Association, Business Law Section*

23.   **John C. Coffee, Jr.**

Adolf A. Berle Professor of Law, Director of Corporate Governance, Columbia Law School

*Reporter to American Law Institute for Principles of Corporate Governance: Analysis and Recommendations (1982)*

24.   **Marcy Sharon Cohen**

General Counsel and Managing Director, ING Financial Holdings Corp.

25.  **James D. Cox**

Brainerd Currie Professor of Law, Duke University School of Law

*Member, American Law Institute; Former Member, American Bar Association, Corporate Laws Committee; Former Member, New York Stock Exchange Legal Advisory Committee*

26.  **Jens Christian Dammann**

Ben H. and Kitty King Powell Chair in Business and Commercial Law, The University of Texas at Austin School of Law

27.  **Barbara Daniele**

*Former General Counsel, GE Capital Americas; prior GE Legal General Counsel roles and Head of Litigation for GE Capital*

28.  **Deneen L. Donnley**

Senior Vice President and General Counsel, Con Edison, Inc.

29.  **Karl John Ege**

Senior Counsel, Perkins Coie LLP

*Former Chair, American Bar Association, Business Law Section; Former Chair, American Bar Association, Corporate Laws Committee*

30.  **Lisa M. Fairfax**

Presidential Professor, Co-Director, Institute for Law and Economics, The University of Pennsylvania Carey Law School

*Former Member, Investor Advisory Committee, U.S. Securities and Exchange Commission*

31.  **Robert Falk**

General Counsel, Truth Initiative

32.  **Celeste Ferber**

Vice President, Corporate Legal, Zymergen, Inc.

33.  **Gina-Gail S. Fletcher**

Professor of Law, Duke University School of Law

34.  **Michael E. Flowers**

Member, Steptoe & Johnson PLLC

*Former Chair, American Bar Association, Business Law Section*

35.  **Raquel L. Fox**

Partner, Skadden, Arps, Slate, Meagher & Flom LLP and Affiliates

*Former Director, Office of International Affairs, Former Senior Advisor to SEC Chairman, U.S. Securities and Exchange Commission*

36.  **Jeannie Carmedelle Frey**

*Former Chair, American Bar Association, Business Law Section*

37.  **Vijaya Gadde**

Chief Legal Officer, Twitter, Inc.

38.  **Henry E. Gallagher, Jr.**

Partner, Connolly Gallagher LLP

*Former Chair, Council of the Delaware State Bar Association Corporation Law Section*

39.   **Elisa D. Garcia**

Chief Legal Officer, Macy's, Inc.

40.   **Craig B. Glidden**

Executive Vice President, Global Public Policy, General Counsel, and Corporate Secretary, General Motors Co.

41.   **Jeffrey N. Gordon**

Richard Paul Richman Professor of Law, Columbia Law School

42.   **Holly J. Gregory**

Partner, Sidley Austin LLP; President and Founding Trustee, American College of Governance Counsel

*Former Chair, American Bar Association, Business Law Section, Corporate Governance Committee; Former Member, American Bar Association, Business Law Section, Corporate Laws Committee; Member, American Law Institute*

43.   **Joseph A. Grundfest**

W. A. Franke Professor of Law and Business, Stanford Law School

*Former Commissioner, U.S. Securities and Exchange Commission*

44.   **Mitu Gulati**

John V. Ray Research Professor of Law, University of Virginia School of Law

45. **Keir D. Gumbs**

Chief Legal Officer, Broadridge Financial Systems, Inc.

*Former Counsel to Commissioner Roel C. Campos, Former Special Counsel in the Office of Chief Counsel, U.S. Securities and Exchange Commission*

46. **Lawrence A. Hamermesh**

Emeritus Professor, Widener University Delaware Law School; Executive Director, Institute for Law and Economics, University of Pennsylvania Carey Law School

*Former Special Counsel, U.S. Securities and Exchange Commission; Member and Former Chair, Council of the Delaware State Bar Association Corporation Law Section*

47. **Grant M. Hayden**

Professor of Law, Southern Methodist University Dedman School of Law

48. **Linda C. Hayman**

Retired Partner, Skadden, Arps, Slate, Meagher & Flom LLP and Affiliates

*Former Chair, American Bar Association, Business Law Section; Co-Founder, DirectWomen*

49. **Keith F. Higgins**

Retired Partner, Ropes & Gray LLP

*Former Director, Corporation Finance, U.S. Securities and Exchange Commission*

50. **Shannon Higginson**

General Counsel and Chief Compliance Officer, lululemon athletica inc.

51.  **Randy J. Holland**

      Senior Of Counsel, Wilson Sonsini Goodrich & Rosati

      *Former Justice, Delaware Supreme Court*

52.  **Erik T. Hoover**

      Senior Vice President and General Counsel, DuPont de Nemours, Inc.

