**No. 21-60626**

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

**ALLIANCE FOR FAIR BOARD RECRUITMENT,
NATIONAL CENTER FOR PUBLIC POLICY RESEARCH,**

*Petitioners,*

**v.**

**SECURITIES AND EXCHANGE COMMISSION,**

*Respondent.*

_____
On Petition for Review of an Order of the
United States Securities and Exchange Commission
No. 34-92590

_____

**BRIEF OF INVESTORS AND INVESTMENT ADVISERS AS *AMICI CURIAE*
IN SUPPORT OF RESPONDENT SECURITIES AND EXCHANGE
COMMISSION**

**(COUNCIL OF INSTITUTIONAL INVESTORS, INVESTMENT ADVISER
ASSOCIATION, NORTHERN TRUST INVESTMENTS, INC., ARIEL
INVESTMENTS LLC, BOSTON TRUST WALDEN CO., LORD, ABBETT &
COMPANY LLC, GAINGELS, INC., ROBERT F. KENNEDY CENTER FOR
HUMAN RIGHTS)**

_____

Neal S. Manne

**SUSMAN GODFREY L.L.P.**
1000 Louisiana St., Ste. 5100
Houston, TX 77002
Phone: (713) 651-9366
nmanne@susmangodfrey.com

Steven M. Shepard
Arun Subramanian

**SUSMAN GODFREY L.L.P.**
1301 Ave. of the Americas, 32nd Fl.
New York, NY 10019
Phone: (212) 336-8330
sshepard@susmangodfrey.com

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Fifth Circuit Rules 28.2.1 and 29.2, the undersigned counsel of record certifies that he is not aware of any additional person or entity, besides those already listed in the parties' Certificates of Interested Persons, which has an interest in the outcome of this litigation. *Amici*'s interests in this matter are described below in the section of this brief entitled "Interest of Amici Curiae." These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1.      The ***Council of Institutional Investors*** ("CII") is a nonprofit membership association with no parent company or subsidiaries other than a Section 501(c)(3) affiliate, the "CII Research and Education Fund." No publicly held corporation owns 10% or more of CII's equity.

2.      The ***Investment Adviser Association*** ("IAA") is a nonprofit membership association with no parent company or subsidiaries. No publicly held corporation owns 10% or more of IAA's equity.

3.      ***Northern Trust Investments, Inc.*** ("Northern Trust") is a wholly owned subsidiary of The Northern Trust Company ("TNTC"), an Illinois state banking corporation. TNTC is a wholly owned subsidiary of Northern Trust Corporation, a financial holding company and publicly traded company.

4.      ***Ariel Investments, LLC*** ("Ariel") does not have any parent corporations, and there are no publicly held corporations that own 10% or more of its equity.

5.      ***Boston Trust Walden Company*** ("Boston Trust Walden") is a wholly owned subsidiary of Boston Trust Walden Corporation. No publicly held corporation owns 10% or more of Boston Trust Walden's stock.

6.      ***Lord, Abbett & Co. LLC*** ("Lord Abbett") does not have any parent company, and there are no publicly held corporations that own 10% or more of its equity.

i

7.　　***Gaingels, Inc.*** ("Gaingels") has a parent company, Gaingels Holding LP. No publicly held corporations own 10% or more of Gaingels' stock.

8.　　***Robert F. Kennedy Center for Justice and Human Rights*** ("RFK Center") is a nonprofit membership association with no parent company or subsidiaries. No publicly held corporation owns 10% or more of the RFK Center's equity.

/s/*Steven M. Shepard*

Steven M. Shepard
*Attorney of Record for The Council of Institutional Investors, The Investment Adviser Association, Northern Trust Investments, Inc., Ariel Investments LLC, Boston Trust Walden Company, Lord, Abbett & Co. LLC, Gaingels, Inc., & Robert F. Kennedy Center for Justice and Human Rights*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................................ i

TABLE OF AUTHORITIES .................................................................... v

INTEREST OF *AMICI CURIAE* ............................................................ 1

INTRODUCTION ............................................................................ 6

ARGUMENT ................................................................................ 7

I.   Many Investors and Investment Advisers Believe that Overall Board Diversity Is a Material Benefit to Companies ........................... 7

II.  The Role of the "Nominating Committee" .......................................... 9

    A.   Companies' "Nominating Committees" Typically Select the Nominees That Are Proposed to Shareholders for Election as Directors ................................................. 10

    B.   Proxy Statements Already Disclose the Process that the "Nominating Committee" Uses to Select Nominees—Including Diversity Considerations ................................. 11

III. Overall Board Diversity, and Explanations for Lack of Diversity, Are Factors Considered by Many Investors and Investment Advisers When Voting For (Or Against) Directors on the "Nominating Committee" ........................................ 13

    A.   Many Investors and Investment Advisers Have Formal Voting Policies That Are Based, In Part, On Overall Board Diversity ................................................. 14

    B.   Many Investors and Investment Advisers Will Also Consider a Non-Diverse Board's *Explanation* for the Lack of Diversity When Casting Their Votes ........................ 20

IV.  Institutional Investors and Investment Advisers Also Take Overall Board Diversity Into Account When Making Investment Decisions ................................................. 21

V.   Nasdaq's Rules Give Investors and Investment Advisers the Information They Need to Implement Their Voting Policies and Make Investment Decisions ........................................ 24

    A.   Data on Overall Board Diversity Is Difficult to Find .............. 24

B.    Rule 5606 Will Improve the Quality, Consistency, and Accessibility of Information Regarding the Overall Diversity of Boards .................................................................27

C.    It Is Difficult for Investors and Investment Advisers to Obtain Explanations from Companies for the Reasons for Lack of Overall Board Diversity...............................................28

D.    Rule 5605(f)(2)(A) Will Improve the Quality, Quantity, and Accessibility of Information Relating to the Challenges Companies May Face in Recruiting Diverse Directors....................................................................................28

