No. 21-60626

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

ALLIANCE FOR FAIR BOARD RECRUITMENT; NATIONAL CENTER FOR PUBLIC POLICY RESEARCH,

*Petitioners,*

*v.*

SECURITIES AND EXCHANGE COMMISSION,

*Respondent.*

On Petitions for Review from the Securities & Exchange Commission, Release No. 34-92590

## BRIEF OF *AD HOC* COALITION OF NASDAQ-LISTED COMPANIES AS *AMICUS CURIAE* IN SUPPORT OF RESPONDENT

Kerry E. Berchem
AKIN GUMP STRAUSS HAUER
 & FELD LLP
One Bryant Park
Bank of America Tower
New York, N.Y. 10036
212-872-1095
kberchem@akingump.com

Pratik A. Shah
Juliana C. DeVries[1]
AKIN GUMP STRAUSS HAUER
 & FELD LLP
2001 K Street N.W.
Washington, D.C. 20006
202-887-4000
pshah@akingump.com

[1]*Licensed to practice in California only and under the direct supervision of a partner of Akin Gump Strauss Hauer & Feld LLP who is an enrolled, active member of the D.C. Bar; application for admission to the D.C. Bar pending*

*Counsel for Amicus Curiae*

## CERTIFICATE OF INTERESTED PERSONS

No. 21-60626, *Alliance for Fair Board Recruitment v. SEC*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1.  The following interested nongovernmental corporations have no parent corporations or publicly held corporations that own 10% or more of their stock: 2U, Inc.; Adobe Inc.; Airbnb, Inc.; Allbirds, Inc.; Brightcove Inc.; Brighthouse Financial, Inc.; Change Healthcare Inc.; Comcast Corporation; FactSet Research Systems, Inc.; Henry Schein, Inc.; Ideanomics, Inc.; Lyft, Inc.; Microsoft Corporation; Morningstar, Inc.; Starbucks Corporation; United Therapeutics Corporation.

2.  Kraft Heinz Company is a nongovernmental corporation with no parent corporations. Berkshire Hathaway Inc. is the only publicly held company that owns 10% or more of the stock of Kraft Heinz Company.

3.  Sleep Number Corporation is a nongovernmental corporation with no parent corporations. BlackRock Fund Advisors is the only publicly held company that owns 10% or more of the stock of Sleep Number Corporation.

4.  WW International, Inc. is a nongovernment corporation with no parent corporations. BlackRock Fund Advisors is the only publicly held company that owns 10% or more of the stock of WW International, Inc.

5.  Pratik A. Shah, Kerry E. Berchem, and Juliana C. DeVries of Akin Gump Strauss Hauer & Feld, LLP—*Counsel for Amicus Curiae.*

6.  The Securities and Exchange Commission is a federal agency.

7.  Dan M. Berkovitz, Michael A. Conley, Tracey A. Hardin, Daniel E. Matro, and John R. Rady of the Securities and Exchange Commission—*Counsel for Respondent Securities and Exchange Commission*.

8.  Vanessa Ann Countryman of the Securities and Exchange Commission—*Secretary of the Securities and Exchange Commission*.

9.  Petitioner Alliance for Fair Board Recruitment is a non-profit membership corporation and has no parent corporations or subsidiaries.

10. C. Boyden Gray, Jonathan Berry, R. Trent McCotter, Michael Buschbacher, and Jordan E. Smith of Boyden Gray & Associates—*Counsel for Petitioner Alliance for Fair Board Recruitment*.

11. Petitioner National Center for Public Policy Research is a non-profit corporation and has no parent corporations or subsidiaries.

12. Margaret A. Little and Sheng Li of The New Civil Liberties Alliance—*Counsel for Petitioner National Center for Public Policy Research*.

13. Allyson N. Ho, Bradley G. Hubbard, Amir C. Tayrani, Amalia E. Reiss, and Paulette Miniter of Gibson, Dunn & Crutcher LLP; John Zecca, Jeffrey S. Davis, John Yetter, and Joanne Pedone of The Nasdaq Stock Market, LLC; and Burt M. Rublin, Stephen J. Kastenberg, Paul Lantieri, III, Peter F. Andrews, and Seth D. Berlin of Ballard Spahr LLP—*Counsel for Intervenor Nasdaq Stock Market, LLC*.

14. The States of Arizona, Alabama, Alaska, Arkansas, Florida, Indiana, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, Oklahoma, South Carolina, Texas, and Utah.

15. Drew C. Ensign, Joseph A. Kanefield, Brunn W. Roysden III, Wilson C. Freeman, and James Rogers—*Counsel for Amici States*.

s/Pratik A. Shah
Pratik A. Shah

*Attorney of Record for Amicus Curiae*

**TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS............................................i

TABLE OF AUTHORITIES...................................................................iv

INTEREST OF *AMICUS CURIAE*...........................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT.........................................3

ARGUMENT ........................................................................................4

I.      THE BOARD DIVERSITY RULE BENEFITS INVESTORS, COMPANIES, AND THE PUBLIC.....................................................4

        A.     The Rule Will Bolster Investor Confidence and Reduce Confusion About Board Diversity Metrics .................................4

        B.     Diverse Boards, As Empirical Research Confirms, Make For Better Companies ................................................................7

