Case No. 21-60626

---

## IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

---

ALLIANCE FOR FAIR BOARD RECRUITMENT;
NATIONAL CENTER FOR PUBLIC POLICY RESEARCH,
*Petitioners,*

v.

SECURITIES AND EXCHANGE COMMISSION,
*Respondent.*

---

On Petition for Review of an Order of the
United States Securities and Exchange Commission

---

## BRIEF OF FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC. AS *AMICUS CURIAE* IN SUPPORT OF RESPONDENT AND INTERVENOR ON THE STATE-ACTION ISSUE

---

Aaron M. Streett
Elisabeth C. Butler
BAKER BOTTS L.L.P.
910 Louisiana Street
Houston, Texas 77002
(713) 229-1234

Bridget Moore
BAKER BOTTS L.L.P.
700 K Street, NW
Washington, D.C. 20001
(202) 639-7700

Robert L.D. Colby
Timothy W. Mountz
Angela Saffoe
FINANCIAL INDUSTRY REGULATORY
AUTHORITY, INC.
1735 K Street, NW
Washington, D.C. 20006
(202) 728-8210

*Counsel for Amicus Curiae*

## <u>CERTIFICATE OF INTERESTED PARTIES</u>

Case No. 21-60626; *Alliance for Fair Board Recruitment; National Center for Public Policy Research v. Securities and Exchange Commission*.

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth section of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. Petitioner National Center for Public Policy Research is a non-profit corporation and has no parent corporations or subsidiaries.

2. Margaret A. Little and Sheng Li of The New Civil Liberties Alliance— *Counsel* for Petitioner National Center for Public Policy Research.

3. Petitioner Alliance for Fair Board Recruitment is a non-profit membership corporation and has no parent corporations or subsidiaries.

4. C. Boyden Gray, Jonathan Berry, R. Trent McCotter, Michael Buschbacher, and Jordan E. Smith of Boyden Gray & Associates— *Counsel* for Petitioner Alliance for Fair Board Recruitment.

5. The Securities and Exchange Commission is a federal agency.

6. Michael A. Conley, Daniel E. Matro, Vanessa Ann Countryman, and Tracy A. Hardin of the Securities and Exchange Commission— *Counsel* for Respondent Securities and Exchange Commission.

7. The Nasdaq Stock Market, L.L.C. is a private limited liability company.

8. Allyson N. Ho, Bradley G. Hubbard, Amir C. Tayrani, and Amalia R. Reiss of Gibson, Dunn & Crutcher LLP; John Zecca, Jeffrey S. Davis, John Yetter, and Joanne Pedone of The Nasdaq Stock Market L.L.C.; and Burt M. Rublin, Stephen J. Kastenberg, Paul Lantieri III, Peter F. Andrews, and Seth D. Berlin of Ballard Spahr LLP—*Counsel* for Intervenor Nasdaq Stock Market, L.L.C.

9. The States of Arizona, Alabama, Alaska, Arkansas, Florida, Indiana, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, Oklahoma, South Carolina, Texas, and Utah.

10. Drew C. Ensign, Joseph A. Kanefield, Brunn ("Beau") W. Roysden III, Wilson C. Freeman, and James Rogers—*Counsel* for *Amici* States.

11. The Financial Industry Regulatory Authority, Inc. ("FINRA") is a private, not-for-profit Delaware corporation. FINRA has no stock or parent corporation. No publicly held corporation owns 10% or more of any FINRA stock.

12. Aaron M. Streett, Bridget Moore, and Elisabeth C. Butler of Baker Botts L.L.P.; Robert L.D. Colby, Timothy W. Mountz, and Angela Saffoe of FINRA—*Counsel* for *Amicus* FINRA.

/s/ Aaron M. Streett
Aaron M. Streett
*Counsel of Record for Amicus Curiae*

iii

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PARTIES ........................................................ i

TABLE OF AUTHORITIES ........................................................................... v

INTEREST OF *AMICUS* ................................................................................ 1

SUMMARY OF ARGUMENT ......................................................................... 2

ARGUMENT .................................................................................................. 3

I.     SROs include private organizations that predate the Exchange Act. ............. 3

    A.     The history of self-regulation provides important context to the
        state-action question. ......................................................................... 4

    B.     The relationship between the SEC and SROs further illustrates
        SROs' private-actor status. ................................................................. 8

    C.     FINRA has successfully executed its private role as a regulator
        of the securities industry. .................................................................. 11

    D.     Congress deliberately chose to preserve the benefits of private
        self-regulation—rather than opting for government regulation—
        when it adopted the Exchange Act and subsequent amendments. ....... 13

II.    Courts consistently held that SROs are not state actors and thus reject
      constitutional challenges to SRO rules and disciplinary action ................... 17

III.   Treating SROs as state actors would misapply Supreme Court
      precedent, upset the well-functioning status quo, and create negative
      consequences. .................................................................................... 23

CONCLUSION ............................................................................................. 27

CERTIFICATE OF SERVICE ....................................................................... 28

CERTIFICATE OF COMPLIANCE WITH RULE 32(**a**) ..................................... 29

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
  526 U.S. 40 (1999) ................................................................................24

*Bernstein v. Lind-Waldock & Co.*,
  738 F.2d 179 (7th Cir. 1984) ................................................21, 23, 26

*Blum v. Yaretsky*,
  457 U.S. 991 (1982).........................................................18, 19, 20, 24

*D.L. Cromwell v. NASD Regulation, Inc.*,
  279 F.3d 155 (2d Cir. 2002) .................................................19, 20, 26

*Datek Sec. Corp. v. Nat'l Ass'n of Sec. Dealers, Inc.*,
  875 F. Supp. 230 (S.D.N.Y. 1995) ........................................................9

*Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc.*,
  191 F.3d 198 (2d Cir. 1999) ................................ 12, 18, 19, 20, 21, 24

*Duffield v. Robertson Stephens & Co.*,
  144 F.3d 1182 (9th Cir. 1998) ............................................................20

*Epstein v. S.E.C.*,
  416 F. App'x 142 (3d Cir. 2010) ..................................................12, 20

*First Jersey Sec., Inc. v. Bergen*,
  605 F.2d 690 (3d Cir. 1979) ........................................................20, 21

*Galuska v. New York Stock Exch.*,
  210 F.3d 374 (7th Cir. 2000) ..............................................................21

*Gold v. S.E.C.*,
  48 F.3d 987 (7th Cir. 1995) ................................................................22

