No. 21-60626

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____

ALLIANCE FOR FAIR BOARD RECRUITMENT,
NATIONAL CENTER FOR PUBLIC POLICY RESEARCH,

*Petitioners*,

v.

SECURITIES & EXCHANGE COMMISSION,

*Respondent*.

_____

On Petition for Review of an Order of the Securities
& Exchange Commission, No. 34-92590

_____

## BRIEF OF *AMICUS CURIAE* AMERICAN CIVIL LIBERTIES UNION,
## INC. IN SUPPORT OF RESPONDENT
## SECURITIES AND EXCHANGE COMMISSION AND INTERVENOR THE
## NASDAQ STOCK MARKET LLC

_____

Brian Hauss
Sandra S. Park
AMERICAN CIVIL LIBERTIES
  UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2500
bhauss@aclu.org
spark@aclu.org

*Counsel for Amicus Curiae*

**SUPPLEMENTAL STATEMENT OF INTERESTED PERSONS**

The undersigned counsel of record for *Amicus Curiae* certifies that the following additional persons and entities as described in Fifth Circuit Rule 29.2.1 have an interest in the outcome of this case.

1. *Amicus Curiae* American Civil Liberties Union, Inc. is a non-profit membership organization and has no parent corporations or subsidiaries, and no publicly held corporation holds ten percent or more of its stock.

2. Brian Hauss and Sandra S. Park—Counsel for *Amicus Curiae* American Civil Liberties Union, Inc.


Dated: February 25, 2022          */s/ Brian Hauss*
                                  Brian Hauss

## STATEMENT PURSUANT TO <u>FED. R. APP. P. 29(a)(4)(E)</u>

Pursuant to <u>Federal Rule of Appellate Procedure 29(a)(4)(E)</u>, counsel for *Amicus Curiae* certifies that no person or entity, other than *Amicus Curiae*, its members, or its counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief in whole or in part. All parties to this case have consented to the filing of this *amicus curiae* brief.

Dated: February 25, 2022             <u>*/s/ Brian Hauss*</u>
                                     Brian Hauss

# TABLE OF CONTENTS

SUPPLEMENTAL STATEMENT OF INTERESTED PERSONS ..........................i

STATEMENT PURSUANT TO FED. R. APP. P. 29(a)(4)(E) .............................. ii

TABLE OF AUTHORITIES.......................................................................iv

INTEREST OF AMICUS CURIAE.............................................................1

SUMMARY OF ARGUMENT..................................................................2

ARGUMENT .........................................................................................4

I.  Nasdaq's Board Diversity Rule Does Not Constitute State Action...................4

II.  The SEC's Decision to Approve Nasdaq's Rule Is Consistent with the Exchange Act and Supported by the First Amendment. ................................10

    A.  The SEC Reasonably Concluded that the Board Diversity Rule Is Consistent with the Exchange Act Because It Facilitates the Disclosure of Information Important to Investor Decision-making..............................12

    B.  The Public's First Amendment Interest in Receiving Corporate Board Diversity Information, and Nasdaq's First Amendment Interest in Providing It, Support the SEC's Decision to Approve Nasdaq's Rule....17

CONCLUSION ....................................................................................20

CERTIFICATE OF COMPLIANCE ......................................................22

CERTIFICATE OF SERVICE...............................................................23

# TABLE OF AUTHORITIES

## Cases

*Albert v. Carovano*,
  851 F.2d 561 (2d Cir. 1988)....................................................................8

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ...........................................................................13

*Blum v. Yaretsky*,
  457 U.S. 991 (1982) .........................................................................7, 8

*D.L. Cromwell Invs., Inc. v. NASD Regul., Inc.*,
  279 F.3d 155 (2d Cir. 2002) ..............................................................5

*Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*,
  518 U.S. 727 (1996) ...............................................................1, 5, 7, 9

*Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc.*,
  191 F.3d 198 (2d Cir. 1999)............................................................6, 8

*Duffield v. Robertson Stephens & Co.*,
  144 F.3d 1182 (9th Cir. 1998).............................................................8

*First Jersey Secs., Inc. v. Bergen*,
  605 F.2d 690 (3d Cir. 1979)...............................................................5

*Flagg Bros., Inc. v. Brooks*,
  436 U.S. 149 (1978) ............................................................................5

*Hague v. CIO*,
  307 U.S. 496 (1939) ............................................................................1

