No. 21-60626

# In the United States Court of Appeals for the Fifth Circuit

—————————

ALLIANCE FOR FAIR BOARD RECRUITMENT,
NATIONAL CENTER FOR PUBLIC POLICY RESEARCH,

*Petitioners,*

— v. —

SECURITIES AND EXCHANGE COMMISSION,

*Respondent.*

—————————

ON PETITION FOR REVIEW OF AN ORDER OF THE UNITED
STATES SECURITIES AND EXCHANGE COMMISSION

No. 34-92590

**BRIEF OF ACADEMIC EXPERTS IN THE FIELDS OF
BUSINESS, MANAGEMENT, AND ECONOMICS AS AMICI
CURIAE IN SUPPORT OF RESPONDENT SECURITIES AND
EXCHANGE COMMISSION**

Dated: February 25, 2022

Jeffrey Dubner*
Aman T. George
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
jdubner@democracyforward.org
ageorge@democracyforward.org

Peter C. Renn
Lambda Legal Defense and
Education Fund, Inc.
4221 Wilshire Blvd., Suite 280
Los Angeles, CA 90010
(213) 382-7600
prenn@lambdalegal.org

Karen L. Loewy
Lambda Legal Defense and
Education Fund, Inc.
1776 K Street NW, 8th Floor
Washington, D.C. 20006
(202) 809-8585
kloewy@lambdalegal.org

*Counsel of Record*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

### *Petitioners*
Alliance for Fair Board Recruitment
National Center for Public Policy Research

### *Counsel for Petitioners*
Jonathan Berry, Boyden Gray & Associates
R. Trent McCotter, Boyden Gray & Assciates
Margaret A. Little, New Civil Liberties Alliance
Aditya Dynar, New Civil Liberties Alliance
Sheng Tao Li

### *Respondent*
U.S. Securities and Exchange Commission

### *Counsel for Respondent*
Daniel Matro, U.S. Securities and Exchange Commission
Vanessa Ann Countryman, U.S. Securities and Exchange Commission
Tracey A. Hardin, U.S. Securities and Exchange Commission
John Robert Rady, U.S. Securities and Exchange Commission

### *Intervenor*
Nasdaq Stock Market, L.L.C.

i

### *Counsel for Intervenor*
Allyson Newton Ho, Gibson, Dunn & Crutcher, L.L.P.
Seth D. Berlin, Ballard Spahr, L.L.P.
Bradley G. Hubbard, Gibson, Dunn & Crutcher, L.L.P.
Stephen J. Kastenberg, Ballard Spahr, L.L.P.
Paul Lanieri, III, Ballard Spahr, L.L.P.
Paulette Miniter, Gibson, Dunn & Crutcher, L.L.P.
Joanne Pedone, Nasdaq Incorporated
Amalia Elizabeth Reiss, Gibson, Dunn & Crutcher, L.L.P.
Amir Cameron Tayrani, Gibson, Dunn & Crutcher, L.L.P.
John Yetter, Nasdaq, Incorporated
John Zecca, Nasdaq, Incorporated

### *State Amici Curiae in Support of Petitioners*
State of Arizona, State of Alabama, State of Alaska, State of Arkansas, State of Florida, State of Indiana, State of Kansas, State of Kentucky, State of Louisiana, State of Mississippi, State of Missouri, State of Montana, State of Nebraska, State of Oklahoma, State of South Carolina, State of Texas, State of Utah

### *Counsel for State Amici*
Drew C. Ensign
Joseph A. Kanefield
Brunn W. Roysden III
Wilson C. Freeman
James Robers

### *Amici Curiae Nonpartisan Group of Academics and Petitioners in the Field of Corporate Governance\* in Support of Respondent*
\*Full list of Nonpartisan Group of Academics and Practitioners in the Field of Corporate Governance listed in the appendix.

### *Counsel for Nonpartisan Group of Academics and Petitioners in the Field of Corporate Governance*
Marc Wolinsky, Wachtell, Lipton, Rosen & Katz
Elaine P. Golin, Wachtell, Lipton, Rosen & Katz

### *Counsel for Nonpartisan Group of Academics and Petitioners in the Field of Corporate Governance, cont'd*

Carrie M. Reilly, Wachtell, Lipton, Rosen & Katz
Kevin S. Schwartz, Wachtell, Lipton, Rosen & Katz
Jeohn Salone Favors, Wachtell, Lipton, Rosen & Katz
Getzel Berger, Wachtell, Lipton, Rosen & Katz

### *Amici Curiae Investors and Investment Advisers in Support of Respondent*

Council of Institutional Investors
Investment Adviser Association
Northern Trust Investments, Incorporated
Ariel Investments, L.L.C.
Boston Trust Walden Company
Lord, Abett & Company, L.L.C.
Gaingels, Incorporated
Robert F. Kennedy Center for Justice & Human Rights

### *Counsel for Amici Curiae Investors and Investment Advisers*

Neal S. Manne, Susman Godfrey L.L.P.
Seven M. Shepard, Susman Godfrey L.L.P.
Arun Subramanian, Susman Godfrey L.L.P.

### *Amicus Curiae Financial Industry Regulatory Authority, Inc. in Support of Respondent*

### *Counsel for Amicus Curiae Financial Industry Regulatory Authority, Inc.*

Aaron Streett, Baker Botts L.L.P.
Elisabeth Butler, Baker Botts L.L.P.

### *Amici Curiae Ad Hoc Coalition of Nasdaq-Listed Companies in Support of Respondent*

### *Counsel for Amici Curiae Ad Hoc Coalition of Nasdaq-Listed Companies*

Pratik Shah, Akin Gump Strauss Hauer & Feld LLP
Juliana DeVries, Akin Gump Strauss Hauer & Feld LLP

### *Amici Curiae Academic Experts in the Fields of Business, Management, and Economics in Support of Respondent*

Gennaro Bernile
Douglas Cumming
Daniel P. Forbes
Aida Sijamic Wahid
Scott E. Yonker
K.J. Martijn Cremers
Amy Hillman
Frances J. Milliken
Quinetta M. Roberson

### *Counsel for Amici Curiae Academic Experts in the Fields of Business, Management and Economics*

Jeffrey Dubner, Democracy Forward Foundation
Aman T. George, Democracy Forward Foundation
Peter C. Renn, Lambda Legal Defense and Education Fund, Inc.
Karen L. Loewy, Lambda Legal Defense and Education Fund, Inc.

Dated: February 25, 2022                     Respectfully submitted,

*/s/ Jeffrey Dubner*
Jeffrey Dubner
Aman T. George
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090

Peter C. Renn
Lambda Legal Defense and
Education Fund, Inc.
4221 Wilshire Blvd., Suite 280
Los Angeles, CA 90010
(213) 382-7600

Karen L. Loewy
Lambda Legal Defense and
Education Fund, Inc.
1776 K Street NW, 8th Floor
Washington, D.C. 20006
(202) 809-8585

# Table of Contents

TABLE OF AUTHORITIES.......................................................................vii

INTERESTS OF AMICI.............................................................................1

STATEMENT REGARDING PARTIES' CONSENT................................3

ARGUMENT.............................................................................................4

    I.    Substantial record evidence supports a link between diversity and non-financial outcomes...........................................................6

    II.   Substantial record evidence supports a link between diversity and firm financial performance ..................................................17

    III.  The Nasdaq Proposal has the added benefit of facilitating transparency and further rigorous study of board dynamics and effects............................................................................................22

IV.   Further evidence continues to emerge since the Nasdaq Proposal, reinforcing the positive links between diversity and performance ........23

CONCLUSION ........................................................................................28

CERTIFICATE OF SERVICE.................................................................41

CERTIFICATE OF COMPLIANCE .......................................................42

# TABLE OF AUTHORITIES

**Page(s)**

**Statutes**

15 U.S.C. § 78 ............................................................. 5, 6, 16, 27

15 U.S.C. § 7262 ...................................................................... 12

**Regulatory Materials**

Notice of Filing of Proposed Rule Change to Adopt Listing
Rules Related to Board Diversity, 85 Fed. Reg. 80,472
(Dec. 11, 2020) ............................................................... *passim*

Order Approving Proposed Rule Changes Related to Board
Diversity and to Offer Certain Listed Companies Access
to a Complimentary Board Recruiting Service, SEC
Release No. 34-92590 (Aug. 6, 2021) ............................ *passim*

**Other Authorities**

David Abad et al., *Does gender diversity on corporate boards
reduce information asymmetry in equity markets?* 20 Bus.
Rsch. Q. 192 (Apr. 2017) ...................................................... 16

Lawrence J. Abbott et al., *Female Board Presence and the
Likelihood of Financial Restatement*¸ 26 Acct. Horizons
607 (2012) ........................................................................... 14

Kenneth R. Ahern & Amy K. Dittmar, *The Changing of the
Boards: The Impact of Firm Valuation of Mandated
Female Board Representation*, 127 Q. J. Econ. 137 (2012) ............... 20

