No. 21-60626

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

**ALLIANCE FOR FAIR BOARD RECRUITMENT,
NATIONAL CENTER FOR PUBLIC POLICY RESEARCH,**

*Petitioners,*

**v.**

**SECURITIES AND EXCHANGE COMMISSION,**

*Respondent.*

_____

On Petition for Review of an Order of the
United States Securities and Exchange Commission
No. 34-92590

_____

**REPLY BRIEF FOR PETITIONER
ALLIANCE FOR FAIR BOARD RECRUITMENT**

_____

C. Boyden Gray
Jonathan Berry
  *Counsel of Record*
R. Trent McCotter
Michael Buschbacher
Jared M. Kelson
BOYDEN GRAY & ASSOCIATES
801 17th Street NW., Suite 350
Washington, DC 20006
202-809-5613
berry@boydengrayassociates.com
*Counsel for Petitioner Alliance
for Fair Board Recruitment*

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

### *Alliance for Fair Board Recruitment v. Securities and Exchange Commission*

No. 21-60626

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Local Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1. Petitioner Alliance for Fair Board Recruitment is a non-profit membership corporation and has no parent corporations or subsidiaries.

2. Petitioner National Center for Public Policy Research is a non-profit corporation and has no parent corporations or subsidiaries.

3. Respondent the Securities and Exchange Commission is a federal agency.

4. Intervenor Nasdaq Stock Market LLC has a parent company Nasdaq, Inc., and Borse Dubai Limited and Investor AB own more than 10 percent of Nasdaq, Inc.'s shares.

i

5. C. Boyden Gray, Jonathan Berry, R. Trent McCotter, Michael Buschbacher, Jared M. Kelson, and Jordan E. Smith of Boyden Gray & Associates—*Counsel for Petitioner Alliance for Fair Board Recruitment.*

6. Michael A. Conley, Daniel E. Matro, Vanessa Ann Countryman, and Tracy A. Hardin of the Securities and Exchange Commission—*Counsel for Respondent Securities and Exchange Commission.*

7. Allyson N. Ho, Bradley G. Hubbard, Amir C. Tayrani, Paulette C. Miniter, and Amalia E. Reiss of Gibson, Dunn & Crutcher LLP; John Zecca, Jeffrey S. Davis, John Yetter, and Joanne Pedone of The Nasdaq Stock Market L.L.C.; and Burt M. Rublin, Stephen J. Kastenberg, Paul Lantieri III, Peter F. Andrews, and Seth D. Berlin of Ballard Spahr LLP—*Counsel for Intervenor Nasdaq Stock Market, L.L.C.*

8. Aditya Dynar, Margaret A. Little, and Sheng Li of New Civil Liberties Alliance—*Counsel for Petitioner National Center for Public Policy Research.*

Dated: April 1, 2022                    /s/ Jonathan Berry

Jonathan Berry
*Counsel of Record for Petitioner*
*Alliance for Fair Board*
*Recruitment*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ..........................................i

TABLE OF CONTENTS ........................................................iv

TABLE OF AUTHORITIES......................................................vi

INTRODUCTION AND SUMMARY ........................................1

ARGUMENT ....................................................................3

I.  The Order and Rule Are Subject to Constitutional
    Scrutiny. .................................................................3

    A.  *Intercontinental Industries* and Its Progeny Remain
        Binding. .........................................................3

    B.  Even Without *Intercontinental Industries*, the
        Order and Rule Are Subject to Constitutional
        Review. .........................................................6

    C.  A Different Conclusion Would Result in an
        Unconstitutional Delegation of Legislative Power to
        Nasdaq..........................................................11

II. The Order And Rule Violate the Fifth Amendment's
    Equal Protection Principles. .................................13

    A.  The Minority Director Rule Fails Strict Scrutiny. ......13

    B.  The Female Director Rule Fails Heightened
        Scrutiny. .........................................................17

III. The Order and Rule Violate the First Amendment. ............17

IV. The Rule Violates the Exchange Act. .................................24

    A.  The Rule Does Not Further the Goals of the
        Exchange Act in Section 6(b)(5)..................................26

B.    The Rule Violates Prohibitions on SRO Rules in
         Sections 6(b)(5) and 6(b)(8). ...........................................30

V.    The Order and Rule Should Be Vacated in Their
         Entireties................................................................................33

CONCLUSION .........................................................................................34

CERTIFICATE OF COMPLIANCE......................................................35

CERTIFICATE OF SERVICE.................................................................36

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adarand Constructors, Inc. v. Peña*, 515 U.S. 200 (1995) ..................... 16

*AMI v. U.S. Dep't of Agric.*, 760 F.3d 18 (D.C. Cir. 2014) ......... 18, 23,24

*Blum v. Yaretsky*, 457 U.S. 991 (1982) .................................................. 8

*Burton v. Wilmington Parking Auth.*, 365 U.S. 715 (1961) ................... 6

*Bus. Roundtable v. SEC*, 905 F.2d 406 (D.C. Cir. 1990) ................ 29, 30

*Carter v. Carter Coal Co.*, 298 U.S. 238 (1936) ..................................... 12

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*,
　447 U.S. 557 (1980) ........................................................................... 23

*Coal. for Econ. Equity v. Wilson*, 122 F.3d 692 (9th Cir. 1997) ............. 16

*Dep't of Com. v. New York*, 139 S. Ct. 2551 (2019) ................................ 14

*Diaz v. Pan Am. World Airways, Inc.*, 442 F.2d 385 (5th Cir. 1971) .... 17

*Frazier v. Bd. of Trustees of Nw. Miss. Reg'l Med. Ctr.*,
　765 F.2d 1278 (5th Cir. 1985) ....................................................... 8, 10

*Full Value Advisors, LLC v. SEC*, 633 F.3d 1101 (D.C. Cir. 2011) ....... 22

*Gahagan v. USCIS*, 911 F.3d 298 (5th Cir. 2018) .................................. 6

*Gratz v. Bollinger*, 539 U.S. 244, 270 (2003) ........................................ 16

