# No. 21-60626

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

ALLIANCE FOR FAIR BOARD RECRUITMENT,
NATIONAL CENTER FOR PUBLIC POLICY RESEARCH,

*Petitioners*,

v.

SECURITIES & EXCHANGE COMMISSION,

*Respondent.*

On Petition for Review of an Order of the
Securities & Exchange Commission, No. 34-92590

## FIFTH CIRCUIT RULE 30.2 JOINT APPENDIX

Margaret A. Little
Sheng Li
NEW CIVIL LIBERTIES ALLIANCE
1225 19th St. NW, Suite 450
Washington, DC 20036
Telephone: 202-869-5210

*Counsel for Petitioner National
Center for Public Policy Research*

Dan M. Berkovitz
Michael A. Conley
Tracy A. Hardin
Daniel E. Matro
John R. Rady
SECURITIES AND EXCHANGE
COMMISSION
100 F Street NE
Washington, DC 20549
Telephone: 202-551-8248

*Counsel for Respondent Securities and
Exchange Commission*

Jonathan Berry
R. Trent McCotter
Michael Buschbacher
Jared M. Kelson
BOYDEN GRAY & ASSOCIATES
801 17th Street NW, Suite 350
Washington, DC 20006
Telephone: 202-809-5613

*Counsel for Petitioner Alliance Fair
Board Recruitment*

Allyson N. Ho
Bradley G. Hubbard
Paulette C. Minter
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
Telephone: 214-698-3100

Amir C. Tayrani
Amalia E. Reiss
GIBSON, DUNN &
CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036

John Zecca
Jeffrey S. Davis
John Yetter
Joanne Pedone
THE NASDAQ STOCK
MARKET LLC
805 King Farm Boulevard
Rockville, Maryland 20850

Stephen J. Kastenberg
Paul Lantieri III
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, Pennsylvania 19103

Seth D. Berlin
BALLARD SPAHR LLP
1909 K Street, N.W., 12th Floor
Washington, D.C. 20006

*Counsel for Intervenor The Nasdaq
Stock Market LLC*

# TABLE OF CONTENTS

**Tab**                                                                    **Page**

1. *Self-Regulatory Organizations; The Nasdaq Stock Market LLC; Order Approving Proposed Rule Changes, as Modified by Amendment No. 1, to Adopt Listing Rules Related to Board Diversity and to Offer Certain Listed Companies Access to a Complimentary Board Recruiting Service*, 86 Fed. Reg. 44,424 (Aug. 12, 2021) ............................JA1

2. Chair Gensler, *Statement on the Commission's Approval of Nasdaq's Proposal for Disclosure about Board Diversity and Proposal for Board Recruiting Service* (Aug. 6, 2021) .................................................................................JA23

3. Commissioners Lee and Crenshaw, *Statement on Nasdaq's Diversity Proposals – A Positive First Step for Investors* (Aug. 6, 2021).........................................JA24

4. Commissioner Roisman, *Statement on the Commission's Order Approving Exchange Rules Relating to Board Diversity* (Aug. 6, 2021)....................................JA26

5. Commissioner Peirce, *Statement on the Commission's Order Approving Proposed Rule Changes, as Modified by Amendments No. 1, to Adopt Listing Rules Related to Board Diversity submitted by the Nasdaq Stock Market LLC* (Aug. 6, 2021) ..................JA30

6. Letter from Shundrawn Thomas, President, Northern Trust Asset Management, File Nos. SR-NASDAQ-2020-081, -082 (Apr. 28, 2021)........JA43

7. Comments from Alliance for Fair Board Recruitment, File No. SR-NASDAQ-2020-081 (Apr. 6, 2021) ...................................................................JA45

8. Letter from Matt Maddox, CEO, Wynn Resorts, File No. SR-NASDAQ-2020-081 (Mar. 10, 2021)...........................................................................JA160

9. Nasdaq, Response to Comments, File No. SR-NASDAQ-2020-082 (Feb. 26, 2021) ("Nasdaq Letter III")...............................................................JA161

10. Nasdaq, Notice of Filing of Amendment No. 1 (attached to Nasdaq Letter III), File No. SR-NASDAQ-2020-082 (Feb. 26, 2021).........................................JA162

11. Nasdaq, Response to Comments, File No. SR-NASDAQ-2020-081 (Feb. 26, 2021) ("Nasdaq Letter II"). ..............................................................JA198

12.    Nasdaq, Notice of Filing of Amendment No. 1 (attached to Nasdaq Letter II), File No. SR-NASDAQ-2020-081 (Feb. 26, 2021)..........................................JA256

13.    Nasdaq Comments on Notice of Filing of Proposed Rule Change, File No. SR-NASDAQ-2020-081 (Feb. 5, 2021) ("Nasdaq Letter I") .............................JA610

14.    Letter from Aron Szapiro, Head of Policy Research, Morningstar Inc., & Michael Jantzi, CEO, Sustainalytics (Jan. 13, 2021).......................................JA638

15.    Letter from Kristi Mitchem, CEO, BMO Global Asset Management, File No. SR-NASDAQ-2020-081 (Jan. 11, 2021) ..........................................................JA640

16.    Letter from Dev Stahlkopf, Corporate Vice President, Microsoft Corp., File No. SR-NASDAQ-2020-081 (Jan. 4, 2021) ...................................................JA642

17.    Letter from Steve Nelson, CEO, Institutional Limited Partners Association, File No. SR-NASDAQ-2020-081 (Jan. 4, 2021)............................................JA645

18.    Letter from Board of Directors, Brighthouse Financial, Inc., File No. SR-NASDAQ-2020-081 (Jan. 4, 2021)...................................................................JA648

19.    Letter from Sheryl Sandberg, COO, Facebook, Inc., File No. SR-NASDAQ-2020-081 (Jan. 3, 2021) .....................................................................................JA650

20.    Letter from Roger W. Ferguson, Jr., President and CEO, TIAA, & Jose Minaya, CEO, Nuveen, File No. SR-NASDAQ-2020-081 (Dec. 31, 2020) .......................................................................................................................JA651

21.    Letter from Michael W. Frerichs, Illinois State Treasurer, File No. SR-NASDAQ-2020-081 (Dec. 31, 2020) ................................................................JA654

22.    Letter from National Center for Public Policy Research, File No. SR-NASDAQ-2020-081 (Dec. 30, 2020) ................................................................JA657

23.    Letter from Jeffrey P. Mahoney, General Counsel, Council of Institutional Investors, File No. SR-NASDAQ-2020-081 (Dec. 30, 2020).......................JA660

24.    Letter from William J. Stromberg, President & CEO, & David Oestreicher, General Counsel & Corporate Secretary, T. Rowe Price, File No. SR-NASDAQ-2020-081 (Dec. 29, 2020) ................................................................JA668

25. Letter from John W. Rogers, Jr., Chairman and Co-CEO, & Mellody Hobson, President and Co-CEO, Ariel Investments, LLC, File No. SR-NASDAQ-2020-081 (Dec. 29, 2020) ...........................................................................JA670

26. Letter from Publius Oeconomicis, File No. SR-NASDAQ-2020-081 (Dec. 28, 2020) ..............................................................................................JA672

27. Letter from Alfred P. Poor, CEO, Ideanomics, Inc., File No. SR-NASDAQ-2020-081 (Dec. 28, 2020) ...............................................................JA684

28. *Self-Regulatory Organizations; The Nasdaq Stock Market LLC; Notice of Filing of Proposed Rule Change To Adopt Listing Rules Related to Board Diversity*, 85 Fed. Reg. 80,472 (Dec. 11, 2020) .....................................................................JA689

29. *Self-Regulatory Organizations; The Nasdaq Stock Market LLC; Notice of Filing of Proposed Rule Change To Adopt Listing Rule IM-5900-9 To Offer Certain Listed Companies Access to a Complimentary Board Recruiting Solution To Help Advance Diversity On Company Boards*, 85 Fed. Reg. 79,556 (Dec. 10, 2020) ...............JA723

**TAB 1:**

*Self-Regulatory Organizations; The Nasdaq Stock Market LLC; Order Approving Proposed Rule Changes, as Modified by Amendment No. 1, to Adopt Listing Rules Related to Board Diversity and to Offer Certain Listed Companies Access to a Complimentary Board Recruiting Service*, 86 Fed. Reg. 44,424 (Aug. 12, 2021)

of the burden imposed by the collection of information; (c) ways to enhance the quality, utility, and clarity of the information collected; and (d) ways to minimize the burden of the collection of information on respondents, including through the use of automated collection techniques or other forms of information technology. Consideration will be given to comments and suggestions submitted in writing within 60 days of this publication.

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid control number.

Please direct your written comment to David Bottom, Director/Chief Information Officer, Securities and Exchange Commission, c/o Cynthia Roscoe, 100 F Street NE, Washington, DC 20549 or send an email to: *PRA_Mailbox@sec.gov*.

Dated: August 6, 2021.

**J. Matthew DeLesDernier,**
*Assistant Secretary.*

[FR Doc. 2021–17156 Filed 8–11–21; 8:45 am]

**BILLING CODE 8011–01–P**

---

**SECURITIES AND EXCHANGE COMMISSION**

**[Release No. 34–92590; File Nos. SR–NASDAQ–2020–081; SR–NASDAQ–2020–082]**

**Self-Regulatory Organizations; The Nasdaq Stock Market LLC; Order Approving Proposed Rule Changes, as Modified by Amendments No. 1, To Adopt Listing Rules Related to Board Diversity and To Offer Certain Listed Companies Access to a Complimentary Board Recruiting Service**

August 6, 2021.

**I. Introduction and Overview**

A self-regulatory organization, or "SRO," may propose a change in its rules or propose a new rule by filing the proposal with the Securities and Exchange Commission ("Commission") pursuant to Section 19(b)(1) of the Securities Exchange Act of 1934 ("Act").[1] This order considers two separate proposed rule changes that The Nasdaq Stock Market LLC ("Nasdaq" or "Exchange") filed with the Commission.

On December 1, 2020, the Exchange filed with the Commission, pursuant to Section 19(b)(1) of the Act and Rule 19b–4 thereunder,[2] a proposed rule change to adopt listing rules related to

board diversity ("Board Diversity Proposal"). The proposed rule change was published for comment in the **Federal Register** on December 11, 2020.[3] On February 26, 2021, the Exchange filed Amendment No. 1 to the proposed rule change, which replaced and superseded the proposed rule change as originally filed.[4]

On December 1, 2020, the Exchange also filed with the Commission, pursuant to Section 19(b)(1) of the Act[5] and Rule 19b–4 thereunder,[6] a proposed rule change to offer certain listed companies access to a complimentary board recruiting service to help advance diversity on company boards ("Board Recruiting Service Proposal"), which was published for comment in the **Federal Register** on December 10, 2020.[7] On February 26, 2021, the Exchange filed Amendment No. 1 to the proposed rule change, which replaced

and superseded the proposed rule change as originally filed.[8]

On March 10, 2021, the Division, for the Commission pursuant to delegated authority, published notice of Amendments No. 1[9] and instituted proceedings pursuant to Section 19(b)(2)(B) of the Act[10] to determine whether to approve or disapprove the proposed rule changes, as modified by Amendments No. 1.[11]

The Act governs the Commission's review of SRO-proposed rules. Section 19(b)(2)(C)(i) provides that the Commission "shall approve" a proposal if it finds that the rule is consistent with the requirements of the Act and the rules and regulations applicable to the SRO—including requirements in Section 6(b).[12] The statute does not give the Commission the ability to make any changes to the rule proposal as submitted, or to disapprove the rule proposal on the ground that the Commission would prefer some alternative rule on the same topic.

Under the Board Diversity Proposal, the Exchange proposes to require each Nasdaq-listed company, subject to certain exceptions, to publicly disclose in an aggregated form, to the extent permitted by applicable law, information on the voluntary self-identified gender and racial characteristics and LGBTQ+ status (all terms defined below) of the company's board of directors. The Exchange also proposes to require each Nasdaq-listed company, subject to certain exceptions, to have, or explain why it does not have, at least two members of its board of directors who are Diverse, including at least one director who self-identifies as female and at least one director who

---

[1] 15 U.S.C. 78s(b)(1).

[2] 17 CFR 240.19b–4.

[3] *See* Securities Exchange Act Release No. 90574 (December 4, 2020), 85 FR 80472 (SR–NASDAQ–2020–081). Comments received on the Board Diversity Proposal are available on the Commission's website at: *https://www.sec.gov/comments/sr-nasdaq-2020-081/srnasdaq2020081.htm*. On January 19, 2021, pursuant to Section 19(b)(2) of the Act, 15 U.S.C. 78s(b)(2), the Division of Trading and Markets ("Division"), for the Commission pursuant to delegated authority, designated a longer period within which to approve the proposed rule change, disapprove the proposed rule change, or institute proceedings to determine whether to disapprove the proposed rule change. *See* Securities Exchange Act Release No. 90951, 86 FR 7135 (January 26, 2021). The Division, for the Commission pursuant to delegated authority, designated March 11, 2021 as the date by which the Commission shall approve or disapprove, or institute proceedings to determine whether to disapprove, the proposed rule change. *See also infra* note 11 and accompanying text (providing additional procedural history for the Board Diversity Proposal).

[4] The full text of Amendment No. 1 to the Board Diversity Proposal is available on the Commission's website at: *https://www.sec.gov/comments/sr-nasdaq-2020-081/srnasdaq2020081-8425992-229601.pdf*.

[5] 15 U.S.C. 78s(b)(1).

[6] 17 CFR 240.19b–4.

[7] *See* Securities Exchange Act Release No. 90571 (December 4, 2020), 85 FR 79556 (SR–NASDAQ–2020–082). Comments received on the Board Recruiting Service Proposal are available on the Commission's website at: *https://www.sec.gov/comments/sr-nasdaq-2020-082/srnasdaq2020082.htm*. On January 19, 2021, pursuant to Section 19(b)(2) of the Act, 15 U.S.C. 78s(b)(2), the Division, for the Commission pursuant to delegated authority, designated a longer period within which to approve the proposed rule change, disapprove the proposed rule change, or institute proceedings to determine whether to disapprove the proposed rule change. *See* Securities Exchange Act Release No. 90952, 86 FR 7148 (January 26, 2021). The Division, for the Commission pursuant to delegated authority, designated March 10, 2021 as the date by which the Commission shall approve or disapprove, or institute proceedings to determine whether to disapprove, the proposed rule change. *See also infra* note 11 and accompanying text (providing additional procedural history for the Board Recruiting Service Proposal).

[8] The full text of Amendment No. 1 to the Board Recruiting Service Proposal is available on the Commission's website at: *https://www.sec.gov/comments/sr-nasdaq-2020-082/srnasdaq2020082-8425987-229599.pdf*.

[9] Amendment No. 1 to the Board Diversity Proposal and Amendment No. 1 to the Board Recruiting Service Proposal are collectively referred to as "Amendments No. 1."

[10] 15 U.S.C. 78s(b)(2)(B).

[11] *See* Securities Exchange Act Release No. 91286, 86 FR 14484 (March 16, 2021). On June 7, 2021, pursuant to Section 19(b)(2) of the Act, 15 U.S.C. 78s(b)(2), the Division, for the Commission pursuant to delegated authority, designated a longer period within which to issue an order approving or disapproving the proposed rule changes, as modified by Amendments No. 1. *See* Securities Exchange Act Release Nos. 92118, 86 FR 31355 (June 11, 2021) (SR–NASDAQ–2020–081); 92119, 86 FR 31355 (June 11, 2021) (SR–NASDAQ–2020–082). The Division, for the Commission pursuant to delegated authority, designated August 8, 2021 as the date by which the Commission shall approve or disapprove the Board Diversity Proposal, and August 7, 2021 as the date by which the Commission shall approve or disapprove the Board Recruiting Service Proposal.

[12] 15 U.S.C. 78s(b)(2)(C)(i).

self-identifies as an Underrepresented Minority or LGBTQ+.[13] Under the Board Recruiting Service Proposal, the Exchange proposes to provide certain Nasdaq-listed companies with one year of complimentary access for two users to a board recruiting service, which would provide access to a network of board-ready diverse candidates for companies to identify and evaluate.

This order applies the governing standard under the Act and finds that the Board Diversity Proposal, as modified by Amendment No. 1, is consistent with the requirements of the Act and the rules and regulations thereunder applicable to a national securities exchange. Separately, it finds that the Board Recruiting Service Proposal, as modified by Amendment No. 1, is also consistent with the requirements of the Act and the rules and regulations thereunder applicable to a national securities exchange. The proposed rule changes therefore are required to be and are approved.[14]

In particular, the Commission finds that the Board Diversity Proposal and the Board Recruiting Service Proposal are consistent with Section 6(b)(5) of the Act,[15] which requires that the rules of a national securities exchange be designed, among other things, to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, to remove impediments to and perfect the mechanism of a free and open market and a national market system and, in general, to protect investors and the public interest, not be designed to permit unfair discrimination between customers, issuers, brokers, or dealers, and not be designed to regulate by virtue of any authority conferred by the Act matters not related to the purposes of the Act or the administration of the exchange; and Section 6(b)(8) of the Act,[16] which requires that the rules of a national securities exchange not impose any burden on competition that is not necessary or appropriate in furtherance of the purposes of the Act. The Commission also finds that the Board Recruiting Service Proposal, as

modified by Amendment No. 1, is consistent with Section 6(b)(4) of the Act,[17] which requires that national securities exchange rules provide for the equitable allocation of reasonable dues, fees, and other charges among its members and issuers and other persons using its facilities. The proposals and Commission findings are discussed below.

## II. Discussion and Commission Findings

The Board Diversity Proposal would establish a disclosure-based framework that would make consistent and comparable statistics widely available to investors regarding the number of Diverse directors serving on a Nasdaq-listed company's board.[18] Board-level diversity statistics are currently not widely available on a consistent and comparable basis, even though the Exchange and many commenters argue that this type of information is important to investors.[19] The Board Diversity Proposal would also provide increased transparency and require an explanation regarding why a Nasdaq-listed company does not meet the proposed board diversity objectives, for those companies that do not choose to meet such objectives. It would augment existing Commission requirements that companies disclose whether, and how, their boards or board nominating committees consider diversity in nominating new directors.[20] As noted by the Exchange and a number of commenters,[21] a better understanding of why a company does not meet the proposed objectives would contribute to

investors' investment and voting decisions. Investors and companies have different views regarding board diversity and whether board diversity affects company performance and governance.[22] As discussed below, commenters representing a broad array of investors have indicated an interest in board diversity information. And, regardless of their views on those issues, the Board Diversity Proposal would provide investors with information to facilitate their evaluation of companies in which they might invest. The Board Diversity Proposal would therefore contribute to the maintenance of fair and orderly markets, which has previously been found by the Commission to support a finding that an exchange listing standard satisfied the requirements of Section 6(b)(5).[23] Accordingly, as discussed below, the Commission finds that the Board Diversity Proposal is designed to promote just and equitable principles of trade, remove impediments to and perfect the mechanism of a free and open market and a national market system, and protect investors and the public interest. The Commission also finds that the Board Diversity Proposal is not designed to permit unfair discrimination between issuers or to regulate by virtue of any authority conferred by the Act matters not related to the purposes of the Act or the administration of the Exchange, and would not impose any burden on competition that is not necessary or appropriate in furtherance of the purposes of the Act.

The Board Recruiting Service Proposal would provide Eligible Companies,[24] which by definition do

---

[13] While these Nasdaq-listed companies would have an objective of at least two Diverse directors, including at least one director who self-identifies as female and at least one director who self-identifies as an Underrepresented Minority or LGBTQ+, as described below, other Nasdaq-listed companies would have different board diversity objectives. *See infra* notes 25–27.

[14] In approving these proposed rule changes, the Commission has considered the proposed rules' impact on efficiency, competition, and capital formation. *See* 15 U.S.C. 78c(f). *See also infra* Section II.

[15] 15 U.S.C. 78f(b)(5).

[16] 15 U.S.C. 78f(b)(8).

[17] 15 U.S.C. 78f(b)(4).

[18] Pursuant to proposed Rule 5605(f)(1), "Diverse" would be defined to mean an individual who self-identifies in one or more of the following categories: (i) Female, (ii) Underrepresented Minority, or (iii) LGBTQ+. Also pursuant to proposed Rule 5605(f)(1), "Female" would be defined to mean an individual who self-identifies her gender as a woman, without regard to the individual's designated sex at birth; "Underrepresented Minority" would be defined to mean an individual who self-identifies as one or more of the following: Black or African American, Hispanic or Latinx, Asian, Native American or Alaska Native, Native Hawaiian or Pacific Islander, or Two or More Races or Ethnicities; and "LGBTQ+" would be defined to mean an individual who self-identifies as any of the following: Lesbian, gay, bisexual, transgender, or as a member of the queer community. *See* Amendment No. 1 to the Board Diversity Proposal at 327; proposed Rule 5605(f)(1).

[19] *See infra* Section II.A.2. (describing the Exchange's and commenters' arguments regarding the demand for board diversity information, including board-level diversity statistics).

[20] *See* Regulation S–K, Item 407(c)(2)(vi).

[21] *See infra* Section II.A.2. (describing the Exchange's and commenters' arguments regarding the demand for board diversity information, including explanations for why a company does not meet the proposed diversity objectives).

[22] *See infra* Section II.B. (describing commenters' differing views regarding board diversity and whether board diversity affects company performance and governance).

[23] *See* Securities Exchange Act Release No. 78223 (July 1, 2016), 81 FR 44400, 44403 (July 7, 2016) (order approving SR–NASDAQ–2016–013) ("2016 Approval Order") (finding that exchange disclosure-related listing standards contribute to the maintenance of fair and orderly markets). The maintenance of "fair and orderly markets" is a statutory goal included throughout the Act, including components that apply to SROs such as Nasdaq. *See, e.g.,* Sections 6(f), 9(i), 11, 11A, 12(f), and 19(b)(3) of the Act.

[24] The Board Recruiting Service Proposal in general defines "Eligible Company" as a listed company that represents to the Exchange that it does not have: (i) At least one director who self-identifies as Female; and (ii) at least one director who self-identifies as one or more of the following: An Underrepresented Minority or LGBTQ+. *See* proposed IM–5900–9(a); Amendment No. 1 to the Board Recruiting Service Proposal at 11 n.20 (describing the treatment of a Company with a Smaller Board). A Foreign Issuer would be an Eligible Company if it represents to the Exchange that it does not have: (i) At least one director who
Continued

not have a specified number of Diverse directors, with access to a network of board-ready diverse candidates, allowing these companies to identify and evaluate such candidates if they choose to use the service to increase diverse representation on their boards. The Board Recruiting Service Proposal would also help Eligible Companies to meet (or exceed, in the case of a Company with a Smaller Board [25]) the diversity objectives under the separately approved Board Diversity Proposal, if they elect to meet those objectives rather than disclose why they have not met the objectives. Further, the Board Recruiting Service Proposal could help the Exchange compete to attract and retain listings, particularly in light of the diversity objectives in the Board Diversity Proposal, which is also approved by this order and that will apply to Nasdaq-listed companies. Accordingly, and as discussed below in Section II.I., the Commission finds that the Board Recruiting Service Proposal is designed to provide for the equitable allocation of reasonable dues, fees, and other charges among issuers, is not designed to permit unfair discrimination between issuers, and does not impose any burden on competition not necessary or appropriate in furtherance of the purposes of the Act. The Commission further believes that the Board Recruiting Service Proposal would provide for the equitable allocation of complimentary services and reflects the current competitive environment for listings among national securities exchanges.

*A. Disclosures Under the Board Diversity Proposal*

1. Disclosure-Based Framework

The Board Diversity Proposal's disclosure-based framework would be established by proposed Rules 5605(f) and 5606. The Exchange proposes to adopt new Rule 5605(f)(2), which would require each Nasdaq-listed company (other than a Foreign Issuer,[26] Smaller

Reporting Company,[27] or Company with a Smaller Board) to have, or explain why it does not have, at least two members of its board of directors who are Diverse,[28] including at least one Diverse director who self-identifies as Female and at least one Diverse director who self-identifies as an Underrepresented Minority or LGBTQ+.[29] If a company elects to satisfy the requirements of proposed Rule 5605(f)(2) by disclosing why it does not meet the applicable diversity objectives, the company would be required to: (i) Specify the requirements of proposed Rule 5605(f)(2) that are applicable; and (ii) explain the reasons why it does not have two Diverse directors (or one Diverse director for a Company with a Smaller Board).[30] The Exchange would not evaluate the substance or merits of a company's explanation.[31]

As proposed, if a company fails to adhere to proposed Rule 5605(f), the Exchange's Listing Qualifications Department would promptly notify the company and inform it that it has until the later of its next annual shareholders meeting or 180 days from the event that caused the deficiency to cure the deficiency.[32] If a company does not regain compliance within the applicable cure period, the Listings Qualifications Department would issue a Staff Delisting Determination Letter.[33]

Pursuant to proposed Rule 5606(a), each Nasdaq-listed company would be required to annually disclose its board-level diversity data in a substantially similar format as the "Board Diversity Matrix." In the proposed Board Diversity Matrix, a company would be required to provide the total number of directors on its board, and the company (other than a Foreign Issuer) would be required to provide the following: (1) The number of directors based on gender identity (female, male, or non-binary[34]) and the number of directors who did not disclose gender; (2) the number of directors based on race and ethnicity (African American or Black, Alaskan Native or Native American, Asian, Hispanic or Latinx, Native Hawaiian or Pacific Islander, White, or Two or More Races or Ethnicities [35]),

---

self-identifies as Female; and (ii) at least one director who self-identifies as one or more of the following: Female, an Underrepresented Individual, or LGBTQ+. *See* proposed IM–5900–9(b). A Smaller Reporting Company would be an Eligible Company if it represents to the Exchange that it does not have: (i) At least one director who self-identifies as Female, and (ii) at least one director who self-identifies as one or more of the following: Female, an Underrepresented Minority, or LGBTQ+. *See* proposed IM–5900–9(c).

[25] Proposed Rule 5605(f)(2)(D) would require each company with a board of directors of five or fewer members ("Company with a Smaller Board") to have, or explain why it does not have, at least one member of its board of directors who is Diverse.

[26] The Exchange proposes to define a Foreign Issuer as: (a) A Foreign Private Issuer (as defined

in Rule 5005(a)(19)); or (b) a company that (i) is considered a "foreign issuer" under Rule 3b–4(b) under the Act, 17 CFR 240.3b–4(b), and (ii) has its principal executive offices located outside of the United States. *See* proposed Rule 5605(f)(1). For Foreign Issuers, the Exchange proposes to define "Diverse" to mean an individual who self-identifies as one or more of the following: Female, LGBTQ+, or an underrepresented individual based on national, racial, ethnic, indigenous, cultural, religious, or linguistic identity in the country of the company's principal executive offices as reported on the company's Form F–1, 10–K, 20–F, or 40–F ("Underrepresented Individual"). *See* proposed Rule 5605(f)(2)(B)(i). Proposed Rule 5605(f)(2)(B) would require each Foreign Issuer (other than a Company with a Smaller Board) to have, or explain why it does not have, at least two members of its board of directors who are Diverse, including at least one Diverse director who self-identifies as Female. The second Diverse director may include an individual who self-identifies as one or more of the following: Female, LGBTQ+, or an Underrepresented Individual.

[27] The Exchange proposes to define a Smaller Reporting Company as set forth in Rule 12b–2 under the Act. *See* proposed Rule 5605(f)(1). Proposed Rule 5605(f)(2)(C) would require each Smaller Reporting Company (other than a Company with a Smaller Board, as discussed below) to have, or explain why it does not have, at least two members of its board of directors who are Diverse, including at least one Diverse director who self-identifies as Female. The second Diverse director may include an individual who self-identifies as one or more of the following: Female, LGBTQ+, or an Underrepresented Minority.

[28] As proposed, "two members of its board of directors who are Diverse" would exclude emeritus directors, retired directors, and members of an advisory board. *See* Amendment No. 1 to the Board Diversity Proposal at 73 n.187.

[29] *See* proposed Rule 5605(f)(2)(A).

[30] *See* proposed Rule 5605(f)(3). The disclosure must be provided in advance of the company's next annual meeting of shareholders: (a) In any proxy statement or any information statement (or, if a company does not file a proxy, in its Form 10–K or 20–F); or (b) on the company's website. *See id.* If the company provides the disclosure on its website, the company must submit such disclosure concurrently with the filing made pursuant to (a) above and submit a URL link to the disclosure through the Nasdaq Listing Center, within one business day after such posting. *See id.*

[31] *See* Amendment No. 1 to the Board Diversity Proposal at 74–75 (emphasizing that an explanation

must "satisfy subparagraphs (i) and (ii) of proposed Rule 5605(f)(3)"—the company must "explain the reasons why it does not have the applicable number of Diverse directors," it is not enough "merely to state that 'the Company does not comply with Nasdaq's diversity rule'"). *See also* letter from John A. Zecca, Executive Vice President, Chief Legal Officer, and Chief Regulatory Officer, Nasdaq, to Vanessa A. Countryman, Secretary, Commission, dated February 26, 2021 ("Nasdaq Response Letter II"), at 8 ("The company can choose to disclose as much, or as little, insight into the company's circumstances or diversity philosophy as the company determines, and shareholders may request additional information directly from the company if they need additional information to make an informed voting or investment decision."). *See id.,* for examples of specific disclosures the Exchange would consider sufficient to satisfy the requirements of proposed Rule 5605(f)(3).

[32] *See* proposed Rule 5605(f)(6)(A). Proposed Rule 5605(f)(6)(B) would provide a grace period for a company that has satisfied the diversity objectives within the applicable timeframes, but later ceases to meet the diversity objectives due to a vacancy on its board of directors.

[33] *See* Rule 5810(c)(3). A company that receives a Staff Delisting Determination can appeal the determination to the Hearings Panel through the process set forth in Rule 5815. *See* Amendment No. 1 to the Board Diversity Proposal at 88.

[34] *See* Amendment No. 1 to the Board Diversity Proposal at 327 (defining "non-binary"). Although non-binary is included as a category in the Board Diversity Matrix, a company would not satisfy the diversity objectives in proposed Rule 5605(f)(2) if a director self-identifies solely as non-binary. *See id.* at 66 n.173.

[35] If a director self-identifies in the "Two or More Races or Ethnicities" category, the director must also self-identify in each individual category, as appropriate. *See id.* at 66 n.174.

disaggregated by gender identity (or did not disclose gender); (3) the number of directors who self-identify as LGBTQ+; and (4) the number of directors who did not disclose a demographic background under item (2) or (3) above.[36]

A company that qualifies as a Foreign Issuer may elect to use an alternative Board Diversity Matrix format.[37] A Foreign Issuer would be required to provide the total number of directors on its board, and would also be required to provide the following: (1) Its country of principal executive offices; (2) whether it is a Foreign Private Issuer; (3) whether disclosure is prohibited under its home country law; (4) the number of directors based on gender identity (female, male, or non-binary) and the number of directors who did not disclose gender; (5) the number of directors who self-identify as Underrepresented Individuals in its home country jurisdiction; (6) the number of directors who self-identify as LGBTQ+; and (7) the number of directors who did not disclose the demographic background under item (5) or (6) above.[38]

As proposed, if a company fails to adhere to proposed Rule 5606, the Exchange would notify the company that it is not in compliance with a listing standard and allow the company 45 calendar days to submit a plan to regain compliance, and, upon review of such plan, the Exchange may provide the company with up to 180 days to regain compliance.[39] If the company does not submit a plan or regain compliance within the applicable time periods, it would be issued a Staff Delisting Determination, which the company could appeal to a Hearings Panel.[40]

The Exchange states that, with these provisions, it is proposing a disclosure-based framework and not a mandate.[41] The Exchange also states that while some companies have made progress in diversifying their boardrooms, the

national market system and the public interest would be well-served by a "disclosure-based, business driven" framework for companies to embrace meaningful and multi-dimensional diversification of their boards.[42]

Some commenters express support for a "flexible" "comply-or-disclose" approach.[43] Some commenters state that the proposal would not impose a quota for board diversity,[44] and emphasize

that the Exchange does not plan to judge the merits of a company's explanation relating to board diversity.[45] Other commenters express the concern that the Board Diversity Proposal would establish a quota for a minimum number of Diverse directors.[46] Some commenters also argue that the proposal would substitute a regulator's judgment for that of shareholders' and companies' boards and management in choosing directors,[47] and that directors should be selected for their experience, competence, and skills.[48]

In response to comments, the Exchange notes that the Board Diversity Proposal would establish a disclosure-based framework and not a mandate or quota.[49] According to the Exchange,

---

[36] See proposed Rule 5606(a).

[37] See id.

[38] See id. Proposed Rule 5606 would become operative one year after Commission approval of the proposal. See proposed Rule 5606(e). A company would be required to be in compliance with proposed Rule 5606 by the later of: (i) One calendar year from the approval date ("Effective Date"); or (ii) the date the company files its proxy statement or its information statement for its annual meeting of shareholders (or, if the company does not file a proxy or information statement, the date it files its Form 10–K or 20–F) during the calendar year of the Effective Date.

[39] See Rule 5810(c)(2).

[40] See id.

[41] See Amendment No. 1 to the Board Diversity Proposal at 19. See also id. at Section 3.a.VII.D (discussing the alternatives that the Exchange has considered, including a mandate versus a disclosure-based approach).

[42] See id. at 8–9, 12, 41. The Exchange states that, although gender diversity has improved among U.S. company boards in recent years, the pace of change has been gradual and the U.S. still lags behind jurisdictions that have focused on board diversity, and progress toward bringing underrepresented racial and ethnic groups into the boardroom has been slower. See id. at 12, Section 3.a.IV.

[43] See, e.g., letter from Kristi Mitchem, Chief Executive Officer, BMO Global Asset Management, to Vanessa Countryman, Secretary, Commission, dated January 11, 2021 ("BMO Letter"), at 2; letter from Brian V. Breheny, Skadden, Arps, Slate, Meagher & Flom LLP, to Vanessa Countryman, Secretary, Commission, dated January 4, 2021 ("Skadden Letter"), at 2; letter from Lisa M. Fairfax, Alexander Hamilton Professor of Business Law, George Washington University Law School, to Vanessa Countryman, Secretary, Commission, dated January 4, 2021 ("Fairfax Letter"), at 10; letter from Molly Gochman, Founder & President, Stardust, to Vanessa Countryman, Secretary, Commission, dated January 4, 2021 ("Stardust Letter"), at 2; letter from Brenda Chia and Sanjiv Shah, Co-Chairs, Association of Asian American Investment Managers, dated December 28, 2020 ("AAAIM Letter"), at 2; letter from Betty T. Yee, California State Controller, to Vanessa Countryman, Secretary, Commission, dated December 21, 2020, at 1–2; letter from Hershel Harper, Chief Investment Officer, UAW Retiree Medical Benefits Trust, to Vanessa Countryman, Secretary, Commission, dated December 22, 2020 ("UAW Letter"), at 2–3; letter from Jay Huish, Executive Director, and William J. Coaker Jr., Chief Investment Officer, San Francisco Employees' Retirement System, to Vanessa Countryman, Secretary, Commission, dated December 17, 2020, at 2.

[44] See, e.g., letter from Kurt Schacht, Head of Advocacy, CFA Institute Advocacy and Karina Karakulova Sr. Manager, Capital Markets Policy—Americas, CFA institute, to Vanessa Countryman, Secretary, Commission, dated January 4, 2021 ("CFA Letter") at 6; letter from Scott M. Stringer, New York City Comptroller, to Vanessa Countryman, Secretary, Commission, dated January 4, 2021 ("New York City Comptroller Letter"), at 1 and 3; letter from William J. Stromberg, President and CEO, and David Oestreicher, General Counsel and Corporate Secretary, T. Rowe Price Group, Inc., to Vanessa Countryman, Secretary, Commission, dated December 29, 2020 ("T. Rowe Letter"), at 2; letter from Joseph M. Torsella, Pennsylvania State Treasurer, to Vanessa Countryman, Secretary, Commission, dated January 4, 2021, at 1–2; AAAIM Letter at 2; letter from Douglas K. Chia, Soundboard Governance LLC, to Vanessa Countryman, Secretary, Commission, dated December 29, 2020 ("Soundboard Letter"), at 2; letter from Amy L. Goodman and John F. Olson to Vanessa A. Countryman, Secretary, Commission, dated December 24, 2010 ("Goodman and Olson Letter"), at 2; letter from Patricia Gazda, Corporate Governance Officer, Ohio Public Employees Retirement System, to Vanessa Countryman, Secretary, Commission, dated December 23, 2020 ("OPERS Letter"), at 2; UAW Letter at 2–3; letter from Barb Smoot, President and CEO, Women for Economic and Leadership Development, to Vanessa Countryman, Secretary, Commission, dated December 21, 2020.

[45] See, e.g., letter from John W. Rogers, Jr., Chairman and Co-CEO, and Mellody Hobson, President and Co-CEO, Ariel Investments, LLC, to Vanessa Countryman, Secretary, Commission, dated December 29, 2020 ("Ariel Letter"), at 1; letter from Aeisha Mastagni, Portfolio Manager, Sustainable Investment and Stewardship Strategies, California State Teachers' Retirement System, to Vanessa A. Countryman, Secretary, Commission, dated December 23, 2020, at 2.

[46] See, e.g., letter from Publius Oeconomicis to Vanessa Countryman, Secretary, Commission, dated May 3, 2021 ("Publius Letter II"), at 1–2; letter from Peter Flaherty, Chair, and Paul D. Kamenar, Counsel, National Legal and Policy Center, to Vanessa Countryman, Secretary, Commission, dated January 14, 2021 ("NLPC Letter"); letter from Henry D. Wolfe, Chairman, De la Vega Occidental & Oriental Holdings L.L.C., to Vanessa Countryman, Secretary, Commission, dated January 4, 2021 ("De La Vega Letter"), at 2; letter from Dennis E. Nixon, President, International Bancshares Corporation, to Vanessa A. Countryman, Secretary, Commission, dated December 31, 2020 ("IBC Letter"), at 5; anonymous letter with pseudonym "Publius Oeconomicis" to Vanessa Countryman, Secretary, Commission, dated December 28, 2020 ("Publius Letter"), at 8–10; letter from Walter Donnellan dated December 14, 2020 ("Donnellan Letter"), at 3. One commenter argues that the Exchange downplays the consequences of non-compliance, and that the proposed framework would require companies to either discriminate based on sex, race, or sexual orientation or assume a serious risk of reputational and litigation harm. See letter from C. Boyden Gray and Jonathan Berry, Boyden Gray & Associates, submitted on behalf of the Alliance for Fair Board Recruitment, dated April 6, 2021 ("Alliance for Fair Board Recruitment Letter"), at 31–33. Some commenters also argue that men and women do not choose or desire all professions equally. See letter from Richard Morrison, Research Fellow, Competitive Enterprise Institute, dated March 11, 2021 ("CEI Letter"), at 3–4; letter from Independent Women's Forum, dated December 24, 2020 ("Independent Women's Forum Letter"), at 2.

[47] See, e.g., letter from David R. Burton, Senior Fellow in Economic Policy, The Heritage Foundation, to J. Matthew DeLesDernier, Assistant Secretary, Commission, dated January 4, 2021 ("Heritage Foundation Letter"), at 6–7; IBC Letter at 2; Donnellan Letter at 2–3; Type A Letter.

[48] See, e.g., De La Vega Letter at 2–3; Heritage Foundation Letter at 16.

[49] See Nasdaq Response Letter II at 6–7. The Exchange also rejects the comments that claim that the proposal is a de facto quota, and states that the proposal is intended to provide shareholders with sufficient information to make an informed voting

Continued

proposed Rule 5605(f) would set forth "aspirational diversity objectives" and not quotas, mandates, or set-asides, and companies that do not meet the objectives need only explain why they do not.[50] The Exchange also provides examples of what might be contained in such an explanation and reiterates that it would not assess the substance of the explanation, but would merely verify that the company has provided one.[51] The Exchange further states that the proposal would not require any particular board composition or require a company to select directors based on any criteria other than an individual's qualifications for the position.[52] The Exchange believes that its proposal would balance the calls of investors for companies to increase diverse representation on their boards with the need for companies to maintain flexibility and decision-making authority over their board composition.[53]

The Board Diversity Proposal would establish a disclosure-based framework for Nasdaq-listed companies that would contribute to investors' investment and voting decisions. While the proposal may have the effect of encouraging some Nasdaq-listed companies to increase diversity on their boards, the proposed rules do not mandate any particular board composition. The proposal would not require a company to select a director solely because that person falls within the proposed definition of "Diverse," would not prevent companies and their shareholders from selecting directors based on experience, competence, and skills, and would not substitute a regulator's judgment for companies' or their shareholders' judgment in selecting directors. Rather, a Nasdaq-listed company that does not meet the board diversity objectives may comply with proposed Rule 5605(f) by identifying the requirements of Rule 5605(f)(2) that apply to the company and explaining why it does not meet the objectives, and the Exchange would not

assess the substance of the company's explanation.[54]

Some companies may prefer not to explain their approach to board diversity for various reasons, such as concerns regarding perceived reputational, legal, or other harm. However, the proposal could mitigate potential concerns by giving companies substantial flexibility in crafting the required explanation—including how much detail to provide—and the Exchange would not evaluate the substance of the explanation. Moreover, while there would be costs to listing elsewhere,[55] companies that object to providing any explanation can choose instead to list on a different exchange. No company is required to list on Nasdaq. Rather, exchanges compete for listings, with four exchanges that currently list securities of operating companies[56] and nine exchanges that have rules for the listing of issuers on the exchange.[57] Listing exchanges compete with each other for listings in many ways, including listing fees, listing standards, and listing services.[58]

---

[54] One commenter states that, if the Exchange is truly interested in establishing only a disclosure framework, it should remove the diversity objectives and only require board-level statistical disclosure, or alternatively require all companies to disclose an explanation for the constitution of their boards. *See* Publius Letter II at 2. As discussed in Section II.C.2., it is not unreasonable to only require companies that do not meet the proposed diversity objectives to disclose why they have not done so, rather than to require all Nasdaq-listed companies to disclose their approach to board diversity. Moreover, as discussed in Section II.A.2., explanations from companies that do not meet the proposed diversity objectives, in addition to board-level statistical disclosure, would contribute to investors' investment and voting decisions.

[55] These costs would include the fixed costs associated with listing on a different exchange (such as the exchange's application fee, and the legal and accounting expenses associated with ensuring that the issuer satisfies the listing standards of the new exchange), as well as the costs associated with communicating with investors about the transfer of listing. *See* Securities Act Release No. 10428 (October 24, 2017), 82 FR 50059, 50065 (October 30, 2017) ("Rule 146 Release").

[56] These exchanges are Nasdaq; New York Stock Exchange LLC ("NYSE"); Cboe BZX Exchange, Inc. ("BZX"); and NYSE American LLC ("NYSE American").

[57] These exchanges are Nasdaq; NYSE; BZX; NYSE American; Investors Exchange LLC ("IEX"); Long-Term Stock Exchange, Inc. ("LTSE"); Nasdaq BX, Inc.; NYSE Arca, Inc.; and NYSE Chicago, Inc. *See also, e.g.,* LTSE Rule 14.425(a)(1)(C) (requiring LTSE-listed issuers to adopt and publish a policy on the company's approach to diversity and inclusion).

[58] *See* Rule 146 Release, *supra* note 55, at 50064. The Exchange, along with other exchanges, currently have a number of listing standards governing a listed company's board of directors. *See, e.g.,* Nasdaq Rule 5600 Series; NYSE Listed Company Manual Section 303A.00.

In approving proposed rule changes relating to complimentary services that exchanges offer to issuers, including issuers that switch listing markets, the Commission has also explained that exchanges are responding to competitive market pressures.[59] As discussed in Section II.D. below, the current proposals may provide another way in which the exchanges compete for listings.

2. Demand for and Potential Benefits of the Proposed Disclosures

In the Board Diversity Proposal, the Exchange states that its discussions with organizational leaders representing a broad spectrum of market participants and stakeholders (including members of the business, investor, governance, legal, and civil rights communities) revealed strong support for disclosure requirements that would standardize the reporting of board diversity statistics.[60] The Exchange also states that current reporting of board diversity data is not provided in a consistent manner or on a sufficiently widespread basis and, as such, investors are not able to readily compare board diversity statistics across companies.[61] In pointing out the "broad latitude" afforded to companies by Commission rules relating to board diversity and proxy disclosure, the Exchange states that the absence of a specific definition of "diversity" for such disclosures has resulted in current reporting of board-level diversity

---

[59] *See, e.g.,* Securities Exchange Act Release No. 90893 (January 11, 2021), 86 FR 4166 (January 15, 2021) (approving SR–NYSE–2020–94 relating to certain complimentary services); Securities Exchange Act Release No. 90729 (December 18, 2020), 85 FR 84434 (December 28, 2020) (approving SR–NASDAQ–2020–060 relating to certain complimentary services).

[60] *See* Amendment No. 1 to the Board Diversity Proposal at Section 3.a.V. The Exchange also states that such discussions reinforced the notion that if companies recruit by skill set and experience rather than title, diverse talent would satisfy demand. *See id.* at 19–20, 46. According to the Exchange, studies suggest that the traditional director candidate selection process may create barriers to considering qualified diverse candidates for board positions. *See id.* at 41–44, Section 3.b.II.A.

[61] *See id.* at 9. The Exchange also states that, while conducting research on the state of board diversity among its listed companies, it encountered multiple key challenges, such as: (1) Inconsistent disclosure and definitions of "diversity" across companies; (2) limited data on diverse characteristics outside of gender; (3) inconsistent or no disclosure of a director's race, ethnicity, or other diversity attributes (*e.g.,* nationality); (4) difficult-to-extract data because statistics are often embedded in graphics; and (5) aggregation of information, making it difficult to separate gender from other categories of diversity. *See id.* at 51. *See also id.* at 59, 107.

---

or investment decision, or to facilitate informed discussions with companies. *See id.* at 8.

[50] *See* letter from Stephen J. Kastenberg, Ballard Spahr LLP, to Vanessa Countryman, Secretary, Commission, dated February 5, 2021 (submitted on behalf of the Exchange by its counsel) ("Nasdaq Response Letter I"), at 2.

[51] *See id.* at 2–3. *See also* Nasdaq Response Letter II at 7.

[52] *See* Nasdaq Response Letter I at 3.

[53] *See* Nasdaq Response Letter II at 7. *See also infra* Section II.D. (describing the Exchange's argument that companies are free to decide where to list and may switch listing markets).

statistics being significantly unreliable and unusable to investors.[62] The Exchange notes that the lack of transparency creates barriers to investment analysis, due diligence, and academic study, and affects investors who are increasingly basing public advocacy, proxy voting, and direct shareholder-company engagement decisions on board diversity considerations.[63]

The Exchange asserts that the disclosure-based framework of proposed Rule 5605(f) may influence corporate conduct if a company chooses to meet the proposed diversity objectives,[64] and could help increase opportunities for Diverse candidates.[65] Moreover, the Exchange states that, if a company does not meet the proposed objectives, the disclosure under proposed Rule 5605(f)(3) would provide analysts and investors with a better understanding about a company's reasons for not doing so.[66] The Exchange believes that this disclosure would enable the investment community to conduct more informed analyses of, and have more informed conversations with, companies and improve the quality of information available to investors who rely on this information to make informed investment and voting decisions.[67]

In addition, the Exchange believes that the disclosure-based framework of proposed Rule 5606 would eliminate data collection inaccuracies, decrease investors' costs, enhance investors' ability to utilize the information disclosed, and make information available to investors who otherwise would not be able to obtain individualized disclosures.[68] The Exchange also states that proposed Rule 5606 would protect investors that view information related to board diversity as material to their investment and voting decisions, and enhance investor confidence by assisting investors in making more informed decisions.[69] Moreover, the Exchange believes that

the disclosures would provide consistent information to the public and would enable investors to continually review the board composition of a company to track trends,[70] as well as simplify or eliminate the need for a company to respond to multiple investor requests for board diversity information.[71]

Many commenters who support the Board Diversity Proposal believe that investors currently do not have sufficient access to consistent, meaningful, or reliable board diversity information.[72] Many commenters believe that board diversity information is important for investment decision making,[73] investment strategies and

analysis,[74] and voting decisions.[75] Some commenters also believe that the availability of board diversity information would facilitate studies on the impact of board diversity.[76] In addition, many commenters believe that the proposed board diversity disclosures would be material to investors,[77] would improve access to transparent and comparable board diversity disclosures across companies,[78] would allow more efficient and less costly access to and usage of board diversity information,[79] and would allow investors to monitor

---

[62] *See id.* at Sections 3.a.VI.A–B.

[63] *See id.* at 51–52. *See also id.* at Section 3.A.VI.C. (describing examples of support for board diversity disclosures).

[64] *See id.* at 121.

[65] *See id.* The Exchange also states that proposed Rule 5605(f) would empower companies to maintain decision-making authority over the composition of their boards. *See id.* at 122. The Exchange recognizes that directors may bring diverse perspectives, skills, and experiences to the board, notwithstanding that they have similar attributes; therefore, the Exchange believes that it is in the public interest to permit a company to choose whether to meet the proposed diversity objectives or explain why it does not. *See id.* at 129–30.

[66] *See id.* at 122.

[67] *See id.* at 122–23.

[68] *See id.* at 110–13.

[69] *See id.* at 110–11.

[70] The Exchange also states that the disclosures under proposed Rule 5606 would provide a means for the Exchange to assess whether companies meet the diversity objectives under proposed Rule 5605(f). *See id.* at 116.

[71] *See id.* at 112.

[72] *See, e.g.,* letter from Aron Szapiro, Head of Policy Research, Morningstar, Inc., and Michael Jantzi, Chief Executive Officer, Sustainalytics, to Vanessa Countryman, Secretary, Commission, dated January 13, 2021 ("Morningstar Letter"), at 1–2; letter from Ramiro A. Cavazos, President and CEO, United States Hispanic Chamber of Commerce, to Vanessa Countryman, Secretary, Commission, dated January 4, 2021 ("Hispanic Chamber of Commerce Letter"), at 3; New York City Comptroller Letter at 2–3; Fairfax Letter at 7; letter from Michael W. Frerichs, Illinois State Treasurer, to Vanessa Countryman, Secretary, Commission, dated December 31, 2020 ("Illinois State Treasurer Letter"), at 2; Constance F. Armstrong, Executive Director, The Boston Club, to Vanessa Countryman, Secretary, Commission, dated December 31, 2020 ("Boston Club Letter") at 1; letter from Roger W. Ferguson, Jr., President and CEO, Teachers Insurance and Annuity Association of America, and Jose Minaya, CEO, Nuveen, LLC, to Vanessa Countryman, Secretary, Commission, dated December 31, 2020 ("TIAA Letter"), at 2; letter from Esther Aguilera, President and CEO, Latino Corporate Directors Association, to Vanessa Countryman, Secretary, Commission, dated December 30, 2020 ("LCDA Letter"), at 9–11; letter from Robert W. Lovelace, Chief Executive Officer, Capital Research and Management Company, to Vanessa Countryman, Secretary, Commission, dated December 22, 2020 ("Capital Research and Management Company Letter"), at 2–3; letter from Rachel Stern, Executive Vice President, Chief Legal Officer and Global Head of Strategic Resources, FactSet Research Systems Inc., to Vanessa Countryman, Secretary, Commission, dated December 22, 2020 ("FactSet Letter"), at 1–2. Some commenters also note that not all investors currently have the same access to board diversity information. *See, e.g.,* Fairfax Letter at 6 (stating that collection of board diversity data on a company-by-company basis creates informational asymmetries, particularly for investors without the time or resources to effectively engage in this manner); New York City Comptroller Letter at 3 (stating that the proposal would level the playing field for smaller institutional investors who may not have the resources available to do the research and engagement necessary to ascertain the racial and ethnic diversity of boards).

[73] *See, e.g.,* BMO Letter at 1; letter from Olshan Frome Wolosky LLP to Vanessa A. Countryman, Secretary, Commission, dated January 6, 2021 ("Olshan Letter"), at 3–4; letter from Steve Nelson, Chief Executive Officer, Institutional Limited

Partners Association, to Vanessa Countryman, Secretary, Commission, dated January 4, 2021 ("Institutional Limited Partners Association Letter"), at 2; TIAA Letter at 3; LCDA Letter at 6–10; letter from Mary Pryshlak, Head of Investment Research, Wellington Management Company LLP, to Vanessa Countryman, Secretary, Commission, dated December 30, 2020 at 1–2; Ariel Letter at 1. Some commenters also specifically express support for the proposed disclosures of the reason why a company does not meet the board diversity objectives and believe that such disclosures would contribute to investment or voting decisions. *See, e.g.,* letter from Jeffrey P. Mahoney, General Counsel, Council of Institutional Investors, to Vanessa Countryman, Secretary, Commission, dated December 30, 2020, at 4–5; Ariel Letter at 1.

[74] *See, e.g.,* T. Rowe Letter at 1–2; UAW Letter at 6; FactSet Letter at 1–2.

[75] *See, e.g.,* letter from Dev Stahlkopf, Corporate Vice President, General Counsel and Secretary, Microsoft Corporation, to Vanessa Countryman, Secretary, Commission, dated January 4, 2021 ("Microsoft Letter"), at 2; New York City Comptroller Letter at 2–3.

[76] *See, e.g.,* letter from Olivia D. Morgan, Executive Director and Co-Founder, California Partners Project, to Vanessa Countryman, Secretary, Commission, dated January 3, 2020 ("California Partners Project Letter"), at 2; letter from Dieter Waizenegger, Executive Director, CtW Investment Group, to Vanessa Countryman, Secretary, Commission, dated December 31, 2020 ("CtW Letter"), at 2; Soundboard Letter at 2; UAW Letter at 6; letter from Sarah Keohane Williamson, Chief Executive Officer, Ariel Fromer Babcock, Managing Director, Head of Research, and Victoria Tellez Leal, Senior Associate, Research, FCLTGlobal, to Vanessa Countryman, Secretary, Commission, dated December 18, 2020, at 3.

[77] *See, e.g.,* letter from Fran Seegull, President, U.S. Impact Investing Alliance, to Vanessa Countryman, Secretary, Commission, dated March 5, 2021 ("Alliance Letter"), at 1; CFA Letter at 3; letter from Edgar Hernandez, Assistant Director, Capital Stewardship, Service Employees International Union, to Vanessa A. Countryman, Secretary, Commission, dated January 4, 2020 [sic] ("SEIU Letter"), at 2; Illinois State Treasurer Letter at 1–2.

[78] *See, e.g.,* BMO Letter at 1; SEIU Letter at 2; letter from Alfred P. Poor, Chief Executive Officer, Ideanomics, Inc., to Vanessa Countryman, Secretary, Commission, dated December 28, 2020 ("Ideanomics Letter"), at 1, 3; letter from Kimberly Jeffries Leonard, National President, The Links, Incorporated, to Vanessa A. Countryman, Secretary, Commission, dated December 17, 2020 ("Links Letter"), at 2.

[79] *See, e.g.,* letter from Paul M. Kinsella, Emily J. Oldshue, Jeremiah Williams, Partners, Ropes & Gray LLP, to Vanessa Countryman, Secretary, Commission, dated December 31, 2020 ("Ropes & Gray Letter"), at 4; UAW Letter at 6.

and assess companies' board diversity.[80] Moreover, some commenters believe that the proposal would enhance progress in increasing board diversity.[81]

Some commenters, by contrast, argue that the perceived investor demand for diverse boards and diversity information is overstated, and if diversity requirements increase returns, then boards, management, and shareholders would not require any regulatory mandate to adopt them.[82] Further, some commenters argue that the proposal is unnecessary and that company boards are already becoming more diverse,[83] and some commenters argue that shareholders have the power to push for diversity changes in the boardroom.[84]

In response, the Exchange states that investors are increasingly interested in board diversity data, as investors view board diversity as a key indicator of corporate governance.[85] Moreover, the Exchange states that the wave of

investors increasingly calling for companies to disclose diversity metrics and diversify their boards, and basing their voting decisions on whether companies do or do not, demonstrates that investors consider diversity disclosures material to their voting and investment decisions.[86] The Exchange explains that its goal is to facilitate the collection, reliability, and uniformity of board diversity data, while expanding access to the information.[87] The Exchange also states that its proposal would level the playing field for retail and institutional investors, and decrease the cost and time associated with data collection for all investors, by providing them with accessible, comparable, and transparent information by which they could critically evaluate a company's decisions with respect to how, whether, or when to pursue board diversity.[88] And the Exchange reiterates that the proposal provides flexibility for companies that do not wish to achieve the diversity objectives or wish to do so on a different timeline.[89]

The Commission finds that the Board Diversity Proposal would provide widely available, consistent, and comparable information that would contribute to investors' investment and voting decisions. Because the Exchange would define "Diverse" for purposes of the proposed disclosures and would require consistent format and timing for the proposed disclosures,[90] the proposal would make it more efficient and less costly for investors to collect, use, and compare information on board diversity. The reduced cost and improved efficiency in collecting, using, and comparing such information could enhance investors' investment and voting decision-making processes, and enhance investors' ability to make

informed investment and voting decisions. Because the proposal would make such information widely available on the same basis to all investors, the proposal would also mitigate any concerns regarding unequal access to information that may currently exist between certain (likely larger and more resourceful) investors who could obtain the information and other (likely smaller) investors who may not be able to do so. Accordingly, the Commission finds that the proposal is designed to promote just and equitable principles of trade, remove impediments to and perfect the mechanism of a free and open market and a national market system, and protect investors and the public interest.

The diverse collection of commenters who expressed interest in board diversity information, including institutional investors, investment managers, listed companies, and individual investors, as well as statements made by institutional investors, asset managers, and business organizations,[91] demonstrates the broad demand for this information.[92] Moreover, while investors may have differing views regarding whether companies should increase board diversity and whether and how board diversity affects company performance and governance, the proposed disclosures would contribute to investors' investment and voting

[80] See, e.g., Fairfax Letter at 7; letter from Lisa Hayles, Investment Manager, Trillium Asset Management, to Vanessa Countryman, Secretary, Commission, dated January 4, 2021 ("Trillium Letter"), at 3; letter from Charlotte Laurent-Ottomane, Executive Director, and Toni Wolfman, Co-Chair, Public Policy Outreach Committee, Thirty Percent Coalition, to Vanessa Countryman, Secretary, Commission, dated January 1, 2021 ("Thirty Percent Coalition Letter"), at 1; CtW Letter at 2; OPERS Letter at 1–2.

[81] See, e.g., FactSet Letter at 2; letter from Fiona Ma, California State Treasurer, to Vanessa Countryman, Secretary, Commission, dated December 15, 2020 ("California State Treasurer Letter"). See also, e.g., letter from Thomas Chow, Irene Liu, and Andrew Song, Co-Chairs, Bay Area Asian American General Counsel, to Vanessa Countryman, Secretary, Commission, dated January 4, 2021, at 2 (stating that the Board Diversity Proposal provides an appropriate impetus to depart from the traditional director search process and to diversify the candidate pool).

[82] See, e.g., Alliance for Fair Board Recruitment Letter at 43; CEI Letter at 1–2; letter from John Quigley to Vanessa Countryman, Secretary, Commission, dated January 25, 2021 ("Quigley Letter"), at 1; Heritage Foundation Letter at 3, 5–6; letter from Boyden Gray & Associates PLLC, dated January 4, 2020 [sic] ("Project on Fair Representation Letter"), at 5; Publius Letter at 3. See also NLPC Letter at 4 (stating that it is in a company's interest to promote and advertise the diversity of its board if it believes that such diversity would attract investors, regardless of, or in addition to, the economic performance of the company).

[83] See, e.g., letter from Pat Toomey et al, U.S. Senators, to Allison Herren Lee, Acting Chair, Commission, dated February 12, 2021 ("Toomey Letter"), at 3; NLPC Letter at 3–4 (also arguing that information is available on a company's website with the biographical information of its board members and officers, and that investors are unlikely to access such information from the Commission); Publius Letter at 2–3.

[84] See, e.g., Project on Fair Representation Letter at 5; letter from Jerry D. Guess, Founder, Chairman, and CEO, Guess & Co. Corporation, to Martha Miller, Director, Office of the Advocate for Small Business Formation, Commission, dated December 2, 2020 ("Guess Letter"), at 2.

[85] See Nasdaq Response Letter II at 20.

[86] See id. at 12.

[87] See id. at 20.

[88] See id. at 13, 25.

[89] See id. at 25. The Exchange also states that, absent encouragement, progress toward increased board diversity has been demonstrably slow, and that regulatory action has proven effective in removing barriers and increasing board diversity among those traditionally underrepresented in other jurisdictions. See id. at 15, 25–26.

[90] In particular, companies would be required to: make board-level diversity disclosures in a substantially similar format as the Board Diversity Matrix; following the first year of disclosure, disclose the current year and immediately prior year Board Diversity Matrix; provide the Board Diversity Matrix in a searchable format; and provide the required disclosures in a proxy statement or information statement (or if a company does not file a proxy, in its Form 10–K or 20–F) in advance of the company's annual shareholders meeting or provide the required disclosures on the company's website concurrently with the filing of the company's proxy statement or information statement (or, if the company does not file a proxy, its Form 10–K or 20–F).

[91] See, e.g., Amendment No. 1 to the Board Diversity Proposal at 8 n.9, 54 n.142 (referencing statements from Vanguard, State Street Global Advisors, and BlackRock that call for companies to disclose board diversity information); id. at 54 nn.139–40 (referencing petitions for Commission rulemaking from groups of institutional investors that call for disclosures of board diversity information); id. at 54 n.143 (referencing an initiative by a state treasurer and group of institutional investors calling for Russell 3000 companies to disclose board diversity information); id. at 57 n.152 (referencing a letter from various business associations expressing support for the passage of a bill by the U.S. House of Representatives that would require board diversity disclosures).

[92] Commenters who express support for the proposed disclosures include institutional investors, investment managers, listed companies, and individual investors. See, e.g., letter from Cynthia Overton to Vanessa Countryman, Secretary, Commission, dated January 3, 2021; letter from Dan Dees, Co-Head Investment Banking Division, Goldman Sachs Group, Inc., to Secretary, Commission, dated January 1, 2021 ("Goldman Sachs Letter"); letter from Marcie Frost, Chief Executive Officer, California Public Employees' Retirement System, to Vanessa Countryman, Secretary, Commission, dated December 31, 2020; TIAA Letter; letter from Jo Brickman, dated December 18, 2020. They also include listed companies. See, e.g., Microsoft Letter; letter from Sheryl Sandberg, Chief Operating Officer, Facebook Inc., to Vanessa Countryman, Secretary, Commission, dated January 3, 2021; letter from Jeff Ray, CEO, Brightcove, to Vanessa Countryman, dated December 23, 2020 ("Brightcove Letter").

decisions regardless of their views on whether board diversity is desirable or beneficial. For example, for investors who support board diversity, the proposed disclosures could inform their decision on issues related to corporate governance, including director elections, and company explanations as to why they do not meet the diversity objectives could better inform those investors as to the risks and costs of increased board diversity. And for investors who do not believe that having additional ''Diverse'' directors would be beneficial for a company, the proposed disclosures could inform their decision to vote to preserve the existing board composition in a company. The disclosures' focus on providing greater transparency regarding existing board composition and companies' approaches to board diversity—rather than mandating any particular board composition or requiring Nasdaq-listed companies to change the composition of their boards—will provide investors with board-level diversity statistics and explanations for certain companies' approaches to board diversity, which would contribute to investors' investment and voting decisions, including decisions related to companies' board compositions.

## B. Potential Effects of Board Diversity on Companies and Investors

In the Board Diversity Proposal, the Exchange states that it has reviewed dozens of empirical studies and found that an extensive body of empirical research demonstrates that diverse boards are positively associated with improved corporate governance and company performance.[93] While the Exchange states that the overwhelming majority of empirical studies it has reviewed indicate that board diversity is positively associated with company performance, it acknowledges that the results of some studies on gender diversity are mixed.[94] Nevertheless, the Exchange believes that ''there is a compelling body of credible research on

the association between company performance and board diversity'' and, at a minimum, the academic and empirical studies support the conclusion that board diversity does not have adverse effects on company performance.[95]

The Exchange also states that there is substantial evidence that board diversity promotes investor protection, including by enhancing the quality of a company's financial reporting, internal controls, public disclosures, and management oversight.[96] According to the Exchange, more than a dozen studies have found a positive association between gender diversity and important investor protections,[97] and some academics assert that such findings may extend to other forms of diversity, including racial and ethnic diversity.[98] The Exchange also states that it has reviewed studies suggesting that board diversity could enhance a company's ability to monitor management by reducing ''groupthink'' and improving decision-making.[99]

Some commenters similarly believe that there are benefits associated with board diversity, such as improved board decision-making,[100] corporate

governance,[101] financial performance or shareholder value,[102] risk mitigation,[103] innovation,[104] investor protection,[105] investor confidence,[106] and corporate culture.[107] By contrast, some commenters argue that the Exchange has not demonstrated causation between board diversity and the benefits described in the Board Diversity Proposal, and that the supporting studies cited by the Exchange do not show that diversity on a company's board causes, rather than is merely correlated with, performance enhancement.[108] Commenters further assert that the peer-reviewed economics literature is inconclusive, with most studies showing little or no discernable effect based on the sexual, racial, or ethnic composition of corporate boards.[109] In addition, some commenters state that some studies have not found a positive correlation between board diversity and benefits, and point out the lack of research relating to LBGTQ+ officer

---

[93] See Amendment No. 1 to the Board Diversity Proposal at 13. The Exchange states that studies have identified positive relationships between board diversity and commonly used financial metrics, including higher returns on invested capital, returns on equity, earnings per share, earnings before interest and taxation margin, asset valuation multiples, and credit ratings. See id. at 13, Section 3.a.III.A. The Exchange also points to a report that suggests that the relationship between board gender diversity and corporate performance may extend to LGBTQ+ diversity. See id. at 25.

[94] See id. at 25–28 (referencing Carter et al., infra note 119, and the U.S. Government Accountability Office's conclusion that the mixed nature of various academic and empirical studies may be due to differences in methodologies, data samples, and time periods).

[95] See id. at 28.

[96] See id. at 29.

[97] See id. at 29, Section 3.a.III.B. The Exchange states that studies have found that gender-diverse boards or audit committees are associated with: More transparent public disclosures and less information asymmetry; better reporting discipline by management; a lower likelihood of manipulated earnings through earnings management; an increased likelihood of voluntarily disclosing forward-looking information; a lower likelihood of receiving audit qualifications due to errors, non-compliance, or omission of information; and a lower likelihood of securities fraud. See id. at 13, Section 3.a.III.B. In addition, the Exchange states that studies found that having at least one woman on the board is associated with a lower likelihood of material weaknesses in internal control over financial reporting and a lower likelihood of material financial restatements. See id. at 13, Section 3.a.III.B, Section 3.b.II.B.

[98] See id. at 29, Section 3.a.III.B.

[99] See id. at 29, Section 3.a.III.C.

[100] See, e.g., letter from Kewsong Lee, Chief Executive Officer, The Carlyle Group, to Vanessa Countryman, Secretary, Commission, dated March 16, 2021 (''Carlyle Letter''), at 1; letter from Joan Haffenreffer, President, Women's Forum of New York, to Vanessa Countryman, Secretary, Commission, dated January 4, 2021 (''Women's Forum Letter''), at 1–2; letter from Abraham Kim, Executive Director, Council of Korean Americans, to Vanessa Countryman, Secretary, Commission, dated January 3, 2021, at 1; Goldman Sachs Letter at 1; T. Rowe Letter at 1–2; Ideanomics Letter at 2, 4; letter from Aaron Meder, CEO, LGIM America, to Vanessa Countryman, Secretary, Commission, dated December 23, 2020 (''LGIM America Letter''), at 2; Goodman and Olson Letter at 1–2; letter from Mercy Investment Services, Inc., to Vanessa Countryman, Secretary, Commission, dated December 22, 2020 (''Mercy Investment Letter''), at 1; letter from Luan Jenifer, President, Miller/Howard Investments, Inc., to Vanessa Countryman, Secretary, Commission, dated December 22, 2020 (''Miller/Howard Letter''), at 1; letter from Kerrie

Waring, Chief Executive Officer, International Corporate Governance Network, to Jay Clayton, Chairman, Commission, dated December 16, 2020, at 2.

[101] See, e.g., Carlyle Letter at 1; letter from Dorri McWhorter, Chief Executive Officer, YWCA Metropolitan Chicago, to Vanessa Countryman, Secretary, Commission, dated January 4, 2021; Women's Forum Letter at 2; AAAIM Letter at 2; Miller/Howard Letter at 1; letter from Seth Brody, Partner and Global Head of the Operational Excellence Practice, Apax Partners, to Vanessa Countryman, Secretary, Commission, dated December 16, 2020.

[102] See, e.g., Carlyle Letter at 1; letter from Kerry E. Berchem, Akin Gump Strauss Hauer & Feld LLP, to Vanessa Countryman, Secretary, dated January 4, 2021 (''Akin Gump Letter''), at 2; Goldman Sachs Letter at 1; Capital Research and Management Company Letter at 1; FactSet Letter at 1.

[103] See, e.g., Akin Gump Letter at 4; letter from Michelle Dunstan, SVP, Global Head of Responsible Investing, and Diana Lee, AVP, Director of Corporate Governance, AllianceBernstein L.P., to Vanessa A. Countryman, Secretary, Commission, dated January 4, 2021 (''AllianceBernstein Letter''), at 1; Hispanic Chamber of Commerce Letter at 3.

[104] See, e.g., LGIM America Letter at 2; Miller/Howard Letter at 1.

[105] See, e.g., Women's Forum Letter at 2; Miller/Howard Letter at 1; Douglas B. Sieg, Managing Partner, Lord Abbett, to Vanessa Countryman, Secretary, Commission, dated December 18, 2020, at 1.

[106] See, e.g., FactSet Letter at 2; Miller/Howard Letter at 1; UAW Letter at 3–4.

[107] See, e.g., Akin Gump Letter at 4; California Partners Project Letter at 2; Capital Research and Management Company Letter at 1–2.

[108] See, e.g., Publius Letter II at 2; Toomey Letter at 2; Heritage Foundation Letter at 7–10; Project on Fair Representation Letter at 3–4; letter from Scott Shepard, Free Enterprise Project, National Center for Public Policy Research, to Vanessa Countryman, Secretary, Commission, dated December 30, 2020 (''Free Enterprise Project Letter''), at 2–3; Publius Letter at 4–7; letter from John Richter dated December 12, 2020 (''Richter Letter''), at 1–2.

[109] See Heritage Foundation Letter at 7–10. See also, e.g., Alliance for Fair Board Recruitment Letter at 7–31; De La Vega Letter at 2; Richter Letter at 1.

representation and diversity relating to Underrepresented Minorities.[110] Moreover, some commenters argue that there is academic work reporting that diversifying boards can harm financial performance or shareholder value.[111] Another commenter argues that the proposal is not consistent with a free market because the proposed diversity requirement does not demonstrably improve corporate performance, and could sometimes harm it.[112] This commenter further argues that the proposal may result in increases in the size of boards, potentially hindering corporate oversight and governance.[113]

With respect to comments that disagree that board diversity is linked to enhanced company performance, innovation, long-term sustainable returns, or investor protection, the Exchange states that ''the weight of empirical evidence'' supports its belief in the benefits of board diversity for companies that choose to meet the proposed diversity objectives.[114] With respect to commenters' view that there is insufficient evidence to establish a positive relationship between LGBTQ+ diversity and board performance, the Exchange reiterates that it is reasonable and in the public interest to treat LGBTQ+ status as ''inextricably'' intertwined with gender identity.[115]

The Exchange also states that Section 6(b)(5) of the Act does not require the Exchange to show that its listing rules enhance the financial performance of listed companies.[116] With respect to the comment that adding board members to satisfy the proposal could create less effective corporate oversight and governance due to a larger board, the Exchange states that the proposal would not require that companies add or remove any directors in order to increase diversity.[117]

The conclusions from the studies together referenced by the Exchange and commenters on the effects of changes in board diversity on investors are

mixed.[118] Some of the results from the studies cited by the Exchange and commenters are consistent with the view that increases in board diversity cause increases in shareholder wealth.[119] One study concludes that greater board diversity leads to better firm performance, consistent with diversity fostering more efficient (real) risk-taking, firms with greater board diversity are found to invest persistently more in research and development and have more efficient innovation processes.[120] Other studies have concluded that increases in board diversity may not be beneficial to investors. For example, one study concludes that the effect of gender diversity on firm performance is negative for some companies.[121] In addition, some studies of some board diversity mandates have concluded they are not beneficial to investors.[122] For example, studies of the effects of the board diversity mandates in Norway have presented indications that the mandates caused a decline in company performance and reduced shareholder wealth.[123] According to one study, some

companies chose to go private rather than comply with the Norway board diversity mandate.[124] A more recent study, however, questions the statistical significance of these findings.[125] Taken together, studies of the effects of board diversity are generally inconclusive, and suggest that the effects of even mandated changes remain the subject of reasonable debate.

Studies of board diversity mandates, in any event, do not provide a reliable basis for evaluating the likely overall effects of the Board Diversity Proposal, which does not mandate any particular board composition. Unlike companies in those studies, Nasdaq-listed companies would have the option of providing an explanation for their board composition under the new listing standard. This is distinct from facing a fine as an alternative to compliance or possibly facing the requirement to dissolve for non-compliance. Some of the mandates requiring increased board diversity do not present companies with the option of providing an explanation rather than facing a sanction, or any other option besides compliance with the mandate.[126] According to one study, comply-or-explain corporate governance reforms have been found to increase shareholder wealth more than corporate governance mandates, on average.[127] Further, under the Board Diversity Proposal, Nasdaq-listed companies would be required to disclose board-level diversity statistics, and those companies that do not meet the proposed diversity objectives would be required to choose between providing an explanation and increasing the diversity of their boards. In responding to the disclosure requirements, companies can consider the analyses and conclusions from academic and

---

[110] *See, e.g.,* Toomey Letter at 2; Donnellan Letter at 1; Project on Fair Representation Letter at 6–7; Publius Letter at 6–7; Alliance for Fair Board Recruitment Letter at 26–28.

[111] *See, e.g.,* letter from Samuel S. Guzik, Guzik & Associates, to J. Matthew DeLesDernier, Assistant Secretary, Commission, dated April 5, 2021 (''Guzik Letter''), at 3–5; letter from Theo Vermaelen, dated December 29, 2020.

[112] *See* Toomey Letter at 2.

[113] *See id.* at 3. Another commenter also predicts that the proposal will weaken corporate governance. *See* De La Vega Letter at 2–3.

[114] *See* Nasdaq Response Letter II at 8–10.

[115] *See id.* at 10.

[116] *See id.*

[117] *See id.* at 28.

[118] These studies and their findings are also subject to the various caveat and limitations that are described in the studies.

[119] *See, e.g.,* Gennaro Bernile et al., Board Diversity, Firm Risk, and Corporate Policies, 127 J. Fin. Econ. 588, 605 (2018); David A. Carter et al., The Gender and Ethnic Diversity of US Boards and Board Committees and Firm Financial Performance, 18 Corporate Governance 396, 410 (2010); Jason M. Thomas & Megan Starr, The Carlyle Group, Global Insights: From Impact Investing to Investing for Impact 5 (2020). *See also* Olga Kuzmina & Valentina Melentyeva, Gender Diversity in Corporate Boards: Evidence from Quota-Implied Discontinuities (CEPR, Discussion Paper No. DP14942, 2021), *available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3638047;* Muhammad Nadeem et al., Women on Boards, Firm Risk and the Profitability Nexus: Does Gender Diversity Moderate the Risk and Return Relationship?, 64 Int'l Rev. Econ. & Fin. 427 (2019).

[120] *See* Bernile et al., *supra* note 119.

[121] *See* Renée B. Adams & Daniel Ferreira, Women in the Boardroom and Their Impact on Governance and Performance, 94 J. Fin. Econ. 291 (2009). This study observes that the effect of gender diversity on firm performance may be negative and in general depends on the specification of the analysis.

[122] *See* Alliance for Fair Board Recruitment Letter at 2, 24.

[123] *See, e.g.,* Kenneth R. Ahern & Amy K. Dittmar, The Changing of the Boards: The Impact on Firm Valuation of Mandated Female Board Representation, 127 Q.J. Econ. 137 (2012); David A. Matsa & Amalia R. Miller, A Female Style in Corporate Leadership? Evidence from Quotas, 5 a.m. Econ. J. Applied Econ. 136 (2013). As an additional example, some studies of the effects of the 2018 California law requiring increased board gender diversity have reported indications of negative effects on shareholder wealth. *See, e.g.,* Daniel Greene et al., Do Board Gender Quotas Affect Firm Value? Evidence from California Senate Bill No. 826, J. Corp. Fin., (February 2020); Sunwoo Hwang et al., Mandating Women on Boards: Evidence from the United States (Kenan Institute of

Private Enterprise, Research Paper No. 18–34, 2018), *available at https://ssrn.com/abstract= 3265783.*

[124] *See* Øyvind Bøhren & Siv Staubo, Does Mandatory Gender Balance Work? Changing Organizational Form to Avoid Board Upheaval, 28 J. Corp. Fin. 152 (2014).

[125] *See* B. Espen Eckbo et al., Valuation Effects of Norway's Board Gender-Quota Law Revisited (ECGI, Finance Working Paper No. 463/2016, 2021), *available at https://ssrn.com/abstract=2746786.*

[126] *See* A.B. 979, 2019–2020 Leg., Reg. Sess. (Cal. 2020) (amending Cal. Corp. Code Section 301.3 and adding Cal. Corp. Code Sections 301.4 and 2115.6), *available at http://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201920200AB979;* S.B. 826, 2017–2018 Leg., Reg. Sess. (Cal. 2018) (adding Cal. Corp. Code Sections 301.3 and 2115.5), *available at https://leginfo.legislature.ca.gov/faces/billNavClient.xhtml?bill_id=201720180SB826.*

[127] *See* Larry Fauver et al., Board Reforms and Firm Value: Worldwide Evidence, 125 J. Fin. Econ. 120 (2017) (providing evidence of a greater increase in firm value from comply-or-explain-based reforms than for rule-based reforms in a study of the impact of corporate board reforms on firm value across 41 countries).

other studies on the effects of changes in board composition on company performance and share value. And they may apply those conclusions to their own circumstances.

The Board Diversity Proposal is thus distinguishable from the board diversity mandates described above. Moreover, the Exchange's proposal would mitigate concerns regarding unequal access to information that may currently exist between certain (likely larger and more resourceful) investors who could obtain board diversity information and other (likely smaller) investors who may not be able to do the same. And, because the Board Diversity Proposal would not mandate any particular board composition, companies that choose to meet the diversity objectives are likely to be the ones who stand to benefit the most, or incur the least cost. Those companies which view the diversity objectives themselves as challenging are likely to choose to explain rather than incur the costs to them of meeting the objectives, and those companies for whom explaining would be challenging will have the option to list on a different exchange. For these reasons, the costs of the Board Diversity Proposal are likely to be relatively limited as compared to those regulatory regimes that have mandated board diversity and provided neither the option to explain or to opt-out of the regimes by listing elsewhere.

In light of the disclosure benefits that the Board Diversity Proposal would provide, and given that the studies of the effects of board diversity are generally inconclusive and the costs of the proposal are likely to be comparatively limited, the Commission finds that the Board Diversity Proposal is consistent with the requirements of the Act.

## C. Applicability of the Board Diversity Rules

### 1. Definition of Diverse

In the Board Diversity Proposal, the Exchange states that current reporting of board-level diversity statistics is unreliable and unusable to investors and points to inconsistencies in the definitions of diversity characteristics across companies.[128] It notes that a transparent, consistent definition of Diverse would provide stakeholders with a better understanding of a company's current board composition and philosophy regarding diversity if the company does not meet the proposed diversity objectives.[129] In addition, the Exchange believes that

having a broader definition of "Diverse" would permit inconsistent, non-comparable disclosures, whereas a narrower definition of "Diverse" focused on race, ethnicity, sexual orientation, and gender identity will promote the public interest by improving transparency and comparability.[130]

Some commenters support the proposed definition of "Diverse" because it would improve the transparency, consistency, and comparability of disclosures across companies, whereas a broader definition would maintain the status quo of inconsistent, non-comparable data.[131] One commenter points out that the proposal would not prevent companies from considering other attributes beyond the proposed definition of "Diverse," such as veteran or disability status.[132] By contrast, other commenters object to the proposed definition of "Diverse" as narrow and superficial.[133] Moreover, some commenters request that the Exchange expand the proposed definition of "Diverse" to include individuals with disabilities,[134]

---

[128] See Amendment No. 1 to the Board Diversity Proposal at 50–51.

[129] See id. at 107.

[130] See id. The Exchange also states that the categories it has proposed to comprise an Underrepresented Minority are consistent with the categories reported to the Equal Employment Opportunity Commission ("EEOC") through the Employer Information Report EEO–1 Form ("EEO–1"). See id. at 9–10, 61. In addition, the Exchange states that, while the EEO–1 report refers to "Hispanic or Latino" rather than "Latinx," the Exchange proposes to use the term "Latinx" to apply broadly to all gendered and gender-neutral forms that may be used by individuals of Latin American heritage. See id. at 61 n.160. The Exchange further states that the terms in the proposed definition of LGBTQ+ are similar to the identities defined in California's A.B. 979, but have been expanded to include the queer community. See id. at 61.

[131] See, e.g., Women's Forum Letter at 2; Miller/Howard Letter at 2. See also, e.g., Fairfax Letter at 8–9; CFA Letter at 4–5.

[132] See Goodman and Olson Letter at 2.

[133] See, e.g., Toomey Letter at 1–3; Heritage Foundation Letter at 16; Richter Letter at 2–3.

[134] See, e.g., letter from National LGBT Chamber of Commerce (NGLCC), National Veteran-Owned Business Association (NaVOBA), Out & Equal Workplace Advocates, U.S. Black Chambers, Inc. (USBC), United States Hispanic Chamber of Commerce (USHCC), US Pan Asian American Chamber of Commerce Education Foundation (USPAACC), and Women Impacting Public Policy (WIPP), to Vanessa Countryman, Secretary, Commission, dated April 2, 2021; letter from The Members of the National Disability Alliance, to Adena T. Friedman, President and Chief Executive Officer, Nasdaq, dated March 9, 2021; letter from Maria Town, President & CEO, American Association of People with Disabilities, and Jill Houghton, President & CEO, Disability:IN, to Allison Lee, Acting Chair, Commission, dated February 2, 2021; letter from Janice S. Lintz, CEO, Hearing Access & Innovations, Inc., dated January 25, 2021; letter from Jennifer Laszlo Mizrahi, President, RespectAbility, Carol Glazer, President, National Organization on Disability, Katherine McCary, CEO, Disability: IN DC Metro, William D. Goren, Attorney and Consultant, Americans with

veterans, or others who are not typically well-represented at the board level.[135]

In response to comments,[136] the Exchange reiterates that the proposed definition of "Diverse" is suitable to improve transparency and comparability of disclosures across companies.[137] The Exchange also states that companies are not precluded from using a broader definition of diversity, including persons with disabilities and other categories such as veteran status or age, provided that these companies disclose this under proposed Rule 5605(f)(3).[138]

The proposal would facilitate comparable board diversity disclosures by Nasdaq-listed companies, which would lead to more efficient collection and use of the information by investors. In connection with facilitating comparable board diversity disclosures and for the reasons discussed below, the Exchange's proposed definition of

---

Disabilities, Thomas Foley, President, National Disability Institute, and Sean Luechtefeld, Senior Director Communications, ANCOR, to Vanessa Countryman, Secretary, dated January 25, 2021; letter from Zainab Alkebsi, President, Board of Directors, Deaf and Hard of Hearing Bar Association, to Vanessa Countryman, Secretary, Commission, dated January 25, 2021; letter from Victor Calise, Commissioner, New York City Mayor's Office for People with Disabilities, dated January 8, 2021; letter from Nicholas D. Lawson, J.D. Candidate, Georgetown University Law Center, to Vanessa Countryman, Secretary, Commission, dated January 15, 2021; letter from Robert Ludke, Founder, Ludke Consulting, LLC, and Regina Kline, Founder and CEO, SmartJob, LLC, to Vanessa Countryman, Secretary, Commission, dated December 31, 2020; CFA Letter at 5; Ideanomics Letter at 4; letter from James Morgan dated December 22, 2020; letter from Carol Glazer, CEO, National Organization on Disability, to Vanessa Countryman, Secretary, Commission, dated December 9, 2020.

[135] See, e.g., CFA Letter at 5; Ideanomics Letter at 4–5. See also, e.g., letter from Kevin R. Eckert, Partner, Task Force X Capital, to Vanessa Countryman, Secretary, Commission, dated April 20, 2021 (urging the inclusion of veterans in the definition of Diverse); letter from David A. Morken, CEO and Chairman, Bandwidth Inc., to Vanessa Countryman, Secretary, Commission, dated April 6, 2021. One commenter states that the proposal would fail to treat similarly situated categories alike, and that the proposal's distinctions are arbitrary and capricious. See Alliance for Fair Board Recruitment Letter at 53–54.

[136] The Exchange also points to commenters who argue that the proposal would not promote diversity because, for example, it would not prohibit homogenous boards, and Diverse directors would bring similar perspectives to those of white male board members. See Nasdaq Response Letter II at 10–11. The Exchange states that companies are free to consider additional diverse attributes when identifying director nominees (e.g., nationality, disability, veteran status) and are free to disclose information relating to diverse attributes beyond those highlighted in the proposal. See id. at 11.

[137] See id. at 14.

[138] See id. The Exchange also encourages companies to disclose board diversity metrics beyond those categories identified in the proposal, to the extent a company considers it material to its investors' voting and investment decisions. See id.

"Diverse" is not unreasonable. It is not unreasonable for the Exchange to propose a definition of "Underrepresented Minority" that is consistent with the EEO–1 categories reported to the EEOC because, among other reasons, companies may already be familiar with the EEO–1 categories, which could promote efficiency for companies in complying with the proposed rules. It is also not unreasonable for the Exchange to include LGBTQ+ in its proposed definition of "Diverse." Moreover, as stated by the Exchange, companies are not precluded from considering director characteristics that do not fall within the proposed definition of "Diverse" and providing the disclosures under proposed Rule 5605(f)(3) if the company does not satisfy the proposed board diversity objectives.

2. Flexibility for Certain Companies

In the Board Diversity Proposal, the Exchange recognizes that the operations, size, and current board composition of each Nasdaq-listed company are unique, and states that it endeavors to provide a disclosure-based, business-driven framework to enhance board diversity that balances the need for flexibility with each company's particular circumstances.[139] According to the Exchange, the proposed disclosure framework and phase-in [140] and

transition periods [141] under Rule 5605(f) recognize the differences (e.g., in demographics or resources) among different types of companies and would not unfairly discriminate among companies.[142] The Exchange states that

the definition of Foreign Issuer is designed to recognize that companies that are not Foreign Private Issuers but are headquartered outside of the United States are foreign companies, notwithstanding the fact that they file domestic Commission reports, and is designed to exclude companies that are domiciled in a foreign jurisdiction without having a physical presence in that country.[143] Further, according to the Exchange, because the EEOC categories of race and ethnicity may not extend to all countries globally since each country has its own unique demographic composition, and because on average women tend to be underrepresented in boardrooms across the globe, proposed Rule 5605(f)(2)(B) would allow Foreign Issuers to meet the diversity objectives by having one Female director and one Underrepresented Individual [144] (rather than Underrepresented Minority) or LGBTQ+ director, or two Female directors.[145] With respect to Smaller Reporting Companies, the Exchange states that, because these companies may not have the resources necessary to compensate an additional director or engage a search firm to search outside of directors' networks, it proposes to provide these companies with additional flexibility in their approach.[146] Moreover, in providing additional flexibility to Companies with a Smaller Board, the Exchange states that these companies may face similar resource constraints to those of Smaller Reporting Companies, but not all Companies with a Smaller Board are Smaller Reporting Companies, and therefore the alternative diversity objective that would be provided to Smaller Reporting Companies may not be available to them.[147] The Exchange further states that Companies with a Smaller Board may be disproportionately impacted if they plan to satisfy proposed Rule 5605(f)(2) by

---

[139] See Amendment No. 1 to the Board Diversity Proposal at 16–17.

[140] Proposed Rule 5605(f)(5) would specify the phase-in period for any company newly listing on the Exchange (including companies listing through an initial public offering, direct listing, transfer from another exchange or the over-the-counter market, in connection with a spin-off or carve-out from a company listed on the Exchange or another exchange, or through a merger with an acquisition company listed under IM–5101–2 ("acquisition company")) that was not previously subject to a substantially similar requirement of another national securities exchange, and any company that ceases to be a Foreign Issuer, a Smaller Reporting Company, or an Exempt Company. In particular, any newly-listed company on the Nasdaq Global Select Market ("NGS") or Nasdaq Global Market ("NGM") would be permitted to satisfy the requirement to have, or explain why it does not have: (i) At least one Diverse director by the later of (a) one year from the date of listing or (b) the date the company files its proxy statement or information statement (or, if the company does not file a proxy, its Form 10–K or 20–F) for the company's first annual meeting of shareholders subsequent to the company's listing; and (ii) at least two Diverse directors by the later of (a) Two years from the date of listing or (b) the date the company files its proxy statement or information statement (or, if the company does not file a proxy, its Form 10–K or 20–F) for the company's second annual meeting of shareholders subsequent to the company's listing. See proposed Rule 5605(f)(5)(A). In addition, any newly-listed company on the Nasdaq Capital Market ("NCM") would be permitted to satisfy the requirement to have, or explain why it does not have, at least two Diverse directors by the later of: (i) Two years from the date

of listing; or (ii) the date the company files its proxy statement or information statement (or, if the company does not file a proxy, its Form 10–K or 20–F) for the company's second annual meeting of shareholders subsequent to the company's listing. See proposed Rule 5605(f)(5)(B). Moreover, any newly listed company with a Smaller Board would be permitted to satisfy the requirement to have, or explain why it does not have, at least one Diverse director by the later of: (i) Two years from the date of listing, or (ii) the date the company files its proxy statement or information statement (or, if the company does not file a proxy, its Form 10–K or 20–F) for the company's second annual meeting of shareholders subsequent to the company's listing. See proposed Rule 5605(f)(5)(D). Any company that ceases to be a Foreign Issuer, Smaller Reporting Company, or Exempt Company would be permitted to satisfy the requirements of proposed Rule 5605(f) by the later of: (i) One year from the date that the company no longer qualifies as a Foreign Issuer, Smaller Reporting Company, or Exempt Company; or (ii) the date the company files its proxy statement or information statement (or, if the company does not file a proxy, its Form 10–K or 20–F) for the company's first annual meeting of shareholders subsequent to such event. See proposed Rule 5605(f)(5)(C).

[141] Proposed Rule 5605(f)(7) would specify the transition period for the implementation of proposed Rule 5605(f). As proposed, each company listed on the Exchange (including a Company with a Smaller Board) would be required to have, or explain why it does not have, at least one Diverse director by the later of: (i) Two calendar years after the approval date of the proposal ("First Effective Date"); or (ii) the date the company files its proxy statement or information statement (or, if the company does not file a proxy, its Form 10–K or 20–F) for the company's annual shareholders meeting during the calendar year of the First Effective Date. See proposed Rule 5605(f)(7)(A). In addition, each company listed on NGS or NGM must have, or explain why it does not have, at least two Diverse directors by the later of: (i) Four calendar years after the approval date of the proposal ("Second NGS/NGM Effective Date"); or (ii) the date the company files its proxy statement or information statement (or, if the company does not file a proxy, its Form 10–K or 20–F) for the company's annual shareholders meeting during the calendar year of the Second NGS/NGM Effective Date. See proposed Rule 5605(f)(7)(B). Moreover, each company listed on NCM must have, or explain why it does not have, at least two Diverse directors by the later of: (i) Five calendar years after the approval date of the proposal ("Second NCM Effective Date"); or (ii) the date the company files its proxy statement or information statement (or, if the company does not file a proxy, its Form 10–K or 20–F) for the company's annual shareholders meeting during the calendar year of the Second NCM Effective Date. See proposed Rule 5605(f)(7)(C).

[142] See Amendment No. 1 to the Board Diversity Proposal at Section 3.b.II.D. According to the Exchange, the proposed transition and phase-in periods are intended to provide newly listed public companies with additional time to meet the diversity objectives of proposed Rule 5605(f)(2), as newly listed public companies may have unique governance structures, such as staggered boards or director seats held by venture capital firms, that require additional timing considerations when adjusting the board's composition. See id. at 79. The Exchange further states that the proposed transition and phase-in periods are intended to provide

additional flexibility to companies listed on NCM, as such companies are typically smaller and may face additional challenges and resource constraints when identifying additional director nominees who self-identify as Diverse. See id. The Exchange also states that its proposed phase-in periods are consistent with the phase-in periods it provides to companies for other board composition requirements. See id. at 81. See also, e.g., Rules 5615(b)(1), 5615(b)(3), and 5620.

[143] See Amendment No. 1 to the Board Diversity Proposal at 83.

[144] The definition of Underrepresented Individual is based on the United Nations Declaration on the Rights of Persons Belonging to National or Ethnic, Religious and Linguistic Minorities and the United Nations Declaration on the Rights of Indigenous Peoples. See id. at 69, 140–41.

[145] See id. at 81–82.

[146] See id. at 84–85.

[147] See id. at 86.

adding additional directors, which may impose additional costs in the form of director compensation and D&O insurance.[148] With respect to Exempt Companies,[149] the Exchange states that they do not have boards, do not list equity securities, list only securities with no voting rights towards the election of directors, or are not operating companies, and that holders of the securities they issue do not expect to have a say in the composition of their boards.[150] And the Exchange states that proposed Rule 5606 would provide appropriate flexibility for Foreign Issuers [151] and exceptions for certain types of Nasdaq-listed companies.[152]

Some commenters express support for the proposed additional flexibility for foreign or smaller companies, or "other groups of issuers that are more constrained for valid reasons." [153] Another commenter contends, however, that the proposal is inconsistent with Section 6(b)(5) of the Act because it appears to be designed to permit unfair discrimination between issuers and impose burdens on competition that are

not necessary or appropriate in furtherance of the applicable provisions of the Act.[154] One commenter further asserts that the proposal is inconsistent with Section 6(b)(5) of the Act because it unfairly discriminates among issuers by giving foreign issuers flexibility that is not available to domestic issuers.[155] One commenter also argues that the proposal would unnecessarily burden competition and unfairly discriminate between issuers who meet the proposed diversity objectives and those who do not,[156] and one commenter argues that the proposal would burden competition between exempt and non-exempt companies.[157]

In response to comments, the Exchange states that the Board Diversity Proposal would provide companies with a flexible, attainable approach to achieving a reasonable objective that is not overly burdensome or coercive.[158] The Exchange also states that the Board Diversity Proposal would align investors' demands for increased diversity with companies' needs for a flexible approach that accommodates each company's unique circumstances.[159]

The Board Diversity Proposal is consistent with Sections 6(b)(5) and 6(b)(8) of the Act. As discussed below, the proposal is not designed to permit unfair discrimination between issuers and would not impose a burden on competition between issuers that is not necessary or appropriate in furtherance of the purposes of the Act.[160] As an initial matter, even though the Board Diversity Proposal would establish different diversity objectives and disclosures for different types of Nasdaq-listed companies, it would not mandate any particular board composition for Nasdaq-listed companies, companies that do not meet the applicable diversity objectives would only need to explain their reason(s) for not meeting the objectives and would have substantial flexibility in crafting such an explanation, and directors would not be required to self-

identify their Diverse characteristics for purposes of the Board Diversity Matrix.

Moreover, it is not unreasonable for the Exchange, in crafting board diversity disclosures, to recognize that the proposed definition of "Underrepresented Minority" for domestic companies may not be as effective in identifying underrepresented board members in foreign countries that have differing ethnic and racial compositions, and may therefore result in disclosures that are less useful for investors who seek board diversity information for Foreign Issuers. It is therefore not unreasonable for the Exchange to require Foreign Issuers to provide disclosures relating to underrepresented individuals based on national, racial, ethnic, indigenous, cultural, religious, or linguistic identity in the country of the issuer's principal executive offices. Similarly, to the extent Foreign Issuers choose to meet the proposed diversity objectives, it is not unreasonable for the Exchange to take into account the differing demographic compositions of foreign countries and to provide Foreign Issuers flexibility in recognition of the different circumstances associated with Foreign Issuers hiring Diverse directors. Moreover, investors would still have access to a Foreign Issuer's Board Diversity Matrix and any disclosures explaining why it does not meet the applicable diversity objective, and this information may still be important to investors' investment and voting decisions notwithstanding the flexibility provided to Foreign Issuers. Accordingly, it is not unfairly discriminatory, and does not impose an unnecessary or inappropriate burden on competition, for the Exchange to provide this flexibility to Foreign Issuers.

In addition, it is not unreasonable for the Exchange to recognize the unique challenges (including potential resource constraints) faced by Smaller Reporting Companies and Companies with a Smaller Board in meeting the proposed diversity objectives and to provide more flexibility to these companies to the extent they choose to meet the diversity objectives (i.e., two Diverse directors, which could be satisfied with two Female directors, for a Smaller Reporting Company or one Diverse director for a Company with a Smaller Board). And, as with Foreign Issuers, investors would still have access to the Board Diversity Matrix from Smaller Reporting Companies and Companies with a Smaller Board, as well as any disclosures explaining why such companies do not meet their applicable board diversity objectives, and this

[148] See id. The Exchange also states that proposed Rule 5605(f)(2)(D) would avoid complexity for Companies with a Smaller Board that attempt to satisfy the diversity objectives by adding a Diverse director to their board, and prevent such companies from thereby being subject to a higher threshold (i.e., that of proposed Rule 5605(f)(2)(A), (B), or (C)) as a result. See id. at 86–87.

[149] Proposed Rule 5605(f)(4) would exempt the following types of companies from the requirements of proposed Rule 5605(f) ("Exempt Companies"): (1) Acquisition companies; (2) asset-backed issuers and other passive issuers (as set forth in Rule 5615(a)(1)); (3) cooperatives (as set forth in Rule 5615(a)(2)); (4) limited partnerships (as set forth in Rule 5615(a)(4)); (5) management investment companies (as set forth in Rule 5615(a)(5)); (6) issuers of non-voting preferred securities, debt securities, and derivative securities (as set forth in Rule 5615(a)(6)) that do not have equity securities listed on the Exchange; and (7) issuers of securities listed under the Rule 5700 series.

[150] See Amendment No. 1 to the Board Diversity Proposal at 90, 150. The Exchange states that, although it is exempting acquisition companies from the requirements of proposed Rule 5605(f), upon such a company's completion of a business combination with an operating company, the post-business combination entity would be provided the same phase-in period as other newly listed companies to satisfy the requirements of proposed Rule 5605(f). See id. at 90–91, 151.

[151] See id. at 115–16. The Exchange recognizes that some Foreign Issuers may have their principal executive offices located outside of the U.S. and in jurisdictions that may impose laws limiting or prohibiting self-identification questionnaires. See id. at 68. The Exchange also states that the proposed definition of Underrepresented Minority may be inapplicable to a Foreign Issuer and make the Board Diversity Matrix less relevant for such companies and not useful for investors. See id.

[152] See id. at 117–18.

[153] See AllianceBernstein Letter at 2. See also, e.g., Stardust Letter at 2; letter from Gary A. LaBranche, FASAE, CAE, President & CEO, National Investor Relations Institute, to Vanessa Countryman, Secretary, Commission, dated December 30, 2020, at 4.

[154] See Guzik Letter at 1, 7–10.

[155] See Alliance for Fair Board Recruitment Letter at 47–49.

[156] See Guzik Letter at 8.

[157] See Project on Fair Representation Letter at 6.

[158] See Nasdaq Response Letter II at 4.

[159] See id. The Exchange also states that companies are not precluded from striving to achieve higher or lower diversity objectives. See id.

[160] Exchanges currently provide flexibilities to certain issuers under their listing standards. See, e.g., Nasdaq Rule 5615(a)(3) (providing certain flexibility to foreign private issuers); Nasdaq Rule 5605(d)(5) (providing certain flexibility to smaller reporting companies); NYSE Listed Company Manual Section 303A.00 (providing certain flexibility to foreign private issuers and smaller reporting companies).

information may still be important to investors' investment and voting decisions even though these companies have more flexible diversity objectives. Accordingly, it is not unfairly discriminatory, and does not impose an unnecessary or inappropriate burden on competition for the Exchange to provide more flexible diversity objectives for Smaller Reporting Companies and Companies with a Smaller Board.

Moreover, the Board Diversity Proposal would not unfairly discriminate against companies that make disclosures under proposed Rule 5605(f)(3) or impose an unnecessary or inappropriate burden on competition between companies that choose to meet the diversity objectives and companies that make the disclosures under proposed Rule 5605(f)(3). Specifically, as discussed below, the Board Diversity Proposal is designed to not unduly burden Nasdaq-listed companies and would provide companies flexibility in formulating an explanation for not meeting the diversity objectives,[161] thereby minimizing any potential burdens on competition. In addition, it is not unreasonable, and mitigates the impact of different circumstances on how companies respond to the proposal, to only require companies that do not meet the proposed diversity objectives to disclose why they have not met such objectives, rather than to require all Nasdaq-listed companies (including those that already have Diverse directors on their boards sufficient to satisfy the objectives) to more generally disclose their approaches to board diversity. In addition, the proposal would not mandate any particular board composition, and there is competition among the exchanges for listings. A company may choose to meet the proposed diversity objectives or explain its reasons for not doing so, or the company may transfer its listing to another exchange if it does not wish to comply with the proposed listing rules.

Finally, the proposal would not unfairly discriminate against companies that are not exempt from the proposal or impose an unnecessary or inappropriate burden on competition between Exempt Companies and companies that are not exempt. It is not unreasonable for the Exchange to recognize the differences between operating companies that issue equity securities with voting rights that are listed on the Exchange and Exempt Companies.[162]

*D. Burdens Associated With Complying With the Board Diversity Rules and Other Economic Impacts Associated With the Board Diversity Rules*

In the Board Diversity Proposal, the Exchange states that collecting and disclosing the statistical data under proposed Rule 5606 would impose a minimal time and economic burden on listed companies,[163] and any such burden would be counterbalanced by the benefits that the information would provide to a company's investors.[164]

The Exchange also argues that because proposed Rule 5605(f) would allow a company to explain why it does not meet the proposed diversity objectives, it would mitigate any burdens on companies for which meeting those objectives is not cost effective, appropriate, feasible, or desirable.[165] Moreover, the Exchange states that the costs of identifying director candidates and total annual director compensation can range widely.[166] The Exchange states, however, that most, if not all, of these costs would be borne in the search for new directors regardless of the proposed rule.[167] The Exchange also notes that while the proposal may lead some companies to search for director candidates outside of already established networks, the incremental costs of doing so would be tied directly to the benefits of a broader search.[168] Moreover, the Exchange states, the proposed compliance periods would allow companies to avoid incurring immediate costs, and the proposed flexibilities for certain types of companies would reduce their compliance burden.[169]

Some commenters believe that the Board Diversity Proposal would not be burdensome because companies are already familiar with the type of

disclosures required,[170] disclosures are required on an aggregate basis, and the disclosures are based on voluntary self-identification.[171] One commenter asserts that the proposal would not be burdensome, as companies could expand the size of their boards to add Diverse directors instead of replacing existing directors or could simply explain why they have not met the proposed diversity objectives.[172] Some commenters also state that finding qualified Diverse directors would not be unduly difficult.[173]

Other commenters express concern with the economic impacts of proposed Rule 5605(f), however.[174] One argues that the proposal could harm economic growth by imposing costs on public corporations, discouraging private corporations from going public, and enabling interest groups to initiate pressure campaigns against corporations with non-Diverse boards; the same commenter expresses concern that the Exchange has not undertaken a serious effort to quantify the proposal's costs and benefits.[175]

---

[161] *See infra* Section II.D.

[162] The Exchange currently exempts certain types of issuers from certain corporate governance requirements. *See* Nasdaq Rule 5615.

[163] *See* Amendment No. 1 to the Board Diversity Proposal at 159 (stating that, while the time and economic burden may vary based on a company's board size, the Exchange does not believe that there is any significant burden associated with gathering, preparing, and reporting this data).

[164] *See id.* at 159–60.

[165] *See id.* at 160–61.

[166] *See id.* at 161.

[167] *See id.*

[168] *See id.* at 161–62 (also stating that the Board Recruiting Service Proposal would reduce costs for companies that do not currently meet the separately proposed diversity objectives, that the Exchange has published FAQs on its Listing Center to provide guidance to companies on the application of the proposed rules in the Board Diversity Proposal, and that the Exchange will establish a dedicated mailbox for companies and their counsel to email additional questions to the Exchange regarding the application of such proposed rules).

[169] *See id.* at 162.

[170] Some commenters point out that the Board Diversity Proposal would require disclosure based on the same categories that companies already use to report workforce diversity data to the EEOC on the EEO–1 report. *See, e.g.,* Morningstar Letter at 1–2; Fairfax Letter at 7–8; Ideanomics Letter at 4; Goodman and Olson Letter at 2.

[171] *See, e.g.,* Olshan Letter at 3–4; CFA Letter at 5; Fairfax Letter at 7–8; Soundboard Letter at 1–2; TIAA Letter at 3; Soundboard Letter at 2–3. *See also* letter from Theresa Whitmarsh, Executive Director, Washington State Investment Board, to Vanessa A. Countryman, Secretary, Commission, dated December 23, 2020 ("Washington State Investment Board Letter"), at 2.

[172] *See* Akin Gump Letter at 5 (also stating that boards of directors of Nasdaq-listed companies will not be confronted with any undue hardship, other than the ordinary course onboarding hurdles or drafting of requisite disclosure).

[173] *See, e.g.,* letter from Rosie Richard and Patricia Rodriguez Christian, Co-Presidents, WomenExecs on Boards, to Jay Clayton, Chairman, Commission, dated January 4, 2021 ("WomenExecs Letter"); Ariel Letter at 1. *See also* Goodman and Olson Letter at 2–3.

[174] *See, e.g.,* CEI Letter at 4–5; Quigley Letter; IBC Letter at 1–4; letter from Matthew Glen dated December 31, 2020 (noting the need for additional services to seek Diverse candidates).

[175] *See* Toomey Letter at 1, 5–6. *See also, e.g.,* Alliance for Fair Board Recruitment Letter at 31–32 (stating that failure to cure a deficiency would result in a staff delisting determination, that the proposal would create a target for activist divestment campaigns or shareholder lawsuits alleging misrepresentations and breach of fiduciary duties, and that companies will need to spend limited resources to hire communications consultants and attorneys to evaluate the marketing and legal risks of providing an explanation for not having the applicable number of Diverse directors); Guzik Letter at 8 (expressing concern regarding pressure from activist groups, as well as litigation, for issuers that are unwilling or unable to meet the proposed diversity objectives); letter from Art Ally, President and CEO, Timothy Plan, dated March 25, 2021 ("Timothy Plan Letter"), at 1–2 (stating that the proposal may subject certain firms to

In response to such comments, the Exchange states that companies may decide where to list and that listings contracts and fees do not impede issuers from switching listing markets.[176] The Exchange also asserts that many long-term, newer, and potential public companies strongly support and value the objectives of the proposal and may affirm their choice or choose to list on Nasdaq because of it.[177] The Exchange further contends that private companies recognize the value of board diversity for public companies and would not have any misgivings about going public as a result of the proposal.[178] The Exchange additionally states that the proposal's framework would allow companies with non-Diverse boards to simply explain their approach, which would limit pressure campaigns.[179] Further, the Exchange states that it has carefully considered the potential costs on listed companies (and those considering listing), including the costs of retaining a director search firm to conduct the search for new or replacement directors, the time employees spend conducting the search and completing and providing the required disclosures, and the potential disruption to the board from these activities.[180] The Exchange states, however, because existing, new, and potential public companies would experience those costs in vastly different ways and combinations, those costs cannot be quantified with meaningful certainty.[181]

In approving the Board Diversity Proposal, the Commission has considered the proposal's impact on efficiency, competition, and capital formation and finds that it would not have a material impact on efficiency, that it is reasonably designed not to unduly burden Nasdaq-listed companies, and that it would not unduly deter capital formation (e.g., by affecting companies' decisions to go public and list on the Exchange). As proposed, companies that choose not to meet the diversity objectives would not be required to meet those objectives. Any company that neither wishes to meet the diversity objectives nor disclose its reasons for not doing so may transfer its listing to a competing listing exchange. Moreover, the Board Diversity Proposal would provide directors with the option to not self-identify.

Further, various aspects of the two proposals would mitigate any burdens associated with compliance, as well as any related impact on capital formation. In particular, the Board Diversity Proposal would provide: Flexibility in formulating an explanation for not meeting the diversity objectives; flexibility for Foreign Issuers, Smaller Reporting Companies, and Companies with a Smaller Board; Flexibility with respect to the location of the required disclosures (i.e., in the company's proxy statement or information statement (or if the company does not file a proxy, in its Form 10–K or 20–F),[183] or on the company's website); phase-in periods for companies newly listing on the Exchange, companies switching listing tiers on the Exchange, and companies that cease to be Foreign Issuers, Smaller Reporting Companies, or Exempt Companies to comply with the proposed rules; a cure period for a company that previously satisfied proposed Rule 5605(f) but subsequently ceases to meet the diversity objective due to a vacancy on its board; and transition periods for companies to comply with the proposals after they are approved.[184] Additionally,

the Board Recruiting Service Proposal—which is separately approved by this order—would offer a one-year complimentary board recruiting service that would mitigate costs associated with hiring additional Diverse directors.[185] Moreover, the Board Diversity Proposal would provide reasonable time periods for companies that fail to maintain compliance to regain compliance and avoid being delisted from the Exchange: A company that does not comply with proposed Rule 5605(f)(2) would be provided until the later of its next annual shareholders meeting or 180 days from the event that caused the deficiency to cure the deficiency, and a company that does not comply with proposed Rule 5606 would have 45 calendar days to submit a plan of compliance to the Exchange and upon review of such plan, Exchange staff may provide the company with up to 180 days to regain compliance.

Finally, the proposals may promote competition for listings among exchanges by allowing the Exchange to update its disclosure rules and related listing services in a way that better attracts and retains the listings of companies that prefer to be listed on an exchange that provides investors with the information required by the Board Diversity Proposal. While some companies that do not prefer the Board Diversity Proposal's required

---

harassment, including legal threats); letter from Tom Quaadman, Executive Vice President, U.S. Chamber of Commerce's Center for Capital Markets Competitiveness, to Vanessa Countryman, Secretary, Commission, dated January 4, 2021, at 2 (expressing support for the Board Diversity Proposal while suggesting ongoing careful assessment of how the proposal could affect Emerging Growth Companies, as well as the potential effect that the proposed new listing standards could have on the future of initial public offerings).

[176] See Nasdaq Response Letter II at 28–29.

[177] See id. at 29.

[178] See id. The Exchange specifically states that, among the many elements companies consider when becoming public, board composition is growing in importance among pre-public company stakeholders. See id. (noting Goldman Sach's new standard for taking companies public (i.e., the company must have at least one diverse board member), and citing Washington State Investment Board Letter at 2, which states that many private equity general partners are already moving toward "new and improved" diversity standards, and Institutional Limited Partners Association Letter at 2, which states that, given the frequency of private equity and venture-backed companies exiting through an IPO, the proposal will likely result in positive movement on board diversity of portfolio companies owned by private funds). The Exchange also states that Amendment No. 1 to the Board Diversity Proposal would provide a newly listed company with a reasonable amount of time to publish its board disclosure and to have Diverse directors in alignment with the proposed diversity objectives after going public. See id.

[179] See id. at 30.

[180] See id.

[181] See id. The Exchange states that it has taken multiple steps to mitigate the potential costs of the proposal (e.g., proposing to offer the complimentary recruiting service, proposing the alternative of an explanation if a company chooses to not meet the proposed diversity objectives). See id.

[182] See 15 U.S.C. 78c(f). See also Section II.A.2. (discussing the efficiencies that could result from the Board Diversity Proposal).

[183] To account for the fact that not every company files a proxy statement, the Exchange amended the Board Diversity Proposal in Amendment No. 1 to allow such companies to provide the disclosures in a Form 10–K or 20–F.

[184] In response to comments, the Exchange amended the Board Diversity Proposal to provide a

grace period under proposed Rule 5605(f)(6)(B) for a company that satisfied the objectives of proposed Rule 5605(f)(2) but ceases to meet the objectives due to a vacancy on its board of directors, to provide additional time for newly listed companies to satisfy the requirements of proposed Rule 5605(f) and to better align the phase-in and transition periods with a company's proxy season. See also letter from Stephen J. Kastenberg, Ballard Spahr LLP, to Vanessa Countryman, Secretary, Commission, dated January 14, 2021 ("Ballard Spahr Letter"), at 1–2 (submitted on behalf of the Exchange) (stating that the Exchange has received requests to: allow additional time for companies listed on the NGS, NGM, and NCM to comply with the diversity objectives of proposed Rule 5605(f)(2); provide a "cure" period for a listed company that does not comply with the diversity objectives of proposed Rule 5605(f)(2) as a result of an unanticipated departure of a Diverse director; and amend the effective date of the proposed rules to better align disclosure requirements with annual meetings and proxy requirements).

[185] The Exchange proposes to provide certain Nasdaq-listed companies with one-year of complimentary access for two users to a board recruiting service, which would provide access to a network of board-ready diverse candidates, allowing companies to identify and evaluate Diverse board candidates. See proposed IM–5900–9; Amendment No. 1 to the Board Recruiting Service Proposal at 10–11. According to the Exchange, this service has an approximate retail value of $10,000 per year. See proposed IM–5900–9. As proposed, until December 1, 2022, any Eligible Company that requests access to this service through the Nasdaq Listing Center will receive complimentary access for one year from the initiation of the service. See id.

disclosures may choose to not go public and list on the Exchange, or they may delist from the Exchange, the proposal contains terms to mitigate adverse effects. Moreover, some companies may shift their listings to the Exchange, or may choose to go public on the Exchange rather than remain private, in response to the Board Diversity Proposal's requirements because of the interest shown in comparable and consistent board diversity information, which could benefit investors by increasing the number of publicly listed companies.

*E. The Exchange's Authority for the Board Diversity Rules*

Section 6(b)(5) of the Act requires, among other things, that the rules of a national securities exchange not be designed to regulate by virtue of any authority conferred by the Act matters not related to the purposes of the Act or the administration of the exchange. In the Board Diversity Proposal, the Exchange argues that the proposal is related to corporate governance standards for listed companies and is therefore not designed to regulate by virtue of any authority conferred by the Act matters not related to the purposes of the Act or the administration of the Exchange.[186] While the Exchange recognizes that U.S. states are increasingly proposing and adopting board diversity requirements, the Exchange states that certain of its current corporate governance listing rules relate to areas that are also regulated by states (*e.g.*, quorums, shareholder approval of certain transactions).[187] The Exchange states that adopting Exchange rules relating to such matters (and the proposed rule changes described herein) would ensure uniformity of such rules among its listed companies.[188]

The Exchange also states that it can establish practices that would assist in carrying out its mandate to protect investors and remove impediments from the market through the Board Diversity Proposal.[189] The Exchange believes that it is within its delegated authority to propose listing rules designed to enhance transparency, provided that they do not conflict with existing

federal securities laws.[190] The Exchange states that, for example, it already requires its listed companies to publicly disclose compensation or other payments by third parties to a company's directors or nominees, notwithstanding that such disclosure is not required by federal securities laws.[191] The Exchange further states that it has designed the proposal to avoid a conflict with existing disclosure requirements under Regulation S–K and to mitigate additional burdens for companies by providing them with flexibility to provide such disclosure on their website, in their proxy statement or information statement, or, if a company does not file a proxy, in its Form 10–K or 20–F, and by not requiring companies to adopt a diversity policy.[192]

Some commenters argue that the Board Diversity Proposal is impermissibly designed to address political and social issues and would redefine the purpose of businesses in a way that is unrelated to traditional business purposes (*e.g.*, profitability, obligation to shareholders, satisfying customers, and treating workers and suppliers fairly).[193] One commenter also asserts that the proposal does not relate to any traditional corporate governance matter.[194] Moreover, some commenters argue that the proposal is not within the purposes of the Act and exceeds the authority of national securities exchanges under the Act.[195]

In response, the Exchange states that the Act provides the standards for approval of rules proposed by SROs, which are different from rulemaking by the Commission.[196] The Exchange states

that it is performing its duties as an exchange to fashion listing rules that promote good corporate governance.[197] The Exchange also notes that it is expected and required, in its role operating an exchange, to develop and enforce listing rules that, among other things, ''remove impediments to and perfect the mechanisms of a free and open market'' and ''protect investors and the public interest.''[198] With respect to the comment that the proposal contributes to the federalization of corporate governance, the Exchange states that it develops listing rules regarding corporate governance standards to promote uniformity among its listed companies, even if the same areas are regulated by states.[199] In addition, the Exchange states that companies voluntarily list on the Exchange, as a private entity, and choose to submit to the Exchange's listing rules.[200] Moreover, national securities exchanges may adopt different approaches.[201]

The Board Diversity Proposal would make consistent and comparable information relating to the corporate governance of Nasdaq-listed companies (*i.e.,* information regarding board diversity) widely available on the same basis to investors, which would increase efficiency for investors that gather and use this information. In addition, the proposal would not redefine the purpose of Nasdaq-listed companies' businesses in a way that is unrelated to traditional business purposes, as claimed by certain commenters. Rather, it could enhance investors' investment and voting decisions and, as discussed throughout this order, is consistent with Section 6 of the Act, which requires that the rules of an exchange be designed to, among other things, remove impediments to and perfect the mechanism of a free and open market and a national market system and protect investors and the public interest.

Exchanges have historically adopted listing rules that require disclosures in addition to those required by Commission rules.[202] National securities exchanges may choose to

---

[186] *See* Amendment No. 1 to the Board Diversity Proposal at Section 3.b.II.E.

[187] *See id.* at 155–56. The Exchange recognizes that several states have enacted or proposed legislation relating to board diversity and that Congress is considering legislation to require Commission-registered companies to provide board diversity statistics and disclose whether they have a board diversity policy. *See id.* at 16.

[188] *See id.* at 156.

[189] *See id.* at 53.

[190] *See id.* at 58.

[191] *See id.* at 58–59. Various provisions under the federal securities laws may require disclosure of third party compensation arrangements with or payments to nominees and/or board members. *See* Securities Exchange Act Release No. 78223 (July 1, 2016), 81 FR 44400, 44403 (July 7, 2016).

[192] *See* Amendment No. 1 to the Board Diversity Proposal at 60.

[193] *See, e.g.,* Timothy Plan Letter at 1–2 (also supporting Toomey Letter); CEI Letter at 1; Toomey Letter at 4; Heritage Foundation Letter at 3–5, 17–18; Guess Letter at 1. Another commenter argues that the Board Diversity Proposal raises concerns about increasing costs and parallels to socialism. *See* letter from Henryk A Kowalczyk dated January 6, 2021 (''Kowalczyk Letter'') (reproducing a December 18, 2020 article published in Medium titled ''Socialists Are Taking Over Wall Street'').

[194] *See* Alliance for Fair Board Recruitment Letter at 49–50.

[195] *See, e.g.,* Guzik Letter at 1; Alliance for Fair Board Recruitment Letter at 49–50; Heritage Foundation Letter at 2; Project on Fair Representation Letter at 7–11; letter from Christopher A. Iacovella, Chief Executive Officer, American Securities Association, to Vanessa Countryman, Secretary, Commission, dated December 31, 2020, at 1–2; Publius Letter at 4–5.

[196] *See* Nasdaq Response Letter II at 22.

[197] *See id.* at 23–24.

[198] *See id.* at 24.

[199] *See id.*

[200] *See id.*

[201] *See id.*

[202] *See, e.g.,* Nasdaq IM–5250–2 (requiring Nasdaq-listed companies to publicly disclose the material terms of all agreements and arrangements between any director or nominee and any person or entity (other than the listed company) relating to compensation or other payment in connection with that person's candidacy or service as a director); LTSE Rule 14.425(a)(1)(C) (requiring LTSE-listed issuers to adopt and publish a policy on the company's approach to diversity and inclusion).

adopt disclosure requirements in their listing rules that supplement or overlap with disclosure requirements otherwise imposed under the federal securities laws, and disclosure-related listing standards that provide investors with information that facilitates informed investment and voting decisions contribute to the maintenance of fair and orderly markets.[203] Accordingly, the proposal would not cause the Exchange to regulate, by virtue of any authority conferred by the Act, matters not related to the purposes of the Act or the administration of the Exchange.

*F. Comments on Constitutional Scrutiny of the Board Diversity Proposal*

Some commenters argue that the Board Diversity Proposal, if approved by the Commission, would constitute impermissible government action,[204] is discriminatory as it is based on sex, race, ethnicity, and sexual orientation,[205] and would require Nasdaq-listed companies to discriminate in hiring and, if approved, would violate the Fifth Amendment to the U.S. Constitution.[206] According to one commenter, all racial classifications, both disadvantaging and benefitting minorities, are subject to strict scrutiny, and the government must demonstrate that the racial classifications are narrowly tailored to further a compelling government interest.[207] This commenter asserts that ''Diversity'' itself and ''outright racial balancing'' are not compelling interests.[208] In addition, this commenter argues that the proposed objective to have at least one director who self-identifies as a female is a gender quota that, like the racial quota, if adopted, would violate the Fifth Amendment.[209]

Other commenters argue that the Board Diversity Proposal is akin to affirmative action or is distinguishable from permissible affirmative action plans.[210] Finally, some commenters argue that the Board Diversity Proposal would violate the First Amendment because it would require companies to engage in compelled disclosure.[211]

The Exchange states that it is not a state actor, and the proposal does not constitute state action subject to constitutional scrutiny.[212] As support, the Exchange notes that courts have uniformly concluded that SROs like the Exchange are not state actors.[213] The Exchange also argues that the Board Diversity Proposal does not satisfy the test for determining whether actions are fairly attributable to the government because there is no Commission rule or action requiring or encouraging the Exchange to adopt the proposed Exchange rules, and the Commission's approval of a private entity's action does not convert private action into state action.[214]

With respect to concerns expressed by commenters regarding Equal Protection under the Fifth Amendment to the U.S. Constitution, the Exchange states that, even if it were found to be a state actor, the proposal would not mandate any particular number of Diverse directors and would therefore survive scrutiny.[215] The Exchange further notes that proposed Rule 5605(f) establishes aspirational diversity objectives, and proposed Rule 5606 is a disclosure requirement for demographic data on all directors serving on the boards of Nasdaq-listed companies.[216] The Exchange states that, accordingly, the proposal does not impose a burden on or confer a benefit to the exclusion of others based on a suspect classification, and ''rational basis'' would be the appropriate standard of review.[217] The Exchange also states that the proposal reflects several legitimate government interests, such as increasing transparency about board diversity so that investors can make investment decisions based on consistent and readily accessible data.[218]

The Exchange also argues that even if the proposal triggered heightened scrutiny, proposed Rule 5605(f) would survive strict scrutiny because it is necessary to achieve a compelling state interest[219] and is narrowly tailored to achieve that interest.[220] The Exchange further contends that, with respect to gender and LGBTQ+ status, proposed Rule 5605(f) would satisfy intermediate scrutiny because it is necessary to achieve an important government interest,[221] and is substantially related to that important interest.[222]

The Exchange also argues that the proposal is not a form of affirmative action because proposed Rule 5605(f) would allow for explanation as a path to compliance.[223] Even assuming the proposal constitutes affirmative action, the Exchange contends, comparable programs that do not include mandates are lawful.[224]

With respect to commenters' concerns that the proposal would violate the First Amendment because it would require companies to engage in compelled speech, the Exchange again argues that it is not a state actor.[225] The Exchange also argues that the proposal does not result in compelled speech because it allows a voluntary association of private companies bound together by contract to engage in truthful and lawful speech on the subject of board diversity.[226] The Exchange also states that, even if it were a state actor and the proposal were interpreted as the government requiring speech, the particular speech at issue would not constitute compelled speech.[227] According to the Exchange, proposed Rule 5606's disclosures about board composition are the kinds of disclosures that are routinely permitted,[228] and the proposed Rule 5605(f) disclosures containing a company's explanation for not meeting the proposed diversity objectives do not compel a company to convey any specific message.[229] Moreover, the Exchange states that even if it were a state actor and the proposal implicated the compelled speech doctrine, the proposal would be constitutional in light of the substantial body of studies

---

[203] *See* 2016 Approval Order, *supra* note 23.

[204] *See, e.g.,* letter from Thomas J. Fitton, President, Judicial Watch, Inc., to Vanessa Countryman, Secretary, Commission, dated December 29, 2020 (''Judicial Watch Letter''), at 5–6; Project on Fair Representation Letter at 12–13. One commenter argues that the proposal constitutes state action, and that even if the proposal of the board diversity rules is free from government coercion or encouragement, the enforcement of the rules is not. *See* Alliance for Fair Board Recruitment Letter at 59–64.

[205] *See, e.g.,* letter from Colin Gallagher dated January 8, 2021; Heritage Foundation Letter at 12–16; letter from Eugene Kelly to Jay Clayton, Chairman, Commission, dated December 29, 2020; Richter Letter at 3.

[206] *See, e.g.,* NLPC Letter at 4–6; Project on Fair Representation Letter at 12–15; Judicial Watch Letter at 2–7.

[207] *See* Judicial Watch Letter at 3–4. *See also, e.g.,* Free Enterprise Project Letter at 2 (arguing that the Board Diversity Proposal is impermissibly vague).

[208] *See* Judicial Watch Letter at 3–4. *See also* Alliance for Fair Board Recruitment Letter at 67–68.

[209] *See* Judicial Watch Letter at 4. *See also* Alliance for Fair Board Recruitment Letter at 64–

66 (arguing that the proposal relating to female directors would not satisfy heightened scrutiny); NLPC Letter at 4–6.

[210] *See, e.g.,* Richter Letter at 3; NLPC Letter at 5; Judicial Watch Letter at 3.

[211] *See* Alliance for Fair Board Recruitment Letter at 70–72; Project on Fair Representation Letter at 15–16.

[212] *See* Nasdaq Response Letter I at 2, 9–13.

[213] *See id.* at 9–10.

[214] *See id.* at 11–12.

[215] *See id.* at 14.

[216] *See id.* at 15.

[217] *See id.*

[218] *See id.* at 15–16.

[219] *See id.* at 17–18.

[220] *See id.* at 18–22.

[221] *See id.* at 22–24.

[222] *See id.* at 24.

[223] *See id.* at 8.

[224] *See id.*

[225] *See id.* at 25.

[226] *See id.* at 25–26.

[227] *See id.* at 27.

[228] *See id.*

[229] *See id.*

showing the benefits of diverse boards.[230]

Numerous courts (and the Commission) have repeatedly held that SROs generally are not state actors,[231] and commenters identify no persuasive basis for reaching a different conclusion with respect to the Exchange's Board Diversity Proposal. The Commission's "[m]ere approval" of the proposal as consistent with the requirements of the Act is "not sufficient" to convert it into state action.[232] Similarly, the fact that the Exchange is subject to "extensive and detailed" regulation by the Commission—including, for example, the Commission's role in reviewing the Exchange's enforcement of its listing standards—"does not convert [its] actions into those of the [Commission]." [233] In any event, the proposal would survive constitutional scrutiny because the objectives set forth in the proposal are not mandates, and the disclosures that the proposal requires are factual in nature and advance important interests as described throughout this order.

### G. Comments on the Applicability of Other Laws to the Board Diversity Proposal

#### 1. Comments on the Materiality Standard

One commenter argues that the Board Diversity Proposal would violate materiality principles that the commenter believes govern securities disclosures because the disclosures would not help a reasonable investor evaluate a company's performance.[234] Another commenter argues that the proposal would conflict with the Commission's existing regulatory framework for disclosure of securities.[235] In response, the Exchange notes the Commission's statement that "it is within the purview of a national securities exchange to impose heightened governance requirements, consistent with the Act, that are designed to improve transparency and

accountability into corporate decision making and promote investor confidence in the integrity of the securities markets." [236] The Exchange also states its concern that the current lack of transparency and consistency in board diversity information makes it difficult for investors to determine the state of diversity among listed companies and boards' philosophy regarding diversity.[237] The Exchange believes that it is within its authority to propose listing rules designed to enhance transparency, provided that they do not conflict with existing federal securities laws.[238]

As the Commission has previously stated, national securities exchanges may adopt disclosure requirements in their listing rules designed to improve governance, as well as transparency and accountability into corporate decision making for listed issuers, including imposing heightened standards over that which the Commission currently requires.[239] Disclosure-related listing standards that provide investors with information that facilitates informed investment and voting decisions contribute to the maintenance of fair and orderly markets.[240] Accordingly, to the extent the proposal would result in disclosures that are not currently required by Commission rules, such disclosures would not conflict with the Commission's regulatory framework for diversity disclosures.

#### 2. Comments on Reporting Fraud

One commenter argues that the proposal would be subject to reporting fraud,[241] and another commenter argues that reliance on self-identification for board diversity disclosures would pose unique liability concerns under the antifraud and reporting provisions of the federal securities laws.[242] In response, the Exchange states that voluntary self-identification of personal characteristics is generally accepted as accurate without a "truth test" and that the Exchange would not judge the accuracy of a director's self-identification.[243] The Exchange also states that some directors may feel that a "truth test" would violate their privacy rights and right to choose their self-identification.[244] Moreover, the Exchange states that any legal risk that

may arise from the proposed disclosures would be nominal and are outweighed by transparency benefits.[245]

The Board Diversity Proposal would not pose unique liability concerns as a result of its requirement for companies to disclose their directors' self-identified Diverse characteristics, and the proposed disclosures would not cause a company to be subject to reporting fraud any differently from other types of company disclosures required by an exchange rule. Rather, a company would be obligated to accurately disclose the self-reported information it receives from its directors, and any failure to do so would be comparable to a failure to accurately disclose any other information the company is obligated to disclose.

#### 3. Comments on Director Privacy

Some commenters believe that the proposed aggregated board-level diversity statistics disclosures would respect individual directors' privacy,[246] including in particular because no individual directors would be identified as members of an underrepresented minority group or as LGBTQ+.[247] Some commenters also point out that directors would not be required to disclose information about their diversity attributes and, in cases where they did not, companies would note their status as "undisclosed." [248] Other commenters, however, express concern that the proposed disclosures would violate directors' privacy.[249] Some also argue that individuals do not wish to be characterized by their ethnicity, gender, or sexual orientation [250] and suggest that requiring certain board seats to be filled by specific demographic groups could invite criticism of such board members' achievements and potentially worsen

---

[230] See id.

[231] See, e.g., Charles C. Fawcett, IV, Securities Exchange Act Release No. 56770, 91 SEC. Docket 2594 (November 8, 2007); D.L. Cromwell Invs., Inc. v. NASD Regulation, Inc., 279 F.3d 155, 162 (2d Cir. 2002); Desiderio v. National Ass'n of Secs. Dealers, Inc., 191 F.3d 198, 206–07 (2d Cir. 1999); Jones v. SEC, 115 F.3d 1173, 1183 (4th Cir. 1997); First Jersey Secs., Inc. v. Bergen, 605 F.2d 690, 698 (3d Cir. 1979).

[232] Blum v. Yaretsky, 457 U.S. 991, 1004 (1982). See also Desiderio, 191 F.3d at 207 (Commission's approval of FINRA's Form U–4).

[233] Desiderio, 191 F.3d at 207 (quoting Jackson v. Metropolitan Edison Co., 419 U.S. 345, 350 (1974)).

[234] See Toomey Letter at 1, 3–4.

[235] See Alliance for Fair Board Recruitment at 54–56.

[236] See Nasdaq Response Letter II at 13.

[237] See id.

[238] See id.

[239] See 2016 Approval Order, supra note 23 at 44403.

[240] See id.

[241] See Richter Letter at 2.

[242] See Toomey Letter at 4–5.

[243] See Nasdaq Response Letter II at 19.

[244] See id.

[245] See id. at 19–20.

[246] See, e.g., Skadden Letter at 3; CFA Letter at 5; letter from Gary A. LaBranche, President & CEO, National Investor Relations Institute, to Vanessa Countryman, Secretary, Commission, dated December 30, 2020 ("NIRI Letter"), at 3; Ideanomics Letter at 3.

[247] See NIRI Letter at 3.

[248] See, e.g., Fairfax Letter at 7–8; Ideanomics Letter at 3; Goodman and Olson Letter at 2. See also letter from Heidi W. Hardin, MFS Investment Management, to Vanessa Countryman, Secretary, Commission, dated January 4, 2021.

[249] See, e.g., CEI Letter at 3; Kowalczyk Letter at 3; IBC Letter at 5 (expressing particular concern for small boards where aggregated data would provide little protection); Publius Letter at 10; Richter Letter at 2.

[250] See, e.g., Kowalczyk Letter at 3; Publius Letter at 10–11; letter from John P. Reddy to Adena Friedman, President and CEO, Nasdaq, dated December 5, 2020 ("Reddy Letter").

stereotypes and prejudices against these groups.[251]

In response, the Exchange states that directors may choose not to disclose their race, gender, or LGBTQ+ status.[252] The Exchange further notes that when directors choose to self-identify, the Board Diversity Matrix requires aggregated disclosures only.[253]

The proposed disclosures are reasonably designed to address potential privacy concerns. Specifically, the disclosures under proposed Rule 5606 would be based on directors' voluntary self-identification and would be provided on an aggregated basis. Moreover, for domestic issuers, while the number of directors who fall under a specific race and ethnicity would be broken down by gender categories, information regarding the number of directors who self-identify as LGBTQ+ would not be broken down, which would further lower the likelihood that a specific director's Diverse characteristics could be identified from the Board Diversity Matrix and further mitigate privacy concerns. Similarly, Foreign Issuers would not be required to break down the number of directors who are Underrepresented Individuals or who self-identify as LGBTQ+ by gender, which again would further mitigate privacy concerns.

### 4. Other Comments

Some commenters argue that the Board Diversity Proposal would be inconsistent with the principles underpinning the Civil Rights Act of 1964, which makes it an unlawful employment practice for an employer to limit, segregate, or classify its employees because of such individual's race, color, religion, sex, or national origin.[254] One commenter also states that even if independent directors are not covered by Title VII of the Civil Rights Act, directors selected from among the company's employees are covered; and a company employee who is denied a board position because he or she lacks a particular sex, race, or sexual orientation trait would have a

cognizable Title VII claim.[255] In response, the Exchange argues that Title VII does not apply to most directors of Nasdaq-listed companies because they are not employees and, even if Title VII applied, the proposal would not discriminate or encourage discrimination because the proposed board diversity objectives are not mandatory.[256]

Commenters' concerns that the proposal is inconsistent with the principles underlying Title VII are unwarranted in light of the proposal's framework. Moreover, individual employment decisions would continue to be governed by Title VII to the extent they are covered by that statute.

Additionally, although some commenters also express concern that the Board Diversity Proposal may cause Nasdaq-listed companies to violate their legal fiduciary obligations to their shareholders[257] and argue that corporate governance is a matter of state law,[258] the proposal would not cause companies to violate their fiduciary obligations or violate state laws because, as discussed above, the proposal would not mandate any particular board composition and would not require Nasdaq-listed companies to hire directors based solely on whether they fall within the proposed definition of "Diverse." If a company believes that it cannot meet the proposed diversity objectives because it has concerns regarding compliance with other laws, rules, or obligations, then the company would only need to disclose its reasons for not meeting the objectives.[259] In addition, companies that choose not to meet the diversity objectives and not explain their reasons for not meeting the objectives may transfer their listings to a different exchange.

One commenter argues that the Board Diversity Proposal violates the Paperwork Reduction Act.[260] The Board Diversity Proposal, however, contains no "collection of information" requirements within the meaning of the Paperwork Reduction Act, because the disclosure contemplated under the

Board Diversity Proposal is not being done "by or for an agency."[261] Other commenters believe that the proposal could violate various federal statutes, including the federal RICO statute, the Equal Pay Act, and the Genetic Information Nondiscrimination Act.[262] Nothing contemplated in the Board Diversity Proposal constitutes impermissible activity under the federal RICO statute,[263] wage discrimination between employees on the basis of sex under the Equal Pay Act,[264] or discrimination based on genetic information under the Genetic Information Nondiscrimination Act.[265]

One commenter argues that approval of the Board Diversity Proposal would be unconstitutional because the Commission's commissioners are unlawfully insulated from Presidential control.[266] But the Commission's independent structure complies with constitutional requirements.[267] Contrary to the views of one commenter, the Supreme Court's decision in *Seila Law LLC* v. *CFPB*, 140 S. Ct. 2183 (2020), does not alter that conclusion. There, the Court—twice—expressly declined to "revisit" its earlier decisions affirming Congress's authority to "create expert agencies led by a *group* of principal officers removable by the President only for good cause."[268] Instead, the Court made clear that it was "the CFPB's leadership by a single independent Director" that "violate[d] the separation of powers."[269] And the Court invited Congress to remedy the "problem" by "converting the CFPB into a multimember agency" like the Commission.[270]

---

[251] *See* CEI Letter at 2–3; Quigley Letter; Kowalczyk Letter at 3; Publius Letter at 10–11; Independent Women's Forum Letter at 1–2.

[252] *See* Nasdaq Response Letter II at 27. *See also* Nasdaq Response Letter I at 13–14.

[253] *See* Nasdaq Response Letter II at 27.

[254] *See, e.g.,* Alliance for Fair Board Recruitment Letter at 56–58; letter from A. Christians to Vanessa Countryman, Secretary, Commission, dated February 2, 2021 ("A. Christians Letter"); Heritage Foundation Letter at 12–15; letter from Concerned American Executives dated January 2, 2021. Other commenters also generally assert discrimination concerns. *See, e.g.,* Donnellan Letter at 2; letter from Samuel Sloniker, dated December 17, 2020 (comment letter submitted to File No. SR–NASDAQ–2020–082).

[255] *See* Alliance for Fair Board Recruitment at 57–58.

[256] *See* Nasdaq Response Letter I at 1, 6–8. The Exchange states that only one of the comment letters that raises constitutional or discrimination concerns with the Board Diversity Proposal was submitted by a Nasdaq-listed company that would be subject to the proposal. *See id.* at 4–5.

[257] *See, e.g.,* Toomey Letter at 1–3; Free Enterprise Project Letter at 3.

[258] *See* NLPC Letter at 7–8; Heritage Foundation Letter at 20.

[259] Similarly, the disclosures under proposed Rule 5606 would be required only "to the extent permitted by applicable law."

[260] *See* NLPC Letter at 6–7.

[261] 44 U.S.C. 3502(3) and 5 CFR 1320.3(c).

[262] *See* letter from Werner Lind to Vanessa Countryman, Secretary, Commission, dated February 6, 2021; A. Christians Letter.

[263] 18 U.S.C. 1961(1).

[264] 29 U.S.C. 206(d).

[265] 42 U.S.C. 2000ff–1(a).

[266] *See* Alliance for Fair Board Recruitment Letter at 77–78. This commenter also argues that by making certain public statements related to diversity, some Commissioners have prejudged the Board Diversity Proposal and must recuse themselves. *See id.* at 75–77. But recusal is unwarranted. It is settled law that an official may take public positions like the statements cited by the commenter without diminishing the presumption that the official will act fairly and impartially in any particular matter. *See, e.g., Nuclear Info. & Res. Serv.* v. *NRC,* 509 F.3d 562, 571 (DC Cir. 2007).

[267] *See, e.g., Free Enter. Fund* v. *Pub. Co. Accounting Oversight Bd.,* 561 U.S. 477, 487, 509 (2010).

[268] *Seila Law LLC,* 140 S. Ct. at 2192, 2206.

[269] *Id.* at 2207.

[270] *Id.* at 2211. The same commenter's challenge based on the supposition that the proposals would be approved by the acting director of the Commission's Division of Trading and Markets, *see* Alliance for Fair Board Recruitment Letter at 74—

Continued

## H. Commenter Suggestions on the Board Diversity Proposal

The Exchange revised the Board Diversity Proposal in response to certain commenter suggestions and explained why it did not revise the proposal in response to others. The Exchange's decision not to incorporate certain suggestions does not render the current proposal without a rational basis or inconsistent with the Act. As described throughout this order, the Board Diversity Proposal satisfies the statutory and regulatory requirements for approval. The comments the Exchange did not incorporate into its proposal are nonetheless briefly described below.

Some commenters suggest that the Board Diversity Proposal should impose a diversity requirement rather than provide for a "comply-or-disclose" framework.[271] As discussed above, the Exchange asserts that its proposal appropriately balances the calls of investors for companies to increase diverse representation on their boards with the need for companies to maintain flexibility and decision-making authority over their board composition.[272]

One commenter suggests that the concept of cognitive diversity (or diversity of thought) should be introduced into the proposed rules and disclosures.[273] Another commenter states that the proposed definition of "Diverse" is pragmatic, and that it is important that the proposal include the flexibility to modify or expand the set of included demographic groups.[274] Another commenter encourages the Exchange to assess whether the proposed definition of "Diverse" should be expanded.[275] The Exchange responds that companies would not be precluded from using a broader definition of diversity, provided that the company discloses this under proposed Rule 5605(f)(3).[276] With respect to commenters' views that the definition of Diverse should be expanded, the Exchange states that its proposal inherently recognizes the cognitive diversity and broader range of

experiences that diverse directors bring to the boardroom.[277]

One commenter argues that the Board Diversity Proposal would create structural competition among minorities,[278] and some commenters request that the proposal explicitly require two Black or African American directors[279] or require one African American (or another racial/ethnic minority) director and a director who is a member of the LGBTQ community, one of whom might also be female.[280] One commenter suggests that the proposal be limited to individuals of underrepresented racial minorities.[281] Another commenter states that the proposal would not address how a director of Central Asian descent would be classified and that the proposal would potentially preclude them from being considered "Diverse," as it would with persons of North African or Middle Eastern descent.[282] In response, the Exchange states that it chose its definition of "Diverse" to ensure that more categories of historically underrepresented individuals are included and to allow companies the flexibility to diversify their boards in a manner that fits their unique circumstances and stakeholders.[283] The Exchange states that companies may choose to meet the proposed diversity objectives by, for example, having two directors who self-identify as Black or African American, or by having two directors who self-identify in racial or ethnic categories beyond those included in the EEO–1 report (e.g., Middle Eastern, North African, Central Asian) and describing that the company considers diversity more broadly than the proposed definition of "Diverse."[284]

One commenter suggests that the Exchange expand the definition of "Diverse" to ensure that companies with operations in other countries do

not simply use the availability of candidates in those countries to fill a director or officer role when the people within those countries could be considered a minority in the U.S.[285] In response, the Exchange states that a company is not precluded from satisfying proposed Rule 5605(f)(2) with a director who is not a U.S. citizen or resident,[286] and that it is solely in the company's discretion to identify qualified director nominees who reflect diverse backgrounds that are reflective of the company's communities, employees, investors, or other stakeholders, regardless of the director's nationality.[287]

Some commenters suggest that more than two Diverse directors may be necessary to have a strong voice in the boardroom.[288] Another commenter believes that two Diverse directors is a reasonable minimum standard to escalate market awareness of listed companies with limited diversity.[289] In response, the Exchange states that the Board Diversity Proposal would provide companies with a flexible, attainable approach to achieving a reasonable objective that is not overly burdensome or coercive.[290] The Exchange also states that the proposed objective of two Diverse directors would align investors' demands for increased board diversity with companies' needs for a flexible approach that accommodates each company's unique circumstances.[291]

Some commenters suggest that diversity statistics should be disclosed on a director-by-director basis,[292] or that companies should at least be permitted to disclose diversity statistics on a director-by-director basis.[293] Some commenters encourage companies to also disclose a skills matrix for the board, aligned with the companies' strategic needs and succession planning, and a policy on board refreshment.[294]

---

75, is inapplicable because the Commission, not the Division of Trading and Markets pursuant to delegated authority, is approving the proposed rule change.

[271] See, e.g., letter from Marc H. Morial, President and CEO, National Urban League, to Vanessa Countryman, Secretary, Commission, dated January 4, 2021 ("NUL Letter"), at 4–5; CtW Letter at 2.

[272] See Nasdaq Response Letter II at 6–7.

[273] See letter from Snowdon Beinn, Snowdon Beinn Ltd., to Vanessa Countryman, Secretary, Commission, dated January 4, 2021.

[274] See Carlyle Letter at 2.

[275] See Alliance Letter at 2.

[276] See Nasdaq Response Letter II at 14.

[277] See id.

[278] See NUL Letter at 2–5.

[279] See letter from Aldrin K. Enis, President, One Hundred Black Men, Inc., dated January 4, 2021.

[280] See NUL Letter at 4.

[281] See letter from Omar A. Karim, President, Banneker Ventures, and Chairman, The Collective, to Vanessa Countryman, Secretary, Commission, dated January 4, 2021 ("Collective Letter").

[282] See letter from David A. Bell, Co-Chair, Corporate Governance, Fenwick & West LLP, to Vanessa Countryman, Secretary, Commission, dated January 4, 2021, at 2.

[283] See Nasdaq Response Letter II at 15–16 (also noting that the Exchange based its proposed definition of Underrepresented Minority on the categories reported to the EEOC through the EEO–1 report and that the Exchange included a category for LGBTQ+ status in recognition of the Supreme Court's decision in Bostock v. Clayton Cnty., Ga., 140 S. Ct. 1731, 1742 (2020), which held that sexual orientation and gender status are "inextricably" intertwined with sex).

[284] See id. at 16.

[285] See Ideanomics Letter at 4.

[286] See Nasdaq Response Letter II at 16.

[287] See id.

[288] See, e.g., CtW Letter at 2; letter from Mark Ferguson and Miguel Nogales, Co-Chief Investment Officers, Global Equity Strategy, Generation Investment Management LLP, at 1.

[289] See LGIM America Letter at 3.

[290] See Nasdaq Response Letter II at 4.

[291] See id.

[292] See, e.g., New York City Controller Letter at 1.

[293] See Ropes & Gray Letter at 2–3. See also Skadden Letter at 3; Trillium Letter at 2.

[294] See, e.g., WomenExecs Letter; New York City Comptroller Letter at 3; Ropes & Gray Letter at 3. One commenter asserts that if the Commission "chooses to countenance diversity statistical reporting, it should require reporting of types of diversity that are more relevant to business success than the immutable racial, ethnic or sexual characteristics of its directors." See Heritage Foundation Letter, at 4, 20.

**Federal Register** / Vol. 86, No. 153 / Thursday, August 12, 2021 / Notices **44443**

One commenter also suggests that directors should be subject to regular re-election based on satisfactory evaluation of their contribution to the board, and that a report from the nomination committee explaining how it considered the representation of women and/or other minorities in director selection and board evaluation would also be useful.[295] One commenter encourages the Exchange and the Commission to consider whether the disclosure requirements should extend to board nominees.[296] In response, the Exchange states that the proposal seeks a balance between obtaining key board diversity data and respecting the privacy of directors (with respect to the suggestions for director-by-director disclosures) and that limiting the disclosures to current directors optimizes the consistency and comparability of board diversity statistical information across companies (with respect to the suggestions for disclosures relating to board nominees).[297] Moreover, the Exchange states that a company would not be prohibited from disclosing more detail than required by the Board Diversity Matrix.[298]

Some commenters suggest that the Board Diversity Matrix should be included in companies' annual shareholders meeting proxy or information statement filed with the Commission, rather than solely posted on the web.[299] In response, the Exchange states that it is in the public interest to allow companies the flexibility to publish board diversity information through alternatives other than Commission filings, because it would avoid imposing additional disclosure and filing obligations on companies while providing shareholders with access to information in a recognized channel of distribution.[300]

One commenter states that the phase-in periods under proposed Rule 5605(f) are too long.[301] Another suggests that companies should have two Diverse directors within one calendar year after the approval date of proposed Rule 5605(f).[302] A different commenter suggests reducing the proposed two-, four-, and five-year phase-in periods by one year each.[303] Some commenters

instead express support for the proposed phase-in and transition periods.[304] In response, the Exchange notes that an accelerated timeframe may increase challenges for companies seeking to meet the objectives of proposed Rule 5605(f), particularly smaller companies.[305]

One commenter requests that the Exchange commit to publishing a study of the impact of the proposals on board diversity and the relationship between diversity and corporate governance and financial results.[306] In response, the Exchange states that the greater benefit of publicly disclosing board diversity data would be that all interested parties can adequately conduct their own analyses of the impact of the proposal on board diversity and its relationship with company performance and that the Exchange welcomes these analyses.[307]

## I. Board Recruiting Service Proposal

As described above, the Board Recruiting Service Proposal would provide certain Nasdaq-listed companies with one year of complimentary access for two users to a board recruiting service, which would provide access to a network of board-ready diverse candidates for companies to identify and evaluate. In the proposal, the Exchange states that offering a board recruiting service would assist listed companies with increasing diverse board representation, which the Exchange believes could result in improved corporate governance, strengthening of market integrity, and improved investor confidence.[308] The Exchange further states that offering this service would help companies to achieve compliance with the Board Diversity Proposal, if it were approved.[309] The Exchange states that utilization of the complimentary board recruiting service would be optional,

and no company would be required to use the service.[310]

The Exchange further argues that it is reasonable and not unfairly discriminatory to offer the board recruiting service only to Eligible Companies because the Exchange believes these companies have the greatest need to identify diverse board candidates, particularly if these companies elect to meet the diversity objectives in the Board Diversity Proposal, if approved, rather than disclosing why they have not met the objectives.[311] Additionally, the Exchange believes that companies that already have two Diverse directors have demonstrated by their current board composition that they do not need additional assistance provided by the Exchange to identify diverse candidates for their boards.[312] Finally, the Exchange believes that offering this service would help it compete to attract and retain listings.[313]

Some commenters express general support for the Board Recruiting Service Proposal,[314] while others oppose the Board Recruiting Service Proposal.[315] The commenters supporting the proposal state that the proposed service would assist companies that choose to diversify their boards[316] and would be of particular benefit to smaller companies.[317] One commenter opposing the proposal argues that the Exchange does not identify how it would address the potential conflicts of interest between establishing a regulatory standard and concurrently promoting a revenue-generating compliance solution.[318] Another argues that the

---

[295] *See* WomenExecs Letter.

[296] *See* CFA Letter at 5–6.

[297] *See* Nasdaq Response Letter II at 18.

[298] *See id.*

[299] *See, e.g.,* Thirty Percent Coalition Letter at 2; Boston Club Letter at 2; Ropes & Gray Letter at 2.

[300] *See* Nasdaq Response Letter II at 17.

[301] *See* NUL Letter at 5.

[302] *See* Collective Letter at 2.

[303] *See* Olshan Letter at 3.

[304] *See, e.g.,* Fairfax Letter at 13; Skadden Letter at 2–3; Microsoft Letter at 2; Ariel Letter at 2; T. Rowe Letter at 2; Brightcove Letter; Mercy Investment Letter at 2; letter from Faye Sahai, Partner, Mirai Global, to Vanessa Countryman, Secretary, Commission, dated December 14, 2020.

[305] *See* Nasdaq Response Letter II at 5–6.

[306] *See* letter from Suzanne Rothwell, Managing Member, Rothwell Consulting LLC, to Vanessa Countryman, Secretary, Commission, dated December 23, 2020, at 3.

[307] *See* Nasdaq Response Letter II at 16.

[308] *See* Amendment No. 1 to the Board Recruiting Service Proposal at 10. The Exchange states that research demonstrates diverse boards are positively associated with improved corporate governance and company performance. *See id.* at 6. Moreover, the Exchange states that investors and investor groups are calling for diversification in the boardroom, and legislators at the federal and state level are increasingly taking action to respond to those calls. *See id.* at 9–10.

[309] *See id.* at 10.

[310] *See id.* at 13, 15.

[311] *See id.*

[312] *See id.* at 13–14. Although proposed Rule 5605(f)(2)(D) would require a Company with a Smaller Board to have, or explain why it does not have, at least one Diverse director on its board, such a company would be considered an Eligible Company if it does not have at least one director who self-identifies as Female and at least one director who self-identifies as an Underrepresented Minority or LGBTQ+, which the Exchange believes would help promote greater diversity on boards of all sizes. *See id.* at 11 n.20.

[313] *See id.* at 14.

[314] *See, e.g.,* Ideanomics Letter at 4; Goodman and Olson Letter at 2–3; Capital Research and Management Company Letter at 2; UAW Letter at 3.

[315] *See, e.g.,* Toomey Letter at 3; letter from Matthew Glen dated December 31, 2020 (comment letter submitted to File No. SR–NASDAQ–2020–082) ("Glen Letter"); letter from Eugene Kelly to Vanessa Countryman, Secretary, Commission, dated December 13, 2020 ("Kelly Letter").

[316] *See, e.g.,* Ideanomics Letter at 4; Goodman and Olson Letter at 2–3; Capital Research and Management Company Letter at 2; UAW Letter at 3; California State Treasurer Letter.

[317] *See* UAW Letter at 3.

[318] *See* Toomey Letter at 3.

Board Recruiting Service Proposal would divert funds from the efficient administration of the Exchange, reducing the order and efficiency of markets that the Commission was created to promote.[319] Finally, another commenter opposing the proposal argues that the proposed complimentary recruiting service would be an extension of the "unlawful" and "discriminatory" quota policy contained in the Board Diversity Proposal by seeking to move Nasdaq-listed companies towards intentionally implementing "discriminatory hiring practices." [320]

In response, the Exchange states that it is not generating any revenue from its partnership with the proposed provider of the board recruiting service, Equilar, and instead is offering these services to companies at its own expense.[321] The Exchange also states that the complimentary service does not introduce any conflict of interest because the Exchange is not in the board recruitment services business.[322] In addition, the Exchange states that there is no requirement that listed companies take advantage of the complimentary service, and there is no requirement that they pay for the service if they choose to utilize it.[323] Moreover, the Exchange states that whether a listed company takes advantage of the complimentary board recruiting service has no relationship to how, or whether, the Exchange would enforce proposed Rule 5605(f), and there are no circumstances under which the Exchange would penalize a company solely for its decision to not take advantage of a complimentary board recruiting service.[324]

The Board Recruiting Service Proposal is consistent with the requirements of Section 6 of the Act, including Sections 6(b)(4) and 6(b)(5).[325] The proposal is designed to provide for the equitable allocation of reasonable dues, fees, and other charges among Exchange members, issuers, and other persons using the Exchange's facilities, and is not designed to permit unfair discrimination between customers, issuers, brokers, or dealers. And the proposal is consistent with Section 6(b)(8) [326] because it does not impose any burden on competition not necessary or appropriate in furtherance of the purposes of the Act.

The Commission finds that it is consistent with the Act for the Exchange to provide a one-year complimentary board recruiting service to Eligible Companies.[327] The board recruiting service would provide access to a network of board-ready diverse candidates, allowing companies to identify and evaluate such candidates. The board recruiting service would also assist Eligible Companies that choose to use the service to increase diverse representation on their boards and would help Eligible Companies to meet (or exceed, in the case of a Company with a Smaller Board) the proposed diversity objectives under the Board Diversity Proposal.[328]

It is also consistent with the Act for the Exchange to offer the complimentary board recruiting service only to Eligible Companies because, by definition, those companies do not have a specified number of Diverse directors and therefore may have a greater interest or feel a greater need to identify diverse board candidates by utilizing the board recruiting service than non-Eligible Companies.[329] The provision of the service only to Eligible Companies is thus an equitable allocation of complimentary services and does not unfairly discriminate among issuers.[330]

Further, offering the one-year complimentary service would help the Exchange compete to attract and retain listings, particularly in light of the diversity objective in the separately approved Board Diversity Proposal. The Exchange has indicated that individual listed companies would not be given specially negotiated packages of products or services to list, or remain listed; that no other company will be required to pay higher fees as a result of the proposal; and that providing the complimentary board recruiting service will have no impact on the resources available for its regulatory programs.[331] No commenter has provided any reason to doubt these indications as to how the service will be run. Accordingly, the proposal reflects the current competitive environment for listings among national securities exchanges,[332] does not impose any unnecessary or inappropriate burden on competition between individual listed companies, and is therefore appropriate and consistent with Section 6(b)(8) of the Act.[333]

In addition, describing in the Exchange's rules the products and services available to listed companies and their associated values also adds greater transparency to the rules and applicable fees and will ensure that individual listed companies are not given specially negotiated packages of products or services to list, or remain listed, that would raise unfair discrimination issues under the Act.

Finally, with respect to concerns that the Exchange's offering of the board recruiting service may create a conflict of interest or divert funds from the efficient administration of the Exchange, the Exchange has indicated that providing the proposed complimentary service would have no impact on the resources available for its regulatory programs and that it will not generate any revenue from the service, nor is it in the board recruitment services business.[334] The Exchange further explains that utilization of the board recruiting service will not impact the manner in which it enforces compliance with the Board Diversity Proposal.[335] With respect to a concern that the recruiting service may influence a Nasdaq-listed company's hiring practice, the Exchange has emphasized that utilization of the service would be optional, and no company would be required to use it.[336] Here again, commenters have provided no reason for the Commission to doubt the Exchange's indication about how the service will be run. Accordingly, the Exchange's representations and the optionality of the board recruiting service are sufficient to address commenters' concerns that the provision of the complimentary service

[319] See Glen Letter.

[320] See Kelly Letter.

[321] See Nasdaq Response Letter II at 20–21.

[322] See id. at 21.

[323] See id. at 21–22.

[324] See id.

[325] 15 U.S.C. 78f, 78f(b)(4)–(5). In approving the Board Recruiting Service Proposal, the Commission has considered the proposed rule's impact on efficiency, competition, and capital formation. See 15 U.S.C. 78c(f).

[326] 15 U.S.C. 78f(b)(8).

[327] The Commission has previously approved the provision of complimentary services by the Exchange to varying categories of eligible listed companies. See, e.g., Securities Exchange Act Release Nos. 65963 (December 15, 2011), 76 FR 79262 (December 21, 2011) (SR–NASDAQ–2011–122) and 72669 (July 24, 2014), 79 FR 44234 (July 30, 2014) (SR–NASDAQ–2014–058).

[328] See Amendment No. 1 to the Board Recruiting Service Proposal at 10.

[329] See id. at 13–14.

[330] The Commission has previously found that the specific needs of differently situated categories of listings (e.g., new listings, transfers, larger capitalized issuers) is a sufficient basis for providing additional services, or varying the types of services provided, to different categories of listings, and thereby does not raise unfair discrimination issues under the Act. See, e.g., Securities Exchange Act Release Nos. 78806 (September 9, 2016), 81 FR 63523 (September 15, 2016) (order approving SR–NASDAQ–2016–098); 72669 (July 24, 2014), 79 FR 44234 (July 30, 2014) (order approving SR–NASDAQ–2014–058).

[331] See Amendment No. 1 to the Board Recruiting Service Proposal at 12, 15.

[332] See supra notes 56–59 (describing this competitive environment for exchange listings).

[333] 15 U.S.C. 78f(b)(8).

[334] See supra notes 321–322 and 331 and accompanying text.

[335] See supra note 324 and accompanying text.

[336] See supra note 310 and accompanying text.

may create a conflict of interest, divert funds from the efficient administration of the Exchange, or unduly influence listed companies.

### III. Conclusion

*It is therefore ordered*, pursuant to Section 19(b)(2) of the Act,[337] that: (1) The proposed rule change (SR–NASDAQ–2020–081), as modified by Amendment No. 1, be, and hereby is, approved, and (2) the proposed rule change (SR–NASDAQ–2020–082), as modified by Amendment No. 1, be, and hereby is, approved.

By the Commission.

**J. Matthew DeLesDernier,**
*Assistant Secretary.*

[FR Doc. 2021–17179 Filed 8–11–21; 8:45 am]

**BILLING CODE 8011–01–P**

---

## SECURITIES AND EXCHANGE COMMISSION

**[SEC File No. 270–360, OMB Control No. 3235–0409]**

### Proposed Collection; Comment Request

*Upon Written Request, Copies Available From:* Securities and Exchange Commission, Office of FOIA Services, 100 F Street NE, Washington, DC 20549–2736

*Extension:*
   Rules 17Ad–15

Notice is hereby given that pursuant to the Paperwork Reduction Act of 1995 ("PRA") (44 U.S.C. 3501 *et seq.*), the Securities and Exchange Commission ("Commission") is soliciting comments on the existing collection of information provided for in Rule 17Ad–15 (17 CFR 240.17Ad–15) ("Rule 17Ad–15") under the Securities Exchange Act of 1934 (15 U.S.C. 78a *et seq.*) ("Exchange Act"). The Commission plans to submit this existing collection of information to the Office of Management and Budget ("OMB") for extension and approval.

Rule 17Ad–15 requires every registered transfer agent to establish written standards for the acceptance of guarantees of securities transfers from eligible guarantor institutions. Every registered transfer agent is also required to establish procedures, including written guidelines where appropriate, to ensure that the transfer agent uses those standards to determine whether to accept or reject guarantees from eligible guarantor institutions. In implementing these requirements, the Commission's purpose is to ensure that registered

transfer agents treat eligible guarantor institutions equitably.

Additionally, Rule 17Ad–15 requires every registered transfer agent to make and maintain records in the event the transfer agent determines to reject signature guarantees from eligible guarantor institutions. Registered transfer agents' records must include, following the date of rejection, a record of the rejected transfer, along with the reason for rejection, the identification of the guarantor, and an indication whether the guarantor failed to meet the transfer agent's guarantee standards.

Rule 17Ad–15 requires registered transfer agents to maintain these records for a period of three years. The Commission designed these mandatory recordkeeping requirements to assist the Commission and other regulatory agencies with monitoring registered transfer agents and ensuring compliance with the rule. This rule does not involve the collection of confidential information.

The Commission estimates that approximately 366 registered transfer agents will spend a total of approximately 14,640 hours per year complying with recordkeeping requirements of Rules 17Ad–15 (40 hours per year per registered transfer agent).

Written comments are invited on: (a) Whether the proposed collection of information is necessary for the proper performance of the functions of the Commission, including whether the information shall have practical utility; (b) the accuracy of the Commission's estimates of the burden of the proposed collection of information; (c) ways to enhance the quality, utility, and clarity of the information collected; and (d) ways to minimize the burden of the collection of information on respondents, including through the use of automated collection techniques or other forms of information technology. Consideration will be given to comments and suggestions submitted in writing within 60 days of this publication.

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information under the PRA unless it displays a currently valid OMB control number.

Please direct your written comments to: (ii) David Bottom, Director/Chief Information Officer, Securities and Exchange Commission, c/o Cynthia Roscoe, 100 F Street NE, Washington, DC 20549, or send email to: *PRA_Mailbox@sec.gov*.

Dated: August 6, 2021.

**J. Matthew DeLesDernier,**
*Assistant Secretary.*

[FR Doc. 2021–17154 Filed 8–11–21; 8:45 am]

**BILLING CODE 8011–01–P**

---

## SECURITIES AND EXCHANGE COMMISSION

**[SEC File No. 270–521, OMB Control No. 3235–0579]**

### Proposed Collection; Comment Request

*Upon Written Request Copies Available From:* Securities and Exchange Commission, Office of FOIA Services, 100 F Street NE, Washington, DC 20549–2736

*Extension:*
   Regulation BTR

Notice is hereby given that, pursuant to the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 *et seq.*), the Securities and Exchange Commission ("Commission") is soliciting comments on the collection of information summarized below. The Commission plans to submit this existing collection of information to the Office of Management and Budget for extension and approval.

Regulation Blackout Trade Restriction ("Regulation BTR") (17 CFR 245.100–245.104) clarifies the scope and application of Section 306(a) of the Sarbanes-Oxley Act of 2002 ("Act") (15 U.S.C. 7244(a)). Section 306(a)(6) [15 U.S.C.7244(a)(6)] of the Act requires an issuer to provide timely notice to its directors and executive officers and to the Commission of the imposition of a blackout period that would trigger the statutory trading prohibition of Section 306(a)(1) [15 U.S.C. 7244(a)(1)]. Section 306(a) of the Act prohibits any director or executive officer of an issuer of any equity security, directly or indirectly, from purchasing, selling or otherwise acquiring or transferring any equity security of that issuer during any blackout period with respect to such equity security, if the director or executive officer acquired the equity security in connection with his or her service or employment. Approximately 1,230 issuers file Regulation BTR notices approximately 5 times a year for a total of 6,150 responses. We estimate that it takes approximately 2 hours to prepare the blackout notice for a total annual burden of 2,460 hours. The issuer prepares 75% of the 2,460 annual burden hours for a total reporting burden of (1,230 issuers × 2 hours per issuer × 0.75) 1,845 hours. In addition, we estimate that an issuer distributes a

---

[337] 15 U.S.C. 78s(b)(2).

**TAB 2:**

Chair Gensler, *Statement on the Commission's Approval of Nasdaq's Proposal for Disclosure about Board Diversity and Proposal for Board Recruiting Service* (Aug. 6, 2021)

# Statement

## Statement on the Commission's Approval of Nasdaq's Proposal for Disclosure about Board Diversity and Proposal for Board Recruiting Service



**Chair Gary Gensler**

**Aug. 6, 2021**

Today, the Commission voted to approve Nasdaq's proposed rule changes requiring issuers to disclose certain information about the diversity of the company's board and to offer certain companies access to a complimentary board recruiting service.[1] These rules will allow investors to gain a better understanding of Nasdaq-listed companies' approach to board diversity, while ensuring that those companies have the flexibility to make decisions that best serve their shareholders.

As the order discusses, the rules are consistent with the requirements of the Exchange Act. These rules reflect calls from investors for greater transparency about the people who lead public companies, and a broad cross-section of commenters supported the proposed board diversity disclosure rule. Investors are looking for consistent and comparable data when making decisions about their investments. I believe that our markets work best when investors have access to such information.

---

[1] *See* Securities Exchange Act Release No. 34-92590 (August 6, 2021) (order approving SR-NASDAQ-2020-081 and SR-NASDAQ-2020-082).

**TAB 3:**

Commissioners Lee and Crenshaw, *Statement on Nasdaq's Diversity Proposals – A Positive First Step for Investors* (Aug. 6, 2021)

## Statement

# Statement on Nasdaq's Diversity Proposals – A Positive First Step for Investors



**Commissioner Allison Herren Lee**



**Commissioner Caroline A. Crenshaw**

**Aug. 6, 2021**

Today, the Commission approved Nasdaq Stock Market LLC's proposed rule changes related to board diversity and disclosure.[1] The new listing standards will require each Nasdaq-listed company, subject to certain exceptions, to have at least two diverse board members or explain why it does not.[2] The new listing standards also will require disclosure, in an aggregated form, of information on the voluntary self-identified gender, racial characteristics, and LGBTQ+ status of the company's board.[3] We support the proposal because it represents a step forward for investors on board diversity.

As we have noted in the past, investors are increasingly demanding diverse boards and diversity-related information about public companies.[4] Nasdaq's proposal should improve the quality of information available to investors for making investment and voting decisions by providing consistent and comparable diversity metrics.[5]

Nevertheless, there is more work to be done in improving both diversity and transparency at public companies and in our capital markets more broadly. For example, disability may be a relevant characteristic, as well as diversity among senior management and the workforce more broadly. There is a continued, harmful disparity in the representation of a wide range of communities in our capital markets. Because enhanced diversity is critically important for investors, the markets, and our economy, we hope this is a starting point for initiatives related to diversity, not the finish line.

---

[1] *See* Securities Exchange Act Release No. 34-92590 (August 6, 2021) (order approving SR-NASDAQ-2020-081 and SR-NASDAQ-2020-082) ("Order").

[2] *See id.*

[3] Nasdaq also will offer a complimentary board recruiting service for certain eligible Nasdaq-listed companies. *See id.*

[4] *See* Commissioner Allison Herren Lee, Diversity Matters, Disclosure Works, and the SEC Can Do More: Remarks at the Council of Institutional Investors Fall 2020 Conference (September 22, 2020); Commissioner Caroline Crenshaw, Statement on the "Modernization" of Regulation S-K Items 101, 103, and 105 (August 26, 2020).

[5] *See* Order at 25 ("The Commission finds that the Board Diversity Proposal would provide widely available, consistent, and comparable information that would contribute to investors' investment and voting decisions.").

JA24

**TAB 4:**

Commissioner Roisman, *Statement on the Commission's Order Approving Exchange Rules Relating to Board Diversity* (Aug. 6, 2021)

Case: 21-60626    Document 187    Page: 35    Date Filed: 04/01/2022

## Statement

# Statement on the Commission's Order Approving Exchange Rules Relating to Board Diversity



**Commissioner Elad L. Roisman**

**Aug. 6, 2021**

## A Goal for All

Today, the Commission approved rule changes proposed by The Nasdaq Stock Market LLC ("Nasdaq" or the "Exchange") relating to board diversity.[1] One will offer certain listed companies free access, for a limited time, to a board recruitment service with access "to a network of board-ready diverse candidates."[2] The other will "require each Nasdaq-listed company, subject to certain exceptions, to publicly disclose in an aggregated form, to the extent permitted by applicable law, information on the voluntary self-identified gender and racial characteristics and LGBTQ+ status (all terms defined [in the Approval Order]) of the company's board of directors."[3] It will also "require each Nasdaq-listed company, subject to certain exceptions, to have, or explain why it does not have, at least two members of its board of directors who are Diverse, including at least one director who self-identifies as female and at least one director who self-identifies as an Underrepresented Minority or LGBTQ+ [all terms are defined in the Approval Order]."[4] Failure to comply could eventually, after a specified period, subject companies to delisting.

Nasdaq's commitment to diversity and inclusion, demonstrated through its work to promote a financial industry that includes, at the highest levels of leadership, more women, individuals from underrepresented minority communities, and people identifying as LGBTQ+ is commendable. Throughout history, there have been too many barriers preventing deserving individuals from participating fully in our economy. Not only have those individuals been denied opportunities, but society at large has missed out on the value their talents offer. As I have said before, it is important for all of us to assess the causes for such barriers and move to address them; and the SEC has a critical role to play in identifying barriers that its own regulations have created over the years preventing people from participating in our capital markets.[5]

Public company boards of directors should not be private clubs with membership limited to narrow social circles. Regardless of intentions, it appears that existing board members' social and business networks can be a predominant source for companies seeking new director candidates.[6] This presents a barrier to entry to individuals outside those networks and could yield director candidates with similar backgrounds and experiences as those of current board members. The specter of "groupthink" is a serious risk for governing bodies that are supposed to keep watch over, and act as a critical check on, the management of companies they oversee.

<u>JA26</u>

I have voted to support Nasdaq's proposal to offer listed companies recruiting services that may identify new candidates outside these companies' go-to networks, and I applaud Nasdaq for this effort. I am keenly interested to see the impact this will have over the next several years at Nasdaq-listed companies and think we will have a lot to learn from how this service is utilized. I also applaud the New York Stock Exchange for its work in this area, specifically establishing the NYSE Board Advisory Council, which was "launched to address the critical need for inclusive leadership by connecting diverse candidates with companies seeking new directors."[7] The more companies can recruit people on boards who think differently and have different backgrounds from one another, the more they can hopefully foster environments where directors engage in critical reasoning and consider broader ranges of possible consequences and solutions than any of them could if each were operating in his or her own echo chamber. Such diversity and inclusiveness is a worthy goal to have for businesses across our capital markets, and I have yet to meet a person who does not aspire to that objective.

## Supporting the Goal but Not This Proposal

Today, however, I cannot join some of my colleagues in supporting the portion of the Commission's order that approves Nasdaq's proposed disclosure requirements for listed companies (the "Proposal"). While I support the goal of having more diverse and inclusive boards of directors, a noble goal does not justify short-changing the agency's legal obligations. Regrettably, I do not believe that the Commission has fulfilled its obligations to find that this Proposal, which has delisting implications for companies, meets the legal standards that we are required to apply in evaluating rules proposed by self-regulatory organizations ("SROs").[8]

The Approval Order rests in large part on the idea that investors, as evidenced by the Proposal's comment file and the Exchange's own assertions, are demanding the type of categorical diversity information the Proposal aims to elicit from Nasdaq's listed companies. Based largely on this demand, the Commission appears to conclude that the Proposal would "promote just and equitable principles of trade, remove impediments to and perfect the mechanism of a free and open market and a national market system, and protect investors and the public interest."[9] I can see a logical connection between providing information to investors and improving investor protection.[10] But I have a harder time with respect to the Approval Order's analysis as to how the Commission found that the Proposal satisfies the Act's other criteria. The Commission mostly reiterates the Exchange's assertions and then in places summarily finds that the Proposal is consistent with the Exchange Act.[11] Almost four years ago, Judge Merrick Garland of the D.C. Circuit Court of Appeals wrote an opinion holding that the Commission had not fulfilled its obligations under the Act when approving another SRO rule proposal because the Commission did not undertake its own "reasoned analysis" to evaluate the merits of the proposal at issue.[12] I believe the Approval Order today suffers from the same failing and could set a troubling precedent for SRO oversight.

Similarly, I believe the Approval Order should have included a more thorough discussion of whether the Proposal could be considered state action, warranting analysis under the Constitutional standards of scrutiny. The Commission has stated that "[N]umerous courts (and the Commission) have repeatedly held that SROs *generally* are not state actors [emphasis added]" and reaches a conclusion that Constitutional concerns are not implicated. [13] However, I am not sure this Proposal fits into the general archetype of SRO actions, and it could raise novel issues for the Commission. A serious concern is that the SEC—without any doubt, a state actor—may need to take future action in which the agency must consider disclosure of the racial, ethnic, gender, or LGBTQ+ status of individual directors. After all, the Commission is the adjudicating body for exchange delisting decisions. I think that the Approval Order should have included more analysis of whether the Proposal could implicate state action through the Commission's downstream enforcement responsibilities, or why the Commission believes this is unlikely. Instead, the Approval Order gives short shrift to this point, quickly concluding that even if the Proposal were to amount to state action, it "would survive constitutional scrutiny because the objectives set forth in the Proposal are not mandates, and the disclosures that the Proposal requires are factual in nature and advance important interests as described throughout this order."[14]

JA27

# Conclusion

In sum, I share the interest and desire in ensuring that our public companies have truly diverse leadership—and not just at the board level—to innovate and think creatively. I have found that diverse perspectives and backgrounds have brought about better analysis, thinking, and ultimately results. I have seen it at every job I have ever had and continue to see it today. While this has been a decision with which I have struggled, I do not believe the Commission has fulfilled its obligations in its approval of the Exchange's Proposal, and therefore I respectfully dissent from this portion of the Approval Order.

---

[1] Self-Regulatory Organizations; The Nasdaq Stock Market LLC; Order Approving Proposed Rule Changes, as Modified by Amendments No. 1, to Adopt Listing Rules Related to Board Diversity and to Offer Certain Listed Companies Access to a Complimentary Board Recruiting Service, Rel No. 34-92590 (Aug. 6, 2021) (hereinafter the "Approval Order"), https://www.sec.gov/rules/sro/nasdaq/2021/34-92590.pdf.

[2] *Id*. at 4.

[3] *Id*. at 3-4.

[4] *Id*. at 4.

[5] *See, e.g.*, Commissioner Elad L. Roisman, "Statement on Amending the 'Accredited Investor' Definition" (Aug. 26, 2020), https://www.sec.gov/news/public-statement/roisman-statement-amendments-accredited-investor-definition; "Statement at the Meeting of the Asset Management Advisory Committee" (July 16, 2020), https://www.sec.gov/news/public-statement/roisman-statement-amac-2020-07-16.

[6] Amendment No. 1 of Proposed Rule Change to Adopt Listing Rules Related to Board Diversity, File No. SR-NASDAQ-2020-081 (Feb. 26, 2021), at 41-43, https://listingcenter.nasdaq.com/assets/RuleBook/Nasdaq/filings/SR-NASDAQ-2020-081_Amendment_1.pdf.

[7] *See* The New York Stock Exchange, "Initiative to Advance Board Diversity," https://www.nyse.com/boardadvisory/about-the-council.

[8] Section 19(b)(2)(C) of the Securities and Exchange Act of 1934 (the "Exchange Act" or the "Act")[15 U.S.C. 78s(b)(2)(C)] provides that the Commission "shall approve" a proposal if it finds that the rule is consistent with the requirements of the Act and the rules and regulations applicable to the SRO—including requirements in Section 6(b). As indicated by the Approval Order, I do not think the Commission has analyzed the Proposal or the Exchange's assertions sufficiently to make those findings, which the Act requires.

[9] *See, e.g.*, Approval Order at 7.

[10] However, as I have raised before, I am not convinced that responding to investors' demands for any information necessarily equates to serving investor protection. I see no limiting principle to such a rationale, and I believe, when developing our *own* rules, we must continue to consider the materiality of information companies must disclose. *See* Commissioner Elad L. Roisman, "Can the SEC Make ESG Rules that are Sustainable?" (June 22, 2021), https://www.sec.gov/news/speech/can-the-sec-make-esg-rules-that-are-sustainable ("In developing any new disclosure requirements, including those related to ESG, I believe that the Commission should act consistently with our historic approach by focusing on what information is material to an investment decision.").

[11] *See, e.g.*, Approval Order at 25-26.

[12] *Susquehanna International Group, LLP, et al. v. SEC* (DC Cir.) (Aug. 8, 2017), https://www.cadc.uscourts.gov/internet/opinions.nsf/88E0BCE087554C0B8525817600508F2A/$file/16-1061-1687695.pdf.

[13] *See* Approval Order at 61-62.

[14] *See* Approval Order at 62.

JA29

**TAB 5:**

Commissioner Peirce, *Statement on the Commission's Order Approving Proposed Rule Changes, as Modified by Amendments No. 1, to Adopt Listing Rules Related to Board Diversity submitted by the Nasdaq Stock Market LLC* (Aug. 6, 2021)

## Statement

# Statement on the Commission's Order Approving Proposed Rule Changes, as Modified by Amendments No. 1, to Adopt Listing Rules Related to Board Diversity submitted by the Nasdaq Stock Market LLC



**Commissioner Hester M. Peirce**

**Aug. 6, 2021**

I write in opposition to the approval of the Board Diversity Proposal ("Board Diversity Proposal" or "Proposal") submitted for approval by the Nasdaq Stock Market LLC ("the Exchange").[1] The Proposal attempts to expand opportunity, a goal I share,[2] but it does so in a way that improperly leverages authority that Congress has entrusted to it under the Exchange Act. Because the Exchange cannot show that its Proposal is consistent with the Exchange Act, and because the Proposal is in fact outside the scope of the Act and contrary to fundamental Constitutional principles, I cannot support its approval.[3]

## I. The Board Diversity Proposal is not designed to achieve the purposes of the Exchange Act.

The Exchange submitted its Board Diversity Proposal with the Commission pursuant to Section 19(b)(1) of the Securities Exchange Act of 1934 ("Act").[4] Under Section 19(b)(2)(C)(i), the Commission "shall approve" a proposal "if it finds that such proposed rule change is consistent with the requirements of this chapter and the rules and regulations issued under this chapter that are applicable to such organization."[5] To determine whether an exchange rule filing is consistent with the Act, the Commission looks primarily to Section 6(b)(5), which requires an exchange's rules to be:

> designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade,. . . to remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect investors and the public interest; and [] not designed to permit unfair discrimination between customers, issuers, brokers, or dealers, or to regulate by virtue of any authority conferred by this chapter matters not related to the purposes of this chapter or the administration of the exchange.[6]

## a. The Exchange has failed to meet its burden of showing that the Board Diversity Proposal is consistent with the Exchange Act.

The Exchange dutifully recites the statutory standard but never actually provides evidence sufficient to establish that the Board Diversity Proposal is reasonably designed to satisfy any of the affirmative criteria enumerated in Section 6(b)(5). The Exchange's argument essentially distills to this: A number of studies—most examining only the effects of gender diversity, and a few addressing racial diversity—appear to show (or suggest, or perhaps to hint at) a correlation between (primarily) gender diversity and (to a lesser extent) racial diversity on the one hand and, on the other, certain desirable effects on corporate performance, such as greater transparency, fewer financial restatements, higher quality audits, reduced information asymmetry, and lower stock price volatility.[7] Accordingly, the Exchange asserts, investors and the market would benefit if Exchange-listed issuers were required to report specified demographic characteristics of board members and to either meet a "diversity objective" or explain why they do not. Further, the Exchange contends, having a certain number of directors who are diverse according to the demographic characteristics it has chosen would benefit issuers by reducing "groupthink."[8]

The Exchange makes no effort to examine the underlying quality of the studies to which it points, nor does it attempt to establish that any of them demonstrates a causal relationship between diversity, however defined, and any of the purported positive effects.[9] Moreover, several commenters identified serious weaknesses with this empirical research,[10] and one commenter submitted two separate studies that closely examined the studies supporting the Exchange's Proposal.[11] These commenters and studies persuasively demonstrate that the studies used by the Exchange are generally of low quality; that several do not make public the underlying data and the others that make the underlying data available show, at best, correlation; and that the Exchange has disregarded several high-quality studies that contradict the studies upon which the Exchange relies. Finally, the Exchange makes no effort to explain why studies examining the effects of gender and, to a lesser extent, racial diversity support its decision to include in its rule other types of diversity for which there is no evidence linking board membership to corporate performance.

These deficiencies should have doomed the Board Diversity Proposal, as they leave the Exchange without a persuasive basis for concluding that the Proposal is reasonably designed to advance the objectives set forth in Section 6(b)(5) of the Exchange Act. The Exchange insists that, even if the empirical evidence is equivocal, its conversations with various stakeholders and statements by current and former SEC Commissioners demonstrate that investors desire consistent and comparable information relating to diversity in making their investment decisions, but this type of anecdotal support for the rule is insufficient to meet the Exchange's burden to show that its Proposal is consistent with the Act. That investors or the significantly more nebulous "stakeholder" community wants certain information does not itself determine whether an exchange rule mandating or incentivizing the disclosure of that information is consistent with the Exchange Act. The Act nowhere delegates authority to exchanges to impose on issuers disclosure mandates or "objectives"[12] related to internal corporate affairs, much less those related to important societal problems, simply because current investor or "stakeholder" sentiment is said to favor such requirements.

If the Exchange were able to show compelling evidence that the obligations imposed by the Proposal satisfy one or more of the affirmative criteria enacted in Section 6(b)(5), this anecdotal evidence might be relevant in weighing whether the Proposal is a prudent exercise of the Exchange's authority under the Exchange Act. The Exchange, however, has presented no compelling evidence that the Proposal satisfies any of these criteria; and assertions that some investors and some "stakeholders" would really like to have it cannot bootstrap the Proposal into consistency with the Act.

The Commission's Order, in turn, politely declines to wade into the messy job of assessing the Exchange's empirical claims on their merits and instead finds that investors would be served by this diversity information because "commenters representing a broad array of investors" so clearly want it.[13] The Order attempts to establish a link between the Proposal and the Section 6(b)(5) criteria by asserting that it "would provide investors with information to facilitate their evaluation of companies in which they might invest."[14] By providing this

information, the Order concludes, the Proposal would "contribute to the maintenance of fair and orderly markets," which in turn demonstrates that "the Board Diversity Proposal is designed to promote just and equitable principles of trade, remove impediments to and perfect the mechanism of a free and open market and a national market system, and protect investors and the public interest."[15]

But this reasoning either begs the very question that needs to be asked—whether the information is relevant to investors in a way that matters under the Exchange Act—or suggests that an exchange may impose any obligation on issuers for which "commenters representing a broad array of investors" are clamoring. To the extent that it is begging the question, it fails under the D.C. Circuit's decision in *Susquehanna International Group LLC v. SEC*, in which the Court held that the Commission's "unquestioning reliance" on a self-regulatory organization's analysis in approving a rule filing violated both the Exchange Act and the Administrative Procedure Act.[16] The Commission is obliged to critically assess the "self-serving views of the regulated entit[y],"[17] and it cannot evade this obligation by assuming that the Proposal imposes disclosures and other obligations that are meaningful to investors (and "commenters representing" them) in a way that is relevant under the Exchange Act.

To the extent that the Commission's Order is approving the Proposal because it finds the Exchange Act permits exchanges to impose any disclosure requirement that some investors (or their purported representatives) demand, it is adopting a standard that is both contrary to the Exchange Act and ultimately unworkable. Section 6(b)(5) of the Act prohibits exchanges from adopting rules that "regulate by virtue of any authority conferred by [the Exchange Act] matters not related to the purposes of [the Act] or the administration of the exchange." One can easily imagine investors—and more importantly, as their views seem to have been given particular weight in this Proposal, "stakeholders" and other non-investor groups—asking for disclosure on any number of issues of public or social concern. Most of these issues, however, fall outside the purposes of the Act, which Congress made quite narrow in scope.[18]

## b. The Board Diversity Proposal does not protect investors.

As noted above, the Exchange contends that the Board Diversity Proposal responds to investor demand for consistent, comparable information about directors. Even setting aside the deficiencies in the empirical evidence relied upon by the Exchange and in the Commission's analysis, it is worth taking a closer look at how the Exchange's diversity disclosures create the impression of clarity for investors while actually serving to mislead them.

The Exchange's designation of relevant demographic categories is arbitrary, as it has not shown that they are tailored to provide the "consistent" and "comparable" diversity-related information the Exchange believes investors are demanding. First, the Proposal relies on self-identification, which is unlikely to be comparable within any one board, let alone across all boards.[19] Second, because the rule applies different categories to foreign listed companies, even assuming that all board members self-identify in a consistent manner and that they all self-identify in accordance with some generally accepted norm, the rule will not facilitate comparisons across all firms. Third, because the Board Diversity Proposal elicits aggregate information about a company's board broken down by race and ethnicity, gender, and LGBTQ+ status presumably to protect director privacy, cross-company comparisons of the number of directors who have some Diversity characteristic will be difficult.

The information required under the Proposal obscures by eliding the type of detail that may be important to an investor trying to assess a board's effectiveness. For one thing, the mandated diversity matrix will encourage investors to overlook important differences in director perspectives by shifting their focus to demographic characteristics of the board as a whole rather than to the individual experiences and skill sets that each director brings to the board room. Is a Black director who grew up in the Cleveland suburbs and studied accounting at Ohio State before embarking on a long career at a large American public company really likely to represent the same perspective as a Rwandan director who has an engineering degree and runs a large manufacturing plant in Rwanda? Unlikely, but both show up in the same boxes in an American company's matrix if they self-identify as Black cis-gendered heterosexual males. For that matter, two Black men who grew up in Cleveland and attended

Ohio State before embarking on impressive careers in different fields are unlikely to represent the same perspective on a board, but the Exchange's rule may encourage the belief that, because one of the two is sitting on the board and thus the "diversity objective" is satisfied, the company should be less concerned about trying to recruit the other. Comparability has its merits, but reducing a person to a few checkmarks on a chart presents the person in a manner that strips away his or her unique, hard-won expertise and knowledge and thus is not meaningfully illuminating for investors or salutary for issuers.

## c. The Board Diversity Proposal harms market integrity.

Although the Exchange argues that the Proposal will "remove impediments to and perfect[] a free and open market and a national market system," the Proposal will actually harm the market in several ways. First, the Exchange seeks to micromanage the delicate process of composing a board, a process that does not lend itself well to standardization. If, for example, a company with an all-male board seeks to fill a director opening, and the candidate with the qualifications the board most needs—industry-specific cybersecurity expertise—is a Native American man, the company may pass him over in favor of a non-minority woman without that experience, particularly if the cybersecurity expert opts not to self-identify as belonging to any demographic category (other than cybersecurity expert). The company would want to be able to report that it complies with the Exchange's diversity targets (and to avoid the likely reputational and market consequences if it does not), so it may choose the woman who is less likely to round out the expertise of the board of that particular company.[20] The company is at reputational, legal, and financial risk regardless of which path it takes: If it does not hire the woman in this scenario, it has to explain why it does not meet the mandate, which may lead to outcry, a drop in its stock price, and a shareholder suit. If it does hire the woman, it avoids those particular consequences in exchange for possible longer-term reputational, legal, and financial consequences, as it finds itself without necessary expertise. The Exchange's rule may contribute inadvertently to short-term decision-making in board selection.

Second, the Commission's approval of the Board Diversity Proposal will have consequences on matters beyond board composition. By approving the Proposal on the strained rationale cobbled together from a less than compelling set of empirical studies and closed door conversations with select issuers, investor "representatives," and stakeholders, the Commission can expect to receive poorly reasoned and poorly substantiated rationales for future rule filings. Moreover, approval of Nasdaq's filing on the basis given by the Exchange may send the message that "the SEC could or should approve nearly any [SRO proposal]—hardly the result the Exchange Act envisions."[21]

Third, notwithstanding its argument that the Board Diversity Proposal is designed to prevent fraudulent and manipulative acts and practices, the Exchange's Proposal will incentivize misleading disclosure. By setting "diversity objectives," requiring companies that fail to reach those targets to explain publicly why they have failed to do so, and relying on director self-identification, the Proposal invites disclosure that pushes the envelope of plausibility. To avoid having to admit noncompliance with the Exchange's "diversity objectives," a confession that likely will draw negative attention, including perhaps shareholder litigation,[22] customer boycotts, and higher capital costs, companies will be under tremendous pressure to fit their directors into one of the favored categories.

While most companies will proceed honestly, experience in other areas of corporate disclosure suggests that some companies will not. Some issuers that do not satisfy the Exchange's "diversity objectives" might falsify the prescribed diversity matrix to make it appear that they do. These companies may be willing to gamble that nobody will second-guess their matrices because doing so would require deconstructing the aggregated presentation to second-guess very personal information about individual directors. Self-identification, while certainly preferable to an alternative that would require proof of membership in a particular group, makes deception by a company intent on doing so easier.[23]

Fourth, the Exchange's Proposal may lead to less effective oversight of boards of directors by investors and asset managers. Even assuming that the Exchange's proposed Board Diversity Matrix actually facilitates consistent reporting and comparable disclosure across issuers (which it, of course, does not, for the reasons explained above

and below), it could overshadow the obligation of asset managers to assess the qualifications, skills, experience, and background of each nominee to each issuer's board. If a company reports compliance with the Exchange's "diversity objectives," will investors and asset managers continue to push companies to conduct wide-ranging director searches to ensure that female or minority candidates with needed expertise are not overlooked?

Finally, the Board Diversity Proposal will create an unfair advantage for certain issuers. Specifically, the Board Diversity Proposal favors foreign issuers by giving them a more flexible set of "diversity objectives" and an option to choose among disclosure matrices. Further, practically speaking, it will be more difficult for the Exchange to monitor and enforce compliance by foreign issuers since it is unlikely that Exchange personnel will understand foreign issuers' home country diversity dynamics sufficiently to assess those issuers' compliance.

## d. The Board Diversity Proposal is contrary to the public interest.

The Exchange contends that the public interest will be served by a disclosure-based framework that encourages meaningful board diversity.[24] However, Commission approval of the Exchange's Proposal lends a government imprimatur to the race- and sex-based board-selection objectives that are contrary to the public interest. The disclosure categories and the Exchange's numerical "diversity objectives" rely on inappropriate stereotyping, are poorly tailored to the Exchange's justifications for selecting them, and—intending to remedy societal discrimination —actually place a disproportionate burden on women, underrepresented minorities, and LGBTQ+ individuals.

First, a key rationale underlying the Board Diversity Proposal assumes that people within a particular diversity category necessarily provide a different perspective from those within a different diversity category. The Proposal thus treats women as interchangeable with one another because it assumes that, if nothing else, any given woman necessarily will bring a consistently different, *womanly* perspective to the board than would a male director. Because the Proposal allows a company to choose its second "diverse" director from among enumerated minorities or the LGBTQ+ community, the Proposal seems to assume that directors within and between these two groups are interchangeable, again because any given member of either of these groups necessarily will bring a uniformly different perspective on matters related to the board from a non-minority cis-gendered heterosexual man or woman.

As noted above, the Exchange relies on generally poor-quality or irrelevant empirical evidence to support this view, which should perhaps not surprise us, as it echoes essentialist conceptions of race and sex that are now broadly considered offensive and reminiscent of historical racist and sexist thinking. It should be obvious to anyone with a diverse group of friends or colleagues that two people who look different may share very similar backgrounds and attitudes toward a range of issues, including corporate governance, whereas two people who look similar may bring very different qualities to a board's decision-making.[25]

Moreover, the Exchange looks to the Board Diversity Proposal to combat "groupthink," but the Proposal may in fact encourage groupthink. The Proposal singles out companies that choose not to select directors based on candidates' race, ethnicity, gender, and LGBTQ+ status as qualifying characteristics when choosing their boards. Although the Exchange emphasizes the option the Proposal gives to issuers to explain why they do not satisfy the disclosure requirements, it disregards the current social and political context that is likely to make this alternative extremely undesirable to most issuers.[26] In addition, given these high stakes, it is possible that companies may reject underrepresented minorities or women who choose not to self-identify, which could transform the proposed framework into an ideological screen that selects for people who are willing to subject themselves to the prescribed categorization. To the extent that the Proposal selects for a director's willingness to overcome personal discomfort with such classifications in response to pressure from future board or management colleagues to self-identify, it may filter out people who would be willing to push back against management: Their unwillingness to pay the self-identification entry price will bar them from the boardroom. The Exchange's hopes of combatting groupthink might not materialize.

Second, none of the Exchange's justifications provide a non-arbitrary basis for its decision to include the three categories it has chosen to include. For example:

3/25/22, 11:06 AM
Case 21-80626 on the Document of Approved Proposed Rule Change as Modified by Amendments No. 1, to Ado...

Case: 21-60626   Document: 187   Page: 45   Date Filed: 04/01/2022

- *The Exchange's selected Diversity characteristics are not tailored to the evidence provided by the Exchange.* The evidence cited by Nasdaq relates primarily to female participation on boards[27] and, to a lesser extent, racially diverse boards, but Nasdaq has cited no empirical evidence regarding the effect of LGBTQ+ diversity on boards. Notwithstanding this lack of evidence, the Exchange includes LGBTQ+ diversity in its Diversity Matrix and "diversity objectives," explaining that including this category may facilitate the analysis of potential links between LGBTQ+ diversity and board performance.[28] At the same time, it dismisses suggestions that it include categories such as veteran status, disability status, and national origin, in part because there is inadequate information about the effects these types of diversity on board performance. Nasdaq offers no explanation for its arbitrary imposition of asymmetrical evidentiary requirements among different categories within its own definition of Diverse director.

- *The Exchange's selected Diversity characteristics are not tailored to facilitate disclosure of consistent and comparable information.* The Exchange repeatedly emphasizes that it is important that investors receive consistent, comparable data regarding diversity. It explains that this objective influenced its decision to use the characteristics required on the U.S. Equal Employment Opportunity Commission's EEO-1 report, which many issuers already are required to submit. The Exchange further states that it considered other characteristics, "including LGBTQ+, nationality, veteran status, and individuals with disabilities,"[29] but, after consultation with "stakeholders," determined to include only the LGBTQ+ category, as "adopting a broad definition of Diverse would maintain the status quo of inconsistent, noncomparable disclosures, whereas a narrower definition of Diverse focused on race, ethnicity, sexual orientation and gender identity will promote the public interest by improving transparency and comparability."[30] Nowhere does the Exchange explain why the urgent need for consistent and comparable disclosures justifies including LGBTQ+ (a category the definition of which is fluid across communities and through time) in the Proposal while excluding veteran status, disability status, or national origin from it. The Exchange's rationale suggests an unusual view of diversity, one that assumes that "the more underrepresented groups that you permit into that conversation, potentially you start to water it down and have less diversity."[31] How do more categories of people undermine diversity? Why do directors who are veterans, disabled, of foreign national origin, or non-binary[32] not result in a diversity "credit" under the rule? If a female director changes her self-identification to non-binary, why should that director no longer count as diverse?

- *The Exchange arbitrarily excludes historically protected groups from its Diversity characteristics.* The Exchange asserts that it has designed the Proposal to "ensure that board diversity is occurring across *all protected* groups."[33] The Exchange does not define the phrase "protected groups," which is used only once in its filing, but assuming that it is using it in a manner consistent with common usage, its Proposal manifestly does *not* do this, as it excludes several groups that are protected under federal anti-discrimination laws, including some that commenters suggested be included (such as veteran or disability status) or some that the Exchange is permitting foreign (but not American) issuers to include (such as religion or language).

- *The Exchange's accommodation for foreign issuers highlights the arbitrariness of its selected Diversity characteristics.* The Proposal permits foreign issuers to use different metrics because "it is challenging to apply a consistent definition of minorities to all countries globally."[34] Although this concern for the practicability of the rule for certain issuers is certainly understandable, the Exchange fails to grapple with how this exception undermines its argument that disclosures must be consistent and comparable. Not only does this exception render the disclosures of U.S. and foreign issuers inconsistent and non-comparable with each other, the Exchange fails to explain how someone could reasonably compare disclosures made, say, by an issuer in Spain with those made by an issuer in Japan, two countries with very different demographics. Moreover, this exception heightens the arbitrariness of its requirements for U.S. issuers. If the four additional categories applicable to foreign firms do not, in the Exchange's view, render the disclosures inconsistent or non-comparable, it is difficult to see why using the three additional characteristics requested by commenters in the U.S. context would do so.

To summarize the discussion thus far, these arbitrary inclusions and exclusions show that the Exchange's definition of "diverse" is not reasonably tied (1) to board compositions purportedly shown to increase corporate performance, or (2) to categories that firms already report, or (3) to groups historically protected under federal law, or (4) to conditions necessary to obtain consistent and comparable disclosures, or indeed (5) to ensuring that boards are composed of people with diverse cognitive diversity[35] and backgrounds.

Finally, the Board Diversity Proposal will subject directors and would-be directors to intense pressure to disclose personal information, and this pressure will fall disproportionately on women, underrepresented minorities, and LGBTQ+ individuals. The Board Diversity Proposal would permit directors to choose not to disclose their gender, race, ethnicity, or LGBTQ+ status. In reality, however, the pressure on directors, particularly those who "count" toward the "diversity objectives," to disclose these characteristics will be strong. Imagine an Asian-American director who chooses to opt out of self-identifying his ethnicity. His last name might suggest that he is Asian-American, so the company may ask whether the company can simply report an Asian director in its matrix. Will willingness to self-identify become a prerequisite for board service? What about a female director who is considering transitioning to male? Will she be permitted to change her self-identification to male as part of the transition process? What about a bisexual director who marries and wishes to renounce his or her self-identification as bisexual in order to underscore his or her commitment to an exclusive relationship with his or her spouse? What about a director who was adopted as a child and honestly believes that he has African American ancestry, but a genetic test reveals that all of his ancestors are southern Italian? If he chooses to change his self-identification from African American, will the company protest? If he chooses to retain his African American self-identification, but discloses to management the results of the test, will the company face legal or reputational consequences for reporting his self-identification as African American if the arguably contradictory evidence later becomes public? What about a director on the board of a foreign issuer who is LGBTQ+, but only his closest friends on the board and in management are aware of this fact. Public self-identification could expose him to persecution or even death. Even though the disclosures are aggregated, reverse engineering may reveal his identity. Will he feel pressure to self-identify?

All of these situations are intensely personal. Pressuring self-identification, expressly or implicitly, would be inhumane, yet the Board Diversity Proposal creates incentives to force directors to acquiesce to the revelation of personal characteristics. How easy will it really be for a board member who knows that her ethnicity can save the company from having to explain why it does not meet the Exchange's "diversity objectives" to say, "No, put me down as 'Did not disclose demographic background'"?[36] Will she be violating her fiduciary duty to the company by not disclosing her ethnicity—because she prefers not to do so—even though it may expose the company to public opprobrium and perhaps a costly activist campaign? Could a company require its director candidates to undergo genetic testing to check for qualification in one of the Exchange's racial or ethnic categories? Perhaps these scenarios will be rare, in large part because many people are happy to disclose their race, ethnicity, gender, or LGBTQ+ status, but even infrequent instances of forced self-identification are serious and ought to have been taken into account as part of the consideration of this Proposal.

## II. The Board Diversity Proposal addresses issues outside the scope and purposes of the Exchange Act.

The Exchange finds it so difficult to fit the Board Diversity Proposal to any of the criteria of Section 6(b)(5) because the rule is not actually intended or designed to address any matter relevant to the scope or purposes of the Exchange Act. The Proposal in fact reflects the Exchange's efforts to address matters of grave social concern by using its authority as a listing exchange to create incentives for issuers to make changes that the Exchange believes will bring about socially desirable results. Recognizing that it cannot impose requirements in either capacity without seeking Commission approval, the Exchange has attempted to articulate a rationale that fits within the limitations prescribed by the Exchange Act, but that effort fails.

As already noted, Section 6(b)(5) provides that an exchange's rules not only need to be designed to satisfy certain affirmative criteria, as described above, but that they must not "regulate by virtue of any authority conferred by [the Exchange Act] matters not related to the purposes of [the Act] or the administration of the exchange." Section 2 of the Act describes in general terms the purposes of the Act as a whole, which boil down to regulating securities transactions with an eye toward protecting interstate commerce and the financial system and ensuring the maintenance of fair and honest markets in securities transactions.[37]

The Board Diversity Proposal does not advance any of these purposes. Merely because the Exchange has identified a societal problem that it believes it can address through its power to set listing standards or regulate its members does not bring the proposed solution within the scope of the Exchange Act.[38] This limitation is important: As a nation, we face myriad societal, economic, and political challenges. But the notion that Congress— which has not given exchanges and other SROs, or even the Commission, a mandate to address these challenges and remedy these injustices—expected them to attempt to do so merely because they have leverage over market participants through the authority granted them in the Exchange Act, is fanciful.[39]

Our political and civil institutions, which are directly responsive to the American people, are charged with wrestling with these problems.[40] Cloaking attempted solutions in the language of the Exchange Act leads the Exchange and thus the Commission where it does not belong—to tackling thorny societal and cultural issues that properly belong in the political and civil arena. Moreover, focusing on issues that belong in the political and civil arenas diminishes the capacity of both the Commission and self-regulatory organizations to focus on their respective missions and weakens rather than strengthens market integrity.

## III. The Board Diversity Proposal conflicts with core Constitutional principles.

The objectives and disclosure requirements imposed by the Board Diversity Proposal encourage discrimination and effectively compel speech by both individuals[41] and issuers[42] in a way that offends protected Constitutional interests. Courts will allow the government to interfere with these interests only if it can show a compelling interest and the requirement is narrowly tailored to achieve that interest.

The Commission's Order and the Exchange both dismiss this concern out of hand on the basis that courts have generally held that self-regulatory organizations like exchanges are not state actors. Courts appear to be divided on this question,[43] though here the Exchange justifies the standard in part on its conclusion that the Commission has not taken steps to foster board diversity, which may weigh in favor of treating it as a state actor.[44] If the Exchange is a state actor, the Exchange's rule, which encourages companies to make distinctions among directors and director candidates based on race, ethnicity, gender, and LGBTQ+ status, likely would face careful scrutiny in a court challenge.

However, neither the Commission's Order nor the Exchange gives due consideration to a more important question, namely the Commission's own role in this rule, which extends beyond approving the rule, as the Commission is doing here, to a significant role in its administration and enforcement by the Exchange. Once the Proposal is approved, the Exchange will have an obligation to comply with its own rules by initiating delisting proceedings against an issuer that does not comply with the new listing standard. The Commission, in turn, is required by the Exchange Act both to ensure that the Exchange complies with its own rules (by initiating such delisting proceedings),[45] and, in the event of a delisting, potentially to hear appeals from the delisted issuer challenging the Exchange's decision.[46]

Commission action in either context could involve the Commission in making factual determinations[47] that a government body should not be able to—and, under our Constitutional order, cannot—make. These determinations may, depending on the context of the action, involve questions about the validity of an individual's self-identification or the adequacy of a firm's "philosophy regarding diversity."[48] Either type of inquiry by a government agency should trouble every American, and a rule, like the Board Diversity Proposal, that could

require the Commission to engage in such determinations is inconsistent with key principles that our founding charter upholds.

# IV. Conclusion

Our society is increasingly recognizing the urgency of ensuring that people are not shut out of opportunities on the basis of characteristics irrelevant to their ability to excel. The unique value of each individual is able to shine brightest when the individual's personal, educational, and professional opportunities are as broad as possible. Families, neighborhoods, communities, companies, governments, and civil society institutions in turn benefit from the dynamism created when members with complementary talents and diverse backgrounds, perspectives, skills, and experiences are all able to contribute to those institutions.

Unfortunately, the Proposal will not help to achieve greater opportunity for all members of society to exercise their talents. Nor will it advance the Exchange's stated objectives of more accurate and comparable board diversity data and less "groupthink." It is more likely to do the opposite because it relies on crude categorizations of people into racial, gender, ethnic, and LGBTQ+ status boxes that deprive the people being categorized of their individuality and their professional, educational, experiential, and personal complexity.

The Exchange speaks in the language of choice—a company can choose not to meet the Exchange's "diversity objectives" and a director can choose not to self-identify—but there is no real choice here. The Exchange's focus on the disclosure option as a key element that prevents the rule from being a mandate disregards the current political context: No issuer will consider disclosure (rather than compliance) a realistic option in the current environment. No director who qualifies as "diverse" will consider non-disclosure a realistic option.

The Exchange's Board Diversity Proposal, rather than contributing to the work of breaking down barriers to entry into the boardroom, raises new arbitrary barriers. The Proposal furthers the growing trend by private and public institutions of classifying people by gender, racial, ethnic, and LGBTQ+ categories. Such classifications strip people of their individuality, their ability to focus on what makes them uniquely valuable to society, their freedom to think and speak for themselves, and their right to decide when and with whom to share their personal attributes. The Proposal should be disapproved because it is inconsistent with the Act, outside the scope of the Act, and offensive to important Constitutional principles.

---

[1] *See* Securities Exchange Act Release No. 92600 ("Approval Order") (August 6, 2021) (SR-NASDAQ-2020-081). This proposed rule change would adopt listing rules related to board diversity. Specifically, the rule would require each Nasdaq-listed company, subject to certain exceptions, to have, or explain why it does not have, at least one director who self-identifies as a female; to have, or explain why it does not have, at least one director who self-identifies as Black or African American, Hispanic or Latinx, Asian, Native American or Alaska Native, Native Hawaiian or Pacific Islander, two or more races or ethnicities, or as LGBTQ+; and to provide statistical information in a proposed uniform format on the company's board of directors related to a director's self-identified gender, race, and self-identification as LGBTQ+. *See* Amendment No. 1 to the Board Diversity Proposal ("Amendment No. 1"), available at https://www.sec.gov/comments/sr-nasdaq-2020-081/srnasdaq2020081-8425992-229601.pdf. For the Exchange's initial filing, see Securities Exchange Act Release No. 90574 (December 4, 2020), 85 FR 80472 (SR-NASDAQ-2020-081).

[2] *See* Commissioner Hester M. Peirce, "Prosperity's Door," Remarks at the FINRA Certified Regulatory and Compliance Professional Program at Georgetown University (July 21, 2021), https://www.sec.gov/news/speech/peirce-prosperity-door-072121.

[3] I do not object to the approval of the Board Recruiting Service Proposal, which would offer certain listed companies access to a complimentary board recruiting service to help advance diversity on company boards.

[4] 15 U.S.C. 78s(b)(1).

JA38

[5] 15 U.S.C. 78s(b)(2)(C)(i).

[6] 15 U.S.C. 78f(b)(5).

[7] *See* Amendment No. 1 at 21-29.

[8] Amendment No. 1 at 123 (positing that issuers would benefit from "including diverse directors with a broader range of skills, perspectives and experiences [which] may help detect and prevent fraudulent and manipulative acts and practices by mitigating 'groupthink'").

[9] The Exchange notes, for example, that "[a]t a minimum . . . the academic and empirical studies support the conclusion that board diversity does not have adverse effects on company performance." Amendment No. 1 at 28.

[10] *See*, *e.g.*, letter from Publius Oeconomicus to Vanessa Countryman, Secretary, Commission, dated Dec. 28, 2020 ("Publius Letter"); letter from David Burton, Heritage Foundation, to J. Matthew DesLesDernier, Assistant Secretary, Commission, dated Jan. 4, 2021; letter from Boyden Gray & Associates PLLC on behalf of Alliance for Fair Board Recruitment, dated January 4, 2021 ("Boyden Gray Letter").

[11] Boyden Gray, writing on behalf of the Alliance for Fair Board Recruitment, submitted a review of the literature on corporate board diversity by Jonathan Klick of the American Enterprise Institute and a paper by Harvard Law Professor Jesse M. Fried that assessed the quality of the studies relied upon by the Exchange in the course of discussing the likely effect of the Exchange's Proposal on investors. *See* Boyden Gray Letter; letter from Boyden Gray & Associates PLLC on behalf of Alliance for Fair Board Recruitment, dated April 9, 2021). The original papers are available online. *See* Jonathan Klick, American Enterprise Institute, "Review of the Literature on Diversity on Corporate Boards" (Apr. 6, 2021), https://www.aei.org/research-products/report/review-of-the-literature-on-diversity-on-corporate-boards/; Jesse M. Fried, "Will Nasdaq's Diversity Rules Harm Investors?," European Corporate Governance Institute – Law Working Paper No. 579/2021 (Mar. 31, 2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3812642. Professor Fried concludes his analysis by stating that "Nasdaq's proposed diversity rules may well have desirable social effects, but we should not pretend that, conveniently, these rules will also benefit investors. High quality scholarship, including a study Nasdaq itself cites and several studies that Nasdaq ignores, tends to point in the opposite direction." Fried, "Will Nasdaq's Diversity Rules Harm Investors?" at 8.

[12] Although the Board Diversity Proposal now refers to an "objective" instead of a "requirement", it is essentially designed to work like a requirement, which is why it allows for a phase-in period ("consistent with the phase-in periods for Nasdaq's other board composition requirements") and accommodations for certain types of issuers. *See* Amendment No. 1 at 81. *See also* Amendment No. 1 at 331 (setting out a "Diversity Objective": "Each Company . . . must have, or explain why it does not have, at least two members of its board of directors who are Diverse, including (i) at least one Diverse director who self-identifies as a Female; and (ii) at least one Diverse director who self-identifies as an Underrepresented Minority or LGBTQ+.").

[13] Approval Order at 6.

[14] *Id*. at 7.

[15] *Id*.

[16] *Susquehanna Int'l Grp., LLP v. SEC*, 866 F.3d 442, 447 (D.C. Cir. 2017).

[17] *Id*.

[18] *See* 15 U.S.C. 78b.

[19] I am not endorsing an approach that would require proof of fitting into a particular Diversity category, which is objectionable in a society that values each individual equally without regard to ethnicity, race, gender, or LGBTQ+ status. I am merely pointing out that the Exchange's approach will not result in comparability.

[20] Yes, the company could put both candidates on the board, but the company may be loathe to make too many simultaneous changes to a board that is performing well and, for a small company, the cost of an additional director is not negligible.

[21] *Susquehanna*, 866 F.3d at 448.

[22] Diversity-related shareholder litigation is already occurring, and there is no reason to believe that the Exchange's Proposal will mitigate, rather than exacerbate, this phenomenon. *See*, e.g., *Foot, et al v. Mehrotra et al, and Micron Technology, Inc.*, D. Del (1:21-cv-00169-UNA) filed 02/09/21.

[23] *See*, e.g., letter from John Richter dated December 12, 2020, at 2 ("Relying on self-declaration encourages unassailable false claims.").

[24] *See*, e.g., Amendment No. 1 at 8-9 (stating that the Exchange "believes that the national market system and the public interest would be well-served by a 'disclosure-based, business-driven' framework for companies to embrace meaningful and multi-dimensional diversification of their boards"); *id.* at 12-13 (stating that the Exchange "believes that the lack of reliable and consistent data creates a barrier to measuring and improving diversity in the boardroom"); *id.* at 41 (stating that the Exchange "has concluded that a disclosure-based approach to encouraging greater diversity and data transparency would be beneficial").

[25] The empirical research supporting the Proposal is equivocal, but even if it were definitive, it is dangerous to rely solely on this type of data or on supposed demands from investors, as both may lead us to places we do not want to go. For example, what if empirical research showed that having more than two women on a board led to worse corporate performance? Would we approve a listing rule that required companies to have no more than two women or explain why they were not in compliance with that limit? I would hope not as such a rule would be detrimental to issuers, investors, and the public.

[26] Some of the comments suggest that it is already difficult to raise questions about the merits of this proposal in the financial industry, which may indicate that groupthink is a problem not limited to corporate boards. *See*, e.g., Publius Letter at 1, n.1 (writing in opposition to the Proposal "anonymously because I fear that my opposition to the Proposed Rule will adversely impact my career").

[27] Even with respect to women's participation on boards, some of the studies cited looked at women with business or financial expertise, so the results may not be relevant for female directors without such expertise. See, e.g., Amendment No. 1 at 31 (discussing two studies).

[28] This rationale echoes that of the Commission in adopting the transaction fee pilot. The D.C. Circuit vacated that rule in part because the rule was adopted "to secure information that may or may not indicate . . . whether there is a problem worthy of regulation." N.Y. Stock Exch. LLC v. SEC, 962 F.3d 541, 555 (D.C. Cir. 2020).

[29] Amendment No. 1, at 106.

[30] *Id*. at 107.

[31] Interview with Jeff Thomas, Senior Vice President, Nasdaq Corporate Services Business Unit, Nasdaq, Axios podcast, December 1, 2020

[32] See Amendment No. 1, at n. 173 ("Although non-binary is included as a category in the proposed Matrix, a company would not satisfy the "diversity objectives" proposed by Rule 5605(f)(2) if a director self-identifies solely as non-binary.").

[33] Amendment No. 1, at 117 (emphasis added).

[34] Amendment No. 1, at 140.

[35] The Exchange acknowledges that cognitive diversity is not the objective it is trying to achieve. *See*, e .g., Amendment No. 1 at 107 ("Nasdaq also is concerned that the broader definitions of diversity utilized by some

3/25/22, 11:06 AM                                Statement on the Commission's Order Approving Proposed Rule Changes, as Modified by Amendments No. 1, to Ado…

Case 21-60626     Document 187     Page: 51     Date Filed: 04/01/2022

companies may result in Diverse candidates being overlooked, and may be hindering meaningful progress on improving diversity related to race, ethnicity, sexual orientation and gender identity. For example, a company may consider diversity to include age, education, and board tenure. While such characteristics may provide laudable cognitive diversity, this focus may result in a homogenous board with respect to race, ethnicity, sexual orientation, and gender identity that, by extension, does not reflect the diversity of a company's communities, employees, investors, or other stakeholders.").

[36] How could a company explain its non-compliance with the Diversity requirements in such a situation? "We do actually have the requisite number of Diverse directors, but one of them refuses to self-identify"?

[37] 15 U.S.C. 78b.

[38] As one commenter noted, the Exchange's proposal to address concerns about diversity through regulation of corporate boards is a novel exercise of exchange authority under the Act and is distinguishable from its prior intervention into corporate governance issues. *See* Boyden Gray Letter at 49-50.

[39] Would the Commission approve a rule filing by an exchange that sought to address concerns about wealth inequality by requiring companies either to adopt a sliding scale for the compensation of managers and executives tied to their net worth or to explain their philosophy on issues related to wealth inequality?

[40] *See, e.g.*, letter from Christopher A. Iacovella, American Securities Association to Vanessa Countryman, Secretary, Commission, dated Dec. 31, 2020, at 1 (explaining that the Board Diversity Proposal is "another example of self-regulatory organization (SRO) 'mission creep' that has serious long-term consequences for our markets and investors across America. If SROs can use the listing rule process to effectively dictate the composition of company boards without the express authorization of Congress, what can't they do?").

[41] Individuals will be under pressure to disclose to the company their diversity characteristics. Diverse individuals will be under particular pressure to speak, as their presence on the board will count toward the Exchange's "diversity objectives" only if they disclose their self-identification. Other candidates will not face the same pressure.

[42] Issuers will be required to disclose aggregated data on board composition and those that do not meet the "diversity objectives" will be required to explain why they do not, including by explaining their "philosophy related to board diversity." *See, e.g.*, Amendment No. 1 at 19 ("Nasdaq believes that additional disclosure regarding a board's composition and philosophy related to board diversity will improve transparency and accountability into corporate decision making.").

[43] Compare *D. L. Cromwell Invs., Inc. v. NASD Regulation, Inc.*, 279 F.3d 155 (2d. Cir. 2002) (holding that NASD Regulation was not a state actor) with *Blount v. SEC*, 61 F.3d 938 (D.C. Cir. 1995) (holding that rule promulgated by the Municipal Standards Rulemaking Board and approved by the Commission constituted government action).

[44] Amendment No. 1 at 48-52 and 111.

[45] 15 U.S.C 78s(h) (authorizing the Commission to bring an enforcement action against a self-regulatory organization that, among other things, fails to comply with "its own rules").

[46] See 15 U.S.C.78s(d). The Exchange does not indicate how it plans to enforce the rule, and it is unclear whether the Exchange will, as a practical matter, enforce it beyond ensuring that issuers publish a diversity matrix and, if needed, a reason for not achieving the Exchange's "diversity objectives." Indeed, it promises not to administer a "truth test" regarding directors' self-identification. *See* Nasdaq Response Letter at 19. Given the inherent weaknesses in the rule described above, perhaps it is more appropriate to view the rule as a marketing ploy designed to show the Exchange's commitment to diversity and inclusion without commitment to potentially awkward (and inappropriate) inquiries on the Exchange's part.

On the other hand, the Exchange may be drawn unwittingly into truth testing if shareholders or others cast doubt on the self-identification of a director who has publicly self-identified in one of the Exchange's categories. For example, shareholders and other interested parties could check the matrix against information derived from other

JA41

3/25/22, 11:06 AM    Statement on the Commission's Order Approving Proposed Rule Changes, as Modified by Amendments No. 1, to Ado…

Case 21-60626   Document 187   Page 52   Date Filed 04/01/2022

sources and, if the matrix appeared inaccurate, pressure the Exchange to look into the discrepancy and perhaps delist the company. If the company appealed, the Commission also might be drawn into assessing the accuracy of a company's reporting matrix, as discussed further below.

[47] *See, e.g.*, In the Matter of the Application of Cleantech Innovations, Inc., Exch. Act Rel. No 69968 at 10 (July 11, 2013) (stating that the legal standard applicable to Commission review of exchange delisting determinations includes, among other things, inquiry into whether "the specific grounds on which the delisting is based exist *in fact*" (emphasis added)).

[48] Amendment No. 1 at 19, 59, 100, 107-108. Compelling disclosure of a company's philosophy on a topic that is hotly contested in society (and passing judgment on the acceptability of that disclosure) is very different from compelling disclosure of facts and runs counter to the core protections guaranteed by the First Amendment.

**TAB 6:**

Letter from Shundrawn Thomas, President, Northern Trust Asset Management, File Nos. SR-NASDAQ-2020-081, -082 (Apr. 28, 2021)



April 28, 2021

Ms. Vanessa A. Countryman
Secretary
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, D.C. 20549-1090

**Re:  Response of Northern Trust Asset Management to Request for Comment on The Nasdaq Stock Market LLC's Proposed Rule Change to Adopt Listing Rules Related to Board Diversity (File Nos. SR-NASDAQ-2020-081; SR-NASDAQ-2020-082)**

Ms. Countryman:

Northern Trust Asset Management ("NTAM") is pleased to submit these comments to the U.S. Securities and Exchange Commission (the "Commission" or the "SEC") in full support of the proposed rule change of The Nasdaq Stock Market LLC ("Nasdaq") to adopt listing rules related to board diversity ("Board Diversity Proposal").

NTAM is the branding name of the asset management business of Northern Trust Corporation ("Northern Trust"), a financial holding company and publicly traded company.  Northern Trust is a leading provider of wealth management, asset servicing, asset management and banking to corporations, institutions, families and individuals.  As of March 31, 2021, Northern Trust had assets under custody/administration of US$14.8 trillion and assets under management of US$1.4 trillion.  Northern Trust Investments, Inc. ("NTI") is the primary U.S. investment adviser of NTAM.  NTI is registered with the Commission as an investment adviser under the Investment Advisers Act of 1940.

Nasdaq has proposed that most Nasdaq-listed companies have, or explain why they do not have, at least two diverse directors, including one who self-identifies as female and one who self-identifies as either an underrepresented minority or LGBTQ+.  In addition, Nasdaq would require companies to annually disclose board-level diversity data in a prescribed Board Diversity Matrix (or substantially similar format).  The Board Diversity Proposal's requirements for diverse board representation and transparent disclosure align with similar advocacy already taken by NTAM, and we appreciate the opportunity to share the following perspectives that lend support to Nasdaq's goals and objectives.

**Board diversity creates long-term value for shareholders.**

NTAM, like Northern Trust as a whole, embraces diversity and recognizes the strength it brings to its organization, employees, clients, shareholders, and local communities.  Without question, Nasdaq's Board Diversity Proposal strongly resonates with our core beliefs concerning diversity. Corporate leadership, starting with the board of directors and extending to executive management , must reflect the diversity of the broader population in order for society to achieve meaningful and lasting progress on diversity, equity and inclusion.

We believe that shareholder value is enhanced when a company's board of directors reflects a wide diversity of perspectives and backgrounds.  Such board diversity should reflect the diversity of the workforce and society, ensuring that a variety of viewpoints are represented in company decision-making.

NTAC:3NS-20



NTAM believes an effective board is one that is comprised of directors with a broad mix of skills and experience, as well as a diversity of backgrounds, including, but not limited to, experience, age, race, gender, and ethnicity.

The case for increased shareholder value through a diverse board is clear. For example, a 2019 McKinsey & Company study[1] found that companies in the top quartile for gender diversity on boards were 28 percent more likely to financially outperform their peers. Furthermore, for ethnic and cultural diversity on executive management teams, the study found that the top quartile companies outperformed the bottom quartile by 36 percent in profitability.

We have aligned our core beliefs on diversity with our actions. Northern Trust's Proxy Committee has utilized guidelines that it developed with the goal of advancing diversity on company boards. Effective in 2021, our Proxy Committee raised its minimum diversity requirement, increasing expectations on companies to further diversify their boards. Under this approach, we set an expectation that all company boards have at least 20% female directors and U.S. company boards to have at least one ethnic/racially diverse director. Our standards align with the spirit of Nasdaq's proposed requirements; as such, we are proud to support Nasdaq's call to action through its Board Diversity Proposal.

**Investment stewardship will be well served by annual disclosures.**

As one of the world's largest investment managers, we appreciate the responsibility we have as investment stewards. In voting portfolio securities on behalf of our clients, the availability of transparent and meaningful board diversity information is essential. We believe that the Board Diversity Proposal will significantly aid our stewardship efforts and those of other industry participants.

Last year, as part of our engagement with various companies in connection with proxy voting, we urged these companies to improve their workforce diversity transparency by disclosing quantitative metrics of diversity across their workforce, senior management and board of directors. We endorse Nasdaq's push toward annual data disclosures, as it mirrors our own efforts to obtain such information.

As we believe Nasdaq's Board Diversity Proposal will advance the interests of shareholders through improved long-term value creation, we provide our support and urge the Commission to approve the proposed rule change.

Sincerely,

Shundrawn Thomas
President, Northern Trust Asset Management

[1] McKinsey & Company, "Diversity Wins: How Inclusion Matters" (May 19, 2020). https://www.mckinsey.com/featured-insights/diversity-and-inclusion/diversity-wins-how-inclusion-matters

**TAB 7:**

Comments from Alliance for Fair Board Recruitment, File No. SR-NASDAQ-2020-081 (Apr. 6, 2021)

**COMMENTS**

**submitted on behalf of**

# Alliance for Fair Board Recruitment

**Concerning the**

***The Nasdaq Stock Market LLC;***

***Notice of Filing of Proposed Rule Change to Adopt Listing Rules***

***Related to Board Diversity,***

***Amendment No. 1***

**File No. SR-NASDAQ-2020-081**

by

C. Boyden Gray
Jonathan Berry
   *Primary Contact*
Michael Buschbacher
James R. Conde
T. Elliot Gaiser
Jordan E. Smith
BOYDEN GRAY & ASSOCIATES
801 17th Street NW, Suite 350
Washington, DC 20006
202-955-0620
berry@boydengrayassociates.com

April 6, 2021

# CONTENTS

INTERESTED PARTY ................................................................. 1

INTRODUCTION ...................................................................... 1

PROCEDURAL HISTORY .......................................................... 6

COMMENT ............................................................................. 7

I.  ACADEMIC RESEARCH DOES NOT SUPPORT NASDAQ'S DIVERSITY RULE............. 7

  A.  Academic Research Does Not Show That the Female Director Rule Will Improve Corporate Performance or Investor Protections. ................................ 8

    1.  Academic research does not show that board gender diversity improves corporate performance. ........................................... 8

    2.  Academic research does not show that board gender diversity promotes investor protections................................................ 20

  B.  Academic Research Does Not Show That the Minority Director Rule Will Improve Firm Performance or Promote Investor Protections. ................ 26

    1.  Academic research has not even examined the impact of LGBTQ+ board members. ................................................. 26

    2.  Academic research does not show that board racial diversity improves firm performance or promotes investor protections.............. 28

II.  NASDAQ'S DIVERSITY RULE IS NOT A MERE "ASPIRATION," "OBJECTIVE," OR "OPPORTUNITY." ........................................................ 31

III.  NASDAQ'S DIVERSITY RULE IS INCONSISTENT WITH THE EXCHANGE ACT AND UNSUPPORTED BY SUBSTANTIAL EVIDENCE.................................. 34

  A.  Statutory Background and Standard of Review. ............................. 34

  B.  Nasdaq Fails to Show That the Diversity Rule Is Consistent With the Purposes of the Exchange Act. ............................................. 36

    1.  Nasdaq's diversity rule is not designed to prevent fraud and manipulative acts and practices. ........................................ 36

    2.  Nasdaq's diversity rule is not designed to promote just and equitable principles of trade. ............................................. 39

3.   Nasdaq's diversity rule is not designed to foster cooperation and coordination with persons engaged in regulating, clearing, settling, processing information with respect to, and facilitating transactions in securities. .......................................... 40

4.   Nasdaq's diversity rule is not designed to remove impediments to and perfect the mechanism of a free and open market and national market system. .......................................... 40

5.   Nasdaq's diversity rule is not designed to protect investors or the public interest. .......................................... 44

6.   Nasdaq's diversity rule permits unfair discrimination between issuers. .......................................... 47

7.   Nasdaq's diversity rule regulates matters unrelated to the purposes of the Exchange Act. .......................................... 49

C.   Nasdaq's Diversity and Disclosure Rules Will Burden Competition and Harm Investors. .......................................... 50

D.   Nasdaq's Justification for the Disclosure Requirement Proves It Does Not Have Substantial Evidence to Support the Diversity Rule. .......................................... 52

E.   Nasdaq's Minority Director Rule Is Arbitrary and Capricious. .......................................... 53

F.   Nasdaq's Diversity and Disclosure Rules Conflict With the SEC's Existing Regulatory Framework for Diversity Disclosures .......................................... 54

IV.   NASDAQ'S DIVERSITY RULE IS INCONSISTENT WITH TITLE VII OF THE CIVIL RIGHTS ACT AND § 1981. .......................................... 56

V.   SECTION 342 OF THE DODD-FRANK ACT IS IRRELEVANT. .......................................... 58

VI.   NASDAQ'S DIVERSITY RULE VIOLATES THE U.S. CONSTITUTION. .......................................... 59

A.   Nasdaq's Diversity Rule Is Subject to Constitutional Scrutiny. .......................................... 59

B.   Nasdaq's Diversity Rule Violates the Fifth Amendment. .......................................... 64

1.   The Proposed Female Director Rule Does Not Satisfy Heightened Scrutiny. .......................................... 64

2.   Nasdaq's Proposed Minority Director Rule Does Not Satisfy Strict Scrutiny, Heightened Scrutiny, or Rational Basis Review. .......................................... 67

C.   Nasdaq's Diversity and Disclosure Rules Violate the First Amendment. .......................................... 70

ii

D.   Default Approval of Nasdaq's Diversity Rule Would Violate the Private Non-Delegation Doctrine and the Appointments Clause. ............................... 72

E.   Approval by the Acting Director of Markets and Trading Would Violate the Appointments Clause. ................................................................. 74

F.   Commissioners Lee and Crenshaw Have Prejudged Nasdaq's Diversity Rule and Must Recuse to Preserve Due Process............................................. 75

G.   The SEC is Unconstitutionally Insulated from the President's Removal Power. ................................................................................................. 77

CONCLUSION.......................................................................................................... 78

iii

## **INTERESTED PARTY**

Alliance for Fair Board Recruitment is a non-profit membership organization incorporated under the Texas Business Organizations Code and located in Texas. The Alliance was formed to defend the civil rights of director candidates, including their right to equal protection under the law, through all lawful means.

The Alliance for Fair Board Recruitment appreciates consideration of its comments on The Nasdaq Stock Market LLC's ("Nasdaq's") *Notice of Filing of Proposed Rule Change to Adopt Listing Rules Related to Board Diversity*, File No. SR-NASDAQ-2020-081.

## **INTRODUCTION**

Responding to the calls of the "social justice movement," and dissatisfied with "the pace of progress" toward "gender parity" in corporate boardrooms, Nasdaq proposes to increase boardroom diversity in its listed companies through a "regulatory approach." Nasdaq seeks the Securities and Exchange Commission's (SEC's) approval of proposed listing rule 5605(f), requiring Nasdaq-listed companies to have (A) "at least one director who self-identifies as female," and (B) "at least one director who self-identifies as Black or African American, Hispanic or Latinx, Asian, Native American or Alaska Native, two or more races or ethnicities, or as LGBTQ+." In the alternative, Nasdaq would require listed companies to publicly "explain"—in writing—why they do not comply. Firms that fail to comply or explain after a warning would be delisted from the exchange.

The diversity rule should be disapproved because it is contrary to law, arbitrary, and unconstitutional.

*First*, Nasdaq's discriminate-or-explain command is unlawful because it fails to advance any legitimate exchange purpose. It is instead a prohibited regulation of "matters not related to the purposes" of the Exchange Act. To be lawful, Nasdaq's diversity rule must be "designed to" achieve one or more of the purposes of an exchange, like preventing fraud or protecting investors, and it may not impose unnecessary burdens on competition. But Nasdaq's rule is designed to promote board

diversity, not to prevent fraud or further any other legitimate purpose under the Exchange Act.

Nasdaq's contrary argument is unsupported by the evidence. Nasdaq's pretext is that the diversity rule will mystically improve corporate governance. But its analysis is based on misrepresentations of the evidence and defective pseudoscience by self-interested social advocacy groups and investors that is contradicted by more rigorous and scholarly meta-analyses.

Professor Jon Klick's literature review of the relevant studies, commissioned by the American Enterprise Institute, is attached as Exhibit A. Professor Klick concludes:

> The vast majority of the studies used to support the diversity regulations do not identify causal effects, and, therefore, they do not constitute reliable evidence. Among the few studies that provide valid insights into the causal effects of mandating diversity, the evidence is, at best, mixed; as a whole, the literature is more suggestive that such mandates will do little to improve firm performance and may actually generate losses for shareholders.

The SEC should review Exhibit A, as Professor Klick's literature review undermines Nasdaq's characterization of the evidence and highlights the unreasonableness of drawing any causal inferences from the existing literature on boardroom diversity.

Most studies cited by Nasdaq suffer from serious design flaws. As Professor Klick explains in detail, studies finding a correlation often exclude the control variables needed to isolate the effect of diversity on firm performance. This likely biases the results. It could be, for example, that technology firms are doing better than other firms and are also independently more likely to recruit female directors than other firms. If so, a study that fails to control for differences between technology firms and other firms would misleadingly attribute the positive performance effect of being a technology firm to the effect of recruiting a female. This form of omitted variable bias is pervasive in the boardroom diversity literature and alone makes it impossible to reasonably infer that the correlations asserted by Nasdaq are causal.

2

Yet Nasdaq's proposed rule fails to acknowledge these design problems and invites the SEC to unreasonably infer causation from fatally flawed studies lacking even the most basic controls, let alone robust controls. The SEC should decline this invitation.

Consistent with Professor Klick's literature review, our own review of the research reveals that rigorous, objective studies over the last two decades consistently show boardroom gender diversity has inconclusive effects on corporate performance or investor protections. There is little or no support to reasonably infer any causal connections given the inconsistent data, design problems, and the ambiguous correlations found in the more sophisticated studies. And there is no reliable empirical evidence of causation—not a shred—that having a minority director improves corporate performance or improves investor protections by enhancing internal controls or improving corporate auditing practices. The weakness of the empirical evidence compels the conclusion that Nasdaq's investor-protection justification is a mere pretext to engage in social justice legislation unrelated to the Exchange Act's purposes.

The SEC has been down this road before. In *Business Roundtable*, the Court of Appeals for the D.C. Circuit unanimously vacated the SEC's proxy access rule for relying on, "at best," mixed empirical evidence. The empirical evidence supporting the diversity rule in this proceeding is far weaker and, in the case of the minority director rule, non-existent. The SEC should not repeat the mistakes of the past. It should disapprove the diversity rule.

The diversity rule also fails as a matter of law because it imposes unnecessary burdens on competition, relies on arbitrary classifications and distinctions, contradicts SEC rules, and runs contrary to settled principles of federal anti-discrimination law.

*Second*, even if Nasdaq's diversity rule were legally permissible and supported by substantial evidence (and it is not), it is not permissible under the U.S. Constitution. The U.S. Constitution's Fifth Amendment prohibits federal discrimination based on sex, race, or sexual orientation except in very narrow

circumstances. To approve the proposed discrimination, the SEC would have to conclude that Nasdaq's rule survives the exacting scrutiny needed to justify the discriminatory treatment of individuals based on their sex, race, or sexual orientation. Nasdaq's pretextual interest in improving securities markets does not remotely begin to justify discriminatory classifications based on sex, race, or sexual orientation. The diversity rule would also unconstitutionally compel speech, exceed federal authority, and raise serious separation of powers concerns.

Nasdaq's principal response is that an SEC order approving exchange rules is subject to *no* constitutional restraints because listing rules are a "private contract" and not "state action." Under Nasdaq's state-action test, the SEC must have coerced or encouraged Nasdaq's diversity rule. Otherwise, the diversity rule remains a mere private "contract" with listed firms.

Nasdaq is wrong. The Supreme Court has expressly rejected Nasdaq's argument that government coercion or encouragement is a necessary element of state action. The Supreme Court instead looks at a broad host of facts to determine whether the relationship between a private entity and the state is sufficient to give rise to state action.

The relevant facts support a finding of state action in this case. Nasdaq has a right to exist as a national exchange only if the SEC concludes that its listing rules adequately discharge public regulatory functions, like preventing and punishing securities fraud. The proposed diversity rule is not enforceable without an SEC order approving it, so it qualifies as state action under *Shelley v. Kraemer*'s holding that state orders enforcing "private" racial covenants are state action. Moreover, Nasdaq would have an ongoing federal duty to enforce the diversity rule against listed companies. Nasdaq would be subject to SEC sanctions if it does not enforce the rule. This state-sanctioned and state-backed regime of discrimination falls comfortably within the scope of the Supreme Court's state action doctrine. Nasdaq's assertion that its listing rules are a mere private agreement and not state action is no different from the argument that racial covenants are mere private agreements. That argument was unanimously rejected by the Supreme Court in *Shelley v. Kraemer*. Because *Shelley*

4

*v. Kraemer* is right, Nasdaq is wrong.

Any other conclusion would greenlight the circumvention of core civil rights protections through "self-regulatory" quasi-governmental cartels. Nasdaq's state action test, if applied, would allow the SEC to approve listing rules that ban Jews, Blacks, or Catholics from serving as corporate directors with constitutional impunity. That cannot be right.

Nasdaq's alternative response is that the quota is no quota at all—it is merely an "aspiration," "objective," and even an "opportunity" for firms that can be ignored with impunity. But Nasdaq's diversity *rule* is no mere exhortation. A company that fails to comply will be banished from Nasdaq's exchange, impairing the company's value and access to capital.

To be sure, Nasdaq's rule gives issuers the "option" of publicly explaining why they do not discriminate, even if the explanation is a simple statement of disagreement with Nasdaq's diversity "philosophy." But a choice between being forced to discriminate and being forced to engage in protected speech is no constitutional choice at all. Nor is Nasdaq's "explanation" option a free lunch. As Nasdaq acknowledges and intends, the comply-or-explain rule encourages listed firms to engage in discriminatory director recruitment based on gender, race, or sexual orientation. That encouragement results from the fact that Nasdaq's "explanation" option is a functional penalty for most or all publicly traded firms. The non-compliance explanation will inflict reputational and litigation risks on firms that fail to meet Nasdaq's diversity quotas, creating a target for activist divestment campaigns or shareholder lawsuits alleging misrepresentations and breach of fiduciary duties. Firms will need to spend limited resources to hire communications consultants and attorneys (like the ones supporting the proposal) to evaluate the marketing and legal risks of providing an explanation of non-compliance instead of discriminating. Given the real costs of an explanation, Nasdaq's repeated insistence that the quota is best characterized as an aspirational "objective" is mere semantics. A choice between meeting a quota or issuing a costly non-compliance explanation does not make the quota any more constitutional. Nasdaq's quotas can be avoided, but only

5

at a price.

The SEC has no choice—it is legally bound to disapprove the proposed diversity rule.

These comments proceed as follows. Part I of the comments will review the academic literature cited by Nasdaq. Part II will explain why Nasdaq's diversity rule is not a mere "objective." Part III will explain why Nasdaq's diversity rule is unlawful and lacks substantial evidence under the Exchange Act, is arbitrary and capricious, and contradicts SEC policy. Part IV will explain why Nasdaq's diversity rule is inconsistent with core anti-discrimination principles of federal civil rights law. Part V will explain why Dodd-Frank's diversity provision is irrelevant and provides no support to Nasdaq. Part VI will explain why approval of Nasdaq's diversity rule would be unconstitutional, and why Commissioners Lee and Crenshaw are recused from this proceeding.

## PROCEDURAL HISTORY

On December 1, 2020, Nasdaq filed a notice of the proposed diversity rule with the SEC.[1] The notice was published for comment in the Federal Register on December 11.[2] On February 5, 2021, Nasdaq, through Ballard Spahr, filed a letter to the docket responding to several commenters who argued that the diversity rule was unconstitutional and violated civil rights laws.[3] On February 26, Nasdaq filed "Amendment No. 1" with the SEC, making changes to the original proposed rule, along with a response to comments.[4] On March 10, the Acting Director of Trading and Markets instituted proceedings to determine whether to approve or disapprove

---

[1] Securities Exchange Act Release No. 90574 (Dec. 4. 2020).

[2] 85 Fed. Reg. 80,472 (Dec. 11, 2020).

[3] Ballard Spahr Response Letter (Feb. 5, 2021) (Ballard Spahr Response).

[4] Nasdaq's response and Amendment 1 are available on the online SEC docket. Nasdaq, Response to Comments and Notice of Filing of Amendment No. 1, File No. SR-NASDAQ-2020-081 (Feb. 26, 2021) (Nasdaq Response), https://www.sec.gov/comments/sr-nasdaq-2020-081/srnasdaq2020081-8425992-229601.pdf.

6

the proposed rule.[5]

## COMMENT

### I.    ACADEMIC RESEARCH DOES NOT SUPPORT NASDAQ'S DIVERSITY RULE.

In reviewing the available academic research, Nasdaq makes two bold claims: (1) that "the overwhelming majority of studies" show that board diversity improves corporate financial performance[6] and (2) that "[t]here is substantial evidence that board diversity" "enhances the quality of a company's financial reporting, public disclosures and management oversight."[7]

The "overwhelming" academic consensus is fiction. Rigorous observational studies show that gender diversity has little or no discernible effect on firm performance or investor protections. At best, the available evidence is inconclusive. As for the other types of diversity favored by Nasdaq—race and LGBTQ+ identity— there is no reliable empirical evidence at all.

Professor Jonathan Klick's review in Exhibit A provides a detailed explanation for why the academic research does not support drawing causal inferences.[8] As Professor Klick explains, most or all studies are poorly designed and likely suffer from omitted variable bias, making it impossible to infer causal effects from any correlation. These comments complement his more searching analysis.

---

[5] 86 Fed. Reg. 14,484, 14,484 (Mar. 16, 2021).

[6] 85 Fed. Reg. at 80,476/3.

[7] *Id.* at 80,477/3.

[8] Also attached to these comments as Exhibit C is a spreadsheet summarizing just the studies cited by Nasdaq.

7

A.     **Academic Research Does Not Show That the Female Director Rule Will Improve Corporate Performance or Investor Protections.**

1.     **Academic research does not show that board gender diversity improves corporate performance.**

Confidently asserting that "the evidence is in,"[9] Nasdaq cites twelve sources in its academic research review[10] to support its claim "that there is a compelling body of credible research on the association between economic performance and board diversity."[11] Indeed, it asserts that "the overwhelming majority of studies" shows a positive correlation between gender diversity and corporate financial performance.[12]

Nasdaq's "compelling body of credible research" consists largely of promotional materials prepared by self-interested investment firms and advocacy groups that lack any scientific or statistical rigor. More troubling, Nasdaq misrepresents other studies to bolster its claims. An examination of Nasdaq's sources—along with the many sources Nasdaq fails to cite—shows that the impact of boardroom gender diversity on firm performance is inconclusive. The consensus is clear: the academic research has not established a positive correlation between female board directors and firm performance. Even the "mixed" studies finding a correlation are not strong evidence that having one or more women directors *causes* better financial performance, which is what Nasdaq needs to prove.[13]

Correlations are not proof of causation.[14] To reasonably infer causation from a

---

[9] *Id.* at 80,475/3 (quoting SEC Commissioner Allison Herren Lee).

[10] *Id.* at 80,475–77, Part II.A.1.II.a.

[11] *Id.* at 80,476/3.

[12] *Id.* at 80,477/2.

[13] *See Bus. Roundtable v. SEC*, 647 F.3d 1144, 1151 (D.C. Cir. 2011) (*Bus. Roundtable II*) ("In view of the admittedly (and at best) 'mixed' empirical evidence, we think the Commission has not sufficiently supported its conclusion that increasing the potential for election of directors nominated by shareholders will result in improved board and company performance and shareholder value.").

[14] Exhibit A; Daniel L. Rubinfeld, *Reference Guide on Multiple Regression*, Reference Manual on Scientific Evidence 309 (3rd ed. 2011) ("A correlation between two variables does not imply that one event causes the second"); *Norfolk & W. Ry. Co. v. Ayers*, 538 U.S. 135, 173 (2003) (Kennedy, J., concurring in part and dissenting in part) ("correlation is not causation").

correlation, and even assuming the underlying data sample is appropriate for the population and free of measurement error, Nasdaq would need to demonstrate that the studies are well designed, and all relevant variables are accounted for. One common threat to valid inferences of causation from correlation is the risk of omitted variable bias. Omitted variable bias in this context would arise if variables excluded from the board diversity regression models are correlated with both the relevant firm performance outcomes and with firm board diversity. If an excluded variable meets these conditions, then firm board diversity would "be credited with an effect that actually is caused by the excluded variable."[15] For example, if technology companies have performed better over the past decade because of factors unrelated to boardroom diversity, and technology firm boards also happen to be more diverse than average firm boards, a model that fails to control for differences between technology firms and other firms would be biased—the performance effects of being a technology firm would be falsely attributed to having a diverse board. While this omitted variable bias can often be fixed by including the variable in the model, in many cases, the identity of the omitted variable is not known, or data related to the omitted variable is not available.

A related form of error is simultaneous causality bias, which could occur if, for example, boardroom diversity causes better (or worse) firm performance, and better (or worse) firm performance also causes boardroom diversity. Simultaneous causality cannot be addressed by simply adding variables to a regression, but requires the use of more advanced techniques. One of these techniques is known as "instrumental variables" regression, which, in this case, would use a separate variable ("instrument") to try to isolate the effect of boardroom diversity from any errors caused by omitted variable or simultaneous causality bias.[16] But effectively designing instrumental variables is often very difficult, and the use of weak instruments can

---

[15] Rubinfeld, *supra* note 14, at 314.

[16] For a more detailed explanation see James H. Stock & Mark W. Watson, Introduction to Econometrics 419 (3rd ed. 2011).

also lead to misleading results.[17]

Nasdaq's studies suffer from serious design flaws, making any causal inferences unreasonable. As Professor Klick explains in greater detail in his report, most or all the studies asserting the correlations Nasdaq highlights fail to include adequate controls to isolate causal effects—and some include no controls at all.[18] Even the studies that try to isolate causation through "instrumental variables" likely suffer from serious defects.[19]

Even if the statistical evidence allowed causal inferences—and it does not—Nasdaq would still need to posit a plausible causal theory that explains why gender diversity causes better corporate performance.[20] This is important because even if there is a correlation, causality may well run in the opposite direction: it may be that firms that are doing well have more resources to hire a diverse board. The best Nasdaq can do is assert that women somehow inherently bring "fresh perspectives" or avoid "groupthink" in the boardroom.[21] But these assertions are shopworn sex stereotypes, not a testable theory of causation.[22]

> a. **Does it matter that most of Nasdaq's statistical sources are academically substandard? "The answer to this question is an emphatic yes."**

Of the twelve sources cited by Nasdaq as "suggesting a positive association between diversity and shareholder value,"[23] only two were subject to peer review.[24]

---

[17] *Id.* at 438–39.

[18] Exhibit. A.

[19] *Id.*

[20] Rubinfeld, *supra* note 14, at 310.

[21] 85 Fed. Reg. at 80,472/2, 80,479.

[22] Karl R. Popper, Conjectures and Refutations: The Growth of Scientific Knowledge 37 (5th ed. 1989) ("[T]he criterion of the scientific status of a theory is its falsifiability, or refutability, or testability").

[23] 85 Fed. Reg. at 80,475/3.

[24] David A. Carter et al., *Corporate Governance, Board Diversity, and Firm Value*, 38 Fin. Rev. 33 (2003) ("Carter 2003"), *cited at* 85 Fed. Reg. at 80,476 n.27; Bernile et al., *Board Diversity, Firm*

10

The remainder of Nasdaq's "studies" include: one report from an investor ratings agency,[25] seven surveys from investment groups or consulting firms,[26] and two publications from gender and LGBTQ+ advocacy groups.[27]

These self-interested studies are unreliable. As noted gender diversity scholar Alice Eagly of Northwestern has observed:

> Advocates are often ideologically polarized players who eagerly invoke social scientific data that support their objectives but whose use of science can be selective and thus unrepresentative of the available scientific knowledge. . . . [Relying on] reports from advocacy and consulting organizations [that compare] groups of firms that differ[] in the gender diversity of their corporate boards . . . [is problematic, in part] because of the elementary form of their data presentations. Such group comparisons do not reveal the strength of the relation between the participation of women and financial success [of the firm]. [Such] analyses lack[] even correlations relating the percentages of women on corporate boards to corporate outcomes or simple scatter plots of these relationships. Such studies do not meet the standards of the relevant academic disciplines, which are economics and management. Does it

---

*Risk, and Corporate Policies* (Mar. 2017), *cited at* 85 Fed. Reg. at 80,476 n.28. Though Nasdaq cites Bernile's unpublished white paper, the white paper was published in substantially similar form in a peer-reviewed journal. Bernile et al., *Board diversity, firm risk, and corporate policies*, 127 J. Fin. Econ. 588 (2018).

[25] Moody's Investors Service, *Gender Diversity is Correlated with Higher Ratings, but Mandates Pose Short-Term Risk* (Sept. 11, 2019), *cited at* 85 Fed. Reg. at 80,476 n.37.

[26] Jason M. Thomas & Megan Starr, *From Impact Investing to Investing for Impact*, The Carlyle Group (Feb. 2019), *cited at* 85 Fed. Reg. at 80,475 n.23; Ariel F. Babcock et al., *The Long-term Habits of a Highly Effective Corporate Board*, FCLT Global (Mar. 2019), *cited at* 85 Fed. Reg. at 80,475 n.25; Vivian Hunt et. al, *Diversity Matters*, McKinsey & Company (Feb. 2015) ("2015 McKinsey Report"), *cited at* 85 Fed. Reg. at 80,476 n.26; Richard Kerlsley et al., *The CS Gender 3000: Women in Senior Management*, Credit Suisse (Sept. 2014), *cited at* 85 Fed. Reg. at 80,476 n.30; Meggin Thwing Eastman et al., *The Tipping Point: Women on Boards and Financial Performance*, MCSI (Dec. 2016), *cited at* 85 Fed. Reg. at 80,476 n.31; Credit Suisse ESG Research, *LGBT: The Value of Diversity* (Apr. 2016), *cited at* 85 Fed. Reg. at 80,476 n.33; Vivian Hunt et al., *Diversity Wins: How Inclusion Matters*, McKinsey & Company (May 2020) ("2020 McKinsey Report"), *cited at* 85 Fed. Reg. at 80,476 n.37.

[27] Nancy M. Carter & Harvey M. Wagner, *The Bottom Line: Corporate Performance and Women's Representation on Boards (2004-2008)*, Catalyst (2011) ("Catalyst Report"), *cited at* 85 Fed. Reg. at 80,476 n.32; Quorum, *Out Leadership's LGBT+ Board Diversity and Disclosure Guidelines (2019)*, *cited at* 85 Fed. Reg. at 80,476 n.35.

matter that the studies are academically substandard? The answer to this question is an emphatic yes.[28]

Of the eleven sources we accessed,[29] fewer than half (five) performed even the most basic statistical analysis—a determination whether their results were "statistically significant"—the minimum necessary to assert that the results did not arise purely by chance.[30] Determining that an effect is "statistically significant" does not mean that the correlation is strong or causal, but merely that, based on a statistical analysis of the collected data, it is unlikely to have arisen by random chance.

To be clear, statistical significance is just one very basic test of statistical rigor, and the threshold of statistical significance does not suffice to draw any reasonable causal inferences from a study. Statistical significance does not tell you whether an observational study is well designed, or well controlled for, or if the results have been cherry-picked. But it at least allows one to assert that the observed correlations are likely not random. The sources that do not evaluate statistical significance cannot reasonably be used as evidence of any correlation between firm performance and gender diversity, since the correlation may result from pure chance. Nasdaq's reliance

---

[28] Alice H. Eagly, *When Passionate Advocates Meet Research on Diversity, Does the Honest Broker Stand a Chance?* 72 J. Social Issues 199, 200–01 (2016).

[29] The Moody's Investment Services report, cited at 85 Fed. Reg. at 80,476 n.37, appears to be available only to subscribers. Because Moody's secret science is not available for public examination, it is not appropriately considered as evidence in the record. *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 237 (D.C. Cir. 2008) ("It would appear to be a fairly obvious proposition that studies upon which an agency relies in promulgating a rule must be made available during the rulemaking in order to afford interested persons meaningful notice and an opportunity for comment.").

[30] "Statistical significance" refers to the probability that the results could have arisen by random chance. David H. Kaye & David A. Freedman, *Reference Guide on Statistics*, Reference Manual on Scientific Evidence 249–50 (3rd ed. 2011). The statistical significance of an observed effect is often measured by calculating the effect's "$p$-value." "Large $p$-values indicate that a disparity can easily be explained by the play of chance: The data fall within the range likely to be produced by chance variation. On the other hand, if $p$ is very small, something other than chance must be involved." *Id.* at 250. Commonly, a threshold of 0.05 (5%) is used (i.e., if an effect has a $p$-value < 0.05, it is considered statistically significant). *Id.* at 251. The six sources that did not report the statistical significance of their findings are: Thomas, *supra* note 26; Babcock, *supra* note 26; Kerlsley, *supra* note 26; Eastman, *supra* note 26; Credit Suisse ESG Research, *supra* note 26; Quorum, *supra* note 27.

on these studies is misplaced.

The 2019 Wall Street Journal study Nasdaq cites in its response to comments similarly falls short.[31] The study rates companies using a complex composite diversity score—of which board gender diversity is only a small component. The study provides no analysis of the statistical significance of its results, and it fails to establish any causal link between diversity and firm performance.[32]

### b.     Nasdaq mischaracterizes study results, omitting findings that show boardroom gender diversity does not improve firm performance.

Many of the remaining studies Nasdaq relies on have significant defects, like failing to control for firm differences, that render any causal conclusions entirely unreliable.[33] Even if one accepts these study's correlations as credible—and they are often not—Nasdaq's selective reporting of their findings obscures an unavoidable conclusion: the evidence in the literature simply does not establish whether board gender diversity causes any change in firm performance. It remains equally plausible to believe that the correlations highlighted by Nasdaq are spurious or that causality runs in the opposite direction.

Nasdaq cites the 2003 study by Carter et al. for its contention that board diversity improves shareholder value, quoting that study as finding a "statistically significant positive relationship[] between the presence of women . . . on the board and firm value."[34] But that study's finding is counterbalanced by a later 2010 report by the same authors that comes to a different conclusion.[35] Examining data from 641 unique S&P 500 firms, the 2010 study found "no evidence of a significant link between

---

[31] Nasdaq Response to Comments 9.

[32] *See* Dieter Holger, *The Business Case for More Diversity*, WSJ (Oct. 26, 2019); *How the WSJ Research Analysts' Diversity and Inclusion Rankings Were Compiled*, WSJ (Oct. 26, 2019).

[33] *See* Exhibit A.

[34] 85 Fed. Reg. at 80,476/1.

[35] David A. Carter, et al*., The Gender and Ethnic Diversity of US Boards and Board Committees and Firm Financial Performance*, 18 Corp. Governance 396 (2010) ("Carter 2010").

13

Tobin's Q [a measure of firm value] and the number of women directors."[36] Nor do any of the authors' "regression models indicate a significant relationship between Tobin's Q and the number of women directors on a board committee."[37] This is in contrast to their observation of a positive link "between the number of women on the board and [return on assets]," another measure of firm performance.[38] Summarizing the mixed results, the 2010 study concludes, "[o]ur statistical analysis supports the theoretical position of no effect, either positive or negative," of gender diversity on firm financial performance.[39]

Nasdaq goes on to cite the 2017 white paper by Bernile et al. as finding that board diversity "is associated with increased operating performance, higher asset valuation multiples, lower stock return volatility, reduced financial leverage, increased dividend payouts to shareholders, higher investment in R&D and better innovation."[40] But that white paper measures "diversity" using a custom composite index based on six director characteristics—age, gender, ethnicity, financial expertise, number of directorships, and educational background.[41] The white paper's authors are unable to isolate a statistically significant beneficial association between any particular index characteristic and firm performance and instead conclude that it is "the joint effect of different aspects of board diversity that matters for firm risk, as opposed to any single aspect."[42] Nasdaq cannot disentangle any "joint effect," so its assertion that a director improves firm performance merely as a result of her gender, race, or sexual orientation is not supported by the Bernile results.

Nasdaq also fails to note that Bernile further concludes that board diversity— as measured by the composite diversity index—is not beneficial to all firms in all

---

[36] *Id*. at 407. Tobin's Q "is the market value of the firm's assets divided by the replacement value of the firm's assets." *Id*. at 403.

[37] *Id*. at 407.

[38] *Id*. at 408.

[39] *Id*. at 396.

[40] 85 Fed. Reg. at 80,476/1.

[41] Bernile, *supra* note 24, at 2–3.

[42] *Id*. at 21–24.

14

circumstances. Instead, the authors observe that board diversity may be detrimental to firms operating in more volatile markets,[43] suggesting that listing rules aimed at pressuring firms into adopting certain kinds of diversity practices may be detrimental to some firms' performance.

Nasdaq also cites two reports by consulting firm McKinsey as evidence that diverse boards improve firm performance. While Nasdaq describes a 2015 McKinsey Report's results on racial diversity,[44] it fails to note that report's finding that board gender diversity does not have a statistically significant impact on firm financial returns.[45] And Nasdaq quotes a later 2020 McKinsey Report as showing "a positive, statistically significant correlation between company financial outperformance and [board] diversity on the dimensions of both gender and ethnicity."[46] This is, however, the first time across several years of studies that McKinsey has found the correlation to be statistically significant.[47] And McKinsey qualifies its results by cautioning: "Correlation is not causation. There are real limitations, and we are not asserting a causal link."[48] Given the mixed and inconclusive results of these studies, more data is needed before any reasonable inferences can be drawn regarding the causal effect of gender board diversity on firm performance.[49]

Finally, Nasdaq cites a 2011 report from women's advocacy group Catalyst as finding "that the [return on equity] of Fortune 500 companies with at least three women on the board (in at least four of five years) was 46% higher than companies with no women on the board, and the return on sales and return on invested capital

---

[43] *Id.* at 24 (writing that their results "indicate that board diversity exacerbates the effects of market-wide volatility on firm risk").

[44] 85 Fed. Reg. at 80,476/1.

[45] 2015 McKinsey Report, *supra* note 26, at 4, Ex. 3. For all firms, the *p*-value for the effect of gender board diversity is 0.11. For North American firms, the *p*-value is 0.69. Both are above even the relaxed threshold of $p < 0.10$ for determining statistical significance. *Id.*

[46] 85 Fed. Reg. at 80,476/3.

[47] 2020 McKinsey Report, *supra* note 26, at 13, Box 2.

[48] *Id.* at 51.

[49] Exhibit A (reviewing McKinsey study and concluding that correlations do not allow causal inferences).

15

was 84% and 60% higher, respectively." But Nasdaq fails to note that Catalyst found that the difference in return on equity was "no[t] statistically significant," that the differences in return on sales and returns on invested capital were only marginally significant, and that the study did not include controls for relevant firm characteristics that may obscure the real effect of board diversity.[50] In any event, the Catalyst study lacks even basic controls and is therefore entirely unreliable as evidence of causation.[51]

### c. Nasdaq downplays the substantial—and scientifically rigorous—body of peer-reviewed research that shows board gender diversity does *not* improve firm performance.

Nasdaq also downplays the robustness of the studies that show "mixed" results and fails to report numerous additional peer-reviewed studies that counter its core claim that board gender diversity improves firm performance. An objective evaluation would conclude that the body of literature showing that board gender diversity has little to no impact on firm performance is far more substantial than the sources Nasdaq cites to support its diversity rule.

All six studies that Nasdaq cites as showing "mixed" results are published in peer-reviewed, academic journals and perform—or review—research that applied rigorous statistical methods.[52] Two of the six are meta-analyses that examine the

---

[50] Catalyst Report, *supra* note 27, at 2. The differences in return on sales and return on invested capital had p-values of 0.06 and 0.07, respectively. *Id*. While Catalyst finds these effects to be statistically significant under the less rigorous p-value < 0.10 threshold, under standard analyses with p-value < 0.05 as the threshold, the differences Catalyst finds in return on sales and return on invested capital would not be considered significant. *See also* Exhibit A at 10.

[51] Exhibit A.

[52] Nasdaq cites the following six studies as showing "mixed" results: Jan Luca Pletzer et al. *Does Gender Matter? Female Representation on Corporate Boards and Firm Financial Performance—A Meta-Analysis*, 10 PLOS ONE (2015), *cited in* 85 Fed. Reg. at 85,476 n.38; Eagly, *supra* note 28, *cited in* 85 Fed. Reg. at 85,476 n.38; Corinne Post & Kris Byron, *Women on Boards and Firm Financial Performance: A Meta-Analysis*, 58 Acad. of Mgmt. J. 1546 (2015), *cited at* 85 Fed. Reg. at 80,477 n.39; Carter 2010, *supra* note 24, *cited at* 85 Fed. Reg. at 80,477 n.40; Kevin Campbell & Antonio Minguez-Vera, *Gender Diversity in the Boardroom and Financial Performance*, 83 J. Bus. Ethics 13 (2008), *cited at* 85 Fed. Reg. at 80,477 n.41; Renee B. Adams & Daniel Ferreira, *Women in the Boardroom and their Impact on Governance and Performance*, 94 J. Fin. Econ. 291 (2009), *cited at* 85 Fed. Reg. at 80,477 n.42.

16

literature in aggregate—one (Pletzer) evaluated twenty peer-reviewed, published academic studies, and the other (Post) evaluated 146 published and unpublished studies. While meta-analyses are not without limitation, appropriately conducted meta-analyses are generally considered more informative than single studies or narrative reviews because they can "powerfully test hypotheses that cannot be answered clearly with one or a few studies and [can] eliminate[] the ambiguity" that may result from narrative reviews.[53] In the social sciences, meta-analyses can be particularly useful "to clarify the state of a field of research," to "determine whether an effect is constant across studies," and "to discover what study-level or sample characteristics have an effect on the phenomenon being studied."[54] Meta-analyses thus can bear considerably more persuasive weight than individual studies or informal surveys.

Both the Pletzer and Post meta-analyses perform systematic statistical evaluations of relevant studies, and both conclude that gender-diverse boards have little to no impact on firm performance. Pletzer observes that "the relationship between the percentage of female directors on corporate boards and firm financial performance is consistently small and non-significant" and that its meta-analysis results "show that a higher representation of females on corporate boards is neither related to a decrease, nor to an increase in firm financial performance. . . . These results do not support the business case for diversity."[55] Post similarly observes that its meta-analysis "suggest[s] that firms with greater female board representation tend to have [slightly] higher accounting returns," but that, "in general, female board representation is not significantly related to market performance."[56] The Post authors reiterate the mixed nature of their findings, emphasizing that their "results suggest that board diversity is neither wholly detrimental nor wholly beneficial to

---

[53] Bruce E. Wampold et al., *Meta-analysis in the Social Sciences: A Useful Way to Make Sense of a Series of Findings from a Large Number of Studies*, 1 Asia Pacific Educ. Rev. 67, 67 (2000).

[54] Jacqueline Davis et al., *Viewing Systematic Reviews and Meta-Analysis in Social Research Through Different Lenses*, 3 SpringerPlus 511, 511 (2014).

[55] Pletzer, *supra* note 52, at 13.

[56] Post, *supra* note 52, at 1557.

17

firm financial performance."[57]

The conclusions of these meta-analyses are consistent with expert reviews. Wharton Professor Katherine Klein, an avowed proponent of gender diversity in the boardroom, candidly summarizes the statistical evidence on gender diversity and corporate performance as follows:

> Rigorous, peer-reviewed studies suggest that companies do not perform better when they have women on the board. Nor do they perform worse. Depending on which meta-analysis you read, board gender diversity either has a very weak relationship with board performance or no relationship at all.[58]

Nasdaq acknowledges that the 2010 Carter paper, described above, shows no statistically significant effect of boardroom gender diversity on firm performance when measured by Tobin's Q,[59] but then glosses over the findings of a 2008 study by Campbell et al. by stating only that the study "suggests, at a minimum, that increased gender diversity can be achieved without destroying shareholder value."[60] Campbell, however, goes beyond that milquetoast assessment, asserting that its "findings demonstrate that the presence of women on the board of directors does not, in itself, affect firm value."[61]

Nasdaq similarly acknowledges that the 2009 study by Adams and Ferreira "found that 'gender diversity has beneficial effects in companies with weak shareholder rights, where additional board monitoring could enhance firm value, but detrimental effects in companies with strong shareholder rights.'"[62] But Nasdaq fails

---

[57] *Id.* at 1563.

[58] Social Impact, Does Gender Diversity on Boards Really Boost Company Performance (May 18, 2017), https://knowledge.wharton.upenn.edu/article/will-gender-diversity-boards-really-boost-company-performance/.

[59] 85 Fed. Reg. at 80,477/1.

[60] *Id.*

[61] Campbell, *supra* note 52, at 447. The study authors go on to report, however, that they "find that the diversity of the board (measured by the percentage of women . . .) has a positive impact on firm value," underscoring the contradictory and inconclusive nature of the results in this field. *Id.*

[62] 85 Fed. Reg. at 80,477/1.

18

to note that study's relevant finding "that, on average, firms perform worse the greater is the gender diversity of the board."[63]

In addition to downplaying the significance of "mixed" result reports, Nasdaq omits from its academic review many peer-reviewed sources that show board gender diversity has no—or even a negative—impact on firm performance.[64] Highlighting results from just a few of these sources: a 1997 study of large U.S. firms found that the "[p]ercentage of women on the board [actually] decreases [firm] performance," whether performance is measured by return on sales, return on assets, return on investment, or return on equity;[65] a 2005 study found that "there is no wealth effect [in market returns] associated" with announcements adding women to boards of Fortune 500 companies and no discernible "link [between] increased representation of women on corporate boards [and] expectations of enhanced firm performance;"[66] and a 2009 study of Fortune 500 companies found no statistically significant effect of board gender diversity on firm performance, where performance was measured by a composite metric.[67] Countless other studies have similarly been unable to establish a robust link between board gender diversity and improved firm performance.[68]

---

[63] Adams, *supra* note 52, at 292.

[64] Many of the studies showing no or negative correlation between board diversity and firm performance are cited in and described by the sources that Nasdaq selectively includes, suggesting that Nasdaq was, or should have been, aware of these negative studies. *See, e.g.,* Carter 2010, *supra* note 24, at 399–400.

[65] Charles B. Shrader et al., *Women in Management and Firm Financial Performance: An Exploratory Study*, 9 J. of Managerial Issues 355, 364 (1997).

[66] Kathleen A. Farrell et al., *Additions to Corporate Boards: The Effect of Gender*, 11 J. of Corp. Fin. 85, 104 (2005).

[67] Toyah Miller & Mira del Carmen Triana, *Demographic Diversity in the Boardroom: Mediators of the Board Diversity-Firm Performance Relationship*, 46 J. of Mgmt. Stud. 755, 770, Tbl. I. The same study found a positive statistically significant correlation between board racial diversity and firm performance. *Id.*

[68] *See, e.g.,* Amit Kumar Singh, et al., *Do Women on Boards affect Firm's Financial Performance? Evidence from Indian IPO Firms*, 13 Australasian Acct. Bus. & Fin. J. 53, 64 (2019) (finding that "[t]he presence of women on boards [of 41 Indian companies that recently went through IPOs] does not influence Tobin's Q and hence the performance" of the firm); Ian Gregory-Smith et al., *Appointments, Pay and Performance in UK Boardrooms by Gender*, 124 Econ. J. F109, F122–23 (2014) (finding that "there is no significant link between [firm performance as measured by

19

## 2.    Academic research does not show that board gender diversity promotes investor protections.

Nasdaq further claims, in both its academic research review and its defense of its statutory authority to impose the diversity rule, "that board diversity is positively associated with more transparent public disclosures and higher quality financial reporting"[69] and thus promotes investor protections because it "may reduce the likelihood of . . . fraudulent and manipulative acts and practices."[70] But this claim is also uncorroborated by the available empirical evidence. Nasdaq again relies on unrepresentative sources—here, studies of firms based outside the United States—and selective reporting of results to mask the weakness of the support.

---

shareholder return, return on assets, return on equity and the price to book ratio] and the extent of boardroom gender diversity" in a study of UK companies listed on the FTSE350); Kenneth R. Ahern & Amy K. Dittmar, *The Changing of the Boards: The Impact on Firm Valuation of Mandated Female Board Representation,* 127 Q. J. Econ. 137, 139 (2012) (evaluating the effect of a 2003 Norwegian law mandating at least 40% female board representation and finding "a large negative impact of the mandated board changes on firm value" of 248 Norwegian firms); Yi Wang & Bob Clift, *Is There a "Business Case" for Board Diversity?*, 21 Pac. Acct. Rev. 88, 95 (2009) (finding "no statistically significant association between [return on assets, return on equity] and shareholder return, and the percentage of female members on the board" or the proportion of minority directors of large Australian companies); Claude Francoeur et al., *Gender Diversity in Corporate Governance and Top Management,* 81 J. of Bus. Ethics 83, 93 (2007) (analyzing large Canadian firms and finding that "having more women on corporate boards . . . does not seem to generate significant excess returns"); Caspar Rose, *Does female board representation influence firm performance? The Danish evidence*, 15 Corp. Governance 404, 411 (2007) (finding "that gender in relation to board composition does not influence firm performance" among Danish companies); Nina Smith, *Do women in top management affect firm performance? A panel study of 2,500 Danish firms*, 55 Int'l J. of Productivity and Performance Mgmt., 569, 579, 581, tbl. IV (2006) (finding a "significantly negative" correlation between the presence of female directors and firm performance in a study of 2,500 large Danish firms when unobserved variables are controlled for); *see also* Suheer Reddy & Aditya Mohan Jadjav, *Gender Diversity in Boardrooms—A Literature* Review, 7 Cogent Econ. & Fin. 1644703, 1 (2019) (reviewing the available literature and concluding that "[s]tudies on the impact of board gender diversity on firm performance present inconclusive results"); Deborah L. Rhode & Amanda K. Packel, *Diversity on Corporate Boards: How Much Difference Does Difference Make*, 39 Del. J. Corp. L. 377, 383 (2014) ("Despite increasing references to acceptance of the business case for diversity, empirical evidence on the issue is mixed."); Frank Dobbin & Jiwook Jung, *Corporate Board Gender Diversity and Stock Performance: The Competence Gap or Institutional Investor Bias*, 89 N.C. L. Rev. 809, 817 (2011) (reviewing the available board gender diversity literature and concluding, "[t]he overall pattern of findings across the several dozen studies that have been published to date tends to support the view that gender diversity inhibits performance").

[69] 85 Fed. Reg. at 80,498/3.

[70] *Id.* at 80,497/1; *see also* Academic Research on Diversity and Investor Protection, *id.* at 80,477–79 (Part II.A.1.II.b); Statutory Basis for the Diverse Board Representation or Explanation, Prevent Fraudulent and Manipulative Acts and Practices, *id.* at 80,497–98 (Part II.A.2.II.b).

20

### a.    Nasdaq cannot apply results of studies of foreign firms to predict effects on the U.S. companies subject to the proposed diversity rule.

In its academic research review, Nasdaq cites thirteen studies as "substantial evidence that board diversity enhances the quality of a company's financial reporting, internal controls, public disclosures and management oversight."[71] However, at least five of these studies analyze only foreign firms that operate in legal and cultural environments that differ substantially from the United States.[72]

Three of Nasdaq's sources (Pucheta-Martinez, Abad, and Lucas-Perez) analyze only Spanish companies,[73] one (Gull) analyzes only French companies,[74] and another (Cumming) analyzes only Chinese companies.[75] The authors of these reports emphasize the unique country-specific features that prevent extrapolation of

---

[71] 85 Fed. Reg. at 80,477–79. The thirteen studies cited by Nasdaq are: Adams, *supra* note 52, *cited at* 85 Fed. Reg. at 80,477 n.49; Bin Srinidhi et al. *Female Directors and Earnings Quality*, 28 Contemporary Acct. Research 1610 (2011), *cited at* 85 Fed. Rev. at 80,477 n.50; Maria Consuelo Pucheta-Martinez et al., *Corporate Governance, Female Directors and Quality of Financial Information*, 25 Bus. Ethics: A European Rev. 363 (2016), *cited at* 85 Fed. Reg. at 80,478 n.52; Ammar Gull et al., *Beyond Gender Diversity: How Specific Attributes of Female Directors Affect Earnings Management*, 50 British Acct. Rev. 255 (Sept. 2017), *cited at* 85 Fed. Reg. at 80,478 n.55; Francisco Bravo and Maria Dolores Alcaide-Ruiz, *The Disclosure of Financial Forward-Looking Information, 34 Gender in Management* 140, 147 (2019), *cited at* 85 Fed. Reg. at 80,478 n.56; Lawrence J. Abbott et al., *Female Board Presence and the Likelihood of Financial Restatement*, 26 Acct. Horizons 607 (2012), *cited at* 85 Fed. Reg. at 80,478 n.58; Aida Sijamic Wahid, *The Effects and the Mechanisms of Board Gender Diversity: Evidence from Financial Manipulation*, 159 J. Bus. Ethics 705 (2019), *cited at* 85 Fed. Reg. at 80,478 n.59; Douglas J. Cumming et al., *Gender Diversity and Securities Fraud*, 58 Acad. of Mgmt. J. 1572 (2015), *cited at* 85 Fed. Reg. at 80,478 n.62; Yu Chen et al., *Board Gender Diversity and Internal Control Weaknesses*, 33 Advances in Acct. 11 (2016), *cited at* 85 Fed. Reg. at 80478 n.64; Ferdinand Gul et al., *Does Board Gender Diversity Improve the Informativeness of Stock Prices?*, 51 J. Acct. & Econ. 314 (2011), *cited at* 85 Fed. Reg. at 80,478 n.66; David Abad et al., *Does Gender Diversity on Corporate Boards Reduce Information Asymmetry in Equity Markets?* 20 Bus. Res. Q. 192 (2017), *cited at* 85 Fed. Reg. at 80,479 n.67; Maria Encarnacion Lucas-Perez et al., *Women on the Board and Managers' Pay: Evidence from Spain*, 129 J. Bus. Ethics 285 (2014), *cited at* 85 Fed. Reg. at 80,479 n.69; James D. Westphal & Edward J. Zajac, *Who Shall Govern? CEO/Board Power, Demographic Similarity, and New Director Selection*, 40 Admin. Sci. Q. 60 (1995), *cited at* 85 Fed. Reg. at 80,479 n.71.

[72] Pucheta-Martinez, *supra* note 71; Gull, *supra* note 71; Cumming, *supra* note 71; Abad, *supra* note 71; Lucas-Perez, *supra* note 71.

[73] Pucheta-Martinez, *supra* note 71; Abad, *supra* note 71; Lucas-Perez, *supra* note 71.

[74] Gull, *supra* note 71.

[75] Cumming, *supra* note 71.

21

corporate trends across borders. Pucheta-Martinez observes that the business context in Spain is "characterized by less developed capital markets," considerably greater "ownership concentration[,] . . . lower level[s] of protection for minority investors and a stronger presence of majority shareholders" than in Anglo-Saxon countries, factors which could be expected to influence corporate response to board composition.[76] Abad observes that "the separation between owners and managers is much less clear [in Spain] than in the US or UK," which could "give rise to a lack of independence and supervisory effectiveness of the board" that varies with board diversity.[77] Cumming notes that, "[u]nlike U.S. companies, . . . Chinese and European companies have a two-tiered board structure consisting of a supervisory board and a board of directors" and fewer independent directors, which may be expected to affect the board's influence on corporate practices.[78] Even in countries as similar as the U.K. and the U.S., board gender diversity has been shown to have significantly different effects: the 2015 McKinsey Report observes that "UK companies experience more than ten times the impact for their efforts in gender diversity than US companies do."[79]

Conclusions based on data from firms in countries with widely different corporate and legal cultures cannot be used to support inferences about effects in U.S. firms. But to support its claim that "including diverse directors . . . may help detect and prevent fraudulent and manipulative acts and practices,"[80] Nasdaq relies *primarily* on foreign-firm data, citing extensively from a case study of Norwegian directors,[81] an analysis of Spanish-listed firms,[82] and a study of Chinese companies.[83] Nasdaq fails to explain why these foreign studies can be reliably used to make useful

---

[76] Pucheta-Martinez, *supra* note 71, at 365.

[77] Abad, *supra* note 71, at 193–94.

[78] Cumming, *supra* note 71, at 1577.

[79] 2015 McKinsey Report, *supra* note 26, at 4.

[80] 85 Fed. Reg. at 80,497/1.

[81] *Id*. at 80,497/2 (citing Aaron A. Dhir, *Challenging Boardroom Diversity: Corporate Law, Governance, and Diversity* (2015)).

[82] *Id*. at 80,497/2 (citing Pucheta-Martinez, *supra* note 71).

[83] *Id*. at. 80,497/3 (citing Cumming, *supra* note 71).

predictions about U.S. issuers.

### b. Nasdaq selectively omits results that show board gender diversity has little to no effect on investor protections.

Nasdaq further masks the weakness of its claim by selectively omitting results that show that board diversity has little to no effect on the quality of corporate reporting. When all study results are considered, the evidence that a board's gender composition improves investor protections is weak at best.

To support its claim that the diversity rule "may help detect and prevent fraudulent and manipulative practices,"[84] Nasdaq describes results from two studies, Wahid and Abbott, that evaluated U.S.-based firms.[85] But Nasdaq failed to describe other results from those same studies that show the effects of board gender diversity are complex and limited, making it unreasonable to assume that the proposed rule is likely to have a causal effect on fraud.

Nasdaq quotes Wahid as concluding that "gender-diverse boards commit fewer financial reporting mistakes and engage in less fraud" and as finding "that companies with female directors have 'fewer irregularity-type [financial] restatements, which tend to be indicative of financial manipulation.'"[86] But Nasdaq fails to report that Wahid also observes that "[a]s the number of female directors increases, the benefit of diversity reverses,"[87] meaning that the quality of financial reporting actually *decreases* when more than two women are on the board.[88] This contradiction is difficult to explain if the diversity correlations observed in the study have some causal explanation. Moreover, while Wahid attempts to isolate causation through instrumental variables, Professor Klick cautions that the instrumental variables

---

[84] *Id.* at 80,497/1.

[85] 85 Fed. Reg. at 80,497–98 (citing Wahid, *supra* note 71, and Abbott, *supra* note 71).

[86] *Id.* at 80,497/3.

[87] Wahid, *supra* note 71, at 706.

[88] *Id.* at 718–20.

chosen may be weak, "leaving the estimates without credibility."[89] Nasdaq, though, just ignores the problem.

Similarly, Nasdaq states that Abbott finds "a significant association between the presence of at least one woman on the board and a lower likelihood of [a material financial] restatement,"[90] but fails to note that Abbott, like Wahid, finds no benefit to adding more than one female director.[91] And as Professor Klick explains, the study's methodology does not adequately address the risk of omitted variable bias, so the correlations cannot be deemed causal.[92] The complex and contradictory correlations on board gender composition, and the design flaws in the studies cited by Nasdaq, highlight the infirmity of Nasdaq's claim that adding directors based on gender, racial, and sexual orientation characteristics will mystically improve corporate reporting or protect investors.

Nasdaq similarly fails to provide important context for the other findings it reports in its academic research review, context that significantly weakens its argument that gender-diverse boards improve corporate governance. For example, Nasdaq notes that the 2009 Adams and Ferreira study "found that women are 'more likely to sit on'" audit committees[93] and that boards with more women directors "are more likely to hold CEOs accountable for poor stock price performance" and result in "CEO turnover [that] is more sensitive to stock return performance."[94] But that same study states that, though their "results suggest that gender-diverse boards are tougher monitors,"[95] their results also "imply that, on average, tough boards do not improve firm value."[96] The authors warn that "mandating gender quotas in the

---

[89] Exhibit A.

[90] 85 Fed. Reg. at 80,499/3.

[91] Abbott, *supra* note 71, at 626.

[92] Exhibit A.

[93] 85 Fed. Reg. at 80,477/3.

[94] *Id*. at 80,479/1.

[95] Adams, *supra* note 52, at 293.

[96] *Id*. at 306.

boardroom could harm well-governed firms in which additional monitoring is counterproductive."[97]

Nasdaq suggests that a 1995 study by Westphal and Zajac supports its claim that boards with more diverse gender, racial, and LGBTQ+ membership are better corporate stewards, quoting that study's finding "that 'increased demographic similarity between CEOs and the board is likely to result in more generous CEO compensation contracts.'"[98] But Westphal's "demographic similarity" consists of functional background, educational background, insider/outsider status, and age;[99] it does not include any of the demographic categories—gender, race, and LGBTQ+ identity—that Nasdaq includes in its diversity rule. And, despite its hints and implications, Nasdaq provides no evidence that trends related to diverse experiential and educational backgrounds can be extended to diverse gender, race, or LGBTQ+ identity characteristics. Intimation cannot cover category error.

Nasdaq also suggests that a 2019 study by Bravo and Alcaide-Ruiz supports the diversity rule because it "found a positive association between women on the audit committee with financial or accounting expertise and the voluntary disclosure of forward-looking information."[100] But that study's critical finding is that women directors have no effect *unless they have financial expertise*; a director's gender alone, is inconsequential: "gender diversity on the [audit committee] does not make a difference in the disclosure of financial forward-looking information."[101] Indeed, the Bravo authors observe that their "results fail to find an association between the presence of women in the [audit committee] and the disclosure of financial forward-looking information" and that it is "the financial expertise of women in the [audit committee that] appears to be determinant for disclosure strategies," not the mere

---

[97] *Id.* at 293. The authors also observe that "gender diversity has beneficial effects in companies with weak shareholder rights, where additional board monitoring could enhance firm value, but detrimental effects in companies with strong shareholder rights." *Id.* at 292.

[98] 85 Fed. Reg. at 80,479/1.

[99] Westphal, *supra* note 71, at 69–70.

[100] 85 Fed. Reg. at 80,499/1.

[101] Bravo, *supra* note 71, at 147.

fact of the board members' gender.[102] They reiterate that their "findings suggest that intrinsic characteristics linked to women appear to be insufficient for [audit committees] that include women to enhance voluntary disclosures on financial forward-looking information . . . *gender per se seems to be not enough to have an effect on particular reporting policies*."[103]

## B. Academic Research Does Not Show That the Minority Director Rule Will Improve Firm Performance or Promote Investor Protections.

Nasdaq lumps gender, racial, and LGBTQ+ differences into the single term "board diversity" to mask the fact that the empirical evidence to support racial and LGBTQ+ board diversity quotas is non-existent. The reports Nasdaq cites overwhelmingly investigate gender diversity alone, with only a handful examining racial diversity and not a single report studying LGBTQ+ board diversity. Nasdaq provides no empirical basis for concluding that correlations for female directors would hold true for race or LGBTQ+ identity.

### 1. Academic research has not even examined the impact of LGBTQ+ board members.

Nasdaq fails to present any evidence that LGBTQ+ board diversity improves firm performance, reporting, or governance.

Not one of Nasdaq's sources examined the performance or governance of firms with LGBTQ+ board members. Nasdaq cites only two sources related to LGBTQ+ diversity. The first is an investment group's evaluation of companies it deemed to be LGBT diverse—those "that have either openly LGBT leaders and senior management," have been "voted leading LGBT employers" in various surveys, or "whose employees are openly members of local LGBT business networks."[104] None of the evaluated companies was identified as having even a single LGBTQ+ board

---

[102] *Id*. at 141.

[103] *Id*. at 147 (emphasis added).

[104] Credit Suisse ESG Research, *supra* note 26, at 2.

member, so the report's findings are irrelevant to Nasdaq's diversity rule. The second is not a study at all, but a set of recommendations from an advocacy organization whose mission is "to increas[e] LGBT+ representation and inclusion at the corporate board level."[105] The recommendations of an advocacy group—even if well-intentioned—are not evidence at all, let alone substantial evidence.

Nasdaq concedes that "there is a lack of published research on the issue of LGBTQ+ representation on boards."[106] It instead points to the Supreme Court's recent opinion in *Bostock v. Clayton County* to argue that the literature on *gender* diversity also justifies an LGBTQ+ quota.[107] It asserts that "the U.S. Supreme Court in *Bostock v. Clayton County* has established that sexual orientation and gender identity are 'inextricably' intertwined."[108]

But *Bostock* is not empirical evidence, nor does it bear on the question of whether gender diversity and LGBTQ+ diversity can be expected to have similar effects on business performance. *Bostock* is a statutory interpretation case about the meaning of the phrase "because of sex" in Title VII. *Bostock* holds that sexual-orientation discrimination and transgender discrimination constitute discrimination "because of sex" because such discrimination is possible only if the employer takes the employee's sex into account.[109] It is in this sense only that the Court held that "homosexuality and transgender status are inextricably bound up with sex. Not because homosexuality or transgender status is related to sex in some vague sense or because discrimination on these bases has some disparate impact on one sex or another, but because to discriminate on these grounds requires an employer to

---

[105] Quorum, *supra* note 26, at 2.

[106] 85 Fed. Reg. at 80,476/2, 80,494.

[107] *Id.* at 80,494/1 ("Nonetheless, Nasdaq believes it is reasonable and in the public interest to include a reporting category for LGBTQ+ in recognition of the U.S. Supreme Court's recent affirmation that sexual orientation and gender identity are 'inextricably' intertwined with sex, and based on studies demonstrating a positive association between board diversity and decision making, company performance and investor protections.").

[108] Nasdaq Response to Comments at 10.

[109] *Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731, 1742 (2020).

27

intentionally treat individual employees differently because of their sex."[110] This holding in no way supports Nasdaq's wooden assertion that for example, a gay man will bring the same or even analogous "cognitive diversity" contributions to the boardroom as a woman would. Nasdaq's talismanic citation to *Bostock* only confirms that Nasdaq lacks any non-speculative evidence to support an LGBTQ+ quota.

### 2.     Academic research does not show that board racial diversity improves firm performance or promotes investor protections.

Nasdaq similarly fails to establish any link between a board's racial composition and firm performance or investor protections.

None of the thirteen sources Nasdaq cites as "substantial evidence that board diversity enhances the quality of a company's financial reporting, internal controls, public disclosures and management oversight," examine racial diversity.[111] The strongest support that Nasdaq can muster is to note "the assertions by some academics that [] findings [related to gender diversity] *may* extend to other forms of diversity, including racial and ethnic diversity."[112] But the few academics who have published studies on board racial composition disagree: "we believe that gender diversity and ethnic diversity are not the same phenomenon and will not affect the firm in identical ways."[113] And at any rate, Nasdaq must reference more than the musings of academics to establish that board diversity improves investor protections. It has not done so.

Nasdaq cites the 2003 Carter study as finding a positive relationship between racially diverse boards and firm performance.[114] But when that study accounts for independent factors like firm size and industry, it finds minority directors have *no*

---

[110] *Id.*

[111] *Id.* at 80,477/3; *see also supra* note 71 (citing sources).

[112] 85 Fed. Reg. at 80,477/3 (emphasis added).

[113] Carter 2010, *supra* note 24, at 397.

[114] 85 Fed. Reg. at 80,476/1.

*statistically significant effect* on firm value.[115] A later 2010 study by the same authors similarly finds scant support for a relationship between diverse boards and firm performance: though observing that the presence of ethnic minority directors has a marginally significant positive correlation with one measure of firm value (return on assets), it finds no statistically significant effect on another commonly-used measure of firm value (Tobin's Q).[116] This latter study also finds "no evidence of a significant relationship between the numbers of ethnic minority directors [on board committees] and financial performance as measured by either [return on assets] or Tobin's Q."[117]

Nasdaq further cites the Bernile white paper as supporting the premise that racially diverse boards improve firm performance.[118] But, as described above, that study includes ethnicity as one component of a composite diversity index and explains that no diversity characteristic alone—including ethnicity—is responsible for any benefit it measures.[119]

The only other sources Nasdaq cites that examine board racial diversity are the previously discussed promotional reports authored by investment groups and consulting firms, none of which provide reliable evidence that board racial diversity improves firm performance.

For example, the 2019 report from investment firm The Carlyle Group cited by Nasdaq claims that the Group's "portfolio companies with two or more diverse board members" had higher average earnings growth than "companies that lack diversity."[120] But the report's diversity metric included both gender and race, so the effect of race cannot be isolated, and the authors provide no statistical significance

---

[115] Carter 2003, *supra* note 24, at 46, 49–50 (showing that, when matched-pair analysis is used to control for firm size and industry, minority representation on boards does not have a statistically significant effect on Tobin's Q).

[116] Carter 2010, *supra* note 24, at 406, Tbl. 3.

[117] *Id.* at 408.

[118] 85 Fed. Reg. at 80,476/1.

[119] Bernile, *supra* note 24, at 22.

[120] Thomas, *supra* note 26, at 5.

analysis of their results, so we cannot know whether their observed effect is statistically robust or arises by chance.[121]

Nasdaq also quotes the executive summary of the 2015 McKinsey Report as stating that "companies in the top quartile for racial/ethnic diversity were 35 percent more likely to have financial returns above their national industry median."[122] But that report's data shows that the impact of ethnic board diversity for North American firms—those most relevant for Nasdaq's diversity rule—is not statistically significant at standard thresholds.[123]

Nasdaq quotes the 2020 McKinsey Report as showing "a positive, statistically significant correlation between company financial outperformance and [board] diversity on the dimensions of both gender and ethnicity."[124] But this, again, is misleading. The statements that Nasdaq cites relate to gender—not racial—diversity.[125] The report's ethnic diversity analysis is limited to *executive teams*, not corporate boards.[126] Executive teams, which are responsible for day-to-day management, operate differently than boards, which deal with corporate governance.[127] Nasdaq provides no reason for why statistical correlations in executive teams extend to directors.

---

[121] *Id.*

[122] 85 Fed. Reg. at 80,476/1.

[123] 2015 McKinsey Report, *supra* note 26, at 4, Ex. 3. Exhibit 3 states that the *p*-value for the effect of ethnic board diversity on firm financial performance for North American firms, which comprise 51% (186/366) of the firms surveyed, is 0.10, which fails to satisfy even the relaxed significance threshold of *p*-value < 0.10. The effect only reaches a statistically significant threshold in McKinsey's analysis when data from Latin American and U.K. firms is added, which lowers the *p*-value to the marginally-significant 0.08. *Id.*

[124] 85 Fed. Reg. at 80,476/3.

[125] 2020 McKinsey Report, *supra* note 26, at 13, Box 2. The report refers readers to "Box 2" for evidence that "[t]he business case for ethnic and cultural diversity on boards remained significant in 2019," however, Box 2 describes the effect of gender board diversity, not ethnic or racial board diversity. *Id.* at 13.

[126] *Id.* at 20–21.

[127] *See id.* at 48 (describing executive teams as typically including the CEO and up to two levels of executives below the CEO).

This is the evidence Nasdaq presents that board racial diversity improves firm value and performance. It is hardly substantial.

## II.   NASDAQ'S DIVERSITY RULE IS NOT A MERE "ASPIRATION," "OBJECTIVE," OR "OPPORTUNITY."

In Amendment 1, Nasdaq revised the label for the rule from "diversity requirement" to "diversity objective." In the accompanying response to comments, Nasdaq also repeatedly insists that the rule is not a "quota" or "mandate" and characterizes the rule as a "disclosure-based framework," an aspirational "objective," an "option," and even an "*opportunity*" for regulated firms.[128]  Nasdaq's newspeak does not change the legal or practical analysis.

Nasdaq's diversity *rule* is no mere exhortation. Listed firms that fail to meet the comply-or-explain diversity requirement will have "180 days . . . to cure the deficiency."[129]  Failure to cure a deficiency would result in a staff delisting determination, banishing a firm from the exchange.[130]  These are severe consequences.

Nasdaq downplays these consequences by arguing that firms can "always describe their reasons for following a different path," including by publicly expressing a different philosophy each year in a proxy statement or on the firm's website.[131]  Nasdaq promises it will not police the adequacy of the firm's proffered reasons for non-compliance, as long as the firm proffers reasons.[132]  For example, Nasdaq says a company could simply choose to disclose that "it does not believe Nasdaq's listing rule

---

[128] Nasdaq Response to Comments at 6–8 (emphasis in original).

[129] 86 Fed. Reg. at 14,487/2.

[130] Nasdaq Response to Comments at 6.

[131] *Id.*

[132] *Id.* A mere assertion of non-compliance or gibberish would apparently not do. Ballard Spahr Response at 3 n.3.

31

is appropriate."[133]

As set forth in more detail in the expert affidavit of James Copland, attached as Exhibit B, this response ignores the real-world costs of denying firms the right to remain silent on their diversity policies. Dealing with "external pressure by investors and others" and having "more informed conversations" with activist investors and diversity advocates is no free lunch for listed firms.[134] Firms that publicly explain their reasons for non-compliance will generate a paper trail that makes them more likely to be targeted by negative media campaigns by activist groups or shareholder lawsuits alleging misrepresentations or breach of fiduciary duties like the ones brought against Gap, Oracle, Facebook, Micron, Monster, and Qualcomm.[135] Under the rule, firms will need to spend limited resources on lawyers and corporate communications consultants to assess the reputational and legal risks of a firm's explanation. Given these serious risks, the rule is functionally a discriminate-or-*else* rule: discriminate based on sex, race, or sexual orientation or else assume a serious risk of reputational and litigation harms.

The deterrence effects of "external pressures" and "progressive societal norms" are essential to Nasdaq's goals.[136] The diversity requirement, after all, is meant as a "regulatory impetus to drive meaningful and systemic change in board diversity."[137] As Nasdaq says, citing Acting Chair Lee, apart from informing, disclosure "can also drive corporate behavior" by creating "external pressure from investors and

---

[133] Nasdaq Response to Comments at 8. It is difficult to see how this empty response could "provide shareholders with sufficient information to make an informed voting or investment decision, or to facilitate informed discussions with companies." *Id.*

[134] 85 Fed. at 80,496/3, 80,497/1.

[135] *Id.* at 80,487; *see, e.g., Foote v. Mehrotra*, 21-cv-00169 (D. Del.); Kevin LaCroix, *Micron Technology Hit with Board Diversity Law Suit* (Feb. 10, 2021), https://bit.ly/39vwT21.

[136] 85 Fed. Reg. at 80,496 n.233 (quoting article conclusion that external pressures from "progressive societal norms" and "regulations" "are needed to increase board diversity") (quoting Albertine d'Hoop-Azar et al., *Gender Parity on Boards Around the World*, Harv. L. Sch. Forum on Corp. Governance (Jan. 5, 2017)).

[137] 85 Fed. Reg. at 80,496/2.

others."[138] Indeed, Nasdaq cites empirical evidence showing that "comply-or-explain" rules have driven increased boardroom diversity in other countries because compelled explanations deter non-compliance.[139]

Nasdaq cannot have it both ways. If the explanation is not a functional penalty that deters firms from non-compliance, the comply-or-explain rule could not drive the "meaningful and systematic change in board diversity" that Nasdaq touts. There would also be no need for phase-in periods, grace periods, exceptions for smaller companies, companies with small boards, or foreign firms. And there would be no need for Nasdaq to *subsidize* listed firms with temporary "free access to a network of board-ready diverse candidates and a tool to support board evaluation, benchmarking, and refreshment."[140] All of these flexibilities and subsidies show that Nasdaq in fact *expects* (and intends) explanations will have serious negative consequences on firms. The "penalty" for failure to comply with diversity quotas may not amount to a gun to the head that will ensure complete fealty to the quota, but neither is the explanation likely to be an insignificant deterrent. Nasdaq's diversity rule is a quota that can be avoided, but only at a price.[141]

In the alternative, if the rule is truly a mere aspiration and the explanation has no deterrent effects at all, the rule must be disapproved. If Nasdaq's diversity "objectives" can be ignored with impunity through barebones explanations that provide no real information to investors, without any risk of reputational or legal consequences, then Nasdaq's diversity rule has no plausible benefits under the Exchange Act at all. A rule that no one feels any compulsion to seriously comply with at any margin cannot have any "public interest" benefits and should be disapproved as unreasonable on that ground alone.

---

[138] *Id.* at 80,496. In the Response to Comments, Nasdaq contradicts itself by asserting its proposal "will limit pressure campaigns by activist groups." Nasdaq Response to Comments at 30. It is hard to imagine how a rule that aims to give diversity activists the information they need to mount more effective diversity pressure campaigns could quell diversity pressure campaigns.

[139] 85 Fed. Reg. at 80,496/2; Nasdaq Response to Comments at 25–26.

[140] *Id.* at 80,487/3.

[141] Exhibit B.

## III.   NASDAQ'S DIVERSITY RULE IS INCONSISTENT WITH THE EXCHANGE ACT AND UNSUPPORTED BY SUBSTANTIAL EVIDENCE.

### A.   Statutory Background and Standard of Review.

Stock exchanges "serve, first of all, as an indispensable mechanism through which corporate securities can be bought and sold."[142] Because securities exchanges exercise substantial market power, have limited antitrust liability,[143] and are not accountable to voters or investors, exchanges are subject to government-imposed limits and significant government oversight.

Under the Exchange Act of 1934, as substantially amended in 1975, the SEC may approve a proposed exchange rule change only "if it finds that such proposed rule change is consistent with the requirements of [the Exchange Act] and the rules and regulations issued under the [Act] that are applicable to such organization."[144]

To be consistent with the Exchange Act, exchange rules must be

> designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, to foster cooperation and coordination with persons engaged in regulating, clearing, settling, processing information with respect to, and facilitating transactions in securities, to remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect investors and the public interest; and are not designed to permit unfair discrimination between customers, issuers, brokers, or dealers, or to regulate by virtue of any authority conferred by this chapter matters not related to the purposes of this chapter or the administration of the exchange.[145]

Nasdaq's rules also may not "impose any burden on competition not necessary

---

[142] *Silver v. New York Stock Exch.*, 373 U.S. 341, 349 (1963).

[143] *Id.* at 360–61 (applying a flexible rule of reason analysis to reconcile the Sherman Act and the Exchange Act).

[144] 15 U.S.C. § 78s(b)(2)(C); *see also Bus. Roundtable v. SEC*, 905 F.2d 4, 414–15 (1990) (*Business Roundtable I*) (reviewing the legislative history); *Susquehanna Int'l Grp., LLP v. SEC*, 866 F.3d 442, 445 (D.C. Cir. 2017) (requiring consistency).

[145] 15 U.S.C. § 78f(b)(5).

34

or appropriate" to advance these purposes.[146] These requirements were enacted in the 1975 amendments to eliminate exchange rules that hampered efficient national capital markets.[147]

The SEC's findings supporting the rule must be "supported by substantial evidence,"[148] and the agency must engage in the "reasoned analysis" required by the Administrative Procedure Act.[149] The substantial evidence standard requires "(1) that the agency's decision be based upon the entire record, taking into account whatever in the record detracts from the weight of the agency's decision; and (2) that the agency's decision be what a reasonable mind might accept as adequate to support [its] conclusion."[150] Although this standard requires "something less than the weight of the evidence," it is "more rigorous than the arbitrary and capricious standard normally applied to informal rulemaking."[151] The test "imposes a considerable burden on the agency and limits its discretion in arriving at a factual predicate."[152] Under this standard of review, courts of appeal have not hesitated to reverse the SEC when it has relied on at best "mixed" observational studies to formulate corporate governance rules.[153]

Because Nasdaq is a private organization, not an executive agency charged with administering the Exchange Act, no deference is owed either to its findings of

---

[146] *Id.* § 78f(b)(8).

[147] *Bus. Roundtable I*, 905 F.2d at 416 (reviewing legislative history and concluding that the "cornerstone" of the 1975 amendments was the removal of anti-competitive rules from exchange markets); *see also* Pub. L. 94-29, § 6(b)(5) (1975), 89 Stat. 97, 104; S. Rep. 94-75, at 27, 1975 U.S.C.C.A.N. 179, 205 (focusing on eliminating barriers to perfect the national market system).

[148] 15 U.S.C. § 78y(a)(4).

[149] *Susquehanna Int'l Grp.*, 866 F.3d at 445 ("We review the Order under the Administrative Procedure Act").

[150] *Corrosion Proof Fittings v. EPA*, 947 F.2d 1201, 1213 (5th Cir. 1991) (internal quotation marks omitted).

[151] *Id.* at 1213–14.

[152] *Id.* at 1214.

[153] *See Bus. Roundtable II*, 647 F.3d at 1151 ("In view of the admittedly (and at best) 'mixed' empirical evidence, we think the Commission has not sufficiently supported its conclusion that increasing the potential for election of directors nominated by shareholders will result in improved board and company performance and shareholder value.").

fact or its interpretations of the law, and no presumption of regularity attaches to its actions. To the extent any deference is owed under the statute, it would be to the SEC's findings and legal conclusions in an approval or disapproval order. If an SEC order approving or disapproving Nasdaq's decision fails to comply with the reasoned decision-making requirements of the Administrative Procedure Act, courts must reverse the order.

### B.     Nasdaq Fails to Show That the Diversity Rule Is Consistent With the Purposes of the Exchange Act.

#### 1.     Nasdaq's diversity rule is not designed to prevent fraud and manipulative acts and practices.

An exchange rule may be permissible if it is "designed to prevent fraudulent and manipulative acts and practices."

Nasdaq argues that the diversity rule will indirectly prevent fraud. It asserts that the rule "is designed to reduce groupthink, and otherwise enhance the functioning of the boards, and thereby to prevent fraudulent and manipulative acts or practices."[154] To assert a causal connection between the diversity rule and fraud prevention, Nasdaq relies on studies asserting correlations between diversity and auditing practices that, in its view, "provide substantial evidence suggesting an association between gender-diverse boards or audit committees and a lower likelihood of fraud; a lower likelihood of receiving audit qualifications due to errors, non-compliance or omission of information; and a greater likelihood of disclosing audit reports with uncertainties and scope limitations."[155] It asserts that this evidence extends to the context of race and LGBTQ+ diversity.[156]

Nasdaq's anti-fraud rationale is a mere pretext. The SEC should reject this fig-leaf justification for the diversity rule.

---

[154] 85 Fed. Reg. at 80,498/1.

[155] *Id.*

[156] *Id.*

### a.      Nasdaq must show that the diversity rule will prevent fraud.

The phrase "fraudulent and manipulative acts or practices" in the Exchange Act has long been interpreted to refer to acts of "misrepresentation or nondisclosure" calculated to mislead investors by distorting the perceived value of a firm's securities.[157] The verb "designed to" means having "the goal or purpose" mentioned, namely, securities fraud prevention.[158] The verb "designed" is a strict and limited one.

Nasdaq says that the rule "is *designed to reduce groupthink*, and otherwise enhance the functioning of the boards, and *thereby to* prevent fraudulent and manipulative acts or practices."[159] Of course, reducing groupthink is not in itself a legitimate purpose. But Nasdaq relies on studies finding correlations between the purpose of board diversity and the proper goal of fraud prevention and suggesting this association may be caused by less "groupthink."

This misreads the law. In effect, Nasdaq's argument is that correlations are enough. This waters down the strict verb "designed to" to mean nothing more than "related to"—a capacious verb that means "to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with."[160] But the law's use of the stricter and more limited verb "designed to" required Nasdaq to show more than mere associations. Rather, to show the diversity rule has the "purpose or goal" of preventing securities fraud, an exchange must show evidence sufficient to infer a direct causal connection between the diversity rule and lower risks of fraud. Correlations in poorly designated studies and "groupthink" stereotypes are not enough.

---

[157] *Cf. Schreiber v. Burlington N., Inc.*, 472 U.S. 1, 8 (1985) ("We hold that the term 'manipulative' as used in § 14(e) requires misrepresentation or nondisclosure.").

[158] The American Heritage Dictionary of the English Language 357 (1969).

[159] 85 Fed. Reg. at 80,498/1 (emphasis added).

[160] *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (quoting Black's Law Dictionary 1158 (5th ed. 1979)).

Nasdaq's expansive reading of "designed to" would justify the practically unlimited pursuit of "social justice movement" causes favored by exchanges under the pretext of preventing fraud. Under Nasdaq's reading, exchanges could, based on (weak) correlations between diversity and fraud prevention, require that all corporate boards have a certain racial composition, as California has done, denying firms that refuse to discriminate access to national capital markets. Nor need exchanges stop there. If possibly spurious correlations between "cognitive diversity" (or rather, Nasdaq's arbitrary proxies for cognitive diversity) and fraud prevention are enough, exchanges could micromanage board composition in myriad other ways. Exchanges could mandate, for example, that board members have a minority of directors who identify as, say, practicing Protestants, limiting equal opportunities for Jewish, Catholic, Hindu, or atheist director candidates. All they would need is junk science asserting correlations between some—or any—metric of corporate governance and the Protestant ethic. A construction of "related to" that greenlights this kind of interference with internal corporate affairs must not be favored.[161]

Nasdaq's expansive reading of the anti-fraud authority also runs into the constitutional-avoidance canon. "Under the constitutional-avoidance canon, when statutory language is susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems."[162] As discussed in Part VI, Nasdaq's reading of "designed to" as authorizing discriminate-or-explain commands based on less than compelling evidence raises serious constitutional questions, questions that would be avoided if Nasdaq's expansive interpretation of "designed to" is rejected by the SEC.

The SEC should give "designed to" its fair meaning and require Nasdaq to demonstrate a clear causal connection between the asserted fraud justification and the diversity rule.

---

[161] *See Bus. Roundtable I*, 905 F.2d at 412–13 (rejecting broad SEC interpretation that would have legitimized exchange rules governing the voting rights of common stockholders).

[162] *Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018).

38

### b. Nasdaq lacks substantial evidence that the diversity rule will prevent fraud.

Nasdaq has failed to show substantial evidence that the diversity rule will prevent fraud.

To support an anti-fraud rationale for the female director requirement, Nasdaq cites (1) surveys of Norwegian directors, (2) one study of Spanish firms that the authors caution may not apply to U.S. firms, and (3) two studies of U.S. firms finding (internally) contradictory statistical correlations between gender diversity and certain auditing measures, which are (externally) contradicted by other studies that find no effects or detrimental effects on auditing practices.[163] As Professor Jon Klick's literature review and these comments demonstrate, the academic research on gender diversity and fraud prevention is not the kind of evidence a reasonable mind would find supports a conclusion that the diversity rule will prevent fraud.[164]

Nasdaq, meanwhile, provides no empirical support for the minority director requirement's relation to fraud. None exists. Nasdaq's sole justification is that "academics have suggested that other forms of diversity, including racial and ethnic diversity, may reduce fraud and mitigate groupthink."[165] Academic speculation is not evidence—let alone substantial evidence—that the minority director rule will prevent fraud.

Nasdaq has not shown substantial evidence that the diversity rule will prevent fraud.

### 2. Nasdaq's diversity rule is not designed to promote just and equitable principles of trade.

An exchange rule may be permissible if it is "designed . . . to promote just and equitable principles of trade." Nasdaq does not argue that its diversity rule will

---

[163] 85 Fed. Reg. at 80,497–98.

[164] Exhibit A.

[165] *Id.* at 80,497/3.

"promote just and equitable principles *of trade*."[166] Rightly so, as boardroom diversity does nothing to require that exchanges run just and equitable trading floors. Nasdaq has failed to raise this rationale in the proposal, so it has waived any arguments under this authority. The SEC may not approve the proposed diversity rule on this ground, at least in the absence of additional opportunity to comment.[167]

> ### 3. Nasdaq's diversity rule is not designed to foster cooperation and coordination with persons engaged in regulating, clearing, settling, processing information with respect to, and facilitating transactions in securities.

An exchange rule may be permissible if it is "designed . . . to foster cooperation and coordination with persons engaged in regulating, clearing, settling, processing information with respect to, and facilitating transactions in securities."[168] Nasdaq has waived arguments under this authority, so the SEC may not approve the diversity rule on this ground, at least in the absence of additional opportunity to comment.

> ### 4. Nasdaq's diversity rule is not designed to remove impediments to and perfect the mechanism of a free and open market and national market system.

An exchange rule may be permissible if it is "designed . . . to remove impediments to and perfect the mechanism of a free and open market and a national market system."[169]

Nasdaq first argues that the diversity rule perfects securities markets because the rule will encourage companies to consider candidates "that otherwise may be overlooked due to the impediments of the traditional director recruitment process, which will thereby remove impediments to a free and open market and a national

---

[166] *Id.* at 80,499/1 (emphasis added).

[167] *Cf. Bus. Roundtable I*, 905 F.2d at 417 (courts may not consider grounds not raised by the SEC).

[168] 15 U.S.C. § 78f(b)(5).

[169] *Id*. at § 78f(b)(5).

40

market system."[170] Next, Nasdaq argues that the rule is justified because "studies suggest that diversity is positively associated with reduced stock volatility, more transparent public disclosures, and less information asymmetry."[171] Both arguments fail.

### a. Nasdaq misreads the authority to perfect the national market system.

Alleged market failures in corporate recruiting practices are not legally within the ambit of Nasdaq's authority to "perfect" the national market system. The verb to "perfect" means to "bring to perfection or completion" and render something "without defect; flawless."[172] The "national market system" object is the national exchanges.[173] As the Court of Appeals for the Second Circuit has said, this authority means "to operate a fair and orderly exchange."[174] As Congress has described, operating a fair and orderly exchange includes rules "to assure—

(i)     economically efficient execution of securities transactions;

(ii)    fair competition among brokers and dealers, among exchange markets, and between exchange markets and markets other than exchange markets;

(iii)   the availability to brokers, dealers, and investors of information with respect to quotations for and transactions in securities;

(iv)    the practicability of brokers executing investors' orders in the best market; and

(v)     an opportunity, consistent with the provisions of clauses (i) and (iv) of this subparagraph, for investors' orders to be executed without the participation of a dealer."[175]

---

[170] 85 Fed. Reg. at 80,496/3.

[171] *Id.* at 80,496/3.

[172] The American Heritage Dictionary of the English Language 973–74 (1969).

[173] 15 U.S.C. § 78k-1(a)(1)(A).

[174] *NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*, 770 F.3d 1010, 1021 (2d Cir. 2014) (emphasis added).

[175] 15 U.S.C. § 78k-1(a)(1)(A).

This authority is limited to rules that pursue similar goals.[176] A rule must ultimately be designed to perfect *securities* transactions—it must have the "purpose" of solving a defect in securities markets, reducing transaction costs for investors and the like. This does not give exchanges carte blanche to solve perceived problems in a non-securities market: the market for corporate director recruitment. But that is the only "market" Nasdaq's diversity rule specifically seeks to "perfect."

The SEC must reject this argument as a matter of law.

### b. Nasdaq lacks substantial evidence that the diversity rule will perfect the national market system.

Nasdaq must show more than a mere "association" to show that the diversity rule is "designed to" perfect securities markets. It must at least show enough evidence to infer that the diversity rule *will* achieve that legitimate end. That requires showing causation.

Nasdaq lacks substantial evidence that the diversity rule will solve a "market failure" in corporate recruiting, let alone in securities markets. Nasdaq posits a failure resulting from "existing directors' social networks."[177] But Nasdaq fails to substantiate this generalization about directors' social networks with any empirical evidence.

There is little reason to believe there is a market failure that harms investors. More likely, the demographic "diversity" Nasdaq calls "progress" has little material relevance to average investors. This makes sense, as there is no legitimate basis to assume that boardroom tokenism brings the "progress" investors generally do care about—increased share value. Indeed, statistical evidence suggests that if anything, investors punish boardroom diversity initiatives, as they send a negative signal that a firm's leadership is more focused on promoting its personal ideology or pleasing

---

[176] *Bus. Roundtable I*, 905 F.2d at 416.

[177] 85 Fed. Reg. at 80,496/1.

"social justice" activists than enhancing shareholder value.[178] To the extent corporations have incentives to focus on boardroom diversity, their focus may be driven by public relations, pressure from large institutional investors managing other people's money (e.g., government-operated pension funds or large institutional investors seeking to burnish their own image), or government mandates like California's recent legislation, all of which would tend to be adverse to average investor interests. Appeasing activists or catering to these interest groups is not the proper role of securities exchanges under the Exchange Act.

The available academic evidence also does not support Nasdaq's assertion that diverse directors are *even correlated* with, let alone cause, reduced volatility, more transparent public disclosures, and less information asymmetry. As to boards with at least one female director, the data is at best inconclusive on a correlation, and even more ambiguous as to causation. As observed above, Nasdaq's reliance on studies that survey only foreign firms is misplaced,[179] and studies of U.S. firms, in the aggregate, show mixed results.[180] Bravo's findings related to corporate disclosures are representative: "fail[ing] to find an association between the presence of women in the [board auditing committee] and the disclosure of financial forward-looking information," the study authors concluded that "gender per se seems to be not enough."[181]

As to boards with one minority director, the data is nil. As previously observed, Nasdaq fails to present a single empirical study that examines correlations between LGBTQ+ directors on any aspect of corporate performance.[182] Nasdaq cites only two peer-reviewed studies that isolate board racial representation, neither of which

---

[178] Isabelle Solal & Kaisa Snellman, *Women Don't Mean Business? Gender Penalty in Board Composition*, 30 Org. Sci. (Oct. 1, 2019); Isabelle Solal & Kaisa Snellman, *Why Investors React Negatively to Companies that Put Women on Their Boards*, Harvard Business Review (Nov. 25, 2019).

[179] *See supra* Section I.A.2.a.

[180] *See supra* Section I.A.2.b.

[181] Bravo, *supra* note 71, at 141, 147.

[182] *See supra* Section I.B.1.

43

established a link between director race and corporate reporting, transparency, or firm value.[183] As the most recent of these studies forthrightly concludes, "[t]he results . . . do not support the business case for inclusion of . . . ethnic minorities on corporate boards."[184]

### 5. Nasdaq's diversity rule is not designed to protect investors or the public interest.

An exchange rule may be permissible if it is "designed . . . in general, to protect investors and the public interest."[185]

Nasdaq asserts that its diversity rule "promotes investor protection and is in the public interest" because "*gender*-diverse boards are associated with more transparent public disclosures and less information asymmetry, leading to stock prices that better reflect public information."[186] This justification is wrong on the law and the evidence.

### a. The catch-all authority to protect investors and the public interest is limited.

The catch-all "investor protection and the public interest" standard is open-ended. But "[t]his open-ended standard, however, is part of a larger list of more specific standards concerning the administration and operation of the self-regulatory organizations themselves, not the fairness of the issuers' corporate structures."[187] Under the canon of *ejusdem generis*, "the general standard at the end of this list should be construed to embrace only issues similar to the specific ones."[188] The term public interest "is never an unbounded term"—it must be understood in the context

---

[183] *See* Carter 2003, *supra* note 24 and discussion in Section I.B.2; Carter 2010, *supra* note 24, at 396 ("We do not find a significant relationship between the gender or ethnic diversity of the board, or important board committees, and financial performance for a sample of major US corporations.").

[184] Carter 2010, *supra* note 24, at 396.

[185] 15 U.S.C. § 78f(b)(5).

[186] 85 Fed. Reg. at 80,498/3 (emphasis added).

[187] *Bus. Roundtable I*, 905 F.2d at 413.

[188] *Id.*

44

of the Exchange Act.[189] It cannot include an "advance into an area not contemplated by Congress."[190] Moreover, the rule must both "promote[] investor protection" *and* be "in the public interest."

### b.    Nasdaq lacks substantial evidence that the diversity rule will protect investors.

Nasdaq lacks substantial evidence to support the claim that the diversity rule is designed to promote investor protection and is in the public interest.

*First*, Nasdaq provides zero empirical evidence that the minority director rule does anything to protect investors or protect the public interest in securities exchanges.[191] Academic musings and citations to *Bostock* are not evidence. Not even close.

*Second*, the evidence on gender diversity causal effects on investor protections is, as discussed in detail in Professor Klick's review and these comments, at best inconclusive and at worse negative on causal effects.[192] The most comprehensive studies—meta-analyses that evaluate the entire body of existing research—consistently conclude that there is insufficient data to infer any causal link between female board representation and corporate governance, findings echoed by gender diversity experts.[193] Numerous other studies uncited by Nasdaq similarly find no positive correlation—let alone a likelihood of any causation—between board gender diversity and investor protections.[194]

Ignoring the weight of the evidence and relying on Nasdaq's characterizations would be arbitrary. As the Court of Appeals for the D.C. Circuit has held, it is impermissible for the SEC to rely upon "relatively unpersuasive studies" while

---

[189] *Id.*

[190] *Id.*

[191] *See supra* Sections I.B, III.B.4.b.

[192] Exhibit A.

[193] *See supra* Section I.A.1.c.

[194] *See, e.g., supra* note 68.

ignoring "the numerous studies submitted by commenters that reached the opposite result."[195] The SEC should not look the other way here.

### c.     Nasdaq's public interest justification is arbitrary.

Nasdaq's public interest justification is also arbitrary because it ignores relevant factors and fails to show that the advantages outweigh the disadvantages of the diversity rule.

When Congress uses "broad and all-encompassing" language like "the public interest," that "naturally and traditionally includes consideration of all the relevant factors," including "cost."[196]

The diversity rule imposes serious and concrete costs. Few firms appear to meet the diversity quotas, although Nasdaq claims it does not know how many.[197] Nasdaq acknowledges some direct costs for firms.[198] These include recurring director compensation costs, liability insurance costs, and a one-time "search cost" loss for firms and investors.[199]

Nasdaq attempts to downplay these director costs by asserting "that [m]ost, if not all, of these costs would be borne in any event in the search for new directors regardless of the proposed rule."[200] But Nasdaq fails to show the costs of the diversity rule will be borne "in any event." Firms may opt to add a new diverse director to the board instead of replacing an existing director. For these firms, the costs will not be

---

[195] *Bus. Roundtable*, 647 F.3d at 1150–51.

[196] *See Michigan v. EPA*, 576 U.S. 743, 752 (2015) (internal citation omitted).

[197] *Nasdaq Seeks Board-Diversity Rule that Most Listed Firms Don't Meet*, WSJ (Dec. 1, 2020).

[198] 85 Fed. Reg. at 80,504 (citing cost estimates).

[199] Nasdaq quotes one industry observer's estimates $75,000 to $150,000 per director, or about a third of a director's annual salary, in search costs. 85 Fed. Reg. 80,504/3. Director pay ranges depending on size, from about $100,000 or less to over $300,000 per year for S&P 500 firms. *Id.* Nasdaq's cost estimates likely underestimate costs because searching for a candidate that meets characteristics based on gender, race, or sexual orientation likely entails greater than average recruitment costs.

[200] *Id.*

borne "in any event."

Nasdaq also asserts that enough qualified diverse candidates will be available to meet the new demand, but this claim is based on no evidence.[201] Indeed, if qualified diverse directors were easily available, there would be no need for Nasdaq to *subsidize* listed firms with temporary "free access to a network of board-ready diverse candidates and a tool to support board evaluation, benchmarking, and refreshment."[202] Nor would firms need exemptions, phase-ins, or grace periods to find qualified directors.

On the other side of the balance, there are no likely benefits. This is not a close call. No disinterested reviewer would conclude that the evidence allows a conclusion that the diversity requirements will cause any corporate governance changes that protect investors. Indeed, peer-reviewed empirical evidence suggests that gender diversity may hurt investors.[203] One could reasonably debate whether "academic and empirical studies support the conclusion that board diversity does not have adverse effects on companies."[204] But for a rule to further the public interest, more is needed than evidence that a rule will not destroy shareholder value. Nasdaq fails to provide more.

In any event, the public interest cannot be read to authorize intrusion into areas never contemplated by Congress in the Exchange Act. That certainly describes diversity rules aimed at prescribing the gender, racial, or sexual characteristics of directors serving in private firms.

### 6.    Nasdaq's diversity rule permits unfair discrimination between issuers.

The proposed diversity rule discriminates between issuers by giving foreign issuers "flexibility" denied to domestic issuers. The diversity rule allows foreign

---

[201] Nasdaq Response to Comments at 26–27.

[202] 85 Fed. Reg. at 80,487/3.

[203] *See supra* note 178 and accompanying text.

[204] 86 Fed. Reg. at 14,490/1.

issuers, regardless of size or country of origin, to meet the diversity rule by adding a female instead of an underrepresented minority.[205] Nasdaq's justification for this disparate treatment is unfair and arbitrary.

Nasdaq asserts that disparate treatment for foreign issuers is justified because of "the unique demographic composition of the United States, and its historical marginalization of Underrepresented Minorities and the LGBTQ+ community, may not extend to all countries outside of the United States."[206]

It is unclear what "the unique demographic composition of the United States" and "historical marginalization" have to do with the rule. According to Nasdaq, the diversity rule is premised on the "cognitive diversity" benefits that mystically flow from having even one minority director. A desire to redress past discrimination or promote demographic balancing is not relevant to the cognitive diversity justification asserted by Nasdaq. Nasdaq does not explain why cognitive diversity benefits to investors from having a minority would not accrue to investors in foreign firms. Indeed, Nasdaq relies heavily on empirical evidence from foreign firms. While the foreign evidence is extraordinarily weak evidence of causation, it is no weaker than the evidence for U.S. firms. Nasdaq's arbitrary distinction makes little sense.

Even if redressing past societal discrimination or demographic balancing were permissible goals for Nasdaq under the Exchange Act, and they are not, that is no fair reason to give more flexibility to foreign firms. The political and economic marginalization of underrepresented minorities in many (indeed most) foreign countries around the world is significantly worse, not better, than in the United States. It is unlikely that Nasdaq's Chinese issuers, for example, have many non-Han Chinese minority directors on their boards. Indeed, the Chinese Communist Party to this day has a genocidal policy of Han racial supremacy, not just a legacy of "historical

---

[205] 85 Fed. Reg. at 80,501/1.

[206] *Id.*

48

marginalization."[207] Under Nasdaq's minority "marginalization" theory, the Chinese government's overt and pervasive policy of Han supremacism if anything demands more stringent treatment than applies to U.S. firms, not more "flexibility."

Nasdaq unfairly singles out foreign issuers for less restrictive rules, without reasonable justification.

### 7.     Nasdaq's diversity rule regulates matters unrelated to the purposes of the Exchange Act.

Nasdaq's diversity rule "regulates matters unrelated to the purposes of the Exchange Act."[208] The actual and obvious goal of the rule, promoting diversity based on race, gender, or sexual orientation, is far removed from the purposes of the Exchange Act. As already demonstrated, every other legitimate purpose asserted by Nasdaq in the diversity rule is a mere pretext to justify Nasdaq's social justice agenda.

Nasdaq argues that "the proposal relates to the Exchange's corporate governance standards for listed companies."[209] Nasdaq's diversity rule, however, does not deal with matters of corporate governance analogous to prior exchange rules. "There are, of course, shadings within the notion" of corporate governance.[210] But diversity quotas are quite unlike anything ever attempted by exchanges. Prior governance standards control traditional corporate law matters, including the structure, processes, and procedures by which companies are directed and controlled. The diversity quota, however, does not set rules controlling the structure, processes, or procedures of corporations. Rather, it attempts to encourage recruiting *individual* directors with identity characteristics.

---

[207] *See* Anthony J. Blinken, Promoting Accountability for Human Rights Abuse with Our Partners (Mar. 22, 2021); Michael R. Pompeo, Determination of the Secretary of State on Atrocities in Xinjiang (Jan. 19, 2021); Jon M. Friend & Bradley A. Thayer, *The Rise of Han-Centrism and What it Means for International Politics*, 17 Studies in Ethnicity and Nationalism (2017).

[208] 15 U.S.C. § 78f(b)(5).

[209] 85 Fed. Reg. at 80,503/1.

[210] *Bus. Roundtable I*, 905 F.2d at 411.

Nasdaq relies by analogy on its independent director rules, but the analogy is a poor one. Independent director rules govern corporate structure by ensuring some structural separation between management and governance. Nothing in the independent director rules prescribes or encourages the recruiting of directors with particular personal identity characteristics. Nasdaq's rule is unprecedented.

### C.    Nasdaq's Diversity and Disclosure Rules Will Burden Competition and Harm Investors.

Nasdaq's rules may not "impose any burden on competition not necessary or appropriate" to advance the purposes of the Exchange Act.[211] When Congress uses words like "necessary or appropriate," such "broad and all-encompassing" language "naturally and traditionally includes consideration of all the relevant factors," including consideration of "cost."[212] And "[n]o regulation is 'appropriate' if it does significantly more harm than good."[213]

For the same reasons it fails to show the diversity rule is in the public interest, Nasdaq fails to show that the asserted benefits of the diversity rule outweigh the costs.

Directly addressing costs to competition, Nasdaq argues that its rule will not impose competitive burdens because firms can always opt to explain non-compliance:

> Nasdaq believes that [its rule] will avoid imposing undue costs or burdens on companies that, for example, cannot afford to compensate an additional director or believe it is not appropriate, feasible or desirable to meet the diversity objectives of Rule 5605(f) based on the company's particular circumstances (for example, the company's size, operations or current board composition). Rather than requiring a company to divert

---

[211] 15 U.S.C. § 78f(b)(8). Congress expected the SEC would balance costs and benefits. S. Rep. 94-75, 13-14, 1975 U.S.C.C.A.N. 179, 192 ("[T]he Commission's responsibility would be to balance the perceived anti-competitive effects of the regulatory policy or decision at issue against the purposes of the Exchange Act that would be advanced thereby and the costs of doing so. Competition would not thereby become paramount to the great purposes of the Exchange Act, but the need for and effectiveness of regulatory actions in achieving those purposes would have to be weighed against any detrimental impact on competition.").

[212] *See Michigan v. EPA*, 576 U.S. at 752 (internal citation omitted).

[213] *Id.*

resources to compensate an additional director, and place the company at a competitive disadvantage with its peers, the rule provides the flexibility for such company to explain why it does not meet the diversity objective.[214]

But as demonstrated in Part II, non-compliance explanations are not a free lunch. They will have (and are explicitly intended to have) real costs for firms and investors. Nasdaq asserts that its proposal "will limit pressure campaigns by activist groups," but this conclusory assertion contradicts Nasdaq's own statements and is arbitrary.[215] It is hard to imagine how a rule that aims to give diversity activists the information they need to have "more informed conversations" with corporations could quell diversity pressure campaigns, unless Nasdaq assumes that every firm will opt instead to comply with the illegal quotas.

Both the diversity rule and the diversity disclosure rule, rule 5606, will likely impose other costs. For example, one can easily imagine litigation over "fraudulent" uses of highly subjective self-identifications of race or ethnicity, resulting in wasteful class action litigation over, for example, whether a firm misrepresented having a "Native American" or "Black" minority director.[216] As discussed in Part IV, it is also easy to imagine firms being sued for discrimination. Nasdaq dismisses these risks because "there are legal risks in many aspects of operating a company" and companies can always purchase liability "insurance to protect against misrepresentations."[217] That is arbitrary. Nasdaq must show these increased risks and costs are *necessary and appropriate* at the margin, when compared to the benefits of the rule. It is not enough to say that the legal risks and insurance premiums will be small in comparison to the totality of all legal risks and costs faced by firms.

Nasdaq's failure to account for and balance the likely costs and benefits of the

---

[214] 85 Fed. Reg. at 80,503.

[215] Nasdaq Response to Comments at 29–31; *see supra* note 138 and accompanying text.

[216] *See, e.g.*, Antonia Noori Farzan, *A DNA test said a man was 4% black. Now he wants to qualify as a minority business owner*, Wash. Post (Sept. 25, 2018); Brooke Jarvis, *Who decides who counts as Native American?* N.Y. Times (Jan. 18, 2017).

[217] Nasdaq Response to Comments at 19.

diversity and the diversity disclosure rules when assessing the "competitive burden" prong is arbitrary. In *Business Roundtable*, the Court of Appeals for the D.C. Circuit held that an analogous failure by the SEC to adequately address the serious risk that a proxy disclosure rule would be exploited by agenda-driven investors—in that case, unions and pension funds—to the detriment of the general investing public was arbitrary and capricious.[218] The SEC should not make the same mistake again.

### D. Nasdaq's Justification for the Disclosure Requirement Proves It Does Not Have Substantial Evidence to Support the Diversity Rule.

Considered as a whole, Nasdaq's proposal suffers from a fatal internal contradiction. Nasdaq admits it does not have enough consistent and reliable data to determine the "diversity"—as Nasdaq defines it—of its own member companies' boards. The lack of reliable and consistent data is the very reason for Nasdaq's desire to impose a uniform boardroom "diversity" disclosure mandate, proposed rule 5606.

This diversity disclosure requirement is in tension with the diversity quotas. Nasdaq cannot both confidently assert that the data demonstrates a relevant correlation between board diversity and corporate performance, and then simultaneously plead that the paucity and poor quality of the available data is a reason to mandate diversity disclosures. If Nasdaq believes current corporate diversity disclosures are "unreliable, unusable, and insufficient to inform investment and voting decisions," it is not clear why it also believes the academic data is sufficiently rigorous to infer a causal relationship between diversity and corporate performance.[219] If sophisticated investors and even Nasdaq lack enough consistent data to measure boardroom diversity, why would academics possess that kind of data? Nasdaq provides no answer. That is arbitrary.

---

[218] *Bus. Roundtable II,* 747 F.3d at 1152 ("The Commission failed to respond to comments arguing that investors with a special interest, such as unions and state and local governments whose interests in jobs may well be greater than their interest in share value, can be expected to pursue self-interested objectives rather than the goal of maximizing shareholder value, and will likely cause companies to incur costs even when their nominee is unlikely to be elected.").

[219] *Id.* at 80,483/2.

### E.    Nasdaq's Minority Director Rule Is Arbitrary and Capricious.

Nasdaq's justifications for a minority quota are also arbitrary and capricious.

First, Nasdaq fails to treat other similarly situated categories alike, a core requirement of reasoned decision-making under the Administrative Procedure Act. Nasdaq justifies its failure to require veteran or disabled directors based on "a dearth of empirical analysis on the relationship between investor protection or company performance and broader diversity characteristics such as veteran status or individuals with disabilities."[220] In the same breath, "Nasdaq acknowledges that there also is a lack of published research on the issue of LGBTQ+ representation on boards."[221] And yet it does not hesitate to include LGBTQ+ directors in the minority requirement. Nasdaq provides no non-arbitrary justification for this disparity in treatment.

Nasdaq's arbitrary reasoning is again fully on display in its counsel's response to comments. Nasdaq's counsel asserts that "[t]he relative paucity of studies relating to LGBTQ+ status and board performance may be due, in part, to the lack of consistent data on board demographics, which only further illustrates the need for the Proposed Rules."[222] In reality, the only thing this circular reasoning demonstrates is that Nasdaq has no legitimate basis to include LGBTQ+ directors as part of the diversity rule.

Second, the minority rule also relies on highly arbitrary classifications. It is unclear, for example, who qualifies as a "member of the queer community."[223] Does it mean anyone who is not heterosexual, or does it include heterosexuals who associate frequently with gays?

As Professor Bernstein also persuasively demonstrates in his manuscript, *The*

---

[220] *Id.* at 80,493/1.

[221] *Id.* at 80,493–94.

[222] Ballard Spahr Response at 23 n.54.

[223] 86 Fed. Reg. at 14,485.

*American Law of Race*, definitions of race and ethnicity like the ones used by Nasdaq are also entirely arbitrary, as is Nasdaq's reliance on self-identification.[224] It is unclear why, for example, a Spaniard qualifies as a "Hispanic" minority and magically adds to cognitive diversity while an Italian director with similar genetic lineage and experiences does not. As the Seventh Circuit has observed, there is "nothing to differentiate immigrants from Spain or Portugal from immigrants from Italy, Greece, or other southern European countries so far as a history of discrimination in the United States is concerned."[225]  Nasdaq cannot explain why a "Hispanic" from Spain adds to "cognitive diversity" in any way that other white Europeans do not. Nasdaq also cannot explain why "persons having origins in any of the original peoples of "the Middle East or North Africa" should be classified as white.[226] Does Nasdaq believe that people originating in North Africa or the Middle East do not add any "cognitive diversity" to firms, while people originating in Spain do? Nasdaq does not explain. These are just some of the many arbitrary distinctions made in Nasdaq's definitions that are highlighted in Professor Bernstein's paper. The arbitrariness would almost be comical if it were not the case that firms will be subjected to an increased risk of abusive shareholder litigation over "false" director self-identifications. For the same reasons, these arbitrary classifications also doom the "diversity disclosure" rule.

### F.    Nasdaq's Diversity and Disclosure Rules Conflict With the SEC's Existing Regulatory Framework for Diversity Disclosures

By insisting on wooden and arbitrary definitions of diversity limited to gender, race, and sexual orientation, Nasdaq's diversity and diversity disclosure rules also directly conflict with the SEC's existing reporting framework, which expressly rejects Nasdaq's one-size-fits-all definition of diversity for corporate disclosures. That conflict alone is fatal to Nasdaq's proposal because proposed rule changes must be

---

[224] *Id.* n.16 (discussing the definitions); David Bernstein, The Modern American Law of Race (May 4, 2020) (discussing the arbitrariness of the definitions),
https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3592850.

[225] *Builders Ass'n of Greater Chi. v. Cook Cty.*, 256 F.3d 642, 647–48 (7th Cir. 2001).

[226] 86 Fed. Reg. at 14,485 n.16 (March 16, 2021).

54

"consistent with . . . the rules and regulations issued under [the Exchange Act]."[227]

In 2009, the SEC amended Regulation S-K to require companies to disclose the "specific experience, qualifications, attributes or skills" of each director or nominee that qualify that person for the board.[228] SEC considered directing disclosure of particular categories of information, but ultimately declined to do so, stating instead that it "believe[s] companies and other proponents should be afforded flexibility in determining the information about a director's or nominee's skills, qualifications or particular area of expertise that would benefit the company and should be disclosed to shareholders."[229] With regards to "self-identified diversity characteristics," such as "race, gender, ethnicity, religion, nationality, disability, sexual orientation, or cultural background," SEC guidance says that, "to the extent a board or nominating committee . . . considered" those characteristics—and only if "an individual consented to the company's disclosure"—the company should "identify those characteristics" and describe "how they were considered" along with other attributes to determine the individual's qualification.[230]

The 2009 amendments also require companies to disclose "whether, and if so how, the nominating committee (or the board) has a policy with regard to the consideration of diversity in identifying director nominees," and to "describe how this policy is implemented, as well as how the nominating committee (or the board) assess the effectiveness of its policy."[231]

As Nasdaq notes, however, neither SEC's 2009 regulations nor its updated 2019 guidance define "diversity."[232] This is not an oversight, but an intentional policy choice by SEC. As the commission explained its 2009 regulations: "We recognize that

---

[227] 15 U.S.C. § 78s(c)(i).

[228] 17 C.F.R. § 229.401(e).

[229] 74 Fed. Reg. 68,334, 68,343/1 (Dec. 23, 2009).

[230] SEC, *Compliance & Disclosure Interpretations for Regulation S-K*, Question 116.11, https://www.sec.gov/divisions/corpfin/guidance/regs-kinterp.htm (Feb. 6, 2019).

[231] 17 C.F.R. § 229.407(c)(2)(vi).

[232] 85 Fed. Reg. at 80,482/2,3.

companies may define diversity in various ways, reflecting different perspectives. For instance, some companies may conceptualize diversity expansively to include differences of viewpoint, professional experience, education, skill and other individual qualities and attributes that contribute to board heterogeneity, while others may focus on diversity concepts such as race, gender and national origin. We believe that for purposes of this disclosure requirement, companies should be allowed to define diversity in ways that they consider appropriate."[233]

By requiring its members to measure boardroom diversity solely in terms of arbitrary gender, race, and sexual orientation classifications, Nasdaq's diversity rule and diversity disclosure rule both conflict with the SEC's determination not to adopt a one-size-fits-all diversity definition, overriding the SEC's conclusion that companies should have flexibility to report board characteristics, qualifications, and diversity in the way that most benefits their particular shareholders. To preserve its carefully considered policy determinations, the SEC must reject Nasdaq's diversity rule.

## IV.  NASDAQ'S DIVERSITY RULE IS INCONSISTENT WITH TITLE VII OF THE CIVIL RIGHTS ACT AND § 1981.

Nasdaq's attempt to encourage member companies to recruit directors based on gender, race, and sexual orientation also increases the risk these firms will run afoul of federal anti-discrimination law, namely Title VII of the Civil Rights Act and the Civil Rights Act of 1866, as amended and codified in 42 U.S.C. § 1981.

Title VII prohibits an employer from, among other actions, "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment . . . or limit[ing], segregat[ing], or classif[ing] his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."[234] But by demanding that member companies reserve board positions for individuals of

---

[233] 74 Fed. Reg. at 68,344/1.

[234] 42 U.S.C. § 2000e-2(a).

56

a particular self-identified gender, race, or sexual orientation, Nasdaq's rule encourages companies to do just that: deprive potential directors of the opportunity to compete for particular board positions simply because they do not possess Nasdaq's preferred sex, race, and sexual orientation traits.

Nasdaq responds that its diversity rule is acceptable because most directors are independent, and independent directors are excluded from Title VII coverage because "by definition, they are not employees of the companies on whose boards they sit."[235] But Nasdaq's characterization is overly broad. Whether an independent director is an employee under Title VII is an open question requiring an organization-specific inquiry.[236] And even if independent directors are excluded from Title VII coverage, directors selected from among the company's employees are not. The Supreme Court and the Equal Employment Opportunity Commission agree: "[e]ven if someone in a particular position is not covered, consideration by an employer of its own employees for such positions may constitute a term, condition, or privilege of employment."[237] A company employee who is denied a board position because he lacks a particular sex, race, or sexual orientation trait has a cognizable Title VII claim.[238] And under Title VII, the employee need only show that his sex, race, or sexual

---

[235] Ballard Spahr Response at 6.

[236] *See* EEOC Compliance Manual, Section 2 Threshold Issues, Section 2.A.1.d, https://www.eeoc.gov/laws/guidance/section-2-threshold-issues#2-III-A-1-d (May 12, 2000) (While "[in] most circumstances, individuals who are . . . members of boards of directors . . . will not qualify as employees[,] [a]n individual's title, [ ] does not determine whether the individual is a . . . member of a board of directors . . . as opposed to an employee."). The determination of whether a particular individual is an employee instead must be made by considering various position- and organization-specific factors. *Id*; *see also Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 449–51 (2003).

[237] EEOC Compliance Manual, Section 2 Threshold Issues, Section 2.A.1.d at n.77; *Hishon v. King & Spalding*, 467 U.S. 69, 75 (1984).

[238] EEOC Compliance Manual, Section 2 Threshold Issues, Section 2.A.1.d at n. 77 (observing that, in the context of a law firm partnership, "even if a partner is not protected, an employee who is denied partner status may have a claim covered by the EEO statutes") (citing *Hishon*). In *Hishon*, the Supreme Court found that the petitioner attorney had a cognizable Title VII claim that she was denied partnership on the basis of her sex, even though partners were not considered "employees." 467 U.S. at 78. The Court concluded that consideration for a partnership need not be part of an express or implied employment contract to be protected; any "benefits that comprise the 'incidents of employment' . . . or that form 'an aspect of the relationship between the employer and employees' . . . may not be afforded in a manner contrary to Title VII." *Id.* at 75.

57

orientation was a "motivating factor"—not the sole reason—for the challenged adverse action.[239]

Nasdaq's rule similarly places its member companies in jeopardy of violating 42 U.S.C. § 1981, which grants to "[a]ll persons . . . the same right . . . to make and enforce contracts" without regard to the person's race, where "the term 'make and enforce contracts' includes . . . the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."[240] By pressuring its member companies to use race-based selection processes, Nasdaq not only interferes with an applicant's right to enter into board membership contracts on an equal footing with applicants of other races, but, as in the Title VII context, Nasdaq's diversity rule may also prevent employees of non-preferred races from enjoying a privilege of their employment contract—consideration for board positions—equally to employees of preferred races.

Because Nasdaq's diversity rule encourages member companies to violate federal anti-discrimination law, the SEC must reject it.

## V.    SECTION 342 OF THE DODD-FRANK ACT IS IRRELEVANT.

Nasdaq tries to argue that imposing diversity quotas on its member companies advances the purposes of Section 342 of the Dodd-Frank Act.[241] But that statute only ensures that agencies, like SEC, pursue diversity within the agency, and that they have non-binding standards for assessing the diversity of the firms, like Nasdaq, that they regulate.[242] The statute also clearly disclaims any delegation of the kind Nasdaq implies, saying that "[n]othing in [the relevant paragraph] may be construed to mandate any requirement or . . . to require any specific action on the findings of the

---

[239] *See* 42 U.S.C. § 2000e-2 (m).

[240] *Id.* § 1981(a), (b).

[241] 85 Fed. Reg. at 80,503/3, 80,474–75.

[242] 12 U.S.C. § 5452(b)(2)(C); *Final Interagency Policy Statement Establishing Joint Standards for Assessing the Diversity Policies and Practices of Entities Regulated by the Agencies*, 80 Fed. Reg. 33,016 (June 10, 2015).

assessment."[243]

Nor do the non-binding joint diversity standards issued by SEC and other agencies pursuant to Dodd-Frank authorize Nasdaq's proposed board diversity quotas. The joint statement merely suggests "a framework" that regulated entities like Nasdaq may use "to create and strengthen [their own internal] diversity policies and practices."[244] And unlike Nasdaq's diversity rule, the non-binding standards impose no diversity requirement—or aspirational target—on Nasdaq's board, nor do they require any reporting or compliance explanation by Nasdaq.[245] The standards do not direct, or even suggest, that Nasdaq's efforts to enhance the diversity of its own organization can legitimize its attempt to force listed firms to discriminate on the basis of sex, race, or sexual orientation or explain why they do not.

Accordingly, Section 342 of the Dodd-Frank Act does not support Nasdaq's attempt to mandate diversity in the boardroom of its listed companies.

## VI.   NASDAQ'S DIVERSITY RULE VIOLATES THE U.S. CONSTITUTION.

Even if the proposed quotas were consistent with the Exchange Act and supported by substantial evidence, and they are not, they would be unconstitutional for multiple, independent reasons.

### A.      Nasdaq's Diversity Rule Is Subject to Constitutional Scrutiny.

An SEC order approving Nasdaq's rule is subject to constitutional scrutiny. It does not matter that Nasdaq is a "private" securities exchange. Nasdaq may be a "private" organization, but the SEC is an agency of the United States, and any final order by the SEC is subject to constitutional scrutiny. Moreover, exchanges like Nasdaq are "subject to comprehensive SEC oversight and control."[246] Securities cannot be publicly traded in interstate commerce unless they are registered in an

---

[243] 12 U.S.C. § 5452(b)(4).

[244] 80 Fed. Reg. at 33,023/1.

[245] *See id*. at 33,023–24.

[246] *NetCoalition v. SEC*, 615 F.3d 525, 528 (D.C. Cir. 2010).

exchange, and an exchange cannot be registered unless it performs numerous regulatory functions like fraud prevention on behalf of the SEC to protect the public interest.[247] As Congress recognized in 1975, exchanges like Nasdaq "exercise governmental power" in ways that affect both the rights of exchange members and securities issuers:

> The self-regulatory organizations exercise government power, and they do so in basically three ways which may adversely affect the interests of particular persons: (1) by imposing a disciplinary sanction, broadly defined, on a member or person affiliated with a member, (2) by denying membership to an applicant, and (3) by requiring members to cease doing business entirely or in specified ways with a particular non-member *or with respect to a particular security.*[248]

Justice William O. Douglas, former chair of the SEC, put it more bluntly. The Act's intention was "letting the exchanges take the leadership with Government playing a residual role. Government would keep the shotgun, so to speak, behind the door, loaded, well oiled, cleaned, ready for use but with the hope it would never have to be used."[249] In other words, if Nasdaq fails to adequately exercise its delegated regulatory authority, the SEC will use its own regulatory shotgun. Pervasive government coercion is a feature of the Exchange Act's self-regulatory model.

As relevant here, Nasdaq's diversity rule change is only enforceable through an order by the SEC affirming that the rule adequately serves one or more of the Exchange Act's public functions, like fraud prevention. Nasdaq is also subject to the ongoing threat of SEC sanctions, including deregistration, suspension, or revocation, if it fails to enforce approved exchange listing rules.[250] Nasdaq, in other words, has a federally enforceable duty to delist issuers that do not comply with listing rules, subject to the SEC's shotgun.

---

[247] 15 U.S.C. §§ 78e, 78(f).

[248] S. Rep. 94-75, 24, 1975 U.S.C.C.A.N. 179, 202–03 (emphasis added).

[249] Douglas, Democracy and Finance 82 (1940), *quoted in Silver*, 373 U.S. at 352.

[250] 15 U.S.C. § 78s(e), (f), (g), (h); *see In re The Nasdaq Stock Market, LLC and Nasdaq Execution Services, LLC*, Admin. Proceeding File No. 3-15339 (May 29, 2013) (imposing sanctions on Nasdaq in part for failing to follow its rules in connection with Facebook's initial public offering).

Given the nature of the SEC's involvement in approving, superintending, and enforcing Nasdaq's exchange rules, an SEC order approving Nasdaq's diversity rule would be governmental action subject to the same constitutional scrutiny as any other reviewable agency action.[251] And under the Administrative Procedure Act, courts must "hold unlawful and set aside" any agency order that is "contrary to constitutional right, power, privilege, or immunity."[252] That is why the Court of Appeals for the Fifth Circuit has held that exchange rules approved by the SEC are government action subject to constitutional scrutiny under the Fifth Amendment, and has also rejected Nasdaq's contention here as "contrary to numerous court decisions."[253]

Nasdaq argues that the SEC's approval of the diversity rule would not be government action, citing *Blum v. Yaretski* and *Desiderio v. National Association of Securities Dealers*.[254] Nasdaq asserts that under *Blum*, the SEC's approval of the diversity rule is only subject to constitutional scrutiny if the SEC forced or encouraged Nasdaq's adoption of the diversity rule, and would be free from scrutiny otherwise.[255]

Nasdaq's test is wrong. Government coercion or even encouragement has never been a necessary element for fairly attributing private action to the state. As the Supreme Court held in *Brentwood Academy*, "[w]hat is fairly attributable is a matter of normative judgment, and the criteria lack rigid simplicity."[256] Instead, the Court

---

[251] *See Shelley v. Kraemer*, 334 U.S. 1, 19 (1948) (judicial enforcement of private racial covenants was state action); *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 172 (1972) ("[T]he impetus for the forbidden discrimination need not originate with the State if it is state action that enforces privately originated discrimination").

[252] 5 U.S.C. § 706(2)(B).

[253] *Intercontinental Indus., Inc. v. Am. Stock Exch.*, 452 F.2d 935, 941 (5th Cir. 1971) ("The Exchange's position that constitutional due process is not required since the Exchange is not a governmental agency is clearly contrary to numerous court decisions.").

[254] 191 F.3d 198, 206 (2d Cir. 1999) ("NASD is a private actor, not a state actor); Ballard Spahr Response at 11.

[255] Ballard Spahr Response at 11.

[256] *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288, 289 (2001).

looks at a "host of facts."[257] For example, the Supreme Court has found state action "when a private actor operates as a willful participant on joint activity with the State and its agents," "when it is controlled by an agency of the state," "when it has been delegated a public function by the State," and "when it is entwined with governmental policies."[258]

In *Brentwood Academy*, the Supreme Court expressly rejected Nasdaq's argument that government coercion or encouragement are necessary to attribute state action to a private entity:

> [I]t avails the Association nothing to stress that the State neither coerced nor encouraged the actions complained of. "Coercion" and "encouragement" are like "entwinement" in referring to kinds of facts that can justify characterizing an ostensibly private action as public instead. Facts that address any of these criteria are significant, but no one criterion must necessarily be applied. When, therefore, the relevant facts show pervasive entwinement to the point of largely overlapping identity, the implication of state action is not affected by pointing out that the facts might not loom large under a different test.[259]

As in *Brentwood Academy*, it avails Nasdaq nothing to stress that the SEC neither coerced nor encouraged Nasdaq's diversity rule.

The SEC's approval of Nasdaq's rule is state action under longstanding precedent. Nasdaq's diversity rule is not enforceable without an SEC order, so an SEC order that makes its rule binding qualifies is state action under *Shelley v. Kraemer*'s prohibition of state enforcement of "private" racial covenants.[260] Moreover, Nasdaq downplays the role of the SEC in supervising the operation of exchanges. Apart from needing SEC approval for the rule to be effective at all, Nasdaq has an ongoing federal duty to enforce its exchange rules against listed companies, subject to SEC sanctions if it does not. Thus, even if the *proposal* of the rule is free from

---

[257] *Id.* at 296.

[258] *Id.* (quotation marks and citations omitted).

[259] *Id.* at 303.

[260] *Shelley*, 334 U.S. at 19.

government coercion or encouragement, the *enforcement* of the diversity rule is not. The SEC, in Justice Douglas' words, stands behind Nasdaq's exchange rules with a shotgun. This state-sanctioned and state-backed regime of private discrimination falls comfortably within the scope of the Supreme Court's state action doctrine.

Nasdaq further argues its "listing rules" are not state action because it is "part of a private compact between Nasdaq and its listed companies."[261] But this argument also contradicts Supreme Court precedent. In *Shelley v. Kraemer*, there was no evidence that the state coerced homeowners into adopting racially restrictive "private" covenants. But because the private covenants were only enforceable by order of a state court, the order enforcing the covenants was state action.[262] Here, as in *Shelley*, the rules are only enforceable by an order of the SEC. *Shelley* and its progeny control, and compel the conclusion that Nasdaq's diversity rule is state action.

Numerous other facts ignored by Nasdaq also suggest that Nasdaq's action is fairly attributable to the state under the applicable Supreme Court doctrine.

First, Nasdaq is exercising traditional public regulatory functions. Whether characterized as setting corporate governance rules to promote diversity, preventing fraud, protecting investors, or promoting the public interest under the Exchange Act, the rule regulates traditional areas controlled by states and the SEC. Indeed, Nasdaq cites to state legislation and congressional bills that propose similar diversity requirements for boardrooms. Nasdaq's exercise of traditional public functions is strong evidence of state action.[263]

Second, Nasdaq and the SEC have a deeply symbiotic relationship. Courts attribute state action to a private entity when a state has "so far insinuated itself into a position of interdependence" with a private entity that "it must be recognized as a

---

[261] *Id.* at 12.

[262] *Shelley*, 334 U.S. at 19.

[263] *Evans v. Newton*, 382 U.S. 296, 302 (1966).

joint participant in the challenged activity."[264] A high level of mutual interdependence exists between Nasdaq and the SEC. Nasdaq's very existence is attributable to an SEC registration order, which requires Nasdaq to perform numerous public regulatory functions on behalf of the public interest, subject to SEC review, and subject to SEC penalties if it does not. As the Court of Appeals for the Fifth Circuit has held, the "intimate involvement of the Exchange with the Securities and Exchange Commission brings it within the purview of the Fifth Amendment's controls over governmental due process."[265]

The SEC's approval order would therefore be subject to constitutional scrutiny.

## B. Nasdaq's Diversity Rule Violates the Fifth Amendment.

### 1. The Proposed Female Director Rule Does Not Satisfy Heightened Scrutiny.

The diversity rule would violate core anti-discrimination and equal protection principles protected by the Fifth Amendment. As the Supreme Court has held, "[e]qual protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment."[266] Under the Fifth Amendment, sex discrimination is subject to "heightened scrutiny," which means it "requires an exceedingly persuasive justification."[267] Courts view with "suspicion laws that rely on 'overbroad generalizations about the different talents, capacities, or preferences of males and females.'"[268] The general classification must serve "important governmental objectives" through means "substantially related to" achieving those objectives.[269] Even if gender generalizations have "statistical support" and are "descriptive," the Supreme Court "reject[s] measures that classify unnecessarily and overbroadly by

---

[264] *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725 (1961).

[265] *Intercontinental Indus., Inc.*, 452 F.2d at 941.

[266] *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 224 (1995) (quoting *Buckley v. Valeo*, 424 U.S. 1, 93 (1976)).

[267] *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1690 (2017) (quoting *United States v. Virginia*, 518 U.S. 515, 555–56 (1996)).

[268] *Id.* (quoting *Virginia*, 518 U.S. at 533).

[269] *Virginia*, 518 U.S. at 533 (quoting *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982)).

gender when more accurate and impartial lines can be drawn."[270] All sex discrimination is subject to the same stringent standard of review even if it is not motivated by "invidious" discrimination.[271]

Nasdaq's justification cannot survive the Supreme Court's "exceedingly persuasive justification" standard for sex discrimination under the Fifth Amendment.

First, Nasdaq contends that "there are important government interests in perfecting the mechanisms of a free and open market and promoting investor confidence through the promotion of diverse boards (to include female and LGBTQ+ directors)."[272] But Nasdaq attempts a sleight of hand, claiming that its proposed solution—promoting diverse boards—*is* the government interest. This cannot be correct; Nasdaq has no authority under the Exchange Act to advance social objectives like board diversity. The only legitimate government interests that Nasdaq may assert are improving securities markets and protecting investors; any promotion of board diversity is at most a means to achieve these interests. In any event, improving cognitive diversity in the boardroom is not among the very limited "important governmental objectives" that have ever justified government-sponsored sex discrimination.

Second, Nasdaq fails to show that its female director rule is "substantially related" to improving markets or protecting investors. As explained above, Nasdaq's justification for a female director rule relies on stereotypes drawn from at best mixed and weak statistical evidence.[273] Nasdaq's claim that it "did not make assumptions about how women or men think"[274] is absurd: a rule "designed to reduce groupthink"[275] simply by requiring the group to include at least one woman is necessarily based on "assumptions about how women or men think." To survive

---

[270] *Morales-Santana*, 137 S. Ct. at 1693 & n.13.

[271] *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 800 (10th Cir. 2019).

[272] Ballard Spahr Response at 22.

[273] *See* Exhibit A.

[274] *Id.* at 23.

[275] *See, e.g.,* 85 Fed. Reg. at 80,498/1.

heightened scrutiny, Nasdaq must do more than selectively cite a handful of preferred third-party "studies" and sex-based stereotypes, it must show that its gender-based classification substantially serves its asserted governmental objective. It has failed to do so.

Third, there are many more tailored, gender-neutral ways of promoting the cognitive diversity that Nasdaq allegedly seeks. Rules requiring directors with differences in educational attainment and background (e.g., financial auditing expertise), age, political affiliation, socioeconomic status, or any other number of gender-neutral criteria would seem to be better suited and impartial means of achieving genuine cognitive diversity in the boardroom—at least the kind of cognitive diversity that may improve corporate boardrooms' work. Nasdaq had many other direct and sex- and race-neutral means at its disposal to protect investors. It could have, for example, required that one or more independent directors with accounting or auditing expertise sit on the audit committee. Instead, the diversity rule mandates a token female and minority director, regardless of any difference in their skill, perspective, or experience relative to other directors, and regardless of whether they will even sit in an audit committee.[276] The availability of non-discriminatory alternatives to enhance auditing—and Nasdaq's refusal to consider them—undermines Nasdaq's purported justification of the rule as a narrowly tailored remedy.

Nasdaq provides no persuasive justification for its failure to consider viable and seemingly more accurate alternatives to achieve cognitive diversity.

Nasdaq's rule fails heightened scrutiny.

---

[276] Sarbanes-Oxley regulations require national exchanges, including Nasdaq, to have listing rules requiring independent audit committees, and prescribe certain other procedural requirements. 17 C.F.R. § 240.10A-3. But these rules do not require audit committee members to have any financial expertise.

### 2. Nasdaq's Proposed Minority Director Rule Does Not Satisfy Strict Scrutiny, Heightened Scrutiny, or Rational Basis Review.

"'Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people.'"[277] There are no "benign" racial classifications; sorting people by race always "stimulate[s] our society's latent race consciousness,' "delay[s] the time when race will become . . . truly irrelevant," and "perpetuat[es] the very racial divisions the polity seeks to transcend."[278] For that reason, the Supreme Court has held that racial classifications "must be analyzed by a reviewing court under strict scrutiny. In other words, such classifications are constitutional only if they are narrowly tailored measures that further compelling governmental interests."[279]

There are few, if any, compelling governmental interests that justify racially discriminatory quotas. Remedying past invidious discrimination by a company may qualify as a compelling interest justifying discrimination, but the law remains unsettled.[280] In the unique context of higher education admissions practices, the Supreme Court has held that universities have a compelling interest in pursuing the educational benefits that may flow from racial diversity and may do so if race is narrowly used as no more than a flexible plus factor in the admissions process.[281] But even in this very limited context, the Supreme Court has held that racial quotas, automatic race "points," or any kind of inflexible admissions rules based on race are not permissible.

Improving the efficiency of securities markets or protecting investors are emphatically not compelling interests that could ever justify racial discrimination. Nor is Nasdaq's rule narrowly tailored. Nasdaq seeks to characterize its "comply-or-

---

[277] *Rice v. Cayetano*, 528 U.S. 495, 517 (2000).

[278] *Shaw v. Reno*, 509 U.S. 630, 643 (1993).

[279] *Adarand Constructors*, 515 U.S. at 227.

[280] *Id.* at 239 (Scalia, J., concurring in part and concurring in the judgment) ("In my view, government can never have a 'compelling interest' in discriminating on the basis of race in order to 'make up' for past racial discrimination in the opposite direction.").

[281] *Fisher v. University of Texas (Fisher II)*, 136 S. Ct. 2198 (2016); *Grutter v. Bollinger*, 539 U.S. 306 (2003); *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978).

explain" mandate as a flexible disclosure-based information-enhancing requirement, but Nasdaq fully expects that the mandate will have the desired effect of forcing member companies to consider race as a criterion in hiring board members.[282] That is impermissible.

Because the minority director rule contains a racial classification, it is subject to strict scrutiny, which it fails.

But even if the minority director rule contained only a sexual-orientation classification, it would also fail.

Although the Supreme Court has not specified the standard of review that applies to discrimination based on sexual orientation,[283] the rule fails both heightened and rational basis scrutiny.

First, at least one circuit has held that heightened scrutiny applies to discrimination based on sexual orientation,[284] and the sexual orientation portion of the minority rule, like that based on gender, conspicuously lacks the "exceedingly persuasive justification" required by this demanding level of review. Indeed, as explained above, unlike for gender, Nasdaq readily concedes that it lacks any statistical support relating to the effect of LGBTQ+ directors on corporate performance.

Nasdaq contends, however, that a single, unreviewed survey from an investment firm indicating that a subset of "companies 'supporting and embracing LGBT employees' outperformed [a particular index] by an average of 3.0% per year over the past six years" "sufficiently establishes that there is an important government interest in promoting LGBTQ+ diversity on corporate boards."[285] But as

---

[282] 85 Fed. Reg. at 80,496/2.

[283] *See, e.g., Obergefell v. Hodges*, 576 U.S. 644 (2015) (holding that same-sex marriage was a fundamental liberty protected by the Fourteenth Amendment but not specifying the level of scrutiny for sexual orientation discrimination).

[284] *See SmithKline Beecham Corp. v. Abbott Labs.*, 740 F.3d 471, 481 (9th Cir. 2014).

[285] Nasdaq Response Comments at 23.

68

explained above, the government interest, if any exists, is in improving securities markets or protecting investors—not promoting diversity on boards. Moreover, limited data suggesting that LGBTQ+ employees and policies may improve corporate returns does not establish that LGBTQ+ directors improve overall market mechanisms or protect investors. Nasdaq's rule fails heightened scrutiny for the simple reason that it cites no evidence that LGBTQ+ board representation is "substantially related" to any legitimate government interest.

Nasdaq also argues that "sexual orientation and gender identity are 'inextricably' intertwined with sex" and thus extrapolates its conclusions on board gender diversity to board LGBTQ+ diversity.[286] The structure of Nasdaq's diversity rule belies this assertion of belief: rather than combining female and LGBTQ+ directors into a single quota, as would be appropriate were they so intertwined, Nasdaq separated them, lumping LGBTQ+ identity into a "catchall" minority diversity category.[287] Nasdaq cannot rely on studies of gender diversity to justify a separate LGBTQ+ diversity mandate.

Second, and in the alternative, a sexual orientation quota would also fail under rational basis review because there is no "rational relationship between the disparity of treatment and some legitimate governmental purpose."[288] No evidence in the record provides rational support for treating LGBTQ+ directors differently than any otherwise similarly situated directors.

The diversity rule would also both stigmatize minority directors with paternalistic tokenism and stigmatize non-minority directors with a badge of inferiority because of race or sexual orientation, "a stigma and injury of the kind prohibited by our basic charter."[289]

---

[286] *Id.* at 23–24.

[287] 85 Fed. Reg. at 80,472/1.

[288] *Armour v. City of Indianapolis, Ind.*, 566 U.S. 673, 680 (2012).

[289] *Obergefell*, 576 U.S. at 671.

69

The SEC must deny approval of the minority quota rule.

**C.  Nasdaq's Diversity and Disclosure Rules Violate the First Amendment.**

The diversity and disclosure rules also violate the First Amendment impermissibly compelling directors and companies to speak, in the forms of (1) requiring companies to publicly comply with a diversity mandate or explain why they do not, and (2) requiring disclosure of board diversity data.

"[F]reedom of speech prohibits the government from telling people what they must say."[290] The Nasdaq quota rules inappropriately compel corporations to either adopt unconstitutional and controversial classifications based on gender, race, or sexual orientation when hiring directors or explain why they do not comply—a form of compelled apology.[291] This "comply-or-explain" requirement—as well as the requirement to disclose board diversity data—compels the disclosure of controversial information from companies without satisfying the strict scrutiny required by the First Amendment.

In *National Institute of Family & Life Advocates v. Becerra (NIFLA)*, the Supreme Court held that a compelled disclosure is subject to strict scrutiny unless it falls into one of two categories—"laws that require professionals to disclose factual, noncontroversial information in their 'commercial speech,'" and regulation of "professional conduct, even though that conduct incidentally involves speech."[292]

As in *NIFLA*, Nasdaq's discriminate-or-explain and disclosure data requirements do more than incidentally regulate speech. Under the diversity rule, a company that does not have at least two diverse directors must explain its reasons for not having these directors either "in the company's proxy statement or

---

[290] *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 61 (2006) (citing *West Virginia State Bd. of Ed. v. Barnette*, 319 U.S. 624, 642 (1943), and *Wooley v. Maynard*, 430 U.S. 705, 717 (1977)).

[291] 85 Fed. Reg. at 80,502/1.

[292] 138 S. Ct. at 2372 (2018).

information statement for its annual meeting of shareholders or, alternatively on the company's website."[293] The rule also requires that companies annually disclose their board diversity statistics, according to Nasdaq's preferred and arbitrary taxonomy of diversity categories.[294] These requirements are not forced disclosures of "factual, *noncontroversial* information in . . . 'commercial speech.' "[295] The compelled disclosure of a company's reasons for failing to recruit directors of certain racial, gender, and sexual orientation identities is palpably different from examples of required disclosures of noncontroversial information cited by the diversity rule, such as a requirement to disclose whether a company has at least one financial expert on its audit committee.[296] And as the SEC recognized in 2009 when it decided *against* endorsing a uniform definition of diversity, the very concept of boardroom diversity is itself highly controversial and contested. Nasdaq's rule requires disclosure of highly controversial information, and it is not a regulation of companies' commercial speech, as the speech is entirely rule-created. The rule is therefore subject to strict scrutiny.

Furthermore, the diversity and disclosure rules cannot survive strict scrutiny because these requirements serve no compelling governmental interest. The only interest advanced by the non-compliance explanation is a vague assertion that explanations would "enable more informed analysis of, and conversations with, companies."[297] The same is true for Nasdaq's diversity disclosure framework. But a vague interest in "more informed conversations" has never been held to be a compelling interest justifying speech commands.

Nasdaq's arguments to the contrary are unpersuasive. It does not matter that "there is no particular message prescribed by the Proposed Rules."[298] Simply "[m]andating speech that a speaker would not otherwise make necessarily alters the

---

[293] 85 Fed. Reg. 80,502/1.

[294] *Id.* at 80,486.

[295] 138 S. Ct. at 2372 (emphasis added).

[296] *See* 85 Fed. Reg. 80,502 (referencing Regulation S-K, Item 407).

[297] 85 Fed. Reg. at 80,492/2.

[298] Ballard Spahr Response at 27.

71

content of the speech."[299]

In *Riley v. National Federation of the Blind of North Carolina, Inc.*, the Supreme Court held that a state "requirement that professional fundraisers disclose to potential donors, before an appeal for funds, the percentage of charitable contributions collected during the previous 12 months that were actually turned over to charity" was a "content-based regulation of speech" even though it accepted the state's characterization that its regulation was "compelled statements of 'fact'" that did not dictate the content of any particular disclosure.[300] This holding was based on numerous precedents. For example, the *Riley* court cited *Miami Herald Pub. Co. v. Tornillo*, where the Supreme Court held that it did not matter that the "statute in question here has not prevented the Miami Herald from saying anything it wished."[301] "Compelling editors or publishers to publish"—regardless of whether the speaker can choose the content of the publication—was a content-based restriction.[302]

Thus, the diversity rule impermissibly compels speech.

### D. Default Approval of Nasdaq's Diversity Rule Would Violate the Private Non-Delegation Doctrine and the Appointments Clause.

If the SEC fails to act, at least in theory the diversity rule may be approved by default.[303] Such a means of approval may be convenient for Nasdaq, but approval by default would violate the private non-delegation doctrine and the Appointments Clause.

The Exchange Act provides that a proposed rule change shall be deemed to have been approved by the SEC if the SEC does not approve or disapprove the

---

[299] *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 795 (1988).

[300] *Id*. at 796-98.

[301] 418 U.S. 241, 256 (1974).

[302] *Id*.

[303] *See* 15 U.S.C. 78s(b)(2)(D)(i) (providing that a proposed rule change shall be deemed to have been approved by the SEC if the SEC does not approve or disapprove the proposed rule change within 45 days after the date of publication).

proposed rule change within 45 days after the date of publication.[304] This raises constitutional concerns under the private non-delegation doctrine. Under that doctrine, agency delegation to a private entity is only lawful on the condition that "the entities function subordinately to the federal agency and the federal agency has authority and surveillance over their activities."[305] When an agency delegates a statutory duty, the agency may not "reflexively rubber stamp[]" a rule prepared by a private entity but instead must "independently perform its reviewing, analytical and judgmental function and participate actively and significantly in the preparation and drafting process."[306]

The diversity rule setting diversity quotas for corporate boards is a legislative rule that governs "private conduct."[307] If the SEC does not review and affirmatively approve or disapprove this diversity rule, the SEC will not have exercised the necessary "authority and surveillance" over Nasdaq's regulatory activities, as required by the non-delegation doctrine. Thus, an automatic approval by the SEC of the diversity rule after the 45-day window would amount to an unconstitutional "rubber stamp" of a legislative rule prepared by a private entity.[308]

For similar reasons, an SEC rubber stamp would also violate the Appointments Clause. Article II of the Constitution demands that the President generally appoint all "Officers of the United States" with the Senate's advice and consent.[309] This provision ensures that those who exercise the power of the United States are

---

[304] *Id.*

[305] *Texas v. Rettig*, 968 F.3d 402, 414 (5th Cir. 2020) (internal quotation marks omitted); *see also Dep't of Transp. v. Ass'n of Am. Railroads*, 575 U.S. 43, 61 (2015) (Alito, J., concurring); *id.* at 87 (Thomas, J., concurring in the judgment).

[306] *See Sierra Club v. Lynn*, 502 F.2d 43, 59 (5th Cir. 1974).

[307] *See Ass'n of Am. Railroads*, 575 U.S. at 70 (Alito, J., concurring) ("[T]he formulation of generally applicable rules of private conduct . . . requires the exercise of legislative power.").

[308] Even if the SEC approved the rule, the statute may be an unlawful delegation of authority to the SEC, as Congress itself must regulate important subjects like boardroom diversity or at least supply an intelligible principle for regulation. *See Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019).

[309] Art. II, § 2, cl. 2.

accountable to the President, who himself is accountable to the people.[310] The Supreme Court has held that someone who exercises "significant authority pursuant to the laws of the United States" is an officer.[311]

The power to promulgate legislative rules governing the internal affairs of public corporations pursuant to the Exchange Act would certainly qualify as "significant authority" under federal law. Such significant rules must be adopted or at least properly ratified by lawfully appointed executive officers, not by Nasdaq's politically unelected President and CEO, who has never been appointed to federal office. As Justice Alito has noted, "nothing final should appear in the Federal Register unless a Presidential appointee has at least signed off on it."[312]

### E.    Approval by the Acting Director of Markets and Trading Would Violate the Appointments Clause.

The Acting Director of Markets and Trading lacks authority to approve the rule under the U.S. Constitution.

Under the Appointments Clause of the U.S. Constitution, only the President, "Courts of Law," or "Heads of Departments" can appoint "Officers." Art. II, § 2, cl. 2. A federal official is an "Officer[]" under the appointments clause if the official occupies "a continuing office established by law," and possesses "significant discretion" when carrying out "important functions."[313]

The Director of Markets and Trading is a paradigmatic example of such an "Officer." The Director occupies a continuous office defined by law, and exercises significant discretion over important functions.[314] Indeed, the Commission has fully delegated its power to administer the Exchange Act to the Director of Market and

---

[310] See *Free Enterprise Fund v. PCAOB,* 561 U.S. 477, 497–498 (2010) (citing The Federalist No. 72, p. 487 (J. Cooke ed. 1961) (A. Hamilton)).

[311] *Lucia v. SEC*, 138 S. Ct. 2044, 2051 (2018) (quoting *Buckley v. Valeo*, 424 U.S. 1, 126 n.162 (1976) (per curiam).

[312] *Ass'n of Am. Railroads*, 575 U.S. at 64 (Alito, J.).

[313] *Lucia v. SEC*, 138 S. Ct. 2044, 2052–53 (2018).

[314] 15 U.S.C. § 78d(h)(1); 17 C.F.R. § 200.19a.

Trading, subject to six enumerated exceptions.[315] The Director can even express views in federal court independent of the SEC.[316]

However, no validly appointed officer currently occupies this office. Instead, a career deputy has assumed the role of Acting Director of Markets and Trading.[317] Therefore any official actions by the Acting Director would be the unconstitutional actions of an unappointed "Officer[]" under Art. II, § 2, clause 2, unless the full SEC reviews and affirmatively ratifies those official actions.[318] Should the Acting Director alone purport to approve Nasdaq's diversity rule, that approval would be void and unlawful as carried out by an unappointed officer.

### F.    Commissioners Lee and Crenshaw Have Prejudged Nasdaq's Diversity Rule and Must Recuse to Preserve Due Process.

While the proposed rule is in front of the Director of Trading Markets, should the Commission become involved, Commissioners Lee and Crenshaw would have to be recused because they have prejudged the diversity rule.

The principle that due process of law requires a neutral decisionmaker stretches back at least as far back as seventeenth English common law.[319] Under that longstanding principle of due process, an agency official in an adjudication must be disqualified if "a disinterested observer may conclude that the agency [official] has in some measure adjudged the facts as well as the law of a particular case in advance of hearing it."[320]

---

[315] 17 C.F.R. § 200.19a(a)(1)-(6).

[316] *See, e.g., City of Providence, Rhode Island v. BATS Glob. Markets*, No. 14-CV-2811 (JMF), 2020 WL 582461, at *2 n. 2 (S.D.N.Y. Feb. 6, 2020).

[317] *See* SEC Press Release 2020-317, *Brett W. Redfearn to Conclude Transformative Tenure as SEC Trading and Markets Director* (Dec. 15, 2020) ("Upon Mr. Redfearn's departure, Christian Sabella, currently a deputy director of the Division, will assume the role of Acting Director.").

[318] 15 U.S.C. § 78d-1(b)-(c).

[319] *Bonham's Case*, 77 Eng. Rep. 646, 652 (1610).

[320] *Cinderella Career & Finishing Sch., Inc. v. FTC*, 425 F.2d 583, 591 (D.C. Cir. 1970) (cleaned up). This standard is distinct and less demanding than the standard for an agency engaged in legislative rulemaking, as opposed to adjudicating the approval or disapproval of Nasdaq's proposal, as

That standard for recusal has been met here. Indeed, in a matter "critical to the disposition" of this case—whether substantial evidence supports Nasdaq's claimed Exchange Act justifications for its proposed diversity rule—Commissioner Lee is quoted by Nasdaq as having "adjudged" the facts: "to the extent one seeks economic support for diversity and inclusion (instead of requiring economic support for the lack of diversity and exclusion), *the evidence is in.*"[321] Commissioner Lee's statement prejudged the evidence Nasdaq seeks to rely upon in this adjudication in more than "some measure" before any of that evidence was actually "in" the record.

Similarly, Commissioner Lee has prejudged the law when she demeaned the adequacy of the current legal regime that Nasdaq's proposed diversity disclosure rule seeks to replace. She stated that current SEC disclosure requirements have "led to spotty information that is not standardized, not consistent period to period, not comparable across companies, and not necessarily reliable. . . And the current state of disclosure reveals the shortcomings of a principles-based materiality regime in this area."[322] Because of these judgments, Nasdaq favorably quotes Commissioner Lee as calling for the very proposed diversity disclosure rule that Nasdaq now has pending before her and the SEC: "it's time to consider how to get investors the diversity information they need to allocate their capital wisely."[323] Indeed, Commissioner Lee has emphasized that a heavy-handed rule like Nasdaq's diversity disclosure proposal "creates external pressure" to "drive corporate behavior."[324] A disinterested observer would conclude that Commissioner Lee has "adjudged the facts as well as the law" for Nasdaq's particular case.

---

articulated in *United Steelworkers of Am., AFL-CIO-CLC v. Marshall*, 647 F.2d 1189, 1209 (D.C. Cir. 1980) (holding that an official's recusal in rulemaking is required "when there has been a clear and convincing showing that (she) has an unalterably closed mind on matters critical to the disposition of the proceeding." (alteration in original)).

[321] Commissioner Allison Herren Lee, Diversity Matters, Disclosure Works, and the SEC Can Do More: Remarks at the Council of Institutional Investors Fall 2020 Conference (September 22, 2020), https://www.sec.gov/news/speech/lee-cii-2020-conference-20200922 (emphasis added).

[322] *Id.*

[323] *Id.*

[324] *Id.*

Likewise, Commissioner Crenshaw is cited throughout the Nasdaq proposal as similarly in favor of Nasdaq's diversity rule.[325] Indeed, Nasdaq notes that Commissioner Crenshaw "expressed disappointment with the Commission's silence on diversity."[326] Criticizing the current SEC disclosure rules as "silent on diversity," Commissioner Crenshaw described the matter now pending before the SEC as "extremely important to investors and to the national conversation. The failure to grapple with these issues is, quite simply, a failure to modernize."[327] A disinterested observer would conclude that Commissioner Crenshaw has adjudged Nasdaq's proposal before hearing it.

Commissioners Lee and Crenshaw should recuse from adjudicating Nasdaq's proposed rules.

### G.    The SEC is Unconstitutionally Insulated from the President's Removal Power.

Any action to approve Nasdaq's diversity rule would also be unconstitutional because SEC commissioners are unlawfully insulated from presidential control.

SEC Commissioners have some degree of legal independence from presidential oversight because they may not be removed by the President except for good cause, meaning inefficiency, neglect of duty, or malfeasance in office.[328] That is the same standard of tenure protection that the Supreme Court recently held unconstitutional under the separation of powers in *Seila Law v. CFPB*.[329] The only difference here is that the SEC is a multimember commission.

That is irrelevant. The limited Supreme Court exception for "multimember expert agencies that do not wield substantial executive power" does not apply to the

---

[325] Commissioner Caroline Crenshaw, Statement on the "Modernization" of Regulation S-K Items 101, 103, and 105 (August 26, 2020), https://www.sec.gov/news/public-statement/crenshaw-statementmodernization-regulation-s-k.

[326] 85 Fed. Reg. 80,472/1 n.146.

[327] Crenshaw, *supra* note 325.

[328] *PCAOB*, 561 U.S. at 496 (assuming good cause tenure protections apply to SEC Commissioners).

[329] 140 S. Ct. 2183, 2197 (2020).

SEC, which has enormous executive power to implement statutes "in a major segment of the U.S. economy" and exercises regulatory and adjudicative powers that are almost a carbon copy of the CFPB's executive powers under Title X of the Dodd-Frank Act, which the Supreme Court deemed "substantial executive power" in *Seila Law*.[330] The SEC is therefore unconstitutionally insulated from presidential control.

## **CONCLUSION**

Nasdaq's diversity rule is unlawful, unconstitutional, and procedurally defective. The SEC must disapprove the rule.

---

[330] *Id.* at 2199–200.

# EXHIBIT A



# Review of the Literature on Diversity on Corporate Boards

**Jonathan Klick**

APRIL 2021

A M E R I C A N   E N T E R P R I S E   I N S T I T U T E

# Executive Summary

Despite large increases in the representation of women and people from other minority groups on corporate boards, public and private regulators are pushing for more. California already passed mandates requiring firms headquartered in the state to meet quotas for women and members of other underrepresented groups on their corporate boards. The Nasdaq stock exchange proposed a similar mandate. To support this forced injection of diversity, the regulators point to a wealth of citations claiming diversity improves a firm's value.

Upon examination, though, the research base does not hold up. Many citations come from consulting firm position papers that lack credibility. These reports imply that, because higher-value firms tend to have more-diverse boards, diversity causes the increase in value, without even attempting to adjust for other differences across firms. The academic literature noted in the Nasdaq proposal is not much better. Reliable causal inferences require methods that ensure one is comparing apples to apples, whereas most of the cited literature does little more than add a few control variables to get to an apples-to-bananas comparison, at best.

It also appears that the Nasdaq proposal selectively surveyed the literature on board diversity. When meta-analyses are consulted, the literature as a whole finds little relationship between board diversity and firm value. This systematic review of the literature aligns with numerous other literature reviews, even those performed by individuals predisposed to favor diversity mandates, finding that the evidence is weak for a business case for diversity.

The Nasdaq proposal ignores many studies that are much more reliable methodologically. For example, studies examined the enactment of diversity requirements in Norway, using it as a natural experiment that would provide insight into what happens when firms are forced to diversify their boards. Findings from the Norwegian experience indicate, at best, that diversity mandates do not improve firm value, and some studies find the quotas harmed firm performance. Additionally, many firms chose to go private to avoid the regulation.

There is no credible evidence that diversity requirements systematically improve firm performance.

# Review of the Literature on Diversity on Corporate Boards

## Jonathan Klick

Women are better represented on US corporate boards than ever before. According to data from the proxy advisory firm Institutional Shareholder Services (ISS), by 2019, women held more than one-fourth of board seats in S&P 500 firms and about one-fifth of seats among the Russell 3000.[1] This represents a substantial increase compared to the preceding decade. ISS data also portend even more growth, with women composing almost half of new directors appointed in 2019 in the S&P 500 and the Russell 3000, a more than threefold increase since 2008.[2] In this same period, there was also growth in the inclusion on boards of individuals self-identifying as ethnic minorities.[3]

Despite this organic growth and signs of continued gains in the future, entities such as California[4] and the Nasdaq stock exchange[5] have passed or proposed regulations mandating that firms add women and minority group members to their boards or, in the case of the Nasdaq proposal, provide an explanation for not meeting the requirement.

The California regulation and Nasdaq rule proposal are premised on findings that female board members improve firm performance. For example, California S.B. 826 indicates, "Numerous independent studies have concluded that publicly held companies perform better when women serve on their boards of directors," before summarizing numerous studies from consulting firms such as McKinsey & Company and a few academic studies.[6] Likewise, citing many of the same studies, the Nasdaq proposal asserts, "There is a significant body of research suggesting a positive association between diversity and shareholder value."[7]

As firms are pushed to change their practices to accelerate the already swift trend toward more diversity on boards, it is useful to review the findings of the literature, both those studies cited and more broadly. One concern with the cited literature is its reliance on nonacademic reports from consulting firms that may be influenced by branding considerations and, at minimum, have never been subjected to peer review. With the handful of peer-reviewed studies California and the Nasdaq proposal relied on, it is important to examine whether those studies are representative of the academic literature or cherry-picked.

In this report, I start with a brief, relatively nontechnical primer on empirical work in general, with a focus on causality. As many of the consulting reports admit, their findings cannot answer whether any claimed relationship between firm performance and board makeup represents a causal relationship. While firms with more-diverse boards might perform better than they would with less-diverse boards, the findings could also reflect that more-successful firms might choose diverse board members without the diversity actually affecting performance. Diverse boards might also be concentrated in industries that have happened to do well over the past decade, independently of any contribution by the board. Similarly, almost none of the studies cited explores whether it may be more costly or difficult for some firms to comply with the diversity mandates. A one-size-fits-all approach, as opposed to allowing organic diversity gains, could harm many firms even if the effect on average is positive.

To sort this out, it is necessary to focus on studies that credibly identify the causal impact of board diversity on firm performance. The vast majority of

the studies used to support the diversity regulations do not identify causal effects and, therefore, do not constitute reliable evidence. Among the few studies that provide valid insights into the causal effects of mandating diversity, the evidence is mixed at best. Overall, the literature suggests that such mandates will do little to improve firm performance and may generate losses for shareholders.

## Correlation Is Not Necessarily Causation

The evidence (discussed below) regarding how increasing diversity affects corporate boards either compares an average outcome (e.g., market return) across two or more groups of firms broken down according to the degree of diversity of the firms' boards or uses more-sophisticated techniques (e.g., regression analysis) to compare the relationship between board diversity and outcomes, adjusting for other firm characteristics.

The FCLTGlobal report Nasdaq cited used the general comparison approach.[8] It indicated,

> Looking at MSCI ACWI firms between 2010 and 2017 and using a diversity metric that compasses [sic] both age and gender, we found that the most diverse boards (top 20 percent) added 3.3 percentage points to ROIC [return on invested capital], as compared to their least diverse peers (bottom 20 percent).[9]

There are many problems with relying on this approach to support the claim that the Nasdaq proposal will generate firm value. First, there is a relevance problem with taking a claim about a composite diversity index that confounds age and sex and using it as a basis for a regulation focused on sex and minority status. While the FCLTGlobal analysis says gender diversity drives much of the effect (2.6 percent[10]), there is no analysis of minority-status diversity.

Perhaps more importantly, the FCLTGlobal comparison does not account for other potential differences across the companies with the most- and least-diverse boards. For example, during the past decade, the auto industry suffered a slight loss in

market return, whereas internet and direct-marketing retail saw growth exceeding 1,000 percent.[11] The primary underlying causes of these diverging prospects obviously have nothing to do with who makes up the company boards in those industries. Car sales are suffering from shifting generational preferences[12] and changing environmental concerns, whereas internet-based retail is a relatively young industry that has benefited from changing technology and other exogenous factors. If car companies have mostly men on their boards and internet-based retail firms have more women on theirs, then a comparison will mechanically generate something like the FCLTGlobal result. At minimum, any such comparison would need to be made on a within-industry basis, to say nothing of needing to adjust for other differences across the firms. Without such adjustments, it is impossible to say anything meaningful about how increasing female participation affects corporate boards.

## To isolate the causal effect of board diversity on outcomes, one needs to compare apples to apples.

Unfortunately, making the required adjustments is easier said than done. To isolate the causal effect of board diversity on outcomes, one needs to compare apples to apples. Conceptually, the purest test would involve two otherwise identical companies in which one had an all-white, all-male board and the other had a more diverse board. If one were certain the two companies were truly identical, except for their board composition, any differences in outcomes would be either due to random chance or caused by the board differences. Statistically, if the sample size were large enough (many identical firms, some with nondiverse and some with diverse boards), the random component becomes

relatively small on average (and can be bounded), leaving just the board-induced differences.

Of course, it is not possible to examine identical companies since real-life firms differ. If those differences happen to be correlated with board composition (such as the example above positing that boards may differ across industries), determining whether observed outcome differences are due to board composition or these other distinctions will not generally be possible. In statistics, this is called an omitted variable bias. In such a situation, the other differences will confound any estimate of board effects.

To guard against this omitted variable bias, researchers attempt to account for differences across firms. In group-based comparisons, such as the FCLT-Global example, instead of comparing companies with the most-diverse boards to companies with the least-diverse boards, as suggested, one might make the comparisons in a particular industry. Beyond the industry comparison, one might also try comparing firms with similar corporate governance mechanisms (e.g., comparing firms with staggered boards to other such firms or firms operating under Delaware law with other firms operating this way). This matching or grouping process gets complicated quickly. First, the more attributes an analyst matches on, the smaller the sample gets on which the comparison is performed. Smaller sample sizes increase the influence of random variation in the comparison. In the extreme, it might not be possible to distinguish even large outcome differences among the groups from random noise.

Second, the intuition above is conceptually clear for discrete categories (e.g., firm industry or a particular corporate governance attribute), but grouping by continuous variables is necessary too. If a firm's vintage relates to the outcome metric and the board's diversity, an adjustment is needed. Should the analyst compare only firms that started in the same year? If market capitalization relates to board composition and performance, how close is close enough for grouping purposes? Is the arbitrary distinction between mid- and large-cap firms enough for matching purposes, or should more fine-grained distinctions be made?

These complications must be addressed for FCLTGlobal-type analyses to be taken seriously. Unfortunately, the bulk of these studies, which the Nasdaq proposal relied on, ignore this issue altogether, making their conclusions scientifically unreliable. This leaves the possibility that the studies are vastly overestimating (or underestimating) the causal effect of board diversity on firm outcomes.

Some of the more sophisticated studies use regression techniques to adjust for differences across firms when attempting to isolate how diversity affects corporate outcomes. Generally understood, regression methods "fit" a linear function, relating the control variables (in the current case, the chosen board diversity metric and whatever firm attributes that are to be accounted for) to the outcome variable in an optimal way.[13] For example, if a firm's age is found to have a certain relationship, on average, with the outcome variable and a firm's market capitalization has an estimated relationship with the outcome, then two firms of different ages and market caps can be adjusted to yield an after-adjustment comparison wherein the firms are now conditionally similar, except for their board compositions. After these effects have been accounted for and there are no other differences among the firms, any leftover difference in the firms' outcomes must be due to either random variation or the differing levels of diversity on their boards. Again, if this regression is estimated over many firms, the random component will become relatively less important,[14] and it may be possible to make probabilistic statements about the causal effect of board diversity on the outcome examined.

Although regression techniques are widely used, there is a well-known problem: Regression estimates can be interpreted only as causal effects if the model does not suffer from omitted variable bias. That is, if the model fails to include a control variable (or numerous control variables) that affects the outcome and is correlated with the control variables included in the model, the estimates will not represent the causal effect of a variable on the outcome. For example, even in a regression framework, if one did not account for the industry effects noted above and board diversity differed systematically by industry, the estimated

coefficient on the board diversity variable will include both the true causal effect of board diversity on the outcome and some portion of the industry effects on the outcome. If the regression happens to estimate the true causal effect, it will be entirely accidental, and it is impossible for the researcher to know whether the actual causal effect is bigger, smaller, or the same as the estimated effect is. The researcher cannot even reliably know the sign (i.e., the direction) of the true causal effect.

> # Although regression techniques are widely used, there is a well-known problem: Regression estimates can be interpreted only as causal effects if the model does not suffer from omitted variable bias.

In the example of omitting the industry effects, a simple solution is to adjust by industry. How specifically to define the industry is problematic, as the bias problem could arise if board diversity and outcomes vary at the subindustry—say, four-digit North American Industry Classification System (NAICS)—level, while the researcher adjusts for industry only at the two-digit NAICS level. But conceptually, this is manageable.

The bigger problem is that board diversity and outcomes may be associated with factors the researcher is entirely unaware of, or, sometimes, he or she might be aware of the factor but has no data to make the adjustment. Unobserved heterogeneity is a ubiquitous

problem in empirical work, but solving it is crucial to reliably estimating effects.

## When Is Correlation Causation?

Although almost everyone nods in the direction of the causality concerns noted above, many researchers mention it but then progress without taking the implications seriously. For example, the McKinsey report cited in the Nasdaq proposal[15] touts,

> The analysis found a statistically significant relationship between a more diverse leadership team and better financial performance. The companies in the top quartile of gender diversity were 15 percent more likely to have financial returns that were above their national industry median. Companies in the top quartile of racial/ethnic diversity were 35 percent more likely to have financial returns above their national industry median. Companies in the bottom quartile for both gender and ethnicity/race were statistically less likely to achieve above-average financial returns than the average companies in the dataset (that is, they were not just not leading, they were lagging). The results varied by country and industry. Companies with 10 percent higher gender and ethnic/racial diversity on management teams and boards in the US, for instance, had EBIT [earnings before interest and taxes] that was 1.1 percent higher; in the UK, companies with the same diversity level had EBIT that was 5.8 percent higher. Moreover, the unequal performance across companies in the same industry and same country implies that diversity is a competitive differentiator that shifts market share towards more diverse companies.[16]

The report notes, "The relationship between diversity and performance highlighted in the research is a correlation, not a causal link." Almost immediately, the study drops the caution and declares, "More diverse companies are better able to win top talent, and improve their customer orientation, employee satisfaction, and decision making, leading to a virtuous cycle of increasing returns."[17] It could just as

likely be that high-performing firms are better able or more willing to seek out and attract more diverse board members, or there could be some other mediating factor unaccounted for in the analysis that leads to better performance and more diverse boards. Noting that correlation is not causation does not then free one to make such causal claims.

---

# Noting that correlation is not causation does not then free one to make such causal claims.

How, then, are causal claims ever possible? Modern statistical and econometric techniques provide some insight.[18] Most modern methods of causal inference take their cue from randomized controlled trials or experiments. If omitted variable bias arises when variables are omitted that influence the outcome (e.g., firm performance) being studied and that are correlated with the "treatment" of interest (e.g., board diversity), one can try to include all the relevant variables. However, failure is guaranteed for the reasons described above. Instead, it makes more sense to ensure somehow that the omitted variables are not correlated with the treatment of interest.

Random assignment of the treatment in an experiment achieves this. If, metaphorically, a coin flip determines whether a firm receives a diverse board, then the existence of a diverse board cannot be associated with firm characteristics such as industry, age, and market cap. Maybe even more importantly, the board assignment will not be correlated with the unquantifiable (but still potentially important) variables such as how forward-looking or progressive a firm is, a firm's risk-taking propensity, and countless other unobservable firm characteristics. If, in this experiment, a firm's board diversity is unrelated to any of the firm's attributes and if one observes firms with more-diverse boards performing better than

firms with nondiverse boards are, then the performance differential is either due to random variation (which, as noted earlier, becomes less important as the experiment's sample size grows) or is driven by the presence of the diverse board itself.

This experimental approach is used regularly to test the safety and efficacy of pharmaceuticals and vaccines and in developing other products. In these settings, there are few concerns about whether an observed effect is causal. Unfortunately, it is often impractical to implement this approach for economic policies and regulations. Equal protection constraints and practical considerations limit the extent to which governments can engage in this kind of experimentation in the real world. Lab experiments are sometimes used to examine how mixed-sex groups affect business decision-making,[19] but their artificial settings limit their external validity in extrapolating the results to infer how gender diversity might affect board decision-making in real-world settings with real-world stakes. For example, the stakes involved in the lab experiments are small, and the short duration of the team decision periods may obscure what would happen over longer periods as the decision makers grow more comfortable with each other.

Instead, modern empirical work focuses on quasi-experimental approaches, which mimic the randomization of the lab but in naturalistic settings. Since these are real decision-making settings with real-life stakes, the external validity concerns diminish. In the board diversity literature, there are two main quasi-experimental approaches that have been used to varying degrees of success. For reference when I later describe the studies, I briefly explain their intuition.

The first approach in some of the papers the Nasdaq proposal relied on is a so-called instrumental variables technique.[20] The idea behind instrumental variables is that one finds an instrument (or multiple instruments) that is correlated with the policy variable of interest (in the current case, board diversity) but is otherwise uncorrelated with anything else related to the outcome variable. The first of these conditions allows one to model the policy variable with regression techniques, exploiting that the

instrument is highly related to the policy variable. Because, by assumption, this instrument is otherwise unrelated to the outcome variable, it (as distinct from the policy variable) will not be correlated with any of the unobservable characteristics we worried about above. In practice, the researcher first regresses the policy variable on the instrument (and any other control variables), yielding a model that can be used to predict the policy variable. This prediction of the policy variable is then used in the regression to model the outcome variable (e.g., firm performance). Since the instrument is uncorrelated with the firm's unobservable characteristics, the predicted policy variable (as distinct from the actual policy variable) will likewise be uncorrelated with the unobservable characteristics. Thus, the estimated relationship between the predicted policy variable and the outcome variable will not suffer from omitted variable bias and, therefore, can be interpreted causally.

Although the instrumental variables approach works in theory, practice is a different matter. For starters, the researcher must find a suitable instrument. This instrument needs to strongly correlate with the policy variable being studied, and it must otherwise be unrelated to the outcome variable being examined. The first requirement is testable. Unfortunately, the second criterion is not.[21] At best, the researcher provides an intuitive argument for why he or she believes the instrument is not otherwise related to the outcome variable (except through its effect on the policy variable). If someone can intuit why the instrument is not unrelated to the outcome (or even if he or she cannot, but a reason nonetheless exists), then the instrumental variables analysis should be viewed skeptically. For it to be credible, there should be strong intuitions for both why the instrument is strongly correlated with the policy variable of interest and why the instrument is not otherwise related to the outcome variable being studied. In practice, these intuitions are rarely strong enough to be compelling.

The second approach, not often used in the Nasdaq-cited studies but regularly used in other relevant papers, is more promising. This approach exploits natural experiments. That is, the researcher leverages some outside change in the world that is not initiated (or maybe not even expected) by those affected by it that imposes a change in the policy variable on some firms but not others, as if by random chance. In the current context, the most commonly used natural experiment is the passage of legislation affecting firms in a given jurisdiction as the treatment group, using firms outside the jurisdiction as the control or counterfactual comparison group. Sometimes, these natural experiments might even create within-jurisdiction treatment and control groups through policy exemptions (e.g., a size threshold) or because some firms already inadvertently complied with the rule (e.g., a policy requiring a certain number of women on a board will not affect companies that already have that many women on their boards).

When evaluating these natural experiments, it is important to focus on whether the imposition of the policy shock was random and whether the control group is a suitable counterfactual comparison. Unfortunately, here, too, no diagnostic tests are available to ensure these requirements are satisfied. Intuitively, the more unexpected and less targeted the policy shock is, the more credible the research design and the estimates arising from it are. Likewise, the more comparable the treatment and control groups are, the more confidence one has in the study's findings.

In the finance context, event studies are a common form of a natural experiment.[22] In the standard event study, the event is the policy shock, and the analyst compares how the stock return of a firm (or portfolio of firms) differs relative to what would be expected had the event not occurred. The expectation is estimated using a regression of the firm's returns on various variables (usually including a measure of the overall market return) in the period before the event. This predicted event day (or period) return is netted out of the actual return on the event day, generating the estimate of the event's effect (often called an abnormal or excess return). A similar procedure is used on comparison firms (that are not affected by the event) to rule out the possibility that something other than the event being studied generated the event day effect. In the current context, these event studies could be used to examine the market's reaction to proposed diversity mandates, providing a

"wisdom of crowds"–type estimate of the likely effect of increased diversity on corporate boards.

# Event studies could be used to examine the market's reaction to proposed diversity mandates, providing a "wisdom of crowds"–type estimate of the likely effect of increased diversity on corporate boards.

While I have simplified this primer for a nontechnical audience, it conveys the main intuitions that can be used to assess empirical analyses of how diverse boards affect firm performance. Conceptually, the closer an analysis is to an apples-to-apples comparison, the more reliable it is. If a study finds that firms having more-diverse boards leads to improved outcomes, then the relevant question is whether diversity actually drives the outcomes in a but-for sense. That is, in the counterfactual world in which the firms did not have diverse boards, would their outcomes be different? Because it is not possible to observe the counterfactual world, it is necessary to rely on comparisons with firms that do not have diverse boards. However, if those nondiverse firms differ along other dimensions, the comparison will not be informative. Omitted variable bias could lead the observed difference to over- or understate the true effect of board diversity on performance. Worse, it is impossible to know even the direction of the true relationship

between board diversity and the outcomes being studied, much less the magnitude of the relationship.

To combat this bias, it is tempting to believe that one can adjust for the other differences across firms by either matching firms with diverse boards with similar counterparts whose boards are less diverse or using more-sophisticated regression techniques. However, it is not generally possible to know all the relevant differences. Beyond that, many of the relevant dimensions will not be quantifiable.

In what follows, I examine the studies the Nasdaq proposal relied on and other informative studies ignored in the proposal, categorizing them by how they attempt to address these issues of causal inference. In the first grouping, I look at the studies that make no attempt to address these problems. I do not spend much time on this set since it is wholly unreliable and provides no guidance on how board diversity affects firm outcomes. Next, I cover the studies that attempt to control or adjust for differences across firms. Given the discussion above, these studies are just as unreliable as are those that do nothing to ensure comparability between firms with and without diverse boards. Lastly, I examine the studies that attempt to use some quasi-experimental approach. Because these studies offer the most-credible approaches and, potentially, the most-reliable estimates of the causal effect of board diversity on firm performance, I examine them in detail. With the benefit of this literature review, I then offer general conclusions about the likely effects of the proposed Nasdaq board diversity mandate.

## Studies with Merely Descriptive Comparisons

As discussed above, comparisons of firm outcomes based only on differences in board diversity metrics without adjustments for other differences across firms are not informative. Board diversity might differ coincidentally with many firm attributes that also affect firm outcomes. It is reasonable to suspect that diversity differs by industry, firm age, state of incorporation, and other firm characteristics that also affect

market returns, accounting profits, sales, research and development, and almost everything else one might care to examine as a company outcome. In such a situation, while it may appear that outcomes vary systematically with board diversity, it is just as likely that the relationship is driven by these other variables that are unaccounted for. Any estimated difference will be subject to statistical bias.

As discussed above, the Nasdaq proposal relies on the FCLTGlobal report,[23] which accounts for no differences across firms beyond the diversity of their boards. If board diversity is not randomly distributed across industries (or any other firm characteristic), any difference related to diversity could be driven by these other characteristics. Further, the report provides no test of statistical significance of the reported board diversity effects. This omission is especially notable given that the report mentions a lack of statistical significance with its results regarding firm performance and board member tenure length.[24] It also mentions a lack of a statistically significant relationship between firm returns and whether the firm CEO was a board member.[25]

The MSCI study cited in the Nasdaq proposal[26] indicates that firms with at least three female board members experience gains in return on equity and earnings per share, while firms with no women on their boards saw losses in both metrics.[27] It does not attempt to adjust for any firm characteristics and admits that its small sample size should lead a reader to treat the results with caution.[28] These issues render the study's results wholly unreliable.

The Catalyst report that the Nasdaq proposal relied on proposes that having a sustained large female contingent (three or more board members for at least four of five years) is related to large increases in return on sales, invested capital, and equity.[29] This analysis makes no adjustments across firms, and, rather than examine the overall effect of female board participation, it compares firms with zero women on their boards to firms with three or more women on their boards. As stated earlier, throwing out such variation has little justification and indicates either a lack of statistical sophistication or potentially purposeful data mining.

## Studies with Basic Controls

The Nasdaq proposal cites a 2020 report from the Carlyle Group[30] that indicates that companies in its portfolios with two or more female or minority group directors outperform companies with only one such director, which, in turn, outperform companies with no female or minority directors, controlling for "industry, fund, and vintage year."[31] Unfortunately, the report provides no details on these estimates, nor does it indicate whether these performance differentials are statistically significant. There is no basis to judge these estimates' reliability, even if one were willing to believe that the only variables important to adjust for are industry, fund, and firm age, which would be a largely unjustified assumption.

---

**The McKinsey authors admit that the relationships observed are correlational, not causal, but they then discuss their results as if the performance metrics they examine can be tied to their board diversity indicators.**

The McKinsey report likewise attempts to use a handful of controls such as firm nationality and a broad-based industry grouping. As noted above, the McKinsey authors admit that the relationships observed are correlational, not causal, but they then

discuss their results as if the performance metrics they examine can be tied to their board diversity indicators. Their analysis has numerous oddities. First, rather than looking at the whole continuous relationship between their diversity indicator and firm performance, they repeatedly simply compare firms in the lowest quartile of diversity with firms in the highest quartile, as if intermediate levels of diversity provide no relevant information. Perhaps intermediate levels of diversity are much more beneficial (or maybe harmful), but it is not possible to know based on the McKinsey analysis.

In an equally odd way, rather than looking at diversity's effect on performance in general, the outcome they study is the likelihood a firm's performance exceeds its nation's industry average. Throwing out variation could obscure important limitations in their findings. For example, if firms with low diversity are trivially below the average and firms with high diversity are trivially above the average, the proper conclusion would be that diversity does not appear to have an effect, even if there is a statistically significant effect on whether a firm is above or below the average. How this analysis is presented makes it is impossible to rule out such a case.[32]

When the McKinsey report does look at a continuous outcome in Exhibit 3, in which EBIT is related to board diversity for the US and Canada, there is no statistically significant relationship between either gender or ethnic diversity of the corporate board and firm performance. This is surprising since the US sample is the largest one examined, which makes it the most reliable of the regions studied. (For the US and Canada, 186 companies were examined, while just 107 UK and 73 Latin American companies were studied.) If there were a robust relationship between board diversity and outcomes, one would have expected to observe it in the US and Canada sample. At best, this suggests that the McKinsey evidence most relevant to US firms does not establish a basis for mandating diverse boards and, at worse, that the statistically significant correlations elsewhere are spurious.

Credit Suisse's gender report cited in the Nasdaq proposal[33] suggests a positive relationship between firm performance and the presence of a woman on

a firm's board, adjusting for the firm's sector.[34] The differentials noted in the report (e.g., the 12.2 percent return on equity for firms with at least one female board member vs. the 10.1 percent return for firms with no female directors), however, do not indicate whether they are statistically significant.[35] As with other studies in this section, the Credit Suisse report makes no effort to isolate causality in these relationships.

## Studies That Attempt to Isolate Causation

The Nasdaq proposal frequently cites David A. Carter, Betty J. Simkins, and W. Gary Simpson's study for the proposition that there is a positive relationship between firm value and the presence of women or minorities on a firm's board.[36] Superficially, this study attempts to control for many differences across firms, including differences in total firm size and board size. Of course, since it is never possible to be sure one has made all the necessary adjustments, the authors note that something more is necessary.

> While board diversity could affect firm value, firm value could also affect board diversity. If this is the case, estimation of Equation (1) using OLS [ordinary least squares] can produce biased coefficient estimates. To control for the possibility of endogeneity, we estimate the following system of equations using 2SLS.[37]

Endogeneity is a particular form of the omitted variable bias, and 2SLS is an implementation of the instrumental variables analysis discussed above. However, in implementing 2SLS, the authors do not even attempt to include the necessary instrument. Their Table 4 results illustrate this, as the only variables included in their diversity prediction that are not also included in their firm value equation are the log of the average age of the board (which, by the argument presented in the FCLTGlobal report, directly affects firm value and so is not unrelated to the outcome variable here), an indicator for whether there is a minority board member (in the female

diversity model), and an indicator for whether there is a female board member (in the minority diversity model). Without getting into intuitive arguments about whether an instrument is good, if female board members affect firm value, then a variable capturing that cannot serve as a good instrument for the presence of minority board members and vice versa. That is, even by the logic of the authors' own estimation strategies, their instruments are bad, and therefore their results are not credible.

The Gennaro Bernile, Vineet Bhagwat, and Scott Yonker paper[38] cited in the Nasdaq proposal[39] that indicates board diversity improves many firm outcomes is potentially more credible. It also uses an instrumental variables strategy to account for omitted variable bias. Specifically, the authors use a metric of the diversity of potential directors (defined as people who are serving or have served as directors) who live more than 150 miles from their firms' headquarters but who live near an airport with a nonstop flight to an airport near their headquarters. The intuition is that people agree to be on boards only if it is convenient to participate, which will be a function of transportation ease. If the relevant pool of director candidates who can easily travel to the firm is more diverse, the firm will more successfully attract diverse board members. The data bear this out. The authors find a strong relationship between this pool variable and the diversity of the firms' boards. Through the instrumental variables technique, they show that diversity is associated with many positive firm outcomes.

While this instrument is clever, it does raise concerns. First, even if one assumes arguendo that the empirical strategy is valid, it does not say diverse board members lead to improved outcomes in general. It indicates that diverse candidates who have already served on boards can improve firm outcomes. While this distinction might appear slight, it does make a difference in the context of policies that mandate many firms all chase the existing pool of female and minority board members simultaneously. This research says nothing about how adding female and minority individuals affects a board when such individuals have no previous experience. Second, and more importantly, if firms' outcomes are influenced

by factors in their local communities (e.g., agglomeration effects or shared labor markets) and if, all other things being equal, more dynamic and vibrant places attract more transportation linkages because more people want to be there, then the authors' instrument is necessarily capturing effects related to firm outcomes independent of the board member accessibility issue they focus on. If this or anything similar is occurring, then the authors' instrument is no good, and the estimates are not reliable.

In an alternative instrumental variables specification provided in an online appendix,[40] the authors use an instrument that captures average board diversity of a firm's competitors (defined as being a similar size and in the same industry) on the assumption that firms may learn from each other about the benefits of diversity. A first problem with this strategy is that, if a firm's performance is affected by competitors' performance and the existence of a more-diverse board (as is the conclusion of the paper), then, by definition, this instrument is no good. That is, more-diverse boards among competitors both change outcomes in the industry (affecting the firm in that industry) and the firm's likelihood of having a diverse board. Again, the results would be unreliable in this case. A second problem, as discussed above, is that if multiple instruments are available, they could be used simultaneously to allow for calculating the test of overidentifying restrictions, which would provide at least a weak diagnostic of whether the instruments were good. The authors not providing this diagnostic test is a red flag.

If one is skeptical of the authors' instrumental variables strategy but does not wish to throw out the research entirely on this basis, it would be more conservative to examine the authors' regular OLS regression results, which are uniformly much smaller in magnitude, often by a factor of 20 or 30. This suggests a questionable estimation strategy primarily drives the authors' results.

Carter et al.[41] use a fixed effects model to attempt to estimate a causal effect of board diversity on firm performance. A fixed effects model attempts to absorb all fixed unobservable aspects of a firm by including separate baselines for each firm (the so-called fixed effects). This approach works if all relevant

unobservable characteristics are fixed or constant at the firm level. If the unobservable characteristics are changing in a way that is constant across firms in a given period, separate period effects will account for these changes. However, if the unobservable characteristics are changing differentially across firms, the omitted variable bias problem is still present.

---

# The assumption that current performance is unrelated to previous performance defies belief.

The authors also attempt a simultaneous equations model (a variant of the instrumental variables technique) to further guard against omitted variable problems. However, as in the earlier Carter, Simkins, and Simpson paper, this approach has problems. Specifically, the authors use lagged outcome variables as their instruments. As with any instrument, if the lagged outcome is related to the current outcome, these instruments will be no good. The assumption that current performance is unrelated to previous performance defies belief. Given the implausibility of the assumptions of Carter et al., their finding that board diversity does not have a statistically significant effect on firm outcomes is not credible.

For similar reasons, Kevin Campbell and Antonio Mínguez-Vera's use of fixed effects models to examine how board diversity affects firm value in a Spanish sample is not credible.[42] As stated before, for the fixed effects model to avoid omitted variable bias, one must assume that either the unobservable heterogeneity across firms is constant or, to the extent it changes, it changes for all firms similarly over time. The authors also attempt an instrumental variables technique, but their instruments are not plausible. For example, one of their instruments is the size of the board of

directors. If board size has any effect on firm performance, then their instrumental variables approach does not work. Thus, their mixed conclusions[43] about how women affect boards and other metrics of board diversity are not credible.

One of the better papers cited by the Nasdaq proposal, by Renée B. Adams and Daniel Ferreira, uses both fixed effects and a potentially more plausible instrument in the instrumental variables analysis.[44] The authors instrument the fraction of the firm's board composed of women with a measure of how many female connections male board members have for other boards they sit on. The idea is that knowing more female board members allows women to engage in more networking, leading to an increased likelihood of being on a firm's board. This instrument could be subjected to the concern raised with Bernile, Bhagwat, and Yonker's secondary instrument. Namely, if a competitor's performance affects the firm's performance and if more women on a board affect the competitor's performance, then the instrument would not be unrelated to the outcome being studied. However, Adams and Ferreira do not restrict attention to connections to women made through competitors' boards, so any concern of this type might be mitigated. This represents a reasonable strategy. While Adams and Ferreira show that increasing female board membership improves board attendance by all board members and improves other monitoring metrics, the ultimate effect on firm value appears detrimental, sometimes to a statistically significant degree.

Bin Srinidhi, Ferdinand A. Gul, and Judy Tsui use an instrumental variables technique (specifically a Heckman selection model) to examine how female directors affect the transparency or quality of a firm's earnings data, focusing on accruals estimation errors by the firm and indicators of manipulation or excessive management of earnings announcements.[45] As cited in the Nasdaq proposal, they find that female participation on a firm's board improves the indicators of earnings data quality.[46] As with much of this literature, the authors do little to discuss or justify why their identification strategy supposedly works. Most of the variables in the first stage of the analysis are explicitly related to firm performance and

attributes.[47] Clearly, these variables can directly affect the outcome variable and therefore cannot serve as good instruments for identification purposes. The only plausible candidate is the inclusion of the percentage of women employed in the firm's industry. However, since women are not randomly distributed across industries and since firms in an industry likely mimic each other in many things related to earnings, earnings management, and earnings reporting (e.g., using the same outside auditor[48]), this candidate instrument also is likely related to the outcome variables examined in the paper. As I have repeatedly noted, this concern undercuts the reliability of the paper's empirical conclusions.

---

## Of necessity, matching can be carried out using only observable characteristics, since it is impossible to know whether the firms are similar on unobserved dimensions.

María Consuelo Pucheta-Martínez, Immaculada Bel-Oms, and Gustau Olcina-Sempere's paper also looks at transparency metrics (specifically, measures of audit report quality).[49] Although the authors find that their measures of female board participation are associated with better audit quality metrics in Spanish data, they make no attempt to account for unobservable characteristics, merely controlling for observable firm characteristics. This leaves no confidence that their results represent causal effects.

Similarly, the Nasdaq proposal cites[50] Francisco Bravo and Maria Dolores Alcaide-Ruiz's finding that,

although female participation on a firm's audit committee does not affect a firm's propensity to disclose forward-looking financial information, having women with financial expertise on the committee improves this propensity.[51] Once again, however, this analysis does nothing to account for omitted variable bias and lacks credibility.

Lawrence J. Abbott, Susan Parker, and Theresa J. Presley find that firms with at least one female director are less likely to issue financial restatements than firms with no women on their board are.[52] Their attempt to isolate causality involves matching each firm with a female board member with a comparable firm from the same industry (similar size, type of audit firm used, etc.) with no women on the board. Matching approaches such as this are similar to regression techniques but allow for a type of non-linear modeling of the effect of the match or control variables. However, of necessity, matching can be carried out using only observable characteristics, since it is impossible to know whether the firms are similar on unobserved dimensions. Thus, generally, matching does not address omitted variable bias.

Aida Sijamic Wahid's article[53] also attempts to examine the transparency of firms with female representation on their boards by examining financial reporting mistakes and fraud indicators. The article uses instrumental variables techniques to isolate causality and finds that firms with women on their boards engage in less fraud and make fewer reporting mistakes. In addition to the instrumental variables approach, the article uses fixed effects models, though it never combines the fixed effects and instrumental variables approach, which would be the most rigorous approach. Wahid's instruments for female participation are the female population around the firm's headquarters and the longitude measurement at the firm's headquarters. While the first instrument has an intuitive explanation—namely, firms located where there are more women may find it easier to solicit female board members—the longitude instrument is not intuitive and smacks of data mining (i.e., opportunistically searching for an instrument that provides particular results). Because neither instrument is likely to vary much

(or at all for longitude) at the firm level from year to year, it becomes obvious why Wahid does not estimate the instrumental variables regressions with fixed effects. That is, with no variation, estimation becomes impossible. Because of this, however, any firm characteristics related to a firm's location (e.g., more-talented CEOs may prefer to live in certain locations) will cause the instruments to fail, leaving the estimates without credibility.

Using Chinese firms, Douglas Cumming, T. Y. Leung, and Oliver Rui examine how gender diversity affects the likelihood that a firm engages in fraud.[54] They find that firms with a higher fraction of women on the board engage in less fraud, although the effects are smaller (and sometimes not statistically significant) in female-dominated industries. In an attempt to determine causality, their paper uses an instrumental variables technique but proceeds to use firm characteristics, including characteristics of the firm's chairperson and general manager, board, and ownership structure. Obviously, all these characteristics can directly affect the likelihood of fraud (e.g., one of the characteristics used is frequency of board meetings, which should help monitor fraud) and so provide no confidence in a causal interpretation. The paper also discusses that one would find similar results with other forms of diversity,[55] but since the authors do not study this, it is pure speculation.

Gul, Srinidhi, and Anthony C. Ng's 2011 paper also examines the informativeness of firms with greater female representation on boards.[56] It concludes that firms with more female representation on their boards have more informative stock prices, as measured by idiosyncratic volatility and "future earnings incremental explanatory power."[57] While this paper uses longitudinal data, it does not estimate fixed effects models for its regressions even though that would account for more unobservable characteristics of the firms studied. In addition to this bias point, because fixed effects absorb much of the variation in the data, many of the paper's borderline statistically significant effects (if not the others) would likely no longer be statistically significant (e.g., regressions 9, 10, and 12 in Table 4). It is puzzling why the authors did not examine the more standard (and credible) fixed

effects regression specification given there appear to be no data limitations in doing so.

The paper does exploit a potentially interesting natural experiment involving Norwegian legislation that required firms to have more female directors. After examining how many additional female directors 75 Norwegian firms added between 2005 and 2009, the authors report that idiosyncratic volatility increased as more female directors were added and the effect was statistically significant. Once again, the authors choose not to examine the fixed effects model, which would be more credible. Further, they artificially focus only on Norwegian firms, when they could have easily used non-Norwegian firms in a more standard natural experiment framework wherein non-Norwegian firms serve as the comparison or control group. Such an analysis would be more informative and reliable.

Although ignored in the Nasdaq proposal, a 2019 paper by Philip Yang et al. offers a more thorough examination of the Norwegian experience.[58] It uses the natural experiment in Norway to compare the performance of Norwegian firms with a control group of firms in other Scandinavian countries. Paying close attention to whether the conditions for a natural experiment are met, the authors find that the regulation requiring more women on Norwegian boards led to worse firm performance and greater firm risk. These results are consistent with the findings of Kenneth R. Ahern and Amy K. Dittmar, who found that firms that were more affected by the Norwegian regulation (i.e., had to appoint more women) suffered statistically significant declines in stock price, firm value, and other measures of operating performance and exhibited greater risk after the adoption of the mandate.[59]

David A. Matsa and Amalia R. Miller provide additional support,[60] comparing Norwegian firms to firms in other Scandinavian countries and private Norwegian companies that were not subject to the rule. This variation allows the authors to rule out any possibility that a nonregulation-related event in Norway may have been affecting firms subjected to the regulation. Across many specifications, Matsa and Miller find robust evidence that the regulation led to declining profits and the effect was statistically significant. This

decline was not observed among the unaffected Norwegian private firms nor among the unaffected firms from other countries.

Given this evidence of the bad effects of the Norwegian mandate, it is not surprising that Øyvind Bøhren and Siv Staubo found that about half of Norwegian firms that were going to be affected by the mandate changed their status (i.e., went private) to avoid the regulation.[61] In a more recent working paper, B. Espen Eckbo, Knut Nygaard, and Karin S. Thorburn make different modeling choices (e.g., looking at different time windows and examining the effect of heterogeneity) and find results that are more aligned with the conclusion that the Norwegian mandate did not affect stock returns or other measures of firm value in a statistically significant way.[62]

Taking these findings on transparency and informativeness, David Abad et al. examine information asymmetries via bid-ask spreads, the idea being that, if firms are more transparent, there is less concern of trading by relatively better-informed insiders.[63] When outsiders worry about information deficits, markets become less liquid, leading to larger bid-ask spreads. Analyzing Spanish data, the authors find that firms with better female representation on boards exhibit smaller bid-ask spreads, again suggesting that such firms are more transparent. The authors use a generalized method of moments (GMM) estimation technique to account for omitted variable bias. GMM is a variant of instrumental variables and requires good instruments. As is common in GMM approaches, the authors use lagged or differenced versions of their model's variables as instruments and (distinct from the other papers reviewed here) appropriately report the diagnostic test of overidentifying restrictions, which indicates the instruments are good.

However, as discussed in the empirical primer, this diagnostic test "works" only if one believes the various instruments are not subject to similar omitted variable effects. For example, if one believes the model's variables lags (i.e., the observation from the prior period) are subject to similar random shocks (or something related), the instruments will pass the diagnostic test but still not work as instruments that surmount the omitted variable bias. If there

is unexplained persistence in the instruments that could be related to unobservable characteristics that also affect the outcome variable, the GMM approach does not solve the bias concern.

---

# The Nasdaq proposal clearly cherry-picks studies based on whether they claim to find positive outcomes associated with an increase in female representation on boards and a smattering of articles looking at other kinds of diversity.

The same concern undercuts the conclusions of Maria Encarnación Lucas-Pérez et al., who relate female participation on boards with better controls on executive pay using a similar GMM approach with lagged variables as the instruments.[64] Unless one is willing to assume a firm's past characteristics are unrelated to the outcome variables, GMM's use of lagged variables as instruments does not overcome the omitted variable bias problem.

## Meta-Analyses

The studies cited in the Nasdaq proposal are clearly not an exhaustive review of the literature, nor are they a random sampling. The Nasdaq proposal clearly

cherry-picks studies based on whether they claim to find positive outcomes associated with an increase in female representation on boards and a smattering of articles looking at other kinds of diversity. As discussed above, the proposal also cannot claim to focus on methodologically sound studies, given the generally poor quality of the studies invoked.

Many other studies in the literature find no effect, or even a negative effect, from increased board diversity. For example, Kathleen A. Farrell and Philip L. Hersch find a negative, though statistically insignificant, effect of appointing a new female board member on firms' stock returns.[65] Interestingly, this paper also clearly demonstrates that adding a female board member is well predicted by firm outcomes. That is, better-performing firms are more likely to add a woman when a new board seat becomes available. This highlights the omitted variable concern raised above, suggesting that any study failing to account for the endogeneity of female board representation is destined to yield noncredible results.

In another example, Caspar Rose finds a negative (though statistically insignificant) relationship between female board representation and firm value in Danish data.[66] However, this is not done well because it, too, does not account for omitted variable bias. The methods are not substantially different from those used in many of the Nasdaq-cited studies described above. Even using Danish data cannot be cited as the reason for exclusion, given Nasdaq's repeated use of studies with international data (e.g., multiple studies cited use Spanish data).

One is left with the distinct impression that the proposal's statement "**Nasdaq reviewed dozens of empirical studies and found that an extensive body of academic research demonstrates that diverse boards are positively associated with improved corporate governance and financial performance**"[67] (emphasis in original) is not altogether accurate, since clearly Nasdaq ignored evidence that did not support (or even contradicted) its proposal. The review of the evidence on how women affect corporate boards by noted feminist scholar Deborah Rhode and Amanda K. Packel provides an interesting contrast: "After exploring the strengths and

limitations of various methodological approaches and survey findings, [we conclude] that the relationship between diversity and financial performance has not been convincingly established."[68]

For a more comprehensive, aggregate view of the literature, one can examine what meta-analyses of the articles find. Meta-analyses attempt to define the literature according to certain criteria and then use the empirical findings as a dataset, providing average results across papers and sometimes providing what are essentially regression analyses of the other papers' regression results to see what factors appear to influence the findings in general. Meta-analyses are not without flaws, and there are reasonable grounds for criticisms. Choosing what articles constitute a literature can be arbitrary, though the better meta-analyses lay out specific criteria and document how they searched for articles that fit. A more substantive concern involves treating studies of widely differing methodological quality comparably (with each study counting as an equal data point). However, meta-analyses can provide a useful and somewhat more objective summary of a literature. Meta-analyses can also sometimes be used to identify publication biases, such as the tendency of journals to accept only articles with statistically significant or ideologically attractive results.

The Nasdaq proposal cites a few meta-analyses but does not appear to internalize the message that many of them suggest a different story from its selective review of the literature. For example, an analysis by Jan Luca Pletzer et al. of 20 studies finds that the average effect estimated by the studies regarding female participation on boards and firm performance is small and statistically insignificant.[69] Corrine Post and Kris Byron's 2015 meta-analysis of 140 studies (45 using US data) found that, on average, there was a small, positive, and highly variable (perhaps providing evidence of model mis-specification concerns) relationship between female board participation and accounting measure-based returns. But there was no relationship, on average, between female board members and market returns.[70] The authors also present a meta-analysis of the relationship between women on boards and the likelihood a firm engages in stakeholder facing, or

so-called socially responsible business practices, finding a positive relationship on average.[71]

The mixed relationship, at best, between female board participation and firm outcomes that results from a less selective analysis of the literature contrasts with the overwhelmingly positive picture painted in the Nasdaq proposal. Alice H. Eagly chastises the ideologically motivated cherry-picking that seems to infect documents such as the Nasdaq proposal, writing, "Despite advocates' insistence that women on boards enhance corporate performance and that diversity of task groups enhances their performance, research findings are mixed, and repeated meta-analyses have yielded average correlational findings that are null or extremely small."[72]

## Wishful Thinking

A more complete and nuanced view of the literature on female participation on corporate boards suggests that the literature provides no strong evidentiary basis for requiring firms to increase female participation. The papers purporting to find large gains to increasing gender diversity suffer from crippling methodological flaws. It is clear from the data that firms do not randomly decide to appoint women. Many performance-related characteristics predict whether a firm fills an open board seat with a woman. This requires an empirical researcher to take the omitted variable bias question seriously. Many of the attempts in the literature to use instrumental variables techniques to overcome selection and endogeneity problems are not well-thought-out. In some cases, the papers try to implement instrumental variables without using any instruments; in other cases, the papers use instruments that their own analyses suggest directly affect the outcome variable being studied. Therefore, they are invalid instruments.

Perhaps the better way forward is examining the handful of natural experiments that exist, such as the Norwegian experience. As discussed, the papers that do the most–methodologically sophisticated analyses of this experience, such as by Ahern and Dittmar and Matsa and Miller, demonstrate that the mandate worsened firm performance and value and that the effects are statistically significant and economically large. At best, Eckbo and Nygaard's results indicate the Norwegian experiment had no systematic effect on firm performance. Further, Bøhren and Staubo's analysis indicates firms are willing to make organizational changes rather than be forced to alter their boards. If this experience can be generalized to the United States, one might predict that mandates such as the Nasdaq proposal or California's board diversity regulations will lead firms to switch exchanges or the location of their headquarters or go private. Organic growth in the numbers of women and people from other underrepresented groups likely is the best approach to achieving more-diverse corporate boards.

## About the Author

**Jonathan Klick** is a professor of law at the University of Pennsylvania and the Erasmus Chair of Empirical Legal Studies at the Erasmus University Rotterdam. He has held visiting positions at Yale Law School, Columbia Law School, Northwestern Pritzker School of Law, and the University of Southern California Gould School of Law. He was the Jeffrey A. Stoops Professor of Law and Economics at Florida State University.

# Notes

1. Kosmas Papadopoulos, "U.S. Board Diversity Trends in 2019," Institutional Shareholder Services, ISS Analytics, May 31, 2019, 4, https://www.issgovernance.com/file/publications/ISS_US-Board-Diversity-Trends-2019.pdf.

2. Papadopoulos, "U.S. Board Diversity Trends in 2019," 3.

3. Papadopoulos, "U.S. Board Diversity Trends in 2019," 4.

4  S.B. 826, 2017–18, Reg. Sess. (CA 2018), https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201720180SB826; and A.B. 979, 2019–20, Reg. Sess. (CA 2020), https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201920200AB979.

5. Nasdaq Stock Market LLC, "Proposed Rule Change to Adopt Listing Rules Related to Board Diversity" (Form 19b-4), December 1, 2020, https://listingcenter.nasdaq.com/assets/RuleBook/Nasdaq/filings/SR-NASDAQ-2020-081.pdf.

6. S.B. 826, 2017–18, Reg. Sess. (CA 2018), § 1.

7. See Nasdaq Stock Market LLC, "Proposed Rule Change to Adopt Listing Rules Related to Board Diversity," 16.

8. Nasdaq Stock Market LLC, "Proposed Rule Change to Adopt Listing Rules Related to Board Diversity," 17.

9. FCLTGlobal, *The Long-Term Habits of a Highly Effective Corporate Board*, March 29, 2019, 11, https://www.fcltglobal.org/resource/the-long-term-habits-of-a-highly-effective-corporate-board/.

10. FCLTGlobal, *The Long-Term Habits of a Highly Effective Corporate Board*, 12.

11. Fidelity Investments, "Sectors & Industries—Performance," https://eresearch.fidelity.com/eresearch/markets_sectors/sectors/si_performance.jhtml?tab=siperformance.

12. See, for example, Adrienne Roberts, "Driving? The Kids Are So Over It," *Wall Street Journal*, April 20, 2019, https://www.wsj.com/articles/driving-the-kids-are-so-over-it-11555732810.

13. In the standard case of ordinary least squares regression, the parameters or coefficients for the control variables are chosen to minimize the sum of the squared errors, in which the errors are calculated as the difference between the regression's prediction and the actual outcome for each observation. By squaring the errors, the regression treats positive and negative errors of the same magnitude equivalently.

14. Under reasonable assumptions, it will be possible to engage in hypothesis testing in which a researcher can ask what the likelihood is that he or she would observe the estimated relationship between board diversity and the studied outcome if, in reality, the relationship is zero. If this likelihood is low (conventionally, less than 5 percent), the researcher will conclude that the estimated difference is statistically significant; that is, the difference is too large to be explained by random variation alone. Alternatively, the researcher might provide an estimate of how unlikely it is that one would observe an estimated effect as large or larger in magnitude than the study's finding is, if the "true" effect were zero. This estimate of unlikeliness is referred to as a *p* value. Many of the results relied on in the Nasdaq proposal do not provide a *p* value or even statements about the statistical significance of their findings. These omissions make it impossible to know whether the reported outcome differences between diverse and nondiverse firms are anything but random noise.

15. Nasdaq Stock Market LLC, "Proposed Rule Change to Adopt Listing Rules Related to Board Diversity," 17.

16. Vivian Hunt, Dennis Layton, and Sara Prince, *Diversity Matters*, McKinsey & Company, February 2, 2015, 1, https://www.mckinsey.com/~/media/mckinsey/business%20functions/organization/our%20insights/why%20diversity%20matters/diversity%20matters.ashx.

17. Hunt, Layton, and Prince, *Diversity Matters*, 1.

18. For a more technical discussion of the details in this section, see Jonah B. Gelbach and Jonathan Klick, "Empirical Law and Economics," in *The Oxford Handbook of Law and Economics, Volume I: Methodology and Concepts*, ed. Francesco Parisi (Oxford, UK: Oxford University Press, 2017).

19. See, for example, Vicki L. Bogan, David R. Just, and Chekitan S. Dev, "Team Gender Diversity and Investment Decision Making Behavior," *Review of Behavioral Finance* 5, no. 2 (February 2013): 134–52, https://www.researchgate.net/publication/228204293_Team_Gender_Diversity_and_Investment_Decision_Making_Behavior. The authors show that increasing gender diversity in teams has

mixed effects on risk-taking behavior.

20. For a technical discussion of instrumental variables, see Jeffrey M. Wooldridge, *Introductory Econometrics: A Modern Approach*, 4th ed. (Mason, OH: South-Western Cengage Learning, 2009), chap. 15.

21. In principle, if one can identify many instruments, a test for overidentifying restrictions exists. The intuition for the test assumes that at least one of the instruments satisfies both conditions (related to the policy variable and otherwise unrelated to the outcome variable). The test examines the estimates from using each instrument separately and in each combination and then examines whether all the estimates are statistically equivalent. The idea is that, if one has found the "right" answer and all the instruments are good instruments, each should lead to the same outcome. If different outcomes are estimated, then at least one of the instruments (and maybe all) is bad. The problem, however, is that, if all the instruments are similarly correlated with the unobservable characteristics (a condition that cannot be tested since it is not possible to examine a correlation with an unobserved quantity), they will all lead to the same biased estimate, passing the test without validating the estimates.

22. For a relatively thorough but accessible overview of event studies, see Jill E. Fisch, Jonah B. Gelbach, and Jonathan Klick, "The Logic and Limits of Event Studies in Securities Fraud Litigation," *Texas Law Review* 96, no. 3 (February 2018): 553–618, https://texaslawreview.org/logic-limits-event-studies-securities-fraud-litigation/.

23. FCLTGlobal, *The Long-Term Habits of a Highly Effective Corporate Board*, 11.

24. FCLTGlobal, *The Long-Term Habits of a Highly Effective Corporate Board*, 12.

25. FCLTGlobal, *The Long-Term Habits of a Highly Effective Corporate Board*, 10.

26. Nasdaq Stock Market LLC, "Proposed Rule Change to Adopt Listing Rules Related to Board Diversity," 18.

27. Meggin Thwing Eastman, Damion Rallis, and Gaia Mazzucchelli, *The Tipping Point: Women on Boards and Financial Performance*, MSCI, December 2016, https://www.msci.com/documents/%2010199/fd1f8228-cc07-4789-acee-3f9ed97ee8bb.

28. Thwing Eastman, Rallis, and Mazzucchelli, *The Tipping Point*, 7.

29. Harvey M. Wagner and Nancy M. Carter, "The Bottom Line: Corporate Performance and Women's Representation on Boards (2004–2008)," Catalyst, March 1, 2011, https://www.catalyst.org/research/the-bottom-line-corporate-performance-and-womens-representation-on-boards-2004-2008/.

30. Nasdaq Stock Market LLC, "Proposed Rule Change to Adopt Listing Rules Related to Board Diversity," 16, 144.

31. Jason M. Thomas and Megan Starr, *From Impact Investing to Investing for Impact*, Carlyle Group, February 24, 2020, 5, https://www.carlyle.com/global-insights/invest-with-impact-whitepaper-thomas-starr.

32. Hunt, Layton, and Prince, *Diversity Matters*, Exhibits 1 and 2. Similar criticisms apply to the updated analyses presented in Sundiatu Dixon-Fyle et al., *Diversity Wins: How Inclusion Matters*, McKinsey & Company, May 19, 2020, 13, https://www.mckinsey.com/featured-insights/diversity-and-inclusion/diversity-wins-how-inclusion-matters.

33. See, for example, Nasdaq Stock Market LLC, "Proposed Rule Change to Adopt Listing Rules Related to Board Diversity," 18.

34. Julia Dawson, Richard Kersley, and Stefano Natella, *The CS Gender 3000: Women in Senior Management*, Credit Suisse, September 2014.

35. Dawson, Kersley, and Natella, *The CS Gender 3000*, 16.

36. See, for example, Nasdaq Stock Market LLC, "Proposed Rule Change to Adopt Listing Rules Related to Board Diversity," 17.

37. David A. Carter, Betty J. Simkins, and W. Gary Simpson, "Corporate Governance, Board Diversity, and Firm Value," *Financial Review* 38, no. 1 (February 2003): 43, https://onlinelibrary.wiley.com/doi/10.1111/1540-6288.00034.

38. Note the paper cited is the working paper, which has since been published as Gennaro Bernile, Vineet Bhagwat, and Scott Yonker, "Board Diversity, Firm Risk, and Corporate Policies," *Journal of Financial Economics* 127, no. 3 (March 2018): 588–612, https://www.sciencedirect.com/science/article/abs/pii/S0304405X17303215.

39. See Nasdaq Stock Market LLC, "Proposed Rule Change to Adopt Listing Rules Related to Board Diversity," 17–18.

40. Gennaro Bernile, Vineet Bhagwat, and Scott Yonker, "Internet Appendix to 'Board Diversity, Firm Risk, and Corporate Policies,'" *Journal of Financial Economics* 127, no. 3 (March 2018), http://jfe.rochester.edu/Bernile_Bhagwat_Yonker_app.pdf.

41. David A. Carter et al., "The Gender and Ethnic Diversity of US Boards and Board Committees and Firm Financial Performance," *Corporate Governance: An International Review* 18, no. 5 (September 2010): 396–414, https://onlinelibrary.wiley.com/doi/abs/

10.1111/j.1467-8683.2010.00809.x.

42. Kevin Campbell and Antonio Mínguez-Vera, "Gender Diversity in the Boardroom and Firm Financial Performance," *Journal of Business Ethics* 83, no. 3 (December 2008): 435–51, https://link.springer.com/article/10.1007/s10551-007-9630-y.

43. The Nasdaq proposal cites the study's conclusion that "at a minimum . . . increased gender diversity can be achieved without destroying shareholder value," but given the methodological flaws, even this conclusion is too strong. Nasdaq Stock Market LLC, "Proposed Rule Change to Adopt Listing Rules Related to Board Diversity," 148.

44. Renée B. Adams and Daniel Ferreira, "Women in the Boardroom and Their Impact on Governance and Performance," *Journal of Financial Economics* 94, no. 2 (November 2009): 291–309, https://personal.lse.ac.uk/ferreird/gender.pdf.

45. Bin Srinidhi, Ferdinand A. Gul, and Judy Tsui, "Female Directors and Earnings Quality," *Contemporary Accounting Research* 28, no. 5 (December 2011): 1610–44, https://onlinelibrary.wiley.com/doi/abs/10.1111/j.1911-3846.2011.01071.x.

46. Nasdaq Stock Market LLC, "Proposed Rule Change to Adopt Listing Rules Related to Board Diversity," 151.

47. See Srinidhi, Gul, and Tsui, "Female Directors and Earnings Quality," 1617.

48. See, for example, Ahsan Habib, "Audit Firm Industry Specialization and Audit Outcomes: Insights from Academic Literature," *Research in Accounting Regulation* 23, no. 2 (October 2011): 114–29, https://www.sciencedirect.com/science/article/abs/pii/S1052045711000373.

49. María Consuelo Pucheta-Martínez, Inmaculada Bel-Oms, and Gustau Olcina-Sempere, "Corporate Governance, Female Directors and Quality of Financial Information," *Business Ethics: A European Review* 25, no. 4 (October 2016): 363–85, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2836230.

50. Among other places, see Nasdaq Stock Market LLC, "Proposed Rule Change to Adopt Listing Rules Related to Board Diversity," 25.

51. Francisco Bravo and Maria Dolores Alcaide-Ruiz, "The Disclosure of Financial Forward-Looking Information: Does the Financial Expertise of Female Directors Make a Difference?," *Gender in Management* 34, no. 2 (March 2019): 140–56, https://www.researchgate.net/publication/331744002_The_disclosure_of_financial_forward-looking_information_Does_the_financial_expertise_of_female_directors_make_a_difference.

52. Lawrence J. Abbott, Susan Parker, and Theresa J. Presley, "Female Board Presence and the Likelihood of Financial Restatement," *Accounting Horizons* 26, no. 4 (December 2012): 607–29, https://www.researchgate.net/publication/274429063_Female_Board_Presence_and_the_Likelihood_of_Financial_Restatement.

53. Aida Sijamic Wahid, "The Effects and the Mechanisms of Board Gender Diversity: Evidence from Financial Manipulation," *Journal of Business Ethics* 159, no. 3 (October 2019): 705–25, https://link.springer.com/article/10.1007/s10551-018-3785-6.

54. Douglas Cumming, T. Y. Leung, and Oliver Rui, "Gender Diversity and Securities Fraud," *Academy of Management Journal* 58, no. 5 (October 2015): 1572–93, https://journals.aom.org/doi/abs/10.5465/amj.2013.0750.

55. Nasdaq Stock Market LLC, "Proposed Rule Change to Adopt Listing Rules Related to Board Diversity," 154.

56. Ferdinand A. Gul, Bin Srinidhi, and Anthony C. Ng, "Does Board Gender Diversity Improve the Informativeness of Stock Prices?," *Journal of Accounting and Economics* 51, no. 3 (April 2011): 314–38, https://www.sciencedirect.com/science/article/abs/pii/S0165410111000176.

57. Essentially, this measures how much of an improvement one gets in the R squared of a firm's returns when future earnings terms are added to the regression. Gul, Srinidhi, and Ng, "Does Board Gender Diversity Improve the Informativeness of Stock Prices?"

58. Philip Yang et al., "Women Directors, Firm Performance, and Firm Risk: A Causal Perspective," *Leadership Quarterly* 30, no. 5 (October 2019), https://www.sciencedirect.com/science/article/pii/S1048984318303217.

59. Kenneth R. Ahern and Amy K. Dittmar, "The Changing of the Boards: The Impact on Firm Valuation of Mandated Female Board Representation," *Quarterly Journal of Economics* 127, no. 1 (February 2012): 137–97, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1364470.

60. David A. Matsa and Amalia R. Miller, "A Female Style in Corporate Leadership? Evidence from Quotas," *American Economic Journal: Applied Economics* 5, no. 3 (July 2013): 136–69, https://www.aeaweb.org/articles?id=10.1257/app.5.3.136. https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1636047.

61. Øyvind Bøhren and Siv Staubo, "Does Mandatory Gender Balance Work? Changing Organizational Form to Avoid Board Upheaval," *Journal of Corporate Finance* 28 (October 2014): 152–68, https://www.sciencedirect.com/science/article/abs/pii/S0929119913001302.

62. B. Espen Eckbo, Knut Nygaard, and Karin S. Thorburn, "Valuation Effects of Norway's Board Gender-Quota Law Revisited," *Management Science* (forthcoming), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2746786.

63. David Abad et al., "Does Gender Diversity on Corporate Boards Reduce Information Asymmetry in Equity Markets?," *BRQ Business Research Quarterly* 20, no. 3 (July–September 2017): 192–205, https://www.sciencedirect.com/science/article/pii/S2340943617300142.

64. Maria Encarnación Lucas-Pérez et al., "Women on the Board and Managers' Pay: Evidence from Spain," *Journal of Business Ethics* 129, no. 2 (June 2015): 265–80, https://link.springer.com/article/10.1007/s10551-014-2148-1.

65. Kathleen A. Farrell and Philip L. Hersch, "Additions to Corporate Boards: The Effect of Gender," *Journal of Corporate Finance* 11, nos. 1–2 (March 2005): 85–106, https://www.sciencedirect.com/science/article/abs/pii/S0929119904000264.

66. Caspar Rose, "Does Female Board Representation Influence Firm Performance? The Danish Evidence," *Corporate Governance: An International Review* 15, no. 2 (March 2007): 404–13, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=972533.

67. Nasdaq Stock Market LLC, "Proposed Rule Change to Adopt Listing Rules Related to Board Diversity," 9.

68. Deborah L. Rhode and Amanda K. Packel, "Diversity on Corporate Boards: How Much Difference Does Difference Make?," *Delaware Journal of Corporate Law* 39, no. 2 (2014): 377–426, https://law.stanford.edu/publications/diversity-on-corporate-boards-how-much-difference-does-difference-make-2/.

69. Jan Luca Pletzer et al., "Does Gender Matter? Female Representation on Corporate Boards and Firm Financial Performance—A Meta-Analysis," *PLOS ONE* 10, no. 6 (2015), https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0130005.

70. Corinne Post and Kris Byron, "Women on Boards and Firm Financial Performance: A Meta-Analysis," *Academy of Management Journal* 58, no. 5 (October 2015): 1546–71, https://journals.aom.org/doi/10.5465/amj.2013.0319.

71. Kris Byron and Corinne Post, "Women on Boards of Directors and Corporate Social Performance: A Meta-Analysis," *Corporate Governance: An International Review* 24, no. 4 (July 2016): 428–42, https://onlinelibrary.wiley.com/doi/10.1111/corg.12165.

72. Alice H. Eagly, "When Passionate Advocates Meet Research on Diversity, Does the Honest Broker Stand a Chance?," *Journal of Social Issues* 72, no. 1 (March 2016): 199, https://spssi.onlinelibrary.wiley.com/doi/abs/10.1111/josi.12163.

© 2021 by the American Enterprise Institute for Public Policy Research. All rights reserved.

The American Enterprise Institute (AEI) is a nonpartisan, nonprofit, 501(c)(3) educational organization and does not take institutional positions on any issues. The views expressed here are those of the author(s).

# EXHIBIT B

## AFFIDAVIT OF JAMES R. COPLAND

1. My name is James R. Copland. I am over the age of 18 and am competent to make this declaration.

2. The facts set forth in this declaration are based on my personal knowledge and expertise and are submitted in my individual capacity.

3. I am a senior fellow at the Manhattan Institute and the Institute's director of Legal Policy. I received my J.D. and M.B.A. from Yale University, my M.Sc. from the London School of Economics, and my B.A. from the University of North Carolina at Chapel Hill.

4. I serve as a director and vice chairman of a privately held for-profit corporation and as a director of multiple nonprofit boards. I have previously served on many private-company, public and nonprofit boards. I also previously worked as a management consultant with McKinsey and Company and served as a law clerk to Hon. Ralph K. Winter on the U.S. Court of Appeals for the Second Circuit.

5. I have testified before Congress as well as state and municipal legislatures.

6. I am the author of *The Unelected: How an Unaccountable Elite Is Governing America* (Encounter 2020). I am also the author of many policy briefs, book chapters, articles, and opinion pieces in a variety of publications, including the *Harvard Business Law Review* and *Yale Journal on Regulation.*

7. In 2011 and 2012, I was named to the National Association of Corporate Directors "Directorship 100" list, which designates the individuals most influential over U.S. corporate governance.

8. A true and correct copy of my curriculum vitae, detailing my educational and professional experience, is attached to this declaration.

9. I understand that Nasdaq seeks the Securities and Exchange Commission's (SEC's) approval of proposed listing rule 5605(f), known as the diversity rule.

10. I understand that this proposed diversity rule would require Nasdaq-listed companies to have (A) "at least one director who self-identifies as female," and (B) "at least one director who self-identifies as Black or African American, Hispanic or Latinx, Asian, Native American or Alaska Native, two or more races or ethnicities, or as LGBTQ+." In the alternative, I understand Nasdaq would require listed companies to publicly "explain" in writing why

they do not comply with either or both diverse director requirements. Firms that fail to comply or explain after a warning would be delisted from the exchange.

11. As a director, management consultant, and academic, I have significant expertise in management, corporate communications, corporate law, and corporate litigation risk.

12. In my expert opinion, the diversity rule will likely result in increased director compensation costs, director liability insurance costs, and a one-time director "search cost" loss for firms and investors.

13. Compliance with the diversity rule will likely result in increased reputational and legal risks for firms because the proposed rule relies on highly arbitrary and subjective minority classifications that create opportunities for negative media coverage and an increased risk of misrepresentation lawsuits or government investigations.

14. For example, I cannot say for certain who will qualify as a "member of the queer community." This classification might mean anyone who is not heterosexual, or it might mean heterosexuals who associate frequently with or identify as allies of gay individuals.

15. This subjectivity might trigger lawsuits alleging misrepresentations about the minority status of members of a firm's board of directors.

16. For example, a firm may communicate that a director is Native American based on the self-identification of that individual director. But in doing so, a firm may incur legal risks should that director's self-identification be challenged as false by investors or regulators because the director lacks a "tribal affiliation" or "community recognition" needed to qualify under Nasdaq's definition.

17. As another example, a firm may communicate that a director is "black" based on the director's self-identification. But in doing so, the firm may include legal risks should that director's self-identification be challenged as false by investors or regulators if the director happens to have "origins in . . . North Africa" and is therefore "White" under Nasdaq's definition.

18. Compliance with the diversity rule would also increase the liability risk for some firms under federal or state non-discrimination laws, which generally prohibit making employment decisions based on race and often prohibit

making employment decisions based on other protected categories like sex and sexual orientation.

19. In order to avoid the legal risks of publicly classifying persons by sex, race, or sexual orientation, some firms may be compelled to explain their decision not to comply.

20. In my expert opinion, firms that opt to publicly explain their reasons for non-compliance with Nasdaq's diversity rule will be subject to an increased risk of reputational harm.

21. Negative news coverage and diversity activist campaigns highlighting a firm's statement of non-compliance with the diversity rule could impair a firm's reputation with its customer base or investors and result in a higher cost of capital, reduced profitability, and lower share prices, even if such effects might be mitigated in the long run.

22. Firms that publicly explain their reasons for non-compliance will also incur significant legal risk. Such public explanation statements may attract legal investigations or shareholder lawsuits alleging material misrepresentations or omissions.

23. A statement explaining a firm's reasons for non-compliance may also expose a firm to enforcement risks from state regulators. For example, the New York Martin Act only requires a plausible allegation that an exchange listed firm made (1) a misrepresentation or omission; (2) that is material. Under such open-ended standards, it is probable that exchange-listed firms may trigger state enforcement investigations or lawsuits based on statements explaining reasons for non-compliance with the diversity rule.

24. Indeed, shareholder lawsuits regarding corporate misrepresentations in statements about diversity have already been brought against firms such as Gap, Oracle, Facebook, Micron, Monster, and Qualcomm. A firm that makes a statement about its non-compliance with Nasdaq's proposed diversity rule is likely to face an increased risk of similar shareholder lawsuits.

25. The explanation, in effect, functions as a penalty for non-compliance with the diversity rule.

26. Given these serious risks, I believe the proposed rule is a double-edged sword requiring that firms discriminate based on sex, race, or sexual orientation in hiring directors, or else assume a serious risk of reputational and litigation harms.

27.  Given these risks, the diversity rule pushes prudent directors and managers to spend more limited resources on corporate communications consultants and lawyers to assess and mitigate the costs, and the reputational and legal risks, of a firm's attempt to comply with the diversity rule or provide a public explanation for non-compliance.

28.  I declare that the foregoing is a true and correct statement of my expert opinion and judgment.

Executed on: _____, 2021

James R. Copland

# JAMES R. COPLAND IV

---

## CURRENT POSITION

**Manhattan Institute for Policy Research**                                    New York, NY
*Director, Legal Policy*                                                       2003-Present
*Senior Fellow*                                                               2010-Present

- Manage legal policy efforts for non-partisan 501(c)(3) think tank.

    - Legal policy efforts center on developing and communicating sound ideas for reforming America's civil and criminal justice systems.
    - Portfolio of projects and initiatives has included empirical analyses, policy development, and popular communications.

- Engage in written research and advocacy, as both an author and editor.

    - Have authored scores of policy white papers, book chapters, and articles in law journals.
    - Have edited papers written by leaders in the academy and private practice.
    - Have written more than 100 popular opinion pieces leading national periodicals including *The Wall Street Journal*, *The Washington Post*, *National Law Journal*, and *USA Today*.

- Speak regularly to specialized and popular audiences on legal-reform issues.

    - Have testified before both houses of Congress, state and municipal legislative bodies, and international government bodies.
    - Have been consulted by the U.S. Sentencing Commission, the Administrative Conference of the United States, and the Executive Office of the President.
    - Have made hundreds of media appearances in such outlets as PBS, Fox News, MSNBC, CNBC, Fox Business, Bloomberg, C-Span, and NPR.

### Author: *The Unelected: How an Unaccountable Elite Is Governing America* (Encounter Books, 2020)

- "Copland argues persuasively . . . that quite a lot of our governance comes from people we didn't vote for, and whom we cannot vote out to hold them accountable for misrule."
  —Dan McLaughlin, *National Review*

- "The clearest and most succinct summary of these complicated subjects that I have ever seen."
  —Mark Pulliam, *Law and Liberty*

- "A masterful history."
  —Philip K. Howard, author, *The Death of Common Sense*; founder, Common Good

- "Valuable reading for anyone committed to a republican form of government."
  —Leonard Leo, Co-Chairman, Federalist Society for Law and Public Policy Studies

- "Ideas we should be discussing to get on a better path."
  —Thomas J. Donohue, Chief Executive Officer, U.S. Chamber of Commerce

- "Copland's insightful historical and legal analysis is a necessary precondition to any institutional solution."
  — Richard A. Epstein, Laurence A. Tisch Professor of Law, NYU Law School

- "Jim Copland knows more about this subject than almost anyone—and after you read this book, you will too."
  —Walter K. Olson, author, *The Litigation Explosion*; senior fellow, Cato Institute

### Awards

*Directorship 100*: Published by the National Association of Corporate Directors, designating the individuals most influential over U.S. corporate governance (multiple occasions).

*Legal Reform Champion: Research*: Awarded by the U.S. Chamber of Commerce Institute for Legal Reform, for *Trial Lawyers, Inc.* series of publications on civil litigation in America.

**PRIOR POSITIONS**

### McKinsey and Company
New York, NY
*Associate*
2000-2002
- Worked on post-merger management for major pharmaceutical companies and banks and on high-net-worth client strategy for financial institutions.
- Assisted on development of McKinsey's internal electronic research platform.
- Assisted McKinsey's internal asset manager on firm's private and public equity portfolio.

### United States Court of Appeals for the Second Circuit
New York, NY
*Law Clerk, Chief Judge Ralph K. Winter*
1999-2000

### Chase Securities, Inc.
New York, NY
*Summer Associate, Investment Banking*
Summer 1998

### Moore & Van Allen
Charlotte, NC
*Summer Associate, Corporate Law*
Summer 1997

### Robinson, Bradshaw & Hinson
Charlotte, NC
*Summer Associate, Law*
Summer 1997

**EDUCATION**

### Yale University
New Haven, CT
*Juris Doctor*
2003
*Master of Business Administration*
1999

*Awards:*  John M. Olin Fellow in Law and Economics
Coker Fellow in Constitutional Law
*Leadership:*  Yale Federalist Society, Vice President
*Yale Journal on Regulation*, Articles Editor, Submissions Committee
Yale Skeet & Trap Team, Captain, ACUI AA American Skeet

### London School of Economics and Political Science
London, UK
*Master of Science in Politics of the World Economy*
1995

### University of North Carolina at Chapel Hill
Chapel Hill, NC
*Bachelor of Arts with Highest Distinction, Economics with Highest Honors*
1994

*Awards:*  John Motley Morehead Scholar
National Merit Scholar
Honors Prize in Economics
Phi Beta Kappa
*Leadership:*  Student Body President
*Carolina Critic*, Editor

**BOARDS AND OTHER AFFILIATIONS**

*Tryon Palace Foundation*, *Director* (2020-Present)
*First Presbyterian Church* (New Bern, NC), *Pastor Nominating Committee* (2020-Present)
*African-American Heritage & Culture Center of New Bern*, *Founding Director, Treasurer* (2019-Present)
*Copland Fabrics, Inc.* (Hopedale, NC), *Director* (1998-Present), *Vice Chairman* (2018-Present)
*Government Justice Center* (Albany, NY), *Director* (2018-Present)
*Epiphany School of Global Studies* (New Bern, NC), *Trustee* (2019-2020)
*Copland Industries, Inc.* (Hopedale, NC), *Director* (1997-2019), *Vice Chairman* (2018-2019)
*Union Church of Pocantico Hills* (Sleepy Hollow, NY), *Trustee* (2014-2019), *President* (2015-2016)
*Fifth Avenue Presbyterian Church* (New York, NY), *Elder* (2006-2009)
*University of North Carolina at Chapel Hill* (Chapel Hill, NC), *Trustee* (1993-1994) (*ex officio*)

# EXHIBIT C

## Summary of Studies Cited by Nasdaq in its Review of the Academic Research, 85 Fed. Reg. 80,472, 80,475-80 (Dec. 11, 2020)

| Study No. | Study Authors (Date) *see sheet for full citation | Peer Reviewed | Includes Statistical Significance Analysis | Includes Control Variable Analysis N=none; B=basic; C=controls | Only Non-U.S. Companies | Gender | Race | Sexual Orientation | Only Combined Diversity Metric | Comment |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Thomas & Starr, Carlyle Group (2019) | N | N | B | N | Y | Y | N | Y | Combined diversity metric includes female, Black, Hispanic and Asian directors, does not separate effects due to race, gender (p. 5, n. 19) |
| 2 | Babcock et al, FCLT Global (2019) | N | N | N | N | Y | N | N | N | Diversity metric includes age and gender (p. 11), separate analyses address age and gender (p. 12) |
| 3 | Hunt et al, McKinsey (2015) | N | Y | B | N | Y | Y | N | N | |
| 4 | D. Carter et al (2003) | Y | Y | C | N | Y | Y | N | N | |
| 5 | Bernile et al (2017) | Y | Y | C | N | Y | Y | N | Y | Composite diversity metric includes age, gender, ethnicity, financial expertise, number of directorships, educational background, does not separate effects due to race, gender (p. 10) |
| 6 | Kerlsey et al, Credit Suisse (2014) | N | N | B | N | Y | N | N | N | |
| 7 | Eastman et al, MCSI (2016) | N | N | N | N | Y | N | N | N | |
| 8 | N. Carter et al, Catalyst (2011) | N | Y | N | N | Y | N | N | N | |
| 9 | Credit Suisse ESG Research (2016) | N | N | N | N | N | N | Y | N | |
| 10 | Quorum (2019) | N | N | N | N | N | N | N | N | Not a study |
| 11 | Hunt et al, McKinsey (2020) | N | Y | B | N | Y | Y | N | N | |
| 12 | Moody's Investors Service (2019) | N | | | | | | | | Unable to access without subscription |
| 13 | Pletzer et al (2015) | Y | Y | C | N | Y | N | N | N | Meta-analysis |
| 14 | Eagly (2016) | Y | N | N | N | Y | N | N | N | Narrative summary of literature |
| 15 | Post and Byron (2015) | Y | Y | C | N | Y | N | N | N | Meta-analysis |
| 16 | Byron and Post (2016) | Y | Y | C | N | Y | N | N | N | Meta-analysis, but related to corporate social performance--not relevant |
| 17 | D. Carter et al (2010) | Y | Y | C | N | Y | Y | N | N | |
| 18 | Campbell & Minguez-Vera | Y | Y | C | Y | Y | N | N | N | Only Spanish companies |
| 19 | Adams & Ferreira | Y | Y | C | N | Y | N | N | N | |
| 20 | Srinidhi et al (2011) | Y | Y | C | N | Y | N | N | N | |
| 21 | Pucheta-Martinez et al (2016) | Y | Y | C | Y | Y | N | N | N | Only Spanish companies |
| 22 | Gull et al (2017) | Y | Y | C | Y | Y | N | N | N | Only French companies |
| 23 | Bravo & Alcaide-Ruiz (2019) | Y | Y | C | N | Y | N | N | N | |
| 24 | Abbott et al (2012) | Y | Y | C | N | Y | N | N | N | |
| 25 | Wahid (2019) | Y | Y | C | N | Y | N | N | N | |
| 26 | Cumming et al (2015) | Y | Y | C | N | Y | N | N | N | Only Chinese companies |
| 27 | Chen et al (2016) | Y | Y | C | N | Y | N | N | N | |
| 28 | Gul et al (2011) | Y | Y | C | N | Y | N | N | N | |
| 29 | Abad et al (2017) | Y | Y | C | Y | Y | N | N | N | Only Spanish companies |
| 30 | Lucas-Perez et al (2014) | Y | Y | C | Y | Y | N | N | N | Only Spanish companies |
| 31 | Westphal et al (1995) | Y | Y | C | N | N | N | N | Y | Combined diversity metric includes educational background, functional background, insider status, age; does not include gender, race, or sexual orientation |
| 32 | Forbes & Milliken (1999) | Y | N | N | N | N | N | N | N | |
| 33 | Dallas (2002) | Y | N | N | N | Y | Y | N | N | Not a study |
| 34 | Dhir (2015) | N | N | N | Y | Y | N | N | N | Only Norwegian companies, qualitative study |

1 Jason M. Thomas and Megan Starr, From Impact Investing to Investing for Impact, The Carlyle Group (Feb. 2019), https://www.carlyle.com/global-insights/invest-with-impact-whitepaper-thomas-starr

2 Ariel F. Babcock, et al., The Long-term Habits of a Highly Effective Corporate Board, FCLT Global (Mar. 2019), https://www.fcltglobal.org/resource/the-long-term-habits-of-a-highly-effective-corporate-board,

3 Vivian Hunt, et al., Diversity Matters, McKinsey & Company (Feb. 2015), https://www.mckinsey.com/business-functions/organization/our-insights/~/media/2497d4ae4b534ee89d929cc6e3aea485.ashx

4 David A. Carter, et al., Corporate Governance, Board Diversity, and Firm Value, 38 Fin. Rev. 33 (2003).

5 Gennaro Bernile et al., Board Diversity, Firm Risk, and Corporate Policies, (Mar. 2017), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2733394 (whitepaper, not peer reviewed)

6 Richard Kerlsley, et al., The CS Gender 3000: Women in Senior Management, Credit Suisse (Sept. 2014), https://directwomen.org/sites/default/files/news-pdfs/9.pdf

7 Meggin Thwing Eastman, et al., The Tipping Point: Women on Boards and Financial Performance, MCSI (Dec. 2016), https://www.msci.com/documents/10199/fd1f8228-cc07-4789-acee-3f9ed97eed8b

8 Nancy M. Carter and Harvey M. Wagner, The Bottom Line: Corporate Performance and Women's Representation on Boards (2004-2008), Catalyst (2011), https://www.catalyst.org/wp-content/uploads/2019/01/the_bottom_line_corporate_performance_and_womens_representation_on_boards_2004-2008.pdf

9 LGBT: the value of diversity, Credit Suisse ESG Research (Apr. 2016), https://research-doc.credit-suisse.com/docView?language=ENG&source=emfromsendlink&format=PDF&document_id=807075590&extdocid=807075590_1_eng_pdf&serialid=esu4wNcHexx7kusNLaZQphUkT9nax1Pvpt2DyPjr1k%3d

10 Quorum, Out Leadership's LGBT+ Board Diversity and Disclosure Guidelines (2019), http://www.insurance.ca.gov/diversity/41-ISDGBD/GBDExternal/upload/Quorum-Template-Board-Diversity-Guidelines-2019-Mar.pdf

11 Vivian Hunt, et al., Diversity Wins: How inclusion matters, McKinsey & Company (May 2020), https://www.mckinsey.com/~/media/McKinsey/Featured%20Insights/Diversity%20and%20Inclusion/Diversity%20wins%20How%20inclusion%20matters/Diversity-wins-How-inclusion-matters-vF.pd

12 Moody's Investors Service, Gender diversity is correlated with higher ratings, but mandates pose short-term risk (Sept. 2019), https://www.moodys.com/researchdocumentcontentpage.aspx?docid=PBC_1184245

13 Jan Luca Pletzer, et al, Does Gender Matter? Female Representation on Corporate Boards and Firm Financial Performance—A Meta-Analysis, 10 PLOS ONE (2015), doi:10.1371/journal.pone.0130005

14 Alice H. Eagly, When Passionate Advocates Meet Research on Diversity, Does the Honest Broker Stand a Chance? 72 J. Social Issues 199 (2016), doi: 10.1111/josi.12163

15 Corinne Post and Kris Byron, Women on Boards and Firm Financial Performance: A Meta-Analysis, 58 Academy Of Management J. 1546 (2015), https://doi.org/10.5465/amj.2013.0319

16 Kris Byron and Corinne Post, Women on Boards of Directors and Corporate Social Performance: A Meta-Analysis, 24 Corp. Governance: An Int'l Rev. 428 (2016), https://doi.org/10.1111/corg.12165

17 David A. Carter, et al., The Gender and Ethnic Diversity of US Boards and Board Committees and Firm Financial Performance, 18 Corp. Governance 396 (2010), http://wedc-online.wildapricot.org/Resources/WEDC-Documents/Women%20On%20Board/Gender%20Diversity%20and%20Boards.pdf

18 Kevin Campbell and Antonio Mínguez-Vera, Gender Diversity in the Boardroom and Financial Performance, 83 J. Bus. Ethics 13 (2008), https://link.springer.com/article/10.1007/s10551-007-9630-y

19 Renee B. Adams and Daniel Ferreira, Women in the boardroom and their impact on governance and performance, 94 J. Fin. Econ. 291 (2009), https://doi.org/10.1016/j.jfineco.2008.10.007

20 Bin Srinidhi, et al., Female Directors and Earnings Quality, 28 Contemporary Accounting Research 1610 (2011)

21 Maria Consuelo Pucheta-Martínez et al., Corporate governance, female directors and quality of financial information, 25 Bus. Ethics: A European Rev. 363 (2016).

22 Ammar Gul, et al., Beyond gender diversity: How specific attributes of female directors affect earnings management, 50 British Acct. Rev. 255 (Sept. 2017)

23 Francisco Bravo and María Dolores Alcaide-Ruiz, The disclosure of financial forward-looking information, 34 Gender in Management 140 (2019)

24 Lawrence J. Abbott, et al., Female Board Presence and the Likelihood of Financial Restatement, 26 Accounting Horizons 607 (2012)

25 Aida Sijamic Wahid, The Effects and the Mechanisms of Board Gender Diversity: Evidence from Financial Manipulation, 159 J. Bus. Ethics 705 (2019), https://doi.org/10.1007/s10551-018-3785-6

26 Douglas J. Cumming, et al., Gender Diversity and Securities Fraud, 58 Academy of Management Journal 1572 (2015), http://dx.doi.org/10.5465/amj.2013.0750

27 Yu Chen, et al., Board Gender Diversity and Internal Control Weaknesses, 33 Advances in Acct. 11 (2016)

28 Ferdinand A. Gul, et al., Does board gender diversity improve the informativeness of stock prices? 51 J. Acct. & Econ. 314 (2011)

29 David Abad, et al., Does Gender Diversity on Corporate Boards Reduce Information Asymmetry in Equity Markets? 20 Business Research Quarterly 192 (2017)

30 María Encarnacion Lucas-Perez, et al., Women on the Board and Managers' Pay: Evidence from Spain, 129 J. Bus. Ethics 285 (2014)

31 James D. Westphal and Edward J. Zajac, Who Shall Govern? CEO/Board Power, Demographic Similarity, and New Director Selection, 40 Admin. Sci. Q. 60 (1995)

32 Daniel P Forbes and Frances J. Milliken, Cognition and Corporate Governance: Understanding Boards of Directors as Strategic Decision-Making Groups, 24 Academy of Management Review 489 (1999)

33 Lynne L. Dallas, Does Corporate Law Protect the Interests of Shareholders and Other Stakeholders?: The New Managerialism and Diversity on Corporate Boards of Directors, 76 Tul. L. Rev. 1363 (2002)

34 Aaron A. Dhir, "Lessons from Norway: Successes and Limitations of the Quota Model," in CHALLENGING BOARDROOM HOMOGENEITY: CORPORATE LAW, GOVERNANCE, AND DIVERSITY, (2015) Cambridge University Press, https://doi.org/10.1017/CBO9781139053327, https://www.cambridge.org/core/books/challenging-boardroom-homogeneity/A26334FBF5B99AF2A40DF5CB69906D69

**TAB 8:**

Letter from Matt Maddox, CEO, Wynn Resorts, File No. SR-NASDAQ-2020-081
(Mar. 10, 2021)



RESORTS

**VIA EMAIL**: rule-comments@sec.gov

March 10, 2021

Vanessa Countryman, Secretary
Securities and Exchange Commission
100 F. Street, NE
Washington, DC 20549-1090

Re: File Number SR-NASDAQ-2020-081
(Notice of Filing of Proposed Rule Change to Adopt Listing Rules Related to Board Diversity)

Dear Secretary Countryman:

Wynn Resorts, Limited ("Wynn") supports the Nasdaq proposal to require all companies listed on its U.S. exchange to publicly disclose consistent, transparent diversity statistics regarding their Board of Directors ("Board").

Our Board is diverse, with four female directors and one racially diverse director. Our Board believes that a broad spectrum of professional and life experiences results in the different points of view essential to effective decision-making. Examples of our commitment to this belief include:

- Adoption of the so-called NFL Rooney Rule in its Corporate Governance Guidelines, establishing a policy to consider candidates with a diverse background when evaluating new candidates for the Board. This change, made in 2019 was implemented to ensure that any initial slate of candidates includes those with a diversity of race, gender and ethnicity; and
- Establishment of a goal of 50% diversity among Board members.

Diversity and inclusion are a cornerstone of our human capital management efforts. As a signatory to the CEO Action for Diversity and Inclusion Pledge, we are committed to publicly supporting programs and practices that promote diversity. While the Pledge is new, the evidence of our workforce demonstrates that the commitment is not: more than 70% of our line level employees are ethnically diverse and more than 50% of our managers are ethnically diverse.

To ensure we maintain the competitive edge we believe we have derived from our currently diverse Board, we continue to explore ways to not only increase the diversity of voices within our company, but also ensure those voices are heard. Wynn enjoys the best team in hospitality and we believe that our efforts to be even more inclusive will further our competitive advantage.

We urge the SEC to affirm the proposed rule.

Sincerely,

Matt Maddox
Chief Executive Officer

**TAB 9:**

Nasdaq, Response to Comments, File No. SR-NASDAQ-2020-082 (Feb. 26, 2021)
("Nasdaq Letter III")



**ARNOLD GOLUB**
805 KING FARM BLVD
ROCKVILLE, MD 20850
NASDAQ.COM

February 26, 2021

Ms. Vanessa A. Countryman
Secretary
U.S. Securities and Exchange Commission
100 F Street NE
Washington, DC 20549-1090

      Re:    <u>Amendment No. 1 (SR-NASDAQ-2020-082)</u>

Dear Ms. Countryman:

    The Nasdaq Stock Market LLC filed the above-referenced filing on February 25, 2021.

Sincerely,

Arnold Golub
Vice President
Deputy General Counsel

**TAB 10:**

Nasdaq, Notice of Filing of Amendment No. 1 (attached to Nasdaq Letter III), File No. SR-NASDAQ-2020-082 (Feb. 26, 2021)

OMB APPROVAL

OMB Number:        3235-0045
Estimated average burden
hours per response............ 38

*Required fields are shown with yellow backgrounds and asterisks.*

| | |
|---|---|
| Page 1 of * 36 | SECURITIES AND EXCHANGE COMMISSION<br>WASHINGTON, D.C. 20549<br>Form 19b-4 | File No.* SR - 2020 - * 082<br>Amendment No. (req. for Amendments *) 1 |

**Filing by** The Nasdaq Stock Market LLC

Pursuant to Rule 19b-4 under the Securities Exchange Act of 1934

| Initial * ☐ | Amendment * ☑ | Withdrawal ☐ | Section 19(b)(2) * ☑ | Section 19(b)(3)(A) * ☐ | Section 19(b)(3)(B) * ☐ |
|---|---|---|---|---|---|

| Pilot ☐ | Extension of Time Period for Commission Action * ☐ | Date Expires * | Rule |
|---|---|---|---|

☐ 19b-4(f)(1)   ☐ 19b-4(f)(4)
☐ 19b-4(f)(2)   ☐ 19b-4(f)(5)
☐ 19b-4(f)(3)   ☐ 19b-4(f)(6)

Notice of proposed change pursuant to the Payment, Clearing, and Settlement Act of 2010

| Section 806(e)(1) * ☐ | Section 806(e)(2) * ☐ | Security-Based Swap Submission pursuant to the Securities Exchange Act of 1934<br>Section 3C(b)(2) * ☐ |
|---|---|---|

Exhibit 2 Sent As Paper Document ☐    Exhibit 3 Sent As Paper Document ☐

**Description**

Provide a brief description of the action (limit 250 characters, required when Initial is checked *).

Proposal to offer certain listed companies access to a complimentary board recruiting solution to help advance diversity on company boards.

**Contact Information**

Provide the name, telephone number, and e-mail address of the person on the staff of the self-regulatory organization prepared to respond to questions and comments on the action.

| First Name * | Arnold | Last Name * | Golub |
|---|---|---|---|
| Title * | Deputy General Counsel | | |
| E-mail * | ▉▉▉▉▉▉ | | |
| Telephone * | ▉▉▉▉ | Fax | |

**Signature**

Pursuant to the requirements of the Securities Exchange Act of 1934,

has duly caused this filing to be signed on its behalf by the undersigned thereunto duly authorized.

(Title *)

| Date | 02/26/2021 | EVP and Chief Legal Officer |
|---|---|---|
| By | John Zecca | |
| | (Name *) | |

NOTE: Clicking the button at right will digitally sign and lock this form. A digital signature is as legally binding as a physical signature, and once signed, this form cannot be changed.

▉▉▉▉▉▉▉▉▉▉

JA162

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

For complete Form 19b-4 instructions please refer to the EFFS website.

**Form 19b-4 Information ***

Add    Remove    View

The self-regulatory organization must provide all required information, presented in a clear and comprehensible manner, to enable the public to provide meaningful comment on the proposal and for the Commission to determine whether the proposal is consistent with the Act and applicable rules and regulations under the Act.

**Exhibit 1 - Notice of Proposed Rule Change ***

Add    Remove    View

The Notice section of this Form 19b-4 must comply with the guidelines for publication in the Federal Register as well as any requirements for electronic filing as published by the Commission (if applicable). The Office of the Federal Register (OFR) offers guidance on Federal Register publication requirements in the Federal Register Document Drafting Handbook, October 1998 Revision. For example, all references to the federal securities laws must include the corresponding cite to the United States Code in a footnote. All references to SEC rules must include the corresponding cite to the Code of Federal Regulations in a footnote. All references to Securities Exchange Act Releases must include the release number, release date, Federal Register cite, Federal Register date, and corresponding file number (e.g., SR-[SRO]-xx-xx). A material failure to comply with these guidelines will result in the proposed rule change being deemed not properly filed. See also Rule 0-3 under the Act (17 CFR 240.0-3)

**Exhibit 1A- Notice of Proposed Rule Change, Security-Based Swap Submission, or Advance Notice by Clearing Agencies ***

Add    Remove    View

The Notice section of this Form 19b-4 must comply with the guidelines for publication in the Federal Register as well as any requirements for electronic filing as published by the Commission (if applicable). The Office of the Federal Register (OFR) offers guidance on Federal Register publication requirements in the Federal Register Document Drafting Handbook, October 1998 Revision. For example, all references to the federal securities laws must include the corresponding cite to the United States Code in a footnote. All references to SEC rules must include the corresponding cite to the Code of Federal Regulations in a footnote. All references to Securities Exchange Act Releases must include the release number, release date, Federal Register cite, Federal Register date, and corresponding file number (e.g., SR-[SRO]-xx-xx). A material failure to comply with these guidelines will result in the proposed rule change, security-based swap submission, or advance notice being deemed not properly filed. See also Rule 0-3 under the Act (17 CFR 240.0-3)

**Exhibit 2 - Notices, Written Comments, Transcripts, Other Communications**

Add    Remove    View

Exhibit Sent As Paper Document
☐

Copies of notices, written comments, transcripts, other communications. If such documents cannot be filed electronically in accordance with Instruction F, they shall be filed in accordance with Instruction G.

**Exhibit 3 - Form, Report, or Questionnaire**

Add    Remove    View

Exhibit Sent As Paper Document
☐

Copies of any form, report, or questionnaire that the self-regulatory organization proposes to use to help implement or operate the proposed rule change, or that is referred to by the proposed rule change.

**Exhibit 4 - Marked Copies**

Add    Remove    View

The full text shall be marked, in any convenient manner, to indicate additions to and deletions from the immediately preceding filing. The purpose of Exhibit 4 is to permit the staff to identify immediately the changes made from the text of the rule with which it has been working.

**Exhibit 5 - Proposed Rule Text**

Add    Remove    View

The self-regulatory organization may choose to attach as Exhibit 5 proposed changes to rule text in place of providing it in Item I and which may otherwise be more easily readable if provided separately from Form 19b-4. Exhibit 5 shall be considered part of the proposed rule change.

**Partial Amendment**

Add    Remove    View

If the self-regulatory organization is amending only part of the text of a lengthy proposed rule change, it may, with the Commission's permission, file only those portions of the text of the proposed rule change in which changes are being made if the filing (i.e. partial amendment) is clearly understandable on its face. Such partial amendment shall be clearly identified and marked to show deletions and additions.

1.    Text of the Proposed Rule Change

(a)    The Nasdaq Stock Market LLC ("Nasdaq" or "Exchange"), pursuant to

Section 19(b)(1) of the Securities Exchange Act of 1934 ("Act")[1] and Rule 19b-4

thereunder,[2] is filing with the Securities and Exchange Commission ("SEC" or

"Commission") a proposal to adopt Listing Rule IM-5900-9 to offer certain listed

companies access to a complimentary board recruiting solution to help advance diversity

on company boards.  This Amendment 1 replaces and supersedes the original filing in its

entirety.

A notice of the proposed rule change for publication in the Federal Register is

attached as Exhibit 1.  The text of the proposed rule change is set forth below.  Proposed

new language is underlined.

* * * * *

**IM-5900-9. Board Diversity Services**

On December 1, 2020, Nasdaq filed a proposal (SR-Nasdaq-2020-081) to require each
listed Company, subject to certain exceptions, to have, or explain why it does not have, at
least two diverse directors on its board (the "Diversity Objective").  A company with five
or fewer directors on its board would have to have, or explain why it does not have, at
least one diverse director on its board.  In order to help advance diversity on Company
boards and to help Companies prepare for and, if approved, comply with the Diversity
Objective, Nasdaq offers Eligible Companies complimentary access to two seats of a
board recruiting solution, which will allow Companies to identify and evaluate diverse
board candidates. Until December 1, 2022, any Eligible Company that requests access to
this service through the Nasdaq Listing Center will receive complimentary access for
one-year from the initiation of the service.  This service has a retail value of
approximately $10,000 per year.

---

[1]    15 U.S.C. 78s(b)(1).

[2]    17 CFR 240.19b-4.

An Eligible Company is:

(a) any listed Company, except as described below, that represents to Nasdaq that it does not have (i) at least one director who self-identifies as female; and (ii) at least one director who self-identifies as one or more of the following: Black or African American, Hispanic or Latinx, Asian, Native American or Alaska Native, Native Hawaiian or Pacific Islander, or Two or More Races or Ethnicities, or who self-identifies as lesbian, gay, bisexual, transgender or as a member of the queer community;

(b) a listed Company that (i) is a Foreign Private Issuer (as defined in Rule 5005(a)(19), or (ii) is considered a foreign issuer under Rule 3b-4(b) under the Act and has its principal executive offices located outside of the United States, if it represents to Nasdaq that it does not have (i) at least one director who self-identifies as female; and (ii) at least one director who self-identifies as one or more of the following: female, an underrepresented individual based on national, racial, ethnic, indigenous, cultural, religious or linguistic identity in the country of the company's principal executive offices, or lesbian, gay, bisexual, transgender or as a member of the queer community; or

(c) a listed Company that is a Smaller Reporting Company (as defined in Rule 12b-2 under the Act), if it represents to Nasdaq that it does not have (i) at least one director who self-identifies as female, and (ii) at least one director who self-identifies as one or more of the following: female, Black or African American, Hispanic or Latinx, Asian, Native American or Alaska Native, Native Hawaiian or Pacific Islander, or Two or More Races or Ethnicities, or who self-identifies as lesbian, gay, bisexual, transgender or as a member of the queer community.

* * * * *

(b)     Not applicable.

(c)     Not applicable.

2.     Procedures of the Self-Regulatory Organization

The proposed rule change was approved by senior management of the Exchange pursuant to authority delegated by the Board of Directors (the "Board") on November 5, 2020.  Exchange staff will advise the Board of any action taken pursuant to delegated authority.  No other action is necessary for the filing of the rule change.

Questions and comments on the proposed rule change may be directed to:

Arnold Golub
Deputy General Counsel
Nasdaq, Inc.
(301) 978-8075

3.      <u>Self-Regulatory Organization's Statement of the Purpose of, and Statutory Basis for, the Proposed Rule Change</u>

a.      <u>Purpose</u>

In a separate rule filing,[3] Nasdaq is proposing to require each of its listed companies, subject to certain exceptions, to: (i) provide statistical information regarding diversity among the members of the company's board of directors; and (ii) to have, or explain why the company does not have at least two "Diverse" directors on its board (or one "Diverse" director for companies with five or fewer directors).  Under this proposed rule, "Diverse" means a director who self-identifies as: (i) female, (ii) an Underrepresented Minority, or (iii) LGBTQ+ (the "Diversity Objective").[4]  Through the rule change proposed herein, Nasdaq proposes to provide companies that do not have at least two Diverse directors, or otherwise would need to take action to satisfy the Diversity Objective, if approved, with a service to help them recruit Diverse directors.

---

[3]     Securities Exchange Act Release No. 90574 (December 4, 2020), 85 FR 80472 (December 11, 2020) (SR-Nasdaq-2020-081) (the "Nasdaq Diversity Proposal"). Amendment 1 to the Nasdaq Diversity Proposal was filed on February 26, 2020.

[4]     As defined in the proposed rule change, "Female" means an individual who self-identifies her gender as a woman, without regard to the individual's designated sex at birth; "Underrepresented Minority" means an individual who self-identifies as one or more of the following: Black or African American, Hispanic or Latinx, Asian, Native American or Alaska Native, Native Hawaiian or Pacific Islander, two or more races or ethnicities; and "LGBTQ+" means an individual who self-identifies as any of the following: lesbian, gay, bisexual, transgender or a member of the queer community.

Nasdaq is filing this Amendment 1 to SR-Nasdaq-2020-082[5] in order to make

conforming changes to align with changes proposed in Amendment 1 of the Nasdaq

Diversity Proposal.

In researching the Diversity Proposal, Nasdaq reviewed dozens of empirical

studies and found that an extensive body of academic and empirical research

demonstrates that diverse boards are positively associated with improved corporate

governance and company performance.[6]  In particular, studies have found that companies

with gender-diverse boards or audit committees are associated with:  more transparent

public disclosures[7] and less information asymmetry;[8] better reporting discipline by

management;[9] a lower likelihood of manipulated earnings through earnings

---

[5]     Securities Exchange Act Release No. 90571 (December 4, 2020), 85 FR 79556
        (December 10, 2020).

[6]     See Nasdaq Diversity Proposal at Section III, Empirical Research: The
        Relationship between Diversity and Company Performance, Investor Protection
        and Decision Making.

[7]     See Ferdinand A. Gul et al., *Does board gender diversity improve the
        informativeness of stock prices?*, 51(3) J. Acct. & Econ. 314 (April 2011)
        (analyzing 4,084 firm years during the period from 2002 to 2007, excluding
        companies in the utilities and financial industries, measuring public information
        disclosure using "voluntary continuous disclosure of 'other' events in 8K reports"
        and measuring stock price informativeness by "idiosyncratic volatility," or
        volatility that cannot be explained to systematic factors and can be diversified
        away).

[8]     See David Abad et al., *Does Gender Diversity on Corporate Boards Reduce
        Information Asymmetry in Equity Markets?* 20(3) BRQ Business Research
        Quarterly 192 at 202 (July 2017) (analyzing 531 company-year observations from
        2004 to 2009 of non-financial companies traded on the electronic trading platform
        of the Spanish Stock Exchange (SIBE)).

[9]     See Bin Srinidhi et al., *Female Directors and Earnings Quality*, 28(5)
        Contemporary Accounting Research 1610 at 1612-16 (Winter 2011) (analyzing
        3,132 firm years during the period from 2001 to 2007 based on S&P
        COMPUSTAT, Corporate Library's Board Analyst, and IRRC databases;

management;[10] an increased likelihood of voluntarily disclosing forward-looking

information;[11] a lower likelihood of receiving audit qualifications due to errors,[12] non-

compliance or omission of information;[13] and a lower likelihood of securities fraud.[14]  In

addition, studies found that having at least one woman on the board is associated with a

---

"choos[ing] the accruals quality as the metric that best reflects the ability of current earnings to reflect future cash flows" (noting that it "best predicts the incidence and magnitude of fraud relative to other commonly used measures of earnings quality") and analyzing surprise earnings results that exceeded previous earnings or analyst forecasts, because "managers of firms whose unmanaged earnings fall marginally below the benchmarks have [an] incentive to manage earnings upwards so as to meet or beat previous earnings").

[10]  See Ammar Gull et al., *Beyond gender diversity: How specific attributes of female directors affect earnings management*, 50(3) British Acct. Rev. 255 (Sept. 2017), available at: https://ideas.repec.org/a/eee/bracre/v50y2018i3p255-274.html (analyzing 394 French companies belonging to the CAC All-Shares index listed on Euronext Paris from 2001 to 2010, prior to the implementation of France's gender mandate law that required women to comprise 20% of a company's board of directors by 2014 and 40% by 2016).

[11]  See Francisco Bravo and Maria Dolores Alcaide-Ruiz, *The disclosure of financial forward-looking information*, 34(2) Gender in Mgmt. 140 at 142-44 (2019) (analyzing companies included in the S&P 100 Index in 2016, "focus[ing] on the disclosure of financial forward-looking information (which is likely to require financial expertise), such as earnings forecasts, expected revenues, anticipated cash flows or any other financial indicator").

[12]  See Maria Consuelo Pucheta-Martínez et al., *Corporate governance, female directors and quality of financial information.* 25(4) Bus. Ethics: A European Rev. 363 at 368 (2016) (analyzing a sample of non-financial companies listed on the Madrid Stock Exchange during 2004-2011).

[13]  Id. at 363.

[14]  See Douglas J. Cumming et al., *Gender Diversity and Securities Fraud*, Academy of Management Journal Vol. 58, No. 5, 1572–1593 (2015) (analyzing China Securities Regulatory Commission data from 2001 to 2010, including 742 companies with enforcement actions for fraud, and 742 non-fraudulent companies for a control group).

lower likelihood of material weaknesses in internal control over financial reporting,[15] and

a lower likelihood of material financial restatements.[16] Studies also identified positive

relationships between board diversity and commonly used financial metrics, including

higher returns on invested capital, returns on equity, earnings per share, earnings before

interest and taxation margin, asset valuation multiples and credit ratings.[17]

---

[15]    See Yu Chen et al., *Board Gender Diversity and Internal Control Weaknesses*, 33 Advances in Acct. 11 (2016) (analyzing a sample of 4267 firm-year observations during the period from 2004 to 2013, beginning "the first year internal control weaknesses were required to be disclosed under section 404 of SOX").

[16]    See Lawrence J. Abbott et al., *Female Board Presence and the Likelihood of Financial Restatement*, 26(4) Accounting Horizons 607, 626 (2012) (analyzing a sample of 278 pre-SOX annual financial restatements and 187 pre-SOX quarterly financial restatements of U.S. companies from January 1, 1997 through June 30, 2002 identified by the U.S. General Accounting Office restatement report 03-138 (which only included "material misstatements of financial results"), and 75 post-SOX annual financial restatements from July 1, 2002, to September 30, 2005 identified by U.S. General Accounting Office restatement report 06-678 (which only included "restatements that were being made to correct material misstatements of previously reported financial information"), consisting almost exclusively of non-Fortune 1000 companies); See also Aida Sijamic Wahid, The *Effects and the Mechanisms of Board Gender Diversity: Evidence from Financial Manipulation*, J. Bus. Ethics 159, 705–725 (2019) (analyzing 6,132 U.S. public companies during the period from 2000 to 2010, for a total of 38,273 firm-year observations).

[17]    See, generally, FCLTGlobal, *The Long-term Habits of a Highly Effective Corporate Board* 11 (March 2019), available at: https://www.fcltglobal.org/wp-content/uploads/long-term-habits-of-highly-effective-corporate-boards.pdf (analyzing 2017 MSCI ACWI constituents from 2010 to 2017 using Bloomberg data); Credit Suisse, *The CS Gender 3000: Women in Senior Management* 16 (Sept. 2014), available at: https://www.credit-suisse.com/media/assets/corporate/docs/about-us/research/publications/the-cs-gender-3000-women-in-senior-management.pdf (analyzing 3,000 companies across 40 countries from the period from 2005 to 2013); Meggin Thwing Eastman et al., MSCI, *The tipping point: Women on boards and financial performance* 3 (December 2016), available at: https://www.msci.com/documents/10199/fd1f8228-cc07-4789-acee-3f9ed97ee8bb (analyzing of U.S. companies that were constituents of the MSCI World Index for the entire period from July 1, 2011 to June 30, 2016); Harvey M. Wagner, Catalyst, *The Bottom Line: Corporate Performance and Women's*

In addition, investors and investor groups are calling for diversification in the

boardroom[18] and legislators at the federal and state level are increasingly taking action to

_Representation on Boards (2004–2008)_ (March 1, 2011), available at:
https://www.catalyst.org/research/the-bottom-line-corporate-performance-and-womens-representation-on-boards-2004-2008/ (analyzing gender diversity data
from Catalyst's annual Fortune 500 Census of Women Board Directors report
series for the years 2005 to 2009, and corresponding financial data from S&P's
Compustat database for the years 2004 to 2008); Credit Suisse ESG Research,
_LGBT: the value of diversity_ 1 (April 15, 2016), available at: https://research-doc.credit-suisse.com/docView?language=ENG&source=emfromsendlink&format=PDF&document_id=807075590&extdocid=807075590_1_eng_pdf&serialid=evu4wNcHexx7kusNLaZQphUkT9naxi1PvptZQvPjr1k%3d; McKinsey & Company,
_Diversity wins: How inclusion matters_ 13 (May 2020), available at:
https://www.mckinsey.com/~/media/McKinsey/Featured%20Insights/Diversity%20and%20Inclusion/Diversity%20wins%20How%20inclusion%20matters/Diversity-wins-How-inclusion-matters-vF.pdf (analyzing 1,039 companies across 15
countries for the period from December 2018 to November 2019); and Moody's
Investors Service, _Gender diversity is correlated with higher ratings, but
mandates pose short-term risk_ 2 (Sept. 11, 2019), available at:
https://www.moodys.com/research/Moodys-Corporate-board-gender-diversity-associated-with-higher-credit-ratings--PBC_1193768 (analyzing 1,109 publicly
traded North American companies rated by Moody's).

[18]    Vanguard announced in 2020 it would begin asking companies about the race and
ethnicity of directors.  See Vanguard, _Investment Stewardship 2020 Annual
Report_ (2020), available at: https://about.vanguard.com/investment-stewardship/perspectives-and-commentary/2020_investment_stewardship_annual_report.pdf ("Vanguard 2020
Annual Report").  Starting in 2020, State Street Global Advisors will vote against
the entire nominating committee of companies that do not have at least one
woman on their boards and have not addressed questions on gender diversity
within the last three years.  See State Street Global Advisors, _Summary of
Material Changes to State Street Global Advisors' 2020 Proxy Voting and
Engagement Guidelines_ (2020), available at: https://www.ssga.com/library-content/pdfs/global/proxy-voting-and-engagement-guidelines.pdf.  State Street
Global Advisors' CEO, Cyrus Taraporevala, stated in his annual proxy voting
agenda letter that starting in 2021, the company would commence voting against
the Chair of the Nominating & Governance Committee at companies in the
S&P 500 and FTSE 100 that do not disclose the racial and ethnic composition
of their boards.  Beginning in 2022, it "will vote against the Chair of the
Nominating & Governance Committee at companies in the S&P 500 and FTSE
100 that do not have at least 1 director from an underrepresented community on
their boards."  See Cyrus Taraporevala, CEO's Letter on 2021 Proxy Voting

encourage or mandate corporations to diversify their boards and improve diversity

disclosures.[19]

Given the positive attributes associated with diverse boards and investor desire for

greater diversity in the boardroom, Nasdaq wants to advance board diversity among its

listed companies.  Nasdaq believes that offering a board recruiting solution will assist and

encourage listed companies to increase diverse representation on their boards, which can

result in improved corporate governance, thus strengthening the integrity of the market

and building investor confidence.  Nasdaq also believes that offering this service will

help aid compliance with the Nasdaq Diversity Proposal, if it is approved.  Nasdaq

---

Agenda, dated January 11, 2021, available at
https://www.ssga.com/us/en/institutional/ic/insights/ceo-letter-2021-proxy-
voting-agenda?WT.mc_id=social_-ibr_asset-stewardship-
web_gl_lkdin_img__n_n_jan21&spi=100001784867075.  Beginning in 2018,
BlackRock stated in proxy voting guidelines they "would normally expect to see
at least 2 women directors on every board."  See BlackRock Investment
Stewardship, *Corporate governance and proxy voting guidelines for U.S.
securities* (Jan. 2020), available at:
https://www.blackrock.com/corporate/literature/fact-sheet/blk-responsible-
investment-guidelines-us.pdf.  The NYC Comptroller's Office in 2019 asked
companies to adopt policies to ensure women and people of color are on the initial
list for every open board seat.  See Scott M. Stringer, *Remarks at the Bureau of
Asset Management 'Emerging Managers and MWBE Managers Conference* (Oct.
11, 2019), available at: https://comptroller.nyc.gov/wp-
content/uploads/2019/10/10.11.19-SMS-BAM-remarks_distro.pdf.

[19]  For example, California requires companies headquartered in the state to have at
least one director who self-identifies as a Female and one from an
Underrepresented Community.  See Cal. S.B. 826 (Sept. 30, 2018); Cal. A.B. 979
(Sept. 30, 2020).  Washington requires companies headquartered in the state to
have at least 25% women on the board by 2022 or provide certain disclosures.
See Wash. Subst. S.B. 6037 (June 11, 2020).  At least eleven states have proposed
diversity-related requirements.  See Michael Hatcher and Weldon Latham, *States
are Leading the Charge to Corporate Boards: Diversify!*, Harv. L. Sch. Forum on
Corp. Governance (May 12, 2020), available at:
https://corpgov.law.harvard.edu/2020/05/12/states-are-leading-the-charge-to-
corporate-boards-diversify/.

therefore is proposing to provide companies that have not yet achieved a certain level of

diversity with one-year complimentary access for two users to a board recruiting solution,

which will provide access to a network of board-ready diverse candidates, allowing

companies to identify and evaluate diverse board candidates, and a tool to support board

benchmarking.  This service has an approximate retail value of $10,000.

Nasdaq will offer this service to any Eligible Company, which is a listed company

(except as described below) that represents to Nasdaq that it does not have: (i) at least one

director who self-identifies as female; and (ii) at least one director who self-identifies as

one or more of the following: Black or African American, Hispanic or Latinx, Asian,

Native American or Alaska Native, Native Hawaiian or Pacific Islander, or Two or More

Races or Ethnicities or who self-identifies as lesbian, gay, bisexual, transgender or as a

member of the queer community.[20]  A company that is a Foreign Private Issuer (as

defined in Rule 5005(a)(19)) or, (i) is considered a foreign issuer under Rule 3b-4(b) of

the Act and (ii) has its principal executive offices located outside of the United States,

will be an Eligible Company if the company represents to Nasdaq that it does not have:

(i) at least one director who self-identifies as female; and (ii) at least one director who

self-identifies as one or more of the following: female, an underrepresented individual

based on national, racial, ethnic, indigenous, cultural, religious or linguistic identity in the

country of the company's principal executive offices, or lesbian, gay, bisexual,

transgender or as a member of the queer community.  A company that is a Smaller

---

[20]    Under the Nasdaq Diversity Proposal, a company with five or fewer directors on
its board would have to have, or explain why it does not have, at least one Diverse
director on its board.  Nonetheless, in order to promote greater diversity on boards
of all sizes, these companies would be Eligible Companies if they do not have at
least one director who self-identifies as female and at least one director who self-
identifies as an Underrepresented Minority or LGBTQ+.

Reporting Company (as defined in Rule 12b-2 under the Act), will be an Eligible

Company if the company represents to Nasdaq that it does not have: (i) at least one

director who self-identifies as female, and (ii) at least one director who self-identifies as

one or more of the following: female, Black or African American, Hispanic or Latinx,

Asian, Native American or Alaska Native, Native Hawaiian or Pacific Islander, or Two

or More Races or Ethnicities, or who self-identifies as lesbian, gay, bisexual, transgender

or as a member of the queer community.[21]

     Nasdaq will offer this one-year service to Eligible Companies that request it on or

before December 1, 2022.  Nasdaq intends to evaluate the service and the progress made

in enhancing diversity and may extend the program prior to its expiration through another

rule filing.

     Nasdaq notes that no other company will be required to pay higher fees as a result

of this proposal and represents that providing this service will have no impact on the

resources available for its regulatory programs.

     b.    <u>Statutory Basis</u>

     The Exchange believes that its proposal is consistent with Section 6(b) of the

Exchange Act,[22] in general, and furthers the objectives of Section 6(b)(5) of the

Exchange Act,[23] in particular, in that it is designed to promote just and equitable

principles of trade, to remove impediments to and perfect the mechanism of a free and

---

[21]    A company that is not an Eligible Company is able to receive complimentary 90-day access to the board recruiting solution, which is being offered by Nasdaq's partner to all clients of Nasdaq, Inc., including non-listed companies.

[22]    15 U.S.C. 78f(b).

[23]    15 U.S.C. 78f(b)(5).

open market and a national market system, and, in general to protect investors and the

public interest.  It is also consistent with this provision because it is not designed to

permit unfair discrimination between issuers.  Nasdaq also believes that the proposed rule

change is consistent with the provisions of Sections 6(b)(4)[24] and 6(b)(8),[25] in that the

proposal is designed, among other things, to provide for the equitable allocation of

reasonable dues, fees, and other charges among Exchange members and issuers and other

persons using its facilities and that the rules of the Exchange do not impose any burden

on competition not necessary or appropriate in furtherance of the purposes of the

Exchange Act.

    Nasdaq believes that research surrounding the value of diversity on a company's

board and investor interest in more diverse boards supports the fact that the proposal to

offer access to a board recruiting solution promotes just and equitable principles of trade

and protects investors and the public interest.  Nasdaq believes that by making this

service available more companies will seek to enhance the diversity of their boards to

achieve these benefits.  However, no company is required to use this service.

    Nasdaq also believes it is reasonable, and not unfairly discriminatory, to offer the

board recruiting solution only to Eligible Companies because these companies have the

greatest need to identify diverse board candidates.  In addition, if the Nasdaq Diversity

Proposal is approved, these companies will need to identify diverse board candidates if

they wish to satisfy that requirement instead of explaining why they do not satisfy it.

Further, Nasdaq believes that companies that already have two Diverse directors will

---

[24]     15 U.S.C. 78f(4).

[25]     15 U.S.C. 78f(8).

already be familiar with the benefits of board diversity and have demonstrated that they do not need Nasdaq's assistance in identifying diverse candidates.

If the Nasdaq Diversity Proposal is approved by the Commission, companies will have two calendar years from the date of approval to have at least one Diverse director and four calendar years to have at least two Diverse directors. Some Eligible Companies may request the service immediately, while other Eligible Companies may first use an alternate approach to identify a Diverse director. Therefore, to provide Eligible Companies with adequate time to determine whether to utilize the complimentary service, Nasdaq believes it is reasonable to allow companies until December 1, 2022 to begin using the service.

Nasdaq faces competition in the market for listing services,[26] and competes, in part, by offering valuable services to companies. Nasdaq believes that it is reasonable to offer this complimentary service as a tool to attract and retain listings as part of this competition. In particular, Nasdaq believes some companies will view the proposed board recruiting solution as a valuable tool to help achieve diversity, to the potential benefit of the company and its investors. Nasdaq also believes that offering this complimentary service will help it compete to attract and retain listings in light of the additional requirements contained in the Nasdaq Diversity Proposal.

---

[26]     The Justice Department has noted the intense competitive environment for exchange listings. See "NASDAQ OMX Group Inc. and Intercontinental Exchange Inc. Abandon Their Proposed Acquisition Of NYSE Euronext After Justice Department Threatens Lawsuit" (May 16, 2011), available at http://www.justice.gov/atr/public/press_releases/2011/271214.htm.

For these reasons, Nasdaq believes it is not an inequitable allocation of fees, unfairly discriminatory, nor an unnecessary or inappropriate burden on competition to offer the board recruiting solution only to Eligible Companies.

The Commission has previously indicated pursuant to Section 19(b) of the Exchange Act[27] that providing and updating the value of services offered to certain listed companies within the rulebook is necessary,[28] and Nasdaq does not believe this indication of value has an effect on the allocation of fees nor does it permit unfair discrimination, as all companies with fewer than two Diverse directors will receive the same services.  Further, this provision will enhance the transparency of Nasdaq's rules and the value of the services it offers, thus promoting just and equitable principles of trade.  As such, the proposed rule change is consistent with the requirements of Section 6(b)(4) and (5) of the Exchange Act.

Nasdaq represents, and this proposed rule change will help ensure, that individual listed companies are not given specially negotiated packages of products or services to list, or remain listed, which the Commission has previously stated would raise unfair discrimination issues under the Exchange Act.[29]

---

[27]     15 U.S.C. 78s(b).

[28]     See Exchange Act Release No. 72669 (July 24, 2014), 79 FR 44234 (July 30, 2014) (SR-NASDAQ-2014-058) (footnote 39 and accompanying text: "We would expect Nasdaq, consistent with Section 19(b) of the Exchange Act, to periodically update the retail values of services offered should they change. This will help to provide transparency to listed companies on the value of the free services they receive and the actual costs associated with listing on Nasdaq.")

[29]     See Exchange Act Release No. 79366, 81 FR 85663 at 85665 (citing Securities Exchange Act Release No. 65127 (August 12, 2011), 76 FR 51449, 51452 (August 18, 2011) (approving NYSE–2011–20)).

4.    <u>Self-Regulatory Organization's Statement on Burden on Competition</u>

Nasdaq does not believe that the proposed rule change will result in any burden on competition that is not necessary or appropriate in furtherance of the purposes of the Act, as amended.  As noted above, Nasdaq faces competition in the market for listing services, and competes, in part, by offering valuable services to companies.  The proposed rule change reflects that competition, but does not impose any burden on the competition with other exchanges.  Rather, Nasdaq believes that some companies will find the proposed board recruiting solution an attractive offering and therefore make listing or remaining listed on Nasdaq more attractive, which will enhance competition for listings.

Other exchanges can also offer similar services to companies, thereby increasing competition to the benefit of those companies and their shareholders.  Accordingly, Nasdaq does not believe the proposed rule change will impose any burden on competition that is not necessary or appropriate in furtherance of the purposes of the Exchange Act, as amended.

5.    <u>Self-Regulatory Organization's Statement on Comments on the Proposed Rule Change Received from Members, Participants, or Others</u>

No written comments were either solicited or received.

6.    <u>Extension of Time Period for Commission Action</u>

Not applicable.

7.    <u>Basis for Summary Effectiveness Pursuant to Section 19(b)(3) or for Accelerated Effectiveness Pursuant to Section 19(b)(2)</u>

Not applicable.

8.     <u>Proposed Rule Change Based on Rules of Another Self-Regulatory Organization or of the Commission</u>

    Not applicable.

9.     <u>Security-Based Swap Submissions Filed Pursuant to Section 3C of the Act</u>

    Not applicable.

10.    <u>Advance Notices Filed Pursuant to Section 806(e) of the Payment, Clearing and Settlement Supervision Act</u>

    Not applicable.

11.    <u>Exhibits</u>

    1.     Notice of Proposed Rule Change for publication in the <u>Federal Register</u>.

**EXHIBIT 1**

SECURITIES AND EXCHANGE COMMISSION
(Release No.            ; File No. SR-NASDAQ-2021-082)

February__, 2021

Self-Regulatory Organizations; The Nasdaq Stock Market LLC; Notice of Filing of
Proposed Rule Change, as Modified by Amendment No. 1 to Offer Certain Listed
Companies Access to a Complimentary Board Recruiting Solution to Help Advance
Diversity on Company Boards

Pursuant to Section 19(b)(1) of the Securities Exchange Act of 1934 ("Act")[1], and

Rule 19b-4 thereunder,[2] notice is hereby given that on February 26, 2021, The Nasdaq

Stock Market LLC ("Nasdaq" or "Exchange") filed with the Securities and Exchange

Commission ("SEC" or "Commission") the proposed rule change as described in Items I,

II, and III, below, which Items have been prepared by the Exchange.  The Commission is

publishing this notice to solicit comments on the proposed rule change from interested

persons.

I.    Self-Regulatory Organization's Statement of the Terms of Substance of the
      Proposed Rule Change

The Exchange proposes to offer certain listed companies access to a

complimentary board recruiting solution to help advance diversity on company boards.

This Amendment 1 replaces and supersedes the original filing in its entirety.

The text of the proposed rule change is detailed below: proposed new language is

underlined and proposed deletions are in brackets.

* * * * *

---

[1]      15 U.S.C. 78s(b)(1).

[2]      17 CFR 240.19b-4.

**IM-5900-9. Board Diversity Services**

On December 1, 2020, Nasdaq filed a proposal (SR-Nasdaq-2020-081) to require each listed Company, subject to certain exceptions, to have, or explain why it does not have, at least two diverse directors on its board (the "Diversity Objective").  A company with five or fewer directors on its board would have to have, or explain why it does not have, at least one diverse director on its board.  In order to help advance diversity on Company boards and to help Companies prepare for and, if approved, comply with the Diversity Objective, Nasdaq offers Eligible Companies complimentary access to two seats of a board recruiting solution, which will allow Companies to identify and evaluate diverse board candidates. Until December 1, 2022, any Eligible Company that requests access to this service through the Nasdaq Listing Center will receive complimentary access for one-year from the initiation of the service.  This service has a retail value of approximately $10,000 per year.

An Eligible Company is:

>   (a)   any listed Company, except as described below, that represents to Nasdaq that it does not have (i) at least one director who self-identifies as female; and (ii) at least one director who self-identifies as one or more of the following: Black or African American, Hispanic or Latinx, Asian, Native American or Alaska Native, Native Hawaiian or Pacific Islander, or Two or More Races or Ethnicities, or who self-identifies as lesbian, gay, bisexual, transgender or as a member of the queer community;

(b)  a listed Company that (i) is a Foreign Private Issuer (as defined in Rule 5005(a)(19), or (ii) is considered a foreign issuer under Rule 3b-4(b) under the Act and has its principal executive offices located outside of the United States, if it represents to Nasdaq that it does not have (i) at least one director who self-identifies as female; and (ii) at least one director who self-identifies as one or more of the following: female, an underrepresented individual based on national, racial, ethnic, indigenous, cultural, religious or linguistic identity in the country of the company's principal executive offices, or lesbian, gay, bisexual, transgender or as a member of the queer community; or

(c)  a listed Company that is a Smaller Reporting Company (as defined in Rule 12b-2 under the Act), if it represents to Nasdaq that it does not have (i) at least one director who self-identifies as female, and (ii) at least one director who self-identifies as one or more of the following: female, Black or African American, Hispanic or Latinx, Asian, Native American or Alaska Native, Native Hawaiian or Pacific Islander, or Two or More Races or Ethnicities, or who self-identifies as lesbian, gay, bisexual, transgender or as a member of the queer community.

* * * * *

II.    Self-Regulatory Organization's Statement of the Purpose of, and Statutory Basis for, the Proposed Rule Change

In its filing with the Commission, the Exchange included statements concerning the purpose of and basis for the proposed rule change and discussed any comments it received on the proposed rule change.  The text of these statements may be examined at

the places specified in Item IV below.  The Exchange has prepared summaries, set forth

in sections A, B, and C below, of the most significant aspects of such statements.

>    A.    Self-Regulatory Organization's Statement of the Purpose of, and Statutory
>          Basis for, the Proposed Rule Change

>        1.    Purpose

In a separate rule filing,[3] Nasdaq is proposing to require each of its listed

companies, subject to certain exceptions, to: (i) provide statistical information regarding

diversity among the members of the company's board of directors; and (ii) to have, or

explain why the company does not have at least two "Diverse" directors on its board (or

one "Diverse" director for companies with five or fewer directors).  Under this proposed

rule, "Diverse" means a director who self-identifies as: (i) female, (ii) an

Underrepresented Minority, or (iii) LGBTQ+ (the "Diversity Objective").[4]  Through the

rule change proposed herein, Nasdaq proposes to provide companies that do not have at

least two Diverse directors, or otherwise would need to take action to satisfy the

Diversity Objective, if approved, with a service to help them recruit Diverse directors.

Nasdaq is filing this Amendment 1 to SR-Nasdaq-2020-082[5] in order to make

---

[3]    Securities Exchange Act Release No. 90574 (December 4, 2020), 85 FR 80472
       (December 11, 2020) (SR-Nasdaq-2020-081) (the "Nasdaq Diversity Proposal").
       Amendment 1 to the Nasdaq Diversity Proposal was filed on February 26, 2020.

[4]    As defined in the proposed rule change, "Female" means an individual who self-
       identifies her gender as a woman, without regard to the individual's designated
       sex at birth; "Underrepresented Minority" means an individual who self-identifies
       as one or more of the following: Black or African American, Hispanic or Latinx,
       Asian, Native American or Alaska Native, Native Hawaiian or Pacific Islander,
       two or more races or ethnicities; and "LGBTQ+" means an individual who self-
       identifies as any of the following: lesbian, gay, bisexual, transgender or a member
       of the queer community.

[5]    Securities Exchange Act Release No. 90571 (December 4, 2020), 85 FR 79556
       (December 10, 2020).

conforming changes to align with changes proposed in Amendment 1 of the Nasdaq

Diversity Proposal.

In researching the Diversity Proposal, Nasdaq reviewed dozens of empirical

studies and found that an extensive body of academic and empirical research

demonstrates that diverse boards are positively associated with improved corporate

governance and company performance.[6]  In particular, studies have found that companies

with gender-diverse boards or audit committees are associated with:  more transparent

public disclosures[7] and less information asymmetry;[8] better reporting discipline by

management;[9] a lower likelihood of manipulated earnings through earnings

---

[6]     See Nasdaq Diversity Proposal at Section III, Empirical Research: The
        Relationship between Diversity and Company Performance, Investor Protection
        and Decision Making.

[7]     See Ferdinand A. Gul et al., *Does board gender diversity improve the
        informativeness of stock prices?*, 51(3) J. Acct. & Econ. 314 (April 2011)
        (analyzing 4,084 firm years during the period from 2002 to 2007, excluding
        companies in the utilities and financial industries, measuring public information
        disclosure using "voluntary continuous disclosure of 'other' events in 8K reports"
        and measuring stock price informativeness by "idiosyncratic volatility," or
        volatility that cannot be explained to systematic factors and can be diversified
        away).

[8]     See David Abad et al., *Does Gender Diversity on Corporate Boards Reduce
        Information Asymmetry in Equity Markets?* 20(3) BRQ Business Research
        Quarterly 192 at 202 (July 2017) (analyzing 531 company-year observations from
        2004 to 2009 of non-financial companies traded on the electronic trading platform
        of the Spanish Stock Exchange (SIBE)).

[9]     See Bin Srinidhi et al., *Female Directors and Earnings Quality*, 28(5)
        Contemporary Accounting Research 1610 at 1612-16 (Winter 2011) (analyzing
        3,132 firm years during the period from 2001 to 2007 based on S&P
        COMPUSTAT, Corporate Library's Board Analyst, and IRRC databases;
        "choos[ing] the accruals quality as the metric that best reflects the ability of
        current earnings to reflect future cash flows" (noting that it "best predicts the
        incidence and magnitude of fraud relative to other commonly used measures of
        earnings quality") and analyzing surprise earnings results that exceeded previous
        earnings or analyst forecasts, because "managers of firms whose unmanaged

management;[10] an increased likelihood of voluntarily disclosing forward-looking

information;[11] a lower likelihood of receiving audit qualifications due to errors,[12] non-

compliance or omission of information;[13] and a lower likelihood of securities fraud.[14]  In

addition, studies found that having at least one woman on the board is associated with a

lower likelihood of material weaknesses in internal control over financial reporting,[15] and

---

earnings fall marginally below the benchmarks have [an] incentive to manage
earnings upwards so as to meet or beat previous earnings").

[10]     See Ammar Gull et al., *Beyond gender diversity: How specific attributes of female
directors affect earnings management*, 50(3) British Acct. Rev. 255 (Sept. 2017),
available at: https://ideas.repec.org/a/eee/bracre/v50y2018i3p255-274.html
(analyzing 394 French companies belonging to the CAC All-Shares index listed
on Euronext Paris from 2001 to 2010, prior to the implementation of France's
gender mandate law that required women to comprise 20% of a company's board
of directors by 2014 and 40% by 2016).

[11]     See Francisco Bravo and Maria Dolores Alcaide-Ruiz, *The disclosure of financial
forward-looking information*, 34(2) Gender in Mgmt. 140 at 142-44 (2019)
(analyzing companies included in the S&P 100 Index in 2016, "focus[ing] on the
disclosure of financial forward-looking information (which is likely to require
financial expertise), such as earnings forecasts, expected revenues, anticipated
cash flows or any other financial indicator").

[12]     See Maria Consuelo Pucheta-Martínez et al., *Corporate governance, female
directors and quality of financial information.* 25(4) Bus. Ethics: A European
Rev. 363 at 368 (2016) (analyzing a sample of non-financial companies listed on
the Madrid Stock Exchange during 2004-2011).

[13]     Id. at 363.

[14]     See Douglas J. Cumming et al., *Gender Diversity and Securities Fraud*, Academy
of Management Journal Vol. 58, No. 5, 1572–1593 (2015) (analyzing China
Securities Regulatory Commission data from 2001 to 2010, including 742
companies with enforcement actions for fraud, and 742 non-fraudulent companies
for a control group).

[15]     See Yu Chen et al., *Board Gender Diversity and Internal Control Weaknesses*, 33
Advances in Acct. 11 (2016) (analyzing a sample of 4267 firm-year observations
during the period from 2004 to 2013, beginning "the first year internal control
weaknesses were required to be disclosed under section 404 of SOX").

a lower likelihood of material financial restatements.[16]  Studies also identified positive

relationships between board diversity and commonly used financial metrics, including

higher returns on invested capital, returns on equity, earnings per share, earnings before

interest and taxation margin, asset valuation multiples and credit ratings.[17]

---

[16]     See Lawrence J. Abbott et al., *Female Board Presence and the Likelihood of Financial Restatement*, 26(4) Accounting Horizons 607, 626 (2012) (analyzing a sample of 278 pre-SOX annual financial restatements and 187 pre-SOX quarterly financial restatements of U.S. companies from January 1, 1997 through June 30, 2002 identified by the U.S. General Accounting Office restatement report 03-138 (which only included "material misstatements of financial results"), and 75 post-SOX annual financial restatements from July 1, 2002, to September 30, 2005 identified by U.S. General Accounting Office restatement report 06-678 (which only included "restatements that were being made to correct material misstatements of previously reported financial information"), consisting almost exclusively of non-Fortune 1000 companies); See also Aida Sijamic Wahid, The *Effects and the Mechanisms of Board Gender Diversity: Evidence from Financial Manipulation*, J. Bus. Ethics 159, 705–725 (2019) (analyzing 6,132 U.S. public companies during the period from 2000 to 2010, for a total of 38,273 firm-year observations).

[17]     See, generally, FCLTGlobal, *The Long-term Habits of a Highly Effective Corporate Board* 11 (March 2019), available at: https://www.fcltglobal.org/wp-content/uploads/long-term-habits-of-highly-effective-corporate-boards.pdf (analyzing 2017 MSCI ACWI constituents from 2010 to 2017 using Bloomberg data); Credit Suisse, *The CS Gender 3000: Women in Senior Management* 16 (Sept. 2014), available at: https://www.credit-suisse.com/media/assets/corporate/docs/about-us/research/publications/the-cs-gender-3000-women-in-senior-management.pdf (analyzing 3,000 companies across 40 countries from the period from 2005 to 2013); Meggin Thwing Eastman et al., MSCI, *The tipping point: Women on boards and financial performance* 3 (December 2016), available at: https://www.msci.com/documents/10199/fd1f8228-cc07-4789-acee-3f9ed97ee8bb (analyzing of U.S. companies that were constituents of the MSCI World Index for the entire period from July 1, 2011 to June 30, 2016); Harvey M. Wagner, Catalyst, *The Bottom Line: Corporate Performance and Women's Representation on Boards (2004–2008)* (March 1, 2011), available at: https://www.catalyst.org/research/the-bottom-line-corporate-performance-and-womens-representation-on-boards-2004-2008/ (analyzing gender diversity data from Catalyst's annual Fortune 500 Census of Women Board Directors report series for the years 2005 to 2009, and corresponding financial data from S&P's Compustat database for the years 2004 to 2008); Credit Suisse ESG Research, *LGBT: the value of diversity* 1 (April 15, 2016), available at: https://research-

In addition, investors and investor groups are calling for diversification in the

boardroom[18] and legislators at the federal and state level are increasingly taking action to

doc.credit-
suisse.com/docView?language=ENG&source=emfromsendlink&format=PDF&d
ocument_id=807075590&extdocid=807075590_1_eng_pdf&serialid=evu4wNcH
exx7kusNLaZQphUkT9naxi1PvptZQvPjr1k%3d; McKinsey & Company,
*Diversity wins: How inclusion matters* 13 (May 2020), available at:
https://www.mckinsey.com/~/media/McKinsey/Featured%20Insights/Diversity%
20and%20Inclusion/Diversity%20wins%20How%20inclusion%20matters/Diversi
ty-wins-How-inclusion-matters-vF.pdf (analyzing 1,039 companies across 15
countries for the period from December 2018 to November 2019); and Moody's
Investors Service, *Gender diversity is correlated with higher ratings, but
mandates pose short-term risk* 2 (Sept. 11, 2019), available at:
https://www.moodys.com/research/Moodys-Corporate-board-gender-diversity-
associated-with-higher-credit-ratings--PBC_1193768 (analyzing 1,109 publicly
traded North American companies rated by Moody's).

[18]    Vanguard announced in 2020 it would begin asking companies about the race and
ethnicity of directors.  See Vanguard, *Investment Stewardship 2020 Annual
Report* (2020), available at: https://about.vanguard.com/investment-
stewardship/perspectives-and-
commentary/2020_investment_stewardship_annual_report.pdf ("Vanguard 2020
Annual Report").  Starting in 2020, State Street Global Advisors will vote against
the entire nominating committee of companies that do not have at least one
woman on their boards and have not addressed questions on gender diversity
within the last three years. See State Street Global Advisors, *Summary of
Material Changes to State Street Global Advisors' 2020 Proxy Voting and
Engagement Guidelines* (2020), available at: https://www.ssga.com/library-
content/pdfs/global/proxy-voting-and-engagement-guidelines.pdf.  State Street
Global Advisors' CEO, Cyrus Taraporevala, stated in his annual proxy voting
agenda letter that starting in 2021, the company would commence voting against
the Chair of the Nominating & Governance Committee at companies in the
S&P 500 and FTSE 100 that do not disclose the racial and ethnic composition
of their boards.  Beginning in 2022, it "will vote against the Chair of the
Nominating & Governance Committee at companies in the S&P 500 and FTSE
100 that do not have at least 1 director from an underrepresented community on
their boards." See Cyrus Taraporevala, CEO's Letter on 2021 Proxy Voting
Agenda, dated January 11, 2021, available at
https://www.ssga.com/us/en/institutional/ic/insights/ceo-letter-2021-proxy-
voting-agenda?WT.mc id=social -ibr asset-stewardship-
web_gl_lkdin_img__n_n_jan21&spi=100001784867075.  Beginning in 2018,
BlackRock stated in proxy voting guidelines they "would normally expect to see
at least 2 women directors on every board." See BlackRock Investment
Stewardship, *Corporate governance and proxy voting guidelines for U.S.*

encourage or mandate corporations to diversify their boards and improve diversity disclosures.[19]

Given the positive attributes associated with diverse boards and investor desire for greater diversity in the boardroom, Nasdaq wants to advance board diversity among its listed companies. Nasdaq believes that offering a board recruiting solution will assist and encourage listed companies to increase diverse representation on their boards, which can result in improved corporate governance, thus strengthening the integrity of the market and building investor confidence. Nasdaq also believes that offering this service will help aid compliance with the Nasdaq Diversity Proposal, if it is approved. Nasdaq therefore is proposing to provide companies that have not yet achieved a certain level of diversity with one-year complimentary access for two users to a board recruiting solution, which will provide access to a network of board-ready diverse candidates, allowing

---

*securities* (Jan. 2020), available at: https://www.blackrock.com/corporate/literature/fact-sheet/blk-responsible-investment-guidelines-us.pdf. The NYC Comptroller's Office in 2019 asked companies to adopt policies to ensure women and people of color are on the initial list for every open board seat. See Scott M. Stringer, *Remarks at the Bureau of Asset Management 'Emerging Managers and MWBE Managers Conference* (Oct. 11, 2019), available at: https://comptroller.nyc.gov/wp-content/uploads/2019/10/10.11.19-SMS-BAM-remarks_distro.pdf.

[19]    For example, California requires companies headquartered in the state to have at least one director who self-identifies as a Female and one from an Underrepresented Community. See Cal. S.B. 826 (Sept. 30, 2018); Cal. A.B. 979 (Sept. 30, 2020). Washington requires companies headquartered in the state to have at least 25% women on the board by 2022 or provide certain disclosures. See Wash. Subst. S.B. 6037 (June 11, 2020). At least eleven states have proposed diversity-related requirements. See Michael Hatcher and Weldon Latham, *States are Leading the Charge to Corporate Boards: Diversify!*, Harv. L. Sch. Forum on Corp. Governance (May 12, 2020), available at: https://corpgov.law.harvard.edu/2020/05/12/states-are-leading-the-charge-to-corporate-boards-diversify/.

companies to identify and evaluate diverse board candidates, and a tool to support board

benchmarking.  This service has an approximate retail value of $10,000.

Nasdaq will offer this service to any Eligible Company, which is a listed company

(except as described below) that represents to Nasdaq that it does not have: (i) at least one

director who self-identifies as female; and (ii) at least one director who self-identifies as

one or more of the following: Black or African American, Hispanic or Latinx, Asian,

Native American or Alaska Native, Native Hawaiian or Pacific Islander, or Two or More

Races or Ethnicities or who self-identifies as lesbian, gay, bisexual, transgender or as a

member of the queer community.[20]  A company that is a Foreign Private Issuer (as

defined in Rule 5005(a)(19)) or, (i) is considered a foreign issuer under Rule 3b-4(b) of

the Act and (ii) has its principal executive offices located outside of the United States,

will be an Eligible Company if the company represents to Nasdaq that it does not have:

(i) at least one director who self-identifies as female; and (ii) at least one director who

self-identifies as one or more of the following: female, an underrepresented individual

based on national, racial, ethnic, indigenous, cultural, religious or linguistic identity in the

country of the company's principal executive offices, or lesbian, gay, bisexual,

transgender or as a member of the queer community.  A company that is a Smaller

Reporting Company (as defined in Rule 12b-2 under the Act), will be an Eligible

Company if the company represents to Nasdaq that it does not have: (i) at least one

director who self-identifies as female, and (ii) at least one director who self-identifies as

---

[20]    Under the Nasdaq Diversity Proposal, a company with five or fewer directors on
its board would have to have, or explain why it does not have, at least one Diverse
director on its board.  Nonetheless, in order to promote greater diversity on boards
of all sizes, these companies would be Eligible Companies if they do not have at
least one director who self-identifies as female and at least one director who self-
identifies as an Underrepresented Minority or LGBTQ+.

one or more of the following: female, Black or African American, Hispanic or Latinx, Asian, Native American or Alaska Native, Native Hawaiian or Pacific Islander, or Two or More Races or Ethnicities, or who self-identifies as lesbian, gay, bisexual, transgender or as a member of the queer community.[21]

Nasdaq will offer this one-year service to Eligible Companies that request it on or before December 1, 2022. Nasdaq intends to evaluate the service and the progress made in enhancing diversity and may extend the program prior to its expiration through another rule filing.

Nasdaq notes that no other company will be required to pay higher fees as a result of this proposal and represents that providing this service will have no impact on the resources available for its regulatory programs.

2.    Statutory Basis

The Exchange believes that its proposal is consistent with Section 6(b) of the Exchange Act,[22] in general, and furthers the objectives of Section 6(b)(5) of the Exchange Act,[23] in particular, in that it is designed to promote just and equitable principles of trade, to remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general to protect investors and the public interest. It is also consistent with this provision because it is not designed to permit unfair discrimination between issuers. Nasdaq also believes that the proposed rule

---

[21]    A company that is not an Eligible Company is able to receive complimentary 90-day access to the board recruiting solution, which is being offered by Nasdaq's partner to all clients of Nasdaq, Inc., including non-listed companies.

[22]    15 U.S.C. 78f(b).

[23]    15 U.S.C. 78f(b)(5).

change is consistent with the provisions of Sections 6(b)(4)[24] and 6(b)(8),[25] in that the proposal is designed, among other things, to provide for the equitable allocation of reasonable dues, fees, and other charges among Exchange members and issuers and other persons using its facilities and that the rules of the Exchange do not impose any burden on competition not necessary or appropriate in furtherance of the purposes of the Exchange Act.

Nasdaq believes that research surrounding the value of diversity on a company's board and investor interest in more diverse boards supports the fact that the proposal to offer access to a board recruiting solution promotes just and equitable principles of trade and protects investors and the public interest.  Nasdaq believes that by making this service available more companies will seek to enhance the diversity of their boards to achieve these benefits.  However, no company is required to use this service.

Nasdaq also believes it is reasonable, and not unfairly discriminatory, to offer the board recruiting solution only to Eligible Companies because these companies have the greatest need to identify diverse board candidates.  In addition, if the Nasdaq Diversity Proposal is approved, these companies will need to identify diverse board candidates if they wish to satisfy that requirement instead of explaining why they do not satisfy it. Further, Nasdaq believes that companies that already have two Diverse directors will already be familiar with the benefits of board diversity and have demonstrated that they do not need Nasdaq's assistance in identifying diverse candidates.

---

[24]     15 U.S.C. 78f(4).

[25]     15 U.S.C. 78f(8).

If the Nasdaq Diversity Proposal is approved by the Commission, companies will have two calendar years from the date of approval to have at least one Diverse director and four calendar years to have at least two Diverse directors.  Some Eligible Companies may request the service immediately, while other Eligible Companies may first use an alternate approach to identify a Diverse director.  Therefore, to provide Eligible Companies with adequate time to determine whether to utilize the complimentary service, Nasdaq believes it is reasonable to allow companies until December 1, 2022 to begin using the service.

Nasdaq faces competition in the market for listing services,[26] and competes, in part, by offering valuable services to companies.  Nasdaq believes that it is reasonable to offer this complimentary service as a tool to attract and retain listings as part of this competition.  In particular, Nasdaq believes some companies will view the proposed board recruiting solution as a valuable tool to help achieve diversity, to the potential benefit of the company and its investors.  Nasdaq also believes that offering this complimentary service will help it compete to attract and retain listings in light of the additional requirements contained in the Nasdaq Diversity Proposal.

For these reasons, Nasdaq believes it is not an inequitable allocation of fees, unfairly discriminatory, nor an unnecessary or inappropriate burden on competition to offer the board recruiting solution only to Eligible Companies.

---

[26]     The Justice Department has noted the intense competitive environment for exchange listings.  See "NASDAQ OMX Group Inc. and Intercontinental Exchange Inc. Abandon Their Proposed Acquisition Of NYSE Euronext After Justice Department Threatens Lawsuit" (May 16, 2011), available at http://www.justice.gov/atr/public/press_releases/2011/271214.htm.

The Commission has previously indicated pursuant to Section 19(b) of the

Exchange Act[27] that providing and updating the value of services offered to certain listed

companies within the rulebook is necessary,[28] and Nasdaq does not believe this

indication of value has an effect on the allocation of fees nor does it permit unfair

discrimination, as all companies with fewer than two Diverse directors will receive the

same services.  Further, this provision will enhance the transparency of Nasdaq's rules

and the value of the services it offers, thus promoting just and equitable principles of

trade.  As such, the proposed rule change is consistent with the requirements of Section

6(b)(4) and (5) of the Exchange Act.

Nasdaq represents, and this proposed rule change will help ensure, that individual

listed companies are not given specially negotiated packages of products or services to

list, or remain listed, which the Commission has previously stated would raise unfair

discrimination issues under the Exchange Act.[29]

    B.    <u>Self-Regulatory Organization's Statement on Burden on Competition</u>

Nasdaq does not believe that the proposed rule change will result in any burden

on competition that is not necessary or appropriate in furtherance of the purposes of the

Act, as amended.  As noted above, Nasdaq faces competition in the market for listing

---

[27]    15 U.S.C. 78s(b).

[28]    <u>See</u> Exchange Act Release No. 72669 (July 24, 2014), 79 FR 44234 (July 30, 2014) (SR-NASDAQ-2014-058) (footnote 39 and accompanying text: "We would expect Nasdaq, consistent with Section 19(b) of the Exchange Act, to periodically update the retail values of services offered should they change. This will help to provide transparency to listed companies on the value of the free services they receive and the actual costs associated with listing on Nasdaq.")

[29]    <u>See</u> Exchange Act Release No. 79366, 81 FR 85663 at 85665 (citing Securities Exchange Act Release No. 65127 (August 12, 2011), 76 FR 51449, 51452 (August 18, 2011) (approving NYSE–2011–20)).

services, and competes, in part, by offering valuable services to companies.  The proposed rule change reflects that competition, but does not impose any burden on the competition with other exchanges.  Rather, Nasdaq believes that some companies will find the proposed board recruiting solution an attractive offering and therefore make listing or remaining listed on Nasdaq more attractive, which will enhance competition for listings.

Other exchanges can also offer similar services to companies, thereby increasing competition to the benefit of those companies and their shareholders.  Accordingly, Nasdaq does not believe the proposed rule change will impose any burden on competition that is not necessary or appropriate in furtherance of the purposes of the Exchange Act, as amended.

      C.    <u>Self-Regulatory Organization's Statement on Comments on the Proposed Rule Change Received from Members, Participants, or Others</u>

No written comments were either solicited or received.

III.  <u>Date of Effectiveness of the Proposed Rule Change and Timing for Commission Action</u>

Within 45 days of the date of publication of this notice in the Federal Register or within such longer period (i) as the Commission may designate up to 90 days of such date if it finds such longer period to be appropriate and publishes its reasons for so finding or (ii) as to which the Exchange consents, the Commission shall: (a) by order approve or disapprove such proposed rule change, or (b) institute proceedings to determine whether the proposed rule change should be disapproved.

IV.     <u>Solicitation of Comments</u>

Interested persons are invited to submit written data, views, and arguments

concerning the foregoing, including whether the proposed rule change is consistent with

the Act.  Comments may be submitted by any of the following methods:

<u>Electronic comments</u>:

- Use the Commission's Internet comment form

    ([http://www.sec.gov/rules/sro.shtml](http://www.sec.gov/rules/sro.shtml)); or

- Send an e-mail to [rule-comments@sec.gov.](mailto:rule-comments@sec.gov)  Please include File Number SR-

    NASDAQ-2020-082 on the subject line.

<u>Paper comments</u>:

- Send paper comments in triplicate to Secretary, Securities and Exchange

    Commission, 100 F Street, NE, Washington, DC 20549-1090.

All submissions should refer to File Number SR-NASDAQ-2020-082.  This file

number should be included on the subject line if e-mail is used.  To help the Commission

process and review your comments more efficiently, please use only one method.  The

Commission will post all comments on the Commission's Internet Web site

([http://www.sec.gov/rules/sro.shtml](http://www.sec.gov/rules/sro.shtml)).

Copies of the submission, all subsequent amendments, all written statements with

respect to the proposed rule change that are filed with the Commission, and all written

communications relating to the proposed rule change between the Commission and any

person, other than those that may be withheld from the public in accordance with the

provisions of 5 U.S.C. 552, will be available for website viewing and printing in the

Commission's Public Reference Room, 100 F Street, NE, Washington, DC 20549, on

official business days between the hours of 10:00 a.m. and 3:00 p.m.  Copies of the filing

also will be available for inspection and copying at the principal office of the Exchange. All comments received will be posted without change; the Commission does not edit personal identifying information from submissions. You should submit only information that you wish to make available publicly.

All submissions should refer to File Number SR-NASDAQ-2020-082 and should be submitted on or before [insert date 21 days from publication in the <u>Federal Register</u>].

For the Commission, by the Division of Trading and Markets, pursuant to delegated authority.[30]

J. Matthew DeLesDernier
Assistant Secretary

---

[30]    17 CFR 200.30-3(a)(12).

**EXHIBIT 4**

Changes to the Proposed Rule Text

Text is marked to show changes to proposed rule language in the original filing. Additions to original filing are <u>double underlined</u>; deletions from original filing are ~~stricken through~~.

* * * * *

## <u>IM-5900-9. Board Diversity Services</u>

<u>On December 1, 2020, Nasdaq filed a proposal (SR-Nasdaq-2020-081) to require each listed Company, subject to certain exceptions, to have, or explain why it does not have, at least two diverse directors on its board (the "Diversity ~~Rule~~Objective"). A company with five or fewer directors on its board would have to have, or explain why it does not have, at least one diverse director on its board. In order to help advance diversity on Company boards and to help Companies prepare for and, if approved, comply with the Diversity ~~Rule~~Objective, Nasdaq offers Eligible Companies complimentary access to two seats of a board recruiting solution, which will allow Companies to identify and evaluate diverse board candidates. Until December 1, 2022, any Eligible Company that requests access to this service through the Nasdaq Listing Center will receive complimentary access for one-year from the initiation of the service. This service has a retail value of approximately $10,000 per year.</u>

<u>An Eligible Company is:</u>

    (a)  <u>any listed Company, except as described below, that represents to Nasdaq that it does not have (i) at least one director who self-identifies as female; and (ii) at least one director who self-identifies as one or more of the following: Black or African American, Hispanic or Latinx, Asian, Native American or Alaska Native, Native Hawaiian or Pacific Islander, or Two or More Races or Ethnicities, or who self-identifies as lesbian, gay, bisexual, transgender or as a member of the queer community;</u>

    (b)  <u>a listed Company that (i) is a Foreign Private Issuer (as defined in Rule 5005(a)(19), or (ii) is considered a foreign issuer under Rule 3b-4(b) under the Act and has its principal executive offices located outside of the United States, if it represents to Nasdaq that it does not have (i) at least one director who self-identifies as female; and (ii) at least one director who self-identifies as one or more of the following: female, an underrepresented individual based on national, racial, ethnic, indigenous, cultural, religious or linguistic identity in the country of the company's principal executive offices</u>~~home country jurisdiction~~<u>, or lesbian, gay, bisexual, transgender or as a member of the queer community; or</u>

    (c)  <u>a listed Company that is a Smaller Reporting Company (as defined in Rule 12b-2 under the Act), if it represents to Nasdaq that it does not have (i) at</u>

least one director who self-identifies as female, and (ii) at least one director who self-identifies as one or more of the following: female, Black or African American, Hispanic or Latinx, Asian, Native American or Alaska Native, Native Hawaiian or Pacific Islander, or Two or More Races or Ethnicities, or who self-identifies as lesbian, gay, bisexual, transgender or as a member of the queer community.

\* \* \* \* \*

**TAB 11:**

Nasdaq, Response to Comments, File No. SR-NASDAQ-2020-081 (Feb. 26, 2021)
("Nasdaq Letter II").



JOHN A. ZECCA
EXECUTIVE VICE PRESIDENT,
CHIEF LEGAL OFFICER
& CHIEF REGULATORY OFFICER
805 KING FARM BLVD
ROCKVILLE, MD 20850

February 26, 2021

Ms. Vanessa A. Countryman
Secretary
U.S. Securities and Exchange Commission
100 F Street NE
Washington, DC 20549-1090

> **Re: Response to Comments and Notice of Filing of Amendment No. 1 of Proposed Rule Change to Adopt Listing Rules Related to Board Diversity** (File No. SR-NASDAQ-2020-081)

Dear Ms. Countryman:

The Nasdaq Stock Market LLC ("Nasdaq") submits this letter in response to comments the Securities and Exchange Commission ("SEC" or "Commission") received regarding the above-referenced rule filing to adopt listing rules supporting board diversity (the "Proposal"). The SEC published the Proposal for comment in the <u>Federal</u> <u>Register</u> on December 11, 2020.[1]  On January 8, 2021, Nasdaq publicly consented to a 45-day extension for the Commission to act on the Proposal.[2]  Today, Nasdaq is also filing Amendment No. 1 (attached as Exhibit 1) to propose modifications and clarifications based on comments received by the SEC.[3]

**I.  Executive Summary**

The Commission received over 200 letters on the Proposal from Nasdaq-listed issuers, institutional investors, asset managers, legislators at the state and federal level, advocacy organizations, law firms, individual board members and other citizens.[4]  An overwhelming majority of commenters supported the goals of the Proposal; some supportive commenters recommended modifications or clarifications.  Other commenters opposed the Proposal; some recommended modifications.  Nasdaq appreciates the thoughtful comments and carefully considered each commenter's views and any concerns expressed.

After reviewing all comment letters, Nasdaq firmly believes that the Proposal ameliorates concerns regarding the consistency and comparability of current board disclosure data by enhancing transparency related to board diversity.  Additionally, Nasdaq continues to believe that the diversity objectives for its listed companies will promote board diversity and thus enhance corporate governance and strengthen the integrity of the market by building investor confidence, and enhancing capital formation, efficiency and competition.

Ms. Vanessa A. Countryman
U.S. Securities and Exchange Commission
February 26, 2021
Page 2

      A.   Broad and Strong Support for Nasdaq's Proposal

Nearly 85% of substantive letters supported the Proposal, including commenters representing every constituency of corporate stakeholder. As illustrated in Appendix 1, the following are the most-cited supportive comments:

- **Enhances Corporate Governance**. Board diversity enhances corporate governance and board decision making.

- **Business-Driven Approach**. Commenters commended Nasdaq's pragmatic, disclosure-based approach to improving board diversity without undue burden, coercion or mandates.

- **Advances Board Diversity**. Nasdaq's Proposal will help meaningfully improve board diversity related to race, ethnicity, sexual orientation, and gender identity.

- **Facilitates Transparency**. By standardizing board diversity disclosures that are material to investors, the Proposal will reduce data collection costs and improve data quality, availability, and comparability.

- **Reflects Core Values**. Nasdaq's Proposal reflects the core values of commenters and/or their clients.

- **Enhances Corporate Performance**. Board diversity is linked to enhanced corporate performance, innovation and/or long-term sustainable returns.

- **Facilitates Decision Making**. Investors seek board diversity statistics that are widespread, consistent and/or transparent so they can integrate diversity into their decision making.

- **Promotes Investor Confidence**. Nasdaq's Proposal will enhance investor confidence and/or improve capital market efficiency.

Based on the comments received, Nasdaq believes that the Proposal aligns with investor expectations for board diversity and with an overwhelming stakeholder commitment to advancing diversity and inclusion.

      B.   Amendments That Strengthen the Proposal

Nasdaq is proposing amendments that strengthen the Proposal in response to comments by Nasdaq-listed companies and other stakeholders:

- **Offer more flexibility to companies with small boards**.  Nasdaq is revising the Proposal to provide companies with boards of five or fewer directors the ability to achieve the diversity objective by having one diverse director.

- **Provide companies a one year grace period**. Nasdaq is revising the Proposal to provide a one year grace period for a listed company that no longer meets the diversity objectives as a result of a vacancy on the board of directors, for example if a diverse director falls ill or resigns.

- **Align listed companies' disclosure requirements with their annual meetings**.  Nasdaq is proposing that issuers make board diversity information publicly available in advance of annual

Ms. Vanessa A. Countryman
U.S. Securities and Exchange Commission
February 26, 2021
Page 3

shareholder meetings to align with the timing of other governance-related disclosures, such as those provided in the proxy.

- **Provide companies that list on Nasdaq after the phase-in period additional time to add diverse directors**.  To ensure the timeline is reasonable for new companies, Nasdaq is proposing to provide all new companies listing after the phase-in period with two years to fully meet the diverse director objective.

    C.   Common Misperceptions

Nasdaq would like to address common misperceptions expressed by commenters about the Proposal:

- **Nasdaq's Proposal is not a quota**. Nasdaq's Proposal is a disclosure framework and does not set a quota or numeric mandate.  Companies can elect to meet the diverse director objective or disclose why they do not, and the explanation can include a description of a different approach.

- **Nasdaq's Proposal will not force companies to appoint unqualified directors to meet the minimum diverse director objective**.  Nasdaq's Proposal does not discourage board candidate recruitment on the basis of merit, and there is a sufficient community of available and qualified diverse candidates.

- **Nasdaq companies will not be delisted solely for choosing not to meet the minimum diverse director objective**.  The diverse director objective is not a mandate that subjects Nasdaq companies to delisting since companies have the option to provide an explanation instead.

- **Nasdaq's partnership with Equilar is not generating any revenue for Nasdaq**.  Rather, Nasdaq is paying a substantial amount of money to provide listed companies complementary access to a network of board-ready diverse candidates to assist companies that choose to satisfy the diversity objectives.

- **Nasdaq's relationship with Equilar does not create a conflict of interest**. Nasdaq has long offered a suite of technologies and services to companies through Nasdaq Governance Solutions, but none of those services includes board recruitment.

## II.  Commenters' Views and Nasdaq Responses

Nasdaq has separated comments into three categories:  (A) Diversity Objectives, (B) Board Diversity Disclosure Framework, and (C) Other Concerns about the Proposal in general.  Nasdaq has responded to each substantive comment with an explanation, a proposed amendment or clarification, or both. The number of comments ascribed to each comment category may exceed the total number of comments received, as many comment letters expressed opinions on multiple elements of the Proposal. For those commenters who opposed the Proposal but did not provide substantive arguments in opposition,[5] Nasdaq nonetheless endeavored to respond to them alongside the commenters who did provide substantive arguments.

Ms. Vanessa A. Countryman
U.S. Securities and Exchange Commission
February 26, 2021
Page 4

    A.   <u>Diversity Objectives</u>

        1.   <u>The Proposal Provides Companies with a Flexible Approach to Achieving the Two Diverse Directors Objective</u>

*Comment*:  While 45 commenters agreed that Nasdaq's disclosure-based approach towards achieving an objective of two diverse directors is reasonable, flexible, allows companies to be self-accountable, and will not be overly burdensome or coercive,[6] one commenter argued that Rule 5605(f)'s proposed requirement that companies have two diverse directors, or explain why they do not, will not result in a critical mass of diverse directors.[7]  CtW Investment Group expressed that "unless the board is very small, two diverse board members are not sufficient to constitute the critical mass often considered necessary to avoid tokenism and for minorities to have a strong voice in the boardroom."[8]  Nasdaq also received informal comments that "Nasdaq should amend the proposed rules to allow greater flexibility for companies with relatively small boards."[9]

*Response*:  Nasdaq carefully considered concerns that the Proposal does not go far enough and also considered critical mass theory in constructing the Proposal.[10]  Nasdaq also considered CtW Investment Group's observation that "[t]he proposed listing requirement to add two diverse board members will be the push that many laggards need to start the refreshment process."[11]  As noted in Amendment No. 1, Nasdaq "endeavored to provide a disclosure-based, business-driven framework to enhance board diversity that balances the need for flexibility with each company's particular circumstances."[12]  Companies may choose to have less than or more than two diverse directors on their board.  Nasdaq believes that the Proposal provides companies with a flexible, attainable approach to achieving a reasonable objective that is not overly burdensome or coercive.

Among the 45 commenters supporting Nasdaq's disclosure-based approach towards achieving an objective of two diverse directors,[13] LGIM America stated that "[t]he Proposed Rule establishes a bright line which we believe creates a reasonable minimum standard to appropriately escalate market awareness of listed companies with limited diversity. We have taken a similar public position that US companies should have at least one ethnically diverse director by 2022 or we will vote against the board."[14]  Generation Investment Management, LLP observed that "[t]he Nasdaq proposals go with the grain of investor expectations and US corporate good practice,"[15] a sentiment shared by four other commenters.[16]  Reflecting this trend in investor expectations, on January 11, 2021, State Street Global Advisors announced that, beginning in 2022, it "will vote against the Chair of the Nominating & Governance Committee at companies in the S&P 500 and FTSE 100 that do not have at least 1 director from an underrepresented community on their boards."[17]  Nasdaq therefore believes that the proposed objective of two diverse directors aligns investors' demands for increased board diversity with companies' needs for a flexible approach that accommodates each company's unique circumstances.  As noted in the Proposal, companies are not precluded from striving to achieve higher or lower diversity objectives,[18] and may even be required to do so pursuant to local laws in the jurisdiction of a company's headquarters or operations.[19]

Nasdaq carefully considered and agrees with commenters claiming that the proposed rules should provide additional flexibility for smaller boards.  Nasdaq believes that companies with smaller boards may face similar resource constraints to those of Smaller Reporting Companies.  However, Nasdaq recognizes that not all companies with smaller boards are Smaller Reporting Companies and therefore the alternative objective for Smaller Reporting Companies may not be available to them.

Further, companies with smaller boards may be disproportionately impacted by the proposed rule if they plan to satisfy Rule 5605(f)(2) by adding additional directors.  For example, two diverse directors on a five member board comprise 40% of the board, whereas two diverse directors on an eight member board comprise 25% of the board.  Alternatively, if a five-member board does not have two diverse directors and expands its board to satisfy Rule 5605(f)(2), it may require the company to incur additional costs through director compensation and D&O insurance.

*Amendment*:  In response to these concerns, Nasdaq is amending the Proposal to adopt Rule 5605(f)(2)(D), which proposes that a company with a board of directors of five or fewer members have, or explain why it does not have, at least one member of its board of directors who is diverse.[20]  As described under "*Nasdaq's Proposal is a Disclosure-Based Framework, not a Mandate*," the explanation could include describing a different approach. Consequently, all references in this letter to diversity objectives should be construed as a diversity objective of one director for companies with a board of directors of five or fewer members.

2.  The Phase-in Period Gives Companies Adequate Time to Satisfy the Rule

*Comment*:  Three commenters suggested that Nasdaq should limit the phase-in period to one calendar year after SEC approval,[21] two years after SEC approval,[22] or compress the phase-in period by one year for all market tiers.[23]  Conversely, Nasdaq received informal comments that "Nasdaq should amend the proposed rules to allow additional time for companies listed on the Nasdaq Global Select, Nasdaq Global Market, and Nasdaq Capital Market tiers to meet the diversity objectives of proposed Rule 5605(f)(2)."[24]  Nasdaq also received informal comments that "Nasdaq should amend the effective date of the proposed rules better to align listed companies' disclosure requirements with their annual meetings and proxy requirements" and "should amend the proposed rules to provide a 'cure' period for a listed company that does not comply with the diversity objectives of proposed Rule 5605(f)(2) as a result of an unanticipated departure of a diverse director."[25]

*Response*:  Nasdaq observed that 20 commenters applauded Nasdaq for implementing a phase-in period for companies to satisfy the rule and/or stated that the proposed phase-in period gives companies adequate time.[26]  For example, Nasdaq-listed issuer Microsoft Corporation stated that "while the composition of our current Board of Directors already exceeds Nasdaq's diversity goal of at least two diverse directors, we believe that Nasdaq's proposed phase-in period of two to five years is reasonable for companies who will need to make changes in the composition of their boards."[27]  Another Nasdaq-listed issuer, Ideanomics, Inc., stated that "[w]hile we currently do not meet Nasdaq's diversity goal . . . [w]e believe that Nasdaq's phased approach provides us with sufficient time to attract, screen, and recruit suitable applicants and we base this on the diversity progress achieved in our employee base."[28]  Skadden, Arps, Slate, Meagher & Flom LLP, in its capacity as counsel to Nasdaq-listed companies, believes the proposed transition periods "should provide an appropriate level of flexibility for most Nasdaq-listed companies. . . .  In our view, requiring a board to engage in this process on an accelerated basis—especially if a board is dealing with other significant matters, such as a pandemic, economic uncertainty, a cybersecurity breach or a transformative transaction—may compromise the likelihood of long-term success and would not be in the interests of Nasdaq-listed companies, their investors or other stakeholders."[29]

As noted in the Proposal, "Nasdaq considered whether an alternative timeframe for satisfying the diversity objectives of Rule 5605(f)(2) would better promote the public interest than the timeframe

Nasdaq has proposed under Rule 5605(f)(7)."[30]  Nasdaq endeavored to construct a timeframe that would provide each company with "substantial lead time to identify, interview and select board nominees."[31]

Nasdaq agrees that an accelerated timeframe may increase the challenges for companies seeking to meet the diversity objectives of Rule 5605(f), particularly smaller companies.  However, "companies are not precluded from adding additional directors to their boards to satisfy Rule 5605(f)(2) by having two Diverse directors sooner than contemplated by the proposed rule[.]"[32]  Therefore, Nasdaq is not amending Rule 5605(f) to reduce the phase-in period for companies to have, or explain why they do not have, at least two diverse directors.  As described under "*Nasdaq's Proposal is a Disclosure-Based Framework, not a Mandate*," the explanation could include describing a different approach, but companies would not need to explain their reasons for meeting the objectives early.

*Amendment*:  Nasdaq has considered the comment that it should provide a "cure" period for a company in the event of "an unanticipated departure of a diverse director."[33]  Nasdaq recognizes that a company that satisfies Rule 5605(f)(2) with two diverse directors may no longer satisfy the requirement due to a vacancy on the board, for example if a diverse director resigns or falls ill.  Given the personal circumstances that may accompany a vacancy on the board, Nasdaq has determined to amend its Proposal to provide each company that previously satisfied Rule 5605(f)(2)'s diversity objectives with a grace period of the later of (i) one year from the date of vacancy, or (ii) the date the company files its proxy statement or information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F) in the calendar year following the date of vacancy, to meet, or explain why it does not meet, the applicable diversity objectives.  As described under "*Nasdaq's Proposal is a Disclosure-Based Framework, not a Mandate*," the explanation provided under Rule 5605(f)(3) could include describing a different approach, but in lieu of providing the disclosure required by Rule 5605(f)(3), a company relying on this provision may publicly disclose that it is relying on the grace period provided by Rule 5605(f)(6)(B).  This is intended to notify stakeholders of the company's change in board composition without imposing an additional, unexpected disclosure burden on the company.

*Amendment*:  Nasdaq agrees that it would be beneficial for the proposed phase-in to better align with a company's proxy season, and proposes to amend the Proposal accordingly.  Nasdaq also proposes amending the Proposal to provide newly listed companies with two years from the date of listing (or the date the company files its proxy statement or its information statement, or if the company does not file a proxy, its Form 10-K or 20-F, for the company's second annual meeting of shareholders subsequent to the company's listing, whichever is longer), which is an additional year from the initial Proposal, to satisfy the requirements of Rule 5605(f) so that the Proposal is not a barrier to private companies accessing capital through the public markets.  This is intended to provide newly public companies with additional time to meet the diversity objectives of Rule 5605(f)(2), recognizing that newly public companies may have unique governance structures, such as staggered boards or director seats held by venture capital firms, that require careful timing when adjusting the composition of the board of directors.  These phase-in periods will apply after the end of the transition period provided in Rule 5605(f)(7).

3.  Nasdaq's Proposal is a Disclosure-Based Framework, not a Mandate

*Comment*:  Ten commenters mistakenly argued that Nasdaq is proposing a mandate or quota by requiring Nasdaq-listed companies to have at least two diverse directors on their board.[34]  Another six

commenters argued the Proposal would limit the ability of boards to determine their own relationships, composition, and future.[35]

*Response*:  Nasdaq believes that comments characterizing the Proposal as a mandate or quota are premised on a misunderstanding of the Proposal.  In actuality, the Proposal is a disclosure-based framework, not a mandate or quota.  As detailed in the Proposal, Rule 5605(f) would require each company to have, *or explain why it does not have*, at least two diverse directors.  The Proposal does not dictate that each company must have at least two diverse directors.  Rather, the Proposal provides each company with the option of meeting the proposed diversity objectives, or explaining its reasons for not doing so, which could include describing a different approach.

A company that chooses to not meet the diversity objectives will not face consequences or be delisted.  Rather, they can describe their reasons for following a different path.  Nasdaq will not adjudicate the merits of a company's reasons for not achieving the diversity objectives, and will not assess the substance of a company's explanation.  It will simply verify that the company has specified the requirements of Rule 5605(f)(2) that are applicable to the company (for example, describing the objectives applicable to a Smaller Reporting Company, Foreign Issuer, a smaller board, or the general objective) and has provided an explanation of its reasons for not meeting the objectives of the applicable rule, which could include describing a different approach.

Nasdaq carefully considered the benefits and drawbacks of a mandate and a disclosure-based approach.  It consulted with industry stakeholders and considered their feedback that "a disclosure-based framework that provides companies with flexibility would empower companies to maintain decision-making authority over their board's composition while providing stakeholders with a better understanding of the company's current board composition and its philosophy regarding diversity."[36]  Nasdaq believes that a disclosure-based approach that requires each company to have, or explain why it does not have, at least two diverse directors balances the calls of investors for companies to increase diverse representation on their boards with the need for companies to maintain flexibility and decision-making authority over their board composition.  Seven commenters commended Nasdaq for proposing a disclosure-based approach rather than imposing a quota.[37]

Nasdaq considered whether it was necessary to clarify in the Amendment No. 1 that Rule 5605(f) is not a quota in order to eliminate any ambiguity.  We do not believe there is any ambiguity on this point: Nasdaq's proposal does not set a quota or numeric mandate and, if adopted, it will not be interpreted as imposing such a quota.  Indeed, 27 commenters agreed that Nasdaq's proposal is a disclosure-based requirement rather than a quota, representing institutional investors,[38] the legal community,[39] advocacy organizations,[40] academia,[41] and industry or professional associations.[42] One commenter astutely observed that the Proposal "is providing companies with the *opportunity* to increase board diversity through a disclosure-based, business-driven approach rather than a quota."[43]  Another noted that "[t]he [Proposal's] comply or explain provision is consistent with the SEC's disclosure-based regulatory approach rather than serving as a quota or mandate.  Indeed, the proposal is modeled after other SEC rules related to board composition that have comply or explain provisions."[44]  One commenter observed that "Nasdaq, in their wisdom, has not mandated but rather *recommended* action that will improve the companies on its exchange.  And to keep the focus on the goal each year, they simply ask to know the reasons behind a lack of representation if the situation occurs."[45]  While Nasdaq has therefore determined that Rule 5605(f) is accurately described in the Proposal as a "have-

Ms. Vanessa A. Countryman
U.S. Securities and Exchange Commission
February 26, 2021
Page 8

or-explain" framework rather than a mandate or quota, it has further clarified in the Amendment that the Proposal is not a mandate or quota.

Nasdaq rejects the two comments claiming that the Proposal is a *de facto* quota.[46]  As noted by Ballard Spahr, LLP, counsel to Nasdaq:  The diversity objectives of Rule 5605(f) are "not quotas, mandates, or set asides.  Companies that do not meet the diversity objectives need only explain why they do not."[47]  The Proposal is intended to provide shareholders with sufficient information to make an informed voting or investment decision, or to facilitate informed discussions with companies.  The company can choose to disclose as much, or as little, insight into the company's circumstances or diversity philosophy as the company determines, and shareholders may request additional information directly from the company if they need additional information to make an informed voting or investment decision.  For example, the company could disclose that "The Company does not meet the diversity objectives of Rule 5605(f)(2)(C) because it does not believe Nasdaq's listing rule is appropriate," or "because it does not believe achieving Nasdaq's diversity objectives are feasible given the company's current circumstances."  A company who chooses to describe a different approach could explain that, for example, "The Company does not meet the diversity objectives of Rule 5605(f)(2)(A) because the Nominations Committee considers a variety of professional, industry, and personal backgrounds and skill sets to provide the Board with the appropriate talent, skills, and expertise to oversee the Company's business" or "is committed to ensuring that the Board's composition appropriately reflects the current and anticipated needs of the Board and the company."

4.  <u>Evidence Supports an Association between Board Diversity and Company Performance</u>

**Comment**:  While 74[48] commenters agreed that board diversity is linked to enhanced company performance, innovation, long-term sustainable returns, and/or investor protection, eight[49] commenters disagreed.

**Response:**  The weight of empirical evidence supports Nasdaq's belief in the benefits of board diversity for companies that choose to meet the diversity objectives of Rule 5605(f).[50]  Nasdaq reviewed two dozen academic studies from researchers writing in peer-reviewed and other academic journals, using data from the U.S. and other countries, spanning more than two decades, along with a dozen empirical studies by investors, corporate governance organizations, consultants and financial institutions.  The overwhelming majority of these studies found a positive association between board diversity and company performance, investor protection, and/or enhanced decision making.[51]

These studies are bolstered by the commenters who expressed their belief that board diversity is linked to enhanced company performance, innovation, and/or long-term sustainable returns. Eighteen[52] of these commenters agreed that the breadth of studies referenced in Nasdaq's Proposal represent substantial credible evidence of the benefits of board diversity, including Microsoft:

Based on our regular conversations with investors and their requests for diversity data, we understand they are increasingly focused on board diversity and many view it as material to their voting decisions. We believe this is important to investors because, as Nasdaq has noted, there is considerable empirical data that a diversity of backgrounds, experiences, and opinions leads to superior decision-making, better business outcomes, and more consistent long-term growth.[53]

Twenty-six commenters also cited additional third party studies or data gleaned from their own independent research to support their view that there is a link between board diversity and enhanced company performance.[54] Senator Dianne Feinstein noted a 2019 study by the Wall Street Journal, which "found that S&P 500 companies with greater board diversity performed better on a range of metrics."[55] The study, which analyzed 10 metrics including board diversity (gender, age, and independence) and workforce diversity (ethnic and gender representation), observed:

> The research showed that the 20 most diverse firms in the ranking have an average operating profit margin (the profit a company generates from its core business before interest and tax, as a percentage of sales) of 12%, compared with 8% for the lowest-ranking companies. Their shares, meanwhile, had an average annual total return of 10% in the five years through June 28 and 14% over the 10 years through June 28, versus 4.2% and 12% for the 20 least-diverse companies.

The Wall Street Journal study concluded that "[p]robably the biggest takeaway from the study is that diversity and inclusion appear to be good for business."[56] Another commenter representing Teachers Insurance and Annuity Association of America ("TIAA"), citing a 2020 corporate director's survey published by Harvard Law School Forum on Corporate Governance, pointed out that "[r]ecent research shows that directors themselves see the benefits of board diversity in promoting unique perspectives among the board, improving a company's relationships with its investors and enhancing long-term performance."[57] FCLTGlobal stated in its letter that, "[b]ased on FCLTGlobal's review of existing academic evidence, our own analysis, and research informed by our multi-year conversations with our Members and other experts, we suggest the SEC carefully consider…[s]ignificant evidence demonstrat[ing] diverse boards add value over the long term."[58] T. Rowe Price Group noted that "we have found that insufficient board diversity increases the risk that a company will become less competitive over time, which will impact its performance."[59] Legal & General Investment Management America, Inc. ("LGIM America"), a subsidiary of the fourth largest institutional global asset manager, believes that "[m]ore diverse organizations make better strategic decisions, show superior growth and innovation, and exhibit lower risk – all significant measures for investors."[60] Wellington Management Company LLP "share[s] Nasdaq's belief, based on compelling research, that board diversity is strongly associated with positive corporate performance. In our view, businesses create shareholder value by appointing boards that thoughtfully debate company strategy and direction."[61] The Pennsylvania State Treasurer believes that "[r]esearch shows that improving board diversity positively impacts corporations[.]"[62]

In addition, 80 commenters agreed that diversity on the board improves corporate governance and board decision-making.[63] For example, State Street Global Advisors notes they "have long viewed strong, independent and effective corporate board oversight as the single most important driver of long term value in public companies, which we view as closely correlated to board diversity."[64] Trillium Asset Management stated that their "belief that greater diversity of opinion, backgrounds and experience enhances decision-making, improves risk assessments and supports the consideration of all stakeholders is echoed in the findings of research from multiple corporate governance experts and business organizations."[65] The International Corporate Governance Network noted that its members, spanning more than 45 countries and including companies, advisors and investors collectively managing assets over $54 trillion, "regard diversity as a strategic issue that is fundamental to board quality."[66]

Ms. Vanessa A. Countryman
U.S. Securities and Exchange Commission
February 26, 2021
Page 10

Nasdaq disagrees with the contention advanced by certain commenters that there is insufficient evidence to establish a positive relationship between LGBTQ+ diversity and board performance.[67]  To begin, the U.S. Supreme Court in *Bostock v. Clayton County* has established that sexual orientation and gender identity are "inextricably" intertwined.[68]  In addition, Out Leadership (2019) suggested that "many of the reasons that gender diversity is considered beneficial are also applicable to LGBT+ diversity.  LGBT+ diversity in the boardroom may create a dynamic that enables better decision-making, and it brings to the boardroom the perspective of a community that is a critical component of the company's consumer population and organizational talent."[69]  During the comment period, Equality California expressed the view that "[e]nsuring LGBTQ+ representation on corporate boards is in the public interest, in that it fosters the growth of companies, promotes good governance and board decision-making, boosts investor confidence, and improves the overall economy."[70]  Nasdaq therefore reiterates its belief that is reasonable and in the public interest to treat LGBTQ+ status as "inextricably" intertwined with gender identity.

One commenter argued that the Proposal "is not consistent with a free market under Section 6(b)(5) of the Exchange Act because its arbitrary diversity requirement does not demonstrably improve corporate performance, and could sometimes harm it."[71]  Nasdaq respectfully asserts that, while Nasdaq of course wants its listed companies to succeed financially, Section 6(b)(5) of the Act does not require Nasdaq to demonstrate that its listing rules enhance the financial performance of its listed companies.  Rather, Nasdaq must demonstrate to the Commission that any proposed rule is consistent with Section 6(b) of the Act because, among other things, it is designed to protect investors, promote the public interest, prevent fraudulent and manipulative acts and practices, and remove impediments to the mechanism of a free and open market. Nasdaq must also balance promoting capital formation, efficiency, and competition, among other things, alongside enhancing investor confidence.

Nasdaq considered the studies cited by the critical commenters that did not find a statistically significant relationship between diversity and company performance, and observed that they are inconclusive.[72]  The United States Government Accountability Office has concluded that the mixed nature of various academic and empirical studies may be due to differences in methodologies, data samples and time periods.[73]  One study cited by a commenter that found a negative relationship between diversity and performance analyzed "mandatory" diversity regulations, and therefore is inapplicable to Nasdaq's disclosure-based proposal,[74] which does not "mandate" diversity.  The fact that a majority of studies show benefits, while a minority are inconclusive, demonstrates that the weight of the evidence supports Nasdaq's conclusion that the Proposal will not negatively impact capital formation, competition or efficiency among its public companies.

*Comment*:  Two commenters claimed that the Proposal does not promote diversity because, for example, it does not prohibit homogenous boards or diverse directors will bring similar perspectives to those of white male board members.[75]

*Response*:  Nasdaq carefully considered each perspective, but found that these comment letters primarily presented anecdotal evidence, whereas multiple studies cited in the Proposal identify the positive association between diversity and board decision making, as well as 66 comment letters affirming that the Proposal will promote diversity of identity and ideas.[76]  In addition, Nasdaq's goal of the proposal was not to impose a board composition requirement on its companies or preclude boards from adding directors on their board who are not considered "diverse" as defined in the Proposal—rather, Nasdaq believes that diversity in all forms, including white males, enhances corporate

governance and board decision making.  To that end, the Proposal sets forth a disclosure-based framework for each company to choose whether to achieve the proposed diversity objectives or explain its reasons for not doing so, which could include describing a different approach.

To that end, other commenters believe the proposal does not go far enough.  For example, two commenters suggested adding other categories of underrepresented groups.[77]  As explained in more detail under "*Nasdaq's Definition of Diverse is Consistent with Categories Reported to the EEOC through the EEO-1 Report*," Nasdaq's Proposal does not preclude other methods of populating boards of directors.  Under the Proposal, listed companies are free to consider additional diverse attributes when identifying director nominees, such as nationality, disability, or veteran status, and are free to disclose information related to diverse attributes of board members beyond those highlighted in the rule.  Nasdaq believes that the Proposal will encourage meaningful progress on diversity for companies that choose to meet the diversity objectives, and will provide meaningful disclosures to investors for companies that choose to explain their reasons for not doing so.

5.   Investors Consider Diversity Disclosures Material to Investment and Voting Decisions

*Comment*: Two commenters asserted that investors do not consider diversity disclosures to be useful or material information and therefore the Proposal is inconsistent with Section 6(b)(5) of the Exchange Act.[78]

*Response*:  One of these commenters, citing *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988), defines information as material when there is a "substantial likelihood that a reasonable investor would consider it important to an investment decision."[79]  The commenter concludes that "NASDAQ's proposal violates the concept of materiality because, as discussed above, the disclosures would not help a reasonable investor evaluate a company's performance. This purportedly violates Section 6(b)(5) of the Exchange Act for regulating an area that is unrelated to the purpose of the Exchange Act or 'administration of the exchange.'"[80]  Nasdaq infers that the commenters cross-reference to "as discussed above" relates to its earlier assertion that "NASDAQ does not sufficiently address the research results finding that gender board diversity correlates very little, if at all, with corporate performance. NASDAQ has also not proven that board diversity *causes* improved corporate performance."[81]

Nasdaq respectfully notes that *Basic* in fact defines information as material when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[82]  This view was reaffirmed by the U.S. Supreme Court in *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011) and *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014), and has been accepted and adopted by the Commission.[83]  Notably, in *Matrixx*, the Court also determined that statistically significant information was not required to establish materiality, noting that "[g]iven that medical professionals and regulators act on the basis of evidence of causation that is not statistically significant, it stands to reason that in certain cases reasonable investors would as well."[84]

Nasdaq respectfully submits— although a majority of studies in the Proposal found a relationship between company performance, investor protection and decision-making—that there is no bright-line test requiring a certain number of studies to establish a statistically significant relationship between diversity and company performance in order for diversity disclosures to be considered material to investors.  The Supreme Court case cited by the commenter, and later decisions affirming its holding,

Ms. Vanessa A. Countryman
U.S. Securities and Exchange Commission
February 26, 2021
Page 12

held that information is material if its omission would significantly alter the 'total mix' of information available to a reasonable investor.

In crafting the Proposal, Nasdaq identified data omissions, inconsistencies, and asymmetries in diversity disclosures among companies. For example, Nasdaq found inconsistent disclosures and definitions of diversity; inconsistent or no disclosure of a director's race, ethnicity, or other diverse attributes; difficult-to-extract data because statistics are often embedded in graphics; and aggregation of information, making it difficult to separate gender from other categories of diversity. As stated in the Proposal, "Nasdaq is concerned that investors also face the many data collection challenges Nasdaq encountered, rendering current diversity disclosures unreliable, unusable, and insufficient to inform investment and voting decisions."[85] Comment letters submitted by institutional investors and asset managers affirmed this view, noting that there is "a lack of standardized, comparable, data on directors' diversity"[86] and "[d]espite the clear benefits of diversity to corporate performance, there is insufficient transparency into the diversity of corporate boards.[87] One commenter pointed to a 2019 study conducted by the Wall Street Journal that concluded "only 17 companies [in the S&P 500] fully report ethnic diversity at the board level."[88] This is further discussed herein under "*There is Ample Evidence that Investors Want Board Diversity Data*."

The wave of investors increasingly calling for companies to disclose diversity metrics and diversify their boards, and basing their voting decisions on whether they do or not, demonstrates that investors consider diversity disclosures material to their voting and investment decisions. As noted in the Initial Proposal, institutional investors including Vanguard, State Street, Blackrock and the NYC Comptroller's Office include board diversity expectations in their engagement and proxy voting guidelines.[89] State Street's comment letter in support of the Proposal stated that "[a]s investors, we believe improving the availability of useful information and data is a critical element in advancing board diversity, and, as a result, will help improve corporate governance and long-term risk management and financial performance.[90] The NYC Comptroller's Office stated that "[t]he Proposed Rules will provide investors with vital information to inform investment and proxy voting decisions, as well as improve shareowner value by fostering increased board racial and gender diversity without imposing mandates or quotas."[91] The Pennsylvania State Treasurer expressed support for Nasdaq's Proposal, noting that "[n]o voice is more important to shareholders than a corporation's board of directors, but most corporate boards do not reflect the increasing diversity of the shareholder base."[92] The Illinois State Treasurer commented that:

> One materially important board attribute we examine within the office of State Treasury is diversity. . . Given the business case for board diversity, investors have a material interest in assessing board diversity data and applying that within the total mix of information. But here lies the underlying problem: investors do not have adequate access to board diversity data.[93]

The SEC's Office of the Investor Advocate[94] and 25 other commenters[95] expressed the view that investors consider diversity disclosures to be material information or useful in making informed voting and investment decisions. LGIM America explained that "[a]s prudent fiduciaries, we consider and engage with companies on a range of factors when making investment decisions on behalf of our clients. Among those are considerations of a company's diversity practices."[96] An association representing over 4,500 attorneys believes that "[a]doption of the proposal will better align companies in the United States with trends within the global economy that recognize the materiality of board diversity."[97] As noted above, Microsoft stated that "[b]ased on our regular conversations with investors and their

Ms. Vanessa A. Countryman
U.S. Securities and Exchange Commission
February 26, 2021
Page 13

requests for diversity data, we understand they are increasingly focused on board diversity and many view it as material to their voting decisions."[98]  The U.S. Chamber of Commerce posited that other companies have similar views on diversity:

> It is clear that board diversity is valuable. In fact, according to PwC's 2019 Annual Corporate Directors Survey, corporate directors feel that board diversity significantly benefits a company: 94% of board directors who responded indicated that a diverse board brings unique perspectives; 87% thought that diversity enhances board performance; 84% felt that board diversity improves relationships with investors; and 76% agree that board diversity enhances the performance of the company.[99]

Investors also expressed support for the Proposal, with several noting that they are "relying on returns from my portfolio of investments in publicly traded companies to retire" and urged the SEC to adopt Nasdaq's proposal to "advance board diversity and enhance transparency of diversity statistics through new proposed listing requirements."[100]  However, as described in the Proposal, Nasdaq is concerned that the current disclosure framework results in "information asymmetries between larger stakeholders, who are able to collect this data directly from companies, and smaller investors, who must rely on incomplete public disclosures."[101]  Two commenters noted that some investors also rely on third party data providers that aggregate diversity disclosures, which is expensive and "raises concerns about accuracy, objectivity and consistency."[102]

Nasdaq believes the Proposal would level the playing field for retail and institutional investors, and decrease the cost and time associated with data collection for all investors, by providing them with accessible, comparable, transparent information that is material to their voting and investment decisions.  Nasdaq agrees with UAW Retiree Medical Benefits Trust that "the reduction in information asymmetry occasioned by the Proposed Rules would increase efficiency and improve the functioning of the capital markets."[103]  Nasdaq therefore reaffirms its belief that the Proposal "will improve the quality of information available to investors who rely on this information to make informed investment and voting decisions."[104]

Nasdaq respectfully disagrees with the commenter's conclusion that the Proposal "violates the concept of materiality" and therefore "violates Section 6(b)(5) of the Exchange Act for regulating an area that is unrelated to the purpose of the Exchange Act or "administration of the exchange."[105]  As stated in the Initial Proposal, Nasdaq firmly believes, and the commenter agrees, that disclosure of material information is the "cornerstone" or "bedrock" of federal securities law.[106]  In approving Nasdaq's rule related to third party director compensation, the Commission affirmed that "it is within the purview of a national securities exchange to impose heightened governance requirements, consistent with the Act, that are designed to improve transparency and accountability into corporate decision making and promote investor confidence in the integrity of the securities markets."[107]  Nasdaq is concerned that while investors have increasingly emphasized that they consider board diversity information to be material, the current lack of transparency and consistency makes it difficult for Nasdaq and investors to determine the state of diversity among listed companies as well as each board's philosophy regarding diversity.[108]  Nasdaq believes it is well within its delegated regulatory authority to propose listing rules designed to enhance transparency, provided they do not conflict with existing federal securities laws. As noted by Ballard Spahr, LLP, counsel to Nasdaq, "there are compelling government interests in perfecting the mechanisms of a free and open market and promoting investor confidence through the promotion of racially or ethnically diverse boards, or through increased transparency (achieved by

Ms. Vanessa A. Countryman
U.S. Securities and Exchange Commission
February 26, 2021
Page 14

explanation) about the diversity of a company's board."[109]  For these reasons, and the reasons discussed herein under "*Exchanges Play an Important Role in Promoting Good Corporate Governance Practices*," Nasdaq believes the Proposal is consistent with Section 6(b)(5) of the Act.

> 6.  Nasdaq's Definition of Diverse is Consistent with Categories Reported to the EEOC through the EEO-1 Report

*Comment*:  Fifteen commenters recommended that Nasdaq expand the definition of diverse to include persons with disabilities and other categories, such as age, veteran status, experience in other industries, and cognitive diversity.[110]

*Response*:  When constructing the Proposal, and during its review of the aforementioned comment letters, Nasdaq considered expanding the definition of diverse to include categories beyond gender identity, race, ethnicity, and sexual orientation, such as the examples provided by the SEC staff's Compliance & Disclosure Interpretations ("C&DIs").[111]  Currently, the C&DIs provide a list of examples for companies to consider for purposes of providing disclosure of a director's or director nominee's self-identified diverse attributes under Items 401 and 407 of Regulation S-K, including "race, gender, ethnicity, religion, nationality, disability, sexual orientation, or cultural background" and "diverse work experiences, military service, or socio-economic or demographic characteristics."[112]  As described in the Proposal, Nasdaq observed that, as a result, "companies currently are permitted to define diversity 'in ways they consider appropriate' under federal securities laws.  One of the challenges of this principles-based approach has been the disclosure of inconsistent and noncomparable data across companies."[113]  Commenter Professor Lisa M. Fairfax agreed, noting that "when corporations can define boards as diverse using different definitions and criteria, diversity disclosures become inconsistent, confusing, and potentially misleading."[114]

Professor Fairfax and six other commenters expressed the view that Nasdaq's proposed definition of diverse is "suitable to improve transparency and comparability of disclosures across companies, whereas a broader definition could maintain the status quo of inconsistent, non-comparable data."[115]  As described in the Proposal, Nasdaq heard similar feedback during its stakeholder outreach, where "most stakeholders supported a narrower definition of Diversity focused on gender, race and ethnicity, with several supporting broadening the definition to include the LGBTQ+ community."[116]  Under the Proposal, companies are not precluded from using a broader definition of diversity, including persons with disabilities, veteran status or age, provided that a company that seeks broader diversity in lieu of diversity of race, ethnicity, sexual orientation, or gender identity transparently discloses this under Rule 5605(f)(3).  While Nasdaq hopes to offer companies an attainable, consistent, and transparent approach to board diversity, Nasdaq encourages companies to disclose board diversity metrics beyond those categories recognized in the Proposal to the extent a company considers it material to its investors' voting and investment decisions.

Nasdaq considered the view of commenters that suggested the definition of diverse should be expanded to include cognitive diversity[117] and experience, education, political views, and geographic locations.[118]  Although companies may consider a variety of factors when selecting a director nominee, Nasdaq believes the Proposal inherently recognizes the cognitive diversity[119] and broader range of experiences that diverse directors bring to the boardroom,[120] particularly those from professional pathways beyond the traditional C-suite experience.[121]  Nasdaq agrees with commenter Professor Lisa M. Fairfax that "there is a significantly greater likelihood that racial, ethnic, and gender board diversity

Ms. Vanessa A. Countryman
U.S. Securities and Exchange Commission
February 26, 2021
Page 15

will bring differences in perspectives and views than boards that do not have such diversity. . . . Nasdaq's rule is therefore entirely consistent, and in fact inextricably linked, with boards' expressed desire to enhance the diversity of experiences and perspectives within the boardroom."[122]  Similar views were expressed by Washington State Investment Board,[123] Nasdaq-listed issuer Microsoft Corporation,[124] and non-profit BoardReady.[125]  As Nasdaq explained in Amendment No. 1, we "endeavored to provide a disclosure-based, business-driven framework to enhance board diversity that balances the need for flexibility with each company's particular circumstances."[126]  Therefore, Nasdaq encourages companies to consider board diversity beyond those diversity categories recognized in the Proposal.

*Comment*:  Three commenters stated that the Proposal's definition of Underrepresented Minority is too expansive and does not sufficiently increase representation of racial minorities on boards, particularly Black/African Americans.  One commenter suggested limiting the definition of Underrepresented Minority to individuals from underrepresented racial minorities,[127] and one commenter recommended revising the Proposal to require companies to have, or explain why they do not have, "at least two (2) directors—who self-identify as Black or African American—separate from other ethnicities or races."[128]  Another commenter suggested "the addition of both an African American board member (or another racial/ethnic minority) and a member of the LGBTQ community, one of which might also be female," and making these requirements mandatory.[129] Two commenters recommended that Nasdaq amend the definition of diverse to include people of Central Asian, North African or Middle Eastern descent.[130]

*Response*:  Nasdaq appreciates that representation of racial minorities on public company boards is progressing at a slow rate.  While Nasdaq's definition was carefully considered from many perspectives, Nasdaq chose to propose a more expansive definition of diverse to ensure that more categories of historically underrepresented individuals are included, and to allow companies the flexibility to diversify their boards in a manner that fits their unique circumstances and stakeholders.

In constructing the Proposal, Nasdaq based its proposed definition of Underrepresented Minority on the categories reported to the Equal Employment Opportunity Commission ("EEOC") through the EEO-1 report with which most companies are already familiar, and while it is not included in the EEO-1 report, Nasdaq "believes it is reasonable and in the public interest to include a reporting category for LGBTQ+ status in recognition of the U.S. Supreme Court's recent decision in *Bostock v. Clayton County* that sexual orientation and gender identity are 'inextricably' intertwined with sex."[131]

Eleven commenters supported Nasdaq's proposed definition of diverse.[132]  The New York City Comptroller noted that "[b]y using the same EEO-1 categories as is applicable for their employees, we note that the Proposed Rules will reinforce the importance of self-identification of diversity within the boardroom and help bring transparency and comparability of this type of data into the marketplace."[133]  While Nasdaq-listed issuer Ideanomics, Inc. advocated for a broader definition of diverse, it also noted that it "believe[s] it is appropriate for Nasdaq to base its definition of diversity on the EEO-1 reporting categories.  We are already familiar with these categories and do not find this disclosure burdensome."[134]  Women for Economic and Leadership Development expressed the view that "Nasdaq's proposal will help make meaningful progress in improving board diversity related to race, ethnicity, sexual orientation and gender identity."[135]

Nasdaq believes that the Proposal provides flexibility to each company to determine whether and how to meet the diversity objectives of Rule 5605(f), based on the company's circumstances, board composition, and stakeholders.  Companies may choose to meet the Rule's objectives by, for example, having two directors who self-identify as Black or African American, as suggested by the commenter One Hundred Black Men of NY.[136]  Companies may also choose to meet the Rule's objectives by having two directors who self-identify in racial or ethnic categories beyond those included in the EEO-1 report, such as Middle Eastern, North African or Central Asian and describing to stakeholders that the company considers diversity more broadly than Nasdaq's definition of diversity.  Therefore, Nasdaq has determined to maintain alignment with the EEO-1 definitions.

*Comment*:  One commenter recommended that Nasdaq expand the definition of diversity to ensure that U.S. companies, with significant operations in countries that have a substantial number of underrepresented minorities, do not use director candidates from those countries to fill their board seats.[137]  The commenter believes that allowing this "would be against the spirit of the diversity goals of the Nasdaq [by allowing a director] who is ethnically a minority in the U.S., but who would otherwise not qualify were the same standards in place in their country of origin."

*Response*:  While Nasdaq commends the commenter's efforts to ensure that companies meet the spirit of Rule 5605(f)(2) by recommending that Nasdaq amend the definition of diverse for domestic companies that conduct significant business outside of the United States, a company is not precluded from satisfying Rule 5605(f)(2) with a director who is not a U.S. citizen or resident.  Nasdaq believes that it is solely in the company's discretion to identify qualified director nominees who reflect diverse backgrounds that are reflective of the company's communities, employees, investors or other stakeholders, regardless of the director's nationality.  Therefore, while Nasdaq appreciates this comment, it is not proposing any amendments to the definition of diversity for U.S. companies.

7.    Nasdaq Encourages Post-Implementation Studies

*Comment*:  One commenter welcomed the Proposal, noting the need for increased representation of diverse board members on public company boards.  The commenter also noted that the Proposal could aid companies in recruiting diverse candidates and was "a creative and important initiative that will assist companies to achieve the purposes of the Diversity Proposal."[138]  The commenter requested that Nasdaq commit to publishing a study analyzing the impact of the Proposal on board diversity and the relationship between diversity and corporate governance and financial results, based on data available three years after implementation.[139]

*Response*:  Nasdaq appreciates the author's comments and suggestions.  While the Proposal encourages increased board diversity and improved disclosures, the greater benefit of publicly disclosing this data will be that all interested parties, such as Nasdaq-listed companies, academicians, investors or members of the general public can adequately conduct their own analysis of the impact of the Proposal on diverse representation on boards of Nasdaq-listed companies and its relationship with company performance in the years ahead.  Nasdaq welcomes these analyses, which will allow for the free exchange of views and increase the substantive discussion on the topic.

B.    Board Diversity Disclosure Framework

While most commenters supported Nasdaq's proposed Rule 5606 with no recommended changes, a few commenters provided specific feedback on ways to enhance the disclosure and provide

greater flexibility in the Board Diversity Matrix ("Matrix") format.  After reviewing all of the feedback, and upon further review of the Proposal, Nasdaq has made certain clarifying and conforming changes via Amendment No. 1, as discussed below.

### 1.  Nasdaq is Revising the Operative Date for Disclosure

**Comment**:  Nasdaq received informal comments from interested parties asking Nasdaq to amend the effective date of the proposed rules to align listed companies' disclosure requirements with their annual meetings and proxy requirements.[140]

**Response**:  The uncertainty of when the Commission may take action on the Proposal, including Amendment No. 1, may have caused the initial operative date in Rule 5606(e) to give companies less than a year to satisfy Rule 5606(a).  For some companies, it may take some time to collect the data required by the proposed rule.  Therefore, Nasdaq wants to provide companies with at least one year to publish their Matrix.

**Amendment**:  Nasdaq is amending Rule 5606(e) to propose that companies satisfy Rule 5606 by the later of: (1) one calendar year from the date the SEC issues an order granting approval of the Proposal the (the "Effective Date"); or (2) the date the Company files its proxy statement or its information statement (or, if the Company does not file a proxy, in its Form 10-K or 20-F) for its annual meeting of shareholders during the calendar year of the Effective Date.

### 2.  Nasdaq is Providing Companies with Greater Flexibility to Choose where to Disclose Board Diversity Information

**Comment**:  Four commenters recommended amending Rule 5606(b) to prevent companies from satisfying the diversity reporting requirement by solely posting their board diversity information on the company's website.[141]  Rather, these commenters believe that Nasdaq should require companies to include the data in their annual proxy statement or information statement in addition to posting the data on their websites.[142]  As two commenters explained, "[i]t is important to make this information available in a manner that available software can be used to compare and aggregate this important data via firms such as FactSet."[143]  Additionally, one commenter expressed that companies that are not required to file a proxy or information statement should be given the option of publishing the information in any other SEC filing.[144]

**Response**:  As Nasdaq notes in its Proposal, the SEC has recognized that "[a] company's website is an obvious place for investors to find information about the company"[145] and permits companies to make public disclosure of material information through website disclosures if, among other things, the company's website is "a recognized channel of distribution of information."[146]  Nasdaq believes it is in the public interest to allow companies the flexibility to publish board diversity information through alternatives other than SEC filings, because it will avoid imposing additional disclosure and filing obligations on companies while providing shareholders with access to information in a recognized channel of distribution.  Additionally, as one commenter noted, not all companies are required under U.S. federal securities laws to file an annual proxy statement.[147]  Although two of the commenters mentioned FactSet as a firm that would benefit from Nasdaq not allowing the Matrix to be posted solely on a company's website, FactSet's comment letter did not raise any concerns with the Proposal.[148]

**Amendment**:  In response to the commenters, Nasdaq has amended the instructions to the Matrix to require companies to publish the board diversity information in a searchable format.  If a

company uses a graphic or image format (*i.e.,* tif, jpg, gif, png), the company must also include the same information as searchable text or in a searchable table. The searchable information could be included, for example, together with the related graphic or in an appendix.[149]  Nasdaq believes that requiring a searchable version of the Matrix will make it easier for investors, firms, and researchers to collect and aggregate the data.  In addition, to account for the fact that not every company files a proxy statement, Nasdaq amended the Proposal to allow such companies to provide the disclosures in a Form 10-K or 20-F.[150]

> 3.   <u>A Standardized Matrix Optimizes the Consistency and Comparability of Board Diversity Information across Companies</u>

**Comment**:  Nasdaq received 17 comments generally supporting the proposed Matrix[151]. One Nasdaq-listed issuer is "look[ing] forward to using Nasdaq's board matrix to present board-level diversity data in a manner consistent with our peers."[152]  The commenter also expressed that in the company's experience, "directors are comfortable reporting, and even proud of, their background, as they are already required by securities laws to disclose certain other personal information including age and compensation."[153]  However, some commenters suggested revisions to the Matrix.  Six commenters recommended that Nasdaq amend the Matrix to require director-by-director disclosure.[154]  One of those five suggested that Nasdaq clarify that companies could satisfy the rule even if the company's disclosure reflects the information on a director-by-director basis, and recommended that Nasdaq allow sufficient flexibility in the template so that companies are not required to include multiple matrices in their disclosures.[155]  This commenter also recommended adding an instruction to permit companies to revise the Matrix to omit inapplicable columns or rows to enhance readability.[156]  One commenter also requested that Nasdaq expand the Matrix to include other relevant factors, such as experience and skillset.[157]  One additional commenter requested that Nasdaq extend Rule 5606 to director nominees to be consistent with the recent recommendations issued by the Commission's Office of the Investor Advocate.[158]

**Response**:  While Nasdaq appreciates that requiring the information on a director-by-director basis may be helpful to some investors, the Proposal seeks a balance between obtaining key board diversity data and respecting the privacy of directors.  As one commenter mentioned, "[w]e appreciate that Nasdaq has structured its board matrix to allow directors to anonymously identify with diverse attributes or opt out of disclosing anything at all.  We believe this is a thoughtful way to respect each director's personal decision to identify as diverse."[159]  Additionally, Nasdaq encourages companies who seek to meet the diversity objectives of Rule 5605(f) to increase the diversity among its slate of director nominees, by selecting qualified candidates who reflect diverse backgrounds, including among other things, diversity of gender, race, and sexual orientation.  However, Nasdaq is not proposing to amend Rule 5606 to include director nominees.  We believe that limiting the disclosure to current directors optimizes the consistency and comparability of board diversity statistical information across companies.  Notwithstanding, the Proposal does not preclude a company from disclosing additional information beyond the requirements of Rule 5606.

**Amendments**:  Nasdaq is not proposing to amend the Matrix to provide for more detailed information.  However, in response to commenters, Nasdaq has amended the instructions to clarify that a company is not prohibited from disclosing more detail than required by the Matrix.  The instructions explain that a company may supplement its disclosure by providing additional information related to its directors.  The instructions also explain that a company may choose to provide the information on a

Ms. Vanessa A. Countryman
U.S. Securities and Exchange Commission
February 26, 2021
Page 19

director-by-director basis or may choose to include any skills, experience and attributes of each of its directors that are relevant to the company.[160]  As described in the Proposal, companies must provide the diversity data in a format substantially similar to the Matrix.[161]

Nasdaq is also amending the Matrix Instructions to include a definition of non-binary in response to informal questions Nasdaq received.  As defined in the Matrix, non-binary "refers to genders that are not solely man or woman; someone who is non-binary may have more than one gender, no gender, or their gender may not be in relation to the gender binary."[162]  Nasdaq hopes this enables investors to understand all terms used in the Matrix.

### 4.  Nasdaq will not Judge the Accuracy of Company-Reported Self-Identifications and Companies will Not be Subject to Greater Liability

*Comment*: Two commenters expressed concern that Nasdaq has not included a test to determine the accuracy or falsehood of a director's association with any of the categories in the Matrix.[163]  One stated that Nasdaq's reliance on self-identification poses a unique liability concern, which could expose Nasdaq listed companies to liability.[164]  More specifically, the commenter expressed that the "federal securities laws could hold issuers, as the makers of false statements, liable for reporting board members' diversity information if their ethnic or gender identity is misrepresented."[165]  Additionally, this commenter expressed concerns that more complexity could arise if a director self-identifies in a way that investors would consider misleading.[166]

*Response*:  Voluntary self-identification of personal characteristics is generally accepted as accurate without a "truth test".  For example, a person's voluntary self-identification on a census questionnaire or one's driver's license is not subject to any verification.  Therefore, Nasdaq will not judge the accuracy of a director's self-identification.  Nasdaq believes the risk of falsehood is outweighed by the benefits of allowing directors to determine which disclosure category (or categories) they identify with.  Some directors may feel that a "truth test" would violate their privacy and right to choose their self-identification.  Moreover, there are legal risks in many aspects of operating a company.  Companies are already subject to providing certain diversity information to the EEOC, and the categories used in the Matrix are mostly based on the EEOC's Employer Information Report EEO-1 Form.[167]  Similar to Nasdaq, the EEOC has not established a test to determine the accuracy of a self-identification in any of the EEO-1 Form categories.  Furthermore, some companies are already disclosing certain diversity information of their boards and have not seen an uptick in plaintiff litigation based on their board diversity disclosure.[168]  As one commenter discussed, the company's directors "have undertaken an exercise to voluntarily self-identify with respect to gender, race or ethnicity and LGBTQ+ status, while being sensitive to any of our Board members' preferences to opt out of self-identification.  [The company] plan[s] to use this information to enhance disclosures in our 2021 proxy statement regarding [their] Board's composition."[169]

Additionally, most directors and nominees are required to complete a directors' and officers' ("D&O") questionnaire and attest to the accuracy of their responses.  The D&O questionnaire requires the directors and nominees to provide their name, age, and other relevant information which may be subject to misrepresentations.  A company uses the director's information provided in the D&O questionnaire to ensure that the company has accurately disclosed information in its SEC filings.  Along with that, companies carry D&O insurance to protect against misrepresentations.  Therefore, Nasdaq does not believe that a director's self-identification responses will subject its company to greater liability

than any other questions found in the D&O questionnaire. Nasdaq believes any legal risk that may arise from these additional disclosures would be nominal and are outweighed by the benefits of providing greater transparency of a company's board.

### 5. Ample Evidence Shows that Investors Want Board Diversity Data

**Comment**: With respect to Nasdaq's explanation that more investors are demanding companies to disclose the race, ethnicity, and gender of their board members, one commenter, however, challenges the authenticity of these demands.[170] The commenter does not refute that there is a demand for the data. Rather, the commenter challenges the authenticity of the requests by certain investors and does not believe that Nasdaq should propose new listing standards as a response to investor demand for improved corporate governance and performance.[171]

**Response:** Nasdaq has observed, and cited within the Proposal, ample evidence that investors are increasingly interested in board diversity data as they view board diversity as a key indicator of corporate governance.[172] Over 50 commenters,[173] including 28 investors and eight Nasdaq-listed companies, stated that investors are seeking consistent board diversity disclosures across issuers so they can integrate board diversity into their decision-making. One Nasdaq-listed issuer stated that "[t]he composition of a company's board and management is an important element of our fundamental analysis, and we see diversity and representation as key investment considerations."[174]

A number of commenters[175] affirmed that Nasdaq's Matrix disclosure format will facilitate investors' ability to integrate board diversity into their decision making. Three commenters praised Nasdaq's efforts in proposing a standardized disclosure format.[176] One commenter stated that "[t]here is currently a lack of standardized, comparable, data on directors' diversity, so the proposed rule would be a positive step towards solving this challenge."[177] Another commenter noted that "Nasdaq's disclosure provisions serve to boost investor confidence and protect investors that view information related to board diversity as material to their investment and voting decisions, thereby also promoting capital formation and market efficiency."[178] One investor noted that, "for companies, a matrix would provide standard definitions and a structure that facilitates intentional discussion with directors on the topic of diversity."[179]

After considering commenters' concerns, Nasdaq does not believe that it should judge the intentions behind any investor's stated desire for companies to disclose information relevant to their board composition. Rather, Nasdaq's goal is to facilitate the collection and improve the reliability and uniformity of the data, while expanding access to the information.[180] Nasdaq also believes that the disclosure provision of Rule 5606 will enhance investor confidence and protect investors that view information related to board diversity as material to their investment and voting decisions.[181]

### C. Other Concerns

#### 1. Nasdaq is Offering Complimentary Access to a Board Recruiting Solution to Help Nasdaq-Issuers Meet the Diversity Objectives

**Comment**: Two commenters expressed the mistaken view that Nasdaq has a potential conflict of interest related to the Proposal because of Nasdaq's partnership with Equilar, which is intended to provide services to listed companies to aid them in meeting the Proposal's diversity objectives.[182] For example, one commenter noted that it was unclear "how [Nasdaq] would address the potential conflicts

of interest between establishing a regulatory standard and concurrently promoting a revenue-generating compliance solution."[183]  Another commenter expressed the view that the comment period for the companion rule filing relating to Nasdaq's partnership with Equilar, SR-NASDAQ-2020-082, should not expire before the comment period for the Proposal.[184]

*Response*:  Nasdaq has considered the comments and concludes that the commenters misstate the nature of the services Nasdaq is providing to listed companies.  First, Nasdaq is not generating any revenue from its partnership with Equilar.  Instead, Nasdaq is making a substantial investment in its listed companies by paying for services to help Nasdaq-issuers that want to pursue the diversity objectives.  Nasdaq is offering these services to companies at its own expense, and the complementary access offered to each company has a retail value of approximately $10,000, a value that Nasdaq is required by the SEC to disclose whenever Nasdaq supplies a free service to a listed company.[185]  Thus, Nasdaq is not promoting a "revenue-generating compliance solution" because Nasdaq is not generating any revenue, nor is the relationship intended to generate revenue.  As such, this comment misconstrues the nature of the partnership between Nasdaq and Equilar.

Second, to be clear, there is no requirement that listed companies take advantage of this offer, nor is there a requirement that they pay for the services if they choose to utilize this resource.  In the companion rule filing, SR-NASDAQ-2020-082,[186] Nasdaq explained that it was offering a complimentary service to its listed companies in order to help advance diversity on company boards and to help companies prepare for and meet the diversity objectives of the Proposal.  Specifically, Nasdaq is offering listed companies complimentary access to two seats of a board recruiting solution, which will allow companies to identify and evaluate diverse board candidates.  Nasdaq is offering this complementary access to a network of board-ready diverse candidates solely to assist listed companies that want to, but currently do not, satisfy the diversity objectives.

Third, there is no conflict of interest because Nasdaq is not in the board recruitment services business.  Nasdaq has long offered a suite of technologies and services to companies through Nasdaq Governance Solutions to help organize, streamline, and manage boardroom processes and requirements,[187] but none of those services includes board recruitment.  Specifically, Nasdaq offers board portal software, which is a secure platform designed specifically to enhance the effectiveness of meetings, collaboration and decision-making for boards, committees, and senior leadership teams.[188]  In addition, Nasdaq offers certain Board Engagement Services, which include board evaluations and assessments to help boards find opportunities to improve effectiveness, digital D&O questionnaires, and CEO and management evaluations designed to promote management and board alignment for a successful leadership culture.[189]  However, the services offered through the Nasdaq Governance Solutions business are wholly separate from Nasdaq's partnership with Equilar to provide free board recruitment services.  This partnership is solely designed to help companies that want to pursue the diversity objectives.  As such, Nasdaq concludes that there is no merit to the contention that a potential conflict of interest exists because Nasdaq is offering listed companies a free service through a board recruiting solution.

One commenter noted that a conflict may exist because Nasdaq "could require the use of a particular service as condition to resolving a listing rule enforcement action or take a non-enforcement posture so long as a company was seeking diversity among its board members using its solution."[190]  Nasdaq firmly disagrees with this assertion.  Whether a listed company chooses to take advantage of the free board recruiting service has no relationship to how, or whether, Nasdaq enforces the proposed

Ms. Vanessa A. Countryman
U.S. Securities and Exchange Commission
February 26, 2021
Page 22

rule. As described above, companies are not required to use the free service, nor are they even required to pursue the diversity objectives. Accordingly, there are no circumstances under which Nasdaq would penalize a company for its decision not to take advantage of a free board recruiting service. Nor would Nasdaq penalize a company solely for its decision not to pursue the diversity objectives, since this is not mandatory. As such, the suggestion that Nasdaq's enforcement of the proposed rule will be tainted by whether companies use the free board recruiting solution is wholly unfounded and represents a misunderstanding of both the Proposal and the companion rule filing.

Moreover, Nasdaq believes that its costs incurred to provide listed companies with access to a complimentary board recruiting service is justified. As noted in SR-NASDAQ-2020-082, the research surrounding the value of diversity on a company's board, and investor interest in more diverse boards, support Nasdaq's conclusion that offering free access to a board recruiting solution promotes just and equitable principles of trade and protects investors and the public interest. Nasdaq believes in the benefits of increased board diversity and is committed to assisting its listed companies that choose to pursue the diversity objectives.

Regarding one commenter's concern that the comment period for SR-NASDAQ-2020-082 expires before the comment period for the Proposal, Nasdaq concludes that this concern is moot because the comment periods for both the Proposal and the companion rule filing have been extended and are being considered together by the Commission.[191]

## 2. Exchanges Play a Key Role in Promoting Corporate Governance

**Comment:** While a number of commenters[192] expressed the opinion that the Proposal is consistent with Nasdaq's role as a stock exchange, seven commenters suggested that Nasdaq lacks the authority to propose the changes to its listing rules contained in the Proposal because it is not the role of Nasdaq, as an exchange, to promote board diversity.[193] According to one commenter, "Nasdaq's rule is a forbidden attempt to engage in social legislation and invade internal corporate affairs, exceeding the authority of stock exchanges under the [Securities Exchange Act of 1934 (the "Exchange Act")]."[194] Other commenters erroneously argued that corporate governance is solely a function of state law and the Proposal improperly furthers the "federalization" of corporate governance.[195]

**Response:** As an initial matter, Nasdaq notes that the Exchange Act provides the standard for approval of rules proposed by self-regulatory organizations, which is different than rulemaking by the SEC. Unlike the SEC—which is a federal government agency—a proposed rule change of a self-regulatory organization shall be approved by the Commission if it is consistent with the requirements of section 6(b) of the Exchange Act.[196] To be consistent with the Exchange Act, exchange rules must be "designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, to foster cooperation and coordination with persons engaged in regulating, clearing, settling, processing information with respect to, and facilitating transactions in securities, to remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect investors and the public interest; and are not designed to permit unfair discrimination between customers, issuers, brokers, or dealers, or to regulate by virtue of any authority conferred by this title matters not related to the purposes of this title or the administration of the exchange."[197] Nasdaq's responsibility to its listed companies, as a voluntary association of private companies bound together by contract, is to engage in rulemaking that furthers these goals in the Exchange Act.

Nasdaq respectfully disagrees with the commenters that contend the Proposal is beyond its authority because the proposed rule is consistent with Nasdaq's important role in shaping corporate governance.  The commenters misapprehend the historical role of stock exchanges in advancing the quality of corporate governance, which has been acknowledged and encouraged by the SEC.  Indeed, as aptly noted by one commenter, Nasdaq has "played an important role in fostering accountability, transparency and investor confidence in the securities and financial markets" with the "development of corporate governance listing standards covering matters ranging from financial statements to audit committees and director independence."[198]  Importantly, the SEC has explained that "[t]hrough their corporate governance listing standards," exchanges such as Nasdaq "play an important role in assuring that their listed issuers establish good governance practices."[199]  Thus, rather than overstepping its role, Nasdaq is performing its duties as an exchange to fashion listing rules that promote good corporate governance.[200]

Indeed, in the past few decades, Nasdaq has proposed, and the SEC has approved, numerous rules relating to corporate governance that are not mandated by federal law.  For example, Nasdaq imposed standards on listed companies beyond those required by Sarbanes-Oxley.  Congress passed the Sarbanes-Oxley Act of 2002 to "protect investors by improving the accuracy and reliability of corporate disclosures," which had a profound impact on corporate governance.[201]  While Sarbanes-Oxley does not impose a requirement that director nominees be selected by an independent nominations committee, Nasdaq's rules do.  Specifically, Nasdaq requires that director nominees either be selected, or recommended for the board's selection, by independent directors constituting a majority of the board's independent directors in a vote in which only independent directors participate, or by a nominations committee comprised solely of independent directors.[202]  Similarly, Nasdaq's listing rules required that each member of a listed company's compensation committee be an independent director for nearly a decade *before* the same requirement was imposed by the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010.[203]  In addition, Nasdaq requires certain disclosures of third party director and nominee compensation that are not required by federal law.  For example, Nasdaq requires the disclosure of the material terms of all arrangements between any director or nominee for director and any third party relating to compensation or other payment in connection with such person's candidacy or service as a director of the company.  In sum, self-regulatory organizations, such as Nasdaq, have maintained a strong oversight role of board composition for decades, which is part of the exchange's responsibility to the investing public.  An exchange that abdicates this role would risk violating its self-regulatory organization's statutory duties.

Through the Proposal, Nasdaq shapes corporate governance in a way consistent with its prior rulemaking that was approved by the Commission.  For example, the Commission has approved Nasdaq listing rules concerning board composition that were intended to improve board decision making—like the Proposal—but with respect to director independence.  In that instance, Nasdaq's proposed rule was intended to remedy a perceived weakness in board composition that could compromise board decision making.  Although the data concerning the benefits of independent directors was not uniformly positive,[204] nonetheless the SEC concluded that requiring independent directors on boards "should increase the likelihood that boards will make decisions in the best interests of shareholders."  The SEC further concluded that requiring boards to affirmatively disclose their determination of independence "will increase the accountability of boards to shareholders" and will also "give shareholders the ability to evaluate" the board's determinations concerning independence.[205]

Ms. Vanessa A. Countryman
U.S. Securities and Exchange Commission
February 26, 2021
Page 24

Consistent with Nasdaq's previous rules regulating corporate governance, Nasdaq identified a potential weakness in board composition that the Proposal is intended to remedy. Specifically, available evidence overwhelmingly demonstrates that boards lack diversity with respect to gender identity, race, and sexual orientation.[206] Nasdaq's review of an extensive body of academic research and empirical studies demonstrated that a lack of board diversity may negatively impact the decision-making processes of boards.[207] As such, the Proposal is intended to encourage companies to consider achieving the diversity objectives or provide transparency into their reasons for not doing so. The SEC has made clear that listing rules that "foster greater transparency, accountability and objectivity in the oversight by, and decision-making processes of" boards is an appropriate objective.[208] Nasdaq believes that the Proposal, like the independent director listing rules, "should increase the likelihood that boards will make decisions in the best interests of shareholders."[209]

In addition, the Proposal responds to increased investor demand for more detailed disclosures with respect to board diversity.[210] For example, one commenter noted its desire as an investor to have disclosures regarding "diversity at the board level [that] are made in a transparent and consistent way."[211] Another investor explained that "[w]e, along with many others in the financial-services industry, favor the creation of an external framework that would motivate companies to diversify their boards and standardize disclosures regarding their board composition."[212] The Proposal thus requires companies to disclose the Matrix and, if they chose not to meet the diversity objectives, explain why, which explanation could include describing a different approach. This added transparency provides investors the information they seek regarding board composition and management's approach toward diversity. Like Nasdaq's independent director disclosures, the proposed disclosures "will increase the accountability of boards to shareholders" and will also "give shareholders the ability to evaluate" the board's determinations regarding diversity. By responding to investor demands regarding the need for greater transparency, Nasdaq believes that the Proposal constitutes corporate governance listing standards that ultimately "enhance investor confidence in the securities markets."[213]

Nasdaq also respectfully disagrees with commenters that contend the Proposal contributes to the improper federalization of corporate governance. To the extent commenters are arguing that corporate governance should only be a function of state law, they misconstrue the nature of Nasdaq's role as an exchange operator as contemplated by the Exchange Act. As noted in the Proposal, Nasdaq develops listing rules regarding corporate governance standards to promote uniformity among its listed companies, even if the same areas are also regulated by states.[214] For example, states impose standards related to quorums[215] and shareholder approval of certain transactions,[216] which also are regulated under Nasdaq's listing rules.[217] Inherent in the role of operating an exchange, Nasdaq is expected and required to develop and enforce listing rules that, among other things, "remove impediments to and perfect the mechanisms of a free and open market" and "protect investors and the public interest."[218] In addition, unlike regulation by the federal government, companies voluntarily list on Nasdaq, as a private entity, and choose to submit to Nasdaq's listing rules. Further, listing rules differ across exchanges. Thus, to the extent commenters argued that "federalization" means uniformity, this result will not necessarily follow since national securities exchanges are not required to have identical listing rules. Accordingly, the argument that the listing rules of one exchange can result in the federalization of corporate governance is unfounded.

Notably, 80 commenters, which constitutes the vast majority of commenters that addressed the issue, agreed that the Proposal will enhance corporate governance and board decision making by improving board diversity.[219] For example, commenters with substantial experience in corporate

Ms. Vanessa A. Countryman
U.S. Securities and Exchange Commission
February 26, 2021
Page 25

governance issues that have "worked closely with boards that have become more diverse," noted that they "witnessed a discernible, positive impact on the boardroom environment. Deliberation and discussion have become more focused, and the group has benefited from the additional perspectives contributed by women and individuals from other historically underrepresented groups."[220] Numerous other commenters shared similar experiences and perspectives.[221] For all the above-described reasons, Nasdaq believes that the Proposal fosters accountability, transparency, and investor confidence among Nasdaq-listed companies, consistent with Section 6(b) of the Exchange Act.

> 3. Companies Will Retain Broad Discretion to Decide How, Whether or When They Meet the Diversity Objectives

**Comment**: Five commenters expressed the view that the Proposal is unnecessary because, to the extent shareholders and companies value increased board diversity, such changes will occur organically over time.[222] As expressed by one commenter, "[i]f the public is patient, companies will make changes on their own, at the right time and with the right people. . . . Over the years, major companies have elected visible minorities to their boards."[223] Another commenter noted that regulatory action was unnecessary because a "company that purposively does not take advantage of talented, qualified women and minorities places itself at a competitive disadvantage and also risks antidiscrimination lawsuits, enforcement actions and reputational damage."[224] Likewise, another commenter argued that the Proposal "is not needed because it unnecessarily pressures corporations to do something they are already seeking to do."[225] In sum, these commenters view the pursuit of board diversity as best left to the discretion of each company without regulatory action.

**Response**: Nasdaq reiterates that the Proposal provides flexibility for companies not wishing to achieve the diversity objectives or that wish to do so on a different timeline than that proposed by Nasdaq. The Proposal does not require companies to achieve the diversity objectives if they explain their reasons for not having at least two diverse directors, and the explanation could include describing a different approach. As such, companies are free to use their discretion as to how, whether, or when they pursue the diversity objectives. The Proposal's disclosure requirement also provides shareholders transparency into the companies' decisions with respect to board diversity. As Acting Chair Lee noted, increased disclosure "gets investors the information they need to make investment decisions based on their own judgment of what indicators matter for long-term value."[226] By increasing transparency for investors, the Proposal thus allows them to critically evaluate a company's decisions with respect to how, whether, or when to pursue board diversity.

Regulatory action has proven effective in removing barriers and in increasing board diversity among those traditionally underrepresented in other jurisdictions.[227] For example, women account for at least 30% of the largest boards of companies in six countries using disclosure-based models: Australia, Finland, Sweden, New Zealand, Canada, and the United Kingdom.[228] And while the Proposal is not a mandate, Nasdaq observed that following the implementation of Norway's board gender mandate, the number of public company board seats held by women in Norway increased from 6% in 2002 to 42% in 2020.[229] In addition, since California required companies headquartered in the state to have at least one director who self-identifies as female and one director from an underrepresented community, 669 women have joined public company boards in the state and the number of public companies with all male boards has declined from 30% in 2018 to 3% in 2020.[230] Multiple commenters have similarly touted the success of California's law in increasing board diversity.[231]

Ms. Vanessa A. Countryman
U.S. Securities and Exchange Commission
February 26, 2021
Page 26

Nasdaq notes that absent encouragement, progress toward increased board diversity has been demonstrably slow. The Proposal cited statistics on board diversity that confirm that women, underrepresented minorities, and those with LGBTQ+ status have been and remain underrepresented on boards.[232] As one commenter noted, "Black and African American directors only comprise 4.1% of Russell 3000 board seats in the U.S., 72% of Fortune 1000 companies have no Asian directors, and Hispanic and Latino directors only make up 2.28% of S&P 1500 board seats. These numbers have changed minimally in the past decade, indicating that more direct targets are necessary to address what are materially unequal hiring practices."[233] Numerous commenters have provided additional, similar data.[234] As succinctly noted by one commenter, Senator Josh Becker of the California State Senate, "[w]omen today hold less than 23% of the board seats of companies in the Russell 3000. Underrepresented ethnic and racial groups make up 12.5% of board directors, but are 40% of the U.S. population. While the number is increasing over time, it does so at a glacial pace insufficient with what should be expected as we enter 2021."[235] In light of this research, Nasdaq continues to believe that a "disclosure-based, business-driven framework to enhance board diversity that balances the need for flexibility with each company's particular circumstances" is in the public interest.[236]

4. The Proposal Encourages Companies to Consider Qualified Diverse Director Candidates

**Comment**: Eight commenters expressed the mistaken belief that the Proposal encourages listed companies to discriminate on the basis of race and sex when seeking board nominees instead of encouraging listed companies to review prospective board members based on their qualifications.[237] As the commenter, Judicial Watch, Inc., noted, "[r]equiring Nasdaq members to focus more on race and gender takes away from the focus on merit."[238] Similarly, one commenter, The Heritage Foundation, expressed the erroneous view that the Proposal "is racist and sexist in that it mandates that firms establish quotas and discriminate based on sex, skin color, ethnicity or sexual orientation rather than making determinations based on individual achievement, talent, experience or competence."[239] Likewise, one commenter mistakenly argued that the Proposal "interferes with the best interest requirement and ignores the dictum, most famously articulated by Warren Buffett, that board members should be chosen on merit and ability to improve corporate performance," and thus the Proposal "weakens shareholder rights."[240]

**Response**: For the reasons stated in the Ballard Spahr LLP Letter, Nasdaq concludes that the Proposal neither encourages companies to discriminate nor discourages board candidate recruitment on the basis of merit.[241]

Nasdaq categorically rejects the premise that there is a lack of available and qualified candidates who are women, underrepresented minorities, or individuals that self-identify as LGBTQ+. Individuals from these groups collectively comprise the majority of the U.S. population. Women account for approximately 51% of the total U.S. population, while underrepresented ethnic and racial minorities account for approximately 40% of the total U.S. population. Nine commenters[242] wrote to affirm that finding qualified, diverse board candidates will not be unduly difficult, including John Rogers and Mellody Hobson of Ariel Investments who stated, "[i]n a country with over 330 million people, there are plenty of qualified candidates . . . [and] the growing number of attendees at Ariel's annual Black Corporate Directors Conference is a testament to a business community that is rich with untapped Black and brown board talent."[243] Similarly, Olshan Frome Wolosky LLC noted that, "[d]uring the 2019 and 2020 proxy seasons, our shareholder activist clients were responsible for the appointment of

approximately 85 diverse director candidates to public company boards," which reinforces the notion that "if companies recruit by skill set and expertise rather than title, they will find there is more than enough diverse talent to satisfy demand."[244]

Despite the availability of qualified diverse candidates, traditional board nominee recruiting practices may result in qualified diverse candidates being overlooked. Studies suggest that the director candidate selection process may create barriers to considering qualified diverse candidates for board positions by limiting the search for director nominees to existing directors' social networks and candidates with C-suite experience.[245] Indeed, one commenter bolstered this point by citing additional studies that "found that 84% of large-cap and 90% of mid-cap organizations most often rely on current director recommendations when seeking to diversify their boards."[246] As a result, that commenter concluded that "reliance on current directors [to recruit board nominees], most of whom are white men, 'will generally produce candidates much like those directors.'"[247]

As such, Nasdaq wholly rejects the viewpoint expressed by some commenters that encouraging companies to consider qualified diverse candidates would in any way undercut a director's "merit or ability to improve corporate performance." Expanding director searches to include qualified women, underrepresented minorities, and those with LGBTQ+ status will not in any way shrink the talent pool. Commenters have cited no evidence for the assertion that encouraging companies to consider diverse board candidates would result in a "weaken[ing] of shareholder rights." To the contrary, as noted in the Proposal and as identified by 72 commenters,[248] board diversity is linked to enhanced company performance, innovation and/or long-term sustainable returns. Moreover, the increased transparency fostered by additional disclosures empowers shareholders to make informed decisions.

## 5.   The Proposal Protects the Privacy Interests of Directors

*Comment:* Eleven commenters expressed appreciation that the Matrix facilitates disclosure in a manner that simultaneously protects director privacy.[249] However, three commenters disagreed, expressing the view that the Proposal will result in violations of a director's right to privacy and that companies will offend directors by inquiring about their race, ethnicity, sexual orientation, or gender identification.[250] Specifically, International Bancshares Corporation, a Nasdaq-listed company, argued that it "is concerned that forced disclosure based upon a quota system infringes on the privacy rights of board members (particularly on small boards where aggregated data would provide little protection)[.]"[251] In addition, a commenter contended that directors would be "offended" if asked about their ethnicity or gender identification,[252] and one commenter stated that "[i]nvestors' right to know is outweighed by board members right to privacy."[253]

*Response*: While Nasdaq appreciates the commenters' concerns, Nasdaq believes the Proposal adequately accounts for directors' privacy interests. The Proposal does not require directors to provide any information with respect to their race, gender, or LGBTQ+ status, and thus there is no "forced disclosure" to satisfy a "quota system." Directors may choose to self-identify their respective race, gender, or LGBTQ+ status, or they may decide not to disclose such information. One commenter noted that "directors have self-determination on how to report – including the option to not report," giving them "empowerment."[254] If directors choose not to disclose, the Matrix provides companies with the ability to reflect this non-disclosure.[255] Thus, companies can complete the Matrix even if a director chooses not to self-identify. In addition, when directors choose to self-identify, the Matrix requires aggregated disclosures, rather than individualized, director-by-director disclosures. As mentioned

Ms. Vanessa A. Countryman
U.S. Securities and Exchange Commission
February 26, 2021
Page 28

above, numerous commenters concluded that the format of the Matrix adequately protects a director's privacy interests.[256] Directors with concerns that even aggregated data, based on the unique circumstances of the company, may not fully protect their privacy can choose not to self-identify. Nasdaq believes that the Proposal adequately encourages board diversity disclosure while balancing the privacy interests of directors to ensure they are not compelled to identify their respective race, gender, or LGBTQ+ status.

The Proposal's reliance on self-identification through voluntary disclosures is familiar to directors. For example, D&O questionnaires seek information concerning a director's age, experience, and related party transactions, and the information sought for the Matrix would be an extension of similar questions already posed to directors. Moreover, the voluntary, self-identification approach is well established in a number of familiar contexts. Millions of Americans seeking COVID-19 vaccines are being asked to fill out forms concerning gender, race, and ethnicity on a voluntary basis. In sum, Nasdaq concludes that the Proposal's reliance on the voluntary, self-identification approach to collecting information from directors is appropriate, and the format of the Matrix adequately protects directors' privacy interests.

6.  The Proposal Provides Sufficient Flexibility for Companies to Meet the Diversity Objectives

*Comment*: One commenter worried that the Proposal could cause listed companies to feel compelled to ask current, non-diverse directors to resign from their boards.[257] Another commenter expressed concern that companies would likely add board members to satisfy the proposed diversity objective, "thereby increasing their board's size and potentially creating less effective corporate oversight and governance due to the larger size."[258]

*Response*: Nasdaq seeks to clarify that the Proposal is neither requiring nor suggesting that companies add or remove any current directors in order to increase diversity. Companies seeking to meet the Proposal's diversity objectives can do so in a number of ways, and the Proposal provides adequate flexibility that allows each company the ability to pursue the approach most suitable for its circumstances. The Proposal is not imposing a required board size or composition, and each company that desires increased board diversity can pursue the diversity objectives in a manner appropriate for that company. Alternatively, a company may choose to pursue different diversity objectives, or none at all, and instead provide an explanation. Commenters illustrated the unique paths a company can take to satisfy the rule. For example, one commenter stated that, as opposed to displacing current directors, research shows companies increase diversity either by expanding their board or by filling seats left vacant.[259] In contrast, Akin Gump stated that "the proposal provides Nasdaq-listed companies with the option of explaining why a minimum of two diverse directors is not achievable, recommended or necessary in lieu of adding new (or replacing existing) directors."[260] Therefore, Nasdaq believes the Proposal provides sufficient flexibility for companies to follow any approach that they choose.

7.  Economic Growth will not be Stymied and Companies will not Incur Substantial Costs as a Result of the Proposal

*Comment*: One commenter raised concerns that the Proposal could expose Nasdaq listed companies to additional costs.[261] More specifically, the commenter expressed concern that companies may opt to stay private as a result of the Proposal. The commenter also conveyed that activist groups could use the diversity disclosures to start costly pressure campaigns against corporations with non-

Ms. Vanessa A. Countryman
U.S. Securities and Exchange Commission
February 26, 2021
Page 29

diverse boards.  Additionally, the commenter noted that Nasdaq should provide a more detailed cost-benefit analysis.

*Response*: Nasdaq recognizes that equity markets are the engine of growth for the United States economy, and that initial public offerings are an important opportunity for investors to share in that growth.  In 2017, Nasdaq published a blueprint entitled *The Promise of Market Reform: Revitalizing America's Economic Engine* ("Revitalize") that enumerated concrete enhancements to the public company model.  Revitalize was based on years of engagement with investors, public companies, and policy makers, and Nasdaq then engaged in a multi-year effort to advance the reforms recommended in the blueprint.  Nasdaq would be loath to undermine the public company model.

Nasdaq carefully considered the risks, rewards, and competitive implications of making the Proposal.  While Nasdaq would regret losing even a single valued issuer, Nasdaq fully recognizes that companies are free to decide where they list; experience and empirical data demonstrates that neither the listings contract nor listings fees present an impediment to issuers switching listings markets.  Nonetheless, Nasdaq believes that many long-term, newer, and potential public companies strongly support and value the objectives of the Proposal and may affirm their choice or choose anew to list on Nasdaq because of it.

Additionally, Nasdaq respectfully disagrees with the commenter's suggestion that the Proposal will reduce the number of companies desiring to go public.  Among the many elements companies consider when becoming public, board composition is growing in importance among pre-public company stakeholders.  For example, in February 2020, Goldman Sachs announced a new standard for taking companies public — the company must have at least one diverse board member — effective July 2020.  Private equity firms also are being urged to address diversity.  As one commenter stated, "many private equity general partners are already moving aggressively toward new and improved standards of diversity in a universe where requirements for public disclosure are far less demanding."[262]  Another commenter noted that "[g]iven the frequency of private equity and venture backed companies exiting through an IPO, it appears likely that the Proposed Rules will result in positive movement on board diversity of the portfolio companies owned by the private funds in which our members invest."[263]  Nasdaq, in concurrence with these commenters, believes that private companies are recognizing the value of board diversity as an important component of becoming a public company and therefore, will not have misgivings about going public as a result of the Proposal.

Nasdaq also believes that Amendment No. 1 provides a newly listed company with a reasonable amount of time to publish its board disclosure and to have diverse directors in alignment with Nasdaq's diversity objectives after going public.  Amendment No. 1 provides a newly listed company with at least one year from the date of listing to have at least one diverse director and at least two years to obtain two diverse directors.[264]  These companies would also have the benefit of the initial two to five year phase-in period.  Therefore, companies will not avoid going public because Amendment No. 1 provides sufficient time for newly listed companies to have, or explain why they do not have, at least two diverse directors.

Moreover, Nasdaq disagrees with the commenter's belief that pressure campaigns by activist groups will increase because of the proposal.  In fact, Nasdaq believes that its Proposal may help to quell such pursuits.  As Akin Gump noted in its comment letter, "[i]n light of George Floyd's death in May 2020, coupled with the resulting broader societal awareness and focus on racial inequality and systemic

Ms. Vanessa A. Countryman
U.S. Securities and Exchange Commission
February 26, 2021
Page 30

racism . . . it is logical to expect, absent the adoption of Nasdaq's accelerated rule-based approach for action, that 2021 will bring an increase in the number of shareholder proposals received by Nasdaq-listed companies relating to diversity, equity and inclusion."[265]  Amendment No. 1's "have-or-explain" framework allows companies with non-diverse boards to explain their approach to diversity, which Nasdaq believes will limit pressure campaigns by activist groups.

Nasdaq carefully considered the costs potentially imposed on listed companies or those considering listings, including the costs of retaining a director search firm to conduct the search for new or replacement directors; the time corporate employees spend conducting the search, completing the Matrix and/or providing an explanation, and providing corporate disclosure; and potential disruption to Boards from these activities.  Because existing, new, and potential public companies will experience these potential costs in vastly different ways and combinations, it is impossible to quantify the costs with meaningful certainty.

Accordingly, Nasdaq took multiple steps to mitigate the potential costs that this Proposal might create.  For example, Nasdaq proposed at least two alternatives to help companies mitigate the costs of retaining a search firm:  (1) by offering complementary access via Equilar, as described above, and (2) by offering the alternative of an explanation if the company chooses not to meet the diversity objectives. To mitigate the time needed to complete and post the Matrix, Nasdaq has simplified both the Matrix itself and the mechanisms for making it available, in line with commenters' recommendations.

* * * * *

I hope this information is useful to you in determining under Section 19(b) of the Exchange Act that Nasdaq's proposal to adopt listing rules related to board diversity is consistent with the Exchange Act.  Nasdaq believes that its Amendment No. 1 aligns with good corporate governance, investor priorities and enhanced transparency around disclosures.  For the above reasons, Nasdaq asks that the Commission approve the Amendment No. 1.

If you have any further questions, please do not hesitate to contact me.

Sincerely yours,

John A. Zecca

Ms. Vanessa A. Countryman
U.S. Securities and Exchange Commission
February 26, 2021
Page 31

---

1    <u>See</u> Securities Exchange Act Release No. 90574 (December 4, 2020), 85 FR 80472 (December 11, 2020) ("Proposal").

2    <u>See</u> Letter from Jeffrey S. Davis, Nasdaq Inc., (January 8, 2021), available at https://www.sec.gov/comments/sr-nasdaq-2020-081/srnasdaq2020081-8221271-227700.pdf.

3    <u>See</u> NASDAQ-2020-081 [(February 26, 2021) available at https://listingcenter.nasdaq.com/Amendment 1 Diversity Proposal.pdf ("Amendment No. 1").

4    <u>See</u> letters published on *Comments on NASDAQ Rulemaking, The Nasdaq Stock Market LLC; Notice of Filing of Proposed Rule Change to Adopt Listing Rules Related to Board Diversity [Release No. 34-90574; File No. SR-NASDAQ-2020-081]* available at https://www.sec.gov/comments/sr-nasdaq-2020-081/srnasdaq2020081.htm and *Comments on NASDAQ Rulemaking The Nasdaq Stock Market LLC; Notice of Filing of Proposed Rule Change to Adopt Listing Rule IM-5900-9 to Offer Certain Listed Companies Access to a Complimentary Board Recruiting Solution to Help Advance Diversity on Company Boards [Release No. 34-90571; File No. SR-NASDAQ-2020-082]* available at https://www.sec.gov/comments/sr-nasdaq-2020-082/srnasdaq2020082.htm.

5    <u>See</u> David Pusateri E-mail; Kit Wong E-mails #1 and #2; Peter Samson E-mail; Alex Magid E-mail; Samuel Sloniker E-mail; Yolanda Rivera E-mail; Kevin and Roberta Vinyard E-mail; Jenny Barcus E-mail; Phil Goldstein E-mail; Leslyek Killian E-mail; W. Fischer E-mail; Karen Smith E-mail; Steve Ashe E-mail; Clayton Butler E-mail; Spencer Cleaves E-mail; Jason Negri E-mail; James Huggins E-mail; Robert Harold E-mail; Scott Young E-mail; Jeremy Wichman E-mail; Geoffrey White E-mail; Joseph Miller E-mail; Concerned American Executives E-mail; Werner Lind E-mail; R. Harris E-mail; and Cindy Brandt E-mail.

6    <u>See</u> Mercy Investment Services, Inc. Letter; Miller/Howard Investments, Inc. Letter; Stardust Letter; Soundboard Governance LLC Letter; Buck Gee E-mail; San Francisco Employees' Retirement System Letter; UAW Retiree Medical Benefits Trust Letter; Professor Margaret M. Chin E-mail; Women for Economic and Leadership Development Letter; Parity.org Letter; Generation Investment Management, LLP Letter; Brightcove, Inc. E-mail; Ohio Public Employees Retirement System Letter; Ariel Investments, LLC Letter; AllianceBernstein L.P. Letter; California State Teachers' Retirement System Letter; MFS Investment Management Letter; New York City Office of the Comptroller Letter; Pennsylvania State Treasurer Letter; 2U, Inc. Letter; Ideanomics, Inc. Letter; Microsoft Corporation Letter; T. Rowe Price Group, Inc. Letter; Apax Partners Letter; Capital Research and Management Company Letter; LGIM America Letter; Lord Abbett Letter; Washington State Investment Board Letter; Professor Lisa M. Fairfax E-mail; Skadden Arps LLP Letter; Akin Gump Strauss Hauer & Feld LLP Letter; California State Treasurer Letter; Amy Goodman and John Olson E-mail; Faye Sahai E-mail; Professor Morgan Flake E-mail; Association of Asian American Investment Managers Letter; Int'l Corporate Governance Network Letter; WomenExecs on Boards E-mail; California State Controller Letter; Olshan Shareholder Activism Group Letter; State of New York Office of the State Comptroller Letter; National Investor Relations Institute Letter; BMO Global Asset Management Letter; BoardReady Letter; and YWCA Metropolitan Chicago Letter.

7    <u>See</u> CtW Investment Group Letter at 2.

8    <u>See</u> CtW Investment Group Letter at 2.

9    On January 14, 2021, Ballard Spahr LLP filed a letter with the Commission summarizing comments that Nasdaq had received informally from interested parties that are not necessarily reflected in the range of comments submitted directly to the Commission. <u>See</u> Ballard Spahr LLP Letter dated January 14, 2021 at 1.

10   <u>See</u> Proposal at 80,492.

11   <u>See</u> CtW Investment Group Letter at 2.

12   <u>See</u> Amendment No. 1 at 16-17.

13   <u>See</u> 2U, Inc. Letter; Akin Gump Strauss Hauer & Feld LLP Letter; AllianceBernstein L.P. Letter; Amy Goodman and John Olson E-mail; Apax Partners Letter; Ariel Investments, LLC Letter; Association of Asian American

Ms. Vanessa A. Countryman
U.S. Securities and Exchange Commission
February 26, 2021
Page 32

---

Investment Managers Letter; BMO Global Asset Management Letter; BoardReady Letter; Brightcove, Inc. E-mail; Buck Gee E-mail; California State Controller Letter; California State Teachers' Retirement System Letter; Capital Research and Management Company Letter; New York City Office of the Comptroller Letter; Faye Sahai E-mail; Generation Investment Management, LLP Letter; Professor Lisa M. Fairfax E-mail; Ideanomics, Inc. Letter; Int'l Corporate Governance Network Letter; LGIM America Letter; Lord Abbett Letter; Professor Margaret M. Chin E-mail; Mercy Investment Services, Inc. Letter; MFS Investment Management Letter; Microsoft Corporation Letter; Miller/Howard Investments, Inc. Letter; Professor Morgan Flake E-mail; National Investor Relations Institute Letter; State of New York Office of the State Comptroller Letter; Ohio Public Employees Retirement System Letter; Olshan Shareholder Activism Group Letter; Parity.org Letter; Pennsylvania State Treasurer Letter; San Francisco Employees' Retirement System Letter; Skadden Arps LLP Letter; Soundboard Governance LLC Letter; Stardust Letter; California State Treasurer Letter; T. Rowe Price Group, Inc. Letter; UAW Retiree Medical Benefits Trust Letter; Washington State Investment Board Letter; Women for Economic and Leadership Development Letter; WomenExecs on Boards E-mail; and YWCA Metropolitan Chicago Letter.

[14]  See LGIM America Letter at 3.

[15]  See Generation Investment Management, LLP Letter at 1.

[16]  See Washington State Investment Board Letter at 2; Professor Lisa M. Fairfax E-mail at 2, 4-5; Skadden Arps LLP Letter at 2; and Akin Gump Strauss Hauer & Feld LLP Letter at 3.

[17]  See State Street Global Advisors *CEO's Letter on Our 2021 Proxy Voting Agenda* at https://www.ssga.com/us/en/institutional/ic/insights/ceo-letter-2021-proxy-voting-agenda.

[18]  See Proposal at 80,493.

[19]  See Akin Gump Strauss Hauer & Feld LLP Letter ("We note that the Nasdaq Diversity Proposal is not the first proposed regulation of its kind. For example, in September 2018, California mandated all public companies with executive offices in the State to have at least one female board member by not later than December 2019. Other states have followed suit and adopted similar requirements. Further, on September 30, 2020, California's governor, Gavin Newsom, signed into law Senate Bill (SB) 979, a measure that will require California corporations to achieve diversity on their boards of directors by January 2023, thereby effectively banning all-white boards for more than 600 publicly held companies. Countries around the globe, including Norway, Germany, France, Spain, Belgium, Netherlands and Iceland, have adopted diversity legislation similar to California's[.]").

[20]  See Amendment No. 1 at 87.

[21]  See Banneker Ventures and The Collective Letter at 2.

[22]  See National Urban League Letter at 5.

[23]  See Olshan Shareholder Activism Group Letter at 3.

[24]  See Ballard Spahr LLP Letter dated January 14, 2021 at 1; see also U.S. Chamber of Commerce Letter at 2 ("It is important for start-ups and EGCs to have the flexibility needed to tap specific founder and entrepreneur expertise. It is why Congress, through the 2012 JOBS Act, provided flexibility in certain board requirements to businesses who fall within the EGC category. We believe that it is important for EGCs and start-ups to have similar levels of flexibility under the Proposal.")

[25]  See Ballard Spahr LLP Letter dated January 14, 2021 at 1, 2.

[26]  See Mercy Investment Services, Inc. Letter; San Francisco Employees' Retirement System Letter; Women for Economic and Leadership Development Letter; Ariel Investments, LLC Letter; California State Teachers' Retirement System Letter; Capital Stewardship, SEIU Letter; Pennsylvania State Treasurer Letter; Ideanomics, Inc. Letter; Microsoft Corporation Letter; T. Rowe Price Group Inc. Letter; Apax Partners Letter; Miller/Howard Investments, Inc. Letter; TIAA Letter; Professor Lisa M. Fairfax E-mail; Skadden Arps LLP Letter; Akin Gump

Ms. Vanessa A. Countryman
U.S. Securities and Exchange Commission
February 26, 2021
Page 33

---

Strauss Hauer & Feld LLP Letter; Faye Sahai E-mail; The Links, Incorporated Letter; California State Controller Letter; and Association of Asian American Investment Managers Letter.

27  See Microsoft Corporation Letter at 2.

28  See Ideanomics, Inc. Letter at 4.

29  See Skadden Arps LLP Letter at 2, 3.

30  See Proposal at 80,493.

31  See Proposal at 80,493.

32  See Proposal at 80,493.

33  See Ballard Spahr LLP Letter dated January 14, 2021 at 1.

34  See Guess & Co, Corporation Letter at 1; Publius Oeconomicis Letter at 9; Matthew Glen E-mail at 1; Judicial Watch, Inc. Letter at 4; Letter Type A at 1; Walter Donnellan Letter at 1; Independent Women's Forum Letter at 1; International Bancshares Corporation Letter at 2; De la Vega Occidental & Oriental Holdings L.L.C. Letter at 2; and Colin Gallagher E-mail at 1.

35  See Letter Type A at 1 and Independent Women's Forum Letter at 1.

36  See Proposal at 80,492.

37  See Mercy Investment Services, Inc. Letter at 1 ("We commend Nasdaq for providing companies with the opportunity to increase board diversity through a disclosure-based, business-driven approach rather than a quota. We do not believe Nasdaq's requirements will be overly burdensome or coercive."); National Investor Relations Institute Letter at 3 ("NIRI generally favors principles-based disclosure rules that allow for flexibility to account for industry differences and seek to reduce compliance burdens for smaller companies. We are pleased to see that Nasdaq has taken this approach with its diversity disclosure proposal."). See also Miller/Howard Investments, Inc. Letter at 1; Women for Economic and Leadership Development Letter at 1; San Francisco Employees' Retirement System Letter at 2; California State Controller Letter at 1; and Stardust Letter at 2.

38  See UAW Retiree Medical Benefits Trust Letter at 2, 3; New York City Office of the Comptroller Letter at 1; Pennsylvania State Treasurer Letter at 1; T. Rowe Price Group, Inc. Letter at 1; Apax Partners Letter at 1; Washington State Investment Board Letter at 2; Mercy Investment Services, Inc. Letter at 1; Miller/Howard Investments, Inc. Letter at 1; San Francisco Employees' Retirement System Letter at 2; California State Controller Letter at 1; and Stardust Letter at 2.

39  See Amy Goodman and John Olson E-mail at 2; Akin Gump Strauss Hauer & Feld LLP Letter at 5; Soundboard Governance LLC Letter at 2; and Skadden Arps LLP Letter at 2.

40  See Parity.org Letter at 1; Faye Sahai E-mail at 1; and Women for Economic and Leadership Development Letter at 1.

41  See Professor Lisa M. Fairfax E-mail at 10.

42  See U.S. Chamber of Commerce Letter at 2; Association of Asian American Investment Managers Letter at 2; The Forum of Executive Women Letter at 1; Women Business Collaborative Letter at 1; YWCA Metropolitan Chicago Letter at 1; and National Investor Relations Institute Letter at 3.

43  See Stardust Letter at 2.  Emphasis in original.

44  See Professor Lisa M. Fairfax E-mail at 10.

45  See Parity.org Letter at 1. Emphasis in original.

46  See Judicial Watch, Inc. Letter at 4 ("Moreover, the "comply-or-explain" framework does not save the Rule from its constitutionally fatal flaws. Nasdaq portrays its Proposed Rule as a choice rather than a mandate.");

Ms. Vanessa A. Countryman
U.S. Securities and Exchange Commission
February 26, 2021
Page 34

and Publius Oeconomicis Letter at 10 ("The "or explain why it does not have" prong of the Diversity Mandate is not sufficient to transform this requirement from a mandate to merely a disclosure requirement.").

47  On February 5, 2021, Ballard Spahr LLP filed a letter with the Commission to address certain comments submitted to the Commission concerning the Proposal.  See Ballard Spahr LLP Letter dated February 5, 2021 at 2.

48  See Senator Catherine Cortez Masto, et al. Letter; State Street Global Advisors Letter; BMO Global Asset Management Letter; California Legislative Black Caucus Letter; BoardReady Letter; Senator Dianne Feinstein Letter; UAW Retiree Medical Benefits Trust Letter; Mercy Investment Services, Inc. Letter; Wellington Management Company LLP Letter; TIAA Letter; Miller/Howard Investments, Inc. Letter; LGIM America Letter; Generation Investment Management, LLP Letter; Ariel Investments, LLC Letter;  FCLTGlobal Letter; The Links, Incorporated Letter; Ohio Public Employees Retirement System Letter; California Public Employees' Retirement System Letter; California State Teachers' Retirement System Letter; Stardust Letter; Capital Stewardship, SEIU Letter; CtW Investment Group Letter; MFS Investment Management Letter; New York City Office of the Comptroller Letter; 2U, Inc. Letter; FactSet Research Systems Inc. Letter; Henry Schein, Inc. Letter; Microsoft Corporation Letter; T. Rowe Price Group, Inc. Letter; WW International, Inc. Letter; Apax Partners Letter; Capital Research and Management Company Letter; Goldman Sachs Group, Inc. Letter; Parity.org Letter; Lord Abbett Letter; Washington State Investment Board Letter; Catalyst Letter; California Partners Project Letter; Biotechnology Innovation Organization Letter; Corporate Counsel Women of Color Letter; State of Rhode Island, Office of the General Treasurer Letter; Professor Lisa M. Fairfax Email; Akin Gump Strauss Hauer & Feld LLP; Cynthia Overton Letter; Brandi Nicole Johnson E-mail; Jo Brickman Email; Paolo Guadiano Email; U.S. Chamber of Commerce Letter; American Civil Liberties Union Letter; Association of Asian American Investment Managers Letter; Bay Area Asian American General Counsel Letter; Greater Sacramento Urban League Letter; Institutional Limited Partners Association Letter; Metro NY Chapter, National Black MBA Association Letter; The Forum of Executive Women Letter; AFL-CIO Letter; National Association of Securities Professionals Letter; The Boston Club  Letter; United States Hispanic Chamber of Commerce Letter; The Forum for Sustainable and Responsible Investment Letter; Women Business Collaborative Letter; WomenExecs on Boards E-mail; Banneker Ventures and The Collective Letter; L Catterton Management Company, LLC; BetterInvesting (NAIC) Letter; Letter Type C (3); Latino Corporate Directors Association Letter; Olshan Shareholder Activism Group Letter; State of New York Office of the State Comptroller Letter; Robin Hood Letter; Congresswoman Carolyn Maloney and Congressman Gregory Meeks Letter; and California State Controller Letter.

49  See Publius Oeconomicis Letter at 5; Walter Donnellan Letter at 1; John Richter E-mail at 1-2; Theo Vermaelan E-mail at 1-3; De la Vega Occidental & Oriental Holdings L.L.C. Letter at 2; The Heritage Foundation Letter at 6-9; Project on Fair Representation Presentation at 6-9; and Senator Pat Toomey, et al. Letter at 6.

50  See Aida Sijamic Wahid, The Effects and the Mechanisms of Board Gender Diversity: Evidence from Financial Manipulation, J. Bus. Ethics Journal of Business Ethics (2019) 159:705–725; Aaron Dhir, Osgoode Hall, Challenging Boardroom Diversity:  Corporate Law, Governance, and Diversity 150 (2015); Scott Yonker, Vineet Bhagwat, Gennaro Bernile, Board Diversity, Firm Risk, and Corporate Policies (March 6, 2017), Journal of Financial Economics Volume 127, Issue 3, March 2018, Pages 588-612; Lawrence J. Abbott, Susan Parker, Theresa J. Presley, Female Board Presence and the Likelihood of Financial Restatement, 26(4) Accounting Horizons 607, 626 (2012); Daniel P. Forbes and Frances I. Milliken, Cognition and Corporate Governance: Understanding Boards of Directors as Strategic Decision-Making Groups, 24(3) Acad. Mgmt. Rev. 489, 496 (Jul. 1999); David Abad-Diaz, M. Encarnacion Lucas-Perez, Antonio Mínguez Vera, Does Gender Diversity on Corporate Boards Reduce Information Asymmetry in Equity Markets? 20(3) BRQ Business Research Quarterly 192, 202 (July 2017); Marıa Consuelo Pucheta-Martınez, Inmaculada Bel-Oms, Gustau Olcina-Sempere, Corporate governance, female directors and quality of financial information; 25(4) Bus. Ethics: A European Rev. 363, 378 (2016); Yu Chen, John Daniel Eshleman, Jared S. Soileau, Board Gender Diversity and Internal Control Weaknesses, 33 Advances in Acct. 11 (2016); Bin Srinidhi, Ferdinand A. Gul, Judy Tsui, Female Directors and Earnings Quality, 28(5) Contemporary Accounting Research 1610, 1612-16 (Winter 2011); Francisco Bravo,

Ms. Vanessa A. Countryman
U.S. Securities and Exchange Commission
February 26, 2021
Page 35

Maria Dolores Alcaide-Ruiz, *The disclosure of financial forward-looking information*, 34(2) Gender in Mgmt. 140, 142-44 (2019); Ammar Ali Gull, Mehdi Nekhili, Haithem Nagati, France Tawhid Chtioui, *Beyond gender diversity: How specific attributes of female directors affect earnings management*, 50(3) British Acct. Rev. 255 (Sept. 2017), available at: https://ideas.repec.org/a/eee/bracre/v50y2018i3p255-274.html; Ferdinand A. Gul, Bin Srinidhi, Anthony C. Ng, *Does board gender diversity improve the informativeness of stock prices?*, 51(3) J. Acct. & Econ. 314 (April 2011); Douglas Cumming, T. Y. Leung, Oliver Rui, *Gender Diversity and Securities Fraud*, Academy of Management Journal Vol. 58, No 5 (Feb. 9, 2015), available at https://ssrn.com/abstract=2562399; David A. Carter, Betty J. Simkins, W. Gary Simpson, *Corporate Governance, Board Diversity, and Firm Value*. 38(1) Fin. Rev. 33; James D. Westphal and Edward J. Zajac, *Who Shall Govern? CEO/Board Power, Demographic Similarity, and New Director Selection*, 40(1) Admin. Sci. Q. 60, 77 (March 1995);  Maria Encarnación Lucas-Pérez, Antonio Mínguez-Vera, Juan Samuel Baixauli-Soler, Juan Francisco Martín-Ugedo, and Gregorio Sánchez-Marín, *Women on the Board and Managers' Pay: Evidence from Spain*, 129 J. Bus. Ethics 285 (April 2014); Lynne Dallas, *Does Corporate Law Protect the Interests of Shareholders and Other Stakeholders?: The New Managerialism and Diversity on Corporate Boards of Directors*, 76 Tul. L. Rev. 1363, 1391 (June 2002); Deborah Rhode, *Diversity on Corporate Boards: How Much Difference Does Difference Make?*, 39(2) Del. J. Corp. L. 377, 402-403 (2014).

[51] This includes four studies (Carlyle (2020), McKinsey (2015), McKinsey (2020) and Carter, Simkins and Simpson (2003)) that specifically analyzed the relationship between company performance and gender, race and ethnic diversity on the board, and the findings of Carter et al. (2003) were affirmed by Bernile, Bhagwat and Yonker (2018).  Bernile, Bhagwat and Yonker (2018) found that greater diversity on boards—including gender, ethnicity, educational background, age, financial expertise and board experience—is associated with increased operating performance, higher asset valuation multiples, lower stock return volatility, reduced financial leverage, increased dividend payouts to shareholders, higher investment in R&D and better innovation. The authors observed that "[t]his is in line with the results in Carter, Simkins, and Simpson (2003), which show a positive association between local demographic diversity and firm value."  18 commenters agreed that one or more of these studies represent substantial credible evidence of the benefits of board diversity. See The Links Incorporated, Letter at 2; FCLT Global Letter at 3; LGIM America Letter at 1; Corporate Counsel Women of Color Letter at 2; 41st District of California Letter at 1; 58th District of California Letter at 1; UAW Retiree Medical Benefits Trust Letter at 3; Ariel Investments, LLC Letter at 1; 2U, Inc. Letter at 1; The Forum for Sustainable and Responsible Investment Letter at 2; Greater Sacramento Urban League Letter at 1; AFL-CIO Letter at 1; Stardust Letter at 1; Akin Gump Strauss Hauer & Feld LLP Letter at 2; Capital Stewardship, SEIU Letter at 1; California Legislative LGBTQ Caucus Letter at 1; Latino Corporate Directors Association Letter at 8; and California Legislative Black Caucus at 1.  Acting Chair Lee also cited the studies by Bernile et al. and McKinsey (2020) studies in her remarks at the Council of Institutional Investors Fall 2020 Conference. See Acting Chair Allison Herren Lee, *Diversity Matters, Disclosure Works, and the SEC Can Do More: Remarks at the Council of Institutional Investors Fall 2020 Conference* (September 22, 2020), available at: https://www.sec.gov/news/speech/lee-cii-2020-conference-20200922. Wahid (2019) concluded that gender-diverse boards commit fewer financial reporting mistakes and engage in less fraud, and has publicly stated that she believes her findings could extend to racial backgrounds. See Aida Sijamic Wahid, *The Effects and the Mechanisms of Board Gender Diversity: Evidence from Financial Manipulation*, J Bus Ethics 159, 705–725 (2019) (analyzing 6,132 U.S. public companies during the period from 2000 to 2010, for a total of 38,273 firm-year observations); see also Barbara Shecter, *Diverse boards tied to fewer financial 'irregularities,' Canadian study finds*. Financial Post (Feb. 5, 2020), https://business.financialpost.com/news/fp-street/diverse-boards-tied-to-fewer-financial-irregularities-canadian-study-finds (last accessed Nov. 27, 2020).

[52] See UAW Retiree Medical Benefits Trust Letter; FCLTGlobal Letter; California State Teachers' Retirement System Letter; Stardust Letter; CtW Investment Group Letter; MFS Investment Management Letter; FactSet Research Systems Inc. Letter; Microsoft Corporation Letter; Apax Partners Letter; Capital Research and Management Company Letter;  Goldman Sachs Group, Inc. Letter; California Partners Project Letter; Professor Lisa M. Fairfax Email; Association of Asian American Investment Managers Letter; Bay Area Asian American

Ms. Vanessa A. Countryman
U.S. Securities and Exchange Commission
February 26, 2021
Page 36

---

General Counsel Letter; Metro NY Chapter, National Black MBA Association Letter; BMO Global Asset Management Letter; and Banneker Ventures and The Collective Letter.

53   See Microsoft Corporation Letter at 2.

54   See Parity.org Letter; Professor Lisa M Fairfax E-mail; The Forum for Sustainable and Responsible Investment Letter; ALF-CIO Letter; California Legislative Black Caucus Letter; Greater Sacramento Urban League Letter; Institutional Limited Partners Association Letter; Latino Corporate Directors Association Letter; Brandi Nicole Johnson E-mail; Cynthia Overton Letter; Jo Brickman E-mail; U.S. Chamber of Commerce Letter; Akin Gump Strauss Hauer & Feld LLP Letter; Washington State Investment Board Letter; 2U, Inc. Letter; TIAA Letter; LGIM America Letter; Ariel Investments, LLC Letter; FCLTGlobal Letter; The Links, Incorporated Letter; Stardust Letter; Capital Stewardship, SEIU Letter; California Partners Project Letter; Senator Dianne Feinstein Letter; Senator Catherine Cortez Masto, et al. Letter; and Corporate Counsel Women of Color Letter.

55   See Senator Dianne Feinstein Letter at 1.

56   See The Wall Street Journal, The Business Case for More Diversity (October 26, 2019), available at: https://www.wsj.com/articles/the-business-case-for-more-diversity-11572091200 ("2019 WSJ Study").

57   See TIAA Letter at 2.

58   See FCLTGlobal Letter at 1.

59   See T. Rowe Price Group, Inc. Letter at 2.

60   LGIM America Letter at 2; see also AllianceBernstein L.P. Letter at 1 ("We believe that diversity, in thought as well as personal characteristics, is an important element of assessing the board's capabilities, as it promotes a wider range of perspectives to be considered for companies to both strategize and mitigate risks."); see also San Francisco Employees' Retirement System Letter at 1 ("We believe this diversity is critical in order for the hoard to properly oversee management, business strategy and risk mitigation.").

61   See Wellington Management Company LLP Letter at 1.

62   See Pennsylvania State Treasurer Letter at 1.

63   See Senator Catherine Cortez Masto, et al. Letter; RespectAbility et al. E-mail; UAW Retiree Medical Benefits Trust Letter; Mercy Investment Services, Inc. Letter; Trillium Asset Management Letter; Fairpointe Capital Letter; Miller/Howard Investments, Inc. Letter; Amy Goodman and John Olson E-mail;  TIAA Letter; The Links, Incorporated Letter; LGIM America Letter; San Francisco Employees' Retirement System Letter; Brightcove, Inc. E-mail; Office of the Illinois State Treasurer Letter; Ohio Public Employees Retirement System Letter; Ariel Investments, LLC Letter; Capital Stewardship, SEIU Letter; CtW Investment Group Letter; MFS Investment Management Letter; Pennsylvania State Treasurer Letter; Facebook, Inc. Letter; Henry Schein, Inc. Letter; Ideanomics, Inc. Letter; Microsoft Corporation Letter; T. Rowe Price Group, Inc. Letter; Brighthouse Financial, Inc. E-mail; Apax Partners Letter; Capital Research and Management Company Letter; The Investment Diversity Exchange Letter; Goldman Sachs Group, Inc. Letter; Lord Abbett Letter; National Investor Relations Institute Letter; Stardust Letter; Washington State Investment Board Letter; Biotechnology Innovation Organization Letter; California Partners Project Letter; Equality California Letter; Wellington Management Company LLP Letter; Soundboard Governance LLC Letter; Professor Lisa M. Fairfax E-mail; Loring, Wolcott & Coolidge Letter; Akin Gump Strauss Hauer & Feld LLP Letter; California Legislative Women's Caucus Letter; 58th District of California Letter; 41st District of California Letter; California State Senate Letter; California State Treasurer Letter; Faye Sahai E-mail; Thirty Percent Coalition Letter; U.S. Chamber of Commerce Letter; American Civil Liberties Union Letter; Association of Asian American Investment Managers Letter; Bay Area Asian American General Counsel Letter; Greater Sacramento Urban League Letter; Institutional Limited Partners Association Letter; Int'l Corporate Governance Network Letter; Council of Korean Americans Letter; Metro NY Chapter, National Black MBA Association Letter; The Forum of Executive Women Letter; AFL-CIO Letter; National Association of Securities Professionals Letter; National Asian Pacific American Bar Association Letter; The Boston Club Letter; The Committee of 100 Letter; United States Hispanic Chamber of Commerce

---

Letter; Women's Forum of New York Letter; The Forum for Sustainable and Responsible Investment Letter; Women Business Collaborative Letter; Women for Economic and Leadership Development Letter; WomenExecs on Boards E-mail; YWCA Metropolitan Chicago Letter; Banneker Ventures and The Collective Letter; Olshan Shareholder Activism Group Letter; BMO Global Asset Management Letter; Morningstar, Inc and Sustainalytics Letter; Latino Corporate Directors Association Letter; State Street Global Advisors Letter; State of New York Office of the State Comptroller Letter; *L* Catterton Management Company, LLC Letter; and California State Controller Letter.

[64] <u>See</u> State Street Global Advisors Letter at 1.

[65] <u>See</u> Trillium Asset Management Letter at 1.

[66] <u>See</u> Int'l Corporate Governance Network Letter at 2.

[67] <u>See</u>, e.g., Walter Donnellan Letter at 1 ("[T]here are not any studies at all which support LGBTQ+ members or those who identify with a gender different than on their birth certificate."); and Project on Fair Representation Presentation at 9 ("Nasdaq concedes 'there is a lack of published research on the issue of LGBTQ+ representation on boards.'").

[68] <u>See</u> <u>Bostock v. Clayton Cty.</u>, 140 S. Ct. 1731, 1742 (2020) ("But unlike any of these other traits or actions, homosexuality and transgender status are inextricably bound up with sex.  Not because homosexuality or transgender status are related to sex in some vague sense or because discrimination on these bases has some disparate impact on one sex or another, but because to discriminate on these grounds requires an employer to intentionally treat individual employees differently because of their sex.").

[69] <u>See</u> Quorum, Out Leadership's LGBT+ Board Diversity and Disclosure Guidelines 3 (2019), available at: https://outleadership.com/content/uploads/2019/01/OL-LGBT-Board-Diversity-Guidelines.pdf. In addition, Credit Suisse in 2016 found an association between LGBTQ+ diversity and stock performance, "finding that a basket of 270 companies 'supporting and embracing LGBT employees' outperformed the MSCI ACWI index by an average of 3.0% per year over the past six years."  <u>See</u> Proposal at 80,476.  Credit Suisse also found that "[a]gainst a custom basket of companies in North America, Europe and Australia, the LGBT 270 has outperformed by 140 bps annually."  <u>See</u> Id.

[70] <u>See</u> Equality California Letter at 2.

[71] <u>See</u> Senator Toomey, et al. Letter at 2.

[72] <u>See,</u> e.g., Publius Oeconomicis Letter at 6 ("Contrary to the research cited by the NASDAQ, other studies have not even found the same positive correlation."); Walter Donnellan Letter at 1 ("Pletzer et al. (2015) found that board gender diversity alone has a "small and non-significant" relationship with a company's financial performance.  Post and Byron (2014) found a "near zero" relationship with a company's market performance. Carter, D'Souza, Simkins and Simpson (2010) found that "[w]hen Tobin's Q is used as the measure of financial performance, we find no relationship to gender diversity or ethnic minority diversity, neither positive nor negative."); The Heritage Foundation Letter at 2 ("The actual empirical peer reviewed economics literature is highly inconclusive with most studies showing little or no discernable effect on financial performance due to the sexual, racial or ethnic composition of corporate boards."); and the Senator Toomey et al. Letter at 2 ("First, the research underpinning NASDAQ's proposal is incomplete at best. For example, NASDAQ does not sufficiently address the research results finding that gender board diversity correlates very little, if at all, with corporate performance. NASDAQ has also not proven that board diversity *causes* improved corporate performance. In fact, some evidence suggests that 'the interaction of gender diversity and ethnic minority diversity do not impact financial performance.'"). Emphasis in original.

[73] <u>See</u> United States Government Accountability Office, Report to the Ranking Member, Subcommittee on Capital Markets and Government Sponsored Enterprises, Committee on Financial Services, House of Representatives, Corporate Boards: Strategies to Address Representation of Women Include Federal Disclosure Requirements 5 (Dec. 2015) (the "GAO Report"), available at: https://www.gao.gov/assets/680/674008.pdf ("Some research has found that gender diverse boards may

Ms. Vanessa A. Countryman
U.S. Securities and Exchange Commission
February 26, 2021
Page 38

---

have a positive impact on a company's financial performance, but other research has not. These mixed results depend, in part, on differences in how financial performance was defined and what methodologies were used").

[74]  See Theo Vermaelen E-Mail at 2 ("NASDAQ does not cite the most relevant studies, studies that show significant stock price declines after *mandatory* diversity regulations in Norway (Ahern and Dittmar, 2012; Matsa and Miller, 2013) and California (Greene et al (2020).") Emphasis in original.

[75]  See Publius Oeconomicis Letter at 8 ("Further, and as suggested by Professor Klein, the Proposed Rule will not produce actual diversity, but instead will simply require the appointment of people who "self-identify" as women, a designated minority, or gay or transgender, when in reality, these individuals will more likely than not carry with them substantially similar experiences as the white male cisgendered board members they are intended to replace."); see also John Richter E-mail at 2 ("We have already seen cases where companies bring in a "token minority officer" for appearances sake, but no intention to let them change anything.") ("The Proposal's demographic identity test is easily counterfeited.  How, precisely, do you define a "black" person? How do you know if a person is bisexual?").

[76]  See Senator Catherine Cortez Masto, et al. Letter; Association of Asian American Investment Managers Letter; Council of Korean Americans Letter; Minority Corporate Counsel Association Letter; The Forum of Executive Women Letter; AFL-CIO Letter; Ascend Pinnacle Letter; The Investment Diversity Exchange Letter; The Links, Incorporated Letter; California State Senate Letter; California State Treasurer Letter; Cynthia Overton Letter; Brandi Nicole Johnson E-mail; Faye Sahai E-mail; Jo Brickman E-mail; Laura Gluhanich E-mail; Suzanne Wertheim E-mail; Apax Partners Letter; Ariel Investments, LLC Letter; California State Teachers' Retirement System Letter; Capital Stewardship, SEIU Letter; Lord Abbett Letter; Mercy Investment Services, Inc. Letter; Miller/Howard Investments, Inc. Letter; Pennsylvania State Treasurer Letter; 2U, Inc. Letter; Brightcove, Inc. E-mail; FactSet Research Systems Inc. Letter; T. Rowe Price Group, Inc. Letter; Brighthouse Financial, Inc. E-mail; Professor Lisa M. Fairfax E-mail; CFA Institute Letter; Equality California Letter; The Forum for Sustainable and Responsible Investment Letter; Women Business Collaborative Letter; Women for Economic and Leadership Development Letter; California Legislative LGBTQ Caucus Letter; California State Controller Letter; BetterInvesting (NAIC) Letter; Letter Type B (21); Letter Type C (3); Katerli bounds E-mail; California Insurance Commissioner Letter and State of New York Office of the State Comptroller Letter.

[77]  See Publius Oeconomicis Letter at 7 ("In addition, the Proposed Rule does [not] fully address diversity because it is incomplete. It does not account for other categorizations that could also increase diversity of a board (e.g., veteran status, disability status, experience in other industries / regions / etc.).") and John Richter E-mail at 2 ("I've been investing in stocks for decades, and the primary board member demographic I've been interested in is their age; which is already widely published.").

[78]  See Senator Pat Toomey, et al. Letter at 1 ("It violates central principles of materiality that govern securities disclosures, and finally, it harms economic growth by imposing costs on public corporations and discouraging private corporations from going public. In so doing, NASDAQ fails to meet its burden to demonstrate that this proposed rule advances investor protection, fosters the public interest, or is otherwise consistent with the Securities Exchange Act of 1934 (Exchange Act)."); see also The Heritage Foundation Letter at 5 ("The proposed rule does not protect investors in any sense. It does not increase their returns or protect them from losses. It does not protect them from fraud or misrepresentation.").

[79]  See Senator Pat Toomey, et al. Letter at 3, 4.

[80]  See Senator Pat Toomey, et al. Letter at 4.

[81]  See Senator Pat Toomey, et al. Letter at 2. Emphasis in original.

[82]  See *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988) ("The Court also explicitly has defined a standard of materiality under the securities laws; see also *TSC Industries, Inc. v. Northway, Inc.*, 426 U. S. 438 (1976), concluding in the proxy-solicitation context that "[a]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." It further explained that, to

Ms. Vanessa A. Countryman
U.S. Securities and Exchange Commission
February 26, 2021
Page 39

---

fulfill the materiality requirement, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available. We now expressly adopt the TSC Industries standard of materiality for the § 10(b) and Rule 10b-5 context.")

[83]  See the Adopting Release for Regulation FD (SEC Release No. 33-7881 (Aug. 15, 2000) ("The regulation does not define the terms "material" and "nonpublic," but relies on existing definitions of these terms established in the case law. Information is material if "there is a substantial likelihood that a reasonable shareholder would consider it important" in making an investment decision. To fulfill the materiality requirement, there must be a substantial likelihood that a fact "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."). See also SEC Staff Accounting Bulletin: No. 99 - Materiality (SEC Release No. SAB 99 (Aug. 12, 1999)) (SAB 99) ("This formulation in the accounting literature is in substance identical to the formulation used by the courts in interpreting the federal securities laws. The Supreme Court has held that a fact is material if there is a substantial likelihood that the . . . fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available. Under the governing principles, an assessment of materiality requires that one views the facts in the context of the "surrounding circumstances," as the accounting literature puts it, or the "total mix" of information, in the words of the Supreme Court.").

[84]  See Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27 (2011) ("Absent statistical significance, Matrixx argues, adverse event reports provide only "anecdotal" evidence that "the user of a drug experienced an adverse event at some point during or following the use of that drug." Accordingly, it contends, reasonable investors would not consider such reports relevant unless they are statistically significant because only then do they "reflect a scientifically reliable basis for inferring a potential causal link between product use and the adverse event." As in Basic, Matrixx's categorical rule would "artificially exclud[e]" information that "would otherwise be considered significant to the trading decision of a reasonable investor." Matrixx's argument rests on the premise that statistical significance is the only reliable indication of causation. This premise is flawed: As the SEC points out, "medical researchers . . . consider multiple factors in assessing causation." Statistically significant data are not always available. For example, when an adverse event is subtle or rare, "an inability to obtain a data set of appropriate quality or quantity may preclude a finding of statistical significance." . . . A lack of statistically significant data does not mean that medical experts have no reliable basis for inferring a causal link between a drug and adverse events. As Matrixx itself concedes, medical experts rely on other evidence to establish an inference of causation. We note that courts frequently permit expert testimony on causation based on evidence other than statistical significance. We need not consider whether the expert testimony was properly admitted in those cases, and we do not attempt to define here what constitutes reliable evidence of causation. It suffices to note that, as these courts have recognized, "medical professionals and researchers do not limit the data they consider to the results of randomized clinical trials or to statistically significant evidence." . . . The FDA similarly does not limit the evidence it considers for purposes of assessing causation and taking regulatory action to statistically significant data. . . Not only does the FDA rely on a wide range of evidence of causation, it sometimes acts on the basis of evidence that suggests, but does not prove, causation" (citations omitted).).

[85]  See Proposal at 80,483.

[86]  See San Francisco Employees' Retirement System Letter at 2.

[87]  See Wellington Management Company LLP Letter at 1.

[88]  See Senator Dianne Feinstein Letter at 1; see also 2019 WSJ Study.

[89]  See Proposal at 80,474.

[90]  See State Street Global Advisors Letter at 2.

[91]  See New York City Office of the Comptroller Letter at 1.

[92]  See Pennsylvania State Treasurer Letter at 1.

Ms. Vanessa A. Countryman
U.S. Securities and Exchange Commission
February 26, 2021
Page 40

---

93  See Office of the Illinois State Treasurer Letter at 1, 2.

94  See Office of the Investor Advocate, U.S. Securities and Exchange Commission, Report on Activities, Fiscal Year 2020 (Dec. 29, 2020), available at: https://www.sec.gov/files/sec-investor-advocate-report-on-activities-2020.pdf. ("To make fully informed investment decisions, investors generally would benefit from greater insight into the diversity characteristics of a company's current board, as well as its policies designed to promote diversity in board composition going forward. Thus, to be listed on a national exchange, a company should be required to provide more fulsome disclosure regarding the composition of its board of directors, nominees for director positions, and executive officers . . . listing standards could help ensure that more companies make this information publicly available on a basis that enables investors to draw comparisons.").

95  See FactSet Research Systems Inc. Letter at 1; California State Teachers' Retirement Systems Letter at 1; Ohio Public Employees Retirement System Letter at 1; Ideanomics, Inc. Letter at 3; Soundboard Governance LLC Letter at 2; Ariel Investments, LLC Letter at 1; State of Rhode Island, Office of the General Treasurer Letter at 1; TIAA Letter at 3; CFA Institute Letter at 3; MFS Investment Management Letter at 2; The Forum for Sustainable and Responsible Investment Letter at 2; Lisa Fairfax E-mail at 5; United States Hispanic Chamber of Commerce Letter at 2; Stardust Letter at 2; Skadden Arps LLP Letter at 2; Women's Forum of New York Letter at 2; Akin Gump Strauss Hauer & Feld LLP Letter at 3; Latino Corporate Directors Association Letter at 6; BoardReady Letter at 1; Olshan Shareholder Activism Group Letter at 2; BMO Global Asset Management Letter at 1; Morningstar, Inc. and Sustainalytics Letter at 1; BetterInvesting (NAIC) Letter at 1; The Links, Incorporated Letter at 2; LGIM American Letter at 1; Corporate Counsel Women of Color Letter at 2; Microsoft Corporate Letter at 2; and Capital Stewardship, SEIU Letter at 2.

96  See LGIM America Letter at 1.

97  See Corporate Counsel Women of Color Letter at 2.

98  See Microsoft Corporation Letter at 2.

99  See U.S. Chamber of Commerce Letter at 1.

100  See Letter Type C at 1; see also Jo Brickman E-mail at 1 and Cynthia Overton Letter at 1.

101  See Proposal at 80,485.  see also Lisa Fairfax Letter at 6 ("The company-by-company engagement effort to determine whether and to what extent boards promote diversity on their board is similarly time consuming, expensive, inaccurate and ultimately inefficient. This effort also creates informational asymmetries, particularly for investors without the time or resources to effectively engage in this manner.").

102  See TIAA Letter at 2 ("Many investors are left to consult board data that has been "assessed" by third parties for commercial purposes rather than collected directly from company reporting, which raises concerns about accuracy, objectivity and consistency."); see also LGIM America Letter at 2 ("Specialty diversity data is expensive. Only the large investors can afford to pay for this information. . .Assessed data by data providers creates problems for companies because they lose control of the profile of directors of their companies as subjective assessments by data providers are made. If they disclosed through a standard matrix they would control the quality and accuracy of their data.").

103  See UAW Retiree Medical Benefits Trust Letter at 6.

104  See Proposal at 80,497.

105  See Senator Pat Toomey, et al. Letter at 1 ("It violates central principles of materiality that govern securities disclosures, and finally, it harms economic growth by imposing costs on public corporations and discouraging private corporations from going public. In so doing, NASDAQ fails to meet its burden to demonstrate that this proposed rule advances investor protection, fosters the public interest, or is otherwise consistent with the Securities Exchange Act of 1934 (Exchange Act).") and 4.

106  See Senator Pat Toomey, et al. Letter at 3 and Proposal at 80,474, 80,484.

107  See Proposal at 80,485.

Ms. Vanessa A. Countryman
U.S. Securities and Exchange Commission
February 26, 2021
Page 41

---

[108] See Proposal at 80,485.

[109] See Ballard Spahr LLP Letter dated February 5, 2021 at 17.

[110] See Ludke Consulting LLC and Smartjob, LLC Letter;  National Organization on Disability Letter; Publius Oeconomicis Letter; Ideanomics, Inc. Letter; James Morgan E-mail; Snowdon Beinn Ltd. Letter; NYC Mayor's Office for People with Disabilities Letter; Nicholas D. Lawson Letter; Hearing Access & Innovations, Inc. Letter; Deaf and Hard of Hearing Bar Association Letter; RespectAbility et al. E-mail; National Stuttering Association Letter; Congressman Brad Sherman Letter; Disability:IN/American Association of People with Disabilities Letter; and Senator Pat Toomey, et al. Letter.

[111] See Proposal at 80,493.

[112] See SEC C&DI 116.11 and 133.13. https://www.sec.gov/divisions/corpfin/guidance/regs-kinterp.htm#116-11

[113] See Proposal at 80,493.

[114] See Professor Lisa M. Fairfax E-mail at 8.

[115] See San Francisco Employees' Retirement System Letter at 2; Association of Asian American Investment Managers Letter at 2; Ariel Investments, LLC Letter at 2; Mercy Investment Services, Inc. Letter at 2; Miller/Howard Investments, Inc. Letter at 2; Professor Lisa M. Fairfax E-mail at 8; and Faye Sahai E-mail at 1.

[116] See Proposal at 80,493.

[117] See Snowdon Beinn Ltd. Letter at 1, 2, 3.

[118] See The Heritage Foundation Letter at 16, 20.

[119] See Proposal at 80,497.

[120] See Proposal at 80,497.

[121] See Proposal at 80,496.

[122] See Professor Lisa M. Fairfax E-mail at 9, 10.

[123] See Washington State Investment Board Letter at 1 ("We believe that teams with cognitive diversity and diversity of background can make better decisions, and one way to achieve this is to appoint directors representing a range of racial and ethnic backgrounds, as well as a material number of women").

[124] See Microsoft Corporation Letter at 1 ("Diversity in our leadership and our workforce matters. It provides an opportunity for everyone to learn from the breadth of experiences each of us have to create better outcomes for the customers we serve.").

[125] See BoardReady Letter at 1 ("In our experience on boards in the United States, The United Kingdom, and Canada, diverse boards exhibit a broader range of perspectives than homogeneous boards do, which can broaden a company's awareness of risk and revenue opportunities. In many industries, a diverse board is paramount to representing multiple stakeholder perspectives.").

[126] See Amendment No. 1 at 16-17.

[127] See Banneker Ventures and The Collective Letter at 1.

[128] See One Hundred Black Men, Inc. Letter at 1.

[129] See National Urban League Letter at 4, 5.

[130] See Fenwick & West LLP Letter at 2 and Ideanomics, Inc. Letter at 4.

[131] See Proposal at 5480,486.

[132] See LGIM America Letter;  San Francisco Employees' Retirement System Letter;  Wellington Management Company LLP Letter;  Women for Economic and Leadership Development Letter;  Office of the Illinois State Treasurer Letter;  Ariel Investments, LLC Letter; New York City Office of Comptroller Letter; Professor Lisa M.

Ms. Vanessa A. Countryman
U.S. Securities and Exchange Commission
February 26, 2021
Page 42

---

Fairfax E-mail; Faye Sahai E-mail; Morningstar, Inc. and Sustainalytics Letter; and California State Controller Letter.

[133]  See New York City Office of the Comptroller Letter at 2.

[134]  See Ideanomics, Inc. Letter at 4.

[135]  See Women for Economic and Leadership Development Letter at 1.

[136]  See One Hundred Black Men, Inc. Letter at 1.

[137]  See Ideanomics, Inc. Letter at 4.

[138]  See Rothwell Consulting LLC Letter at 2.

[139]  See Rothwell Consulting LLC Letter at 3.

[140]  See Ballard Spahr LLP Letter dated January 14, 2021 at 2.

[141]  See The Boston Club Letter at 2; Ropes & Gray LLP Letter at 2-4 and Annex A; Thirty Percent Coalition Letter at 2-4; and Trillium Asset Management Letter at 2.

[142]  See The Boston Club Letter at 2; Ropes & Gray LLP Letter at 2-4 and Annex A; Thirty Percent Coalition Letter at 2-4; and Trillium Asset Management Letter at 2.

[143]  See The Boston Club Letter at 2 and Thirty Percent Coalition Letter at 2.

[144]  See Skadden Arps LLP Letter at 3.

[145]  See Proposal at 80,502 (citing Commission Guidance on the Use of Company Websites, 73 FR 45,862, 45,864 (Aug. 7, 2008).

[146]  See Proposal at 80,502 (citing Commission Guidance on the Use of Company Websites, 73 FR 45,862, 45,867 (Aug. 7, 2008).

[147]  For example, foreign private issuers are not required to file proxy statements.  See 17 CFR § 240.3a12-3(b); see also Skadden Arps LLP Letter at 3 (noting that a foreign private issuer may not file a proxy or information statement).

[148]  See FactSet Research Systems Inc. Letter.

[149]  See Amendment No. 1, Exhibit 3 (proposed Instruction No. 7).

[150]  See Amendment No. 1, Proposed Rule 5606(b).

[151]  See LGIM America Letter; Ideanomics, Inc. Letter; San Francisco Employees' Retirement System Letter; Wellington Management Company LLP Letter; Office of the Illinois State Treasurer Letter; Ariel Investments, LLC Letter; AllianceBernstein L.P. Letter; New York City Office of the Comptroller Letter;  Brighthouse Financial, Inc. E-mail; Professor Lisa M. Fairfax E-mail; Olshan Shareholder Activism Group Letter; Morningstar, Inc. and Sustainalytics Letter; MFS Investment Management Letter; CFA Institute Letter; Skadden Arps LLP Letter; National Investor Relations Institute Letter; and 2U, Inc. Letter.

[152]  See Ideanomics, Inc. Letter at 3.

[153]  See Ideanomics, Inc. Letter at 3.

[154]  See The Boston Club Letter at 2; Ropes & Gray LLP Letter at 2-4 and Annex A; Skadden Arps LLP Letter at 3; Thirty Percent Coalition Letter at 2-4; New York City Office of the Comptroller Letter at 1; and Trillium Asset Management Letter at 2.

[155]  See Skadden Arps LLP Letter at 3.

[156]  See Skadden Arps LLP Letter at 3-4.

[157]  See New York City Office of the Comptroller Letter at 3.

[158]  See CFA Institute Letter at 6.

Ms. Vanessa A. Countryman
U.S. Securities and Exchange Commission
February 26, 2021
Page 43

---

[159]   See Ideanomics, Inc. Letter at 3.

[160]   See Amendment No. 1, Exhibit 3 (proposed Instruction No. 9).

[161]   See Proposal at 80,486.

[162]   See Amendment No. 1, Exhibit 3 (proposed Definitions).

[163]   See John Richter E-mail at 2 and Senator Pat Toomey, et al. Letter at 4 - 5.

[164]   See Senator Pat Toomey, et al. Letter at 4.

[165]   Id.

[166]   Id. at 5.

[167]   See Proposal at 80,473.

[168]   See PepsiCo 2020 Proxy Statement at 13, available at https://www.pepsico.com/docs/album/annual-reports/pepsico-inc-2020-proxy-statement.pdf?sfvrsn=b0543005_2 and Intel 2020 Proxy Statement at 24, available at https://s21.q4cdn.com/600692695/files/doc_financials/2019/Final-2020-Proxy-Statement.pdf.

[169]   See Brighthouse Financial, Inc. Email at 1, 2.

[170]   See Publius Oeconomicis Letter at 3.

[171]   See Publius Oeconomicis Letter at 3.

[172]   See Proposal at 80,472, 80474; 80482-83.  Nasdaq also discusses in its Amendment No. 1 that Blackrock recently published its annual proxy voting guidelines encouraging boards to disclose demographics related to board diversity, including, but not limited to, gender, ethnicity, race, age, and geographic location.  Nasdaq also notes in Amendment No. 1 that in August 2020, State Street Global Advisors reiterated their call for U.S. companies in State Street's portfolio to disclose board-level diversity characteristics, including the racial and ethnic makeup of directors.  See State Street Global Advisors Letter at 3.  Additionally, Amendment No. 1 notes that State Street Global Advisors' CEO, Cyrus Taraporevala, stated in his annual proxy voting agenda letter that starting in 2021, the company would commence voting against of the Chair of the Nominating & Governance Committee at companies in the S&P 500 and FTSE 100 that do not disclose the racial and ethnic composition of their boards.  See Amendment No. 1 at 56-57.

[173]   See Lord Abbett Letter; Stardust Letter; Trillium Asset Management Letter; Wellington Management Company LLP Letter; Principles for Responsible Investment E-mail; Soundboard Governance LLC Letter; Office of the Illinois State Treasurer Letter; San Francisco Employees' Retirement System Letter; TIAA Letter; UAW Retiree Medical Benefits Trust Letter; Ropes and Gray Letter; Washington State Investment Board Letter; LGIM America Letter; Brightcove, Inc. E-mail; Ohio Public Employees Retirement System Letter; Ariel Investments, LLC Letter; AllianceBernstein L.P. Letter; California Public Employees' Retirement System Letter; California State Teachers' Retirement System Letter; CtW Investment Group Letter; MFS Investment Management Letter; New York City Office of Comptroller Letter; 2U, Inc. Letter; FactSet Research Systems Inc. Letter; Ideanomics, Inc. Letter; Microsoft Corporation Letter; T. Rowe Price Group, Inc. Letter; Brighthouse Financial, Inc. E-mail; Capital Research and Management Company Letter; The Alliance for Board Diversity Letter; Goldman Sachs Group, Inc. Letter; Miller/Howard Investments, Inc. Letter; CFA Institute Letter; Professor Lisa M. Fairfax E-mail; Skadden Arps LLP Letter; Loring, Wolcott & Coolidge Letter; Akin Gump Strauss Hauer & Feld LLP Letter;  Amy Goodman and John Olson E-mail;  Thirty Percent Coalition Letter; Institutional Limited Partners Association Letter;  Int'l Corporate Governance Network Letter; AFL-CIO Letter; The Forum for Sustainable and Responsible Investment Letter; Senator Dianne Feinstein Letter; Olshan Shareholder Activism Group Letter;  BMO Global Asset Management Letter; Morningstar, Inc. and Systainalytics Letter; Latino Corporate Directors Association Letter; California State Controller Letter; L Catteron Management Company, LLC Letter; BetterInvesting (NAIC) Letter; National Investor Relations Institute Letter; and State of New York Office of the Comptroller Letter.

[174]   See T. Rowe Price Group, Inc. Letter at 2.

Ms. Vanessa A. Countryman
U.S. Securities and Exchange Commission
February 26, 2021
Page 44

---

[175] See LGIM America Letter; Ideanomics, Inc. Letter; San Francisco Employees' Retirement System Letter; Wellington Management Company LLP Letter; Office of the Illinois State Treasurer Letter; Ariel Investments, LLC Letter; AllianceBernstein L.P. Letter; New York City Office of the Comptroller Letter; Brighthouse Financial, Inc. E-mail; Professor Lisa M. Fairfax E-mail; Olshan Shareholder Activism Group Letter; Morningstar, Inc. and Sustainalytics Letter; MFS Investment Management Letter; CFA Institute Letter; Skadden Arps LLP Letter; National Investor Relations Institute Letter; and 2U, Inc. Letter.

[176] See San Francisco Employees' Retirement System Letter at 2; Stardust Letter at 2; and T. Rowe Price Group, Inc. Letter at 1.

[177] See San Francisco Employees' Retirement System Letter at 2.

[178] See Professor Lisa M. Fairfax E-mail at 5.

[179] See LGIM America Letter at 2.

[180] As one investor noted, typically, only large investors can afford to pay for this information when it is not freely published by a company. See LGIM America Letter at 2. Additionally, in the Proposal, Nasdaq noted the inconsistencies in the disclosures related to the board composition of companies. See Proposal at 80,473; 80,475; 80,483; 80,485; and 80,573.

[181] See Proposal at 80,475; 80,477; 80,486; 80,494; 80,495; and 80,500.

[182] See Judicial Watch, Inc. Letter at 2 & n.5 and Senator Pat Toomey, et al. Letter at 3. Two other commenters raised related concerns that are also addressed in this section. See Matthew Glen E-mail at 1 ("The proposed rule diverts funds from the efficient administration of the NASDAQ reducing the order and efficiency of markets the SEC was created to promote.") and Eugene F. Kelly E-mail at 1 (arguing that "the -082 proposal seeks to offer an unwise, deforming, and unlawful assistance -- disguised as a useful and laudatory service. The -082 proposal is not in the public interest.").

[183] See Senator Pat Toomey, et al. Letter at 3.

[184] See Eugene F. Kelly E-mail at 1.

[185] See Exchange Act Release No. 72669 (July 24, 2014), 79 FR 44234 (July 30, 2014) (SR-NASDAQ-2014-058) (footnote 39 and accompanying text: "We would expect Nasdaq, consistent with Section 19(b) of the Exchange Act, to periodically update the retail values of services offered should they change. This will help to provide transparency to listed companies on the value of the free services they receive and the actual costs associated with listing on Nasdaq.").

[186] See Securities Exchange Act Release No. 90571 (December 4, 2020), 89 FR 79556 (December 10, 2020).

[187] See https://www.nasdaq.com/solutions/nasdaq-governance-solutions.

[188] See https://www.nasdaq.com/solutions/boardvantage.

[189] See https://www.nasdaq.com/solutions/board-engagement.

[190] See Senator Pat Toomey, et al. Letter at 3.

[191] For clarity, Nasdaq filed both rule filings with the Commission on the same date, December 1, 2020. Nasdaq does not control the timing of the publication of its rule filings.

[192] See Amy Goodman and John Olson E-mail at 3; Stardust Letter at 2; LGIM America Letter at 3; Washington State Investment Board Letter at 1, 2; Soundboard Governance LLC Letter at 3; Int'l Corporate Governance Network Letter at 2; and WomenExecs on Boards E-mail at 1.

[193] See American Securities Association Letter at 1-2; Walter Donnellan Letter at 2; The Heritage Foundation Letter at 20; National Legal and Policy Center Letter at 7-8; Project on Fair Representation Presentation at 1; Edward J. Shoen Letter at 1; and Senator Pat Toomey, et al. Letter at 6.

[194] See Project on Fair Representation Presentation 4. See also American Securities Association Letter at 1-2.

Ms. Vanessa A. Countryman
U.S. Securities and Exchange Commission
February 26, 2021
Page 45

---

[195]  See The Heritage Foundation Letter at 20 ("Traditionally, corporate governance is a function of state law and private decision-making. The Nasdaq rule is one more large step towards the federalization of corporate governance."). See also Walter Donnellan Letter at 2 ("While diversity is a good goal, enforcing it goes down a road outside the realm of a stock exchange."); and National Legal and Policy Center Letter at 7 ("While there is a legitimate need for the federal government to regulate the financial markets to ensure their integrity, corporate governance is a matter of state law where the company is chartered.").

[196]  See 15 U.S.C. § 78f(b).

[197]  See 15 U.S.C.S. § 78f(b)(5).

[198]  See Amy Goodman and John Olson E-mail at 3 (arguing that "[t]he Proposal is consistent with the historical role of the stock exchanges in advancing the quality of corporate governance"); see also CFA Institute Letter at 4 ("We agree that the Proposal is consistent with the historical role of stock exchanges in furthering good corporate governance.").

[199]  See Order Approving Proposed Rule Changes, 68 Fed. Reg. 64,154, 64,175 (Nov. 12, 2003) (approving SR-NASD-2002-77, SR-NASD-2002-80, SR-NASD-2002-138, SR-NASD-2002-139, and SR-NASD-2002-141).

[200]  Exchanges have historically served as leaders in the field of corporate governance. For example, the Blue Ribbon Committee was established in September 1998 by the New York Stock Exchange and the NASD to make recommendations on strengthening the role of audit committees in overseeing the corporate financial reporting process and was comprised of members from the business, financial and accounting communities. See NYSE Chair Richard Grasso, NASD Chair Frank Zarb, and Blue Ribbon Panel Co-Chairs Ira Millstein and John Whitehead Announce "Ten Point Plan" to Improve Oversight of Financial Reporting Process, available at: https://www.sec.gov/news/press/pressarchive/1999/99-14.txt. The SEC noted that "in response to the recommendations of the Blue Ribbon Committee," "several exchanges and Nasdaq implemented rules to strengthen the effectiveness of their listed companies' audit committees." See also Order Approving Proposed Rule Changes, 68 Fed. Reg. 64,154, 64,175 (Nov. 12, 2003) (approving SR-NASD-2002-77, SR-NASD-2002-80, SR-NASD-2002-138, SR-NASD-2002-139, and SR-NASD-2002-141).

[201]  See Sarbanes- Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745, 745.

[202]  See Nasdaq Listing Rule 5606(e)(1).

[203]  On June 20, 2012, the Commission adopted Rule 10C-1, which implemented Section 10C of the Exchange Act, as added by Section 952 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010. Rule 10C-1 requires, among other things, each exchange to adopt rules providing that each member of the compensation committee of a listed issuer must be a member of the board of directors of the issuer, and must otherwise be independent. However, Nasdaq's rules had already "require[d] each member of a listed company's compensation committee to be an Independent Director as defined in Nasdaq Rule 5605(a)(2)." Securities Exchange Act Release No. 34-68640 (Jan. 11, 2013), 78 FR 4554, 4555 (Jan. 22, 2013). Indeed, Nasdaq first proposed this listing requirement on October 9, 2002. See Securities Exchange Act Release No. 34-47516 (Mar. 17, 2003), 68 FR 14451 (Mar. 25, 2003).

[204]  See Proposal at 80,477; see also Professor Lisa M. Fairfax E-mail at 3-4 ("[T]he SEC, Nasdaq, and other regulatory bodies have embraced corporate governance reforms despite . . . equivocal support. The most recent and visible example of this relates to director independence. There is a clear consensus that director independence is consistent with good corporate governance. However, the empirical evidence supporting the link between director independence and corporate or firm performance has been characterized as mixed or weak." (citations omitted)).

[205]  See Order Approving Proposed Rule Changes, 68 Fed. Reg. 64,154, 64,176 (Nov. 12, 2003) (approving SR-NASD-2002-77, SR-NASD-2002-80, SR-NASD-2002-138, SR-NASD-2002-139, and SR-NASD-2002-141).

[206]  See Proposal at 80,480.

[207]  See Proposal at 80,475-80,480.

Ms. Vanessa A. Countryman
U.S. Securities and Exchange Commission
February 26, 2021
Page 46

---

208  <u>See</u> Order Approving Proposed Rule Changes, 68 Fed. Reg. 64,154, 64,175 (Nov. 12, 2003) (approving SR-NASD-2002-77, SR-NASD-2002-80, SR-NASD-2002-138, SR-NASD-2002-139, and SR-NASD-2002-141).

209  <u>Id.</u> at 64,176.

210  In addition to the investor demand noted in the Proposal, 54 commenters submitted comment letters confirming that investors seek board diversity statistics that are widespread, consistent and/or transparent so that they can integrate diversity into their decision-making.

211  <u>See</u> Trillium Asset Management Letter at 2.  <u>See also</u> UAW Retiree Medical Benefits Trust Letter at 5 (noting that "Vanguard and State Street, two of the largest U.S. asset managers, have endorsed aggregate board diversity disclosure, including disclosure of racial and ethnic characteristics, as a minimum standard.  Recently, the Russell 3000 Board Diversity Disclosure Initiative sent letters signed by 21 investor organizations— including the Trust—representing over $3 trillion in assets under management, urging Russell 3000 companies to disclose the racial/ethnic and gender composition of their boards in their 2021 proxy statements." (citations omitted)).

212  <u>See</u> TIAA Letter at 2.

213  <u>See</u> Order Approving Proposed Rule Changes, 68 Fed. Reg. 64,154, 64,176 (Nov. 12, 2003) (approving SR-NASD-2002-77, SR-NASD-2002-80, SR-NASD-2002-138, SR-NASD-2002-139, and SR-NASD-2002-141).

214  <u>See</u> Proposal at 80,503.

215  <u>Id.</u> (citing 8 Del. Code § 216 (providing that a quorum at a shareholder's meeting shall consist of no less than 1/3 of the shares entitled to vote at such meeting)).

216  <u>See</u> Proposal at 80,503 (citing 8 Del. Code §§ 251, 271 (providing that shareholder approval by a majority of the outstanding voting shares entitled to vote is required for mergers and the sale of all or substantially all of a corporation's assets)).

217  <u>See</u> Proposal at 80,503 (citing Nasdaq Rulebook, Rules 5620(c) and 5635(a)).

218  In [re] Nasdaq Stock Market, 71 Fed. Reg. 3550, 3551 (Jan. 23, 2006).

219  <u>See</u> note 63, <u>supra</u>.

220  <u>See</u> Amy Goodman and John Olson E-mail at 1-2.

221  <u>See</u> Akin Gump Strauss Hauer & Feld LLP Letter at 2 ("[W]e believe that the proposal . . . will aid boards in the fulfillment of their fiduciary duties and will serve to benefit stockholders', as well as other stakeholders', interests."); BoardReady Letter at 1 ("In our experience on boards in the United States, The United Kingdom, and Canada, diverse boards exhibit a broader range of perspectives than homogeneous boards do, which can broaden a company's awareness of risk and revenue opportunities."); Goldman Sachs Group, Inc. Letter at 1 ("Diversity in the boardroom can also lead to an increased variety of unique perspectives, better decision-making and improved oversight."); and Brighthouse Financial, Inc. E-mail at 1 (according to the board of the company, "[w]e recognize that diversity of all kinds adds to the overall mix of perspectives of the Board as a whole, enriching our discussions and enhancing our decision-making. We believe that having a diverse Board has made us better able to effectively oversee the Company's management and its strategy to deliver long-term value for its stockholders.").

222  <u>See</u> Walter Donnellan Letter at 2; Guess & Co, Corporation Letter at 1-2; The Heritage Foundation Letter at 6; Paul Kraft E-mail at 1; and Senator Pat Toomey, et al. Letter at 3.

223  <u>See</u> Guess & Co, Corporation Letter at 1.  Relatedly, another commenter noted that "[t]he idea of a free market is that anyone can have a business and run it how they choose.  There is nothing stopping anyone regardless of sexual orientation, gender identity, or ethnic background from starting their own business and running it however they choose[.]"  <u>See also</u> Walter Donnellan Letter at 2.

224  <u>See</u> The Heritage Foundation Letter at 6.

Ms. Vanessa A. Countryman
U.S. Securities and Exchange Commission
February 26, 2021
Page 47

---

225  See Senator Pat Toomey, et al. Letter at 3.

226  See Proposal at 80,496 (citing [Commissioner Allison Herren Lee, Diversity Matters, Disclosure Works], and the SEC Can Do More: Remarks at the Council of Institutional Investors Fall 2020 Conference (September 22, 2020), available at: https://www.sec.gov/news/speech/lee-cii-2020-conference-20200922).

227  See Proposal at 80,496.

228  Proposal at 80,496 (citing Paul Hastings, *Breaking the Glass Ceiling: Women in the Boardroom* 139 (2018), available at: https://www.paulhastings.com/genderparity/; Deloitte, *Women in the Boardroom: A global perspective* (6th ed. 2019), available at: https://www2.deloitte.com/content/dam/Deloitte/global/Documents/Risk/gx-risk-women-in-theboardroom-sixth-edition.pdf); KPMG and ASX, *ASX Corporate Governance Council Principles and Recommendations on Diversity: Analysis of disclosures for financial years ended 1 January 2015 and 31 December 2015* 4 (2016) available at: https://www.asx.com.au/documents/asx-compliance/asx-corpgovernance-kpmg-diversity-report.pdf; The Conference Board of Canada, *Data Dashboard* (Sept. 23, 2020), available at: https://www.conferenceboard.ca/focus-areas/inclusion/2020/aob-comparisons-around-the-worldtable?AspxAutoDetectCookieSupport=1; Andrew MacDougall et al., Osler, Diversity Disclosure Practices 4 (2020), available at https://www.osler.com/osler/media/Osler/reports/corporategovernance/Diversity-and-Leadership-in-Corporate-Canada-2020.pdf).

229  Id. (citing Marianne Bertrand et al., *Breaking the Glass Ceiling? The Effect of Board Quotas on Female Labor Market Outcomes in Norway*, Nat'l Bureau of Econ. Rsch. Working Paper 20256 (June 2017), available at https://www.nber.org/papers/w20256; Statistics Norway, *Board and management in limited companies* (Mar. 6, 2020), https://www.ssb.no/en/styre (last accessed Nov. 27, 2020)).

230  Proposal at 80,485 (citing California Partners Project, *Claim Your Seat: A Progress Report on Women's Representation on California Corporate Boards* 4 (2020), available at: https://www.calpartnersproject.org/claimyourseat). See Cal. S.B. 826 (Sept. 30, 2018) and Cal. A.B. 979 (Sept. 30, 2020).

231  See California Insurance Commissioner Letter at 2 (noting that "of the 511 newly appointed public board seats subject to this recently chaptered measure [in California], white women account for 77.9%, followed by Asian women at 11.5%, African American women at 5.3%, and Latina at 3.3%"; see also Buck Gee E-mail at 1; California Partners Project Letter at 2-3; California Legislative Women's Caucus Letter at 1; 58th District of California Letter at 1; and 41st District of California Letter at 1.

232  See Proposal at 80,480.

233  See BoardReady Letter at 1 (citations omitted).

234  See CtW Investment Group Letter at 1-2 ("According to a 2020 report published by The Conference Board and ESG data analytics firm ESGAUGE, over 13 percent of companies in the Russell 3000 had no female directors on their boards. According to their analysis, only 10 percent of S&P 500 companies disclosed director ethnicity and of those 8 out of 10 directors were white.") (citation omitted); Professor Lisa M. Fairfax E-mail at 6 ("Only 19% of directors at the 200 largest S&P 500 companies are people of color. One 2019 study found that 37% of S&P 500 boards did not have any Black directors. Recent studies have referred to board diversity improvements with respect to racial and ethnicity as 'disappointing,' noting that 'little progress' has been made with respect to racial and ethnic diversity on large boards.") (citations omitted); and Parity.org Letter at 2 ("Can companies do this without interventions like those Nasdaq has proposed? Perhaps, but getting there has been excruciatingly slow. The World Economic Forum has predicted that it will take 257 years for women to reach economic gender parity in the world, and 151 years before the United States achieves gender parity. When we began Parity.org three years ago, the prediction was a 'mere' 160 years for global equality—we are going backwards. If progress is measured by how quickly women and people of color are represented on the S&P, without impetus like the proposed, the results have been appallingly low numbers.").

235  See California State Senate Letter at 1.

Ms. Vanessa A. Countryman
U.S. Securities and Exchange Commission
February 26, 2021
Page 48

---

236  <u>See</u> Proposal at 80,474.

237  <u>See</u> Colin Gallagher E-mail at 1; The Heritage Foundation Letter at 15-16; Paul Kraft E-mail at 1; Judicial Watch, Inc. Letter at 5; Eugene F. Kelly E-mail at 2; John Richter E-mail at 3; Edward J. Shoen Letter at 2; and Senator Pat Toomey, et al. Letter at 2.

238  <u>See</u> Judicial Watch, Inc. Letter at 5.

239  <u>See</u> The Heritage Foundation Letter at 16.

240  <u>See</u> Senator Pat Toomey, et al. Letter at 2.

241  To the extent these commenters also intended to challenge the Proposal on legal grounds, Nasdaq's response is addressed separately in the letter filed by Ballard Spahr LLP with the Commission on January 29, 2021.

242  <u>See</u> Ariel Investments, LLC Letter at 1; Professor Lisa M. Fairfax E-mail at 12-13; Parity.org Letter at 3; Latino Corporate Directors Association Letter at 3-4; The Alliance for Board Diversity Letter at 2; Ascend Pinnacle Letter at 1; Amy Goodman and John Olson E-mail at 2-3; Buck Gee E-mail at 1; and Olshan Shareholder Activism Group Letter at 3.

243  <u>See</u> Ariel Investments, LLC Letter at 1.

244  <u>See</u> Olshan Shareholder Activism Group Letter at 3.

245  <u>See</u> Proposal at 80,496.

246  <u>See</u> Professor Lisa M. Fairfax E-mail at 12 (citing Deloitte, *2017 Board Survey: Seeing is Believing*, 10, available at: https://www2.deloitte.com/content/dam/Deloitte/us/Documents/aboutdeloitte/us-about-board-diversity-survey-seeing-is-believing.pdf).

247  Id.

248  <u>See</u> note 48, <u>supra</u>.

249  <u>See</u> Ideanomics, Inc. Letter at 3; Ariel Investments, LLC Letter at 2; AllianceBernstein L.P. Letter at 1; MFS Investment Management Letter at 2; Brighthouse Financial, Inc. E-mail at 1-2; LGIM America Letter at 2; CFA Institute Letter at 5; Professor Lisa M. Fairfax E-mail at 8; Skadden Arps LLP Letter at 3; Olshan Shareholder Activism Group Letter at 4; and National Investor Relations Institute Letter at 3.

250  <u>See</u> International Bancshares Corporation Letter at 5; John Reddy Letter at 1; and John Richter Letter at 2.

251  <u>See</u> International Bancshares Corporation Letter at 5.

252  <u>See</u> John Reddy Letter at 1.

253  <u>See</u> John Richter Letter at 2.

254  <u>See</u> LGIM America Letter at 2.

255  <u>See</u> Ideanomics, Inc. Letter at 3 ("We appreciate that Nasdaq has structured its board matrix to allow directors to anonymously identify with diverse attributes or opt out of disclosing anything at all.  We believe this is a thoughtful way to respect each director's personal decision to identify as diverse."); <u>see also</u> AllianceBernstein L.P. Letter at 2 (noting support for the Proposal, in part, because the Board Diversity Matrix "includes an option for directors to not disclose their gender, LGBTQ+ and/or ethnic identity").

256  <u>See</u> note 249, <u>supra</u>.

257  <u>See</u> Ballard Spahr LLP Letter dated January 14, 2021 at 1.

258  <u>See</u> Senator Toomey, et al. Letter at 3.

259  <u>See</u> Professor Lisa M. Fairfax E-mail at 11 ("To the extent there is concern that compliance with Nasdaq's rule will require boards to displace existing directors, research negates that concern. This is because, as indicated above, companies increase diversity either by expanding their board, or by filling seats that are left vacant due to turnover. Research reveals that since 2012, boards primarily add seats to accommodate diversity rather

Ms. Vanessa A. Countryman
U.S. Securities and Exchange Commission
February 26, 2021
Page 49

than waiting for men to step down." (citing 2020 Women on Boards: Gender Diversity Index, 5, available at: https://2020wob.com/wp-content/uploads/2020/10/2020-GDIFINAL.pdf)).

[260] See Akin Gump Strauss Hauer & Feld LLP Letter at 5 ("We believe that the Nasdaq Diversity Rule – which includes a one-year phase-in approach – is neither burdensome to comply with or adopt and provides sufficient flexibility. Notably, the proposed rule is not quota based, and it provides a board with the option to simply expand its size so as to add new members and not replace existing directors. Further, the proposal provides Nasdaq-listed companies with the option of explaining why a minimum of two diverse directors is not achievable, recommended or necessary in lieu of adding new (or replacing existing) directors. Accordingly, should the SEC approve the Nasdaq Diversity Proposal, we do not believe boards of directors of Nasdaq-list companies will be confronted with any undue hardship, other than the ordinary course onboarding hurdles and/or drafting of requisite disclosure.").

[261] See Senator Pat Toomey, et al. Letter at 1, 4-5.

[262] See Washington State Investment Board Letter at 2.

[263] See Institutional Limited Partners Association Letter at 2.

[264] See Amendment No. 1, Rule 5605(f)(5).

[265] See Akin Gump Strauss Hauer & Feld LLP Letter at 3-4.

**Appendix 1: Supportive Comments**

| | Enhances Corporate Governance | Pragmatic, Business-Driven Approach | Advances Board Diversity | Facilitates Transparency | Reflects Core Values | Enhances Corporate Performance | Facilitates Decision Making | Promotes Investor Confidence | Generally Supportive |
|---|---|---|---|---|---|---|---|---|---|
| 2U, Inc. Letter | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | ✓ |
| 41st District of California Letter | ✓ | | | | ✓ | | | | ✓ |
| 58th District of California Letter | ✓ | | | | ✓ | | | | ✓ |
| AFL-CIO Letter | ✓ | | ✓ | ✓ | | | ✓ | | ✓ |
| Akin Gump Strauss Hauer & Feld LLP Letter | ✓ | ✓ | | | ✓ | | ✓ | | ✓ |
| AllianceBernstein L.P. Letter | | ✓ | | ✓ | | | ✓ | ✓ | ✓ |
| American Civil Liberties Union Letter | ✓ | | | | ✓ | | | | ✓ |
| Amy Goodman and John Olson E-mail | ✓ | ✓ | | | | | ✓ | | ✓ |
| Amy Hepburn E-mail | | | | | | | | | ✓ |
| Apax Partners Letter | ✓ | ✓ | ✓ | | ✓ | ✓ | | | ✓ |
| Ariel Investments, LLC Letter | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | ✓ |
| Ascend Pinnacle Letter | | | ✓ | | | | | | ✓ |
| Association of Asian American Investment Managers Letter | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | ✓ | ✓ |
| Banneker Ventures and The Collective Letter | ✓ | | | | | | | | ✓ |
| Bay Area Asian American General Counsel Letter | ✓ | | | ✓ | ✓ | ✓ | | | ✓ |
| BetterInvesting Letter | | | ✓ | ✓ | | ✓ | ✓ | | ✓ |
| Biotechnology Innovation Organization Letter | ✓ | | | ✓ | | ✓ | | | ✓ |
| BMO Global Asset Management Letter | ✓ | ✓ | | ✓ | ✓ | ✓ | ✓ | | ✓ |
| BoardReady Letter | | ✓ | | ✓ | | ✓ | | | ✓ |
| Brandi Nicole Johnson E-mail | | | ✓ | | | ✓ | | | ✓ |
| Brightcove, Inc. E-mail | ✓ | ✓ | ✓ | | | | ✓ | ✓ | ✓ |
| Brighthouse Financial, Inc. E-mail | ✓ | | ✓ | ✓ | ✓ | | ✓ | | ✓ |

## Appendix 1: Supportive Comments

| | Enhances Corporate Governance | Pragmatic, Business-Driven Approach | Advances Board Diversity | Facilitates Transparency | Reflects Core Values | Enhances Corporate Performance | Facilitates Decision Making | Promotes Investor Confidence | Generally Supportive |
|---|---|---|---|---|---|---|---|---|---|
| Buck Gee E-mail | | ✓ | | | | | | | ✓ |
| California Insurance Commissioner Letter | | | ✓ | | ✓ | | | | ✓ |
| California Legislative Black Caucus Letter | | | | | ✓ | ✓ | | | ✓ |
| California Legislative LGBTQ Caucus Letter | | | ✓ | | ✓ | | | | ✓ |
| California Legislative Women's Caucus Letter | ✓ | | | | ✓ | | | | ✓ |
| California Partners Project Letter | ✓ | | | ✓ | | ✓ | | | ✓ |
| California Public Employees' Retirement System Letter | | | | ✓ | ✓ | ✓ | ✓ | | ✓ |
| California State Controller Letter | ✓ | ✓ | ✓ | ✓ | | ✓ | ✓ | | ✓ |
| California State Senate Letter | ✓ | | ✓ | | ✓ | | | ✓ | ✓ |
| California State Teachers' Retirement System Letter | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | ✓ |
| California State Treasurer Letter | ✓ | ✓ | ✓ | | | | | ✓ | ✓ |
| Capital Research and Management Company Letter | ✓ | ✓ | | ✓ | | ✓ | ✓ | | ✓ |
| Capital Stewardship, SEIU Letter | ✓ | | ✓ | ✓ | | ✓ | | | ✓ |
| Catalyst Letter | | | | | | ✓ | | | ✓ |
| CFA Institute Letter | | | ✓ | ✓ | | | ✓ | | ✓ |
| Committee of 100 Letter | ✓ | | | | | | | ✓ | ✓ |
| Congressman Brad Sherman Letter | | | | | | | | | ✓ |
| Congresswoman Carolyn Maloney and Congressman Gregory Meeks Letter | | | | ✓ | | ✓ | ✓ | | ✓ |
| Corporate Counsel Women of Color Letter | | | | ✓ | | ✓ | | | ✓ |
| Council of Korean Americans Letter | ✓ | | ✓ | | ✓ | | | ✓ | ✓ |

**Appendix 1: Supportive Comments**

| | Enhances Corporate Governance | Pragmatic, Business-Driven Approach | Advances Board Diversity | Facilitates Transparency | Reflects Core Values | Enhances Corporate Performance | Facilitates Decision Making | Promotes Investor Confidence | Generally Supportive |
|---|---|---|---|---|---|---|---|---|---|
| CtW Investment Group Letter | ✓ | | | ✓ | ✓ | ✓ | ✓ | | ✓ |
| Cynthia Overton Letter | | | ✓ | | | ✓ | | | ✓ |
| Deaf and Hard of Hearing Bar Association Letter | | | | | | | | | ✓ |
| Disability:IN/ American Association of People with Disabilities Letter | | | | | | | | | ✓ |
| Elicia Banks-Gabriel E-mail | | | | | | | | | ✓ |
| Equality California Letter | ✓ | | ✓ | | | | | | ✓ |
| Facebook, Inc. Letter | ✓ | | | | ✓ | | | | ✓ |
| FactSet Research Systems Inc. Letter | | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Fairpointe Capital Letter | ✓ | | | | ✓ | | | ✓ | ✓ |
| Faye Sahai E-mail | ✓ | ✓ | ✓ | ✓ | ✓ | | | ✓ | ✓ |
| FCLTGlobal Letter | | | | ✓ | | ✓ | | | ✓ |
| Fenwick & West LLP Letter | | | | | | | | | ✓ |
| Generation Investment Management, LLP Letter | | ✓ | | | | ✓ | | | ✓ |
| Goldman Sachs Group, Inc. Letter | ✓ | | | | ✓ | ✓ | ✓ | | ✓ |
| Greater Sacramento Urban League Letter | ✓ | | | | ✓ | ✓ | | | ✓ |
| Hearing Access & Innovations, Inc. Letter | | | | | | | | | ✓ |
| Henry Schein, Inc. Letter | ✓ | | | | ✓ | ✓ | | | ✓ |
| Ideanomics, Inc. Letter | ✓ | ✓ | | ✓ | ✓ | | ✓ | | ✓ |
| Institutional Limited Partners Association Letter | ✓ | | | ✓ | ✓ | ✓ | ✓ | | ✓ |
| Int'l Corporate Governance Network Letter | ✓ | ✓ | | | ✓ | | ✓ | | ✓ |
| James Morgan E-mail | | | | | | | | | ✓ |

**Appendix 1: Supportive Comments**

| | Enhances Corporate Governance | Pragmatic, Business-Driven Approach | Advances Board Diversity | Facilitates Transparency | Reflects Core Values | Enhances Corporate Performance | Facilitates Decision Making | Promotes Investor Confidence | Generally Supportive |
|---|---|---|---|---|---|---|---|---|---|
| Jo Brickman E-mail | | | ✓ | | | ✓ | | | ✓ |
| Katerli bounds E-mail | | | ✓ | | | | | | ✓ |
| *L* Catterton Management Company, LLC Letter | ✓ | | | ✓ | ✓ | ✓ | ✓ | | ✓ |
| Latino Corporate Directors Association Letter | ✓ | | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Laura Gluhanich E-mail | | | ✓ | | | | | | ✓ |
| Letter Type B | | | ✓ | ✓ | | | | | ✓ |
| Letter Type C | | | ✓ | ✓ | | ✓ | | | ✓ |
| LGIM America Letter | ✓ | ✓ | | ✓ | ✓ | ✓ | ✓ | | ✓ |
| Lord Abbett Letter | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Loring, Wolcott & Coolidge Letter | ✓ | | | | | | ✓ | | ✓ |
| Ludke Consulting, LLC and Smartjob, LLC Letter | | | | | | | | | ✓ |
| Mercy Investment Services, Inc. Letter | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | ✓ | ✓ |
| Metro NY Chapter, National Black MBA Association Letter | ✓ | | | | ✓ | ✓ | | | ✓ |
| MFS Investment Management Letter | ✓ | ✓ | | ✓ | ✓ | ✓ | ✓ | | ✓ |
| Microsoft Corporation Letter | ✓ | ✓ | | | ✓ | ✓ | ✓ | ✓ | ✓ |
| Miller/Howard Investments, Inc. Letter | ✓ | ✓ | ✓ | ✓ | | ✓ | ✓ | ✓ | ✓ |
| Minority Corporate Counsel Association Letter | | | ✓ | | ✓ | | | | ✓ |
| Morningstar, Inc. and Sustainalytics Letter | ✓ | | | ✓ | | | ✓ | | ✓ |
| National Asian Pacific American Bar Association Letter | ✓ | | | ✓ | ✓ | | | ✓ | ✓ |

**Appendix 1: Supportive Comments**

| | Enhances Corporate Governance | Pragmatic, Business-Driven Approach | Advances Board Diversity | Facilitates Transparency | Reflects Core Values | Enhances Corporate Performance | Facilitates Decision Making | Promotes Investor Confidence | Generally Supportive |
|---|---|---|---|---|---|---|---|---|---|
| National Association of Securities Professionals Letter | ✓ | | | ✓ | ✓ | ✓ | | | ✓ |
| National Investor Relations Institute Letter | ✓ | ✓ | | | | | ✓ | | ✓ |
| National Organization on Disability Letter | | | | | | | | | ✓ |
| National Stuttering Association Letter | | | | | | | | | ✓ |
| National Urban League Letter | | | | | | | | | ✓ |
| New York City Office of the Comptroller Letter | | ✓ | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Nicholas D. Lawson Letter | | | | | | | | | ✓ |
| NYC Mayor's Office for People with Disabilities Letter | | | | | | | | | ✓ |
| Office of the Illinois State Treasurer Letter | ✓ | | | ✓ | | | ✓ | ✓ | ✓ |
| Ohio Public Employees Retirement System Letter | ✓ | ✓ | | | | ✓ | ✓ | ✓ | ✓ |
| Olshan Shareholder Activism Group Letter | ✓ | ✓ | | ✓ | | ✓ | ✓ | ✓ | ✓ |
| One Hundred Black Men, Inc. Letter | | | | | ✓ | | | | ✓ |
| Paolo Gaudiano E-mail | | | | | ✓ | ✓ | | | ✓ |
| Parity.org Letter | | ✓ | | | ✓ | ✓ | | | ✓ |
| Pennsylvania State Treasurer Letter | ✓ | ✓ | ✓ | | | | | | ✓ |
| Principles for Responsible Investment E-mail | | | | ✓ | | | ✓ | | ✓ |
| Professor Julie Park E-mail | | | | | | | | | ✓ |
| Professor Lisa M. Fairfax E-mail | ✓ | ✓ | ✓ | ✓ | | ✓ | ✓ | ✓ | ✓ |

## Appendix 1: Supportive Comments

| | Enhances Corporate Governance | Pragmatic, Business-Driven Approach | Advances Board Diversity | Facilitates Transparency | Reflects Core Values | Enhances Corporate Performance | Facilitates Decision Making | Promotes Investor Confidence | Generally Supportive |
|---|---|---|---|---|---|---|---|---|---|
| Professor Margaret M. Chin E-mail | | ✓ | | | | | | | ✓ |
| Professor Morgan Flake E-mail | | ✓ | | | | | | | ✓ |
| RespectAbility et al. E-mail | ✓ | | | | | | | | ✓ |
| Robin Hood Letter | | | | ✓ | ✓ | ✓ | | | ✓ |
| Ropes and Gray LLP Letter | | | | ✓ | | | ✓ | | ✓ |
| Rothwell Consulting LLC Letter | | | | | ✓ | | | | ✓ |
| San Francisco Employees' Retirement System Letter | ✓ | ✓ | | ✓ | | | ✓ | ✓ | ✓ |
| Senator Dianne Feinstein Letter | | | | | | ✓ | ✓ | | ✓ |
| Senator Catherine Cortez Masto, et al. Letter | ✓ | | ✓ | | | ✓ | | | ✓ |
| Skadden Arps LLP Letter | | ✓ | | | ✓ | | ✓ | | ✓ |
| Snowdon Beinn Ltd. Letter | | | | | ✓ | | | | ✓ |
| Soundboard Governance LLC Letter | ✓ | ✓ | | | | | ✓ | ✓ | ✓ |
| Stardust Letter | ✓ | ✓ | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| State of New York Office of the State Comptroller Letter | ✓ | ✓ | ✓ | ✓ | | ✓ | ✓ | | ✓ |
| State of Rhode Island, Office of the General Treasurer Letter | | | | | | ✓ | | | ✓ |
| State Street Global Advisors Letter | ✓ | | | ✓ | | ✓ | | | ✓ |
| Suzanne Wertheim E-mail | | | ✓ | | | | | | ✓ |
| T. Rowe Price Group, Inc. Letter | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | ✓ |
| The Alliance for Board Diversity Letter | | | | ✓ | ✓ | | ✓ | | ✓ |
| The Boston Club Letter | ✓ | | | ✓ | ✓ | ✓ | | | ✓ |

**Appendix 1: Supportive Comments**

| | Enhances Corporate Governance | Pragmatic, Business-Driven Approach | Advances Board Diversity | Facilitates Transparency | Reflects Core Values | Enhances Corporate Performance | Facilitates Decision Making | Promotes Investor Confidence | Generally Supportive |
|---|---|---|---|---|---|---|---|---|---|
| The Forum for Sustainable and Responsible Investment Letter | ✓ | | ✓ | ✓ | | ✓ | ✓ | | ✓ |
| The Forum of Executive Women Letter | ✓ | | ✓ | | ✓ | ✓ | | | ✓ |
| The Harkin Institute for Public Policy Citizen Engagement E-mail | | | | | | | | | ✓ |
| The Investment Diversity Exchange Letter | ✓ | | ✓ | | ✓ | | | ✓ | ✓ |
| The Links, Incorporated Letter | ✓ | | ✓ | ✓ | ✓ | ✓ | | ✓ | ✓ |
| Thirty Percent Coalition Letter | ✓ | | | ✓ | ✓ | | ✓ | | ✓ |
| TIAA Letter | ✓ | | | ✓ | ✓ | ✓ | ✓ | | ✓ |
| Trillium Asset Management Letter | ✓ | | | ✓ | ✓ | | ✓ | | ✓ |
| U.S. Chamber of Commerce Letter | ✓ | | | | ✓ | ✓ | | | ✓ |
| UAW Retiree Medical Benefits Trust Letter | ✓ | ✓ | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| United States Hispanic Chamber of Commerce Letter | ✓ | | | ✓ | | ✓ | | | ✓ |
| Washington State Investment Board Letter | ✓ | ✓ | | ✓ | ✓ | ✓ | ✓ | | ✓ |
| Wellington Management Company LLP Letter | ✓ | | | ✓ | ✓ | ✓ | ✓ | | ✓ |
| Women Business Collaborative Letter | ✓ | | ✓ | | ✓ | ✓ | | ✓ | ✓ |
| Women for Economic and Leadership Development Letter | ✓ | ✓ | ✓ | ✓ | ✓ | | | ✓ | ✓ |
| WomenExecs on Boards E-mail | ✓ | ✓ | | ✓ | | ✓ | | | ✓ |
| Women's Forum of New York Letter | ✓ | | | ✓ | ✓ | | | ✓ | ✓ |
| Working Mother Media Letter | | | | ✓ | ✓ | | | | ✓ |

**Appendix 1: Supportive Comments**

| | Enhances Corporate Governance | Pragmatic, Business-Driven Approach | Advances Board Diversity | Facilitates Transparency | Reflects Core Values | Enhances Corporate Performance | Facilitates Decision Making | Promotes Investor Confidence | Generally Supportive |
|---|---|---|---|---|---|---|---|---|---|
| WW International, Inc. Letter | | | | | | ✓ | | | ✓ |
| YWCA Metropolitan Chicago Letter | ✓ | ✓ | | | | | | ✓ | ✓ |

**TAB 12:**

Nasdaq, Notice of Filing of Amendment No. 1 (attached to Nasdaq Letter II), File No. SR-NASDAQ-2020-081 (Feb. 26, 2021)

OMB APPROVAL

OMB Number:      3235-0045
Estimated average burden
hours per response............38

*Required fields are shown with yellow backgrounds and asterisks.*

Page 1 of * 354

**SECURITIES AND EXCHANGE COMMISSION**
WASHINGTON, D.C.  20549
Form 19b-4

File No.* SR - 2020 - * 081

Amendment No. (req. for Amendments *) 1

Filing by   The Nasdaq Stock Market LLC

Pursuant to Rule 19b-4 under the Securities Exchange Act of 1934

| Initial * | Amendment * ☑ | Withdrawal | Section 19(b)(2) * ☑ | Section 19(b)(3)(A) * | Section 19(b)(3)(B) * |
|---|---|---|---|---|---|

| Pilot | Extension of Time Period for Commission Action * | Date Expires * | | | |
|---|---|---|---|---|---|

Rule

19b-4(f)(1)     19b-4(f)(4)
19b-4(f)(2)     19b-4(f)(5)
19b-4(f)(3)     19b-4(f)(6)

Notice of proposed change pursuant to the Payment, Clearing, and Settlement Act of 2010

Section 806(e)(1) *          Section 806(e)(2) *

Security-Based Swap Submission pursuant to the Securities Exchange Act of 1934

Section 3C(b)(2) *

Exhibit 2 Sent As Paper Document          Exhibit 3 Sent As Paper Document

**Description**

Provide a brief description of the action (limit 250 characters, required when Initial is checked *).

**Contact Information**

Provide the name, telephone number, and e-mail address of the person on the staff of the self-regulatory organization prepared to respond to questions and comments on the action.

First Name * Jeffrey S.                  Last Name * Davis

Title *   Senior Vice President, Senior Deputy General Counsel

E-mail *  jeffrey.davis@nasdaq.com

Telephone * (301) 978-8484      Fax

**Signature**

Pursuant to the requirements of the Securities Exchange Act of 1934,

has duly caused this filing to be signed on its behalf by the undersigned thereunto duly authorized.

Date  02/26/2021

By    John Zecca

(Name *)

(Title *)

EVP and Chief Legal Counsel

NOTE: Clicking the button at right will digitally sign and lock this form.  A digital signature is as legally binding as a physical signature, and once signed, this form cannot be changed.

Digitally Sign and Lock Form

*Required fields are shown with yellow backgrounds and asterisks.*

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C.  20549

For complete Form 19b-4 instructions please refer to the EFFS website.

| | |
|---|---|
| **Form 19b-4 Information ***<br><br>Add   Remove   View | The self-regulatory organization must provide all required information, presented in a clear and comprehensible manner, to enable the public to provide meaningful comment on the proposal and for the Commission to determine whether the proposal is consistent with the Act and applicable rules and regulations under the Act. |
| **Exhibit 1 - Notice of Proposed Rule Change ***<br><br>Add   Remove   View | The Notice section of this Form 19b-4 must comply with the guidelines for publication in the Federal Register as well as any requirements for electronic filing as published by the Commission (if applicable).  The Office of the Federal Register (OFR) offers guidance on Federal Register publication requirements in the Federal Register Document Drafting Handbook, October 1998 Revision.  For example, all references to the federal securities laws must include the corresponding cite to the United States Code in a footnote.  All references to SEC rules must include the corresponding cite to the Code of Federal Regulations in a footnote.  All references to Securities Exchange Act Releases must include the release number, release date, Federal Register cite, and corresponding file number (e.g., SR-[SRO]-xx-xx).  A material failure to comply with these guidelines will result in the proposed rule change being deemed not properly filed.  See also Rule 0-3 under the Act (17 CFR 240.0-3) |
| **Exhibit 1A- Notice of Proposed Rule Change, Security-Based Swap Submission, or Advance Notice by Clearing Agencies ***<br><br>Add   Remove   View | The Notice section of this Form 19b-4 must comply with the guidelines for publication in the Federal Register as well as any requirements for electronic filing as published by the Commission (if applicable).  The Office of the Federal Register (OFR) offers guidance on Federal Register publication requirements in the Federal Register Document Drafting Handbook, October 1998 Revision. For example, all references to the federal securities laws must include the corresponding cite to the United States Code in a footnote.  All references to SEC rules must include the corresponding cite to the Code of Federal Regulations in a footnote.  All references to Securities Exchange Act Releases must include the release number, release date, Federal Register cite, Federal Register date, and corresponding file number (e.g., SR-[SRO]-xx-xx). A material failure to comply with these guidelines will result in the proposed rule change, security-based swap submission, or advance notice being deemed not properly filed.  See also Rule 0-3 under the Act (17 CFR 240.0-3) |
| **Exhibit 2 - Notices, Written Comments, Transcripts, Other Communications**<br><br>Add   Remove   View<br><br>Exhibit Sent As Paper Document<br>☐ | Copies of notices, written comments, transcripts, other communications.  If such documents cannot be filed electronically in accordance with Instruction F, they shall be filed in accordance with Instruction G. |
| **Exhibit 3 - Form, Report, or Questionnaire**<br><br>Add   Remove   View<br><br>Exhibit Sent As Paper Document<br>☐ | Copies of any form, report, or questionnaire that the self-regulatory organization proposes to use to help implement or operate the proposed rule change, or that is referred to by the proposed rule change. |
| **Exhibit 4 - Marked Copies**<br><br>Add   Remove   View | The full text shall be marked, in any convenient manner, to indicate additions to and deletions from the immediately preceding filing.  The purpose of Exhibit 4 is to permit the staff to identify immediately the changes made from the text of the rule with which it has been working. |
| **Exhibit 5 - Proposed Rule Text**<br><br>Add   Remove   View | The self-regulatory organization may choose to attach as Exhibit 5 proposed changes to rule text in place of providing it in Item I and which may otherwise be more easily readable if provided separately from Form 19b-4.  Exhibit 5 shall be considered part of the proposed rule change. |
| **Partial Amendment**<br><br>Add   Remove   View | If the self-regulatory organization is amending only part of the text of a lengthy proposed rule change, it may, with the Commission's permission, file only those portions of the text of the proposed rule change in which changes are being made if the filing (i.e. partial amendment) is clearly understandable on its face.  Such partial amendment shall be clearly identified and marked to show deletions and additions. |

1. <u>Text of the Proposed Rule Change</u>

(a) The Nasdaq Stock Market LLC ("Nasdaq" or "Exchange"), pursuant to Section 19(b)(1) of the Securities Exchange Act of 1934, as amended ("Act"),[1] and Rule 19b-4 thereunder,[2] is filing with the Securities and Exchange Commission ("SEC" or "Commission") a proposal to adopt listing rules related to board diversity, as described in more detail below:

(i) to adopt Rule 5605(f) (Diverse Board Representation), which would require each Nasdaq-listed company, subject to certain exceptions, (A) to have, or explain why it does not have, at least one director who self-identifies as a female, and (B) to have, or explain why it does not have, at least one director who self-identifies as Black or African American, Hispanic or Latinx, Asian, Native American or Alaska Native, Native Hawaiian or Pacific Islander, two or more races or ethnicities, or as LGBTQ+;

(ii) to adopt Rule 5606 (Board Diversity Disclosure), which would require each Nasdaq-listed company, subject to certain exceptions, to provide statistical information in a proposed uniform format on the company's board of directors related to a director's self-identified gender, race, and self-identification as LGBTQ+; and

(iii) to update Rule 5615 and IM-5615-3 (Foreign Private Issuers) and Rule 5810(c) (Types of Deficiencies and Notifications) to incorporate references to proposed Rule 5605(f) and proposed Rule 5606; and

(iv) to make certain other non-substantive conforming changes.

This Amendment No. 1 amends and supersedes the original filing in its entirety.

---

[1]    15 U.S.C. § 78s(b)(1).

[2]    17 C.F.R. § 240.19b-4.

A notice of the proposed rule change for publication in the <u>Federal Register</u> is attached as <u>Exhibit 1</u>.  A proposed Board Diversity Matrix form is attached as <u>Exhibit 3</u> and the amended rule text indicating additions to or deletions from the preceding filing is attached as <u>Exhibit 4</u>.  The text of the proposed rule change is attached as <u>Exhibit 5</u>.

(b)  Not applicable.

(c)  Not applicable.

2.  <u>Procedures of the Self-Regulatory Organization</u>

The proposed rule change was approved by the Board of Directors of the Exchange on November 5, 2020.  No other action is necessary for the filing of the rule change.

Questions and comments on the proposed rule change may be directed to:

Jeffrey S. Davis
Senior Vice President, Senior Deputy General Counsel
Nasdaq, Inc.
(301) 978-8484

3.  <u>Self-Regulatory Organization's Statement of the Purpose of, and Statutory Basis for, the Proposed Rule Change</u>

a.  <u>Purpose</u>

Nasdaq is filing this amendment to SR-NASDAQ-2020-081, which was published for comment by the Commission on December 11, 2020,[3] in order to: make certain material, technical, and conforming amendments to the Initial Proposal, and to provide additional clarification and justification in support of the proposed rule changes.

---

[3]    Securities Exchange Act Release No. 90574 (December 4, 2020), 85 FR 80472 (December 11, 2020) ("Initial Proposal").

This amendment supersedes and replaces the Initial Proposal in its entirety.

Nasdaq is submitting by separate letter its response to comments on the proposed rule

change contemporaneously with this Amendment No. 1.

> I.    Summary of Amendments to the Initial Proposal

As discussed in Nasdaq's response to comments filed in conjunction with this

Amendment No. 1, upon further examination of the Initial Proposal and after carefully

reviewing all comment letters submitted by commenters, Nasdaq has modified the Initial

Proposal to propose certain material amendments, technical clarifications, and non-

substantive changes, as well as provided additional clarification and justification in

support of the proposed rule change.

As a result of the comments received, Nasdaq is proposing the following three

**material amendments**:

- Adding proposed Rule 5605(f)(2)(D) to provide more flexibility in achieving the diversity objectives of Rule 5605(f)(2) for companies with boards of five or fewer directors (as discussed in Section 3.a.VII.C.iii).

- Amending proposed Rule 5605(f)(5) to allow additional time for newly listing companies on the Nasdaq Global Select ("NGS"), Nasdaq Global Market ("NGM"), and Nasdaq Capital Market ("NCM") tiers (as discussed in Section 3.a.VII.C.i).

- Adding proposed Rule 5605(f)(6)(B) to provide a grace period for a listed company that no longer meets the diversity objectives as a result of a vacancy on the board of directors, for example if a diverse director falls ill or resigns (as discussed in Section 3.a.VII.C.iii).

Nasdaq is also proposing the following **technical amendments** to the Initial Proposal:

- Amending proposed Rule 5605(f)(3) and proposed Rule 5606(b) to allow companies the flexibility of providing the disclosures in advance of the company's next annual meeting of shareholders: (a) in any proxy statement or any information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F); or (b) on the company's website. If the company provides such disclosure on its website, then the company must submit such disclosure concurrently with the filing made pursuant to (a) and submit a URL link to the

disclosure through the Nasdaq Listing Center, within one business day after such posting.

- Clarifying in the Board Diversity Matrix ("Matrix") Instructions that a company may include supplemental data in addition to the information required by the Matrix.

- Revising proposed Rule 5605(f)(2)(B)(i) to change the reference from "home country jurisdiction" to "country of the Company's principal executive offices."

- Providing a definition in the Matrix for "Non-binary."

- Amending proposed Rule 5606(d) to clarify the types of newly listed companies.

- Revising operative dates in proposed Rule 5606(e).

Finally, Nasdaq has also proposed certain **non-substantive** changes to the Initial Proposal, including clarifying throughout the filing that the proposed rule change is a disclosure requirement, not a mandate, and clarifying in the Matrix Instructions that a company may not substantially alter the Matrix and must disclose the information in a searchable format.

II.    The Diversity Imperative for Corporate Boards

**The past year has brought heightened attention to the commitment of public companies to diversity and inclusion**.  Corporate culture, human capital management, and technology-driven changes to the business landscape have underscored the benefits of enhanced board diversity—diversity in the boardroom is good corporate governance. The benefits to stakeholders of increased diversity are becoming more apparent and include an increased variety of fresh perspectives, improved decision making and oversight, and strengthened internal controls.  Nasdaq believes that the heightened focus

on corporate board diversity by companies,[4] investors,[5] corporate governance

organizations,[6] and legislators[7] demonstrates that investor confidence is enhanced when

boardrooms are comprised of more than one demographic group.  Nasdaq has also

---

[4]    See Deloitte and the Society for Corporate Governance, *Board Practices Quarterly: Diversity, equity, and inclusion* (Sept. 2020), available at: https://www2.deloitte.com/us/en/pages/center-for-board-effectiveness/articles/diversity-equity-and-inclusion.html (finding, in a survey of over 200 companies, that "most companies and/or their boards have taken, or intend to take, actions in response to recent events surrounding racial inequality and inequity; 71% of public companies and 65% of private companies answered this question affirmatively").

[5]    See ISS Governance, *2020 Global Benchmark Policy Survey, Summary of Results* 6 (Sept. 24, 2020), available at: https://www.issgovernance.com/wp-content/uploads/publications/2020-iss-policy-survey-results-report-1.pdf (finding that "a significant majority of investors (61 percent) indicated that boards should aim to reflect the company's customer base and the broader societies in which they operate by including directors drawn from racial and ethnic minority groups").

[6]    See International Corporate Governance Network, *ICGN Guidance on Diversity on Boards* 5 (2016), available at: https://www.icgn.org/sites/default/files/ICGN%20Guidance%20on%20Diversity%20on%20Boards%20-%20Final.pdf ("The ICGN believes that diversity is a core attribute of a well-functioning board which supports greater long-term value for shareholders and companies.").

[7]    See, e.g., John J. Cannon et al., Sherman & Sterling LLP, *Washington State Becomes Next to Mandate Gender Diversity on Boards* (May 28, 2020), available at: https://www.shearman.com/perspectives/2020/05/washington-state-becomes-next-to-mandate-gender-diversity-on-boards; Cal. S.B. 826 (Sept. 30, 2018); Cal. A.B. 979 (Sept. 30, 2020) (California legislation requiring companies headquartered in the state to have at least one director who self-identifies as a Female and one from an Underrepresented Community).

observed recent calls from SEC commissioners[8] and investors[9] for companies to provide

more transparency regarding board diversity.

**While Nasdaq-listed companies have made laudable progress in diversifying their boardrooms, Nasdaq believes that the national market system and the public interest would be well-served by a "disclosure-based, business-driven" framework for companies to embrace meaningful and multi-dimensional diversification of their**

---

[8]     See Acting Chair Allison Herren Lee, *Regulation S-K and ESG Disclosures: An Unsustainable Silence* (Aug. 26, 2020), available at: https://www.sec.gov/news/public-statement/lee-regulation-s-k-2020-08-26#_ftnref15 ("There is ever-growing recognition of the importance of diversity from all types of investors . . . [a]nd large numbers of commenters on this [SEC] rule proposal emphasized the need for specific diversity disclosure requirements."); see also Commissioner Caroline Crenshaw, *Statement on the "Modernization" of Regulation S-K Items 101, 103, and 105* (August 26, 2020), available at: https://www.sec.gov/news/public-statement/crenshaw-statement-modernization-regulation-s-k ("As Commissioner Lee noted in her statement, the final [SEC] rule is also silent on diversity, an issue that is extremely important to investors and to the national conversation. The failure to grapple with these issues is, quite simply, a failure to modernize."); Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), available at: https://www.sec.gov/news/speech/chair-white-icgn-speech.html ("Companies' disclosures on board diversity in reporting under our current requirements have generally been vague and have changed little since the rule was adopted… Our lens of board diversity disclosure needs to be re-focused in order to better serve and inform investors.").

[9]     See Vanguard, *Investment Stewardship 2019 Annual Report* (2019), available at: https://about.vanguard.com/investment-stewardship/perspectives-and-commentary/2019_investment_stewardship_annual_report.pdf ("We want companies to disclose the diversity makeup of their boards on dimensions such as gender, age, race, ethnicity, and national origin, at least on an aggregate basis."); see also State Street Global Advisors, *Diversity Strategy, Goals & Disclosure: Our Expectations for Public Companies* (Aug. 27, 2020) https://www.ssga.com/us/en/individual/etfs/insights/diversity-strategy-goals-disclosure-our-expectations-for-public-companies (announcing expectation that State Street's portfolio companies (including US companies "and, to the greatest extent possible, non-US companies") provide board level "[d]iversity characteristics, including racial and ethnic makeup, of the board of directors").

**boards.**[10]  Nasdaq has also found that current reporting of board diversity data was not provided in a consistent manner or on a sufficiently widespread basis.  As such, investors are not able to readily compare board diversity statistics across companies.

**Accordingly, Nasdaq is proposing to require each of its listed companies, subject to certain exceptions for non-operating companies, to:  (i) provide statistical information regarding diversity among the members of the company's board of directors under proposed Rule 5606; and (ii) have, or explain why it does not have, at least two "Diverse" directors on its board under proposed Rule 5605(f)(2).**

"Diverse" means an individual who self-identifies as:  (i) Female, (ii) an Underrepresented Minority, or (iii) LGBTQ+.  Each listed company must have, or explain why it does not have, at least one Female director and at least one director who is either an Underrepresented Minority or LGBTQ+.  Foreign Issuers (including Foreign Private Issuers) and Smaller Reporting Companies, by contrast, have more flexibility and may satisfy the rule by having, or explaining why they do not have, two Female directors. Further, each company with a board of directors of five or fewer members may satisfy the rule by having, or explaining why it does not have, one Diverse director.[11]  "Female" means an individual who self-identifies her gender as a woman, without regard to the individual's designated sex at birth.  "Underrepresented Minority" means, consistent with the categories reported to the Equal Employment Opportunity Commission ("EEOC")

---

[10]    See Letter from Mercy Investments Inc. to Ms. Vanessa Countryman (December 22, 2020); see also Letter from San Francisco City and County Employees Retirement System to Ms. Vanessa Countryman (December 17, 2020); see also Letter from Ideanomics, Inc. to Ms. Vanessa Countryman (December 28, 2020).

[11]    Consequently, all references in this Amendment No. 1 to "diversity objectives" should be construed as a diversity objective of one Diverse director for companies with a board of directors of five or fewer members.

through the Employer Information Report EEO-1 Form ("EEO-1 Report"), an individual

who self-identifies as one or more of the following:  Black or African American,

Hispanic or Latinx, Asian, Native American or Alaska Native, Native Hawaiian or

Pacific Islander, or Two or More Races or Ethnicities.  "LGBTQ+" means an individual

who self-identifies as any of the following:  lesbian, gay, bisexual, transgender, or a

member of the queer community.

**Nasdaq proposes that Rule 5606 will be operative one year after the Commission approves this proposal (the "Approval Date").**  As such, Nasdaq

proposes to require a company to provide statistical information regarding its board's

diversity by the later of (1) one calendar year from the Approval Date (the "Effective

Date"); or (2) the date the company files its proxy statement or its information statement

for its annual meeting of shareholders (or, if the company does not file a proxy or

information statement, the date it files its Form 10-K or 20-F) during the calendar year of

the Effective Date.

**Under proposed Rule 5605(f)(2), Nasdaq proposes that each listed company in the NGS, NGM, and NCM have, or explain why it does not have, one Diverse director by the later of:  (i) two calendar years after the date that the Commission approves this proposal (the "First Effective Date"); or (ii) the date the company files its proxy statement or its information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F) for the company's annual shareholders meeting during the calendar year of the First Effective Date.**  Further, each company must

have, or explain why it does not have, two Diverse directors no later than:  (i) four

calendar years after the Approval Date for companies listed on the NGS or NGM tiers; or

(ii) five calendar years after the Approval Date for companies listed on the NCM tier.  If a company files its proxy statement or its information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F) for the company's annual shareholders meeting after the anniversary of the Approval Date in the calendar year for each respective year noted above, then the company will have until the date it makes such filing to have, or explain why it does not have, two Diverse directors.

**Nasdaq proposes that a company with a board of five or fewer members have, or explain why it does not have, at least one member of its board of directors who is Diverse.**  Nasdaq proposes that such companies share the timeline described above for companies that must have, or explain why they do not have, one Diverse director by the later of:  (i) the First Effective Date; or (ii) the date the company files its proxy statement or its information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F) for the company's annual shareholders meeting during the calendar year of the First Effective Date.

**Nasdaq undertook extensive research and analysis and has concluded that the proposal will fulfill the objectives of the Act in that it is designed to remove impediments to and perfect the mechanism of a free and open market and a national market system, to prevent fraudulent and manipulative acts and practices, and to protect investors and the public interest**.  In addition to conducting its own internal analysis, Nasdaq reviewed a substantial body of third-party research and interviewed leaders representing a broad spectrum of market participants and other stakeholders to:

- determine whether empirical evidence demonstrates an association between board diversity, company performance, investor protection and board decision-making;

- understand investors' interest in, and impediments to obtaining, information regarding the state of board diversity at public companies;

- review the current state of board diversity and disclosure, both among Nasdaq-listed companies and more broadly within the U.S.;

- gain a better understanding of the causes of underrepresentation on boards;

- obtain the views of leaders representing public companies, investment banks, corporate governance organizations, investors, regulators and civil rights groups on the value of more diverse corporate boards, and on various approaches to encouraging more diversity on corporate boards; and

- evaluate the success of approaches taken by exchanges, regulators, and governments in both the U.S. and foreign jurisdictions to remedy underrepresentation on boards.

**While gender diversity has improved among U.S. company boards in recent years, the pace of change has been gradual, and the U.S. still lags behind other jurisdictions that have focused on board diversity. Progress in bringing underrepresented racial and ethnic groups into the boardroom has been slower.** Nasdaq is unable to provide definitive estimates regarding the number of listed companies that will be affected by the proposal due to the inconsistent disclosures and definitions of diversity across companies and the extremely limited disclosure of race and ethnicity information – an information gap the proposed rule addresses. Based on the limited information that is available, Nasdaq believes a supermajority of listed companies have made notable strides to improve gender diversity in the boardroom and have at least one woman on the board. Nasdaq also believes that listed companies are diligently working to add directors with other diverse attributes, although consistent with other studies of U.S. companies, Nasdaq believes the pace of progress, in this regard, is happening more gradually. While studies suggest that current candidate selection processes may result in diverse candidates being overlooked, Nasdaq also believes that

the lack of reliable and consistent data creates a barrier to measuring and improving diversity in the boardroom.

**Nasdaq reviewed dozens of empirical studies and found that an extensive body of empirical research demonstrates that diverse boards are positively associated with improved corporate governance and company performance.**[12]  For example, as discussed in detail below in *Section III, Empirical Research: The Relationship between Diversity and Company Performance, Investor Protection and Decision Making*, studies have found that companies with gender-diverse boards or audit committees are associated with:  more transparent public disclosures and less information asymmetry; better reporting discipline by management; a lower likelihood of manipulated earnings through earnings management; an increased likelihood of voluntarily disclosing forward-looking information; a lower likelihood of receiving audit qualifications due to errors, non-compliance or omission of information; and a lower likelihood of securities fraud.  In addition, studies found that having at least one woman on the board is associated with a lower likelihood of material weaknesses in internal control over financial reporting and a lower likelihood of material financial restatements.  Studies also identified positive relationships between board diversity and commonly used financial metrics, including higher returns on invested capital, returns on equity, earnings per share, earnings before interest and taxation margin, asset valuation multiples and credit ratings.

---

[12]     See e.g., Bernile et al. (2018), infra note 33; Wahid (2019), infra note 65; Abbott, Parker & Persley (2012), infra note 64; Abad el al. (2017), infra note 73.

**Nasdaq believes there are additional compelling reasons to support the diversification of company boards beyond a link to improved corporate governance and company performance**:

- Investors are calling in greater numbers for diversification of boardrooms. Vanguard, State Street Advisors, BlackRock, and the NYC Comptroller's Office include board diversity expectations in their engagement and proxy voting guidelines.[13] The heightened investor focus on corporate diversity and inclusion efforts demonstrates that investor confidence is undermined when a company's

---

[13]    Vanguard announced in 2020 it would begin asking companies about the race and ethnicity of directors.  See Vanguard, *Investment Stewardship 2020 Annual Report* (2020), available at: https://about.vanguard.com/investment-stewardship/perspectives-and-commentary/2020_investment_stewardship_annual_report.pdf ("Vanguard 2020 Annual Report").  Starting in 2020, State Street Global Advisors will vote against the entire nominating committee of companies that do not have at least one woman on their boards and have not addressed questions on gender diversity within the last three years. See State Street Global Advisors, *Summary of Material Changes to State Street Global Advisors' 2020 Proxy Voting and Engagement Guidelines* (2020), available at: https://www.ssga.com/library-content/pdfs/global/proxy-voting-and-engagement-guidelines.pdf.  State Street Global Advisors' CEO, Cyrus Taraporevala, stated in his annual proxy voting agenda letter that starting in 2021, the company would commence voting against the Chair of the Nominating & Governance Committee at companies in the S&P 500 and FTSE 100 that do not disclose the racial and ethnic composition of their boards. Beginning in 2022, it "will vote against the Chair of the Nominating & Governance Committee at companies in the S&P 500 and FTSE 100 that do not have at least 1 director from an underrepresented community on their boards."  See Cyrus Taraporevala, CEO's Letter on 2021 Proxy Voting Agenda, dated January 11, 2021, available at https://www.ssga.com/us/en/institutional/ic/insights/ceo-letter-2021-proxy-voting-agenda?WT.mc_id=social_-ibr_asset-stewardship-web_gl_lkdin_img__n_n_jan21&spi=100001784867075. Beginning in 2018, BlackRock stated in proxy voting guidelines they "would normally expect to see at least 2 women directors on every board."  See BlackRock Investment Stewardship, *Corporate governance and proxy voting guidelines for U.S. securities* (Jan. 2020), available at: https://www.blackrock.com/corporate/literature/fact-sheet/blk-responsible-investment-guidelines-us.pdf.  The NYC Comptroller's Office in 2019 asked companies to adopt policies to ensure women and people of color are on the initial list for every open board seat.  See Scott M. Stringer, *Remarks at the Bureau of Asset Management 'Emerging Managers and MWBE Managers Conference* (Oct. 11, 2019), available at: https://comptroller.nyc.gov/wp-content/uploads/2019/10/10.11.19-SMS-BAM-remarks_distro.pdf.

boardroom is homogenous and when transparency about such efforts is lacking. Investors frequently lack access to information about corporate board diversity that could be material to their decision making, and they might divest from companies that fail to take into consideration the demographics of their corporate stakeholders when they refresh their boards. Nasdaq explores these investor sentiments in *Section IV, Current State of Board Diversity and Causes of Underrepresentation on Boards.*

- Nasdaq believes, consistent with SEC disclosure requirements in other contexts,[14] that management's vision on key issues impacting the company should be communicated with investors in a clear and straightforward manner. Indeed, transparency is the bedrock of federal securities laws regarding disclosure, and this sentiment is reflected in the broad-based support for uniform disclosure requirements regarding board diversity that Nasdaq observed during the course of its outreach to the industry. In addition, organizational leaders representing every category of corporate stakeholders Nasdaq spoke with (including business, investor, governance, regulatory, and civil rights communities) were

---

[14]    See Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations, 68 Fed. Reg. 75,056 (Dec. 29, 2003) ("We believe that management's most important responsibilities include communicating with investors in a clear and straightforward manner. MD&A is a critical component of that communication. The Commission has long sought through its rules, enforcement actions and interpretive processes to elicit MD&A that not only meets technical disclosure requirements but generally is informative and transparent."); see also Management's Discussion and Analysis, Selected Financial Data, and Supplementary Financial Information, Release No. 33-10890 (Nov. 19, 2020) (citing the 2003 MD&A Interpretative Release and stating that the purpose of the MD&A section is to enable investors to see a company "through the eyes of management").

overwhelmingly in favor of diversifying boardrooms. Nasdaq summarizes the findings of its stakeholder outreach in *Section V, Stakeholder Perspectives.*

- Legislators at the federal and state level increasingly are taking action to encourage or mandate corporations to diversify their boards and improve diversity disclosures. Congress currently is considering legislation requiring each SEC-registered company to provide board diversity statistics and disclose whether it has a board diversity policy. To date, eleven states have passed or proposed legislation related to board diversity.[15] SEC regulations require companies to disclose whether diversity is considered when identifying director nominees and, if so, how. Nasdaq explores various state and federal initiatives in *Section VI, U.S. Regulatory Framework and Section VII, Nasdaq's Proposal*.

**In considering the merits and shaping the substance of the proposed listing rule, Nasdaq also sought and received valuable input from corporate stakeholders. During those discussions, Nasdaq found consensus across every constituency in the inherent value of board diversity**. Business leaders also expressed concern that companies –particularly smaller ones – would prefer an approach that allows flexibility for their unique circumstances and stakeholders. Nasdaq recognizes that the operations, size, and current board composition of each Nasdaq-listed company are unique, and Nasdaq therefore endeavored to provide a disclosure-based, business-driven framework

---

[15]    See Michael Hatcher and Weldon Latham, *States are Leading the Charge to Corporate Boards: Diversify!*, Harv. L. Sch. Forum on Corp. Governance (May 12, 2020), available at: https://corpgov.law.harvard.edu/2020/05/12/states-are-leading-the-charge-to-corporate-boards-diversify/.

to enhance board diversity that balances the need for flexibility with each company's

particular circumstances.

**The Exchange also considered the experience of its parent company, Nasdaq,**

**Inc., as a public company.**[16]  In 2002, Nasdaq, Inc. met the milestone of welcoming its

first woman, Mary Jo White, who later served as SEC Chair, to its board of directors.  In

her own words, "I was the first and only woman to serve on the board when I started, but,

happily, I was joined by another woman during my tenure . . . .  And then there were two.

Not enough, but better than one."[17]  In 2019, Nasdaq, Inc. also welcomed its first Black

director.  As a Charter Pledge Partner of The Board Challenge, Nasdaq supports The

Board Challenge's goal of "true and full representation on all boards of directors."[18]

**As a self-regulatory organization, Nasdaq also is cognizant of its role in**

**advancing diversity within the financial industry, as outlined in the Commission's**

**diversity standards issued pursuant to Section 342 of the Dodd-Frank Wall Street**

---

[16]  While the Exchange recognizes that it is only one part of an ecosystem in which multiple stakeholders are advocating for board diversity, that part is meaningful:  the United Nations Sustainable Stock Exchanges Initiative, of which Nasdaq, Inc., is an official supporter, recognized that "[s]tock exchanges are uniquely positioned to influence their market in a way few other actors can."  See United Nations Sustainable Stock Exchanges Initiative, *How Stock Exchanges Can Advance Gender Equality* 2 (2017), available at: https://sseinitiative.org/wp-content/uploads/2019/12/How-stock-exchanges-can-advance-gender-equality.pdf.

[17]  See Mary Jo White, Completing the Journey: Women as Directors of Public Companies (Sept. 16, 2014), available at: https://www.sec.gov/news/speech/2014-spch091614-mjw#.VBiLMhaaXDo.

[18]  See The Board Challenge, https://theboardchallenge.org/.  See also Nasdaq, Inc., *Notice of 2020 Annual Meeting of Shareholders and Proxy Statement* 52 (Mar. 31, 2020), available at: https://ir.nasdaq.com/static-files/ce5519d4-3a0b-48ac-8441-5376ccbad4e5 (Nasdaq, Inc. believes that "[d]iverse backgrounds lead to diverse perspectives.  We are committed to ensuring diverse backgrounds are represented on our board and throughout our organization to further the success of our business and best serve the diverse communities in which we operate.").

Reform and Consumer Protection Act of 2010 ("Standards").[19]  Authored jointly by

the Commission and five other financial regulators, the Standards seek to provide a

framework for exchanges and financial services organizations "to create and strengthen

[their] diversity policies and practices."  Through these voluntary Standards, the

Commission and other regulators "encourage each entity to use the[] Standards in a

manner appropriate to its unique characteristics."[20]  To that end, the proposed rule

leverages the Exchange's unique ability to influence corporate governance in furtherance

of the goal of Section 342, which is to address the lack of diversity in the financial

services industry.[21]  Finally, while the Exchange recognizes the importance of

maximizing company performance, its role as a listing venue is to establish and enforce

substantive standards that promote investor protection.  As a self-regulatory organization,

the Exchange must demonstrate to the Commission that any proposed rule is consistent

with Section 6(b) of the Act because, among other things, it is designed to protect

investors, promote the public interest, prevent fraudulent and manipulative acts and

practices, and remove impediments to the mechanism of a free and open market.  The

Exchange must also balance promoting capital formation, efficiency, and competition,

among other things, alongside enhancing investor confidence.

**With these objectives in mind, Nasdaq believes that a listing rule designed to**

**enhance transparency related to board diversity will increase consistency and**

**comparability of information across Nasdaq-listed companies, thereby increasing**

---

[19]    See Final Interagency Policy Statement Establishing Joint Standards for Assessing the Diversity Policies and Practices of Entities Regulated by the Agencies, 80 Fed. Reg. 33,016 (June 10, 2015).

[20]    Id. at 33,023.

[21]    156 Cong. Rec. H5233-61 (June 30, 2010).

**transparency and decreasing information collection costs.**  Nasdaq further believes that a listing rule designed to encourage listed companies to increase diverse representation on their boards will result in improved corporate governance, thus strengthening the integrity of the market, enhancing capital formation, efficiency, and competition, and building investor confidence.  The proposal is a disclosure-based framework, not a mandate.  To the extent a company chooses not to meet the diversity objectives of proposed Rule 5605(f)(2), Nasdaq believes that the proposal will provide investors with additional transparency through disclosure explaining the company's reasons for not doing so.  For example, the company may choose to disclose that it does not meet the diversity objectives of proposed Rule 5605(f)(2) because it is subject to an alternative standard under state or foreign laws and has chosen to meet that standard instead, or has a board philosophy regarding diversity that differs from the diversity objectives set forth in proposed Rule 5605(f)(2), including an expanded or different definition of diversity.  Nasdaq believes that such disclosure will improve the quality of information available to investors who rely on this information to make informed investment and voting decisions, thereby promoting capital formation and efficiency.

**Nasdaq plans to assist listed companies who choose to achieve the diversity objectives of this proposal.**  Nasdaq has observed that studies suggest that certain groups may be underrepresented on boards because the traditional director nomination process is limited by directors looking within their own social networks for candidates with previous C-suite experience.[22]  Leaders from across the spectrum of stakeholders with whom Nasdaq spoke reinforced the notion that if companies recruit by skill set and

---

[22]    See infra Section II of the Statutory Basis section.

expertise rather than title, they will find there is more than enough diverse talent to satisfy

demand.  In order to assist companies that strive to meet the diversity objectives of

proposed Rule 5605(f)(2), Nasdaq has proposed to provide listed companies that have not

yet met diversity objectives with free access to a network of board-ready diverse

candidates and a tool to support board evaluation, benchmarking, and refreshment and

has submitted a rule filing to the Commission regarding the provision of such services.[23]

Nasdaq has also published FAQs on its Listing Center to provide guidance to companies

on the application of the proposed rules, and to establish a dedicated mailbox for

companies and their counsel to email additional questions to Nasdaq regarding the

application of the proposed rule.  Nasdaq believes that these services will help to ease the

compliance burden on companies whether they choose to meet the listing rule's diversity

objectives or provide an explanation for not doing so.

> III.    <u>Empirical Research:  The Relationship between Diversity and Company
> Performance, Investor Protection and Decision Making</u>

A company's board of directors plays a critical role in formulating company

strategy; appointing, advising, and overseeing management; and protecting investors.

Nasdaq has recognized the importance of varied perspectives on boards since 2003, when

the Exchange adopted a listing rule intended to enhance investor confidence by requiring

listed companies, subject to certain exceptions and grace periods, to have a majority

independent board.[24]  Accompanying the rule are interpretive materials recognizing that

---

[23]    Securities Exchange Act Release No. 90571 (December 4, 2020), 85 FR 79556
(December 10, 2020) (SR-NASDAQ-2020-082).

[24]    <u>See</u> The Nasdaq Stock Market Rulebook ("Rulebook"), Rules 5605(b), 5615(a), and
5605(b)(1)(A).

independent directors "play an important role in assuring investor confidence.  Through

the exercise of independent judgment, they act on behalf of investors to maximize

shareholder value in the Companies they oversee and guard against conflicts of

interest."[25]

### A.  Diversity and Company Performance

A significant body of research suggests a positive association between diversity

and several measures of company performance.[26]  In the words of SEC Acting Chair

Allison Herren Lee: "to the extent one seeks economic support for diversity and inclusion

(instead of requiring economic support for the lack of diversity and exclusion), the

evidence is in."[27]

The Carlyle Group (2020) found that its portfolio companies with two or more

diverse directors had average earnings growth of 12.3% over the previous three years,

compared to 0.5% among portfolio companies with no diverse directors, where diverse

directors were defined as female, Black, Hispanic, or Asian.[28]  "After controlling for

---

[25]    Id., IM-5605-1.

[26]    Some companies recently have expressed the belief that a company must consider the
impact of its activities on a broader group of stakeholders beyond shareholders.  See
Business Roundtable, *Statement on the Purpose of a Corporation* (Aug. 19, 2019),
available at:  https://s3.amazonaws.com/brt.org/BRT-
StatementonthePurposeofaCorporationOctober2020.pdf.  Commentators articulated this
view as early as 1932.  See E. Merrick Dodd, Jr., *For Whom Are Corporate Managers
Trustees?*, 45 Harv. L. Rev. 1145, 1153 (1932).

[27]    See Acting Chair Allison Herren Lee, *Diversity Matters, Disclosure Works, and the SEC
Can Do More: Remarks at the Council of Institutional Investors Fall 2020 Conference*
(September 22, 2020), available at: https://www.sec.gov/news/speech/lee-cii-2020-
conference-20200922.

[28]    See Jason M. Thomas and Megan Starr, The Carlyle Group, *Global Insights: From
Impact Investing to Investing for Impact* 5 (Feb. 24, 2020), available at:
https://www.carlyle.com/sites/default/files/2020-

industry, fund, and vintage year, companies with diverse boards generate earnings growth

that's five times faster, on average, with each diverse board member associated with a 5%

increase in annualized earnings growth."[29]

Several other studies found a positive association between diverse boards and

other measures of company performance.  McKinsey (2015) found that "companies in the

top quartile for racial/ethnic diversity were 35 percent more likely to have financial

returns above their national industry median."[30]  McKinsey reaffirmed their findings in a

2020 study, finding "a positive, statistically significant correlation between company

financial outperformance and [board] diversity, on the dimensions of both gender and

ethnicity," with companies in the top quartile for board gender diversity "28 percent more

likely than their peers to outperform financially," and a statistically significant correlation

between board gender diversity and outperformance on earnings before interest and

taxation margin.[31]  Carter, Simkins and Simpson (2003) found among Fortune 1000

---

02/From%20Impact%20Investing%20to%20Investing%20for%20Impact_022420.pdf
(analyzing Carlyle U.S. portfolio company data, February 2020).

[29]    Id.

[30]    See Vivian Hunt et al., McKinsey & Company, *Diversity Matters* (February 2, 2015),
available at:
https://www.mckinsey.com/~/media/mckinsey/business%20functions/organization/our%
20insights/why%20diversity%20matters/diversity%20matters.pdf (analyzing 366 public
companies in the United Kingdom, Canada, the United States, and Latin America in
industries for the years 2010 to 2013, using the ethnic and racial categories African
ancestry, European ancestry, Near Eastern, East Asian, South Asian, Latino, Native
American, and other).

[31]    See McKinsey & Company, *Diversity wins: How inclusion matters* 13 (May 2020),
available at:
https://www.mckinsey.com/~/media/McKinsey/Featured%20Insights/Diversity%20and%
20Inclusion/Diversity%20wins%20How%20inclusion%20matters/Diversity-wins-How-
inclusion-matters-vF.pdf (analyzing 1,039 companies across 15 countries for the period
from December 2018 to November 2019).

companies "statistically significant positive relationships between the presence of women or minorities on the board and firm value."[32]  Bernile, Bhagwat and Yonker (2018) found that greater diversity on boards—including gender, ethnicity, educational background, age, financial expertise, and board experience—is associated with increased operating performance, higher asset valuation multiples, lower stock return volatility, reduced financial leverage, increased dividend payouts to shareholders, higher investment in R&D, and better innovation.[33]  The authors observed that "[t]his is in line with the results in Carter, Simkins, and Simpson (2003), which show a positive association between local demographic diversity and firm value."[34]

Several studies have found a positive association between gender diversity and company performance.  Credit Suisse (2014) found companies with at least one woman on the board had an average sector-adjusted return on equity ("ROE") of 12.2%, compared to 10.1% for companies with no female directors, and average sector-adjusted ROEs of 14.1% and 11.2%, respectively, for the previous nine years.[35]  MSCI (2016) found that U.S. companies with at least three women on the board in 2011 experienced

---

[32]    See David A. Carter et al., *Corporate Governance, Board Diversity, and Firm Value*. 38(1) Fin. Rev. 33 (analyzing 638 Fortune 1000 firms in 1997, measuring firm value by Tobin's Q, with board diversity defined as the percentage of women, African Americans, Asians, and Hispanics on the board of directors).

[33]    See Gennaro Bernile et al., *Board Diversity, Firm Risk, and Corporate Policies,* Journal of Financial Economics 127(3), 588-612 (2018)  (analyzing 21,572 firm-year observations across non-financial, non-utility firms for the years 1996 to 2014, based on the ExecuComp, RiskMetrics, Compustat and Center for Research on Security Prices databases).

[34]    Id. at 604.

[35]    See Credit Suisse, *The CS Gender 3000: Women in Senior Management* 16 (Sept. 2014), available at: https://www.credit-suisse.com/media/assets/corporate/docs/about-us/research/publications/the-cs-gender-3000-women-in-senior-management.pdf (analyzing 3,000 companies across 40 countries from the period from 2005 to 2013).

median gains in ROE of 10% and earnings per share ("EPS") of 37% over a five year

period, whereas companies that had no female directors in 2011 showed median changes

of -1% in ROE and -8% in EPS over the same five-year period.[36]  Catalyst (2011) found

that the ROE of Fortune 500 companies with at least three women on the board (in at

least four of five years) was 46% higher than companies with no women on the board,

and return on sales and return on invested capital was 84% and 60% higher,

respectively.[37]  FCLTGlobal (2019) found that "the most diverse boards (top 20 percent)

added 3.3 percentage points to [return on invested capital], as compared to their least

diverse peers (bottom 20 percent)."[38]  Moody's (2019) found that greater board gender

diversity is associated with higher credit ratings, with women accounting for an average

of 28% of board seats at Aaa-rated companies but less than 5% of board seats at Ca-rated

companies.[39]

---

[36]    See Meggin Thwing Eastman et al., MSCI, *The tipping point: Women on boards and financial performance* 3 (December 2016), available at: https://www.msci.com/documents/10199/fd1f8228-cc07-4789-acee-3f9ed97ee8bb (analyzing of U.S. companies that were constituents of the MSCI World Index for the entire period from July 1, 2011 to June 30, 2016).

[37]    See Harvey M. Wagner, Catalyst, *The Bottom Line: Corporate Performance and Women's Representation on Boards (2004–2008)* (March 1, 2011), available at: https://www.catalyst.org/research/the-bottom-line-corporate-performance-and-womens-representation-on-boards-2004-2008/ (analyzing gender diversity data from Catalyst's annual Fortune 500 Census of Women Board Directors report series for the years 2005 to 2009, and corresponding financial data from S&P's Compustat database for the years 2004 to 2008).

[38]    See FCLTGlobal, *The Long-term Habits of a Highly Effective Corporate Board* 11 (March 2019), available at: https://www.fcltglobal.org/wp-content/uploads/long-term-habits-of-highly-effective-corporate-boards.pdf (analyzing 2017 MSCI ACWI constituents from 2010 to 2017 using Bloomberg data, with board diversity encompassing gender and age).

[39]    See Moody's Investors Service, *Gender diversity is correlated with higher ratings, but mandates pose short-term risk* 2 (Sept. 11, 2019), available at: https://www.moodys.com/research/Moodys-Corporate-board-gender-diversity-

Credit Suisse (2016) found an association between LGBTQ+ diversity and stock performance, finding that a basket of 270 companies "supporting and embracing LGBT employees" outperformed the MSCI ACWI index by an average of 3.0% per year over the past 6 years.[40]  Further, "[a]gainst a custom basket of companies in North America, Europe and Australia, the LGBT 270 has outperformed by 140 bps annually."[41]  Nasdaq acknowledges that this study focused on LGBTQ+ employees as opposed to directors, and that there is a lack of published research on the issue of LGBTQ+ representation on boards.  However, Out Leadership (2019) suggests that the relationship between board gender diversity and corporate performance may extend to LGBTQ+ diversity:

> While the precise reason for the positive correlation between gender diversity and better corporate performance is unknown, many of the reasons that gender diversity is considered beneficial are also applicable to LGBT+ diversity. LGBT+ diversity in the boardroom may create a dynamic that enables better decision-making, and it brings to the boardroom the perspective of a community that is a critical component of the company's consumer population and organizational talent.[42]

While the overwhelming majority of empirical studies Nasdaq reviewed present a compelling case that board diversity is positively associated with company performance, the results of some other studies on gender diversity are mixed.  For example, Pletzer et

---

associated-with-higher-credit-ratings--PBC_1193768 (analyzing 1,109 publicly traded North American companies rated by Moody's).

[40]    See Credit Suisse ESG Research, *LGBT: the value of diversity* 1 (April 15, 2016), available at: https://research-doc.credit-suisse.com/docView?language=ENG&source=emfromsendlink&format=PDF&document_id=807075590&extdocid=807075590_1_eng_pdf&serialid=evu4wNcHexx7kusNLaZQphUkT9naxi1PvptZQvPjr1k%3d.

[41]    Id.

[42]    See Quorum, *Out Leadership's LGBT+ Board Diversity and Disclosure Guidelines* 3 (2019), available at: https://outleadership.com/content/uploads/2019/01/OL-LGBT-Board-Diversity-Guidelines.pdf.

al. (2015) found that board gender diversity alone has a "small and non-significant" relationship with a company's financial performance.[43]  Post and Byron (2014) found a "near zero" relationship with a company's market performance, but a positive relationship with a company's accounting returns.[44]  Carter, D'Souza, Simkins and Simpson (2010) found that "[w]hen Tobin's Q is used as the measure of financial performance, we find no relationship to gender diversity or ethnic minority diversity, neither positive nor negative."[45]  A study conducted by Campbell and Minguez-Vera (2007) "suggests, at a minimum, that increased gender diversity can be achieved without destroying shareholder value."[46]  Adams and Ferreira (2009) found that "gender diversity has beneficial effects in companies with weak shareholder rights, where additional board

---

[43]    See Jan Luca Pletzer et al., *Does Gender Matter? Female Representation on Corporate Boards and Firm Financial Performance – A Meta-Analysis* 1, PLOS One (June 18, 2015); see also Alice H. Eagly (2016), *When Passionate Advocates Meet Research on Diversity, Does the Honest Broker Stand a Chance?*, 72 J. Social Issues 199 (2016), available at https://doi.org/10.1111/josi.12163 (concluding that the "research findings are mixed, and repeated meta-analyses have yielded average correlational findings that are null or extremely small" with respect to board gender diversity and company performance).

[44]    See Corinne Post and Kris Byron, *Women on Boards and Firm Financial Performance: A Meta-Analysis* 1 (2014).  In 2016, the same authors, based on a review of the results for 87 studies, "found that board gender diversity is weakly but significantly positively correlated with [corporate social responsibility]," although they noted that "a significant correlational relationship does not prove causality."  See Corinne Post and Kris Byron, *Women on Boards of Directors and Corporate Social Performance: A Meta-Analysis*, 24(4) Corp. Governance: An Int'l Rev. 428 (July 2016), available at http://dx.doi.org/10.1111/corg.12165.

[45]    See David A. Carter et al., *The Gender and Ethnic Diversity of US Boards and Board Committees and Firm Financial Performance*, 18(5) Corp. Governance 396, 410 (2010) (analysis of 541 S&P 500 companies for the years 1998-2002).

[46]    See Kevin Campbell and Antonio Minguez-Vera, *Gender Diversity in the Boardroom and Firm Financial Performance*, 83(3) J. Bus. Ethics 13 (Feb. 2008) (analyzing 68 non-financial companies listed on the continuous market in Madrid during the period from January 1995 to December 2000, measuring firm value by an approximation of Tobin's Q defined as the sum of the market value of stock and the book value of debt divided by the book value of total assets).

monitoring could enhance firm value, but detrimental effects in companies with strong

shareholder rights."[47]  Carter et al. (2010)[48] and the U.S. Government Accountability

Office ("GAO") (2015)[49] concluded that the mixed nature of various academic and

empirical studies may be due to differences in methodologies, data samples, and time

periods.  Di Miceli and Donaggio (2018) concluded that "[t]he overwhelming majority of

empirical studies conclude that a higher ratio of women in business leadership does not

impair corporate performance (virtually all studies find positive or non-statistically

significant results)".[50]

---

[47]    See Renee B. Adams and Daniel Ferreira, *Women in the boardroom and their impact on governance and performance*, 94 J. Fin. Econ. 291 (2009) (analyzing 1,939 S&P 500, S&P MidCaps, and S&P SmallCap companies for the period 1996 to 2003, measuring company performance by a proxy for Tobin's Q (the ratio of market value to book value) and return on assets).

[48]    See Carter et al., supra note 45, at 400 (observing that the different "statistical methods, data, and time periods investigated vary greatly so that the results are not easily comparable.").

[49]    See United States Government Accountability Office, Report to the Ranking Member, Subcommittee on Capital Markets and Government Sponsored Enterprises, Committee on Financial Services, House of Representatives, *Corporate Boards: Strategies to Address Representation of Women Include Federal Disclosure Requirements* 5 (Dec. 2015) (the "GAO Report"), available at: https://www.gao.gov/assets/680/674008.pdf ("Some research has found that gender diverse boards may have a positive impact on a company's financial performance, but other research has not. These mixed results depend, in part, on differences in how financial performance was defined and what methodologies were used").

[50]    See Alexandre Di Miceli and Angela Donaggio, *Women in Business Leadership Boost ESG Performance: Existing Body of Evidence Makes Compelling Case*, 42 International Finance Corporation World Bank Group, Private Sector Opinion at 11 n.15 (2018), available at: https://www.ifc.org/wps/wcm/connect/topics_ext_content/ifc_external_corporate_site/ifc+cg/resources/private+sector+opinion/women+in+business+leadership+boost+esg+performance ("The overwhelming majority of empirical studies conclude that a higher ratio of women in business leadership does not impair corporate performance (virtually all studies find positive or non-statistically significant results)").

While there are studies drawing different conclusions, Nasdaq believes that there is a compelling body of credible research on the association between company performance and board diversity.  At a minimum, Nasdaq believes that the academic and empirical studies support the conclusion that board diversity does not have adverse effects on company performance.  This is not the first time Nasdaq has considered whether, on balance, various studies finding mixed results related to board composition and company performance are a sufficient rationale to propose a listing rule.  For example, in 2003, notwithstanding the varying findings of studies at the time regarding the relationship between company performance and board independence,[51] Nasdaq adopted listing rules requiring a majority independent board that were "intended to enhance investor confidence in the companies that list on Nasdaq."[52]  In its Approval Order, the SEC stated that "[t]he Commission has long encouraged exchanges to adopt and strengthen their corporate governance listing standards in order to, among other things, enhance investor confidence in the securities markets."[53]

---

[51]   See, e.g., Benjamin E. Hermalin and Michael S. Weisbach, *The Effects of Board Composition and Direct Incentives on Firm Performance*, 20 Fin. Mgmt. 101, 111 (1991) (finding that "there appears to be no relation between board composition and performance"); Sanjai Bhagat and Bernard Black, *The Uncertain Relationship Between Board Composition and Firm Performance*, 54(3) Bus. Law. 921, 950 (1999) ("At the very least, there is no convincing evidence that increasing board independence, relative to the norms that currently prevail among large American firms, will improve firm performance. And there is some evidence suggesting the opposite—that firms with supermajority-independent boards perform worse than other firms, and that firms with more inside than independent directors perform about as well as firms with majority- (but not supermajority-) independent boards.").

[52]   See Order Approving Proposed Rule Changes, 68 Fed. Reg. 64,154, 64,161 (Nov. 12, 2003) (approving SR-NASD-2002-77, SR-NASD-2002-80, SR-NASD-2002-138, SR-NASD-2002-139, and SR-NASD-2002-141).

[53]   Id. at 64,176.

Along the same lines, even without clear consensus among studies related to board diversity and company performance, the heightened focus on corporate board diversity by investors demonstrates that investor confidence is undermined when data on board diversity is not readily available and when companies do not explain the reasons for the apparent absence of diversity on their boards.  Therefore, Nasdaq believes that the proposal will enhance investor confidence that all listed companies are considering diversity in the context of selecting directors, either by meeting the applicable diversity objective of proposed Rule 5605(f)(2) or by explaining their rationale for not meeting that objective.  Further, Nasdaq believes that the proposal is consistent with the Act because it will not negatively impact capital formation, competition or efficiency among its public companies, and will promote investor protection and the public interest.[54]

B.  Diversity and Investor Protection

There is substantial evidence that board diversity enhances the quality of a company's financial reporting, internal controls, public disclosures, and management oversight.  In reaching this conclusion, Nasdaq evaluated the results of more than a dozen studies spanning more than two decades that found a positive association between gender diversity and important investor protections, and the assertions by some academics that such findings may extend to other forms of diversity, including racial and ethnic diversity.  The findings of the studies reviewed by Nasdaq are summarized below.

---

[54]    See also Lee, supra note 27 ("I could never quite buy in to the view that some 40 percent of the population in our country (if we're talking about minorities) or over half the country (if we're talking about women) must rationalize their inclusion in corporate boardrooms and elsewhere in economic terms instead of the reverse. How can one possibly justify—in economic terms—the systematic exclusion of a major portion of our talent base from the corporate pool?").

Adams and Ferreira (2009) found that women are "more likely to sit on" the audit committee,[55] and a subsequent study by Srinidhi, Gul and Tsui (2011) found that companies with women on the audit committee are associated with "higher earnings quality" and "better reporting discipline by managers,"[56] leading the authors to conclude that "including female directors on the board and the audit committee are plausible ways of improving the firm's reporting discipline and increasing investor confidence in financial statements."[57]

A study conducted in 2016 by Pucheta-Martínez et al. concluded that gender diversity on the audit committee "improves the quality of financial information."[58] They found that "the percentage of females on [audit committees] reduces the probability of [audit] qualifications due to errors, non-compliance or the omission of information,"[59] and found a positive association between gender diverse audit committees and disclosing audit reports with uncertainties and scope limitations. This suggests that gender diverse

---

[55]     See Adams and Ferreira, supra note 47, at 292.

[56]     See Bin Srinidhi et al., *Female Directors and Earnings Quality*, 28(5) Contemporary Accounting Research 1610, 1612-16 (Winter 2011) (analyzing 3,132 firm years during the period from 2001 to 2007 based on S&P COMPUSTAT, Corporate Library's Board Analyst, and IRRC databases; "choos[ing] the accruals quality as the metric that best reflects the ability of current earnings to reflect future cash flows" (noting that it "best predicts the incidence and magnitude of fraud relative to other commonly used measures of earnings quality") and analyzing surprise earnings results that exceeded previous earnings or analyst forecasts, because "managers of firms whose unmanaged earnings fall marginally below the benchmarks have [an] incentive to manage earnings upwards so as to meet or beat previous earnings").

[57]     Id. at 1612.

[58]     See Maria Consuelo Pucheta-Martínez et al., *Corporate governance, female directors and quality of financial information.* 25(4) Bus. Ethics: A European Rev. 363, 378 (2016) (analyzing a sample of non-financial companies listed on the Madrid Stock Exchange during 2004-2011).

[59]     Id. at 363.

audit committees "ensure that managers do not seek to pressure auditors into issuing a clean opinion instead of a qualified opinion" when any uncertainties or scope limitations are identified.[60]

More recently, a study by Gull in 2018 found that the presence of female audit committee members with business expertise is associated with a lower magnitude of earnings management,[61] and a study conducted in 2019 by Bravo and Alcaide-Ruiz found "the disclosure of [financial forward-looking] information is associated with the presence of female audit committee members with financial expertise, especially accounting expertise."[62] Bravo and Alcaide-Ruiz concluded that "female [audit committee] members with financial expertise play an important role in influencing disclosure strategies that provide forward-looking information containing projections and financial data useful for investors."[63]

While the above studies demonstrate a positive association between gender diverse audit committees and the quality of a company's earnings, financial information,

---

[60]    Id. at 368.

[61]    See Ammar Gull et al., *Beyond gender diversity: How specific attributes of female directors affect earnings management*, 50(3) British Acct. Rev. 255 (Sept. 2017), available at: https://ideas.repec.org/a/eee/bracre/v50y2018i3p255-274.html (analyzing 394 French companies belonging to the CAC All-Shares index listed on Euronext Paris from 2001 to 2010, prior to the implementation of France's gender mandate law that required women to comprise 20% of a company's board of directors by 2014 and 40% by 2016).

[62]    See Francisco Bravo and Maria Dolores Alcaide-Ruiz, *The disclosure of financial forward-looking information*, 34(2) Gender in Mgmt. 140, 140 (2019) (analyzing companies included in the S&P 100 Index in 2016, "focus[ing] on the disclosure of financial forward-looking information (which is likely to require financial expertise), such as earnings forecasts, expected revenues, anticipated cash flows or any other financial indicator").

[63]    Id. at 150.

and public disclosures, other studies found a positive association between board gender

diversity and important investor protections regardless of whether or not women are on

the audit committee.

Abbott, Parker & Persley (2012) found, within a sample of non-Fortune 1000

companies, "a significant association between the presence of at least one woman on the

board and a lower likelihood of [a material financial] restatement."[64]  Their findings are

consistent with a subsequent study by Wahid (2019), which concluded that "gender-

diverse boards commit fewer financial reporting mistakes and engage in less fraud."[65]

Specifically, companies with female directors have "fewer irregularity-type [financial]

restatements, which tend to be indicative of financial manipulation."[66]  Wahid suggested

that the implications of her study extend beyond gender diversity:

> If you're going to introduce perspectives, those perspectives might be coming not
> just from male versus female.  They could be coming from people of different
> ages, from different racial backgrounds . . . [and] [i]f we just focus on one, we

---

[64]  See Lawrence J. Abbott et al., *Female Board Presence and the Likelihood of Financial Restatement*, 26(4) Accounting Horizons 607, 626 (2012) (analyzing a sample of 278 pre-SOX annual financial restatements and 187 pre-SOX quarterly financial restatements of U.S. companies from January 1, 1997 through June 30, 2002 identified by the U.S. General Accounting Office restatement report 03-138 (which only included "material misstatements of financial results"), and 75 post-SOX annual financial restatements from July 1, 2002, to September 30, 2005 identified by U.S. General Accounting Office restatement report 06-678 (which only included "restatements that were being made to correct material misstatements of previously reported financial information"), consisting almost exclusively of non-Fortune 1000 companies).

[65]  Further, these results hold whether firm governance is weak or strong, suggesting that benefits of gender-diverse boards can be realized even in already well-governed firms. See Aida Sijamic Wahid, The *Effects and the Mechanisms of Board Gender Diversity: Evidence from Financial Manipulation*, J Bus Ethics 159, 705–725 (2019) (analyzing 6,132 U.S. public companies during the period from 2000 to 2010, for a total of 38,273 firm-year observations).

[66]  Id. at 721.

could be essentially taking away from other dimensions of diversity and decreasing perspective.[67]

Cumming, Leung and Rui (2015) also examined the relationship between gender diversity and fraud, and found that the presence of women on boards is associated with a lower likelihood of securities fraud; indeed, they found "strong evidence of a negative and diminishing effect of women on boards and the probability of being in our fraud sample."[68]  The authors suggested that "other forms of board diversity, including but not limited to gender diversity, may likewise reduce fraud."[69]

Chen, Eshleman and Soileau (2016) suggested that the relationship between gender diversity and higher earnings quality observed by Srinidhi, Gul and Tsui (2011) is ultimately driven by reduced weaknesses in internal control over financial reporting, noting that "prior literature has established a negative relationship between internal control weaknesses and earnings quality."[70]  The authors found that having at least one woman on the board (regardless of whether or not she is on the audit committee) "may

---

[67]   See Barbara Shecter, *Diverse boards tied to fewer financial 'irregularities,' Canadian study finds*. Financial Post (Feb. 5, 2020), https://business.financialpost.com/news/fp-street/diverse-boards-tied-to-fewer-financial-irregularities-canadian-study-finds (last accessed Nov. 27, 2020).

[68]   See Douglas J. Cumming et al., *Gender Diversity and Securities Fraud*, Academy of Management Journal Vol. 58, No. 5, 1572–1593 (2015) (analyzing China Securities Regulatory Commission data from 2001 to 2010, including 742 companies with enforcement actions for fraud, and 742 non-fraudulent companies for a control group).

[69]   Id. at 1588.

[70]   See Yu Chen et al., *Board Gender Diversity and Internal Control Weaknesses*, 33 Advances in Acct. 11 (2016) (analyzing a sample of 4267 firm-year observations during the period from 2004 to 2013, beginning "the first year internal control weaknesses were required to be disclosed under section 404 of SOX").

lead to [a] reduced likelihood of material weaknesses [in internal control over financial reporting]."[71]

Board gender diversity also was found to be positively associated with more transparent public disclosures. Gul, Srinidhi & Ng (2011) concluded that "gender diversity improves stock price informativeness by increasing voluntary public disclosures in large firms and increasing the incentives for private information collection in small firms."[72] Abad et al. (2017) concluded that companies with gender diverse boards are associated with lower levels of information asymmetry, suggesting that increasing board gender diversity is associated with "reducing the risk of informed trading and enhancing stock liquidity."[73]

Other studies have found that diverse boards are better at overseeing management. Adams and Ferreira (2009) found "direct evidence that more diverse boards are more likely to hold CEOs accountable for poor stock price performance; CEO turnover is more sensitive to stock return performance in firms with relatively more women on boards."[74] Lucas-Perez et al. (2014) found that board gender diversity is positively associated with

---

[71]     Id. at 18.

[72]     See Ferdinand A. Gul et al., *Does board gender diversity improve the informativeness of stock prices?*, 51(3) J. Acct. & Econ. 314 (April 2011) (analyzing 4,084 firm years during the period from 2002 to 2007, excluding companies in the utilities and financial industries, measuring public information disclosure using "voluntary continuous disclosure of 'other' events in 8K reports" and measuring stock price informativeness by "idiosyncratic volatility," or volatility that cannot be explained to systematic factors and can be diversified away).

[73]     See David Abad et al., *Does Gender Diversity on Corporate Boards Reduce Information Asymmetry in Equity Markets?* 20(3) BRQ Business Research Quarterly 192, 202 (July 2017) (analyzing 531 company-year observations from 2004 to 2009 of non-financial companies traded on the electronic trading platform of the Spanish Stock Exchange (SIBE)).

[74]     See Adams and Ferreira, supra note 47, at 292.

linking executive compensation plans to company performance,[75] which may be an effective mechanism to deter opportunistic behavior by management and align their interests with shareholders.[76]  A lack of diversity has been found to have the opposite effect.  Westphal and Zajac (1995) found that "increased demographic similarity between CEOs and the board is likely to result in more generous CEO compensation contracts."[77]

C.  Diversity and Decision Making

Wahid (2019) suggests that "at a minimum, gender diversity on corporate boards has a neutral effect on governance quality, and at best, it has positive consequences for boards' ability to monitor firm management."[78]  Nasdaq reviewed studies suggesting that board diversity can indeed enhance a company's ability to monitor management by reducing "groupthink" and improving decision making.

In 2009, the Commission, in adopting rules requiring proxy disclosure describing whether a company considers diversity in identifying director nominees, recognized the impact of diversity on decision making and corporate governance:

A board may determine, in connection with preparing its disclosure, that it is beneficial to disclose and follow a policy of seeking diversity.  Such a policy may encourage boards to conduct broader director searches, evaluating a wider range of candidates and potentially improving board quality.  To the extent that boards branch out from the set of candidates they would ordinarily consider, they may nominate directors who have fewer existing ties to the board or management and are, consequently, more independent.  To the extent that a more independent board is desirable at a particular company, the resulting increase in board

---

[75]    See Maria Encarnacion Lucas-Perez et al., *Women on the Board and Managers' Pay: Evidence from Spain*, 129 J. Bus. Ethics 285 (April 2014).

[76]    Id.

[77]    See James D. Westphal and Edward J. Zajac, *Who Shall Govern? CEO/Board Power, Demographic Similarity, and New Director Selection*, 40(1) Admin. Sci. Q. 60, 77 (March 1995).

[78]    See Wahid, supra note 65, at 707.

independence could potentially improve governance.  In addition, in some companies a policy of increasing board diversity may also improve the board's decision making process by encouraging consideration of a broader range of views.[79]

Nasdaq agrees with the Commission's suggestion that board diversity improves board quality, governance, and decision making.  Nasdaq is concerned that boards lacking diversity can inadvertently suffer from "groupthink," which is "a dysfunctional mode of group decision making characterized by a reduction in independent critical thinking and a relentless striving for unanimity among members."[80]  The catastrophic financial consequences of groupthink became evident in the 2008 global financial crisis, after which the IMF's Independent Evaluation Office concluded that "[t]he IMF's ability to correctly identify the mounting risks [as the crisis developed] was hindered by a high degree of groupthink."[81]

Other studies suggest that increased diversity reduces groupthink and leads to robust dialogue and better decision making.  Dallas (2002) observed that "heterogeneous groups share conflicting opinions, knowledge, and perspectives that result in a more thorough consideration of a wide range of interpretations, alternatives, and

---

[79]    See Proxy Disclosure Enhancements, 74 Fed. Reg. 68,334, 68,355 (Dec. 23, 2009).

[80]    See Daniel P. Forbes and Frances J. Milliken, *Cognition and Corporate Governance: Understanding Boards of Directors as Strategic Decision-Making Groups*, 24(3) Acad. Mgmt. Rev. 489, 496 (Jul. 1999).

[81]    See International Monetary Fund, *IMF Performance in the Run-Up to the Financial and Economic Crisis* (August 2011), available at: https://www.elibrary.imf.org/view/IMF017/11570-9781616350789/11570-9781616350789/ch04.xml?language=en&redirect=true ("The evaluation found that incentives were not well aligned to foster the candid exchange of ideas that is needed for good surveillance—many staff reported concerns about the consequences of expressing views contrary to those of supervisors, [m]anagement, and country authorities.").

consequences."[82]  Bernile et al. (2018) found that "diversity in the board of directors

reduces stock return volatility, which is consistent with diverse backgrounds working as a

governance mechanism, moderating decisions, and alleviating problems associated with

'groupthink.'"[83]  Dhir (2015) concluded that gender diversity may "promote cognitive

diversity and constructive conflict in the boardroom."[84]  After interviewing 23 directors

about their experience with Norway's board gender mandate, he observed:

> First, many respondents contended that gender diversity promotes enhanced
> dialogue.  Interviewees frequently spoke of their belief that heterogeneity has
> resulted in:  (1) higher quality boardroom discussions; (2) broader discussions that
> consider a wide range of angles or viewpoints; (3) deeper or more thorough
> discussions; (4) more frequent and lengthier discussions; (5) better informed
> discussions; (6) discussions that are more frequently brought inside the
> boardroom (as opposed to being held in spaces outside the boardroom, either
> exclusively or in addition to inside the boardroom); or (7) discussions in which
> items that directors previously took for granted are drawn out and addressed—
> where the implicit becomes explicit.  Second, and intimately related, many
> interviewees indicated that diversification has led to (or has the potential to lead
> to) better decision making processes and/or final decisions.[85]

Investors also have emphasized the importance of diversity in decision making.

A group of institutional investors charged with overseeing state investments and the

retirement savings of public employees asserted that "board members who possess a

variety of viewpoints may raise different ideas and encourage a full airing of dissenting

views.  Such a broad pool of talent can be assembled when potential board candidates are

---

[82]    See Lynne L. Dallas, *Does Corporate Law Protect the Interests of Shareholders and Other Stakeholders?:  The New Managerialism and Diversity on Corporate Boards of Directors*, 76 Tul. L. Rev. 1363, 1391 (June 2002).

[83]    See Bernile et al., supra note 33, at 608.

[84]    See Aaron A. Dhir, CHALLENGING BOARDROOM DIVERSITY: CORPORATE LAW, GOVERNANCE, AND DIVERSITY 150 (2015) (emphasis removed) (sample included 23 directors of Norwegian corporate boards, representing an aggregate of 95 board appointments at more than 70 corporations).

[85]    Id. at 124 (emphasis removed).

not limited by gender, race, or ethnicity."[86]

Nasdaq believes that cognitive diversity is particularly important on boards in their advisory role, especially related to corporate strategy, because "the 'output' that boards produce is entirely cognitive in nature."[87]  While in 1999, Forbes and Milliken characterized boards as "large, elite, and episodic decision making groups that face complex tasks pertaining to strategic-issue processing,"[88] over the past two decades, their role has evolved; boards are now more active, frequent advisors on areas such as cybersecurity, social media, and environmental, social and governance ("ESG") issues such as climate change and racial and gender inequality.  Nasdaq believes that boards comprised of directors from diverse backgrounds enhance investor confidence by ensuring that board deliberations include the perspectives of more than one demographic group, leading to more robust dialogue and better decision making.

IV.    Current State of Board Diversity and Causes of Underrepresentation on Boards

While the above studies suggest a positive association between board diversity, company performance, investor protections, and decision making, there is a noticeable lack of diversity among U.S. public companies.  Nasdaq is a global organization and operates in many countries that already have implemented diversity-focused directives. In fact, Nasdaq-listed companies in Europe already are subject to diversity

---

[86]    See Petition for Amendment of Proxy Rule (March 31, 2015), available at: https://www.sec.gov/rules/petitions/2015/petn4-682.pdf.

[87]    See Forbes and Milliken, supra note 80, at 492.

[88]    Id.

requirements.[89]  This first-hand experience provides Nasdaq with a unique perspective to incorporate global best practices into its proposal to advance diversity on U.S. corporate boards.  Given that the U.S. ranks 53rd in board gender diversity, according to the World Economic Forum in its 2020 Global Gender Gap Report, Nasdaq believes advancing board diversity in the U.S. is a critical business and market imperative.  This same report also found that "American women still struggle to enter the very top business positions: only 21.7% of corporate managing board members are women."[90]  As of 2019, women directors held 19% of Russell 3000 seats (up from 16% in 2018).[91]  In comparison, women hold more than 30% of board seats in Norway, France, Sweden, and Finland.[92]  At the current pace, the U.S. GAO estimates that it could take up to 34 years for U.S. companies to achieve gender parity on their boards.[93]

---

[89]    On Nasdaq's Nordic and Baltic exchanges, large companies must comply with EU Directive 2014/95/EU (the "EU Directive"), as implemented by each member state, which requires companies to disclose a board diversity policy with measurable objectives (including gender), or explain why they do not have such a policy.  On Nasdaq Vilnius, companies are also required to comply with the Nasdaq Corporate Governance Code for Listed Companies or explain why they do not, which requires companies to consider diversity and seek gender equality on the board.  Similarly, on Nasdaq Copenhagen, companies are required to comply with the Danish Corporate Governance Recommendations or explain why they do not, which requires companies to adopt and disclose a diversity policy that considers gender, age and international experience.  On Nasdaq Iceland, listed companies must have at least 40% women on their board (a government requirement) and comply with the EU Directive.

[90]    See World Economic Forum, *Global Gender Gap Report 2020* 33 (2019), available at: http://www3.weforum.org/docs/WEF_GGGR_2020.pdf.

[91]    See Kosmas Papadopoulos, ISS Analytics, *U.S. Board Diversity Trends in 2019* 4-5 (May 31, 2019), available at: https://www.issgovernance.com/file/publications/ISS_US-Board-Diversity-Trends-2019.pdf.

[92]    See Deloitte, *Women in the Boardroom: A global perspective* (6th ed. 2019), available at: https://www2.deloitte.com/content/dam/Deloitte/global/Documents/Risk/gx-risk-women-in-the-boardroom-sixth-edition.pdf.

[93]    See GAO Report, supra note 49.

Progress toward greater racial and ethnic diversity in U.S. company boardrooms has been slower.  Over the past ten years, the percentage of African American/Black directors at Fortune 500 companies has remained between 7 and 9%, while the percentage of women directors has grown from 16 to 23%.[94]  In 2019, only 10% of board seats at Russell 3000 companies were held by racial minorities, reflecting an incremental increase from 8% in 2008.[95]  Among Fortune 500 companies in 2018, there were fewer than 20 directors who publicly self-identified as LGBT+, and only nine companies reported considering sexual orientation and/or gender identity when identifying director nominees.[96]

Women and minority directors combined accounted for 34% of Fortune 500 board seats in 2018.[97]  While women of color represent 18% of the U.S. population, they held 4.6% of Fortune 500 board seats in 2018.[98]  Male underrepresented minorities held 11.5% of board seats at Fortune 500 companies in 2018, compared to 66% of board seats held by Caucasian/White men.  Overall in 2018, 83.9% of board seats among Fortune 500 companies were held by Caucasian/White individuals (who represent 60.1% of the U.S. population), 8.6% by African American/Black individuals (who represent 13% of

---

[94]    See Russell Reynolds, *Ethnic & Gender Diversity on US Public Company Boards* 6 (September 8, 2020).

[95]    See Papadopoulous, supra note 91, at 5.

[96]    See Out Leadership, supra note 42.

[97]    See Deloitte, *Missing Pieces Report: The 2018 Board Diversity Census of Women and Minorities on Fortune 500 Boards* 9 (2018), available at: https://www2.deloitte.com/content/dam/Deloitte/us/Documents/center-for-board-effectiveness/us-cbe-missing-pieces-report-2018-board-diversity-census.pdf.

[98]    See Catalyst, *Too Few Women of Color on Boards: Statistics and Solutions* (Jan. 31, 2020), https://www.catalyst.org/research/women-minorities-corporate-boards/.

the U.S. population), 3.8% by Hispanic/Latino(a) individuals (who represent 19% of the U.S. population), and 3.7% by Asian/Pacific Islander individuals (who represent 6% of the U.S. population).[99]  In its analysis of Russell 3000 companies, 2020 Women on Boards concluded that "larger companies do better with their diversity efforts than smaller companies."[100]

Based on the limited information that is available, Nasdaq believes a supermajority of listed companies have made notable strides to improve gender diversity in the boardroom and have at least one woman on the board.  Nasdaq also believes that listed companies are diligently working to add directors with other diverse attributes, although consistent with other studies of U.S. companies, Nasdaq believes the pace of progress, in this regard, is happening more gradually.  Thus, and for the reasons discussed in this Section IV of the Purpose section, Nasdaq has concluded that a disclosure-based approach to encouraging greater diversity and data transparency would be beneficial.

Nasdaq reviewed academic and empirical studies on the causes of underrepresentation on boards and the approaches taken by other jurisdictions to remedy underrepresentation.  Those studies suggest that the traditional director candidate selection process may create barriers to considering qualified diverse candidates for board positions.  Dhir (2015) explains that "[t]he presence of unconscious bias in the board appointment process, coupled with closed social networks, generates a complex set

---

[99]    See Deloitte, *Missing Pieces Report*, supra note 97; United States Census Bureau, *QuickFacts*, available at: https://www.census.gov/quickfacts/fact/table/US/PST045219.

[100]   See *2020 Women On Boards Gender Diversity Index* 4 (2019), available at: https://2020wob.com/wp-content/uploads/2019/10/2020WOB_Gender_Diversity_Index_Report_Oct2019.pdf.

of barriers for diverse directors; these are the 'phantoms' that prevent entry."[101]  In 2011,

the Davies Review found that "informal networks influential in board appointments"

contribute to the underrepresentation of women in the boardrooms of U.K. listed

companies.[102]  In 2017, the Parker Review acknowledged that "as is the case with gender,

people of colour within the UK have historically not had the same opportunities as many

mainstream candidates to develop the skills, networks and senior leadership experience

desired in a FTSE Boardroom."[103]  In 2020, the United Kingdom Financial Reporting

Council commissioned a report to analyze barriers to LGBTQ+ inclusion and promotion

in the workplace.  Leaders who self-identified as LGBTQ+ expressed concerns about the

current board nomination process, which includes "relying on personal recommendations

without transparent competition or due process [and] informal 'interviewing' outside the

selection process."[104]

     These concerns are not unique to the United Kingdom.  The U.S. GAO (2015)

found that women's representation on corporate boards may be hindered by directors'

tendencies to "rely on their personal networks to identify new board candidates."[105]  Vell

(2017) found that "92% of board seats [of public U.S. and Canadian technology

---

[101]    See Dhir, supra note 84, at 47.

[102]    See Lord Davies of Abersoch, *Women on Boards* 17 (Feb. 2011), available at: https://ftsewomenleaders.com/wp-content/uploads/2015/08/women-on-boards-review.pdf.

[103]    See Sir John Parker, *A Report into the Ethnic Diversity of UK Boards* 38 (Oct. 12, 2017), available at: https://assets.ey.com/content/dam/ey-sites/ey-com/en_uk/news/2020/02/ey-parker-review-2017-report-final.pdf.

[104]    See Catriona Hay et al., The Financial Reporting Council, *Building more open business* 25 (2020), available at: https://www.frc.org.uk/getattachment/19f3b216-bd45-4d46-af2f-f191f5bf4a07/The-Good-Side-x-Financial-Reporting-Council-1811-AMENDED.pdf.

[105]    See GAO Report, supra note 49, at 15.

companies] are filled through networking, and women have less access to these

networks."[106]  Deloitte and the Society for Corporate Governance (2019) found that this

is also common in other industries including media, communications, energy, consumer

products, financial services and life sciences.[107]  They observed that although 94% of

companies surveyed were looking to increase diversity among their boards, 77% of those

boards looked to referrals from current directors when identifying diverse director

candidates, suggesting that "networking is still key to board succession."[108]  Dhir (2015),

in a qualitative study of Norwegian directors, observed that "[b]oard seats tend to be

filled by directors engaging their networks, and the resulting appointees tend to be of the

same socio-demographic background."[109]

Another contributing factor may be the traditional experience sought in director

nominees.  Rhode & Packel (2014) observed that:

> One of the most common reasons for the underrepresentation of women and
> minorities on corporate boards is their underrepresentation in the traditional
> pipeline to board service.  The primary route to board directorship has long been
> through experience as a CEO of a public corporation. . . .  Given the low
> representation of women and minorities in top executive positions, their talents
> are likely to be underutilized if selection criteria are not broadened.[110]

---

[106]   See Vell Executive Search, *Women Board Members in Tech Companies: Strategies for
Building High Performing Diverse Boards* 6 (2017), available at:
https://www.vell.com/images/pdf/VELL%20Report%20Women%20Board%20Members
%20on%20Tech%20Boards%202017%203%2029.pdf.

[107]   See Deloitte and the Society of Corporate Governance, *Board Practices Report: Common
threads across boardrooms* 5 (2019), available at:
https://higherlogicdownload.s3.amazonaws.com/GOVERNANCEPROFESSIONALS/a8
892c7c-6297-4149-b9fc-
378577d0b150/UploadedImages/1202241_2018_Board_Practices_Report_FINAL.pdf.

[108]   Id. at 6.

[109]   See Dhir, supra note 84, at 52.

[110]   See Deborah Rhode and Amanda K. Packel, *Diversity on Corporate Boards: How Much
Difference Does Difference Make?*, 39(2) Del. J. Corp. L. 377, 402-403 (2014); see also

Hillman et al. (2002) found that while white male directors of public companies were more likely to have current or former experience as a CEO, senior manager or director, African-American and white women directors were more likely to have specialized expertise in law, finance, banking, public relations or marketing, or community influence from positions in politics, academia or clergy.[111]  Dhir (2015) suggests that "[c]onsidering persons from other, non-management pools, such as academia, legal and accounting practice, the not-for-profit sector and politics, may help create a broader pool of diverse candidates."[112]  Directors surveyed by the U.S. GAO also "suggested, for example, that boards recruit high performing women in other senior executive level positions, or look for qualified female candidates in academia or the nonprofit and government sectors. . . . [I]f boards were to expand their director searches beyond CEOs more women might be included in the candidate pool."[113]

Investors have begun calling for greater transparency surrounding ethnic diversity on company boards, and in the past several months as the U.S. has seen an uprising in the racial justice movement, there has been an increase in the number of African Americans

---

Dhir, supra note 84, at 39 ("[T]here is an apparent preference for either CEOs (whether current or retired) or senior management who have experience at the helm of a particular business stream or unit….  The fact that far fewer women than men have been CEOs has a potentially devastating effect on access to the boardroom, which in turn can have an effect on the number of women who rise to the level of CEO and to the executive suite.").

[111]  See Amy J. Hillman et al., *Women and Racial Minorities in the Boardroom: How Do Directors Differ?*, 28(6) J. Mgmt. 747, 749, 754 (2002).

[112]  See Dhir, supra note 84, at 42.

[113]  See GAO Report supra note 49, at 18.

appointed to Russell 3000 corporate boards.[114]  In a five-month span, 130 directors

appointed were African American, in comparison to the 38 African American directors

who were appointed in the preceding five months.[115]  Although tracking the acceleration

in board diversity is feasible for some Russell 3000 companies, many of the companies

do not disclose the racial makeup of the board, making it impossible to more broadly

assess the impact of recent events on board diversity.

  V.  <u>Stakeholder Perspectives</u>

    To gain a better understanding of the current state of board diversity, benefits of

diversity, causes of underrepresentation on boards, and potential remedies to address

underrepresentation, Nasdaq spoke with leaders representing a broad spectrum of market

participants and other stakeholders.  Nasdaq sought their perspectives to inform its

analysis of whether the proposed rule changes would promote the public interest and

protection of investors without unduly burdening competition or conflicting with existing

securities laws.  The group included representatives from the investor, regulatory,

investment banking, venture capital and legal communities.  Nasdaq also spoke with

leaders of civil rights and corporate governance organizations, and organizations

representing the interests of private and public companies, including Nasdaq-listed

companies.  Specifically, Nasdaq obtained their views on:

- the current state of board diversity in the U.S.;

- the inherent value of board diversity;

---

[114]  <u>See</u> Leslie P. Norton, *The Number of Black Board Members Surged After George Floyd's Death*, <u>Barron's</u>, Oct. 27, 2020, available at:  https://www.barrons.com/articles/after-george-floyds-death-the-number-of-black-board-members-surges-51603809011.

[115]  <u>Id.</u>

- increasing pressure from legislators and investors to improve diverse representation on boards and board diversity disclosure;

- whether a listing rule related to board diversity is in the public interest;

- how to define a "diverse" director; and

- the benefits and challenges of various approaches to improving board diversity disclosures and increasing diverse representation on boards, including mandates and disclosure-based models.

The discussions revealed strong support for disclosure requirements that would standardize the reporting of board diversity statistics.  The majority of organizations also were in agreement that companies would benefit from a disclosure-based, business-driven framework to drive meaningful and systemic change in board diversity, and that a disclosure-based approach would be more palatable to the U.S. business community than a mandate.  While many organizations recognized that mandates can accelerate the rate of change, they expressed that a disclosure-based approach is less controversial, would spur companies to take action, and make meaningful progress on board diversity.  Business leaders also expressed concern that smaller companies would require flexibility and support to meet with any time-sensitive objectives to add diverse directors.  Some stakeholders highlighted additional challenges that smaller companies, and companies in certain industries, may face finding diverse board members.  Leaders from across the spectrum of stakeholders that Nasdaq surveyed reinforced the notion that if companies recruit by skill set and expertise rather than title, then they will find there is more than enough diverse talent to satisfy demand.  Leaders from the legal community emphasized that any proposed rule that imposed additional burdens beyond, or is inconsistent with, existing securities laws—by, for example, requiring companies to adopt a diversity policy

or include disclosure solely in their proxy statements—would present an additional burden and potentially more legal liability for listed companies.

VI.    U.S. Regulatory Framework

As detailed above, diversity has been the topic of a growing number of studies over the past decade and, in recent years, investors have been increasingly advocating for greater diversity among directors of public companies.[116]   In recent years, diversity has become increasingly important to the public, including institutional investors, pension funds, and other stakeholders who believe that board diversity enhances board performance and is an important factor in the voting decisions of some investors.[117] Legislators increasingly are taking action to encourage corporations to diversify their boards and improve diversity disclosures.[118]

---

[116]    In 2009, when the Commission proposed enhancements to proxy disclosures, including addressing board diversity disclosures, the Commission received over 130 comment letters related to its proposal, including from corporations, pension funds, professional associations, trade unions, accounting firms, law firms, consultants, academics, individual investors and other interested parties.  See Proxy Disclosure Enhancements, 74 Fed. Reg. at 68,335; see also David A. Katz and Laura McIntosh, *Raising the Stakes for Board Diversity*, Law.com (July 22, 2020), available at: https://www.law.com/newyorklawjournal/2020/07/22/raising-the-stakes-for-board-diversity/?slreturn=20201017021522; Office of the Illinois State Treasurer, *The Investment Case For Board Diversity: A Review of the Academic and Practitioner Research on the Value of Gender and Racial/Ethnic Board Diversity for Investors* 7 (Oct. 2020), available at: https://illinoistreasurergovprod.blob.core.usgovcloudapi.net/twocms/media/doc/il%20treasurer%20white%20paper%20-%20the%20investment%20case%20for%20board%20diversity%20(oct%202020).pdf.

[117]    See Comments on Proposed Rule: Proxy Disclosure and Solicitation Enhancements, available at:  https://www.sec.gov/comments/s7-13-09/s71309.shtml.  See also CGLytics, *Diversity on the Board? Metrics Used by Fortune 100 Companies* (June 29, 2020), available at:  https://www.cglytics.com/diversity-on-the-board-metrics-of-fortune-100-companies/; Office of the Illinois State Treasurer, supra note 116.

[118]    For example, California requires companies headquartered in the state to have at least one director who self-identifies as a Female and one director from an Underrepresented Community.  See Cal. S.B. 826 (Sept. 30, 2018); Cal. A.B. 979 (Sept. 30, 2020). Washington requires companies headquartered in the state to have at least 25% women

### A. SEC Diversity Disclosure Requirements – Background

In 2009, the Commission sought comment on whether to amend Item 407(c)(2)(v) of Regulation S-K to require disclosure of whether a nominating committee considers diversity when selecting a director for a position on the board.[119]  The Commission received more than 130 comment letters on its proposal.  According to a University of Dayton Law Review analysis of those comment letters, most were submitted by groups with a specific interest in diversity, or by institutional investors, including mutual funds, pension funds, and socially responsible investment funds.[120]  Further, the analysis showed that 56 commenters addressed the issue of diversity disclosures, and only five of those 56 commenters did not favor such disclosure.[121]  Twenty-seven of the 56 mentioned gender diversity, 18 mentioned racial diversity, and 13 mentioned ethnic diversity.  However, neither the proposed rule nor the final rule defined diversity.[122]

Ten years after adopting board diversity disclosure rules, the Commission staff revisited the rules by establishing new Compliance and Disclosure Interpretations ("C&DI").[123]  However, the staff did not provide a definition of diversity, and therefore

---

on the board by 2022 or provide certain disclosures.  See Wash. Subst. S.B. 6037 (June 11, 2020).  At least eleven states have proposed diversity-related requirements.  See Hatcher and Latham, supra note 15.

[119]    See Proxy Disclosure and Solicitation Enhancements, 74 Fed. Reg. 35,076, 35,084 (July 17, 2009) (proposed rule).

[120]    See Thomas Lee Hazen and Lissa Lamkin Broome, *Board Diversity and Proxy Disclosure*, 37:1 Univ. Dayton L. Review 41, 51, n. 82 (citing the comment letters).

[121]    Of the five comments that opposed diversity disclosure, three stated that diversity was an important value.  See Comments on Proposed Rule, supra note 117; see also Hazen and Broome, supra note 120, at 54 n.88 (citing the 56 comment letters).

[122]    See Hazen and Broome, supra note 120, at 53 n. 84-86.

[123]    See Securities and Exchange Commission Compliance & Disclosure Interpretations, available at: https://www.sec.gov/divisions/corpfin/cfguidance.shtml.

issuers currently are not required to disclose the race, ethnicity or gender of their directors or nominees.

Currently, Item 401(e)(1) of Regulation S-K requires a company to "briefly discuss the specific experience, qualifications, attributes or skills that led to the conclusion that the person should serve as a director."[124]  The C&DI, in response to Question 116.11, clarifies that if a board considered a director's self-identified diversity characteristics (*e.g.*, race, gender, ethnicity, religion, nationality, disability, sexual orientation, or cultural background) during the nomination process, and the individual consents to disclose those diverse characteristics, the Commission staff "would expect that the company's discussion required by Item 401 would include, but not necessarily be limited to, identifying those characteristics and how they were considered."[125]

Rather than providing a specific definition of diversity, the C&DI provides a non-exhaustive list of examples of diverse characteristics that a company could consider for purposes of Item 401(e)(1), including "race, gender, ethnicity, religion, nationality, disability, sexual orientation, or cultural background."[126]  Additionally, the Commission staff stated that any description of a company's diversity policy would be expected to include "a discussion of how the company considers the self-identified diversity attributes of nominees as well as any other qualifications its diversity policy takes into

---

[124]  <u>See</u> 17 C.F.R. § 229.401(e)(1).

[125]  <u>See</u> Securities and Exchange Commission, Regulation S-K Compliance & Disclosure Interpretations (Sept. 21, 2020), Question 116.11 Answer, available at: https://www.sec.gov/divisions/corpfin/guidance/regs-kinterp.htm.

[126]  <u>Id.</u>

account, such as diverse work experiences, military service, or socio-economic or

demographic characteristics."[127]

Item 407(c)(2)(vi) of Regulation S-K requires proxy disclosure regarding whether

diversity is considered when identifying director nominees and, if so, how.  In addition, if

the board or nominations committee has adopted a diversity policy, the company must

describe how the policy is implemented and its effectiveness is assessed.[128]  When

adopting Item 407(c)(2)(vi), the Commission explained:

> We recognize that companies may define diversity in various ways, reflecting
> different perspectives.  For instance, some companies may conceptualize diversity
> expansively to include differences of viewpoint, professional experience,
> education, skill and other individual qualities and attributes that contribute to
> board heterogeneity, while others may focus on diversity concepts such as race,
> gender and national origin.  We believe that for purposes of this disclosure
> requirement, companies should be allowed to define diversity in ways that they
> consider appropriate.  As a result, we have not defined diversity in the
> amendments.[129]

Moreover, Item 407(c)(2)(vi) does not require companies to adopt a formal policy

and does not require them to explain why they have not.  It also does not require public

disclosure of board-level diversity statistics.

B.  <u>Weaknesses of Current Diversity Disclosure Requirements</u>

Given the broad latitude afforded to companies by the Commission's rules related

to board diversity and proxy disclosure, current reporting of board-level diversity

statistics is unreliable and unusable to investors.  This is due to myriad data collection

challenges, including the scarcity of reported information, the lack of uniformity in the

---

[127]    <u>Id.</u>

[128]    <u>See</u> 17 C.F.R. § 229.407(c)(2)(vi).

[129]    <u>See</u> Proxy Disclosure Enhancements, 74 Fed. Reg. at 68,344.

information that is disclosed and inconsistencies in the definitions of diversity characteristics across companies.[130]  Nasdaq recently began examining the state of board diversity among its listed companies.  While conducting that research, Nasdaq encountered multiple key challenges, such as:  (1) inconsistent disclosure and definitions of diversity across companies; (2) limited data on diverse characteristics outside of gender; (3) inconsistent or no disclosure of a director's race, ethnicity, or other diversity attributes (*e.g.*, nationality); (4) difficult-to-extract data because statistics are often embedded in graphics; and (5) aggregation of information, making it difficult to separate gender from other categories of diversity.  Investors and data analysts have raised similar criticisms.

As the Illinois Treasurer observed, the paucity of data on race and ethnicity creates barriers to investment analysis, due diligence, and academic study.[131]  For example, the scarcity of such data is an impediment to academics who want to study the performance impact of racially diverse boards.[132]  Nasdaq is concerned that investors also face the many data collection challenges Nasdaq encountered, rendering current diversity disclosures unreliable, unusable, and insufficient to inform investment and voting decisions.  Acting Chair Allison Herren Lee expressed similar concerns, stating that the current SEC disclosure requirements have "led to spotty information that is not

---

[130]     See Petition for Rulemaking (July 6, 2017), available at: https://www.sec.gov/rules/petitions/2017/petn4-711.pdf.

[131]     See Press Release, *Illinois State Treasurer Frerichs Calls on Russell 3000 Companies to Disclose Diversity Data* (Oct. 28, 2020), available at https://illinoistreasurergovprod.blob.core.usgovcloudapi.net/twocms/media/doc/october2020_russell3000.pdf.

[132]     See Office of Illinois State Treasurer, supra note 116, at 3-4.

standardized, not consistent period to period, not comparable across companies, and not

necessarily reliable. . . .  And the current state of disclosure reveals the shortcomings of a

principles-based materiality regime in this area."[133]

Some stakeholders believe there is a correlation between companies that disclose

the gender, racial and ethnic composition of their board, and the number of diverse

directors on those companies' boards.[134]  Currently, the lack of reliable and consistent

data makes it difficult to measure diversity in the boardroom, and a common set of

standards for diversity definitions and disclosure format is greatly needed.  At present,

U.S. companies must navigate a complex patchwork of federal and state regulations and

disclosure requirements.  The limited disclosure currently provided voluntarily, which is

primarily focused on gender (due in part to that data being the most readily available),

fails to provide the full scope of a board's diverse characteristics.[135]  It is difficult to

improve what one cannot accurately measure.  This lack of transparency is impacting

investors who are increasingly basing public advocacy, proxy voting and direct

shareholder-company engagement decisions on board diversity considerations.[136]

---

[133]    See Lee, supra note 27.

[134]    See Proxy Disclosure Enhancements, 74 Fed. Reg. at 68,355 ("Although the[se] amendments are not intended to steer behavior, diversity policy disclosure may also induce beneficial changes in board composition.  A board may determine, in connection with preparing its disclosure, that it is beneficial to disclose and follow a policy of seeking diversity."); see also Office of Illinois State Treasurer, supra note 116, at 3.

[135]    See, e.g., CGLytics, supra note 117, at https://www.cglytics.com/diversity-on-the-board-metrics-of-fortune-100-companies/; Petition for Amendment of Proxy Rule, supra note 86; Office of Illinois State Treasurer, supra note 116.

[136]    See Office of the Illinois State Treasurer, *Russell 3000 Board Diversity Disclosure Initiative*, https://www.illinoistreasurer.gov/Financial_Institutions/Equity,_Diversity__Inclusion/Russell_3000_Board_Diversity_Disclosure_Initiative (last accessed Nov. 25, 2020).

C.  Widespread Support for Updating Diversity Disclosure Requirements

Nasdaq's surveys of investors and reviews of their disclosed policies and actions show that board diversity is a priority when assessing companies, and investors report, in some cases, relying on intuition when there is a lack of empirical, evidenced-based data. Furthermore, the continued growth of ESG investing raises the importance of quality data, given the data-driven nature of investment products such as diversity-specific indices and broader ESG funds.

Shareholders have a unique platform from which to engage and influence a company's position on important topics like diversity.  Similarly, Nasdaq, like other self-regulatory organizations, is well positioned to establish practices that will assist in carrying out Nasdaq's mandate to protect investors and remove impediments from the market.  Various stakeholders, including Nasdaq, believe that clear and concise annual disclosure of board diversity information that disaggregates the data by race, ethnicity, gender identity, and sexual orientation will provide the public, including key stakeholders, with a better sense of a company's approach to improving corporate diversity and the support needed to effectuate any changes.  Required disclosures also would eliminate the number of shareholder proposals asking for these key metrics and the need for companies to respond to multiple investor requests for information.[137] Moreover, companies manage issues more closely and demonstrate greater progress when data is available.[138]

---

[137]     See Petition for Rulemaking, supra note 130, at 2.

[138]     See, e.g., Gwen Le Berre, Parametric, *Investors Need Data to Make Diversity a Reality* (Aug. 24, 2020), https://www.parametricportfolio.com/blog/investors-need-data-to-make-diversity-a-reality.

In 2015, nine large public pension funds that collectively supervised $1.12 trillion in assets at the time petitioned the Commission to require registrants to disclose information related to, among other things, the gender, racial, and ethnic diversity of the registrant's board nominees.[139]  In 2017, Human Capital Management Coalition, which described itself as a group of institutional investors with $2.8 trillion in assets at the time, made a similar petition to the Commission.[140]  Additionally, Vanguard announced in 2020 it would begin asking companies about the race and ethnicity of directors.[141]  More recently, in January 2021, Blackrock published its annual proxy voting guidelines encouraging boards to disclose demographics related to board diversity, including, but not limited to, gender, ethnicity, race, age, and geographic location.[142]  In October 2020, the Illinois Treasurer spearheaded an initiative along with twenty other investor organizations, asking for all companies in the Russell 3000 Index to disclose the composition of their board, including each board member's gender, race, and ethnicity.[143]  And in August 2020, State Street Global Advisors reiterated their call for U.S. companies in State Street's portfolio to disclose board-level diversity characteristics, including the racial and ethnic makeup of directors.[144]

---

[139]    See Petition for Amendment of Proxy Rule, supra note 86.

[140]    See Petition for Rulemaking, supra note 130.

[141]    See Vanguard 2020 Annual Report supra note 13.

[142]    See Blackrock Investor Stewardship Proxy Voting Guidelines for U.S. Securities, available at https://www.blackrock.com/corporate/literature/fact-sheet/blk-responsible-investment-guidelines-us.pdf.

[143]    See Press Release, supra note 131.

[144]    See Richard, F. Lacaille, State Street Global Advisors, Diversity Strategy, Goals & Disclosure: Our Expectation for Public Companies, dated August 27, 2020, available at https://www.ssga.com/us/en/institutional/etfs/insights/diversity-strategy-goals-disclosure-our-expectations-for-public-companies.

The largest proxy advisory firms have aligned their voting policies to encourage increased board diversity disclosure. Institutional Shareholder Services ("ISS") recently adopted a new voting policy under which it will identify boards of companies in the Russell 3000 or S&P 1500 that "lack racial and ethnic diversity (or lack disclosure of such)" in 2021 and, beginning in 2022, will recommend voting against the chair of the nominating committee of such companies. The stated goal of the policy is "helping investors identify companies with which they may wish to engage and to foster dialogue between investors and companies on this topic."[145] In 2017, proxy advisory firm Glass Lewis announced a policy regarding board gender diversity that took effect in 2019. Glass Lewis generally recommends voting against the nominating committee chair of a board that has no female members, and when making such a recommendation, the firm closely examines the company's disclosure of its board diversity considerations and other relevant contextual factors.[146] On November 24, 2020, Glass Lewis announced the publication of its 2021 Proxy Voting Policy Guidelines, which expand its board gender diversity policy to vote against nominating chairs if there are fewer than two female directors, beginning in 2022.[147] Most notably, beginning with the 2021 proxy season, the company will include an assessment report of company proxy disclosures relating to

---

[145]   See ISS Governance, *ISS Announces 2021 Benchmark Policy Updates* (November 12, 2020), available at: https://www.issgovernance.com/iss-announces-2021-benchmark-policy-updates/.

[146]   See Glass Lewis, *2019 Policy Guideline Updates* (Oct. 24, 2018), available at: https://www.glasslewis.com/2019-policy-guideline-updates-united-states-canada-shareholder-initiatives-israel/.

[147]   See Glass Lewis, *2021 Proxy Paper Guidelines: An Overview of the Glass Lewis Approach to Proxy Advice - United States* (2020), available at: https://www.glasslewis.com/wp-content/uploads/2020/11/US-Voting-Guidelines-GL.pdf?hsCtaTracking=7c712e31-24fb-4a3a-b396-9e8568fa0685%7C86255695-f1f4-47cb-8dc0-e919a9a5cf5b.

board diversity, skills and the director nomination process for companies in the S&P 500

index.  According to Glass Lewis, it "will reflect how a company's proxy statement

presents: (i) the board's current percentage of racial/ethnic diversity; (ii) whether the

board's definition of diversity explicitly includes gender and/or race/ethnicity; (iii)

whether the board has adopted a policy requiring women and minorities to be included in

the initial pool of candidates when selecting new director nominees (aka 'Rooney Rule');

and (iv) board skills disclosure."[148]

Congress and members of the Commission also have weighed in on the

importance of improving board transparency.  In 2017, Representative Carolyn Maloney

introduced the "Gender Diversity in Corporate Leadership Act of 2017," which proposed

requiring public companies to provide proxy disclosure regarding the gender diversity of

the board of directors and nominees.[149]  In November 2019, the U.S. House of

Representatives, with bipartisan support, passed the "Corporate Governance Through

Diversity Act of 2019," which requires certain registrants annually to disclose the racial,

ethnic, and gender composition of their boards and executive officers, as well as the

veteran status of any of those directors and officers, in their proxy statements.[150]  The bill

also requires the disclosure of any policy, plan or strategy to promote racial, ethnic, and

---

[148]    Id.

[149]    Gender Diversity in Corporate Leadership Act of 2017, H.R. 1611, 115th Cong. (2017).

[150]    Improving Corporate Governance Through Diversity Act of 2019, H.R. 5084, 116th
       Cong. (2019).

gender diversity among these groups.  Legislators have proposed a companion bill in the U.S. Senate.[151]

The Council of Institutional Investors ("CII"), U.S. Chamber of Commerce,[152] National Urban League, Office of New York State Comptroller, and the National Association for the Advancement of Colored People praised the House of Representatives' for passing the 2019 legislation.  According to the U.S. Chamber of Commerce's members and associations, it has become increasingly important to see improvements in board diversity.[153]  Additionally, CII's General Counsel stated that the proxy statement disclosure requirement in the legislation "could contribute to enhancing U.S. public company board consideration of diversity."[154]

More recently, SEC Commissioners have called for greater transparency surrounding ethnic diversity on company boards.  In a September 2020 speech titled "Diversity Matters, Disclosure Works, and the SEC Can Do More" given at the CII Fall Conference, Acting Chair Lee advocated advancing corporate diversity and for various approaches by which the Commission could promote diversity, including among other

---

[151]    Improving Corporate Governance Through Diversity Act of 2019, S. 360, 116th Cong. (2019).

[152]    See Letter from Various U.S. Chamber of Commerce Associations and Members to Chairman Mike Crapo and Ranking Member Sherrod Brown, U.S. House Committee on Banking, Housing, and Urban Affairs (July 27, 2020), available at: https://www.uschamber.com/sites/default/files/200727_coalition_h.r._5084_senatesmallbusiness.pdf.

[153]    Id.

[154]    See Joe Mont, SEC, Congress seek better diversity disclosures, Compliance Week (Feb. 20, 2019), https://www.complianceweek.com/sec-congress-seek-better-diversity-disclosures/24802.article.

things, strengthening the Commission staff's C&DI's guidance related to disclosure of

board candidate diversity characteristics.[155]  Acting Chair Lee stated:

> [The SEC has] largely declined to require diversity-related disclosure.  In 2009, we
> adopted a requirement for companies to disclose if and how diversity is considered as
> a factor in the process for considering candidates for board positions, including any
> policies related to the consideration of diversity.  In 2018, we issued guidance
> encouraging the disclosure of self-identified characteristics of board candidates.
> While I appreciate these measures, given that women of color hold just 4.6% of
> Fortune 500 board seats and less than one percent of Fortune 500 CEOs are Black,
> it's time to consider how to get investors the diversity information they need to
> allocate their capital wisely.[156]

VII.    Nasdaq's Proposal

   A.  Overview of Disclosure Requirements

Disclosure of information material to an investor's voting and investment decision

is the bedrock of federal securities laws.  The Exchange's listing rules require companies

to comply with federal securities laws, including the registration requirements under the

Securities Act of 1933.  Once listed, companies are obligated to solicit proxies and file all

annual and periodic reports with the Commission under the Act at the prescribed times.[157]

In discharging its obligation to protect investors, Nasdaq monitors listed companies for

compliance with those disclosure obligations, and the failure to do so results in a notice

of deficiency or delisting.

Proposing listing rules designed to enhance transparency is well within the

Exchange's delegated regulatory authority, provided they do not conflict with existing

federal securities laws.  For example, Nasdaq already requires listed companies to

---

[155]    See Lee, supra note 27.

[156]    Id.  Commissioner Crenshaw also expressed disappointment with the Commission's
silence on diversity.  See Crenshaw, supra note 8.

[157]    See Nasdaq Rulebook, Rules 5250(c) and (d).

publicly disclose compensation or other payments by third parties to a company's directors or nominees, notwithstanding that such disclosure is not required by federal securities laws.  In approving that proposed rule, the Commission noted:

> To the extent there are certain factual scenarios that would require disclosure not otherwise required under Commission rules, we believe that it is within the purview of a national securities exchange to impose heightened governance requirements, consistent with the Act, that are designed to improve transparency and accountability into corporate decision making and promote investor confidence in the integrity of the securities markets.[158]

Nasdaq is concerned that while investors have increasingly emphasized that they consider board diversity information to be material, the current lack of transparency and consistency makes it difficult for Nasdaq and investors to determine the state of diversity among listed companies as well as each board's philosophy regarding diversity. Investors also have voiced dissatisfaction about having to independently collect board-level data about race, ethnicity, and gender identity because such investigations can be time consuming, expensive, and fraught with inaccuracies.[159]  Moreover, in some instances, based on Nasdaq's own investigation, such information is either unavailable, or, if available, not comparable across companies.  To the extent investors must obtain this information on their own through an imperfect process, Nasdaq is concerned that it increases information asymmetries between larger stakeholders, who are able to collect this data directly from companies, and smaller investors, who must rely on incomplete public disclosures.  For all investors who take on the burden of independently obtaining the current information, there is a cost and time burden related to the data collection.

---

[158]    See Order Granting Accelerated Approval of a Proposed Rule Change, 81 Fed. Reg. 44,400, 44,403 (July 7, 2016).

[159]    See Petition for Amendment of Proxy Rule, supra note 86, at 2.

Nasdaq believes that additional disclosure regarding a board's composition and philosophy related to board diversity will improve transparency and accountability into corporate decision making.  Nasdaq proposes to improve transparency regarding board diversity by requiring all listed companies to publicly disclose unbundled, consistent data utilizing a uniform, transparent framework on their website or in their proxy statement or information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F) under proposed Rule 5606.  Similarly, Nasdaq proposes to promote accountability in corporate decision-making by requiring companies that do not meet the applicable diversity objectives of proposed Rule 5605(f)(2) to provide investors with an alternative public disclosure of the board's reasons for not doing so under proposed Rule 5605(f)(3). The proposal is a disclosure-based framework, not a mandate.  Nasdaq designed the proposal to avoid a conflict with existing disclosure requirements under Regulation S-K and to mitigate additional burdens for companies by providing them with flexibility to provide such disclosure in advance of the company's next annual meeting of shareholders on their website, in their proxy statement or information statement, or, if the Company does not file a proxy, in its Form 10-K or 20-F, and not requiring them to adopt a formal diversity policy.

Nasdaq proposes to foster consistency in board diversity data disclosure by defining "Diverse" under proposed Rule 5605(f)(1) as "an individual who self-identifies in one or more of the following categories:  Female, Underrepresented Minority, or LGBTQ+," and by adopting the following definitions under proposed Rule 5605(f)(1):

- "Female" means an individual who self-identifies her gender as a woman, without regard to the individual's designated sex at birth.

- "LGBTQ+" means an individual who self-identifies as any of the following: lesbian, gay, bisexual, transgender, or as a member of the queer community.

- "Underrepresented Minority" means an individual who self-identifies as one or more of the following:  Black or African American, Hispanic or Latinx, Asian, Native American or Alaska Native, Native Hawaiian or Pacific Islander, or Two or More Races or Ethnicities.

The terms in the proposed definition of "Underrepresented Minority" reflect the EEOC's categories and are construed in accordance with the EEOC's definitions, which are set forth in Exhibit 3 - Board Diversity Matrix and Instructions.[160]  The terms in the proposed definition of LGBTQ+ are similar to the identities defined in California's A.B. 979, described below, but have been expanded to include the queer community based on Nasdaq's consultation with stakeholders, including human rights organizations.[161]

When defining "Diverse," Nasdaq considered various state and federal legislation, stakeholder sentiments, and academic and empirical studies.  For example, California requires public companies headquartered in the state to have at least one individual who self-identifies as a female on the board by 2019 under S.B. 826[162] and at least one director who is a member of an "underrepresented community" by 2021 under A.B.

---

[160]    While the EEO-1 report refers to "Hispanic or Latino" rather than Latinx, Nasdaq proposes to use the term Latinx to apply broadly to all gendered and gender-neutral forms that may be used by individuals of Latin American heritage, including individuals who self-identify as Latino/a/e.

[161]    Nasdaq agrees with the United Kingdom Financial Reporting Council that the acronym LGBTQ+ "does not attempt to exclude other groups, nor does it imply that the experiences of people under its umbrella are the same."  See Hay et al., supra note 104, at 14.

[162]    See Cal. S.B. 826, supra note 118.

979.[163] S.B. 826 defines "Female" as "an individual who self-identifies her gender as a woman, without regard to the individual's designated sex at birth," consistent with legislation proposed by New Jersey, Michigan and Hawaii related to board gender diversity.[164] A.B. 979 considers directors from underrepresented communities to be individuals who self-identify as Black, African American, Hispanic, Latino, Asian, Pacific Islander, Native American, Native Hawaiian or Alaska Native, or as gay, lesbian, bisexual or transgender. Since S.B. 826 was passed, 669 women have joined public company boards in the state and the number of public companies with all male boards has declined from 30% in 2018 to 3% in 2020.[165]

The state of Washington requires public companies whose boards are not comprised of at least 25% directors who self-identify as women by January 1, 2022 to provide public disclosures related to the board's consideration of "diverse groups" during the director nomination process. The state considers "diverse groups" to include "women, racial minorities, and historically underrepresented groups."[166]

As discussed above, Congress has proposed legislation relating to disclosure of racial, ethnic, gender and veteran status among the company's directors. Section 342 of the Dodd-Frank Act defines "minority" as "Black American, Native American, Hispanic

---

[163]    See Cal. A.B. 979, supra note 118.

[164]    See Cal. S.B. 826, supra note 118. See also N.J. Senate No. 3469, § 3(b)(2) (2019); Mich. S.B. 115, § 505a(2)(b) (2019); Haw. H.B. 2720, § 414-1(b)(2) (2020).

[165]    See California Partners Project, *Claim Your Seat: A Progress Report on Women's Representation on California Corporate Boards* 4 (2020), available at: https://www.calpartnersproject.org/claimyourseat.

[166]    See Wash. Subst. S.B. 6037, supra note 118. At least 11 states have proposed diversity-related requirements. See Hatcher and Latham, supra note 15.

American, and Asian American,"[167] and the Diversity Assessment Report for Entities

Regulated by the SEC requires the Exchange to report workforce composition data to the

SEC based on the EEOC's categories.[168]  Most companies are required by law to provide

similar workforce data to the EEOC through the EEO-1 Report, which requires

employers to report statistical data related to race, ethnicity and gender to the EEOC.[169]

Nasdaq has designed the proposed rule to require all companies to provide

consistent, comparable data under proposed Rule 5606 by utilizing the existing EEO-1

reporting categories that companies are already familiar with, and by requiring companies

to have, or publicly explain why they do not have, at least two directors who are diverse

in terms of race, ethnicity, sexual orientation, or gender identity under proposed Rule

5605(f)(2).  While the EEO-1 report does not currently include sexual orientation or

gender identity, Nasdaq believes it is reasonable and in the public interest to include a

reporting category for LGBTQ+ status in recognition of the U.S. Supreme Court's recent

decision in *Bostock v. Clayton County* that sexual orientation and gender identity are

"inextricably" intertwined with sex.[170]

---

[167]    See 12 U.S.C. § 5452(g)(3) and Pub. L. 101-73 § 1204(c)(3).

[168]    See Securities and Exchange Commission, Diversity Assessment Report for Entities
Regulated by the SEC, available at: https://www.sec.gov/files/OMWI-DAR-FORM.pdf.

[169]    All companies with 100 or more employees are required to complete the EEO-1 Report.
See U.S. Equal Employment Opportunity Commission, EEO-1: Who Must File,
https://www.eeoc.gov/employers/eeo-1-survey/eeo-1-who-must-file (last accessed Nov.
27, 2020).

[170]    See Bostock v. Clayton Cty., 140 S. Ct. 1731, 1742 (2020) ("But unlike any of these
other traits or actions, homosexuality and transgender status are inextricably bound up
with sex.  Not because homosexuality or transgender status are related to sex in some
vague sense or because discrimination on these bases has some disparate impact on one
sex or another, but because to discriminate on these grounds requires an employer to
intentionally treat individual employees differently because of their sex.").

The proposal does not preclude companies from considering additional diverse attributes, such as nationality, disability, or veteran status in selecting board members. Nor would the proposal prevent companies from disclosing information related to other diverse attributes of board members beyond those highlighted in the rule if they felt such disclosure would benefit investors. However, the company would have to provide the disclosure under proposed Rule 5605(f)(3) if the company does not also meet the diversity objectives of proposed Rule 5605(f)(2). Nasdaq believes such disclosure would provide investors with additional information about the company's philosophy regarding broader diversity characteristics.

Overall, Nasdaq believes the proposal will enhance investor confidence that board discussions at listed companies that meet the applicable diversity objectives of proposed Rule 5605(f)(2) include the perspectives of more than one demographic group. They will also be confident that boardrooms that do not meet the applicable diversity objectives are having a thoughtful discussion about their reasons for not doing so and publicly explaining those reasons. On balance, the proposal will advance the public interest and enhance investor confidence in the integrity of the securities markets by ensuring investors that Nasdaq is monitoring all listed companies to verify that they have the applicable number of Diverse directors under proposed Rule 5605(f) or explain why they do not, and by requiring all listed companies to provide consistent, comparable diversity disclosures.

B. Board Statistical Disclosure

Proposed Rule 5606(a) would require each company to publicly disclose, to the extent permitted by applicable law, information on the directors' voluntary self-identified gender and racial characteristics and LGBTQ+ status.

All Nasdaq-listed companies that are subject to proposed Rule 5605(f), whether they choose to have the applicable number of Diverse directors under proposed Rule 5605(f)(2) or to explain why they do not, would be required to make the proposed Rule 5606 disclosure.  This proposed rule will assist the Exchange in assessing whether companies meet the diversity objectives of proposed Rule 5605(f)(2).  Under proposed Rule 5606(e), Nasdaq proposes to make proposed Rule 5606 operative for listed companies by the later of (1) one calendar year from the Approval Date ("Effective Date"); or (2) the date the company files its proxy statement or its information statement for its annual meeting of shareholders (or, if the company does not file a proxy or information statement, the date it files its Form 10-K or 20-F) during the calendar year of the Effective Date.[171]

Pursuant to proposed Rule 5606(a), each company would annually provide its board-level diversity data in a format substantially similar to the Matrix in proposed Rule 5606(a) and attached as Exhibit 3.  In accordance with the proposed accompanying instructions to the Matrix, companies are required to provide the Matrix information at least once per year.  If, within the same year, a company changes its board composition after it publishes its Matrix, the company may, but is not required to, publish its updated information.

---

[171]    Based on informal feedback requesting that the Exchange better align the compliance date for proposed Rule 5606 with its listed companies' annual shareholder meetings and proxy filings, Nasdaq is amending proposed Rule 5606(e).  See Letter from Stephen J. Kastenberg, Ballard Spahr LLP, to Ms. Vanessa Countryman, dated January 14, 2021 ("Ballard Spahr Comment Letter"), available at: https://www.sec.gov/comments/sr-nasdaq-2020-081/srnasdaq2020081-8245975-227819.pdf.

In accordance with proposed Rule 5606(a), a company would provide the total number of directors on its board and include the date the information was collected as the "As of Date." If a director voluntarily self-identifies, each company, other than a Foreign Issuer (as defined under proposed Rule 5605(f)(1)) or Foreign Private Issuer (as defined under Rule 3b-4(b) of the Act),[172] would include the following in a table titled "Board Diversity Matrix," in accordance with the instructions accompanying the proposed disclosure format: (1) the number of directors based on gender identity (female, male, or non-binary[173]); (2) the number of directors based on race and ethnicity (African American or Black, Alaskan Native or Native American, Asian, Hispanic or Latinx, Native Hawaiian or Pacific Islander, White, or Two or More Races or Ethnicities[174]); and (3) the number of directors who self-identify as LGBTQ+.

Any director who chooses not to disclose a gender would be included in the "Did Not Disclose Gender" category and any director who chooses not to identify as any race or not to identify as LGBTQ+ would be included in the "Did Not Disclose Demographic Background " category at the bottom of the table. The defined terms for the race and ethnicity categories in the instructions to the Matrix disclosure format are substantially

---

[172]  See 17 C.F.R. § 240.3b-4.

[173]  Nasdaq received informal questions on the definition of "non-binary." As a result, Nasdaq is amending the Matrix to define non-binary as genders that are not solely man or woman; someone who is non-binary may have more than one gender, no gender, or their gender may not be in relation to the gender binary. Although non-binary is included as a category in the proposed Matrix, a company would not satisfy the diversity objectives proposed by Rule 5605(f)(2) if a director self-identifies solely as non-binary.

[174]  If a director self-identifies in the "Two or More Races or Ethnicities" category, the director must also self-identify in each individual category, as appropriate.

similar to the terms and definitions used in the EEO-1 Report.[175] LGTBQ+ is defined

similarly to proposed Rule 5605(f)(1) as a person who identifies as any of the following:

lesbian, gay, bisexual, transgender, or as a member of the queer community.

In addition to providing the information included in the Matrix, the accompanying

directions to the Matrix allows a company to supplement its disclosure including

additional information related to its directors.[176] For example, a company may choose to

provide the information on a director-by-director basis or may choose to include any

skills, experience, and attributes of each of its directors that are relevant to the company.

Below is an example of a Matrix that companies may use, which is also attached

as Exhibit 3:[177]

| Board Diversity Matrix (As of [DATE]) | | | | |
|---|---|---|---|---|
| Total Number of Directors | # | | | |
| | **Female** | **Male** | **Non-Binary** | **Did Not Disclose Gender** |
| **Part I: Gender Identity** | | | | |
| Directors | # | # | # | # |
| **Part II: Demographic Background** | | | | |
| African American or Black | # | # | # | # |
| Alaskan Native or Native American | # | # | # | # |

---

[175] See supra note 169. Additionally, the EEOC does not categorize LGTBQ+ or any other sexual orientation identifier on its EEO-1 Report. The definitions of the EEO-1 race and ethnicity categories may be found in the appendix to the EEO-1 Report instructional booklet, available at https://www.eeoc.gov/employers/eeo-1-survey/eeo-1-instruction-booklet.

[176] While Nasdaq is not proposing to amend the information required by the Matrix, based on commenter feedback, Nasdaq is amending the instructions to clarify that a company is not limited to only providing the information required by the Matrix.

[177] Nasdaq is proposing two non-substantive amendments to the Matrix that was provided in the Initial Proposal. First, Nasdaq has alphabetized the gender columns by listing "Female" before "Male." Nasdaq has also replaced the term "American Indian" with "Native American" to conform with the terms used in the EEO-1 report and proposed Rule 5605(f)(1).

| Asian | # | # | # | # |
|---|---|---|---|---|
| Hispanic or Latinx | # | # | # | # |
| Native Hawaiian or Pacific Islander | # | # | # | # |
| White | # | # | # | # |
| Two or More Races or Ethnicities | # | # | # | # |
| LGBTQ+ | # | | | |
| Did Not Disclose Demographic Background | # | | | |

Nasdaq recognizes that some Foreign Issuers, including Foreign Private Issuers as defined by the Act,[178] may have their principal executive offices located outside of the United States and in jurisdictions that may impose laws limiting or prohibiting self-identification questionnaires, particularly as they relate to race, ethnicity, or LGBTQ+ status. In such countries, a Foreign Issuer may be precluded by law from requesting diversity data from its directors. Moreover, Nasdaq's definition of Underrepresented Minority proposed in proposed Rule 5606(f)(1) may be inapplicable to a Foreign Issuer, making this Matrix data less relevant for such companies and not useful for investors.

As a result of these limitations, Nasdaq is proposing the option of a separate Matrix for Foreign Issuers and Foreign Private Issuers, as defined by Rule 3b-4(b) of the Act.[179] Similar to other companies, a Foreign Issuer would provide the total number of directors on its board. If a director voluntarily self-identifies, the company would include the following in a table titled "Board Diversity Matrix": (1) the country of its principal executive offices; (2) whether or not the company is a Foreign Private Issuer; (3) whether

---

[178]    See 17 C.F.R. § 240.3b-4.

[179]    Id. Nasdaq has made a non-substantive amendment to the title of the Matrix for Foreign Issuers to further clarify that it is applicable to Foreign Issuers with a principal executive office outside of the United States.

or not the disclosure is prohibited under the company's home country law; (4) the total number of directors; (5) the number of directors based on gender identity (female, male or non-binary[180]); (6) the number of directors who are considered underrepresented in the country of the principal executive office; and (7) the number of directors who self-identify as LGBTQ+.  If a director chooses not to self-identify, the company would select "Did Not Disclose Gender" and/or "Did Not Disclose Demographic Background," as applicable.  "Underrepresented Individual in Home Country Jurisdiction" is defined in the instructions to the Matrix as a person who self-identifies as an underrepresented individual based on national, racial, ethnic, indigenous, cultural, religious or linguistic identity in the country of the Foreign Private Issuer or Foreign Issuer's principal executive offices (as reported on the Foreign Issuer's Forms F-1, 10-K, 20-F or 40-F).[181] Rule 5605(f)(2)(B)(i) also proposes the same definition for Diverse directors of Foreign Issuers.  As described below in Section II.D.i of the Statutory Basis section, this definition is based on the United Nations *Declaration on the Rights of Persons Belonging to National or Ethnic, Religious and Linguistic Minorities* and the United Nations *Declaration on the Rights of Indigenous Peoples*.[182]

Nasdaq is also proposing new Rule 5606(b), under which each company would provide the disclosure described in proposed Rule 5606(a) in advance of the company's

---

[180]    Although non-binary is included as a category in the proposed Matrix, a company would not satisfy any aspect of the diversity objective proposed by Rule 5605(f)(2) if a director self-identifies solely as non-binary.

[181]    In an effort to provide more clarification, Nasdaq is amending the definition of "Underrepresented Individual in Home Country Jurisdiction" in Exhibit 3 by removing "a Foreign Issuer's home country jurisdiction" and replacing it with "the Foreign Issuer's principal executive office."

[182]    See infra note 337.

next annual meeting of shareholders: (1) in any proxy statement or any information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F); or (2) on the company's website.  If the company provides such disclosure on its website, then the company must submit such disclosure concurrently with the filing made pursuant to (1) and submit a URL link to the disclosure through the Nasdaq Listing Center, within one business day after such posting.[183]  The proposed time period to submit information in the Matrix is aligned with the time period provided in proposed Rule 5605(f)(3) for a company to submit its explanation for why it does not have the applicable number of Diverse directors under proposed Rule 5605(f).  Disclosure of the statistical data is not in lieu of any SEC requirements for a company to disclose any required information pursuant to Regulation S-K or any other federal, state or foreign laws or regulations.  As described in the instructions to the Matrix and proposed Rule 5606(a), each year following the first year of the disclosure of the Matrix, all companies must include the current year and immediately prior year diversity statistics in its disclosure.  If the company publishes the Matrix on its website, the disclosure must remain accessible on the company's website.  Additionally, the instructions require companies to publish the Matrix information in a searchable format.  If a company uses a graphic or image format (*i.e.,* tif, jpg, gif, png), the company must also include the same information as searchable text or in a searchable table.  The searchable information could be included, for example, together with the related graphic or in an appendix to the filing.[184]

---

[183]    Nasdaq is amending the proposed Rule 5606(b) to align the timing of this disclosure with the timing of other governance-related disclosures.

[184]    Nasdaq's clarification on the manner in which companies must provide the Board Diversity Matrix information is a non-substantive amendment to the Initial Proposal.

Nasdaq is also proposing Rule 5606(c), which exempts the following types of companies from proposed Rule 5606(a): asset-backed issuers and other passive issuers (as set forth in Rule 5615(a)(1)); cooperatives (as set forth in Rule 5615(a)(2)); limited partnerships (as set forth in Rule 5615(a)(4)); management investment companies (as set forth in Rule 5615(a)(5)); issuers of non-voting preferred securities, debt securities and Derivative Securities (as set forth in Rule 5615(a)(6)) that do not have equity securities listed on Nasdaq; and issuers of securities listed under the Rule 5700 Series.  The exemption of these companies is consistent with the approach taken by Nasdaq in Rule 5615 as it relates to certain Nasdaq corporate governance standards for board composition.  Additionally, Nasdaq is proposing to exempt an acquisition company listed under IM-5101-2 from the requirements of proposed Rule 5606.  This approach is similar to other phase-in periods granted to SPACs.

Nasdaq is also proposing Rule 5606(d) to allow newly listed Nasdaq companies to satisfy the requirement of proposed Rule 5606 within one year of listing on Nasdaq. Newly-listed companies include those listing through an initial public offering, direct listing, transfer from the over-the-counter market or another exchange, in connection with a spin-off or carve-out from a company listed on Nasdaq or another exchange, or through a merger with an acquisition company listed under IM-5101-2.  A newly listed company would be required to provide the information proposed by proposed Rule 5606(a) in advance of the company's next annual meeting of shareholders: (a) in any proxy statement or any information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F); or (b) on the company's website.  If the company provides such disclosure on its website, then the company must submit such disclosure concurrently

with the filing made pursuant to (a) and submit a URL link to the disclosure through the

Nasdaq Listing Center, within one business day after such posting.

If a company does not timely provide the diversity disclosure, Nasdaq will notify

the company that it is not in compliance with a listing requirement and begin its existing,

standard process to allow the company to regain compliance. Consistent with

deficiencies from most other rules that allow a company to submit a plan to regain

compliance,[185] Nasdaq proposes to amend Rule 5810(c)(2)(A)(iv) to provide companies

that fail to adhere to proposed Rule 5606 with 45 calendar days to submit a plan in

accordance with Rule 5810(c)(2) to regain compliance. Based on that plan, Nasdaq can

provide the company with up to 180 days to regain compliance. If the company does not

do so, it would be issued a Staff Delisting Determination, which the company could

appeal to a Hearings Panel pursuant to Rule 5815.

Although proposed Rule 5606 is not identical to current Regulation S-K

disclosure requirements, it is similar to, and does not deviate from, the Commission

staff's C&DI related to Items 401(e)(1) and 407(c)(2)(vi) of Regulation S-K. Moreover,

the proposed rule provides clarity to the definition of diversity and streamlines investors'

desire for clear, complete and consistent disclosures. Nasdaq believes that the format of

---

[185]     Pursuant to Nasdaq Rule 5810(c)(2)(A)(iii), a company is provided 45 days to submit a plan to regain compliance with Rules 5620(a) (Meetings of Shareholders), 5620(c) (Quorum), 5630 (Review of Related Party Transactions), 5635 (Shareholder Approval), 5250(c)(3) (Auditor Registration), 5255(a) (Direct Registration Program), 5610 (Code of Conduct), 5615(a)(4)(D) (Partner Meetings of Limited Partnerships), 5615(a)(4)(E) (Quorum of Limited Partnerships), 5615(a)(4)(G) (Related Party Transactions of Limited Partnerships), and 5640 (Voting Rights). Pursuant to Nasdaq Rule 5810(c)(2)(A)(iv), a company is also provided 45 days to submit a plan to regain compliance with Rule 5250(b)(3) (Disclosure of Third Party Director and Nominee Compensation). A company is generally provided 60 days to submit a plan to regain compliance with the requirement to timely file periodic reports contained in Rule 5250(c)(1).

the Matrix and the information that it will provide offers greater transparency into a company's board composition and will enable the data to be easily aggregated across issuers.[186]  Nasdaq also believes that requiring annual disclosure of the data will ensure that the information remains current and easy for investors, data analysts and other parties to track.

### C. Diverse Board Representation or Explanation

Nasdaq is proposing to adopt new Rule 5605(f)(2) to require each listed company to have, or explain why it does not have, the applicable number of Diverse directors. Generally, the diversity objectives under proposed Rule 5605(f)(2)(A) would include having at least two members of its board of directors who are Diverse, including at least one who self-identifies as Female and one who self-identifies as an Underrepresented Minority or LGBTQ+.[187]  The proposal is a disclosure-based framework, not a mandate. A company does not need to provide additional public disclosures if the company demonstrates under proposed Rule 5606 that it meets the applicable diversity objectives of proposed Rule 5605(f)(2).  The terms in the proposed definition of "Underrepresented Minority" reflect the EEOC's categories and are construed in accordance with the EEOC's definitions.  Nasdaq has provided additional flexibility for Smaller Reporting Companies, Foreign Issuers (including Foreign Private Issuers), and each company with a board of directors of five or fewer members to meet alternative objectives.

---

[186]    Various stakeholders have requested easier aggregation.  See Petition for Amendment of Proxy Rule, supra note 86, at 1.

[187]    Nasdaq has published an FAQ on the Listing Center clarifying that "two members of its board of directors who are Diverse" would exclude emeritus directors, retired directors and members of an advisory board.

Under proposed Rule 5605(f)(3), if a company chooses to satisfy proposed Rule 5605(f)(2) by explaining why it does not have the applicable number of Diverse directors under proposed Rule 5605(f)(2), the company must: (i) specify the requirements of proposed Rule 5605(f)(2) that are applicable (*e.g.*, the applicable subparagraph, the applicable diversity objectives, and the timeframe applicable to the company's market tier); and (ii) explain the reasons why it does not have two Diverse directors (or one Diverse director for companies with five or fewer directors).  Such disclosure must be provided: (a) in any proxy statement or any information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F); or (b) on the company's website.[188]  If the company provides such disclosure on its website, then the company must submit such disclosure concurrently with the filing made pursuant to (a) and submit a URL link to the disclosure through the Nasdaq Listing Center, within one business day after such posting.[189]

Nasdaq will not evaluate the substance or merits of the company's explanation, but would verify that the company has provided one at the time it files its proxy statement or information statement (or, if the company does not file a proxy, at the time it files its Form 10-K or 20-F).[190]  If the company does not meet the diversity objectives and has

---

[188]    Nasdaq is amending the proposed Rule 5605(f)(3) to align the timing of this disclosure with the timing of other governance-related disclosures, such as those provided in the proxy, to make it easier for investors to know where a company has provided the disclosure and to give shareholders have access to the information prior to the company's annual shareholder meetings.

[189]    Nasdaq's clarification on the timing in which a company must provide such disclosure on its website is an amendment to the Initial Proposal.

[190]    Nasdaq's clarification on the timing in which Nasdaq will verify that the company has provided an explanation under proposed Rule 5605(f)(3) is an amendment to the Initial Proposal.

not provided any explanation, or has provided an explanation that does not satisfy

subparagraphs (i) and (ii) of proposed Rule 5605(f)(3), then the explanation will not

satisfy proposed Rule 5605(f)(3).  For example, it would not satisfy proposed Rule

5605(f)(3) merely to state that "the Company does not comply with Nasdaq's diversity

rule."  As described above, the company must specify the requirements of proposed Rule

5605(f)(2) that are applicable, which is intended to provide transparency to investors who

are not familiar with Nasdaq's listing rules, and explain the reasons why it does not have

the applicable number of Diverse directors.  For example, a company could disclose the

following to satisfy subparagraph (i) of proposed Rule 5605(f)(3):  "As a Smaller

Reporting Company listed on the Nasdaq Capital Market tier, the Company is subject to

Nasdaq Rule 5605(f)(2)(C), which requires the company to have, or explain why it does

not have, at least two Diverse directors, including at least one director who self-identifies

as Female.  Under Rule 5605(f)(7), the Company may have at least one Diverse director

by March 10, 2023, and a second Diverse director by March 10, 2026, or explain its

reasons for not doing so.  The Company has chosen to satisfy Rule 5605(f)(2)(C) by

explaining its reasons for not meeting the diversity objectives of Rule 5605(f)(2)(C),

which the Company has set forth below."

   i.   Effective Dates and Phase-in Period

    Proposed Rule 5605(f)(7) provides a transition period before companies must

fully meet the diversity objectives or explain why they do not upon the initial

implementation of the rule.  Under this transition rule, each NGS, NGM, and NCM listed

company (including companies with smaller boards under proposed Rule 5606(f)(2)(D))

must have, or explain why it does not have, at least one Diverse director by the later of:

(i) two calendar years after the Approval Date[191] (the "First Effective Date"); or (ii) the date the company files its proxy statement or its information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F) for the company's annual shareholders meeting during the calendar year of the First Effective Date. Each company listed on the NGS or NGM tiers must have, or explain why it does not have, two Diverse directors by the later of: (i) four calendar years after the Approval Date (the "Second NGS/NGM Effective Date"); or (ii) the date the company files its proxy statement or its information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F) for the company's annual shareholders meeting during the calendar year of the Second NGS/NGM Effective Date. Each company listed on the NCM tier must have, or explain why it does not have, at least two Diverse directors by the later of: (i) five calendar years after the Approval Date (the "Second NCM Effective Date") or (ii) the date the company files its proxy statement or its information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F) for the company's annual shareholders meeting during the calendar year of the Second NCM Effective Date.[192]

For example, if the Approval Date is March 10, 2021, all companies (including companies with smaller boards under proposed Rule 5606(f)(2)(D)) would be required to have, or explain why they do not have, one Diverse director by March 10, 2023 (the First Effective Date). Companies with boards of more than five members would be required to

---

[191]    The "Approval Date" is the date that the SEC approves the proposed rule.

[192]    Nasdaq's proposal to permit companies to satisfy Rule 5605(f)(2) by the later of: (i) each respective effective date described above; or (ii) the date the company files its proxy statement or its information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F) for the company's annual shareholders meeting during the calendar year of each respective effective date is an amendment to the Initial Proposal.

have, or explain why they do not have, two Diverse directors by March 10, 2025 (the Second NGS/NGM Effective Date applicable to NGS/NGM companies only) or March 10, 2026 (the Second NCM Effective Date applicable to NCM companies only). However, if a company files its proxy statement or its information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F) for the company's annual shareholders meeting after the anniversary of the Approval Date in the respective calendar year noted above, it would not be required to satisfy proposed Rule 5605(f)(2) until such filing date. This is intended to better to align listed companies' disclosure requirements with their annual meetings and proxy requirements.[193]

Under proposed Rule 5605(f)(5)(A), a newly listed company on the NGS or NGM tiers that was not previously subject to a substantially similar requirement of another national securities exchange will be permitted to satisfy the requirement of proposed Rule 5605(f)(2) to have, or explain why it does not have: (i) at least one Diverse director by the later of: (a) one year from the date of listing; or (b) the date the company files its proxy statement or its information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F) for the company's first annual meeting of shareholders subsequent to the company's listing; and (ii) at least two Diverse directors by the later of: (a) two years from the date of listing; or (b) the date the company files its proxy statement or its information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F) for the company's second annual meeting of shareholders subsequent to the company's listing.

---

[193]    See Ballard Spahr Comment Letter, supra note 171.

Under proposed Rule 5605(f)(5)(B), a newly listed company on the NCM tier that was not previously subject to a substantially similar requirement of another national securities exchange will be permitted to satisfy the requirement of proposed Rule 5605(f)(2) to have, or explain why it does not have, the applicable number of Diverse directors under proposed Rule 5605(f)(2) by the later of: (a) two years from the date of listing; or (b) the date the company files its proxy statement or its information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F) for the company's second annual meeting of shareholders subsequent to the company's listing.

Under proposed Rule 5605(f)(5)(D), any newly listed company on any market tier that has a board of five or fewer members and was not previously subject to a substantially similar requirement of another national securities exchange will be permitted to satisfy the requirement of proposed Rule 5605(f)(2) to have, or explain why it does not have at least one Diverse director by the later of: (a) two years from the date of listing; or (b) the date the company files its proxy statement or its information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F) for the company's second annual meeting of shareholders subsequent to the company's listing.

These "phase-in" periods apply to companies listing in connection with an initial public offering, a direct listing, a transfer from another exchange or the over-the-counter market, in connection with a spin-off or carve-out from a company listed on Nasdaq or another exchange, or through a business combination with a SPAC.

Under proposed Rule 5605(f)(7)(E), any company listing before the end of the phase-in periods described in proposed Rule 5605(f)(7) would have the remaining length of the phase-in periods to satisfy proposed Rule 5605(f)(2), or the two year period set

forth in proposed Rule 5605(f)(5), whichever is longer.  As a result, companies listing on

the NGS or NGM tiers after the expiration of the phase-in periods provided by proposed

Rule 5605(f)(7) would be provided with at least one year from the date of listing to

satisfy the applicable requirement of proposed Rule 5605(f)(2) to have, or explain why

they do not have, at least one Diverse director, and one additional year to satisfy the

requirement to have, or explain why they do not have, at least two Diverse directors.

Companies listing on the NCM tier after the expiration of the phase-in periods provided

by proposed Rule 5605(f)(7) would be provided with at least two years from the date of

listing to satisfy the applicable requirement of proposed Rule 5605(f)(2) to have, or

explain why they do not have, at least two Diverse directors.  This is intended to provide

newly public companies with additional time to meet the diversity objectives of proposed

Rule 5605(f)(2), recognizing that newly public companies may have unique governance

structures, such as staggered boards or director seats held by venture capital firms, that

require additional timing considerations when adjusting the composition of the board of

directors.  It is also intended to provide additional flexibility to companies on the NCM

tier in recognition that such companies are typically smaller and may face additional

challenges and resource constraints when identifying additional director nominees who

self-identify as Diverse.

For example, if the Approval Date is March 10, 2021, all companies (including

companies with smaller boards) would be required to have, or explain why they do not

have, one Diverse director by March 10, 2023.  Companies with boards of more than five

members would be required to have, or explain why they do not have, at least two

Diverse directors by March 10, 2025 (for NGS/NGM companies) or March 10, 2026 (for

NCM companies) (or the date the company files its proxy statement or its information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F) for the company's annual shareholders meeting in each respective year, whichever is later). If a company lists on the NGS or NGM tier on January 1, 2023, it would be required to have, or explain why it does not have, at least one Diverse director by the later of January 1, 2024 and the date it files its proxy statement for its 2024 annual shareholders meeting (or, if the Company does not file a proxy, in its Form 10-K or 20-F), rather than March 10, 2023. Similarly, if a company lists on the NCM tier on September 1, 2025 and has a board of more than five members, it would be required to have at least two Diverse directors by the later of September 1, 2027 and the date of the filing of the proxy statement for its 2027 annual shareholders meeting (or, if the company does not file a proxy, in its Form 10-K or 20-F), rather than March 10, 2026.

Under proposed Rule 5605(f)(7)(F), a company listed on the NCM tier that transfers to the NGS or NGM tiers after the Approval Date, but prior to the expiration of the phase-in periods provided by proposed Rule 5605(f)(7), would be provided with the later of the periods set forth in proposed Rule 5605(f)(7)(C) or one year from the date of transfer. As a result, if a company transfers from NCM to NGS/NGM, they still have the benefit of the phase-in for NCM, or one year from the date of transfer, whichever is later. For example, if a U.S. company with a board of more than five members transfers from the NCM tier to the NGS tier on August 1, 2024, and already has at least one Diverse director, it would be required to have, or explain why it does not have, at least two Diverse directors by the later of August 1, 2025 and the date it files its proxy statement for its 2025 annual shareholders meeting, rather than March 10, 2025. However, if such

company does not have at least one Diverse director, it would be required to have, or explain why it does not have, at least two Diverse directors by August 1, 2025 (or the date it files its proxy statement for its annual shareholders meeting in each respective year, whichever is later).

Nasdaq believes these proposed periods are consistent with the phase-in periods for Nasdaq's other board composition requirements.  For example, Rule 5615(b)(1) provides a company listing in connection with its initial public offering one year to fully comply with the compensation and nomination committee requirements of Rules 5605(d) and (e), and with the majority independent board requirement of proposed Rule 5605(b). Similarly, SEC Rule 10A-3(b)(1)(iv)(A) allows a company up to one year from the date its registration statement is effective to fully comply with the applicable audit committee composition requirements.  Nasdaq Rule 5615(b)(3) provides a one-year timeframe for compliance with the board composition requirements for companies transferring from other listed markets that do not have a substantially similar requirement.  In addition, Rule 5620 and IM-5620 requires each new listing to hold its first annual shareholders within one-year after its first fiscal year-end following listing.  Therefore, Nasdaq believes it is appropriate to provide each new listing additional time to satisfy proposed Rule 5605(f)(2) if the date it files its proxy statement for the company's annual shareholders meeting subsequent to the company's listing is later than the anniversary of listing.

    ii.   <u>Foreign Issuers</u>

Nasdaq recognizes that the EEOC categories of race and ethnicity may not extend to all countries globally because each country has its own unique demographic composition.  However, Nasdaq observed that on average, women tend to be

underrepresented in boardrooms across the globe, holding an estimated 16.9% of board seats in 2018.[194]  As an official supporter of the United Nations Sustainable Stock Exchanges Initiative, Nasdaq recognizes that ensuring women have equal opportunities for leadership in economic decision making is one of the United Nations Sustainable Development Goals to be accomplished by 2030.[195]  However, studies estimate that at current rates, it could take 18[196] to 34 years[197] for U.S. companies to achieve gender parity on their boards.

Accordingly, under proposed Rule 5605(f)(2)(B), each Foreign Issuer with a board of more than five members must have, or explain why it does not have, at least two Diverse directors on its board, including at least one Female.  Nasdaq proposes to provide Foreign Issuers with additional flexibility in that Foreign Issuers may satisfy the diversity objective by having two Female directors.  In addition, Foreign Issuers may also satisfy the diversity objective by having one Female director, and one individual who self-identifies as (i) LGBTQ+ or (ii) an underrepresented individual based on national, racial, ethnic, indigenous, cultural, religious or linguistic identity in the country of the company's principal executive offices (as reported on the company's Form F-1, 10-K,

---

[194]    See Deloitte, *Women in the Boardroom*, supra note 92.

[195]    See United Nations Sustainable Stock Exchanges Initiative, *Gender Equality*, https://www.un.org/sustainabledevelopment/gender-equality/ (last accessed Nov. 24, 2020).

[196]    See McKinsey & Company, supra note 31, at 17.

[197]    See GAO Report, supra note 49, at 9 (estimating "it could take about 10 years from 2014 for women to comprise 30 percent of board directors and more than 40 years for the representation of women on boards to match that of men").

20-F or 40-F).[198]  Alternatively, a company could satisfy proposed Rule 5605(f)(2)(B) by publicly explaining the company's reasons for not meeting the diversity objectives of the rule.

Nasdaq proposes to define a Foreign Issuer under proposed Rule 5605(f)(1) as (a) a Foreign Private Issuer (as defined in Rule 5005(a)(19)) or (b) a company that:  (i) is considered a "foreign issuer" under Rule 3b-4(b) under the Act;[199] and (ii) has its principal executive offices located outside of the United States.  This definition will include all Foreign Private Issuers (as defined in Rule 5005(a)(19), regardless of where they are headquartered or whether they file domestic SEC reports),[200] and any foreign issuers that are not foreign private issuers so long as they are also headquartered outside of the United States.  This is designed to recognize that companies that are not Foreign Private Issuers but are headquartered outside of the United States are foreign companies notwithstanding the fact that they file domestic SEC reports.  It is also designed to exclude companies that are domiciled in a foreign jurisdiction without having a physical presence in that country.

Proposed Rule 5605(f)(5)(C) will allow any company that ceases to be a Foreign Issuer to satisfy the diversity objectives of proposed Rule 5605(f) by the later of:  (i) one year from the date that the company no longer qualifies as a Foreign Issuer; or (ii) the

---

[198]    To provide more clarity, Nasdaq is amending the definition of "Diverse" by removing "a company's home country jurisdiction" and replacing it with "the company's principal executive office (as reported on the company's Form F-1, 10-K, 20-F or 40-F)."

[199]    See 17 C.F.R. § 240.3b-4(b) ("The term foreign issuer means any issuer which is a foreign government, a national of any foreign country or a corporation or other organization incorporated or organized under the laws of any foreign country.").

[200]    Under Nasdaq Rule 5005(a)(19), the term Foreign Private Issuer has "the same meaning as under Rule 3b-4 under the Act."

date the company files its proxy statement or its information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F) for the company's first annual meeting of shareholders subsequent to such event.  Nasdaq proposes to define "board of directors" in proposed Rule 5605(f)(2)(B)(i)(b) to mean, in the case of a Foreign Issuer with a two-tiered board system, the company's supervisory or non-management board, which is consistent with the SEC's definition in Rule 10A-3(e)(2) of the Exchange Act.[201]

Nasdaq also proposes to revise Rule 5615 and IM-5615-3, which currently permit a Foreign Private Issuer to follow home country practices in lieu of the requirements set forth in the Rule 5600 Series, subject to several exclusions.  Nasdaq proposes to revise Rule 5615 and IM-5615-3 to add Rules 5605(f) and 5606 to the list of excluded corporate governance rules.  As a result, Foreign Private Issuers must satisfy the requirements of proposed Rules 5605(f) and 5606 and may not follow home country practices in lieu of such requirements.  However, Foreign Private Issuers that elect to follow an alternative diversity objective in accordance with home country practices, or are located in jurisdictions that restrict the collection of personal data, may satisfy the requirements of proposed Rule 5605(f) by explaining their reasons for doing so instead of meeting the diversity objectives of the rule.

---

[201]     See 17 CFR § 240.10A-3(e)(2) ("In the case of foreign private issuers with a two-tier board system, the term board of directors means the supervisory or non-management board.").  Nasdaq's clarification on the definition of "board of directors" for a Foreign Issuer is an amendment to the Initial Proposal.

### iii.  Smaller Reporting Companies

Smaller companies, especially pre-revenue companies that depend on the capital markets to fund ground-breaking research and technological advancements, may not have the resources necessary to compensate an additional director or engage a search firm to search outside of directors' networks.  Recognizing the resource constraints smaller companies face, Nasdaq proposes to provide each Smaller Reporting Company with additional flexibility.  Specifically, these companies could satisfy the two Diverse directors objective under proposed Rule 5605(f)(2)(C) by having two Female directors.

Like other companies, Smaller Reporting Companies could also satisfy the diversity objectives by having one Female director and one director who self-identifies as either (i) an Underrepresented Minority, or (ii) a member of the LGBTQ+ community.  Alternatively, a company could satisfy proposed Rule 5605(f)(2)(C) by publicly explaining the company's reasons for not meeting the diversity objectives of the rule.  Under proposed Rule 5605(f)(1), Nasdaq proposes to define a Smaller Reporting Company as set forth in Rule 12b-2 under the Act.[202]

Proposed Rule 5605(f)(5)(C) will allow any company that ceases to be a Smaller Reporting Company to satisfy the requirements of proposed Rule 5605(f) by the later of: (i) one year from the date that the company no longer qualifies as a Smaller Reporting Company; or (ii) the date the company files its proxy statement or its information

---

[202]    Under 12b-2 of the Act, a Smaller Reporting Company "means an issuer that is not an investment company, an asset-backed issuer (as defined in § 229.1101 of this chapter), or a majority-owned subsidiary of a parent that is not a smaller reporting company and that: (1) Had a public float of less than $250 million; or (2) Had annual revenues of less than $100 million and either: (i) No public float; or (ii) A public float of less than $700 million."  See 17 C.F.R. § 240.12b-2.

statement (or, if the company does not file a proxy, in its Form 10-K or 20-F) for the

company's first annual meeting of shareholders subsequent to such event.

    iv.   <u>Companies with Smaller Boards</u>

      Nasdaq considered comments that it should "amend the proposed rules to allow

greater flexibility for companies with relatively small boards."[203]  Nasdaq believes that

companies with smaller boards may face similar resource constraints to those of Smaller

Reporting Companies.  However, not all companies with small boards are Smaller

Reporting Companies, and therefore the alternative diversity objective provided to

Smaller Reporting Companies may not be available to them.  Further, companies with

smaller boards may be disproportionately impacted by the proposed rule if they plan to

satisfy proposed Rule 5605(f)(2) by adding additional directors.  For example, two

Diverse directors on a five member board comprise 40% of the board, whereas two

Diverse directors on an eight member board comprise 25% of the board.  Alternatively, if

a five-member board does not have two Diverse directors and expands its board to satisfy

proposed Rule 5605(f)(2), it may require the company to incur additional costs through

director compensation and D&O insurance.

      Accordingly, Nasdaq proposes to adopt Rule 5605(f)(2)(D) to require a company

with a board of directors of five or fewer members to have, or explain why it does not

have, at least one member of its board of directors who is Diverse.  Nasdaq seeks to avoid

complexity for companies that attempt to satisfy the diversity objective by adding a

---

[203]    <u>See</u> Ballard Spahr Comment Letter, <u>supra</u> note 171.

Diverse director.[204]  To prevent such companies from being subject to a higher threshold

by virtue of adding directors, Nasdaq proposes to clarify in proposed Rule 5605(f)(2)(D)

that if a company has five members on its board of directors before becoming subject to

proposed Rule 5605(f), then it shall not become subject to the requirement of

subparagraphs (A), (B), or (C) to have, or explain why it does not have, at least two

members of its board of directors who are Diverse if it adds one director to satisfy

subparagraph (D), thereby becoming a six member board.  However, a company would

become subject to proposed Rule 5605(f)(2)(A), (B), or (C) if it subsequently expands its

board.

v.    Cure Period and Grace Period

Nasdaq proposes to adopt Rule 5605(f)(6)(A) and a new Rule 5810(c)(3)(F) to

specify what happens if a company (i) does not meet the applicable diversity objectives

set forth under proposed Rule 5605(f)(2) and fails to provide the disclosure required by

proposed Rule 5605(f)(3), or (ii) fails to hold an annual meeting of shareholders during

the applicable periods in proposed Rule 5605(f)(5) or (7) and therefore fails to have, or

explain why it does not have, the applicable number of Diverse directors under proposed

Rule 5605(f)(2).[205]  In these circumstances, the Listing Qualifications Department will

promptly notify the company that it has until the later of its next annual shareholders

---

[204]    See e.g. David A. Katz and Laura A. McIntosh, Wachtell, Lipton, Rosen & Katz, *Gender Diversity and Board Quotas*, New York Law Journal (July 25, 2018), available at: https://www.wlrk.com/webdocs/wlrknew/AttorneyPubs/WLRK.26150.18.pdf ("California legislators dispute that the bill requires men to be displaced by women, noting that boards can simply increase their size.  This may be easier said than done, however:  Because the required quota increases with board size, a company with a four-man board that did not wish to force out a current director would need to add three women to accommodate the requirements of the law by 2021.").

[205]    Nasdaq proposes that existing Rules 5810(c)(3)(F) and (G) be renumbered as Rules 5810(c)(3)(G) and (H) respectively.

meeting, or 180 days from the event that caused the deficiency, to cure the deficiency. The company can cure the deficiency either by nominating additional directors so that it satisfies the diversity objective of proposed Rule 5605(f)(2) or by providing the disclosure required by proposed Rule 5605(f)(3).  If a company does not regain compliance within the applicable cure period, the Listings Qualifications Department would issue a Staff Delisting Determination Letter.  A company that receives a Staff Delisting Determination can appeal the determination to the Hearings Panel through the process set forth in Rule 5815.  Nasdaq also proposes revising Rule 5810(c)(2)(A)(iv) to make a non-substantive change clarifying that Rule 5250(b)(3) is related to "Disclosure of Third Party Director and Nominee Compensation."

Nasdaq proposes to adopt Rule 5605(f)(6)(B) to provide a grace period for a company that no longer meets the diversity objectives of proposed Rule 5605(f)(2) due to a vacancy on the board of directors.[206]  A company that met the diversity objectives of proposed Rule 5605(f)(2) within the timeframes set forth in proposed Rule 5605(f)(7), but no longer meets the diversity objectives of proposed Rule 5605(f)(2) due to a vacancy on its board of directors (for example if a diverse director falls ill or resigns), shall have until the later of:  (i) one year from the date of vacancy; or (ii) the date the company files its proxy statement or its information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F) in the calendar year following the year of the date of vacancy, to satisfy proposed Rule 5605(f)(2) or (3).  In lieu of providing the disclosure required by proposed Rule 5605(f)(3), a company relying on this provision may publicly disclose that it is relying on the grace period provided by proposed Rule 5605(f)(6)(B).  Such

---

[206]     Nasdaq's proposed grace period is an amendment to the Initial Proposal.

disclosure must be provided: (a) in any proxy statement or any information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F); or (b) on the company's website. If the company provides such disclosure on its website, then the company must submit such disclosure concurrently with the filing made pursuant to (a) and submit a URL link to the disclosure through the Nasdaq Listing Center, within one business day after such posting. This is intended to notify stakeholders of the company's change in board composition without imposing an additional, unexpected disclosure burden on the company.

For example, if the Approval Date is March 10, 2021, all companies (including companies with smaller boards) would be required to have, or explain why they do not have, one Diverse director by March 10, 2023. Companies with boards of more than five members would be required to have, or explain why they do not have, two Diverse directors by March 10, 2025 (for NGS/NGM companies) or March 10, 2026 (for NCM companies). Company ABC had one Female director on March 10, 2023, and she self-identified as Female in the company's Board Diversity Matrix published in the company's proxy statements for its 2023 and 2024 annual shareholders meetings. She unexpectedly resigned from the company's board on March 10, 2024, prior to April 30, 2024, which is the date the company files its proxy statement for its annual shareholders meeting to be held on June 10, 2024. The company would have until March 10, 2025, to satisfy the diversity objectives of proposed Rule 5605(f)(2), rather than April 30, 2024.

The company could disclose in its 2025 proxy statement or on its website at the time it files its 2025 proxy statement, "The Company is relying on the grace period provided by Nasdaq Rule 5605(f)(6)(B) related to diverse board representation."

vi.    Exempt Companies

Under proposed Rule 5605(f)(4), Nasdaq proposes to exempt the following types

of companies from the requirements of proposed Rule 5605(f) ("Exempt Companies"):

SPACs, asset-backed issuers and other passive issuers (as set forth in Rule 5615(a)(1));

cooperatives (as set forth in Rule 5615(a)(2)); limited partnerships (as set forth in Rule

5615(a)(4)); management investment companies (as set forth in Rule 5615(a)(5)); issuers

of non-voting preferred securities, debt securities and Derivative Securities (as set forth

in Rule 5615(a)(6)) that do not have equity securities listed on Nasdaq; and issuers of

securities listed under the Rule 5700 Series.

Proposed Rule 5605(f)(5)(C) will allow any company that ceases to be an Exempt

Company to satisfy the requirements of proposed Rule 5605(f) by the later of:  (i) one

year from the date that the company no longer qualifies as an Exempt Company; or (ii)

the date the company files its proxy statement or its information statement (or, if the

company does not file a proxy, in its Form 10-K or 20-F) for the company's first annual

meeting of shareholders subsequent to such event.

Nasdaq believes it is appropriate to exempt these types of companies from the

proposed rule because such companies do not have boards, do not list equity securities, or

are not operating companies.  These companies are already exempt from certain of

Nasdaq's corporate governance standards related to board composition, as described in

Rule 5615.  Nasdaq is also proposing to exempt SPACs from the requirements of

proposed Rule 5605(f), and the post-business combination entity would have at least two

years after they complete a business combination.  This approach is similar to other

phase-in periods granted to SPACs.  For example, Rule 5615(b)(1) provides a company

listing in connection with its initial public offering, including a SPAC, one year to fully

comply with the independent compensation and nomination committee requirements of Rules 5605(d) and (e), and the majority independent board requirement of proposed Rule 5605(b). Similarly, Rule 5615(b)(1) and SEC Rule 10A-3(b)(1)(iv)(A) allow a newly listed company, including a SPAC, up to one year from the date its registration statement is effective to fully comply with the applicable audit committee composition requirements.

Under proposed Rule 5605(f)(5)(A) or (B), a newly listed company, including through a business combination with a SPAC, would be permitted to satisfy the requirement of proposed Rule 5605(f)(2) to have, or explain why it does not have, the applicable number of Diverse directors under proposed Rule 5605(f)(2) by the later of two years from the date of listing or the date the company files its proxy statement or its information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F) for the company's second annual meeting of shareholders subsequent to the company's listing, with differing milestones depending on the company's market tier. Nasdaq believes it is not appropriate to subject SPACs to proposed Rule 5605(f) prior to completing a business combination because SPACs are shell companies until they complete an acquisition of an operating company. Rather, Nasdaq believes it is appropriate to provide SPACs with the same phase-in provided to other newly listed companies upon completing a business combination, because a SPAC must satisfy all of Nasdaq's initial listing requirements upon completing a business combination, including its requirements related to committee composition and majority independent board.

D. Alternatives Considered

Nasdaq considered multiple alternatives in determining whether requiring listed companies to have, or explain why they do not have, a minimum number of diverse

directors would better promote the public interest.  Nasdaq's reasoned decision-making

process included considering:  (i) mandate and disclosure-based approaches; (ii) higher

and lower diversity objectives; (iii) longer and shorter timeframes; and (iv) broader and

narrower definitions of "Diverse."

     i.   <u>Mandate vs. Disclosure Based Approach</u>

     The proposal is a disclosure-based framework, not a mandate.  Globally, gender

mandates range from requiring at least one woman on the board,[207] requiring two or more

women based on board size,[208] or requiring 30 to 50% women on the board.[209]  Some

---

[207]    For example, the Securities and Exchange Board of India requires public companies to have at least one woman on the board.  <u>See</u> Securities and Exchange Board of India (Listing Obligations and Disclosure Requirements) Regulations, Regulation 17(1)(a) (2015), available at: https://www.sebi.gov.in/legal/regulations/jan-2020/securities-and-exchange-board-of-india-listing-obligations-and-disclosure-requirements-regulations-2015-last-amended-on-january-10-2020-_37269.html. Similarly, the Israeli Companies Law requires public companies to have at least one woman on the board.  <u>See</u> Paul Hastings, *Breaking the Glass Ceiling: Women in the Boardroom* 139 (2018), available at: https://www.paulhastings.com/genderparity/.  In the United States, California's S.B. 826 requires public companies headquartered in California to have at least one woman on the board.  <u>See</u> Cal. S.B. 826, <u>supra</u> note 118, at § 301.3(b)(3).

[208]    For example, California's S.B. 826 requires public companies headquartered in California to have at least two women on the board if their board is comprised of five directors, and at least three women on the board if their board is comprised of six or more directors.  <u>See</u> Cal. S.B. 826, <u>supra</u> note 118, at § 301.3(b)(1) and (2).  Similar legislation has been proposed in New Jersey, Michigan and Hawaii.  <u>See</u> N.J. Senate No. 3469, § 3(b)(2) (2019); Mich. S.B. 115, § 505a(2)(b) (2019); Haw. H.B. 2720, § 414-1(b)(2) (2020).

[209]    For example, Norway imposes a gender quota ranging from 33%-50% depending on board size.  <u>See</u> Paul Hastings, <u>supra</u> note 207, at 103.  Portugal requires listed companies to have at least 33.3% women on boards by 2020.  <u>See</u> Deloitte, *Women in the Boardroom*, <u>supra</u> note 92, at 143.  Germany requires public companies with co-determined boards (at least 50% employee representation) to have at least 30% women, and all other listed companies to establish a company-defined target.  <u>See</u> Ulrike Binder and Guido Zeppenfeld, Mayer Brown, *Germany Introduces Rules on Female Quota for Supervisory Boards and Leadership Positions* (March 13, 2015), available at https://www.mayerbrown.com/en/perspectives-events/publications/2015/03/germany-introduces-rules-on-female-quota-for-super.  Belgium requires listed companies to have at least 33% women on the board.  <u>See</u> Deloitte, *Women in the Boardroom*, <u>supra</u> note 92, at 85.  Austria requires listed companies with more than 1,000 employees to have at least

mandates vary by board size—for example, Norway imposes different standards for boards of two to three directors, four to five directors, six to eight directors, nine directors and ten or more directors.[210]  California imposes a higher standard for gender diversity that boards with five directors or six or more directors must satisfy by the end of 2021 under S.B. 826, and a higher standard for underrepresented communities that boards with five to eight directors and nine or more directors must satisfy by the end of 2022 under A.B. 979.  Nasdaq did not observe a common denominator among the mandates applicable to varying board sizes.  However, Nasdaq considered observations that a model based on various board sizes could subject companies to a higher threshold by virtue of adding directors.[211]  Based on Nasdaq data, the average board size of its listed companies is eight directors.

Soft targets ranging from 25% to 40% women on boards have been suggested by various corporate governance codes and corporate governance organizations.  For example, Rule 4.1 of the Swedish Corporate Governance Code (the "Code") provides that

---

30% women on the board.  See id. at 81.  Iceland requires public companies with more than 50 employees to have at least 40% women on the board.  See Act respecting Public Limited Companies No. 2/199, Article 63, available at: https://www.government.is/publications/legislation/lex/2018/02/06/TRANSLATION-OF-RECENT-AMENDMENTS-OF-ICELANDIC-PUBLIC-AND-PRIVATE-LIMITED-COMPANIES-LEGISLATION-2008-2010-including-Acts-13-2010-sex-ratios-and-68-2010-minority-protection-remuneration/. France and Italy both require public companies to have at least 40% women on their boards.  See Paul Hastings, supra note 207, at 91; White & Case, *Italy increases gender quotas in corporate boards of listed companies* (Jan. 29, 2020), available at: https://www.whitecase.com/publications/alert/italy-increases-gender-quotas-corporate-boards-listed-companies).

[210]    See Paul Hastings, supra note 207, at 103.

[211]    See David A. Katz and Laura A. McIntosh, infra note 204.

listed companies are to "strive for gender balance on the board."[212]  Each company's nominations committee is to publish a statement on its website at the time it issues notice of its shareholders meeting "with regard to the requirement in rule 4.1, that the proposed composition of the board is appropriate according to the criteria set out in the Code and that the company is to strive for gender balance."[213]  Companies are not required to comply with the Code, "but are allowed the freedom to choose alternative solutions which they feel are better suited to their particular circumstances, as long as they openly report every deviation, describe the alternative solution they have chosen and explain their reasons for doing so."[214]  Signifying progress, in 2019, 7% of nominations committees did not issue a statement on board gender balance, compared to 58% in 2013.[215]

In 2015, the Swedish Corporate Governance Board, which is responsible for administering the Code, established a goal to achieve representation of women on boards of small/mid cap (and Swedish companies listed on NGM Equity) and large cap companies of 30% and 35%, respectively, by 2017.  Further, the Board aimed to achieve

---

[212]   See Swedish Corporate Governance Board, *The Swedish Corporate Governance Code* §4.1 17 (eff. Jan. 1, 2020), available at: http://www.bolagsstyrning.se/UserFiles/Koden/The_Swedish_Corporate_Governance_C ode_1_January_2020.pdf.

[213]   See Swedish Corporate Governance Board, *Annual Report 2020* 22 (August 2020), available at: http://www.bolagsstyrning.se/userfiles/archive/3930/kodkoll_arsrapport-2020_eng.pdf.

[214]   See Swedish Corporate Governance Board, *Gender balance on boards of listed companies: The Swedish Corporate Governance Board assesses the situation ahead of this year's AGMs* (February 3, 2015), available at: http://www.bolagsstyrning.se/userfiles/archive/3856/pressrelease_gender_2014-02-03.pdf.

[215]   See Swedish Corporate Governance Board, *Annual Report 2020*, supra note 213, at 22.

40% representation of women on boards of all listed Swedish companies by 2020.[216]

Based on data as of June 30, 2020, among listed companies, women accounted for 32.7%

of board seats on small/mid cap companies and NGM Equity, 38.6% of large cap

companies and 34.7% of all listed companies.[217]

    In the United Kingdom, the Financial Conduct Authority requires companies with

a premium listing on the London Stock Exchange to publicly disclose whether or not they

comply with the Financial Reporting Council's U.K. Corporate Governance Code (the

"U.K. Code"), and if not, to explain their reasons for non-compliance.[218]  Provision 23 of

the U.K. Code requires each company to publicly describe "the work of the nomination

committee, including . . . the policy on diversity and inclusion, its objectives and linkage

to company strategy, how it has been implemented and progress on achieving the

objectives,"[219] and Principle J states that board appointments and succession planning

---

[216]    See Swedish Corporate Governance Board, *Gender balance*, supra note 214.

[217]    See Swedish Corporate Governance Board, *Statistics regarding gender balance* (July 15, 2020), available at: http://www.bolagsstyrning.se/userfiles/archive/3922/200715_gender_balance_on_boards.pdf; see also *Sammanfattning*, available at http://www.bolagsstyrning.se/userfiles/archive/3922/statistik_konsfordelning_2020.pdf.

[218]    See Financial Conduct Authority, LR 9.8.6(6), available at: https://www.handbook.fca.org.uk/handbook/LR/9/8.html; see also Financial Reporting Council, *The UK Corporate Governance Code* 3 (July 2018), available at https://www.frc.org.uk/getattachment/88bd8c45-50ea-4841-95b0-d2f4f48069a2/2018-UK-Corporate-Governance-Code-FINAL.PDF.  In addition, "[i]n 2016, the [UK] Government also implemented the relevant provision of the EU Non-Financial Reporting Directive with a new reporting requirement in the FCA's Disclosure and Transparency Rules. This requires issuers (excluding [small and medium-sized enterprises]) admitted to trading on an EU regulated market to disclose their diversity policy in the corporate governance statement."  See Financial Reporting Council, *Board Diversity Reporting* 5 (September 2018), available at: https://www.frc.org.uk/getattachment/62202e7d-064c-4026-bd19-f9ac9591fe19/Board-Diversity-Reporting-September-2018.pdf.

[219]    See Financial Reporting Council, *The UK Corporate Governance Code*, supra note 218, at 9.

should, among other things, "promote diversity of gender, social and ethnic backgrounds."[220]  In addition, the Companies Act requires companies to disclose gender diversity statistics among the board, management and employees.[221]  In 2018, the Financial Reporting Council reported that 83% of FTSE 100 and 74% of FTSE 250 companies had established a board diversity policy specifying gender, with approximately 1/3 specifying ethnicity.[222]  More recently, a report commissioned by the Financial Reporting Council concluded that there is a lack of public disclosure regarding the LGBTQ+ status among directors and executives of public companies.  While the report did not recommend amending Principle J of the U.K. Code to consider sexual orientation or gender identity, it emphasized that the U.K. Code "seeks to promote diversity and inclusion of all minority groups within business"[223] and suggested that the government "update corporate reporting requirements to require companies to demonstrate how they intend to capture data on the sexual orientation and gender identity of staff."[224]

In 2011, the Davies Review called on FTSE 100 boards to achieve 25% women on boards by 2015.[225]  After that milestone was achieved, the Hampton Alexander Review encouraged FTSE 350 boards to have 1/3 women by 2020, and it has been

---

[220]    Id. at 8.

[221]    See UK Companies Act 2006, § 414C.

[222]    See Financial Reporting Council, Board Diversity Reporting, supra note 218, at 9.

[223]    See Hay et al., supra note 104, at 37.

[224]    Id.

[225]    See Women on boards, supra note 100.

achieved by FTSE 100 companies.[226]  In 2017, the Parker Review called on FTSE 100

and 250 companies to have at least one director of color by 2021 and 2024,

respectively.[227]  As of February 2020, approximately 37% of FTSE 100 companies

surveyed and 69% of FTSE 250 companies surveyed did not have one director of color

on their board.[228]

    Australian Securities Exchange ("ASX")-listed companies must comply with the

ASX Corporate Governance Council's Corporate Governance Principles and

Recommendations (the "ASX Recommendations") or explain why they do not.  The ASX

Recommendations require companies to have and disclose a diversity policy with

measurable objectives and report on progress towards meeting those objectives.  If the

company is in the ASX/S&P 300, its objective for achieving gender diversity should be at

least 30%.[229]  The Australian government also requires companies with 100 or more

employees to provide an annual report about gender equality indicators, including the

gender composition of the board and the rest of the workforce.[230]  In 2015, the ASX and

KPMG found that 99% of S&P/ASX 200 companies and 88% of ASX 201-500

---

[226]   See *Hampton-Alexander Review: FTSE Women Leaders* (November 2016), available at: https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/613085/ftse-women-leaders-hampton-alexander-review.pdf.

[227]   See Parker, supra note 103.

[228]   See Sir John Parker, *Ethnic Diversity Enriching Business Leadership* 19 (Feb. 5, 2020), available at: https://assets.ey.com/content/dam/ey-sites/ey-com/en_uk/news/2020/02/ey-parker-review-2020-report-final.pdf.

[229]   See ASX Corporate Governance Council, *Corporate Governance Principles and Recommendations* 9 (4th ed. Feb. 2019), available at: https://www.asx.com.au/documents/asx-compliance/cgc-principles-and-recommendations-fourth-edn.pdf.

[230]   Workplace Gender Equality Act 2012, Part IV § 13 (March 25, 2015), available at: https://www.legislation.gov.au/Details/C2015C00088.

companies disclosed establishing a diversity policy rather than explaining why they do not have one.[231]  As of July 2020, women account for 28.4% and 31.8% of board seats among ASX 300 and ASX 100 companies, respectively.[232]

Nasdaq observed that women account for at least 30% of the boards of the largest companies in Australia, Sweden, and the United Kingdom, and in three other countries that have implemented disclosure requirements or suggested milestones on a comply-or-explain basis:  Finland, New Zealand, and Canada.[233]  Nasdaq considered that countries that have implemented mandates have also seen progress in women's representation on boards, including, for example, Austria, Iceland, Belgium, France, Germany, Italy, and

---

[231]  See KPMG and ASX, *ASX Corporate Governance Council Principles and Recommendations on Diversity: Analysis of disclosures for financial years ended 1 January 2015 and 31 December 2015* 4 (2016) available at: https://www.asx.com.au/documents/asx-compliance/asx-corp-governance-kpmg-diversity-report.pdf.

[232]  See KPMG and 30% Club, *Building Gender Diversity on ASX 300 Boards: Seven Learnings from the ASX 200* 4 (July 2020), available at: https://assets.kpmg/content/dam/kpmg/au/pdf/2020/building-gender-diversity-asx-300-boards.pdf. The report also noted that diversity counteracts groupthink and that ASX 201-299 companies with at least 30% female directors "are more likely than not to [have seen] market capitalisation increases over the past 12 months." Id. at 6.

[233]  See The Conference Board of Canada, *Data Dashboard* (Sept. 23, 2020), available at: https://www.conferenceboard.ca/focus-areas/inclusion/2020/aob-comparisons-around-the-world-table?AspxAutoDetectCookieSupport=1; see also Andrew MacDougall et al.*,* Osler, *Diversity Disclosure Practices* 4 (2020), available at https://www.osler.com/osler/media/Osler/reports/corporate-governance/Diversity-and-Leadership-in-Corporate-Canada-2020.pdf. But see Heike Mensi-Klarbach et al., *The Carrot or the Stick: Self-Regulation for Gender-Diverse Boards via Codes of Good Governance*, J. Bus. Ethics 11 (2019), available at: https://doi.org/10.1007/s10551-019-04336-z (reviewing longitudinal data from 2006 to 2016 on listed and state-owned companies in Austria and concluding that "self-regulation of gender diversity on boards is ineffective if merely based on recommendations in codes of good governance"). Mensi-Klarbach recommends setting concrete targets and providing public monitoring to improve the effectiveness of comply-or-explain frameworks.

Portugal.[234]  On average, women account for 31% of board seats in countries with gender

mandates.[235]  Albertine d'Hoop-Azar et al. (2017) compared gender diversity on boards

in countries with varying requirements and enforcement measures and concluded that

external pressures—"progressive societal norms" and regulations—are needed to increase

board diversity.[236]

Nasdaq discussed the benefits and challenges of mandate and comply-or-explain

models with over a dozen stakeholders, and while the majority of organizations were in

agreement that companies would benefit from a disclosure-based, business-driven

framework to drive meaningful and systemic change in board diversity, the majority also

stated that a disclosure-based approach would be more palatable to the U.S. business

community than a mandate.  Most organizations Nasdaq spoke with expressed general

discomfort with mandates, although they acknowledged that opposition is lessening in the

wake of California's S.B. 826[237] and A.B. 979.[238]  While many recognized that mandates

can force boards to act more quickly and accelerate the rate of change, they believe that a

disclosure-based approach is less controversial, would spur companies to take action and

would make meaningful progress on board diversity.  Some stakeholders also highlighted

---

[234]    See Paul Hastings, supra note 207; see also Deloitte, *Women in the Boardroom*, supra
note 92.

[235]    See Paul Hastings, supra note 207; The Conference Board of Canada, supra note 233.

[236]    See Albertine d'Hoop-Azar et al., Gender Parity on Boards Around the World, Harv. L.
Sch. Forum on Corp. Governance (January 5, 2017), available at:
https://corpgov.law.harvard.edu/2017/01/05/gender-parity-on-boards-around-the-world/
(comparing gender diversity on boards in countries with varying requirements and
enforcement measures and concluding that external pressures—"progressive societal
norms" and regulations—are needed to increase board diversity).

[237]    See Cal. S.B. 826, supra note 118.

[238]    See Cal. A.B. 979, supra note 118.

additional challenges that smaller companies and companies in certain industries may face finding diverse board members.  In contrast, a disclosure-based framework that provides companies with flexibility would empower companies to maintain decision-making authority over their board's composition while providing stakeholders with a better understanding of the company's current board composition and its philosophy regarding diversity.  This approach would better inform the investment community and enable more informed analysis of, and conversations with, companies.  Nasdaq believes that these goals will be achieved through the disclosure of consistent, comparable data across companies, as would be required by the Exchange's proposed definition of Diverse.  The Exchange is therefore proposing a disclosure-based framework rather than a mandate.

For example, if, under Israeli law regarding board diversity, an Israeli company is required only to have a minimum of one woman on the board and such Israeli company chooses to meet the requirements under Israeli home country law in lieu of meeting the diversity objectives of proposed Rule 5605(f)(2)(B), it may choose to disclose that "the Company is incorporated in Israel and required by Israeli law to have a minimum of one woman on the board, and satisfies home country requirements in lieu of Nasdaq Rule 5605(f)(2)(B), which requires each Foreign Issuer to have at least two Diverse directors." If a U.S. company had two Diverse directors but one resigned due to unforeseen circumstances, and it is not eligible for the grace period under proposed Rule 5605(f)(6), it could disclose, for example:  "Due to the unexpected resignation of Ms. Smith this year, the Company does not have at least one director who self-identifies as Female and one director who self-identifies as an Underrepresented Minority or LGBTQ+.  We

intend to undertake reasonable efforts to meet the diversity objectives of proposed Rule

5605(f)(2)(A) prior to our next annual shareholder meeting and have engaged a search

firm to identify qualified Diverse candidates.  However, due to unforeseen circumstances,

we may not achieve this goal." Or a U.S. company may disclose that it chooses to define

diversity more broadly than Nasdaq's definition by considering national origin, veteran

status or individuals with disabilities when identifying nominees for director because it

believes such diversity brings a wide range of perspectives and experiences to the board.

In each case, investors will have a better understanding of the company's reasons for not

meeting the applicable diversity objectives and can use that information to make an

informed investment or voting decision.

### ii.    Higher and Lower Diversity Objectives

Nasdaq observed that existing empirical research spanned companies across

several countries, including the United States, Spain, China, Canada, France, and

Norway.  Nasdaq considered that the studies related to company performance and board

diversity found positive associations at various levels and measures of board diversity,

including having at least one woman on the board,[239] two or more diverse directors (with

diverse considered female, Black, Hispanic, or Asian),[240] at least three women on the

board[241] and being in the top quartile for gender and ethnic diversity.[242]

---

[239]    See Credit Suisse, supra note 35, at 16.

[240]    See Thomas and Starr, supra note 28, at 5.

[241]    See Eastman et al., supra note 36, at 3; Wagner, supra note 37.

[242]    See McKinsey, supra note 31.

Nasdaq considered that the academic and empirical studies related to investor protection and board diversity found positive associations at various levels and measures of board diversity, including having at least one woman on the board[243] or up to 50% women on the board, and the assertions of certain academics that their findings may extend to other forms of diversity, including racial and ethnic diversity.[244]  Nasdaq also reviewed academic and empirical research suggesting that "critical mass" is achieved by having three or more women on the board, and that having only one diverse director on the board risks "tokenism."[245]  Nasdaq considered that although the legislation enacted by Norway and California, and proposed by several other states, varies based on board size, the academic and empirical research considered companies across a spectrum of sizes and board sizes, including Fortune 500, S&P 500, Fortune 1000 and smaller (non-Fortune 1000) companies.

Nasdaq concluded that there is no "one-size fits all" approach to promoting board diversity and that the academic and empirical studies regarding the relationship between board diversity, company performance and investor protections is continuing to evolve. However, in Nasdaq's survey of academic studies described above—and of the targets or mandates promulgated by regulatory bodies and organizations worldwide—Nasdaq

---

[243]    See Abbott et al., supra note 64; Chen et al., supra note 70.

[244]    See Wahid, supra note 65; Cumming et al., supra note 68, at 1588 (observing that previous studies considered directors' independence, experience and education, and "further research is warranted on the comparison of different forms of diversity with respect to securities fraud.").

[245]    See Alison M. Konrad et al., *Critical Mass: The Impact of Three or More Women on Corporate Boards*, 37(2) Org. Dynamics 145 (April 2008); Miriam Schwartz-Ziv, *Gender and Board Activeness: The Role of a Critical Mass*, 52(2) J. Fin. & Quant. Analysis 751 (April 2017);  Mariateresa Torchia et al., *Women Directors on Corporate Boards: From Tokenism to Critical Mass*, 102(2) J. Bus. Ethics. 299 (Feb. 25, 2011), available at https://ssrn.com/abstract=1858347.

observed a common denominator of having at least one woman on the board.  Similarly,

Nasdaq observed a common denominator of having at least one director who is diverse in

terms of race, ethnicity or sexual orientation among the requirements related to, and

academic research considering, board diversity beyond gender identity.  Nasdaq therefore

believes that a diversity objective of at least two Diverse directors provides a reasonable

baseline for comparison across companies.  However, Nasdaq considered comments that

it should "amend the proposed rules to allow greater flexibility for companies with

relatively small boards."[246]  Nasdaq considered that, based on the requirement of

proposed Rule 5605(c)(2) for each listed company to have an audit committee composed

of at least three independent directors,[247] the minimum board size of a company listed on

Nasdaq must be at least three directors.  Based on Nasdaq data, the average board size of

all listed companies is eight directors, with an average board size of 7.3 for Smaller

Reporting Companies and Foreign Issuers.  However, not all companies with small

boards are Smaller Reporting Companies, and therefore the alternative diversity objective

provided to Smaller Reporting Companies may not be available to them.  Further,

companies with smaller boards may be disproportionately impacted by the proposed rule

if they plan to satisfy proposed Rule 5605(f)(2) by adding additional directors.  For

example, two Diverse directors on a five member board comprise 40% of the board,

whereas two Diverse directors on an eight member board comprise 25% of the board.

Alternatively, if a five-member board does not have two Diverse directors and expands

its board to satisfy proposed Rule 5605(f)(2), it may require the company to incur

---

[246]    See Ballard Spahr Comment Letter, supra note 171.

[247]    See Nasdaq Rulebook, Rule 5605(c)(2).

additional costs through director compensation and D&O insurance.  Accordingly, Nasdaq proposes to adopt Rule 5605(f)(2)(D) a company with a board of directors of five or fewer members to have, or explain why it does not have, at least one member of its board of directors who is Diverse.

Nasdaq considered criticisms levied against other models that base board diversity objectives on board size.  For example, such models may create complexity for companies by subjecting them to a higher diversity objective for larger boards if they add diverse directors.[248]  In California under S.B. 826, a five member board is required to have at least two female directors, and a board of six or more members must have at least three female directors.  Therefore, if a five member board adds two female directors to comply with S.B. 826, it becomes a seven member board subject to the higher threshold to have at least three female directors, and must add another female director.  Therefore, Nasdaq proposes to clarify in proposed Rule 5605(f)(2)(D) that if a company has five members on its board of directors before becoming subject to proposed Rule 5605(f), it shall not become subject to the requirement of subparagraphs (A), (B), or (C) to have at least two members of its board of directors who are Diverse if it adds one director to satisfy subparagraph (D), thereby becoming a six member board.  However, a company would become subject to proposed Rule 5605(f)(2)(A), (B) or (C) if it subsequently expands its board.

Companies are not precluded from meeting a higher or lower alternative measurable objective.  For example, a company may choose to disclose that it does not meet the diversity objectives under proposed Rule 5605(f)(2) because it is subject to an

---

[248]    See David A. Katz and Laura A. McIntosh, supra note 204.

alternative standard under state or foreign laws and has chosen to satisfy that diversity

objective instead. On the other hand, many firms may strive to achieve even greater

diversity than the objectives set forth in Nasdaq's proposed rule. Nasdaq believes that

providing flexibility and clear disclosure when the company determines to follow a

different path will improve the quality of information available to investors who rely on

this information to make informed investment and voting decisions.

    iii.    <u>Longer and Shorter Timeframes</u>

       Nasdaq considered whether an alternative timeframe for satisfying the diversity

objectives of proposed Rule 5605(f)(2) would better promote the public interest than the

timeframe Nasdaq has proposed under Rule 5605(f)(7). While companies are not

precluded from adding additional directors to their boards to meet the diversity objectives

of proposed Rule 5605(f)(2) sooner than contemplated by the proposed rule, Nasdaq

understands that some companies may need to obtain shareholder approval to amend their

governing documents to allow for board expansion. Other companies may choose to

replace an existing director on the board with a Diverse director, and board turnover may

be low.[249] Nasdaq recognizes that it also takes substantial lead time to identify,

interview, and select board nominees. To provide companies with sufficient time to meet

the diversity objectives of proposed Rule 5605(f)(2), while recognizing that investors are

calling for expedient change, Nasdaq has structured its proposal similarly to the approach

taken by California, where companies with larger boards must achieve one target by an

---

[249]    <u>See</u> Matteo Tonello, *Corporate Board Practices in the Russell 3000 and S&P 500*, Harv.
L. Sch. Forum on Corp. Governance (Oct. 18, 2020),
https://corpgov.law.harvard.edu/2020/10/18/corporate-board-practices-in-the-russell-
3000-and-sp-500/ (last accessed Nov. 24, 2020).

earlier date and satisfy the entire diversity objective at a later date. Nasdaq also considered the approaches taken by foreign jurisdictions to implement diversity objectives. For example, Belgium and France implemented diversity objectives under a phased approach that provided companies with at least five years to fully satisfy the objectives,[250] whereas Iceland and Portugal provided companies with three years or less.[251]

While companies may choose to satisfy proposed Rule 5605(f)(2) on an alternative timeframe, a company that chooses a timeframe that is longer than the timeframes set forth in proposed Rule 5605(f)(7) also must publicly explain its reasons for doing so. For example, an NGM-listed company that chooses to comply with the NCM timeframe may disclose the following: "While the Company is listed on NGM, the Company believes that it is similarly situated to companies listed on NCM in terms of its annual revenues and public float, and therefore has chosen to meet the objectives of Rule 5605(f)(2)(C) in lieu of Rule 5605(f)(2)(A). The company has met these objectives by having at least two Diverse directors on the board who self-identify as Female within the timeframe provided under Rule 5605(f)(7) applicable to NCM-listed companies."

    iv.   Broader and Narrower Definition of Diverse

Nasdaq considered whether the definition of Diverse should include broader characteristics than those reported on the EEO-1 report, such as the examples provided by the Commission staff's C&DI, including LGBTQ+, nationality, veteran status, and individuals with disabilities. During its stakeholder outreach, Nasdaq inquired whether a

---

[250]    See Paul Hastings, supra note 207, at 79 and 90; see also supra note 209.

[251]    See Deloitte, Women in the Boardroom, supra note 92, at 115 and 143; see also supra note 209.

broad definition of Diversity would promote the public interest.  While recognizing the diverse perspectives that different backgrounds can provide, most stakeholders supported a narrower definition of Diversity focused on gender, race and ethnicity, with several supporting broadening the definition to include the LGBTQ+ community.

As discussed above, companies currently are permitted to define diversity "in ways they consider appropriate" under federal securities laws.  One of the challenges of this principles-based approach has been the disclosure of inconsistent and noncomparable data across companies.  However, most companies are required by law to report data on race, ethnicity and gender to the EEOC through the EEO-1 Report.  Nasdaq believes that adopting a broad definition of Diverse would maintain the status quo of inconsistent, noncomparable disclosures, whereas a narrower definition of Diverse focused on race, ethnicity, sexual orientation and gender identity will promote the public interest by improving transparency and comparability.  Nasdaq also is concerned that the broader definitions of diversity utilized by some companies may result in Diverse candidates being overlooked, and may be hindering meaningful progress on improving diversity related to race, ethnicity, sexual orientation and gender identity.  For example, a company may consider diversity to include age, education, and board tenure.  While such characteristics may provide laudable cognitive diversity, this focus may result in a homogenous board with respect to race, ethnicity, sexual orientation, and gender identity that, by extension, does not reflect the diversity of a company's communities, employees, investors, or other stakeholders.

Nasdaq also believes that a transparent, consistent definition of Diverse would provide stakeholders with a better understanding of the company's current board

composition and its philosophy regarding diversity if it does not meet the diversity objectives of proposed Rule 5605(f)(2).  This would enable the investment community to conduct more informed analysis of, and have more informed conversations with, companies.  To the extent a company chooses to satisfy proposed Rule 5605(f)(2) by meeting the applicable diversity objectives, it will have the ancillary benefit of making meaningful progress in improving board diversity related to race, ethnicity, sexual orientation and gender identity.

Nasdaq's review of academic and empirical research on board diversity revealed a dearth of empirical analysis on the relationship between investor protection or company performance and broader diversity characteristics such as veteran status or individuals with disabilities.[252]  Nasdaq acknowledges that there also is a lack of published research on the issue of LGBTQ+ representation on boards.[253]  This may be due to a lack of consistent, transparent data on broader diverse attributes, or because there is no voluntary self-disclosure workforce reporting requirements for LGBTQ+ status, such as the EEO-1 reporting framework for race, ethnicity, and gender.  In any event, it is evident that while

---

[252]    KPMG (2020) states that veterans are underrepresented in boardrooms, with retired General and Flag Officers ("GFOs") occupying less than 1% of Fortune 500 board seats. See KPMG, *The value of veterans in the boardroom* 1 (2020), available at: https://boardleadership.kpmg.us/content/dam/boardleadership/en/pdf/2020/the-value-of-veterans-in-the-boardroom.pdf (noting that "[r]etired GFOs who have honed their leadership and critical decision-making skills in a high-threat environment can bring extensive risk oversight experience to the board, which may be especially valuable in the context of today's risk landscape").  Accenture (2018) observed that companies that offered inclusive working environments for employees with disabilities achieved an average of 28% higher revenue, 30% higher economic profit margins, and 2x net income than their industry peers.  See Accenture, *Getting to Equal: The Disability Inclusion Advantage* (2018), available at: https://www.accenture.com/_acnmedia/PDF-89/Accenture-Disability-Inclusion-Research-Report.pdf.

[253]    See Credit Suisse ESG Research, supra note 40, at 1; see also Out Leadership, supra note 42.

"[b]oardroom diversity is a topic that has gained significant traction . . . LGBT+ diversity, however, has largely been left out of the conversation."[254]

Nonetheless, Nasdaq believes it is reasonable and in the public interest to include a reporting category for LGBTQ+ in recognition of the U.S. Supreme Court's recent affirmation that sexual orientation and gender identity are "inextricably" intertwined with sex,[255] and based on studies demonstrating a positive association between board diversity and decision making, company performance and investor protections.  Nasdaq also believes that the proposed rule would foster the development of data to conduct meaningful assessments of the association between LGBTQ+ board diversity, company performance, and investor protections.

As noted above, the proposal does not preclude companies from considering additional diverse attributes, such as nationality, disability, or veteran status in selecting board members; however, company would still have to provide the required disclosure under proposed Rule 5605(f)(3) if the company does not also have at least two directors who are Diverse (or one Diverse director for companies with a board of directors of five or fewer members).  Nor would the proposal prevent companies from disclosing information related to other diverse attributes of board members beyond those highlighted in the rule if they felt such disclosure would benefit investors.  Nasdaq believes such disclosure would help inform the evolving body of research on the relationship between broader diverse attributes, company performance and investor

---

[254]    See Out Leadership, supra note 42, at 3.

[255]    See Bostock v. Clayton Cnty., supra note 170.

protection and provide investors with additional information about the company's philosophy regarding broader diversity characteristics.

b.  Statutory Basis

The Exchange believes that its proposal is consistent with Section 6(b) of the Act,[256] in general, and furthers the objectives of Section 6(b)(5) of the Act,[257] in that it is designed to remove impediments to and perfect the mechanism of a free and open market and a national market system, to prevent fraudulent and manipulative acts and practices, and, in general, to protect investors and the public interest, for the reasons set forth below.  Further, Nasdaq believes the proposal is not designed to permit unfair discrimination between issuers or to regulate by virtue of any authority conferred by the Act matters not related to the purposes of the Act or the administration of the Exchange, for the reasons set forth below.

I.    Board Statistical Disclosure

Nasdaq has proposed what it believes to be a straightforward and clear approach for companies to publish their statistical data pursuant to proposed Rule 5606.  This disclosure requirement will protect investors that view information related to board diversity as material to their investment and voting decisions.  The proposed disclosure format prescribed by the rule also protects investors by eliminating data collection inaccuracies and decreasing costs, while enhancing investors' ability to utilize the information.  Nasdaq also believes that the rule will enhance investor confidence by assisting investors in making more informed decisions through Nasdaq's efforts to

---

[256]      See 15 U.S.C. § 78f(b).

[257]      Id. § 78f(b)(5).

require meaningful, consistent, reliable and comparable data readily available and in a clear and comprehensive manner.  Nasdaq also believes that the disclosure format provides a company with a uniformed template with the flexibility to include any additional details about its board that the company believes would be useful to investors.

As a threshold matter, as discussed above, diversity has become an increasingly important subject and, in recent years, investors increasingly have been advocating for greater board diversity and for the disclosure of board diversity statistics.[258]  The current board diversity disclosure regime is lacking in several respects, and Nasdaq believes that its proposed Rule 5606 addresses many of the current concerns and responds to investors' demands for greater transparency into the diversity characteristics of a company's board composition by mandating disclosure and curing certain deficiencies that exist within the current SEC disclosure requirements.

Investors have expressed their dissatisfaction with having to independently collect board-level data about race, ethnicity, and gender identity because such investigations can be time consuming, expensive, and fraught with inaccuracies.[259]  The lack of consistency and specificity in Regulation S-K has been a major impediment for many investors and data collectors.  As a general matter, the Commission's requirements have not addressed the concerns expressed by commenters that "disclosure about board diversity was important information to investors."[260]  Nasdaq believes that its proposed Rule 5606 addresses many of the concerns that have been raised.

---

[258]    See Petition for Amendment of Proxy Rule, supra note 86; see also Office of Illinois State Treasurer, supra note 116.

[259]    See Petition for Amendment of Proxy Rule, supra note 86, at 2.

[260]    See Proxy Disclosure Enhancements, 74 Fed. Reg. at 68,343-44 (amending Item 407(c)(2)(vi) of Regulation S-K, codified at 17 C.F.R. § 229.407(c)(2)(vi)).

Nasdaq also believes that requiring the annual disclosure of a company's board diversity, as proposed in Rule 5606(a), will provide consistent information to the public and will enable investors to continually review the board composition of a company to track trends and simplify or eliminate the need for a company to respond to multiple investor requests for information about the diverse characteristics of the company's board. Requiring annual disclosures also would make information available to investors who otherwise would not be able to obtain individualized disclosures.[261] Moreover, consistent disclosures may encourage boards to consider a wider range of board candidates in the nomination process, including candidates with fewer ties to the current board.[262]

The Commission's 2009 amendments to Regulation S-K provide no definition for diversity and do not explicitly require disclosures specifically related to details about the board's gender, racial, ethnic and LGBTQ+ composition. Additionally, the Commission staff's C&DI does not address the definition of diversity, and it requires a registrant to disclose diversity information only in certain limited circumstances. Investors have expressed that current regulations and accompanying interpretations impair their ability to obtain clear and consistent data.[263] As a result, Nasdaq believes that proposed Rule 5606(a) protects investors and the public interest by making clear that a company's annual diversity data disclosure must include information related to gender identity, race,

---

[261]    See Petition for Rulemaking, supra note 130.

[262]    See Proxy Disclosure Enhancements, 74 Fed. Reg. at 68,355 ("To the extent that boards branch out from the set of candidates they would ordinarily consider, they may nominate directors who have fewer existing ties to the board or management and are, consequently, more independent."); Hazen and Broome, supra note 120, at 57-58.

[263]    See Petition for Amendment of Proxy Rule, supra note 86, at 2; Petition for Rulemaking, supra note 130, at 7.

ethnicity and LGBTQ+ status, thereby leaving less discretion for companies to selectively disclose certain diversity information and enhancing the comparability of such data across companies. Moreover, it is in the public interest to provide clear requirements for diversity disclosure, and Nasdaq's proposed Matrix format provides such clarity.

Nasdaq does not intend to obligate directors to self-identify in any of the categories related to gender identity, race, ethnicity, and LGBTQ+. Nasdaq believes that directors should have autonomy to decide whether to provide such information to their company. Therefore, Nasdaq believes that it is reasonable and in the public interest to allow directors to opt out of disclosing the information required by proposed Rule 5606(a) by permitting a company to categorize such directors in the "Did Not Disclose Gender" and "Did Not Disclose Demographic Background" sections of the Matrix.

Nasdaq believes that it is in the public interest to utilize the Matrix format for all companies as proposed in Rule 5606(a). Additionally, Nasdaq believes that the format removes impediments to aggregating and analyzing data across all companies by requiring each company to disclose separately the number of female, male, and non-binary directors, the number of female, male, and non-binary directors that fall into certain racial and ethnic categories, and the number of directors that identify as LGBTQ+. In addition to the format, Nasdaq believes that prohibiting companies from providing the information through graphics and images will allow investors to easily disaggregate the data and track directors with multiple diversity characteristics. Nasdaq also believes that it is reasonable and in the public interest to allow companies the flexibility of a supplementing their disclosure by providing additional information related to its directors in the Matrix, beyond what is required by proposed Rule 5606(a).

As discussed above, most listed companies are required by law to complete an EEOC Employer Information Report EEO-1 Form.  Although outside directors generally are not employees and therefore are not covered in the EEO-1,[264] Nasdaq believes that collecting the information required by proposed Rule 5606(a) is familiar to most companies, and that it is reasonable to require disclosure of the additional board information.

Further, Nasdaq believes that the disclosure proposed under Rule 5606(a) will remove impediments to shareholders by making available information related to board-level diversity in a standardized manner, thereby enhancing the consistency and comparability of the information and helping to better protect investors.  The proposed disclosure will also help protect investors and the public interest by enabling investors to determine the total number of diverse directors, which is information that is not consistently available in existing proxy disclosures in cases where a single director has multiple diverse characteristics.  Nasdaq believes it is in the public interest to allow companies the option to provide the disclosure in a way they believe will be most meaningful to their shareholders.  Therefore, Nasdaq has proposed Rule 5606(b) to provide companies the option of electing to provide the information in the same manner as, and concurrently with, the disclosure required by proposed Rule 5605(f)(3).  Specifically, such disclosure must be provided in advance of the company's next annual meeting of shareholders: (a) in any proxy statement or any information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F); or (b) on the company's

---

[264]    The EEO-1 Form does not require a company to disclose data for outside directors because such directors are not company employees.

website.  Aligning the timing for providing the board composition disclosure with other governance-related disclosures, such as those provided in the proxy, makes it easier for investors to know where a company has provided the proposed Rule 5606(b) disclosure and gives shareholders access to the Matrix information prior to a company's annual shareholder meeting.

Moreover, Nasdaq believes it is reasonable to request that companies that publish their Matrix data on their website also submit such disclosure concurrently with the filing made pursuant to (a) and submit a URL link to the disclosure through the Nasdaq Listing Center, within one business day after such posting because this closely aligns the timing for companies who opt to disclose via their website and companies who choose to provide the disclosure through an SEC filing.  In the interest of providing companies flexibility, Nasdaq has not required companies that publish their Matrix data on their websites to publish the data in a specified location on their websites.

Nasdaq believes it is reasonable, and not unfairly discriminatory, to provide a separate Matrix to Foreign Issuers.  Nasdaq recognizes that the proposed definition of Underrepresented Minority in proposed Rule 5605(f)(1) may not apply to companies outside of the United States because each country has its own unique demographic composition.  Moreover, Nasdaq's definition of Underrepresented Minority proposed in Rule 5605(f)(1) may be inapplicable to a Foreign Issuer, making this Matrix data less relevant for such companies and not useful for investors.  Therefore, Nasdaq believes that offering Foreign Issuers the option of a separate template that requires different disclosure categories will provide investors with more accurate disclosures related to the diversity of directors among the board of a Foreign Issuer.  Additionally, Nasdaq believes

that providing an "Underrepresented Individual in Home Country Jurisdiction" category provides Foreign Issuers with more flexibility to identify and disclose diverse directors within their home countries.

The annual requirement in proposed Rule 5606(a) will guarantee that the information is available to the public on a continuous and consistent basis. As described in the instructions to the Matrix disclosure form and proposed Rule 5606(a), each year following the first year of disclosure of the Matrix, all companies must include the current year and immediately prior year diversity statistics in its disclosure. If the company publishes the Matrix on its website, the disclosure must remain accessible on the company's website. Nasdaq believes that disclosing at least two years of data allows the public to view any changes and track a board's diversity progress. Moreover, requiring the disclosure to remain accessible on the company's website will allow investors to maintain access to the disclosure in the same manner as they would for companies who opt to provide the disclosure in an SEC filing.

In addition to providing a means for shareholders to assess a company's board-level diversity and measure its progress in improving that diversity over time, Nasdaq believes that proposed Rule 5606 will provide a means for Nasdaq to assess whether companies meet the diversity objectives of proposed Rule 5605(f). The ability to determine satisfaction of the proposed listing rule's diversity objectives will protect investors and the public interest.

Moreover, the proposed rule provides transparency into diversity based not only on race, ethnicity, and gender identity, but also on a director's self-identified sexual orientation. Nasdaq believes that expanding the diversity characteristics beyond those

which are commonly reported by companies currently will broaden the way boards view diversity and ensure that board diversity is occurring across all protected groups.

Nasdaq believes that the proposal is not unfairly discriminatory because proposed Rule 5606 will apply to all Nasdaq-listed companies, except for the following companies exempt pursuant to proposed Rule 5606(c):  SPACs; asset-backed issuers and other passive issuers (as set forth in Rule 5615(a)(1)); cooperatives (as set forth in Rule 5615(a)(2)); limited partnerships (as set forth in Rule 5615(a)(4)); management investment companies (as set forth in Rule 5615(a)(5)); issuers of non-voting preferred securities, debt securities and Derivative Securities (as set forth in Rule 5615(a)(6)) that do not have equity securities listed on Nasdaq; and issuers of securities listed under the Rule 5700 Series—which meet the definition of Exempt Companies as defined under proposed Rule 5605(f)(4).  Nasdaq believes it is reasonable and not unfairly discriminatory to exempt these companies from the proposed rule because the exemption of these companies, except for SPACs, is consistent with the approach taken by Nasdaq in Rule 5615 as it relates to certain Nasdaq corporate governance standards for board composition.  Nasdaq believes it is not unfairly discriminatory to exempt SPACs from the requirements of proposed Rule 5605(f) because this approach is similar to other phase-in periods granted to SPACs.  For example, Rule 5615(b)(1) provides a company listing in connection with its initial public offering, including a SPAC, one year to fully comply with the compensation and nomination committee requirements of Rules 5605(d) and (e), and the majority independent board requirement of proposed Rule 5605(b).  Similarly, Rule 5615(b)(1) and SEC Rule 10A-3(b)(1)(iv)(A) allows a newly listed company, including a SPAC, up to one year from the date its registration statement is effective to

fully comply with the applicable audit committee composition requirements. Moreover, the post-business combination entity would be required to satisfy proposed Rule 5605(f) by the later of two years from the date of listing or the date the Company files its proxy statement or its information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F) for the company's second annual meeting of shareholders subsequent to the company's listing, with differing milestones depending on the company's market tier.

Finally, Nasdaq believes it is reasonable under proposed Rule 5606(e) to allow companies the later of (1) one calendar year from the Approval Date, which is the Effective Date; or (2) the date the Company files its proxy statement or its information statement for its annual meeting of shareholders (or, if the Company does not file a proxy or information statement, the date it files its Form 10-K or 20-F) during the calendar year of the Effective Date. Nasdaq believes proposed Rule 5606(e) is reasonable because there is only a *de minimis* burden placed on companies to collect the board data and prepare the Matrix given that most companies already collect similar information for certain employees. Additionally, most companies are required to prepare an annual proxy statement and update the Commission within four business days when a new director is appointed to the board.[265] Proposed Rule 5606(e) also aligns the operative date for proposed Rule 5606 with Nasdaq's listed companies' annual shareholder meetings and proxy filings with the uncertainty of when the Commission may take action on the proposed changes. Therefore, Nasdaq believes that at least a minimum of one year is sufficient time for companies to incorporate their directors into their data collection.

---

[265]     See SEC Form 8-K, available at:  https://www.sec.gov/files/form8-k.pdf.

II.    Diverse Board Representation or Explanation

    A.    Removes Impediments to and Perfects the Mechanism of a Free and Open Market and a National Market System

As discussed above, studies suggest that the traditional director candidate selection process may create barriers to considering qualified diverse candidates for board positions by limiting the search for director nominees to existing directors' social networks and candidates with C-suite experience.[266] As noted in Section IV of the Purpose section, women hold more than 30% of board seats in Norway, France, Sweden, and Finland.[267] As noted in Section IV of the Purpose section, in analyzing Norway's experience in implementing a gender mandate, Dhir (2015) observed that "[b]oard seats tend to be filled by directors engaging their networks, and the resulting appointees tend to be of the same socio-demographic background."[268] Dhir concluded that broadening the search for directors outside of traditional networks "is unlikely to occur without some form of regulatory intervention, given the prevalence of homogenous social networks and in-group favoritism."[269] He also observed that regulatory action was effective in increasing the representation of women on boards in Norway by "democratiz[ing] access to a space previously unavailable to women."[270] One Norwegian director "grudgingly

---

[266]    See GAO Report, supra note 49; Vell, supra note 106; Rhode & Packel, supra note 110, at 39; Deloitte, *Women in the Boardroom*, supra note 92; see also Parker, supra note 103, at 38 (acknowledging that, "as is the case with gender, people of colour within the UK have historically not had the same opportunities as many mainstream candidates to develop the skills, networks and senior leadership experience desired in a FTSE Boardroom").

[267]    See supra note 92.

[268]    See Dhir, supra note 84, at 52.

[269]    Id. at 51.  See also Albertine d'Hoop-Azar et al., supra note 236.

[270]    See Dhir, supra note 84, at 101.

accept[ed] that the free market principles she held so dearly had disappointed her—and

that the [mandate] was a necessary correction of market failure."[271]

In contrast, Nasdaq observed that other countries have made comparable progress

using a disclosure-based model.  Women account for at least 30% of the largest boards of

companies in six countries using comply-or-explain models:[272]  Australia, Finland,

Sweden, New Zealand, Canada, and the United Kingdom.[273]  Nasdaq discussed the

benefits and challenges of mandate and disclosure-based models with over a dozen

stakeholders, and the majority of organizations were in agreement that companies would

benefit from a disclosure-based, business-driven framework to drive meaningful and

systemic change in board diversity, and that a disclosure-based approach would be more

palatable to the U.S. business community than a mandate.  While many organizations

recognized that mandates can force boards to act more quickly and accelerate the rate of

change, they believe that a disclosure-based approach is less controversial, would spur

companies to take action and would make meaningful progress on board diversity.  Some

stakeholders also highlighted additional challenges that smaller companies and

companies in certain industries may face finding diverse board members.  However,

leaders from across the spectrum of stakeholders with whom Nasdaq spoke reinforced the

notion that if companies recruit by skill set and expertise rather than title, then they will

find there is more than enough diverse talent to satisfy demand.  The Exchange is

therefore proposing a disclosure-based framework, not a mandate.

---

[271]    See Dhir, supra note 84, at 116.

[272]    See Paul Hastings, supra note 207; Deloitte, *Women in the Boardroom*, supra note 92.

[273]    See Conference Board of Canada, supra note 233; Osler, supra note 233, at 4.

Nasdaq also considered Acting Chair Lee's observation that disclosure "gets investors the information they need to make investment decisions based on their own judgment of what indicators matter for long-term value. Importantly, it can also drive corporate behavior." Specifically, she observed that:

> For one thing, when companies have to formulate disclosure on topics it can influence their treatment of them, something known as the "what gets measured, gets managed" phenomenon. Moreover, when companies have to be transparent, it creates external pressure from investors and others who can draw comparisons company to company. The Commission has long-recognized that influencing corporate behavior is an appropriate aim of our regulations, noting that "disclosure may, depending on determinations made by a company's management, directors and shareholders, influence corporate conduct" and that "[t]his sort of impact is clearly consistent with the basic philosophy of the disclosure provisions of the federal securities laws."[274]

Nasdaq believes that a disclosure-based framework may influence corporate conduct if a company chooses to meet the diversity objectives of proposed Rule 5605(f)(2). A company may satisfy that objective by broadening the search for qualified candidates and considering candidates from other professional pathways that bring a wider range of skills and perspectives beyond traditional C-suite experience.[275] Nasdaq believes that this will help increase opportunities for Diverse candidates that otherwise may be overlooked due to the impediments of the traditional director recruitment process, and therefore the proposed rule is designed to remove impediments to a free and open market and a national market system. Further, boards that choose to meet the applicable diversity objectives may experience other benefits from diversity that perfect the

---

[274]    See Lee, supra note 27.

[275]    See, e.g., Hillman et al., supra note 111 (finding that African-American and white women directors were more likely to have specialized expertise in law, finance, banking, public relations or marketing, or community influence from positions in politics, academia or clergy).

mechanism of a free and open market and national market system.  As discussed above in Section 3.a.III.B of the Purpose section (*Diversity and Investor Protection*), and further discussed below in Section 3.b.II.B of the Statutory basis section (*Prevents Fraudulent and Manipulative Acts and Practices*), studies suggest that diversity is positively associated with reduced stock volatility,[276] more transparent public disclosures,[277] and less information asymmetry,[278] leading to stock prices that better reflect public information, and therefore Nasdaq believes the proposed rule is designed to remove impediments to and perfecting a free and open market and a national market system. Importantly, Nasdaq believes that the disclosure-based framework proposed under proposed Rule 5605(f) is not designed to create additional impediments to a free and open market and a national market system because it will empower companies to maintain decision-making authority over the composition of their boards.

To the extent a company chooses not to meet the applicable diversity objectives of proposed Rule 5605(f)(2), Nasdaq believes that proposed Rule 5605(f)(3) will provide analysts and investors with a better understanding about the company's reasons for not doing so and its philosophy regarding diversity.  Proposed Rule 5605(f) is thus designed to remove impediments to a free and open market and a national market system by enabling the investment community to conduct more informed analyses of, and have more informed conversations with, companies.  Nasdaq believes that such analyses and conversations will be better informed by consistent, comparable data across companies,

---

[276]    See Bernile et al., supra note 33.

[277]    See Gul et al., supra note 72; Bravo and Alcaide-Ruiz, supra note 62.

[278]    See Abad et al., supra note 73.

which Nasdaq proposes to achieve by adopting a consistent definition of "Diverse" under

proposed Rule 5605(f)(1).  Nasdaq further believes that providing such disclosure will

improve the quality of information available to investors who rely on this information to

make informed investment and voting decisions, and is therefore designed to promote

capital formation and efficiency and perfect the mechanism of a free and open market and

a national market system.

### B.  Prevents Fraudulent and Manipulative Acts and Practices

As discussed above in Section III of the Purpose section, Nasdaq is concerned that

the failure of homogenous boards to consider a broad range of viewpoints can result in

"groupthink," which may lead to suboptimal decisions that have adverse effects on

company performance, board performance and stakeholders.  Nasdaq believes that

including diverse directors with a broader range of skills, perspectives and experiences

may help detect and prevent fraudulent and manipulative acts and practices by mitigating

"groupthink."  Increased board diversity also may reduce the likelihood of insider trading

and other fraudulent and manipulative acts and practices.

Nasdaq reached this conclusion by reviewing public statements by investors and

organizations regarding the impact of groupthink on decision making processes, as well

as academic and empirical studies on the relationship between diversity, groupthink and

fraud.  Nasdaq observed that groupthink can result in "self-censorship"[279] and failure to

voice dissenting viewpoints in pursuit of "consensus without critical evaluation and

without considering different possibilities."[280]  In contrast, "board members who possess

---

[279]    See Forbes and Milliken, supra note 80, at 496.

[280]    See Dhir, supra note 84, at 124.

a variety of viewpoints may raise different ideas and encourage a full airing of dissenting views.  Such a broad pool of talent can be assembled when potential board candidates are not limited by gender, race, or ethnicity."[281]

Dhir (2015) concluded that gender diversity may "promote cognitive diversity and constructive conflict in the boardroom" and gender diverse boards may be more effective at overseeing management.[282]  One respondent in Dhir's survey of Norwegian directors observed that:

> I've seen situations where the women were more willing to dig into the difficult questions and really go to the bottom even if it was extremely painful for the rest of the board, but mostly for the CEO . . . when it comes to the really difficult situations, [where] you think that the CEO has . . . done something criminal . . . [o]r you think that he has done something negligent, something that makes it such that you . . . are unsure whether he's the suitable person to be in the driving seat.[283]

Another director observed that "[i]f you have different experiences and a more diversified board, you will have different questions asked."[284]  Dhir concluded that "women directors may be particularly adept at critically questioning, guiding and advising management without disrupting the overall working relationship between the board and management."[285]

Pucheta-Martínez et al. (2016) reasoned that questioning management is a critical part of the audit committee's oversight role, along with ensuring that management does not pressure the external auditor to issue a clean audit opinion notwithstanding the

---

[281]    See Petition for Amendment of Proxy Rule, supra note 86, at 4.

[282]    See Dhir, supra note 84, at 150.

[283]    Id. at xiv.

[284]    Id. at 120.

[285]    Id. at 35.

identification of any uncertainties or scope limitations.[286]  Otherwise, "[a]uditors may

accept the demands of management for a clean audit report when the firm deserves a

scope limitation and an uncertainty qualification."[287]  The authors found that "the

percentage of female [directors] on [audit committees] reduces the probability of [audit]

qualifications due to errors, non-compliance or the omission of information,"[288] and

further found that:

> The percentage of female directors on [audit committees], the proportion of
> independent female directors on [audit committees] and [audit committees]
> chaired by women, impact positively on the likelihood of disclosing scope
> limitations and uncertainties qualifications, suggesting an improvement of the
> quality of financial information.[289]

The authors concluded that this suggests that gender-diverse audit committees

better "ensure that managers do not seek to pressure auditors into issuing a clean opinion

instead of a qualified opinion" when any uncertainties or scope limitations are

identified.[290]

Nasdaq also reviewed studies that found a positive association between board

gender diversity and important investor protections regardless of whether women are on

the audit committee, and considered the assessment of some academics that their findings

may extend to other forms of diversity, including racial and ethnic diversity.  Nasdaq

therefore believes that such findings with respect to audit committees would be expected

to be more broadly applicable to the quality of the broader board's decision-making

---

[286]     See Pucheta-Martínez et al., supra note 58, at 368.

[287]     Id. at 364.

[288]     Id. at 363.

[289]     Id. at 378.

[290]     Id. at 368.

process, and to other forms of diversity, including diversity of race, ethnicity and sexual

orientation.

In examining the association between broader board gender diversity and fraud,

Cumming, et al. observed that "[g]ender diversity, in particular, has been found to

facilitate more effective monitoring by the board and protection of shareholder interests

by broadening the board's expertise, experience, interests, perspectives and creativity."[291]

They observed that the presence of women on boards is associated with a lower

likelihood of securities fraud; indeed, they found "strong evidence of a negative and

diminishing effect of women on boards and the probability of being in our fraud

sample."[292]  The authors suggested that "other forms of board diversity, including but not

limited to gender diversity, may likewise reduce fraud."[293]

Similarly, Wahid (2019) noted that board gender diversity may "lead to less

biased and superior decision-making" because it "has a potential to alter group dynamics

by affecting cognitive conflict and cohesion."[294]  Wahid (2019) concluded that "gender-

diverse boards commit fewer financial reporting mistakes and engage in less fraud,"[295]

finding that companies with female directors have "fewer irregularity-type [financial]

restatements, which tend to be indicative of financial manipulation."[296]  Wahid also

suggested that other forms of diversity, including racial diversity, could introduce

---

[291]     See Cumming et al., supra note 68, at 1574.

[292]     Id. at 1589.

[293]     Id. at 1588.

[294]     See Wahid, supra note 65, at 707.

[295]     Id. at 705.

[296]     Id. at 721.

additional perspectives to the boardroom,[297] which Nasdaq believes could further

mitigate groupthink.

Abbott, Parker and Persley (2012) posited that "a female board presence

contribut[es] to the board's ability to maintain an attitude of mental independence,

diminish[es] the extent of groupthink and enhance[es] the ability of the board to monitor

financial reporting."[298]  They noted that "poorer [internal] controls and the lack of an

independent and questioning board-level attitude toward accounting judgments can create

an opportunity for fraud."[299]  They observed a lower likelihood of a material financial

restatements stemming from fraud or error in companies with at least one woman on the

board.[300]

Nasdaq believes that these studies provide substantial evidence suggesting an

association between gender diverse boards or audit committees and a lower likelihood of

fraud; a lower likelihood of receiving audit qualifications due to errors, non-compliance

or omission of information; and a greater likelihood of disclosing audit reports with

uncertainties and scope limitations.  Moreover, academics have suggested that other

---

[297]    Id. at 24-25; see also Shecter, supra note 67 (quoting Wahid as saying that "[i]f you're
          going to introduce perspectives, those perspectives might be coming not just from male
          versus female. They could be coming from people of different ages, from different racial
          backgrounds…. If we just focus on one, we could be essentially taking away from other
          dimensions of diversity and decreasing perspective.").

[298]    See Abbott et al., supra note 64, at 607.

[299]    Id. at 610.

[300]    Id. at 613 ("The previously discussed lines of research lead us to form our hypothesis. In
          summary, restatements may stem from error or fraud. In either instance, the internal
          control system (to which the board of directors contributes by setting the overall tone at
          the top) has failed to detect or prevent a misstatement. Ineffective internal controls may
          stem from insufficient questioning of assumptions underlying financial reporting,
          inadequate attention to the internal control systems, or insufficient support for the audit
          committee's activities.").

forms of diversity, including racial and ethnic diversity, may reduce fraud and mitigate groupthink.  Further, while homogenous boards may unwittingly fall into the trap of groupthink due to a lack of diverse perspectives, "heterogeneous groups share conflicting opinions, knowledge, and perspectives that result in a more thorough consideration of a wide range of interpretations, alternatives, and consequences."[301]  Nasdaq therefore believes that the proposed rule is designed to reduce groupthink, and otherwise to enhance the functioning of boards, and is therefore designed to prevent fraudulent and manipulative acts and practices.

Further, the Commission has suggested that in seeking board diversity, "[t]o the extent that boards branch out from the set of candidates they would ordinarily consider, they may nominate directors who have fewer existing ties to the board or management and are, consequently, more independent."[302]  Nasdaq believes that the benefits of the proposed rule are analogous to the benefits of Nasdaq's rules governing and requiring director independence.  In 2003, Nasdaq adopted listing rules requiring, among other things, that independent directors comprise a majority of listed companies' boards, which were "intended to enhance investor confidence in the companies that list on Nasdaq."[303] The Commission observed that self-regulatory organizations "play an important role in assuring that their listed issuers establish good governance practices," and concluded that the proposed rule changes would secure an "objective oversight role" for issuers' boards of directors, and "foster greater transparency, accountability, and objectivity" in that

---

[301]    See Dallas, supra note 82, at 1391.

[302]    See Proxy Disclosure Enhancements, supra note 79, 74 Fed. Reg. at 68,355.

[303]    See Order Approving Proposed Rule Changes, supra note 52, at 64,161.

role."[304]  Along the same lines, in approving Nasdaq's application for registration as a

national securities exchange, the Commission found Nasdaq's rules governing the

independence of members of boards and certain committees to be consistent with Section

6(b)(5) of the Act because they advanced the "interests of shareholders" in "greater

transparency, accountability, and objectivity" in oversight and decision-making by

corporate boards.[305] Nasdaq proposes to promote accountability in corporate decision-

making by requiring companies that do not have the applicable number of Diverse

directors under proposed Rule 5605(f)(2) to provide investors with a public explanation

of the board's reasons for not doing so under proposed Rule 5605(f)(3).

Nasdaq believes it is critical to the detection and prevention of fraudulent and

manipulative acts and practices to have directors on the board who are willing to

critically question management and air dissenting views.  Nasdaq believes that boards

comprised of directors from Diverse backgrounds enhance investor confidence by

ensuring that board deliberations consider the perspectives of more than one demographic

group, leading to robust dialogue and better decision making.  However, Nasdaq

recognizes that directors may bring diverse perspectives, skills and experiences to the

board, notwithstanding that they have similar attributes.  Nasdaq therefore believes it is in

the public interest to permit a company to choose whether to meet the diversity objectives

of proposed Rule 5605(f)(2) or to explain why it does not, in accordance with proposed

---

[304]    Id. at 64, 175.

[305]    See In re Nasdaq Stock Market, 71 Fed. Reg. 3550, 3565 (Jan. 23, 2006).  See also 68
         Fed. Reg. 18,788, 18,815 (April 16, 2003) (in adopting Rule 10A-3, setting standards for
         the independence of audit committee members, the Commission concluded that such
         standards would "enhance the quality and accountability of the financial reporting
         process and may help increase investor confidence, which implies increased efficiency
         and competitiveness of the U.S. capital markets").

Rule 5605(f)(3).  For example, it may believe that defining diversity more broadly than

Nasdaq (by considering national origin, veteran status and disabilities) brings a wide

range of perspectives and experiences to the board.  Nasdaq believes such disclosure will

provide investors with a better understanding of the company's philosophy regarding

diversity.  This would better inform the investment community and enable more informed

analyses of, and conversations with, companies.  Therefore, Nasdaq believes satisfying

proposed Rule 5605(f)(2) through disclosure pursuant to proposed Rule 5605(f)(3) is

consistent with Section 6(b)(5) of the Act because it is designed to advance the "interests

of shareholders" in "greater transparency, accountability, and objectivity" of boards and

their decision-making processes.[306]  In addition, as discussed further in Section 3.b.II.C

of the Statutory Basis section (*Promotes Investor Protection and the Public Interest*)

below, Nasdaq believes that proposed Rule 5605(f) could help to reduce information

asymmetry, and thereby reduce the risk of insider trading or other opportunistic insider

behavior.

### C.  Promotes Investor Protection and the Public Interest

Substantial evidence exists that board diversity is positively associated with more

transparent public disclosures and higher quality financial reporting, and therefore

Nasdaq believes the proposal is designed to promote investor protection.  Specifically,

studies have concluded that companies with gender-diverse boards are associated with

more transparent public disclosures and less information asymmetry, leading to stock

prices that better reflect public information.  Gul, Srinidhi & Ng (2011) found that

---

[306]    *Id.*

"gender diversity improves stock price informativeness by increasing voluntary public disclosures in large firms and increasing the incentives for private information collection in small firms."[307]  Bravo and Alcaide-Ruiz (2019) concluded that "female [audit committee] members with financial expertise play an important role in influencing disclosure strategies that provide forward-looking information containing projections and financial data useful for investors."[308]  Abad et al. (2017) concluded that companies with gender diverse boards are associated with lower levels of information asymmetry, suggesting that increasing board gender diversity is associated with "reducing the risk of informed trading and enhancing stock liquidity."[309]

Nasdaq believes that one consequence of information asymmetry is that insiders may engage in opportunistic behavior prior to a public announcement of financial results and before the market incorporates the new information into the company's stock price. This can result in unfair gains or an avoidance of losses at the expense of shareholders who did not have access to the same information.  This may exacerbate the principal-agent problem, in which the interests of a company's board and shareholders are not aligned.  Lucas-Perez et al. (2014) found that board gender diversity is positively associated with linking executive compensation plans to company performance,[310] which may be an effective mechanism to deter opportunistic behavior by management and better align their interests with those of their company's shareholders.[311]

---

[307]    See Gul et al., supra note 72, at 2.

[308]    See Bravo and Alcaide-Ruiz, supra note 62, at 151.

[309]    See Abad et al., supra note 73, at 202.

[310]    See Lucas-Perez et al., supra note 75.

[311]    Id.

Another concern is that "[w]hen information asymmetry is high, stakeholders do not have sufficient resources, incentives, or access to relevant information to monitor managers' actions, which gives rise to the practice of earnings management."[312] Earnings management "is generally defined as the practice of using discretionary accounting methods to attain desired levels of reported earnings."[313]  Manipulating earnings is particularly concerning to investors because "[i]f users of financial data are 'misled' by the level of reported income, then investors' allocation of resources may be inappropriate when based on the financial statements provided by management,"[314] which could undermine the efficacy of the capital formation process for investors who rely on such information to make informed investment and voting decisions.

Gull et al. (2018)[315] observe that overseeing management is a crucial component of investor protection, particularly with regard to earnings management:

> The role of the board of directors and board characteristics (*i.e.* board independence and gender diversity) is usually associated with the protection of shareholder interests…. This role is particularly crucial with regard to the issue of earnings management, in that one of the responsibilities of boards is to monitor management.[316]

The authors of that study found that the presence of female audit committee members with business expertise is associated with a lower magnitude of earnings management.  Srinidhi, Gul and Tsui (2011) observed that better oversight of

---

[312]  See Vernon J. Richardson, *Information Asymmetry and Earnings Management: Some Evidence*, 15 Rev. Quantitative Fin. and Acct. 325 (2000).

[313]  See Gull et al., supra note 61, at 2.

[314]  Id.

[315]  See generally id.

[316]  Id. at 6 (citations omitted).

management combined with lower information asymmetry leads to better earnings quality. They noted that "[e]arnings quality is an important outcome of good governance demanded by investors and therefore its improvement constitutes an important objective of the board."[317] They found that companies with women on the board, specifically on the audit committee, exhibit "higher earnings quality" and "better reporting discipline by managers."[318] They concluded that "including female directors on the board and the audit committee are plausible ways of improving the firm's reporting discipline and increasing investor confidence in financial statements."[319]

Chen, Eshleman and Soileau (2016) suggested that the relationship between gender diversity and higher earnings quality observed by Srinidhi, Gul and Tsui (2011) is ultimately driven by reduced internal control weaknesses, noting that "prior literature has established a negative relationship between internal control weaknesses and earnings quality."[320] Internal control over financial reporting are procedures designed "to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP."[321] Weaknesses in

---

[317] See Srinidhi et al., supra note 56, at 1638.

[318] Id. at 1612. The authors used two measures of earnings quality: discretionary accruals quality "computed as the absolute value of the estimation error in accruals after controlling for current, past, and future cash flows, sales and long-term assets, and operating cycle and volatility in sales" and "the lower propensity among firms whose unmanaged earnings are just shy of earnings benchmarks to manage earnings and beat the benchmarks by a small amount."

[319] Id.

[320] See Chen et al., supra note 70, at 18.

[321] See Public Company Accounting Oversight Board, *Auditing Standard No. 5: Appendix A*, A5 available at: https://pcaobus.org/oversight/standards/archived-standards/details/Auditing_Standard_5_Appendix_A.

internal controls can "lead to poor financial reporting quality" and "more severe insider trading"[322] or failure to detect a material misstatement. According to the PCAOB:

> A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis.[323]

A material misstatement can occur "as a result of some type of inherent risk, whether fraud or error (*e.g.*, management's aggressive accounting practices, erroneous application of GAAP)."[324] The failure to prevent or detect a material misstatement before financial statements are issued can require the company to reissue its financial statements and potentially face costly shareholder litigation. Chen et al. found that having at least one woman on the board (regardless of whether or not she is on the audit committee) "may lead [a] to reduced likelihood of material weaknesses [in internal control over financial reporting],"[325] and Abbott, Parker and Persley (2012) found "a significant association between the presence of at least one woman on the board and a lower likelihood of [a material financial] restatement."[326] Notably, while the Sarbanes-Oxley Act ("SOX") implemented additional measures to ensure that a company has robust internal controls, the findings of Abbott et al. were consistent among a sample of pre- and post-SOX restatements, suggesting that "an additional, beneficial layer of independence in group decision-making is associated with gender diversity."[327]

---

[322]     See Chen et al., supra note 70, at 12.

[323]     See Public Company Accounting Oversight Board, supra note 321, at A7.

[324]     See Abbott et al., supra note 64, at 609-10.

[325]     See Chen et al., supra note 70, at 18.

[326]     See Abbott et al., supra note 64, at 607.

[327]     Id. at 609.

Nasdaq believes that the proposal to require listed companies to have, or explain

why they do not have, the applicable number of Diverse directors under proposed Rule

5605(f) could help to lower information asymmetry and reduce the risk of insider trading

or other opportunistic insider behavior, which would help to increase stock price

informativeness and enhance stock liquidity, and is therefore designed to protect

investors and promoting capital formation and efficiency.  Nasdaq believes that

information asymmetry could also be reduced by permitting companies to satisfy

proposed Rule 5605(f)(2) by publicly disclosing their reasons for not meeting the

applicable diversity objectives in accordance with proposed Rule 5605(f)(3), because the

requirement will improve the quality of information available to investors who rely on

this information to make informed investment and voting decisions, and is therefore

designed to protect investors and promote capital formation and efficiency.  Aligning the

timing for companies to provide an explanation in accordance with 5605(f) with other

governance-related disclosures, such as those provided in the proxy, will make it easier

for investors to know where a company has provided the proposed Rule 5605(f)

disclosure and gives shareholders access to the information prior to a company's annual

shareholder meeting.

Moreover, Nasdaq believes that proposed Rule 5605(f) could foster more

transparent public disclosures, higher quality financial reporting, and stronger internal

control over financial reporting and mechanisms to monitor management.  This could be

particularly beneficial for Smaller Reporting Companies that are not subject to the SOX

404(b) requirement to obtain an independent auditor's attestation of management's

assessment of the effectiveness of internal control over financial reporting, which is therefore designed to promote investor protection.

Nasdaq believes that the body of research on the relationship between company performance and board diversity summarized under Section III.A of the Purpose section above provides substantial evidence supporting the conclusion that board diversity does not have adverse effects on company performance, and therefore Nasdaq believes the proposal is designed to not negatively impact capital formation, competition or efficiency among its public companies.[328]  Nasdaq considered that some studies on gender diversity alone have had mixed results,[329] and that the U.S. GAO (2015) and Carter et al. (2010) concluded that the mixed results are due to differences in methodologies, data samples and time periods.[330]  This is not the first time Nasdaq has considered whether, on balance, various studies finding mixed results related to board composition and company performance are sufficient rationale to propose a listing rule.  For example, in 2003, notwithstanding the mixed results of studies regarding the relationship between company

---

[328]    See Di Miceli and Donaggio, supra note 50 ("The overwhelming majority of empirical studies conclude that a higher ratio of women in business leadership does not impair corporate performance (virtually all studies find positive or non-statistically significant results)").  See also Wahid, supra note 65, at 707 (suggesting that "at a minimum, gender diversity on corporate boards has a neutral effect on governance quality, and at best, it has positive consequences for boards' ability to monitor firm management").

[329]    See, e.g., Pletzer et al., supra note 43; Post and Byron, supra note 44; Adams and Ferreira, supra note 47.

[330]    See GAO Report, supra note 49, at 5 ("Some research has found that gender diverse boards may have a positive impact on a company's financial performance, but other research has not.  These mixed results depend, in part, on differences in how financial performance was defined and what methodologies were used"); Carter (2010), supra note 45, at 400 (observing that the different "statistical methods, data, and time periods investigated vary greatly so that the results are not easily comparable.").

performance and board independence,[331] Nasdaq adopted listing rules requiring a majority independent board that were "intended to enhance investor confidence in the companies that list on Nasdaq."[332] In its Approval Order, the SEC noted that "[t]he Commission has long encouraged exchanges to adopt and strengthen their corporate governance listing standards in order to, among other things, enhance investor confidence in the securities markets;" the Commission concluded that the independence rules would secure an "objective oversight role" for issuers' boards, and "foster greater transparency, accountability, and objectivity" in that role.[333] Nasdaq believes this reasoning applies to the current proposed rule as well. Even without clear consensus among studies related to board diversity and company performance, the heightened focus on corporate board diversity by investors demonstrates that investor confidence is undermined when data on board diversity is not readily available and when companies do not explain the reasons for the apparent absence of diversity on their boards.[334] Legislators are increasingly taking action to encourage corporations to diversify their boards and improve diversity disclosures.[335] Moreover, during its discussions with stakeholders, Nasdaq found consensus across every constituency that there is inherent value in board diversity. Lastly, it has been a longstanding principle that "Nasdaq stands for integrity and ethical

---

[331]    See supra note 50.

[332]    See Order Approving Proposed Rule Changes, supra note 52, at 64,161.

[333]    Id. at 64,176.

[334]    See supra notes 4 and 8.

[335]    See supra note 118.

business practices in order to enhance investor confidence, thereby contributing to the financial health of the economy and supporting the capital formation process."[336]

For all the foregoing reasons, Nasdaq believes that proposed Rule 5605(f) is designed to promote investor protection and the public interest by enhancing investor confidence that all listed companies are considering diversity in the context of selecting directors, either by meeting the applicable diversity objectives of proposed Rule 5605(f)(2) or by explaining their rationale for not doing so.  To the extent a company chooses not to meet the diversity objectives of proposed Rule 5605(f)(2), Nasdaq believes that the proposal will provide investors with additional disclosure about the company's reasons for doing so under proposed Rule 5605(f)(3).  For example, the company may choose to disclose that it does not meet the diversity objectives of proposed Rule 5605(f)(2) because it is subject to an alternative standard under state or foreign laws and has chosen to satisfy that diversity objective instead.  On the other hand, many firms may strive to achieve even greater diversity than the objectives set forth in our proposed rule.  Nasdaq believes that providing such flexibility and clear disclosure where the company determines to follow a different path will improve the quality of information available to investors who rely on this information to make informed investment and voting decisions, thereby promoting capital formation and efficiency, and further promoting the public interest.

---

[336]     See Nasdaq Rulebook, Rule 5101.

D.  Not Designed to Permit Unfair Discrimination between Customers, Issuers, Brokers, or Dealers

Nasdaq believes that proposed Rule 5605(f) is not designed to permit unfair discrimination among companies because it requires all companies subject to the rule to meet the applicable diversity objectives under proposed Rule 5605(f)(2) or explain why they do not, which could include describing a different approach.  While the proposal provides different objectives for the second Diverse director among Smaller Reporting Companies, Foreign Issuers, and other companies, Nasdaq believes that the rule is not designed to permit unfair discrimination among companies.  In all cases, a company can choose to meet the diversity objectives of the entire rule or to satisfy only certain elements of the rule.  Further, while the proposal provides an alternative objective for companies with smaller boards, the proposed rule does not limit board sizes—if a board chooses to nominate a Diverse individual to the board to meet the diversity objectives of the proposed rule, it is not precluded from also nominating a non-Diverse director for an additional board seat.  Lastly, the proposal is a disclosure-based framework, not a mandate, and companies can choose to explain their reasons for not meeting the proposed diversity objectives.

i.  Rule 5605(f)(2)(B):  Foreign Issuers

Similar to all other companies subject to proposed Rule 5605(f), the proposal requires all Foreign Issuers with boards of more than five members to have, or explain why they do not have, at least two Diverse directors, including one director who self-identifies as Female.  Foreign Issuers with boards of five or fewer members could meet an alternative objective of one Diverse director. However, Nasdaq proposes to provide Foreign Issuers with boards of more than five members with additional flexibility with

regard to the second Diverse director.  Foreign Issuers could satisfy the second director

objective by including another Female director, or an individual who self-identifies as

LGBTQ+ or as an underrepresented individual based on national, racial, ethnic,

indigenous, cultural, religious or linguistic identity in the country of the company's

principal executive offices (as reported on the company's Form 10-K, 20-F or 40-F).

While the proposal provides a different objective for the second Diverse director for

Foreign Issuers with larger boards, Nasdaq believes it is not designed to permit unfair

discrimination between Foreign Issuers and other companies because it recognizes that

the unique demographic composition of the United States, and its historical

marginalization of Underrepresented Minorities and the LGBTQ+ community, may not

extend to all countries outside of the United States.  Further, Nasdaq believes that it is

challenging to apply a consistent definition of minorities to all countries globally because

"[t]here is no internationally agreed definition as to which groups constitute

minorities."[337]  However, Nasdaq observed that the United Nations *Declaration on the*

*Rights of Persons Belonging to National or Ethnic, Religious and Linguistic Minorities*

states that:

---

[337]     See United Nations, *Minority Rights: International Standards and Guidance for
          Implementation* 2 (2010), available at:
          https://www.ohchr.org/Documents/Publications/MinorityRights_en.pdf.  See also G.A.
          Res. 47/135. art. 1.1 (Dec. 18, 1992) ("States shall protect the existence and the national
          or ethnic, cultural, religious and linguistic identity of minorities within their respective
          territories and shall encourage conditions for the promotion of that identity.").  The
          preamble to the Declaration also "[r]eaffirm[s] that one of the basic aims of the United
          Nations, as proclaimed in the Charter, is to promote and encourage respect for human
          rights and for fundamental freedoms for all, without distinction as to race, sex, language
          or religion."

States shall protect the existence and the national or ethnic, cultural, religious and linguistic identity of minorities within their respective territories and shall encourage conditions for the promotion of that identity. [Article 1.1]

Persons belonging to national or ethnic, religious and linguistic minorities (hereinafter referred to as persons belonging to minorities) have the right to enjoy their own culture, to profess and practise their own religion, and to use their own language, in private and in public, freely and without interference or any form of discrimination. [Article 2.1]

Similarly, "there is no universally accepted international definition of indigenous peoples."[338]  Rather, the United Nations *Declaration on the Rights of Indigenous Peoples* recognizes "that the situation of indigenous peoples varies from region to region and from country to country and that the significance of national and regional particularities and various historical and cultural backgrounds should be taken into consideration."[339] Accordingly, Nasdaq believes that it is not unfairly discriminatory to allow an alternative mechanism for Foreign Issuers to satisfy proposed Rule 5605(f)(2) in recognition that the U.S.-based EEOC definition of Underrepresented Minorities is not appropriate for every Foreign Issuer.  In addition, Foreign Issuers have the ability to satisfy proposed Rule 5605(f)(2)(B) by explaining that they do not satisfy this alternative definition.  Similarly, any company that is not a Foreign Issuer, but that prefers the alternative definition available for Foreign Issuers, could follow proposed Rule 5605(f)(2)(B) and disclose its reasons for doing so.

Under the proposal, Foreign Issuer means (a) a Foreign Private Issuer (as defined in Rule 5005(a)(19)) or (b) a company that (i) is considered a "foreign issuer" under Rule 3b-4(b) under the Act, and (ii) has its principal executive offices located outside of the

---

[338]    See id. at 3.

[339]    See G.A. Res. 61/295 (Sept. 13, 2007).

United States.  For example, a company that is considered a "foreign issuer" under Rule

3b-4(b) under the Act and has its principal executive offices located in Ireland would

qualify as a Foreign Issuer for purposes of proposed Rule 5605(f)(2), even if it is not

considered a Foreign Private Issuer under Nasdaq or SEC rules.  Nasdaq proposes to

define "board of directors" in proposed Rule 5605(f)(2)(B)(i)(b) to mean, in the case of a

Foreign Issuer with a two-tiered board system, the company's supervisory or non-

management board, which is consistent with the SEC's definition in Rule 10A-3(e)(2) of

the Exchange Act.[340]

Nasdaq recognizes that Foreign Issuers may be located in jurisdictions that

impose privacy laws limiting or prohibiting self-identification questionnaires, particularly

as they relate to race or ethnicity.  In such countries, a company may not be able to

determine each director's self-identified Diverse attributes due to restrictions on the

collection of personal information.  The company may instead publicly disclose pursuant

to proposed Rule 5605(f)(3) that "Due to privacy laws in the company's home country

jurisdiction limiting its ability to collect information regarding a director's self-identified

Diverse attributes, the company is not able to determine that it has two Diverse directors

as set forth under Rule 5605(f)(2)(B)(ii)."

ii.     Rule 5605(f)(2)(C): Smaller Reporting Companies

While the proposal provides a different objective for the second Diverse director

for Smaller Reporting Companies with boards of more than five members, Nasdaq

believes that this distinction is not designed to permit unfair discrimination among

---

[340]    See 17 CFR § 240.10A-3(e)(2) ("In the case of foreign private issuers with a two-tier
board system, the term board of directors means the supervisory or non-management
board.").

companies.  Nasdaq has designed the proposed rule to ensure it does not have a disproportionate economic impact on Smaller Reporting Companies by imposing undue costs or burdens.  Nasdaq recognizes that Smaller Reporting Companies, especially pre-revenue companies that depend on the capital markets to fund ground-breaking research and technological advancements, may not have the resources to compensate an additional director or engage a search firm to find director candidates outside of the directors' traditional networks.  Nasdaq believes that this is a reasonable basis to distinguish Smaller Reporting Companies from other companies subject to the rule.

Smaller Reporting Companies already are provided certain exemptions from Nasdaq's listing rules.  For example, under proposed Rule 5605(d)(3), Smaller Reporting Companies must have a compensation committee comprised of at least two independent directors and a formal written compensation committee charter or board resolution that specifies the committee's responsibilities and authority, but such companies are not required to grant authority to the committee to retain or compensate consultants or advisors or consider certain independence factors before selecting such advisors, consistent with Rule 10C-1 of the Act.[341]  In its approval order, the SEC concluded as follows:

> The Commission believes that these provisions are consistent with the Act and do not unfairly discriminate between issuers.  The Commission believes that, for similar reasons to those for which Smaller Reporting Companies are exempted from the Rule 10C-1 requirements, it makes sense for Nasdaq to provide some flexibility to Smaller Reporting Companies regarding whether the compensation committee's responsibilities should be set forth in a formal charter or through board resolution.  Further . . . in view of the potential additional costs of an annual

---

[341]     See Nasdaq Rulebook, Rule 5605(d)(3).

review, it is reasonable not to require a Smaller Reporting Company to conduct an annual assessment of its charter or board resolution.[342]

The Commission also makes accommodations for Smaller Reporting Companies based on their more limited resources, allowing them to comply with scaled disclosure requirements in certain SEC reports rather than the more rigorous disclosure requirements for larger companies.  For example, Smaller Reporting Companies are not required to include a compensation discussion and analysis in their proxy or Form 10-K describing the material elements of the compensation of its named executive officers.[343] Eligible Smaller Reporting Companies also are relieved from the SOX 404(b) requirement to obtain an independent auditor's attestation of management's assessment of the effectiveness of internal control over financial reporting.[344]  In each case, companies may choose to satisfy the more rigorous requirements in lieu of relying on the exemptions.

Any company that is not a Smaller Reporting Company, but prefers the alternative rule available for Smaller Reporting Companies, could follow proposed Rule 5605(f)(2)(C) and disclose their reasons for doing so.  In addition, companies with boards of five or fewer members could meet an alternative objective of one Diverse director.  As such, Nasdaq believes that the proposed alternative rule for Smaller Reporting Companies is not designed to, and does not, unfairly discriminate among companies.  Lastly, Nasdaq believes that proposed Rule 5605(f)(2)(C) is not designed to permit unfair

---

[342]    See Order Granting Accelerated Approval of Proposed Rule Change, 78 Fed. Reg. 4,554, 4,567 (Jan. 22, 2013).

[343]    See 17 C.F.R. § 229.402(l).

[344]    See Accelerated Filer and Large Accelerated Filer Definitions, 85 Fed. Reg. 17,178 (March 26, 2020).

discrimination among companies because it requires Smaller Reporting Companies to have, or explain why they do not have, at least one director who self-identifies as Female, similar to other companies subject to Rule 5065(f).

### iii.   Rule 5605(f)(2)(D): Companies with Smaller Boards

While Nasdaq proposes to permit each company with a board of directors of five or fewer members to satisfy proposed Rule 5605(f)(2) by having, or explaining why it does not have, at least one member of its board of directors who is Diverse, Nasdaq believes that this distinction does not unfairly discriminate among issuers.

Nasdaq considered comments that it should "amend the proposed rules to allow greater flexibility for companies with relatively small boards." [345]   Based on Nasdaq data, the average board size of all listed companies is eight directors, with an average board size of 7.3 for Smaller Reporting Companies and Foreign Issuers.  The average market value of all companies with five or fewer directors is $706,062,658, with a median market value of $72,087,090, which is similar to the SEC's thresholds for Smaller Reporting Companies and non-accelerated filers, respectively. [346]   Under 12b-2 of the Act, a company may qualify as a Smaller Reporting Company if it has: (1) public float of less than $250 million; or (2) annual revenues of less than $100 million and either: (i) no public float; or (ii) public float of less than $700 million. [347]   A company may qualify as a non-accelerated filer if it has less than $75 million public float. [348]

---

[345]    See Ballard Spahr Comment Letter, supra note 171.

[346]    Compared to an average market value of approximately $8,483,965,004 and median market value of $615,940,923 for all companies with more than five directors.

[347]    See 17 C.F.R. § 240.12b-2.

[348]    Id.

Based on these thresholds, while a company with a smaller board and $706 million public float may be similarly situated with a company with a public float of $699 million, it would not qualify as a Smaller Reporting Company under the Act. In contrast, a company with a smaller board and a public float of $72 million would qualify as a Smaller Reporting Company and as a non-accelerated filer, providing it with additional time to file its periodic reports and exempting it from the requirement to provide an auditor's attestation of management's assessment of ICFR.

Nasdaq believes that companies with smaller boards may face similar resource constraints to those of Smaller Reporting Companies. However, the alternative diversity objective Nasdaq proposes to provide Smaller Reporting Companies may not be available to them because not all companies with small boards qualify as Smaller Reporting Companies. Nasdaq believes that providing companies with boards of five or fewer with an alternative diversity objective recognizes that they are similarly situated with Smaller Reporting Companies without disproportionately impacting board composition. For example, companies with smaller boards may be disproportionately impacted by the proposed rule if they plan to satisfy proposed Rule 5605(f)(2) by adding additional directors. Two Diverse directors on a five member board comprise 40% of the board, whereas two Diverse directors on an eight member board comprise 25% of the board. Alternatively, if a five-member board does not have two Diverse directors and expands its board to satisfy proposed Rule 5605(f)(2), it may require the company to incur additional costs through director compensation and D&O insurance. Nasdaq seeks to avoid creating complexity for companies that attempt to meet the alternative diversity objective by subjecting them to a higher diversity objective.

Nasdaq believes that proposed Rule 5605(f)(2)(D) therefore recognizes that companies with smaller boards are not similarly situated with companies with larger boards, and has designed the proposal to avoid imposing undue costs and burdens on them. Further, companies with smaller boards are not precluded from satisfying the higher objective to have, or explain why they do not have, at least two Diverse directors, nor are companies with larger boards precluded from satisfying a lower objective, provided they transparently explain their reasons for doing so.

iv.    Rule 5605(f)(3): Alternative Public Disclosure

The proposal is a disclosure-based framework, not a mandate. Under proposed Rule 5605(f)(3), a company may choose to meet the diversity objectives of proposed Rule 5605(f) or choose to explain its reasons for not meeting the applicable objective, which could include describing a different approach. Nasdaq designed the proposal to avoid unduly burdening competition or efficiency, or conflicting with existing securities laws, by providing all companies subject to proposed Rule 5605(f) with the option to make the public disclosure required under proposed Rule 5605(f)(3) in the company's proxy statement or information statement for its annual meeting of shareholders (or, if the company does not file a proxy, in its Form 10-K or 20-F). Alternatively, such disclosure may be provided on the company's website concurrently with the filing of the company's proxy statement or any information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F), provided the company submits a URL link to the disclosure through the Nasdaq Listing Center, within one business day after such posting. Nasdaq believes proposed Rule 5605(f)(3) is not designed to permit unfair discrimination among companies because the proposed rule provides all companies subject to proposed Rule

5605(f) the option to disclose an explanation rather than meet the diversity objectives of proposed Rule 5605(f)(2). Additionally, all companies who choose to explain their reason for not meeting the applicable objective are given the same options for providing the disclosure.

Certain federal securities laws similarly permit companies to satisfy corporate governance requirements through disclosure of reasons for not meeting the applicable requirement. For example, under Regulation S-K, Item 407 requires a company to disclose whether or not its board of directors has determined that the company has at least one audit committee financial expert. If a company does not have a financial expert on the audit committee, it must provide an explanation.[349] Item 406 requires a company to disclose whether it has adopted a written code of ethics that applies to the chief executive officer and senior financial or accounting officers. If a company has not adopted such a code of ethics, it must disclose the reasons why not.[350] Item 402 regarding pay ratio disclosure defines how total compensation for employees should be calculated, but permits companies to use a different measure as long as they explain their approach.[351] In addition, under Nasdaq's listing rules, foreign private issuers may choose to follow home country practice in lieu of the corporate governance standards set forth in the Rule 5600 series, provided that a company publicly discloses in its annual reports or on its website "each requirement that it does not follow and describe the home country practice followed by the Company in lieu of such requirements."[352]

---

[349]　　See 17 C.F.R. § 229.407(d)(5).

[350]　　Id. § 229.406(a).

[351]　　Id. § 229.402.

[352]　　See Nasdaq Rulebook, Rule 5615(a)(3)(B)(i).

Nasdaq rules and SEC guidance already recognize that website disclosure can be a method of disseminating information to the public. For example, in addition to permitting foreign private issuers to provide website disclosures related to home country practices,[353] Nasdaq listing rules also provide such flexibility for disclosures regarding third party director compensation[354] and reliance on the exception relating to independent compensation committee members.[355] The SEC has recognized that "[a] company's web site is an obvious place for investors to find information about the company"[356] and permits companies to make public disclosure of material information through website disclosures if, among other things, the company's website is "a recognized channel of distribution of information."[357]

　　v.　　Rule 5605(f)(4): Exempt Companies

Under proposed Rule 5605(f)(4), Nasdaq proposes to exempt the following types of companies from the requirements of proposed Rule 5605(f) (defined as "Exempt Companies"): SPACs; asset-backed issuers and other passive issuers (as set forth in Rule 5615(a)(1)); cooperatives (as set forth in Rule 5615(a)(2)); limited partnerships (as set forth in Rule 5615(a)(4)); management investment companies (as set forth in Rule 5615(a)(5)); issuers of non-voting preferred securities, debt securities and Derivative Securities (as set forth in Rule 5615(a)(6)) that do not have equity securities listed on

---

[353]　Id., Rule 5615(a)(3)(B) and IM-5615-3.

[354]　See Nasdaq Rulebook, Rule 5250(b)(3)(A).

[355]　Id., Rules 5605(d)(2)(B) (non-independent compensation committee member under exceptional and limited circumstances) and 5605(e)(3) (non-independent nominations committee member under exceptional and limited circumstances).

[356]　See Commission Guidance on the Use of Company Websites, 73 Fed. Reg. 45,862, 45,864 (Aug. 7, 2008).

[357]　Id. at 45,867.

Nasdaq; and issuers of securities listed under the Rule 5700 Series. Each of the types of

Exempt Companies either has no board of directors, lists only securities with no voting

rights towards the election of directors, or is not an operating company, and the holders

of the securities they issue do not expect to have a say in the composition of their boards.

As such, Nasdaq believes the proposal is not designed to permit unfair discrimination by

excluding Exempt Companies from the application of proposed Rule 5605(f). These

companies, other than SPACs, already are exempt from certain of Nasdaq's corporate

governance standards related to board composition, as described in Rule 5615.

Nasdaq is also proposing to exempt SPACs from the requirements of proposed

Rule 5605(f), and the post-business combination entity would have at least two years

after they complete a business combination. This approach is similar to other phase-in

periods granted to SPACs. For example, Rule 5615(b)(1) provides a company listing in

connection with its initial public offering, including a SPAC, one year to fully comply

with the independent compensation and nomination committee requirements of Rules

5605(d) and (e), and the majority independent board requirement of proposed Rule

5605(b). Similarly, Rule 5615(b)(1) and SEC Rule 10A-3(b)(1)(iv)(A) allows a newly

listed company, including a SPAC, up to one year from the date its registration statement

is effective to fully comply with the applicable audit committee composition

requirements.

Under proposed Rule 5605(f)(5)(A) or (B), a newly listed company, including

through a business combination with a SPAC, would be permitted to satisfy the

requirement of proposed Rule 5605(f)(2) to have, or explain why it does not have, the

applicable number of Diverse directors under proposed Rule 5605(f)(2) by the later of

two years from the date of listing or the date the company files its proxy statement or its information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F) for the company's second annual meeting of shareholders subsequent to the company's listing, with differing milestones depending on the company's market tier. Nasdaq believes it is not appropriate to subject SPACs to proposed Rule 5605(f) prior to completing a business combination because SPACs are shell companies until they complete an acquisition of an operating company. Rather, Nasdaq believes it is appropriate to provide SPACs with the same phase-in provided to other newly listed companies upon completing a business combination, because a SPAC must satisfy all of Nasdaq's initial listing requirements upon completing a business combination, including its requirements related to committee composition and majority independent board.

    vi.   <u>Rule 5605(f)(5):  Phase-in Period</u>

Under proposed Rule 5605(f)(5)(A), a newly listed company on the NGS or NGM tiers that was not previously subject to a substantially similar requirement of another national securities exchange will be permitted to satisfy the requirement of proposed Rule 5605(f)(2) to have, or explain why it does not have: (i) at least one Diverse director by the later of: (a) one year from the date of listing; or (b) the date the company files its proxy statement or its information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F) for the company's first annual meeting of shareholders subsequent to the company's listing; and (ii) at least two Diverse directors by the later of: (a) two years from the date of listing; or (b) the date the company files its proxy statement or its information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F) for the company's second annual meeting of shareholders subsequent to the company's listing.

Under proposed Rule 5605(f)(5)(B), a newly listed company on the NCM tier that was not previously subject to a substantially similar requirement of another national securities exchange will be permitted to satisfy the requirement of proposed Rule 5605(f)(2) to have, or explain why it does not have at least two Diverse directors by the later of: (a) two years from the date of listing; or (b) the date the company files its proxy statement or its information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F) for the company's second annual meeting of shareholders subsequent to the company's listing.

Under proposed Rule 5605(f)(5)(D), any newly listed company on any market tier that has a board of five or fewer members and was not previously subject to a substantially similar requirement of another national securities exchange will be permitted to satisfy the requirement of proposed Rule 5605(f)(2) to have, or explain why it does not have at least one Diverse director by the later of: (a) two years from the date of listing; or (b) the date the company files its proxy statement or its information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F) for the company's second annual meeting of shareholders subsequent to the company's listing.

These "phase-in" periods apply to companies listing in connection with an initial public offering, a direct listing, a transfer from another exchange or the over-the-counter market, in connection with a spin-off or carve-out from a company listed on Nasdaq or another exchange, or through a business combination with a SPAC.

Nasdaq believes this approach is not designed to permit unfair discrimination because it provides all companies that become newly subject to the rule the same time period within which to satisfy proposed Rule 5605(f)(2), while providing additional

flexibility to companies on the NCM tier and companies with smaller boards in recognition that such companies are typically smaller and may face additional challenges and resource constraints when identifying additional director nominees who self-identify as Diverse.

In addition, this approach is similar to other phase-in periods granted to companies listing on or transferring to Nasdaq.  For example, Rule 5615(b)(1) provides a company listing in connection with its initial public offering one year to fully comply with the compensation and nomination committee requirements of Rules 5605(d) and (e), and the majority independent board requirement of proposed Rule 5605(b).  Similarly, SEC Rule 10A-3(b)(1)(iv)(A) allows a company up to one year from the date its registration statement is effective to fully comply with the applicable audit committee composition requirements.  Nasdaq Rule 5615(b)(3) provides a one-year timeframe for compliance with the board composition requirements for companies transferring from other listed markets that do not have a substantially similar requirement.

vii.    Rule 5605(f)(7):  Effective Dates/Transition

Under proposed Rule 5605(f)(7), each company (including a company with a smaller board under proposed Rule 5606(f)(2)(D)) must have, or explain why it does not have, at least one Diverse director by the later of: (i) the First Effective Date;[358] or (ii) the date the company files its proxy statement or its information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F) for the company's annual shareholders meeting during the calendar year of the First Effective Date.

---

[358]    The "First Effective Date" is two calendar years after the Approval Date.

Each company listed on the NGS or NGM tiers must have, or explain why it does not have, two Diverse directors by the later of: (i) the Second NGS/NGM Effective Date;[359] or (ii) the date the company files its proxy statement or its information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F) for the company's annual shareholders meeting during the calendar year of the Second NGS/NGM Effective Date. Each company listed on the NCM tier must have, or explain why it does not have, at least two Diverse directors by the later of: (i) the Second NCM Effective Date[360] or (ii) the date the company files its proxy statement or its information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F) for the company's annual shareholders meeting during the calendar year of the Second NCM Effective Date.

Nasdaq believes this approach is not designed to permit unfair discrimination because it recognizes that companies listed on the NCM tier may not have the resources necessary to compensate an additional director or engage a search firm to search for director candidates outside of the directors' traditional networks. Therefore, Nasdaq believes it is in the public interest to provide such companies with one additional year to meet the diversity objectives of proposed Rule 5605(f), should they choose to do so. Nasdaq notes that all companies may choose to follow a timeframe applicable to a different market tier, provided they publicly describe their explanation for doing so. They also may construct their own timeframe for meeting the diversity objectives of proposed Rule 5605(f), provided they publicly disclose their reasons for not abiding by Nasdaq's timeframe.

---

[359]    The "Second NGS/NGM Effective Date" is four calendar years after the Approval Date.

[360]    The "Second NCM Effective Date" is five calendar years after the Approval Date.

E.  Not Designed to Regulate by Virtue of any Authority Conferred by the Act Matters Not Related to the Purposes of the Act or the Administration of the Exchange

Nasdaq believes that the proposal is not designed to regulate by virtue of any authority conferred by the Act matters not related to the purposes of the Act or the administration of the Exchange.[361]  The proposal relates to the Exchange's corporate governance standards for listed companies.  As discussed above, "[t]he Commission has long encouraged exchanges to adopt and strengthen their corporate governance listing standards in order to, among other things, enhance investor confidence in the securities markets."[362]  And because "it is not always feasible to define . . . every practice which is inconsistent with the public interest or with the protection of investors," the Act leaves to SROs "the necessary work" of rulemaking pursuant to Section 6(b)(5).[363]

Nasdaq recognizes that U.S. states are increasingly proposing and adopting board diversity requirements, and because corporations are creatures of state law, some market participants may believe that such regulation is best left to states.  However, Nasdaq considered that certain of its listing rules related to corporate governance currently relate to areas that are also regulated by states.  For example, states impose standards related to quorums[364] and shareholder approval of certain transactions,[365] which also are regulated

---

[361]    See 15 U.S.C. § 78f(b)(5).

[362]    See Order Approving Proposed Rule Changes, supra note 52, at 64,161.

[363]    See Heath v. SEC, 586 F.3d 122, 132 (2d Cir. 2009) (citing Avery v. Moffat, 55 N.Y.S.2d 215, 228 (Sup. Ct. 1945)).

[364]    See, e.g., 8 Del. Code § 216 (providing that a quorum at a shareholder's meeting shall consist of no less than 1/3 of the shares entitled to vote at such meeting).

[365]    See, e.g., id. §§ 251, 271 (providing that shareholder approval by a majority of the outstanding voting shares entitled to vote is required for mergers and the sale of all or substantially all of a corporation's assets).

under Nasdaq's listing rules.[366]  Nasdaq has adopted rules relating to such matters to ensure uniformity of such rules among its listed companies.  Similarly, Nasdaq believes that the proposed rule will create uniformity among listed companies by helping to assure investors that all non-exempt companies meet the applicable diversity objectives of proposed Rule 5605(f)(2) or publicly describe why they do not.

Further, Nasdaq believes the proposal will enhance investor confidence that listed companies that meet the diversity objectives of proposed Rule 5605(f)(2) are considering the perspectives of more than one demographic group, leading to robust dialogue and better decision making, as well as the other corporate governance benefits of diverse boards discussed above in Section II of the Purpose section.  To the extent companies choose to disclose their reasons for not meeting the diversity objectives of proposed Rule 5605(f)(2) pursuant to proposed Rule 5605(f)(3), Nasdaq believes that such disclosure will improve the quality of information available to investors who rely on this information to make an informed voting decision, thereby promoting capital formation and efficiency.  It has been the Exchange's longstanding principle that "Nasdaq stands for integrity and ethical business practices in order to enhance investor confidence, thereby contributing to the financial health of the economy and supporting the capital formation process."[367]

In addition, as discussed in Section II of the Purpose section, in passing Section 342 of the Dodd-Frank Act, Congress recognized the need to respond to the lack of diversity in the financial services industry, and the Standards designed by the

---

[366]     See, e.g., Nasdaq Rulebook, Rules 5620(c) and 5635(a).

[367]     Id., Rule 5101.

Commission and other financial regulators provide a framework for addressing that industry challenge.  The Standards themselves identify several focus areas, including the importance of "Organizational Commitment," which speaks to the critical role of senior leadership—including boards of directors—in promoting diversity and inclusion across an organization.  In addition, like the proposed rule, the Standards also consider "Practice to Promote Transparency," and recognize that transparency is a key component of any diversity initiative.  Specifically, the Standards provide that the "transparency of an entity's diversity and inclusion program promotes the objectives of Section 342," and also is important because it provides the public with necessary information to assess an entity's diversity policies and practices.[368]

4.  <u>Self-Regulatory Organization's Statement on Burden on Competition</u>

The Exchange does not believe that the proposed rule will impose any burden on competition not necessary or appropriate in furtherance of the purposes of the Act.  Nasdaq reviewed requirements related to board diversity in two dozen foreign jurisdictions, and almost every jurisdiction imposes diversity-focused requirements on listed companies, either through a securities exchange, financial regulator or the government.  Nasdaq competes for listings globally, including in countries that have implemented a more robust regulatory reporting framework for diversity and ESG disclosures.  Nasdaq carefully considered the competitive implications of the proposal.  While Nasdaq would regret losing even a single valued issuer, experience and empirical data demonstrate that neither the listings contract nor listings fees prevents issuers from switching listings markets.   Moreover, based on public comments, Nasdaq believes that a

---

[368]      Final Interagency Policy Statement, <u>supra</u> note 19.

significant body of issuers supports the proposal, and that some issuers share these values so strongly that they may choose to list on Nasdaq because of it.

Currently in the U.S., the Long-Term Stock Exchange ("LTSE"), which has established a coalition of "asset owners and asset managers representing a combined $7 trillion in assets under management,"[369] seeks to distinguish itself by focusing on long-term elements of corporate governance, including, for example, diversity and inclusion. Under Rule 14.425, companies listed on LTSE must adopt and publish a long-term stakeholder policy that explains, among other things, "the Company's approach to diversity and inclusion."[370]

## I.    Board Statistical Disclosure

The Exchange does not believe that proposed Rule 5606 will impose any burden on competition not necessary or appropriate in furtherance of the purposes of the Act. Specifically, the Exchange believes that the adoption of Rule 5606 will not impose any undue burden on competition among listed companies for the reasons set forth below.

With a few exceptions, all companies would be required to make the same disclosure of their board-level statistical information.  The average board size of a company that is currently listed on the Exchange is eight directors.  Although a company would be required to disclose its board-level statistical data, directors may choose to opt out rather than reveal their diversity characteristics to their company.  A company would identify such directors in the "Did Not Disclose Demographic Background" category. For directors who voluntarily disclose their diversity characteristics, the company would

---

[369]    See Long-Term Stock Exchange, *A coalition of long-term company builders*, available at: https://ltse.com/coalition.

[370]    See Long-Term Stock Exchange Rule Book, Rule 14.425.

collect their responses and disclose the information in either the company's proxy statement, information statement of shareholder meeting, any other disclosure form filed with the SEC or on the company's website, using Nasdaq's required format.  While the time and economic burden may vary based on a company's board size, Nasdaq does not believe there is any significant burden associated with gathering, preparing and reporting this data.  Therefore, Nasdaq believes that there will be a *de minimis* time and economic burden on listed companies to collect and disclose the diversity statistical data.

Some investors value demographic diversity, and list it as an important factor influencing their director voting decisions.[371]  Investors have stated that consistent data would make its collection and analysis easier and more equitable for investors that are not large enough to demand or otherwise access individualized disclosures.[372]  Therefore, Nasdaq believes that any burden placed on companies to gather and disclose their board-level diversity statistics is counterbalanced by the benefits that the information will provide to a company's investors.

Moreover, as discussed above, most listed companies are required to submit an annual EEO-1 Report, which provides statistical data related to race and gender data among employees similar to the data required under proposed Rule 5606(a).  Because most companies are already collecting similar information annually to satisfy their EEOC requirement, Nasdaq does not believe that adding directors to the collection will place a significant burden on these companies.  Additionally, the information requested from

---

[371]    See Hunt et al., supra note 30.

[372]    See Petition for Rulemaking, supra note 130, at 2.

Foreign Issuers is limited in scope and therefore does not impose a significant burden on them.

Nasdaq faces competition in the market for listing services. Proposed Rule 5606 reflects that competition, but it does not impose any burden on competition with other exchanges. As discussed above, investors have made clear their desire for greater transparency into public companies' board-level diversity as it relates to gender identity, race, and ethnicity. Nasdaq believes that the proposed rule will enhance the competition for listings. Other exchanges can set similar requirements for their listed companies, thereby increasing competition to the benefit of those companies and their shareholders. Accordingly, Nasdaq does not believe the proposed rule change will impose any burden on competition that is not necessary or appropriate in furtherance of the purposes of the Act.

II.    Diverse Board Representation or Explanation

Nasdaq believes that proposed Rule 5605(f) will not impose burdens on competition among listed companies because the Exchange has constructed a framework for similarly-situated companies to satisfy similar requirements (*i.e.*, Foreign Issuers, Smaller Reporting Companies, companies with smaller boards, and other companies), and has provided all companies with the choice of satisfying the requirements of proposed Rule 5605(f)(2) by having the applicable number of Diverse directors, or by explaining why they do not. Nasdaq believes that this will avoid imposing undue costs or burdens on companies that, for example, cannot afford to compensate an additional director or believe it is not appropriate, feasible or desirable to meet the diversity objectives of proposed Rule 5605(f) based on the company's particular circumstances (for example, the company's size, operations, or current board composition). Rather than

requiring a company to divert resources to compensate an additional director, and place

the company at a competitive disadvantage with its peers, the rule provides the flexibility

for such company to explain why it does not meet the diversity objectives.  The proposal

further mitigates the burden imposed on companies with smaller boards by providing

them with flexibility to have, or explain why they do not have, one Diverse director.

The cost of identifying director candidates can range from nothing or a nominal

fee (via personal, work or school-related networks, or board affinity organizations, as

well as internal research by the corporate secretary's team) to amounts that can vary

widely depending on the specific search firm and the size of the company.  Some industry

observers estimate board searches for independent directors cost about one-third of a

director's annual compensation, while others estimate it costs between $75,000 and

$150,000.  The underlying figures vary; for example, one search firm generally charges

$25,000 to $50,000.  Nasdaq observes that total annual director compensation can range

widely; median director pay is estimated at $134,000 for Russell 3000 companies and

$232,000 for S&P 500 companies. Moreover, there is a wider range of underlying

compensation amounts.  For example, Russell 3000 directors may receive approximately

$32,600 (10th percentile), or up to $250,000 (90th percentile) or more.  S&P 500

directors may receive approximately $100,000 (10th percentile) or up to $310,000 (90th

percentile) or more.[373]  Most, if not all, of these costs would be borne in any event in the

search for new directors regardless of the proposed rule.  While the proposed rule might

---

[373]  Total annual director compensation varies by compensation elements and structure as
well as amount, which is generally based on the size, sector, maturity of the company,
and company specific situation.  See Mark Emanuel et al., Semler Brossy and the
Conference Board, *Director Compensation Practices in the Russell 3000 and S&P 500*
(2020 ed.), available at https://conferenceboard.esgauge.org/directorcompensation/report.

lead some companies to search for director candidates outside of already established

networks, the incremental costs of doing so would be tied directly to the benefit of a

broader search.

To reduce costs for companies that do not currently meet the diversity objectives

of proposed Rule 5605(f)(2), Nasdaq has proposed to provide listed companies that have

not yet met their diversity objectives with free access to a network of board-ready diverse

candidates and a tool to support board evaluation, benchmarking and refreshment.[374]

This offering is designed to ease the search for diverse nominees and reduce the costs on

companies that choose to meet the diversity objectives of proposed Rule 5605(f)(2).

Nasdaq is contemporaneously submitting a rule filing to the Commission regarding the

provision of such services.  Nasdaq also plans to publish FAQs on its Listing Center to

provide guidance to companies on the application of the proposed rules, and to establish a

dedicated mailbox for companies and their counsel to email additional questions to

Nasdaq regarding the application of the proposed rule.  Nasdaq believes that these

services will help to ease the compliance burden on companies whether they choose to

meet the listing rule's diversity objectives or provide an explanation for not doing so.

Nasdaq also has structured the proposed rule to provide companies with at least

four years from the Approval Date to satisfy proposed Rule 5605(f)(2) so that companies

do not incur immediate costs striving to meet the diversity objectives of proposed Rule

5605(f)(2).  Nasdaq also has reduced the compliance burden on Smaller Reporting

Companies and Foreign Issuers by providing them with additional flexibility when

satisfying the objective related to the second Diverse director.  Smaller Reporting

---

[374]     See supra note 23.

Companies could satisfy the proposed diversity objective to have two Diverse directors

under proposed Rule 5605(f)(2)(C) with two Female directors.  Like other companies,

Smaller Reporting Companies also could satisfy the second director objective by

including an individual who self-identifies as an Underrepresented Minority or a member

of the LGBTQ+ community.  Foreign Issuers could satisfy the second director objective

by including another Female director, or an individual who self-identifies as LGBTQ+ or

an underrepresented individual based on national, racial, ethnic, indigenous, cultural,

religious or linguistic identity in the country of the company's principal executive offices

(as reported on the company's Form F-1, 10-K, 20-F or 40-F).  Companies with smaller

boards could satisfy the diversity objective with one Diverse director.  Nasdaq has further

reduced the compliance burdens on companies listed on the NCM tier by providing them

with five years from the Approval Date to satisfy proposed Rule 5605(f)(2), recognizing

that such companies may face additional challenges and resource constraints when

identifying additional director nominees who self-identify as Diverse.

For the foregoing reasons, Nasdaq does not believe that proposed Rule 5605(f)

will impose any burden on competition among issuers that is not necessary or appropriate

in furtherance of the purposes of the Act.  Further, Nasdaq does not believe the proposed

rule will impose any burden on competition among listing exchanges.  As described

above, Nasdaq competes with other exchanges globally for listings, including exchanges

based in jurisdictions that have implemented disclosure requirements related to diversity.

Within the United States, LTSE requires listed companies to adopt and publish a long-

term stakeholder policy that explains, among other things, "the Company's approach to

diversity and inclusion."[375]  Other listing venues within the United States may propose to adopt rules similar to LTSE's requirements or the Exchange's proposal if they believe companies would prefer to list on an exchange with diversity-related listing standards.

5.  <u>Self-Regulatory Organization's Statement on Comments on the Proposed Rule Change Received from Members, Participants, or Others</u>

No written comments were either solicited or received.

6.  <u>Extension of Time Period for Commission Action</u>

The Exchange has consented to an extension of the time period for Commission action until March 11, 2021.[376]

7.  <u>Basis for Summary Effectiveness Pursuant to Section 19(b)(3) or for Accelerated Effectiveness Pursuant to Section 19(b)(2)</u>

Not applicable.

8.  <u>Proposed Rule Change Based on Rules of Another Self-Regulatory Organization or of the Commission</u>

Not applicable.

9.  <u>Security-Based Swap Submissions Filed Pursuant to Section 3C of the Act</u>

Not applicable.

10.  <u>Advance Notices Filed Pursuant to Section 806(e) of the Payment, Clearing and Settlement Supervision Act</u>

Not applicable.

11.  <u>Exhibits</u>

1.  Notice of Proposed Rule Change for publication in the <u>Federal Register</u>.

---

[375]  <u>See</u> Long-Term Stock Exchange Rule Book, Rule 14.425.

[376]  <u>See</u> Securities Exchange Act Release No. 90951 (January 26, 2021), 86 FR 7135 (January 19, 2021); <u>see also</u> Letter from Jeffrey S. Davis, Senior Vice President, Nasdaq, Inc., to Vanessa Countryman, dated January 8, 2021, available at https://www.sec.gov/comments/sr-nasdaq-2020-081/srnasdaq2020081-8221271-227700.pdf.

3.  Board Diversity Matrix and Instructions.

4.  Amended rule text indicating additions to or deletions from the Initial

    Proposal.

5.  Text of the proposed rule change.

**EXHIBIT 1**

SECURITIES AND EXCHANGE COMMISSION
(Release No.            ; File No. SR-NASDAQ-2020-081)

February__, 2021

Self-Regulatory Organizations; The Nasdaq Stock Market LLC; Notice of Filing of
Proposed Rule Change to Adopt Listing Rules Related to Board Diversity

Pursuant to Section 19(b)(1) of the Securities Exchange Act of 1934 ("Act")[1], and

Rule 19b-4 thereunder,[2] notice is hereby given that on February 26, 2021,The Nasdaq

Stock Market LLC ("Nasdaq" or "Exchange") filed with the Securities and Exchange

Commission ("SEC" or "Commission") the proposed rule change as described in Items I,

II, and III, below, which Items have been prepared by the Exchange.  The Commission is

publishing this notice to solicit comments on the proposed rule change from interested

persons.

I.     Self-Regulatory Organization's Statement of the Terms of Substance of the
       Proposed Rule Change

The Exchange proposes to adopt listing rules related to board diversity, as

described in more detail below:

(i) to adopt Rule 5605(f) (Diverse Board Representation), which would require

each Nasdaq-listed company, subject to certain exceptions, (A) to have, or explain why it

does not have, at least one director who self-identifies as a female, and (B) to have, or

explain why it does not have, at least one director who self-identifies as Black or African

American, Hispanic or Latinx, Asian, Native American or Alaska Native, Native

Hawaiian or Pacific Islander, two or more races or ethnicities, or as LGBTQ+;

---

[1]       15 U.S.C. 78s(b)(1).

[2]       17 CFR 240.19b-4.

(ii) to adopt Rule 5606 (Board Diversity Disclosure), which would require each Nasdaq-listed company, subject to certain exceptions, to provide statistical information in a proposed uniform format on the company's board of directors related to a director's self-identified gender, race, and self-identification as LGBTQ+; and

(iii) to update Rule 5615 and IM-5615-3 (Foreign Private Issuers) and Rule 5810(c) (Types of Deficiencies and Notifications) to incorporate references to proposed Rule 5605(f) and proposed Rule 5606; and

(iv) to make certain other non-substantive conforming changes.

This Amendment No. 1 amends and supersedes the original filing in its entirety.

The text of the proposed rule change is available on the Exchange's Website at https://listingcenter.nasdaq.com/rulebook/nasdaq/rules, at the principal office of the Exchange, and at the Commission's Public Reference Room.

II.     Self-Regulatory Organization's Statement of the Purpose of, and Statutory Basis for, the Proposed Rule Change

In its filing with the Commission, the Exchange included statements concerning the purpose of and basis for the proposed rule change and discussed any comments it received on the proposed rule change.  The text of these statements may be examined at the places specified in Item IV below.  The Exchange has prepared summaries, set forth in sections A, B, and C below, of the most significant aspects of such statements.

A.     Self-Regulatory Organization's Statement of the Purpose of, and Statutory Basis for, the Proposed Rule Change

1.     Purpose

Nasdaq is filing this amendment to SR-NASDAQ-2020-081, which was published for comment by the Commission on December 11, 2020,[3] in order to: make certain material, technical, and conforming amendments to the Initial Proposal, and to provide additional clarification and justification in support of the proposed rule changes.

This amendment supersedes and replaces the Initial Proposal in its entirety. Nasdaq is submitting by separate letter its response to comments on the proposed rule change contemporaneously with this Amendment No. 1.

I.     Summary of Amendments to the Initial Proposal

As discussed in Nasdaq's response to comments filed in conjunction with this Amendment No. 1, upon further examination of the Initial Proposal and after carefully reviewing all comment letters submitted by commenters, Nasdaq has modified the Initial Proposal to propose certain material amendments, technical clarifications, and non-substantive changes, as well as provided additional clarification and justification in support of the proposed rule change.

As a result of the comments received, Nasdaq is proposing the following three **material amendments**:

- Adding proposed Rule 5605(f)(2)(D) to provide more flexibility in achieving the diversity objectives of Rule 5605(f)(2) for companies with boards of five or fewer directors (as discussed in Section 3.a.VII.C.iii).
- Amending proposed Rule 5605(f)(5) to allow additional time for newly listing companies on the Nasdaq Global Select ("NGS"), Nasdaq Global Market

---

[3]     Securities Exchange Act Release No. 90574 (December 4, 2020), 85 FR 80472 (December 11, 2020) ("Initial Proposal").

("NGM"), and Nasdaq Capital Market ("NCM") tiers (as discussed in Section 3.a.VII.C.i).

- Adding proposed Rule 5605(f)(6)(B) to provide a grace period for a listed company that no longer meets the diversity objectives as a result of a vacancy on the board of directors, for example if a diverse director falls ill or resigns (as discussed in Section 3.a.VII.C.iii).

Nasdaq is also proposing the following **technical amendments** to the Initial Proposal:

- Amending proposed Rule 5605(f)(3) and proposed Rule 5606(b) to allow companies the flexibility of providing the disclosures in advance of the company's next annual meeting of shareholders: (a) in any proxy statement or any information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F); or (b) on the company's website. If the company provides such disclosure on its website, then the company must submit such disclosure concurrently with the filing made pursuant to (a) and submit a URL link to the disclosure through the Nasdaq Listing Center, within one business day after such posting.

- Clarifying in the Board Diversity Matrix ("Matrix") Instructions that a company may include supplemental data in addition to the information required by the Matrix.

- Revising proposed Rule 5605(f)(2)(B)(i) to change the reference from "home country jurisdiction" to "country of the Company's principal executive offices."

- Providing a definition in the Matrix for "Non-binary."

- Amending proposed Rule 5606(d) to clarify the types of newly listed companies.

- Revising operative dates in proposed Rule 5606(e).

Finally, Nasdaq has also proposed certain **non-substantive** changes to the Initial Proposal, including clarifying throughout the filing that the proposed rule change is a disclosure requirement, not a mandate, and clarifying in the Matrix Instructions that a company may not substantially alter the Matrix and must disclose the information in a searchable format.

## II.    The Diversity Imperative for Corporate Boards

**The past year has brought heightened attention to the commitment of public companies to diversity and inclusion**. Corporate culture, human capital management,

and technology-driven changes to the business landscape have underscored the benefits

of enhanced board diversity—diversity in the boardroom is good corporate governance.

The benefits to stakeholders of increased diversity are becoming more apparent and

include an increased variety of fresh perspectives, improved decision making and

oversight, and strengthened internal controls.  Nasdaq believes that the heightened focus

on corporate board diversity by companies,[4] investors,[5] corporate governance

organizations,[6] and legislators[7] demonstrates that investor confidence is enhanced when

boardrooms are comprised of more than one demographic group.  Nasdaq has also

---

[4]     See Deloitte and the Society for Corporate Governance, *Board Practices Quarterly: Diversity, equity, and inclusion* (Sept. 2020), available at: https://www2.deloitte.com/us/en/pages/center-for-board-effectiveness/articles/diversity-equity-and-inclusion.html (finding, in a survey of over 200 companies, that "most companies and/or their boards have taken, or intend to take, actions in response to recent events surrounding racial inequality and inequity; 71% of public companies and 65% of private companies answered this question affirmatively").

[5]     See ISS Governance, *2020 Global Benchmark Policy Survey, Summary of Results* 6 (Sept. 24, 2020), available at: https://www.issgovernance.com/wp-content/uploads/publications/2020-iss-policy-survey-results-report-1.pdf (finding that "a significant majority of investors (61 percent) indicated that boards should aim to reflect the company's customer base and the broader societies in which they operate by including directors drawn from racial and ethnic minority groups").

[6]     See International Corporate Governance Network, *ICGN Guidance on Diversity on Boards* 5 (2016), available at: https://www.icgn.org/sites/default/files/ICGN%20Guidance%20on%20Diversity%20on%20Boards%20-%20Final.pdf ("The ICGN believes that diversity is a core attribute of a well-functioning board which supports greater long-term value for shareholders and companies.").

[7]     See, e.g., John J. Cannon et al., Sherman & Sterling LLP, *Washington State Becomes Next to Mandate Gender Diversity on Boards* (May 28, 2020), available at: https://www.shearman.com/perspectives/2020/05/washington-state-becomes-next-to-mandate-gender-diversity-on-boards; Cal. S.B. 826 (Sept. 30, 2018); Cal. A.B. 979 (Sept. 30, 2020) (California legislation requiring companies headquartered in the state to have at least one director who self-identifies as a Female and one from an Underrepresented Community).

observed recent calls from SEC commissioners[8] and investors[9] for companies to provide

more transparency regarding board diversity.

   **While Nasdaq-listed companies have made laudable progress in diversifying**

**their boardrooms, Nasdaq believes that the national market system and the public**

**interest would be well-served by a "disclosure-based, business-driven" framework**

**for companies to embrace meaningful and multi-dimensional diversification of their**

**boards.[10]** Nasdaq has also found that current reporting of board diversity data was not

---

[8]     See Acting Chair Allison Herren Lee, *Regulation S-K and ESG Disclosures: An Unsustainable Silence* (Aug. 26, 2020), available at: https://www.sec.gov/news/public-statement/lee-regulation-s-k-2020-08-26#_ftnref15 ("There is ever-growing recognition of the importance of diversity from all types of investors . . . [a]nd large numbers of commenters on this [SEC] rule proposal emphasized the need for specific diversity disclosure requirements."); see also Commissioner Caroline Crenshaw, *Statement on the "Modernization" of Regulation S-K Items 101, 103, and 105* (August 26, 2020), available at: https://www.sec.gov/news/public-statement/crenshaw-statement-modernization-regulation-s-k ("As Commissioner Lee noted in her statement, the final [SEC] rule is also silent on diversity, an issue that is extremely important to investors and to the national conversation. The failure to grapple with these issues is, quite simply, a failure to modernize."); Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), available at: https://www.sec.gov/news/speech/chair-white-icgn-speech.html ("Companies' disclosures on board diversity in reporting under our current requirements have generally been vague and have changed little since the rule was adopted… Our lens of board diversity disclosure needs to be re-focused in order to better serve and inform investors.").

[9]     See Vanguard, *Investment Stewardship 2019 Annual Report* (2019), available at: https://about.vanguard.com/investment-stewardship/perspectives-and-commentary/2019_investment_stewardship_annual_report.pdf ("We want companies to disclose the diversity makeup of their boards on dimensions such as gender, age, race, ethnicity, and national origin, at least on an aggregate basis."); see also State Street Global Advisors, *Diversity Strategy, Goals & Disclosure: Our Expectations for Public Companies* (Aug. 27, 2020) https://www.ssga.com/us/en/individual/etfs/insights/diversity-strategy-goals-disclosure-our-expectations-for-public-companies (announcing expectation that State Street's portfolio companies (including US companies "and, to the greatest extent possible, non-US companies") provide board level "[d]iversity characteristics, including racial and ethnic makeup, of the board of directors").

[10]    See Letter from Mercy Investments Inc. to Ms. Vanessa Countryman (December 22, 2020); see also Letter from San Francisco City and County Employees Retirement

provided in a consistent manner or on a sufficiently widespread basis. As such, investors are not able to readily compare board diversity statistics across companies.

**Accordingly, Nasdaq is proposing to require each of its listed companies, subject to certain exceptions for non-operating companies, to: (i) provide statistical information regarding diversity among the members of the company's board of directors under proposed Rule 5606; and (ii) have, or explain why it does not have, at least two "Diverse" directors on its board under proposed Rule 5605(f)(2).**
"Diverse" means an individual who self-identifies as: (i) Female, (ii) an Underrepresented Minority, or (iii) LGBTQ+. Each listed company must have, or explain why it does not have, at least one Female director and at least one director who is either an Underrepresented Minority or LGBTQ+. Foreign Issuers (including Foreign Private Issuers) and Smaller Reporting Companies, by contrast, have more flexibility and may satisfy the rule by having, or explaining why they do not have, two Female directors. Further, each company with a board of directors of five or fewer members may satisfy the rule by having, or explaining why it does not have, one Diverse director.[11] "Female" means an individual who self-identifies her gender as a woman, without regard to the individual's designated sex at birth. "Underrepresented Minority" means, consistent with the categories reported to the Equal Employment Opportunity Commission ("EEOC") through the Employer Information Report EEO-1 Form ("EEO-1 Report"), an individual who self-identifies as one or more of the following: Black or African American,

---

System to Ms. Vanessa Countryman (December 17, 2020); see also Letter from Ideanomics, Inc. to Ms. Vanessa Countryman (December 28, 2020).

[11]    Consequently, all references in this Amendment No. 1 to "diversity objectives" should be construed as a diversity objective of one Diverse director for companies with a board of directors of five or fewer members.

Hispanic or Latinx, Asian, Native American or Alaska Native, Native Hawaiian or Pacific Islander, or Two or More Races or Ethnicities.  "LGBTQ+" means an individual who self-identifies as any of the following:  lesbian, gay, bisexual, transgender, or a member of the queer community.

**Nasdaq proposes that Rule 5606 will be operative one year after the Commission approves this proposal (the "Approval Date").**  As such, Nasdaq proposes to require a company to provide statistical information regarding its board's diversity by the later of (1) one calendar year from the Approval Date (the "Effective Date"); or (2) the date the company files its proxy statement or its information statement for its annual meeting of shareholders (or, if the company does not file a proxy or information statement, the date it files its Form 10-K or 20-F) during the calendar year of the Effective Date.

**Under proposed Rule 5605(f)(2), Nasdaq proposes that each listed company in the NGS, NGM, and NCM have, or explain why it does not have, one Diverse director by the later of:  (i) two calendar years after the date that the Commission approves this proposal (the "First Effective Date"); or (ii) the date the company files its proxy statement or its information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F) for the company's annual shareholders meeting during the calendar year of the First Effective Date.**  Further, each company must have, or explain why it does not have, two Diverse directors no later than:  (i) four calendar years after the Approval Date for companies listed on the NGS or NGM tiers; or (ii) five calendar years after the Approval Date for companies listed on the NCM tier.  If a company files its proxy statement or its information statement (or, if the company does

not file a proxy, in its Form 10-K or 20-F) for the company's annual shareholders meeting after the anniversary of the Approval Date in the calendar year for each respective year noted above, then the company will have until the date it makes such filing to have, or explain why it does not have, two Diverse directors.

**Nasdaq proposes that a company with a board of five or fewer members have, or explain why it does not have, at least one member of its board of directors who is Diverse.**  Nasdaq proposes that such companies share the timeline described above for companies that must have, or explain why they do not have, one Diverse director by the later of:  (i) the First Effective Date; or (ii) the date the company files its proxy statement or its information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F) for the company's annual shareholders meeting during the calendar year of the First Effective Date.

**Nasdaq undertook extensive research and analysis and has concluded that the proposal will fulfill the objectives of the Act in that it is designed to remove impediments to and perfect the mechanism of a free and open market and a national market system, to prevent fraudulent and manipulative acts and practices, and to protect investors and the public interest**.  In addition to conducting its own internal analysis, Nasdaq reviewed a substantial body of third-party research and interviewed leaders representing a broad spectrum of market participants and other stakeholders to:

- determine whether empirical evidence demonstrates an association between board diversity, company performance, investor protection and board decision-making;

- understand investors' interest in, and impediments to obtaining, information regarding the state of board diversity at public companies;

- review the current state of board diversity and disclosure, both among Nasdaq-listed companies and more broadly within the U.S.;

- gain a better understanding of the causes of underrepresentation on boards;

- obtain the views of leaders representing public companies, investment banks, corporate governance organizations, investors, regulators and civil rights groups on the value of more diverse corporate boards, and on various approaches to encouraging more diversity on corporate boards; and

- evaluate the success of approaches taken by exchanges, regulators, and governments in both the U.S. and foreign jurisdictions to remedy underrepresentation on boards.

**While gender diversity has improved among U.S. company boards in recent years, the pace of change has been gradual, and the U.S. still lags behind other jurisdictions that have focused on board diversity.  Progress in bringing underrepresented racial and ethnic groups into the boardroom has been slower**.  Nasdaq is unable to provide definitive estimates regarding the number of listed companies that will be affected by the proposal due to the inconsistent disclosures and definitions of diversity across companies and the extremely limited disclosure of race and ethnicity information – an information gap the proposed rule addresses.  Based on the limited information that is available, Nasdaq believes a supermajority of listed companies have made notable strides to improve gender diversity in the boardroom and have at least one woman on the board.  Nasdaq also believes that listed companies are diligently working to add directors with other diverse attributes, although consistent with other studies of U.S. companies, Nasdaq believes the pace of progress, in this regard, is happening more gradually.  While studies suggest that current candidate selection processes may result in diverse candidates being overlooked, Nasdaq also believes that the lack of reliable and consistent data creates a barrier to measuring and improving diversity in the boardroom.

**Nasdaq reviewed dozens of empirical studies and found that an extensive body of empirical research demonstrates that diverse boards are positively associated with improved corporate governance and company performance.**[12]  For example, as discussed in detail below in *Section III, Empirical Research: The Relationship between Diversity and Company Performance, Investor Protection and Decision Making*, studies have found that companies with gender-diverse boards or audit committees are associated with:  more transparent public disclosures and less information asymmetry; better reporting discipline by management; a lower likelihood of manipulated earnings through earnings management; an increased likelihood of voluntarily disclosing forward-looking information; a lower likelihood of receiving audit qualifications due to errors, non-compliance or omission of information; and a lower likelihood of securities fraud.  In addition, studies found that having at least one woman on the board is associated with a lower likelihood of material weaknesses in internal control over financial reporting and a lower likelihood of material financial restatements.  Studies also identified positive relationships between board diversity and commonly used financial metrics, including higher returns on invested capital, returns on equity, earnings per share, earnings before interest and taxation margin, asset valuation multiples and credit ratings.

**Nasdaq believes there are additional compelling reasons to support the diversification of company boards beyond a link to improved corporate governance and company performance**:

---

[12]     See e.g., Bernile et al. (2018), infra note 33; Wahid (2019), infra note 65; Abbott, Parker & Persley (2012), infra note 64; Abad el al. (2017), infra note 73.

- Investors are calling in greater numbers for diversification of boardrooms.

  Vanguard, State Street Advisors, BlackRock, and the NYC Comptroller's Office

  include board diversity expectations in their engagement and proxy voting

  guidelines.[13]  The heightened investor focus on corporate diversity and inclusion

  efforts demonstrates that investor confidence is undermined when a company's

  boardroom is homogenous and when transparency about such efforts is lacking.

  Investors frequently lack access to information about corporate board diversity

  that could be material to their decision making, and they might divest from

  companies that fail to take into consideration the demographics of their corporate

---

[13]  Vanguard announced in 2020 it would begin asking companies about the race and ethnicity of directors.  See Vanguard, *Investment Stewardship 2020 Annual Report* (2020), available at: https://about.vanguard.com/investment-stewardship/perspectives-and-commentary/2020_investment_stewardship_annual_report.pdf ("Vanguard 2020 Annual Report").  Starting in 2020, State Street Global Advisors will vote against the entire nominating committee of companies that do not have at least one woman on their boards and have not addressed questions on gender diversity within the last three years.  See State Street Global Advisors, *Summary of Material Changes to State Street Global Advisors' 2020 Proxy Voting and Engagement Guidelines* (2020), available at: https://www.ssga.com/library-content/pdfs/global/proxy-voting-and-engagement-guidelines.pdf.  State Street Global Advisors' CEO, Cyrus Taraporevala, stated in his annual proxy voting agenda letter that starting in 2021, the company would commence voting against the Chair of the Nominating & Governance Committee at companies in the S&P 500 and FTSE 100 that do not disclose the racial and ethnic composition of their boards. Beginning in 2022, it "will vote against the Chair of the Nominating & Governance Committee at companies in the S&P 500 and FTSE 100 that do not have at least 1 director from an underrepresented community on their boards."  See Cyrus Taraporevala, CEO's Letter on 2021 Proxy Voting Agenda, dated January 11, 2021, available at https://www.ssga.com/us/en/institutional/ic/insights/ceo-letter-2021-proxy-voting-agenda?WT.mc_id=social_-ibr_asset-stewardship-web_gl_lkdin_img__n_n_jan21&spi=100001784867075. Beginning in 2018, BlackRock stated in proxy voting guidelines they "would normally expect to see at least 2 women directors on every board."  See BlackRock Investment Stewardship, *Corporate governance and proxy voting guidelines for U.S. securities* (Jan. 2020), available at: https://www.blackrock.com/corporate/literature/fact-sheet/blk-responsible-investment-guidelines-us.pdf.  The NYC Comptroller's Office in 2019 asked companies to adopt policies to ensure women and people of color are on the initial list for every open board seat.  See Scott M. Stringer, *Remarks at the Bureau of Asset Management 'Emerging Managers and MWBE Managers Conference* (Oct. 11, 2019), available at: https://comptroller.nyc.gov/wp-content/uploads/2019/10/10.11.19-SMS-BAM-remarks_distro.pdf.

stakeholders when they refresh their boards. Nasdaq explores these investor

sentiments in *Section IV, Current State of Board Diversity and Causes of*

*Underrepresentation on Boards.*

- Nasdaq believes, consistent with SEC disclosure requirements in other contexts,[14]

    that management's vision on key issues impacting the company should be

    communicated with investors in a clear and straightforward manner. Indeed,

    transparency is the bedrock of federal securities laws regarding disclosure, and

    this sentiment is reflected in the broad-based support for uniform disclosure

    requirements regarding board diversity that Nasdaq observed during the course of

    its outreach to the industry. In addition, organizational leaders representing every

    category of corporate stakeholders Nasdaq spoke with (including business,

    investor, governance, regulatory, and civil rights communities) were

    overwhelmingly in favor of diversifying boardrooms. Nasdaq summarizes the

    findings of its stakeholder outreach in *Section V, Stakeholder Perspectives.*

- Legislators at the federal and state level increasingly are taking action to

    encourage or mandate corporations to diversify their boards and improve diversity

    disclosures. Congress currently is considering legislation requiring each SEC-

    registered company to provide board diversity statistics and disclose whether it

---

[14]   See Commission Guidance Regarding Management's Discussion and Analysis of
Financial Condition and Results of Operations, 68 Fed. Reg. 75,056 (Dec. 29, 2003)
("We believe that management's most important responsibilities include communicating
with investors in a clear and straightforward manner. MD&A is a critical component of
that communication. The Commission has long sought through its rules, enforcement
actions and interpretive processes to elicit MD&A that not only meets technical
disclosure requirements but generally is informative and transparent."); see also
Management's Discussion and Analysis, Selected Financial Data, and Supplementary
Financial Information, Release No. 33-10890 (Nov. 19, 2020) (citing the 2003 MD&A
Interpretative Release and stating that the purpose of the MD&A section is to enable
investors to see a company "through the eyes of management").

has a board diversity policy.  To date, eleven states have passed or proposed

legislation related to board diversity.[15]  SEC regulations require companies to

disclose whether diversity is considered when identifying director nominees and,

if so, how.  Nasdaq explores various state and federal initiatives in *Section VI,*

*U.S. Regulatory Framework and Section VII, Nasdaq's Proposal*.

**In considering the merits and shaping the substance of the proposed listing**

**rule, Nasdaq also sought and received valuable input from corporate stakeholders.**

**During those discussions, Nasdaq found consensus across every constituency in the**

**inherent value of board diversity**.  Business leaders also expressed concern that

companies –particularly smaller ones – would prefer an approach that allows flexibility

for their unique circumstances and stakeholders.  Nasdaq recognizes that the operations,

size, and current board composition of each Nasdaq-listed company are unique, and

Nasdaq therefore endeavored to provide a disclosure-based, business-driven framework

to enhance board diversity that balances the need for flexibility with each company's

particular circumstances.

**The Exchange also considered the experience of its parent company, Nasdaq,**

**Inc., as a public company**.[16]  In 2002, Nasdaq, Inc. met the milestone of welcoming its

---

[15]    See Michael Hatcher and Weldon Latham, *States are Leading the Charge to Corporate Boards: Diversify!*, Harv. L. Sch. Forum on Corp. Governance (May 12, 2020), available at: https://corpgov.law.harvard.edu/2020/05/12/states-are-leading-the-charge-to-corporate-boards-diversify/.

[16]    While the Exchange recognizes that it is only one part of an ecosystem in which multiple stakeholders are advocating for board diversity, that part is meaningful:  the United Nations Sustainable Stock Exchanges Initiative, of which Nasdaq, Inc., is an official supporter, recognized that "[s]tock exchanges are uniquely positioned to influence their market in a way few other actors can."  See United Nations Sustainable Stock Exchanges Initiative, *How Stock Exchanges Can Advance Gender Equality* 2 (2017), available at: https://sseinitiative.org/wp-content/uploads/2019/12/How-stock-exchanges-can-advance-gender-equality.pdf.

first woman, Mary Jo White, who later served as SEC Chair, to its board of directors.  In

her own words, "I was the first and only woman to serve on the board when I started, but,

happily, I was joined by another woman during my tenure . . . .  And then there were two.

Not enough, but better than one."[17]  In 2019, Nasdaq, Inc. also welcomed its first Black

director.  As a Charter Pledge Partner of The Board Challenge, Nasdaq supports The

Board Challenge's goal of "true and full representation on all boards of directors."[18]

**As a self-regulatory organization, Nasdaq also is cognizant of its role in**

**advancing diversity within the financial industry, as outlined in the Commission's**

**diversity standards issued pursuant to Section 342 of the Dodd-Frank Wall Street**

**Reform and Consumer Protection Act of 2010 ("Standards").[19]**  Authored jointly by

the Commission and five other financial regulators, the Standards seek to provide a

framework for exchanges and financial services organizations "to create and strengthen

[their] diversity policies and practices."  Through these voluntary Standards, the

Commission and other regulators "encourage each entity to use the[] Standards in a

manner appropriate to its unique characteristics."[20]  To that end, the proposed rule

leverages the Exchange's unique ability to influence corporate governance in furtherance

---

[17]    See Mary Jo White, Completing the Journey: Women as Directors of Public Companies (Sept. 16, 2014), available at: https://www.sec.gov/news/speech/2014-spch091614-mjw#.VBiLMhaaXDo.

[18]    See The Board Challenge, https://theboardchallenge.org/.  See also Nasdaq, Inc., *Notice of 2020 Annual Meeting of Shareholders and Proxy Statement* 52 (Mar. 31, 2020), available at: https://ir.nasdaq.com/static-files/ce5519d4-3a0b-48ac-8441-5376ccbad4e5 (Nasdaq, Inc. believes that "[d]iverse backgrounds lead to diverse perspectives.  We are committed to ensuring diverse backgrounds are represented on our board and throughout our organization to further the success of our business and best serve the diverse communities in which we operate.").

[19]    See Final Interagency Policy Statement Establishing Joint Standards for Assessing the Diversity Policies and Practices of Entities Regulated by the Agencies, 80 Fed. Reg. 33,016 (June 10, 2015).

[20]    Id. at 33,023.

of the goal of Section 342, which is to address the lack of diversity in the financial

services industry.[21]  Finally, while the Exchange recognizes the importance of

maximizing company performance, its role as a listing venue is to establish and enforce

substantive standards that promote investor protection.  As a self-regulatory organization,

the Exchange must demonstrate to the Commission that any proposed rule is consistent

with Section 6(b) of the Act because, among other things, it is designed to protect

investors, promote the public interest, prevent fraudulent and manipulative acts and

practices, and remove impediments to the mechanism of a free and open market.  The

Exchange must also balance promoting capital formation, efficiency, and competition,

among other things, alongside enhancing investor confidence.

**With these objectives in mind, Nasdaq believes that a listing rule designed to
enhance transparency related to board diversity will increase consistency and
comparability of information across Nasdaq-listed companies, thereby increasing
transparency and decreasing information collection costs.**  Nasdaq further believes

that a listing rule designed to encourage listed companies to increase diverse

representation on their boards will result in improved corporate governance, thus

strengthening the integrity of the market, enhancing capital formation, efficiency, and

competition, and building investor confidence.  The proposal is a disclosure-based

framework, not a mandate.  To the extent a company chooses not to meet the diversity

objectives of proposed Rule 5605(f)(2), Nasdaq believes that the proposal will provide

investors with additional transparency through disclosure explaining the company's

reasons for not doing so.  For example, the company may choose to disclose that it does

---

[21]     156 Cong. Rec. H5233-61 (June 30, 2010).

not meet the diversity objectives of proposed Rule 5605(f)(2) because it is subject to an alternative standard under state or foreign laws and has chosen to meet that standard instead, or has a board philosophy regarding diversity that differs from the diversity objectives set forth in proposed Rule 5605(f)(2), including an expanded or different definition of diversity.  Nasdaq believes that such disclosure will improve the quality of information available to investors who rely on this information to make informed investment and voting decisions, thereby promoting capital formation and efficiency.

**Nasdaq plans to assist listed companies who choose to achieve the diversity objectives of this proposal.**  Nasdaq has observed that studies suggest that certain groups may be underrepresented on boards because the traditional director nomination process is limited by directors looking within their own social networks for candidates with previous C-suite experience.[22]  Leaders from across the spectrum of stakeholders with whom Nasdaq spoke reinforced the notion that if companies recruit by skill set and expertise rather than title, they will find there is more than enough diverse talent to satisfy demand.  In order to assist companies that strive to meet the diversity objectives of proposed Rule 5605(f)(2), Nasdaq has proposed to provide listed companies that have not yet met diversity objectives with free access to a network of board-ready diverse candidates and a tool to support board evaluation, benchmarking, and refreshment and has submitted a rule filing to the Commission regarding the provision of such services.[23]  Nasdaq has also published FAQs on its Listing Center to provide guidance to companies on the application of the proposed rules, and to establish a dedicated mailbox for

---

[22]    See infra Section II of the Statutory Basis section.

[23]    Securities Exchange Act Release No. 90571 (December 4, 2020), 85 FR 79556 (December 10, 2020) (SR-NASDAQ-2020-082).

companies and their counsel to email additional questions to Nasdaq regarding the application of the proposed rule. Nasdaq believes that these services will help to ease the compliance burden on companies whether they choose to meet the listing rule's diversity objectives or provide an explanation for not doing so.

### III.    Empirical Research: The Relationship between Diversity and Company Performance, Investor Protection and Decision Making

A company's board of directors plays a critical role in formulating company strategy; appointing, advising, and overseeing management; and protecting investors. Nasdaq has recognized the importance of varied perspectives on boards since 2003, when the Exchange adopted a listing rule intended to enhance investor confidence by requiring listed companies, subject to certain exceptions and grace periods, to have a majority independent board.[24] Accompanying the rule are interpretive materials recognizing that independent directors "play an important role in assuring investor confidence. Through the exercise of independent judgment, they act on behalf of investors to maximize shareholder value in the Companies they oversee and guard against conflicts of interest."[25]

#### A.    *Diversity and Company Performance*

A significant body of research suggests a positive association between diversity and several measures of company performance.[26] In the words of SEC Acting Chair

---

[24]    <u>See</u> The Nasdaq Stock Market Rulebook ("Rulebook"), Rules 5605(b), 5615(a), and 5605(b)(1)(A).

[25]    <u>Id.</u>, IM-5605-1.

[26]    Some companies recently have expressed the belief that a company must consider the impact of its activities on a broader group of stakeholders beyond shareholders. <u>See</u> Business Roundtable, *Statement on the Purpose of a Corporation* (Aug. 19, 2019), available at: https://s3.amazonaws.com/brt.org/BRT-StatementonthePurposeofaCorporationOctober2020.pdf. Commentators articulated this

Allison Herren Lee: "to the extent one seeks economic support for diversity and inclusion (instead of requiring economic support for the lack of diversity and exclusion), the evidence is in."[27]

The Carlyle Group (2020) found that its portfolio companies with two or more diverse directors had average earnings growth of 12.3% over the previous three years, compared to 0.5% among portfolio companies with no diverse directors, where diverse directors were defined as female, Black, Hispanic, or Asian.[28]  "After controlling for industry, fund, and vintage year, companies with diverse boards generate earnings growth that's five times faster, on average, with each diverse board member associated with a 5% increase in annualized earnings growth."[29]

Several other studies found a positive association between diverse boards and other measures of company performance.  McKinsey (2015) found that "companies in the top quartile for racial/ethnic diversity were 35 percent more likely to have financial returns above their national industry median."[30]  McKinsey reaffirmed their findings in a

---

view as early as 1932.  See E. Merrick Dodd, Jr., *For Whom Are Corporate Managers Trustees?*, 45 Harv. L. Rev. 1145, 1153 (1932).

[27]    See Acting Chair Allison Herren Lee, *Diversity Matters, Disclosure Works, and the SEC Can Do More: Remarks at the Council of Institutional Investors Fall 2020 Conference* (September 22, 2020), available at: https://www.sec.gov/news/speech/lee-cii-2020-conference-20200922.

[28]    See Jason M. Thomas and Megan Starr, The Carlyle Group, *Global Insights: From Impact Investing to Investing for Impact* 5 (Feb. 24, 2020), available at: https://www.carlyle.com/sites/default/files/2020-02/From%20Impact%20Investing%20to%20Investing%20for%20Impact_022420.pdf (analyzing Carlyle U.S. portfolio company data, February 2020).

[29]    Id.

[30]    See Vivian Hunt et al., McKinsey & Company, *Diversity Matters* (February 2, 2015), available at: https://www.mckinsey.com/~/media/mckinsey/business%20functions/organization/our%20insights/why%20diversity%20matters/diversity%20matters.pdf (analyzing 366 public companies in the United Kingdom, Canada, the United States, and Latin America in

2020 study, finding "a positive, statistically significant correlation between company financial outperformance and [board] diversity, on the dimensions of both gender and ethnicity," with companies in the top quartile for board gender diversity "28 percent more likely than their peers to outperform financially," and a statistically significant correlation between board gender diversity and outperformance on earnings before interest and taxation margin.[31]  Carter, Simkins and Simpson (2003) found among Fortune 1000 companies "statistically significant positive relationships between the presence of women or minorities on the board and firm value."[32]  Bernile, Bhagwat and Yonker (2018) found that greater diversity on boards—including gender, ethnicity, educational background, age, financial expertise, and board experience—is associated with increased operating performance, higher asset valuation multiples, lower stock return volatility, reduced financial leverage, increased dividend payouts to shareholders, higher investment in R&D, and better innovation.[33]  The authors observed that "[t]his is in line with the results

---

industries for the years 2010 to 2013, using the ethnic and racial categories African ancestry, European ancestry, Near Eastern, East Asian, South Asian, Latino, Native American, and other).

[31]  See McKinsey & Company, *Diversity wins: How inclusion matters* 13 (May 2020), available at: https://www.mckinsey.com/~/media/McKinsey/Featured%20Insights/Diversity%20and%20Inclusion/Diversity%20wins%20How%20inclusion%20matters/Diversity-wins-How-inclusion-matters-vF.pdf (analyzing 1,039 companies across 15 countries for the period from December 2018 to November 2019).

[32]  See David A. Carter et al., *Corporate Governance, Board Diversity, and Firm Value*. 38(1) Fin. Rev. 33 (analyzing 638 Fortune 1000 firms in 1997, measuring firm value by Tobin's Q, with board diversity defined as the percentage of women, African Americans, Asians, and Hispanics on the board of directors).

[33]  See Gennaro Bernile et al., *Board Diversity, Firm Risk, and Corporate Policies,* Journal of Financial Economics 127(3), 588-612 (2018)  (analyzing 21,572 firm-year observations across non-financial, non-utility firms for the years 1996 to 2014, based on the ExecuComp, RiskMetrics, Compustat and Center for Research on Security Prices databases).

in Carter, Simkins, and Simpson (2003), which show a positive association between local demographic diversity and firm value."[34]

Several studies have found a positive association between gender diversity and company performance. Credit Suisse (2014) found companies with at least one woman on the board had an average sector-adjusted return on equity ("ROE") of 12.2%, compared to 10.1% for companies with no female directors, and average sector-adjusted ROEs of 14.1% and 11.2%, respectively, for the previous nine years.[35] MSCI (2016) found that U.S. companies with at least three women on the board in 2011 experienced median gains in ROE of 10% and earnings per share ("EPS") of 37% over a five year period, whereas companies that had no female directors in 2011 showed median changes of -1% in ROE and -8% in EPS over the same five-year period.[36] Catalyst (2011) found that the ROE of Fortune 500 companies with at least three women on the board (in at least four of five years) was 46% higher than companies with no women on the board, and return on sales and return on invested capital was 84% and 60% higher, respectively.[37] FCLTGlobal (2019) found that "the most diverse boards (top 20 percent)

---

[34]    Id. at 604.

[35]    See Credit Suisse, *The CS Gender 3000: Women in Senior Management* 16 (Sept. 2014), available at: https://www.credit-suisse.com/media/assets/corporate/docs/about-us/research/publications/the-cs-gender-3000-women-in-senior-management.pdf (analyzing 3,000 companies across 40 countries from the period from 2005 to 2013).

[36]    See Meggin Thwing Eastman et al., MSCI, *The tipping point: Women on boards and financial performance* 3 (December 2016), available at: https://www.msci.com/documents/10199/fd1f8228-cc07-4789-acee-3f9ed97ee8bb (analyzing of U.S. companies that were constituents of the MSCI World Index for the entire period from July 1, 2011 to June 30, 2016).

[37]    See Harvey M. Wagner, Catalyst, *The Bottom Line: Corporate Performance and Women's Representation on Boards (2004–2008)* (March 1, 2011), available at: https://www.catalyst.org/research/the-bottom-line-corporate-performance-and-womens-representation-on-boards-2004-2008/ (analyzing gender diversity data from Catalyst's annual Fortune 500 Census of Women Board Directors report series for the years 2005 to

added 3.3 percentage points to [return on invested capital], as compared to their least diverse peers (bottom 20 percent)."[38]  Moody's (2019) found that greater board gender diversity is associated with higher credit ratings, with women accounting for an average of 28% of board seats at Aaa-rated companies but less than 5% of board seats at Ca-rated companies.[39]

Credit Suisse (2016) found an association between LGBTQ+ diversity and stock performance, finding that a basket of 270 companies "supporting and embracing LGBT employees" outperformed the MSCI ACWI index by an average of 3.0% per year over the past 6 years.[40]  Further, "[a]gainst a custom basket of companies in North America, Europe and Australia, the LGBT 270 has outperformed by 140 bps annually."[41]  Nasdaq acknowledges that this study focused on LGBTQ+ employees as opposed to directors, and that there is a lack of published research on the issue of LGBTQ+ representation on boards.  However, Out Leadership (2019) suggests that the relationship between board gender diversity and corporate performance may extend to LGBTQ+ diversity:

---

2009, and corresponding financial data from S&P's Compustat database for the years 2004 to 2008).

[38]  See FCLTGlobal, *The Long-term Habits of a Highly Effective Corporate Board* 11 (March 2019), available at: https://www.fcltglobal.org/wp-content/uploads/long-term-habits-of-highly-effective-corporate-boards.pdf (analyzing 2017 MSCI ACWI constituents from 2010 to 2017 using Bloomberg data, with board diversity encompassing gender and age).

[39]  See Moody's Investors Service, *Gender diversity is correlated with higher ratings, but mandates pose short-term risk* 2 (Sept. 11, 2019), available at: https://www.moodys.com/research/Moodys-Corporate-board-gender-diversity-associated-with-higher-credit-ratings--PBC_1193768 (analyzing 1,109 publicly traded North American companies rated by Moody's).

[40]  See Credit Suisse ESG Research, *LGBT: the value of diversity* 1 (April 15, 2016), available at: https://research-doc.credit-suisse.com/docView?language=ENG&source=emfromsendlink&format=PDF&document_id=807075590&extdocid=807075590_1_eng_pdf&serialid=evu4wNcHexx7kusNLaZQphUkT9naxi1PvptZQvPjr1k%3d.

[41]  Id.

While the precise reason for the positive correlation between gender diversity and better corporate performance is unknown, many of the reasons that gender diversity is considered beneficial are also applicable to LGBT+ diversity. LGBT+ diversity in the boardroom may create a dynamic that enables better decision-making, and it brings to the boardroom the perspective of a community that is a critical component of the company's consumer population and organizational talent.[42]

While the overwhelming majority of empirical studies Nasdaq reviewed present a compelling case that board diversity is positively associated with company performance, the results of some other studies on gender diversity are mixed.  For example, Pletzer et al. (2015) found that board gender diversity alone has a "small and non-significant" relationship with a company's financial performance.[43]  Post and Byron (2014) found a "near zero" relationship with a company's market performance, but a positive relationship with a company's accounting returns.[44]  Carter, D'Souza, Simkins and Simpson (2010) found that "[w]hen Tobin's Q is used as the measure of financial performance, we find no relationship to gender diversity or ethnic minority diversity,

---

[42]     See Quorum, *Out Leadership's LGBT+ Board Diversity and Disclosure Guidelines* 3 (2019), available at: https://outleadership.com/content/uploads/2019/01/OL-LGBT-Board-Diversity-Guidelines.pdf.

[43]     See Jan Luca Pletzer et al., *Does Gender Matter? Female Representation on Corporate Boards and Firm Financial Performance – A Meta-Analysis* 1, PLOS One (June 18, 2015); see also Alice H. Eagly (2016), *When Passionate Advocates Meet Research on Diversity, Does the Honest Broker Stand a Chance?*, 72 J. Social Issues 199 (2016), available at https://doi.org/10.1111/josi.12163 (concluding that the "research findings are mixed, and repeated meta-analyses have yielded average correlational findings that are null or extremely small" with respect to board gender diversity and company performance).

[44]     See Corinne Post and Kris Byron, *Women on Boards and Firm Financial Performance: A Meta-Analysis* 1 (2014).  In 2016, the same authors, based on a review of the results for 87 studies, "found that board gender diversity is weakly but significantly positively correlated with [corporate social responsibility]," although they noted that "a significant correlational relationship does not prove causality."  See Corinne Post and Kris Byron, *Women on Boards of Directors and Corporate Social Performance: A Meta-Analysis*, 24(4) Corp. Governance: An Int'l Rev. 428 (July 2016), available at http://dx.doi.org/10.1111/corg.12165.

neither positive nor negative."[45]  A study conducted by Campbell and Minguez-Vera

(2007) "suggests, at a minimum, that increased gender diversity can be achieved without

destroying shareholder value."[46]  Adams and Ferreira (2009) found that "gender diversity

has beneficial effects in companies with weak shareholder rights, where additional board

monitoring could enhance firm value, but detrimental effects in companies with strong

shareholder rights."[47]  Carter et al. (2010)[48] and the U.S. Government Accountability

Office ("GAO") (2015)[49] concluded that the mixed nature of various academic and

empirical studies may be due to differences in methodologies, data samples, and time

periods.  Di Miceli and Donaggio (2018) concluded that "[t]he overwhelming majority of

empirical studies conclude that a higher ratio of women in business leadership does not

---

[45]    See David A. Carter et al., *The Gender and Ethnic Diversity of US Boards and Board
        Committees and Firm Financial Performance*, 18(5) Corp. Governance 396, 410 (2010)
        (analysis of 541 S&P 500 companies for the years 1998-2002).

[46]    See Kevin Campbell and Antonio Minguez-Vera, *Gender Diversity in the Boardroom
        and Firm Financial Performance*, 83(3) J. Bus. Ethics 13 (Feb. 2008) (analyzing 68 non-
        financial companies listed on the continuous market in Madrid during the period from
        January 1995 to December 2000, measuring firm value by an approximation of Tobin's Q
        defined as the sum of the market value of stock and the book value of debt divided by the
        book value of total assets).

[47]    See Renee B. Adams and Daniel Ferreira, *Women in the boardroom and their impact on
        governance and performance*, 94 J. Fin. Econ. 291 (2009) (analyzing 1,939 S&P 500,
        S&P MidCaps, and S&P SmallCap companies for the period 1996 to 2003, measuring
        company performance by a proxy for Tobin's Q (the ratio of market value to book value)
        and return on assets).

[48]    See Carter et al., supra note 45, at 400 (observing that the different "statistical methods,
        data, and time periods investigated vary greatly so that the results are not easily
        comparable.").

[49]    See United States Government Accountability Office, Report to the Ranking Member,
        Subcommittee on Capital Markets and Government Sponsored Enterprises, Committee
        on Financial Services, House of Representatives, *Corporate Boards: Strategies to
        Address Representation of Women Include Federal Disclosure Requirements* 5 (Dec.
        2015) (the "GAO Report"), available at: https://www.gao.gov/assets/680/674008.pdf
        ("Some research has found that gender diverse boards may have a positive impact on a
        company's financial performance, but other research has not. These mixed results
        depend, in part, on differences in how financial performance was defined and what
        methodologies were used").

impair corporate performance (virtually all studies find positive or non-statistically

significant results)".[50]

    While there are studies drawing different conclusions, Nasdaq believes that there

is a compelling body of credible research on the association between company

performance and board diversity.  At a minimum, Nasdaq believes that the academic and

empirical studies support the conclusion that board diversity does not have adverse

effects on company performance.  This is not the first time Nasdaq has considered

whether, on balance, various studies finding mixed results related to board composition

and company performance are a sufficient rationale to propose a listing rule.  For

example, in 2003, notwithstanding the varying findings of studies at the time regarding

the relationship between company performance and board independence,[51] Nasdaq

adopted listing rules requiring a majority independent board that were "intended to

---

[50]    See Alexandre Di Miceli and Angela Donaggio, *Women in Business Leadership Boost ESG Performance: Existing Body of Evidence Makes Compelling Case*, 42 International Finance Corporation World Bank Group, Private Sector Opinion at 11 n.15 (2018), available at: https://www.ifc.org/wps/wcm/connect/topics_ext_content/ifc_external_corporate_site/ifc +cg/resources/private+sector+opinion/women+in+business+leadership+boost+esg+perfo rmance ("The overwhelming majority of empirical studies conclude that a higher ratio of women in business leadership does not impair corporate performance (virtually all studies find positive or non-statistically significant results)").

[51]    See, e.g., Benjamin E. Hermalin and Michael S. Weisbach, *The Effects of Board Composition and Direct Incentives on Firm Performance*, 20 Fin. Mgmt. 101, 111 (1991) (finding that "there appears to be no relation between board composition and performance"); Sanjai Bhagat and Bernard Black, *The Uncertain Relationship Between Board Composition and Firm Performance*, 54(3) Bus. Law. 921, 950 (1999) ("At the very least, there is no convincing evidence that increasing board independence, relative to the norms that currently prevail among large American firms, will improve firm performance. And there is some evidence suggesting the opposite—that firms with supermajority-independent boards perform worse than other firms, and that firms with more inside than independent directors perform about as well as firms with majority- (but not supermajority-) independent boards.").

enhance investor confidence in the companies that list on Nasdaq."[52]  In its Approval

Order, the SEC stated that "[t]he Commission has long encouraged exchanges to adopt

and strengthen their corporate governance listing standards in order to, among other

things, enhance investor confidence in the securities markets."[53]

Along the same lines, even without clear consensus among studies related to

board diversity and company performance, the heightened focus on corporate board

diversity by investors demonstrates that investor confidence is undermined when data on

board diversity is not readily available and when companies do not explain the reasons

for the apparent absence of diversity on their boards.  Therefore, Nasdaq believes that the

proposal will enhance investor confidence that all listed companies are considering

diversity in the context of selecting directors, either by meeting the applicable diversity

objective of proposed Rule 5605(f)(2) or by explaining their rationale for not meeting

that objective.  Further, Nasdaq believes that the proposal is consistent with the Act

because it will not negatively impact capital formation, competition or efficiency among

its public companies, and will promote investor protection and the public interest.[54]

### B.  *Diversity and Investor Protection*

There is substantial evidence that board diversity enhances the quality of a

company's financial reporting, internal controls, public disclosures, and management

---

[52]     See Order Approving Proposed Rule Changes, 68 Fed. Reg. 64,154, 64,161 (Nov. 12, 2003) (approving SR-NASD-2002-77, SR-NASD-2002-80, SR-NASD-2002-138, SR-NASD-2002-139, and SR-NASD-2002-141).

[53]     Id. at 64,176.

[54]     See also Lee, supra note 27 ("I could never quite buy in to the view that some 40 percent of the population in our country (if we're talking about minorities) or over half the country (if we're talking about women) must rationalize their inclusion in corporate boardrooms and elsewhere in economic terms instead of the reverse. How can one possibly justify—in economic terms—the systematic exclusion of a major portion of our talent base from the corporate pool?").

oversight.  In reaching this conclusion, Nasdaq evaluated the results of more than a dozen

studies spanning more than two decades that found a positive association between gender

diversity and important investor protections, and the assertions by some academics that

such findings may extend to other forms of diversity, including racial and ethnic

diversity.  The findings of the studies reviewed by Nasdaq are summarized below.

Adams and Ferreira (2009) found that women are "more likely to sit on" the audit

committee,[55] and a subsequent study by Srinidhi, Gul and Tsui (2011) found that

companies with women on the audit committee are associated with "higher earnings

quality" and "better reporting discipline by managers,"[56] leading the authors to conclude

that "including female directors on the board and the audit committee are plausible ways

of improving the firm's reporting discipline and increasing investor confidence in

financial statements."[57]

A study conducted in 2016 by Pucheta-Martínez et al. concluded that gender

diversity on the audit committee "improves the quality of financial information."[58]  They

found that "the percentage of females on [audit committees] reduces the probability of

---

[55]    See Adams and Ferreira, supra note 47, at 292.

[56]    See Bin Srinidhi et al., *Female Directors and Earnings Quality*, 28(5) Contemporary
        Accounting Research 1610, 1612-16 (Winter 2011) (analyzing 3,132 firm years during
        the period from 2001 to 2007 based on S&P COMPUSTAT, Corporate Library's Board
        Analyst, and IRRC databases; "choos[ing] the accruals quality as the metric that best
        reflects the ability of current earnings to reflect future cash flows" (noting that it "best
        predicts the incidence and magnitude of fraud relative to other commonly used measures
        of earnings quality") and analyzing surprise earnings results that exceeded previous
        earnings or analyst forecasts, because "managers of firms whose unmanaged earnings fall
        marginally below the benchmarks have [an] incentive to manage earnings upwards so as
        to meet or beat previous earnings").

[57]    Id. at 1612.

[58]    See Maria Consuelo Pucheta-Martínez et al., *Corporate governance, female directors
        and quality of financial information.* 25(4) Bus. Ethics: A European Rev. 363, 378 (2016)
        (analyzing a sample of non-financial companies listed on the Madrid Stock Exchange
        during 2004-2011).

[audit] qualifications due to errors, non-compliance or the omission of information,"[59] and found a positive association between gender diverse audit committees and disclosing audit reports with uncertainties and scope limitations.  This suggests that gender diverse audit committees "ensure that managers do not seek to pressure auditors into issuing a clean opinion instead of a qualified opinion" when any uncertainties or scope limitations are identified.[60]

More recently, a study by Gull in 2018 found that the presence of female audit committee members with business expertise is associated with a lower magnitude of earnings management,[61] and a study conducted in 2019 by Bravo and Alcaide-Ruiz found "the disclosure of [financial forward-looking] information is associated with the presence of female audit committee members with financial expertise, especially accounting expertise."[62]  Bravo and Alcaide-Ruiz concluded that "female [audit committee] members with financial expertise play an important role in influencing disclosure

---

[59]     Id. at 363.

[60]     Id. at 368.

[61]     See Ammar Gull et al., *Beyond gender diversity: How specific attributes of female directors affect earnings management*, 50(3) British Acct. Rev. 255 (Sept. 2017), available at: https://ideas.repec.org/a/eee/bracre/v50y2018i3p255-274.html (analyzing 394 French companies belonging to the CAC All-Shares index listed on Euronext Paris from 2001 to 2010, prior to the implementation of France's gender mandate law that required women to comprise 20% of a company's board of directors by 2014 and 40% by 2016).

[62]     See Francisco Bravo and Maria Dolores Alcaide-Ruiz, *The disclosure of financial forward-looking information*, 34(2) Gender in Mgmt. 140, 140 (2019) (analyzing companies included in the S&P 100 Index in 2016, "focus[ing] on the disclosure of financial forward-looking information (which is likely to require financial expertise), such as earnings forecasts, expected revenues, anticipated cash flows or any other financial indicator").

strategies that provide forward-looking information containing projections and financial data useful for investors."[63]

While the above studies demonstrate a positive association between gender diverse audit committees and the quality of a company's earnings, financial information, and public disclosures, other studies found a positive association between board gender diversity and important investor protections regardless of whether or not women are on the audit committee.

Abbott, Parker & Persley (2012) found, within a sample of non-Fortune 1000 companies, "a significant association between the presence of at least one woman on the board and a lower likelihood of [a material financial] restatement."[64] Their findings are consistent with a subsequent study by Wahid (2019), which concluded that "gender-diverse boards commit fewer financial reporting mistakes and engage in less fraud."[65] Specifically, companies with female directors have "fewer irregularity-type [financial]

---

[63]    Id. at 150.

[64]    See Lawrence J. Abbott et al., *Female Board Presence and the Likelihood of Financial Restatement*, 26(4) Accounting Horizons 607, 626 (2012) (analyzing a sample of 278 pre-SOX annual financial restatements and 187 pre-SOX quarterly financial restatements of U.S. companies from January 1, 1997 through June 30, 2002 identified by the U.S. General Accounting Office restatement report 03-138 (which only included "material misstatements of financial results"), and 75 post-SOX annual financial restatements from July 1, 2002, to September 30, 2005 identified by U.S. General Accounting Office restatement report 06-678 (which only included "restatements that were being made to correct material misstatements of previously reported financial information"), consisting almost exclusively of non-Fortune 1000 companies).

[65]    Further, these results hold whether firm governance is weak or strong, suggesting that benefits of gender-diverse boards can be realized even in already well-governed firms. See Aida Sijamic Wahid, The *Effects and the Mechanisms of Board Gender Diversity: Evidence from Financial Manipulation*, J Bus Ethics 159, 705–725 (2019) (analyzing 6,132 U.S. public companies during the period from 2000 to 2010, for a total of 38,273 firm-year observations).

restatements, which tend to be indicative of financial manipulation."[66]  Wahid suggested

that the implications of her study extend beyond gender diversity:

> If you're going to introduce perspectives, those perspectives might be coming not
> just from male versus female.  They could be coming from people of different
> ages, from different racial backgrounds . . . [and] [i]f we just focus on one, we
> could be essentially taking away from other dimensions of diversity and
> decreasing perspective.[67]

Cumming, Leung and Rui (2015) also examined the relationship between gender

diversity and fraud, and found that the presence of women on boards is associated with a

lower likelihood of securities fraud; indeed, they found "strong evidence of a negative

and diminishing effect of women on boards and the probability of being in our fraud

sample."[68]  The authors suggested that "other forms of board diversity, including but not

limited to gender diversity, may likewise reduce fraud."[69]

Chen, Eshleman and Soileau (2016) suggested that the relationship between

gender diversity and higher earnings quality observed by Srinidhi, Gul and Tsui (2011) is

ultimately driven by reduced weaknesses in internal control over financial reporting,

noting that "prior literature has established a negative relationship between internal

control weaknesses and earnings quality."[70]  The authors found that having at least one

---

[66]     Id. at 721.

[67]     See Barbara Shecter, *Diverse boards tied to fewer financial 'irregularities,' Canadian
study finds*. Financial Post (Feb. 5, 2020), https://business.financialpost.com/news/fp-
street/diverse-boards-tied-to-fewer-financial-irregularities-canadian-study-finds (last
accessed Nov. 27, 2020).

[68]     See Douglas J. Cumming et al., *Gender Diversity and Securities Fraud*, Academy of
Management Journal Vol. 58, No. 5, 1572–1593 (2015) (analyzing China Securities
Regulatory Commission data from 2001 to 2010, including 742 companies with
enforcement actions for fraud, and 742 non-fraudulent companies for a control group).

[69]     Id. at 1588.

[70]     See Yu Chen et al., *Board Gender Diversity and Internal Control Weaknesses*, 33
Advances in Acct. 11 (2016) (analyzing a sample of 4267 firm-year observations during

woman on the board (regardless of whether or not she is on the audit committee) "may lead to [a] reduced likelihood of material weaknesses [in internal control over financial reporting]."[71]

Board gender diversity also was found to be positively associated with more transparent public disclosures.  Gul, Srinidhi & Ng (2011) concluded that "gender diversity improves stock price informativeness by increasing voluntary public disclosures in large firms and increasing the incentives for private information collection in small firms."[72]  Abad et al. (2017) concluded that companies with gender diverse boards are associated with lower levels of information asymmetry, suggesting that increasing board gender diversity is associated with "reducing the risk of informed trading and enhancing stock liquidity."[73]

Other studies have found that diverse boards are better at overseeing management. Adams and Ferreira (2009) found "direct evidence that more diverse boards are more likely to hold CEOs accountable for poor stock price performance; CEO turnover is more

---

the period from 2004 to 2013, beginning "the first year internal control weaknesses were required to be disclosed under section 404 of SOX").

[71]   Id. at 18.

[72]   See Ferdinand A. Gul et al., *Does board gender diversity improve the informativeness of stock prices?*, 51(3) J. Acct. & Econ. 314 (April 2011) (analyzing 4,084 firm years during the period from 2002 to 2007, excluding companies in the utilities and financial industries, measuring public information disclosure using "voluntary continuous disclosure of 'other' events in 8K reports" and measuring stock price informativeness by "idiosyncratic volatility," or volatility that cannot be explained to systematic factors and can be diversified away).

[73]   See David Abad et al., *Does Gender Diversity on Corporate Boards Reduce Information Asymmetry in Equity Markets?* 20(3) BRQ Business Research Quarterly 192, 202 (July 2017) (analyzing 531 company-year observations from 2004 to 2009 of non-financial companies traded on the electronic trading platform of the Spanish Stock Exchange (SIBE)).

sensitive to stock return performance in firms with relatively more women on boards."[74]
Lucas-Perez et al. (2014) found that board gender diversity is positively associated with
linking executive compensation plans to company performance,[75] which may be an
effective mechanism to deter opportunistic behavior by management and align their
interests with shareholders.[76]  A lack of diversity has been found to have the opposite
effect.  Westphal and Zajac (1995) found that "increased demographic similarity between
CEOs and the board is likely to result in more generous CEO compensation contracts."[77]

### C. *Diversity and Decision Making*

Wahid (2019) suggests that "at a minimum, gender diversity on corporate boards
has a neutral effect on governance quality, and at best, it has positive consequences for
boards' ability to monitor firm management."[78]  Nasdaq reviewed studies suggesting that
board diversity can indeed enhance a company's ability to monitor management by
reducing "groupthink" and improving decision making.

In 2009, the Commission, in adopting rules requiring proxy disclosure describing
whether a company considers diversity in identifying director nominees, recognized the
impact of diversity on decision making and corporate governance:

> A board may determine, in connection with preparing its disclosure, that it is
> beneficial to disclose and follow a policy of seeking diversity.  Such a policy may
> encourage boards to conduct broader director searches, evaluating a wider range
> of candidates and potentially improving board quality.  To the extent that boards

---

[74]    See Adams and Ferreira, supra note 47, at 292.

[75]    See Maria Encarnacion Lucas-Perez et al., *Women on the Board and Managers' Pay:
        Evidence from Spain*, 129 J. Bus. Ethics 285 (April 2014).

[76]    Id.

[77]    See James D. Westphal and Edward J. Zajac, *Who Shall Govern? CEO/Board Power,
        Demographic Similarity, and New Director Selection*, 40(1) Admin. Sci. Q. 60, 77
        (March 1995).

[78]    See Wahid, supra note 65, at 707.

branch out from the set of candidates they would ordinarily consider, they may nominate directors who have fewer existing ties to the board or management and are, consequently, more independent. To the extent that a more independent board is desirable at a particular company, the resulting increase in board independence could potentially improve governance. In addition, in some companies a policy of increasing board diversity may also improve the board's decision making process by encouraging consideration of a broader range of views.[79]

Nasdaq agrees with the Commission's suggestion that board diversity improves board quality, governance, and decision making. Nasdaq is concerned that boards lacking diversity can inadvertently suffer from "groupthink," which is "a dysfunctional mode of group decision making characterized by a reduction in independent critical thinking and a relentless striving for unanimity among members."[80] The catastrophic financial consequences of groupthink became evident in the 2008 global financial crisis, after which the IMF's Independent Evaluation Office concluded that "[t]he IMF's ability to correctly identify the mounting risks [as the crisis developed] was hindered by a high degree of groupthink."[81]

Other studies suggest that increased diversity reduces groupthink and leads to robust dialogue and better decision making. Dallas (2002) observed that "heterogeneous groups share conflicting opinions, knowledge, and perspectives that result in a more thorough consideration of a wide range of interpretations, alternatives, and

---

[79]      See Proxy Disclosure Enhancements, 74 Fed. Reg. 68,334, 68,355 (Dec. 23, 2009).

[80]      See Daniel P. Forbes and Frances J. Milliken, *Cognition and Corporate Governance: Understanding Boards of Directors as Strategic Decision-Making Groups*, 24(3) Acad. Mgmt. Rev. 489, 496 (Jul. 1999).

[81]      See International Monetary Fund, *IMF Performance in the Run-Up to the Financial and Economic Crisis* (August 2011), available at: https://www.elibrary.imf.org/view/IMF017/11570-9781616350789/11570-9781616350789/ch04.xml?language=en&redirect=true ("The evaluation found that incentives were not well aligned to foster the candid exchange of ideas that is needed for good surveillance—many staff reported concerns about the consequences of expressing views contrary to those of supervisors, [m]anagement, and country authorities.").

consequences."[82]  Bernile et al. (2018) found that "diversity in the board of directors reduces stock return volatility, which is consistent with diverse backgrounds working as a governance mechanism, moderating decisions, and alleviating problems associated with 'groupthink.'"[83]  Dhir (2015) concluded that gender diversity may "promote cognitive diversity and constructive conflict in the boardroom."[84]  After interviewing 23 directors about their experience with Norway's board gender mandate, he observed:

> First, many respondents contended that gender diversity promotes enhanced dialogue.  Interviewees frequently spoke of their belief that heterogeneity has resulted in:  (1) higher quality boardroom discussions; (2) broader discussions that consider a wide range of angles or viewpoints; (3) deeper or more thorough discussions; (4) more frequent and lengthier discussions; (5) better informed discussions; (6) discussions that are more frequently brought inside the boardroom (as opposed to being held in spaces outside the boardroom, either exclusively or in addition to inside the boardroom); or (7) discussions in which items that directors previously took for granted are drawn out and addressed— where the implicit becomes explicit.  Second, and intimately related, many interviewees indicated that diversification has led to (or has the potential to lead to) better decision making processes and/or final decisions.[85]

Investors also have emphasized the importance of diversity in decision making.  A group of institutional investors charged with overseeing state investments and the retirement savings of public employees asserted that "board members who possess a variety of viewpoints may raise different ideas and encourage a full airing of dissenting views.  Such a broad pool of talent can be assembled when potential board candidates are

---

[82]    See Lynne L. Dallas, *Does Corporate Law Protect the Interests of Shareholders and Other Stakeholders?:  The New Managerialism and Diversity on Corporate Boards of Directors*, 76 Tul. L. Rev. 1363, 1391 (June 2002).

[83]    See Bernile et al., supra note 33, at 608.

[84]    See Aaron A. Dhir, CHALLENGING BOARDROOM DIVERSITY: CORPORATE LAW, GOVERNANCE, AND DIVERSITY 150 (2015) (emphasis removed) (sample included 23 directors of Norwegian corporate boards, representing an aggregate of 95 board appointments at more than 70 corporations).

[85]    Id. at 124 (emphasis removed).

not limited by gender, race, or ethnicity."[86]

Nasdaq believes that cognitive diversity is particularly important on boards in their advisory role, especially related to corporate strategy, because "the 'output' that boards produce is entirely cognitive in nature."[87]  While in 1999, Forbes and Milliken characterized boards as "large, elite, and episodic decision making groups that face complex tasks pertaining to strategic-issue processing,"[88] over the past two decades, their role has evolved; boards are now more active, frequent advisors on areas such as cybersecurity, social media, and environmental, social and governance ("ESG") issues such as climate change and racial and gender inequality.  Nasdaq believes that boards comprised of directors from diverse backgrounds enhance investor confidence by ensuring that board deliberations include the perspectives of more than one demographic group, leading to more robust dialogue and better decision making.

### IV.    Current State of Board Diversity and Causes of Underrepresentation on Boards

While the above studies suggest a positive association between board diversity, company performance, investor protections, and decision making, there is a noticeable lack of diversity among U.S. public companies.  Nasdaq is a global organization and operates in many countries that already have implemented diversity-focused directives. In fact, Nasdaq-listed companies in Europe already are subject to diversity

---

[86]    See Petition for Amendment of Proxy Rule (March 31, 2015), available at: https://www.sec.gov/rules/petitions/2015/petn4-682.pdf.

[87]    See Forbes and Milliken, supra note 80, at 492.

[88]    Id.

requirements.[89]  This first-hand experience provides Nasdaq with a unique perspective to incorporate global best practices into its proposal to advance diversity on U.S. corporate boards.  Given that the U.S. ranks 53rd in board gender diversity, according to the World Economic Forum in its 2020 Global Gender Gap Report, Nasdaq believes advancing board diversity in the U.S. is a critical business and market imperative.  This same report also found that "American women still struggle to enter the very top business positions: only 21.7% of corporate managing board members are women."[90]  As of 2019, women directors held 19% of Russell 3000 seats (up from 16% in 2018).[91]  In comparison, women hold more than 30% of board seats in Norway, France, Sweden, and Finland.[92] At the current pace, the U.S. GAO estimates that it could take up to 34 years for U.S. companies to achieve gender parity on their boards.[93]

---

[89]     On Nasdaq's Nordic and Baltic exchanges, large companies must comply with EU Directive 2014/95/EU (the "EU Directive"), as implemented by each member state, which requires companies to disclose a board diversity policy with measurable objectives (including gender), or explain why they do not have such a policy.  On Nasdaq Vilnius, companies are also required to comply with the Nasdaq Corporate Governance Code for Listed Companies or explain why they do not, which requires companies to consider diversity and seek gender equality on the board.  Similarly, on Nasdaq Copenhagen, companies are required to comply with the Danish Corporate Governance Recommendations or explain why they do not, which requires companies to adopt and disclose a diversity policy that considers gender, age and international experience.  On Nasdaq Iceland, listed companies must have at least 40% women on their board (a government requirement) and comply with the EU Directive.

[90]     See World Economic Forum, *Global Gender Gap Report 2020* 33 (2019), available at: http://www3.weforum.org/docs/WEF_GGGR_2020.pdf.

[91]     See Kosmas Papadopoulos, ISS Analytics, *U.S. Board Diversity Trends in 2019* 4-5 (May 31, 2019), available at: https://www.issgovernance.com/file/publications/ISS_US-Board-Diversity-Trends-2019.pdf.

[92]     See Deloitte, *Women in the Boardroom: A global perspective* (6th ed. 2019), available at: https://www2.deloitte.com/content/dam/Deloitte/global/Documents/Risk/gx-risk-women-in-the-boardroom-sixth-edition.pdf.

[93]     See GAO Report, supra note 49.

Progress toward greater racial and ethnic diversity in U.S. company boardrooms has been slower.  Over the past ten years, the percentage of African American/Black directors at Fortune 500 companies has remained between 7 and 9%, while the percentage of women directors has grown from 16 to 23%.[94]  In 2019, only 10% of board seats at Russell 3000 companies were held by racial minorities, reflecting an incremental increase from 8% in 2008.[95]  Among Fortune 500 companies in 2018, there were fewer than 20 directors who publicly self-identified as LGBT+, and only nine companies reported considering sexual orientation and/or gender identity when identifying director nominees.[96]

Women and minority directors combined accounted for 34% of Fortune 500 board seats in 2018.[97]  While women of color represent 18% of the U.S. population, they held 4.6% of Fortune 500 board seats in 2018.[98]  Male underrepresented minorities held 11.5% of board seats at Fortune 500 companies in 2018, compared to 66% of board seats held by Caucasian/White men.  Overall in 2018, 83.9% of board seats among Fortune 500 companies were held by Caucasian/White individuals (who represent 60.1% of the U.S. population), 8.6% by African American/Black individuals (who represent 13% of the U.S. population), 3.8% by Hispanic/Latino(a) individuals (who represent 19% of the

---

[94]    See Russell Reynolds, *Ethnic & Gender Diversity on US Public Company Boards* 6 (September 8, 2020).

[95]    See Papadopoulous, supra note 91, at 5.

[96]    See Out Leadership, supra note 42.

[97]    See Deloitte, *Missing Pieces Report: The 2018 Board Diversity Census of Women and Minorities on Fortune 500 Boards* 9 (2018), available at: https://www2.deloitte.com/content/dam/Deloitte/us/Documents/center-for-board-effectiveness/us-cbe-missing-pieces-report-2018-board-diversity-census.pdf.

[98]    See Catalyst, *Too Few Women of Color on Boards: Statistics and Solutions* (Jan. 31, 2020), https://www.catalyst.org/research/women-minorities-corporate-boards/.

U.S. population), and 3.7% by Asian/Pacific Islander individuals (who represent 6% of the U.S. population).[99]  In its analysis of Russell 3000 companies, 2020 Women on Boards concluded that "larger companies do better with their diversity efforts than smaller companies."[100]

Based on the limited information that is available, Nasdaq believes a supermajority of listed companies have made notable strides to improve gender diversity in the boardroom and have at least one woman on the board.  Nasdaq also believes that listed companies are diligently working to add directors with other diverse attributes, although consistent with other studies of U.S. companies, Nasdaq believes the pace of progress, in this regard, is happening more gradually.  Thus, and for the reasons discussed in this Section IV of the Purpose section, Nasdaq has concluded that a disclosure-based approach to encouraging greater diversity and data transparency would be beneficial.

Nasdaq reviewed academic and empirical studies on the causes of underrepresentation on boards and the approaches taken by other jurisdictions to remedy underrepresentation.  Those studies suggest that the traditional director candidate selection process may create barriers to considering qualified diverse candidates for board positions.  Dhir (2015) explains that "[t]he presence of unconscious bias in the board appointment process, coupled with closed social networks, generates a complex set of barriers for diverse directors; these are the 'phantoms' that prevent entry."[101]  In 2011, the Davies Review found that "informal networks influential in board appointments"

---

[99]    See Deloitte, *Missing Pieces Report*, supra note 97; United States Census Bureau, *QuickFacts*, available at: https://www.census.gov/quickfacts/fact/table/US/PST045219.

[100]   See *2020 Women On Boards Gender Diversity Index* 4 (2019), available at: https://2020wob.com/wp-content/uploads/2019/10/2020WOB_Gender_Diversity_Index_Report_Oct2019.pdf.

[101]   See Dhir, supra note 84, at 47.

contribute to the underrepresentation of women in the boardrooms of U.K. listed

companies.[102]  In 2017, the Parker Review acknowledged that "as is the case with gender,

people of colour within the UK have historically not had the same opportunities as many

mainstream candidates to develop the skills, networks and senior leadership experience

desired in a FTSE Boardroom."[103]  In 2020, the United Kingdom Financial Reporting

Council commissioned a report to analyze barriers to LGBTQ+ inclusion and promotion

in the workplace.  Leaders who self-identified as LGBTQ+ expressed concerns about the

current board nomination process, which includes "relying on personal recommendations

without transparent competition or due process [and] informal 'interviewing' outside the

selection process."[104]

    These concerns are not unique to the United Kingdom.  The U.S. GAO (2015)

found that women's representation on corporate boards may be hindered by directors'

tendencies to "rely on their personal networks to identify new board candidates."[105]  Vell

(2017) found that "92% of board seats [of public U.S. and Canadian technology

companies] are filled through networking, and women have less access to these

networks."[106]  Deloitte and the Society for Corporate Governance (2019) found that this

---

[102]     See Lord Davies of Abersoch, *Women on Boards* 17 (Feb. 2011), available at:
          https://ftsewomenleaders.com/wp-content/uploads/2015/08/women-on-boards-
          review.pdf.

[103]     See Sir John Parker, *A Report into the Ethnic Diversity of UK Boards* 38 (Oct. 12, 2017),
          available at: https://assets.ey.com/content/dam/ey-sites/ey-com/en_uk/news/2020/02/ey-
          parker-review-2017-report-final.pdf.

[104]     See Catriona Hay et al., The Financial Reporting Council, *Building more open business*
          25 (2020), available at: https://www.frc.org.uk/getattachment/19f3b216-bd45-4d46-af2f-
          f191f5bf4a07/The-Good-Side-x-Financial-Reporting-Council-1811-AMENDED.pdf.

[105]     See GAO Report, supra note 49, at 15.

[106]     See Vell Executive Search, *Women Board Members in Tech Companies: Strategies for
          Building High Performing Diverse Boards* 6 (2017), available at:

is also common in other industries including media, communications, energy, consumer products, financial services and life sciences.[107]  They observed that although 94% of companies surveyed were looking to increase diversity among their boards, 77% of those boards looked to referrals from current directors when identifying diverse director candidates, suggesting that "networking is still key to board succession."[108]  Dhir (2015), in a qualitative study of Norwegian directors, observed that "[b]oard seats tend to be filled by directors engaging their networks, and the resulting appointees tend to be of the same socio-demographic background."[109]

Another contributing factor may be the traditional experience sought in director nominees.  Rhode & Packel (2014) observed that:

> One of the most common reasons for the underrepresentation of women and minorities on corporate boards is their underrepresentation in the traditional pipeline to board service.  The primary route to board directorship has long been through experience as a CEO of a public corporation. . . .  Given the low representation of women and minorities in top executive positions, their talents are likely to be underutilized if selection criteria are not broadened.[110]

---

[107] https://www.vell.com/images/pdf/VELL%20Report%20Women%20Board%20Members%20on%20Tech%20Boards%202017%203%2029.pdf.

[107] See Deloitte and the Society of Corporate Governance, *Board Practices Report: Common threads across boardrooms* 5 (2019), available at: https://higherlogicdownload.s3.amazonaws.com/GOVERNANCEPROFESSIONALS/a8892c7c-6297-4149-b9fc-378577d0b150/UploadedImages/1202241_2018_Board_Practices_Report_FINAL.pdf.

[108] Id. at 6.

[109] See Dhir, supra note 84, at 52.

[110] See Deborah Rhode and Amanda K. Packel, *Diversity on Corporate Boards: How Much Difference Does Difference Make?*, 39(2) Del. J. Corp. L. 377, 402-403 (2014); see also Dhir, supra note 84, at 39 ("[T]here is an apparent preference for either CEOs (whether current or retired) or senior management who have experience at the helm of a particular business stream or unit….  The fact that far fewer women than men have been CEOs has a potentially devastating effect on access to the boardroom, which in turn can have an effect on the number of women who rise to the level of CEO and to the executive suite.").

Hillman et al. (2002) found that while white male directors of public companies were more likely to have current or former experience as a CEO, senior manager or director, African-American and white women directors were more likely to have specialized expertise in law, finance, banking, public relations or marketing, or community influence from positions in politics, academia or clergy.[111]  Dhir (2015) suggests that "[c]onsidering persons from other, non-management pools, such as academia, legal and accounting practice, the not-for-profit sector and politics, may help create a broader pool of diverse candidates."[112]  Directors surveyed by the U.S. GAO also "suggested, for example, that boards recruit high performing women in other senior executive level positions, or look for qualified female candidates in academia or the nonprofit and government sectors. . . . [I]f boards were to expand their director searches beyond CEOs more women might be included in the candidate pool."[113]

Investors have begun calling for greater transparency surrounding ethnic diversity on company boards, and in the past several months as the U.S. has seen an uprising in the racial justice movement, there has been an increase in the number of African Americans appointed to Russell 3000 corporate boards.[114]  In a five-month span, 130 directors appointed were African American, in comparison to the 38 African American directors who were appointed in the preceding five months.[115]  Although tracking the acceleration

---

[111]    See Amy J. Hillman et al., *Women and Racial Minorities in the Boardroom: How Do Directors Differ?*, 28(6) J. Mgmt. 747, 749, 754 (2002).

[112]    See Dhir, supra note 84, at 42.

[113]    See GAO Report supra note 49, at 18.

[114]    See Leslie P. Norton, *The Number of Black Board Members Surged After George Floyd's Death*, Barron's, Oct. 27, 2020, available at: https://www.barrons.com/articles/after-george-floyds-death-the-number-of-black-board-members-surges-51603809011.

[115]    Id.

in board diversity is feasible for some Russell 3000 companies, many of the companies

do not disclose the racial makeup of the board, making it impossible to more broadly

assess the impact of recent events on board diversity.

### V.    Stakeholder Perspectives

To gain a better understanding of the current state of board diversity, benefits of

diversity, causes of underrepresentation on boards, and potential remedies to address

underrepresentation, Nasdaq spoke with leaders representing a broad spectrum of market

participants and other stakeholders.  Nasdaq sought their perspectives to inform its

analysis of whether the proposed rule changes would promote the public interest and

protection of investors without unduly burdening competition or conflicting with existing

securities laws.  The group included representatives from the investor, regulatory,

investment banking, venture capital and legal communities.  Nasdaq also spoke with

leaders of civil rights and corporate governance organizations, and organizations

representing the interests of private and public companies, including Nasdaq-listed

companies.  Specifically, Nasdaq obtained their views on:

- the current state of board diversity in the U.S.;

- the inherent value of board diversity;

- increasing pressure from legislators and investors to improve diverse representation on boards and board diversity disclosure;

- whether a listing rule related to board diversity is in the public interest;

- how to define a "diverse" director; and

- the benefits and challenges of various approaches to improving board diversity disclosures and increasing diverse representation on boards, including mandates and disclosure-based models.

The discussions revealed strong support for disclosure requirements that would standardize the reporting of board diversity statistics. The majority of organizations also were in agreement that companies would benefit from a disclosure-based, business-driven framework to drive meaningful and systemic change in board diversity, and that a disclosure-based approach would be more palatable to the U.S. business community than a mandate. While many organizations recognized that mandates can accelerate the rate of change, they expressed that a disclosure-based approach is less controversial, would spur companies to take action, and make meaningful progress on board diversity. Business leaders also expressed concern that smaller companies would require flexibility and support to meet with any time-sensitive objectives to add diverse directors. Some stakeholders highlighted additional challenges that smaller companies, and companies in certain industries, may face finding diverse board members. Leaders from across the spectrum of stakeholders that Nasdaq surveyed reinforced the notion that if companies recruit by skill set and expertise rather than title, then they will find there is more than enough diverse talent to satisfy demand. Leaders from the legal community emphasized that any proposed rule that imposed additional burdens beyond, or is inconsistent with, existing securities laws—by, for example, requiring companies to adopt a diversity policy or include disclosure solely in their proxy statements—would present an additional burden and potentially more legal liability for listed companies.

VI.    U.S. Regulatory Framework

As detailed above, diversity has been the topic of a growing number of studies over the past decade and, in recent years, investors have been increasingly advocating for

greater diversity among directors of public companies.[116]   In recent years, diversity has

become increasingly important to the public, including institutional investors, pension

funds, and other stakeholders who believe that board diversity enhances board

performance and is an important factor in the voting decisions of some investors.[117]

Legislators increasingly are taking action to encourage corporations to diversify their

boards and improve diversity disclosures.[118]

    A.   *SEC Diversity Disclosure Requirements – Background*

    In 2009, the Commission sought comment on whether to amend Item 407(c)(2)(v)

of Regulation S-K to require disclosure of whether a nominating committee considers

---

[116]   In 2009, when the Commission proposed enhancements to proxy disclosures, including addressing board diversity disclosures, the Commission received over 130 comment letters related to its proposal, including from corporations, pension funds, professional associations, trade unions, accounting firms, law firms, consultants, academics, individual investors and other interested parties.  See Proxy Disclosure Enhancements, 74 Fed. Reg. at 68,335; see also David A. Katz and Laura McIntosh, *Raising the Stakes for Board Diversity*, Law.com (July 22, 2020), available at: https://www.law.com/newyorklawjournal/2020/07/22/raising-the-stakes-for-board-diversity/?slreturn=20201017021522; Office of the Illinois State Treasurer, *The Investment Case For Board Diversity: A Review of the Academic and Practitioner Research on the Value of Gender and Racial/Ethnic Board Diversity for Investors* 7 (Oct. 2020), available at: https://illinoistreasurergovprod.blob.core.usgovcloudapi.net/twocms/media/doc/il%20treasurer%20white%20paper%20-%20the%20investment%20case%20for%20board%20diversity%20(oct%202020).pdf.

[117]   See Comments on Proposed Rule: Proxy Disclosure and Solicitation Enhancements, available at:  https://www.sec.gov/comments/s7-13-09/s71309.shtml.  See also CGLytics, *Diversity on the Board? Metrics Used by Fortune 100 Companies* (June 29, 2020), available at:  https://www.cglytics.com/diversity-on-the-board-metrics-of-fortune-100-companies/; Office of the Illinois State Treasurer, supra note 116.

[118]   For example, California requires companies headquartered in the state to have at least one director who self-identifies as a Female and one director from an Underrepresented Community.  See Cal. S.B. 826 (Sept. 30, 2018); Cal. A.B. 979 (Sept. 30, 2020). Washington requires companies headquartered in the state to have at least 25% women on the board by 2022 or provide certain disclosures.  See Wash. Subst. S.B. 6037 (June 11, 2020).  At least eleven states have proposed diversity-related requirements.  See Hatcher and Latham, supra note 15.

diversity when selecting a director for a position on the board.[119]  The Commission

received more than 130 comment letters on its proposal.  According to a University of

Dayton Law Review analysis of those comment letters, most were submitted by groups

with a specific interest in diversity, or by institutional investors, including mutual funds,

pension funds, and socially responsible investment funds.[120]  Further, the analysis showed

that 56 commenters addressed the issue of diversity disclosures, and only five of those 56

commenters did not favor such disclosure.[121]  Twenty-seven of the 56 mentioned gender

diversity, 18 mentioned racial diversity, and 13 mentioned ethnic diversity.  However,

neither the proposed rule nor the final rule defined diversity.[122]

Ten years after adopting board diversity disclosure rules, the Commission staff

revisited the rules by establishing new Compliance and Disclosure Interpretations

("C&DI").[123]  However, the staff did not provide a definition of diversity, and therefore

issuers currently are not required to disclose the race, ethnicity or gender of their

directors or nominees.

Currently, Item 401(e)(1) of Regulation S-K requires a company to "briefly

discuss the specific experience, qualifications, attributes or skills that led to the

---

[119]     See Proxy Disclosure and Solicitation Enhancements, 74 Fed. Reg. 35,076, 35,084 (July 17, 2009) (proposed rule).

[120]     See Thomas Lee Hazen and Lissa Lamkin Broome, *Board Diversity and Proxy Disclosure*, 37:1 Univ. Dayton L. Review 41, 51, n. 82 (citing the comment letters).

[121]     Of the five comments that opposed diversity disclosure, three stated that diversity was an important value.  See Comments on Proposed Rule, supra note 117; see also Hazen and Broome, supra note 120, at 54 n.88 (citing the 56 comment letters).

[122]     See Hazen and Broome, supra note 120, at 53 n. 84-86.

[123]     See Securities and Exchange Commission Compliance & Disclosure Interpretations, available at: https://www.sec.gov/divisions/corpfin/cfguidance.shtml.

conclusion that the person should serve as a director."[124]  The C&DI, in response to

Question 116.11, clarifies that if a board considered a director's self-identified diversity

characteristics (*e.g.*, race, gender, ethnicity, religion, nationality, disability, sexual

orientation, or cultural background) during the nomination process, and the individual

consents to disclose those diverse characteristics, the Commission staff "would expect

that the company's discussion required by Item 401 would include, but not necessarily be

limited to, identifying those characteristics and how they were considered."[125]

        Rather than providing a specific definition of diversity, the C&DI provides a non-

exhaustive list of examples of diverse characteristics that a company could consider for

purposes of Item 401(e)(1), including "race, gender, ethnicity, religion, nationality,

disability, sexual orientation, or cultural background."[126]  Additionally, the Commission

staff stated that any description of a company's diversity policy would be expected to

include "a discussion of how the company considers the self-identified diversity

attributes of nominees as well as any other qualifications its diversity policy takes into

account, such as diverse work experiences, military service, or socio-economic or

demographic characteristics."[127]

        Item 407(c)(2)(vi) of Regulation S-K requires proxy disclosure regarding whether

diversity is considered when identifying director nominees and, if so, how.  In addition, if

the board or nominations committee has adopted a diversity policy, the company must

---

[124]    See 17 C.F.R. § 229.401(e)(1).

[125]    See Securities and Exchange Commission, Regulation S-K Compliance & Disclosure
         Interpretations (Sept. 21, 2020), Question 116.11 Answer, available at:
         https://www.sec.gov/divisions/corpfin/guidance/regs-kinterp.htm.

[126]    Id.

[127]    Id.

describe how the policy is implemented and its effectiveness is assessed.[128]  When

adopting Item 407(c)(2)(vi), the Commission explained:

> We recognize that companies may define diversity in various ways, reflecting
> different perspectives.  For instance, some companies may conceptualize diversity
> expansively to include differences of viewpoint, professional experience,
> education, skill and other individual qualities and attributes that contribute to
> board heterogeneity, while others may focus on diversity concepts such as race,
> gender and national origin.  We believe that for purposes of this disclosure
> requirement, companies should be allowed to define diversity in ways that they
> consider appropriate.  As a result, we have not defined diversity in the
> amendments.[129]

Moreover, Item 407(c)(2)(vi) does not require companies to adopt a formal policy

and does not require them to explain why they have not.  It also does not require public

disclosure of board-level diversity statistics.

### B.  *Weaknesses of Current Diversity Disclosure Requirements*

Given the broad latitude afforded to companies by the Commission's rules related

to board diversity and proxy disclosure, current reporting of board-level diversity

statistics is unreliable and unusable to investors.  This is due to myriad data collection

challenges, including the scarcity of reported information, the lack of uniformity in the

information that is disclosed and inconsistencies in the definitions of diversity

characteristics across companies.[130]  Nasdaq recently began examining the state of board

diversity among its listed companies.  While conducting that research, Nasdaq

encountered multiple key challenges, such as:  (1) inconsistent disclosure and definitions

of diversity across companies; (2) limited data on diverse characteristics outside of

gender; (3) inconsistent or no disclosure of a director's race, ethnicity, or other diversity

---

[128]   See 17 C.F.R. § 229.407(c)(2)(vi).

[129]   See Proxy Disclosure Enhancements, 74 Fed. Reg. at 68,344.

[130]   See Petition for Rulemaking (July 6, 2017), available at:
https://www.sec.gov/rules/petitions/2017/petn4-711.pdf.

attributes (*e.g.*, nationality); (4) difficult-to-extract data because statistics are often embedded in graphics; and (5) aggregation of information, making it difficult to separate gender from other categories of diversity.  Investors and data analysts have raised similar criticisms.

As the Illinois Treasurer observed, the paucity of data on race and ethnicity creates barriers to investment analysis, due diligence, and academic study.[131]  For example, the scarcity of such data is an impediment to academics who want to study the performance impact of racially diverse boards.[132]  Nasdaq is concerned that investors also face the many data collection challenges Nasdaq encountered, rendering current diversity disclosures unreliable, unusable, and insufficient to inform investment and voting decisions.  Acting Chair Allison Herren Lee expressed similar concerns, stating that the current SEC disclosure requirements have "led to spotty information that is not standardized, not consistent period to period, not comparable across companies, and not necessarily reliable. . . .  And the current state of disclosure reveals the shortcomings of a principles-based materiality regime in this area."[133]

Some stakeholders believe there is a correlation between companies that disclose the gender, racial and ethnic composition of their board, and the number of diverse directors on those companies' boards.[134]  Currently, the lack of reliable and consistent

---

[131]    See Press Release, *Illinois State Treasurer Frerichs Calls on Russell 3000 Companies to Disclose Diversity Data* (Oct. 28, 2020), available at https://illinoistreasurergovprod.blob.core.usgovcloudapi.net/twocms/media/doc/october2020_russell3000.pdf.

[132]    See Office of Illinois State Treasurer, supra note 116, at 3-4.

[133]    See Lee, supra note 27.

[134]    See Proxy Disclosure Enhancements, 74 Fed. Reg. at 68,355 ("Although the[se] amendments are not intended to steer behavior, diversity policy disclosure may also induce beneficial changes in board composition.  A board may determine, in connection

data makes it difficult to measure diversity in the boardroom, and a common set of

standards for diversity definitions and disclosure format is greatly needed.  At present,

U.S. companies must navigate a complex patchwork of federal and state regulations and

disclosure requirements.  The limited disclosure currently provided voluntarily, which is

primarily focused on gender (due in part to that data being the most readily available),

fails to provide the full scope of a board's diverse characteristics.[135]  It is difficult to

improve what one cannot accurately measure.  This lack of transparency is impacting

investors who are increasingly basing public advocacy, proxy voting and direct

shareholder-company engagement decisions on board diversity considerations.[136]

### C. *Widespread Support for Updating Diversity Disclosure Requirements*

Nasdaq's surveys of investors and reviews of their disclosed policies and actions

show that board diversity is a priority when assessing companies, and investors report, in

some cases, relying on intuition when there is a lack of empirical, evidenced-based data.

Furthermore, the continued growth of ESG investing raises the importance of quality

data, given the data-driven nature of investment products such as diversity-specific

indices and broader ESG funds.

Shareholders have a unique platform from which to engage and influence a

company's position on important topics like diversity.  Similarly, Nasdaq, like other self-

---

with preparing its disclosure, that it is beneficial to disclose and follow a policy of seeking diversity."); see also Office of Illinois State Treasurer, supra note 116, at 3.

[135] See, e.g., CGLytics, supra note 117, at https://www.cglytics.com/diversity-on-the-board-metrics-of-fortune-100-companies/; Petition for Amendment of Proxy Rule, supra note 86; Office of Illinois State Treasurer, supra note 116.

[136] See Office of the Illinois State Treasurer, *Russell 3000 Board Diversity Disclosure Initiative*, https://www.illinoistreasurer.gov/Financial_Institutions/Equity,_Diversity__Inclusion/Russell_3000_Board_Diversity_Disclosure_Initiative (last accessed Nov. 25, 2020).

regulatory organizations, is well positioned to establish practices that will assist in carrying out Nasdaq's mandate to protect investors and remove impediments from the market. Various stakeholders, including Nasdaq, believe that clear and concise annual disclosure of board diversity information that disaggregates the data by race, ethnicity, gender identity, and sexual orientation will provide the public, including key stakeholders, with a better sense of a company's approach to improving corporate diversity and the support needed to effectuate any changes. Required disclosures also would eliminate the number of shareholder proposals asking for these key metrics and the need for companies to respond to multiple investor requests for information.[137] Moreover, companies manage issues more closely and demonstrate greater progress when data is available.[138]

In 2015, nine large public pension funds that collectively supervised $1.12 trillion in assets at the time petitioned the Commission to require registrants to disclose information related to, among other things, the gender, racial, and ethnic diversity of the registrant's board nominees.[139] In 2017, Human Capital Management Coalition, which described itself as a group of institutional investors with $2.8 trillion in assets at the time, made a similar petition to the Commission.[140] Additionally, Vanguard announced in 2020 it would begin asking companies about the race and ethnicity of directors.[141] More recently, in January 2021, Blackrock published its annual proxy voting guidelines

---

[137]    See Petition for Rulemaking, supra note 130, at 2.

[138]    See, e.g., Gwen Le Berre, Parametric, *Investors Need Data to Make Diversity a Reality* (Aug. 24, 2020), https://www.parametricportfolio.com/blog/investors-need-data-to-make-diversity-a-reality.

[139]    See Petition for Amendment of Proxy Rule, supra note 86.

[140]    See Petition for Rulemaking, supra note 130.

[141]    See Vanguard 2020 Annual Report supra note 13.

encouraging boards to disclose demographics related to board diversity, including, but not limited to, gender, ethnicity, race, age, and geographic location.[142]  In October 2020, the Illinois Treasurer spearheaded an initiative along with twenty other investor organizations, asking for all companies in the Russell 3000 Index to disclose the composition of their board, including each board member's gender, race, and ethnicity.[143] And in August 2020, State Street Global Advisors reiterated their call for U.S. companies in State Street's portfolio to disclose board-level diversity characteristics, including the racial and ethnic makeup of directors.[144]

The largest proxy advisory firms have aligned their voting policies to encourage increased board diversity disclosure.  Institutional Shareholder Services ("ISS") recently adopted a new voting policy under which it will identify boards of companies in the Russell 3000 or S&P 1500 that "lack racial and ethnic diversity (or lack disclosure of such)" in 2021 and, beginning in 2022, will recommend voting against the chair of the nominating committee of such companies.  The stated goal of the policy is "helping investors identify companies with which they may wish to engage and to foster dialogue between investors and companies on this topic."[145]  In 2017, proxy advisory firm Glass Lewis announced a policy regarding board gender diversity that took effect in 2019.

---

[142]    See Blackrock Investor Stewardship Proxy Voting Guidelines for U.S. Securities, available at https://www.blackrock.com/corporate/literature/fact-sheet/blk-responsible-investment-guidelines-us.pdf.

[143]    See Press Release, supra note 131.

[144]    See Richard, F. Lacaille, State Street Global Advisors, Diversity Strategy, Goals & Disclosure: Our Expectation for Public Companies, dated August 27, 2020, available at https://www.ssga.com/us/en/institutional/etfs/insights/diversity-strategy-goals-disclosure-our-expectations-for-public-companies.

[145]    See ISS Governance, ISS Announces 2021 Benchmark Policy Updates (November 12, 2020), available at:  https://www.issgovernance.com/iss-announces-2021-benchmark-policy-updates/.

Glass Lewis generally recommends voting against the nominating committee chair of a board that has no female members, and when making such a recommendation, the firm closely examines the company's disclosure of its board diversity considerations and other relevant contextual factors.[146]  On November 24, 2020, Glass Lewis announced the publication of its 2021 Proxy Voting Policy Guidelines, which expand its board gender diversity policy to vote against nominating chairs if there are fewer than two female directors, beginning in 2022.[147]  Most notably, beginning with the 2021 proxy season, the company will include an assessment report of company proxy disclosures relating to board diversity, skills and the director nomination process for companies in the S&P 500 index.  According to Glass Lewis, it "will reflect how a company's proxy statement presents: (i) the board's current percentage of racial/ethnic diversity; (ii) whether the board's definition of diversity explicitly includes gender and/or race/ethnicity; (iii) whether the board has adopted a policy requiring women and minorities to be included in the initial pool of candidates when selecting new director nominees (aka 'Rooney Rule'); and (iv) board skills disclosure."[148]

Congress and members of the Commission also have weighed in on the importance of improving board transparency.  In 2017, Representative Carolyn Maloney introduced the "Gender Diversity in Corporate Leadership Act of 2017," which proposed

---

[146]  See Glass Lewis, *2019 Policy Guideline Updates* (Oct. 24, 2018), available at: https://www.glasslewis.com/2019-policy-guideline-updates-united-states-canada-shareholder-initiatives-israel/.

[147]  See Glass Lewis, *2021 Proxy Paper Guidelines: An Overview of the Glass Lewis Approach to Proxy Advice - United States* (2020), available at: https://www.glasslewis.com/wp-content/uploads/2020/11/US-Voting-Guidelines-GL.pdf?hsCtaTracking=7c712e31-24fb-4a3a-b396-9e8568fa0685%7C86255695-f1f4-47cb-8dc0-e919a9a5cf5b.

[148]  Id.

requiring public companies to provide proxy disclosure regarding the gender diversity of the board of directors and nominees.[149]  In November 2019, the U.S. House of Representatives, with bipartisan support, passed the "Corporate Governance Through Diversity Act of 2019," which requires certain registrants annually to disclose the racial, ethnic, and gender composition of their boards and executive officers, as well as the veteran status of any of those directors and officers, in their proxy statements.[150]  The bill also requires the disclosure of any policy, plan or strategy to promote racial, ethnic, and gender diversity among these groups.  Legislators have proposed a companion bill in the U.S. Senate.[151]

The Council of Institutional Investors ("CII"), U.S. Chamber of Commerce,[152] National Urban League, Office of New York State Comptroller, and the National Association for the Advancement of Colored People praised the House of Representatives' for passing the 2019 legislation.  According to the U.S. Chamber of Commerce's members and associations, it has become increasingly important to see improvements in board diversity.[153]  Additionally, CII's General Counsel stated that the

---

[149]    Gender Diversity in Corporate Leadership Act of 2017, H.R. 1611, 115th Cong. (2017).

[150]    Improving Corporate Governance Through Diversity Act of 2019, H.R. 5084, 116th Cong. (2019).

[151]    Improving Corporate Governance Through Diversity Act of 2019, S. 360, 116th Cong. (2019).

[152]    See Letter from Various U.S. Chamber of Commerce Associations and Members to Chairman Mike Crapo and Ranking Member Sherrod Brown, U.S. House Committee on Banking, Housing, and Urban Affairs (July 27, 2020), available at: https://www.uschamber.com/sites/default/files/200727_coalition_h.r._5084_senatesmallbusiness.pdf.

[153]    Id.

proxy statement disclosure requirement in the legislation "could contribute to enhancing U.S. public company board consideration of diversity."[154]

More recently, SEC Commissioners have called for greater transparency surrounding ethnic diversity on company boards.  In a September 2020 speech titled "Diversity Matters, Disclosure Works, and the SEC Can Do More" given at the CII Fall Conference, Acting Chair Lee advocated advancing corporate diversity and for various approaches by which the Commission could promote diversity, including among other things, strengthening the Commission staff's C&DI's guidance related to disclosure of board candidate diversity characteristics.[155]  Acting Chair Lee stated:

> [The SEC has] largely declined to require diversity-related disclosure.  In 2009, we adopted a requirement for companies to disclose if and how diversity is considered as a factor in the process for considering candidates for board positions, including any policies related to the consideration of diversity.  In 2018, we issued guidance encouraging the disclosure of self-identified characteristics of board candidates. While I appreciate these measures, given that women of color hold just 4.6% of Fortune 500 board seats and less than one percent of Fortune 500 CEOs are Black, it's time to consider how to get investors the diversity information they need to allocate their capital wisely.[156]

## VII.  Nasdaq's Proposal

### A. *Overview of Disclosure* Requirements

Disclosure of information material to an investor's voting and investment decision is the bedrock of federal securities laws.  The Exchange's listing rules require companies to comply with federal securities laws, including the registration requirements under the Securities Act of 1933.  Once listed, companies are obligated to solicit proxies and file all

---

[154]    See Joe Mont, *SEC, Congress seek better diversity disclosures*, Compliance Week (Feb. 20, 2019), https://www.complianceweek.com/sec-congress-seek-better-diversity-disclosures/24802.article.

[155]    See Lee, supra note 27.

[156]    Id.  Commissioner Crenshaw also expressed disappointment with the Commission's silence on diversity.  See Crenshaw, supra note 8.

annual and periodic reports with the Commission under the Act at the prescribed times.[157]

In discharging its obligation to protect investors, Nasdaq monitors listed companies for

compliance with those disclosure obligations, and the failure to do so results in a notice

of deficiency or delisting.

Proposing listing rules designed to enhance transparency is well within the

Exchange's delegated regulatory authority, provided they do not conflict with existing

federal securities laws.  For example, Nasdaq already requires listed companies to

publicly disclose compensation or other payments by third parties to a company's

directors or nominees, notwithstanding that such disclosure is not required by federal

securities laws.  In approving that proposed rule, the Commission noted:

> To the extent there are certain factual scenarios that would require disclosure not
> otherwise required under Commission rules, we believe that it is within the
> purview of a national securities exchange to impose heightened governance
> requirements, consistent with the Act, that are designed to improve transparency
> and accountability into corporate decision making and promote investor
> confidence in the integrity of the securities markets.[158]

Nasdaq is concerned that while investors have increasingly emphasized that they

consider board diversity information to be material, the current lack of transparency and

consistency makes it difficult for Nasdaq and investors to determine the state of diversity

among listed companies as well as each board's philosophy regarding diversity.

Investors also have voiced dissatisfaction about having to independently collect board-

level data about race, ethnicity, and gender identity because such investigations can be

time consuming, expensive, and fraught with inaccuracies.[159]  Moreover, in some

---

[157]    See Nasdaq Rulebook, Rules 5250(c) and (d).

[158]    See Order Granting Accelerated Approval of a Proposed Rule Change, 81 Fed. Reg.
44,400, 44,403 (July 7, 2016).

[159]    See Petition for Amendment of Proxy Rule, supra note 86, at 2.

instances, based on Nasdaq's own investigation, such information is either unavailable, or, if available, not comparable across companies. To the extent investors must obtain this information on their own through an imperfect process, Nasdaq is concerned that it increases information asymmetries between larger stakeholders, who are able to collect this data directly from companies, and smaller investors, who must rely on incomplete public disclosures. For all investors who take on the burden of independently obtaining the current information, there is a cost and time burden related to the data collection.

Nasdaq believes that additional disclosure regarding a board's composition and philosophy related to board diversity will improve transparency and accountability into corporate decision making. Nasdaq proposes to improve transparency regarding board diversity by requiring all listed companies to publicly disclose unbundled, consistent data utilizing a uniform, transparent framework on their website or in their proxy statement or information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F) under proposed Rule 5606. Similarly, Nasdaq proposes to promote accountability in corporate decision-making by requiring companies that do not meet the applicable diversity objectives of proposed Rule 5605(f)(2) to provide investors with an alternative public disclosure of the board's reasons for not doing so under proposed Rule 5605(f)(3). The proposal is a disclosure-based framework, not a mandate. Nasdaq designed the proposal to avoid a conflict with existing disclosure requirements under Regulation S-K and to mitigate additional burdens for companies by providing them with flexibility to provide such disclosure in advance of the company's next annual meeting of shareholders on their website, in their proxy statement or information statement, or, if the Company

does not file a proxy, in its Form 10-K or 20-F, and not requiring them to adopt a formal diversity policy.

Nasdaq proposes to foster consistency in board diversity data disclosure by defining "Diverse" under proposed Rule 5605(f)(1) as "an individual who self-identifies in one or more of the following categories:  Female, Underrepresented Minority, or LGBTQ+," and by adopting the following definitions under proposed Rule 5605(f)(1):

- "Female" means an individual who self-identifies her gender as a woman, without regard to the individual's designated sex at birth.

- "LGBTQ+" means an individual who self-identifies as any of the following: lesbian, gay, bisexual, transgender, or as a member of the queer community.

- "Underrepresented Minority" means an individual who self-identifies as one or more of the following:  Black or African American, Hispanic or Latinx, Asian, Native American or Alaska Native, Native Hawaiian or Pacific Islander, or Two or More Races or Ethnicities.

The terms in the proposed definition of "Underrepresented Minority" reflect the EEOC's categories and are construed in accordance with the EEOC's definitions, which are set forth in Exhibit 3 - Board Diversity Matrix and Instructions.[160]  The terms in the proposed definition of LGBTQ+ are similar to the identities defined in California's A.B.

---

[160]     While the EEO-1 report refers to "Hispanic or Latino" rather than Latinx, Nasdaq proposes to use the term Latinx to apply broadly to all gendered and gender-neutral forms that may be used by individuals of Latin American heritage, including individuals who self-identify as Latino/a/e.

979, described below, but have been expanded to include the queer community based on

Nasdaq's consultation with stakeholders, including human rights organizations.[161]

When defining "Diverse," Nasdaq considered various state and federal legislation,

stakeholder sentiments, and academic and empirical studies.  For example, California

requires public companies headquartered in the state to have at least one individual who

self-identifies as a female on the board by 2019 under S.B. 826[162] and at least one

director who is a member of an "underrepresented community" by 2021 under A.B.

979.[163]  S.B. 826 defines "Female" as "an individual who self-identifies her gender as a

woman, without regard to the individual's designated sex at birth," consistent with

legislation proposed by New Jersey, Michigan and Hawaii related to board gender

diversity.[164]  A.B. 979 considers directors from underrepresented communities to be

individuals who self-identify as Black, African American, Hispanic, Latino, Asian,

Pacific Islander, Native American, Native Hawaiian or Alaska Native, or as gay, lesbian,

bisexual or transgender.  Since S.B. 826 was passed, 669 women have joined public

company boards in the state and the number of public companies with all male boards has

declined from 30% in 2018 to 3% in 2020.[165]

---

[161]     Nasdaq agrees with the United Kingdom Financial Reporting Council that the acronym
          LGBTQ+ "does not attempt to exclude other groups, nor does it imply that the
          experiences of people under its umbrella are the same."  See Hay et al., supra note 104, at
          14.

[162]     See Cal. S.B. 826, supra note 118.

[163]     See Cal. A.B. 979, supra note 118.

[164]     See Cal. S.B. 826, supra note 118. See also N.J. Senate No. 3469, § 3(b)(2) (2019); Mich.
          S.B. 115, § 505a(2)(b) (2019); Haw. H.B. 2720, § 414-1(b)(2) (2020).

[165]     See California Partners Project, *Claim Your Seat: A Progress Report on Women's
          Representation on California Corporate Boards* 4 (2020), available at:
          https://www.calpartnersproject.org/claimyourseat.

The state of Washington requires public companies whose boards are not comprised of at least 25% directors who self-identify as women by January 1, 2022 to provide public disclosures related to the board's consideration of "diverse groups" during the director nomination process. The state considers "diverse groups" to include "women, racial minorities, and historically underrepresented groups."[166]

As discussed above, Congress has proposed legislation relating to disclosure of racial, ethnic, gender and veteran status among the company's directors. Section 342 of the Dodd-Frank Act defines "minority" as "Black American, Native American, Hispanic American, and Asian American,"[167] and the Diversity Assessment Report for Entities Regulated by the SEC requires the Exchange to report workforce composition data to the SEC based on the EEOC's categories.[168] Most companies are required by law to provide similar workforce data to the EEOC through the EEO-1 Report, which requires employers to report statistical data related to race, ethnicity and gender to the EEOC.[169]

Nasdaq has designed the proposed rule to require all companies to provide consistent, comparable data under proposed Rule 5606 by utilizing the existing EEO-1 reporting categories that companies are already familiar with, and by requiring companies to have, or publicly explain why they do not have, at least two directors who are diverse in terms of race, ethnicity, sexual orientation, or gender identity under proposed Rule

---

[166]    See Wash. Subst. S.B. 6037, supra note 118. At least 11 states have proposed diversity-related requirements. See Hatcher and Latham, supra note 15.

[167]    See 12 U.S.C. § 5452(g)(3) and Pub. L. 101-73 § 1204(c)(3).

[168]    See Securities and Exchange Commission, Diversity Assessment Report for Entities Regulated by the SEC, available at: https://www.sec.gov/files/OMWI-DAR-FORM.pdf.

[169]    All companies with 100 or more employees are required to complete the EEO-1 Report. See U.S. Equal Employment Opportunity Commission, EEO-1: Who Must File, https://www.eeoc.gov/employers/eeo-1-survey/eeo-1-who-must-file (last accessed Nov. 27, 2020).

5605(f)(2). While the EEO-1 report does not currently include sexual orientation or gender identity, Nasdaq believes it is reasonable and in the public interest to include a reporting category for LGBTQ+ status in recognition of the U.S. Supreme Court's recent decision in *Bostock v. Clayton County* that sexual orientation and gender identity are "inextricably" intertwined with sex.[170]

The proposal does not preclude companies from considering additional diverse attributes, such as nationality, disability, or veteran status in selecting board members. Nor would the proposal prevent companies from disclosing information related to other diverse attributes of board members beyond those highlighted in the rule if they felt such disclosure would benefit investors. However, the company would have to provide the disclosure under proposed Rule 5605(f)(3) if the company does not also meet the diversity objectives of proposed Rule 5605(f)(2). Nasdaq believes such disclosure would provide investors with additional information about the company's philosophy regarding broader diversity characteristics.

Overall, Nasdaq believes the proposal will enhance investor confidence that board discussions at listed companies that meet the applicable diversity objectives of proposed Rule 5605(f)(2) include the perspectives of more than one demographic group. They will also be confident that boardrooms that do not meet the applicable diversity objectives are having a thoughtful discussion about their reasons for not doing so and publicly explaining those reasons. On balance, the proposal will advance the public interest and

---

[170]   See Bostock v. Clayton Cty., 140 S. Ct. 1731, 1742 (2020) ("But unlike any of these other traits or actions, homosexuality and transgender status are inextricably bound up with sex. Not because homosexuality or transgender status are related to sex in some vague sense or because discrimination on these bases has some disparate impact on one sex or another, but because to discriminate on these grounds requires an employer to intentionally treat individual employees differently because of their sex.").

enhance investor confidence in the integrity of the securities markets by ensuring investors that Nasdaq is monitoring all listed companies to verify that they have the applicable number of Diverse directors under proposed Rule 5605(f) or explain why they do not, and by requiring all listed companies to provide consistent, comparable diversity disclosures.

### B. *Board Statistical Disclosure*

Proposed Rule 5606(a) would require each company to publicly disclose, to the extent permitted by applicable law, information on the directors' voluntary self-identified gender and racial characteristics and LGBTQ+ status.

All Nasdaq-listed companies that are subject to proposed Rule 5605(f), whether they choose to have the applicable number of Diverse directors under proposed Rule 5605(f)(2) or to explain why they do not, would be required to make the proposed Rule 5606 disclosure. This proposed rule will assist the Exchange in assessing whether companies meet the diversity objectives of proposed Rule 5605(f)(2). Under proposed Rule 5606(e), Nasdaq proposes to make proposed Rule 5606 operative for listed companies by the later of (1) one calendar year from the Approval Date ("Effective Date"); or (2) the date the company files its proxy statement or its information statement for its annual meeting of shareholders (or, if the company does not file a proxy or information statement, the date it files its Form 10-K or 20-F) during the calendar year of the Effective Date.[171]

---

[171]    Based on informal feedback requesting that the Exchange better align the compliance date for proposed Rule 5606 with its listed companies' annual shareholder meetings and proxy filings, Nasdaq is amending proposed Rule 5606(e). See Letter from Stephen J. Kastenberg, Ballard Spahr LLP, to Ms. Vanessa Countryman, dated January 14, 2021 ("Ballard Spahr Comment Letter"), available at: https://www.sec.gov/comments/sr-nasdaq-2020-081/srnasdaq2020081-8245975-227819.pdf.

Pursuant to proposed Rule 5606(a), each company would annually provide its board-level diversity data in a format substantially similar to the Matrix in proposed Rule 5606(a) and attached as <u>Exhibit 3</u>.  In accordance with the proposed accompanying instructions to the Matrix, companies are required to provide the Matrix information at least once per year.  If, within the same year, a company changes its board composition after it publishes its Matrix, the company may, but is not required to, publish its updated information.

In accordance with proposed Rule 5606(a), a company would provide the total number of directors on its board and include the date the information was collected as the "As of Date."  If a director voluntarily self-identifies, each company, other than a Foreign Issuer (as defined under proposed Rule 5605(f)(1)) or Foreign Private Issuer (as defined under Rule 3b-4(b) of the Act),[172] would include the following in a table titled "Board Diversity Matrix," in accordance with the instructions accompanying the proposed disclosure format:  (1) the number of directors based on gender identity (female, male, or non-binary[173]); (2) the number of directors based on race and ethnicity (African American or Black, Alaskan Native or Native American, Asian, Hispanic or Latinx, Native Hawaiian or Pacific Islander, White, or Two or More Races or Ethnicities[174]); and (3) the number of directors who self-identify as LGBTQ+.

---

[172]    <u>See</u> 17 C.F.R. § 240.3b-4.

[173]    Nasdaq received informal questions on the definition of "non-binary."  As a result, Nasdaq is amending the Matrix to define non-binary as genders that are not solely man or woman; someone who is non-binary may have more than one gender, no gender, or their gender may not be in relation to the gender binary.  Although non-binary is included as a category in the proposed Matrix, a company would not satisfy the diversity objectives proposed by Rule 5605(f)(2) if a director self-identifies solely as non-binary.

[174]    If a director self-identifies in the "Two or More Races or Ethnicities" category, the director must also self-identify in each individual category, as appropriate.

Any director who chooses not to disclose a gender would be included in the "Did Not Disclose Gender" category and any director who chooses not to identify as any race or not to identify as LGBTQ+ would be included in the "Did Not Disclose Demographic Background " category at the bottom of the table.  The defined terms for the race and ethnicity categories in the instructions to the Matrix disclosure format are substantially similar to the terms and definitions used in the EEO-1 Report.[175]  LGTBQ+ is defined similarly to proposed Rule 5605(f)(1) as a person who identifies as any of the following: lesbian, gay, bisexual, transgender, or as a member of the queer community.

In addition to providing the information included in the Matrix, the accompanying directions to the Matrix allows a company to supplement its disclosure including additional information related to its directors.[176]  For example, a company may choose to provide the information on a director-by-director basis or may choose to include any skills, experience, and attributes of each of its directors that are relevant to the company.

Below is an example of a Matrix that companies may use, which is also attached as Exhibit 3:[177]

| Board Diversity Matrix (As of [DATE]) |
| --- |

---

[175]    See supra note 169.  Additionally, the EEOC does not categorize LGBTQ+ or any other sexual orientation identifier on its EEO-1 Report.  The definitions of the EEO-1 race and ethnicity categories may be found in the appendix to the EEO-1 Report instructional booklet, available at https://www.eeoc.gov/employers/eeo-1-survey/eeo-1-instruction-booklet.

[176]    While Nasdaq is not proposing to amend the information required by the Matrix, based on commenter feedback, Nasdaq is amending the instructions to clarify that a company is not limited to only providing the information required by the Matrix.

[177]    Nasdaq is proposing two non-substantive amendments to the Matrix that was provided in the Initial Proposal.  First, Nasdaq has alphabetized the gender columns by listing "Female" before "Male."  Nasdaq has also replaced the term "American Indian" with "Native American" to conform with the terms used in the EEO-1 report and proposed Rule 5605(f)(1).

| Total Number of Directors | # | | | |
|---|---|---|---|---|
| | **Female** | **Male** | **Non-Binary** | **Did Not Disclose Gender** |
| **Part I: Gender Identity** | | | | |
| Directors | # | # | # | # |
| **Part II: Demographic Background** | | | | |
| African American or Black | # | # | # | # |
| Alaskan Native or Native American | # | # | # | # |
| Asian | # | # | # | # |
| Hispanic or Latinx | # | # | # | # |
| Native Hawaiian or Pacific Islander | # | # | # | # |
| White | # | # | # | # |
| Two or More Races or Ethnicities | # | # | # | # |
| LGBTQ+ | # | | | |
| Did Not Disclose Demographic Background | # | | | |

Nasdaq recognizes that some Foreign Issuers, including Foreign Private Issuers as defined by the Act,[178] may have their principal executive offices located outside of the United States and in jurisdictions that may impose laws limiting or prohibiting self-identification questionnaires, particularly as they relate to race, ethnicity, or LGBTQ+ status.  In such countries, a Foreign Issuer may be precluded by law from requesting diversity data from its directors.  Moreover, Nasdaq's definition of Underrepresented Minority proposed in proposed Rule 5606(f)(1) may be inapplicable to a Foreign Issuer, making this Matrix data less relevant for such companies and not useful for investors.

As a result of these limitations, Nasdaq is proposing the option of a separate Matrix for Foreign Issuers and Foreign Private Issuers, as defined by Rule 3b-4(b) of the

---

[178]    See 17 C.F.R. § 240.3b-4.

Act.[179]  Similar to other companies, a Foreign Issuer would provide the total number of

directors on its board.  If a director voluntarily self-identifies, the company would include

the following in a table titled "Board Diversity Matrix":  (1) the country of its principal

executive offices; (2) whether or not the company is a Foreign Private Issuer; (3) whether

or not the disclosure is prohibited under the company's home country law; (4) the total

number of directors; (5) the number of directors based on gender identity (female, male

or non-binary[180]); (6) the number of directors who are considered underrepresented in the

country of the principal executive office; and (7) the number of directors who self-

identify as LGBTQ+.  If a director chooses not to self-identify, the company would select

"Did Not Disclose Gender" and/or "Did Not Disclose Demographic Background," as

applicable.  "Underrepresented Individual in Home Country Jurisdiction" is defined in

the instructions to the Matrix as a person who self-identifies as an underrepresented

individual based on national, racial, ethnic, indigenous, cultural, religious or linguistic

identity in the country of the Foreign Private Issuer or Foreign Issuer's principal

executive offices (as reported on the Foreign Issuer's Forms F-1, 10-K, 20-F or 40-F).[181]

Rule 5605(f)(2)(B)(i) also proposes the same definition for Diverse directors of Foreign

Issuers.  As described below in Section II.D.i of the Statutory Basis section, this

definition is based on the United Nations *Declaration on the Rights of Persons Belonging*

---

[179]    Id.  Nasdaq has made a non-substantive amendment to the title of the Matrix for Foreign Issuers to further clarify that it is applicable to Foreign Issuers with a principal executive office outside of the United States.

[180]    Although non-binary is included as a category in the proposed Matrix, a company would not satisfy any aspect of the diversity objective proposed by Rule 5605(f)(2) if a director self-identifies solely as non-binary.

[181]    In an effort to provide more clarification, Nasdaq is amending the definition of "Underrepresented Individual in Home Country Jurisdiction" in Exhibit 3 by removing "a Foreign Issuer's home country jurisdiction" and replacing it with "the Foreign Issuer's principal executive office."

*to National or Ethnic, Religious and Linguistic Minorities* and the United Nations

*Declaration on the Rights of Indigenous Peoples*.[182]

Nasdaq is also proposing new Rule 5606(b), under which each company would

provide the disclosure described in proposed Rule 5606(a) in advance of the company's

next annual meeting of shareholders: (1) in any proxy statement or any information

statement (or, if the company does not file a proxy, in its Form 10-K or 20-F); or (2) on

the company's website.  If the company provides such disclosure on its website, then the

company must submit such disclosure concurrently with the filing made pursuant to (1)

and submit a URL link to the disclosure through the Nasdaq Listing Center, within one

business day after such posting.[183]  The proposed time period to submit information in the

Matrix is aligned with the time period provided in proposed Rule 5605(f)(3) for a

company to submit its explanation for why it does not have the applicable number of

Diverse directors under proposed Rule 5605(f).  Disclosure of the statistical data is not in

lieu of any SEC requirements for a company to disclose any required information

pursuant to Regulation S-K or any other federal, state or foreign laws or regulations.  As

described in the instructions to the Matrix and proposed Rule 5606(a), each year

following the first year of the disclosure of the Matrix, all companies must include the

current year and immediately prior year diversity statistics in its disclosure.  If the

company publishes the Matrix on its website, the disclosure must remain accessible on

the company's website.  Additionally, the instructions require companies to publish the

Matrix information in a searchable format.  If a company uses a graphic or image format

---

[182]     See infra note 337.

[183]     Nasdaq is amending the proposed Rule 5606(b) to align the timing of this disclosure with
the timing of other governance-related disclosures.

(*i.e.,* tif, jpg, gif, png), the company must also include the same information as searchable text or in a searchable table.  The searchable information could be included, for example, together with the related graphic or in an appendix to the filing.[184]

Nasdaq is also proposing Rule 5606(c), which exempts the following types of companies from proposed Rule 5606(a): asset-backed issuers and other passive issuers (as set forth in Rule 5615(a)(1)); cooperatives (as set forth in Rule 5615(a)(2)); limited partnerships (as set forth in Rule 5615(a)(4)); management investment companies (as set forth in Rule 5615(a)(5)); issuers of non-voting preferred securities, debt securities and Derivative Securities (as set forth in Rule 5615(a)(6)) that do not have equity securities listed on Nasdaq; and issuers of securities listed under the Rule 5700 Series.  The exemption of these companies is consistent with the approach taken by Nasdaq in Rule 5615 as it relates to certain Nasdaq corporate governance standards for board composition.  Additionally, Nasdaq is proposing to exempt an acquisition company listed under IM-5101-2 from the requirements of proposed Rule 5606.  This approach is similar to other phase-in periods granted to SPACs.

Nasdaq is also proposing Rule 5606(d) to allow newly listed Nasdaq companies to satisfy the requirement of proposed Rule 5606 within one year of listing on Nasdaq. Newly-listed companies include those listing through an initial public offering, direct listing, transfer from the over-the-counter market or another exchange, in connection with a spin-off or carve-out from a company listed on Nasdaq or another exchange, or through a merger with an acquisition company listed under IM-5101-2.  A newly listed company would be required to provide the information proposed by proposed Rule 5606(a) in

---

[184]     Nasdaq's clarification on the manner in which companies must provide the Board Diversity Matrix information is a non-substantive amendment to the Initial Proposal.

advance of the company's next annual meeting of shareholders: (a) in any proxy

statement or any information statement (or, if the company does not file a proxy, in its

Form 10-K or 20-F); or (b) on the company's website.  If the company provides such

disclosure on its website, then the company must submit such disclosure concurrently

with the filing made pursuant to (a) and submit a URL link to the disclosure through the

Nasdaq Listing Center, within one business day after such posting.

    If a company does not timely provide the diversity disclosure, Nasdaq will notify

the company that it is not in compliance with a listing requirement and begin its existing,

standard process to allow the company to regain compliance.  Consistent with

deficiencies from most other rules that allow a company to submit a plan to regain

compliance,[185] Nasdaq proposes to amend Rule 5810(c)(2)(A)(iv) to provide companies

that fail to adhere to proposed Rule 5606 with 45 calendar days to submit a plan in

accordance with Rule 5810(c)(2) to regain compliance.  Based on that plan, Nasdaq can

provide the company with up to 180 days to regain compliance.  If the company does not

do so, it would be issued a Staff Delisting Determination, which the company could

appeal to a Hearings Panel pursuant to Rule 5815.

    Although proposed Rule 5606 is not identical to current Regulation S-K

disclosure requirements, it is similar to, and does not deviate from, the Commission

---

[185]    Pursuant to Nasdaq Rule 5810(c)(2)(A)(iii), a company is provided 45 days to submit a
plan to regain compliance with Rules 5620(a) (Meetings of Shareholders), 5620(c)
(Quorum), 5630 (Review of Related Party Transactions), 5635 (Shareholder Approval),
5250(c)(3) (Auditor Registration), 5255(a) (Direct Registration Program), 5610 (Code of
Conduct), 5615(a)(4)(D) (Partner Meetings of Limited Partnerships), 5615(a)(4)(E)
(Quorum of Limited Partnerships), 5615(a)(4)(G) (Related Party Transactions of Limited
Partnerships), and 5640 (Voting Rights).  Pursuant to Nasdaq Rule 5810(c)(2)(A)(iv), a
company is also provided 45 days to submit a plan to regain compliance with Rule
5250(b)(3) (Disclosure of Third Party Director and Nominee Compensation).  A
company is generally provided 60 days to submit a plan to regain compliance with the
requirement to timely file periodic reports contained in Rule 5250(c)(1).

staff's C&DI related to Items 401(e)(1) and 407(c)(2)(vi) of Regulation S-K. Moreover, the proposed rule provides clarity to the definition of diversity and streamlines investors' desire for clear, complete and consistent disclosures. Nasdaq believes that the format of the Matrix and the information that it will provide offers greater transparency into a company's board composition and will enable the data to be easily aggregated across issuers.[186] Nasdaq also believes that requiring annual disclosure of the data will ensure that the information remains current and easy for investors, data analysts and other parties to track.

### C. *Diverse Board Representation or Explanation*

Nasdaq is proposing to adopt new Rule 5605(f)(2) to require each listed company to have, or explain why it does not have, the applicable number of Diverse directors. Generally, the diversity objectives under proposed Rule 5605(f)(2)(A) would include having at least two members of its board of directors who are Diverse, including at least one who self-identifies as Female and one who self-identifies as an Underrepresented Minority or LGBTQ+.[187] The proposal is a disclosure-based framework, not a mandate. A company does not need to provide additional public disclosures if the company demonstrates under proposed Rule 5606 that it meets the applicable diversity objectives of proposed Rule 5605(f)(2). The terms in the proposed definition of "Underrepresented Minority" reflect the EEOC's categories and are construed in accordance with the EEOC's definitions. Nasdaq has provided additional flexibility for Smaller Reporting

---

[186]    Various stakeholders have requested easier aggregation. See Petition for Amendment of Proxy Rule, supra note 86, at 1.

[187]    Nasdaq has published an FAQ on the Listing Center clarifying that "two members of its board of directors who are Diverse" would exclude emeritus directors, retired directors and members of an advisory board.

Companies, Foreign Issuers (including Foreign Private Issuers), and each company with a board of directors of five or fewer members to meet alternative objectives.

Under proposed Rule 5605(f)(3), if a company chooses to satisfy proposed Rule 5605(f)(2) by explaining why it does not have the applicable number of Diverse directors under proposed Rule 5605(f)(2), the company must: (i) specify the requirements of proposed Rule 5605(f)(2) that are applicable (*e.g.*, the applicable subparagraph, the applicable diversity objectives, and the timeframe applicable to the company's market tier); and (ii) explain the reasons why it does not have two Diverse directors (or one Diverse director for companies with five or fewer directors).  Such disclosure must be provided: (a) in any proxy statement or any information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F); or (b) on the company's website.[188]  If the company provides such disclosure on its website, then the company must submit such disclosure concurrently with the filing made pursuant to (a) and submit a URL link to the disclosure through the Nasdaq Listing Center, within one business day after such posting.[189]

Nasdaq will not evaluate the substance or merits of the company's explanation, but would verify that the company has provided one at the time it files its proxy statement or information statement (or, if the company does not file a proxy, at the time it files its

---

[188]    Nasdaq is amending the proposed Rule 5605(f)(3) to align the timing of this disclosure with the timing of other governance-related disclosures, such as those provided in the proxy, to make it easier for investors to know where a company has provided the disclosure and to give shareholders have access to the information prior to the company's annual shareholder meetings.

[189]    Nasdaq's clarification on the timing in which a company must provide such disclosure on its website is an amendment to the Initial Proposal.

Form 10-K or 20-F).[190]  If the company does not meet the diversity objectives and has not

provided any explanation, or has provided an explanation that does not satisfy

subparagraphs (i) and (ii) of proposed Rule 5605(f)(3), then the explanation will not

satisfy proposed Rule 5605(f)(3).  For example, it would not satisfy proposed Rule

5605(f)(3) merely to state that "the Company does not comply with Nasdaq's diversity

rule."  As described above, the company must specify the requirements of proposed Rule

5605(f)(2) that are applicable, which is intended to provide transparency to investors who

are not familiar with Nasdaq's listing rules, and explain the reasons why it does not have

the applicable number of Diverse directors.  For example, a company could disclose the

following to satisfy subparagraph (i) of proposed Rule 5605(f)(3):  "As a Smaller

Reporting Company listed on the Nasdaq Capital Market tier, the Company is subject to

Nasdaq Rule 5605(f)(2)(C), which requires the company to have, or explain why it does

not have, at least two Diverse directors, including at least one director who self-identifies

as Female.  Under Rule 5605(f)(7), the Company may have at least one Diverse director

by March 10, 2023, and a second Diverse director by March 10, 2026, or explain its

reasons for not doing so.  The Company has chosen to satisfy Rule 5605(f)(2)(C) by

explaining its reasons for not meeting the diversity objectives of Rule 5605(f)(2)(C),

which the Company has set forth below."

   i.   Effective Dates and Phase-in Period

     Proposed Rule 5605(f)(7) provides a transition period before companies must

fully meet the diversity objectives or explain why they do not upon the initial

---

[190]   Nasdaq's clarification on the timing in which Nasdaq will verify that the company has
        provided an explanation under proposed Rule 5605(f)(3) is an amendment to the Initial
        Proposal.

implementation of the rule.  Under this transition rule, each NGS, NGM, and NCM listed company (including companies with smaller boards under proposed Rule 5606(f)(2)(D)) must have, or explain why it does not have, at least one Diverse director by the later of: (i) two calendar years after the Approval Date[191] (the "First Effective Date"); or (ii) the date the company files its proxy statement or its information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F) for the company's annual shareholders meeting during the calendar year of the First Effective Date.  Each company listed on the NGS or NGM tiers must have, or explain why it does not have, two Diverse directors by the later of:  (i) four calendar years after the Approval Date (the "Second NGS/NGM Effective Date"); or (ii) the date the company files its proxy statement or its information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F) for the company's annual shareholders meeting during the calendar year of the Second NGS/NGM Effective Date.  Each company listed on the NCM tier must have, or explain why it does not have, at least two Diverse directors by the later of:  (i) five calendar years after the Approval Date (the "Second NCM Effective Date") or (ii) the date the company files its proxy statement or its information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F) for the company's annual shareholders meeting during the calendar year of the Second NCM Effective Date.[192]

        For example, if the Approval Date is March 10, 2021, all companies (including companies with smaller boards under proposed Rule 5606(f)(2)(D)) would be required to

---

[191]    The "Approval Date" is the date that the SEC approves the proposed rule.

[192]    Nasdaq's proposal to permit companies to satisfy Rule 5605(f)(2) by the later of:  (i) each respective effective date described above; or (ii) the date the company files its proxy statement or its information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F) for the company's annual shareholders meeting during the calendar year of each respective effective date is an amendment to the Initial Proposal.

have, or explain why they do not have, one Diverse director by March 10, 2023 (the First

Effective Date).  Companies with boards of more than five members would be required to

have, or explain why they do not have, two Diverse directors by March 10, 2025 (the

Second NGS/NGM Effective Date applicable to NGS/NGM companies only) or March

10, 2026 (the Second NCM Effective Date applicable to NCM companies only).

However, if a company files its proxy statement or its information statement (or, if the

company does not file a proxy, in its Form 10-K or 20-F) for the company's annual

shareholders meeting after the anniversary of the Approval Date in the respective

calendar year noted above, it would not be required to satisfy proposed Rule 5605(f)(2)

until such filing date.  This is intended to better to align listed companies' disclosure

requirements with their annual meetings and proxy requirements.[193]

Under proposed Rule 5605(f)(5)(A), a newly listed company on the NGS or NGM

tiers that was not previously subject to a substantially similar requirement of another

national securities exchange will be permitted to satisfy the requirement of proposed Rule

5605(f)(2) to have, or explain why it does not have:  (i) at least one Diverse director by

the later of: (a) one year from the date of listing; or (b) the date the company files its

proxy statement or its information statement (or, if the company does not file a proxy, in

its Form 10-K or 20-F) for the company's first annual meeting of shareholders

subsequent to the company's listing; and (ii) at least two Diverse directors by the later of:

(a) two years from the date of listing; or (b) the date the company files its proxy

statement or its information statement (or, if the company does not file a proxy, in its

---

[193]    See Ballard Spahr Comment Letter, supra note 171.

Form 10-K or 20-F) for the company's second annual meeting of shareholders subsequent to the company's listing.

Under proposed Rule 5605(f)(5)(B), a newly listed company on the NCM tier that was not previously subject to a substantially similar requirement of another national securities exchange will be permitted to satisfy the requirement of proposed Rule 5605(f)(2) to have, or explain why it does not have, the applicable number of Diverse directors under proposed Rule 5605(f)(2) by the later of: (a) two years from the date of listing; or (b) the date the company files its proxy statement or its information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F) for the company's second annual meeting of shareholders subsequent to the company's listing.

Under proposed Rule 5605(f)(5)(D), any newly listed company on any market tier that has a board of five or fewer members and was not previously subject to a substantially similar requirement of another national securities exchange will be permitted to satisfy the requirement of proposed Rule 5605(f)(2) to have, or explain why it does not have at least one Diverse director by the later of: (a) two years from the date of listing; or (b) the date the company files its proxy statement or its information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F) for the company's second annual meeting of shareholders subsequent to the company's listing.

These "phase-in" periods apply to companies listing in connection with an initial public offering, a direct listing, a transfer from another exchange or the over-the-counter market, in connection with a spin-off or carve-out from a company listed on Nasdaq or another exchange, or through a business combination with a SPAC.

Under proposed Rule 5605(f)(7)(E), any company listing before the end of the phase-in periods described in proposed Rule 5605(f)(7) would have the remaining length of the phase-in periods to satisfy proposed Rule 5605(f)(2), or the two year period set forth in proposed Rule 5605(f)(5), whichever is longer.  As a result, companies listing on the NGS or NGM tiers after the expiration of the phase-in periods provided by proposed Rule 5605(f)(7) would be provided with at least one year from the date of listing to satisfy the applicable requirement of proposed Rule 5605(f)(2) to have, or explain why they do not have, at least one Diverse director, and one additional year to satisfy the requirement to have, or explain why they do not have, at least two Diverse directors. Companies listing on the NCM tier after the expiration of the phase-in periods provided by proposed Rule 5605(f)(7) would be provided with at least two years from the date of listing to satisfy the applicable requirement of proposed Rule 5605(f)(2) to have, or explain why they do not have, at least two Diverse directors.  This is intended to provide newly public companies with additional time to meet the diversity objectives of proposed Rule 5605(f)(2), recognizing that newly public companies may have unique governance structures, such as staggered boards or director seats held by venture capital firms, that require additional timing considerations when adjusting the composition of the board of directors.  It is also intended to provide additional flexibility to companies on the NCM tier in recognition that such companies are typically smaller and may face additional challenges and resource constraints when identifying additional director nominees who self-identify as Diverse.

For example, if the Approval Date is March 10, 2021, all companies (including companies with smaller boards) would be required to have, or explain why they do not

have, one Diverse director by March 10, 2023. Companies with boards of more than five members would be required to have, or explain why they do not have, at least two Diverse directors by March 10, 2025 (for NGS/NGM companies) or March 10, 2026 (for NCM companies) (or the date the company files its proxy statement or its information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F) for the company's annual shareholders meeting in each respective year, whichever is later). If a company lists on the NGS or NGM tier on January 1, 2023, it would be required to have, or explain why it does not have, at least one Diverse director by the later of January 1, 2024 and the date it files its proxy statement for its 2024 annual shareholders meeting (or, if the Company does not file a proxy, in its Form 10-K or 20-F), rather than March 10, 2023. Similarly, if a company lists on the NCM tier on September 1, 2025 and has a board of more than five members, it would be required to have at least two Diverse directors by the later of September 1, 2027 and the date of the filing of the proxy statement for its 2027 annual shareholders meeting (or, if the company does not file a proxy, in its Form 10-K or 20-F), rather than March 10, 2026.

Under proposed Rule 5605(f)(7)(F), a company listed on the NCM tier that transfers to the NGS or NGM tiers after the Approval Date, but prior to the expiration of the phase-in periods provided by proposed Rule 5605(f)(7), would be provided with the later of the periods set forth in proposed Rule 5605(f)(7)(C) or one year from the date of transfer. As a result, if a company transfers from NCM to NGS/NGM, they still have the benefit of the phase-in for NCM, or one year from the date of transfer, whichever is later. For example, if a U.S. company with a board of more than five members transfers from the NCM tier to the NGS tier on August 1, 2024, and already has at least one Diverse

director, it would be required to have, or explain why it does not have, at least two

Diverse directors by the later of August 1, 2025 and the date it files its proxy statement

for its 2025 annual shareholders meeting, rather than March 10, 2025.  However, if such

company does not have at least one Diverse director, it would be required to have, or

explain why it does not have, at least two Diverse directors by August 1, 2025 (or the

date it files its proxy statement for its annual shareholders meeting in each respective

year, whichever is later).

Nasdaq believes these proposed periods are consistent with the phase-in periods

for Nasdaq's other board composition requirements.  For example, Rule 5615(b)(1)

provides a company listing in connection with its initial public offering one year to fully

comply with the compensation and nomination committee requirements of Rules 5605(d)

and (e), and with the majority independent board requirement of proposed Rule 5605(b).

Similarly, SEC Rule 10A-3(b)(1)(iv)(A) allows a company up to one year from the date

its registration statement is effective to fully comply with the applicable audit committee

composition requirements.  Nasdaq Rule 5615(b)(3) provides a one-year timeframe for

compliance with the board composition requirements for companies transferring from

other listed markets that do not have a substantially similar requirement.  In addition,

Rule 5620 and IM-5620 requires each new listing to hold its first annual shareholders

within one-year after its first fiscal year-end following listing.  Therefore, Nasdaq

believes it is appropriate to provide each new listing additional time to satisfy proposed

Rule 5605(f)(2) if the date it files its proxy statement for the company's annual

shareholders meeting subsequent to the company's listing is later than the anniversary of

listing.

### ii.    Foreign Issuers

Nasdaq recognizes that the EEOC categories of race and ethnicity may not extend to all countries globally because each country has its own unique demographic composition.  However, Nasdaq observed that on average, women tend to be underrepresented in boardrooms across the globe, holding an estimated 16.9% of board seats in 2018.[194]  As an official supporter of the United Nations Sustainable Stock Exchanges Initiative, Nasdaq recognizes that ensuring women have equal opportunities for leadership in economic decision making is one of the United Nations Sustainable Development Goals to be accomplished by 2030.[195]  However, studies estimate that at current rates, it could take 18[196] to 34 years[197] for U.S. companies to achieve gender parity on their boards.

Accordingly, under proposed Rule 5605(f)(2)(B), each Foreign Issuer with a board of more than five members must have, or explain why it does not have, at least two Diverse directors on its board, including at least one Female.  Nasdaq proposes to provide Foreign Issuers with additional flexibility in that Foreign Issuers may satisfy the diversity objective by having two Female directors.  In addition, Foreign Issuers may also satisfy the diversity objective by having one Female director, and one individual who self-identifies as (i) LGBTQ+ or (ii) an underrepresented individual based on national, racial,

---

[194]    See Deloitte, *Women in the Boardroom*, supra note 92.

[195]    See United Nations Sustainable Stock Exchanges Initiative, *Gender Equality*, https://www.un.org/sustainabledevelopment/gender-equality/ (last accessed Nov. 24, 2020).

[196]    See McKinsey & Company, supra note 31, at 17.

[197]    See GAO Report, supra note 49, at 9 (estimating "it could take about 10 years from 2014 for women to comprise 30 percent of board directors and more than 40 years for the representation of women on boards to match that of men").

ethnic, indigenous, cultural, religious or linguistic identity in the country of the

company's principal executive offices (as reported on the company's Form F-1, 10-K,

20-F or 40-F).[198]   Alternatively, a company could satisfy proposed Rule 5605(f)(2)(B) by

publicly explaining the company's reasons for not meeting the diversity objectives of the

rule.

Nasdaq proposes to define a Foreign Issuer under proposed Rule 5605(f)(1) as (a)

a Foreign Private Issuer (as defined in Rule 5005(a)(19)) or (b) a company that:  (i) is

considered a "foreign issuer" under Rule 3b-4(b) under the Act;[199] and (ii) has its

principal executive offices located outside of the United States.  This definition will

include all Foreign Private Issuers (as defined in Rule 5005(a)(19), regardless of where

they are headquartered or whether they file domestic SEC reports),[200] and any foreign

issuers that are not foreign private issuers so long as they are also headquartered outside

of the United States.  This is designed to recognize that companies that are not Foreign

Private Issuers but are headquartered outside of the United States are foreign companies

notwithstanding the fact that they file domestic SEC reports.  It is also designed to

exclude companies that are domiciled in a foreign jurisdiction without having a physical

presence in that country.

Proposed Rule 5605(f)(5)(C) will allow any company that ceases to be a Foreign

Issuer to satisfy the diversity objectives of proposed Rule 5605(f) by the later of:  (i) one

---

[198]    To provide more clarity, Nasdaq is amending the definition of "Diverse" by removing "a company's home country jurisdiction" and replacing it with "the company's principal executive office (as reported on the company's Form F-1, 10-K, 20-F or 40-F)."

[199]    See 17 C.F.R. § 240.3b-4(b) ("The term foreign issuer means any issuer which is a foreign government, a national of any foreign country or a corporation or other organization incorporated or organized under the laws of any foreign country.").

[200]    Under Nasdaq Rule 5005(a)(19), the term Foreign Private Issuer has "the same meaning as under Rule 3b-4 under the Act."

year from the date that the company no longer qualifies as a Foreign Issuer; or (ii) the

date the company files its proxy statement or its information statement (or, if the

company does not file a proxy, in its Form 10-K or 20-F) for the company's first annual

meeting of shareholders subsequent to such event.  Nasdaq proposes to define "board of

directors" in proposed Rule 5605(f)(2)(B)(i)(b) to mean, in the case of a Foreign Issuer

with a two-tiered board system, the company's supervisory or non-management board,

which is consistent with the SEC's definition in Rule 10A-3(e)(2) of the Exchange Act.[201]

   Nasdaq also proposes to revise Rule 5615 and IM-5615-3, which currently permit

a Foreign Private Issuer to follow home country practices in lieu of the requirements set

forth in the Rule 5600 Series, subject to several exclusions.  Nasdaq proposes to revise

Rule 5615 and IM-5615-3 to add Rules 5605(f) and 5606 to the list of excluded corporate

governance rules.  As a result, Foreign Private Issuers must satisfy the requirements of

proposed Rules 5605(f) and 5606 and may not follow home country practices in lieu of

such requirements.  However, Foreign Private Issuers that elect to follow an alternative

diversity objective in accordance with home country practices, or are located in

jurisdictions that restrict the collection of personal data, may satisfy the requirements of

proposed Rule 5605(f) by explaining their reasons for doing so instead of meeting the

diversity objectives of the rule.

### iii.  Smaller Reporting Companies

   Smaller companies, especially pre-revenue companies that depend on the capital

markets to fund ground-breaking research and technological advancements, may not have

---

[201]  See 17 CFR § 240.10A-3(e)(2) ("In the case of foreign private issuers with a two-tier
board system, the term board of directors means the supervisory or non-management
board."). Nasdaq's clarification on the definition of "board of directors" for a Foreign
Issuer is an amendment to the Initial Proposal.

the resources necessary to compensate an additional director or engage a search firm to search outside of directors' networks.  Recognizing the resource constraints smaller companies face, Nasdaq proposes to provide each Smaller Reporting Company with additional flexibility.  Specifically, these companies could satisfy the two Diverse directors objective under proposed Rule 5605(f)(2)(C) by having two Female directors.

Like other companies, Smaller Reporting Companies could also satisfy the diversity objectives by having one Female director and one director who self-identifies as either (i) an Underrepresented Minority, or (ii) a member of the LGBTQ+ community.  Alternatively, a company could satisfy proposed Rule 5605(f)(2)(C) by publicly explaining the company's reasons for not meeting the diversity objectives of the rule.  Under proposed Rule 5605(f)(1), Nasdaq proposes to define a Smaller Reporting Company as set forth in Rule 12b-2 under the Act.[202]

Proposed Rule 5605(f)(5)(C) will allow any company that ceases to be a Smaller Reporting Company to satisfy the requirements of proposed Rule 5605(f) by the later of: (i) one year from the date that the company no longer qualifies as a Smaller Reporting Company; or (ii) the date the company files its proxy statement or its information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F) for the company's first annual meeting of shareholders subsequent to such event.

---

[202]     Under 12b-2 of the Act, a Smaller Reporting Company "means an issuer that is not an investment company, an asset-backed issuer (as defined in § 229.1101 of this chapter), or a majority-owned subsidiary of a parent that is not a smaller reporting company and that: (1) Had a public float of less than $250 million; or (2) Had annual revenues of less than $100 million and either: (i) No public float; or (ii) A public float of less than $700 million."  See 17 C.F.R. § 240.12b-2.

iv.    <u>Companies with Smaller Boards</u>

Nasdaq considered comments that it should "amend the proposed rules to allow greater flexibility for companies with relatively small boards."[203]  Nasdaq believes that companies with smaller boards may face similar resource constraints to those of Smaller Reporting Companies.  However, not all companies with small boards are Smaller Reporting Companies, and therefore the alternative diversity objective provided to Smaller Reporting Companies may not be available to them.  Further, companies with smaller boards may be disproportionately impacted by the proposed rule if they plan to satisfy proposed Rule 5605(f)(2) by adding additional directors.  For example, two Diverse directors on a five member board comprise 40% of the board, whereas two Diverse directors on an eight member board comprise 25% of the board.  Alternatively, if a five-member board does not have two Diverse directors and expands its board to satisfy proposed Rule 5605(f)(2), it may require the company to incur additional costs through director compensation and D&O insurance.

Accordingly, Nasdaq proposes to adopt Rule 5605(f)(2)(D) to require a company with a board of directors of five or fewer members to have, or explain why it does not have, at least one member of its board of directors who is Diverse.  Nasdaq seeks to avoid complexity for companies that attempt to satisfy the diversity objective by adding a Diverse director.[204]  To prevent such companies from being subject to a higher threshold

---

[203]    <u>See</u> Ballard Spahr Comment Letter, <u>supra</u> note 171.

[204]    <u>See</u> <u>e.g.</u> David A. Katz and Laura A. McIntosh, Wachtell, Lipton, Rosen & Katz, *Gender Diversity and Board Quotas*, New York Law Journal (July 25, 2018), available at: https://www.wlrk.com/webdocs/wlrknew/AttorneyPubs/WLRK.26150.18.pdf ("California legislators dispute that the bill requires men to be displaced by women, noting that boards can simply increase their size.  This may be easier said than done, however:  Because the required quota increases with board size, a company with a four-

by virtue of adding directors, Nasdaq proposes to clarify in proposed Rule 5605(f)(2)(D) that if a company has five members on its board of directors before becoming subject to proposed Rule 5605(f), then it shall not become subject to the requirement of subparagraphs (A), (B), or (C) to have, or explain why it does not have, at least two members of its board of directors who are Diverse if it adds one director to satisfy subparagraph (D), thereby becoming a six member board. However, a company would become subject to proposed Rule 5605(f)(2)(A), (B), or (C) if it subsequently expands its board.

    v.   <u>Cure Period and Grace Period</u>

Nasdaq proposes to adopt Rule 5605(f)(6)(A) and a new Rule 5810(c)(3)(F) to specify what happens if a company (i) does not meet the applicable diversity objectives set forth under proposed Rule 5605(f)(2) and fails to provide the disclosure required by proposed Rule 5605(f)(3), or (ii) fails to hold an annual meeting of shareholders during the applicable periods in proposed Rule 5605(f)(5) or (7) and therefore fails to have, or explain why it does not have, the applicable number of Diverse directors under proposed Rule 5605(f)(2).[205] In these circumstances, the Listing Qualifications Department will promptly notify the company that it has until the later of its next annual shareholders meeting, or 180 days from the event that caused the deficiency, to cure the deficiency. The company can cure the deficiency either by nominating additional directors so that it satisfies the diversity objective of proposed Rule 5605(f)(2) or by providing the disclosure required by proposed Rule 5605(f)(3). If a company does not regain

---

man board that did not wish to force out a current director would need to add three women to accommodate the requirements of the law by 2021.").

[205]    Nasdaq proposes that existing Rules 5810(c)(3)(F) and (G) be renumbered as Rules 5810(c)(3)(G) and (H) respectively.

compliance within the applicable cure period, the Listings Qualifications Department would issue a Staff Delisting Determination Letter.  A company that receives a Staff Delisting Determination can appeal the determination to the Hearings Panel through the process set forth in Rule 5815.  Nasdaq also proposes revising Rule 5810(c)(2)(A)(iv) to make a non-substantive change clarifying that Rule 5250(b)(3) is related to "Disclosure of Third Party Director and Nominee Compensation."

Nasdaq proposes to adopt Rule 5605(f)(6)(B) to provide a grace period for a company that no longer meets the diversity objectives of proposed Rule 5605(f)(2) due to a vacancy on the board of directors.[206]  A company that met the diversity objectives of proposed Rule 5605(f)(2) within the timeframes set forth in proposed Rule 5605(f)(7), but no longer meets the diversity objectives of proposed Rule 5605(f)(2) due to a vacancy on its board of directors (for example if a diverse director falls ill or resigns), shall have until the later of:  (i) one year from the date of vacancy; or (ii) the date the company files its proxy statement or its information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F) in the calendar year following the year of the date of vacancy, to satisfy proposed Rule 5605(f)(2) or (3).  In lieu of providing the disclosure required by proposed Rule 5605(f)(3), a company relying on this provision may publicly disclose that it is relying on the grace period provided by proposed Rule 5605(f)(6)(B).  Such disclosure must be provided:  (a) in any proxy statement or any information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F); or (b) on the company's website.  If the company provides such disclosure on its website, then the company must submit such disclosure concurrently with the filing made pursuant to (a)

---

[206]    Nasdaq's proposed grace period is an amendment to the Initial Proposal.

and submit a URL link to the disclosure through the Nasdaq Listing Center, within one business day after such posting.  This is intended to notify stakeholders of the company's change in board composition without imposing an additional, unexpected disclosure burden on the company.

For example, if the Approval Date is March 10, 2021, all companies (including companies with smaller boards) would be required to have, or explain why they do not have, one Diverse director by March 10, 2023.  Companies with boards of more than five members would be required to have, or explain why they do not have, two Diverse directors by March 10, 2025 (for NGS/NGM companies) or March 10, 2026 (for NCM companies).  Company ABC had one Female director on March 10, 2023, and she self-identified as Female in the company's Board Diversity Matrix published in the company's proxy statements for its 2023 and 2024 annual shareholders meetings.  She unexpectedly resigned from the company's board on March 10, 2024, prior to April 30, 2024, which is the date the company files its proxy statement for its annual shareholders meeting to be held on June 10, 2024.  The company would have until March 10, 2025, to satisfy the diversity objectives of proposed Rule 5605(f)(2), rather than April 30, 2024.

The company could disclose in its 2025 proxy statement or on its website at the time it files its 2025 proxy statement, "The Company is relying on the grace period provided by Nasdaq Rule 5605(f)(6)(B) related to diverse board representation."

vi.    Exempt Companies

Under proposed Rule 5605(f)(4), Nasdaq proposes to exempt the following types of companies from the requirements of proposed Rule 5605(f) ("Exempt Companies"): SPACs, asset-backed issuers and other passive issuers (as set forth in Rule 5615(a)(1)); cooperatives (as set forth in Rule 5615(a)(2)); limited partnerships (as set forth in Rule

5615(a)(4)); management investment companies (as set forth in Rule 5615(a)(5)); issuers of non-voting preferred securities, debt securities and Derivative Securities (as set forth in Rule 5615(a)(6)) that do not have equity securities listed on Nasdaq; and issuers of securities listed under the Rule 5700 Series.

Proposed Rule 5605(f)(5)(C) will allow any company that ceases to be an Exempt Company to satisfy the requirements of proposed Rule 5605(f) by the later of: (i) one year from the date that the company no longer qualifies as an Exempt Company; or (ii) the date the company files its proxy statement or its information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F) for the company's first annual meeting of shareholders subsequent to such event.

Nasdaq believes it is appropriate to exempt these types of companies from the proposed rule because such companies do not have boards, do not list equity securities, or are not operating companies. These companies are already exempt from certain of Nasdaq's corporate governance standards related to board composition, as described in Rule 5615. Nasdaq is also proposing to exempt SPACs from the requirements of proposed Rule 5605(f), and the post-business combination entity would have at least two years after they complete a business combination. This approach is similar to other phase-in periods granted to SPACs. For example, Rule 5615(b)(1) provides a company listing in connection with its initial public offering, including a SPAC, one year to fully comply with the independent compensation and nomination committee requirements of Rules 5605(d) and (e), and the majority independent board requirement of proposed Rule 5605(b). Similarly, Rule 5615(b)(1) and SEC Rule 10A-3(b)(1)(iv)(A) allow a newly listed company, including a SPAC, up to one year from the date its registration statement

is effective to fully comply with the applicable audit committee composition requirements.

Under proposed Rule 5605(f)(5)(A) or (B), a newly listed company, including through a business combination with a SPAC, would be permitted to satisfy the requirement of proposed Rule 5605(f)(2) to have, or explain why it does not have, the applicable number of Diverse directors under proposed Rule 5605(f)(2) by the later of two years from the date of listing or the date the company files its proxy statement or its information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F) for the company's second annual meeting of shareholders subsequent to the company's listing, with differing milestones depending on the company's market tier.  Nasdaq believes it is not appropriate to subject SPACs to proposed Rule 5605(f) prior to completing a business combination because SPACs are shell companies until they complete an acquisition of an operating company.  Rather, Nasdaq believes it is appropriate to provide SPACs with the same phase-in provided to other newly listed companies upon completing a business combination, because a SPAC must satisfy all of Nasdaq's initial listing requirements upon completing a business combination, including its requirements related to committee composition and majority independent board.

D.  *Alternatives Considered*

Nasdaq considered multiple alternatives in determining whether requiring listed companies to have, or explain why they do not have, a minimum number of diverse directors would better promote the public interest.  Nasdaq's reasoned decision-making process included considering:  (i) mandate and disclosure-based approaches; (ii) higher and lower diversity objectives; (iii) longer and shorter timeframes; and (iv) broader and narrower definitions of "Diverse."

i.    Mandate vs. Disclosure Based Approach

The proposal is a disclosure-based framework, not a mandate.  Globally, gender

mandates range from requiring at least one woman on the board,[207] requiring two or more

women based on board size,[208] or requiring 30 to 50% women on the board.[209]  Some

---

[207]    For example, the Securities and Exchange Board of India requires public companies to have at least one woman on the board.  See Securities and Exchange Board of India (Listing Obligations and Disclosure Requirements) Regulations, Regulation 17(1)(a) (2015), available at: https://www.sebi.gov.in/legal/regulations/jan-2020/securities-and-exchange-board-of-india-listing-obligations-and-disclosure-requirements-regulations-2015-last-amended-on-january-10-2020-_37269.html.  Similarly, the Israeli Companies Law requires public companies to have at least one woman on the board.  See Paul Hastings, *Breaking the Glass Ceiling: Women in the Boardroom* 139 (2018), available at: https://www.paulhastings.com/genderparity/.  In the United States, California's S.B. 826 requires public companies headquartered in California to have at least one woman on the board.  See Cal. S.B. 826, supra note 118, at § 301.3(b)(3).

[208]    For example, California's S.B. 826 requires public companies headquartered in California to have at least two women on the board if their board is comprised of five directors, and at least three women on the board if their board is comprised of six or more directors.  See Cal. S.B. 826, supra note 118, at § 301.3(b)(1) and (2).  Similar legislation has been proposed in New Jersey, Michigan and Hawaii.  See N.J. Senate No. 3469, § 3(b)(2) (2019); Mich. S.B. 115, § 505a2(b) (2019); Haw. H.B. 2720, § 414-1(b)(2) (2020).

[209]    For example, Norway imposes a gender quota ranging from 33%-50% depending on board size.  See Paul Hastings, supra note 207, at 103.  Portugal requires listed companies to have at least 33.3% women on boards by 2020.  See Deloitte, *Women in the Boardroom*, supra note 92, at 143.  Germany requires public companies with co-determined boards (at least 50% employee representation) to have at least 30% women, and all other listed companies to establish a company-defined target.  See Ulrike Binder and Guido Zeppenfeld, Mayer Brown, *Germany Introduces Rules on Female Quota for Supervisory Boards and Leadership Positions* (March 13, 2015), available at https://www.mayerbrown.com/en/perspectives-events/publications/2015/03/germany-introduces-rules-on-female-quota-for-super.  Belgium requires listed companies to have at least 33% women on the board.  See Deloitte, *Women in the Boardroom*, supra note 92, at 85.  Austria requires listed companies with more than 1,000 employees to have at least 30% women on the board.  See id. at 81.  Iceland requires public companies with more than 50 employees to have at least 40% women on the board.  See Act respecting Public Limited Companies No. 2/199, Article 63, available at: https://www.government.is/publications/legislation/lex/2018/02/06/TRANSLATION-OF-RECENT-AMENDMENTS-OF-ICELANDIC-PUBLIC-AND-PRIVATE-LIMITED-COMPANIES-LEGISLATION-2008-2010-including-Acts-13-2010-sex-ratios-and-68-2010-minority-protection-remuneration/. France and Italy both require public companies to have at least 40% women on their boards.  See Paul Hastings, supra note 207, at 91; White & Case, *Italy increases gender quotas in corporate boards of listed companies*

mandates vary by board size—for example, Norway imposes different standards for boards of two to three directors, four to five directors, six to eight directors, nine directors and ten or more directors.[210]  California imposes a higher standard for gender diversity that boards with five directors or six or more directors must satisfy by the end of 2021 under S.B. 826, and a higher standard for underrepresented communities that boards with five to eight directors and nine or more directors must satisfy by the end of 2022 under A.B. 979.  Nasdaq did not observe a common denominator among the mandates applicable to varying board sizes.  However, Nasdaq considered observations that a model based on various board sizes could subject companies to a higher threshold by virtue of adding directors.[211]  Based on Nasdaq data, the average board size of its listed companies is eight directors.

Soft targets ranging from 25% to 40% women on boards have been suggested by various corporate governance codes and corporate governance organizations.  For example, Rule 4.1 of the Swedish Corporate Governance Code (the "Code") provides that listed companies are to "strive for gender balance on the board."[212]  Each company's nominations committee is to publish a statement on its website at the time it issues notice of its shareholders meeting "with regard to the requirement in rule 4.1, that the proposed composition of the board is appropriate according to the criteria set out in the Code and

---

(Jan. 29, 2020), available at: https://www.whitecase.com/publications/alert/italy-increases-gender-quotas-corporate-boards-listed-companies).

[210]    See Paul Hastings, supra note 207, at 103.

[211]    See David A. Katz and Laura A. McIntosh, infra note 204.

[212]    See Swedish Corporate Governance Board, *The Swedish Corporate Governance Code* §4.1 17 (eff. Jan. 1, 2020), available at: http://www.bolagsstyrning.se/UserFiles/Koden/The_Swedish_Corporate_Governance_Code_1_January_2020.pdf.

that the company is to strive for gender balance."[213]  Companies are not required to comply with the Code, "but are allowed the freedom to choose alternative solutions which they feel are better suited to their particular circumstances, as long as they openly report every deviation, describe the alternative solution they have chosen and explain their reasons for doing so."[214]  Signifying progress, in 2019, 7% of nominations committees did not issue a statement on board gender balance, compared to 58% in 2013.[215]

In 2015, the Swedish Corporate Governance Board, which is responsible for administering the Code, established a goal to achieve representation of women on boards of small/mid cap (and Swedish companies listed on NGM Equity) and large cap companies of 30% and 35%, respectively, by 2017.  Further, the Board aimed to achieve 40% representation of women on boards of all listed Swedish companies by 2020.[216] Based on data as of June 30, 2020, among listed companies, women accounted for 32.7% of board seats on small/mid cap companies and NGM Equity, 38.6% of large cap companies and 34.7% of all listed companies.[217]

---

[213]    See Swedish Corporate Governance Board, *Annual Report 2020* 22 (August 2020), available at: http://www.bolagsstyrning.se/userfiles/archive/3930/kodkoll_arsrapport-2020_eng.pdf.

[214]    See Swedish Corporate Governance Board, *Gender balance on boards of listed companies: The Swedish Corporate Governance Board assesses the situation ahead of this year's AGMs* (February 3, 2015), available at: http://www.bolagsstyrning.se/userfiles/archive/3856/pressrelease_gender_2014-02-03.pdf.

[215]    See Swedish Corporate Governance Board, *Annual Report 2020*, supra note 213, at 22.

[216]    See Swedish Corporate Governance Board, *Gender balance*, supra note 214.

[217]    See Swedish Corporate Governance Board, *Statistics regarding gender balance* (July 15, 2020), available at: http://www.bolagsstyrning.se/userfiles/archive/3922/200715_gender_balance_on_boards.pdf; see also *Sammanfattning*, available at http://www.bolagsstyrning.se/userfiles/archive/3922/statistik_konsfordelning_2020.pdf.

In the United Kingdom, the Financial Conduct Authority requires companies with a premium listing on the London Stock Exchange to publicly disclose whether or not they comply with the Financial Reporting Council's U.K. Corporate Governance Code (the "U.K. Code"), and if not, to explain their reasons for non-compliance.[218]  Provision 23 of the U.K. Code requires each company to publicly describe "the work of the nomination committee, including . . . the policy on diversity and inclusion, its objectives and linkage to company strategy, how it has been implemented and progress on achieving the objectives,"[219] and Principle J states that board appointments and succession planning should, among other things, "promote diversity of gender, social and ethnic backgrounds."[220]  In addition, the Companies Act requires companies to disclose gender diversity statistics among the board, management and employees.[221]  In 2018, the Financial Reporting Council reported that 83% of FTSE 100 and 74% of FTSE 250 companies had established a board diversity policy specifying gender, with approximately 1/3 specifying ethnicity.[222]  More recently, a report commissioned by the

---

[218]    See Financial Conduct Authority, LR 9.8.6(6), available at: https://www.handbook.fca.org.uk/handbook/LR/9/8.html; see also Financial Reporting Council, *The UK Corporate Governance Code* 3 (July 2018), available at https://www.frc.org.uk/getattachment/88bd8c45-50ea-4841-95b0-d2f4f48069a2/2018-UK-Corporate-Governance-Code-FINAL.PDF.  In addition, "[i]n 2016, the [UK] Government also implemented the relevant provision of the EU Non-Financial Reporting Directive with a new reporting requirement in the FCA's Disclosure and Transparency Rules. This requires issuers (excluding [small and medium-sized enterprises]) admitted to trading on an EU regulated market to disclose their diversity policy in the corporate governance statement."  See Financial Reporting Council, *Board Diversity Reporting* 5 (September 2018), available at: https://www.frc.org.uk/getattachment/62202e7d-064c-4026-bd19-f9ac9591fe19/Board-Diversity-Reporting-September-2018.pdf.

[219]    See Financial Reporting Council, *The UK Corporate Governance Code*, supra note 218, at 9.

[220]    Id. at 8.

[221]    See UK Companies Act 2006, § 414C.

[222]    See Financial Reporting Council, Board Diversity Reporting, supra note 218, at 9.

Financial Reporting Council concluded that there is a lack of public disclosure regarding the LGBTQ+ status among directors and executives of public companies. While the report did not recommend amending Principle J of the U.K. Code to consider sexual orientation or gender identity, it emphasized that the U.K. Code "seeks to promote diversity and inclusion of all minority groups within business"[223] and suggested that the government "update corporate reporting requirements to require companies to demonstrate how they intend to capture data on the sexual orientation and gender identity of staff."[224]

In 2011, the Davies Review called on FTSE 100 boards to achieve 25% women on boards by 2015.[225] After that milestone was achieved, the Hampton Alexander Review encouraged FTSE 350 boards to have 1/3 women by 2020, and it has been achieved by FTSE 100 companies.[226] In 2017, the Parker Review called on FTSE 100 and 250 companies to have at least one director of color by 2021 and 2024, respectively.[227] As of February 2020, approximately 37% of FTSE 100 companies surveyed and 69% of FTSE 250 companies surveyed did not have one director of color on their board.[228]

---

[223]    See Hay et al., supra note 104, at 37.

[224]    Id.

[225]    See Women on boards, supra note 100.

[226]    See Hampton-Alexander Review: FTSE Women Leaders (November 2016), available at: https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_ data/file/613085/ftse-women-leaders-hampton-alexander-review.pdf.

[227]    See Parker, supra note 103.

[228]    See Sir John Parker, Ethnic Diversity Enriching Business Leadership 19 (Feb. 5, 2020), available at: https://assets.ey.com/content/dam/ey-sites/ey-com/en_uk/news/2020/02/ey-parker-review-2020-report-final.pdf.

Australian Securities Exchange ("ASX")-listed companies must comply with the ASX Corporate Governance Council's Corporate Governance Principles and Recommendations (the "ASX Recommendations") or explain why they do not. The ASX Recommendations require companies to have and disclose a diversity policy with measurable objectives and report on progress towards meeting those objectives. If the company is in the ASX/S&P 300, its objective for achieving gender diversity should be at least 30%.[229] The Australian government also requires companies with 100 or more employees to provide an annual report about gender equality indicators, including the gender composition of the board and the rest of the workforce.[230] In 2015, the ASX and KPMG found that 99% of S&P/ASX 200 companies and 88% of ASX 201-500 companies disclosed establishing a diversity policy rather than explaining why they do not have one.[231] As of July 2020, women account for 28.4% and 31.8% of board seats among ASX 300 and ASX 100 companies, respectively.[232]

---

[229]    See ASX Corporate Governance Council, *Corporate Governance Principles and Recommendations* 9 (4th ed. Feb. 2019), available at: https://www.asx.com.au/documents/asx-compliance/cgc-principles-and-recommendations-fourth-edn.pdf.

[230]    Workplace Gender Equality Act 2012, Part IV § 13 (March 25, 2015), available at: https://www.legislation.gov.au/Details/C2015C00088.

[231]    See KPMG and ASX, *ASX Corporate Governance Council Principles and Recommendations on Diversity: Analysis of disclosures for financial years ended 1 January 2015 and 31 December 2015* 4 (2016) available at: https://www.asx.com.au/documents/asx-compliance/asx-corp-governance-kpmg-diversity-report.pdf.

[232]    See KPMG and 30% Club, *Building Gender Diversity on ASX 300 Boards: Seven Learnings from the ASX 200* 4 (July 2020), available at: https://assets.kpmg/content/dam/kpmg/au/pdf/2020/building-gender-diversity-asx-300-boards.pdf. The report also noted that diversity counteracts groupthink and that ASX 201-299 companies with at least 30% female directors "are more likely than not to [have seen] market capitalisation increases over the past 12 months." Id. at 6.

Nasdaq observed that women account for at least 30% of the boards of the largest

companies in Australia, Sweden, and the United Kingdom, and in three other countries

that have implemented disclosure requirements or suggested milestones on a comply-or-

explain basis:  Finland, New Zealand, and Canada.[233]  Nasdaq considered that countries

that have implemented mandates have also seen progress in women's representation on

boards, including, for example, Austria, Iceland, Belgium, France, Germany, Italy, and

Portugal.[234]  On average, women account for 31% of board seats in countries with gender

mandates.[235]  Albertine d'Hoop-Azar et al. (2017) compared gender diversity on boards

in countries with varying requirements and enforcement measures and concluded that

external pressures—"progressive societal norms" and regulations—are needed to increase

board diversity.[236]

---

[233]    See The Conference Board of Canada, *Data Dashboard* (Sept. 23, 2020), available at: https://www.conferenceboard.ca/focus-areas/inclusion/2020/aob-comparisons-around-the-world-table?AspxAutoDetectCookieSupport=1; see also Andrew MacDougall et al.*,* Osler, *Diversity Disclosure Practices* 4 (2020), available at https://www.osler.com/osler/media/Osler/reports/corporate-governance/Diversity-and-Leadership-in-Corporate-Canada-2020.pdf.  But see Heike Mensi-Klarbach et al., *The Carrot or the Stick: Self-Regulation for Gender-Diverse Boards via Codes of Good Governance*, J. Bus. Ethics 11 (2019), available at: https://doi.org/10.1007/s10551-019-04336-z (reviewing longitudinal data from 2006 to 2016 on listed and state-owned companies in Austria and concluding that "self-regulation of gender diversity on boards is ineffective if merely based on recommendations in codes of good governance").  Mensi-Klarbach recommends setting concrete targets and providing public monitoring to improve the effectiveness of comply-or-explain frameworks.

[234]    See Paul Hastings, supra note 207; see also Deloitte, *Women in the Boardroom*, supra note 92.

[235]    See Paul Hastings, supra note 207; The Conference Board of Canada, supra note 233.

[236]    See Albertine d'Hoop-Azar et al., Gender Parity on Boards Around the World, Harv. L. Sch. Forum on Corp. Governance (January 5, 2017), available at: https://corpgov.law.harvard.edu/2017/01/05/gender-parity-on-boards-around-the-world/ (comparing gender diversity on boards in countries with varying requirements and enforcement measures and concluding that external pressures—"progressive societal norms" and regulations—are needed to increase board diversity).

Nasdaq discussed the benefits and challenges of mandate and comply-or-explain models with over a dozen stakeholders, and while the majority of organizations were in agreement that companies would benefit from a disclosure-based, business-driven framework to drive meaningful and systemic change in board diversity, the majority also stated that a disclosure-based approach would be more palatable to the U.S. business community than a mandate.  Most organizations Nasdaq spoke with expressed general discomfort with mandates, although they acknowledged that opposition is lessening in the wake of California's S.B. 826[237] and A.B. 979.[238]  While many recognized that mandates can force boards to act more quickly and accelerate the rate of change, they believe that a disclosure-based approach is less controversial, would spur companies to take action and would make meaningful progress on board diversity.  Some stakeholders also highlighted additional challenges that smaller companies and companies in certain industries may face finding diverse board members.  In contrast, a disclosure-based framework that provides companies with flexibility would empower companies to maintain decision-making authority over their board's composition while providing stakeholders with a better understanding of the company's current board composition and its philosophy regarding diversity.  This approach would better inform the investment community and enable more informed analysis of, and conversations with, companies.  Nasdaq believes that these goals will be achieved through the disclosure of consistent, comparable data across companies, as would be required by the Exchange's proposed definition of Diverse.  The Exchange is therefore proposing a disclosure-based framework rather than a mandate.

---

[237]    See Cal. S.B. 826, supra note 118.

[238]    See Cal. A.B. 979, supra note 118.

For example, if, under Israeli law regarding board diversity, an Israeli company is required only to have a minimum of one woman on the board and such Israeli company chooses to meet the requirements under Israeli home country law in lieu of meeting the diversity objectives of proposed Rule 5605(f)(2)(B), it may choose to disclose that "the Company is incorporated in Israel and required by Israeli law to have a minimum of one woman on the board, and satisfies home country requirements in lieu of Nasdaq Rule 5605(f)(2)(B), which requires each Foreign Issuer to have at least two Diverse directors." If a U.S. company had two Diverse directors but one resigned due to unforeseen circumstances, and it is not eligible for the grace period under proposed Rule 5605(f)(6), it could disclose, for example: "Due to the unexpected resignation of Ms. Smith this year, the Company does not have at least one director who self-identifies as Female and one director who self-identifies as an Underrepresented Minority or LGBTQ+. We intend to undertake reasonable efforts to meet the diversity objectives of proposed Rule 5605(f)(2)(A) prior to our next annual shareholder meeting and have engaged a search firm to identify qualified Diverse candidates. However, due to unforeseen circumstances, we may not achieve this goal." Or a U.S. company may disclose that it chooses to define diversity more broadly than Nasdaq's definition by considering national origin, veteran status or individuals with disabilities when identifying nominees for director because it believes such diversity brings a wide range of perspectives and experiences to the board. In each case, investors will have a better understanding of the company's reasons for not meeting the applicable diversity objectives and can use that information to make an informed investment or voting decision.

## ii.    Higher and Lower Diversity Objectives

Nasdaq observed that existing empirical research spanned companies across several countries, including the United States, Spain, China, Canada, France, and Norway.  Nasdaq considered that the studies related to company performance and board diversity found positive associations at various levels and measures of board diversity, including having at least one woman on the board,[239] two or more diverse directors (with diverse considered female, Black, Hispanic, or Asian),[240] at least three women on the board[241] and being in the top quartile for gender and ethnic diversity.[242]

Nasdaq considered that the academic and empirical studies related to investor protection and board diversity found positive associations at various levels and measures of board diversity, including having at least one woman on the board[243] or up to 50% women on the board, and the assertions of certain academics that their findings may extend to other forms of diversity, including racial and ethnic diversity.[244]  Nasdaq also reviewed academic and empirical research suggesting that "critical mass" is achieved by having three or more women on the board, and that having only one diverse director on the board risks "tokenism."[245]  Nasdaq considered that although the legislation enacted by

---

[239]    See Credit Suisse, supra note 35, at 16.

[240]    See Thomas and Starr, supra note 28, at 5.

[241]    See Eastman et al., supra note 36, at 3; Wagner, supra note 37.

[242]    See McKinsey, supra note 31.

[243]    See Abbott et al., supra note 64; Chen et al., supra note 70.

[244]    See Wahid, supra note 65; Cumming et al., supra note 68, at 1588 (observing that previous studies considered directors' independence, experience and education, and "further research is warranted on the comparison of different forms of diversity with respect to securities fraud.").

[245]    See Alison M. Konrad et al., *Critical Mass: The Impact of Three or More Women on Corporate Boards*, 37(2) Org. Dynamics 145 (April 2008); Miriam Schwartz-Ziv, *Gender and Board Activeness: The Role of a Critical Mass*, 52(2) J. Fin. & Quant.

Norway and California, and proposed by several other states, varies based on board size, the academic and empirical research considered companies across a spectrum of sizes and board sizes, including Fortune 500, S&P 500, Fortune 1000 and smaller (non-Fortune 1000) companies.

Nasdaq concluded that there is no "one-size fits all" approach to promoting board diversity and that the academic and empirical studies regarding the relationship between board diversity, company performance and investor protections is continuing to evolve. However, in Nasdaq's survey of academic studies described above—and of the targets or mandates promulgated by regulatory bodies and organizations worldwide—Nasdaq observed a common denominator of having at least one woman on the board. Similarly, Nasdaq observed a common denominator of having at least one director who is diverse in terms of race, ethnicity or sexual orientation among the requirements related to, and academic research considering, board diversity beyond gender identity. Nasdaq therefore believes that a diversity objective of at least two Diverse directors provides a reasonable baseline for comparison across companies. However, Nasdaq considered comments that it should "amend the proposed rules to allow greater flexibility for companies with relatively small boards."[246] Nasdaq considered that, based on the requirement of proposed Rule 5605(c)(2) for each listed company to have an audit committee composed of at least three independent directors,[247] the minimum board size of a company listed on Nasdaq must be at least three directors. Based on Nasdaq data, the average board size of

---

Analysis 751 (April 2017); Mariateresa Torchia et al., *Women Directors on Corporate Boards: From Tokenism to Critical Mass*, 102(2) J. Bus. Ethics. 299 (Feb. 25, 2011), available at https://ssrn.com/abstract=1858347.

[246]   See Ballard Spahr Comment Letter, supra note 171.

[247]   See Nasdaq Rulebook, Rule 5605(c)(2).

all listed companies is eight directors, with an average board size of 7.3 for Smaller Reporting Companies and Foreign Issuers. However, not all companies with small boards are Smaller Reporting Companies, and therefore the alternative diversity objective provided to Smaller Reporting Companies may not be available to them. Further, companies with smaller boards may be disproportionately impacted by the proposed rule if they plan to satisfy proposed Rule 5605(f)(2) by adding additional directors. For example, two Diverse directors on a five member board comprise 40% of the board, whereas two Diverse directors on an eight member board comprise 25% of the board. Alternatively, if a five-member board does not have two Diverse directors and expands its board to satisfy proposed Rule 5605(f)(2), it may require the company to incur additional costs through director compensation and D&O insurance. Accordingly, Nasdaq proposes to adopt Rule 5605(f)(2)(D) a company with a board of directors of five or fewer members to have, or explain why it does not have, at least one member of its board of directors who is Diverse.

Nasdaq considered criticisms levied against other models that base board diversity objectives on board size. For example, such models may create complexity for companies by subjecting them to a higher diversity objective for larger boards if they add diverse directors.[248] In California under S.B. 826, a five member board is required to have at least two female directors, and a board of six or more members must have at least three female directors. Therefore, if a five member board adds two female directors to comply with S.B. 826, it becomes a seven member board subject to the higher threshold to have at least three female directors, and must add another female director. Therefore,

---

[248]    See David A. Katz and Laura A. McIntosh, supra note 204.

Nasdaq proposes to clarify in proposed Rule 5605(f)(2)(D) that if a company has five members on its board of directors before becoming subject to proposed Rule 5605(f), it shall not become subject to the requirement of subparagraphs (A), (B), or (C) to have at least two members of its board of directors who are Diverse if it adds one director to satisfy subparagraph (D), thereby becoming a six member board.  However, a company would become subject to proposed Rule 5605(f)(2)(A), (B) or (C) if it subsequently expands its board.

Companies are not precluded from meeting a higher or lower alternative measurable objective.  For example, a company may choose to disclose that it does not meet the diversity objectives under proposed Rule 5605(f)(2) because it is subject to an alternative standard under state or foreign laws and has chosen to satisfy that diversity objective instead.  On the other hand, many firms may strive to achieve even greater diversity than the objectives set forth in Nasdaq's proposed rule.  Nasdaq believes that providing flexibility and clear disclosure when the company determines to follow a different path will improve the quality of information available to investors who rely on this information to make informed investment and voting decisions.

### iii.    Longer and Shorter Timeframes

Nasdaq considered whether an alternative timeframe for satisfying the diversity objectives of proposed Rule 5605(f)(2) would better promote the public interest than the timeframe Nasdaq has proposed under Rule 5605(f)(7).  While companies are not precluded from adding additional directors to their boards to meet the diversity objectives of proposed Rule 5605(f)(2) sooner than contemplated by the proposed rule, Nasdaq understands that some companies may need to obtain shareholder approval to amend their governing documents to allow for board expansion.  Other companies may choose to

replace an existing director on the board with a Diverse director, and board turnover may

be low.[249]  Nasdaq recognizes that it also takes substantial lead time to identify,

interview, and select board nominees.  To provide companies with sufficient time to meet

the diversity objectives of proposed Rule 5605(f)(2), while recognizing that investors are

calling for expedient change, Nasdaq has structured its proposal similarly to the approach

taken by California, where companies with larger boards must achieve one target by an

earlier date and satisfy the entire diversity objective at a later date.  Nasdaq also

considered the approaches taken by foreign jurisdictions to implement diversity

objectives.  For example, Belgium and France implemented diversity objectives under a

phased approach that provided companies with at least five years to fully satisfy the

objectives,[250] whereas Iceland and Portugal provided companies with three years or

less.[251]

   While companies may choose to satisfy proposed Rule 5605(f)(2) on an

alternative timeframe, a company that chooses a timeframe that is longer than the

timeframes set forth in proposed Rule 5605(f)(7) also must publicly explain its reasons

for doing so.  For example, an NGM-listed company that chooses to comply with the

NCM timeframe may disclose the following:  "While the Company is listed on NGM, the

Company believes that it is similarly situated to companies listed on NCM in terms of its

annual revenues and public float, and therefore has chosen to meet the objectives of Rule

---

[249]    See Matteo Tonello, *Corporate Board Practices in the Russell 3000 and S&P 500*, Harv. L. Sch. Forum on Corp. Governance (Oct. 18, 2020), https://corpgov.law.harvard.edu/2020/10/18/corporate-board-practices-in-the-russell-3000-and-sp-500/ (last accessed Nov. 24, 2020).

[250]    See Paul Hastings, supra note 207, at 79 and 90; see also supra note 209.

[251]    See Deloitte, Women in the Boardroom, supra note 92, at 115 and 143; see also supra note 209.

5605(f)(2)(C) in lieu of Rule 5605(f)(2)(A). The company has met these objectives by having at least two Diverse directors on the board who self-identify as Female within the timeframe provided under Rule 5605(f)(7) applicable to NCM-listed companies."

### iv.    Broader and Narrower Definition of Diverse

Nasdaq considered whether the definition of Diverse should include broader characteristics than those reported on the EEO-1 report, such as the examples provided by the Commission staff's C&DI, including LGBTQ+, nationality, veteran status, and individuals with disabilities. During its stakeholder outreach, Nasdaq inquired whether a broad definition of Diversity would promote the public interest. While recognizing the diverse perspectives that different backgrounds can provide, most stakeholders supported a narrower definition of Diversity focused on gender, race and ethnicity, with several supporting broadening the definition to include the LGBTQ+ community.

As discussed above, companies currently are permitted to define diversity "in ways they consider appropriate" under federal securities laws. One of the challenges of this principles-based approach has been the disclosure of inconsistent and noncomparable data across companies. However, most companies are required by law to report data on race, ethnicity and gender to the EEOC through the EEO-1 Report. Nasdaq believes that adopting a broad definition of Diverse would maintain the status quo of inconsistent, noncomparable disclosures, whereas a narrower definition of Diverse focused on race, ethnicity, sexual orientation and gender identity will promote the public interest by improving transparency and comparability. Nasdaq also is concerned that the broader definitions of diversity utilized by some companies may result in Diverse candidates being overlooked, and may be hindering meaningful progress on improving diversity related to race, ethnicity, sexual orientation and gender identity. For example, a company

may consider diversity to include age, education, and board tenure.  While such characteristics may provide laudable cognitive diversity, this focus may result in a homogenous board with respect to race, ethnicity, sexual orientation, and gender identity that, by extension, does not reflect the diversity of a company's communities, employees, investors, or other stakeholders.

Nasdaq also believes that a transparent, consistent definition of Diverse would provide stakeholders with a better understanding of the company's current board composition and its philosophy regarding diversity if it does not meet the diversity objectives of proposed Rule 5605(f)(2).  This would enable the investment community to conduct more informed analysis of, and have more informed conversations with, companies.  To the extent a company chooses to satisfy proposed Rule 5605(f)(2) by meeting the applicable diversity objectives, it will have the ancillary benefit of making meaningful progress in improving board diversity related to race, ethnicity, sexual orientation and gender identity.

Nasdaq's review of academic and empirical research on board diversity revealed a dearth of empirical analysis on the relationship between investor protection or company performance and broader diversity characteristics such as veteran status or individuals with disabilities.[252]  Nasdaq acknowledges that there also is a lack of published research

---

[252]    KPMG (2020) states that veterans are underrepresented in boardrooms, with retired General and Flag Officers ("GFOs") occupying less than 1% of Fortune 500 board seats. See KPMG, *The value of veterans in the boardroom* 1 (2020), available at: https://boardleadership.kpmg.us/content/dam/boardleadership/en/pdf/2020/the-value-of-veterans-in-the-boardroom.pdf (noting that "[r]etired GFOs who have honed their leadership and critical decision-making skills in a high-threat environment can bring extensive risk oversight experience to the board, which may be especially valuable in the context of today's risk landscape").  Accenture (2018) observed that companies that offered inclusive working environments for employees with disabilities achieved an average of 28% higher revenue, 30% higher economic profit margins, and 2x net income

on the issue of LGBTQ+ representation on boards.[253]  This may be due to a lack of

consistent, transparent data on broader diverse attributes, or because there is no voluntary

self-disclosure workforce reporting requirements for LGBTQ+ status, such as the EEO-1

reporting framework for race, ethnicity, and gender.  In any event, it is evident that while

"[b]oardroom diversity is a topic that has gained significant traction . . . LGBT+

diversity, however, has largely been left out of the conversation."[254]

Nonetheless, Nasdaq believes it is reasonable and in the public interest to include

a reporting category for LGBTQ+ in recognition of the U.S. Supreme Court's recent

affirmation that sexual orientation and gender identity are "inextricably" intertwined with

sex,[255] and based on studies demonstrating a positive association between board diversity

and decision making, company performance and investor protections.  Nasdaq also

believes that the proposed rule would foster the development of data to conduct

meaningful assessments of the association between LGBTQ+ board diversity, company

performance, and investor protections.

As noted above, the proposal does not preclude companies from considering

additional diverse attributes, such as nationality, disability, or veteran status in selecting

board members; however, company would still have to provide the required disclosure

under proposed Rule 5605(f)(3) if the company does not also have at least two directors

who are Diverse (or one Diverse director for companies with a board of directors of five

---

than their industry peers.  See Accenture, *Getting to Equal: The Disability Inclusion Advantage* (2018), available at: https://www.accenture.com/_acnmedia/PDF-89/Accenture-Disability-Inclusion-Research-Report.pdf.

[253]   See Credit Suisse ESG Research, supra note 40, at 1; see also Out Leadership, supra note 42.

[254]   See Out Leadership, supra note 42, at 3.

[255]   See Bostock v. Clayton Cnty., supra note 170.

or fewer members). Nor would the proposal prevent companies from disclosing information related to other diverse attributes of board members beyond those highlighted in the rule if they felt such disclosure would benefit investors. Nasdaq believes such disclosure would help inform the evolving body of research on the relationship between broader diverse attributes, company performance and investor protection and provide investors with additional information about the company's philosophy regarding broader diversity characteristics.

2.    Statutory Basis

The Exchange believes that its proposal is consistent with Section 6(b) of the Act,[256] in general, and furthers the objectives of Section 6(b)(5) of the Act,[257] in that it is designed to remove impediments to and perfect the mechanism of a free and open market and a national market system, to prevent fraudulent and manipulative acts and practices, and, in general, to protect investors and the public interest, for the reasons set forth below. Further, Nasdaq believes the proposal is not designed to permit unfair discrimination between issuers or to regulate by virtue of any authority conferred by the Act matters not related to the purposes of the Act or the administration of the Exchange, for the reasons set forth below.

I.    Board Statistical Disclosure

Nasdaq has proposed what it believes to be a straightforward and clear approach for companies to publish their statistical data pursuant to proposed Rule 5606. This disclosure requirement will protect investors that view information related to board

---

[256]    See 15 U.S.C. § 78f(b).

[257]    Id. § 78f(b)(5).

diversity as material to their investment and voting decisions.  The proposed disclosure

format prescribed by the rule also protects investors by eliminating data collection

inaccuracies and decreasing costs, while enhancing investors' ability to utilize the

information.  Nasdaq also believes that the rule will enhance investor confidence by

assisting investors in making more informed decisions through Nasdaq's efforts to

require meaningful, consistent, reliable and comparable data readily available and in a

clear and comprehensive manner.  Nasdaq also believes that the disclosure format

provides a company with a uniformed template with the flexibility to include any

additional details about its board that the company believes would be useful to investors.

As a threshold matter, as discussed above, diversity has become an increasingly

important subject and, in recent years, investors increasingly have been advocating for

greater board diversity and for the disclosure of board diversity statistics.[258]  The current

board diversity disclosure regime is lacking in several respects, and Nasdaq believes that

its proposed Rule 5606 addresses many of the current concerns and responds to investors'

demands for greater transparency into the diversity characteristics of a company's board

composition by mandating disclosure and curing certain deficiencies that exist within the

current SEC disclosure requirements.

Investors have expressed their dissatisfaction with having to independently collect

board-level data about race, ethnicity, and gender identity because such investigations

can be time consuming, expensive, and fraught with inaccuracies.[259]  The lack of

consistency and specificity in Regulation S-K has been a major impediment for many

---

[258]    See Petition for Amendment of Proxy Rule, supra note 86; see also Office of Illinois State Treasurer, supra note 116.

[259]    See Petition for Amendment of Proxy Rule, supra note 86, at 2.

investors and data collectors.  As a general matter, the Commission's requirements have

not addressed the concerns expressed by commenters that "disclosure about board

diversity was important information to investors."[260]  Nasdaq believes that its proposed

Rule 5606 addresses many of the concerns that have been raised.

Nasdaq also believes that requiring the annual disclosure of a company's board

diversity, as proposed in Rule 5606(a), will provide consistent information to the public

and will enable investors to continually review the board composition of a company to

track trends and simplify or eliminate the need for a company to respond to multiple

investor requests for information about the diverse characteristics of the company's

board.  Requiring annual disclosures also would make information available to investors

who otherwise would not be able to obtain individualized disclosures.[261]  Moreover,

consistent disclosures may encourage boards to consider a wider range of board

candidates in the nomination process, including candidates with fewer ties to the current

board.[262]

The Commission's 2009 amendments to Regulation S-K provide no definition for

diversity and do not explicitly require disclosures specifically related to details about the

board's gender, racial, ethnic and LGBTQ+ composition.  Additionally, the Commission

staff's C&DI does not address the definition of diversity, and it requires a registrant to

disclose diversity information only in certain limited circumstances.  Investors have

---

[260]    See Proxy Disclosure Enhancements, 74 Fed. Reg. at 68,343-44 (amending Item 407(c)(2)(vi) of Regulation S-K, codified at 17 C.F.R. § 229.407(c)(2)(vi)).

[261]    See Petition for Rulemaking, supra note 130.

[262]    See Proxy Disclosure Enhancements, 74 Fed. Reg. at 68,355 ("To the extent that boards branch out from the set of candidates they would ordinarily consider, they may nominate directors who have fewer existing ties to the board or management and are, consequently, more independent."); Hazen and Broome, supra note 120, at 57-58.

expressed that current regulations and accompanying interpretations impair their ability to obtain clear and consistent data.[263]  As a result, Nasdaq believes that proposed Rule 5606(a) protects investors and the public interest by making clear that a company's annual diversity data disclosure must include information related to gender identity, race, ethnicity and LGBTQ+ status, thereby leaving less discretion for companies to selectively disclose certain diversity information and enhancing the comparability of such data across companies.  Moreover, it is in the public interest to provide clear requirements for diversity disclosure, and Nasdaq's proposed Matrix format provides such clarity.

Nasdaq does not intend to obligate directors to self-identify in any of the categories related to gender identity, race, ethnicity, and LGBTQ+.  Nasdaq believes that directors should have autonomy to decide whether to provide such information to their company.  Therefore, Nasdaq believes that it is reasonable and in the public interest to allow directors to opt out of disclosing the information required by proposed Rule 5606(a) by permitting a company to categorize such directors in the "Did Not Disclose Gender" and "Did Not Disclose Demographic Background" sections of the Matrix.

Nasdaq believes that it is in the public interest to utilize the Matrix format for all companies as proposed in Rule 5606(a).  Additionally, Nasdaq believes that the format removes impediments to aggregating and analyzing data across all companies by requiring each company to disclose separately the number of female, male, and non-binary directors, the number of female, male, and non-binary directors that fall into certain racial and ethnic categories, and the number of directors that identify as LGBTQ+.  In addition to the format, Nasdaq believes that prohibiting companies from

---

[263]     See Petition for Amendment of Proxy Rule, supra note 86, at 2; Petition for Rulemaking, supra note 130, at 7.

providing the information through graphics and images will allow investors to easily disaggregate the data and track directors with multiple diversity characteristics. Nasdaq also believes that it is reasonable and in the public interest to allow companies the flexibility of a supplementing their disclosure by providing additional information related to its directors in the Matrix, beyond what is required by proposed Rule 5606(a).

As discussed above, most listed companies are required by law to complete an EEOC Employer Information Report EEO-1 Form. Although outside directors generally are not employees and therefore are not covered in the EEO-1,[264] Nasdaq believes that collecting the information required by proposed Rule 5606(a) is familiar to most companies, and that it is reasonable to require disclosure of the additional board information.

Further, Nasdaq believes that the disclosure proposed under Rule 5606(a) will remove impediments to shareholders by making available information related to board-level diversity in a standardized manner, thereby enhancing the consistency and comparability of the information and helping to better protect investors. The proposed disclosure will also help protect investors and the public interest by enabling investors to determine the total number of diverse directors, which is information that is not consistently available in existing proxy disclosures in cases where a single director has multiple diverse characteristics. Nasdaq believes it is in the public interest to allow companies the option to provide the disclosure in a way they believe will be most meaningful to their shareholders. Therefore, Nasdaq has proposed Rule 5606(b) to provide companies the option of electing to provide the information in the same manner

---

[264]    The EEO-1 Form does not require a company to disclose data for outside directors because such directors are not company employees.

as, and concurrently with, the disclosure required by proposed Rule 5605(f)(3).

Specifically, such disclosure must be provided in advance of the company's next annual

meeting of shareholders: (a) in any proxy statement or any information statement (or, if

the company does not file a proxy, in its Form 10-K or 20-F); or (b) on the company's

website.  Aligning the timing for providing the board composition disclosure with other

governance-related disclosures, such as those provided in the proxy, makes it easier for

investors to know where a company has provided the proposed Rule 5606(b) disclosure

and gives shareholders access to the Matrix information prior to a company's annual

shareholder meeting.

Moreover, Nasdaq believes it is reasonable to request that companies that publish

their Matrix data on their website also submit such disclosure concurrently with the filing

made pursuant to (a) and submit a URL link to the disclosure through the Nasdaq Listing

Center, within one business day after such posting because this closely aligns the timing

for companies who opt to disclose via their website and companies who choose to

provide the disclosure through an SEC filing.  In the interest of providing companies

flexibility, Nasdaq has not required companies that publish their Matrix data on their

websites to publish the data in a specified location on their websites.

Nasdaq believes it is reasonable, and not unfairly discriminatory, to provide a

separate Matrix to Foreign Issuers.  Nasdaq recognizes that the proposed definition of

Underrepresented Minority in proposed Rule 5605(f)(1) may not apply to companies

outside of the United States because each country has its own unique demographic

composition.  Moreover, Nasdaq's definition of Underrepresented Minority proposed in

Rule 5605(f)(1) may be inapplicable to a Foreign Issuer, making this Matrix data less

relevant for such companies and not useful for investors. Therefore, Nasdaq believes that offering Foreign Issuers the option of a separate template that requires different disclosure categories will provide investors with more accurate disclosures related to the diversity of directors among the board of a Foreign Issuer. Additionally, Nasdaq believes that providing an "Underrepresented Individual in Home Country Jurisdiction" category provides Foreign Issuers with more flexibility to identify and disclose diverse directors within their home countries.

The annual requirement in proposed Rule 5606(a) will guarantee that the information is available to the public on a continuous and consistent basis. As described in the instructions to the Matrix disclosure form and proposed Rule 5606(a), each year following the first year of disclosure of the Matrix, all companies must include the current year and immediately prior year diversity statistics in its disclosure. If the company publishes the Matrix on its website, the disclosure must remain accessible on the company's website. Nasdaq believes that disclosing at least two years of data allows the public to view any changes and track a board's diversity progress. Moreover, requiring the disclosure to remain accessible on the company's website will allow investors to maintain access to the disclosure in the same manner as they would for companies who opt to provide the disclosure in an SEC filing.

In addition to providing a means for shareholders to assess a company's board-level diversity and measure its progress in improving that diversity over time, Nasdaq believes that proposed Rule 5606 will provide a means for Nasdaq to assess whether companies meet the diversity objectives of proposed Rule 5605(f). The ability to

determine satisfaction of the proposed listing rule's diversity objectives will protect investors and the public interest.

Moreover, the proposed rule provides transparency into diversity based not only on race, ethnicity, and gender identity, but also on a director's self-identified sexual orientation. Nasdaq believes that expanding the diversity characteristics beyond those which are commonly reported by companies currently will broaden the way boards view diversity and ensure that board diversity is occurring across all protected groups.

Nasdaq believes that the proposal is not unfairly discriminatory because proposed Rule 5606 will apply to all Nasdaq-listed companies, except for the following companies exempt pursuant to proposed Rule 5606(c): SPACs; asset-backed issuers and other passive issuers (as set forth in Rule 5615(a)(1)); cooperatives (as set forth in Rule 5615(a)(2)); limited partnerships (as set forth in Rule 5615(a)(4)); management investment companies (as set forth in Rule 5615(a)(5)); issuers of non-voting preferred securities, debt securities and Derivative Securities (as set forth in Rule 5615(a)(6)) that do not have equity securities listed on Nasdaq; and issuers of securities listed under the Rule 5700 Series—which meet the definition of Exempt Companies as defined under proposed Rule 5605(f)(4). Nasdaq believes it is reasonable and not unfairly discriminatory to exempt these companies from the proposed rule because the exemption of these companies, except for SPACs, is consistent with the approach taken by Nasdaq in Rule 5615 as it relates to certain Nasdaq corporate governance standards for board composition. Nasdaq believes it is not unfairly discriminatory to exempt SPACs from the requirements of proposed Rule 5605(f) because this approach is similar to other phase-in periods granted to SPACs. For example, Rule 5615(b)(1) provides a company listing in

connection with its initial public offering, including a SPAC, one year to fully comply

with the compensation and nomination committee requirements of Rules 5605(d) and (e),

and the majority independent board requirement of proposed Rule 5605(b).  Similarly,

Rule 5615(b)(1) and SEC Rule 10A-3(b)(1)(iv)(A) allows a newly listed company,

including a SPAC, up to one year from the date its registration statement is effective to

fully comply with the applicable audit committee composition requirements.  Moreover,

the post-business combination entity would be required to satisfy proposed Rule 5605(f)

by the later of two years from the date of listing or the date the Company files its proxy

statement or its information statement (or, if the company does not file a proxy, in its

Form 10-K or 20-F) for the company's second annual meeting of shareholders

subsequent to the company's listing, with differing milestones depending on the

company's market tier.

　　　　Finally, Nasdaq believes it is reasonable under proposed Rule 5606(e) to allow

companies the later of (1) one calendar year from the Approval Date, which is the

Effective Date; or (2) the date the Company files its proxy statement or its information

statement for its annual meeting of shareholders (or, if the Company does not file a proxy

or information statement, the date it files its Form 10-K or 20-F) during the calendar year

of the Effective Date.  Nasdaq believes proposed Rule 5606(e) is reasonable because

there is only a *de minimis* burden placed on companies to collect the board data and

prepare the Matrix given that most companies already collect similar information for

certain employees.  Additionally, most companies are required to prepare an annual

proxy statement and update the Commission within four business days when a new

director is appointed to the board.[265]  Proposed Rule 5606(e) also aligns the operative date for proposed Rule 5606 with Nasdaq's listed companies' annual shareholder meetings and proxy filings with the uncertainty of when the Commission may take action on the proposed changes.  Therefore, Nasdaq believes that at least a minimum of one year is sufficient time for companies to incorporate their directors into their data collection.

## II.    Diverse Board Representation or Explanation

### E.   *Removes Impediments to and Perfects the Mechanism of a Free and Open Market and a National Market System*

As discussed above, studies suggest that the traditional director candidate selection process may create barriers to considering qualified diverse candidates for board positions by limiting the search for director nominees to existing directors' social networks and candidates with C-suite experience.[266]  As noted in Section IV of the Purpose section, women hold more than 30% of board seats in Norway, France, Sweden, and Finland.[267]  As noted in Section IV of the Purpose section, in analyzing Norway's experience in implementing a gender mandate, Dhir (2015) observed that "[b]oard seats tend to be filled by directors engaging their networks, and the resulting appointees tend to be of the same socio-demographic background."[268]  Dhir concluded that broadening the search for directors outside of traditional networks "is unlikely to occur without some form of regulatory intervention, given the prevalence of homogenous social networks and

---

[265]    See SEC Form 8-K, available at:  https://www.sec.gov/files/form8-k.pdf.

[266]    See GAO Report, supra note 49; Vell, supra note 106; Rhode & Packel, supra note 110, at 39; Deloitte, *Women in the Boardroom*, supra note 92; see also Parker, supra note 103, at 38 (acknowledging that, "as is the case with gender, people of colour within the UK have historically not had the same opportunities as many mainstream candidates to develop the skills, networks and senior leadership experience desired in a FTSE Boardroom").

[267]    See supra note 92.

[268]    See Dhir, supra note 84, at 52.

in-group favoritism."[269]  He also observed that regulatory action was effective in

increasing the representation of women on boards in Norway by "democratiz[ing] access

to a space previously unavailable to women."[270]  One Norwegian director "grudgingly

accept[ed] that the free market principles she held so dearly had disappointed her—and

that the [mandate] was a necessary correction of market failure."[271]

In contrast, Nasdaq observed that other countries have made comparable progress

using a disclosure-based model.  Women account for at least 30% of the largest boards of

companies in six countries using comply-or-explain models:[272]  Australia, Finland,

Sweden, New Zealand, Canada, and the United Kingdom.[273]  Nasdaq discussed the

benefits and challenges of mandate and disclosure-based models with over a dozen

stakeholders, and the majority of organizations were in agreement that companies would

benefit from a disclosure-based, business-driven framework to drive meaningful and

systemic change in board diversity, and that a disclosure-based approach would be more

palatable to the U.S. business community than a mandate.  While many organizations

recognized that mandates can force boards to act more quickly and accelerate the rate of

change, they believe that a disclosure-based approach is less controversial, would spur

companies to take action and would make meaningful progress on board diversity.  Some

stakeholders also highlighted additional challenges that smaller companies and

companies in certain industries may face finding diverse board members.  However,

leaders from across the spectrum of stakeholders with whom Nasdaq spoke reinforced the

---

[269]    Id. at 51.  See also Albertine d'Hoop-Azar et al., supra note 236.

[270]    See Dhir, supra note 84, at 101.

[271]    See Dhir, supra note 84, at 116.

[272]    See Paul Hastings, supra note 207; Deloitte, *Women in the Boardroom*, supra note 92.

[273]    See Conference Board of Canada, supra note 233; Osler, supra note 233, at 4.

notion that if companies recruit by skill set and expertise rather than title, then they will find there is more than enough diverse talent to satisfy demand.  The Exchange is therefore proposing a disclosure-based framework, not a mandate.

Nasdaq also considered Acting Chair Lee's observation that disclosure "gets investors the information they need to make investment decisions based on their own judgment of what indicators matter for long-term value.  Importantly, it can also drive corporate behavior."  Specifically, she observed that:

> For one thing, when companies have to formulate disclosure on topics it can influence their treatment of them, something known as the "what gets measured, gets managed" phenomenon.  Moreover, when companies have to be transparent, it creates external pressure from investors and others who can draw comparisons company to company.  The Commission has long-recognized that influencing corporate behavior is an appropriate aim of our regulations, noting that "disclosure may, depending on determinations made by a company's management, directors and shareholders, influence corporate conduct" and that "[t]his sort of impact is clearly consistent with the basic philosophy of the disclosure provisions of the federal securities laws."[274]

Nasdaq believes that a disclosure-based framework may influence corporate conduct if a company chooses to meet the diversity objectives of proposed Rule 5605(f)(2).  A company may satisfy that objective by broadening the search for qualified candidates and considering candidates from other professional pathways that bring a wider range of skills and perspectives beyond traditional C-suite experience.[275]  Nasdaq believes that this will help increase opportunities for Diverse candidates that otherwise may be overlooked due to the impediments of the traditional director recruitment process, and therefore the proposed rule is designed to remove impediments to a free and open

---

[274]      See Lee, supra note 27.

[275]      See, e.g., Hillman et al., supra note 111 (finding that African-American and white women directors were more likely to have specialized expertise in law, finance, banking, public relations or marketing, or community influence from positions in politics, academia or clergy).

market and a national market system.  Further, boards that choose to meet the applicable diversity objectives may experience other benefits from diversity that perfect the mechanism of a free and open market and national market system.  As discussed above in Section 3.a.III.B of the Purpose section (*Diversity and Investor Protection*), and further discussed below in Section 3.b.II.B of the Statutory basis section (*Prevents Fraudulent and Manipulative Acts and Practices*), studies suggest that diversity is positively associated with reduced stock volatility,[276] more transparent public disclosures,[277] and less information asymmetry,[278] leading to stock prices that better reflect public information, and therefore Nasdaq believes the proposed rule is designed to remove impediments to and perfecting a free and open market and a national market system.  Importantly, Nasdaq believes that the disclosure-based framework proposed under proposed Rule 5605(f) is not designed to create additional impediments to a free and open market and a national market system because it will empower companies to maintain decision-making authority over the composition of their boards.

To the extent a company chooses not to meet the applicable diversity objectives of proposed Rule 5605(f)(2), Nasdaq believes that proposed Rule 5605(f)(3) will provide analysts and investors with a better understanding about the company's reasons for not doing so and its philosophy regarding diversity.  Proposed Rule 5605(f) is thus designed to remove impediments to a free and open market and a national market system by enabling the investment community to conduct more informed analyses of, and have more informed conversations with, companies.  Nasdaq believes that such analyses and

---

[276]    See Bernile et al., supra note 33.

[277]    See Gul et al., supra note 72; Bravo and Alcaide-Ruiz, supra note 62.

[278]    See Abad et al., supra note 73.

conversations will be better informed by consistent, comparable data across companies, which Nasdaq proposes to achieve by adopting a consistent definition of "Diverse" under proposed Rule 5605(f)(1). Nasdaq further believes that providing such disclosure will improve the quality of information available to investors who rely on this information to make informed investment and voting decisions, and is therefore designed to promote capital formation and efficiency and perfect the mechanism of a free and open market and a national market system.

### F.  *Prevents Fraudulent and Manipulative Acts and Practices*

As discussed above in Section III of the Purpose section, Nasdaq is concerned that the failure of homogenous boards to consider a broad range of viewpoints can result in "groupthink," which may lead to suboptimal decisions that have adverse effects on company performance, board performance and stakeholders. Nasdaq believes that including diverse directors with a broader range of skills, perspectives and experiences may help detect and prevent fraudulent and manipulative acts and practices by mitigating "groupthink." Increased board diversity also may reduce the likelihood of insider trading and other fraudulent and manipulative acts and practices.

Nasdaq reached this conclusion by reviewing public statements by investors and organizations regarding the impact of groupthink on decision making processes, as well as academic and empirical studies on the relationship between diversity, groupthink and fraud. Nasdaq observed that groupthink can result in "self-censorship"[279] and failure to voice dissenting viewpoints in pursuit of "consensus without critical evaluation and

---

[279]    See Forbes and Milliken, supra note 80, at 496.

without considering different possibilities."[280]  In contrast, "board members who possess

a variety of viewpoints may raise different ideas and encourage a full airing of dissenting

views.  Such a broad pool of talent can be assembled when potential board candidates are

not limited by gender, race, or ethnicity."[281]

Dhir (2015) concluded that gender diversity may "promote cognitive diversity and

constructive conflict in the boardroom" and gender diverse boards may be more effective

at overseeing management.[282]  One respondent in Dhir's survey of Norwegian directors

observed that:

> I've seen situations where the women were more willing to dig into the difficult
> questions and really go to the bottom even if it was extremely painful for the rest
> of the board, but mostly for the CEO . . . when it comes to the really difficult
> situations, [where] you think that the CEO has . . . done something criminal . . .
> [o]r you think that he has done something negligent, something that makes it such
> that you . . . are unsure whether he's the suitable person to be in the driving
> seat.[283]

Another director observed that "[i]f you have different experiences and a more

diversified board, you will have different questions asked."[284]  Dhir concluded that

"women directors may be particularly adept at critically questioning, guiding and

advising management without disrupting the overall working relationship between the

board and management."[285]

Pucheta-Martínez et al. (2016) reasoned that questioning management is a critical

part of the audit committee's oversight role, along with ensuring that management does

---

[280]    See Dhir, supra note 84, at 124.

[281]    See Petition for Amendment of Proxy Rule, supra note 86, at 4.

[282]    See Dhir, supra note 84, at 150.

[283]    Id. at xiv.

[284]    Id. at 120.

[285]    Id. at 35.

not pressure the external auditor to issue a clean audit opinion notwithstanding the

identification of any uncertainties or scope limitations.[286]  Otherwise, "[a]uditors may

accept the demands of management for a clean audit report when the firm deserves a

scope limitation and an uncertainty qualification."[287]  The authors found that "the

percentage of female [directors] on [audit committees] reduces the probability of [audit]

qualifications due to errors, non-compliance or the omission of information,"[288] and

further found that:

> The percentage of female directors on [audit committees], the proportion of
> independent female directors on [audit committees] and [audit committees]
> chaired by women, impact positively on the likelihood of disclosing scope
> limitations and uncertainties qualifications, suggesting an improvement of the
> quality of financial information.[289]

The authors concluded that this suggests that gender-diverse audit committees

better "ensure that managers do not seek to pressure auditors into issuing a clean opinion

instead of a qualified opinion" when any uncertainties or scope limitations are

identified.[290]

Nasdaq also reviewed studies that found a positive association between board

gender diversity and important investor protections regardless of whether women are on

the audit committee, and considered the assessment of some academics that their findings

may extend to other forms of diversity, including racial and ethnic diversity.  Nasdaq

therefore believes that such findings with respect to audit committees would be expected

to be more broadly applicable to the quality of the broader board's decision-making

---

[286]    See Pucheta-Martínez et al., supra note 58, at 368.

[287]    Id. at 364.

[288]    Id. at 363.

[289]    Id. at 378.

[290]    Id. at 368.

process, and to other forms of diversity, including diversity of race, ethnicity and sexual

orientation.

In examining the association between broader board gender diversity and fraud,

Cumming, et al. observed that "[g]ender diversity, in particular, has been found to

facilitate more effective monitoring by the board and protection of shareholder interests

by broadening the board's expertise, experience, interests, perspectives and creativity."[291]

They observed that the presence of women on boards is associated with a lower

likelihood of securities fraud; indeed, they found "strong evidence of a negative and

diminishing effect of women on boards and the probability of being in our fraud

sample."[292]  The authors suggested that "other forms of board diversity, including but not

limited to gender diversity, may likewise reduce fraud."[293]

Similarly, Wahid (2019) noted that board gender diversity may "lead to less

biased and superior decision-making" because it "has a potential to alter group dynamics

by affecting cognitive conflict and cohesion."[294]  Wahid (2019) concluded that "gender-

diverse boards commit fewer financial reporting mistakes and engage in less fraud,"[295]

finding that companies with female directors have "fewer irregularity-type [financial]

restatements, which tend to be indicative of financial manipulation."[296]  Wahid also

suggested that other forms of diversity, including racial diversity, could introduce

---

[291]    See Cumming et al., supra note 68, at 1574.

[292]    Id. at 1589.

[293]    Id. at 1588.

[294]    See Wahid, supra note 65, at 707.

[295]    Id. at 705.

[296]    Id. at 721.

additional perspectives to the boardroom,[297] which Nasdaq believes could further

mitigate groupthink.

Abbott, Parker and Persley (2012) posited that "a female board presence

contribut[es] to the board's ability to maintain an attitude of mental independence,

diminish[es] the extent of groupthink and enhance[es] the ability of the board to monitor

financial reporting."[298]  They noted that "poorer [internal] controls and the lack of an

independent and questioning board-level attitude toward accounting judgments can create

an opportunity for fraud."[299]  They observed a lower likelihood of a material financial

restatements stemming from fraud or error in companies with at least one woman on the

board.[300]

Nasdaq believes that these studies provide substantial evidence suggesting an

association between gender diverse boards or audit committees and a lower likelihood of

fraud; a lower likelihood of receiving audit qualifications due to errors, non-compliance

or omission of information; and a greater likelihood of disclosing audit reports with

uncertainties and scope limitations.  Moreover, academics have suggested that other

forms of diversity, including racial and ethnic diversity, may reduce fraud and mitigate

---

[297]    Id. at 24-25; see also Shecter, supra note 67 (quoting Wahid as saying that "[i]f you're
going to introduce perspectives, those perspectives might be coming not just from male
versus female. They could be coming from people of different ages, from different racial
backgrounds…. If we just focus on one, we could be essentially taking away from other
dimensions of diversity and decreasing perspective.").

[298]    See Abbott et al., supra note 64, at 607.

[299]    Id. at 610.

[300]    Id. at 613 ("The previously discussed lines of research lead us to form our hypothesis. In
summary, restatements may stem from error or fraud. In either instance, the internal
control system (to which the board of directors contributes by setting the overall tone at
the top) has failed to detect or prevent a misstatement. Ineffective internal controls may
stem from insufficient questioning of assumptions underlying financial reporting,
inadequate attention to the internal control systems, or insufficient support for the audit
committee's activities.").

groupthink.  Further, while homogenous boards may unwittingly fall into the trap of groupthink due to a lack of diverse perspectives, "heterogeneous groups share conflicting opinions, knowledge, and perspectives that result in a more thorough consideration of a wide range of interpretations, alternatives, and consequences."[301]  Nasdaq therefore believes that the proposed rule is designed to reduce groupthink, and otherwise to enhance the functioning of boards, and is therefore designed to prevent fraudulent and manipulative acts and practices.

Further, the Commission has suggested that in seeking board diversity, "[t]o the extent that boards branch out from the set of candidates they would ordinarily consider, they may nominate directors who have fewer existing ties to the board or management and are, consequently, more independent."[302]  Nasdaq believes that the benefits of the proposed rule are analogous to the benefits of Nasdaq's rules governing and requiring director independence.  In 2003, Nasdaq adopted listing rules requiring, among other things, that independent directors comprise a majority of listed companies' boards, which were "intended to enhance investor confidence in the companies that list on Nasdaq."[303] The Commission observed that self-regulatory organizations "play an important role in assuring that their listed issuers establish good governance practices," and concluded that the proposed rule changes would secure an "objective oversight role" for issuers' boards of directors, and "foster greater transparency, accountability, and objectivity" in that role."[304]  Along the same lines, in approving Nasdaq's application for registration as a

---

[301]    See Dallas, supra note 82, at 1391.

[302]    See Proxy Disclosure Enhancements, supra note 79, 74 Fed. Reg. at 68,355.

[303]    See Order Approving Proposed Rule Changes, supra note 52, at 64,161.

[304]    Id. at 64, 175.

national securities exchange, the Commission found Nasdaq's rules governing the

independence of members of boards and certain committees to be consistent with Section

6(b)(5) of the Act because they advanced the "interests of shareholders" in "greater

transparency, accountability, and objectivity" in oversight and decision-making by

corporate boards.[305] Nasdaq proposes to promote accountability in corporate decision-

making by requiring companies that do not have the applicable number of Diverse

directors under proposed Rule 5605(f)(2) to provide investors with a public explanation

of the board's reasons for not doing so under proposed Rule 5605(f)(3).

Nasdaq believes it is critical to the detection and prevention of fraudulent and

manipulative acts and practices to have directors on the board who are willing to

critically question management and air dissenting views.  Nasdaq believes that boards

comprised of directors from Diverse backgrounds enhance investor confidence by

ensuring that board deliberations consider the perspectives of more than one demographic

group, leading to robust dialogue and better decision making.  However, Nasdaq

recognizes that directors may bring diverse perspectives, skills and experiences to the

board, notwithstanding that they have similar attributes.  Nasdaq therefore believes it is in

the public interest to permit a company to choose whether to meet the diversity objectives

of proposed Rule 5605(f)(2) or to explain why it does not, in accordance with proposed

Rule 5605(f)(3).  For example, it may believe that defining diversity more broadly than

Nasdaq (by considering national origin, veteran status and disabilities) brings a wide

---

[305]    See In re Nasdaq Stock Market, 71 Fed. Reg. 3550, 3565 (Jan. 23, 2006).  See also 68
Fed. Reg. 18,788, 18,815 (April 16, 2003) (in adopting Rule 10A-3, setting standards for
the independence of audit committee members, the Commission concluded that such
standards would "enhance the quality and accountability of the financial reporting
process and may help increase investor confidence, which implies increased efficiency
and competitiveness of the U.S. capital markets").

range of perspectives and experiences to the board. Nasdaq believes such disclosure will provide investors with a better understanding of the company's philosophy regarding diversity. This would better inform the investment community and enable more informed analyses of, and conversations with, companies. Therefore, Nasdaq believes satisfying proposed Rule 5605(f)(2) through disclosure pursuant to proposed Rule 5605(f)(3) is consistent with Section 6(b)(5) of the Act because it is designed to advance the "interests of shareholders" in "greater transparency, accountability, and objectivity" of boards and their decision-making processes.[306] In addition, as discussed further in Section 3.b.II.C of the Statutory Basis section (*Promotes Investor Protection and the Public Interest*) below, Nasdaq believes that proposed Rule 5605(f) could help to reduce information asymmetry, and thereby reduce the risk of insider trading or other opportunistic insider behavior.

### G. *Promotes Investor Protection and the Public Interest*

Substantial evidence exists that board diversity is positively associated with more transparent public disclosures and higher quality financial reporting, and therefore Nasdaq believes the proposal is designed to promote investor protection. Specifically, studies have concluded that companies with gender-diverse boards are associated with more transparent public disclosures and less information asymmetry, leading to stock prices that better reflect public information. Gul, Srinidhi & Ng (2011) found that "gender diversity improves stock price informativeness by increasing voluntary public disclosures in large firms and increasing the incentives for private information collection

---

[306]    <u>Id.</u>

in small firms."[307]  Bravo and Alcaide-Ruiz (2019) concluded that "female [audit committee] members with financial expertise play an important role in influencing disclosure strategies that provide forward-looking information containing projections and financial data useful for investors."[308]  Abad et al. (2017) concluded that companies with gender diverse boards are associated with lower levels of information asymmetry, suggesting that increasing board gender diversity is associated with "reducing the risk of informed trading and enhancing stock liquidity."[309]

Nasdaq believes that one consequence of information asymmetry is that insiders may engage in opportunistic behavior prior to a public announcement of financial results and before the market incorporates the new information into the company's stock price. This can result in unfair gains or an avoidance of losses at the expense of shareholders who did not have access to the same information.  This may exacerbate the principal-agent problem, in which the interests of a company's board and shareholders are not aligned.  Lucas-Perez et al. (2014) found that board gender diversity is positively associated with linking executive compensation plans to company performance,[310] which may be an effective mechanism to deter opportunistic behavior by management and better align their interests with those of their company's shareholders.[311]

Another concern is that "[w]hen information asymmetry is high, stakeholders do not have sufficient resources, incentives, or access to relevant information to monitor

---

[307]    See Gul et al., supra note 72, at 2.

[308]    See Bravo and Alcaide-Ruiz, supra note 62, at 151.

[309]    See Abad et al., supra note 73, at 202.

[310]    See Lucas-Perez et al., supra note 75.

[311]    Id.

managers' actions, which gives rise to the practice of earnings management."[312]  Earnings

management "is generally defined as the practice of using discretionary accounting

methods to attain desired levels of reported earnings."[313]  Manipulating earnings is

particularly concerning to investors because "[i]f users of financial data are 'misled' by

the level of reported income, then investors' allocation of resources may be inappropriate

when based on the financial statements provided by management,"[314] which could

undermine the efficacy of the capital formation process for investors who rely on such

information to make informed investment and voting decisions.

Gull et al. (2018)[315] observe that overseeing management is a crucial component

of investor protection, particularly with regard to earnings management:

> The role of the board of directors and board characteristics (*i.e.* board
> independence and gender diversity) is usually associated with the protection of
> shareholder interests…. This role is particularly crucial with regard to the issue of
> earnings management, in that one of the responsibilities of boards is to monitor
> management.[316]

The authors of that study found that the presence of female audit committee

members with business expertise is associated with a lower magnitude of earnings

management.  Srinidhi, Gul and Tsui (2011) observed that better oversight of

management combined with lower information asymmetry leads to better earnings

quality.  They noted that "[e]arnings quality is an important outcome of good governance

demanded by investors and therefore its improvement constitutes an important objective

---

[312]    See Vernon J. Richardson, *Information Asymmetry and Earnings Management: Some Evidence*, 15 Rev. Quantitative Fin. and Acct. 325 (2000).

[313]    See Gull et al., supra note 61, at 2.

[314]    Id.

[315]    See generally id.

[316]    Id. at 6 (citations omitted).

of the board."[317]  They found that companies with women on the board, specifically on

the audit committee, exhibit "higher earnings quality" and "better reporting discipline by

managers."[318]  They concluded that "including female directors on the board and the

audit committee are plausible ways of improving the firm's reporting discipline and

increasing investor confidence in financial statements."[319]

Chen, Eshleman and Soileau (2016) suggested that the relationship between

gender diversity and higher earnings quality observed by Srinidhi, Gul and Tsui (2011) is

ultimately driven by reduced internal control weaknesses, noting that "prior literature has

established a negative relationship between internal control weaknesses and earnings

quality."[320]  Internal control over financial reporting are procedures designed "to provide

reasonable assurance regarding the reliability of financial reporting and the preparation of

financial statements for external purposes in accordance with GAAP."[321]  Weaknesses in

internal controls can "lead to poor financial reporting quality" and "more severe insider

trading"[322] or failure to detect a material misstatement.  According to the PCAOB:

> A material weakness is a deficiency, or a combination of deficiencies, in internal
> control over financial reporting, such that there is a reasonable possibility that a

---

[317]    See Srinidhi et al., supra note 56, at 1638.

[318]    Id. at 1612.  The authors used two measures of earnings quality: discretionary accruals
quality "computed as the absolute value of the estimation error in accruals after
controlling for current, past, and future cash flows, sales and long-term assets, and
operating cycle and volatility in sales" and "the lower propensity among firms whose
unmanaged earnings are just shy of earnings benchmarks to manage earnings and beat the
benchmarks by a small amount."

[319]    Id.

[320]    See Chen et al., supra note 70, at 18.

[321]    See Public Company Accounting Oversight Board, Auditing Standard No. 5: Appendix A,
A5 available at: https://pcaobus.org/oversight/standards/archived-
standards/details/Auditing_Standard_5_Appendix_A.

[322]    See Chen et al., supra note 70, at 12.

material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis.[323]

A material misstatement can occur "as a result of some type of inherent risk, whether fraud or error (*e.g.*, management's aggressive accounting practices, erroneous application of GAAP)."[324]  The failure to prevent or detect a material misstatement before financial statements are issued can require the company to reissue its financial statements and potentially face costly shareholder litigation.  Chen et al. found that having at least one woman on the board (regardless of whether or not she is on the audit committee) "may lead [a] to reduced likelihood of material weaknesses [in internal control over financial reporting],"[325] and Abbott, Parker and Persley (2012) found "a significant association between the presence of at least one woman on the board and a lower likelihood of [a material financial] restatement."[326]   Notably, while the Sarbanes-Oxley Act ("SOX") implemented additional measures to ensure that a company has robust internal controls, the findings of Abbott et al. were consistent among a sample of pre- and post-SOX restatements, suggesting that "an additional, beneficial layer of independence in group decision-making is associated with gender diversity."[327]

Nasdaq believes that the proposal to require listed companies to have, or explain why they do not have, the applicable number of Diverse directors under proposed Rule 5605(f) could help to lower information asymmetry and reduce the risk of insider trading or other opportunistic insider behavior, which would help to increase stock price

---

[323]     See Public Company Accounting Oversight Board, *supra* note 321, at A7.

[324]     See Abbott et al., *supra* note 64, at 609-10.

[325]     See Chen et al., *supra* note 70, at 18.

[326]     See Abbott et al., *supra* note 64, at 607.

[327]     Id. at 609.

informativeness and enhance stock liquidity, and is therefore designed to protect investors and promoting capital formation and efficiency.  Nasdaq believes that information asymmetry could also be reduced by permitting companies to satisfy proposed Rule 5605(f)(2) by publicly disclosing their reasons for not meeting the applicable diversity objectives in accordance with proposed Rule 5605(f)(3), because the requirement will improve the quality of information available to investors who rely on this information to make informed investment and voting decisions, and is therefore designed to protect investors and promote capital formation and efficiency.  Aligning the timing for companies to provide an explanation in accordance with 5605(f) with other governance-related disclosures, such as those provided in the proxy, will make it easier for investors to know where a company has provided the proposed Rule 5605(f) disclosure and gives shareholders access to the information prior to a company's annual shareholder meeting.

Moreover, Nasdaq believes that proposed Rule 5605(f) could foster more transparent public disclosures, higher quality financial reporting, and stronger internal control over financial reporting and mechanisms to monitor management.  This could be particularly beneficial for Smaller Reporting Companies that are not subject to the SOX 404(b) requirement to obtain an independent auditor's attestation of management's assessment of the effectiveness of internal control over financial reporting, which is therefore designed to promote investor protection.

Nasdaq believes that the body of research on the relationship between company performance and board diversity summarized under Section III.A of the Purpose section above provides substantial evidence supporting the conclusion that board diversity does

not have adverse effects on company performance, and therefore Nasdaq believes the

proposal is designed to not negatively impact capital formation, competition or efficiency

among its public companies.[328]  Nasdaq considered that some studies on gender diversity

alone have had mixed results,[329] and that the U.S. GAO (2015) and Carter et al. (2010)

concluded that the mixed results are due to differences in methodologies, data samples

and time periods.[330]  This is not the first time Nasdaq has considered whether, on balance,

various studies finding mixed results related to board composition and company

performance are sufficient rationale to propose a listing rule.  For example, in 2003,

notwithstanding the mixed results of studies regarding the relationship between company

performance and board independence,[331] Nasdaq adopted listing rules requiring a

majority independent board that were "intended to enhance investor confidence in the

companies that list on Nasdaq."[332]  In its Approval Order, the SEC noted that "[t]he

Commission has long encouraged exchanges to adopt and strengthen their corporate

governance listing standards in order to, among other things, enhance investor confidence

in the securities markets;" the Commission concluded that the independence rules would

---

[328]  See Di Miceli and Donaggio, supra note 50 ("The overwhelming majority of empirical studies conclude that a higher ratio of women in business leadership does not impair corporate performance (virtually all studies find positive or non-statistically significant results)").  See also Wahid, supra note 65, at 707 (suggesting that "at a minimum, gender diversity on corporate boards has a neutral effect on governance quality, and at best, it has positive consequences for boards' ability to monitor firm management").

[329]  See, e.g., Pletzer et al., supra note 43; Post and Byron, supra note 44; Adams and Ferreira, supra note 47.

[330]  See GAO Report, supra note 49, at 5 ("Some research has found that gender diverse boards may have a positive impact on a company's financial performance, but other research has not.  These mixed results depend, in part, on differences in how financial performance was defined and what methodologies were used"); Carter (2010), supra note 45, at 400 (observing that the different "statistical methods, data, and time periods investigated vary greatly so that the results are not easily comparable.").

[331]  See supra note 50.

[332]  See Order Approving Proposed Rule Changes, supra note 52, at 64,161.

secure an "objective oversight role" for issuers' boards, and "foster greater transparency, accountability, and objectivity" in that role.[333]  Nasdaq believes this reasoning applies to the current proposed rule as well.  Even without clear consensus among studies related to board diversity and company performance, the heightened focus on corporate board diversity by investors demonstrates that investor confidence is undermined when data on board diversity is not readily available and when companies do not explain the reasons for the apparent absence of diversity on their boards.[334]  Legislators are increasingly taking action to encourage corporations to diversify their boards and improve diversity disclosures.[335]  Moreover, during its discussions with stakeholders, Nasdaq found consensus across every constituency that there is inherent value in board diversity.  Lastly, it has been a longstanding principle that "Nasdaq stands for integrity and ethical business practices in order to enhance investor confidence, thereby contributing to the financial health of the economy and supporting the capital formation process."[336]

For all the foregoing reasons, Nasdaq believes that proposed Rule 5605(f) is designed to promote investor protection and the public interest by enhancing investor confidence that all listed companies are considering diversity in the context of selecting directors, either by meeting the applicable diversity objectives of proposed Rule 5605(f)(2) or by explaining their rationale for not doing so.  To the extent a company chooses not to meet the diversity objectives of proposed Rule 5605(f)(2), Nasdaq believes that the proposal will provide investors with additional disclosure about the

---

[333]     Id. at 64,176.

[334]     See supra notes 4 and 8.

[335]     See supra note 118.

[336]     See Nasdaq Rulebook, Rule 5101.

company's reasons for doing so under proposed Rule 5605(f)(3).  For example, the

company may choose to disclose that it does not meet the diversity objectives of

proposed Rule 5605(f)(2) because it is subject to an alternative standard under state or

foreign laws and has chosen to satisfy that diversity objective instead.  On the other hand,

many firms may strive to achieve even greater diversity than the objectives set forth in

our proposed rule.  Nasdaq believes that providing such flexibility and clear disclosure

where the company determines to follow a different path will improve the quality of

information available to investors who rely on this information to make informed

investment and voting decisions, thereby promoting capital formation and efficiency, and

further promoting the public interest.

### H. *Not Designed to Permit Unfair Discrimination between Customers, Issuers, Brokers, or Dealers*

Nasdaq believes that proposed Rule 5605(f) is not designed to permit unfair

discrimination among companies because it requires all companies subject to the rule to

meet the applicable diversity objectives under proposed Rule 5605(f)(2) or explain why

they do not, which could include describing a different approach.  While the proposal

provides different objectives for the second Diverse director among Smaller Reporting

Companies, Foreign Issuers, and other companies, Nasdaq believes that the rule is not

designed to permit unfair discrimination among companies.  In all cases, a company can

choose to meet the diversity objectives of the entire rule or to satisfy only certain

elements of the rule.  Further, while the proposal provides an alternative objective for

companies with smaller boards, the proposed rule does not limit board sizes—if a board

chooses to nominate a Diverse individual to the board to meet the diversity objectives of

the proposed rule, it is not precluded from also nominating a non-Diverse director for an

additional board seat.  Lastly, the proposal is a disclosure-based framework, not a

mandate, and companies can choose to explain their reasons for not meeting the proposed

diversity objectives.

### i.  Rule 5605(f)(2)(B):  Foreign Issuers

Similar to all other companies subject to proposed Rule 5605(f), the proposal

requires all Foreign Issuers with boards of more than five members to have, or explain

why they do not have, at least two Diverse directors, including one director who self-

identifies as Female.  Foreign Issuers with boards of five or fewer members could meet

an alternative objective of one Diverse director. However, Nasdaq proposes to provide

Foreign Issuers with boards of more than five members with additional flexibility with

regard to the second Diverse director.  Foreign Issuers could satisfy the second director

objective by including another Female director, or an individual who self-identifies as

LGBTQ+ or as an underrepresented individual based on national, racial, ethnic,

indigenous, cultural, religious or linguistic identity in the country of the company's

principal executive offices (as reported on the company's Form 10-K, 20-F or 40-F).

While the proposal provides a different objective for the second Diverse director for

Foreign Issuers with larger boards, Nasdaq believes it is not designed to permit unfair

discrimination between Foreign Issuers and other companies because it recognizes that

the unique demographic composition of the United States, and its historical

marginalization of Underrepresented Minorities and the LGBTQ+ community, may not

extend to all countries outside of the United States.  Further, Nasdaq believes that it is

challenging to apply a consistent definition of minorities to all countries globally because

"[t]here is no internationally agreed definition as to which groups constitute

minorities."[337]  However, Nasdaq observed that the United Nations *Declaration on the Rights of Persons Belonging to National or Ethnic, Religious and Linguistic Minorities* states that:

> States shall protect the existence and the national or ethnic, cultural, religious and linguistic identity of minorities within their respective territories and shall encourage conditions for the promotion of that identity. [Article 1.1]

> Persons belonging to national or ethnic, religious and linguistic minorities (hereinafter referred to as persons belonging to minorities) have the right to enjoy their own culture, to profess and practise their own religion, and to use their own language, in private and in public, freely and without interference or any form of discrimination. [Article 2.1]

Similarly, "there is no universally accepted international definition of indigenous peoples."[338]  Rather, the United Nations *Declaration on the Rights of Indigenous Peoples* recognizes "that the situation of indigenous peoples varies from region to region and from country to country and that the significance of national and regional particularities and various historical and cultural backgrounds should be taken into consideration."[339] Accordingly, Nasdaq believes that it is not unfairly discriminatory to allow an alternative mechanism for Foreign Issuers to satisfy proposed Rule 5605(f)(2) in recognition that the U.S.-based EEOC definition of Underrepresented Minorities is not appropriate for every Foreign Issuer.  In addition, Foreign Issuers have the ability to satisfy proposed Rule

---

[337]    See United Nations, *Minority Rights: International Standards and Guidance for Implementation* 2 (2010), available at: https://www.ohchr.org/Documents/Publications/MinorityRights_en.pdf.  See also G.A. Res. 47/135. art. 1.1 (Dec. 18, 1992) ("States shall protect the existence and the national or ethnic, cultural, religious and linguistic identity of minorities within their respective territories and shall encourage conditions for the promotion of that identity.").  The preamble to the Declaration also "[r]eaffirm[s] that one of the basic aims of the United Nations, as proclaimed in the Charter, is to promote and encourage respect for human rights and for fundamental freedoms for all, without distinction as to race, sex, language or religion."

[338]    See id. at 3.

[339]    See G.A. Res. 61/295 (Sept. 13, 2007).

5605(f)(2)(B) by explaining that they do not satisfy this alternative definition.  Similarly, any company that is not a Foreign Issuer, but that prefers the alternative definition available for Foreign Issuers, could follow proposed Rule 5605(f)(2)(B) and disclose its reasons for doing so.

Under the proposal, Foreign Issuer means (a) a Foreign Private Issuer (as defined in Rule 5005(a)(19)) or (b) a company that (i) is considered a "foreign issuer" under Rule 3b-4(b) under the Act, and (ii) has its principal executive offices located outside of the United States.  For example, a company that is considered a "foreign issuer" under Rule 3b-4(b) under the Act and has its principal executive offices located in Ireland would qualify as a Foreign Issuer for purposes of proposed Rule 5605(f)(2), even if it is not considered a Foreign Private Issuer under Nasdaq or SEC rules.  Nasdaq proposes to define "board of directors" in proposed Rule 5605(f)(2)(B)(i)(b) to mean, in the case of a Foreign Issuer with a two-tiered board system, the company's supervisory or non-management board, which is consistent with the SEC's definition in Rule 10A-3(e)(2) of the Exchange Act.[340]

Nasdaq recognizes that Foreign Issuers may be located in jurisdictions that impose privacy laws limiting or prohibiting self-identification questionnaires, particularly as they relate to race or ethnicity.  In such countries, a company may not be able to determine each director's self-identified Diverse attributes due to restrictions on the collection of personal information.  The company may instead publicly disclose pursuant to proposed Rule 5605(f)(3) that "Due to privacy laws in the company's home country

---

[340]    See 17 CFR § 240.10A-3(e)(2) ("In the case of foreign private issuers with a two-tier board system, the term board of directors means the supervisory or non-management board.").

jurisdiction limiting its ability to collect information regarding a director's self-identified Diverse attributes, the company is not able to determine that it has two Diverse directors as set forth under Rule 5605(f)(2)(B)(ii)."

   ii.   Rule 5605(f)(2)(C): Smaller Reporting Companies

         While the proposal provides a different objective for the second Diverse director for Smaller Reporting Companies with boards of more than five members, Nasdaq believes that this distinction is not designed to permit unfair discrimination among companies.  Nasdaq has designed the proposed rule to ensure it does not have a disproportionate economic impact on Smaller Reporting Companies by imposing undue costs or burdens.  Nasdaq recognizes that Smaller Reporting Companies, especially pre-revenue companies that depend on the capital markets to fund ground-breaking research and technological advancements, may not have the resources to compensate an additional director or engage a search firm to find director candidates outside of the directors' traditional networks.  Nasdaq believes that this is a reasonable basis to distinguish Smaller Reporting Companies from other companies subject to the rule.

         Smaller Reporting Companies already are provided certain exemptions from Nasdaq's listing rules.  For example, under proposed Rule 5605(d)(3), Smaller Reporting Companies must have a compensation committee comprised of at least two independent directors and a formal written compensation committee charter or board resolution that specifies the committee's responsibilities and authority, but such companies are not required to grant authority to the committee to retain or compensate consultants or advisors or consider certain independence factors before selecting such advisors,

consistent with Rule 10C-1 of the Act.[341]  In its approval order, the SEC concluded as

follows:

> The Commission believes that these provisions are consistent with the Act and do
> not unfairly discriminate between issuers.  The Commission believes that, for
> similar reasons to those for which Smaller Reporting Companies are exempted
> from the Rule 10C-1 requirements, it makes sense for Nasdaq to provide some
> flexibility to Smaller Reporting Companies regarding whether the compensation
> committee's responsibilities should be set forth in a formal charter or through
> board resolution.  Further . . . in view of the potential additional costs of an annual
> review, it is reasonable not to require a Smaller Reporting Company to conduct an
> annual assessment of its charter or board resolution.[342]

The Commission also makes accommodations for Smaller Reporting Companies

based on their more limited resources, allowing them to comply with scaled disclosure

requirements in certain SEC reports rather than the more rigorous disclosure

requirements for larger companies.  For example, Smaller Reporting Companies are not

required to include a compensation discussion and analysis in their proxy or Form 10-K

describing the material elements of the compensation of its named executive officers.[343]

Eligible Smaller Reporting Companies also are relieved from the SOX 404(b)

requirement to obtain an independent auditor's attestation of management's assessment

of the effectiveness of internal control over financial reporting.[344]  In each case,

companies may choose to satisfy the more rigorous requirements in lieu of relying on the

exemptions.

---

[341]    See Nasdaq Rulebook, Rule 5605(d)(3).

[342]    See Order Granting Accelerated Approval of Proposed Rule Change, 78 Fed. Reg. 4,554, 4,567 (Jan. 22, 2013).

[343]    See 17 C.F.R. § 229.402(l).

[344]    See Accelerated Filer and Large Accelerated Filer Definitions, 85 Fed. Reg. 17,178 (March 26, 2020).

Any company that is not a Smaller Reporting Company, but prefers the alternative rule available for Smaller Reporting Companies, could follow proposed Rule 5605(f)(2)(C) and disclose their reasons for doing so.  In addition, companies with boards of five or fewer members could meet an alternative objective of one Diverse director.  As such, Nasdaq believes that the proposed alternative rule for Smaller Reporting Companies is not designed to, and does not, unfairly discriminate among companies. Lastly, Nasdaq believes that proposed Rule 5605(f)(2)(C) is not designed to permit unfair discrimination among companies because it requires Smaller Reporting Companies to have, or explain why they do not have, at least one director who self-identifies as Female, similar to other companies subject to Rule 5065(f).

### iii.    Rule 5605(f)(2)(D): Companies with Smaller Boards

While Nasdaq proposes to permit each company with a board of directors of five or fewer members to satisfy proposed Rule 5605(f)(2) by having, or explaining why it does not have, at least one member of its board of directors who is Diverse, Nasdaq believes that this distinction does not unfairly discriminate among issuers.

Nasdaq considered comments that it should "amend the proposed rules to allow greater flexibility for companies with relatively small boards."[345]  Based on Nasdaq data, the average board size of all listed companies is eight directors, with an average board size of 7.3 for Smaller Reporting Companies and Foreign Issuers.  The average market value of all companies with five or fewer directors is $706,062,658, with a median market value of $72,087,090, which is similar to the SEC's thresholds for Smaller

---

[345]    See Ballard Spahr Comment Letter, supra note 171.

Reporting Companies and non-accelerated filers, respectively.[346]  Under 12b-2 of the Act,

a company may qualify as a Smaller Reporting Company if it has: (1) public float of less

than $250 million; or (2) annual revenues of less than $100 million and either: (i) no

public float; or (ii) public float of less than $700 million.[347]  A company may qualify as a

non-accelerated filer if it has less than $75 million public float.[348]

Based on these thresholds, while a company with a smaller board and $706

million public float may be similarly situated with a company with a public float of $699

million, it would not qualify as a Smaller Reporting Company under the Act.  In contrast,

a company with a smaller board and a public float of $72 million would qualify as a

Smaller Reporting Company and as a non-accelerated filer, providing it with additional

time to file its periodic reports and exempting it from the requirement to provide an

auditor's attestation of management's assessment of ICFR.

Nasdaq believes that companies with smaller boards may face similar resource

constraints to those of Smaller Reporting Companies.  However, the alternative diversity

objective Nasdaq proposes to provide Smaller Reporting Companies may not be available

to them because not all companies with small boards qualify as Smaller Reporting

Companies.  Nasdaq believes that providing companies with boards of five or fewer with

an alternative diversity objective recognizes that they are similarly situated with Smaller

Reporting Companies without disproportionately impacting board composition.  For

example, companies with smaller boards may be disproportionately impacted by the

proposed rule if they plan to satisfy proposed Rule 5605(f)(2) by adding additional

---

[346]     Compared to an average market value of approximately $8,483,965,004 and median
          market value of $615,940,923 for all companies with more than five directors.

[347]     See 17 C.F.R. § 240.12b-2.

[348]     Id.

directors.  Two Diverse directors on a five member board comprise 40% of the board,

whereas two Diverse directors on an eight member board comprise 25% of the board.

Alternatively, if a five-member board does not have two Diverse directors and expands

its board to satisfy proposed Rule 5605(f)(2), it may require the company to incur

additional costs through director compensation and D&O insurance.  Nasdaq seeks to

avoid creating complexity for companies that attempt to meet the alternative diversity

objective by subjecting them to a higher diversity objective.

Nasdaq believes that proposed Rule 5605(f)(2)(D) therefore recognizes that

companies with smaller boards are not similarly situated with companies with larger

boards, and has designed the proposal to avoid imposing undue costs and burdens on

them.  Further, companies with smaller boards are not precluded from satisfying the

higher objective to have, or explain why they do not have, at least two Diverse directors,

nor are companies with larger boards precluded from satisfying a lower objective,

provided they transparently explain their reasons for doing so.

### iv.   Rule 5605(f)(3): Alternative Public Disclosure

The proposal is a disclosure-based framework, not a mandate.  Under proposed

Rule 5605(f)(3), a company may choose to meet the diversity objectives of proposed

Rule 5605(f) or choose to explain its reasons for not meeting the applicable objective,

which could include describing a different approach.  Nasdaq designed the proposal to

avoid unduly burdening competition or efficiency, or conflicting with existing securities

laws, by providing all companies subject to proposed Rule 5605(f) with the option to

make the public disclosure required under proposed Rule 5605(f)(3) in the company's

proxy statement or information statement for its annual meeting of shareholders (or, if the

company does not file a proxy, in its Form 10-K or 20-F). Alternatively, such disclosure may be provided on the company's website concurrently with the filing of the company's proxy statement or any information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F), provided the company submits a URL link to the disclosure through the Nasdaq Listing Center, within one business day after such posting. Nasdaq believes proposed Rule 5605(f)(3) is not designed to permit unfair discrimination among companies because the proposed rule provides all companies subject to proposed Rule 5605(f) the option to disclose an explanation rather than meet the diversity objectives of proposed Rule 5605(f)(2). Additionally, all companies who choose to explain their reason for not meeting the applicable objective are given the same options for providing the disclosure.

Certain federal securities laws similarly permit companies to satisfy corporate governance requirements through disclosure of reasons for not meeting the applicable requirement. For example, under Regulation S-K, Item 407 requires a company to disclose whether or not its board of directors has determined that the company has at least one audit committee financial expert. If a company does not have a financial expert on the audit committee, it must provide an explanation.[349] Item 406 requires a company to disclose whether it has adopted a written code of ethics that applies to the chief executive officer and senior financial or accounting officers. If a company has not adopted such a code of ethics, it must disclose the reasons why not.[350] Item 402 regarding pay ratio disclosure defines how total compensation for employees should be calculated, but

---

[349]     See 17 C.F.R. § 229.407(d)(5).

[350]     Id. § 229.406(a).

permits companies to use a different measure as long as they explain their approach.[351]
In addition, under Nasdaq's listing rules, foreign private issuers may choose to follow
home country practice in lieu of the corporate governance standards set forth in the Rule
5600 series, provided that a company publicly discloses in its annual reports or on its
website "each requirement that it does not follow and describe the home country practice
followed by the Company in lieu of such requirements."[352]

Nasdaq rules and SEC guidance already recognize that website disclosure can be
a method of disseminating information to the public. For example, in addition to
permitting foreign private issuers to provide website disclosures related to home country
practices,[353] Nasdaq listing rules also provide such flexibility for disclosures regarding
third party director compensation[354] and reliance on the exception relating to independent
compensation committee members.[355] The SEC has recognized that "[a] company's web
site is an obvious place for investors to find information about the company"[356] and
permits companies to make public disclosure of material information through website
disclosures if, among other things, the company's website is "a recognized channel of
distribution of information."[357]

---

[351]    Id. § 229.402.

[352]    See Nasdaq Rulebook, Rule 5615(a)(3)(B)(i).

[353]    Id., Rule 5615(a)(3)(B) and IM-5615-3.

[354]    See Nasdaq Rulebook, Rule 5250(b)(3)(A).

[355]    Id., Rules 5605(d)(2)(B) (non-independent compensation committee member under
exceptional and limited circumstances) and 5605(e)(3) (non-independent nominations
committee member under exceptional and limited circumstances).

[356]    See Commission Guidance on the Use of Company Websites, 73 Fed. Reg. 45,862,
45,864 (Aug. 7, 2008).

[357]    Id. at 45,867.

### v.    Rule 5605(f)(4): Exempt Companies

Under proposed Rule 5605(f)(4), Nasdaq proposes to exempt the following types of companies from the requirements of proposed Rule 5605(f) (defined as "Exempt Companies"): SPACs; asset-backed issuers and other passive issuers (as set forth in Rule 5615(a)(1)); cooperatives (as set forth in Rule 5615(a)(2)); limited partnerships (as set forth in Rule 5615(a)(4)); management investment companies (as set forth in Rule 5615(a)(5)); issuers of non-voting preferred securities, debt securities and Derivative Securities (as set forth in Rule 5615(a)(6)) that do not have equity securities listed on Nasdaq; and issuers of securities listed under the Rule 5700 Series.  Each of the types of Exempt Companies either has no board of directors, lists only securities with no voting rights towards the election of directors, or is not an operating company, and the holders of the securities they issue do not expect to have a say in the composition of their boards. As such, Nasdaq believes the proposal is not designed to permit unfair discrimination by excluding Exempt Companies from the application of proposed Rule 5605(f).  These companies, other than SPACs, already are exempt from certain of Nasdaq's corporate governance standards related to board composition, as described in Rule 5615.

Nasdaq is also proposing to exempt SPACs from the requirements of proposed Rule 5605(f), and the post-business combination entity would have at least two years after they complete a business combination.  This approach is similar to other phase-in periods granted to SPACs.  For example, Rule 5615(b)(1) provides a company listing in connection with its initial public offering, including a SPAC, one year to fully comply with the independent compensation and nomination committee requirements of Rules 5605(d) and (e), and the majority independent board requirement of proposed Rule 5605(b).  Similarly, Rule 5615(b)(1) and SEC Rule 10A-3(b)(1)(iv)(A) allows a newly

listed company, including a SPAC, up to one year from the date its registration statement is effective to fully comply with the applicable audit committee composition requirements.

Under proposed Rule 5605(f)(5)(A) or (B), a newly listed company, including through a business combination with a SPAC, would be permitted to satisfy the requirement of proposed Rule 5605(f)(2) to have, or explain why it does not have, the applicable number of Diverse directors under proposed Rule 5605(f)(2) by the later of two years from the date of listing or the date the company files its proxy statement or its information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F) for the company's second annual meeting of shareholders subsequent to the company's listing, with differing milestones depending on the company's market tier. Nasdaq believes it is not appropriate to subject SPACs to proposed Rule 5605(f) prior to completing a business combination because SPACs are shell companies until they complete an acquisition of an operating company. Rather, Nasdaq believes it is appropriate to provide SPACs with the same phase-in provided to other newly listed companies upon completing a business combination, because a SPAC must satisfy all of Nasdaq's initial listing requirements upon completing a business combination, including its requirements related to committee composition and majority independent board.

### vi.   Rule 5605(f)(5):  Phase-in Period

Under proposed Rule 5605(f)(5)(A), a newly listed company on the NGS or NGM tiers that was not previously subject to a substantially similar requirement of another national securities exchange will be permitted to satisfy the requirement of proposed Rule 5605(f)(2) to have, or explain why it does not have: (i) at least one Diverse director by the later of: (a) one year from the date of listing; or (b) the date the company files its

proxy statement or its information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F) for the company's first annual meeting of shareholders subsequent to the company's listing; and (ii) at least two Diverse directors by the later of: (a) two years from the date of listing; or (b) the date the company files its proxy statement or its information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F) for the company's second annual meeting of shareholders subsequent to the company's listing.

Under proposed Rule 5605(f)(5)(B), a newly listed company on the NCM tier that was not previously subject to a substantially similar requirement of another national securities exchange will be permitted to satisfy the requirement of proposed Rule 5605(f)(2) to have, or explain why it does not have at least two Diverse directors by the later of: (a) two years from the date of listing; or (b) the date the company files its proxy statement or its information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F) for the company's second annual meeting of shareholders subsequent to the company's listing.

Under proposed Rule 5605(f)(5)(D), any newly listed company on any market tier that has a board of five or fewer members and was not previously subject to a substantially similar requirement of another national securities exchange will be permitted to satisfy the requirement of proposed Rule 5605(f)(2) to have, or explain why it does not have at least one Diverse director by the later of: (a) two years from the date of listing; or (b) the date the company files its proxy statement or its information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F) for the company's second annual meeting of shareholders subsequent to the company's listing.

These "phase-in" periods apply to companies listing in connection with an initial public offering, a direct listing, a transfer from another exchange or the over-the-counter market, in connection with a spin-off or carve-out from a company listed on Nasdaq or another exchange, or through a business combination with a SPAC.

Nasdaq believes this approach is not designed to permit unfair discrimination because it provides all companies that become newly subject to the rule the same time period within which to satisfy proposed Rule 5605(f)(2), while providing additional flexibility to companies on the NCM tier and companies with smaller boards in recognition that such companies are typically smaller and may face additional challenges and resource constraints when identifying additional director nominees who self-identify as Diverse.

In addition, this approach is similar to other phase-in periods granted to companies listing on or transferring to Nasdaq.  For example, Rule 5615(b)(1) provides a company listing in connection with its initial public offering one year to fully comply with the compensation and nomination committee requirements of Rules 5605(d) and (e), and the majority independent board requirement of proposed Rule 5605(b).  Similarly, SEC Rule 10A-3(b)(1)(iv)(A) allows a company up to one year from the date its registration statement is effective to fully comply with the applicable audit committee composition requirements.  Nasdaq Rule 5615(b)(3) provides a one-year timeframe for compliance with the board composition requirements for companies transferring from other listed markets that do not have a substantially similar requirement.

### vii.    Rule 5605(f)(7): Effective Dates/Transition

Under proposed Rule 5605(f)(7), each company (including a company with a smaller board under proposed Rule 5606(f)(2)(D)) must have, or explain why it does not

have, at least one Diverse director by the later of: (i) the First Effective Date;[358] or (ii) the date the company files its proxy statement or its information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F) for the company's annual shareholders meeting during the calendar year of the First Effective Date.

Each company listed on the NGS or NGM tiers must have, or explain why it does not have, two Diverse directors by the later of: (i) the Second NGS/NGM Effective Date;[359] or (ii) the date the company files its proxy statement or its information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F) for the company's annual shareholders meeting during the calendar year of the Second NGS/NGM Effective Date.  Each company listed on the NCM tier must have, or explain why it does not have, at least two Diverse directors by the later of: (i) the Second NCM Effective Date[360] or (ii) the date the company files its proxy statement or its information statement (or, if the company does not file a proxy, in its Form 10-K or 20-F) for the company's annual shareholders meeting during the calendar year of the Second NCM Effective Date.

Nasdaq believes this approach is not designed to permit unfair discrimination because it recognizes that companies listed on the NCM tier may not have the resources necessary to compensate an additional director or engage a search firm to search for director candidates outside of the directors' traditional networks.  Therefore, Nasdaq believes it is in the public interest to provide such companies with one additional year to meet the diversity objectives of proposed Rule 5605(f), should they choose to do so.  Nasdaq notes that all companies may choose to follow a timeframe applicable to a

---

[358]    The "First Effective Date" is two calendar years after the Approval Date.

[359]    The "Second NGS/NGM Effective Date" is four calendar years after the Approval Date.

[360]    The "Second NCM Effective Date" is five calendar years after the Approval Date.

different market tier, provided they publicly describe their explanation for doing so. They also may construct their own timeframe for meeting the diversity objectives of proposed Rule 5605(f), provided they publicly disclose their reasons for not abiding by Nasdaq's timeframe.

### I. *Not Designed to Regulate by Virtue of any Authority Conferred by the Act Matters Not Related to the Purposes of the Act or the Administration of the Exchange*

Nasdaq believes that the proposal is not designed to regulate by virtue of any authority conferred by the Act matters not related to the purposes of the Act or the administration of the Exchange.[361] The proposal relates to the Exchange's corporate governance standards for listed companies. As discussed above, "[t]he Commission has long encouraged exchanges to adopt and strengthen their corporate governance listing standards in order to, among other things, enhance investor confidence in the securities markets."[362] And because "it is not always feasible to define . . . every practice which is inconsistent with the public interest or with the protection of investors," the Act leaves to SROs "the necessary work" of rulemaking pursuant to Section 6(b)(5).[363]

Nasdaq recognizes that U.S. states are increasingly proposing and adopting board diversity requirements, and because corporations are creatures of state law, some market participants may believe that such regulation is best left to states. However, Nasdaq considered that certain of its listing rules related to corporate governance currently relate to areas that are also regulated by states. For example, states impose standards related to

---

[361]   See 15 U.S.C. § 78f(b)(5).

[362]   See Order Approving Proposed Rule Changes, supra note 52, at 64,161.

[363]   See Heath v. SEC, 586 F.3d 122, 132 (2d Cir. 2009) (citing Avery v. Moffat, 55 N.Y.S.2d 215, 228 (Sup. Ct. 1945)).

quorums[364] and shareholder approval of certain transactions,[365] which also are regulated under Nasdaq's listing rules.[366] Nasdaq has adopted rules relating to such matters to ensure uniformity of such rules among its listed companies. Similarly, Nasdaq believes that the proposed rule will create uniformity among listed companies by helping to assure investors that all non-exempt companies meet the applicable diversity objectives of proposed Rule 5605(f)(2) or publicly describe why they do not.

Further, Nasdaq believes the proposal will enhance investor confidence that listed companies that meet the diversity objectives of proposed Rule 5605(f)(2) are considering the perspectives of more than one demographic group, leading to robust dialogue and better decision making, as well as the other corporate governance benefits of diverse boards discussed above in Section II of the Purpose section. To the extent companies choose to disclose their reasons for not meeting the diversity objectives of proposed Rule 5605(f)(2) pursuant to proposed Rule 5605(f)(3), Nasdaq believes that such disclosure will improve the quality of information available to investors who rely on this information to make an informed voting decision, thereby promoting capital formation and efficiency. It has been the Exchange's longstanding principle that "Nasdaq stands for integrity and ethical business practices in order to enhance investor confidence, thereby contributing to the financial health of the economy and supporting the capital formation process."[367]

---

[364]    See, e.g., 8 Del. Code § 216 (providing that a quorum at a shareholder's meeting shall consist of no less than 1/3 of the shares entitled to vote at such meeting).

[365]    See, e.g., id. §§ 251, 271 (providing that shareholder approval by a majority of the outstanding voting shares entitled to vote is required for mergers and the sale of all or substantially all of a corporation's assets).

[366]    See, e.g., Nasdaq Rulebook, Rules 5620(c) and 5635(a).

[367]    Id., Rule 5101.

In addition, as discussed in Section II of the Purpose section, in passing Section 342 of the Dodd-Frank Act, Congress recognized the need to respond to the lack of diversity in the financial services industry, and the Standards designed by the Commission and other financial regulators provide a framework for addressing that industry challenge. The Standards themselves identify several focus areas, including the importance of "Organizational Commitment," which speaks to the critical role of senior leadership—including boards of directors—in promoting diversity and inclusion across an organization. In addition, like the proposed rule, the Standards also consider "Practice to Promote Transparency," and recognize that transparency is a key component of any diversity initiative. Specifically, the Standards provide that the "transparency of an entity's diversity and inclusion program promotes the objectives of Section 342," and also is important because it provides the public with necessary information to assess an entity's diversity policies and practices.[368]

B.    Self-Regulatory Organization's Statement on Burden on Competition

The Exchange does not believe that the proposed rule will impose any burden on competition not necessary or appropriate in furtherance of the purposes of the Act. Nasdaq reviewed requirements related to board diversity in two dozen foreign jurisdictions, and almost every jurisdiction imposes diversity-focused requirements on listed companies, either through a securities exchange, financial regulator or the government. Nasdaq competes for listings globally, including in countries that have implemented a more robust regulatory reporting framework for diversity and ESG disclosures. Nasdaq carefully considered the competitive implications of the proposal.

---

[368]    Final Interagency Policy Statement, supra note 19.

While Nasdaq would regret losing even a single valued issuer, experience and empirical data demonstrate that neither the listings contract nor listings fees prevents issuers from switching listings markets.   Moreover, based on public comments, Nasdaq believes that a significant body of issuers supports the proposal, and that some issuers share these values so strongly that they may choose to list on Nasdaq because of it.

Currently in the U.S., the Long-Term Stock Exchange ("LTSE"), which has established a coalition of "asset owners and asset managers representing a combined $7 trillion in assets under management,"[369] seeks to distinguish itself by focusing on long-term elements of corporate governance, including, for example, diversity and inclusion. Under Rule 14.425, companies listed on LTSE must adopt and publish a long-term stakeholder policy that explains, among other things, "the Company's approach to diversity and inclusion."[370]

### III.    Board Statistical Disclosure

The Exchange does not believe that proposed Rule 5606 will impose any burden on competition not necessary or appropriate in furtherance of the purposes of the Act. Specifically, the Exchange believes that the adoption of Rule 5606 will not impose any undue burden on competition among listed companies for the reasons set forth below.

With a few exceptions, all companies would be required to make the same disclosure of their board-level statistical information.  The average board size of a company that is currently listed on the Exchange is eight directors.  Although a company would be required to disclose its board-level statistical data, directors may choose to opt

---

[369]    See Long-Term Stock Exchange, *A coalition of long-term company builders*, available at: https://ltse.com/coalition.

[370]    See Long-Term Stock Exchange Rule Book, Rule 14.425.

out rather than reveal their diversity characteristics to their company.  A company would identify such directors in the "Did Not Disclose Demographic Background" category. For directors who voluntarily disclose their diversity characteristics, the company would collect their responses and disclose the information in either the company's proxy statement, information statement of shareholder meeting, any other disclosure form filed with the SEC or on the company's website, using Nasdaq's required format.  While the time and economic burden may vary based on a company's board size, Nasdaq does not believe there is any significant burden associated with gathering, preparing and reporting this data.  Therefore, Nasdaq believes that there will be a *de minimis* time and economic burden on listed companies to collect and disclose the diversity statistical data.

Some investors value demographic diversity, and list it as an important factor influencing their director voting decisions.[371]  Investors have stated that consistent data would make its collection and analysis easier and more equitable for investors that are not large enough to demand or otherwise access individualized disclosures.[372]  Therefore, Nasdaq believes that any burden placed on companies to gather and disclose their board-level diversity statistics is counterbalanced by the benefits that the information will provide to a company's investors.

Moreover, as discussed above, most listed companies are required to submit an annual EEO-1 Report, which provides statistical data related to race and gender data among employees similar to the data required under proposed Rule 5606(a).  Because most companies are already collecting similar information annually to satisfy their EEOC requirement, Nasdaq does not believe that adding directors to the collection will place a

---

[371]    See Hunt et al., supra note 30.

[372]    See Petition for Rulemaking, supra note 130, at 2.

significant burden on these companies.  Additionally, the information requested from Foreign Issuers is limited in scope and therefore does not impose a significant burden on them.

Nasdaq faces competition in the market for listing services.  Proposed Rule 5606 reflects that competition, but it does not impose any burden on competition with other exchanges.  As discussed above, investors have made clear their desire for greater transparency into public companies' board-level diversity as it relates to gender identity, race, and ethnicity.  Nasdaq believes that the proposed rule will enhance the competition for listings.  Other exchanges can set similar requirements for their listed companies, thereby increasing competition to the benefit of those companies and their shareholders. Accordingly, Nasdaq does not believe the proposed rule change will impose any burden on competition that is not necessary or appropriate in furtherance of the purposes of the Act.

## IV.    Diverse Board Representation or Explanation

Nasdaq believes that proposed Rule 5605(f) will not impose burdens on competition among listed companies because the Exchange has constructed a framework for similarly-situated companies to satisfy similar requirements (*i.e.*, Foreign Issuers, Smaller Reporting Companies, companies with smaller boards, and other companies), and has provided all companies with the choice of satisfying the requirements of proposed Rule 5605(f)(2) by having the applicable number of Diverse directors, or by explaining why they do not.  Nasdaq believes that this will avoid imposing undue costs or burdens on companies that, for example, cannot afford to compensate an additional director or believe it is not appropriate, feasible or desirable to meet the diversity

objectives of proposed Rule 5605(f) based on the company's particular circumstances (for example, the company's size, operations, or current board composition). Rather than requiring a company to divert resources to compensate an additional director, and place the company at a competitive disadvantage with its peers, the rule provides the flexibility for such company to explain why it does not meet the diversity objectives. The proposal further mitigates the burden imposed on companies with smaller boards by providing them with flexibility to have, or explain why they do not have, one Diverse director.

The cost of identifying director candidates can range from nothing or a nominal fee (via personal, work or school-related networks, or board affinity organizations, as well as internal research by the corporate secretary's team) to amounts that can vary widely depending on the specific search firm and the size of the company. Some industry observers estimate board searches for independent directors cost about one-third of a director's annual compensation, while others estimate it costs between $75,000 and $150,000. The underlying figures vary; for example, one search firm generally charges $25,000 to $50,000. Nasdaq observes that total annual director compensation can range widely; median director pay is estimated at $134,000 for Russell 3000 companies and $232,000 for S&P 500 companies. Moreover, there is a wider range of underlying compensation amounts. For example, Russell 3000 directors may receive approximately $32,600 (10th percentile), or up to $250,000 (90th percentile) or more. S&P 500 directors may receive approximately $100,000 (10th percentile) or up to $310,000 (90th percentile) or more.[373] Most, if not all, of these costs would be borne in any event in the

---

[373]    Total annual director compensation varies by compensation elements and structure as well as amount, which is generally based on the size, sector, maturity of the company, and company specific situation. See Mark Emanuel et al., Semler Brossy and the

search for new directors regardless of the proposed rule. While the proposed rule might lead some companies to search for director candidates outside of already established networks, the incremental costs of doing so would be tied directly to the benefit of a broader search.

   To reduce costs for companies that do not currently meet the diversity objectives of proposed Rule 5605(f)(2), Nasdaq has proposed to provide listed companies that have not yet met their diversity objectives with free access to a network of board-ready diverse candidates and a tool to support board evaluation, benchmarking and refreshment.[374] This offering is designed to ease the search for diverse nominees and reduce the costs on companies that choose to meet the diversity objectives of proposed Rule 5605(f)(2). Nasdaq is contemporaneously submitting a rule filing to the Commission regarding the provision of such services. Nasdaq also plans to publish FAQs on its Listing Center to provide guidance to companies on the application of the proposed rules, and to establish a dedicated mailbox for companies and their counsel to email additional questions to Nasdaq regarding the application of the proposed rule. Nasdaq believes that these services will help to ease the compliance burden on companies whether they choose to meet the listing rule's diversity objectives or provide an explanation for not doing so.

   Nasdaq also has structured the proposed rule to provide companies with at least four years from the Approval Date to satisfy proposed Rule 5605(f)(2) so that companies do not incur immediate costs striving to meet the diversity objectives of proposed Rule 5605(f)(2). Nasdaq also has reduced the compliance burden on Smaller Reporting

---

Conference Board, *Director Compensation Practices in the Russell 3000 and S&P 500* (2020 ed.), available at https://conferenceboard.esgauge.org/directorcompensation/report.

[374] See supra note 23.

Companies and Foreign Issuers by providing them with additional flexibility when satisfying the objective related to the second Diverse director.  Smaller Reporting Companies could satisfy the proposed diversity objective to have two Diverse directors under proposed Rule 5605(f)(2)(C) with two Female directors.  Like other companies, Smaller Reporting Companies also could satisfy the second director objective by including an individual who self-identifies as an Underrepresented Minority or a member of the LGBTQ+ community.  Foreign Issuers could satisfy the second director objective by including another Female director, or an individual who self-identifies as LGBTQ+ or an underrepresented individual based on national, racial, ethnic, indigenous, cultural, religious or linguistic identity in the country of the company's principal executive offices (as reported on the company's Form F-1, 10-K, 20-F or 40-F).  Companies with smaller boards could satisfy the diversity objective with one Diverse director.  Nasdaq has further reduced the compliance burdens on companies listed on the NCM tier by providing them with five years from the Approval Date to satisfy proposed Rule 5605(f)(2), recognizing that such companies may face additional challenges and resource constraints when identifying additional director nominees who self-identify as Diverse.

For the foregoing reasons, Nasdaq does not believe that proposed Rule 5605(f) will impose any burden on competition among issuers that is not necessary or appropriate in furtherance of the purposes of the Act.  Further, Nasdaq does not believe the proposed rule will impose any burden on competition among listing exchanges.  As described above, Nasdaq competes with other exchanges globally for listings, including exchanges based in jurisdictions that have implemented disclosure requirements related to diversity.  Within the United States, LTSE requires listed companies to adopt and publish a long-

term stakeholder policy that explains, among other things, "the Company's approach to diversity and inclusion."[375]  Other listing venues within the United States may propose to adopt rules similar to LTSE's requirements or the Exchange's proposal if they believe companies would prefer to list on an exchange with diversity-related listing standards.

C.    Self-Regulatory Organization's Statement on Comments on the Proposed Rule Change Received from Members, Participants, or Others

No written comments were either solicited or received.

III.    Date of Effectiveness of the Proposed Rule Change and Timing for Commission Action

Within 45 days of the date of publication of this notice in the Federal Register or within such longer period (i) as the Commission may designate up to 90 days of such date if it finds such longer period to be appropriate and publishes its reasons for so finding or (ii) as to which the Exchange consents, the Commission shall: (a) by order approve or disapprove such proposed rule change, or (b) institute proceedings to determine whether the proposed rule change should be disapproved.

IV.    Solicitation of Comments

Interested persons are invited to submit written data, views, and arguments concerning the foregoing, including whether the proposed rule change is consistent with the Act.  Comments may be submitted by any of the following methods:

Electronic comments:

- Use the Commission's Internet comment form (http://www.sec.gov/rules/sro.shtml); or

- Send an e-mail to rule-comments@sec.gov.  Please include File Number SR-NASDAQ-2020-081 on the subject line.

---

[375]    See Long-Term Stock Exchange Rule Book, Rule 14.425.

Paper comments:

- Send paper comments in triplicate to Secretary, Securities and Exchange Commission, 100 F Street, NE, Washington, DC 20549-1090.

All submissions should refer to File Number SR-NASDAQ-2020-081.  This file number should be included on the subject line if e-mail is used.  To help the Commission process and review your comments more efficiently, please use only one method.  The Commission will post all comments on the Commission's Internet Web site (http://www.sec.gov/rules/sro.shtml).

Copies of the submission, all subsequent amendments, all written statements with respect to the proposed rule change that are filed with the Commission, and all written communications relating to the proposed rule change between the Commission and any person, other than those that may be withheld from the public in accordance with the provisions of 5 U.S.C. 552, will be available for website viewing and printing in the Commission's Public Reference Room, 100 F Street, NE, Washington, DC 20549, on official business days between the hours of 10:00 a.m. and 3:00 p.m.  Copies of the filing also will be available for inspection and copying at the principal office of the Exchange. All comments received will be posted without change; the Commission does not edit personal identifying information from submissions.  You should submit only information that you wish to make available publicly.

All submissions should refer to File Number SR-NASDAQ-2020-081 and should be submitted on or before [insert date 21 days from publication in the Federal Register].

For the Commission, by the Division of Trading and Markets, pursuant to

delegated authority.[376]

> J. Matthew DeLesDernier
> Assistant Secretary

---

[376]    17 CFR 200.30-3(a)(12).

**EXHIBIT 3**

## Instructions:

1.  All Nasdaq listed companies, except those that are exempt under Nasdaq Listing Rule 5605(f)(4) are required to disclose board level diversity statistics using the format below. The disclosure must be titled "Board Diversity Matrix" and include the date the information was collected as the "As of Date".

2.  Companies are required to provide the Board Diversity Matrix information at least once per year. If, within the same year, a company changes its board composition after it publishes its Matrix, the company may, but is not required to, publish its updated information.

3.  When completing the table, enter the number of directors that self-identify in each category. If a director self-identifies in the "Two or More Races or Ethnicities" category, the director must also self-identify in each individual category, as appropriate. For more details on the categories, refer to the definitions below.

4.  The information provided below must be based on the voluntary self-identification of each member of the company's board of directors. For a U.S. incorporated company, any director who chooses not to disclose a gender should be included under "Did Not Disclose Gender" and any director who chooses not to identify as any race or not to identify as LGBTQ+ should be included in the "Did Not Disclose Demographic Background" category.

5.  A company that qualifies as a Foreign Issuer (as defined under Rule 5605(f)(1)) or a Foreign Private Issuer may elect to use the format below for a Foreign Issuer. Any director who chooses not to disclose a gender should be included under "Did Not Disclose Gender" and any director who chooses not to identify as an "Underrepresented Individual in Home Country Jurisdiction" or LGBTQ+ should be included in the "Did Not Disclose Demographic Background" category.

6.  A company may publish the information in advance of its next annual meeting of shareholders by using either of the following methods: (a) in any proxy statement or any information statement (or, if the Company does not file a proxy, in its Form 10-K or 20-F); or (b) on the Company's website. If the Company provides such disclosure on its website, then the Company must submit such disclosure concurrently with the filing made pursuant to (a) and submit a URL link to the disclosure through the Nasdaq Listing Center, within one business day after such posting.

7.  Any publication of the information in the Board Diversity Matrix must be included in a searchable format. If a company uses a graphic or image format (*i.e.,* tif, jpg, gif, png), the company must also include the same information as searchable text or in a searchable table. The searchable information could be included, for example, together with the related graphic or in an appendix.

8.  Following the first year of disclosure of the Matrix, all companies must include the current year and immediately prior year diversity statistics in its disclosure. If the company publishes the Matrix on its website, the disclosure must remain accessible on the company's website.

9.  A company may not substantially alter the Board Diversity Matrix. However, a company may supplement its disclosure by providing additional information related to its directors. For example, a company may choose to provide the information on a director-by-director

basis or may choose to include any skills, experience and attributes of each of its directors that are relevant to the company.  Supplemental information may be included below the information required by the Board Diversity Matrix or in a separate table.

Definitions:

- **Non-Binary** – Refers to genders that are not solely man or woman.  Someone who is non-binary may have more than one gender, no gender, or their gender may not be in relation to the gender binary.

- **African American or Black** (not of Hispanic or Latinx origin) – A person having origins in any of the Black racial groups of Africa.

- **Alaskan Native or Native American** – A person having origins in any of the original peoples of North and South America (including Central America), and who maintain cultural identification through tribal affiliation or community recognition.

- **Asian** – A person having origins in any of the original peoples of the Far East, Southeast Asia, or the Indian subcontinent, including, for example, Cambodia, China, India, Japan, Korea, Malaysia, Pakistan, the Philippine Islands, Thailand, and Vietnam.

- **Hispanic or Latinx** – A person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin, regardless of race.  The term Latinx applies broadly to all gendered and gender-neutral forms that may be used by individuals of Latin American heritage, including individuals who self-identify as Latino/a/e.

- **Native Hawaiian or Pacific Islander** – A person having origins in any of the peoples of Hawaii, Guam, Samoa, or other Pacific Islands.

- **White** (not of Hispanic or Latinx origin) – A person having origins in any of the original peoples of Europe, the Middle East, or North Africa.

- **Two or More Races or Ethnicities** – A person who identifies with more than one of the above categories.

- **Underrepresented Individual in Home Country Jurisdiction** – A person who self-identifies as an underrepresented individual based on national, racial, ethnic, indigenous, cultural, religious or linguistic identity in the country of the Foreign Issuer's principal executive offices (as reported on the Foreign Issuer's Forms F-1, 10-K, 20-F or 40-F).

- **LGBTQ+** – A person who identifies as any of the following: lesbian, gay, bisexual, transgender or as a member of the queer community.

**Board Disclosure Format**

| Board Diversity Matrix (As of [DATE]) | | | | |
|---|---|---|---|---|
| Total Number of Directors | # | | | |
| | **Female** | **Male** | **Non-Binary** | **Did Not Disclose Gender** |
| **Part I: Gender Identity** | | | | |
| Directors | # | # | # | # |
| **Part II: Demographic Background** | | | | |
| African American or Black | # | # | # | # |
| Alaskan Native or Native American | # | # | # | # |
| Asian | # | # | # | # |
| Hispanic or Latinx | # | # | # | # |
| Native Hawaiian or Pacific Islander | # | # | # | # |
| White | # | # | # | # |
| Two or More Races or Ethnicities | # | # | # | # |
| LGBTQ+ | # | | | |
| Did Not Disclose Demographic Background | # | | | |

| Board Diversity Matrix (As of [DATE]) | | | | |
|---|---|---|---|---|
| To be completed by Foreign Issuers (with principal executive offices outside of the U.S.) and Foreign Private Issuers | | | | |
| Country of Principal Executive Offices: | [Insert Country Name] | | | |
| Foreign Private Issuer | Yes/No | | | |
| Disclosure Prohibited Under Home Country Law | Yes/No | | | |
| Total Number of Directors | # | | | |
| | **Female** | **Male** | **Non-Binary** | **Did Not Disclose Gender** |
| **Part I: Gender Identity** | | | | |
| Directors | # | # | # | # |
| **Part II: Demographic Background** | | | | |
| Underrepresented Individual in Home Country Jurisdiction | # | | | |
| LGBTQ+ | # | | | |
| Did Not Disclose Demographic Background | # | | | |

**EXHIBIT 4**

Changes to the Proposed Rule Text

Text is marked to show changes to proposed rule language in the original filing. Additions to original filing are <u>double underlined</u>; deletions from original filing are ~~striken through~~.

**The Nasdaq Stock Market LLC Rules**

\* \* \* \* \*

**5605.   Board of Directors and Committees**

**(a) – (e)** No change.

<u>**(f) Diverse Board Representation**</u>

<u>**(1) Definitions**</u>

<u>For purposes of this Rule 5605(f):</u>

<u>"Diverse" means an individual who self-identifies in one or more of the following categories: Female, Underrepresented Minority, or LGBTQ+.</u>

<u>"Female" means an individual who self-identifies her gender as a woman, without regard to the individual's designated sex at birth.</u>

<u>"Foreign Issuer" means (a) a Foreign Private Issuer (as defined in Rule 5005(a)(19)); or (b) a company that (i) is considered a "foreign issuer" under Rule 3b-4(b) under the Act and (ii) has its principal executive offices located outside of the United States.</u>

<u>"LGBTQ+" means an individual who self-identifies as any of the following: lesbian, gay, bisexual, transgender, or as a member of the queer community.</u>

<u>"Approval Date" means the date that the Commission issues an order granting the approval of this proposed Rule 5605(f).</u>

<u>"Smaller Reporting Company" has the definition set forth in Rule 12b-2 under the Act.</u>

<u>"Underrepresented Minority" means an individual who self-identifies as one or more of the following: Black or African American, Hispanic or Latinx, Asian, Native American or Alaska Native, Native Hawaiian or Pacific Islander, or Two or More Races or Ethnicities.</u>

<u>"Two or More Races or Ethnicities" means a person who identifies with more than one of the following categories: White (not of Hispanic or Latinx origin), Black or African American, Hispanic or Latinx, Asian, Native American or Alaska Native, Native Hawaiian or Pacific Islander.</u>

**(2) Diversity ~~Requirement~~Objective**

**(A) General ~~Requirement~~Objective**

Each Company, except as described below in (B)~~, or~~ (C) or (D), must have, or explain why it does not have, at least two members of its board of directors who are Diverse, including (i) at least one Diverse director who self-identifies as Female; and (ii) at least one Diverse director who self-identifies as an Underrepresented Minority or LGBTQ+.

**(B) Foreign Issuers**

**(i)** ~~In the case~~For purposes of a Foreign Issuer~~, in lieu of the definition in~~this Rule 5605(f)(~~1~~2)(B), (a) "Diverse" means an individual who self-identifies as one or more of the following: Female, LGBTQ+, or an underrepresented individual based on national, racial, ethnic, indigenous, cultural, religious or linguistic identity in the ~~Company's home country jurisdiction~~country of the Company's principal executive offices (as reported on the Company's Form F-1, 10-K, 20-F or 40-F); and (b) "board of directors" means, in the case of a Foreign Issuer with a two-tier board system, the Company's supervisory or non-management board.

**(ii)** Subject to subparagraph (D) below, ~~E~~each Foreign Issuer must have, or explain why it does not have, at least two members of its board of directors who are Diverse, including at least one Diverse director who self-identifies as Female. For greater clarity, the second Diverse director may include an individual who self-identifies as one or more of the following: Female, LGBTQ+, or an underrepresented individual based on national, racial, ethnic, indigenous, cultural, religious or linguistic identity in the country of the Company's ~~home country jurisdiction~~principal executive offices.

**(C) Smaller Reporting Companies**

Subject to subparagraph (D) below, ~~e~~Each Smaller Reporting Company must have, or explain why it does not have, at least two members of its board of directors who are Diverse, including at least one Diverse director who self-identifies as Female. For greater clarity, the second Diverse director may include an individual who self-identifies as one or more of the following: Female, LGBTQ+, or an Underrepresented Minority.

**(D) Companies with Smaller Boards**

Each Company with a board of directors of five or fewer members must have, or explain why it does not have, at least one member of its board of directors who is Diverse. If a Company has five members on its board of directors before becoming subject to this Rule 5605(f), it shall not become subject to the

requirement of subparagraphs (A), (B) or (C) to have at least two members of its board of directors who are Diverse if it adds one director to satisfy this subparagraph (D), thereby becoming a six member board. However, a company would become subject to Rule 5605(f)(2)(A), (B) or (C) if it subsequently expands its board.

**(3) Alternative Public Disclosure ~~of Non-Diverse Board~~**

If a Company satisfies the requirements of Rule 5605(f)(2) by explaining why it does not ~~have two Diverse directors~~meet the applicable diversity objectives of Rule 5605(f)(2), the Company must: (i) specify the requirements of Rule 5605(f)(2) that are applicable; and (ii) explain the reasons why it does not have two Diverse directors (or one Diverse director for Companies subject to Rule 5606(f)(2)(D)).  Such disclosure must be provided~~: (i)~~ in advance of the Company's next annual meeting of shareholders: (a) in any proxy statement or any information statement ~~for~~ (or, if the Company does not file a proxy, in its ~~annual meeting of shareholders; or (ii)~~Form 10-K or 20-F); or (b) on the Company's website.  If the Company provides such disclosure on its website, then the Company must ~~also notify Nasdaq of the location where~~submit such disclosure concurrently with the ~~information is available by submitting the~~ filing made pursuant to (a) and submit a URL link to the disclosure through the Nasdaq Listing Center ~~no later than 15 calendar days,~~ within one business day after ~~the Company's annual shareholders meeting~~such posting.

**(4) Exempt Companies**

The following types of companies are exempt from the requirements of this Rule 5605(f) ("Exempt Companies"):  acquisition companies listed under IM-5101-2; asset-backed issuers and other passive issuers (as set forth in Rule 5615(a)(1)); cooperatives (as set forth in Rule 5615(a)(2)); limited partnerships (as set forth in Rule 5615(a)(4)); management investment companies (as set forth in Rule 5615(a)(5)); issuers of non-voting preferred securities, debt securities and Derivative Securities (as set forth in Rule 5615(a)(6)); that do not have equity securities listed on Nasdaq; and issuers of securities listed under the Rule 5700 Series.

**(5) Phase-in Period**

**(A)** Any Company newly listing on The Nasdaq Global Select Market or The Nasdaq Global Market that was not previously subject to a substantially similar requirement of another national securities exchange, including through an initial public offering, direct listing, transfer from the over-the-counter market or another exchange, in connection with a spin-off or carve-out from a company listed on Nasdaq or another exchange, or through a merger with an acquisition company listed under IM-5101-2, shall be permitted ~~one year from the date of listing to satisfy the requirements of Rule 5605(f).  This phase-in period will apply after the end of the transition periods provided in Rule 5605(f)(7)~~to satisfy the requirement of Rule 5605(f)(2) to have, or explain why it does not have: (i) at least one

Diverse director by the later of: (a) one year from the date of listing; or (b) the date the Company files its proxy statement or its information statement (or, if the Company does not file a proxy, in its Form 10-K or 20-F) for the Company's first annual meeting of shareholders subsequent to the Company's listing; and  (ii) at least two Diverse directors by the later of: (a) two years from the date of listing; or (b) the date the Company files its proxy statement or its information statement (or, if the Company does not file a proxy, in its Form 10-K or 20-F) for the Company's second annual meeting of shareholders subsequent to the Company's listing.

**(B)** ~~Any Company that ceases to be a Foreign Issuer, a Smaller Reporting Company or an Exempt Company shall be permitted~~Any Company newly listing on The Nasdaq Capital Market that was not previously subject to a substantially similar requirement of another national securities exchange, including through an initial public offering, direct listing, transfer from the over-the-counter market or another exchange, in connection with a spin-off or carve-out from a company listed on Nasdaq or another exchange, or through a merger with an acquisition company listed under IM-5101-2, shall be permitted to satisfy the requirement of Rule 5605(f)(2) to have, or explain why it does not have at least two Diverse directors by the later of: (a) two years from the date of listing; or (b) the date the Company files its proxy statement or its information statement (or, if the Company does not file a proxy, in its Form 10-K or 20-F) for the Company's second annual meeting of shareholders subsequent to the Company's listing.

**(C)** Any Company that ceases to be a Foreign Issuer, a Smaller Reporting Company, or an Exempt Company shall be permitted to satisfy the requirements of Rule 5605(f) by the later of: (i) one year from the date that the Company no longer qualifies as a Foreign Issuer, a Smaller Reporting Company or an Exempt Company, respectively~~, to satisfy the requirements of Rule 5605(f)~~; or (ii) the date the Company files its proxy statement or its information statement (or, if the Company does not file a proxy, in its Form 10-K or 20-F) for the Company's first annual meeting of shareholders subsequent to such event.

**(D)** Any Company newly listing on The Nasdaq Global Select Market, The Nasdaq Global Market and The Nasdaq Capital Market that has a board of five or fewer members and was not previously subject to a substantially similar requirement of another national securities exchange, including through an initial public offering, direct listing, transfer from the over-the-counter market or another exchange, in connection with a spin-off or carve-out from a company listed on Nasdaq or another exchange, or through a merger with an acquisition company listed under IM-5101-2, shall be permitted to satisfy the requirement of Rule 5605(f)(2) to have, or explain why it does not have at least one Diverse director by the later of: (a) two years from the date of listing; or (b) the date the Company files its proxy statement or its information statement (or, if the Company does not

file a proxy, in its Form 10-K or 20-F) for the Company's second annual meeting of shareholders subsequent to the Company's listing.

**(6) Cure Period and Grace Period**

**(A)** If a Company (i) does not ~~have at least two Diverse directors as set forth under Rule 5605(f)(2) and fails to provide the disclosure required by Rule 5605(f)(3)~~meet the applicable diversity objectives set forth under Rule 5605(f)(2) and fails to provide the disclosure required by Rule 5605(f)(3), or (ii) fails to hold an annual meeting of shareholders during the applicable periods in Rule 5605(f)(5) or (7) and therefore fails to meet, or explain why it does not meet, the diversity objectives of Rule 5605(f)(2), the Listing Qualifications Department will promptly notify the Company and inform it that it has until the latter of its next annual shareholders meeting or 180 days from the event that caused the deficiency to cure the deficiency.

**(B)** A Company that satisfied the diversity objectives of Rule 5605(f)(2) within the timeframes set forth in Rule 5605(f)(7), but ceases to meet the diversity objectives of Rule 5605(f)(2) due to a vacancy on its board of directors, shall have until the later of: (i) one year from the date of vacancy; or (ii) the date the Company files its proxy statement or its information statement (or, if the Company does not file a proxy, in its Form 10-K or 20-F) in the calendar year following the year of the date of vacancy, to satisfy Rule 5605(f)(2) or (3). In lieu of providing the disclosure required by Rule 5605(f)(3), a Company relying on this provision may publicly disclose that it is relying on the grace period provided by this Rule 5605(f)(6)(B). Such disclosure must be provided in advance of the Company's next annual meeting of shareholders: (a) in any proxy statement or any information statement (or, if the Company does not file a proxy, in its Form 10-K or 20-F); or (b) on the Company's website. If the Company provides such disclosure on its website, then the Company must submit such disclosure concurrently with the filing made pursuant to (a) and submit a URL link to the disclosure through the Nasdaq Listing Center, within one business day after such posting.

**(7) Effective Dates/Transition**

**(A)** Each Company listed on The Nasdaq Global Select Market, The Nasdaq Global Market, and The Nasdaq Capital Market (including a Company with a smaller board under Rule 5606(f)(2)(D)) must have, or explain why it does not have, at least one Diverse director by the later of: (i) two calendar years after the Approval Date (the "First Effective Date"); or (ii) the date the Company files its proxy statement or its information statement (or, if the Company does not file a proxy, in its Form 10-K or 20-F) for the Company's annual shareholders meeting during the calendar year of the First Effective Date.

**(B)** Each Company listed on The Nasdaq Global Select Market or The Nasdaq Global Market must have, or explain why it does not have, at least ~~one Diverse director no later than two calendar years after the Approval Date and at least~~ two Diverse directors ~~no~~by the later ~~than~~of: (i) four calendar years after the Approval Date (the "Second NGS/NGM Effective Date"); or (ii) the date the Company files its proxy statement or its information statement (or, if the Company does not file a proxy, in its Form 10-K or 20-F) for the Company's annual shareholders meeting during the calendar year of the Second NGS/NGM Effective Date.

**(C)** Each Company listed on The Nasdaq Capital Market must have, or explain why it does not have, at least ~~one Diverse director no later than two calendar years after the Approval Date and at least~~ two Diverse directors ~~no~~by the later ~~than~~of: (i) five calendar years after the Approval Date (the "Second NCM Effective Date") or (ii) the date the Company files its proxy statement or its information statement (or, if the Company does not file a proxy, in its Form 10-K or 20-F) for the Company's annual shareholders meeting during the calendar year of the Second NCM Effective Date.

**(D)** Notwithstanding the foregoing, a Company is not required to comply with the requirements of this Rule 5605(f) prior to the end of the phase-in periods described in Rule 5605(f)(5), if applicable.

**(E)** A company listing after the Approval Date, but prior to the end of the periods set forth in this subparagraph (7), must fully satisfy the requirements of this Rule 5605(f) by the later of the periods set forth in this subparagraph (7) or the two year phase-in periods set forth in Rule 5605(f)(5).

**(F)** A company listed on The Nasdaq Capital Market that transfers to The Nasdaq Global Select Market or The Nasdaq Global Market after the Approval Date, but prior to the end of the periods set forth in this subparagraph (7), must satisfy the requirements of this Rule 5605(f) by the la~~tt~~er of: (i) the periods set forth in this subparagraph (7)(C); or (ii) one year from the date of ~~listing~~transfer.

## 5606.  Board Diversity Disclosure

**(a)** Each Company must annually disclose, to the extent permitted by applicable law, information on each director's voluntary self-identified characteristics in a substantially ~~the~~similar format below.  Following the first year of disclosure, all companies must disclose the current year and immediately prior year diversity statistics using the Board Diversity Matrix.

| Board Diversity Matrix (As of [DATE]) | |
| --- | --- |
| ~~**Board Size:**~~ | |
| Total Number of Directors | # |

| ~~Gender:~~ | Fem~~Male~~ | ~~Fem~~Male | Non-Binary | ~~Un~~Did Not Disclose Gender |
|---|---|---|---|---|
| **Part I: Gender Identity** | | | | |
| ~~Number of d~~Directors ~~based on gender identity~~ | # | # | # | # |
| **Part II: Demographic Background** | | | | |
| African American or Black | # | # | # | # |
| Alaskan Native or Native American ~~Indian~~ | # | # | # | # |
| Asian | # | # | # | # |
| Hispanic or Latinx | # | # | # | # |
| Native Hawaiian or Pacific Islander | # | # | # | # |
| White | # | # | # | # |
| Two or More Races or Ethnicities | # | # | # | # |
| LGBTQ+ | # | | | |
| Did Not ~~Und~~Disclose~~d~~ Demographic Background | # | | | |

However, a Company that qualifies as a Foreign Issuer under Rule 5605(f)(1) may elect to use the format below:

| **Board Diversity Matrix (As of [DATE])** | | | |
|---|---|---|---|
| ~~Foreign Issuer under Rule 5605(f)(1)~~To be completed by Foreign Issuers (with principal executive offices outside of the U.S.) and Foreign Private Issuers | | | |
| Country of Principal Executive Offices~~Incorporation~~ | [Insert Country Name] | | |
| Foreign Private Issuer | Yes/No | | |
| Disclosure Prohibited under Home Country Law | Yes/No | | |
| ~~Board Size:~~ | | | |
| Total Number of Directors | # | | |

| ~~Gender:~~ | Fem~~Male~~ | ~~Fem~~Male | Non-Binary | Did Not Disclose Gender ~~Undisclosed~~ |
|---|---|---|---|---|
| **Part I: Gender Identity** | | | | |

| | | | | |
|---|---|---|---|---|
| ~~Number of d~~Directors ~~based on gender identity~~ | # | # | # | # |
| **Part II: Demographic Background** | | | | |
| Underrepresented Individual in Home Country Jurisdiction~~LGBTQ+~~ | # | | | |
| LGBTQ+~~Underrepresented Individual in Home Country Jurisdiction~~ | # | | | |
| Did Not ~~Und~~Disclosed Demographic Background | # | | | |

**(b)** The disclosure required by this Rule 5606 must be provided ~~(i)~~ in the ~~Company's proxy statement or information statement for its annual meeting of shareholders or (ii) on~~same manner as, and concurrently with, the ~~Company's website.  If the Company provides such disclosure on its website, the Company must also submit such disclosure and include a URL link to the disclosure through the Nasdaq Listing Center no later than 15 calendar days after the Company's annual shareholders meeting~~required by Rule 5605(f)(3).

**(c)** This Rule 5606 shall not apply to Exempt Companies as defined in Rule 5605(f)(4).

**(d)** A Company newly listing on Nasdaq that was not previously subject to a substantially similar requirement of another national securities exchange, including ~~a company~~ through an initial public offering, direct listing, transfer from the over-the-counter market or another exchange, in connection with a ~~business combination~~spin-off or carve-out from a company listed on Nasdaq or another exchange, or through a merger with an acquisition company listed under IM-5101-2, must satisfy the requirement of this Rule 5606 within one year of listing.

**(e)** This Rule 5606 will be operative one year after the ~~date that the~~ Commission issues an order granting the approval of this proposed Rule 5606 ("Approval Date").  A Company must be in compliance with this Rule 5606 by the later of: (1) one calendar year from the Approval Date ("Effective Date"); or (2) the date the Company files its proxy statement or its information statement for its annual meeting of shareholders (or, if the Company does not file a proxy or information statement, the date it files its Form 10-K or 20-F) during the calendar year of the Effective Date.

* * * * *

**5615. Exemptions from Certain Corporate Governance Requirements**

* * * * *

**(a) Exemptions to the Corporate Governance Requirements**

**(1) – (2)** No change.

**(3) Foreign Private Issuers**

   **(A)** A Foreign Private Issuer may follow its home country practice in lieu of the requirements of the Rule 5600 Series, the requirement to disclose third party director and nominee compensation set forth in Rule 5250(b)(3), and the requirement to distribute annual and interim reports set forth in Rule 5250(d), provided, however, that such a Company shall: comply with the Notification of Noncompliance requirement (Rule 5625), the Voting Rights requirement (Rule 5640), the Diverse Board Representation Rule (Rule 5605(f)), the Board Diversity Disclosure Rule (Rule 5606), have an audit committee that satisfies Rule 5605(c)(3), and ensure that such audit committee's members meet the independence requirement in Rule 5605(c)(2)(A)(ii). Except as provided in this paragraph, a Foreign Private Issuer must comply with the requirements of the Rule 5000 Series.

   **(B)** No change.

**IM-5615-3. Foreign Private Issuers**

A Foreign Private Issuer (as defined in Rule 5005) listed on Nasdaq may follow the practice in such Company's home country (as defined in General Instruction F of Form 20-F) in lieu of the provisions of the Rule 5600 Series, Rule 5250(b)(3), and Rule 5250(d), subject to several important exceptions. First, such an issuer shall comply with Rule 5625 (Notification of Noncompliance). Second, such a Company shall have an audit committee that satisfies Rule 5605(c)(3). Third, members of such audit committee shall meet the criteria for independence referenced in Rule 5605(c)(2)(A)(ii) (the criteria set forth in Rule 10A-3(b)(1) under the Act, subject to the exemptions provided in Rule 10A-3(c) under the Act). Fourth, such an issuer shall comply with Rule 5605(f) (Diverse Board Representation) and Rule 5606 (Board Diversity Disclosure). Finally, a Foreign Private Issuer that elects to follow home country practice in lieu of a requirement of Rules 5600, 5250(b)(3), or 5250(d) shall submit to Nasdaq a written statement from an independent counsel in such Company's home country certifying that the Company's practices are not prohibited by the home country's laws. In the case of new listings, this certification is required at the time of listing. For existing Companies, the certification is required at the time the Company seeks to adopt its first noncompliant practice. In the interest of transparency, the rule requires a Foreign Private Issuer to make appropriate disclosures in the Company's annual filings with the Commission (typically Form 20-F or 40-F), and at the time of the Company's original listing in the United States, if that listing is on Nasdaq, in its registration statement (typically Form F-1, 20-F, or 40-F); alternatively, a Company that is not required to file an annual report on Form 20-F may provide these disclosures in English on its website in addition to, or instead of, providing these disclosures on its registration statement or annual report. The Company shall disclose each requirement that it does not follow and include a brief statement of the home country practice the Company follows in lieu of these corporate governance requirement(s). If the disclosure is only available on the website, the annual report and

registration statement should so state and provide the web address at which the information may be obtained. Companies that must file annual reports on Form 20-F are encouraged to provide these disclosures on their websites, in addition to the required Form 20-F disclosures, to provide maximum transparency about their practices.

**(4) - (6)** No change.

**(b) – (c)** No change.

\* \* \* \* \*

### 5810. Notification of Deficiency by the Listing Qualifications Department

When the Listing Qualifications Department determines that a Company does not meet a listing standard set forth in the Rule 5000 Series, it will immediately notify the Company of the deficiency. As explained in more detail below, deficiency notifications are of four types:

**(1) – (4)** No change.

Notifications of deficiencies that allow for submission of a compliance plan or an automatic cure or compliance period may result, after review of the compliance plan or expiration of the cure or compliance period, in issuance of a Staff Delisting Determination or a Public Reprimand Letter.

**(a) – (b)** No change.

**(c) Types of Deficiencies and Notifications**

No change.

**(1)** No change.

**(2) Deficiencies for which a Company may Submit a Plan of Compliance for Staff Review**

> **(A)** Unless the Company is currently under review by an Adjudicatory Body for a Staff Delisting Determination, the Listing Qualifications Department may accept and review a plan to regain compliance when a Company is deficient with respect to one of the standards listed in subsections (i) through (vi) below. In accordance with Rule 5810(c)(2)(C), plans provided pursuant to subsections (i) through (iv) and (vi) below must be provided generally within 45 calendar days, and in accordance with Rule 5810(c)(2)(F), plans provided pursuant to subsection (v) must be provided generally within 60 calendar days. If a Company's plan consists of transferring from the Nasdaq Global or Global Select Market to the Nasdaq Capital Market, the Company should submit its application and the applicable application fee at the same time as its plan to regain compliance.

**(i) – (ii)** No change.

**(iii)** deficiencies from the standards of Rules 5620(a) {Meetings of Shareholders}, 5620(c) {Quorum}, 5630 {Review of Related Party Transactions}, 5635 {Shareholder Approval}, 5250(c)(3) {Auditor Registration}, 5255(a) {Direct Registration Program}, 5610 {Code of Conduct}, 5615(a)(4)(D) {Partner Meetings of Limited Partnerships}, 5615(a)(4)(E) {Quorum of Limited Partnerships}, 5615(a)(4)(G) {Related Party Transactions of Limited Partnerships}, or 5640 {Voting Rights};[or]

**(iv)** failure to make the disclosure required by Rule 5250(b)(3)[.] {Disclosure of Third Party Director and Nominee Compensation} or Rule 5606 {Board Diversity Disclosure};

**(v)** failure to file periodic reports as required by Rules 5250(c)(1) or (2)[.]; or

**(vi)** failure to meet a continued listing requirement contained in the Rule 5700 Series.

## IM-5810-2. Staff Review of Deficiencies

No change.

**(B) – (G)** No change.

## (3) Deficiencies for which the Rules Provide a Specified Cure or Compliance Period

With respect to deficiencies related to the standards listed in (A) – [(F)](G) below, Staff's notification will inform the Company of the applicable cure or compliance period provided by these Rules and discussed below. If the Company does not regain compliance within the specified cure or compliance period, the Listing Qualifications Department will immediately issue a Staff Delisting Determination letter.

### (A) Bid Price

A failure to meet the continued listing requirement for minimum bid price shall be determined to exist only if the deficiency continues for a period of 30 consecutive business days. Upon such failure, the Company shall be notified promptly and shall have a period of 180 calendar days from such notification to achieve compliance. Compliance can be achieved during any compliance period by meeting the applicable standard for a minimum of 10 consecutive business days during the applicable compliance period, unless Staff exercises its discretion to extend this 10 day period as discussed in Rule 5810(c)(3)[(G)](H).

**(i) – (iv)** No change.

### (B) Market Makers

No change.

### (C) Market Value of Listed Securities

A failure to meet the continued listing requirements for Market Value of Listed Securities shall be determined to exist only if the deficiency continues for a period of 30 consecutive business days. Upon such failure, the Company shall be notified promptly and shall have a period of 180 calendar days from such notification to achieve compliance. Compliance can be achieved by meeting the applicable standard for a minimum of 10 consecutive business days during the 180 day compliance period, unless Staff exercises its discretion to extend this 10 day period as discussed in Rule 5810(c)(3)[(G)](H).

### (D) Market Value of Publicly Held Shares

A failure to meet the continued listing requirement for Market Value of Publicly Held Shares shall be determined to exist only if the deficiency continues for a period of 30 consecutive business days. Upon such failure, the Company shall be notified promptly and shall have a period of 180 calendar days from such notification to achieve compliance. Compliance can be achieved by meeting the applicable standard for a minimum of 10 consecutive business days during the 180 day compliance period, unless Staff exercises its discretion to extend this 10 day period as discussed in Rule 5810(c)(3)[(G)](H).

### (E) Independent Director and Audit Committee Rules

No change.

### (F) Diverse Board Representation Rule

If a Company, that is not relying on the grace period set forth in Rule 5605(f)(6)(B), (i) does not ~~have at least two Diverse directors~~meet the applicable diversity objectives as set forth under Rule 5605(f)(2) and fails to provide the disclosure required by Rule 5605(f)(3), or (ii) fails to hold an annual meeting of shareholders during the applicable periods in Rule 5605(f)(5) or (7) and therefore fails to meet, or explain why it does not meet, the diversity objectives of Rule 5605(f)(2), the Company shall be notified promptly and shall have until the latter of its next annual shareholders meeting or 180 days from the event that caused the deficiency to cure the deficiency.

### [(F)](G) Market Value/Principal Amount Outstanding of Non-Convertible Bonds

A failure to meet the continued listing requirement for non-convertible bonds, as set forth in Rule 5702(b)(1) (requiring non-convertible bonds to have at least $400,000 in market value or principal amount outstanding) shall be determined to exist only if the deficiency continues for a period of 30 consecutive business days. Upon such failure, the Company shall be notified promptly and shall have a

period of 180 calendar days from such notification to achieve compliance. Compliance can be achieved during this 180 calendar day compliance period by meeting the applicable standard for a minimum of 10 consecutive business days during the applicable compliance period, unless Staff exercises its discretion to extend this 10 day period as discussed in Rule 5810(c)(3)[(G)](H).

**[(G)](H) Staff Discretion Relating to the Price-based Requirements**

No change.

**(4) Public Reprimand Letter**

No change.

**(d) Additional Deficiencies**

No change.

* * * * *

**EXHIBIT 5**

Deleted text is [bracketed].  New text is underlined.

**The Nasdaq Stock Market LLC Rules**

\* \* \* \* \*

**5605.   Board of Directors and Committees**

**(a) – (e)** No change.

**(f) Diverse Board Representation**

**(1) Definitions**

For purposes of this Rule 5605(f):

"Diverse" means an individual who self-identifies in one or more of the following categories: Female, Underrepresented Minority, or LGBTQ+.

"Female" means an individual who self-identifies her gender as a woman, without regard to the individual's designated sex at birth.

"Foreign Issuer" means (a) a Foreign Private Issuer (as defined in Rule 5005(a)(19)); or (b) a company that (i) is considered a "foreign issuer" under Rule 3b-4(b) under the Act and (ii) has its principal executive offices located outside of the United States.

"LGBTQ+" means an individual who self-identifies as any of the following: lesbian, gay, bisexual, transgender, or as a member of the queer community.

"Approval Date" means the date that the Commission issues an order granting the approval of this proposed Rule 5605(f).

"Smaller Reporting Company" has the definition set forth in Rule 12b-2 under the Act.

"Underrepresented Minority" means an individual who self-identifies as one or more of the following: Black or African American, Hispanic or Latinx, Asian, Native American or Alaska Native, Native Hawaiian or Pacific Islander, or Two or More Races or Ethnicities.

"Two or More Races or Ethnicities" means a person who identifies with more than one of the following categories: White (not of Hispanic or Latinx origin), Black or African American, Hispanic or Latinx, Asian, Native American or Alaska Native, Native Hawaiian or Pacific Islander.

**(2) Diversity Objective**

**(A) General Objective**

Each Company, except as described below in (B), (C) or (D), must have, or explain why it does not have, at least two members of its board of directors who are Diverse, including (i) at least one Diverse director who self-identifies as Female; and (ii) at least one Diverse director who self-identifies as an Underrepresented Minority or LGBTQ+.

**(B) Foreign Issuers**

**(i)** For purposes of this Rule 5605(f)(2)(B), (a) "Diverse" means an individual who self-identifies as one or more of the following: Female, LGBTQ+, or an underrepresented individual based on national, racial, ethnic, indigenous, cultural, religious or linguistic identity in the country of the Company's principal executive offices (as reported on the Company's Form F-1, 10-K, 20-F or 40-F); and (b) "board of directors" means, in the case of a Foreign Issuer with a two-tier board system, the Company's supervisory or non-management board.

**(ii)** Subject to subparagraph (D) below, each Foreign Issuer must have, or explain why it does not have, at least two members of its board of directors who are Diverse, including at least one Diverse director who self-identifies as Female. For greater clarity, the second Diverse director may include an individual who self-identifies as one or more of the following: Female, LGBTQ+, or an underrepresented individual based on national, racial, ethnic, indigenous, cultural, religious or linguistic identity in the country of the Company's principal executive offices.

**(C) Smaller Reporting Companies**

Subject to subparagraph (D) below, each Smaller Reporting Company must have, or explain why it does not have, at least two members of its board of directors who are Diverse, including at least one Diverse director who self-identifies as Female. For greater clarity, the second Diverse director may include an individual who self-identifies as one or more of the following: Female, LGBTQ+, or an Underrepresented Minority.

**(D) Companies with Smaller Boards**

Each Company with a board of directors of five or fewer members must have, or explain why it does not have, at least one member of its board of directors who is Diverse. If a Company has five members on its board of directors before becoming subject to this Rule 5605(f), it shall not become subject to the requirement of subparagraphs (A), (B) or (C) to have at least two members of its board of directors who are Diverse if it adds one director to satisfy this subparagraph (D), thereby becoming a six member board. However, a company would become subject to Rule 5605(f)(2)(A), (B) or (C) if it subsequently expands its board.

**(3) Alternative Public Disclosure**

If a Company satisfies the requirements of Rule 5605(f)(2) by explaining why it does not meet the applicable diversity objectives of Rule 5605(f)(2), the Company must: (i) specify the requirements of Rule 5605(f)(2) that are applicable; and (ii) explain the reasons why it does not have two Diverse directors (or one Diverse director for Companies subject to Rule 5606(f)(2)(D)).  Such disclosure must be provided in advance of the Company's next annual meeting of shareholders: (a) in any proxy statement or any information statement (or, if the Company does not file a proxy, in its Form 10-K or 20-F); or (b) on the Company's website.  If the Company provides such disclosure on its website, then the Company must submit such disclosure concurrently with the filing made pursuant to (a) and submit a URL link to the disclosure through the Nasdaq Listing Center, within one business day after such posting.

**(4) Exempt Companies**

The following types of companies are exempt from the requirements of this Rule 5605(f) ("Exempt Companies"):  acquisition companies listed under IM-5101-2; asset-backed issuers and other passive issuers (as set forth in Rule 5615(a)(1)); cooperatives (as set forth in Rule 5615(a)(2)); limited partnerships (as set forth in Rule 5615(a)(4)); management investment companies (as set forth in Rule 5615(a)(5)); issuers of non-voting preferred securities, debt securities and Derivative Securities (as set forth in Rule 5615(a)(6)) that do not have equity securities listed on Nasdaq; and issuers of securities listed under the Rule 5700 Series.

**(5) Phase-in Period**

    **(A)** Any Company newly listing on The Nasdaq Global Select Market or The Nasdaq Global Market that was not previously subject to a substantially similar requirement of another national securities exchange, including through an initial public offering, direct listing, transfer from the over-the-counter market or another exchange, in connection with a spin-off or carve-out from a company listed on Nasdaq or another exchange, or through a merger with an acquisition company listed under IM-5101-2, shall be permitted to satisfy the requirement of Rule 5605(f)(2) to have, or explain why it does not have: (i) at least one Diverse director by the later of: (a) one year from the date of listing; or (b) the date the Company files its proxy statement or its information statement (or, if the Company does not file a proxy, in its Form 10-K or 20-F) for the Company's first annual meeting of shareholders subsequent to the Company's listing; and  (ii) at least two Diverse directors by the later of: (a) two years from the date of listing; or (b) the date the Company files its proxy statement or its information statement (or, if the Company does not file a proxy, in its Form 10-K or 20-F) for the Company's second annual meeting of shareholders subsequent to the Company's listing.

**(B)** Any Company newly listing on The Nasdaq Capital Market that was not previously subject to a substantially similar requirement of another national securities exchange, including through an initial public offering, direct listing, transfer from the over-the-counter market or another exchange, in connection with a spin-off or carve-out from a company listed on Nasdaq or another exchange, or through a merger with an acquisition company listed under IM-5101-2, shall be permitted to satisfy the requirement of Rule 5605(f)(2) to have, or explain why it does not have at least two Diverse directors by the later of: (a) two years from the date of listing; or (b) the date the Company files its proxy statement or its information statement (or, if the Company does not file a proxy, in its Form 10-K or 20-F) for the Company's second annual meeting of shareholders subsequent to the Company's listing.

**(C)** Any Company that ceases to be a Foreign Issuer, a Smaller Reporting Company, or an Exempt Company shall be permitted to satisfy the requirements of Rule 5605(f) by the later of: (i) one year from the date that the Company no longer qualifies as a Foreign Issuer, a Smaller Reporting Company or an Exempt Company, respectively; or (ii) the date the Company files its proxy statement or its information statement (or, if the Company does not file a proxy, in its Form 10-K or 20-F) for the Company's first annual meeting of shareholders subsequent to such event.

**(D)** Any Company newly listing on The Nasdaq Global Select Market, The Nasdaq Global Market and The Nasdaq Capital Market that has a board of five or fewer members and was not previously subject to a substantially similar requirement of another national securities exchange, including through an initial public offering, direct listing, transfer from the over-the-counter market or another exchange, in connection with a spin-off or carve-out from a company listed on Nasdaq or another exchange, or through a merger with an acquisition company listed under IM-5101-2, shall be permitted to satisfy the requirement of Rule 5605(f)(2) to have, or explain why it does not have at least one Diverse director by the later of: (a) two years from the date of listing; or (b) the date the Company files its proxy statement or its information statement (or, if the Company does not file a proxy, in its Form 10-K or 20-F) for the Company's second annual meeting of shareholders subsequent to the Company's listing.

**(6) Cure Period and Grace Period**

**(A)** If a Company (i) does not meet the applicable diversity objectives set forth under Rule 5605(f)(2) and fails to provide the disclosure required by Rule 5605(f)(3), or (ii) fails to hold an annual meeting of shareholders during the applicable periods in Rule 5605(f)(5) or (7) and therefore fails to meet, or explain why it does not meet, the diversity objectives of Rule 5605(f)(2), the Listing Qualifications Department will promptly notify the Company and inform it that it

has until the later of its next annual shareholders meeting or 180 days from the event that caused the deficiency to cure the deficiency.

**(B)** A Company that satisfied the diversity objectives of Rule 5605(f)(2) within the timeframes set forth in Rule 5605(f)(7), but ceases to meet the diversity objectives of Rule 5605(f)(2) due to a vacancy on its board of directors, shall have until the later of: (i) one year from the date of vacancy; or (ii) the date the Company files its proxy statement or its information statement (or, if the Company does not file a proxy, in its Form 10-K or 20-F) in the calendar year following the year of the date of vacancy, to satisfy Rule 5605(f)(2) or (3). In lieu of providing the disclosure required by Rule 5605(f)(3), a Company relying on this provision may publicly disclose that it is relying on the grace period provided by this Rule 5605(f)(6)(B).  Such disclosure must be provided in advance of the Company's next annual meeting of shareholders: (a) in any proxy statement or any information statement (or, if the Company does not file a proxy, in its Form 10-K or 20-F); or (b) on the Company's website.  If the Company provides such disclosure on its website, then the Company must submit such disclosure concurrently with the filing made pursuant to (a) and submit a URL link to the disclosure through the Nasdaq Listing Center, within one business day after such posting.

## (7) Effective Dates/Transition

**(A)** Each Company listed on The Nasdaq Global Select Market, The Nasdaq Global Market, and The Nasdaq Capital Market (including a Company with a smaller board under Rule 5606(f)(2)(D)) must have, or explain why it does not have, at least one Diverse director by the later of: (i) two calendar years after the Approval Date (the "First Effective Date"); or (ii) the date the Company files its proxy statement or its information statement (or, if the Company does not file a proxy, in its Form 10-K or 20-F) for the Company's annual shareholders meeting during the calendar year of the First Effective Date.

**(B)** Each Company listed on The Nasdaq Global Select Market or The Nasdaq Global Market must have, or explain why it does not have, at least two Diverse directors by the later of: (i) four calendar years after the Approval Date (the "Second NGS/NGM Effective Date"); or (ii) the date the Company files its proxy statement or its information statement (or, if the Company does not file a proxy, in its Form 10-K or 20-F) for the Company's annual shareholders meeting during the calendar year of the Second NGS/NGM Effective Date.

**(C)** Each Company listed on The Nasdaq Capital Market must have, or explain why it does not have, at least two Diverse directors by the later of: (i) five calendar years after the Approval Date (the "Second NCM Effective Date") or (ii) the date the Company files its proxy statement or its information statement (or, if the Company does not file a proxy, in its Form 10-K or 20-F) for the Company's

annual shareholders meeting during the calendar year of the Second NCM Effective Date.

**(D)** Notwithstanding the foregoing, a Company is not required to comply with the requirements of this Rule 5605(f) prior to the end of the phase-in periods described in Rule 5605(f)(5), if applicable.

**(E)** A company listing after the Approval Date, but prior to the end of the periods set forth in this subparagraph (7), must fully satisfy the requirements of this Rule 5605(f) by the later of the periods set forth in this subparagraph (7) or the two year phase-in periods set forth in Rule 5605(f)(5).

**(F)** A company listed on The Nasdaq Capital Market that transfers to The Nasdaq Global Select Market or The Nasdaq Global Market after the Approval Date, but prior to the end of the periods set forth in this subparagraph (7), must satisfy the requirements of this Rule 5605(f) by the later of: (i) the periods set forth in this subparagraph (7)(C); or (ii) one year from the date of transfer.

## 5606.  Board Diversity Disclosure

**(a)** Each Company must annually disclose, to the extent permitted by applicable law, information on each director's voluntary self-identified characteristics in a substantially similar format below.  Following the first year of disclosure, all companies must disclose the current year and immediately prior year diversity statistics using the Board Diversity Matrix.

| Board Diversity Matrix (As of [DATE]) | | | | |
|---|---|---|---|---|
| Total Number of Directors | # | | | |
| | **Female** | **Male** | **Non-Binary** | **Did Not Disclose Gender** |
| **Part I: Gender Identity** | | | | |
|   Directors | # | # | # | # |
| **Part II: Demographic Background** | | | | |
|   African American or Black | # | # | # | # |
|   Alaskan Native or Native American | # | # | # | # |
|   Asian | # | # | # | # |
|   Hispanic or Latinx | # | # | # | # |
|   Native Hawaiian or Pacific Islander | # | # | # | # |
|   White | # | # | # | # |
|   Two or More Races or Ethnicities | # | # | # | # |
|   LGBTQ+ | # | | | |

| Did Not Disclose Demographic Background | # |
|---|---|

However, a Company that qualifies as a Foreign Issuer under Rule 5605(f)(1) may elect to use the format below:

| Board Diversity Matrix (As of [DATE]) | | | | |
|---|---|---|---|---|
| To be completed by Foreign Issuers (with principal executive offices outside of the U.S.) and Foreign Private Issuers | | | | |
| Country of Principal Executive Offices | [Insert Country Name] | | | |
| Foreign Private Issuer | Yes/No | | | |
| Disclosure Prohibited under Home Country Law | Yes/No | | | |
| Total Number of Directors | # | | | |
| | **Female** | **Male** | **Non-Binary** | **Did Not Disclose Gender** |
| **Part I: Gender Identity** | | | | |
| Directors | # | # | # | # |
| **Part II: Demographic Background** | | | | |
| Underrepresented Individual in Home Country Jurisdiction | # | | | |
| LGBTQ+ | # | | | |
| Did Not Disclose Demographic Background | # | | | |

**(b)** The disclosure required by this Rule 5606 must be provided in the same manner as, and concurrently with, the disclosure required by Rule 5605(f)(3).

**(c)** This Rule 5606 shall not apply to Exempt Companies as defined in Rule 5605(f)(4).

**(d)** A Company newly listing on Nasdaq that was not previously subject to a substantially similar requirement of another national securities exchange, including through an initial public offering, direct listing, transfer from the over-the-counter market or another exchange, in connection with a spin-off or carve-out from a company listed on Nasdaq or another exchange, or through a merger with an acquisition company listed under IM-5101-2, must satisfy the requirement of this Rule 5606 within one year of listing.

**(e)** This Rule 5606 will be operative one year after the Commission issues an order granting the approval of this proposed Rule 5606 ("Approval Date"). A Company must be in compliance with this Rule 5606 by the later of: (1) one calendar year from the Approval Date ("Effective Date"); or (2) the date the Company files its proxy statement or its information statement for its annual meeting of shareholders (or, if the Company does not file a proxy or information statement, the date it files its Form 10-K or 20-F) during the calendar year of the Effective Date.

\* \* \* \* \*

## 5615. Exemptions from Certain Corporate Governance Requirements

\* \* \* \* \*

### (a) Exemptions to the Corporate Governance Requirements

**(1) – (2)** No change.

### (3) Foreign Private Issuers

> **(A)** A Foreign Private Issuer may follow its home country practice in lieu of the requirements of the Rule 5600 Series, the requirement to disclose third party director and nominee compensation set forth in Rule 5250(b)(3), and the requirement to distribute annual and interim reports set forth in Rule 5250(d), provided, however, that such a Company shall: comply with the Notification of Noncompliance requirement (Rule 5625), the Voting Rights requirement (Rule 5640), the Diverse Board Representation Rule (Rule 5605(f)), the Board Diversity Disclosure Rule (Rule 5606), have an audit committee that satisfies Rule 5605(c)(3), and ensure that such audit committee's members meet the independence requirement in Rule 5605(c)(2)(A)(ii). Except as provided in this paragraph, a Foreign Private Issuer must comply with the requirements of the Rule 5000 Series.

> **(B)** No change.

### IM-5615-3. Foreign Private Issuers

A Foreign Private Issuer (as defined in Rule 5005) listed on Nasdaq may follow the practice in such Company's home country (as defined in General Instruction F of Form 20-F) in lieu of the provisions of the Rule 5600 Series, Rule 5250(b)(3), and Rule 5250(d), subject to several important exceptions. First, such an issuer shall comply with Rule 5625 (Notification of Noncompliance). Second, such a Company shall have an audit committee that satisfies Rule 5605(c)(3). Third, members of such audit committee shall meet the criteria for independence referenced in Rule 5605(c)(2)(A)(ii) (the criteria set forth in Rule 10A-3(b)(1) under the Act, subject to the exemptions provided in Rule 10A-3(c) under the Act). Fourth, such an issuer shall comply with Rule 5605(f) (Diverse Board Representation) and Rule 5606 (Board Diversity Disclosure). Finally, a Foreign Private Issuer that elects to follow home country practice in lieu of a requirement of Rules 5600, 5250(b)(3), or 5250(d) shall submit to Nasdaq a written statement from an independent counsel in such Company's home country certifying that the Company's practices are not prohibited by the home country's laws. In the case of new listings, this certification is required at the time of listing. For existing Companies, the certification is required at the time the Company seeks to adopt its first noncompliant practice. In the interest of transparency, the rule requires a Foreign Private Issuer to make appropriate

disclosures in the Company's annual filings with the Commission (typically Form 20-F or 40-F), and at the time of the Company's original listing in the United States, if that listing is on Nasdaq, in its registration statement (typically Form F-1, 20-F, or 40-F); alternatively, a Company that is not required to file an annual report on Form 20-F may provide these disclosures in English on its website in addition to, or instead of, providing these disclosures on its registration statement or annual report. The Company shall disclose each requirement that it does not follow and include a brief statement of the home country practice the Company follows in lieu of these corporate governance requirement(s). If the disclosure is only available on the website, the annual report and registration statement should so state and provide the web address at which the information may be obtained. Companies that must file annual reports on Form 20-F are encouraged to provide these disclosures on their websites, in addition to the required Form 20-F disclosures, to provide maximum transparency about their practices.

**(4) - (6)** No change.

**(b) – (c)** No change.

\* \* \* \* \*

### 5810. Notification of Deficiency by the Listing Qualifications Department

When the Listing Qualifications Department determines that a Company does not meet a listing standard set forth in the Rule 5000 Series, it will immediately notify the Company of the deficiency. As explained in more detail below, deficiency notifications are of four types:

**(1) – (4)** No change.

Notifications of deficiencies that allow for submission of a compliance plan or an automatic cure or compliance period may result, after review of the compliance plan or expiration of the cure or compliance period, in issuance of a Staff Delisting Determination or a Public Reprimand Letter.

**(a) – (b)** No change.

### (c) Types of Deficiencies and Notifications

No change.

**(1)** No change.

### (2) Deficiencies for which a Company may Submit a Plan of Compliance for Staff Review

**(A)** Unless the Company is currently under review by an Adjudicatory Body for a Staff Delisting Determination, the Listing Qualifications Department may accept and review a plan to regain compliance when a Company is deficient with respect

to one of the standards listed in subsections (i) through (vi) below. In accordance with Rule 5810(c)(2)(C), plans provided pursuant to subsections (i) through (iv) and (vi) below must be provided generally within 45 calendar days, and in accordance with Rule 5810(c)(2)(F), plans provided pursuant to subsection (v) must be provided generally within 60 calendar days. If a Company's plan consists of transferring from the Nasdaq Global or Global Select Market to the Nasdaq Capital Market, the Company should submit its application and the applicable application fee at the same time as its plan to regain compliance.

**(i) – (ii)** No change.

**(iii)** deficiencies from the standards of Rules 5620(a) {Meetings of Shareholders}, 5620(c) {Quorum}, 5630 {Review of Related Party Transactions}, 5635 {Shareholder Approval}, 5250(c)(3) {Auditor Registration}, 5255(a) {Direct Registration Program}, 5610 {Code of Conduct}, 5615(a)(4)(D) {Partner Meetings of Limited Partnerships}, 5615(a)(4)(E) {Quorum of Limited Partnerships}, 5615(a)(4)(G) {Related Party Transactions of Limited Partnerships}, or 5640 {Voting Rights};[or]

**(iv)** failure to make the disclosure required by Rule 5250(b)(3)[.] {Disclosure of Third Party Director and Nominee Compensation} or Rule 5606 {Board Diversity Disclosure};

**(v)** failure to file periodic reports as required by Rules 5250(c)(1) or (2)[.]; or

**(vi)** failure to meet a continued listing requirement contained in the Rule 5700 Series.

## IM-5810-2. Staff Review of Deficiencies

No change.

**(B) – (G)** No change.

## (3) Deficiencies for which the Rules Provide a Specified Cure or Compliance Period

With respect to deficiencies related to the standards listed in (A) – [(F)](G) below, Staff's notification will inform the Company of the applicable cure or compliance period provided by these Rules and discussed below. If the Company does not regain compliance within the specified cure or compliance period, the Listing Qualifications Department will immediately issue a Staff Delisting Determination letter.

### (A) Bid Price

A failure to meet the continued listing requirement for minimum bid price shall be determined to exist only if the deficiency continues for a period of 30 consecutive business days. Upon such failure, the Company shall be notified promptly and

shall have a period of 180 calendar days from such notification to achieve compliance. Compliance can be achieved during any compliance period by meeting the applicable standard for a minimum of 10 consecutive business days during the applicable compliance period, unless Staff exercises its discretion to extend this 10 day period as discussed in Rule 5810(c)(3)[(G)](H).

**(i) – (iv)** No change.

**(B) Market Makers**

No change.

**(C) Market Value of Listed Securities**

A failure to meet the continued listing requirements for Market Value of Listed Securities shall be determined to exist only if the deficiency continues for a period of 30 consecutive business days. Upon such failure, the Company shall be notified promptly and shall have a period of 180 calendar days from such notification to achieve compliance. Compliance can be achieved by meeting the applicable standard for a minimum of 10 consecutive business days during the 180 day compliance period, unless Staff exercises its discretion to extend this 10 day period as discussed in Rule 5810(c)(3)[(G)](H).

**(D) Market Value of Publicly Held Shares**

A failure to meet the continued listing requirement for Market Value of Publicly Held Shares shall be determined to exist only if the deficiency continues for a period of 30 consecutive business days. Upon such failure, the Company shall be notified promptly and shall have a period of 180 calendar days from such notification to achieve compliance. Compliance can be achieved by meeting the applicable standard for a minimum of 10 consecutive business days during the 180 day compliance period, unless Staff exercises its discretion to extend this 10 day period as discussed in Rule 5810(c)(3)[(G)](H).

**(E) Independent Director and Audit Committee Rules**

No change.

**(F) Diverse Board Representation Rule**

If a Company, that is not relying on the grace period set forth in Rule 5605(f)(6)(B), (i) does not meet the applicable diversity objectives as set forth under Rule 5605(f)(2) and fails to provide the disclosure required by Rule 5605(f)(3), or (ii) fails to hold an annual meeting of shareholders during the applicable periods in Rule 5605(f)(5) or (7) and therefore fails to meet, or explain why it does not meet, the diversity objectives of Rule 5605(f)(2), the Company shall be notified promptly and shall have until the later of its next annual

shareholders meeting or 180 days from the event that caused the deficiency to cure the deficiency.

**[(F)](G) Market Value/Principal Amount Outstanding of Non-Convertible Bonds**

A failure to meet the continued listing requirement for non-convertible bonds, as set forth in Rule 5702(b)(1) (requiring non-convertible bonds to have at least $400,000 in market value or principal amount outstanding) shall be determined to exist only if the deficiency continues for a period of 30 consecutive business days. Upon such failure, the Company shall be notified promptly and shall have a period of 180 calendar days from such notification to achieve compliance. Compliance can be achieved during this 180 calendar day compliance period by meeting the applicable standard for a minimum of 10 consecutive business days during the applicable compliance period, unless Staff exercises its discretion to extend this 10 day period as discussed in Rule 5810(c)(3)[(G)](H).

**[(G)](H) Staff Discretion Relating to the Price-based Requirements**

No change.

**(4) Public Reprimand Letter**

No change.

**(d) Additional Deficiencies**

No change.

* * * * *

**TAB 13:**

Nasdaq Comments on Notice of Filing of Proposed Rule Change, File No. SR-NASDAQ-2020-081 (Feb. 5, 2021) ("Nasdaq Letter I")

# Ballard Spahr
### LLP

1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599

███████████████

Stephen J. Kastenberg

████████████████

February 5, 2021

*Via E-mail (rule-comments@sec.gov)*

Vanessa Countryman, Secretary
U.S. Securities and Exchange Commission
100 F. Street NE
Washington, D.C. 20549-1090

Re:     The Nasdaq Stock Market LLC; Comments on Notice of Filing of Proposed Rule
        Change To Adopt Listing Rules Related To Board Diversity
        Release No. 34-90574; File No. SR-NASDAQ-2020-081

Dear Ms. Countryman:

Ballard Spahr LLP represents The Nasdaq Stock Market LLC ("Nasdaq," or the
"Exchange"), and submits this letter on behalf of Nasdaq to address certain comments
submitted to the Commission concerning Nasdaq's proposed listing Rules 5605(f) and 5606,
and to update Rule 5615 and IM-5615-2 (Foreign Private Issuers) and Rule 5810(c) (Types
of Deficiencies and Notifications) to incorporate references to the proposed rules related to
board diversity (collectively, the "Proposed Rules").[1]

Specifically, as set forth in greater detail below:

    (i)    Title VII of the Civil Rights Act of 1964 ("Title VII") does not apply to the
            Proposed Rules because most directors of Nasdaq-listed companies are not
            employees, and even if Title VII did apply, the Proposed Rules do not
            discriminate or encourage discrimination because the proposed board
            diversity objectives are aspirational and not mandatory;

---

[1]    The proposed rules were published for comment in the *Federal Register* on
    December 11, 2020.  Securities Exchange Act Rel. No. 90574 (Dec. 4, 2020), 85
    Fed. Reg. 80472 (Dec. 11, 2020) (the "Notice").

Vanessa Countryman, Secretary
February 5, 2021
Page 2

(ii)    constitutional arguments against the proposed rule fail for the threshold
reason that Nasdaq is not a state actor, and the Proposed Rules do not
constitute state action subject to constitutional scrutiny; and

(iii)    even were Nasdaq a state actor, the constitutional arguments raised by some
commenters do not have merit in any event because:

a.    the Proposed Rules meet any potentially applicable Equal Protection
requirements and self-identification by individuals is voluntary; and

b.    the Proposed Rules do not constitute compelled speech under the First
Amendment because they serve a fundamentally commercial interest.

Nasdaq will address other comments concerning the Proposed Rules in a separate
submission.

## I.    BACKGROUND

### A.    <u>The Proposed Rules</u>

Proposed Rule 5606 would require all Nasdaq-listed companies to disclose statistics
regarding the diversity of their boards of directors.  For the sake of consistency and
comparability among all listed companies, the proposed rule sets forth a uniform definition
of diversity and prescribes a template matrix for the disclosures.

In addition, proposed Rule 5605(f) would require most Nasdaq-listed companies to have, or
explain why they do not have, at least two diverse directors, including one who self-
identifies as female and one who self-identifies as either an underrepresented minority[2] or
LGBTQ+.

To be clear, the Proposed Rules do not ***require*** any particular board composition.  Rule
5605(f) sets forth aspirational diversity ***objectives*** – not quotas, mandates, or set asides.
Companies that do not meet the diversity objectives need only explain why they do not.  As
set forth in Nasdaq's Notice, "Nasdaq would not assess the substance of the company's

---

[2]    Proposed Rule 5605(f)(1) defines "underrepresented minority" as being "consistent
with the categories reported to the Equal Employment Opportunity Commission
("EEOC") through the Employer Information Report EEO-1 Form ("EEO-1
Report"), an individual who self-identifies as one or more of the following:  Black or
African American, Hispanic or Latinx, Asian, Native American or Alaska Native,
Native Hawaiian or Pacific Islander, or Two or More Races or Ethnicities."

Vanessa Countryman, Secretary
February 5, 2021
Page 3

explanation, but would verify that the company has provided one."[3]  Notice at 80488.  By way of example, a company's explanation could include scenarios in which a diverse director resigned before their term expired; the listed company is subject to different state or local board diversity standards and has opted to or is obligated to follow those requirements; or the listed company would meet the diversity objectives based on a broader definition of diversity (*e.g.*, a definition that includes People with Disabilities or veterans).

The Proposed Rules do not require that a company select directors based on any criteria other than an individual's qualifications for the position.  Indeed, there is no penalty for not achieving the diversity objectives.  Rather, in recognition of the governance and performance benefits of board diversity, the Proposed Rules establish aspirational diversity objectives, and seek to strengthen the securities markets by empowering the investing public with consistent, readily accessible information about the diversity of Nasdaq-listed company boards.

### B.      The Public Comments

To date, 162 substantive comment letters have been filed concerning the Proposed Rule.  Of them, the overwhelming majority (86%) of commenters – including Nasdaq-listed issuers and investors – have expressed support for the Proposed Rules.  The supportive comments include the following:

- "Women, particularly women of color, remain woefully underrepresented on boards and in leadership.  Research suggests that companies with greater diversity increase their ability to retain top talent, increase shareholder engagement, better serve their customer base by reflecting diverse perspectives, and enjoy higher levels of innovation, creativity, and effectiveness;"[4]

- "Initiatives like this can help increase disclosure and transparency around diversity numbers on corporate boards and provide investors with the

---

[3]     Proposed Rule 5605(f)(2) requires a company that does not meet the diversity objectives to specify the objectives from the rule and to provide some explanation.  Thus, "it would not satisfy Rule 5605(f)(3) merely to state that 'the Company does not comply with Nasdaq's diversity rule.'"  Notice at 80488.

[4]     Comment, Lorraine Hariton, President & Chief Executive Officer, Catalyst, at 1 (Dec. 18, 2020).

Vanessa Countryman, Secretary
February 5, 2021
Page 4

necessary data they need to better integrate diversity in other engagement efforts;"[5]

• "We commend Nasdaq for providing companies with the opportunity to increase board diversity through this disclosure-based, business-driven approach rather than implementing a strict quota;"[6]

• "[W]e share the view that diverse boards tend to make better decisions and support better financial performance of the companies they govern. . . . [D]iverse boards help companies to be more aligned with, and relevant to, an increasingly diverse set of customers, employee and talent pools;"[7] and

• "As a Nasdaq-listed issuer, . . . [w]e believe that, by giving companies adequate time to phase in changes to their boards and applying a comply-or-explain framework . . . [the proposal] encourages companies to increase board diversity without mandating a one-size-fits-all approach. . . . [As a] global asset manager, . . . we have found that insufficient board diversity increases the risk that a company will become less competitive over time, which will impact performance. . . . [The proposal] would improve our ability, as an asset manager, to obtain and analyze board diversity data in a standardized format."[8]

This letter addresses the assertions of 17 commenters that the Proposed Rules raise constitutional or discrimination concerns.[9]  Notably, only one such comment was submitted

---

[5]     Comment, Fiona Reynolds, CEO, Principles for Responsible Investment, at 1 (Dec. 18, 2020).

[6]     Comment, Jay Huish, Executive Director, Mr. William J. Coaker Jr., Chief Investment Officer, San Francisco Employees' Retirement System, at 2 (Dec. 18, 2020).

[7]     Comment, Robert W. Lovelace, CEO, Capital Research and Management Company, at 2, 3 (Dec. 22, 2020).

[8]     Comment, William J. Stromberg, President & CEO, and David Oestreicher, General Counsel & Corporate Secretary, T. Rowe Price, at 1, 2 (Dec. 29, 2020).

[9]     A few commenters expressed a concern that the Proposed Rules create a risk of litigation initiated by:  (i) listed companies, on the basis that the Proposed Rules will require them to engage in unlawful discrimination; (ii) investors in listed companies alleging that the Proposed Rules require the companies to engage in unlawful

Vanessa Countryman, Secretary
February 5, 2021
Page 5

by a Nasdaq-listed company that would be subject to the Proposed Rules.[10]  The others were submitted by advocacy or other non-governmental organizations;[11] individuals;[12] and institutional investors.[13]

## II.     THE PROPOSED RULES DO NOT RUN AFOUL OF STATUTORY ANTI-DISCRIMINATION LAWS

### A.     Compliance with the Proposed Rules Would Not Violate Title VII

Certain commenters posit that the diversity objectives of the Proposed Rules would violate Title VII of the Civil Rights Act of 1964 ("Title VII"), or would encourage listed companies

---

discrimination; or (iii) prospective directors who do not obtain board positions with listed companies and who might allege that the Proposed Rules prevented them from competing on equal footing with diverse candidates.  *See* Comments from Justin Danhof & Scott Shepard, National Center for Public Policy Research, at 2 (Dec. 30, 2020) ("NCPLR Comment"); Thomas J. Fitton, President, Judicial Watch, Inc. at 2 (Dec. 29, 2020) ("Judicial Watch Comment"); Publius Oeconomicus, at 1, 11, 12 (Dec. 28, 2020) ("Publius Comment").  Nasdaq respectfully submits that concerns about such litigation risks should be assuaged by the analysis in this letter demonstrating that the theoretical claims contemplated by these comments would be without merit.

[10]     *See* Comment, Dennis E. Nixon, International Bancshares Corporation (dated Dec. 31, 2020) ("Nixon Comment").

[11]     *See* Comments from National Legal and Policy Center (Jan. 14, 2021) ("NLPC Comment"); David Burton, The Heritage Foundation (Jan. 4, 2021) ("Burton Comment"); Project on Fair Representation (Jan. 4, 2021) ("PFR Comment"); NCPLR Comment; Independent Women's Forum (Dec. 23, 2020) ("IWF Comment"); Judicial Watch Comment.

[12]     *See* comments from Leslye Killian (Jan. 6, 2021) ("Killian Comment"); Concerned America Executives (Jan. 2, 2021) ("CAE Comment"); Samuel Sloniker (Dec. 17, 2020) ("Sloniker Comment"); John Richter (Dec. 12, 2020) ("Richter Comment"); Walter Donnellan (Dec. 14, 2020) ("Donnellan Comment"); David Pusateri (Dec. 2, 2020) ("Pusateri Comment"); James Morgan (Dec. 4, 2020) ("Morgan Comment"); Eugene F. Kelly (Dec. 29, 2020) ("Kelly Comment").

[13]     *See* Comment, Matthew Glen (Dec. 31, 2020) ("Glen Comment"); Publius Comment.

Vanessa Countryman, Secretary
February 5, 2021
Page 6

to violate Title VII to remain on the Exchange.[14]  Nasdaq respectfully disagrees for the reasons set forth below.

### 1.     Title VII Is Inapplicable Because Most Directors Are Not Employees

As a threshold matter, Title VII – which protects employees against discrimination based on protected classifications, including race, color, religion, sex[15] and national origin – would not protect current or prospective ***independent*** directors because, by definition, they are not employees of the companies on whose boards they sit.  *See* Nasdaq Rule 5605(a)(2) (excluding from the definition of "independent director" "an Executive Officer or employee of the Company").  *See also* EEOC, Section 2 Threshold Issues, "Partners, Officers, Members of Boards of Directors, and Major Shareholders," avail. at: https://www.eeoc.gov/laws/guidance/section-2-threshold-issues#2-III-A-1-d ("In most circumstances, individuals who are . . . members of boards of directors . . . will not qualify as employees.").  Case law has also examined whether, in the context of professional or closely held corporations, a large shareholder can be considered an employee, and applies a six-factor test for doing so.[16]  *See Clackamas Gastroenterology Assocs, P.C. v. Wells,* 538 U.S. 440 (2003); *see also, e.g.*, *Mariotti v. Mariotti Bldg. Prods.*, 714 F.3d 761, 767-68 (3d Cir.

---

[14]      *See* Judicial Watch Comment at 2 n.4, 4; Kelly Comment at 1 n.1, 2; Richter Comment at 3; CAE Comment at 1; Nixon Comment at 3; Burton Comment at 2, 11, 14; NLPC Comment at 4-6.  Certain other comments assert discrimination concerns without reference to Title VII.  *See* Donnellan Comment; Pusateri Comment; Sloniker Comment; Killian Comment.

[15]      For purposes of Title VII, "sex" includes sexual orientation and gender identity. *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1743 (2020).

[16]      These factors are:  (i) whether the organization could hire or fire the individual or set the rules and regulations of the individual's work; (ii) whether and, if so, to what extent the organization supervised the individual's work; (iii) whether the individual reported to someone higher in the organization; (iv) whether and, if so, to what extent the individual was able to influence the organization; (v) whether the parties intended that the individual be an employee, as expressed in written agreements or contracts; and (vi) whether the individual shared in the profits, losses and liabilities of the organization.  *Clackamas* applied these factors to a professional corporation.

Vanessa Countryman, Secretary
February 5, 2021
Page 7

2013); *De Jesus v. LTT Card Servs.*, 474 F.3d 16, 24 (1st Cir. 2007) (applying *Clackamas* to closely held corporations).[17]

The vast majority – 78% – of directors currently serving on the boards of Nasdaq-listed companies are independent, and companies would be free to meet proposed Rule 5605(f)'s diversity objectives solely with their current or additional independent directors, such that Title VII would never be at issue.  *See also* Betty Moy Huber and Paula H. Simkins, Spencer Stuart Shows How Boards Are Transforming, Davis Polk Briefing: Governance (Oct. 30, 2019), avail. at: https://www.briefinggovernance.com/2019/10/spencer-stuart-shows-how-boards-are-transforming/ (independent directors occupied 85% of board seats at S&P 500 companies in 2019).

> ### 2.     The Proposed Rules Do Not Violate or Encourage the Violation of Title VII

Even for the minority of directors who are not independent (*e.g.*, because they are company employees), and setting aside that any listed company could diversify its board through current or additional independent board member positions, the Proposed Rules would not, on their own, violate Title VII; nor would they encourage listed companies to engage in unlawful employment practices.[18]  Again, nothing in proposed Rule 5605(f) mandates any particular composition of boards such that race, gender, ethnicity, or LGBTQ+ status dictates director selection.  Indeed, there are no consequences for failing to comply with the diversity objectives of proposed Rule 5605(f).  Instead, listed companies may disclose that their boards do not comply with the objectives and state why.  As a result, compliance can be achieved even in the absence of any change to board composition.  And even when companies do add one or more directors who meet the Proposed Rule's definition of diverse,

---

[17]     While the governance structures of professional and closely-held corporations are generally quite different from those of public companies, application of the six *Clackamas* factors would, in any event, compel the conclusion that independent directors of public companies are not employees.  Independent directors are not subject to their companies' employment policies; their removal is not governed by traditional employment standards or policies; the companies do not supervise their work – quite the contrary, they oversee the companies' management; they are expressly categorized as directors, not employees; and they typically do not share in the profits or losses of their companies.

[18]     As a practical matter, for the relatively small percentage of non-independent (and non-diverse) directors currently serving on boards, it is difficult to imagine how they would have a cause of action under Title VII given that the addition of a diverse director would in no way impact their current ability to serve.

Vanessa Countryman, Secretary
February 5, 2021
Page 8

such acts alone would not violate Title VII.[19]  To the contrary, Title VII requires a plaintiff to prove that a company's decision not to extend a director position was "on account of" the plaintiff's race, color, religion, sex or national origin.  *Bostock*, 140 S. Ct. at 1739 (finding that Title VII prohibits employers from taking certain actions "because of" or "on account of" someone's sex.).  The non-mandatory nature of the Proposed rules puts that argument to rest, as does the fact that the majority of directors are not employees.  Simply put, the plain text belies any suggestion that the Proposed Rules encourage discrimination.

In a similar vein, certain commenters posit that the Proposed Rules are a form of affirmative action and therefore discriminatory.[20]  As a threshold matter, Nasdaq disagrees with the premise that the Proposed Rules are a form of affirmative action.  The Proposed Rules are premised on the statistically-supported view that board diversity benefits companies and their shareholders.  The Proposed Rules also identify diversity objectives that align with that premise.  However, those facts alone do not convert the Proposed Rules into an affirmative action program.  Rather, proposed Rule 5605(f) allows for explanation as a path to compliance, and, together with proposed Rule 5606's disclosure requirements, the Proposed Rules create a framework that provides the investing public with access to critical data and promotes an awareness of this important corporate governance issue.  Nasdaq believes that this level of transparency will position companies better to prioritize the development of board-ready, diverse candidates for director positions.  To that end, Nasdaq also is proposing to provide listed companies that have not yet met their diversity objectives with free access to a network of board-ready diverse candidates and related tools.  Notice at 80475.

However, for the sake of responding to these comments, Nasdaq notes that affirmative action programs have long been held to be lawful when they are aspirational in nature – as are the diversity objectives of proposed Rule 5605(f).  *See, e.g.*, *Johnson v. Transp. Agency, Santa Clara Co.,* 480 U.S. 616, 626 (1987).  Thus, while certain commenters argue that the Proposed Rules are discriminatory because they are akin to affirmative action programs, such a characterization, even if accurate, would not mean the Proposed Rules are unlawful.[21]

---

[19]     Companies also may choose to expand the size of their boards to open greater opportunities to meet the diversity objectives of proposed Rule 5605(f).

[20]     *See* NLPC Comment at 5; Nixon Comment at 3; Richter Comment at 3; Judicial Watch Comment at 3.

[21]     Another commenter referred to 42 U.S.C. § 1981, which prohibits discrimination based on race and ethnicity in contracting.  *See* Kelly Comment at 1 n.2.  While not clear from the face of the comment, it appears that the concern is that the Proposed Rule could violate, or encourage listed companies to violate, Section 1981's prohibition against discrimination in contracting.  Section 5605(f), however, in no

Vanessa Countryman, Secretary
February 5, 2021
Page 9

### III.    THE PROPOSED RULES ARE CONSTITUTIONAL

Certain comments raise constitutional issues of privacy and Equal Protection,[22] and one raises the issue of compelled speech.[23]  This letter addresses the substance of those comments in turn.  However, as a threshold matter, a reviewing court ought not reach the merits of such constitutional arguments because Nasdaq is not a state actor.

### A.    Nasdaq Is Not a State Actor

The Constitution regulates only the government, not private parties.  *See, e.g.*, *Fabrikant v. French*, 691 F.3d 193, 206 (2d Cir. 2012).  Thus, a plaintiff asserting a constitutional claim must first establish that the challenged conduct constitutes state action.  Well-developed case law establishes that self-regulatory organization rulemaking is not state action or fairly attributable to the state, absent specific compulsion or encouragement from the SEC that the SRO adopt the rule in question.

For an alleged constitutional deprivation to be state action, "the party charged with the deprivation must be a person who may fairly be said to be a state actor."  *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)).  Although some commenters suggest that Nasdaq is a state actor,[24] courts have

---

way dictates with whom listed companies can contract for director positions.  In any event, a plaintiff asserting a Section 1981 claim would also be obligated to prove that race was the "but-for cause" of the alleged injury – a very high burden, particularly because the Proposed Rules do not dictate that a listed company select any director based solely on their race.  *See Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 140 S. Ct. 1009, 1015 (2020).

[22]    For privacy arguments, *see* Publius Comment at 10; Donnellan Comment at 2; Richter Comment at 2; Nixon Comment at 5.  For Equal Protection arguments, *see* NLPC Comment at 4-6; Burton Comment at 2-3, 12-16; PFR Comment at 13-15; Morgan Comment at 3; Judicial Watch Comment at 5-7; Publius Comment at 9-10.

[23]    *See* PFR Comment at 15-16.

[24]    *See, e.g.,* Burton Comment at 10 (stating, without authority, that "[m]any courts" have held that SROs are state actors).  Mr. Burton cites an IRS memorandum concluding that a SRO is "a corporation serving as an agency or instrumentality of the government" within the meaning of Section 162 of the Internal Revenue Code.  *See id*. at 12 (citing Internal Revenue Service, Memorandum No. 201623006, Office of Chief Counsel (June 3, 2016)).  But whether an SRO is a state actor is a different question than whether it is an "agency" or "instrumentality" within the meaning of

uniformly concluded that SROs like Nasdaq are not state actors.[25]  Because Nasdaq is not a state actor, the proposed rule cannot be not state action just because it is promulgated by Nasdaq in its capacity as a SRO.

One commenter suggests that SROs should be deemed state actors because SROs are afforded absolute immunity when they act consistently with their delegated quasi-governmental powers.[26]  However, courts have concluded otherwise.  For example, one court held that "it is by no means 'inconsistent' to find that, on the one hand, the [SRO] exercises insufficient state action to trigger constitutional protections in a case such as this, while nevertheless holding that the [SRO] is entitled to absolute immunity in the exercise of its quasi-public regulatory duties."  *See Scher v. NASD*, 386 F. Supp. 2d 402, 408 (S.D.N.Y. 2005).  Other courts have likewise decided that SROs are simultaneously not state actors for constitutional purposes and entitled to quasi-governmental immunity when facing claims for damages.  *See Am. Benefits Group, Inc. v. NASD*, 1999 U.S. Dist. LEXIS 12321, at *23-25 (S.D.N.Y. Aug. 10, 1999) (dismissing constitutional claims against an SRO because it "is not a state actor in its role as a self-regulatory organization," while finding the SRO absolutely immune from a tortious interference claim arising from the SRO's exercise of its authority within the scope of its official duties); *Dobbins v. NASD*, 2007 U.S. Dist. LEXIS 61767 (N.D. Ohio Aug. 22, 2007) (holding that "[t]he absence of state action [by the SRO] requires dismissal of the constitutional claims" and that "NASD has absolute immunity for its regulatory acts and omissions"); *cf. Lowe v. Nat'l Ass'n of Sec. Dealers, Inc.*, 548 F.3d 110, 115 (D.C. Cir. 2008) (stating that the Exchange Act's structure "is suggestive both of an intent to create immunity for [delegated governmental] duties and of an intent to preempt state-law causes of action" against SROs).  Thus, SRO immunity does not render Nasdaq a state actor.

---

the tax code.  *See Guardian Indus. Corp. v. Comm'r*, 143 T.C. 1, 12-19 (2014) (test for whether an entity is an "agency" or "instrumentality").

[25]  *See Desiderio v. NASD*, 191 F.3d 198, 206 (2d Cir. 1999) ("NASD is a private actor, not a state actor"); *D.L. Cromwell Invs., Inc. v. NASD Regulation, Inc.*, 279 F.3d 155, 162 (2d Cir. 2002) (reciting the consensus that "the NASD itself is not a government functionary"); *United States v. Solomon*, 509 F.2d 863, 867-71 (2d Cir. 1975) (concluding that NYSE is not a state actor); *Santos-Buch v. Fin. Indus. Regulatory Auth., Inc.*, 591 Fed. Appx. 32, 34 (2d Cir. 2015) (holding that an SRO "is not a state actor that can be held to constitutional standards"); *Marchiano v. NASD*, 134 F. Supp. 2d 90, 95 (D.D.C. 2001) ("The court is aware of no case . . . in which NASD [d]efendants were found to be state actors . . . .").

[26]  *See* Burton Comment at 12.

Vanessa Countryman, Secretary
February 5, 2021
Page 11

### B.     The Proposed Rule Is Not Fairly Attributable to the State

Alternatively, private entities like Nasdaq may be held to constitutional standards if their actions are "fairly attributable" to the state. *See Lugar*, 457 U.S. at 937. Actions are fairly attributable to the state only if (i) there is "a sufficiently close nexus between the [s]tate and the challenged action," and (ii) the state has "exercised coercive power" or provided "such significant encouragement" that the choice must be "deemed to be that of the state." *Desiderio*, 191 F.3d at 206 (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004-05 (1982)).

SRO rulemaking, such as that at issue here, does not satisfy this test. The Second Circuit squarely considered this issue in *Desiderio*, in which the plaintiff challenged an arbitration clause contained in an NASD broker registration form as required by an SEC-approved NASD rule. Applying the *Blum* test, the court concluded that because there was no SEC rule or action encouraging the SRO to include an arbitration clause, there was no nexus between the state and the SRO's specific conduct. *Id.* at 207. The court also held that the SEC's approval of the registration form did not make the SRO's adoption of the form state action because "mere approval" of a private entity's action is not sufficient to justify holding the state responsible for that action. *Id.* (citing *Blum*, 457 U.S. at 1004). Along the same lines, a district court has held that the SEC's "role in reviewing exchange rules . . . does not make [those rules] the product of state action." *Cremin v. Merrill Lynch Pierce Fenner & Smith*, 957 F. Supp. 1460, 1468 (N.D. Ill. 1997). As was the case here, the SEC did not "encourage[] or coerce[] the exchanges to adopt" the rules challenged in *Cremin. Id.* Other courts have reached the same conclusion as to non-rulemaking SRO activity. *See, e.g., Scher*, 386 F. Supp. 2d at 407-08 (an SRO "exercises insufficient state action to trigger constitutional protections"); *Meyers v. NASD*, 1996 U.S. Dist. LEXIS 6044, at *25-26 (E.D. Mich. Mar. 29, 1996) (rejecting proposed due process claim under 42 U.S.C. § 1983 on the grounds that "[t]he alleged conduct by the NASD . . . is not chargeable to any state").

Thus, the case law contradicts the commenters who argue that the "nature of the SEC's involvement in approving, superintending, and enforcing Nasdaq's exchange rules . . . make[s] SEC approval of the proposed rule state action."[27] As set forth above, the SEC's "mere approval" of a private entity's action like Nasdaq's proposed diversity listing rules does not convert the private entity's action into state action. *See Desiderio*, 191 F.3d at 207; *see also Cremin*, 957 F. Supp. at 1468. To establish state action, a plaintiff would have to show that the proposed rule is a choice that can be deemed that of the state. Here, as in *Desiderio*, there is no SEC rule or action requiring or encouraging Nasdaq to adopt the Proposed Rules beyond the generically applicable Exchange Act provisions with which all proposed SRO rules must be consistent. *See Desiderio*, 191 F.3d at 207. Thus, the Proposed Rules are not the product of state action.

---

[27]     *See* PFR Comment at 12; *see also* Judicial Watch Comment at 5-6.

Vanessa Countryman, Secretary
February 5, 2021
Page 12

Certain commenters rely on a case holding that a rule promulgated by the Municipal Securities Rulemaking Board was "government action."[28] *Blount v. SEC*, 61 F.3d 938, 941 (D.C. Cir. 1995). That case is inapposite. In *Blount*, the court concluded that the rule in question was state action because it "operate[d] not as a private compact among brokers and dealers but as federal law," given that a violation of the MSRB rule by dealers could lead to revocation or suspension of their licenses to deal in securities, as well as federal criminal penalties.[29] *Id.* In contrast, Nasdaq's Proposed Rules are part of a private compact between Nasdaq and its listed companies. *See Graman v. NASD*, 1998 U.S. Dist. LEXIS 11624, at *10 (D.D.C. Apr. 24, 1998) (stating that *Blount* does not apply to SRO rules, which are a "private compact"). Companies that choose to be listed on Nasdaq agree to comply with its listing rules, which include corporate governance requirements like the proposed diversity rules.[30] In contrast to the consequences of a violation of the MSRB rule at issue in *Blount*, a company that fails to comply with Nasdaq's Proposed Rules here would not face federal criminal sanctions or any such penalties; rather, it would be provided an opportunity to cure the deficiency by the later of its next annual shareholders meeting or 180 days from the event that caused the deficiency. Notice at 80488.[31] Because the Proposed Rules are part of a private compact between private entities, *Blount* does not apply.[32]

---

[28]     *See* Judicial Watch Comment at 5-6; PFR Comment at 11-12; NLPC Comment at 4.

[29]     It bears noting that the MSRB, unlike Nasdaq, was created by an act of Congress. *See* 15 U.S.C. § 78o-4(b). The *Blount* court thus considered it "questionable" whether the MSRB was a "purely private organization" at all. 61 F.3d at 941.

[30]     *See* Nasdaq Rules 5600, *et seq*.

[31]     "The company can cure the deficiency either by nominating additional directors so that it satisfies the Diversity requirement of proposed Rule 5605(f)(2) or by providing the disclosure required by proposed Rule 5605(f)(3). If a company does not regain compliance within the applicable cure period, the Listings Qualifications Department would issue a Staff Delisting Determination Letter. A company that receives a Staff Delisting Determination can appeal the determination to the Hearings Panel through the process set forth in Rule 5815." Notice at 80488

[32]     Judicial Watch also cites *N.Y. Republican State. Comm. v. SEC*, 927 F.3d 499 (D.C. Cir. 2019), for the proposition that the SEC's approval of the Proposed Rules would be state action. *See* Judicial Watch at 6. However, the rule at issue in that case was "identical in every constitutionally relevant way" to the MSRB rule in *Blount*. *See N.Y. Republican*, 927 F.2d at 510 (calling the two cases "indistinguishable"). *N.Y. Republican* is therefore inapposite for the same reasons as *Blount*.

Vanessa Countryman, Secretary
February 5, 2021
Page 13

In sum, arguments that the Proposed Rules are unconstitutional falter at the first hurdle:  the Proposed Rules are not state action because Nasdaq is not a state actor, and the SEC's approval of the Proposed Rules would not convert them into state action.

### C.    The Self-Identification Aspects of the Proposed Rule Do Not Violate Constitutional Privacy Rights

Certain commenters assert "privacy" concerns associated with asking individuals to self-identify, with one commenter referring to self-disclosure as "bad policy" and "likely unconstitutional."[33]  However, the voluntary nature of the Proposed Rule allows any individual director to decline to self-identify, which would have no impact on a company's ability to comply.  As set forth in the Notice, "Nasdaq does not intend to obligate directors to self-identify in any of the categories related to gender identity, race, ethnicity and LGBTQ+. Nasdaq believes that a director should have autonomy to decide whether to provide such information to their company.  Therefore, Nasdaq believes that it is reasonable and in the public interest to allow directors to opt out of disclosing the information required by proposed Rule 5606(a) by permitting a company to identify such directors in the 'Undisclosed' category." Notice at 80495.  In addition, "[a]ny director who chooses not to disclose a gender would be included under 'Gender Undisclosed' and any director who chooses not to identify as any race or not to identify as LGBTQ+ would be included in the 'Undisclosed' category at the bottom of the table." *Id.* at 80486.

For those who do elect to self-identify for one or more categories, their information would not be made public on an individual basis, but rather in the aggregate with the diversity characteristics of the entire board.

Moreover, voluntary self-disclosure is a regular practice in employment settings.[34]  Since 1967, Title VII has mandated private employers with more than 100 employees to file with the EEOC an Employee Information Report (EEO-1), which is an annual compliance survey that provides a demographic breakdown of the employer's workforce by race/ethnicity, gender, and job category.[35]  Employers subject to the EEO-1 requirement collect the information through self-identification by individual employees; however, if an employee

---

[33]    *See* Publius Comment at 10; *see also* Donnellan Comment at 2; Richter Comment at 2; Nixon Comment at 5.

[34]    Public company directors are also accustomed to disclosing the personal information – including relevant family relationships, business experience, and involvement in certain legal proceedings – required by Item 401 of Regulation S-K.  *See* 17 C.F.R. § 229.401.

[35]    Issued in 1965, Executive Order 11246 creates a similar construct for federal contractors.

Vanessa Countryman, Secretary
February 5, 2021
Page 14

declines to self-identify, there are no adverse consequences, and employers are directed that
they may use observer identification.

The EEO-1 disclosure requirements do not violate constitutionally protected privacy
interests. For example, in *EEOC v. Ass'n of Cmty. Orgs. for Reform Now*, No. 95-30347,
1996 U.S. App. LEXIS 44921, at *10 (5th Cir. Mar. 20, 1996), the Fifth Circuit held that the
required use of the EEO-1 did not violate a non-profit organization's right to private
association, right to expressive association, or organizational right to privacy. Specifically,
the court relied on the fact that EEO-1 did not require the organization "to divulge the
names, identities, or any other personal information about either its employees or members.
Instead . . . the data comprise a statistical analysis of the racial and gender composition" of
the workforce. *Id.* Like the longstanding EEO-1 program, Nasdaq's Proposed Rules allow
for individual directors to decline to self-identify for one or more of the diversity categories,
and do not ask companies to divulge, or even collect, the names, identities, or any other
personal information about their directors. The disclosure requirements of the Proposed
Rules do not give rise to any constitutional privacy infirmity.

### D.     The Proposed Rule Complies with the Fifth Amendment's Equal Protection Requirements

Certain commenters assert that the Proposed Rules are unconstitutional on Equal Protection
grounds.[36] Many of them, however, mischaracterize the diversity objectives of proposed
Rule 5605(f) as a "rigid racial quota" or "set aside."[37] To the contrary, and as discussed
above, *see* § I.A, *supra*, the Proposed Rules do not mandate any particular number of diverse
directors; instead, they provide aspirational goals. For companies that do not meet those
objectives, their explanation for noncompliance (along with the disclosure required by
proposed Rule 5606) will provide shareholders and other stakeholders with helpful
information to assess a company's quantitative and qualitative approach to board diversity.
Therefore, even if Nasdaq were found to be a state actor, the Proposed Rules would survive
scrutiny under the Fifth Amendment's Equal Protection[38] requirements.

---

[36]     *See* NLPC Comment at 4-6; Burton Comment at 2-3, 12-16; PFR Comment at 13-15;
Morgan Comment at 3; Judicial Watch Comment at 5-7; Publius Comment at 9-10.

[37]     *See* Judicial Watch Comment at 3-4; PFR Comment at 14-15; NLPC Comment at 8;
Morgan Comment at 2; Burton Comment at 2, 5, 8-9. Others refer to Proposed Rule
5605(f) as a "quota" without referencing an Equal Protection violation. *See* IWF
Comment at 2; CAE Comment at 1; Nixon Comment at 5; Glen Comment at 1.

[38]     To the extent commenters assert constitutional objections to the Proposed Rules, they
take the (implicit or explicit) position that Nasdaq is an extension of the federal
government, which is subject to the Fifth Amendment. While the Fifth Amendment

JA623

Vanessa Countryman, Secretary
February 5, 2021
Page 15

### 1.    The Proposed Rules Satisfy the Rational Basis Standard

If subject to such scrutiny, the Proposed Rules would need only satisfy the rational basis standard, meaning that they are rationally related to a legitimate government interest. *Box v. Planned Parenthood of Ind. & Ky.*, 139 S. Ct. 1780, 1782 (2019). Laws that do not treat individuals differently based on a suspect class are analyzed under the "rational basis" standard of review. *Id.* Under this standard, laws bear a "strong presumption of validity, and those attacking its rationality have the burden to negate every conceivable basis that might support it." *FCC v. Beach Commcns.*, 508 U.S. 307, 314 (1993).

Neither proposed Rule 5605(f) nor proposed Rule 5606 treats individuals differently based on a suspect class. Proposed Rule 5605(f) establishes aspirational goals and is not compulsory. Proposed Rule 5606 is a disclosure requirement for demographic data on all directors serving on the boards of Nasdaq-listed companies. Accordingly, the Proposed Rules do not impose a burden on, or confer a benefit to, the exclusion of others based on a suspect classification, and rational basis is the appropriate standard of review.

While Nasdaq would need only articulate one legitimate government interest for the Proposed Rules, *FCC*, 508 U.S. at 314, the Proposed Rules reflect several legitimate interests. One such interest is increasing transparency about board diversity so that shareholders and other stakeholders are empowered to make investment decisions based on consistent and readily-accessible data. To that end, the needs for increased transparency and data collection are set forth in detail in the Notice. For example, the Notice states that:

- "Nasdaq has also observed recent calls from SEC commissioners and investors for companies to provide more transparency regarding board diversity." Notice at 80472-73.

- "Current reporting of board diversity data [is] not provided in a consistent manner or on a sufficiently widespread basis. As such, investors are not able to readily compare board diversity statistics across companies." *Id.* at 80473.

- "Nasdaq is unable to provide definitive estimates regarding the number of listed companies that will be affected by the proposal due to the inconsistent disclosures and definitions of diversity across companies and the extremely limited disclosure of race and ethnicity information – an information gap the proposed rule addresses." *Id.*

---

does not contain an express Equal Protection clause, it is well established that courts construe the Fifth Amendment Due Process Clause as "contain[ing] an Equal Protection component." *Washington v. Davis*, 426 U.S. 229, 239 (1976).

Vanessa Countryman, Secretary
February 5, 2021
Page 16

- "[I]nvestors frequently lack access to information about corporate board diversity that could be material to their decision making, and they might divest from companies that fail to take into consideration the demographics of their corporate stakeholder when they refresh their boards." *Id.* at 80474.

- Discussions with stakeholders "revealed strong support for disclosure requirements that would standardize the reporting of board diversity statistics." *Id.* at 80481-82.

In addition, the Proposed Rules advance those legitimate government interests by requiring companies that do not have at least two diverse directors to provide an explanation as to why, and by requiring that all companies annually report on a uniform set of board diversity metrics. Accordingly, the Proposed Rule would readily satisfy rational basis scrutiny.

### 2.    The Proposed Rules Would Survive Heightened Scrutiny

Even if the Proposed Rules triggered heightened scrutiny – which they would not for the reasons set forth in subsection D.1 immediately above – they would nonetheless survive such scrutiny. Proposed Rule 5605(f)(A), which relates to a director who self-identifies as female, would satisfy intermediate scrutiny, and proposed Rule 5605(f)(B),[39] which relates to a director who self-identifies as Black or African American, Hispanic or Latinx, Asian, Native American or Alaska Native, Native Hawaiian or Pacific Islander, or two or more races or ethnicities, would satisfy strict scrutiny. As for directors who self-identify as LGBTQ+, courts are divided on the question of the appropriate constitutional scrutiny (*i.e.*, intermediate scrutiny or rational basis review),[40] but we need not settle that here because under either standard, 5605(f)(B)'s reference to LGBTQ+ status is constitutional.

---

[39]    Similar references to sex, race, ethnicity, national origin, and LGBTQ+ status in proposed Rule 5606's disclosure requirements would be subject only to the rational-basis standard because those requirements are neutral on their face and their application. That is, every director, regardless of race, ethnicity, gender, or LGBTQ+ status is presented with the same opportunity to disclose or decline to disclose the same information. Thus, the heightened-scrutiny analysis set forth here focuses only on proposed Rules 5605(f)(A) and (B).

[40]    The Supreme Court's decision in *Bostock*, which examines the meaning of "because of sex" for purposes of Title VII, may suggest that LGBTQ+ status, like gender classifications, would be subject to intermediate scrutiny for Equal Protection purposes. 140 S. Ct. 1731, 1742 (2020) ("But unlike any of these other traits or actions, homosexuality and transgender status are inextricably bound up with sex. Not because homosexuality or transgender status are related to sex in some vague sense or because discrimination on these bases has some disparate impact on one sex

Vanessa Countryman, Secretary
February 5, 2021
Page 17

Because commenters have likened 5605(f) to an affirmative action program, the following analysis applies the legal framework courts use to assess the constitutionality of such programs. As as discussed above, *see* § II.A.2, *supra*, however, the Proposed Rules do not constitute an affirmative action program. With that in mind, and starting with the more stringent standard of strict scrutiny, this Letter addresses proposed Rule 5605(f)(B) first, and then proposed Rule 5605(f)(A).

### a.    Proposed Rule 5605(f)(B) Would Survive Strict Scrutiny

With respect to race, ethnicity, or national origin, proposed Rule 5605(f)(B) would survive strict scrutiny because (i) it is necessary to achieve a compelling state interest, and (ii) it is narrowly tailored to achieve that interest. *See Grutter v. Bollinger*, 539 U.S. 306, 323 (2003) (finding that a public university law school's affirmative action plan survived strict scrutiny).

As the Notice discusses in detail, there are compelling government interests in perfecting the mechanisms of a free and open market and promoting investor confidence through the promotion of racially or ethnically diverse boards, or through increased transparency (achieved by explanation) about the diversity of a company's board.[41]  Much like the Supreme Court's recognition in *Grutter,* 539 U.S. at 328-334, that there is a compelling government interest in attaining a diverse student body because of the many benefits diversity contributes to education, Nasdaq has identified and articulated compelling government interests in promoting diverse boards for its listed companies. In so doing, Nasdaq correctly relied on statistical and anecdotal evidence. *See Adarand Constructors, Inc. v. Slater*, 228 F.3d 1147, 1166 (10th Cir. Sept. 20, 2000) ("Both statistical and anecdotal evidence are appropriate in the strict scrutiny calculus . . . ."). Indeed, the Notice is replete with statistical data showing that the compelling interest is more than just theoretical.[42]

---

or another, but because to discriminate on these grounds requires an employer to intentionally treat individual employees differently because of their sex.").

[41]   These compelling government interests align with the Exchange's responsibility to demonstrate that any proposed rule is consisted with Section 6(b) of the Act because, among other things, it is designed to protect investors, promote the public interest, prevent fraudulent and manipulative acts and practices, and remove impediments to the mechanism of a free and open market. *See* 15 U.S.C. § 78f(b); Notice at 80475.

[42]   In demonstrating a compelling interest, the government may present both direct and indirect evidence, including post-enactment evidence not found on the face of the rule itself. Accordingly, while the Notice contains voluminous evidence to support compelling government interests, it need not reflect the full universe of supporting information. *Adarand*, 228 F.3d at 1166.

Vanessa Countryman, Secretary
February 5, 2021
Page 18

For example, Nasdaq extensively examined third-party studies of the benefits of board diversity, including empirical studies from companies, investors, and governance organizations.  Notice at 80473.  Those studies on the whole identify a relationship between racial and ethnic diversity on boards and shareholder value, investor protection, and enhanced decision making.  *Id.* at 80475-80480.

Nasdaq also conducted its own study of the current state of board diversity among Nasdaq-listed companies and found that "the national market system and the public interest would best be served by an additional regulatory impetus for companies to embrace meaningful and multi-dimensional diversification of their boards."  *Id.* at 80473.  This conclusion is supported by comments from Nasdaq-listed issuers expressing support for the rule.[43]

Accordingly, Nasdaq has sufficiently identified compelling government interests.

Nasdaq has also narrowly tailored the Proposed Rules to achieve those compelling government interests.  In assessing the concept of "narrow tailoring," courts often apply one or more of the following factors:  (i) the availability of race-neutral means; (ii) limits on the duration of the race-conscious program; (iii) flexibility; (iv) numerical proportionality; (v) the burden on third parties; and (vi) over- or under-inclusiveness.  *Adarand*, 228 F.3d at 1177-78.  The Proposed Rules are carefully calibrated to satisfy these standards.

As discussed above, the Proposed Rules are a race-neutral means of achieving the compelling interests of perfecting the mechanisms of a free and open market and promoting investor confidence through the promotion of diverse boards because the Proposed Rules permit compliance through explanation.  Thus, the first two factors demonstrate narrow tailoring.

With respect to the third factor, the Proposed Rules demonstrate an appropriate degree of flexibility.  Courts have found that the existence of a waiver is an indicator of such flexibility.  *See*, *e.g.*, *Adarand*, 228 F.3d at 1177 (identifying the existence of a waiver as a factor in assessing whether a race-conscious program offers flexibility).  Certain commenters characterize proposed Rule 5605(f) and the comply-or-explain framework as a quota,

---

[43]     *See, e.g.*, T. Rowe Price Comment, at 1, 2 ("[As a] global asset manager, . . . we have found that insufficient board diversity increases the risk that a company will become less competitive over time, which will impact performance. . . . [The proposal] would improve our ability, as an asset manager, to obtain and analyze board diversity data in a standardized format.").

Vanessa Countryman, Secretary
February 5, 2021
Page 19

comparing it to the rigid and unconstitutional city ordinance in at issue *Richmond v. J. A. Croson Co.*, 109 S. Ct. 706, 713 (1989).[44]  We respectfully disagree.

The ordinance at issue in *Croson* required non-minority-owned prime contractors who were awarded city construction contracts to subcontract at least 30% of the amount of the contract to minority business enterprises.  *Id.*  Failure to meet the 30% mandate would disqualify an otherwise-winning bid.  In addition, waivers were not granted unless a contractor showed "exceptional circumstances" where "every feasible attempt ha[d] been made to comply" and the requesting contractor demonstrated that "sufficient, relevant, qualified" MBEs were "unavailable or unwilling to participate in the contract."  *Id.* at 714.  In contrast, the Proposed Rules do not include any quota or disqualification provision; rather, companies that do not meet the diversity objectives can explain why, and "Nasdaq would not assess the substance of the company's explanation."  Notice at 80488.  So long as the company explains its reasoning (and discloses it along with the board demographic data required by proposed Rule 5606), the company would remain in compliance.  The Proposed Rules also offer several other elements of flexibility, including by providing companies with ample time to prepare for compliance,[45] by allowing Foreign Issuers and Smaller Reporting Companies to comply by having two Female directors, and by permitting companies to increase the size of their boards – which is the antithesis of a percentage ratio requirement.  *See* Proposed Rule 5605(f)(2)(B-C).

The Proposed Rules also are attentive to numerical proportionality.  *Croson* reasoned that it was "completely unrealistic" to assume that "minorities will choose a particular trade in lockstep proportion to their representation in the local market."  *Id.* at 714 (striking down a city requirement that minority subcontractors receive contracts equal to 30% of the prime contract because the city population was 30% People of Color).  Unlike the unconstitutional ordinance in *Croson*, Nasdaq's Proposed Rules are not aimed at aligning board representation with demographic data for any geographical area; rather, the Proposed Rules

---

[44]   *See* Publius Comment at 10 ("The 'or explain why it does not have' prong of the Diversity Mandate is not sufficient to transform this requirement from a mandate to merely a disclosure requirement."); Judicial Watch Comment at 4 ("Moreover, the "comply-or-explain" framework does not save the Rule from its constitutionally fatal flaws. Nasdaq portrays its Proposed Rule as a choice rather than a mandate."); Morgan Comment at 2; Burton Comment at 2, 5, 8-9.

[45]   Specifically, Nasdaq has proposed to provide companies with at least two years to have, or explain why they do not have, one diverse director, and, depending on the company's listing tier, either four or five years to have or explain why they do not have two diverse directors.  Notice at 80503.

Vanessa Countryman, Secretary
February 5, 2021
Page 20

aim to have companies reach a minimum of one director who is a Person of Color (or LGBTQ+).

The Proposed Rules also are narrowly tailored because they reduce the burden on third parties – *i.e.*, listed companies and their directors.  For example, Nasdaq proposes to provide listed companies with free access to a network of board-ready diverse candidates.  In addition, Nasdaq has published FAQs on its Listing Center providing guidance on the application of the Proposed Rule, and established a dedicated email address for listed companies with questions.[46]  *See* Notice at 80504-05.  Nasdaq acknowledges comments that discuss the potential financial burden on companies, especially small companies, that may feel pressure to expend financial resources to recruit diverse candidates in order to comply.[47]  However, the Proposed Rules reflect Nasdaq's mindfulness of their potential impact on small companies.  For example, "in recognition of the resource constraints faced by smaller companies," Smaller Reporting Companies may satisfy Rule 5605(f)(2)'s requirement by having two Female directors as opposed to two "Diverse" directors.  In addition, the financial burden or unique recruitment challenges posed by the diversity objectives (*e.g.*, a large company headquartered in a geographical market with limited diversity) would be appropriate explanations for a company's inability to meet the diversity objectives in any given year.  As for the potential burden on directors themselves, they may decline to share their individual demographic data for one or more of the identified categories, and completion of the proposed self-identification would require no more than a few minutes of their time annually.

Finally, the Proposed Rules are neither over- nor under-inclusive.  They apply only to Nasdaq-listed companies, all of which are part of the national market that Nasdaq seeks to protect and enhance.  Moreover, Nasdaq seeks to promote diversity in specific categories (race, gender, ethnicity, and LGBTQ+ status) based on established data showing that board diversity will enhance decision making and performance.  As discussed in the Notice, the current market faces challenges with respect to board diversity.  *See* Notice at 80480-81.

Other factors further demonstrate that the Proposed Rules are not over-inclusive.  For example, in recognition of resource constraints that may be faced by smaller – especially pre-revenue – companies, Notice at 80501, Section 5605(f)(4) limits the requirements for Smaller Reporting Companies, as defined in Section 5605(f)(1), to two diverse directors, including at least one who self-identifies as female.  In addition, the Proposed Rules exempt companies located in countries where collecting data is prohibited, *see* Rule 5615 and IM-

---

[46]   The FAQs are available at:
https://listingcenter.nasdaq.com/Material_Search.aspx?mcd=LQ&cid=157&sub_cid=
&years=2020,2019,2018,2020,2019,2018,2017,2016,2015,2014,2013,2012,2011,201
0,2009,2008,2007,2006,2005,2004,2003,2002&criteria=1&materials=.

[47]   *See* Nixon Comment at 4; PFR Comment at 5-6; Glen Comment at 1.

Vanessa Countryman, Secretary
February 5, 2021
Page 21

5615-3, and allow foreign private issuers to follow home country practice in lieu of the corporate governance standards set forth in the Rule 5600 series, provided that the company publicly discloses in its annual reports or on its website "each requirement that it does not follow and describe[s] the home country practice followed by the Company in lieu of such requirements." Proposed Rule IM-5615-2(B).

Similarly, the Proposed Rules are not under-inclusive. A law is under-inclusive if it does not apply to individuals who are similarly situated to those to whom the law applies. *Supreme Court of N.H. v. Piper*, 470 U.S. 274, 285 n.19 (1985) (finding a rule excluding nonresidents from the New Hampshire bar was under-inclusive "because it permit[ted] lawyers who move away from the State to retain their membership in the bar," but there was "no reason to believe that a former resident would maintain a more active practice in the New Hampshire courts than would a non-resident lawyer who had never lived in the State"). Certain commenters assert that Nasdaq's Proposed Rules are under-inclusive for a variety of reasons, all of which are readily rebutted.[48] For example, some commenters assert that the definition of diversity in proposed Rule 5605(f)(1) is under-inclusive because it does not account for People with Disabilities, veterans, age, profession, or personal experience. However, the fact that Nasdaq has not proposed the broadest possible definition of "diversity" does not render the Proposed Rules under-inclusive. In fact, doing so without evidence of need could cause the rules to be improperly over-inclusive. The proposed definition of diversity tracks the findings of academic studies of the benefits of diverse boards that include members of different races, genders, ethnicities, and LGBTQ+ status. In addition, the Proposed Rules permit companies to consider additional diverse attributes, including in lieu of Nasdaq's definition, so long as that information is contained in its explanation as to why if that company does not have two directors who are "diverse" as defined by proposed Rule 5605(f)(1). Notice at 80486.

Some commenters argue that recent progress in increasing board diversity makes the Proposed Rules unnecessary.[49] However, as Nasdaq found, "progress towards meaningful and multi-dimensional diversification of corporate boardrooms is slow." Moreover, data collection is challenging due to "inconsistent disclosure and definitions of diversity across companies." Notice at 80473.

---

[48]    *See* Publius Comment at 2-3, 7; Morgan Comment at 1-2; PFR Comment at 2, 7, 8, 10; Donnellan Comment at 2; Richter Comment at 2-3; NCPLR Comment at 3; Burton Comment at 3-4, 20; NLPC Comment at 3; IWF Comment at 1-2.

[49]    *See* Publius Comment at 2-3; PFR Comment at 2, 8, 10; IWF Comment at 1-2; Burton Comment at 3-4; NLPC Comment at 3.

Vanessa Countryman, Secretary
February 5, 2021
Page 22

Finally, the fact that companies may explain why they do not comply with proposed Rule 5605(f) does not render the Proposed Rules under-inclusive.[50]  As Nasdaq explained, listed companies would be required to disclose diversity data pursuant to Section 5606 whether they comply with Section 5605(f) or explain why they do not.  The requirement that all companies disclose such data satisfies the need for consistent and efficient disclosure of board diversity statistics so that investors can establish a baseline and monitor progress for their investment decisions.  Greater transparency also would empower shareholders or potential shareholders to engage in conversations with companies that do not meet the diversity objective about initiatives to encourage and promote a more diverse pipeline of qualified board candidates for consideration in the future.

For all of the foregoing reasons, proposed Rule 5606(f)(B) is narrowly tailored to meet compelling government interests, and therefore would satisfy strict scrutiny.

### b.  *Proposed Rule 5065(f)(A) Would Survive Intermediate Scrutiny*

With respect to gender and LGBTQ+ status,[51] 5605(f)(A) would satisfy intermediate scrutiny because (i) it is necessary to achieve an important government interest, and (ii) it is substantially related to that important interest.  *See Danskine v. Miami Dade Fire Dep't*, 253 F.3d 1288, 1294 (11th Cir. 2001).

As discussed with respect to race and ethnicity in the preceding section, there are important government interests in perfecting the mechanisms of a free and open market and promoting investor confidence through the promotion of diverse boards (to include female and LGBTQ+ directors), or through increased transparency (through explanation) about the diversity of a company's board.  Moreover, Nasdaq not only has an interest, but a ***responsibility*** to ensure that any rule it promulgates under the Act is designed "to protect investors and the public interest," "prevent fraudulent and manipulative acts and practices,"

---

[50]   PFR Comment at 6 n. 22 (asserting that if the comply-or-explain provision nullifies any coercive effect on diversity practices beyond disclosure, then it would not serve a useful purpose and therefore would be illegal).

[51]   Certain commenters question whether intermediate scrutiny or rational basis is the appropriate standard to analyze the inclusion of LGBTQ+ status in the Proposed Rule, and opine that under either standard of review, the Proposed Rules' inclusion of LGBTQ+ status would fail.  *See* PFR Comment at 6-7, 15; Morgan Comment at 2; Burton Comment at 14-15.  As noted above, courts are divided on this issue.  Regardless, for the sake of argument this letter analyzes LGBTQ+ status under the more exacting intermediate scrutiny standard.

Vanessa Countryman, Secretary
February 5, 2021
Page 23

and "remove impediments to and perfect the mechanism of a free and open market."  15 U.S.C. § 78f(b)(5).

One commenter states that the Proposed Rules inappropriately rely on the assumption that "women think differently than men" in a way that can affect board functioning.[52]  To the contrary, Nasdaq did not make assumptions about how women or men think, but rather, considered third-party studies on the benefits of board diversity, including empirical studies from companies, investors, and governance organizations.  Notice at 80473.  Those studies identify a relationship between gender diversity on boards and shareholder value, investor protection, and decision making.  *Id.* at 80475-80.

With respect to studies focused on LGBTQ+ status, certain commenters assert that Nasdaq has provided insufficient evidence to establish an important government interest as to LGBTQ+ directors, and, to the extent Nasdaq has identified such evidence, it is unreliable because it comes from an LGBTQ+ advocacy organization.[53]  Nasdaq acknowledges that there is a relative "lack of published research on LGBTQ+ representation on boards."[54]  The available research, however, sufficiently establishes that there is an important government interest in promoting LGBTQ+ diversity on corporate boards.  Specifically, in 2016, Credit Suisse found an association between LGBTQ+ diversity and stock performance, "finding that a basket of 270 companies 'supporting and embracing LGBT employees' outperformed the MSCI ACWI index by an average of 3.0% per year over the past six years."  Notice at 80476.  Credit Suisse also found that "[a]gainst a custom basket of companies in North America, Europe and Australia, the LGBT 270 has outperformed by 140 bps annually."  *Id.*

Certain commenters question the argument outlined by Out Leadership's statement that "the relationship between board gender diversity and corporate performance may extend to LGBTQ+ diversity."[55]  However, the Supreme Court has settled that, at least for purposes of Title VII, sexual orientation and gender identity are "inextricably" intertwined with sex.  *Bostock*, 140 S. Ct. at 1742.  That finding, combined with the research demonstrating a "positive association between board diversity and decision making, company performance

---

[52]     *See* Judicial Watch Comment at 4.

[53]     *See* PFR Comment at 15; Donnellan Comment at 2; Morgan Comment at 2; Publius Comment at 6-7.

[54]     The relative paucity of studies relating to LGBTQ+ status and board performance may be due, in part, to the lack of consistent data on board demographics, which only further illustrates the need for the Proposed Rules.

[55]     *See* PFR Comment at 6-7; Morgan Comment at 2; Publius Comment at 6-7; Burton Comment at 14-15.

Vanessa Countryman, Secretary
February 5, 2021
Page 24

and investor protections," establishes an important government interest in increasing LGBTQ+ diversity.[56]  Notice at 80494.

Accordingly, proposed Rule 5605(f)(A) is necessary to achieve important government interests, and it is substantially related to those interests.

As detailed in the strict scrutiny section above, *see* § D.2.a., the Proposed Rules are narrowly tailored to address important government interests.  It is well-settled that the "substantially related" provision of intermediate scrutiny is a less demanding standard than the "narrowly tailored" requirements of strict scrutiny, and accordingly, for the same reasons as discussed in § D.2.a., above, the Proposed Rules would meet the "substantially related" requirement of intermediate scrutiny.  *See Danskine*, 253 F.3d at 1294 (upholding a fire department's hiring goals and noting that "[i]n the gender context, less evidence is required").

In addition, as *Danskine* acknowledged, determining whether there is sufficient evidence to meet the "substantially related" standard "may elude precise formulation." *Id.* at 1294.  The critical component of the analysis is to ensure that any preference rests on an "evidence-informed analysis rather than on stereotypical generalizations." *Id.* at 1294-95 (applying intermediate scrutiny and upholding a fire department's long-term goal to hire 36% female firefighters).  With that guidance in mind, the Proposed Rules do not rely on stereotypes or make assumptions about how certain classes of people think; rather, they are guided by evidence-based studies and statistics that justify the proposed diversity objectives with respect to gender and LGBTQ+ status.  Notice at 80475-80.  The data Nasdaq relied upon alone[57] would satisfy the substantially related argument articulated in *Danskine*.  253 F.3d at 1294-95.

---

[56]     As a general matter, with respect to all diversity categories identified in the Proposed Rules, certain comments discuss studies that have found no causation between diversity and financial performance, and some suggest that the studies Nasdaq cited in its Notice confuse correlation with causation.  *See* Burton Comment at 7-8; NCPLR Comment at 2; Killian Comment at 1; Richter Comment at 1-2; Donnellan Comment at 1; PFR Comment at 4, 6, 8, 9; Publius Comment at 5-6.  While there is undoubtedly a substantial body of research on the effects of board diversity and all the studies do not reach the same conclusions, *see* Notice at 80476-77, on the whole the voluminous research discussed in the Notice amply supports Nasdaq's conclusion that the Proposed Rules will strengthen the market and improve investor protection.  That conclusion is bolstered by the overwhelmingly supportive comments submitted to the Commission, which include strong support from listed companies and investors.

[57]     The Notice contains ample evidence showing the underrepresentation of women on corporate boards.  For example, in its 2020 Global Gender Gap Report, the World

Vanessa Countryman, Secretary
February 5, 2021
Page 25

Accordingly, for all of the foregoing reasons, proposed Rule 5605(f)(A) is substantially related to important government interests and would satisfy the requirements of intermediate scrutiny.

## IV.     THE PROPOSED RULES DO NOT VIOLATE THE FIRST AMENDMENT

One commenter, The Project on Fair Representation (the "PFR"), asserts that the Proposed Rules violate the First Amendment because they require companies to engage in compelled speech. *See* PFR Comment at 15-16. Putting aside that the Proposed Rules impose no obligations on PFR (speech or otherwise), and that no listed company has complained that the Proposed Rules violate the First Amendment, Nasdaq respectfully submits that PFR's assertion is incorrect for several reasons.

First, by its terms, the First Amendment – which begins with the words "Congress shall make" – applies only to government actors. As explained in Section V.A. above, Nasdaq is not a state actor and is therefore not subject to the First Amendment. While this alone rebuts the comment, even were the Commission to credit PFR's assertions, that would turn the First Amendment on its head by allowing the government to prevent Nasdaq and its listed companies, as a voluntary association of private companies bound together by contract, from engaging in truthful, lawful speech on the subject of board diversity.

The core purpose of the First Amendment is to prevent the government from restraining such speech and association. There can be no serious question that an individual company enjoys full First Amendment protection to engage in truthful speech about board diversity, including to disclose the composition of its Board or to explain its philosophy of board diversification. *See, e.g.*, *Citizens United v. FEC*, 558 U.S. 310, 342 (2010) ("The Court has

---

Economic Forum found that "American women still struggle to enter the very top business positions: only 21.7% of corporate managing board members are women." Notice at 80480. In comparison, women hold more than 30% of board seats in Norway, France, Sweden, and Finland. *Id.* Without action, the U.S. GAO estimates it could take up to 34 years for U.S. companies to achieve gender parity on their boards. *Id.*

While less data is available for LGBTQ+ status, the Notice also includes information on the underrepresentation of that community. Specifically, "[a]mong Fortune 500 companies in 2018, there were fewer than 20 directors who publicly self-identified as LGBT+." *Id.* Relatedly, Nasdaq observed that the lack of LGBTQ+ board representation data "may be due to a lack of consistent, transparent data on broader diverse attributes, or because there is no voluntary self-disclosure workforce reporting requirements for LGBTQ+ status, such as the EEO-1 reporting framework for race, ethnicity, and gender." *Id.* at 80494.

Vanessa Countryman, Secretary
February 5, 2021
Page 26

recognized that First Amendment protection extends to corporations.") (citing numerous cases); *id.* at 361-62 (rejecting argument that regulation can be justified based on "protecting dissenting shareholders from being compelled to fund corporate" speech).  And, under the First Amendment, members of the public – including, as relevant here, corporate investors – have a concomitant right to ***receive*** information on those subjects.  *See, e.g.*, *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 569 (2011) (recognizing that infringement of the public's right to receive information "transgresses the First Amendment").  Finally, as speakers protected by the First Amendment, companies enjoy a First Amendment right to associate with one another and to agree to speak as a group.  *See, e.g.*, *Citizens United*, 558 U.S. at 342-44 (First Amendment protects the rights of corporations to associate with one another to engage in speech); *see also NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 933 (1982) ("one of the foundations of our society is the right . . . to combine with other[s] in pursuit of a common goal by lawful means"); *see id.* at 933 n.80 ("'The most natural privilege of man, next to the right of acting for himself, is that of combining his exertions with those of his fellow creatures and of acting in common with them.  The right of association therefore appears to me almost as inalienable in its nature as the right of personal liberty.'") (quoting 1 A. de Tocqueville, Democracy in America 203 (P. Bradley ed. 1954)).  Given these clear First Amendment protections for speech and association, the Proposed Rules cannot reasonably be viewed as government-compelled speech, when they in fact do the opposite by allowing a voluntary association of private companies to band together to engage in truthful and lawful speech.[58]

---

[58]     Several commenters also contend that Nasdaq failed to give sufficient weight to studies that they assert did not show advantages to Board diversification.  *See* Morgan Comment at 2; Donnellan Comment at 1-2; Burton Comment at 2, 5; NLPC Comment at 2; NCPLR Comment at 2-3; Nixon Comment at 2; IWF Comment at 1-2; Richter at 1; Publius Comment at 4-6; PFR Comment at 3-7.  But the First Amendment also protects Nasdaq's and listed companies' freedom of thought to reach a reasonable interpretation of the body of available research, even if others might have reached a different interpretation, and to express their conclusions.  *See, e.g.*, *Time, Inc. v. Pape*, 401 U.S. 279, 290 (1971) (the First Amendment protects the "adoption of one of a number of possible rational interpretations" of circumstances "that bristled with ambiguities," even if it "arguably reflect[ed] a misconception"); *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 496-97 (2d Cir. 2013) (even where propositions "advanced in the literature may be highly controversial and subject to rigorous debate by qualified experts," courts "are ill-equipped to undertake to referee such controversies" and, [i]nstead, the trial of ideas plays out in the pages of peer-reviewed journals").

Vanessa Countryman, Secretary
February 5, 2021
Page 27

Second, even if Nasdaq were a state actor and the Proposed Rules were somehow interpreted as the government requiring speech, the particular speech at issue would not constitute compelled speech in any event. We address the Proposed Rules' two components below.

Proposed Rule 5606's basic informational disclosures about board composition are the kinds of disclosures that are routinely permitted without running afoul of the compelled speech doctrine. *See, e.g.*, *AHA v. Azar*, --- F.3d ----, 2020 U.S. App. LEXIS 40545, *29 (D.C. Cir. Dec. 29, 2020) (approving DHHS rule requiring hospitals to disclose charges for services negotiated with insurers, because government "reasonably concluded that the rule's disclosure scheme will help the vast majority of consumers"); *Spirit Airlines, Inc. v. DOT*, 687 F.3d 403, 414 (D.C. Cir. 2012) (sustaining DOT rule requiring airlines to prominently display final prices on their website because "the rule is aimed at providing accurate information, not restricting it").

Proposed Rule 5605(f), requiring that companies that do not comply with its aspirational diversity targets explain their reasons for failing to do so, likewise does not compel a company to convey any specific message, much less a particular message with which it disagrees. PFR incorrectly contends that the Proposed Rules require a "compelled political apology," and analogizes them to a California statute at issue in *National Institute of Family & Life Advocates v. Becerra*, 138 S. Ct. 2861 (2018), under which clinics operated by groups opposed to abortion were required to provide information about family planning services that provided abortion. PFR Comment at 16. Unlike the circumstances in *NIFLA*, however, where clinics were forced to communicate a specific, required message with which they strongly disagreed, here there is no particular message prescribed by the Proposed Rules. Indeed, "Nasdaq would not assess the substance of the company's explanation, but would verify that the company has provided one." Notice at 80488. In the Notice, Nasdaq provided an example of an acceptable disclosure – "The Company has chosen to satisfy Rule 5605(f)(2)(C) by explaining its reasons for not meeting the diversity objectives of Rule 5605(f)(2)(C), which the Company has set forth below" – without in any way prescribing the content of the reasons or explanation a company may provide. *Id.* As a result, the Proposed Rules simply do not require any particular speech.

Finally, even if Nasdaq were a state actor *and* the Proposed Rules implicated the compelled speech doctrine, the Proposed Rules would nevertheless be constitutional in light of the substantial body of studies showing the benefits of diverse corporate boards. As explained in the discussion of the other, more onerous alternatives Nasdaq considered and rejected, the Proposed Rules' combination of aspirational targets with disclosures is a narrowly tailored approach to encouraging greater board diversity in line with those studies, while still allowing individual companies substantial flexibility in whether they meet the aspirational target and in the reasons they may provide if they do not do so.

Vanessa Countryman, Secretary
February 5, 2021
Page 28

## V.    CONCLUSION

For all of the foregoing reasons, and as further explained in its Notice, Nasdaq respectfully submits that its proposed listing rules related to board diversity are consistent with the Exchange Act and should be approved.

Very truly yours,

Stephen J. Kastenberg

**TAB 14:**

Letter from Aron Szapiro, Head of Policy Research, Morningstar Inc., & Michael Jantzi, CEO, Sustainalytics (Jan. 13, 2021)

# MORNINGSTAR®

22 West Washington Street
Chicago
Illinois 60602

Telephone: +1 312 696-6000
Facsimile: +1 312 696-6001

January 13, 2021

Vanessa Countryman, Secretary
Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549-0609

RE: Release No. 34-90574

Dear Ms. Countryman,

Thank you for the opportunity to comment on the "Notice of Filing of Proposed Rule Change to Adopt Listing Rules Related to Board Diversity." Morningstar supports this proposal and believes it addresses a major information gap investors face in assessing board diversity.

Investors are increasingly interested in workforce diversity in general, including gender diversity in board representation. For example, shareholders have submitted many resolutions over the past decade requesting information about board diversity, indicating their interest in using it to assess corporate governance. The reason for this interest is clear: A company with less board diversity than its peers may raise questions for investors. In his July 2020 post to the *Harvard Law School Forum on Corporate Governance*, Jared Landaw (COO and General Counsel at Barington Capital Group LP) commented that "[t]he most common corporate governance weaknesses we find at the underperforming companies we invest in are issues with the composition of their boards. Many of these companies have a board comprised of a homogeneous group of directors."[1] For their part, companies know investors are interested: Nearly all issuers already disclose some level of board diversity information.

Regrettably, current board diversity disclosures are insufficient and noncomparable. Some companies report their board composition using broad groupings, such as "minority" or "ethnically diverse," while a few report by specific racial or ethnic groups. For example, one disclosure from a large Fortune 500 company reads: "At year-end 2018, 44 percent of the board's independent directors were female or an ethnic minority." Another peer company simply reports that "The company's Board of Directors is composed of exceptional leaders with diverse backgrounds who help ensure that the company's decisions and actions advance and respond to shareholders' interests." These disclosures provide little actionable or decision-useful information for investors. Despite this opacity, what is clear is that while companies know investors want information on board diversity, they have little guidance on how to disclose it in a consistent fashion, nor incentive to disclose more than their peers do.

Morningstar therefore welcomes Nasdaq's proposal to require statistical information in a proposed uniform format on a company's board of directors related to a director's self-

---

[1] See https://corpgov.law.harvard.edu/2020/07/14/maximizing-the-benefits-of-board-diversity-lessons-learned-from-activist-investing/

identified gender; race; and self-identification as LGBTQ+. We believe the proposed template will be a major step forward from the kinds of disclosures we often see today. We further believe anchoring the disclosures on the Equal Employment Opportunity Commission definitions is sensible, as most companies are familiar with those categorizations. No diversity framework will be perfect, but the framework Nasdaq proposes will add important consistency and comparability.

Thank you again for the opportunity to comment on Nasdaq's proposed rule to adopt listing rules related to board diversity. We believe the proposal is an important step forward.

Sincerely,

Aron Szapiro
Head of Policy Research
Morningstar, Inc.

Michael Jantzi
Chief Executive Officer
Sustainalytics

**TAB 15:**

Letter from Kristi Mitchem, CEO, BMO Global Asset Management, File No. SR-
NASDAQ-2020-081 (Jan. 11, 2021)



**BMO Global Asset Management**
115 S. LaSalle Street, 11th Floor
Chicago, IL 60603

Vanessa Countryman
Secretary
Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549-0609

**Re: The Nasdaq Stock Market LLC; Notice of Filing of Proposed Rule Change to Adopt Listing Rules Related to Board Diversity (Release No. 34-90574; File No. SR-NASDAQ-2020-081)**

Ladies and Gentlemen:

I am writing to you on behalf of BMO Global Asset Management (BMO GAM), whose institutional and retail clients collectively represent over US$ 269 billion of assets. In addition, BMO GAM has been authorised to vote and/or engage in dialogue on behalf of a further 37 other investment institutions with assets totalling over US$ 325 billion.

At BMO GAM, portfolio investment decisions are always made in the best interests of our clients. Supporting these investment decisions is the belief that prudent management of environmental, social and governance (ESG) issues, such as board diversity, can have an important impact on the creation of long-term investor value. Alongside this work we also see our active ownership activities, including proxy voting at company meetings and direct engagement with companies, as part of our duty as an investor acting in the best interest of our clients.

BMO GAM appreciates the opportunity to comment on the Nasdaq's proposed rule change to adopt listing rules related to board diversity (the "Proposal").  Overall, we support Nasdaq's proposed listing requirements for board diversity for Nasdaq-listed firms and encourage the US SEC to approve this for the following reasons:

- **Aligns with a core value for our organization** - Enhancing diversity and inclusion is a core value at BMO GAM and BMO Financial Group more broadly. We approach this both from an internal perspective by advancing diversity and inclusion within our organization, as well as from an investment perspective where diversity and inclusion is a key theme of our active ownership activities with investee companies. We agree with Nasdaq's conclusion that "academic research demonstrates that diverse boards are positively associated with improved corporate governance and financial performance" and therefore look to improve the diversity of those boards at investee companies.

- **Data transparency will be improved** – The disclosure requirements detailed in the Proposal will greatly enhance transparency for investors, with the comparability of the resulting data assisting us in our investment decision-making as well as with active ownership activities. Nasdaq's suggestions relating to disclosing board-level diversity statistics and the requirement for companies to explain when they do not have at least two diverse directors are particularly useful. Our experience with other comply-or-explain regimes introduced within other markets, such as Canada, is that they have been successful in improving both the quality and quantity of diversity data.

- **Aligned with our in-house proxy voting approach** – Nasdaq's objective of improving the diversity of company boards is one that we have been encouraging through our own proxy voting, as expressed in our Corporate Governance Guidelines[1] for several years. Our current expectations for the U.S. market is that companies should have a minimum of two female directors on their board, which will change in 2021 to an expectation of at least 25% gender diversity. Additionally, we aim to put in place expectations for ethnicity on boards in 2022, with a minimum of at least one director of an underrepresented group.

JA640

---
[1] https://www.bmogam.com/gb-en/intermediary/wp-content/uploads/2019/05/corporate-governance-guidelines.pdf

- **Supportive of flexibility with a comply-or-explain approach** - We agree with Nasdaq that companies should have the flexibility to approach board diversity in a manner that works best for them, as well as have the time to integrate diversity in a thoughtful manner. As such we are supportive with the comply-or-explain approach and the timelines proposed for implementation, as well as the phase-in period for companies to adhere to the new listing standards.

<u>Conclusion</u>

The level of diversity on U.S. corporate boards has improved over recent years, but there is still much work to do[2]. We consider that the Nasdaq's proposal will be an important step in continuing this progress, but also hope is that companies will not regard the proposal as the limits of their ambitions.

We appreciate the opportunity to submit this comment and are available to answer any questions.

Sincerely,

Kristi Mitchem | Chief Executive Officer
**BMO Global Asset Management**

BMO | A part of BMO Financial Group

---

[2] As shown by the results of the U.S. Spencer Stuart Board Index, concluding only 28% of S&P 500 company directors are women and only 22% of newly appointed directors are minorities (defined as Black/African American, Asian and Hispanic/Latinx). (https://www.spencerstuart.com/-/media/2020/december/ssbi2020/ssbi_2020_highlights.pdf)

JA641

**TAB 16:**

Letter from Dev Stahlkopf, Corporate Vice President, Microsoft Corp., File No. SR-NASDAQ-2020-081 (Jan. 4, 2021)

Microsoft Corporation      Tel 425 882 8080
One Microsoft Way          Fax 425 706 7329
Redmond, WA 98052-6399     www.microsoft.com

 Microsoft

January 4, 2021

Via email to rule-comments@sec.gov

Vanessa Countryman, Secretary
Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549-0609

Re: File No. SR-NASDAQ-2020-081

Dear Secretary Countryman,

Microsoft appreciates the opportunity to submit this letter in response to the
Securities and Exchange Commission's request for comments regarding the above-
referenced release on The Nasdaq Stock Market's proposal to advance board
diversity and enhance transparency of diversity statistics through new proposed
listing requirements.

Nasdaq proposes to require each listed company to provide board-level diversity
statistics through a board diversity matrix and have, or explain why it does not have,
at least two "Diverse" directors.

Microsoft supports Nasdaq's proposal. The fundamental purpose of Nasdaq's
corporate governance listing rules is to increase investor confidence in the public
markets by ensuring listed companies adopt governance structures and follow
practices that maximize their chances of long-term stability, predictability, and
success. We believe Nasdaq's board diversity proposal will effectively further this
purpose.

At Microsoft, our mission is deeply inclusive: empower every person and every
organization on the planet to achieve more. We expect each of us—no matter our
level, role, or function—to play an active role in creating environments where
people of a diverse range of backgrounds are thrive in the workplace and do their
best work.

Diversity in our leadership and our workforce matters. It provides an opportunity for
everyone to learn from the breadth of experiences each of us have to create better
outcomes for the customers we serve. At Microsoft we believe innovation drives

Microsoft Corporation
One Microsoft Way
Redmond, WA 98052-6399

Tel 425 882 8080
Fax 425 706 7329
www.microsoft.com



long-term success, and diversity unlocks innovation. This principle applies throughout our organization. Our commitment to diversity not only includes our Board of Directors, senior leadership team, and every employee, but also the ecosystem that surrounds Microsoft from our supply chain to our partner community.

Microsoft, as a Washington corporation, has already publicly supported the Women on Corporate Boards Act, enacted in Washington state in 2020, which requires public companies incorporated in Washington to have at least 25% of their boards comprised of directors identifying as women by 2022, or provide to their shareholders a report on their board diversity and analysis. We believe Nasdaq's proposal is consistent with the goals of the Washington statute, and uses similar disclosure mechanisms to enable shareholders to make informed voting and investment decisions that can include consideration of a company's approach to diversity on its board.

Investors who review Microsoft's annual proxy statement can readily find our detailed disclosure regarding the diversity of our Board of Directors. Of the company's current 12-member board, five members are women, two of our four board committees are chaired by women, and three board members are from racial or ethnic minority groups, including our independent Board Chair. Additionally, investors can find information about the diversity of the company's workforce in our Global Diversity & Inclusion Report 2020. By publicly disclosing this data, we provide visibility to internal and external stakeholders on our progress against our diversity commitment, and also hold our leadership accountable to make continuous progress.

Based on our regular conversations with investors and their requests for diversity data, we understand they are increasingly focused on board diversity and many view it as material to their voting decisions. We believe this is important to investors because, as Nasdaq has noted, there is considerable empirical data that a diversity of backgrounds, experiences, and opinions leads to superior decision-making, better business outcomes, and more consistent long-term growth.

And while the composition of our current Board of Directors already exceeds Nasdaq's diversity goal of at least two diverse directors, we believe that Nasdaq's proposed phase-in period of two to five years is reasonable for companies who will need to make changes in the composition of their boards.

Microsoft Corporation          Tel 425 882 8080
One Microsoft Way              Fax 425 706 7329
Redmond, WA 98052-6399         www.microsoft.com

 Microsoft

In conclusion, Microsoft would like to reiterate our support for Nasdaq's proposal and commends the proactive efforts of its leadership in spearheading a disclosure-based, business-driven approach. We appreciate this opportunity to provide feedback on the proposal to the SEC and hope that you will adopt Nasdaq's proposal. Thank you for considering our views on this important topic.

Sincerely,

Dev Stahlkopf
Corporate Vice President, General Counsel
 and Secretary
Microsoft Corporation

**TAB 17:**

Letter from Steve Nelson, CEO, Institutional Limited Partners Association, File No. SR-NASDAQ-2020-081 (Jan. 4, 2021)



January 4, 2021

Vanessa Countryman
Secretary
U.S. Securities & Exchange Commission
100 F Street NE
Washington, D.C. 20549-0609

**Re:    Comments on Nasdaq Stock Market LLC; Notice of Filing of Proposed Rule
Change to Adopt Listing Rules Related to Board Diversity, Release No. 34-
90574; File No. SR-NASDAQ-2020-081**

Dear Ms. Countryman:

The Institutional Limited Partners Association (ILPA)[1] is pleased to submit comments on
the proposed rules for issuers listed on the Nasdaq Stock Market LLC that were recently
submitted for approval[2] by the U.S. Securities & Exchange Commission. ILPA is
committed to advancing diversity, equity and inclusion (DEI) in the private equity industry
and has actively led industry initiatives, including our recently launched *Diversity in
Action*[3] initiative to help improve industry practice.

While ILPA and our members are actively involved in shaping DEI in the private
markets, we believe that both public and private markets are inherently interconnected,
impacting one another. From 2009-2019, 500 private equity backed companies held an

---

[1]ILPA is the voice of the institutional investors invested in private equity, colloquially known as Limited Partners or
LPs. Our 550+ member institutions represent over USD 2 trillion in private equity assets under management globally
and include public and private pension funds, insurance companies, university endowments, charitable foundations,
family offices and sovereign wealth funds, all of which invest in the U.S. alternative investment market. LPs provide
the capital that fuels private equity and venture capital investment, generating economic growth and job creation,
across America and around the world.

In addition to providing this critical capital for economic growth, LPs are the trusted financial stewards investing the
assets of millions of Americans. Limited partner beneficiaries include teachers, first responders, students receiving
university scholarships, charity recipients and insurance policyholders, among others. ILPA is headquartered in
Washington, D.C. with additional offices in Toronto, Ontario. For more information on ILPA's members, please visit:
http://www.ilpa.org/members.

[2] *See* The Nasdaq Stock Market LLC; Notice of Filing of Proposed Rule Change To Adopt Listing Rules Related to
Board Diversity; File No. SR-NASDAQ-2020-081 (December 4, 2020). (Proposed Rules)

[3] ILPA Diversity In Action Initiative: https://ilpa.org/ilpa_diversityinaction/



initial public offering (IPO) at exit.[4] As of October 2020, over 70 venture capital backed companies had gone public in that year, many of them tech companies that listed on Nasdaq.[5] Given the frequency of private equity and venture backed companies exiting through an IPO, it appears likely that the Proposed Rules will result in positive movement on board diversity of the portfolio companies owned by the private funds in which our members invest.

ILPA believes that diversity at both the level of portfolio company boards as well as within decision making teams at the fund level (in private funds) results in better outcomes for investors. Board diversity at the portfolio company level, and within the investment committees of private funds making these investments, can bring forward a greater variety of viewpoints and perspectives, leading to improved decision-making and ultimately better performance. Recent research has highlighted the positive impact on performance of firms with diverse investment committees. A 2019 assessment of performance by diverse-owned private equity firms, published by the National Association of Investment Companies (NAIC), found that diverse private equity funds performed better than the Burgiss Median Quartile in 78.6 percent of vintage years studied.[6] Moreover, in its examination of gender balance in private equity and venture capital firms investing in the emerging markets, a 2019 study by the International Finance Corporation (IFC) indicated that gender balanced funds realized an excess net internal rate of return of 1.7 percentage points greater than male- or female-dominated funds when controlling for vintage, geography and strategy.[7] In sum, research is growing to show the value of diverse viewpoints and experiences on investment committees and boards of directors.

The Proposed Rules raise the bar by requiring a certain level of diversity on the boards of listed Nasdaq companies, or by requiring issuers to explain why they were unable to identify diverse candidates. Further, the clear reporting requirements in the Proposed Rules will help investors, many of whom increasingly consider diversity as a factor in their investment decisions, to gather the information more efficiently that they require on

---

[4] Pitchbook, 2019 Annual U.S. PE Breakdown, p. 14, *available at:* https://files.pitchbook.com/website/files/pdf/2019_Annual_US_PE_Breakdown.pdf

[5] Ryan Browne, *Why tech IPOs are flourishing in the U.S. and China — but not Europe*, CNBC, October 20, 2020, *available at:* https://www.cnbc.com/2020/10/19/why-tech-ipos-are-flourishing-in-the-us-and-china-but-not-europe.html

[6] NAIC, Examining the Returns 2019: The Financial Returns of Diversity Private Equity Firms, available at: https://2rp8zq2kdoxy38kvwx23zbuc-wpengine.netdna-ssl.com/wp-content/uploads/2020/04/2019-NAIC-ExaminingTheResults-FINAL.pdf

[7] IFC, Moving toward gender balance in private equity and venture capital 2019, available at: https://www.ifc.org/wps/wcm/connect/79e641c9-824f-4bd8-9f1c-00579862fed3/Moving+Toward+Gender+Balance+Final_3_22.pdf?MOD=AJPERES&CVID=mCBJFra



board diversity. We encourage the Commission to move expeditiously to approve the Proposed Rules and thereby take a significant step to improve board diversity among listed companies in the United States. We also dedicate ourselves to encouraging private equity and venture managers to consider taking similar steps to improve board diversity at their portfolio companies.

Sincerely,

Steve Nelson
Chief Executive Officer
Institutional Limited Partners Association (ILPA)

**TAB 18:**

Letter from Board of Directors, Brighthouse Financial, Inc., File No. SR-NASDAQ-2020-081 (Jan. 4, 2021)



January 4, 2021

**Via e-mail to rule-comments@sec.gov**

Vanessa Countryman, Secretary
Securities and Exchange Commission
100 F Street NE
Washington, DC 20549-1090

Re:    File No. SR-NASDAQ-2020-081

Dear Ms. Countryman:

The Board of Directors ("we" or the "Board") of Brighthouse Financial, Inc. ("Brighthouse Financial" or the "Company") (Nasdaq: BHF), appreciates the opportunity to submit this letter in response to the Securities and Exchange Commission's (the "Commission") request for comments regarding the above-referenced release on The Nasdaq Stock Market LLC's ("Nasdaq") proposal to advance board diversity and enhance transparency of diversity statistics through new listing requirements (the "Proposed Rule").

We write to express our support for the Proposed Rule, which we believe offers a practical and balanced approach to promoting diversity on corporate boards and enhancing disclosure about board diversity.

Brighthouse Financial is one of the largest providers of annuities and life insurance in the U.S.[1] The Company's mission is to help people achieve financial security, and it specializes in products designed to help people protect what they've earned and ensure it lasts. Fostering a diverse and inclusive workplace has been a core component of Brighthouse Financial's values and culture, as well as a key element of our strategy, since becoming an independent, public company in 2017. Likewise, diversity has been a guiding principle and priority for us as we have built, and continue to build, our Board. We recognize that diversity of all kinds adds to the overall mix of perspectives of the Board as a whole, enriching our discussions and enhancing our decision-making. We believe that having a diverse Board has made us better able to effectively oversee the Company's management and its strategy to deliver long-term value for its stockholders.

We are proud of our efforts to build a Board that exhibits strong diversity. Beginning with the Company's first annual proxy statement, we have disclosed the aggregate diversity profile of the Board with respect to gender and racial or ethnic diversity. The Board is currently composed of nine directors, including our President and Chief Executive Officer. We have gender parity among our eight independent directors, with four women and four men, and two of our independent directors are racially or ethnically diverse (one is a man and one is a woman). We also have strong diverse representation among our Board leadership positions. Our Chairman of the Board, who is also the chair of our Finance and Risk Committee, and the chairs of three other Board committees are all diverse.

We also recognize there is more work to be done to provide stakeholders with useful, comparable data about the composition of corporate boards. It is a theme that we consistently hear in regular governance engagements with the Company's stockholders. In response to these expectations and in consideration of the Proposed Rule, this year, for the first time, we have undertaken an exercise to voluntarily self-identify with respect to gender, race or ethnicity and LGBTQ+ status, while being sensitive to any of our Board members'

---

[1] Ranked by 2019 admitted assets. Best's Review®: Top 200 U.S. Life/Health Insurers. A.M. Best, 2020.

preferences to opt out of self-identification. We plan to use this information to enhance disclosures in our 2021 proxy statement regarding our Board's composition. We believe that the board diversity matrix contained in the Proposed Rule is a pragmatic and effective means of making such disclosure.

In conclusion, we reiterate our support for the Proposed Rule and urge the Commission to adopt it. Thank you again for the opportunity to present our perspective on this important matter.

Sincerely,

The Board of Directors
Brighthouse Financial, Inc.

**TAB 19:**

Letter from Sheryl Sandberg, COO, Facebook, Inc., File No. SR-NASDAQ-2020-081
(Jan. 3, 2021)

# FACEBOOK

January 3, 2021

Vanessa A. Countryman, Secretary
Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549-1090

Re:    File Number SR-NASDAQ-2020-081
       (Notice of Filing of Proposed Rule Change to Adopt Listing Rules Related to Board Diversity)

Secretary Countryman,

I am writing to you in support of the Nasdaq proposal to require all companies listed on its U.S. exchange to publicly disclose consistent, transparent diversity statistics regarding their boards of directors.

We believe diversity is core to every business and companies should be committed to a policy of inclusiveness. For Facebook, this long-held principle enables us to build better products, make better decisions and better serve clients.

Over the years, we have been able to attract a diverse group of world-class directors to help guide the company and represent the interests of our shareholders. Currently, a majority of our board (5 of 9 members) is diverse when considering women and underrepresented communities, including the LGBTQ community. We believe that having a diverse board with directors who bring different experiences and perspectives to the table makes our board more effective.

Importantly, Facebook was one of the first major companies to adopt a formal Board Diversity Policy that requires we:
- consider candidates with diverse backgrounds in terms of knowledge, experience, skills, and other characteristics; and
- ensure that the "initial list" of candidates from which new director nominees are chosen by the board includes candidates with a diversity of race, ethnicity and gender.

More broadly, we remain focused on increasing the number of underrepresented racial and ethnic minorities and women across our workforce. For example, in 2019, we set the goal of "50 in 5," which means that by 2024 at least 50% of our workforce will be from underrepresented groups. Through this endeavor, we are aiming to double the number of women employees globally and double the number of Black and Hispanic employees in the U.S. In 2020, we also made an additional commitment to increase the representation of people of color in leadership positions in the U.S. by 30%, including a 30% increase in the representation of Black people in leadership, by 2025.

At Facebook we believe in leading by example. We aim to create a workplace where everyone has meaningful opportunities. We believe it is critical not just for us, but for all our nation's leading companies to compose their boards in a manner that values diversity and inclusion as key drivers of value and productivity. We are asking the SEC to affirm the proposed rule.

Sincerely,

Sheryl Sandberg
Chief Operating Officer
Facebook, Inc.

**TAB 20:**

Letter from Roger W. Ferguson, Jr., President and CEO, TIAA, & Jose Minaya, CEO, Nuveen, File No. SR-NASDAQ-2020-081 (Dec. 31, 2020)



**Roger W. Ferguson, Jr.**
President and CEO, TIAA
730 Third Avenue
New York, NY 10017

**Jose Minaya**
CEO, Nuveen
8500 Andrew Carnegie Blvd
Charlotte, NC 28262

December 31, 2020

Vanessa A. Countryman
Secretary
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549-1090
Email: rule-comments@sec.gov

**Re: The Nasdaq Stock Market LLC; Notice of Filing of Proposed Rule Change to Adopt Listing Rules Related to Board Diversity; File No. SR-NASDAQ-2020-081**

Dear Ms. Countryman:

On behalf of Teachers Insurance and Annuity Association of America ("TIAA") and its asset management arm, Nuveen, LLC ("Nuveen"), we welcome the opportunity to submit this comment to the Securities and Exchange Commission (the "SEC" or "Commission") in response to Nasdaq's proposed Rule 5605(f)(2) and Rule 5606 regarding board diversity (the "Proposed Rules").[1] We are writing to express our organization's strong support for the Proposed Rules, which are designed to encourage greater diversity and inclusion on boards of Nasdaq-listed companies and also prompt consistent, transparent disclosure by these companies about the makeup of their boards. As industry leaders in responsible investing, TIAA and Nuveen have been staunch advocates of board diversity for decades. We firmly believe that diverse boards produce better outcomes for the companies and investors they serve, as well as markets in general, by promoting innovation and long-term financial performance. The Proposed Rules are a significant step in an industry-wide effort to enhance the diversity of corporate boards, and we respectfully urge the Commission to approve them without delay.

Founded in 1918, TIAA is the leading retirement provider for those in academic, research, medical and cultural fields. For over a century, TIAA's mission has been to aid and strengthen the institutions and participants we serve and to provide investment solutions that meet their needs. TIAA also has five decades of experience in responsible investing, and offered one of the first dedicated environmental, social and governance funds, the CREF Social Choice Account. As TIAA's asset manager, Nuveen offers a comprehensive range of outcome-focused investment solutions designed to secure the long-term financial goals of institutional and individual investors. Nuveen is also responsible for executing TIAA's responsible investing policy across the enterprise. Drawing on TIAA's decades of expertise, Nuveen has established

---

[1]     *Notice of Filing of Proposed Rule Change to Adopt Listing Rules Related to Board Diversity* (Dec. 1, 2020), *available at*: https://listingcenter.nasdaq.com/assets/RuleBook/Nasdaq/filings/SR-NASDAQ-2020-081.pdf.

itself as a leader in the responsible investing space and is dedicated to promoting the financial progress of its investors while also advancing global economic, social and environmental well-being.

Since the 1990s, TIAA has identified board diversity as an issue of crucial importance to our organization – and to our clients' outcomes. In our experience, diverse boards fuel greater innovation and solve problems more creatively and effectively, in turn producing better long-term financial outcomes for companies and investors. Including diverse directors on a company's board can also be an effective tool in combatting management entrenchment and groupthink. Recent research shows that directors themselves see the benefits of board diversity in promoting unique perspectives among the board, improving a company's relationships with its investors and enhancing long-term performance.[2]

As companies become increasingly complex in nature and global in scope, boards too must become more diverse – not just in terms of their members' gender, race, ethnicity, or identification as LGBTQ+, but in their skills and experience as well. Studies have shown that diverse boards are more likely to include directors who possess nontraditional skills (*e.g.*, technology, sales, risk management) in addition to more traditional skills (*e.g.*, leadership experience, management training, industry knowledge).[3] A board consisting of directors with a diverse range of abilities and experience will be better positioned to provide oversight through the many challenges and complexities facing 21st-century companies. For this reason, we urge companies to take a holistic approach to diversifying their boards, focusing not only on directors' self-identification as members of underrepresented groups, but also on the unique and varied skills they have to offer.

Despite the extensive evidence of the benefits of board diversity, there has been a lack of incentive, outside of shareholder pressure, for publicly traded companies in the United States to diversify their boards. Moreover, investors have struggled to get uniform and transparent data about board members. Many investors are left to consult board data that has been "assessed" by third parties for commercial purposes rather than collected directly from company reporting, which raises concerns about accuracy, objectivity and consistency. Regulators and self-regulatory organizations have failed to act on this issue with the appropriate level of urgency, neglecting to hold companies sufficiently accountable for diversifying their boards and providing reliable board data to investors. We believe it is high time for that failure to be remedied.

For these reasons, we enthusiastically support Nasdaq's filing of the Proposed Rules. We, along with many others in the financial-services industry, favor the creation of an external framework that would motivate companies to diversify their boards and standardize disclosures regarding their board composition. The Proposed Rules would provide just such a framework. Proposed rule 5605(f)(2) would require Nasdaq-listed companies to have, or explain why they do not have, at least (i) one director who self-identifies as female, and (ii) one who self-identifies as an underrepresented minority or LGBTQ+ (as those terms are defined in the Proposed

---

[2]    *See* Loop, Paula, Paul DeNicola, and Leah Malone, "2020 Annual Corporate Directors Survey," *Harvard Law School Forum on Corporate Governance* (Nov. 1, 2020), *available at*: https://corpgov.law.harvard.edu/2020/11/01/2020-annual-corporate-directors-survey/.

[3]    *See* Garcia, Anthony, "Director Skills: Diversity of Thought and Experience in the Boardroom," *Harvard Law School Forum on Corporate Governance* (Oct. 10, 2018), *available at*: https://corpgov.law.harvard.edu/2018/10/10/director-skills-diversity-of-thought-and-experience-in-the-boardroom/.

Rules). Proposed rule 5606 would require listed companies to provide statistical information regarding the diversity of their board in a uniform format. We believe these rules will provide companies with much-needed encouragement to not only diversify their boards, but also to provide clear, easily accessible information about their board makeup in a consistent manner so that investors can make more informed investment decisions that reflect their values and objectives. The Proposed Rules will shed long-overdue light on the efforts of individual issuers to diversify their boards and will make it easier for institutional investors like TIAA and Nuveen to ensure that their investment decisions are consistent with their responsible investing policies.

In our view, the benefits of implementing the Proposed Rules far outweigh the costs, particularly given that many Nasdaq-listed companies already collect the data required to be reported under proposed rule 5606 and will be subject to a generous phase-in period. While the costs of complying with the Proposed Rules should be relatively limited and predictable, the potential upside is extensive. Investors will enjoy easy access to clear, reliable, standardized information about board diversity that will help them make more informed investment decisions and better understand how issuers think about this important topic. Issuers will be able to take advantage of "a network of board-ready diverse candidates and a tool to support board evaluation, benchmarking and refreshment," provided free of charge by Nasdaq. And U.S. capital markets will be brought more in line with global markets, which have already adopted quota systems, listing rules and disclosure requirements aimed at increasing board diversity among publicly listed companies. This is a key point, as the board diversity initiatives adopted in other countries have in many cases helped to drive local company performance.[4] Given the wide-ranging potential benefits of Nasdaq's proposal, we urge the SEC to approve the Proposed Rules in short order, for the good of investors, issuers, and the market as a whole.

TIAA and Nuveen appreciate your consideration of our thoughts on this important issue. We hope the perspective we have offered will assist the Commission in its review of the Proposed Rules, and we welcome further engagement on any aspect of this letter.

Sincerely,

Roger W. Ferguson, Jr.
President and CEO
TIAA

Jose Minaya
CEO
Nuveen, a TIAA Company

---

[4]     As an example, MSCI and Morningstar both offer indices with above-average exposure to non-US companies located in jurisdictions that have stricter gender diversity reporting requirements. Data over the past several years show that these indices have outperformed their more "mainstream" peers. *See* "Japan's government pension fund unveils $12bn allocation to global ESG and gender equity indices," *Responsible Investor* (Dec. 18, 2020), *available at*: https://www.responsible-investor.com/articles/japan-s-government-pension-fund-unveils-usd12bn-allocation-to-global-esg-and-gender-equity-indices.

**TAB 21:**

Letter from Michael W. Frerichs, Illinois State Treasurer, File No. SR-NASDAQ-2020-081 (Dec. 31, 2020)



## OFFICE OF THE ILLINOIS STATE TREASURER
## MICHAEL W. FRERICHS

December 31, 2020

Vanessa Countryman, Secretary
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, D.C. 20549-1090

**Re:    SR-NASDAQ-2020-081 – Proposed Rule Change to Adopt Listing Rules Related to Board Diversity**

Dear Secretary Countryman,

I am writing to voice my support for the proposed rule change filed by the Nasdaq Stock Market LLC ("Nasdaq") to adopt listing rules related to board diversity, pursuant to Rule 19b-4 under the Securities Exchange Act of 1934.

As the Treasurer of the State of Illinois, I am responsible for safeguarding and prudently investing $35 billion on behalf of taxpayers, college savers, and units of local government.  To effectively execute my fiduciary duties as State Treasurer, my office and our investment service providers routinely examine the composition of corporate board directors when making investment and proxy voting decisions.  We seek to evaluate board attributes that are material to good governance and decision-making, and thereby may contribute to better investment performance.  This process is critical in our endeavor to provide the highest level of service, stewardship, and financial value to our beneficiaries and participants.

One materially important board attribute we examine is diversity.  Research demonstrates that a diverse board of directors is better equipped to ensure multiple perspectives are considered and better positioned to enhance long-term company performance within a marketplace defined by extensive diversity and multiculturalism.[i, ii, iii] Diversity is inclusive of gender, race/ethnicity, skill sets, professional backgrounds, and LGBTQ+ status.

| State Capitol | James R. Thompson Center | Illinois Business Center | Myers Building |
| --- | --- | --- | --- |
| Room 219 | 100 West Randolph Street | 400 West Monroe Street | One West Old State Capitol Plaza |
| Springfield, IL 62706 | Suite 15-600 | Suite 401 | Suite 400 |
| Phone: (217) 782-2211 | Chicago, IL 60601 | Springfield, IL 62704 | Springfield, IL 62701 |
| Fax: (217) 785-2777 | Phone: (312) 814-1700 | Phone: (217) 782-6540 | Phone: (217) 785-6998 |
| TTY: (866) 877-6013 | Fax: (312) 814-5930 | Fax: (217) 524-3822 | Fax: (217) 557-9365 |
|  | TTY: (866) 877-6013 | TTY: (866) 877-6013 | TTY: (866) 877-6013 |

Given the business case for board diversity, investors have a material interest in assessing board diversity data and applying that within the total mix of information.  But here lies the underlying problem:  investors do not have adequate access to board diversity data.

The current environment is characterized by a lack of standardization, which creates a lack of consistency, comparability and transparency.  While some companies provide robust disclosure on their board's composition and their attention to diversity factors, others provide no disclosure on these pertinent board attributes.  As a result, investors are often unable to discern the level of board diversity at many companies in which they invest, and even among those that provide some level of disclosure, comparability is tenuous.

In the context of the SEC's mission, the current reporting environment does not help protect investors, nor does it help maintain fair, orderly and efficient markets or facilitate capital formation.  In fact, the current environment creates confusion and barriers to effective investment analysis and decision-making; it generates information asymmetry, disorder and inefficiency; and it jeopardizes optimal capital formation.

Given the paucity and incomparability of board-level diversity data, it is reasonable and appropriate that Nasdaq listed companies self-disclose the composition of their boards of directors in a transparent and consistent format.  In addition, given the correlation between board diversity and long-term outperformance, it is reasonable and appropriate that Nasdaq listed companies be required to have, or explain why their boards do not include at least two diverse directors, including one who self-identifies as female and one who self-identifies as either an underrepresented minority or LGBTQ+.

Again, we support Nasdaq's new requirement and would further support a split of the three categories of diversity covered by the proposal (gender, race, and LGBTQ+ status) to ensure all three aspects are addressed.  This proposal is a sensible, simple, and cost-effective way to provide all stakeholders – and particularly investors – with a better understanding of a company's board composition and its attention to diversity as a material and relevant board attribute.

Thank you for your consideration, and please do not hesitate to contact me with any questions.

Sincerely,

Michael W. Frerichs
Illinois State Treasurer

cc:    The Honorable Jay Clayton, Chairman
       The Honorable Robert J. Jackson, Jr., Commissioner
       The Honorable Allison Herren Lee, Commissioner
       The Honorable Hester M. Peirce, Commissioner
       The Honorable Elad L. Reisman, Commissioner

i Diversity Wins," McKinsey & Company, 2020, available at:
www.mckinsey.com/~/media/McKinsey/Featured%20Insights/Diversity%20and%20Inclusion/Diversity%20wins%20How%20inclusion%20matters/Diversity-wins-How-inclusion-matters-vF.pdf.

ii Diversity Matters," McKinsey & Company, 2015, available at:
https://assets.mckinsey.com/~/media/857F440109AA4D13A54D9C496D86ED58.ashx.

iii David Rock and Heidi Grant, "Why Diverse Teams are Smarter," Harvard Business Review, Nov. 4, 2016, available at: https://hbr.org/2016/11/why-diverse-teams-are-smarter.

**TAB 22:**

Letter from National Center for Public Policy Research, File No. SR-NASDAQ-2020-081 (Dec. 30, 2020)



December 30, 2020

**Via email (rule-comments@sec.gov)**

Vanessa Countryman
Secretary
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549–1090

Re: File Number SR– NASDAQ–2020–081

Ms. Countryman:

We at the Free Enterprise Project[1] of the National Center for Public Policy Research[2] appreciate the opportunity to submit this comment on the above-styled proposed rule that would, *inter alia*, "require Nasdaq-listed companies, subject to certain exceptions, (A) to have at least one director who self-identifies as a female, and (B) to have at least one director who self-identifies as Black or African American, Hispanic or Latinx, Asian, Native American or Alaska Native,

---

[1] Launched in 2007, the National Center for Public Policy Research's Free Enterprise Project (FEP) focuses on shareholder activism and the confluence of big government and big business. FEP is the conservative movement's only full-service shareholder activism and education program: It files shareholder resolutions, engages corporate CEOs and board members at shareholder meetings, petitions the U.S. Securities and Exchange Commission (SEC) for interpretive guidance, and sponsors effective media campaigns to create the incentives for corporations to stay focused on their missions. More information is available here.

[2] The National Center for Public Policy Research is a communications and research foundation dedicated to providing free market solutions to today's public policy problems. We believe that the principles of a free market, individual liberty and personal responsibility provide the greatest hope for meeting the challenges facing America in the 21st century. More information is available here.

Native Hawaiian or Pacific Islander, two or more races or ethnicities, or as LGBTQ+, or (C) to explain why the company does not have at least two directors on its board who self-identify in the categories listed above."[3]  Because we think that the proposed rule raises constitutional concerns, is impermissibly vague, and has been proposed without sufficient support to allow the Securities & Exchange Commission (SEC) to conclude that it is appropriately tailored to achieve its stated purpose, we oppose the proposed rule.

The central objection to the proposed rule is constitutional.  Race and sex are suspect classifications, meaning that there is a high bar against making distinctions on the basis of race and sex.  That bar is necessarily highest where the distinction is determinative, as it would be under the proposed rule:  the fact of race and sex would preclude consideration for employment in the relevant positions by those of the disfavored race or sex.  The proponent has not demonstrated that its proposed suspect classifications are narrowly tailored to achieve pressing needs; in fact, as explored below, the proponent has not demonstrated that its constitutionally suspect proposal is even reasonably suited to its stated purposes, while alternative and likely far more effective strategies that do not implicate suspect classifications are available to achieve the stated ends.  Under all of these circumstances, the SEC cannot with constitutional fidelity approve the proposed rule.

Second, the proposed rule is impermissibly vague.  Most notably in this regard, it would require that at least one member of the board of directors at Nasdaq-listed firms be, amongst other alternatives, a "member of the queer community."  It fails, though, to define "queer community."  We have been unable to determine a stable meaning for that term, while there appear to be any number of conflicting interpretations of it and sharp disagreement about its "true" meaning and relevance.  A rule that requires one member of a board of directors to be part of something that the rule itself has not defined, and for which there is no settled, coherent meaning, is impermissibly vague, inviting confusion, challenge, litigation, unnecessary expense and other needless and unacceptable risks.

Third, the relationship between the proposed rule and its central and tertiary claimed benefits has not been established.  The proponent asserts that it has "reviewed dozens of empirical studies and found that an extensive body of academic research demonstrates that diverse boards are positively associated with improved corporate governance and financial performance"[4] as well as transparent communication by corporations and firm decision-making.  Correlation, however, is very different from causation.  As the Free Enterprise Project has established in significant detail,[5] while there is significant research demonstrating that *viewpoint* diversity increases financial, governance and other relevant performance, there appear to be no studies that establish that surface-characteristic diversity of the sort that would be mandated under this proposed rule causes, rather than is merely correlated with, such

---

[3] U.S. Securities & Exchange Commission, SELF-REGULATORY ORGANIZATIONS; THE NASDAQ STOCK MARKET LLC; NOTICE OF FILING OF PROPOSED RULE CHANGE TO ADOPT LISTING RULES RELATED TO BOARD DIVERSITY 1 (2020) ("Notice") *available at* https://www.sec.gov/rules/sro/nasdaq/2020/34-90574.pdf.

[4] Notice, *supra* note 3, at p. 7.

[5] Free Enterprise Project, INVESTOR VALUE VOTER GUIDE 20-32 (2020), *available at* http://nationalcenter.org/IVVG/.

performance enhancement. Neither, crucially, are there any studies that separate out the two factors. For the proponent to demonstrate that its proposal would really achieve the purposes for which it is proposed, it would need to demonstrate that surface-characteristic diversity boosts performance and outcomes even when that surface-characteristic diversity adds no viewpoint diversity. (This, though, may prove hard to accomplish, as the proponent has proffered no reason, and we can think of none, why surface-characteristic diversity by itself would allow companies to "think out of the box" or otherwise make better decisions. These results naturally derive from an increase in *viewpoints* and *worldviews*, not skin color or generative equipment.) Until it does, its rule must be rejected as providing the wrong solution to the concerns that it addresses, and one fraught with constitutional objections. Meanwhile, we posit that a key to corporate success is true *viewpoint* diversity, requiring protection against discrimination on the basis of viewpoint which is now rife at so many American corporations.

Relatedly: as active shareholders in numerous companies listed on the Nasdaq, we are concerned that the proposed rule may cause companies to break state laws which require directors to serve as stewards for the benefit of shareholders. Selecting directors on the basis of arbitrary surface (and related) characteristics, rather than business acumen, industry knowledge, prior experience, viewpoint diversity and other factors genuinely relevant to firm performance, may cause Nasdaq-listed companies to violate their legal fiduciary obligations to their shareholders.

Thank you for your consideration of this comment. Please feel free to contact us if we can be of any further assistance in this matter.

Sincerely,

Justin Danhof

Scott Shepard

Free Enterprise Project
National Center for Public Policy Research
The National Center

**TAB 23:**

Letter from Jeffrey P. Mahoney, General Counsel, Council of Institutional Investors, File No. SR-NASDAQ-2020-081 (Dec. 30, 2020)

Council of Institutional Investors®
The voice of corporate governance

<u>Via Email</u>

December 30, 2020

Secretary
Securities and Exchange Commission
100 F Street NE
Washington, DC 20549-1090

*Re:  File Number SR-NASDAQ-2020-081[1]*

Dear Madam Secretary:

I am writing on behalf of the Council of Institutional Investors (CII) to express our general support for the Nasdaq Stock Market LLC (Nasdaq) "Notice of Filing of Proposed Rule Change To Adopt Listing Rules Related to Board Diversity" (Proposal).[2] We applaud Nasdaq's efforts to enhance diversity through the Proposal's expectations for listed companies.

CII is a nonprofit, nonpartisan association of U.S. public, corporate and union employee benefit funds, other employee benefit plans, state and local entities charged with investing public assets, and foundations and endowments with combined assets under management of approximately $4 trillion. Our member funds include major long-term shareowners with a duty to protect the retirement savings of millions of workers and their families, including public pension funds with more than 15 million participants – true "Main Street" investors through their pension funds. Our associate members include non-U.S. asset owners with about $4 trillion in assets, and a range of asset managers with more than $35 trillion in assets under management.[3]

**Proposal Requirements**

The Proposal has two requirements for each of Nasdaq's listed companies, subject to certain exceptions: (1) Provide statistical information regarding diversity among the members of the company's board of directors under proposed Rule 5606; and (2) have, or explain why it does not have, at least two *"Diverse"* directors on its board under proposed [R]ule 5605(f)(2).[4] The

---

[1] Self-Regulatory Organizations; The Nasdaq Stock Market LLC; Notice of Filing of Proposed Rule Change To Adopt Listing Rules Related to Board Diversity, Exchange Act Release No. 90,574, 85 Fed. Reg. 80,472 (Dec. 11, 2020), https://www.federalregister.gov/documents/2020/12/11/2020-27091/self-regulatory-organizations-the-nasdaq-stock-market-llc-notice-of-filing-of-proposed-rule-change.
[2] 85 Fed. Reg. at 80,472.
[3] For more information about the Council of Institutional Investors (CII), including its board and members, please visit CII's website at https://www.cii.org/about.
[4] *See* 85 Fed. Reg. at 80,473 ("*Nasdaq is proposing to require each of its listed companies, subject to certain exceptions, to: (i) Provide statistical information regarding diversity among the members of the company's board of*

Proposal defines ''Diverse'' under Rule 5605(f)(1) as ''an individual who self-identifies in one or more of the following categories: Female, Underrepresented Minority or LGBTQ+,'' and by adopting the following definitions under Rule 605(f)(1):

- ''Female'' means an individual who self-identifies her gender as a woman, without regard to the individual's designated sex at birth.
- ''LGBTQ+'' means an individual who self-identifies as any of the following: lesbian, gay, bisexual, transgender or a member of the queer community.
- ''Underrepresented Minority'' means an individual who self-identifies as one or more of the following: Black or African American, Hispanic or Latinx, Asian, Native American or Alaska Native, Native Hawaiian or Pacific Islander, or Two or More Races or Ethnicities.[5]

## CII Policies

CII membership approved policies relevant to the subject matter of the Proposal include the following;

**2.8b Board Diversity**: The Council supports a diverse board. The Council believes a diverse board has benefits that can enhance corporate financial performance, particularly in today's global market place. Nominating committee charters, or equivalent, ought to reflect that boards should be diverse, including such considerations as background, experience, age, race, gender, ethnicity, and culture.[6]

**Statement on Company Disclosure**
In evaluating proposals to expand company disclosure, CII considers the following factors:

- Materiality to investment and voting decisions
- Depth, consistency and reliability of empirical evidence supporting the connection between the disclosure and long-term shareowner value
- Anticipated benefit to investors, net of the cost of collection and reporting
- Prospect of substantially improving transparency, comparability, reliability and accuracy[7]

---

*directors under proposed Rule 5606; and (ii) have, or explain why it does not have, at least two ''Diverse'' directors on its board under proposed rule 5605(f)(2).'').*
[5] *Id.* at 80,485.
[6] Council of Institutional Investors, Corporate Governance Policies § 2.8b Board Diversity (updated Sept. 22, 2020), https://www.cii.org/files/policies/09_22_20_corp_gov_policies.pdf.
[7] Council of Institutional, Policies on Other Issues, Statement on Company Disclosure (adopted Mar. 10, 2020), https://www.cii.org/policies_other_issues#Company_disclosure.

December 30, 2020

**Application of Policies**

Board Diversity

CII's policy on board diversity reflects the view that corporate governance best practices include the expectation that corporate boards will reflect the diversity of their communities, customers, and employees. And that diverse boards can have a significant positive effect on financial performance.[8] We, however, believe diverse boards can be achieved without quotas which may result in "check-the-box" diversity.

We support the Proposal's comply-or-explain model that provides a transparent framework for listed companies to present their board composition, with the flexibility to explain why the Nasdaq proposed standards cannot be met.[9] While Nasdaq's proposed definition of diversity is narrower than suggested by our policy, we believe that, as discussed below, the Proposal would improve transparency and comparability of disclosure across companies. And, we also believe investors can use the resulting transparency and comparability to make better-informed investment and voting decisions.

Company Disclosure

The following is an analysis of the application of the four factors contained in CII's company disclosure policy to the Proposal requirements. We conclude that the Proposal includes elements of all four factors.

*Material to investment and voting decisions*

CII believes the Proposal's requirements are material to investment and voting decisions. We agree with Nasdaq's observation that "diversity has become increasingly important to . . . institutional investors, pension funds and other stakeholders who believe that board diversity . . . is an important factor in the voting decisions of some investors."[10]

We also agree with Nasdaq's observation that "[i]nvestors frequently lack access to information about corporate board diversity that could be material to their decision making."[11] We share

---

[8] *See, e.g.,* Vivian Hunt et al., Delivering through Diversity, McKinsey & Co. 13 (Jan. 2018), https://www.mckinsey.com/~/media/mckinsey/business%20functions/organization/our%20insights/delivering%20through%20diversity/delivering-through-diversity_full-report.ashx ("We found that companies with the most ethnically/ culturally diverse boards worldwide are 43% more likely to experience higher profits.").

[9] We note that CII has previously expressed general support for the stated goal of proposed federal legislation that would establish a comply-or- explain approach for cyber security risk management experience or expertise on reporting company boards. *See* Letter from Ken Bertsch, Executive Director, Council of Institutional Investors to the Honorable Jack Reed, United States Senate 1 (July 7, 2017), https://www.cii.org/files/07_07_17%20letter%20to%20Senator%20Reed.pdf ("CII strongly supports the stated goal of the [S.536, the Cybersecurity Disclosure Act of 2017] to "promote transparency in the oversight of cybersecurity risks at publicly traded companies").

[10] 85 Fed. Reg. at 80,482.

[11] *Id.* at 80,475.

Nasdaq's concern that "investors . . . face . . . many data collection challenges . . . rendering current diversity disclosures unreliable, unusable, and insufficient to inform investment and voting decisions."[12] We generally agree with Nasdaq that "[t]his lack of transparency is impacting investors who are increasingly basing public advocacy, proxy voting and direct shareholder company engagement decisions on board diversity considerations."[13]

We agree with the remarks of Commissioner Allison Herren Lee at CII's Fall conference that improving diversity disclosures:

> [G]ets investors the information they need to make investment decisions based on their own judgment of what indicators matter for long-term value. Importantly, it can also drive corporate behavior.[14]

More recently, in its Report on Activities, the Office of the Investor Advocate of the Securities and Exchange Commission (SEC) states:

> To make fully informed investment decisions, investors generally would benefit from greater insight into the diversity characteristics of a company's current board . . . Thus, to be listed on a national exchange, a company should be required to provide more fulsome disclosure regarding the composition of its board of directors . . . .Voluntary disclosures in this regard have been useful, but listing standards could help ensure that more companies make this information publicly available on a basis that enables investors to draw comparisons.[15]

We agree with Nasdaq that the Proposal's disclosures providing statistical information regarding diversity among the members of the company's board of directors "will improve the quality of information available to investors who rely on this information to make informed investment and voting decisions" . . . ."[16] More specifically, we agree that those disclosures "will assist investors in making more informed decisions by making meaningful, consistent, and reliable data readily available and in a clear and comprehensive format prescribed by the proposed rule." [17]

With respect to the Proposal's requirement to explain why a corporation does not have at least two ''Diverse'' directors on its board, we agree with Nasdaq that that the disclosure would provide "investors . . . a better understanding of the company's reasons for not having at least

---

[12] *Id.* at 80,483.

[13] *Id.*

[14] Commissioner Allison Herren Lee, Remarks at the Council of Institutional Investors Fall 2020 Conference: Diversity Matters, Disclosure Works, and the SEC Can Do More (Sept. 22, 2020), https://www.sec.gov/news/speech/lee-cii-2020-conference-20200922.

[15] Office of the Investor Advocate, U.S. Securities and Exchange Commission, Report on Activities, Fiscal Year 2020 at 11 (Dec. 29, 2020), https://www.sec.gov/advocate/reportspubs/annual-reports/sec-investor-advocate-report-on-activities-2020.pdf.

[16] 85 Fed. Reg. at 80,475.

[17] *Id.* at 80,494.

two Diverse directors and can use that information to make an informed investment or voting decision."[18]

*Empirical evidence*

CII agrees with Nasdaq's finding that there is "an extensive body of academic research [that] demonstrates that diverse boards are positively associated with improved corporate governance and financial performance."[19]

We note that Nasdaq's finding was confirmed by FCLTGlobal, a 501(c)3 not-for-profit research organization. In its comment letter in response to the Proposal, FCLTGlobal states:

> In a 2019 study by FCLTGlobal, "Predicting Long-term Success for Corporations and Investors Worldwide," we found that having a diverse board—including a mix of genders and ages—is connected to strong long-term returns. The availability of data has been a barrier to robust studies in the past, and the effects of gender diversity are often easier to analyze than other types of diversity (e.g. race, ethnicity, other). Additionally, FCLTGlobal published an article in 2019 highlighting further evidence that diverse boards add long-term value.
>
> In addition to our own analysis, there have been several academic studies to date that explore the connection between diversity and productivity, and the evidence is compelling. Using a multi-dimensional measure of diversity combining ethnicity, age, gender, education, financial expertise, and prior board experience, Bernile, Bhagwat and Yonker (2017) found that greater board diversity correlates with lower stock price volatility, more consistent investment in R&D projects over time, and better performance overall. In a separate study, Carter, Simkins and Simpson (2003) examined the relationship between board diversity and firm value for Fortune 1000 firms, and after controlling for size, industry, and other corporate governance measures they found significant positive relationships between a company's value and the contingent of women or minorities on a company's board. In an analysis of global corporate boards, Credit Suisse's CS Gender 3000 report "reaffirms findings from previous iterations: that a material correlation exists between companies with a higher participation of women in decision-making roles and their stock market and corporate performance.[20]

In our view, the Proposal's required disclosures would likely contribute to public company board consideration of diversity and such consideration can benefit long-term shareholder value.[21]

---

[18] *Id.* at 80,492.

[19] *Id.* at 80,473 (emphasis omitted).

[20] Letter from Sarah Keohane Williamson, CAIA, CFA, Chief Executive Officer, FCLTGlobal et al. (2020), e[https://www.sec.gov/comments/sr-nasdaq-2020-081/srnasdaq2020081-8159463-226899.pdf](https://www.sec.gov/comments/sr-nasdaq-2020-081/srnasdaq2020081-8159463-226899.pdf).

[21] *See, e.g.,* Letter from Jeffrey P. Mahoney, General Counsel, Council of Institutional Investors to The Honorable Maxine Watters, Chair, Committee on Financial Services, United States House of Representatives et al. 4 (July 10,

*Anticipated benefit to investors, net of the cost*

CII generally agrees with Nasdaq that the anticipated benefits of the Proposal to investors include that it "will enhance investor confidence that listed companies that have two Diverse directors are considering the perspectives of more than one demographic group, leading to robust dialogue and better decision making, as well as the other corporate governance benefits of diverse boards . . . ."[22] In addition, we agree that the "disclosure format required by proposed Rule 5606 [benefits] . . . investors by eliminating data collection inaccuracies and decreasing costs, while enhancing investors' ability to utilize the information."[23]

We generally agree with Nasdaq that the comply-or-explain approach of the Proposal "will avoid costs or burdens on companies that, for example, cannot afford to compensate an additional director or believe it is not appropriate, feasible or desirable to meet the diversity objectives of Rule 5605(f) based on the company's particular circumstances (for example, the company's size, operations or current board composition)."[24] We note that "Nasdaq has structured the proposed rule to provide companies with at least four years from the Approval Date to satisfy Rule 5605(f)(2) so that companies do not incur immediate costs striving to meet the diversity objectives of Rule 5605(f)(2)."[25] We also note that "[t]o reduce costs for companies that do not currently meet the diversity objectives of Rule 5605(f)(2), Nasdaq is proposing to provide listed companies that have not yet met their diversity objectives with free access to a network of board-ready diverse candidates and a tool to support board evaluation, benchmarking and refreshment."[26]

With respect to the Proposal's requirement for disclosure of board level diversity statistics, we agree with Nasdaq that "any burden placed on companies to gather and disclose their board-level diversity statistics is counterbalanced by the benefits that the information will provide to a company's investors."[27]

*Prospect of substantially improving transparency, comparability, reliability and accuracy*

We agree with Nasdaq that "transparency is the bedrock of federal securities laws regarding disclosure, and this sentiment is reflected in the broad-based support for uniform disclosure requirements regarding board diversity . . . ."[28] We also agree that "[t]he heightened investor

---

2019),
https://www.cii.org/Files/July%2010%202019%20%20Letter%20to%20Committee%20on%20Financial%20Services%20.docx%20(final)%20KB.pdf ("In our view, the disclosures . . . that would be required by H.R. 3279 or H.R. 1018 would likely contribute to enhancing public company board consideration of diversity consistent with CII's policies [and] CII believes long-term investors, including our members, will benefit from the long-term shareowner value that can result, in part, from corporations embracing board diversity.").
[22] 85 Fed. Reg. at 80,503.
[23] *Id.* at 80,494.
[24] *Id.* at 80,504.
[25] *Id.* at 80,505.
[26] *Id.* at 80,504.
[27] *Id.*
[28] *Id.* at 80,474.

focus on corporate diversity and inclusion efforts demonstrates that investor confidence is undermined when a company's boardroom is homogenous and when transparency about such efforts is lacking."[29] We also agree that "a listing rule designed to enhance transparency related to board diversity will increase consistency and comparability of information . . . , thereby increasing transparency and decreasing information collection costs."[30]

We share Nasdaq's view that "proposed Rule 5606 addresses many of the current concerns and responds to investors' demands for greater transparency into the diversity characteristics of a company's board composition and by mandating disclosure and curing certain deficiencies that exist within the current SEC disclosure requirements."[31]

More specifically, we note that "[t]o the extent a company chooses not to meet the diversity objectives of Rule 5605(f)(2), . . . the proposal will provide investors with additional transparency through disclosure explaining the company's reasons for not doing so."[32] While we acknowledge that the diversity objectives of Rule 5605(f)(2) are much narrower than the objectives of CII's board diversity policy, we agree with Nasdaq that a narrower definition of "Diverse focused on race, ethnicity, sexual orientation and gender identity will promote the public interest by improving transparency and comparability."[33]

In addition, we agree "that the disclosure required by proposed Rule 5606(a) will remove impediments to shareholders by making available information related to board-level diversity in a standardized manner, thereby enhancing the consistency and comparability of the information and helping to better protect investors."[34] More specifically, "the format of the [Proposal's] Diversity Matrix and the information that it will provide offers greater transparency into a company's board composition and will enable the data to be easily aggregated across issuers."[35] Moreover, the Proposal would improve "transparency . . .  by requiring all listed companies to . . . disclose [the required information] . . . on their website or in their proxy statement under Rule 5606."[36]

**** 

---

[29] *Id.*
[30] *Id.* at 80,475 (emphasis omitted).
[31] *Id.* at 80,494.
[32] *Id.* at 80,475.
[33] *Id.* at 80,493.
[34] *Id.* at 80,495.
[35] *Id.* at 80,488.
[36] *Id.* at 80,485.

Thank you for allowing CII the opportunity to comment on the Proposal. We hope our letter is helpful to the SEC staff in their review of the Proposal. As always, we welcome the opportunity to discuss our perspectives on board diversity and other corporate governance issues at your convenience.

Sincerely,

Jeffrey P. Mahoney
General Counsel

**TAB 24:**

Letter from William J. Stromberg, President & CEO, & David Oestreicher, General Counsel & Corporate Secretary, T. Rowe Price, File No. SR-NASDAQ-2020-081 (Dec. 29, 2020)

 

29 December 2020

via SEC Rulemaking Portal

Vanessa Countryman, Secretary
Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549-0609

RE: SR-2020-081

Dear Secretary Countryman:

This letter provides comments of T. Rowe Price Group, Inc. and its affiliates (collectively "T. Rowe Price") in response to the Proposed Rule Change to Adopt Listing Rules Related to Board Diversity. We appreciate the opportunity to provide our perspective on the proposal, which for the reasons outlined below, we support.

We offer two perspectives in evaluating the proposal.  Not only is T. Rowe Price Group, Inc. a Nasdaq-listed publicly traded company, but our business as a fiduciary asset management company is to evaluate companies and manage portfolios on behalf of our global client base.

Based on our experience as a corporate issuer, we strongly believe that a diverse board is better equipped to analyze problems and reach sound decisions than a board lacking diversity. With intentional design, over the years the composition of our board has come to better reflect the diversity of the stakeholders the company serves: our clients, employees, communities and investors. We believe this is a core strength of the T. Rowe Price Group, Inc. board.

As a Nasdaq-listed issuer, T. Rowe Price supports the proposal. We recognize that not all companies have achieved the level of board diversity that the proposal seeks to encourage. We understand there are multiple factors that have resulted in the slow pace of change across many segments of the market. The Nasdaq proposal accommodates different approaches by giving companies adequate time to phase in changes to their boards and applying a comply-or-explain framework to the entire exercise. We believe this is a reasonable and thoughtful approach, which encourages companies to increase board diversity without mandating a one-size-fits-all approach.[1]

---

[1] For example, we believe the proposal's "comply or explain" provision would provide flexibility for a company with a smaller-sized board to incorporate diverse board membership differently than one with a larger-sized board.

 

We also support the proposal from our perspective as a large, global asset manager. The composition of a company's board and management is an important element of our fundamental analysis, and we see diversity and representation as key investment considerations. For example, a lack of board diversity along gender or racial lines has been a component of the T. Rowe Price Proxy Voting Guidelines since 2017. We look for greater board diversity because we have found that insufficient board diversity increases the risk that a company will become less competitive over time, which will impact its performance. We support the Nasdaq proposal because it fosters greater board diversity, which we believe will lead to better decision-making at the companies in which we invest. In addition, we support the proposal because it would improve our ability, as an asset manager, to obtain and analyze board diversity data in a standardized format.

We note that we invest in regions around the world, including a number of markets where some element of board diversity is mandated, either through listing standards, hard quotas, or "soft law" such as governance codes. Our experience is that improvements in board diversity proceed slowly in markets where no mandates exist. Progress is notably faster in regions where the expectations are clear to all market participants.

In the U.S., institutional investors and proxy advisors who place a high importance on a diverse board composition have adopted their own policies and expectations. For example, it has become common for investors to oppose directors over a perceived lack of board diversity. However, because there is no unified standard or practice in the U.S. market, there is a confusing mix of differing and changing standards for issuers. An exchange-level standard for board diversity that recognizes flexibility in approach, like the Nasdaq proposal, would be an improvement.

For all these reasons, we believe the Nasdaq proposal strikes the right balance for the U.S. market. The proposal does not constitute a quota; it is an aspirational target with a manageable phase-in period within a comply-or-explain framework. Having observed the very slow pace of change in U.S. board diversity over many years, we believe such a target is necessary, appropriate and beneficial for investors and would have a real impact in fostering stronger, more diverse corporate boards.

In summary, T. Rowe Price supports the Nasdaq proposal from both sides of our business - as a listed company and as an investment adviser - and we strongly encourage the Securities and Exchange Commission to approve the proposal.

Sincerely,

William J. Stromberg
*President & CEO*

David Oestreicher
*General Counsel & Corporate Secretary*

**TAB 25:**

Letter from John W. Rogers, Jr., Chairman and Co-CEO, & Mellody Hobson, President and Co-CEO, Ariel Investments, LLC, File No. SR-NASDAQ-2020-081 (Dec. 29, 2020)



December 29, 2020

Vanessa A. Countryman
Secretary
Securities and Exchange Commission
100 F Street NE
Washington, DC 20549-0609

RE: Nasdaq's Proposed Listing Requirements for Board Diversity; File Number SR-NASDAQ-2020-081.

Dear Secretary Countryman:

We are writing to comment on Nasdaq's proposed listing requirements for board diversity. As the first minority-owned asset management firm in the United States with a nearly 38-year history, we have seen overwhelming evidence that diverse leadership drives better shareholder outcomes. Companies that cultivate inclusive cultures are not only more likely to attract the best talent – they are also able to broaden their sales and marketing opportunities and drive revenue. Accordingly, a 2018 McKinsey study found that companies with the most ethnically and culturally diverse boards were 43% more likely to experience higher profits.

Diversity has increasingly become a material issue that many investors consider as fiduciaries. At Ariel, we seek comparable comprehensive data on material ESG issues, including board composition. This information helps us make informed investment decisions on behalf of our institutional and individual clients. As such, we believe it to be in the best interest of shareholders to require diversity disclosures.

As seasoned public company board directors, we have experienced first-hand how a business can benefit from a myriad of perspectives at the highest ranks. Furthermore, in an ever-connected world, employees, customers and the general public are holding all corporations accountable for diversity issues. Public companies seeking to be world-class, 21st century organizations, must ultimately show real, measurable results when it comes to fostering an inclusive environment.

There are some misconceptions about Nasdaq's proposal.

First, we do not believe Nasdaq's disclosure requirements will be overly burdensome or coercive. The proposal provides flexibility for companies to explain why they do not meet the minimum objective of two diverse directors. Nasdaq has no plans to judge the merits of a company's explanation. A disclosure would enable shareholders to decide if this information is meaningful to their investment decisions.

Second, finding qualified diverse directors is not unduly difficult. In a country with over 330 million people, there are plenty of qualified candidates. As respected, long-term shareholders, we are proud to say that over 50 of Ariel's portfolio companies have added diverse directors. We believe these actions were in part due to our questioning and encouragement. Also, the growing number of attendees at Ariel's annual Black Corporate Directors Conference is a testament to a business community that is rich with untapped Black and brown board talent.

Third, the proposal is not radical. In fact, there is a rising chorus for board diversity and inclusion among financial institutions, state policy makers, and other market participants. Our fellow investors, including Goldman Sachs Asset Management, State Street, Vanguard, and many others, have stepped up their advocacy on this topic. States such as California and Illinois been pushing this agenda as well. In 2022, proxy advisors like ISS and Glass Lewis plan to consider diversity when making board recommendations.

This is the right approach. What gets measured, gets done. Companies set targets for many other important business initiatives. In the annual reports that we read regularly, diversity is often stated as a "strategic imperative." It is impossible to measure progress without data. As such, when it comes to board diversity disclosures, clarity and uniformity are needed. Nasdaq's proposal provides clear guidance on reporting standardized, aggregated, board-level diversity data, while allowing directors to voluntarily self-identify. Nasdaq's proposed definition of diversity will improve transparency and comparability of disclosures across companies—while a broader definition would maintain the status quo of inconsistent, incompatible data.

We acknowledge there may be reasons why a company does not meet Nasdaq's minimum objective. For example, they may focus on diversity and inclusion at the executive level or company-wide, rather than the board level. Or, a company might consider diversity more broadly than Nasdaq's definition. Nasdaq's proposed disclosure-based approach, as well as the two-year timeframe to satisfy the objective, is reasonable in our view. Since there is a six-month cure period for companies who do not satisfy the rule within the proposed timeframe, there is plenty of time to comply, rather than be immediately delisted.

Nasdaq's proposal will enhance corporate governance, board decision-making, investor protections, confidence, and ultimately shareholder returns. Not to mention, this approach will make board rooms more diverse when it comes to race, ethnicity, sexual orientation and gender identity.

Thank you, in advance, for your consideration.

Sincerely,

John W. Rogers, Jr.
Chairman and Co-CEO
Ariel Investments, LLC

Mellody Hobson
President and Co-CEO
Ariel Investments, LLC

**TAB 26:**

Letter from Publius Oeconomicis, File No. SR-NASDAQ-2020-081 (Dec. 28, 2020)



Publius Oeconomicis

United States of America
Publius_O@protonmail.com

December 28, 2020

Vanessa Countryman
Secretary
Securities and Exchange Commission,
100 F Street, NE
Washington, DC 20549-1090

Via e-mail: rule-comments@sec.gov

**Re:     The Nasdaq Stock Market LLC; Notice of Filing of Proposed Rule Change to Adopt
Listing Rules Related to Board Diversity
File Number SR-NASDAQ-2020-081 (the "Proposal")**

Ms. Countryman:

I appreciate the opportunity to comment on the Nasdaq Stock Market LLC ("**NASDAQ**")'s
recent proposed rule change to adopt listing rules relating to board diversity (the "**Proposed
Rule**"). I am a United States citizen, investor and a managing director of a well-known, large,
global financial services company.[1] I strongly oppose the Proposed Rule and urge the Securities
and Exchange Commission ("**SEC**" or the "**Commission**") to deny NASDAQ's application.

While I personally share the NASDAQ's goal of ensuring that women and underrepresented
minorities are provided with equal opportunities to join and participate on corporate boards, I
strongly believe the Proposed Rule will do more harm than good; both to the cause of diversity
and to the markets as a whole. As discussed in more detail below, I am concerned that the
Proposed Rule is unnecessary, outside of the authority of the NASDAQ, subject to legitimate
Constitutional challenges and ultimately a bad social idea. I am further concerned tat adopting
the Proposed Rule will create litigation and disputes that will distract companies and regulators
from taking actions that could have real and lasting impacts with respect to corporate diversity.

**Background**

The NASDAQ Proposed Rule is comprised of two primary elements. First, amendments to Rule
5605 would adopt new paragraph (f) imposing a new diversity requirement. Under proposed
rule 5605(f), issuers listed on the NASDAQ would be required to appoint one director who self-
identifies as female and at least one director who self-identifies as one of the acceptable racial or

---

[1]     I write anonymously because I fear that my opposition to the Proposed Rule will adversely impact my
career. In US financial services firms, especially investment advisory arms, the promotion of diversity and
environmentally, social and governance ("**ESG**") goals have become an undeniable religion. Those who
do not agree that we should use capital markets to impose a social or political agenda are quietly excluded
from key meetings, committees and groups or suddenly find the need to pursue "other opportunities."

Securities and Exchange Commission
December 28, 2020
Page 2

sexual classifications (the "**Diversity Mandate**").[2]  Alternatively, issuers may explain non-compliance with the Diversity Mandate through disclosure.  The second element is the adoption of new Rule 5606, which requires NASDAQ listed companies to provide statistical information on the self-identified racial, gender and sexual-orientation of the members of the boards in a uniform format.

## The Proposed Rule is Unnecessary

### *Diversity is Already Coming to Corporate Boards*

In its application, the NASDAQ asserts that "the public interest would best be served by an additional regulatory impetus for companies to embrace meaningful and multi-dimensional diversification of their boards,"[3] while at the same time acknowledging the positive trends towards increasing corporate board diversity. The NASDAQ notes that "some companies have made laudable progress in diversifying their boardrooms."[4]  Later in the release, NASDAQ more honestly concedes that "a supermajority [not just 'some'] of listed companies have made notable strides to improve gender diversity in the boardroom … [and] listed companies are diligently working to add directors with other diverse attributes."[5]

Thus, NASDAQ concedes that the goal of their regulation, i.e., "meaningful and multi-dimensional diversification of their boards" is already occurring.  As of May 31, 2019, the percentage of women joining boards reached a record high with 45% of new board seats filled by women (with 19% of board seats overall held by women).[6]  Ethnic diversity reached a record high as well, with 21.1% of new directors in S&P500 companies being ethnically diverse (versus only 12.4% in 2009).[7]  This process is accelerating in 2020, with 59% of board appointments in 2020 going to women and minority men, resulting in all constituents in the S&P500 having at least one woman on their boards of directors.[8]

These numbers show that boards are already moving to become more diverse without the "additional regulatory impetus."  In other words, these proposed listing standards are unnecessary to achieve the desired goal of promoting diversity on boards – the market is already doing this.  And the market is doing this for the right reasons: because public issuers recognize

---

[2]     The acceptable categories are: "Black or African American, Hispanic or Latinx, Asian, Native American or Alaska Native, Native Hawaiian or Pacific Islander, two or more races or ethnicities, or as LGBTQ+". Self-Regulatory Organizations; The Nasdaq Stock Market LLC; Notice of Filing of Proposed Rule Change to Adopt Listing Rules Related to Board Diversity, SEC Rel. No 34-90574 (Dec. 4, 2020) (the "**Rule Proposal**") at 1.

[3]     Rule Proposal at 4.

[4]     Id.

[5]     Id. At 7 and 33.

[6]     Papadopoulos, Kosmas.  U.S. Board Diversity Trends in 2019.  ISS Analytics Whitepaper, May 31, 2019. ("**ISS Whitepaper**")

[7]     Id.

[8]     Connely, Courtney.  "For the first time in over 20 years, all S&P 500 boards have at least one woman", CNBC.com.  Dec. 15, 2020 (available at: https://www.cnbc.com/2020/12/15/all-sp-500-boards-have-at-least-1-woman-first-time-in-over-20-years.html)

Securities and Exchange Commission
December 28, 2020
Page 3

that women and underrepresented individuals should be considered for seats on corporate boards because they add value, not because they are necessary to meet a regulatory quota.

*The Appearance of Investor Demand is Likely Overstated … and Irrelevant*

The NASDAQ also claims that it is responding to investor demand, stating that "investors are calling in greater numbers for diversification in boardrooms."[9] This perceived investor demand for diverse boardrooms and information on board diversity is most likely overstated. As an (anonymous) insider in a large, global financial services firm, I can report that diversity and other social goals are priorities only for the marketing and sales departments, or within the dedicated "sustainability" or "corporate engagement" groups. The individuals who actually make investment decisions are not full-throated supporters of these initiatives, are not sold on the body of academic literature and, much to the dismay of these marketing, sales and sustainability teams, do not make investment decisions informed by factors such as the gender composition of a board. In fact, special coaching is often given to professionals prior to meeting with clients to ensure they can describe the services provided to these clients in terms of ESG and diversity factors that are not as wholly embedded in these products. To these men and women, who are white and non-white, these factors simply do not matter to the generation of investment performance.

But, individuals at financial services firms are afraid to voice their opposition to the diversity and ESG juggernaut. I can say from experience that the marketing and sustainability teams at these firms are frustrated with the lack of practical uptake of their zeal to, in the words of one of my colleagues (slightly modified to preserve anonymity) "use the power of the capital markets to effect social change," and seek to find every way to "move the needle" in their direction. Those in my firm and other firms who dare raise questions about the orthodoxy of diversity do so at great personal peril (hence this anonymous letter). In the words of one of my investor colleagues (paraphrased to preserve anonymity), "I'll 'consider' diversity and ESG factors when making investment decisions because I'm supposed to, but I'm not going to change an investment decision based on those factors. I'm also not going to express that view here, because it would be very bad for my career."

In short, the investors who are calling in greater numbers for diversification are probably not representative of the views of those who are actually doing the investing. Those investors would more likely agree with the view, as discussed below, that the racial and gender composition of a board is irrelevant to an issuer's performance.

Further, even if investors are demanding more disclosure and more diverse boards, the NASDAQ should not be proposing new listing standards in response to investor demand for better corporate governance and performance. These demands are being made by investors to issuers. If investors require diversified boardrooms as a condition to investing, then issuers who do not deliver on that demand will see that reflected in reduced demand for their securities as these investors put their money in companies that do meet their demands. Investors also demand

---

[9]    Rule Proposal at 8.

Securities and Exchange Commission
December 28, 2020
Page 4

that issuers make more money while reducing expenses, yet it is patently obvious that the NASDAQ should not respond to this demand through its rulemaking authority.

**The Proposed Rule is Outside the Authority of NASDAQ**

*The Exchange Act Permits Exchanges to Adopt Rules only in Furtherance of the Goals of the Exchange Act*

Even if the Proposed Rule was necessary to promote diversity in the boardroom, NASDAQ lacks the regulatory authority to adopt it.  As a national securities exchange, NASDAQ's rules must comply with the requirements of Section 6(b)(5) of the Securities Exchange Act of 1934, as amended (the "**Exchange Act**").  This section requires that an exchange's rules be, in relevant part, "designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, … to remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect investors and the public interest."[10]  In addition, the rules may not be "designed to permit unfair discrimination between customers, issuers, brokers, or dealers" or "regulate … matters not related to the purposes of this chapter or the administration of the exchange."[11]

Pausing on that last prohibition for a moment, Section 2 of the Exchange Act sets forth the "purposes of [the] chapter" as, again in relevant part, to: "require appropriate reports, to remove impediments to and perfect the mechanisms of a national market system for securities and a national system for the clearance and settlement of securities transactions and the safeguarding of securities and funds related thereto, and to impose requirements necessary to make such regulation and control reasonably complete and effective, in order to protect interstate commerce, the national credit, the Federal taxing power, to protect and make more effective the national banking system and Federal Reserve System."

*The Proposed Rule is not Permitted under the Exchange Act*

Conspicuously absent from the stated purposes of the Exchange Act is anything related to imposing "regulatory impetus for companies to embrace meaningful and multi-dimensional diversification of their boards."  Thus Section 6(b)(5) does not provide the NASDAQ or the SEC with any authority to impose the Proposed Rule.

The NASDAQ, aware of this deficiency, seeks to recharacterize their stated goal within their own rule proposal.  Contradicting the original statement of purpose, the Proposed Rule is later described as an effort designed to "remove impediments to and perfect the mechanism of a free and open market and a national market system, to prevent fraudulent and manipulative acts and practices, and to protect investors and the public interest."[12]  This thesis is based on academic research that seeks to conclude that diverse boards enhance the quality of a company's financial reporting, internal controls, public disclosures and management oversight.  In addition, these

---

10    Section 6(b)(5) of the Exchange Act
11    Id.
12    See, e.g., Rule Proposal at 6.

studies are intended to show that diverse boards engage in less fraud.  As discussed in more detail below, these studies fail to actually demonstrate any causal nexus between board diveristy and corporate performance, much less any of the specific regulatory goals the NASDAQ purports to meet with the Proposed Rule.

*The Academic Research on the Benefits of Diversity is Inconclusive*

The NASDAQ lays out a body of academic and consultant research that tends to show a correlation between corporate performance and board diversity.  These studies, in the NASDAQ's view, show that diverse boards improve corporate performance on a number of factors, including transparency of disclosure and fraud reduction.  If this view is in fact correct then the corollary view must also be correct, i.e., that white, cisgendered males, when unfettered by the presence of diverse board members, will engage in poor decision-making, mislead investors through non-transparent financial reporting and ultimately engage in securities fraud. If this is true, then surely the protection of investor demands not only should the NASDAQ and the SEC adopt rules mandating diverse boards, but they should also adopt rule that would prohibited these incompetent and potentially criminal people from obtaining board representation altogether.

However, the NASDAQ's research does not actually support this conclusion.  The studies cited by the NASDAQ in the Rule Proposal show positive *correlations* between diversity and positive corporate performance – not causation.  For example, the NASDAQ cites the following studies or research:

> a 2020 study by the Carlyle Group that shows that "companies with diverse boards [defined as Black, female, Hispanic or Asian] generate earnings growth that's five times faster, on average, with each diverse board member associated with a 5% increase in annualized earnings growth.";[13]

> In a 2019 report, FCLT Global found that "the most diverse boards [diversity here is based on age and gender, not race as implied in the Rule Proposal] added 3.3 percentage points to [return on invested capital], as compared to their least diverse peers (bottom 20 percent)";[14]

> Reaching back to 2003, an academic study by Carter, Simkins and Simpson found that "After controlling for size, industry, and other corporate governance measures, we find statistically significant positive relationships between the presence of women or

---

[13]     See Jason M. Thomas and Megan Starr, The Carlyle Group, Global Insights: From Impact Investing to Investing for Impact 5 (Feb. 24, 2020), available at: https://www.carlyle.com/sites/default/files/2020-02/From%20Impact%20Investing%20to%20Investing%20for%20Impact_022420.pdf (analyzing Carlyle U.S. portfolio company data, February 2020)

[14]     FCLTGlobal, The Long-term Habits of a Highly Effective Corporate Board (March 2019), available at: https://www.fcltglobal.org/wp-content/uploads/long-termhabits-of-highly-effective-corporate-boards.pdf (analyzing 2017 MSCI ACWI constituents from 2010 to 2017 using Bloomberg data).

Securities and Exchange Commission
December 28, 2020
Page 6

minorities [defined as African Americans, Asians, and Hispanics] on the board and firm value, as measured by Tobin's Q."[15]

The NASDAQ includes additional examples of research and studies that also show a positive correlation; **however, there is no evidence in any study cited by NASDAQ or any that I could find independently, that showed any causal link between board diversity and performance**.  As of the date of this letter, the comment file for the Proposed Rule is similarly lacking.[16]  If board diversity, on its own, contributed to financial returns, then a simple study of corporate performance of companies who add diverse members to the boards should show statistically significant improvements to company performance resulting from the addition of such board members.  The absence of this data or any research showing a causal nexus between board racial and gender diversity and corporate performance is glaring, especially considering how relatively simple such data would be to obtain.

The NASDAQ admits that the research is mixed.[17]  Contrary to the research cited by the NASDAQ, other studies have not even found the same positive correlation.  For example, recent meta-studies that have reviewed the evidence and research on the benefits of gender diversity and have found no positive correlation.[18]  Providing a possible explanation for this lack of correlation, Katherine Klein, a management professor at the Wharton School notes, "the women named to corporate boards may not in fact differ very much in their values, experiences, and knowledge from the men who already serve on these boards."[19]

Further, there is no research at all extending the above cited research (each of which uses varying definitions of "diversity")[20] to LBGTQ+ board representation, one of the Underrepresented Minorities as defined in the Proposed Rule.  Here, the lack of research is not problematic for the

---

[15]    David A. Carter et al., Corporate Governance, Board Diversity, and Firm Value. 38(1) Fin. Rev. 33 (2003).

[16]    The comment letters (to date) that support the Proposed Rule do so citing the moral purposes of the rule (e.g., "it's the right thing to do"), support for the axiomatic benefits of "diversity" (e.g., "diverse perspectives are good") or generic support for disclosure of diversity characteristics.  None have provided any support for the Diversity Mandate in particular beyond citing the same lacking research as the NASDAQ.

[17]    Rule Proposal at 19.  Here the NASDAQ asserts that the "overwhelming majority of studies … present a compelling case," but notes that "some other studies on gender diversity are mixed."  Without the NASDAQ providing numbers, I dispute the assertion that the "overwhelming majority of studies" support the conclusion that diversity (and diversity alone) yields better management.

[18]    Corinne Post and Kris Byron.  Women on Boards and Firm Financial Performance: A Meta-Analysis. Academy of Management Journa lVol. 58, No. 5 7 Nov 2014 available at: https://doi.org/10.5465/amj.2013.0319;
        Pletzer JL, Nikolova R, Kedzior KK, Voelpel SC (2015) Does gender matter? Female representation on corporate boards and firm financial performance-a meta-analysis. PLoS ONE 10(6): e0130005 available at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4473005/

[19]    Klein, Katherine.  "Does Gender Diversity on Boards Really Boost Company Performance?" Knowledge@Wharton (May 18, 2017).  Available at: https://knowledge.wharton.upenn.edu/article/will-gender-diversity-boards-really-boost-company-performance/ (accessed 12/18/2020).

[20]    The lack of consistency in definitions among the studies further decreases their reliability as indicators of corporate performance.  NASDAQ cited not a single study that utilized the definitions provided in this Proposed Rule.  This alone should render the academic research irrelevant for the purposes of evaluating whether this Proposed Rule is necessary under the federal securities laws.

Securities and Exchange Commission
December 28, 2020
Page 7

NASDAQ, as they are content to establish an appropriate regulatory purpose based only on an unfounded conjecture by an organization whose mission is to increase LBGTQ+ representation on corporate boards.[21]

So, the research underpinning the NASDAQ's claims that board diversity is necessary to meet the permitted purposes for exchange rules under the Exchange Act is sorely lacking. In fact, a more plausible (and less racist / sexist) explanation for the positive correlations shown in the cited studies readily presents itself: Successful and well-run companies are just better able to attract diverse candidates, who are actually in higher demand than white, cisgendered males.[22]

The NASDAQ effectively concedes this point by noting that "at a minimum … the studies support that board diversity does not have adverse effects on company financial performance."[23] While this statement is much more likely to be true, it is insufficient to establish that the Proposed Rule is within the purposes of the Exchange Act, as required under Section 6(b)(5). A rule that imposes a requirement merely because the requirement will not have adverse effects should be dismissed out of hand.

### The Proposed Rule would Not Achieve the Cited Benefits

In addition, the Proposed Rule, as drafted, would not deliver on its goal or providing diversity across corporate boards. It would provide, as suggested, a "regulatory impetus" for issuers to appoint more individuals who self-identify as female or Underrepresented Minorities, but the Diversity Mandate would not uniformly result in diverse board membership. Nothing in the Proposed Rule would require a board with all women or Underrepresented Minorities to seek out white, cisgendered males to join their board or to include an explanation as to why they failed to do so. Implicit in the NASDAQ's proposal is the premise that the white, cisgendered male's perspective should not be welcome in the boardroom – perhaps due to their racial and gender-oriented propensity to defraud investors through inaccurate financial statements.

In addition, the Proposed Rule does fully address diversity because it is incomplete. It does not account for other categorizations that could also increase diversity of a board (e.g., veteran status, disability status, experience in other industries / regions / etc.). By way of example, current board composition also does not reflect the general population in terms of age. In 2017, the average age of a board director was 63, and only 6% of the board seats of S&P500 companies were occupied by individuals under 50, with over half of companies having no such

---

[21]    Quorum, Out Leadership's LGBT+ Board Diversity and Disclosure Guidelines (2019), available at: https://outleadership.com/content/uploads/2019/01/OL-LGBTBoard-Diversity-Guidelines.pdf. ("While the precise reason for the positive correlation between gender diversity and better corporate performance is unknown, many of the reasons that gender diversity is considered beneficial are also applicable to LGBT+ diversity. LGBT+ diversity in the boardroom may create a dynamic that enables better decisionmaking, and it brings to the boardroom the perspective of a community that is a critical component of the company's consumer population and organizational talent.")

[22]    While only anecdotal, I have been personally told several times in connection with multiple board searches that white male executives need not apply.

[23]    Rule Proposal at 21.

Securities and Exchange Commission
December 28, 2020
Page 8

directors.[24]  Using the same rationale as that underpins the NASDAQ's Proposed Rule, PwC conjectured that, "Boards that have added younger directors find that they bring new skills and perspectives," and went on to note that younger directors bring new skills, are more actively connected to the business world in ways older directors are not, and they increase board diversity, because the younger workforce is itself more diverse.[25]  Even the NASDAQ recognized this lack of age diversity in its own article in 2019, noting "[as] corporate boards seek to become more diverse, multiple factors, including gender, race and experience, are considered, yet there is lack of diversity of age in boardrooms with few directors under the age of 50."[26]  Thus, age diversity should also be considered as a relevant factor for improving board performance.

Despite this recognition that younger professionals are underrepresented on corporate boards and would add diverse perspectives that should improve decision-making and therefore corporate performance, the Proposed Rule lacks and requirement to appoint directors of younger age groups or explain why they have not.  This is most likely because, in the words of the Jeff Thomas, Senior Vice President of NASDAQ corporate services, "the more inclusive you try to make your diversity policies, then frankly, sometimes they don't have the same impact."[27]  These omissions however belie the fact that the NASDAQ's goal with the Proposed Rule is not to achieve the benefits of a better functioning board or address anything in the goals of the Exchange Act, but rather to achieve a social equity goal for certain identity groups by establishing a "regulatory impetus".

Further, and as suggested by Professor Klein, the Proposed Rule will not produce actual diversity, but instead will simply require the appointment of people who "self-identify" as women, a designated minority, or gay or transgender, when in reality, these individuals will more likely than not carry with them substantially similar experiences as the white male cisgendered board members they are intended to replace.[28]  They will have been educated in the same handful of schools and come from the same backgrounds as most existing directors.

All of this shows that the NASDAQ's goal with this Proposed Rule is not diversity to improve corporate governance and investor protection or to "remove impediments to and perfect the mechanism of a free and open market and a national market system, to prevent fraudulent and manipulative acts and practices, and to protect investors and the public interest."  Instead, the NASDAQ is seeking to accomplish a social justice cause through the application of racial, gender and sexual orientation quotas to require issuers to add women and underrepresented

---

[24]    PWC White Paper.  "Age Diverisity in the Boardroom" (2018).  Available at: https://www.pwc.com/us/en/services/governance-insights-center/library/younger-directors-bring-boardroom-age-diversity.html

[25]    Id.

[26]    NASDAQ. "Addressing Age Diversity on Corporate Boards. (Jun 5, 2019).  Available at: https://www.nasdaq.com/articles/addressing-age-diversity-corporate-boards-2019-06-05

[27]    Axios podcast.  "Nasdaq exec Jeff Thomas on new diversity rules for listed companies." Dec. 1, 2020.  Available at: https://www.axios.com/nasdaq-jeff-thomas-diversity-rules-listed-companies-cbf245b3-2888-49bf-b8e9-7f3ea388cb0a.html

[28]    See note 13 above.

Securities and Exchange Commission
December 28, 2020
Page 9

minorities to their boards.  While this may be a laudable goal, it is not included within the purposes of the Exchange Act and therefore not an eligible basis for a rule.

**The Diversity Mandate is Subject to Constitutional Challenges**

The Proposed Rule, especially the Diversity Mandate, also likely runs afoul of the United States Constitution.  The U.S Supreme Court has struck down university admissions programs that are based on quotas as being in violation of the Equal Protection Clause of the Fourteenth Amendment.[29]  In that case, the Supreme Court noted that racial distinctions are inherently suspect, and require that the state action be necessary and narrowly tailored to achieve a compelling goal.[30]

Here, the NASDAQ is proposing just such a quota in the form of the Diversity Mandate.  While the Supreme Court's decision was made in the context of university admissions, there is no reason to believe that nomination to corporate boards should be treated differently under the U.S. Constitution.  The NASDAQ has attempted recharacterize the Diversity Mandate as a disclosure requirement, no doubt in order to address this issue, but the structure of the Proposed Rule confirms that the Diversity Mandate is intended as a requirement.  Proposed Section (f)(2)(A) reads:

> "Each Company, except as described below in (B) or (C), **must have**, or explain why it does not have, at least two members of its board of directors who are Diverse…" (emphasis added)[31]

The plain language shows that the Diversity Mandate is indeed a mandate.  Disclosure regulation is not written in terms of "must have".  Instead, disclosure regulation is drafted as "must disclose".  The NASDAQ is aware of this distinction, and utilizes the appropriate language in its proposed new Section 5606, which reads:

> "Each Company **must annually disclose**, to the extent permitted by applicable law, information on each director's voluntary self-identified characteristics in substantially the format below…." (emphasis added)[32]

Thus, the NASDAQ indicates, even in this Rule Proposal, that it is aware of how disclosure requirements work.  When coupled with the discussion in the Rule Proposal regarding the purposes and rationale behind the Proposed Rule, it is inescapable that the NASDAQ intends the Diversity Mandate to be a requirement, or, "a regulatory impetus for companies to embrace meaningful and multi-dimensional diversification of their boards."[33]

---

[29]    <u>Regents of the University of California v. Bakke</u>, 438 US 265 (1978).
[30]    Id.
[31]    Section 5605(f)(2) of the Proposed Rule.
[32]    Proposed Section 5606
[33]    NASDAQ Press Release.  "Nasdaq to Advance Diversity through New Proposed Listing Requirements".  Available at: https://www.nasdaq.com/press-release/nasdaq-to-advance-diversity-through-new-proposed-listing-requirements-2020-12-01

Securities and Exchange Commission
December 28, 2020
Page 10

The "or explain why it does not have" prong of the Diversity Mandate is not sufficient to transform this requirement from a mandate to merely a disclosure requirement. It is clear that the NASDAQ's intention is to, in the words of Nelson Griggs, President of the NASDAQ Stock Exchange, "give[] companies an opportunity to make progress toward increasing representation of women, underrepresented minorities and the LGBTQ+ community on their boards". This "opportunity" is the application of the Diversity Mandate.

Thus, the Diversity Mandate will likely be viewed as a racially-based quota prohibited under the U.S. Constitution. Even if the Diversity Mandate is view differently, the Constitution requires that any laws that discriminate on race or gender be necessary and narrowly tailored to accomplish a compelling state interest that is not merely a "generalized assertion" of policy.[34] While equal opportunity for women and underrepresented minorities to join and participate in corporate boards is indeed a compelling goal, the fact that the markets are already providing that opportunity is evidence enough that the goal is being met and that the proposed state action is not "necessary" to achieve that goal. Further, given that the data and research that NASDAQ provides as supporting the Proposed Rule fails to actually provide that support (given the lack of a causal nexus), the remaining motivation for the rule is a generalized assertion of past wrongs, specifically prohibited under the United States Constitution.[35]

Further, the requirement that board members publicly self-identify their race, gender or sexual orientation raises Constitutional issues with respect to the right to privacy outside the scope of my experience, so I will not attempt to address those here.

**Bad Policy**

In addition to the Proposed Rule being unnecessary, outside the scope of the NASDAQ's authority and most likely prohibited by the United States Constitution, the Proposed Rule is also simply bad policy.

First, the rule pressures directors to self-identify as a group, but makes no account for the director who does not want to publicly announce their gender, race or sexual orientation. Imagine the pressure that this rule would create on a LBGTQ+ director who does not want to announce their sexual orientation publicly to nonetheless make public disclosure of their sexual preference do so in order to satisfy the Diversity Mandate.

Second, the Proposed Rule is bad for women and minorities in that it creates the presumption that they achieved their seat only to meet the requirement, not because their contributions were welcome. Many boards already today limit searches for new directors to minority and women

---

[34]    City of Richmond v. J.A. Croson Company, 488 U.S. 469 (1989) ("To accept Richmond's claim that past societal discrimination alone can serve as the basis for rigid racial preferences would be to open the door to competing claims for "remedial relief" for every disadvantaged group. The dream of a Nation of equal citizens in a society where race is irrelevant to personal opportunity and achievement would be lost in a mosaic of shifting preferences based on inherently unmeasurable claims of past wrongs.")

[35]    See, e.g. the Rule Proposal at 34-35 (asserting that established networks of professionals create barriers to woman being appointed to boards).

Securities and Exchange Commission
December 28, 2020
Page 11

candidates, not because they value the perspectives of these individuals, but rather to "check the box" of diversity.[36]  In my experience with board searches, I can offer that every search starts with a request made in hushed tones that the issuer "of course would prefer a woman or minority."  This is tokenism of the highest order, and otherwise qualified candidates are being excluded from these board searches already, based solely on their race or gender.  The Proposed Rule would only cement this tokenism as a matter of law, stripping away the credibility of board members who are women and people from under-represented groups.

I will also note that the Proposed Rule will do nothing to help the systemic issues relating to race and gender that face our society today.  The individuals who would benefit from appointments to corporate boards are not the individuals who need our attention and assistance.  The pool of potential directors is comprised of people who already have achieved significant measures of success in their careers, and are, frankly, not the subject of discrimination by any reasonable operating company.  The Proposed Rule might make its authors and supporters feel good, but it will do precious little to help the vast majority of underrepresented individuals succeed or help promote the structural changes in our society that actually yield underrepresentation of certain groups in corporate boards.

David Burton and Mike Gonzalez provide the best summary of why this policy is so bad.  Writing for the Washington Examiner, they note:

> Morally, [the Proposed Rule] represents a marked step backward. It is a rejection of the principle that people should be judged on the content of their character and their individual achievement rather than their sex, race, national origin, ethnicity, or sexual preference. It is a rejection of the principle of equal protection under the law (or, in this case, regulations promulgated under law). Legal discrimination or quotas on the basis of race or sex should be a relic of the past.[37]

**Conclusion**

For the reasons set forth above, I urge the SEC to reject the Proposed Rule.  It is not necessary to achieve the goals of the NASDAQ, and it is not in the interests of our markets, our country or the moral fabric of our nation.  The Proposed Rule is not authorized by the relevant enabling statutes in the Exchange Act and is not permissible under the United States Constitution.  More critically, adopting the Proposed Rule will yield years of litigation and dispute that will distract from the goal of improving equal access to opportunities for women and Underrepresented Minorities.

---

[36]    Creary, Ghai, and Scruggs.  "When and Why Diversity Improves Your Board's Performance".  Harvard Business Review, March 27, 2019.  Available at: https://hbr.org/2019/03/when-and-why-diversity-improves-your-boards-performance  ("[Interviewees] raised concerns with what they referred to as "checking the box" initiatives and "tokenism" for the sake of board diversity. One interviewee revealed how she turned down a board position because she felt that the interviewing board members were not able to comment on her expertise — only their desire to have gender diversity on the board.")

[37]    Burton, David R. and Gonzales, Mike.  "Nasdaq's diversity rule is discriminatory and immoral."  Washington Examiner, December 14, 2020.  Available at: https://www.washingtonexaminer.com/opinion/nasdaqs-diversity-rule-is-discriminatory-and-immoral

Securities and Exchange Commission
December 28, 2020
Page 12

Instead of creating a flashpoint with this Proposed Rule that will generate years of protracted litigation and cost millions of dollars, let's instead redirect those resources into early education and community development initiatives where we create real change for an entire generation of people.

In our zeal to correct past wrongs and provide better lives to everyone, let's not lose sight of the overriding goal of full equality for all.  As Dr. Martin Luther King, Jr. said in his iconic speech:

> I have a dream that my four little children will one day live in a nation where they will not be judged by the color of their skin but by the content of their character.[38]

Racial, gender and sexual orientation-based quotas make it impossible to judge people only by the content of their character.  In this way, the Proposed Rule is an anathema to truly becoming a post-racial society, inclusive of everyone.

I urge the SEC not to adopt this Proposed Rule.

Sincerely,

Publius Oeconomicis
(pseudonym)

P.S.:

I do not envy the responsibility that lies on the Commission and its staff in evaluating this Proposed Rule. Race and gender are incredibly sensitive issues that invoke fierce passions, and I urge the Commission and staff (unlike the industry you regulate) to take special efforts to ensure that the individuals deliberating the merits of the Proposed Rule feel safe to express views for or against the Proposed Rule.

---

[38]    King, Martin Luther. "I Have a Dream by Martin Luther King, Jr; August 28, 1963." *The Avalon Project*, Yale Law School, http://avalon.law.yale.edu/20th_century/mlk01.asp

**TAB 27:**

Letter from Alfred P. Poor, CEO, Ideanomics, Inc., File No. SR-NASDAQ-2020-081
(Dec. 28, 2020)

# IDEANOMICS

**December 28, 2020**

**Via E-mail to rule-comments@sec.gov**

**Vanessa Countryman, Secretary**
**Securities and Exchange Commission**
**100 F Street NE**
**Washington, DC 20549-1090**

Dear Ms. Countryman:

**Re:     File No. SR-NASDAQ-2020-081**

Ideanomics, Inc. ("Ideanomics") appreciates the opportunity to submit this letter in response to the Securities and Exchange Commission's ("SEC") request for comments regarding the above-referenced release on The Nasdaq Stock Market LLC's ("Nasdaq") proposal to advance board diversity and enhance transparency of diversity statistics through new proposed listing requirements ("Proposal").

Ideanomics is a Nevada corporation that primarily operates in the United States and Asia through its subsidiaries and variable interest entities ("VIEs"). It has two business segments, the first of which, Ideanomics Capital, is a focused on transactional industries including trading systems and large ticket financing, such as lease financing and mortgages. The second business segment, Mobile Energy Global, or MEG, is focused on the electric vehicle ("EV") industry and is a service provider to large-scale commercial fleet operators looking to migrate their fleet over to zero emission vehicles, including the sale and distribution of zero emission vehicles.

**Nasdaq's Proposed Rules**

Under Rule 5606, Nasdaq proposes to require each listed company, other than Exempt Companies (as defined in the Proposal), to publicly disclose board-level diversity statistics through a board diversity matrix on its website or in its proxy statement.  Under Rule 5605(f), Nasdaq proposes to require each company, other than Smaller Reporting Companies, Foreign Issuers, and Exempt Companies (as defined in the Proposal), to have, or explain why it does not have, at least two "Diverse" directors, including (i) at least one director who self-identifies as female; and (i) at least one director who self-identifies as an Underrepresented Minority, or as LGBTQ+.  Each Smaller Reporting Company and Foreign Issuer could satisfy this requirement by having two Female directors or explaining why it does not. Each company would be provided

# IDEANOMICS

with one year after the SEC approves the Proposal to satisfy Rule 5606, and two to five years to satisfy Rule 5605(f), depending on the company's market tier.

## Ideanomics Supports Nasdaq's Proposal

We offer our support for Nasdaq's Proposal for the following reasons:

Ideanomics has a diverse base of personnel, located in several countries which includes the United States, Ukraine, Malaysia, and China. The diverse regional locations provide for a multi-cultural environment, in which mutual respect of everything from local customs and cultures, through to ethnic and religious differences, is an important dynamic in the company. We are an equal opportunity, progressive, employer that works to foster an inclusive and supportive environment for our staff. While we have made tremendous strides in that regard and consider ourselves to be further developed in our ideologies and practice than many other companies, we are undertaking a review of our management and directors to ensure we remain at the forefront of what we consider to be a deep societal change occurring globally. That change embraces gender equality and promotes support for minorities. One example of this is our majority-owned subsidiary in Malaysia, Treeletrik. Malaysia is a society which has experienced challenges with workplace discrimination against the majority population of Muslim Malay peoples. Treeletrik has promoted the hiring of Malay people over the large contingent of ethnically Indian and Chinese that typically dominate the business environment in that country, including Malay women who have typically experienced cultural resistance to pursuing white collar jobs in addition to the general discrimination.

*General*

- We agree with Nasdaq that diversity enhances decision making. We have seen this play out in our own board deliberations. One striking example is the gender pay gap, which is more exaggerated in Asia than in the Western world. As a result, we have taken positive steps to recruit female senior managers in each of our locations and to ensure their compensation is on par with their male counterparts, putting them at the top of the market pay scale in comparison to their peers. Additionally, as I mentioned in the previous section, is our focus on employing indigenous Malay female employees in our Malaysia operations, as well as ensuring our U.S. staff and management has representation from the LGBTQ+ demographic. We have already seen an effect akin to enlightenment, as a surprising number of staff had never worked with colleagues from different or diverse backgrounds. The positive impact of diversity helps shape and influence our decision-making, as we gain access to different opinions and perspectives from valuable contributors to the business. To further support the influence of our diverse employee base, and to help keep communication channels open, we have implemented a regular internal learning program where employees get to showcase

# IDEANOMICS

what they are working on. This has had the benefit of allowing everyone within the organization to benefit, ranging from fostering connections through to an understanding of how different people think, behave, and contribute to the company. We feel a conviction to elevate this up to the board level so that our diverse employee base feels represented by the officers and directors of the company.

*Disclosure*

- Our investors are increasingly focused on diversity. We look forward to using Nasdaq's board matrix to present board-level diversity data in a manner consistent with our peers. Many institutional investors are adopting ESG standards as the basis for their investing decisions and are indicating that they will not consider investments into companies which do not exhibit compliance with ESG standards. This is causing confusion, as we receive varying and competing examples of frameworks which we are expected to adhere to. Such frameworks are attempting to fill the void created by a lack of standards at the listing authority and/or regulatory level. With such standards available, it would be mutually beneficial for both the investor community and the company as there would be a consistent and uniform way to evaluate and interpret a company's performance on diversity.

- We appreciate that Nasdaq has structured its board matrix to allow directors to anonymously identify with diverse attributes or opt out of disclosing anything at all. We believe this is a thoughtful way to respect each director's personal decision to identify as diverse. At this time, we believe that society in general has not developed to the point of acceptance of diversity which would encourage someone sufficiently to openly identify, for example, as LGBTQ+ without the risk that they may be targeted by people with offensive opinions based on bigotry from a complex spectrum of causes including religious beliefs, ideologies, and baseless claims that these are optional lifestyle choices. For this reason, we consider anonymity and discretion to be of paramount importance.

- In our experience, directors are comfortable reporting, and even proud of, their background, as they are already required by securities laws to disclose certain other personal information including age and compensation. Currently, our directors and officers are selected based on a blend of their perspectives, relevant experience, skill set and background. Each was recruited for their suitability to the role, as opposed to their ethnicity or gender. That said, there is a need to expand the candidate standards to ensure diversity as the board at Ideanomics is consistent with boardrooms throughout the world in that is comprised only of men. It is important that U.S. companies step forward to embrace diversity through the organization, including board level, such that they serve as flag bearers for change and inclusion. This can have an important global impact, particularly if, in the future, U.S. companies begin to select business partners based on their adoption and support of similar standards.

# IDEANOMICS

*Minimum Diverse Director Goal*

- We already consider diversity in our director selection process, so this does not represent a significant change. We see this as an incremental step that reflects the growing consensus that diversity is good for business. We believe that broader diversity leads to increased perspective in both development and execution of business planning and has the potential to help improve everything from identifying market opportunities, through to improved decision-making, improved risk management, and even financial performance.

- While we currently do not meet Nasdaq's diversity goal, we believe it provides a reasonable baseline for companies to strive towards. We appreciate that Nasdaq proposes to assist companies with the search for candidates through free access to Equilar's Diverse Director Network. We believe that Nasdaq's phased approach provides us with sufficient time to attract, screen, and recruit suitable applicants and we base this on the diversity progress achieved in our employee base. Furthermore, we believe the option to explain our efforts under rule 5605(f) provides the company with sufficient flexibility to continue the search for candidates if we are unable to attract the diversity within a reasonable period of two to five years.

*Definition of Diversity*

- We believe it is appropriate for Nasdaq to base its definition of diversity on the EEO-1 reporting categories. We are already familiar with these categories and do not find this disclosure burdensome. We agree that Nasdaq should include additional categories which are not currently covered in the EEO-1 report, such as LGBTQ+, and other race-based categories such as North African, Middle Eastern, and Central Asian as we believe these foster a more transparent approach. Furthermore, we would like to see the Nasdaq expand the definition to ensure that companies such as Ideanomics, with meaningful operations in other countries, do not simply use the availability of candidates in those countries to fill a director of officer role when the people within those countries could be considered a minority in the U.S. For example, for companies with operations in large population countries such as China or India we feel it would be against the spirit of the diversity goals of the Nasdaq to designate someone who is ethnically a minority in the U.S., but who would otherwise not qualify were the same standards in place in their country of origin. We feel this is not embracing diversity but rather compounding the issue and exporting the type of board composition this proposed framework is intended to move away from. Furthermore, we believe the categories might benefit from being expanded to include qualified candidate from demographics such as the disabled, veterans of our armed forces, and others who

# IDEANOMICS

otherwise contribute meaningfully to society but are not typically well-represented at board level.

In conclusion, Ideanomics reiterates our support for Nasdaq's proposal and commends the proactive efforts of its leadership in spearheading a disclosure-based, business-driven approach.  We appreciate this opportunity to provide feedback on the proposal to the SEC and we remain hopeful that you will give it due consideration for adoption.


Thank you for considering our views on this important topic.


**Sincerely,**

**Alfred P. Poor**
**Chief Executive Officer**
**Ideanomics, Inc.**

**TAB 28:**

*Self-Regulatory Organizations; The Nasdaq Stock Market LLC; Notice of Filing of Proposed Rule Change To Adopt Listing Rules Related to Board Diversity*, 85 Fed. Reg. 80,472 (Dec. 11, 2020)

## SECURITIES AND EXCHANGE COMMISSION

**[Release No. 34–90574; File No. SR–NASDAQ–2020–081]**

**Self-Regulatory Organizations; The Nasdaq Stock Market LLC; Notice of Filing of Proposed Rule Change To Adopt Listing Rules Related to Board Diversity**

December 4, 2020.

Pursuant to Section 19(b)(1) of the Securities Exchange Act of 1934 ("Act"),[1] and Rule 19b–4 thereunder,[2] notice is hereby given that on December 1, 2020, The Nasdaq Stock Market LLC ("Nasdaq" or "Exchange") filed with the Securities and Exchange Commission ("SEC" or "Commission") the proposed rule change as described in Items I and II below, which Items have been prepared by the Exchange. The Commission is publishing this notice to solicit comments on the proposed rule change from interested persons.

### I. Self-Regulatory Organization's Statement of the Terms of Substance of the Proposed Rule Change

The Exchange proposes to adopt listing rules related to board diversity, as described in more detail below:

(i) To adopt Rule 5605(f) (Diverse Board Representation), which would require Nasdaq-listed companies, subject to certain exceptions, (A) to have at least one director who self-identifies as a female, and (B) to have at least one director who self-identifies as Black or African American, Hispanic or Latinx, Asian, Native American or Alaska Native, Native Hawaiian or Pacific Islander, two or more races or ethnicities, or as LGBTQ+, or (C) to explain why the company does not have at least two directors on its board who self-identify in the categories listed above;

(ii) to adopt Rule 5606 (Board Diversity Disclosure), which would require Nasdaq-listed companies, subject to certain exceptions, to provide statistical information in a proposed uniform format on the company's board of directors related to a director's self-identified gender, race, and self-identification as LGBTQ+; and

(iii) to update Rule 5615 and IM–5615–3 (Foreign Private Issuers) and Rule 5810(c) (Types of Deficiencies and Notifications) to incorporate references to proposed Rule 5605(f) and Rule 5606; and

(iv) to make certain other non-substantive conforming changes.

The text of the proposed rule change is available on the Exchange's website at *https://listingcenter.nasdaq.com/rulebook/nasdaq/rules,* at the principal office of the Exchange, and at the Commission's Public Reference Room.

### II. Self-Regulatory Organization's Statement of the Purpose of, and Statutory Basis for, the Proposed Rule Change

In its filing with the Commission, the Exchange included statements concerning the purpose of and basis for the proposed rule change and discussed any comments it received on the proposed rule change. The text of these statements may be examined at the places specified in Item IV below. The Exchange has prepared summaries, set forth in sections A, B, and C below, of the most significant aspects of such statements.

### A. Self-Regulatory Organization's Statement of the Purpose of, and Statutory Basis for, the Proposed Rule Change

#### 1. Purpose

I. The Diversity Imperative for Corporate Boards

*Over the past year, the social justice movement has brought heightened attention to the commitment of public companies to diversity and inclusion.* Controversies arising from corporate culture and human capital management challenges, as well as technology-driven changes to the business landscape, already underscored the need for enhanced board diversity—diversity in the boardroom is good corporate governance. The benefits to stakeholders of increased diversity are becoming more apparent and include an increased variety of fresh perspectives, improved decision making and oversight, and strengthened internal controls. Nasdaq believes that the heightened focus on corporate board diversity by companies,[3] investors,[4] corporate

governance organizations,[5] and legislators[6] demonstrates that investor confidence is enhanced when boardrooms are comprised of more than one demographic group. Nasdaq has also observed recent calls from SEC commissioners[7] and investors[8] for

---

in which they operate by including directors drawn from racial and ethnic minority groups").

[5] *See* International Corporate Governance Network, *ICGN Guidance on Diversity on Boards* 5 (2016), available at: *https://www.icgn.org/sites/default/files/ICGN%20Guidance%20on%20 Diversity%20on%20Boards%20-%20Final.pdf* ("The ICGN believes that diversity is a core attribute of a well-functioning board which supports greater long-term value for shareholders and companies.").

[6] *See, e.g.,* John J. Cannon et al., *Sherman & Sterling LLP, Washington State Becomes Next to Mandate Gender Diversity on Boards* (May 28, 2020), available at: *https://www.shearman.com/perspectives/2020/05/washington-state-becomes-next-to-mandate-gender-diversity-on-boards;* Cal. S.B. 826 (Sept. 30, 2018); Cal. A.B. 979 (Sept. 30, 2020) (California legislation requiring companies headquartered in the state to have at least one director who self-identifies as a Female and one from an Underrepresented Community).

[7] *See* Commissioner Allison Herren Lee, *Regulation S–K and ESG Disclosures: An Unsustainable Silence* (Aug. 26, 2020), available at: *https://www.sec.gov/news/public-statement/lee-regulation-s-k-2020-08-26#_ftnref15* ("There is ever-growing recognition of the importance of diversity from all types of investors . . . [a]nd large numbers of commenters on this [SEC] rule proposal emphasized the need for specific diversity disclosure requirements."); *see also* Commissioner Caroline Crenshaw, *Statement on the "Modernization" of Regulation S–K Items 101, 103, and 105* (August 26, 2020), available at: *https://www.sec.gov/news/public-statement/crenshaw-statement-modernization-regulation-s-k* ("As Commissioner Lee noted in her statement, the final [SEC] rule is silent on diversity, an issue that is extremely important to investors and to the national conversation. The failure to grapple with these issues is, quite simply, a failure to modernize."); Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), available at: *https://www.sec.gov/news/speech/chair-white-icgn-speech.html* ("Companies' disclosures on board diversity in reporting under our current requirements have generally been vague and have changed little since the rule was adopted . . . Our lens of board diversity disclosure needs to be re-focused in order to better serve and inform investors.").

[8] *See* Vanguard, *Investment Stewardship 2019 Annual Report* (2019), available at: *https://about.vanguard.com/investment-stewardship/perspectives-and-commentary/2019_investment_stewardship_annual_report.pdf* ("We want companies to disclose the diversity makeup of their boards on dimensions such as gender, age, race, ethnicity, and national origin, at least on an aggregate basis."); *see also* State Street Global Advisors, *Diversity Strategy, Goals & Disclosure: Our Expectations for Public Companies* (Aug. 27, 2020) *https://www.ssga.com/us/en/individual/etfs/insights/diversity-strategy-goals-disclosure-our-expectations-for-public-companies* (announcing expectation that State Street's portfolio companies (including US companies "and, to the greatest extent possible, non-US companies") provide board level "[d]iversity characteristics, including racial and ethnic makeup, of the board of directors").

---

[3] *See* Deloitte and the Society for Corporate Governance, *Board Practices Quarterly: Diversity, equity, and inclusion* (Sept. 2020), available at: *https://www2.deloitte.com/us/en/pages/center-for-board-effectiveness/articles/diversity-equity-and-inclusion.html* (finding, in a survey of over 200 companies, that "most companies and/or their boards have taken, or intend to take, actions in response to recent events surrounding racial inequality and inequity; 71% of public companies and 65% of private companies answered this question affirmatively").

[4] *See* ISS Governance, *2020 Global Benchmark Policy Survey, Summary of Results* 6 (Sept. 24, 2020), available at: *https://www.issgovernance.com/wp-content/uploads/publications/2020-iss-policy-survey-results-report-1.pdf* (finding that "a significant majority of investors (61 percent) indicated that boards should aim to reflect the company's customer base and the broader societies

---

[1] 15 U.S.C. 78s(b)(1).

[2] 17 CFR 240.19b–4.

companies to provide more transparency regarding board diversity.

*Nasdaq conducted an internal study of the current state of board diversity among Nasdaq-listed companies based on public disclosures, and found that while some companies already have made laudable progress in diversifying their boardrooms, the national market system and the public interest would best be served by an additional regulatory impetus for companies to embrace meaningful and multi-dimensional diversification of their boards.* It also found that current reporting of board diversity data was not provided in a consistent manner or on a sufficiently widespread basis. As such, investors are not able to readily compare board diversity statistics across companies.

*Accordingly, Nasdaq is proposing to require each of its listed companies, subject to certain exceptions, to:* (i) Provide statistical information regarding diversity among the members of the company's board of directors under proposed Rule 5606; and (ii) have, or explain why it does not have, at least two "Diverse" directors on its board under proposed rule 5605(f)(2). "Diverse" means a director who self-identifies as: (i) Female, (ii) an Underrepresented Minority, or (iii) LGBTQ+. Each listed company must have, or explain why it does not have, at least one Female director and at least one director who is either an Underrepresented Minority or LGBTQ+. Foreign Issuers (including Foreign Private Issuers) and Smaller Reporting Companies, by contrast, have more flexibility and may satisfy the requirement by having two Female directors. "Female" means an individual who self-identifies her gender as a woman, without regard to the individual's designated sex at birth. "Underrepresented Minority" means, consistent with the categories reported to the Equal Employment Opportunity Commission ("EEOC") through the Employer Information Report EEO–1 Form ("EEO–1 Report"), an individual who self-identifies as one or more of the following: Black or African American, Hispanic or Latinx, Asian, Native American or Alaska Native, Native Hawaiian or Pacific Islander, or Two or More Races or Ethnicities. "LGBTQ+" means an individual who self-identifies as any of the following: Lesbian, gay, bisexual, transgender or a member of the queer community.

*Under proposed Rule 5606, Nasdaq proposes to provide each company with one calendar year from the date that the Commission approves this proposal (the "Approval Date") to comply with the*

*requirement for statistical information regarding diversity.* Under proposed Rule 5605(f)(2), no later than two calendar years after the Approval Date, each company must have, or explain why it does not have, one Diverse director. Further, each company must have, or explain why it does not have, two Diverse directors no later than: (i) Four calendar years after the Approval Date for companies listed on the Nasdaq Global Select or Global Market tiers; or (ii) five calendar years after the Approval Date for companies listed on the Nasdaq Capital Market tier.

*Nasdaq undertook extensive research and analysis and has concluded that the proposal will fulfill the objectives of the Act in that it is designed to remove impediments to and perfect the mechanism of a free and open market and a national market system, to prevent fraudulent and manipulative acts and practices, and to protect investors and the public interest.* In addition to conducting its own internal analysis as described above, Nasdaq reviewed a substantial body of third-party research and interviewed leaders representing a broad spectrum of market participants and other stakeholders to:

• Determine whether empirical evidence demonstrates an association between board diversity, shareholder value, investor protection and board decision-making;

• understand investors' interest in, and impediments to obtaining, information regarding the state of board diversity at public companies;

• review the current state of board diversity and disclosure, both among Nasdaq-listed companies and more broadly within the U.S.;

• gain a better understanding of the causes of underrepresentation on boards;

• obtain the views of leaders representing public companies, investment banks, corporate governance organizations, investors, regulators and civil rights groups on the value of more diverse corporate boards, and on various approaches to encouraging more diversity on corporate boards; and

• evaluate the success of approaches taken by exchanges, regulators, and governments in both the U.S. and foreign jurisdictions to remedy underrepresentation on boards.

*While gender diversity has improved among U.S. company boards in recent years, the pace of change has been gradual, and the U.S. still lags behind other jurisdictions that have imposed requirements related to board diversity. Moreover, progress toward bringing underrepresented racial and ethnic groups into the boardroom has been*

*even slower.* Nasdaq is unable to provide definitive estimates regarding the number of listed companies that will be affected by the proposal due to the inconsistent disclosures and definitions of diversity across companies and the extremely limited disclosure of race and ethnicity information—an information gap the proposed rule addresses. Based on the limited information that is available, Nasdaq believes a supermajority of listed companies have made notable strides to improve gender diversity in the boardroom and have at least one woman on the board. Nasdaq also believes that listed companies are diligently working to add directors with other diverse attributes, although consistent with other studies of U.S. companies, Nasdaq believes the pace of progress, in this regard, is happening more gradually. While studies suggest that current candidate selection processes may result in diverse candidates being overlooked, Nasdaq also believes that the lack of reliable and consistent data creates a barrier to measuring and improving diversity in the boardroom.

*Nasdaq reviewed dozens of empirical studies and found that an extensive body of academic research demonstrates that diverse boards are positively associated with improved corporate governance and financial performance.* For example, as discussed in detail below in *Section II, Academic Research: The Relationship between Diversity and Shareholder Value, Investor Protection and Decision Making,* studies have found that companies with gender-diverse boards or audit committees are associated with: More transparent public disclosures and less information asymmetry; better reporting discipline by management; a lower likelihood of manipulated earnings through earnings management; an increased likelihood of voluntarily disclosing forward-looking information; a lower likelihood of receiving audit qualifications due to errors, non-compliance or omission of information; and a lower likelihood of securities fraud. In addition, studies found that having at least one woman on the board is associated with a lower likelihood of material weaknesses in internal control over financial reporting and a lower likelihood of material financial restatements. Studies also identified positive relationships between board diversity and commonly used financial metrics, including higher returns on invested capital, returns on equity, earnings per share, earnings before interest and taxation margin, asset valuation multiples and credit ratings.

*Nasdaq believes there are additional compelling reasons to support the diversification of company boards beyond a link to improved corporate governance and financial performance:*

• Investors are calling in greater numbers for diversification of boardrooms. Vanguard, State Street Advisors, BlackRock, and the NYC Comptroller's Office include board diversity expectations in their engagement and proxy voting guidelines.[9] The heightened investor focus on corporate diversity and inclusion efforts demonstrates that investor confidence is undermined when a company's boardroom is homogenous and when transparency about such efforts is lacking. Investors frequently lack access to information about corporate board diversity that could be material to their decision making, and they might divest from companies that fail to take into consideration the demographics of their corporate stakeholders when they refresh their boards. Nasdaq explores these investor sentiments in *Section III, Current State of Board Diversity and Causes of Underrepresentation on Boards.*

• Nasdaq believes, consistent with SEC disclosure requirements in other contexts,[10] that management's vision on

key issues impacting the company should be communicated with investors in a clear and straightforward manner. Indeed, transparency is the bedrock of federal securities laws regarding disclosure, and this sentiment is reflected in the broad-based support for uniform disclosure requirements regarding board diversity that Nasdaq observed during the course of its outreach to the industry. In addition, organizational leaders representing every category of corporate stakeholders Nasdaq spoke with (including business, investor, governance, regulatory and civil rights communities) were overwhelmingly in favor of diversifying boardrooms. Nasdaq summarizes the findings of its stakeholder outreach in *Section IV, Stakeholder Perspectives.*

• Legislators at the federal and state level increasingly are taking action to encourage or mandate corporations to diversify their boards and improve diversity disclosures. Congress currently is considering legislation requiring each SEC-registered company to provide board diversity statistics and disclose whether it has a board diversity policy. To date, eleven states have passed or proposed legislation related to board diversity.[11] SEC regulations require companies to disclose whether diversity is considered when identifying director nominees and, if so, how. Nasdaq explores various state and federal initiatives in *Section V, U.S. Regulatory Framework and Section VI, Nasdaq Proposal.*

*In considering the merits and shaping the substance of the proposed listing rule, Nasdaq also sought and received valuable input from corporate stakeholders. During those discussions, Nasdaq found consensus across every constituency in the inherent value of board diversity.* Business leaders also expressed concern that companies—and particularly smaller companies—would prefer an approach that allows flexibility to comply in a manner that fits their unique circumstances and stakeholders. Nasdaq recognizes that the

operations, size, and current board composition of each Nasdaq-listed company are unique, and Nasdaq therefore endeavored to provide a regulatory impetus to enhance board diversity that balances the need for flexibility with each company's particular circumstances.

*The Exchange also considered the experience of its parent company, Nasdaq, Inc., as a public company.*[12] In 2002, Nasdaq, Inc. met the milestone of welcoming its first woman, Mary Jo White, who later served as SEC Chair, to its board of directors. In her own words, "I was the first and only woman to serve on the board when I started, but, happily, I was joined by another woman during my tenure . . . And then there were two. Not enough, but better than one." [13] In 2019, Nasdaq, Inc. also welcomed its first Black director. As a Charter Pledge Partner of The Board Challenge, Nasdaq supports The Board Challenge's goal of "true and full representation on all boards of directors." [14]

*As a self-regulatory organization, Nasdaq also is cognizant of its role in advancing diversity within the financial industry, as outlined in the Commission's diversity standards issued pursuant to Section 342 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Standards").*[15] Authored jointly by the Commission and five other financial regulators, the Standards seek to provide a framework for exchanges and financial services organizations "to create and strengthen

---

[9] Vanguard announced in 2020 it would begin asking companies about the race and ethnicity of directors. *See* Vanguard, *Investment Stewardship 2020 Annual Report* (2020), available at: *https://about.vanguard.com/investment-stewardship/perspectives-and-commentary/2020_investment_stewardship_annual_report.pdf.* Starting in 2020, State Street Global Advisors will vote against the entire nominating committee of companies that do not have at least one woman on their boards and have not addressed questions on board diversity within the last three years. *See* State Street Global Advisors, *Summary of Material Changes to State Street Global Advisors' 2020 Proxy Voting and Engagement Guidelines* (2020), available at: *https://www.ssga.com/library-content/pdfs/global/proxy-voting-and-engagement-guidelines.pdf.* Beginning in 2018, BlackRock stated in proxy voting guidelines they "would normally expect to see at least 2 women directors on every board." *See* BlackRock Investment Stewardship, *Corporate governance and proxy voting guidelines for U.S. securities* (Jan. 2020), available at: *https://www.blackrock.com/corporate/literature/fact-sheet/blk-responsible-investment-guidelines-us.pdf.* The NYC Comptroller's Office in 2019 asked companies to adopt policies to ensure women and people of color are on the initial list for every open board seat. *See* Scott M. Stringer, *Remarks at the Bureau of Asset Management 'Emerging Managers and MWBE Managers Conference* (Oct. 11, 2019), available at: *https://comptroller.nyc.gov/wp-content/uploads/2019/10/10.11.19-SMS-BAM-remarks_distro.pdf.*

[10] *See* Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations, 68 FR 75,056 (Dec. 29, 2003) ("We believe that management's most important responsibilities include communicating with investors in a clear and straightforward manner. MD&A is a critical component of that communication. The

Commission has long sought through its rules, enforcement actions and interpretive processes to elicit MD&A that not only meets technical disclosure requirements but generally is informative and transparent."); *see also* Management's Discussion and Analysis, Selected Financial Data, and Supplementary Financial Information, Release No. 33–10890 (Nov. 19, 2020) (citing the 2003 MD&A Interpretative Release and stating that the purpose of the MD&A section is to enable investors to see a company "through the eyes of management'').

[11] *See* Michael Hatcher and Weldon Latham, *States are Leading the Charge to Corporate Boards: Diversify!,* Harv. L. Sch. Forum on Corp. Governance (May 12, 2020), available at: *https://corpgov.law.harvard.edu/2020/05/12/states-are-leading-the-charge-to-corporate-boards-diversify/.*

[12] While the Exchange recognizes that it is only one part of an ecosystem in which multiple stakeholders are advocating for board diversity, that part is meaningful: The United Nations Sustainable Stock Exchanges Initiative, of which Nasdaq, Inc., is an official supporter, recognized that "[s]tock exchanges are uniquely positioned to influence their market in a way few other actors can." *See* United Nations Sustainable Stock Exchanges Initiative, *How Stock Exchanges Can Advance Gender Equality* 2 (2017), available at: *https://sseinitiative.org/wp-content/uploads/2019/12/How-stock-exchanges-can-advance-gender-equality.pdf.*

[13] *See* Mary Jo White, Completing the Journey: Women as Directors of Public Companies (Sept. 16, 2014), available at: *https://www.sec.gov/news/speech/2014-spch091614-mjw#.VBiLMhaaXDo.*

[14] *See* The Board Challenge, *https://theboardchallenge.org/. See also* Nasdaq, Inc., *Notice of 2020 Annual Meeting of Shareholders and Proxy Statement* 52 (Mar. 31, 2020), available at *https://ir.nasdaq.com/static-files/ce5519d4-3a0b-48ac-8441-5376ccbad4e5* (Nasdaq, Inc. believes that "[d]iverse backgrounds lead to diverse perspectives. We are committed to ensuring diverse backgrounds are represented on our board and throughout our organization to further the success of our business and best serve the diverse communities in which we operate.").

[15] *See* Final Interagency Policy Statement Establishing Joint Standards for Assessing the Diversity Policies and Practices of Entities Regulated by the Agencies, 80 FR 33,016 (June 10, 2015).

[their] diversity policies and practices.'' Through these voluntary Standards, the Commission and other regulators ''encourage each entity to use the[ ] Standards in a manner appropriate to its unique characteristics.''[16] To that end, the proposed rule leverages the Exchange's unique ability to influence corporate governance in furtherance of the goal of Section 342, which is to address the lack of diversity in the financial services industry.[17] Finally, while the Exchange recognizes the importance of maximizing shareholder value, its role as a listing venue is to establish and enforce substantive standards that promote investor protection. As a self-regulatory organization, the Exchange must demonstrate to the Commission that any proposed rule is consistent with Section 6(b) of the Act because, among other things, it is designed to protect investors, promote the public interest, prevent fraudulent and manipulative acts and practices, and remove impediments to the mechanism of a free and open market. The Exchange must also balance promoting capital formation, efficiency, and competition, among other things, alongside enhancing investor confidence.

*With these objectives in mind, Nasdaq believes that a listing rule designed to enhance transparency related to board diversity will increase consistency and comparability of information across Nasdaq-listed companies, thereby increasing transparency and decreasing information collection costs.* Nasdaq further believes that a listing rule designed to encourage listed companies to increase diverse representation on their boards will result in improved corporate governance, thus strengthening the integrity of the market, enhancing capital formation, efficiency, and competition, and building investor confidence. To the extent a company chooses not to meet the diversity objectives of Rule 5605(f)(2), Nasdaq believes that the proposal will provide investors with additional transparency through disclosure explaining the company's reasons for not doing so. For example, the company may choose to disclose that it does not meet the diversity objectives of Rule 5605(f)(2) because it is subject to an alternative standard under state or foreign laws and has chosen to meet that standard instead, or has a board philosophy regarding diversity that differs from the diversity objectives set forth in Rule 5605(f)(2). Nasdaq believes that such disclosure

will improve the quality of information available to investors who rely on this information to make informed investment and voting decisions, thereby promoting capital formation and efficiency.

*Nasdaq observed that studies suggest that certain groups may be underrepresented on boards because the traditional director nomination process is limited by directors looking within their own social networks for candidates with previous C-suite experience.*[18] Leaders from across the spectrum of stakeholders with whom Nasdaq spoke reinforced the notion that if companies recruit by skill set and expertise rather than title, they will find there is more than enough diverse talent to satisfy demand. In order to assist companies that strive to meet the diversity objectives of Rule 5605(f)(2), Nasdaq is proposing to provide listed companies that have not yet met its diversity objectives with free access to a network of board-ready diverse candidates and a tool to support board evaluation, benchmarking and refreshment. Nasdaq is contemporaneously submitting a rule filing to the Commission regarding the provision of such services. Nasdaq also plans to publish FAQs on its Listing Center to provide guidance to companies on the application of the proposed rules, and to establish a dedicated mailbox for companies and their counsel to email additional questions to Nasdaq regarding the application of the proposed rule. Nasdaq believes that these services will help to ease the compliance burden on companies whether they choose to meet the listing rule's diversity objectives or provide an explanation for not doing so.

## II. Academic Research: The Relationship Between Diversity and Shareholder Value, Investor Protection and Decision Making

A company's board of directors plays a critical role in formulating company strategy; appointing, advising and overseeing management; and protecting investors. Nasdaq has recognized the importance of varied perspectives on boards since 2003, when the Exchange adopted a listing rule intended to enhance investor confidence by requiring listed companies, subject to certain exceptions and cure periods, to have a majority independent board.[19] Accompanying the rule are interpretive materials recognizing that independent directors ''play an important role in assuring investor confidence. Through

the exercise of independent judgment, they act on behalf of investors to *maximize shareholder value* in the Companies they oversee and guard against conflicts of interest.''[20]

### a. Diversity and Shareholder Value

There is a significant body of research suggesting a positive association between director and shareholder value.[21] In the words of SEC Commissioner Allison Herren Lee: ''to the extent one seeks economic support for diversity and inclusion (instead of requiring economic support for the lack of diversity and exclusion), the evidence is in.''[22]

The Carlyle Group (2020) found that its portfolio companies with two or more diverse directors had average earnings growth of 12.3% over the previous three years, compared to 0.5% among portfolio companies with no diverse directors, where diverse directors were defined as female, Black, Hispanic or Asian.[23] ''After controlling for industry, fund, and vintage year, companies with diverse boards generate earnings growth that's five times faster, on average, with each diverse board member associated with a 5% increase in annualized earnings growth.''[24]

Several other studies also found a positive association between diverse boards and company performance. FCLTGlobal (2019) found that ''the most diverse boards (top 20 percent) added 3.3 percentage points to [return on invested capital], as compared to their least diverse peers (bottom 20 percent).''[25] McKinsey (2015) found

[16] *Id.* at 33,023.

[17] 156 Cong. Rec. H5233–61 (June 30, 2010).

[18] *See infra* Section III.

[19] *See* Nasdaq Stock Market Rulebook, Rules 5605(b), 5615(a), and 5605(b)(1)(A).

[20] *Id.*, IM–5605–1 (emphasis added).

[21] Some companies recently have expressed the belief that a company must consider the impact of its activities on a broader group of stakeholders beyond shareholders. *See* Business Roundtable, *Statement on the Purpose of a Corporation* (Aug. 19, 2019), available at: *https://s3.amazonaws.com/brt.org/BRT-StatementonthePurposeofaCorporationOctober2020.pdf.* Commentators articulated this view as early as 1932. *See* E. Merrick Dodd, Jr., *For Whom Are Corporate Managers Trustees?,* 45 Harv. L. Rev. 1145, 1153 (1932).

[22] *See* Commissioner Allison Herren Lee, *Diversity Matters, Disclosure Works, and the SEC Can Do More: Remarks at the Council of Institutional Investors Fall 2020 Conference* (September 22, 2020), available at: *https://www.sec.gov/news/speech/lee-cii-2020-conference-20200922.*

[23] *See* Jason M. Thomas and Megan Starr, The Carlyle Group, *Global Insights: From Impact Investing to Investing for Impact* 5 (Feb. 24, 2020), available at: *https://www.carlyle.com/sites/default/files2020-02/From%20Impact%20Investing%20to%20Investing%20for%20Impact_022420.pdf* (analyzing Carlyle U.S. portfolio company data, February 2020).

[24] *Id.*

[25] *See* FCLTGlobal, *The Long-term Habits of a Highly Effective Corporate Board* 11 (March 2019), available at: *https://www.fcltglobal.org/wp-content/uploads/long-term-habits-of-highly-effective-*

Continued

that "companies in the top quartile for racial/ethnic diversity were 35 percent more likely to have financial returns above their national industry median." [26] Carter, Simkins and Simpson (2003) found among Fortune 1000 companies "statistically significant positive relationships between the presence of women or minorities on the board and firm value." [27] Bernile, Bhagwat and Yonker (2017) found that greater diversity on boards—including gender, ethnicity, educational background, age, financial expertise and board experience—is associated with increased operating performance, higher asset valuation multiples, lower stock return volatility, reduced financial leverage, increased dividend payouts to shareholders, higher investment in R&D and better innovation. [28] The authors observed that "[t]his is in line with the results in Carter, Simkins, and Simpson (2003), which show a positive association between local demographic diversity and firm value." [29]

Several studies have found a positive association between gender diversity and financial performance. Credit Suisse (2014) found companies with at least one woman on the board had an average sector-adjusted return on equity ("ROE") of 12.2%, compared to 10.1% for companies with no female directors, and average sector-adjusted ROEs of 14.1% and 11.2%, respectively, for the previous nine years. [30] MSCI (2016) found that U.S. companies with at least

three women on the board in 2011 experienced median gains in ROE of 10% and earnings per share ("EPS") of 37% over a five year period, whereas companies that had no female directors in 2011 showed median changes of $-1\%$ in ROE and $-8\%$ in EPS over the same five-year period. [31] Catalyst (2011) found that the ROE of Fortune 500 companies with at least three women on the board (in at least four of five years) was 46% higher than companies with no women on the board, and return on sales and return on invested capital was 84% and 60% higher, respectively. [32]

Credit Suisse (2016) found an association between LGBTQ+ diversity and stock performance, finding that a basket of 270 companies "supporting and embracing LGBT employees" outperformed the MSCI ACWI index by an average of 3.0% per year over the past 6 years. [33] Further, "[a]gainst a custom basket of companies in North America, Europe and Australia, the LGBT 270 has outperformed by 140 bps annually." [34] Nasdaq acknowledges that this study focused on LGBTQ+ employees as opposed to directors, and that there is a lack of published research on the issue of LGBTQ+ representation on boards. However, Out Leadership (2019) suggests that the relationship between board gender diversity and corporate performance may extend to LGBTQ+ diversity:

While the precise reason for the positive correlation between gender diversity and better corporate performance is unknown, many of the reasons that gender diversity is considered beneficial are also applicable to LGBT+ diversity. LGBT+ diversity in the boardroom may create a dynamic that enables better decisionmaking, and it brings to the boardroom the perspective of a

community that is a critical component of the company's consumer population and organizational talent. [35]

McKinsey (2020) found "a positive, statistically significant correlation between company financial outperformance and [board] diversity, on the dimensions of both gender and ethnicity," with companies in the top quartile for board gender diversity "28 percent more likely than their peers to outperform financially," and a statistically significant correlation between board gender diversity and outperformance on earnings before interest and taxation margin. [36] Moody's (2019) found that greater board gender diversity is associated with higher credit ratings, with women accounting for an average of 28% of board seats at Aaa-rated companies but less than 5% of board seats at Ca-rated companies. [37]

While the overwhelming majority of studies on the association between economic performance and board diversity, including gender diversity, present a compelling case that board diversity is positively associated with financial performance, the results of some other studies on gender diversity are mixed. For example, Pletzer et al. (2015) found that board gender diversity alone has a "small and non-significant" relationship with a company's financial performance. [38] Post and Byron (2014) found a "near zero" relationship with a company's market performance, but a positive relationship with a company's

---

*corporate-boards.pdf* (analyzing 2017 MSCI ACWI constituents from 2010 to 2017 using Bloomberg data).

[26] *See* Vivian Hunt et al., McKinsey & Company, *Diversity Matters* (February 2, 2015), available at: *https://www.mckinsey.com/~/media/mckinsey/business%20functions/organization/our%20insights/why%20diversity%20matters/diversity%20matters.pdf* (analyzing 366 public companies in the United Kingdom, Canada, the United States, and Latin America in industries for the years 2010 to 2013, using the ethnic and racial categories African ancestry, European ancestry, Near Eastern, East Asian, South Asian, Latino, Native American, and other).

[27] *See* David A. Carter et al., *Corporate Governance, Board Diversity, and Firm Value.* 38(1) Fin. Rev. 33 (analyzing 638 Fortune 1000 firms in 1997, measuring firm value by Tobin's Q, with board diversity defined as the percentage of women, African Americans, Asians and Hispanics on the board of directors).

[28] *See* Gennaro Bernile et al., *Board Diversity, Firm Risk, and Corporate Policies* (March 6, 2017), available at: *https://ssrn.com/abstract=2733394* (analyzing 21,572 firm-year observations across non-financial, non-utility firms for the years 1996 to 2014, based on the ExecuComp, RiskMetrics, Compustat and CRSP databases).

[29] *Id.* at 32.

[30] *See* Credit Suisse, *The CS Gender 3000: Women in Senior Management* 16 (Sept. 2014), available at: *https://www.credit-suisse.com/media/assets/corporate/docs/about-us/research/publications/the-cs-gender-3000-women-in-senior-management.pdf* (analyzing 3,000 companies across 40 countries from the period from 2005 to 2013).

[31] *See* Meggin Thwing Eastman et al., MSCI, *The tipping point: Women on boards and financial performance* 3 (December 2016), available at: *https://www.msci.com/documents/10199/fd1f8228-cc07-4789-acee-3f9ed97ee8bb* (analyzing of U.S. companies that were constituents of the MSCI World Index for the entire period from July 1, 2011 to June 30, 2016).

[32] *See* Harvey M. Wagner, Catalyst, *The Bottom Line: Corporate Performance and Women's Representation on Boards (2004–2008)* (March 1, 2011), available at: *https://www.catalyst.org/research/the-bottom-line-corporate-performance-and-womens-representation-on-boards-2004-2008/* (analyzing gender diversity data from Catalyst's annual Fortune 500 Census of Women Board Directors report series for the years 2005 to 2009, and corresponding financial data from S&P's Compustat database for the years 2004 to 2008).

[33] *See* Credit Suisse ESG Research, *LGBT: The value of diversity* 1 (April 15, 2016), available at: *https://research-doc.credit-suisse.com/docView?language=ENG&source=emfromsendlink&format=PDF&document_id=807075590&extdocid=807075590_1_eng_pdf&serialid=evu4wXNcHexx7kusNLaZQphUkT9naxi1PvptZQvPjr1k%3d.*

[34] *Id.*

[35] *See* Quorum, *Out Leadership's LGBT+ Board Diversity and Disclosure Guidelines* 3 (2019), available at: *https://outleadership.com/content/uploads/2019/01/OL-LGBT-Board-Diversity-Guidelines.pdf.*

[36] *See* McKinsey & Company, *Diversity wins: How inclusion matters* 13 (May 2020), available at: *https://www.mckinsey.com/~/media/McKinsey/Featured%20Insights/Diversity%20and%20Inclusion/Diversity%20wins%20How%20inclusion%20matters/Diversity-wins-How-inclusion-matters-vF.pdf* (analyzing 1,039 companies across 15 countries for the period from December 2018 to November 2019).

[37] *See* Moody's Investors Service, *Gender diversity is correlated with higher ratings, but mandates pose short-term risk* 2 (Sept. 11, 2019), available at: *https://www.moodys.com/research/Moodys-Corporate-board-gender-diversity-associated-with-higher-credit-ratingsPBC_1193768* (analyzing 1,109 publicly traded North American companies rated by Moody's).

[38] *See* Jan Luca Pletzer et al., *Does Gender Matter? Female Representation on Corporate Boards and Firm Financial Performance—A Meta-Analysis* 1, PLOS One (June 18, 2015); *see also* Alice H. Eagly (2016), *When Passionate Advocates Meet Research on Diversity, Does the Honest Broker Stand a Chance?,* 72 J. Social Issues 199 (2016), available at *https://doi.org/10.1111/josi.12163* (concluding that the "research findings are mixed, and repeated meta-analyses have yielded average correlational findings that are null or extremely small" with respect to board gender diversity and company performance).

accounting returns.[39] Carter, D'Souza, Simkins and Simpson (2010) found that "[w]hen Tobin's Q is used as the measure of financial performance, we find no relationship to gender diversity or ethnic minority diversity, neither positive nor negative." [40] A study conducted by Campbell and Minguez-Vera (2007) "suggests, at a minimum, that increased gender diversity can be achieved without destroying shareholder value." [41] Adams and Ferreira (2009) found that "gender diversity has beneficial effects in companies with weak shareholder rights, where additional board monitoring could enhance firm value, but detrimental effects in companies with strong shareholder rights." [42] Carter et al. (2010) [43] and the U.S. Government Accountability Office ("GAO") (2015) [44] concluded that the mixed nature of various academic studies may be due to differences in methodologies, data samples and time periods.

While there are studies drawing different conclusions, Nasdaq believes that there is a compelling body of credible research on the association between economic performance and board diversity. At a minimum, Nasdaq believes that the academic studies support the conclusion that board diversity does not have adverse effects on company financial performance. This is not the first time Nasdaq has considered whether, on balance, various studies finding mixed results related to board composition and company performance are a sufficient rationale to propose a listing rule. For example, in 2003, notwithstanding the varying findings of studies at the time regarding the relationship between company performance and board independence,[45] Nasdaq adopted listing rules requiring a majority independent board that were "intended to enhance investor confidence in the companies that list on Nasdaq." [46] In its Approval Order, the SEC stated that "[t]he Commission has long encouraged exchanges to adopt and strengthen their corporate governance listing standards in order to, among other things, enhance investor confidence in the securities markets." [47]

Along the same lines, even without clear consensus among studies related to board diversity and company performance, the heightened focus on corporate board diversity by investors demonstrates that investor confidence is undermined when data on board diversity is not readily available and when companies do not explain the reasons for the apparent absence of diversity on their boards. Therefore, Nasdaq believes that the proposal will enhance investor confidence that all listed companies are considering diversity in the context of selecting directors, either by including at least two Diverse directors on their boards or by explaining their rationale for not meeting that objective. Further, Nasdaq believes that the proposal is consistent with the Act because it will not negatively impact capital formation, competition or efficiency among its public companies, and will promote investor protection and the public interest.[48]

b. Diversity and Investor Protection

There is substantial evidence that board diversity enhances the quality of a company's financial reporting, internal controls, public disclosures and management oversight. In reaching this conclusion, Nasdaq evaluated the results of more than a dozen studies spanning more than two decades that found a positive association between gender diversity and important investor protections, and the assertions by some academics that such findings may extend to other forms of diversity, including racial and ethnic diversity. The findings of the studies reviewed by Nasdaq are summarized below.

Adams and Ferreira (2009) found that women are "more likely to sit on" the audit committee,[49] and a subsequent study by Srinidhi, Gul and Tsui (2011) found that companies with women on the audit committee are associated with "higher earnings quality" and "better reporting discipline by managers," [50] leading the authors to conclude that "including female directors on the board and the audit committee are plausible ways of improving the firm's reporting discipline and increasing

[39] See Corinne Post and Kris Byron, *Women on Boards and Firm Financial Performance: A Meta-Analysis* 1 (2014). In 2016, the same authors, based on a review of the results for 87 studies, "found that board gender diversity is weakly but significantly positively correlated with [corporate social responsibility]," although they noted that "a significant correlational relationship does not prove causality." *See* Corinne Post and Kris Byron, *Women on Boards of Directors and Corporate Social Performance: A Meta-Analysis,* 24(4) Corp. Governance: An Int'l Rev. 428 (July 2016), available at *http://dx.doi.org/10.1111/corg.12165.*

[40] See David A. Carter et al., *The Gender and Ethnic Diversity of US Boards and Board Committees and Firm Financial Performance,* 18(5) Corp. Governance 396, 410 (2010) (analysis of 541 S&P 500 companies for the years 1998–2002).

[41] See Kevin Campbell and Antonio Minguez-Vera, *Gender Diversity in the Boardroom and Firm Financial Performance,* 83(3) J. Bus. Ethics 13 (Feb. 2008) (analyzing 68 non-financial companies listed on the continuous market in Madrid during the period from January 1995 to December 2000, measuring firm value by an approximation of Tobin's Q defined as the sum of the market value of stock and the book value of debt divided by the book value of total assets).

[42] See Renee B. Adams and Daniel Ferreira, *Women in the boardroom and their impact on governance and performance,* 94 J. Fin. Econ. 291 (2009) (analyzing 1,939 S&P 500, S&P MidCaps, and S&P SmallCap companies for the period 1996 to 2003, measuring company performance by a proxy for Tobin's Q (the ratio of market value to book value) and return on assets).

[43] See Carter et al., *supra* note 40, at 400 (observing that the different "statistical methods, data, and time periods investigated vary greatly so that the results are not easily comparable.").

[44] See United States Government Accountability Office, Report to the Ranking Member, Subcommittee on Capital Markets and Government Sponsored Enterprises, Committee on Financial Services, House of Representatives, *Corporate Boards: Strategies to Address Representation of Women Include Federal Disclosure Requirements* 5 (Dec. 2015) (the "GAO Report"), available at: *https://www.gao.gov/assets/680/674008.pdf* ("Some research has found that gender diverse boards may have a positive impact on a company's financial performance, but other research has not. These mixed results depend, in part, on differences in how financial performance was defined and what methodologies were used").

[45] See, e.g., Benjamin E. Hermalin and Michael S. Weisbach, *The Effects of Board Composition and Direct Incentives on Firm Performance,* 20 Fin. Mgmt. 101, 111 (1991) (finding that "there appears to be no relation between board composition and performance"); Sanjai Bhagat and Bernard Black, *The Uncertain Relationship Between Board Composition and Firm Performance,* 54(3) Bus. Law. 921, 950 (1999) ("At the very least, there is no convincing evidence that increasing board independence, relative to the norms that currently prevail among large American firms, will improve firm performance. And there is some evidence suggesting the opposite—that firms with supermajority-independent boards perform worse than other firms, and that firms with more inside than independent directors perform about as well as firms with majority- (but not supermajority-) independent boards.").

[46] See Order Approving Proposed Rule Changes, 68 FR 64,154, 64,161 (Nov. 12, 2003) (approving SR–NASD–2002–77, SR–NASD–2002–80, SR–NASD–2002–138, SR–NASD–2002–139, and SR–NASD–2002–141).

[47] Id. at 64,176.

[48] See also Lee, *supra* note 22 ("I could never quite buy in to the view that some 40 percent of the population in our country (if we're talking about minorities) or over half the country (if we're talking about women) must rationalize their inclusion in corporate boardrooms and elsewhere in economic terms instead of the reverse. How can one possibly justify—in economic terms—the systematic exclusion of a major portion of our talent base from the corporate pool?").

[49] See Adams and Ferreira, *supra* note 42, at 292.

[50] See Bin Srinidhi et al., *Female Directors and Earnings Quality,* 28(5) Contemporary Accounting Research 1610, 1612–16 (Winter 2011) (analyzing 3,132 firm years during the period from 2001 to 2007 based on S&P COMPUSTAT, Corporate Library's Board Analyst, and IRRC databases; "choos[ing] the accruals quality as the metric that best reflects the ability of current earnings to reflect future cash flows" (noting that it "best predicts the incidence and magnitude of fraud relative to other commonly used measures of earnings quality") and analyzing surprise earnings results that exceeded previous earnings or analyst forecasts, because "managers of firms whose unmanaged earnings fall marginally below the benchmarks have [an] incentive to manage earnings upwards so as to meet or beat previous earnings").

investor confidence in financial statements."[51]

A study conducted in 2016 by Pucheta-Martínez et al. concluded that gender diversity on the audit committee "improves the quality of financial information."[52] They found that "the percentage of females on [audit committees] reduces the probability of [audit] qualifications due to errors, non-compliance or the omission of information,"[53] and found a positive association between gender diverse audit committees and disclosing audit reports with uncertainties and scope limitations. This suggests that gender diverse audit committees "ensure that managers do not seek to pressure auditors into issuing a clean opinion instead of a qualified opinion" when any uncertainties or scope limitations are identified.[54]

More recently, a study by Gull in 2018 found that the presence of female audit committee members with business expertise is associated with a lower magnitude of earnings management,[55] and a study conducted in 2019 by Bravo and Alcaide-Ruiz found a positive association between women on the audit committee with financial or accounting expertise and the voluntary disclosure of forward-looking information.[56] Bravo and Alcaide-Ruiz concluded that "female [audit committee] members with financial expertise play an important role in influencing disclosure strategies that provide forward-looking information containing projections and financial data useful for investors."[57]

While the above studies demonstrate a positive association between gender diverse audit committees and the quality of a company's earnings, financial information and public disclosures, other studies found a positive association between board gender diversity and important investor protections regardless of whether or not women are on the audit committee.

Abbott, Parker & Persley (2012) found, within a sample of non-Fortune 1000 companies, "a significant association between the presence of at least one woman on the board and a lower likelihood of [a material financial] restatement."[58] Their findings are consistent with a subsequent study by Wahid (2017), which concluded that "gender-diverse boards commit fewer financial reporting mistakes and engage in less fraud."[59] Specifically, companies with female directors have "fewer irregularity-type [financial] restatements, which tend to be indicative of financial manipulation."[60] Wahid suggested that the implications of her study extend beyond gender diversity:

If you're going to introduce perspectives, those perspectives might be coming not just from male versus female. They could be coming from people of different ages, from different racial backgrounds . . . [and] [i]f we just focus on one, we could be essentially taking away from other dimensions of diversity and decreasing perspective.[61]

Cumming, Leung and Rui (2015) also examined the relationship between gender diversity and fraud, and found

that the presence of women on boards is associated with a lower likelihood of securities fraud; indeed, they found "strong evidence of a negative and diminishing effect of women on boards and the probability of being in our fraud sample."[62] The authors suggested that "other forms of board diversity, including but not limited to gender diversity, may likewise reduce fraud."[63]

Chen, Eshleman and Soileau (2016) suggested that the relationship between gender diversity and higher earnings quality observed by Srinidhi, Gul and Tsui (2011) is ultimately driven by reduced weaknesses in internal control over financial reporting, noting that "prior literature has established a negative relationship between internal control weaknesses and earnings quality."[64] The authors found that having at least one woman on the board (regardless of whether or not she is on the audit committee) "may lead to [a] reduced likelihood of material weaknesses [in internal control over financial reporting]."[65]

Board gender diversity also was found to be positively associated with more transparent public disclosures. Gul, Srinidhi & Ng (2011) concluded that "gender diversity improves stock price informativeness by increasing voluntary public disclosures in large firms and increasing the incentives for private information collection in small firms."[66] Abad et al. (2017) concluded that companies with gender diverse boards are associated with lower levels of information asymmetry, suggesting that increasing board gender diversity is associated with "reducing the risk of

[51] *Id.* at 1612.

[52] *See* Maria Consuelo Pucheta-Martínez et al., *Corporate governance, female directors and quality of financial information.* 25(4) Bus. Ethics: A European Rev. 363, 378 (2016) (analyzing a sample of non-financial companies listed on the Madrid Stock Exchange during 2004–2011).

[53] *Id.* at 363.

[54] *Id.* at 368.

[55] *See* Ammar Gull et al., *Beyond gender diversity: How specific attributes of female directors affect earnings management,* 50(3) British Acct. Rev. 255 (Sept. 2017), available at: *https://ideas.repec.org/a/eee/bracre/v50y2018i3p255-274.html* (analyzing 394 French companies belonging to the CAC All-Shares index listed on Euronext Paris from 2001 to 2010, prior to the implementation of France's gender mandate law that required women to comprise 20% of a company's board of directors by 2014 and 40% by 2016).

[56] *See* Francisco Bravo and Maria Dolores Alcaide-Ruiz, *The disclosure of financial forward-looking information,* 34(2) Gender in Mgmt. 140, 142–44 (2019) (analyzing companies included in the S&P 100 Index in 2016, "focus[ing] on the disclosure of financial forward-looking information (which is likely to require financial expertise), such as earnings forecasts, expected revenues, anticipated cash flows or any other financial indicator").

[57] *Id.* at 150.

[58] *See* Lawrence J. Abbott et al., *Female Board Presence and the Likelihood of Financial Restatement,* 26(4) Accounting Horizons 607, 626 (2012) (analyzing a sample of 278 pre-SOX annual financial restatements and 187 pre-SOX quarterly financial restatements of U.S. companies from January 1, 1997 through June 30, 2002 identified by the U.S. General Accounting Office restatement report 03–138 (which only included "material misstatements of financial results"), and 75 post-SOX annual financial restatements from July 1, 2002, to September 30, 2005 identified by U.S. General Accounting Office restatement report 06–678 (which only included "restatements that were being made to correct material misstatements of previously reported financial information"), consisting almost exclusively of non-Fortune 1000 companies).

[59] *See* Aida Sijamic Wahid, The *Effects and the Mechanisms of Board Gender Diversity: Evidence from Financial Manipulation,* J. Bus. Ethics (forthcoming) (Dec. 2017) Rotman School of Management Working Paper No. 2930132 at 1, available at: *https://ssrn.com/abstract=2930132* (analyzing 6,132 U.S. public companies during the period from 2000 to 2010, for a total of 38,273 firm-year observations).

[60] *Id.* at 23.

[61] *See* Barbara Shecter, *Diverse boards tied to fewer financial 'irregularities,' Canadian study finds.* Financial Post (Feb. 5, 2020), *https://business.financialpost.com/news/fp-street/diverse-boards-tied-to-fewer-financial-irregularities-canadian-study-finds* (last accessed Nov. 27, 2020).

[62] *See* Douglas J. Cumming et al., *Gender Diversity and Securities Fraud,* Academy of Management Journal 34 (forthcoming) (Feb. 2, 2015), available at *https://ssrn.com/abstract=2562399* (analyzing China Securities Regulatory Commission data from 2001 to 2010, including 742 companies with enforcement actions for fraud, and 742 non-fraudulent companies for a control group).

[63] *Id.* at 33.

[64] *See* Yu Chen et al., *Board Gender Diversity and Internal Control Weaknesses,* 33 Advances in Acct. 11 (2016) (analyzing a sample of 4267 firm-year observations during the period from 2004 to 2013, beginning "the first year internal control weaknesses were required to be disclosed under section 404 of SOX").

[65] *Id.* at 18.

[66] *See* Ferdinand A. Gul et al., *Does board gender diversity improve the informativeness of stock prices?,* 51(3) J. Acct. & Econ. 314 (April 2011) (analyzing 4,084 firm years during the period from 2002 to 2007, excluding companies in the utilities and financial industries, measuring public information disclosure using "voluntary continuous disclosure of 'other' events in 8K reports" and measuring stock price informativeness by "idiosyncratic volatility," or volatility that cannot be explained by systematic factors and can be diversified away).

informed trading and enhancing stock liquidity."[67]

Other studies have found that diverse boards are better at overseeing management. Adams and Ferreira (2009) found "direct evidence that more diverse boards are more likely to hold CEOs accountable for poor stock price performance; CEO turnover is more sensitive to stock return performance in firms with relatively more women on boards."[68] Lucas-Perez et al. (2014) found that board gender diversity is positively associated with linking executive compensation plans to company performance,[69] which may be an effective mechanism to deter opportunistic behavior by management and align their interests with shareholders.[70] A lack of diversity has been found to have the opposite effect. Westphal and Zajac (1995) found that "increased demographic similarity between CEOs and the board is likely to result in more generous CEO compensation contracts."[71]

c. Diversity and Decision Making

Wahid (2017) suggests that "at a minimum, gender diversity on corporate boards has a neutral effect on governance quality, and at best, it has positive consequences for boards' ability to monitor firm management."[72] Nasdaq reviewed studies suggesting that board diversity can indeed enhance a company's ability to monitor management by reducing "groupthink" and improving decision making.

In 2009, the Commission, in adopting rules requiring proxy disclosure describing whether a company considers diversity in identifying director nominees, recognized the impact of diversity on decision making and corporate governance:

A board may determine, in connection with preparing its disclosure, that it is beneficial to disclose and follow a policy of seeking diversity. Such a policy may encourage boards to conduct broader director searches, evaluating a wider range of candidates and potentially improving board quality. To the extent that boards branch out from the set of candidates they would ordinarily consider, they may nominate directors who have fewer existing ties to the board or management and are, consequently, more independent. To the extent that a more independent board is desirable at a particular company, the resulting increase in board independence could potentially improve governance. In addition, in some companies a policy of increasing board diversity may also improve the board's decision making process by encouraging consideration of a broader range of views.[73]

Nasdaq agrees with the Commission's suggestion that board diversity improves board quality, governance and decision making. Nasdaq is concerned that boards lacking diversity can inadvertently suffer from "groupthink," which is "a dysfunctional mode of group decision making characterized by a reduction in independent critical thinking and a relentless striving for unanimity among members."[74] The catastrophic financial consequences of groupthink became evident in the 2008 global financial crisis, after which the IMF's Independent Evaluation Office concluded that "[t]he IMF's ability to correctly identify the mounting risks [as the crisis developed] was hindered by a high degree of groupthink."[75]

Other studies suggest that increased diversity reduces groupthink and leads to robust dialogue and better decision making. Dallas (2002) observed that "heterogeneous groups share conflicting opinions, knowledge, and perspectives that result in a more thorough consideration of a wide range of interpretations, alternatives, and consequences."[76] Bernile et al. (2017) found that "diversity in the board of directors reduces stock return volatility, which is consistent with diverse backgrounds working as a governance mechanism, moderating decisions, and alleviating problems associated with

'groupthink.'"[77] Dhir (2015) concluded that gender diversity may "promote cognitive diversity and constructive conflict in the boardroom."[78] After interviewing 23 directors about their experience with Norway's board gender mandate, he observed:

First, many respondents contended that gender diversity promotes enhanced dialogue. Interviewees frequently spoke of their belief that heterogeneity has resulted in: (1) Higher quality boardroom discussions; (2) broader discussions that consider a wide range of angles or viewpoints; (3) deeper or more thorough discussions; (4) more frequent and lengthier discussions; (5) better informed discussions; (6) discussions that are more frequently brought inside the boardroom (as opposed to being held in spaces outside the boardroom, either exclusively or in addition to inside the boardroom); or (7) discussions in which items that directors previously took for granted are drawn out and addressed—where the implicit becomes explicit. Second, and intimately related, many interviewees indicated that diversification has led to (or has the potential to lead to) better decision making processes and/or final decisions.[79]

Investors also have emphasized the importance of diversity in decision making. A group of institutional investors charged with overseeing state investments and the retirement savings of public employees asserted that "board members who possess a variety of viewpoints may raise different ideas and encourage a full airing of dissenting views. Such a broad pool of talent can be assembled when potential board candidates are not limited by gender, race, or ethnicity."[80]

Nasdaq believes that cognitive diversity is particularly important on boards because in their advisory role, especially related to corporate strategy, "the 'output' that boards produce is entirely cognitive in nature."[81] While in 1999, Forbes and Milliken characterized boards as "large, elite, and episodic decision making groups that face complex tasks pertaining to strategic-issue processing,"[82] over the past two decades, the role has evolved; boards are now more active, frequent advisors on areas such as cybersecurity, social media, and environmental, social and governance ("ESG") issues such as climate change and racial and gender

[67] See David Abad et al., *Does Gender Diversity on Corporate Boards Reduce Information Asymmetry in Equity Markets?* 20(3) BRQ Business Research Quarterly 192, 202 (July 2017) (analyzing 531 company-year observations from 2004 to 2009 of non-financial companies traded on the electronic trading platform of the Spanish Stock Exchange (SIBE)).

[68] See Adams and Ferreira, *supra* note 42, at 292.

[69] See Maria Encarnacion Lucas-Perez et al., *Women on the Board and Managers' Pay: Evidence from Spain*, 129 J. Bus. Ethics 285 (April 2014).

[70] Id.

[71] See James D. Westphal and Edward J. Zajac, *Who Shall Govern? CEO/Board Power, Demographic Similarity, and New Director Selection*, 40(1) Admin. Sci. Q. 60, 77 (March 1995).

[72] See Wahid, *supra* note 59, at 5.

[73] See Proxy Disclosure Enhancements, 74 FR 68,334, 68,355 (Dec. 23, 2009).

[74] See Daniel P. Forbes and Frances J. Milliken, *Cognition and Corporate Governance: Understanding Boards of Directors as Strategic Decision-Making Groups*, 24(3) Acad. Mgmt. Rev. 489, 496 (Jul. 1999).

[75] See International Monetary Fund, *IMF Performance in the Run-Up to the Financial and Economic Crisis* (August 2011), available at: *https://www.elibrary.imf.org/view/IMF017/11570-9781616350789/11570-9781616350789/ch04.xml?language=en&redirect=true* ("The evaluation found that incentives were not well aligned to foster the candid exchange of ideas that is needed for good surveillance—many staff reported concerns about the consequences of expressing views contrary to those of supervisors, [m]anagement, and country authorities.").

[76] See Lynne L. Dallas, *Does Corporate Law Protect the Interests of Shareholders and Other Stakeholders?: The New Managerialism and Diversity on Corporate Boards of Directors*, 76 Tul. L. Rev. 1363, 1391 (June 2002).

[77] See Bernile et al., *supra* note 28, at 38.

[78] See Aaron A. Dhir, Challenging Boardroom Diversity: Corporate Law, Governance, and Diversity 150 (2015) (emphasis removed) (sample included 23 directors of Norwegian corporate boards, representing an aggregate of 95 board appointments at more than 70 corporations).

[79] Id. at 124 (emphasis removed).

[80] See Petition for Amendment of Proxy Rule (March 31, 2015), available at: *https://www.sec.gov/rules/petitions/2015/petn4-682.pdf*.

[81] See Forbes and Milliken, *supra* note 74, at 492.

[82] Id.

inequality. Nasdaq believes that boards comprised of directors from diverse backgrounds enhance investor confidence by ensuring that board deliberations include the perspectives of more than one demographic group, leading to more robust dialogue and better decision making.

## III. Current State of Board Diversity and Causes of Underrepresentation on Boards

While the above studies suggest a positive association between board diversity, company performance, investor protections, and decision making, there is a noticeable lack of diversity among U.S. public companies. Nasdaq is a global organization and operates in many countries around the world that already have implemented diversity-focused directives. In fact, Nasdaq-listed companies in Europe already are subject to diversity requirements.[83] This first-hand experience provides Nasdaq with a unique perspective to incorporate global best practices in its proposal to advance diversity on U.S. corporate boards. Given that the U.S. ranks 53rd in board gender diversity, according to the World Economic Forum in its 2020 Global Gender Gap Report, Nasdaq believes advancing board diversity in the U.S. is a critical business and market imperative. This same report also found that "American women still struggle to enter the very top business positions: only 21.7% of corporate managing board members are women." [84] As of 2019, women directors held 19% of Russell 3000 seats (up from 16% in 2018).[85] In comparison, women hold more than 30% of board seats in Norway, France,

Sweden and Finland.[86] At the current pace, the U.S. GAO estimates that it could take up to 34 years for U.S. companies to achieve gender parity on their boards.[87]

Progress toward greater racial and ethnic diversity in U.S. company boardrooms has been even slower. Over the past ten years, the percentage of African American/Black directors at Fortune 500 companies has remained between 7 and 9%, while the percentage of women directors has grown from 16 to 23%.[88] In 2019, only 10% of board seats at Russell 3000 companies were held by racial minorities, reflecting an incremental increase from 8% in 2008.[89] Among Fortune 500 companies in 2018, there were fewer than 20 directors who publicly self-identified as LGBT+, and only nine companies reported considering sexual orientation and/or gender identity when identifying director nominees.[90]

Women and minority directors combined accounted for 34% of Fortune 500 board seats in 2018.[91] While women of color represent 18% of the U.S. population, they held only 4.6% of Fortune 500 board seats in 2018.[92] Male underrepresented minorities held 11.5% of board seats at Fortune 500 companies in 2018, compared to 66% of board seats held by Caucasian/White men. Overall in 2018, 83.9% of board seats among Fortune 500 companies were held by Caucasian/White individuals (who represent 60.1% of the U.S. population), 8.6% by African American/Black individuals (who represent 13% of the U.S. population), 3.8% by Hispanic/Latino(a) individuals (who represent 19% of the U.S. population) and 3.7% by Asian/Pacific Islander individuals (who represent 6% of the U.S. population).[93] In its analysis of Russell

3000 companies, 2020 Women on Boards concluded that "larger companies do better with their diversity efforts than smaller companies." [94]

Based on the limited information that is available, Nasdaq believes a supermajority of listed companies have made notable strides to improve gender diversity in the boardroom and have at least one woman on the board. Nasdaq also believes that listed companies are diligently working to add directors with other diverse attributes, although consistent with other studies of U.S. companies, Nasdaq believes the pace of progress, in this regard, is happening more gradually. Thus, and for the reasons discussed in this Section II.A.1.III, Nasdaq has concluded that a regulatory approach to encouraging greater diversity and data transparency would be beneficial.

Nasdaq reviewed academic studies on the causes of underrepresentation on boards and the approaches taken by other jurisdictions to remedy underrepresentation. Those studies suggest that the traditional director candidate selection process may create barriers to considering qualified diverse candidates for board positions. Dhir (2015) explains that "[t]he presence of unconscious bias in the board appointment process, coupled with closed social networks, generates a complex set of barriers for diverse directors; these are the 'phantoms' that prevent entry." [95] In 2011, the Davies Review found that "informal networks influential in board appointments" contribute to the underrepresentation of women in the boardrooms of U.K. listed companies.[96] In 2017, the Parker Review acknowledged that "as is the case with gender, people of colour within the UK have historically not had the same opportunities as many mainstream candidates to develop the skills, networks and senior leadership experience desired in a FTSE Boardroom." [97] In 2020, the United Kingdom Financial Reporting Council commissioned a report to analyze barriers to LGBTQ+ inclusion and promotion in the workplace. Leaders who self-identified as LGBTQ+ expressed concerns about the current

[83] On Nasdaq's Nordic and Baltic exchanges, large companies must comply with EU Directive 2014/95/EU (the "EU Directive"), as implemented by each member state, which requires companies to disclose a board diversity policy with measurable objectives (including gender), or explain why they do not have such a policy. On Nasdaq Vilnius, companies are also required to comply with the Nasdaq Corporate Governance Code for Listed Companies or explain why they do not, which requires companies to consider diversity and seek gender equality on the board. Similarly, on Nasdaq Copenhagen, companies are required to comply with the Danish Corporate Governance Recommendations or explain why they do not, which requires companies to adopt and disclose a diversity policy that considers gender, age and international experience. On Nasdaq Iceland, listed companies must have at least 40% women on their board (a government requirement) and comply with the EU Directive.

[84] See World Economic Forum, Global Gender Gap Report 2020 33 (2019), available at: http://www3.weforum.org/docs/WEF_GGGR_2020.pdf.

[85] See Kosmas Papadopoulos, ISS Analytics, U.S. Board Diversity Trends in 2019 4–5 (May 31, 2019), available at: https://www.issgovernance.com/file/publications/ISS_US-Board-Diversity-Trends-2019.pdf.

[86] See Deloitte, Women in the Boardroom: A global perspective (6th ed. 2019), available at: https://www2.deloitte.com/content/dam/Deloitte/global/Documents/Risk/gx-risk-women-in-the-boardroom-sixth-edition.pdf.

[87] See GAO Report, supra note 44.

[88] See Russell Reynolds, Ethnic & Gender Diversity on US Public Company Boards 6 (September 8, 2020).

[89] See Papadopoulous, supra note 85, at 5.

[90] See Out Leadership, supra note 35.

[91] See Deloitte, Missing Pieces Report: The 2018 Board Diversity Census of Women and Minorities on Fortune 500 Boards 9 (2018), available at: https://www2.deloitte.com/content/dam/Deloitte/us/Documents/center-for-board-effectiveness/us-cbe-missing-pieces-report-2018-board-diversity-census.pdf.

[92] See Catalyst, Too Few Women of Color on Boards: Statistics and Solutions (Jan. 3, 2020), https://www.catalyst.org/research/women-minorities-corporate-boards/.

[93] See Deloitte, Missing Pieces Report, supra note 91; United States Census Bureau, QuickFacts, available at: https://www.census.gov/quickfacts/fact/table/US/PST045219.

[94] See 2020 Women On Boards Gender Diversity Index 4 (2019), available at: https://2020wob.com/wp-content/uploads/2019/10/2020WOB_Gender_Diversity_Index_Report_Oct2019.pdf.

[95] See Dhir, supra note 78, at 47.

[96] See Women on Boards 17 (Feb. 2011), available at: https://ftsewomenleaders.com/wp-content/uploads/2015/08/women-on-boards-review.pdf.

[97] See Sir John Parker, A Report into the Ethnic Diversity of UK Boards 38 (Oct. 12, 2017), available at: https://assets.ey.com/content/dam/ey-sites/ey-com/en_uk/news/2020/02/ey-parker-review-2017-report-final.pdf.

board nomination process, which includes "relying on personal recommendations without transparent competition or due process [and] informal 'interviewing' outside the selection process." [98]

These concerns are not unique to the United Kingdom. The U.S. GAO (2015) found that women's representation on corporate boards may be hindered by directors' tendencies to "rely on their personal networks to identify new board candidates." [99] Vell (2017) found that "92% of board seats [of public U.S. and Canadian technology companies] are filled through networking, and women have less access to these networks." [100] Deloitte and the Society for Corporate Governance (2019) found that this is also common in other industries including media, communications, energy, consumer products, financial services and life sciences.[101] They observed that although 94% of companies surveyed were looking to increase diversity among their boards, 77% of those boards looked to referrals from current directors when identifying diverse director candidates, suggesting that "networking is still key to board succession." [102] Dhir (2015), in a qualitative study of Norwegian directors, observed that "[b]oard seats tend to be filled by directors engaging their networks, and the resulting appointees tend to be of the same socio-demographic background." [103]

Another contributing factor may be the traditional experience sought in director nominees. Rhode & Packel (2014) observed that:

One of the most common reasons for the underrepresentation of women and minorities on corporate boards is their underrepresentation in the traditional pipeline to board service. The primary route to board directorship has long been through experience as a CEO of a public corporation. . . . Given the low

representation of women and minorities in top executive positions, their talents are likely to be underutilized if selection criteria are not broadened.[104]

Hillman et al. (2002) found that while white male directors of public companies were more likely to have current or former experience as a CEO, senior manager or director, African-American and white women directors were more likely to have specialized expertise in law, finance, banking, public relations or marketing, or community influence from positions in politics, academia or clergy.[105] Dhir (2015) suggests that "[c]onsidering persons from other, non-management pools, such as academia, legal and accounting practice, the not-for-profit sector and politics, may help create a broader pool of diverse candidates." [106] Directors surveyed by the U.S. GAO also "suggested, for example, that boards recruit high performing women in other senior executive level positions, or look for qualified female candidates in academia or the nonprofit and government sectors. . . . [I]f boards were to expand their director searches beyond CEOs more women might be included in the candidate pool." [107]

Investors have begun calling for greater transparency surrounding ethnic diversity on company boards, and in the past several months as the U.S. has seen an uprising in the racial justice movement, there has been an increase in the number of African Americans appointed to Russell 3000 corporate boards.[108] In a five-month span, 130 directors appointed were African American, in comparison to the 38 African American directors who were appointed in the preceding five months.[109] Although tracking the acceleration in board diversity is feasible for some Russell 3000

companies, many of the companies do not disclose the racial makeup of the board, making it impossible to more broadly assess the impact of recent events on board diversity.

## IV. Stakeholder Perspectives

To gain a better understanding of the current state of board diversity, benefits of diversity, causes of underrepresentation on boards and potential remedies to address underrepresentation, Nasdaq spoke with leaders representing a broad spectrum of market participants and other stakeholders. Nasdaq sought their perspectives to inform its analysis of whether the proposed rule changes would promote the public interest and protection of investors without unduly burdening competition or conflicting with existing securities laws. The group included representatives from the investor, regulatory, investment banking, venture capital and legal communities. Nasdaq also spoke with leaders of civil rights and corporate governance organizations, and organizations representing the interests of private and public companies, including Nasdaq-listed companies. Specifically, Nasdaq obtained their views on:
• The current state of board diversity in the U.S.;
• the inherent value of board diversity;
• increasing pressure from legislators and investors to improve diverse representation on boards and board diversity disclosure;
• whether a listing rule related to board diversity is in the public interest;
• how to define a "diverse" director; and
• the benefits and challenges of various approaches to improving board diversity disclosures and increasing diverse representation on boards, including mandates and disclosure-based models.

The discussions revealed strong support for disclosure requirements that would standardize the reporting of board diversity statistics. The majority of organizations also were in agreement that companies would benefit from a regulatory impetus to drive meaningful and systemic change in board diversity, and that a disclosure-based approach would be more palatable to the U.S. business community than a mandate. While many organizations recognized that mandates can accelerate the rate of change, they expressed that a disclosure-based approach is less controversial and would spur companies to take action and achieve the same results. Business leaders also

[98] See Catriona Hay et al., The Financial Reporting Council, Building more open business 25 (2020), available at: https://www.frc.org.uk/getattachment/19f3b216-bd45-4d46-af2f-f191f5bf4a07/The-Good-Side-x-Financial-Reporting-Council-1811-AMENDED.pdf.

[99] See GAO Report, supra note 44, at 15.

[100] See Vell Executive Search, Women Board Members in Tech Companies: Strategies for Building High Performing Diverse Boards 6 (2017), available at: https://www.vell.com/images/pdf/VELL%20Report%20Women%20Board%20Members%20on%20Tech%20Boards%202017%203%2029.pdf.

[101] See Deloitte and the Society of Corporate Governance, Board Practices Report: Common threads across boardrooms 5 (2019), available at: https://higherlogicdownload.s3.amazonaws.com/GOVERNANCEPROFESSIONALS/a8892c7c-6297-4149-b9fc-378577d0b150/UploadedImages/1202241_2018_Board_Practices_Report_FINAL.pdf.

[102] Id. at 6.

[103] See Dhir, supra note 78, at 52.

[104] See Deborah Rhode and Amanda K. Packel, Diversity on Corporate Boards: How Much Difference Does Difference Make?, 39(2) Del. J. Corp. L. 377, 402–403 (2014); see also Dhir, supra note 78, at 39 ("[T]here is an apparent preference for either CEOs (whether current or retired) or senior management who have experience at the helm of a particular business stream or unit. . . . The fact that far fewer women than men have been CEOs has a potentially devastating effect on access to the boardroom, which in turn can have an effect on the number of women who rise to the level of CEO and to the executive suite.").

[105] See Amy J. Hillman et al., Women and Racial Minorities in the Boardroom: How Do Directors Differ?, 28(6) J. Mgmt. 747, 749, 754 (2002).

[106] See Dhir, supra note 78, at 42.

[107] See GAO Report supra note 44, at 18.

[108] See Leslie P. Norton, The Number of Black Board Members Surged After George Floyd's Death, Barron's, Oct. 27, 2020, available at: https://www.barrons.com/articles/after-george-floyds-death-the-number-of-black-board-members-surges-51603809011.

[109] Id.

expressed concern that smaller companies would require flexibility and support to comply with any time-sensitive requirements to add diverse directors. Some stakeholders highlighted additional challenges that smaller companies, and companies in certain industries, may face finding diverse board members. Leaders from across the spectrum of stakeholders that Nasdaq surveyed reinforced the notion that if companies recruit by skill set and expertise rather than title, then they will find there is more than enough diverse talent to satisfy demand. Leaders from the legal community emphasized that any proposed rule that imposed additional burdens beyond, or is inconsistent with, existing securities laws—by, for example, requiring companies to adopt a diversity policy or include disclosure solely in their proxy statements—would present an additional burden and potentially more legal liability for listed companies.

**V. U.S. Regulatory Framework**

As detailed above, diversity has been the topic of a growing number of studies over the past decade and, in recent years, some investors have been increasingly advocating for greater diversity among directors of public companies.[110] Over the past year, the social justice movement has underscored the importance of having diverse perspectives and representation at all levels of decision-making, including on public company boards. In recent years, diversity has become increasingly important to the public, including institutional investors, pension funds and other stakeholders who believe that board diversity enhances board performance and is an important factor in the voting decisions

of some investors.[111] Legislators increasingly are taking action to encourage corporations to diversify their boards and improve diversity disclosures.[112]

*a. SEC Diversity Disclosure Requirements—Background*

In 2009, the Commission sought comment on whether to amend Item 407(c)(2)(vi) of Regulation S–K to require disclosure of whether a nominating committee considers diversity when selecting a director for a position on the board.[113] The Commission received more than 130 comment letters on its proposal. According to a University of Dayton Law Review analysis of those comment letters, most were submitted by groups with a specific interest in diversity, or by institutional investors, including mutual funds, pension funds, and socially responsible investment funds.[114] Further, the analysis showed that 56 commenters addressed the issue of diversity disclosures, and only 5 of those 56 commenters did not favor such disclosure.[115] Twenty-seven of the 56 mentioned gender diversity, 18 mentioned racial diversity, and 13 mentioned ethnic diversity. However, neither the proposed rule nor the final rule defined diversity.[116]

Ten years after its adoption of board diversity disclosure rules, the Commission revisited the rules by establishing new Compliance and Disclosure Interpretations ("C&DI").

However, the Commission did not provide a definition of diversity, and therefore issuers currently are not required to disclose the race, ethnicity or gender of their directors or nominees.

Currently, Item 401(e)(1) of Regulation S–K requires a company to "briefly discuss the specific experience, qualifications, attributes or skills that led to the conclusion that the person should serve as a director." [117] The C&DI clarifies that if a board considered a director's self-identified diversity characteristics (*e.g.*, race, gender, ethnicity, religion, nationality, disability, sexual orientation or cultural background) during the nomination process, and the individual consents to disclose those diverse characteristics, the Commission "would expect that the company's discussion required by Item 401 would include, but not necessarily be limited to, identifying those characteristics and how they were considered." [118]

Rather than providing a specific definition of diversity, the C&DI provides a non-exhaustive list of examples of diverse characteristics that a company could consider for purposes of Item 401(e)(1), including "race, gender, ethnicity, religion, nationality, disability, sexual orientation, or cultural background." [119] Additionally, the Commission stated that any description of a company's diversity policy would be expected to include "a discussion of how the company considers the self-identified diversity attributes of nominees as well as any other qualifications its diversity policy takes into account, such as diverse work experiences, military service, or socio-economic or demographic characteristics." [120]

Item 407(c)(2)(vi) of Regulation S–K requires proxy disclosure regarding whether diversity is considered when identifying director nominees and, if so, how. In addition, if the board or nominations committee has adopted a diversity policy, the company must describe how the policy is implemented and its effectiveness is assessed.[121] When adopting Item 407(c)(2)(vi), the Commission explained:

We recognize that companies may define diversity in various ways, reflecting different perspectives. For instance, some companies may conceptualize diversity expansively to

---

[110] In 2009, when the Commission proposed enhancements to proxy disclosures, including addressing board diversity disclosures, the Commission received over 130 comment letters related to its proposal, including from corporations, pension funds, professional associations, trade unions, accounting firms, law firms, consultants, academics, individual investors and other interested parties. *See* Proxy Disclosure Enhancements, 74 FR at 68,335; *see also* David A. Katz and Laura McIntosh, *Raising the Stakes for Board Diversity*, Law.com (July 22, 2020), available at: *https://www.law.com/newyorklawjournal/2020/07/22/raising-the-stakes-for-board-diversity/?slreturn=20201017021522*; Office of the Illinois State Treasurer, *The Investment Case For Board Diversity: A Review of the Academic and Practitioner Research on the Value of Gender and Racial/Ethnic Board Diversity for Investors* 7 (Oct. 2020), available at: *https:// illinoistreasurergovprod.blob.core. usgovcloudapi.net/twocms/media/doc/il%20 treasurer%20white%20paper%20-%20the% 20investment%20case%20for%20 board%20diversity%20(oct%202020).pdf*.

[111] *See* Comments on Proposed Rule: Proxy Disclosure and Solicitation Enhancements, available at: *https://www.sec.gov/comments/s7-13-09/s71309.shtml. See also* CGLytics, *Diversity on the Board? Metrics Used by Fortune 100 Companies* (June 29, 2020), available at: *https:// www.cglytics.com/diversity-on-the-board-metrics-of-fortune-100-companies/*; Office of the Illinois State Treasurer, *supra* note 110.

[112] For example, California requires companies headquartered in the state to have at least one director who self-identifies as a Female and one director from an Underrepresented Community. *See* Cal. S.B. 826 (Sept. 30, 2018); Cal. A.B. 979 (Sept. 30, 2020). Washington requires companies headquartered in the state to have at least 25% women on the board by 2022 or provide certain disclosures. *See* Wash. Subst. S.B. 6037 (June 11, 2020). At least eleven states have proposed diversity-related requirements. *See* Hatcher and Latham, *supra* note 11.

[113] *See* Proxy Disclosure and Solicitation Enhancements, 74 FR 35,076, 35,084 (July 17, 2009) (proposed rule).

[114] *See* Thomas Lee Hazen and Lissa Lamkin Broome, *Board Diversity and Proxy Disclosure*, 37:1 Univ. Dayton L. Review 41, 51, n. 82 (citing the comment letters).

[115] In the five comments that opposed diversity disclosure, three stated that diversity was an important value. *See* Comments on Proposed Rule, *supra* note 111; *see also* Hazen and Broome, *supra* note 114, at 54 n.88 (citing the 56 comment letters).

[116] *See* Hazen and Broome, *supra* note 114, at 53 n. 84–86.

[117] *See* 17 CFR 229.401(e)(1).

[118] *See* Securities and Exchange Commission, Regulation S–K Compliance & Disclosure Interpretations (Sept. 21, 2020), available at: *https:// www.sec.gov/divisions/corpfin/guidance/regs-kinterp.htm*.

[119] *Id.*

[120] *Id.*

[121] *See* 17 CFR 229.407(c)(2)(vi).

include differences of viewpoint, professional experience, education, skill and other individual qualities and attributes that contribute to board heterogeneity, while others may focus on diversity concepts such as race, gender and national origin. We believe that for purposes of this disclosure requirement, companies should be allowed to define diversity in ways that they consider appropriate. As a result we have not defined diversity in the amendments.[122]

Moreover, Item 407(c)(2)(vi) does not require companies to adopt a formal policy and does not require them to explain why they have not. It also does not require public disclosure of board-level diversity statistics.

### b. Complaints Surrounding Current Diversity Disclosure Requirements

Given the broad latitude afforded to companies by the Commission's rules related to board diversity and proxy disclosure, current reporting of board-level diversity statistics has been significantly unreliable and unusable to investors. This has been due to myriad data collection challenges, including the scarcity of reported information, the lack of uniformity in the information that is disclosed and inconsistencies in the definitions of diversity characteristics across companies.[123] The heightened national discourse around diversity and mounting grievances from investors surrounding transparency on board diversity prompted Nasdaq to examine the state of board diversity among its listed companies. While conducting that research, Nasdaq identified a number of key challenges, such as: (1) Inconsistent disclosure and definitions of diversity across companies; (2) limited data on diverse characteristics outside of gender; (3) inconsistent or no disclosure of a director's race, ethnicity, or other diversity attributes (e.g., nationality); (4) difficult-to-extract data because statistics are often embedded in graphics; and (5) aggregation of information, making it difficult to separate gender from other categories of diversity. Investors and data analysts have raised similar criticisms.

As the Illinois Treasurer observed, the paucity of data on race and ethnicity creates barriers to investment analysis, due diligence and academic study.[124] For example, the scarcity of such data

is an impediment to academics who want to study the performance impact of racially diverse boards.[125] Nasdaq is concerned that investors also face the many data collection challenges Nasdaq encountered, rendering current diversity disclosures unreliable, unusable, and insufficient to inform investment and voting decisions. Commissioner Allison Herren Lee expressed similar concerns, stating that the current SEC disclosure requirements have ''led to spotty information that is not standardized, not consistent period to period, not comparable across companies, and not necessarily reliable. . . . And the current state of disclosure reveals the shortcomings of a principles-based materiality regime in this area.'' [126]

Some stakeholders believe there is a correlation between companies that disclose the gender, racial and ethnic composition of their board and the number of diverse directors on those companies' boards.[127] Currently, the lack of reliable and consistent data makes it difficult to measure diversity in the boardroom, and a common set of standards for diversity definitions and disclosure format is greatly needed. At present, U.S. companies must navigate a complex patchwork of federal and state regulations and disclosure requirements. The limited disclosure currently provided voluntarily, which is primarily focused on gender (due in part to that data being the most readily available), fails to provide the full scope of a board's diverse characteristics.[128] It is difficult to improve what one cannot accurately measure. This lack of transparency is impacting investors who are increasingly basing public advocacy, proxy voting and direct shareholder-company engagement decisions on board diversity considerations.[129]

### c. Support for Updating Diversity Disclosure Requirements

Nasdaq's surveys of investors and reviews of their disclosed policies and actions show that board diversity is a priority when assessing companies, and investors report, in some cases, relying on intuition when there is a lack of empirical, evidenced-based data. Furthermore, the continued growth of ESG investing raises the importance of quality data, given the data-driven nature of investment products such as diversity-specific indices and broader ESG funds.

Investors have a unique platform from which to engage and influence a company's position on important topics like diversity. Similarly, Nasdaq, like other self-regulatory organizations, is uniquely positioned to establish practices that will assist in carrying out Nasdaq's mandate to protect investors and remove impediments from the market. Various stakeholders, including Nasdaq, believe that clear and concise annual disclosure of board diversity information that disaggregates the data by race, ethnicity, gender identity and sexual orientation will provide the public, including key stakeholders, with a better sense of a company's approach to improving corporate diversity and the support needed to effectuate any changes. Required disclosures also would eliminate the number of shareholder proposals asking for these key metrics and the need for companies to respond to multiple investor requests for information.[130] Moreover, companies manage issues more closely and demonstrate greater progress when data is available.[131]

In 2015, nine large public pension funds who collectively supervised $1.12 trillion in assets at the time petitioned the Commission to require registrants to disclose information related to, among other things, the gender, racial, and ethnic diversity of the registrant's board nominees.[132] In 2017, Human Capital Management Coalition, which described itself as a group of institutional investors with $2.8 trillion in assets at the time, made a similar petition to the Commission.[133] More recently, in October 2020, the Illinois Treasurer spearheaded an initiative along with twenty other investor organizations, asking for all companies in the Russell

---

[122] See Proxy Disclosure Enhancements, 74 FR at 68,344.

[123] See Petition for Rulemaking (July 6, 2017), available at: https://www.sec.gov/rules/petitions/2017/petn4-711.pdf.

[124] See Press Release, Illinois State Treasurer Frerichs Calls on Russell 3000 Companies to Disclose Diversity Data (Oct. 28, 2020), available at https://illinoistreasurer govprod.blob.core.usgovcloudapi.net/twocms/media/doc/october2020_russell3000.pdf.

[125] See Office of Illinois State Treasurer, supra note 110, at 3–4.

[126] See Lee, supra note 22.

[127] See Proxy Disclosure Enhancements, 74 FR at 68,355 (''Although the[se] amendments are not intended to steer behavior, diversity policy disclosure may also induce beneficial changes in board composition. A board may determine, in connection with preparing its disclosure, that it is beneficial to disclose and follow a policy of seeking diversity.''); see also Office of Illinois State Treasurer, supra note 110, at 3.

[128] See, e.g., CGLytics, supra note 111, at https://www.cglytics.com/diversity-on-the-board-metrics-of-fortune-100-companies/; Petition for Amendment of Proxy Rule, supra note 80; Office of Illinois State Treasurer, supra note 110.

[129] See Office of the Illinois State Treasurer, Russell 3000 Board Diversity Disclosure Initiative, https://www.illinoistreasurer.gov/Financial_Institutions/Equity._Diversity__Inclusion/Russell_3000_Board_Diversity_Disclosure_Initiative (last accessed Nov. 25, 2020).

[130] See Petition for Rulemaking, supra note 123, at 2.

[131] See, e.g., Gwen Le Berre, Parametric, Investors Need Data to Make Diversity a Reality (Aug. 24, 2020), https://www.parametricportfolio.com/blog/investors-need-data-to-make-diversity-a-reality.

[132] See Petition for Amendment of Proxy Rule, supra note 80.

[133] See Petition for Rulemaking, supra note 123.

3000 Index to disclose the composition of their board, including each board member's gender, race and ethnicity.[134]

The largest proxy advisory firms have aligned their voting policies to encourage increased board diversity disclosure. Institutional Shareholder Services ("ISS"), recently adopted a new voting policy under which it will identify boards of companies in the Russell 3000 or S&P 1500 that "lack racial and ethnic diversity (or lack disclosure of such)" in 2021 and, beginning in 2022, will recommend voting against the chair of the nominating committee of such companies. The stated goal of the policy is "helping investors identify companies with which they may wish to engage and to foster dialogue between investors and companies on this topic." [135] In 2017, proxy advisory firm Glass Lewis announced a policy regarding board gender diversity that took effect in 2019. Glass Lewis generally recommends voting against the nominating committee chair of a board that has no female members, and when making such a recommendation, the firm closely examines the company's disclosure of its board diversity considerations and other relevant contextual factors.[136] On November 24, 2020, Glass Lewis announced the publication of its 2021 Proxy Voting Policy Guidelines, which expand its board gender diversity policy to vote against nominating chairs if there are fewer than two female directors, beginning in 2022.[137] Most notably, beginning with the 2021 proxy season, the company will include an assessment report of company proxy disclosures relating to board diversity, skills and the director nomination process for companies in the S&P 500 index. According to Glass Lewis, it "will reflect how a company's proxy statement presents: (i) The board's current percentage of racial/ethnic diversity; (ii) whether the board's definition of diversity explicitly includes gender and/or race/ethnicity;

(iii) whether the board has adopted a policy requiring women and minorities to be included in the initial pool of candidates when selecting new director nominees (aka 'Rooney Rule'); and (iv) board skills disclosure." [138]

Congress and members of the Commission also have weighed in on the importance of improving board transparency. In 2017, Representative Carolyn Maloney introduced the "Gender Diversity in Corporate Leadership Act of 2017," which proposed requiring public companies to provide proxy disclosure regarding the gender diversity of the board of directors and nominees.[139] In November 2019, the U.S. House of Representatives, with bipartisan support, passed the "Corporate Governance Through Diversity Act of 2019," which requires certain registrants annually to disclose the racial, ethnic, and gender composition of their boards and executive officers, as well as the veteran status of any of those directors and officers, in their proxy statements.[140] The bill also requires the disclosure of any policy, plan or strategy to promote racial, ethnic, and gender diversity among these groups. Legislators have proposed a companion bill in the U.S. Senate.[141]

The Council of Institutional Investors ("CII"), U.S. Chamber of Commerce,[142] National Urban League, Office of New York State Comptroller and the National Association for the Advancement of Colored People praised the House of Representatives' for passing the 2019 legislation. According to the U.S. Chamber of Commerce's members and associations, it has become increasingly important to see improvements in board diversity.[143] Additionally, CII's General Counsel stated that the proxy statement disclosure requirement in the legislation "could contribute to enhancing U.S. public company board consideration of diversity." [144]

More recently, SEC Commissioners have called for greater transparency surrounding ethnic diversity on company boards. In a September 2020 speech titled "Diversity Matters, Disclosure Works, and the SEC Can Do More" given at the CII Fall Conference, Commissioner Lee advocated advancing corporate diversity and for various approaches by which the Commission could promote diversity, including among other things, strengthening the C&DI's guidance related to disclosure of board candidate diversity characteristics.[145] Commissioner Lee stated:

[The SEC has] largely declined to require diversity-related disclosure. In 2009, we adopted a requirement for companies to disclose if and how diversity is considered as a factor in the process for considering candidates for board positions, including any policies related to the consideration of diversity. In 2018, we issued guidance encouraging the disclosure of self-identified characteristics of board candidates. While I appreciate these measures, given that women of color hold just 4.6% of Fortune 500 board seats and less than one percent of Fortune 500 CEOs are Black, it's time to consider how to get investors the diversity information they need to allocate their capital wisely.[146]

## VI. Nasdaq Proposal

### a. Overview of Disclosure Requirements

Disclosure of information material to an investor's voting and investment decision is the bedrock of federal securities laws. The Exchange's listing rules require companies to comply with federal securities laws, including the registration requirements under the Securities Act of 1933. Once listed, companies are obligated to solicit proxies and file all annual and periodic reports with the Commission under the Act at the prescribed times.[147] In discharging its obligation to protect investors, Nasdaq monitors listed companies for compliance with those disclosure obligations, and the failure to do so results in a notice of deficiency or delisting.

Nasdaq believes it is well within the Exchange's delegated regulatory authority to propose listing rules designed to enhance transparency so long as they do not conflict with existing federal securities laws. For example, Nasdaq requires listed companies to publicly disclose compensation or other payments by third parties to a company's directors or

---

[134] *See* Press Release, *supra* note 124.

[135] *See* ISS Governance, *ISS Announces 2021 Benchmark Policy Updates* (November 12, 2020), available at: *https://www.issgovernance.com/iss-announces-2021-benchmark-policy-updates/.*

[136] *See* Glass Lewis, *2019 Policy Guideline Updates* (Oct. 24, 2018), available at: *https://www.glasslewis.com/2019-policy-guideline-updates-united-states-canada-shareholder-initiatives-israel/.*

[137] *See* Glass Lewis, *2021 Proxy Paper Guidelines: An Overview of the Glass Lewis Approach to Proxy Advice—United States* (2020), available at: *https://www.glasslewis.com/wp-content/uploads/2020/11/US-Voting-Guidelines-GL.pdf?hsCtaTracking=7c712e31-24fb-4a3a-b396-9e8568fa0685%7C86255695-f1f4-47cb-8dc0-e919a9a5cf5b.*

[138] *Id.*

[139] Gender Diversity in Corporate Leadership Act of 2017, H.R. 1611, 115th Cong. (2017).

[140] Improving Corporate Governance Through Diversity Act of 2019, H.R. 5084, 116th Cong. (2019).

[141] Improving Corporate Governance Through Diversity Act of 2019, S. 360, 116th Cong. (2019).

[142] *See* Letter from Various U.S. Chamber of Commerce Associations and Members to Chairman Mike Crapo and Ranking Member Sherrod Brown, U.S. House Committee on Banking, Housing, and Urban Affairs (July 27, 2020), available at: *https://www.uschamber.com/sites/default/files/200727_coalition_h.r._5084_senatesmallbusiness.pdf.*

[143] *Id.*

[144] *See* Joe Mont, *SEC, Congress seek better diversity disclosures,* Compliance Week (Feb. 20, 2019), *https://www.complianceweek.com/sec-congress-seek-better-diversity-disclosures/24802.article.*

[145] *See* Lee, *supra* note 22.

[146] *Id.* Commissioner Crenshaw also expressed disappointment with the Commission's silence on diversity. *See* Crenshaw, *supra* note 7.

[147] *See* Nasdaq Stock Market Rulebook, Rules 5250(c) and (d).

nominees, notwithstanding that such disclosure is not required by federal securities laws. In approving that proposed rule, the Commission noted:

To the extent there are certain factual scenarios that would require disclosure not otherwise required under Commission rules, we believe that it is within the purview of a national securities exchange to impose heightened governance requirements, consistent with the Act, that are designed to improve transparency and accountability into corporate decision making and promote investor confidence in the integrity of the securities markets.[148]

Nasdaq is concerned that while investors have increasingly emphasized that they consider board diversity information to be material, the current lack of transparency and consistency makes it difficult for Nasdaq and investors to determine the state of diversity among listed companies as well as each board's philosophy regarding diversity. Investors also have voiced dissatisfaction about having to independently collect board-level data about race, ethnicity and gender identity because such investigations can be time consuming, expensive, and fraught with inaccuracies.[149] Moreover, in some instances, based on Nasdaq's own investigation, such information is either unavailable, or, if available, not comparable across companies. To the extent investors must obtain this information on their own through an imperfect process, Nasdaq is concerned that it increases information asymmetries between larger stakeholders, who are able to collect this data directly from companies, and smaller investors, who must rely on incomplete public disclosures. For all investors who take on the burden of independently obtaining the current information, there is a cost and time burden related to the data collection.

Nasdaq believes that additional disclosure regarding a board's composition and philosophy related to board diversity will improve transparency and accountability into corporate decision making. Nasdaq proposes to improve transparency regarding board diversity by requiring all listed companies to publicly disclose unbundled, consistent data utilizing a uniform, transparent framework on their website or in their proxy statement under Rule 5606. Similarly, Nasdaq proposes to promote accountability in corporate decision-making by requiring companies who do not have at least two

Diverse directors on their board to provide investors with a public explanation of the board's reasons for not doing so under Rule 5605(f)(3). Nasdaq designed the proposal to avoid a conflict with existing disclosure requirements under Regulation S–K and to mitigate additional burdens for companies by providing them with flexibility to provide such disclosure on their website or in their proxy statement, and not requiring them to adopt a formal diversity policy.

Nasdaq proposes to foster consistency in board diversity data disclosure by defining "Diverse" under Rule 5605(f)(1) as "an individual who self-identifies in one or more of the following categories: Female, Underrepresented Minority or LGBTQ+," and by adopting the following definitions under Rule 5605(f)(1):

• "Female" means an individual who self-identifies her gender as a woman, without regard to the individual's designated sex at birth.

• "LGBTQ+" means an individual who self-identifies as any of the following: lesbian, gay, bisexual, transgender or a member of the queer community.

• "Underrepresented Minority" means an individual who self-identifies as one or more of the following: Black or African American, Hispanic or Latinx, Asian, Native American or Alaska Native, Native Hawaiian or Pacific Islander, or Two or More Races or Ethnicities.

The terms in the proposed definition of "Underrepresented Minority" reflect the EEOC's categories and are construed in accordance with the EEOC's definitions.[150] The terms in the proposed definition of LGBTQ+ are similar to the identities defined in California's A.B. 979, described below, but have been expanded to include the queer community based on Nasdaq's consultation with stakeholders, including human rights organizations.[151]

In constructing its proposed definition of "Diverse," Nasdaq considered various state and federal legislation, stakeholder sentiments and academic studies. For example,

California requires public companies headquartered in the state to have at least one individual who self-identifies as a female on the board by 2019 under S.B. 826 [152] and at least one director who is a member of an "underrepresented community" by 2021 under A.B. 979.[153] S.B. 826 defines "Female" as "an individual who self-identifies her gender as a woman, without regard to the individual's designated sex at birth," consistent with legislation proposed by New Jersey, Michigan and Hawaii related to board gender diversity.[154] A.B. 979 considers directors from underrepresented communities to be individuals who self-identify as Black, African American, Hispanic, Latino, Asian, Pacific Islander, Native American, Native Hawaiian or Alaska Native, or as gay, lesbian, bisexual or transgender. Since S.B. 826 was passed, 669 women have joined public company boards in the state and the number of public companies with all male boards has declined from 30% in 2018 to 3% in 2020.[155]

The state of Washington requires public companies whose boards are not comprised of at least 25% directors who self-identify as women by January 1, 2022 to provide public disclosures related to the board's consideration of "diverse groups" during the director nomination process. The state considers "diverse groups" to include "women, racial minorities, and historically underrepresented groups." [156]

As discussed above, Congress has proposed legislation relating to disclosure of racial, ethnic, gender and veteran status among the company's directors. Section 342 of the Dodd-Frank Act defines "minority" as "Black American, Native American, Hispanic American, and Asian American," [157] and the Diversity Assessment Report for Entities Regulated by the SEC requires the Exchange to report workforce composition data to the SEC based on

---

[148] See Order Granting Accelerated Approval of a Proposed Rule Change, 81 FR 44,400, 44,403 (July 7, 2016).

[149] See Petition for Amendment of Proxy Rule, supra note 80, at 2.

[150] While the EEO–1 report refers to "Hispanic or Latino" rather than Latinx, Nasdaq proposes to use the term Latinx to apply broadly to all gendered and gender-neutral forms that may be used by individuals of Latin American heritage, including individuals who self-identify as Latino/a/e.

[151] Further, Nasdaq agrees with the United Kingdom Financial Reporting Council that the acronym LGBTQ+ "does not attempt to exclude other groups, nor does it imply that the experiences of people under its umbrella are the same." See Hay et al., supra note 98, at 14.

[152] See Cal. S.B. 826, supra note 112.

[153] See Cal. A.B. 979, supra note 112.

[154] See Cal. S.B. 826, supra note 112. See also N.J. Senate No. 3469, § 3(b)(2) (2019); Mich. S.B. 115, § 505a(2)(b) (2019); Haw. H.B. 2720, § 414–1(b)(2) (2020).

[155] See California Partners Project, Claim Your Seat: A Progress Report on Women's Representation on California Corporate Boards 4 (2020), available at: https://www.calpartnersproject.org/claimyourseat.

[156] See Wash. Subst. S.B. 6037, supra note 112. At least 11 states have proposed diversity-related requirements. See Hatcher and Latham, supra note 11.

[157] See 12 U.S.C. 5452(g)(3) and Public Law 101–73 § 1204(c)(3).

the EEOC's categories.[158] Most companies are required by law to provide similar workforce data to the EEOC through the EEO–1 Report, which requires employers to report statistical data related to race, ethnicity and gender to the EEOC.[159]

Nasdaq has designed the proposed rule to require all companies to provide consistent, comparable data under Rule 5606 by utilizing the existing EEO–1 reporting categories that companies are already familiar with, and by requiring companies to have, or publicly explain why they do not have, at least two directors who are diverse in terms of race, ethnicity, sexual orientation or gender identity under Rule 5605(f)(2). While the EEO–1 report does not currently include sexual orientation or gender identity, Nasdaq believes it is reasonable and in the public interest to include a reporting category for LGBTQ+ status in recognition of the U.S. Supreme Court's recent decision in *Bostock* v. *Clayton County* that sexual orientation and gender identity are "inextricably" intertwined with sex.[160]

The proposal does not preclude companies from considering additional diverse attributes, such as nationality, disability, or veteran status in selecting board members; however, the company would still have to provide the required disclosure under Rule 5605(f)(3) if the company does not also have at least two directors who are otherwise considered Diverse under Rule 5605(f)(1). Nor would the proposal prevent companies from disclosing information related to other diverse attributes of board members beyond those highlighted in the rule if they felt such disclosure

would benefit investors. Nasdaq believes such disclosure would provide investors with additional information about the company's philosophy regarding broader diversity characteristics.

Overall, Nasdaq believes the proposal will enhance investor confidence that all listed companies are considering diversity of race, ethnicity, sexual orientation and gender identity in the context of selecting directors. Investors will be confident that board discussions at listed companies with at least two Diverse directors include the perspectives of more than one demographic group. They will also be confident that boardrooms without at least two Diverse directors are having a thoughtful discussion about their reasons for not doing so and publicly explaining those reasons. On balance, the proposal will advance the public interest and enhance investor confidence in the integrity of the securities markets by ensuring investors that Nasdaq is monitoring all listed companies to verify that they have at least two Diverse directors or explain why they do not, and by requiring all listed companies to provide consistent, comparable diversity disclosures.

*b. Board Statistical Disclosure*

Given the increased interest in, and advocacy for, improvements in board transparency related to diversity disclosure information, the Exchange is proposing to adopt new Rule 5606(a), which would require each company to publicly disclose, to the extent permitted by applicable law, information on each director's voluntary self-identified gender and racial characteristics and LGBTQ+ status.

All Nasdaq-listed companies that are subject to proposed Rule 5605(f), whether they choose to meet the diversity objectives of proposed Rule 5605(f)(2) or to explain why they do not, would be required to make the proposed Rule 5606 disclosure. This proposed rule also will assist the Exchange in assessing whether companies meet the diversity objectives of proposed Rule 5605(f). Under Rule 5606(e), Nasdaq proposes to make proposed Rule 5606 operative for listed companies one year after the SEC Approval Date of this proposal.

Pursuant to proposed Rule 5606(a), each company would be instructed to annually provide its board-level diversity data in a format substantially similar to the Board Diversity Matrix in proposed Rule 5606(a) and attached [sic] as *Exhibit 3.* The company would be required to provide the total number of directors on its board. If a director voluntarily self-identifies, each company, other than a Foreign Issuer (as defined under Rule 5605(f)(1)), would include the following in a table titled "Board Diversity Matrix," in accordance with the instructions accompanying the proposed disclosure format: (1) the number of directors based on gender identity (male, female or non-binary [161]); (2) the number of directors based on race and ethnicity (African American or Black, Alaskan Native or American Indian, Asian, Hispanic or Latinx, Native Hawaiian or Pacific Islander, White, or Two or More Races or Ethnicities); and (3) the number of directors who self-identify as LGBTQ+.

Any director who chooses not to disclose a gender would be included under "Gender Undisclosed" and any director who chooses not to identify as any race or not to identify as LGBTQ+ would be included in the "Undisclosed" category at the bottom of the table. The defined terms for the race and ethnicity categories in the instructions to the Board Diversity Matrix disclosure format are substantially similar to the terms and definitions used in the EEO–1 Report.[162] LGBTQ+ is defined similarly to proposed Rule 5605(f)(1) as a person who identifies as any of the following: lesbian, gay, bisexual, transgender or a member of the queer community.

Below is an example of a Board Diversity Matrix that companies may use, which is also attached [sic] as *Exhibit 3:*

[158] *See* Securities and Exchange Commission, Diversity Assessment Report for Entities Regulated by the SEC, available at: *https://www.sec.gov/files/OMWI-DAR-FORM.pdf.*

[159] All companies with 100 or more employees are required to complete the EEO–1 Report. *See* U.S. Equal Employment Opportunity Commission, EEO–1: Who Must File, *https://www.eeoc.gov/employers/eeo-1-survey/eeo-1-who-must-file* (last accessed Nov. 27, 2020).

[160] *See Bostock* v. *Clayton Cty.,* 140 S. Ct. 1731, 1742 (2020) ("But unlike any of these other traits or actions, homosexuality and transgender status are inextricably bound up with sex. Not because homosexuality or transgender status are related to sex in some vague sense or because discrimination on these bases has some disparate impact on one sex or another, but because to discriminate on these grounds requires an employer to intentionally treat individual employees differently because of their sex.").

[161] Although non-binary is included as a category in the proposed Board Diversity Matrix, a company would not satisfy the diversity requirement proposed by Rule 5605(f)(2) if a director self-identifies solely as non-binary.

[162] *See supra* note 159. Additionally, the EEOC does not categorize LGBTQ+ or any other sexual orientation identifier on its EEO–1 Report. The definitions of the EEO–1 race and ethnicity categories may be found in the appendix to the EEO–1 Report instructional booklet, available at *https://www.eeoc.gov/employers/eeo-1-survey/eeo-1-instruction-booklet.*

### BOARD DIVERSITY MATRIX
[As of [DATE]]

| Board Size: | | | | |
|---|---|---|---|---|
| Total Number of Directors ................................................................... | # | | | |
| Gender: | Male | Female | Non-Binary | Gender undisclosed |
| Number of directors based on gender identity ......................................... | # | # | # | # |
| Number of directors who identify in any of the categories below: | | | | |
| African American or Black ....................................................... | # | # | # | # |
| Alaskan Native or American Indian .......................................... | # | # | # | # |
| Asian ................................................................................... | # | # | # | # |
| Hispanic or Latinx ................................................................. | # | # | # | # |
| Native Hawaiian or Pacific Islander ........................................ | # | # | # | # |
| White ................................................................................... | # | # | # | # |
| Two or More Races or Ethnicities ........................................... | # | # | # | # |
| LGBTQ+ ....................................................................................... | # | | | |
| Undisclosed ................................................................................. | # | | | |

Nasdaq recognizes that some Foreign Issuers, including Foreign Private Issuers as defined by the Act,[163] may have their principal executive offices located outside of the United States and in jurisdictions that may impose laws limiting or prohibiting self-identification questionnaires, particularly as they relate to race, ethnicity or LGBTQ+ status. In such countries, a Foreign Issuer may be precluded by law from requesting diversity data from its directors. Moreover, Nasdaq's definition of Underrepresented Minority proposed in Rule 5606(f)(1) may be inapplicable to a Foreign Issuer, making this Board Matrix data less relevant for such companies and not useful for investors.

As a result of these limitations, Nasdaq is proposing the option of a separate Board Diversity Matrix for Foreign Issuers. Similar to other companies, a Foreign Issuer would be required to provide the total number of directors on its board. If a director voluntarily self-identifies, the company would include the following in a table titled ''Board Diversity Matrix'': (1) The number of directors based on gender identity (male, female or non-binary[164]); (2) the number of directors who are considered underrepresented in the company's home country jurisdiction;[165] and (3) the number of directors who self-identify as LGBTQ+.

An ''Underrepresented Individual in Home Country Jurisdiction'' is defined in the instructions to the Board Diversity Matrix as a person who self-identifies as an underrepresented individual based on national, racial, ethnic, indigenous, cultural, religious or linguistic identity in a Foreign Issuer's home country jurisdiction. Rule 5605(f)(2)(B)(i) also proposes the same definition for Diverse directors of Foreign Issuers.

Nasdaq is also proposing new Rule 5606(b), which would require each company to provide the disclosure required under Rule 5606(a) in either the company's proxy statement or information statement for its annual meeting for shareholders, or on the company's website. If the company elects to disclose the information on its website, the company must also submit such disclosure along with a URL link to the information through the Nasdaq Listing Center within 15 calendar days of the company's annual shareholder meeting. The proposed time period to submit the information to the Nasdaq Listing Center is aligned with the time period provided in proposed Rule 5605(f)(3) for a company to submit its explanation for why it does not have at least two Diverse directors. Disclosure of the statistical data is not in lieu of any SEC requirements for a company to disclose any required information pursuant to Regulation S–K or any other federal, state or foreign laws or regulations. As described in the instructions to the Board Diversity Matrix and Rule 5606(a), each year following the first year that a company publishes its annual Board Diversity Matrix, the company would be required to publish its data for the current and immediately prior years.

Additionally, Nasdaq is proposing Rule 5606(c), which exempts the following types of companies from proposed Rule 5606(a): acquisition companies listed under IM–5101–2; asset-backed issuers and other passive issuers (as set forth in Rule 5615(a)(1)); cooperatives (as set forth in Rule 5615(a)(2)); limited partnerships (as set forth in Rule 5615(a)(4)); management investment companies (as set forth in Rule 5615(a)(5)); issuers of non-voting preferred securities, debt securities and Derivative Securities (as set forth in Rule 5615(a)(6)); and issuers of securities listed under the Rule 5700 Series. The exemption of these companies is consistent with the approach taken by Nasdaq in Rule 5615 as it relates to certain Nasdaq corporate governance standards for board composition.

Nasdaq is also proposing Rule 5606(d) to allow for a company newly listing on Nasdaq, including a company listing in connection with a business combination under IM–5101–2, to satisfy the requirement of Rule 5606 within one year of listing on Nasdaq. The disclosure required by proposed Rule 5606(d) would be required to be included in the company's annual proxy statement or information statement for its annual meeting of shareholders or on the company's website. If the company provides such disclosure on its website, the company must also submit the disclosure and a URL link to the disclosure through the Nasdaq Listing Center no later than 15 calendar days after the company's annual shareholder meeting.

When a company does not timely provide the required disclosure, Nasdaq will notify the company that it is not in compliance with a listing requirement

[163] See 17 CFR 240.3b–4.

[164] Although non-binary is included as a category in the proposed Board Diversity Matrix, a company would not satisfy any aspect of the diversity requirement proposed by Rule 5605(f)(2) if a director self-identifies solely as non-binary.

[165] To clarify, although a Foreign Issuer may disclose directors that meet the requirement of Underrepresented Minority pursuant to new Rule 5605(f)(1), such disclosure may not meet the diversity objectives of new Rule 5605(f)(2)(B)(ii).

and allow the company to provide a plan to regain compliance. Consistent with deficiencies from most other rules that allow a company to submit a plan to regain compliance,[166] Nasdaq proposes to allow companies deficient under proposed Rule 5606 45 calendar days to submit a plan in accordance with Rule 5810(c)(2) to regain compliance and, based on that plan, Nasdaq can provide the company with up to 180 days to regain compliance. If the company does not do so, it would be issued a Staff Delisting Determination, which the company could appeal to a Hearings Panel pursuant to Rule 5815. Although proposed Rule 5606 is not identical to the current Commission requirements, it is similar to, and does not deviate from, the Commission's CD&I related to Items 401(e)(1) and 407(c)(2)(vi) of Regulation S–K. Moreover, the proposed rule strengthens the Commission's requirements by providing clarity to the definition of diversity and streamlining investors' desire for clear, complete and consistent disclosures. Nasdaq believes that the format of the Board Diversity Matrix and the information that it will provide offers greater transparency into a company's board composition and will enable the data to be easily aggregated across issuers.[167] Nasdaq also believes that requiring annual disclosure of the data will ensure that the information remains current and easy for investors, data analysts and other parties to track.

### c. Diverse Board Representation or Explanation

Nasdaq is proposing to adopt new Rule 5605(f)(2) to require each listed company to have, or explain why it does not have, at least two members of its board of directors who are Diverse, including at least one who self-identifies as Female and one who self-identifies as an Underrepresented

Minority or LGBTQ+.[168] A company does not need to provide additional public disclosures if the company discloses under Rule 5606 that it has at least two Diverse directors satisfying this requirement. The terms in the proposed definition of "Underrepresented Minority" reflect the EEOC's categories and are construed in accordance with the EEOC's definitions. Nasdaq has provided additional flexibility for Smaller Reporting Companies and Foreign Issuers (including Foreign Private Issuers).

Under proposed Rule 5605(f)(3), if a company satisfies the requirements of Rule 5605(f)(2) by explaining why it does not have two Diverse directors, the company must: (i) Specify the requirements of Rule 5605(f)(2) that are applicable (e.g., the applicable subparagraph, the applicable diversity objectives, and the timeframe applicable to the company's market tier); and (ii) explain the reasons why it does not have two Diverse directors. Such disclosure must be provided: (i) In the company's proxy statement or information statement for its annual meeting of shareholders; or (ii) on the company's website. If the company provides such disclosure on its website, the company must also notify Nasdaq of the location where the information is available by submitting the URL link through the Nasdaq Listing Center no later than 15 calendar days after the company's annual shareholder meeting.

Nasdaq would not assess the substance of the company's explanation, but would verify that the company has provided one. If the company has not provided any explanation, or has provided an explanation that does not satisfy subparagraphs (i) and (ii) of Rule 5605(f)(3), the explanation will not satisfy the requirements of Rule 5605(f)(3). For example, it would not satisfy Rule 5605(f)(3) merely to state that "the Company does not comply with Nasdaq's diversity rule." As described above, the company must specify the requirements of Rule 5605(f)(2) that are applicable and explain the reasons why it does not have two Diverse directors. For example, a company could disclose the following to satisfy subparagraph (i) of Rule 5605(f)(3): "As a Smaller Reporting Company listed on the Nasdaq Capital Market tier, the Company is subject to Nasdaq Rule 5605(f)(2)(C), which requires the company to have, or explain why it does not have, at least

two Diverse directors, including at least one director who self-identifies as Female. Under Rule 5605(f)(7), the Company is required to have at least one Diverse director by March 10, 2023, and a second Diverse director by March 10, 2026. The Company has chosen to satisfy Rule 5605(f)(2)(C) by explaining its reasons for not meeting the diversity objectives of Rule 5605(f)(2)(C), which the Company has set forth below."

### i. Effective Dates and Phase-in Period

Proposed Rule 5605(f)(7) provides a transition period before companies must fully satisfy the requirement to have two Diverse directors or explain why they do not upon the initial implementation of the rule. Under this transition rule, each company must have, or explain why it does not have, one Diverse director no later than two calendar years after SEC approval of the proposed rule (the "Approval Date"), and two Diverse directors no later than (i) four calendar years after the Approval Date for companies listed on the Nasdaq Global Select ("NGS") or Global Market ("NGM") tiers, or (ii) five calendar years after the Approval Date for companies listed on the Nasdaq Capital Market ("NCM") tier. For example, if the Approval Date is March 10, 2021, all companies would be required to have, or explain why they do not have, one Diverse director by March 10, 2023 and two Diverse directors by March 10, 2025 (for NGS/NGM companies) or March 10, 2026 (for NCM companies).

Under proposed Rule 5605(f)(5)(A), a newly listed company that was not previously subject to a substantially similar requirement of another national securities exchange will be allowed one year from the date of listing to satisfy the requirement described above. This "phase-in" period applies to companies listing in connection with an initial public offering, a direct listing, a transfer from another exchange or the over-the-counter market, or through a business combination with an acquisition company listed under IM–5101–2, such that the company is no longer subject to IM–5101–2 after the combination. This phase-in period will apply after the end of the transition period provided in Rule 5605(f)(7). As a result, companies listing after the expiration of the phase-in periods provided by Rule 5605(f)(7) would be provided with one year from the date of listing to satisfy the applicable requirement of Rule 5605(f)(2) to have, or explain why they do not have, at least two Diverse directors. Companies listing after the Approval Date, but prior to the expiration of the phase-in periods provided by Rule 5605(f)(7), would be

---

[166] Pursuant to Nasdaq Rule 5810(c)(2)(A)(iii), a company is provided 45 days to submit a plan to regain compliance with Rules 5620(a) (Meetings of Shareholders), 5620(c) (Quorum), 5630 (Review of Related Party Transactions), 5635 (Shareholder Approval), 5250(c)(3) (Auditor Registration), 5255(a) (Direct Registration Program), 5610 (Code of Conduct), 5615(a)(4)(D) (Partner Meetings of Limited Partnerships), 5615(a)(4)(E) (Quorum of Limited Partnerships), 5615(a)(4)(G) (Related Party Transactions of Limited Partnerships), and 5640 (Voting Rights). Pursuant to Nasdaq Rule 5810(c)(2)(A)(iv), a company is also provided 45 days to submit a plan to regain compliance with Rule 5250(b)(3)(Disclosure of Third Party Director and Nominee Compensation). A company is generally provided 60 days to submit a plan to regain compliance with the requirement to timely file periodic reports contained in Rule 5250(c)(1).

[167] Various stakeholders have requested easier aggregation. See Petition for Amendment of Proxy Rule, supra note 80, at 1.

[168] Nasdaq plans to publish an FAQ on the Listing Center clarifying that "two members of its board of directors who are Diverse" would exclude emeritus directors, retired directors and members of an advisory board.

provided with the latter of the periods set forth in Rule 5605(f)(7) or one year from the date of listing.

Nasdaq believes this proposed period is consistent with the phase-in periods granted to companies for Nasdaq's other board composition requirements. For example, Rule 5615(b)(1) provides a company listing in connection with its initial public offering one year to fully comply with the compensation and nomination committee requirements of Rules 5605(d) and (e), and with the majority independent board requirement of Rule 5605(b). Similarly, SEC Rule 10A–3(b)(1)(iv)(A) allows a company up to one year from the date its registration statement is effective to fully comply with the applicable audit committee composition requirements. Nasdaq Rule 5615(b)(3) provides a one-year timeframe for compliance with the board composition requirements for companies transferring from other listed markets that do not have a substantially similar requirement.

ii. Foreign Issuers

Nasdaq recognizes that the EEOC categories of race and ethnicity may not extend to all countries globally because each country has its own unique demographic composition. However, Nasdaq observed that on average, women tend to be underrepresented in boardrooms across the globe, holding an estimated 16.9% of board seats in 2018.[169] As an official supporter of the United Nations Sustainable Stock Exchanges Initiative, Nasdaq recognizes that ensuring women have equal opportunities for leadership in economic decision making is one of the United Nations Sustainable Development Goals to be accomplished by 2030.[170] However, studies estimate that at current rates, it could take 18[171] to 34 years[172] for U.S. companies to achieve gender parity on their boards.

Accordingly, under proposed Rule 5605(f)(2)(B), each Foreign Issuer must have, or explain why it does not have, at least two Diverse directors on its board, including at least one Female. Nasdaq proposes to provide Foreign Issuers with additional flexibility in that

Foreign Issuers may satisfy the diversity requirement by having two Female directors. In addition, Foreign Issuers may also satisfy the diversity requirement by having one Female director, and an individual who self identifies as (i) LGBTQ+ or (ii) an underrepresented individual based on national, racial, ethnic, indigenous, cultural, religious or linguistic identity in the company's home country jurisdiction. Alternatively, a company could satisfy Rule 5605(f)(2)(B) by publicly explaining the company's reasons for not meeting the diversity objectives of the rule.

Nasdaq proposes to define a Foreign Issuer under Rule 5605(f)(1) as (a) a Foreign Private Issuer (as defined in Rule 5005(a)(19)) or (b) a company that: (i) Is considered a "foreign issuer" under Rule 3b–4(b) under the Act;[173] and (ii) has its principal executive offices located outside of the United States. This definition will include all Foreign Private Issuers (as defined in Rule 5005(a)(19)),[174] and any foreign issuers that are not foreign private issuers so long as they are also headquartered outside of the United States. This is designed to recognize that companies that are not Foreign Private Issuers but are headquartered outside of the United States are foreign companies notwithstanding the fact that they file domestic SEC reports. It is also designed to exclude companies that are domiciled in a foreign jurisdiction without having a physical presence in that country. Proposed Rule 5605(f)(5)(B) will allow any company that ceases to be a Foreign Issuer one year from the date that the company no longer qualifies as a Foreign Issuer to satisfy the requirements of Rule 5605(f).

Nasdaq also proposes to revise Rule 5615 and IM–5615–3, which currently permit a Foreign Private Issuer to follow home country practices in lieu of the requirements set forth in the Rule 5600 Series, subject to several exclusions. Nasdaq proposes to revise Rule 5615 and IM–5615–3 to add Rules 5605(f) and 5606 to the list of excluded corporate governance rules. As a result, Foreign Private Issuers must satisfy the requirements of Rule 5605(f) and 5606 and may not follow home country practices in lieu of such requirements. However, Foreign Private Issuers that elect to follow an alternative diversity

objective in accordance with home country practices, or are located in jurisdictions that restrict the collection of personal data, may satisfy the requirements of Rule 5605(f) by explaining their reasons for doing so instead of meeting the diversity objectives of the rule.

iii. Smaller Reporting Companies

Nasdaq also recognizes that smaller companies, especially pre-revenue companies that depend on the capital markets to fund ground-breaking research and technological advancements, may not have the resources necessary to compensate an additional director or engage a search firm to search outside of directors' networks. In recognition of the resource constraints faced by smaller companies, Nasdaq proposes to provide each Smaller Reporting Company with additional flexibility. Specifically, these companies could satisfy the two Diverse directors objective under Rule 5605(f)(2)(C) by having two Female directors.

Like other companies, Smaller Reporting Companies could also satisfy the two Diverse directors by having one Female director and one director who self-identifies as either (i) an Underrepresented Minority, or (ii) a member of the LGBTQ+ community. Alternatively, a company could satisfy Rule 5605(f)(2)(C) by publicly explaining the company's reasons for not meeting the diversity objectives of the rule. Under Rule 5605(f)(1), Nasdaq proposes to define a Smaller Reporting Company as set forth in Rule 12b–2 under the Act.[175] Proposed Rule 5605(f)(5)(B) will allow any company that ceases to be a Smaller Reporting Company one year from the date that the company no longer qualifies as a Smaller Reporting Company to satisfy the requirements of Rule 5605(f).

iv. Cure Period

Nasdaq proposes to adopt Rule 5605(f)(6) and a new Rule 5810(c)(3)(F) to specify what happens if a company does not have at least two Diverse directors as set forth under Rule 5605(f)(2) and fails to provide the disclosure required by Rule

---

[169] See Deloitte, *Women in the Boardroom, supra* note 36.

[170] See United Nations Sustainable Stock Exchanges Initiative, *Gender Equality, https://www.un.org/sustainabledevelopment/gender-equality/* (last accessed Nov. 24, 2020).

[171] See McKinsey & Company, *supra* note 36, at 17.

[172] See GAO Report, *supra* note 44, at 9 (estimating "it could take about 10 years from 2014 for women to comprise 30 percent of board directors and more than 40 years for the representation of women on boards to match that of men").

[173] *See* 17 CFR 240.3b–4(b) ("The term foreign issuer means any issuer which is a foreign government, a national of any foreign country or a corporation or other organization incorporated or organized under the laws of any foreign country.").

[174] Under Nasdaq Rule 5005(a)(19), the term Foreign Private Issuer has "the same meaning as under Rule 3b–4 under the Act."

[175] Under 12b–2 of the Act, a Smaller Reporting Company "means an issuer that is not an investment company, an asset-backed issuer (as defined in § 229.1101 of this chapter), or a majority-owned subsidiary of a parent that is not a smaller reporting company and that: (1) Had a public float of less than $250 million; or (2) Had annual revenues of less than $100 million and either: (i) No public float; or (ii) A public float of less than $700 million." *See* 17 CFR 240.12b–2.

5605(f)(3).[176] Under those provisions, the Listing Qualifications Department will promptly notify the company that it has until the latter of its next annual shareholders meeting, or 180 days from the event that caused the deficiency, to cure the deficiency. The company can cure the deficiency either by nominating additional directors so that it satisfies the Diversity requirement of Rule 5605(f)(2) or by providing the disclosure required by Rule 5605(f)(3). If a company does not regain compliance within the applicable cure period, the Listings Qualifications Department would issue a Staff Delisting Determination Letter. A company that receives a Staff Delisting Determination can appeal the determination to the Hearings Panel through the process set forth in Rule 5815. Nasdaq also proposes revising Rule 5810(c)(2)(A)(iv) to make a non-substantive change clarifying that Rule 5250(b)(3) is related to "Disclosure of Third Party Director and Nominee Compensation."

v. Exempt Companies

Under proposed Rule 5605(f)(4), Nasdaq proposes to exempt the following types of companies from the requirements of Rule 5605(f) ("Exempt Companies"): acquisition companies listed under IM–5101–2; asset-backed issuers and other passive issuers (as set forth in Rule 5615(a)(1)); cooperatives (as set forth in Rule 5615(a)(2)); limited partnerships (as set forth in Rule 5615(a)(4)); management investment companies (as set forth in Rule 5615(a)(5)); issuers of non-voting preferred securities, debt securities and Derivative Securities (as set forth in Rule 5615(a)(6)); and issuers of securities listed under the Rule 5700 Series. Proposed Rule 5605(f)(5)(B) will allow any company that ceases to be an Exempt Company one year from the date that the company no longer qualifies as an Exempt Company to satisfy the requirements of Rule 5605(f).

Nasdaq believes it is appropriate to exempt these types of companies from the proposed rule because such companies do not have boards, do not list equity securities, or are not operating companies. These companies are already exempt from certain of Nasdaq's corporate governance standards related to board composition, as described in Rule 5615.

d. Alternatives Considered

Nasdaq considered whether requiring listed companies to have, or explain

why they do not have, two Diverse directors would better promote the public interest than an alternative threshold or approach. Nasdaq's reasoned decision-making process included considering: (i) Mandate and disclosure-based approaches; (ii) higher and lower diversity objectives; (iii) longer and shorter timeframes; and (iv) broader and narrower definitions of "Diverse."

i. Mandate vs. Disclosure Based Approach

Globally, gender mandates range from requiring at least one woman on the board,[177] requiring two or more women based on board size,[178] or requiring 30 to 50% women on the board.[179] Some

mandates vary by board size—for example, Norway imposes different standards for boards of two to three directors, four to five directors, six to eight directors, nine directors and ten or more directors.[180] California imposes a higher standard for gender diversity that boards with five directors or six or more directors must satisfy by the end of 2021 under S.B. 826, and a higher standard for underrepresented communities that boards with five to eight directors and nine or more directors must satisfy by the end of 2022 under A.B. 979. Nasdaq did not observe a common denominator among the mandates applicable to varying board sizes. However, Nasdaq considered criticism that a model based on various board sizes could subject companies to a higher threshold by virtue of adding directors.[181] Based on Nasdaq data, the average board size of its listed companies is eight directors.

Soft targets ranging from 25% to 40% women on boards have been suggested by various corporate governance codes and corporate governance organizations. For example, Rule 4.1 of the Swedish Corporate Governance Code (the "Code") provides that listed companies are to "strive for gender balance on the board."[182] Each company's nominations committee is to publish a statement on its website at the time it issues notice of its shareholders meeting "with regard to the requirement in rule 4.1, that the proposed composition of the board is appropriate according to the criteria set out in the Code and that the company is to strive for gender balance."[183] Companies are not

---

[176] Nasdaq proposes that existing Rules 5810(c)(3)(F) and (G) be renumbered as Rules 5810(c)(3)(G) and (H) respectively.

[177] For example, the Securities and Exchange Board of India requires public companies to have at least one woman on the board. *See* Securities and Exchange Board of India (Listing Obligations and Disclosure Requirements) Regulations, Regulation 17(1)(a) (2015), available at: *https://www.sebi.gov.in/legal/regulations/jan-2020/securities-and-exchange-board-of-india-listing-obligations-and-disclosure-requirements-regulations-2015-last-amended-on-january-10-2020-_37269.html*. Similarly, the Israeli Companies Law requires public companies to have at least one woman on the board. *See* Paul Hastings, *Breaking the Glass Ceiling: Women in the Boardroom* 139 (2018), available at: *https://www.paulhastings.com/genderparity/*. In the United States, California's S.B. 826 requires public companies headquartered in California to have at least one woman on the board. *See* Cal. S.B. 826, *supra* note 112, at § 301.3(b)(3).

[178] For example, California's S.B. 826 requires public companies headquartered in California to have at least two women on the board if their board is comprised of five directors, and at least three women on the board if their board is comprised of six or more directors. *See* Cal. S.B. 826, *supra* note 112, at § 301.3(b)(1) and (2). Similar legislation has been proposed in New Jersey, Michigan and Hawaii. *See* N.J. Senate No. 3469, § 3(b)(2) (2019); Mich. S.B. 115, § 505a(2)(b) (2019); Haw. H.B. 2720, § 414–11(b)(2) (2020).

[179] For example, Norway imposes a gender quota ranging from 33%–50% depending on board size. *See* Paul Hastings, *supra* note 177, at 103. Portugal requires listed companies to have at least 33.3% women on boards by 2020. *See* Deloitte, *Women in the Boardroom, supra* note 86, at 143. Germany requires public companies with co-determined boards (at least 50% employee representation) to have at least 30% women, and all other listed companies to establish a company-defined target. *See* Ulrike Binder and Guido Zeppenfeld, Mayer Brown, *Germany Introduces Rules on Female Quota for Supervisory Boards & Leadership Positions* (March 13, 2015), available at *https://www.mayerbrown.com/en/perspectives-events/publications/2015/03/germany-introduces-rules-on-female-quota-for-super*. Belgium requires listed companies to have at least 33% women on the board. *See* Deloitte, *Women in the Boardroom, supra* note 86, at 85. Austria requires listed companies with more than 1,000 employees to have at least 30% women on the board. *See id.* at 81. Iceland requires public companies with more than 50 employees to have at least 40% women on the board. *See* Act respecting Public Limited Companies No. 2/199, Article 63, available at: *https://www.government.is/publications/legislation/lex/2018/02/06/THANSLATION-OF-RECENT-AMENDMENTS-OF-ICELANDIC-PUBLIC-AND-PRIVATE-LIMITED-COMPANIES-*

*LEGISLATION-2008-2010-including-Acts-13-2010-sex-ratios-and-68-2010-minority-protection-remuneration/*. France and Italy both require public companies to have at least 40% women on their boards. *See* Paul Hastings, *supra* note 177, at 91; White & Case, *Italy increases gender quotas in corporate boards of listed companies* (Jan. 29, 2020), available at: *https://www.whitecase.com/publications/alert/italy-increases-gender-quotas-corporate-boards-listed-companies*).

[180] *See* Paul Hastings, *supra* note 177, at 103.

[181] *See* David A. Katz and Laura A. McIntosh, Wachtell, Lipton, Rosen & Katz, *Gender Diversity and Board Quotas*, New York Law Journal (July 25, 2018), available at: *https://www.wlrk.com/webdocs/wlrknew/AttorneyPubs/WLRK.26150.18.pdf* ("California legislators dispute that the bill requires men to be displaced by women, noting that boards can simply increase their size. This may be easier said than done, however: Because the required quota increases with board size, a company with a four-man board that did not wish to force out a current director would need to add three women to accommodate the requirements of the law by 2021.").

[182] *See* Swedish Corporate Governance Board, *The Swedish Corporate Governance Code* § 4.1 17 (eff. Jan. 1, 2020), available at: *http://www.bolagsstyrning.se/UserFiles/Koden/The_Swedish_Corporate_Governance_Code_1_January_2020.pdf*.

[183] *See* Swedish Corporate Governance Board, *Annual Report 2020* 22 (August 2020), available at:

required to comply with the Code, "but are allowed the freedom to choose alternative solutions which they feel are better suited to their particular circumstances, as long as they openly report every deviation, describe the alternative solution they have chosen and explain their reasons for doing so." [184] Signifying progress, in 2019, 7% of nominations committees did not issue a statement on board gender balance, compared to 58% in 2013.[185]

In 2015, the Swedish Corporate Governance Board, which is responsible for administering the Code, established a goal to achieve representation of women on boards of small/mid cap (and Swedish companies listed on NGM Equity) and large cap companies of 30% and 35%, respectively, by 2017. Further, the Board aimed to achieve 40% representation of women on boards of all listed Swedish companies by 2020.[186] Based on data as of June 30, 2020, among listed companies, women accounted for 32.7% of board seats on small/mid cap companies and NGM Equity, 38.6% of large cap companies and 34.7% of all listed companies.[187]

In the United Kingdom, the Financial Conduct Authority requires companies with a premium listing on the London Stock Exchange to publicly disclose whether or not they comply with the Financial Reporting Council's U.K. Corporate Governance Code (the "U.K. Code"), and if not, to explain their reasons for non-compliance.[188]

Provision 23 of the U.K. Code requires each company to publicly describe "the work of the nomination committee, including . . . the policy on diversity and inclusion, its objectives and linkage to company strategy, how it has been implemented and progress on achieving the objectives," [189] and Principle J states that board appointments and succession planning should, among other things, "promote diversity of gender, social and ethnic backgrounds." [190] In addition, the Companies Act requires companies to disclose gender diversity statistics among the board, management and employees.[191] In 2018, the Financial Reporting Council reported that 83% of FTSE 100 and 74% of FTSE 250 companies had established a board diversity policy specifying gender, with approximately 1/3 specifying ethnicity.[192] More recently, a report commissioned by the Financial Reporting Council concluded that there is a lack of public disclosure regarding the LGBTQ+ status among directors and executives of public companies. While the report did not recommend amending Principle J of the U.K. Code to consider sexual orientation or gender identity, it emphasized that the U.K. Code "seeks to promote diversity and inclusion of all minority groups within business" [193] and suggested that the government "update corporate reporting requirements to require companies to demonstrate how they intend to capture data on the sexual orientation and gender identity of staff." [194]

In 2011, the Davies Review called on FTSE 100 boards to achieve 25% women on boards by 2015.[195] After that milestone was achieved, the Hampton Alexander Review encouraged FTSE 350 boards to have 1/3 women by 2020, and it has been achieved by FTSE 100 companies.[196] In 2017, the Parker Review called on FTSE 100 and 250 companies to have at least one director of color by 2021 and 2024,

respectively.[197] As of February 2020, approximately 37% of FTSE 100 companies surveyed and 59% of FTSE 350 companies surveyed did not have one director of color on their board.[198]

Australian Securities Exchange ("ASX")-listed companies must comply with the ASX Corporate Governance Council's Corporate Governance Principles and Recommendations (the "ASX Recommendations") or explain why they do not. The ASX Recommendations require companies to have and disclose a diversity policy with measurable objectives and report on progress towards meeting those objectives. If the company is in the ASX/S&P 300, its objective for achieving gender diversity should be at least 30%.[199] The Australian government also requires companies with 100 or more employees to provide an annual report about gender equality indicators, including the gender composition of the board and the rest of the workforce.[200] In 2015, the ASX and KPMG found that 99% of S&P/ASX 200 companies and 88% of ASX 201–500 companies disclosed establishing a diversity policy rather than explaining why they do not have one.[201] As of July 2020, women account for 28.4% and 31.8% of board seats among ASX 300 and ASX 100 companies, respectively.[202]

Nasdaq observed that women account for at least 30% of the boards of the largest companies in Australia, Sweden and the United Kingdom, and in three other countries that have implemented disclosure requirements or suggested milestones on a comply-or-explain

---

http://www.bolagsstyrning.se/userfiles/archive/3930/kodkoll_arsrapport-2020_eng.pdf.

[184] See Swedish Corporate Governance Board, Gender balance on boards of listed companies: The Swedish Corporate Governance Board assesses the situation ahead of this year's AGMs (February 3, 2015), available at: http://www.bolagsstyrning.se/userfiles/archive/3856/pressrelease_gender_2014-02-03.pdf.

[185] See Swedish Corporate Governance Board, Annual Report 2020, supra note 183, at 22.

[186] See Swedish Corporate Governance Board, Gender balance, supra note 184.

[187] See Swedish Corporate Governance Board, Statistics regarding gender balance (July 15, 2020), available at: http://www.bolagsstyrning.se/userfiles/archive/3922/200715_gender_balance_on_boards.pdf; see also Sammanfattning, available at http://www.bolagsstyrning.se/userfiles/archive/3922/statistik_konsfordelning_2020.pdf.

[188] See Financial Conduct Authority, LR 9.8.6(6), available at: https://www.handbook.fca.org.uk/handbook/LR/9/8.html; see also Financial Reporting Council, The UK Corporate Governance Code (3 July 2018), available at https://www.frc.org.uk/getattachment/88bd8c45-50ea-4841-95b0-d2f4f48069a2/2018-UK-Corporate-Governance-Code-FINAL.PDF. In addition, "[i]n 2016, the [UK] Government also implemented the relevant provision of the EU Non-Financial Reporting Directive with a new reporting requirement in the FCA's Disclosure and Transparency Rules. This requires issuers (excluding [small and medium-sized enterprises]) admitted to trading on an EU regulated market to disclose their diversity policy in the corporate

governance statement." See Financial Reporting Council, Board Diversity Reporting 5 (September 2018), available at: https://www.frc.org.uk/getattachment/62202e7d-064c-4026-bd19-f9ac9591fe19/Board-Diversity-Reporting-September-2018.pdf.

[189] See Financial Reporting Council, The UK Corporate Governance Code, supra note 188, at 9.

[190] Id. at 8.

[191] See UK Companies Act 2006, § 414C.

[192] See Financial Reporting Council, Board Diversity Reporting, supra note 188, at 9.

[193] See Hay et al., supra note 98, at 37.

[194] Id.

[195] See Women on boards, supra note 96.

[196] See Hampton-Alexander Review: FTSE Women Leaders (November 2016), available at: https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/613085/ftse-women-leaders-hampton-alexander-review.pdf.

[197] See Parker, supra note 97.

[198] See Sir John Parker, Ethnic Diversity Enriching Business Leadership 19 (Feb. 5, 2020), available at: https://assets.ey.com/content/dam/ey-sites/ey-com/en_uk/news/2020/02/ey-parker-review-2020-report-final.pdf.

[199] See ASX Corporate Governance Council, Corporate Governance Principles and Recommendations 9 (4th ed. Feb. 2019), available at: https://www.asx.com.au/documents/asx-compliance/cgc-principles-and-recommendations-fourth-edn.pdf.

[200] Workplace Gender Equality Act 2012, Part IV § 13 (March 25, 2015), available at: https://www.legislation.gov.au/Details/C2015C00088.

[201] See KPMG and ASX, ASX Corporate Governance Council Principles and Recommendations on Diversity: Analysis of disclosures for financial years ended 1 January 2015 and 31 December 2015 4 (2016) available at: https://www.asx.com.au/documents/asx-compliance/asx-corp-governance-kpmg-diversity-report.pdf.

[202] See KPMG and 30% Club, Building Gender Diversity on ASX 300 Boards: Seven Learnings from the ASX 200 4 (July 2020), available at: https://assets.kpmg/content/dam/kpmg/au/pdf/2020/building-gender-diversity-asx-300-boards.pdf. The report also noted that diversity counteracts groupthink and that ASX 201–299 companies with at least 30% female directors "are more likely than not to [have seen] market capitalisation increases over the past 12 months." Id. at 6.

basis: Finland, New Zealand, and Canada.[203] Nasdaq considered that countries that have implemented mandates have also seen progress in women's representation on boards, including, for example, Austria, Iceland, Belgium, France, Germany, Italy and Portugal.[204] On average, women account for 31% of board seats in countries with gender mandates.[205]

Nasdaq discussed the benefits and challenges of mandate and comply-or-explain models with over a dozen stakeholders, and while the majority of organizations were in agreement that companies would benefit from a regulatory impetus to drive meaningful and systemic change in board diversity, the majority also stated that a disclosure-based approach would be more palatable to the U.S. business community than a mandate. Most organizations Nasdaq spoke with expressed general discomfort with mandates, although they acknowledged that opposition is lessening in the wake of California's S.B. 826 [206] and A.B. 979.[207] While many recognized that mandates can force boards to act more quickly and accelerate the rate of change, they believe that a disclosure-based approach is less controversial and would spur companies to take action and achieve the same results. Some stakeholders also highlighted additional challenges that smaller companies and companies in certain industries may face finding diverse board members. In contrast, a disclosure-based framework that provides companies with flexibility would empower companies to maintain decision-making authority over their board's composition while providing stakeholders with a better understanding of the company's current board composition and its philosophy regarding diversity. This approach would better inform the investment community and enable more informed analysis of, and conversations with, companies. Nasdaq believes that these goals will be achieved through the disclosure of consistent, comparable data across companies, as would be required by the Exchange's proposed definition of Diverse.

For example, if, under Israeli law regarding board diversity, an Israeli company is required only to have a minimum of one woman on the board and such Israeli company chooses to comply with Israeli home country law in lieu of meeting the diversity objectives of Rule 5605(f)(2)(B), it may choose to disclose that "the Company is incorporated in Israel and required by Israeli law to have a minimum of one woman on the board, and satisfies home country requirements in lieu of Nasdaq Rule 5605(f)(2)(B), which requires each Foreign Issuer to have at least two Diverse directors." If a U.S. company had two Diverse directors but one resigned due to unforeseen circumstances, it could disclose, for example: "Due to the unexpected resignation of Ms. Smith this year, the Company does not have at least one director who self-identifies as Female and one director who self-identifies as an Underrepresented Minority or LGBTQ+. We intend to undertake reasonable efforts to meet the diversity objectives of Rule 5605(f)(2)(A) prior to our next annual shareholder meeting and have engaged a search firm to identify qualified Diverse candidates. However, due to unforeseen circumstances, we may not achieve this goal." Or a U.S. company may disclose that it chooses to define diversity more broadly than Nasdaq's definition by considering national origin, veteran status or individuals with disabilities when identifying nominees for director because it believes such diversity brings a wide range of perspectives and experiences to the board. In each case, investors will have a better understanding of the company's reasons for not having at least two Diverse directors and can use that information to make an informed investment or voting decision.

## ii. Higher vs. Lower Diversity Objectives

Nasdaq observed that existing empirical research spanned companies across several countries, including the United States, Spain, China, Canada, France and Norway. Nasdaq considered that the studies related to company performance and board diversity found positive associations at various levels and measures of board diversity, including having at least one woman on the board,[208] two or more diverse directors (with diverse considered female, Black, Hispanic or Asian),[209] at least three women on the board [210] and being in the top quartile for gender and ethnic diversity.[211]

Nasdaq considered that the academic studies related to investor protection and board diversity found positive associations at various levels and measures of board diversity, including having at least one woman on the board [212] or up to 50% women on the board, and the assertions of certain academics that their findings may extend to other forms of diversity, including racial and ethnic diversity.[213] Nasdaq also reviewed academic research suggesting that "critical mass" is achieved by having three or more women on the board, and that having only one diverse director on the board risks "tokenism." [214] Nasdaq considered that although the legislation enacted by Norway and California, and proposed by several other states, varies based on board size, the academic research considered companies across a spectrum of sizes and board sizes, including Fortune 100, S&P 500, Fortune 1000 and smaller (non-Fortune 1000) companies.

Nasdaq concluded that there is no "one-size fits all" approach to promoting board diversity and that the academic literature regarding the relationship between board diversity, company performance and investor protections is continuing to evolve. However, in Nasdaq's survey of academic studies described above—and of the targets or mandates promulgated by regulatory bodies and organizations worldwide—Nasdaq observed a common denominator of having at least one woman on the board. Similarly, Nasdaq observed a common denominator of having at least one director who is diverse in terms of race, ethnicity or sexual orientation among

---

[203] See The Conference Board of Canada, *Data Dashboard* (Sept. 23, 2020), available at: *https://www.conferenceboard.ca/focus-areas/inclusion/2020/aob-comparisons-around-the-world-table?AspxAutoDetectCookieSupport=1*; Andrew MacDougall et al., Osler, *Diversity Disclosure Practices* 4 (2020), available at *https://www.osler.com/osler/media/Osler/reports/corporate-governance/Diversity-and-Leadership-in-Corporate-Canada-2020.pdf. But see* Heike Mensi-Klarbach et al., *The Carrot or the Stick: Self-Regulation for Gender-Diverse Boards via Codes of Good Governance*, J. Bus. Ethics 11 (2019), available at: *https://doi.org/10.1007/s10551-019-04336-z* [reviewing longitudinal data from 2006 to 2016 on listed and state-owned companies in Austria and concluding that "self-regulation of gender diversity on boards is ineffective if merely based on recommendations in codes of good governance"]. Mensi-Klarbach recommends setting concrete targets and providing public monitoring to improve the effectiveness of comply-or-explain frameworks.

[204] See Paul Hastings, *supra* note 177; *see also* Deloitte, *Women in the Boardroom, supra* note 86.

[205] See Paul Hastings, *supra* note 177; The Conference Board of Canada, *supra* note 203.

[206] See Cal. S.B. 826, *supra* note 112.

[207] See Cal. A.B. 979, *supra* note 112.

[208] See Credit Suisse, *supra* note 30, at 16.

[209] See Thomas and Starr, *supra* note 23, at 5.

[210] See Eastman et al., *supra* note 31, at 3; Wagner, *supra* note 32.

[211] See McKinsey, *supra* note 36.

[212] See Abbott et al., *supra* note 58; Chen et al., *supra* note 64.

[213] See Wahid, *supra* note 59; Cumming et al., *supra* note 62, at 34.

[214] See Alison M. Konrad et al., *Critical Mass: The Impact of Three or More Women on Corporate Boards*, 37(2) Org. Dynamics 145 (April 2008); Miriam Schwartz-Ziv, *Gender and Board Activeness: The Role of a Critical Mass*, 52(2) J. Fin. & Quant. Analysis 751 (April 2017); Mariateresa Torchia et al., *Women on Corporate Boards: From Tokenism to Critical Mass*, 102(2) J. Bus. Ethics. 299 (Feb. 25, 2011), available at *https://ssrn.com/abstract=1858347*.

the requirements related to, and academic research considering, board diversity beyond gender identity. Nasdaq therefore believes that a diversity objective of at least two Diverse directors provides a reasonable baseline for comparison across companies. Companies are not precluded from meeting a higher or lower alternative measurable objective. For example, a company may choose to disclose that it does not meet the diversity objective under Rule 5605(f)(2) because it is subject to an alternative standard under state or foreign laws and has chosen to satisfy that diversity objective instead. On the other hand, many firms may strive to achieve even greater diversity than the objectives set forth in Nasdaq's proposed rule. Nasdaq believes that providing flexibility and clear disclosure when the company determines to follow a different path will improve the quality of information available to investors who rely on this information to make informed investment and voting decisions.

iii. Longer vs. Shorter Timeframes

Nasdaq considered whether an alternative timeframe for satisfying the diversity objectives of Rule 5605(f)(2) would better promote the public interest than the timeframe Nasdaq has proposed under Rule 5605(f)(7). While companies are not precluded from adding additional directors to their boards to satisfy Rule 5605(f)(2) by having two Diverse directors sooner than contemplated by the proposed rule, Nasdaq understands that some companies may need to obtain shareholder approval to amend their governing documents to allow for board expansion. Other companies may choose to replace an existing director on the board with a Diverse director, and board turnover may be low.[215] Nasdaq recognizes that it also takes substantial lead time to identify, interview and select board nominees. To provide companies with sufficient time to satisfy Rule 5605(f) by having two Diverse directors, while recognizing that investors are calling for expedient change, Nasdaq has structured its proposal similarly to the approach taken by California, where companies must achieve one target by an earlier date and satisfy the entire diversity objective at a later date. Nasdaq also considered the approaches taken by foreign

jurisdictions to implement diversity objectives. For example, Belgium and France implemented diversity objectives under a phased approach that provided companies with at least five years to fully satisfy the objectives,[216] whereas Iceland and Portugal provided companies with three years or less.[217]

While companies may choose to satisfy Rule 5605(f)(2) on an alternative timeframe, a company that chooses a timeframe that is longer than the timeframes set forth in Rule 5605(f)(7) also must publicly explain its reasons for doing so. For example, an NGM-listed company that, while not technically a Smaller Reporting Company, views itself as similarly situated to a NCM-listed Smaller Reporting Company may disclose the following: ''While the Company is listed on NGM and technically qualifies as a Smaller Reporting Company, it does not file its SEC reports utilizing the Smaller Reporting Company designation. However, the Company believes that it is similarly situated to other Smaller Reporting Companies listed on NCM in terms of its annual revenues and public float, and therefore has chosen to satisfy Rule 5605(f)(2)(C) in lieu of Rule 5605(f)(2)(A) and has satisfied this requirement by having at least two Diverse directors on the board who self-identify as Female within the timeframe provided under Rule 5605(f)(7) applicable to NCM-listed companies.''

iv. Broader vs. Narrower Definition of Diverse

Nasdaq considered whether the definition of Diverse should include broader characteristics than those reported on the EEO–1 report, such as the examples provided by the Commission's CD&I, including LGBTQ+, nationality, veteran status, and individuals with disabilities. During its stakeholder outreach, Nasdaq inquired whether a broad definition of Diversity would promote the public interest. While recognizing the diverse perspectives that different backgrounds can provide, most stakeholders supported a narrower definition of Diversity focused on gender, race and ethnicity, with several supporting broadening the definition to include the LGBTQ+ community.

As discussed above, companies currently are permitted to define diversity ''in ways they consider appropriate'' under federal securities laws. One of the challenges of this

principles-based approach has been the disclosure of inconsistent and noncomparable data across companies. However, most companies are required by law to report data on race, ethnicity and gender to the EEOC through the EEO–1 Report. Nasdaq believes that adopting a broad definition of Diverse would maintain the status quo of inconsistent, noncomparable disclosures, whereas a narrower definition of Diverse focused on race, ethnicity, sexual orientation and gender identity will promote the public interest by improving transparency and comparability. Nasdaq also is concerned that the broader definitions of diversity utilized by some companies may result in Diverse candidates being overlooked, and may be hindering meaningful progress on improving diversity related to race, ethnicity, sexual orientation and gender identity. For example, a company may consider diversity to include age, education and board tenure. While such characteristics may provide laudable cognitive diversity, this focus may result in a homogenous board with respect to race, ethnicity, sexual orientation and gender identity that, by extension, does not reflect the diversity of a company's communities, employees, investors or other stakeholders.

Nasdaq also believes that a transparent, consistent definition of Diverse would provide stakeholders with a better understanding of the company's current board composition and its philosophy regarding diversity if it does not have two Diverse directors. This would enable the investment community to conduct more informed analysis of, and have more informed conversations with, companies. To the extent a company chooses to satisfy the requirement of Rule 5605(f)(2) by having at least two Diverse directors on its board, it will have the ancillary benefit of making meaningful progress in improving board diversity related to race, ethnicity, sexual orientation and gender identity.

Nasdaq's review of academic research on board diversity revealed a dearth of empirical analysis on the relationship between investor protection or company performance and broader diversity characteristics such as veteran status or individuals with disabilities.[218] Nasdaq

---

[215] See Matteo Tonello, *Corporate Board Practices in the Russell 3000 and S&P 500*, Harv. L. Sch. Forum on Corp. Governance (Oct. 18, 2020), *https://corpgov.law.harvard.edu/2020/10/18/corporate-board-practices-in-the-russell-3000-and-sp-500/* (last accessed Nov. 24, 2020).

[216] See Paul Hastings, *supra* note 177, at 79 and 90; *see also supra* note 179.

[217] See Deloitte, Women in the Boardroom, *supra* note 86, at 115 and 143; *see also supra* note 179.

[218] KPMG (2020) states that veterans are underrepresented in boardrooms, with retired General and Flag Officers (''GFOs'') occupying less than 1% of Fortune 500 board seats. *See* KPMG, *The value of veterans in the boardroom* 1 (2020), available at: *https://boardleadership.kpmg.us/content/dam/boardleadership/en/pdf/2020/the-value-of-veterans-in-the-boardroom.pdf* (noting that Continued

acknowledges that there also is a lack of published research on the issue of LGBTQ+ representation on boards.[219] This may be due to a lack of consistent, transparent data on broader diverse attributes, or because there is no voluntary self-disclosure workforce reporting requirements for LGBTQ+ status, such as the EEO–1 reporting framework for race, ethnicity, and gender. In any event, it is evident that while "[b]oardroom diversity is a topic that has gained significant traction . . . LGBT+ diversity, however, has largely been left out of the conversation." [220]

Nonetheless, Nasdaq believes it is reasonable and in the public interest to include a reporting category for LGBTQ+ in recognition of the U.S. Supreme Court's recent affirmation that sexual orientation and gender identity are "inextricably" intertwined with sex,[221] and based on studies demonstrating a positive association between board diversity and decision making, company performance and investor protections. Nasdaq also believes that the proposed rule would foster the development of data to conduct meaningful assessments of the association between LGBTQ+ board diversity, company performance and investor protections.

As noted above, the proposal does not preclude companies from considering additional diverse attributes, such as nationality, disability, or veteran status in selecting board members; however, company would still have to provide the required disclosure under Rule 5605(f)(3) if the company does not also have at least two directors who are Diverse. Nor would the proposal prevent companies from disclosing information related to other diverse attributes of board members beyond those highlighted in the rule if they felt such disclosure would benefit investors. Nasdaq believes such disclosure would help inform the evolving body of research on the relationship between broader diverse attributes, company

performance and investor protection and provide investors with additional information about the company's philosophy regarding broader diversity characteristics.

### 2. Statutory Basis

The Exchange believes that its proposal is consistent with Section 6(b) of the Act,[222] in general, and furthers the objectives of Section 6(b)(5) of the Act,[223] in that it is designed to remove impediments to and perfect the mechanism of a free and open market and a national market system, to prevent fraudulent and manipulative acts and practices, and, in general, to protect investors and the public interest, for the reasons set forth below. Further, Nasdaq believes the proposal is not designed to permit unfair discrimination between issuers or to regulate by virtue of any authority conferred by the Act matters not related to the purposes of the Act or the administration of the Exchange, for the reasons set forth below.

### I. Board Statistical Disclosure

Nasdaq has proposed what it believes to be a straightforward and clear approach for companies to publish their statistical data pursuant to proposed Rule 5606. The disclosure will assist investors in making more informed decisions by making meaningful, consistent, and reliable data readily available and in a clear and comprehensive format prescribed by the proposed rule. Nasdaq also believes that the disclosure format required by proposed Rule 5606 protects investors by eliminating data collection inaccuracies and decreasing costs, while enhancing investors' ability to utilize the information.

As a threshold matter, as discussed above, diversity has become an increasingly important subject and, in recent years, investors increasingly have been advocating for greater board diversity and for the disclosure of board diversity statistics. The current board diversity disclosure regime is lacking in several respects, and Nasdaq believes that its proposed Rule 5606 addresses many of the current concerns and responds to investors' demands for greater transparency into the diversity characteristics of a company's board composition by mandating disclosure and curing certain deficiencies that exist within the current SEC disclosure requirements.

Investors have expressed their dissatisfaction with having to independently collect board-level data

about race, ethnicity and gender identity because such investigations can be time consuming, expensive, and fraught with inaccuracies.[224] The lack of consistency and specificity in Regulation S–K has been a major impediment for many investors and data collectors. As a general matter, the Commission's requirements have not addressed the concerns expressed by commenters that "disclosure about board diversity was important information to investors." [225] Nasdaq believes that its proposed Rule 5606 addresses many of the concerns that have been raised.

Nasdaq believes that requiring the annual disclosure of a company's board diversity, as proposed in Rule 5606(a), will provide consistent information to the public and will enable investors to continually review the board composition of a company to track trends and simplify or eliminate the need for a company to respond to multiple investor requests for information about the diverse characteristics of the company's board. Requiring annual disclosures also would make information available to investors who otherwise would not be able to obtain individualized disclosures.[226] Moreover, consistent disclosures may encourage boards to consider a wider range of board candidates in the nomination process, including candidates with fewer ties to the current board.[227]

The Commission's 2009 amendments to Regulation S–K provide no definition for diversity and do not explicitly require disclosures specifically related to details about the board's gender, racial, ethnic and LGBTQ+ composition. Additionally, the Commission's CD&I does not address the definition of diversity, and it requires a registrant to disclose diversity information only in certain limited circumstances. Investors have expressed that current regulations and accompanying interpretations impair their ability to obtain clear and consistent data.[228] As a result, Nasdaq believes that proposed Rule 5606(a) protects investors and the public

---

"[r]etired GFOs who have honed their leadership and critical decision-making skills in a high-threat environment can bring extensive risk oversight experience to the board, which may be especially valuable in the context of today's risk landscape"). Accenture (2018) observed that companies that offered inclusive working environments for employees with disabilities achieved an average of 28% higher revenue, 30% higher economic profit margins, and 2x net income than their industry peers. *See* Accenture, *Getting to Equal: The Disability Inclusion Advantage* (2018), available at: *https://www.accenture.com/_acmedia/PDF-89/ Accenture-Disability-Inclusion-Research-Report.pdf*.

[219] *See* Credit Suisse ESG Research, *supra* note 33, at 1; *see also* Out Leadership, *supra* note 35.

[220] *See* Out Leadership, *supra* note 35, at 3.

[221] *See* Bostock v. Clayton Cnty., *supra* note 160.

[222] *See* 15 U.S.C. 78f(b).

[223] *Id.* § 78f(b)(5).

[224] *See* Petition for Amendment of Proxy Rule, *supra* note 80, at 2.

[225] *See* Proxy Disclosure Enhancements, 74 FR at 68,343–44 (amending Item 407(c)(2)(vi) of Regulation S–K, codified at 17 CFR 229.407(c)(2)(vi)).

[226] *See* Petition for Rulemaking, *supra* note 123.

[227] *See* Proxy Disclosure Enhancements, 74 FR at 68,355 ("To the extent that boards branch out from the set of candidates they would ordinarily consider, they may nominate directors who have fewer existing ties to the board or management and are, consequently, more independent."); Hazen and Broome, *supra* note 114, at 57–58.

[228] *See* Petition for Amendment of Proxy Rule, *supra* note 80, at 2; Petition for Rulemaking, *supra* note 123, at 7.

interest by making clear that a company's annual diversity data disclosure must include information related to gender identity, race, ethnicity and LGBTQ+ status, thereby leaving less discretion for companies to selectively disclose certain diversity information and enhancing the comparability of such data across companies. Moreover, it is in the public interest to provide clear requirements for diversity disclosure, and Nasdaq's proposed Board Diversity Matrix format provides such clarity.

Nasdaq does not intend to obligate directors to self-identify in any of the categories related to gender identity, race, ethnicity and LGBTQ+. Nasdaq believes that a director should have autonomy to decide whether to provide such information to their company. Therefore, Nasdaq believes that it is reasonable and in the public interest to allow directors to opt out of disclosing the information required by proposed Rule 5606(a) by permitting a company to identify such directors in the ''Undisclosed'' category.

Nasdaq believes that it is in the public interest to utilize the Board Diversity Matrix format for all companies as proposed in Rule 5606(a). Additionally, Nasdaq believes that the format removes any impediments to aggregating and analyzing data across all companies by requiring each company to disclose separately the number of male, female, and non-binary directors, the number of male, female, and non-binary directors that fall into certain racial and ethnic categories, and the number of directors that identify as LGBTQ+. The format allows investors to easily disaggregate the data and track directors with multiple diversity characteristics.

As discussed above, most listed companies are required by law to complete an EEOC Employer Information Report EEO–1 Form. Although outside directors generally are not employees and therefore are not covered in the EEO–1,[229] Nasdaq believes that collecting the information required by proposed Rule 5606(a) is familiar to most companies, and that it is reasonable to require disclosure of the additional board information.

Nasdaq also believes that requiring currently listed companies to comply with proposed Rule 5606 within one year from the date of Commission approval is a reasonable amount of time, given that most companies already collect similar information for certain employees. Moreover, most companies

are required to prepare an annual proxy statement and update the Commission within four business days when a new director is appointed to the board.[230]

Further, Nasdaq believes that the disclosure required by proposed Rule 5606(a) will remove impediments to shareholders by making available information related to board-level diversity in a standardized manner, thereby enhancing the consistency and comparability of the information and helping to better protect investors. The proposed disclosure will also help protect investors and the public interest by enabling investors to determine the total number of diverse directors, which is information that is not consistently available in existing proxy disclosures in cases where a single director has multiple diverse characteristics. While companies can elect to make this information available either in a proxy statement or on the company's website, Nasdaq believes it is in the public interest to allow companies the option to provide the disclosure in a way they believe will be most meaningful to their shareholders.

Nasdaq recognizes that the proposed definition of Underrepresented Minority in Rule 5605(f)(1) may not apply to companies outside of the United States because each country has its own unique demographic composition. Moreover, Nasdaq's definition of Underrepresented Minority proposed in Rule 5606(f)(1) may be inapplicable to a Foreign Issuer, making this Board Matrix data less relevant for such companies and not useful for investors. Therefore, Nasdaq believes that offering Foreign Issuers the option of a separate template that requires different disclosure categories will provide investors with more accurate disclosures related to the diversity of directors among the board of a Foreign Issuer. Additionally, Nasdaq believes that providing an ''Underrepresented Individual in Home Country Jurisdiction'' category provides Foreign Issuers with more flexibility to identify and disclose diverse directors within their home countries.

The annual requirement in the proposed rule will guarantee that the information is available to the public on a continuous and consistent basis. As described in the instructions to the Board Diversity Matrix disclosure form and Rule 5606(a), each year following the first year that a company publishes the Board Diversity Matrix, the company will be required to publish its data for the current and immediately

prior years. Nasdaq believes that disclosing at least two years of data allows the public to view any changes and track a board's diversity progress.

In addition to providing a means for shareholders to assess a company's board-level diversity and measure its progress in improving that diversity over time, Nasdaq believes that proposed Rule 5606 will provide a means for Nasdaq to assess whether companies meet the diversity objectives of proposed Rule 5605(f). The ability to determine satisfaction of the proposed listing rule's diversity objectives will protect investors and the public interest.

Moreover, the proposed rule provides transparency into diversity based not only on race, ethnicity, and gender identity, but also on a director's self-identified sexual orientation. Nasdaq believes that expanding the diversity characteristics beyond those which are commonly reported by companies currently will broaden the way boards view diversity, and ensure that board diversity is occurring across all protected groups.

Finally, Nasdaq believes that the proposal is not unfairly discriminatory because proposed Rule 5606 will apply to all Nasdaq-listed companies, except for the following companies: Acquisition companies listed under IM–5101–2; asset-backed issuers and other passive issuers (as set forth in Rule 5615(a)(1)); cooperatives (as set forth in Rule 5615(a)(2)); limited partnerships (as set forth in Rule 5615(a)(4)); management investment companies (as set forth in Rule 5615(a)(5)); issuers of non-voting preferred securities, debt securities and Derivative Securities (as set forth in Rule 5615(a)(6)); and issuers of securities listed under the Rule 5700 Series—which meet the definition of Exempt Companies as defined under proposed Rule 5605(f)(4). Nasdaq believes it is reasonable and not unfairly discriminatory to exempt these companies from the proposed rule because the exemption of these companies is consistent with the approach taken by Nasdaq in Rule 5615 as it relates to certain Nasdaq corporate governance standards for board composition.

Nasdaq further believes it is reasonable to provide companies with a one-year phase-in period to comply with proposed Rule 5606. Nasdaq believes there is only a *de minimis* burden placed on companies to collect the board data and prepare the Board Diversity Matrix. Moreover, as discussed above, companies already are required to gather similar information for certain employees. Therefore, Nasdaq believes that one year is

---

[229] The EEO–1 Form does not require a company to disclose data for outside directors because such directors are not company employees.

[230] *See* SEC Form 8–K, available at: *https://www.sec.gov/files/form8-k.pdf.*

sufficient time for companies to incorporate their directors into their data collection. Furthermore, newly listed companies have many obligations to meet under Nasdaq listing rules. Therefore, Nasdaq believes that it is reasonable under proposed Rule 5606(d) to provide newly listed Nasdaq companies, including companies listing in connection with a business combination under IM–5101–2, with one year from the time of listing to comply with the proposed rule.

## II. Diverse Board Representation or Explanation

a. Removes Impediments to and Perfects the Mechanism of a Free and Open Market and a National Market System

As discussed above, studies suggest that the traditional director candidate selection process may create barriers to considering qualified diverse candidates for board positions by limiting the search for director nominees to existing directors' social networks and candidates with C-suite experience.[231] In analyzing Norway's experience in implementing a gender mandate, Dhir (2015) observed that "[b]oard seats tend to be filled by directors engaging their networks, and the resulting appointees tend to be of the same socio-demographic background."[232] Dhir concluded that broadening the search for directors outside of traditional networks "is unlikely to occur without some form of regulatory intervention, given the prevalence of homogenous social networks and in-group favoritism."[233] Regulatory action was effective in increasing the representation of women on boards in Norway by "democratiz[ing] access to a space previously unavailable to women."[234] The number of public company board seats held by women in Norway increased from 6% in 2002 to

42% in 2020.[235] One Norwegian director "grudgingly accept[ed] that the free market principles she held so dearly had disappointed her—and that the [mandate] was a necessary correction of market failure."[236]

In contrast, Nasdaq observed that other countries have made comparable progress using a disclosure-based model. Women account for at least 30% of the largest boards of companies in six countries using comply-or-explain models:[237] Australia, Finland, Sweden, New Zealand, Canada and the United Kingdom.[238] Nasdaq discussed the benefits and challenges of mandate and disclosure-based models with over a dozen stakeholders, and the majority of organizations were in agreement that companies would benefit from a regulatory impetus to drive meaningful and systemic change in board diversity, and that a disclosure-based approach would be more palatable to the U.S. business community than a mandate. While many organizations recognized that mandates can force boards to act more quickly and accelerate the rate of change, they believe that a disclosure-based approach is less controversial and would spur companies to take action and achieve the same results. Some stakeholders also highlighted additional challenges that smaller companies and companies in certain industries may face finding diverse board members. However, leaders from across the spectrum of stakeholders with whom Nasdaq spoke reinforced the notion that if companies recruit by skill set and expertise rather than title, then they will find there is more than enough diverse talent to satisfy demand.

Nasdaq also considered Commissioner Lee's observation that disclosure "gets investors the information they need to make investment decisions based on their own judgment of what indicators matter for long-term value. Importantly, it can also drive corporate behavior." Specifically, she observed that:

For one thing, when companies have to formulate disclosure on topics it can influence their treatment of them, something known as the "what gets measured, gets managed" phenomenon. Moreover, when

companies have to be transparent, it creates external pressure from investors and others who can draw comparisons company to company. The Commission has long-recognized that influencing corporate behavior is an appropriate aim of our regulations, noting that "disclosure may, depending on determinations made by a company's management, directors and shareholders, influence corporate conduct" and that "[t]his sort of impact is clearly consistent with the basic philosophy of the disclosure provisions of the federal securities laws.[239]

Nasdaq believes that a disclosure-based framework may influence corporate conduct if a company chooses to meet the diversity objective of Rule 5605(f)(2) by having two Diverse directors on the board. A company may satisfy that objective by broadening the search for qualified candidates and considering candidates from other professional pathways that bring a wider range of skills and perspectives beyond traditional C-suite experience.[240] Nasdaq believes that this will help increase opportunities for Diverse candidates that otherwise may be overlooked due to the impediments of the traditional director recruitment process, which will thereby remove impediments to a free and open market and a national market system. Further, boards that choose to have at least two Diverse directors may experience other benefits from diversity that perfect the mechanism of a free and open market and national market system. As discussed above in Section II.A.1.II.b (Diversity and Investor Protection), and further discussed below in Section II.A.2.II.b (Prevent Fraudulent and Manipulative Acts and Practices), studies suggest that diversity is positively associated with reduced stock volatility,[241] more transparent public disclosures,[242] and less information asymmetry,[243] leading to stock prices that better reflect public information, and further removing impediments to and perfecting a free and open market and a national market system. Importantly, Nasdaq believes that the disclosure-based framework proposed under Rule 5605(f) will not create additional impediments to a free and open market and a national market system because it will empower

---

[231] See GAO Report, *supra* note 44; Vell, *supra* note 100; Rhode & Packel, *supra* note 104, at 39; Deloitte, *Women in the Boardroom*, *supra* note 86; *see also* Parker, *supra* note 97, at 38 (acknowledging that, "as is the case with gender, people of colour within the UK have historically not had the same opportunities as many mainstream candidates to develop the skills, networks and senior leadership experience desired in a FTSE Boardroom").

[232] See Dhir, *supra* note 78, at 52.

[233] *Id.* at 51. *See also* Albertine d'Hoop-Azar et al., *Gender Parity on Boards Around the World*, Harv. L. Sch. Forum on Corp. Governance (January 5, 2017), available at *https://corpgov.law. harvard.edu/2017/01/05/gender-parity-on-boards-around-the-world/* (comparing gender diversity on boards in countries with varying requirements and enforcement measures and concluding that external pressures—'progressive societal norms" and regulations—are needed to increase board diversity).

[234] See Dhir, *supra* note 78, at 101.

[235] See Marianne Bertrand et al., *Breaking the Glass Ceiling? The Effect of Board Quotas on Female Labor Market Outcomes in Norway*, Nat'l Bureau of Econ. Rsch. Working Paper 20256 (June 2017), available at *https://www.nber.org/papers/ w20256*; Statistics Norway, *Board and management in limited companies* (Mar. 6, 2020), *https:// www.ssb.no/en/styre* (last accessed Nov. 27, 2020).

[236] See Dhir, *supra* note 78, at 116.

[237] See Paul Hastings, *supra* note 177; Deloitte, *Women in the Boardroom*, *supra* note 86.

[238] See Conference Board of Canada, *supra* note 201; Osler, *supra* note 203, at 4.

[239] See Lee, *supra* note 22.

[240] *See, e.g.,* Hillman et al., *supra* note 105 (finding that African-American and white women directors were more likely to have specialized expertise in law, finance, banking, public relations or marketing, or community influence from positions in politics, academia or clergy).

[241] See Bernile et al., *supra* note 28.

[242] See Gul et al., *supra* note 66; Bravo & Alcaide-Ruiz, *supra* note 56.

[243] See Abad et al., *supra* note 67.

companies to maintain decision-making authority over the composition of their boards.

To the extent a company chooses not to meet the diversity objectives of Rule 5605(f)(2) to have at least two Diverse directors, Nasdaq believes that proposed Rule 5605(f)(3) will provide analysts and investors with a better understanding about the company's reasons for not doing so and its philosophy regarding diversity. Rule 5605(f) will thus remove impediments to a free and open market and a national market system by enabling the investment community to conduct more informed analyses of, and have more informed conversations with, companies. Nasdaq believes that such analyses and conversations will be better informed by consistent, comparable data across companies, which Nasdaq proposes to achieve by adopting a consistent definition of "Diverse" under Rule 5605(f)(1). Nasdaq further believes that providing such disclosure will improve the quality of information available to investors who rely on this information to make informed investment and voting decisions, thereby promoting capital formation and efficiency and perfecting the mechanism of a free and open market and a national market system.

### b. Prevent Fraudulent and Manipulative Acts and Practices

Nasdaq's analysis discussed above in Section II.A.1.II raises the concern that the failure of homogenous boards to consider a broad range of viewpoints can result in suboptimal decisions that have adverse effects on company performance, board performance and stakeholders. Nasdaq believes that including diverse directors with a broader range of skills, perspectives and experiences may help detect and prevent fraudulent and manipulative acts and practices by mitigating "groupthink." Increased board diversity also may reduce the likelihood of insider trading and other fraudulent and manipulative acts and practices.

Nasdaq reached this conclusion by reviewing public statements by investors and organizations regarding the impact of groupthink on decision making processes, as well as academic studies on the relationship between diversity, groupthink and fraud. Nasdaq observed that groupthink can result in "self-censorship" [244] and failure to voice dissenting viewpoints in pursuit of "consensus without critical evaluation and without considering different

possibilities." [245] In contrast, "board members who possess a variety of viewpoints may raise different ideas and encourage a full airing of dissenting views. Such a broad pool of talent can be assembled when potential board candidates are not limited by gender, race, or ethnicity." [246]

Dhir (2015) concluded that gender diversity may "promote cognitive diversity and constructive conflict in the boardroom" and may be more effective at overseeing management.[247] One respondent in Dhir's survey of Norwegian directors observed that:

I've seen situations where the women were more willing to dig into the difficult questions and really go to the bottom even if it was extremely painful for the rest of the board, but mostly for the CEO . . . when it comes to the really difficult situations, [where] you think that the CEO has . . . done something criminal . . . [o]r you think that he has done something negligent, something that makes it such that you . . . are unsure whether he's the suitable person to be in the driving seat.[248]

Another director observed that "[i]f you have different experiences and a more diversified board, you will have different questions asked." [249] Dhir concluded that "women directors may be particularly adept at critically questioning, guiding and advising management without disrupting the overall working relationship between the board and management." [250]

Pucheta-Martínez et al. (2016) reasoned that questioning management is a critical part of the audit committee's oversight role, along with ensuring that management does not pressure the external auditor to issue a clean audit opinion notwithstanding the identification of any uncertainties or scope limitations.[251] Otherwise, "[a]uditors may accept the demands of management for a clean audit report when the firm deserves a scope limitation and an uncertainty qualification." [252] The authors found that "the percentage of female [directors] on [audit committees] reduces the probability of [audit] qualifications due to errors, non-compliance or the omission of information," [253] and further found a positive association between gender-

diverse audit committees and disclosing audit reports with uncertainties and scope limitations. This suggests that gender-diverse audit committees better "ensure that managers do not seek to pressure auditors into issuing a clean opinion instead of a qualified opinion" when any uncertainties or scope limitations are identified.[254]

Nasdaq also reviewed other studies that found a positive association between board gender diversity and important investor protections regardless of whether women are on the audit committee, and considered the assessment of some academics that their findings may extend to other forms of diversity, including racial and ethnic diversity. Nasdaq therefore believes that such findings with respect to audit committees would be expected to be more broadly applicable to the quality of the broader board's decision-making process, and to other forms of diversity, including diversity of race, ethnicity and sexual orientation.

In examining the association between broader board gender diversity and fraud, Cumming, et al. observed that "[g]ender diversity in particular facilitates more effective monitoring by the board and protection of shareholder interests by broadening the board's expertise, experience, interests, perspectives and creativity." [255] They observed that the presence of women on boards is associated with a lower likelihood of securities fraud; indeed, they found "strong evidence of a negative and diminishing effect of women on boards and the probability of being in our fraud sample." [256] The authors suggested that "other forms of board diversity, including but not limited to gender diversity, may likewise reduce fraud." [257]

Similarly, Wahid (2017) noted that board gender diversity may "lead to less biased and superior decision-making" because it "has a potential to alter group dynamics by affecting cognitive conflict and cohesion." [258] Wahid (2017) concluded that "gender-diverse boards commit fewer financial reporting mistakes and engage in less fraud," [259] finding that companies with female directors have "fewer irregularity-type [financial] restatements, which tend to be indicative of financial manipulation." [260] Wahid also suggested that other forms of diversity, including

---

[244] See Forbes and Milliken, *supra* note 74, at 496.

[245] See Dhir, *supra* note 78, at 124.
[246] See Petition for Amendment of Proxy Rule, *supra* note 80, at 4.
[247] See Dhir, *supra* note 78, at 150.
[248] *Id.* at xiv.
[249] *Id.* at 120.
[250] *Id.* at 35.
[251] See Pucheta-Martínez et al., *supra* note 52, at 368.
[252] *Id.* at 364.
[253] *Id.* at 363.

[254] *Id.* at 368.
[255] See Cumming et al., *supra* note 62, at 34.
[256] *Id.* at 12–14.
[257] *Id.* at 33.
[258] See Wahid, *supra* note 59, at 6.
[259] *Id.* at 1.
[260] *Id.* at 23.

racial diversity, could introduce additional perspectives to the boardroom,[261] which Nasdaq believes could further mitigate groupthink.

Abbott, Parker and Persely (2012) posited that "a female board presence contribut[es] to the board's ability to maintain an attitude of mental independence, diminish[es] the extent of groupthink and enhance[es] the ability of the board to monitor financial reporting." [262] They noted that "poorer [internal] controls and the lack of an independent and questioning board-level attitude toward accounting judgments can create an opportunity for fraud." [263] They observed a lower likelihood of a material financial restatements stemming from fraud or error in companies with at least one woman on the board.[264]

Nasdaq believes that these studies provide substantial evidence suggesting an association between gender diverse boards or audit committees and a lower likelihood of fraud; a lower likelihood of receiving audit qualifications due to errors, non-compliance or omission of information; and a greater likelihood of disclosing audit reports with uncertainties and scope limitations. Moreover, academics have suggested that other forms of diversity, including racial and ethnic diversity, may reduce fraud and mitigate groupthink. Further, while homogenous boards may unwittingly fall into the trap of groupthink due to a lack of diverse perspectives, "heterogeneous groups share conflicting opinions, knowledge, and perspectives that result in a more thorough consideration of a wide range of interpretations, alternatives, and consequences." [265] Nasdaq therefore believes that the proposed rule is designed to reduce groupthink, and otherwise to enhance the functioning of boards, and thereby to prevent

fraudulent and manipulative acts and practices.

Further, the Commission has suggested that in seeking board diversity, "[t]o the extent that boards branch out from the set of candidates they would ordinarily consider, they may nominate directors who have fewer existing ties to the board or management and are, consequently, more independent." [266] Nasdaq believes that the benefits of the proposed rule are analogous to the benefits of Nasdaq's rules governing and requiring director independence. In 2003, Nasdaq adopted listing rules requiring, among other things, that independent directors comprise a majority of listed companies' boards, which were "intended to enhance investor confidence in the companies that list on Nasdaq." [267] The Commission observed that self-regulatory organizations "play an important role in assuring that their listed issuers establish good governance practices," and concluded that the proposed rule changes would secure an "objective oversight role" for issuers' boards of directors, and "foster greater transparency, accountability, and objectivity" in that role." [268] Along the same lines, in approving Nasdaq's application for registration as a national securities exchange, the Commission found Nasdaq's rules governing the independence of members of boards and certain committees to be consistent with Section 6(b)(5) of the Act because they advanced the "interests of shareholders" in "greater transparency, accountability, and objectivity" in oversight and decision-making by corporate boards.[269] Nasdaq proposes to promote accountability in corporate decision-making by requiring companies who do not have at least two Diverse directors on their board to provide investors with a public explanation of the board's reasons for not doing so under Rule 5605(f)(3).

Nasdaq believes it is critical to the detection and prevention of fraudulent and manipulative acts and practices to have directors on the board who are willing to critically question

management and air dissenting views. Nasdaq believes that boards comprised of directors from Diverse backgrounds enhance investor confidence by ensuring that board deliberations consider the perspectives of more than one demographic group, leading to robust dialogue and better decision making. However, Nasdaq recognizes that directors may bring diverse perspectives, skills and experiences to the board, notwithstanding that they have similar attributes. Nasdaq therefore believes it is in the public interest to permit a company that chooses not to meet the diversity objectives of Rule 5605(f)(2) to explain why it does not, in accordance with Rule 5605(f)(3)—for example, if it believes that defining diversity more broadly than Nasdaq, for example by considering national origin, veteran status and disabilities, brings a wide range of perspectives and experiences to the board. Nasdaq believes such disclosure will provide investors with a better understanding of the company's philosophy regarding diversity. This would better inform the investment community and enable more informed analyses of, and conversations with, companies. Therefore, Nasdaq believes satisfying Rule 5605(f)(2) through disclosure pursuant to Rule 5605(f)(3) is consistent with Section 6(b)(5) of the Act because it advances the "interests of shareholders" in "greater transparency, accountability, and objectivity" of boards and their decision-making processes.[270] In addition, as discussed further in Section II.A.2.II.c (*Promotes Investor Protection and the Public Interest*) below, Nasdaq believes that the proposed diversity requirement could help to reduce information asymmetry, and thereby reduce the risk of insider trading or other opportunistic insider behavior.

c. Promotes Investor Protection and the Public Interest

Nasdaq has found substantial evidence that board diversity is positively associated with more transparent public disclosures and higher quality financial reporting, thereby promoting investor protection. Specifically, studies have concluded that companies with gender-diverse boards are associated with more transparent public disclosures and less information asymmetry, leading to stock prices that better reflect public information. Gul, Srinidhi & Ng (2011) found that "gender diversity improves stock price informativeness by increasing voluntary public disclosures in large firms and increasing the

---

[261] *Id.* at 24–25; *see also* Shecter, *supra* note 61 (quoting Wahid as saying that "[i]f you're going to introduce perspectives, those perspectives might be coming not just from male versus female. They could be coming from people of different ages, from different racial backgrounds. . . . If we just focus on one, we could be essentially taking away from other dimensions of diversity and decreasing perspective.").

[262] *See* Abbott et al., *supra* note 58, at 607.

[263] *Id.* at 610.

[264] *Id.* at 613 ("The previously discussed lines of research lead us to form our hypothesis. In summary, restatements may stem from error or fraud. In either instance, the internal control system (to which the board of directors contributes by setting the overall tone at the top) has failed to detect or prevent a misstatement. Ineffective internal controls may stem from insufficient questioning of assumptions underlying financial reporting, inadequate attention to the internal control systems, or insufficient support for the audit committee's activities.").

[265] *See* Dallas, *supra* note 76, at 1391.

[266] *See* Proxy Disclosure Enhancements, *supra* note 73, 74 FR at 68,355.

[267] *See* Order Approving Proposed Rule Changes, 68 FR at 64,161.

[268] *Id.* at 64, 175.

[269] *See* In re Nasdaq Stock Market, 71 FR 3550, 3565 (Jan. 23, 2006). *See also* 68 FR 18,788, 18,815 (April 16, 2003) (in adopting Rule 10A–3, setting standards for the independence of audit committee members, the Commission concluded that such standards would "enhance the quality and accountability of the financial reporting process and may help increase investor confidence, which implies increased efficiency and competitiveness of the U.S. capital markets").

[270] *Id.*

incentives for private information collection in small firms." [271] Bravo and Alcaide-Ruiz (2019) found a positive association between women on the audit committee with financial or accounting expertise and the voluntary disclosure of forward-looking information.[272] Abad et al. (2017) concluded that companies with gender-diverse boards are associated with lower levels of information asymmetry, suggesting that "the policies recently implemented in several European countries to increase the presence of female directors in company boards could have beneficial effects on stock markets by reducing the risk of informed trading and enhancing stock liquidity." [273]

Nasdaq believes that one consequence of information asymmetry is that insiders may engage in opportunistic behavior prior to a public announcement of financial results and before the market incorporates the new information into the company's stock price. This can result in unfair gains or an avoidance of losses at the expense of shareholders who did not have access to the same information. This may exacerbate the principal-agent problem, in which the interests of a company's board and shareholders are not aligned. Lucas-Perez et al. (2014) found that board gender diversity is positively associated with linking executive compensation plans to company performance,[274] which may be an effective mechanism to deter opportunistic behavior by management and better align their interests with those of their company's shareholders.[275]

Another concern is that "[w]hen information asymmetry is high, stakeholders do not have sufficient resources, incentives, or access to relevant information to monitor managers' actions, which gives rise to the practice of earnings management." [276] Earnings management "is generally defined as the practice of using discretionary accounting methods to attain desired levels of reported earnings." [277] Manipulating earnings is particularly concerning to investors because "[i]f users of financial data are 'misled' by the level of reported income,

then investors' allocation of resources may be inappropriate when based on the financial statements provided by management," [278] thereby undermining the efficacy of the capital formation process for investors who rely on such information to make informed investment and voting decisions.

Gull et al. (2018) [279] observe that overseeing management is a crucial component of investor protection, particularly with regard to earnings management:

The role of the board of directors and board characteristics (*i.e.* board independence and gender diversity) is usually associated with the protection of shareholder interests. . . . This role is particularly crucial with regard to the issue of earnings management, in that one of the responsibilities of boards is to monitor management.[280]

The authors of that study found that the presence of female audit committee members with business expertise is associated with a lower magnitude of earnings management. Srinidhi, Gul and Tsui (2011) observed that better oversight of management combined with lower information asymmetry leads to better earnings quality. They noted that "[e]arnings quality is an important outcome of good governance demanded by investors and therefore its improvement constitutes an important objective of the board." [281] They found that companies with women on the board, specifically on the audit committee, exhibit "higher earnings quality" and "better reporting discipline by managers." [282] They concluded that "including female directors on the board and the audit committee are plausible ways of improving the firm's reporting discipline and increasing investor confidence in financial statements." [283]

Chen, Eshleman and Soileau (2016) suggested that the relationship between gender diversity and higher earnings quality observed by Srinidhi, Gul and Tsui (2011) is ultimately driven by reduced internal control weaknesses, noting that "prior literature has established a negative relationship between internal control weaknesses and earnings quality." [284] Internal control over financial reporting are procedures designed "to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for

external purposes in accordance with GAAP." [285] Weaknesses in internal controls can "lead to poor financial reporting quality" and "more severe insider trading" [286] or failure to detect a material misstatement. According to the PCAOB:

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis.[287]

A material misstatement can occur "as a result of some type of inherent risk, whether fraud or error (*e.g.,* management's aggressive accounting practices, erroneous application of GAAP)." [288] The failure to prevent or detect a material misstatement before financial statements are issued can require the company to reissue its financial statements and potentially face costly shareholder litigation. Chen et al. found that having at least one woman on the board (regardless of whether or not she is on the audit committee) "may lead [a] to reduced likelihood of material weaknesses [in internal control over financial reporting]," [289] and Abbott, Parker and Persley (2012) found "a significant association between the presence of at least one woman on the board and a lower likelihood of [a material financial] restatement." [290] Notably, while the Sarbanes-Oxley Act ("SOX") implemented additional measures to ensure that a company has robust internal controls, the findings of Abbott et al. were consistent among a sample of pre- and post-SOX restatements, suggesting that "an additional, beneficial layer of independence in group decision-making is associated with gender diversity." [291]

Nasdaq believes that the proposal to require listed companies to have at least two Diverse directors under Rule 5605(f) could help to lower information asymmetry and reduce the risk of insider trading or other opportunistic insider behavior, which would help to increase stock price informativeness and enhance stock liquidity, thereby protecting investors and promoting capital formation and efficiency. Nasdaq

---

[271] See Gull et al., *supra* note 66, at 2.

[272] See Bravo and Alcaide-Ruiz, *supra* note 56, at 151.

[273] See Abad et al., *supra* note 67, at 202.

[274] See Lucas-Perez et al., *supra* note 69.

[275] Id.

[276] See Vernon J. Richardson, *Information Asymmetry and Earnings Management: Some Evidence,* 15 Rev. Quantitative Fin. and Acct. 325 (2000).

[277] See Gull et al., *supra* note 55, at 2.

[278] Id.

[279] See generally id.

[280] Id. at 6 (citations omitted).

[281] See Srinidhi et al., *supra* note 50, at 1638.

[282] Id. at 1612.

[283] Id.

[284] See Chen et al., *supra* note 64, at 18.

[285] See Public Company Accounting Oversight Board, *Auditing Standard No. 5: Appendix A,* A5 available at: *https://pcaobus.org/oversight/ standards/archived-standards/details/Auditing_ Standard_5_Appendix_A.*

[286] See Chen et al., *supra* note 64, at 12.

[287] See Public Company Accounting Oversight Board, *supra* note 285, at A7.

[288] See Abbott et al., *supra* note 58, at 609–10.

[289] See Chen et al., *supra* note 64, at 18.

[290] See Abbott et al., *supra* note 58, at 607.

[291] Id. at 609.

believes that information asymmetry could also be reduced by permitting companies to satisfy Rule 5605(f)(2) by publicly disclosing their reasons for not meeting its diversity objectives in accordance with Rule 5605(f)(3), because the requirement will improve the quality of information available to investors who rely on this information to make informed investment and voting decisions, which will further protect investors and promote capital formation and efficiency.

Moreover, Nasdaq believes that proposed Rule 5605(f) could foster more transparent public disclosures, higher quality financial reporting, and stronger internal control over financial reporting and mechanisms to monitor management. This could be particularly beneficial for Smaller Reporting Companies that are not subject to the SOX 404(b) requirement to obtain an independent auditor's attestation of management's assessment of the effectiveness of internal control over financial reporting, thereby promoting investor protection.

Nasdaq believes that the body of research on the relationship between economic performance and board diversity summarized under Section II.A.1.II.a above provides substantial evidence supporting the conclusion that board diversity does not have adverse effects on company financial performance, and therefore Nasdaq believes the proposal will not negatively impact capital formation, competition or efficiency among its public companies.[292] Nasdaq considered that some studies on gender diversity alone have had mixed results,[293] and that the U.S. GAO (2015) and Carter et al. (2010) concluded that the mixed results are due to differences in methodologies, data samples and time periods.[294] This

is not the first time Nasdaq has considered whether, on balance, various studies finding mixed results related to board composition and company performance are sufficient rationale to propose a listing rule. For example, in 2003, notwithstanding the mixed results of studies regarding the relationship between company performance and board independence,[295] Nasdaq adopted listing rules requiring a majority independent board that were "intended to enhance investor confidence in the companies that list on Nasdaq." [296] In its Approval Order, the SEC noted that "[t]he Commission has long encouraged exchanges to adopt and strengthen their corporate governance listing standards in order to, among other things, enhance investor confidence in the securities markets;" the Commission concluded that the independence rules would secure an "objective oversight role" for issuers' boards, and "foster greater transparency, accountability, and objectivity" in that role.[297] Nasdaq believes this reasoning applies to the current proposed rule as well. Even without clear consensus among studies related to board diversity and company performance, the heightened focus on corporate board diversity by investors demonstrates that investor confidence is undermined when data on board diversity is not readily available and when companies do not explain the reasons for the apparent absence of diversity on their boards.[298] Legislators are increasingly taking action to encourage corporations to diversify their boards and improve diversity disclosures.[299] Moreover, during its discussions with stakeholders, Nasdaq found consensus across every constituency that there is inherent value in board diversity. Lastly, it has been a longstanding principle that "Nasdaq stands for integrity and ethical business practices in order to enhance investor confidence, thereby contributing to the financial health of the economy and supporting the capital formation process." [300]

For all the foregoing reasons, Nasdaq believes that proposed Rule 5605(f) will promote investor protection and the public interest by enhancing investor confidence that all listed companies are considering diversity in the context of selecting directors, either by including at least two Diverse directors on their boards or by explaining their rationale for not meeting that objective. To the extent a company chooses not to meet the diversity objectives of Rule 5605(f)(2), Nasdaq believes that the proposal will provide investors with additional disclosure about the company's reasons for doing so under Rule 5605(f)(3). For example, the company may choose to disclose that it does not meet the diversity objectives of Rule 5605(f)(2) because it is subject to an alternative standard under state or foreign laws and has chosen to satisfy that diversity objective instead. On the other hand, many firms may strive to achieve even greater diversity than the objectives set forth in our proposed rule. Nasdaq believes that providing such flexibility and clear disclosure where the company determines to follow a different path will improve the quality of information available to investors who rely on this information to make informed investment and voting decisions, thereby promoting capital formation and efficiency, and further promoting the public interest.

d. Not Designed to Permit Unfair Discrimination Between Customers, Issuers, Brokers, or Dealers

Nasdaq believes that proposed Rule 5605(f) is not designed to permit unfair discrimination among companies because it requires all companies subject to the rule to have at least two Diverse directors or explain why they do not. Further, the proposal requires at least one of the two Diverse directors to be an individual who self-identifies as Female. While the proposal provides different requirements for the second Diverse director among Smaller Reporting Companies, Foreign Issuers and other companies, Nasdaq believes that the rule is not designed to permit unfair discrimination among companies. In all cases, a company can choose to meet the diversity objectives of the entire rule or to satisfy only certain elements of the rule. Further, the proposed rule does not limit board sizes—if a board chooses to nominate a Diverse individual to the board to meet the diversity objectives of the proposed rule, it is not precluded from also nominating a non-Diverse director for an additional board seat.

---

[292] See Alexandre Di Miceli and Angela Donaggio, *Women in Business Leadership Boost ESG Performance: Existing Body of Evidence Makes Compelling Case*, 42 International Finance Corporation World Bank Group, Private Sector Opinion at 11 n.15 (2018), available at: https:// www.ifc.org/wps/wcm/connect/topics_ext_content/ ifc_external_corporate_site/ifc+cg/resources/ private+sector+opinion/women+in+business+ leadership+boost+esg+performance ("The overwhelming majority of empirical studies conclude that a higher ratio of women in business leadership does not impair corporate performance (virtually all studies find positive or non-statistically significant results)"). See also Wahid, *supra* note 59, at 6 (suggesting that "at a minimum, gender diversity on corporate boards has a neutral effect on governance quality, and at best, it has positive consequences for boards' ability to monitor firm management").

[293] See, e.g., Pletzer et al., *supra* note 38; Post and Byron, *supra* note 39; Adams and Ferreira, *supra* note 42.

[294] See GAO Report, *supra* note 44, at 5 ("Some research has found that gender diverse boards may

have a positive impact on a company's financial performance, but other research has not. These mixed results depend, in part, on differences in how financial performance was defined and what methodologies were used"); Carter (2010), *supra* note 40, at 400 (observing that the different "statistical methods, data, and time periods investigated vary greatly so that the results are not easily comparable.").

[295] See *supra* note 45.

[296] See Order Approving Proposed Rule Changes, 68 FR at 64,161.

[297] Id. at 64,176.

[298] See *supra* notes 4 and 8.

[299] See *supra* note 112.

[300] See Nasdaq Rulebook, Rule 5101.

### i. Rule 5605(f)(2)(B): Foreign Issuers

Similar to all other companies subject to Rule 5605(f), the proposal requires all Foreign Issuers to have, or explain why they do not have, at least two Diverse directors, including one director who self-identifies as Female. However, Nasdaq proposes to provide Foreign Issuers with additional flexibility with regard to the second Diverse director. Foreign Issuers could satisfy the second director objective by including another Female director, or an individual who self-identifies as LGBTQ+ or as an underrepresented individual based on national, racial, ethnic, indigenous, cultural, religious or linguistic identity in the company's home country jurisdiction. While the proposal provides a different requirement for the second Diverse director for Foreign Issuers, Nasdaq believes it is not designed to permit unfair discrimination between Foreign Issuers and other companies because it recognizes that the unique demographic composition of the United States, and its historical marginalization of Underrepresented Minorities and the LGBTQ+ community, may not extend to all countries outside of the United States. Further, Nasdaq believes that it is challenging to apply a consistent definition of minorities to all countries globally because "[t]here is no internationally agreed definition as to which groups constitute minorities." [301] Similarly, "there is no universally accepted international definition of indigenous peoples." [302] Rather, the United Nations *Declaration on the Rights of Indigenous Peoples* recognizes "that the situation of indigenous peoples varies from region to region and from country to country and that the significance of national and regional particularities and various historical and cultural backgrounds should be taken into consideration." [303] Accordingly, Nasdaq believes that it is not unfairly discriminatory to allow an alternative mechanism for Foreign

Issuers to satisfy Rule 5605(f)(2) in recognition that the U.S.-based EEOC definition of Underrepresented Minorities is not appropriate for every Foreign Issuer. In addition, Foreign Issuers have the ability to satisfy Rule 5605(f)(2)(B) by explaining that they do not satisfy this alternative definition. Similarly, any company that is not a Foreign Issuer, but that prefers the alternative definition available for Foreign Issuers, could follow Rule 5605(f)(2)(B) and disclose its reasons for doing so.

Under the proposal, Foreign Issuer means (a) a Foreign Private Issuer (as defined in Rule 5005(a)(19)) or (b) a company that (i) is considered a "foreign issuer" under Rule 3b–4(b) under the Act, and (ii) has its principal executive offices located outside of the United States. For example, a company that is considered a "foreign issuer" under Rule 3b–4(b) under the Act and has its principal executive offices located in Ireland would qualify as a Foreign Issuer for purposes of Rule 5605(f)(2), even if it is not considered a Foreign Private Issuer under Nasdaq or SEC rules.

Nasdaq recognizes that Foreign Issuers may be located in jurisdictions that impose privacy laws limiting or prohibiting self-identification questionnaires, particularly as they relate to race or ethnicity. In such countries, a company may not be able to determine each director's self-identified Diverse attributes due to restrictions on the collection of personal information. The company may instead publicly disclose pursuant to Rule 5605(f)(3) that "Due to privacy laws in the company's home country jurisdiction limiting its ability to collect information regarding a director's self-identified Diverse attributes, the company is not able to determine that it has two Diverse directors as set forth under Rule 5605(f)(2)(B)(ii)."

### ii. Rule 5605(f)(2)(C): Smaller Reporting Companies

While the proposal provides a different requirement for the second Diverse director for Smaller Reporting Companies, Nasdaq believes that this distinction is not designed to permit unfair discrimination among companies. Nasdaq has designed the proposed rule to ensure it does not have a disproportionate economic impact on Smaller Reporting Companies by imposing undue costs or burdens. Nasdaq recognizes that Smaller Reporting Companies, especially pre-revenue companies that depend on the capital markets to fund ground-breaking research and technological

advancements, may not have the resources to compensate an additional director or engage a search firm to find director candidates outside of the directors' traditional networks. Nasdaq believes that this is a reasonable basis to distinguish Smaller Reporting Companies from other companies subject to the rule.

Smaller Reporting Companies already are provided certain exemptions from Nasdaq's listing rules. For example, under Rule 5605(d)(3), Smaller Reporting Companies must have a compensation committee comprised of at least two independent directors and a formal written compensation committee charter or board resolution that specifies the committee's responsibilities and authority, but such companies are not required to grant authority to the committee to retain or compensate consultants or advisors or consider certain independence factors before selecting such advisors, consistent with Rule 10C–1 of the Act.[304] In its approval order, the SEC concluded as follows:

The Commission believes that these provisions are consistent with the Act and do not unfairly discriminate between issuers. The Commission believes that, for similar reasons to those for which Smaller Reporting Companies are exempted from the Rule 10C–1 requirements, it makes sense for Nasdaq to provide some flexibility to Smaller Reporting Companies regarding whether the compensation committee's responsibilities should be set forth in a formal charter or through board resolution. Further . . . in view of the potential additional costs of an annual review, it is reasonable not to require a Smaller Reporting Company to conduct an annual assessment of its charter or board resolution.[305]

The Commission also makes accommodations for Smaller Reporting Companies based on their more limited resources, allowing them to comply with scaled disclosure requirements in certain SEC reports rather than the more rigorous disclosure requirements for larger companies. For example, Smaller Reporting Companies are not required to include a compensation discussion and analysis in their proxy or Form 10–K describing the material elements of the compensation of its named executive officers.[306] Eligible Smaller Reporting Companies also are relieved from the SOX 404(b) requirement to obtain an independent auditor's attestation of management's assessment of the effectiveness of internal control over

---

[301] *See* United Nations, *Minority Rights: International Standards and Guidance for Implementation* 2 (2010), available at: *https:// www.ohchr.org/Documents/Publications/ MinorityRights_en.pdf. See also* G.A. Res. 47/135. art. 1.1 (Dec. 18, 1992) ("States shall protect the existence and the national or ethnic, cultural, religious and linguistic identity of minorities within their respective territories and shall encourage conditions for the promotion of that identity."). The preamble to the Declaration also "[r]eaffirm[s] that one of the basic aims of the United Nations, as proclaimed in the Charter, is to promote and encourage respect for human rights and for fundamental freedoms for all, without distinction as to race, sex, language or religion."

[302] *See* United Nations, *Minority Rights, supra* note 301, at 3.

[303] *See* G.A. Res. 61/295 (Sept. 13, 2007).

[304] *See* Nasdaq Rulebook, Rule 5605(d)(3).

[305] *See* Order Granting Accelerated Approval of Proposed Rule Change, 78 FR 4,554, 4,567 (Jan. 22, 2013).

[306] *See* 17 CFR 229.402(l).

financial reporting.[307] In each case, companies may choose to comply with the more rigorous requirements in lieu of relying on the exemptions.

Any company that is not a Smaller Reporting Company, but prefers the alternative rule available for Smaller Reporting Companies, could follow Rule 5605(f)(2)(C) and disclose their reasons for doing so. As such, Nasdaq believes that the proposed alternative rule for Smaller Reporting Companies is not designed to, and does not, unfairly discriminate among companies. Lastly, Nasdaq believes that Rule 5605(f)(2)(C) is not designed to permit unfair discrimination among companies because it requires Smaller Reporting Companies to have at least one director who self-identifies as Female, similar to other companies subject to Rule 5065(f).

### iii. Rule 5605(f)(3): Public Disclosure of Non-Diverse Board

Under proposed Rule 5605(f)(3), if a company determines not to meet the diversity objectives of Rule 5605(f) in its entirety, it must specify the applicable requirements of the Rule and explain its reasons for not having at least two Diverse directors. Nasdaq designed the proposal to avoid unduly burdening competition or efficiency, or conflicting with existing securities laws, by providing all companies subject to Rule 5605(f) with the option to make the public disclosure required under Rule 5605(f)(3) in the company's proxy statement or information statement for its annual meeting of shareholders or, alternatively on the company's website, provided that the company submits a URL link to such disclosure to Nasdaq through the Listing Center no later than 15 calendar days after the company's annual shareholder meeting. Nasdaq believes Rule 5605(f)(3) is not designed to permit unfair discrimination among companies because the proposed rule provides all companies subject to Rule 5605(f) the option to disclose an explanation rather than meet the diversity objectives of Rule 5605(f)(2).

Certain federal securities laws similarly permit companies to satisfy corporate governance requirements through disclosure of reasons for not meeting the applicable requirement. For example, under Regulation S–K, Item 407 requires a company to disclose whether or not its board of directors has determined that the company has at least one audit committee financial expert. If a company does not have a financial expert on the audit committee,

it must provide an explanation.[308] Item 406 requires a company to disclose whether it has adopted a written code of ethics that applies to the chief executive officer and senior financial or accounting officers. If a company has not adopted such a code of ethics, it must disclose the reasons why not.[309] Item 402 regarding pay ratio disclosure defines how total compensation for employees should be calculated, but permits companies to use a different measure as long as they explain their approach.[310]

Furthermore, Nasdaq rules and SEC guidance already recognize that website disclosure can be a method of disseminating information to the public. For example, Nasdaq listing rules permit companies to provide website disclosures related to third party director compensation,[311] foreign private issuer home country practices,[312] and reliance on the exception relating to independent compensation committee members.[313] The SEC has recognized that "[a] company's website is an obvious place for investors to find information about the company"[314] and permits companies to make public disclosure of material information through website disclosures if, among other things, the company's website is "a recognized channel of distribution of information."[315]

### iv. Rule 5605(f)(4): Exempt Companies

Under proposed Rule 5605(f)(4), Nasdaq proposes to exempt the following types of companies from the requirements of Rule 5605(f) (defined as "Exempt Companies"): acquisition companies listed under IM–5101–2; asset-backed issuers and other passive issuers (as set forth in Rule 5615(a)(1)); cooperatives (as set forth in Rule 5615(a)(2)); limited partnerships (as set forth in Rule 5615(a)(4)); management investment companies (as set forth in Rule 5615(a)(5)); issuers of non-voting preferred securities, debt securities and Derivative Securities (as set forth in Rule 5615(a)(6)); and issuers of securities listed under the Rule 5700

Series. Each of the types of Exempt Companies either has no board of directors, lists only securities with no voting rights towards the election of directors, or is not an operating company, and the holders of the securities they issue do not expect to have a say in the composition of their boards. As such, Nasdaq believes the proposal is not designed to permit unfair discrimination by excluding Exempt Companies from the application of proposed Rule 5605(f). These companies already are exempt from certain of Nasdaq's corporate governance standards related to board composition, as described in Rule 5615.

### v. Rule 5605(f)(5): Phase-in Period

Proposed Rule 5605(f)(5)(A) will allow any newly listing company that was not previously subject to a substantially similar requirement of another national securities exchange one year from the date of listing to satisfy the requirements of Rule 5605(f). Proposed Rule 5605(f)(5)(B) also will allow any company that ceases to be a Foreign Issuer, a Smaller Reporting Company or an Exempt Company one year from the date that the company no longer qualifies as a Foreign Issuer, a Smaller Reporting Company or an Exempt Company, respectively, to satisfy the requirements of Rule 5605(f). This phase-in period will apply after the end of the transition period provided in Rule 5605(f)(7).

Nasdaq believes this approach is not designed to permit unfair discrimination because it provides all companies that become newly subject to the rule the same time period within which to comply. In addition, this approach is similar to other phase-in periods granted to companies listing on or transferring to Nasdaq. For example, Rule 5615(b)(1) provides a company listing in connection with its initial public offering one year to fully comply with the compensation and nomination committee requirements of Rules 5605(d) and (e), and the majority independent board requirement of Rule 5605(b). Similarly, SEC Rule 10A–3(b)(1)(iv)(A) allows a company up to one year from the date its registration statement is effective to fully comply with the applicable audit committee composition requirements. Nasdaq Rule 5615(b)(3) provides a one-year timeframe for compliance with the board composition requirements for companies transferring from other listed markets that do not have a substantially similar requirement.

---

[307] *See* Accelerated Filer and Large Accelerated Filer Definitions, 85 FR 17,178 (March 26, 2020).

[308] *See* 17 CFR 229.407(d)(5).

[309] *Id.* § 229.406(a).

[310] *Id.* § 229.402.

[311] *See* Nasdaq Rulebook, Rule 5250(b)(3)(A).

[312] *Id.,* Rule 5615(a)(3)(B) and IM–5615–3.

[313] *Id.,* Rules 5605(d)(2)(B) (non-independent compensation committee member under exceptional and limited circumstances) and 5605(e)(3) (non-independent nominations committee member under exceptional and limited circumstances).

[314] *See* Commission Guidance on the Use of Company websites, 73 FR 45,862, 45,864 (Aug. 7, 2008).

[315] *Id.* at 45,867.

vi. Rule 5605(f)(7): Effective Dates/Transition

Under proposed Rule 5605(f)(7), each company must have, or explain why it does not have, one Diverse director no later than two calendar years after the Approval Date,[316] and two Diverse directors no later than (i) four calendar years after the Approval Date for companies listed on the NGS or NGM tiers, or (ii) five calendar years after the Approval Date for companies listed on the NCM tier.

Nasdaq believes this approach is not designed to permit unfair discrimination because it recognizes that companies listed on the Nasdaq Capital Market may not have the resources necessary to compensate an additional director or engage a search firm to search for director candidates outside of the directors' traditional networks. Therefore, Nasdaq believes it is in the public interest to provide such companies with one additional year to meet the diversity objectives of Rule 5605(f), should they choose to do so. Nasdaq notes that all companies may choose to follow a timeframe applicable to a different market tier, provided they publicly describe their explanation for doing so. They also may construct their own timeframe for meeting the diversity objectives of Rule 5605(f), provided they publicly disclose their reasons for not abiding by Nasdaq's timeframe.

e. Not Designed to Regulate by Virtue of any Authority Conferred by the Act Matters Not Related to the Purposes of the Act or the Administration of the Exchange

Nasdaq believes that the proposal is not designed to regulate by virtue of any authority conferred by the Act matters not related to the purposes of the Act or the administration of the Exchange.[317] The proposal relates to the Exchange's corporate governance standards for listed companies. As discussed above, "[t]he Commission has long encouraged exchanges to adopt and strengthen their corporate governance listing standards in order to, among other things, enhance investor confidence in the securities markets." [318] And because "it is not always feasible to define . . . every practice which is inconsistent with the public interest or with the protection of investors," the Act leaves to SROs "the

necessary work" of rulemaking pursuant to Section 6(b)(5).[319]

Nasdaq recognizes that U.S. states are increasingly proposing and adopting board diversity requirements, and because corporations are creatures of state law, some market participants may believe that such regulation is best left to states. However, Nasdaq considered that certain of its listing rules related to corporate governance currently relate to areas that are also regulated by states. For example, states impose standards related to quorums [320] and shareholder approval of certain transactions,[321] which also are regulated under Nasdaq's listing rules.[322] Nasdaq has adopted rules relating to such matters to ensure uniformity of such rules among its listed companies. Similarly, Nasdaq believes that the proposed rule will create uniformity among listed companies by helping to assure investors that all non-exempt companies have at least two Diverse directors on their board or publicly describe why they do not.

Further, Nasdaq believes the proposal will enhance investor confidence that listed companies that have two Diverse directors are considering the perspectives of more than one demographic group, leading to robust dialogue and better decision making, as well as the other corporate governance benefits of diverse boards discussed above in Section II.A.1.II. To the extent companies choose to disclose their reasons for not meeting the diversity objectives of Rule 5605(f)(2) pursuant to Rule 5605(f)(3), Nasdaq believes that such disclosure will improve the quality of information available to investors who rely on this information to make an informed voting decision, thereby promoting capital formation and efficiency. It has been the Exchange's longstanding principle that "Nasdaq stands for integrity and ethical business practices in order to enhance investor confidence, thereby contributing to the financial health of the economy and supporting the capital formation process." [323]

In addition, as discussed in Section II.A.1.I, in passing Section 342 of the

Dodd-Frank Act, Congress recognized the need to respond to the lack of diversity in the financial services industry, and the Standards designed by the Commission and other financial regulators provide a framework for addressing that industry challenge. The Standards themselves identify several focus areas, including the importance of "Organizational Commitment," which speaks to the critical role of senior leadership—including boards of directors—in promoting diversity and inclusion across an organization. In addition, like the proposed rule, the Standards also consider "Practice to Promote Transparency," and recognize that transparency is a key component of any diversity initiative. Specifically, the Standards provide that the "transparency of an entity's diversity and inclusion program promotes the objectives of Section 342," and also is important because it provides the public with necessary information to assess an entity's diversity policies and practices.[324]

*B. Self-Regulatory Organization's Statement on Burden on Competition*

The Exchange does not believe that the proposed rule will impose any burden on competition not necessary or appropriate in furtherance of the purposes of the Act. Nasdaq reviewed requirements related to board diversity in two dozen foreign jurisdictions, and almost every jurisdiction imposes diversity-focused requirements on listed companies, either through a securities exchange, financial regulator or the government. Nasdaq competes for listings globally, including in countries that have implemented a more robust regulatory reporting framework for diversity and ESG disclosures. Currently in the U.S., the Long Term Stock Exchange ("LTSE"), which includes a number of sponsors which have investment businesses, has communicated to institutional investors that it that it seeks to distinguish itself by focusing on corporate governance, including, for example, diversity and inclusion. Under Rule 14.425, companies listed on LTSE must adopt and publish a long-term stakeholder policy that explains, among other things, "the Company's approach to diversity and inclusion." [325]

---

[316] The "Approval Date" is the date that the SEC approves the proposed rule.

[317] *See* 15 U.S.C. 78f(b)(5).

[318] *See* Order Approving Proposed Rule Changes, 68 FR at 64,161.

[319] *See Heath* v. *SEC,* 586 F.3d 122, 132 (2d Cir. 2009) (citing *Avery* v. *Moffat,* 55 N.Y.S.2d 215, 228 (Sup. Ct. 1945)).

[320] *See, e.g.,* 8 Del. Code § 216 (providing that a quorum at a shareholder's meeting shall consist of no less than ⅓ of the shares entitled to vote at such meeting).

[321] *See, e.g., id.* §§ 251, 271 (providing that shareholder approval by a majority of the outstanding voting shares entitled to vote is required for mergers and the sale of all or substantially all of a corporation's assets).

[322] *See, e.g.,* Nasdaq Rulebook, Rules 5620(c) and 5635(a).

[323] *Id.,* Rule 5101.

[324] Final Interagency Policy Statement Establishing Joint Standards for Assessing the Diversity Policies and Practices of Entities Regulated by the Agencies, 80 FR 33,016 (June 10, 2015).

[325] *See* Long-Term Stock Exchange Rule Book, Rule 14.425.

## I. Board Statistical Disclosure

The Exchange does not believe that proposed Rule 5606 will impose any burden on competition not necessary or appropriate in furtherance of the purposes of the Act. Specifically, the Exchange believes that the adoption of Rule 5606 will not impose any undue burden on competition among listed companies for the reasons set forth below.

With a few exceptions, all companies would be required to make the same disclosure of their board-level statistical information. The average board size of a company that is currently listed on the Exchange is eight directors. Although a company would be required to disclose its board-level statistical data, directors may choose to opt out rather than reveal their diversity characteristics to their company. A company would identify such directors in the "Undisclosed" category. For directors who voluntarily disclose their diversity characteristics, the company would collect their responses and disclose the information in either the company's proxy statement, information statement of shareholder meeting or on the company's website, using Nasdaq's required format. While the time and economic burden may vary based on a company's board size, Nasdaq does not believe there is any significant burden associated with gathering, preparing and reporting this data. Therefore, Nasdaq believes that there will be a *de minimis* time and economic burden on listed companies to collect and disclose the diversity statistical data.

Some investors value demographic diversity, and list it as an important factor influencing their director voting decisions.[326] Investors have stated that consistent data would make its collection and analysis easier and more equitable for investors that are not large enough to demand or otherwise access individualized disclosures.[327] Therefore, Nasdaq believes that any burden placed on companies to gather and disclose their board-level diversity statistics is counterbalanced by the benefits that the information will provide to a company's investors.

Moreover, as discussed above, most listed companies are required to submit an annual EEO–1 Report, which provides statistical data related to race and gender data among employees similar to the data required under proposed Rule 5606(a). Because most companies are already collecting similar information annually to satisfy their

EEOC requirement, Nasdaq does not believe that adding directors to the collection will place a significant burden on these companies. Additionally, the information requested from Foreign Issuers is limited in scope and therefore does not impose a significant burden on them.

Nasdaq faces competition in the market for listing services. Proposed Rule 5606 reflects that competition, but it does not impose any burden on competition with other exchanges. As discussed above, investors have made clear their desire for greater transparency into public companies' board-level diversity as it relates to gender identity, race, and ethnicity. Nasdaq believes that the proposed rule will enhance the competition for listings. Other exchanges can set similar requirements for their listed companies, thereby increasing competition to the benefit of those companies and their shareholders. Accordingly, Nasdaq does not believe the proposed rule change will impose any burden on competition that is not necessary or appropriate in furtherance of the purposes of the Act.

## II. Diverse Board Representation or Explanation

Nasdaq believes that proposed Rule 5605(f) will not impose burdens on competition among listed companies because the Exchange has constructed a framework for similarly-situated companies to satisfy similar requirements (*i.e.*, Foreign Issuers, Smaller Reporting Companies and other companies), and has provided all companies with the choice of satisfying the requirements of Rule 5605(f)(2) by having at least two Diverse directors, or by explaining why they do not. Nasdaq believes that this will avoid imposing undue costs or burdens on companies that, for example, cannot afford to compensate an additional director or believe it is not appropriate, feasible or desirable to meet the diversity objectives of Rule 5605(f) based on the company's particular circumstances (for example, the company's size, operations or current board composition). Rather than requiring a company to divert resources to compensate an additional director, and place the company at a competitive disadvantage with its peers, the rule provides the flexibility for such company to explain why it does not meet the diversity objective.

The cost of identifying director candidates can range from nothing or a nominal fee (via personal, work or school-related networks, or board affinity organizations, as well as internal research by the corporate secretary's team) to amounts that can vary widely

depending on the specific search firm and the size of the company. Some industry observers estimate board searches for independent directors cost about one-third of a director's annual compensation, while others estimate it costs between $75,000 and $150,000. The underlying figures vary; for example, one search firm generally charges $25,000 to $50,000. Nasdaq observes that total annual director compensation can range widely; median director pay is estimated at $134,000 for Russell 3000 companies and $232,000 for S&P 500 companies. Moreover, there is a wider range of underlying compensation amounts. For example, Russell 3000 directors may receive approximately $32,600 (10th percentile), or up to $250,000 (90th percentile) or more. S&P 500 directors may receive approximately $100,000 (10th percentile) or up to $310,000 (90th percentile) or more.[328] Most, if not all, of these costs would be borne in any event in the search for new directors regardless of the proposed rule. While the proposed rule might lead some companies to search for director candidates outside of already established networks, the incremental costs of doing so would be tied directly to the benefit of a broader search.

To reduce costs for companies that do not currently meet the diversity objectives of Rule 5605(f)(2), Nasdaq is proposing to provide listed companies that have not yet met their diversity objectives with free access to a network of board-ready diverse candidates and a tool to support board evaluation, benchmarking and refreshment. This offering is designed to ease the search for diverse nominees and reduce the costs on companies that choose to meet the diversity objectives of Rule 5605(f)(2). Nasdaq is contemporaneously submitting a rule filing to the Commission regarding the provision of such services. Nasdaq also plans to publish FAQs on its Listing Center to provide guidance to companies on the application of the proposed rules, and to establish a dedicated mailbox for companies and their counsel to email additional questions to Nasdaq regarding the application of the proposed rule. Nasdaq believes that these services will

---

[326] *See* Hunt et al., *supra* note 26.

[327] *See* Petition for Rulemaking, *supra* note 123, at 2.

[328] Total annual director compensation varies by compensation elements and structure as well as amount, which is generally based on the size, sector, maturity of the company, and company specific situation. *See* Mark Emanuel et al., Semler Brossy and the Conference Board, *Director Compensation Practices in the Russell 3000 and S&P 500* (2020 ed.), available at *https://conferenceboard.esgauge.org/directorcompensation/report*.

help to ease the compliance burden on companies whether they choose to meet the listing rule's diversity objectives or provide an explanation for not doing so.

Nasdaq also has structured the proposed rule to provide companies with at least four years from the Approval Date to satisfy Rule 5605(f)(2) so that companies do not incur immediate costs striving to meet the diversity objectives of Rule 5605(f)(2). Nasdaq also has reduced the compliance burden on Smaller Reporting Companies and Foreign Issuers by providing them with additional flexibility when satisfying the requirement related to the second Diverse director. Smaller Reporting Companies could satisfy the proposed diversity objective to have two Diverse directors under Rule 5605(f)(2)(C) with two Female directors. Like other companies, Smaller Reporting Companies also could satisfy the second director objective by including an individual who self-identifies as an Underrepresented Minority or a member of the LGBTQ+ community. Foreign Issuers could satisfy the second director objective by including another Female director, or an individual who self-identifies as LGBTQ+ or an underrepresented individual based on national, racial, ethnic, indigenous, cultural, religious or linguistic identity in the company's home country jurisdiction. Nasdaq has further reduced the compliance burdens on companies listed on the Nasdaq Capital Market tier by providing them with five years from the Approval Date to satisfy Rule 5605(f)(2), recognizing that such companies may face additional challenges and resource constraints when identifying additional director nominees who self-identify as Diverse.

For the foregoing reasons, Nasdaq does not believe that proposed Rule 5605(f) will impose any burden on competition among issuers that is not necessary or appropriate in furtherance of the purposes of the Act. Further, Nasdaq does not believe the proposed rule will impose any burden on competition among listing exchanges. As described above, Nasdaq competes with other exchanges globally for listings, including exchanges based in jurisdictions that have implemented disclosure requirements related to diversity. Within the United States, LTSE requires listed companies to adopt and publish a long-term stakeholder policy that explains, among other things, "the Company's approach to diversity and inclusion." [329] Other listing venues within the United States may propose to adopt rules similar to LTSE's requirements or the Exchange's proposal if they believe companies would prefer to list on an exchange with diversity-related listing standards.

*C. Self-Regulatory Organization's Statement on Comments on the Proposed Rule Change Received From Members, Participants, or Others*

No written comments were either solicited or received.

## III. Date of Effectiveness of the Proposed Rule Change and Timing for Commission Action

Within 45 days of the date of publication of this notice in the **Federal Register** or within such longer period up to 90 days (i) as the Commission may designate if it finds such longer period to be appropriate and publishes its reasons for so finding or (ii) as to which the self-regulatory organization consents, the Commission will:

(A) By order approve or disapprove the proposed rule change, or

(B) institute proceedings to determine whether the proposed rule change should be disapproved.

## IV. Solicitation of Comments

Interested persons are invited to submit written data, views, and arguments concerning the foregoing, including whether the proposed rule change is consistent with the Act. Comments may be submitted by any of the following methods:

*Electronic Comments*

• Use the Commission's internet comment form (*http://www.sec.gov/ rules/sro.shtml*); or

• Send an email to *rule-comments@ sec.gov.* Please include File Number SR–NASDAQ–2020–081 on the subject line.

*Paper Comments*

• Send paper comments in triplicate to Secretary, Securities and Exchange Commission, 100 F Street NE, Washington, DC 20549–1090.

All submissions should refer to File Number SR–NASDAQ–2020–081. This file number should be included on the subject line if email is used. To help the Commission process and review your comments more efficiently, please use only one method. The Commission will post all comments on the Commission's internet website (*http://www.sec.gov/ rules/sro.shtml*). Copies of the submission, all subsequent amendments, all written statements with respect to the proposed rule change that are filed with the Commission, and all written communications relating to the proposed rule change between the Commission and any person, other than those that may be withheld from the public in accordance with the provisions of 5 U.S.C. 552, will be available for website viewing and printing in the Commission's Public Reference Room, 100 F Street NE, Washington, DC 20549, on official business days between the hours of 10:00 a.m. and 3:00 p.m. Copies of the filing also will be available for inspection and copying at the principal office of the Exchange. All comments received will be posted without change. Persons submitting comments are cautioned that we do not redact or edit personal identifying information from comment submissions. You should submit only information that you wish to make available publicly. All submissions should refer to File Number SR–NASDAQ–2020–081, and should be submitted on or before January 4, 2021.

For the Commission, by the Division of Trading and Markets, pursuant to delegated authority.[330]

**J. Matthew DeLesDernier,**
*Assistant Secretary.*

[FR Doc. 2020–27091 Filed 12–10–20; 8:45 am]

**BILLING CODE 8011–01–P**

---

[329] *See* Long-Term Stock Exchange Rule Book, Rule 14.425.

---

[330] 17 CFR 200.30–3(a)(12).

**TAB 29:**

*Self-Regulatory Organizations; The Nasdaq Stock Market LLC; Notice of Filing of Proposed Rule Change To Adopt Listing Rule IM-5900-9 To Offer Certain Listed Companies Access to a Complimentary Board Recruiting Solution To Help Advance Diversity On Company Boards*, 85 Fed. Reg. 79,556 (Dec. 10, 2020)

## SECURITIES AND EXCHANGE COMMISSION

**[Release No. 34–90571; File No. SR–NASDAQ–2020–082]**

**Self-Regulatory Organizations; The Nasdaq Stock Market LLC; Notice of Filing of Proposed Rule Change To Adopt Listing Rule IM–5900–9 To Offer Certain Listed Companies Access to a Complimentary Board Recruiting Solution To Help Advance Diversity on Company Boards**

December 4, 2020.

Pursuant to Section 19(b)(1) of the Securities Exchange Act of 1934 ("Act"),[1] and Rule 19b–4 thereunder,[2] notice is hereby given that on December 1, 2020, The Nasdaq Stock Market LLC ("Nasdaq" or "Exchange") filed with the Securities and Exchange Commission ("Commission") the proposed rule change as described in Items I and II below, which Items have been prepared by the Exchange. The Commission is publishing this notice to solicit comments on the proposed rule change from interested persons.

### I. Self-Regulatory Organization's Statement of the Terms of Substance of the Proposed Rule Change

The Exchange proposes to adopt Listing Rule IM–5900–9 to offer certain listed companies access to a complimentary board recruiting solution to help advance diversity on company boards.

The text of the proposed rule change is detailed below: proposed new language is italicized and proposed deletions are in brackets.

\*    \*    \*    \*    \*

*IM–5900–9. Board Diversity Services*

*On December 1, 2020, Nasdaq filed a proposal (SR–Nasdaq–2020–081) to require each listed Company, subject to certain exceptions, to have, or explain why it does not have, at least two diverse directors on its board (the "Diversity Rule"). In order to help advance diversity on Company boards and to help Companies prepare for and, if approved, comply with the Diversity Rule, Nasdaq offers Eligible Companies complimentary access to two seats of a board recruiting solution, which will allow Companies to identify and evaluate diverse board candidates. Until December 1, 2022, any Eligible Company that requests access to this service through the Nasdaq Listing Center will receive complimentary access for one-year from the initiation of the service. This service has a retail value of approximately $10,000 per year.*

*An Eligible Company is:*

*(a) Any listed Company, except as described below, that represents to Nasdaq that it does not have (i) at least one director who self-identifies as female; and (ii) at least one director who self-identifies as one or more of the following: Black or African American, Hispanic or Latinx, Asian, Native American or Alaska Native, Native Hawaiian or Pacific Islander, or Two or More Races or Ethnicities, or who self-identifies as lesbian, gay, bisexual, transgender or as a member of the queer community;*

*(b) a listed Company that (i) is a Foreign Private Issuer (as defined in Rule 5005(a)(19), or (ii) is considered a foreign issuer under Rule 3b–4(b) under the Act and has its principal executive offices located outside of the United States, if it represents to Nasdaq that it does not have (i) at least one director who self-identifies as female; and (ii) at least one director who self-identifies as one or more of the following: female, an underrepresented individual based on national, racial, ethnic, indigenous, cultural, religious or linguistic identity in the company's home country jurisdiction, or lesbian, gay, bisexual, transgender or as a member of the queer community; or*

*(c) a listed Company that is a Smaller Reporting Company (as defined in Rule 12b–2 under the Act), if it represents to Nasdaq that it does not have (i) at least one director who self-identifies as female, and (ii) at least one director who self-identifies as one or more of the following: female, Black or African American, Hispanic or Latinx, Asian, Native American or Alaska Native, Native Hawaiian or Pacific Islander, or Two or More Races or Ethnicities, or who self-identifies as lesbian, gay, bisexual, transgender or as a member of the queer community.*

\*    \*    \*    \*    \*

### II. Self-Regulatory Organization's Statement of the Purpose of, and Statutory Basis for, the Proposed Rule Change

In its filing with the Commission, the Exchange included statements concerning the purpose of and basis for the proposed rule change and discussed any comments it received on the proposed rule change. The text of these statements may be examined at the places specified in Item IV below. The Exchange has prepared summaries, set forth in sections A, B, and C below, of the most significant aspects of such statements.

#### A. Self-Regulatory Organization's Statement of the Purpose of, and Statutory Basis for, the Proposed Rule Change

##### 1. Purpose

In a separate rule filing,[3] Nasdaq is proposing to require each of its listed companies, subject to certain exceptions, to: (i) Provide statistical information regarding diversity among the members of the company's board of directors; and (ii) to have, or explain why the company does not have, at least one director who self-identifies as a female, and at least one director who self-identifies as Black or African American, Hispanic or Latinx, Asian, Native American or Alaska Native, Native Hawaiian or Pacific Islander, two or more races or ethnicities, or as LGBTQ+.[4] Nasdaq is proposing herein to provide companies that would need to take action to satisfy that requirement, if approved, with a service to help them recruit diverse directors.

In researching the Diversity Proposal, Nasdaq reviewed dozens of empirical studies and found that an extensive body of academic research demonstrates that diverse boards are positively associated with improved corporate governance and financial performance.[5] In particular, studies have found that companies with gender-diverse boards or audit committees are associated with: more transparent public disclosures[6] and less information asymmetry;[7] better reporting discipline by management;[8] a lower likelihood of manipulated

---

[1] 15 U.S.C. 78s(b)(1).

[2] 17 CFR 240.19b–4.

[3] SR-Nasdaq-2020–081(December 1, 2020) available at *https://listingcenter.nasdaq.com/assets/ Board%20Diversity%20Disclosure%20Rule%20 Filing.pdf* (the "Nasdaq Diversity Proposal").

[4] As defined in the proposed rule change, "female" means an individual who self-identifies her gender as a woman, without regard to the individual's designated sex at birth; and "LGBTQ+" means an individual who self-identifies as any of the following: lesbian, gay, bisexual, transgender or a member of the queer community.

[5] *See* Nasdaq Diversity Proposal at Section II, Academic Research: The Relationship between Diversity and Shareholder Value, Investor Protection and Decision Making.

[6] *See* Ferdinand A. Gul et al., *Does board gender diversity improve the informativeness of stock prices?,* 51(3) J. Acct. & Econ. 314 (April 2011) (analyzing 4,084 firm years during the period from 2002 to 2007, excluding companies in the utilities and financial industries, measuring public information disclosure using "voluntary continuous disclosure of 'other' events in 8K reports" and measuring stock price informativeness by "idiosyncratic volatility," or volatility that cannot be explained to systematic factors and can be diversified away).

[7] *See* David Abad et al., *Does Gender Diversity on Corporate Boards Reduce Information Asymmetry in Equity Markets?* 20(3) BRQ Business Research Quarterly 192 at 202 (July 2017) (analyzing 531 company-year observations from 2004 to 2009 of non-financial companies traded on the electronic trading platform of the Spanish Stock Exchange (SIBE)).

[8] *See* Bin Srinidhi et al., *Female Directors and Earnings Quality,* 28(5) Contemporary Accounting Research 1610 at 1612–16 (Winter 2011) (analyzing 3,132 firm years during the period from 2001 to 2007 based on S&P COMPUSTAT, Corporate Library's Board Analyst, and IRRC databases; "choos[ing] the accruals quality as the metric that best reflects the ability of current earnings to reflect future cash flows" (noting that it "best predicts the incidence and magnitude of fraud relative to other commonly used measures of earnings quality") and analyzing surprise earnings results that exceeded previous earnings or analyst forecasts, because "managers of firms whose unmanaged earnings fall marginally below the benchmarks have [an] incentive to manage earnings upwards so as to meet or beat previous earnings").

earnings through earnings management;[9] an increased likelihood of voluntarily disclosing forward-looking information;[10] a lower likelihood of receiving audit qualifications due to errors,[11] non-compliance or omission of information;[12] and a lower likelihood of securities fraud.[13] In addition, studies found that having at least one woman on the board is associated with a lower likelihood of material weaknesses in internal control over financial reporting,[14] and a lower likelihood of material financial restatements.[15]

Studies also identified positive relationships between board diversity and commonly used financial metrics, including higher returns on invested capital, returns on equity, earnings per share, earnings before interest and taxation margin, asset valuation multiples and credit ratings.[16]

In addition, investors and investor groups are calling for diversification in the boardroom[17] and legislators at the

federal and state level are increasingly taking action to encourage or mandate corporations to diversify their boards and improve diversity disclosures.[18]

Given the positive attributes associated with diverse boards and investor desire for greater diversity in the boardroom, Nasdaq wants to advance board diversity among its listed companies. Nasdaq believes that offering a board recruiting solution will assist and encourage listed companies to increase diverse representation on their boards, which can result in improved corporate governance, thus strengthening the integrity of the market and building investor confidence. Nasdaq also believes that offering this service will help aid compliance with the Nasdaq Diversity Proposal, if it is approved. Nasdaq therefore is proposing to provide companies that have not yet achieved a certain level of diversity with one-year complimentary access for two users to a board recruiting solution, which will provide access to a network of board-ready diverse candidates, allowing companies to identify and evaluate diverse board candidates, and a tool to support board benchmarking. This service has an approximate retail value of $10,000.

Nasdaq will offer this service to any Eligible Company, which is a listed company (except as described below)

[9] *See* Ammar Gull et al., *Beyond gender diversity: How specific attributes of female directors affect earnings management*, 50(3) British Acct. Rev. 255 (Sept. 2017), available at: *https://ideas.repec.org/a/eee/bracre/v50y2018i3p255-274.html* (analyzing 394 French companies belonging to the CAC All-Shares Index listed on Euronext Paris from 2001 to 2010, prior to the implementation of France's gender mandate law that required women to comprise 20% of a company's board of directors by 2014 and 40% by 2016).

[10] *See* Francisco Bravo and Maria Dolores Alcaide-Ruiz, *The disclosure of financial forward-looking information*, 34(2) Gender in Mgmt. 140 at 142–44 (2019) (analyzing companies included in the S&P 100 Index in 2016, "focus[ing] on the disclosure of financial forward-looking information (which is likely to require financial expertise), such as earnings forecasts, expected revenues, anticipated cash flows or any other financial indicator").

[11] *See* Maria Consuelo Pucheta-Martínez et al., *Corporate governance, female directors and quality of financial information*. 25(4) Bus. Ethics: A European Rev. 363 at 368 (2016) (analyzing a sample of non-financial companies listed on the Madrid Stock Exchange during 2004–2011).

[12] *Id.* at 363.

[13] *See* Douglas J. Cumming et al., *Gender Diversity and Securities Fraud*, Academy of Management Journal 34 (forthcoming) (Feb. 2, 2015), available at *https://ssrn.com/abstract=2562399* (analyzing China Securities Regulatory Commission data from 2001 to 2010, including 742 companies with enforcement actions for fraud, and 742 non-fraudulent companies for a control group).

[14] *See* Yu Chen et al., *Board Gender Diversity and Internal Control Weaknesses*, 33 Advances in Acct. 11 (2016) (analyzing a sample of 4267 firm-year observations during the period from 2004 to 2013, beginning "the first year internal control weaknesses were required to be disclosed under section 404 of SOX").

[15] *See* Lawrence J. Abbott et al., *Female Board Presence and the Likelihood of Financial Restatement*, 26(4) Accounting Horizons 607, 626 (2012) (analyzing a sample of 278 pre-SOX annual financial restatements and 187 pre-SOX quarterly financial restatements of U.S. companies from January 1, 1997 through June 30, 2002 identified by the U.S. General Accounting Office restatement report 03–138 (which only included "material misstatements of financial results"), and 75 post-SOX annual financial restatements from July 1, 2002, to September 30, 2005 identified by U.S. General Accounting Office restatement report 06–678 (which only included "restatements that were being made to correct material misstatements of previously reported financial information"), consisting almost exclusively of non-Fortune 1000 companies); *See also* Aida Sijamic Wahid, The *Effects and the Mechanisms of Board Gender Diversity: Evidence from Financial Manipulation*, J. Bus. Ethics (forthcoming) (Dec. 2017) Rotman School of Management Working Paper No. 2930132

at 1, available at: *https://ssrn.com/abstract=2930132* (analyzing 6,132 U.S. public companies during the period from 2000 to 2010, for a total of 38,273 firm-year observations).

[16] *See, generally*, FCLTGlobal, *The Long-term Habits of a Highly Effective Corporate Board* 11 (March 2019), available at: *https://www.fclt.global.org/wp-content/uploads/long-term-habits-of-highly-effective-corporate-boards.pdf* (analyzing 2017 MSCI ACWI constituents from 2010 to 2017 using Bloomberg data); Credit Suisse, *The CS Gender 3000: Women in Senior Management* 16 (Sept. 2014), available at: *https://www.credit-suisse.com/media/assets/corporate/docs/about-us/research/publications/the-cs-gender-3000-women-in-senior-management.pdf* (analyzing *3,000 companies across 40 countries from the period from 2005 to 2013*); Meggin Thwing Eastman et al., MSCI, *The tipping point: Women on boards and financial performance* 3 (December 2016), available at: *https://www.msci.com/documents/10199/fd1f8228-cc07-4789-acee-3f9ed97ee8bb* (analyzing of U.S. companies that were constituents of the MSCI World Index for the entire period from July 1, 2011 to June 30, 2016); Harvey M. Wagner, Catalyst, *The Bottom Line: Corporate Performance and Women's Representation on Boards (2004–2008)* (March 1, 2011), available at: *https://www.catalyst.org/research/the-bottom-line-corporate-performance-and-womens-representation-on-boards-2004-2008/* (analyzing gender diversity data from Catalyst's annual Fortune 500 Census of Women Board Directors report series for the years 2005 to 2009, and corresponding financial data from S&P's Compustat database for the years 2004 to 2008); Credit Suisse ESG Research, *LGBT: the value of diversity* 1 (April 15, 2016), available at: *https://research-doc.credit-suisse.com/docView?language=ENG&source=emfromsendlink&format=PDF&document_id=807075590&extdocid=807075590_1_eng_pdf&serialid=eva4wNcHexx7kusNLaZQphUkT9naxi1PvptZQvPjr1k%3d*; McKinsey & Company, *Diversity wins: How inclusion matters* 13 (May 2020), available at: *https://www.mckinsey.com/~/media/McKinsey/Featured%20Insights/Diversity%20and%20Inclusion/Diversity%20wins%20How%20inclusion%20matters/Diversity-wins-How-inclusion-matters-vF.pdf* (analyzing 1,039 companies across 15 countries for the period from December 2018 to November 2019); and Moody's Investors Service, *Gender diversity is correlated with higher ratings, but mandates pose short-term risk* 2 (Sept. 11, 2019), available at: *https://www.moodys.com/research/Moodys-Corporate-board-gender-diversity-associated-with-higher-credit-ratings-PBC_1193768* (analyzing 1,109 publicly traded North American companies rated by Moody's).

[17] Vanguard announced in 2020 it would begin asking companies about the race and ethnicity of directors. *See* Vanguard, *Investment Stewardship 2020 Annual Report* (2020), available at: *https://about.vanguard.com/investment-stewardship/perspectives-and-commentary/2020_investment_stewardship_annual_report.pdf*. Starting in 2020, State Street Global Advisors will vote against the entire nominating committee of companies that do not have at least one woman on their boards and have not addressed questions on gender diversity

within the last three years. State Street Global Advisors, *Summary of Material Changes to State Street Global Advisors' 2020 Proxy Voting and Engagement Guidelines* (2020), available at: *https://www.ssga.com/library-content/pdfs/global/proxy-voting-and-engagement-guidelines.pdf*. Beginning in 2018, BlackRock stated in proxy voting guidelines they "would normally expect to see at least 2 women directors on every board." *See* BlackRock Investment Stewardship, *Corporate governance and proxy voting guidelines for U.S. securities* (Jan. 2020), available at: *https://www.blackrock.com/corporate/literature/fact-sheet/blk-responsible-investment-guidelines-us.pdf*. The NYC Comptroller's Office in 2019 asked companies to adopt policies to ensure women and people of color are on the initial list for every open board seat. *See* Scott M. Stringer, *Remarks at the Bureau of Asset Management 'Emerging Managers and MWBE Managers Conference* (Oct. 11, 2019), available at: *https://comptroller.nyc.gov/wp-content/uploads/2019/10/10.11.19-SMS-BAM-remarks_distro.pdf*.

[18] For example, California requires companies headquartered in the state to have at least one director who self-identifies as a Female and one from an Underrepresented Community. *See* Cal. S.B. 826 (Sept. 30, 2018); Cal. A.B. 979 (Sept. 30, 2020). Washington requires companies headquartered in the state to have at least 25% women on the board by 2022 or provide certain disclosures. *See* Wash. Subst. S.B. 6037 (June 11, 2020). At least eleven states have proposed diversity-related requirements. *See* Michael Hatcher and Weldon Latham, *States are Leading the Charge to Corporate Boards: Diversify!*, Harv. L. Sch. Forum on Corp. Governance (May 12, 2020), available at: *https://corpgov.law.harvard.edu/2020/05/12/states-are-leading-the-charge-to-corporate-boards-diversify/*.

that represents to Nasdaq that it does not have: (i) At least one director who self-identifies as female; and (ii) at least one director who self-identifies as one or more of the following: Black or African American, Hispanic or Latinx, Asian, Native American or Alaska Native, Native Hawaiian or Pacific Islander, or Two or More Races or Ethnicities or who self-identifies as lesbian, gay, bisexual, transgender or as a member of the queer community. A company that is a Foreign Private Issuer (as defined in Rule 5005(a)(19)) or, (i) is considered a foreign issuer under Rule 3b–4(b) under the Act and (ii) has its principal executive offices located outside of the United States, will be an Eligible Company if the company represents to Nasdaq that it does not have: (i) At least one director who self-identifies as female; and (ii) at least one director who self-identifies as one or more of the following: Female, an underrepresented individual based on national, racial, ethnic, indigenous, cultural, religious or linguistic identity in the company's home country jurisdiction, or lesbian, gay, bisexual, transgender or as a member of the queer community. A company that is a Smaller Reporting Company (as defined in Rule 12b–2 under the Act), will be an Eligible Company if the company represents to Nasdaq that it does not have: (i) At least one director who self-identifies as female, and (ii) at least one director who self-identifies as one or more of the following: female, Black or African American, Hispanic or Latinx, Asian, Native American or Alaska Native, Native Hawaiian or Pacific Islander, or Two or More Races or Ethnicities, or who self-identifies as lesbian, gay, bisexual, transgender or as a member of the queer community.[19]

Nasdaq will offer this one-year service to Eligible Companies that request it on or before December 1, 2022. Nasdaq intends to evaluate the service and the progress made in enhancing diversity and may extend the program prior to its expiration through another rule filing.

Nasdaq notes that no other company will be required to pay higher fees as a result of this proposal and represents that providing this service will have no impact on the resources available for its regulatory programs.

### 2. Statutory Basis

The Exchange believes that its proposal is consistent with Section 6(b)

of the Exchange Act,[20] in general, and furthers the objectives of Section 6(b)(5) of the Exchange Act,[21] in particular, in that it is designed to promote just and equitable principles of trade, to remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general to protect investors and the public interest. It is also consistent with this provision because it is not designed to permit unfair discrimination between issuers. Nasdaq also believes that the proposed rule change is consistent with the provisions of Sections 6(b)(4)[22] and 6(b)(8),[23] in that the proposal is designed, among other things, to provide for the equitable allocation of reasonable dues, fees, and other charges among Exchange members and issuers and other persons using its facilities and that the rules of the Exchange do not impose any burden on competition not necessary or appropriate in furtherance of the purposes of the Exchange Act.

Nasdaq believes that research surrounding the value of diversity on a company's board and investor interest in more diverse boards supports the fact that the proposal to offer access to a board recruiting solution promotes just and equitable principles of trade and protects investors and the public interest. Nasdaq believes that by making this service available more companies will seek to enhance the diversity of their boards to achieve these benefits. However, no company is required to use this service.

Nasdaq also believes it is reasonable, and not unfairly discriminatory, to offer the board recruiting solution only to Eligible Companies because these companies have the greatest need to identify diverse board candidates. In addition, if the Nasdaq Diversity Proposal is approved, these companies will need to identify diverse board candidates if they wish to satisfy that requirement instead of explaining why they do not satisfy it. Further, Nasdaq believes that companies that already have two diverse directors will already be familiar with the benefits of board diversity and have demonstrated that they do not need Nasdaq's assistance in identifying diverse candidates.

Nasdaq faces competition in the market for listing services,[24] and

competes, in part, by offering valuable services to companies. Nasdaq believes that it is reasonable to offer this complimentary service as a tool to attract and retain listings as part of this competition. In particular, Nasdaq believes some companies will view the proposed board recruiting solution as a valuable tool to help achieve diversity, to the potential benefit of the company and its investors. Nasdaq also believes that offering this complimentary service will help it compete to attract and retain listings in light of the additional requirements contained in the Nasdaq Diversity Proposal.

For these reasons, Nasdaq believes it is not an inequitable allocation of fees, unfairly discriminatory, nor an unnecessary or inappropriate burden on competition to offer the board recruiting solution only to Eligible Companies.

The Commission has previously indicated pursuant to Section 19(b) of the Exchange Act[25] that providing and updating the value of services offered to certain listed companies within the rulebook is necessary,[26] and Nasdaq does not believe this indication of value has an effect on the allocation of fees nor does it permit unfair discrimination, as all companies with fewer than two diverse directors will receive the same services. Further, this provision will enhance the transparency of Nasdaq's rules and the value of the services it offers, thus promoting just and equitable principles of trade. As such, the proposed rule change is consistent with the requirements of Section 6(b)(4) and (5) of the Exchange Act.

Nasdaq represents, and this proposed rule change will help ensure, that individual listed companies are not given specially negotiated packages of products or services to list, or remain listed, which the Commission has previously stated would raise unfair discrimination issues under the Exchange Act.[27]

---

[19] A company that is not an Eligible Company is able to receive a complimentary 90-day trial of the board recruiting solution, which is being offered by Nasdaq's partner to all clients of Nasdaq, Inc., including non-listed companies.

[20] 15 U.S.C. 78f(b).
[21] 15 U.S.C. 78f(b)(5).
[22] 15 U.S.C. 78f(4).
[23] 15 U.S.C. 78f(8).
[24] The Justice Department has noted the intense competitive environment for exchange listings. *See* "NASDAQ OMX Group Inc. and Intercontinental Exchange Inc. Abandon Their Proposed Acquisition Of NYSE Euronext After Justice Department Threatens Lawsuit" (May 16, 2011), available at

*http://www.justice.gov/atr/public/press_releases/ 2011/271214.htm.*
[25] 15 U.S.C. 78s(b).
[26] *See* Exchange Act Release No. 72669 (July 24, 2014), 79 FR 44234 (July 30, 2014) (SR–NASDAQ–2014–058) (footnote 39 and accompanying text: "We would expect Nasdaq, consistent with Section 19(b) of the Exchange Act, to periodically update the retail values of services offered should they change. This will help to provide transparency to listed companies on the value of the free services they receive and the actual costs associated with listing on Nasdaq.")
[27] *See* Exchange Act Release No. 79366, 81 FR 85663 at 85665 (citing Securities Exchange Act Release No. 65127 (August 12, 2011), 76 FR 51449, 51452 (August 18, 2011) (approving NYSE–2011–20)).

## B. Self-Regulatory Organization's Statement on Burden on Competition

Nasdaq does not believe that the proposed rule change will result in any burden on competition that is not necessary or appropriate in furtherance of the purposes of the Act, as amended. As noted above, Nasdaq faces competition in the market for listing services, and competes, in part, by offering valuable services to companies. The proposed rule change reflects that competition, but does not impose any burden on the competition with other exchanges. Rather, Nasdaq believes that some companies will find the proposed board recruiting solution an attractive offering and therefore make listing or remaining listed on Nasdaq more attractive, which will enhance competition for listings.

Other exchanges can also offer similar services to companies, thereby increasing competition to the benefit of those companies and their shareholders. Accordingly, Nasdaq does not believe the proposed rule change will impose any burden on competition that is not necessary or appropriate in furtherance of the purposes of the Exchange Act, as amended.

## C. Self-Regulatory Organization's Statement on Comments on the Proposed Rule Change Received From Members, Participants, or Others

No written comments were either solicited or received.

## III. Date of Effectiveness of the Proposed Rule Change and Timing for Commission Action

Within 45 days of the date of publication of this notice in the **Federal Register** or within such longer period up to 90 days (i) as the Commission may designate if it finds such longer period to be appropriate and publishes its reasons for so finding or (ii) as to which the self-regulatory organization consents, the Commission will:

(A) By order approve or disapprove the proposed rule change, or

(B) institute proceedings to determine whether the proposed rule change should be disapproved.

## IV. Solicitation of Comments

Interested persons are invited to submit written data, views, and arguments concerning the foregoing, including whether the proposed rule change is consistent with the Act. Comments may be submitted by any of the following methods:

*Electronic Comments*

• Use the Commission's internet comment form (*http://www.sec.gov/rules/sro.shtml*); or

• Send an email to *rule-comments@sec.gov*. Please include File Number SR–NASDAQ–2020–082 on the subject line.

*Paper Comments*

• Send paper comments in triplicate to Secretary, Securities and Exchange Commission, 100 F Street, NE, Washington, DC 20549–1090.

All submissions should refer to File Number SR–NASDAQ–2020–082. This file number should be included on the subject line if email is used. To help the Commission process and review your comments more efficiently, please use only one method. The Commission will post all comments on the Commission's internet website (*http://www.sec.gov/rules/sro.shtml*). Copies of the submission, all subsequent amendments, all written statements with respect to the proposed rule change that are filed with the Commission, and all written communications relating to the proposed rule change between the Commission and any person, other than those that may be withheld from the public in accordance with the provisions of 5 U.S.C. 552, will be available for website viewing and printing in the Commission's Public Reference Room, 100 F Street NE, Washington, DC 20549, on official business days between the hours of 10:00 a.m. and 3:00 p.m. Copies of the filing also will be available for inspection and copying at the principal office of the Exchange. All comments received will be posted without change. Persons submitting comments are cautioned that we do not redact or edit personal identifying information from comment submissions. You should submit only information that you wish to make available publicly. All submissions should refer to File Number SR–NASDAQ–2020–082, and should be submitted on or before December 31, 2020.

For the Commission, by the Division of Trading and Markets, pursuant to delegated authority.[28]

**J. Matthew DeLesDernier,**
*Assistant Secretary.*

[FR Doc. 2020–27089 Filed 12–9–20; 8:45 am]

**BILLING CODE 8011–01–P**

---

[28] 17 CFR 200.30–3(a)(12).

---

## DEPARTMENT OF TRANSPORTATION

### Federal Railroad Administration

**[Docket No. FRA–2020–0027–N–35]**

### Proposed Agency Information Collection Activities; Comment Request

**AGENCY:** Federal Railroad Administration (FRA), U.S. Department of Transportation (DOT).

**ACTION:** Notice of information collection; request for comment.

**SUMMARY:** Under the Paperwork Reduction Act of 1995 (PRA) and its implementing regulations, FRA seeks approval of the Information Collection Request (ICR) abstracted below. Before submitting this ICR to the Office of Management and Budget (OMB) for approval, FRA is soliciting public comment on specific aspects of the activities identified below.

**DATES:** Interested parties are invited to submit comments on or before February 8, 2021.

**ADDRESSES:** Submit written comments and recommendations for the proposed ICR to Ms. Kim Toone, Information Collection Clearance Officer, Office of Information Technology, at *Kim.Toone@dot.gov*. Please refer to the assigned OMB control number in any correspondence submitted. FRA will summarize comments received in response to this notice in a subsequent notice and include them in its information collection submission to OMB for approval.

**SUPPLEMENTARY INFORMATION:** The PRA, 44 U.S.C. 3501–3520, and its implementing regulations, 5 CFR part 1320, require Federal agencies to provide 60-days' notice to the public to allow comment on information collection activities before seeking OMB approval of the activities. *See* 44 U.S.C. 3506, 3507; 5 CFR 1320.8 through 1320.12. Specifically, FRA invites interested parties to comment on the following ICR regarding: (1) Whether the information collection activities are necessary for FRA to properly execute its functions, including whether the activities will have practical utility; (2) the accuracy of FRA's estimates of the burden of the information collection activities, including the validity of the methodology and assumptions used to determine the estimates; (3) ways for FRA to enhance the quality, utility, and clarity of the information being collected; and (4) ways for FRA to minimize the burden of information collection activities on the public, including the use of automated

April 1, 2022

Respectfully submitted,

/s/ *Margaret A. Little*
Margaret A. Little
Sheng Li
NEW CIVIL LIBERTIES ALLIANCE
1225 19th St. NW, Suite 450
Washington, DC 20036
Telephone: 202-869-5210

*Counsel for Petitioner National Center for Public Policy Research*

/s/ *Jonathan Berry*
Jonathan Berry
R. Trent McCotter
Michael Buschbacher
Jared M. Kelson
BOYDEN GRAY & ASSOCIATES 801
17th Street NW, Suite 350
Washington, DC 20006 Telephone:
202-809-5613

*Counsel for Petitioner Alliance Fair Board Recruitment*

/s/ *Daniel E. Matro*
Dan M. Berkovitz
Michael A. Conley
Tracy A. Hardin
Daniel E. Matro
John R. Rady
SECURITIES AND EXCHANGE
COMMISSION 100 F Street NE
Washington, DC 20549
Telephone: 202-551-8248

*Counsel for Respondent Securities and Exchange Commission*

/s/ *Allyson N. Ho*
Allyson N. Ho
Bradley G. Hubbard
Paulette C. Minter
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
Telephone: 214-698-3100

Amir C. Tayrani
Amalia E. Reiss
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036

John Zecca
Jeffrey S. Davis
John Yetter
Joanne Pedone
THE NASDAQ STOCK MARKET
LLC
805 King Farm Boulevard
Rockville, Maryland 20850

Stephen J. Kastenberg
Paul Lantieri III
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, Pennsylvania 19103

Seth D. Berlin
BALLARD SPAHR LLP
1909 K Street, N.W., 12th Floor
Washington, D.C. 20006

*Counsel for Intervenor The Nasdaq Stock Market LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on April 1, 2022, an electronic copy of the foregoing Joint Appendix was filed with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/EFC filing system and that service will be accomplished using the appellate CM/ECF system.

/s/ Margaret A. Little
Margaret A. Little

## CERTIFICATE OF ELECTRONIC COMPLIANCE

I hereby certify that in the foregoing brief, filed using the Fifth Circuit CM/EFC filing system, all required privacy redactions have been made pursuant to Fifth Circuit Rule 25.2.13, any required paper copies to be submitted to the Court are exact copies of the version submitted electronically, and the electronic submission was scanned for viruses with the most recent version of a commercial virus scanning program, and is free of viruses.

/s/ Margaret A. Little
Margaret A. Little