No. 21-60626

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

ALLIANCE FOR FAIR BOARD RECRUITMENT,
NATIONAL CENTER FOR PUBLIC POLICY RESEARCH,

*Petitioners*,

v.

SECURITIES & EXCHANGE COMMISSION,

*Respondent.*

On Petition for Review of an Order of the
Securities & Exchange Commission, No. 34-92590

## OPENING BRIEF FOR PETITIONER
## NATIONAL CENTER FOR PUBLIC POLICY RESEARCH

Margaret A. Little
Senior Litigation Counsel
Sheng Li
Litigation Counsel
New Civil Liberties Alliance
1225 19th St. NW, Suite 450
Washington, DC 20036
Telephone: 202-869-5210

*Attorneys for National Center
for Public Policy Research*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1. Petitioner National Center for Public Policy Research is a non-profit corporation and has no parent corporations or subsidiaries.

2. Margaret A. Little and Sheng Li of The New Civil Liberties Alliance—*Counsel* for Petitioner National Center for Public Policy Research.

3. Petitioner Alliance for Fair Board Recruitment is a non-profit membership corporation and has no parent corporations or subsidiaries.

4. C. Boyden Gray, Jonathan Berry, R. Trent McCotter, Michael Buschbacher, and Jordan E. Smith of Boyden Gray & Associates—*Counsel* for Petitioner Alliance for Fair Board Recruitment.

5. The Securities and Exchange Commission is a federal agency.

6. Michael A. Conley, Daniel E. Matro, Vanessa Ann Countryman, and Tracy A. Hardin of the Securities and Exchange Commission—*Counsel* for Respondent Securities and Exchange Commission.

7. Allyson N. Ho, Bradley G. Hubbard, Amir C. Tayrani, and Amalia E. Reiss of Gibson, Dunn & Crutcher LLP; John Zecca, Jeffrey S. Davis, John Yetter, and Joanne Pedone of The Nasdaq Stock Market L.L.C.; and Burt M. Rublin,

i

Stephen J. Kastenberg, Paul Lantieri III, Peter F. Andrews, and Seth D. Berlin

of Ballard Spahr LLP—*Counsel* for Intervenor Nasdaq Stock Market, L.L.C.

/s/ Margaret A. Little
Counsel of Record for Petitioner

## STATEMENT REGARDING ORAL ARGUMENT

Petitioner National Center for Public Policy Research respectfully requests oral argument. This case involves novel and complex issues of constitutional and statutory interpretation and administrative law as well as a lengthy record. Oral argument would substantially aid the Court in its resolution of the case.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ............................................................. i

STATEMENT REGARDING ORAL ARGUMENT ................................................. iii

TABLE OF CONTENTS ............................................................................................. iv

TABLE OF AUTHORITIES ..................................................................................... vii

JURISDICTIONAL STATEMENT.................................................................................. 1

INTRODUCTION.............................................................................................................. 1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ......................................... 2

STATEMENT OF THE CASE ........................................................................................ 3

    Statutory Background ..................................................................................................... 3

    Nasdaq's Diversity Proposals ....................................................................................... 5

    The National Center for Public Policy Research and Others Object...................... 7

    SEC Approves the Board Diversity Rules, with Two Commissioners Dissenting. 9

SUMMARY OF THE ARGUMENT............................................................................... 13

ARGUMENT..................................................................................................................... 15

I.    THE ORDER AND DIVERSITY RULES CONSTITUTE STATE ACTION SUBJECT TO
CONSTITUTIONAL SCRUTINY ........................................................................................ 15

    A.    Nasdaq Is a Government Entity that Must Respect Constitutional Rights 15

    B.    SEC's Approval of Nasdaq's Board Diversity Rules Is State Action Subject
to Constitutional Scrutiny............................................................................................ 18

II.  THE BOARD DIVERSITY RULES COMPEL SPEECH IN VIOLATION OF THE FIRST
AMENDMENT ................................................................................................................... 21

A.    Exacting Scrutiny Applies to the Rules ............................................................ 21

B.    The Constitution Forbids Requiring Companies to "Fill Your Board Seats as We Say or You've Got Some Explaining to Do" ................................................. 21

III. THE DIVERSITY RULES ARE AN UNCONSTITUTIONAL EXERCISE OF LEGISLATIVE POWERS VESTED SOLELY IN CONGRESS ................................................. 24

A.    Federal Agencies May Not Wield Legislative Powers Vested in Congress . 26

B.    The Exchange Act Does Not Authorize SEC or Any SRO SEC Supervises to Regulate the Demographic Composition of Corporate Boards ......................... 28

C.    The Exchange Act Does Not Empower SEC to Regulate Internal Corporate Governance ................................................................................................. 31

D.    The Exchange Act Lacks Any Intelligible Principle ...................................... 33

IV. THE DIVERSITY RULES ARE NOT 'DESIGNED TO' ACCOMPLISH STATUTORILY REQUIRED OBJECTIVES ................................................................................... 37

A.    SEC Improperly Used Subjective Belief to Satisfy the Objective 'Designed' Standard ............................................................................................................... 39

B.    The Court Must Not Defer to SEC's Interpretation of Section 6(b) .......... 42

V.   THE BOARD DIVERSITY RULES REQUIRE DISCLOSURE OF NON-MATERIAL INFORMATION THAT FALLS OUTSIDE THE SCOPE OF THE EXCHANGE ACT ............. 45

VI. SEC'S APPROVAL OF THE BOARD DIVERSITY RULES IS ARBITRARY AND CAPRICIOUS ....................................................................................................... 47

A.    SEC Failed to Engage in Independent Reasoning .......................................... 48

B.    SEC Improperly Approved the Board Recruiting Service Without Any Analysis of Its Content ............................................................................................. 50

CONCLUSION ..................................................................................................... 51

CERTIFICATE OF SERVICE .......................................................................... 52

CERTIFICATE OF COMPLIANCE ............................................................... 53

CERTIFICATE OF ELECTRONIC COMPLIANCE ................................................ 53

# TABLE OF AUTHORITIES

## CASES

*A.L.A. Schechter Poultry Corp. v. United States*,
  295 U.S. 495 (1935)................................................................16, 26, 36

*Agency for Int'l Dev. v. All. for Open Soc'y, Int'l, Inc.*,
  570 U.S. 205 (2013)............................................................................ 23

*Ala. Assoc. of Realtors v. HHS*,
  141 S. Ct. 2485, 2486, 2489 (2021) ........................................... *passim*

*Associated Builders & Contractors of Se. Tex. v. Rung*,
  2016 U.S. Dist. LEXIS 155232 (E.D. Tex. Oct. 24, 2016).......................... 23

*Austin Mun. Sec., Inc. v. NASD*,
  757 F.2d 676 (5th Cir. 1985)....................................................... *passim*

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988)...................................................................46, 47

*Blum v. Yaretsky*,
  457 U.S. 991 (1982)........................................................................... 19

*Bond v. United States*,
  564 U.S. 211 (2011)........................................................................... 27

*Boyd v. United States*,
  116 U.S. 616 (1886)........................................................................... 23

*BST Holdings, LLC v. OSHA*,
  17 F.4th 604 (5th Cir. 2021)........................................................25, 32

*Burton v. Wilmington Parking Authority*,
  365 U.S. 715 (1961)........................................................................... 19

*Bus. Roundtable v. SEC*,
  905 F.2d 406 (D.C. Cir. 1990) .....................................................30, 31

*Bus. Roundtable v. SEC*,
  647 F.3d 1144 (D.C. Cir. 2011) ...................................................38, 40

*Caperton v. A.T. Massey Coal Co.*,
  556 U.S. 868 (2009)........................................................................... 43

*Carlson v. Postal Regul. Comm'n*,
  938 F.3d 337 (D.C. Cir. 2019) ......................................................... 49

*Carpenter v. Stephen F. Austin State Univ.*,
  706 F.2d 608 (5th Cir. 1983)........................................................... 49

*Carter v. Carter Coal Co.*,
  298 U.S. 238 (1936)...................................................................15, 16

*Chevron v. NRDC*,
  467 U.S. 837 (1984)........................................................................ 44

*City of Arlington v. FCC*,
  569 U.S. 290 (2013).............................................................25, 27, 45

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
  140 S. Ct. 1891 (2020) ................................................................... 47

*Dep't of Transp. v. Ass'n of Am. Railroads*,
  575 U.S. 43 (2015) .................................................................. *passim*

*Egan v. Delaware River Port Authority*,
  851 F.3d 263 (3d Cir. 2017) ........................................................... *42*

*FDA v. Brown & Williamson*,
  529 U.S. 120 (2000)................................................................... 28, 30

*FTC v. Hornbeam Special Situations, LLC*,
  2018 U.S. Dist. LEXIS 204339 (N.D Ga. Oct. 15, 2018)............................ 25

*Gundy v. United States*,
  139 S. Ct. 2116 (2019) .............................................................30, 33, 34

*Gutierrez-Brizuela v. Lynch*,
  834 F.3d 1142 (10th Cir. 2016)................................................... 42, 44

*Home Box Office, Inc. v. FCC*,
  567 F.2d 9 (D.C. Cir. 1977) ........................................................... 49

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*,
  515 U.S. 557 (1995)........................................................................ 22

*Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*,
  448 U.S. 607 (1980)................................................................... *passim*

*Int'l Dairy Foods Ass'n v. Amestoy*,
  92 F. 3d 67 (2d Cir. 1996) ............................................................. 23

*Intercontinental Indus., Inc. v. Am. Stock Exch.*,
  452 F.2d 935 (5th Cir. 1971)..................................................... 19, 20

*Janus v. AFSCME*,
  138 S.Ct. 2448 (2018)................................................................ 22, 23

*Jones v. Rath Packing Co.*,
  430 U.S. 519 (1977)........................................................................ 31

viii

*Kisor v. Wilkie*,
  139 S. Ct. 2400 (2019) ................................................................ 45

*La. Pub. Serv. Comm'n v. FCC*,
  476 U.S. 355 (1986) .................................................................... 25

*Lebron v. Nat'l Railroad Passenger Corp.*,
  513 U.S. 374 (1995) ........................................................ 16, 17, 18

*Loving v. United States*,
  517 U.S. 748 (1996) .................................................................... 25

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*,
  138 S. Ct. 1719 (2018) ................................................................ 43

*Michigan v. EPA*,
  576 U.S. 743, 761 (2015) ............................................................ 44

*Meland v. Weber*,
  2 F.4th 838 (9th Cir. 2021) ........................................................... 7

*Merrill Lynch v. NASD*,
  616 F.2d 1363 (5th Cir. 1980) ....................................................... 3

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ...................................................................... 51

*Nat'l Ass'n of Mfrs. v. SEC*,
  800 F. 3d 518 (D.C. Cir. 2015) .................................................... 23

*National Institute of Family and Life Advocates v. Becerra*,
  238 S.Ct. 3462 (2018) .................................................................. 22

*NetCoalition v. SEC*,
  615 F.3d 525 (D.C. Cir. 2010) ..................................................... 48

*R&W Tech. Servs. Ltd. v. CFTC*,
  205 F.3d 165 (5th Cir. 2000) ....................................................... 46

*Riley v. National Fed'n of the Blind of N.C., Inc.*,
  487 U.S. 781 (1988) .................................................................... 21

*Rooms v. SEC*,
  444 F.3d 1208 (10th Cir. 2006) ................................................... 20

*Rumsfeld v. Forum for Academic and Institutional Rights*,
  547 U.S. 47 (2006) ...................................................................... 22

*Sante Fe Industries, Inc. v. Green*,
  430 U.S. 462 (1977) .................................................................... 31

