No. 21-60626

# In the United States Court of Appeals for the Fifth Circuit

---

ALLIANCE FOR FAIR BOARD RECRUITMENT;
NATIONAL CENTER FOR PUBLIC POLICY RESEARCH,

*Petitioners,*

v.

SECURITIES AND EXCHANGE COMMISSION,

*Respondent.*

---

On Petition for Review of an Order of the
Securities and Exchange Commission

---

## BRIEF OF INTERVENOR THE NASDAQ STOCK MARKET LLC

---

John Zecca
Jeffrey S. Davis
John Yetter
Joanne Pedone
THE NASDAQ STOCK MARKET LLC
805 King Farm Boulevard
Rockville, Maryland 20850

Stephen J. Kastenberg
Paul Lantieri III
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, Pennsylvania 19103

Seth D. Berlin
BALLARD SPAHR LLP
1909 K Street, N.W., 12th Floor
Washington, D.C. 20006

Allyson N. Ho
Bradley G. Hubbard
Paulette C. Miniter
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201
Telephone: (214) 698-3100
Facsimile: (214) 573-2900

Amir C. Tayrani
Amalia E. Reiss
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036

*Counsel for Intervenor The Nasdaq Stock Market LLC*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| Petitioners | Counsel for Petitioners |
|---|---|
| Alliance for Fair Board Recruitment | C. Boyden Gray<br>Jonathan Berry<br>R. Trent McCotter<br>Michael Buschbacher<br>Jordan E. Smith<br>BOYDEN GRAY & ASSOCIATES<br>801 17th Street, N.W., Suite 350<br>Washington, D.C. 20006 |
| National Center for Public Policy Research | Margaret A. Little<br>Sheng Li<br>NEW CIVIL LIBERTIES ALLIANCE<br>1225 19th Street, N.W., Suite 450<br>Washington, D.C. 20036 |
| **Respondent** | **Counsel for Respondent** |
| Securities and Exchange Commission | Michael A. Conley<br>Vanessa A. Countryman<br>Tracey A. Hardin<br>Daniel E. Matro<br>John R. Rady<br>U.S. SECURITIES & EXCHANGE COMMISSION<br>100 F Street, N.E.<br>Washington, D.C. 20549 |

| Intervenor | Counsel for Intervenor |
|---|---|
| The Nasdaq Stock Market LLC<br><br>Nasdaq, Inc.<br>(The Nasdaq Stock Market LLC's parent company)<br><br>Borse Dubai Limited<br>(owns more than 10 percent of Nasdaq, Inc.'s shares)<br><br>Investor AB<br>(owns more than 10 percent of Nasdaq, Inc.'s shares) | Allyson N. Ho<br>Bradley G. Hubbard<br>Paulette C. Miniter<br>GIBSON, DUNN & CRUTCHER LLP<br>2001 Ross Avenue, Suite 2100<br>Dallas, Texas 75201<br><br>Amir C. Tayrani<br>Amalia E. Reiss<br>GIBSON, DUNN & CRUTCHER LLP<br>1050 Connecticut Avenue, N.W.<br>Washington, D.C. 20036<br><br>John Zecca<br>Jeffrey S. Davis<br>John Yetter<br>Joanne Pedone<br>THE NASDAQ STOCK MARKET LLC<br>805 King Farm Boulevard<br>Rockville, Maryland 20850<br><br>Stephen J. Kastenberg<br>Paul Lantieri III<br>BALLARD SPAHR LLP<br>1735 Market Street, 51st Floor<br>Philadelphia, Pennsylvania 19103<br><br>Seth D. Berlin<br>BALLARD SPAHR LLP<br>1909 K Street, N.W., 12th Floor<br>Washington, D.C. 20006 |

Respectfully submitted,

/s/ Allyson N. Ho
Allyson N. Ho
*Counsel of Record*

## STATEMENT REGARDING ORAL ARGUMENT

Although the precedents and principles that require this Court to deny the petitions are straightforward, oral argument may aid in the resolution of the issues presented because this case involves important legal questions about the state-action doctrine and the Securities Exchange Act.

## TABLE OF CONTENTS

Page

Certificate of Interested Persons ................................................. i

Statement Regarding Oral Argument ....................................... iii

Table of Authorities ................................................................ vi

Introduction ............................................................................ 1

Jurisdictional Statement ......................................................... 5

Issues Presented ..................................................................... 6

Statement of the Case .............................................................. 7

   I.   Exchanges have existed for hundreds of years as private entities responsible for regulating their members and markets ...................................................................... 7

   II.   Nasdaq proposes the Diversity Rules in response to a groundswell of investor interest in accessing reliable, standardized information about listed companies' board diversity .................................................................. 12

   III.  The Commission approves the Diversity Rules after determining they are consistent with the Exchange Act ........... 17

Summary of Argument ......................................................... 22

Standard of Review .............................................................. 27

Argument ............................................................................. 28

   I.   Petitioners' constitutional arguments fail for lack of state action. .................................................................. 28

      A.   Nasdaq is a private company, not a state actor ................. 29

      B.   Nasdaq's adoption of rules governing its private contractual relationships with listed companies is not state action. ........................................................ 32

          1.   Adopting rules governing a stock exchange is not a traditional, exclusive government function. ............... 32

          2.   There is no pervasive entanglement of government officials in Nasdaq's adoption of rules. ........................ 34

          3.   The Commission neither coerced nor encouraged Nasdaq to adopt the Diversity Rules ........................ 35

# TABLE OF CONTENTS
(continued)

Page

4.    The Commission's approval of the Diversity Rules doesn't subject the rules to constitutional scrutiny..... 36

C.    *Intercontinental Industries* doesn't compel a contrary conclusion............................................................... 41

II.    The Commission reasonably found that the Diversity Rules are consistent with the Exchange Act ....................................... 45

A.    Substantial evidence supports the Commission's factual findings about the function and benefits of the Board Diversity Rule............................................................... 46

B.    The Commission reasonably applied the Exchange Act's requirements to the Board Diversity Rule................ 51

1.    Disclosure furthers core statutory purposes.............. 52

2.    There is no "materiality" test, but even if there were, it would be satisfied. ........................................ 59

3.    The record reflects thorough, independent review...... 64

4.    The Commission reasonably assessed other requirements.............................................................. 65

C.    The Commission properly approved the Board Recruiting Service Rule. ................................................... 67

Conclusion.................................................................................. 70

Certificate of Service................................................................. 71

Certificate of Compliance.......................................................... 71

## TABLE OF AUTHORITIES

Page(s)

## Cases

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
  526 U.S. 40 (1999) ....................................................................39, 43

*Barnes v. Lehman*,
  861 F.2d 1383 (5th Cir. 1988)...............................................38

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) .................................................................60, 61

*Bernstein v. Lind-Waldock & Co.*,
  738 F.2d 179 (7th Cir. 1984) ...............................................31

*Blum v. Yaretsky*,
  457 U.S. 991 (1982) ............................................................*passim*

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*,
  531 U.S. 288 (2001) ........................................23, 32, 34, 35

*Burton v. Wilmington Parking Auth.*,
  365 U.S. 715 (1961) ...............................................................43

*Business Roundtable v. SEC*,
  647 F.3d 1144 (D.C. Cir. 2011).............................................55

*Business Roundtable v. SEC*,
  905 F.2d 406 (D.C. Cir. 1990)...............................52, 57, 58

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) ...............................................................27

*Cody v. SEC*,
  693 F.3d 251 (1st Cir. 2012)...............................................44

*D.L. Cromwell Invs., Inc. v. NASD Regul., Inc.*,
  279 F.3d 155 (2d Cir. 2002)..................................................28

*Dep't of Transp. v. Ass'n of Am. R.Rs.*,
  575 U.S. 43 (2015) .........................................................30, 31

*Desiderio v. NASD, Inc.*,
  191 F.3d 198 (2d Cir. 1999)..................................................28

*Domestic Sec., Inc. v. SEC*,
  333 F.3d 239 (D.C. Cir. 2003)...............................27, 53

TABLE OF AUTHORITIES
(continued)

Page(s)

*Duffield v. Robertson Stephens & Co.*,
144 F.3d 1182 (9th Cir. 1998) ............................................. 28

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v.
JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009) ................................................ 63

*EEOC v. Luce, Forward, Hamilton & Scripps*,
345 F.3d 742 (9th Cir. 2003) .............................................. 28

*First Jersey Secs., Inc. v. Bergen*,
605 F.2d 690 (3d Cir. 1979) ................................................ 28

*Flagg Bros., Inc. v. Brooks*,
436 U.S. 149 (1978) ........................................................... 33

*Gen. Bond & Share Co. v. SEC*,
39 F.3d 1451 (10th Cir. 1994) ............................................ 44

*Intercontinental Indus., Inc. v. Am. Stock Exch.*,
452 F.2d 935 (5th Cir. 1971) .................................... 41, 42, 43

*Jackson v. Metro. Edison Co.*,
419 U.S. 345 (1974) ................................................... *passim*

*Jones v. SEC*,
115 F.3d 1173 (4th Cir. 1997) ............................................ 28

*Kokesh v. SEC*,
137 S. Ct. 1635 (2017) ........................................... 25, 52, 57

*Lebron v. Nat'l R.R. Passenger Corp.*,
513 U.S. 374 (1995) ............................................... 23, 29, 30

*Lugar v. Edmondson Oil Co.*,
457 U.S. 922 (1982) ..................................................... 23, 32

*Manhattan Cmty. Access Corp. v. Halleck*,
139 S. Ct. 1921 (2019) ............................................... *passim*

*Meadows v. SEC*,
119 F.3d 1219 (5th Cir. 1997) ............................................ 27

*Moose Lodge No. 107 v. Irvis*,
407 U.S. 163 (1972) ........................................................... 40

vii

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v.*
  *State Farm Mut. Auto Ins. Co.*, 463 U.S. 29 (1983) ......................... 69

*Perpetual Secs., Inc. v. Tang*,
  290 F.3d 132 (2d Cir. 2002) .................................................30

*R&W Tech. Servs. Ltd. v. CFTC*,
  205 F.3d 165 (5th Cir. 2000) .............................................. 60

*Rooms v. SEC*,
  444 F.3d 1208 (10th Cir. 2006) ...........................................44

*Shelley v. Kraemer*,
  334 U.S. 1 (1948) ......................................................40, 41

*Sierra Club v. U.S. Dep't of Interior*,
  990 F.3d 898 (5th Cir. 2021) .............................................27

*Skinner v. Ry. Labor Execs.' Ass'n*,
  489 U.S. 602 (1989) .....................................................35

*Sunshine Anthracite Coal Co. v. Adkins*,
  310 U.S. 381 (1940) .....................................................45

*Susquehanna Int'l Grp. v. SEC*,
  866 F.3d 442 (D.C. Cir. 2017) ...........................................64

