# No. 21-60626

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

ALLIANCE FOR FAIR BOARD RECRUITMENT,
NATIONAL CENTER FOR PUBLIC POLICY RESEARCH,

*Petitioners,*

v.

SECURITIES & EXCHANGE COMMISSION,

*Respondent.*

On Petition for Review of an Order of the
Securities & Exchange Commission, No. 34-92590

## REPLY BRIEF WITH SUPPORTING DECLARATION
## FOR PETITIONER
## NATIONAL CENTER FOR PUBLIC POLICY RESEARCH

Margaret A. Little
Senior Litigation Counsel
Sheng Li
Litigation Counsel
New Civil Liberties Alliance
1225 19th St. NW, Suite 450
Washington, DC 20036
Telephone: 202-869-5210

*Attorneys for National Center
for Public Policy Research*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1. Petitioner National Center for Public Policy Research is a non-profit corporation and has no parent corporations or subsidiaries.

2. Margaret A. Little and Sheng Li of The New Civil Liberties Alliance—*Counsel* for Petitioner National Center for Public Policy Research.

3. Petitioner Alliance for Fair Board Recruitment is a non-profit membership corporation and has no parent corporations or subsidiaries.

4. C. Boyden Gray, Jonathan Berry, R. Trent McCotter, Michael Buschbacher, and Jared M. Kelson of Boyden Gray & Associates—*Counsel* for Petitioner Alliance for Fair Board Recruitment.

5. The Securities and Exchange Commission is a federal agency.

6. Michael A. Conley, Daniel E. Matro, Vanessa Ann Countryman, Tracy A. Hardin, and Dan M. Berkovitz of the Securities and Exchange Commission—*Counsel* for Respondent Securities and Exchange Commission.

7. Allyson N. Ho, Bradley G. Hubbard, Amir C. Tayrani, Paulette C. Minter, and Amalia E. Reiss of Gibson, Dunn & Crutcher LLP; John Zecca, Jeffrey S. Davis, John Yetter, and Joanne Pedone of The Nasdaq Stock Market L.L.C.;

and Burt M. Rublin, Stephen J. Kastenberg, Paul Lantieri III, Peter F. Andrews, and Seth D. Berlin of Ballard Spahr LLP—*Counsel* for Intervenor Nasdaq Stock Market, L.L.C.

/s/ *Margaret A. Little*
Counsel of Record for Petitioner

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ............................................................. i

TABLE OF CONTENTS ............................................................. iii

TABLE OF AUTHORITIES ............................................................. iv

SUMMARY OF THE ARGUMENT ............................................................. 1

ARGUMENT ............................................................. 2

    I.   SEC'S STANDING ARGUMENTS ARE MERITLESS ............................................................. 2

    II.  THE BOARD DIVERSITY RULES ARE SUBJECT TO CONSTITUTIONAL LIMITS ....... 5

        A.    Constitutional Limits Apply to Nasdaq's Exercise of Governmental Powers to Perform Regulatory Functions ............................................................. 5

        B.    SEC Approval of Nasdaq's Board Diversity Rules Is State Action Subject to Constitutional Scrutiny ............................................................. 10

    III. THE BOARD DIVERSITY RULES COMPEL SPEECH IN VIOLATION OF THE FIRST AMENDMENT ............................................................. 16

    IV. THE EXCHANGE ACT DOES NOT AUTHORIZE SEC TO APPROVE THE BOARD DIVERSITY RULES ............................................................. 18

    V.  SEC APPROVED THE BOARD DIVERSITY RULES WITHOUT CRITICAL REVIEW . 24

CONCLUSION ............................................................. 26

CERTIFICATE OF SERVICE ............................................................. 27

CERTIFICATE OF COMPLIANCE ............................................................. 28

CERTIFICATE OF ELECTRONIC COMPLIANCE ............................................................. 28

# TABLE OF AUTHORITIES

CASES

*Alabama Ass'n of Realtors v. HHS*, 141 S. Ct. 2485 (2021) .................................... 24

*Am. Libr. Ass'n v. FCC*, 401 F.3d 489 (D.C. Cir. 2005) ...................................... 4

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40 (1999) ................................... 11

*Austin Mun. Sec., Inc. v. NASD*, 757 F.2d 676 (5th Cir. 1985) ........................... 5

*Barbara v. NYSE*, 99 F.3d 49 (2d Cir. 1996)......................................................... 6

*Barnes v. Lehman*, 861 F.2d 1383 (5th Cir. 1988) .............................................. 11

*Blount v. SEC*, 61 F.3d 938, 941 (D.C. Cir. 1995) ............................................... 8

*Boeta v. FAA*, 831 F.3d 636 (5th Cir. 2016)....................................................... 25

*Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288 (2001) ............... 13

*Camreta v. Greene*, 563 U.S. 692 (2011)............................................................ 15

*Chevron USA, Inc. v. NRDC*, 467 U.S. 837 (1984)............................................. 19

*Cochran v. SEC*, 20 F.4th 194 (5th Cir. 2021) ................................................... 20

*Corrosion Proof Fitting v. EPA*, 947 F.2d 1201 (5th Cir. 1991) ........................... 4

*D'Alessio v. NYSE*, 258 F.3d 93 (2d Cir. 2001) ................................................. 6

*Delaware Dep't of Nat. Res. & Env't Control v. EPA*, 785 F.3d 1 (D.C. Cir. 2015) ........ 3, 5

*Dep't of Transp. v. Ass'n of Am. Railroads*, 575 U.S. 43 (2015)........................... 10

*Department of Commerce v. New York*, 139 S. Ct. 2551 (2019)........................... 18

*DL Capital Group, LLC v. NASDAQ Stock Mrkt. Inc.*, 409 F.3d 93 (2d Cir. 2005)........ 5

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000)...................... 20

*Gutierrez-Brizuela v. Lynch,* 834 F.3d 1142 (10th Cir. 2016) ............................. 19

*Horne v. Coughlin*, 191 F.3d 244 (2d Cir. 1999) .................................................... 15

*Intercontinental Industries, Inc. v. American Stock Exchange*, 452 F.2d 935 (5th Cir. 1971) . 15

*Jones v. SEC*, 298 1 (1936) ....................................................................... 20

*La. Publ. Serv. Comm'n v. FCC*, 476 U.S. 355 (1986) ..................................... 20, 22

