No. 21-60626

UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

ALLIANCE FOR FAIR BOARD RECRUITMENT;
NATIONAL CENTER FOR PUBLIC POLICY RESEARCH,
*Petitioners*,

v.

SECURITIES AND EXCHANGE COMMISSION,
*Respondent.*

On Petition for Review of an Order of the Securities and Exchange Commission

**RESPONSE OF THE SECURITIES AND EXCHANGE COMMISSION
TO THE PETITIONS FOR REHEARING EN BANC**

MEGAN BARBERO
General Counsel

MICHAEL A. CONLEY
Solicitor

TRACEY A. HARDIN
Assistant General Counsel

DANIEL E. MATRO
Senior Appellate Counsel

JOHN R. RADY
Appellate Counsel

Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-8248 (Matro)

## CERTIFICATE OF INTERESTED PERSONS

Alliance for Fair Board Recruitment et al. v. SEC, No. 21-60626

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1. The Securities and Exchange Commission is a federal agency.

2. Megan Barbero, Michael A. Conley, Tracey A. Hardin, Daniel E. Matro, and John R. Rady of the Securities and Exchange Commission—*Counsel for Respondent Securities and Exchange Commission.*

3. Vanessa Ann Countryman of the Securities and Exchange Commission—*Secretary of the Securities and Exchange Commission.*

4. Petitioner Alliance for Fair Board Recruitment is a non-profit membership corporation and has no parent corporations or subsidiaries.

5. C. Boyden Gray, Jonathan Berry, R. Trent McCotter, Michael Buschbacher, and Jordan E. Smith of Boyden Gray & Associates—*Counsel for Petitioner Alliance for Fair Board Recruitment.*

6. Petitioner National Center for Public Policy Research is a non-profit corporation and has no parent corporations or subsidiaries.

7. Margaret A. Little and Sheng Li of The New Civil Liberties Alliance—*Counsel for Petitioner National Center for Public Policy Research.*

8. Allyson N. Ho, Bradley G. Hubbard, Amir C. Tayrani, Amalia E. Reiss, and Paulette Miniter of Gibson, Dunn & Crutcher LLP; John Zecca, Jeffrey S. Davis, John Yetter, and Joanne Pedone of The Nasdaq Stock Market, L.L.C.; and Burt M. Rublin, Stephen J. Kastenberg, Paul Lantieri III, Peter

F. Andrews, and Seth D. Berlin of Ballard Spahr LLP—*Counsel for Intervenor Nasdaq Stock Market, L.L.C.*

9. The States of Arizona, Alabama, Alaska, Arkansas, Florida, Indiana, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, Oklahoma, South Carolina, Texas, and Utah.

10. Drew C. Ensign and Christopher A. Bates—*Counsel for Amici States.*

/s/ Daniel E. Matro

*Attorney of Record for Respondent*
*Securities and Exchange Commission*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................. iv

INTRODUCTION ................................................................................................. 1

BACKGROUND .................................................................................................... 2

ARGUMENT .......................................................................................................... 4

I.    The panel's state-action holding is consistent with the Supreme Court's and this Court's precedent ........................................................................................... 4

    A.    The panel decision is consistent with *Moose Lodge* ........................................ 5

    B.    The panel was not bound by cursory dicta in *Intercontinental Industries, Inc. v. American Stock Exchange* ................................................................................ 8

    C.    The private nondelegation doctrine has no bearing on the state-action question presented here ............................................................................. 9

II.    The panel correctly held that the Commission acted reasonably and on the basis of substantial evidence in approving Nasdaq's rules .................................. 12

CONCLUSION ................................................................................................... 17

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Case**          **Page(s)**

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40 (1999) ................................................. *passim*

*Austin Mun. Sec., Inc. v. NASD*, 757 F.2d 676 (5th Cir. 1985) ....................................... 10

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ....................................................... 15, 16

*Blum v. Yaretsky*, 457 U.S. 991 (1982) ........................................................................ 7

