No. 21-60626

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

---

ALLIANCE FOR FAIR BOARD RECRUITMENT and
NATIONAL CENTER FOR PUBLIC POLICY RESEARCH,
*Petitioners*,

v.

SECURITIES AND EXCHANGE COMMISSION,
*Respondent*.

---

On Petition for Review of an Order of the
Securities and Exchange Commission
Agency No. 34-92590

---

**NATIONAL CENTER FOR PUBLIC POLICY RESEARCH'S
BRIEF ON REHEARING *EN BANC***

---

Margaret A. Little
Sheng Li
Mark Chenoweth
New Civil Liberties Alliance
1225 19th St. NW, Suite 450
Washington, DC 20036
Telephone: 202-869-5210
*Counsel for National Center
for Public Policy Research*

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................ i

TABLE OF AUTHORITIES .............................................................. iii

INTRODUCTION ..............................................................................1

STATEMENT OF THE CASE ............................................................2

I.   Statutory Background .............................................................2

II.  Nasdaq's Diversity Proposals .................................................5

III. The National Center for Public Policy Research and Others Object ...8

IV.  SEC Approves Diversity Rules over Two Dissenting Commissioners ....11

ISSUES PRESENTED .....................................................................16

SUMMARY OF THE ARGUMENT ...................................................16

ARGUMENT ..................................................................................18

I.   SEC Lacks Authority to Approve Diversity Rules ..................18

    A.  The Diversity Rules Regulate Matters Not Related to the Purposes of the Exchange Act .........................................................19

        1.  *The Exchange Act's Purposes Do Not Include Pressuring Companies to Hire Directors Based on Race, Gender, and Sexuality* ................20

        2.  *The Exchange Act's Purposes Do Not Include Disclosing Immaterial Information to Facilitate Irrational Discrimination* ........................24

        3.  *The SEC's Approach Is Boundless and Without Precedent* ..............26

        4.  *Plain Application of the Exchange Act's Text Requires This Court to Set Aside the Rules* ..........................................................27

    B.  The Diversity Rules Are Not Designed to Further Any of the Mandatory Objectives Under § 6(b)(5) .........................................29

        1.  *A Disclosure Requirement Does Not Serve § 6(b)(5)'s Objectives* ...30

        2.  *A Quota Requirement Does Not Serve § 6(b)(5)'s Objectives* ..........32

    C.  The Diversity Rules Impose Unnecessary and Inappropriate Burdens ......32

II.  The Diversity Rule Compels Speech in Violation of the First Amendment ...................................................................36

A.  The Order and Diversity Rule Constitute State Action Subject to First Amendment Scrutiny ........................................................... 36

    1.  *Nasdaq's Exercise of Governmental Powers to Perform Regulatory Functions Is State Action* ................................ 36

    2.  *SEC's Approval of the Diversity Rules Is State Action Subject to Constitutional Scrutiny* ..................................... 40

B.  The Speech-Compelling Diversity Rule Violates the First Amendment .... 44

    1.  *Exacting Scrutiny Applies to the Diversity's Rule's Explanation and Disclosure Requirements* ................................ 45

    2.  *The Diversity's Rule's Explanation and Disclosure Requirements Fail Exacting Scrutiny* ...................................... 46

III. SEC'S APPROVAL OF THE DIVERSITY AND RECRUITING SERVICES RULES IS ARBITRARY AND CAPRICIOUS ........................................................... 50

A.  SEC Failed to Engage in Independent Reasoning in Approving the Diversity Rule .................................................................. 51

B.  SEC Failed to Engage in Independent Reasoning in Approving the Recruiting Services Rule ...................................................... 53

CONCLUSION ................................................................................. 54

CERTIFICATE OF SERVICE ............................................................... 56

CERTIFICATE OF COMPLIANCE ........................................................ 56

CERTIFICATE OF ELECTRONIC COMPLIANCE ...................................... 57

# TABLE OF AUTHORITIES

## Cases

*303 Creative LLC v. Elenis*,
  600 U.S. 570 (2023)....................................................................45

*A.L.A. Schechter Poultry Corp. v. United States*,
  295 U.S. 495 (1935)....................................................................39

*Agency for Int'l Dev. v. All. for Open Soc'y, Int'l, Inc.*,
  570 U.S. 205 (2013)....................................................................48

*All. for Fair Bd. Recruitment v. Weber*,
  No. 21-CV-01951, 2023 WL 3481146 (E.D. Cal. May 15, 2023).......................20

*Associated Builders & Contractors of Se. Tex. v. Rung*,
  No. 16-CV-425, 2016 U.S. Dist. LEXIS 155232 (E.D. Tex. Oct. 24, 2016).......48

*Austin Mun. Secs., Inc. v. NASD*,
  757 F.2d 676 (5th Cir. 1985) ..................................................... passim

*Blount v. SEC*,
  61 F.3d 938 (D.C. Cir. 1995)..........................................................36

*Blum v. Yaretsky*,
  457 U.S. 991 (1982)....................................................................41

*Boeta v. FAA*,
  831 F.3d 636 (5th Cir. 2016) ..........................................................24

*Briscoe v. Bank of Commonwealth of Ky.*,
  36 U.S. 257 (1837).......................................................................35

*Burton v. Wilmington Parking Authority*,
  365 U.S. 715 (1961)......................................................................42

*Bus. Roundtable v. SEC*,
  905 F.2d 406 (D.C. Cir. 1990)..........................................................32

*Carter v. Carter Coal Co.*,
  298 U.S. 238 (1936)....................................................................39

*Chamber of Com. v. SEC*,
  85 F.4th 760 (5th Cir. 2023) ...................................................... 29, 30

*Chevron v. NRDC*,
  467 U.S. 837 (1984)....................................................................30

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
140 S. Ct. 1891 (2020) ........................................................49

*Dep't of Transp. v. Ass'n of Am. R.Rs.*,
575 U.S. 43 (2015)................................................................39

*DL Cap. Grp., LLC v. Nasdaq Stock Mkt., Inc.*,
409 F.3d 93 (2d Cir. 2005) .................................................38

*Edmonson v. Leesville Concrete Co.*,
500 U.S. 614 (1991)..............................................................24

*Ellis v. Liberty Life Assur. Co. of Bos.*,
394 F.3d 262 (5th Cir. 2004) ..............................................24

*Gregory v. Ashcroft*,
501 U.S. 452 (1991)..............................................................23

*Gutierrez-Brizuela v. Lynch*,
834 F.3d 1142 (10th Cir. 2016) ..........................................30

*Hurley v. Irish-American Gay, Lesbian and Bisexual Grp. of Boston*,
515 U.S. 557 (1995)..............................................................47

*Int'l Dairy Foods Ass'n v. Amestoy*,
92 F.3d 67 (2d Cir. 1996) ............................................ 46, 48

*Intercontinental Indus., Inc. v. Am. Stock Exch.*,
452 F.2d 935 (5th Cir. 1971) ....................................... 42, 43

*Janus v. AFSCME*,
138 S.Ct. 2448 (2018)..........................................................47

*Loper Bright Enters. v. Raimondo*,
No. 22-451, cert. granted (May 1, 2023) ............................30

*MD/DC/DE Broadcasters Association v. FCC*,
236 F.3d 13 (D.C. Cir. 2001) ................................... 20, 21, 22

*Meland v. Weber*,
2 F.4th 838 (9th Cir. 2021) ..............................................8, 22

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*,
578 U.S. 374 (2016)..............................................................36

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. NASD*,
616 F.2d 1363 (5th Cir. 1980) ...............................................3

*Mexican Gulf Fishing Co. v. United States Dep't of Com.*,
60 F.4th 956 (5th Cir. 2023) ...............................................33

*Miller v. Johnson*,
515 U.S. 900 (1995) ........................................................................ 19, 25

*Missouri v. Biden*,
83 F.4th 350 (5th Cir. 2023) ...............................................43

*Moose Lodge No. 107 v. Irvis*,
407 U.S. 163 (1972)............................................................24

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)..............................................................53

*Murthy v. Missouri*,
144 S. Ct. 7 (2023)..............................................................43

*Nat'l Ass'n of Mfrs. v. SEC*,
800 F.3d 518 (D.C. Cir. 2015)............................................ 47, 48, 49

*Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*,
53 F.4th 869 (5th Cir. 2022) ...............................................38

*Nat'l Inst. of Family and Life Advocates v. Becerra*,
585 U.S. 755 (2018) ..................................................... 44, 47

*Norwood v. Harrison*,
413 U.S. 455 (1973)............................................................34

*Oklahoma v. United States*,
62 F.4th 221 (6th Cir. 2023) ...................................... 40, 41, 42

*R&W Tech. Servs. Ltd. v. CFTC*,
205 F.3d 165 (5th Cir. 2000) ..............................................25

*Relentless v. Dep't of Com.*,
No. 22-1291, cert. granted (Oct. 13, 2023).........................30

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
487 U.S. 781 (1988)..................................................... 44, 45

*Roberts v. La. Downs, Inc.*,
742 F.2d 221 (5th Cir. 1984) ...................................... 42, 43

*Rooms v. SEC*,
444 F.3d 1208 (10th Cir. 2006) ..........................................43

*Rumsfeld v. Forum for Acad. and Institutional Rights*,
547 U.S. 47 (2006)..............................................................46

*Santa Fe Industries v. Green*,
430 U.S. 462 (1977).............................................................23

v

*SEC v. Edwards*,
  540 U.S. 389 (2004) ...................................................................... 24, 25

*Sivaraman v. Guizzetti & Assocs.*,
  228 A.3d 1066 (D.C. 2020) ...................................................................27

*Smith v. Turner*,
  48 U.S. 283 (1849)................................................................................35

*Sparta Surgical Corp. v. NASD*,
  159 F.3d 1209 (9th Cir. 1998) ................................................ 36, 37, 44

*Sprecher v. Graber*,
  716 F.2d 968 (2d Cir. 1983) ................................................................38

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
  600 U.S. 181 (2023)................................................................... passim

*Sunshine Anthracite Coal Co. v. Adkins*,
  310 U.S. 381 (1940) ......................................................................... 39, 40

*Susquehanna Int'l Grp., LLP v. SEC*,
  866 F.3d 442 (D.C. Cir. 2017)................................................... passim

*TSC Industries, Inc. v. Northway, Inc.*,
  426 U.S. 438 (1976).............................................................................25

*United Hous. Found. v. Forman*,
  421 U.S. 837 (1975)................................................................... 24, 25

*United States v. Freeman*,
  44 U.S. (3 How.) 556 (1845) ...............................................................28

*Util. Air Regul. Grp. v. EPA*,
  573 U.S. 302 (2014)..............................................................................23

*West Virginia v. Barnette*,
  319 U.S. 624 (1943)................................................................... 44, 46

*West Virginia v. EPA*,
  142 S.Ct. 2587 (2022)................................................................. 23, 28

*Wooley v. Maynard*,
  430 U.S. 705 (1977)..............................................................................46

**Statutes**

15 U.S.C. § 78b........................................................................2, 19

15 U.S.C. § 78d.............................................................................2

15 U.S.C. § 78f.............................................................................. passim

15 U.S.C. § 78o...................................................................................37

15 U.S.C. § 78s.............................................................................. passim

28 U.S.C. § 2112.................................................................................15

5 U.S.C. § 553.......................................................................................4

5 U.S.C. § 706.................................................................................2, 49

Securities Act Amends. of 1975,
  Pub. L. No. 94-29, 89 Stat. 97 (1975)....................................................3

