No. 21-60626

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

**ALLIANCE FOR FAIR BOARD RECRUITMENT,
NATIONAL CENTER FOR PUBLIC POLICY RESEARCH,**
*Petitioners,*

**v.**

**SECURITIES AND EXCHANGE COMMISSION,**
*Respondent.*

On Petition for Review of an Order of the
United States Securities and Exchange Commission
No. 34-92590

**EN BANC BRIEF FOR PETITIONER
ALLIANCE FOR FAIR BOARD RECRUITMENT**

Jonathan Berry
  *Counsel of Record*
R. Trent McCotter
Michael Buschbacher
Jared Kelson
James R. Conde
BOYDEN GRAY PLLC
801 17th Street NW, Suite 350
Washington, DC 20006
202-955-0620
jberry@boydengray.com

*Counsel for Petitioner Alliance
for Fair Board Recruitment*

# CERTIFICATE OF INTERESTED PERSONS

*Alliance for Fair Board Recruitment et al. v. SEC*
No. 21-60626

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Local Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1.    Petitioner Alliance for Fair Board Recruitment is a non-profit membership corporation and has no parent corporations or subsidiaries.

2.    Petitioner National Center for Public Policy Research is a non-profit corporation and has no parent corporations or subsidiaries.

3.    Respondent the Securities and Exchange Commission is a federal agency.

4.    Intervenor Nasdaq Stock Market LLC has a parent company Nasdaq, Inc., and Borse Dubai Limited and Investor AB own more than 10 percent of Nasdaq, Inc.'s shares.

5.    Amici curiae the States of Arizona, Alabama, Alaska, Arkansas, Florida, Indiana, Kansas, Kentucky, Louisiana, Mississippi,

Missouri, Montana, Nebraska, Oklahoma, South Carolina, Texas, and Utah.

6.     Amicus Curiae Financial Industry Regulatory Authority, Inc.

7.     Amicus Curiae Ad Hoc Coalition of Nasdaq-Listed Companies.

8.     Amicus Curiae Nonpartisan Group of Academics and Practitioners in the Field of Corporate Governance.

9.     Amicus Curiae Investors and Investment Advisers.

10.     Amicus Curiae American Civil Liberties Union.

11.     Amicus Curiae Academic Experts in the Fields of Business, Management, and Economics.

12.     Jonathan Berry, R. Trent McCotter, Michael Buschbacher, Jared M. Kelson, and James R. Conde of Boyden Gray PLLC (formerly Boyden Gray & Associates)—*Counsel for Petitioner Alliance for Fair Board Recruitment.*

13.     Michael A. Conley, Daniel E. Matro, Vanessa Ann Countryman, John Robert Rady, and Tracy A. Hardin of the Securities and Exchange Commission—*Counsel for Respondent Securities and Exchange Commission.*

14.    Allyson N. Ho, Bradley G. Hubbard, Amir C. Tayrani, Paulette C. Miniter, and Amalia E. Reiss of Gibson, Dunn & Crutcher LLP; John Zecca, Jeffrey S. Davis, John Yetter, and Joanne Pedone of The Nasdaq Stock Market L.L.C.; and Burt M. Rublin, Stephen J. Kastenberg, Paul Lantieri III, Peter F. Andrews, and Seth D. Berlin of Ballard Spahr LLP—*Counsel for Intervenor Nasdaq Stock Market, L.L.C.*

15.    Aditya Dynar, Margaret A. Little, and Sheng Li of New Civil Liberties Alliance—*Counsel for Petitioner National Center for Public Policy Research.*

16.    Drew C. Ensign, Joseph A. Kanefield, Brunn ("Beau") W. Roysden III, Wilson C. Freeman, and James Rogers—*Counsel for Amici States.*

17.    Aaron Michael Streett, Elisabeth C. Butler, Baker Botts L.L.P.—*Counsel for Amicus Curiae Financial Industry Regulatory Authority, Inc.*

18.    Pratik A. Shah, Juliana C. DeVries, Akin Gump Strauss Hauer & Feld LLP—*Counsel for Amicus Curiae Ad Hoc Coalition of Nasdaq-Listed Companies.*

*19.*    Brian Hauss, Sandra S. Park—*Counsel for Amicus Curiae American Civil Liberties Union.*

20.    Marc Wolinsky, Elaine P. Golin, Carrie M. Reilly, Kevin S. Schwartz, Jeohn Salone Favors, Getzel Berger; Wachtell, Lipton, Rosen & Katz—*Counsel for Amicus Curiae Nonpartisan Group of Academics and Practitioners in the Field of Corporate Governance.*

21.    Steven M. Shepard, Arun Subramanian, Neal S. Manne—*Counsel for Amicus Curiae Investors and Investment Advisers.*

*22.*    Jeffrey Dubner, Aman T. George—*Counsel for Amicus Curiae Academic Experts in the Fields of Business Management, and Economics.*

Dated: March 21, 2024                    /s/ Jonathan Berry
                                         Jonathan Berry
                                         BOYDEN GRAY PLLC
                                         801 17th Street NW, Suite 350
                                         Washington, DC 20006
                                         202-955-0620

                                         *Counsel for Petitioner Alliance*
                                         *for Fair Board Recruitment*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................vi

JURISDICTIONAL STATEMENT ......................................................xiii

STATEMENT OF THE ISSUES.........................................................xiii

INTRODUCTION................................................................................1

STATEMENT OF THE CASE ..............................................................2

I.     Statutory Background....................................................................3

II.    Agency Proceedings......................................................................4

III.   Proceedings at This Court.............................................................5

STATEMENT OF FACTS NECESSARY TO THE ARGUMENT............7

SUMMARY OF THE ARGUMENT .......................................................7

ARGUMENT .......................................................................................10

I.     The Order Violates the Constitution. ...........................................10

       A.     The Order's Race and Sex Discrimination Violates
              the Fifth Amendment..........................................................11

       B.     The Order Compels Speech In Violation of the First
              Amendment. .......................................................................27

       C.     There Is State Action. .........................................................38

II.    The Order is Not Authorized by the Exchange Act.......................50

       A.     Race and Sex Discrimination Is Not Consistent With
              the Exchange Act. ...............................................................53

       B.     Special-Interest Stakeholder "Demand" Doesn't Satisfy
              the Exchange Act ................................................................54

       C.     The Rule Violates the Exchange Act's Prohibitions
              Applicable to Stock Exchange Rules....................................63

CONCLUSION ....................................................................................69

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Cases

*303 Creative LLC v. Elenis,*
  600 U.S. 570 (2023) ............................................................ 34

*Adarand Constructors, Inc. v. Pena,*
  515 U.S. 200 (1995) ................................................ 12, 15, 23

*All. for Fair Bd. Recruitment v. SEC,*
  85 F.4th 226 (5th Cir. 2023) ...................... 7, 38, 39, 42, 45, 46, 47, 53

*Am. Meat Inst. v. U.S. Dep't of Agric.,*
  760 F.3d 18 (D.C. Cir. 2014) ........................................ 30, 36

*Am. Mfrs. Mut. Ins. Co. v. Sullivan,*
  526 U.S. 40 (1999) .............................................................. 39

*Blum v. Yaretsky,*
  457 U.S. 991 (1982) ............................................................ 39

*Book People, Inc. v. Wong,*
  91 F.4th 318 (5th Cir. 2024) .............................................. 30

*Bras v. Cal. Pub. Utils. Comm'n,*
  59 F.3d 869 (9th Cir. 1995) ................................................ 25

*Torch Liquidating Tr. ex rel. Bridge Assocs. L.L.C. v.
  Stockstill,*
  561 F.3d 377 (5th Cir. 2009) .............................................. 34

*Bus. Roundtable v. SEC,*
  647 F.3d 1144 (D.C. Cir. 2011) ...................... 52, 56, 60, 68

*Bus. Roundtable v. SEC,*
  905 F.2d 406 (D.C. Cir. 1990) ........................ 57, 61, 63, 65

*Corrosion Proof Fittings v. EPA,*
  947 F.2d 1201 (5th Cir. 1991) ............................................ 52

*Dean v. City of Shreveport,*
  438 F.3d 448 (5th Cir. 2006) ............................................................ 18

*Dep't of Com. v. New York,*
  139 S. Ct. 2551 (2019) .................................................................... 21

*Dubin v. United States,*
  599 U.S. 110 (2023) ....................................................................... 59

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan
  Chase Co.,*
  553 F.3d 187 (2d Cir. 2009) ............................................................ 60

*Epic Sys. Corp. v. Lewis,*
  584 U.S. 497 (2018) ....................................................................... 59

*Free Enter. Fund v. PCAOB,*
  561 U.S. 477 (2010) .................................................................. 43, 44

*Free Speech Coal., Inc. v. Paxton,*
  No. 23-50627, 2024 WL 982225 (5th Cir. Mar. 7, 2024) ........ 28, 31, 35

*Harding v. ASE,*
  527 F.2d 1366 (5th Cir. 1976) .......................................................... 46

*Heart of Atlanta Motel, Inc. v. United States,*
  379 U.S. 241 (1964) ....................................................................... 18

*Heath v. SEC,*
  586 F.3d 122 (2d Cir. 2009) ............................................................ 61

*Iancu v. Brunetti,*
  588 U.S. 388 (2019) ....................................................................... 32

*Intercont'l Indus., Inc. v. Am. Stock Exchange,*
  452 F.2d 935 (5th Cir. 1971) .................................................. 44, 45, 46

*Matrixx Initiatives, Inc. v. Siracusano,*
  563 U.S. 27 (2011) ......................................................................... 59

*Mexican Gulf Fishing Co. v. U.S. Dep't of Com.,*
  60 F.4th 956 (5th Cir. 2023) ............................................................ 67

*Michigan v. EPA*,
  576 U.S. 743 (2015) ............................................................ 67

*Monterey Mech. Co. v. Wilson*,
  125 F.3d 702 (9th Cir. 1997) ............................................ 25

*Moose Lodge No. 107 v. Irvis*,
  407 U.S. 163 (1972) ............................... 40, 41, 42, 43, 47, 53

*N. Ala. Express, Inc. v. United States*,
  585 F.2d 783 (5th Cir. 1978) ....................................... 46, 47

*NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*,
  770 F.3d 1010 (2d Cir. 2014) ............................................ 62

*Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*,
  53 F.4th 869 (5th Cir. 2022) ............................................. 49

*Nat'l Inst. of Family & Life Advocs. v. Becerra*,
  585 U.S. 755 (2018) ............................................... 28, 33, 35

*Nat'l Ass'n of Mfrs. v. SEC*,
  800 F.3d 518 (D.C. Cir. 2015) .................... 29, 30, 31, 33, 37

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*,
  508 U.S. 656 (1993) ............................................................ 14

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*,
  551 U.S. 701 (2007) ............................................................ 17

*Regents of Univ. of Cal. v. Bakke*,
  438 U.S. 265 (1978) ............................................................ 15

*Rice v. Cayetano*,
  528 U.S. 495 (2000) ............................................................ 11

*Rumsfeld v. F. for Acad. & Inst. Rts., Inc.*,
  547 U.S. 47 (2006) .............................................................. 27

*Schuette v. BAMN*,
  572 U.S. 291 (2014) ............................................................ 12

*SEC v. W.J. Howey Co.*,
   328 U.S. 293 (1946).................................................................56

*Sessions v. Morales-Santana*,
   582 U.S. 47 (2017)................................................... 23, 24, 25

