No. 21-60626

# In the United States Court of Appeals for the Fifth Circuit

───────────────

ALLIANCE FOR FAIR BOARD RECRUITMENT; NATIONAL CENTER FOR PUBLIC POLICY RESEARCH, *Petitioners*,

v.

SECURITIES AND EXCHANGE COMMISSION, *Respondent*.

───────────────

**On Petition for Review of an Order of the Securities and Exchange Commission Agency No. 34-92590**

───────────────

**BRIEF OF AMICI CURIAE ADVANCING AMERICAN FREEDOM; MANHATTAN INSTITUTE; DR. ALLEN MENDENHALL, EXECUTIVE DIRECTOR, MANUEL H. JOHNSON CENTER FOR POLITICAL ECONOMY, SORRELL COLLEGE OF BUSINESS; AMAC ACTION; AMERICAN VALUES; AMERICANS FOR LIMITED GOVERNMENT; CATHOLICS COUNT; CENTER FOR POLITICAL RENEWAL; CENTER FOR URBAN RENEWAL AND EDUCATION (CURE); EAGLE FORUM; CHARLIE GEROW; INTERNATIONAL CHRISTIAN AMBASSADORS ASSOCIATION; INTERNATIONAL CONFERENCE OF EVANGELICAL CHAPLAIN ENDORSERS; TIM JONES, FMR. SPEAKER, MISSOURI HOUSE; CHAIRMAN, MISSOURI CENTER-RIGHT COALITION; NATIONAL RELIGIOUS BROADCASTERS; NEW JERSEY FAMILY FOUNDATION; RIO GRANDE FOUNDATION; ROUGHRIDER POLICY CENTER; SETTING THINGS RIGHT; 60 PLUS ASSOCIATION; RICHARD VIGUERIE; YANKEE INSTITUTE; AND YOUNG AMERICA'S FOUNDATION SUPPORTING PETITIONERS AND REVERSAL**

───────────────

ILYA SHAPIRO
Tim Rosenberger
MANHATTAN INSTITUTE
52 VANDERBILT AVE.
NEW YORK, NY 10017
(212) 599-7000
ISHAPIRO@MANHATTAN.INSTITUTE

J. MARC WHEAT
  *Counsel of Record*
Timothy Harper (Admitted in DC)
ADVANCING AMERICAN FREEDOM, INC.
801 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 780-4848
MWheat@advancingamericanfreedom.com

*Counsel for Amici Curiae*

*Counsel continued on inside cover*

DR. ALLEN MENDENHALL
EXECUTIVE DIRECTOR, MANUEL
H. JOHNSON CENTER FOR
POLITICAL ECONOMY
SORRELL COLLEGE OF BUSINESS
JOHN ROBERT LEWIS HALL
TROY, ALABAMA 36081
334-808-6205
AMENDENHALL@TROY.EDU

March 28, 2024

**STATEMENT OF INTERESTED PERSONS FIFTH CIRCUIT RULE 29.2**

The undersigned counsel certifies that the following persons and entities have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal. J. Marc Wheat, General Counsel for Advancing American Freedom, Amicus Curiae. The undersigned counsel also certifies that Amici Curiae, Manhattan Institute; Dr. Allen Mendenhall, Executive Director, Manuel H. Johnson Center for Political Economy, Sorrell College of Business; AMAC Action; American Values; Americans for Limited Government; Catholics Count; Center for Political Renewal; Center for Urban Renewal and Education (CURE); Eagle Forum; Charlie Gerow; International Christian Ambassadors Association; International Conference of Evangelical Chaplain Endorsers; Tim Jones, Fmr. Speaker, Missouri House; Chairman, Missouri Center-Right Coalition; National Religious Broadcasters; New Jersey Family Foundation; Rio Grande Foundation; Roughrider Policy Center; Setting Things Right; 60 Plus Association; Richard Viguerie; Yankee Institute; and Young America's Foundation are nonprofit corporations that have no parent corporations, are not publicly held corporations, and do not issue stock.

/s/ J. Marc Wheat
J. Marc Wheat
General Counsel for Advancing American Freedom

i

# TABLE OF CONTENTS

STATEMENT OF INTERESTED PERSONS FIFTH CIRCUIT RULE 29.2 ......... i

TABLE OF AUTHORITIES .................................................................. iv

STATEMENT OF INTEREST OF AMICI CURIAE ............................................ 1

INTRODUCTION AND SUMMARY OF THE ARGUMENT ............................ 3

ARGUMENT ......................................................................................... 6

I.     The Nasdaq Board Diversity Rule Promotes the Interests of Corporate Management and Institutional Investors Over the Interests of Retail Shareholders and Market Participants ............................................. 6

II.    The Nasdaq Rule Incentivizes Corporate Board Membership to be Distributed on an Arbitrary and Capricious Basis that is thus Contrary to the Fundamental Principles of America .................................................. 12

III.   Nasdaq's Rule Will Almost Certainly Harm Investors and Thus is Inconsistent with the Securities and Exchange Act...................................... 15

   A.    *The evidence presented by Nasdaq in its rule proposal, contrary to its claims, does not show that board diversity provides better returns for shareholders* ...................................................................... 16

   B.    *Even if Nasdaq's studies did suggest a causal link between board diversity and improved returns for shareholders, that would not justify the conclusion that the implementation of this rule would lead to improved returns for shareholders* ......................................... 18

   C.    *Nasdaq's rule deals with social and political issues, not market issues.* ............................................................................................... 21

IV.    The Fact That the Diversity Rule in its Current Form is Not Strictly Mandatory is no Reason to Think it Will Not Become Mandatory in the Future ......................................................................................................... 23

CONCLUSION ................................................................................ 24

CERTIFICATE OF COMPLIANCE ................................................ 26

ECF CERTIFICATIONS ................................................................ 27

CERTIFICATE OF SERVICE ........................................................ 28

# TABLE OF AUTHORITIES

**CASES**

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*,
    551 U.S. 701 (2007) ...................................................................................13

*Strauder v. West Virginia*,
    100 U.S. 303 (1880) ................................................................................ 14-15

*Students for Fair Admissions v. Harvard*,
    143 S. Ct. 2141 (2023) ............................................................................14, 15

**CONSTITUTIONAL PROVISIONS**

The Declaration of Independence para. 2 (U.S. 1776) ........................................5, 12

**STATUTES**

15 U.S.C. § 78f(b)(5) ........................................................................................15, 21

**OTHER AUTHORITIES**

Renee Adams & Daniel Ferreira, *Women in the Boardroom and Their Impact on Governance and Performance*, 94 J. FIN. ECON. 291 (2009) ...........................17

*A Mission for Inclusion: In Conversation with Gary Gensler*, SEC (modified Nov. 22, 2023) https://www.sec.gov/sec-stories/mission-inclusion-conversation-gary-gensler#bubble-8 .......................................................................................23, 24

