No. 21-60626

# In the United States Court of Appeals for the Fifth Circuit

ALLIANCE FOR FAIR BOARD RECRUITMENT, and
NATIONAL CENTER FOR PUBLIC POLICY RESEARCH,
*Petitioners,*

*v.*

SECURITIES AND EXCHANGE COMMISSION,
*Respondent.*

On Petition for Review of an Order of the
United States Securities and Exchange Commission
No. 34-92590

## AMICUS BRIEF OF THE STATE OF UTAH AND 23 OTHER STATES IN SUPPORT OF PETITIONERS

Drew C. Ensign
Holtzman, Vogel, Baran,
Torchinsky & Josefiak PLLC
2300 N Street NW
Suite 643
Washington, DC 20037
Phone: (202) 737-8808

Sean D. Reyes
Attorney General
Stanford E. Purser
Utah Solicitor General
Christopher A. Bates
Deputy Solicitor General
Office of the Utah
Attorney General
160 E. 300 S., 5th Floor
Salt Lake City, UT 84114
Phone: (801) 366-0260

*Counsel for Amici Curiae*
*Additional counsel listed at end of brief*

Dated:  March 28, 2024

## CERTIFICATE OF INTERESTED PARTIES

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. Petitioner National Center for Public Policy Research is a non-profit corporation and has no parent corporations or subsidiaries.

2. Margaret A. Little and Sheng Li of The New Civil Liberties Alliance—*Counsel* for Petitioner National Center for Public Policy Research.

3. Petitioner Alliance for Fair Board Recruitment is a non-profit membership corporation and has no parent corporations or subsidiaries.

4. Jonathan Berry, R. Trent McCotter, Michael Buschbacher, and Jordan E. Smith of Boyden Gray & Associates—*Counsel* for Petitioner Alliance for Fair Board Recruitment.

5. The Securities and Exchange Commission is a federal agency.

6. Michael A. Conley, Daniel E. Matro, Vanessa Ann Countryman, and Tracy A. Hardin of the Securities and Exchange Commission—*Counsel* for Respondent Securities and Exchange Commission.

7. Allyson N. Ho, Bradley G. Hubbard, Amir C. Tayrani, and Amalia E. Reiss of Gibson, Dunn & Crutcher LLP; John Zecca, Jeffrey S. Davis, John Yetter, and Joanne Pedone of The Nasdaq Stock Market L.L.C.; and Burt M. Rublin, Stephen J. Kastenberg, Paul Lantieri III, Peter F. Andrews, and Seth D. Berlin of Ballard Spahr LLP—*Counsel* for Intervenor Nasdaq Stock Market, L.L.C.

8. The States of Utah, Alabama, Alaska, Arkansas, Florida, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Ohio, South Carolina, South Dakota, Tennessee, Texas, Virginia, and West Virginia.

9. Drew C. Ensign, Stanford E. Purser, and Christopher A. Bates—*Counsel* for Amici States.[1]

March 28, 2024                    */s/ Christopher A. Bates*
                                 Christopher A. Bates

---

[1]  Because the States are amici curiae listed in the first sentence of FRAP 29(a)(2), they are not subject to FRAP 29(a)(4)(E). The Interests of Amici section, *infra* at 1, sets forth the identity of the Amici States, as well as their interests and authority. *See* FRAP 29(a)(4)(D).

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES ...........................................ii

TABLE OF AUTHORITIES ...................................................................vi

INTERESTS OF AMICI ..........................................................................1

ARGUMENT ...........................................................................................2

    I.    The Quota Rule Violates the Constitution's Guarantee of Equal Protection....................................................................3

        A.    The Quota Rule, and the SEC's Approval of It, Are State Action Subject to Constitutional Scrutiny. ...............................................................3

        B.    The Quota Rule Violates the Equal Protection Clause. ..................................................................8

    II.    The Quota Rule Undermines Traditional State Authority and Violates State Laws. .....................................12

        A.    Nasdaq and the SEC's Rulemaking Authority Is Limited in Scope. ........................................13

        B.    Nasdaq's Regulation of Corporate Board Diversity Alters the Federal-State Balance. ...............15

        C.    The Purported Statutory Justifications for the Quota Rule Are Inadequate.......................................17

CONCLUSION ......................................................................................21

ADDITIONAL COUNSEL......................................................................24

CERTIFICATE OF COMPLIANCE ......................................................26

CERTIFICATE OF SERVICE................................................................27

# TABLE OF AUTHORITIES

## Federal Cases

*Adarand Constructors, Inc. v. Pena,*
  515 U.S. 200 (1995) ................................................................. 9

