No. 21-60626

———————◆———————

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

———————◆———————

ALLIANCE FOR FAIR BOARD RECRUITMENT;
NATIONAL CENTER FOR PUBLIC POLICY RESEARCH,
*Petitioners,*

v.

SECURITIES AND EXCHANGE COMMISSION,
*Respondent.*

———————◆———————

On Petition for Review of an Order of the
Securities and Exchange Commission
Agency No. 34-92590

———————◆———————

**BRIEF AMICUS CURIAE OF THE BUCKEYE
INSTITUTE IN SUPPORT OF PETITIONERS**

———————◆———————

Jay R. Carson
*Counsel of Record*
David C. Tryon
Alex M. Certo
The Buckeye Institute
88 East Broad Street
Suite 1300
Columbus, OH 43215
(614) 224-4422
J.Carson@BuckeyeInstitute.org

John J. Park Jr.
P.O. Box 3073
Gainesville, GA 30503
(678) 608-1920
(m) 703-888-8329
jackparklaw@gmail.com

*Attorneys for Amicus Curiae*

## CERTIFICATE OF INTERESTED PERSONS

*Alliance for Fair Board Recruitment, et al. v. SEC*,
No. 21-60626

The undersigned counsel of record for amicus The Buckeye Institute certifies that The Buckeye Institute is an Ohio nonprofit organization. Pursuant to Fed. R. App. 29(a)(4)(E), The Buckeye Institute has authored this brief in whole. Counsel is not aware of any person or entity as described in the fourth sentence of Rule 28.2.1 that have an interest in the outcome of this case other than those listed in the parties' certificates. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

/s/ *Jay R. Carson*

Jay R. Carson
*Attorney of record for*
*The Buckeye Institute*

i

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ..........................................................i

TABLE OF AUTHORITIES ................................................................................. iii

INTEREST OF *AMICUS CURIAE*..........................................................................1

SUMMARY OF ARGUMENT ...............................................................................1

ARGUMENT .........................................................................................................3

   I.   For-profit corporations are formed to maximize profits for their shareholders, not to promote social causes ......................................................3

   II.  Congress enacted the Securities and Exchange Commission to assist investors, not to enforce select societal goals endorsed by a government agency ............................................................................................................6

   III. The Supreme Court has rejected diversity and related interests as explanations for discriminatory conduct ............................................................10

   IV. The studies on which the SEC and Nasdaq relied are seriously flawed, making the SEC's decision arbitrary and capricious ......................................13

   V.  Congress has not authorized the SEC's "regulatory shaming" .....................15

CONCLUSION ....................................................................................................18

# TABLE OF AUTHORITIES

**Cases**

*Alexander v. Sandoval*,
    532 U.S. 275 (2001)................................................................8

*Cort v. Ash*,
    422 U.S. 66 (1975)..................................................................6

*CTS Corp. v. Dynamics Corp. of Am.*,
    481 U.S. 69 (1987)..................................................................6

*Dodge v. Ford Motor Co.*,
    204 Mich. 459, 170 N.W. 668 (1919).................................2, 3

*eBay Domestic Holdings v. Newmark*,
    16 A. 3d 1 (Del. Ch. 2010) ....................................................2

*First Nat. Bank of Bos. v. Bellotti*,
    435 U.S. 765 (1978)............................................................4, 5

*Miller v. Johnson*,
    515 U.S. 900 (1995)..............................................................13

*Nat'l Ass'n for Advancement of Colored People v. Button*,
    371 U.S. 415 (1963)................................................................5

*Piper v. Chris-Craft Industries, Inc.*,
    430 U.S. 1 (1977)....................................................................9

*Santa Fe Indus., Inc. v. Green*,
    430 U.S. 462 (1977) .......................................................6, 8, 9

*Shaw v. Hunt*,
    509 U.S. 630 (1993)..............................................................13

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
    600 U.S. 181 (2023) ................................................2, 10, 11

*Swann v. Charlotte- Mecklenburg Board of Education*,
    402 U.S. 1 (1971)..................................................................12

*Washington v. Davis*,
    426 U.S. 229 (1976)................................................................2

*Wygant v. Jackson Board of Education*,
  476 U.S. 267 (1986) ...................................................................................... 11, 12

