No. 21-60626

# In the United States Court of Appeals for the Fifth Circuit

ALLIANCE FOR FAIR BOARD RECRUITMENT,
NATIONAL CENTER FOR PUBLIC POLICY RESEARCH,

*Petitioners*,

*v.*

SECURITIES AND EXCHANGE COMMISSION,

*Respondent.*

Petition for Review from an Order
of the Securities and Exchange Commission

## BRIEF OF AMICUS CURIAE PROFESSOR
## SEAN J. GRIFFITH IN SUPPORT OF PETITIONERS

Heather Gebelin Hacker
HACKER STEPHENS LLP
108 Wild Basin Road South
Suite 250
Austin, Texas 78746
(512) 399-3022 (phone)
heather@hackerstephens.com
*Counsel for Amicus Curiae*

# CERTIFICATE OF INTERESTED PERSONS

No. 21-60626

ALLIANCE FOR FAIR BOARD RECRUITMENT,
NATIONAL CENTER FOR PUBLIC POLICY RESEARCH,
*Petitioners*,

*v.*

SECURITIES AND EXCHANGE COMMISSION,
*Respondent.*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| Petitioners | Counsel |
|---|---|
| • Alliance for Fair Board Recruitment | Boyden Gray & Associates<br>• R. Trent Cotter<br>• Jonathan Berry<br>• Michael Buschbacher<br>• Jordan E. Smith |
| • National Center for Public Policy Research | The New Civil Liberties Alliance<br>• Margaret A. Little<br>• Sheng Li |

| Respondent | Counsel |
|---|---|
| • Securities and Exchange Commission | Securities and Exchange Commission<br>• Dan M. Berkowitz<br>• Michael A. Conley<br>• Tracey A. Hardin<br>• Daniel E. Matro<br>• John R. Rady |
| **Intervenor** | **Counsel** |
| • Nasdaq Stock Market, LLC | Gibson, Dunn & Crutcher LLP<br>• Allyson N. Ho<br>• Bradley G. Hubbard<br>• Amir C. Tayrani<br>• Amalia E. Reiss<br>• Paulette Miniter<br><br>Ballard Spahr LLP<br>• Burt M. Rublin<br>• Stephen J. Kastenberg<br>• Paul Lantieri III<br>• Peter F. Andrews<br>• Seth D. Berlin<br><br>Nasdaq Stock Market, LLC<br>• John Zecca<br>• Jeffrey S. Davis<br>• John Yetter<br>• Joanne Pedone |
| *Amicus Curiae* | **Counsel** |
| • Professor Sean J. Griffith | Hacker Stephens LLP<br>• Heather Gebelin Hacker |

/s/ Heather Gebelin Hacker

HEATHER GEBELIN HACKER
*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

Page(s)

Certificate of Interested Persons ....................................................................i

Table of Authorities ........................................................................................iv

Interest of *Amicus Curiae* ..............................................................................1

Summary of the Argument ...............................................................................2

Argument............................................................................................................4

    I.   The First Amendment Applies to the Board Diversity Rules, and Strict Scrutiny is the Default Standard of Review. ...................................4

    II.  Less Exacting Scrutiny Does Not Apply Because the Board Diversity Rules are Not Directed at Misleading Commercial Speech. ...............................................................................................8

    III. Less Exacting Scrutiny Does Not Apply Because the Board Diversity Disclosures Are Controversial. ......................................... 11

    IV. Strict Scrutiny Applies Because the Board Diversity Rules Regulate  Ideological Expression and Engage in Viewpoint Discrimination. ...................................................................... 18

    V.  The Board Diversity Rules Fail Both Strict and Intermediate Scrutiny. ......................................................................................22

Conclusion.......................................................................................................24

Certificate of Service......................................................................................25

Certificate of Compliance ............................................................................25

# Table of Authorities

Page(s)

**Cases**

*Allstate Ins. Co v. Abbott*,
495 F.3d 151 (5th Cir. 2007) ........................................................... 10

*Am. Beverage Ass'n v. City and Cnty. of San Francisco*,
871 F.3d 884 (9th Cir. 2017) ............................................................. 9

*Am. Meat Inst. v. U.S. Dep't of Agric.*,
760 F.3d 18 (D.C. Cir. 2014) ............................................................. 9

*Ark. Writers' Project, Inc. v. Ragland*,
481 U.S. 221 (1987) ........................................................................... 21

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
447 U.S. 557 (1980) ........................................................... 18, 22, 23

*Chamber of Com. v. SEC*,
85 F.4th 760 (5th Cir. 2023) ........................................... 10, 13, 14

*Citizens United v. FEC*,
558 U.S. 310 (2010) ............................................................................. 4

*CTIA - The Wireless Ass'n v. City of Berkeley*,
854 F.3d 1105 (9th Cir. 2017) ........................................................... 9

*Discount Tobacco City & Lottery, Inc. v. U.S.*,
674 F.3d 509 (6th Cir. 2012) ............................................................. 9

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*,
472 U.S. 749 (1985) ............................................................................. 6

*Dwyer v. Cappell*,
762 F.3d 275 (3d Cir. 2014) ............................................................. 8

*Ent. Software Ass'n v. Blagojevich*,
469 F.3d 641 (7th Cir. 2006) ............................................................. 8

*First Nat'l Bank of Boston v. Bellotti*,
435 U.S. 765 (1978) ............................................................................. 4

*Handsome Brook Farm v. Humane Farm Animal Care*,
700 F. App'x 251 (4th Cir. 2017) ..................................................... 8

