No. 21-60626

UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

ALLIANCE FOR FAIR BOARD RECRUITMENT;
NATIONAL CENTER FOR PUBLIC POLICY RESEARCH,
*Petitioners*,

v.

SECURITIES AND EXCHANGE COMMISSION,
*Respondent.*

On Petition for Review of an Order of the Securities and Exchange Commission

**EN BANC BRIEF FOR RESPONDENT
SECURITIES AND EXCHANGE COMMISSION**

MEGAN BARBERO
General Counsel

MICHAEL A. CONLEY
Solicitor

TRACEY A. HARDIN
Assistant General Counsel

DANIEL E. MATRO
Senior Appellate Counsel

JOHN R. RADY
Appellate Counsel

Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-8248 (Matro)

## CERTIFICATE OF INTERESTED PERSONS

Alliance for Fair Board Recruitment et al. v. SEC, No. 21-60626

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1. The Securities and Exchange Commission is a federal agency.

2. Megan Barbero, Michael A. Conley, Tracey A. Hardin, Daniel E. Matro, and John R. Rady of the Securities and Exchange Commission—*Counsel for Respondent Securities and Exchange Commission.*

3. Vanessa Ann Countryman of the Securities and Exchange Commission—*Secretary of the Securities and Exchange Commission.*

4. Petitioner Alliance for Fair Board Recruitment is a non-profit membership corporation and has no parent corporations or subsidiaries.

5. Jonathan Berry, R. Trent McCotter, Michael Buschbacher, Jared M. Kelson, and James R. Conde of Boyden Gray & Associates—*Counsel for Petitioner Alliance for Fair Board Recruitment.*

6. Petitioner National Center for Public Policy Research is a non-profit corporation and has no parent corporations or subsidiaries.

7. Margaret A. Little, Sheng Li, and Mark Chenoweth of The New Civil Liberties Alliance—*Counsel for Petitioner National Center for Public Policy Research.*

8. Allyson N. Ho, Bradley G. Hubbard, Amir C. Tayrani, Amalia E. Reiss, and Paulette Miniter of Gibson, Dunn & Crutcher LLP; John Zecca, Jeffrey S. Davis, John Yetter, and Joanne Pedone of The Nasdaq Stock Market, L.L.C.; and Burt M. Rublin, Stephen J. Kastenberg, Paul Lantieri III, Peter

i

F. Andrews, and Seth D. Berlin of Ballard Spahr LLP—*Counsel for Intervenor Nasdaq Stock Market, L.L.C.*

9. The States of Arizona, Alabama, Alaska, Arkansas, Florida, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Ohio, Oklahoma, South Carolina, Tennessee, Texas, Utah, Virginia, and West Virginia—*Amici.*

10. Drew C. Ensign, Joseph A. Kanefield, Brunn ("Beau") W. Roysden III, Wilson C. Freeman, James Rogers, Sean D. Reyes, Stanford E. Purser, and Christopher A. Bates—*Counsel for Amici States.*

11. Financial Industry Regulatory Authority, Inc.—*Amicus.*

12. Aaron Michael Streett and Elisabeth C. Butler of Baker Botts L.L.P.—*Counsel for Amicus Financial Industry Regulatory Authority, Inc.*

13. Nonpartisan Group of Academics and Practitioners in the Field of Corporate Governance—*Amici.*

14. Mark Wolinsky, Elaine P. Golin, Carrie M. Reilly, Kevin S. Schwartz, Jeohn Salone Favors, Getzel Berger of Wachtell, Lipton, Rosen & Katz—*Counsel for Amici Nonpartisan Group of Academics and Practitioners in the Field of Corporate Governance.*

15. Ad Hoc Coalition of Nasdaq-Listed Companies—*Amici.*

16. Pratik A. Shah and Juliana C. DeVries of Akin Gump Strauss Hauer & Feld LLP—*Counsel for Amici Ad Hoc Coalition of Nasdaq-Listed Companies.*

17. Investors and Investment Advisers—*Amici.*

18. Steven M. Shepard, Arun Subramanian, and Neal S. Manne of Susman Godfrey L.L.P.—*Counsel for Amici Investors and Investment Advisers.*

19. American Civil Liberties Union—*Amicus.*

20. Brian Hauss and Sandra S. Park—*Counsel for Amicus American Civil Liberties Union.*

21. Academic Experts in the Fields of Business, Management, and

Economics—*Amici.*

22. Jeffrey Dubner and Aman T. George of Democracy Forward Foundation; Peter C. Renn and Karen L. Loewy of Lambda Legal Defense and Education Fund, Inc.—*Counsel for Academic Experts in the Fields of Business, Management, and Economics.*

23. Professor Sean J. Griffith—*Amicus.*

24. Heather Gebelin Hacker of Hacker Stephens LLP—*Counsel for Amicus Professor Sean J. Griffith.*

25. The Buckeye Institute—*Amicus.*

26. Jay R. Carson, David C. Tryon, and Alex M. Certo of the Buckeye Institute; John J. Park Jr.—*Counsel for Amicus The Buckeye Institute.*

27. Advancing American Freedom et al.—*Amici.*

28. J. Marc Wheat and Timothy Harper of Advancing American Freedom, Inc.; Ilya Shapiro and Tim Rosenberger of Manhattan Institute—*Counsel for Amici Advancing American Freedom et al.*

29. Cory R. Liu—*Amicus.*

30. Daniel I. Morenoff and Joseph A. Bingham of American Civil Rights Project; Devon Westhill of Center for Equal Opportunity—*Counsel for Amicus Cory R. Liu.*

/s/ Daniel E. Matro

*Attorney of Record for Respondent*
*Securities and Exchange Commission*

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS ..................................................... i

TABLE OF AUTHORITIES ................................................................................. vii

INTRODUCTION .................................................................................................. 1

COUNTERSTATEMENT OF THE ISSUES ....................................................... 4

COUNTERSTATEMENT OF THE CASE ........................................................... 4

A.    Statutory and Regulatory Background ........................................................ 4

    1.    Exchanges are private entities that register with the Commission as self-regulatory organizations ................................................. 4

    2.    Exchanges also enter contractual arrangements to provide a market for the securities of companies that abide by their listing standards ........ 7

B.    Prior Proceedings ..................................................................................... 10

    1.    Nasdaq's Proposed Rule Changes ................................................ 10

        a.    Board Disclosure Rules ...................................................... 10

        b.    Board Recruiting Service Rule ........................................... 11

    2.    The Commission's Order ................................................................ 11

    3.    The Panel Decision ........................................................................ 13

STANDARD OF REVIEW ................................................................................. 14

SUMMARY OF ARGUMENT ........................................................................... 14

ARGUMENT ...................................................................................................... 16

I.    The Commission reasonably concluded that Nasdaq's rules are consistent with the requirements of the Exchange Act ................................................. 16

A. The Commission reasonably concluded that Nasdaq's rules are designed to promote Section 6(b)(5)'s objectives and do not regulate matters unrelated to the Act's purposes ........................................17

 1. Substantial evidence shows that the Board Disclosure Rules promote Section 6(b)(5)'s objectives....................................17

 2. The Commission reasonably found Nasdaq's rules to be "related to" the purposes of the Act....................................25

 3. Petitioners misstate the Exchange Act's limitations on the scope of exchange disclosure rules, which Nasdaq's rules meet ........................................................................................27

 4. Petitioners' other arguments fail ..........................................30

B. The Commission reasonably concluded that Nasdaq's rules do not unfairly discriminate among issuers or impose inappropriate burdens on competition ...................................................................33

C. NCPPR's challenge to the Board Recruiting Service Rule is meritless ..............................................................................36

II. Nasdaq's rules do not constitute state action subject to constitutional scrutiny ....................................................................................36

 A. Nasdaq is a private entity, not a part of the government ..........................37

 B. Nasdaq's rules are not fairly attributable to the Commission...................38

  1. The traditional, exclusive public function test is not met.............39

  2. The joint action test is not met ..........................................39

  3. The close nexus test is not met..........................................41

 C. Petitioners' alternative theories of state action are meritless ...................43

1.   The Commission's approval of Nasdaq's rules does not
     convert them into state action.............................................43

2.   *Moose Lodge* does not support constitutional review of
     Nasdaq's rules ............................................................45

3.   The private nondelegation doctrine has no bearing on the
     state-action question in this case........................................47

III.  In any event, Nasdaq's Board Disclosure Rules withstand constitutional
      scrutiny ...............................................................................50

A.   The Board Disclosure Rules do not violate the First Amendment .........50

B.   The Board Disclosure Rules do not violate the Fifth Amendment.........54

CONCLUSION ...............................................................................57

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Adarand Constructors v. Pena*, 515 U.S. 200 (1995) ................................. 55

*Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758 (2021) ........................... 32

*All. for Fair Bd. Recruitment v. SEC*,
    85 F.4th 226 (5th Cir. 2023) ........................................ 2, 3, 13, 14, 17, 31, 32, 38, 40

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40 (1999) ................ 38, 40, 41, 42, 43, 44-45

*Austin Mun. Secs., Inc. v. NASD*, 757 F.2d 676 (5th Cir. 1985) ...................... 50

*Barbara v. N.Y. Stock Exch.*, 99 F.3d 49 (2d Cir. 1996) .............................. 49

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ............................... 21, 23, 29

*Belenke v. SEC*, 606 F.2d 193 (7th Cir. 1979) .............................. 34, 35

*Belton v. Hatch*, 17 N.E. 225 (N.Y. 1888) ................................. 4

*Blount v. SEC*, 61 F.3d 938 (D.C. Cir. 1995) ......................... 50

*Blum v. Yaretsky*, 457 U.S. 991 (1982) ............................ 41, 42, 43

*Boeta v. FAA*, 831 F.3d 636 (5th Cir. 2016) ....................... 14

*Bradford Nat'l Clearing Corp. v. SEC*, 590 F.2d 1085 (D.C. Cir. 1978) .......... 34, 35

*Brentwood Academy v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288 (2001),
    531 U.S. 288 (2001) ............................... 39, 40, 48

*Burton v. Wilmington Parking Auth.*, 365 U.S. 715 (1961) .................... 40

*Bus. Roundtable v. SEC*, 905 F.2d 406 (D.C. Cir. 1990) ............... 6, 8, 20, 24, 30, 31, 32

*Bus. Roundtable v. SEC*, 647 F.3d 1144 (D.C. Cir. 2011) ............... 20

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n* ,
    447 U.S. 557 (1980) ........................... 54

*Chamber of Comm. v. United States*, 85 F.4th 760 (5th Cir. 2023) ............ 51, 52, 53

*Cremin v. Merrill Lynch Pierce Fenner & Smith*,
    957 F. Supp. 1460 (N.D. Ill. 1997) ........................ 43

*D.L. Cromwell Invs., Inc. v. NASD Regulation, Inc.*,
  279 F.3d 155 (2d Cir. 2002) ............................................................ 42

*Desiderio v. NASD*, 191 F.3d 198 (2d Cir. 1999) ................................... 42

*Duffield v. Robertson Stephens & Co.*, 144 F.3d 1182 (9th Cir. 1998) ........................ 42-43

*Flagg Bros., Inc. v. Brooks*, 436 U.S. 149 (1978) ................................ 43-44

*Frazier v. Bd. of Trs.*, 765 F.2d 1278 (5th Cir. 1985) ................... 40, 49

*Free Enter. Fund v. PCAOB*, 561 U.S. 477 (2010) ................................. 38

*Graman v. NASD*,
  1998 WL 294022 (D.D.C. Apr. 24, 1998) ....................................... 43

*Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421 (5th Cir. 2021) ......................... 16

*Intercontinental Indus., Inc. v. Am. Stock Exch.*,
  452 F.2d 935 (5th Cir. 1971) ......................................... 17-18, 40

*J.I. Case Co. v. Borak*, 377 U.S. 426 (1964) ....................................... 21

