No. 21-60626

# In the United States Court of Appeals for the Fifth Circuit

ALLIANCE FOR FAIR BOARD RECRUITMENT;
NATIONAL CENTER FOR PUBLIC POLICY RESEARCH,

*Petitioners*,

v.

SECURITIES AND EXCHANGE COMMISSION,

*Respondent*.

On Petition for Review of an Order of the
Securities and Exchange Commission

## SUPPLEMENTAL EN BANC BRIEF OF INTERVENOR THE NASDAQ STOCK MARKET LLC

John Zecca
Jeffrey S. Davis
John Yetter
Joanne Pedone
THE NASDAQ STOCK MARKET LLC
805 King Farm Boulevard
Rockville, Maryland  20850

Stephen J. Kastenberg
Paul Lantieri III
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, Pennsylvania  19103

Seth D. Berlin
BALLARD SPAHR LLP
1909 K Street, N.W., 12th Floor
Washington, D.C.  20006

Allyson N. Ho
Bradley G. Hubbard
Paulette C. Miniter
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas  75201
Telephone: (214) 698-3100
Facsimile:  (214) 571-2900

Amir C. Tayrani
Amalia E. Reiss
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036

*Counsel for Intervenor The Nasdaq Stock Market LLC*

### CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| Petitioners | Counsel for Petitioners |
|---|---|
| Alliance for Fair Board Recruitment | C. Boyden Gray<br>Jonathan Berry<br>R. Trent McCotter<br>Michael Buschbacher<br>Jordan E. Smith<br>BOYDEN GRAY & ASSOCIATES<br>801 17th Street, N.W., Suite 350<br>Washington, D.C. 20006 |
| National Center for Public Policy Research | Margaret A. Little<br>Sheng Li<br>NEW CIVIL LIBERTIES ALLIANCE<br>1225 19th Street, N.W., Suite 450<br>Washington, D.C. 20036 |
| **Respondent** | **Counsel for Respondent** |
| Securities and Exchange Commission | Michael A. Conley<br>Vanessa A. Countryman<br>Tracey A. Hardin<br>Daniel E. Matro<br>John R. Rady<br>U.S. SECURITIES & EXCHANGE COMMISSION<br>100 F Street, N.E.<br>Washington, D.C. 20549 |

| Intervenor | Counsel for Intervenor |
|---|---|
| The Nasdaq Stock Market LLC<br><br>Nasdaq, Inc. (The Nasdaq Stock Market LLC's parent company)<br><br>Borse Dubai Limited (owns more than 10 percent of Nasdaq, Inc.'s shares)<br><br>Investor AB (owns more than 10 percent of Nasdaq, Inc.'s shares)<br><br>Thoma Bravo UGP, LLC (owns more than 10 percent of Nasdaq, Inc.'s shares) | Allyson N. Ho<br>Bradley G. Hubbard<br>Paulette C. Miniter<br>GIBSON, DUNN & CRUTCHER LLP<br>2001 Ross Avenue, Suite 2100<br>Dallas, Texas 75201<br><br>Amir C. Tayrani<br>Amalia E. Reiss<br>GIBSON, DUNN & CRUTCHER LLP<br>1050 Connecticut Avenue, N.W.<br>Washington, D.C. 20036<br><br>John Zecca<br>Jeffrey S. Davis<br>John Yetter<br>Joanne Pedone<br>THE NASDAQ STOCK MARKET LLC<br>805 King Farm Boulevard<br>Rockville, Maryland 20850<br><br>Stephen J. Kastenberg<br>Paul Lantieri III<br>BALLARD SPAHR LLP<br>1735 Market Street, 51st Floor<br>Philadelphia, Pennsylvania 19103<br><br>Seth D. Berlin<br>BALLARD SPAHR LLP<br>1909 K Street, N.W., 12th Floor<br>Washington, D.C. 20006 |

Respectfully submitted,

/s/ Allyson N. Ho

Allyson N. Ho
*Counsel of Record*

## TABLE OF CONTENTS

Page

Certificate of Interested Persons ..............................................i

Table of Authorities ............................................................v

Introduction ......................................................................1

Jurisdictional Statement.........................................................5

Issues Presented .................................................................6

Statement of the Case ...........................................................7

   I.   Exchanges have existed for hundreds of years as private entities responsible for regulating their members and markets. ..................................................................7

   II.  Nasdaq proposes the Diversity Rules in response to a groundswell of investor interest in reliable, standardized information about listed companies' board diversity.................12

   III. The Commission approves the Diversity Rules after determining they're consistent with the Exchange Act. .............17

   IV. The panel rejects petitioners' challenges to the Diversity Rules.............................................................21

Summary of Argument...........................................................21

Argument .........................................................................26

   I.   Petitioners' constitutional arguments fail for lack of state action. .................................................................26

       A.   Nasdaq is a private company, not a state actor..................27

       B.   Nasdaq's adoption of rules governing its private contractual relationships with listed companies isn't state action. .........................................................29

          1.   Adopting rules governing a stock exchange isn't a traditional, exclusive government function.................30

          2.   There's neither pervasive government entwinement nor significant government coercion or encouragement.......................................33

          3.   The Commission's approval of the Diversity Rules doesn't subject the rules to constitutional scrutiny......34

# TABLE OF CONTENTS
### (continued)

Page

II. The Commission reasonably determined that the Diversity Rules are consistent with the Exchange Act. ............................ 47

   A. Substantial evidence supports the Commission's factual findings about the function and benefits of the Board Diversity Rule. ............................................................. 47

   B. The Commission reasonably applied the Exchange Act's requirements. .................................................... 52

      1. Disclosure furthers core statutory purposes. .............. 53

      2. The Board Diversity Rule doesn't regulate matters unrelated to the Exchange Act. .................................... 57

      3. The Commission reasonably assessed other Exchange Act requirements. ........................................ 64

   C. The record reflects the Commission's thorough and independent review. ............................................................. 67

   D. The Commission properly approved the Board Recruiting Service Rule. ..................................................... 69

Conclusion ............................................................................................. 71

Certificate of Service .................................................................. 73

Certificate of Compliance ....................................................... 73

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
526 U.S. 40 (1999) ........................................................ 35, 37

*Barnes v. Lehman*,
861 F.2d 1383 (5th Cir. 1988) ........................................ 35

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ........................................................ 61

*Bernstein v. Lind-Waldock & Co.*,
738 F.2d 179 (7th Cir. 1984) ........................................ 27, 29

*Blount v. SEC*,
61 F.3d 938 (D.C. Cir. 1995) .......................................... 32

*Blum v. Yaretsky*,
457 U.S. 991 (1982) ................................................... *passim*

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*,
531 U.S. 288 (2001) ............................................ 23, 30, 33

*Burton v. Wilmington Parking Auth.*,
365 U.S. 715 (1961) ........................................................ 44

*Business Roundtable v. SEC*,
647 F.3d 1144 (D.C. Cir. 2011) ...................................... 67

*Business Roundtable v. SEC*,
905 F.2d 406 (D.C. Cir. 1990) .............................. 55, 58, 59

*Cody v. SEC*,
693 F.3d 251 (1st Cir. 2012) .......................................... 42

*D.L. Cromwell Invs., Inc. v. NASD Regul., Inc.*,
279 F.3d 155 (2d Cir. 2002) ........................................ 27, 42

*Desiderio v. NASD, Inc.*,
191 F.3d 198 (2d Cir. 1999) .......................................... 27

*Domestic Sec., Inc. v. SEC*,
333 F.3d 239 (D.C. Cir. 2003) ........................................ 55

*Duffield v. Robertson Stephens & Co.*,
144 F.3d 1182 (9th Cir. 1998) ...................................... 27, 42

v

# TABLE OF AUTHORITIES
(continued)

Page(s)

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v.*
  *JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009) ................................................................ 63

*EEOC v. Luce, Forward, Hamilton & Scripps*,
  345 F.3d 742 (9th Cir. 2003) ................................................................ 27

*First Jersey Secs., Inc. v. Bergen*,
  605 F.2d 690 (3d Cir. 1979) ................................................................ 27

*Flagg Bros., Inc. v. Brooks*,
  436 U.S. 149 (1978) ................................................................ 30

*Frazier v. Bd. of Trs. of Nw. Miss. Reg'l Med. Ctr.*,
  765 F.2d 1278 (5th Cir. 1985) ................................................................ 45

*Free Enter. Fund v. PCAOB*,
  561 U.S. 477 (2010) ................................................................ 28

*Gen. Bond & Share Co. v. SEC*,
  39 F.3d 1451 (10th Cir. 1994) ................................................................ 43

*Goss v. Mem'l Hosp. Sys.*,
  789 F.2d 353 (5th Cir. 1986) ................................................................ 32

*Harding v. Am. Stock. Exch., Inc.*,
  527 F.2d 1366 (5th Cir. 1976) ................................................................ 44

*Hawkins v. NASD Inc.*,
  149 F.3d 330 (5th Cir. 1998) ................................................................ 31

*Intercontinental Indus., Inc. v. Am. Stock Exch.*,
  452 F.2d 935 (5th Cir. 1971) ................................................................ 42, 43, 44

*Jackson v. Metro. Edison Co.*,
  419 U.S. 345 (1974) ................................................................ *passim*

*Jason v. Am. Arbitration Ass'n*,
  62 F. App'x 557 (5th Cir. 2003) ................................................................ 31

*Jones v. SEC*,
  115 F.3d 1173 (4th Cir. 1997) ................................................................ 27

*Kokesh v. SEC*,
  581 U.S. 455 (2017) ................................................................ 25, 52, 53

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Lebron v. Nat'l R.R. Passenger Corp.*,
513 U.S. 374 (1995)........................................................22, 28

*Lugar v. Edmondson Oil Co.*,
457 U.S. 922 (1982)........................................................23, 29

*Manhattan Cmty. Access Corp. v. Halleck*,
587 U.S. 802 (2019)....................................................... *passim*

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011)................................................................60

*MD/DC/DE Broadcasters Ass'n v. FCC*,
236 F.3d 13 (D.C. Cir. 2001).........................................48, 49

*Moose Lodge No. 107 v. Irvis*,
407 U.S. 163 (1972)........................................................40, 41

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)................................................................70

*N. Ala. Express, Inc. v. United States*,
585 F.2d 783 (5th Cir. 1978)..............................................44

*Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*,
53 F.4th 869 (5th Cir. 2022)...............................................46

*Oklahoma v. United States*,
62 F.4th 221 (6th Cir. 2023)...............................................46

*Perpetual Secs., Inc. v. Tang*,
290 F.3d 132 (2d Cir. 2002)................................................28

*R&W Tech. Servs. Ltd. v. CFTC*,
205 F.3d 165 (5th Cir. 2000)...............................................61

*Roberts v. La. Downs, Inc.*,
742 F.2d 221 (5th Cir. 1984)...............................................45

*Rooms v. SEC*,
444 F.3d 1208 (10th Cir. 2006).......................................42, 43

*Sunshine Anthracite Coal Co. v. Adkins*,
310 U.S. 381 (1940)..............................................................46

*Susquehanna Int'l Grp. v. SEC*,
866 F.3d 442 (D.C. Cir. 2017).............................................68

# TABLE OF AUTHORITIES
### (continued)

Page(s)

*TSC Indus., Inc. v. Northway, Inc.*,
  426 U.S. 438 (1976) ............................................................ 60

*United States v. NASD, Inc.*,
  422 U.S. 694 (1975) ............................................................ 58

