# United States Court of Appeals

*for the*

# Fifth Circuit

_____

Case No. 21-60626

_____

ALLIANCE FOR FAIR BOARD RECRUITMENT,

*Petitioners,*

v.

SECURITIES AND EXCHANGE COMMISSION,

*Respondent.*

_____

ON PETITION FOR REVIEW OF AN ORDER OF
THE SECURITIES AND EXCHANGE COMMISSION

## EN BANC BRIEF OF *AMICUS CURIAE*
## INTERFAITH CENTER ON CORPORATE RESPONSIBILITY
## IN SUPPORT OF RESPONDENT

BETH-ANN ROTH
RICHARD A. KIRBY
R|K INVEST LAW, PBC
*Attorneys for Amicus Curiae*
1725 I Street NW - Suite 300
Washington, DC 20006
(202) 664-7171

## CERTIFICATE OF INTERESTED PERSONS

*Alliance for Fair Board Recruitment and*
*National Center for Public Policy Research v. SEC*
No. 21-60626

The undersigned counsel of record certifies that the following listed persons

and entities as described in the fourth sentence of Rule 28.2.1 have an interest in

the outcome of this case. These representations are made in order that the judges of

this court may evaluate possible disqualification or recusal.

| | |
|---|---|
| **Petitioner** | Alliance for Fair Board Recruitment |
| **Counsel for Petitioners** | Jonathan Berry (Lead Counsel) R. Trent McCotter, Michael Buschbacher, Jared Kelson, James R. Conde<br>BOYDEN GRAY & ASSOCIATES PLLC |
| **Petitioner** | National Center for Public Policy Research |
| **Counsel for Petitioners** | Margaret A. Little, Sheng Li, Mark Chenoweth<br>NEW CIVIL LIBERTIES ALLIANCE |
| **Respondent** | U.S. Securities and Exchange Commission |
| **Counsel for Respondent** | Daniel Matro, Tracey A. Hardin, John Robert Rady<br>SECURITIES AND EXCHANGE COMMISSION |
| **Intervenor** | Nasdaq Stock Market, L.L.C. |
| **Counsel for Intervenor** | Allyson Newton Ho, Seth D. Berlin, Bradley G. Hubbard, Stephen J. Kastenberg, Paul Lantieri, III, Paulette Miniter, Joanne Pedone, Amalia E. Reiss, Amir C. Tayrani, John Yetter, John Zecca<br>GIBSON, DUNN & CRUTCHER LLP |
| ***Amici Curiae* ISO Petitioners** | Alabama, Alaska, Arizona, Arkansas, Florida, Indiana, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, Oklahoma, South Carolina, Texas, Utah |
| **Counsel** | Drew C. Ensign<br>HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEŇAK, P.L.L.C. |

i

| | |
|---|---|
| | Georgia, Idaho, Indiana, Iowa, North Dakota, Ohio, South Dakota, Tennessee, Virginia, West Virginia, Utah |
| | Christopher Bates |
| | OFFICE OF THE ATTORNEY GENERAL FOR THE STATE OF UTAH |
| | Advancing American Freedom, Manhattan Inst., Allen Mendenhall, Ctr for Political Economy, AMAC Action, American Values, Americans for Limited Government, Catholics Count, Ctr for Political Renewal and Education, Eagle Forum, Charlie Gerow, Int'l Christian Ambassadors Ass'n, Int'l Conf. of Evangelical Chaplain Endorsers, Tim Jones, Missouri Center-Right Coalition, Nat'l Religious Broadcasters, NJ Family Fnd., Rio Grande Fnd., Roughrider Policy Ctr., Setting Things Right, 60 Plus Ass'n, Richard Viguene, Yankee Inst. |
| | John Marc Wheat |
| | ADVANCING AMERICAN FREEDOM, INC. |
| | Buckeye Institute |
| | Jay R. Carson |
| | WEGMAN HESSLER VALORE |
| | Sean J. Griffith |
| | Heather G. Hacker |
| | HACKER STEPHENS, L.L.P. |
| | Cory R. Liu |
| | Daniel I. Morenoff |
| | AMERICAN CIVIL RIGHTS PROJECT |
| **Amicus Curiae ISO Respondents** | Interfaith Center on Corporate Responsibility* <br> * A list of the organization's members can be found at <br> https://www.iccr.org/membership/iccr-members |
| **Counsel** | Beth-ann Roth, Richard A. Kirby <br> R\|K INVEST LAW, PBC w/ support from ESG LEGAL SERVICES, INC. |

