**No. 21-60626**

# In the United States Court of Appeals for the Fifth Circuit

———————————

ALLIANCE FOR FAIR BOARD RECRUITMENT,
NATIONAL CENTER FOR PUBLIC POLICY RESEARCH,

*Petitioners,*

— v. —

SECURITIES AND EXCHANGE COMMISSION,

*Respondent.*

———————————

ON PETITION FOR REVIEW OF AN ORDER OF THE UNITED
STATES SECURITIES AND EXCHANGE COMMISSION

No. 34-92590

═══════════════

**BRIEF OF ACADEMIC EXPERTS IN THE FIELDS OF
BUSINESS, MANAGEMENT, AND ECONOMICS AS AMICI
CURIAE IN SUPPORT OF RESPONDENT SECURITIES AND
EXCHANGE COMMISSION**

═══════════════

Dated: May 3, 2024

Aman T. George*
Victoria Nugent
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
vnugent@democracyforward.org
ageorge@democracyforward.org

Peter C. Renn
Lambda Legal Defense and
Education Fund, Inc.
4221 Wilshire Blvd., Suite 280
Los Angeles, CA 90010
(213) 382-7600
prenn@lambdalegal.org

Karen L. Loewy
Lambda Legal Defense and
Education Fund, Inc.
111 K Street NE, 7th Floor
Washington, D.C. 20002
(202) 809-8585
kloewy@lambdalegal.org

*Counsel of Record*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. Pursuant to Fed. R. App. P. 29(a)(4)(E), Amici Academic Experts in the Fields of Business, Management, and Economics and their Counsel authored this brief in whole. No other person, including any party or party's counsel, contributed money intended to fund preparing or submitting this brief. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

### *Petitioners*
Alliance for Fair Board Recruitment
National Center for Public Policy Research

### *Counsel for Petitioners*
Jonathan Berry, Boyden Gray & Associates
R. Trent McCotter, Boyden Gray & Associates
Michael Buschbacher, Boyden Gray & Associates
Jared Kelson, Boyden Gray & Associates
James R. Conde, Boyden Gray & Associates
Mark Chenoweth, New Civil Liberties Alliance
Margaret A. Little, New Civil Liberties Alliance
Sheng Tao Li, New Civil Liberties Alliance

### *Respondent*
U.S. Securities and Exchange Commission

### *Counsel for Respondent*

i

Megan Barbero, U.S. Securities and Exchange Commission
Michael A. Conley, U.S. Securities and Exchange Commission
Daniel Matro, U.S. Securities and Exchange Commission
Tracey A. Hardin, U.S. Securities and Exchange Commission
John Robert Rady, U.S. Securities and Exchange Commission

### *Intervenor*
Nasdaq Stock Market, L.L.C.

### *Counsel for Intervenor*
Allyson Newton Ho, Gibson, Dunn & Crutcher, L.L.P.
Seth D. Berlin, Ballard Spahr, L.L.P.
Bradley G. Hubbard, Gibson, Dunn & Crutcher, L.L.P.
Stephen J. Kastenberg, Ballard Spahr, L.L.P.
Paul Lantieri, III, Ballard Spahr, L.L.P.
Paulette Miniter, Gibson, Dunn & Crutcher, L.L.P.
Joanne Pedone, Nasdaq Incorporated
Amalia E. Reiss, Gibson, Dunn & Crutcher, L.L.P.
Amir C. Tayrani, Gibson, Dunn & Crutcher, L.L.P.
John Yetter, Nasdaq, Incorporated
John Zecca, Nasdaq, Incorporated

### *Amicus Curiae Cory R. Liu*

### *Counsel for Amicus Curiae Cory R. Liu*
Devon Westhill, Center for Equal Opportunity
Daniel I. Morenoff, American Civil Rights Project
Joseph A. Bingham, American Civil Rights Project

### *State Amici Curiae in Support of Petitioners*
State of Arizona, State of Alabama, State of Alaska, State of Arkansas,
State of Florida, State of Georgia, State of Idaho, State of Indiana, State
of Iowa, State of Kansas, State of Kentucky, State of Louisiana, State of
Mississippi, State of Missouri, State of Montana, State of Nebraska,
State of North Dakota, State of Ohio, State of Oklahoma, State of South
Carolina, State of South Dakota, State of Tennessee, State of Texas,
State of Utah, State of Virginia, State of West Virginia

***Counsel for State Amici***
Drew C. Ensign, Holtzman Vogel Baran Torchinsky & Josefiak, PLLC
Sean D. Reyes, Office of the Utah Attorney General
Stanford E. Pursuer, Office of the Utah Attorney General
Christopher A. Bates, Office of the Utah Attorney General

***Amicus Curiae Buckeye Institute***

***Counsel for Amicus Curiae Buckeye Institute***
Jay R. Carson, Buckeye Institute
David C. Tyron, Buckeye Institute
Alex M. Certo, Buckeye Institute
John J. Park Jr.

***Amicus Curiae Advancing American Freedom, Inc. et al.***

***Counsel for Advancing American Freedom, Inc. et al.***
J. Marc Wheat, Advancing American Freedom, Inc.
Tiomthy Harper, Advancing American Freedom, Inc.
Ilya Shapiro, Manhattan Institute
Tim Rosenberger, Manhattan Institute

***Amici Curiae Nonpartisan Group of Academics and Petitioners in the Field of Corporate Governance\* in Support of Respondent***

***Counsel for Nonpartisan Group of Academics and Petitioners in the Field of Corporate Governance***
Marc Wolinsky, Wachtell, Lipton, Rosen & Katz
Elaine P. Golin, Wachtell, Lipton, Rosen & Katz
Carrie M. Reilly, Wachtell, Lipton, Rosen & Katz
Kevin S. Schwartz, Wachtell, Lipton, Rosen & Katz
Jeohn Salone Favors, Wachtell, Lipton, Rosen & Katz

***Amici Curiae Investors and Investment Advisers in Support of Respondent***
Council of Institutional Investors
Investment Adviser Association
Northern Trust Investments, Incorporated

Ariel Investments, L.L.C.
Boston Trust Walden Company
Lord, Abett & Company, L.L.C.
Gaingels, Incorporated
Robert F. Kennedy Center for Justice & Human Rights

***Counsel for Amici Curiae Investors and Investment Advisers***
Neal S. Manne, Susman Godfrey L.L.P.
Seven M. Shepard, Susman Godfrey L.L.P.
Arun Subramanian, Susman Godfrey L.L.P.

