No. 21-60626

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

ALLIANCE FOR FAIR BOARD RECRUITMENT;
NATIONAL CENTER FOR PUBLIC POLICY RESEARCH,
*Petitioners,*
v.
SECURITIES AND EXCHANGE COMMISSION,
*Respondent.*

ON PETITION FOR REVIEW OF AN ORDER OF THE
SECURITIES AND EXCHANGE COMMISSION
AGENCY NO. 34-92590

**UNOPPOSED MOTION FOR LEAVE TO FILE BRIEF OF THE NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC. AS *AMICUS CURIAE* IN SUPPORT OF RESPONDENT AND INTERVENOR**

Janai S. Nelson
  *President & Director-Counsel*
Samuel Spital
Elizabeth G. Caldwell
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector Street, Fifth Floor
New York, NY 10006

May 6, 2024

Jin Hee Lee
Michaele N. Turnage Young
Jennifer A. Holmes
  *Counsel of Record*
Amber M. Koonce
Molly M. Cain
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th Street NW, Suite 600
Washington, DC 20005
(212) 965-2200
jholmes@naacpldf.org

*Counsel for Amicus Curiae*

Pursuant to Federal Rule of Appellate Procedure 29, the NAACP Legal Defense and Educational Fund, Inc. ("LDF") respectfully moves this Court for leave to file a brief as *amicus curiae* in support of Respondent and Intervenor. The proposed brief accompanies this motion as an attachment. *Amicus curiae* sought consent for the filing of this brief from all parties. On May 2 and 3, 2024, counsel for Alliance for Fair Board Recruitment, National Center for Public Policy Research, the SEC, and Nasdaq provided their consent.

LDF is the nation's first and foremost civil rights law organization. Founded in 1940 under the leadership of Thurgood Marshall, LDF's mission is to achieve racial justice, equality, and an inclusive society. LDF pursues equal justice under the law for all Americans, including the full, fair, and free exercise of constitutional and statutory rights for Black people and other people of color. Through litigation, LDF seeks to defend and advance the proper interpretation of the Equal Protection Clause and anti-discrimination law to ensure that our judicial system champions equality and opportunity.

For over five decades, LDF has advocated for racial integration and worked to eradicate exclusionary practices that are unjust and undermine the function of free and fair markets in the private sector. To that end, LDF has litigated several matters to ensure corporate markets are free from racial exclusion, fraud, manipulation or discrimination. *See, e.g.*, *Hall v. Coburn Corp. of Am.*, 26 N.Y.2d 396 (N.Y. 1970);

1

*Cline v. Credit Bureau of Santa Clara Valley*, 1 Cal.3d 908 (Cal. 1970); *Sniadach v. Fam. Fin. Corp.*, 395 U.S. 337 (1969); *Russell v. Coburn Corp. of Am.*, 298 N.Y.S.2d 893 (N.Y. App. Div. 1969). Through policy advocacy, public education, and outreach, LDF also educates the corporate sector on how it may lawfully expand opportunities to individuals from all backgrounds so that its ranks reflect all the available talent in our diverse society.

LDF submits the attached brief to highlight the important role that board diversity disclosures play in financial markets and aid the Court's consideration of AFBR's equal protection claim under the Fifth Amendment. LDF seeks to provide important background about the role that diversity disclosures play in improving economic performance, the broad investor demand for these disclosures, and the limited progress achieved in board diversity. By outlining this relevant background, LDF's brief seeks to show why Nasdaq's rules align with the Exchange Act.

As to the constitutional claims raised by Petitioners, the panel opinion and Respondent's and Intervenor's briefs focus their analysis on the question of state action, an understandable approach given the clear case law that exchange rules are not state action. However, LDF's brief will assist the Court by providing a detailed analysis of why Nasdaq's rules would not be subject to heightened scrutiny and would not violate equal protection even if they did involve state action. LDF has significant experience litigating issues of equal protection and advocating for

measures that eliminate barriers to opportunity, including through disclosure mechanisms. LDF's brief will explain that courts do not subject the collection and reporting of demographic information to heightened scrutiny, and the level of constitutional scrutiny does not change merely because the disclosures may lead to greater diversity. LDF seeks to ensure that courts continue to analyze demographic disclosures under the proper legal framework given the crucial role of such disclosures in many industries in promoting transparency, accountability, and compliance with antidiscrimination law.

## CONCLUSION

Accordingly, *amicus curiae* respectfully requests that this Court grant leave to file the accompanying amicus brief in support of SEC and Nasdaq.

Dated: May 6, 2024                    Respectfully submitted,

                                      */s/ Jennifer A. Holmes*
                                      Jin Hee Lee
                                      Michaele N. Turnage Young
                                      Jennifer A. Holmes
                                        *Counsel of Record*
                                      Amber M. Koonce
                                      Molly M. Cain
                                      NAACP LEGAL DEFENSE &
                                      EDUCATIONAL FUND, INC.
                                      700 14th Street NW, Suite 600
                                      Washington, DC 20005

Janai S. Nelson
  *President & Director-Counsel*
Samuel Spital
Elizabeth G. Caldwell
NAACP Legal Defense &
Educational Fund, Inc.
40 Rector Street, Fifth Floor
New York, NY 10006
(212) 965-2200

*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I certify on this 6th day of May, 2024, that I electronically filed this motion with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF filing system. I further certify that all participants in this case are registered CM/ECF users and that all service will be accomplished by the appellate CM/ECF system.

*/s/ Jennifer A. Holmes*
Jennifer A. Holmes

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), I certify on this 6th day of May, 2024, that this motion complies with the typeface and type style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E), 27(d)(2)(A), 32(a)(5) and 32(a)(6). This motion totals 589 words and has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14-point font.

*/s/ Jennifer A. Holmes*
Jennifer A. Holmes

*Counsel for Amicus Curiae*

No. 21-60626

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

ALLIANCE FOR FAIR BOARD RECRUITMENT;
NATIONAL CENTER FOR PUBLIC POLICY RESEARCH,
*Petitioners,*

v.

SECURITIES AND EXCHANGE COMMISSION,
*Respondent.*

ON PETITION FOR REVIEW OF AN ORDER OF THE
SECURITIES AND EXCHANGE COMMISSION
AGENCY NO. 34-92590

## BRIEF OF THE NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC. AS *AMICUS CURIAE* IN SUPPORT OF RESPONDENT AND INTERVENOR

Janai S. Nelson
  *President & Director-Counsel*
Samuel Spital
Elizabeth G. Caldwell
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector Street, Fifth Floor
New York, NY 10006

May 6, 2024

Jin Hee Lee
Michaele N. Turnage Young
Jennifer A. Holmes
  *Counsel of Record*
Amber M. Koonce
Molly M. Cain
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th Street NW, Suite 600
Washington, DC 20005
(212) 965-2200
jholmes@naacpldf.org

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................. ii

SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS ..................... vi

INTEREST OF *AMICUS CURIAE* ............................................................1

INTRODUCTION ...............................................................................3

I.  The Nasdaq Rules Reflect Broad Investor Interest in Both the Market
    Benefits of Board Diversity and the Ongoing Barriers to Equal Opportunity 5

    A.  Board diversity disclosures increase market function..........................5

    B.  There is broad investor interest in access to information about
        corporate board diversity. ........................................................7

    C.  Insular board selection practices have impeded progress in board
        diversity, contrary to the public interest. ...............................9

II.  The Nasdaq Rules Do Not Violate Equal Protection......................................12

    A.  The Nasdaq Rules do not trigger heightened scrutiny. ......................13

        1.  The collection and disclosure of information about race and
            other demographic characteristics is not subject to heightened
            scrutiny. ...............................................................13

        2.  The Nasdaq Rules do not impose unequal treatment...............18

        3.  Expressing a desire to increase diversity does not violate equal
            protection. ...............................................................24

