No. 21-60626

## IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————————————————————

## ALLIANCE FOR FAIR BOARD RECRUITMENT; NATIONAL CENTER FOR PUBLIC POLICY RESEARCH,

*Petitioners,*

*v.*

## SECURITIES AND EXCHANGE COMMISSION,

*Respondent.*

———————————————————————

On Petitions for Review from the Securities & Exchange
Commission,
Release No. 34-92590

## BRIEF OF *AD HOC* COALITION OF NASDAQ-LISTED
COMPANIES AS *AMICUS CURIAE* IN SUPPORT OF
RESPONDENT

Kerry E. Berchem
AKIN GUMP STRAUSS HAUER
 & FELD LLP
One Bryant Park
Bank of America Tower
New York, N.Y. 10036

Zach ZhenHe Tan
AKIN GUMP STRAUSS HAUER
 & FELD LLP
100 Pine Street, Suite 3200
San Francisco, CA 94114

Pratik A. Shah
AKIN GUMP STRAUSS HAUER
 & FELD LLP
2001 K Street N.W.
Washington, D.C. 20006
202-887-4000
pshah@akingump.com

*Counsel for Amicus Curiae*

## CERTIFICATE OF INTERESTED PERSONS

No. 21-60626, *Alliance for Fair Board Recruitment v. SEC*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case.  These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. The following interested nongovernmental corporations have no parent corporations or publicly held corporations that own 10% or more of their stock: 2U, Inc.; Airbnb, Inc.; FactSet Research Systems Inc.; Fossil Group, Inc.; Henry Schein, Inc.; Ideanomics, Inc.; Intel Corporation; Micron Technology, Inc.; Microsoft Corporation; Morningstar, Inc.

2. Brighthouse Financial, Inc. is a nongovernmental corporation with no parent corporations.  BlackRock Inc. is the only publicly held company that owns 10% or more of the stock of Brighthouse Financial, Inc.

3. Lyft, Inc. is a publicly held corporation traded on the Nasdaq Global Select Market with no parent corporation. Based on Lyft, Inc.'s knowledge from publicly available U.S. Securities and Exchange Commission filings, no publicly held corporation or entity owns ten percent or more of Lyft, Inc.'s outstanding common stock.

4. United Therapeutics Corporation is a nongovernmental corporation with no parent corporations.  BlackRock Inc. is the only publicly held company that owns 10% or more of the stock of United Therapeutics Corporation.

5. Pratik A. Shah, Kerry E. Berchem, and Zach ZhenHe Tan of Akin Gump Strauss Hauer & Feld, LLP—*Counsel for Amicus Curiae.*

6. The Securities and Exchange Commission is a federal agency.

i

7. Dan M. Berkovitz, Michael A. Conley, Tracey A. Hardin, Daniel E. Matro, and John R. Rady of the Securities and Exchange Commission—*Counsel for Respondent Securities and Exchange Commission*.

8. Vanessa Ann Countryman of the Securities and Exchange Commission—*Secretary of the Securities and Exchange Commission*.

9. Petitioner Alliance for Fair Board Recruitment is a non-profit membership corporation and has no parent corporations or subsidiaries.

10. Jonathan Berry, R. Trent McCotter, Michael Buschbacher, Jared Kelson, and James R. Conde of Boyden Gray & Associates—*Counsel for Petitioner Alliance for Fair Board Recruitment*.

11. Petitioner National Center for Public Policy Research is a non-profit corporation and has no parent corporations or subsidiaries.

12. Margaret A. Little, Sheng Li, and Mark Chenoweth of The New Civil Liberties Alliance—*Counsel for Petitioner National Center for Public Policy Research*.

13. Allyson N. Ho, Bradley G. Hubbard, Amir C. Tayrani, Amalia E. Reiss, and Paulette Miniter of Gibson, Dunn & Crutcher LLP; John Zecca, Jeffrey S. Davis, John Yetter, and Joanne Pedone of The Nasdaq Stock Market, LLC; and Burt M. Rublin, Stephen J. Kastenberg, Paul Lantieri, III, Peter F. Andrews, and Seth D. Berlin of Ballard Spahr LLP—*Counsel for Intervenor Nasdaq Stock Market, LLC*.

*s/Pratik A. Shah*

Pratik A. Shah

*Attorney of Record for Amicus Curiae*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ......................................................... I

TABLE OF AUTHORITIES ..................................................................................... IV

INTEREST OF *AMICUS CURIAE* ............................................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................... 2

ARGUMENT ............................................................................................................. 3

I.  THE RULE PROVIDES INVESTORS WITH A UNIFORM
    AND CONSISTENT WAY TO ACCESS MATERIAL
    INFORMATION ..................................................................................... 3

    A.  Many Investors Care About A Company's Approach To
        Board Diversity ............................................................................ 3

    B.  The Rule Provides Investors With A Consistent Way Of
        Accessing This Information ......................................................... 6

II. THE RULE ACHIEVES THIS GOAL WITHOUT IMPOSING
    SIGNIFICANT BURDENS ON NASDAQ-LISTED
    COMPANIES .......................................................................................... 9

    A.  The Rule Neither Imposes A Quota Nor Compels Speech ....... 10

    B.  Additional Flexibility Under The Rule Minimizes Any
        Burden ......................................................................................... 15