53.  **Cathy Hwang**

      Barron F. Black Research Professor of Law, University of Virginia School of Law

54.  **Howell E. Jackson**

      James S. Reid, Jr., Professor of Law, Harvard Law School

55.  **Robert J. Jackson, Jr.**

      Pierrepont Family Professor of Law, Co-Director of the Institute for Corporate Governance and Finance, Director of the Program on Corporate Law and Policy, NYU School of Law

      *Former Commissioner, U.S. Securities and Exchange Commission*

56.  **Matthew Jennejohn**

      Professor of Law, Brigham Young University Law School

57.  **Cherée Haswell Johnson**

      Chief Legal Officer, General Counsel and Secretary, Dentsply Sirona Inc.

58. **Roberta Karmel**

Distinguished Research Professor of Law, Brooklyn Law School

*Former Commissioner, U.S. Securities and Exchange Commission*

59. **Denise Keane**

*Former General Counsel, Altria Group, Inc.*

60. **Stanley Keller**

Senior Partner, Locke Lord LLP

*Former Chair, Committee on Federal Regulation of Securities, American Bar Association, Corporate Laws Committee*

61. **Richard G. Ketchum**

*Former Chair, Board of Governors; Former Chair and CEO, Financial Industry Regulatory Authority; Former CEO, New York Stock Exchange Regulation; Former Chief Regulatory Officer, New York Stock Exchange; Former President, Nasdaq Stock Market*

62. **Sung Eun (Summer) Kim**

Professor of Law, University of California, Irvine, School of Law

63. **Sung Hui Kim**

Professor of Law, UCLA School of Law

64. **William M. Lafferty**

Partner, Morris, Nichols, Arsht & Tunnell LLP

*Chair, Delaware Court of Chancery Rules Committee; Advisory Board Member, John L. Weinberg Center for Corporate Governance; Advisory Board, New York University School of Law Institute for Corporate Governance and Finance; Fellow, American College of Trial Lawyers*

65. **Stephen P. Lamb**

Of Counsel, Paul, Weiss, Rifkind, Wharton & Garrison LLP

*Former Vice Chancellor, Delaware Court of Chancery*

66. **Don Langevoort**

Thomas Aquinas Reynolds Professor of Law, Georgetown University Law Center

*Former Special Counsel, U.S. Securities and Exchange Commission*

67. **Jannie K. Lau**

*Former Executive Vice President, General Counsel and Corporate Secretary, InterDigital, Inc.*

68. **Susan Lindberg**

*Former Executive Vice President and General Counsel, SemGroup Corporation*

69. **Paul L. Lion, III**

Partner, Morrison & Foerster LLP

*Former Chair, American Bar Association, Business Law Section*

70. **Martin Lipton**

   Founding Partner, Wachtell, Lipton, Rosen & Katz

   *Member of and Counsel to New York Stock Exchange Corporate Accountability and Listing Standards Committee, 2002; Honorary Fellow, American College of Governance Counsel*

   Wachtell, Lipton, Rosen & Katz serves as counsel for Nasdaq, Inc., the parent company of The Nasdaq Stock Market, L.L.C., on unrelated matters.

71. **Lindsay Llewellyn**

   General Counsel, Lyft, Inc.

72. **Dorothy S. Lund**

   Associate Professor of Law, University of Southern California Gould School of Law

73. **Jonathan Macey**

   Sam Harris Professor of Corporate Law, Corporate Finance, and Securities Law, Yale Law School

74. **David B.H. Martin**

   Senior Counsel, Covington & Burling LLP

   *Former Chair, Corporate Laws Committee, Business Law Section, American Bar Association*

75. **Veronica Root Martinez**

   Professor of Law, Robert & Marion Short Scholar, Director, Program on Ethics, Compliance & Inclusion, Notre Dame Law School

76.  **Barbara Mendel Mayden**

Principal, Young Mayden, LLC

*Former Chair, American Bar Association, Business Law Section*

77.  **David C. McBride**

Partner, Young Conaway Stargatt & Taylor, LLP

*Member, Corporate Laws Committee, Business Law Section, American Bar Association; Former Chair, Council of the Delaware State Bar Association Corporation Law Section*

78.  **Brett McDonnell**

Dorsey and Whitney Chair in Law, University of Minnesota Law School

79.  **Norman M. Monhait**

Of Counsel, Reid Collins & Tsai

*Former Partner, Rosenthal Monhait & Goddess P.A.; Former Chair of the Council of the Delaware State Bar Association Corporation Law Section; Former Member, Delaware Court of Chancery Rules Committee*