E.    Both Rules Are Particularly Important for Smaller Investors and Investment Advisers ..........................................30

CONCLUSION ..................................................................................................31

CERTIFICATE OF COMPLIANCE ......................................................................33

CERTIFICATE OF SERVICE ..............................................................................34

iv

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Marchand v. Barnhill*,
  212 A.3d 805 (Del. 2019) ........................................................8

*Spanakos v. Pate*,
  237 A.3d 809 (Del. 2020) ......................................................10

*United Food & Com. Workers Union & Participating Food Indus.*
  *Emps. Tri-State Pension Fund v. Zuckerberg*,
  No. 404, 2020, 2021 WL 4344361 (Del. Sept. 23, 2021) ...................8

**Statutes**

Del. Code Ann. tit. 8, § 211(b) ...................................................10

Del. Code Ann. tit. 8, § 212(b) ...................................................10

**Federal Regulations**

17 C.F.R. § 229.407(c)(vi) .........................................11, 12, 13, 24

17 C.F.R. § 240.14c-2(b) .........................................................11, 25

**Federal Register Publications**

*Disclosure Regarding Nominating Comm. Functions and Commc'ns*
  *Between Security Holders and Bds. of Directors,* 68 Fed. Reg.
  66,992, at 66,996 (Nov. 28, 2003) ...........................................12

*Proxy Disclosure Enhancements,* 74 Fed. Reg. 68,334, at 68,343-44
  (Dec. 23, 2009) ..............................................................12, 13

**Nasdaq Rules**

Nasdaq Rule 5605(f)(2)(A) ...............................................7, 28, 29, 30

Nasdaq Rule 5606 ..................................................................27

**Other Authorities**

5 Fletcher Cyc. Corp. § 2049.10, *Proxy Voting—In general* ..................................10

5 Fletcher Cyc. Corp. § 2052.20, *Federal regulation of proxies—
Solicitation of proxies* ..........................................................................................11

Amanda Barroso, *Most Black Adults Say Race is Central to Their
Identity and Feel Connected to a Broader Black Community,* PEW
RESEARCH CTR., Feb. 5, 2020 ...............................................................................7

Boston Trust Walden, *Comment Letter on Proposed Rule Change to
Adopt Listing Rules Related to Board Diversity*, Dec. 30, 2020 ........................26

Corinne Post, *When is Female Leadership an Advantage?
Coordination Requirements, Team Cohesion, and Team
Interaction Norms, 36* J. OF ORGANIZATIONAL BEHAV. 1153 (2015) ..................8

Emily Glazer & Theo Francis, *As Corporate Boards Pursue Diversity,
Director Training Programs Spring Up,* WALL ST. J., Dec. 31,
2021.......................................................................................................................20

International Corporate Governance Network, *Comment Letter on
Proposed Rule Change to Adopt Listing Rules Related to Board
Diversity*, Dec. 16, 2020 .......................................................................................25

Law Of Corp. Offs. & Dirs.: Rts., Duties & Liabs. § 8:8, *Composition
and function of particular committees—Nominating Committee*
(West 2021)...........................................................................................................11

Sundiatu Dixon-Fyle et al., *Diversity Wins: How Inclusion Matters,*
MCKINSEY & CO., May 19, 2020......................................................................8, 9

US SIF, *Report on US Sustainable and Impact Investing Trends 2020* ..................23

## INTEREST OF *AMICI CURIAE*

*Amici* (and many of their members) currently consider overall board diversity when voting for (or against) directors serving on "nominating committees," and, in certain instances, when making investment decisions. *Amici* support Nasdaq's Rules because the Rules will improve investors' ability to obtain and use relevant information on overall board diversity.

The ***Council of Institutional Investors*** ("CII") is a nonprofit, nonpartisan association of U.S. public, corporate, and union employee benefit funds; state and local entities charged with investing public assets; and foundations and endowments with combined assets under management of approximately $4 trillion. CII is a leading voice for effective corporate governance, strong shareowner rights, and sensible financial regulations that foster fair capital markets. Many of CII's members consider overall board diversity information a relevant factor in voting shares and making investment decisions.

The ***Investment Adviser Association*** ("IAA") is a not-for-profit organization that has exclusively represented the interests of investment adviser firms for more than eight decades. IAA currently has approximately 600 investment adviser members, who collectively manage more than $35 trillion in assets for a wide variety of investor clients. IAA supports promoting the values of diversity, equity, and inclusion at all levels of the investment adviser industry. Many of IAA's

1

members consider overall board diversity information as a relevant factor in voting shares and making investment decisions.

*Northern Trust Investments, Inc.* ("Northern Trust") is the primary U.S. investment adviser to the asset-management business of Northern Trust Corporation, which business (branded as "Northern Trust Asset Management") has approximately $1.3 trillion of assets under management as of December 31, 2021. Northern Trust believes that at least 20% of a board's directors should be female, and that U.S. corporate boards should include at least one ethnically or racially diverse director. Northern Trust, on behalf of its clients for whom Northern Trust has voting discretion, casts votes for directors based, in part, on board-diversity information, in an effort to achieve the diversity goals stated above. Furthermore, Northern Trust Asset Management offers its clients a variety of sustainable investment strategies that incorporate analysis of environmental, social and governance risks and opportunities, and that may include use of Northern Trust's proprietary "ESG Vector Scores." Northern Trust's ESG Vector Scores are based, in part, on a company's ability to adhere to best practices, including the practice of recruiting qualified and diverse candidates for board positions.

*Ariel Investments, LLC* ("Ariel") is an investment adviser with approximately $18.3 billion of assets under management, which are primarily

invested in publicly traded equity securities.[1] Ariel exercises the authority to vote the shares that it manages, and cast votes for directors based, in part, on board-diversity information, in an effort to promote board diversity. In addition, Ariel's investment research team assigns a proprietary ESG Risk Rating for each existing and prospective portfolio company. The ESG Risk Rating is based on assessments of industry exposure, disclosure, and management of material ESG issues, including diversity and inclusion.