        C.     More Diverse Boards Further The Public Interest....................10

II.     THE BOARD DIVERSITY RULE IS NOT BURDENSOME FOR COMPANIES IN LIGHT OF THE FLEXIBILITY AND AUTONOMY IT PROVIDES ............................................................12

CONCLUSION ....................................................................................21

CERTIFICATE OF SERVICE .................................................................22

CERTIFICATE OF COMPLIANCE ..........................................................23

# TABLE OF AUTHORITIES

Alden, William, *Oracle to Leave Nasdaq for the Big Board*, N.Y.
TIMES (June 20, 2013) .......................................................................20

Amendment No. 1 to the Board Diversity Proposal, File No. SR-
NASDAQ-2020-081 (Feb. 26, 2021) .....................................13, 14, 18

Associated Press, *Kraft Foods to Switch Listing to Nasdaq From
NYSE*, CNBC (June 8, 2012) .............................................................20

Bernile, Gennaro, et al., *Board Diversity, Firm Risk, and Corporate
Policies* (Lee Kong Chian Sch. of Bus. Working Paper, 2016) ..........9

BlackRock Investment Stewardship, *Our Approach to Engagement on
Board Diversity* (Mar. 2021) .................................................................5

Carter, David A., et al., *Corporate Governance, Board Diversity, and
Firm Value*, 38 FIN. REV. 33 (2003) ....................................................9

Duprey, Rich, *What PepsiCo's Move From NYSE to Nasdaq Means
for Investors*, THE MOTLEY FOOL (Dec. 18, 2017) ...........................20

Eckbo, B. Espen, et al., *Valuation Effects of Norway's Board Gender-
Quota Law Revisited* (ECGI, Finance Working Paper, 2021)...........10

Hsu, Tiffany, *Kraft Foods Jumps Ship from NYSE to Nasdaq*, L.A.
TIMES (June 8, 2012)..........................................................................20

ISS Governance, *2020 Global Benchmark Policy Survey, Summary of
Results* (Sept. 24, 2020) .......................................................................5

Kuzmina, Olga & Valentina Melentyeva, *Gender Diversity in
Corporate Boards: Evidence from Quota-Implied Discontinuities*
(ZEW Discussion Papers, Working Paper No. 21-023, 2021)............9

Landaw, Jared, Barington Capital Group LP, *Maximizing the Benefits
of Board Diversity: Lessons Learned from Activist Investing*,
Harvard Law School Forum on Corporate Governance (July 14,
2020) ....................................................................................................7

Letter from Alfred P. Poor, Chief Executive Officer, Ideanomics, Inc.,
to Vanessa Countryman, Secretary, Securities and Exchange
Commission (Dec. 28, 2020) .............................................................4, 6, 16, 17

Letter from Aron Szapiro, Head of Policy Research & Michael Jantzi,
Chief Executive Officer, Morningstar, Inc., to Vanessa
Countryman, Secretary, Securities and Exchange Commission
(Jan. 13, 2021).................................................................................................5, 16

Letter from Dev Stahlkopf, Corporate Vice President, General
Counsel and Secretary, Microsoft, to Vanessa Countryman,
Secretary, Securities and Exchange Commission (Jan. 4, 2021) ..................7, 16

Letter from Jeff Ray, Chief Executive Officer, Brightcove, to Vanessa
Countryman, Secretary, Securities and Exchange Commission
(Dec. 23, 2020) ...................................................................................................6

Letter from John A. Zecca, Executive Vice President, Chief Legal
Officer, and Chief Regulatory Officer, Nasdaq, to Vanessa A.
Countryman, Secretary, Securities and Exchange Commission
(Feb. 26, 2021)..............................................................................................13, 14

Letter from Kerry E. Berchem, Partner, Akin Gump Strauss Hauer &
Feld LLP, to Vanessa Countryman, Secretary, Securities and
Exchange Commission (Jan. 4, 2021) ...............................................................11

Letter from Rachel Stern, Executive Vice President, Chief Legal
Officer and Global Head of Strategic Resources, FactSet Research
Systems, Inc., to Vanessa Countryman, Secretary, Securities and
Exchange Commission (Dec. 22, 2020) ..........................................................4, 5

Letter from Sheryl Sandberg, Chief Operating Officer, Facebook, Inc.,
to Vanessa Countryman, Secretary, Securities and Exchange
Commission (Jan. 3, 2021) ...................................................................................8

McKinsey & Company, *Diversity Wins: How Inclusion Matters* (May
2020) .....................................................................................................................9

Nasdaq Rule
5605(b) ................................................................................................................14
5605(f).........................................................................................................*passim*

Nasdaq, Advancing Boardroom Diversity: A Guide to Resources and
   Partners (2021) ................................................................................... 19

Nasdaq, Nasdaq's Board Diversity Rule: What Nasdaq-Listed
   Companies Should Know (Oct. 1, 2021) ........................................... 15

Nasdaq, The Nasdaq Stock Market Tiers ................................................ 14

Papadopoulos, Kosmas, ISS Analytics, *U.S. Board Diversity Trends
in 2019* (May 31, 2019) ...................................................................... 11