*Intercontinental Indus., Inc. v. Am. Stock Exch.*,
  452 F.2d 935 (5th Cir. 1971) ..............................................................23

*Jackson v. Metro. Edison Co.*,
    419 U.S. 345 (1974)..................................................................18, 20, 25

*Jones v. S.E.C.*,
    115 F.3d 1173 (4th Cir. 1997) ....................................................11, 22

*Loftus v. Fin. Indus. Regulatory Auth., Inc.*,
    No. 20-CV-7290 (SHS), 2021 WL 325773 (S.D.N.Y. Feb. 1,
    2021) ......................................................................................9, 18, 25, 26

*Lugar v. Edmondson Oil Co., Inc.*,
    457 U.S. 922 (1982)..........................................................................24, 26

*Marchiano v. Nat'l Ass'n of Sec. Dealers, Inc.*,
    134 F. Supp. 2d 90 (D.D.C. 2001)........................................................22

*Mohlman v. Fin. Indus. Regulatory Auth., Inc.*,
    3:19-CV-154, 2020 WL 905269 (S.D. Ohio Feb. 25, 2020)......................22, 23

*Morrison v. Nat'l Australia Bank Ltd.*,
    561 U.S. 247 (2010)..............................................................................18

*Perpetual Sec., Inc. v. Tang*,
    290 F.3d 132 (2d Cir. 2002) ..........................................................19, 25

*Rooms v. S.E.C.*,
    444 F.3d 1208 (10th Cir. 2006) ...........................................................23

*Rosee v. Bd. of Trade of City of Chicago*,
    311 F.2d 524 (7th Cir. 1963) ...............................................................21

*Silver v. New York Stock Exch.*,
    373 U.S. 341 (1963)..............................................................................5, 6

*Sparta Surgical Corp. v. Nat'l Ass'n of Sec. Dealers, Inc.*,
    159 F.3d 1209 (9th Cir. 1998) ...............................................................3

*Turbeville v. Fin. Indus. Regulatory Auth., Inc.*,
    874 F.3d 1268 (11th Cir. 2017) ........................................................8, 12

*United States v. Solomon*,
    509 F.2d 863 (2d Cir. 1975) ..........................................................20, 21, 24

## STATUTES

15 U.S.C. § 78c ....................................................................................4

15 U.S.C. § 78f....................................................................................5, 8, 9

15 U.S.C. § 78*o* ....................................................................................8

15 U.S.C. § 78*o*-3...........................................................................1, 2, 7, 8, 9, 11

15 U.S.C. § 78s ....................................................................................2, 9, 10, 11

Maloney Act of 1938, S. 3255, 75th Cong., 3d Sess. (1938) .....................1, 6, 7, 16

Pub. L. 99-571, 100 Stat. 3218 ...................................................................17

Pub. L. 101-429, 104 Stat. 957 ...................................................................17

Pub. L. 103-202, 107 Stat. 2350 ...................................................................17

Pub. L. 106-102, 113 Stat. 1391 ...................................................................17

Pub. L. 111-203, 124 Stat. 1652 ...................................................................17

Securities Exchange Act of 1934, H.R. 9323, 73d Cong., 2d Sess. § 11
    (1934)....................................................................................14

## LEGISLATIVE MATERIALS

Hearings on H.R. 7852 and H.R. 8720 Before the House Comm. on
    Interstate and Foreign Commerce, 73d Cong., 2d Sess. (1934). .................13, 14

H.R. Rep. No. 73-1383 (1934).........................................................................5, 6, 15

H.R. Rep. No. 75-2307 (1938).........................................................................16

H.R. Rep. No. 88-95 (1963).............................................................................15, 23

H.R. Rep. No. 92-1519 (1972).........................................................................13

S. Rep. No. 73-1455 (1934) ............................................................................4, 5

S. Rep. No. 75-1455 (1938) ............................................................................16

S. Rep. No. 94-75 (1975) ................................................................................9, 14, 16, 17, 27

# REGULATORY MATERIALS

Exemption for Certain Exchange Members, Exchange Act Release No. 74,581, 111 SEC Docket 680 (Mar. 25, 2015) ....................................7

Order Approving Proposed Rule Change To Amend the By-Laws of NASD To Implement Governance and Related Changes To Accommodate the Consolidation of the Member Firm Regulatory Functions of NASD and NYSE Regulation, Inc., 72 Fed. Reg. 42,169 (Aug. 1, 2007) ............................7

SEC Concept Release Concerning Self-Regulation, 69 Fed. Reg. 71,256 (2004) .......................................................................................5, 6, 14

Securities Exchange Act Release No. 34-94214 (Feb. 10, 2022), 87 Fed. Reg. 8901 (Feb. 16, 2022). ...................................................................25

U.S. Securities and Exchange Commission, Self-Regulatory Organization Rulemaking (March 2, 2021)................................................................4

Eric J. Weiss, Exchange Act Release No. 69177, 2013 WL 1122496 (Mar. 19, 2013) ..........................................................................................25

# SRO DOCUMENTS

2020 FINRA Annual Financial Report ..................................................12

FINRA By-Laws Schedule A ..............................................................12

FINRA Rule 2010 ............................................................................15

FINRA Rule 8210 ............................................................................10

FINRA Rule 9552 ............................................................................10

FINRA Sanction Guidelines (October 2021)........................................10

Nasdaq Rule 8310 ...........................................................................10

# BOOKS AND ARTICLES

Onnig H. Dombalagian, *Demythologizing the Stock Exchange: Reconciling Self-Regulation and the National Market System*, 39 U. Rich. L. Rev. 1069 (2005)..........................................................................................4

Richard W. Jennings, *Self-Regulation in the Securities Industry: The Role of the Securities and Exchange Commission*, 29 Law & Contemp. Probs. 663 (1964) ............................................................................................... 13

Phil Mackintosh, Nasdaq: 50 Years of Market Innovation (Feb. 11, 2021) ............ 7

Donna Nagy, *Playing Peekaboo With Constitutional Law: The PCAOB and Its Public/Private Status*, 80 Notre Dame L. Rev. 975 (2005) ........................................................................................................... 6, 7

Robert Sobel, The Big Board: A History of the New York Stock Market (The Free Press 1965). ............................................................................. 5

## INTEREST OF *AMICUS*

This brief is filed by the Financial Industry Regulatory Authority, Inc. ("FINRA") as *amicus curiae*[1] in support of Respondent U.S. Securities and Exchange Commission ("SEC" or "Commission") and Intervenor Nasdaq Stock Market, L.L.C. ("Nasdaq"). FINRA's brief is limited to addressing whether the challenged rule constitutes "state action" subject to scrutiny under the Constitution. FINRA takes no position on any other issue.