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*,
  515 U.S. 557 (1995) ..........................................................................18

*Intercont'l Indus., Inc. v. Am. Stock Exch.*,
  452 F.2d 935 (5th Cir. 1971)...............................................................6

*Jackson v. Metro. Edison Co.*,
  419 U.S. 345 (1974) ............................................................................6

*Jones v. SEC*,
  115 F.3d 1173 (4th Cir. 1997)..............................................................5

*Kokesh v. SEC*,
  137 S. Ct. 1635 (2018) ......................................................................13

*Lugar v. Edmondson Oil Co.*,
  457 U.S. 922 (1982) ..........................................................................5

*Manhattan Cmty. Access Corp. v. Halleck*,
  139 S. Ct. 1921 (2019) ...............................................................1, 5, 6

*New York Times Co. v. Sullivan*,
  376 U.S. 254 (1964) ..........................................................................1

*New York Times Co. v. United States*,
  403 U.S. 713 (1971) ..........................................................................1

*Rundus v. City of Dallas*,
  634 F.3d 309 (5th Cir. 2011)............................................................9

*Sistrunk v. City of Strongsville*,
  99 F.3d 194 (6th Cir. 1996)..................................................9, 10, 18

*Thornhill v. Alabama*,
  310 U.S. 88 (1940) ..........................................................................17

*UAW, Local No. 5285 v. Gaston Festivals, Inc.*,
  43 F.3d 902 (4th Cir. 1995)..............................................................9

*Underwager v. Salter*,
  22 F.3d 730 (7th Cir. 1994)............................................................18

*United States v. Solomon*,
  509 F.2d 863 (2d Cir. 1975)..........................................................5, 6

*Villegas v. Gilroy Garlic Festival Ass'n*,
  541 F.3d 950 (9th Cir. 2008)............................................................9

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,
  425 U.S. 748 (1976) ........................................................................17

*W. Virginia State Bd. of Educ. v. Barnette*,
  319 U.S. 624 (1943) ..........................................................................1

*Wheat v. Mass*,
  994 F.2d 273 (5th Cir. 1993)............................................................5

*Whitney v. California*,
  274 U.S. 357 (1927) ..........................................................................1

**Statutes**

15 U.S.C. § 78 ........................................................................10, 11

## Regulations

*Self-Regulatory Organizations; the Nasdaq Stock Market LLC; Order
   Approving Proposed Changes, as Modified by Amendment No. 1, to
   Adopt Listing Rules Related to Board Diversity and to Offer Certain
   Listed Companies Access to a Complimentary Board Recruiting Service*,
   <u>86 Fed. Reg. 44,424</u> (Aug. 12, 2021) ...........................................................passim

## Other Authorities

Am. Arb. Ass'n, *Code of Ethics for Arbitrators in Commercial
   Disputes* (2004) ......................................................................................................19

John C. Coffee, *Racing Towards the Top?: The Impact of Cross-Listings
   and Stock Market Competition on International Corporate Governance*,
   102 Colum. L. Rev. 1757 (2002) .........................................................................20

John Maynard Keynes, *General Theory of Employment, Interest and Money*
   (Harvest/Harcourt, Inc. 1st ed. 1964) (1936) .......................................................15

Letter from Anthony D. Romero, Executive Director, Am. Civil Liberties
   Union, to Vanessa Countryman, Secretary, U.S. Secs. & Exchange Comm.,
   in Support for File No. SR-NASDAQ-2020-081, Related to Board Diversity
   (Dec. 23, 2020).........................................................................................................2

## INTEREST OF AMICUS CURIAE

The American Civil Liberties Union ("ACLU") is a nationwide, non-partisan, non-profit organization dedicated to the principles of liberty and equality embodied in the Constitution and our nation's civil rights laws. Since its founding in 1920, the ACLU has appeared in numerous cases involving the exercise of First Amendment rights. *See, e.g.*, *Whitney v. California*, 274 U.S. 357 (1927); *Hague v. CIO*, 307 U.S. 496 (1939); *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943); *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964); and *New York Times Co. v. United States*, 403 U.S. 713 (1971). The ACLU also served as counsel for Petitioners in *Denver Area Educational Telecommunications Consortium, Inc. v. FCC*, 518 U.S. 727 (1996), and submitted an *amicus curiae* brief in support of Respondents in *Manhattan Community Access Corp. v. Halleck*, 139 S. Ct. 1921 (2019).