Mary Akimoto et al., *Board Diversity and Effectiveness in
FTSE 350 Companies*, London Bus. Sch. Leadership Ins.,
SQW, and Fin. Reporting Council (July 2021), *available at*
https://www.london.edu/-/media/images/leadership-
institute-refresh/frc-board-diversity-and-effectiveness-in-
ftse-350-companies.pdf ........................................................... 9

vii

F. Arnaboldi et al., *Gender diversity and bank misconduct,*
    71 J. Corp. Fin. (2021) .......................................................... 26

*Restatements: the costly result of an error*, Baker Tilly (July
    26, 2019), *available at*
    https://www.bakertilly.com/insights/restatements-costly-
    result-error ........................................................................... 11

Gennaro Bernile, Vineet Bhagwat, and Scott Yonker, *Board
    Diversity, Firm Risk, and Corporate Policies*, 127 J. of Fin.
    Econ. 588 (2018) ............................................................. 13, 19

Vicki L. Bogan et al., *What Drives Racial Diversity on U.S.
    Corporate Boards?*, Harvard L. Sch. F. on Corp.
    Governance (Oct. 29, 2021), *available at*
    https://ssrn.com/abstract=3952897 .............................. 21, 24

David A. Carter et al., *The Gender and Ethnic Diversity of
    US Boards and Board Committees and Firm Financial
    Performance*, 18 Corp. Governance: An Int'l. Rev. 396
    (2010) ................................................................................... 18

Yu Chen, John Daniel Eshleman, and Jared S. Soileau,
    *Board Gender Diversity and Internal Control Weaknesses*,
    33 Advances in Acct. 11 (2016) ........................................... 12

Barnali Choudhury, *New Rationales for Women on Boards*
    34 Oxford J. of Legal Stud. 511 (2014) ................................. 9

Credit Suisse, *The CS Gender 3000: Women in Senior
    Management* (Sept. 2014), *available at* https://www.credit-
    suisse.com/media/assets/corporate/docs/about-
    us/research/publications/the-cs-gender-3000-women-in-
    senior-management.pdf ....................................................... 19

Credit Suisse ESG Rsch., *LGBT: The value of diversity* (Apr. 15, 2016), *available at* https://research-doc.credit-suisse.com/docView?language=ENG&source=emfromsend link&format=PDF&document_id=807075590&extdocid=8 07075590_1_eng_pdf&serialid=evu4wNcHexx7kusNLaZQ phUkT9naxi1PvptZQvPjr1k%3d........................................................ 20

Douglas Cumming et al., *Gender Diversity and Securities Fraud*, 58 Acad. of Mgmt. J. 1572 (Feb. 2015) ............................. 14, 27

Lawrence A. Cunningham, *Lessons from Quality Shareholders on Corporate Governance Practice, Research and Scholarship*, 5 Geo. Wash. Bus. & Fin. L. Rev. 1 (2021) ........................................................................................ 27, 28

Meggin Thwing Eastman et al., *The tipping point: Women on boards and financial performance*, MSCI (Dec. 2016), *available at* https://www.msci.com/documents/%2010199/fd1f8228-cc07-4789-acee-3f9ed97ee8bb ............................................... 19

Larry Fauver et al., *Board Reforms and Firm Value: Worldwide Evidence*, 125 J. Fin. Econ. 120 (2017)............................ 22

FCLTGlobal, *The Long-term Habits of a Highly Effective Corporate Board* (Mar. 2019), *available at* https://www.fcltglobal.org/wp-content/uploads/long-term-habits-of-highly-effective-corporate-boards.pdf.................................. 19

Brian Feinstein at al., *Board Diversity Matters: An Empirical Assessment of Community Lending at Federal Reserve-Regulated Banks* (Jan. 5, 2022), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4000 110 ..................................................................................... 24

Daniel P. Forbes & Frances J. Milliken, *Cognition and Corporate Governance: Understanding Boards of Directors as Strategic Decision-Making Groups*, 24 Acad. of Mgmt. Rev. 489 (1999)........................................................................ 7

John Gillespie & David Zweig, *BOOKS: The Failure of Corporate Boards and the Price We All Pay*, Bus. Ethics (Jan. 18, 2010), *available at* https://business-ethics.com/2010/01/18/885/ .................................................................... 8

Ferdinand A. Gul et al., *Does board gender diversity improve the informativeness of stock prices?* 51 J. of Acct. & Econ. 314 (2011) ......................................................................................... 11

Verlin B. Hinsz et al., *The Emerging Conceptualization of Groups as Information Processors*, 121 Psych. Bull. (1997)................ 9

Vivian Hunt et al., *Diversity Matters*, McKinsey & Company (Feb. 2, 2015), *available at* https://www.mckinsey.com/insights/organization/~/media/2497d4ae4b534ee89d929cc6e3aea485.ashx ....................................... 19

Mohammad Hashemi Joo et al., *Securities litigation risk and board gender diversity*, 71 J. Corp. Fin. (2021). ................................. 25

Olga Kuzmina & Valentina Melentyeva, *Gender diversity in corporate boards: Evidence from quota-implied discontinuities* (Dec. 6, 2021), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3976227 ........................................................................................... 26

Luis L. Martins & Wonbin Sohn, *How does diversity affect team cognitive processes? Understanding the cognitive pathways underlying the diversity dividend in teams*, 16 Acad. Of Mgmt. Annals 134 (2022) ......................................................... 9

*Diversity wins: How inclusion matters*, McKinsey & Co. 13 (May 19, 2020), *available at* https://www.mckinsey.com/featured-insights/diversity-and-inclusion/diversity-wins-how-inclusion-matters .......................... 20

Corinne Post & Kris Byron, *Women on Boards and Firm Financial Performance: A Meta Analysis*, 58 Acad. of Mgmt. J. 1546 (Oct. 2015) ................................................................... 18

María Consuelo Pucheta-Martínez et al., *Corporate governance, female directors and quality of financial information*, 25 Bus. Ethics: A European Rev. 363 (Oct. 2016) .................................................................................................. 15

Edward B. Rock, *Shareholder Eugenics in the Public Corporation*, 97 Cornell L. Rev. 849 (2012) ........................................ 27

Jeffrey A. Sonnenfeld, *What Makes Great Boards Great*, 80 Harvard Bus. Rev. (Sept. 2002) ............................................................ 8

Jason M. Thomas and Megan Starr, *Global Insights: From Impact Investing to Investing for Impact*, The Carlyle Group (Feb. 24, 2020), *available at https://www.carlyle.com/sites/default/files/2020-02/From%20Impact%20Investing%20to%20Investing%20f or%20Impact_022420.pdf* .................................................................... 19

Aida Sijamic Wahid, *The Effects and the Mechanisms of Board Gender Diversity: Evidence from Financial Manipulation*, 159 J. of Bus. Ethics 705 (Oct. 2019).............. 10, 11, 13

## INTERESTS OF AMICI[1]

Proposed Amici Curiae Gennaro Bernile,[2] Douglas Cumming,[3] Daniel P. Forbes,[4] Aida Sijamic Wahid,[5] and Scott E. Yonker,[6] joined by K.J. Martijn Cremers,[7] Amy Hillman,[8] Frances J. Milliken,[9] and Quinetta M. Roberson,[10] (collectively, "Amici"), are academic experts in business, management, and economics, with particular expertise in

---

[1] No party's counsel authored this brief in whole or in part, no party or party's counsel contributed money intended to fund this brief, and no person other than Amici, their members, and their counsel contributed money to fund this brief.

[2] Associate Professor at the University of Miami Herbert School of Business Administration

[3] DeSantis Distinguished Professor of Finance and Entrepreneurship at the Florida Atlantic University College of Business

[4] Associate Professor of Strategic Management & Entrepreneurship at the University of Minnesota, Carlson School of Management

[5] Associate Professor of Accounting at the University of Toronto Department of Management

[6] Associate Professor of Finance at the Cornell SC Johnson College of Business

[7] Bernard J. Hank Professor of Finance, University of Notre Dame Mendoza College of Business

[8] Former Dean, Rusty Lyon Chair of Strategy, Arizona State University, and ASU Foundation Professor.

[9] Professor of Management at the New York University Leonard N. Stern School of Business

[10] John A. Hannah Distinguished Professor in Management and Psychology at the Michigan State University Eli Broad College of Business and College of Social Science

1

studying the role of corporate board diversity in company performance. Amici's written works are frequently cited in their field, including, as detailed further below, in the record underlying the Nasdaq Proposal, Notice of Filing of Proposed Rule Change to Adopt Listing Rules Related to Board Diversity, 85 Fed. Reg. 80,472 (Dec. 11, 2020) ("Nasdaq Proposal"), and the SEC's order approving it, Order Approving Proposed Rule Changes Related to Board Diversity and to Offer Certain Listed Companies Access to a Complimentary Board Recruiting Service, SEC Release No. 34-92590 at 35 (Aug. 6, 2021) ("SEC Order").