*Harding v. Am. Stock Exch., Inc.*, 527 F.2d 1366 (5th Cir. 1976) ........... 5

*In re Bonvillian Marine Serv., Inc.*, 19 F.4th 787 (5th Cir. 2021) ........... 6

*Intercont'l Indus., Inc. v. Am. Stock Exch.*, 452 F.2d 935
　(5th Cir. 1971) ....................................................................... 3, 4, 5, 6

*Jennings v. Mahoney*, 404 U.S. 25 (1971) ................................................ 5

*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011) .................. 27

*Moose Lodge No. 107 v. Irvis*, 407 U.S. 163 (1972) .................... 10, 11, 24

*N. Ala. Exp., Inc. v. United States*, 585 F.2d 783 (5th Cir. 1978) ........... 5

*NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*, 770 F.3d 1010
    (2d Cir. 2014) .............................................................................. 29

*Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518
    (D.C. Cir. 2015) ............................................................. 19, 20, 21, 22

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361
    (2018) ..................................................................................... 17, 19

*Plessy v. Ferguson*, 163 U.S. 537 (1896) ................................................ 16

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781 (1988) ....... 21

*SEC v. Chenery Corp.*, 318 U.S. 80 (1943) ................................. 13, 18, 26

*SEC v. Wall St. Publ'g Inst., Inc.*, 851 F.2d 365 (D.C. Cir. 1988) ......... 22

*Shelley v. Kraemer*, 334 U.S. 1 (1948) ..................................................... 9

*State v. Rettig*, 987 F.3d 518 (5th Cir. 2021) ......................................... 12

*Vill. of Bensenville v. FAA*, 457 F.3d 52 (D.C. Cir. 2006) ....................... 9

*W.H. Scott Constr. Co. v. City of Jackson*, 199 F.3d 206
    (5th Cir. 1999) ......................................................................... 15, 17

## U.S. CONSTITUTION

U.S. Const. amend. I ...................................1, 12, 17, 20, 21, 22, 23, 24, 25

U.S. Const. amend. V ........................................................ 1, 3, 4, 12, 13

**PUBLIC LAWS AND U.S. CODE**

15 U.S.C. § 78 ....................................................8, 9, 24, 26, 29, 30, 31, 32

42 U.S.C. § 1981 .............................................................................. 27, 32

**REGULATORY MATERIALS**

85 Fed. Reg. 80,472 (Dec. 11, 2020) ........................................... 14, 15, 30

86 Fed. Reg. 44,424 (Aug. 12, 2021).......................... 13, 14, 15, 18, 19, 33

**MISCELLANEOUS**

Hester M. Peirce, *We Are Not the Securities and Environment
    Commission—At Least Not Yet*, Mar. 21, 2022,
    https://www.sec.gov/news/statement/peirce-climate-disclosure-
    20220321 ...................................................................................... 21, 28

## INTRODUCTION AND SUMMARY

In its opening brief, Petitioner Alliance for Fair Board Recruitment ("the Alliance") demonstrated that this Court should vacate the Order and Rule because they violate the Fifth Amendment by encouraging discrimination on the basis of race and sex. The Alliance also demonstrated that the Order and Rule violate the First Amendment by compelling controversial speech.

In response, the SEC and Nasdaq barely dispute that the Order and Rule would fail constitutional scrutiny, instead claiming that the Constitution does not apply at all. But Petitioners challenge government action—the SEC's approval of the Rule. This Court has also held for over fifty years that the Constitution applies to actions taken by a Self-Regulatory Organization ("SRO") like Nasdaq in interdependent coordination with the SEC. The SEC has the statutory power to order Nasdaq to comply with the Rule, which is invalid absent SEC's independent determination that the Rule is in the public interest, and the SEC even added a new basis to support the Rule that Nasdaq itself never sought. This demonstrates the SEC's intimate and unusual involvement with promulgation and enforcement of the Rule, amounting

1

to state action. Because the Constitution applies, and because the Order and Rule do not satisfy heightened scrutiny, the Court should vacate them as unconstitutional.

Any other conclusion would violate the private nondelegation doctrine because the Exchange Act would delegate federal rulemaking authority to Nasdaq. The SEC and Nasdaq argue that Nasdaq is in the driver's seat for state-action purposes, but the SEC is in control for nondelegation purposes. They cannot have it both ways.

The Alliance also demonstrated that the Order and Rule violate the Exchange Act. In response, the SEC and Nasdaq insist this is just an ordinary disclosure regime. But they point to no prior example of the SEC compelling controversial speech to encourage decision-making on the basis of race and sex. Requiring such "disclosures" for social-justice reasons is not an acceptable statutory basis.

Finally, the SEC and Nasdaq repeatedly assert that companies can always delist themselves and seek another exchange. But race and sex discrimination have *never* been acceptable simply because a party could seek business elsewhere.

# ARGUMENT

## I.  THE ORDER AND RULE ARE SUBJECT TO CONSTITUTIONAL SCRUTINY.

### A.  *INTERCONTINENTAL INDUSTRIES* AND ITS PROGENY REMAIN BINDING.

In its opening brief, the Alliance demonstrated that the Order and Rule are subject to constitutional scrutiny pursuant to this Court's decision in *Intercontinental Industries, Inc. v. American Stock Exchange*, 452 F.2d 935 (5th Cir. 1971), which addressed an order of the SEC granting the American Stock Exchange ("ASE")—an SRO like Nasdaq— the right to strike a common stock from listing and registration on its exchange. The Court held that ASE's delisting procedures "do not provide the necessary elements for constitutional due process," expressly rejecting ASE's argument that "constitutional due process is not required since [ASE] is not a governmental agency." *Id.* at 940, 941. Citing a bevy of other decisions, this Court held that ASE's attempt to avoid constitutional scrutiny "is clearly contrary to numerous court decisions," and that the "intimate involvement of [ASE] with the Securities and Exchange Commission brings it within the purview of the Fifth Amendment controls over governmental due process." *Id.*

3

The SEC and Nasdaq claim the Court's analysis was "cursory dicta." SEC.Br.49; *see* Nasdaq.Br.42–43. But whether the Fifth Amendment applied to ASE was a threshold question that this Court necessarily resolved before proceeding to the merits. This Court cited numerous decisions and expressly rejected the argument—raised by ASE itself—that ASE was not subject to the Fifth Amendment when closely coordinating with the SEC. *Intercont'l Indus.*, 452 F.2d at 941 & n.9. This Court then proceeded to address at length whether ASE had complied with the requirements of due process, an analysis predicated on the determination that the Fifth Amendment applied. *Id.* at 941–43.