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*,
    531 U.S. 159 (2001)........................................................................ 33

*Susquehanna Int'l Grp., LLP v. SEC*,
    866 F.3d 442 (D.C. Cir. 2017) ................................................. *passim*

*Texas v. Rettig*,
    993 F.3d 408 (5th Cir. 2021)...............................................27, 28

*Tiger Lily, LLC v. United States Dep't of Hous. & Urb. Dev.*,
    5 F.4th 666 (6th Cir. 2021)...............................................27, 32

*TSC Industries, Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976)..........................................................45, 46

*U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*,
    140 S. Ct. 1837, 1849–1850 (2020) ..................................... 32

*Util. Air Regul. Grp v. EPA*,
    573 U.S. 302 (2014)..........................................................32, 33

*Va. Uranium, Inc. v. Warren*,
    139 S. Ct. 1894 (2019) ........................................................ 25

*Valent v. Commissioner of Social Security*,
    918 F.3d 516 (6th Cir. 2019)............................................... 44

*Whitman v. Am. Trucking Assocs.*,
    531 U.S. 457 (2001)..................................................26, 30, 35

*Wooley v. Maynard*,
    430 U.S. 705 (1977)............................................................ 22

## STATUTES

15 U.S.C. § 78............................................................................*passim*
28 U.S.C. § 2112 ....................................................................... 15
28 U.S.C. § 453.......................................................................... 43
5 U.S.C. § 533.............................................................................. 4
5 U.S.C. § 706........................................................................2, 18

## OTHER AUTHORITIES

Commissioner Peirce, *Statement on the Commission's Order Approving Proposed Rule Changes, as Modified by Amendments No. 1, to Adopt Listing Rules Related to Board Diversity submitted by the Nasdaq Stock Market LLC* (Aug. 6, 2021) ......................................................13, 26

Commissioner Roisman, *Statement on the Commission's Order Approving Exchange Rules Relating to Board Diversity* (Aug. 6, 2021) ...................................................................12, 41

James Madison, 4 The Debates in the Several State Conventions on the Adoption of the Federal Constitution (Jonathan Elliot, ed., 2d ed., 1836) ................................33, 34

Letter from C. Boyden Gray and Jonathan Berry, Boyden Gray & Associates, submitted on behalf of the Alliance for Fair Board Recruitment, dated April 6, 2021 ......................................................................................................................................... 8

Letter from David R. Burton, Senior Fellow in Economic Policy, The Heritage Foundation, to J. Matthew DeLesDernier, Assistant Secretary, Commission, dated January 4, 2021 .................................................................................................................. 8

Letter from Dennis E. Nixon, President, International Bancshares Corporation, to Vanessa A. Countryman, Secretary, Commission, dated December 31, 2020............ 8

Letter from Justin Danhof and Scott Shepard, Free Enterprise Project, National Center for Public Policy Research, to Vanessa Countryman, Secretary, Commission, dated December 30, 2020 .................................................................................................. 8

Letter from Publius Oeconomicis to Vanessa Countryman, Secretary, Commission, dated Dec. 28, 2020 ........................................................................................................... 8

Letter from Senator Pat Toomey and 11 other U.S. Senators, to Allison Herren Lee, Acting Chair, Commission, dated February 12, 2021.................................................... 8

Nasdaq, *Response to Comments and Notice of Filing of Amendment No. 1*, File No. SR-NASDAQ-2020-081 (Feb. 26, 2021)......................................................................... *passim*

Nasdaq, *Response to Comments and Notice of Filing of Amendment No. 1*, File No. SR-NASDAQ-2020-082 (Feb. 26, 2021)................................................................................ 6

Philip Hamburger, Chevron *Bias*, 84 Geo. Wash. L. Rev. 1187 (2016)................... 43, 44

Statistica, *Largest stock exchange operators worldwide as of October 2021, by market capitalization of listed companies* ............................................................................... 29

**RULES**

Nasdaq Rule 5606................................................................................................................ 6

Nasdaq Rule 5801................................................................................................................ 6

Nasdaq Rule IM-5900-9 ......................................................................................... 6

## REGULATIONS

*Self-Regulatory Organizations; The Nasdaq Stock Market LLC; Notice of Filing of Proposed Rule Change To Adopt Listing Rule* IM-5900-9 *To Offer Certain Listed Companies Access to a Complimentary Board Recruiting Solution To Help Advance Diversity On Company Boards*, 85 Fed. Reg. 79,556 (Dec. 10, 2020) ..................................................................................... 6

*Self-Regulatory Organizations; The Nasdaq Stock Market LLC; Notice of Filing of Proposed Rule Change To Adopt Listing Rules Related to Board Diversity*, 85 Fed. Reg. 80,472 (Dec. 11, 2020) ......................................................................................................................... 5, 26

SEC, *Securities Exchange Act Release No. 91286*, 86 Fed Reg 14,484 (March 16, 2021).... 9

*Self-Regulatory Organizations; The Nasdaq Stock Market LLC; Order Approving Proposed Rule Changes, as Modified by Amendment No. 1, to Adopt Listing Rules Related to Board Diversity and to Offer Certain Listed Companies Access to a Complimentary Board Recruiting Service*, 86 Fed. Reg. 44,424 (Aug. 12, 2021) ........................................................................... *passim*

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. I, § 1 ...................................................................................................... 24, 26

## JURISDICTIONAL STATEMENT

The Securities and Exchange Commission approved the Nasdaq Stock Market LLC's rule change on August 6, 2021. 86 FR 44,424 (Aug. 12, 2021), JA1.Tab1. The Securities and Exchange Commission acted under § 19(b)(2)(C) of the Securities Exchange Act, 15 U.S.C. § 78s(b)(2)(C). 86 FR at 44,445, JA22.Tab1. The Court has jurisdiction to review such an order pursuant to § 25(a) of the Exchange Act. 15 U.S.C. § 78y(a). The petition was filed timely on October 5, 2021.

## INTRODUCTION

Petitioner National Center for Public Policy Research ("NCPPR") challenges the Securities and Exchange Commission's ("SEC") order approving a rule change that requires Nasdaq-listed companies to disclose the race, gender, and sexuality of their directors and to ensure their boards of directors satisfy quotas for those characteristics. Any company that fails to meet these race, gender, and sexuality quotas must make a public explanation. Companies that fail to meet the board diversity requirements are subject to delisting from the Nasdaq Stock Market ("Nasdaq"). The SEC's order violates the Vesting Clause in Article I of the Constitution because it is an exercise of sweeping legislative power to regulate demographics that Congress could not have delegated. The order also violates the First Amendment by compelling explanatory speech from companies that do not meet controversial demographic quotas. Apart from these constitutional violations, the SEC's order also violates statutory requirements under the Securities and Exchange Act of 1934 ("Exchange Act") and the

Administrative Procedure Act ("APA"). For these reasons and others described below, the Court should vacate the SEC's order and the Nasdaq rules that order approved.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1. Do the Board Diversity Rules issued by Nasdaq and approved by SEC constitute state action that is subject to constitutional restraints?

2. Do the Board Diversity Rules violate the First Amendment by compelling companies to explain why they do not have directors of races, gender, and sexualities favored by Nasdaq?

3. Does the Exchange Act delegate authority to Nasdaq to issue and SEC to approve the Board Diversity Rules, which impose quotas and disclosure requirements regarding race, gender, and sexuality on boards of companies listed on Nasdaq?

4. Are the Board Diversity Rules approved by the SEC designed to prevent fraudulent and manipulative acts and practices, promote just and equitable principles of trade, remove impediments to a free and open market, and protect investors and the public interest, as required by Section 6(b)(5) of the Exchange Act?

5. Do the Board Diversity Rules mandate the disclosure of non-material information outside the scope of the Exchange Act?

6. Whether the SEC's approval of the Board Diversity Rules was arbitrary and capricious, in violation of the APA. *See* 5 U.S.C. § 706.

## STATEMENT OF THE CASE

**Statutory Background**

The Exchange Act created the SEC to regulate securities transactions to ensure greater transparency and to prevent fraud and manipulation. 15 U.S.C. § 78(b), (d). Nasdaq was established as a national securities exchange pursuant to the Exchange Act and is required by the Act to operate as a self-regulatory organization ("SRO") under SEC's supervision. 15 U.S.C. § 78(f). "Congress delegated power to these organizations to enforce, at their own initiative, 'compliance by members of the industry with both the legal requirements laid down in the Exchange Act and the ethical standards going beyond those requirements.'" *Austin Mun. Sec., Inc. v. NASD*, 757 F.2d 676, 680 (5th Cir. 1985) (quoting *Merrill Lynch v. NASD*, 616 F.2d 1363, 1367 (5th Cir. 1980)). "Every self-regulatory organization must comply with the provisions of the Exchange Act, its own rules, and [SEC] rules[,]" and "must force compliance with these rules by their members and persons associated with members." *Id.* If an SRO "fails to comply with these requirements, the SEC has broad sanctioning power. The SEC can suspend or revoke the registration of the self-regulatory organization, or censure or restrict the activities, functions, and operations of the organization[.]" *Id.*

In 1975, Congress amended the Exchange Act to formalize SROs' rulemaking powers and place them fully within the control of the SEC. Securities Act Amendment of 1975, Pub. L. No. 94-29, 89 Stat. 97a (1975) ("1975 Amendments"). This was done in part to dispel the "common and serious misunderstanding" that "self-regulation is

thought to mean that the securities industry regulates itself and therefore is not regulated by the government." S. REP. 94-75, 22, 1975 U.S.C.C.A.N. 179, 201. "Such a conception of self-regulation is seriously misleading in that it fails to recognize the essential and continuing role of the federal government. Industry regulation and government regulation are not alternatives, but complementary components of the self-regulatory process." *Id.*

Recognizing that "[self-regulatory] organizations, *i.e.*, the exchanges and the NASD, are delegated governmental power in order to enforce … the Exchange Act," *id.,* the 1975 Amendments require SROs to publish proposed rule changes in the Federal Register for public comment like other government agencies to which Congress delegates power. *Compare* 15 U.S.C. § 78s(b)(2)(E) *with* 5 U.S.C. § 533(b). Additionally, "SEC must approve all [SRO] rules, policies, practices, and interpretations prior to their implementation. … In addition, the SEC may abrogate or add such rules as it deems necessary." *Austin Mun. Sec.*, 757 F.2d at 680 (citing 15 U.S.C. § 78s); *see also* 15 U.S.C. § 78s(c) (authorizing SEC to "abrogate, add to, and delete from … the rules of a self-regulatory organization … as the Commission deems necessary or appropriate[.]"). Approval of an SRO's proposed rule must be based on the SEC's own "reasoned analysis." *Susquehanna Int'l Grp., LLP v. SEC*, 866 F.3d 442, 447 (D.C. Cir. 2017) (Garland, J.). SEC must also make its own "findings and determinations" and "not merely accept those made by [the SRO]." *Id.* (cleaned up).