*TSC Indus., Inc. v. Northway, Inc.*,
  426 U.S. 438 (1976) .....................................................60

*United States v. Litvak*,
  889 F.3d 56 (2d Cir. 2018) .............................................. 62

*United States v. NASD, Inc.*,
  422 U.S. 694 (1975) .....................................................59

*United States v. Solomon*,
  509 F.2d 863 (2d Cir. 1975) .............................................28

*Village of Bensenville v. FAA*,
  457 F.3d 52 (D.C. Cir. 2006) .................................24, 38, 39, 40

*Yeager v. City of McGregor*,
  980 F.2d 337 (5th Cir. 1993) ............................................33

TABLE OF AUTHORITIES
(continued)

Page(s)

**Statutes**

5 U.S.C. § 706....................................................................27

15 U.S.C. § 78f..........................................................*passim*

15 U.S.C. § 78o-3................................................................8

15 U.S.C. § 78s..........................................................*passim*

15 U.S.C. § 78w..................................................................8

15 U.S.C. § 78y.................................................5, 27, 47

Securities Exchange Act of 1934,
    Pub. L. No. 73-291, 48 Stat. 881
    (codified as amended at 15 U.S.C. § 78a *et seq.*).......................*passim*

**Rules, Regulations & Regulatory Materials**

17 C.F.R. § 229.407......................................................13, 56

17 C.F.R. § 240.12d2-2 (1970)..............................................42

17 C.F.R. § 240.12d2-2 (2021)..............................................42

17 C.F.R. § 240.19b-4.......................................................9, 67

Concept Release Concerning Self-Regulation,
    69 Fed. Reg. 71,256 (Dec. 8, 2004) ............................7, 8, 33

Nasdaq Rule 5250.................................................................12

Nasdaq Rule 5605.............................................................12, 64

Nasdaq Rule 5610.................................................................12

Notice of Nasdaq's Proposal to Adopt Diversity Rules,
    85 Fed. Reg. 80,472 (Dec. 11, 2020) .................................17

Order Approving Nasdaq's Diversity Rules,
    86 Fed. Reg. 44,424 (Aug. 12, 2021)...........................*passim*

Order Approving Nasdaq's Rule Change Related to
    Switching from NYSE to Nasdaq,
    85 Fed. Reg. 84,434 (Dec. 28, 2020) ..............................68

TABLE OF AUTHORITIES
(continued)

Page(s)

Order Approving Nasdaq's Rule Requiring Disclosure
of Compensation by Third Parties to
Board Members or Nominees,
81 Fed. Reg. 44,400 (July 7, 2016) ..................................................... 60

Order Approving The Nasdaq Stock Market LLC's
Registration as a National Securities Exchange,
71 Fed. Reg. 3550 (Jan. 23, 2006) .....................................................10

Suspension of Trading and Removal from
Listing and Registration,
28 Fed. Reg. 1506 (Feb. 16, 1963) .....................................................42

## Other Authorities

By-laws of The Nasdaq Stock Market LLC ............................................11

Steven J. Cleveland,
*The NYSE as State Actor?: Rational Actors, Behavioral
Insights & Joint Investigations*,
55 Am. U. L. Rev. 1 (2005) ...............................................................43

Virginia Harper Ho,
*"Comply or Explain" and the Future of
Nonfinancial Reporting*,
21 Lewis & Clark L. Rev. 317 (2017) ...............................................48

Phil Mackintosh,
*Nasdaq: 50 Years of Market Innovation*,
Nasdaq (Feb. 11, 2021)......................................................................11

Nasdaq, *Initial Listing Guide* (Jan. 2022)..........................................11

Nasdaq, *Listing Agreement*...................................................................11

SEC Div. of Mkt. Regul.,
*Market 2000: An Examination of Current Equity Market
Developments* (Jan. 1994)....................................................................8

Second Amended Limited Liability Company Agreement of
The Nasdaq Stock Market LLC (July 9, 2009) ..................................10

**TABLE OF AUTHORITIES**
(continued)

Page(s)

Steve Seeling & Lindsay Green,
   *Initial 10-K Disclosures Provide Limited Data*
   *on Human Capital Metrics*,
   Willis Towers Watson (Jan. 28, 2021).............................................. 62

*Webster's New International Dictionary* (2d ed. 1934) ...........................54

xi

## INTRODUCTION

Issues surrounding boardroom diversity raise important questions on which people of good faith can disagree. But this case presents none of those questions. Petitioners seek to make this case a referendum on boardroom diversity, but it is not.

The petitions for review should be denied for two reasons. First, accepting petitioners' expansion of state action would turn broad swaths of the Nation's economy into arms of the state—subjecting an almost unlimited array of private, commercial transactions to constitutional constraints. Second, petitioners' policy disagreement about the merits of boardroom diversity isn't sufficient to show that the Securities and Exchange Commission's findings lacked substantial evidence or that its conclusion that Nasdaq's rules are consistent with the Securities Exchange Act was arbitrary and capricious.

Nasdaq is a private company registered with the Commission as a national securities exchange. Nasdaq establishes rules concerning the operations of its exchange, including the listing rules that companies agree to follow when they enter into private, voluntary contractual relationships with Nasdaq to list their securities for purchase and sale

on its exchange.  Before a proposed rule can become effective, Nasdaq must submit it to the Commission, which "shall" approve the rule if it is consistent with the Exchange Act.  Responding to a groundswell of interest from investors in the diversity of public companies' boards, Nasdaq proposed two rules and submitted them to the Commission for review.

The first—the Board Diversity Rule—requires listed companies to (1) disclose aggregated information about voluntarily self-identified diversity characteristics (race, gender, and sexual orientation) of their board members, and (2) provide an explanation if fewer than two board members are diverse.  The second—the Board Recruiting Service Rule—provides listed companies with free, optional access to a third-party board recruiting service with a network of diverse, board-ready candidates. The Commission approved both rules after determining that they comply with the Exchange Act.

Petitioners seek to overturn that approval, but they only cursorily argue that the Commission's order is arbitrary, capricious, or lacking in substantial evidence—for good reason, because it is not.  Instead, petitioners devote the vast bulk of their challenge to arguing that the rules violate various provisions of the Constitution.

2

But even *reaching* those constitutional questions would require transgressing well-settled limits on the rare circumstances in which private companies like Nasdaq can be deemed state actors—a step that would "significantly endanger individual liberty and private enterprise" by imposing constitutional constraints on private commercial activity throughout the economy. *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1932 (2019). Under petitioners' view, businesses subject to government regulation necessarily become arms of the state. But that is not the law. Indeed, accepting petitioners' view would work a radical sea change that upends longstanding state-action precedent and disrupts the economy by requiring vast numbers of regulated private companies—in an array of industries—to comply with the Constitution when making routine, private business decisions.

Petitioners are left to challenge the Commission's determination that the rules are consistent with the Exchange Act. In so doing, petitioners ask this Court to take sides in a debate about boardroom diversity. But that policy question is not before the Court. What is before the Court is whether the Commission reasonably determined that Nasdaq's Board Diversity Rule would "provide widely available,

consistent, and comparable information that would contribute to investors' investment and voting decisions" and further the Exchange Act's disclosure-related objectives. JA7.

Ample record evidence—including submissions from a "diverse collection of commenters who expressed interest in board diversity information," JA7—supports that determination, along with the Commission's determination that the Board Recruiting Service Rule would help listed companies "meet . . . the diversity objectives" of the Board Diversity Rule, "if they elect to meet those objectives." JA3.

Because the Commission did not act arbitrarily, capriciously, or without substantial evidence in finding that the rules comply with the Exchange Act, the Court should deny the petitions for review.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under Section 25(a) of the Exchange Act. 15 U.S.C. § 78y(a). The Commission issued the challenged order on August 6, 2021. Petitioners filed timely petitions for review on August 9 and October 5, 2021.

## ISSUES PRESENTED

1.     Whether Nasdaq—a private company that adopted the rules at issue concerning its own private contractual relationships with the companies that voluntarily decide to list on its exchange—is a state actor.

2.     Whether the Commission's determination that the rules at issue comport with the Exchange Act is arbitrary, capricious, or lacking in substantial evidence.

**STATEMENT OF THE CASE**

## I.     Exchanges have existed for hundreds of years as private entities responsible for regulating their members and markets.

**A.**     The New York Stock Exchange—the first organization to formally govern securities trading in the United States—was established in 1792, and adopted rules governing its members and listed companies in the early nineteenth century. *See*, *e.g.*, 69 Fed. Reg. 71,256, 71,257 (Dec. 8, 2004).

Exchanges regulated their members and markets unhampered by federal intervention until, in response to the stock market crash of 1929 and other events, Congress passed the Securities Exchange Act of 1934, Pub. L. No. 73-291, 48 Stat. 881 (codified as amended at 15 U.S.C. § 78a *et seq.*). The Exchange Act formally recognized the self-regulatory role of exchanges and required them to register with the Commission as "self-regulatory organizations." 15 U.S.C. §§ 78f, 78s.

Under the Exchange Act, self-regulatory organizations—which include exchanges as well as other entities such as FINRA, the self-regulatory body for broker-dealers—are private entities that adopt their own rules to govern their members and enforce compliance with those

rules and the federal securities laws. *See* 15 U.S.C. §§ 78f, 78o-3. The Commission, in turn, exercises oversight over exchanges and other self-regulatory organizations—including through its review of self-regulatory organizations' proposed rule changes for consistency with the Exchange Act—and also promulgates its own rules of general applicability governing the securities markets. *See, e.g.*, 15 U.S.C. §§ 78f, 78o-3, 78w.

As the Commission has explained, "Congress concluded that self-regulation . . . was a mutually beneficial balance between government and securities industry interests" because it allows for "supervis[ion] by an organization familiar with the nuances of securities industry operations" and "less invasive regulation," while also allowing the government to "benefit[] by being able to leverage its resources through its oversight" function. 69 Fed. Reg. at 71,257. In the judgment of Congress and the Commission, self-regulation by private entities like Nasdaq is more efficient and effective than government regulation. *See* 69 Fed. Reg. at 71,258; SEC Div. of Mkt. Regul., *Market 2000: An Examination of Current Equity Market Developments* VI-6–7 (Jan. 1994), https://tinyurl.com/2wyzd9wr.

Despite amending the Exchange Act on multiple occasions, Congress has declined to alter the private, non-governmental status of exchanges and other self-regulatory organizations.

**B.**    Under the Exchange Act, exchanges develop their own rules to govern the companies that agree to list their stock on the exchange (as well as the brokers and dealers that trade on the exchange). 15 U.S.C. § 78f. With the exception of rules establishing fees or addressing certain non-controversial matters—which exchanges can deem immediately effective, 15 U.S.C. § 78s(b)(3)(A), 17 C.F.R. § 240.19b-4(f)—exchanges' rules (and amendments to existing rules) cannot take effect until they have been reviewed and approved by the Commission. 15 U.S.C. § 78s(b)(1). The Commission "shall" approve the rules or amendments "if it finds" them "consistent with the requirements" of the Exchange Act and its implementing regulations. 15 U.S.C. § 78s(b)(2)(C)(i).