*Lebron v. National Railroad Passenger Corporation*, 513 U.S. 374 (1995) ........................... 6, 7

*Little Sisters of the Poor v. Pennsylvania*, 140 S. Ct. 2367 (2020) ........................... 3

*Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982) .................................................. 11

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ............................................................. 3

*Meland v. Weber*, 2 F.4th 838 (9th Cir. 2021) ........................................................... 2

*Nat'l Ass'n of Mfrs v. SEC*, 800 F.3d 518 (D.C. Cir. 2015) ................................... 17

*NFIB v. OSHA*, 142 S.Ct. 661 (2022) ..................................................................... 24

*Oregon Restaurant and Lodging Ass'n v. Perez*, 843 F.3d 355 (9th Cir. 2016) ..................... 22

*Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935) ................................. 23

*SEC v. Zandford*, 535 U.S. 813 (2002) .................................................................... 19

*Skinner v. Ry. Lab. Executives' Ass'n*, 489 U.S. 602 (1989) ................................... 13

*Sparta Surgical Corp. v. NASD*, 159 F.3d 1209 (9th Cir. 1998) ........................... 5

*Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381 (1940) ............................. 10

*Susquehanna Int'l Grp., LLP v. SEC*, 866 F.3d 442 (D.C. Cir. 2017) ..................... 12, 25

*Texas v. EEOC*, 933 F.3d 433 (5th Cir. 2019) ..................................................... 21

*The Nasdaq Stock Market, LLC and Nasdaq Execution Services, LLC*, Admin. Proceeding File No. 3-15339 (May 29, 2013) .................................................................... 8

*Town of Chester v. Laroe Estates Inc.*, 137 S. Ct. 1645 (2017) ........................... 3, 4

*United States v. Mead Corp.*, 533 U.S. 218 (2001) ................................................................. 20

*Village of Bensonville v. FAA*, 457 F.3d 52 (D.C. Cir. 2006) ............................................. 12

*XY Planning Network, LLC v. SEC*, 963 F.3d 244 (2d Cir. 2020)...................................... 3

*Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985)............................................ 17

**STATUTES**

15 U.S.C. § 78............................................................................................................ *passim*

**OTHER AUTHORITIES**

Laws, Sir John, *The Rule of Law: The Presumption of Liberty and Justice*, 22(4) JUDICIAL
     REVIEW 365 (2017) .......................................................................................... 22

Philip Hamburger, Chevron *Bias*, 84 Geo. Wash. L. Rev. 1187 (2016)......................... 19

## SUMMARY OF THE ARGUMENT

It is unacceptable—not to mention often illegal—to inquire about someone's race, gender self-identification, or preference in sexual partners when making hiring decisions because such information is private, irrelevant, and enables invidious discrimination. Yet the challenged Order, JA1 (Tab1), 86 Fed. Reg. 44,424 (Order), not only makes Nasdaq-listed companies ask these offensive questions when hiring directors but also forces those companies to publicly disclose answers.[1] What's worse, the Order imposes race, gender, and sexuality quotas that violate not only the law but common decency. Forcing a company to "explain the reasons why it does not have the applicable number of Diverse directors," JA3 (Tab1), *id.* at 44,426 n. 31, does not change the fact that the "applicable number" is a quota. Rather, mandatory explanation is compelled speech that only compounds the Order's constitutional vices.

Nasdaq's Board Diversity Rules are state action subject to constitutional scrutiny because Nasdaq is empowered through a federal statute to serve a federal regulatory purpose under the supervision of federal officials at SEC. Even if this were not so, SEC's Order approving the Rules transforms them into state action subject to First Amendment and Due Process requirements, which they utterly fail. SEC approval of

---

[1] Aggregate disclosure provides little privacy protection. Consider a company that made a prior disclosure of having one LGBTQ+ director. After a new director joins, the company discloses that it now has two LGBTQ+ directors. One need not be Sherlock Holmes to make deductions about the new director's private life.

race, gender, and sexuality quotas and mandatory disclosure of such demographic information further violates Congress's command that SEC ensure Nasdaq's rules "are not designed to … regulate … matters not related to the purposes of [the Exchange Act.]." 15 U.S.C. § 78f(b)(5). Finally, approval was arbitrary and capricious because SEC failed to critically review Nasdaq's justifications for the Rules.

## ARGUMENT

### I.   SEC'S STANDING ARGUMENTS ARE MERITLESS

National Center for Public Policy Research (NCPPR)'s standing is clear under *Meland v. Weber*, 2 F.4th 838 (9th Cir. 2021), because it "both holds stocks and exercises its voting rights in Nasdaq-listed companies." NCPPR Opening Br. 7 (citing *Meland*). SEC argues unconvincingly that NCPPR forfeited its standing argument by not elaborating further in its opening brief. SEC Br. 20-21. No elaboration was needed because *Meland* speaks for itself and is directly applicable: a shareholder has standing to challenge a regulation that "requires or encourages" the corporate board of any company in which he owns shares to meet demographic specifications. 2 F.4th at 849.

SEC tellingly does not dispute *Meland*'s reasoning or application and instead objects that NCPPR did not file an affidavit regarding its ownership of Nasdaq-listed companies. SEC Br. 20-21. But such affidavit was unnecessary because NCPPR's ownership of Nasdaq-listed companies is a matter of public record, and its comment already affirmed that "as active shareholders in numerous companies listed on the Nasdaq, we are concerned that the proposed rule may cause companies to … violate

their legal fiduciary obligations to their shareholders." JA659 (Tab22), NCPPR Comment (December 30, 2020). As such, "it was reasonable for [NCPPR] to believe that its standing was self-evident." *Delaware Dep't of Nat. Res. & Env't Control v. EPA*, 785 F.3d 1, 9 (D.C. Cir. 2015).