*Brentwood Academy v. Tenn. Secondary Sch. Athletic Ass'n*,
   531 U.S. 288 (2001) ......................................................................... 11, 12

*Burton v. Wilmington Parking Auth.*, 365 U.S. 715 (1961) ....................................... 9

*Bus. Roundtable v. SEC*, 905 F.2d 406 (D.C. Cir. 1990) ................................... 3, 9

*Frazier v. Bd. of Trs.*, 765 F.2d 1278 (5th Cir. 1985) ........................................ 9, 12

*Goss v. Memorial Hosp. Sys.*, 789 F.2d 353 (5th Cir. 1986) .......................... 10

*In re Hearn*, 376 F.3d 447 (5th Cir. 2004) ..................................................... 8

*In re Bonvillian Marine Serv., Inc.*, 19 F.4th 787 (5th Cir. 2021) ................. 8

*Intercontinental Indus., Inc. v. Am. Stock Exch.*,
   452 F.2d 935 (5th Cir. 1971) ........................................................... 8-9

*Jackson v. Metro. Edison Co.*, 419 U.S. 345 (1974) ........................................ 7, 9

*Maher v. Gagne*, 448 U.S. 122 (1980) ............................................................ 8

*Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921 (2019) ............ 4, 9, 12

*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011) ...................... 16

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware* ,
   414 U.S. 117 (1973) ........................................................................... 3

*Moose Lodge No. 107 v. Irvis*, 407 U.S. 163 (1972) .......................... 5, 6, 7, 14

*Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*,
   53 F.4th 869 (5th Cir. 2022) ......................................................... 12

*Oklahoma v. United States*, 62 F.4th 221 (6th Cir. 2023) ................... 11

*Rendell-Baker v. Kohn*, 457 U.S. 830 (1982) ..................................... 11-12

*SEC v. World Tree Fin., L.L.C.*, 43 F.4th 448 (5th Cir. 2022) .......................................... 16

*Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381 (1940) .............................................. 11

*TSC Indus., Inc. v. Northway*, 426 U.S. 438 (1976) ...................................................... 14, 15

*United States v. Litvak*, 889 F.3d 56 (2d Cir. 2018) ........................................................ 15

*W.H. Scott Constr. Co. v. City of Jackson*, 199 F.3d 206 (5th Cir. 1999) ............................ 7

*Yeager v. City of McGregor*, 980 F.2d 337 (5th Cir. 1993) ............................................... 9-10

**Statutes**

Securities Exchange Act of 1934, 15 U.S.C. 78a, *et seq.*

    Section 3(a)(1), 15 U.S.C. 78c(a)(1) ................................................................... 3
    Section 3(a)(3)(A), 15 U.S.C. 78c(a)(3)(A) ........................................................ 6
    Section 3(a)(26), 15 U.S.C. 78c(a)(26) ............................................................... 3
    Section 5, 15 U.S.C. 78e ................................................................................... 3
    Section 6(b)(5), 15 U.S.C. 78f(b)(5) ...................................... 3, 12, 13, 14, 15
    Section 6(b)(6), 15 U.S.C. 78f(b)(6) ................................................................. 6
    Section 6(b)(8), 15 U.S.C. 78f(b)(8) ................................................................. 3
    Section 19(b)(2)(C)(i), 15 U.S.C. 78s(b)(2)(C)(i) ......................................... 3, 6
    Section 19(h)(1), 15 U.S.C. 78s(h)(1) .............................................................. 6
    Section 19(g)(1), 15 U.S.C. 78s(g)(1) ............................................................... 6

**Commission Releases**

*Concept Release Concerning Self-Regulation*,
    69 Fed. Reg. 71,256 (Dec. 8, 2004) .......................................................... 2-3

**Other Authorities**

Louis Loss et al., FUNDAMENTALS OF SECURITIES REGULATION 6.A.5
    (7th ed. 2018) ................................................................................................ 9