**Rules**

Nasdaq Rule 5605 ...............................................................................11

Nasdaq Rule 5606 ......................................................................... 11, 30

Nasdaq Rule IM-5900-9 ............................................................ 11, 22, 52

**Other Authorities**

Antonin Scalia & Bryan A. Garner,
  READING LAW (2012)............................................................................27

Asaf Shalev,
  *A New BDS Battlefront Emerges In Investing World, With Spotlight On
  Morningstar,*
  Times of Israel (Feb. 9, 2022)....................................................... 26, 27

Jenna Wortham,
  *When Everyone Can be 'Queer,' Is Anyone?*
  New York Times (July 12, 2016) ...........................................................51

Letter from C. Boyden Gray and Jonathan Berry, Boyden Gray & Associates
  submitted on behalf of the Alliance for Fair Board Recruitment, dated April 6,
  2021..................................................................................................10

Letter from David R. Burton, Senior Fellow in Economic Policy, The Heritage
  Foundation, to J. Matthew DeLesDernier, Assistant Secretary, Commission,
  dated January 4, 2021 ...........................................................................9

Letter from Dennis E. Nixon, President, International Bancshares Corporation,
  to Vanessa A. Countryman, Secretary, Commission, dated December 31, 2020 ..9

Letter from Senator Pat Toomey and 11 other U.S. Senators,
  to Allison Herren Lee, Acting Chair, Commission, dated February 12, 2021 .......9

Nasdaq Rule 5801 .................................................................................6

S. REP. 94-75 (1975),
1975 U.S.C.C.A.N. 179 ................................................................. 3, 4, 36

SEC Commissioners Allison Herren Lee and Caroline A. Crenshaw,
Statement on Nasdaq's Diversity Proposals—A Positive First Step for Investors
(Aug. 6, 2021) ........................................................................................12

SEC Mission Statement,
SEC (last visited Mar. 18, 2024)..........................................................1

SEC,
*Enhancement and Standardization of Climate-Related Disclosures for Investors*
(Mar. 6, 2024) ......................................................................................25

*Self-Regulatory Organizations; Nasdaq ISE, LLC; Notice of Filing and Immediate*
*Effectiveness of Proposed Rule Change To Amend the Exchange's Pricing*
*Schedule at Options 7, Section 3,*
86 Fed Reg 14,482 (March 16, 2021)....................................................8

W. Eskridge,
*Interpreting Law: A Primer on How to Read Statutes and the Constitution* (2016)
..............................................................................................................28

# INTRODUCTION

Petitioner National Center for Public Policy Research ("NCPPR") challenges the Securities and Exchange Commission's ("SEC") order approving Rules that require companies listed on the Nasdaq Stock Exchange ("Nasdaq") to disclose the race, gender, and sexuality of their directors and to ensure their boards of directors satisfy quotas for those characteristics. Any company that fails to meet these race, gender, and sexuality quotas must publicly explain why it has fallen short of this government-approved requirement. Companies that fail to meet these disclosure and quota requirements are subject to the draconian penalty of delisting from Nasdaq.

SEC's Order approving the rules violates provisions of the Securities and Exchange Act of 1934 ("Exchange Act") that require SEC to ensure Nasdaq rules are limited to regulating fair and open markets, investor protection, ensuring orderly and efficient markets, and facilitating capital formation. *See* SEC Mission Statement, SEC (last visited Mar. 18, 2024).[1] The order further violates SEC's statutory duty to ensure that Nasdaq's rules "are not designed to … regulate by virtue of any authority conferred by [the Exchange Act] matters not related to the purposes of [the Act]." 15 U.S.C. § 78f(b)(5). Congress did not—and indeed, could not have—placed the recruitment of corporate directors based on race, gender, and sexuality, within the purposes of the Exchange Act.

---

[1] *Available at* https://www.sec.gov/about/mission.

Contrary to SEC's and Nasdaq's assertions, the Rules do not merely create a disclosure-based regime. Rather, they are designed to pressure companies to recruit directors based on race, gender, and sexuality. But even if viewed as "merely" a disclosure rule, it still falls outside of any lawful regulatory power the Exchange Act conferred on SEC—and self-regulatory organizations it supervises—to compel disclosure of material information, because the demographic characteristics at issue have no relevance to investment returns. The order also violates the First Amendment by compelling the reporting of a "diversity matrix" and explanatory speech from companies whose demographics do not meet these controversial quotas.

Finally, SEC's approval is arbitrary and capricious under the Administrative Procedure Act (APA) because it failed to engage in any independent reasoning or its own analysis of the rules' lawfulness, content, and relatedness to the purposes of the Exchange Act. *See* 5 U.S.C. § 706.

For these reasons, as set forth more fully below, the Court should vacate SEC's order and the Nasdaq rules that order approved.

## STATEMENT OF THE CASE

### I.    STATUTORY BACKGROUND

The Exchange Act created SEC to regulate securities transactions to ensure fair and open markets and investor protection. 15 U.S.C. § 78b, 78d. The Act further permits the establishment of national securities exchanges that operate as self-

2

regulatory organizations ("SRO") under SEC's supervision. 15 U.S.C. § 78f. Nasdaq was established as an SRO. "Every self-regulatory organization must comply with the provisions of the Exchange Act, its own rules, and [SEC] rules[,]" and "must force compliance with these rules by their members and persons associated with members." *Austin Mun. Secs., Inc. v. NASD*, 757 F.2d 676, 680 (5th Cir. 1985) (first quotation citing 15 U.S.C. § 78s(g)(1)) (second quotation citing 15 U.S.C. § 78s(h))). If an SRO "fails to comply with these requirements, the SEC has broad sanctioning power. The SEC can suspend or revoke the registration of the self-regulatory organization, or censure or restrict the activities, functions, and operations of the organization[.]" *Id*. (citing *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. NASD*, 616 F.2d 1363, 1367 (5th Cir. 1980)).

In 1975, Congress amended the Exchange Act to formalize SROs' rulemaking powers and place them fully within SEC's control. Securities Act Amends. of 1975, Pub. L. No. 94-29, 89 Stat. 97 (1975) ("1975 Amendments"). This was done in part to dispel the "common and serious misunderstanding" that "self-regulation is thought to mean that the securities industry regulates itself and therefore is not regulated by the government." S. Rep. 94-75, at 22 (1975), 1975 U.S.C.C.A.N. 179, 201. "Such a conception of self-regulation is seriously misleading in that it fails to recognize the essential and continuing role of the federal government. Industry

regulation and government regulation are not alternatives, but complementary components of the self-regulatory process." *Id.*

Recognizing that "[self-regulatory] organizations, *i.e.*, the exchanges and the NASD, are delegated governmental power in order to enforce … the Exchange Act[,]" *id.* at 23, the 1975 Amendments require SROs to publish proposed rule changes in the Federal Register for public comment like other government agencies to which Congress delegates power. *Compare* 15 U.S.C. § 78s(b)(2)(E) *with* 5 U.S.C. § 553(b). Additionally, "SEC must approve all [SRO] rules, policies, practices, and interpretations prior to their implementation. 15 U.S.C. § 78s. In addition, SEC may abrogate or add such rules as it deems necessary." *Austin Mun. Sec.*, 757 F.2d at 680; *see also* 15 U.S.C. § 78s(c) (authorizing SEC to "abrogate, add to, and delete from … the rules of a self-regulatory organization … as the Commission deems necessary or appropriate[.]"). An exchange may adopt a rule only with SEC approval, 15 U.S.C. § 78s, which requires SEC to determine whether the rule is designed to accomplish statutorily-defined objectives of fair and honest markets, and does not "regulate by virtue of any authority conferred by [the Exchange Act] matters not related to the purposes of [the Act] or the administration of the exchange," *id.* § 78f(b)(5). Approval of an SRO's proposed rule must be based on SEC's own "reasoned analysis" and its own "findings and determinations." *Susquehanna Int'l Grp., LLP v. SEC*, 866 F.3d 442, 447 (D.C. Cir. 2017).

4

## II.    NASDAQ'S DIVERSITY PROPOSALS

Nasdaq filed a proposed rule change to adopt listing rules concerning race, gender, and sexuality of corporate board members on December 1, 2020, which was published for comment in the Federal Register on December 11, 2020. *See Self-Regulatory Organizations; The Nasdaq Stock Market LLC; Notice of Filing of Proposed Rule Change to Adopt Listing Rules Related to Board Diversity*, 85 Fed. Reg. 80,472 (Dec. 11, 2020) ("Diversity Proposal"), JA689. Nasdaq explained the Diversity Proposal addressed "the need for enhanced board diversity" as identified by "the social justice movement [that] has brought heightened attention to the commitment of public companies to diversity and inclusion." *Id*. (emphasis removed in second quotation). On February 26, 2021, Nasdaq filed an Amendment Letter to the Board Diversity Proposal relaxing certain compliance requirements. Nasdaq, *Response to Comments and Notice of Filing of Amendment No. 1*, File No. SR-NASDAQ-2020-081 (Feb. 26, 2021) ("Nasdaq Letter II"), JA198. The Diversity Proposal, as amended, would subject Nasdaq-listed companies (subject to narrow exceptions for non-operating companies) to the following requirements:

- Have or explain why it does not have at least one board director who "self-identifies her gender as a woman, without regard to the individual's designated sex at birth." *Id.* at JA264.

- Have or explain why it does not have at least one board director who self-identifies as "Black or African American, Hispanic or Latinx, Asian, Native American or Alaska Native, Native Hawaiian or Pacific Islander, or Two or

More Races or Ethnicities," or as "LGBTQ+," defined as lesbian, gay, bisexual, transgender, or as a member of the queer community." *Id.* at JA265.

- Disclose statistical information on each director's "voluntary self-identified gender and racial characteristics and LGBTQ+ status" using a "Board Diversity Matrix." *Id.* at JA319-21.

Foreign Nasdaq-listed companies may satisfy the race and sexuality quotas by adding a second board member who self-identifies as a woman instead of one who self-identifies as a racial or sexual minority. *Id.* at JA264. Nasdaq claimed foreign companies should be subject to a different quota requirement because "each country has its own unique demographic composition, and because on average women tend to be underrepresented in board rooms across the globe." *Self-Regulatory Organizations; The Nasdaq Stock Market LLC; Order Approving Proposed Rule Changes, as Modified by Amendment No. 1, to Adopt Listing Rules Related to Board Diversity and to Offer Certain Listed Companies Access to a Complimentary Board Recruiting Service*, 86 Fed. Reg. 44,424 (Aug. 12, 2021) (hereinafter, "Order"), JA1, JA11.

The gender and race and sexuality quotas (collectively "Quota Requirement") were embodied in proposed Nasdaq Rule 5605(f), and the Demographic Disclosure Requirement was embodied in proposed Rule Nasdaq 5606. Nasdaq would delist any company that fails to comply with the Quota Requirement. *See* Nasdaq Rule 5801 ("A Company's failure to maintain compliance with the applicable provisions of the Rule 5000 Series will result in the termination of the listing unless an

6

exception is granted to the Company[.]"); *see also* Order at JA4 (noncompliant companies "would be issued a Staff Delisting Determination").