*Shaw v. Reno*,
   509 U.S. 630 (1993)......................................................... 11, 12

*Shelley v. Kraemer*,
   334 U.S. 1 (1948).....................................................................41

*SmithKline Beecham Corp. v. Abbott Lab'ys*,
   740 F.3d 471 (9th Cir. 2014)................................................23

*Speech First, Inc. v. Cartwright*,
   32 F.4th 1110 (11th Cir. 2022) ...........................................35

*Students for Fair Admissions, Inc. v. President & Fellows of
   Harvard Coll.*,
   600 U.S. 181 (2023)...............................................................22

*TSC Indus., Inc. v. Northway, Inc.*,
   426 U.S. 438 (1976)...............................................................58

*United States v. Virginia*,
   518 U.S. 515 (1996)......................................................... 24, 26

*W.H. Scott Construction Co. v. City of Jackson*,
   199 F.3d 206 (5th Cir. 1999)................................ 15, 16, 21, 23, 25, 40

*Wygant v. Jackson Bd. of Educ.*,
   476 U.S. 267 (1986)...............................................................28

**Statutes**

15 U.S.C. § 77g(a)(1).................................................................58

15 U.S.C. § 78c(f) ......................................................................52

15 U.S.C. § 78e ...........................................................................2

15 U.S.C. § 78f(b) ..................................................................... 2

15 U.S.C. § 78f(b)(5) .............................51, 54, 57, 61, 62, 64, 66

15 U.S.C. § 78f(b)(6) ...................................................... 2, 42, 53

15 U.S.C § 78f(b)(8) ............................................... 51, 64, 67

15 U.S.C. § 78s(g)(1) ...................................................... 2, 42

15 U.S.C. § 78j-1(m) ............................................................. 65

15 U.S.C. § 78k-1(a)(1) ........................................................ 63

15 U.S.C. § 78l ...................................................................... 59

15 U.S.C. § 78l(b)(1) ...................................................... 58, 59

15 U.S.C. § 78m(a) ............................................................... 58

15 U.S.C. § 78m(b)(1) .......................................................... 59

15 U.S.C. § 78m(p)(1) .......................................................... 59

15 U.S.C. § 78o(d) ............................................................... 58

15 U.S.C. § 78s ..................................................................... 49

15 U.S.C. § 78s(a) ................................................................. 2

15 U.S.C. § 78s(b) ................................................................. 2

15 U.S.C. § 78s(b)(1) ....................................................... 2, 41

15 U.S.C. § 78s(b)(2) ...................................... xiii, 2, 48, 50, 64

15 U.S.C. § 78s(c) ................................................................ 48

15 U.S.C. § 78s(g)(1) ........................................................... 41

15 U.S.C. §§ 78s(h)(1) ..................................................... 2, 41

15 U.S.C. § 78y ..................................................................... 46

15 U.S.C. § 78y(a) ..................................................................... xiii

15 U.S.C. § 78y(a)(4) .................................................................. 51

42 U.S.C. § 1981 ........................................................ 5, 22, 58, 66

Del. Code § 141(b) ...................................................................... 65

Pub. L. No. 94-29, 89 Stat. 97 (1975) ......................... 48, 50, 64

**Other Authorities**

17 C.F.R. § 240.12d2-2(d)(4) ..................................................... 48

17 C.F.R. § 240.14a-9 .................................................................. 65

17 C.F.R. § 240.14a-101 ............................................................. 65

Admin. Conf. of the U.S., *Severability in Agency Rulemaking*
   (June 29, 2019) ..................................................................... 50

As You Sow et al., *Proxy Preview 2021* (2021) ......................... 13

Comment Letter from Edgar Hernandez, Assistant Dir.,
   Cap. Stewardship, SEIU, to Vanessa Countryman,
   Sec'y, SEC (Jan. 4, 2020) ..................................................... 56

Comment Letter from Benjamin Colton & Robert Walker,
   Glob. Co-heads of Asset Stewardship, State Street Glob.
   Advisors, to Vanessa Countryman, Sec'y, SEC (Dec. 30,
   2020) ....................................................................................... 56

Douglas C. Michael, *Untenable Status of Corporate
   Governance Listing Standards Under the Exchange Act*,
   47 Bus. Law. 1461 (1992) ..................................................... 49

S. Rep. 94-75 (1975) ............................................................ 47, 48

SEC Comm'r Hester M. Peirce, Remarks before the
   Brookings Institution: Chocolate-Covered Cicadas (July
   20, 2021) ................................................................................ 55

U.S. Dep't of State, *Determination of the Secretary of State on Atrocities in Xinjiang* (Jan. 19, 2021) ........................................... 67

## JURISDICTIONAL STATEMENT

The Securities and Exchange Commission ("SEC") issued an order on August 6, 2021 (hereinafter, "Order"), approving the Nasdaq Stock Market L.L.C.'s ("Nasdaq") new Board Diversity Rule (hereinafter, "Rule"). 86 Fed. Reg. 44,424 (Aug. 12, 2021), JA1. The SEC acted under section 19(b)(2)(C) of the Securities Exchange Act ("Exchange Act"), 15 U.S.C. § 78s(b)(2)(C). *See* 86 Fed. Reg. at 44,445, JA22. The Court has jurisdiction under section 25(a) of the Exchange Act, 15 U.S.C. § 78y(a). The petition was timely filed on August 9, 2021.

## STATEMENT OF THE ISSUES

(1)   Whether the Order, which justifies and approves a Rule that discriminates on the basis of race and sex and compels controversial speech, is unconstitutional state action; and

(2)   Whether the Rule is justified under the Exchange Act on the sole basis that select special-interest stakeholders want information about the race and sex diversity of corporate boards, grounds the SEC did *not* find would enhance corporate performance.

**INTRODUCTION**

Petitioner Alliance for Fair Board Recruitment challenges an SEC Order approving a Rule that requires Nasdaq-listed companies to meet "diversity" quotas for certain minimum numbers of women, racial minorities, and sexual minorities on their boards of directors. Companies that don't meet those quotas must publish an "explanation" for their failure.

The Order violates the Fifth Amendment because it encourages discrimination in the selection of board members and stigmatizes board members who identify as one of the preferred demographics. The Order also violates the First Amendment by authorizing a Rule that requires the disclosure of controversial information without a compelling justification and narrow tailoring. Contrary to the now-vacated panel decision of this Court, there is state action here. Among other reasons, the Order justifies and approves a facially discriminatory Rule, which Nasdaq is required to enforce against unwilling listed companies—something the Supreme Court has long held is textbook state action.

Finally, the SEC lacked statutory authority to issue the Order because the Rule doesn't satisfy the requirements of the Exchange Act, but instead seeks to regulate demographics and advance social-policy goals under the guise of corporate "informational" disclosures.

The Court should vacate the Order.

## STATEMENT OF THE CASE

### I. STATUTORY BACKGROUND

An SEC-registered stock exchange like Nasdaq is a "self-regulatory organization" that must obtain SEC approval to change its rules. 15 U.S.C. § 78s(b)(1); *see also id.* § 78s(a), (b). The SEC can only approve rules that are "consistent with the requirements of" the Exchange Act and the regulations applicable to the exchange. *Id.* §§ 78s(b)(2)(C)(i), 78f(b).

Exchanges have an ongoing statutory duty to enforce their rules. *Id.* §§ 78s(g)(1), 78f(b)(6). The SEC may revoke an exchange's registration if it fails to do so. *Id.* § 78s(h)(1). That is effectively the death penalty for an exchange because, absent registration (or exemption), an exchange cannot do interstate business. *Id.* § 78e.

2

## II.    AGENCY PROCEEDINGS

### A.    NASDAQ'S PROPOSED RULE

On February 26, 2021, Nasdaq filed the proposed Rule with the SEC. JA162. The Rule requires each Nasdaq-listed company, subject to exceptions for small and foreign firms, to affirm it has (1) at least one director who "self-identifies her gender as a woman, without regard to the individual's designated sex at birth" ("Female Director Rule"); and (2) at least one director who self-identifies as "Black or African American, Hispanic or Latinx [sic], Asian, Native American or Alaska Native, Native Hawaiian or Pacific Islander, or Two or More Races or Ethnicities," or as "LGBTQ+," defined as "lesbian, gay, bisexual, transgender, or as a member of the queer community" ("Minority Director Rule"). JA315–16. Foreign firms have "flexibility" to meet the latter requirement by adding a second female-identifying director instead of a racial or sexual minority. JA264. Noncompliant firms must publish an "explanation" for why they fail to meet these quotas, JA315, 318, and any firm that fails to do so would be subject to delisting from the exchange. JA327. Collectively, these requirements were labeled Rule 5605(f).

The proposal also included an additional disclosure requirement—labeled Rule 5606—for each Nasdaq-listed company to provide statistical information on the self-identified sex, race, and sexual orientation of its board members. JA264.

Nasdaq argued to the SEC that the Rule satisfied the Exchange Act's criteria because "diverse" boards "are positively associated with improved corporate governance and company performance" along financial metrics like "returns on invested capital, returns on equity, [and] earnings per share," among others. JA8 & n.93.

## B.    ALLIANCE FOR FAIR BOARD RECRUITMENT'S COMMENT

On April 6, 2021, Petitioner Alliance for Fair Board Recruitment filed a comment with the SEC on the Rule. JA45. Petitioner is a non-profit membership organization located in Texas that has several members, including a Nasdaq-listed company and both shareholders and current and potential directors of Nasdaq-listed companies. Petitioner's comment outlined legal shortcomings of the Rule, including:

- The academic research cited by Nasdaq did not show that board diversity benefited company performance or furthered the purposes of the Exchange Act. JA55–78. Relying on an expert

study by University of Pennsylvania Professor of Law Jonathan
Klick, JA128–49, Petitioner's comment refuted the studies
Nasdaq cited in support of the Rule as flawed and not credible.

- The Rule was a mandate, not an aspirational target, because of
the reputational harms and litigation risk resulting from being
compelled to publicly explain why a company does not satisfy
Nasdaq's diversity quotas. JA79–81. Petitioner supported this
with an affidavit from James Copland, a corporate governance
expert recognized by the National Association of Corporate
Directors, which went unrebutted in the record. JA151–54.

- The Rule violated federal civil rights statutes, including Title VII
of the Civil Rights Act and 42 U.S.C. § 1981. JA104–06.

- The proposed Rule violated both the Fifth Amendment and the
First Amendment. JA107–20.

## C.    THE SEC'S ORDER APPROVING THE RULE

Despite these objections, the SEC approved the Rule in a lengthy
Order on August 6, 2021. JA1–22. In the Order, the SEC rejected
Nasdaq's financial-performance justification for the Rule and
acknowledged there was no demonstrable link between board diversity

and corporate performance. JA9, 19. Nonetheless, the SEC concluded the Rule was consistent with the requirements of the Exchange Act, albeit on a different theory.

The SEC concluded the disclosures and quotas were justified because Nasdaq was responding to "demand" from stakeholders who wanted increased board-diversity information. JA5–7. As evidence of this demand, the SEC noted supportive statements from the asset managers BlackRock, State Street Global Advisors, and Vanguard, the companies Goldman Sachs, Microsoft, and Facebook, the California Public Employees' Retirement System, and the NAACP, among others. JA7 nn.91–92 (citing JA312). The SEC summarily concluded that this information-disclosure justification satisfied the Exchange Act's statutory criteria for approving the Rule. JA7.