Berle and Means, *The Modern Corporation and Private Property* (1932)...............6

Gennaro Bernile et al., *Board Diversity, Firm Risk, and Corporate Policies*, 127 J. FIN. ECON. 588 (2018) .......................................................... 17, 18, 19, 20, 21

Matthew Boyle, *Tax Documents: U.S. Chamber of Commerce Foundation Turns to Soros-Funded Groups and Democrats to Keep Dwindling Operations Alive*, Breitbart (Mar. 25, 2024) https://www.breitbart.com/politics/2024/03/25/exclusive-tax-documents-chamber-commerce-foundation-turns-soros-funded-groups-democrats-keep-dwindling-operations-alive/ ................................................................4

*Bud Light sales plunged after boycott over campaign with transgender influencer, company reveals*, NBC News (Aug. 3, 2023, 9:32 AM) https://www.nbcnews.com/business/business-news/bud-light-sales-plunged-boycott-campaign-transgender-influencer-compan-rcna97944 ...........................4

James Burnham, *The Managerial Revolution: What is Happening in the World* (New York: The John Day Company, Inc. 1941).........................................11, 12

*Business Roundtable Redefines the Purpose of a Corporation to Promote 'An Economy That Serves All Americans*,' Business Roundtable (Aug. 19, 2019) https://www.businessroundtable.org/business-roundtable-redefines-the-purpose-of-a-corporation-to-promote-an-economy-that-serves-all-americans ...................4

David A. Carter et al., *Corporate Governance, Board Diversity, and Firm Value*, 38 FIN. REV. 33 (2003) ..................................................................................17

Comment of Advancing American Freedom on New York Stock Exchange Proposed Rule to the SEC, Jan. 17, 2024 https://advancingamericanfreedom.com/new-york-stock-exchange-securities-and-exchange-commission-proposal-for-zombie-natural-asset-corporations/ ......6

Amil Dasgupta, Vyacheslav Fos, and Zacharias Sautner, *Institutional Investors and Corporate Governance, Foundations and Trends in Finance, forthcoming – Finance Working Paper 700/2020*, European Corporate Governance Institute at 4 (July 5, 2021) https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3682800..9

Randy Diamond, *CalPERS Puts 'Laser-Like Focus' on ESG, Board Diversity, and Executive Pay*, CHIEF INVESTMENT OFFICER (April 22, 2019) ai-cio.com/news/calpers-puts-laser-like-focus-esg-board-diversity-executive-pay/. ......................................................................................................................11

Peter Drucker, *Management* (Harper & Row, 1973, 1974).......................7, 8, 9, 10

Edwin J. Feulner, Jr, *Conservatives Stalk the House: The Story of the Republican Study Committee* (Green Hill Publishers, Inc. 1983) ............................................. 1

Jesse M. Fried, *Will Nasdaq's Diversity Rules Harm Investors*, 12 HARV. BUS. L. REV. ONLINE, art. 1, 2021 .......................................... 16, 17, 18, 19, 20, 21, 22

Milton Friedman, *Capitalism and Freedom* (1962) .................................................... 3

Milton Friedman, *A Friedman Doctrine—The Social Responsibility of Business is to Increase its Profits*, The New York Times (Sept. 13, 1970) https://www.nytimes.com/1970/09/13/archives/a-friedman-doctrine-the-social-responsibility-of-business-is-to.html ...................................................................... 3

Dennis Greene, *Gillette chastises men in a new commercial highlighting the #MeToo movement — and some are furious* Business Insider (Jan. 14, 2019) https://www.businessinsider.com/gillette-metoo-commercial-criticizes-men-2019-1 ............................................................................................................... 4

R.M. Hartwell, *A History of the Mont Pelerin Society* (Liberty Fund, 1995) ......... 10

Friedrich Hayek, *The Use of Knowledge in Society*, The American Economic Review, Vol. 35, No. 4. (Sep., 1945), pp. 519-530, available at https://german.yale.edu/sites/default/files/hayek_-_the_use_of_knowledge_in_society.pdf ............................................................. 3

Ibram X. Kendi, *Ibram X. Kendi defines what it means to be an antiracist*, Penguin Books (June 9, 2020) https://www.penguin.co.uk/articles/2020/06/ibram-x-kendi-definition-of-antiracist ....................................................................... 13, 14

Dr. Martin Luther King, Jr., *I Have a Dream* (1963) Speech Transcript, https://www.archives.gov/files/social-media/transcripts/transcript-march-pt3-of-3-2602934.pdf ............................................................................................................ 5

Stella Morabito, *The Weaponization of Loneliness : How Tyrants Stoke Our Fear of Isolation to Silence Divide and Conquer* (Bombardier Books; 2022) ............ 12

Municipal Issuer Racial Equity & Inclusion Engagement Framework, available at https://justcapital.com/wp-content/uploads/2022/01/QuestionnaireforMuniIssuers2021.pdf (last visited Mar. 27, 2024) ............................................................................................................ 8

Commissioner Hester Peirce, *Statement on the Commission's Order Approving Proposed Rule Changes, as Modified by Amendments No. 1, to Adopt Listing Rules Related to Board Diversity Submitted by the Nasdaq Stock Market LLC* (Aug. 6, 2021) https://www.sec.gov/news/public-statement/peirce-nasdaq-diversity-statement-080621 ............................................................13, 15, 16, 22

Lauren Posner, Cohen Milstein, *Board Diversity is Critical to Protect Shareholders, Bottom Line*, BLOOMBERG LAW (Sept 15, 2021, 4:01 AM) https://news.bloomberglaw.com/securities-law/board-diversity-is-critical-to-protect-shareholders-bottom-line.........................................................................11

Release No. 34-92590, 86 Fed. Reg. 44,426-27 (Aug. 12, 2021) (Approval Order) ........................................................................................3

Release No. 34-92590, 86 Fed. Reg. 44,427 (Aug. 12, 2021) (Approval Order) ...23

*Report on the Inclusion At Work Panel's Recommendations For Improving Diversity And Inclusion (D&I) Practice In The Workplace* (March 20, 2024) available at https://www.gov.uk/government/publications/inclusion-at-work-panel-report-on-improving-workplace-diversity-and-inclusion/report-on-the-inclusion-at-work-panels-recommendations-for-improving-diversity-and-inclusion-di-practice-in-the-workplace#panellists ................................................8

*Self-Regulatory Organizations; New York Stock Exchange LLC; Notice of Withdrawal of Proposed Rule Changes to Amend the NYSE Listed Company Manual to Adopt Listing Standards for Natural Asset Companies* (Jan. 17, 2024) available at https://www.sec.gov/files/rules/sro/nyse/2024/34-99355.pdf............6