*Ala. Ass'n of Realtors v. HHS,*
  141 S. Ct. 2485 (2021) ................................................... 12, 17

*Alfred L. Snapp & Son, Inc. v. Puerto Rico,*
  458 U.S. 592 (1982) ................................................................. 1

*All. For Fair Bd. Recruitment v. SEC,*
  85 F.4th 226 (5th Cir. 2023) ............................................... 6, 8

*Archer v. SEC,*
  133 F.2d 795 (8th Cir. 1943) .................................................. 4

*Bass v. Bd. of Cnty. Comm'rs, Orange Cnty., Fla.,*
  256 F.3d 1095 (11th Cir. 2001) .............................................. 9

*Bolling v. Sharpe,*
  347 U.S. 497 (1954) ................................................................. 5

*Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n,*
  531 U.S. 288 (2001) ............................................................ 6, 7

*Bus. Roundtable v. SEC,*
  905 F.2d 406 (D.C. Cir. 1990) .......................................... 3, 21

*Cort v. Ash,*
  422 U.S. 66 (1975) ................................................................ 15

*Crawford v. Carroll,*
  529 F.3d 961 (11th Cir. 2008) ................................................ 9

*Crimmins v. Am. Stock Exch., Inc.,*
  346 F. Supp. 1256 (S.D.N.Y. 1972) ....................................... 4

*Dep't of Commerce v. New York,*
  139 S. Ct. 2551 (2019) ......................................................... 19

*Fisher v. Univ. of Texas at Austin,*
  570 U.S. 297 (2013) .......................................................... 9, 11

*Gregory v. Ashcroft,*
  501 U.S. 452 (1991) ............................................................. 12

*Grutter v. Bollinger,*
  539 U.S. 306 (2003) ................................................... 2, 11, 21

*Hughes v. SEC,*
  174 F.2d 969 (D.C. Cir. 1949) ............................................... 4

*Intercontinental Indus., Inc. v. Am. Stock Exch.*,
  452 F.2d 935 (5th Cir. 1971) ............................................... 4, 5
*J.E.B. v. Alabama ex rel. T.B.*,
  511 U.S. 127 (1994) ............................................................. 9
*Kinney v. Weaver*,
  367 F.3d 337 (5th Cir. 2004) ............................................... 4
*League of United Latin Am. Citizens v. Perry*,
  548 U.S. 399 (2006) ............................................................. 2
*Marsh v. Rosenbloom*,
  499 F.3d 165 (2d Cir. 2007) ............................................... 15
*McDonald v. Santa Fe Trail Transp. Co.*,
  427 U.S. 273 (1976) ............................................................. 9
*Meland v. Weber*,
  2 F.4th 838 (9th Cir. 2021) ............................................... 16
*Moose Lodge No. 107 v. Irvis*,
  407 U.S. 163 (1972) ............................................................. 6
*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*,
  551 U.S. 701 (2007) ........................................................... 11
*Reliable Automatic Sprinkler Co., v. CPSC*,
  324 F.3d 726 (D.C. Cir. 2003) ........................................... 7
*Rooms v. SEC*,
  444 F.3d 1208 (10th Cir. 2006) ......................................... 4
*Santa Fe Indus. v. Green*,
  430 U.S. 462 (1977) .................................................... 15, 16
*Sessions v. Morales*,
  137 S. Ct. 1678 (2017) ....................................................... 5
*Sloan v. N.Y. Stock Exch., Inc.*,
  489 F.2d 1 (2d Cir. 1973) ................................................... 5
*Students for Fair Admissions, Inc. v. President & Fellows of
    Harvard Coll.*,
  143 S. Ct. 2141 (2023) ................................................... 9, 10
*TSC Indus., Inc. v. Northway, Inc.*,
  426 U.S. 438 (1976) .................................................... 19, 20
*U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*,
  590 U.S. 604 (2020) ........................................................... 12
*Villani v. N.Y. Stock Exch., Inc.*,
  348 F. Supp. 1185 (S.D.N.Y. 1972) ................................... 5

*Villani v. N.Y. Stock Exch., Inc.*,
  367 F. Supp. 1124 (S.D.N.Y. 1973) ........................................................5

## Federal Statutes

15 U.S.C. § 78f ........................................................................................13
15 U.S.C. § 78s ..........................................................................................3

## State Statutes

Utah Code § 34A-5-106 ...........................................................................16