**Statutes**

15 U.S.C. § 77a–77aa ..........................................................................................7

15 U.S.C. § 78a–78nn .......................................................................................7, 17

Sarbanes-Oxley Act, 116 Stat. 745 (July 30, 2002) ..................................................8

**Other Authorities**

Lucian A. Bebchuk, *Federalism and the Corporation: The Desirable Limits on
  State Competition in Corporate Law*, 105 Harv. L. Rev. 1435 (1992) .................6

Lucian A. Bebchuk & Roberto Tallarita, *The Illusory Promise of Stakeholder
  Governance*, 106 Cornell L. Rev. 91 (2020) ....................................................9, 10

Nathan Cortez, *Adverse Publicity by Administrative Agencies in the Internet
  Era*, 2011 B.Y.U. L. Rev. 1371 (2011) ............................................................16

*Ephesians* 4:14 (King James) ...............................................................................18

Kathleen A. Farrell & Philp L. Hirsch, *Additions to Corporate Boards: Does
  Gender Matter*, 11 J. of Corp. Fin. 86 (2005) ....................................................9

Jesse M. Fried, *Will Nasdaq's Diversity Rules Harm Investors?* (2021) ......... 13, 15

Milton Friedman, *The Social Responsibility of Business is to Increase its Profits*,
  The N.Y. Times Magazine (Sept. 13, 1970) ................................................. 1, 7, 18

Tyler Halloran, *A Brief History of the Corporate Form and Why it Matters*,
  Fordham J. Corp. & Fin. L. (November 18, 2018) ................................................4

Nathaniel Hawthorne, *The Scarlet Letter* (Bantam Classic ed. 1986) ....................16

Hon. James C. Ho, *On Ilya Shapiro, Cancel Culture, and Color Blindness*, 20
  Geo. J.L. & Pub. Pol'y 381 (2022) ...................................................................17

H.R. Rep. No. 73-1383 (1934) ................................................................................7

Lyman Johnson, *Pluralism in Corporate Form: Corporate Law and Benefit
  Corps.*, 25 Regent U. L. Rev. 269 (2013) ............................................................4

Dan M. Kahan, *What Do Alternative Sanctions Mean?*, 63 U. Chi. L. Rev. 591 (1996) .................................................................................................16

Faith Stevelman Kahn, *Pandora's Box: Managerial Discretion and the Problem of Corporate Philanthropy*, 44 UCLA L. Rev. 579 (1997) ...................................5

Jonathan Klick, *Review of the Literature on Diversity on Corporate Boards* (2021) ......................................................................................... 14, 15

Carl W. Mills, *Breach of Fiduciary Duty as Securities Fraud:* Sec v. Chancellor Corp., 10 Fordham J. Corp. & Fin. L. 439 (2005) ........................................ 6, 7, 8

Order Approving Proposed Rule Changes To Adopt Listing Rules Related to Board Diversity, Exchange Act Release No. 34-92590, 86 Fed. Reg. 44424, 4431 (Aug. 12, 2021) ................................................................... 12, 13

Sharon Yadin, *Regulatory Shaming*, 49 Envtl. L. 407 (2019).......................... 16, 17

## Regulations

17 C.F.R. § 240.10b-5 (1976) ...................................................................................8

## INTEREST OF AMICUS CURIAE

The Buckeye Institute was founded in 1989 as an independent research and educational institution—a think tank—whose mission is to advance free-market policies for our country and its states. It is a nonpartisan, nonprofit, tax-exempt organization, as defined by I.R.C. § 501(c)(3). The Institute's staff accomplishes the organization's mission by performing timely and reliable research on key issues, compiling and synthesizing data, formulating free-market policies, and promoting those solutions for implementation in Ohio and replication across the country. Through its Legal Center, The Buckeye Institute works to restrain governmental overreach at all levels of government. Buckeye also protects these interests by writing and joining *amicus* briefs on issues of importance.