*In re R.M.J.*,
455 U.S. 191 (1982) ............................................................................. 9

iv

*Lowe v. SEC,*
    472 U.S. 181 (1985) ............................................................ 6
*Milavetz, Gallop & Milavetz, P.A. v. United States,*
    541 F.3d 785 (8th Cir. 2008) ............................................ 8
*Milavetz, Gallop & Milavetz, P.A. v. United States,*
    559 U.S. 229 (2010) ....................................... 5, 8, 9, 11, 18
*Nat'l Ass'n of Mfrs. v. SEC,*
    748 F.3d 359 (D.C. Cir. 2014) .......................................... 6
*Nat'l Ass'n of Mfrs. v. SEC,*
    800 F.3d 518 (D.C. Cir. 2015) .......................................... 6
*Nat'l Ass'n of Mfrs. v. SEC,*
    956 F. Supp. 2d 43 (D.D.C. 2013) .................................... 6
*Nat'l Elec. Mfrs. Ass'n v. Sorrell,*
    272 F.3d 104 (2d Cir. 2001) ............................................. 9
*NetChoice, L.L.C. v. Paxton,*
    49 F.4th 439 (5th Cir. 2022) .............................. 10, 13, 14
*NIFLA v. Becerra,*
    585 U.S. 755 (2018) ...................................................12, 15
*Ohralik v. Ohio State Bar Ass'n,*
    436 U.S. 447 (1978) ........................................................ 6
*Paris Adult Theatre I v. Slaton,*
    413 U.S. 49 (1973) .......................................................... 6
*Pharm. Care Mgmt. Ass'n v. Rowe,*
    429 F.3d 294 (1st Cir. 2005) ............................................. 9
*Pub. Citizen Inc. v. La. Att'y Disciplinary Bd.,*
    632 F.3d 212 (5th Cir. 2011) ............................................ 9
*R.A.V. v. City of St. Paul,*
    505 U.S. 377 (1992) ....................................................... 21
*R.J. Reynolds Tobacco Co. v. Food & Drug Admin.,*
    No. 23-40076, 2024 WL 1208111, at *13 (5th Cir. Mar. 21, 2024) ..............10, 13
*Reed v. Town of Gilbert, Ariz.,*
    576 U.S. 155 (2015) ........................................................ 4
*SEC v. Wall St. Publ'g Inst.,*
    851 F.3d 365 (D.C. Cir. 1988) .......................................... 6

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*,
  502 U.S. 105 (1991) ........................................................ 21
*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011) ........................................................ 22
*Test Masters Educ. Servs., Inc. v. Robin Singh Educ. Servs., Inc.*,
  799 F.3d 437 (5th Cir. 2015) ........................................ 9-10
*Tillman v. Miller*,
  1996 WL 767477 (N.D. Ga. 1996) .................................. 8
*U.S. v. Wegner*,
  427 F.3d 840 (10th Cir. 2005) ........................................ 8
*United States v. Playboy Ent. Grp., Inc.*,
  529 U.S. 803 (2000) ........................................................ 4
*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
  425 U.S. 748 (1976) ........................................................ 8
*W. Va. State Bd. of Educ. v. Barnette*,
  319 U.S. 624 (1943) ................................................... 4, 20
*West Virginia v. EPA*,
  597 U.S. 697 (2022) ........................................................ 7
*Wooley v. Maynard*,
  430 U.S. 705 (1977) ........................................................ 4
*Zauderer v. Off. of Disciplinary Council*,
  471 U.S. 626 (1985) ................................................ 5, 6, 11

## Constitutional Provisions

U.S. Const. am. I ................................................................ 4

## Statutes

15 U.S.C.
  § 77g(a)(1) .................................................................. 7
  § 78l(b) ........................................................................ 7
  § 78m(a) ...................................................................... 7
  § 78n(a)(1) .................................................................. 7
  § 78o(d) ........................................................................ 7
  § 78s(b)(1) .................................................................. 3

§ 78s(g)(1) ................................................................................. 3

§78s(h)(1) ................................................................................. 3

## Other Authorities

Frederick Schauer, *The Boundaries of the First Amendment: A Preliminary Exploration of Constitutional Salience*, 117 Harv. L. Rev. 1765, 1778 (2004) ..................................................................................... 5

Henry Hansmann, *The Ownership of Enterprise* 62 (1996) ...................................... 17

Michael Barzuza, Quinn Curtis, & David Webber, *Shareholder Value(s): Index Fund ESG Activism and the New Millennial Corporate Governance*, 93 S. Cal. L. Rev. 1243, 1294 (2020)................................................ 19

Roberta Romano, *Metapolitics and Corporate Law Reform*, 36 Stan. L. Rev. 923, 961 (1984)......................................................................... 17

Sean J. Griffith, *Shareholder Proposals and the Negative Speech Rights of Corporations*, Fordham Law Legal Studies Research Paper No. 4709312 (Jan. 30, 2024) ................................................................. 4

Sean J. Griffith, *What's "Controversial" About ESG? A Theory of Compelled Commercial Speech Under the First Amendment*, 101 Neb. L. Rev. 876, 916 (2023) ........................................................................ 14

Securities Exchange Act of 1934, Release No. 5627, 40 Fed. Reg. 51656, 51664 (Nov. 6, 1975) ................................................................... 17

Self-Regulatory Organizations; The Nasdaq Stock Market LLC; Order Approving Proposed Rule Changes, as Modified by Amendments No. 1, To Adopt Listing Rules Related to Board Diversity and To Offer Certain Listed Companies Access to a Complimentary Board Recruiting Service, Release No. 34-92590, 86 Fed. Reg. 44424-01 (Aug. 6, 2021) ..................................................................... 3, 15, 16

## Rules

Fed. R. App. P. 29(a) ................................................................... 1

# Interest of Amicus Curiae

*Amicus curiae*[1] Sean J. Griffith is the T.J. Maloney Chair in Business Law at Fordham Law School. Professor Griffith is an expert in corporate and securities law. He has taught at Columbia Law School, the University of Connecticut School of Law, New York University School of Law, and the University of Pennsylvania Law School. Professor Griffith received his law degree *magna cum laude* from the Harvard Law School, where he was a John M. Olin Fellow in Law and Economics. Professor Griffith has published dozens of books, chapters, and journal articles on corporate and securities law. These include a recently published article addressing the First Amendment issues arising from Securities and Exchange Commission (SEC) rules requiring companies to disclose environmental, social, and governance (ESG) matters as well as a draft article examining the First Amendment rights of corporations. Professor Griffith thus has specific expertise in the issues raised by the parties in this case.