*Jackson v. Metro. Edison Co.*, 419 U.S. 345 (1974) ................... 41, 43, 44, 48

*Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374 (1995) ................... 37, 38

*Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802 (2019) ............ 38, 39, 42, 48

*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011) ................... 22, 28

*MD/DC/DE Broadcasters Ass'n v. FCC*, 236 F.3d 13 (D.C. Cir. 2001) ............... 26, 27

*Meadows v. SEC*, 119 F.3d 1219 (5th Cir. 1997) ................................. 14

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware*, 414 U.S. 117 (1973) ................... 5

*Missouri v. Biden*, 83 F.4th 350 (5th Cir. 2023) ................... 39-40, 42, 44, 49

*Monterey Mech. Co. v. Wilson*, 125 F.3d 702 (9th Cir. 1997) ....................... 55

*Moose Lodge No. 107 v. Irvis*, 407 U.S. 163 (1972) ................... 24, 45, 46

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992) ....................... 25

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ............................................................ 35-36

*NASDAQ OMX Grp., Inc. v. UBS, Secs., LLC,*
   770 F.3d 1010 (2d Cir. 2014) ................................................................ 17, 18

*Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518 (D.C. Cir. 2015) ............................ 53

*Nat'l Horsemen's Benevolent & Protective Ass'n v. Black,*
   53 F.4th 869 (5th Cir. 2022) ................................................................ 48, 49

*Nat'l Inst. of Family & Life Advocates v. Becerra*, 585 U.S. 755 (2018) ............... 52

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville,*
   508 U.S. 656 (1993) ............................................................................. 55

*Oklahoma v. United States*, 62 F.4th 221 (6th Cir. 2023) .................................. 47

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701 (2007) ........ 56

*Perpetual Secs., Inc. v. Tang*, 290 F.3d 132 (2d Cir. 2002) ............................... 42

*R.J. Reynolds Tobacco Co. v. FDA*, 96 F.4th 863 (5th Cir. 2024) ..................... 51, 52

*Rendell-Baker v. Kohn*, 457 U.S. 830 (1982) ............................................... 49

*Roberts v. La. Downs, Inc.*, 742 F.2d 221 (5th Cir. 1984) .................................. 41

*Roosevelt v. E.I. Du Pont de Nemours & Co.*, 958 F.2d 416 (D.C. Cir. 1992) ........... 20

*Santa Fe Indus. v. Green*, 430 U.S. 462 (1977) ............................................ 17

*SEC v. Blackburn*, 15 F.4th 676 (5th Cir. 2021) ........................................ 21, 29

*SEC v. World Tree Fin., L.L.C.*, 43 F.4th 448 (5th Cir. 2022) ......................... 21, 29

*Silver v. N.Y. Stock Exch.*, 373 U.S. 341 (1963) ........................................... 5

*Skinner v. Ry. Labor Executives Ass'n*, 489 U.S. 602 (1989) .............................. 41

*Sparta Surgical Corp. v. NASD*, 159 F.3d 1209 (9th Cir. 1998) ........................ 50

*Stilwell v. Office of Thrift Supervision*, 569 F.3d 514 (D.C. Cir. 2009) ............... 22-23

*Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381 (1940) ...................... 47, 48

*Susquehanna Int'l Grp., LLP v. SEC*, 866 F.3d 442 (D.C. Cir. 2017) .................. 31

*Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.,*
   576 U.S. 519 (2015) ............................................................................. 56

*Timpinaro v. SEC*, 2 F.3d 453 (D.C. Cir. 1993) ................................................. 33

*TSC Indus., Inc. v. Northway,*
    426 U.S. 438 (1976) ........................................................................... 28, 29

*United States v. Philip Morris USA, Inc.*, 566 F.3d 1095 (D.C. Cir. 2009) ........................ 54

*United States v. Wenger*, 427 F.3d 840 (10th Cir. 2005) ................................................. 54

*Vill. of Bensenville v. FAA*, 457 F.3d 52 (D.C. Cir. 2006) ............................................. 44

*W.H. Scott Constr. Co. v. City of Jackson*, 199 F.3d 206 (5th Cir. 1999) .................... 45, 55

*Yeager v. City of McGregor*, 980 F.2d 337 (5th Cir. 1993) .......................................... 39

*Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985) ................................ 50, 51, 52

**Statutes**

5 U.S.C. 706(2)(A) .......................................................................................... 14

Securities Exchange Act of 1934,
    Pub. L. No. 73-291, 48 Stat. 881 (1934) ...................................................... 8

Securities Exchange Act of 1934, 15 U.S.C. 78a, et seq.

    Section 3(a), 15 U.S.C. 78c(a) ...................................................... 5, 6, 46

    Section 5, 15 U.S.C. 78e ............................................................................ 5

    Section 6, 15 U.S.C. 78f ...........................................................................28

    Section 6(b), 15 U.S.C. 78f(b) ..................................... 6, 8, 17, 24, 25, 29, 34

    Section 11A, 15 U.S.C. 78k-1 ................................................................. 24

    Section 12, 15 U.S.C. 78*l* ................................................................... 7, 29

    Section 12(b)(1)(A), 15 U.S.C. 78*l*(b)(1)(A) .......................................... 27

    Section 19(b), 15 U.S.C. 78s(b) .............................................. 6-7, 8, 28

    Section 19(b)(2)(C)(i), 15 U.S.C. 78s(b)(2)(C)(i) ....................... 7, 32-33, 46

    Section 19(c), 15 U.S.C. 78s(c) ...................................... 7, 27-28, 29

    Section 19(g)(1), 15 U.S.C. 78s(g)(1) .......................................... 5-6, 46

    Section 19(h)(1), 15 U.S.C. 78s(h)(1) ...................................................... 6

    Section 25(a)(4), 15 U.S.C. 78y(a)(4) ..................................................... 14

## Rules and Regulations

17 C.F.R. 240.14a-9 ................................................................ 27

17 C.F.R. 240.14a-101 ............................................................ 27

17 C.F.R. 240.10b-5 ............................................................... 28

17 C.F.R. 229.407 .................................................................. 32

## Commission Releases

53 Fed. Reg. 39,565 (Oct. 7, 1988) ....................................... 9

68 Fed. Reg. 64,154 (Nov. 12, 2003) ................................. 9, 32

69 Fed. Reg. 71,256 (Dec. 8, 2004) .......................... 4-5, 7, 9

71 Fed. Reg. 3550 (Jan. 23, 2006) ......................................... 38

81 Fed. Reg. 44,400 (July 7, 2016) ............................. 9, 30, 32

81 Fed. Reg. 81,189 (Nov. 17, 2016) ..................................... 23

82 Fed. Reg. 48,296 (Oct. 17, 2017) ....................................... 9

82 Fed. Reg. 50,059 (Oct. 30, 2017) ....................................... 9

84 Fed. Reg. 31,961 (July 3, 2019) ................................... 23-24

84 Fed. Reg. 33,669 (July 12, 2019) ...................................... 20

86 Fed. Reg. 14,484 (Mar. 16, 2021) ..................................... 23

## Other Authorities

Am. Bar Ass'n, *Special Study on Market Structure, Listing Standards and Corporate Governance*, 57 Bus. Law. 1487 (2002) ................ 7-8, 9, 33

Louis Loss et al., FUNDAMENTALS OF SECURITIES REGULATION 6.A.5 (7th ed. 2018) ...................................................................... 8

S. Rep. No. 73-792 (1934) ...................................................... 8

S. Rep. No. 73-1455 (1934) ............................................... 8, 18

S. Rep. No. 94-75 (1975) ................................................. 7, 8, 35

No. 21-60626

UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

ALLIANCE FOR FAIR BOARD RECRUITMENT;
NATIONAL CENTER FOR PUBLIC POLICY RESEARCH,
*Petitioners*,

v.

SECURITIES AND EXCHANGE COMMISSION,
*Respondent.*

On Petition for Review of an Order of the Securities and Exchange Commission

## EN BANC BRIEF FOR RESPONDENT
## SECURITIES AND EXCHANGE COMMISSION

## INTRODUCTION

Nasdaq Stock Market, L.L.C. ("Nasdaq"), a private company registered with the Securities and Exchange Commission as a national securities exchange, proposed to require that companies choosing to list on its exchange disclose aggregated board-level diversity data and provide an explanation if they do not have at least two diverse board members. Listing agreements such as these are a matter of private contract between exchanges and listed companies. But the Securities Exchange Act of 1934 requires the Commission to ensure that an exchange's listing standards are "consistent with" certain statutory criteria, including that they be "designed" to promote at least one of several objectives and be "related to" the purposes of the Act. If the listing

standards meet these basic requirements, the Act provides that the Commission "shall approve" them. The Commission reasonably concluded that Nasdaq's proposed rules met the standard requiring approval because they will facilitate more consistent and comparable disclosure of information important to investors' investment and proxy voting decisions.

Providing investors with access to information important to their investment and proxy voting decisions is a central objective of the Exchange Act, and—as the panel explained—the Commission "conclusively determined, based on substantial evidence, that Nasdaq's proposal is a disclosure rule, not a mandatory quota." *All. for Fair Bd. Recruitment v. SEC*, 85 F.4th 226, 254 (5th Cir. 2023), *vacated*, 2024 WL 670403 (5th Cir. Feb. 19, 2024). Disregarding the record, petitioners contend instead that the rules impose a diversity quota. But that contention cannot be squared with the rules' actual requirements, which provide that companies choosing to list on Nasdaq that do not have a specified number of diverse directors simply provide an explanation—in their own words, in as much or as little detail as they choose—and any company that would prefer not may list on another exchange or trade off-exchange.

The Commission's conclusion that Nasdaq's rules are related to, and designed to promote, the Exchange Act's core disclosure purpose is well grounded in the record. Indeed, the record demonstrates that the rules would provide more widely available, consistent, and comparable board diversity information that a broad swath

2

of market participants—including sophisticated investors with a fiduciary duty to act in their clients' best interest—consider useful in investment and proxy voting decisions. The record further demonstrates that while the empirical evidence is mixed, a number of studies support the conclusion of many investors that board diversity benefits company performance.

Petitioners devote much of their briefs to arguing that the rules violate the First and Fifth Amendments. But, as the panel unanimously held, the rules are not subject to constitutional scrutiny. Nasdaq—a subsidiary of a publicly traded company—is not a state actor and the rules are not state action. Petitioners do not—and cannot—dispute the panel's conclusion that Nasdaq is a private entity, not part of the government. *Id.* at 239-45. The panel's holdings that exchange listing standards are not a traditional, exclusive public function and that the Commission did not compel or significantly encourage the rules are also undisputed. *Id.* at 245-46. And the "yes-or-no approval process" for Nasdaq's rules (*id.* at 246) falls far short of the kind of pervasive entwinement between government and a private entity that leads to state action.

These holdings accord with every court that has applied the Supreme Court's modern state-action jurisprudence to self-regulatory organizations such as Nasdaq. Petitioners' scattershot arguments for breaking with that uniform consensus—and

3

upending the self-regulatory system that has prevailed in the securities industry for over two centuries—are meritless.

## COUNTERSTATEMENT OF THE ISSUES

1.    Whether the Commission reasonably concluded that Nasdaq's Board Disclosure Rules are consistent with the requirements of the Exchange Act because they facilitate more consistent and comparable disclosure of information important to investors' investment and voting decisions.

2.    Whether petitioners' constitutional challenges fail because Nasdaq is a private entity and its Board Disclosure Rules are not fairly attributable to the Commission.

3.    Whether, in any event, the Board Disclosure Rules more than satisfy the applicable level of constitutional scrutiny because they advance the substantial interest in facilitating disclosure of decision-useful information to investors while providing companies with substantial compliance flexibility.