*United States v. Solomon*,
  509 F.2d 863 (2d Cir. 1975) ........................................ 27, 43

*Village of Bensenville v. FAA*,
  457 F.3d 52 (D.C. Cir. 2006) ................................. 24, 37, 38

*W.H. Scott Constr. Co. v. City of Jackson*,
  199 F.3d 206 (5th Cir. 1999) .............................................. 39

*White v. Scrivner Corp.*,
  594 F.2d 140 (5th Cir. 1979) .............................................. 32

*Yeager v. City of McGregor*,
  980 F.2d 337 (5th Cir. 1993) ................................. 31, 32, 44

## Statutes

15 U.S.C. § 78c ..................................................................... 39

15 U.S.C. § 78f ............................................................ *passim*

15 U.S.C. § 78o-3 ................................................................... 8

15 U.S.C. § 78s ............................................................ *passim*

15 U.S.C. § 78w ..................................................................... 8

15 U.S.C. § 78y ................................................................. 5, 49

Securities Exchange Act of 1934,
  Pub. L. No. 73-291, 48 Stat. 881
  (codified as amended at 15 U.S.C. § 78a *et seq.*) ......................... *passim*

## Rules, Regulations & Regulatory Materials

17 C.F.R. § 229.407 ............................................................. 13

17 C.F.R. § 240.12d2-2 (1970) .......................................... 44

17 C.F.R. § 240.12d2-2 (2021) .......................................... 44

17 C.F.R. § 240.19b-4 ......................................................... 70

# TABLE OF AUTHORITIES
## (continued)

Page(s)

Concept Release Concerning Self-Regulation,
  69 Fed. Reg. 71,256 (Dec. 8, 2004) .............................................. 7, 8, 31

Nasdaq Rule 5250.................................................................................. 12

Nasdaq Rule 5605........................................................................... 12, 63

Nasdaq Rule 5610.................................................................................. 12

Order Approving Nasdaq's Diversity Rules,
  86 Fed. Reg. 44,424 (Aug. 12, 2021)......................................... *passim*

Order Approving Nasdaq's Rule Change Related to
  Switching from NYSE to Nasdaq,
  85 Fed. Reg. 84,434 (Dec. 28, 2020) ..................................................... 70

Order Approving Nasdaq's Rule Requiring Disclosure of
  Compensation by Third Parties to Board Members or
  Nominees,
  81 Fed. Reg. 44,400 (July 7, 2016) ....................................................... 60

Order Approving The Nasdaq Stock Market LLC's
  Registration as a National Securities Exchange,
  71 Fed. Reg. 3550 (Jan. 23, 2006) ........................................................ 10

Suspension of Trading and Removal from Listing and
  Registration,
  28 Fed. Reg. 1506 (Feb. 16, 1963) ....................................................... 43

## Other Authorities

By-laws of The Nasdaq Stock Market LLC ............................................. 11

Steven J. Cleveland,
  *The NYSE as State Actor?: Rational Actors, Behavioral*
  *Insights & Joint Investigations*,
  55 Am. U. L. Rev. 1 (2005).................................................................. 45

Virginia Harper Ho,
  *"Comply or Explain" and the Future of Nonfinancial*
  *Reporting*,
  21 Lewis & Clark L. Rev. 317 (2017) .................................................. 49

### TABLE OF AUTHORITIES
(continued)

Page(s)

Phil Mackintosh,
*Nasdaq: 50 Years of Market Innovation*,
Nasdaq (Feb. 11, 2021) ......................................................... 11

Jerry W. Markham & Daniel J. Harty,
*For Whom the Bell Tolls: The Demise of Exchange*
*Trading Floors & the Growth of ECNs*,
33 J. Corp. L. 865 (2008) ........................................................ 7

Nasdaq,
*Initial Listing Guide* (Jan. 2024) ........................................ 11

Nasdaq,
*Listing Agreement* .............................................................. 11

SEC Div. of Mkt. Regul.,
*Market 2000: An Examination of Current Equity Market*
*Developments* (Jan. 1994) ...................................................... 8

Second Amended Limited Liability Company Agreement of
The Nasdaq Stock Market LLC (July 9, 2009) .................. 10

Steve Seelig & Lindsay Green,
*Initial 10-K Disclosures Provide Limited Data on Human*
*Capital Metrics*,
Willis Towers Watson (Jan. 28, 2021) ................................ 62

*Webster's New International Dictionary* (2d ed. 1934) ........... 56

## INTRODUCTION

This case is about whether Nasdaq—a private securities exchange that sets rules for companies that choose to list on its exchange—is an arm of the state subject to constitutional strictures simply because it's regulated by the Securities and Exchange Commission. The answer is no. Any other result would subject a virtually unlimited array of private conduct—from charter schools' educational decisions to heavily regulated businesses' commercial dealings—to constitutional constraints. This Court should reject such an unprecedented view of state action.

Nasdaq is a private company registered with the Commission as a national securities exchange. As exchanges have done for two centuries, Nasdaq establishes rules concerning the operations of its exchange, including the listing rules companies agree to follow when they enter into private, voluntary contracts with Nasdaq to list their securities on its exchange. Under the Exchange Act, before an exchange's proposed rule can become effective, the exchange must submit it to the Commission, which must approve the rule if it's "consistent with" the Act.

Responding to a groundswell of interest from investors in the diversity of public companies' boards, Nasdaq proposed two rules and

submitted them for the Commission's review. The first—the Board Diversity Rule—requires listed companies to (1) disclose aggregated information about voluntarily self-identified diversity characteristics (race, gender, and sexual orientation) of their board members and (2) provide an explanation if fewer than two board members are diverse. The second—the Board Recruiting Service Rule—provides listed companies with free, optional access to a third-party board recruiting service with a network of diverse, board-ready candidates. The Commission approved both rules after determining they were consistent with the Exchange Act.

Petitioners seek to overturn that approval on the theory that the rules are unconstitutional and, in the alternative, that the Commission's order violates the Exchange Act and the Administrative Procedure Act. Neither argument is correct.

Even *reaching* the constitutional questions would require transgressing well-settled limits on the rare and narrow circumstances in which private companies like Nasdaq can be deemed state actors—a step that would "significantly endanger individual liberty and private enterprise" by imposing constitutional constraints on private commercial

activity throughout the economy. *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 816 (2019).

Abandoning many of their panel-stage state-action arguments, petitioners now focus on arguing that private enterprises that are required to secure government approval of their private conduct necessarily become arms of the state. But that is not the law. And accepting that view would work a radical sea change—upending longstanding state-action precedent and disrupting the economy by requiring vast numbers of regulated private enterprises to comply with the Constitution when making routine, private decisions. This Court shouldn't be the first to take such a drastic step.

Petitioners' challenge to the Commission's determination that the rules are consistent with the Exchange Act fares no better. Although petitioners ask this Court to take sides in a debate about boardroom diversity, that policy question isn't before the Court. What *is* before the Court is whether the Commission reasonably determined that Nasdaq's Board Diversity Rule would "provide widely available, consistent, and comparable information that would contribute to investors' investment and voting decisions"—information that was generally *publicly* available,

just not in an easily accessible and comparable format—and further the Exchange Act's disclosure-related objectives.  JA7.

Ample record evidence—including submissions from a "diverse collection of commenters who expressed interest in board diversity information" to further their investment-related decisions, JA7— supports that determination, along with the Commission's determination that the Board Recruiting Service Rule would help listed companies "meet . . . the diversity objectives" of the Board Diversity Rule, "if they elect to meet those objectives."  JA3.

Issues surrounding boardroom diversity raise important questions on which people of good faith can disagree.  But this case presents none of those questions.  Because the Commission did not act arbitrarily, capriciously, or without substantial evidence in finding that the rules comply with the Exchange Act, the Court should deny the petitions for review.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under Section 25(a) of the Exchange Act. 15 U.S.C. § 78y(a). The Commission issued the challenged order on August 6, 2021. Petitioners filed timely petitions for review on August 9 and October 5, 2021.

## ISSUES PRESENTED

1.  Whether Nasdaq—a private company that adopted the rules at issue concerning its own private contractual relationships with the companies that voluntarily decide to list on its exchange—is a state actor and, if not, whether its rules are nevertheless state action subject to constitutional requirements.

2.  Whether the Commission's determination that the rules at issue comport with the Exchange Act is arbitrary, capricious, or lacking in substantial evidence.

## STATEMENT OF THE CASE

## I.    Exchanges have existed for hundreds of years as private entities responsible for regulating their members and markets.

**A.**    In the late eighteenth century, the first organizations were established to formally govern securities trading in the United States— the Philadelphia Stock Exchange and the New York Stock Exchange— and shortly thereafter they began adopting rules governing their members and listed companies.  *See*, *e.g.*, 69 Fed. Reg. 71,256, 71,257 (Dec. 8, 2004); Jerry W. Markham & Daniel J. Harty, *For Whom the Bell Tolls:  The Demise of Exchange Trading Floors & the Growth of ECNs*, 33 J. Corp. L. 865, 868–69 (2008).

Exchanges regulated their members and markets unhampered by federal intervention until, in response to the stock market crash of 1929 and other events, Congress passed the Securities Exchange Act of 1934, Pub. L. No. 73-291, 48 Stat. 881 (codified as amended at 15 U.S.C. § 78a *et seq.*).  The Exchange Act formally recognized the self-regulatory role of exchanges and required them to register with the Commission as "self-regulatory organizations."  15 U.S.C. §§ 78f, 78s.

Under the Exchange Act, self-regulatory organizations—like exchanges and clearing agencies—are private entities that adopt their own rules governing their members and enforce compliance with those rules. *See* 15 U.S.C. §§ 78f, 78o-3. The Commission, in turn, oversees exchanges and other self-regulatory organizations—including through its review of their proposed rules for consistency with the Exchange Act— and promulgates its own rules that govern the securities markets more generally. *See*, *e.g.*, 15 U.S.C. §§ 78f, 78o-3, 78w.

As the Commission has explained, "Congress concluded that self-regulation . . . was a mutually beneficial balance between government and securities industry interests" because it allows for "supervis[ion] by an organization familiar with the nuances of securities industry operations" and "less invasive regulation," while also allowing the government to "benefit[] by being able to leverage its resources through its oversight" function. 69 Fed. Reg. at 71,257. In the judgment of Congress and the Commission, self-regulation by private entities like Nasdaq is more efficient and effective than government regulation. *See* 69 Fed. Reg. at 71,258; SEC Div. of Mkt. Regul., *Market 2000: An*

*Examination of Current Equity Market Developments* VI-6–7 (Jan. 1994),

https://tinyurl.com/2wyzd9wr.

Despite amending the Exchange Act on multiple occasions, Congress has never altered the private, non-governmental status of exchanges and other self-regulatory organizations.

**B.**    Under the Exchange Act, exchanges develop their own rules to govern the companies that contract to list their stock on the exchange (as well as the brokers and dealers that trade on the exchange).  15 U.S.C. § 78f(b).  With the exception of certain types of rules not at issue here, an exchange's rules take effect only after the Commission reviews and approves them.  15 U.S.C. § 78s(b)(1), (2).

Under the Exchange Act, the Commission "shall approve" an exchange's proposed rule "if it finds that" the rule "is consistent with the [Exchange Act's] requirements."  15 U.S.C. § 78s(b)(2)(C)(i).