Nonpartisan Group of Academics, Practitioners in the Field of Corporate Governance

Marc Wolinsky, Elaine P. Golin, Carrie M. Reilly, Kevin S. Schwartz
   WACHTELL, LIPTON, ROSEN & KATZ

Council of Institutional Investors, Investment Adviser Ass'n, Northern Trust Investments, Inc., Ariel Investments, Boston Trust Walden Co., Lord, Abbett & Co., L.L.C., Gaingels Inc., Robert F. Kennedy Ctr. For Justice & Human Rights

Steven Shepard
   SUSSMAN GODFREY, L.L.P.

Ad Hoc Coalition of Nasdaq-Listed Companies

Pratik A. Shah
   AKIN GUMP STRAUSS HAUER & FELD, L.L.P.

American Civil Liberties Union, Inc.

Brian M. Hauss
   AMERICAN CIVIL LIBERTIES UNION FOUNDATION

Financial Industry Regulatory Authority, Inc.

Aaron M. Streett, Elisabeth C. Butler
   BAKER BOTTS, L.L.P.

Academic Experts in the Fields of Business, Management, and Economics

Jeffrey B. Dubner
   DEMOCRACY FORWARD FOUNDATION
Karen L. Loewy, Peter C. Renn
   LAMBDA LEGAL DEFENSE & EDUCATION FUND, INC.

April 29, 2024

      /s/  Beth-ann Roth
      *Attorney for Amicus Curiae*
      *Interfaith Center on Corporate Responsibility*

# TABLE OF CONTENTS

Certificate of Interested Persons........................................................... i

Table of Authorities............................................................................ v

INTEREST OF THE INTERFAITH CENTER ON
CORPORATE RESPONSIBILITY ................................................. 1

ARGUMENT

The Nasdaq Diversity Rules provide a standardized disclosure tool
for investors to evaluate whether a company's board has sufficient
"idea diversity" to satisfy norms of sound corporate governance.................... 3

A.    The Nasdaq Diversity Rules augment existing state-based governance
      requirements designed to enhance investor confidence........................... 3

      1.    Disclosure standards for Nasdaq exchange-listed companies
            will promote uniformity, and have the potential to
            reduce costs for both shareholders and issuers ................................. 3

      2.    State law imposes fiduciary duties on directors to provide
            fiscal and governance oversight of companies for the benefit of
            the business, and the Nasdaq Diversity Rules enhance directors'
            ability to do so ................................................................................. 8

      3.    Those same state law governance principles incorporated into
            the Nasdaq Diversity Rules are consistent with the Exchange Act
            because Congress, in enacting the Exchange Act, sought to protect
            shareholders' state-law voting rights ................................................. 14

B.    Petitioners mistakenly rely on constitutional law arguments rather
      than recognizing that the state-law governance obligations embedded
      in the Exchange Act proxy and other rules support disclosures of the
      type elicited by Nasdaq's Diversity Rules................................................. 18

      1.    The Exchange Act is designed to provide full, fair, and accurate
            disclosure to investors to help ensure their ability to make
            reasoned investment and voting decisions ........................................ 19

2.   It is disingenuous to assert that it is discriminatory for a private exchange to create standards setting forth uniform disclosure requirements to enhance the ability of investors to make reasoned investment and voting decisions about the sufficiency of corporate governance ................................................... 20

CONCLUSION ................................................................................. 22

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*Barr v. American Assn. of Political Consultants, Inc.*,
    140 S. Ct. 2335 (2020) ........................................................................ 18

*Hall v Geiger Jones Co.*,
    242 U.S. 539 (1917) ............................................................................ 19

*J.I. Case v. Borak*,
    377 U.S. 426 (1964) ............................................................................ 14

*SEC v. Capital Gains Research Bureau, Inc.*,
    375 U.S. 180 (1963) ............................................................................ 15

*SEC v. Wall Street Publishing Co.*,
    851 F.2d 365 (D.C. Cir. 1985) ............................................................ 18

*Superintendent of Insurance v. Bankers Life & Cas. Co.*,
    404 U.S. 6 (1961) ................................................................................ 16

*TSC Indus. v. Northway*,
    426 U.S. 438 (1976) ............................................................................ 10

<u>**Statutes**</u>

Delaware Code § 141(b) ............................................................................ 9

Securities Act of 1933,
    15 U.S.C. §§ 77a ................................................................................ 14