***Amicus Curiae Financial Industry Regulatory Authority, Inc. in Support of Respondent***

***Counsel for Amicus Curiae Financial Industry Regulatory Authority, Inc.***
Aaron Streett, Baker Botts L.L.P.
Elisabeth Butler, Baker Botts L.L.P.
***Amici Curiae Ad Hoc Coalition of Nasdaq-Listed Companies in Support of Respondent***

***Counsel for Amici Curiae Ad Hoc Coalition of Nasdaq-Listed Companies***
Pratik Shah, Akin Gump Strauss Hauer & Feld LLP
Juliana DeVries, Akin Gump Strauss Hauer & Feld LLP


***Amicus Curiae American Civil Liberties Union***

***Counsel for Amicus Curiae American Civil Liberties Union***
Brian Hauss, American Civil Liberties Union
Sandra S. Park, American Civil Liberties Union

***Amicus Curiae Sean J. Griffith***

***Counsel for Amicus Curiae Sean J. Griffith***
Heather Gebelin Hacker, Hacker Stephens LLP

***Amicus Curiae Interfaith Center on Corporate Responsibility***

***Counsel for Amicus Curiae Interfaith Center on Corporate Responsibility***
Beth-Ann Roth, R|K Invest Law, PBC
Richard A. Kirby, R|K Invest Law, PBC

***Amici Curiae Academic Experts in the Fields of Business, Management, and Economics in Support of Respondent***
Gennaro Bernile
Douglas Cumming
Daniel P. Forbes
Aida Sijamic Wahid
Scott E. Yonker
K.J. Martijn Cremers
Amy Hillman
Frances J. Milliken
Quinetta M. Roberson

***Counsel for Amici Curiae Academic Experts in the Fields of Business, Management and Economics***
Victoria Nugent, Democracy Forward Foundation
Aman T. George, Democracy Forward Foundation
Peter C. Renn, Lambda Legal Defense and Education Fund, Inc.
Karen L. Loewy, Lambda Legal Defense and Education Fund, Inc.

Dated: May 3, 2024                    Respectfully submitted,


                                      */s/ Aman T. George*
                                      Aman T. George
                                      Victoria Nugent
                                      Democracy Forward Foundation
                                      P.O. Box 34553
                                      Washington, D.C. 20043
                                      (202) 448-9090

                                      Peter C. Renn
                                      Lambda Legal Defense and
                                      Education Fund, Inc.
                                      4221 Wilshire Blvd., Suite 280
                                      Los Angeles, CA 90010
                                      (213) 382-7600

                                      Karen L. Loewy
                                      Lambda Legal Defense and
                                      Education Fund, Inc.
                                      111 K Street NE, 7th Floor
                                      Washington, D.C. 20002
                                      (202) 809-8585

# Table of Contents

CERTIFICATE OF INTERESTED PERSONS ........................................i

INTEREST OF *AMICI CURIAE*.................................................1

SUMMARY OF THE ARGUMENT .......................................................2

I.    The SEC correctly concluded that the record in this matter was sufficient to warrant approving the Proposal............................4

II.    Substantial evidence in the record supports a relationship between diversity and corporate performance ........................................8

    A.    Board diversity has been linked to reductions in misconduct. ..11

    B.    Board diversity has been linked to improved corporate transparency. .......................................................15

    C.    Board diversity has been linked to increased stability and innovation. ..........................................................17

III.    Substantial evidence in the record supports a relationship between diversity and firm financial performance ...............................18

IV.    Ongoing research since Nasdaq's Proposal supports the SEC's decision ...................................................................23

CONCLUSION ...................................................................30

CERTIFICATE OF SERVICE.......................................................31

CERTIFICATE OF COMPLIANCE....................................................32

# TABLE OF AUTHORITIES

**Cases**                                                **Page(s)**

*Biestek v. Berryhill*, 139 S. Ct. 1148 (2019) ................................................. 7

*Boeta v. FAA*, 831 F.3d 636 (5th Cir. 2016) ............................................... 7

**Statutes**

15 U.S.C. § 7262 ........................................................................... 13

15 U.S.C. § 78f(b)(5) ................................................................... 4, 18

**Other Authorities**

Aaron Dhir, *Challenging Boardroom Diversity: Corporate Law, Governance, and Diversity* (2015) ......................................................... 10

Abigail Allen & Aida Wahid, *Regulating Gender Diversity: Evidence from California Senate Bill 826,* 70 Mgmt. Sci. 2023 (2024) .............. 23

Aida Sijamic Wahid, *The Effects and the Mechanisms of Board Gender Diversity: Evidence from Financial Manipulation*, 159 J. of Bus. Ethics 705 (Oct. 2019) ................................................................. 11, 12

B. Espen Eckbo et al., *Valuation Effects of Norway's Board Gender-Quota Law*, Mgmt. Sci. (Aug. 2021) ...................................................... 22

Brian Feinstein at al., *Board Diversity Matters: An Empirical Assessment of Community Lending at Federal Reserve-Regulated Banks* (Jan. 5, 2022), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4000110 .... 28, 29

Corinne Post & Kris Byron, *Women on Boards and Firm Financial Performance: A Meta Analysis*, 58 Acad. of Mgmt. J. 1546 (Oct. 2015) ................................................................................................ 19

Credit Suisse ESG Research, *LGBT: The value of diversity* (Apr. 15, 2016), *available at* https://research-doc.credit-suisse.com/docView?language=ENG&source=emfromsendlink&format=PDF&document_id=807075590&extdocid=807075590_1_eng_pdf&serialid=evu4wNcHexx7kusNLaZQphUkT9naxi1PvptZQvPjr1k%3d 21

Credit Suisse, *The CS Gender 3000: Women in Senior Management* (Sept. 2014), *available at* https://www.credit-suisse.com/media/assets/corporate/docs/about-us/research/publications/the-cs-gender-3000-women-in-senior-management.pdf ................................................................... 21

Daniel P. Forbes & Frances J. Milliken, *Cognition and Corporate Governance: Understanding Boards of Directors as Strategic Decision-Making Groups*, 24 Acad. of Mgmt. Rev. 489 (1999) ............................. 9

David A. Carter et al., *The Gender and Ethnic Diversity of US Boards and Board Committees and Firm Financial Performance*, 18 Corp. Governance: An Int'l. Rev. 396 (2010) ........................................... 19, 20

David Abad et al., *Does gender diversity on corporate boards reduce information asymmetry in equity markets?*, 20 Bus. Rsh. Q. 192 (Apr. 2017) ..................................................................................... 16

Douglas Cumming et al., *Gender Diversity and Securities Fraud*, 58 Acad. of Mgmt. J. 1572 (Feb. 2015) ......................................... 14, 15, 25

Edward B. Rock, *Shareholder Eugenics in the Public Corporation*, 97 Cornell L. Rev. 849 (2012) .................................................................. 26

F. Arnaboldi et al., *Gender diversity and bank misconduct,* 71 J. Corp. Fin. 101834 (2021) ............................................................................. 25

FCLTGlobal, *The Long-term Habits of a Highly Effective Corporate Board* (Mar. 2019), *available at* https://www.fcltglobal.org/wp-content/uploads/long-term-habits-of-a-highly-effective-corporate-boards.pdf ................................................................................................ 21

Ferdinand A. Gul et al., *Does board gender diversity improve the informativeness of stock prices?* 51 J. of Acct. & Econ. 314 (2011) ..... 16