    B.  The Nasdaq Rules survive rational basis review................................28

CONCLUSION ...............................................................................30

CERTIFICATE OF SERVICE ................................................................32

CERTIFICATE OF COMPLIANCE.........................................................32

# TABLE OF AUTHORITIES

## Cases

*Adarand Constructors Inc., v. Pena*,
515 U.S. 200 (1995).................................................................. 12, 18, 21

*Alabama v. United States*,
304 F.2d 583 (5th Cir. 1962).................................................................18

*All. for Fair Bd. Recruitment v. SEC*,
85 F.4th 226 (5th Cir. 2023) ......................................................... 12, 23

*Anderson v. Martin*,
375 U.S. 399 (1964)..............................................................................16

*Bissett v. Beau Rivage Resorts Inc.*,
442 F. App'x 148 (5th Cir. 2011) .........................................................25

*Burns v. Thiokol Chem. Corp.*,
483 F.2d 300 (5th Cir. 1973).................................................................18

*Caulfield v. Bd. of Ed. of New York*,
583 F.2d 605 (2d Cir. 1978) .................................................................16

*Chamber of Com. v. SEC*,
85 F.4th 760 (5th Cir. 2023) .................................................................28

*City of Cleburne v. Cleburne Living Ctr.*,
473 U.S. 432 (1985)..............................................................................28

*City of Richmond v. J.A. Croson Co.*,
488 U.S. 469 (1989)....................................................................... 19, 22

*Dep't of Com. v. New York*,
139 S. Ct. 2551 (2019)..........................................................................14

*Duffy v. Wolfe*,
123 F.3d 1026 (8th Cir. 1997)...............................................................27

*F.C.C. v. Beach Communications, Inc.*,
508 U.S. 307 (1993)..............................................................................28

*Frank v. Xerox Corp.*,
347 F.3d 130 (5th Cir. 2003) ................................................................23

*Grutter v. Bollinger*,
539 U.S. 30 (2003)................................................................................22

*Hamm v. Va. Bd. of Elections*,
230 F. Supp. 156 (E.D. Va. 1964) ........................................................16

*Honadle v. Univ. of Vt. & State Agric. Coll.*,
  56 F. Supp. 2d 419 (D. Vt. 1999) ...................................................................16

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997) ........................................................................24

*Jana-Rock Constr., Inc. v. N.Y. State Dep't of Econ. Dev.*,
  438 F.3d 195 (2d Cir. 2006) ..........................................................................27

*Johnson v. Metro. Gov't of Nashville & Davidson Cnty.*,
  502 F. App'x 525 (6th Cir. 2012) ..................................................................25

*Legal Tender Cases*,
  79 U.S. 457 (1870) ..........................................................................................14

*Mlynczak v. Bodman*,
  442 F.3d 1050 (7th Cir. 2006) ................................................................ 25, 27

*Monterey Mech. Co. v. Wilson*,
  125 F.3d 702 (9th Cir. 1997) ................................................................... 21, 22

*Morales v. Daley*,
  116 F. Supp. 2d 801 (S.D. Tex. 2000) ..................................................... 14, 15

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*,
  508 U.S. 656 (1993) ................................................................................. 19, 21

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*,
  551 U.S. 701 (2007) ............................................................. 15, 19, 20, 27

*Pederson v. Burton*,
  400 F. Supp. 960 (D.D.C. 1975) ....................................................................16

*Raso v. Lago*,
  135 F.3d 11 (1st Cir. 1998) ............................................................................25

*Sussman v. Tanoue*,
  39 F. Supp. 2d 13 (D.D.C. 1999) ............................................................. 19, 21

*Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*,
  576 U.S. 519 (2015) ........................................................................................20

*United States R.R. Ret. Bd. v. Fritz*,
  449 U.S. 166 (1980) ........................................................................................28

*United States v. New Hampshire*,
  539 F.2d 277 (1st Cir. 1976) ..................................................................... 16, 17

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
  425 U.S. 748 (1976) ................................................................................. 28, 29

*W.H. Scott Constr. Co., Inc. v. City of Jackson*,
  199 F.3d 206 (5th Cir. 1999) .................................................................... 21, 22

*Weser v. Glen*,
190 F. Supp. 2d 384 (E.D.N.Y. 2002) ..................................................15

**Statutes**

17 C.F.R. § 229.407(c)(2)(vi) ..............................................................24
29 C.F.R. § 1602.7 ..............................................................................17
45 C.F.R. § 1355.40(a) .........................................................................17
45 C.F.R. § 1355.40(b)(1) .....................................................................17
12 U.S.C. § 2308(b)(4) .........................................................................17
12 U.S.C. § 2803(a) .............................................................................17
42 U.S.C. § 19152(a) ...........................................................................17
50 U.S.C. § 3334b(b) ...........................................................................17

**Other Authorities**

Atiya Jordan, *A Man of Courage: Leon Sullivan, First Black Corporate Director who Fought Against Inequality and Apartheid*, Black Enter. (Feb. 25, 2023), https://www.blackenterprise.com/a-man-of-courage-leon-sullivan-first-black-corporate-director-who-fought-against-inequality-and-apartheid/ ......................9

Credit Suisse Rsch. Inst., *Gender Diversity and Corporate Performance* (2012), https://www.publicappointmentsni.org/files/publicappointmentsni/media-files/Gender%20diversity%20and%20corporate%20performance%20-%20Credit%20Suisse%20Research%20Institute%20August%202012.pdf ........6

Dame V. Hunt, Dennis Layton, & Sarah Prince, *Why Diversity Matters*, McKinsey & Co. (2015), https://www.mckinsey.com/capabilities/people-and-organizational-performance/our-insights/why-diversity-matters ......................6

David A. Bell & Ron C. Llewellyn, *What's Next for Diversity Shareholder Proposals*, Harvard L. Sch. Forum on Corp. Governance (2023), https://corpgov.law.harvard.edu/2023/10/08/whats-next-for-diversity-shareholder-proposals/ ......................................................................8

David Larcker & Brian Tayan, *Pioneering Women on Boards: Pathways of the First Female Directors* 2, Stanford Closer Look Series (Sept. 3, 2013), https://www.gsb.stanford.edu/sites/default/files/publication-pdf/cgri-closer-look-35-women-boards.pdf ........................................................................9

Klynveld Peat Marwick Goerdeler Int'l Ltd., *African American Representation on Fortune 1000 Boards: 2022 Edition* (2023), https://kpmg.com/kpmg-us/content/dam/kpmg/boardleadership/pdf/2023/african-american-representation-fortune-1000-boards-2022-edition.pdf ......................................11

Lisa M. Fairfax, *Some Reflections on Diversity of Corporate Boards*, 79 St. John's L. Rev. 1105 (2005), http://ssrn.com/abstract=921037 ......................................10

Lisa M. Fairfax, *The Bottom Line on Board Diversity: a Cost-Benefit Analysis of the Business Rationales for Diversity on Corporate Boards*, Wis. L. Rev. 795, 800 (2005), https://ssrn.com/abstract=835406 ........................................... 10, 24

Morgan Stanley Cap. Int'l, *Women on Boards and Beyond: Progress Report* (2023), https://www.msci.com/documents/1296102/43943104/MSCI+Women+on+Boards+and+Beyond+2023+Progress+Report.pdf ............................................ 10, 24

Pub. Religion Rsch. Inst., *Racial and Ethnic Makeup of White Social Networks*, Am. Values Survey (2013), https://latinosleadnow.org/wp-content/uploads/2022/07/PRRI-2013-American-Values-Social-Networks.docx.pdf ..........................................................................................11

Richie Zweigenhaft, *What the Numbers Say About Diversity on Corporate Boards*, Yahoo News (Mar. 13, 2024), https://www.yahoo.com/news/numbers-diversity-corporate-boards-123853530.html.....................................................................10

*Who are the Women in the Board Rooms?*, 16 Bus. & Soc'y Rev. 5, 5 (1975).......10