CONCLUSION ........................................................................................................ 19

CERTIFICATE OF SERVICE ................................................................................ 20

CERTIFICATE OF COMPLIANCE ....................................................................... 21

# TABLE OF AUTHORITIES

Alden, William, *Oracle to Leave Nasdaq for the Big Board*, N.Y. TIMES (June 20, 2013) ..........................................................................18

Amendment No. 1 to the Board Diversity Proposal, File No. SR-NASDAQ-2020-081 (Feb. 26, 2021) ...........................................................11, 17

Ascent Industries Co., *Board Diversity* (Oct. 31, 2023)..........................................12

Associated Press, *Kraft Foods to Switch Listing to Nasdaq From NYSE*, CNBC (June 8, 2012) ..............................................................................18

Bit Origin Limited, Board Diversity Matrix (Nov. 16, 2023) .................................12

BlackRock Investment Stewardship, *Global Principles* (Jan. 2024) .......................4

Bogota Financial Corp., Board Diversity Matrix (June 30, 2023) ..........................14

CorVel Corpo, *Board of Directors Diversity* (last visited Apr. 24, 2024) ...............................................................................................................13

Duprey, Rich, *What PepsiCo's Move From NYSE to Nasdaq Means for Investors*, THE MOTLEY FOOL (Dec. 18, 2017).............................................18

Euroseas Ltd, Board Diversity Matrix (Dec. 22, 2023)...........................................13

FED. R. APP. P. 29(a)(4)(E) ........................................................................................1

Glass Lewis, *2024 Benchmark Policy Guidelines* (2023) .........................................5

Golden Ocean Group Limited, Form 20-F (Mar. 16, 2023)....................................12

Grom Social Enterprises Inc., Schedule 14A (July 10, 2023).................................13

Hsu, Tiffany, *Kraft Foods Jumps Ship from NYSE to Nasdaq*, L.A. TIMES (June 8, 2012)..........................................................................................18

Institutional Shareholder Services, *United States Proxy, Voting Guidelines, Benchmark Policy Recommendations* (Jan. 2024)............................5

ISS Governance, *2020 Global Benchmark Policy Survey, Summary of Results* (Sept. 24, 2020) ........................................................................................4

Landaw, Jared, Barington Capital Group LP, *Maximizing the Benefits of Board Diversity: Lessons Learned from Activist Investing*, Harvard Law School Forum on Corporate Governance (July 14, 2020) ...................................................................................................................5

Letter from Alfred P. Poor, Chief Executive Officer, Ideanomics, Inc., to Vanessa Countryman, Secretary, Securities and Exchange Commission (Dec. 28, 2020) ......................................................................*passim*

Letter from Aron Szapiro, Head of Policy Research & Michael Jantzi, Chief Executive Officer, Morningstar, Inc., to Vanessa Countryman, Secretary, Securities and Exchange Commission (Jan. 13, 2021)..................................................................................................7, 8

Letter from Dev. Stahlkopf, Corporate VP, General Counsel and Secretary, Microsoft Corporation to Vanessa Countryman, Secretary, Securities and Exchange Commission (Jan. 4, 2021) .......................16

Letter from Jeff Ray, Chief Executive Officer, Brightcove, to Vanessa Countryman, Secretary, Securities and Exchange Commission (Dec. 23, 2020) ......................................................................................................9

Letter from John A. Zecca, Executive Vice President, Chief Legal Officer, and Chief Regulatory Officer, Nasdaq, to Vanessa A. Countryman, Secretary, Securities and Exchange Commission (Feb. 26, 2021)...................................................................................................11

Letter from Rachel Stern, Executive Vice President, Chief Legal Officer and Global Head of Strategic Resources, FactSet Research Systems, Inc., to Vanessa Countryman, Secretary, Securities and Exchange Commission (Dec. 22, 2020) ...........................................................4, 5

McKinsey & Company, *Diversity Matters Even More* (Nov. 2023).........................6

Nasdaq, *Initial Listing Guide* (Jan. 2024)................................................................15

Nasdaq, *Nasdaq's Board Diversity Rule: What Companies Should Know* (Feb. 28, 2023) ..........................................................................................15

Nasdaq, The Nasdaq Center for Board Excellence, *Advancing Boardroom Diversity: A Guide to Resources and Partners* (2022) ...................18

Nasdaq Rule

5605(f)(1) ........................................................................................................7

5605(f)(2)(A) ................................................................................................10

5605(f)(2)(B)(ii).............................................................................................17

5605(f)(2)(C).................................................................................................17

5605(f)(2)(D) ...............................................................................15, 16, 17

5605(f)(3).......................................................................................................11

5605(f)(6)(B)..................................................................................................16

5605(f)(7)(A) .................................................................................................15

5605(f)(7)(B)..................................................................................................15

5605(f)(7)(C)..................................................................................................15

5606(a) ............................................................................................................7

5606(b)............................................................................................................11

State Street Global Advisors, *Guidance on Diversity Disclosures and
Practices* (Jan. 2022) ..............................................................................4

Stieghorst, Tom, *Norwegian Cruise Line Holdings Leaving Nasdaq
for NYSE*, TRAVEL WEEKLY (Dec. 8, 2017) ........................................18