80.  **Yaron Nili**

Associate Professor of Law and Smith-Rowe Faculty Fellow in Business Law, The University of Wisconsin Law School

81.  **John W. Noble**

Partner, Morris James

*Former Vice Chancellor, Delaware Court of Chancery*

82.   **Richard W. Painter**

S. Walter Richey Professor of Corporate Law, University of Minnesota Law School

*Former Associate Counsel to the President and Chief White House Ethics Lawyer*

83.   **Donald F. Parsons**

Retired Partner, Morris, Nichols, Arsht & Tunnell

*Former Vice Chancellor, Delaware Court of Chancery*

84.   **Frank Partnoy**

Adrian A. Kragen Professor of Law, University of California, Berkeley School of Law

85.   **Robert K. Rasmussen**

J. Thomas McCarthy Trustee Chair in Law and Political Science, University of Southern California Gould School of Law

*Former Dean, University of Southern California Gould School of Law*

86.   **Anne E. Robinson**

*Managing Director, General Counsel and Corporate Secretary, The Vanguard Group, Inc.*

87.   **Edward Rock**

Martin Lipton Professor of Law, Co-Director, Institute for Corporate Governance and Finance, New York University School of Law

88. **Kim K.W. Rucker**

*Former Executive Vice President, General Counsel and Secretary of Andeavor (f.k.a., Tesoro Corporation); Former Executive Vice President, Corporate and Legal Affairs, General Counsel and Secretary of Kraft Food Group, Inc.; Former Senior Vice President, General Counsel, Corporate Secretary and Chief Compliance Officer of Avon Products, Inc.; Former Senior Vice President, Secretary and Chief Governance Officer of Energy Future Holdings, Corp. (f.k.a., TXU Corporation); Member of American College of Governance Counsel; Former Member, American Bar Association, Corporate Laws Committee*

89. **Kathryn H. Ruemmler**

Chief Legal Officer and General Counsel, The Goldman Sachs Group, Inc.

90. **Hillary A. Sale**

Associate Dean for Strategy, Agnes Williams Sesquicentennial Professor of Law, Professor of Management, Georgetown University

91. **Christina M. Sautter**

Cynthia Felder Fayard Professor of Law, Byron R. Kantrow Professor of Law, and Vinson & Elkins Professorship, Professor of Law, Louisiana State University Paul M. Hebert Law Center

92. **Mary L. Schapiro**

*Former Chair, U.S. Securities and Exchange Commission; Former CEO, Financial Industry Regulatory Authority; Former Chair, U.S. Commodity Futures Trading Commission*

93. **Larry P. Scriggins**

Retired Partner, DLA Piper

*Former Chair, American Bar Association, Business Law Section; Senior Advisor and Former Chair of the Corporate Laws Committee of the Business Law Section; Life Member, American Law Institute; Honorary Member, American College of Corporate Governance*

94. **Joel Seligman**

Professor of Law, Washington University in St. Louis School of Law

*President Emeritus and University Professor, University of Rochester; Dean Emeritus and Professor, Washington University; Former Dean and Samuel M. Fegtly Professor Law, University of Arizona*

95. **Kevin R. Shannon**

Partner, Potter Anderson & Corroon LLP

*Member, Delaware Supreme Court Rules Committee; Member, Delaware Court of Chancery Rules Committee; Fellow, American College of Trial Lawyers*

96. **Nicola Sharpe**

Professor of Law, University of Illinois College of Law; Director, Chicago Business Law Program; Associate Academic Director, Center for Professional Responsibility in Business and Society, Gies College of Business

97. **David C. Shelton**

Senior Vice President, General Counsel, and Corporate Secretary, The Chemours Company

98.  **Omari Scott Simmons**

Howard L. Oleck Professor of Business Law, Wake Forest University School of Law

99.  **Laurie A. Smiley**

Chair, Corporate Laws Committee, Business Law Section, American Bar Association

*Former CEO, TAK Advisory Limited; Former General Counsel, Cascade Investment LLC*

100. **D. Gordon Smith**

Dean and Ira A. Fulton Chair, BYU Law School

101. **Larry Sonsini**

Founding and Senior Partner, Wilson Sonsini Goodrich & Rosati

*Former Member of the New York Stock Exchange Board of Directors, Chair of the NYSE Regulation, Enforcement and Listing Standards Committee, and Chair of the NYSE Commission on Corporate Governance; Chair of the American College of Governance Counsel; Former Member of Nasdaq Legal Advisory Committee*

102. **Holger Spamann**

Lawrence R. Grove Professor of Law, Harvard Law School

103. **A. Gilchrist Sparks, III**

Of Counsel, Morris, Nichols, Arsht & Tunnell LLP

*Former Chair, Council of the Delaware State Bar Association Corporation Law Section; Former Chair, Corporate Laws Committee, Business Law Section, American Bar Association*

104. **James C. Spindler**

Mark L. Hart, Jr. Endowed Chair in Corporate and Securities Law, University of Texas Law School; Professor, University of Texas McCombs School of Business

105. **Dev Stahlkopf**

Executive Vice President and Chief Legal Officer, Cisco Systems, Inc.