***Lord, Abbett & Co. LLC*** ("Lord Abbett") is an independent, privately held firm with a singular focus on the management of money. Lord Abbett manages approximately $250 billion in assets across a full range of mutual funds, institutional accounts, and separately managed accounts as of January 31, 2022. Lord Abbett believes that increasing board diversity is in the public's interest and will enhance corporate governance, board decision-making, investor protections, and investor confidence. In addition, Lord Abbett believes that establishing disclosure expectations and guidance on the presentation of board diversity data will improve transparency, consistency, and comparability of disclosure across companies, providing a source of reliable and consistent information which can then be used to make better-informed investment decisions.

---

[1] These assets include $873.7 million in assets from Ariel Alternatives, a private equity subsidiary of Ariel Investments.

3

***Boston Trust Walden Company*** ("Boston Trust Walden") is a private, employee-owned investment management firm with approximately $15 billion in assets under management. Boston Trust Walden evaluates environmental, social, and governance (ESG) factors as part of its investment decision-making process to identify high-quality companies with sustainable business models. Boston Trust Walden will withhold its votes for directors on nominating committees, if the board does not meet certain diversity criteria described below.

***Gaingels, Inc.*** is the operations arm of an LGBTQIA+ investment syndicate called Gaingels ("Gaingels") comprised of more than 2,000 members who share its commitment to diversity and inclusion at all levels of a company's organization. Gaingels focuses its efforts on identifying portfolio companies with a demonstrated commitment to diverse leadership and/or a desire to improve representation in its C-Suite, board room and cap table. Gaingels actively assists its portfolio companies to promote a culture of diversity and inclusion, including by recruiting diverse directors. Gaingels, its members, and the portfolio companies they have invested in strongly believe that intentional efforts to improve representation are a critical component to building a successful company.

The ***Robert F. Kennedy Center for Justice and Human Rights*** ("RFK Center") is a non-profit organization dedicated to the pursuit of racial and economic equality. The RFK Center's Compass Investors Program is a network of

institutional investors, investment managers, investment advisers, and investment consultants who collectively have close to $7 trillion in assets under management. The Compass Investors Program, along with the RFK Center's Workplace Dignity Program, encourages and facilitates efforts to promote diversity, equity, inclusion and economic dignity by, among other things, increasing the diversity of boards in the public and private markets sectors.

All parties to this case have consented to the filing of this amicus brief.

No party or its counsel authored this brief. *Amici* are the only persons who contributed money to fund the preparation and submission of this brief.

## INTRODUCTION

The overall diversity of a company's board is a relevant factor that many institutional investors and investment advisers consider when voting shares and when making investment decisions.

Most U.S. companies' boards have a "nominating committee" that is responsible for recruiting, selecting, and nominating directors. If the board has no diversity, or very little diversity, then many investors and investment advisers will vote against (or withhold votes for) the directors who serve on the "nominating committee." This brief cites public statements by several investors and investment advisers—who collectively manage **$18.3 trillion**—attesting that they vote in this manner.

By voting against the directors on the nominating committee, these investors and investment advisers seek to encourage that committee to recruit more diverse nominees. When casting these votes, many investors and investment advisers will also consider a non-diverse board's *explanation* (if one is available) of why the board lacks diversity.

Overall board diversity is also a relevant factor in many investors' and investment advisers' Environmental, Social, and Governance ("ESG") investment strategies. ESG strategies have grown exponentially over the last decade. As of

2020, more than $16 trillion assets were held by investors and investment advisers employing ESG strategies.

Unfortunately, information on overall board diversity is difficult to obtain, sometimes inaccurate, and typically presented in inconsistent formats that make it difficult to use efficiently. Obtaining explanations for the reasons why non-diverse boards lack diversity is even more difficult.

*Amici* support Nasdaq's Board Diversity Matrix because it will greatly improve the accessibility, quality, and consistency of information relating to companies' overall board diversity. *Amici* support Nasdaq's Rule 5605(f)(2)(A) because it will greatly improve the accessibility, quantity, and quality of the explanations for why non-diverse boards lack diversity.

## ARGUMENT

## I.    Many Investors and Investment Advisers Believe that Overall Board Diversity Is a Material Benefit to Companies

This nation's public companies operate in a world in which race, ethnicity, gender, and sexual orientation matter. These characteristics inform many Americans' senses of self- and group-identity.[2] These are the Americans whom public companies must recruit, manage, and motivate as employees—or else, fail.

---

[2] *See* Amanda Barroso, *Most Black Adults Say Race is Central to Their Identity and Feel Connected to a Broader Black Community*, PEW RESEARCH CTR., Feb. 5, 2020, https://perma.cc/ZU9Y-5RZQ (comparing percentage of Black, Hispanic, Asian, and White adults who feel that race is an important part of their identity).

These are the Americans whom public companies must convince to buy their goods and services—or else, fail. Companies must be attuned to these characteristics if they are to succeed.

The directors of companies also matter. "A cardinal precept" of Delaware law is "that directors . . . manage the business and affairs of the corporation." *United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg*, No. 404, 2020, 2021 WL 4344361 (Del. Sept. 23, 2021).[3] Directors must put in place a "reasonable board-level system of monitoring and reporting" on issues important to the company's success. *Marchand v. Barnhill*, 212 A.3d 805, 821 (Del. 2019).[4]

Many investors and investment advisers believe that overall board diversity helps the board succeed in these critical tasks.[5] This belief is supported by these investors' and investment advisers' own experience; by their knowledge regarding the companies in which they invest; and by third-party research.[6]

---

[3] *See also* Council of Institutional Investors, *Corporate Governance Policies*, at 7, https://perma.cc/69ZK-35RG (last updated Sept. 22, 2021) ("The board has a fiduciary responsibility to oversee company performance and the management of strategy and risks").

[4] *See id.* ("The board should . . . monitor a company's risk management philosophy and risk appetite.").