QuickFacts United States, United States Census Bureau ....................... 11

Stieghorst, Tom, *Norwegian Cruise Line Holdings Leaving Nasdaq
for NYSE*, Travel Weekly (Dec. 8, 2017) ......................................... 20

Taraporevala, Cyrus, President and Chief Executive Officer, State
   Street Global Investors, *CEO's Letter on Our 2021 Proxy Voting
Agenda* (Jan. 11, 2021) ......................................................................... 4

Thomas, Jason M. & Megan Starr, The Carlyle Group, *Global
Insights: From Impact Investing to Investing for Impact* (Feb.
2020) ...................................................................................................... 8

Vanguard, *Investment Stewardship 2020 Annual Report* (2020) ............. 4

Wahid, Aida Sijamic, *The Effects and the Mechanisms of Board
Gender Diversity: Evidence from Financial Manipulation*, 159 J.
Bus. Ethics 705 (2018) .......................................................................... 9

vi

# INTEREST OF *AMICUS CURIAE*[1]

Amicus "*Ad Hoc* Coalition of Nasdaq-Listed Companies" is comprised of companies listed on the Nasdaq Stock Market and subject to the Board Diversity Rule, Nasdaq Rules 5605(f) and 5606, challenged in this case. Members are all publicly traded, Nasdaq-listed companies of differing sizes in an array of industries. Some companies have long achieved the Rule's board diversity objectives, while others have yet to do so.

Despite the differences among member companies, amicus supports the Board Diversity Rule as a commonsense measure that amicus believes will benefit not only the individual companies but also investors and other stakeholders. Amicus's members have witnessed firsthand the positive impact, reinforced by empirical evidence, that past efforts to diversify have had on their own companies' performance. Given the Rule's flexible disclosure-based regime, amicus does not expect compliance obligations to be burdensome for its members or their peer Nasdaq-listed companies. Amicus therefore offers this brief in support of Respondent and Intervenor Nasdaq, and asks this Court to uphold the Board Diversity Rule.

---

[1] All parties have consented to the filing of this brief. Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), amicus states that no party's counsel has authored this brief in whole or in part, and that no party, party's counsel, or person (other than amicus, its members, and its counsel) have contributed money to fund the preparation or submission of this brief.

1

The following companies are members of amicus *Ad Hoc* Coalition of Nasdaq-Listed Companies:

| | |
|---|---|
| 2U, Inc. | Ideanomics, Inc. |
| Adobe Inc. | Kraft Heinz Company |
| Airbnb, Inc. | Lyft, Inc. |
| Allbirds, Inc. | Microsoft Corporation |
| Brightcove Inc. | Morningstar, Inc. |
| Brighthouse Financial, Inc. | Sleep Number Corporation |
| Change Healthcare Inc. | Starbucks Corporation |
| Comcast Corporation | United Therapeutics Corporation |
| FactSet Research Systems, Inc. | WW International, Inc. |
| Henry Schein, Inc. | |

**INTRODUCTION AND SUMMARY OF ARGUMENT**

Amicus's Nasdaq-listed member companies can attest from their own experience that companies, investors, and other stakeholders need the Board Diversity Rule. By adding disclosure requirements, the Rule provides a baseline for reporting diversity in the boardroom and, accordingly, levels the playing field and alleviates investors' difficulty in finding uniform and consistent data on board diversity—now an important metric for many in assessing potential investments. Greater diversity and transparency on corporate boards also aligns with amicus members' business objectives and shareholder interests because, as studies have shown, it enhances financial performance, adds to diversity of thought, and furthers other related goals. Increasing board diversity is in the public interest as well: by better reflecting society's demographic composition, more diverse boards render not only better companies but also a more equitable economy overall.

At the same time, and contrary to petitioners' position, the Rule is not unduly burdensome for Nasdaq-listed companies. The Rule confers significant flexibility on companies in multiple respects. First, the Rule does *not* impose a diversity mandate: companies are free to *either* (i) have two diverse directors *or* (ii) simply disclose why they do not (subject to no further scrutiny). Second, in addition to flexibility for boards with five or fewer directors and foreign-based companies, the Rule provides for generous phase-in periods before such compliance is required.

3

Third, companies that ultimately prefer neither to meet the diversity objective nor to disclose why not can list on a different exchange.

In amicus members' assessment, as entities actually subject to the Board Diversity Rule, the Rule's significant benefits overwhelmingly outweigh its minimal burdens.

## ARGUMENT

### I.     THE BOARD DIVERSITY RULE BENEFITS INVESTORS, COMPANIES, AND THE PUBLIC

#### A.     The Rule Will Bolster Investor Confidence and Reduce Confusion About Board Diversity Metrics

"[I]nvestors are increasingly focused on diversity."[2]  Diversity data have thus become a critical element of investors' broader ESG-related considerations.[3] Vanguard and State Street, for example, both recently announced they expect companies to disclose and make progress on the diversity makeup of their boards.[4]

---

[2] Letter from Alfred P. Poor, Chief Executive Officer, Ideanomics, Inc., to Vanessa Countryman, Secretary, Securities and Exchange Commission at 3 (hereinafter "Ideanomics Comment Letter") (Dec. 28, 2020), https://www.sec.gov/comments/sr-nasdaq-2020-081/srnasdaq2020081-8186015-227181.pdf.