FINRA is a private, not-for-profit corporation that is registered with the SEC as a national securities association under the Maloney Act of 1938, 15 U.S.C. § 78*o*-3, *et seq.*, amending the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.* ("Exchange Act"). Like Nasdaq, FINRA is a self-regulatory organization ("SRO"). FINRA is the nation's only registered national securities association as well as the nation's largest SRO. As part of its obligations as a national securities association and SRO, FINRA reviews the qualifications of broker-dealer firms and their associated persons; promulgates rules that govern FINRA members; and enforces compliance by its members with those rules and federal securities laws. 15 U.S.C.

---

[1] All parties consented to the filing of this brief. *See* Fed. R. App. P. 29(a)(2). No counsel for any party authored this brief in whole or in part and no entity or person, aside from *amicus curiae*, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(4)(e).

§§ 78*o*-3(b)(2), 78s(b), 78s(g)(1).   In 2020, FINRA's members included 3,435 securities firms with 152,861 branch offices and 617,549 registered representatives.

FINRA is interested in safeguarding SROs' long-recognized status as private actors, rather than governmental actors.  In enacting the Exchange Act, Congress carefully crafted a system of cooperative regulation in which the private entities that historically self-regulated the securities industry could continue to perform that function, subject to SEC oversight.  FINRA seeks to ensure that courts continue to respect the deliberate balance struck by Congress and acknowledge the SROs' status as private actors not subject to the Constitution's constraints on state action.

## SUMMARY OF ARGUMENT

SROs are not state actors subject to the strictures of the Constitution.  Stock exchanges that are today classified as SROs existed before the Exchange Act and began the task of self-regulation well before Congress enveloped them within a comprehensive plan for regulating the securities markets.  The structure and history of the Exchange Act demonstrate that Congress intended for SROs to retain their private character.  Congress designed a scheme that left a degree of regulatory authority with members of the securities industry engaging in self-regulation, while providing for SEC oversight of SRO regulation.  Congress has repeatedly reaffirmed the concept of self-regulation in amending the Exchange Act.

With this background in mind, courts have consistently declined to hold that SROs are state actors. Because SROs are private organizations that regulate their own members, employ no government officials, and receive no public funding, courts have uniformly considered SROs regulated businesses rather than agents of the federal government. That common judicial understanding has allowed SROs like FINRA the flexibility to robustly protect the integrity of the securities industry without all of the governmental limitations that attend state-actor status. The Court should maintain this beneficial status quo, which honors Congressional intent, and hold that Nasdaq is not a state actor.[2]

## ARGUMENT

## I.    SROs include private organizations that predate the Exchange Act.

Through the Exchange Act, Congress established a comprehensive statutory plan for "cooperative regulation" of the securities markets, "under which self-regulatory organizations would exercise a primary supervisory role." *Sparta Surgical Corp. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 159 F.3d 1209, 1213-14 (9th Cir. 1998), *abrogated in part on other grounds by Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Manning*, 578 U.S. 374 (2016). The Exchange Act defines an SRO as "any national securities exchange, registered securities association, or registered clearing

---

[2] FINRA takes no position on the statutory challenges to the rule or on the rule's constitutional merits beyond the threshold state-action question.

agency, or[, for limited purposes,] the Municipal Securities Rulemaking Board."  15 U.S.C. § 78c(a)(26).  Examples of SROs include securities exchanges like Nasdaq and the New York Stock Exchange ("NYSE"), as well as FINRA, which is a registered national securities association.[3]

### A.     The history of self-regulation provides important context to the state-action question.

Exchanges and securities associations existed as private, voluntary organizations long before Congress required them to register as SROs subject to certain SEC oversight.  The exchanges were initially formed as professional associations of securities brokers and dealers who sought to centralize securities-trading activity.  Onnig H. Dombalagian, *Demythologizing the Stock Exchange: Reconciling Self-Regulation and the National Market System*, 39 U. Rich. L. Rev. 1069, 1071 (2005).  Approximately forty-three exchanges existed by 1934.  *Id.* at 1072 n.10.

NYSE, the largest exchange, was organized in 1792 and existed as an unincorporated association prior to enactment of the Exchange Act.  S. Rep. No. 73-1455, at 77 (1934).  NYSE adopted its first constitution in 1817 and replaced it with a set of bylaws in 1820, through which it promulgated rules governing its members.

---

[3] A full list of SROs is available on the SEC's website.  *See* U.S. Securities and Exchange Commission, Self-Regulatory Organization Rulemaking (March 2, 2021), available at: https://www.sec.gov/rules/sro.shtml.

Robert Sobel, The Big Board: A History of the New York Stock Market 30, 39 (The Free Press 1965).  By 1869, NYSE merged with another exchange and ratified a constitution that provided "listing requirements," "rigid scrutiny of all securities," and "surveillance over members in respect of their fidelity to contracts." *Id.* at 86.

Before the Exchange Act's adoption in 1934, the exchanges were "subject to regulation by no governmental authority and . . . exercised unrestricted dominion over the activities of their members."  S. Rep. No. 73-1455, at 77.  They were historically "treated by the courts as private clubs" and were "given great latitude by the courts in disciplining their errant members." *Silver v. New York Stock Exch.*, 373 U.S. 341, 350-51 (1963).

After the 1929 stock market crash, Congress endeavored to regulate the securities industry.  In the Exchange Act, Congress left "a wide measure of initiative [and] responsibility . . . with the exchanges," but "reserved control . . . in the Commission if the exchanges do not meet their responsibility."  H.R. Rep. No. 73-1383, at 15 (1934).  Congress codified the role of the exchanges in Section 6 of the Exchange Act, which required all existing securities exchanges to register with the SEC and function as SROs.  15 U.S.C. § 78f; SEC Concept Release Concerning Self-Regulation, 69 Fed. Reg. 71,256, 71,257 (2004).  SEC Chairman (and later Justice) William O. Douglas explained that Congress's intention was "one of 'letting the exchanges take the leadership with Government playing a residual role.'" *Silver*,

373 U.S. at 352 (quoting William O. Douglas, Democracy and Finance 82 (1940)). Congress expressed hope that this system of self-regulation would "give to the well-managed exchanges that power necessary to enable them to effect themselves needed reforms and that the occasion for direct action by the Commission will not arise." H.R. Rep. No. 73-1383, at 15. The Exchange Act was therefore designed to "giv[e] the exchanges a major part in curbing abuses by obligating them to regulate themselves." *Silver*, 373 U.S. at 356.