Because this case requires the Court to distinguish between private action, which is protected by the First Amendment, and state action, which is constrained by the First Amendment, its proper resolution is a matter of significant concern to the ACLU and its members. Additionally, the ACLU submitted a statement supporting Nasdaq's proposed rule before Respondent Securities and Exchange Commission. Letter from Anthony D. Romero, Executive Director, Am. Civil Liberties Union, to Vanessa Countryman, Secretary, U.S. Secs. & Exchange Comm.,

in Support for File No. SR-NASDAQ-2020-081, Related to Board Diversity (Dec. 23, 2020), *available at* https://bit.ly/36sEn7k.

## SUMMARY OF ARGUMENT

In response to investor demand for access to information about the diversity of corporate boards of directors, Nasdaq promulgated a Board Diversity Rule. The rule requires companies that choose to list on Nasdaq's stock exchange to publicly disclose aggregate data on the self-identified gender and racial characteristics and LGBTQ+ status of the company's corporate board. If the company's board does not meet certain diversity criteria, the rule requires the company to provide an explanation. The rule does not authorize Nasdaq to evaluate the substance or merits of the company's explanation. As required under the Securities Exchange Act of 1934, Nasdaq submitted its proposed rule to the Securities and Exchange Commission, which approved the rule after notice-and-comment.

Petitioners argue *inter alia* that the Board Diversity Rule violates the First and Fifth Amendments. But Nasdaq's rule does not constitute state action, and therefore cannot violate the First or Fifth Amendments. Numerous circuits have held that self-regulatory organizations (SROs) like Nasdaq are not state actors under the Constitution. And although the SEC approved Nasdaq's rule, it neither solicited the rule nor played any role in its drafting. Under these circumstances, Nasdaq's private

2

rule cannot be attributed to the government, there is no state action, and Petitioners' First and Fifth Amendment rights are not implicated.

The state action doctrine is central to the question of whether the First Amendment constrains or protects Nasdaq. Because Nasdaq is a private party, it has its own First Amendment rights, including the right to editorial autonomy—which it exercised here in deciding what information companies must disclose in order to list on its exchange. If this Court concludes that Nasdaq's exercise of its own First Amendment rights constitutes state action implicating listed companies' First Amendment rights, it will be drawn into thorny debates about how to balance the competing First Amendment rights of the exchange and its listed companies. Moreover, treating SROs' disclosure rules as state action would open the door to any number of challenges to the editorial autonomy of other private entities.

Petitioners also argue that the SEC's decision to approve the Board Diversity Rule was arbitrary and capricious. To the contrary, the SEC correctly concluded that the rule is consistent with the Exchange Act because it facilitates the public dissemination of corporate board diversity information. Whether motivated by moral conviction or economic self-interest, many investors support the diversification of corporate boards to ensure that underrepresented communities have a seat at the table. While Petitioners dispute whether corporate board diversity improves firm performance, the Court need not resolve this dispute. Nasdaq's rule merely ensures

3

that investors have access to the facts so that they can make their own decisions. Any company that would prefer not to disclose information about the diversity of its corporate board is free to vote with its feet by transferring its listing to another exchange.

Additionally, First Amendment considerations support the SEC's decision to approve Nasdaq's rule. On the one hand, the First Amendment favors robust public access to both commercial and noncommercial information, which facilitates both informed private decision-making and public debate. On the other, Nasdaq has a First Amendment interest in supplementing the government's disclosure requirements with its own rules for companies that choose to list on its exchange. The disclosures produced pursuant to these rules collectively constitute Nasdaq's speech to its investors and the public at large. The SEC's decision is therefore consistent with both the public's interest in receiving information and Nasdaq's interest in providing it.

For these reasons, *Amicus* respectfully submits that this Court should deny the Petitions.

## ARGUMENT

### I.     Nasdaq's Board Diversity Rule Does Not Constitute State Action.

Petitioners' constitutional claims stumble at the state action threshold. It is axiomatic that "most rights secured by the Constitution," including First and Fifth

Amendment rights, "are protected only against infringement by governments." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 936 (1982) (quoting *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 156 (1978)); *see also, e.g.*, *Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*, 518 U.S. 727, 737 (1996) (plurality opinion of Breyer, J.); *Wheat v. Mass*, 994 F.2d 273, 276 (5th Cir. 1993) (collecting cases). In the First Amendment context, in particular, the state action doctrine prevents judicial interference with private entities' editorial autonomy. *See Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1932 (2019). Thus, to prevail on their constitutional claims, Petitioners must demonstrate either that Nasdaq is a state actor or that Nasdaq's Board Diversity Rule is actually attributable to the government, rather than to Nasdaq. *See Lugar*, 457 U.S. at 937.