The Petitioners in this case have argued that the SEC's approval of the Nasdaq Proposal must be vacated because the proffered benefits of the Nasdaq Proposal were not supported by substantial evidence in the record. *See* AFBR Br. at 54–63; NCPPR Br. at 47–49.

Given Amici's expertise in studying the role of board diversity in company performance, they are particularly well-positioned to synthesize and explain the state of the empirical research relating to the Nasdaq Proposal to inform this Court's evaluation of the evidence underpinning the Proposal and the SEC's decision to approve it.

## STATEMENT REGARDING PARTIES' CONSENT

Pursuant to Rule 29(a)(2) of the Federal Rules of Appellate Procedure, on February 22, 2022, counsel for Amici conferred with counsel for Petitioners AFPB and NCPPR, counsel for Respondent, and counsel for Intervenor Nasdaq, and all parties consented to the filing of this brief.

## ARGUMENT

Amici come before this Court to explain the state of empirical research related to Nasdaq's proposal to require disclosure and explanation to the public by companies whose governing boards do not meet certain diversity targets.

Based on their deep familiarity with the literature surrounding diversity and corporate board performance, including both their own work and that of other peers in the field, Amici believe the Petitioners in this case mischaracterize the administrative record and the body of work on board diversity in stating that the Nasdaq Proposal contained "no substantial evidence to support the ultimate goal (diverse boards)." *See*, *e.g.*, AFBR Br. at 60.

On the contrary, ample evidence supports Nasdaq's statement that "there is a compelling body of credible research on the association between economic performance and board diversity." Nasdaq Proposal, 85 Fed. Reg. at 80,477. While the SEC ultimately chose to emphasize the disclosure benefits of the Rule when approving it, rather than its expected effects on corporate performance,[11] Amici write separately to

---

[11] *See* SEC Order at 35 (Aug. 6, 2021) (approving the Proposal "[i]n light of the disclosure benefits that [it] would provide").

explain that the body of evidence Nasdaq and the SEC considered in evaluating the links between board diversity and corporate performance would be independently sufficient to uphold the Proposal, and therefore also sufficient to uphold the SEC's conclusion that the Proposal would provide investors information relevant to the pursuit of the Exchange Act's goals. *See* SEC Br. at 27–28 (arguing that the investor protection goals of the Exchange Act may be furthered by information disclosure even if the judgments investors make aren't conclusively supported by a consensus of empirical research). Put differently, if the evidence is sufficient to warrant Nasdaq's belief that board diversity would likely improve corporate performance, it is necessarily the case that the evidence is sufficient to conclude that disclosure of board diversity metrics would likely be relevant information for investors.

As Amici discuss below, a large body of high-quality evidence in the record supports a link between board diversity and a variety of corporate performance outcomes, such as risk, innovation, and shareholder protection. Several studies in the record also support a link between board diversity and narrower indicators of firm financial performance. The record further supports the SEC's conclusion that the

transparency benefits of the Proposal, independent of the effects on corporate performance, will be substantial.

Finally, because experts in this field continue to study the link between diversity and board performance, Amici wish to highlight additional studies published since the SEC's Decision, which reinforce Nasdaq's conclusion.

The sum total of the academic literature in this space is sufficient to support the Nasdaq Proposal as advancing the goals of the Exchange Act, by being designed to "prevent fraudulent and manipulative acts and practices," "promote just and equitable principles of trade," "remove impediments to and perfect the mechanism of a free and open market," and "protect investors and the public interest." 15 U.S.C. § 78f(b)(5).

## I.     Substantial record evidence supports a link between diversity and non-financial outcomes

Nasdaq presented, and the SEC captured in the record, substantial evidence of a link between board diversity and corporate performance. This link is a key focus of academic literature, producing a variety of studies attempting to understand and explain it. Collectively, this body of work has produced a substantial number of rigorous, high-quality, peer-reviewed studies, finding a positive association between diversity on companies' corporate boards and the performance of those

companies on various axes of corporate governance and performance such as risk, innovation, and shareholder protection. Far from there being "no substantial evidence" to support a link between board diversity and the goals of the Exchange Act, *see* AFBR Br. at 62, the research evidence that diversity on corporate boards promotes stronger corporate governance and shareholder protection is very strong.

At its core, the link between board diversity and corporate decision-making is based on the unique role that boards of directors play in the governance process. Unlike senior managers, they do not implement strategic decisions or run the firm on a day-to-day basis. Rather, as Amici Professor Forbes and Professor Milliken have described, boards are "episodic" and "interdependent" groups that "face complex, multifaceted tasks related to strategic-issue processing."[12] Accordingly, "the effectiveness of boards is likely to depend heavily on social-psychological processes, particularly those pertaining to group

---

[12] Daniel P. Forbes & Frances J. Milliken, *Cognition and Corporate Governance: Understanding Boards of Directors as Strategic Decision-Making Groups*, 24 Acad. of Mgmt. Rev. 489, 491–92 (1999) (cited in Nasdaq Proposal, 85 Fed. Reg. at 80,479).

participation and interaction, the exchange of information, and critical discussion."[13]

When those group participation dynamics are lacking or unhealthy, boards become less effective contributors to firm governance.[14] Indeed, it is now widely accepted among experts in corporate governance that "groupthink" (the tendency of many directors to refrain from surfacing viewpoints that conflict with those of their colleagues) on corporate boards presents an acute and altogether too common danger to modern firms.[15]

The boards of contemporary corporations also oversee firms that employ highly diverse workforces, sell their products and services to a diverse array of customers and customer segments, and often operate across multiple national and institutional environments. Social psychological research strongly suggests that boards will be better able

---

[13] *Id.* at 492.

[14] One widely cited quote from Harvard Business School Professor Myles Mace in 1971 dismissed boards altogether as "ornaments on the corporate Christmas tree" based on the widespread perception at the time that boards tended to be overly docile leaders. *See*, *e.g.*, John Gillespie & David Zweig, *BOOKS: The Failure of Corporate Boards and the Price We All Pay*, Bus. Ethics (Jan. 18, 2010), *available at* https://business-ethics.com/2010/01/18/885/.

[15] *See*, *e.g.*, Jeffrey A. Sonnenfeld, *What Makes Great Boards Great*, 80 Harvard Bus. Rev. 106, 106-13 (Sept. 2002).

to process strategic issues on behalf of firms facing such challenges when they themselves possess a diverse range of cognitive resources (e.g., information, experiences, and knowledge) and cognitive structures (e.g., beliefs and perspectives).[16]

Modern corporate governance theory thus posits an economic rationale for gender diversity on corporate boards that focuses on the contributions that women directors make to board discussions and acknowledges that directors often influence firm performance in a "complex and indirect manner."[17] Indeed, Amici's interactions with business leaders in the course of their research and teaching, along with recent research conducted by scholars at the London Business School,[18]

---

[16] *See, e.g.*, Luis L. Martins & Wonbin Sohn, *How does diversity affect team cognitive processes? Understanding the cognitive pathways underlying the diversity dividend in teams*, 16 Acad. Of Mgmt. Annals 134, 137-161 (2022) (reviewing the literature on groups as information processors with a focus on the ways that diverse views add information, knowledge, and varied perspectives to teams to enhance their group cognitive capabilities); Verlin B. Hinsz et al., *The Emerging Conceptualization of Groups as Information Processors*, 121 Psych. Bull. 43, 54 (1997) (noting that minority views in a diverse group lead members to view situations and issues from multiple perspectives).

[17] *See* Barnali Choudhury, *New Rationales for Women on Boards*, 34 Oxford J. of Legal Stud. 511, 513, 523 (2014).

[18] Mary Akimoto et al., *Board Diversity and Effectiveness in FTSE 350 Companies*, London Bus. Sch. Leadership Ins., SQW, and Fin. Reporting Council 1, 27–41 (July 2021), *available at* https://www.london.edu/-/media/images/leadership-institute-refresh/frc-board-diversity-and-effectiveness-in-ftse-350-companies.pdf.

suggests a widespread belief among directors that diverse boards are valuable for their capacity to improve the range of information and perspectives boards bring to their work.[19]

These links between diversity and corporate decision-making have been explored in a variety of empirical studies that support the notion that diversity of the types encouraged by the Nasdaq Proposal would likely advance corporate governance and shareholder protection.

A recent study of over 6,000 U.S. firms between 2000 and 2010 by Amicus Professor Wahid explored whether gender diversity on corporate boards affects the quality of a firm's financial reporting and the likelihood of financial misconduct.[20] Professor Wahid studied corporate financial restatements,[21] "the ultimate ex-post indication of a

---

[19] Significantly, the SEC received a substantial body of comments from the business community emphasizing their belief that diversity on boards of the type encouraged by the Nasdaq Proposal would improve board decision-making, corporate governance, risk mitigation, innovation, investor protection, investor confidence, and corporate culture. *See* SEC Order at 29–30, collecting comments from the Carlyle Group, Goldman Sachs, Mercy Investment Services, Inc., Miller/Howard Investments, International Corporate Governance Network, the Association of Asian-American Investment Managers, AllianceBernstein L.P., Capital Research and Management Company, Lord Abbett, and Hispanic Chamber of Commerce.