The SEC and Nasdaq point to part of *Intercontinental Industries* saying the Court need not "decide those points," SEC.Br.49; Nasdaq.Br.43, but that language refers to the immediately preceding paragraph, which discussed whether there were sufficient property or economic interests at issue such that due process would require a hearing, *not* whether ASE's actions in conjunction with the SEC were subject to constitutional scrutiny in the first place (a point the Court had already emphatically resolved against ASE in a prior paragraph). *See Intercont'l Indus.*, 452 F.2d at 941.

This reading is confirmed by the fact that the Court immediately stated that "[t]he important thing to be determined in this litigation is whether the Exchange did grant INI a hearing meeting all the applicable procedural requirements." *Id.* That inquiry would make no sense if the Court had not already held that the Due Process Clause applied, as there would be no "applicable procedural requirements" for purely private action.[1]

In any event, this Court has since cited *Intercontinental Industries* for its constitutional holding, both confirming that this aspect of the opinion was not dicta and providing independent precedents that are likewise binding. *See Harding v. ASE*, 527 F.2d 1366, 1370 n.5 (5th Cir. 1976); *N. Ala. Exp., Inc. v. United States*, 585 F.2d 783, 786 (5th Cir. 1978). The SEC and Nasdaq do not address these other precedents.

---

[1] This is further supported by *Intercontinental Industries*' invocation of *Jennings v. Mahoney*, 404 U.S. 25 (1971) (per curiam), where the Supreme Court cited precedent that due process requirements applied to state traffic statutes, but concluded it was unnecessary to resolve whether the traffic statute at issue "afford[ed] the procedural due process required" because the petitioner had received a constitutionally sufficient hearing. *Id.* 26. This Court in *Intercontinental Industries* likewise held that due process applied, but then declined to decide whether a hearing was necessary because INI had received one that would satisfy due process.

5

The SEC next argues that *Intercontinental Industries* relies on *Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961), and that *Burton* has been "substantially limited by subsequent decisions." SEC.Br.50; *see* Nasdaq.Br.44. But none of those subsequent decisions about *Burton* limited *Intercontinental Industries*. This Court does not infer an overruling absent the most compelling evidence—"the [Supreme Court] decision must unequivocally overrule prior precedent." *Gahagan v. USCIS*, 911 F.3d 298, 302 (5th Cir. 2018). Neither the SEC nor Nasdaq asserts that this high standard is met here.

Meanwhile, the factual posture of *Intercontinental Industries* is almost exactly the same as here. In issuing and enforcing the Rule, Nasdaq is "intimate[ly]" involved with the SEC. 452 F.2d at 941; *see also* Part I.B, *infra*. This Court's "strict and rigidly applied" prior-panel rule therefore applies. *In re Bonvillian Marine Serv., Inc.*, 19 F.4th 787, 792 (5th Cir. 2021).

## B. EVEN WITHOUT *INTERCONTINENTAL INDUSTRIES*, THE ORDER AND RULE ARE SUBJECT TO CONSTITUTIONAL REVIEW.

Even if the Court considered the issue on a blank slate, the Order and Rule qualify as state action. Alliance.Br.22–23; *see also Intercont'l*

6

*Indus.*, 452 F.2d at 941 n.9. The SEC issued the Order being challenged, the Rule required SEC approval, the SEC independently justified and made policy judgments about the Rule, and Nasdaq has an ongoing statutory obligation to enforce the Rule, subject to SEC sanctions if it does not.

The SEC argues that its own "approval" of the Rule is somehow not state action, SEC.Br.43, but the SEC is obviously a governmental entity, and its approval order, as the SEC has conceded, constitutes "final agency action." The SEC cites cases about whether the government is "responsible for a private decision," *id.*, but that ignores that the Alliance is also challenging the SEC's *own* actions.

The SEC responds that its "independent finding" that the Rule is consistent with the Exchange Act is not a sufficient level of government involvement to trigger constitutional review. SEC.Br.44. But as its lengthy Order demonstrates, the SEC's review is no mere ministerial task. Rather, the SEC determined whether the Rule satisfies a bevy of open-ended, discretionary policy standards like "promot[ing] just and equitable principles of trade," "protect[ing] investors and the public interest," and considering whether it "impose[s] any burden on

competition not necessary or appropriate." 15 U.S.C. §§ 78s(b)(2)(C), 78f(b)(5), (8). The SEC even added an entirely new subjective basis for approval that Nasdaq itself never sought, SEC.Br.32, and relied on "studies Nasdaq had not cited and comments and statements from investors and other corporate stakeholders," *id.*, which makes this a far cry from "[m]ere approval of or acquiescence in the initiatives of a private party," SEC.Br.37 (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004–05 (1982)). Thus, the SEC certainly "'is responsible for the specific conduct of which the plaintiff complains.'" *Id.* at 43 (quoting *Blum*, 457 U.S. at 1004).

Moreover, there is a "symbiotic relationship" between the SEC and Nasdaq here, "denot[ing] a level of functional intertwining whereby the state plays some meaningful role in the mechanism leading to the disputed act," triggering state-action review. *Frazier v. Bd. of Trustees of Nw. Miss. Reg'l Med. Ctr.*, 765 F.2d 1278, 1288 (5th Cir. 1985). For example, pursuant to the Exchange Act, the Rule is invalid unless the SEC approves it, *see* 15 U.S.C. § 78s(a)–(b), and Nasdaq has an ongoing

statutory duty to enforce the Rule, subject to SEC sanctions including revocation of Nasdaq's registration, *see* 15 U.S.C. § 78s(g)(1), (h)(1).[2]

The SEC also downplays its authority to "abrogate, add to, and delete from … the rules of a self-regulatory organization," 15 U.S.C. § 78s(c), because this power does not apply to its initial review of rules proposed by Nasdaq. *See* SEC.Br.45. But that misses the point: the SEC's power to unilaterally modify Nasdaq's rules after issuance (and thereby require Nasdaq to enforce the changes against its issuers) is yet another example of the unusually intimate involvement of the SEC in SROs' rule-enforcement process. The SEC cannot facilitate, approve, and require compliance with unconstitutional rules just because Nasdaq suggests them first.