**Nasdaq's Diversity Proposals**

Nasdaq filed a proposed rule change to adopt listing rules concerning race, gender, and sexuality of corporate board members on December 1, 2020, which was published for comment in the Federal Register on December 11, 2020. *See Self-Regulatory Organizations; The Nasdaq Stock Market LLC; Notice of Filing of Proposed Rule Change To Adopt Listing Rules Related to Board Diversity*, 85 Fed. Reg. 80,472 (Dec. 11, 2020) ("Board Diversity Proposal"), JA689.Tab28. Nasdaq explained the Board Diversity Proposal addressed "the need for enhanced board diversity" as identified by "the social justice movement [that] has brought heightened attention to the commitment of public companies to diversity and inclusion." *Id.* at 80,472. On February 26, 2021, Nasdaq filed an Amendment Letter to the Board Diversity Proposal relaxing certain compliance requirements. Nasdaq, *Response to Comments and Notice of Filing of Amendment No. 1*, File No. SR-NASDAQ-2020-081 (Feb. 26, 2021) ("Nasdaq Letter II"), JA198.Tab.11. The Board Diversity Proposal, as amended, would subject Nasdaq-listed companies (subject to narrow exceptions for non-operating companies) to the following requirements:

- Have or explain why it does not have at least one board director who "self-identifies her gender as a woman, without regard to the individual's designated sex at birth" (the "Gender Quota"). *Id.* at 9-10, JA264-65.Tab.12.

- Have or explain why it does not have at least one board director who self-identifies as "Black or African American, Hispanic or Latinx, Asian, Native American or Alaska Native, Native Hawaiian or Pacific Islander, or Two or More Races or Ethnicities," or as "LGBTQ+," defined as "lesbian, gay, bisexual, transgender, or as a member of the queer community" (the "Race and Sexuality Quota"). *Id.*

- • Disclose statistical information on each director's "voluntary self-identified gender and racial characteristics and LGBTQ+ status" using a "Board Diversity Matrix" (the "Disclosure Requirement"). *Id.* at 64-66, JA319-21.Tab.12.

Foreign Nasdaq-listed companies may satisfy the Minority Requirement by adding a second board member who self-identifies as a woman instead of one who self-identifies as a racial or sexual minority. *Id.* at 9, JA264.Tab.12.

The Gender and Race and Sexuality Quotas (collectively "Quota Requirements") were embodied in proposed Rule 5605(f), and the Disclosure Requirement was embodied in proposed Rule 5606. *Id.* Nasdaq would delist any company that fails to comply with these requirements. *See* Nasdaq Rule 5801 ("A Company's failure to maintain compliance with the applicable provisions of the Rule 5000 Series will result in the termination of the listing unless an exception is granted to the Company[.]").

Nasdaq also proposed adoption of List Rule IM-5900-9 as a "Board Recruiting Service Proposal," which it also amended on February 26, 2021. *See Self-Regulatory Organizations; The Nasdaq Stock Market LLC; Notice of Filing of Proposed Rule Change To Adopt Listing Rule* IM-5900-9, 85 Fed. Reg. 79,556 (Dec. 10, 2020), JA 723 .Tab 29; Nasdaq, *Response to Comments and Notice of Filing of Amendment No. 1*, File No. SR-NASDAQ-2020-082 (Feb. 26, 2021) ("Nasdaq Letter III"), JA162.Tab10. Under the Board Recruiting Service Proposal, Nasdaq would provide listed companies that do not comply with the Quota Requirements "access to a network of board-ready diverse candidates." *Id.* at 3, JA164.Tab10. The Board Recruiting Service Proposal provides no

information regarding how candidates will be selected for inclusion in such network, who at Nasdaq will select them, or what criteria will determine whether they are "board-ready." On March 10, 2021, SEC commenced proceedings to approve or disapprove the Board Diversity and Board Recruiting Service Proposals. SEC, *Securities Exchange Act Release No. 91286*, 86 Fed Reg 14,484 (March 16, 2021).

**The National Center for Public Policy Research and Others Object**

NCPPR is a non-profit organization incorporated in Delaware and located in Washington, D.C. It both holds stock and exercises its voting rights in Nasdaq-listed companies.[1] NCPPR 's Free Enterprise Project engages in shareholder activism to promote free-market corporate governance by filing shareholder resolutions, engaging corporate CEOs and board members at shareholder meetings, petitioning SEC for interpretative guidance, and sponsoring media campaigns to encourage corporations to focus on their duty to shareholders.

On December 30, 2020, NCPPR filed a comment in response to the Board Diversity Proposal objecting to the proposed race-, gender-, sexuality-based discrimination in corporate board membership. *See* Letter from Justin Danhof and Scott Shepard, Free Enterprise Project, National Center for Public Policy Research, to

---

[1] *See Meland v. Weber*, 2 F.4th 838, 843-47 (9th Cir. 2021).

Vanessa Countryman, Secretary, Commission, dated December 30, 2020 ("NCPPR Letter"), JA657.Tab22. According to NCPPR:

> [A]s active shareholders in numerous companies listed on the Nasdaq, we are concerned that the proposed rule may cause companies to break state laws which require directors to serve as stewards for the benefit of shareholders. Selecting directors on the basis of arbitrary surface (and related) characteristics, rather than business acumen, industry knowledge, prior experience, viewpoint diversity and other factors genuinely relevant to firm performance, may cause Nasdaq-listed companies to violate their legal fiduciary obligations to their shareholders.

*Id.* at 3, JA659.Tab22. NCPPR further explained that the Board Diversity Proposal was unconstitutional and unlawful. *Id.* at 2, JA658.Tab22. It questioned Nasdaq's reliance on social science studies to support its contention that surface-characteristic diversity along race, gender, or sexuality dimensions improves corporate governance and financial performance. While "*viewpoint* diversity increases financial, governance and other relevant performance, there appear to be no studies that establish that surface-characteristic diversity of the sort that would be mandated under this proposed rule causes … such performance enhancement." *Id.* at 2-3, JA658-59.Tab22.

Numerous other commenters echoed these objections.[2] Of particular concern was that out of 55 objecting commenters, 12 or nearly 22% were filed anonymously or

---

[2] *See, e.g.*, Letter from David R. Burton, Senior Fellow in Economic Policy, The Heritage Foundation, to J. Matthew DeLesDernier, Assistant Secretary, Commission, dated January 4, 2021 ("Heritage Letter"); Letter from Senator Pat Toomey and 11 other U.S. Senators, to Allison Herren Lee, Acting Chair, Commission, dated February 12, 2021 ("Senators Letter"); Letter from Dennis E. Nixon, President, International Bancshares Corporation, to Vanessa A. Countryman, Secretary, Commission, dated December 31, 2020 ("IBC Letter"); Letter from C. Boyden Gray and Jonathan Berry, Boyden Gray &

under a clear pseudonym out of fear of reprisal. For example, "Publius Oeconomicis" explained:

> I write anonymously because I fear that my opposition to the Proposed Rule will adversely impact my career. In US financial services firms, especially investment advisory arms, the promotion of diversity … social and governance roles have become an undeniable religion … . Those who do not agree that we should use capital markets to impose a social or political agenda are quietly excluded from key meetings, committees and groups.[3]

Nearly a quarter of respondents who are concerned about the lawfulness, propriety, and wisdom of a rule that divides Americans by immutable—and irrelevant—characteristics for board service felt they could not safely speak in their own name. This fact suggests that "viewpoint diversity" that NCPPR believes to be integral to healthy corporate governance may be in short supply among corporate leaders.

### SEC Approves the Board Diversity Rules, with Two Commissioners Dissenting

On August 6, 2021, SEC approved Nasdaq's Board Diversity and Board Recruiting Services Proposals. *Self-Regulatory Organizations; The Nasdaq Stock Market LLC; Order Approving Proposed Rule Changes, as Modified by Amendment No. 1, to Adopt Listing Rules Related to Board Diversity and to Offer Certain Listed Companies Access to a Complimentary Board Recruiting Service*, 86 Fed. Reg. 44,424 (Aug. 12, 2021) (hereinafter, "Order"), JA1.Tab1.

---

Associates, submitted on behalf of the Alliance for Fair Board Recruitment, dated April 6, 2021 ("AFBR Letter"); Letter from Publius Oeconomicis to Vanessa Countryman, Secretary, Commission, dated Dec. 28, 2020 ("Publius Letter"), JA672.Tab26.

[3] Publius Letter at 1 n.1, JA672.Tab26.

The approved "Board Diversity Rules" have three principal components: (1) the Quota Requirements regarding race, gender, and sexuality are embodied in Nasdaq Rule 5605(f); (2) the Disclosure Requirement regarding those characteristics is embodied in Nasdaq Rule 5606; and (3) the offering of Board Recruiting Services is embodied in Nasdaq Rule IM-5900-9.

In approving the Board Diversity Rules, SEC did not identify any provision of the Exchange Act that explicitly authorizes SEC—or any SRO under SEC's supervision—to regulate the race, gender, or sexuality of corporate directors. SEC nonetheless concluded the Board Diversity Rules are "consistent with the requirements of the [Exchange] Act." *Id.* at 44,425, JA2.Tab1. In particular, SEC cited consistency with Section 6(b)(5) of the Exchange Act, which

> requires that the rules of a national securities exchange be designed, among other things, to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, to remove impediments to and perfect the mechanism of a free and open market and a national market system and, in general, to protect investors and the public interest, not be designed to permit unfair discrimination between customers, issuers, brokers, or dealers, and not be designed to regulate by virtue of any authority conferred by the Act matters not related to the purposes of the Act or the administration of the exchange.

*Id.* (citing 15 U.S.C. § 78f(b)(5)). SEC also found the Board Diversity Rules are consistent with "Section 6(b)(8) of the Act, which requires that the rules of a national securities exchange not impose any burden on competition that is not necessary or appropriate in furtherance of the purposes of the Act." *Id.* (citing 15 U.S.C. § 78f(b)(8)).

10

SEC agreed with objecting commenters that "the proposal may have the effect of encouraging some Nasdaq-listed companies to increase [favored races, gender, and sexual orientations] on their boards," *id.* at 44,428, JA5.Tab1, but paradoxically concluded that the Board Diversity Rules would not "encourage discrimination because the proposed board diversity objectives are not mandatory," *id.* at 44,441, JA18.Tab1. Statements by approving SEC Commissioners confirm that encouraging companies to discriminate in favor certain races, gender, and sexual preferences is the intended effect of the Order. SEC Commissioners Lee and Crenshaw, Statement on Nasdaq's Diversity Proposals—A positive First Step for Investors, Aug. 6, 2021 ("Because enhanced diversity is critically important … we hope this is a starting point for initiatives related to diversity, not the finish line."), JA24.Tab3.

SEC asserted that the Board Diversity Rules' mandatory disclosure and explanation (if race, gender, and sexuality quotas are not met) requirements do not compel speech in violation of the First Amendment because "Nasdaq is not a state actor" and SEC's approval "is not sufficient to convert [the Rules] into state action." 86 FR at 44,439-40 (quotation marks and footnote omitted), JA16-17.Tab1. SEC further contended that mandatory disclosure and explanation requirements do not constitute compelled speech because "they are the kinds of disclosures routinely permitted, … do not compel a company to convey any specific message[, and] … would be constitutional in light of the substantial body of studies showing the benefits of diverse boards." *Id.* It is unclear what "substantial body of studies" the SEC refers to

11

because, in the same breath, it acknowledged that "studies of the effects of board diversity are generally inconclusive." *Id.* at 44,432, JA9.Tab1.

SEC also approved the Board Recruiting Services Proposal. Companies that do not satisfy the Quota Requirements would be offered a complimentary "board recruiting service, which would provide access to a network of board-ready diverse candidates." *Id.* at 44,443, JA20.Tab1. The SEC's Order made no attempt to understand how and who at Nasdaq would determine whether an individual could become part of the "network of board-ready diverse candidates" or what "board-ready" means.