An exchange's proposed rule is consistent with the Exchange Act if it is "designed" to:

- Prevent fraudulent and manipulative acts and practices,
- Promote just and equitable principles of trade,

9

- Foster cooperation and coordination with persons engaging in regulating, clearing, settling, processing information with respect to, and facilitating transactions in securities,

- Remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general,

- Protect investors and the public interest.

15 U.S.C. § 78f(b)(5). The Commission must also find that the rule is "not designed to permit unfair discrimination between customers, issuers, brokers, or dealers, or to regulate by virtue of any authority conferred by [the Exchange Act] matters not related to the purposes of [the Act] or the administration of the exchange," *id.*, and would "not impose any burden on competition not necessary or appropriate." 15 U.S.C. § 78f(b)(8).

**C.** Nasdaq is a private, limited liability company. It is wholly owned by Nasdaq, Inc., its publicly listed parent company. *See* Second Amended Limited Liability Company Agreement of The Nasdaq Stock Market LLC (July 9, 2009), https://tinyurl.com/2s3vt8nw.

Nasdaq was launched in 1971 by the National Association of Securities Dealers (NASD)—a self-regulatory organization responsible for regulating broker-dealers—and spun off in 2006, when it registered with the Commission as an exchange. *See* 71 Fed. Reg. 3550 (Jan. 23,

10

2006); Phil Mackintosh, *Nasdaq: 50 Years of Market Innovation*, Nasdaq (Feb. 11, 2021), https://tinyurl.com/2x3z3uda.

Nasdaq's board of directors is selected by its broker-dealer members and by Nasdaq, Inc.—neither the Commission nor any other government agency has the power to appoint a director to Nasdaq's board or otherwise control board membership. *See* By-laws of The Nasdaq Stock Market LLC, arts. II–III, https://tinyurl.com/2p99k62s.

To list their stock on Nasdaq, companies enter into voluntary contractual agreements with the exchange that provide for Nasdaq to facilitate the listing and trading of their securities and for the companies to abide by Nasdaq's rules. *See*, *e.g.*, Nasdaq, *Initial Listing Guide* (Jan. 2022), https://tinyurl.com/bdh8794f; Nasdaq, *Listing Agreement*, https://tinyurl.com/2whjhzt3.

Over the years, Nasdaq has developed and proposed—and the Commission has approved—many rules governing companies listed on its exchange. These rules address everything from listing qualifications and procedures to corporate disclosures and governance, including requirements for the composition of listed companies' boards and

11

committees. [1] If a listed company disagrees with Nasdaq's rules, it is free to delist from the exchange and remain publicly traded by listing with a competitor (such as NYSE), publicly trade "over-the-counter" without listing on any exchange, or go private.

## II. Nasdaq proposes the Diversity Rules in response to a groundswell of investor interest in accessing reliable, standardized information about listed companies' board diversity.

In recent years, there has been an increasingly intense focus on corporate board diversity on the part of investors, corporate-governance organizations, and legislators. *See*, *e.g.*, JA262 nn.4–7 (citing survey results showing corporate and investor focus on diversity).

Publicly traded companies have also increased their focus on board diversity and related disclosures. *See*, *e.g.*, JA160 (noting adoption of policy to consider candidates with diverse backgrounds when evaluating board candidates); JA648 (emphasizing importance of "useful, comparable data about the composition of corporate boards"). This

---

[1] For example, Nasdaq-listed companies must have a majority independent board, Rule 5605(b)(1); adopt a code of conduct and disclose any waivers of the code for directors or executive officers, Rule 5610; and disclose any third-party compensation of board members and nominees, Rule 5250(b)(3). Nasdaq's *Rulebook* is available online at https://tinyurl .com/37w6mr5h.

widespread interest in board diversity prompted the Commission to adopt a rule in 2009 that requires the disclosure of whether and how a company's board or board nominating committee considers diversity in identifying nominees for the board. *See* 17 C.F.R. § 229.407(c)(2)(vi).

Despite the adoption of that rule, institutional investors and other market participants continued to call for greater disclosure of board-level diversity information, which wasn't covered by the Commission's 2009 rule or widely available in a reliable, uniform format. JA305–313. These demands were prompted by a substantial and growing body of empirical evidence indicating that board diversity improves corporate governance and company performance. *See*, *e.g.*, JA275–293 (reviewing empirical studies).

In response, Nasdaq sought the perspectives of "leaders representing a broad spectrum of market participants and other stakeholders" to obtain their views on possible rule changes related to diversity disclosures. JA300. These stakeholders made clear that they desired "disclosure requirements that would standardize the reporting of board diversity statistics." JA301.

To satisfy these pervasive demands, Nasdaq developed the Board Diversity Rule and the Board Recruiting Service Rule, and submitted them to the Commission for approval.

**A.** The Board Diversity Rule has two principal elements. First, the rule requires companies listed on Nasdaq to publicly disclose a standardized Board Diversity Matrix that provides aggregated information on the voluntarily self-identified gender and racial characteristics and LGBTQ+ status of their board of directors. JA319–328. Second, the rule requires listed companies to have, or explain why they do not have, at least two diverse board members (including at least one director who self-identifies as female and at least one director who self-identifies as a racial minority or LGBTQ+). JA328–330.

The rule provides a great deal of flexibility to listed companies. Companies that are unable to, or choose not to, meet the rule's diversity objectives can provide an explanation as anodyne as: "The Company does not meet the diversity objectives . . . because it does not believe Nasdaq's listing rule is appropriate," or "because it does not believe achieving Nasdaq's diversity objectives [is] feasible given the company's current

14

circumstances." JA205. Nasdaq will not evaluate the substance or merits of a company's explanation. JA5.

Nasdaq also provides greater leeway for foreign issuers, smaller reporting companies, and companies with smaller boards. JA11–13. For example, smaller reporting companies and foreign issuers can meet the diversity objectives by having two female directors. JA3 nn.26–27. And companies with smaller boards—comprising five or fewer members— have a diversity objective of only one diverse member. JA3 n.25.

Nasdaq's compliance measures will be limited to ensuring that listed companies disclose their board members' voluntarily self-reported demographic statistics and either meet the Board Diversity Rule's diversity objectives or provide an explanation for not doing so. JA3–4. No company will be delisted—or face any other sanctions—based on the demographic composition of its board, the substance of its explanation, or a director's unwillingness to make a voluntary demographic disclosure. JA204, 224–225.

**B.** Under the Board Recruiting Service Rule, Nasdaq will provide listed companies that do not meet the diversity objectives of the Board Diversity Rule with one year of free access to a board recruiting service

offered by Equilar, a company unaffiliated with Nasdaq. JA218–219. That service provides companies that opt to use it with access to Equilar's network of diverse, board-ready candidates, whom the companies can evaluate at their discretion. JA218–219. No company is required to use the board recruiting service, and Nasdaq has no role in the compilation of the service's list of director candidates. JA20–21.

**C.** Comment letters from investors emphasized the value of standardized diversity disclosures, which would help investors make informed trading and proxy-voting decisions and facilitate their ability to assess the impact of board diversity on company performance.

The Illinois State Treasurer, for example, highlighted that the "current reporting environment . . . creates confusion and barriers to effective investment analysis and decision-making; it generates information asymmetry, disorder and inefficiency; and it jeopardizes optimal capital formation." JA655. Ariel Investments emphasized that "comparable comprehensive data" along these lines "helps us make informed investment decisions." JA670. And the Council of Institutional Investors stated that the rules would provide investors with "a better understanding of [a] company's reasons for not having at least two

Diverse directors" and that investors "can use that information to make an informed investment or voting decision." JA663–664 (quoting 85 Fed. Reg. 80,472, 80,492 (Dec. 11, 2020)).

Several Nasdaq-listed companies also filed comments supporting the rules, emphasizing that "consistent and uniform" disclosures would be "mutually beneficial for both the investor community and the company." JA686; *see also* JA650; JA642–643.

## III. The Commission approves the Diversity Rules after determining they are consistent with the Exchange Act.

After the notice-and-comment period, the Commission determined that the rules are "consistent with the requirements of the [Exchange] Act and the rules and regulations thereunder applicable to a national securities exchange," and therefore approved the rules. JA2.

**A.** The Commission reaffirmed that Nasdaq is a private entity, not a state actor. The Commission explained that "[n]umerous courts (and the Commission) have repeatedly held that [self-regulatory organizations] generally are not state actors," and that commenters urging the application of constitutional scrutiny to Nasdaq's proposal identified "no persuasive basis for reaching a different conclusion." JA17 & n.231 (citing cases).

17

The Commission further explained that neither its "[m]ere approval" of Nasdaq's proposed rules nor its "extensive and detailed" regulation of Nasdaq is sufficient to convert Nasdaq's actions into state action. JA17 & nn.232–33 (citing cases). And the Commission concluded that, even if the Diversity Rules were state action, they "would survive constitutional scrutiny" because they "are not mandates" and the required disclosures "are factual in nature." JA17.

**B.**     The Commission also determined that the rules are consistent with the Exchange Act. As one justification for the rules, Nasdaq pointed to its finding that "an extensive body of empirical research demonstrates that diverse boards are positively associated with improved corporate governance and company performance." JA8. The Commission examined those studies and independently determined that, in its view, the studies' conclusions "on the effects of changes in board diversity on investors are mixed." JA9.

The Commission nevertheless determined, based on an independent justification offered by Nasdaq, that the Board Diversity Rule complies with the Exchange Act because the rule would "make consistent and comparable statistics widely available to investors

regarding the number of Diverse directors serving on a Nasdaq-listed company's board," information that is "currently not widely available" and in which "commenters representing a broad array of investors have indicated an interest." JA2.

The Commission further found that the rule would "provide increased transparency" and "augment existing Commission requirements that companies disclose whether, and how, their boards or board nominating committees consider diversity in nominating new directors," including by facilitating "a better understanding of why a company does not meet the proposed objectives" set forth in the rule. JA2. These disclosures, in turn, would "make it more efficient and less costly for investors to collect, use, and compare information on board diversity" and "enhance investors' ability to make informed investment and voting decisions." JA7.

Because the Board Diversity Rule would "provide investors with information to facilitate their evaluation of companies in which they might invest," the Commission found it would "contribute to the maintenance of fair and orderly markets" and therefore was "designed to promote just and equitable principles of trade, remove impediments to

19

and perfect the mechanism of a free and open market and a national market system, and protect investors and the public interest" within the meaning of the Exchange Act.  JA2.