Where, as here, it is uncontested that Alliance for Fair Board Recruitment (AFBR), which seeks identical relief has standing, it is also unnecessary for this Court to address the independent standing of NCPPR. *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017) ("At least one plaintiff must have standing to seek each form of relief requested[.]"); *see also Massachusetts v. EPA*, 549 U.S. 497, 518 (2007) ("Only one of the petitioners needs to have standing to permit us to consider the petition for review."). Indeed, the Supreme Court held that an appellate court "erred by inquiring into [a party's] independent Article III standing" where its co-party "clearly has standing" and "both ask the court to dissolve the [same] injunction." *Little Sisters of the Poor v. Pennsylvania*, 140 S. Ct. 2367, 2379 n.6 (2020). The Second Circuit recently applied this one-party principle in circumstances identical to this case in *XY Planning Network, LLC v. SEC*, 963 F.3d 244, 253 (2d Cir. 2020). There, multiple petitions challenging the same SEC regulation were consolidated, and the court concluded that "because [a single petitioner] has standing, we have jurisdiction to proceed to the merits of the [multiple] petitions for review." *Id.* There is no dispute that NCPPR's co-petitioner, AFBR, has standing. As such, it would be error to inquire into NCPPR's independent standing. *Little Sisters of the Poor*, 140 S. Ct. at 2397 n.6.

SEC's reliance on *Corrosion Proof Fitting v. EPA*, 947 F.2d 1201, 1209-10 (5th Cir. 1991), for a contrary conclusion is misplaced because co-petitioners in that case sought different relief. Specifically, the foreign petitioners sought to require the EPA to consider the economic impact of asbestos regulations on foreign countries, which domestic petitioners did not seek. *Id.* ("Canadian petitioners believe that the EPA erred by not considering the effects of the ban on foreign countries and workers."). In contrast, NCPPR and AFBR seek identical relief: invalidating SEC's Order approving Nasdaq's Board Diversity Rules. They also raise the same issues. *Compare* AFBR Docketing Statement, Doc. 00515006712 (Sep. 8, 2021) *with* NCPPR Docketing Statement, 00516074373 (Oct. 29, 2021). Hence, the Court need not verify NCPPR's independent standing. *Town of Chester*, 137 S. Ct. at 1651.

Even if an independent standing inquiry were appropriate—it is not—petitioners are required to submit evidence to "explain the basis for their standing at the earliest appropriate stage" only "when they have good reason to know that their standing is not self-evident." *Am. Libr. Ass'n v. FCC*, 401 F.3d 489, 493 (D.C. Cir. 2005). "Nothing … suggests … a 'gotcha' trap whereby parties who reasonably think their standing is self-evident nonetheless may have their cases summarily dismissed if they fail to document fully their standing at the earliest possible stage in the litigation." *Id.* Because the Board Diversity Rules apply to virtually all Nasdaq-listed companies, NCPPR "had good reason to assume that at least one [Nasdaq-listed company in which it owns shares provides] an Article III injury with the implementation of the disputed rule." *Id.* at 492.

4

To the extent an affidavit is needed, "the court may allow petitioners to support their standing in their reply brief [and] in affidavits submitted along with the reply brief." *Id.; see also Delaware*, 785 F.3d at 9 ("we look beyond the opening brief to the reply brief to establish standing"). *See* NCPPR Declaration of Scott Shepard, Ex. A hereto.

## II.    THE BOARD DIVERSITY RULES ARE SUBJECT TO CONSTITUTIONAL LIMITS

### A. Constitutional Limits Apply to Nasdaq's Exercise of Governmental Powers to Perform Regulatory Functions

SEC and Nasdaq's assertion that "Nasdaq has never been, and is not a government entity," SEC Br. 39; *see also* Nasdaq Br. 29, is inconsistent with Nasdaq's (and its predecessor NASD's) repeated and successful claim that it is a government entity for the purpose of immunity doctrines. *DL Capital Group, LLC v. NASDAQ Stock Mrkt. Inc.*, 409 F.3d 93, 99 (2d Cir. 2005) ("Because Nasdaq here engaged in conduct consistent with the quasi-governmental powers delegated to it … , Nasdaq and its officers are entitled to absolute immunity from plaintiff's suit."); *Sparta Surgical Corp. v. NASD*, 159 F.3d 1209, 1214 (9th Cir. 1998)  ("NASD has immunity when acting in an adjudicatory, prosecutorial, arbitrative or regulatory capacity."); *Austin Mun. Sec., Inc. v. NASD*, 757 F.2d 676, 692 (5th Cir. 1985) ("NASD is entitled to absolute immunity for its role in disciplining its members and associates.").

This Court extends absolute immunity to self-regulatory organizations (SROs) such as Nasdaq because they "exercise[] quasi-governmental authority pursuant to a statutory scheme enacted by the national sovereign." *Id.* The Second Circuit emphasized

that "absolute immunity is particularly appropriate in the unique context of the self-regulation of the national securities exchanges. Under the Exchange Act, [Nasdaq] performs a variety of regulatory functions that would, in other circumstances, be performed by a government agency." *Barbara v. NYSE*, 99 F.3d 49, 59 (2d Cir. 1996). "[A]lthough the immunity inquiry in *Barbara* was confined to the NYSE's conduct in connection with disciplinary proceedings, *Barbara* stood for the broader proposition that a SRO, such as [Nasdaq], may be entitled to immunity from suit for [any] conduct falling within the scope of the SRO's regulatory and general oversight functions." *D'Alessio v. NYSE*, 258 F.3d 93, 105 (2d Cir. 2001). Nasdaq cannot have it both ways: If it enjoys immunity as a government entity when performing "regulatory and general oversight functions," the exercise of that regulatory authority must be subject to the same constitutional constraints that apply to a government entity. Otherwise, government power could evade constitutional bounds by being laundered through a nominally private entity. *See Lebron v. National Railroad Passenger Corporation*, 513 U.S. 374, 398 (1995).

*Lebron* held that Amtrak, while nominally private, was a government entity for the purpose of constitutional constraints on its conduct because it was "established and organized under federal law for the very purpose of pursuing federal governmental objectives, under the direction and control of federal government appointees." *Id.* SEC's and Nasdaq's attempt to distinguish *Lebron* on the basis that Nasdaq was not created *by* a federal statute, *see* SEC Br. 40; Nasdaq Br. 29-30, fails because Nasdaq was

nonetheless created *through* a federal statute to serve a federal purpose. Specifically, "an organization may not become a registered securities association unless its by-laws and rules conform to the Exchange Act," *Austin*, 757 F.2d at 680, which includes being required to "enforce compliance … with the provisions of [the Exchange Act], the rules and regulations thereunder, and the rules of the exchange," and being forbidden from "regulat[ing] … matters not related to the purposes of [the Exchange Act]." 15 U.S.C. § 78f(b)(1), (5).