S. Rep. No. 94-75 (1975) ................................................................................. 3, 9

# INTRODUCTION

Responding to significant investor demand, the Nasdaq Stock Market, L.L.C. ("Nasdaq") proposed to require that companies choosing to list on its exchange disclose aggregated board-level diversity data and provide an explanation if they do not have at least two diverse board members.  Nasdaq is registered with the Securities and Exchange Commission as a national securities exchange, and its listing standards must be approved by the Commission under the Securities Exchange Act of 1934. The Commission determined that Nasdaq's proposal met the criteria requiring approval under the Act.

The panel unanimously upheld the Commission's order.  It concluded that Nasdaq—a subsidiary of a publicly traded company—is not a state actor and that the listing standards were not state action subject to constitutional scrutiny.  The panel also concluded that the Commission acted reasonably and on the basis of substantial evidence in finding that the standards are consistent with the Exchange Act.  These holdings are correct, do not conflict with any decision of the Supreme Court, this Court, or another court of appeals, and present no question of exceptional importance.

Every court that has applied the Supreme Court's modern state-action jurisprudence to self-regulatory organizations such as Nasdaq has concluded that their rules and other activities are not state action.  Petitioners' scattershot arguments for breaking with that uniform consensus are meritless.

And substantial evidence supports the Commission's reasonable conclusion that Nasdaq's proposal is consistent with the Exchange Act.  As the panel recognized, the proposal establishes a disclosure-based framework, not a mandatory or *de facto* quota.  The record also demonstrates that there is broad-based market demand for enhanced board diversity disclosures—including among sophisticated investors with a fiduciary duty to act in their clients' best interest—for use in investment and proxy voting decisions; that the proposal would facilitate more consistent and comparable disclosure of such information; and that a number of empirical studies substantiating investors' conclusions that board diversity benefits companies gave rise to a "reasonable debate" about its impact on company performance.

By facilitating access to information that many market participants reasonably consider important to their investment and proxy voting decisions, the proposal advances a core purpose of the Exchange Act.  This straightforward conclusion, supported by an extensive record, does not authorize the mandatory disclosure of any information on any topic for any reason, as petitioners baselessly assert.  The petitions for rehearing should be denied.

## BACKGROUND

1.  The first securities exchanges emerged over two centuries ago as voluntary associations of brokers that operated trading markets and enforced their members' compliance with self-imposed rules.  *Concept Release Concerning Self-Regulation*, 69 Fed.

Reg. 71,256, 71,257 (Dec. 8, 2004). Listing of company stock on these exchanges was and remains today a matter of private contractual agreement. *See id.* at 71,257, 71,263; S. Rep. No. 94-75 at 18 (1975).

In the Exchange Act, Congress preserved "the traditional private governance of exchanges," while subjecting them to "appropriate federal regulatory supervision." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware*, 414 U.S. 117, 127-30 (1973); *see also Concept Release*, 69 Fed. Reg. at 71,257-58. Generally, an "exchange" as defined by the Act must register with the Commission as a "national securities exchange," thereby becoming a "self-regulatory organization" ("SRO"). 15 U.S.C. 78c(a)(1), 78c(a)(26), 78e.

To grant registration, the Commission must determine that the exchange's rules satisfy certain criteria. *Id.* 78f(b)(5), (b)(8). This includes both the rules that apply to its broker-dealer members and the requirements in its listing agreements with listed companies. *See Bus. Roundtable v. SEC*, 905 F.2d 406, 409 (D.C. Cir. 1990). If a national securities exchange proposes to change its rules, it must file the proposal with the Commission. The Commission "shall" approve the proposal if it finds that it "is consistent with the requirements of" the Act and regulations thereunder. 15 U.S.C. 78s(b)(2)(C)(i).