Nasdaq also proposed adoption of List Rule IM-5900-9 as a "Board Recruiting Service Proposal," which it also amended on February 26, 2021. *See Self-Regulatory Organizations; The Nasdaq Stock Market LLC; Notice of Filing of Proposed Rule Change To Adopt Listing Rule* IM-5900-9 *To Offer Certain Listed Companies Access to a Complimentary Board Recruiting Solution To Help Advance Diversity On Company Boards*, 85 Fed. Reg. 79,556 (Dec. 10, 2020), JA 723; Nasdaq, *Response to Comments and Notice of Filing of Amendment No. 1*, File No. SR-NASDAQ-2020-082 (Feb. 26, 2021) ("Nasdaq Letter III"), JA162. Under the Recruiting Service Proposal, Nasdaq will pay a company called Equilar to provide listed companies that do not comply with the Quota Requirement "access to a network of board-ready diverse candidates." *Id.* at JA172. The Recruiting Service Proposal provides no information regarding how Equilar will select candidates for inclusion in such a network, or what criteria will determine whether the candidates are "board-ready." On March 10, 2021, SEC commenced proceedings to approve or disapprove the Diversity and Recruiting Service Proposals. *Self-Regulatory Organizations; Nasdaq ISE, LLC; Notice of Filing and Immediate Effectiveness of Proposed Rule Change To Amend the Exchange's Pricing Schedule at Options 7, Section 3*, 86 Fed Reg 14,482 (March 16, 2021).

7

### III.    THE NATIONAL CENTER FOR PUBLIC POLICY RESEARCH AND OTHERS OBJECT

NCPPR is a non-profit organization incorporated in Delaware and located in Washington, D.C. It both holds stock and exercises its voting rights in Nasdaq-listed companies. *See* Decl. of Scott Shepard, Doc. 00516264526, at 3-4 (Apr. 1, 2022), attached as Exhibit A ("Shepard Declaration"). NCPPR's Free Enterprise Project engages in shareholder activism to promote free-market corporate governance by filing shareholder resolutions, engaging corporate CEOs and board members at shareholder meetings, petitioning SEC for interpretative guidance, and sponsoring media campaigns to encourage corporations to focus on their duty to shareholders. *Id.* at 3. NCPPR has standing to challenge SEC's Order because it "requires or encourages" NCPPR to discriminate based on race, gender, and sexuality of director candidates when voting its shares. *Meland v. Weber*, 2 F.4th 838, 843-47 (9th Cir. 2021); Shepard Declaration.

NCPPR filed a comment objecting to the Diversity Proposal. *See* Letter from Justin Danhof and Scott Shepard, Free Enterprise Project, National Center for Public Policy Research to Vanessa Countryman, Secretary, Commission, dated December 30, 2020 (''NCPPR Letter''), JA657. According to NCPPR:

> [A]s active shareholders in numerous companies listed on the Nasdaq, we are concerned that the proposed rule may cause companies to break state laws which require directors to serve as stewards for the benefit of shareholders. Selecting directors on the basis of arbitrary surface (and related) characteristics, rather than business acumen, industry

knowledge, prior experience, viewpoint diversity and other factors genuinely relevant to firm performance, may cause Nasdaq-listed companies to violate their legal fiduciary obligations to their shareholders.

*Id*. at JA659. NCPPR further explained that the Diversity Proposal was unconstitutional and unlawful. *Id*. at JA658. It questioned Nasdaq's reliance on social science studies to support its contention that surface-characteristic diversity along race, gender, or sexuality dimensions improves corporate governance and financial performance. While "viewpoint diversity increases financial, governance and other relevant performance, there appear to be no studies that establish that surface-characteristic diversity of the sort that would be mandated under this proposed rule causes … such performance enhancement." *Id*. at JA658-59.

Numerous other commenters echoed these objections.[2] NCPPR's co-petitioner, for instance, filed a 115-page comment objecting to the proposal on numerous grounds, including that the Diversity Rule is inconsistent with the Exchange Act and violates the Constitution. *See* Letter from C. Boyden Gray and Jonathan Berry, Boyden Gray & Associates submitted on behalf of the Alliance for Fair Board Recruitment, dated April 6, 2021 ("AFBR Letter"), JA45. And of

---

[2] *See, e.g.,* Letter from David R. Burton, Senior Fellow in Economic Policy, The Heritage Foundation, to J. Matthew DeLesDernier, Assistant Secretary, Commission, dated January 4, 2021 ("Heritage Letter"); Letter from Senator Pat Toomey and 11 other U.S. Senators, to Allison Herren Lee, Acting Chair, Commission, dated February 12, 2021 ("Senators Letter"); Letter from Dennis E. Nixon, President, International Bancshares Corporation, to Vanessa A. Countryman, Secretary, Commission, dated December 31, 2020 ("IBC Letter"); Letter from Publius Oeconomicis to Vanessa Countryman, Secretary, Commission, dated Dec. 28, 2020 ("Publius Letter"), JA672.

particular concern to this proceeding was that out of 55 objecting commenters, 12 or nearly 22% were filed anonymously or under a clear pseudonym out of fear of reprisal. For example, "Publius Oeconomicis" explained:

> I write anonymously because I fear that my opposition to the Proposed Rule will adversely impact my career. In US financial services firms, especially investment advisory arms, the promotion of diversity … social and governance … roles have become an undeniable religion … Those who do not agree that we should use capital markets to impose a social or political agenda are quietly excluded from key meetings, committees and groups[.][3]

Nearly a quarter of respondents who are concerned about the lawfulness, propriety, and wisdom of a rule that divides Americans by immutable—and irrelevant—characteristics for board service felt they could not safely speak in their own name. This fact—and that this Court agreed that AFBR's Petition would be filed under seal to protect the identity of the Nasdaq-listed company challenging the rule, *see* Doc. 00516099897 (Nov. 18, 2021)—suggests that "viewpoint diversity" that NCPPR believes to be integral to healthy corporate governance may be in short supply among corporate leaders. The unusual judicial acknowledgement of the necessity of anonymity for an objecting Nasdaq company exposes the purpose and effect of the Diversity Rule, which is to promote public shaming of corporations that do not comply with these government-imposed quotas and disclosures about race, gender

---

[3] Publius Letter, *supra* at n.2, at JA672 n.1.

10

identification and sexuality that would be and are forbidden in any other context by state and federal law.

## IV. SEC APPROVES DIVERSITY RULES OVER TWO DISSENTING COMMISSIONERS

On August 6, 2021, SEC approved Nasdaq's Diversity and Recruiting Services Proposals. *See* Order. The approved "Diversity Rule" has two principal components: (1) the Quota Requirement regarding race, gender, and sexuality embodied in Nasdaq Rule 5605(f); and (2) the Demographic Disclosure Requirement regarding those characteristics embodied in Nasdaq Rule 5606. The approved "Recruiting Services Rule" is embodied in Nasdaq Rule IM-5900-9.

In approving the Diversity Rule, SEC did not identify any provision of the Exchange Act that explicitly authorizes SEC—or any SRO under SEC's supervision—to regulate the race, gender, or sexuality of corporate directors, or to compel disclosure of such characteristics. SEC nonetheless concluded the Diversity Rule is "consistent with the requirements of the [Exchange] Act." Order, at JA2. SEC concluded that the Diversity Rule is consistent with Section 6(b)(5) of the Exchange Act, which:

> requires that the rules of a national securities exchange be designed, among other things, to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, to remove impediments to and perfect the mechanism of a free and open market and a national market system and, in general, to protect investors and the public interest, not be designed to permit unfair discrimination between customers, issuers, brokers, or dealers, and not be designed to

11

regulate by virtue of any authority conferred by the Act matters *not related to the purposes of the Act or the administration of the exchange.*

*Id.* (citing 15 U.S.C. § 78f(b)(5)) (emphasis added). SEC also found the Diversity Rule is consistent with "Section 6(b)(8) of the Act, which requires that the rules of a national securities exchange not impose any burden on competition that is not necessary or appropriate in furtherance of the purposes of the Act." *Id.* (citing 15 U.S.C. § 78f(b)(8)).

SEC said "the proposed rules do not mandate any particular board composition," but conceded that "the proposal may have the effect of encouraging some Nasdaq-listed companies to increase [favored races, gender, and sexual orientations] on their boards." *Id.* at JA5. Statements by approving SEC Commissioners confirm that encouraging companies to discriminate in favor of some races, the female gender, and certain sexual preferences (and against others) in the recruitment of directors is the intended effect of the Order. SEC Commissioners Allison Herren Lee and Caroline A. Crenshaw, Statement on Nasdaq's Diversity Proposals—A Positive First Step for Investors (Aug. 6, 2021)[4] ("Because enhanced diversity is critically important … we hope this is a starting point for initiatives related to diversity, not the finish line.").

---

[4] *Available at* https://www.sec.gov/news/public-statement/statement-nasdaq-diversity-080621.

SEC asserted that the Diversity Rule's mandatory demographic disclosure and explanation (if race, gender, and sexuality quotas are not met) requirements do not compel speech in violation of the First Amendment because "SROs generally are not state actors[]" and SEC's approval "is not sufficient to convert [the Rules] into state action." Order, at JA17 (quotation marks and footnote omitted). SEC further contended that the demographic disclosure and explanation requirements do not constitute compelled speech because they "are the kinds of disclosures that are routinely permitted, … do not compel a company to convey any specific message [, and] … would be constitutional in light of the substantial body of studies showing the benefits of diverse boards.[]" *Id*. (footnotes omitted). It is unclear what "substantial body of studies" SEC refers to because, in the same Order, it acknowledged that "studies of the effects of board diversity are generally inconclusive." *Id*. at JA9.

SEC also approved the Recruiting Services Proposal. Companies that do not satisfy the Quota Requirement would be offered a complimentary "board recruiting service, which would provide access to a network of board-ready diverse candidates." *Id*. at JA2. Nasdaq would pay a company called Equilar to provide this. SEC's Order made no attempt to understand how Equilar would determine how an individual could become part of the "network of board-ready diverse candidates" or

what "board-ready" means, aside from having the correct race, gender, or sexuality characteristics.

Two Commissioners dissented from the Order. Commissioner Roisman stated the Order "reiterates [Nasdaq's] assertions and then in places summarily finds that the Proposal is consistent with the Exchange Act," which falls short of SEC's obligation to "undertake its own 'reasoned analysis' to evaluate the merits of the proposal." Commissioner Roisman, *Statement on the Commission's Order Approving Exchange Rules Relating to Board Diversity* (Aug. 6, 2021), JA26, JA27 ("Roisman Dissent"). Commissioner Roisman also believed the "Order should have included a more thorough discussion of whether the Proposal could be considered state action, warranting analysis under the Constitutional standards of scrutiny." *Id.* at JA27.

Commissioner Peirce dissented to explain that the Diversity Proposal was "not actually intended or designed to address any matter relevant to the scope or purposes of the Exchange Act." Commissioner Peirce, *Statement on the Commission's Order Approving Proposed Rule Changes, as Modified by Amendments No. 1, to Adopt Listing Rules Related to Board Diversity submitted by the Nasdaq Stock Market LLC* (Aug. 6, 2021), JA30 ("Peirce Dissent"). Rather, it "reflects [Nasdaq]'s efforts to address matters of grave social concern by using its authority as a listing exchange to create incentives for issuers to make changes that

14

[Nasdaq] believes will bring about socially desirable results." *Id.* at JA36. She further stated that the Order "never actually provides evidence sufficient to establish that the Board Diversity Proposal is reasonably designed to satisfy any of the affirmative criteria enumerated in Section 6(b)(5) [of the Exchange Act]," *id.* at JA31, and that "the Board Diversity Proposal encourage[s] discrimination and effectively compel[s] speech … in a way that offends protected Constitutional interests." *Id.* at JA37. (Footnotes omitted).[5]

NCPPR timely filed its petition in the United States Court of Appeals for the Third Circuit on October 5, 2021. Pursuant to 28 U.S.C. § 2112(a), on November 9, 2021, the Third Circuit transferred the case to this Court for consolidation with an earlier-filed petition by the Alliance for Fair Board Recruitment ("AFBR"). The consolidated Petitions were heard by a panel of this circuit on August 29, 2022, which issued its opinion denying relief on October 18, 2023. Both AFBR and NCPPR timely petitioned for *en banc* rehearing, which this Court granted on February 19, 2024, vacating the panel decision.