The SEC also explained that, while the Rule would "encourag[e]" companies to make decisions based on race and sex to meet "'aspirational diversity objectives,'" it did "not mandate any particular board composition." JA5. The SEC also dismissed concerns that the Rule's required "explanation" would cause "reputational, legal, or other harm,"

stating that companies that disagree with discriminating could simply de-list themselves from Nasdaq altogether. *Id.*

In response to objections that approving the Rule would violate the Fifth Amendment and First Amendment, the SEC claimed constitutional scrutiny did not apply, then included only one vague sentence explaining why approving the Rule would otherwise survive heightened scrutiny. JA16–17.

## III.   PROCEEDINGS AT THIS COURT

Petitioner promptly filed suit in this Court on August 10, 2021. Argument was held on August 29, 2022, and the panel issued its decision on October 18, 2023. *See All. for Fair Bd. Recruitment v. SEC* ("*AFBR*"), 85 F.4th 226 (5th Cir. 2023). Petitioners sought rehearing en banc, which was granted on February 19, 2024.

## STATEMENT OF FACTS NECESSARY TO THE ARGUMENT

No additional facts are necessary to the argument of the issues.

## SUMMARY OF THE ARGUMENT

This Court should vacate the Order. *First*, the Order violates the right to equal protection under the Fifth Amendment. Potential board members who do not self-identify as a preferred demographic now face an uneven playing field when competing for board positions. Current

board members and shareholders are encouraged to discriminate in their selection of board members. And board members who identify as a preferred demographic are stigmatized by the implication that they could not succeed without help from the SEC and Nasdaq.

Because it justifies and approves a facially discriminatory Rule, thereby encouraging discrimination on protected bases, the race- and sex-based quotas approved by the Order must satisfy strict and intermediate scrutiny, respectively. Nasdaq insisted there is a compelling government interest in increasing company financial performance—a risible basis for discrimination, and one also unsupported by the record. JA626–27. There is also no tailoring whatsoever to the Rule, which uses the bluntest mechanism available: the quota. For its part, the SEC offered only one perfunctory sentence about why the Rule survives constitutional scrutiny—an implicit recognition of its unconstitutionality.

*Second*, the Order violates the First Amendment by demanding the disclosure of controversial information. Race and sex quotas are inherently controversial. Forcing companies that are unwilling or unable to satisfy these quotas to "explain" why they do not conform only confirms the Rule's purpose is to pressure companies into discriminating.

*Third*, the SEC and the panel were wrong to conclude that constitutional scrutiny does not apply, finding a lack of state action. The Order is an order of the SEC, a governmental entity, which approved and even gave its own independent justification for the Rule. Without this Order, Nasdaq could not enforce the Rule, and now that the SEC has approved the Rule, both the Order and the Exchange Act now *require* Nasdaq to enforce its discriminatory requirements against listed companies. This renders the Order unconstitutional state action under longstanding Supreme Court precedent. This Court's caselaw finding state action for certain stock exchange actions further confirms the state action here.

*Fourth*, the Order fails the Exchange Act's requirements for stock exchange rules. Because the Order renders enforcement of the Rule unconstitutional, the Rule necessarily violates the Exchange Act's requirement that exchange rules be enforced. There is no valid financial reason to demand diversity disclosures or quotas, since the SEC declined to find that board "diversity" actually improves company performance. Requiring such disclosures simply because vocal special-interest stakeholders demand it is not an acceptable statutory basis. Nor is

compelled or encouraged discrimination in the "public interest," especially because the SEC's statutory remit does not extend to regulating the composition of corporate boards.

## ARGUMENT

### I.    THE ORDER VIOLATES THE CONSTITUTION.

The Order violates the Fifth Amendment by justifying and approving a facially discriminatory Rule, and encouraging discrimination based on race and sex, *see infra* Part I.A, and the First Amendment by compelling the disclosure of controversial information in an asymmetrical manner, *see infra* Part I.B, all without the slightest hint of a compelling governmental interest or narrow tailoring.

The Order must abide by these core constitutional protections because it is state action. *See infra* Part I.C. The Order was issued by the SEC and at minimum encourages discrimination, which violates the Fifth Amendment, and also compels speech, which violates the First Amendment. Further, the Order and the Exchange Act compel Nasdaq—on pain of SEC sanctions—to enforce the discriminatory Rule, which the Supreme Court held over fifty years ago is textbook state action.

### A.    THE ORDER'S RACE AND SEX DISCRIMINATION VIOLATES THE FIFTH AMENDMENT.

By justifying and giving effect to the Rule, the Order at minimum encourages companies to make decisions based on race and sex. Indeed, that is its acknowledged purpose. This triggers strict scrutiny for the Minority Director Rule and intermediate scrutiny for the Female Director Rule. *See* JA112–17. Neither comes close to satisfying those burdens. The Order devoted only a single sentence to why the Rule supposedly satisfies heightened review, which failed to even address the standard for strict scrutiny. JA17.

### 1.    *Strict scrutiny applies to the Minority Director Rule.*

The Minority Director Rule requires companies to have minimum numbers of racial- or sexual-minority board members or else publicly explain in writing why they did not meet this quota. That triggers strict scrutiny.

"'Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people.'" *Rice v. Cayetano*, 528 U.S. 495, 517 (2000). There are no "benign" racial classifications. *Shaw v. Reno*, 509 U.S. 630, 642–43 (1993). Sorting people by race always

"'stimulate[s] our society's latent race consciousness,'" *id.* at 643, "'delay[s] the time when race will become … truly irrelevant,'" *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 229 (1995), and "perpetuat[es] the very racial divisions the polity seeks to transcend," *Schuette v. BAMN*, 572 U.S. 291, 308 (2014). For that reason, racial classifications "must be analyzed by a reviewing court under strict scrutiny." *Adarand*, 515 U.S. at 227.

The Order provides only one sentence for why the Minority Director Rule would "survive constitutional scrutiny," explaining that "the objectives set forth in the proposal are not mandates, and the disclosures that the proposal requires are factual in nature and advance important interests as described throughout this order." JA17. That is insufficient.

*First*, the SEC is wrong that the Order does not impose a "mandate." Petitioner submitted expert evidence below—which the SEC never rebutted—that the "comply-or-explain" nature of the Rule operates as a mandate, because there are tremendous harms associated with not satisfying the requisite number of "minority" directors. JA151–54. By compelling disclosure of board diversity information and forced explanations about their shortcomings, the Rule requires companies to

generate a paper trail that makes them vulnerable to negative media and social-activist campaigns and shareholder lawsuits alleging misrepresentations about or breach of fiduciary duties for a lack of board diversity, like those recently brought against Gap, Oracle, Facebook, Micron, Monster, and Qualcomm. *Id.* Companies also will make themselves the targets of costly proxy campaigns led by social activists with *de minimis* shareholdings seeking to increase board diversity. *See* As You Sow et al., *Proxy Preview 2021*, at 62 (2021), https://perma.cc/2UN5-ZGXZ (noting 30 shareholder proposals sponsored by activists in 2021, targeting "smaller, less commonly known firms" that lack "diverse" boards). Companies will need to spend resources on lawyers and communications consultants to assess the reputational and legal risks of a firm's explanation.

The Order justifies and gives effect to a Rule that requires companies to discriminate based on race, sex, and sexual orientation, or else assume a serious risk of reputational and litigation harm. Indeed, that was the *purpose* of the Rule, and Nasdaq even cited evidence that "comply-or-explain" rules drive increased hiring of preferred

demographics precisely because compelled explanations deter non-compliance. JA713, 222–23.

*Second*, strict scrutiny applies regardless of whether the Rule is a mandate. The Supreme Court and this Court have long held that the government cannot escape strict scrutiny by labeling racial programs as goals or "aspirational diversity objectives." JA5, 16. Strict scrutiny is triggered if the government even *encourages* decisions based on race.

For example, in *Northeastern Florida Chapter of Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656 (1993), the Supreme Court held that an ordinance setting a target that 10% of the city's contract dollars would go to minority-owned businesses caused a constitutional injury. *Id.* at 658–59. The Court was clear that "[w]hen the government erects a barrier that makes it more difficult for members of one group to obtain a benefit," those members "need not allege that [they] would have obtained the benefit but for the barrier in order to establish standing." *Id.* at 666. The constitutional injury is the "inability to compete on an equal footing" and "denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to

obtain the benefit." *Id.*; *see also Adarand*, 515 U.S. at 211; *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 280 n.14 (1978).

This Court similarly held in *W.H. Scott Construction Co. v. City of Jackson*, 199 F.3d 206 (5th Cir. 1999), that a government "goal" of 5% (later increased to 15%) minority- and women-owned contractors was subject to strict scrutiny. *Id.* at 208, 214–15. This Court emphatically rejected the argument that "strict scrutiny should not be applied to policies that merely encourage participation 'goals,' rather than mandate strict 'quotas.'" *Id.* at 215. That distinction was "irrelevant" and "immaterial because any one of these techniques induces an employer to hire with an eye toward meeting a numerical target. As such, they can and surely will result in individuals being granted a preference because of their race." *Id.* (cleaned up). This Court concluded that "the relevant question is not whether a statute requires the use of such measures, but whether it authorizes or encourages them." *Id.* (quoting *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 711 (9th Cir. 1997)).

There is no doubt the Rule at least encourages hiring decisions to be made based on race. Nasdaq boasted during the agency proceedings below that the Rule "may have the effect of *encouraging* some Nasdaq-

listed companies to increase" the number of women and racial minorities on their boards, JA5 (emphasis added), and that Nasdaq "endeavored to provide a regulatory impetus to drive meaningful and systemic change in" the racial composition of boards, JA713; *see also* JA7 n.89, 208, 213, 223, 224, 225. That's why the Rule allows a four-year phase-in for listed companies, with extensions for newly listed companies not previously subject to a similar diversity requirement, smaller entities, and foreign issuers, JA11 nn.140–142, exempts companies that do not vote on directors, JA12, provides foreign companies with flexibility in meeting the quota, *id*, and even provides companies with complimentary access to a diverse director recruiting service, JA2. None of these provisions make any sense if the Rule's purpose is merely to disclose existing board-diversity information. "Improving" board "diversity" is the whole point.

## 2.    *The Minority Director Rule fails strict scrutiny.*

The Minority Director Rule cannot survive strict scrutiny. The SEC must "demonstrate that there was a compelling interest for the plan and that the plan was narrowly tailored to serve that interest." *Scott Constr.*, 199 F.3d at 217. The SEC never identified *any* interest as compelling.

Rather, it said only that the Rule advances "important interests" and vaguely gestured to those "described throughout this order." JA17.

For its part, Nasdaq submitted a letter to the SEC arguing that "there are compelling government interests in perfecting the mechanisms of a free and open market and promoting investor confidence through the promotion of racially or ethnically diverse boards, or through increased transparency (achieved by explanation) about the diversity of a company's board." JA626. But Nasdaq cites no case holding that improving corporate or investor performance is a compelling interest that justifies racial discrimination. That's because there is no such case.

Moreover, Nasdaq's clear attempt to impose minimum racial balancing through board diversity requirements can *never* satisfy the compelling-interest requirement. "Accepting racial balancing as a compelling state interest would justify the imposition of racial proportionality throughout American society, contrary to our repeated recognition that '[a]t the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class.'" *Parents Involved in Cmty. Schs. v. Seattle Sch.*

17

*Dist. No. 1*, 551 U.S. 701, 730 (2007). Special "flexibility" for companies "in foreign countries that have differing ethnic and racial compositions" further confirms the Rule is about racial balancing. JA12.