Adam Smith, 2 *Wealth of Nations* (Glasgow ed. 1976)  available at Liberty Fund: Online Library of Liberty, https://oll.libertyfund.org/titles/smith-an-inquiry-into-the-nature-and-causes-of-the-wealth-of-nations-cannan-ed-vol-2 ...................6, 7

Thomas Sowell, *The Quest for Cosmic Justice* (Touchstone 2002).......................23

Aubrie Spady, *BlackRock CEO Slammed for 'Forced Behaviors" Comment After 2017 Interview Re-emerges About DEI Initiatives*, FOX BUSINESS (June 5, 2023, 3:17 PM) https://www.foxbusiness.com/politics/blackrock-ceo-slammed-force-behaviors-dei-initiatives.........................................................................................11

Stigler and Friedlander, "The Literature of Economics: The Case of Berle and
    Means," 26 J.L. & Econ. 237 (1983) .....................................................................6

George Stigler, *The Theory of Economic Regulation* (Bell J Econ Manag Sci
    2(1):3–21, 1971). .................................................................................................9

Shannon Thaler, *Boeing prioritizing diversity and inclusion over flier safety, Elon
    Musk says after near-catastrophic Alaska Airlines mishap*, New York Post (Jan.
    11, 2024) https://nypost.com/2024/01/11/business/elon-musk-rips-boeing-they-
    prioritized-dei-over-safety ...................................................................................4

The Badenoch Report, op.cit. ................................................................................12

Adrian Wooldridge, *The Aristocracy of Talent: How Meritocracy Made the
    Modern World* (2021) ...........................................................................................5

Philip Yang, Jan Riepe Jan, Katharina Moser, Pull Kersin, Siri Terjesen, *Women
    directors, firm performance, and firm risk: A causal perspective*, 30 The
    Leadership Quarterly, 5, 2019, 8-9 .....................................................................20

**STATEMENT OF INTEREST OF AMICI CURIAE**

Advancing American Freedom (AAF) is a nonprofit organization that promotes and defends policies that elevate traditional American values, including the uniquely American idea that all men are created equal and endowed by their Creator with unalienable rights to life, liberty, and the pursuit of happiness.[1] AAF "will continue to serve as a beacon for conservative ideas, a reminder to all branches of government of their responsibilities to the nation"[2] and believes that every American has a right to be treated equally by the government, without regard to irrelevant characteristics like race. Industrious and thrifty families are the stewards of American civilization; regulatory capture of the SEC by institutional investors and Nasdaq-listed corporate executives to further impair board oversight will lower returns for saving and investing, which diminishes the American dream for all of us.

The Manhattan Institute for Policy Research ("MI") is a nonpartisan public policy research foundation whose mission is to develop and disseminate ideas that foster greater economic choice and individual responsibility. MI's constitutional studies program aims to preserve the Constitution's original public meaning. As the foremost policy researchers in the world's financial capital, it has a particular interest

---

[1] No counsel for a party authored this brief in whole or in part. No person other than Amicus Curiae and its counsel made any monetary contribution intended to fund the preparation or submission of this brief. All parties have consented to the filing of this amicus brief.

[2] Edwin J. Feulner, Jr, *Conservatives Stalk the House: The Story of the Republican Study Committee*, 212 (Green Hill Publishers, Inc. 1983).

1

in fair markets and economic liberty. MI scholars and affiliates are sought after experts on financial regulation and have conducted research demonstrating the transformative power of open markets on unlocking American prosperity.

*Amici* Dr. Allen Mendenhall, Executive Director, Manuel H. Johnson Center for Political Economy, Sorrell College of Business; AMAC Action; American Values; Americans for Limited Government; Catholics Count; Center for Political Renewal; Center for Urban Renewal and Education (CURE); Eagle Forum; Charlie Gerow; International Christian Ambassadors Association; International Conference of Evangelical Chaplain Endorsers; Tim Jones, Fmr. Speaker, Missouri House; Chairman, Missouri Center-Right Coalition; National Religious Broadcasters; New Jersey Family Foundation; Rio Grande Foundation; Roughrider Policy Center; Setting Things Right; 60 Plus Association; Richard Viguerie; Yankee Institute; and Young America's Foundation are concerned that shareholder interests protected by corporate boards are being harmed by political projects pursued by Nasdaq and the Securities and Exchange Commission that go beyond their authorities to ensure sound stewardship of a free and fair marketplace for shares in public companies.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

The purpose of a for-profit corporation is to provide a return for its investors.[3] For-profit corporations do not exist to create social change or serve the general interests of so-called "stakeholders."[4] The statutory law establishing self-regulating exchanges like Nasdaq reflects that understanding.

This case challenges a rule that requires corporate boards of directors listed on Nasdaq to report on race,[5] sex, or sexual orientation characteristics in the selection

---

[3] "[T]here is one and only one social responsibility of business – to use its resources and engage in activities designed to increase its profits so long as it stays within the rules of the game, which is to say, engages in open and free competition, without deception or fraud… If businessmen do have a social responsibility other than making maximum profits for shareholders, how are they to know what it is?" Milton Friedman, *Capitalism and Freedom*, 133 (1962). *See also,* Friedrich Hayek, "The Use of Knowledge in Society," The American Economic Review, Vol. 35, No. 4. (Sep., 1945), pp. 519-530, available at https://german.yale.edu/sites/default/files/hayek_-_the_use_of_knowledge_in_society.pdf.

[4] "In a free-enterprise, private-property system, a corporate executive is an employe of the owners of the business. He has direct responsibility to his employers. That responsibility is to conduct the business in accordance with their desires, which generally will be to make as much money as possible while conforming to the basic rules of the society, both those embodied in law and those embodied in ethical custom." Milton Friedman, *A Friedman Doctrine—The Social Responsibility of Business is to Increase its Profits*, The New York Times (Sept. 13, 1970) https://www.nytimes.com/1970/09/13/archives/a-friedman-doctrine-the-social-responsibility-of-business-is-to.html.

[5] Despite progress in recent years towards equality before the law regardless of race, there are those who continue to insist not only on discriminating against people based on their race, but on requiring others to do so as well. Racial essentialists insist that the amount of pigment in one's skin has some effect on the perspectives of individuals such that people possessed of a certain degree of pigmentation will have a unique perspective inaccessible to those of another pigmentation. This makes as much sense as determining board membership by phrenology, the pseudo-science of locating and counting the bumps on board members' heads. Why not require corporations to disclose the number and location of the bumps on board members' heads? After all, it may well be that more cranial nodes reflects increased life experience and thus greater wisdom, or at least having been mugged by reality.