## Federal Regulations

*Order Approving Proposed Rule Changes to Adopt Listing Rules
  Related to Board Diversity*,
  86 Fed. Reg. 44,424 (Aug. 12, 2021) ........................................16, 18, 20

## Other Authorities

Cal. A.B. 979 (2020) ................................................................................16
Commissioner Elad L. Roisman, *Statement on the Commission's
  Order Approving Exchange Rules Relating to Board Diversity*
  (Aug. 6, 2021), https://www.sec.gov/news/public-
  statement/roisman-board-diversity .....................................................14
Commissioner Hester M. Pierce, *Statement on the Commission's
  Order Approving Proposed Rule Changes* (Aug. 6, 2021),
  https://www.sec.gov/news/public-statement/peirce-nasdaq-
  diversity-statement-080621 .................................................................18
Commissioners Allison Herren Lee & Caroline A. Crenshaw,
  *Statement on Nasdaq's Diversity Proposals – A Positive First Step
  for Investors* (Aug. 6, 2021), https://www.sec.gov/news/public-
  statement/statement-nasdaq-diversity-080621 ..................................14
H.R. 1277, 117th Cong. (2021-2022) .......................................................17
H.R. 5084, 116th Cong. (2019-2020) .......................................................17
Nasdaq, *Response to Comments and Notice of Filing of Amendment
  No. 1*, File No. SR-NASDAQ-2020-081 at 12-13 (Feb. 26, 2021)
  (Nasdaq Letter) ...................................................................................18
S. Rep. No. 792 (1934) .............................................................................21

**INTERESTS OF AMICI**

The States of Utah, Alabama, Alaska, Arkansas, Florida, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Ohio, South Carolina, South Dakota, Tennessee, Texas, Virginia, and West Virginia ("Amici States") have significant interests in this dispute. As explained below, Amici States have a unique interest because they are traditionally the primary regulators of corporate structure and organization within their jurisdictions.

In addition, Amici States have "quasi-sovereign interest[s] in the health and well-being—both physical and economic—of [their] residents in general." *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 607 (1982). Federal courts "ha[ve] had too much experience with the political, social, and moral damage of discrimination not to recognize that a State has a substantial interest in assuring its residents that it will act to protect them from these evils." *Id.* at 609. SEC's rule directly affects those interests.

More generally, the legal issues in this case, and the real-world impact of their resolution, are of great importance to Amici States.

1

Nasdaq's proposed rule and SEC's approval of it ("Quota Rule") not only contravene the federal Constitution, but potentially undermine state law and policy on corporate board composition and racial and gender preferences.

## ARGUMENT

"It is a sordid business, this divvying us up by race." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 511 (2006) (Roberts, C.J., concurring in part and dissenting in part). But rather than eliminating race-based discrimination, SEC is affirmatively perpetuating it. Put simply, SEC is practicing what it is constitutionally bound to be eliminating. The agency has blessed explicit race-based requirements for listed corporations, and further included overt sex-based mandates. And the types of preferences it adopted are particularly problematic: outright quotas rather than any sort of "plus factor."

None of this is lawful, and SEC has transgressed both constitutional and statutory limitations on its authority. Indeed, SEC's Quota Rule "amount[s] to outright racial balancing, which is patently unconstitutional." *Grutter v. Bollinger*, 539 U.S. 306, 330 (2003).

2

Similarly, SEC lacks the "power to interfere in the management of corporations." *Bus. Roundtable v. SEC*, 905 F.2d 406, 411 (D.C. Cir. 1990) (cleaned up). SEC thus lacks statutory authority to embark on its foray into the compositions of corporate boards generally—even if it had managed to stay within constitutional bounds. That the agency's crusade culminated in adopting explicit race- and sex-based quotas should make this case an easy one: the Quota Rule both violates the Constitution and exceeds the SEC and Nasdaq's statutory authority.

## I.    The Quota Rule Violates the Constitution's Guarantee of Equal Protection.

### A.    The Quota Rule, and the SEC's Approval of It, Are State Action Subject to Constitutional Scrutiny.

The Securities Exchange Act provides that "[t]he Commission shall approve a proposed rule change of a self-regulatory organization," but only if the Commission "finds that such proposed rule change is consistent with the requirements of this chapter and the rules and regulations issued under this chapter that are applicable to such organization." 15 U.S.C. § 78s(b)(2)(C)(i).

As with all federal statutes, the Securities Exchange Act and its regulations cannot mandate any actions that violate the Constitution: "[G]overnmental discretion is always constrained by the Constitution."