## SUMMARY OF THE ARGUMENT

Nearly 55 years ago, Milton Friedman observed, "The discussion of 'social responsibilities of business' are notable for their analytical looseness and lack of rigor." Milton Friedman, *The Social Responsibility of Business is to Increase its Profits*, The N.Y. Times Magazine (Sept. 13, 1970).[1] The SEC's and Nasdaq's mandate to allocate two board seats on the basis of race, gender, or gender identity cannot be squared with Friedman's understanding of a corporation's purpose. Instead of that lack of rigor, it has long been the case that "[a] business corporation is

---

[1] https://www.nytimes.com/1970/09/13/archives/a-friedman-doctrine-the-social-responsibility-of-business-is-to.html.

organized and carried on primarily for the profit of the stockholder. The powers of the directors are to be employed for that end." *Dodge v. Ford Motor Co.*, 204 Mich. 459, 507, 170 N.W. 668, 684 (1919). Nearly one hundred years later, then Chancellor William Chandler explained:

> Having chosen a for-profit corporate form . . . directors are bound by the fiduciary duties and standards that accompany that form. Those standards include acting to promote the value of the corporation for the benefit of its stockholders. The "Inc." after the company name has to mean at least that. Thus, I cannot accept as valid . . . a corporate policy that specifically and admittedly seeks *not* to maximize the economic value of a for-profit Delaware corporation for the benefit of its stockholders.

*eBay Domestic Holdings v. Newmark*, 16 A. 3d 1, 34 (Del. Ch. 2010) (emphasis in original). Public for profit companies are not organized as social benefit entities. That is the role of non-profit corporations.

The Supreme Court also condemned mandates of all types based on race and surely also gender identity. *See, e.g., Washington v. Davis*, 426 U.S. 229, 239 (1976) ("The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race."). Indeed, "[e]liminating racial [and gender] discrimination means eliminating all of it." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 206 (2023) (*SFFA*). The mandate directs the opposite.

Equally concerning is that even if there were a legal justification for the

mandate, there is no data to support the notion that the mandated "board diversification" based on race or gender/gender identity will improve financial performance or otherwise improve corporate performance to the benefit of the shareholders.

Finally, the mandates appear to be nothing more than regulatory shaming. The SEC Acts of 1933 and 1934 are designed to assure that investors have adequate information to make good investment decision, and any failure to provide that information may result in financial penalties. But the mandate goes beyond the statutorily authorized penalties—they impose regulatory shaming. If the corporations do not have at least two of a racial minority, one female, and a LGBTQ+-identifying board member, they must explain why not. Congress imposed a disclosure regime to inform investors, not to affix a scarlet letter to corporations that do not comply with the administration's moral views of inclusion and diversity.

The SEC's and Nasdaq's mandate falls outside any statutory authorization and must be set aside.

## ARGUMENT

### I.  For-profit corporations are formed to maximize profits for their shareholders, not to promote social causes.

There are multiple kinds of corporate structures. When a corporation is formed as a for-profit corporation, its stated goal is to maximize profits for the investing shareholders. See *Dodge*, 170 N.W. at 684. Indeed, it seems redundant to state that

the purpose of a for-profit corporation is to make profits. Hence, "the singular purpose in a for-profit corporation must be to zealously maximize profits." Lyman Johnson, *Pluralism in Corporate Form: Corporate Law and Benefit Corps.*, 25 Regent U. L. Rev. 269, 280 (2013). The Supreme Court concurs: "Of course, it may be assumed that corporate investors are united by a desire to make money, for the value of their investment to increase." *First Nat. Bank of Bos. v. Bellotti*, 435 U.S. 765, 805 (1978). And this is not an antiquated notion.

> [D]irectors of corporations, governed by American law, must manage corporations primarily for the benefit of shareholders. . . . [*Dodge v. Ford Motor*] held that the profits of a corporation cannot be withheld from stockholders for the benefit of the general public and that [ ] dividend[s] [to the shareholders] must be reinstated."

Tyler Halloran, *A Brief History of the Corporate Form and Why it Matters*, Fordham J. Corp. & Fin. L. (November 18, 2018).[2] Some may argue that this is not a statutorily-imposed duty, but that would miss the point—the duty to increase the investor's value is inherent in a "for-profit" venture.