---

[1] All parties have consented to the filing of this brief. *See* Fed. R. App. P. 29(a)(2). Pursuant to Rule 29(a)(4)(E), undersigned counsel affirms that no counsel for any party authored this brief in whole or in part and that no person or entity other than *amicus curiae* or his counsel made a monetary contribution intended to fund the preparation and submission of this brief.

## Summary of the Argument

Professor Griffith, as *amicus curiae*, files this brief to respond to arguments made by the Securities and Exchange Commission ("SEC") regarding the application of the First Amendment to the Board Diversity Rules. The SEC claims that the Board Diversity Rules do not violate the First Amendment. SEC Br. at 51.[2] But the SEC's argument mischaracterizes the doctrine and applies the wrong standard of judicial review to the facts of this case.

This brief explains how First Amendment doctrine applies to securities law generally and to the Board Diversity Rules in particular. See Part I *infra*. There is no special standard of deference for securities regulation under the First Amendment. Rather, application of a lesser standard of judicial review depends upon whether the regulation meets the requirements of the commercial speech doctrine. Under that doctrine, less exacting scrutiny is available for mandatory disclosures only if both (1) the disclosure rule is aimed at preventing consumers from being misled and (2) the resulting disclosures are "purely factual and uncontroversial."

The Board Disclosure Rules satisfy neither of these tests. First, the Rules are not aimed at preventing consumers from being misled. See Part II *infra*. Second, the disclosures called forth by the rules are not uncontroversial. See Part III *infra*. Instead, they thrust corporations into contentious debates over questions of race, gender, and sexual orientation. Additionally, the disclosures are controversial by reference to the

---

[2] All references herein to "SEC Br." refer to the Revised Appellee Brief filed by SEC on April 7, 2022.

basic purpose of the commercial speech paradigm, which seeks to protect consumers or, in the context of securities regulation, investors.

Having failed to qualify for less exacting scrutiny under the commercial speech paradigm, the Board Diversity Rules should be judged under the standard of strict scrutiny. See Part IV *infra*. Strict scrutiny is the appropriate standard because the rules target ideological expression, the core interest protected by the First Amendment, and because the rules engage in viewpoint discrimination. But the Board Diversity Rules would fail even under the commercial speech doctrine's standard of intermediate scrutiny. *See* Part V *infra*.

Application of the First Amendment depends upon state action. The presence of state action in this case is apparent from the SEC's Approval Order and from provisions of the Exchange Act compelling Nasdaq to enforce the Board Diversity Rules.[3] Because the state action arguments are thoroughly addressed by petitioners, this amicus brief limits itself to the First Amendment question.

---

[3] Self-Regulatory Organizations; The Nasdaq Stock Market LLC; Order Approving Proposed Rule Changes, as Modified by Amendments No. 1, To Adopt Listing Rules Related to Board Diversity and To Offer Certain Listed Companies Access to a Complimentary Board Recruiting Service, Release No. 34-92590, 86 Fed. Reg. 44424-01 (Aug. 6, 2021) ("SEC Approval Order"). The Exchange Act makes the Board Diversity Rules valid only upon SEC approval. 15 U.S.C. § 78s(b)(1). SEC approval triggers an ongoing duty to enforce the Rules, subject to SEC sanctions including revocation of Nasdaq's registration for failure to do so. *Id*. § 78s(g)(1), (h)(1).

**ARGUMENT**

### I.   The First Amendment Applies to the Board Diversity Rules, and Strict Scrutiny is the Default Standard of Review.

The First Amendment to the U.S. Constitution prohibits the government from "abridging the freedom of speech." Corporations as well as individuals have speech rights protected by the First Amendment.[4] *First Nat'l Bank of Boston v. Bellotti*, <u>435 U.S. 765</u> (1978); *Citizens United v. FEC*, <u>558 U.S. 310</u> (2010). Freedom of speech includes both the affirmative right to speak as well as the negative right to refrain from speaking, and First Amendment doctrine generally protects both rights equally. *W. Va. State Bd. of Educ. v. Barnette*, <u>319 U.S. 624</u> (1943); *Wooley v. Maynard*, <u>430 U.S. 705</u> (1977); *see also United States v. Playboy Ent. Grp., Inc.*, <u>529 U.S. 803, 812</u> (2000) ("[C]ontent-based burdens must satisfy the same rigorous scrutiny as its content-based bans."). Regulations that target speech based on its content are subject to strict scrutiny, which requires that the government prove the restrictions are narrowly tailored to serve a compelling state interest. *Reed v. Town of Gilbert, Ariz.*, <u>576 U.S. 155, 163</u> (2015) ("Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests.") (citations omitted).

---

[4] *See also* Sean J. Griffith, *Shareholder Proposals and the Negative Speech Rights of Corporations*, Fordham Law Legal Studies Research Paper No. 4709312 (Jan. 30, 2024), *available at* https://papers.ssrn.com/sol3/Delivery.cfm/SSRN_ID4709312_code339387.pdf?abstractid=4709312&mirid=1&type=2.

4

Disclosure mandates infringe on negative speech rights. And because disclosures are inevitably about *something*, the infringement is content based. The mandatory disclosures promulgated by the SEC are firmly in this category, leading one prominent commentator to refer to the agency as "the Content Regulation Commission."[5] The Board Diversity Rules are content based on their face because they force companies whose boards fall below a specified standard of "diversity" to explain why they do not have more female or minority directors. Because the Board Diversity Rules constitute content-based infringements on the freedom of speech, the starting point for First Amendment judicial review is strict scrutiny.