## COUNTERSTATEMENT OF THE CASE

### A.    Statutory and Regulatory Background

### 1.    Exchanges are private entities that register with the Commission as self-regulatory organizations.

**a.**  For well over a century after the Founding, securities exchanges operated as private "business club[s]" supervising the conduct of their own members.  *Belton v. Hatch*, 17 N.E. 225, 226 (N.Y. 1888); *see also Concept Release Concerning Self-Regulation,* 69

4

Fed. Reg. 71,256, 71,257 (Dec. 8, 2004).  The stock market crash of 1929 and Great Depression convinced Congress of the "need for statutory regulation of securities exchanges." *Silver v. N.Y. Stock Exch.*, 373 U.S. 341, 349-51 (1963).  But "the task was deemed to be of such magnitude that Government simply could not regulate effectively every aspect of the industry" directly. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware*, 414 U.S. 117, 129 n.9 (1973).

Thus, in the Exchange Act, Congress preserved "the traditional private governance of exchanges"—under which exchanges retain the "initiative and responsibility for" establishing their own rules—but subjected them to "appropriate federal regulatory supervision." *Id.* at 127-30 (quotation omitted).  In subsequent amendments, Congress has chosen to "preserve[] and strengthen[]" the Act's basic self-regulatory framework to harness the benefits of that scheme, which it has determined to be "distinctly preferable" to a "purely governmental approach."  69 Fed. Reg. at 71,257-58 (quotation omitted).

**b.**  The Exchange Act requires every exchange to register with the Commission as a "national securities exchange" or seek an exemption from registration.  15 U.S.C. 78c(a)(1), 78e.  Once registered, a national securities exchange becomes a self-regulatory organization ("SRO").  *Id.* 78c(a)(26).  Exchanges that are SROs are required to comply with, and enforce compliance by their broker-dealer "members" with, the federal securities laws, rules, and regulations, as well as the exchange's own

rules. *Id.* 78s(g)(1); *see also id.* 78c(a)(3) (defining "member"). The Commission may limit an exchange's activities or suspend its registration if it violates, is unable to comply with, or fails to enforce its broker-dealer members' compliance with those laws and rules. *Id.* 78s(h)(1).

Section 6(b) of the Act requires that an exchange's rules—including both the rules that apply to its broker-dealer members and the requirements imposed on the companies that list on the exchange—be "designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, . . . to remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect investors and the public interest." *Id.* 78f(b)(5); *Bus. Roundtable v. SEC*, 905 F.2d 406, 409 (D.C. Cir. 1990). An exchange's rules must not be "designed to permit unfair discrimination between customers, issuers, brokers, or dealers, or to regulate by virtue of any authority conferred by [the Exchange Act] matters not related to the purposes of [the Act] or the administration of the exchange." 15 U.S.C. 78f(b)(5). And they also must "not impose any burden on competition not necessary or appropriate in furtherance of the purposes of" the Act. *Id.* 78f(b)(8).

Under Section 19(b) of the Act, a national securities exchange must file with the Commission any proposal to change its rules. With exceptions not relevant here, the Commission must, after notice and comment, approve or disapprove the

proposal. *Id.* 78s(b). The Commission "shall approve a proposed rule change" if it finds that the proposal "is consistent with the requirements of" the Act and the rules and regulations thereunder, which include the requirements of Section 6(b). *Id.* 78s(b)(2)(C)(i). Separately, under Section 19(c), the Commission may initiate its own rulemaking proceeding to "abrogate, add to, and delete from" existing exchange rules, but this case does not involve such a rulemaking. *Id.* 78s(c).

> **2.      Exchanges also enter contractual arrangements to provide a market for the securities of companies that abide by their listing standards.**

Generally, under the Exchange Act, a stock cannot be traded on any exchange unless it is "listed" on at least one exchange. *Id.* 78*l*. Listing on an exchange is voluntary—securities also trade off-exchange—and multiple exchanges compete vigorously to attract and retain listings, including through their choice of listing standards. 69 Fed. Reg. at 71,263.

Listing is a private, contractual agreement between an issuer and an exchange "in accordance with which the issuer assumes certain duties, and the exchange undertakes to provide a fair and orderly market for the securities." S. Rep. No. 94-75 at 18 (1975). Exchanges began to include standards in their listing agreements with issuers in the late 1800s to promote market stability and investor confidence and to differentiate themselves from competing exchanges. *See* Am. Bar Ass'n, *Special Study*

*on Market Structure, Listing Standards and Corporate Governance*, 57 Bus. Law. 1487, 1496-1503 (2002).

Congress subjected these private agreements to federal regulatory oversight when it enacted the Exchange Act in 1934. *See* S. Rep. No. 73-1455 at 68-69 (1934), S. Rep. No. 73-792 at 4-5 (1934). While Congress granted the Commission authority to "alter or supplement" an exchange's listing standards in certain circumstances, it preserved exchanges' ability to "adopt[] and enforc[e]" listing standards "not inconsistent with [the Act]." §§ 6(c), 19(b), 48 Stat. 881, 886, 898-99 (1934).

In 1975, Congress expanded the Commission's authority, requiring it to determine (through the rule-approval process described above) that an exchange's rules, including its listing standards, are consistent with certain statutory criteria. 15 U.S.C. 78f(b), 78s(b). But this did not alter the private, "contractual" character of listing rules. S. Rep. No. 94-75 at 18; *see also* Louis Loss et al., FUNDAMENTALS OF SECURITIES REGULATION 6.A.5 (7th ed. 2018) (listing rules are "unaffected by the Exchange Act, except for a residual power in the Commission . . . to disapprove new rules or rules changes generally before they become effective and to make changes in exchange rules"). As Congress explained, exchanges exercise "self-regulatory authority" over their broker-dealer members, not listed companies. S. Rep. 94-75 at 22-24, 32; *see also Bus. Roundtable*, 905 F.2d at 414.

8

Exchanges thus retain the freedom to impose listing standards reflecting their own policy views and competitive positioning, provided they are consistent with the Act's requirements. *See* 53 Fed. Reg. 39,565, 39,566 (Oct. 7, 1988). Listing standards differ among exchanges, and it is not uncommon for one exchange to adopt a rule that others may not. *See, e.g.*, NYSE Listed Company Manual 303A.09 (requiring issuers adopt and disclose corporate governance guidelines); LTSE Rule 14.425 (requiring issuers adopt and publish policies concerning their long-term strategies).

Listing standards also can, and often do, go beyond what is required by federal securities law and regulation. *See, e.g.*, 81 Fed. Reg. 44,400, 44,403 (July 7, 2016). Some impose minimum financial qualifications. 82 Fed. Reg. 48,296, 48,298 (Oct. 17, 2017). Others address corporate governance matters such as financial statements, disclosure requirements, director compensation, and board structure and independence. *See, e.g.*, 68 Fed. Reg. 64,154, 64,175 (Nov. 12, 2003); 81 Fed. Reg. at 44,403; 69 Fed. Reg. at 71,263; 57 Bus. Law at 1498-1500, 1510-14. Listing standards remain an important way that exchanges distinguish themselves in the market for listing services, and they influence issuers' decisions about where to list. 82 Fed. Reg. 50,059, 50,064 (Oct. 30, 2017); 69 Fed. Reg. at 71,263.

9

**B.    Prior Proceedings**

**1.    Nasdaq's Proposed Rule Changes**

In December 2020, Nasdaq filed with the Commission proposals to adopt listing rules relating to board diversity ("Board Disclosure Rules") and to offer certain listed companies one-year complimentary access to a board recruiting service ("Board Recruiting Service Rule").  JA689, 723.  Nasdaq explained that its research and market outreach revealed "broad-based support for uniform disclosure requirements regarding board diversity" that would make it more efficient and less costly to access and compare diversity information.  JA270; *see also* JA209-10, 217, 301, 305-13. Nasdaq also argued that an extensive body of empirical research supports the view of many investors that diverse boards are positively associated with improved company performance and corporate governance.  JA205-07, 210, 221-22, 276-93.

**a.    Board Disclosure Rules**

The Board Disclosure Rules have two components.  *First*, they require each Nasdaq-listed company to publicly disclose aggregated information on the voluntary, self-identified gender and racial characteristics and LGBTQ+ status of the company's board of directors using a standardized Board Diversity Matrix.  JA603-04.

*Second*, they require Nasdaq-listed companies that do not have at least two diverse board members, including at least one who self-identifies as female and one who self-identifies as an underrepresented minority or LGBTQ+, to provide some

10

explanation why it does not.  JA598-99.  Where a company represents that it does not

meet the diversity objectives, Nasdaq verifies that the company has provided an

explanation but does not evaluate its substance.  JA329-30, 599.

### b.    Board Recruiting Service Rule

Nasdaq's Board Recruiting Service Rule offers certain Nasdaq-listed companies

one year of optional, complimentary access to a board recruiting service to help them

identify and evaluate diverse board candidates.  JA2-3, 20-21.

### 2.    The Commission's Order

The Commission approved the proposed rules as consistent with the

requirements of the Exchange Act.  JA2.  In particular, it found that the rules were

"designed to promote just and equitable principles of trade, remove impediments to

and perfect the mechanism of a free and open market and a national market system,

and protect investors and the public interest."  JA7; *see also* JA15, 17.  It further found

that the rules are "not designed to permit unfair discrimination between issuers or to

regulate by virtue of any authority conferred by the Act matters not related to the

purposes of the Act or the administration of the Exchange, and would not impose

any burden on competition that is not necessary or appropriate in furtherance of the

purposes of the Act."  JA2.

In reaching those conclusions, the Commission first determined that Nasdaq's

rules do not mandate any particular board composition but instead establish a

11

disclosure-based framework.  JA5.  A company that cannot or chooses not to meet Nasdaq's diversity goals need only provide investors an explanation.  And the rules seek to minimize that burden—companies may craft the explanation in their own words, with as much or little detail as they choose, and Nasdaq will not evaluate its substance.  JA5.  Moreover, "[n]o company is required to list on Nasdaq," and thus a company that objects to providing any explanation at all may transfer its listing to a competing exchange.  JA5.

The Commission then found that although there is "broad demand" among investors for board diversity information for use in their investment and proxy voting decisions, such information is "currently not widely available on a consistent and comparable basis."  JA2, 7.  It further determined that the rules "would provide widely available, consistent, and comparable information that would contribute to investors' investment and voting decisions."  JA7-8.  And in doing so, the rules "would make it more efficient and less costly for investors to collect, use, and compare information on board diversity."  JA7; *see also* JA10, 15.

The Commission did not rest its approval on a finding that increases in board diversity have been empirically proven to improve company performance.  It concluded that the empirical evidence on that question is "mixed," and that the effects of board diversity are "the subject of reasonable debate."  JA9.  At the same time, the Commission concluded that any adverse effects of Nasdaq's rules are likely

to be comparatively limited because of the options companies have to either provide an explanation or list on a competing exchange.  JA10.

The Commission responded to constitutional concerns raised by some commenters by explaining that the rules do not constitute state action and, in any event, require factual disclosures that advance important interests.  JA17.

### 3.    The Panel Decision

On October 18, 2023, a unanimous panel of this Court denied the petitions for review.  The panel upheld the Commission's finding that the rules are consistent with the Exchange Act's disclosure-related objectives as supported by substantial evidence.  *All.*, 85 F.4th at 259-60.  It explained that the Commission's finding that Nasdaq's rules establish "a 'disclosure-based framework' and not a quota is supported by substantial evidence and therefore conclusive."  *All.*, 85 F.4th at 254.  And it concluded that substantial evidence likewise supports the Commission's findings that board diversity information is "important to investors"—many of whom "already use [it] to make investments"—and that the required disclosures "would inform how investors behave in the market."  *Id.* at 252-53, 259 (quotation omitted).  And "the record is full of evidence that the status quo deprives market participants of fair access to information about board composition."  *Id.* at 259.

With respect to petitioners' constitutional challenges, the panel held, "[i]n accord with the many courts that have considered th[e] question," that "Nasdaq is not

13

a state actor." *Id.* at 239. It further held that the rules "drafted and proposed by Nasdaq, a private self-regulatory organization, are not attributable to the government and are therefore not subject to constitutional scrutiny." *Id.* at 248.