A rule is consistent with the Exchange Act if it's "designed to":

- prevent fraudulent and manipulative acts and practices,

- promote just and equitable principles of trade,

- foster cooperation and coordination with persons engaged in regulating, clearing, settling, processing information with respect to, and facilitating transactions in securities,

- remove impediments to and perfect the mechanism of a free and open market and a national market system, and

- protect investors and the public interest.

15 U.S.C. § 78f(b)(5).  The Commission must also find that the rule is "not designed to":

- permit unfair discrimination between customers, issuers, brokers, or dealers, or

- regulate matters unrelated to the Exchange Act's purposes.

15 U.S.C. § 78f(b)(5).  And the Commission must determine that the rule "do[es] not impose" any unnecessary or inappropriate burden on competition.  15 U.S.C. § 78f(b)(8).

**C.**  Nasdaq is a private, limited liability company wholly owned by Nasdaq, Inc., its publicly listed parent company.  *See* Second Amended Limited Liability Company Agreement of The Nasdaq Stock Market LLC (July 9, 2009), https://tinyurl.com/2s3vt8nw.

Nasdaq was launched in 1971 by the National Association of Securities Dealers (NASD)—a self-regulatory organization responsible for regulating broker-dealers—and spun off in 2006, when it registered with the Commission as an exchange.  *See* 71 Fed. Reg. 3550 (Jan. 23,

2006); Phil Mackintosh, *Nasdaq:  50 Years of Market Innovation*, Nasdaq (Feb. 11, 2021), https://tinyurl.com/2x3z3uda.

Nasdaq's board of directors is selected by its broker-dealer members and by Nasdaq, Inc.—neither the Commission nor any other government agency has the power to appoint a director to Nasdaq's board or otherwise control board membership.  *See* By-laws of The Nasdaq Stock Market LLC, arts. II–III, https://tinyurl.com/2p99k62s.

To list their stock on Nasdaq, companies enter into voluntary contractual agreements with the exchange that provide for Nasdaq to facilitate the listing and trading of their securities and for the companies to abide by Nasdaq's rules.  *See*, *e.g.*, Nasdaq, *Initial Listing Guide* (Jan. 2024), https://tinyurl.com/4z6jktzk; Nasdaq, *Listing Agreement*, https://tinyurl.com/2whjhzt3.

Over the years, Nasdaq has developed and proposed—and the Commission has approved—many rules governing companies listed on its exchange.  These rules address everything from listing qualifications and procedures to corporate disclosures and governance, including requirements for the composition of listed companies' boards and committees.  For example, Nasdaq-listed companies must have a

majority independent board, Rule 5605(b)(1); adopt a code of conduct and disclose any waivers of the code for directors or executive officers, Rule 5610; and disclose any third-party compensation of board members and nominees, Rule 5250(b)(3).[1]

In lieu of listing on Nasdaq, companies are free to decide to list with a competitor exchange; publicly trade without listing ("over-the-counter"); or go private.

## II. Nasdaq proposes the Diversity Rules in response to a groundswell of investor interest in reliable, standardized information about listed companies' board diversity.

In recent years, there has been an increasingly intense focus on corporate board diversity by significant segments of investors. *See, e.g.*, JA262 nn.4–7 (citing survey results).

In response, many publicly traded companies have increased their focus on board diversity and related disclosures. *See, e.g.*, JA160; JA648 (emphasizing importance of "useful, comparable data about the composition of corporate boards"); Listed Companies Panel-Stage Amicus Br. 5 (describing "strong and growing investor interest in board diversity data"). This widespread interest in board diversity prompted the

---

[1]  Nasdaq's *Rulebook* is available at https://tinyurl.com/37w6mr5h.

Commission to adopt a rule in 2009 that requires the disclosure of whether and how a company's board or board nominating committee considers diversity in identifying nominees for the board. *See* 17 C.F.R. § 229.407(c)(2)(vi).

Despite the adoption of that rule, institutional investors and other market participants continued to call for greater disclosure of board-level diversity information, which wasn't covered by the Commission's 2009 rule or widely available in a reliable, standardized format. JA305–13. These demands were prompted by a substantial and growing body of empirical evidence that board diversity improves corporate governance and company performance. *See*, *e.g.*, JA275–93 (reviewing empirical studies); *see* Business Academics Panel-Stage Amicus Br. 6–21.

In response, Nasdaq consulted investors, venture capitalists, and public and private companies to obtain their views on possible rule changes related to diversity disclosures. JA300. These stakeholders made clear that they desired "disclosure requirements that would standardize the reporting of board diversity statistics." JA301.

To satisfy this broad-based investor demand, Nasdaq developed the Board Diversity Rule and the Board Recruiting Service Rule and submitted them to the Commission for approval.

**A.**    The Board Diversity Rule has two principal elements.  First, the rule requires companies listed on Nasdaq to publicly disclose a standardized Board Diversity Matrix that provides aggregated information on the voluntarily self-identified gender and racial characteristics and LGBTQ+ status of their board of directors.  JA319–28.  Second, the rule requires listed companies to provide an explanation if they don't have at least two diverse board members (including at least one director who self-identifies as female and at least one director who self-identifies as a racial minority or LGBTQ+).  JA328–30.

The rule provides significant flexibility to board members and listed companies.  Board members may choose to opt out rather than disclose their diversity characteristics to their company.  JA368.  And companies that don't have at least two diverse board members can provide an explanation as anodyne as:  "The Company does not meet the diversity objectives . . . because it does not believe Nasdaq's listing rule is appropriate" or "because it does not believe achieving Nasdaq's diversity

objectives [is] feasible given the company's current circumstances." JA205.  Nasdaq doesn't evaluate in any way the substance or merits of a company's explanation.  JA5.

Nasdaq's compliance measures are limited to ensuring that listed companies disclose their board members' voluntarily self-reported demographic statistics and provide any required explanation regarding their board's composition.  JA3–4.  No company will be delisted—or face any other sanction—based on its board composition, the substance of its explanation, or a director's unwillingness to make a voluntary demographic disclosure.  JA204, 224–25.

**B.**    Under the Board Recruiting Service Rule, Nasdaq provides listed companies that don't have two diverse board members with one year of free access to Equilar's board recruiting service.  JA218–19.  That service provides companies that opt to use it with access to Equilar's network of candidates, whom the companies can evaluate at their discretion.  JA218–19.  No company is required to use the service, or to select any proffered candidate, and Nasdaq has no role in Equilar's compilation of director candidates.  JA20–21.

**C.**    Investors' comment letters emphasized the value of standardized diversity disclosures, which would help investors make informed trading and proxy-voting decisions and facilitate their ability to assess the impact of board diversity on company performance.

The Illinois State Treasurer, for example, highlighted that the "current reporting environment . . . creates confusion and barriers to effective investment analysis and decision-making; it generates information asymmetry, disorder and inefficiency; and it jeopardizes optimal capital formation." JA655. Ariel Investments emphasized that "comparable comprehensive data" along these lines "helps us make informed investment decisions." JA670. And the Council of Institutional Investors stated that the rules would provide investors with "a better understanding of [a] company's reasons for not having at least two Diverse directors" and that investors "can use that information to make an informed investment or voting decision." JA663–64.

Several Nasdaq-listed companies also filed comments supporting the rules, emphasizing that "consistent and uniform" disclosures would be "mutually beneficial for both the investor community and the company." JA686; *see also* JA642–43; JA650.

16

### III. The Commission approves the Diversity Rules after determining they're consistent with the Exchange Act.

After the notice-and-comment period, the Commission approved the rules as "consistent with the requirements of the [Exchange] Act."  JA2.

**A.**   The Commission reaffirmed that Nasdaq is a private entity, not a state actor:  "Numerous courts (and the Commission) have repeatedly held that [self-regulatory organizations] generally are not state actors."  JA17 & n.231 (citing cases).  The Commission further explained that neither its "[m]ere approval" of Nasdaq's proposed rules nor its "extensive and detailed" regulation of Nasdaq is sufficient to convert Nasdaq's private conduct into state action.  JA17 & nn.232–33.  And the Commission concluded that, even if the rules were state action, they "would survive constitutional scrutiny" because they do not establish board-composition "mandates" and the required disclosures "are factual in nature."  JA17.

**B.**   The Commission also determined that the rules are consistent with the Exchange Act.  Nasdaq justified the rules in part by pointing to an "extensive body of empirical research [that] demonstrates that diverse boards are positively associated with improved corporate governance and company performance."   JA268.   The Commission independently

determined that the studies on the performance "effects of changes in board diversity" were "mixed" and "remain the subject of reasonable debate." JA9.

The Commission nevertheless determined, based on Nasdaq's second justification, that the Board Diversity Rule would "make consistent and comparable statistics widely available to investors regarding the number of Diverse directors serving on a Nasdaq-listed company's board"—information that's "currently not widely available" and about which "commenters representing a broad array of investors have indicated an interest." JA2.

The Commission further found that the rule would "provide increased transparency" and "augment existing Commission requirements that companies disclose whether, and how, their boards or board nominating committees consider diversity in nominating new directors." JA2. These disclosures, in turn, would "make it more efficient and less costly for investors to collect, use, and compare information on board diversity" and "enhance investors' ability to make informed investment and voting decisions." JA7.

Because the Board Diversity Rule would "provide investors with information to facilitate their evaluation of companies in which they might invest," the Commission found it would "contribute to the maintenance of fair and orderly markets" and therefore was "designed to promote just and equitable principles of trade, remove impediments to and perfect the mechanism of a free and open market and a national market system, and protect investors and the public interest." JA2.

Finally, the Commission found that the Board Diversity Rule was "not designed to permit unfair discrimination between issuers or to regulate by virtue of any authority conferred by the Act matters not related to the purposes of the Act or the administration of the Exchange, and would not impose any burden on competition that is not necessary or appropriate in furtherance of the purposes of the Act." JA2.

The Commission emphasized that the rule "would not impose a burden on competition between issuers that is not necessary or appropriate in furtherance of the purposes of the Act" because it didn't "mandate any particular board composition" and because it provided "companies flexibility in formulating an explanation for" their board composition. JA2, 13.

Providing "more flexibility" to smaller companies with smaller boards isn't "unfairly discriminatory, and does not impose an unnecessary or inappropriate burden on competition," the Commission explained, given "the unique challenges (including potential resource constraints)" those companies face.  JA12–13.  So, too, for providing foreign issuers "flexibility," given "the differing demographic compositions of foreign countries" and the "different circumstances associated with Foreign Issuers hiring Diverse directors."  JA12.

**C.**    Turning to the Board Recruiting Service Rule, the Commission found that it would enable eligible companies to "identify and evaluate" diverse candidates if they choose to use the optional service and "help [Nasdaq] compete to attract and retain listings."  JA3.

As a result, the Commission found that the rule was "designed to provide for the equitable allocation of reasonable dues, fees, and other charges among issuers, is not designed to permit unfair discrimination among issuers, and does not impose any burden on competition not necessary or appropriate in furtherance of the purposes of the Act."  JA3.

## IV. The panel rejects petitioners' challenges to the Diversity Rules.

Petitioners sought review in this Court, contending that the Diversity Rules violate the Constitution and that the Commission's approval of the rules violated the Exchange Act and the APA. A panel of this Court denied the petitions.

The panel rejected petitioners' constitutional challenges, holding, in accordance with longstanding precedent, that Nasdaq isn't a state actor and the Commission's review and approval of rules Nasdaq developed and proposed didn't transform Nasdaq's rules into state action. Op. 7–22.