Securities Exchange Act of 1934,
    15 U.S.C. §§ 78a et seq ......................................... 10, 11, 14, *passim*

Securities Exchange Act of 1934 Section 19(b),
    15 U.S.C. § 78s(b) .............................................................................. 17

**Rules**

Nasdaq Diversity Rules ........................................................3, 6, 7, *passim*

**SEC Releases**

Self-Regulatory Organizations; The Nasdaq Stock Market LLC;
Order Approving Rule Changes, as Modified by Amendments
No. 1, To Adopt Listing Rules Relating to Board Diversity and
To Offer Certain Listed Companies Access to a Complimentary
Board Recruiting Service, SEC Rel. No. 34-92590 (August 6,
2021), 86 Fed. Reg. 44424. ("SEC Order"). ........................................ 6, 7, 8 *passim*

**Other Materials**

SEC Briefing paper: Roundtable on the Federal Proxy Rules and State
Corporate Law (May 7, 2007) ........................................................... 15

## INTEREST OF THE INTERFAITH CENTER
## ON CORPORATE RESPONSIBILITY[1]

The Interfaith Center on Corporate Responsibility ("ICCR") is a coalition of more than 300 institutional investors collectively holding over $4 trillion in assets under management. Its members are a cross section of religious investors, foundations, asset managers, pension funds, endowments, and other long-term institutional investors, most of which owe fiduciary duties to clients and beneficiaries.

Many of ICCR's members consider board structure and the corporate governance practices of the companies in which they invest as one indicator of the long-term health of a business. Multiple board member perspectives and experiences contribute to the sound corporate decision-making obligations imposed by state corporate law. However, while listed companies have been working diligently to add diverse voices to their boards, obtaining information relating to those efforts has lacked uniformity and accordingly tends to be costly. The Nasdaq Board Diversity Rules and the uniform disclosure matrix facilitates

---

[1] This brief is submitted accompanied by a Motion for Leave to File an *Amicus Curiae* Brief under Rule 29 of both the Federal Rules of Appellate Procedure and Fifth Circuit Rules and Internal Operating Procedures, and has the consent of all parties. The *amicus* certifies that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund the preparation or submission of this brief; and no person other than *amicus* and its counsel contributed money intended to fund this brief.

access to that information for investors while imposing no burden on a company that already employs best governance practices.

The federal securities laws provide a disclosure framework on which shareholders rely for information. It is an orderly mechanism for the two-way exchange of ideas between those who manage a company for long-term success, and the shareholders who are committed to that long-term success. Shareholders demonstrate their confidence in a company by supplying it with the financial resources on which the company relies.

ICCR is troubled by the mischaracterizations put forth by the petitioners, including sloganizing Nasdaq's disclosure standardization as a "quota rule" that violates constitutional norms. Their arguments are neither supported by law or public policy, nor is there a legitimate constitutional issue based on the requirement that a company provide easily-accessible information as a condition to listing its shares on the exchange. If a company asks its shareholders to vote, it is only logical that the shareholders need sufficient information to assist them with their voting decision. If a company does not wish to provide that information, it can choose to list on a different exchange or to not seek financial resources from the public.

# ARGUMENT

**The Nasdaq Diversity Rules provide a standardized disclosure tool for investors to evaluate whether a company's board has sufficient "idea diversity" to satisfy norms of sound corporate governance.**

**A.    The Nasdaq Diversity Rules augment existing state-based governance requirements designed to enhance investor confidence.**

The Nasdaq Diversity Rules do not change the duties already imposed on companies with respect to governance. Rather, they provide a disclosure-based element of standardization and a starting point for definition that helps both boards and investors evaluate how a particular company is implementing its governance oversight. In that respect, the rules enhance the ability of investors to acquire information necessary to make informed investment and voting decisions.

**1.    Disclosure standards for Nasdaq exchange-listed companies will promote uniformity, and have the potential to reduce costs for both shareholders and issuers.**

Investors such as pension funds and asset managers are bound by fiduciary duties, and all money managers are stewards of their clients' assets. In carrying out their duties and exploring appropriate investments, money managers rely on a range of assessments designed to manage risk to their portfolios and to protect long-term investment value. As part of the obligation to vote for members of the board, investors apply governance standards to evaluate whether the board of directors is comprised of people who bring a variety of perspectives to the board discussions in the quest for best governance oversight of the business.