Gennaro Bernile et al., *Board Diversity, Firm Risk, and Corporate Policies*, 127 J. of Fin. Econ. 588 (2018) ............................................... 17

Giulia Ferrari et al., *Do Board Gender Quotas Matter? Selection, Performance, and Stock Market Effects*, 68 Mgmt. Sci. 5618 (2022) .. 24

Jason M. Thomas & Megan Starr, *Global Insights: From Impact Investing to Investing for Impact*, The Carlyle Group (Feb. 24, 2020), *available at https://www.carlyle.com/sites/default/files/2020-*

*02/From%20Impact%20Investing%20to%20Investing%20for%20Impa ct_022420.pdf* .................................................................................... 21

Jeffrey M. Woolridge, Introductory Econometrics: A Modern Approach (South-Western, Cenage Learning, 5th ed. 2013) .............................. 14

Kenneth R. Ahern & Amy K. Dittmar, *The Changing of the Boards: The Impact of Firm Valuation of Mandated Female Board Representation*, 127 Q. J. Econ. 137 (2012) ................................................................... 22

Larry Fauver et al., *Board Reforms and Firm Value: Worldwide Evidence*, 125 J. Fin. Econ. 120 (2017) .................................................... 6

Lawrence A. Cunningham, *Lessons from Quality Shareholders on Corporate Governance Practice, Research and Scholarship*, 5 Geo. Wash. Bus. & Fin. L. Rev. 1 (2021) .................................................... 26

Lawrence J. Abbott et al., *Female Board Presence and the Likelihood of Financial Restatement¸* 26 Acct. Horizons 607 (2012) .................. 12, 13

Lynne L. Dallas, *The New Managerialism and Diversity on Corporate Boards of Directors*, 76 Tul. L. Rev. 1363 (2002) .................................. 9

María Consuelo Pucheta-Martínez et al., *Corporate governance, female directors and quality of financial information*, 25 Bus. Ethics: A European Rev. 363(Oct. 2016) ........................................................... 15

Mary Akimoto et al., *Board Diversity and Effectiveness in FTSE 350 Companies*, London Bus. Sch. Leadership Ins., SQW, and Fin. Reporting Council 1 (July 2021), *available at* https://www.london.edu/-/media/images/leadership-institute-refresh/frc-board-diversity-and-effectiveness-in-ftse-350-companies.pdf .................................................................................. 11

McKinsey & Company, *Diversity wins: How inclusion matters* (May 2020), *available at* https://www.mckinsey.com/featured-insights/diversity-and-inclusion/diversity-wins-how-inclusion-matters .......................................................................................................... 21

Meggin Thwing Eastman et al., *The tipping point: Women on boards and financial performance*, MSCI (Dec. 2016), *available at* https://www.msci.com/documents/%2010199/fd1f8228-cc07-4789-acee-3f9ed97ee8bb........................................................................................ 21

Mohammad Hashemi Joo et al., *Securities litigation risk and board gender diversity*, 71 J. Corp. Fin. 102102 (2021)...........................24, 25

Olga Kuzmina & Valentina Melentyeva, *Gender diversity in corporate boards: Evidence from quota-implied discontinuities* 1 (Nov. 1, 2021), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3976227..........28

*Restatements: the costly result of an error*, Baker Tilly (July 26, 2019) *available at* https://www.bakertilly.com/insights/restatements-costly-result-error............................................................................................12

Shenyang Guo & Mark W. Fraser, *Propensity Score Analysis: Statistical Methods and Applications* (Sage Publishing, 2d ed. 2014).................14

Vivian Hunt et al., *Diversity Matters*, McKinsey & Company (Feb. 2, 2015), *available at* https://www.mckinsey.com/insights/organization/~/media/2497d4ae4b 534ee89d929cc6e3aea485.ashx ..........................................................21

Yu Chen et al., *Board Gender Diversity and Internal Control Weaknesses*, 33 Advances in Acct., incorporating Advances in Int'l Acct. (2016)..........................................................................................13

# INTEREST OF *AMICI CURIAE*

*Amici Curiae* Douglas Cumming,[1] Daniel P. Forbes,[2] Aida Sijamic Wahid,[3] and Scott E. Yonker,[4] joined by Frances J. Milliken[5] and Quinetta M. Roberson,[6] are academic experts in business, management, and economics, with particular expertise in studying the role of corporate board diversity in company performance. Their written works are frequently cited in their field, including, as detailed further below, in the record underlying the Nasdaq Proposal, Nasdaq, Notice of Filing of Amendment No. 1, SR-NASDAQ-2020-081 (Feb. 26, 2021), JA256 ("Nasdaq Proposal"), and the SEC's order approving it, Order Approving Proposed Rule Changes to Adopt Listing Rules Related to Board Diversity and to Offer Certain Listed Companies Access to a

---

[1] DeSantis Distinguished Professor of Finance and Entrepreneurship at the Florida Atlantic University College of Business

[2] Associate Professor of Strategic Management & Entrepreneurship at the University of Minnesota, Carlson School of Management

[3] Associate Professor of Accounting at the University of Toronto Department of Management

[4] Associate Professor of Finance at the Cornell SC Johnson College of Business

[5] Professor of Management at the New York University Leonard N. Stern School of Business

[6] John A. Hannah Distinguished Professor in Management and Psychology at the Michigan State University Eli Broad College of Business and College of Social Science

Complimentary Board Recruiting Service at 35 (Aug. 12, 2021), JA1 ("SEC Order").

Given Amici's expertise in studying the role of board diversity in company performance, they are particularly well-positioned to synthesize and explain the state of the empirical research relating to the Nasdaq Proposal to inform this Court's evaluation of the evidence underpinning the Proposal and the SEC's decision to approve it.

## SUMMARY OF THE ARGUMENT

Business, management, and economics experts have extensively studied the relationship of corporate board diversity to performance. When Nasdaq evaluated this research in 2021, it concluded that "an extensive body of empirical research demonstrates that diverse boards are positively associated with improved corporate governance and company performance." JA268. While the body of research is not *unanimous* in reaching this conclusion, Nasdaq's statement was accurate—a substantial body of high-quality, peer-reviewed research finds a positive relationship between diversity and performance.

As widely-published and cited scholars in this field, including by Nasdaq and the SEC in the underlying record, Amici come before this Court to address a narrow point: the mischaracterization by Petitioners (and some other *amici*) of the empirical record before the SEC and

Nasdaq. Contrary to Petitioners' assertions that the SEC lacked substantial evidence to approve Nasdaq's, s*ee* En Banc Br. for Pet'r AFBR 56, ECF No. 365 (herein after "AFBR Br."), En Banc Br. for Pet'r 24, ECF No. 364 (herein after "NCPPR Br."), significant evidence in the record supported Nasdaq's conclusion that "there is a compelling body of credible research on the association between economic performance and board diversity." JA283.