Yannick Thams, Bari L. Bendell, & Siri Terjesen, *Explaining Women's Presence on Corporate Boards: The Institutionalization of Progressive Gender-Related Policies*, 86 J. Bus. Rsch. 130, 130–140 (May 2018), https://www.sciencedirect.com/science/article/pii/S0148296318300444 ... 10, 24

**Rules**

Nasdaq Rule 5605(f) ...............................................................................................4

Nasdaq Rule 5606 ...................................................................................................3

Nasdaq Rule IM-5900-9 ..........................................................................................4

**SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS**

The undersigned counsel of record certifies, pursuant to Fed. R. App. P. 26.1 and 5th Cir. R. 28.2.1, *amicus curiae* NAACP Legal Defense and Educational Fund, Inc. ("LDF") is a nonprofit, non-partisan corporation. LDF has no parent corporation, and no publicly held corporation holds ten percent of its stock. The undersigned counsel of record certifies that, in addition to the persons and entities listed in the parties' Certificate of Interested Persons, the following persons and entities as described in the fourth sentence of 5th Cir. R. 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| Amicus Curiae in Support of Petitioners | Counsel |
|---|---|
| Buckeye Institute | Jay R. Carson,<br>    Buckeye Institute<br>David C. Tryon,<br>    Buckeye Institute<br>Alex M. Certo,<br>    Buckeye Institute |
| Cory R. Liu | Devon Westhill,<br>    Center for Equal Opportunity<br>Daniel I. Morenoff,<br>    American Civil Rights Project<br>Joseph A. Bingham,<br>    American Civil Rights Project |
| Sean J. Griffith | Heather Gebelin<br>    Hacker, Jacker Stephens LLP |
| State of Alabama<br>State of Alaska<br>State of Arkansas<br>State of Florida | Drew C. Ensign,<br>    Holtzman, Vogel, Baran,<br>    Torchinsky & Josefiak PLLC |

| | |
|---|---|
| State of Georgia | Christopher A. Bates, |
| State of Idaho |     Office of the Utah Attorney |
| State of Indiana |     General |
| State of Iowa | Stanford E. Purser, |
| State of Kansas |     Office of the Utah Attorney |
| State of Kentucky |     General |
| State of Louisiana | Sean D. Reyes, |
| State of Mississippi |     Office of the Utah Attorney |
| State of Missouri |     General |
| State of Montana | |
| State of Nebraska | |
| State of North Dakota | |
| State of Ohio | |
| State of South Carolina | |
| State of South Dakota | |
| State of Tennessee | |
| State of Texas | |
| State of Utah | |
| State of Virginia | |
| State of West Virginia | |
| 60 Plus Association | Timothy Harper, |
| AMAC Action |     Advancing American |
| Advancing American Freedom |     Freedom, Inc. |
| American Values | J. Marc Wheat, |
| Americans for Limited Government |     Advancing American |
| Catholics Count |     Freedom, Inc. |
| Center For Political Renewal | Tim Rosenberger, |
| Center For Urban Renewal and Education |     Manhattan Institute |
| Eagle Forum | Ilya Shapiro, |
| Charlie Gerow |     Manhattan Institute |
| International Christian Ambassadors | Allen Mendenhall, |
| Association |     Manuel H. Johnson Center for |
| International Conference of Evangelical |     Political Economy |
| Chaplain Endorsers | |
| Manuel H. Johnson | |
| Tim Jones | |
| Manhattan Institute | |
| Allen Mendenhall | |
| Missouri Center-Right Coalition | |
| National Religious Broadcasters | |

| New Jersey Family Foundation<br>Rio Grande Foundation<br>Roughrider Policy Center<br>Setting Things Right<br>Richard Viguerie<br>Yankee Institute<br>Young America's Foundation | |
| --- | --- |
| **Amicus Curiae in Support of Respondents** | **Counsel** |
| Nonpartisan Group of Academics and Practitioners in the Field of Corporate Governance | Marc Wolinsky,<br>   Wachtell, Lipton, Rosen & Katz<br>Elaine P. Golin,<br>   Wachtell, Lipton, Rosen & Katz<br>Carrie M. Reilly,<br>   Wachtell, Lipton, Rosen & Katz<br>Kevin S. Schwartz,<br>   Wachtell, Lipton, Rosen & Katz<br>Jeohn Salone Favors,<br>   Wachtell, Lipton, Rosen & Katz |
| Robert F. Kennedy Center for Justice & Human Rights<br>Gaingels, Inc.<br>Lord, Abbett & Company, LLC<br>Boston Trust Walden Co.<br>Ariel Investments, LLC<br>Northern Trust Investments, Inc.<br>Investment Adviser Association and Council of Institutional Investors | Neal S. Manne,<br>   Susman Godfrey LLP<br>Seven M. Shepard,<br>   Susman Godfrey LLP<br>Arun Subramanian,<br>   Susman Godfrey LLP |
| Interfaith Center on Corporate Responsibility | Richard A. Kirby,<br>   R|K Invest Law, PBC<br>Beth-ann Roth,<br>   R|K Invest Law, PBC |
| Financial Industry Regulatory Authority | Elisabeth C. Butler,<br>   Baker Botts LLP |

|  | Aaron M. Streett,<br>  Baker Botts LLP |
|---|---|
| American Civil Liberties Union, Inc. | Brian Hauss,<br>  American Civil Liberties<br>  Union<br>Sandra S. Park,<br>  American Civil Liberties<br>  Union |
| Ad Hoc Coalition of Nasdaq-Listed Companies | Kerry E. Berchem,<br>  Akin Gump Strauss Hauer &<br>  Feld LLP<br>Pratik A. Shah,<br>  Akin Gump Strauss Hauer &<br>  Feld LLP<br>Zach ZhenHe Tan,<br>  Akin Gump Strauss Hauer &<br>  Feld LLP |
| Academic Experts in the Fields of Business, Management, and Economics | Aman T. George,<br>  Democracy Forward<br>  Foundation<br>Victoria Nugent,<br>  Democracy Forward<br>  Foundation<br>Karen L. Loewy,<br>  Lambda Legal Defense and<br>  Education Fund, Inc.<br>Peter C. Renn,<br>  Lambda Legal Defense and<br>  Education Fund, Inc. |
| NAACP Legal Defense and Educational Fund, Inc.* | Molly M. Cain,<br>  NAACP Legal Defense and<br>  Educational Fund, Inc.<br>Elizabeth G. Caldwell,<br>  NAACP Legal Defense and<br>  Educational Fund, Inc.<br>Jennifer A. Holmes,<br>  NAACP Legal Defense and<br>  Educational Fund, Inc. |

| | Amber M. Koonce,<br>    NAACP Legal Defense and<br>    Educational Fund, Inc.<br>Jin Hee Lee,<br>    NAACP Legal Defense and<br>    Educational Fund, Inc.<br>Janai S. Nelson,<br>    NAACP Legal Defense and<br>    Educational Fund, Inc.<br>Samuel Spital,<br>    NAACP Legal Defense and<br>    Educational Fund, Inc.<br>Michaele N. Turnage Young,<br>    NAACP Legal Defense and<br>    Educational Fund, Inc. |
|---|---|

*Motion for leave to file amicus brief pending.*

Dated: May 6, 2024                          /s/ Jennifer A. Holmes
                                            Jennifer A. Holmes

                                            *Counsel for Amicus Curiae*

x

## INTEREST OF *AMICUS CURIAE*[1]

LDF is the nation's first and foremost civil rights law organization. Founded in 1940 under the leadership of Thurgood Marshall, LDF's mission is to achieve racial justice, equality, and an inclusive society. LDF pursues equal justice under the law for all Americans, including the full, fair, and free exercise of constitutional and statutory rights for Black people and other people of color. Through litigation, LDF seeks to defend and advance the proper interpretation of the Equal Protection Clause and anti-discrimination law to ensure that our judicial system champions equality and opportunity.