Synaptogenix, Inc., Schedule 14A (Nov. 13, 2023) .................................12

Thomas, Jason M. & Megan Starr, The Carlyle Group, *Global
Insights: From Impact Investing to Investing for Impact* (Feb.
2020) ...........................................................................................................6

Topships, Ex. 99.1 to 6-K (Oct. 31, 2023)..................................................13

Vanguard, *Investment Stewardship 2020 Annual Report* (2023) ...............................4

Wallace, Danielle, *Vivek Ramaswamy rips BlackRock, State Street
and Vanguard as "the most powerful cartel in human history* FOX
BUSINESS (Aug. 21, 2023) .....................................................................4

Zynex, Inc., Schedule 14A (Mar. 30, 2023) ..............................................14

## INTEREST OF *AMICUS CURIAE*[1]

Amicus "*Ad Hoc* Coalition of Nasdaq-Listed Companies" is comprised of companies listed on the Nasdaq Stock Market and subject to the Board Diversity Disclosure Rule challenged in this case.  Members are all publicly traded, Nasdaq-listed companies of differing sizes in an array of industries.

Despite the differences among member companies, amicus supports the Rule as a commonsense measure that will ensure greater consistency and uniformity in companies' disclosures, to the benefit of investors and other stakeholders.  Given the Rule's flexible disclosure-based regime, amicus can attest that the compliance obligations have not been—and will not be—burdensome for its members or their peer Nasdaq-listed companies.  Amicus therefore offers this brief in support of Respondent and Intervenor Nasdaq, and asks this Court to uphold the Rule.

The following companies are members of amicus *Ad Hoc* Coalition of Nasdaq-Listed Companies:  2U, Inc., Airbnb, Inc., Brighthouse Financial, Inc., FactSet Research Systems Inc., Fossil Group, Inc., Henry Schein, Inc., Ideanomics, Inc., Intel Corporation, Lyft, Inc., Micron Technology, Inc., Microsoft Corporation, Morningstar, Inc., United Therapeutics Corporation.

---

[1]  Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), amicus states that no party's counsel has authored this brief in whole or in part, and that no party, party's counsel, or person (other than amicus, its members, and its counsel) have contributed money to fund the preparation or submission of this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Throughout these proceedings, Petitioners have persistently attempted to emphasize the alleged burdens that the Board Diversity Disclosure Rule imposes on Nasdaq-listed companies. But far from providing any evidence of actual harm, Petitioners have instead resorted to mischaracterizing the Rule as a "quota," invoking the specter of "compelled speech," and speculating that the disclosure-based Rule will result in "tremendous harms" to Nasdaq-listed companies.

Reason and experience prove otherwise. As the entities directly subject to— and which have been complying with—the Rule, amicus's members can attest from their own experience that the Rule imposes minimal burdens on Nasdaq-listed companies. At various levels, the Rule confers significant flexibility. For one, the Rule does *not* impose a diversity mandate or quota: companies are free to either have two diverse directors or simply explain why they do not. Next, the Rule neither prescribes what form a company's explanation must take nor compels any specific message. Indeed, companies complying with the Rule have adopted various forms of disclosures—most of which say nothing about their stances on the topic of board diversity and some expressly disagreeing with the premise that such diversity is a valuable goal that should be taken into account when selecting directors. Beyond that, the Rule provides additional flexibility and benefits—including generous phase-in periods for compliance and free assistance from a third-party recruiting

2

service if a company so desires.  As a result, there is no evidence that any companies have been delisted from Nasdaq for failure to comply with the Rule.

At bottom, despite Petitioners' sound and fury, this Court should be clear about what the Rule does and does not do.  Far from imposing a quota, compelling speech, or significantly burdening Nasdaq-listed companies, the Rule merely provides a baseline for reporting diversity statistics in the boardroom.  This modest rule alleviates investors' difficulty in finding uniform and consistent data on board diversity, and levels the playing field by providing stakeholders with the necessary information to make their own informed decisions.  The Rule offends no part of the Constitution and falls squarely within the bounds of the SEC's statutory authority.  This Court should uphold the Rule.

## ARGUMENT

## I.  THE RULE PROVIDES INVESTORS WITH A UNIFORM AND CONSISTENT WAY TO ACCESS MATERIAL INFORMATION

### A.  Many Investors Care About A Company's Approach To Board Diversity

It is undeniable that many investors are now "increasingly focused on diversity,"[2] with diversity data becoming a critical element of investors' broader

---

[2] Letter from Alfred P. Poor, Chief Executive Officer, Ideanomics, Inc., to Vanessa Countryman, Secretary, Securities and Exchange Commission at 3 (Dec. 28, 2020) (hereinafter "Ideanomics Comment Letter"), https://www.sec.gov/comments/sr-nasdaq-2020-081/srnasdaq2020081-8186015-227181.pdf.