106. **Robert Stebbins**

Partner, Willkie Farr & Gallagher LLP

*Former General Counsel, U.S. Securities and Exchange Commission*

107. **Myron T. Steele**

Partner, Potter Anderson & Corroon LLP

*Former Chief Justice of the Delaware Supreme Court; Former Vice Chancellor, Delaware Court of Chancery*

108. **Marc I. Steinberg**

Rupert and Lillian Radford Chair in Law and Professor of Law, Southern Methodist University Dedman School of Law

*Former Member, National Adjudicatory Council, Financial Industry Regulatory Authority; Former Attorney, Division of Enforcement and Office of the General Counsel, U.S. Securities and Exchange Commission*

109. **Joseph A. Stern**

Managing Director and Senior Counsel, The Goldman Sachs & Co. LLC

## 110. Rachel Stern

Executive Vice President, Chief Legal Officer and Global Head of Strategic Resources, FactSet Research Systems Inc.

## 111. Leo E. Strine, Jr.

Of Counsel, Wachtell, Lipton, Rosen & Katz

*Former Chief Justice of the Delaware Supreme Court; Former Chancellor of the Delaware Court of Chancery; Former Vice Chancellor of the Delaware Court of Chancery; Michael L. Wachter Distinguished Fellow in Law and Policy, University of Pennsylvania Carey Law School; Senior Fellow, Harvard Program on Corporate Governance; Former Special Judicial Advisor to the American Bar Association's Committee on Corporate Laws*

Wachtell, Lipton, Rosen & Katz serves as counsel for Nasdaq, Inc., the parent company of The Nasdaq Stock Market, L.L.C., on unrelated matters.

## 112. Kristin Sverchek

President of Business Affairs, Lyft, Inc.

*Former General Counsel, Lyft, Inc.*

## 113. Eric Talley

Isidor and Seville Sulzbacher Professor of Law, Columbia Law School; Co-director, Ira M. Millstein Center for Global Markets and Corporate Ownership

*Immediate Past Chair, Society for Empirical Legal Studies*

## 114. Vicki O. Tucker

*Former Chair, American Bar Association, Business Law Section*

115. **E. Norman Veasey**

Special Counsel, Gordon, Fournaris & Mammarella

*Former Chief Justice, Delaware Supreme Court; Honorary Fellow and Founding Chair, American College of Governance Counsel; Former Chair, American Bar Association, Business Law Section*

116. **Cheryl L. Wade**

Harold F. McNiece Professor of Law, St. John's University School of Law

117. **Elisse B. Walter**

*Former Chair, U.S. Securities and Exchange Commission; Former Director, Occidental Petroleum; Former Member, Sustainability Accounting Standards Board*

118. **David H. Webber**

Professor of Law and Paul M. Siskind Scholar, Boston University School of Law

119. **Cynthia A. Williams**

Professor Emerita of Law, University of Illinois College of Law

120. **Gregory P. Williams**

Director, Richards, Layton & Finger

*Former Chair, Litigation Rules Committee of the Delaware Supreme Court; Former Chair, Delaware Court of Chancery Rules Committee; Former Chair, Delaware Supreme Court Rules Committee; Former Chair, Corporate and Securities Law Subcommittee, United States Law Firm Group*

## CERTIFICATE OF SERVICE

I certify that all counsel of record who have consented to electronic service are being served today with a copy of this document via the Court's CM/ECF system. All parties in this case are represented by counsel consenting to electronic service.

February 25, 2022

/s/ Marc Wolinsky
Marc Wolinsky
Kevin S. Schwartz
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY 10019
(212) 403-1000

*Counsel for Amici Curiae Nonpartisan Group of Academics and Practitioners in the Field of Corporate Governance*

54

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of <u>Fed. R. App. P. 29(a)(5)</u> because it contains 6,493 words, excluding the parts of the brief exempted by <u>Fed. R. App. P. 32(f)</u>.

This brief also complies with the typeface requirements of <u>Fed. R. App. P. 32(a)(5)(A)</u> and the type style requirements of <u>Fed. R. App. P. 32(a)(6)</u> because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook font size 14.

February 24, 2022

/s/ Marc Wolinsky
Marc Wolinsky
Kevin S. Schwartz
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY 10019
(212) 403-1000

*Counsel for Amici Curiae Nonpartisan Group of Academics and Practitioners in the Field of Corporate Governance*