[5] *See id.* at 8 ("The Council believes a diverse board has benefits that can enhance corporate financial performance, particularly in today's global market place.").

[6] *See, e.g.*, Corinne Post, *When is Female Leadership an Advantage? Coordination Requirements, Team Cohesion, and Team Interaction Norms*, 36 J. OF ORGANIZATIONAL BEHAV. 1153, 1158 (2015); Sundiatu Dixon-Fyle et al., *Diversity*

One Petitioner contends that this widespread belief is "bigoted" and "irrational." National Center for Public Policy Research ("NCPPR") Br. at 47-48. *Amici* disagree. Institutional investors and investment advisers are obligated to act in the best interests of their clients (investors) and to do so rationally.

Moreover, in addition to being guided by their fiduciary duties, many institutional investors and investment advisers are also responsive to their clients' expectations and to the market forces that shape American finance. The U.S. market for financial services is fiercely competitive.

This amicus brief quotes the public statements of numerous institutional investors and investment advisers that state their belief in the benefits of overall board diversity and describe how they will cast their votes to attempt to achieve that diversity. The authors of these public statements collectively manage **approximately $18.3 trillion**.[7] If their beliefs were irrational, then their assets under management would decline significantly. That has not happened.

## II.    The Role of the "Nominating Committee"

*Amici* offer the following description of the typical process, followed by most U.S. companies, in nominating and electing directors. This background is

---

*Wins: How Inclusion Matters,* McKinsey & Co., May 19, 2020, at 3-4, https://perma.cc/F2WL-6WPC.

[7] BlackRock ($8.68trn); Vanguard ($7.2trn); Northern Trust ($1.3trn); CalPERS ($477bn); NY State Common Retirement Fund ($279.7bn); Lord Abbett ($250bn); OPERS ($125bn); Ariel ($18.3bn); Boston Trust Walden ($15bn).

9

intended to aid the Court in understanding the voting practices described in this brief.

### A. Companies' "Nominating Committees" Typically Select the Nominees That Are Proposed to Shareholders for Election as Directors

With few exceptions, public companies must hold an "annual meeting" of shareholders for the purpose of electing directors. *See, e.g.*, <u>Del. Code Ann. tit. 8, § 211(b)</u> ("an annual meeting of stockholders shall be held for the election of directors"); *see also Spanakos v. Pate*, <u>237 A.3d 809, 815</u> (Del. 2020) ("The shareholder meeting to elect directors is a cornerstone of Delaware corporate law . . . ."). In practice, few shareholders attend these annual meetings.

Instead, most shareholders cast their votes by granting their "proxies" to someone else who does attend. *See, e.g.*, <u>Del. Code Ann. tit. 8, § 212(b)</u>. Public companies' typical practice is to select their own nominees for election as directors and to then distribute "proxy statements" to all shareholders, asking the shareholders to grant their "proxies" to the company to vote for those nominees. *See* 5 Fletcher Cyc. Corp. § 2049.10, *Proxy voting—In general* (the shareholders' meeting is often "a species of absentee voting by mail by a one-way ballot for the slate [of director nominees] . . . suggested by the management").

Many corporate boards have "nominating committees" (also referred to as "corporate governance" committees). The directors who serve on the "nominating

committee" are responsible for identifying, recruiting, vetting, and otherwise selecting the nominees that the company proposes for election, as directors, in its "proxy statement" to shareholders. *See* Law of Corp. Offs. & Dirs.: Rts., Duties & Liabs. § 8:8, *Composition and function of particular committees—Nominating Committee* (West 2021).[8]

### B. Proxy Statements Already Disclose the Process that the "Nominating Committee" Uses to Select Nominees—Including Diversity Considerations

Companies' proxy statements must already disclose information relating to the process that the "nominating committee" uses to select nominees for director roles—including whether the nominating committee considered diversity. 17 C.F.R. § 240.14a-101 Schedule 14A, Item 7, ¶ b; 17 C.F.R. § 229.407(c)(v), (vi); *see generally* 5 Fletcher Cyc. Corp. § 2052.20, *Federal regulation of proxies—Solicitation of proxies*.

Since 2003, companies have been required to disclose any "specific qualities or skills that the nominating committee believes are necessary for . . . directors to possess."[9] When promulgating this requirement, the SEC stated its belief that the

---

[8] *See also* Council of Institutional Investors, *supra* note 3, at 8.
[9] This rule is codified at 17 C.F.R. § 229.407(c)(v) ("Item 407").

rule would prompt many companies to disclose the extent to which they took diversity into consideration in nominating director candidates.[10]

Since 2009, companies have been required to disclose "whether, and if so how, a nominating committee considers diversity in identifying nominees for director."[11] If a company's nominating committee has a policy to consider diversity, the company must disclose "how this policy is implemented, as well as how the nominating committee (or the board) assesses the effectiveness of the policy."[12] In promulgating this rule, the SEC took note of commenters who reported that "there appears to be a meaningful relationship between diverse boards and improved corporate financial performance, and that diverse boards can help companies more effectively recruit talent and retain staff."[13] The SEC found that "it is useful for investors to understand how the board considers and addresses diversity, as well as the board's assessment of the implementation of its diversity policy, if any."[14]

Many institutional investors and investment advisers—including *amici*— already review and rely upon these disclosures to learn how a company "considers

---

[10] *See* SEC Release No. 33-8340, *Disclosure Regarding Nominating Comm. Functions and Commc'ns Between Security Holders and Bds. of Directors,* 68 Fed. Reg. 66,992, at 66,996 (Nov. 28, 2003).

[11] This rule is codified at 17 C.F.R. § 229.407(c)(vi).

[12] *Id.*

[13] SEC Release No. 33-9089, *Proxy Disclosure Enhancements,* 74 Fed. Reg. 68,334, at 68,343-44 (Dec. 23, 2009).

diversity in identifying nominees for director" and "how this policy is implemented." 17 C.F.R. § 229.407(c)(vi). However, these disclosures do *not* typically describe the board's overall diversity.