[3] *Id.*; Letter from Rachel Stern, Executive Vice President, Chief Legal Officer and Global Head of Strategic Resources, FactSet Research Systems, Inc., to Vanessa Countryman, Secretary, Securities and Exchange Commission (hereinafter "FactSet Research Systems Comment Letter") (Dec. 22, 2020), https://www.sec.gov/comments/sr-nasdaq-2020-081/srnasdaq2020081-8177996-227049.pdf.

[4] Vanguard, *Investment Stewardship 2020 Annual Report* 27 (2020), https://about.vanguard.com/investment-stewardship/perspectives-and-commentary/2020_investment_stewardship_annual_report.pdf; Cyrus Taraporevala, President and Chief Executive Officer, State Street Global Investors, *CEO's Letter on Our*

BlackRock has similarly stated that it expects "companies to have at least two women on their boards."[5]   That is because, in amicus members' collective experience, many investors have come to view board diversity as both a social and financial imperative:  "What was once viewed as data that might help investors align their investments with their values is now viewed as fundamental data for assessing the overall viability of any investment."[6]

Despite strong and growing investor interest in board diversity data, current reporting is sporadic at best.   Existing disclosures "provide little actionable or decision-useful information for investors. *** [W]hile companies know investors want information on board diversity, they have little guidance on how to disclose it in a consistent fashion, nor incentive to disclose more than their peers do."[7]

---

*2021 Proxy Voting Agenda* (Jan. 11, 2021), https://www.ssga.com/us/en/institutional/ic/insights/ceo-letter-2021-proxy-voting-agenda.

[5] BlackRock Investment Stewardship, *Our Approach to Engagement on Board Diversity*, 2 (Mar. 2021), https://www.blackrock.com/corporate/literature/publication/blk-commentary-engaging-on-diversity.pdf; *see also* ISS Governance, *2020 Global Benchmark Policy Survey, Summary of Results* 6, 18 (Sept. 24, 2020) (survey of 151 investors found that sixty-one percent agreed that corporate boards need to "include[] directors drawn from racial and ethnic minority groups"), https://www.issgovernance.com/wp-content/uploads/publications/2020-iss-policy-survey-results-report-1.pdf.

[6] FactSet Research Systems Comment Letter, *supra* note 3, at 1.

[7] Letter from Aron Szapiro, Head of Policy Research & Michael Jantzi, Chief Executive Officer, Morningstar, Inc., to Vanessa Countryman, Secretary, Securities and Exchange Commission at 1 (hereinafter "Morningstar Comment letter") (Jan. 13, 2021), https://www.sec.gov/comments/sr-nasdaq-2020-081/srnasdaq2020081-8262444-227960.pdf.

Investors therefore cannot compare statistics among companies easily, and small investors may lack the resources to gather and analyze diversity data at all. *See* Center Record Excerpts, Ex. 1 at 12.

The Board Diversity Rule remedies that problem by defining diversity for reporting purposes and requiring disclosure in a uniform manner. As the Commission found, the Rule "provide[s] widely available, consistent, and comparable information that would contribute to investors' investment and voting decisions." Center Record Excerpts, Ex. 1 at 12. Even if companies are motivated to disclose board diversity data on their own, the Rule solves discrepancies in the form and content of such disclosures so that investors can more readily compare data across companies. By making board diversity information widely available, the Rule "also mitigate[s] any concerns regarding unequal access to information that may currently exist between certain (likely larger and more resourceful) investors who could obtain the information and other (likely smaller) investors who may not be able to do so." *Id.*

The Rule "would be mutually beneficial for both the investor community and the company as there would be a consistent and uniform way to evaluate and interpret a company's performance on diversity."[8] It is therefore no surprise that

---

[8] Ideanomics Comment Letter, *supra* note 2, at 3; *see also* Letter from Jeff Ray, Chief Executive Officer, Brightcove, to Vanessa Countryman, Secretary, Securities and Exchange Commission (Dec. 23, 2020) ("Investors need the

both institutional investors and individual investors submitted comments supporting

the new rules.  Center Record Excerpts, Ex. 1 at 12-13 n.92 (collecting comments).

## B.  Diverse Boards, As Empirical Research Confirms, Make For Better Companies

Investors seek board diversity data not only to align their investments with

their values, but also because the diversity of a company's board portends overall

financial performance.  Corporate performance problems often can be tied to a lack

of board diversity:  "The most common corporate governance weaknesses we find

at the underperforming companies we invest in are issues with the composition of

their boards.  Many of these companies have a board comprised of a homogeneous

group of directors."[9]   Major companies, including but not limited to amicus

members, have found that having diverse leadership allows them to "create better

outcomes for the customers we serve. *** [I]nnovation drives long-term success,

and diversity unlocks innovation."[10]  Diverse boards help companies "build better

---

transparency in board diversity data that is central to this initiative, and we have no doubt that providing the required disclosures will not be burdensome for Brightcove in any way."), https://www.sec.gov/comments/sr-nasdaq-2020-081/srnasdaq 2020081-8180171-227078.htm.

[9] Jared Landaw, Barington Capital Group LP, *Maximizing the Benefits of Board Diversity: Lessons Learned from Activist Investing*, Harvard Law School Forum on Corporate Governance (July 14, 2020), https://corpgov.law.harvard.edu/ 2020/07/14/maximizing-the-benefits-of-board-diversity-lessons-learned-from-activist-investing/.