The market crash also prompted over-the-counter securities dealers, through their then-existing trade group the Investment Bankers Association of America, to form the Investment Bankers Code Committee ("IBCC") in 1933. SEC Concept Release Concerning Self-Regulation, 69 Fed. Reg. at 71,257. The IBCC was a voluntary organization that promulgated best practices for the securities industry. *Id.* That group reorganized itself in 1936 into the Investment Bankers Conference ("IBC"), which worked with Congress and the SEC to create an SRO for securities dealers. *See* Donna Nagy, *Playing Peekaboo With Constitutional Law: The PCAOB and Its Public/Private Status*, 80 Notre Dame L. Rev. 975, 1023-24 (2005) (hereinafter Nagy). This effort culminated in the passage of the Maloney Act in 1938, which created the concept of registered securities associations as SROs and "provide[d] for the establishment of a mechanism of regulation among over-the-counter brokers and dealers . . . to prevent acts and practices inconsistent with just

and equitable principles of trade." Maloney Act of 1938, S. 3255, 75th Cong., 3d

Sess., 52. Stat. 1070 (1938) (codified as amended at 15 U.S.C. § 78*o*-3, *et seq*.).

The IBC subsequently reorganized itself into the National Association of

Securities Dealers ("NASD"). In 1939, NASD became the first national securities

association registered with the SEC. *See* Nagy at 1023-24; Exemption for Certain

Exchange Members, Exchange Act Release No. 74,581, 111 SEC Docket 680 (Mar.

25, 2015). NASD, in turn, created the Nasdaq stock exchange in 1971. Phil

Mackintosh, Nasdaq: 50 Years of Market Innovation (Feb. 11, 2021).[4] NASD later

spun off Nasdaq, which registered as an exchange and became a public company in

2005. *Id.* In 2007, NASD and NYSE consolidated their member-firm regulation

and enforcement functions to form FINRA. *See* Order Approving Proposed Rule

Change To Amend the By-Laws of NASD To Implement Governance and Related

Changes To Accommodate the Consolidation of the Member Firm Regulatory

Functions of NASD and NYSE Regulation, Inc., 72 Fed. Reg. 42,169 (Aug. 1, 2007).

FINRA is not an exchange; rather, it is a national securities association that regulates

and disciplines securities dealers and their associated persons.[5] FINRA is currently

---

[4] Available at: https://www.nasdaq.com/articles/nasdaq%3A-50-years-of-market-innovation-2021-02-11.

[5] FINRA also operates the largest dispute-resolution forum in the securities industry. As the forum administrator, FINRA provides support to independent arbitrators selected by the parties to resolve monetary and business disputes between and among investors, securities firms, and individual registered representatives.

the only registered national securities association in the United States. *See Turbeville v. Fin. Indus. Regulatory Auth., Inc.*, 874 F.3d 1268, 1270 n.2 (11th Cir. 2017).

With roots in the 18th century, securities exchanges and private regulatory bodies like Nasdaq, NYSE, FINRA, and their predecessors have effectively policed and governed their members. Those self-regulatory functions were specifically preserved by the Exchange Act.

## B.    The relationship between the SEC and SROs further illustrates SROs' private-actor status.

The Exchange Act created a system of cooperative regulation, through which SROs regulate themselves by promulgating rules that govern their members and enforcing those rules through disciplinary proceedings. The SEC, in turn, supervises SROs' actions to ensure they are consistent with the Exchange Act.

The Exchange Act requires broker-dealers to register with the SEC and join an SRO in order to trade securities. 15 U.S.C. § 78*o*(a)(1). The SROs themselves must also be registered with the SEC. *Id.* §§ 78e, 78*o*-3. To be registered, an SRO must agree to enforce compliance with the Exchange Act and the SRO's own rules. *Id.* §§ 78f(b)(1), 78*o*-3(b)(2). The SRO's rules must be designed to, among other things, prevent fraud, promote just and equitable principles of trade, and protect investors and the public interest. *Id.* §§ 78f(b)(5), 78*o*-3(b)(6).

SROs initially formulate and propose their own rules. *See* 15 U.S.C. § 78s(b)(1); S. Rep. No. 94-75, at 28 (1975) ("The Exchange Act says very little about the internal decision-making processes of self-regulatory organizations."). SROs must file their proposed rules with the SEC for approval. 15 U.S.C. § 78s(b)(1). The SEC "shall approve" a proposed rule if the rule is consistent with the Exchange Act, and it "shall disapprove" a rule that is not. *Id.* § 78s(b)(2)(C). It may not alter a proposed SRO rule. The SEC has the power to initiate its own rulemaking proceeding to abrogate, add to, and delete the final rules of an SRO as necessary or appropriate to ensure the fair administration of the SRO or to conform its rules to the Exchange Act and applicable regulations. *Id.* § 78s(c). The SEC must comply with notice-and-comment procedures in approving and amending SRO rules. *Id.* §§ 78s(b)(1), 78s(c).

The Exchange Act also mandates that SROs investigate and discipline member firms and their associated persons for violating SRO rules or federal securities laws. *Loftus v. Fin. Indus. Regulatory Auth., Inc.*, No. 20-CV-7290 (SHS), 2021 WL 325773, at *1 (S.D.N.Y. Feb. 1, 2021) (citing *Datek Sec. Corp. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 875 F. Supp. 230, 232 (S.D.N.Y. 1995)); *see also* 15 U.S.C. §§ 78f(b)(6), 78*o*-3(b)(7). Unlike the SEC, SROs do not have the authority to issue administrative or judicial subpoenas to aid them in obtaining information for their investigations. Instead, to conduct investigations of its members, FINRA

uses its authority under FINRA Rule 8210, which permits FINRA to "require a member, person associated with a member, or any other person subject to FINRA's jurisdiction to provide information . . . and to testify."[6]  Compliance with FINRA Rule 8210 is not enforced by the SEC or the courts.  Rather, FINRA has a process, requiring notice and an opportunity to be heard, whereby it can sanction a member or associated person, including by suspension or expulsion, for noncompliance with FINRA Rule 8210.  *See* FINRA Rule 9552.  Thus, as the primary examining authority for the securities industry, FINRA's investigative efforts are largely dependent upon information that is supplied voluntarily by member firms, customers, and others.  FINRA, like other SROs, applies its specialized knowledge of the securities industry to identify what conduct should be investigated and to determine whether the conduct appears to violate FINRA's rules or federal securities laws.