Numerous courts have recognized that SROs such as the National Association of Securities Dealers (NASD) and the New York Stock Exchange are not state actors bound by the Constitution. *See, e.g.*, *D.L. Cromwell Invs., Inc. v. NASD Regul., Inc.*, 279 F.3d 155, 162 (2d Cir. 2002) ("It has been found, repeatedly, that the NASD itself is not a government functionary." (collecting cases)); *accord Jones v. SEC*, 115 F.3d 1173, 1183 (4th Cir. 1997), *cert. denied*, 523 U.S. 1072 (1998); *First Jersey Secs., Inc. v. Bergen*, 605 F.2d 690, 698 (3d Cir. 1979), *cert. denied*, 444 U.S. 1074 (1980); *see also United States v. Solomon*, 509 F.2d 863, 867–71 (2d Cir. 1975) (holding that the New York Stock Exchange is not a state actor). The same holds

true here. The factors relied on by Petitioners to impute state action do not support a different result.

Petitioners argue that the regulatory regime governing SROs supports the conclusion that they are state actors. Opening Brief for Petitioner Alliance for Fair Board Recruitment ("Alliance Br.") 21–22; Opening Brief for Petitioner National Center for Public Policy Research ("NCPPR Br.") 16–18. However, as the Supreme Court recently stated, "[T]he 'being heavily regulated makes you a state actor' theory of state action is entirely circular and would significantly endanger individual liberty and private enterprise." *Manhattan Cmty. Access Corp.*, 139 S. Ct. at 1932; *see also Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc.*, 191 F.3d 198, 206 (2d Cir. 1999) (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 350 (1974)).[1]

Such a rule would "be especially problematic in the speech context, because it could eviscerate certain private entities' rights to exercise editorial control" over the speech of third parties. *Manhattan Cmty. Access Corp.*, 139 S. Ct. at 1932. The First Amendment ordinarily does not apply to a private party's decisions to permit,

---

[1] Petitioners cite this Court's decision in *Intercontinental Industries, Inc. v. American Stock Exchange*, 452 F.2d 935 (5th Cir. 1971), for the proposition that the regulatory relationship between the national securities exchanges and the SEC makes the exchanges state actors. Alliance Br. 21–22; NCPPR Br. 19–20. The passage on which Petitioners rely, however, is self-identified dicta. *See Intercont'l Indus.*, 452 F.3d at 941. Furthermore, whatever persuasive value it might have was undermined by the Supreme Court's subsequent decision in *Jackson*, which held that extensive state regulation of a private entity does not convert the entity into a state actor. *See Solomon*, 509 F.2d at 871.

restrict, or compel speech, "even where those decisions take place within the framework of a regulatory regime." *Denver Area*, <u>518 U.S. at 737</u> (plurality opinion of Breyer, J.). "Were that not so, courts might have to face the difficult, and potentially restrictive, practical task of deciding which, among any number of private parties . . . is the 'speaker' whose rights may not be abridged." *Id.* Moreover, "a court's decision that a private party . . . is a 'censor,' could itself interfere with that private 'censor's' freedom to speak as an editor" of third-party speech. *Id.* at 737–38.

Petitioners alternatively argue that, even if Nasdaq is not itself a government entity, its Board Diversity Rule should be attributed to the government because the SEC approved it. Alliance Br. 22–23; NCPPR Br. 18–20. But government approval of a private party's rule does not, by itself, convert the rule into state action. "Mere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the [government] responsible for those initiatives." *Blum v. Yaretsky*, <u>457 U.S. 991, 1004–05</u> (1982). That principle applies even when the private party is heavily regulated by the government. *See id.* at 1004 (observing that "nursing homes in New York are extensively regulated").

Thus, *Blum* held that state laws requiring nursing homes to make detailed medical assessments regarding the transfer or discharge of Medicaid patients was not sufficient to convert the nursing homes' transfer and discharge decisions into

state action, because those transfer or discharge decisions "ultimately turn[ed] on medical judgments made by private parties according to professional standards that are not established by the State." *Id.* at 1008. Similarly, in *Albert v. Carovano*, 851 F.2d 561 (2d Cir. 1988) (en banc), the Second Circuit held that a private university's disciplinary action against a student was not fairly attributable to the state, where the only factor advanced in support of state action was the fact that state law required the university to formulate a disciplinary code and submit it for state approval. *Id.* at 570–71.