[20] Aida Sijamic Wahid, *The Effects and the Mechanisms of Board Gender Diversity: Evidence from Financial Manipulation*, 159 J. of Bus. Ethics 705, 705 (Oct. 2019) (cited in Nasdaq Proposal, 85 Fed. Reg. at 80,478).

[21] A restatement is a re-issuance of a company's financial statement to correct a material error in what was previously disclosed, often the result of accounting

poor financial reporting process and willful financial misconduct."[22] The study found that "boards with female directors have fewer restatements" and specifically "fewer irregularity-type restatements, which tend to be indicative of financial manipulation," and found that these improved outcomes were likely the result of beneficial changes to group decision-making dynamics resulting from diverse boards, rather than any hypothetical differences between male and female directors (such as differences in qualification or effort).[23]

In another study, a group of professors analyzed a sample of 7,597 U.S. company firm-years to assess whether gender-diverse boards (defined as those which include at least one woman, similar to the Nasdaq Proposal) improve transparency.[24] This study found "a positive link between gender diversity in the corporate board and stock price informativeness"—that is, gender-diverse firms are more likely to

---

mistakes, noncompliance with generally accepted accounting principles, fraud, misrepresentation, or clerical errors. *See Restatements: the costly result of an error*, Baker Tilly, July 26, 2019, *available at* https://www.bakertilly.com/insights/restatements-costly-result-error.

[22] Wahid, *supra* note 20, at 8.

[23] *Id.* at 23.

[24] Ferdinand A. Gul et al., *Does board gender diversity improve the informativeness of stock prices?* 51 J. of Acct. & Econ. 314, 314 (2011) (cited in Nasdaq Proposal, 85 Fed. Reg. at 80,478).

collect and disclose robust information about their performance to prospective investors.[25]

Another paper studied audit reports under Section 404 of the Sarbanes-Oxley Act of 2002, Pub. L. 107-204, *codified at* 15 U.S.C. § 7262, which mandates auditor evaluations of the quality of companies' internal controls over financial reporting.[26] Weak controls can "lead to poor financial reporting quality, less efficient investments, and insider trading."[27] The authors found that across more than 4,000 firm-years observed between 2004 and 2013, "firms with a greater presence of female board members [were] less likely to report having weak internal controls."[28]

In a recent study co-authored by Amici Curiae Professors Bernile and Yonker, the authors analyzed U.S. firms in the S&P 1500 index from 1996 to 2014 and found, among other things, "strong and consistent support for the notion that greater board diversity *causes*

---

[25] *Id.* at 336.

[26] Yu Chen, John Daniel Eshleman, and Jared S. Soileau, *Board Gender Diversity and Internal Control Weaknesses*, 33 Advances in Acct., incorporating Advances in Int'l Acct. 11 (2016) (cited in Nasdaq Proposal, 85 Fed. Reg. at 80,478).

[27] *Id.* at 12.

[28] *Id.* at 15, 18.

lower firm risk," using what is called an instrumental variable in its analysis to attempt to prove causation rather than simple correlation.[29] "[F]irms with greater board diversity adopt less risky financial policies," leading to lower volatility in their returns; further, these firms rely less on debt capital and maintain greater dividend payouts, all while "invest[ing] more aggressively in research and development."[30] As a result, not only did more diverse firms perform better financially and provide more security to investors, but they also saw "greater innovation output (in absolute and per dollar invested) that is more impactful and original, as measured by firms' patenting activity."[31]

Another study used a different methodology to examine the same link between diversity and financial restatements that Professor Wahid examined.[32] This study created 278 pairs of American firms, in which one firm was recorded by the U.S. General Accounting Office as having restated their annual financial statements (either due to error or fraud,

---

[29] Gennaro Bernile, Vineet Bhagwat, and Scott Yonker, *Board Diversity, Firm Risk, and Corporate Policies*, 127 J. of Fin. Econ. 588, 590 (2018) (cited in the SEC Order at 32).

[30] *Id.*

[31] *Id.*

[32] *See* Wahid, *supra* note 20.

in either case demonstrating a failure of internal controls), and the other 278 had not (and were of similar size, date, auditor, and industry).[33] The study found "a significant reduction in the likelihood of financial restatement" in firms governed by boards with at least one female board director.[34]

Amicus Professor Cumming, along with two colleagues, studied 742 pairs of similar companies in China, where one company in each pair had been subject to securities fraud enforcement actions between 2001 and 2010 and the other had not.[35] The study utilized two different econometric tools, known as two-stage estimates and propensity score matching, to seek to show a causal relationship rather than merely a correlation in its data.[36] The authors found "strong evidence of a negative and diminishing effect" of the presence of women on boards

---

[33] Lawrence J. Abbott et al., *Female Board Presence and the Likelihood of Financial Restatement*¸ 26 Acct. Horizons 607, 608, 613 (2012) (cited in Nasdaq Proposal, 85 Fed. Reg. at 80,478).

[34] *Id.* at 626.

[35] Douglas Cumming et al., *Gender Diversity and Securities Fraud*, 58 Acad. of Mgmt. J. 1572, 1576 (Feb. 2015) (cited in Nasdaq Proposal, 85 Fed. Reg. at 80,478).

[36] *Id.* at 1584. *See also* Jeffrey M. Woolridge, Introductory Econometrics: A Modern Approach 512-51 (South-Western, Cenage Learning, 5th ed. 2013) (explaining two-stage estimates); Shenyang Guo and Mark W. Fraser, Propensity Score Analysis: Statistical Methods and Applications (Sage Publishing, 2d ed. 2014) (explaining propensity score matching).

and on the probability of being the subject of a fraud enforcement action (i.e., the presence of women on boards made such an action less likely), and that the presence of women on boards "reduce[d] the severity of fraud" (in terms of the magnitude of negative share price reaction experienced by the company from the disclosure of enforcement) within the sample of companies studied.[37]

Two studies of Spanish firms made similar findings. In one study of 920 firm-years of observations of non-financial firms listed on the Madrid Stock Exchange, the authors concluded that "having a high proportion of female directors and independent female directors" on corporate boards' audit committees, and "having an [audit committee] chairperson who is a female" have the effect of "enhanc[ing] financial reporting quality."[38] Those results support the conclusion that "gender diversity in corporate governance is likely to be useful in creating value … by improving the reliability of financial reporting."[39]

---

[37] Cumming, *supra* note 35, at 1573, 1589. These findings were mirrored in a recent study of U.S. firms, see *infra* Section IV.

[38] María Consuelo Pucheta-Martínez et al., *Corporate governance, female directors and quality of financial information*, 25 Bus. Ethics: A European Rev. 363, 364 (Oct. 2016) (cited in Nasdaq Proposal, 85 Fed. Reg. at 80,478).

[39] *Id.*

Another study of over 500 firms in Spain found that gender diversity on corporate boards was associated with reduced "information asymmetry"—that is, the trading behavior of informed vs. uninformed traders was more similar for companies whose boards were more gender diverse.[40] This finding suggests that firms with more diverse boards were either more transparent in their disclosures to the public or were less prone to insider trading, because less sophisticated traders were more able to arrive at similar evaluations of firm value as more sophisticated ones.[41]

In sum, a substantial body of research on the links between corporate board diversity and various firm outcomes exists and was considered by Nasdaq and the SEC, particularly with regard to gender diversity. The results of this research strongly suggest that diversity enhances corporate board decision-making in ways that advance the goals of the Exchange Act, by promoting transparency, protecting investors, and reducing fraud. *See* 15 U.S.C. § 78f(b)(5). Taken together, these findings are consistent with, and to some extent may help explain,

---

[40] David Abad et al., *Does gender diversity on corporate boards reduce information asymmetry in equity markets?*, 20 Bus. Rsh. Q. 192, 193 (Apr. 2017) (cited in Nasdaq Proposal, 85 Fed. Reg. at 80,478–79).

[41] *Id.* at 193, 201–02.

the broader linkages identified by studies in the following section—i.e.,
that diversity enhances firm performance. But they also stand
independently as demonstrating meaningful board- and firm-level
outcomes of diversity consistent with the Exchange Act's purpose.

## II.    Substantial record evidence supports a link between diversity and firm financial performance

In addition to the record evidence captured above showing strong
linkages between board diversity and broad outcomes of corporate
governance, Nasdaq presented, and the SEC captured in its record,
substantial evidence of a link between board diversity and narrower
financial measures of corporate performance and shareholder returns.