The simple truth is that a Rule that facially discriminates based on race and sex now has the imprimatur and backing of the federal government. This case thus tracks *Shelley v. Kraemer,* 334 U.S. 1 (1948),

---

[2] The fact that Nasdaq cannot promulgate the Rule without SEC approval distinguishes this case from *Village of Bensenville v. FAA*, 457 F.3d 52 (D.C. Cir. 2006), where (contrary to Nasdaq's assertion, Nasdaq.Br.39–40), the FAA's approval was *not* required to make alterations to O'Hare Airport. *See* 457 F.3d at 57, 65 (noting that FAA approval was needed only if the airport "wishes to receive any federal funding," and the alterations would "proceed without federal funds if necessary").

and *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163 (1972), where the Supreme Court enjoined government action that would ultimately encourage or compel discrimination. *See also Frazier*, 765 F.2d at 1286 (holding that "private conduct is fairly attributable" to the government where the "state has had some affirmative role, albeit one of encouragement short of compulsion"). The SEC tries to distinguish *Shelley* but inadvertently emphasizes how its facts are similar to those here: "the necessary effect of the challenged orders was to coerce acts of racial discrimination that would not have otherwise occurred." SEC.Br.48. Through the Exchange Act, the Order requires Nasdaq to enforce the Rule against Nasdaq issuers, which encourages decisions to be made on the basis of protected categories like race and sex. The fact that Nasdaq may want to encourage discrimination anyway does not excuse the governmental compulsion that now ensures it happens.

Nasdaq adds that "[s]ubsequent enforcement of the rules by Nasdaq doesn't convert their adoption into state action." Nasdaq.Br.42 n.3. But that misses the point. The relevant consideration is that the Order, through the Exchange Act, *requires* Nasdaq to enforce the Rule. Just as in *Moose Lodge*: a "regulation [that] requires compliance by [a private

party] with provisions of its constitution and bylaws containing racially discriminatory provisions" is unconstitutional. 407 U.S. at 179. That alone resolves the matter.

The SEC acknowledges that SROs "exercise 'delegated government power' … where they act as regulators of their broker-dealer members," but insists that this does not apply when SROs "propose or enforce listing standards" for Nasdaq issuers (*i.e.*, Nasdaq-listed companies). SEC.Br.9. But because Nasdaq is statutorily required to enforce its listing standards against *issuers* or else face SEC sanctions, enforcement of the Rule is likewise government-compelled enforcement.

Nasdaq claims that subjecting the Order and Rule to constitutional review "would massively expand who is considered a state actor," Nasdaq.Br.29, but tellingly Nasdaq fails to identify other scenarios involving the unique type of statutorily mandated, interdependent and coordinated enforcement regime as here.

### C.    A DIFFERENT CONCLUSION WOULD RESULT IN AN UNCONSTITUTIONAL DELEGATION OF LEGISLATIVE POWER TO NASDAQ.

Delegating rulemaking authority under federal statutes like the Exchange Act to private parties would violate the private nondelegation

11

doctrine. *See Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936). In the state-action portions of their briefs, the SEC and Nasdaq insist that the Rule, its approval, and its subsequent enforcement by Nasdaq under penalty of SEC sanctions are purely private actions. But when confronted with the argument that this violates the private nondelegation doctrine, the SEC and Nasdaq insist that Nasdaq functions subordinately to the SEC, and that the SEC's review of the Rule insulates it from any private nondelegation challenge. *See* SEC.Br.42; Nasdaq.Br.45n.6. They cannot have it both ways.

This Court held in *State v. Rettig* that a supervising agency must "independently perform its reviewing, analytical and judgmental functions," or else there is a private nondelegation violation. 987 F.3d 518, 532 (5th Cir. 2021) (cleaned up). If the SEC performed such a review here, there is state action, and the Order and Rule violate the First and Fifth Amendments as demonstrated below. If the SEC did not perform such a review here, there is a nondelegation violation. Either way, the Order and Rule are invalid.

II.     **THE ORDER AND RULE VIOLATE THE FIFTH AMENDMENT'S EQUAL PROTECTION PRINCIPLES.**

The Order includes only one vague sentence stating the Order and Rule would allegedly pass constitutional muster under the equal protection principles in the Fifth Amendment. 86 Fed. Reg. 44,424, 44,440 (Aug. 12, 2021), JA17. Because the SEC is limited to those reasons it provided below, *SEC v. Chenery Corp.*, 318 U.S. 80, 92–95 (1943), this Court should find those issues forfeited and vacate the Order and Rule as unconstitutional.

In any event, the SEC's brief provides only the most cursory response to the equal protection claim. SEC.Br.56–57. And Nasdaq's brief provides no response at all.

A.     **THE MINORITY DIRECTOR RULE FAILS STRICT SCRUTINY.**

The Supreme Court and this Court have long held that strict scrutiny is triggered whenever the government *encourages* decision-making on the basis of race. *See* Alliance.Br.13–20, 24–29 (citing cases). The Order and Rule encourage discrimination by requiring certain numbers of racial or sexual minorities to be board members, or else the company must publicly explain in writing why it did not meet this quota.

13

The Alliance also demonstrated that there are no compelling government interests, nor is there narrow tailoring. Alliance.Br.24–36.