Two out of five Commissioners dissented from the Order. Commissioner Roisman stated the Order "reiterates [Nasdaq's] assertions and then in places summarily finds that the Proposal is consistent with the Exchange Act," which falls short of the SEC's obligation to "undertake its own 'reasoned analysis' to evaluate the merits of the proposal." Commissioner Roisman, *Statement on the Commission's Order Approving Exchange Rules Relating to Board Diversity* (Aug. 6, 2021) ("Roisman Dissent"), JA27.Tab4. Commissioner Roisman also believed the "Order should have included a more thorough discussion of whether the Proposal could be considered state action, warranting analysis under the Constitutional standards of scrutiny." *Id.*

Commissioner Peirce dissented to explain that the Board Diversity Proposal was "not actually intended or designed to address any matter relevant to the scope or purposes of the Exchange Act." Commissioner Peirce, *Statement on the Commission's Order Approving Proposed Rule Changes, as Modified by Amendments No. 1, to Adopt Listing Rules*

*Related to Board Diversity* (Aug. 6, 2021) ("Peirce Dissent"), JA30.Tab5. Rather, it "reflects [Nasdaq]'s efforts to address matters of grave social concern by using its authority as a listing exchange to create incentives for issuers to make changes that [Nasdaq] believes will bring about socially desirable results." *Id.,* JA36.Tab5. She further stated that the Order "never actually provides evidence sufficient to establish that the Board Diversity Proposal is reasonably designed to satisfy any of the affirmative criteria enumerated in Section 6(b)(5) [of the Exchange Act]," and that "the Board Diversity Proposal encourage[s] discrimination and effectively compel[s] speech … in a way that offends protected Constitutional interests." *Id.* (Footnotes omitted), JA31, 37.Tab5.[4]

NCPPR timely filed its petition in the United States Court of Appeals for the Third Circuit on October 5, 2021. Pursuant to 28 U.S.C. § 2112(a), on November 9, 2021, the Third Circuit transferred the case to this Court for consolidation with an earlier-filed petition by the Alliance for Fair Board Recruitment.

## SUMMARY OF THE ARGUMENT

The Board Diversity Rules constitute state action subject to constitutional scrutiny, which they fail. SEC cannot act without a source of authority. Here, the '34 Act expressly *prohibits* SEC from making rules that are irrelevant to its directive to

---

[4] The dissenting Commissioners did not object to the second Rule providing for a service to make available a list of board-ready candidates to non-complying Nasdaq-listed companies.  Because these Rules are conceptually and practically intertwined (a default under the first rule triggers the provision of a list), for purposes of this petition both Rules fail the constitutional vesting, equal protection, First Amendment and APA tests argued herein.

regulate free and fair markets.  Mandating companies to explain why their boards do not conform to race, gender, and sexuality quotas is compelled speech in violation of the First Amendment. The Board Diversity Rules also violate Article I's Vesting Clause as an exercise of legislative power. Congress did not—and indeed could not—delegate power to SEC to approve SRO regulations imposing race, gender, and sexuality quotas that fit the subjective preferences of investors whom the SEC favors.

The Board Diversity Rules also fail to satisfy requirements placed on SRO rules by Section 6(b)(5) of the Exchange Act. 15 U.S.C. § 78f(b)(5). SEC admits that empirical evidence does not support Nasdaq's contention that race, gender, and sexuality quotas are "designed" to advance the mandatory investor-protection objectives set forth in Section 6(b)(5), and it may not rely on investors' subjective view to meet the "designed" standard. *Id.* Additionally, the Board Diversity Rules violate Section 6(b)(5)'s prohibition against an SRO's "regulat[ing] … matters not related to the purposes of this [Act]" because they require disclosure of non-material information regarding directors' race, gender, and sexuality.

Finally, SEC's approval of the Diversity Rules is arbitrary and capricious.  In approving the Quota and Disclosure Requirements, SEC accepted (without conducting its own analysis) Nasdaq's assertion that "a wave of investors" base investment decision on directors' race, gender, and sexuality out of a belief that such information indicates good governance. 86 FR 44,430, JA 7.Tab1. And SEC approved the Board Recruiting Service without any consideration of its contents, namely which candidates will be

14

selected for inclusion in Nasdaq's diversity recruiting network, who at Nasdaq will select them, or how Nasdaq plans to determine whether they are "board-ready."

## ARGUMENT

## I. THE ORDER AND DIVERSITY RULES CONSTITUTE STATE ACTION SUBJECT TO CONSTITUTIONAL SCRUTINY

Contrary to Nasdaq's and SEC's insistence otherwise, Nasdaq's Rules and SEC's Order approving them are state action subject to constitutional scrutiny. *See* 86 FR at 44,440, JA 17.Tab1.

### A. Nasdaq Is a Government Entity that Must Respect Constitutional Rights

To start, Nasdaq's purported status as a purely private actor would be patently incompatible with the Constitution's prohibition against delegating regulatory authority to private entities. *See Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936). There can be no doubt that "Congress delegated power to [self-regulatory] organizations," such as Nasdaq, "to enforce … the legal requirements laid down in the Exchange Act." *Austin*, 757 F.2d at 680. The text of the Exchange Act explicitly recognizes that SROs "regulate by virtue of … authority conferred by this [Act]," 15 U.S.C. § 78f(b)(5); *see also* S. Rep. 94-75, 24, 1975 U.S.C.C.A.N. 179, 202 (recognizing that "self-regulatory organizations utilize governmental-type powers in carrying out their responsibilities under the Exchange Act[.]").

If Nasdaq were purely private—as it and SEC repeatedly insist—then Congress' delegation of "government-type power" to it would amount to unconstitutional

delegation of regulatory power to a "private person," which the Supreme Court has deemed "legislative delegation in its *most obnoxious form*; for it is not even delegation to an official or an official body[.]" *Carter Coal Co.*, 298 U.S. at 311 (emphasis added). Such delegation is "unknown to our law" and "utterly inconsistent with the constitutional prerogatives and duties of Congress." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 537 (1935). After all, "[w]hen it comes to [delegating to] private entities, ... there is not even a fig leaf of constitutional justification," since "[p]rivate entities are not vested with 'legislative Powers.' Nor are they vested with the 'executive Power,' which belongs to the President." *Dep't of Transp. v. Ass'n of Am. Railroads*, 575 U.S. 43, 62 (2015) (Alito, J., concurring) (citations omitted). Accordingly, if Nasdaq were a private entity, all its regulations would be the product of unconstitutional private delegation and thus invalid. *See Carter Coal Co.*, 298 U.S. at 311.

Such a dramatic result is unnecessary because SEC's declaration of Nasdaq's private status does not make it true. Rather, "for purposes of [Nasdaq's] status as a federal actor or instrumentality under the Constitution, the practical reality of federal control and supervision prevails over [SEC's] disclaimer of [Nasdaq's] governmental status." *Ass'n of Am. Railroads*, 575 U.S. at 55 (citing *Lebron v. Nat'l Railroad Passenger Corp.*, 513 U.S. 374 (1995)). In *Lebron*, the Supreme Court held that, despite being labeled by its own charter and Congress as a private actor, Amtrak is a government entity subject to the First Amendment because it "is established and organized under federal law for the very purpose of pursuing federal governmental objectives, under the

direction and control of federal governmental appointees." 513 U.S. at 398. The same is true for Nasdaq.

    First, Nasdaq is established and organized under federal law because it came into existence as a "national securities exchange" through operation of the Exchange Act, which required Nasdaq to apply to the SEC and register as an exchange under procedures set forth in 15 U.S.C. § 78f. Next, Congress tasked Nasdaq to serve federal governmental objectives, namely "to enforce the securities laws." *Austin*, 757 F.2d at 692. Finally, in carrying out its responsibilities under the Exchange Act, Nasdaq operates under the direction and control of federal appointees, namely SEC Commissioners, because it is "subject to extensive oversight, supervision, and control by the SEC on an ongoing basis." *Id.* at 680 (citing 15 U.S.C. § 78s). SEC has power to reject, revise, or abrogate any Nasdaq rule; overturn or modify any Nasdaq enforcement decision; remove Nasdaq officers; and enjoin any Nasdaq activity. *Id.*

    Nasdaq's claim to being a private entity is even weaker than Amtrak's claim in *Lebron*. At least Amtrak could point to Congress' statement that it "will not be an agency or establishment of the United States Government." *id.* at 970 (quoting 45 U.S.C. § 541 (repealed)). By contrast, Congress said the opposite of SROs like Nasdaq when it enacted the 1975 Amendments to explicitly dispel the notion that SROs somehow operate separately from the federal government: "Such a conception of self-regulation is seriously misleading in that it fails to recognize the essential and continuing role of the federal government." S. REP. 94-75, 22, 1975 U.S.C.C.A.N. 179, 201. Congress

further noted that SROs "at all times [are] quasi-public organizations, not private clubs," when explaining why the 1975 Amendments placed SROs' rulemaking under complete SEC supervision and required SROs to undergo the same notice-and-comment procedures as federal agencies. *Id.* at 207.

In sum, Nasdaq is a state actor constrained to act within constitutional bounds because it is a creature of federal law, serves federal interests, and is controlled by a federal agency. *Lebron,* 513 U.S. at 398. Indeed, the only way Nasdaq could lawfully exercise the "government-type" regulatory and enforcement powers Congress delegated to SROs under the Exchange Act is if it is a government entity. *See Ass'n of Am. Railroads*, 575 U.S. at 55 (reversing D.C. Circuit decision holding that Congress unconstitutionally delegated to Amtrak rulemaking powers because "Amtrak is a governmental entity, not a private one"). Thus, SEC's inaccurately labeling Nasdaq a private actor does not enable the Board Diversity Rules to evade constitutional scrutiny.

## B. SEC's Approval of Nasdaq's Board Diversity Rules Is State Action Subject to Constitutional Scrutiny

Even if Nasdaq were a purely private entity—it is not—SEC is still an agency of the United States, and any final order by SEC approving Nasdaq's Rules is subject to constitutional scrutiny. *See* 5 U.S.C. § 706(2)(B) (courts must "hold unlawful and set aside agency action … found to be … contrary to constitutional right, power, privilege, or immunity").

The SEC's Order mistakenly relies on *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982), to assert that "'[m]ere approval' of [Nasdaq's] proposal as consistent with the requirements of the Act is 'not sufficient' to convert it into state action." 86 FR at 44,440 (quoting *Blum*, 457 U.S. at 1004), JA17.Tab1. *Blum* is inapposite because it addressed whether state subsidization and regulation of nursing home facilities converted private decisions by the facilities to discharge patients into state action. 457 U.S. at 1004. The "approval of acquiescence" in that case simply referred to the fact that facilities were able to discharge patients without regulators' permission. *Id.* In contrast, before Nasdaq may implement any rule, SEC must review it, conduct its own "reasoned analysis" of the rule, and then approve it. *Susquehanna*, 866 F.3d at 447. Thus, the *passive* "approval or acquiescence" by health regulators in *Blum* is categorically different from the *active* SEC approval needed to enact Nasdaq rules.

While *Blum* does not consider—let alone answer—whether such active involvement entails state action, this Court's binding precedent unequivocally answers that question in the affirmative. *Intercontinental Indus., Inc. v. Am. Stock Exch.*, 452 F.2d 935 (5th Cir. 1971). *American Stock Exchange* concerned an SEC order granting an SRO Exchange the authority to delist a company. *Id.* at 937. This Court explicitly rejected the Exchange's argument that "constitutional due process is not required since the Exchange is not a governmental agency" as being "clearly contrary to numerous court decisions." *Id.* at 941 (citing, among others, *Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961)). In *Burton*, the Supreme Court held that the action of an otherwise

private entity is state action subject to constitutional scrutiny if the state has "so far insinuated itself into a position of interdependence" with the private entity that "it must be recognized as a joint participant in the challenged activity." 365 U.S. at 725.