Finally, the Commission found that the Board Diversity Rule was "not designed to permit unfair discrimination between issuers or to regulate by virtue of any authority conferred by the Act matters not related to the purposes of the Act or the administration of the Exchange, and would not impose any burden on competition that is not necessary or appropriate in furtherance of the purposes of the Act."  JA2.

The Commission emphasized that the rule "would not impose a burden on competition between issuers that is not necessary or appropriate in furtherance of the purposes of the Act" because it did "not mandate any particular board composition" and because it provided "companies flexibility in formulating an explanation for not meeting the diversity objectives."  JA2, 13.

Providing "more flexibility" to smaller reporting companies and companies with smaller boards is not "unfairly discriminatory, and does not impose an unnecessary or inappropriate burden on competition," the Commission explained, in light of "the unique challenges (including

potential resource constraints)" faced by those companies. JA12–13. So, too, for providing foreign issuers "flexibility," given "the differing demographic compositions of foreign countries" and the "different circumstances associated with Foreign Issuers hiring Diverse directors." JA12.

**C.** Turning to the Board Recruiting Service Rule, the Commission found that it would (1) enable eligible companies to "identify and evaluate" board-ready diverse candidates if they choose to use the optional service, (2) help those companies satisfy the Board Diversity Rule's diversity objectives, "if they elect to meet those objectives rather than disclose why they have not met the objectives," and (3) "help [Nasdaq] compete to attract and retain listings." JA3.

As a result, the Commission found that the rule was "designed to provide for the equitable allocation of reasonable dues, fees, and other charges among issuers, is not designed to permit unfair discrimination among issuers, and does not impose any burden on competition that is not necessary or appropriate in furtherance of the purposes of the Act." JA3.

### SUMMARY OF ARGUMENT

Petitioners focus on boardroom diversity as a question of public policy, but this case does not present that issue. Instead, the first issue is whether Nasdaq's adoption of rules concerning its private contractual relationships with its listed companies amounts to state action—a position that would require massively expanding who is considered a state actor and what is considered state action and, in doing so, subject the commercial transactions of vast swaths of private industry to constitutional constraints. The second issue is whether the Commission acted arbitrarily, capriciously, or without substantial evidence in determining that Nasdaq's rules are consistent with the Exchange Act. Because the answer to both questions is no, the petitions for review should be denied.

**I.** Petitioners challenge Nasdaq's rules primarily on constitutional grounds, but those arguments fail at the outset because Nasdaq is a private company—not a state actor—so its rules aren't subject to constitutional scrutiny. None of the Supreme Court's very narrow exceptions to that general rule applies here. Nasdaq was not created by the government for the furtherance of governmental

objectives, and the government has no authority to appoint Nasdaq's directors. *See Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 399 (1995). And the fact that Nasdaq is heavily regulated isn't sufficient to transform it into a state actor because, as the Supreme Court has made clear, "being regulated by the State does not make one a state actor." *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1932 (2019). If it did, every business in every regulated industry in the country would be an arm of the state. That cannot be right.

Nasdaq's adoption of rules that govern its own contractual relationships with listed companies doesn't transform it into a state actor, either. *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982). Exchanges have been private enterprises since the eighteenth century and have never been operated by the government, so Nasdaq's adoption of rules doesn't entail "exercis[ing] powers that are 'traditionally the exclusive prerogative of the State.'" *Blum v. Yaretsky*, 457 U.S. 991, 1005 (1982) (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 353 (1974)).

Nor is Nasdaq sufficiently "entwined" with the government to satisfy the state-action requirement. *See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001). All Nasdaq

personnel are private employees, Nasdaq's board neither comprises nor involves public officials, and Nasdaq's adoption of the rules wasn't coerced or even encouraged by the government—so Nasdaq isn't "entwined" with the government at all.

Neither the Commission's approval of Nasdaq's rules—which it is statutorily required to give when proposed rules are consistent with the Exchange Act—nor its status as a respondent in this case alters the analysis. *See Village of Bensenville v. FAA*, 457 F.3d 52, 65 (D.C. Cir. 2006). A contrary result would render the state-action doctrine a dead letter by allowing plaintiffs to subject private activity to constitutional constraints simply by suing the government agency that renders regulatory approval rather than the private party that requests it.

Courts have rejected this dangerous artifice—and wisely so because, again, embracing it would result in vast numbers of regulated industries becoming arms of the state simply because they need to seek their regulators' approval to take certain actions.

**II.** Petitioners are left with their statutory challenge to the Commission's approval of Nasdaq's rules, but that too fails because the

Commission acted reasonably on the basis of substantial evidence when it found that Nasdaq's rules are consistent with the Exchange Act.

First, as to the Board Diversity Rule, substantial evidence supports the Commission's finding that the rule creates a "disclosure-based framework" that "would provide widely available, consistent, and comparable information" to investors and that the Board Diversity Matrix, in particular, would meet the "broad demand" for a "more efficient and less costly" way "to collect, use, and compare information on board diversity." JA5, 7. Petitioners' efforts to characterize the rule as a rigid quota, rather than a disclosure provision, ignore the rule's text and operation, including the significant flexibility it provides to listed companies.

Especially given the Commission's findings on the rule's informational benefits—which petitioners don't meaningfully challenge—the Commission reasonably concluded that the rule complies with the Exchange Act because fostering increased transparency and providing investors with sought-after information further the Act's core disclosure-related objectives. *See*, *e.g.*, *Kokesh v. SEC*, 137 S. Ct. 1635, 1640 & n.1 (2017). Petitioners' arguments that board diversity has not

conclusively been shown to improve corporate governance or performance are beside the point.  As long as Nasdaq's rule provides investors with information that they will use in making investment and proxy-voting decisions—which the Commission found to be the case based on substantial record evidence—the rule is consistent with the purposes of the Exchange Act.

Contrary to petitioners' atextual argument, nothing in the Act limits Nasdaq to rules requiring the disclosure of "material" information. In any event, the rule would satisfy that standard because there is substantial record evidence confirming that reasonable investors would conclude that information about the demographic composition of a company's board alters the total mix of information about the company.

Second, as to the Board Recruiting Service Rule, the Commission reasonably concluded that the rule is consistent with the Exchange Act because it would alleviate the costs of meeting the Board Diversity Rule's objectives and help Nasdaq compete to attract and retain listings. Indeed, the rule is consistent with many prior filings by exchanges, which commonly provide complimentary products and services in response to

competitive pressures.  Petitioners provide no basis for overriding the Commission's determination.

## STANDARD OF REVIEW

The factual aspects of the Commission's order are reviewed for substantial evidence.  15 U.S.C. § 78y(a)(4).  "Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion.    It is more than a mere scintilla and less than a preponderance." *Meadows v. SEC*, 119 F.3d 1219, 1224 (5th Cir. 1997).

In all respects other than the Commission's factual findings, review is limited to assessing whether the order is arbitrary, capricious, or an abuse of discretion.  *Domestic Sec., Inc. v. SEC*, 333 F.3d 239, 248 (D.C. Cir. 2003); *see also* 5 U.S.C. § 706(2)(A).  In making that determination, "the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. . . .    The court is not empowered to substitute its judgment for that of the agency." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971); *Sierra Club v. U.S. Dep't of Interior*, 990 F.3d 898, 904 (5th Cir. 2021).

## ARGUMENT

### I.   Petitioners' constitutional arguments fail for lack of state action.

Nasdaq is a private company, not a government actor.  It adopted the rules at issue on its own initiative—without any government coercion, encouragement, or entanglement.  Petitioners' constitutional arguments thus fail at the outset because Nasdaq isn't an arm of the state whose actions are subject to constitutional scrutiny—nor is Nasdaq's adoption of its rules fairly attributable to the government.  Courts across the country have rejected similar attempts to subject private self-regulatory organizations like Nasdaq to constitutional scrutiny.[2]

This Court should do the same because accepting petitioners' argument would massively expand who is considered a state actor and

---

[2] *See*, *e.g.*, *D.L. Cromwell Invs., Inc. v. NASD Regul., Inc.*, 279 F.3d 155, 162 (2d Cir. 2002); *Desiderio v. NASD, Inc.*, 191 F.3d 198, 206–07 (2d Cir. 1999); *Duffield v. Robertson Stephens & Co.*, 144 F.3d 1182, 1200–02 (9th Cir. 1998), *overruled on other grounds by EEOC v. Luce, Forward, Hamilton & Scripps*, 345 F.3d 742 (9th Cir. 2003); *Jones v. SEC*, 115 F.3d 1173, 1183 (4th Cir. 1997); *First Jersey Secs., Inc. v. Bergen*, 605 F.2d 690, 698 (3d Cir. 1979); *United States v. Solomon*, 509 F.2d 863, 871 (2d Cir. 1975) (Friendly, J.).

what is considered state action and, in doing so, subject virtually every aspect of private enterprise to constitutional constraints.

## A.    Nasdaq is a private company, not a state actor.

The Constitution, of course, doesn't generally apply to private companies like Nasdaq. In *Lebron v. National Railroad Passenger Corp.*, however, the Supreme Court recognized a narrow exception to that general rule where a nominally private corporation—in that case, Amtrak—has been "create[d]" by the government "for the furtherance of government objectives" and the government "retains for itself permanent authority to appoint a majority of the directors of that corporation." 513 U.S. 374, 399 (1995). Nasdaq has none of those features—indeed, the Supreme Court didn't include stock exchanges or other self-regulatory organizations in its list of "corporations created and participated in by the United States for the achievement of governmental objectives"— decisively demonstrating that Nasdaq is not a state actor. *Id.* at 386–91.

Far from being "create[d]" by the government, *Lebron*, 513 U.S. at 400, Nasdaq was established by the NASD, a private association of securities dealers registered as a self-regulatory organization. *See supra* pp. 10–11. Nasdaq doesn't operate under the direction or control of the

Commission or any other government actor—it is a privately held company operating as the wholly owned subsidiary of a publicly traded corporation. *See supra* p. 10. Its board members are not government appointees, nor are they removable by the President or any other government official. *See supra* p. 11. Nasdaq's board is therefore free to determine Nasdaq's budget and operational priorities without government interference.

The contrast with *Lebron* could not be starker, as Nasdaq possesses none of the characteristics that led the *Lebron* Court to conclude that Amtrak was a state actor. *Cf. Perpetual Secs., Inc. v. Tang*, 290 F.3d 132, 138 (2d Cir. 2002) ("*Lebron* is clearly distinguishable" because there "is no commonality between NASD and Amtrak"); *see also Dep't of Transp. v. Ass'n of Am. R.Rs.*, 575 U.S. 43, 55 (2015) (Amtrak is a state actor because the "political branches created Amtrak, control its Board, define its mission, specify many of its day-to-day operations, have imposed substantial transparency and accountability mechanisms, and, for all practical purposes, set and supervise its annual budget").