Nor does it matter that Nasdaq's "board members are not government appointees" like Amtrak's, Nasdaq Br. 30, because SEC Commissioners controls Nasdaq's regulatory functions in other, equally effective ways. SEC has power to reject, revise, or abrogate any Nasdaq rule; directly enforce any Nasdaq rule or punish Nasdaq for not enforcing a rule; overturn or modify any Nasdaq enforcement decision; remove Nasdaq officers; and enjoin any Nasdaq activity. *See* 15 U.S.C. § 78s. As this Court recognized in *Austin*, 757 F.2d at 680, "Congress delegated power to [Nasdaq] to enforce … the legal requirements laid down in the Exchange Act," and "granted the SEC broad supervisory responsibilities over" its exercise of "Congressionally-mandated power." Because Nasdaq exercises government-delegated, government-serving, and government-supervised regulatory powers—and claims immunity as a government entity while doing so—it must be treated as a government entity subject to constitutional restrictions. *Lebron*, 513 U.S. at 398.

SEC concedes that national securities exchanges like Nasdaq play a "quasi-governmental role as regulators," SEC Br. 2, but insists "exchanges do not perform a quasi-governmental function when they propose or enforce listing standards," which SEC contends instead "arise from 'contractual agreement,'" *id.* at 9. But an SRO's rule "operates not as a private compact among [market participants] but as federal law" because companies must comply to participate in the securities market.[2] *Blount v. SEC,* 61 F.3d 938, 941 (D.C. Cir. 1995) (holding SRO's rule "constitutes government action of the purest sort"). Moreover, private contracts require mutual consent supported by consideration, and cannot be unilaterally imposed by one party (Nasdaq with SEC approval) on others (listed companies). Nor are private contracts published in the federal register for public comment, as is required for listing rules. Rather, notice-and-comment is reserved for federal regulations that are subject to constitutional limits. Next, private contracts can be modified or voided by the parties. Not so with listing rules—the SEC must approval any changes to rules based on its independent review after formal notice-and-comment. Whereas private contracts are enforced at the discretion of the contracting parties, Nasdaq *must* enforce its listing rule or else face punishment. 15 U.S.C. §§ 78s(e), (f), (g), (h); *In re The Nasdaq Stock Market, LLC and Nasdaq Execution Services, LLC,* Admin. Proceeding File No. 3-15339 (May 29, 2013)

---

[2] It matters not that companies may theoretically list on other exchanges such as NYSE, *see* SEC Br. 8, because SEC's logic would enable other exchanges to enact the same unconstitutional listing rules.

(imposing sanctions on Nasdaq for failing to enforce its own rules in connection with Facebook's IPO).

Finally, and perhaps most salient, SEC may directly enforce Nasdaq's listing rules. "Whenever it shall appear to the Commission that any person is engaged or is about to engage in acts or practices constituting a violation of any provision of … *the rules of a national securities exchange* … it may in its discretion bring an [enforcement] action in the proper district court[.]" 15 U.S.C. § 78u(d)(1) (emphasis added). Obviously, federal regulators are not roving enforcers of private contractual terms. What they do enforce are federal regulations, which are subject to constitutional scrutiny.

SEC's contention that the Board Diversity Rules are mere private contracts is contradicted by its own Order, which argued that the Rules are not "designed to regulate by virtue of any authority conferred by the [Exchange] Act matters not related to the purposes of the Act." JA2 (Tab1), 86 Fed. Reg. 44,425 (citing 15 U.S.C. § 78f(b)(5)); *see also* JA15 (Tab1), *id.* at 44,438. If SEC truly believed the Rules were private contracts unrelated to "authority conferred by the [Exchange] Act," it would have said so. The Order's attempt to explain—unsuccessfully—why the Rules fell within "authority conferred" by the Exchange Act reveals SEC's then-honest belief that the Rules invoked such governmental powers.

The inescapable conclusion is that the Board Diversity Rules are not private contractual agreements but rather regulations that underwent two rounds of notice and comment and are directly enforceable by SEC. The promulgation and enforcement of

9

such rules indisputably fall within Nasdaq's quasi-governmental "regulatory functions" and are thus subject to constitutional constraints.

### B. SEC Approval of Nasdaq's Board Diversity Rules Is State Action Subject to Constitutional Scrutiny

SEC and Nasdaq rely on *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381 (1940), cited at SEC Br. 41 and Nasdaq Br. 45 n.6 to rebut NCPPR's argument that the private nondelegation doctrine would be violated if Nasdaq were not a government entity. *See* NCPPR Opening Br. 18 (citing *Dep't of Transp. v. Ass'n of Am. Railroads*, 575 U.S. 43, 55 (2015)). But *Adkins* actually proves that Nasdaq rules are subject to constitutional scrutiny.

*Adkins* concerned a statute that permitted a private entity to propose price regulations that would not take effect until approved by a supervising federal agency. 310 U.S. at 388. The Supreme Court held that the private nondelegation doctrine was not offended because the enactment of a regulation is attributed to the approving federal agency rather than the private entity. *Id.* at 399 ("The members of the [private entity] function subordinately to the Commission. It, not the [private] authorities, determines the prices."). If Nasdaq were a private entity—as it and SEC insist—then under *Adkins*, Nasdaq's exercise of regulatory power would be constitutional only if the resulting rule were attributed to SEC, the government agency that ultimately approves the rule. *Id.* If not attributed to SEC, then Nasdaq itself must be a government entity. *See Ass'n of Am. Railroads*, 575 U.S. at 55. Either way, constitutional scrutiny applies.

SEC's contention that "[t]he 'mere fact' that Nasdaq is subject to Commission regulation 'does not by itself convert its action into that of the State,'" SEC Br. 42 (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 52 (1999)), ignores that SEC supervision over Nasdaq extends far beyond private business decisions into the exercise of governmental regulatory powers. In *Sullivan*, the Supreme Court held that an insurance company's decision to withhold payment was not state action because it "turn[ed] on … judgments made by private parties" and involved no "standards … established by the State." 526 U.S. at 52. That decision is clearly inapposite because approval of the Board Diversity Rules turned on SEC's judgments based on standards established by the Exchange Act. *See* JA1 (Tab1), 86 Fed. Reg. 44,424.