2. Nasdaq's proposed board diversity rules have two components. *First*, they require each Nasdaq-listed company to publicly disclose aggregated information on

the voluntary, self-identified gender and racial characteristics and LGBTQ+ status of the company's board of directors using a standardized Board Diversity Matrix. JA603-04.

*Second*, they require Nasdaq-listed companies that do not have at least two diverse board members, including at least one who self-identifies as female and one who self-identifies as an underrepresented minority or LGBTQ+, to provide some explanation why it does not. JA598-99. Nasdaq verifies that a company that does not meet these objectives has provided an explanation but does not evaluate its substance or merits. JA329-30.

On August 6, 2021, the Commission approved Nasdaq's proposal. JA2. A panel of this Court denied the petitions for review on October 18, 2023.

## ARGUMENT

### I.   The panel's state-action holding is consistent with the Supreme Court's and this Court's precedent.

Petitioners do not—and cannot—dispute the panel's conclusion that Nasdaq is a private entity, not a part of the government. *See* Op. 14-15. Nasdaq's rules are thus subject to constitutional scrutiny only if they are "fairly attributable" to the government. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999). But none of the "few limited circumstances" in which private conduct may be so attributed is present here. *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019). The panel's holdings (Op. 17-19) that exchange listing standards are not a "traditional,

exclusive public function" and that the Commission did not compel or significantly encourage the rules are undisputed. And the "yes-or-no approval process" for Nasdaq rules (Op. 19) falls far short of the kind of pervasive "entwinement" between government and a private entity that leads to state action.

Every court in the last half-century to have applied these principles to SRO actions has reached the same conclusions. Op. 8-10, 20 (citing cases). Rather than dispute the panel's analysis, petitioners attempt to manufacture conflicts with Supreme Court and circuit case law through a series of misunderstandings and mischaracterizations.

### A. The panel decision is consistent with *Moose Lodge.*

1. AFBR erroneously asserts that the panel opinion conflicts with *Moose Lodge No. 107 v. Irvis*, which involved a private club whose bylaws "required racial discrimination." 407 U.S. 163, 166, 178-79 (1972). The Court *rejected* an argument that the state liquor board's licensing and regulation of the club converted its discriminatory practices into unconstitutional state action. *Id.* at 176-77. As a result, the Court left the club's rules in place. *Id.*

AFBR points out that the Court nonetheless enjoined the state from enforcing a regulatory provision that required licensees to comply with their bylaws "insofar as that regulation require[d]" the club to enforce its discriminatory policies. *Id.* at 179. But unlike the club's bylaws, Nasdaq's rules do not "require[] racial discrimination."

*Id.* They simply require Nasdaq-listed companies with fewer than two diverse board members to provide an explanation—in their own words, in as much or little detail as they choose. JA3 & n.31; Op. 32. As the panel explained, a company is subject to delisting only if it chooses to give "*no* explanation at all." Op. 33.

Moreover, petitioners here do not seek to "enjoin[] the enforcement" of any statutory duty Nasdaq may have to enforce its listing standards. *Moose Lodge*, 407 U.S. at 179.[1] They "seek constitutional review of the Rules themselves." Op. 21; *see* AFBR Pet. iv-v, 9-10; NCPPR Pet. v; *Sullivan*, 526 U.S. at 51 (state-action inquiry "requires careful attention to the gravamen of the plaintiff's complaint" (quotation omitted)). *Moose Lodge* forecloses such review. 407 U.S. at 176-77.[2]

2. AFBR's attempt (at 6-7) to recast the Commission's approval of the rules as the "regulation" that imposes a duty to enforce them conflates two distinct elements of the statutory scheme. The Commission must approve a proposed exchange rule if it finds the rule is consistent with the Act's requirements. 15 U.S.C. 78s(b)(2)(C)(i). Different provisions require exchanges to enforce their rules against members. *Id.* 78s(g)(1), (h)(1). A court order setting aside the Commission's approval would do

---

[1] Petitioners cite provisions requiring that exchanges enforce their rules against "members," 15 U.S.C. 78f(b)(6), 78s(g)(1), (h)(1), but that term refers to broker-dealer members, not listed companies. *Id.* 78c(a)(3)(A).