---

[5] The dissenting Commissioners did not object to the second Rule providing for a service to make available a list of board-ready candidates to non-complying Nasdaq-listed companies. Because these Rules are conceptually and practically intertwined (a default under the first rule triggers the provision of a list), for purposes of this petition both Rules violate the Exchange Act and the Constitution as argued herein.

15

## ISSUES PRESENTED

1) Whether the Exchange Act allows SEC to approve Nasdaq Rules that are unrelated to the Act's purposes, fail to serve required objectives under the Act, impose prohibited burdens, and violate state and federal laws and constitutions prohibiting such discrimination.

2) Whether SEC's approval of Nasdaq Rules that compel listed companies to speak on matters unrelated to the purposes of the Exchange Act; that discriminate on the basis of content- and viewpoint- of the speech; and which require disclosure, compliance or explanation of the gender, racial and sexual orientation composition of their boards; and which encourage investor discrimination against—or for that matter, for—companies with respect to these characteristics of its board members violates the First Amendment.

3) Whether SEC's approval of these Nasdaq Rules was arbitrary and capricious, thus violating the Administrative Procedure Act.

## SUMMARY OF THE ARGUMENT

SEC's Order approving the Diversity Rule violates the Exchange Act, which explicitly requires SEC to reject any Nasdaq rule that regulates matters outside the Act's purposes or that fails to advance one of the Act's market-promotion or investor-protection objectives. 15 U.S.C. § 78f(b)(6). Regulating the makeup of corporate boards' race, gender, and sexuality falls far outside the Act's purposes and objectives. The Exchange Act further requires SEC to reject the Diversity Rule as

16

imposing significant burdens without any benefits, *id.* § 78f(b)(8), in light of the Supreme Court's recent explanation that the Rule's purportedbenefit—*i.e.,* checkbox diversity—rests on "pernicious stereotype[s]." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 220 (2023).

The Diversity Rule's demographic-disclosure and explanation (if quotas are unmet) requirements also constitute compelled speech in violation of the First Amendment. Nasdaq exercises governmental power in its rulemaking process, and SEC's Order approving the Diversity Rule is state action subject to constitutional scrutiny. The Diversity Rule fails such scrutiny because there is no compelling governmental interest to compel speech regarding the demographic composition of boards, and it is not narrowly tailored to serve any compelling interest.

Finally, SEC's approval of the Diversity Rule was arbitrary and capricious because SEC simply accepted Nasdaq's assertion that the Rule serves investor interests without any independent analysis. Its approval of the Recruiting Services Rule is likewise arbitrary and capricious because SEC failed to analyze how Nasdaq (or the company it hired to provide recruiting services) determines when a candidate is "board-ready."

**ARGUMENT**

### I.    SEC LACKS AUTHORITY TO APPROVE DIVERSITY RULES

The Exchange Act provides that SEC "shall approve" a SRO's proposed rule if it independently determines that "such proposed rule change is consistent with the requirements of [the Exchange Act]." 15 U.S.C. § 78s(b)(2)(C)(i). SEC must look to Section 6(b) to determine a proposed rule's consistency with the Act.

Three requirements are relevant here. *First*, § 6(b)(5) requires SEC to ensure that an exchange's rules "are not designed to … regulate by virtue of any authority conferred by this chapter matters not related to the purposes of [the Exchange Act]." 15 U.S.C. § 78f(b)(5). The Diversity Rule violates this requirement because encouraging discrimination based on race, gender, and sexuality of board members and requiring disclosure of such demographic information in a "diversity matrix" both fall far outside the purposes of the Act.

*Second*, § 6(b)(5) further requires SEC to ensure an exchange's rules:

> are designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, to foster cooperation and coordination with persons engaged in regulating, clearing, settling, processing information with respect to, and facilitating transactions in securities, to remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect investors and the public interest.

*Id.* The Diversity Rule violates this requirement because it is not designed to achieve any of the above-listed statutory goals. Rather, it is designed to help certain investors

18

to discriminate based on race, gender, and sexuality of board members and to pressure Nasdaq-listed companies to hire board members based on these demographic characteristics.

*Third*, § 6(b)(8) requires SEC to ensure "[t]he rules of the exchange do not impose any burden on competition not necessary or appropriate in furtherance of the purposes of [the Exchange Act]." *Id.* at (b)(8). The Diversity Rule violates this cost-benefit balancing requirement because the sole claimed benefit of encouraging diversity along race, gender, and sexuality dimensions is not a benefit at all. Rather, as the Supreme Court recently explained, the pursuit of such checkbox diversity "engages in the offensive and demeaning assumption that [directors] of a particular race [or gender], because of their race [or gender], think alike." *Students for Fair Admissions*, 600 U.S. at 220–21 (quoting *Miller v. Johnson*, 515 U.S. 900, 911–912 (1995)) (internal quotation marks omitted).

## A. The Diversity Rules Regulate Matters Not Related to the Purposes of the Exchange Act

The Exchange Act requires SEC to ensure that an exchange's rules "are not designed to … regulate by virtue of any authority conferred by this chapter matters not related to the purposes of [the Exchange Act]." 15 U.S.C. § 78f(b)(5). Section 2 of the Act describes the Act's purposes, which consist of regulating securities transactions to "protect interstate commerce" and the financial system, and to maintain "fair and honest markets in [securities] transactions." *Id.* § 78b. This case

19

should be easy because race, gender, and sexuality of directors—or indeed any person—do not relate to any of the Act's purposes. *See* Peirce Dissent at JA31–32.

### 1. *The Exchange Act's Purposes Do Not Include Pressuring Companies to Hire Directors Based on Race, Gender, and Sexuality*

Pressuring companies to recruit diverse directors does not fall within the purposes of the Act. Since at least 1975, SEC has recognized that "it generally not authorized to consider the promotion of social goals unrelated to the objectives of the federal securities laws." SEC, *Environmental and Social Disclosure*, 40 Fed. Reg. 51,656 (Nov. 6, 1975). Neither SEC nor Nasdaq attempts to argue that the Exchange Act's scope includes encouragement of companies to recruit corporate directors based on race, gender, and sexuality. Indeed, Congress could not have done so because pressuring or encouraging companies to recruit based on race or gender is clearly unconstitutional. *See MD/DC/DE Broadcasters Association v. FCC*, 236 F.3d 13, 18 (D.C. Cir. 2001) (striking down as unconstitutional governmental action that "create[s] pressure to recruit women and minorities.").

SEC instead claims that the Diversity Rule "would establish a disclosure-based framework" that "would not require a company to select a director solely because that person falls within the proposed definition of 'Diverse[.]'" Order at JA5; *see also* SEC Br. at 12 That argument misses the point because a company faced with a quota can always choose to pay the penalty for noncompliance. A

California law that fined corporations for not having a minimum number of racial minorities on their boards was recently struck down as a racial quota. *All. for Fair Bd. Recruitment v. Weber*, No. 21-CV-01951, 2023 WL 3481146, at *1 (E.D. Cal. May 15, 2023). The only difference here is that the Diversity Rule's Quota Requirement imposes a different penalty: a company must either make a public apology (styled as an explanation) or be delisted, both are burdensome and costly. SEC cannot avoid the conclusion that the Diversity Rule imposes quotas based on race, gender, and sexuality. The question is not whether the Rule *mandates* hiring directors based on those characteristics, but whether it pressures or encourages companies to do so.

For instance, *MD/DC/DE Broadcasters Association* involved a disclosure framework whereby regulated broadcasters must "report the race, sex, and source of referral for each applicant." *Id.* at 19. The D.C. Circuit had no problem concluding such disclosure exerted unlawful pressured because companies were encouraged to recruit based on race and gender. *Id.* Here, the Diversity Rule is likewise designed to pressure companies to recruit directors based on their race, gender, and sexuality. Indeed, Nasdaq's proffered benefits of board diversity in terms of risk mitigation and improving corporate governance—which SEC held to be unsupported, *see* Order at JA8-9—is premised precisely on companies being pressured or encouraged by the Rule to recruit directors based on those characteristics.

21

The encouragement here is far more direct than in *MD/DC/DE Broadcasters Association*, 236 F.3d at 19. There, companies had to "report the race, sex, and source of referral for each [job] applicant," which the agency used to assess compliance with companies' equal opportunity recruitment obligations. *Id.* While the agency nominally claimed to seek nondiscrimination, its "focus upon the race and sex of applicants" created a "powerful incentive for [companies] to focus their recruiting efforts upon women and minorities, at least until those groups generate a safe proportion of the [companies'] job applications." *Id.* at 19-20. By contrast, the Diversity Rule acts much more directly by imposing a hard quota that takes the guesswork out of what the regulator wants: a minimum number of women and minority directors. Moreover, having women and minorities in the applicant pool is not enough. Nasdaq-listed companies must actually hire them as directors. That the quotas are not enforced by monetary penalty but rather by a compelled-explanation-or-delisting requirement does not change the fact that they encourage recruitment based on race, gender, and sexuality, *see Meland*, 2 F.4th at 846 ("A law may require or encourage action whether or not it imposes a monetary sanction for noncompliance."). And, in fact, they impose the serious cost of involuntary delisting. The Recruiting Services Rule dispels any possible doubt of what is being encouraged by providing a "board-ready" list of so-called diverse directors to companies that fall short of the quotas. *See* Nasdaq Letter III at JA172; Nasdaq Rule IM-5900-9.

While board diversity along dimensions encouraged by the Diversity and Recruiting Services Rules may well be desirable as a *symptom* of a healthy business climate, nothing in the Exchange Acts suggests that ensuring or encouraging such diversity falls within the Act's purposes. Encouraging race, gender, and sexuality discrimination is unprecedented in the many decades in which SEC and SROs it supervises have regulated financial markets. The Court must reject SEC's "claim to discover … an unheralded power" in the 1934 Exchange Act to approve such encouragement as "a transformative expansion of its regulatory authority in … a long-extant … statute." *West Virginia v. EPA*, 142 S.Ct. 2587, 2610 (2022) (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)) (cleaned up). As the state amici pointed out, corporate board composition is a traditional state concern falling outside the Exchange Act's scope, which ends all doubt on the question. Amicus Curiae of 17 States at 11-12 (Dec. 27, 2021) (citing *Santa Fe Industries v. Green*, 430 U.S. 462, 479 (1977)).[6] So, section 6(b)(5) requires SEC to reject the Diversity Rule as being designed to regulate matters that fall outside the Act's purposes.

---

[6] Congress "must make its intention … unmistakably clear in the language of the statute" "to alter the usual constitutional balance between the States and the Federal Government." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (internal quotation marks and citation omitted). The Exchange Act lacks explicit language needed to evince that Congress intended to place corporate board composition, an area of traditional state concern, within the Act's regulatory scope.

**2.  *The Exchange Act's Purposes Do Not Include Disclosing Immaterial Information to Facilitate Irrational Discrimination***

Even if SEC could characterize the Diversity Rule as a pure disclosure framework that does not pressure companies to recruit based on race and gender (which it cannot), that Rule would still fall outside the Exchange Act's purposes.