Especially puzzling is Nasdaq's claim below that "support for the rule" somehow shows a compelling interest. JA627, 633 n.56, 209 (a "wave of investors" demand that companies "diversify their boards"). The notion that a "wave" of popular support could justify racial discrimination has long since been rejected as antithetical to equal protection. *See, e.g.*, *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 260 (1964). In any event, the supposed popular support here is, in reality, the support of vocal special-interest stakeholders. JA248–55 (appendix of "supportive comments").

Nor is the Rule narrowly tailored. Courts consider factors such as (1) the availability of race-neutral alternative mechanisms, (2) whether the race-based program is time-limited, (3) the flexibility or rigidity of the program, and (4) over- or under-inclusiveness. *Dean v. City of Shreveport*, 438 F.3d 448, 458 (5th Cir. 2006). Once again, the SEC never even addressed these issues, apparently recognizing that no plausible argument exists. JA17.

*First,* the SEC admits four different times that the evidence of improved corporate performance from increased minority board members is "generally inconclusive" and thus (at best) "mixed." JA8–10. The SEC is encouraging choices based on race but cannot even bring itself to say that this racialized inquiry is actually associated with any financial benefit.

The Rule itself confirms a race-neutral mechanism is available. Companies can satisfy the Minority Director Rule by hiring LGBTQ+ individuals and thereby never consider race. Or companies can instead provide an explanation for not using race (which is itself problematic, but the SEC still provides it as an option). Even the SEC and Nasdaq do not believe it is necessary to use race to achieve their alleged goals here.

Nasdaq argued below that the Rule is "race-neutral," JA627, blatantly ignoring that it expressly classifies board members by race and preferences certain races over others. There is no minimum number of white, male, or non-LGBTQ+ members required or preferred. And a board consisting exclusively of one racial minority would satisfy the Minority Director Rule even though the board would be entirely homogeneous and therefore not "diverse" at all.

19

Nor did the SEC or Nasdaq seriously consider race-neutral alternatives like requiring directors with different educational backgrounds, political affiliations, or socioeconomic statuses. *See* JA114.

*Second,* there's no temporal limitation on this discrimination. Nasdaq argued below that the Rule is narrowly tailored in this respect because there is "ample time to prepare for compliance." JA628. But that is the opposite of a temporal limitation and just confirms that the Rule is about driving changes in board composition. It implies this discrimination will continue for so long into the future that Nasdaq felt the need to impose a warning period. Under Nasdaq's view, the government can discriminate indefinitely if it gives advance notice.

*Third*, the Rule is also not "flexible." It mandates a certain minimum number of people, with any violation requiring a public explanation or potential delisting. As noted above, it is unpersuasive to claim that the "comply-or-explain" nature of the Rule is anything but a fig leaf designed to give Nasdaq and the SEC deniability about the fact that the Rule imposes quotas backed by threats of reputational harm for any firm that does not meet those quotas. JA151–54; *see supra* Part I.A.1. That cynical goal is clear as a matter of common sense, and judges "are

not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575–76 (2019) (cleaned up).

Nasdaq also claimed narrow tailoring because the Rule simultaneously provides "free access to a network of board-ready diverse candidates," which will "reduce the burden" on compliance. JA629. Nasdaq failed to cite authority for the idea that reducing burdens on *discriminators* is evidence of flexibility or narrow tailoring. Under Nasdaq's view, discrimination is legal if well-funded.

*Fourth*, the Rule is also wildly over-inclusive. It applies to nearly every Nasdaq-listed company, regardless of any history of discrimination or of its current board composition.[1] Nasdaq argued below that the Rule is narrowly tailored because it applies "only to Nasdaq-listed companies, all of which are part of the national market that Nasdaq seeks to protect and enhance." JA629. Left unexplained is how a Rule can be "narrowly tailored" when it applies to nearly every entity within the regulator's grasp. That is like saying a state's racially discriminatory policies are

---

[1] Neither the SEC nor Nasdaq claimed the Rule is justified to counter past illegal discrimination by any Nasdaq-listed companies, or by the SEC or Nasdaq. *See Scott Constr.*, 199 F.3d at 217.

narrowly tailored because they apply only within that state. And to the extent the Rule really does somehow further a compelling interest, it is under-inclusive because it does not apply to those companies that are perhaps the most likely to engage in discrimination: foreign corporations unbound by laws like Title VII and 42 U.S.C. § 1981. JA630; JA96–97.

The Supreme Court has also held that use of "opaque racial categories" is not narrow tailoring, which is fatal here. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 217 (2023). And the Rule provides no justification why individuals identical in every way but race will bring diverse views our change outcomes, instead "devolv[ing] into illegitimate stereotyping." *Id.* at 211 (cleaned up).

The Minority Director Rule ultimately fails constitutional scrutiny because it relies on the most offensive of stereotypes that certain minorities are alike and can be grouped together.

### 3. *Even if intermediate scrutiny applies, the Minority Director Rule still violates the Fifth Amendment.*

The inclusion of sexual minorities in the Minority Director Rule does not save it. It still *encourages* decisions based on race, even if those decisions could be made on other bases, as well. That is enough to trigger

strict scrutiny. *See, e.g., Adarand*, 515 U.S. at 212–13 ("race-based" aspects of the statutes and regulations subject to strict scrutiny); *Scott Constr.*, 199 F.3d at 215 & n.9 (applying strict scrutiny to the race-based aspects of a law that favored both minority- and women-owned businesses); *see also supra* Part I.A.1.

The Court therefore need not decide what level of review applies to sexual-orientation classifications. But if the Court does so, and assuming *arguendo* the same scrutiny applies as for sex-based classifications, *see SmithKline Beecham Corp. v. Abbott Lab'ys*, 740 F.3d 471, 481 (9th Cir. 2014), the SEC and Nasdaq must satisfy "heightened scrutiny," which "requires an 'exceedingly persuasive justification,'" *Sessions v. Morales-Santana*, 582 U.S. 47, 58 (2017) (quoting *United States v. Virginia*, 518 U.S. 515, 555–56 (1996)). Courts view with "suspicion laws that rely on 'overbroad generalizations about the different talents, capacities, or preferences of males and females.'" *Id.* at 62. The classification must serve "important governmental objectives" through means "substantially

related to" achieving those objectives. *Virginia*, 518 U.S. at 533 (cleaned up).[2]

Again, the SEC proffered no specific statement of what important interest is at issue, JA17, and Nasdaq raised the same arguments about corporate performance and demographic balancing it did for the racial aspect of the Minority Director Rule, JA631. Those explanations fail to provide any justification, let alone an "'exceedingly persuasive'" one. *Morales-Santana*, 582 U.S. at 58.

Nasdaq even conceded that it lacks *any* evidence showing LGBTQ+ directors improve corporate performance, JA632, which means the SEC cannot allege (let alone prove) a link to an important government interest, even assuming corporate performance could be such an interest.

Nasdaq argued below that the lack of data showing LGBTQ+ directors' effects on boards actually "illustrates the need" for the Rule. JA632 n.54. This turns heightened review on its head, reasoning that the

---

[2] Nasdaq also argued that "sexual orientation and gender identity are 'inextricably' intertwined with sex." JA632–33. But Nasdaq refutes itself because the Rule makes LGBTQ+ individuals interchangeable with racial minorities, not with women.

lack of evidence showing an important interest is *itself* a justification. Discriminate first, justify later.

The LGBTQ+ provision is also not tailored. The SEC offered no defense here, JA17, and Nasdaq simply referred to the same analysis as for the racial aspects of the Minority Director Rule, JA629–31. As demonstrated above, there were available neutral alternatives, there is no time limit on the discrimination, and the Rule is both over- and under-inclusive. *See supra* Part I.A.2.

### 4.    *The Female Director Rule fails heightened scrutiny.*

As with the Minority Director Rule, the Female Director Rule likewise triggers constitutional scrutiny because it at least *encourages* decisionmaking based on sex. *Scott Constr.*, 199 F.3d at 215; *Monterey Mech.*, 125 F.3d at 707–11 (holding that equal protection is violated where "the government requires or encourages" discrimination "against others based on their race or sex"); *Bras v. Cal. Pub. Utils. Comm'n*, 59 F.3d 869, 873–75 (9th Cir. 1995).

As noted above, classifications based on sex are subject to "heightened scrutiny," which "requires an exceedingly persuasive justification." *Morales-Santana*, 137 S. Ct. at 1690. The classification

must serve "important governmental objectives" through means "substantially related to" achieving those objectives. *Virginia*, 518 U.S. at 533. But the SEC again admits that the evidence that putting more women on boards improved performance is "generally inconclusive" and thus (at best) "mixed." JA8, 9, 10.

The Female Director Rule likewise fails the tailoring requirement. As with the racial classifications, there are neutral ways of promoting the cognitive diversity that Nasdaq allegedly seeks. *See* JA114; *Virginia*, 518 U.S. at 533. Nor is the Female Director Rule time limited. And it is over- and under-inclusive because it applies to nearly every listed company except, of course, foreign companies, which on aggregate are likelier to discriminate against women. JA630, 96–97.

The Female Director Rule similarly relies on pernicious stereotypes that all women are alike. Nasdaq claims that it "did not make assumptions about how women or men think," JA632, but that statement is absurd in the context of a Rule designed to "reduc[e] 'groupthink'" by requiring the presence of a woman—and any woman will do. JA8.

\* \* \*

26

The Minority Director Rule and Female Director Rule both violate the Fifth Amendment.

## B.    THE ORDER COMPELS SPEECH IN VIOLATION OF THE FIRST AMENDMENT.

The Order violates the First Amendment by compelling the disclosure of controversial information in a viewpoint-biased manner. The Rule requires: (1) companies to comply with quotas or publicly explain (apologize for, really) why they failed to do so, but companies that *do* comply are not required to explain why they chose to do so (Rule 5605(f)); and (2) disclosure of controversial, personal matters like the racial and sexual-orientation breakdown of their board members (Rule 5606).

"[F]reedom of speech prohibits the government from telling people what they must say." *Rumsfeld v. F. for Acad. & Inst. Rts., Inc.*, 547 U.S. 47, 61 (2006). Compelled disclosures are subject to strict scrutiny as a content-based regulation of speech *unless* they fall into one of two categories: (1) "laws that require professionals to disclose factual, noncontroversial information in their 'commercial speech'"; or (2) regulation of "professional conduct, even though that conduct

incidentally involves speech." *Nat'l Inst. of Family & Life Advocs. v. Becerra* ("*NIFLA*"), 585 U.S. 755, 768 (2018).

Rules 5605(f) and 5606 trigger strict scrutiny because they require disclosure of controversial information that is not the regulation or professional conduct only incidentally involving speech. They fail to satisfy strict scrutiny because there is no compelling (or even substantial) government interest at stake, nor are the rules narrowly tailored.

### 1.  The comply-or-explain rule triggers strict scrutiny.

Common sense confirms that the topics of race, sex, and sexual-orientation discrimination and affirmative action are, *under no circumstances*, "noncontroversial"—and thus compelling speech on those topics must satisfy strict scrutiny. *Id.*; *see Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 312 (1986) (Marshall, J., dissenting) (acknowledging "the controversial issue of affirmative action"). "[A] compelled statement is 'uncontroversial' for purposes of [*NIFLA*] where the truth of the statement is not subject to good-faith scientific or evidentiary dispute *and* where the statement is not an integral part of a live, contentious political or moral debate." *Free Speech Coal., Inc. v. Paxton*, No. 23-50627, 2024 WL 982225, at *14 (5th Cir. Mar. 7, 2024) (emphasis added).