[5] Release No. 34-92590, 86 Fed. Reg. 44,426-27 (Aug. 12, 2021) (Approval Order).

of their members, or to explain why they have failed to do so.[6] This rule, proposed by Nasdaq and approved by the Securities and Exchange Commission ("SEC"), is aimed at alleviating supposed representational inequities,[7] making boards less effective at time when corporations are larded with virtue signalers and performance artists[8] – while sticking shareholders with the bill. It is another step in the Gramscian long march through the institutions to replace free exchange and private contract with bureaucratic one-size-fits-all diktat.[9]

---

[6] Release No. 34-92590, 86 Fed. Reg. 44,426-27 (Aug. 12, 2021) (Approval Order).

[7] Nasdaq is not alone in its effort to refocus corporate governance not around investors and ensuring that their money is effectively and efficiently used to grow the business for their benefit, but around "stakeholders" and the managerial class who service them. In 2019, the Business Roundtable (an association for senior executives, not, it should be clear, for board members) issued an "Updated Statement" that "Move[d] Away from Shareholder Primacy," and towards a "Commitment to All Shareholders." *Business Roundtable Redefines the Purpose of a Corporation to Promote 'An Economy That Serves All Americans*,' Business Roundtable (Aug. 19, 2019) https://www.businessroundtable.org/business-roundtable-redefines-the-purpose-of-a-corporation-to-promote-an-economy-that-serves-all-americans.

[8] *See, e.g.* Shannon Thaler, *Boeing prioritizing diversity and inclusion over flier safety, Elon Musk says after near-catastrophic Alaska Airlines mishap*, New York Post (Jan. 11, 2024) https://nypost.com/2024/01/11/business/elon-musk-rips-boeing-they-prioritized-dei-over-safety; *Bud Light sales plunged after boycott over campaign with transgender influencer, company reveals*, NBC News (Aug. 3, 2023, 9:32 AM) https://www.nbcnews.com/business/business-news/bud-light-sales-plunged-boycott-campaign-transgender-influencer-compan-rcna97944; Dennis Green; *Gillette chastises men in a new commercial highlighting the #MeToo movement — and some are furious*, Business Insider (Jan. 14, 2019) https://www.businessinsider.com/gillette-metoo-commercial-criticizes-men-2019-1.

[9] This institutional capture may now also include the U.S. Chamber of Commerce which, between 2018 and 2022, took over $12 million in funds from the Tides Foundation. Matthew Boyle, *Tax Documents: U.S. Chamber of Commerce Foundation Turns to Soros-Funded Groups and Democrats to Keep Dwindling Operations Alive*, Breitbart (Mar. 25, 2024) https://www.breitbart.com/politics/2024/03/25/exclusive-tax-documents-chamber-commerce-foundation-turns-soros-funded-groups-democrats-keep-dwindling-operations-alive/.

Nasdaq's rule is both inconsistent with a fundamental principle of America[10] and with the statutory requirement that exchange rules protect the market and shareholders. The Declaration of Independence expresses the exceptional American principle that "all men are created equal." The Declaration of Independence para. 2 (U.S. 1776). The Declaration and the Constitution were "a promissory note," conveying "a promise that all men, yes, black men as well as white men, would be guaranteed the 'unalienable Rights' of 'Life, Liberty, and the pursuit of Happiness.'"[11] That in two centuries America has yet to fully live up to that principle does not make it any less a just aspiration. Last year marked the 60th anniversary of Dr. Martin Luther King's dream that his children might "one day live in a nation where they [would] not be judged by the color of their skin but by the content of their character."[12] Nasdaq's rule makes the realization of that dream more, not less, remote.

The Nasdaq board diversity rule incentivizes corporate boards of directors to discriminate based on arbitrary characteristics when choosing directors. The Securities Exchange Act of 1934 requires that the rules of self-regulatory exchanges

---

[10] See, generally, Adrian Wooldridge, *The Aristocracy of Talent: How Meritocracy Made the Modern World* (2021). ("The meritocratic idea made the modern world, sweeping aside race and sex-based barriers to competition, building ladders of opportunity from the bottom of society to the top, and electrifying sluggish institutions with intelligence and energy.")

[11] Dr. Martin Luther King, Jr., *I Have a Dream* (1963) Speech Transcript, https://www.archives.gov/files/social-media/transcripts/transcript-march-pt3-of-3-2602934.pdf (last visited Mar. 20, 2024).

[12] *Id.*

like Nasdaq protect investors and the market, a duty about which the exchanges need reminding.[13] The rule at issue in this case does neither and will almost certainly harm both investors and firms listed on American exchanges. For these reasons, this Court should reverse the panel's decision and rule for appellees.

## ARGUMENT

### I.     The Nasdaq Board Diversity Rule Promotes the Interests of Corporate Management and Institutional Investors Over the Interests of Retail Shareholders and Market Participants.

The separation of ownership and control in an exchange-traded corporation raises the serious problem of whether the property is being managed effectively since managers' interests diverge from those of shareholders.[14] As early as 1776, Adam Smith wrote that "directors of [joint stock] companies … being the managers rather of other people's money than of their own, it cannot well be expected that they should watch over it with the same anxious vigilance with which the partners in a

---

[13] The New York Stock Exchange proposed an economically illiterate rule last fall that would allow for the listing of a corporate structure called a Natural Asset Company (NAC), the primary purpose of which was not creating a return for investors, but rather was to manage and maintain so-called "ecosystem services." The rule was withdrawn only after significant concern was raised regarding the harm these NACs would cause not only to investors, but to American national security. Comment of Advancing American Freedom on New York Stock Exchange Proposed Rule to the SEC, Jan. 17, 2024 https://advancingamericanfreedom.com/new-york-stock-exchange-securities-and-exchange-commission-proposal-for-zombie-natural-asset-corporations/.     *Self-Regulatory Organizations; New York Stock Exchange LLC; Notice of Withdrawal of Proposed Rule Changes to Amend the NYSE Listed Company Manual to Adopt Listing Standards for Natural Asset Companies* (Jan. 17, 2024) available at https://www.sec.gov/files/rules/sro/nyse/2024/34-99355.pdf.

[14] The classic academic discussion began with Berle and Means, *The Modern Corporation and Private Property* (1932); *See also* Stigler and Friedlander, "The Literature of Economics: The Case of Berle and Means," 26 J.L. & Econ. 237, 238 (1983).

private copartnery frequently watch over their own."[15] Much ink has been spilled since 1776 on ideas to best monitor the actions of executives to ensure that their incentives are aligned with those of shareholders, represented in the corporation by the board.