*Kinney v. Weaver*, 367 F.3d 337, 357 (5th Cir. 2004) (en banc). Furthermore, "regulation [under the Securities Exchange Act] must be done in strict subordination to constitutional and lawful safeguards of individual rights." *Archer v. SEC*, 133 F.2d 795, 803 (8th Cir. 1943); *Hughes v. SEC*, 174 F.2d 969, 975 (D.C. Cir. 1949) (same).

And when it comes to Self-Regulatory Organizations ("SROs"), such as Nasdaq, their "intimate involvement . . . with the Securities and Exchange Commission brings [them] within the purview of the Fifth Amendment controls over governmental due process." *Intercontinental Indus., Inc. v. Am. Stock Exch.*, 452 F.2d 935, 941 (5th Cir. 1971); *accord Rooms v. SEC*, 444 F.3d 1208, 1214 (10th Cir. 2006) (holding that due process requirements apply to the National Association of Securities Dealers). When an SRO acts "under the self-regulatory power conferred upon it by the 1934 Act, it is engaged in governmental action, federal in character, and the Act impose[s] upon it the requirement that it comply with . . . Fifth Amendment controls over governmental due process." *Crimmins v. Am. Stock Exch., Inc.*, 346 F. Supp. 1256, 1259 (S.D.N.Y. 1972).

4

"It is now beyond dispute that the Fifth Amendment due process requirements as to federal action apply to" SROs because they act "under the self-regulatory power conferred upon [them] by a federal agency, the Securities & Exchange Commission." *Villani v. N.Y. Stock Exch., Inc.*, 348 F. Supp. 1185, 1188 n.1 (S.D.N.Y. 1972), *opinion modified on reargument*, 367 F. Supp. 1124 (S.D.N.Y. 1973), *and aff'd sub nom. Sloan v. N.Y. Stock Exch., Inc.*, 489 F.2d 1 (2d Cir. 1973).

The Supreme Court established in *Bolling v. Sharpe*, 347 U.S. 497 (1954), that the Equal Protection Clause of the Fourteenth Amendment is incorporated against the federal government through the Fifth Amendment's Due Process Clause. *Id.* at 498; *see also Sessions v. Morales*, 137 S. Ct. 1678, 1686 n.1 (2017) (the Supreme Court's "approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment").

Because SROs such as Nasdaq are bound by the Due Process Clause of the Fifth Amendment through their "intimate involvement" with the SEC, *Intercontinental Indus.*, 452 F.2d at 941, and because that clause incorporates the requirements of the Equal Protection

5

Clause, Nasdaq is unambiguously subject to the requirements of the Equal Protection Clause. (For ease of reference this brief will refer to the Equal Protection Clause, although it is technically the Fifth Amendment's incorporation of that clause that applies to SEC/Nasdaq.)

The panel's opinion, however, purports to bypass all constitutional limitations by deeming SEC's governmental actions not to be state action—even though SEC's approval was the but-for cause of the race- and sex-based requirements becoming legally operative and even though violation of them can result in *governmentally imposed penalties. See All. for Fair Bd. Recruitment v. SEC*, 85 F.4th 226, 239-48 (5th Cir. 2023).

The panel even refused to concede that "later enforcement [by SEC] of the [Quota Rule] against Nasdaq would be state action," saying that was "not a question presented." *Id.* at 247. But an enforcement action by the government is unquestionably state action. *See, e.g., Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n*, 531 U.S. 288, 296 (2001) ("[A] challenged activity may be state action when it results from the State's exercise of 'coercive power.'"); *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 172 (1972) ("[The] impetus for the forbidden

6

discrimination need not originate with the State if it is state action that enforces privately originated discrimination."). And a governmentally imposed mandate is likewise state action even if not yet specifically enforced by the government—the government mandate and *threat* of enforcement suffices as an "exercise of 'coercive power.'" *Brentwood Acad.*, 531 U.S. at 296.

By the panel's logic, even enactments of *criminal* statutes prohibiting or mandating actions would not be state action until the government actually attempted to enforce them in court (and maybe not even then, given the panel's refusal to concede SEC enforcement actions against Nasdaq would be state action). That is plainly incorrect. When government action is a but-for cause of the creation of a mandate that must be complied with under threat of a governmental enforcement action, that is state action.