For example, "[f]rom the late nineteenth century through the early twentieth century, the most pressing legal question concerning corporate charitable contributions was whether businesses had the legal authority to make them." Faith Stevelman Kahn, *Pandora's Box: Managerial Discretion and the Problem of*

---

[2] https://news.law.fordham.edu/jcfl/2018/11/18/a-brief-history-of-the-corporate-form-and-why-it-matters/.

*Corporate Philanthropy*, 44 UCLA L. Rev. 579, 594 (1997). Subsequently, states enacted "philanthropy laws" that permited charitable contributions, with each state providing different limitations thereon. Some required any such contributions to further business and affairs of the corporations and others require a charitable, scientific, or educational purpose. *Id.* at 602. For-profit corporations wishing to include charitable contributions in their business model have the choice of which such laws will govern their charitable giving by their choice of state of incorporation.

In contrast to for-profit corporations, if an organization wants to be a social-benefit society, it can form as a non-profit. "The basic aims and purposes of NAACP [a non-profit corporation] are to secure the elimination of all racial barriers which deprive Negro citizens of the privileges and burdens of equal citizenship rights in the United States." *Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 419 (1963). Of course, a small privately held for-profit corporation is free to do as its shareholders decide. But here we address shareholders of publicly held companies—those regulated by the Securities and Exchange Commission.

> Shareholders in such entities do not share a common set of political or social views, and they certainly have not invested their money for the purpose of advancing political or social causes or in an enterprise engaged in the business of disseminating news and opinion. In fact, . . . the government has a strong interest in assuring that investment decisions are not predicated upon agreement or disagreement with the activities of corporations in the political arena.

*First Nat. Bank of Bos. v. Bellotti*, 435 U.S. 765, 805 (1978).

**II.    Congress enacted the Securities and Exchange Commission to assist investors, not to enforce select societal goals endorsed by a government agency.**

"[S]tates have traditionally set the rules for incorporation." Carl W. Mills, *Breach of Fiduciary Duty as Securities Fraud:* Sec v. Chancellor Corp., 10 Fordham J. Corp. & Fin. L. 439, 445 (2005). And "states also assumed primary responsibility for regulating internal corporate affairs." *Id.* Indeed, "[n]o principle of corporation law and practice is more firmly established than a State's authority to regulate domestic corporations . . . ." *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 89 (1987). Indeed, corporations are free to choose which state in which to incorporate based on the laws and regulations of those states. And "because states benefit from having corporations incorporate within their boundaries, states are likely to compete to attract incorporations." Lucian A. Bebchuk, *Federalism and the Corporation: The Desirable Limits on State Competition in Corporate Law*, 105 Harv. L. Rev. 1435, 1438 (1992). This flexibility for corporations and the variability of the state laws is central to the concept of federalism, upon which the country was founded. "Corporations are creatures of state law, and investors commit their funds to corporate directors on the understanding that, except where federal law expressly requires certain responsibilities of directors with respect to stockholders, state law will govern the internal affairs of the corporation." *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977) (quoting *Cort v. Ash*, 422 U.S. 66, 84 (1975)).

While that may not preclude federal regulation, before the federal government treads on state territory, it must demonstrate its authority to do so. In this case, the SEC's action intrudes on the corporate form without legal justification.

The first federal intrusion on the internal governance of corporations came with the enactment of the Securities Act of 1933, 15 U.S.C. § 77a–77aa, and the Securities Act of 1934, 15 U.S.C. § 78a–78nn, for the purpose of protecting the "interests of investors," H.R. Rep. No. 73-1383, 21 (1934), not for imposing nebulous "social responsibilities." *See Friedman*, *supra*. As Carl W. Mills notes, after the enactment of the Securities Act of 1933 and the Securities Act of 1934, "federal involvement in securities regulation was viewed as strictly limited to rules regarding disclosure, and procedural and anti-fraud rules to ensure the accuracy of disclosures." Mills, *supra*, at 446–47; 482–83.

Congress set forth the scope of the disclosures as those "necessary or appropriate for the proper protection of investors and to insure fair dealing in the security— . . . ." 15 U.S.C. § 78m(a). While this "necessary or appropriate" language is broad, it is limited—limited to "protection of investors and to insure fair dealing in the security." *Id*. This is financial information, and the language of the statute can hardly include disclosures on the color of skin or gender/gender identity of directors, officers, managers, employees, or others associated with the corporation.