The SEC asserts that it is entitled to a lesser standard of review, "akin to that applied to commercial speech." SEC Br. at 51. It is true that compelled *commercial* speech—that is, communications involved in marketing goods or services—may be subject to "less exacting" scrutiny. *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 230 (2010). This standard requires only that "disclosure requirements are reasonably related to the State's interest in preventing deception of consumers." *Zauderer v. Off. of Disciplinary Council*, 471 U.S. 626, 651 (1985). But less exacting scrutiny is available only if two requirements are met. First, the compelled disclosure must be "directed at *misleading* commercial speech." *Milavetz*, 559 U.S. at 230 (emphasis added). Second, the information compelled must be "purely

---

[5] Frederick Schauer, *The Boundaries of the First Amendment: A Preliminary Exploration of Constitutional Salience*, 117 Harv. L. Rev. 1765, 1778 (2004).

factual and uncontroversial." *Zauderer*, <u>471 U.S. at 651</u>. As described below, the Board Diversity Rules fail to meet either requirement. *See* Parts II and III *infra*.

Securities regulation is not otherwise eligible for special treatment under the First Amendment. The SEC hints that it is, citing *Paris Adult Theatre I v. Slaton*, <u>413 U.S. 49, 64</u> (1973), *Ohralik v. Ohio State Bar Association*, <u>436 U.S. 447, 456</u> (1978), and *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, <u>472 U.S. 749, 758</u>, n.5 (1985). SEC Br. 51. But any such suggestion in these cases is cursory dicta, unnecessary to the holding, and offered without any analysis. Indeed, the *Dun & Bradstreet* citation is dicta on dicta, merely citing *Ohralik* as one in a string of cases in which deferential review applied. None of these cases supports privileged status for securities regulation. And the Supreme Court has expressly disclaimed the idea. *Lowe v. SEC*, <u>472 U.S. 181, 210</u>, n.58 (1985) ("[I]t is difficult to see why the expression of an opinion about a marketable security should not… be protected" under the First Amendment). Recent circuit precedent also demonstrates that securities regulation does not have special immunity from First Amendment scrutiny. *See Nat'l Ass'n of Mfrs. v. SEC*, <u>956 F. Supp. 2d 43</u> (D.D.C. 2013); *Nat'l Ass'n of Mfrs. v. SEC*, <u>748 F.3d 359</u> (D.C. Cir. 2014); *Nat'l Ass'n of Mfrs. v. SEC*, <u>800 F.3d 518</u> (D.C. Cir. 2015). Even *SEC v. Wall Street Publishing Institute*, cited by the SEC (at page 51 of the Appellee Brief), clearly states that First Amendment principles apply to securities law. <u>851 F.3d 365, 373</u> (D.C. Cir. 1988) ("[I]t would be an overstatement to assert that the First Amendment does not limit regulation in the securities field.").

The SEC is constrained by both statute and constitution. The Exchange Act confines the SEC to the regulatory purpose of investor protection.[6] Other interests, such as the advancement of women and minorities or the correction of historical injustices, cannot become SEC concerns without "clear congressional authorization." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022). At the same time, the First Amendment limits the SEC's power to compel speech. A lesser standard of constitutional scrutiny may be available under the commercial speech doctrine, which like the Exchange Act, looks to a regulatory purpose rooted in investor protection. *See* Part III *infra*. Although these may seem to be parallel inquiries, the motivating concerns are distinct.

The analysis that follows elaborates the First Amendment inquiry. Whether a lesser standard of review applies to the Board Diversity Rules depends entirely upon application of the commercial speech doctrine. Failure to qualify for a lesser standard of review under this doctrine leaves the Board Diversity Rules subject to the default standard of review—that is, strict scrutiny.

---

[6] *See* 15 U.S.C. § 77g(a)(1) (granting regulatory authority over registration statements); *id.* § 78n(a)(1) (authority to regulate proxies "as necessary or appropriate in the public interest or for the protection of investors"); *id.* § 78m(a) (requiring registered companies to file annual reports "in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate for the proper protection of investors and to insure fair dealing in the security"); *id.* §§ 78l(b), 78o(d).

## II.    Less Exacting Scrutiny Does Not Apply Because the Board Diversity Rules are Not Directed at Misleading Commercial Speech.

There is a tradeoff at the heart of the commercial speech doctrine. On one hand, the doctrine recognizes that First Amendment protections apply to commercial speech. *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.,* 425 U.S. 748, 770 (1976). On the other hand, the doctrine allows commercial speech to be regulated in order to prevent consumers from being misled. *Id.* at 771-72 ("The First Amendment, as we construe it today does not prohibit the State from insuring that the stream of commercial information flow cleanly as well as freely."). Consistent with the logic of this tradeoff, the Supreme Court has stated that less exacting scrutiny is limited to regulations "directed at *misleading* commercial speech. . . ." *Milavetz,* 559 U.S. at 230 (emphasis added). By implication, regulations aimed at accomplishing any objective other than the prevention of consumer deception would not have access to the standard of less exacting scrutiny.