## STANDARD OF REVIEW

Under the Administrative Procedure Act ("APA"), the Commission's order may be set aside only if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. 706(2)(A). "The findings of the Commission as to the facts, if supported by substantial evidence, are conclusive." 15 U.S.C. 78y(a)(4). Substantial evidence is "more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Boeta v. FAA*, 831 F.3d 636, 641 (5th Cir. 2016) (quotation omitted); *see also Meadows v. SEC*, 119 F.3d 1219, 1224 (5th Cir. 1997).

## SUMMARY OF ARGUMENT

**1.** The Exchange Act provides that the Commission "shall approve" a proposed exchange rule if it is "consistent with" applicable statutory requirements, including that it be designed to promote at least one of several objectives, and does not contravene any of the limitations, set forth in Section 6(b). The Commission reasonably concluded that Nasdaq's rules satisfy that standard. Exchange rules that provide decision-useful information to investors on a consistent and comparable basis advance the Act's core disclosure purpose and are consistent with Section 6(b)'s requirements. And here, substantial evidence shows that a diverse collection of

14

institutional investors, individual investors, listed companies, and others consider board diversity information important to investment and voting decisions; that investors could reasonably conclude that board diversity benefits companies, even if the empirical evidence is mixed; and that Nasdaq's rules will make more consistent, comparable, and useful board diversity information more widely available.

Petitioners argue that the real purpose of Nasdaq's rules is not to facilitate disclosure but to coerce companies into satisfying a diversity quota. But that contention is belied by the rules' design, and substantial evidence supports the Commission's contrary conclusion. Petitioners also incorrectly assert that the Commission may only approve exchange disclosure rules that concern matters empirically proven to affect company performance and that meet the materiality standard governing liability under the antifraud provisions of the securities laws. There is no support for either proposition in the statutory text, structure, or history.

**2.** Petitioners' constitutional arguments fail because Nasdaq is a private entity, and none of the few limited circumstances in which private conduct may be attributed to the government is present here. Exchange listing standards are not a traditional, exclusive public function. The Commission did not compel or significantly encourage Nasdaq's rules, which Nasdaq conceived of, developed, and proposed on its own initiative. And the Commission is not pervasively entwined with Nasdaq's management or control. The mere fact that Nasdaq is regulated by the Commission

15

and that its listing standards must be approved by the Commission does not convert them into state action.  Petitioners' contrary arguments cannot be squared with modern Supreme Court state-action doctrine and the consensus view of circuit courts that have applied that doctrine to SRO actions.

**3.**  Even if state action were not a bar, petitioners' arguments that the rules are subject to strict scrutiny under the First and Fifth Amendments are meritless.  The rules would be subject to lesser scrutiny, which they more than satisfy because they further the government's substantial interest in providing investors with information that contributes to their investment and voting decisions.

## ARGUMENT

### I.   The Commission reasonably concluded that Nasdaq's rules are consistent with the requirements of the Exchange Act.

The Commission's determination that Nasdaq's Board Disclosure Rules and Board Recruiting Service Rule are consistent with the requirements of the Exchange Act—which required the Commission to approve the rules under the governing statute—readily satisfies the APA's "narrow and highly deferential" arbitrary-and-capricious standard.  *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 449 (5th Cir. 2021) (quotation omitted).

**A.     The Commission reasonably concluded that Nasdaq's rules are designed to promote Section 6(b)(5)'s objectives and do not regulate matters unrelated to the Act's purposes.**

As relevant here, under Section 6(b)(5) of the Exchange Act, exchange rules must be "designed" to "promote just and equitable principles of trade, . . .to remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect investors and the public interest." 15 U.S.C. 78f(b)(5); *see also All.*, 85 F.4th at 259 ("Petitioners agree that an SRO rule need only be designed to meet one of the enumerated statutory objectives."); NCPPR Br. 29; AFBR Panel Br. 54. And those rules may not "regulate by virtue of any authority conferred by" the Exchange Act "matters not related to the purposes of [the Act]." *Id.* Substantial evidence in the record supports the Commission's determination that the rules are consistent with these requirements.

**1.     Substantial evidence shows that the Board Disclosure Rules promote Section 6(b)(5)'s objectives.**

**a.** "[T]he animating goal of federal securities law" is the maintenance of fair and orderly markets, *NASDAQ OMX Group, Inc. v. UBS Secs., LLC*, 770 F.3d 1010, 1021 (2d Cir. 2014), which is referenced "throughout the [Exchange] Act, including components that apply to SROs such as Nasdaq," JA2 & n.23. And a key means by which the Act pursues this goal is implementing a "philosophy of full disclosure." *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 477-78 (1977) (quotation omitted); *see Intercontinental Indus., Inc. v. Am. Stock Exch.*, 452 F.2d 935, 940 (5th Cir. 1971) ("[F]ull

17

disclosure of all corporate information which might influence investment decisions is the very heart of the federal securities regulations.").

This philosophy underpins many of Section 6(b)(5)'s requirements. *Cf.* S. Rep. 73-1455 at 55 ("One of the prime concerns of the exchanges should be to make available to the public, honest, complete, and correct information regarding the securities listed."); *NASDAQ OMX Group*, 770 F.3d at 1021 (noting that Section 6(b)(5)'s requirements aim to promote fair and orderly markets). Exchange rules that facilitate the disclosure of, and mitigate unequal access to, information that contributes to informed investment and proxy voting decisions are thus designed to meet these objectives. JA2, 16, 17.

Substantial record evidence shows that Nasdaq's rules both facilitate the disclosure of information important to investors' decision-making and promote more efficient and equal access to such information. JA2. As the Commission explained, comments and statements from a "diverse collection" of institutional investors, investment managers, listed companies, and individual investors establish that many investors seek board diversity information for use in their investment and voting decisions. JA7 & nn.85-86, 91-92; *see also* JA2, 6 & nn.73-75 (citing "many commenters" representing a "broad array" of investors).

The record also shows that such information is "currently not widely available on a consistent and comparable basis." JA2; *see also* JA6 n.72 (citing comments). And

the Commission reasonably found that Nasdaq's rules address this disparity by making "consistent and comparable" board diversity data "widely available to investors." JA2, 7; *see also* JA6 nn.78-79 (citing comments). In particular, by defining "Diverse" and standardizing the disclosure format and timing, the rules will "make it more efficient and less costly for investors to collect, use, and compare information on board diversity." JA7; *see also* JA10, 15. The rules will "also mitigate any concerns regarding unequal access to information" between larger and smaller investors. JA7.

In addition, the record supports the Commission's finding that the explanation requirement will "facilitate [investors'] evaluation of companies in which they might invest" and help investors make more informed decisions "on issues related to corporate governance, including director elections," whether "to preserve the existing board composition," and "the risks and costs of increased board diversity," regardless of their views on whether board diversity is desirable or beneficial. JA2, 5 n.54, 8; *see also* JA4 n.43, 6 & nn.73, 77-80 (citing comments).

For all these reasons, the Commission reasonably concluded that the Board Disclosure Rules would "contribute to the maintenance of fair and orderly markets," and are thus "designed to promote just and equitable principles of trade, remove impediments to and perfect the mechanism of a free and open market and a national market system, and protect investors and the public interest." JA2, 7.

**b.** Petitioners fail to demonstrate that the Commission's analysis was arbitrary and capricious. AFBR's primary response (at 55) is to deny the relevance of comments from asset managers and pension plans—even though these entities make investment decisions on behalf of their clients and have a fiduciary duty to make those decisions in their clients' best interest. *See* 84 Fed. Reg. 33,669, 33,671-74 (July 12, 2019). And aside from mischaracterizing an irrelevant discussion in *Business Roundtable v. SEC*, 647 F.3d 1144, 1152 (D.C. Cir. 2011), AFBR identifies no support for its suggestion (at 56) that the Commission was required to discount the views of the many commenters who consider board diversity in making investment and proxy voting decisions. *See also* NCPPR Br. 51 (asserting without basis that the Commission should not "tak[e] . . . certain commenters' word" that board diversity information is relevant to their investment decisions).

AFBR also erroneously criticizes the Commission (at 60) for relying on evidence that shareholders use diversity information in their proxy voting decisions. One of the Exchange Act's central goals is to facilitate proxy disclosures that "bolster the intelligent exercise of shareholder rights granted by state corporate law," *Roosevelt v. E.I. DuPont de Nemours & Co.*, 958 F.2d 416, 421 (D.C. Cir. 1992), and thereby "enable proxy voters to control the corporation as effectively as they might have by attending a shareholder meeting," *Bus. Roundtable*, 905 F.2d at 410. It was thus reasonable to conclude that an exchange rule facilitating the consistent dissemination

of information important to proxy voting decisions is designed to promote the public

interest and protection of investors within the meaning of the Act. And in any event,

contrary to AFBR's assertion (at 60 n.9), numerous comments supported the finding

that a broad array of investors use board diversity information in their *investment*

decisions as well. *See, e.g.,* JA652, 654, 662, 669, 670, 686.

The premise of many of petitioners' other challenges—that the Act only

permits exchanges to require disclosure of matters that have been empirically proven

to improve corporate or board performance—is mistaken. AFBR Br. 56-58; NCPPR

Br. 30-32. The relevant provisions in Section 6(b)(5) address market effects beyond

financial performance—such as "just and equitable principles of trade," "remov[ing]

impediments to and perfect[ing] the mechanism of a free and open market and a

national market system," and the "protect[ion] [of] investors."

Indeed, the Supreme Court has recognized the substantial investor-protection

interest in providing investors information important to their investment and proxy

voting decisions. *See Basic Inc. v. Levinson*, 485 U.S. 224, 246 (1988); *J.I. Case Co. v.*

*Borak*, 377 U.S. 426, 431 (1964). And information beyond just "balance-book" issues

(AFBR Br. 59) is important to investors. *See SEC v. World Tree Fin., L.L.C.*, 43 F.4th

448, 465 (5th Cir. 2022) (conflicts of interest); *SEC v. Blackburn*, 15 F.4th 676, 681 (5th

Cir. 2021) (identity of individuals influencing management).

The Commission's finding that the connection between board diversity and corporate performance is not proven conclusively (JA9) does not make it "irrational" for investors to make decisions based on this information.  NCPPR Br. 24-25, 30-31; *see also* AFBR Br. 56-58.  Nor does the lack of conclusive empirical evidence mean that market demand for this information is necessarily driven by "extraneous social goals."  AFBR Br. 56.  Investors regularly make investment decisions based on judgments that have not been empirically validated.  *Cf. Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 43 (2011) (observing that "reasonable investors" may "act on the basis of evidence of causation that is not statistically significant").

Petitioners likewise err in asserting that the Commission concluded that the required disclosures promote the Exchange Act's objectives merely because "some" investors "want" the information.  NCPPR Br. 26.  The record shows that a broad array of market participants—including some of the country's largest and most sophisticated asset managers, who have a fiduciary duty to act in their clients' best interest—currently use board diversity information when making investment and voting decisions.  *Supra* 18-19.  And it reveals a "reasonable debate" among researchers about the value of board diversity, with a number of studies finding benefits, thus supporting the basis for investors' use of board diversity information.  JA9.  That evidence supports the Commission's conclusion that Nasdaq's rules are "designed" to meet Section 6(b)(5)'s objectives.  *See Stilwell v. Office of Thrift Supervision*,

569 F.3d 514, 519 (D.C. Cir. 2009) (upholding agency judgment that "found support in various comments"); *cf. Levinson*, 485 U.S. at 234 (Exchange Act embodies a policy of disclosure over "paternalistic withholding of accurate information").

Nor is there any merit to AFBR's argument (at 61) that the Commission erred in finding that Nasdaq's rules promote just and equitable principles of trade because Nasdaq did not expressly rely on that objective. Nothing in the Act or Commission rules limits the Commission to the statutory factors analyzed by the exchange. And AFBR had the opportunity to comment on this factor. *See* 86 Fed. Reg. 14,484, 14,492-93 (Mar. 16, 2021) (order instituting proceedings and requesting comment).