The panel also rejected petitioners' statutory challenges, holding that substantial evidence supports the Commission's finding that the Board Diversity Rule is consistent with the Exchange Act's disclosure-related objectives, and that the Commission's approval of the Board Recruiting Service Rule was neither arbitrary nor capricious. Op. 22–52.

### SUMMARY OF ARGUMENT

Petitioners focus on boardroom diversity as a question of public policy, but this case doesn't present that issue. Instead, the fundamental issue is whether Nasdaq's adoption of disclosure rules as part of its

private contractual relationships with its listed companies is subject to constitutional scrutiny—a position that would require massively expanding who's a state actor and what's state action. Adopting that position would subject vast swaths of the private sector—from energy companies and airlines to charter schools—to constitutional constraints.

The second issue is whether the Commission acted arbitrarily, capriciously, or without substantial evidence in determining that Nasdaq's rules are consistent with the Exchange Act. Because the answer to both questions is no, the petitions for review should be denied.

**I.** Petitioners challenge Nasdaq's rules primarily on constitutional grounds, but those arguments fail at the outset because Nasdaq is a private company, so its rules aren't subject to constitutional scrutiny.

The Supreme Court's narrow exception for treating a nominally private company as part of the government is inapplicable here. Nasdaq wasn't created by the government for the furtherance of government objectives, and the government has no authority to appoint Nasdaq's directors. *See Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 399 (1995). And the fact that Nasdaq is heavily regulated isn't sufficient to

transform it into a state actor because, as the Supreme Court has made clear, "being regulated by the State does not make one a state actor." *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 816 (2019).  If it did, every heavily regulated private enterprise in the country would be an arm of the state.  That cannot be right.

Nor does Nasdaq's adoption of rules that govern its own contractual relationships with listed companies meet any of the tests for attributing a private party's conduct to the government.  *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982).  Exchanges have been exclusively private enterprises since the eighteenth century, so Nasdaq's adoption of rules doesn't entail "exercis[ing] powers that are 'traditionally the exclusive prerogative of the State.'" *Blum v. Yaretsky*, 457 U.S. 991, 1005 (1982) (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 353 (1974)).

Nasdaq isn't sufficiently "entwined" with—and wasn't sufficiently coerced or encouraged by—the government to satisfy the state-action requirement, and petitioners don't argue otherwise.  *See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001).

Petitioners instead contend that there's state action because the Commission approved Nasdaq's rules.  But neither the Commission's

approval nor its status as a respondent in this case alters the analysis. *See Village of Bensenville v. FAA*, 457 F.3d 52, 65 (D.C. Cir. 2006). A contrary result would render the state-action doctrine a dead letter by allowing plaintiffs to subject private activity to constitutional constraints simply by suing the approving government agency rather than the private party that requested the government agency's approval.

Finally, petitioners' state-action argument finds no support in the provision of the Exchange Act requiring Nasdaq to enforce its rules against its members and associated persons. 15 U.S.C. § 78s(g)(1). That provision doesn't require Nasdaq to enforce its rules against the listed companies to which the Board Diversity Rule applies.

**II.**    Petitioners' statutory challenges fare no better. The Commission acted reasonably on the basis of substantial evidence when it found that Nasdaq's rules are consistent with the Exchange Act.

First, substantial evidence supports the Commission's finding that the Board Diversity Rule creates a "disclosure-based framework" that provides investors with "widely available, consistent, and comparable information" and that the Board Diversity Matrix, in particular, meets the "broad demand" for a "more efficient and less costly" way "to collect,

use, and compare information on board diversity." JA5, 7. Petitioners'
efforts to characterize the rule as a rigid quota, rather than a disclosure
provision, ignore the rule's text and operation, including the significant
flexibility it provides to listed companies.

Given the Commission's findings on the rule's informational
benefits, the Commission reasonably concluded that the rule complies
with the Exchange Act. That's because fostering increased transparency
and providing investors with sought-after information both further the
Act's core, disclosure-related objectives. *See, e.g.*, *Kokesh v. SEC*, 581
U.S. 455, 458 & n.1 (2017).

Petitioners' contention that the SEC decisively rejected a link
between board diversity and improved corporate governance is wrong.
The Commission examined the evidence and concluded it was "mixed."
And the record makes clear that an array of investors believes that board
diversity improves corporate performance. As long as the rule provides
those investors with information they'll use in making investment and
proxy-voting decisions—which the Commission found to be the case,
based on substantial record evidence—it's consistent with the Exchange
Act. And contrary to petitioners' arguments, nothing in the Exchange

25

Act restricts the disclosure rules Nasdaq can adopt to those involving "material" information—but even if there were, the rule would meet that standard.

Second, the Commission reasonably concluded that the Board Recruiting Service Rule is consistent with the Exchange Act because it enables companies to identify candidates for board seats and helps Nasdaq compete to attract and retain listings. Petitioners provide no basis for overriding the Commission's determination.

## ARGUMENT

## I.    Petitioners' constitutional arguments fail for lack of state action.

Nasdaq is a private company, not a government actor. It adopted the rules on its own initiative without any government coercion, encouragement, or entanglement. Petitioners' constitutional arguments fail at the outset because Nasdaq isn't a state actor whose actions are subject to constitutional scrutiny, nor is its adoption of its rules fairly attributable to the government. Courts across the country have rejected

similar attempts to subject private self-regulatory organizations like Nasdaq to constitutional scrutiny.[2]

This Court should do the same because accepting petitioners' argument would massively expand who is considered a state actor and what is considered state action and, in doing so, subject virtually every aspect of private enterprise to constitutional constraints.

### A.    Nasdaq is a private company, not a state actor.

The Constitution doesn't generally apply to private companies like Nasdaq. And petitioners no longer contend that Nasdaq is a state actor. *Compare* NCPPR Panel-Stage Br. 16–18 (arguing Nasdaq is a state actor under *Lebron*), *with* NCPPR Supp. Br. (abandoning *Lebron* argument).

For good reason. Far from being created by the government, Nasdaq was established by a private association of securities dealers; it

---

[2] *See, e.g.*, *D.L. Cromwell Invs., Inc. v. NASD Regul., Inc.*, 279 F.3d 155, 162 (2d Cir. 2002); *Desiderio v. NASD, Inc.*, 191 F.3d 198, 206–07 (2d Cir. 1999); *Duffield v. Robertson Stephens & Co.*, 144 F.3d 1182, 1200–02 (9th Cir. 1998), *overruled on other grounds by EEOC v. Luce, Forward, Hamilton & Scripps*, 345 F.3d 742 (9th Cir. 2003); *Jones v. SEC*, 115 F.3d 1173, 1183 (4th Cir. 1997); *Bernstein v. Lind-Waldock & Co.*, 738 F.2d 179, 186 (7th Cir. 1984); *First Jersey Secs., Inc. v. Bergen*, 605 F.2d 690, 698 (3d Cir. 1979); *United States v. Solomon*, 509 F.2d 863, 871 (2d Cir. 1975) (Friendly, J.); *see also* FINRA Panel-Stage Amicus Br. 17–23 (providing circuit-by-circuit analysis).

doesn't operate under the direction or control of the Commission or any other government actor; and its board members are free to determine its budget and operational priorities without government interference— they're neither government appointees nor removable by the President or any other government official. *See supra* p. 11; *compare Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 399 (1995) (Amtrak is a state actor because it was "created" by the government "for the furtherance of governmental objectives" and the government retained "authority to appoint a majority of [its] directors").[3]

Petitioners don't contend that the Commission's oversight converts Nasdaq into a state actor, either. *Compare* NCPPR Panel-Stage Br. 17 (arguing Nasdaq is a state actor because it is "subject to extensive oversight"), *with* NCPPR Br. (abandoning oversight argument). As the Supreme Court recently reiterated, "the 'being heavily regulated makes you a state actor' theory of state action is entirely circular and would

---

[3] *See also Free Enter. Fund v. PCAOB*, 561 U.S. 477, 484–85 (2010) (distinguishing "private self-regulatory organizations in the securities industry," which aren't "Government-created, Government-appointed" entities); *Perpetual Secs., Inc. v. Tang*, 290 F.3d 132, 138 (2d Cir. 2002) ("*Lebron* is clearly distinguishable" because there "is no commonality between NASD and Amtrak").

significantly endanger individual liberty and private enterprise." *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 816 (2019) ("being regulated by the State does not make one a state actor"); *see also Jackson v. Metro. Edison Co.*, 419 U.S. 345, 350 (1974) (same). A contrary rule would federalize "much of the private sector, ranging from hospitals to railroads," and would sweep in not only Nasdaq, but also the NYSE, more than a dozen other securities exchanges, and every other private entity subject to comprehensive government oversight. *Bernstein*, 738 F.2d at 186.

## B. Nasdaq's adoption of rules governing its private contractual relationships with listed companies isn't state action.

Petitioners claim (Alliance Br. 39–40; NCPPR Br. 41–44) that even if Nasdaq isn't a state actor for all purposes, its adoption of rules to govern its contractual relationships with listed companies is nonetheless state action under the Supreme Court's "fairly attributable to the government" exception in *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982). Not so. None of the indicia of state action in *Lugar* and its progeny is present here—no (1) traditional, exclusive government function; no (2) excessive entanglement with the government; and no

(3) government coercion or encouragement.  *See Blum v. Yaretsky*, 457 U.S. 991, 1004–05 (1982); *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296–97 (2001).

### 1.    Adopting rules governing a stock exchange isn't a traditional, exclusive government function.

The conduct of a private entity may be deemed state action where it performs a public function by "exercis[ing] powers that are 'traditionally the exclusive prerogative of the State.'"  *Blum*, 457 U.S. at 1005 (quoting *Jackson*, 419 U.S. at 353).  To "qualify as a traditional, exclusive public function within the meaning of [the Supreme Court's] state-action precedents, the government must have traditionally *and* exclusively performed the function."  *Halleck*, 587 U.S. at 809; *see also Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 158 (1978) ("While many functions have been traditionally performed by governments, very few have been 'exclusively reserved to the State.'").

Historically, the regulation of securities exchanges has been a *private* function undertaken by exchanges themselves, not the government.  *See supra* p. 7.  Indeed, until the 1930s, the federal government had *no role at all* in regulating exchanges or their members.

*Id.*  Congress left that century-and-a-half-old model of self-regulation in place when it enacted the Exchange Act.  *See* 69 Fed. Reg. at 71,257.

Because establishing exchange rules isn't a "power traditionally exclusively reserved to the state," *Yeager v. City of McGregor*, 980 F.2d 337, 340 (5th Cir. 1993) (quoting *Jackson*, 419 U.S. at 352), Nasdaq's adoption of rules governing its private contractual relationships with listed companies isn't one of the "very few" functions that fall into the category of "exclusive public function[s]."  *Halleck*, 587 U.S. at 809; *see also Yeager*, 980 F.2d at 340–41 (volunteer fire department not a state actor because firefighting isn't an exclusive state function in Texas).

NCPPR's suggestion (at 37–38) that Nasdaq's *adoption* of rules constitutes state action because it has immunity from suits based on its *enforcement* of those rules misses the mark.  After all, no one contends that the AAA or its arbitrators are state actors—despite near-universal recognition that both are "entitled to immunity from civil liability" from claims "related to the arbitration."  *Jason v. Am. Arbitration Ass'n*, 62 F. App'x 557, 557 (5th Cir. 2003); *Hawkins v. NASD Inc.*, 149 F.3d 330, 332 (5th Cir. 1998) ("NASD enjoys arbitral immunity from civil liability for the acts of its arbitrators.").