Assessments about board member candidates require access to information. Uniformity of the type of information that is required to be disclosed can be a critical adjunct to a money manager's ability to acquire and assess the information needed to comply with their fiduciary obligations. How the information is used is not prescriptive or designed to plug into a formula to reach one of a few pre-determined answers. Rather, asset holders need the information to be able to exercise their discretion in determining what does and does not match their stated investment objectives and strategies, and which companies are instituting governance practices conducive to building long-term value.

For over a decade, the numerous asset owners and investment firms that identified a need for the information held meetings with and wrote to management and board members, and voted proxies. On occasion they filed shareholder resolutions requesting access to governance-related information and encouraged the adoption of policies designed to recognize the benefits of the different perspectives that board members of varied backgrounds could bring to the table. Investors with trillions of dollars in assets under management had proxy voting policies allowing "no votes" for the Nominating Committee members of companies with poor board diversity as could best be determined from limited available information.

Corporate-shareholder engagements continued, with asset holders arguing an effective business case for the positive financial impact of having a diverse board as well as the improved decision making at the board level, noting studies and their own experience. Investors regularly pointed out that it was often not easy to learn the gender or whether a nominee was potentially diverse from the broader board body, especially when a proxy disclosed only names and no photographs.

Impressively, engagement with companies was usually constructive and with positive outcomes. It was made clear that active governance is an important issue within the investor community, a point that was widely acknowledged by business leaders and boards themselves. Numerous companies told ICCR's coalition partners and other members of the investment community that they understood the value to their firm of board diversity and took steps to improve it when asked.

Nevertheless, even for those companies in agreement with the investor community about the benefits of having diverse voices on their boards, the disclosures had no uniform format and there were no definitions, making it expensive for companies to produce and for asset owners to acquire. In addition, the disclosures were not guided by definitions or a specific format, rendering the information labor-intensive to find and potentially not as reliable as it would be with a disclosure rule in place.

For that reason, when Nasdaq embarked on its rulemaking proposal, investors spoke out on the importance of board diversity in their governance assessments and made it clear that the absence of standardized information was seen as a serious problem. Lack of readily-available information hampered their ability to service their clients and thus to comply with their legal obligations.

The list of investors speaking out in favor of the disclosure rule was extensive and impressive. As reflected in the SEC administrative record, they included major investment firms such as State Street Global Advisors, Vanguard and Blackrock;[2] major asset owners such as the California Public Employees' Retirement System (CalPERS)[3] and the California State Teachers' Retirement System (CalSTRS),[4] the pension funds of Illinois and New York City,[5] religious investors, foundations and union investment funds. Companies also submitted comments in favor of the Rules.[6]

---

[2] Self-Regulatory Organizations; The Nasdaq Stock Market LLC; Order Approving Rule Changes, as Modified by Amendments No. 1, To Adopt Listing Rules Relating to Board Diversity and To Offer Certain Listed Companies Access to a Complimentary Board Recruiting Service, SEC Rel. No. 34-92590 at 26 note 92 (August 6, 2021), 86 Fed. Reg. 44424. ("SEC Order").

[3] *Id*.

[4] *Id*. at 14 note 45.

[5] *Id*. at 20 note 72.

[6] *See*, *e.g.*, *Id*. at 22 note 75 (Microsoft), and 24 note 84 (Guess).

For ICCR and its coalition members, a key benefit of the Nasdaq Diversity Rules is the obligation for all Nasdaq-listed issuers to report the required information in a consistent disclosure format. The focus is on the ability to access the information. Nasdaq itself identified this as a major impetus for the proposed rules. As explained by Nasdaq, investors identified the essential need to reduce the cost of acquiring information about board diversity.[7] Absent a common disclosure regimen, there is a substantial cost and burden on investors to ferret out that information from pre-existing disclosures not necessarily focused on the uniform set of disclosure requirements now embedded in the Rules.

For all investors – especially smaller ones – having to identify and distill information not available in a uniform format is both burdensome and costly. The benefit of facilitating research and simultaneously reducing the cost of acquiring the information institutional investors need in order to comply with their clients' investment strategies and instructions supports the SEC's conclusion that the Nasdaq Diversity Rules are consistent with the Exchange Act and were therefore properly approved.[8] The Rules provide a thoughtfully-designed standardized tool for both issuers and investors.

---

[7] *Id*. at 20.

[8] *Id*. at 81.