Amici explain why the SEC's decision was well-supported in the four sections below. Section I reviews the SEC's reasoning in approving the Nasdaq Proposal, and the substantial evidence standard against which it must be judged. Section II reviews the wide-ranging and compelling evidence considered by Nasdaq and the SEC in the record supporting a link between board diversity and a variety of non-financial corporate performance outcomes, such as risk, innovation, and shareholder protection. Section III reviews the several studies considered in the record that also support a link between board diversity and narrower indicators of firm financial performance. Finally, Section IV briefly expands beyond the underlying record to summarize research released since the SEC's decision concerning the link between board diversity and corporate performance, reinforcing the SEC's decision to approve Nasdaq's Proposal.

Taken together, the empirical research in this field and considered in the record is sufficient to support the Nasdaq Proposal as advancing the goals of the Exchange Act, by seeking to "prevent fraudulent and manipulative acts and practices," "promote just and equitable principles of trade," "remove impediments to and perfect the mechanism of a free and open market," and "protect investors and the public interest." 15 U.S.C. § 78f(b)(5).

## I. The SEC correctly concluded that the record in this matter was sufficient to warrant approving the Proposal

The SEC considered a variety of high-quality empirical evidence on the relationship between board diversity and corporate performance, as well as the specific nature of the Proposal, and concluded that the record was strong enough to warrant approval. That conclusion was correct.

The logic of the SEC's approval decision was straightforward: the SEC reviewed a number of studies "consistent with the view that increases in board diversity cause increases in shareholder wealth" as well as "more efficient (real) risk-taking," "more [investment] in research and development," and "more efficient innovation processes." JA9. The SEC also reviewed research that came to the opposite conclusion, but those studies were predominantly about the effects of

mandatory board diversity quotas. *Id.* Because the Nasdaq Proposal "does not mandate any particular board any particular board composition," the SEC explained that research about the effects of mandatory board diversity quotas may not be "a reliable basis for evaluating the likely effects of the Board Diversity Proposal." *Id.* Further, even those narrow studies of mandatory quotas have been called into question by other research, leaving "the effects of [mandatory quotas] the subject of reasonable debate." *Id.*

Given that the record contained evidence that could reasonably (but not conclusively) link board diversity to corporate performance, and given that numerous investors indicated on the record that they value this information in making investment decisions, *see* JA8, the SEC approved Nasdaq's proposed disclosure rule. In doing so, the SEC sought to "make consistent and comparable information relating to the corporate governance of Nasdaq-listed companies . . . widely available on the same basis to investors, which would increase efficiency for investors that gather and use this information." JA15. The Proposal would enable investors to "consider the analyses and conclusions from academic and other studies on the effects of changes in board composition on company performance and share value," and apply their own judgments to their investment strategies as they saw fit. JA9-10.

And the SEC approved the Proposal because the record also suggested that "comply-or-explain corporate governance reforms have been found to increase shareholder wealth more than corporate governance mandates, on average." JA9.[7]

Petitioners seize on the SEC's acknowledgement of a mixed evidentiary record as proof that Nasdaq's Proposal is unlawful and mischaracterize the significance of the SEC's assessment. Petitioner AFBR asserts that "the SEC itself admitted that it lacked substantial evidence that diverse boards improve corporate financial performance," AFBR Br. 56, but the SEC admitted no such thing. Petitioner NCPPR similarly claims that the "SEC concluded that no reasonable mind could accept [that diversity] has a rational relationship to corporate performance or investor returns," NCPPR Br. 24, but nowhere did the SEC reach this conclusion.

Petitioners make a logical leap, from the SEC's acknowledgement of mixed evidence, to a legal conclusion that the Proposal was unsupported by substantial evidence. This leap is unfounded. The burden on Nasdaq and the SEC was not to prove by a preponderance of

---

[7] *Citing* Larry Fauver et al., *Board Reforms and Firm Value: Worldwide Evidence*, 125 J. Fin. Econ. 120 (2017).

evidence that board diversity strengthens corporate performance. *Boeta v. FAA*, 831 F.3d 636, 641 (5th Cir. 2016) (cleaned up) (substantial evidence requires "less than a preponderance" of evidence). Rather, their burden was to present "more than a mere scintilla" of evidence, sufficient that "a reasonable mind *might accept* as adequate to support a conclusion," *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (cleaned up) (emphasis added).

As experts in this field, familiar with the research relied upon by the SEC and Nasdaq, there is no question to Amici that *a reasonable mind might accept* the existence of a positive link between board diversity and corporate performance. Many Amici and many of their peers believe there is a positive empirical link between board diversity and performance; at the same time, some of Amici's peers dispute the existence of this link. Importantly, neither position is too outrageous to be held by a reasonable mind (or, of particular relevance to the SEC's decision, a reasonable investor).

The breadth, strength, and quality of the evidence linking board diversity to various aspects of corporate performance, presented in detail below, easily meets the substantial evidence threshold. And it follows that the SEC's decision to provide more consistent transparency to investors into board diversity was supported by the record.

## II.    Substantial evidence in the record supports a relationship between diversity and corporate performance

The record considered by Nasdaq and the SEC contained substantial evidence of a link between board diversity and corporate performance. This area of research has produced a substantial number of rigorous, high-quality, peer-reviewed studies finding a positive association between diversity on companies' corporate boards and the performance of those companies on various axes of corporate governance and performance such as risk, innovation, and shareholder protection. The research evidence that diversity on corporate boards promotes stronger corporate governance and shareholder protection is very strong, and certainly sufficient to constitute substantial evidence.[8]

At its core, the link between board diversity and corporate decision-making is based on the unique role that boards of directors play in the governance process. Unlike senior managers, they do not implement strategic decisions or run the firm on a day-to-day basis. Rather, as Amici Professor Forbes and Professor Milliken have

---

[8] One amicus brief seeks to disregard this body of evidence entirely, quoting a research paper arguing that the only acceptable basis for a rule on an exchange is "higher stock prices." *See* Br. of Amicus Curiae Advancing Am. Freedom et al. 18, ECF No. 394-1. The idea that the SEC must disregard the effects of an exchange's rules on risk, innovation, shareholder protection, fraud, or other crucial elements of corporate governance has no basis in the Exchange Act.

described, boards are "episodic" groups that "face complex tasks related to strategic-issue processing."[9] Accordingly, "the effectiveness of boards is likely to depend heavily on social-psychological processes, particularly those pertaining to group participation and interaction, the exchange of information, and critical discussion."[10]

Heterogenous groups "share conflicting opinions, knowledge, and perspectives that result in a more thorough consideration of a wide range of interpretations, alternatives, and consequences."[11] The result can be stronger decision-making, by allowing "diverse perspectives" to be aired on issues and forcing boards to reach compromises, with "subsequent enhanced oversight" relative to decisions simply reached by consensus.[12] Indeed, it is now widely accepted among experts in corporate governance that "groupthink" (the tendency of many directors to refrain from raising viewpoints that conflict with those of their

---

[9] Daniel P. Forbes & Frances J. Milliken, *Cognition and Corporate Governance: Understanding Boards of Directors as Strategic Decision-Making Groups*, 24 Acad. of Mgmt. Rev. 489, 491–92 (1999) (cited in Nasdaq Proposal at JA293).