For over five decades, LDF has advocated for racial integration and worked to eradicate exclusionary practices that are unjust and undermine the function of free and fair markets in the private sector. To that end, LDF has litigated several matters to ensure corporate markets are free from racial exclusion, fraud, manipulation or discrimination. *See, e.g.*, *Hall v. Coburn Corp. of Am.*, 26 N.Y.2d 396 (N.Y. 1970); *Cline v. Credit Bureau of Santa Clara Valley*, 1 Cal.3d 908 (Cal. 1970); *Sniadach v. Fam. Fin. Corp.*, 395 U.S. 337 (1969); *Russell v. Coburn Corp. of Am.*, 298 N.Y.S.2d 893 (N.Y. App. Div. 1969). Through policy advocacy, public education, and

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amicus curiae* states that no party's counsel authored this brief either in whole or in part, and further, that no party or party's counsel, or person or entity other than *amicus curiae* and its counsel contributed money intended to fund preparing or submitting this brief.

1

outreach, LDF also educates the corporate sector on how it may lawfully expand opportunities to individuals from all backgrounds so that its ranks reflect all the available talent in our diverse society.

# INTRODUCTION

Broad market demand for information about corporate board diversity led Nasdaq to adopt rules requiring public disclosure of this information. These rules do not violate the Exchange Act or the Constitution's guarantee of equal protection.

Empirical evidence shows that board diversity is an indicator of potential economic performance and that diverse boards generate better economic outcomes. But despite this evidence, there has been inconsistent progress towards diversifying corporate boards, and barriers continue to hamper opportunities for historically excluded groups. Recognizing the importance of board diversity for economic outcomes, investors and other stakeholders demanded board diversity disclosures, which would produce standardized data that would promote better investment decisions.

Heeding the calls of investors, Nasdaq adopted a disclosure-based regime it believed would not only provide the information investors sought but would also aid companies in voluntarily identifying and eliminating barriers in their board director selection process. Specifically, the rules (1) require listed companies to disclose aggregate, voluntarily self-identified demographic information about their board of directors (Rule 5606), and (2) set optional, diversity objectives that companies may satisfy by at least two diverse directors, including a woman and an underrepresented minority or LGBTQ+ director, or alternatively, by explaining why they do not meet

the objective (Rule 5605(f)) (collectively, "the Nasdaq Rules").[2] The Rules impose no negative consequences if companies choose to provide an explanation instead of having two diverse directors, and the content of that explanation is not evaluated by Nasdaq or SEC.

Nothing about this regime violates the Constitution's guarantee of equal protection. Even if this Court were to find the existence of state action to trigger constitutional scrutiny—a conclusion contrary to the case law governing exchanges—the Nasdaq Rules do not violate the Fifth Amendment.[3] Petitioner Alliance for Fair Board Recruitment ("AFBR") urges this Court to extend heightened scrutiny to the Nasdaq Rules, but this contention is squarely inconsistent with controlling precedent.

It is well established that the collection and reporting of demographic data does not trigger heightened scrutiny, and courts routinely reject equal protection

---

[2] Nasdaq also adopted the Board Diversity Services Rule (IM-5900-9), which provides companies with optional access to free, third-party recruiting services to expand outreach to networks of diverse, board-ready candidates. Petitioners did not challenge this rule under the Fifth Amendment, but it nonetheless would not violate equal protection for the reasons stated herein.

[3] *Amicus curiae* writes to respond to AFBR's Fifth Amendment claim, but this brief should not be construed to mean that the Court *should* reach the equal protection issues addressed herein. As Nasdaq and SEC make clear, Petitioners' constitutional claims fail right out of the gate due to the lack of state action. SEC Br. 36–50; Nasdaq Br. 26–46. Although this brief addresses only AFBR's Fifth Amendment claim, Petitioners' First Amendment claims also would fail even if state action were present. *See* SEC Br. 50–54.

challenges to such requirements. Strict (or heightened) scrutiny is reserved for classifications based on race (or gender) that impose unequal treatment. The Nasdaq Rules, however, require only disclosure of demographic information, including information concerning optional, no-strings-attached benchmarks for diversity on corporate boards. They do not mandate classifications based on race or gender and lack enforcement mechanisms or inducements to compel unequal treatment. AFBR seeks a radical departure from equal protection doctrine, wherein all diversity-related information or aspirations are highly suspect and tantamount to discrimination. That approach threatens to conceal and entrench persistent disparities and barriers to opportunity.

## ARGUMENT

### I. The Nasdaq Rules Reflect Broad Investor Interest in Both the Market Benefits of Board Diversity and the Ongoing Barriers to Equal Opportunity

#### A. Board diversity disclosures increase market function.

Data show that more diverse corporate boards generate better economic performance. A 2015 report on 366 public companies found that those in the top quartile for ethnic and racial diversity in management were 35 percent more likely to have financial returns above the industry mean, and those in the top quartile for

gender diversity were 15 percent more likely to do so.[4] Furthermore, a 2012 global

analysis of 2,400 companies found those with at least one female director yielded a

higher return on equity and a higher net income growth than those without women

on their boards.[5] Likewise, a 2010 study examining 5,500 directors at S&P 500 firms

found a positive and significant correlation between the number of women or ethnic

minorities on the board and the firm's return on assets.[6]

In light of these material benefits, the Nasdaq Rules' diversity disclosures

improve market function by providing accurate, consistent, and comparable

information with which investors can make more informed investment and voting

decisions. *See* JA7. Access to this information on a uniform basis mitigates issues of

information asymmetries, manipulation, or fraud. *See* JA2 (SEC finding that the

Rules were designed "to prevent fraudulent and manipulative acts and practices, to

---

[4] Dame V. Hunt, Dennis Layton, & Sarah Prince, *Why Diversity Matters*, McKinsey & Co. (2015), https://www.mckinsey.com/capabilities/people-and-organizational-performance/our-insights/why-diversity-matters; *see also* JA281 (citing Corinne Post & Kris Byron, *Women on Boards and Firm Financial Performance: A Meta Analysis*, 58 Acad. Mgmt. J. 1546, 1552, 1555, 1557 (Oct. 2015) (meta-analysis of 140 studies finding "firms with greater female board representation tend to have higher accounting returns")).

[5] Credit Suisse Rsch. Inst., *Gender Diversity and Corporate Performance* (2012), https://www.publicappointmentsni.org/files/publicappointmentsni/media-files/Gender%20diversity%20and%20corporate%20performance%20-%20Credit%20Suisse%20Research%20Institute%20August%202012.pdf.

[6] JA9 (SEC Order citing David A. Carter et al., *The Gender and Ethnic Diversity of US Boards and Board Committees and Firm Financial Performance*, 18 Corp. Governance: An Int'l. Rev. 396, 401, 410 (2010)).

promote just and equitable principles of trade, to remove impediments to and perfect the mechanism of a free and open market").

Simply put, because board diversity is good for business, access to diversity disclosures produces better investments. *See* JA23 (SEC recognizing in statement approving Rules that "markets work best when investors have access to such information").

### B. There is broad investor interest in access to information about corporate board diversity.

As investors recognized the economic value of diverse boards, market demand for board diversity information increased. For example, shareholder proposals for diversity initiatives have recently grown, calling for reports on race and gender pay disparities, corporate diversity disclosures, and reports on the effectiveness of diversity initiatives. The Nasdaq Rules were adopted in response to this investor interest. *See* JA23 ("These rules reflect calls from investors for greater transparency about the people who lead public companies, and a broad cross-section of commenters supported the proposed board diversity disclosure rule.").