considerations when making investment decisions.[3]  This trend cannot be dismissed as fringe.  *Contra* Center Supp. Br. 26-27 (Dkt. No. 364); Alliance Supp. Br. 54-57 (Dkt. No. 365).    Instead, as even critics have acknowledged, "the largest shareholders of nearly every major public company" have expressed an interest in board diversity.[4]  Vanguard and State Street, for example, have both announced that they expect companies to disclose and make progress on the diversity makeup of their boards.[5]  As part of its "Global Principles," BlackRock similarly states that it is "interested in diversity in the board room" and "ask[s] boards to disclose how diversity is considered in board composition."[6]  Prominent proxy advisory firms

---

[3] *Id.*; Letter from Rachel Stern, Executive Vice President, Chief Legal Officer and Global Head of Strategic Resources, FactSet Research Systems, Inc., to Vanessa Countryman, Secretary, Securities and Exchange Commission (Dec. 22, 2020) (hereinafter "FactSet Research Systems Comment Letter"), https://www.sec.gov /comments/sr-nasdaq-2020-081/srnasdaq2020081-8177996-227049.pdf.

[4] Danielle Wallace, *Vivek Ramaswamy rips BlackRock, State Street and Vanguard as "the most powerful cartel in human history"*, FOX BUSINESS  (Aug. 21, 2023), https://www.foxbusiness.com/politics/vivek-ramaswamy-rips-blackrock-state-street-vanguard-most-powerful-cartel-human-history.

[5] Vanguard, *Investment Stewardship 2020 Annual Report* 25 (2023), https://corporate.vanguard.com/content/dam/corp/advocate/investment-stewardship/pdf/policies-and-reports/investment_stewardship_2023_annual_report.pdf;    State    Street    Global Advisors, *Guidance on Diversity Disclosures and Practices* (Jan. 2022), https://www.ssga.com/library-content/pdfs/asset-stewardship/racial-diversity-guidance-article.pdf.

[6] BlackRock Investment Stewardship, *Global Principles* 7-8 (Jan. 2024), https://www.blackrock.com/corporate/literature/fact-sheet/blk-responsible-investment-engprinciples-global.pdf; *see also* ISS Governance, *2020 Global Benchmark Policy Survey, Summary of Results* 6, 18 (Sept. 24, 2020) (survey of 151

such as Glass Lewis and Institutional Shareholder Services—who specialize in providing institutional investors with research and data to make informed voting decisions—have also recommended that investors account for board diversity when voting on management and shareholder proxy proposals.[7]

Crucially, investors now consider board diversity not just a social good but also a financial imperative: "What was once viewed as data that might help investors align their investments with their values is now viewed as fundamental data for assessing the overall viability of any investment."[8] These investors' reasonable beliefs have been informed by experience and data. As told by one investor: "The most common corporate governance weaknesses we find at the underperforming companies we invest in are issues with the composition of their boards. Many of these companies have a board comprised of a homogeneous group of directors."[9] A

---

investors found that sixty-one percent agreed that corporate boards need to "include[] directors drawn from racial and ethnic minority groups"), https://www.issgovernance.com/wp-content/uploads/publications/2020-iss-policy-survey-results-report-1.pdf.

[7] Glass Lewis, *2024 Benchmark Policy Guidelines* 42-43 (2023), https://www.glasslewis.com/wp-content/uploads/2023/11/2024-US-Benchmark-Policy-Guidelines-Glass-Lewis.pdf; Institutional Shareholder Services, *United States Proxy, Voting Guidelines, Benchmark Policy Recommendations,* 12-13 (Jan. 2024), https://www.issgovernance.com/file/policy/active/americas/US-Voting-Guidelines.pdf?v=1.

[8] FactSet Research Systems Comment Letter, *supra* note 3, at 1.

[9] Jared Landaw, Barington Capital Group LP, *Maximizing the Benefits of Board Diversity: Lessons Learned from Activist Investing*, Harvard Law School Forum on Corporate Governance (July 14, 2020), https://corpgov.law.harvard.edu/

2020 study by the Carlyle Group, for example, found that its portfolio companies with diverse boards had weighted average earnings growth of 9.8 percent, compared with 4.8 percent for companies with a lack of board diversity.[10]  In a 2023 report that was based on its "largest data set yet[,] spanning 1,265 companies, 23 countries, and six global regions," McKinsey Company similarly found that the "business case" for both gender and ethnic diversity remains strong, with a "39 percent increased" correlation with overperformance for companies in the top-quartile of diverse representation as compared to those in the bottom quartile.[11]

### B.     The Rule Provides Investors With A Consistent Way Of Accessing This Information

While reasonable disagreement may exist on whether greater board diversity has tangible effects on a company's financial performance, it is nevertheless clear that many investors want to know where companies stand on corporate diversity. Access to such information allows those investors to make informed investment

---

2020/07/14/maximizing-the-benefits-of-board-diversity-lessons-learned-from-activist-investing/.

[10] Jason M. Thomas & Megan Starr, The Carlyle Group, *Global Insights: From Impact Investing to Investing for Impact* 5 (Feb. 2020), https://www.carlyle.com/sites/default/files/2020-02/From%20Impact%20Investing%20to%20Investing%20for%20Impact_022420.pdf.    Carlyle defined diverse boards as those with two or more members identifying as female, Black, Hispanic, or Asian. *Id.*

[11] McKinsey & Company, *Diversity Matters Even More* 4 (Nov. 2023), https://www.mckinsey.com/~/media/mckinsey/featured%20insights/diversity%20and%20inclusion/diversity%20matters%20even%20more%20the%20case%20for%20holistic%20impact/diversity-matters-even-more.pdf?shouldIndex=false.

decisions. Yet, despite strong and growing investor interest in such information, reporting—at least prior to the Rule—had been sporadic at best.