### III. Overall Board Diversity, and Explanations for Lack of Diversity, Are Factors Considered by Many Investors and Investment Advisers When Voting For (Or Against) Directors on the "Nominating Committee"

*Amici* disagree with Petitioners' contention that Nasdaq's Rules "encourage[] shareholders to discriminate in their votes for board members," "based on" each board's member's self-identification. Alliance Br., at 13, 16-17; NCPPR Br., at 38, 48. *Amici* do *not* vote against individual directors based on the directors' race, ethnicity, gender, or sexual orientation, and *amici* are not aware of any investors or investment advisers who do so.

Nor do Nasdaq's Rules encourage or enable this kind of voting practice. Nasdaq's Board Diversity Matrix does not identify directors by name. The Matrix only discloses *overall* board diversity, that is, the *total number* of directors that have self-identified (to the company, not to the public) as having a particular identity. It would be impossible for any investor to determine how any individual director has self-identified based solely on the Board Diversity Matrix.

*Overall* board diversity—and not the self-identification of any specific director—is the factor that many investors and investment advisers consider when

---

[14] *Id.*

casting their votes for (or against) the directors who serve on the company's "nominating committee." Those directors, like all others, are typically up for re-election at each year's annual shareholder meeting.

Voting against "nominating committee" directors can send the message that this committee needs to do a better job of finding qualified, diverse nominees to propose to the shareholders. Directors pay attention to shareholders' votes, and it is reasonable for investors to expect that directors serving on the "nominating committee" will interpret a drop-off in votes cast for their re-election as a reflection of shareholder dissatisfaction with the committee's slate of nominees.

At bottom, the nominating committee is responsible for proposing slates of directors that can best manage and mitigate the risks to companies on behalf of their shareholders. Given the role that diversity can play in avoiding group think and reflecting the needs and desires of a diverse workforce and customer base, overall board diversity is important to maximizing shareholder value.

A.    **Many Investors and Investment Advisers Have Formal Voting Policies That Are Based, In Part, On Overall Board Diversity**

Many institutional investors and investment advisers make their voting policies public.[15] And many of those policies explicitly state that the investor or

---

[15] *See* CII, *Policies on Other Issues, Best Disclosure Practices for Institutional Investors*, May 1, 2009, https://perma.cc/JNZ8-ND5R (recommending that institutional investors publish their voting policies).

investment adviser will cast votes for (or against) directors on the "nominating committee," based on the company's overall board diversity.

*Amicus* Northern Trust has publicly stated that it has "set a standard that all boards" of U.S. companies should "be at least 20% female" and "have at least one ethnically/racially diverse director."[16] Northern Trust's policy is to generally vote against the re-election of the director chairing the company's nominating committee if the board's overall diversity does not meet those goals.

*Amicus* Ariel has publicly stated that its policy is to "vote against the nominating and governance chair (or equivalent) of boards of directors lacking female and minority representation."[17] Conversely, Ariel may vote *for* nominating committee chairs based on Ariel's assessment that the company is demonstrating a commitment to improving board diversity.

*Amicus* Boston Trust Walden's policy is to generally vote against nominating committee members, if (1) the board lacks at least one woman and one racially or ethnically diverse director; (2) the nominating committee does not consider gender, racial, and ethnic diversity in director searches; or (3) if the board

---

[16] Northern Trust Asset Management, *Stewardship Report 2020*, at 34, https://perma.cc/S3RS-DZL7 (last modified Dec. 31, 2020).

[17] Ariel Investments, *Environmental, Social, & Governance Annual Report 2020*, at 10, https://perma.cc/DHY4-XW2D (last visited Jan. 10, 2022).

is not 30% diverse overall.[18] This policy is flexible: If a company has demonstrated significant progress towards these guidelines, then Boston Trust Walden may vote for the nominating committee members.

Many investment advisers who are members of *amicus* IAA have similar voting policies in place, as well as other policies that include instructions to support and promote board diversity. These IAA members consider overall board diversity to be an important datapoint used to evaluate the corporate governance of the companies whose shares they vote.

Many institutional investors have similar policies, including members of *amicus* CII. For example, the Ohio Public Employees Retirement System (OPERS)—the 15th-largest retirement system in the United States with $125 billion in assets under management—expects the nominating committee to "commit to identify qualified candidates of diverse gender, racial and ethnic backgrounds for board nomination."[19] OPERS will generally vote against the re-election of "members of accountable committees when the Board . . . is not responsive to shareholders on board composition concerns including board

---

[18] Boston Trust Walden, *Proxy Voting Guidelines*, at 13-14, https://perma.cc/BYL5-MGNX (last modified Feb. 2022).

[19] Ohio Public Employees Retirement System, *Corporate Governance Policy & Proxy Voting Guidelines*, at 6, https://perma.cc/AS62-69AU (last modified Mar. 17, 2021).

diversity."[20] The California Public Employees' Retirement System (CalPERS)—with $477.3 billion in assets under management—will, "on a case-by-case basis . . . withhold votes from directors who are nominating/governance committee members . . . on boards which lack diversity and do not make firm commitments to improving the board diversity in the near term."[21] The New York State Common Retirement Fund—with approximately $279.7 billion in assets under management—"will scrutinize boards that are not sufficiently diverse, including diversity of age, race, gender, ethnicity, sexual orientation and gender identity, geography, and disability." That Fund may withhold "support from incumbent board nominees" if the Fund determines that the "board is not sufficiently diverse," and may "withhold support" from "all incumbent nominating committee nominees when a board does not have more than one woman director."[22]

    In addition to *amici* and their members, other investors and investment advisers have similar policies. For example, BlackRock, Inc., with more than $8.68 trillion in assets under management,[23] has publicly stated that it is "interested in diversity in the board room as a means to promoting diversity of

---

[20] *Id.* at 22.