[10] Letter from Dev Stahlkopf, Corporate Vice President, General Counsel and Secretary, Microsoft, to Vanessa Countryman, Secretary, Securities and Exchange Commission at 1-2 (Jan. 4, 2021) (hereinafter "Microsoft Comment Letter"),

products, make better decisions and better serve clients."[11]

Those experience-based observations, shared by some of the world's most successful business leaders, are supported by empirical research. A compelling body of research demonstrates that a diverse board is positively associated with improved corporate governance and better overall company performance along traditional financial metrics.

A 2020 study by the Carlyle Group, for example, found that its portfolio companies with diverse boards had weighted average earnings growth of 9.8 percent, compared with 4.8 percent for companies with a lack of board diversity.[12] McKinsey Company similarly found that "companies whose boards are in the top quartile of gender diversity are 28 percent more likely than their peers to outperform financially" and that "[t]he business case for ethnic and cultural diversity on boards

---

https://www.sec.gov/comments/sr-nasdaq-2020-081/srnasdaq2020081-8204293-227454.pdf.

[11] Letter from Sheryl Sandberg, Chief Operating Officer, Facebook, Inc., to Vanessa Countryman, Secretary, Securities and Exchange Commission (Jan. 3, 2021), https://www.sec.gov/comments/sr-nasdaq-2020-081/srnasdaq2020081-8204223-227411.pdf.

[12] Jason M. Thomas & Megan Starr, The Carlyle Group, *Global Insights: From Impact Investing to Investing for Impact* 5 (Feb. 2020), https://www.carlyle.com/sites/default/files/2020-02/From%20Impact%20Investing%20to%20Investing%20for%20Impact_022420.pdf. Carlyle defined diverse boards as those with two or more members identifying as female, Black, Hispanic, or Asian. *Id.*

8

remain[s] significant."[13]  Another published study of the relationship between board

diversity and firm value found a significant positive relationship between the

fraction of women or minorities on a corporate board and firm financial value.[14]

Other studies have found, more specifically, that diverse boards create companies

that have better risk-related outcomes and greater innovation output (measured by

patenting activity);[15] invest more in research and development;[16] and are less likely

to commit financial misconduct.[17]

---

[13] McKinsey & Company, *Diversity Wins: How Inclusion Matters* 13, 20 (May 2020), https://www.mckinsey.com/~/media/mckinsey/featured%20insights/diversity%20and%20inclusion/diversity%20wins%20how%20inclusion%20matters/diversity-wins-how-inclusion-matters-vf.pdf.

[14] David A. Carter et al., *Corporate Governance, Board Diversity, and Firm Value*, 38 FIN. REV. 33, 36 (2003).  This study looks at Fortune 1000 firms and defines board diversity as the percentage of female, African American, Asian, Hispanic, or other minority board members. *Id.* at 39, 51; *see also* Olga Kuzmina & Valentina Melentyeva, *Gender Diversity in Corporate Boards: Evidence from Quota-Implied Discontinuities* 4 (ZEW Discussion Papers, Working Paper No. 21-023, 2021), https://www.econstor.eu/bitstream/10419/231413/1/1750568462.pdf.

[15] Gennaro Bernile et al., *Board Diversity, Firm Risk, and Corporate Policies* 6-7 (Lee Kong Chian Sch. of Bus. Working Paper, 2016), https://ink.library.smu.edu.sg/cgi/viewcontent.cgi?article=6234&context=lkcsb_research. This study is based on a "board diversity index" that includes the fraction of female directors, the mean number of other boards on which current members serve, age, ethnicity, college, and director financial expertise. *Id.* at 10-11.

[16] *Id.* at 6.

[17] Aida Sijamic Wahid, *The Effects and the Mechanisms of Board Gender Diversity: Evidence from Financial Manipulation*, 159 J. BUS. ETHICS 705, 721 (2018).  This study looks at gender diversity only. *Id.* at 706.

Against the evidence demonstrating the positive effects of board diversity, the Commission acknowledged some studies cutting the other way—particularly those examining Norway's experience with board diversity quotas. Center Record Excerpts, Ex. 1 at 14. But the Commission noted that a more recent study questions both the conclusions and methodology of those earlier studies.[18] As the Commission emphasized, moreover, Norway's mandatory quota system lacks the flexibility of the Rule at issue, which "does not mandate any particular board composition" and allows simply for an explanation for companies that cannot or do not wish to pursue the diversity objective. *Id.*

In any event, the Rule's standardization of the definition of diversity and reporting of related data will facilitate further research to confirm the link between board diversity and company performance. But even now, the available empirical data—consistent with amicus members' experience and investor behavior—make a strong financial case for more diverse corporate boards.

### C.    More Diverse Boards Further The Public Interest

The Board Diversity Rule promotes important interests beyond the documented benefits to investors and companies. At the time of the publication of the proposed Rule, homogeneity was the norm on corporate boards. As of 2019,

---

[18] B. Espen Eckbo, et al., *Valuation Effects of Norway's Board Gender-Quota Law Revisited* 1, 17, 20-21 (ECGI, Finance Working Paper, 2021), https://pubsonline.informs.org/doi/pdf/10.1287/mnsc.2021.4031.