SROs also initiate disciplinary proceedings against their members and impose final disciplinary sanctions, including monetary fines, suspensions, or expulsions of members from the SRO.  *See, e.g.*, FINRA Sanction Guidelines (October 2021)[7]; Nasdaq Rule 8310.[8]  SROs must notify the SEC if they impose a final disciplinary sanction for violation of federal securities law or SRO rules.  15 U.S.C. § 78s(d).

---

[6] All FINRA Rules available at: https://www.finra.org/rules-guidance/rulebooks/finra-rules.

[7] Available at: https://www.finra.org/sites/default/files/Sanctions_Guidelines.pdf.

[8] All Nasdaq Rules available at: https://listingcenter.nasdaq.com/rulebook/nasdaq/rules/Nasdaq %20General%205.

The SEC may review any final disciplinary action by an SRO on its own motion or at the request of an aggrieved party. *Id.* § 78s(d)(2). The SEC's review determines whether the SRO's actions were consistent with the purposes of the Exchange Act, and the SEC may set aside a sanction or remand an action for further proceedings. *Id.* § 78s(e)(1).

Finally, the SEC may suspend or revoke an SRO's registration, or limit an SRO's activities, if the SRO violates the Exchange Act or the SRO's own rules or if it fails to enforce compliance with those provisions against its members. *Id.* § 78s(h)(1).

### C.    FINRA has successfully executed its private role as a regulator of the securities industry.

*Amicus* FINRA exemplifies the central role of SROs in the Exchange Act's comprehensive framework for regulating securities markets. FINRA is charged with "the day-to-day policing of securities professionals." *Jones v. S.E.C.*, 115 F.3d 1173, 1181 (4th Cir. 1997). Specifically, FINRA ensures the qualifications of broker-dealer firms and individual stockbrokers seeking to enter the industry, imposes binding rules on those market actors, and must "enforce compliance by its members" with the federal securities laws and FINRA's rules. 15 U.S.C. §§ 78*o*-3(b)(2), 78s(g)(1), 78s(h). FINRA has detailed and fair procedures for its disciplinary proceedings, including "a multi-layered hearing and appeals process" conducted by

impartial decisionmakers.  *Turbeville*, 874 F.3d at 1271; *Epstein v. S.E.C.*, 416 F. App'x 142, 148 (3d Cir. 2010).

FINRA is not part of the federal government.  No government official serves as a FINRA employee, and the government does not appoint any FINRA board members, officers, or employees.  *See, e.g., Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc.*, 191 F.3d 198, 206 (2d Cir. 1999).  FINRA does not receive any state or federal funding; it is funded by registration, membership, and transaction fees charged to its members.  *See id.*; 2020 FINRA Annual Financial Report at 1[9]; *see generally* FINRA By-Laws Schedule A.[10]

Unlike the exchanges, FINRA functions solely as a regulatory organization, without commercial activities.  FINRA conducts examinations and investigations to ensure its members are complying with the Exchange Act and its own rules.  In 2020, FINRA conducted 5,623 exams and reviews and levied $57 million in fines.  2020 FINRA Annual Financial Report at 3.  It recovered $25.2 million in restitution to harmed investors.  *Id.*  FINRA independently conducts its regulatory functions subject to potential SEC review for conformance with the Exchange Act.

---

[9] Available at:  https://www.finra.org/sites/default/files/2021-06/2020-annual-financial-report.pdf.

[10] Available at: https://www.finra.org/rules-guidance/rulebooks/corporate-organization/schedule-laws-corporation.

**D.    Congress deliberately chose to preserve the benefits of private self-regulation—rather than opting for government regulation—when it adopted the Exchange Act and subsequent amendments.**

In considering the Exchange Act, Congress weighed the extent to which governmental control over the securities industry should supersede the then-existing system of self-regulation.    In 1933, President Roosevelt created a Federal Interdepartmental Committee on Stock Exchanges ("Interdepartmental Committee") to advise Congress on the matter.    H.R. Rep. No. 92-1519, at 80 (1972).    The Chairman of the Interdepartmental Committee stated that it feared too much governmental regulation of the securities industry would "be in danger of breaking down under its own weight and proving ineffective."    Hearings on H.R. 7852 and H.R. 8720 Before the House Comm. on Interstate and Foreign Commerce, 73d Cong., 2d Sess. at 513 (1934).    The Interdepartmental Committee thus recommended that governmental regulation be used only "to supplement and supervise what in the first instance was self-regulation of the exchanges."    *Id.*

Nonetheless, the initial version of the bill disregarded the Interdepartmental Committee's recommendation, giving the federal government extensive powers to directly establish standards for broker-dealers and exchanges.    *See* Richard W. Jennings, *Self-Regulation in the Securities Industry: The Role of the Securities and Exchange Commission*, 29 Law & Contemp. Probs. 663, 669 (1964) (citing H.R. 7852, 73d Cong., 2d Sess. (1934)).    After that proposal was harshly criticized by the

business community, securities industry, and the Roosevelt Administration, one of the initial bill's drafters, Congressman Sam Rayburn, proposed a revised bill that effected a compromise between these two positions. *Id.* at 669-70; *see* Hearings on H.R. 7852 and H.R. 8720 Before the House Comm. on Interstate and Foreign Commerce, 73d Cong., 2d Sess. at 625 (1934). The revised bill, which after a few small changes became the Exchange Act, granted the SEC direct regulatory authority over specialists, odd-lot traders, floor traders, and all other exchange members insofar as they engaged in "excessive trading." Securities Exchange Act of 1934, H.R. 9323, 73d Cong., 2d Sess. § 11 (1934). But the revised bill followed the Interdepartmental Committee's recommendations with respect to the exchanges, granting them "a wide measure of initiative and responsibility." S. Rep. No. 94-75, at 34 (1975). Under the Exchange Act, the SEC relies on self-regulation to oversee the markets and broker-dealers, with parallel authority to address significant problems or to act if the SRO exchanges fail to meet their responsibilities.