Applying these principles in *Desiderio*, the Second Circuit held that an arbitration clause contained in an SRO's registration form was not fairly attributable to the SEC, despite the fact that the SEC approved the registration form. 191 F.3d at 207. The court reasoned that the arbitration clause could not be fairly attributed to the government, because "no SEC rule or action that has been called to our attention encourages the NASD to compel arbitration," and because the arbitration clause itself "was drafted by the NASD in cooperation with other self-regulatory organizations, with no encouragement from the SEC." *Id.* Although "the SEC approved the arbitration clause in Form U–4," this was "not enough" to convert the clause into state action. *Id.*; *accord Duffield v. Robertson Stephens & Co.*, 144 F.3d 1182, 1201–02 (9th Cir. 1998), *overruled on other grounds by EEOC v. Luce, Forward, Hamilton & Scripps*, 345 F.3d 742 (9th Cir. 2003) (en banc).

To the same effect, this Court and others have refused to find state action when the government merely authorizes a private party to establish its own speech rules in the performance of a traditionally nonpublic function. *See, e.g.*, *Rundus v. City of Dallas*, 634 F.3d 309, 315 (5th Cir. 2011); *Villegas v. Gilroy Garlic Festival Ass'n*, 541 F.3d 950, 954–56 (9th Cir. 2008) (en banc); *Sistrunk v. City of Strongsville*, 99 F.3d 194, 198–200 (6th Cir. 1996); *UAW, Local No. 5285 v. Gaston Festivals, Inc.*, 43 F.3d 902, 910–11 (4th Cir. 1995). As discussed above, stable limits on the state action doctrine are necessary to ensure that the government's regulation of a private party does not give rise to judicial interference with the private party's own First Amendment rights. *See Denver Area*, 518 U.S. at 737–38 (plurality opinion of Breyer, J.).

These concerns underscore the impropriety of treating Nasdaq's private rule as state action merely because the SEC approved it. In *Sistrunk*, for example, the plaintiff alleged that the city unconstitutionally approved a private group's plan to exclude anti-Bush messages from a permitted George H.W. Bush rally on the city commons. 99 F.3d at 195–96. The Sixth Circuit rejected the plaintiff's First Amendment claim, writing: "[E]ven if plaintiff has alleged sufficient facts to establish that the city authorized the committee to exclude members of the public who sought to express a discordant message, plaintiff has not alleged that the city violated plaintiff's free speech rights; rather, plaintiff has only established that the

9

city permitted the committee to exercise its free speech rights and autonomy over the content of its own message." *Id.* at 200.

The same principle is fatal to Petitioners' constitutional claims in this case. The rules at issue here are attributable to Nasdaq, not the government. The SEC did not compel or even solicit Nasdaq's rule; indeed, it had no role whatsoever in the rule's drafting. The fact that the SEC allowed Nasdaq to establish its own disclosure requirements for Nasdaq-listed companies is insufficient to establish state action. A contrary ruling would invite countless lawsuits challenging the editorial autonomy of many other private entities subject to government regulation.

## II.     The SEC's Decision to Approve Nasdaq's Rule Is Consistent with the Exchange Act and Supported by the First Amendment.

Petitioners' Administrative Procedure Act challenge also fails, because the SEC did not act arbitrarily and capriciously in approving Nasdaq's Board Diversity Rule. As the SEC determined, the rule is consistent with the Exchange Act because it facilitates public access to corporate governance information of significant interest to investors. The SEC's application of the Exchange Act is also supported by the First Amendment, which favors both public access to truthful, non-misleading corporate governance information, and Nasdaq's right to impose its own disclosure rules on companies that choose to list on its exchange.

The Exchange Act established a minimum threshold of corporate disclosure in capital markets, 15 U.S.C. §§ 78m, 78n, and authorized the SEC to supervise the

exchanges, *id.* § 78s. But the Act did not preempt the exchanges' authority to promulgate their own corporate governance rules. Instead, Congress instructed that the SEC "shall" approve an exchange's proposed change to its own rules "if [the SEC] finds that such proposed rule change is consistent with the requirements" of the Act and its implementing regulations. *Id.* § 78s(b)(2)(C)(i).