For instance, in one recent "meta-analysis" attempting to
aggregate and interpret the varying results of 140 different studies of
gender diversity on corporate boards, the authors concluded that "firms
with greater female board representation tend to have higher
accounting returns," (i.e., profitability) and that those effects were more
pronounced "in countries with stronger shareholder protections" like the
United States.[42] The same study concluded that in countries with

---

[42] Corinne Post & Kris Byron, *Women on Boards and Firm Financial Performance: A Meta Analysis*, 58 Acad. of Mgmt. J. 1546, 1552, 1555, 1557 (Oct. 2015) (cited in Nasdaq Proposal, 85 Fed. Reg. at 80,476–77.)

higher levels of societal gender parity, like the United States, "female board representation is positively related to market performance."[43]

Another study in 2010 examined approximately 5,500 directors on boards of S&P 500 firms to study the effects of both gender and racial diversity and found "a positive and significant relationship between both the number of women on the board and the number of ethnic minorities on the board and the [Return on Assets]" of a firm,[44] although it also noted that the relationship it found was a correlation rather than a causal relationship.[45] The study also found "no evidence of a negative link between board diversity and financial performance."[46]

In the recent study of U.S. firms in the S&P 1500 index by Amici Curiae Professors Bernile and Yonker discussed in the prior section, the

---

[43] *Id.* at 1558. Gender parity was estimated using the World Economic Forum's Global Gender Gap score, "a measure of each country's gender equality in terms of economic participation, educational attainment, health and survival, and political empowerment." *Id.* at 1556.

[44] David A. Carter et al., *The Gender and Ethnic Diversity of US Boards and Board Committees and Firm Financial Performance*, 18 Corp. Governance: An Int'l. Rev. 396, 401, 410 (2010) (cited in the SEC Order at 32; cited in Nasdaq Proposal, 85 Fed. Reg. at 80,477).

[45] *Id.* at 412. Because director selection is correlated with many other firm-level characteristics, identifying a causal relationship of board composition on firm outcomes is notoriously difficult.

[46] *Id.* at 411.

authors found that "on average, both operating performance and asset

valuation multiples increase with board diversity" and that the

relationship between diversity and these performance metrics was

causal.[47]

The conclusions of these empirically rigorous studies, published in

highly selective, peer-reviewed academic journals, are also echoed by a

wide variety of studies undertaken by financial and management firms

and industry research organizations that have found positive links

between firm financial performance and board diversity.[48]

---

[47] Bernile et al., *supra* note 29, at 590.

[48] *See*, *e.g.*, Nasdaq Proposal, 85 Fed. Reg. at 80,475–76 (collecting private sector analyses showing financial benefits to shareholders from diverse boards, citing Jason M. Thomas and Megan Starr, *Global Insights: From Impact Investing to Investing for Impact*, The Carlyle Group 5 (Feb. 24, 2020), *available at https://www.carlyle.com/sites/default/files/2020-02/From%20Impact%20Investing%20to%20Investing%20for%20Impact_022420.pdf)* ; FCLTGlobal, *The Long-term Habits of a Highly Effective Corporate Board* 11 (Mar. 2019), *available at* https://www.fcltglobal.org/wp-content/uploads/long-term-habits-of-highly-effective-corporate-boards.pdf; Vivian Hunt et al., *Diversity Matters*, McKinsey & Company (Feb. 2, 2015), *available at* https://www.mckinsey.com/insights/organization/~/media/2497d4ae4b534ee89d929c c6e3aea485.ashx; Credit Suisse, *The CS Gender 3000: Women in Senior Management* 16 (Sept. 2014), *available at* https://www.credit-suisse.com/media/assets/corporate/docs/about-us/research/publications/the-cs-gender-3000-women-in-senior-management.pdf; Meggin Thwing Eastman et al., *The tipping point: Women on boards and financial performance*, MSCI 3 (Dec. 2016), *available at* https://www.msci.com/documents/%2010199/fd1f8228-cc07-4789-acee-3f9ed97ee8bb; Credit Suisse ESG Research, *LGBT: The value of diversity* 1 (Apr. 15, 2016), *available at* https://research-doc.credit-suisse.com/docView?language=ENG&source=emfromsendlink&format=PDF&docu

19

Petitioners place substantial weight on Nasdaq's and the SEC's acknowledgment that there are both studies that support and studies that call into question a link between board diversity and financial performance. *See* AFBR Br. at 55–56 (describing the SEC's evaluation of the evidence); Nasdaq Proposal, 85 Fed. Reg. at 80,476–77 (collecting and acknowledging "studies drawing different conclusions" from the one Nasdaq reached). Amici agree with the SEC that there is "reasonable debate among researchers about the value of board diversity," SEC Br. at 29 (internal quotation omitted), particularly with regards to the link between board diversity and narrow measures of firm financial performance.[49] But the studies that support such a link, summarized

---

ment_id=807075590&extdocid=807075590_1_eng_pdf&serialid=evu4wNcHexx7kus NLaZQphUkT9naxi1PvptZQvPjr1k%3d; McKinsey & Company, *Diversity wins: How inclusion matters* 13 (May 2020), *available at* https://www.mckinsey.com/featured-insights/diversity-and-inclusion/diversity-wins-how-inclusion-matters.

[49] *See, e.g.*, Kenneth R. Ahern & Amy K. Dittmar, *The Changing of the Boards: The Impact of Firm Valuation of Mandated Female Board Representation*, 127 Q. J. Econ. 137, 137-97 (2012) (cited in SEC Order at 33, note 123) (finding that Norway's 2003 board gender quota law negatively affected firm performance); *but see* B. Espen Eckbo et al., *Valuation Effects of Norway's Board Gender-Quota Law*, Mgmt. Sci, at 1-23 (Aug. 2021) (finding no negative effect on firm performance from the gender quota). Norway's board diversity requirement has been a subject of extensive study, with mixed conclusions about the effects on firm performance. Notably, Norway's law required 40% of board directors to be female, requiring larger changes to existing boards than would be expected from the Nasdaq Proposal for boards to either include one female director or provide an explanation for why that target is impractical for a given firm. *See also* Vicki L. Bogan, Katya

above, are high-quality, robust works linking board diversity to financial performance, and they belie Petitioners' contention that there was "no substantial evidence" for Nasdaq or the SEC to find such a link. *See* AFBR Br. at 60. This body of work provides ample basis to reasonably conclude that strengthened board diversity could improve firm financial performance.

Further, as described more fully in the previous section, despite Petitioners' attempts to focus scrutiny of the Nasdaq Proposal on "quantitative considerations like profit, loss, and revenue," AFBR Br. at 60–61 (internal quotations and citations omitted), a narrow focus on these financial indicators ignores other important aspects of the rule, including expected effects of board diversity on corporate governance, where the evidence is even stronger and the expected effects would clearly advance the Exchange Act's goals. Petitioners' limited focus also ignores the benefits of a disclosure-based regime, as discussed further below.

---

Potemkina, and Scott Yonker, *What Drives Racial Diversity on U.S. Corporate Boards?*, Harvard L. Sch. F. on Corp. Governance (Oct. 29, 2021), *available at* https://ssrn.com/abstract=3952897 (recent study by Amicus Scott Yonker and others showing that 82% of Nasdaq firms already had at least one woman on their board prior to the announcement of the Nasdaq Proposal).

### III.   The Nasdaq Proposal has the added benefit of facilitating transparency and further rigorous study of board dynamics and effects

In its approval, the SEC noted that the design of the Nasdaq Proposal as a disclosure-based regime would need to be evaluated differently from if it were a set of mandatory diversity requirements,[50] and that the transparency into corporate boards facilitated by the Nasdaq Proposal may be an additional benefit in itself. *See* SEC Order at 34–35 (noting the various paths to compliance by companies on Nasdaq's exchange and emphasizing "the disclosure benefits that the Board Diversity Proposal would provide").[51]

Amici note that such disclosure is also likely to facilitate even more robust analyses of the effects of board diversity in the future. As experts seeking to undertake empirical research in this area, one of the most substantial challenges is collecting and preparing a uniform data

---

[50] Indeed, while some studies have suggested a *negative* link between gender diversity and shareholder wealth, it is worth noting that these were studies of the effects of mandatory policies and did not allow companies to continue to tailor the makeup of their boards and simply provide transparency into their boards' makeups. *See* SEC Order at 33 note 123, note 124 (collecting studies linking diversity to declining shareholder wealth after the implementation of mandatory quota policies in Norway and California).

[51] As the SEC noted, there is some evidence to suggest that disclosure-based regimes have uniquely positive effects. *See* Larry Fauver et al., *Board Reforms and Firm Value: Worldwide Evidence*, 125 J. Fin. Econ. 120, 121 (2017) (cited in SEC Order at 34).

set concerning board diversity; indeed, Amici believe that data availability is one of the reasons that research into the effects of gender diversity on corporate boards is more extensive than into other forms of diversity, such as racial or sexual orientation diversity. Implementation of the Nasdaq Proposal will be of tremendous value in facilitating the rigorous study of corporate performance and allow investors to make more informed decisions, both through the provision of thorough and uniform disclosures, as well as by providing an opportunity to evaluate changes in the performance of firms listed on the Nasdaq exchange measured against firms listed on other exchanges that have not implemented policies similar to the Nasdaq Proposal.