In response, the SEC has only one argument: the Order and Rule "merely require[] a factual disclosure." SEC.Br.56. This argument is both wrong and irrelevant. Judges "are not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575–76 (2019) (cleaned up). If the Rule did not encourage choices based on protected categories, it would not serve its announced purpose of increasing the number of minorities and women on boards. *See* 86 Fed. Reg. at 44,428, JA5 (SEC explaining "the proposal may have the effect of *encouraging* some Nasdaq-listed companies to increase" the number of women and minorities on their boards); 85 Fed. Reg. 80,472, 80,496 (Dec. 22, 2020), JA713 (Nasdaq admitting the Rule is "a regulatory impetus to drive meaningful and systemic change in board diversity"); 86 Fed. Reg. at 44,430 n.89, JA7 n.89 (Nasdaq insisting that "*absent encouragement*, progress toward increased board diversity has been demonstrably slow, and … regulatory action has proven effective in removing barriers and increasing board diversity"); *id.* at 44,429, JA6 ("[Nasdaq] asserts that the disclosure-based framework of proposed Rule

14

5605(f) may influence corporate conduct if a company chooses to meet the proposed diversity objectives, and could help increase opportunities for Diverse candidates." (footnotes omitted)).

The Rule even exempts issuers whose boards are not subject to election, *id.* at 44,435 n.149, JA12 n.149, demonstrating the purpose is not to provide diversity data but to spur changes in the demographic composition of boards. And further rebutting the SEC's "mere disclosure" theory, Nasdaq cited evidence that "comply-or-explain" rules have driven increased hiring based on protected statuses *precisely because* compelled explanations deter non-compliance. 85 Fed. Reg. at 80,496, JA713; Nasdaq Amendment Letter at 25–26, JA222–23. The Order and Rule do not impose mine-run financial disclosure requirements.

The SEC claims that racial hiring goals trigger strict scrutiny only "when combined with an enforcement mechanism" that requires discrimination. SEC.Br.56. That is wrong. In *W.H. Scott Construction Co. v. City of Jackson*, the defendant likewise argued that "policies that merely encourage participation 'goals,' rather than mandate strict 'quotas'" do not trigger strict scrutiny, but this Court rejected that view because "'the relevant question is not whether a statute requires the use

of such measures, but whether it authorizes or encourages them.'" 199 F.3d 206, 215 (5th Cir. 1999). "[A]ny one of these techniques induces an employer to hire with an eye toward meeting a numerical target. As such, they can and surely will result in individuals being granted a preference because of their race," triggering strict scrutiny. *Id.* (cleaned up).

In fact, "[a]ny governmental action that classifies persons by race is presumptively unconstitutional and subject to the most exacting scrutiny." *Coal. for Econ. Equity v. Wilson*, 122 F.3d 692, 702 (9th Cir. 1997); *see Gratz v. Bollinger*, 539 U.S. 244, 270 (2003) ("Racial classifications are simply too pernicious to permit any but the most exact connection between justification and classification."); *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 224 (1995); *cf. Plessy v. Ferguson*, 163 U.S. 537, 554 (1896) (Harlan, J., dissenting) ("[T]he constitution of the United States does not, I think, permit any public authority to know the race of those entitled to be protected in the enjoyment of such rights").

The Order and Rule are therefore subject to the most searching of reviews "under strict scrutiny," *Scott Constr.*, 199 F.3d at 215-17, which the SEC's brief never attempts to satisfy, thereby conceding the matter.[3]

## B.   THE FEMALE DIRECTOR RULE FAILS HEIGHTENED SCRUTINY.

The Alliance's opening brief demonstrated that the Female Director Rule likewise triggers and fails heightened constitutional scrutiny. Alliance.Br.39–41. The SEC's brief provides no separate reasoning for this aspect of the Rule, and Nasdaq's brief provides no response at all. The Court should thus hold the female-director aspect of the Rule unconstitutional, as well.

## III.   THE ORDER AND RULE VIOLATE THE FIRST AMENDMENT.

The Order and Rule violate the First Amendment by compelling controversial speech without satisfying strict scrutiny as required by *National Institute of Family & Life Advocates v. Becerra ("NIFLA")*, 138 S. Ct. 2361 (2018). *See* Alliance.Br.42–54.

---

[3] The SEC elsewhere contends that it is satisfying "market demand," SEC.Br.1, but this Court has held that "it would be totally anomalous if we were to allow the preferences and prejudices of the customers to determine whether the [protected category] discrimination was valid," *Diaz v. Pan Am. World Airways, Inc.*, 442 F.2d 385, 389 (5th Cir. 1971).

As noted, the SEC's Order includes only one vague sentence on this, *see* 86 Fed. Reg. at 44,440, JA17, which not only fails to address strict scrutiny—or any other form of heightened scrutiny—but also neglects to address tailoring and incorrectly asserts that the Rule simply requires disclosures that are "factual in nature." Any additional arguments are forfeited under *Chenery*, 318 U.S. at 92–95. But even if the Court reaches those arguments, it should reject them.

The Alliance's opening brief showed that the speech required by the Order and Rule is "controversial" under *NIFLA* and thus triggers strict scrutiny. Alliance.Br.42–50. Diversity quotas and affirmative action are inherently controversial. And, as then-Judge Kavanaugh noted, one sign of compelled controversial speech is when the government is not "'evenhanded.'" Alliance.Br.44 (quoting *AMI v. U.S. Dep't of Agric.*, 760 F.3d 18, 34 (D.C. Cir. 2014) (en banc) (Kavanaugh, J., concurring)). The SEC insists the quota-or-explain disclosure *is* evenhanded because "it applies regardless of a company's position on the value of board diversity." SEC.Br.55. But the SEC and Nasdaq concluded that the only companies that need to provide an explanation—and thus identify themselves for "informed conversations" about diversity, or who require

"critical evaluat[ion]" of their "decisions with respect to how, whether, or when to pursue board diversity"—are those that fail to meet the imposed quotas. 86 Fed. Reg. at 44,429, 44,430; JA6, 7. And the fact that the SEC claims not to care what explanation a company provides just proves that there is no interest beyond forcing non-complying companies to identify themselves for public scorn. Alliance.Br.47.