*Burton*'s logic applied in *American Stock Exchange* because the Exchange required an approving order from the SEC to delist a company. *See* 452 F.2d at 938-39. As such, "[t]he intimate involvement of the Exchange with the Securities and Exchange Commission brings it within the purview of the Fifth Amendment controls over governmental due process." *Id.; accord Rooms v. SEC*, 444 F.3d 1208, 1210 (10th Cir. 2006) ("Due process requires that an NASD rule give fair warning of prohibited conduct before a person may be disciplined for that conduct."). Notably, *American Stock Exchange* was decided *before* the 1975 Amendments gave the SEC even greater oversight responsibility over SROs, including the power to veto proposed rules and to abrogate, amend, or add rules. *See* 15 U.S.C. § 78s(b), (c). Given that SROs' involvement with SEC has only grown more "intimate" since *American Stock Exchange*, there can be no dispute today that SEC's role in reviewing, analyzing, and approving the Board Diversity Rules brings them within the Constitution's purview under this Court's binding precedent.

For all these reasons, Nasdaq's Rules and the SEC's Order approving them are subject to constitutional restrictions, including individual rights secured by the First Amendment and by the Constitution's separation-of-powers structure.

## II.   THE BOARD DIVERSITY RULES COMPEL SPEECH IN VIOLATION OF THE FIRST AMENDMENT

### A.   Exacting Scrutiny Applies to the Rules

The Board Diversity Rules "require[] an explanation" from all Nasdaq-listed companies that do not meet Nasdaq's diversity objectives. Strict scrutiny applies to government-compelled speech regarding race, gender and sexuality. *Riley v. National Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795-97 (1988) (rejecting North Carolina's argument that state-compelled speech regarding solicitations is commercial speech not subject to exacting scrutiny). "Mandating speech that a speaker would not otherwise make necessarily alters the content of the speech," and is "subject to exacting First Amendment scrutiny." *Id.*

### B.   The Constitution Forbids Requiring Companies to "Fill Your Board Seats as We Say or You've Got Some Explaining to Do"

In *West Virginia v. Barnette*, Justice Robert H. Jackson stated: "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." 319 U.S. 624, 642 (1943). The compelled-speech doctrine means not only that the government cannot force individuals or entities to engage in specific expression, but it also prevents the government from punishing someone for refusing to articulate or adhere to government-compelled expression. "[T]he right of freedom of thought protected by the First Amendment … includes both the right to speak freely and the right to refrain

21

from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977); *Barnette*, 319 U.S. at 645. More recently, Chief Justice Roberts succinctly restated the essence of the doctrine, noting "this Court's leading First Amendment precedents have established the principle that freedom of speech prohibits the government from telling people what they must say." *Rumsfeld v. Forum for Academic and Institutional Rights*, 547 U.S. 47, 61 (2006).

Indeed, more recently, the Court has recognized that government officials cannot force parade organizers to accept a gay and lesbian group and its messages as part of its event without infringing on the private group's autonomy and right to disseminate its own messages. *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557 (1995). In *Janus v. AFSCME*, 138 S.Ct. 2448 (2018), the Supreme Court held that public employees could not be compelled to subsidize speech on matters with which they disagree. Likewise, *National Institute of Family and Life Advocates v. Becerra*, 238 S.Ct. 3462 (2018), stopped the State of California from forcing faith-based pregnancy centers to propound government-scripted speech.

The Board Diversity Rules impermissibly require companies to publicly call into question *their own integrity* by forcing them to utter words that infer their own shortcomings in failing to fill board seats with persons whose immutable characteristics are irrelevant to board service—a not-so-subtle form of state-compelled self-condemnation better suited to an authoritarian regime. The Constitution has long forbidden compulsory self-accusation. *Boyd v. United States*, 116 U.S. 616 (1886). The

First and Fifth Amendment interests at stake here intrude on individual liberty even more than those vindicated in *Janus* or *Becerra.*

In *Nat'l Ass'n of Mfrs. v. SEC*, 800 F. 3d 518, 522 (D.C. Cir. 2015), the court held that an SEC-mandated confession that minerals used by companies were not "conflict free" was constitutionally impermissible: "It requires an issuer to tell consumers that its products are ethically tainted … [b]y compelling an issuer to confess blood on its hands, the statute interferes with that exercise of the freedom of speech under the First Amendment." 800 F.3d at 530 (holding both Congress' *statute* and SEC's rule requiring disclosure of "conflict minerals" unconstitutional); *see also Associated Builders & Contractors of Se. Tex. v. Rung*, 2016 U.S. Dist. LEXIS 155232, *28-30 (E.D. Tex. Oct. 24, 2016) (discussing *NAM* in determining that an Executive Order and agency implementing rule and guidance were constitutionally defective because they compelled speech).

Government efforts to compel citizens to utter speech with which they disagree deeply offends the fundamental "principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." *Agency for Int'l Dev. v. All. for Open Soc'y, Int'l, Inc.*, 570 U.S. 205, 213 (2013). Such efforts are routinely struck down. *Int'l Dairy Foods Ass'n v. Amestoy*, 92 F. 3d 67 (2d Cir. 1996) (Dairy manufacturers may not be compelled to "warn" consumers about their methods for producing milk.). This court must accordingly set aside these Rules because they compel speech in violation of the Constitution.

To pass constitutional muster, compelled or content-based speech must be narrowly tailored and serve a compelling government interest by the least restrictive means. Here, the explanation is only required from companies that fail to conform to the *government's* view of board composition, and rather than articulate a compelling government interest, SEC merely invokes SEC's powers to regulate the securities industry. This rationale was rejected by the court in *NAM*, because that broad and undefined authority would mean SEC could "easily regulate otherwise protected speech using the guise of securities laws." *NAM*, 800 F.3d at 555. *NAM* was unwittingly prescient when it posited a hypothetical of SEC disclosures of "the political ideologies of [company] board members, as part of annual reports," that would be "obviously repugnant to the First Amendment." *Id.* The Diversity Rules as formulated make no effort to show narrow tailoring, a compelling government interest or least restrictive means.[5]

## III.   THE DIVERSITY RULES ARE AN UNCONSTITUTIONAL EXERCISE OF LEGISLATIVE POWERS VESTED SOLELY IN CONGRESS

No agency has any inherent power to make law. Article I, § 1 of the U.S. Constitution vests "[a]ll legislative powers" in the Congress, and "the lawmaking

---

[5] Indeed, *The Wall Street Journal* recently reported that corporate boards have experienced a recent surge in diversity. Theo Francis and Emily Glazer, *Board Diversity Push Reaps Results*, Oct. 20, 2021. SEC and Nasdaq's assertions in support of the Rules make no showing whatsoever why, if shareholders want this, they are somehow unable to accomplish these ends through the existing process of shareholder proposals and votes.

function belongs to Congress … and may not be conveyed to another branch or entity." *Loving v. United States*, 517 U.S. 748, 758 (1996). This constitutional barrier means "an agency literally has no power to act … unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 357 (1986). Courts must "carefully scrutinize an agency's suggested interpretations of its mandates and which have the effect of expanding its authority beyond the statutory bounds. If an agency was meant to have authority to do such and such a thing, Congress must say so. And when it has said, 'Thus far and no farther,' it is the Court's responsibility to blow the whistle and call the out of bounds." *FTC v. Hornbeam Special Situations, LLC*, 2018 U.S. Dist. LEXIS 204339 (N.D Ga. Oct. 15, 2018) *citing City of Arlington v. FCC*, 569 U.S. 290, 307 (2013).

The Board Diversity Rules are part of an emerging and disturbing pattern whereby federal agencies unconstitutionally regulate matters clearly outside the scope of their statutory authority. The Supreme Court recently struck down a federal agency's *ultra vires* attempt to ban evictions nationwide based on limited statutory authority to "implement measures like fumigation and pest extermination." *Ala. Assoc. of Realtors v. HHS*, 141 S. Ct. 2485, 2486, 2489 (2021). And this Court enjoined an agency's misuse of a workplace safety statute to impose a nationwide vaccination mandate. *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 611 (5th Cir. 2021); *stay lifted by In re OSHA*, Case no. MCP 21-7000 (6th Cir. Dec. 17, 2021). The Supreme Court has admonished courts to not "ascribe unenacted purposes and objectives to a federal statute." *Va. Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1907 (2019).

SEC and Nasdaq are taking a page out of the same unlawful playbook by misusing the Exchange Act—which concerns "fair and honest markets" in securities, 15 U.S.C. § 78b—to take part in "the social justice movement," 85 FR 80,472, JA689.Tab28; *see also* Peirce Dissent (explaining Diversity Rules "address matters of grave social concern by using [Nasdaq's] authority as a listing exchange to create incentives for issuers to make changes that [Nasdaq] believes will bring about socially desirable results."), JA36.Tab5. The Rules impose on company boards controversial quotas and disclosure requirements regarding race, gender, and sexual preference. These requirements unconstitutionally exercise legislative power that the Exchange Act did not delegate to the SEC or any SRO it supervises—and, in fact, that the Act bars.

## A. Federal Agencies May Not Wield Legislative Powers Vested in Congress

"Article I, § 1, of the Constitution vests all legislative powers herein granted … in a Congress of the United States. This text permits no delegation of those powers." *Whitman v. Am. Trucking Assocs.*, 531 U.S. 457, 472 (2001) (cleaned up). In *Schechter*, 295 U.S. 495 (1935), the Supreme Court unanimously and emphatically rejected a statutory scheme that empowered the President to impose industry-proposed "codes of fair competition" that he deemed would not "promote monopolies." *Id.* at 522–23; *see also id.* at 534 ("[T]he approval of a code by the President is conditioned on his finding that it 'will tend to effectuate the policy of this title.'"). The Court declared that Article I's Vesting Clause forbids Congress to "abdicate or to transfer to others the essential legislative functions with which it is thus vested." *Id.* at 529.

The prohibition against divesting of legislative power is "intended, in part, to protect each branch of government from incursion by the others. Yet the dynamic between and among the branches is not the only object of the Constitution's concern. The structural principles secured by the separation of powers protect the individual as well." *Bond v. United States*, 564 U.S. 211, 222 (2011); *see also Dep't of Transp. v. Ass'n of Am. Railroads*, 575 U.S. 43, 61 (2015) (Alito, J., concurring) ("The principle that Congress cannot delegate away its vested powers exists to protect liberty."). "[O]ur Founders deliberately designed the legislative power to be exercised only by elected representatives in a public process—so that the lines of accountability would be clear and the sovereign people would know, without ambiguity, whom to hold accountable." *Texas v. Rettig*, 993 F.3d 408, 409 (5th Cir. 2021) (Ho, J., dissenting from denial of review *en banc*) (cleaned up). "Of the three branches, Congress is the most responsive to the will of the people. … If legislators misused this power, the people could respond, and respond swiftly." *Tiger Lily, LLC v. United States Dep't of Hous. & Urb. Dev.*, 5 F.4th 666, 674 (6th Cir. 2021) (Thapar, J., concurring). "So, naturally, Congress has an incentive to insulate itself from the consequences of hard choices" by "transfer[ring] hard choices from Congress to the executive branch." *Id.*

But when Congress divests itself of its legislative power, "the citizen confronting thousands of pages of regulations—promulgated by an agency directed by Congress to regulate, say 'in the public interest'—can perhaps be excused for thinking that it is the agency really doing the legislating." *City of Arlington*, 569 U.S. at 315 (Roberts, C.J.,

27

dissenting). Elected officials no longer bear personal responsibility for enacting laws, thereby depriving voters of control over the laws that govern them. "The bureaucracy triumphs—while democracy suffers." *Rettig*, 993 F.3d at 409 (Ho, J., dissenting from denial of review *en banc*).