The Commission's "extensive oversight" of Nasdaq, NCPPR Br. 17, doesn't convert it into a state actor, either, as the Supreme Court has

expressly rejected that argument. *See Jackson v. Metro. Edison Co.*, 419 U.S. 345, 350 (1974) (even where "many particulars" of a private company's business are "subject to extensive state regulation," it does not become a government entity).

As the Supreme Court recently reiterated, "being regulated by the State does not make one a state actor" because "the 'being heavily regulated makes you a state actor' theory of state action is entirely circular and would significantly endanger individual liberty and private enterprise." *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1932 (2019). A contrary rule would federalize "much of the private sector, ranging from hospitals to railroads," and would sweep in not only Nasdaq, but also NYSE, FINRA, and every other organization required to seek federal approval of its rules. *Bernstein v. Lind-Waldock & Co.*, 738 F.2d 179, 186 (7th Cir. 1984) (Chicago Mercantile Exchange not a state actor because "the fact that it is heavily regulated by a federal commission will not do"); *see also* FINRA *Amicus* Br. 26–27.

In short, Nasdaq is not a state actor. It was not "created by the Government," is not "controlled by the Government," and does not "operate[] for the Government's benefit." *Ass'n of Am. R.Rs.*, 575 U.S. at 53.

## B.    Nasdaq's adoption of rules governing its private contractual relationships with listed companies is not state action.

Petitioners adopt the fallback position that even if Nasdaq isn't a state actor for all purposes, its adoption of rules to govern its contractual relationships with listed companies is nonetheless state action under the Supreme Court's "fairly attributable to the government" exception in *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982). *See* Alliance Br. 22–23; NCPPR Br. 18–20.  Not so.  As with *Lebron*, none of the indicia of state action in *Lugar* and its progeny is present here—no (1) traditional, exclusive government function; no (2) excessive entanglement with the government; and no (3) government coercion or encouragement.  *See Blum v. Yaretsky*, 457 U.S. 991, 1004–05 (1982); *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296–97 (2001).

### 1.    Adopting rules governing a stock exchange is not a traditional, exclusive government function.

The conduct of a private entity may be deemed state action where it performs a public function by "exercis[ing] powers that are 'traditionally the exclusive prerogative of the State.'" *Blum*, 457 U.S. at 1005 (quoting *Jackson*, 419 U.S. at 353).  To "qualify as a traditional, exclusive public function within the meaning of [the Supreme Court's]

state-action precedents, the government must have traditionally *and* exclusively performed the function." *Manhattan Cmty. Access*, 139 S. Ct. at 1929; *see also Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 158 (1978) ("While many functions have been traditionally performed by governments, very few have been 'exclusively reserved to the State.'") (quoting *Jackson*, 419 U.S. at 352).

The regulation of securities exchanges historically has been a *private* function undertaken by exchanges themselves, not the government. *See supra* p. 7. Indeed, until the 1930s, the federal government had no role at all in regulating exchanges or their members. *Id.* Congress left that century-and-a-half-old model of self-regulation in place when it enacted the Exchange Act. *See* 69 Fed. Reg. at 71,257.

Because establishing exchange rules is not a "power traditionally exclusively reserved to the state," *Yeager v. City of McGregor*, 980 F.2d 337, 340 (5th Cir. 1993) (quoting *Jackson*, 419 U.S. at 352), Nasdaq's adoption of rules governing its private contractual relationships with listed companies is not one of the "very few" functions that fall into the category of "exclusive public function[s]." *Manhattan Cmty. Access*, 139 S. Ct. at 1929; *see also Yeager*, 980 F.2d at 340–41 (volunteer fire

33

department not a state actor because firefighting was not an exclusive state function in Texas).

### 2. There is no pervasive entanglement of government officials in Nasdaq's adoption of rules.

Private conduct can also be deemed state action where the government is sufficiently "entwined" or entangled in a private entity's "management or control." *Brentwood Acad.*, 531 U.S. at 296. That is not the case here.

In *Brentwood*, the Supreme Court held that the enforcement of a high school athletic association's rule by the "nominally private" association was state action because of "the pervasive entwinement of public institutions and public officials in [the association's] compositions and workings." 531 U.S. at 298–300. The Court emphasized that (1) 84 percent of the association's membership comprised public schools represented by public officials acting in their official capacities, (2) state board of education members served on the association's board, and (3) the association's employees were eligible for the state's retirement system. *Id.* at 299–300.

Here, by contrast, the Nasdaq employees responsible for all of the companies' operations and functions—including developing rules that

govern its contractual relationships with listed companies—are employees of a private company, not public officials. And public officials have no involvement in or control over Nasdaq's board of directors, which is chosen by Nasdaq's parent company and its members. *See supra* p. 11.

In sum, there is no government entanglement in Nasdaq's management and control—let alone the type of "pervasive entwinement" required to convert private conduct into state action. *Brentwood Acad.*, 531 U.S. at 291.

### 3.    The Commission neither coerced nor encouraged Nasdaq to adopt the Diversity Rules.

Private decisions can also be deemed state action if the government "exercise[s] coercive power" or "provide[s] such significant encouragement, either overt or covert, that the choice must in law be deemed that of the State." *Blum*, 457 U.S. at 1004. There is nothing that even comes close to that here.

In *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602 (1989), for example, the Supreme Court found sufficient "encouragement, endorsement, and participation" where the government "removed all legal barriers" to breath and urine tests on trains; "made plain not only its strong preference for testing, but also its desire to share the fruits of

such intrusions"; and "mandated that the railroads not bargain away" their testing authority. *Id.* at 615–16.

In contrast, there is no government coercion or encouragement here because Nasdaq adopted the Diversity Rules on its own initiative based on input from investors, listed companies, and other non-governmental stakeholders that "expressed interest in board diversity information." JA7; *see also supra* pp. 12–14. Indeed, petitioners do not contend that the Commission directed Nasdaq to adopt the Diversity Rules or fostered their adoption in any way.

### 4.    The Commission's approval of the Diversity Rules doesn't subject the rules to constitutional scrutiny.

In an effort to manufacture state action, petitioners emphasize that the Commission approved Nasdaq's proposed rules. Alliance Br. 22; NCPPR Br. 18. But neither the Commission's approval of Nasdaq's privately developed, privately adopted rules—nor the fact that the Commission's approval order is under review in this case—alters the conclusion that Nasdaq's rules are not state action.

The Supreme Court has repeatedly made clear that the government's approval of a private party's actions does not transform that conduct into state action. *See Blum*, 457 U.S. at 1004–05 ("Mere

approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives").

In *Jackson v. Metropolitan Edison*, for example, the Court held that a private utility's termination of a customer's electric service was not state action even though the termination was pursuant to the utility's state-approved tariff.  419 U.S. at 354–59.  As the Court explained, "[a]pproval by a state utility commission of such a request from a regulated utility, where the commission has not put its own weight on the side of the proposed practice by ordering it, does not transmute a practice initiated by the utility and approved by the commission into 'state action.'" *Id.* at 357.

That is precisely the case here, where Nasdaq is required by the Exchange Act to obtain Commission approval for its rules, but the Commission did not "coerc[e]" or "encourage[]" the adoption of the Diversity Rules.  *Blum*, 457 U.S. at 1004.  As this Court has explained, even "[r]egulations that dictate procedures, forms, or even penalties *without dictating the challenged action* do not convert private action into state action." *Barnes v. Lehman*, 861 F.2d 1383, 1387 (5th Cir. 1988) (insurer that terminated benefits, and physician who rendered

37

supporting opinion, were not state actors because the opinion was not encouraged, coerced, or dictated by the state).

The Commission's presence in this case doesn't convert Nasdaq's adoption of the rules into state action, either. If it did, plaintiffs would be free to evade the state-action doctrine entirely simply by suing the agency that approved a private entity's conduct. That outcome would massively expand the range of private conduct subject to constitutional strictures—and, in so doing, "significantly endanger individual liberty and private enterprise," *Manhattan Cmty. Access*, 139 S. Ct. at 1932—by imposing constitutional constraints on a broad array of private businesses required to obtain government licenses, permits, and other forms of regulatory approval.

The D.C. Circuit's decision in *Village of Bensenville v. FAA*, 457 F.3d 52 (D.C. Cir. 2006), is particularly instructive. There, the D.C. Circuit held that the FAA's statutorily required approval of Chicago's airport plan didn't transform the city's action into federal action for purposes of the Religious Freedom Restoration Act (RFRA), even though, like here, the agency was a proper respondent in the suit challenging the approval. *Id.* at 62, 68. Like Nasdaq's rules, the airport plan in *Village*

*of Bensenville* had to be approved by the FAA before it could be implemented. *Id.* at 58. The petitioners there alleged that the FAA-approved plan violated RFRA—which constrains only the federal government, not cities and states.

The D.C. Circuit held that, despite the FAA's approval of the plan and its status as a respondent in the case, there was no federal action at issue. Drawing upon state-action precedent, the court began its analysis by identifying the "specific conduct" under review—the city's plan to seize and relocate a cemetery as part of an airport expansion, 457 F.3d at 64 (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 51 (1999))—and then assessed whether the FAA's role was "'mere approval of or acquiescence in' the City's plan" or whether the FAA had "exercised coercive power" over or "provided . . . significant encouragement" in favor of the plan. *Id.* (brackets omitted).

Even though the city could not act "without the approval of the FAA," the court concluded that the "FAA's peripheral role" could not federalize the city's action and reasoned that the FAA's "role as regulator [was] similar to that in many cases where the Supreme Court has declined to find state action" because the FAA neither "order[ed] the

change" nor "play[ed] some greater role in the design." *Village of Bensenville*, 457 F.3d at 65–66.

So too here. The "specific conduct" that petitioners complain about is Nasdaq's adoption of the Diversity Rules. The Commission did not design those rules. Nor did it encourage—much less compel—Nasdaq to adopt them. And while NCPPR contends (at 19) that cases finding an absence of state action have involved only "*passive* 'approval or acquiescence'" by an agency, not the "*active* SEC approval" at issue here, the D.C. Circuit's decision in *Village of Bensenville* and the Supreme Court precedent on which it relies make clear that even "active" agency approval doesn't convert private action approved by an agency into state action subject to constitutional constraints. That result holds even where, as here, the agency is a proper respondent in the case.

*Shelley v. Kraemer*, 334 U.S. 1 (1948), and *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163 (1972), are not to the contrary. *See* Alliance Br. 22–23. Those cases establish that the Constitution prohibits "invok[ing] the sanctions of the State to enforce a concededly discriminatory private rule," *Moose Lodge*, 407 U.S. at 179—for example, through "judicial enforcement by state courts of restrictive covenants based on race or

40

color." *Shelley*, 334 U.S. at 8, 19–20 (finding state action where state courts entered decrees directing residents to vacate properties they occupied in violation of racially restrictive covenants).