Nasdaq's reliance on *Barnes v. Lehman*, 861 F.2d 1383, 1387 (5th Cir. 1988), cited at Nasdaq Br. 37 to make the same argument, is likewise misguided. The *Barnes* plaintiff invoked the "joint participation" doctrine under *Lugar v. Edmondson Oil* Co., 457 U.S. 922 (1982), to argue that a private insurer's decision to terminate his worker-compensation benefits in accordance with state-law procedures was state action. *Barnes*, 861 F.2d at 1386. This Court distinguished *Barnes* from *Lugar* by emphasizing the "total absence of overt official involvement" in the insurer's benefits-termination decision and held that "[p]rocedural regulations simply do not suffice to establish the degree of joint participation required to convert private action into state action." *Id.* Here, SEC's "overtly official involvement" in approving the Rules extends far beyond "procedural regulations." Again, SEC was required to independently analyze and approve the

11

substance of the Rules as being appropriate under the authority conferred upon Nasdaq by the Exchange Act. *Susquehanna Int'l Grp., LLP v. SEC*, 866 F.3d 442, 447 (D.C. Cir. 2017). That is textbook joint participation. *See Lugar*, 457 U.S. at 941 ("[A] private party's joint participation with state officials … is sufficient to characterize that party as a 'state actor' for purposes of [constitutional rights].").

SEC and Nasdaq's reliance on *Village of Bensonville v. FAA*, 457 F.3d 52 (D.C. Cir. 2006), cited at SEC Br. 43 and Nasdaq Br. 38-39, fares no better. In that case, FAA's approval under the National Environmental Policy Act (NEPA) of a city's airport expansion plan was deemed insufficient to attribute the plan to the federal government. *Id.* at 57. That holding, however, was based on FAA's extremely narrow involvement: "Now that the FAA has approved the [plan under NEPA], the FAA has no authority to demand that the City build the projects described therein." *Id.* at 65. In contrast, SEC's involvement in Nasdaq's rulemaking does not end with approval. "SEC must approve all [Nasdaq] rules, policies, practices, and interpretations prior to their implementation. … In addition, SEC may abrogate or add such rules as it deems necessary," *Austin*, 757 F.2d at 680 (citations omitted), punish Nasdaq for not following its own rules, and even *sua sponte* enforce Nasdaq's rules in federal court. 15 U.S.C. §§ 78f, 78u(d)(1).

Ultimately, none of SEC's or Nasdaq's authorities address the situation where a government agency supervises a nominally private entity's exercise of government power. The Supreme Court has "treated a nominally private entity as a state actor when

12

it is controlled by an 'agency of the State,' when it has been delegated a public function by the State, when it is 'entwined with governmental policies,' or when government is 'entwined in [its] management or control.'" *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001) (collecting cases). All these avenues to state action are present here because "Congress delegated power to [SROs] to enforce, at their own initiative … the legal requirements laid down in the Exchange Act. … To prevent the misuse of this Congressionally-mandated power, Congress granted the SEC broad supervisory responsibilities over these self-regulatory organizations." *Austin*, 757 F.2d at 680.

While SEC's tight control over Nasdaq's "Congressionally-mandated power" by itself establishes state action, evidence for state action is strengthened further because SEC explicitly encouraged Nasdaq to promulgate the Board Diversity Rules. As Nasdaq concedes, governmental "encouragement, either overt or covert," transforms private action into state action whenever the government "ma[kes] plain not only its strong preference for [the act], but also its desire to share the fruits of such [act]." Nasdaq Br. 35-36 (quoting *Blum*, 457 U.S. at 1004, and *Skinner v. Ry. Lab. Executives' Ass'n*, 489 U.S. 602, 615 (1989)).

On August 26, 2020, Commissioner Lee criticized SEC's modernization of Regulation S-K for ignoring "commenters on this rule proposal [who] emphasized the need for specific diversity disclosure requirements." Commissioner Lee, *Regulation S-K*

*and ESG Disclosures: An Unsustainable Silence*, Aug. 26, 2020.[3] Commissioner Crenshaw

likewise criticized the "the final [S-K] rule [for being] silent on diversity, an issue that is

extremely important to investors and to the national conversation. The failure to

grapple with these issues is, quite simply, a failure to modernize." Commissioner

Crenshaw, *Statement on the "Modernization" of Regulation S-K Items 101, 103, and 105*, Aug.

26, 2020.[4] Nasdaq explicitly relied on Commissioners Lee's and Crenshaw's statements

to explain why it proposed the Board Diversity Rules. JA689 (Tab28) 85 Fed. Reg.

80,472 ("Nasdaq has also observed recent calls from SEC commissioners") (citing

Commissioners Lee's and Crenshaw's statements favoring diversity disclosure at

footnote 7); *see also* JA692 (Tab28), *id.* at 80,475 ("In the words of SEC Commissioner

Allison Herren Lee: 'to the extent one seeks economic support for diversity and

inclusion [on corporate boards] …, the evidence is in.'"). Nasdaq's assertion that it

"adopted the rules at issue on its own initiative—without *any* … [SEC] encouragement

or entanglement" is thus demonstrably false. Nasdaq Br. 28 (emphasis added); *see also*

*id.* 36. Nasdaq's motivation to implement its SEC supervisors' policy preferences merely

confirms the already undeniable reality that the Rules are attributable to SEC for the

purpose of constitutional review.

---

[3] Available at: https://www.sec.gov/news/public-statement/lee-regulation-s-k-2020-08-26 (last visited Apr. 1, 2022).

[4] Available at: https://www.sec.gov/news/public-statement/crenshaw-statement-modernization-regulation-s-k (last visited Apr. 1, 2022).

Binding Fifth Circuit precedent under *Intercontinental Industries, Inc. v. American Stock Exchange*, 452 F.2d 935, 941 (5th Cir. 1971), also holds that an SRO's regulatory action—there a delisting proceeding—must respect constitutional due process. Nasdaq and SEC contend *Intercontinental*'s conclusion that plaintiff received all the process it was due, *id.* at 942-43, relegates to dictum the Court's conclusion that due process was required in the first place. SEC Br. 48-49; Nasdaq Br. 41-42. Not so. This exact reasoning was rejected in the context of qualified immunity, which considers (1) whether an allegedly violated constitutional right exists; and (2) whether that right was clearly established.