[2] The panel did not hold that Nasdaq's statutory duty to enforce its rules against members can only be challenged in a future enforcement action. *Contra* AFBR Pet. 7-8. It noted that petitioners "do not challenge [those] provisions" but instead seek to invalidate the rules themselves. Op. 21.

more than enjoin any enforcement duty; such an order would prohibit the private conduct itself, which the Court in *Moose Lodge* held it could not do.

Petitioners' sleight-of-hand also "ignores [the Court's] repeated insistence" that state action exists only if the "specific conduct of which the plaintiff complains" is fairly attributable to the government. *Sullivan*, 526 U.S. at 50-51 (quotation omitted). And private conduct is not attributable to the government simply because of the government's "approval or acquiescence." *Id.* at 52. State action exists "only when [the government] has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the [government]." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982); *see also Jackson v. Metro. Edison Co.*, 419 U.S. 345, 357 (1974). Here, "Nasdaq came up with and proposed the Rules on its own." Op. 18.

*W.H. Scott Construction Co. v. City of Jackson*, 199 F.3d 206 (5th Cir. 1999), is not to the contrary. Its holding that a *city* policy violated equal protection has no bearing on whether *private* conduct is fairly attributable to the government. *See* 199 F.3d at 208-09. Contrary to AFBR's new argument (at 9), the Court did not suggest (let alone hold) that private conduct "authorize[d]" by the government must satisfy equal protection scrutiny. *See, e.g.*, *Sullivan*, 526 U.S. at 50 (state-action requirement applies to *all* private conduct).

**B.   The panel was not bound by cursory dicta in *Intercontinental Industries, Inc. v. American Stock Exchange*.**

The panel correctly concluded (Op. 10-13) that it was not bound by dicta in *Intercontinental Industries, Inc. v. American Stock Exchange*, 452 F.2d 935 (5th Cir. 1971). There is thus no conflict with circuit precedent.

Intercontinental Industries, Inc. (INI) sought review of a Commission order granting an exchange's application to delist INI's stock, arguing that it was deprived of due process. *Id.* at 940. Briefly addressing three substantive defenses, the Court stated (among other points) that the Commission's regulation of the exchange "brings it within the purview of the Fifth Amendment controls over governmental due process." *Id.* at 941 & n.9. But "rather than decide those points," the Court rejected INI's claim because the hearing held by the exchange provided due process in any event. *Id.* at 941-43.

Avoiding a constitutional holding that the facts render unnecessary is not "pointless" (NCPPR Pet. 13)—it is "longstanding judicial policy." *Maher v. Gagne*, 448 U.S. 122, 133 (1980). Because the Court's two-sentence reference to state action was unnecessary to its decision, it is non-precedential dicta. *In re Hearn*, 376 F.3d 447, 453 (5th Cir. 2004). And the same is true of the only two cases that cite it. *See* Op. 13.

In any event, *Intercontinental*'s state-action discussion is "unequivocally out of step" with subsequent Supreme Court cases. *In re Bonvillian Marine Serv., Inc.*, 19 F.4th 787, 792 (5th Cir. 2021). *Intercontinental* relied on the "vague" joint participation test in

*Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961), which has been substantially limited. *Sullivan* 526 U.S. at 57; *see* Op. 11-12. As this Court stated in *Frazier v. Board of Trustees*, *Burton* "is now subject to the gloss of" later cases, and stands only for the proposition that joint participation exists where "the discriminatory practices of [a] lessee . . . not only contributed to, but also were indispensable elements in, the financial success of a governmental agency." 765 F.2d 1278, 1286-88 (5th Cir. 1985) (quotation and alterations omitted); *see also Jackson*, 419 U.S. at 358 (limiting *Burton* to "lessees of public property").