Nasdaq reported a wave of purported investor interest in discriminating against some companies and in favor of others based on the gender, race, and sexual orientation of their directors. Diversity Proposal at JA689. In response, Nasdaq propounded rules that compel companies to disclose the raw material upon which the desired discrimination would operate. Order at JA6. Applying the substantial evidence standard, SEC concluded that no reasonable mind could accept Nasdaq's and activist investors' claim that gender, race, or sexual orientation of directors has a rational relationship to corporate performance or investor returns. *Id.* at JA8-9; *see Boeta v. FAA*, 831 F.3d 636, 641 (5th Cir. 2016) (quoting *Ellis v. Liberty Life Assur. Co. of Bos.*, 394 F.3d 262, 273 (5th Cir. 2004)) (defining substantial evidence as "relevant evidence as a reasonable mind might accept as adequate to support a conclusion."). It necessarily follows that the desire to discriminate in this way is both irrational and invidious. *See Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 619 (1991) ("Racial discrimination [is] invidious in *all contexts*") (emphasis added) (citing *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 172 (1972)).

24

The "touchstone" of the Exchange Act's regulatory reach is "the presence of an investment … premised on a reasonable expectation of profits." *SEC v. Edwards*, 540 U.S. 389, 395 (2004) (quoting *United Hous. Found. v. Forman*, 421 U.S. 837, 852 (1975)). But SEC conclusively determined that gender, race, and sexual orientation of directors have nothing to do with that touchstone of "financial returns on … investments." *Id.* at 396 (quoting *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 853 (1975)) (alteration in original). That determination should come as no surprise, especially in light of the Supreme Court's recent conclusion that similar concepts of checkbox diversity are grounded in "pernicious stereotype[s]" that "treat individuals as the product of their race," *Students for Fair Admissions*, 600 U.S. at 220–21 (quoting *Miller*, 515 U.S. at 911-12)).

SEC's finding on this count should have ensured the Diversity Rule's demise because, as Commissioner Peirce explained in her dissent, it placed the Rule squarely in the forbidden territory of matters not related to any purpose under the Exchange Act. Peirce Dissent at JA36-37. Indeed, SEC's authority to require disclosures under the Act is limited to *material* information, *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 448-49 (1976), meaning "there is a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest." *R&W Tech. Servs. Ltd. v. CFTC*, 205 F.3d 165, 169 (5th Cir. 2000). Materiality has consistently bound disclosure requirements under

the Exchange Act. Given that SEC found no evidence to believe the race, gender, and sexuality makeup of a corporate board has any relationship with investment performance—*i.e.*, what a reasonable investor cares about—the diversity matrices and forced explanation for not meeting quotas constitute mandatory disclosure of decidedly *immaterial* information that falls outside the Exchange Act's purpose.

### 3.  *The SEC's Approach Is Boundless and Without Precedent*

SEC approved the Diversity Rule as furthering the Exchange Act's purposes because it determined the demographic information "would contribute to [certain] investors' investment and voting decisions." Order at JA8. Under this logic, SEC— or SROs it services—could compel the disclosure of *any* information so long as some investors want it. There are no logical boundaries circumscribing where this agency-created source of authority might reach.

For instance, one investment company in favor of the Rules, Morningstar, Inc., *see* Letter from Aron Szapiro, Head of Policy Research, Morningstar Inc., & Michael Jantzi, CEO, Sustainalytics (Jan. 13, 2021), JA638, also participated in the Boycott, Divestment, and Sanctions (BDS) movement, which promotes divestment from companies that support Israel, *see, e.g.*, Asaf Shalev, *A New BDS Battlefront Emerges In Investing World, With Spotlight On Morningstar*, Times of Israel (Feb.

9, 2022).[7] Morningstar's ESG ratings specifically discouraged investments in companies that did business in Israel. *Id.* Under SEC's rationale, BDS investors' desire to learn whether a company has Israeli customers and suppliers, so they can boycott it, would justify rules mandating disclosure of such information, compelling explanations for doing business in Israel, and providing lists of approved alternatives. If this court accepts this purported justification with no limiting principle on materiality, it will have declared open season for agency manipulation of financial markets on any topic of interest to those holding temporary and unaccountable political power willing to engage in off-road driving beyond the regulatory guardrails Congress established in law for the SEC.

### 4. Plain Application of the Exchange Act's Text Requires This Court to Strike Down the Board Diversity Rules

Neither the 1934 Exchange Act nor any subsequent amendment thereto confers power on SEC to approve any exchange's rules that are not designed to further the purposes of the Exchange Act. Section 6(b)(5) and the Act's materiality standard forbid this unprecedented venture into regulating controversial social issues. "Statutes *in pari materia* are to be interpreted together, as though they were one law." Antonin Scalia & Bryan A. Garner, READING LAW 252 (2012) (explaining what is also known as the "Related-Statutes Canon"). *See also Sivaraman v.*

---

[7] *Available at* https://www.timesofisrael.com/a-new-bds-battlefront-emerges-in-investing-world-with-spotlight-on-morningstar/.

*Guizzetti & Assocs.*, 228 A.3d 1066, 1076 (D.C. 2020) ("[T]he doctrine of *in pari materia* simply means 'laws dealing with the same subject … should if possible be interpreted harmoniously.'") (citing Scalia & Garner, *supra*, at 252). This has been a rule of statutory construction for nearly two centuries. *United States v. Freeman*, 44 U.S. (3 How.) 556, 564-65 (1845). This canon of construction remains vital:

> "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." … Where the statute at issue is one that confers authority upon an administrative agency, that inquiry must be "shaped, at least in some measure, by the nature of the question presented"—whether Congress in fact meant to confer the power the agency has asserted. … In the ordinary case, that context has no great effect on the appropriate analysis. Nonetheless, our precedent teaches that there are "extraordinary cases" that call for a different approach—cases in which the "history and the breadth of the authority that [the agency] has asserted," and the "economic and political significance" of that assertion, provide a "reason to hesitate before concluding that Congress" meant to confer such authority.

*West Virginia*, 142 S.Ct. at 2607-08 (cleaned up). See also W. Eskridge, Interpreting Law: A Primer on How to Read Statutes and the Constitution 288 (2016) ("Even if Congress has delegated an agency general rulemaking or adjudicatory power, judges presume that Congress does not delegate its authority to settle or amend major social and economic policy decisions."). Neither SEC nor Nasdaq has pointed to any statutory language that alters this requirement that exchange rules must be related and material

to the purposes of the Act, and that in approving them, SEC must ensure that

proposed new rules meet these standards.

## B. The Diversity Rules Are Not Designed to Further Any of the Mandatory Objectives Under § 6(b)(5)

SEC may approve an SRO's rule only if that rule is affirmatively designed to

achieve at least one of the following investor-protection objectives under § 6(b)(5)

of the Exchange Act:

1. prevent fraudulent and manipulative acts and practices;

2. promote just and equitable principles of trade;

3. remove impediments to and perfect the mechanism of a free and open market and a national market system; and

4. protect investor and public interest.

15 U.S.C. § 78f(b)(5).

SEC did not adopt Nasdaq's assertion that board diversity would prevent

fraud. *See* Order at JA8 n.97. It did, however, accept Nasdaq's assertion that the

Diversity Rule is "designed to promote just and equitable principles of trade,

remove impediments to and perfect the mechanism of a free and open market and

a national market system, and protect investors and the public interest." *Id.* at JA7.

SEC reached this conclusion based solely on its finding that disclosures required

by the Diversity Rule "would provide widely available, consistent, and comparable

information that would contribute to investors' investment and voting decisions."

*Id.* That factual finding is entitled to deference under the substantial evidence standard. *Chamber of Com. v. SEC*, 85 F.4th 760, 767 (5th Cir. 2023). But SEC's assertion that providing "available, consistent, and comparable [demographic] information" to help investors make "investment and voting decisions" based on the race, gender and sexuality of corporate directors serves the statutory objectives under § 6(b)(5) is a legal conclusion subject to *de novo* review, *id.*, which SEC flunks.[8]

### 1. A Disclosure Requirement Does Not Serve § 6(b)(5)'s Objectives

Mandating disclosure of information for investors to use to make investment decisions could satisfy the statutory objectives under § 6(b)(5) only if investment decisions based on such information serves those statutory objectives. Here, SEC determined that there is no basis for a rational person to believe the demographic information that must be disclosed under the Diversity Rule, *i.e.*, the diversity matrix, *see* Nasdaq Rule 5606, is relevant to corporate governance or investment

---

[8] SEC's prior briefing in this case seeks deference under *Chevron v. NRDC*, 467 U.S. 837 (1984). *See* SEC Br. at 17. But this Court may not defer to SEC's interpretation of § 6(b)(5) under *Chevron* or any other judge-made doctrine because doing so "[t]ransfer[s] the job of saying what the law is from the judiciary to the executive." *Gutierrez-Brizuela v. Lynch*, 834 F.3d 1142, 1152 (10th Cir. 2016) (Gorsuch, J., concurring). Such bias and transfer of powers leads to "more than a few due process … problems." *Id.* at 1155. In any event, the Supreme Court is currently considering whether to overrule *Chevron*. *See Loper Bright Enters. v. Raimondo*, No. 22-451, cert. granted on Question 2 of Pet. (May 1, 2023) and *Relentless v. Dep't of Com.*, No. 22-1291, cert. granted on Question 1 of Pet. (Oct. 13, 2023).

performance, *see* Order at JA8-9. So, investors who make investment and voting decisions based on the race, gender, and sexuality of corporate directors do not do so out of any rational expectation of investment returns. Rather, they are acting for either irrational reasons or for reasons unrelated to profits and losses. Providing information to enable or encourage such investment decisions does not serve any of § 6(b)(5)'s mandatory objectives.

To begin, it does not "promote just and equitable principles of trade" to help investors make discriminatory investment and voting decisions based on the race, gender, and sexuality makeup of corporate boards.[9] Indeed, such characteristics have nothing to do with the "trade" in securities.[10] Similarly, demographic information regarding corporate boards has nothing to do with a "free and open market" under § 6(b)(5) because, as SEC concluded, there is no basis for a rational person to believe such information is related to investment profits. Finally, there is no public interest in basing investment decisions on, for instance, the "pernicious stereotype that a black [director] can usually bring something that a white [director] cannot offer." *Students for Fair Admissions*, 600 U.S. at 220 (cleaned up). So,

---

[9] Nasdaq did not claim that the Diversity Rule would improve "promote just and equitable principles of trade" in its proposal.

[10] If anything, justice and fairness are served by discouraging such irrational and invidious discrimination based on race, gender, and sexuality.

providing investors with a "diversity matrix" to facility their invidious discrimination cannot serve the public interest under § 6(b)(5).

### 2. A Quota Requirement Does Not Serve § 6(b)(5)'s Objectives

Even if providing demographic information to enable irrational and invidious discrimination serves one of § 6(b)(5)'s mandatory objectives—it does not—SEC still must reject the Diversity Rule because its Quota Requirement does not serve any of those objectives. The Quota Requirement does not provide demographic information that SEC claims certain investors seek because the Disclosure Requirement's "diversity matrix" already supplies that information.

Rather, as explained above, the Quota Requirement is designed to encourage companies to hire directors based on their race, gender, and sexuality. All of § 6(b)(5)'s mandatory objectives, however, "concern[] the administration and operation of the self-regulatory organizations themselves, *not the fairness of the issuers' corporate structures*." *Bus. Roundtable v. SEC*, 905 F.2d 406, 413 (D.C. Cir. 1990) (emphasis added). Rules concerning whom listed companies could or should hire as corporate leaders cannot serve those objectives.