***Moral Debate/Opprobrium.*** Nasdaq and the SEC hope to shame companies into satisfying the quotas by making non-compliant companies—*and only those companies*—raise their hands and draw public attention. Nasdaq admitted this below. JA631 (euphemistically referring to this as "empower[ing] shareholders or potential shareholders to engage in conversations with companies that do not meet the diversity objective about initiatives to encourage and promote a more diverse pipeline of qualified board candidates").

The D.C. Circuit has previously rejected an attempt by the SEC to force apologies and pin moral blame on companies. In *National Association of Manufacturers v. SEC* ("*NAM*"), 800 F.3d 518 (D.C. Cir. 2015), the court held that the First Amendment prohibited an SEC regulation requiring certain minerals to be labeled as "not conflict free" or "conflict free." The court recognized that the label of "not conflict free" is "a metaphor that conveys moral responsibility," and thereby "interferes with th[e] exercise of the freedom of speech under the First Amendment." *Id.* at 530 (cleaned up).

As with the labeling of diamonds as "not conflict free," requiring companies to proffer an explanation for not meeting quotas is hardly

"non-ideological"—it is designed to brand those companies as unfaithful to "diversity" or not "doing the work" of achieving it. Such a topic is thus "controversial.". *Id.* And that moral opprobrium makes this compelled disclosure palpably different from the only examples Nasdaq could muster, which all involved disclosures of mundane pricing information. JA636; *but see Book People, Inc. v. Wong*, 91 F.4th 318, 340 (5th Cir. 2024) (concluding that statements regarding a library-material's appropriateness for children is controversial).

**Not Evenhanded.** The comply-or-explain rule requires disclosure only from those companies that fail to satisfy the Rule's quotas. Companies that comply are not required to explain why they did so (e.g., was it because they believe decisions should be made based on race?). As then-Judge Kavanaugh noted in a case about compelled country-of-origin labeling, one telltale sign of information being "controversial" is when the regulation is not "evenhanded" across different applications. *Am. Meat Inst. v. U.S. Dep't of Agric.* ("*AMI*"), 760 F.3d 18, 34 (D.C. Cir. 2014) (Kavanaugh, J., concurring). The regime here applies asymmetrically to only one side (the one the government disfavors) and therefore is

30

certainly not evenhanded—a flag that the relevant information is indeed controversial. *See Paxton*, 2024 WL 982225, at \*14.

***Flexibility in Explanation Does Not Save the Rule.*** The SEC and Nasdaq stress that companies can choose how they will phrase their explanations for failing to satisfy the quotas. JA5, 17; JA611–12, 636. That does not save the Rule from strict scrutiny. Quite the opposite: Allowing companies to provide *any* explanation whatsoever defeats the claim of a compelling interest. If the SEC and Nasdaq truly do not care what the explanation says, then why require one? The answer is obvious: the goal is to force such companies to raise their hands for public shaming. The Rule does not require any specific explanation because the SEC and Nasdaq know their goal will be accomplished regardless of what the company says.

In *NAM*, the SEC similarly "argue[d] that issuers can explain the meaning of 'conflict free' in their own terms." 800 F.3d at 556. The D.C. Circuit rejected that view, holding that "the right to explain compelled speech is present in almost every such case and is inadequate to cure a First Amendment violation." *Id.*

Here, the mere fact that the SEC and Nasdaq make companies raise their hands and provide an explanation is itself the illegally compelled speech. Forcing an explanation from only disfavored actors is more than enough to tag these companies with a moral failing for not being sufficiently committed to "diversity" (as defined by the Rule). In that sense, this Rule is not just content-based but also viewpoint discrimination, forcing compelled apologies only by those companies that disagree with preferred views on race and sex. "[V]iewpoint discrimination is an egregious form of content discrimination and is presumptively unconstitutional." *Iancu v. Brunetti*, 588 U.S. 388, 393 (2019) (cleaned up).

For all these reasons, Rule 5605(f) triggers strict scrutiny. Petitioner next shows that Rule 5606 likewise triggers strict scrutiny, and then shows that *neither* of these rules satisfies that scrutiny.

### 2. *The demographic disclosure rule triggers strict scrutiny.*

Rule 5606 requires companies to provide detailed breakdowns of their board members' race, sex, and sexual orientation. Although the SEC frequently mandates disclosures from companies, this one is unusual in that it demands controversial demographic information and thereby

32

triggers strict scrutiny. *See NIFLA*, 585 U.S. at 768–69. There is no doubt that matters like race, sex, and sexual orientation are controversial matters. *See supra* Part I.B.1.

The D.C. Circuit has persuasively rejected the notion that the SEC can compel such disclosures. In *NAM*, the court held that the SEC is not entitled to any greater leeway merely because it invokes "'the federal government's broad powers to regulate the securities industry.'" 800 F.3d at 555. If that position were accepted, the SEC could "easily regulate otherwise protected speech using the guise of securities laws." *Id.* Anticipating laws or regulations precisely like the Rule here, the court continued: "Why, for example, could Congress not require issuers to disclose the labor conditions of their factories abroad or *the political ideologies of their board members*, as part of their annual reports? Those examples, *obviously repugnant to the First Amendment*, should not face relaxed review just because Congress used the 'securities' label." *Id.* (emphasis added).

Given that requiring disclosure of "political ideologies" is "obviously repugnant to the First Amendment," the forced disclosure of even-more-controversial race, sex, and sexual-orientation information stands no

chance, especially when it is an executive agency—not Congress—that is commanding it.

The SEC may claim it is not "forcing" any board member or company to disclose such information because they could always refuse to identify their demographics. But board members have a fiduciary obligation to their companies and their companies' shareholders, *Torch Liquidating Tr. ex rel. Bridge Assocs. L.L.C. v. Stockstill*, 561 F.3d 377, 389 (5th Cir. 2009), meaning women and minority board members likely *must* disclose their demographics because failing to do so may mean the company violates the quotas, triggering (at a minimum) public shaming via forced apology and (at a maximum) delisting from Nasdaq altogether. Thus, LGBTQ+ board directors have a fiduciary obligation to out themselves while Nasdaq and the SEC pat themselves on the back for being "inclusive."

Rule 5606 directly mandates revealing confidential and controversial information. It therefore triggers strict scrutiny.

### 3. *Neither disclosure rule satisfies strict scrutiny.*

Because viewpoint discrimination is per se unconstitutional, the Court need not proceed further. *See, e.g., 303 Creative LLC v. Elenis*, 600

U.S. 570, 588 (2023); *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1126 (11th Cir. 2022) (restrictions "'based on viewpoint are prohibited,' seemingly as a *per se* matter"). Regardless, the rules easily fail strict scrutiny: Neither Rule 5605(f) nor Rule 5606 serves a compelling governmental interest, nor are they narrowly tailored. *See NIFLA*, 585 U.S. at 766–67. Nasdaq offered only one brief paragraph on this topic below, effectively conceding the rules would fail if the Court were to reach this point. JA636.

***No Compelling Government Interest.*** That single paragraph asserted that "studies show[] the benefits of diverse corporate boards." JA636. The SEC, however, refused to rely on that basis, finding that the supposed causal link between diversity and corporate performance was "generally inconclusive" and thus (at best) "mixed." JA8, 9, 10.

But even if it were true, Nasdaq does not explain why compelled *speech* is needed. That is, Nasdaq failed to claim—let alone prove—that compelling disclosures *itself* will benefit corporations' financial positions.

Nasdaq also claimed that explanations and diversity disclosures would "enable more informed analysis of, and conversations with, companies." JA709. But, as then-Judge Kavanaugh aptly noted, the

claim that providing more information is a compelling or even "substantial" government interest is a flawed and circular theory. "[T]he Government broadly contends that it has a substantial interest in 'providing consumers with information,'" but "it is plainly not enough for the Government to say simply that it has a substantial interest in giving consumers information. After all, that would be true of any and all disclosure requirements." *AMI*, 760 F.3d at 31 (Kavanaugh, J., concurring).

The SEC and Nasdaq also suggested below that popular interest in such information is a sufficient government interest. JA7, 633 n.56. But again, then-Judge Kavanaugh correctly concluded in *AMI* that "'consumer curiosity alone is not a strong enough state interest' to sustain a compelled commercial disclosure," even when it concerns factual information. 760 F.3d at 32 (Kavanaugh, J., concurring).

Without a compelling government interest, the disclosure rules fail strict scrutiny.

***No Narrow Tailoring.*** There is also a lack of narrow tailoring. If Nasdaq and the SEC actually cared about "informed conversations," Rule 5605(f) would also require companies who *comply* with the diversity

quotas to explain why they did so. But Nasdaq omitted such a requirement, providing a stunning (and revealing) example of underinclusiveness.

Nasdaq also argued below that Rule 5605(f) is narrowly tailored because "there is no particular message prescribed" by the Rule when the company proffers its explanation. JA636. As discussed above, that argument holds no water. "[T]he right to explain compelled speech is present in almost every such case and is inadequate to cure a First Amendment violation." *NAM*, 800 F.3d at 556.

Rule 5606 also fails narrow tailoring. Even assuming that demographic balancing were an acceptable goal (it is not), the SEC and Nasdaq did not ask for information about, say, religion, disability or veteran status. To the extent they want to avoid "groupthink," the proper disclosure would require information about ideological or experiential diversity—not race, sex, and sexual orientation. And the carve-out for foreign corporations represents yet another example of underinclusiveness. When government action is subject to strict scrutiny, these flaws are fatal.

* * *

For these reasons, the Order violates the First Amendment and should be vacated.

## C. THERE IS STATE ACTION.

The panel decision concluded there has been no state action at all, and thus the Constitution simply does not apply here. *AFBR*, 85 F.4th at 248. That is incorrect for several reasons.

*First*, Petitioners challenge the SEC's Order, which was undoubtedly state action. The SEC made its own policy judgments about the Rule and offered its own justification for a facially discriminatory Rule, which has at minimum the effect of encouraging discrimination.

*Second*, the Order and Exchange Act *compel* Nasdaq to enforce the Rule against listed companies. The Supreme Court has long held that this sort of compelled private discrimination is textbook state action.

*Third*, exchange listing rules are state action subject to constitutional scrutiny, as this Court has previously held.

### 1. *The Order was issued by the government and encourages discrimination.*

The Order was issued by a governmental entity and therefore is undoubtedly state action. The panel tried to evade this obvious conclusion by focusing only on whether Nasdaq is a state actor or engaged

in state action. Under the panel's logic, the Order itself would not be state action if the Rule it gave effect to was "attributable" to Nasdaq rather than the SEC. *AFBR*, 85 F.4th at 245. In support, the panel cited several cases holding that private actions were not attributable to the government where the government "mere[ly]" "approv[ed]" of or "acquiesce[d]" in them. *Id.* at 246–47.

That approach is nonsensical. Petitioners seek review of the SEC's *own* actions, which are unquestionably attributable to the agency itself. The leading case the panel cited, *id.* at 246, recognizes this basic distinction, *see Am. Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 51 (1999) ("All agree that the *public officials* [involved] … are state actors.").

*First*, by issuing the Order, the SEC legally transformed the Rule from proposal to a final, binding rule under the Exchange Act. Unlike the cases the panel cited where private actions took effect even before being approved by the government, *see Blum v. Yaretsky*, 457 U.S. 991, 1005 (1982), the Rule was entirely dependent on the SEC Order giving it effect.