The analysis of management guru Peter Drucker, though written half a century ago, could have been written yesterday. "In the United States in the last few years there has been mounting pressure to make boards 'relevant,' that is, to appoint as board members representatives of all kinds of groups: Blacks, women, the poor, and so on."[16] Professor Drucker goes on to explain that:

> These appointees, no matter how distinguished the individual, cannot function as board members. Their role is to represent this or that outside group, this or that special interest. Their role must be to make demands on top management and to push special projects, special needs, and special policies. They cannot be concerned with, or responsible for, the enterprise. Nor should they be expected to hold in confidence what they hear at board meetings; in fact their trust is not to the enterprise but to their constituents outside.[17]

From Peter Drucker's observations in 1974 to the report presented fifty years later to U.K. Business and Trade Secretary Kemi Badenoch in March 2024 ("Badenoch Report"), there is still no "robust evidence of the relationship between

---

[15] Adam Smith, 2 *Wealth of Nations*, 741 (Glasgow ed. 1976)  available at Liberty Fund: Online Library of Liberty, https://oll.libertyfund.org/titles/smith-an-inquiry-into-the-nature-and-causes-of-the-wealth-of-nations-cannan-ed-vol-2.

[16] Peter Drucker, *Management* 630 (Harper & Row, 1973, 1974).

[17] *Id*. at 630-31. Nor is the desire of management for weak boards limited to for-profit corporations. The same is true of executives in non-profit corporations and even more so at top universities across the country who want the freedom to pursue their own agendas without oversight.

inclusion and profit" that enthusiastic advocates of management-driven diversity, equity, and inclusion (DEI)[18] would have us believe. Indeed, DEI policies and "stakeholder capitalism" are inimical to policies designed to minimize agency costs to the benefit of the shareholder.[19] According to Drucker, at that time, laws in Germany required that representatives of employees be included on the board and in Sweeden the government gave itself the power to appoint members to the boards of major banks.[20] He notes that in the former case, an employee is ineffective as a director because he or she is acting not in the interest of the corporation and its shareholders, but rather in the interests of its employees which are often contrary to the interests of the corporation.[21] In the Swedish example, he notes that as soon as those appointments become political, the appointees will be acting in the best interest

---

[18] "Report on the Inclusion At Work Panel's Recommendations For Improving Diversity And Inclusion (D&I) Practice In The Workplace" (March 20, 2024) available at https://www.gov.uk/government/publications/inclusion-at-work-panel-report-on-improving-workplace-diversity-and-inclusion/report-on-the-inclusion-at-work-panels-recommendations-for-improving-diversity-and-inclusion-di-practice-in-the-workplace#panellists. Known sometimes as D&I, EDI, even DIE, the typical acronym in the U.S. is DEI. The order of the letters is helpfully recalled by the mnemonic "Didn't Earn It."

[19] The scope of this problem is significant. Major institutional investors, including Goldman Sachs, Morgan Stanley, BlackRock, and Vanguard, are concerning themselves not with what creates the best returns for investors but rather with whether municipal governments are sufficiently committed to the cause of racial discrimination in the name of "equity." *Municipal Issuer Racial Equity & Inclusion Engagement Framework*, available at https://justcapital.com/wp-content/uploads/2022/01/QuestionnaireforMuniIssuers2021.pdf (last visited Mar. 27, 2024).

[20] *Id*. at 630.

[21] *Id*.

of their constituents or the politicians who appointed them and not in the best interest of the shareholders of the corporation.[22]

This development, the weakening of corporate boards, harms corporations and their non-institutional shareholders,[23] but inures to the benefit of those in top management for whom a weakening represents the reduction of an unwanted check on power. As Drucker notes:

> These developments demonstrate that society will not allow top management, and especially top management of large and visible businesses, to exercise its power without an appropriate and effective board. The board, as it has been conceived originally—well over a century ago—has indeed outlived its usefulness. This, however, makes it an urgent top-management job to think through what kind of a board the enterprise and its top management need. The decay of the traditional board has created a vacuum. It will not remain unfilled.[24]

Thus, the imposition by management and the SEC[25] of board members who have a constituency other than the corporation and its shareholders represent the

---

[22] *Id.*

[23] Amil Dasgupta, Vyacheslav Fos, and Zacharias Sautner, *Institutional Investors and Corporate Governance, Foundations and Trends in Finance, forthcoming – Finance Working Paper 700/2020*, European Corporate Governance Institute at 4 (July 5, 2021) https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3682800 (click "Open PDF in Browser") ("Table 1 shows that 50 years ago households directly owned almost 80% of US corporate equity. Such direct ownership has declined dramatically over the years, reducing by more than a half, so that today only 38.3% of US corporate equity is directly owned by households. The remainder is indirectly held via different asset managers – commonly referred to as institutional investors.").

[24] *Id.* at 631.

[25] George Stigler developed the theory of regulatory capture, where regulated industries capture a regulatory agency in order to generate regulations for its own benefit. *See generally,* George Stigler, *The Theory of Economic Regulation* (Bell J Econ Manag Sci 2(1):3–21, 1971). Since the awarding of the Nobel Prize in Economics to Stigler, institutional investors have grown

weakening of boards of directors and, by extension, of American business. It is management, not the corporation, that benefits from this arrangement. As explained by Drucker:

> A final factor in the steady decline of the board has surely been that top management, by and large, does not want a really effective board. An effective board demands top-management performance and removes top executives who do not perform adequately—this is its duty. An effective board asks inconvenient questions. An effective board insists on being informed before the event—this is its legal responsibility. An effective board will not unquestioningly accept the recommendations of top management but will want to know why. It will not rubber-stamp the personnel decisions of top management but will want to know, indeed to get personally acquainted with, alternative candidates for senior appointments. An effective board, in other words, insists on being effective. And this, to most top managements, appears to be a restraint, a limitation, an interference with "management prerogatives," and altogether a threat."[26]

Further, in the fifty years since Drucker wrote about the weakening of boards to the benefit of management, another development has further undermined the authority of directors: regulatory capture by institutional investors pushing DEI. For example, in 2017, Larry Fink, CEO of BlackRock, said that the firm "would 'force behaviors' on 'gender or race' and threatened impacts to compensation if diversity

---

tremendously in size and importance in the securities market. Stigler and the other Nobel laureates (Hayek, Friedman, Buchanan, Allais, Coase, and Becker) who were members of the Mont Pelerin Society "had much in common, particularly their support of the free market and of the right of the individual to choose without coercive constraints. Thus, they recognized the need to limit government, to curb socialist tendencies in the democracies, and to be suspicious of appeals to social aggregates like 'the public interest." R.M. Hartwell, *A History of the Mont Pelerin Society* 160 (Liberty Fund, 1995).