More generally, SEC did not contest that its action approving the Quota Rule was final agency action under the APA. Final agency action—*i.e.*, an action that "imposes an obligation" from which "legal consequences will flow," *Reliable Automatic Sprinkler Co., v. CPSC*, 324 F.3d 726, 731 (D.C. Cir. 2003)—by a governmental actor is necessarily

*state* action. Because federal agencies are state actors, final agency actions by them imposing legal obligations and carrying the force of law are state action.

The panel's opinion invents a new zone in which agency rules can operate. In the panel's view, SEC's actions somehow lack a sufficient governmental nexus to trigger scrutiny under the Fifth and Fourteenth Amendments—and yet somehow also possess a sufficient governmental nexus to avoid private non-delegation doctrine concerns. *See All. for Fair Bd. Recruitment*, 85 F.4th at 244-45 (rejecting private non-delegation doctrine challenge).

No other government action of which Amici States are aware has *ever* successfully navigated between that constitutional Scylla and Charybdis. That is unsurprising. The panel's state-action-except-when-it's-not contortions would be problematic in any context. But in service of governmentally sanctioned discrimination, they are especially concerning.

## B.    The Quota Rule Violates the Equal Protection Clause.

The Quota Rule imposes explicit preferences on the basis of race, ethnicity, and sex. All of these categories trigger strict or heightened

8

scrutiny. *See, e.g., Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995) ("[A]ll racial classifications . . . must be analyzed by a reviewing court under strict scrutiny."); *Fisher v. Univ. of Texas at Austin*, 570 U.S. 297, 310 (2013) (strict scrutiny applies to "action that treats a person differently on account of his race or ethnic origin"); *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 135 (1994) (applying "heightened scrutiny" to sex-based classifications).

"Discrimination is discrimination no matter what the race, color, religion, sex, or national origin of the victim. Our Constitution does not distinguish between races and neither do [courts]." *Bass v. Bd. of Cnty. Comm'rs, Orange Cnty., Fla.*, 256 F.3d 1095, 1103 (11th Cir. 2001), *overruled in part on other grounds* by *Crawford v. Carroll*, 529 F.3d 961 (11th Cir. 2008). The law is blind—the same legal standards and protections apply regardless of the race, ethnicity, or sex that is treated differently. *See, e.g. McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 287 (1976).

The panel's acquiescence in governmentally sanctioned discrimination is particularly problematic in light of the Supreme Court's decision in *Students for Fair Admissions, Inc. v. President &*

*Fellows of Harvard Coll.* (*"Fair Admissions"*), 143 S. Ct. 2141 (2023), which was decided between issuance of the rule and the panel decision. As *Fair Admissions* makes clear, "at the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class." *Id.* at 2172 (cleaned up). But the Quota Rule does precisely what *Fair Admissions* forbids: treat individuals purely as "components of a racial" or sexual class.

*Fair Admissions* further reiterates that "[d]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Id.* at 2162. But the Quota Rule relies on just such distinctions. Remarkably, the panel made no effort to reconcile its analysis with the Supreme Court's intervening decision in *Fair Admission.*

Moreover, the type of race- and sex-based preferences in the Quota Rule are particularly crude: outright quotas rather than any sort of holistic analysis or plus factor.

10

"Properly understood, a 'quota' is a program in which a certain fixed number or proportion of opportunities are reserved exclusively for certain minority groups." *Grutter*, 539 U.S. at 335 (cleaned up). "Quotas impose a fixed number or percentage which must be attained." *Id.* (cleaned up).

The Quota Rule does just that, imposing a fixed-number requirement for women and racial minorities.[2]

But quotas are "patently unconstitutional." *Id.* at 330 (explaining that seeking "to assure . . . some specified percentage of a particular group merely because of its race or ethnic origin . . . is patently unconstitutional" (internal quotation marks omitted)). "Racial balancing is not transformed from 'patently unconstitutional' to a compelling state interest simply by relabeling it 'racial diversity.'" *Fisher*, 570 U.S. at 311 (quoting *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 732 (2007)).[3]

---

[2]   SEC does not explain the apparent interchangeability of racial minorities and members of the LGBTQ+ community. Under the Quota Rule, members of each group provide equivalent diversity to a board.

[3]   Nor does the penalty for non-compliance—*i.e.*, requiring corporations to announce their failure to meet the quota—render the

**II.     The Quota Rule Undermines Traditional State Authority and Violates State Laws.**

Federal courts "expect Congress to speak clearly when authorizing an agency to exercise powers of 'vast economic and political significance'" and to use "exceedingly clear language if it wishes to significantly alter the balance between federal and state power." *Ala. Ass'n of Realtors v. HHS* ("*Alabama Realtors*"), 141 S. Ct. 2485, 2489 (2021) (per curiam) (internal quotation marks omitted). The Supreme Court has required this sort of clear statement of agency authority in a range of circumstances, from regulation of "the landlord-tenant relationship," *id.*, to regulation of private property, *U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 590 U.S. 604, 621-22 (2020), to regulation of the retirement age of state court judges, *Gregory v. Ashcroft*, 501 U.S. 452, 460–61 (1991).