Moreover, to the extent that Congress addressed corporate governance in the

Sarbanes-Oxley Act, 116 Stat. 745 (July 30, 2002), the bulk of those changes "focus on the composition and role of audit committees." *Mills*, *supra*, at 487. "The substantive responsibilities of the audit committee are, therefore, determined by disclosure requirements, which have been firmly within the federal government's regulatory control for some time." *Id*. (footnotes omitted).

The Supreme Court's decision in *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, is to the same effect. There, the Court limited the enforcement range of § 10(b) of the Securities Act of 1934 and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 (1976). The Court observed, "The rulemaking power granted to an administrative agency charged with the administration of a federal statute is not the power to make law." *Santa Fe Industries*, 430 U.S. at 472. Rather, the regulatory power is limited to the scope of power that Congress has granted the agency. *Id.* Put differently, "[a]gencies may play the sorcerer's apprentice but not the sorcerer himself." *Alexander v. Sandoval*, 532 U.S. 275, 291 (2001).

The Court further noted, "The language of § 10(b) gives no indication that Congress meant to prohibit any conduct not involving manipulation or deception." *Santa Fe Industries*, 430 U.S. at 473; see also *id*. at 477–78 ("[T]he Court repeatedly has described the 'fundamental purpose' of the [1934] Act as implementing a 'philosophy of full disclosure; once full and fair disclosure has occurred the fairness of the terms of the transaction is at most a tangential concern of the statute."). Finally,

"in determining whether Congress intended to create a federal cause of action in these circumstances is whether 'the cause of action (is) one traditionally relegated to state law . . . .'" *Id*. at 478 (quoting *Piper v. Chris-Craft Industries, Inc*., <u>430 U.S. 1, 40</u> (1977)).

The notion that some corporate issues are relegated to state law and others to federal law does not open the door to federal engineering. Rather, federal action should be made to further the federal interests in rules regarding disclosures and prohibiting fraudulent activity. Federal action should also be necessary, and it is unclear that requiring the addition of women to corporate boards is necessary. Kathleen A. Farrell and Philp L. Hersch have noted that the number of women on corporate boards "steadily increased" during the 1990s. Kathleen A. Farrell & Philp L. Hirsch, *Additions to Corporate Boards: Does Gender* Matter, 11 J. of Corp. Fin. 86 (2005). If the representation of women on corporate boards was increasing well before the mandate, the SEC and Nasdaq should show that the inclusion is necessary.

Moreover, the compensation of directors has shifted from a fixed-cash basis to an increasing reliance on equity-based compensation, which reinforces the directors' focus on shareholders' financial interests. Lucian A. Bebchuk & Roberto Tallarita, *The Illusory Promise of Stakeholder Governance*, 106 Cornell L. Rev. 91, 140 (2020). Bebchuk and Tallarita observe, "Importantly, equity compensation accounts for 56% of the average compensation of non-executive directors. These

stock holdings are intended to provide directors with incentives to increase stock value." *Id*. at 142. In the same way, a director's incentive in retaining his or her position aligns the director's interest with the shareholders in several ways. "First, building a shareholder-friendly reputation increases the chances that directors will keep their positions . . . ." *Id*. at 144. Directors can lose their jobs when shareholder value decreases because proxy fights, takeover bids, and hedge fund actions will try to persuade shareholders to make a change. *Id*. at 145–46. The prime objective of a board of directors is—and should be—increasing shareholder value.

There is no reason to believe that adding the minorities or women/LBGTQ+ directors mandated by the SEC and Nasdaq will increase the value of the shares or that it will increase the directors' incentives to maximize profits. Shareholders benefit from the performance of the directors, not their race or gender/gender identity.