Lower courts have not always followed this implication, and a circuit split has developed on the question whether less exacting scrutiny is limited to regulations aimed at curbing *misleading* speech. Restrictive circuits—those requiring an anti-deception interest—include the Third, Fourth, Seventh, Eighth, and Tenth Circuits.[7] Expansionist circuits—those making less exacting scrutiny available to a broader set

---

[7] *See Dwyer v. Cappell*, 762 F.3d 275, 283 (3d Cir. 2014); *Handsome Brook Farm v. Humane Farm Animal Care*, 700 F. App'x 251, 258 (4th Cir. 2017); *Ent. Software Ass'n v. Blagojevich*, 469 F.3d 641, 652-53 (7th Cir. 2006); *Milavetz, Gallop & Milavetz, P.A. v. United States*, 541 F.3d 785, 795-96 (8th Cir. 2008); *U.S. v. Wegner*, 427 F.3d 840, 850 (10th Cir. 2005); *see also Tillman v. Miller*, 1996 WL 767477, at *2-3 (N.D. Ga. 1996).

of regulatory objectives—include the First, Second, Sixth, Ninth, and D.C. Circuits.[8]

The Fifth Circuit has issued decisions on both sides of this fence. Until very recently, the Fifth Circuit seemed to be in the restrictive camp. Panel precedent treated the question whether a regulation targeted misleading speech as a threshold inquiry:

> To determine whether the rules challenged on appeal are constitutional regulations of commercial speech, the court must first discuss the nature of the speech targeted by each rule: whether it concerns unlawful activity or is inherently misleading, or whether it is only potentially misleading or not misleading.

*Pub. Citizen Inc. v. La. Att'y Disciplinary Bd.*, 632 F.3d 212, 218 (5th Cir. 2011). Speech that is inherently misleading is unprotected and may be prohibited entirely. *Id.* at 218 (citing *In re R.M.J.*, 455 U.S. 191, 202 (1982)). Speech that is "potentially misleading"—that is, speech that "may be presented in a way that is not deceptive"—triggers review under the commercial speech paradigm. *Id.* (citing *In re R.M.J.*, 455 U.S. at 203). The unstated but clear implication, as in *Milavetz*, 559 U.S. 229, was that the regulation of speech that is *not* potentially misleading is ineligible for less exacting scrutiny. *Test Masters Educ. Servs., Inc. v. Robin Singh Educ. Servs.,*

---

[8] *See Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 310 (1st Cir. 2005); *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 115 (2d Cir. 2001); *Discount Tobacco City & Lottery, Inc. v. U.S.*, 674 F.3d 509, 530 (6th Cir. 2012); *CTIA - The Wireless Ass'n v. City of Berkeley*, 854 F.3d 1105, 1117 (9th Cir. 2017); *Am. Beverage Ass'n v. City and Cnty. of San Francisco*, 871 F.3d 884, 892 (9th Cir. 2017); *Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 27 (D.C. Cir. 2014).

*Inc.*, 799 F.3d 437, 453 (5th Cir. 2015), *on reh'g*, No. 13-20250, 2015 WL 13768849 (5th Cir. Oct. 22, 2015) (stating that less exacting scrutiny applies "[w]hen regulations are directed at deceptive or misleading commercial speech" and applying the standard "because Singh's original posting was deceptive"); *Allstate Ins. Co v. Abbott*, 495 F.3d 151, 165 (5th Cir. 2007) (citing the state's anti-deception interest).

A very recent panel decision, however, holds that less exacting scrutiny "does not require the state to assert an anti-deception interest," suggesting that the Fifth Circuit has moved to the expansionist camp. *R.J. Reynolds Tobacco Co. v. Food & Drug Admin.*, No. 23-40076, 2024 WL 1208111, at *13 (5th Cir. Mar. 21, 2024). The *R.J. Reynolds* panel distinguished *Public Citizen*, *Test Masters*, and *Allstate* by arguing that none of these cases expressly held an anti-deception motive was *necessary*, but was merely *sufficient* to access less exacting scrutiny. *Id.* at *14. Furthermore, the court took notice of two decisions that applied less exacting scrutiny without an express finding of an anti-deception motive. *Id.* at *13 (citing *Chamber of Com. v. SEC*, 85 F.4th 760, 771 (5th Cir. 2023) and *NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 485 (5th Cir. 2022) *cert. granted in part*, 144 S. Ct. 477 (2023)). The *R.J. Reynolds* panel noted its agreement with its "sister circuits"—the First, Second, Sixth, and Ninth—without noting that its other sisters—the Third, Fourth, Seventh, Eighth, and Tenth Circuits—disagree. *R.J. Reynolds*, 2024 WL 1208111, at *13; *see also* n.7, 8 *supra*. The *en banc* decision in this case provides an opportunity to clarify this doctrine and any contradiction between the panel decisions.

Requiring an anti-deception rationale reflects the reluctant tradeoff at the heart of the commercial speech doctrine. This tradeoff recognizes substantial value in

commercial speech but permits regulations that protect consumers. Compelled speech is not a mild infringement on the freedom of speech. In the words of Justice Thomas:

> I have never been persuaded that there is any basis in the First Amendment for the relaxed scrutiny this Court applies to laws that suppress nonmisleading commercial speech. . . . I am skeptical of the premise on which *Zauderer* rests—that, in the commercial-speech context, the First Amendment interests implicated by disclosure requirements are substantially weaker than those at stake when speech is actually suppressed. . . . Accordingly, I would be willing to reexamine *Zauderer* and its progeny in an appropriate case to determine whether these precedents provide sufficient First Amendment protection against government-mandated disclosures.

*Milavetz*, 559 U.S. at 255–56 (Thomas, J., concurring) (cleaned up). This Court should hold that commercial speech should not be compelled unless it is aimed at preventing deception.

The SEC does not claim that in the absence of the Board Diversity Rules investors will be deceived about the race, gender, or sexual orientation of board members. Less exacting scrutiny is therefore unavailable for that reason unless the Fifth Circuit fully abandons the threshold requirement of an anti-deception rationale. Even if this Court joins the expansionist side of the Circuit split regarding this requirement, the threshold test of "controversy" remains, as described below.

## III.    Less Exacting Scrutiny Does Not Apply Because the Board Diversity Disclosures Are Controversial.

A second requirement to access less exacting scrutiny is that the regulation in question must compel the production of information that is "purely factual and uncontroversial." *Zauderer*, 471 U.S. at 651. The Supreme Court has emphasized that

the paired elements of this test have independent significance. *NIFLA v. Becerra,* 585 U.S. 755, 768-69 (2018). To be eligible for less exacting scrutiny, mandatory disclosures must be *both* factual *and* uncontroversial.