AFBR also errs in contending that "just and equitable principles of trade" is limited to matters involving the fiduciary duties of securities professionals. AFBR Br. 61. While it can apply in such situations, it also encompasses an array of matters involving fairness in the securities markets. *See, e.g.*, 81 Fed. Reg. 81,189, 81,196 (Nov. 17, 2016) (rule requiring that certain market data "be made available to all market participants at the same time" was designed to promote just and equitable principles of trade and to protect investors and the public interest).

AFBR similarly errs (at 62) in its cramped reading of the "remov[al] [of] impediments to and perfect[ion] [of] the mechanism of a free and open market and a national market system." This objective refers to the removal of obstacles to a competitive marketplace, a key component of which is ensuring full and fair access to

relevant information.  84 Fed. Reg. 31,961, 31,967 (July 3, 2019) (rule that "reduc[ed] information asymmetry among market participants" was designed to promote just and equitable principles of trade and remove impediments to a free and open market).

Contrary to AFBR's assertion (at 63), Section 11A of the Act does not limit the scope of this objective.  That provision does not define "fair and orderly markets." Rather, it contains a congressional finding that assuring specified goals relating to the establishment of a national market system is "appropriate for," among other things, "the maintenance of fair and orderly markets."  15 U.S.C. 78k-1(a)(1).  In other words, the objectives listed in Section 11A are appropriately facilitating the *broader* goal of fair and orderly markets.  And even if Section 11A limited any part of Section 6(b)(5), it would be the reference to the national market system, not the more general concept of fair and orderly markets.[1]

Finally, there is no merit to AFBR's argument (at 53) that Nasdaq's rules are inconsistent with the requirements of the Exchange Act because "[t]he Exchange Act requires Nasdaq to enforce" the rules and such enforcement would be unconstitutional under *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163 (1972).  The

---

[1] Nor does the court's passing description of Section 6(b)(5)'s objectives as concerning the "administration and operation of the exchange" in *Business Roundtable*, 905 F.2d at 413, cited at NCPPR Br. 32; AFBR Br. 57, support petitioners' argument. The court neither interpreted the listed objectives nor spoke authoritatively to their scope.  And, in any event, the "operation of the exchange" encompasses operating the exchange as a fair and orderly market.

Exchange Act provision AFBR cites requires Nasdaq to enforce its rules against its broker-dealer members (and associated persons), not listed companies. 15 U.S.C. 78f(b)(6). And under the rules here, Nasdaq cannot delist any company based on the composition of its board or the substance of its explanation. JA5, 204. Thus, as discussed further below, *Moose Lodge* does not apply. *Infra* 45-47.

### 2.  The Commission reasonably found Nasdaq's rules to be "related to" the purposes of the Act.

The Commission also reasonably found that Nasdaq's rules "relate[]" to the purposes of the Exchange Act as required by Section 6(b)(5)—here, the Act's core disclosure purpose. JA2, 16; *cf. Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) ("The ordinary meaning of th[e] words ['relating to'] is a broad one."). Petitioners contest this finding, erroneously asserting that the "actual and obvious goal" of Nasdaq's rules is not to facilitate disclosure but to "favor[] certain people because of their race, sex, or sexual orientation," or to promote "social goals." AFBR Br. 56, 65; *see also* NCPPR Br. 31-32. But their argument that the explanation requirement is intended to "shame" companies into satisfying a diversity "quota" cannot be squared with the rule's design, and substantial evidence supports the Commission's contrary conclusion that the requirement instead will contribute to investors' decision-making.

Far from compelling an "apology," the rules do not specify what a company must say—it "can choose to disclose as much, or as little, insight into [its]

circumstances or diversity philosophy as [it] determines," and Nasdaq will "not evaluate the substance or merits" of the explanation.  JA3 & n.31.  This approach accords with Nasdaq's recognition that there is more than one reasonable conception of diversity and companies may pursue a different approach or none at all—and that, regardless, disclosure of such information "will improve the quality of information available to investors who rely on [board diversity data] to make informed investment and voting decisions."  JA204, 222, 225, 360.

Indeed, Nasdaq provided multiple examples of explanations that would inform investors' consideration of a company's board-level diversity data, such as that a company "has a board philosophy regarding diversity that differs from Nasdaq's diversity objectives" or does not believe Nasdaq's objectives are "feasible given [its] current circumstances."  JA205, 274, 356, 359-60.  Petitioners contend that even this type of explanation is nonetheless a "penalty" for failure to have a minimum number of diverse directors (NCPPR Br. 21).  But the Commission reasonably concluded that the flexibility provided to issuers, as well as the ability to list elsewhere, meaningfully distinguished the rules from quotas where the alternative to compliance is a fine or dissolution.  JA5, 12-13, 14-15.  And this conclusion was supported by comments, including from issuers.  JA7 n.92, 12, 13 nn.172-72.

Nothing in *MD/DC/DE Broadcasters Association v. FCC*, 236 F.3d 13 (D.C. Cir. 2001), cited at NCPPR Br. 21-22, undermines this conclusion.  In finding that an FCC

requirement to report demographic information regarding job applicants amounted to the "practical equivalent of a rule that oblige[d] an employer" to recruit women and minorities, the D.C. Circuit explained that the agency "promise[d] to investigate any licensee that reports 'few or no' applications from women or minorities."  236 F.3d at 19.  This element of coercion is nowhere to be found in Nasdaq's rules; to the contrary, Nasdaq has promised *not* to question any issuer's explanation.[2]

> **3.**    **Petitioners misstate the Exchange Act's limitations on the scope of exchange disclosure rules, which Nasdaq's rules meet.**

Petitioners' argument that the Exchange Act limits exchange disclosure requirements to "material" information fares no better.  AFBR Br. 58-60; NCPPR Br. 25-26.  The Act places limitations on both disclosure requirements adopted by the Commission and those adopted by exchanges.  The Commission, for example, may require disclosure of information about "the organization, financial structure, and nature of the business" as "necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. 78*l*(b)(1)(A); *see also id.* 78s(c) (authorizing the

---

[2] AFBR errs in asserting that disclosure requirements in the proxy rules undermine the Commission's finding regarding the rules' disclosure purpose.  AFBR Br. 65 (citing 17 C.F.R. 240.14a-101, 240.14a-9).  While the proxy rules they cite require disclosure of certain specified information about director candidates and prohibit material misstatements and omissions, they do not purport to require disclosure of every important fact about their boards.

Commission to "abrogate, add to, and delete from . . . the rules of [an SRO]" as "necessary or appropriate . . . in furtherance of the purposes of" the Act).

The standards that apply to an exchange's ability to condition listing on disclosures differ, as is appropriate given their status as private entities. Exchange rules must be "consistent with" applicable provisions of the Act (*id.* 78s(b)), including Section 6. As a result, they must be consistent with that section's requirements that they be "designed" to promote at least one of Section 6(b)(5)'s statutory objectives and *not* be designed to "regulate by virtue of any authority conferred by [the Act] matters not related to the purposes of" the Act. And they cannot contravene other provisions, such as Section 6(b)(8)'s prohibition on rules that impose a burden on competition not necessary or appropriate in furtherance of the Act. *Id.* 78f.

None of these standards includes an express materiality requirement. Rather, materiality is a concept used in certain of the Commission's antifraud rules, where it is intended "to avoid the adverse consequences of setting too low a threshold for civil liability." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 n.10 (1976); *see also*, *e.g.*, 17 C.F.R. 240.10b-5. In that context, liability depends upon it being "substantially likely that a reasonable investor would have viewed" an alleged misstatement or omission "as having significantly altered the total mix of information made available." *Matrixx Initiatives*, 563 U.S. at 47 (quotation omitted). Petitioners cite no case purporting to apply this limitation in the distinct context of disclosure rules. *See*

28

*Northway*, 426 U.S. at 462-63 (recognizing that while it was not materially misleading to omit information that had "no bearing" on a company's market price, the Commission could have required its disclosure).

AFBR argues that such a requirement should nonetheless be implied here from statutory provisions governing the Commission's rulemaking authority. AFBR Br. 58 (citing 15 U.S.C. 78*l* and 77g). But this case involves *exchange*, not Commission, rules. And consistent with the different statutory standards applicable to the two—exchange rules must be "*related to*" the purposes of the Act, whereas Commission rules must be "necessary or appropriate . . . *in furtherance of* the purposes of" the Act, 15 U.S.C. 78f(b)(5), 78s(c) (emphases added)—exchanges have historically required disclosures beyond those required by the Commission. JA15-16 & n.202.

Moreover, even if there were a materiality requirement, petitioners' contention (at 58, 60) that it is limited to "financially material" information or to quantitative considerations is incorrect. Material facts include any that would be "viewed by [a] reasonable investor as having significantly altered the 'total mix' of information made available." *Levinson*, 485 U.S. at 231-32 (quotation omitted). And as discussed, this Court has recognized the materiality of non-financial information. *See World Tree*, 43 F.4th at 465; *Blackburn*, 15 F.4th at 680-81. Here, the substantial record evidence that a broad spectrum of investors consider board diversity information important to their investment and voting decisions (*e.g.*, JA6 & nn. 72-75; JA7 & nn. 91-92) would

support a finding that Nasdaq's rules elicit material information. *See* JA6 & n.77 ("[M]any commenters believe that the proposed board diversity disclosures would be material to investors.").

### 4. Petitioners' other arguments fail.

Petitioners assert that the rules stray from the purposes of the Exchange Act by impermissibly interfering with state-law matters. AFBR Br. 65; NCPPR Br. 23. But, as already discussed, the rules facilitate disclosure rather than coerce changes to board membership. *See supra* 25-27. And exchange rules "designed to improve governance, as well as transparency and accountability into corporate decision making for listed issuers" have long been permitted. JA2, 15-16 & n.202, 17; *see, e.g.*, 81 Fed. Reg. at 44,403 (approving rule requiring disclosure of third-party compensation to board directors and nominees).

The D.C. Circuit's decision in *Business Roundtable*, 905 F.2d 406, cited at AFBR Br. 63, 65; NCPPR Br. 32, does not cast any doubt on these conclusions. *Business Roundtable* held that a Commission rule requiring that exchange listing standards prohibit companies from nullifying or reducing the voting rights of their existing shareholders exceeded the Commission's authority because it regulated "an issue that is so far beyond matters of disclosure," and if accepted, would allow the Commission to "establish a federal corporate law." 905 F.2d at 408, 412.

Neither concern is implicated here.  Nasdaq's rule is a disclosure rule that advances a "central" purpose of the Exchange Act.  *Id.* at 410; *see supra* 18-19, 25-27.  And it is a rule of an exchange, not the Commission.  As the court explained in *Business Roundtable*, exchanges "may adopt listing rules on . . . corporate governance matters"—indeed, they may adopt the same type of rule the court held the Commission could not impose.  *Id.* at 414 (emphasis omitted).  Commission approval of a disclosure-related listing standard voluntarily adopted by an exchange, which listed companies accept as a condition of listing, does not pose the same threat to "federalize" a "substantial portion" of state corporate law.  *Id.* (quotation omitted).

NCPPR also errs in asserting that the Commission "'merely accept[ed]'" Nasdaq's assertions that diversity information would facilitate informed investor decisions instead of making findings of its own.  NCPPR Br. 51 (citing *Susquehanna Int'l Group, LLP v. SEC*, 866 F.3d 442, 447 (D.C. Cir. 2017)); *see also* AFBR Br. 64.  Here, unlike in *Susquehanna*, the Commission "critically reviewed [Nasdaq's] analysis."  866 F.3d at 447.  As the panel explained, the Commission independently evaluated the statutory factors in light of the "supporting and contrary evidence in the record," including studies Nasdaq had not cited and comments from investors and other market participants—and "[f]aced with this body of evidence, [it] thought for itself and reached a reasonable conclusion."  *All.*, 85 F.4th at 265; *see also* JA2-16.