As this Court repeatedly has made clear, immunity from suit and state action aren't related doctrines with coextensive scopes. That's why this Court has repeatedly "declined to find state action" even where "state law granted civil immunity." *Yeager*, 980 F.2d at 340; *see also*, *e.g.*, *Goss v. Mem'l Hosp. Sys.*, 789 F.2d 353, 356 (5th Cir. 1986) (that "peer review committee members receive immunity from civil liability . . . did not make the[ir] action . . . state action"); *White v. Scrivner Corp.*, 594 F.2d 140, 143 (5th Cir. 1979) ("no state action can be found" despite "statute insulating merchants from liability").[4]

Accordingly, Nasdaq's adoption of exchange rules, as exchanges did for more than a century without government intervention, is not sufficient to find state action.

---

[4] NCPPR's reliance (at 37) on the D.C. Circuit's decision in *Blount v. SEC*, 61 F.3d 938 (D.C. Cir. 1995), is unavailing. Unlike Nasdaq's rules here—with which companies need not comply if they elect to list elsewhere or go private—the MSRB rule there served as "a government-enforced condition to *any* participation in a municipal securities career" because the MSRB is the only self-regulatory organization for municipal securities brokers. *Id.* at 941 (emphasis added).

> **2.    There's    neither    pervasive    government entwinement nor significant government coercion or encouragement.**

Petitioners no longer contend that the Commission is so "entwined" in Nasdaq's "management or control" that all of Nasdaq's actions should be considered state action. *Brentwood*, 531 U.S. at 296; *compare* NCPPR Panel-Stage Reply Br. 12–13, *with* NCPPR Br. (abandoning entwinement argument).    Rightly so.    Nasdaq's employees—including those who develop its listing rules—are employees of a private company, not public officials.    And public officials have neither involvement in nor control over Nasdaq's board.    *See supra* p. 11; *compare Brentwood*, 531 U.S. at 298–300 (enforcement of a high school athletic association's rule by the "nominally private" association was state action because of "the pervasive entwinement of public institutions and public officials in [the association's] compositions and workings").

Nor do petitioners advance their panel-stage argument that the Commission coerced or encouraged Nasdaq to adopt the rules. *Compare* NCPPR Panel-Stage Reply Br. 13–14, *with* NCPPR Br. (abandoning encouragement or coercion argument).    Again, for good reason.    Private decisions can be deemed state action if the government "exercise[s]

coercive power" or "provide[s] such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Blum*, 457 U.S. at 1004. There is no hint of any such coercion or encouragement here. Nasdaq adopted the rules on its own initiative based on input from investors, listed companies, and others that "expressed interest in board diversity information." JA7; *see also supra* pp. 12–13.

### 3. The Commission's approval of the Diversity Rules doesn't subject the rules to constitutional scrutiny.

As demonstrated above, none of the Supreme Court's tests for attributing private conduct to the government is met here. Petitioners nevertheless contend (Alliance Br. 39–40; NCPPR Br. 41–42) that there must be state action here because the Commission approved Nasdaq's rules. But neither the Commission's approval of Nasdaq's privately developed, privately adopted rules—nor the fact that the Commission's approval order is under review—makes Nasdaq's rules state action.

**a.** The Supreme Court has repeatedly underscored that "[m]ere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives."

*Blum*, 457 U.S. at 1004–05; *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 52 (1999) (same).

In *Jackson v. Metropolitan Edison*, for example, the Court held that a private utility's termination of a customer's electric service wasn't state action even though the termination was pursuant to the utility's state-approved tariff. 419 U.S. at 354–59. As the Court explained, "[a]pproval by a state utility commission of such a request from a regulated utility, where the commission has not put its own weight on the side of the proposed practice by ordering it, does not transmute a practice initiated by the utility and approved by the commission into 'state action.'" *Id.* at 357.

That's precisely the case here, where Nasdaq is required by the Exchange Act to obtain Commission approval for its rules, but the Commission didn't "coerc[e]" or "encourage[]" the rules' adoption. *Blum*, 457 U.S. at 1004. As this Court has explained, even "[r]egulations that dictate procedures, forms, or even penalties *without dictating the challenged action* do not convert private action into state action." *Barnes v. Lehman*, 861 F.2d 1383, 1387 (5th Cir. 1988). Because the Commission didn't order Nasdaq to adopt the rules or dictate their adoption, Nasdaq's

private action isn't transformed into state action merely because it was required to obtain the Commission's approval.

**b.**   Petitioners argue (NCPPR Br. 42; Alliance Br. 39) that this extensive line of precedent doesn't apply because they're challenging the Commission's approval order and because the Commission "independently justified the Rule."   But the Commission's presence in this case and its reasoning approving the rule—which didn't rest on an "independent[] justifi[cation]" devised by the Commission but on the same disclosure-based justification proffered by Nasdaq in support of its proposal—don't convert Nasdaq's adoption of the rules into state action.

If they did, challengers would be free to evade the state-action doctrine entirely simply by suing the agency that approved a private entity's conduct.   That outcome would massively expand the range of private conduct subject to constitutional strictures—and, in so doing, "significantly endanger individual liberty and private enterprise," *Halleck*, 587 U.S. at 816—by imposing constitutional constraints on a vast array of private businesses required to obtain licenses, permits, and other forms of government approval.

The D.C. Circuit's decision in *Village of Bensenville v. FAA*, 457 F.3d 52 (D.C. Cir. 2006), is instructive. There, the D.C. Circuit held that the FAA's statutorily required approval of Chicago's airport plan didn't transform the city's action into federal action for purposes of the Religious Freedom Restoration Act (RFRA), even though, like here, the agency was a proper respondent in the suit challenging the approval. *Id.* at 62, 68. Like Nasdaq's rules, the airport plan in *Bensenville* had to be approved by the FAA before it could be implemented. *Id.* at 58. The petitioners there alleged that the FAA-approved plan violated RFRA—which constrains only the federal government, not cities or states.

The D.C. Circuit held that, despite the FAA's approval of the plan and its status as a respondent in the case, there was no federal action. Drawing upon state-action precedent, the court began its analysis by identifying the "specific conduct" under review—the city's plan to relocate a cemetery as part of an airport expansion, 457 F.3d at 64 (quoting *Sullivan*, 526 U.S. at 51)—and then assessed whether the FAA's role was "'mere approval of or acquiescence in' the City's plan" or whether it had "exercised coercive power" over or "provided . . . significant

encouragement" in favor of the plan. *Id.* (brackets omitted) (quoting *Blum*, 457 U.S. at 1004).

Even though the city couldn't receive federal funding "without the approval of the FAA," the court concluded that the "FAA's peripheral role" couldn't federalize the city's action and reasoned that the FAA's "role as regulator [was] similar to that in many cases where the Supreme Court has declined to find state action" because the FAA neither "order[ed] the change" nor "play[ed] some greater role in the design" of the plan. *Bensenville*, 457 F.3d at 65–66.

So too here. The "specific conduct" that petitioners complain about is Nasdaq's adoption of its rules. The Commission didn't design those rules or encourage—much less compel—Nasdaq to adopt them. And while petitioners contend (NCPPR Br. 42; Alliance Br. 39–40) that cases finding no state action involve only "ministerial review" (rather than the "independent review" here), longstanding precedent makes clear that even affirmative government approval doesn't convert private conduct into state action. *See Bensenville*, 457 F.3d at 65 ("The Supreme Court has never held that the government becomes responsible for the actions of a third party due to the length or intensity of its attention to the

actions of the party before approval.").  That's true even where, as here, the agency is a proper respondent in the case.[5]

**c.**  Petitioners' other primary state-action argument—that the Diversity Rules are attributable to the government because Nasdaq is required to enforce compliance with its rules under the Exchange Act—is equally unavailing.

As an initial matter, the provision of the Exchange Act on which petitioners rely (Alliance Br. 41), 15 U.S.C. § 78s(g)(1), doesn't require that Nasdaq enforce listed companies' compliance with its rules—only that an exchange enforce compliance by its "members and persons associated with its members."  15 U.S.C. § 78s(g)(1)(a); *see also id.* § 78f(b)(6) (same).  The members of an exchange are the broker-dealers that transact on that exchange—not listed companies, which aren't persons associated with an exchange's members, either (those are individuals professionally associated with a broker-dealer firm).  15 U.S.C. § 78c(a)(3), (18).  So section 78s(g)(1) doesn't apply here.

---

[5]  The Alliance's reliance (at 40) on *W.H. Scott Construction Co. v. City of Jackson* is misplaced because that case involved a challenge to a "City's minority-participation policy" and the City was indisputably a state actor.  199 F.3d 206, 211 (5th Cir. 1999).

Even if it did, that still wouldn't translate into state action under *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163 (1972), as the Alliance contends (at 40–43). In that case, the Supreme Court enjoined the Pennsylvania Liquor Control Board from enforcing its *own* regulation (requiring license-holders to follow their bylaws), but held that the private license-holder's bylaws weren't state action. 407 U.S. at 176–79. So too here: Nasdaq's adoption of its rules isn't state action. But unlike the plaintiff in *Moose Lodge*, petitioners here don't challenge the sections of the Exchange Act that require Nasdaq to enforce compliance with its rules and authorize the Commission to sanction Nasdaq for any failures in that regard, *see* 15 U.S.C. § 78s(g)–(h)—much less the Commission's exercise of that authority. *See* Op. 21. So there's no state action being challenged under *Moose Lodge*.

In *Moose Lodge*, a black patron who'd been refused service by Moose Lodge based on its racially discriminatory bylaws sued both Moose Lodge and the Liquor Board (which had issued the Lodge a liquor license) under section 1983 asserting an equal protection claim. He sought to have the Liquor Board "revoke Moose Lodge's license so long as it continued its discriminatory practices." 407 U.S. at 165.

40

The Court held that the club's discrimination wasn't state action because "the operation of the [Liquor Board's] regulatory scheme" didn't "sufficiently implicate the State in the discriminatory guest policies of Moose Lodge to make the latter 'state action.'" 407 U.S. at 177. But, the Court continued, the Board's enforcement of its own regulations—which required private clubs like Moose Lodge to adhere to their own bylaws— *was* state action. *Id.* at 177–79. So the Court enjoined the Board from enforcing its own regulation, but left the Lodge's underlying bylaws intact. *Id.* at 179.

Here, by contrast, petitioners are challenging only Nasdaq's own rules, not any statutory authority the Commission may have to require Nasdaq to enforce those rules. Contrary to the Alliance's argument (at 41), the order under review doesn't compel Nasdaq to take any action whatsoever—it merely approved the rules because they are consistent with the Exchange Act. Government approval of private conduct doesn't amount to state action. *Blum*, 457 U.S. at 1004–05; *see also Jackson*, 419 U.S. at 357.[6]

---

[6] Post-approval enforcement of the rules by Nasdaq wouldn't convert their adoption into state action, either. *See Jackson*, 419 U.S. at 358 (utility's enforcement of its rules wasn't "sufficient to connect the State

**d.** Reaching a contrary conclusion would create a circuit split. A uniform body of precedent from circuits across the country holds that self-regulatory organizations like Nasdaq are "private actor[s], not . . . state actor[s]," and their conduct isn't state action. *D.L. Cromwell Invs.*, 279 F.3d at 162; *see also Duffield*, 144 F.3d at 1202 (holding the Commission's "involvement" with the NYSE and NASD "insufficient under *Skinner*, *Blum*, and *Jackson*" to render exchange rules "fairly attributable to the state"); *see also supra* p.27 n.2.