**2.    State law imposes fiduciary duties on directors to provide fiscal and governance oversight of companies for the benefit of the business, and the Nasdaq Diversity Rules enhance directors' ability to do so.**

Standard norms of corporate governance presume that board members will bring different perspectives to the boardroom. There is no prescription as to the source of those voices, and each business will draw from a variety of skillsets to ensure that oversight is robust and based on the experiences of the individuals to forge the consensus of the single board body. That body is generally protected from liability by the "business judgment rule" so long as the board can demonstrate that its directors had sufficient information to serve as the basis for a reasoned decision.  Board members must have the ability to discuss matters during the course of a duly-called meeting at which a quorum is present, as well as an opportunity to ask questions and receive answers.

It is the robustness of the board process that contributes to the protection from liability, and its many components are not merely aspirational. The variety of voices that make up the board body are an integral part of protecting not only the board itself, but also the company for which the board creates and oversees the policies designed to lead to the company's business success. The Nasdaq Diversity Rules help ensure a uniform, compliant process that is memorialized for the benefit of the company and its shareholders.

State corporate law fixes the number of directors required of a corporation. Delaware law, for example, permits a corporation to have only one director.[9] In practice, however, most companies – and in particular public companies - will always have a larger number of directors than the minimum prescribed by law, even in states where the more common minimum number of directors is three. To enhance corporate governance and to provide for greater investor confidence, exchanges have adopted over the years a series of listing requirements such as a minimum number of independent directors.

Modern corporate governance principles demand diversity of thought and the contribution of independent directors. In that connection, exchanges have over the years imposed listing standards to enhance the oversight provided by boards of directors and to promote investor confidence in the securities markets the exchanges facilitate. Obligations on publicly-traded companies imposed by federal law evolve in response to forces such as investor demand for disclosure and readily-accessible information in a usable format.

The Diversity Rules provide some degree of certainty for board Governance and Nominating Committees seeking to identify and recruit appropriate candidates. Standardization such as the categories provided in the Rules provide a way of demonstrating that there is a process in place. That process does not constitute

---

[9]   Delaware Code § 141(b).

adherence to a "quota" system, but rather provides a starting point for guidance in connection with nominations and reporting. The "category" to which a director identifies as belonging is not intended by itself to suffice as a determinant of who qualifies to serve on the board. Rather, the candidate's professional background will define whether the experience each brings to the boardroom meets the board's current talent needs. Nevertheless, identifying backgrounds– both personally and professionally – helps companies ensure that board conversations are likely to produce the diversity of perspectives and robustness of discussion required to satisfy governance requirements. Those considerations contribute to the protections provided by the business judgment rule.

Thus, the Nasdaq Diversity Rules augment the "total mix" of information available to investors in making voting decisions on matters of governance. As such, the information is "material" within the meaning of *TSC Indus. v. Northway*, 426 U.S. 438 (1976).

In that regard, AFBR errs in its assertion that the Nasdaq Diversity Rules do not meet the 1934 Act[10] standards of materiality. As emphasized above and as set forth in Section A.3 below, the preservation and enforceability of state law standards are one of the very purposes of the 1934 Act. The Nasdaq Diversity Rules easily and necessarily meet that standard. Indeed, it was the material

---

[10] Securities Exchange Act of 1934, 15 U.S.C. §§ 78a et seq.

misstatements being made by companies prior to adoption of the Exchange Act that necessitated enactment of the Exchange Act. The administrative record before the SEC as to the Diversity Rule proposal fully supports the conclusion of the agency that the disclosures required by the Rules is "consistent" with the Exchange Act. The Diversity Rules thus advance the public policy of the federal securities laws.

As the SEC summarized in its adopting release, Nasdaq explained that "its discussions with organizational leaders representing a broad spectrum of market participants and stakeholders (including business, investor, governance, legal and civil rights communities) revealed strong support for disclosure requirements that would standardize the reporting of board diversity statistics."[11] In its submission to the SEC, Nasdaq expressly noted that the need for this rule was in part because existing SEC rule guidance had proven inadequate. As Nasdaq has explained, "the absence of a specific definition of diversity for such disclosures has resulted in current reporting of board-level diversity statistics being significantly unreliable and unusable to investors."[12] Further, Nasdaq itself determined that its proposed disclosure rules "would eliminate data collection inaccuracies, decrease investors' costs, enhance investors' ability to utilize the information disclosed, and make

---

[11]  SEC Order at 18 and note 60.