[10] *Id.* at 492.

[11] Lynne L. Dallas, *The New Managerialism and Diversity on Corporate Boards of Directors*, 76 Tul. L. Rev. 1363, 1391 (2002) (cited in Nasdaq Proposal at JA291-92).

[12] *Id.* at 1401.

colleagues) on corporate boards presents an acute and altogether too common danger to modern firms.[13]

The SEC received a substantial body of comments from the business community echoing this belief that diversity on boards of the type made visible by Nasdaq's Proposal would improve board decision-making, corporate governance, risk mitigation, innovation, investor protection, investor confidence, and corporate culture. *See* JA8 (collecting comments from the Carlyle Group, Goldman Sachs, Mercy Investment Services, Inc., Miller/Howard Investments, International Corporate Governance Network, the Association of Asian-American Investment Managers, AllianceBernstein L.P., Capital Research and Management Company, Lord Abbett, and Hispanic Chamber of Commerce).[14] Investors and investment associations echoed this point

---

[13] *See*, *e.g.*, Aaron Dhir, *Challenging Boardroom Diversity: Corporate Law, Governance, and Diversity* 151 (2015) (The inclusion of "outsiders" on a corporate board can "assist the firm in averting the docile conduct and other perils associated with groupthink," described as the tendency of cohesive boards to "striv[e] for unanimity" rather than "realistically appraise alternative courses of action," resulting in a "deterioration of mental efficiency, reality testing, and moral judgment.") (cleaned up) (cited in Nasdaq Proposal at JA292).

[14] Amici's interactions with business leaders in the course of their research and teaching, along with recent research conducted by scholars at the London Business School, reinforce the existence of a widespread belief among directors that diverse boards are valuable for their capacity to improve the range of information and perspectives boards bring to their work. *See* Mary Akimoto et al., *Board Diversity and Effectiveness in FTSE 350 Companies*, London Bus. Sch. Leadership Ins., SQW,

at an earlier stage of this case, noting that "[t]he overall diversity of a company's board is a relevant factor that many institutional investors and investment advisors consider when voting shares and when making investment decisions," particularly because these entities "believe that overall board diversity helps the board succeed" in its management and monitoring duties.[15]

These links between diversity and corporate decision-making have been explored in a variety of empirical studies that support the notion that the types of diversity the Proposal seeks to disclose would likely advance corporate governance and shareholder protection.

A.    Board diversity has been linked to reductions in misconduct.

A recent study of over 6,000 U.S. firms between 2000 and 2010 by Amicus Professor Wahid explored whether gender diversity on corporate boards affects the quality of a firm's financial reporting and the likelihood of financial misconduct.[16] Professor Wahid studied

---

and Fin. Reporting Council 1, 27–41 (July 2021), *available at* https://www.london.edu/-/media/images/leadership-institute-refresh/frc-board-diversity-and-effectiveness-in-ftse-350-companies.pdf.

[15] *See* Br. of Investors and Investment Advisors, ECF No. 140 at 6, 15 (Feb. 24, 2022).

[16] Aida Sijamic Wahid, *The Effects and the Mechanisms of Board Gender Diversity: Evidence from Financial Manipulation*, 159 J. of Bus. Ethics 705, 706 (Oct. 2019) (cited in Nasdaq Proposal at JA287).

corporate financial restatements,[17] "the ultimate ex-post indication of a poor financial reporting process and willful financial misconduct."[18] The study found that "boards with female directors have fewer restatements" and specifically "fewer irregularity-type restatements, which tend to be indicative of financial manipulation," and found that these improved outcomes were likely the result of beneficial changes to group decision-making dynamics resulting from diverse boards, rather than any hypothetical differences between male and female directors (such as differences in qualification or effort).[19]

Another study used a different methodology to examine the same link between diversity and financial restatements that Professor Wahid examined.[20]  This study created 278 pairs of American firms, in which one firm was recorded by the U.S. General Accounting Office as having restated their annual financial statements (either due to error or fraud,

---

[17] A restatement is a re-issuance of a company's financial statement to correct a material error in what was previously disclosed, often the result of accounting mistakes, noncompliance with generally accepted accounting principles, fraud, misrepresentation, or clerical errors. *See Restatements: the costly result of an error*, Baker Tilly (July 26, 2019) *available at* https://www.bakertilly.com/insights/restatements-costly-result-error.

[18] Wahid, *supra* note 16, at 8.

[19] *Id.* at 23.

[20] Lawrence J. Abbott et al., *Female Board Presence and the Likelihood of Financial Restatement¸* 26 Acct. Horizons 607 (2012) (cited in Nasdaq Proposal at JA297).

in either case demonstrating a failure of internal controls), and the other had not (but were otherwise of similar size, date, auditor, and industry).[21] The study found "a significant reduction in the likelihood of financial restatement" in firms governed by boards with at least one female board director.[22]

Another paper studied audit reports under Section 404 of the Sarbanes-Oxley Act of 2002, Pub. L. 107-204, *codified at* 15 U.S.C. § 7262, which mandates auditor evaluations of the quality of companies' internal controls over financial reporting.[23] Weak controls can "lead to poor financial reporting quality, less efficient investments, and insider trading."[24] The authors found that across more than 4,000 firm-years observed between 2004 and 2013, "firms with a greater presence of female board members [were] less likely to report having weak internal controls."[25]

---

[21] *Id.* at 608, 613.

[22] *Id.* at 626.

[23] Yu Chen et al., *Board Gender Diversity and Internal Control Weaknesses*, 33 Advances in Acct., incorporating Advances in Int'l Acct. 11 (2016) (cited in Nasdaq Proposal at JA288).

[24] *Id.* at 12.

[25] *Id.* at 15, 18.

Amicus Professor Cumming, along with two colleagues, studied the effect of board gender diversity on corporate fraud in China. [26] To do so, they compared pairs of Chinese firms in which one company in each pair had been subject to securities fraud enforcement actions between 2001 and 2010, and the other had not, but which otherwise shared many of the same characteristics (a technique known as propensity score matching).[27] The authors studied 742 such pairs using a causal inference technique called "two stage least squares", [28] and found "strong evidence of a negative and diminishing effect" of the presence of women on boards and on the probability of being the subject of a fraud enforcement action (i.e., the presence of women on boards made such an action less likely), and that the presence of women on boards "reduce[d] the severity of fraud" (in terms of the magnitude of negative share price

---

[26] Douglas Cumming et al., *Gender Diversity and Securities Fraud*, 58 Acad. of Mgmt. J. 1572 (Feb. 2015) (cited in Nasdaq Proposal at JA288).

[27] *Id.* at 1576.