The breadth of investor interest in diversity disclosures is well documented. According to Institutional Shareholder Services, there was high majority support among shareholders for proposals related to corporate board diversity for S&P 1500

companies in 2020 and 2021.[7] The following year, asset management firms Black Rock and State Street also saw majority support for proposals related to diversity and opportunity, such as racial equity or civil rights audit proposals to identify potential biases in employee hiring or promotion, measure progress against stated diversity goals, identify ways to improve existing diversity policies, or assess product impact on diverse communities.[8] In 2023, the three largest asset management firms reported continued support (75 percent) for proposed board diversity reports.[9] Such reports generally require disclosure of the gender, racial, and ethnic composition of the boards, as well as an overview of the steps taken to enhance board diversity, commit to including diverse candidate slates for future board seats, or discuss board strategies to reflect the diversity in the company's workforce, community, and customers.[10] Although support for corporate board diversity reports remains high, this information remains unavailable for many corporations.

---

[7] David A. Bell & Ron C. Llewellyn, *What's Next for Diversity Shareholder Proposals*, Harvard L. Sch. Forum on Corp. Governance (2023), https://corpgov.law.harvard.edu/2023/10/08/whats-next-for-diversity-shareholder-proposals/.

[8] *Id.*

[9] *Id.*

[10] *Id.*

**C.   Insular board selection practices have impeded progress in board diversity, contrary to the public interest.**

Strides toward meaningful corporate board diversity are a relatively recent phenomenon after decades of exclusionary policies. Barriers to opportunity persist, including the insular director selection processes used by many companies.

The first women appeared on corporate boards in the early to mid-1900s; however, their sparse inclusion was confined to smaller companies.[11] Moreover, white executives excluded Black people from corporate boards until the early 1970s.[12] Before then, Jim Crow laws, segregation, and other means of racial subordination robbed Black Americans of opportunities to participate in the corporate sector.

Gradual inclusion of women and Black people on corporate boards resulted from decades of strategic organizing, protesting, and lobbying for federal protections during the Civil Rights and Women's Rights Movements. Immediately following the passage of the Civil Rights Act of 1964, advocacy groups leveraged the new federal mandates to push for greater racial and gender equality. The National Black MBA

---

[11] David Larcker & Brian Tayan, *Pioneering Women on Boards: Pathways of the First Female Directors* 2, Stanford Closer Look Series (Sept. 3, 2013), https://www.gsb.stanford.edu/sites/default/files/publication-pdf/cgri-closer-look-35-women-boards.pdf.

[12] Atiya Jordan, *A Man of Courage: Leon Sullivan, First Black Corporate Director who Fought Against Inequality and Apartheid*, Black Enter. (Feb. 25, 2023), https://www.blackenterprise.com/a-man-of-courage-leon-sullivan-first-black-corporate-director-who-fought-against-inequality-and-apartheid/.

Association and the National Organization for Women lobbied corporations to build

diversity programs into their management structures.[13] These programs furthered the

representation of women and Black people on corporate boards.[14]

However, progress has been inconsistent and slow, and both women and

people of color remain underrepresented on corporate boards. In 1973, only 7

percent of Fortune 1000 companies had at least one board director who was an ethnic

minority.[15] And while the share of women directors grew in the 1970s and 1980s,

their inclusion slowed in the 1990s, hovering around just 10 percent.[16] By 2023,

women held 25.8 percent of board seats at large and mid-cap companies.[17] Black

people also remain underrepresented, comprising just 10 percent of Fortune 1000

---

[13] *See* Richie Zweigenhaft, *What the Numbers Say About Diversity on Corporate Boards*, Yahoo News (Mar. 13, 2024), https://www.yahoo.com/news/numbers-diversity-corporate-boards-123853530.html.

[14] *See* Lisa M. Fairfax, *Some Reflections on Diversity of Corporate Boards*, 79 St. John's L. Rev. 1105 (2005), http://ssrn.com/abstract=921037; *Who are the Women in the Board Rooms?*, 16 Bus. & Soc'y Rev. 5, 5 (1975).

[15] Lisa M. Fairfax, *The Bottom Line on Board Diversity: a Cost-Benefit Analysis of the Business Rationales for Diversity on Corporate Boards*, Wis. L. Rev. 795, 800 (2005), https://ssrn.com/abstract=835406.

[16] Yannick Thams, Bari L. Bendell, & Siri Terjesen, *Explaining Women's Presence on Corporate Boards: The Institutionalization of Progressive Gender-Related Policies*, 86 J. Bus. Rsch. 130, 130–140 (May 2018), http://dx.doi.org/10.1016/j.jbusres.2018.01.043.

[17] Morgan Stanley Cap. Int'l, *Women on Boards and Beyond: Progress Report* (2023), https://www.msci.com/documents/1296102/43943104/MSCI+Women+on+Boards+and+Beyond+2023+Progress+Report.pdf.

board seats as of September 2022,[18] and experiencing a significant decrease in their ranks from 2022 to 2023.[19]

Outmoded approaches to director recruitment can create impediments to the consideration of qualified diverse candidates. *See* JA713 (Nasdaq collecting studies identifying insular recruitment practices). Typically, corporate boards rely on their networks to recruit for open seats, but those networks are largely homogenous. *See* JA224, 713 (same). For example, a 2013 American Values Survey found that 75 percent of white Americans have "entirely white social networks without any minority presence."[20] In light of this phenomenon, the Nasdaq Rules seek to remove these impediments and produce markets that realize the full economic potential of diverse boards. This aligns with the Exchange Act, which requires that an exchange's rules be designed to remove impediments to a free and open market, protect investors and the public interest, and promote the just and equitable principles of trade, among other things. JA2 (citing Section 6(b)(5) of the Exchange Act).

---

[18] Klynveld Peat Marwick Goerdeler Int'l Ltd., *African American Representation on Fortune 1000 Boards: 2022 Edition* (2023), https://kpmg.com/kpmg-us/content/dam/kpmg/boardleadership/pdf/2023/african-american-representation-fortune-1000-boards-2022-edition.pdf.

[19] *Id.* (finding an 11 percent decrease among Black directors who joined boards after 2020).

[20] Pub. Religion Rsch. Inst., *Racial and Ethnic Makeup of White Social Networks*, Am. Values Survey (2013), https://latinosleadnow.org/wp-content/uploads/2022/07/PRRI-2013-American-Values-Social-Networks.docx.pdf.

## II.    The Nasdaq Rules Do Not Violate Equal Protection

Even if this Court were to hold that the requisite state action exists to permit Petitioners to challenge the Nasdaq Rules under the Constitution—a conclusion not supported here—the Rules do not violate the Fifth Amendment's equal protection guarantee.

Heightened scrutiny does not apply for at least three reasons. As the panel opinion correctly recognized, the Rules create a disclosure-based regime that requires Nasdaq-listed companies to report about the diversity (or lack thereof) of their boards, but does not enforce any particular board composition. *All. for Fair Bd. Recruitment v. SEC*, 85 F.4th 226, 254–55 (5th Cir. 2023), *vacated* 2024 WL 670403 (5th Cir. Feb. 19, 2024). Neither collecting and disclosing information about race or other demographics, nor requesting factual information explaining that demographic data, trigger heightened scrutiny.

Moreover, the Nasdaq Rules do not trigger heightened scrutiny because they do not "subject[] a person to unequal treatment," nor do they induce companies to do so. *Adarand Constructors Inc., v. Pena*, 515 U.S. 200, 214 (1995). The Rules lack any enforcement mechanism or incentive structure—such as mandates, penalties, fines, bonuses, or other inducements—that require or pressure companies to make hiring decisions based on race or other characteristics. Instead, they require transparency of information, including disclosures concerning an optional board

12

diversity objective. This distinguishes the Rules from programs that condition government contracts or other benefits on targets for minority participation, and courts thus subjected to strict scrutiny.

Finally, merely expressing a desire to increase diversity does not trigger heightened scrutiny. Courts have repeatedly approved of measures undertaken to increase diversity through broadening recruitment and outreach, the mechanisms explicitly encouraged by Nasdaq here. This Court should reject AFBR's radical inversion of equal protection doctrine that considers disclosures, which may lead to greater diversity on corporate boards through voluntary race-neutral means, to be constitutionally suspect.