Prior to the Rule, existing disclosures "provide[d] little actionable or decision-useful information for investors. *** [W]hile companies kn[e]w investors want information on board diversity, they ha[d] little guidance on how to disclose it in a consistent fashion, nor incentive to disclose more than their peers do."[12] Investors therefore could not compare statistics among companies easily, with smaller investors especially harmed by a lack of resources to comprehensively gather and analyze diversity data. *See* Center Record Excerpts (Dkt. No. 120), Ex. 1 at 12.

The Rule remedied that problem by defining diversity for reporting purposes and requiring disclosure in a consistent and easy-to-understand manner. For one, the Rule defines a "[d]iverse" individual as one who "self-identifies in one or more of the following categories: Female, Underrepresented Minority, or LGBTQ+," and provides specific definitions of these terms. Nasdaq Rule 5605(f)(1). The Rule additionally requires companies to "annually disclose *** information on each director's voluntary self-identified characteristics" via a prescribed "Board Diversity Matrix" or in a "substantially similar format." Nasdaq Rule 5606(a).

---

[12] Letter from Aron Szapiro, Head of Policy Research & Michael Jantzi, Chief Executive Officer, Morningstar, Inc., to Vanessa Countryman, Secretary, Securities and Exchange Commission at 1 (Jan. 13, 2021) (hereinafter "Morningstar Comment letter"), https://www.sec.gov/comments/sr-nasdaq-2020-081/srnasdaq2020081-8262444-227960.pdf.

As the Commission found, prescribing such a baseline disclosure framework "provide[s] widely available, consistent, and comparable information that would contribute to investors' investment and voting decisions."  Center Record Excerpts, Ex. 1 at 12.  Even if companies are motivated to disclose board diversity data on their own, the Rule solves discrepancies in the form and content of such disclosures so that investors can more readily compare data across companies.

For example, the Rule's definitions of "diverse" and underrepresented groups echo the categories companies already use to report workforce diversity to the Equal Employment Opportunity Commission (EEOC).  Center Record Excerpts, Ex. 1 at 15-16.  Amicus member Ideanomics, for one, "believe[s] it is appropriate for Nasdaq to base its definition of diversity on the [EEOC] reporting categories.  We are already familiar with these categories and do not find this disclosure burdensome."[13]  Amicus member Morningstar similarly "believe[s] anchoring the disclosures on the Equal Employment Opportunity Commission definitions is sensible, as most companies are familiar with those categorizations.  No diversity framework will be perfect, but the framework Nasdaq proposes will add important consistency and comparability."[14]

---

[13] Ideanomics Comment Letter, *supra* note 2, at 4.

[14] Morningstar Comment Letter, *supra* note 12, at 2.

By providing an accessible template for board diversity information—in the form of a board diversity matrix—the Rule "also mitigate[s] any concerns regarding unequal access to information that may currently exist between certain (likely larger and more resourceful) investors who could obtain the information and other (likely smaller) investors who may not be able to do so." Center Record Excerpts, Ex. 1 at 12. The Rule is thus "mutually beneficial for both the investor community and the company as there [is now] a consistent and uniform way to evaluate and interpret a company's performance on diversity."[15]  It is therefore no surprise that both institutional investors and individual investors submitted comments supporting the new rules. Center Record Excerpts, Ex. 1 at 12-13 n.92 (collecting comments).

## II.  THE RULE ACHIEVES THIS GOAL WITHOUT IMPOSING SIGNIFICANT BURDENS ON NASDAQ-LISTED COMPANIES

While offering the benefits of consistency and fairness, the disclosure-based Rule imposes little burden on Nasdaq-listed companies. Three points—all clear from the face of the Rule and confirmed by the experience of amicus's member companies—warrant emphasis: *First*, the Rule cannot be credibly characterized as

---

[15] Ideanomics Comment Letter, *supra* note 2, at 3; *see also* Letter from Jeff Ray, Chief Executive Officer, Brightcove, to Vanessa Countryman, Secretary, Securities and Exchange Commission (Dec. 23, 2020) ("Investors need the transparency in board diversity data that is central to this initiative, and we have no doubt that providing the required disclosures will not be burdensome for Brightcove in any way."), https://www.sec.gov/comments/sr-nasdaq-2020-081/srnasdaq 2020081-8180171-227078.htm.

a "quota," given that companies remain entirely free *not* to place any diverse directors on their boards. *Second*, the requirement that a company explain a lack of diverse directors is neither burdensome nor does it compel any company to publish any specific message. *Third*, additional flexibility and benefits built into the rule further minimize any conceivable "burden" to Nasdaq-listed companies.