[21] *See* CalPERS, *Proxy Voting Guidelines*, at 2, https://perma.cc/6PZW-5FSM (last updated Apr. 2021).

[22] New York State Common Retirement Fund, *Proxy Voting Guidelines*, at 9, https://perma.cc/C9VL-RX7W (last visited Feb. 20, 2022).

[23] BlackRock, *About BlackRock*, https://perma.cc/662D-Y5RK (last visited Jan. 10, 2022).

thought and avoiding 'group think,'" and to that end "believe[s] that boards should aspire to 30% diversity of membership and encourage companies to have at least two directors on their board who identify as female and at least one who identifies as a member of an underrepresented group."[24] BlackRock states that if "a company has not adequately accounted for diversity in its board composition within a reasonable timeframe, we may vote against members of the nominating/governance committee."[25]

As another example, Vanguard—with $7.2 trillion of assets under management[26]—states that "diversity of thought, background, and experience, as well as of personal characteristics (such as gender, race, and age), meaningfully contributes to the ability of boards to serve as effective, engaged stewards of shareholders' interests."[27] Vanguard also states that its mutual funds "will vote against the nominating and/or governance committee chair (or other director if

---

[24] BlackRock, *BlackRock Investment Stewardship: Proxy Voting Guidelines for U.S. Securities*, at 6-7, https://perma.cc/EW84-PS5S (last modified Jan. 2022); *see also* BlackRock, *Our Approach to Engagement on Board Diversity*, at 2, https://perma.cc/BL38-SLGS (last updated Mar. 2021).

[25] BlackRock, *BlackRock Investment Stewardship*, *supra* note 24, at 7.

[26] Vanguard, *Fast Facts about Vanguard*, https://about.vanguard.com/who-we-are/fast-facts/ (last visited Jan. 10, 2022).

[27] Vanguard, *Proxy Voting Policy for U.S. Portfolio Companies*, at 5, https://perma.cc/XLE9-YP7C (last modified Mar. 1, 2022).

needed) if a company's board is making insufficient progress in its diversity composition."[28]

Many institutional investors and investment advisers employ third-party proxy advisory firms—such as Institutional Shareholder Services (ISS) and Glass Lewis—to help them cast their votes and recommend how to vote.[29] ISS's current policy is to recommend voting "against" or "withholding" votes for the chair of the nominating committee if there are no women on the board, or if the board "has no apparent racially or ethnically diverse members."[30] Glass Lewis "generally" recommends voting against the chair of the nominating committee if the board has fewer than two women directors, and voting against the entire nominating committee if there are no women on the board.[31]

All these voting policies are based on investors' and investment advisers' assessments of what is best for the companies whose shares they own. These

---

[28] *Id.*

[29] Proxy advisory firms typically provide: research and voting recommendations, executive compensation data and analytics, support in helping their clients engage with the company on relevant issues, other consulting services, and an online platform in which the firm's clients can register their voting choices (which the firm then relays to each company).

[30] Institutional Shareholder Services, *Proxy Voting Guidelines: Updates for 2022, Benchmark Policy Changes for U.S., Canada, Brazil, and Americas Regional*, at 6, https://perma.cc/QM66-Y5JM (last modified Dec. 7, 2021) (gender diversity); *id.* at 7 (racial and ethnic diversity).

[31] Glass Lewis, *2022 Policy Guidelines*, at 40, https://perma.cc/MQ4Z-GCWT (last visited Feb. 2, 2022).

policies are not driven by Nasdaq's Rules.[32] Rather, it is Nasdaq that is properly responding to demand, from investors and investment advisers, for the information they need to implement their policies.

**B.      Many Investors and Investment Advisers Will Also Consider a Non-Diverse Board's *Explanation* for the Lack of Diversity When Casting Their Votes**

Many of the voting policies, described above, make room for individualized consideration of a company's circumstances and of the *reasons* for a non-diverse company's lack of board diversity. Investors and investment advisers recognize that companies have differing qualifications for directors and different challenges in recruiting them. A non-diverse company's explanation for its lack of board diversity is another relevant criterion used when casting votes for (or against) the directors serving on the company's "nominating committee."

For example, CII member CalPERS applies its voting policy "on a case-by-case basis, where our engagements [relating to board diversity] are not successful"; CalPERS will only vote against the nominating committee if the company "do[es] not make firm commitments to improving the board diversity in

---

[32] Emily Glazer & Theo Francis, *As Corporate Boards Pursue Diversity, Director Training Programs Spring Up,* WALL ST. J., Dec. 31, 2021, https://perma.cc/2GPW-WBNP (quoting Marc Goldstein, head of U.S. research for ISS, as stating that "The progress we're seeing is as much about investor pressure and engagement on the issue as it is legal mandates.").

the near term."[33] Vanguard's policy is also applied "on a case-by-case basis," considering "company-specific context" and Vanguard's own evaluation of whether the company is "making insufficient progress."[34] BlackRock's policy "recognize[s] that building high-quality, diverse boards can take time,"[35] and therefore BlackRock takes "a multifaceted approach towards evaluating board diversity, regularly engaging with members of the nominating and/or governance committee to understand the director recruitment process and efforts to facilitate a diverse and thoughtfully vetted pool of qualified candidates."[36] Glass Lewis "may refrain from recommending that shareholders vote against directors," if the company's board has "provided a sufficient rationale or plan to address the lack of diversity on the board."[37]

In short: An explanation of *why* a board is non-diverse is relevant information to investors and investment advisers, when deciding whether to vote for or against the directors serving on the "nominating committee."

## IV. Institutional Investors and Investment Advisers Also Take Overall Board Diversity Into Account When Making Investment Decisions

In addition to using overall board diversity when voting their shares, many institutional investors and investment advisers take this information into account

---

[33] CalPERS, *supra* note 21, at 2.

[34] Vanguard, *Proxy Voting Policy*, *supra* note 27, at 6.

[35] BlackRock, *BlackRock Investment Stewardship*, *supra* note 24, at 7.