90% of board directors were Caucasian, and 81% were men.[19]  Lopsided as they remain, the statistics on gender representation actually show some progress—ten years earlier the percentage of women on boards was even lower at just 9%.[20] Improvement in representation of ethnic and racial minorities has been more sluggish—or non-existent.  In the same ten years, the percentage of board members identifying as non-white has hardly changed at all.[21]  Given that approximately 40% of the United States population identifies as non-white,[22] the underrepresentation is undeniable.

The Rule comes on the heels of prior efforts—typically on an ad hoc, individual company basis—that have failed to make a systemic dent in the problem. By helping companies increase board diversity, while knowing that peer companies are committed to doing the same, the Rule is "designed to promote just and equitable principles" and "to further the public interest."[23]  Amicus members recognize that

[19] Kosmas Papadopoulos, ISS Analytics, *U.S. Board Diversity Trends in 2019* 1, 4 (May 31, 2019) (statistics from Russell 3000 companies), https://www.issgovernance.com/file/publications/ISS_US-Board-Diversity-Trends-2019.pdf.

[20] *Id.*

[21] *Id.* at 5 (non-white directors of Russell 3000 companies held approximately 9% of board seats in 2009 and just over 10% in 2019).

[22] QuickFacts United States, United States Census Bureau, https://www.census.gov/quickfacts/fact/table/US/PST045219 (last visited Feb. 24, 2022).

[23] Letter from Kerry E. Berchem, Partner, Akin Gump Strauss Hauer & Feld LLP, to Vanessa Countryman, Secretary, Securities and Exchange Commission at 2

companies have a responsibility to make changes to help realize a more equitable economy and society, and are committed to making those changes. The Rule will help them and other Nasdaq-listed companies bring more diverse voices to the boardroom, to the benefit of all.

## II.    THE BOARD DIVERSITY RULE IS NOT BURDENSOME FOR COMPANIES IN LIGHT OF THE FLEXIBILITY AND AUTONOMY IT PROVIDES

Contrary to petitioners' position (Alliance Br. 66-67), the Board Diversity Rule does not impose undue burdens on companies—a point amicus, which includes Nasdaq-listed companies that have not yet met the board diversity goal, is best situated to address. The Rule has several features that maximize flexibility and minimize costs of compliance.

**Disclosure-Based Framework.** The Rule allows Nasdaq-listed companies that do not fall into an exception either to (i) have two board members who meet the Rule's definition of diverse (at least one who identifies as female and one who identifies as an underrepresented minority or LGBTQ+), or (ii) simply explain why it does not have two such members. Nasdaq Rule 5606(f)(2)(A).

Despite petitioners' (mis-)characterization, that is not a "quota": instead of satisfying the board diversity objective, a company can elect to explain why it does

---

(Jan. 4, 2021), https://www.sec.gov/comments/sr-nasdaq-2020-081/srnasdaq 2020081-8204351-227498.pdf.

not—with no particular requirements for or scrutiny of its explanation. Nasdaq "will not evaluate the substance or merits of the company's explanation."[24] The option to explain, designed to accommodate companies that are unable or otherwise choose not to achieve the Rule's board diversity objective, cannot reasonably be described as an "apology." Alliance Br. 1, 50; *see also* Center Br. 22 ("The Board Diversity Rules impermissibly require companies to publicly call into question *their own integrity* by forcing them to utter words that infer their own shortcomings."). "The company can choose to disclose as much, or as little, insight into the company's circumstances or diversity philosophy as the company determines."[25]

As an illustration, Nasdaq has provided non-exhaustive examples of possible explanations: "'The Company does not meet the diversity objectives of Rule 5605(f)(2)(C) because it does not believe Nasdaq's listing rule is appropriate,' or 'because it does not believe achieving Nasdaq's diversity objectives are feasible given the company's current circumstances.'"[26] Companies can copy those barebones recitals verbatim or devise their own preferred formulations, as they see

---

[24] Amendment No. 1 to the Board Diversity Proposal, at 74 (hereinafter "Amend. 1"), File No. SR-NASDAQ-2020-081 (Feb. 26, 2021).

[25] Letter from John A. Zecca, Executive Vice President, Chief Legal Officer, and Chief Regulatory Officer, Nasdaq, to Vanessa A. Countryman, Secretary, Securities and Exchange Commission, 8 (Feb. 26, 2021), https://www.sec.gov/comments/sr-nasdaq-2020-081/srnasdaq2020081-8425992-229601.pdf (hereinafter "Nasdaq Response to Comments").

[26] *Id.*

fit. They may, for instance, choose to explain affirmatively that they are pursuing a different approach to diversity, such as having veteran board members or board members with disabilities.[27]  Contrary to petitioners' belief, Alliance Br. 26, amicus expects the explanation option to quell, not encourage, "negative media campaigns or shareholder lawsuits alleging misrepresentations or breach of fiduciary duties" based on lack of board diversity.[28]

The Rule additionally provides multiple venues where companies may disclose their explanations and diversity statistics, including on the company website. Nasdaq Rule 5605(f)(3); *id.* 5605(b).  And if companies choose to disclose on their website, there is no specific place on their website where the disclosure must exist—it is up to the company to decide.[29]

**Phase-in Period.**   The Rule provides a generous phase-in period, with different timing rules based on market tier.[30]  All companies are given two years to

---

[27] Amend. 1, *supra* note 24, at 64.