A primary reason for relying on self-regulation was "the sheer ineffectiveness of attempting to [regulate] directly through the government on a wide scale." *Id.* at 22. Self-regulation also has the advantage of entrusting detailed rulemaking responsibility to those most familiar with the complex securities industry. *See* SEC Concept Release Concerning Self-Regulation, 69 Fed. Reg. at 71,257. Self-regulation of exchanges and their members is more flexible than governmental

regulation, and Congress recognized that "flexibility [is] required in dealing with so intricate a subject matter."  H.R. Rep. No. 73-1383, at 7.

Most importantly, self-regulation has the potential for enforcing what Justice Douglas referred to as "ethical standards beyond those any law can establish." Report of Special Study of Securities Markets of the Securities and Exchange Commission, H.R. Rep. No. 88-95, pt. 4, at 694 (1963) (quoting William O. Douglas, Address Before the Bond Club of Hartford, Conn., Jan. 7, 1938).  As he explained:

> Self-regulation . . . can be pervasive and subtle in its conditioning influence over business practices and business morality.  By and large, government can operate satisfactorily only by proscription.  That leaves untouched large areas of conduct and activity; some of it susceptible of government regulation but in fact too minute for satisfactory control; some of it lying beyond the periphery of the law in the realm of ethics and morality.  Into these larger areas self-government and self-government alone, can effectively reach.

*Id.* at 695.   Thus, the founding fathers of the Exchange Act designed a comprehensive system for regulating the securities markets that relied heavily on private self-regulation as an effective and efficient method to ensure integrity in the industry.[11]

Congress reaffirmed its desire for "cooperative regulation" between securities-industry organizations and the SEC in 1938 with the passage of the

---

[11] This framework is still in use today.  *See, e.g.*, FINRA Rule 2010 ("A member, in the conduct of its business, shall observe high standards of commercial honor and just and equitable principles of trade.").

Maloney Act.  H.R. Rep. No. 75-2307, at 2 (1938); Maloney Act of 1938, S. 3255, 75th Cong., 3d Sess. (1938).  The Maloney Act established self-governance of the over-the-counter market by allowing associations of broker-dealers to register with the SEC as national securities associations.  H.R. Rep. No. 75-2307, at 2.  When confronted with the choice between direct governmental regulation or self-regulation, Congress again elected self-regulation.  The Senate Banking and Currency Committee, which spearheaded the amendments, believed that governmental regulation of the over-the-counter market would involve a "pronounced expansion" of the SEC, "a large increase in the expenditures of public funds; an increase in the problem of avoiding the evils of bureaucracy; and a minute, detailed, and rigid regulation of business conduct by law."  S. Rep. No. 75-1455, at 3 (1938).  The committee therefore determined that a system of "cooperative regulation" was "distinctly preferable."  *Id.* at 4.  Under that system, regulation is "largely performed by representative organizations of investment bankers, dealers, and brokers, with the Government exercising appropriate supervision in the public interest and exercising supplementary powers of direct regulation."  *Id.*

When the Exchange Act was amended again in 1975, the Senate Report reaffirmed the belief that the self-regulatory framework should be "preserved and strengthened."  S. Rep. No. 94-75, at 23 (1975).  It explained that SROs "do not act just like Government agencies, whose procedures and functions are derived from,

and often prescribed by, statutes rather than from the decisions of those who choose to become members." *Id.* at 28-29.  This distinction, the Report emphasized, "is essential to the concept of self-regulat[ion]." *Id.* at 29.  Indeed, "it would be self-defeating to saddle the self-regulatory organizations with the whol[e] panoply of Governmental administrative procedure." *Id*.  After all, "[o]ne of the advantages of self-regulation is the flexibility and informality of its decision-making procedures," for "it is doubtful that any . . . formal procedure would better serve the goal of effective securities regulation than the present practice of encouraging each organization to develop procedures which best serve its needs and those of public investors." *Id.*

Congress has thus repeatedly chosen to preserve the system of self-regulation in which SROs and the SEC serve distinct but complementary roles.[12]  Congress did not intend SRO rules or disciplinary sanctions to be treated as government action, and this Court should honor that legislative design.

## II.    Courts consistently hold that SROs are not state actors and thus reject constitutional challenges to SRO rules and disciplinary actions.

In light of the self-regulatory framework of the Exchange Act, courts "have spoken in one voice" to declare that FINRA and other SROs are not state actors.

---

[12] Congress has amended the pertinent sections of the Exchange Act five times since 1975, and these subsequent amendments maintained the self-regulatory scheme.  *See* Pub. L. 99-571, 100 Stat. 3218; Pub. L. 101-429, 104 Stat. 957; Pub. L. 103-202, 107 Stat. 2350; Pub. L. 106-102, 113 Stat. 1391; Pub. L. 111-203, 124 Stat. 1652.

*Loftus*, 2021 WL 325773, at *5 (collecting cases).  We begin with the Second Circuit—"the Mother Court of securities law," *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 276 (2010) (Stevens, J., concurring) (quotation omitted)—which has repeatedly held that SROs are not state actors.

In *Desiderio*, the leading case, the plaintiff brought a constitutional challenge against NASD's mandatory-arbitration provision included in a securities-industry uniform registration form, Form U-4, which the SEC approved.  191 F.3d at 200. The Second Circuit affirmed the dismissal of the plaintiff's claim because NASD is not a state actor.  *Id.* at 206.  The court explained that NASD is "a private corporation that receives no federal or state funding.  Its creation was not mandated by statute, nor does the government appoint its members or serve on any NASD board or committee."  *Id.*  The court also noted that under Supreme Court precedent even "'extensive and detailed' state regulation" would not convert NASD actions into those of the government.  *Id.* (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 350 (1974)).

To evaluate whether the mandatory-arbitration provision was nonetheless "fairly attributable" to the government, the Second Circuit applied the criteria laid out in *Blum v. Yaretsky*, 457 U.S. 991, 1004-05 (1982).  *Blum* dictates that state action exists where (1) there is "a sufficiently close nexus between the state and the challenged action" such that "it can be said that the State is *responsible* for the

specific conduct of which the plaintiff complains," or (2) where the state "has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Id.* at 1004 (emphasis in original). However, "[m]ere approval" by the government "is not sufficient to justify holding the State responsible" for the conduct of a private party. *Id.* at 1004-05.