A proposed exchange rule is consistent with the Exchange Act if it is designed to: (i) "prevent fraudulent and manipulative acts and practices"; (ii) "promote just and equitable principles of trade"; (iii) "foster cooperation and coordination with persons engaging in regulating, clearing, settling, processing information with respect to, and facilitating transactions in securities"; (iv) "remove impediments to and perfect the mechanism of a free and open market and a national market system"; or (v) "protect investors and the public interest." *Id.* § 78f(b)(5).

On the other hand, a proposed exchange rule is inconsistent with the Exchange Act if it is "designed to permit unfair discrimination between customers, issuers, brokers, or dealers, or to regulate by virtue of any authority conferred by [the Act] matters not related to the purposes of [the Act] or the administration of the exchange," *id.*, or if it would "impose any burden on competition [that is] not necessary or appropriate," *id.* § 78f(b)(8).

**A.    The SEC Reasonably Concluded that the Board Diversity Rule Is Consistent with the Exchange Act Because It Facilitates the Disclosure of Information Important to Investor Decision-making.**

In this case, the SEC concluded that Nasdaq's Board Diversity Rule is consistent with the Exchange Act because it would "remove impediments to and perfect the mechanism of a free and open market and a national market system and protect investors and the public interest." *Self-Regulatory Organizations; the Nasdaq Stock Market LLC; Order Approving Proposed Changes, as Modified by Amendment No. 1, to Adopt Listing Rules Related to Board Diversity and to Offer Certain Listed Companies Access to a Complimentary Board Recruiting Service*, 86 Fed. Reg. 44,424, 44,438 (Aug. 12, 2021). This subsection focuses on the informational benefits of the required disclosures. The second subsection focuses on the First Amendment interests supporting those disclosures, since they are procured by a private party.

In approving the Board Diversity Rule, the SEC observed that the rule "would make consistent and comparable information relating to the corporate governance of Nasdaq-listed companies (i.e., information regarding board diversity) widely available on the same basis to investors, which would increase efficiency for investors that gather and use this information." *Id.* Although some commenters argued that the rule would "redefine the purpose of Nasdaq-listed companies' businesses in a way that is unrelated to traditional business purposes," the SEC

rejected this contention. *Id.* Instead, it found that the transparency promoted by the rule "could enhance investors' investment and voting decisions." *Id.*

The SEC's decision to approve Nasdaq's Board Diversity Rule was not arbitrary and capricious. As the Supreme Court has instructed on multiple occasions, "[d]isclosure, and not paternalistic withholding of accurate information, is the policy chosen and expressed by Congress" in enacting the federal securities laws. *Basic Inc. v. Levinson*, 485 U.S. 224, 234 (1988); *see also Kokesh v. SEC*, 137 S. Ct. 1635, 1640 n.1 (2018). In addition to facilitating informed investment and shareholder voting decisions, robust disclosure requirements promote market fairness by ensuring that all shareholders and prospective investors—not only those with the resources, influence, and expertise to collect and compare the relevant data—have access to information that might affect the value or performance of a given security. *See* 86 Fed. Reg. at 44,433.

Corporate board diversity information is a matter of significant market interest, as demonstrated by the numerous comments submitted to the SEC in support of Nasdaq's Board Diversity Rule. *See id.* at 44,430 & n.92 (identifying several examples of institutional investors, investment managers, and individual investors who support the rule). In a world where companies compete vigorously to attract and retain employees, customers, and business partners from diverse communities in the United States and all over the world, many investors have

concluded that corporate board diversity promotes "improved board decision-making, corporate governance, financial performance or shareholder value, risk mitigation, innovation, investor protection, investor confidence, and corporate culture." *Id.* at 44,431 & nn.100–07. These beliefs are reasonably grounded in a number of academic studies showing that corporate board diversity enhances shareholder value. *See id.* at 44,432 & nn.119, 120.