## IV. Further evidence continues to emerge since the Nasdaq Proposal, reinforcing the positive links between diversity and performance

As Amici noted above, the study of corporate board composition and its effects on corporate performance is dynamic and ongoing, and it has continued to produce compelling research even after the Nasdaq Proposal and subsequent SEC Order.

For example, a recent working paper examined the link between the racial diversity of the boards of regional Federal Reserve Banks and the Community Reinvestment Act (CRA) scores of the member banks

23

that those boards supervise.[52] The study found that the presence of

Black and Hispanic directors on regional Federal Reserve Boards

correlated positively with the CRA scores of the member banks they

supervised, meaning that those banks were achieving superior results

in reaching underbanked communities, even when comparing Reserve

Boards that served the same states.[53]

Additionally, a recent, as-yet-unpublished paper by Amicus

Professor Yonker and two other colleagues examined recent trends in

increasing racial diversity on corporate boards.[54] Among other things,

they found that the nationwide introspection concerning racism in

America triggered by the George Floyd murder in 2020 appeared to

trigger substantial increases in Black representation on corporate

boards, and, notably, that the qualifications of these newly appointed

directors were similar to those who had previously been serving on

boards. These findings suggest that lower levels of Black representation

on boards prior to 2020 were not driven by a lack of a qualified

---

[52] Brian Feinstein at al., *Board Diversity Matters: An Empirical Assessment of Community Lending at Federal Reserve-Regulated Banks* (Jan. 5, 2022), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4000110.

[53] *Id.* at 12–13, 25.

[54] Bogan, Potemkina, and Yonker, *supra* note 49.

candidate pool and call into question the degree to which current board composition should be presumed to simply be the outcome of efficient labor market forces.[55]

Another recent study analyzed firms that face securities litigation, which often results in substantial settlement costs and can directly impact a firm's finances (by affecting things like liquidity, investment policies, or credit-worthiness) as well as extract "hidden" costs by damaging a firm's image and harming its relationships with suppliers and customers.[56] The authors studied securities litigation data from S&P 1500 firms between 1998 and 2017, and found that "the presence of female independent directors on a firm's board reduces the risk of securities litigation," and that this effect held true even after using a variety of econometric methods designed to better identify causal relationships.[57]

Another as-yet-unpublished study examined board diversity policies across seven European countries to understand the effects of

---

[55] *Id.* at 8–9, 21–22.

[56] Mohammad Hashemi Joo et al., *Securities litigation risk and board gender diversity*, 71 J. Corp. Fin. 102102, 102102 (2021).

[57] *Id.* at 102104.

expanded female representation on boards on corporate performance in the context of mandatory diversity requirements. It found "positive effects on the value of the firm" from growing shares of women, and importantly also "no negative effect on value, and boards do not become any less competent with more women on boards."[58]

A recent study of misconduct fines issued to European banks by U.S. financial regulators between 2008 and 2018 found that "a greater presence of women on the board of directors is associated with fewer misconduct fines, and the effect is economically significant," with the benefits of greater gender diversity estimated as "equivalent to saving approximately $7.48 million per year" in fines alone.[59] These findings in many ways echo, in an American regulatory context, the findings of Amicus Professor Cumming's work, cited in the Nasdaq Proposal, which found a link between board gender diversity and reduced incidence of fraud among Chinese firms.[60]

---

[58] Olga Kuzmina & Valentina Melentyeva, *Gender diversity in corporate boards: Evidence from quota-implied discontinuities* 1, 37–38 (Nov. 1, 2021), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3976227 (earlier version cited in SEC Order at 32, note 119).

[59] F. Arnaboldi et al., *Gender diversity and bank misconduct,* 71 J. Corp. Fin. 101834, 101835 (2021).

[60] *See* Cumming et al., *supra* note 35.

Another body of literature emphasizes the role that "good" or "quality shareholders" have to play in firm performance.[61] It argues that investments by quality shareholders (those investors who make concentrated investments of their portfolio in companies that are intended to be long-term investments rather than short-term profit opportunities) are beneficial to firms because they provide firm managers longer-term stability to execute strategy, cast more informed shareholder votes, and engage with managers in ways that are productive and patient and can provide an additional "brain trust" for managers to draw upon.[62] In studying the tools companies have available to attract quality shareholders, one recent study found that quality shareholders were more common in firms with more racially and gender-diverse boards, positing that "[c]ompared to the short-term view of transient shareholders, [quality shareholders] benefit more from the multiple viewpoints on boards that come from diversity."[63]

---

[61] *See*, *e.g.*, Edward B. Rock, *Shareholder Eugenics in the Public Corporation*, 97 Cornell L. Rev. 849 (2012).

[62] Lawrence A. Cunningham, *Lessons from Quality Shareholders on Corporate Governance Practice, Research and Scholarship*, 5 George Washington Bus. & Fin. L. Rev. 1, 5–10 (2021).

[63] *Id.* at 42.

## CONCLUSION

Taken as a whole, the record contained substantial evidence supporting the proposition that the Nasdaq Proposal is designed to advance the goals of the Exchange Act, and the SEC's Order rested on a solid foundation of empirical research.

Dated: February 25, 2022                    Respectfully submitted,

*/s/ Jeffrey Dubner*

Jeffrey Dubner
Aman T. George
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090

Peter C. Renn
Lambda Legal Defense and
Education Fund, Inc.
4221 Wilshire Blvd., Suite 280
Los Angeles, CA 90010
(213) 382-7600

Karen L. Loewy
Lambda Legal Defense and
Education Fund, Inc.
1776 K Street NW, 8th Floor
Washington, D.C. 20006
(202) 809-8585

# APPENDIX: LIST OF AMICI NONPARTISAN GROUP OF ACADEMICS AND PRACTITIONERS IN THE FIELD OF CORPORATE GOVERNANCE

Amici are listed in alphabetical order below. Institutional affiliations are provided for identification purposes only. The views expressed in this brief are those of individual amici and do not represent the views or positions of their affiliated institutions.

1. Luis A. Aguilar, Director, Donnelley Financial Solutions, Inc.; Director, Envestnet, Inc.; Partner, Falcon Cyber Investments LLC; Former Commissioner, U.S. Securities and Exchange Commission

2. Frederick H. Alexander, CEO, The Shareholder Commons; Former Partner, Morris, Nichols, Arsht & Tunnell LLP; Fellow, American College of Governance Counsel; Member and Former Chair, Council of the Delaware State Bar Association Corporation Law Section

3. Harvey Anderson, Chief Legal Officer and Corporate Secretary, HP Inc.

4. Michelle Banks, Senior Advisor, BarkerGilmore; Former Executive Vice President, Global General Counsel, Gap Inc.

5. Michal Barzuza, Professor of Law, University of Virginia School of Law

6. Lucian A. Bebchuk, James Barr Ames Professor of Law, Economics, and Finance; Director, Program on Corporate Governance, Harvard Law School

7. Carolyn Berger, Former Justice, Delaware Supreme Court; Former Vice Chancellor, Delaware Court of Chancery

8. David J. Berger, Partner, Wilson Sonsini Goodrich & Rosati; Senior Fellow, NYU Institute of Corporate Governance and Finance; Fellow, American College of Corporate Governance

29

9.  Margaret Mendenhall Blair, Professor of Law, Emerita, Vanderbilt University Law School, and Milton R. Underwood Chair in Free Enterprise, Emerita

10. Matthew T. Bodie, Co-Director, William C. Wefel Center for Employment Law, Callis Family Professor of Law, Saint Louis University

11. April Miller Boise, Executive Vice President and Chief Legal Officer, Eaton Corporation

12. Amelia H. Boss, Trustee Professor of Law, Thomas R. Kline School of Law, Drexel University, Former Chair, American Bar Association, Business Law Section

13. Andre G. Bouchard, Partner, Paul, Weiss, Rifkind, Wharton & Garrison LLP Former Chancellor, Delaware Court of Chancery

14. William Wilson Bratton, Nicholas F. Gallicchio Professor of Law, Emeritus, University of Pennsylvania Carey Law School; de la Cruz/Mentschikoff Chair in Law and Economics and Senior Lecturer, University of Miami School of Law

15. Brian V. Breheny, Partner, Skadden, Arps, Slate, Meagher & Flom LLP and Affiliates; Former Deputy Director, Division of Corporation Finance, U.S. Securities and Exchange Commission; Former Member, Board of Directors, The Society for Corporate Governance

16. Chris Brummer, Agnes N. Williams Research Professor, Georgetown University Law Center; Faculty Director, Institute of International Economic Law