Accordingly, this is no different than the "not conflict free" labeling for minerals at issue in *National Association of Manufacturers* (*"NAM"*) *v. SEC*, which similarly applied regardless of a company's position on the Congo war. 800 F.3d 518, 530 (D.C. Cir. 2015). Yet the goal of shaming companies by making them adopt the label was obvious—a label the D.C. Circuit called "hardly factual and non-ideological"—and the mandated disclosure failed strict scrutiny. *Id.* (cleaned up).[4]

The SEC responds that there is no "'risk that the State has left unburdened those speakers whose messages are in accord with its own views,'" SEC.Br.55 (quoting *NIFLA*, 138 S. Ct. at 2378), but that ignores

---

[4] The SEC claims that such shaming is "speculation," SEC.Br.27, but the SEC is barred from disputing this point because the Alliance provided expert evidence below of such harms, which the SEC never rebutted. Alliance.Cmt.31–33, 107–10, JA79–81, 151–54.

reality. Selective explanation requirements necessarily impose asymmetrical burdens.

This obvious moral opprobrium is another tell-tale sign of compelled controversial speech. As in *NAM,* compelling a company to use even a "metaphor that conveys moral responsibility" triggers strict scrutiny as compelled controversial speech. 800 F.3d at 530. The SEC does the same here by making non-compliant companies raise their hands for shaming. "Requiring a company to publicly condemn itself is undoubtedly a more 'effective' way for the government to stigmatize and shape behavior than for the government to have to convey its views itself, but that makes the requirement more constitutionally offensive, not less so." *Id.* (cleaned up).

Anticipating the kind of compelled controversial speech here, *NAM* explained that "requir[ing] issuers to disclose … the political ideologies of their board members, as part of their annual reports," would be "obviously repugnant to the First Amendment." *Id.* Requiring issuers to disclose or make explanations about the race, sex, and sexual orientation of their boards is no less repugnant. *NAM* refutes the SEC's suggestion that only speech about abortion is considered so "controversial" as to

trigger strict scrutiny. *See* SEC.Br.54. Matters of race-, sex-, and sexual orientation-based affirmative action are at least as controversial as political ideology.

The SEC argues that the petitioners in *NAM* were required to utter "government-dictated language," whereas the Order and Rule allow companies to "craft the explanation themselves." SEC.Br.54. But that is hardly a distinction. "[T]he right to explain compelled speech is present in almost every such case and is inadequate to cure a First Amendment violation." *NAM*, 800 F.3d at 556; *see also Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988) ("Mandating speech that a speaker would not otherwise make necessarily alters the content of the speech.").

Moreover, "the information is unrelated, or only tangentially related, to the statutory objectives [of the SEC]," meaning "it likely is controversial" for the SEC to demand such information. SEC Comm'r Hester M. Peirce, *We Are Not the Securities and Environment Commission—At Least Not Yet*, Mar. 21, 2022, https://www.sec.gov/news/statement/peirce-climate-disclosure-20220321.

Because strict scrutiny applies and the SEC never claims it can satisfy that standard, the Court should hold that the Order and Rule violate the First Amendment.

The SEC pivots and insists that only "lower scrutiny" applies because the SEC—apparently unique among all actors in the federal government—is entitled to special constitutional solicitude when it compels speech. SEC.Br.52. But *NAM* rejected the theory that "'the federal government's broad powers to regulate the securities industry'" warrant any special rule for the SEC. 800 F.3d at 555. If it were otherwise, the SEC could "easily regulate otherwise protected speech using the guise of securities laws." *Id.*[5]

---

[5] The SEC's citation to *Full Value Advisors, LLC v. SEC*, 633 F.3d 1101, 1109 (D.C. Cir. 2011); SEC.Br.52, is off-base because that case says nothing about the level of scrutiny, and was about disclosure *to the SEC* of holdings by institutional investment managers necessary for the "essential operations" of government, which is inapplicable here. The SEC also relies on *SEC v. Wall Street Publishing Institute, Inc.*, 851 F.2d 365 (D.C. Cir. 1988), but that case is limited to regulating "'inherently misleading' speech 'employed ... to sell securities,'" which is not at issue here. *NAM*, 800 F.3d at 555. The SEC's remaining cases are likewise unpersuasive because they merely recognize that some regulation of securities information is permissible, sometimes as commercial speech in the case of requiring advertisers to disclose they're being paid to promote a security.

The SEC invokes *Central Hudson Gas & Electric Corp. v. Public Service Commission*, but the Order and Rule do not regulate "speech proposing a commercial transaction." 447 U.S. 557, 561–62 (1980); *see* SEC.Br.55. Regardless, the SEC cannot demonstrate the "substantial [government] interest" and tailoring required to satisfy heightened review of commercial speech. *Central Hudson*, 447 U.S. at 564.[6] The SEC argues that there is a "substantial interest" in mandating information for securities markets, SEC.Br.55, but that rehashes the SEC's erroneous claim to First Amendment exceptionalism, and in any event the SEC never bothers to answer the Alliance's point (quoting then-Judge Kavanaugh) that "'it is plainly not enough for the Government to say simply that it has a substantial interest in giving consumers information'" because "'that would be true of any and all disclosure requirements.'" Alliance.Br.52 (quoting *AMI*, 760 F.3d at 31 (Kavanaugh,

---

[6] The SEC claims that the Alliance "make[s] no argument that [the Order and Rule] would not satisfy [lesser] scrutiny" requiring a substantial government interest. SEC.Br.51. The SEC ignores no fewer than *four* occasions where the Alliance made exactly that argument. Alliance.Br.43 ("there is no compelling (or even substantial) government interest at stake"); *id.* at 51 ("the claim that providing more information is a compelling or even 'substantial' government interest is a flawed and circular theory"); *id.* (there is no "'substantial interest in providing consumers with information'"); *id.* at 52 (same).

23

J., concurring)). Nor does the SEC answer the Alliance's point (again quoting then-Judge Kavanaugh) that "'consumer curiosity alone is not a strong enough state interest to sustain a compelled commercial disclosure.'" *Id.* (quoting *AMI*, 760 F.3d at 32 (Kavanaugh, J., concurring)).

The SEC barely responds to the Alliance's arguments that the Order and Rule lack narrow tailoring, Alliance.Br.52–53, responding only that such underinclusiveness should be "encouraged" as a form of "restricting less speech," SEC.Br.55. Speech codes are not any more acceptable because the government could have committed an even more egregious First Amendment violation. The proper way to "restrict[] less speech" would have been to reject the Rule altogether.