## B. The Exchange Act Does Not Authorize SEC or Any SRO SEC Supervises to Regulate the Demographic Composition of Corporate Boards

Courts apply "the major questions doctrine in service of the constitutional rule that Congress may not divest itself of legislative power by transferring that power to an executive [or independent] agency." *Gundy*, 139 S. Ct. at 2139. (Gorsuch, J. dissenting). Under that doctrine, agencies lack power to address questions of "economic and political significance" when Congress has not provided clear and explicit authorization. *See FDA v. Brown & Williamson*, 529 U.S. 120, 159 (2000). Put another way, a vaguely worded Congressional delegation to, for example, regulate "as in [the agency's] judgment may be necessary," does not "authoriz[e] an agency to exercise powers of vast economic and political significance." *Ala. Ass'n of Realtors*, 141 S. Ct. at at 2489 (cleaned up). That is because such powers are vested in Congress. *See Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 687 (1980) (Rehnquist J., concurring) ("When fundamental policy decisions underlying important legislation about to be enacted are to be made, the buck stops with Congress.").

Here, the Board Diversity Rules are indisputably an attempt by SEC and Nasdaq to resolve major policy questions of vast economic and political significance. They

impose unprecedented demographic quotas and disclosure requirements regarding race, sex, and sexual preference on companies valued at over 20 *trillion* dollars.[6] If the Exchange Act conferred such power on Nasdaq, every other national securities exchange organized under the Act, including the NYSE, would also have the same power to impose race, gender, and sexual-preference mandates. And SEC itself would be able to do so pursuant to its power to "abrogate, add to, and delete from … the rules of a self-regulatory organization … in furtherance of the purpose of [the Exchange Act]." 15 U.S.C. § 78s(c).

Yet, the Exchange Act does not contain a single phrase explicitly or even implicitly granting SEC or SROs power to impose *any* demographic quota and disclosure requirements on corporate boards, let alone highly politically controversial ones based on race, gender, and sexual preference. What's more, the Exchange Act explicitly prohibits SROs from "regulat[ing] by virtue of any authority conferred by [the Act] matters *not related to the purposes of [the Act]*." 15 U.S.C. § 78f(b)(5) (emphasis added). Against this background proscription, SEC's attempts to ground its authority over Nasdaq's demographic quota and disclosure requirements as "consistent with Section 6 of the Act" collapses. 86 FR at 44,438, JA15.Tab1; *see also* 15 U.S.C. § 78f(b) must fail.

---

[6] Statistica, *Largest stock exchange operators worldwide as of October 2021, by market capitalization of listed companies,* https://www.statista.com/statistics/270126/largest-stock-exchange-operators-by-market-capitalization-of-listed-companies/ (last visited Dec. 20, 2021).

Section 6(b)(5) specifically grants authority for Nasdaq to issue and for SEC to approve rules that:

> [A]re designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, to foster cooperation and coordination with persons engaged in regulating, clearing, settling, processing information with respect to, and facilitating transactions in securities, to remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect investors and the public interest[.]

15 U.S.C. § 78f(b)(5). Specific authority to impose demographic quotas and disclosure requirements cannot be found in the power to "prevent fraud," "foster cooperation," "promote … principles of trade," or "remove impediments to … a free and open market." *Id.* No honest reader could contend otherwise.

Nor can such authority be found in the vague "public interest" category. *Id.* To start, under the "*ejusdem generis*" canon, "the general standard at the end of this list should be construed to embrace only issues similar to the specific ones," none of which relate to the race and gender composition of corporate boards. *Bus. Roundtable v. SEC*, 905 F.2d 406, 413 (D.C. Cir. 1990) ("*Bus. Roundtable I*"). Moreover, "Congress … does not … hide elephants in mouseholes." *AMG Cap. Mgmt., LLC v. Fed. Trade Comm'n*, 141 S. Ct. 1341, 1349 (2021) (quoting *Am. Trucking*, 531 U.S. at 468). As such, the authorization under Section 6(b)(5) to regulate "in general, protect[ing] investors and the public interest" falls far short of the explicit language needed because "Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion." *Brown & Williamson*, 529 U.S. at 160.

## C. The Exchange Act Does Not Empower SEC to Regulate Internal Corporate Governance

SEC's approval of the proposal is an "administrative interpretation [that] alters the federal-state framework by permitting federal encroachment upon a traditional state power," *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172–73 (2001). *Gregory v. Ashcroft* requires as a threshold matter that any infringements on state sovereignty be "plain to anyone reading the [statute]." 501 U.S. 452, 467 (1991). The rule is "an acknowledgment that the States retain substantial sovereign powers under our constitutional scheme, powers with which Congress does not readily interfere." *Id.* at 461. The *Gregory* clear-statement rule "provides assurance that 'the federal-state balance' will not be disturbed unintentionally by Congress or unnecessarily by the courts." *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977) (citation omitted).

"Corporations are creatures of state law, and investors commit their funds to corporate directors on the understanding that, except where federal law *expressly* requires …, state law will govern the internal affairs of the corporation." *Sante Fe Industries, Inc. v. Green,* 430 U.S. 462, at 479 (1977)(emphasis in original); *see also Bus. Roundtable I*, 905 F.2d at 413 (vacating SEC's approval of NYSE's rule that "directly invades the 'firmly established' state jurisdiction over corporate governance"). "Agencies cannot discover in a broadly worded statute authority to supersede state [corporate] law. Instead, Congress must 'enact exceedingly clear language if it wishes to significantly alter the balance between federal and state

power[.]'" *Tiger Lily*, 5 F.4th at 671 (quoting *U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 140 S. Ct. 1837, 1849–1850 (2020)).

A telltale sign that an agency exceeded Congressional authorization in attempting to address a major policy question is if it claims to have power to regulate a new subject matter based on old statutory text that has remained unchanged for decades. *Util. Air Regul. Grp v. EPA*, 573 U.S. 302, 324 (2014). The Supreme Court recently invoked this logic to lift a stay on enjoining a nationwide eviction moratorium imposed by the Centers for Disease Control and Prevention ("CDC"). *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489. CDC claimed to have discovered never-before-exercised authority to impose a nationwide eviction moratorium within a decades-old public health statute that authorized measures like fumigation and pest extermination. *Id.* The Supreme Court balked and explained that it "expect[s] Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance." *Id.* This Court adopted the same reasoning to hold that a statute concerning "safe and healthful working conditions … was not … intended to authorize a workplace safety administration in the deep recesses of the federal bureaucracy to make sweeping pronouncements on matters of public health affecting every member of society in the profoundest of ways." *BST Holdings*, 17 F.4th 604, 611 (citing *Ala. Ass'n of Realtors*, 141 S. Ct. at 2488-90); *stay lifted by In re OSHA*, Case no. MCP 21-7000 (6th Cir. Dec. 17, 2021).

32

Here, the Exchange Act's grant of regulatory authority to SROs has remained unchanged for decades. During that time, SEC has never attempted to approve an SRO rule regarding the race, gender, sexuality, or any other demographic characteristic of corporate board members. "When an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy, [courts must] greet its announcement with a measure of skepticism." *Util. Air Regul. Grp.*, 573 U.S. at 324. Thus, the Board Diversity Rules comprise an unconstitutional exercise of legislative power, in violation of Article I's Vesting Clause.

## D. The Exchange Act Lacks Any Intelligible Principle

Even if Congress did explicitly delegate authority for SROs to adopt and for SEC to approve demographic quota and disclosure requirements—it did not—such delegation would still violate the Vesting Clause because the Exchange Act lacks any intelligible principle whatsoever to guide the SEC and SRO's exercise of that power. Courts have traditionally enforced the Vesting Clause through the intelligible-principle test, which states that where Congress delegates regulatory power to an agency, it must supply "an intelligible principle to guide the [agency]'s use of discretion." *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019). The need for such a test can be traced back to James Madison's warning that delegation by the legislative branch:

> should leave as little as possible to the discretion of those who are to apply and execute the law. If nothing more were required, in exercising a legislative trust, than a general conveyance of authority—without laying down any precise rules by which the authority conveyed should be carried into effect —it would follow that the whole power of legislation might be

transferred by the legislature from itself, and proclamations might become substitutes for law. A delegation of power in this latitude would not be denied to be a union of the different powers.

32 James Madison, 4 The Debates in the Several State Conventions on the Adoption of the Federal Constitution, 559–60 (Jonathan Elliot, ed., 2d ed., 1836).

The intelligible-principle test is currently the subject of sharp criticism at the Supreme Court. Justice Gorsuch recounts that courts have gradually expanded this standard to the point that, like a worn-out elastic band, it no longer imposes any meaningful constraints on Congress' divestment of its legislative powers:

> This mutated version of the 'intelligible principle' remark has no basis in the original meaning of the Constitution, in history, or even in the decision from which it was plucked. Judges and scholars representing a wide and diverse range of views have condemned it as resting on 'misunderst[ood] historical foundations.' They have explained, too, that it has been abused to permit delegations of legislative power that on any other conceivable account should be held unconstitutional. Indeed where some have claimed to see 'intelligible principles' many 'less discerning readers [have been able only to] find gibberish.' Even Justice Douglas, one of the fathers of the administrative state, came to criticize excessive congressional delegations in the period when the intelligible principle 'test' began to take hold.

*Gundy*, at 2144 (Gorsuch, J., dissenting) (citations omitted).[7]

---

[7] In the most recent Supreme Court case applying the intelligible-principle test, three sitting Justices stated that "'intelligible principle' was just another way to describe the traditional rule that Congress may leave the executive the responsibility to find facts and fill up details." *Gundy*, 139 S. Ct. at 2139. (Gorsuch, J. dissenting)). Three other still sitting Justices disagreed, noting that the Court has in the past "upheld even very broad delegations." *Id.* at 2129 (plurality opinion). And one Justice recognized the Court has in the past favored more "capacious standards" while expressing willingness "to reconsider the approach … taken for the past 84 years." *Id.* at 2131 (Alito, J., concurring).

Even assuming the doctrine retains conceptual vitality, the Court has instructed that Congress "must provide *substantial guidance* on setting []standards that affect the entire national economy." *Am. Trucking*, 531 U.S. at 475 (emphasis added).

Here, the Exchange Act is devoid of *any* guiding principle regarding how SEC and SROs it supervises may impose demographic requirements on corporate boards. SEC's attempts to ground its approval in Section 6(b)(5) of the Exchange Act, *see* 86 FR 44,430, 44,438, JA7, 15.Tab1 invoke a vacuum. That section contains no guidance at all regarding when demographic quotas or disclosure requirements would "prevent fraud," "promote just and equitable principles of trade," "remove impediments to … a free and open market," or "protect investors." 15 U.S.C. § 78f(b)(5). This Court should reject such an "open-ended grant" of discretion. *Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607 at 646, (1980) (plurality opinion).

In *American Petroleum*, the Secretary of Labor argued that the Occupational Safety and Health Act authorized him to issue a workplace toxin standard based solely on feasibility, without any evidentiary "requir[ement] that the risk from a toxic substance be quantified sufficiently to enable the Secretary to characterize it as significant in an understandable way." *Id.* at 640-41. The Supreme Court disagreed, concluding that "it is unreasonable to assume that Congress intended to give the Secretary the unprecedented power over American industry that would result from the Government's view," which would "justify pervasive regulation limited only by the constraint of feasibility." *Id.* at 645. The Court thus required the government "to show, on the basis

of substantial evidence, that it is at least more likely than not that long-term exposure to [the regulated toxin concentration] presents a significant risk." *Id.* at 653. Otherwise, the government's evidence-free standard "would make such a 'sweeping delegation of legislative power' that it might be unconstitutional under the Court's reasoning in [*Schechter*, 295 U.S. at 539]." *Id.* at 646.