Here, in contrast, the Commission has not enforced the Diversity Rules against any listed company. Instead, it "[m]ere[ly] approv[ed] . . . the initiatives of a private party"—Nasdaq—which is now free to enforce compliance with the Diversity Rules by its listed companies. *Blum*, 457 U.S. at 1004–05. As the Supreme Court has repeatedly made clear, that act of approval does not give rise to state action. *Id.*; *see also Jackson*, 419 U.S. at 357.[3]

## C.   *Intercontinental Industries* doesn't compel a contrary conclusion.

Petitioners rely heavily on dicta from this Court's fifty-year-old decision in *Intercontinental Industries, Inc. v. American Stock Exchange*, 452 F.2d 935 (5th Cir. 1971), in arguing that Nasdaq's adoption of the Diversity Rules is state action. *See* Alliance Br. 21–22; NCPPR Br. 19–

---

[3] Subsequent enforcement of the rules by Nasdaq doesn't convert their adoption into state action, either. *See Jackson*, 419 U.S. at 358 (utility's enforcement of its rules "in a manner which the Pennsylvania Public Utility Commission found permissible" was "not sufficient to connect the State of Pennsylvania with [the utility's] action so as to make the latter's conduct attributable to the State").

20.   But *Intercontinental Industries* cannot bear the weight petitioners place on it.

In *Intercontinental Industries*, this Court reviewed a Commission order granting the American Stock Exchange's application to delist the petitioner's company.  The petitioner argued that due process required a full and fair hearing, but the Court ultimately declined to decide whether the Due Process Clause applied because the Court concluded that due process had been afforded regardless.  *See* 452 F.2d at 940–41 ("rather than decide those points here, we merely make it clear that our decision does not cast our imprimatur on these arguments").

Thus, the Court's suggestion that the exchange's "intimate involvement" with the Commission warranted constitutional scrutiny is dicta.  452 F.2d at 941; *see also* Commission Br. 48–50.  And it is dicta that has no application outside of the narrow delisting context implicated in *Intercontinental Industries*, which did not involve an exchange rule.[4]

---

[4]  *Intercontinental Industries* is also irrelevant to modern delisting procedures, which no longer require Commission approval. *Compare* 28 Fed. Reg. 1506, 1506 (Feb. 16, 1963) (adopting prior version of 17 C.F.R. § 240.12d2-2(c), which required Commission approval of delisting applications), *and* 17 C.F.R. § 240.12d2-2(c) (1970), *with* 17 C.F.R. § 240.12d2-2(d)(1) (2021) (no requirement for Commission approval).

That dicta, moreover, has been severely undercut by subsequent developments in the law. *Intercontinental Industries*' "intimate involvement" analysis was predicated on *Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961), which held that racial discrimination by a private lessee was state action because the state—which owned the building but didn't encourage or mandate the lessee's discrimination— was a "joint participant" in the private lessee's action. *Id.* at 725; *see also Intercontinental Indus.*, 452 F.2d at 941 (citing *Burton*, 365 U.S. 715).

In the sixty years since the Supreme Court decided *Burton*, however, it has significantly curtailed *Burton*'s expansive theory of "joint participation" and limited the decision to its facts. *See, e.g., Jackson*, 419 U.S. at 358 (explaining that *Burton*'s holding is "limit[ed]" to "lessees of public property"). As the Supreme Court has made clear, "later cases have refined the vague 'joint participation' test embodied in" *Burton* and "established that 'privately owned enterprises providing services that the State would not necessarily provide, even though they are extensively regulated, do not fall within the ambit of *Burton*.'" *Am. Mfrs. Mut. Ins.*, 526 U.S. at 57–58; *see also* Steven J. Cleveland, *The NYSE as State Actor?: Rational Actors, Behavioral Insights & Joint Investigations*, 55

Am. U. L. Rev. 1, 11–12 (2005) (explaining that *Burton* represents the zenith of the Supreme Court's state-action jurisprudence, which had been expanded in the early 1960s to address racial discrimination—an expansion rendered unnecessary by the adoption of civil-rights statutes).[5]

\*　　\*　　\*

Petitioners cannot point to state action under any of the narrow, limited exceptions in the Supreme Court's state-action jurisprudence. The government did not create Nasdaq, does not control Nasdaq's board, does not direct or fund Nasdaq's operations, and neither coerced nor encouraged Nasdaq to adopt the Diversity Rules.    Petitioners'

---

[5] The Tenth Circuit's decision in *Rooms v. SEC*, 444 F.3d 1208 (10th Cir. 2006), does not support petitioners' state-action argument. *See* NCPPR Br. 20.   First, its passing reference to the application of due process to a self-regulatory organization's rules was dicta, as the First Circuit has recognized. *See Cody v. SEC*, 693 F.3d 251, 257 & n.2 (1st Cir. 2012) (*Rooms* "has dicta referring to due process as governing NASD rules").   Second, the Commission did not challenge application of the Due Process Clause—either in *Rooms* or in the only case *Rooms* cited to support its due-process dicta—and the Tenth Circuit therefore did not undertake any state-action analysis. *See* Brief for Respondent at 25–26, *Rooms*, 444 F.3d 1208 (No. 05-9531), 2005 WL 3077660; *see also Rooms*, 444 F.3d at 1214 (citing *Gen. Bond & Share Co. v. SEC*, 39 F.3d 1451, 1455 (10th Cir. 1994)).

44

constitutional challenges thus fail at the threshold—and they also fail on

the merits for the reasons identified by the Commission.  *See* Commission

Br. 50–56.[6]

## II.    The Commission reasonably found that the Diversity Rules are consistent with the Exchange Act.

Petitioners attempt to reframe the statutory question before the

Court as whether it is reasonable for investors to consider board-diversity

information when making investment and voting decisions.  In reality,

the only question before the Court is whether petitioners have

demonstrated that the Commission acted without substantial evidence,

or arbitrarily and capriciously, in concluding that the Diversity Rules are

consistent with the Exchange Act because they will provide investors

---

[6]  NCPPR is incorrect (at 16) that "if Nasdaq were a private entity, all
its regulations would be the product of unconstitutional private
delegation."  The Commission's authority to review Nasdaq's proposed
rules forecloses any possible non-delegation challenge based on Nasdaq's
private status.  *See Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381,
400 (1940) (rejecting non-delegation challenge to a statutory framework
authorizing coal producers to propose prices that were then subject to
review by a federal agency).  NCPPR's other non-delegation arguments
(at 33–37) fail because the Exchange Act's detailed standards governing
the Commission's review of self-regulatory organizations' rules provide
an "intelligible principle" to guide the Commission's approval process.
*See* 15 U.S.C. §§ 78f(b)(5), 78s(b)(2)(C)(i); *see also* Commission Br. 36–38.

with sought-after information that is not currently available in a reliable, consistent format. Petitioners fail to make that showing.

## A. Substantial evidence supports the Commission's factual findings about the function and benefits of the Board Diversity Rule.

The Commission's approval of the Board Diversity Rule rests on factual findings with substantial record support. In particular, the Commission reasonably found that (1) the Board Diversity Rule establishes a disclosure requirement—not a quota, and (2) disclosures under the rule would facilitate the availability of information that investors indicated would be relevant to their investment and proxy-voting decisions. JA2, 7–8.

1. Based on its review of the record, the Commission found that the Board Diversity Rule creates a "disclosure-based framework," not a rigid quota. JA5. That finding is amply supported by substantial evidence both with respect to the requirement that listed companies disclose board members' diversity-related demographic information in a standardized matrix, JA3–4, and the requirement that listed companies with fewer than two diverse board members disclose why.

46

The Commission rejected the contention of some commenters, repeated by NCPPR here (at 28–30), that the rule creates a quota because, the Commission found, a company that is unable to, or chooses not to, meet the rule's diversity objectives can "explain[] why it does not meet the objectives, and the Exchange would not assess the substance of the company's explanation." JA4–5 & n.46; JA258. As the Commission explained, the rule "would not prevent companies and their shareholders from selecting directors based on experience, competence, and skills." JA5.

Those findings are supported by substantial evidence and are therefore "conclusive." 15 U.S.C. § 78y(a)(4). Nasdaq confirmed that it will not evaluate the merits of a company's explanation for not meeting the rule's diversity objectives, that it will not delist companies that do not meet those objectives as long as they provide some explanation, and that, among the numerous possible explanations, companies may simply explain that they "do[] not believe Nasdaq's listing rule is appropriate" or that they take a different approach to board composition.

JA5; JA329; *see also* JA204–205.   Petitioners identify no basis for overturning the Commission's findings.[7]

2.     There is also substantial record support for the Commission's finding that disclosures under the Board Diversity Rule—both the demographic information in the matrix and the explanation from those companies with fewer than two diverse directors—"would provide widely available, consistent, and comparable information that would contribute to investors' investment and voting decisions." JA7.  Three substantially supported premises underlie this finding.

First, the Commission found that "[b]oard-level diversity statistics are currently not widely available on a consistent and comparable basis." JA2.  The record substantiates that finding.  Supported by a number of commenters, Nasdaq explained that board-demographic statistics are not readily available in a standardized, reliable, and usable format.  JA5–6

---

[7]  The Commission's reasoning is also borne out by empirical research finding that many companies choose to provide an explanation, rather than comply with regulatory objectives, when subject to measures that authorize both options.  *See*, *e.g.*, Virginia Harper Ho, *"Comply or Explain" and the Future of Nonfinancial Reporting*, 21 Lewis & Clark L. Rev. 317 app. A at 350–54 (2017) (reviewing empirical research and finding that, in several analogous regulatory regimes, a significant number of companies chose to explain rather than comply).

& n.72; JA305–307; JA638 ("current board diversity disclosures are insufficient and noncomparable"); JA652 ("investors have struggled to get uniform and transparent data").

Second, the Commission found that the "diverse collection of commenters who expressed interest in board diversity information . . . demonstrates the broad demand for this information." JA7. These commenters included "institutional investors, investment managers, listed companies, and individual investors, as well as . . . asset managers[] and business organizations." JA6–7 & nn.73–77, 91–92.

Third, the Commission found that the information disclosed under the rule would be useful to investors because the disclosures would "provide increased transparency" and "make it more efficient and less costly for investors to collect, use and compare information on board diversity," and because "a better understanding of why a company does not meet the proposed [diversity] objectives would contribute to investors' investment and voting decisions." JA2, 7–8.

This finding is substantiated by Nasdaq's explanation that the lack of reliable and usable board-demographic information creates barriers for investors and "information asymmetries between larger stakeholders,

who are able to collect [diversity] data directly from companies, and smaller investors, who must rely on incomplete public disclosures." JA210. Commenters agreed that the proposed disclosures would improve visibility into board diversity and provide investors with information that could be used to inform investment and proxy-voting decisions. *See* JA646–647; JA44; JA669; *see also* JA5–8 & nn. 73, 78, 80; JA205.