The Second Circuit, for example, mistakenly believed "where there is qualified immunity [based on a right not being clearly established], a court's assertion that a constitutional right exists would be pure dictum." *Horne v. Coughlin*, 191 F.3d 244, 247 (2d Cir. 1999). SEC and Nasdaq's argument mirrors *Horne*—they contend that because *Intercontinental* held the SRO did not violate constitutional due-process rights, the court's conclusion that such constitutional rights exist was dictum. SEC Br. 48-49; Nasdaq Br. 41-42. The Supreme Court, however, deemed *Horne*'s reasoning erroneous, explaining that "a constitutional ruling preparatory to a grant of [qualified] immunity creates law" and is "[n]o mere dictum." *Camreta v. Greene*, 563 U.S. 692, 708 (2011). *Intercontinental*'s conclusion that constitutional due process applies to an SRO's regulatory action is likewise "a constitutional ruling preparatory" to the subsequent finding that due process was satisfied. As such, it is "no mere dictum" but "creates law" this Court must follow.

15

For all these reasons, Nasdaq's Rules and the SEC's Order approving them are subject to constitutional restrictions, including individual rights secured by the First Amendment, the Fifth Amendment's Due Process Clause, and by the Constitution's separation-of-powers structure. *See Blount*, 61 F.3d at 941 (holding that SRO's rule was subject to challenge under First and Fifth Amendments).

## III.  THE BOARD DIVERSITY RULES COMPEL SPEECH IN VIOLATION OF THE FIRST AMENDMENT

SEC counterfactually describes Nasdaq's Rules as requiring mere "disclosure" subject to "lesser scrutiny." SEC Br. 50. But the Rules require more than disclosure—companies must admit and explain their failure to meet demographic quotas: "each Nasdaq-listed company … [must] have, *or explain why it does not have*, at least two members of its board of directors who are Diverse…." JA1 (Tab1), 86 Fed. Reg. 44,424 (emphasis added). SEC further argues that companies "are free to convey whatever position they wish on the value of board diversity, or no position at all." SEC Br. 53. But the Order makes clear some positions are unacceptable: "it is not enough 'merely to state that the Company does not comply with Nasdaq's diversity rule.'" JA3 (Tab1), 86 Fed. Reg. 44,426 n.31. Nasdaq's assertion that "it will not delist companies that do not meet these objectives as long as they provide some explanation," Nasdaq Br. 47, makes clear that delisting looms for those companies that refuse to explain or take "no position at all."

16

Additionally, any explanation must still admit to not satisfying Nasdaq's quotas. Forced admission of not meeting the government's moral objective, by itself, violates the First Amendment. *Nat'l Ass'n of Mfrs v. SEC*, 800 F.3d 518, 522 (D.C. Cir. 2015). In *NAM*, the D.C. Circuit held it was unconstitutional to force companies to admit not meeting SEC's "conflict free" minerals standard. *Id.* That requirement would not have been rendered somehow more constitutional if, as with the Board Diversity Rules, companies were also forced to explain themselves.

SEC's counterargument based on *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985) regarding "uncontroversial commercial speech" is misplaced for several reasons. First, "[T]he Supreme Court's opinion in *Zauderer* is confined to advertising, emphatically and, one may infer, intentionally" *NAM*, 800 F.3d at 522. As such, "*Zauderer* has no application to this case" about securities disclosures. *Id.* at 523. Furthermore, the compelled disclosure and explanation regarding race, gender, and sexuality is anything but "uncontroversial," as SEC argues. Nasdaq admits it proposed the Rules in 2020 precisely to address "*[c]ontroversies* arising from corporate culture," to which that year's "social justice movement has brought heightened attention[.]" JA689 (Tab28), 85 Fed. Reg. 80,472 (emphasis added). The Board Diversity Rules' controversial content is reinforced by the felt need for many objecting commenters to use pseudonyms, *see* NCPPR Br. 8-9, and for persons challenging the Rules to seal their identities to avoid cancellation, harassment, blacklisting, and boycotting. Sealing Order, Doc. 00516099897 (Nov. 18, 2021). This Court is not "required to exhibit a naiveté

from which ordinary citizens are free." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575-76 (2019).

SEC's characterization of this compelled speech as "speech relating to the purchase and sale of securities … subject only to limited First Amendment scrutiny" and thus "akin to … commercial speech" is absurd on its face. SEC Br. 51. Compelled disclosure and explanation of racial, gender, and sexuality is "in no way related to the services that [for-profit corporations] provide." *NIFLA v. Becerra*, 138 S. Ct. 2361, 2372 (2018). It is no more commercial speech than government-compelled disclosure of hair color or government-compelled explanation for the lack of redheads. Hair color at least is "factual and uncontroversial," but no one would argue that it follows that the government can compel its disclosure. The Rule's mandatory disclosures and explanations are both controversial *and* government-compelled, so the First Amendment precedents forbidding such compulsion cited at NCPPR's Opening Brief (at 21-24) apply with full force.

## IV. THE EXCHANGE ACT DOES NOT AUTHORIZE SEC TO APPROVE THE BOARD DIVERSITY RULES

Congress commanded SEC to ensure Nasdaq's rules "are not designed to … regulate by virtue of any authority conferred by [the Exchange Act] matters not related to the purposes of [the Act.]" 15 U.S.C. § 78f(b)(5). This case should be easy because race, gender, and sexuality of directors—or indeed any person—do not relate to purposes of the Exchange Act. JA31 (Tab5), Commissioner Peirce, *Statement on the*

18

*Commission's Order Approving Proposed Rule Changes, as Modified by Amendments No. 1, to Adopt Listing Rules Related to Board Diversity submitted by the Nasdaq Stock Market LLC* (Aug. 6, 2021). SEC and Nasdaq's counterarguments rest on an untenable interpretation that, if accepted, would give SEC unconstrained power to regulate whatever it wants. They contend the Exchange Act's scope encompasses any topic that some investors purport to believe is useful, even if SEC concludes such belief is irrational. The Court must reject this unconstitutional power grab and enforce Congress's clear mandate for SRO rules to stay within the purposes of the Exchange Act.