### C.    The private nondelegation doctrine has no bearing on the state-action question presented here.

Petitioners have not raised any private nondelegation claim in this case. Op. 15 n.9. Rather, they assert that Nasdaq's rules must be state action to avoid a violation of the private nondelegation doctrine. The panel correctly rejected that argument.

1. Petitioners' contention that Nasdaq is a state actor because it exercises authority delegated by Congress fails because Nasdaq does not exercise any such authority when choosing the terms of its contractual agreements with listed companies. *See Bus. Roundtable*, 905 F.2d at 414; S. Rep. No. 94-75 at 18, 22-24; Louis Loss et al., Fundamentals of Securities Regulation 6.A.5 (7th ed. 2018). And even if it did, a private entity that performs a public function engages in state action only when exercising "powers traditionally exclusively reserved to the State." *Halleck*, 139 S. Ct. at 1928-29 (quotation omitted); *accord Yeager v. City of McGregor*, 980 F.2d

9

337, 340 (5th Cir. 1993). But exchanges imposed listing standards long before the securities laws were enacted.

NCPPR is thus mistaken when it claims (at 9, 12) that this Court's discussion of exchanges' self-regulatory function with respect to their broker-dealer members in *Austin Municipal Securities, Inc. v. NASD*, 757 F.2d 676 (5th Cir. 1985), answers the state-action question. *Austin* and other cases NCPPR cites (at 9-11) address an exchange's entitlement to regulatory immunity—a distinct, judicially created doctrine not at issue here. *Cf. Goss v. Memorial Hosp. Sys.*, 789 F.2d 353, 356 (5th Cir. 1986) (no state action though state law granted civil immunity).

Petitioners' incantation that Nasdaq's listing standards have the "force of law" does not alter the analysis. State action requires "*both* an alleged constitutional deprivation caused by . . . a rule of conduct imposed by the state . . . *and* that the party charged with the deprivation must be a person who may fairly be said to be a state actor." *Sullivan*, 526 U.S. at 50 (quotation omitted, emphases in original). In any event, the Commission does not enforce listing standards, and listed companies are not subject to government "penalties" or other disciplinary "sanctions" for failure to comply. *Contra* AFBR Pet. 5, 7. Rather, as was true before the Exchange Act, a company that fails to abide by its listing agreement may be delisted. But it remains free to list on another exchange or trade its securities in the over-the-counter market.

10

Op. 21 n.11.  Congress's choice to subject the terms of these private relationships to Commission oversight does not transform them into state action.  *Supra* 4-7.

2.  This straightforward application of state-action principles is not in tension with the private nondelegation doctrine.  That doctrine ensures that a private entity with a role in a statutory scheme "function[s] subordinately" to a public agency with "authority and surveillance" over it.  *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940).  It is focused on the overall structure of a statutory scheme, and every court to consider the issue has held that the Exchange Act comports with *Adkins*.  *See Oklahoma v. United States*, 62 F.4th 221, 228-29 (6th Cir. 2023) (citing cases dating to the 1950s).

State-action doctrine, in contrast, focuses on specific conduct, asking whether there is "such a close nexus between the State and *the challenged action* that seemingly private behavior may be fairly treated as that of the State itself."  *Brentwood Academy v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (quotation omitted, emphasis added).  It has been clear for decades that the structural oversight courts have considered necessary under the private nondelegation doctrine—authority to approve, disapprove, or modify the private entity's actions—is insufficient to attribute private conduct to the government.  *Sullivan*, 526 U.S. at 52.

Petitioners assert that this opens the door to government abuse, but existing law protects against that risk.  State action would be present if the government

attempted to "avoid its constitutional duties" through a "sham" delegation to a private entity. *Rendell-Baker v. Kohn*, 457 U.S. 830, 842 n.7 (1982); *accord Frazier*, 765 F.2d at 1287 n.20. Constitutional constraints also apply if the government coerces or significantly encourages private conduct, *Sullivan*, 526 U.S. at 52, or is pervasively entwined in a private entity's "management or control," *Brentwood*, 531 U.S. at 296. And the nondelegation doctrine ensures that the "last word" in any regulatory program remains with a government body "accountable to the people." *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 872-73 (5th Cir. 2022).