### C. The Diversity Rule Imposes Unnecessary and Inappropriate Burdens

Even if the Diversity Rule regulates matters within the scope of the Exchange Act and serves one of the objectives under § 6(b)(5), the Order would still violate the requirement under § 6(b)(8) that SEC may not approve SRO rules that "impose

any burden on competition not *necessary* or *appropriate*" to advance the purposes of the Exchange Act. 15 U.S.C. § 78f(b)(8). This Court recently "stress[ed] that the adjectives necessary and appropriate limit the authorization contained in [a statutory] provision." *Mexican Gulf Fishing Co. v. United States Dep't of Com.*, 60 F.4th 956, 965 (5th Cir. 2023). A rule can be necessary or appropriate only if "its benefits reasonably outweigh its costs," including non-financial costs. *Id.*

SEC fails to show that the asserted benefits of diversity defined under the Rule outweigh the costs. Because SEC rejected Nasdaq's theory that diversity improves corporate performance, its only claimed benefit is enabling certain investors to discriminate based on race, gender, and sexuality and thereby encouraging surface-level diversity as defined by the Rules, Order at JA13. But the Supreme Court recently explained that such checkbox-like diversity objectives are grounded in "the offensive and demeaning assumption that [directors] of a particular race [or gender], because of their race [or gender], think alike." *Students for Fair Admission*, 600 U.S. at 220–21. As Commissioner Peirce explained, the Rule's disclosure categories and the Exchange's numerical "'diversity objectives' rely on inappropriate stereotyping … that people within a particular diversity category necessarily provide a different perspective from those within a different diversity category." Peirce Dissent at JA34. Such stereotyping can only "cause[] continued hurt and injury," *Students for Fair*

33

*Admission*, 600 U.S. at 221, and thus cannot be categorized as a "benefit" that can outweigh the Rule's costs.

Besides, since when did it become appropriate to ask current or prospective board members their race, gender or sexual preference, a necessary predicate for any accurate reporting? These are considered by many to be personal questions, wholly irrelevant to their qualifications for employment. And rightly so. Even viewed as a mere disclosure regime—it is not—the Diversity Rule imposes personal and privacy burdens on employer and board member or applicant alike. Board members who decline to provide this information—as they have every right to do—would also skew the data, throwing the whole enterprise into well-deserved chaos and futility.

Further, issuing a statement explaining a company's reasons for noncompliance with the Quota Requirement is anything but an innocuous burden. Such forced public explanations open companies up to unfair discrimination by investors and activists. While SEC and Nasdaq attempt to cast the burden of such compelled speech as minimal, the reality is that companies which disagree must now comply with unconstitutional and unlegislated quotas and compelled public confessions of shortfall due to pressure and regulatory sway from larger market players—Nasdaq and SEC itself. Federal law cannot be made by these private actors working hand-in-hand with administrative agencies to do what Congress itself did not and could not lawfully enact. *See Norwood v. Harrison*, 413 U.S. 455, 465

34

(1973) (the government may not "induce, encourage, or promote private persons to accomplish what it is constitutionally forbidden to accomplish."). For nearly two-hundred years the Supreme Court has recognized that "a state … cannot [do] indirectly[] what it is prohibited from doing directly[,]" *Briscoe v. Bank of Commonwealth of Ky.*, 36 U.S. 257, 316 (1837). *See also Smith v. Turner*, 48 U.S. 283, 458 (1849) ("It is a just and well-settled doctrine established by this [C]ourt, that a State cannot do that indirectly which she is forbidden by the Constitution to do directly.").

In sum, the Diversity Rule's only claimed benefit is actually a cost—and an unconstitutional one at that. On top of this, Nasdaq-listed firms face significant financial costs in preparing a diversity matrix; in seeking board members that have the right skin color, gender, or sexual preference; and in developing an explanation for not doing so. Involuntary delisting imposes potential reputational, stock price, liquidity and lack of access to capital costs on non-compliant companies, for purposes entirely outside the purview of the '34 Act.

The Diversity Rule violates 15 U.S.C. § 78f(b)(8) because it imposes tremendous costs, with no benefits in return.

## II.     THE DIVERSITY RULE COMPELS SPEECH IN VIOLATION OF THE FIRST AMENDMENT

The Diversity Rule is state action subject to constitutional scrutiny, which it fails because its explanation and demographic-disclosure requirements constitute compelled speech that violate the First Amendment.

### A. The Order and Diversity Rule Constitute State Action Subject to First Amendment Scrutiny

#### 1.  *Nasdaq's Exercise of Governmental Powers to Perform Regulatory Functions Is State Action*

SROs like Nasdaq exercise power delegated to them by Congress when they engage in their regulatory functions. *Austin Mun. Secs.*, 757 F.2d at 680. ("Congress delegated power to [self-regulatory] organizations," "to enforce … the legal requirements laid down in the Exchange Act."). The Exchange Act explicitly recognizes that SROs "regulate by virtue of … authority conferred by this [Act]," 15 U.S.C. § 78f(b)(5); *see also* S. Rep. 94-75, 24, 1975 U.S.C.C.A.N. 179, 203 (recognizing that "self-regulatory organizations utilize governmental-type powers in carrying out their responsibilities under the Exchange Act[.]"). "The rules issued by [Nasdaq] governing listing and de-listing stock offerings were not issued independent of the Exchange Act, … but by the exchange acting on authority delegated by Congress." *Sparta Surgical Corp. v. NASD*, 159 F.3d 1209, 1214 (9th Cir. 1998), *abrogated on other grounds by Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 578 U.S. 374 (2016) (internal quotations marks and citation

36

omitted). An SRO's rule "constitutes government action of the purest sort" because it comes from governmental power and would subject noncompliant persons to legal sanctions. *Blount v. SEC*, 61 F.3d 938, 941 (D.C. Cir. 1995) (subjecting SRO rule to First Amendment scrutiny).[11] Nasdaq's enactment and enforcement of its listing rules, including the Diversity Rule, is therefore bound by the Constitutional strictures.

Companies that fail to comply with the Diversity Rule are subject to delisting, which is indisputably an exercise of regulatory authority: "[T]here are few functions more quintessentially regulatory than suspension of trading." *Sparta Surgical Corp.*, 159 F.3d at 1214. Nasdaq and other exchanges not only admit this, they insist on it whenever there is a benefit to cloaking themselves in the state's persona. When SROs want immunity from suit based on their regulatory activity, they quickly reach for state-actor status. *See id*.

In *Sparta Surgical*, a listed company sued Nasdaq for temporarily delisting it without explanation. *Id.* at 1211. The Ninth Circuit explained that Nasdaq's listing and de-listing standards "were issued pursuant to the Exchange Act's directive that

---

[11] In *Blount*, the SRO at issue was the only one that regulates dealers in municipal securities. The fact that there are multiple stock exchanges does not change the conclusion that their rules also constitute governmental actions. For one, being delisted and forced to list on another exchange is incredibly costly and is comparable to the legal sanction at issue in *Blout*, *i.e.*, loss of license. Additionally, whether an SRO exercises governmental power when it regulates cannot depend on the number of SROs in the industry. Finally, should the Court uphold Nasdaq's Diversity Rule, NYSE and other exchanges are sure to be subject to demands for similar rules.

self-regulatory organizations adopt rules and by-laws in conformance with the Exchange Act," and "SEC must approve the rules[.]" *Id.* at 1212 (citing 15 U.S.C. §§ 78o-3(b) and 78s(b)). The court held that Nasdaq's de-listing decision was "cloaked in immunity" because it was acting pursuant to government-delegated powers over listing standards. *Id.* at 1215. If Nasdaq were to delist a company for failing to comply with the Diversity Rule—perhaps because it disagrees with the company's definition of LGBTQ+—it undoubtedly would seek and obtain sovereign immunity from suits.

This Court has likewise held that regulatory actions taken by Nasdaq's predecessor, NASD, are entitled to sovereign immunity because it "exercises quasi-governmental authority pursuant to a statutory scheme enacted by the national sovereign." *Austin Mun. Secs.*, 757 F.2d at 680, 692 ("The NASD's [regulatory] actions are more akin to those of the SEC, which has sovereign immunity from damage suits, than to municipal activities.") (citing *Sprecher v. Graber*, 716 F.2d 968, 973-74 (2d Cir. 1983); *see also DL Cap. Grp., LLC v. Nasdaq Stock Mkt., Inc.*, 409 F.3d 93, 95 (2d Cir. 2005) (Recognizing that Nasdaq and other "SROs effectively stand in the shoes of the SEC because they perform regulatory functions that would otherwise be performed by the SEC[.]") (cleaned up). Nasdaq cannot have it both ways. Its enjoyment of sovereign immunity for regulatory activities is patently incompatible with its claim such regulatory activities are not state action.

38

Therefore, even though Nasdaq is a private company, its regulatory activities (authorized by the Exchange Act and empowered by SEC) comprise state action.

Consider the alternative. If Nasdaq were purely private, its exercise of regulatory and enforcement powers would violate the Constitution's prohibition against delegating regulatory authority to private entities. *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 880 (5th Cir. 2022) ("[I]f people outside government could wield the government's power—then the government's promised accountability to the people would be an illusion."). Such delegation is "unknown to our law" and "utterly inconsistent with the constitutional prerogatives and duties of Congress." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 537 (1935). After all, "[w]hen it comes to [delegating to] private entities, ... there is not even a fig leaf of constitutional justification," since "[p]rivate entities are not vested with 'legislative Powers.' Nor are they vested with the 'executive Power,' which belongs to the President." *Dep't of Transp. v. Ass'n of Am. RRs*, 575 U.S. 43, 62 (2015) (Alito, J., concurring) (citations omitted). Accordingly, if Nasdaq were a private entity, all its regulations would be the product of unconstitutional private delegation and thus invalid. *See Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936).

### 2. SEC's Approval of the Diversity Rules Is State Action Subject to Constitutional Scrutiny

Such a dramatic result is unnecessary because, even if Nasdaq were a purely private entity—it is not—SEC is still an agency of the United States that must approve all of Nasdaq's listing rules before they take effect. SEC's final order allowing Nasdaq's Diversity and Recruiting Services Rules to take effect is indisputably state action subject to constitutional scrutiny.

SEC and Nasdaq rely on *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381 (1940), cited at SEC Br. 42 and Nasdaq Br. 45 n.6 to rebut NCPPR's argument that the private nondelegation doctrine would be violated if Nasdaq were not a government entity. But *Adkins* actually proves that Nasdaq rules are subject to constitutional scrutiny. *Adkins* concerned a statute that permitted a private entity to propose price regulations that would not take effect until approved by a supervising federal agency. 310 U.S. at 388. The Supreme Court held that the private nondelegation doctrine was not offended because the enactment of a regulation is attributed to the approving federal agency rather than the private entity. *Id.* at 399 ("The members of the [private entity] function subordinately to the Commission. It, not the [private] authorities, determines the prices."). If Nasdaq were a purely private entity, its exercise of regulatory power would be constitutional only if the resulting rule were attributed to SEC, the government agency that ultimately approves it. *Id.*

*Oklahoma v. United States*, 62 F.4th 221 (6th Cir. 2023), reinforces this conclusion. After this Court held that delegation of regulatory powers to the private Horseracing Authority violated the private nondelegation doctrine, "Congress amended the [statute] to give the Federal Trade Commission discretion to 'abrogate, add to, and modify' any rules," thus "giv[ing] the FTC the final say over" the Horseracing Authority's regulatory actions. *Id.* at 225. In holding that the amendment fixed the private delegation problem, the Sixth Circuit relied on the relationship between SEC and SROs, explaining that "courts have upheld this arrangement" because "the SEC's ultimate control over the [SROs'] rules and their enforcement makes the SROs permissible aides and advisors." *Id.* at 229.