*Second*, the SEC did not engage in merely ministerial review like approving a request for a building permit. It independently justified the Rule and made policy judgments, determining in an 82-page order that

the proposed Rule satisfied a bevy of open-ended and complex policy standards. *See infra* Part II. The SEC even added a new basis for approval that Nasdaq never offered, and the SEC relied on "studies Nasdaq had not cited and comments and statements from investors and other corporate stakeholders." SEC.Panel.Br.32. That makes this a far cry from "[m]ere approval of or acquiescence in the initiatives of a private party." Nasdaq.Panel.Br.37 (quoting *Blum*, 457 U.S. at 1004–05). Thus, the SEC certainly "is *responsible* for the specific conduct of which the plaintiff complains." SEC.Panel.Br.43 (quoting *Blum*, 457 U.S. at 1004).

As further confirmation, this Court has held that a government actor's mere "'authoriz[ing] or encourag[ing]'" of racial discrimination violates equal protection and is thus *a fortiori* state action. *Scott Constr.*, 199 F.3d at 215. The Order undoubtedly encourages racial discrimination by justifying and giving legal force to the Rule. *See supra* Part I.A. That authorizing and encouraging is not just reviewable state action but fully *unconstitutional* state action.

### 2.    *The Order compels discrimination.*

The Order independently qualifies as state action because it compels private discrimination. In *Moose Lodge No. 107 v. Irvis*, 407 U.S.

163 (1972), the Supreme Court held that a government "regulation [that] requires compliance by [a private party] with provisions of its … bylaws containing racially discriminatory provisions" is unconstitutional state action. *Id.* at 179; *see Shelley v. Kraemer,* 334 U.S. 1, 19 (1948) (finding unconstitutional state action when courts enforce private racial covenants). That test describes the Order exactly.

Under the Exchange Act, the proposed Rule was invalid unless and until the SEC approved it. 15 U.S.C. § 78s(b)(1). And now that the SEC has approved it, Nasdaq has an ongoing statutory duty to enforce the Rule against its listed companies, subject to SEC sanctions up to and including revocation of Nasdaq's registration for failure to do so. *Id.* § 78s(g)(1), (h)(1).

Nasdaq-listed companies—including those who do not wish to comply with the Rule—are thus required to encourage and engage in race- and sex-based discrimination (and, further, sacrifice their free speech), because the SEC issued the Order. In other words, the Order is a "regulation [that] requires compliance by [Nasdaq and its listed companies] with provisions of its … bylaws containing racially

discriminatory provisions," precisely what *Moose Lodge* held was unconstitutional state action. 407 U.S. at 179.

The panel claimed *Moose Lodge* did not apply because this case does not involve a direct SEC enforcement action brought against Nasdaq for failing to enforce the Rule. *AFBR*, 85 F.4th at 247. The panel seemed to believe there might be state action only if a Nasdaq-listed company refused to follow the Rule and prompted SEC sanctions.

That is immaterial to the *Moose Lodge* analysis. *First*, once the SEC approved the Rule, the Exchange Act *requires* enforcement. 15 U.S.C. §§ 78s(g)(1), 78f(b)(6). There is no daylight between enforcement and the Order approving the Rule.

*Second*, *Moose Lodge* never said a constitutional challenge could be raised only after the government brings an enforcement action against a private entity for failing to follow its own discriminatory rule. In fact, *Moose Lodge* itself was decided *before* any threatened government enforcement action. That case was brought by a black patron directly against a Lodge that refused him admission because of its discriminatory bylaws, which Pennsylvania state law required the Lodge to enforce. 407 U.S. at 165–66, 177. Despite being a private suit, the Supreme Court held

42

that the challenger "was entitled to a decree enjoining the enforcement" of the regulation requiring the Lodge to follow its discriminatory bylaw, making clear that judicial relief was appropriate before any enforcement by the state itself. *Id.* at 179. That directly refutes the panel's attempt to distinguish *Moose Lodge*.

If anything, the state action here is even clearer than in *Moose Lodge*. Imagine if the Lodge was not only required to enforce its discriminatory bylaw, but that the state itself *also* had to approve that bylaw before it could take effect, and in fact had given such approval after making its own findings that discrimination was in the public interest. That is what happened here.

*Third*, the Supreme Court has repeatedly held that federal courts "do not require plaintiffs to bet the farm by taking the violative action before testing the validity of the law." *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 490 (2010) (cleaned up). Nasdaq-listed companies have no choice but to comply with the Rule given they face being delisted from the exchange, JA3, and Nasdaq has no choice but to enforce it against them, given the severe penalties up to and including or deregistering

Nasdaq itself. Those penalties certainly qualify as "'bet[ting] the farm.'" *Free Enter. Fund*, 561 U.S. at 490.

* * *

Finding state action here breaks no new ground. The SEC's effectuation of the Rule's unique discriminatory designs is state action under *Moose Lodge*.

### 3.     *This Court's precedent confirms state action.*

Finding state action here also fully accords with this Court's caselaw that the enforcement of a stock exchange listing rule is state action. That precedent is not outdated as Nasdaq previously suggested, Nasdaq.Panel.Br.42, but reflects the reality that Congress has subjected exchange listing rules to all-encompassing state control.

In *Intercontinental Industries, Inc. v. American Stock Exchange*, 452 F.2d 935 (5th Cir. 1971), this Court addressed an SEC order allowing the American Stock Exchange to de-list the petitioner's common stock for violating a listing rule that required disclosure of material events. *Id.* at 937. This Court rejected the argument that "constitutional due process is not required since [the exchange] is not a governmental agency." *Id.* at 941. Noting the SEC's comprehensive control over exchange rules, *id.* at

941 n.9, this Court concluded that "[t]he intimate involvement of [the exchange] with the Securities and Exchange Commission brings it within the purview of the Fifth Amendment" in the context of listing rules, *id.* at 941, like the Rule at issue here.

The panel declined to follow *Intercontinental*, however, concluding its discussion on state action was entirely dicta. *AFBR*, 85 F.4th at 242–43. But whether the Fifth Amendment applied to the exchange was a threshold question the Court necessarily resolved in *Intercontinental* before proceeding to address at length whether the challenged action complied with constitutional due process. 452 F.2d at 941–43 & n.9.

The panel decision pointed to part of *Intercontinental* saying the Court need not "decide" certain points, *AFBR*, 85 F.4th at 242 (quoting *Intercontinental*, 452 F.2d at 941), but that language refers to the immediately preceding paragraph, which discussed whether there were sufficient property or economic interests at issue to require a *hearing*, not whether the exchange's actions were subject to constitutional scrutiny in the first place (a point the Court had already emphatically resolved against the exchange in a prior paragraph). *See Intercontinental*, 452 F.2d at 941.

Confirming this reading, the Court immediately stated that "[t]he important thing to be determined in this litigation is whether the Exchange did grant [the petitioner] a hearing meeting all the applicable procedural requirements." *Id.* That inquiry would make no sense if the Court had not already held that the Due Process Clause applied, as there would be no "applicable procedural requirements" for purely private action in the first place.

*Intercontinental*'s holding was then re-affirmed in subsequent decisions. *See Harding v. ASE*, 527 F.2d 1366, 1370 n.5 (5th Cir. 1976); *N. Alabama Express, Inc. v. United States*, 585 F.2d 783, 786 (5th Cir. 1978). In *Harding*, this Court cited *Intercontinental* and expressly recognized the challengers "could have raised alleged due process violations in an appeal from the SEC delisting order under [15 U.S.C. § 78y]." 527 F.2d at 1370 n.5. The panel here labeled that re-affirmation of *Intercontinental* as a mere "passing remark" and refused to follow it, too. *AFBR*, 85 F.4th at 242–43. But the point is that *Harding* recognized *Intercontinental* had indeed held—not merely stated in dicta—that the Constitution applied because there was state action.

46

Further, in *North Alabama*, this Court cited *Intercontinental* and held that "[i]n the administrative context, due process requires that interested parties be given a reasonable opportunity to know the claims of adverse parties and an opportunity to meet them." 585 F.2d at 786. The panel here refused to follow that case, too, on the basis that "[t]here is no mention of *Intercontinental*'s state-action language." *AFBR*, 85 F.4th at 243. But the reason that *North Alabama* held that "due process" applied was because *Intercontinental* had held there was state action that triggered constitutional scrutiny.[3]

If anything, the reasons this Court gave in *Intercontinental* for finding stock exchange rules to be state action have only strengthened since it was first decided. *Intercontinental* was decided in 1971, before Congress significantly expanded the SEC's control over stock exchange rules. Before Congress enacted the Securities Acts Amendments of 1975, stock exchanges were free to adopt rules "not inconsistent" with the Exchange Act without SEC approval. S. Rep. 94-75 at 26–27, 30 (1975)

---

[3] The panel decision also contended that the law of state action has "changed" since *Intercontinental*, *AFBR*, 85 F.4th at 241, but it hasn't changed that much. The directly on-point Supreme Court decision in *Moose Lodge*, 407 U.S. at 172–73, undoubtedly remains good law, for example.

(quoting Securities Exchange Act of 1934, Pub. L. No. 73-291, § 6(c), 48 Stat. 881, 886 (1934)). The 1975 Amendments established the current SEC-approval regime, requiring the SEC to affirmatively determine that a proposed exchange rule is "consistent with" the Exchange Act's requirements for stock exchanges. Pub. L. No. 94-29, 89 Stat. 97, 148 (1975) (codified at 15 U.S.C. § 78s(b)(2)(C)(i)). The 1975 Amendments also gave the SEC its current power to unilaterally amend or abrogate exchange rules. *Id.* at 150 (codified at 15 U.S.C. § 78s(c)). These modifications made clear that stock exchanges should "have no authority to regulate independently of the SEC's control." S. Rep. No. 94-75, at 23.[4]

The SEC has conceded that an exchange's rules governing its "members" are exercises of "'delegated governmental power.'" SEC.Panel.Br.9. That confirms there is state action here because Congress has subjected *all* exchange rules—whether they regulate "members" (i.e., broker-dealers who execute trades on the exchange) or

---

[4] Nasdaq previously pointed out that SEC approval is no longer required for an exchange to delist a security, Nasdaq.Panel.Br.43 n.4, but that's beside the point. The SEC can punish an exchange for failing to enforce exchange rules—including listing rules. *See supra* Part I.C.2. In any case, a delisting action is not outside the SEC's control. 17 C.F.R. § 240.12d2-2(d)(4).

"issuers" (i.e., companies whose securities are listed on the exchange)—to the very same SEC determination of consistency with statutory criteria, obligated enforcement, and plenary SEC authority to amend or delete. 15 U.S.C. § 78s. In other words, if exchange rules governing members amount to state action, then exchange rules governing issuers do, too.[5]

Finally, if there were no state action, the Exchange Act would violate the private nondelegation doctrine. *See Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 880 (5th Cir. 2022). Companies are required under penalty of federal law to comply with the Rule. If the SEC's Order is *not* state action, then Nasdaq has been handed the governmental power to issue rules that must be followed under pain of Exchange Act penalties, all without a government actor ever having "the final word on the substance of the rule[]." *Id.* at 887. After all, if the SEC had the final word, then that would be state action. If it were

_____

[5] The SEC has attempted to distinguish listing standards from the "regulation" of exchange members by characterizing listing standards as a "contractual agreement" between an exchange and issuer. SEC.Panel.Br.9 But that is a false distinction. Exchanges enforce listing standards by preventing their *members* from trading non-compliant issuers' securities. *See* Douglas C. Michael, *Untenable Status of Corporate Governance Listing Standards Under the Exchange Act*, 47 Bus. Law. 1461, 1489–90 (1992). In other words, a listing standard *is* regulation of stock exchange members.

otherwise, the government could partner with private entities to accomplish what neither of them alone could achieve: racial discrimination and controversial disclosures, backed by government sanction but without any constitutional scrutiny.