[26] *Id.* at 629.

equity and inclusion (DEI) standards weren't met."[27] Similarly, "[i]nstitutional investor aggregators also have been forcing board change on a case-by-case basis through shareholder derivative litigation alleging toxic workplace cultures due to discrimination, retaliation, and gender and racial bias."[28] This bullying sue-and-settle tactic allows these major investors to distract boards with allegations of discrimination rather than aligning senior management with the interest of retail shareholders in maximizing financial returns.[29]

Nor is it surprising that the administrative state is willing to approve rules that benefit managers and institutional investors. As James Burnham explained, "In the new form of society, sovereignty is localized in administrative bureaus . . . The actual directing and administrative work of the bureaus is carried on by new men, a new

---

[27] Aubrie Spady, *BlackRock CEO Slammed for 'Forced Behaviors" Comment After 2017 Interview Re-emerges About DEI Initiatives*, Fox Business (June 5, 2023, 3:17 PM) https://www.foxbusiness.com/politics/blackrock-ceo-slammed-force-behaviors-dei-initiatives.

[28] Lauren Posner, Cohen Milstein, *Board Diversity is Critical to Protect Shareholders, Bottom Line*, Bloomberg Law (Sept 15, 2021, 4:01 AM) https://news.bloomberglaw.com/securities-law/board-diversity-is-critical-to-protect-shareholders-bottom-line. ("Through litigation and ultimately settlement, these companies have been forced to not only completely revamp their DEI initiatives and discrimination, harassment and retaliation policies, procedures and oversight functions, but also to change the composition of their boards.").

[29] Nor, apparently, are these institutional investors concerned about squandering the pension plans of public employees who rely on them. Climate Action 100+, one of the founding members of which was the California Public Employees' Retirement System (CalPERS), "represents 300 institutional investors and $32 trillion in assets under management," and "discloses all of its more than 160 target companies, in an approach that resembles in part CalPERS's former policy of 'naming and shaming companies that were underperforming because they did not have good corporate governance or were lax in sustainability policies." Randy Diamond, *CalPERS Puts 'Laser-Like Focus' on ESG, Board Diversity, and Executive Pay*, Chief Investment Officer (April 22, 2019) ai-cio.com/news/calpers-puts-laser-like-focus-esg-board-diversity-executive-pay/.

type of men. It is, specifically, the MANAGERIAL type."[30] Thus, the interests of the administrative state and the interests of corporate managers and institutional investors are similar because, "[t]he active heads of the bureaus are the managers-in-government, the same, or nearly the same, in training, functions, skills, habits of thought as the managers-in-industry."[31]

## II.    The Nasdaq Rule Incentivizes Corporate Board Membership to be Distributed on an Arbitrary and Capricious Basis that is thus Contrary to the Fundamental Principles of America.

The Declaration of Independence expresses America's fundamental philosophy of human dignity, "that all men are created equal, that they are endowed by their Creator with certain inalienable rights." The Declaration of Independence para. 2 (U.S. 1776). The Nasdaq rule in this case incentivizes corporate boards listed on the exchange either to engage in racial and other discrimination, thus treating individuals

---

[30] James Burnham, *The Managerial Revolution: What is Happening in the World* 148 (New York: The John Day Company, Inc. 1941).

[31] *Id.* The Badenoch Report, op.cit., identified groupthink as a danger in institutions that only focused on superficial diversity on the board and among the workforce. Enthusiastic pursuit of superficial diversity by Nasdaq companies may, in fact, chase out the remnants of those who hold diversity of viewpoints: "The theme of 'diversity of thought' (or lack thereof) was often cited as a significant barrier to inclusion and fairness. For example some of those we spoke to expressed concerns of being 'discriminated against' because their views did not align with a perceived dominant culture within their organisations. In relation to employees with beliefs perceived as not conforming with the organisational 'consensus', participants in the roundtables cited wrongful dismissals resulting in legal settlements, and high profile examples of lengthy investigations, bullying and harassment, and a perceived absence of employer protection. Roundtable conversations also covered a perceived lack of freedom of speech and a censorious environment, particularly in large organisations, where candid discussion of the efficacy or neutrality of D&I practice was discouraged." *See also, generally*, Stella Morabito, *The Weaponization of Loneliness : How Tyrants Stoke Our Fear of Isolation to Silence Divide and Conquer* (Bombardier Books; 2022).

as token representatives of their assigned group identity, or to collect data and disclose why they have not done so, a blatant attempt by Nasdaq to pressure boards into engaging in discrimination to avoid the mandatory explanation. Individuals who happen to share some demographic characteristics are not interchangeable with one another, but this rule treats them as though they were. As SEC Commissioner Hester Peirce notes, "It should be obvious to anyone with a diverse group of friends or colleagues that two people who look different may share very similar backgrounds and attitudes toward a range of issues, including corporate governance, whereas two people who look similar may bring very different qualities to a board's decision-making."[32]

There are competing conceptions of equality in America today but only one is consistent with the nation's founding principles. Chief Justice John Roberts articulated the first: "The way to stop discrimination on the basis of race is to stop discriminating on the basis of race." *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1, 551* U.S. 701, 748 (2007). Ibram Kendi expressed the opposing view:

---

[32] Commissioner Hester Peirce, *Statement on the Commission's Order Approving Proposed Rule Changes, as Modified by Amendments No. 1, to Adopt Listing Rules Related to Board Diversity Submitted by the Nasdaq Stock Market LLC* (Aug. 6, 2021) https://www.sec.gov/news/public-statement/peirce-nasdaq-diversity-statement-080621.

"The only remedy to past discrimination is present discrimination. The only remedy to present discrimination is future discrimination."[33]

The competing opinions in *Students for Fair Admissions v. Harvard*, 143 S. Ct. 2141 (2023), illustrated this conflict. There, Justice Sotomayor espoused a group-protection view of equality, writing, "In a society where opportunity is dispensed along racial lines, racial equality cannot be achieved without making room for underrepresented groups that for far too long were denied admission through the force of law." *SFFA*, 143 S. Ct. at 2250 (Sotomayor, J., dissenting). Of course, "making room" for one group in the zero-sum environment of board membership, without regard to individual qualification, necessarily displaces more qualified individuals of other groups. To achieve equality of outcome, unequal individuals must be treated unequally.[34] Under this conception of equality, the individual must either suffer or benefit because of the relative representation of his or her group.

On the other hand, as this Court recognized, "the transcendent aims of the Equal Protection Clause" were "that the law in the states shall be the same for the black as for the white; that all persons, whether colored or white, shall stand equal before the laws of the States[.]" *SFFA*, 143 S. Ct. at 2159 (quoting *Strauder v. West Virginia*,

---

[33] Ibram X. Kendi, *Ibram X. Kendi defines what it means to be an antiracist*, Penguin Books (June 9, 2020) https://www.penguin.co.uk/articles/2020/06/ibram-x-kendi-definition-of-antiracist.

[34] People, of course, are all equal in rights and thus are entitled to equal protection under law. However, no two people are equal in any other way.

100 U.S. 303, 307 (1880) (internal quotation marks omitted). Under the conception of equality established by the Equal Protection Clause of the Fourteenth Amendment, the law must apply the same standard to every individual, regardless of race. That reading is consistent with the fundamental purpose of government, which is the protection of the rights of the people. As the Supreme Court said in its majority opinion, "Eliminating racial discrimination means eliminating all of it." *Id.* at 2161.