The SEC, acting through its approval of the Quota Rule, seeks to encroach upon an area of traditional state concern: corporate governance. The Exchange Act was deliberately limited in scope and

---

Quota Rule constitutional. The imposition of *any* penalty for non-compliance with an unconstitutional requirement violates the Constitution, even if the penalty is not the most extreme one available (here, complete delisting).

has never been understood to allow entities like Nasdaq to use their management authority over the financial system to address matters outside the maintenance of fair and honest markets in securities. Here, the Quota Rule is an obvious attempt to effectuate social change disguised as a mere "disclosure" requirement. This Court should see through this tactic and recognize the far-reaching impact of the Rule.

## A. Nasdaq and the SEC's Rulemaking Authority Is Limited in Scope.

SROs like Nasdaq do not have unlimited power to make rules under the Exchange Act. Rather, the Act requires that the rules of a national securities exchange be designed to achieve at least one of several goals, including preventing fraudulent and manipulative acts and practices, promoting just and equitable principles of trade, removing impediments to, and perfecting the mechanism of, a free and open market and a national market system, or protecting investors and the public interest. 15 U.S.C. § 78f(b)(5). The same section of the Exchange Act expressly states that such rules must *not*, among other things, regulate matters unrelated to the purposes of the Exchange Act or the administration of the exchange. *Id.*

13

In other words, such rules must be grounded in the Exchange Act's overarching purposes and must be tied to one of the several enumerated goals under the Act. But the purpose of the Quota Rule is to force companies to adopt Nasdaq's racial and gender quotas to redress historical imbalances and fix "harmful disparities in representation," as the SEC's commissioners explained in statements accompanying their approval of the rule. *See* Commissioner Elad L. Roisman, *Statement on the Commission's Order Approving Exchange Rules Relating to Board Diversity* (Aug. 6, 2021), https://www.sec.gov/news/public-statement/roisman-board-diversity ("Throughout history, there have been too many barriers preventing deserving individuals from participating fully in our economy [and] it is important for all of us to assess the causes for such barriers and move to address them . . . ."); Commissioners Allison Herren Lee & Caroline A. Crenshaw, *Statement on Nasdaq's Diversity Proposals – A Positive First Step for Investors* (Aug. 6, 2021), https://www.sec.gov/news/public-statement/statement-nasdaq-diversity-080621 ("There is a continued, harmful disparity in the representation of a wide range of communities

14

in our capital markets."). These are not purposes set forth in the Exchange Act.

## B.     Nasdaq's Regulation of Corporate Board Diversity Alters the Federal-State Balance.

"[C]orporate law is overwhelmingly the province of the states." *Marsh v. Rosenbloom*, 499 F.3d 165, 176 (2d Cir. 2007). So "the Supreme Court expressly has cautioned against displacement of state law" in this area. *See id.* at 177.

Indeed, the Court has expressly refused to hold that the Exchange Act provided a cause of action for corporate mismanagement under the Exchange Act because it "would overlap and quite possibly interfere with state corporate law" and "federalize" an area of traditional state concern. *Santa Fe Indus. v. Green*, 430 U.S. 462, 479 (1977). The Court there explained that "investors commit their funds to corporate directors on the understanding that, except where federal law *expressly* requires certain responsibilities of directors, state law will govern the internal affairs of the corporation." *Id.* (quoting *Cort v. Ash*, 422 U.S. 66, 84 (1975)) (emphasis added).

There is no question that corporate board composition is a traditional state concern. Board composition might even be called the

15

quintessential example of the "internal affairs of the corporation" that are outside federal reach without express congressional authorization. *Id.* (internal quotation marks omitted). In fact, as Nasdaq and the SEC recognized, several states have enacted or adopted policies related to board diversity. *See Order Approving Proposed Rule Changes to Adopt Listing Rules Related to Board Diversity*, 86 Fed. Reg. 44,424, 44,438 (Aug. 12, 2021); *see also* Cal. A.B. 979 (2020) (California bill requiring corporations headquartered in California to have female and "underrepresented" directors). The choice to have such laws—or not to have them—is a matter for the states, subject to constitutional and statutory limitations. *See Meland v. Weber*, 2 F.4th 838, 842 (9th Cir. 2021) (shareholders have standing to challenge sex-based quotas for boards of directors).