## III.    The Supreme Court has rejected diversity and related interests as explanations for discriminatory conduct.

The Supreme Court's decision in *Students for Fair Admissions*, 600 U.S. 181, rejected the underlying diversity rationale for the mandate. In *SFFA,* the Court held that Harvard's undergraduate admissions process, which it said was holistic, failed to identify interests that were capable of "meaningful judicial review." *Id*. at 214. It explained that the interests Harvard identified, "includ[ing] training future leaders, acquiring new knowledge based on diverse outlooks, promoting a robust

marketplace of ideas, and preparing engaged and productive citizens," were incapable of measurement, "standardless," and offered no prospect of ending. *Id.* Indeed, the Court recognized that the goal of "diversity" although "commendable" is "not sufficiently coherent for purposes of strict scrutiny." *Id.*

The Court's decision in *Wygant v. Jackson Board of Education*, 476 U.S. 267 (1986), is to similar effect. There, the Court held that the layoff provision in a collective-bargaining agreement that gave a preference to minority teachers was unconstitutional. The plurality, with Justice Powell writing for Chief Justice Burger, Justice Rehnquist, and Justice O'Connor,[3] rejected the court of appeals' and the Board's invocation of an "interest in providing minority role models" to justify racially-motivated action. *Id.* at 274. It observed, "This Court has never held that societal discrimination alone is sufficient to justify a racial classification." *Id.* Only a showing that the classification was necessary to cure past discrimination "by the governmental unit involved" could suffice. *Id.* No such showing was made.

The plurality pointed to two more problems with the proposed justification. First, "the role model theory has no logical stopping point." *Id.* at 275. It not only allowed the board "to engage in discriminatory hiring and layoff practices long past the time required by any legitimate remedial purpose," it also led to "year-to-year

---

[3] Justice O'Connor joined Parts I, II, II, and V of the plurality opinion and concurred in the judgment. Justice White concurred in the judgment.

calibration," *id.*, something the Court had declared to be "unnecessary" in *Swann v. Charlotte- Mecklenburg Board of Education*, <u>402 U.S. 1, 31</u>–32 (1971). Second, to the extent that the classification was designed to remedy societal discrimination, such discrimination, "without more, is too amorphous a basis for imposing a racially classified remedy." *Wygant*, <u>476 U.S. at 276</u>.

*Students for Fair Admissions* and *Wygant* are race cases, but the justifications offered for allocating Board seats on the basis of minority, gender, and LGBTQ+ status are no more compelling than those offered to justify racial classifications. The mandate has no logical stopping point; if two seats don't tilt the playing field, how many will? And why stop with minorities, gender, and LGBTQ+? In that regard, the SEC noted, "According to the Exchange, more than a dozen studies have found a positive association between gender diversity and important investor protections, and some academics assert that such findings may extend to other forms of diversity, including racial and ethnic diversity." Order Approving Proposed Rule Changes To Adopt Listing Rules Related to Board Diversity, Exchange Act Release No. 34-92590, <u>86 Fed. Reg. 44424</u>, 4431 (Aug. 12, 2021) (footnotes omitted).

These identity-based concerns rest on indefensible stereotypes. As the Supreme Court has noted, racial gerrymandering

> reinforces that perception that members of the same racial group—
> regardless of their age, education, economic status, or the community
> in which they live think alike, share the same political interests, and
> will prefer the same candidates at the polls. We have rejected such

perceptions elsewhere as impermissible racial stereotypes. *Shaw v. Hunt*, 509 U.S. 630, 647 (1993); see also *Miller v. Johnson*, 515 U.S. 900, 912 (1995).

The SEC's and Nasdaq's mandate are no less stereotype based. The minority, women, and LBGTQ+ directors are presumed to have specialized knowledge that the existing boards lack. But that cannot be. Skin color, gender and gender identity do not give anyone increased knowledge or inherent financial acumen. Stereotypes based on such characteristics should not infect the actions of the SEC or Nasdaq.

## IV.    The studies on which the SEC and Nasdaq relied are seriously flawed, making the SEC's decision arbitrary and capricious.

In the first instance, "no academic study (or set of studies) can prove beyond doubt that Nasdaq's proposed rules will *harm or benefit* shareholders. Nobody has ever run this precise experiment before; economists will not know the effects of these rules unless they are adopted." Jesse M. Fried, *Will Nasdaq's Diversity Rules Harm Investors?* 2 (2021) (emphasis added).[4]

The SEC concluded that, "[t]aken together, studies of the effects of board diversity [on investor returns] are generally inconclusive, and suggest that the effects of even mandated changes remain the subject of reasonable debate." 86 Fed. Reg. at 44432. The SEC based that conclusion on a summary of what NASDAQ said about

---

[4] https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3812642.

the support for its proposal.