The SEC claims that the Board Diversity Rules are entitled to less exacting scrutiny under *Zauderer*. SEC Br. at 50-51. But although the disclosures required by the Board Diversity Rule may be factual, they are not uncontroversial. The Supreme Court has not given a definition of "controversy," though it has provided an illustrative example. Abortion, the Court found, is "anything but an 'uncontroversial' topic" *NIFLA*, 585 U.S. at 769.

To operationalize the idea of "controversy," the Court used common sense, treating contested social questions or political issues as "controversial." This understanding of controversy looks outward at whether the required information connects to a contested issue in public discourse. It made no difference in *NIFLA* that the required information—the telephone number of a nearby abortion clinic—was not intrinsically controversial. Indeed, it is hard to imagine how a telephone number, in isolation, could be controversial. Rather, the telephone number was controversial because of the broader public context in which the morality and legality of abortion was contested.

Similar logic applies here. A company's explanation as to why it does not have a female director or a minority director on its board may be narrowly factual, but the broader public context of that explanation is a debate concerning the need for and value of diversity based on race, gender, and sexual orientation. As in *NIFLA*, context demonstrates that this is "anything but an 'uncontroversial' topic." *Id.* at 769.

The SEC attempts to limit *NIFLA* to its facts by focusing on the controversy created by imposing pro-abortion disclosure on an anti-abortion counseling center. SEC Br. 53. But *NIFLA* does not rest on the subjective feelings of the parties but rather on the objective context of public contestation. "If mere dislike sufficed, the government could never compel any disclosure." *R.J. Reynolds*, 2024 WL 1208111, at *12 n.58. Likewise, the SEC's plea that finding a "requirement to report one's gender" to be controversial "strains credulity" (SEC Br. 53) can be answered by analogy to the telephone number in *NIFLA*. Like the forced disclosure of a telephone number, the forced disclosure of one's gender becomes controversial when it is bound together with a contentious public debate.

According to recent Fifth Circuit precedent, factual statements occasion controversy "where the inherent nature of the subject raises a live, contentious political dispute." *R.J. Reynolds*, 2024 WL 1208111, at *12 (citations omitted). A panel of this Court has held that mandatory disclosure of the reasons behind a corporation's share repurchases was not controversial. *Chamber of Com.*, 85 F.4th at 770. Nor did a Fifth Circuit panel find controversy in a law requiring disclosure of the reasons behind a social media platform's content removal decisions. *NetChoice,* 49 F.4th at 485. So what makes the Board Diversity Rules more like *NIFLA* and less like *Chamber of Commerce* and *NetChoice*? This question can be answered not by looking outward at public debate, but by looking inward at regulatory purpose.

"Controversy," under the commercial speech paradigm, has a second dimension measured by reference to purpose.[9] Looking inward, the question of controversy depends upon whether a regulation is plausibly motivated to serve the basic tradeoff underlying the commercial speech regime: Is the disclosure is plausibly motivated to protect consumers? If the state acts for some reason other than consumer protection, it creates controversy by reference to the doctrine's foundational purpose, and less exacting scrutiny is inapplicable for that reason.

*NIFLA*, *Chamber of Commerce*, and *NetChoice* can all be explained according to this logic. Although it invoked social media censorship, a highly controversial topic in public discourse, *NetChoice* presents a straightforward application of consumer protection principles, according to which consumers need to understand a platform's content moderation rules in order to choose whether to participate on the platform, what to post, and how to protect their rights. 49 F.4th at 446 (describing the disclosure requirements of HB 20). The required disclosures are thus entirely uncontroversial by reference to the consumer-protection rationale. Likewise, *Chamber of Commerce* is a straightforward case of investor protection, ensuring the provision of information directly relevant to financial return. 85 F.4th at 766 ("[B]ecause a share repurchase could signal either that the issuer's shares were undervalued (and

---

[9] *See* Sean J. Griffith, *What's "Controversial" About ESG? A Theory of Compelled Commercial Speech Under the First Amendment*, 101 Neb. L. Rev. 876, 916 (2023) ("[A]ctions that plausibly exceed their regulatory purpose imply pretext and therefore imply controversy.")

hence an attractive investment) or that the company was attempting to boost its metrics (and hence a poor investment), shareholders, in order to make fully informed investment decisions, needed to know why a company was repurchasing its shares."). By contrast, *NIFLA* presents a case where the state used the consumer-protection rationale as pretext to impose a pro-abortion viewpoint on anti-abortion counseling centers. 585 U.S. at 763 (stating purpose of the regulation to "ensure that California residents make their personal reproductive health care decisions knowing their rights and the health care services available to them.").

The SEC justifies the Board Diversity Rules by citing the general purpose of capital market efficiency and providing access to "all relevant information." SEC Br. at 55. In the Release approving the Rules, the SEC focused on the demand for diversity disclosures, crediting arguments that "market participants and stakeholders" need diversity information for "investment analysis," "academic study," or "public advocacy."[10] The Release marshalled further support for these arguments by citing the comment letters of asset management firms and special interest groups.[11] On this basis, the SEC found that the Board Diversity Rule "would provide

---

[10] SEC Approval Order, at 44429.