Finally, the Commission's approval of Nasdaq's rules does not implicate the major questions doctrine, as NCPPR erroneously suggests (at 23).  This case involves the ordinary exercise of the Commission's statutory responsibility to approve exchange listing standards that are consistent with the Act's requirements.  Nor does the subject matter here make this a major questions case.  Nasdaq's rules require disclosures, not mandatory quotas, and "[d]isclosure rules, including those related to diversity, are business as usual for the SEC."  *All.*, 85 F.4th at 257; *see* 17 C.F.R. 229.407(c)(2)(vi) (requiring companies to disclose how their board nominating committees consider diversity in identifying director nominees).  And listing standards relating to corporate governance have long coexisted with and supplemented state corporate law.  *See* 81 Fed. Reg. at 44,403; 68 Fed. Reg. at 64,175-76; *Bus. Roundtable*, 905 F.2d at 409.

Moreover, the issues of "vast economic and political consequence," *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021) (quotation omitted), the courts have found to be major questions are not comparable to these disclosures, which apply only to companies that voluntarily list on Nasdaq's exchange.  Nor is this a case in which an agency seeks to read a delegation of authority into ambiguous statutory text. The Exchange Act plainly states that the Commission "shall approve" Nasdaq's rules if they are "consistent with the requirements of [the Exchange Act]." 15 U.S.C.

78s(b)(2)(C)(i).  And, as a private entity, Nasdaq itself does not require a separate

delegation of authority to require disclosures in its listing agreements with issuers.

**B.    The Commission reasonably concluded that Nasdaq's rules do not unfairly discriminate among issuers or impose inappropriate burdens on competition.**

Nasdaq's rules do not unfairly discriminate against domestic issuers or unduly

burden competition.

***No unfair discrimination.***  Under Nasdaq's rules, a domestic issuer's second

diverse director may be either LGBTQ+ or an "Underrepresented Minority," a

defined term reflecting the unique demographic composition of the United States.

JA2-3 & n.18.  A foreign issuer's second diverse director, by contrast, may be female,

LGBTQ+, or "an underrepresented individual based on national, racial, ethnic,

indigenous, cultural, religious, or linguistic identity in [its] country."  JA3 & n.26.

Petitioners "have not shown that it is in any way unfair" to establish different

diversity objectives and disclosures for domestic and foreign issuers.  *Timpinaro v.

SEC*, 2 F.3d 453, 456 (D.C. Cir. 1993) (The Exchange Act "prohibits unfair

discrimination, not discrimination *simpliciter*." (quotation omitted)); *see also* JA12 n.160

(citing exchange rules that treat foreign and domestic issuers differently); 57 Bus. Law

at 1514-15 (same).  On the contrary, it was reasonable for Nasdaq "to take into

account the differing demographic compositions of foreign countries and to provide

[foreign issuers] flexibility in recognition of the different circumstances" they face.

33

JA12.  And it was likewise appropriate for Nasdaq to recognize that its definition of "Underrepresented Minority" for domestic purposes "may not be as effective in identifying underrepresented board members in foreign countries" and "may therefore result in disclosures that are less useful for investors who seek board diversity information for [foreign issuers]."  JA12.

*No inappropriate burden on competition.*  Petitioners similarly err in asserting that Nasdaq's rules run afoul of Section 6(b)(8)'s requirement that exchange rules not impose a "burden on competition not necessary or appropriate in furtherance of the purposes of [the Act]."  15 U.S.C. 78f(b)(8).  As an initial matter, NCPPR's arguments (at 34) that the rules burden privacy and speech interests elide the language of the provision, which speaks to burdens *on competition*.

Nor does Section 6(b)(8) require a formal, quantitative analysis of the rules' overall benefits and costs, as petitioners appear to contend.  AFBR Br. 67-68; NCPPR Br. 33.  Unlike the cases on which they rely, the "necessary or appropriate" language in that provision is directly tied to burdens on competition rather than the rule's overall justification.  And courts have made clear that what Section 6(b)(8) requires is to "balance" competitive considerations against other policy goals of the Exchange Act.  *Bradford Nat'l Clearing Corp. v. SEC*, 590 F.2d 1085, 1105 (D.C. Cir. 1978); *Belenke v. SEC*, 606 F.2d 193, 200 (7th Cir. 1979).  Contrary to AFBR's contention (at 68), those goals are not limited to ones that can be quantified on a cost-ledger.  *See*

34

*Bradford*, 590 F.2d at 1105; *Belenke*, 606 F.2d at 200.  And this balancing is subject to the same deferential arbitrary-and-capricious review as other determinations.  S. Rep. No. 94-75 at 13; *Bradford*, 590 F.2d at 1104.

The Commission's reasoned assessment here satisfied that standard.  The Commission explained that companies are not required to meet the diversity objectives.  JA14.  It recognized that there may nonetheless be some adverse effects on companies that choose not to make the required disclosures, but it reasonably determined that the rules contained measures to "mitigate" those effects.  JA14-15.  It also reasonably found that the rules "may promote competition" by allowing Nasdaq to compete for "the listings of companies that prefer to be listed on an exchange that provides investors with" board diversity information.  JA14.

Petitioners' incorrect assertion that the rules have no benefits given the Commission's finding that the empirical evidence regarding company performance is mixed (AFBR Br. 68; NCPPR Br. 33) ignores the Commission's reasonable conclusion that disclosure of board diversity information would nonetheless be beneficial to investors.  *Supra* 21-23.  And as discussed above, the Commission considered studies finding potential adverse effects from board diversity mandates, reasonably determining that any adverse effects of Nasdaq's disclosure-based rules are likely to be "comparatively limited."  JA10.  The Commission thus met its obligation to articulate a "rational connection between the facts found and the choice made."

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)

(quotation omitted).

### C.    NCPPR's challenge to the Board Recruiting Service Rule is meritless.

The Commission determined, based on substantial record evidence, that

Nasdaq's Board Recruiting Service Rule is consistent with the requirements of the

Exchange Act because it will help companies that choose to use the service by

mitigating the costs associated with identifying and evaluating diverse candidates, and

it will help Nasdaq compete to attract and retain listings.  JA14, 21; *see also* JA5 & n.59,

21 n.327 (citing previously approved complimentary services).

NCPPR does not identify any flaw in the Commission's reasoning.  Rather, it

faults the Commission (at 54) for failing to assess in more detail the criteria to be used

by the contractor operating this service.  But NCPPR makes no attempt to establish

the relevance of such an inquiry in determining whether Nasdaq's proposal is

consistent with the Exchange Act.  The service is optional, and no company that uses

it is required to hire any of the candidates identified.  JA21.  Nothing in the Exchange

Act obligated the Commission to micromanage Nasdaq's vendor's practices.

## II.    Nasdaq's rules do not constitute state action subject to constitutional scrutiny.

Petitioners' constitutional claims fail at the outset for lack of state action.

Petitioners' arguments that Nasdaq is a state actor, or that its rules are state action,

misunderstand the nature and history of self-regulation in the securities industry. From almost the time of the Founding, securities exchanges privately operated trading markets and enforced their members' compliance with exchange rules. And from the beginning, the listing of company stock on these exchanges was a matter of private contractual agreement. Companies unwilling to comply with the conditions in those agreements could list elsewhere or trade off-exchange. *See supra* 4-5, 7-8.

The Exchange Act preserved that basic structure. Under the Act, exchanges are subject to Commission oversight both in their role as frontline regulators of their members and in their private, voluntary association with listed companies. As part of that oversight, the Commission reviews exchange rules (including listing standards) to determine whether they are consistent with the requirements of the Act. But that does not make Nasdaq—a private enterprise that, like many exchanges, is part of a publicly traded company—a part of the government. And, as every court that has addressed the question under modern state-action doctrine has held, it also does not make their rules state action.

## A.  Nasdaq is a private entity, not a part of the government.

The Supreme Court set forth the test for determining whether a private company is part of the government in *Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374 (1995). There, it held that Amtrak was "part of the Government for purposes of the First Amendment" because the federal government "create[d]

[Amtrak] by special law" and "retain[ed] for itself permanent authority to appoint a majority of [its] directors." *Lebron*, 513 U.S. at 400.

By contrast, Nasdaq is a private company that was established in 1971 and today is a subsidiary of the publicly traded company Nasdaq, Inc. *See* 71 Fed. Reg. 3,550, 3,551-53 (Jan. 23, 2006). And Nasdaq's directors are chosen by its members and its parent company. *See* By-laws of the Nasdaq Stock Market LLC, Arts. II-III, https://tinyurl.com/2p99k62s. It is thus not part of the government under *Lebron*. 513 U.S. at 400; *see Free Enter. Fund v. PCAOB*, 561 U.S. 477, 484-85, 503 (2010) (distinguishing the "Government-created, Government-appointed" PCAOB from "private organizations" such as Nasdaq). Every circuit to have considered the question has reached the same conclusion. *See All.*, 85 F.4th at 240-41 (citing cases).

## B.    Nasdaq's rules are not fairly attributable to the Commission.

Because Nasdaq is a private entity, its rules are subject to constitutional scrutiny only if they are "fairly attributable" to the government. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999). The Supreme Court has recognized only a "few limited circumstances" in which private conduct may be so attributed, including (1) "when the private entity performs a traditional, exclusive public function," (2) "when the government acts jointly with the private entity," and (3) "when the government compels the private entity to take a particular action." *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 809 (2019). None of those circumstances is

present here, and petitioners' alternative theories disregard long-settled state-action

principles, thereby "endanger[ing] individual liberty and private enterprise." *Id.* at 816.

### 1. The traditional, exclusive public function test is not met.

A private entity that performs a public function may be deemed a state actor

when "exercis[ing] powers traditionally exclusively reserved to the State." *Id.* at 809

(quotation omitted). "[I]t is not enough that the function serves the public good or

the public interest in some way." *Id.* at 809. Rather, "the government must have

traditionally *and* exclusively performed the function." *Id.* Exchanges imposed listing

requirements in their contractual relationships with listed companies long before

Congress chose to regulate them in 1934. *Supra* 7-8. Exchange listing standards are

thus not one of the "very few" functions that fall in this category. *Halleck*, 587 U.S. at

809 (quotation omitted); *see also Yeager v. City of McGregor*, 980 F.2d 337, 340 (5th Cir.

1993) (firefighting is not an exclusive public function in Texas).

### 2. The joint action test is not met.

The Supreme Court has also held that the government's "pervasive

entwinement" in a private entity's "management or control" may give rise to state

action. *Brentwood Academy v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 291, 297

(2001); *see also Missouri v. Biden*, 83 F.4th 350, 373 (5th Cir. 2023) (joint action test

requires "pervasive entwinement between the parties" (quotation omitted)), *cert. granted sub nom. Murthy v. Missouri*, 144 S. Ct. 7.

In *Brentwood*, for example, the Court found a school athletic association to be a state actor because it was composed almost entirely of public schools; public school officials "overwhelmingly perform[ed] all but [its] purely ministerial acts"; its employees were treated as state employees; and it received most of its financial support from public schools. *Id.* at 299-300. No such symbiotic relationship is present here: Nasdaq's members are private broker-dealers; Nasdaq's employees (not the Commission's) perform all functions necessary to its operation; Nasdaq's employees are those of a private corporation; and Nasdaq is funded through fees and market-derived profits.

Relying on cursory dicta in *Intercontinental Industries, Inc. v. American Stock Exchange*, 452 F.2d 935 (5th Cir. 1971), petitioners argue that there is joint action because of the Commission's supervisory authority over exchanges. AFBR Br. 44-48; NCPPR Br. 43-44. But that dicta rested on *Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961), which no longer reflects the governing standard. *Sullivan* 526 U.S. at 57; *see also All.*, 85 F.4th at 241-42. *Burton* now stands only for the proposition that there is joint action when "the discriminatory practices of [a] lessee . . . [are] indispensable elements in . . . the financial success of a governmental agency." *Frazier v. Bd. of Trs.*, 765 F.2d 1278, 1287-88 (5th Cir. 1985) (quotation omitted); *see also*

40

*Jackson v. Metro. Edison Co.*, 419 U.S. 345, 358 (1974) (limiting *Burton* to "lessees of public property").