Petitioners fail to engage with this settled body of law, instead relying (Alliance Br. 44–47; NCPPR Br. 43) on half-century old dicta from *Intercontinental Industries, Inc. v. American Stock Exchange*, 452 F.2d 935 (5th Cir. 1971). But even if it weren't dicta, *Intercontinental Industries* couldn't bear the weight petitioners place on it.[7]

---

of Pennsylvania with [the utility's] action so as to make the latter's conduct attributable to the State").

[7] The Tenth Circuit's decision in *Rooms v. SEC*, 444 F.3d 1208 (10th Cir. 2006), doesn't support petitioners either. *See* NCPPR Br. 43. Its passing reference to applying due process to NASD's rules was dicta, as the First Circuit has recognized. *See Cody v. SEC*, 693 F.3d 251, 257 & n.2 (1st Cir. 2012). And the Commission didn't challenge application of the Due Process Clause—either in *Rooms* or in the only case *Rooms* cites to support its dicta—and the Tenth Circuit didn't undertake any state-action analysis. *See* SEC Br. 25–26, 2005 WL 3077660; *see also Rooms*,

In that case, this Court reviewed a Commission order granting the American Stock Exchange's application to delist the petitioner's company. The petitioner argued that due process required a full and fair hearing before delisting. This Court pretermitted whether the Due Process Clause even applied, because the petitioner had received sufficient process in all events. *See* 452 F.2d at 941–43 ("rather than decide those points here, we merely make it clear that our decision does not cast our imprimatur on these arguments").

So the Court's suggestion that the exchange's "intimate involvement" with the Commission warranted constitutional scrutiny, 452 F.2d at 941, is dicta. *See Solomon*, 509 F.2d at 871 (referring to the due process "dictum in *Intercontinental Industries*"). It's also irrelevant, as the Commission's "intimate involvement" with delisting in that case— even setting aside that delisting no longer requires Commission approval, *compare* 28 Fed. Reg. 1506, 1506 (Feb. 16, 1963), *and* 17 C.F.R.

---

444 F.3d at 1214 (citing *Gen. Bond & Share Co. v. SEC*, 39 F.3d 1451, 1455 (10th Cir. 1994)).

§ 240.12d2-2(c) (1970), *with* 17 C.F.R. § 240.12d2-2(d)(1) (2021)—stands in contrast to the Commission's mere approval of Nasdaq's rules.[8]

Nor has that dicta withstood the test of time. *Intercontinental Industries*' "intimate involvement" analysis was predicated on *Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961), a pre-Civil Rights Act decision holding that a private lessee's racial discrimination was state action because the state—which was the lessor, but didn't encourage or mandate the lessee's discrimination—was a "joint participant" in the private lessee's action. *Id.* at 725; *see also Intercontinental Indus.*, 452 F.2d at 941 (citing *Burton*, 365 U.S. 715).

In the half-century since *Intercontinental Industries* was decided, the Supreme Court has dramatically curtailed *Burton*'s expansive theory of state action, "limit[ing]" it to its facts. *See, e.g., Jackson*, 419 U.S. at 358; *see also Yeager*, 980 F.2d at 341–42 (describing *Burton*'s "symbiotic

---

[8] Contrary to the Alliance's argument (at 46–47), *Intercontinental Industries*' dicta hasn't been "re-affirmed." *See Harding v. Am. Stock Exch., Inc.*, 527 F.2d 1366, 1370 n.5 (5th Cir. 1976) (citing *Intercontinental Industries* in a footnote addressing an unrelated jurisdictional issue); *N. Ala. Express, Inc. v. United States*, 585 F.2d 783, 787 (5th Cir. 1978) (citing *Intercontinental Industries* for the straightforward proposition that due process requires adequate notice in administrative proceedings, which is assessed on a case-by-case basis).

relationship test" as an "archaism"); *Frazier v. Bd. of Trs. of Nw. Miss. Reg'l Med. Ctr.*, 765 F.2d 1278, 1287 (5th Cir. 1985) ("The 'joint' of 1961 does not the 'symbiosis' of today make."); Steven J. Cleveland, *The NYSE as State Actor?: Rational Actors, Behavioral Insights & Joint Investigations*, 55 Am. U. L. Rev. 1, 12–13 (2005) (explaining that *Burton* represents the zenith of the Supreme Court's state-action jurisprudence, which had been expanded in the early 1960s to address racial discrimination—an expansion rendered unnecessary by the adoption of civil-rights statutes).[9]

**e.**  Petitioners argue that if Nasdaq isn't a state actor, its self-regulatory authority runs afoul of the private non-delegation doctrine. NCPPR Br. 39; Alliance Br. 49–50.  But petitioners don't actually raise a

---

[9] NCPPR turns (at 43–44) to *Roberts v. Louisiana Downs, Inc.*, 742 F.2d 221 (5th Cir. 1984), to resurrect its "intimate involvement" argument.  But *Roberts*' determination that a private track's stalling decision was state action relied on the state's "intimate involvement in the day-to-day management of the racetrack's activities and [state officials'] supervision of the employee involved" in the decision.  *Id.* at 226.  No such "intimate and continuous involvement" exists here, nor is there any analogous day-to-day government supervision of Nasdaq's employees.  *Id.* at 228; *see also Frazier*, 765 F.2d at 1288 (state action requires "the state play[] some meaningful role in the mechanism leading to the disputed act").

private non-delegation challenge, *see* Op. 15 n.9—nor could they credibly do so, because the Commission's authority to review and approve Nasdaq's rules forecloses any possible private non-delegation challenge. *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399–400 (1940).

That's why, as this Court recognized recently, courts have "uniformly" rejected these challenges to self-regulatory organizations. *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 877 (5th Cir. 2022); *see also Oklahoma v. United States*, 62 F.4th 221, 229 (6th Cir. 2023) ("In case after case, the courts have upheld [the SRO] arrangement, reasoning that the SEC's ultimate control over the rules and their enforcement makes the SROs permissible aides and advisors.") (citing cases). And no court has held that an absence of state action means that a private party carrying out delegated regulatory authority must necessarily violate the private nondelegation doctrine.

\*     \*     \*

In sum, Nasdaq's rules aren't state action, so petitioners' constitutional challenges fail at the threshold. They also fail on the merits for the reasons identified by the Commission.

## II. The Commission reasonably determined that the Diversity Rules are consistent with the Exchange Act.

The only statutory question before the Court is whether petitioners have demonstrated that the Commission acted without substantial evidence, or arbitrarily and capriciously, in concluding that the Diversity Rules—which provide investors with sought-after, investment-related information that wasn't previously available in a reliable, consistent format—are "consistent with" the Exchange Act. 15 U.S.C. § 78s(b)(2)(C)(i). Petitioners don't make that showing. Their invitation to reframe the question as whether it's reasonable for investors to consider board-diversity information when making investment and proxy-voting decisions—which isn't at issue—should be rejected.

### A. Substantial evidence supports the Commission's factual findings about the function and benefits of the Board Diversity Rule.

The Commission's approval of the Board Diversity Rule rests on factual findings with substantial record support. The Commission reasonably found that (1) the Board Diversity Rule establishes a disclosure requirement (not a quota), and (2) disclosures under the rule would facilitate the availability of information that many investors have

indicated would be relevant to their investment and proxy-voting decisions.  JA2, 7–8.

1.     Based on its review of the record, the Commission found that the Board Diversity Rule creates a "disclosure-based framework," not a rigid quota.  JA5.  That finding is amply supported by substantial evidence as to the requirement that listed companies disclose board members' diversity-related demographic information in a standardized matrix, and the requirement that listed companies with fewer than two diverse board members disclose why.  JA3–4.

The Commission rejected the contention, repeated by NCPPR (at 22), that the rule creates a quota because a company that is unable, or chooses not, to have two diverse board members can explain why, and Nasdaq won't "assess the substance of the company's explanation."  JA4–5; JA258.  As the Commission explained, the rule "would not prevent companies and their shareholders from selecting directors based on experience, competence, and skills."  JA5.[10]

---

[10]  NCPPR's reliance (at 21–23) on *MD/DC/DE Broadcasters Ass'n v. FCC*, 236 F.3d 13 (D.C. Cir. 2001), is misplaced.  That case involved a rule promulgated by a federal agency, which then "promise[d]" the

Those findings are supported by substantial evidence and are therefore "conclusive." 15 U.S.C. § 78y(a)(4). Nasdaq confirmed that: (1) it won't evaluate the merits of a company's explanation for having fewer than two diverse board members, (2) it won't delist companies that don't have two diverse board members as long as they provide some explanation, and (3) among the numerous possible explanations, companies may simply explain that they don't "believe Nasdaq's listing rule is appropriate" or that they take a different approach to board composition. JA5; JA329; JA204–05. Petitioners identify no basis for overturning the Commission's findings.[11]

**2.** There's also substantial record support for the Commission's finding that disclosures under the Board Diversity Rule "would provide widely available, consistent, and comparable information that would

---

"powerful threat" of "investigat[ing] any licensee" with "few or no applications from women or minorities." *Id.* at 19.

[11] The Commission's reasoning is also borne out by empirical research finding that, when given the choice, many companies choose to provide an explanation, rather than comply with regulatory objectives. *See*, *e.g.*, Virginia Harper Ho, *"Comply or Explain" and the Future of Nonfinancial Reporting*, 21 Lewis & Clark L. Rev. 317 app. A at 350–54 (2017).

contribute to investors' investment and voting decisions." JA7. Three substantially supported premises underlie this finding.

First, the Commission found that "[b]oard-level diversity statistics are currently not widely available on a consistent and comparable basis." JA2. Supported by several commenters, Nasdaq explained that board-demographic statistics aren't readily available in a standardized, reliable, and usable format. JA5–6 & n.72; JA305–07; JA638 ("current board diversity disclosures are insufficient and noncomparable"); JA652 ("investors have struggled to get uniform and transparent data").

Second, the Commission found that the "diverse collection of commenters who expressed interest in board diversity information . . . demonstrates the broad demand for this information." JA7. These commenters included "institutional investors, investment managers, listed companies, and individual investors, as well as . . . asset managers[] and business organizations." JA6–7 & nn.73–77, 91–92; *see also* Investors Panel-Stage Amicus Br. 1–5.

Third, the Commission found that the information disclosed under the rule would be useful to investors because the disclosures would "provide investors with board-level diversity statistics and explanations

for certain companies' approaches to board diversity, which would contribute to investors' investment and voting decisions, including decisions related to companies' board compositions." JA7–8.

This finding is substantiated by Nasdaq's explanation that the lack of reliable and usable board-demographic information creates barriers for investors and "information asymmetries between larger stakeholders, who are able to collect [diversity] data directly from companies, and smaller investors, who must rely on incomplete public disclosures." JA210. Commenters agreed that the disclosures would improve visibility into board diversity and provide investors with information that could inform investment and proxy-voting decisions. *See* JA44; JA646–47; JA669; *see also* JA5–8 & nn.73, 78, 80. Commenters also indicated that companies' explanations would foster more informed investor analyses and conversations with companies on diversity issues. *See* JA5–8 & n.73; JA640; JA663–64; JA670.