[12]  *Id*. at 19 and note 62.

information available to investors who otherwise not be able to obtain individualized disclosures."[13]

In support of its decision to approve the rule, the SEC noted particularly that this part of the rule was supported by many commentors summarizing their comments as stating "that investors currently do not have sufficient access to consistent, meaningful, or reliable board diversity information."[14] As the SEC highlighted in its adopting release, "[t]he Commission finds that the Board Diversity Proposal would provide widely available, consistent, and comparable information that would contribute to investors' investment and voting decisions."[15]

That SEC finding is supported by substantial evidence in the administrative record. It is noteworthy that the SEC found that the Diversity Rule would also likely be beneficial to those boards concluding that the composition of their board should not change, finding instead that the disclosure obligation "could inform [the board's] decision to vote to preserve the existing board composition of the company."[16] What the rule does is promote discussion and an opportunity to set forth in its disclosures the rationale for a board's decision. The investor or

---

[13] *Id*. at 20 and note 69.

[14] *Id*. at 20 and note 72.

[15] *Id*. at 25.

[16] Id. at 27.

shareholder then has at least some relevant information to factor into its overall assessment.

In support of its Rules, Nasdaq explained that "the Exchange believes that this disclosure would enable the investment community to conduct more informed analyses of, and have more informed conversations with, companies and improve the quality of information to make informed investment and voting decisions."[17] In response to critics claiming that the rule seeks to mandate board diversity, the SEC found directly to the contrary. Rather than mandating any particular board composition or requiring Nasdaq-listed companies to change the composition of their boards, the Rule would "provide investors with board level diversity statistics and explanations for certain companies' approaches to board diversity, which would contribute to investors' investment and voting decisions relating to companies' board compositions."[18]

The explanations given by the SEC in its adopting release for approval of the Diversity Rule are well-explained by the agency, supported by substantial evidence in the administrative record, and the disclosure focus of the rule is well within the traditional disclosure focus of the federal securities laws.

---

[17] *Id.* at 19-20 and note 67.

[18] *Id.* at 27.

**3.    Those same state law governance principles incorporated into the Nasdaq Diversity Rules are consistent with the Exchange Act because Congress, in enacting the Exchange Act, sought to protect shareholders' state-law voting rights.**

Federal regulation of the proxy process is one of the core functions assigned to the SEC under the original Securities Exchange Act as enacted in 1934. Likewise, disclosure of information that enables investors to make informed investment choices is a core function of both the Securities Act of 1933[19] and the Exchange Act. The Nasdaq Diversity Rule at issue in this case readily meets this criteria and the SEC's decision to approve the rule is well within the scope of its authority.

One purpose of federal regulation was to provide a mechanism for ensuring shareholders the protection of federal law while exercising their state law rights, including shareholders' right to the corporate franchise. *See J.I. Case v. Borak*, 377 U.S. 426, 432 (1964). The federal securities laws are based on the principle that state law defines the substantive law of the rights between shareholders and the corporations in which they invest. Federal regulation is intended to cement these state law rights and enable enforcement under the federal securities laws. The need for this federal oversight is well documented in the legislative history because of the history of abuse of the proxy process that preceded the enactment of the

---

[19] Securities Act of 1933, 15 U.S.C. §§ 77a *et seq*.

Exchange Act and has long been recognized by the courts. *See J.I. Case*, <u>377 U.S. at 432</u> (citing legislative history of the 1934 Act.) The SEC has summarized the purpose of this regulatory power: "The federal interests include the importance of fair corporate suffrage and the prevention of abuses that would frustrate the free exercise of shareholders' voting rights."[20]

At the core of the powers granted to the SEC in the 1933 and 1934 Acts is the power to require full disclosure. As the Supreme Court has recognized, the focus of the federal securities law powers granted to the SEC are its disclosure powers. In *SEC v. Capital Gains Research Bureau, Inc.*, <u>375 U.S. 180</u> (1963), the Court summarized the underlying purpose of the Congressional design of the federal securities laws: "A fundamental purpose, common to these statutes, was to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry." *Id*. at 186. The Supreme Court further emphasized that "[e]xperience has shown that disclosure . . . is needed to preserve the climate of fair dealing which is so essential to maintain public confidence in the securities industry and to preserve the economic health of the country. *Id*. at 201.

---

[20] SEC Briefing paper: Roundtable on the Federal Proxy Rules and State Corporate Law (May 7, 2007) at 1. (available at https://www.sec.gov/spotlight/proxyprocess/proxy-briefing050707.htm)

The Court gave a similar explanation of the purposes of the securities laws two years earlier in clarifying the scope of the antifraud provisions of the federal securities laws in *Superintendent of Insurance v. Bankers Life & Cas. Co.*, 404 U.S. 6,12 (1961) ("Congress meant to bar deceptive devices and contrivances in the organized markets or face to face.")