[28] *Id.* at 1584. *See also* Jeffrey M. Woolridge, Introductory Econometrics: A Modern Approach 512-51 (South-Western, Cenage Learning, 5th ed. 2013) (explaining two-stage estimates); Shenyang Guo & Mark W. Fraser, *Propensity Score Analysis: Statistical Methods and Applications* (Sage Publishing, 2d ed. 2014) (explaining propensity score matching).

reaction experienced by the company from the disclosure of enforcement) within the sample of companies studied.[29]

Two studies of Spanish firms made similar findings. In one study of 920 firm-years of observations of non-financial firms listed on the Madrid Stock Exchange, the authors concluded that "having a high proportion of female directors and independent female directors" on corporate boards' audit committees, and "having an [audit committee] chairperson who is a female" have the effect of "enhanc[ing] financial reporting quality."[30] Those results support the conclusion that "gender diversity in corporate governance is likely to be useful in creating value … by improving the reliability of financial reporting."[31]

B.   Board diversity has been linked to improved corporate transparency.

A group of professors analyzed a sample of 7,597 U.S. company firm-years to assess whether gender-diverse boards (defined as those which include at least one woman, similar to the Nasdaq Proposal)

---

[29] Cumming, *supra* note 26, at 1573, 1589. These findings were mirrored in a recent study of U.S. firms, see *infra* Section IV.

[30] María Consuelo Pucheta-Martínez et al., *Corporate governance, female directors and quality of financial information*, 25 Bus. Ethics: A European Rev. 363, 364 (Oct. 2016) (cited in Nasdaq Proposal at JA285).

[31] *Id.*

improve transparency.[32] This study found "a positive link between gender diversity in the corporate board and stock price informativeness"—that is, gender-diverse firms are more likely to collect and disclose robust information about their performance to prospective investors.[33]

Another study of over 500 firms in Spain found that gender diversity on corporate boards was associated with reduced "information asymmetry"—that is, the trading behavior of more sophisticated versus less sophisticated traders was more similar for companies whose boards were more gender diverse.[34] This finding suggests that firms with more diverse boards were either more transparent in their disclosures to the public or were less prone to insider trading, because less sophisticated traders were more able to arrive at similar evaluations of firm value as more sophisticated traders.[35]

---

[32] Ferdinand A. Gul et al., *Does board gender diversity improve the informativeness of stock prices?* 51 J. of Acct. & Econ. 314, 314 (2011) (cited in Nasdaq Proposal at JA289).

[33] *Id.* at 336.

[34] David Abad et al., *Does gender diversity on corporate boards reduce information asymmetry in equity markets?*, 20 Bus. Rsh. Q. 192, 193 (Apr. 2017) (cited in Nasdaq Proposal at JA289).

[35] *Id.* at 193, 201–02.

C.    <u>Board diversity has been linked to increased stability and innovation.</u>

In a recent study co-authored by Amicus Professor Yonker, the authors analyzed U.S. firms in the S&P 1500 index from 1996 to 2014 and found, among other things, "strong and consistent support for the notion that greater board diversity *causes* lower firm risk," using what is called an instrumental variable in its analysis to attempt to prove causation rather than simple correlation.[36] "[F]irms with greater board diversity adopt less risky financial policies," leading to lower volatility in their returns; further, these firms rely less on debt capital and maintain greater dividend payouts, all while "invest[ing] more aggressively in research and development."[37] As a result, not only did firms with more diverse boards (measuring gender, age, ethnicity, education, financial expertise, and ethnicity) perform better financially and provide more security to investors, but they also saw "greater innovation output (in absolute and per dollar invested) that is more impactful and original, as measured by firms' patenting activity."[38]

---

[36] Gennaro Bernile, Vineet Bhagwat, and Scott Yonker, *Board Diversity, Firm Risk, and Corporate Policies*, 127 J. of Fin. Econ. 588, 590 (2018) (cited in the NASDAQ Proposal at JA278).

[37] *Id.*

[38] *Id.*

In sum, a substantial body of research on the links between corporate board diversity and various non-financial firm outcomes exists and was considered by Nasdaq and the SEC, particularly concerning gender diversity. The results of this research strongly suggest that diversity enhances corporate board decision-making in ways that advance the goals of the Exchange Act, by promoting transparency, protecting investors, and reducing fraud. *See* 15 U.S.C. § 78f(b)(5). Taken together, these findings are consistent with, and to some extent may help explain, the broader linkages identified by studies in the following section—i.e., that diversity enhances financial performance. But they also stand independently as demonstrating meaningful board- and firm-level outcomes of diversity consistent with the Exchange Act's purposes.

## III.  Substantial evidence in the record supports a relationship between diversity and firm financial performance

In addition to the record evidence showing strong linkages between board diversity and non-financial indicators of corporate governance, Nasdaq presented, and the SEC captured in its record, substantial evidence of a link between board diversity and narrower financial measures of corporate performance and shareholder returns.

For instance, in one recent "meta-analysis" attempting to aggregate and interpret the varying results of 140 different studies of gender diversity on corporate boards, the authors concluded that "firms with greater female board representation tend to have higher accounting returns," (i.e., profitability) and that those effects were more pronounced "in countries with stronger shareholder protections" like the United States.[39] The same study concluded that in countries with higher levels of societal gender parity, like the United States, "female board representation is positively related to market performance."[40]

Another study in 2010 examined approximately 5,500 directors on boards of S&P 500 firms to study the effects of both gender and racial diversity and found "a positive and significant relationship between both the number of women on the board and the number of ethnic minorities on the board and the [Return on Assets]" of a firm,[41]

---

[39] Corinne Post & Kris Byron, *Women on Boards and Firm Financial Performance: A Meta Analysis*, 58 Acad. of Mgmt. J. 1546, 1552, 1555, 1557 (Oct. 2015) (cited in Nasdaq Proposal at JA281).

[40] *Id.* at 1558. Gender parity was estimated using the World Economic Forum's Global Gender Gap score, "a measure of each country's gender equality in terms of economic participation, educational attainment, health and survival, and political empowerment." *Id.* at 1556.

[41] David A. Carter et al., *The Gender and Ethnic Diversity of US Boards and Board Committees and Firm Financial Performance*, 18 Corp. Governance: An Int'l. Rev. 396, 401, 410 (2010) (cited in the SEC Order at JA9; cited in Nasdaq Proposal at JA278).

although it also noted that the relationship it found was a correlation rather than a causal relationship.[42] The study also found "no evidence of a negative link between board diversity and financial performance."[43]

In the recent study of U.S. firms in the S&P 1500 index co-authored by Amicus Professor Yonker discussed in the prior section, the authors found that "on average, both operating performance and asset valuation multiples increase with board diversity" and that the relationship between diversity and these performance metrics was causal.[44]

The conclusions of these empirically rigorous studies, published in highly selective, peer-reviewed academic journals, are also echoed by a wide variety of studies undertaken by financial and management firms and industry research organizations that have found positive links between firm financial performance and board diversity.[45]

---

[42] *Id.* at 412. Because director selection is correlated with many other firm-level characteristics, identifying a causal relationship of board composition on firm outcomes is notoriously difficult.