Because heightened scrutiny is inapplicable, rational basis review applies. The Nasdaq Rules easily pass that standard because they advance the legitimate interest of increasing transparency so stakeholders can make investment decisions with consistent and reliable data.

### A.    The Nasdaq Rules do not trigger heightened scrutiny.

*1.    The collection and disclosure of information about race and other demographic characteristics is not subject to heightened scrutiny.*

Because the Nasdaq Rules require only the collection and disclosure of factual information related to board of directors' demographics, heightened scrutiny does not apply. The Supreme Court's treatment of demographic data collection through

the Census illustrates this principle. Repeatedly, the Court has approvingly cited the longstanding inclusion of questions about a respondent's race and sex on the Census without any suggestion that this information-gathering amounts to suspect classification or triggers heightened scrutiny. *See Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566–67 (2019) (stating that "demographic questions have been asked in *every* census since" the first in 1790 and recognizing that this "open, widespread, and unchallenged" practice "since the early days of the Republic" guides the Court's assessment of the questions' constitutionality) (emphasis in original); *Legal Tender Cases*, 79 U.S. 457, 536 (1870) (recognizing that "Congress has repeatedly directed . . . the collection of statistics respecting age, sex, and production" and asking rhetorically "[w]ho questions the power to do this?"). Indeed, the Court has "recognized the role of the census as a 'linchpin of the federal statistical system by collecting data on the characteristics of individuals, households, and housing units throughout the country.'" *Dep't of Com.*, 139 S. Ct. at 2567 (quoting *Dep't of Com. v. United States House of Representatives*, 525 U.S. 316, 341 (1999)).

Consistent with the Supreme Court's longstanding recognition of the validity of demographic data collection in the Census, the only federal court to have directly confronted an equal protection challenge to such data collection easily rejected it. *See Morales v. Daley*, 116 F. Supp. 2d 801, 814–15 (S.D. Tex. 2000). Because asking individuals to self-identify their race did not amount to a suspect

classification, the court held that strict scrutiny did not apply and the questions survived rational basis review. *Id.* Given the important "distinction between [the] collect[ion of] demographic data and governmental use of suspect classifications without a compelling interest," *id.* at 814, this Court should review the Nasdaq Rules under the same standard. Like the Census, the Rules simply require disclosure of voluntarily reported demographic information and, in some cases, additional disclosure concerning the lack of diversity on a company's board.

Federal courts also have affirmed in other contexts that collecting information about race, sex, and other demographic characteristics does not trigger heightened scrutiny. *See*, *e.g.*, *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 789 (2007) (Kennedy, J. concurring in part and concurring in the judgment)[21] ("[T]racking enrollments, performance, and other statistics by race" in public schools are permissible ways to achieve diversity that are "unlikely" to "demand strict scrutiny."); *Weser v. Glen*, 190 F. Supp. 2d 384, 399 n.13 (E.D.N.Y. 2002) ("Consciousness of race and gender in collecting data on an applicant pool and those accepted from the pool also does not amount to a racial classification.");

---

[21] Justice Kennedy's concurring opinion, which parts ways with the plurality opinion about the appropriate consideration of race, is considered controlling because it supplies the narrowest grounds for the Court's ruling. *See Marks v. United States*, 430 U.S. 188, 193 (1977); *see also Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 545 (2015) (endorsing language from Justice Kennedy's concurrence in *Parents Involved*).

15

*Honadle v. Univ. of Vt. & State Agric. Coll.*, 56 F. Supp. 2d 419, 427 (D. Vt. 1999) (recognizing that a public university's "amassing statistics on the racial and ethnic makeup of its faculty" does not "trigger[] the equal protection clause's strict scrutiny review"). So too have courts rejected equal protection challenges to government collection and dissemination of demographic data. *See Caulfield v. Bd. of Ed. of New York*, 583 F.2d 605, 611–12 (2d Cir. 1978) (rejecting constitutional challenge to school system's mandatory questionnaire about race and ethnicity of supervisors and teachers); *United States v. New Hampshire*, 539 F.2d 277 (1st Cir. 1976) (rejecting constitutional challenge to the requirement under the Equal Employment Opportunity Act of 1972, that states must report race and sex data about their employees).[22]

---

[22] Although courts have sometimes struck down statutes requiring *individuals* to publicly disclose their race, these cases are distinguishable from the Rules here. *See, e.g.*, *Anderson v. Martin*, 375 U.S. 399 (1964) (Louisiana statute requiring disclosure of individual candidates' race on election ballots); *Pederson v. Burton*, 400 F. Supp. 960 (D.D.C. 1975) (District of Columbia statute mandating disclosure of marriage license applicants' races); *Hamm v. Va. Bd. of Elections*, 230 F. Supp. 156, 157–58 (E.D. Va. 1964), *aff'd sub. nom., Tancil v. Woolls*, 379 U.S. 19 (1964) (Virginia statutes requiring designation of individual's race in voting and property records). Unlike the mandatory, individualized disclosures at issue in those cases, the Nasdaq Rules require only anonymous, aggregate disclosure of corporate board's demographic information. Individual directors can decline to provide their information. Such "procurement and compilation of" demographic information "for identification or statistical use violates no constitutional privilege." *Hamm*, 230 F. Supp. at 158.

These decisions affirm a basic principle: courts treat the collection and disclosure of demographic information—as the Nasdaq Rules require—differently than the myriad ways that information might be used. *See New Hampshire*, 539 F.2d at 280 ("Statistical information as such is a rather neutral entity which only becomes meaningful when it is interpreted."). The "possible and purely hypothetical misuse of data does not require" courts to ban "reasonable procedures to acquire such data." *Id.*

The existence of countless statutory and regulatory regimes requiring the collection and dissemination of demographic data further confirms that these schemes do not trigger heightened scrutiny. *See, e.g.*, 12 U.S.C. § 2803(a), (b)(4) (requiring financial institutions that originate or purchase mortgage loans to collect and disclose demographic information about mortgagors and mortgage applicants, including their race and gender); 42 U.S.C. § 19152(a) (requiring Federal research agencies to collect demographic information on "applications for merit-reviewed research and development awards made by such agency"); 50 U.S.C. § 3334b(b) (requiring Director of National Intelligence to publish "aggregate demographic data . . . of the workforce of the intelligence community"); 29 C.F.R. § 1602.7 (requiring employers to annually submit workforce demographic information in "Employer Information Report EEO-1"); 45 C.F.R. § 1355.40(a), (b)(1) (requiring that states

17

submit to the Administration for Children and Families race/ethnicity and gender data on children placed in foster care or adopted and foster or adoptive parents).

There are good reasons to collect demographic data. For decades, this Court has recognized demographic data collection as an essential tool in uncovering illegal discrimination. *See Burns v. Thiokol Chem. Corp.*, 483 F.2d 300, 305 (5th Cir. 1973) (recognizing this Court's "heav[y]" reliance on "empirical data" in "cases involving racial discrimination in education, employment and other segments of society"); *Alabama v. United States*, 304 F.2d 583, 586 (5th Cir. 1962), *aff'd*, 371 U.S. 37 (1962) ("In the problem of racial discrimination, statistics often tell much, and Courts listen."). This Court's recognition of the crucial role that demographic data plays in addressing and remedying discrimination forecloses AFBR's premise that such disclosures are themselves suspect.[23]

### 2.    *The Nasdaq Rules do not impose unequal treatment.*

Despite the disclosure-based framework of the Nasdaq Rules, AFBR contends that the Rules encourage hiring decisions based on race and should be subject to strict scrutiny. But this argument relies on inapt comparisons to programs that bear no resemblance to the Rules here. Courts reserve strict scrutiny for "any racial classification" by a government actor that "subject[s] a person to unequal treatment."

---

[23] The role of demographic disclosures in guarding against and addressing discrimination in a company also makes them useful data for potential investors.