### A.    The Rule Neither Imposes A Quota Nor Compels Speech

Despite Petitioners' persistent (mis-)characterizations, the Rule cannot be credibly characterized as a "quota" or "mandate." *See, e.g.*, Alliance Supp. Br. 8, 11, 12, 16, 20, Center Supp. Br. 1, 2, 6, 20, 21, 22, 32, 34. That is because the Rule (even putting aside any exemptions, discussed *infra* at 16-17) allows Nasdaq-listed companies two options:  either have two board members who meet the Rule's definition of diverse or simply explain why it does not have two such members. Nasdaq Rule 5605(f)(2)(A).    Indeed, as practice has demonstrated, numerous Nasdaq-listed companies have elected to comply with the Rule by providing the necessary explanation for a lack of diverse directors.

Faced with the fact that the Rule imposes no enforceable quota or mandate, Petitioners instead retreat to asserting that the requirement of an explanation is itself burdensome—both because it "compel[s] the disclosure of controversial information," Alliance Supp. Br. 27, and because it triggers "tremendous harms" in the form of "negative media," "social-activist campaigns and shareholder lawsuits,"

10

Alliance Supp. Br. 12-13, 20, 68, and "significant financial costs in preparing" the

necessary disclosures," Center Supp. Br. 35.

Again, a fair reading of the Rule and real-world experience prove otherwise.

For one, nothing on the face of the Rule requires Nasdaq-listed companies to publish

any particular message, let alone a message that they disagree with. Instead, in

explaining an absence of diverse directors, a "company can choose to disclose as

much, or as little, insight into the company's circumstances or diversity philosophy

as the company determines."[16] Further, Nasdaq has made clear that it "will not

evaluate the substance or merits of the company's explanation."[17] The Rule

additionally provides multiple venues where companies may disclose their

explanations and diversity statistics, including on the company website. Nasdaq

Rule 5605(f)(3); *id.* 5606(b). And if companies choose to disclose on their website,

there is no specific place on their website where the disclosure must exist—it is up

to the company to decide.[18]

---

[16] Letter from John A. Zecca, Executive Vice President, Chief Legal Officer, and Chief Regulatory Officer, Nasdaq, to Vanessa A. Countryman, Secretary, Securities and Exchange Commission, at 8 (Feb. 26, 2021), https://www.sec.gov/comments/sr-nasdaq-2020-081/srnasdaq2020081-8425992-229601.pdf.

[17] Amendment No. 1 to the Board Diversity Proposal, at 74 (hereinafter "Amend. 1"), File No. SR-NASDAQ-2020-081 (Feb. 26, 2021).

[18] Amend. 1, *supra* note 17, at 275.

It is thus no surprise that, in practice, Nasdaq-listed companies have had no problem complying with the Rule. For instance, some companies have succinctly explained that they have yet to meet the diversity objectives of the Rule because doing so is not "feasible" given the company's "circumstances,"[19] or appropriate given "current and anticipated needs."[20] Others have simply explained that they have "not yet identified a suitable candidate."[21] There is no credible argument that making such a straightforward disclosure imposes any material burden, financial or otherwise, on Nasdaq-listed companies. This is especially true since these companies already operate under a regulatory framework that requires other disclosures to both their investors and the Commission.[22]

---

[19] Synaptogenix, Inc., Schedule 14A, at 11 (Nov. 13, 2023), https://app.quotemedia.com/data/downloadFiling?webmasterId=102213&ref=3178 61998&type=PDF&symbol=SNPX&cdn=41a1f64b967ffa3b23e1d5ff6d8d4b4a&c ompanyName=Synaptogenix+Inc.&formType=DEF+14A&formDescription=Othe r+definitive+proxy+statements&dateFiled=2023-11-13.

[20] Golden Ocean Group Limited, Form 20-F, at 65 (Mar. 16, 2023), https://portalvhds1fxb0jchzgjph.blob.core.windows.net/press-releases-attachments/1500698/Annual%20and%20transition%20report%20of%20foreign% 20private%20issuers%20%5BSections%2013%20or%2015%28d%29%5D.pdf.

[21] *See, e.g.*, Bit Origin Limited, Board Diversity Matrix (Nov. 16, 2023), https://bitorigin.io/pdf/BTOG_Board_Diversity_Matrix_2023.pdf; Ascent Industries Co., *Board Diversity* (Oct. 31, 2023), https://ir.ascentco.com/corporate-governance/board-diversity.

[22] *See, e.g.*, Ideanomics Comment Letter, *supra* note 2, at 3 (noting that directors "are already requited by securities laws to disclose certain other personal information including age and compensation").

Underscoring the lack of any "compelled speech," numerous companies have issued explanatory statements that expressly dispute the premise that they *should* account for diversity in selecting their directors.   For example, Nasdaq-listed companies have explained their lack of diverse directors on the following grounds: (1) that they are committed to a merits-only director selection process "regardless of any other factors such as sex, gender, gender expression, race, color, creed, age, disability, sexual orientation, nationality, national origin, ethnic[ity], language and religion,"[23] (2) that they "do[] not believe the qualifications of an individual to serve on our board should be defined by any one diversity characteristic,"[24] and (3) that they "d[o] not believe that it is appropriate to select nominees through mechanical application of specified criteria." [25]

Other companies have stated an agreement with the general value of board diversity, but have explained that their approach takes into account a broader range

---

[23]    Topships,    Ex.    99.1    to    6-K    (Oct.    31,    2023), https://www.sec.gov/Archives/edgar/data/1296484/000114036123050516/ef20013 741_ex99-1.htm; Euroseas Ltd, Board Diversity Matrix (Dec. 22, 2023); http://www.euroseas.gr/files/Board_Diversity_Matrix122123.pdf.