[36] BlackRock, *Our Approach to Engagement*, *supra* note 24, at 2.

when making decisions whether to buy, sell, or hold shares in a company. Many institutional investors and investment advisers consider Environmental, Social, and Governance ("ESG") criteria when making investments in ESG-labeled funds and when using ESG data in an integrated fashion for other investments. Many ESG strategies include, as one criterion, the diversity of the company's board.

For example, a portion of *amicus* Northern Trust's proprietary ESG Vector Score is, in part, based on Northern Trust's assessment of the company's corporate governance. As one part of that assessment, Northern Trust will consider the company's adherence to best practices. One of the best practices that Northern Trust expects companies to follow is the practice of recruiting and nominating qualified diverse directors. Similarly, *amicus* Ariel's "ESG risk rating" is influenced, in part, by assessments of the company's performance on diversity and inclusion issues, including but not limited to board diversity. Ariel then uses those "ESG risk ratings" to make investment decisions for assets managed under Ariel's domestic equity "traditional value strategies."[38] *Amicus* Boston Trust Walden's ESG analysis includes assessments of corporate governance policies, practices, and performance, including board diversity. Many of *amicus* IAA's members have similar ESG strategies that they make available to their clients, and which consider board diversity as one important factor in their investment models.

---

[37] Glass Lewis, *supra* note 31, at 7.

The last decade has seen explosive growth in the amount of U.S.-domiciled assets deployed in ESG strategies, as illustrated by the following chart prepared by the Forum for Sustainable and Responsible Investment ("US SIF")[39]:



In 2020, according to US SIF, $16.6 trillion of U.S.-domiciled assets were under management by firms that applied ESG criteria to their investment analysis and portfolio selection. Those firms included 530 institutional investors, 384 investment advisers, and 1,204 community investment institutions.[40]

---

[38] *See* Ariel Investments LLC, (Form ADV, Part 2A) at 7-8 (July 7, 2021).

[39] US SIF, *Report on US Sustainable and Impact Investing Trends 2020*, at 1, https://perma.cc/R9XL-PXRT (last visited Jan. 10, 2022).

[40] *Id.*

**V.    Nasdaq's Rules Give Investors and Investment Advisers the Information They Need to Implement Their Voting Policies and Make Investment Decisions**

"What gets measured, gets done," as *amicus* Ariel told the SEC in its comment letter in support of Nasdaq's Rules.[41] As matters currently stand, investors and investment advisers are given information regarding a company's *policy* regarding the recruitment of diverse directors, based on the existing SEC regulations described above. *See* 17 C.F.R. § 229.407(c)(vi). Yet investors and investment advisers lack an efficient and reliable way to *measure* whether these policies achieve any overall board diversity. Most investors and investment advisers also lack the means to obtain and evaluate the reasons why non-diverse boards do not have diverse directors. Nasdaq's Rules will improve the quality and accessibility of both kinds of information.

**A.    Data on Overall Board Diversity Is Difficult to Find**

Institutional investors and investment advisers currently encounter substantial difficulties when attempting to assess the overall diversity of companies' boards. The disclosures that companies make regarding board diversity are "often disappointingly insufficient and boilerplate," in the words of

---

[41] Ariel Investments, *Comment Letter on Proposed Rule Change to Adopt Listing Rules Related to Board Diversity,* Dec. 29, 2020, at 2, https://perma.cc/6HVN-3CMZ.

one commenter.[42] Moreover, even when companies do provide substantive information, they do not do so in a standardized, consistent format.[43] Investors and investment advisers must scour companies' websites, investor presentations, and SEC filings looking for it. If they find anything, they must then interpret the unique format and terms each company decides to use.

Institutional investors and investment advisers often have little time to accomplish these tasks. Many investors and investment advisers vote shares in *thousands* of different companies each year. Most of those votes are cast during "proxy season"—the period between March until August, when most companies hold their annual shareholder meetings. In many cases, investors have just 20 days between receiving the company's proxy statement and casting their votes. *See* 17 C.F.R. § 240.14c-2(b) (setting the 20-day deadline). Clear, reliable, and accessible data, presented in a consistent, usable, and searchable format, is critical to institutional investors and investment advisers seeking to implement voting policies based on overall board diversity.

*Amici* know these data problems first-hand. For its part, *amicus* Ariel's research team assesses approximately 120 current and prospective portfolio

---

[42] International Corporate Governance Network, *Comment Letter on Proposed Rule Change to Adopt Listing Rules Related to Board Diversity*, Dec. 16, 2020, at 2, https://perma.cc/SZ24-Z94C.

companies each year (all of whom are publicly traded). In order to determine these companies' overall board diversity, Ariel's analysts have resorted to looking at photographs on company websites of the company's directors; reviewing directors' LinkedIn or other public profiles, in an effort to assess the director's affiliations with any organizations associated with their minority status; and asking the portfolio company's "investor relations" personnel. These efforts take time, and the results are not always consistent since the companies have not always thought about this issue and "investor relations" personnel do not always have the information readily available.

Many institutional investors and investment advisers—including *amicus* Northern Trust, and many of *amici* CII and IAA's members—rely on the proprietary databases maintained by third-party proxy advisory firms (such as ISS or Glass Lewis), which contain board-diversity information that these firms have collected from various sources. Nasdaq's Rules should improve the completeness, quality, and consistency of these proxy advisory firms' databases, and should also lower the costs of obtaining, organizing, and using this information.

---

[43] *See* Boston Trust Walden, *Comment Letter on Proposed Rule Change to Adopt Listing Rules Related to Board Diversity*, Dec. 30, 2020, at 2, https://perma.cc/UE85-A9LV.

**B.    Rule 5606 Will Improve the Quality, Consistency, and Accessibility of Information Regarding the Overall Diversity of Boards**

The Board Diversity Matrix required by Rule 5606 will enable institutional investors and investment advisers to efficiently assess a company's overall board diversity.