[28] *See* Nasdaq Response to Comments, *supra* note 25, at 29-30.

[29] Amend. 1, *supra* note 24, at 275.

[30] Nasdaq has three market tiers: The Nasdaq Global Select Market, The Nasdaq Global Market, and The Nasdaq Capital Market.  Applicants must satisfy certain financial, liquidity, and corporate governance requirements to join any of these markets.  Those requirements are most stringent for the Nasdaq Global Select Market, with the Nasdaq Global Market being less stringent and the Nasdaq Capital Market least so.  *See* Nasdaq, The Nasdaq Stock Market Tiers, https://www.Nasdaq.com/solutions/Nasdaq-stock-market-tiers (last visited Jan. 19, 2022).

have one diverse director or explain why they do not.  Nasdaq Rule 5605(f)(7)(A).
Companies listed on The Nasdaq Global Select Market or The Nasdaq Global
Market have four years to add a second diverse director, if they so choose.  *Id.*
5605(f)(7)(B).  Companies listed on The Nasdaq Capital Market—Nasdaq's lowest
tier—have five years to do so.  *Id.* 5605(f)(7)(C).  And the second diverse director
objective does not apply at all to boards with five or fewer directors.  *Id.*
5605(f)(2)(D).[31]  Although none of the phase-in periods entails immediate or even
imminent compliance, the Rule's tiered approach further accounts for companies
that are smaller or have fewer resources.  Center Record Excerpts, Ex. 1 at 16 n.142.
On top of that, the Rule provides a one-year grace period for companies that have
previously satisfied the Rule but no longer do so because of a board vacancy.
Nasdaq Rule 5605(f)(6)(B).

Nasdaq-listed companies, whether their boards already meet the diversity
objective or not, should have no trouble following the Rule under the relevant
timelines.  Amicus member Ideanomics, for example, does not currently have two
diverse directors but strongly supports the Rule:  "While we currently do not meet
Nasdaq's diversity goal, we believe it provides a reasonable baseline for companies
to strive towards. *** We believe that Nasdaq's phased approach provides us with

---

[31] *See* Nasdaq, Nasdaq's Board Diversity Rule: What Nasdaq-Listed
Companies Should Know 1 (Oct. 1, 2021), https://listingcenter.nasdaq.com/assets/
Board%20Diversity%20Disclosure%20Five%20Things.pdf.

sufficient time to attract, screen, and recruit suitable applicants and we base this on the diversity progress achieved in our employee base."[32]    Ideanomics further "believe[s] the option to explain our efforts under rule 5605(f) provides the company with sufficient flexibility to continue the search for candidates if we are unable to attract the diversity within a reasonable period of two to five years."[33]    Amicus member Microsoft, whose board already reflects the Rule's diversity objective, similarly attests "that Nasdaq's proposed phase-in period of two to five years is reasonable for companies who will need to make changes in the composition of their boards."[34]

**Familiar Categories.**    The Board Diversity Rule further minimizes burdens because its disclosures echo the categories companies already use to report workforce diversity to the Equal Employment Opportunity Commission (EEOC). Center Record Excerpts, Ex. 1 at 15-16.  Amicus member Morningstar, for example, "believe[s] anchoring the disclosures on the Equal Employment Opportunity Commission definitions is sensible, as most companies are familiar with those categorizations.  No diversity framework will be perfect, but the framework Nasdaq proposes will add important consistency and comparability."[35]  Ideanomics similarly

---

[32] Ideanomics Comment Letter, *supra* note 2, at 4.

[33] *Id.*

[34] Microsoft Comment Letter, *supra* note 10, at 2.

[35] Morningstar Comment Letter, *supra* note 7, at 2.

"believe[s] it is appropriate for Nasdaq to base its definition of diversity on the [EEOC] reporting categories. We are already familiar with these categories and do not find this disclosure burdensome."[36]

In addition, as noted above (pp. 3-6, *supra*), investors had been seeking board diversity data before Nasdaq proposed the Rule. Because companies (including amicus members) already collect diversity and other data for their investors, the Rule does not impose materially new burdens in implementing uniform reporting categories with which companies are familiar. Indeed, the Rule *lessens* the current burden of disclosing diversity data to investors by standardizing disclosures and thereby eliminating the drain on resources from compiling such data on an ad hoc basis.

**Foreign and Small Companies.** The Rule further accommodates foreign and small companies based on their specific situations. Companies that qualify as Foreign Issuers may elect to have two female directors rather than one who identifies as female and one who identifies as an underrepresented minority or LGBTQ+. Nasdaq Rule 5605(f)(2)(B)(ii). This additional flexibility "recognizes that the unique demographic composition of the United States, and its historical

---

[36] Ideanomics Comment Letter, *supra* note 2, at 4.

marginalization of Underrepresented Minorities and the LGBTQ+ community, may not extend to all countries outside of the United States."[37]

Similarly, Smaller Reporting Companies need only have, or explain why they do not have, either two female directors or one female and one who identifies as an underrepresented minority or LGBTQ+. Nasdaq Rule 5605(f)(2)(C). Companies with boards of five or fewer members need only have one board member who meets the definition of diverse. *Id.* 5605(f)(2)(D). And the Rule exempts certain types of companies that have no board of directors, list only securities with no voting rights toward director elections, or do not function as operating companies. Center Record Excerpts, Ex. 1 at 16-17.