Applying these criteria, the Second Circuit held that the SEC's approval of the mandatory-arbitration provision included in the uniform registration form, which was "drafted by the NASD in cooperation with other [SROs], with no encouragement from the SEC," did not convert the private arbitration provision into state action. *Desiderio,* 191 F.3d at 207. The court perceived no nexus between the SEC and the mandatory-arbitration provision because "no SEC rule or action that has been called to our attention encourages the NASD to compel arbitration." *Id.* As the court elaborated:

> Simply because the SEC approved the arbitration clause in Form U-4 is not enough. As *Blum* emphasizes, a state is responsible for a private decision only where it exercised coercive power or provided significant encouragement. The SEC's "[m]ere approval" of Form U-4 is "not sufficient" to justify holding the state liable for the effects of the arbitration clause.

*Id.* (internal citations omitted). The Second Circuit has repeatedly reaffirmed its holding that NASD is not a state actor. *See Perpetual Sec., Inc. v. Tang*, 290 F.3d 132, 139 (2d Cir. 2002); *D.L. Cromwell Invs. v. NASD Regulation, Inc.*, 279 F.3d

155, 162 (2d Cir. 2002). It has also held that NYSE is not a state actor. *United States v. Solomon*, 509 F.2d 863, 867-71 (2d Cir. 1975); *see Desiderio*, 191 F.3d at 206.

The Ninth Circuit has reached the same conclusion with respect to NYSE and NASD's mandatory-arbitration requirements, holding that the SEC's "mere approval" of those provisions did not convert them into state action. *Duffield v. Robertson Stephens & Co.*, 144 F.3d 1182, 1202 (9th Cir. 1998), *overruled on other grounds by E.E.O.C. v. Luce, Forward, Hamilton & Scripps*, 345 F.3d 742 (9th Cir. 2003). That court correctly reasoned that "the SEC's involvement [in the exchanges' rules and procedures] is insufficient under *Skinner* [*v. Railway Labor Executives' Ass'n*, 489 U.S. 602 (1989)], *Blum*, and *Jackson* to render the industry's overall requirement that its employees submit to arbitration in lieu of court proceedings fairly attributable to the state." *Id.*

The Third Circuit has also followed the Second Circuit's lead and held that SROs are not state actors. *See Epstein v. S.E.C.*, 416 F. App'x at 148. Consequently, that court rejected a broker-dealer's attempt to raise a constitutional challenge to a NASD disciplinary action that was later affirmed by the SEC. *Id.* ("Epstein cannot bring a constitutional due process claim against the NASD, because '[t]he NASD is a private actor, not a state actor.'" (quoting *Desiderio*, 191 F.3d at 206)). *See also First Jersey Sec., Inc. v. Bergen*, 605 F.2d 690, 699 n.5 (3d Cir. 1979) ("NASD is

not a state agency; therefore, First Jersey is unable to state a claim under section 1983.").

The Seventh Circuit too has on several occasions stated that SROs are not state actors. In *Bernstein v. Lind-Waldock & Co.*, 738 F.2d 179, 186 (7th Cir. 1984), the Seventh Circuit held that the Chicago Mercantile Exchange ("CME"), an SRO, was not a state actor. There, a CME member challenged the CME's decision to auction off his seat on the exchange without affording him due process. *Id.* at 182. In language that resonates here, the court explained that

> [t]he argument for treating a securities or commodity exchange as an arm of the federal government is that federal law imposes on the exchange a duty of policing its members that makes the exchange in effect a law-enforcement agent of the government. But as Judge Friendly pointed out in the *Solomon* case, the agency analogy is upside down. The exchange is the principal rather than the agent; the purpose of the federal law is to strengthen the power and responsibility of the exchange in performing a policing function that preexisted federal regulation.

*Id.* (internal citations omitted). *See also Rosee v. Bd. of Trade of City of Chicago*, 311 F.2d 524, 526 (7th Cir. 1963) ("The activities of the [Chicago] Board of Trade . . . do not fall within the category of governmental action."). Even in cases where the state-action question was not squarely presented by the parties, the Seventh Circuit has expressed its view that SROs are not state actors. *See, e.g., Galuska v. New York Stock Exch.*, 210 F.3d 374, at *2 (7th Cir. 2000) (Table) ("NYSE is not a governmental actor subject to the Constitution's mandates." (citing *Desiderio*, 191

F.3d at 206)); *Gold v. S.E.C.*, 48 F.3d 987, 991 (7th Cir. 1995) ("This court has expressed doubt about the proposition that the comprehensive regulation of securities exchanges by the federal government would turn those exchanges into government actors.").

The Fourth Circuit concurs. In *Jones v. S.E.C.*, the court rejected a Double Jeopardy challenge to independent SEC punishment that followed NASD disciplinary sanctions because it "agree[d]" that "NASD is a private party and not a governmental agent." 115 F.3d at 1183.

In sum, numerous sister circuits have accurately and consistently applied Supreme Court precedent to hold that SROs are not state actors in circumstances materially indistinguishable from this case. This Court should not break with that overwhelming consensus. *See Marchiano v. Nat'l Ass'n of Sec. Dealers, Inc.*, 134 F. Supp. 2d 90, 95 (D.D.C. 2001) ("The court is aware of no case . . . in which NASD Defendants were found to be state actors . . . . In fact, every court that has addressed those issues has rejected [these] arguments."); *Mohlman v. Fin. Indus. Regulatory Auth.*, *Inc.*, 3:19-CV-154, 2020 WL 905269, at \*6 (S.D. Ohio Feb. 25, 2020) ("Courts have held without exception that FINRA is a private entity and not a state

actor.") (collecting cases), *aff'd sub nom. Mohlman v. Fin. Indus. Regulatory Auth.*, 977 F.3d 556 (6th Cir. 2020).[13]

## III. Treating SROs as state actors would misapply Supreme Court precedent, upset the well-functioning status quo, and create negative consequences.

A novel holding that SROs are state actors would have deleterious consequences. SROs have functioned effectively and efficiently for decades as private—not governmental—actors. FINRA, for instance, vigorously polices the securities industry in precisely the manner envisioned by the founders of modern securities regulation. This self-regulation enforces "ethical standards beyond those any law can establish," "effective[ly] reach[ing]" areas that "self-government and self-government alone" can monitor. H.R. Rep. No. 88-95, pt. 4, at 695. In executing these regulatory duties, SROs do not exercise governmental power; they "perform[] a policing function" with respect to their members "that preexisted federal regulation." *Bernstein*, 738 F.2d at 186. The Court should not disrupt this settled and salutary state of affairs.