Petitioners suggest that investors' interest in information about corporate board diversity carries no weight under the Exchange Act, because the SEC identified other studies with different results and "concluded that '[t]aken together, studies of the effects of board diversity [on firm performance] are generally inconclusive.'" NCPPR Br. 40 (first alteration in original) (quoting 86 Fed. Reg. at 44,432). But investors are not obligated to abide by the SEC's appraisal of the academic literature. They may believe—based on their own analysis, their own evidence, or their intuition—that corporations leading on equity and inclusion will have greater resonance with diverse constituencies. They may support corporate board diversity because they share the moral conviction that underrepresented communities deserve a seat at the corporate table. Or they may conclude that corporate board diversity is important because other investors consider it important. *See* John Maynard Keynes, *General Theory of Employment, Interest and Money* 156

14

(Harvest/Harcourt, Inc. 1st ed. 1964) (1936) ("[W]e devote our intelligences to anticipating what average opinion expects the average opinion to be.").

Whatever their reasons, investors who care about this issue will benefit from the wide availability of corporate board diversity information. "Board-level diversity statistics are currently not widely available on a consistent and comparable basis." 86 Fed. Reg. at 44,425. By "defin[ing] 'Diverse' for purposes of the proposed disclosures and . . . requir[ing] consistent format and timing for the proposed disclosures," Nasdaq's Board Diversity Rule "make[s] it more efficient and less costly for investors to collect, use, and compare information on board diversity." *Id.* at 44,430. This information "could inform [investors'] decision[s] on issues related to corporate governance, including director elections." *Id.* at 44,431. And "company explanations as to why they do not meet the diversity objectives could better inform those investors as to the risks and costs of increased board diversity." *Id.*

As the SEC found, "[t]he reduced cost and improved efficiency in collecting, using, and comparing such information could enhance investors' investment and voting decision-making processes, and enhance investors' ability to make informed investment and voting decisions." *Id.* at 44,430. Moreover, by "mak[ing] such information widely available on the same basis to all investors," Nasdaq's rule "mitigate[s] any concerns regarding unequal access to information that may currently exist between certain (likely larger and more resourceful) investors who

could obtain the information and other (likely smaller) investors who may not be able to do so." *Id.* In short, like many disclosure rules, the Board Diversity Rule promotes both market efficiency and market fairness.

The SEC also found that the costs imposed by Nasdaq's Board Diversity Rule are "limited." *Id.* at 44,433. Investors who believe that corporate board diversity is irrelevant to firm performance are not harmed by the availability of this information; they can either ignore it entirely or use it to inform their own voting and investment decisions. *Id.* at 44,431. In other words, investors are free to exercise their discretion in determining whether and how to weight corporate board diversity information. By contrast, an order striking the Board Diversity Rule would obstruct investors from accessing information that they might find useful.

Furthermore, the mandated disclosures are not extensive. The rule requires only that listed companies disclose aggregate information about the diversity of their boards based on directors' voluntary self-identification. *Id.* at 44,425. And, although the rule requires companies that do not meet applicable diversity objectives to provide an explanation, Nasdaq does "not evaluate the substance or merits of a company's explanation." *Id.* at 44,426. Finally, a company that prefers not to make the required disclosures "may transfer its listing to another exchange," *id.* at 44,436, or take itself private.

**B.     The Public's First Amendment Interest in Receiving Corporate Board Diversity Information, and Nasdaq's First Amendment Interest in Providing It, Support the SEC's Decision to Approve Nasdaq's Rule.**

The SEC's Exchange Act analysis of the Board Diversity Rule is buttressed by First Amendment considerations. The Supreme Court has long recognized the public interest in access to both commercial and noncommercial information. *See, e.g.*, *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 765 (1976) (stating that, under America's "free enterprise economy," "the free flow of commercial information" ensures that individual economic "decisions, in the aggregate, [are] intelligent and well informed," and promotes the "formation of intelligent opinions as to how [the market] system ought to be regulated or altered"); *Thornhill v. Alabama*, 310 U.S. 88, 102 (1940) ("Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period.").

As discussed above, public disclosure of truthful, non-misleading corporate governance information promotes informed investment and shareholder voting decisions, which is an important public good. The public disclosure of this information will also facilitate broader public discussion about corporate governance issues and, ultimately, public oversight of the economy. For example, academic and industry researchers may use the disclosures produced pursuant to Nasdaq's Board

Diversity Rule to reach more definite conclusions about the relationship between board diversity and firm performance. *Cf. Underwager v. Salter*, 22 F.3d 730, 736 (7th Cir. 1994) ("More papers, more discussion, better data, and more satisfactory models . . . mark the path toward superior understanding of the world around us.").