17. Mercer Bullard, Butler Snow Lecturer and Professor of Law, The University of Mississippi School of Law

18. Mary Ann Carlson, Co-Founder, DirectWomen; Former Chair, Global Corporate Practice, Squire Patton Boggs; Former Chair, American Bar Association, Business Law Section, Corporate Laws Committee

19. William B. Chandler, III, Partner, Wilson Sonsini Goodrich & Rosati; Former Chancellor, Delaware Court of Chancery

20. Yen D. Chu, Executive Vice President, Chief Legal Officer, Equinox Group; Member of the Board of Directors, DirectWomen

21. Robert C. Clark, Austin Wakeman Scott Professor of Law, Emeritus, Harvard Law School; Former Dean, Harvard Law School

22. Patrick T. Clendenen, Clendenen & Shea LLC; Former Chair, American Bar Association, Business Law Section

23. John C. Coffee, Jr., Adolf A. Berle Professor of Law, Director of Corporate Governance, Columbia Law School; *Reporter to American Law Institute for Principles of Corporate Governance: Analysis and Recommendations (1982)*

24. Marcy Sharon Cohen, General Counsel and Managing Director, ING Financial Holdings Corp.

25. James D. Cox, Brainerd Currie Professor of Law, Duke University School of Law; Member, American Law Institute; Former Member, American Bar Association, Corporate Laws Committee; Former Member, New York Stock Exchange Legal Advisory Committee

26. Jens Christian Dammann, Ben H. and Kitty King Powell Chair in Business and Commercial Law, The University of Texas at Austin School of Law

27. Barbara Daniele, Former General Counsel, GE Capital Americas; prior GE Legal General Counsel roles and Head of Litigation for GE Capital

28. Deneen L. Donnley, Senior Vice President and General Counsel, Con Edison, Inc.

29. Karl John Ege, Senior Counsel, Perkins Coie LLP; Former Chair, American Bar Association, Business Law Section; Former Chair, American Bar Association, Corporate Laws Committee

30. Lisa M. Fairfax, Presidential Professor, Co-Director, Institute for Law and Economics, The University of Pennsylvania Carey Law School; Former Member, Investor Advisory Committee, U.S. Securities and Exchange Commission

31. Robert Falk, General Counsel, Truth Initiative

32. Celeste Ferber, Vice President, Corporate Legal, Zymergen, Inc.

33. Gina-Gail S. Fletcher, Professor of Law, Duke University School of Law

34. Michael E. Flowers, Member, Steptoe & Johnson PLLC; Former Chair, American Bar Association, Business Law Section

35. Raquel L. Fox, Partner, Skadden, Arps, Slate, Meagher & Flom LLP and Affiliates; Former Director, Office of International Affairs, Former Senior Advisor to SEC Chairman, U.S. Securities and Exchange Commission

36. Jeannie Carmedelle Frey, Former Chair, American Bar Association, Business Law Section

37. Vijaya Gadde, Chief Legal Officer, Twitter, Inc.

38. Henry E. Gallagher, Jr., Partner, Connolly Gallagher LLP; Former Chair, Council of the Delaware State Bar Association Corporation Law Section

39. Elisa D. Garcia, Chief Legal Officer, Macy's, Inc.

40. Craig B. Glidden, Executive Vice President, Global Public Policy, General Counsel, and Corporate Secretary, General Motors Co.

41. Jeffrey N. Gordon, Richard Paul Richman Professor of Law, Columbia Law School

42. Holly J. Gregory, Partner, Sidley Austin LLP; President and Founding Trustee, American College of Governance Counsel; Former Chair, American Bar Association, Business Law Section, Corporate Governance Committee; Former Member, American

Bar Association, Business Law Section, Corporate Laws
Committee; Member, American Law Institute

43.  Joseph A. Grundfest, W. A. Franke Professor of Law and
     Business, Stanford Law School; Former Commissioner, U.S.
     Securities and Exchange Commission

44.  Mitu Gulati, John V. Ray Research Professor of Law, University of
     Virginia School of Law

45.  Keir D. Gumbs, Chief Legal Officer, Broadridge Financial
     Systems, Inc.; Former Counsel to Commissioner Roel C. Campos,
     Former Special Counsel in the Office of Chief Counsel, U.S.
     Securities and Exchange Commission

46.  Lawrence A. Hamermesh, Emeritus Professor, Widener
     University Delaware Law School; Executive Director, Institute for
     Law and Economics, University of Pennsylvania Carey Law
     School; Former Special Counsel, U.S. Securities and Exchange
     Commission; Member and Former Chair, Council of the Delaware
     State Bar Association Corporation Law Section

47.  Grant M. Hayden, Professor of Law, Southern Methodist
     University Dedman School of Law

48.  Keith F. Higgins, Retired Partner, Ropes & Gray LLP; Former
     Director, Corporation Finance, U.S. Securities and Exchange
     Commission

49.  Shannon Higginson, General Counsel and Chief Compliance
     Officer, lululemon athletica inc.

50.  Randy J. Holland, Senior Of Counsel, Wilson Sonsini Goodrich &
     Rosati; Former Justice, Delaware Supreme Court

51.  Erik T. Hoover, Senior Vice President and General Counsel,
     DuPont de Nemours, Inc.

52.  Cathy Hwang, Barron F. Black Research Professor of Law,
     University of Virginia School of Law

53. Howell E. Jackson, James S. Reid, Jr., Professor of Law, Harvard Law School

54. Robert J. Jackson, Jr., Pierrepont Family Professor of Law, Co-Director of the Institute for Corporate Governance and Finance, Director of the Program on Corporate Law and Policy, NYU School of Law; Former Commissioner, U.S. Securities and Exchange Commission

55. Matthew Jennejohn, Professor of Law, Brigham Young University Law School

56. Cherée Haswell Johnson, Chief Legal Officer, General Counsel and Secretary, Dentsply Sirona Inc.

57. Roberta Karmel, Distinguished Research Professor of Law, Brooklyn Law School; Former Commissioner, U.S. Securities and Exchange Commission

58. Denise Keane, Former General Counsel, Altria Group, Inc.

59. Stanley Keller, Senior Partner, Locke Lord LLP; Former Chair, Committee on Federal Regulation of Securities, American Bar Association, Corporate Laws Committee

60. Richard G. Ketchum, Former Chair, Board of Governors; Former Chair and CEO, Financial Industry Regulatory Authority; Former CEO, New York Stock Exchange Regulation; Former Chief Regulatory Officer, New York Stock Exchange; Former President, Nasdaq Stock Market

61. Sung Eun (Summer) Kim, Professor of Law, University of California, Irvine, School of Law

62. Sung Hui Kim, Professor of Law, UCLA School of Law

63. William M. Lafferty, Partner, Morris, Nichols, Arsht & Tunnell LLP; Chair, Delaware Court of Chancery Rules Committee; Advisory Board Member, John L. Weinberg Center for Corporate Governance; Advisory Board, New York University School of Law

Institute for Corporate Governance and Finance; Fellow, American College of Trial Lawyers

64. Stephen P. Lamb, Of Counsel, Paul, Weiss, Rifkind, Wharton & Garrison LLP Former Vice Chancellor, Delaware Court of Chancery

65. Don Langevoort, Thomas Aquinas Reynolds Professor of Law, Georgetown University Law Center, Former Special Counsel, U.S. Securities and Exchange Commission

66. Jannie K. Lau, Former Executive Vice President, General Counsel and Corporate Secretary, InterDigital, Inc.

67. Susan Lindberg, Former Executive Vice President and General Counsel, SemGroup Corporation

68. Paul L. Lion, III, Partner, Morrison & Foerster LLP; Former Chair, American Bar Association, Business Law Section

69. Martin Lipton, Founding Partner, Wachtell, Lipton, Rosen & Katz; Member of and Counsel to New York Stock Exchange; Corporate Accountability and Listing Standards Committee, 2002; Honorary Fellow, American College of Governance Counsel

70. Lindsay Llewellyn, General Counsel, Lyft, Inc.

71. Dorothy S. Lund, Associate Professor of Law, University of Southern California Gould School of Law

72. Jonathan Macey, Sam Harris Professor of Corporate Law, Corporate Finance, and Securities Law, Yale Law School

73. David B.H. Martin, Senior Counsel, Covington & Burling LLP; Former Chair, Corporate Laws Committee, Business Law Section, American Bar Association

74. Veronica Root Martinez, Professor of Law, Robert & Marion Short Scholar, Director, Program on Ethics, Compliance & Inclusion, Notre Dame Law School

35

75. David C. McBride, Partner, Young Conaway Stargatt & Taylor, LLP; Member, Corporate Laws Committee, Business Law Section, American Bar Association; Former Chair, Council of the Delaware State Bar Association Corporation Law Section