## IV. THE RULE VIOLATES THE EXCHANGE ACT.

A proposed rule cannot be "consistent with the requirements of" the Exchange Act, 15 U.S.C. § 78s(b)(2)(C)(i), if the rule would be unconstitutional or would render unconstitutional other provisions of the same statute—like the enforcement provisions, discussed above, *see Moose Lodge*, 407 U.S. at 179. The Rule therefore violates the Exchange Act. *See* Alliance.Br.58–67.

24

The SEC and Nasdaq nonetheless press forward with variations on a single argument—the Rule is a "disclosure-based framework" that has been requested by some investors and therefore necessarily satisfies all statutory requirements because an investor must be able to determine "'the value of the securities he buys or sells.'" SEC.Br. 22–36; Nasdaq.Br.47–65. That is incorrect. The SEC concluded there is no established causal relationship between diversity and corporate performance—*i.e.*, "value"—meaning the SEC is requiring action to achieve a goal the SEC itself has disclaimed as unsupported by substantial evidence. Moreover, as explained, the Rule is not a true disclosure regime. Nasdaq and the SEC admitted below that the Rule aims to encourage board changes on the basis of protected categories. These flaws eliminate the "disclosure" justification, which was the sole rationale relied on by the SEC below, warranting vacatur of the Order and Rule on this basis alone.

Further, the disclosure requirement in the Rule does not satisfy the requirements of the Exchange Act, as demonstrated next.

### A.    THE RULE DOES NOT FURTHER THE GOALS OF THE EXCHANGE ACT IN SECTION 6(B)(5).

***The Rule Is Not Designed to Promote Just and Equitable Principles of Trade.*** Nasdaq did not argue below that its Rule would "promote just and equitable principles of trade," 15 U.S.C. § 78f(b)(5), but the SEC jumped in and provided the justification that Nasdaq had omitted. The SEC insists that "[n]othing in the Act or [SEC] rules limits the [SEC] to the statutory factors analyzed by [Nasdaq]" and that *Chenery* does not apply here, either. SEC.Br.32. Even if true, this only confirms the Alliance's argument above that the SEC's approval is state action. *See* Part I, *supra*. The SEC and Nasdaq elsewhere insist this is Nasdaq's Rule, promulgated by Nasdaq's authority to self-regulate, yet the SEC invoked a legal theory and justification not relied on by the entity allegedly exercising its own powers. *See Chenery*, 318 U.S. at 92 ("[T]he difficulty remains that the considerations" adopted by the SEC "were not those upon which [the Rule] was based."). By insisting that no statute, rule, or even *Chenery* limits the bases on which it could approve the Rule, the SEC concedes it was in the driver's seat.

Regardless, neither the SEC nor Nasdaq points to *any* authority allowing them to establish demographic requirements, showing that, far

from regulating "trade," they are regulating "social justice." And even if it were regulating trade, requiring disclosures to facilitate and encourage decision-making based on protected categories like race is the antithesis of "just and equitable principles," given that it violates the Constitution and 42 U.S.C. § 1981's prohibition on racial discrimination in contracting.

The Alliance also demonstrated in its opening brief that the disclosure power is limited to "material" information, but the Rule cannot satisfy this requirement because the SEC concluded below that diversity has no confirmed, demonstrable effect on corporate performance. Alliance.Br.60–61. The SEC and Nasdaq insist there is no textual requirement for materiality in the Exchange Act, and that materiality is required only under the "antifraud provisions of the federal securities laws." SEC.Br.30; Nasdaq.Br.60. But this ignores that the Supreme Court has identified a materiality requirement in those anti-fraud provisions—which are part of the Exchange Act—even though their text likewise does not expressly use the word "material." *See, e.g.*, *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011); Alliance.Br.60n.6 (collecting cases). The SEC and Nasdaq have no response to the Alliance's

argument that a materiality requirement is likewise in the disclosure statutes—an interpretation that would also avoid serious First Amendment concerns. *See* Peirce, *supra* ("[T]o qualify as uncontroversial and thereby stay within First Amendment bounds, our disclosure mandates must be limited to information that is material to the prospect of financial returns.").

Nasdaq argues that, even if materiality is required, the "broad demand for this information" demonstrates materiality and thus is "sufficient, standing alone, to establish that the [Rule] will further the Exchange Act's disclosure-related objectives." Nasdaq.Br.54; *id.* at 62. But not even the SEC goes that far, conceding that exchanges cannot simply "require any disclosure that investors request." SEC.Br.29. Nasdaq is ultimately left to argue materiality on the basis that "diverse" corporate boards perform better, Nasdaq.Br.63, but again the SEC refused to adopt that basis below.

### *The Rule Does Not Protect Investors or the Public Interest.*

The SEC and Nasdaq do not dispute that the "public interest" standard "concern[s] the administration and operation of the self-regulatory organizations themselves, *not the fairness of the issuers' corporate*

structures." *Bus. Roundtable v. SEC ("Bus. Roundtable I")*, 905 F.2d 406, 413 (D.C. Cir. 1990) (emphasis added); *see* Alliance.Br.61–62. This alone resolves this statutory factor because the Rule is aimed at "issuers' corporate structures," not at Nasdaq itself.

Moreover, as demonstrated above, there is simply no "public interest" served by encouraging contracting decisions to be made based on protected categories like race and sex.

***The Rule Does Not Remove Impediments to or Perfect the Mechanism of a Free and Open Market and a National Market System.*** The SEC and Nasdaq barely attempt to link disclosure of diversity information with free and open markets. They apparently believe expanding access to information is necessarily satisfactory. SEC.Br.23–24; Nasdaq.Br.20. That is wrong because this statutory provision's references to a "free and open market" and a "national market system" mean "a fair and orderly *exchange.*" *NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*, 770 F.3d 1010, 1021 (2d Cir. 2014) (emphasis added). The statute thus refers to Nasdaq's own mechanisms for trading, not to the demographics of Nasdaq-listed companies' boards or the market for board candidates. *See* 15 U.S.C. § 78k-1(a)(1)(A). This alone resolves this factor

in favor of the Alliance, given that the Rule operates at the corporate-board level, not at the exchange level. *See Bus. Roundtable I*, 905 F.2d at 416.