The scope of discretion the SEC claims here is even more sweeping. It approved the Board Diversity Rules as being consistent with investor-protection objectives even though SEC admits the balance of evidence does not support Nasdaq's contention that the Rules serve those objectives. 86 FR 44,432 (conceding evidence is "inconclusive"), JA9.Tab1. Rather, it was enough that some unspecified and unquantified slice of "investors *view* board diversity as a key indicator of corporate governance" and want to base their investment decisions on that subjective view. *Id.* at 44,430 (emphasis added), JA7.Tab1. But an exchange like Nasdaq may not issue and the SEC may not approve demographic quota and disclosure requirements based solely on a presumed, subjective, unquantified, and unverifiable view of investors.

The danger of such unfettered discretion can be illustrated by considering what SEC's interpretation of the Exchange Act would have enabled in America's less tolerant past. One need not travel far into our nation's history to find investors who held a negative view of homosexuals and desired to make investment decisions based on that subjective view. The exact sexuality disclosure requirement in Nasdaq's Board Diversity Rules would "provide widely available, consistent, and comparable information that

36

would contribute to [these] investors' investment and voting decisions," 86 FR 44,430, JA7.Tab1, thereby enabling them to discriminate against companies with homosexual directors and to deter companies from hiring such directors in the first place. Nor would it have been difficult to find in the past investors who believed women were unsuited to corporate leadership and thus subjectively viewed—without evidence—female directors to be negatively associated with corporate performance. According to SEC's logic, an exchange could have relied on that non-evidence-based viewpoint to require listed companies to explain themselves if their board were majority female. It certainly would be "unreasonable to assume that Congress intended to give the [SEC and SROs] the unprecedented power over American industry that would result from the [SEC's] view," which would "justify pervasive regulation limited only by the constraint of [opinion]." *Am. Petroleum Inst.*, 448 U.S. 645. Subjective belief that is neither intelligible nor principled certainly crosses into unconstitutional divesting.

## IV.   THE DIVERSITY RULES ARE NOT 'DESIGNED TO' ACCOMPLISH STATUTORILY REQUIRED OBJECTIVES

SEC may approve an SRO's rule only if that rule is "designed" to achieve the following investor-protection objectives listed under Section 6(b)(5) of the Exchange Act:

- prevent fraudulent and manipulative acts and practices;

- promote just and equitable principles of trade;

- remove impediments to and perfect the mechanism of a free and open market and a national market system; and

- protect investor and public interest.

15 U.S.C. § 78f(b)(5). To be "designed" means being "devised for a specific function or end"[8] and requires a close fitness between means and ends. So, section 6(b)(5)'s "designed" standard is satisfied only if there is substantial evidence to support a close causal nexus between rules proposed by an SRO and one of the mandatory objectives. *See* 15 U.S.C. § 78y(a)(4) (requiring the SEC's decision to be "supported by substantial evidence … based upon the entire record."). This is an objective standard requiring objective evidence. SEC's "admittedly (and at best) 'mixed empirical evidence'" that board diversity "will result in improved board and company performance" falls short. *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1151 (D.C. Cir. 2011) ("*Bus. Roundtable II*").

SEC knew there was not a sufficient empirical, objective basis to support a close nexus between the Board Diversity Rules and Section 6(b)'s objectives. 86 FR 44,432, JA9.Tab1. It instead sought out a subjective one. SEC determined the Diversity Rules were "designed" to advance Section 6(b)(5)'s investor-protection objectives based solely on Nasdaq's assertion that an unspecified subset of investors subjectively believed race, gender, and sexuality are relevant to corporate governance and desired to use such demographic information in their investment and voting decisions. *Id.* at

---

[8] *Design,* Merriam Webster Online Dictionary, https://www.merriam-webster.com/dictionary/design (last visited Dec. 20, 2021).

44,430, JA7.Tab1. The subjective belief and desire of a subset of investors, however, does not satisfy the requirement that SEC independently determine, based on substantial empirical evidence, that Nasdaq's rules have a close causal relationship with Section 6(b)(5)'s investor-protection objectives.

## A. SEC Improperly Used Subjective Belief to Satisfy the Objective 'Designed' Standard

Nasdaq made numerous assertions regarding how board diversity along gender, race, and sexuality dimensions promote Section 6(b)(5)'s "remove impediments," "prevent fraud," and "protect investor" objectives. *See* Nasdaq Letter II at 119-138, JA374-393.Tab12. For example, Nasdaq claimed "diversity is positively associated with reduced stock volatility, more transparent public disclosures, and less information asymmetry, leading to stock prices that better reflect public information, and therefore Nasdaq believes the proposed rule is designed to remove impediments to and perfecting a free and open market and a national market system." *Id.* at 122 (footnotes omitted), JA377.Tab12. Nasdaq further stated that "diverse directors … help detect and prevent fraud and manipulative acts and practices by mitigating 'groupthink,'" *id.* at 123, JA378. Tab12, and are "positively associated with more transparent public disclosures and higher quality financial reporting, and therefore Nasdaq believes the proposal is designed to promote investor protection," *id.* at 130, JA385.Tab12. Based on these assertions, Nasdaq concluded its Board Diversity Proposal "is consistent with Section 6(b)(5) of the Act because "it is designed to advance the "interests of shareholders" in

"greater transparency, accountability, and objectivity of boards and their decision-making processes." *Id.* at 130, JA385.Tab12.

SEC did not accept *any* of Nasdaq's claims regarding the effect of board diversity (in terms of race, gender, and sexuality) on corporate transparency, accountability, objectivity, and decision-making. Rather, it concluded that "[t]aken together, studies of the effects of board diversity are generally inconclusive." 86 FR 44,432, JA9.Tab1; *see also id* ("the effects of changes in board diversity on investors are mixed"). Such "admittedly (and at best) 'mixed empirical evidence' … [can] not sufficiently support [Nasdaq's] conclusion that" mandatory diversity in terms of gender, race, and sexuality, would advance the interest of shareholders. *Bus. Roundtable II*, <u>647 F.3d at 1151</u>.

SEC nonetheless proceeded without evidentiary support to conclude the Board Diversity Rules would advance Section 6(b)(5)'s investor-protection objectives. It credited Nasdaq's assertions that some "investors view board diversity [along race, gender, and sexuality dimensions] as a key indicator of corporate governance" and that a "wave of investors increasingly … consider diversity [along those dimensions] material to their voting and investment decisions." 86 FR 44,430, JA7.Tab1. SEC then found "that the Board Diversity Proposal would provide widely available, consistent, and comparable information that would contribute to [those] investors' investment and voting decisions." *Id.* In other words, even though SEC confirmed that belief regarding the relationship between board diversity and corporate governance is not supported by the weight of evidence, *id.* at 44,432, JA9.Tab1, the desire by some investors to act on

40

such naked belief is enough to demonstrate the Board Diversity Rules are "designed" to improve corporate governance in service of Section 6(b)(5)'s objectives.

SEC has impliedly reduced Section 6(b)(5)'s objective "designed to" standard to a subjective "believed to" standard. Such a reinterpretation must be rejected. To begin, an inherent characteristic of being designed is fitness for purpose, which unsupported subjective belief cannot demonstrate. Moreover, the 1975 Amendments explicitly placed SRO rulemaking into SEC's hands to ensure the "governmental-type power" wielded by SROs is independently authorized by a government entity. Rep. 94-75, 24, 1975 U.S.C.C.A.N. 179, 202. SEC is thus "obligated to make an independent review" to determine that the Board Diversity Proposal is "designed" to advance Section 6(b)(5)'s objectives. *Susquehanna*, 866 F.3d at 446 (Garland, J.); *see also* Roisman Dissent (observing that SEC must "undertake its own 'reasoned analysis' to evaluate the merits of the proposal."). Independent review, however, would be impossible if subjective belief were sufficient to satisfy the requirement. In *Susquehanna*, the court struck down an SEC Order approving an SRO's rule because the SEC "merely accept[ed]" findings made by the SRO instead of making its own findings. *Id.* at 451. Allowing investors' belief to satisfy Section 6(b)(5)'s "designed" standard is far worse—it would allow the SEC to accept the subjective belief of an unspecified group of investors as truth, even as it acknowledges such belief is not supported by the weight of evidence, *see* 86 FR 44,432, JA7.Tab1. The result would be abdication of SEC's oversight responsibility and grant of unlawful power for SROs to exercise government power without government

supervision. Such an interpretation is plainly incompatible with Congress' command for SEC to independently review and determine, based on substantial evidence, that an SRO's rules are "designed" to advance Section 6(b)(5)'s objectives. *See* 15 U.S.C. §§ 78f(b)(5), 78y(a)(4).

## B. The Court Must Not Defer to SEC's Interpretation of Section 6(b)

The Court must not, under *Chevron* or any other judge-made deference doctrine, defer to SEC's attempt to reinterpret Section 6(b)(5) not to require an evidence-based causal connection between Nasdaq's Rules and the mandatory objectives listed in that section. Deferring to SEC's flawed interpretation "[t]ransfer[s] the job of saying what the law is from the judiciary to the executive." *Gutierrez-Brizuela v. Lynch*, 834 F.3d 1142, 1152 (10th Cir. 2016) (Gorsuch, J., concurring). Such bias and transfer of powers leads to "more than a few due process … problems." *Id.* at 1155.

Deference removes the judicial blindfold. It requires judges to display systematic bias favoring government-agency litigants—and against counterparties like NCPPR. Deference "embed[s] perverse incentives in the operations of government" and requires courts to "bow to the nation's most powerful litigant, the government, for no reason other than that it is the government." *Egan v. Delaware River Port Authority*, 851 F.3d 263, 278 (3d Cir. 2017) (Jordan, J., concurring). The "risk of arbitrary conduct is high" and deference puts "individual liberty … in jeopardy" because an agency can provide "minimal justification and still be entitled to full deference." *Id.* at 280. Judges deprive citizens of due process when they "engage in *systematic* bias in favor of the

government … and against other parties." Philip Hamburger, Chevron *Bias*, 84 Geo. Wash. L. Rev. 1187, 1195 (2016) (emphasis added).

Typically, even the *appearance* of potential bias toward a litigant violates the Due Process Clause. *See Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009). Yet deference institutionalizes a regime of systematic judicial bias by requiring courts to "defer" to agency litigants especially where the agency litigant, as here, openly ignores or disregards written text and federal-court precedent. Deference doctrines thus force judges to replace their own judgment about what the law means in favor of the legal judgment of one of the litigants before them.

All federal judges take an oath to "administer justice without respect to persons" and to "faithfully and impartially discharge and perform all the duties incumbent upon [them]." 28 U.S.C. § 453. Federal judges ordinarily follow these commitments scrupulously. Nonetheless, in affording deference to an agency, judges who are supposed to administer justice "without respect to persons" peek from behind the judicial blindfold and effectively pre-commit to favoring the government agency's position. Whenever a deference doctrine is applied in a case in which the government is a party, the court denies due process by favoring the government's interpretation of the law for no reason other than that it comes from the government. Judicial proceedings are, instead, required to provide "neutral and respectful consideration" of a litigant's views free from "hostility or bias." *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1732, 1734 (2018) (Kagan, J., concurring).