Commenters also indicated that companies' explanations for lack of board diversity would foster more informed investor analyses and conversations with companies on diversity issues. *See* JA670; JA640; JA663–664; JA5–8 & n. 73.

Based on this substantial evidence, the Commission concluded that the disclosure requirements would "provide investors with board-level diversity statistics and explanations for certain companies' approaches to board diversity, which would contribute to investors' investment and voting decisions, including decisions related to companies' board compositions." JA2–3, 7–8.

That is true regardless of investors' "differing views" regarding board diversity, the Commission explained. JA7. On one hand, "for investors who support board diversity, the proposed disclosures could

inform their decision on issues related to corporate governance . . . and company explanations as to why they do not meet the diversity objectives could better inform those investors as to the risks and costs of increased board diversity." JA8. On the other hand, "for investors who do not believe that having additional 'Diverse' directors would be beneficial for a company, the proposed disclosures could inform their decision to vote to preserve the existing board." JA8.

Petitioners do not seriously contest that substantial evidence supports these findings. Rather, they dispute whether the Board Diversity Rule's disclosures will further the purposes of, and are otherwise consistent with, the Exchange Act. As explained below, none of petitioners' statutory arguments can withstand scrutiny.

## B. The Commission reasonably applied the Exchange Act's requirements to the Board Diversity Rule.

The Commission reasonably found that the Board Diversity Rule is consistent with the Exchange Act because it is "designed," among other things, "to promote just and equitable principles of trade," "remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect investors and the public interest," and that the rule does not regulate matters

unrelated to the Exchange Act, impose unnecessary burdens on competition, or permit unfair discrimination. 15 U.S.C. §§ 78f(b)(5), (b)(8), 78s(b)(2)(C)(i); *see also* JA2–3. None of petitioners' arguments demonstrates that the Commission's statutory analysis was arbitrary and capricious.

### 1. Disclosure furthers core statutory purposes.

Facilitating the availability of information that investors say is relevant to their investment and proxy-voting decisions—but that is not widely and reliably available at present—furthers the core disclosure-related objectives of the Exchange Act.

**a.** As the Supreme Court has explained, the Exchange Act was passed for "the fundamental purpose of substituting a philosophy of full disclosure for the philosophy of *caveat emptor*." *Kokesh v. SEC*, 137 S. Ct. 1635, 1640 & n.1 (2017) (internal quotation marks and brackets omitted). The Board Diversity Rule furthers that purpose by requiring the disclosure of diversity information that "would contribute to investors' investment and voting decisions." JA7; *see also Business Roundtable v. SEC* ("*Business Roundtable I*"), 905 F.2d 406, 411 (D.C. Cir. 1990) ("In

1934 Congress acted on the premise that shareholder voting could work, so long as investors secured enough information").

In challenging the Commission's statutory finding, petitioners conflate a policy question—whether diversity improves corporate governance and company performance—with the legal question actually before the Court. The Commission reasonably concluded that a rule facilitating the disclosure of board-diversity information is "designed" to further the Exchange Act's objectives—regardless of the "mixed" evidence on diversity's impact, JA9–10—because investors have made clear that diversity information is relevant to their decision-making. JA7–8, 10.

Nothing in the Exchange Act requires the Commission to determine definitively that the disclosures at issue will improve corporate governance or company performance. The fact that there is "broad demand for this information" and that the proposed disclosures would therefore "contribute to investors' investment and voting decisions" is sufficient, standing alone, to establish that the Board Diversity Rule will further the Exchange Act's disclosure-related objectives. JA7–8, 10; *see also Domestic Sec., Inc. v. SEC*, 333 F.3d 239, 249 (D.C. Cir. 2003)

(holding that commenters' "expressions of interest" in using NASD's proposed quotation-display mechanism "support[ed] the SEC's" decision to approve the rule change).   As the Commission explained, the availability of additional information "contribute[s] to the maintenance of fair and orderly markets," which, in turn, promotes multiple statutory objectives set forth in the Exchange Act.  JA2.

There is no basis for second-guessing the Commission's determination that the Board Diversity Rule was "designed" to further the Exchange Act's core disclosure-related objectives.  *See* NCPPR Br. 39–42.  Nasdaq made clear that it was proposing the rule in response to investors' demands for diversity-related information, *see* JA198, 205, 209–211, and the Commission found that the rule would provide investors with that information, which would be used in investment and proxy-voting decisions.  *See* JA2–3, 5–7.

Nothing more is required for a rule to be "designed"—*i.e.*, to be "conceive[d] or execute[d]," *Webster's New International Dictionary* 708 (2d ed. 1934)—to "promote just and equitable principles of trade," "to remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect

investors and the public interest." 15 U.S.C. § 78f(b)(5). Because the rule is unambiguously "designed" to further those statutory purposes, NCPPR's lengthy challenge (at 42–45) to the doctrinal underpinnings of *Chevron* deference—which applies only if a statutory term is ambiguous—is irrelevant.

*Business Roundtable v. SEC* ("*Business Roundtable II*"), 647 F.3d 1144 (D.C. Cir. 2011), doesn't call the Commission's conclusion into question. *See* Alliance Br. 60; NCPPR Br. 38, 40. There, the D.C. Circuit invalidated a Commission rule that required companies to list shareholder-nominated board candidates in their proxy materials because the Commission failed to provide sufficient support for its finding that facilitating the election of shareholder-nominated directors "will improve board performance and increase shareholder value." *Business Roundtable II*, 647 F.3d at 1150. Here, by contrast, the Commission found that board-diversity disclosures would "enhance investors' ability to make informed investment and voting decisions"—not that diversity would improve board or company performance—and the record leaves no doubt that investors seek such disclosures. JA7.

Ultimately, the question before the Court is not whether it is prudent or wise for investors to consider the diversity information disclosed pursuant to the Board Diversity Rule, but whether it was arbitrary and capricious for the Commission to conclude that Nasdaq's rule facilitating the disclosure of that information in response to investors' demands is consistent with the Exchange Act.   15 U.S.C. § 78s(b)(2)(C)(i).  Petitioners cannot show arbitrariness or caprice in the Commission's finding that the rule will further the purposes of the Exchange Act.

**b.**    For the same reasons, the Commission reasonably concluded that the Board Diversity Rule doesn't regulate matters unrelated "to the purposes of [the Exchange Act] or the administration of the exchange." 15 U.S.C. § 78f(b)(5); *see also* JA15–16 & nn.202–03.  Since 2009, the Commission has required companies to provide a similar disclosure of whether and how their board nominating committees consider diversity in identifying director candidates, which underscores that diversity-related disclosures are germane to the Exchange Act's purposes. *See* 17 C.F.R. § 229.407(c)(2)(vi); *see also* JA2 (the rule "would augment existing Commission requirements").

Petitioners nevertheless argue that the Board Diversity Rule improperly regulates corporate-governance matters unrelated to the Exchange Act's purposes because the rule "favor[s] certain people" based on "their race, sex, or sexual orientation" and "there is not sufficient evidence to conclude that diversity . . . improves corporate governance." Alliance Br. 66; NCPPR Br. 46. As the Commission found, however, the rule is a disclosure requirement, not a race- or sex-based quota that "favor[s] certain people." Alliance Br. 66. The rule provides a disclosure option for companies that are unable to, or choose not to, meet the rule's diversity objectives and affords companies nearly boundless discretion in deciding how to explain their board composition. *See* JA12 (the rule "would not mandate any particular board composition for Nasdaq-listed companies"). This type of disclosure regime lies at the heart of the Exchange Act. *See Kokesh*, 137 S. Ct. at 1640 & n.1; *Business Roundtable I*, 905 F.2d at 411.

The D.C. Circuit's decision in *Business Roundtable I* provides no support for petitioners' position. *See* Alliance Br. 61, 63. There, the court held that the Commission's direct regulation of shareholder voting rights did not further the purposes of the Exchange Act and intruded on matters

of "corporate governance traditionally left to the states" because voting rights are "far beyond matters of disclosure." 905 F.2d at 408, 411–14. Here, by contrast, the Board Diversity Rule implements a "disclosure-based framework" that advances the core purposes of the Exchange Act. JA5.

Moreover, *Business Roundtable I* did not involve the Commission's approval of an exchange rule, but instead the Commission's imposition of its own rule addressing shareholders' voting rights. As the court explained, exchanges (unlike the Commission) could adopt not only "listing rules on . . . other corporate governance matters," but also the very type of rule that the Commission lacked authority to impose because exchange rules do not implicate the same concerns about the federalization of corporate governance. 905 F.2d at 414.

As a result, even if the Board Diversity Rule were viewed as affecting matters of corporate governance, as NCPPR and the *amici* States urge it should be, the rule still would "relate[] to the purposes" of the Exchange Act, 15 U.S.C. § 78f(b)(5), because *exchanges* have a long history of requiring listed companies to comply with various governance-related requirements. *See Business Roundtable I*, 905 F.2d at 409

(explaining that, for years, "the exchanges have routinely submitted changes in listing standards for approval," and "[m]any of the past proposals dealt with matters of internal corporate governance"); *see also* Corporate Governance *Amicus* Br. 9–15.

Petitioners' view of the Exchange Act's purposes and exchanges' proper role under the Act would eviscerate the well-settled understanding that exchanges play an essential self-regulatory role in both matters of disclosure and corporate governance. *See United States v. NASD, Inc.*, 422 U.S. 694, 719 (1975) ("consistent and longstanding interpretation by the agency charged with administration of the Act, while not controlling, is entitled to considerable weight").

### 2. There is no "materiality" test, but even if there were, it would be satisfied.

Petitioners contend that the Board Diversity Rule is inconsistent with the Exchange Act because the rule requires disclosure of information that is not "material" to investors. Alliance Br. 60; NCPPR Br. 45. Nothing in the plain language of the Exchange Act, however, limits Nasdaq to adopting rules requiring the disclosure of "material" information. *See* 15 U.S.C. § 78f(b)(5), (b)(8). The Exchange Act requires only that an exchange's disclosure rules be designed to further various

statutory objectives—such as to "remove impediments to and perfect the mechanism of a free and open market"—which is a standard that the Commission found the Board Diversity Rule meets. 15 U.S.C. § 78f(b)(5); *see also* JA2, 7.

The cases cited by petitioners in support of their materiality requirement are inapposite, as they arise in fraud-related settings. *See, e.g.*, *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 445–47 (1976) (misrepresentations in proxy statements); *Basic Inc. v. Levinson*, 485 U.S. 224, 226 (1988) (same in the purchase or sale of a security); *R&W Tech. Servs. Ltd. v. CFTC*, 205 F.3d 165, 169 (5th Cir. 2000) (fraud under the Commodities and Exchange Act).