To start, the Court must reject SEC's claim for *Chevron* deference as to what matters relate to the purposes of the Exchange Act. *See* SEC Br. 17 (citing *SEC v. Zandford*, 535 U.S. 813, 819-20 (2002) and *Chevron USA, Inc. v. NRDC*, 467 U.S. 837, 842-45 (1984)). Deferring to an agency's interpretation of a statute over the Court's own reading violates Article III of the Constitution by "[t]ransferring the job of saying what the law is from the judiciary to the executive." *Gutierrez-Brizuela v. Lynch,* 834 F.3d 1142, 1152 (10th Cir. 2016) (Gorsuch, J. concurring), cited at NCPPR Br. 42. Doing so also constitutes "systematic bias in favor of the government" that deprives NCPPR and AFBR of due process. Philip Hamburger, Chevron *Bias*, 84 Geo. Wash. L. Rev. 1187, 1195 (2016), cited at NCPPR Br. 42.

To mitigate its constitutional defects, the Supreme Court limited *Chevron* to only instances where "the agency interpretation claiming deference was promulgated in the exercise of [congressionally delegated] authority." *United States v. Mead Corp.*, 533 U.S.

218, 227 (2001). As such, even courts that kowtow to agencies may do so only with respect to the "fruits of notice-and-comment rulemaking or formal adjudication." *Id.* SEC's approval of the Board Diversity Rules was not the product of a formal adjudication. Nor does any notice-and-comment regulation support SEC's interpretation of the Exchange Act. As such, SEC's contention that its "interpretation of an ambiguous federal securities statute controls," SEC Br. 17, is a non-starter.

Fundamentally, "an administrative agency's power to regulate … must always be grounded in a valid grant of authority from Congress." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161 (2000). SEC and Nasdaq's interpretation of the Exchange Act would violate the bedrock principle that "[a]n agency may not confer power upon itself." *La. Publ. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).

Six judges of this Court recently warned SEC that:

> If administrative agencies "are permitted gradually to extend their powers by encroachments—even petty encroachments—upon the fundamental right, privileges and immunities of the people … we shall in the end, while avoiding the fatal consequences of a supreme autocracy, become submerged by a multitude of minor invasions of personal rights, less destructive but no less violative of constitutional guaranties."

*Cochran v. SEC*, 20 F.4th 194, 222 (5th Cir. 2021) (en banc) (Oldham J., concurring) (quoting *Jones v. SEC*, 298 1, 56 (1936)). In direct contravention of this advice, SEC attempts to expand the scope of the Exchange Act to include race, gender, and sexuality. "Not only [i]s the Act silent" regarding regulatory authority over these personal characteristics, but the Court will be "unable to find any precedent for the

assumption of such power on the part of an administrative body." *Id.* Not even EEOC, the agency specifically tasked with enforcing federal antidiscrimination law, wields such power. *Texas v. EEOC*, 933 F.3d 433, 451 (5th Cir. 2019) ("the text of Title VII and precedent confirm that EEOC lacks authority to promulgate substantive rules").

Neither SEC nor Nasdaq attempts to argue that *Congress* delegated authority to SEC, or any SRO under its supervision, to regulate the demographic characteristics of corporate boards. To the contrary, Congress explicitly prohibited SEC from allowing SROs to "regulate … matters not related to the purposes of [the 1934 Exchange Act]," 15 U.S.C. § 78f(b)(5), and there is no historical record to support a claim that Congress intended in 1934 for race, gender, and sexuality to fall within the Act's purposes.

Because they cannot affirmatively show how race, gender, and sexuality fall under the Exchange Act, SEC and Nasdaq make contortionist double-negative assertions that the Diversity Rules are "not inconsistent with," SEC Br. 8-9, and "do[] not regulate matters unrelated to the Exchange Act," Nasdaq Br. 51-52. Such a view is akin to letting a dog play basketball simply because "ain't no rules says the dog can't play basketball." Air Bud (Charles Smith, 1997).[5] The Constitution, however, does not follow Air Bud rules and instead rejects the "radical idea that an agency can regulate whatever it wants until Congress says out loud that it must stop." *Oregon Restaurant and Lodging Ass'n v.*

---

[5] Relevant clip available at: https://www.youtube.com/watch?v=Jvf0WWxrYRM (last visited April 1, 2022).

*Perez*, 843 F.3d 355, 362 (9th Cir. 2016) (O'Scannlain, J., joined by nine other judges, dissenting from denial of rehearing en banc). Rather, SEC and SROs it supervises may regulate "unless and until Congress confers [such] power upon [them]." *La. Publ. Serv. Comm'n*, 476 U.S. at 374; *see also* Laws, Sir John, *The Rule of Law: The Presumption of Liberty and Justice*, 22(4) JUDICIAL REVIEW 365 (2017) (describing the driving principle behind English and American legal thought as: "For the individual citizen, everything which is not forbidden is allowed; but for public bodies, and notably government, everything which is not allowed is forbidden").

Nasdaq's argument that there is "no materiality test" for mandatory disclosures, Nasdaq Br. 59-61, also commits the fallacy identified by Judge O'Scannlian above. Congress need not insert the word "material" in a statute that constrains regulatory power. The very statement of the proposition exposes the fallacy, for if this "lack of the prohibitive word," or to quote Judge O'Scannlian, "Congress say[ing] out loud it must stop," were the rule, an agency could regulate activity that is immaterial to its mandate of power.

SEC's broad reading of agency power is foreclosed under both the non-delegation and major-questions doctrines. SEC and Nasdaq admit the purpose of the Rules is to satisfy a purported demand for using racial, gender, and sexuality information in investment decisions. SEC Br. 13, Nasdaq Br. 12-13, a demand that SEC itself concluded no reasonable mind could accept. JA9-10 (Tab1), 86 Fed. Reg 44,431-32 (rejecting Nasdaq's claim "that there is substantial evidence" showing a relationship

between corporate performance and diversity metrics); *see also* SEC Br. 18 (defining substantial evidence as "evidence as a reasonable mind might accept as adequate to support a conclusion") and *id.* at 31 (admitting "there was insufficient evidence … that board diversity improves corporate governance and performance").