In any event, petitioners do not explain why the appropriate response to their hypothetical concerns is to disregard long-settled state-action principles, thereby "endanger[ing] individual liberty and private enterprise." *Halleck*, 139 S. Ct. at 1932.

## II. The panel correctly held that the Commission acted reasonably and on the basis of substantial evidence in approving Nasdaq's rules.

Under Section 6(b)(5) of the Exchange Act, exchange rules must be "designed" to promote specified objectives and may not regulate matters unrelated "to the purposes of [the Act]." 15 U.S.C. 78f(b)(5). The Commission concluded that Nasdaq's rules were consistent with these requirements because they "would provide widely available, consistent, and comparable information that would contribute to investors' investment and [proxy] voting decisions." JA7.

The panel's affirmation of that conclusion is based on an extensive analysis of the record supporting the Commission's findings. Rather than engaging with that

analysis, petitioners mischaracterize it as a blanket authorization of rules requiring disclosure of any information merely because a few "activists" say they want it. AFBR Pet. viii, 15; NCPPR Pet. 5-7.  That both petitioners resort to such distortion is a strong indication that there is no legitimate basis for en banc review.

1.  The record before the Commission established "broad demand" for board diversity information, which is "not widely available on a consistent and comparable basis."  JA2, 7.  Far from relying on the "mere say-so" of a few "activists" (AFBR Pet. 15), the Commission pointed to evidence from a "diverse collection" of "institutional investors, investment managers, listed companies, and individual investors," showing that investors across market sectors believe that board diversity information is important and already use it in making investment and proxy voting decisions.  JA7 & nn.85-86, 91-92; *see also* JA2, 6 & nn.72-75.

Substantial evidence likewise supports the Commission's findings that the rules establish a disclosure-based framework that will make "consistent and comparable" board diversity data "widely available to investors," mitigate  concerns regarding unequal access to information important to investors, and help investors make more informed decisions on corporate governance issues.  JA2, 5 n.54, 6-7 & nn.73, 77-80. As a result, the rules are—consistent with Section 6(b)(5)—"designed" to promote just and equitable principles of trade, remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general,

to protect investors and the public interest. JA2, 7; Op. 41-43. And they are "related to" a core purpose of the Exchange Act: facilitating full disclosure of information important to investor decision-making. JA2; Op. 27, 47-49.[3]

2. Petitioners identify no valid basis to second-guess these conclusions. The panel correctly rejected their argument that exchange disclosure rules are "limited to information that would be material for purposes of a securities fraud claim." Op. 28.

Courts have interpreted the materiality requirement under the antifraud provisions of the securities laws to require "a substantial likelihood that a reasonable shareholder would consider [the omitted information] important" in deciding how to vote or invest. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). This requirement is intended "to avoid the adverse consequences of setting too low a threshold for civil liability." *Id.* at 449 n.10. But there is no basis to conclude that Congress intended to impose such a limitation on exchange disclosure rules.

None of the Section 6(b)(5) factors that exchange rules must be "consistent with" contains an express materiality requirement. *See* 15 U.S.C. 78f(b)(5). And the requirement for exchange rules to be "related to" the Exchange Act's purposes does

---

[3] Nasdaq cannot delist any company based on the composition of its board or the substance of its explanation for not meeting Nasdaq's diversity objectives. JA5, 204; *see also supra* 5-6. AFBR is thus wrong when it asserts (at 16) that approval of Nasdaq's rules "rendered the enforcement provisions of the Exchange Act unconstitutional" under *Moose Lodge.*

not imply one.  The disclosure of information important to investors' investment and

voting decisions is "related to" the Act's core purpose of "implementing a philosophy

of full disclosure," *Basic Inc. v. Levinson*, 485 U.S. 224, 230 (1988) (quotation omitted),

regardless of whether the failure to disclose that information would always be

sufficiently material to state a claim for securities fraud.  *See Northway*, 426 U.S. at 462-