The Horseracing Authority's exercise of regulatory power did not present a private delegation problem only because a government agency—FTC—was made ultimately responsible for the Authority's rules. *Id.* at 225. Similarly, Nasdaq's regulatory power avoids a private delegation problem only because SEC is ultimately responsible for approving Nasdaq's rules, including the Diversity and Recruiting Services Rules at issue in this case. SEC cannot hide behind Nasdaq to avoid constitutional scrutiny of its unconstitutional approval order.

SEC mistakenly relies on *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982), to assert that "'[m]ere approval' of [Nasdaq's] proposal as consistent with the requirements of the Act is 'not sufficient' to convert it into state action." JA17

(quoting *Blum*, 457 U.S. at 1004). *Blum* is wholly inapposite. There, private nursing home residents sued state regulators for the nursing home's discharge decisions. 457 U.S. at 994. The plaintiffs argued that, by regulating and overseeing nursing homes and by requiring "completion of a form" under state law, the government "affirmatively command[ed]" the discharge decision of private physicians. *Id.* at 1005, 1007. The Court disagreed because "physicians, not the [government] forms, make the decision," and they do so under "professional standards that are not established by the State." *Id.* at 1006, 1008.

The regulators in *Blum* did not need to specifically approve a physician's discharge decision before a discharge takes effect. By contrast, no Nasdaq rule takes effect without SEC approval. Nor must the *Blum* regulators conduct and publish an independent review of each discharge decision to ensure that it complied with the governing law. By contrast, SEC approval of any Nasdaq rule must be based on its own "reasoned analysis" to ensure its consistent with the Exchange Act, which must be published the Federal Register. *Susquehanna*, 866 F.3d at 447. In short, the relationship here between SEC and SROs it supervises is a far cry from the one between generic regulators and nursing homes in *Blum*. Rather, it is much closer to the relationship between FTC and the Horse Authority, where the agency has "ultimate control over the rules and their enforcement." *Oklahoma*, 62 F.4th at 229.

42

That Court's precedent makes clear that SEC's ultimate responsibility for Nasdaq's listing rules transforms those rules into state action subject to constitutional restraints. *Roberts v. La. Downs, Inc.*, 742 F.2d 221 (5th Cir. 1984); *Intercontinental Indus., Inc. v. Am. Stock Exch.*, 452 F.2d 935 (5th Cir. 1971). *American Stock Exchange* concerned an SEC order approving an SRO exchange's decision to delist a company. *Id.* at 937. This Court explicitly rejected the exchange's argument that "constitutional due process is not required since the Exchange is not a governmental agency" as being "clearly contrary to numerous court decisions." *Id.* at 941 (citing, among others, *Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961)). Rather, "[t]he intimate involvement of the Exchange with the Securities and Exchange Commission brings it within the purview of the Fifth Amendment controls over governmental due process." *Id.; accord Rooms v. SEC*, 444 F.3d 1208, 1214 (10th Cir. 2006) ("Due process requires that an NASD rule give fair warning of prohibited conduct before a person may be disciplined for that conduct.").

In *Roberts,* a private horseracing club's action was attributable to Louisiana because the State was "intimately involved with the decision to deny [plaintiff] stall space[.]" 742 F.2d at 224. Key to that conclusion was the fact that on-site state officials had the "power to override decisions" by the club, including whom to stall. Thus, "[i]n the area of stalling, … state regulation and involvement is so specific and so pervasive that decisions may be considered to bear the imprimatur of the state."

43

*Id.* at 228. This Court recently described intimate government involvement in *Roberts* as being "on the opposite end of the state-involvement spectrum to *Blum*." *Missouri v. Biden*, 83 F.4th 350, 375 (5th Cir. 2023), *cert. granted sub nom. Murthy v. Missouri*, 144 S. Ct. 7 (2023). SEC's involvement in SRO rulemaking is even more intimate. With certain exceptions not relevant here, no SRO rule may come into effect without SEC preclearance. 15 U.S.C. § 78s(b). That is the equivalent of having an on-site government supervisor with power to override a private club's management decisions. *Roberts*, 742 F.2d at 228. SEC also "may abrogate, add to, and delete from" a SRO's rules as it "deems necessary or appropriate." *Id.* 15 U.S.C. § 78s(c). This intimate SEC involvement in an SRO's rulemaking process suffices to extend SEC's sovereign immunity to the SRO's regulatory activities. *Austin Mun. Secs.*, 757 F.2d at 692; *Sparta Surgical Corp.*, 159 F.3d at 1214. It must also then transform the SRO's regulatory activities into state action.

For all these reasons, Nasdaq's Rules and the SEC's Order approving them are subject to constitutional strictures, including individual rights secured by the First Amendment.

## B. The Speech-Compelling Diversity Rule Violates the First Amendment

The Diversity Rule "requires an explanation" from all Nasdaq-listed companies that do not meet Nasdaq's diversity objectives. Companies must also provide aggregated statistics on the race, sex, and sexuality of its directors. Both the

forced-explanation and demographic-disclosure requirements violate the First Amendment's prohibition against compelled speech. *West Virginia v. Barnette*, 319 U.S. 624, 642 (1943); *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 522 (D.C. Cir. 2015) ("NAM"). .

### 1.    *Exacting Scrutiny Applies to the Diversity Rule's Explanation and Disclosure Requirements*

"Mandating speech that a speaker would not otherwise make necessarily alters the content of the speech," and is "subject to exacting First Amendment scrutiny." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795-99 (1988). *Nat'l Inst. of Family and Life Advocates v. Becerra*, 585 U.S. 755 (2018) ("NIFLA"), held that exacting First Amendment scrutiny applies to government-compelled disclosures, *Id.* at 758, and as in *NIFLA*, the Diversity Rule does not regulate professional conduct or speech.  Recognizing that the essential purpose of the First Amendment is to prohibit improper restraints on the public expression of ideas  and that "[t]here is necessarily … a concomitant freedom *not* to speak publicly," the Supreme Court held in *Pacific Gas & Electric Co. v. Public Utilities Com.*, 475 U.S. 1, 11-12 (1986) that "the State is not free either to restrict ,,, speech to certain topics or views or to force appellant to respond to views that others may hold.":

> That kind of forced response is antithetical to the free discussion that the First Amendment seeks to foster. For corporations as for individuals, the choice to speak includes within it the choice of what not to say, … Were the government freely able to compel corporate speakers to propound political messages with which they disagree, this

> protection would be empty … The danger that appellant will be required to alter its own message as a consequence of the government's coercive action is a proper object of First Amendment solicitude, because the message itself is protected under our decisions in [*First National Bank v.*] *Bellotti* [435 U.S. 765 (1978)] and *Consolidated Edison* [*v. Public Serv. Comm'n of N.Y.*, 447 U.S. 530 (1980)].

Id. at 16. (cleaned up).

And recruitment based on racial, gender, and sexuality categories is extremely controversial. Just last term, the Supreme Court struck down a public accommodation law that required a website designer to "speak as the State demands or face sanctions for expressing her own beliefs[.] … Under [the Supreme Court's] precedents that 'is enough,' more than enough to represent an impermissible abridgment of the First Amendment's right to speak freely." *303 Creative LLC v. Elenis*, 600 U.S. 570, 589 (2023), a conclusion that holds true for companies that wish to exercise their right not to speak at all on such topics. *Riley*, 487 U.S. at 796.

Hence, the compelled explanation under Nasdaq Rule 5605(f) and the "diversity matrix" under Nasdaq Rule 5606 do not fall into either of *NIFLA*'s exceptions and are thus subject to exacting scrutiny, which they fail.

## 2.    *The Diversity's Rule's Explanation and Disclosure Requirements Fail Exacting Scrutiny*

The explanation and demographic disclosure requirements do not serve any government compelling interest. The only rationale Nasdaq proffered in support of the Diversity Rule is that "studies show[] the benefits of diverse corporate boards,"

Nasdaq Comments on Notice of Filing of Proposed Rule Change, File No. SRNASDAQ-2020-081 (Feb. 5, 2021) ("Nasdaq Letter I"), JA610, JA636, a claim that SEC rejected as a basis to approve the Rule, Order at JA8-10. Nor is SEC's reliance on investor interest in demographic information, *id.*, a sufficient reason to compel speech, *Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 73 (2d Cir. 1996) ("strong consumer interest and the public's 'right to know' … are insufficient to justify compromising protected constitutional rights.") (internal citations omitted).

In *Barnette*, Justice Robert H. Jackson stated: "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." 319 U.S. at 642. The compelled-speech doctrine means not only that the government cannot force individuals or entities to engage in specific expression, but it also prevents the government from punishing someone for refusing to articulate or adhere to government-compelled expression. "[T]he right of freedom of thought protected by the First Amendment … includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977); *Barnette*, 319 U.S. at 645 (Murphy, J., concurring). More recently, Chief Justice Roberts succinctly restated the essence of the doctrine, noting "this Court's leading First Amendment precedents have established the principle that freedom of speech prohibits the

47

government from telling people what they must say." *Rumsfeld v. Forum for Acad. and Institutional Rights*, 547 U.S. 47, 61 (2006).

The Court has also recognized that government officials cannot force parade organizers to accept a gay and lesbian group and its messages as part of its event without infringing on the private group's autonomy and right to disseminate its own messages. *Hurley v. Irish-American Gay, Lesbian and Bisexual Grp. of Boston*, 515 U.S. 557 (1995). In *Janus v. AFSCME*, 138 S.Ct. 2448 (2018), the Supreme Court held that public employees could not be compelled to subsidize speech on matters with which they disagree. Likewise, *NIFLA*, 585 U.S. 755, stopped California from forcing faith-based pregnancy centers to propound government-scripted speech.

The Diversity Rule's forced-explanation requirement impermissibly requires companies to publicly call into question *their own integrity* by forcing them to utter words that infer their own shortcomings in failing to fill board seats with persons whose immutable characteristics are irrelevant to board service—a not-so-subtle form of state-compelled self-condemnation better suited to an authoritarian regime. The D.C. Circuit previously rejected SEC's similar attempt to force companies to apologize. *NAM*, 800 F. 3d at 522.  In *NAM*, the court held that an SEC-mandated confession that minerals used by companies were not "conflict free" was constitutionally impermissible: "It requires an issuer to tell consumers that its products are ethically tainted … [b]y compelling an issuer to confess blood on its

hands, the statute interferes with that exercise of the freedom of speech under the First Amendment." 800 F.3d at 530 (holding both Congress's *statute* and SEC's rule requiring disclosure of "conflict minerals" unconstitutional); *see also Associated Builders & Contractors of Se. Tex. v. Rung*, No. 16-cv-425, 2016 U.S. Dist. LEXIS 155232, at *28-30 (E.D. Tex. Oct. 24, 2016) (discussing *NAM* in determining that an Executive Order and agency implementing rule and guidance were constitutionally defective because they compelled speech).

Government efforts to compel citizens to utter speech with which they disagree deeply offends the fundamental "principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." *Agency for Int'l Dev. v. All. for Open Soc'y, Int'l, Inc.*, 570 U.S. 205, 213 (2013). Such efforts are routinely struck down. *Amestoy*, 92 F.3d 67 (Dairy manufacturers may not be compelled to "warn" consumers about their methods for producing milk.). This Court must accordingly set aside the Diversity Rule for compelling speech in violation of the Constitution.