* * *

A Rule that facially discriminates based on race and sex now has the imprimatur and backing of the federal government. Because there is state action that fails to satisfy the requisite scrutiny, *see supra* Part I.A–B, the Court should vacate the entire Order.[6]

## II.   THE ORDER IS NOT AUTHORIZED BY THE EXCHANGE ACT.

To approve a proposed stock exchange rule, the Exchange Act requires the SEC to determine that it is "consistent with the requirements of [the Exchange Act]" and the rules applicable to the exchange. 15 U.S.C. § 78s(b)(2)(C)(i). Among other things, that means the

---

[6] Neither the Order nor the Rule contain a severance clause, nor would one be of any effect because even the SEC disclaims any authority to change or strike any constituent part of the Rule. *See* JA1. If the Court deems any part of the Order or Rule invalid, the entirety must be vacated. *See, e.g.*, Admin. Conf. of the U.S., *Severability in Agency Rulemaking* (June 29, 2019), https://perma.cc/WS2J-LUCE.

SEC must affirmatively find that the Rule is designed to achieve the following goals:

- "to prevent fraudulent and manipulative acts and practices";

- "to promote just and equitable principles of trade";

- "to remove impediments to and perfect the mechanism of a free and open market and a national market system"; and

- "to protect investors and the public interest."

15 U.S.C. § 78f(b)(5).

The SEC must also find that the Rule does *not*:

- "permit unfair discrimination between customers, issuers, brokers, or dealers";

- "regulate … matters not related to the purposes of [the Exchange Act] or the administration of the exchange"; or

- "impose any burden on competition that is not necessary or appropriate in furtherance of the purposes of [the Exchange Act]."

*Id.* § 78f(b)(5), (b)(8).

These determinations must be "supported by substantial evidence," 15 U.S.C. § 78y(a)(4), which "'imposes a considerable burden on the

agency and limits its discretion in arriving at a factual predicate.'" *Corrosion Proof Fittings v. EPA*, 947 F.2d 1201, 1214 (5th Cir. 1991). And it is applied especially carefully to SEC action, which must consider an exchange rule's effect on efficiency, competition, and capital formation. *See* 15 U.S.C. § 78c(f).

As the D.C. Circuit has recognized, observational studies with "mixed" results cannot justify the SEC issuing corporate-governance rules. *See Bus. Roundtable v. SEC* ("*Bus. Roundtable II*"), 647 F.3d 1144, 1151 (D.C. Cir. 2011) ("In view of the admittedly (and at best) 'mixed' empirical evidence, we think the Commission has not sufficiently supported its conclusion that increasing the potential for election of directors nominated by shareholders will result in improved board and company performance and shareholder value.").

The Rule flunks these statutory requirements for several reasons. *First*, the Rule's discriminatory design is not consistent with the Exchange Act because it renders the statute's enforcement provisions unconstitutional. *Second*, the SEC's justification of the Rule based on stakeholder "demand" does not satisfy any of the Exchange Act's criteria

for approving the Rule. *Third*, the Rule violates each of the Exchange Act's prohibitions on exchange rules.

## A.    RACE AND SEX DISCRIMINATION IS NOT CONSISTENT WITH THE EXCHANGE ACT.

The Rule cannot be "consistent with the requirements of [the Exchange Act]" if it renders unconstitutional other provisions of that statute, like its enforcement provisions. That is precisely the case here.

The Exchange Act requires Nasdaq to enforce the Rule, subject to SEC sanctions. *See* 15 U.S.C. § 78f(b)(6); *supra* Part I.C.1. But such mandatory enforcement would be unconstitutional. *See Moose Lodge*, 407 U.S. at 179; *supra* Part I.C.2. Because the Exchange Act requires enforcement of the discriminatory Rule, approval of the Rule renders that statutory provision unconstitutional.

Thus, even if the panel were right that the Rule would be unconstitutional only *when enforced*, *AFBR*, 85 F.4th at 247, that just confirms the Rule violates the Exchange Act. A rule cannot be "consistent with" statutory requirements that it would render unconstitutional and null.

## B.   SPECIAL-INTEREST STAKEHOLDER "DEMAND" DOESN'T SATISFY THE EXCHANGE ACT.

The SEC claimed the Rule would "promote just and equitable principles of trade," "remove impediments to and perfect the mechanism of a free and open market and a national market system," and "protect investors and the public interest." 15 U.S.C § 78f(b)(5); *see* JA7. But the Rule fails to achieve any of those authorized purposes.

When Nasdaq submitted the Rule to the SEC, Nasdaq argued that it satisfied the statutory criteria because companies with "diverse" boards financially outperform others. JA8–10. After record evidence rebutted Nasdaq's claims, *see* JA55–78, the SEC expressly refused to rely on Nasdaq's financial-performance basis. The SEC surveyed the evidence regarding diversity and company performance and held that any suggested causal link was "inconclusive" and the evidence "mixed." JA8–10.

Instead of justifying the Rule on financial-performance grounds, the SEC concluded it was supported exclusively by a different theory: mere "demand" by certain stakeholders for board diversity "information." JA7. The SEC found that the Rule would make it easier for "investors to collect, use, and compare information on board diversity." *Id.* The SEC

then relied on this justification to summarily conclude (in rapid-fire succession) that the Rule "is designed to promote just and equitable principles of trade, remove impediments to and perfect the mechanism of a free and open market and a national market system, and protect investors and the public interest." *Id.*

That justification was insufficient. To reach it, the SEC assumed a false premise: that board diversity information is relevant to *investors*. That premise is wrong for two reasons. *First*, many of the stakeholders the SEC cited are not "investors," but asset managers and pension plans who may have conflicts of interest with actual investors—the plan beneficiaries who are the ultimate owners of the invested capital—especially on controversial matters like board diversity. *See* SEC Comm'r Hester M. Peirce, Remarks before the Brookings Institution: Chocolate-Covered Cicadas (July 20, 2021), https://perma.cc/8WJ5-G49W ("[T]he fact that [asset managers] work for investors does not make them investors."). The stakeholders cited also included non-financial public-interest organizations like the NAACP and National Urban League. JA312 (included in the groups cited by the SEC at JA7 n.91).

*Second*, even to the extent they are "investors," these stakeholders' support for board diversity information—unconnected to financial performance—is not in their capacity as *investors*.

As the SEC's test for the meaning of "security" indicates, investors make investment decisions "with the expectation [of] … profit." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298 (1946). The SEC itself admitted that it lacked substantial evidence that diverse boards improve corporate financial performance. JA9–10. That concession is fatal. Stakeholders' "demand" for board diversity information is not related to their interests as *investors*. Instead, it comes from their extraneous social goals.[7] Such demand thus cannot supply the basis for the SEC to invoke its disclosure powers. *See Bus. Roundtable II*, 647 F.3d at 1152 (discounting evidence

---

[7] *See, e.g.*, JA699 (Nasdaq citing "the social justice movement" as support for the Rule); JA643 (Microsoft cited by the SEC at JA7 n.92) (citing its "diversity commitment" to "internal and external stakeholders"); Comment Letter from Benjamin Colton & Robert Walker, Glob. Co-heads of Asset Stewardship, State Street Glob. Advisors, to Vanessa Countryman, Sec'y, SEC, at 4 (Dec. 30, 2020), https://tinyurl.com/yp7wxzrz (State Street cited by the SEC at JA7 n.91) (citing need to "address inequality and racism"); Comment Letter from Edgar Hernandez, Assistant Dir., Cap. Stewardship, SEIU, to Vanessa Countryman, Sec'y, SEC, at 1 (Jan. 4, 2020), https://tinyurl.com/mrxesx3c (cited by the SEC at JA6 n.77) (citing "disparate[] impact[]" on "communities" where companies lack diverse boards).

from "investors with a special interest, such as unions and state and local governments who[] … can be expected to pursue self-interested objectives rather than the goal of maximizing shareholder value").

Because it relies on this false premise, the SEC's proffered stakeholder "demand" justification fails. It cannot provide the substantial evidence necessary to support the Rule under any of the statutory criteria.

### 1.    *The Rule doesn't protect investors or the public interest.*

One justification under the Exchange Act is to "protect investors and the public interest." 15 U.S.C. § 78f(b)(5). The SEC was wrong to summarily conclude that making board diversity information more accessible satisfied this standard. JA7.

For exchange rules, the "public interest" standard "concern[s] the administration and operation of the self-regulatory organizations themselves, *not the fairness of the issuers' corporate structures.*" *Bus. Roundtable v. SEC*, 905 F.2d 406, 413 (D.C. Cir. 1990) ("*Bus. Roundtable I*") (emphasis added). That is because the SEC lacks authority to regulate corporate board structures and composition. *See id.*; *infra* Part II.C.1. Accordingly, this prong provides no basis for setting board-composition

57

"objectives," JA5, as the Rule does. Discrimination is also hard to square with the public interest. *See, e.g.*, 42 U.S.C. § 1981.

Even if the public-interest catch-all could apply to board composition, there's still no substantial evidence to support the SEC's conclusion that the Rule protects investors, given the SEC itself found "inconclusive" evidence of a causal relationship between board diversity and corporate performance. JA8–10. The Exchange Act's references to "the public interest" and "protection of investors" authorize the SEC to require disclosure only of information that is *financially* material to the "reasonable investor" in the affected companies. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448–49 (1976); *see* 15 U.S.C. §§ 78*l*(b)(1), 78m(a), 78o(d).

That limitation to financially material information derives from statutory text and context. *First*, Congress dictated that disclosure requirements must be in the "public interest" and for the "protection of investors," 15 U.S.C. §§ 77g(a)(1), 78*l*(b)(1), and the Supreme Court has held that "simply … bury[ing] the shareholders in an avalanche of trivial information" "is hardly conducive to informed decisionmaking" and thus would "accomplish more harm than good." *TSC Indus.*, 426 U.S. at

448–49. Mandating disclosure of non-material information *hurts* the "public interest" and investors, and thus isn't statutorily authorized.

*Second*, Congress cabined the SEC's disclosure powers by appending lists of specific types of information, nearly all of which focus on balance-book and management details.[8] When Congress wants the SEC to regulate *outside* the realm of materiality, Congress has provided express authority to do so. 15 U.S.C. §§ 78m(p)(1)(A) (conflict minerals), 78m(q)(2)(A) (resource extraction), 78n(i) (executive compensation).

Thus, even though the relevant statutory disclosure provisions do not expressly include the word "material," they still have a materiality requirement, just as the Supreme Court has recognized for certain antifraud provisions, like section 10(b) of the Exchange Act, that likewise do not expressly use the word "material." *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011).

---

[8] The grant of disclosure power in § 78*l* is cabined by the eleven expressly listed types of information that must be disclosed, which focus on management and balance-sheet information. 15 U.S.C. § 78*l*(b)(1)(A)–(K). It is further limited by a restriction to financial disclosures typically "shown in the balance sheet and the earnings statement." *Id.* § 78m(b)(1); *see Dubin v. United States*, 599 U.S. 110, 124–25 (2023) (*noscitur a sociis*); *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 512 (2018) (*ejusdem generis*).