### III. Nasdaq's Rule Will Almost Certainly Harm Investors and Thus is Inconsistent with the Securities and Exchange Act.

Under 15 U.S.C. § 78f(b)(5), rules of exchanges like Nasdaq must be,

> [D]esigned to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, to foster cooperation and coordination with persons engaged in regulating, clearing, settling, processing information with respect to, and facilitating transactions in securities, to remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect investors and the public interest; and are not designed to permit unfair discrimination between customers, issuers, brokers, or dealers, or to regulate by virtue of any authority conferred by this chapter matters not related to the purposes of this chapter or the administration of the exchange.

The rule here proposed by Nasdaq is not designed "to protect investors and the public interest." Rather, it exists to serve the interests of senior executives (who want no oversight), ideologically motivated investors, and so-called "stakeholders," even at the expense of shareholder returns. As Commissioner Peirce explains in her comment on the rule's approval, the deficiencies in the studies cited by Nasdaq,

"leave the Exchange without a persuasive basis for concluding that the Proposal is reasonably designed to advance the objectives set forth in Section 6(b)(5) of the Exchange Act."[35] The political agenda of some ideologically motivated individuals and institutions should not be prioritized over the financial interests of everyday investors who may be depending on their stock portfolio for educational expenses, retirement, or other income.

> A.    *The evidence presented by Nasdaq in its rule proposal, contrary to its claims, does not show that board diversity provides better returns for shareholders.*

The authorities cited by Nasdaq as support for its claim that board diversity leads to greater returns for investors are either unreliable or do not show what Nasdaq claims they show. First, "Nasdaq relies almost entirely on reports—prepared by consulting and financial firms for marketing purposes—that claim to find a *correlation* between the two."[36] As Professor Jesse Fried of Harvard University points out, these are not academic studies and correlation does not imply causation.[37] Rather, to show causation, researchers must engage in sophisticated analyses to isolate the relevant variable and ensure that it and only it is responsible for the variations in outcome.[38]

---

[35] Peirce, *supra* note 32.
[36] Jesse M. Fried, *Will Nasdaq's Diversity Rules Harm Investors*, 12 HARV. BUS. L. REV. ONLINE, art. 1, 2021, at 3 (emphasis in original).
[37] *Id.*
[38] *Id.* at 3-4.

Fried notes that, "Nasdaq cites only three sources that go beyond mere correlation"[39] and explains that this statement comes from marketing materials and "cannot be assessed and relied upon" because "the data and methodology are not disclosed, and the analysis is not subject to academic peer review."[40]

Similarly, Nasdaq cites David A. Carter et al., *Corporate Governance, Board Diversity, and Firm Value*, 38 FIN. REV. 33 (2003), a study "whose failure to adequately control for omitted variables was subsequently noted in a leading finance journal." Renee Adams & Daniel Ferreira, *Women in the Boardroom and Their Impact on Governance and Performance*, 94 J. FIN. ECON. 291 (2009).[41] The third such authority is "a high-quality study," Gennaro Bernile et al., *Board Diversity, Firm Risk, and Corporate Policies*, 127 J. FIN. ECON. 588 (2018), "that shows a positive effect of board diversity on shareholder value."[42] However, that study's broad definition of diversity consists of six elements; "gender, ethnicity, age, college attended, financial expertise, and other board experience."[43] Thus, the study factors in qualities that will not necessarily be reflected by the board members chosen to fulfil the Nasdaq's diversity quota.

---

[39] *Id.* at 4.
[40] *Id.* at 4.
[41] *Id.* at 4.
[42] *Id.*
[43] *Id.*

17

Further still, "Nasdaq describes various studies showing that diverse boards are associated with (or in some cases, cause) better corporate governance metrics, such as increased board attendance and improved financial reporting quality."[44] However, improved governance outcomes "matter to investors if, *and only if*, they translate into better bottom-line results: higher stock prices."[45] Thus, Nasdaq has not provided evidence to suggest, much less show, that its diversity rule will benefit shareholders. Further, even if it had shown that board diversity can lead to greater returns for investors, it would not follow that *imposed* board diversity would lead to the same result.

> B.    *Even if Nasdaq's studies did suggest a causal link between board diversity and improved returns for shareholders, that would not justify the conclusion that the implementation of this rule would lead to improved returns for shareholders.*

Even if evidence suggested the existence of a causal link between board diversity and returns, such evidence would not support the claim that imposing diversity on boards would have the same effect. After all, whether board diversity, on its own, benefits shareholders is not the relevant question. The relevant question is whether *externally imposed* board diversity benefits shareholders. The two are not the same. In the case of board diversity that occurs organically, it is reasonable to assume that directors are usually chosen because of their qualifications and that their

---

[44] *Id.*

[45] *Id.* (emphasis in original).

18

demographic characteristics are merely coincidental. However, when board diversity is the result of external pressure to meet a quota, those choosing who to appoint to corporate boards must prioritize demographics over qualifications. If the demand for diverse directors outstrips the supply of equally qualified diverse potential directors, then existing directors will necessarily be replaced with less qualified directors for the sake of meeting Nasdaq's diversity quota.[46] Because directors' qualifications impact the performance of their corporation, imposed diversity will tend to lead to worse outcomes for investors unless there is an extant but untapped, sufficiently large pool of diverse potential directors with qualifications equal to those of non-diverse directors they would replace.

One study, ignored by Nasdaq, found that the market intuited this problem. That paper found that Norway's 2003 board gender diversity mandate led to "an immediate 3.5% decrease in the stock prices of firms without female directors," a decrease that remained for at least several years, because "investors expected firms to replace more experienced male directors with less experienced female ones."[47] Another study found that "An increase from one to two female board members on a board with four directors…" as a result of the aforementioned Norwegian quota

---

[46] Alternatively, even if, under the Nasdaq rule, non-diverse directors will be replaced by diverse directors some of whom will be less qualified, perhaps the ineffable demographic abilities of these less qualified diverse directors will overcome that relative shortcoming.

[47] Fried, *supra* note 36 at 5.

system "reduces firms' operating income to assets [ratio] by 12%" and caused a significant "performance-reducing effect . . . for accounting-based performance measures."[48] Thus, even if Nasdaq had shown that organic board diversity leads to improved returns for investors, it would not have thereby shown that *imposed* diversity would do the same.