Furthermore, the Quota Rule stands in clear tension with—if not outright violation of—the existing civil rights laws of States. For example, the Utah Antidiscrimination Act expressly states that employers may not discriminate in employment on the basis of race, sex, or sexual orientation. Utah Code § 34A-5-106. But the Quota Rule necessarily requires corporations to classify directors based on

prohibited grounds. How else would a company know if it satisfied Nasdaq's numerical requirements?

Accordingly, SEC's Quota Rule interferes with and alters the federal-state balance in corporate management. And, as stated above, Congress must use "exceedingly clear language" to allow agencies to alter this balance. *Alabama Realtors*, 141 S. Ct. at 2489. No such language appears in the Exchange Act. To the contrary, multiple bills have been introduced recently in Congress that would provide such exceedingly clear language and expressly require companies to disclose or engage in active board diversity measures. *See, e.g.*, H.R. 1277, 117th Cong. (2021-2022) (requiring certain issuers of securities to disclose the racial, ethnic, and gender composition of their boards of directors and executive officers, as well as their plans to promote diversity among those groups); H.R. 5084, 116th Cong. (2019-2020) (same). None of those bills have become law.

### C.    The Purported Statutory Justifications for the Quota Rule Are Inadequate.

Nasdaq and the SEC both concluded that the Quota Rule was permissible and furthered the purposes of the Exchange Act because it would cause disclosure of information related to board diversity and

this disclosure would benefit investors. For example, Nasdaq asserted that "investors consider diversity disclosures material to their voting and investment decisions" and that the Quota Rule would "level the playing field for" investors "by providing them with accessible, comparable, transparent information that is material to their voting and investment decisions." Nasdaq, *Response to Comments and Notice of Filing of Amendment No. 1*, File No. SR-NASDAQ-2020-081 at 12-13 (Feb. 26, 2021) (Nasdaq Letter).[4] Similarly, the SEC argued that the rule would make "consistent and comparable information relating to the corporate governance of Nasdaq-listed companies . . . widely available on the same basis to investors, which would increase efficiency for investors that gather and use this information." 86 Fed. Reg. at 44,438.

There are two problems with this explanation. *First*, the Quota Rule is not simply a "disclosure" rule. Rather, the Quota Rule requires

---

[4] Nasdaq also asserted that the Quota Rule would increase returns by improving company performance. *See* Nasdaq Letter at 8-9. As explained in the Brief filed by the Alliance for Fair Board Recruitment, Brief at 54-57, this justification was not relied on by the SEC and was effectively refuted. *See also* Commissioner Hester M. Pierce, *Statement on the Commission's Order Approving Proposed Rule Changes* (Aug. 6, 2021), https://www.sec.gov/news/public-statement/peirce-nasdaq-diversity-statement-080621 (arguing that Nasdaq's "equivocal" evidence about company performance "should have doomed" the Rule).

an *explanation* if the quotas are not met. And this explanation effectively operates as a punishment for non-compliance with the quotas. Indeed, using the threat of a forced apology and bad PR to force companies to increase board diversity is the purpose of the Quota Rule, as Nasdaq effectively admits. Nasdaq expressly states that it is not simply seeking to increase disclosure but to "encourage" companies to increase board diversity. *See* Nasdaq Letter at 25-26 (discussing how "regulatory action" can "increas[e] board diversity" and how "absent encouragement, progress toward increased board diversity has been demonstrably slow").

This Court should not ignore Nasdaq's avowed purposes and the intended effect of the Quota Rule in evaluating it; it is not, in other words, "required to exhibit a naiveté from which ordinary citizens are free.'" *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575-76 (2019). Nasdaq has been perfectly clear what the intent of the Quota Rule is— and it is not merely "disclosure." This Court should take Nasdaq at its word as to its true objectives.

*Second*, the Exchange Act's fundamental concern with disclosure extends only to the disclosure of *material* information. *See TSC Indus.*,

*Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) ("[T]here must be a substantial likelihood that disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.") (cleaned up).  The SEC never establishes that board diversity information meets the materiality standard. Instead, the SEC asserts that it is allowed to enhance "transparency" even when the information is not material, as long as such disclosures do not "conflict with existing federal securities laws." 86 Fed. Reg. at 44,438.  That is incompatible with the principles articulated above—*i.e.*, that rules that alter the federal-state balance must have clear congressional authorization. *See supra* at 12. SEC's attempted extension of its disclosure authority into spheres that impinge on State prerogatives is not at all supported by the Exchange Act, much less "clearly" so.