Indeed, "[t]he vast majority of the studies used to support the diversity regulations do not identify causal effects and, therefore, do not constitute reliable evidence." Jonathan Klick, *Review of the Literature on Diversity on Corporate Boards* 2–3 (2021).[5] More to the point, Klick noted, "Overall, the literature suggests that such mandates will do little to improve firm performance and may generate losses for shareholders." *Id*. at 3.

Klick explains that a general comparison report, used in one of the studies on which NASDAQ relied, "does not account for other potential differences across the companies with the most- and least-diverse boards." *Id*. Companies and industries perform differently according to market conditions that are independent of the composition of one or more companies' boards: "[D]uring the past decade, the auto industry suffered a slight loss in market return, whereas internet and direct marketing retail saw growth exceeding 1,000 percent. The primary underlying causes of these diverging prospects obviously have nothing to do with who makes up the company boards." *Id*.

"[T]he bulk" of the studies that NASDAQ has relied on suffer from "an omitted variable bias." *Id*. at 4. That makes "their conclusion scientifically

---

[5] https://www.aei.org/research-products/report/review-of-the-literature-on-diversity-on-corporate-boards/.

unreliable." *Id*. As Fried notes, "[F]actors, such as firm size or industry, could explain both higher returns and a more diverse board. For example, certain industries may have a larger pool of qualified diverse director candidates, and those industries might also (for separate reasons) happen to outperform." *Fried*, *supra*, at 3.

In the end, even if some studies might suggest correlation, that does not show causation. Fried notes that only three of the studies Nasdaq cites nominally go beyond correlation, and those three are not reliable. *Id.* One is "a terse claim" coming from the Carlyle Group without disclosure of the data or methodology, the second fails to control for omitted variables, and the third blends ingredients, which works "even when any one of the individual components is omitted." *Id*. at 3–4. Fried points to the problematic nature of studies from asset management firms like the Carlyle Group: "[T]hey are marketing materials crafted to attract paying clients, presumably those seeking to "do good while doing well." *Id.*; see also *id*. at 8 ("Index fund managers are likely to benefit financially from Nasdaq's diversity rules even if they have no effect on stock prices. . . . [Because the rules] facilitate activism used to attract assets from a particular subset of market participants—socially-minded millennials and pension fund stewards. This in turn increases managers' fees.").

## V.    Congress has not authorized the SEC's "regulatory shaming."

But the point which drew all eyes, and, as it were, transfigured the wearer,—so that both men and women, who had been familiarly acquainted with Hester Prynne, were now impressed as if they beheld her for the first time,— was that SCARLET LETTER, so fantastically

> embroidered and illuminated upon her bosom. It had the effect of a
> spell, taking her out of the ordinary relations with humanity, and
> enclosing her in a sphere by herself.

Nathaniel Hawthorne, *The Scarlet Letter* 51 (Bantam Classic ed. 1986).

The use of shaming to deter criminal activity or other socially unacceptable activity has both been long used and long debated—both the morality and the utility thereof. Shaming is unquestionably a punishment, a penalty. *See generally* Dan M. Kahan, *What Do Alternative Sanctions Mean?*, 63 U. Chi. L. Rev. 591 (1996). It is an "expressive imprisonment." Sharon Yadin, *Regulatory Shaming*, 49 Envtl. L. 407, 419 (2019). And "[s]haming as a criminal sanction is nothing new." *Id.* at 413. Some advocate using it as a tool in government regulation of companies—and presumably private citizens as well. *See generally id.* The wisdom and efficacy of such punishment is debatable. Even using adverse publicity of properly imposed penalties is problematic. "Agencies should not be able to punish alleged regulatory violators with indeterminate sanctions without providing some sort of procedural relief." Nathan Cortez, *Adverse Publicity by Administrative Agencies in the Internet Era*, 2011 B.Y.U. L. Rev. 1371, 1428 (2011).