[11] Asset management firms cited in support of the rule included, among others, BlackRock, Vanguard, State Street, Wellington Management, T. Rowe Price, Goldman Sachs, and Trillium Asset Management. Special interest groups included, among others, the Thirty Percent Coalition, the U.S. Impact Investing Alliance, the Latino Corporate Directors Association, and the Hispanic Chamber of Commerce. SEC Approval Order, at 44429-33.

widely available, consistent, and comparable information that would contribute to investors' investment and voting decisions."[12]

Investor demand is not a coherent regulatory principle. Because there is always some person or group that wants more, demand is infinite. Moreover, demand is inherently contradictory. Just as there is always someone who wants more, there is always an investor who opposes disclosure, either for ideological or economic reasons. Disclosures, it must be remembered, impose costs on investors. These include—in addition to the cost of finding and publishing the relevant information—the increase in agency costs inherent in diverting managers from core business concerns, and the potential that disclosures will be used by outside groups to harm the company through consumer boycotts or other political action. The latter is an especially salient concern here. The SEC acknowledges intra-investor conflict over the Board Diversity Rules, noting that "investors may have differing views regarding whether companies should increase board diversity and whether and how board diversity affects company performance and governance."[13] But because the SEC takes investor demand as its animating principle, it has no means of resolving this or any other intra-investor conflict. Some investors want the rule; some do not.

More fundamentally, investor *demand* is not the same as investor *protection*. Protecting investors means considering the interests of investors as a class, not as individuals or interest groups. The interest that unites investors as a class is the concern

---

[12] SEC Approval Order, at 44430.

[13] SEC Approval Order, at 44430-31.

for financial return.[14] It is true, of course, that human beings have a complex set of interests apart from financial return. But, as noted above, these interests conflict. If not outright, as in the case of persons holding opposite preferences, then they will conflict in the ordinal ranking of preferences, which can generate disagreement even among persons who share the same basic perspective. All investors, however, invest with the hope of financial return. It is the one interest all investors share.[15] It is thus the core interest of investors.

Protecting investors means treating those who invest in securities not as concerned citizens, but as *investors* and protecting them *as such*. This means focusing on financial return—nothing more, nothing less. Financial return operates as a form of agenda control, protecting investors *from* concerned citizens—that is, those interested in social or political issues for their own sake and not as they relate to corporate

---

[14] *See generally* Henry Hansmann, *The Ownership of Enterprise* 62 (1996). The SEC has acknowledged the uniform interest in financial return among investors:

> The Commission's experience over the years in proposing and framing disclosure requirements has not led it to question the basic decision of the Congress that, insofar as investing is concerned, the primary interest of investors is economic. After all, the principal, if not the only, reason why people invest their money in securities is to obtain a return.

Securities Exchange Act of 1934, Release No. 5627, 40 Fed. Reg. 51656, 51664 (Nov. 6, 1975).

[15] *See* Roberta Romano, *Metapolitics and Corporate Law Reform*, 36 Stan. L. Rev. 923, 961 (1984) (observing that "profit maximization is the only goal for which we can at least theoretically posit shareholder unanimity" and suggesting that "the presumption of profit maximization could be changed by express shareholder approval").

profitability. When a disclosure item strays from a plausible relationship to financial return, it becomes controversial and therefore subject to heightened scrutiny.

Acknowledging that a connection between the board diversity and investor return cannot be proven, the SEC does not even attempt to justify the Board Diversity Rules by reference to financial return. SEC Br. at 16 (noting its conclusion that "the empirical evidence on that question is 'mixed,' and that the effects of board diversity are 'the subject of reasonable debate'"). This amounts to a concession that the Rules are "controversial" by definition. Because the Rules are controversial, they are ineligible for less exacting scrutiny under *Zauderer*.

## IV.    Strict Scrutiny Applies Because the Board Diversity Rules Regulate Ideological Expression and Engage in Viewpoint Discrimination.

Having failed to qualify for less exacting scrutiny, the question becomes what standard of review applies to the Board Diversity Rules. Regulations of commercial speech that are non-ideological and non-discriminatory may qualify for a form of "intermediate" scrutiny. *See Milavetz*, 559 U.S. at 249 (describing *Central Hudson Gas & Electric Corp. v. Public Service Commission of N.Y.*, 447 U.S. 557 (1980), as holding that "restrictions on nonmisleading commercial speech regarding lawful activity must withstand intermediate scrutiny"). But intermediate scrutiny is not available for regulations of ideological expression or for regulations that engage in viewpoint discrimination. Because the Board Diversity Rules target ideological expression and engage in viewpoint discrimination, intermediate scrutiny does not apply. Rather, strict scrutiny is the standard.

The SEC justifies the Board Diversity Rules as a means of providing investors with "access to all relevant information." SEC Br. at 55 (citation omitted). But this justification is question begging. It leaves us to ask *how* the information is relevant. The answer to this question reveals the ideological character of the Board Diversity Rules. The rules provide information relevant to asset managers seeking to profit from ideological investors and to ideological investors seeking to discriminate on the basis of race, gender, and sexual orientation. The relevance of the information, in other words, depends on ideology.

Some investment managers use diversity information to design and market investment portfolios in which diversity is relevant, not because it signals financial performance, but because it signals ideological alignment. Ideological portfolios, combining a particular viewpoint on diversity with a particular viewpoint on climate change and similar issues, may be of particular interest to younger investors, especially "millennials."[16] Portfolios that appeal to the social and political opinions of a subset of investors are not objectionable *per se*. But they become objectionable when they rely upon the coercive power of the state to compel ideological speech. That, of course, is precisely what the SEC is doing here.

---

[16] *See* Michael Barzuza, Quinn Curtis, & David Webber, *Shareholder Value(s): Index Fund ESG Activism and the New Millennial Corporate Governance*, 93 S. Cal. L. Rev. 1243, 1294 (2020) (arguing that investing on the basis of social values is driven by the demand of subsets of investors, especially "millennials").

Likewise, when a person factors board diversity or other social values into their investment and voting decisions, those decisions become ideological. Individuals remain free to discriminate on the basis of ideology, but like asset managers, they need information to do so. An investor who wants to discriminate based on the race, gender, or sexual orientation of board members cannot do so if that information is undisclosed. It is precisely this ideologically relevant information that the Board Diversity Rules seek to provide. This, then, is the meaning of "relevance" in the SEC's justification. The rules compel the disclosures of *ideologically* relevant information.