*Roberts v. Louisiana Downs, Inc.*, 742 F.2d 221 (5th Cir. 1984), does not help petitioners either. There, the Court's determination that a private racetrack's stalling decision was state action was based not merely on the state's general authority to override the racetrack's decisions (*contra* NCPPR 43-44), but on the fact that onsite state officials were "intimate[ly] and continuous[ly] involve[d] in the actual day to day management of racing-related activities at the track" and "participat[ed]" in all stall allocation decisions. 742 F.2d at 226, 228. There is no similar involvement in Nasdaq's own decision-making here.

### 3.    The close nexus test is not met.

Absent an exclusive public function or joint action, private conduct is fairly attributable to the government "only when [the government] has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed that of the State." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982); *accord Skinner v. Ry. Labor Executives Ass'n*, 489 U.S. 602, 615-16 (1989) (requiring government "encouragement, endorsement, and participation").

The starting point of this inquiry is "identifying the specific conduct of which the plaintiff complains." *Sullivan*, 526 U.S. at 51 (quotation omitted). Here, all of petitioners' constitutional claims stem from Nasdaq's rules. *See* AFBR Br. 11, 27-28

(arguing that "the Minority Director Rule" and the "Female Director Rule" fail Fifth Amendment scrutiny and that "Rules 5605(f) and 5606 . . . fail to satisfy strict scrutiny" under the First Amendment"); NCPPR Br. 44-45 (arguing that the "forced-explanation and demographic-disclosure requirements violate the First Amendment[]").

State action exists only if there is such a "close nexus" between the Commission and these rules that the Commission is practically "*responsible*" for them. *Blum*, 457 U.S. at 1004 (quotation omitted). The "mere fact" that Nasdaq is subject to "extensive [Commission] regulation" is not sufficient. *Sullivan*, 526 U.S. at 51 (quotation omitted); *Halleck*, 587 U.S. at 816 ("'[T]he 'being heavily regulated makes you a state actor' theory of state action is entirely circular."). The Commission must have "exercise[d] active, meaningful control over [Nasdaq's] decision" to engage in the challenged conduct, such that it "commandeered [Nasdaq's] independent judgment." *Missouri*, 83 F.4th at 380.

Here, Nasdaq conceived of, developed, and proposed the Board Disclosure Rules entirely on its own initiative, so they are not fairly attributable to the Commission. Every court that has applied this test to SRO actions has reached the same conclusion. *See, e.g.*, *Perpetual Sec., Inc. v. Tang*, 290 F.3d 132, 138-39 (2d Cir. 2002); *D.L. Cromwell Invs., Inc. v. NASD Regulation, Inc.*, 279 F.3d 155, 161-62 (2d Cir. 2002); *Desiderio v. NASD*, 191 F.3d 198, 207 (2d Cir. 1999); *Duffield v. Robertson Stephens*

42

*& Co.*, 144 F.3d 1182, 1202 (9th Cir. 1998); *Graman v. NASD*, 1998 WL 294022, at

*2-3 (D.D.C. 1998); *Cremin v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 957 F. Supp.

1460, 1467-68 (N.D. Ill. 1997).

### C.    Petitioners' alternative theories of state action are meritless.

#### 1.    The Commission's approval of Nasdaq's rules does not convert them into state action.

Petitioners contend that exchange rules are subject to constitutional review

because they cannot take effect unless the Commission determines they are consistent

with the Exchange Act.  AFBR Br. 39; NCPPR Br. 42.  But the Supreme Court has

made clear that "[a]ction taken by private entities with the mere approval or

acquiescence of the [government] is not state action."  *Sullivan*, 526 U.S. at 52; *accord*

*Blum*, 457 U.S. at 1004-05; *Jackson*, 419 U.S. at 357.

As discussed, the Commission did not "coerc[e]" or significantly "encourage[]"

Nasdaq to adopt the Board Disclosure Rules.  *Blum*, 457 U.S. at 1004.  Rather, it

assessed whether Nasdaq's choices in its proposed rules are consistent with the Act's

requirements and, concluding that they are, it was statutorily required to approve

them.  This process reflects Congress's "legislative decision" not to interfere with

exchanges' freedom to adopt rules of their own choosing so long as they meet certain

statutory criteria.  *Sullivan*, 526 U.S. at 53.  "Such permission of a private choice

cannot support a finding of state action."  *Id.* at 54; *see also Flagg Bros., Inc. v. Brooks*,

436 U.S. 149, 165 (1978) (a state is not responsible for a private decision that state law

"permits but does not compel"); *Jackson*, 419 U.S. at 357 (determination that a utility was "authorized to employ" a business practice did not make it state action).

Contrary to petitioners' arguments, the fact that Nasdaq's rules could not take effect until the Commission approved them makes no difference. Private businesses are "frequently" required to obtain "approval from a regulatory body" before engaging in certain conduct. *Jackson*, 419 U.S. at 357. But such approval does not "transmute" that conduct into state action "where the [government] has not put its own weight on the side of the proposed [conduct] by ordering it." *Id.*

Nor does it make any difference whether approval is a "ministerial" act or, as here, requires the government to "independently" determine whether statutory criteria are met. AFBR Br. 39-40; NCPPR Br. 42. What matters for state action purposes is the government's responsibility for "the *private party's* decision" to engage in the challenged conduct. *Missouri*, 83 F.4th at 380 (emphasis added); *see also Vill. of Bensenville v. FAA*, 457 F.3d 52, 65 (D.C. Cir. 2006) ("The Supreme Court has never held that the government becomes responsible for the actions of a third party due to the length or intensity of its attention to the actions of the party before approval.").

In their attempt to frame the relevant state action as the Commission's approval of Nasdaq's rules (AFBR Br. 39; NCPPR Br. 40), petitioners "ignore[] [the Supreme Court's] repeated insistence that state action requires . . . [that] *the allegedly unconstitutional conduct* [be] fairly attributable to the [government]." *Sullivan*, 526 U.S. at

44

50 (emphasis added); *see also id.* at 51 (state-action inquiry "requires careful attention to the gravamen of the plaintiff's complaint" (quotation omitted)).  Here, the alleged constitutional flaws are in Nasdaq's rules, not the terms of the Commission's order.

*W.H. Scott Construction Co. v. City of Jackson*, 199 F.3d 206 (5th Cir. 1999), cited at AFBR Br. 40, is not to the contrary.  Its holding that a *city* policy violated equal protection has no bearing on whether *private* conduct is fairly attributable to the government.  *See* 199 F.3d at 208-09.  The Court did not suggest (let alone hold) that private conduct "authorize[d]" by the government (AFBR Br. 40) must satisfy equal protection scrutiny.  *See, e.g., Sullivan*, 526 U.S. at 50 (state-action requirement applies to *all* private conduct).

## 2.    *Moose Lodge* does not support constitutional review of Nasdaq's rules.

AFBR likewise errs in asserting (at 40-44) that the Commission's order is itself unconstitutional under *Moose Lodge*, which involved a challenge to a private club's bylaws that "required racial discrimination" by refusing service to non-whites.  407 U.S. at 166, 178-79.  There, the Court *rejected* an argument that the state liquor board's licensing and regulation of the club converted its discriminatory practices into unconstitutional state action.  *Id.* at 176-77.  As a result, the Court left the club's rules in place.  *Id.*  The case thus *supports* the private nature of Nasdaq's rules.

AFBR points out that the Court nonetheless enjoined the state from enforcing a regulatory provision requiring licensees to comply with their bylaws "insofar as that

regulation require[d]" the club to enforce its discriminatory policies. *Id.* at 179. But unlike the club's bylaws, Nasdaq's rules do not "require[] racial discrimination." *Id.* They require disclosure: Nasdaq-listed companies with fewer than two diverse board members must provide an explanation—in their own words, in as much or little detail as they choose. JA3 & n.31. A company is subject to delisting from Nasdaq only if it chooses to give no explanation at all. For that reason alone, applying *Moose Lodge* here would unquestionably "break[] . . . new ground." AFBR Br. 44.

Moreover, petitioners do not seek to "enjoin[] the enforcement" of any statutory duty Nasdaq may have to enforce its Board Disclosure Rules. *Moose Lodge*, 407 U.S. at 179. They seek to have the rules themselves set aside. But AFBR's attempt (at 41-42) to recast the approval of the rules as the "regulation" that imposes a duty to enforce them conflates two distinct elements of the statutory scheme. The Commission must approve a proposed exchange rule if it is consistent with the Act's requirements. 15 U.S.C. 78s(b)(2)(C)(i). Different provisions require exchanges to enforce their rules against "members." *Id.* 78s(g)(1), (h)(1).[3] Setting aside the Commission's approval order would go far beyond enjoining any enforcement duty—

---

[3] As AFBR concedes (at 49 n.5), the term "members" refers to an exchange's broker-dealer members, not listed companies. 15 U.S.C. 78c(a)(3)(A). AFBR's assertion (at 49 n.5) that listing standards "regulat[e] . . . members" conflates the requirements placed on companies in listing standards with the separate rules addressing the activities of broker-dealer members on the exchange.

it would prohibit private conduct that is not fairly attributable to the government, precisely what *Moose Lodge* forecloses.

### 3. The private nondelegation doctrine has no bearing on the state-action question in this case.

Petitioners contend that in adopting listing standards, exchanges exercise "regulatory" or "governmental" power that must be deemed state action to avoid a violation of the private nondelegation doctrine. AFBR Br. 48-50; NCPPR Br. 36-41. This argument fundamentally misunderstands both the state-action and private nondelegation doctrines, as well as the Exchange Act.

The private nondelegation doctrine provides that a private entity may play an important role in a federal statutory scheme if it "function[s] subordinately" to a public agency with "authority and surveillance" over it. *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940). The doctrine is focused on the overall structure of the statutory scheme, and every court to consider the issue has held that the Exchange Act comports with *Adkins*. *See Oklahoma v. United States*, 62 F.4th 221, 228-29 (6th Cir. 2023) (citing cases dating to the 1950s). Petitioners do not challenge that consensus, and there is no private nondelegation claim in this case.

Instead, petitioners contend that Nasdaq exercises authority delegated by Congress when it adopts listing standards and, in doing so, engages in state action. AFBR Br. 48-50; NCPPR Br. 36-39. That argument is wrong in all respects. The Exchange Act does not delegate to exchanges any authority to impose listing

47

requirements in their contractual agreements with listed companies or to delist

companies that fail to comply with such requirements—exchanges did those things

long before the securities laws were enacted. *Supra* 7-8. Congress instead granted *the*

*Commission* authority to ensure that proposed exchange listing standards are consistent

with the Act, to modify or abrogate existing listing standards, and to review exchange

delisting decisions, among other things.

But even if listing standards involved the exercise of delegated authority, that

would not resolve the state-action question. The "exercise by [a private entity] of . . .

power delegated to it by the State" is state action only if the delegated power is one

"traditionally exclusively reserved to the State." *Jackson*, 419 U.S. at 352-53; *see also*

*Halleck*, 587 U.S. at 809. Listing standards do not qualify. *Supra* 39.