That's true regardless of investors' "differing views" regarding board diversity, the Commission explained. JA7. On one hand, "for investors who support board diversity, the proposed disclosures could inform their decision on issues related to corporate governance . . . and

51

company explanations" of why they do not comply "could better inform those investors as to the risks and costs of increased board diversity." JA8.  On the other, "for investors who do not believe that having additional 'Diverse' directors would be beneficial for a company, the proposed disclosures could inform their decision to vote to preserve the existing board."  JA8.

Petitioners don't seriously contest that substantial evidence supports these findings.  Instead, they dispute whether the Board Diversity Rule's disclosures will further the purposes of, and are otherwise consistent with, the Exchange Act.  As explained below, none of petitioners' statutory arguments withstands scrutiny.

## B.    The Commission reasonably applied the Exchange Act's requirements.

As the Supreme Court has explained, the Exchange Act was passed for "the 'fundamental purpose' of 'substitut[ing] a philosophy of full disclosure for the philosophy of *caveat emptor*.'" *Kokesh v. SEC*, 581 U.S. 455, 458 & n.1 (2017) (alteration in original) (quoting *SEC v. Capital Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 186 (1963)).

The Commission reasonably found that the Board Diversity Rule is consistent with the Exchange Act because it advances that fundamental,

disclosure-centered purpose and is "designed to," among other things, "promote just and equitable principles of trade," "remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect investors and the public interest."  15 U.S.C. §§ 78f(b)(5), 78s(b)(2)(C)(i).

The Commission also reasonably found that the rule doesn't regulate matters unrelated to the Exchange Act, impose unnecessary burdens on competition, or permit unfair discrimination.  15 U.S.C. §§ 78f(b)(5), (b)(8), 78s(b)(2)(C)(i); *see also* JA2–3; Op. 40.  None of petitioners' arguments demonstrates that the Commission's statutory analysis was arbitrary and capricious.[12]

### 1.    Disclosure furthers core statutory purposes.

The Board Diversity Rule furthers the Exchange Act's core purpose of "full disclosure," *Kokesh*, 581 U.S. at 458 & n.1, by facilitating the availability of information that "would contribute to investors'

---

[12] The Alliance's argument (at 53) that the Board Diversity Rule violates the Exchange Act because 15 U.S.C. § 78f(b)(6) "requires Nasdaq to enforce the Rule," which "would be unconstitutional" under *Moose Lodge*, misses the mark.  That statute only requires Nasdaq to enforce its rules against members and persons associated with its members—not listed companies.  *See supra* p. 39.

investment and voting decisions"—but that wasn't widely or reliably available.  JA7.

There's no basis for second-guessing the Commission's conclusions. The Commission reasonably concluded that the Board Diversity Rule is "designed" to "promote just and equitable principles of trade" because making board-diversity information "widely available on the same basis to all investors" "mitigate[s]" the unequal access to information "between certain (likely larger and more resourceful) investors who could obtain the information" without Nasdaq's assistance and "other (likely smaller) investors who may not be able to do so."  JA7.  As Nasdaq explained to the Commission, the rule "level[s] the playing field for retail and institutional investors."  JA210.  The Alliance provides no support for its argument (at 61) that "just and equitable principles of trade" encompass adhering to fiduciary duties and nothing more.

The Commission also reasonably found that the Board Diversity Rule is "designed" to foster "free and open markets" and "protect investors and the public interest" given the "broad demand for [board-diversity] information."  JA7.  Satisfying investor demand, as the Commission found, would "reduce[] cost and improve[] efficiency in

collecting, using, and comparing" board-diversity information, which in turn would "enhance investors' investment and voting decision-making processes." JA7.

Contrary to petitioners' arguments (NCPPR Br. 31; Alliance Br. 58), nothing in the Exchange Act—which sets forth the specific, limited criteria that an exchange rule must meet to secure Commission approval—requires the Commission to determine definitively that the disclosures at issue will improve corporate governance or company performance. As the Commission explained, the availability of additional information—even if its impact on corporate performance was "subject to reasonable debate," JA9—would "contribute to the maintenance of fair and orderly markets." JA2. That conclusion accords with the D.C. Circuit's holding that "expressions of interest" from investors can support the Commission's approval of a rule. *Domestic Sec., Inc. v. SEC*, 333 F.3d 239, 249 (D.C. Cir. 2003); *see also Business Roundtable v. SEC* ("*Business Roundtable I*"), 905 F.2d 406, 411 (D.C. Cir. 1990) ("In 1934 Congress acted on the premise that shareholder voting could work, so long as investors secured enough information.").

NCPPR is wrong that "the SEC concluded that no reasonable mind could accept" that diversity "has a rational relationship to corporate performance or investor returns." NCPPR Br. 24. The SEC carefully examined studies on both sides of the issue and concluded that the evidence was "mixed." JA9. That is a far cry from a finding that "no reasonable" investor could believe that board diversity improves corporate governance and company performance. In fact, the record makes clear that some investors sincerely hold that belief, which was the impetus for their demands for greater transparency and uniformity in reporting about board diversity and for Nasdaq's decision to propose the Board Diversity Rule. JA305–13.

Nothing more is required for a rule to be "designed"—*i.e.*, to be "conceive[d] or execute[d]," *Webster's New International Dictionary* 708 (2d ed. 1934)—to "promote just and equitable principles of trade," "to remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect investors and the public interest." 15 U.S.C. § 78f(b)(5).

**2.    The Board Diversity Rule doesn't regulate matters unrelated to the Exchange Act.**

Because the Board Diversity Rule is designed to advance the Exchange Act's purposes, it follows that the Commission reasonably concluded that the rule doesn't "regulate" "matters not related" to the Act's "purposes."  15 U.S.C. § 78f(b)(5); *see also* JA15–16 & nn.202–03. Petitioners' arguments to the contrary are unpersuasive.

**a.**    Petitioners insist (Alliance Br. 65; NCPPR Br. 23) that the Exchange Act leaves corporate-governance law to the states and forbids exchanges from regulating board composition.  But the rule does not, as petitioners argue (Alliance Br. 65), regulate board composition by requiring companies to "favor[] certain people" based on "their race, sex, or sexual orientation."  It requires only disclosure of information.

And the rule isn't "in tension" with state antidiscrimination laws, States Amicus Br. 16, because companies can explain why they don't have two diverse board members by pointing to those state laws.  *See* JA205.  Because the rule imposes only a disclosure obligation that's consistent with state law—not a quota—petitioners' argument fails.

Even if the Board Diversity Rule did address corporate governance, that wouldn't render the rule invalid.  To the contrary, the rule would

57

still "relate[] to the purposes" of the Exchange Act, 15 U.S.C. § 78f(b)(5)—particularly given exchanges' long history of requiring listed companies to comply with various governance-related requirements. *See Business Roundtable I*, 905 F.2d at 409 ("[m]any of the [exchanges'] past proposals dealt with matters of internal corporate governance"); *see also* Corporate Governance Panel-Stage Amicus Br. 9–15.

Indeed, petitioners' view of the Exchange Act would eviscerate the well-settled understanding that exchanges play an essential self-regulatory role in matters of both disclosure and corporate governance. *See United States v. NASD, Inc.*, 422 U.S. 694, 719 (1975) ("consistent and longstanding interpretation by the agency charged with administration of the Act, while not controlling, is entitled to considerable weight").

The D.C. Circuit's *Business Roundtable I* decision isn't to the contrary. Alliance Br. 57; NCPPR Br. 32. *Business Roundtable I* involved a *Commission* rule—not an *exchange* rule. As the court explained, exchanges (unlike the Commission) can adopt not just "listing rules on . . . corporate governance matters," but also the very types of rules that the Commission lacked authority to impose. 905 F.2d at 414. Exchange

rules simply don't implicate the same concerns about federalizing corporate governance as Commission rules.  *See id.*

Moreover, that case held that the Commission's direct regulation of shareholder voting rights didn't further the Exchange Act's purposes and intruded on matters of "corporate governance traditionally left to the states."  905 F.2d at 408, 411–14.  But that was because voting rights are "far beyond matters of disclosure."  *Id.* at 408.  The Board Diversity Rule, by contrast, implements a "disclosure-based framework."  JA5.

**b.**    Petitioners also contend (Alliance Br. 58; NCPPR Br. 25) that the Exchange Act only allows for rules requiring the disclosure of quantitative, financially "material" information—and because the Commission found that the effect of diverse boards on corporate performance was "mixed," JA9, no rational investor would believe that this information was material.

But nothing in the Exchange Act's plain language limits the disclosure rules Nasdaq can adopt to those that involve financially "material" information.  *See* 15 U.S.C. § 78f(b)(5), (b)(8).  The Exchange Act requires only that an exchange's disclosure rules be designed to further various statutory objectives—such as "remov[ing] impediments

59

to and perfect[ing] the mechanism of a free and open market"—a standard that the Commission found the Board Diversity Rule meets.  15 U.S.C. § 78f(b)(5); *see also* JA2, 7.

Petitioners' argument (Alliance Br. 58; NCPPR Br. 25) that the *Commission* is limited to requiring the disclosure of only material information fails in all events because the Board Diversity Rule is *Nasdaq's* rule, not the Commission's.  "Exchanges have historically adopted listing rules that require disclosures in addition to those required by Commission rules."  JA15 & nn.191, 202; *see also* 81 Fed. Reg. 44,400, 44,403 (July 7, 2016) ("[I]t is within the purview of a national securities exchange to impose heightened governance requirements, consistent with the Act, that are designed to improve transparency.").  As the Commission found, the Board Diversity Rule "augment[s]" existing requirements and reinforces the Exchange Act's purposes.  JA2.

The cases cited by petitioners in support of their materiality requirement arise in inapposite fraud-related settings.  *See*, *e.g.*, *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 442, 445–47 (1976) (misrepresentations in proxy statements); *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011) (same in the purchase or sale of a

security); *R&W Tech. Servs. Ltd. v. CFTC*, 205 F.3d 165, 169 (5th Cir. 2000) (fraud under the Commodity Exchange Act). There's no authority for petitioners' position that the requirement that those advancing fraud claims prove material misrepresentations or omissions applies to whether an exchange can adopt disclosure requirements for its listed companies.

Further, even if the Exchange Act contained a "materiality" requirement, *contra* 15 U.S.C. § 78f(b)(5) and (b)(8), the Board Diversity Rule would satisfy it. To be material, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988).

Substantial evidence supports the Commission's factual findings of "broad demand" from a "diverse collection of commenters," including "institutional investors, investment managers, listed companies, and . . . asset managers," for "board diversity information," and that "the proposed disclosures would contribute to investors' investment and voting decisions." JA6–8 ("many commenters believe that the proposed

board diversity disclosures would be material to investors"). The Commission's reasoning necessarily means that reasonable investors likely would view such information as significantly altering the mix of available information about a company.

Indeed, that investor interest has already prompted a number of companies to disclose at least some demographic information voluntarily. *See* Steve Seelig & Lindsay Green, *Initial 10-K Disclosures Provide Limited Data on Human Capital Metrics*, Willis Towers Watson (Jan. 28, 2021), https://tinyurl.com/2wpe2w86 (initial analysis showing that 38 percent of companies voluntarily included their workforce's race and ethnicity representations and 44 percent included gender representations). Even if some investors remain uncertain (or unpersuaded) about the impact of board diversity on corporate performance, they might nevertheless seek diversity-related information to improve their ability to assess its impact. *See* JA6 & n.76.