The Nasdaq Diversity Rule at issue in this case is designed to follow on these disclosure principles. Part of the rule requires a mechanism for standardized disclosure of the question of diversity of the board of directors. As summarized by the SEC, "the Exchange proposes to require each Nasdaq-listed company, subject to certain exceptions, to publicly disclose in an aggregated form, to the extent permitted by applicable law, information on the voluntary self-identified gender and racial characteristics and LGBTQ+ status (all terms defined below) of the company's board of directors."[21] The other part of the rule requires an explanation of the board policy as to diversity on its board. As described by the SEC "The Exchange also proposes to require each Nasdaq-listed company, subject to certain exceptions, to have, or explain why it does not have, at least two members of its board of directors who are Diverse, including at least one director who self-identifies as female and at least one director who self-identifies as an

---

[21] SEC Order at 3-4.

Underrepresented Minority or LGBTQ+."[22] Finally, a third-part of the Rule

includes a "Board Recruiting Service Proposal" whereby "[t]he Exchange proposes

to provide certain Nasdaq-listed companies with one year of complimentary access

for two users to a board recruiting service, which would provide access to a

network of board-ready diverse candidates for companies to identify and

evaluate."[23]

Section 19(b) of the Exchange Act, 15 U.S.C. §78s(b), sets out the limited

review scope of the SEC in reviewing SRO rules[24] and requires the SEC to find

that the rule is consistent with the Exchange Act."[25] The SEC in this case

concluded that each facet of the rule, the disclosure focus of the rule was consistent

with the underlying policies of the Exchange Act.[26] That decision is on the

administrative record before the SEC supported by substantial evidence.[27]

---

[22] *Id*. at 4.

[23] *Id*.

[24] In general, the new rules must comply both with the original listing standards set out in Section 6(b) of the Exchange Act, 15 U.S.C. §78f(b) and the requirements of Section 19(b). Notably, the Exchange Act listing requirements include a requirement that the rules be "designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, . . . to remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect investors and the public interest." *Id.* at 6(b)(5).

[25] SEC Order at 3.

[26] *Id*. at 4.

[27] *Id*. at 19, 21 and 22 (discussing comments filed in support of the rule).

Petitioners' attempt to paint the substance of the Nasdaq Diversity Rules as violating constitutional norms. That assessment is misguided. By jumping over the Exchange-Act mandated obligation of companies to follow state-law corporate governance principles, Petitioners ignore the standards applicable to the SEC's review and approval of the Exchange's rules. The SEC reviewed the rules and found them to be consistent with the 1934 Act. The record supports that finding. Given that finding, the review and approval procedures mandate that the SEC approve Nasdaq's rules. That is precisely what the SEC did.

**B.    Petitioners mistakenly rely on constitutional law arguments rather than recognizing that the state-law governance obligations embedded in the Exchange Act proxy and other rules support disclosures of the type elicited by Nasdaq's Diversity Rules.**

Petitioners assert Constitutional impediments to the Diversity Rule. ICCR believes that the Diversity Rule imposes disclosure obligations well within the scope of accepted norms of government commercial regulation of the economic market place for securities by states or the federal government. *See Barr v. American Assn. of Political Consultants, Inc.*, 140 S. Ct. 2335, 2347 (2020) ("[T]he courts have generally been able to distinguish impermissible content-based speech restrictions from traditional ordinary economic regulation of commercial activity that imposes incidental burdens on speech.") *Accord, SEC v. Wall Street Publishing Co.*, 851 F.2d 365, 373 (D.C. Cir. 1985) ("If speech employed directly or indirectly to sell securities were totally protected, any regulation of the securities

18

market would be infeasible and that result has long since been rejected." )

(Citations omitted). *See also Hall v Geiger Jones Co.*, <u>242 U.S. 539, 552</u> (1917)

(upholding state regulation of interstate securities markets through blue sky laws).

> **1.    The Exchange Act is designed to provide full, fair, and accurate disclosure to investors to help ensure their ability to make reasoned investment and voting decisions.**

The courts have long recognized that the disclosure-based obligations at the core of government regulation of the securities markets is well within the bounds of the government's regulatory power over the securities markets. As set forth above, the Nasdaq Diversity Rules are reflective of corporate governance-based criteria mandating a diversity of opinions in the boardroom, and are therefore consistent with the Exchange Act.