[43] *Id.* at 411.

[44] Bernile et al., *supra* note 36, at 590.

[45] *See*, *e.g.*, Nasdaq Proposal at JA276-80 (collecting private sector analyses showing financial benefits to shareholders from diverse boards, citing Jason M. Thomas & Megan Starr, *Global Insights: From Impact Investing to Investing for Impact*, The Carlyle Group 5 (Feb. 24, 2020), *available at*

Petitioners place substantial weight on Nasdaq's and the SEC's acknowledgment that there are both studies that support and studies that call into question a link between board diversity and financial performance. *See, e.g.*, AFBR Br. 58 (describing the SEC's evaluation of the evidence); Nasdaq Proposal at JA283 (collecting and acknowledging "studies drawing different conclusions" from the one Nasdaq reached). Amici agree with the SEC that "the effects of board diversity are the subject of reasonable debate," En Banc Br. for Resp't SEC 12 (herein after "SEC Br.") (internal quotation omitted), particularly with regards to the link between board diversity and narrow measures of firm

---

*https://www.carlyle.com/sites/default/files/2020-02/From%20Impact%20Investing%20to%20Investing%20for%20Impact_022420.pdf* FCLTGlobal, *The Long-term Habits of a Highly Effective Corporate Board* 11 (Mar. 2019), *available at* https://www.fcltglobal.org/wp-content/uploads/long-term-habits-of-highly-effective-corporate-boards.pdf; Vivian Hunt et al., *Diversity Matters*, McKinsey & Company (Feb. 2, 2015), *available at* https://www.mckinsey.com/insights/organization/~/media/2497d4ae4b534ee89d929c c6e3aea485.ashx; Credit Suisse, *The CS Gender 3000: Women in Senior Management* 16 (Sept. 2014), *available at* https://www.credit-suisse.com/media/assets/corporate/docs/about-us/research/publications/the-cs-gender-3000-women-in-senior-management.pdf; Meggin Thwing Eastman et al., *The tipping point: Women on boards and financial performance*, MSCI 3 (Dec. 2016), *available at* https://www.msci.com/documents/%2010199/fd1f8228-cc07-4789-acee-3f9ed97ee8bb; Credit Suisse ESG Research, *LGBT: The value of diversity* 1 (Apr. 15, 2016), *available at* https://research-doc.credit-suisse.com/docView?language=ENG&source=emfromsendlink&format=PDF&docu ment_id=807075590&extdocid=807075590_1_eng_pdf&serialid=evu4wNcHexx7kus NLaZQphUkT9naxi1PvptZQvPjr1k%3d; McKinsey & Company, *Diversity wins: How inclusion matters* 13 (May 2020), *available at* https://www.mckinsey.com/featured-insights/diversity-and-inclusion/diversity-wins-how-inclusion-matters.

financial performance.[46] But the studies that support such a link, summarized above, are high-quality, robust works linking board diversity to financial performance, and they belie Petitioners' contention that there was "no substantial evidence" for Nasdaq or the SEC to find such a link. *See* AFBR Br. 58. This body of work provides ample basis to reasonably conclude that strengthened board diversity may improve firm financial performance.

Further, as described more fully in the previous section, despite Petitioners' attempts to focus scrutiny of the Proposal solely on "quantitative considerations like profit, loss, and revenue," AFBR Br. 60 (internal quotations and citations omitted), a narrow focus on these financial indicators ignores other important aspects of the Proposal,

---

[46] *See*, *e.g.*, Kenneth R. Ahern & Amy K. Dittmar, *The Changing of the Boards: The Impact of Firm Valuation of Mandated Female Board Representation*, 127 Q. J. Econ. 137, 137-97 (2012) (cited in SEC Order at 33, note 123) (finding that Norway's 2003 board gender quota law negatively affected firm performance); *but see* B. Espen Eckbo et al., *Valuation Effects of Norway's Board Gender-Quota Law*, Mgmt. Sci, at 1-23 (Aug. 2021) (finding no negative effect on firm performance from the gender quota). Norway's board diversity requirement has been a subject of extensive study, with mixed conclusions about the effects on firm performance. Notably, Norway's law required 40% of board directors to be female, requiring larger changes to existing boards than would be expected from the Nasdaq Proposal for boards to either include one female director or provide an explanation for why that target is impractical for a given firm. *See also* Vicki L. Bogan et al., *What Drives Racial Diversity on U.S. Corporate Boards?*, Harvard L. Sch. F. on Corp. Governance 1, 27 (Oct. 29, 2021), *available at* https://ssrn.com/abstract=3952897 (recent study by Amicus Scott Yonker and others showing that 85% of Nasdaq firms were already compliant with the Nasdaq Proposal's targets by the end of 2018).

including expected effects of board diversity on corporate governance, where the evidence is even stronger and the expected effects would clearly advance the Exchange Act's goals.

## IV. Ongoing research since Nasdaq's Proposal supports the SEC's decision

As Amici noted above, the study of corporate board composition and its effects on corporate performance is dynamic and ongoing, and has continued to produce compelling research even after the Nasdaq Proposal and subsequent SEC Order.

A recent study published by Amicus Aida Wahid and a colleague examined the passage of California's gender board diversity bill, SB 826, and found that market reactions to the bill ranged from insignificant to positive, with results "more consistent with a positive rather than negative valuation impact of mandated [gender] diversity."[47] The research also found "no evidence to support a decline in female director quality in response to gender quotas," either in formal qualifications or investor perceptions.[48]

---

[47] Abigail Allen & Aida Wahid, *Regulating Gender Diversity: Evidence from California Senate Bill 826,* 70 Mgmt. Sci. 2023, 2025 (2024).

[48] *Id.*

A similar recent study of the effects of a gender diversity quota on the boards of Italian companies led to "higher average education levels of all members of the board," with no significant effects on "firm performance as measured by number of employees, assets, production, profits, return on assets (ROA), Tobin's Q, and debts."[49] The authors found that "the presence of female directors reduces the variability of stock prices," and found no reduction in stock market returns for companies complying with the quota; "[i]f anything, investors positively reacted to the appointment of women on boards in elections that happened after the approval of the quota law."[50]

A recent study published in the Journal of Corporate Finance analyzed firms that face securities litigation, which often results in substantial settlement costs and can directly impact a firm's finances (by affecting things like liquidity, investment policies, or credit-worthiness) as well as extract "hidden" costs by damaging a firm's image and harming its relationships with suppliers and customers.[51]

---

[49] Giulia Ferrari et al., *Do Board Gender Quotas Matter? Selection, Performance, and Stock Market Effects*, 68 Mgmt. Sci. 5618, 5619 (2022).

[50] *Id.* at 5619-20.

[51] Mohammad Hashemi Joo et al., *Securities litigation risk and board gender diversity*, 71 J. Corp. Fin. 102102, 102102 (2021).