18

*See Adarand*, 515 U.S. at 224. The harm of racial classification derives not from the government's mere categorization or acknowledgment of race, but from its unequal treatment, segregation, or subordination on the basis of race.[24] *See Parents Involved*, 551 U.S. at 789 (Kennedy, J., concurring) ("[M]echanisms [that] are race conscious but do not lead to different treatment based on a classification" are "unlikely . . . [to] demand strict scrutiny to be found permissible."); *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993) ("The 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier."); *Sussman v. Tanoue*, 39 F. Supp. 2d 13, 25 (D.D.C. 1999) (holding that FDIC's plan requiring data collection about the race and gender of employees, analysis for disparities compared to the labor market, and efforts to reduce barriers to entry "does not allocate benefits on the basis of race or gender, and therefore does not trigger strict scrutiny"), *abrogated on other grounds by Passenger Corp. v. Morgan*, 536 U.S. 101 (2002). "[T]he Framers of the Fourteenth Amendment . . . desired to place clear limits on the States'

---

[24] LDF respectfully submits that the Fourteenth Amendment, properly interpreted, reflects an anti-subordination commitment and should not impose heightened scrutiny on government programs that use limited racial classifications for the purpose of remedying discrimination or promoting racial diversity. But LDF recognizes that the Supreme Court has held such programs are generally subject to strict scrutiny even when implemented for those purposes. The key point here is that the Nasdaq Rules do not impose classifications at all. They are instead disclosure requirements, and, as such, clearly do not trigger heightened scrutiny.

use of race as a criterion for legislative action," *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 491 (1989), but not eliminate awareness of race altogether, *see Parents Involved*, 551 U.S. at 789 (Kennedy, J. concurring); *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 545 (2015) ("[R]ace may be considered in certain circumstances and in a proper fashion.").

Heightened scrutiny does not apply to the Nasdaq Rules, which do not subject board candidates to unequal treatment on the basis of race, gender, or LGBTQ+ status. First, the Rules do not mandate who a company may select as a director or how the selection process is conducted. Indeed, SEC's approval order and the Rules themselves make clear their voluntary nature: each director may voluntarily provide self-identified demographic information to be disclosed by the company; although the rules express an optional diversity benchmark, a company may choose to provide an explanation in lieu of having two diverse directors; and the content of that explanation is left to the discretion of the company, not scrutinized or evaluated by Nasdaq or SEC. JA5, 204.

Nor has AFBR demonstrated that the Rules induce the companies to select directors based on race. Unlike regulatory schemes cited by AFBR that purportedly "encourage decisions based on race," AFBR Br. 14, the Rules here offer no benefit or penalty that is contingent on whether a company has two diverse board directors. In the cases relied upon by AFBR, companies could lose out on government

contracts or financial bonuses if they failed to meet certain targets for minority-owned contractor participation, even where those targets were ostensibly voluntary. *See Adarand*, 515 U.S. at 205–09 (program providing government contractors with additional monetary compensation for hiring minority-owned subcontractors); *City of Jacksonville*, 508 U.S. at 658–59, 662 (ordinances earmarking 10% of city contracts for minority business enterprises and according other "preferential treatment to black- and female-owned contractors"); *W.H. Scott Constr. Co., Inc. v. City of Jackson*, 199 F.3d 206, 208–09, 214 (5th Cir. 1999) (city procurement program where contractors "risk termination of [the] contract" if they do not include 15% participation by minority-owned subcontractors or demonstrate adequate good faith efforts to meet the goal); *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 704–05 (9th Cir. 1997) (statute imposing minority and gender participation "goal requirements" for contractor bids or specific documentation of good faith efforts to meet the goals). Courts have held that such programs, in which companies risk the denial of lucrative government contracts or regulatory benefits, "provide[] strong incentives to [private companies] to grant racial preferences in hiring," making them "subject to strict scrutiny." *Sussman*, 39 F. Supp. 2d at 26.

The Nasdaq Rules are different because this government pressure is absent. They only mandate disclosure, a requirement that the cases relied on by AFBR do not address, and one that does not trigger heightened scrutiny, as discussed above.

The Rules' diversity objectives are purely expressive benchmarks because they impose no enforcement mechanism or incentive structure. Nasdaq and SEC cannot penalize or deny any regulatory benefit to companies that do not meet the diversity objectives or bestow benefits on companies that do. For example, a company cannot be delisted or fined for lacking two diverse directors. JA5, 204. Thus, the Rules decline to "erect[] race," or gender or LGBTQ+ status, as a "criterion in an aspect of public decisionmaking." *Croson*, 488 U.S. at 493. And, contrary to AFBR's mischaracterization, they do not operate as a "quota." *See Grutter v. Bollinger*, 539 U.S. 306, 335 (2003) (describing a quota as a system where "a certain fixed number or proportion of opportunities are *reserved exclusively* for certain minority groups") (emphasis added); *Croson*, 488 U.S. at 496 (describing "a plan that completely eliminated nonminorities from consideration for a specified percentage of opportunities" as a quota).

The Nasdaq Rules require only that a company without minimal diversity on its board provide another disclosure in the form of an explanation. The explanation requirement is not coercive because Nasdaq and SEC "w[ill] not evaluate the substance or merits of a company's explanation" or assess company efforts to increase diversity. *See* JA3; *contra Scott*, 199 F.3d at 214 (in contract bidding process, the city government evaluated the good faith efforts of contactors to meet minority participation goals); *Monterey Mech.*, 125 F.3d at 712 (describing the time,

effort, and expense associated with satisfying the detailed requirements of the statute's good faith exception to minority participation goals); *cf. Frank v. Xerox Corp.*, 347 F.3d 130, 137 (5th Cir. 2003) (the fact that "managers were evaluated on how well they complied with" the defendant employer's "explicit racial goals for each job and grade level" was evidence that could support a finding that defendant "considered race in fashioning its employment policies"). As the panel recognized, "[t]he only sanction is for giving *no* explanation at all." *All. for Fair Bd. Recruitment*, 85 F.4th at 255 (emphasis in original). AFBR cites no case applying strict scrutiny to a disclosure rule with optional, no-strings-attached diversity benchmarks.

To make up for this deficit, AFBR speculates about hypothetical harms that could befall a company that must disclose diversity information. AFBR Br. 12–13. None of these potential "tremendous harms," such as reputational risks or shareholder responses, are imposed by the Rules, Nasdaq, or SEC. Rather, what AFBR desires is for companies to be shielded from investor and shareholder scrutiny of the makeup of their boards, despite clear investor demand for this information. Equal protection protects individuals from unequal treatment; it does not insulate companies from public scrutiny that may accompany the disclosure of non-

proprietary, factual information.[25] Indeed, AFBR's argument goes against the Exchange Act's fundamental disclosure purpose and the principle that publicly traded companies shoulder greater reporting obligations than their privately held counterparts, especially concerning their directors, who are supposed to serve shareholder interests. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997) (Alito, J.) ("Public companies make large quantities of information available to the public, as a result of both mandatory disclosure requirements and self-initiated voluntary disclosure."). A company's explanation can provide investors with insight into its "circumstances or diversity philosophy," JA3 n.31, including, for example, whether its board has other kinds of diversity such as veteran status or disability status, JA356. Public company disclosure requirements, even of demographic data, are a routine part of corporate life,[26] *see supra* 15–17, and potential public reaction does not render these requirements subject to heightened scrutiny.

> 3. *Expressing a desire to increase diversity does not violate equal protection.*

Contrary to AFBR's argument, the Nasdaq Rules are not unconstitutional

---

[25] Tellingly, Facebook, which AFBR referenced as a company facing attacks due to lack of board diversity, submitted a comment in support of the Nasdaq Rules. *See* JA650.