[24] CorVel Corpo, *Board of Directors Diversity*, https://www.corvel.com/company/investors/#filings (last visited Apr. 24, 2024).

[25] Grom Social Enterprises Inc., Schedule 14A , at 10 (July 10, 2023), https://app.quotemedia.com/data/downloadFiling?webmasterId=102691&ref=3176 13397&type=PDF&symbol=GROM&cdn=efc519436f1aaf7490fde6c37b61a9bc& companyName=Grom+Social+Enterprises+Inc.&formType=DEF+14A&formDesc ription=Other+definitive+proxy+statements&dateFiled=2023-07-10.

of diverse traits than what is recognized by the Rule, such as "a diversity of experience, professions, viewpoints, skills, and backgrounds." [26]

The varied nature of these explanations, both in tone and content, put to rest Petitioners' concerns that the Rule is either intended to or would have the effect of coercing companies into parroting a single message about the value of board diversity. Instead, as actual experience has shown, Nasdaq-listed companies remain entirely free to provide whatever explanation they desire—including ones that (like Petitioners) challenge certain premises behind the Rule.

Given the ability of companies to provide an explanation it believes best represents their values and philosophy, the explanation option also helps quell, not encourage, the kinds of "negative media *** campaigns [or] shareholder lawsuits" that Petitioners warn of. Alliance Supp. Br. 13. Under the Rule's December 31, 2023 disclosure deadline, Nasdaq-listed companies have already published their explanations—with many companies having done so far earlier. Nevertheless,

---

[26] Zynex, Inc., Schedule 14A, at 12 (Mar. 30, 2023), https://www.sec.gov/Archives/edgar/data/846475/000110465922041836/tm221116 1d1_def14a.htm; *see also* Bogota Financial Corp., Board Diversity Matrix (June 30, 2023) ("The Bank defines diversity more broadly and with different criteria than NASDAQ by considering national origin, different underrepresented group affiliations and how they identify. The company believes this diversity allows for the selection of the best individual(s) to provide a wide range of experience that benefits the board."), https://www.bogotasavingsbank.com/ContentDocumentHandler.ashx?documentId= 74582.

14

Petitioners conspicuously provide zero evidence that Nasdaq-listed companies have faced a public backlash because of the Rule's disclosure elements.

### B. Additional Flexibility Under The Rule Minimizes Any Burden

Beyond the lack of any real burden or compulsion, other aspects of the Rule further minimize any costs or burdens associated with compliance.

Phase-in Period. First, the Rule was designed, and continues, to provide generous phase-in periods, with different timing rules based on market tier.[27] All companies were given two years to have one diverse director or explain why they do not. Nasdaq Rule 5605(f)(7)(A). Companies listed on The Nasdaq Global Select Market or The Nasdaq Global Market have four years to add a second diverse director, if they so choose. *Id.* 5605(f)(7)(B). Companies listed on The Nasdaq Capital Market—Nasdaq's lowest tier—have five years to do so. *Id.* 5605(f)(7)(C). And the second diverse director objective does not apply at all to boards with five or fewer directors. *Id.* 5605(f)(2)(D).[28] The Rule's tiered approach further accounts

---

[27] Nasdaq has three market tiers: The Nasdaq Global Select Market, The Nasdaq Global Market, and The Nasdaq Capital Market. Applicants must satisfy certain financial, liquidity, and corporate governance requirements to join any of these markets. Those requirements are most stringent for the Nasdaq Global Select Market, with the Nasdaq Global Market being less stringent and the Nasdaq Capital Market least so. *See* Nasdaq, *Initial Listing Guide* 5 (Jan. 2024), https://listingcenter.nasdaq.com/assets/initialguide.pdf.

[28] *See* Nasdaq, *Nasdaq's Board Diversity Rule: What Companies Should Know* 1 (Feb. 28, 2023), https://listingcenter.nasdaq.com/assets/Board%20Diversity%20Disclosure%20Five%20Things.pdf.

for companies that are smaller or have fewer resources. Center Record Excerpts, Ex. 1 at 16 n.142. On top of that, the Rule provides a one-year grace period for companies that have previously satisfied the Rule but no longer do so because of a board vacancy. Nasdaq Rule 5605(f)(6)(B).

The real-world evidence shows that Nasdaq-listed companies have had—and should have—no trouble following the Rule under the relevant timelines. Amicus member Ideanomics, for example, had not met the Rule's diversity goals at the time the Rule was adopted, but nevertheless supported the Rule given a belief "that Nasdaq's phased approach provides us with sufficient time to attract, screen, and recruit suitable applicants."[29] Indeed, Ideanomics has now achieved the Rule's diversity objectives under Nasdaq Rule 5605(f)(2)(D). Amicus member Microsoft, whose board already reflects the Rule's diversity objective, similarly attests "that Nasdaq's proposed phase-in period of two to five years is reasonable for companies who will need to make changes in the composition of their boards."[30]

Foreign and Small Companies. The Rule further accommodates foreign and small companies based on their specific situations. Companies that qualify as Foreign Issuers may elect to have two female directors rather than one who identifies

---

[29] Ideanomics Comment Letter, *supra* note 2, at 4.