The Matrix *does not* identify each director by name. Instead, the Matrix states the total number of directors that self-identify as "Female," "Male," or "Non-Binary," and the total number of directors that self-identify as "African American or Black," "Alaskan Native or Native American," "Asian," "Hispanic or Latinx," "Native Hawaiian or Pacific Islander," "White," "Two or More Races," "LGBTQ+," or who elect not to disclose their "Demographic Background." By presenting these numbers in a consistent format, the Matrix makes it possible for investors and investment advisers to quickly obtain reliable information about how many directors self-identify as each of these different diversity criteria.

*Amici* disagree with Petitioners' contention that the Matrix is designed to encourage investors to vote for or against individual directors based on those directors' race, ethnicity, gender, or sexual orientation. The Matrix only discloses the *overall* diversity of the board. It would be impossible for anyone, based on the Matrix alone, to vote for or against individual directors based on these characteristics.

27

*Amici* also disagree with Petitioners' contention that the Matrix's categories are arbitrarily chosen. *See* NCPPR Br., at 8. On the contrary, these categories are well selected. They are identical or very similar to the diversity categories that are in widespread use by many institutional investors and investment advisers.

### C.    It Is Difficult for Investors and Investment Advisers to Obtain Explanations from Companies for the Reasons for Lack of Overall Board Diversity

Many institutional investors and investment advisers encounter significant difficulties in obtaining explanations of the reasons why non-diverse companies lack overall board diversity.

For example, *amicus* Ariel's research team has, in recent years, devoted significant resources to obtaining these explanations. The explanations were usually not available in written form, and instead Ariel had to obtain them through one or more telephone calls with the company's "investor relations" personnel. On some occasions, the company had not yet settled on an official explanation of its position regarding its lack of board diversity and had to decide upon an explanation in response to Ariel's query.

### D.    Rule 5605(f)(2)(A) Will Improve the Quality, Quantity, and Accessibility of Information Relating to the Challenges Companies May Face in Recruiting Diverse Directors

Rule 5605(f)(2)(A) requires a company that does not have "at least two members of its board of directors who are Diverse" to "explain why" that is.

28

This Rule will improve the quantity and quality of information regarding the reasons why non-diverse companies lack overall board diversity. The Rule will require non-diverse companies to think about the issue and provide a formal, public statement. Many companies have not yet done this. In such cases, the company's "investor relations" department may not know what to say in response to an investor or investment adviser's query.

Rule 5605(f)(2)(A) will also improve the accessibility of this information. Although BlackRock may be able to "regularly engag[e]" directly "with members of the nominating and/or governance committee" to obtain these explanations,[44] most institutional investors and many investment advisers do not enjoy that level of direct engagement with directors, management, or even company representatives that can speak to the issue. Rule 5605(f)(2)(A) will make this information accessible to all institutional investors and investment advisers, without the need for direct "engagement" with the board or management.

*Amici* disagree with Petitioners' contention that Rule 5605(f)(2)(A) is an attempt to "shame" or "force apologies" from companies that lack diverse directors. Alliance Br. at 10 ("shame"); *id.* at 45 ("force apologies"). *Amici* view Nasdaq's Rule as a disclosure requirement, whose purpose is to provide

---

[44] BlackRock, *Our Approach to Engagement*, *supra* note 24, at 2; *see also* CalPERS, *supra* note 21, at 2 (noting that CalPERS seeks "engagements" on this issue).

institutional investors and investment advisers with information that many consider relevant when casting votes for (or against) the "nominating committee" directors and when making investment decisions.

Rule 5605(f)(2)(A) also gives companies "substantial flexibility" in providing those explanations.[45] That flexibility is appropriate, since companies differ greatly from each other in many ways, including the specific qualities and skills they seek in directors.

### E. Both Rules Are Particularly Important for Smaller Investors and Investment Advisers

Many institutional investors and investment advisers with fewer assets or assets under management typically have fewer resources to devote to obtaining board-diversity information. Approximately 87.9% of investment advisers are small businesses with fewer than fifty employees.[46] In *amici's* experience, companies' "investor relations" departments typically prioritize requests made by those institutional investors and investment advisers that own large stakes in the company's equity or, based on their size, have the potential to make a sizable investment. Nasdaq's Rules will "level the playing field" by making this

---

[45] *See* SEC, *Order Approving Proposed Rule Changes*, Release No. 34-92590 (Aug. 6, 2021) (giving companies "substantial flexibility" on the content of their explanations under Rule 5605(f)).

[46] IAA, *Investment Adviser Industry Snapshot 2021*, at 3, https://perma.cc/4DTD-3XGV (last updated Jul. 2021).

information available to all institutional investors and investment advisers, regardless of their size or the size of their investments.

## CONCLUSION

*Amici* support Nasdaq's Rules because overall board diversity is a relevant consideration used by many institutional investors and investment advisers when voting shares and making investment decisions. Nasdaq's Rules will significantly improve the quality, consistency, and accessibility of this information.

Dated:  Feb. 24, 2022          Respectfully submitted,

*/s/ Steven M. Shepard*
Steven M. Shepard

### SUSMAN GODFREY L.L.P.

Neal S. Manne
SUSMAN GODFREY L.L.P.
1000 Louisiana Street
Suite 5100
Houston, TX 77002
Phone: (713) 651-9366
nmanne@susmangodfrey.com

Arun Subramanian
1301 Avenue of the Americas
32nd Floor
New York, NY 10019
Phone: (212) 336-8330
sshepard@susmangodfrey.com
asubramanian@susmangodfrey.com

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I certify that this brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7) because the brief contains 6,278 words, excluding those parts of the brief that are exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in 14-point Times New Roman Font.

/s/ Steven M. Shepard
Steven M. Shepard

## CERTIFICATE OF SERVICE

I hereby certify that on February 24, 2022, I caused the foregoing brief to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system, which will effect electronic service on all counsel of record.

*/s/ Steven M. Shepard*
Steven M. Shepard