**<u>Free Board Recruiting Assistance.</u>** If companies do not already have two diverse directors, but intend to hire diverse directors, they need not incur additional costs associated with their talent search. Filling open board seats requires resources a company will expend regardless. And to the extent finding diverse candidates requires special resources, Nasdaq covers them. The Board Recruiting Service Proposal, which the Commission approved in the challenged order, offers companies that do not have two diverse directors one year of optional, complimentary access to a third-party board recruiting service that provides high-quality diverse candidates.

---

[37] Amend. 1, *supra* note 24, at 299.

Center Record Excerpts, Ex. 1 at 19, 25-27. Even companies that already have two diverse directors are offered ninety days of free access to the service.[38]

Contrary to petitioners' contention, the Rule does not require companies to hire directors based on any criteria other than their qualifications.[39] To be sure, companies may need to expand their applicant pools to include qualified diverse candidates (beyond, for example, relying only on recommendations from current board members consisting only of white males). But Nasdaq has offered to fund that expansion through the board recruiting service. And, as discussed, a company need not hire any diverse board candidates—or even make use of the complimentary recruiting service—to comply with the Rule.

**<u>Availability of Other Exchanges.</u>** Despite all the flexibility the Rule affords, a company that wishes *neither* to meet the Rule's diversity objective *nor* offer any explanation for why it has not done so may instead choose to list on a different exchange. Companies are not required to list on Nasdaq: their agreement to list

---

[38] Nasdaq, Advancing Boardroom Diversity: A Guide to Resources and Partners 1 (2021), https://listingcenter.nasdaq.com/assets/Advancing%20 Boardroom%20Diversity.pdf.

[39] *Compare* Alliance Br. 13 ("There can be no doubt that the Rule, at the very least, encourages shareholders to discriminate in their votes for board members."), *and* Center Br. 11 ("[E]ncouraging companies to discriminate in favor [*sic*] certain races, gender, and sexual preferences is the intended effect of the Order."), *with* Center Record Excerpts, Ex. 1 at 10 ("The proposal would not require a company to select a director solely because that person falls within the proposed definition of 'Diverse'" and "would not prevent companies and their shareholders from selecting directors based on experience, competence, and skills.").

with Nasdaq is a matter of contract between two sophisticated businesses, and exchanges compete for listings.  SEC. Br. 8-11; Center Record Excerpts, Ex. 1 at 10. Indeed, there are many examples of companies that have switched exchanges for any number of reasons.[40]

Based on their own experience as Nasdaq-listed companies, amicus's members have no doubt that they and their peer companies will be able to follow the Rule (one way or the other) rather than switch to a different exchange.  Companies that elect to stay and operate under the Board Diversity Rule will reap benefits for themselves, their investors, and the public.  But the option to list on another exchange is readily available for companies that object to the Rule, further diminishing the Rule's purportedly "tremendous" costs (Alliance Br. 67).

---

[40] *See, e.g.*, Rich Duprey, *What PepsiCo's Move From NYSE to Nasdaq Means for Investors*, THE MOTLEY FOOL (Dec. 18, 2017), https://www.fool.com/ investing/2017/12/18/what-pepsicos-move-from-nyse-to-nasdaq-means-for-i.aspx; Tom Stieghorst, *Norwegian Cruise Line Holdings Leaving Nasdaq for NYSE*, TRAVEL WEEKLY (Dec. 8, 2017), https://www.travelweekly.com/Cruise-Travel/ Norwegian-Cruise-Line-Holdings-leaving-Nasdaq-for-NYSE;   William   Alden, *Oracle to Leave Nasdaq for the Big Board*, N.Y. TIMES (June 20, 2013), https://dealbook.nytimes.com/2013/06/20/oracle-to-leave-nasdaq-for-the-big-board/; *see also* Associated Press, *Kraft Foods to Switch Listing to Nasdaq From NYSE*, CNBC (June 8, 2012), https://www.cnbc.com/id/47735180; Tiffany Hsu, *Kraft Foods Jumps Ship from NYSE to Nasdaq*, L.A. TIMES (June 8, 2012), https://www.latimes.com/business/la-fi-mo-kraft-foods-nyse-nasdaq-20120608-story.html.

## CONCLUSION

For the foregoing reasons and those stated in the briefs of Respondent and

Intervenor Nasdaq, this Court should deny the petitions for review.

Respectfully submitted,

*s/Pratik A. Shah*
Pratik A. Shah
Kerry E. Berchem
Juliana C. DeVries
AKIN GUMP STRAUSS HAUER
  & FELD LLP

*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on February 25, 2022, I electronically filed the foregoing with the Clerk of the Court of the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the CM/ECF system.

*s/Pratik A. Shah*
Pratik A. Shah

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains 4,380 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it was prepared in a proportionally spaced typeface using Microsoft Word Version 2016, 14-point Times New Roman font.

*s/Pratik A. Shah*
Pratik A. Shah