The state-action doctrine places important limits on courts' power to apply constitutional constraints against private entities, including SROs. In this way, "[c]areful adherence to the 'state action' requirement preserves an area of individual

---

[13] FINRA agrees with the SEC that the dicta in *Intercontinental Industries, Inc. v. American Stock Exchange*, 452 F.2d 935 (5th Cir. 1971), and *Rooms v. S.E.C.*, 444 F.3d 1208 (10th Cir. 2006), do not support a contrary conclusion. *See* SEC Br. 49-50.

freedom by limiting the reach of federal law and federal judicial power," *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 936 (1982), "ensur[ing] that the prerogative of regulating private business remains with the States and the representative branches, not the courts." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 52 (1999). The Constitution simply does not reach private conduct, "no matter how discriminatory or wrongful." *Id.* at 50 (quotation omitted). Thus, while petitioners contend that Nasdaq's rule is unconstitutional, because the rule is a private rule for Nasdaq's own members it does not constitute state action.

Time and again, courts have held that SEC approval of an SRO action does not convert that private conduct into state action. *See, e.g.*, *Desiderio*, 191 F.3d at 207. As Judge Friendly explained, SROs have "broad responsibility . . . to administer their own affairs," while the SEC's role is to ensure "that responsibility [is] diligently and effectively used." *Solomon*, 509 F.2d at 869. An SRO thus acts "in pursuance of its own interests and obligations" in promulgating rules and disciplining its members—"not as an agent of the SEC." *Id.*

This case exemplifies that principle. The SEC did not "coerc[e]" or "encourage[]" Nasdaq to propose the challenged rule. *Blum*, 457 U.S. at 1004. Nasdaq formulated and proposed the rule on its own initiative. *See Desiderio*, 191 F.3d at 207 (no state action where "no SEC rule or action . . . encourages the [SRO]" to adopt the challenged rule). The SEC's "[m]ere approval" of the rule as consistent

with the Exchange Act does not transform its private character. *Id.* at 206; *see Jackson*, 419 U.S. at 354-56 (no state action by public utility where utility "initiated" the rule that was approved but not "order[ed]" by the state).

SROs promulgate a wide range of rules that are subject to SEC review or approval, including, for example, rules establishing the fees that exchanges charge listed companies, disciplinary procedures, the SROs' codes of arbitration procedure, and dress codes and standards of conduct on the trading floor. *See, e.g*, Nasdaq Rule 5900 *et seq.*[14]; FINRA Rule 12000 *et seq.*[15]; Securities Exchange Act Release No. 34-94214 (Feb. 10, 2022), 87 Fed. Reg. 8901 (Feb. 16, 2022). These rules are quintessential private-membership rules that govern the minutia of broker-dealer and exchange practice. If petitioners' state-action arguments were adopted, there is no principled limit to the scope of SRO actions that would potentially be subject to constitutional challenge.

The cases discussed above further illustrate the potential effects of a holding that SROs are state actors. For example, SRO members and their associated persons would be newly empowered to attack SRO disciplinary proceedings on due process or other constitutional grounds. *Cf. Tang*, 290 F.3d at 137; *Loftus*, 2021 WL 325773,

---

[14] Available at: https://listingcenter.nasdaq.com/rulebook/nasdaq/rules/nasdaq-5900-series.

[15] Available at: https://www.finra.org/arbitration-mediation/printable-code-arbitration-procedure-12000.

at *4-*5.  Such challenges would overturn the longstanding rule that litigants may not pursue constitutional claims against an SRO at either the SEC or judicial-review level.  Eric J. Weiss, Exchange Act Release No. 69177, 2013 WL 1122496, at *6 n.40 (Mar. 19, 2013) (collecting cases) ("SROs such as FINRA are not state actors and thus not subject to the Constitution's due process requirements.").  What is more, while FINRA must rely on voluntary compliance with its investigations, if this Court were to accept petitioners' view of SRO action, broker-dealers and their associated persons could thwart FINRA's investigative and enforcement efforts by refusing to submit to interviews or provide documents on constitutional grounds.  *Cf. D.L. Cromwell*, 279 F.3d at 156.  And imagination would be the only limit on First Amendment and myriad other claims that members or associated persons could bring with respect to FINRA rules and actions.

The broader implications of petitioners' theory are no less profound.  As the Seventh Circuit recognized, a rationale that treats SROs as state actors would also "bring under the Fifth Amendment much of the private sector, ranging from hospitals to railroads."  *Bernstein*, 738 F.2d at 186.  After all, participants in those industries are regulated by federal agencies and must submit rules, rates, or other actions for agency approval.  The same is true of public utilities.

Such an outcome would be antithetical to the "area of individual freedom" that is secured by the state-action doctrine.  *Lugar*, 457 U.S. at 936.  It would also

contradict Congress's repeatedly expressed intent for SROs to remain private actors, with all the flexibility and efficiency that attend that status.  Congress specifically sought to avoid transforming SROs into "[g]overnment agencies," S. Rep. No. 94-75, at 28-29, because "it would be self-defeating to saddle the self-regulatory organizations with the whol[e] panoply of Governmental administrative procedure." *Id*. at 29.  Congress opted instead for "the flexibility and informality of [SROs'] decision-making procedures" that are chief virtues of self-regulation.  *Id.*  Treating SROs as state actors would not only upend the well-functioning status quo.  It would also profoundly undermine the very reasons that Congress elected self-regulation in the first place.

## CONCLUSION

*Amicus* FINRA urges this Court to hold that Nasdaq's diversity rule is not subject to constitutional challenge because it does not embody state action.

Respectfully submitted,

*/s/ Aaron M. Streett*
Aaron M. Streett
Elisabeth C. Butler
BAKER BOTTS L.L.P.
910 Louisiana Street
Houston, Texas 77002-4995
(713) 229-1234

Bridget Moore
BAKER BOTTS L.L.P.
700 K Street, NW
Washington, D.C. 20001
(202) 639-7700

Robert L.D. Colby
Timothy W. Mountz
Angela Saffoe
FINANCIAL INDUSTRY REGULATORY
AUTHORITY, INC.
1735 K Street, NW
Washington, D.C. 20006
(202) 728-8210

*Counsel for Amicus Curiae*

# CERTIFICATE OF SERVICE

This will certify that a true and correct copy of the above document was served on this the 25th day of February, 2022, via the Court's CM/ECF system on all counsel of record.

*/s/ Aaron M. Streett*
Aaron M. Streett
*Counsel of Record for Amicus Curiae*

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because this brief contains 6,206 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using the Microsoft Office Word software in 14-point Times New Roman type style.

*/s/ Aaron M. Streett*
Aaron M. Streett
*Counsel of Record for Amicus Curiae*