In addition, because Nasdaq is a private party, it has its own First Amendment interest in establishing disclosure rules for Nasdaq-listed companies. Although Nasdaq is not speaking directly to the public, it is speaking indirectly by determining what information its listed companies must disclose. As the Supreme Court recognized in *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557 (1995), "First Amendment protection" does not "require a speaker to generate, as an original matter, each item featured in the communication." *Id.* at 570. A newspaper editor's decision about which op-eds to publish, a cable operator's decision about what programs or commercials to air, and a parade organizer's decision about which contingents to include all involve exercises of First Amendment rights—even if the underlying speech is originated by third parties. *Id.* When a private party coordinating group expression excludes certain messages, or mandates others, it is exercising editorial "autonomy over the content of its own message." *Sistrunk*, 99 F.3d at 200.

The principle of editorial autonomy applies to all sorts of private-party rules mandating speech. For example, the American Arbitration Association (AAA)

18

requires commercial arbitrators to disclose "any known existing or past financial, business, professional or personal relationships which might reasonably affect impartiality or lack of independence in the eyes of any of the parties." Am. Arb. Ass'n, *Code of Ethics for Arbitrators in Commercial Disputes* 3 (2004) (Canon II(A)(2)), *available at* https://bit.ly/3GHgLZ9. Along the same lines, a media company may require its journalists to publicly disclose potential conflicts of interest. A restaurant chain may require its franchise operators to disclose nutrition information to their customers. And the Boy Scouts may compel members to recite the Scout Oath or to wear certain Scout insignia. In all of these cases, the leader of a private group enterprise has its own First Amendment interest in requiring the enterprise's voluntary participants to disclose certain information or communicate a particular message. Where these rules are imposed by private parties, without state action, they do not offend the First Amendment; they are in fact exercises of First Amendment rights.

The editorial-autonomy principle also applies to Nasdaq's disclosure rules, including the Board Diversity Rule. While each Nasdaq-listed company's disclosure is individually attributable to that enterprise, the sum total of disclosures produced pursuant to Nasdaq's rules constitute the exchange's speech to its investors. By responding to market demands for corporate governance information, Nasdaq's disclosure rules enhance Nasdaq's reputation for promoting good corporate

governance among its listed companies; incentivize companies to leverage the reputational benefits of listing on Nasdaq in order to maximize share value; and distinguish Nasdaq from rival exchanges with less stringent disclosure requirements. *See* John C. Coffee, *Racing Towards the Top?: The Impact of Cross-Listings and Stock Market Competition on International Corporate Governance*, 102 Colum. L. Rev. 1757, 1811–16 (2002). Nasdaq's First Amendment interest in providing this information to the public further supports the SEC's decision to approve the Board Diversity Rule.

## CONCLUSION

Whether they are motivated by personal conviction or economic self-interest, many investors are interested in the diversity of corporate boards. Nasdaq's Board Diversity Rule is a market-based attempt to satisfy this demand by requiring Nasdaq-listed companies to publicly disclose information about board diversity. Because the rule does not constitute state action, it does not violate Petitioners' constitutional rights. Furthermore, the SEC did not act arbitrarily and capriciously in approving the rule, particularly in light of the public's interest in receiving corporate governance information and Nasdaq's interest in providing it.

Dated: February 25, 2022                 Respectfully submitted,

                                         */s/ Brian Hauss*
                                         Brian Hauss
                                         Sandra S. Park
                                         AMERICAN CIVIL LIBERTIES
                                           UNION FOUNDATION
                                         125 Broad Street, 18th Floor
                                         New York, NY 10004
                                         Tel.: (212) 549-2500
                                         bhauss@aclu.org
                                         spark@aclu.org

                                         *Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limits because, excluding those parts of the brief exempted under <u>Federal Rule of Appellate Procedure 32(f)</u>, it contains 4,624 words. The brief complies with the typeface requirements of <u>Federal Rule of Appellate Procedure 32(a)(5)</u> and type-style requirements of <u>Federal Rule of Appellate Procedure 32(a)(6)</u> because it has been prepared in a proportionally spaced typeface (14-point Times New Roman) using Microsoft Word Version 16.57.

Dated: February 25, 2022           */s/ Brian Hauss*
                                   Brian Hauss

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 25th day of February, 2022, the foregoing

brief of *Amicus Curiae* American Civil Liberties Union, Inc. was filed electronically

through the Court's CM/ECF system. Notice of this filing will be sent by e-mail to

all parties by operation of the Court's electronic filing system.

> */s/ Brian Hauss*
> Brian Hauss