76. Brett McDonnell, Dorsey and Whitney Chair in Law, University of Minnesota Law School

77. Norman M. Monhait, Of Counsel, Reid Collins & Tsai; Former Partner, Rosenthal Monhait & Goddess P.A.; Former Chair of the Council of the Delaware State Bar Association Corporation Law Section; Former Member, Delaware Court of Chancery Rules Committee

78. Yaron Nili, Associate Professor of Law and Smith-Rowe Faculty Fellow in Business Law, The University of Wisconsin Law School

79. John W. Noble, Partner, Morris James; Former Vice Chancellor, Delaware Court of Chancery

80. Richard W. Painter, S. Walter Richey Professor of Corporate Law, University of Minnesota Law School; Former Associate Counsel to the President and Chief White House Ethics Lawyer

81. Donald F. Parsons, Retired Partner, Morris, Nichols, Arsht & Tunnell; Former Vice Chancellor, Delaware Court of Chancery

82. Frank Partnoy, Adrian A. Kragen Professor of Law, University of California, Berkeley School of Law

83. Robert K. Rasmussen, J. Thomas McCarthy Trustee Chair in Law and Political Science, University of Southern California Gould School of Law; Former Dean, University of Southern California Gould School of Law

84. Anne E. Robinson, Managing Director, General Counsel and Corporate Secretary, The Vanguard Group, Inc.

85. Edward Rock, Martin Lipton Professor of Law, Co-Director, Institute for Corporate Governance and Finance, New York University School of Law

86. Kim K.W. Rucker, Former Executive Vice President, General Counsel and Secretary of Andeavor (f.k.a., Tesoro Corporation); Former Executive Vice President, Corporate and Legal Affairs, General Counsel and Secretary of Kraft Food Group, Inc.; Former Senior Vice President, General Counsel, Corporate Secretary and Chief Compliance Officer of Avon Products, Inc.; Former Senior Vice President, Secretary and Chief Governance Officer of Energy Future Holdings, Corp. (f.k.a., TXU Corporation); Member of American College of Governance Counsel; Former Member, American Bar Association, Corporate Laws Committee

87. Kathryn H. Ruemmler, Chief Legal Officer and General Counsel, The Goldman Sachs Group, Inc.

88. Hillary A. Sale, Associate Dean for Strategy, Agnes Williams Sesquicentennial Professor of Law, Professor of Management, Georgetown University

89. Christina M. Sautter, Cynthia Felder Fayard Professor of Law, Byron R. Kantrow Professor of Law, and Vinson & Elkins Professorship, Professor of Law, Louisiana State University Paul M. Hebert Law Center

90. Mary L. Schapiro, Former Chair, U.S. Securities and Exchange Commission; Former CEO, Financial Industry Regulatory Authority; Former Chair, U.S. Commodity Futures Trading Commission

91. Larry P. Scriggins, Retired Partner, DLA Piper; Former Chair, American Bar Association, Business Law Section; Senior Advisor and Former Chair of the Corporate Laws Committee of the Business Law Section; Life Member, American Law Institute; Honorary Member, American College of Corporate Governance

92.   Joel Seligman, Professor of Law, Washington University in St. Louis School of Law; President Emeritus and University Professor, University of Rochester; Dean Emeritus and Professor, Washington University; Former Dean and Samuel M. Fegtly Professor Law, University of Arizona

93.   Kevin R. Shannon, Partner, Potter Anderson & Corroon LLP; Member, Delaware Supreme Court Rules Committee; Member, Delaware Court of Chancery Rules Committee; Fellow, American College of Trial Lawyers

94.   Nicola Sharpe, Professor of Law, University of Illinois College of Law; Director, Chicago Business Law Program; Associate Academic Director, Center for Professional Responsibility in Business and Society, Gies College of Business

95.   David C. Shelton, Senior Vice President, General Counsel, and Corporate Secretary, The Chemours Company

96.   Omari Scott Simmons, Howard L. Oleck Professor of Business Law, Wake Forest University School of Law

97.   Laurie A. Smiley, Chair, Corporate Laws Committee, Business Law Section, American Bar Association; Former CEO, TAK Advisory Limited; Former General Counsel, Cascade Investment LLC

98.   D. Gordon Smith, Dean and Ira A. Fulton Chair, BYU Law School

99.   Larry Sonsini, Founding and Senior Partner, Wilson Sonsini Goodrich & Rosati; Former Member of the New York Stock Exchange Board of Directors, Chair of the NYSE Regulation, Enforcement and Listing Standards Committee, and Chair of the NYSE Commission on Corporate Governance; Chair of the American College of Governance Counsel; Former Member of Nasdaq Legal Advisory Committee

100.   Holger Spamann, Lawrence R. Grove Professor of Law, Harvard Law School

101. Gilchrist Sparks, III, Of Counsel, Morris, Nichols, Arsht & Tunnell LLP; Former Chair, Council of the Delaware State Bar Association Corporation Law Section; Former Chair, Corporate Laws Committee, Business Law Section, American Bar Association

102. James C. Spindler, Mark L. Hart, Jr. Endowed Chair in Corporate and Securities Law, University of Texas Law School; Professor, University of Texas McCombs School of Business

103. Dev Stahlkopf, Executive Vice President and Chief Legal Officer, Cisco Systems, Inc.

104. Robert Stebbins, Partner, Willkie Farr & Gallagher LLP; Former General Counsel, U.S. Securities and Exchange Commission

105. Myron T. Steele, Partner, Potter Anderson & Corroon LLP; Former Chief Justice of the Delaware Supreme Court; Former Vice Chancellor, Delaware Court of Chancery

106. Marc I. Steinberg, Rupert and Lillian Radford Chair in Law and Professor of Law, Southern Methodist University Dedman School of Law; Former Member, National Adjudicatory Council, Financial Industry Regulatory Authority; Former Attorney, Division of Enforcement and Office of the General Counsel, U.S. Securities and Exchange Commission

107. Joseph A. Stern, Managing Director and Senior Counsel, The Goldman Sachs & Co. LLC

108. Rachel Stern, Executive Vice President, Chief Legal Officer and Global Head of Strategic Resources, FactSet Research Systems Inc.

109. Leo E. Strine, Jr., Of Counsel, Wachtell, Lipton, Rosen & Katz; Former Chief Justice of the Delaware Supreme Court; Former Chancellor of the Delaware Court of Chancery; Former Vice Chancellor of the Delaware Court of Chancery; Michael L. Wachter Distinguished Fellow in Law and Policy, University of Pennsylvania Carey Law School; Senior Fellow, Harvard Program

on Corporate Governance; Former Special Judicial Advisor to the American Bar Association's Committee on Corporate Laws

110. Kristin Sverchek, President of Business Affairs, Lyft, Inc.; Former General Counsel, Lyft, Inc.

111. Eric Talley, Isidor and Seville Sulzbacher Professor of Law, Columbia Law School; Co-director, Ira M. Millstein Center for Global Markets and Corporate Ownership; Immediate Past Chair, Society for Empirical Legal Studies

112. Vicki O. Tucker, Former Chair, American Bar Association, Business Law Section

113. E. Norman Veasey, Special Counsel, Gordon, Fournaris & Mammarella; Former Chief Justice, Delaware Supreme Court; Honorary Fellow and Founding Chair, American College of Governance Counsel; Former Chair, American Bar Association, Business Law Section

114. Cheryl L. Wade, Harold F. McNiece Professor of Law, St. John's University School of Law

115. Elisse B. Walter, Former Chair, U.S. Securities and Exchange Commission; Former Director, Occidental Petroleum; Former Member, Sustainability Accounting Standards Board

116. David H. Webber, Professor of Law and Paul M. Siskind Scholar, Boston University School of Law

117. Cynthia A. Williams, Professor Emerita of Law, University of Illinois College of Law

118. Gregory P. Williams, Director, Richards, Layton & Finger; Former Chair, Litigation Rules Committee of the Delaware Supreme Court; Former Chair, Delaware Court of Chancery Rules Committee; Former Chair, Delaware Supreme Court Rules Committee; Former Chair, Corporate and Securities Law Subcommittee, United States Law Firm Group

## CERTIFICATE OF SERVICE

I, Jeffrey Dubner, counsel for Proposed Amici¸ certify that all counsel of record who have consented to electronic service are being served today with a copy of the foregoing brief via filing with the Clerk of the Court through the appellate CM/ECF. All parties in this case are represented by counsel consenting to electronic service.

*/s/ Jeffrey Dubner*
JEFFREY DUBNER

March 2, 2022

## CERTIFICATE OF COMPLIANCE

With Type-Volume Limit, Typeface Requirements,
and Type-Style Requirements

I certify that this filing complies with the type-volume limitation of Rule 32(a)(7)(B) because it contains 5,587 words, excluding the parts exempted by Fed. R. App. P. 32(f).

This filing also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Fifth Circuit Rule 32.1 and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Windows in Century Schoolbook 14-point font typeface, with 12-point font typeface for footnotes.

*/s/ Jeffrey Dubner*
JEFFREY DUBNER

February 25, 2022