**B.    THE RULE VIOLATES PROHIBITIONS ON SRO RULES IN SECTIONS 6(B)(5) AND 6(B)(8).**

If the Rule is found to violate any of the three following prohibitions, it is invalid under the Exchange Act. The Rule violates all three.

***The Rule Results in Unfair Discrimination Among Issuers.***

The Rule violates the prohibition in Section 6(b)(5), 15 U.S.C. § 78f(b)(5), of unfair discrimination among issuers. Alliance.Br.64–65. The SEC and Nasdaq merely parrot their assertion that the Rule gives foreign issuers "flexibility" in satisfying the quotas because of "the unique demographic composition of the United States." SEC.Br.33; Nasdaq.Br.66; 85 Fed. Reg. 80,501, JA718. But even if that could justify allowing foreign issuers to fill their second diversity slot with an "indigenous, cultural, religious, or linguistic" minority in its own country, it makes no sense *also* to allow foreign issuers to fill their second diversity slot with a woman. Not only does this bizarrely treat women as interchangeable with racial minorities, but it also makes it far easier for foreign issuers to comply with the Rule because women represent roughly 50% of the population.

Nasdaq argues that more stringent requirements for foreign companies "would result in unfair discrimination against foreign issuers." Nasdaq.Br.67. But this proves the Alliance's point: more stringent requirements for *domestic* companies results in unfair discrimination against them. This one concession alone resolves the entire statutory-authority issue.

Moreover, the SEC never explains why it would allow foreign companies flexibility if the purpose of the Rule is truly a desire for uniform disclosure. By recognizing the need for flexibility in satisfying the Rule, the SEC and Nasdaq admit the Rule is intended to change board compositions and that the alternative "explanation" requirement imposes a real cost on companies that needs to be mitigated in some contexts. The Rule thus unfairly discriminates against companies that fail to comply with the diversity quota.

***The Rule Regulates Matters Unrelated to the Purposes of the Exchange Act.*** The Rule also regulates "matters not related to the purposes of [the Exchange Act] or the administration of the exchange." 15 U.S.C § 78f(b)(5). Nothing in the Exchange Act supports the acknowledged objective of changing corporate board composition,

31

especially when the SEC cannot bring itself to say that "diverse" boards improve corporate performance. Nasdaq's willingness to facilitate "diversity hires" via the board recruitment provision is more evidence that the goal is to effect change and encourage decisions to be made on the basis of protected categories.

Thus, even assuming SROs have broader regulatory power than the SEC, *see* SEC.Br.31; Nasdaq.Br.59, that power does not extend to regulations that encourage violations of the Constitution or other federal laws like 42 U.S.C. § 1981.

***The Rule Unnecessarily and Inappropriately Burdens Competition and Harms Investors.*** No SRO rule may "impose any burden on competition not necessary or appropriate" to advance the purposes of the Exchange Act. 15 U.S.C. § 78f(b)(8). The SEC and Nasdaq attack a strawman by claiming there is no requirement for a "formal, quantitative cost-benefit analysis." SEC.Br.35; Nasdaq.Br.67. The Alliance's point is that the SEC refused to weigh the social costs, on the erroneous theory that companies could costlessly "explain" why they did not comply with the quota. But that contradicts the SEC's and Nasdaq's own arguments (noted above) about the need for "flexibility" so foreign

issuers will not incur the costs of having to explain their failure to satisfy the quotas. Moreover, the Alliance submitted unrebutted expert evidence below that the costs of non-compliance are tremendous, Alliance.Cmt.31–33, 107–10, JA79–81, 151–54, and the SEC cannot now challenge that conclusion.

Company Doe's affidavit explains how the Rule forces companies to choose between three impossible burdens: (1) discriminate on the basis of race and sex, in violation of law; (2) subject themselves to public shaming for not satisfying Nasdaq's quotas, resulting in loss of corporate value; or (3) delist altogether from Nasdaq, a move so fraught that it is nearly unthinkable. Alliance.Br.Ex.2¶¶7–10. The SEC did not meaningfully engage with these burdens, instead flippantly stating that companies could either "explain" their failure to satisfy the quotas, or just list elsewhere. 86 Fed. Reg. at 44,428, 44,433, 44,436, 44,441, JA5, 10, 13, 18.

## V.    THE ORDER AND RULE SHOULD BE VACATED IN THEIR ENTIRETIES.

In its opening brief, the Alliance argued that if "any part of the Rule or Order [is] invalid, the entirety must be vacated" because there is no severance clause. Alliance.Br.41 n.4. Neither the SEC nor Nasdaq

contends otherwise, and it is thus undisputed that the Order and Rule must fall in their entireties if any substantive portion is found invalid.

## CONCLUSION

The Court should grant the Petition and vacate the Order and the Rule in their entireties.

April 1, 2022

Respectfully submitted,

/s/ Jonathan Berry
C. Boyden Gray
Jonathan Berry
  *Counsel of Record*
R. Trent McCotter
Michael Buschbacher
Jared M. Kelson
BOYDEN GRAY & ASSOCIATES
801 17th Street NW, Suite 350
Washington, DC 20006
202-809-5613
berry@boydengrayassociates.com

*Counsel for Petitioner Alliance
for Fair Board Recruitment*

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the type-volume limitations of Fifth Circuit Rule 32 and Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6416 words, excluding the portions exempted by Rule 32(f). This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure Rule 32(a)(5)–(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook and 14-point font.

April 1, 2022

/s/ Jonathan Berry
BOYDEN GRAY & ASSOCIATES PLLC
801 17th Street NW, Suite 350
Washington, DC 20006
202-809-5613

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that all counsel of record who have consented to electronic service are being served today with a copy of this document via the Court's CM/ECF. All parties in this case are represented by counsel consenting to electronic service.

April 1, 2022                    /s/ Jonathan Berry
                                 BOYDEN GRAY & ASSOCIATES PLLC
                                 801 17th Street NW, Suite 350
                                 Washington, DC 20006
                                 202-809-5613