43

In addition to violating due process, "*Chevron* deference precludes judges from exercising [independent] judgment, forcing them to abandon what they believe is 'the best reading of an ambiguous statute' in favor of an agency's construction." *Michigan v. EPA*, 576 U.S. 743, 761 (2015) (Thomas, J., concurring); *see also* Hamburger, 84 Geo. Wash. L. Rev. at 1205 ("When a judge defers to an agency's interpretation of a statute, he defers to its judgment about what the law is, and he thereby violates his office or duty to exercise his own independent judgment."). Judges abandon their Article III duty of independent judgment when they "become habituated to defer to the interpretive views of executive agencies, not as a matter of last resort but first." *Valent v. Commissioner of Social Security*, 918 F.3d 516, 525 (6th Cir. 2019) (Kethledge, J., dissenting). "In this way, *Chevron* seems no less than a judge-made doctrine for the abdication of the judicial duty." *Gutierrez-Brizuela*, 834 F.3d at 1152 (Gorsuch, J., concurring). "[T]he agency is [then] free to expand or change the obligations upon our citizenry without any change in the statute's text." *Valent*, 918 F.3d at 525. That truth is especially obvious here because the Exchange Act has not changed in relevant part since it was enacted, and yet SEC has discovered new power to approve a rule that discriminates on the basis of suspect classifications.

Deference mandates that the government litigant win as long as its preferred interpretation seems "permissible," even if it is inferior. But the Supreme Court requires lower courts to engage in a rigorous traditional-tools analysis to interpret statutes. *Chevron v. NRDC*, 467 U.S. 837, 843 n.9 (1984) ("The judiciary is the final authority on

issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent. … If a court, employing traditional tools of statutory construction ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect."); *City of Arlington*, 569 U.S. at 296 ("First, applying the ordinary tools of statutory construction, the court must determine whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter[.]"); *see also Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) (courts must "empty" the "legal toolkit"). Here, traditional principles of statutory interpretation confirm that SEC's determination that an SRO's rule is "designed" to accomplish Section 6(b)(5)'s objectives must be based on substantial objective evidence demonstrating a close fit between the rules and the objectives. Unsubstantiated subjective belief or desire of unspecified investors not before the court is irrelevant.

## V. THE BOARD DIVERSITY RULES REQUIRE DISCLOSURE OF NON-MATERIAL INFORMATION THAT FALLS OUTSIDE THE SCOPE OF THE EXCHANGE ACT

Section 6(b)(5) of the Exchange Act prohibits SROs from adopting and the SEC from approving any rule that "regulate[s] by virtue of any authority conferred by [the Act] matters not related to the purposes of [the Act.]" 15 U.S.C. § 78f(b)(5). A disclosure requirement must be limited to "material" information to fall within the scope of the Exchange Act. *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 448-49 (1976). Information is not material simply because a "shareholder *might* consider [it]

important." *Id.* at 449 (emphasis in original). Rather, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). Put another way, information is material "if there is a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest." R&W *Tech. Servs. Ltd. v. CFTC*, 205 F.3d 165, 169 (5th Cir. 2000). Here, information regarding directors' race, gender, and sexuality is not material. Any requirement for disclosure must fail.

The SEC's Order recognized that several commenters objected to Nasdaq's Board Diversity Proposal on the basis that it requires companies to disclose non-material race, gender, and sexuality information. 86 FR 44,440, JA17.Tab1. But SEC refused to address that issue. Instead, SEC said that "exchanges may adopt disclosure requirements in their listing rules designed to improve governance, as well as transparency and accountability into corporate decision making for listed issuers, including imposing heightened standards over that which the Commission currently requires." *Id.* This statement is a red herring that fails to address materiality because, as explained above, SEC conceded there is not sufficient evidence to conclude that diversity along race, gender, and sexuality dimensions improves corporate governance, transparency, accountability, or decision-making. *Id.* at 44,432, JA9.Tab1 (conceding that evidence is at best "mixed" and "inconclusive").

SEC further asserted that, "to the extent the proposal would result in disclosures that are not currently required by Commission rules, such disclosures would not conflict with the Commission's regulatory framework for diversity disclosures." *Id.* at 44,440. This assertion also fails to address materiality. The issue is not whether Nasdaq can have different disclosure requirements than SEC—it can—but rather whether the race, gender, and sexuality information subject to Nasdaq's disclosure requirement is material. SEC purposefully evaded that question because the answer is an obvious "no."

To be sure, there may be some bigoted individuals who would base investment decisions on the race, gender, and sexual preference of a company's directors, and thus regard such information as important. But the materiality standard must be assessed from the perspective of a "reasonable investor." *Basic*, 485 U.S. at 231-32. As SEC concedes, 86 FR 44,432, JA 9.Tab1, there is no evidentiary basis to believe race, gender, and sexual preference of directors bear any relationship to corporate governance or performance. Any interest by investors to make investment decisions based thereon is objectively unreasonable. Accordingly, disclosure of directors' race, gender, and sexual preference is not related to the purpose of the Exchange Act. *See* 15 U.S.C. § 78f(b)(5).

## VI.    SEC'S APPROVAL OF THE BOARD DIVERSITY RULES IS ARBITRARY AND CAPRICIOUS

SEC is prohibited by the APA from making "arbitrary and capricious" decisions, 5 U.S.C. § 706(2)(A), and instead must engage in "reasoned decisionmaking." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1906 (2020). Approval

of an SRO's proposed rule is arbitrary and capricious unless SEC grounds such approval in its own independent findings and determinations—it may "not merely accept those made by [the SRO]." *Susquehana*, 866 F.3d at 447 ("SEC's unquestioning reliance on [the SRO's] defense of its own actions is not enough to justify approving the Plan. Instead, the SEC should have critically reviewed [the SRO's] analysis or performed its own."). Here, SEC failed to conduct an independent analysis and merely accepted Nasdaq's assertions in approving the Board Diversity Rules.

## A. SEC Failed to Engage in Independent Reasoning

In determining that diversity quota and disclosure requirements protect investor interests, SEC accepted without analysis Nasdaq's assertions that "investors view board diversity as a key indicator of corporate governance" and that "investors consider diversity disclosures material to their voting and investment decisions." 86 FR 44,430, JA7.Tab1. SEC performed no independent analysis of whether significant numbers of investors in fact base their voting and investment decisions on the race, gender, and sexual preferences of company directors. Given the lack of substantial evidence connecting diversity along these dimensions and investment performance, which the SEC concedes, *id.* at 44,432, it would be irrational if these characteristics drove investors' decisions. Yet, instead of testing Nasdaq's assertion regarding investor behavior, SEC simply accepted Nasdaq's "self-serving views" as true. *NetCoalition v. SEC*, 615 F.3d 525, 541 (D.C. Cir. 2010).

48

Even if some investors do base their investment decisions on the race, gender, and sexual preference of directors, it does not necessarily follow that such "investors view board diversity as a key indicator of corporate governance." 86 FR 44,430, JA7.Tab1. As SEC conceded, the weight of evidence does not support such a view. *Id.* at 44,432. Yet, SEC accepted without analysis Nasdaq's assertion that preference for directors with certain racial, gender, and sexuality characteristics originate from investors' rational—but not evidence-based—desire for improved corporate governance. Such acceptance is strange given that race-, gender-, and sexuality-based preferences in similar contexts "justify the inference of discriminatory animus," not rationality. *Carpenter v. Stephen F. Austin State Univ.*, 706 F.2d 608, 623 (5th Cir. 1983).

To its credit, SEC did consider and reject Nasdaq's contention that "a majority of studies … found a relationship between company performance, investor protection and decision-making." Nasdaq Letter II at 11-12, JA208-09 .Tab10; *see* 86 FR 44,432, JA9.Tab1. But it did not take the logical next step and reject Nasdaq's conclusion, based on the above contention, that race, gender, and sexuality information is material. Instead, SEC dodged questions raised by commenters who objected to the mandatory disclosure of such non-material information. *See Supra*, Argument Section V; 86 FR 44,338. SEC thus "fails to respond to 'significant points' and consider 'all relevant factors' raised by the public comments," which further renders its decision arbitrary and capricious. *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019) (quoting *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35–36 (D.C. Cir. 1977)).

**B.    SEC Improperly Approved the Board Recruiting Service Without Any Analysis of Its Content**

The services purport to offer companies that do not meet the Quota Requirements "complimentary access to two seats of a board recruiting solution, which will allow Companies to identify and evaluate diverse board candidates." Nasdaq Rule IM-5900-9. SEC approved this service based solely on Nasdaq's representation that it "would provide access to a network of board-ready diverse candidates for companies to identify and evaluate." 86 FR 44,443, JA20.Tab1.

Who at Nasdaq will compile this list of "board-ready diverse candidates"? Or will Nasdaq hire an outside company to compile the list? If so, which company and what are the hiring criteria? What will compilers review—do candidates submit an application, or does Nasdaq recruit candidates, and in either case, what are the criteria? What does "board-ready" mean—is this a defined term or one that is left for Nasdaq or whomever it hires to define at their discretion? Where are such recommendations posted, or are they only privately conveyed to companies that fail to satisfy the Quota Requirements?  This service, the value of which is estimated at $10,000, is provided free to Nasdaq-listed companies that fail to meet race, gender, and sexuality quotas. Is the same service available to other companies for a fee?  Is this service only for Nasdaq companies or may other publicly traded companies purchase access?  If so, what does Nasdaq propose to do with the subscription fees generated by this government-mandated program?

50

SEC answered none of these questions and thus acted arbitrarily and capriciously because it "entirely failed to consider [] important aspect[s] of the problem." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). It approved the Board Recruiting Service without any details of operations, hiring, duties, or mechanics of the process. As with Ko-Ko, Gilbert & Sullivan's Lord High Executioner, all we know is that there is a list that satisfies the Quota Requirement, and Nasdaq gets to make it.[9] All other details and aspects of the Nasdaq list process remain shrouded in mystery. A more arbitrary and capricious power can hardly be imagined outside the world of comedic light opera.

## CONCLUSION

For the foregoing reasons, the Court should hold that SEC's Order and Nasdaq's Rules are unconstitutional and were issued without statutory authority. The Court should vacate the Order and the Rules in their entirety.

December 20, 2021          Respectfully submitted,

/s/ Margaret A. Little
**Margaret A. Little**
**Sheng Li**
New Civil Liberties Alliance
1225 19th St. NW, Suite 450
Washington, DC 20036
Telephone: 202-869-5210
*Attorneys for Petitioner National Center for Public Policy Research*

---

[9] Ko-Ko's famous song, "I've got a little list" is often parodied to illustrate the dangers of vesting undefined, limitless power in appointed political functionaries.

## CERTIFICATE OF SERVICE

I hereby certify that on December 20, 2021, an electronic copy of the foregoing brief was filed with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/EFC filing system and that service will be accomplished using the appellate CM/ECF system.

*/s/ Margaret A. Little*

## CERTIFICATE OF COMPLIANCE

Pursuant to _Federal Rule of Appellate Procedure 32(a)(7)(C)_, I hereby certify that this document complies with _Federal Rule of Appellate Procedure 32(a)(7)(B)(ii)_. It is printed in Garamond, a proportionately spaced font, and includes 12,968 words, excluding items enumerated in _Federal Rule of Appellate Procedure 32(a)(7)(B)(iii)_ and Fifth Circuit Rule 32.2. I relied on my word processor, Microsoft Word, to obtain the count.

_/s/ Margaret A. Little_

## CERTIFICATE OF ELECTRONIC COMPLIANCE

I hereby certify that in the foregoing brief, filed using the Fifth Circuit CM/EFC filing system, all required privacy redactions have been made pursuant to Fifth Circuit Rule 25.2.13, any required paper copies to be submitted to the Court are exact copies of the version submitted electronically, and the electronic submission was scanned for viruses with the most recent version of a commercial virus scanning program, and is free of viruses.

_/s/ Margaret A. Little_

53