The requirement that plaintiffs advancing fraud claims prove the materiality of a company's misrepresentations or omissions has no bearing on the authority of an exchange to establish its own disclosure requirements for listed companies. Indeed, "[e]xchanges have historically adopted listing rules that require disclosures in addition to those required by Commission rules." JA15 & nn.191, 202; *see also* 81 Fed. Reg. 44,400, 44,403 (July 7, 2016) ("[I]t is within the purview of a national securities exchange to impose heightened governance

requirements, consistent with the Act, that are designed to improve transparency.").

Even if a materiality requirement did apply here, the Board Diversity Rule would satisfy it. To be material, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic*, 485 U.S. at 231–32. Substantial evidence supports the Commission's factual findings that there was "broad demand" from a "diverse collection of commenters," including "institutional investors, investment managers, listed companies, and . . . asset managers," for "board diversity information," and that "the proposed disclosures would contribute to investors' investment and voting decisions." JA6–8 ("many commenters believe that the proposed board diversity disclosures would be material to investors"). The Commission's reasoning necessarily means that reasonable investors likely would view such information as significantly altering the mix of available information about a company.

NCPPR has no basis for its speculation (at 47) that diversity information is immaterial because only "bigoted individuals"—not

"reasonable investor[s]"—would base investment decisions on board diversity. Among the commenters supporting the Diversity Rules were a number of large asset managers and institutional investment firms, all of which are focused on maximizing investment return for themselves and their clients. *See* JA7 nn.91–92. The existence of multiple empirical analyses finding that diversity improves company performance—even if those studies do not represent an uncontested consensus view— underscores the legitimate, investment-related reasons that these sophisticated market participants, as well as other investors, would seek access to standardized diversity information. *See* JA9 & nn.119–20; *see also United States v. Litvak*, 889 F.3d 56, 65 (2d Cir. 2018) ("materiality" turns on "the mainstream thinking of investors").

In fact, that investor interest has already prompted a number of companies voluntarily to disclose at least some demographic information. *See* Steve Seeling & Lindsay Green, *Initial 10-K Disclosures Provide Limited Data on Human Capital Metrics*, Willis Towers Watson (Jan. 28, 2021), https://tinyurl.com/bdw3cetk (initial analysis showing that 38 percent of companies voluntarily included their workforce's race and ethnicity representations and 44 percent included gender representations

in their Human Capital Management disclosures in their 10-K). And even if some investors remain uncertain (or unpersuaded) about the impact of board diversity on corporate performance, they might nevertheless seek diversity-related information to improve their ability to assess its impact. *See* JA6 & n.76.[8]

Nor is there a basis to limit materiality in this context to "'quantitative considerations' like profit, loss, and revenue." Alliance Br. 60–61. As the case cited by the Alliance makes clear, "both quantitative and qualitative factors should be considered in assessing a statement's materiality," *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197–98 (2d Cir. 2009), which is consistent with the Commission's prior approval of non-quantitative disclosures. *See*,

---

[8] Moreover, petitioners' conception of a "bigoted" investor using the Board Diversity Rule's disclosures to vote against certain board candidates is entirely fanciful because investors who are dissatisfied with a company's failure to meet the rule's diversity objectives are likely to take that information into account by voting against the company's nominating committee—which is responsible for identifying and nominating board candidates—rather than by voting against individual board members, whose diversity characteristics are not required to be disclosed on an individualized basis under the rule. *See* Investors & Investment Advisers *Amicus* Br. 6, 9, 15–21 (citing statements of institutional investors and investment advisers, collectively managing $18.3 trillion, that use their votes in this manner).

*e.g.*, Nasdaq Rule 5605(b)(1) (Commission-approved rule requiring disclosure of whether board members are "independent"). Under any accepted definition of the term, then, the disclosures mandated by the Board Diversity Rule are material.

### 3.    The record reflects thorough, independent review.

The Commission's comprehensive order confirms that it engaged in an extensive, independent analysis when approving the Board Diversity Rule. Nonetheless, relying on *Susquehanna International Group v. SEC*, 866 F.3d 442 (D.C. Cir. 2017), NCPPR questions (at 41–42) whether the Commission undertook "an independent review." It did.

In *Susquehanna*, the court concluded that the Commission approved a clearing agency rule without independently finding that the rule was consistent with the Exchange Act—indeed, the Commission "candidly admit[ted] that it simply 'rel[ied] on the [clearing agency]'s analysis.'" 866 F.3d at 447 (second alteration in original). Here, in contrast, the Commission's order reflects thorough, independent analysis based on substantial record evidence submitted by Nasdaq and third-party commenters—including articles and research that Nasdaq didn't cite in its own filings. *See* JA9 n.123–25, 127.

Far from rubber-stamping Nasdaq's submission, the Commission found that there was insufficient evidence conclusively to support one of Nasdaq's rationales for the Board Diversity Rule—that diversity facilitates good corporate governance and company performance. JA9–10. Instead, the Commission approved the rule based on the disclosure-related rationale that the measure would provide investors with sought-after diversity-related information. JA7–8. Thus, to the extent that *Susquehanna*'s "independent review" requirement applies here, the Commission met that standard.

### 4. The Commission reasonably assessed other requirements.

The Alliance's cursory arguments (at 64–67) that the Board Diversity Rule permits unfair discrimination between domestic and foreign issuers, and burdens competition, are similarly unavailing.

As to unfair discrimination, the Commission reasonably found that it is appropriate for foreign companies' diversity disclosures to be different from those of U.S. companies both because of the unique demographic composition of the United States and because the information from foreign companies may still have value in informing

investing and voting decisions, despite some variation in the demographics disclosed. JA12 & n.153.

The Alliance's conclusory argument that Nasdaq should have imposed "more stringent" disclosure requirements on foreign issuers as compared to U.S. issuers, Alliance Br. 65, would result in unfair discrimination against foreign issuers. Nor does the Alliance's argument establish that it was unreasonable for Nasdaq to provide more flexibility for foreign issuers given the demographic differences among the countries in which those issuers are based (and between those countries and the United States). JA323–324, 336–337.

As to burdening competition, the Alliance cites no authority for its argument (at 66–67) that Section 6(b)(8) of the Exchange Act requires the Commission to conduct a formal cost-benefit analysis of an exchange's proposed rules. And for good reason—there is none.

Nor does the Alliance identify any burden on competition imposed by the Board Diversity Rule. To the contrary, the Commission reasonably concluded that the rule promotes competition among exchanges by allowing Nasdaq to compete for the listings of companies supportive of disclosing board-diversity information. JA14–15.

\*     \*     \*

Petitioners' complaints about the policy choices animating the Board Diversity Rule have no bearing on whether the Commission properly approved the rule. Because the Commission based its approval on findings supported by substantial evidence, and reasonably applied the Exchange Act, there is no basis for this Court to disturb the order.

## C. The Commission properly approved the Board Recruiting Service Rule.

The Commission based its approval of the Board Recruiting Service Rule on findings supported by substantial evidence, including that the complimentary service (1) alleviates any costs of meeting the diversity objectives of the Board Diversity Rule—should a company elect to do so rather than to offer an explanation—by helping identify and evaluate diverse board candidates, and (2) will help Nasdaq compete to attract and retain listings. JA21.

Although the Board Recruiting Service Rule doesn't require or proscribe any conduct, Nasdaq submitted the rule to the Commission for approval nonetheless because exchanges must do so when offering financial services to listed companies. *See* 17 C.F.R. § 240.19b-4(c).

Nasdaq's proposal was in keeping with many similar exchange filings. As the Commission has explained, exchanges commonly provide complimentary products and services in "responding to competitive pressures in the market for listings." JA5; *see*, *e.g.*, 85 Fed. Reg. 84,434, 84,435 (Dec. 28, 2020) (approving a rule providing complimentary services to certain companies that switch their listings).

NCPPR offers (at 50–51) a laundry list of rhetorical questions that the Board Recruiting Service Rule purportedly raises and complains that the Commission "answered none" of them. But the answers to a number of the questions—*e.g.*, "will Nasdaq hire an outside company to compile the list"—are provided by the rule itself or are otherwise in the record.

In particular, Nasdaq explained it will offer complimentary access to a third-party board recruiting service, Equilar, for companies that do not meet the Board Diversity Rule's objectives and wish to take advantage of the service. Nasdaq will not generate any revenue from the service, will offer this service at Nasdaq's own expense, and will not develop its own list of board candidates. JA217–218. In addition, listed companies are free to draw on candidates from any source, not just Equilar.

In any event, none of the questions posed by NCPPR addresses an "important aspect of the problem" that was before the Commission, *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)—whether the Board Recruiting Service Rule comports with the Exchange Act. The Commission reasonably answered that question in the affirmative, and NCPPR does not even attempt to explain why the questions it poses are important or why any aspect of the Commission's reasoning was arbitrary and capricious.

*    *    *

Petitioners' principal challenge—that Nasdaq's rules are unconstitutional—fails because Nasdaq's voluntary adoption of rules governing its private contractual relationships isn't state action, which is a prerequisite for constitutional scrutiny. Petitioners' statutory challenges fare no better. Their quota argument can't alter the substantial evidence supporting the Commission's conclusion to the contrary. Nor can their policy disagreements about the merits of boardroom diversity alter the propriety of the Commission's conclusion that the rules are consistent with the Exchange Act. The petitions should be denied.

## CONCLUSION

The Court should deny the petitions for review.

Dated: February 25, 2022

Respectfully submitted,

/s/ *Allyson N. Ho*

John Zecca
Jeffrey S. Davis
John Yetter
Joanne Pedone
THE NASDAQ STOCK MARKET LLC
805 King Farm Boulevard
Rockville, Maryland 20850

Stephen J. Kastenberg
Paul Lantieri III
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, Pennsylvania 19103

Seth D. Berlin
BALLARD SPAHR LLP
1909 K Street, N.W., 12th Floor
Washington, D.C. 20006

Allyson N. Ho
Bradley G. Hubbard
Paulette C. Miniter
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201
Telephone: (214) 698-3100
Facsimile: (214) 571-2971
*aho@gibsondunn.com*
*bhubbard@gibsondunn.com*
*pminiter@gibsondunn.com*

Amir C. Tayrani
Amalia E. Reiss
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036

*Counsel for Intervenor*
*The Nasdaq Stock Market LLC*

## CERTIFICATE OF SERVICE

I certify that, on February 25, 2022, a true and correct copy of the foregoing brief was served via the Court's CM/ECF system on all counsel of record.

 /s/ Allyson N. Ho
Allyson N. Ho

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the typeface requirements of Rule 32(a)(5) and the typestyle requirements of Rule 32(a)(6) because this brief was prepared in 14-point New Century Schoolbook, a proportionally spaced typeface, using Microsoft Word 2019. This brief complies with the type-volume limitation of Rule 32(a)(7)(B) because it contains 12,968 words, excluding the parts exempted under Rule 32(f).

 /s/ Allyson N. Ho
Allyson N. Ho