Responding to NCPPR's non-delegation argument, SEC does not identify "even a fig leaf" of an "intelligible principle" in the Exchange Act that supposedly grants power to approve SRO rules based on irrational demands of unquantified investors. *Ass'n of Am. Railroads*, 575 U.S. at 62 (Alito, J. concurring). Instead, it merely argues that the intelligible-principle test is "not demanding" and asserts that whatever the unarticulated intelligible principle may be, it "falls comfortably within the outer boundaries demarcated by the Supreme Court." SEC Br. 38. This is not reasoned argument. As Justice Cardozo said of "unconfined and vagrant" delegation, SEC has no "roving commission to inquire into evils and upon discovery correct them." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 551 (1935) (Cardozo, J. concurring). Such delegation is "unknown to our law" and "utterly inconsistent with the constitutional prerogatives and duties of Congress." *Id.* at 537. Respect for the separation of powers requires this Court to interpret SEC's rule-approval power far more narrowly.

In response to NCPPR's major-questions argument, SEC argues that issues of "vast economic and political consequence" implicated in the eviction and vaccine regulations set aside in *Alabama Ass'n of Realtors v. HHS*, 141 S. Ct. 2485 (2021) and

*NFIB v. OSHA*, 142 S.Ct. 661 (2022), "are not comparable to the disclosures [and quotas] Nasdaq has required here." SEC Br. 36-37. Not so. Dictating the composition of corporate leadership across the nation is *economically* significant, and basing that composition on race, gender, and sexuality makes the Rules *politically* significant. SEC's glib assertion that "issuers are free to list on other exchanges," *id.*, is irrelevant for the purpose of the major-questions doctrine because if SEC can approve Nasdaq's race, gender, and sexuality quotas, it can approve (or even impose) identical quotas for NYSE and every other stock exchange.

Congress refused to delegate rulemaking power to ameliorate racial, gender and sexuality discrimination even to the agency tasked with enforcing antidiscrimination law, *EEOC*, 933 F.3d at 451, perhaps because Congress recognized only a democratically accountable branch of government is vested with the legislative power to navigate such a nuanced and consequential topic. The notion that "authority conferred" by the 1934 Exchange Act, 15 U.S.C. § 78f(b)(5), includes power for SROs to issue, and SEC to approve, racial, gender, and sexuality regulations is indefensible.

## V. SEC APPROVED THE BOARD DIVERSITY RULES WITHOUT CRITICAL REVIEW

Rejecting "one of the two principal rationales Nasdaq had advanced—that board diversity improved corporate governance and performance[,]" SEC Br. 31—does not support SEC's contention that it "critically reviewed [Nasdaq's] analysis," *id.* (quoting *Susquehanna*, 866 F.3d 447). In fact, that rejection renders SEC's approval of Nasdaq's

second rationale—"facilitat[ing] the disclosure of [race, gender, and sexuality] information important to investors' decision making," SEC Br. 23—even more arbitrary.

As SEC's brief recognized, substantial evidence is "less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." SEC Br. 18 (quoting *Boeta v. FAA*, 831 F.3d 636, 641 (5th Cir. 2016)). SEC's rejection of Nasdaq's first rationale under that lax standard, JA9-10 (Tab1), 86 Fed. Reg. 44,431-32, means no reasonable mind could accept that race, gender, and sexuality of directors impacts corporate performance. One might therefore expect a modicum of curiosity into Nasdaq's claim that "investors view board diversity as a key indicator of corporate governance" and make investment decisions based on that view, JA7 (Tab1), *id.* at 44,430.

But SEC displayed none. It did not, for example, ask why or how many investors purport to hold that irrational view. Nor did it inquire whether such investors put their money where their mouths are or are merely virtue signaling to appease the same powerful interests who intimidate objectors to race, gender, and sexuality quotas—including AFBR's members and commenters such as Publius Oeconomicis—to remain anonymous. Instead, SEC blindly accepted Nasdaq's assertion that important investment decisions are driven by race, gender, and sexuality information that SEC concedes have no rational relationship to investment performance.

25

SEC's approval of the Board Recruitment Rule was likewise devoid of critical inquiry. The Order provides no details regarding Equilar, the recruitment company, nor explains why it was selected. Nor does it answer how and by what metrics Equilar determines a candidate's "board ready" qualification status. SEC's suggestion that such questions are somehow unimportant, SEC Br. 38, simply reveals its lack of inquiry regarding the most fundamental part of the Board Recruitment Rule—*i.e.*, how board members are recruited.

## CONCLUSION

No one doubts that SEC could not lawfully promulgate the Board Diversity Rules itself. Indeed, even Congress could not do so. This court must recognize and reject the attempted end-run by a powerful—and unaccountable—agency to mandate through Nasdaq's rule-approval process what it could not lawfully do directly.

For the foregoing reasons, the Court should hold that SEC's Order and Nasdaq's Rules are unconstitutional and were issued without statutory authority. The Court should vacate the Order and set aside the Rules.

April 1, 2022                                   Respectfully submitted,

                                                */s/ Margaret A. Little*
                                                **Margaret A. Little**
                                                **Sheng Li**
                                                New Civil Liberties Alliance
                                                1225 19th St. NW, Suite 450
                                                Washington, DC 20036
                                                Telephone: 202-869-5210
                                                *Attorneys for Petitioner National Center for Public Policy Research*

26

## CERTIFICATE OF SERVICE

I hereby certify that on April 1, 2022, an electronic copy of the foregoing brief was filed with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/EFC filing system and that service will be accomplished using the appellate CM/ECF system.

*/s/ Margaret A. Little*
Margaret A. Little

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), I hereby certify that this document complies with Federal Rule of Appellate Procedure 32(a)(7)(B)(ii). It is printed in Garamond, a proportionately spaced font, and includes 6,491 words, excluding items enumerated in Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Fifth Circuit Rule 32.2. I relied on my word processor, Microsoft Word, to obtain the count.

*/s/ Margaret A. Little*
Margaret A. Little

# CERTIFICATE OF ELECTRONIC COMPLIANCE

I hereby certify that in the foregoing brief, filed using the Fifth Circuit CM/EFC filing system, all required privacy redactions have been made pursuant to Fifth Circuit Rule 25.2.13, any required paper copies to be submitted to the Court are exact copies of the version submitted electronically, and the electronic submission was scanned for viruses with the most recent version of a commercial virus scanning program, and is free of viruses.

*/s/ Margaret A. Little*
Margaret A. Little