63 (recognizing that while it was not materially misleading to omit information that

had "no bearing" on a company's market price, the Commission could have required

its disclosure).  Nor would it make sense to apply that "inherently fact-specific"

standard here.  *Levinson*, 485 U.S. at 236; *see* Op. 27-28.

Moreover, as the panel correctly recognized, the record evidence that a wide

swath of investors consider board diversity information relevant to their investment

and voting decisions would satisfy a materiality requirement.  *See United States v. Litvak*,

889 F.3d 56, 65 (2d Cir. 2018) (looking to "the mainstream thinking of investors").

And it is simply not true that the Commission found "no link" between board

diversity and company performance.  AFBR Pet. viii, 13-15; NCPPR Pet. 5-6.

Reviewing the empirical evidence, the Commission concluded that the effects of

board diversity on company performance are "the subject of reasonable debate"—

with some studies finding benefits—and that the studies finding negative effects from

*mandates* are likely inapplicable to Nasdaq's disclosure-based rules.  JA9.

The empirical uncertainty did not require the Commission to dismiss investor interest in board diversity as mere "social activism." NCPPR Pet. 6-7; AFBR Pet. 13. Some of the largest and most sophisticated asset managers, who operate in competitive markets and are subject to a fiduciary duty to their clients, have concluded that board diversity benefits companies and make decisions based on it. JA7 & nn.91-92; Op. 28-29. The existence of multiple studies supporting their conclusions further suggests that investors consider board diversity for investment-related reasons—even if the matter has not been settled beyond "reasonable debate." JA9; *cf. Levinson*, 485 U.S. at 234 (Exchange Act embodies a policy of disclosure over "paternalistic withholding of accurate information"). Indeed, even in the antifraud context, materiality does not require conclusive empirical proof of a causal link to financial performance. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 43 (2011); *SEC v. World Tree Fin., L.L.C.*, 43 F.4th 448, 465 (5th Cir. 2022).

The panel opinion does not remotely suggest that "anything is 'material' and can be forcibly disclosed if someone wants it." AFBR Pet. viii. The opinion speaks only to the scope of *exchange* disclosure rules, which are subject to different statutory limits than Commission rules. And, as the panel emphasized, exchange rules must be "related to" the Act's purposes, must be designed to accomplish statutory objectives, and cannot violate other statutory requirements. Op. 28. The panel's conclusion regarding Nasdaq's rules was based upon the substantial evidence supporting the

Commission's findings that there is "broad demand" for board diversity information among a diverse range of investors who "already use [it] to make investments." Op. 28-30, 40-51. The panel opinion would thus have no bearing on the hypothetical disclosure rules AFBR posits.

## CONCLUSION

The Court should deny the petitions for rehearing en banc.

Respectfully submitted,

/s/ Daniel E. Matro

MEGAN BARBERO
General Counsel

MICHAEL A. CONLEY
Solicitor

TRACEY A. HARDIN
Assistant General Counsel

DANIEL E. MATRO
Senior Appellate Counsel

JOHN R. RADY
Appellate Counsel

Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-8248 (Matro)

December 2023

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 35(b)(2)(A) because it contains 3,895 words, excluding the parts exempted by Fed. R. App. P. 32(f) and 5th Cir. R. 32.2.

I also certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface—Garamond, 14 point—using Microsoft Word.

*/s/ Daniel E. Matro*

Daniel E. Matro

December 18, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on December 18, 2023, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system, which will send notice to all the parties.

/s/ *Daniel E. Matro*
Daniel E. Matro

December 18, 2023