To pass constitutional muster, compelled or content-based speech must be narrowly tailored and serve a compelling government interest by the least restrictive means. Here, the explanation is only required from companies that fail to conform to the *government's* view of board composition, and rather than articulate a compelling government interest, SEC merely invokes SEC's powers to regulate the

49

securities industry. This rationale was rejected by the court in *NAM*, because that broad and undefined authority would mean SEC could "easily regulate otherwise protected speech using the guise of securities laws." *NAM*, 800 F.3d at 555. *NAM* was unwittingly prescient when it posited a hypothetical of mandatory disclosures of "the political ideologies of [company] board members, as part of annual reports," that would be "obviously repugnant to the First Amendment." *Id.* The forced-explanation and demographic-disclosure requirements as formulated make no effort to show narrow tailoring, a compelling government interest or least restrictive means. They, and the SEC Order that approved them, violate the First Amendment.

## III.    SEC's APPROVAL OF THE DIVERSITY AND RECRUITING SERVICES RULES IS ARBITRARY AND CAPRICIOUS

SEC is prohibited by the APA from making "arbitrary" and "capricious" decisions, 5 U.S.C. § 706(2)(A), and instead must engage in "reasoned decisionmaking." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1905 (2020). Approval of an SRO's proposed rule is arbitrary and capricious unless SEC grounds such approval in its own independent findings and determinations—it may "not merely accept those made by [the SRO]." *Susquehana*, 866 F.3d at 447 ("SEC's unquestioning reliance on [the SRO's] defense of its own actions is not enough to justify approving the Plan. Instead, the SEC should have critically reviewed [the SRO's] analysis or performed its own."). Here, SEC failed

to conduct an independent analysis and merely accepted Nasdaq's assertions in approving the Diversity and Recruiting Services Rules.

## A. SEC Failed to Engage in Independent Reasoning in Approving the Diversity Rule

The Exchange Act requires information provided by the quota-or-explanation and demographic disclosure requirements to be relevant and meaningful to investors under the Act. 15 U.S.C. § 78f(b)(5). SEC's determination that demographic information is relevant because it is responsive to demands by some investors is circular; it simply assumes whatever Nasdaq claims investors demand is relevant. Such "unquestioning reliance" on Nasdaq's analysis violates SEC's obligations under the Exchange Act and the APA to independently analyze the Rule's validity. *Susquehana*, 866 F.3d at 447. Put another way, SEC may not dodge its obligation to critically assess Nasdaq's "self-serving views" by taking its and certain commenters' word that the information mandated by the Rule is relevant to investors for purposes of the Exchange Act. *Id.*

To its credit, SEC did consider and reject Nasdaq's contention that diversity along the dimension defined by the Diversity Rule improves corporate performance and investment returns. But it failed to take the logical next step to question why investors would clamor for demographic information that is not relevant to corporate performance or investment returns.

Even if Nasdaq and certain commenters' assertion of investor interest justifies disclosing demographic information, Order at JA8, that rationale fails to provide a justification for the Rule's quota-or-explanation requirement. The mandatory disclosure of a board's race, gender, and sexuality composition through a diversity matrix would fully satisfy investor interest for information regarding those characteristics. Thus, even if investor interest in demographic disclosure were a justification, which it is not, that does not justify the additional quota-or-explanation requirement. SEC's failure to independently analyze how the quota-or-explanation requirement fits within the scope of the Exchange Act is arbitrary and capricious.

Even if some investors base investment decisions on board diversity, it does not necessarily follow that such investors value diversity as defined by the quota-or-explain requirement, *i.e.*, treating different racial minorities as being interchangeable with not only one another but also with LGBTQ+ individuals. Indeed, the amorphous definition of LGBTQ+, which can include practically anyone, serves to obscure rather than illuminate diversity that SEC claims investors care about.[12] SEC's blind acceptance of Nasdaq's definition of diversity without engaging in its own findings

---

[12] *See* Jenna Wortham, *When Everyone Can Be 'Queer,' Is Anyone*? New York Times (July 12, 2016), *available at* https://www.nytimes.com/2016/07/17/magazine/when-everyone-can-be-queer-is-anyone.html (last visited Mar. 18, 2024).

and reasoning to determine whether that matches the type of diversity investors supposedly want renders its approval Order arbitrary and capricious.

Further evidence of this mismatch is foreign companies' exemption from the race-and-sexuality quota. Order at JA11. Nasdaq's explanation for the exemption that "each country has its unique demographic composition," *id.*, is incompatible with SEC's investor-interest justification for the Diversity Rule, *see id.* at JA7-8. SEC did not find, for instance, that investors prefer racially diverse boards for American companies but not for French ones. If, as SEC and Nasdaq claims, investors believed (without evidence) that racially diverse boards improve corporate performance, they would want foreign companies' boards to be racially diverse as well.[13] SEC again blindly accepted Nasdaq's explanation without independent analysis, further demonstrating why its approval of the Diversity Rule was arbitrary and capricious.

### B.    SEC Failed to Engage in Independent Reasoning in Approving the Recruiting Services Rule

The services purport to offer companies that do not meet the Quota Requirement "complimentary access to two seats of a board recruiting solution,

---

[13] A foreign company with a board that is not racially diverse because of the country's "demographic composition" can say so in its compelled explanation. If SEC and Nasdaq honestly believe such compelled explanation is not a burden, then there would be no reason to exempt foreign companies from explaining their lack of racial diversity.

which will allow Companies to identify and evaluate diverse board candidates." Nasdaq Rule IM-5900-9. SEC approved this service based solely on Nasdaq's representation that the company it hired "would provide access to a network of board-ready diverse candidates for companies to identify and evaluate." Order at JA20.

But what does "board-ready" mean? The criteria by which Nasdaq or the company it hired would select candidates to fill director positions is an "important aspect" of the Recruiting Services Rule that SEC "entirely failed to consider." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). As with Ko-Ko, Gilbert & Sullivan's Lord High Executioner, all we know is that there is a list that satisfies the Quota Requirement, and Nasdaq (or the company it hires) gets to make it.[14] This uncritical acceptance of Nasdaq's self-serving assertion that any candidate its recruiting service would provide is "board-ready" fails SEC's obligation of independent analysis. *Susquehana*, 866 F.3d at 447.

## CONCLUSION

For the foregoing reasons, this Court should vacate SEC's Final Order and the Nasdaq rules that order approved.

March 21, 2024

---

[14] Ko-Ko's famous song, "I've got a little list" is often parodied to illustrate the dangers of vesting undefined, limitless power in appointed political functionaries.

Respectfully submitted,

*/s/ Margaret A. Little*
Margaret A. Little
Sheng Li
Mark Chenoweth
New Civil Liberties Alliance
1225 19th St. NW, Suite 450
Washington, DC 20036
Telephone: 202-869-5210

*Counsel for National Center*
*for Public Policy Research*

## CERTIFICATE OF SERVICE

I hereby certify that on March 21, 2024, an electronic copy of the foregoing brief was filed with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/EFC filing system and that service will be accomplished using the appellate CM/ECF system.

*/s/ Margaret A. Little*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), I hereby certify that this document complies with Federal Rule of Appellate Procedure 32(a)(7)(B)(ii). It is printed in Times New Roman, a proportionately spaced font, and includes 12,035 words, excluding items enumerated in Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Fifth Circuit Rule 32.2. I relied on my word processor, Microsoft Word, to obtain the count.

*/s/ Margaret A. Little*

**CERTIFICATE OF ELECTRONIC COMPLIANCE**

I hereby certify that in the foregoing brief, filed using the Fifth Circuit CM/EFC filing system, all required privacy redactions have been made pursuant to Fifth Circuit Rule 25.2.13, any required paper copies to be submitted to the Court are exact copies of the version submitted electronically, and the electronic submission was scanned for viruses with the most recent version of a commercial virus scanning program, and is free of viruses.

*/s/ Margaret A. Little*

# EXHIBIT A

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

ALLIANCE FOR FAIR BOARD RECRUITMENT,
NATIONAL CENTER FOR PUBLIC POLICY RESEARCH,

*Petitioners*,

       v.                                    No. 21-60626

SECURITIES AND EXCHANGE COMMISSION,

*Respondent.*

### Declaration of Scott Shepard in Support of Petitioner National Center for Public Policy Research's Petition for Review

Margaret A. Little
Sheng Li
Richard Samp
New Civil Liberties Alliance
1225 19th St. NW, Suite 450
Washington, DC 20036
Telephone: 202-869-5210
*Attorneys for Petitioner National
Center for Public Policy Research*

\

1. I, Scott Shepard, am employed by the National Center for Public Policy Research (NCPPR), a 501(c)(3) incorporated in Delaware with its principal place of business in Washington, D.C.  I am Director of NCPPR's Free Enterprise Project. The facts stated in this declaration are true and of my own personal knowledge and if called as a witness, I could and would competently testify to the matters set forth below.

2. The Free Enterprise Project at the National Center for Public Policy Research focuses on shareholder activism and the confluence of big government and big business.  It files shareholder resolutions, engages corporate CEOs and board members at shareholder meetings, petitions respondent Securities and Exchange Commission (SEC) for interpretive guidance and sponsors media and shareholder campaigns to create incentives for corporations to stay focused on their missions. We believe that the principles of a free market, individual liberty, and personal responsibility provide the greatest hope for the American future.

3. In order to engage in NCPPR's mission of shareholder activism, the Free Enterprise Project was formed in 2007 to acquire and vote NCPPR shares of companies on the major stock exchanges, including Nasdaq.  As of the date of the filing of the above-captioned petition for review, NCPPR held shares in about 30 Nasdaq-listed companies.

4. NCPPR has regularly voted its shares at Nasdaq-listed companies' shareholder meetings from 2007 to the present, and plans to continue that practice at future shareholder meetings.

5. These NCPPR-owned shares are subject to the Nasdaq board diversity Rules that are at issue in this petition for review.

6. Ordinarily, NCPPR would vote according to a board candidate's individual qualifications. Under the Nasdaq Rules approved by the SEC, NCPPR feels pressured to vote according to immutable characteristics such as racial, gender, or sexuality classifications, or the corporation in which NCPPR owns shares will fall out of compliance with the exchange Rules and risk delisting, blacklisting or public efforts at cancellation.

7. In some cases, NCPPR will also be presented with a slate of candidates artificially and legally constrained by illegitimate and/or irrelevant classifications.

8. Furthermore, the cumulative disclosures required by the Rules are so vague and veiled in the mysteries of self-identification, and undefined racial, gender and sexuality classification, that NCPPR cannot intelligently exercise its shareholder franchise.

9. These Rules both confuse and pressure NCPPR to discriminate on the basis of indeterminable, incoherent, and irrelevant classifications of a board

candidate's possible immutable characteristics, all of which should have no bearing on NCPPR's vote.

10. Even if NCPPR elects to vote in defiance of the Rules, the coercive pressure placed on other shareholders to vote for candidates that appear to satisfy the SEC/Nasdaq board diversity requirements, will skew the election.

11. The Rules tilt the election in favor of irrelevant classifications that affect both NCPPR's vote and the value of its Nasdaq holdings.

I declare under penalty of perjury under the laws of the United States of America and the State of West Virginia, that the foregoing is true and correct.

DATED: March 31, 2022

Scott Shepard

Director, Free Enterprise Project at the National Center for Public Policy Research