The SEC itself has said that, outside the narrow realm of unlawful behavior or misstatements, materiality is triggered by "quantitative considerations" like profit, loss, and revenue—things that the SEC just concluded have no demonstrable link to "diversity." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197–98, 204 (2d Cir. 2009).

The SEC did not determine that board diversity information is financially material. JA9. Worse still, the SEC lacked support for its finding that diversity information was even relevant, let alone material, to the actual "investment … decisions" of investors. JA7. The SEC relied almost exclusively on evidence showing that stakeholders use diversity information to engage in proxy voting and other non-investment "advocacy" and "engagement" activities to pressure companies to increase board diversity, as they do with other social issues.[9] But imposing social-

---

[9] *See* JA7 (Nasdaq arguing stakeholders "basing their *voting* decisions on whether companies do or do not" "diversify their boards" shows impact on "voting *and investment decisions*") (emphasis added), 640, 662–63, 669, 671; *cf. Bus. Roundtable II*, 647 F.3d at 1152. Amidst a sea of vague assertions by stakeholders that diversity information is relevant to unexplained "investment … decisions," *see, e.g.*, JA654, the only actual example the SEC cited of a stakeholder even possibly using diversity information to determine which companies to *invest in* concerns a non-value maximizing "responsible" investment portfolio, JA653.

policy preferences via the proxy process is not a financial investment decision. The Rule thus fails the "public interest" and "protect[ion of] investors" tests.

### 2. The Rule doesn't promote just and equitable principles of trade.

Another justification under the Exchange Act is to "promote just and equitable principles of trade." 15 U.S.C. § 78f(b)(5). Nasdaq did not argue the Rule satisfied this provision. Instead, the SEC offered that justification *sua sponte*. JA7. It was error for the SEC to find that the Rule satisfied this provision when it was not raised below for comment. *Cf. Bus. Roundtable I*, 905 F.2d at 417.

In any event, the SEC lacks substantial evidence for this basis. A violation of the "just and equitable principles of trade" is established by a securities professional's breach of "fiduciary duties." *Heath v. SEC*, 586 F.3d 122, 134 (2d Cir. 2009). Predicated on special-interests and social-policy goals, the Rule creates new opportunities for asset managers and other fiduciaries to make decisions for collateral diversity promotion rather than their clients' financial interests. *See* Peirce, Remarks, *supra*. That undermines the fiduciary norms that underlie markets and cannot advance just and equitable principles of trade.

61

### 3. The Rule doesn't remove impediments to or perfect the mechanism of a free and open market and a national market system.

Another justification under the Exchange Act is to "remove impediments to and perfect the mechanism of a free and open market and a national market system." 15 U.S.C. § 78f(b)(5). Nasdaq argued below that disclosing board diversity information would force companies to consider candidates who "otherwise may be overlooked due to the impediments of the traditional director recruitment process, which will thereby remove impediments to a free and open market and a national market system." JA713. It is unclear whether the SEC agreed with this rationale when it cursorily stated that disclosing such information would satisfy this statutory justification. JA7.

Either way, this justification fails. The SEC's approval authority is limited to removing impediments in the market for *securities transactions*, not in the employment market for board directors. The statutory references to a "free and open market" and a "national market system" mean "a fair and orderly *exchange*." *NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*, 770 F.3d 1010, 1021 (2d Cir. 2014) (emphasis added).

None of those goals deals with employment decisions for corporate boards. *See Bus. Roundtable I*, 905 F.2d at 416.

Nor could the SEC satisfy this criteria by falling back on its assertion that disclosing information to investors is *per se* beneficial without a connection to financial performance. JA7. Congress has elaborated that a free and open market and national market system relates to *financial* information. 15 U.S.C. § 78k-1(a)(1) ("economically efficient execution of securities transactions" and "information with respect to quotations for and transactions in securities"). The SEC's disavowal of a causal relationship to financial performance means board diversity is not information that the market "prices," and thus information about it cannot relate to market functioning.

* * *

Acquiescing to supposed public demand, shorn from any material link to financial performance, does not satisfy any of the Exchange Act's bases for approving an exchange's rules.

## C.   THE RULE VIOLATES THE EXCHANGE ACT'S PROHIBITIONS APPLICABLE TO STOCK EXCHANGE RULES.

As noted above, the SEC was also required to find that the Rule does *not* "permit unfair discrimination between customers, issuers,

brokers, or dealers," "regulate … matters not related to the purposes of [the Exchange Act] or the administration of the exchange," or "impose any burden on competition not necessary or appropriate in furtherance of the purposes of [the Exchange Act]." 15 U.S.C § 78f(b)(5), (b)(8). The Rule violates each of these prohibitions.

### 1.    *The Rule regulates matters unrelated to the purposes of the Exchange Act.*

The Rule regulates "matters not related to the purposes of [the Exchange Act] or the administration of the exchange." 15 U.S.C § 78f(b)(5). The SEC summarily concluded otherwise because, it said, "exchanges may choose to adopt disclosure requirements … that provide investors with information that facilitates informed investment and voting decisions." JA15–16.

That justification would permit stock exchanges to compel that *any* company information be disclosed to investors. At minimum, the SEC erred by abdicating an independent review of whether the Rule's quotas and compelled "explanations" would be outside the purposes of the Exchange Act. *See* 15 U.S.C. § 78s(b)(2)(C)(i) (the "Commission" must "find[] that such proposed rule change is consistent with the requirements of this chapter").

64

Such a review would have revealed the Rule's plainly unrelated purpose. The actual and obvious goal of the Rule—favoring certain people because of their race, sex, or sexual orientation and increasing board "diversity"—is far removed from the purposes of the Exchange Act. True enough, the Exchange Act is concerned with investor access to material and non-misleading information. But companies already must disclose material information about the membership of their boards when they solicit proxy votes to elect directors. 17 C.F.R. §§ 240.14a-101, 240.14a-9. The Rule's transparent purpose in compelling its weighted-scale disclosures of immaterial information about board diversity is to motivate companies to *change* their boards' race and sex compositions.

The Exchange Act does not generally concern board composition, which is a matter of state corporate law. *See, e.g.*, 8 Del. Code § 141(b); *cf. Bus. Roundtable I*, 905 F.2d at 408. The only Exchange Act provisions that do are narrowly focused on board audit and compensation committee independence. *See* 15 U.S.C. §§ 78j-1(m) (independence of board audit committees), 78j-3 (independence of board compensation committees). Not only does the Exchange Act say nothing about race, sex, or diversity, but bedrock civil rights statutes prohibit the Rule's quotas. JA104–05 (42

65

U.S.C. § 1981). The Rule's diversity aims thus regulate matters unrelated to the purposes of the Exchange Act.

## 2. *The Rule permits unfair discrimination among issuers.*

The Exchange Act prohibits rules that are "designed to permit unfair discrimination between … issuers." 15 U.S.C. § 78f(b)(5). The Rule breaches that prohibition by giving foreign issuers special "flexibility" to satisfy the Minority Director Rule by adding a woman instead of a racial or LGBTQ+ minority. JA3 n.26. Nasdaq asserted that disparate treatment for foreign issuers is justified because of "the unique demographic composition of the United States, and its historical marginalization of Underrepresented Minorities and the LGBTQ+ community," which "may not extend to all countries outside of the United States." JA718. The SEC adopted the former point but not the latter. JA12.

This justification proves the Rule is a preliminary attempt at racial balancing. *See supra* Part I.A.1–2. It is also illogical and violates the prohibition of stock exchange rules that permit unfair discrimination among issuers. Nasdaq claimed "cognitive diversity" benefits that mystically flow from having even one minority director, JA211 but there

is no reason this would not apply to foreign firms, as well. Moreover, the political and economic marginalization of underrepresented minorities in many foreign countries around the world is probably worse, not better, than in the United States. It is unlikely that Nasdaq's Chinese issuers, for example, have many non-Han Chinese minority directors on their boards (or *any* Uyghurs, *see* U.S. Dep't of State, *Determination of the Secretary of State on Atrocities in Xinjiang* (Jan. 19, 2021)). This demands *more* stringent treatment of foreign issuers, not less.

The Rule thus permits unfair discrimination among issuers.

### 3.  *The Rule burdens competition and harms investors.*

No stock exchange rule may "impose any burden on competition not necessary or appropriate" to advance the purposes of the Exchange Act. 15 U.S.C. § 78f(b)(8). When Congress uses words like "necessary or appropriate," such "broad and all-encompassing" language "naturally and traditionally includes consideration of all the relevant factors," including consideration of "cost." *Michigan v. EPA*, 576 U.S. 743, 752 (2015) (citation omitted). And "[n]o regulation is 'appropriate' if it does significantly more harm than good." *Id.*; *see Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 965 (5th Cir. 2023) ("necessary and

appropriate … at a minimum requires that [the rule's] benefits reasonably outweigh its costs").

For the same reasons it fails to show the Rule is in the public interest, the SEC failed to show that its asserted benefits outweigh the costs. Since the SEC disclaimed that diversity improves company performance, the only claimed benefit seems to be from the act of forcing disclosures about diversity. JA13. But that makes no cost-ledger sense: there is no corresponding financial benefit to investors to overcome the cost to companies from making the disclosures. *See Bus. Roundtable II,* 647 F.3d at 1152 ("By ducking serious evaluation of the costs that could be imposed upon companies from use of the rule by shareholders representing special interests … the [SEC] acted arbitrarily.").

The SEC claims that firms can avoid meaningful costs because there is "flexibility" to either comply with the SEC's preferred quotas or provide an explanation for not doing so. JA13. But as explained above, there are tremendous costs for firms that dare to defy the quotas. *See supra* Part I.A. The Rule is functionally a discriminate-or-else rule.

The Rule thus burdens competition

\* \* \*

68

Because the Rule doesn't meet the requirements of the Exchange Act, the Order approving it was unlawful and should be vacated.

## CONCLUSION

For the foregoing reasons, the Court should declare that the Order is unconstitutional and was issued without statutory authority or support. The Court should vacate the Order in its entirety.

March 21, 2024                           Respectfully submitted,

/s/ Jonathan Berry
Jonathan Berry
  *Counsel of Record*
R. Trent McCotter
Michael Buschbacher
Jared Kelson
James R. Conde
BOYDEN GRAY PLLC
801 17th Street NW, Suite 350
Washington, DC 20006
202-955-0620
jberry@boydengray.com

*Counsel for Petitioner Alliance
for Fair Board Recruitment*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of Fifth Circuit Rule 32 and Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,999 words, excluding the portions exempted by Rule 32(f). This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure Rule 32(a)(5)–(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook and 14-point font.

March 21, 2024                    /s/ Jonathan Berry
                                  BOYDEN GRAY PLLC
                                  801 17th Street NW, Suite 350
                                  Washington, DC 20006
                                  202-955-0620

                                  *Counsel for Petitioner Alliance for
                                  Fair Board Recruitment*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that all counsel of record who have consented to electronic service are being served today with a copy of this document via the Court's CM/ECF. All parties in this case are represented by counsel consenting to electronic service.

March 21, 2024

/s/ Jonathan Berry
BOYDEN GRAY PLLC
801 17th Street NW, Suite 350
Washington, DC 20006
202-955-0620

*Counsel for Petitioner Alliance for Fair Board Recruitment*