As discussed above, the evidence provided by Nasdaq to support its rule does not actually support the claim that greater board diversity leads to greater returns for investors. Nor would evidence showing a link between improved returns and board diversity prove that imposed board diversity would produce the same results. Worse still, "[h]igh-quality academic studies suggest that board diversity can harm shareholders, but Nasdaq ignores this information."[49]

First, Nasdaq cites a paper for some of its intermediate findings but ignores that paper's ultimate conclusion, that gender diversity tends to have a negative impact on firm performance.[50] "Nasdaq also fails to note several studies demonstrating that stock returns suffer when firms are pressured to hire new directors for diversity reasons."[51] One such study out of Norway was discussed above. Another found that the announcement of California's board diversity law "caused stock prices of

---

[48] Philip Yang, Jan Riepe Jan, Katharina Moser, Pull Kersin, Siri Terjesen, *Women directors, firm performance, and firm risk: A causal perspective*, 30 The Leadership Quarterly, 5, 2019, 8-9.
[49] Fried, *supra* note 36 at 5.
[50] *Id.*
[51] *Id.*

affected firms to drop by a market-adjusted 2.6%, with a mean value loss of $328.31 million."[52] As Professor Fried notes, "stock price reactions to the announcements of new rules are considered highly probative of the effects of these rules on shareholder value."[53] These papers do not prove that board diversity harms shareholder returns but they do cast significant doubt on Nasdaq's claim that board diversity benefits investors.

### C.    *Nasdaq's rule deals with social and political issues, not market issues.*

Under the Securities Exchange Act, the purposes toward which the rules of an exchange like Nasdaq must be directed are the prevention of fraud, the removal of "impediments to . . . the mechanism of a free and open market and a national market system," and to the protection of "investors and the public interest." 15 U.S.C. § 78f(b)(5). Nasdaq's rule, on the other hand, is directed at advancing a political and social agenda whatever the costs to the market and investors. DEI efforts have become seemingly ubiquitous in America's major institutions. Whatever the merits or demerits of dividing people among demographic lines and treating the various groups created differently depending on their assigned status as victims or victimizers, privileged or underprivileged, those efforts have nothing to do with avoiding fraud in the stock market or protecting investors. Such "thorny societal and

---

[52] *Id.* at 6.
[53] *Id.*

cultural issues [] properly belong in the political and civil arena,"[54] not in the hands of bureaucrats.

Further, the rules of exchanges like Nasdaq may not "regulate by virtue of any authority conferred by this chapter matters not related to the purposes of this chapter or the administration of the exchange." *Id*. Those purposes, described in Section 2 of the Securities and Exchange Act, "boil down to regulating securities transactions with an eye toward protecting interstate commerce and the financial system and ensuring the maintenance of fair and honest markets in securities transactions."[55] As Commissioner Peirce explained in her statement following the SEC's approval of Nasdaq's proposed rule:

> The Board Diversity Proposal does not advance any of these purposes. Merely because the Exchange has identified a societal problem that it believes it can address through its power to set listing standards or regulate its members does not bring the proposed solution within the scope of the Exchange Act. This limitation is important: As a nation, we face myriad societal, economic, and political challenges. But the notion that Congress— which has not given exchanges and other SROs, or even the Commission, a mandate to address these challenges and remedy these injustices—expected them to attempt to do so merely because they have leverage over market participants through the authority granted them in the Exchange Act, is fanciful.[56]

---

[54] Peirce, *supra* note 32.

[55] *Id*.

[56] *Id*.

22

Nasdaq is not some dispenser of "cosmic justice."[57] It is a securities exchange with a specific and limited job; to advance a fair and free securities market. Nasdaq's rule is an excursion into social and political issues over which exchanges have no authority and is a prioritization of those issues over the market Nasdaq exists to protect and promote.

IV.    **The Fact That the Diversity Rule in its Current Form is Not Strictly Mandatory is no Reason to Think it Will Not Become Mandatory in the Future.**

The Nasdaq rule in its current form does not require boards to comply with its diversity quotas. Rather, the rule requires that the boards who fail to adjust their board membership according to skin pigmentation, sex, or sexual orientation must explain why they have failed to do so.[58] This requirement is clearly intended to pressure boards that, by Nasdaq's logic, are insufficiently demographically varied. Further, boards that refuse to discriminate in their appointment of directors should not be confident that their relative freedom to do so will continue for long.

When asked whether the SEC will be moving from voluntary to mandatory DEI disclosure requirements, Gary Gensler, Chair of the SEC, said that while he didn't "want to get ahead of the work and recommendations coming from the staff and [his] fellow commissioners . . . markets benefit from consistency and comparability that

---

[57] *See generally* Thomas Sowell, *The Quest for Cosmic Justice* (Touchstone 2002).
[58] Release No. 34-92590, 86 Fed. Reg. 44,427 (Aug. 12, 2021) (Approval Order).

investors can then use to make decisions."[59] He concludes, "[t]here is a benefit to some standardization, to get to consistency, comparability and decision usefulness."[60] If such standardization is beneficial, why should it not be mandatory? In the near future, whatever obstacles that prevented Nasdaq from making its diversity quotas fully mandatory may no longer hold that requirement at bay.

If board diversity necessarily leads to greater shareholder returns, which is Nasdaq's claim, then why would board diversity not be required? Further, the logic of DEI demands constant movement towards some ill-defined equitable society, even at the expense of treating people fairly. That forward march is unlikely to long be constrained by the relative voluntariness of the board diversity rule at issue here.

Nasdaq's rule should be invalidated. It is contrary to the purposes of the Securities and Exchange Act, demands discrimination based on irrelevant personal characteristics, is based on unsubstantiated claims and unstated assumptions, and is unlikely to remain voluntary.

## CONCLUSION

This Court should reverse the panel decision and rule for the Alliance for Fair Board Recruitment and the National Center for Public Policy Research.

---

[59] *A Mission for Inclusion: In Conversation with Gary Gensler*, SEC (modified Nov. 22, 2023) https://www.sec.gov/sec-stories/mission-inclusion-conversation-gary-gensler#bubble-8 (see answer to question number 8).
[60] *Id.*

Respectfully submitted,

/s/ J. Marc Wheat
J. Marc Wheat
Advancing American Freedom, Inc.
801 Pennsylvania Avenue, N.W.
Suite 930
Washington, D.C. 20004
(202) 780-4848
mwheat@advancingamericanfreedom.com

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,438 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Times New Roman 14-point font in text and Times New Roman 12-point font in footnotes produced by Microsoft Word software.

/s/ J. Marc Wheat
J. Marc Wheat

**ECF CERTIFICATIONS**

I certify that the required privacy redactions have been made pursuant to 5th Cir. R. 25.2.13, the electronic submission is an exact copy of the paper submission, and the document has been scanned for viruses and is free of viruses.

/s/ J. Marc Wheat
J. Marc Wheat

## CERTIFICATE OF SERVICE

I hereby certify that on March 28, 2024, an electronic copy of the foregoing brief was filed with the Clerk of this Court using the CM/ECF system, which will serve all counsel of record.

<u>/s/ J. Marc Wheat</u>
J. Marc Wheat