The D.C. Circuit has previously struck down an SEC rule governing SROs that attempted to insert the Exchange Act into traditional state-law corporate governance issues. In *Business Roundtable*, the D.C. Circuit rejected a rule that would have barred national securities exchanges from listing stock of corporations that

20

adopted certain prohibited stock voting structures. 905 F.2d at 407. The D.C. Circuit explained that the Exchange Act "did not seek to regulate the stockholders' choices" and did not give the SEC the "power to interfere in the management of corporations." *Id.* at 411 (quoting S. Rep. No. 792, at 10 (1934)).

In so doing, the *Business Roundtable* court rejected various SEC explanations that attempted to tie the rule to the Exchange Act because there was no justification for the rule that would not also justify a claim to regulate "corporate governance as a whole." *Id.* at 413. Rather, the D.C. Circuit required a strong tie between the proffered rule and the Exchange Act's fundamental purposes.

The same principle controls here. There is simply no tie between the Quota Rule and the purposes of the Exchange Act that would justify such significant encroachment on traditional State authority. The Quota Rule thus exceeds SEC's authority and unlawfully trespasses on federalism.

## CONCLUSION

The Quota Rule adopts explicit race- and sex-based quotas and is thus "patently unconstitutional." *Grutter*, 539 U.S. at 330. SEC's

21

willingness to employ such outright quotas, which are plainly repugnant to the Constitution, is deeply concerning. Moreover, SEC lacks statutory authority to promulgate the Quota Rule.

Because SEC has transgressed both constitutional and statutory limitations on its authority, the Quota Rule must be vacated.

Dated:  March 28, 2024

Respectfully submitted,

*/s/ Christopher A. Bates*

Drew C. Ensign
Holtzman, Vogel, Baran,
Torchinsky & Josefiak PLLC
2300 N Street NW
Suite 643
Washington, DC 20037
Phone: (202) 737-8808

Sean D. Reyes
Attorney General
Stanford E. Purser
Utah Solicitor General
Christopher A. Bates
Deputy Solicitor General
Office of the Utah
Attorney General
160 E. 300 S., 5th Floor
Salt Lake City, UT 84114
Phone: (801) 366-0260

*Counsel for Amici Curiae*

23

# ADDITIONAL COUNSEL
*Counsel for Amici States*

STEVE MARSHALL
Attorney General
State of Alabama

TREG R. TAYLOR
Attorney General
State of Alaska

TIM GRIFFIN
Attorney General
State of Arkansas

ASHLEY MOODY
Attorney General
State of Florida

CHRISTOPHER M. CARR
Attorney General
State of Georgia

RAÚL LABRADOR
Attorney General
State of Idaho

THEODORE E. ROKITA
Attorney General
State of Indiana

BRENNA BIRD
Attorney General
State of Iowa

KRIS KOBACH
Attorney General
State of Kansas

RUSSELL COLEMAN
Attorney General
Commonwealth of Kentucky

LIZ MURRILL
Attorney General
State of Louisiana

LYNN FITCH
Attorney General
State of Mississippi

ANDREW BAILEY
Attorney General
State of Missouri

AUSTIN KNUDSEN
Attorney General
State of Montana

MICHAEL T. HILGERS
Attorney General
State of Nebraska

DREW WRIGLEY
Attorney General
State of North Dakota

DAVE YOST
Attorney General
State of Ohio

ALAN WILSON
Attorney General
State of South Carolina

MARTY J. JACKLEY
Attorney General
State of South Dakota

KEN PAXTON
Attorney General
State of Texas

PATRICK MORRISEY
Attorney General
State of West Virginia

JONATHAN SKRMETTI
Attorney General
State of Tennessee

JASON S. MIYARES
Attorney General
State of Virginia

**CERTIFICATE OF COMPLIANCE**

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains 3,976 words, excluding the parts exempted by Rule 32(f); and (2) the typeface and type style requirements of Rule 32(a)(5) and Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word (the program used for the word count).


*/s/ Christopher A. Bates*

## CERTIFICATE OF SERVICE

I, Christopher A. Bates, hereby certify that I electronically filed the foregoing Amicus Brief of the State of Utah and 23 Other States in Support of Petitioners with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit on March 28, 2024 by using the appellate CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

/s/ *Christopher A. Bates*