Congress has, on occasion, enacted laws which seem to be designed to shame corporations. "The Dodd-Frank Wall Street Reform and Consumer Protection Act138 and the subsequent SEC regulations require public companies, as of 2018, to disclose the salary ratios of their employees and company executives in regulatory

filings." Yadin, *supra*, at 423–24. But without congressional authorization for such penalties, agencies have no authority to issue such punishments. And Congress did not authorize the SEC to use, or to sanction shaming to control board membership.

Congress sets forth penalties for violations of the SEC Acts of 1933 and 1934. For example, section 21A of the 1934 Act (Authority to impose civil penalties, 15 USC § 78u-1) authorized specific financial penalties. One will search in vain to find any congressional authorization to use corporate shaming as a penalty for not having a specific makeup of the corporate board based on race or gender/gender identity.

The purpose of the SEC Acts and related laws such as Sarbanes-Oxley is, and has always been, to provide information to investors, not to create "socially responsible" corporations; however, that might be defined by unnamed bureaucrats—and subject to different values depending on who is in power in any particular administration.

And, of course, in this era of cancel culture and doxxing, the shaming can—and indeed may be intended to—lead to socially canceling the offending company or its directors and executives. But this "cancel culture is not just antithetical to our constitutional culture and our American culture. It's completely antithetical to [our] legal system . . . ." Hon. James C. Ho, *On Ilya Shapiro, Cancel Culture, and Color Blindness*, 20 Geo. J.L. & Pub. Pol'y 381, 382 (2022).

Agencies exist to implement duly enacted laws, not to impose the morality of

those running the agency at any given time, lest the regulated parties be "tossed to and fro and carried about with every wind of [dogma]," *Ephesians* 4:14 (King James), espoused by any given administration. The court should reject the unauthorized shaming regulations.

## CONCLUSION

In *A Friedman doctrine--The Social Responsibility of Business Is to Increase Its Profits*, Milton Friedman pointed to his book *Capitalism and Freedom*, and concluded by quoting from it, "[T]here is one and only one social responsibility of business—to use its resources and engage in activities designed to increase its profits so long as it stays within the rules of the game, which is to say, engages in open and free competition without deception or fraud." Friedman, *supra*. The SEC and Nasdaq policy cannot be squared with this responsibility. They should be set aside.

For the foregoing reasons, this Court should reverse the panel's decision and enter judgment in favor of the Petitioners.

Respectfully submitted,

 */s/ Jay R. Carson*
Jay R. Carson
   *Counsel of Record*
The Buckeye Institute
88 East Broad Street, Suite 1300
Columbus, Ohio 43215
(614) 224-4422
Email: j.carson@buckeyeinstitute.org
*Counsel continued on next page

David C. Tryon
 Alex M. Certo
The Buckeye Institute
88 East Broad Street
Suite 1300
Columbus, OH 43215
(614) 224-4422
D.Tryon@BuckeyeInstitute.org

John J. Park Jr.
P.O. Box 3073
Gainesville, GA 30503
(678) 608-1920
(m) 703-888-8329
jackparklaw@gmail.com

*Attorneys for Amicus Curiae*

March 28, 2024

## CERTIFICATE OF COMPLIANCE
Federal Rules of Appellate Procedure Appendix 6 1.

1. This document complies with the word limit of Fed. R. App. Rule 29(a)(2) because, excluding the parts of the document exempted by <u>Fed. R. App. P. 32(f)</u>:

   **X**   this document contains 4,281 words, or

   ☐ this brief uses a monospaced typeface and contains [state the number of] lines of text.

2. This document complies with the typeface requirements of Fed. R. App. R. 32(a)(5) and the type-style requirements of Fed. R. App. R. 32(a)(6) because:

   **X**   this document has been prepared in a proportionally spaced typeface using Microsoft Word for the most current version of Office 365 in 14point type, Times New Roman, or

   ☐ this document has been prepared in a monospaced typeface using [state name and version of word-processing program] with [state number of characters per inch and name of type style].

/s/ *Jay R. Carson*
Jay R. Carson
*Attorney of record for*
*The Buckeye Institute*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing amicus brief was

served on all counsel of record via the Court's electronic filing system this 28th day

of March 2024.

Respectfully submitted,

/s/ *Jay R. Carson*

Jay R. Carson
*Attorney of record for*
*The Buckeye Institute*