Protection of ideological expression is the core interest protected by First Amendment jurisprudence. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *Barnette*, 319 U.S. at 642. Ideological content does not lose its protection if expressed during a commercial transaction. Rather, regulations of ideological expression receive strict scrutiny wherever the expression occurs.

It does no good to claim, as the SEC does, that purely factual disclosures are not ideological because they do not call for statements of opinion. SEC Br. 54. It may be that the disclosure of race or gender is not ideological in a doctor's office where the information is used to determine a patient's genetic predisposition to medical conditions. But that is not the context here. These disclosures are inextricably tied to a larger public debate concerning the composition of social institutions based on race,

gender, and sexual orientation. The Board Diversity Rules compel disclosure precisely because of that debate—so that persons may act upon their viewpoint with respect to the contested issue at its heart.

Furthermore, the Rules adopt a viewpoint on the debate. If minority and female representation on boards is relevant, it is relevant only to the affirmative side of the debate—the side that promotes diversity either to improve institutions or correct injustices. For the negative side of the debate—those who deny that diversity improves institutions or social justice—these numbers are irrelevant. By requiring disclosure of information relevant only to one side of the debate, the Rules implicitly adopt an affirmative viewpoint: "Diversity matters." Moreover, the Rules do not merely require companies to disclose diversity statistics. They also force companies whose boards fall below minimum thresholds for minority and female members to explain themselves. The viewpoint-based discrimination here is clear. According to the SEC, board diversity matters and dissenters must explain themselves.

Even regulations affecting traditionally unprotected speech are impermissible when they discriminate based on viewpoint. For example, in *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992), the Court struck down a hate speech law targeting the use of "fighting words," an otherwise unprotected category of speech, because it applied "special prohibitions on those speakers who express views on disfavored subjects." *Id.* at 391 (citing *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991); *Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 229–230 (1987)). Even less protected forms of speech, a category in which commercial

speech is included, cannot "be made the vehicles for content discrimination unrelated to their distinctively proscribable content." *Id.* at 383-84.

In sum, speech between corporations and their investors transcends the commercial speech paradigm when it does not "result[] from an economic motive." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011). The Board Diversity rules are in this category. They regulate ideological content and compel speech so that it may be put to ideological use. Furthermore, the Rules adopt an implicit viewpoint on the underlying social question, and discriminate on that basis, requiring dissenters to explain themselves. Because the Rules infringe core First Amendment interests, the commercial speech paradigm's lesser standards of scrutiny are inapt. Strict scrutiny applies. Moreover, viewpoint-based discrimination triggers strict scrutiny even for otherwise unprotected speech. Strict scrutiny therefore applies to the Board Diversity Rules.

## V.    The Board Diversity Rules Fail Both Strict and Intermediate Scrutiny.

In ordinary commercial contexts—that is, when regulations are non-ideological and non-discriminatory—disclosure rules that fail to qualify for less exacting scrutiny under *Zauderer* are reviewed according to a form of intermediate scrutiny. Intermediate scrutiny in the context of commercial speech requires, first, that the regulation advance a "substantial" governmental end and, second, that it "directly advance" that end by means that are "no more extensive than necessary." *Cent. Hudson*, 447 U.S. at 569-70. Although, as discussed above, strict scrutiny is the appropriate standard of review, the Board Diversity Rules fail under either standard.

Regarding urgency of ends, mandatory disclosure of board composition based on race, gender, and sexual orientation is neither a substantial nor a compelling interest. The SEC claims a substantial interest in ensuring the disclosure of all relevant information on securities markets. SEC Br. at 54-55. But this claim is overbroad, suggesting that the SEC has limitless authority to compel securities disclosures on any subject. The government does not have a substantial interest in all subjects. Rather, the government's interest in securities disclosures is limited by the fundamental purpose of the securities laws—that is, in investor protection. Investor protection is founded upon the production of financially relevant information. *See* Part III *supra*. Because they are not financially relevant, the ideological disclosures provoked by the Board Diversity Rules advance no cognizable goal of securities regulation.

Even if the hollow recitation of investor protection is held to satisfy the requirement of a substantial governmental interest, the disclosures compelled by the Board Diversity Rules cannot be said to advance it and must therefore fail the under the means prong of the test. Compulsory disclosure of information that is irrelevant to financial return does not provide even "ineffective or remote" support for investor protection. *Cent. Hudson*, 447 U.S. at 564. It provides no support at all. Moreover, insofar as these disclosures may be weaponized against non-conforming companies through boycotts and other political action, they allow ideologically motivated investors to impose harm on financially motivated investors. In this way, the Board Diversity Rules not only fail to *advance* the government's interest in protecting investors, but they also *subvert* it by allowing one group of investors to impose harm upon an-

other. Because harming investors is the opposite of protecting them, the Board Diversity Rules cannot be said to be no more restrictive than necessary in advancing this goal.

As a result, the Board Diversity Rules cannot survive First Amendment scrutiny under either an intermediate or strict standard of review.

## Conclusion

The Court should grant the Petition and vacate the Order and the Rule because they violate the First Amendment.

Respectfully submitted.

/s/Heather Gebelin Hacker
Heather Gebelin Hacker
Andrew B. Stephens
Hacker Stephens LLP
108 Wild Basin Road South
Suite 250
Austin, Texas 78746
(512) 399-3022 (phone)
heather@hackerstephens.com

*Counsel for Amicus Curiae*

## Certificate of Service

On March 28, 2024, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; and (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1.

/s/ Heather Gebelin Hacker
HEATHER GEBELIN HACKER

## Certificate of Compliance

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains 6123 words, excluding the parts exempted by Rule 32(f); and (2) the typeface and type style requirements of Rule 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the program used for the word count).

/s/ Heather Gebelin Hacker
HEATHER GEBELIN HACKER