The lack of state action in this case creates no tension with the private

nondelegation doctrine. *Contra* AFBR Br. 49; NCPPR Br. 39. Whether Nasdaq

"function[s] subordinately" to the Commission under the Exchange Act, *Adkins*, 310

U.S. at 399, and whether any particular Nasdaq rule "may be fairly treated as that of

the [Commission] itself," *Brentwood*, 531 U.S. at 295 (quotation omitted), are distinct

questions. As this Court has explained, the Commission has the "final word on the

substance of [SRO] rules," as *Adkins* requires, because it has the power to "abrogate"

or "*require* modifications" of SRO rules. *Nat'l Horsemen's Benevolent & Protective Ass'n v.*

*Black*, 53 F.4th 869, 887-88 (5th Cir. 2022). But the Commission did not exercise that

power here.  And Nasdaq's rules are not fairly attributable to the Commission for state-action purposes because the Commission did not "coerce[] or significantly encourage[]" their adoption.  *Missouri*, 83 F.4th at 380.

AFBR asserts (at 49-50) that this opens the door to government abuse, but state action would be present if the government attempted to "avoid its constitutional duties" through a "sham" delegation to a private entity.  *Rendell-Baker v. Kohn*, 457 U.S. 830, 842 n.7 (1982); *accord Frazier*, 765 F.2d at 1287 n.20.  Constitutional constraints also apply if the government coerces or significantly encourages private conduct or is pervasively entwined with a private entity.  *Supra* 41-42.  And the private nondelegation doctrine ensures that the "last word" in any regulatory program remains with a government body "accountable to the people."  *Black*, 53 F.4th at 872-73.

Finally, the judicially created doctrine of SRO regulatory immunity has nothing to do with SROs' "state-actor status."  *Contra* NCPPR Br. 37-39.  Cases recognizing such immunity all start with the premise that SROs are "*private* actors" that "do[] *not* share in the SEC's sovereign immunity," and then conclude that immunity from civil liability for certain activities is warranted as a matter of policy and congressional intent.  *Barbara v. N.Y. Stock Exch.*, 99 F.3d 49, 58-59 (2d Cir. 1996) (emphases added);

*accord Sparta Surgical Corp. v. NASD*, 159 F.3d 1209, 1214 (9th Cir. 1998); *Austin Mun. Secs., Inc. v. NASD*, 757 F.2d 676, 689-90, 692 (5th Cir. 1985).[4]

## III.    In any event, Nasdaq's Board Disclosure Rules withstand constitutional scrutiny.

Even if this Court were to disregard the clear precedent discussed above and find Nasdaq's rules to be state action, they survive constitutional scrutiny.

### A.    The Board Disclosure Rules do not violate the First Amendment.

Although no company is required to list on Nasdaq, petitioners argue that Nasdaq's Board Disclosure Rules impermissibly compel speech in violation of the First Amendment. But their arguments rest solely on the incorrect assertion that strict scrutiny applies. The required disclosures would be subject to lesser scrutiny, which they satisfy.

Consistent with this Court's recent precedent, Nasdaq's rules would be subject to lesser scrutiny under *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985). *See*

---

[4] *Blount v. SEC*, 61 F.3d 938 (D.C. Cir. 1995), cited at NCPPR Br. 37, is likewise inapposite. It found that a Municipal Securities Rulemaking Board ("MSRB") regulation "constitute[d] government action" because it operated as "a government-enforced condition to any participation in a municipal securities career." 61 F.3d at 941. The court emphasized that a broker-dealer that failed to comply with the regulation could be barred from the profession and face criminal penalties, including fines and imprisonment. *Id.* By contrast, the Commission does not enforce listing standards, and there is no federal "penalty" for failing to comply with them. *Contra* AFBR Br. 42, 49, 50. Rather, as was true before the Exchange Act, an exchange may delist a company that fails to abide by its listing agreement. But the company remains free to list on another exchange or trade its securities in the over-the-counter market.

*R.J. Reynolds Tobacco Co. v. FDA*, 96 F.4th 863, 877 (5th Cir. 2024); *Chamber of Comm. v. United States*, 85 F.4th 760, 768-69 (5th Cir. 2023). That case provides that the government may compel disclosure of "purely factual and uncontroversial information" in commercial speech so long as the disclosures "reasonably relate[]" to an adequate interest and are not "unduly burdensome." *Zauderer*, 471 U.S. at 651. Petitioners do not dispute that the board-diversity matrix and explanation disclosures are "purely factual." As this Court recently held in a challenge to a securities law disclosure requirement, "forcing a company to 'explain the reason' for its actions is a purely factual disclosure" under *Zauderer*. *Chamber of Comm.*, 85 F.4th at 769-70; *see also R.J. Reynolds*, 96 F.4th at 878-79.

A factual statement is "controversial" under *Zauderer* "where the truth of the statement is not settled or is overwhelmingly disproven or where the inherent nature of the subject raises a live, contentious political dispute." *R.J. Reynolds*, 96 F.4th at 881. Neither a "mere connection to a live, contentious, political issue," nor the fact that "the speaker does not like the message," is sufficient. *Id.* Here, "just as bankruptcy warnings, disclosure of stock buyback rationales, and explanations of social media censorship decisions may induce emotions or be related to ideological

51

and political issues while remaining uncontroversial, so too the" diversity matrix and explanation requirement. *Id.* at 882; *see also Chamber*, 85 F.4th at 770.

The *Zauderer* test therefore applies, and the disclosures satisfy it. This Court's precedent establishes that the Commission has a "legitimate interest" in promoting the disclosure of information that may be useful to investors and would alleviate "information asymmetry." *Id.* at 771-72 (disclosure rule satisfied *Zauderer* even though the Court was not "persuaded by the SEC's reasoning" as an APA matter). And as in *Chamber*, the explanation requirement does not impose an undue burden on speech because listed companies are "free to speak (or not) however and whenever [they] wish[] apart from a privately crafted explanation of [their] reasons for" not having two diverse directors. *Id.* at 772.

Petitioners arguments for strict scrutiny lack merit. AFBR contends (at 27-28) that, under *National Institute of Family and Life Advocates v. Becerra*, 585 U.S. 755 (2018) ("*NIFLA*"), "[c]ompelled disclosures are subject to strict scrutiny unless they fall into one of two" narrowly construed categories. But *NIFLA* did not purport to narrow or overrule *Zauderer*, *see* 585 U.S. at 768, and subsequent decisions of this Court have applied it outside of petitioners' categories. *See, e.g.*, *R.J. Reynolds*, 96 F.4th at 877. Nor

are the disclosures required here controversial merely because they touch on topics AFBR considers controversial (at 33). *See Chamber*, 85 F.4th at 770.

Petitioners likewise err in asserting that the explanation requirement is controversial because it compels "self-condemnation" or forces companies to "infer their own shortcomings." NCPPR Br. 48; *see also* AFBR Br. 29. Unlike *National Association of Manufacturers v. SEC*, 800 F.3d 518, 522 (D.C. Cir. 2015), companies are not required to utter *any* government-dictated language, much less language that conveys "moral responsibility" or an "ethical[] taint[]." *Id.* at 530. Companies craft the explanation themselves and are free to convey whatever position they wish on board diversity, or no position at all. *See* JA3 & n.31.[5]

AFBR's contention (at 30-31) that the explanation requirement is controversial because it applies only to some companies is also incorrect. The same was true in *Chamber*, where only companies that repurchased their own stock had to provide an explanation. 85 F.4th at 771. In both cases, the distinction was drawn not to favor "one side" of a debate, but to tailor the disclosure requirement to those circumstances in which the information would be most useful to investors. JA13.

---

[5] AFBR asserts (at 31) that this flexibility does not mitigate First Amendment concerns, relying on *National Association of Manufacturers*. But there the court concluded that the ability to provide an explanation did not cure the constitutional violation it found in requiring the government-scripted language to begin with.

Nasdaq's rules would also withstand intermediate scrutiny under *Central Hudson Gas & Electric Corporation v. Public Service Commission*, 447 U.S. 557, 566 (1980), because they "are 'narrowly tailored' to achieve a substantial government goal." *United States v. Phillip Morris USA Inc.*, 566 F.3d 1095, 1143 (D.C. Cir. 2009) (quoting *Bd. of Trs. v. Fox*, 492 U.S. 469, 480 (1989)). The government "has a substantial interest through the securities laws in making capital markets more open and efficient" by giving "all investors equal access to all relevant information." *United States v. Wenger*, 427 F.3d 840, 850-51 (10th Cir. 2005). And, while these are Nasdaq's rules rather than the Commission's, the Commission reasonably found that they further those purposes by ensuring that investors have consistent, comparable access to information important to their investment and voting decisions. *See supra* 17-19.

### B.     The Board Disclosure Rules do not violate the Fifth Amendment.

AFBR largely concedes that Nasdaq's rules do not, either on their face or by implication, require listed issuers to base board nominations on protected classifications. *See, e.g.*, AFBR Br. 19 (describing "race-neutral" ways companies can comply). It nonetheless argues (at 10) that the rules are subject to strict and heightened scrutiny under the Fifth Amendment's equal protection component

because they "encourag[e]" discrimination based on race and sex.  But the cases they

rely on are inapposite.

All of those cases involved schemes that required compliance (or "good faith

efforts" to comply) with a racial set-aside or conferred tangible advantages based on

the race or sex of a company's owners, employees, or contractors.  *See Adarand

Constructors, Inc. v. Pena*, 515 U.S. 200, 205-09 (1995) (financial incentives rewarding the

hiring of minority contractors); *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v.

City of Jacksonville*, 508 U.S. 656, 667 (1993) (set-aside program that "excluded [non-

minority-owned businesses] from consideration for a certain portion of [municipal

contracts]"); *W.H. Scott*, 199 F.3d at 214 (city policy under which non-minority

contractors "risk[ed] termination of [their] contracts" if they failed to meet a numeric

goal for minority participation or demonstrate good faith efforts to do so); *Monterey

Mech. Co. v. Wilson*, 125 F.3d 702, 708-10 (9th Cir. 1997) (statute disadvantaging bids

of contractors that did not meet minority or gender participation goals or demonstrate

good faith efforts to do so).

These cases found a constitutional injury because companies were advantaged

or disadvantaged by governmental entities based on the racial or sexual composition

of their ownership or employees (or their efforts to achieve a particular racial or

sexual composition).  *See, e.g., City of Jacksonville*, 508 U.S. at 666.  But nothing like that

is at issue here.  There are multiple ways companies can comply with Nasdaq's rules

without making any decisions or additional efforts based on suspect classifications.  A rule that merely facilitates disclosure of information important to investors' decision-making—without dictating who it may hire—is not subject to heightened scrutiny. *See, e.g.*, *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 745 (2007) (plurality opinion); *id.* at 788 (2007) (Kennedy, J., concurring); *cf. Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 545 (2015).  And for all the reasons already discussed, the rules easily survive rational basis review.

*    *    *

AFBR contends (at, *e.g.*, 8, 11, 12, 18) that the brevity of the response to the First and Fifth Amendment objections in the Commission's order shows that the Commission cannot justify the rules.  But the order's treatment of those issues is understandable in light of the uniform judicial consensus for the last half-century that SRO rules are not state action subject to constitutional constraints.  If the Court were to depart from that longstanding consensus, and if it were to agree that consideration of the constitutional issues would benefit from a more fully developed agency analysis, such an analysis could be undertaken on remand.

## CONCLUSION

The petitions for review should be denied.

Respectfully submitted,

/s/ Daniel E. Matro

MEGAN BARBERO
General Counsel

MICHAEL A. CONLEY
Solicitor

TRACEY A. HARDIN
Assistant General Counsel

DANIEL E. MATRO
Senior Appellate Counsel

JOHN R. RADY
Appellate Counsel

Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-8248 (Matro)

April 2024

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,991 words, excluding the parts exempted by Fed. R. App. P. 32(f) and 5th Cir. R. 32.2.

I also certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface—Garamond, 14 point—using Microsoft Word.

April 29, 2024

 /s/ *Daniel E. Matro*
Daniel E. Matro

## CERTIFICATE OF SERVICE

I hereby certify that on April 29, 2024, I electronically filed the foregoing En Banc Brief of the Securities and Exchange Commission, Respondent, with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system, which will send notice to all the parties.

*/s/ Daniel E. Matro*
Daniel E. Matro

April 29, 2024