Petitioners brush away (NCPPR Br. 24) this investor interest as the work of "activist[s]," and argue (Alliance Br. 60–61) that materiality in this context should be limited to "'quantitative considerations' like profit, loss, and revenue." But they identify nothing in the Exchange Act that

requires the Commission to determine that the disclosures at issue will conclusively improve corporate governance or company performance.

As the case cited by the Alliance (at 60) makes clear, "both quantitative and qualitative factors should be considered in assessing a statement's materiality," *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009), which is consistent with the Commission's prior approval of other non-quantitative disclosure requirements. *See*, *e.g.*, Nasdaq Rule 5605(b)(1) (board member independence).

In all events, as the Commission acknowledged, a "reasonable debate" exists on whether companies' boardroom diversity improves financial performance. JA9. Nasdaq, for its part, offered several empirical studies linking the two. JA275–93. Although the Commission found that the evidence on that front was "mixed," JA9–10, the link between diversity and corporate performance need not be conclusively established for investors to have a reasonable basis for seeking out diversity information or for Nasdaq to have a reasonable basis for facilitating its dissemination.

Moreover, the existence of multiple empirical analyses finding that diversity improves company performance underscores the legitimate, investment-related reasons that sophisticated market participants seek access to standardized diversity information. *See* JA9 & nn.119–20. Indeed, among the commenters supporting the Diversity Rules were several large asset managers and institutional investment firms, all of which are focused on maximizing investment return for themselves and their clients. *See* JA7 nn.91–92; Investors Panel-Stage Amicus Br. 7–9. This legitimate investor interest—based on empirical analyses finding that diversity improves company performance, JA275–93—distinguishes Nasdaq's diversity rules from petitioners' hypotheticals regarding disclosures with no demonstrable link to company performance. *See* NCPPR Br. 27.

### 3. The Commission reasonably assessed other Exchange Act requirements.

The Commission also reasonably found that the Board Diversity Rule complies with the Exchange Act's requirements that exchange rules not be "designed to permit unfair discrimination between customers, issuers, brokers, or dealers" and not "impose any burden on competition

not necessary or appropriate in furtherance of the purposes of this chapter." 15 U.S.C. § 78f(b)(5), (8).

**a.** The Commission reasonably found the Board Diversity Rule's different treatment of domestic and foreign companies wouldn't result in unfair discrimination between issuers. It rightly reasoned that it's appropriate for foreign companies' diversity disclosures to be different from those of U.S. companies both because of the unique demographic composition of the United States and because the information from foreign companies may still have value in informing investing and voting decisions, despite some variation in the demographics disclosed. JA12 & n.153.

The Alliance's cursory argument (at 66) that the Board Diversity Rule permits unfair discrimination between domestic and foreign issuers is unavailing—indeed, its argument that Nasdaq should have imposed "*more* stringent" disclosure requirements on foreign issuers would result in unfair discrimination *against* foreign issuers.

**b.** The Commission also reasonably found that the Board Diversity Rule wasn't designed to burden competition given companies' flexibility in explaining why they don't have two diverse board members.

JA14.  The Commission found that the rule would "*promote*" competition among the exchanges by allowing Nasdaq to "attract[] and retain[] the listings of companies that prefer to be listed on an exchange that provides investors with the information required" by the rule.  JA14.

Petitioners cite no authority for their argument (NCPPR Br. 33; Alliance Br. 67–68) that Exchange Act Section 6(b)(8) requires the Commission to conduct a formal cost-benefit analysis of an exchange's proposed rules.  For good reason.  There is none.  And at any rate, the Commission *did* consider the rule's competitive burden and found that its benefits outweighed the minimal burden.  *See* JA13–14.  Rightly so. As the Commission recognized, Nasdaq's rules simply remove an information asymmetry by making the information widely available to all investors, small and large, in a consistent and comparable format. JA7.  The flexibility that the rule provides companies in their explanations renders hollow petitioners' bare statement (Alliance Br. 68) that the rule will impose "tremendous costs."  *Cf.* Listed Companies Panel-Stage Amicus Br. 12–14.

*Business Roundtable II* doesn't call the Commission's conclusion into doubt.  *See* Alliance Br. 68.  There, the D.C. Circuit invalidated a

*Commission* (not a self-regulatory organization) rule requiring companies to list shareholder-nominated board candidates in their proxy materials because the Commission failed to "adequately address the probability the rule will be of no net benefit." *Business Roundtable v. SEC*, 647 F.3d 1144, 1150 (D.C. Cir. 2011). Here, by contrast, the Commission found that board-diversity disclosures would "enhance investors' ability to make informed investment and voting decisions" with no corresponding burden on companies. JA7, 13–14.

Ultimately, the question before the Court isn't whether investors should consider diversity information, but whether it was arbitrary and capricious for the Commission to conclude that Nasdaq's rule—which facilitates the disclosure of that information in response to investor demand—is consistent with the Exchange Act. 15 U.S.C. § 78s(b)(2)(C)(i). Petitioners haven't shown (and can't show) arbitrariness or caprice.

## C. The record reflects the Commission's thorough and independent review.

The Commission's comprehensive order confirms that it engaged in a detailed and thorough analysis when reviewing Nasdaq's Board Diversity Rule. *Contra* NCPPR Br. 51–53.

The Commission didn't rubber stamp Nasdaq's rules. It found that the evidence on one of Nasdaq's rationales for the Board Diversity Rule—that diversity facilitates good corporate governance and company performance—was "mixed." JA9–10. So the Commission approved the rule based on Nasdaq's disclosure-related rationale—that the rule would provide investors with sought-after diversity-related information in a consistent and comparable format. JA7–8. In its independent review, the Commission analyzed studies submitted by Nasdaq and third-party commenters. *See* JA9 & nn.123–25, 127. And the Commission carefully considered and rejected alternative suggestions offered by some commenters, who called for more expansive initiatives. JA19–20.

The Commission's independent review distinguishes this case from *Susquehanna International Group v. SEC*, 866 F.3d 442 (D.C. Cir. 2017), where the D.C. Circuit rejected the Commission's approval of a clearing agency rule because the Commission "itself" didn't find that the rule was consistent with the Exchange Act. *Id.* at 443. Indeed, the Commission there "candidly admit[ted] that it simply 'rel[ied] on the [clearing agency]'s analysis.'" *Id.* at 447 (second alteration in original). Here, by

contrast, the Commission engaged in a thorough, independent analysis based on substantial record evidence.

*     *     *

Petitioners' policy complaints about the Board Diversity Rule have no bearing on whether the Commission properly approved the rule. The Commission based its approval on findings supported by substantial evidence. And it reasonably applied the Exchange Act to the rule. There is no basis for this Court to disturb the Commission's order.

### D. The Commission properly approved the Board Recruiting Service Rule.

NCPPR's half-hearted challenge (at 53–54) to the Board Recruiting Service Rule—which imposes *no* obligations on Nasdaq-listed companies—is equally meritless. The Commission approved the Board Recruiting Service Rule on the basis of its independent findings supported by substantial evidence, including that the complimentary service (1) helps companies identify and evaluate diverse board candidates, should they choose to do so, (2) helps Nasdaq compete to

attract and retain listings, and (3) is "optional" and doesn't require any company to "pay higher fees as a result of the proposal."  JA21.[13]

Nasdaq's proposal was consistent with many similar exchange filings.  As the Commission has explained, exchanges commonly provide complimentary products and services in "responding to competitive" pressures in the market for listings.  JA5; *see*, *e.g.*, 85 Fed. Reg. 84,434, 84,435 (Dec. 28, 2020) (approving a rule providing complimentary services to certain companies that switch their listings).  The Commission thus reasonably found that the Board Recruiting Service Rule is consistent with the Exchange Act.

NCPPR doesn't address (much less dispute) whether the Board Recruiting Service Rule comports with the Exchange Act's requirements. Instead, it argues (at 54) that the Commission failed to consider what "board-ready" means with respect to potential candidates.  But how Equilar develops its list of candidates isn't an "important aspect" of the rule.  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463

---

[13] Although the Board Recruiting Service Rule doesn't require or proscribe any conduct, Nasdaq submitted the rule to the Commission for approval nonetheless, as it's required to do when offering financial services to listed companies. *See* 17 C.F.R. § 240.19b-4(c).

U.S. 29, 43 (1983).   Moreover, the Commission explained that, after carefully considering all objections to the rule, it didn't find any reason "to doubt . . . how the service will be run," JA21—and NCPPR provides none here.   The Commission didn't act arbitrarily or capriciously in approving the rule.

*    *    *

Petitioners' principal challenge—that the rules are unconstitutional—fails at the outset because Nasdaq isn't a state actor and its voluntary adoption of rules governing its private contractual relationships isn't state action.  Petitioners' statutory challenges fare no better.  Their attempt to reframe the rules as a "quota" can't alter the substantial evidence supporting the Commission's conclusion to the contrary.  Nor can their policy disagreements about boardroom diversity alter the propriety of the Commission's conclusion that the rules provide investors with sought-after investment-related information and are therefore consistent with the Exchange Act.   The petitions should be denied.

## CONCLUSION

The Court should deny the petitions for review.

71

Dated:  April 29, 2024

Respectfully submitted,

/s/ *Allyson N. Ho*

| | |
|---|---|
| John Zecca | Allyson N. Ho |
| Jeffrey S. Davis | Bradley G. Hubbard |
| John Yetter | Paulette C. Miniter |
| THE NASDAQ STOCK MARKET LLC | GIBSON, DUNN & CRUTCHER LLP |
| 805 King Farm Boulevard | 2001 Ross Avenue, Suite 2100 |
| Rockville, Maryland  20850 | Dallas, Texas  75201 |
| | Telephone:  (214) 698-3100 |
| Stephen J. Kastenberg | Facsimile:   (214) 571-2900 |
| Paul Lantieri III | *aho@gibsondunn.com* |
| BALLARD SPAHR LLP | |
| 1735 Market Street, 51st Floor | Amir C. Tayrani |
| Philadelphia, Pennsylvania  19103 | Amalia E. Reiss |
| | GIBSON, DUNN & CRUTCHER LLP |
| Seth D. Berlin | 1050 Connecticut Avenue, N.W. |
| BALLARD SPAHR LLP | Washington, D.C.  20036 |
| 1909 K Street, N.W., 12th Floor | |
| Washington, D.C.  20006 | |

*Counsel for Intervenor*
*The Nasdaq Stock Market LLC*

## CERTIFICATE OF SERVICE

I certify that, on April 29, 2024, a true and correct copy of the foregoing brief was served via CM/ECF on all counsel of record.

*/s/ Allyson N. Ho*
Allyson N. Ho

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the typeface requirements of Rule 32(a)(5) and the typestyle requirements of Rule 32(a)(6) because this brief was prepared in 14-point New Century Schoolbook, a proportionally spaced typeface, using Microsoft 365. This brief complies with the type-volume limitation of Rule 32(a)(7)(B) because it contains 12,778 words, excluding the parts exempted under Rule 32(f).

I certify that: (1) any required privacy redactions have been made, 5th Cir. R. 25.2.13; (2) the electronic submission of this document is an exact copy of any corresponding paper document, 5th Cir. R. 25.2.1; and (3) the document has been scanned for viruses with the most recent version of a commercial virus-scanning program and is free of viruses.

*/s/ Allyson N. Ho*
Allyson N. Ho

73