The focus of this *en banc* review should therefore be on the standards pursuant to which the Nasdaq Diversity Rules were properly adopted as explained by the SEC and as set forth in the administrative record before the Court, and not converted to a discussion of constitutional standards not reflective of the actual purpose of the Rules.

The SEC's standard for statutory review of self-regulatory organization ("SRO") rules such as those of Nasdaq and other private stock exchanges is whether the disclosure rule at issue is consistent with the policies of the Exchange Act. There is substantial evidence in the record from which the SEC could

conclude that the rules drafted by Nasdaq are consistent with the disclosure-based theory of government regulation of the federal securities markets.

**2.    It is disingenuous to assert that it is discriminatory for a private exchange to create standards setting forth uniform disclosure requirements to enhance the ability of investors to make reasoned investment and voting decisions about the sufficiency of corporate governance.**

Contrary to petitioners' claims and those of some of their *amici*, the Nasdaq Diversity Rule is not a so-called "Quota Rule." Claims of "race and sex discrimination" are likewise without basis, as are the charges that the rule "violates the equal protection clause." The disclosure rules have no capacity to alter the "federal-state balance," the record on which the rules were approved are far from "inadequate," and the SEC has not engaged in "regulatory shaming."

These sensationalist characterizations suggest a misreading of the agency administrative record before the Court and a distortion of the Nasdaq Diversity Rule and its intent. As the above discussion from the SEC decision adopting the proposed Diversity Rule explains, the rule - far from mandating any particular board composition - is in fact focused on providing information to investors and voters to make informed choices about corporate governance of the companies in which they invest.

There is also no basis for any charge of discrimination based on a disclosure mandate. A disclosure-based rule like the one at issue does not reasonably lead to

20

fostering discrimination in company boards. Rather, the Nasdaq Diversity Rules support investors' need to be fully-informed on issues important to fulfilling their fiduciary obligations to their clients, especially with respect to how a company manages its governance. Governance issues are as telling about a company's potential success as a business as are other business policy- and management-related issues.

Following the Diversity Rule requirements should not by themselves lead to a board's changing its composition. Rather, it should lead to a governance-led discussion on the most appropriate composition for the specific company the board has been elected to lead. If the collective membership of the board believes it has satisfied the governance standard of having a sufficient number of voices to adequately make policy decisions on behalf of a company, its conclusions will be set forth in its disclosures and its obligations will have been met as long as they appear to be reasonable. Those to whom the disclosure is directed are then free to add the information to the mix and reach their own conclusions based on their own fiduciary and contractual obligations to the clients they serve.

On balance, the rules greatly benefit both companies and their investors. ICCR respectfully submits that the SEC has complied with the administrative process required for approval of the Nasdaq Diversity Rules, and that the legal

duties imposed on boards and investors will be more easily met with the assistance of the Rules.

## CONCLUSION

For the foregoing reasons, ICCR requests that this Court grant the SEC's request that the petitions of AFBR and NCPPR be dismissed.


April 29, 2024                              Respectfully Submitted,

                                           /s/ Beth-ann Roth

                                           Beth-ann Roth
                                           Richard A. Kirby

                                           R|K INVEST LAW, PBC
                                           1725 I St. NW Ste 300
                                           Washington, DC 20006
                                           (202) 664-7171

                                           *Counsel for* Amicus Curiae
                                           *Interfaith Center on Corporate Responsibility*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 4,732 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally-spaced typeface using Microsoft Word in Times New Roman font size 14.

Date: April 29, 2024          /s/ Beth-ann Roth

                                                 Beth-ann Roth
                                                 R|K INVEST LAW, PBC
                                                 1725 I St. NW Ste 300
                                                 Washington, DC 20006
                                                 (202) 664-7171

                                               *Counsel for Amicus Curiae*
                                               *Interfaith Center on Corporate Responsibility*

## CERTIFICATE OF SERVICE

I hereby certify that on April 29, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished through the CM/ECF system.


Date: April 29, 2024                    /s/ Beth-ann Roth

                                        Beth-ann Roth
                                        R|K INVEST LAW, PBC
                                        1725 I St. NW Ste 300
                                        Washington, DC 20006
                                        (202) 664-7171

                                        *Counsel for Amicus Curiae*
                                        *Interfaith Center on Corporate Responsibility*