The authors studied securities litigation data from S&P 1500 firms between 1998 and 2017, and found that "the presence of female independent directors on a firm's board reduces the risk of securities litigation," and that this effect held even after using a variety of econometric methods designed to better identify causal relationships.[52]

Another recently published study of misconduct fines issued to European banks by U.S. financial regulators between 2008 and 2018 found that "a greater presence of women on the board of directors is associated with fewer misconduct fines, and the effect is economically significant," with the benefits of greater gender diversity estimated as "equivalent to saving approximately $7.48 million per year" in fines alone.[53] These findings in many ways echo, in an American regulatory context, the findings of Amicus Professor Cumming's work, cited in the Nasdaq Proposal, which found a link between board gender diversity and reduced incidence of fraud among Chinese firms.[54]

---

[52] *Id.* at 102104.

[53] F. Arnaboldi et al., *Gender diversity and bank misconduct,* 71 J. Corp. Fin. 101834, 101835 (2021).

[54] *See* Cumming et al., *supra* note 26.

Another developing body of literature emphasizes the role that "good" or "quality shareholders" have to play in firm performance.[55] It argues that investments by quality shareholders (those investors who make concentrated investments of their portfolio in companies that are intended to be long-term investments rather than short-term profit opportunities) are beneficial to firms because they provide firm managers longer-term stability to execute strategy, cast more informed shareholder votes, and engage with managers in ways that are productive and patient and can provide an additional "brain trust" for managers to draw upon.[56] In studying the tools companies have available to attract quality shareholders, one recently published study found that quality shareholders were more common in firms with more racially and gender-diverse boards, positing that "[c]ompared to the short-term view of transient shareholders, [quality shareholders] benefit more from the multiple viewpoints on boards that come from diversity."[57]

---

[55] *See, e.g.*, Edward B. Rock, *Shareholder Eugenics in the Public Corporation*, 97 Cornell L. Rev. 849 (2012).

[56] Lawrence A. Cunningham, *Lessons from Quality Shareholders on Corporate Governance Practice, Research and Scholarship*, 5 Geo. Wash. Bus. & Fin. L. Rev. 1, 5–10 (2021).

[57] *Id.* at 42.

Other recent working papers by Amici and others continue to echo and build upon the larger body of literature finding beneficial effects of board diversity on corporate performance. Research by Amicus Professor Yonker and two other colleagues examined recent trends in increasing racial diversity on corporate boards.[58] Among other things, they found that the nationwide introspection concerning racism in America triggered by the George Floyd murder in 2020 appeared to trigger substantial increases in Black representation on corporate boards, and, notably, that the qualifications of these newly appointed directors were similar to those who had previously been serving on boards.[59] These findings suggest that lower levels of Black representation on boards prior to 2020 were not driven by a lack of a qualified candidate pool and call into question the degree to which existing board composition should be presumed to simply be the outcome of efficient labor market forces.

---

[58] Bogan et al., *supra* note 46

[59] *Id.* at 6-7 (estimating a "185% increase in the number of Black directors appointed in the latter half of 2020 compared to the same period in 2019" and that "the quality of newly appointed minority directors is not significantly lower than that of previously appointed minority directors . . . inconsistent with the notion that the supply of minority directors has been insufficient to meet the demand.").

Another recent study came to similar conclusions to the previous one when it examined board diversity policies across seven European countries to understand the effects of expanded female representation on boards on corporate performance in the context of mandatory diversity requirements. It found "positive effects on the value of the firm" from growing shares of women, and importantly also "no negative effect on value, and boards do not become any less competent with more women on boards."[60]

Yet another working paper examined the link between the racial diversity of the boards of regional Federal Reserve Banks and the Community Reinvestment Act (CRA) scores of the member banks that those boards supervise.[61] The study found that the presence of Black and Hispanic directors on regional Federal Reserve Boards correlated positively with the CRA scores of the member banks they supervised, meaning that those banks were achieving superior results in reaching

---

[60] Olga Kuzmina & Valentina Melentyeva, *Gender diversity in corporate boards: Evidence from quota-implied discontinuities* 1, 37–38 (Nov. 1, 2021), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3976227 (earlier version cited in SEC Order at JA9).

[61] Brian Feinstein at al., *Board Diversity Matters: An Empirical Assessment of Community Lending at Federal Reserve-Regulated Banks* (Jan. 5, 2022), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4000110.

underbanked communities, even when comparing Reserve Boards that served the same states.[62]

Finally, Amici note that the Proposal's disclosure regime is likely to facilitate even more robust analyses of the effects of board diversity in the future. As experts seeking to undertake empirical research in this area, one of the most substantial challenges is collecting and preparing a uniform data set concerning board diversity; indeed, Amici believe that data availability is one of the reasons that research into the effects of gender diversity on corporate boards is more extensive than into other forms of diversity, such as racial or sexual orientation diversity. Implementation of the Nasdaq Proposal will be of significant value in facilitating the rigorous study of corporate performance and allow investors to make more informed decisions, both through the provision of thorough and uniform disclosures, as well as by providing an opportunity to evaluate changes in the performance of firms listed on the Nasdaq exchange measured against firms listed on other exchanges that have not implemented policies similar to the Proposal.

---

[62] *Id.* at 12–13, 25.

## CONCLUSION

Taken as a whole, the record contained substantial evidence supporting the proposition that the Nasdaq Proposal is designed to advance the goals of the Exchange Act, and the SEC's Order rested on a solid foundation of empirical research.

Dated: May 3, 2024                    Respectfully submitted,

                                      */s/ Aman T. George*

                                      Aman T. George
                                      Victoria Nugent
                                      Democracy Forward Foundation
                                      P.O. Box 34553
                                      Washington, D.C. 20043
                                      (202) 448-9090

                                      Peter C. Renn
                                      Lambda Legal Defense and
                                      Education Fund, Inc.
                                      4221 Wilshire Blvd., Suite 280
                                      Los Angeles, CA 90010
                                      (213) 382-7600

                                      Karen L. Loewy
                                      Lambda Legal Defense and
                                      Education Fund, Inc.
                                      111 K Street NE, 7th Floor
                                      Washington, D.C. 20002
                                      (202) 809-8585

# CERTIFICATE OF SERVICE

I, Aman George, counsel for Proposed Amici¸ certify that all counsel of record who have consented to electronic service are being served today with a copy of the foregoing brief via filing with the Clerk of the Court through the appellate CM/ECF. All parties in this case are represented by counsel consenting to electronic service.

*/s/ Aman Tewari George*
AMAN TEWARI GEORGE

May 3, 2024

# CERTIFICATE OF COMPLIANCE

With Type-Volume Limit, Typeface Requirements,
and Type-Style Requirements

I certify that this filing complies with the type-volume limitation of Rule 29(a)(5) because it contains 6,046 words, excluding the parts exempted by Fed. R. App. P. 32(f).

This filing also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Fifth Circuit Rule 32.1 and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Windows in Century Schoolbook 14-point font typeface, with 12-point font typeface for footnotes.

*/s/ Aman Tewari George*
AMAN TEWARI GEORGE

May 3, 2024