[26] Indeed, for more than a decade, SEC has required companies to disclose how their board nominating committees consider diversity in identifying director nominees. *See* 17 C.F.R. § 229.407(c)(2)(vi).

simply because Nasdaq hoped they would increase opportunities for diverse candidates. AFBR conflates aspirations to improve board diversity (which are lawful and do not trigger strict scrutiny) with making hiring decisions based on race (which is unlawful in most circumstances). This Court should reject AFBR's effort to make diversity synonymous with discrimination. That is not the law.

Courts have been clear, time and time again, that diversity policies or aspirational statements about wanting to increase diversity are not evidence of discrimination. *See, e.g.*, *Bissett v. Beau Rivage Resorts Inc.*, 442 F. App'x 148, 152–53 (5th Cir. 2011) (holding that employer's diversity policy stating the company was "committed to maintaining a workforce that reflects the diversity of the community" was not evidence of discrimination because the plaintiff offered no evidence that she was terminated to increase diversity); *see also Johnson v. Metro. Gov't of Nashville & Davidson Cnty.*, 502 F. App'x 525, 535 (6th Cir. 2012) (holding "statements reflecting a desire to improve diversity do not equate to direct evidence of unlawful discrimination") (citation omitted); *Mlynczak v. Bodman*, 442 F.3d 1050, 1058 (7th Cir. 2006) (holding that evidence that employer was "philosophically favorable to the hiring of minorities" was not evidence of discrimination). Indeed, as the First Circuit explained, "[e]very antidiscrimination statute aimed at racial discrimination . . . reflects a concern for race[, but t]hat does not make such enactments . . . automatically 'suspect' under the Equal Protection Clause." *Raso v. Lago*, 135 F.3d

11, 16 (1st Cir. 1998).

Nasdaq explained that it believed a disclosure-based framework would reduce unfair barriers in the traditional director recruitment process, thereby "help[ing] increase opportunities for Diverse candidates that otherwise may be overlooked," which in turn advances a free and open market. JA713–14. Contrary to AFBR's claims, Nasdaq's aspirations that the Rules could lead to greater diversity do not make them constitutionally suspect.

To the extent that Nasdaq encourages changes in companies' boards, it is through reducing impediments to diverse candidates by requiring transparency and encouraging expanded recruitment beyond traditional, insular networks. *See* JA713. Nasdaq determined that the "traditional candidate selection process may create barriers to considering qualified diverse candidates for board positions by limiting the search for director nominees to existing directors' social networks and candidates with C-suite experience." *Id*. And SEC determined that "a company may satisfy the [Rules' diversity] objective by broadening the search for qualified candidates and considering candidates from other professional pathways that bring a wider range of skills and perspectives beyond traditional C-suite experience." *Id*. This is also evidenced by Nasdaq's companion rule, the Board Diversity Services Rule, which will help companies recruit from a broader universe of board-ready candidates to expand opportunities to diverse candidates who are excluded or overlooked in the

current system. JA723.

Policies expanding recruitment to create a more diverse applicant pool are entirely lawful. *See Mlynczak*, 442 F.3d at 1054, 1058 (finding that U.S. Department of Energy's recruitment policies were intended to ensure "diversity in the applicant pool" and were not evidence of discrimination because they "were of the type that expand the pool of persons under consideration, which is permitted"); *see also Parents Involved*, 551 U.S. at 789 (Kennedy, J., concurring) ("School boards may pursue the goal of bringing together students of diverse backgrounds and races through . . . recruiting students and faculty in a targeted fashion[.]"). In fact, "inclusive recruitment efforts to recruit minority and female applicants" not only do not constitute discrimination, but they also reduce the threat of discrimination by "enabl[ing] employers to generate the largest pool of qualified applicants and help[ing] to ensure that minorities and women are not discriminatorily excluded from employment." *Duffy v. Wolfe*, 123 F.3d 1026, 1038–39 (8th Cir. 1997), *abrogated on other grounds by Togerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011).

AFBR's argument disregards courts' warnings not to conflate a desire to eliminate hurdles for disadvantaged groups with an intent to discriminate. *See Jana-Rock Constr., Inc. v. N.Y. State Dep't of Econ. Dev.*, 438 F.3d 195, 211 (2d Cir. 2006) (quoting *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 51 (2d Cir. 1999)) ("[T]o equate a

'desire to eliminate the discriminatory impact' on some disadvantaged groups with 'an intent to discriminate against' other groups 'could seriously stifle attempts to remedy discrimination[.]'").

### B.    The Nasdaq Rules survive rational basis review.

The Nasdaq Rules survive constitutional scrutiny. Without heightened scrutiny, government regulations are subject to "rational basis review" in an equal protection claim. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439–41 (1985). Rational basis review is "a paradigm of judicial restraint," and the challenged government action "comes . . . bearing a strong presumption of validity." *F.C.C. v. Beach Communications, Inc.*, 508 U.S. 307, 314 (1993). The party challenging the government policy bears the burden to disprove "every conceivable basis which might support it." *Id.* at 315. So long as there are "plausible reasons" for the governmental action, judicial review "is at an end." *United States R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980).

The Nasdaq Rules easily surpass this low bar. The Rules advance a legitimate government interest: increasing transparency about board composition so shareholders and other stakeholders can make investment and proxy-voting decisions with consistent and reliable data. *See Chamber of Com. v. SEC*, 85 F.4th 760, 771 (5th Cir. 2023) ("SEC has a legitimate interest in promoting the free flow of commercial information."); *see also Va. State Bd. of Pharmacy v. Va. Citizens*

*Consumer Council, Inc.*, 425 U.S. 748, 764 (1976) (recognizing individuals' and society's "strong interest in the free flow of commercial information"). As the Supreme Court explained, in our nation's "free enterprise economy," "the free flow of commercial information" ensures that individual economic "decisions, in the aggregate, [are] intelligent and well informed," and promotes the "formation of intelligent opinions as to how [the market] system ought to be regulated or altered." *Id*. at 765.

The Nasdaq Rules are rationally related to this interest. As SEC recognized in its approval order, "investors view board diversity as a key indicator of corporate governance," as evidenced by the "diverse collection of commenters who expressed interest in board diversity information . . ." JA7 & n.91 (collecting comments). Currently, however, board diversity data is not provided consistently or widely, which makes it difficult to compare across companies. *See* JA10 (Nasdaq explaining that "current reporting of board-level diversity statistics is unreliable and unusable to investors" in part because of "inconsistencies in the definition of diversity characteristics across companies"). Listed companies, business organizations, investors, and other stakeholders have consistently called for standardized reporting. By requiring companies to report board diversity statistics in a consistent manner, and explain why certain diversity is absent, the Nasdaq Rules correct an information

29

gap that plagued the market, promoting the transparency sought by a broad swath of Nasdaq stakeholders.

## CONCLUSION

For the foregoing reasons, the Court should reject AFBR's Fifth Amendment claim even if it finds there was state action and should deny the Petitions in their entirety.

Dated: May 6, 2024

Respectfully submitted,

/s/ Jennifer A. Holmes

Jin Hee Lee
Michaele N. Turnage Young
Jennifer A. Holmes
  *Counsel of Record*
Amber M. Koonce
Molly M. Cain
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th Street NW, Suite 600
Washington, DC 20005

Janai S. Nelson
  *President & Director-Counsel*
Samuel Spital
Elizabeth G. Caldwell
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector Street, Fifth Floor
New York, NY 10006
(212) 965-2200

*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I certify on this 6th day of May, 2024, that I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF filing system. I further certify that all participants in this case are registered CM/ECF users and that all service will be accomplished by the appellate CM/ECF system.

*/s/ Jennifer A. Holmes*
Jennifer A. Holmes

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), I certify on this 6th day of May, 2024, that this brief complies with the typeface and type style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E), 27(d)(2)(A), 32(a)(5) and 32(a)(6). This brief totals 6,494 words, which abides by the 6,500-word limit for this brief, and has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14-point font.

*/s/ Jennifer A. Holmes*
Jennifer A. Holmes

*Counsel for Amicus Curiae*