[30] Letter from Dev. Stahlkopf, Corporate VP, General Counsel and Secretary, Microsoft Corporation to Vanessa Countryman, Secretary, Securities and Exchange Commission, at 2 (Jan. 4, 2021), https://www.sec.gov/comments/sr-nasdaq-2020-081/srnasdaq2020081-8204293-227454.pdf.

as female and one who identifies as an underrepresented minority or LGBTQ+. Nasdaq Rule 5605(f)(2)(B)(ii). This additional flexibility "recognizes that the unique demographic composition of the United States, and its historical marginalization of Underrepresented Minorities and the LGBTQ+ community, may not extend to all countries outside of the United States."[31]

Similarly, Smaller Reporting Companies need only have, or explain why they do not have, either two female directors or one female and one who identifies as an underrepresented minority or LGBTQ+. Nasdaq Rule 5605(f)(2)(C). Companies with boards of five or fewer members need only have one board member who meets the definition of diverse. *Id.* 5605(f)(2)(D). And the Rule exempts certain types of companies that have no board of directors, list only securities with no voting rights toward director elections, or do not function as operating companies. Center Record Excerpts, Ex. 1 at 16-17.

Free Board Recruiting Assistance. If companies do not already have two diverse directors, but desire to hire diverse directors, they need not incur additional costs associated with their talent search. Indeed, to the extent finding diverse candidates requires special resources, Nasdaq covers them. The Board Recruiting Service Proposal, which the Commission approved in the challenged order, offers companies that do not have two diverse directors one year of optional,

---

[31] Amend. 1, *supra* note 17, at 299.

17

complimentary access to a third-party board recruiting service that provides high-quality diverse candidates.  Center Record Excerpts, Ex. 1 at 19, 25-27.  Even companies that already have two diverse directors are offered ninety days of free access to the service.[32]

Availability of Other Exchanges.   Finally, despite all the flexibility the Rule affords, a company that wishes *neither* to meet the Rule's diversity objective *nor* offer any explanation for why it has not done so may instead choose to list on a different exchange.  Companies are not required to list on Nasdaq:  their agreement to list with Nasdaq is a matter of contract between two sophisticated businesses, and exchanges compete for listings.  Center Record Excerpts, Ex. 1 at 10.  Indeed, there are many historic examples of companies that have switched exchanges for any number of reasons.[33]

---

[32] Nasdaq, The Nasdaq Center for Board Excellence, *Advancing Boardroom Diversity: A Guide to Resources and Partners* 10 (2022), https://listingcenter.nasdaq.com/assets/Advancing%20 Boardroom%20Diversity.pdf.

[33] *See, e.g.*, Rich Duprey, *What PepsiCo's Move From NYSE to Nasdaq Means for Investors*, THE MOTLEY FOOL (Dec. 18, 2017), https://www.fool.com/ investing/2017/12/18/what-pepsicos-move-from-nyse-to-nasdaq-means-for-i.aspx; Tom Stieghorst, *Norwegian Cruise Line Holdings Leaving Nasdaq for NYSE*, TRAVEL WEEKLY (Dec. 8, 2017), https://www.travelweekly.com/Cruise-Travel/ Norwegian-Cruise-Line-Holdings-leaving-Nasdaq-for-NYSE;   William   Alden, *Oracle to Leave Nasdaq for the Big Board*, N.Y. TIMES (June 20, 2013), https://dealbook.nytimes.com/2013/06/20/oracle-to-leave-nasdaq-for-the-big-board/; *see also* Associated Press, *Kraft Foods to Switch Listing to Nasdaq From NYSE*, CNBC (June 8, 2012), https://www.cnbc.com/id/47735180; Tiffany Hsu, *Kraft Foods Jumps Ship from NYSE to Nasdaq*, L.A. TIMES (June 8, 2012),

Having said that, it bears emphasis that there is no evidence that any companies have been delisted from Nasdaq for failure to comply with the Rule—highlighting the lack of any real burdens associated with compliance. Instead, companies that have elected to stay within Nasdaq and operate under the Rule will now reap benefits of its consistent and uniform disclosure framework.

## CONCLUSION

For the foregoing reasons and those stated in the briefs of Respondent and Intervenor Nasdaq, this Court should deny the petitions for review.

Respectfully submitted,

*s/Pratik A. Shah*
Pratik A. Shah
Kerry E. Berchem
Zach ZhenHe Tan
AKIN GUMP STRAUSS HAUER
& FELD LLP

*Counsel for Amicus Curiae*

---

https://www.latimes.com/business/la-fi-mo-kraft-foods-nyse-nasdaq-20120608-story.html.

## CERTIFICATE OF SERVICE

I hereby certify that on April 30, 2024, I electronically filed the foregoing with the Clerk of the Court of the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the CM/ECF system.

*s/Pratik A. Shah*
Pratik A. Shah

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains 4,078 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it was prepared in a proportionally spaced typeface using Microsoft Word Version 2016, 14-point Times New Roman font.

*s/Pratik A. Shah*
Pratik A. Shah
