No. 21-60626

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

ALLIANCE FOR FAIR BOARD RECRUITMENT;
NATIONAL CENTER FOR PUBLIC POLICY RESEARCH,

*Petitioners*,

v.

SECURITIES AND EXCHANGE COMMISSION,

*Respondent*.

On Petition for Review of an Order of the
Securities and Exchange Commission

**BRIEF OF BETTER MARKETS, INC., AS *AMICUS CURIAE*
IN SUPPORT OF RESPONDENT AND DENYING THE PETITION FOR
REVIEW**

JOHN PAUL SCHNAPPER-CASTERAS
  *COUNSEL OF RECORD*
SCHNAPPER-CASTERAS PLLC
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 630-3644
jpsc@schnappercasteras.com
*Counsel for Amicus Curiae*

## SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS

### No. 21-60626, Alliance for Fair Board Recruitment et al. v.  SEC

The undersigned counsel of record certifies that, in addition to the persons and entities listed in the parties' briefs, the following additional persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case.  These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

Amicus curiae Better Markets, Inc., ("Better Markets") is a non-profit organization founded to promote the public interest in the financial markets.  It advocates for greater transparency, accountability, and oversight in the financial system.  Better Markets has no parent corporation and no publicly held corporation owns 10% or more of its stock.

Better Markets is represented by John Paul Schnapper-Casteras of Schnapper-Casteras PLLC, 1717 K Street NW, Suite 900, Washington, DC 20006.

*/s/ John Paul Schnapper-Casteras*
John Paul Schnapper-Casteras
Counsel for Better Markets

i

# TABLE OF CONTENTS

**Page**

SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS......................... i

TABLE OF AUTHORITIES .................................................................... iv

STATEMENT OF INTEREST OF *AMICUS CURIAE*............................................1

SUMMARY OF ARGUMENT ..................................................................3

ARGUMENT ........................................................................................4

I.   The rule provides investors with important information and does not impose a quota or pressure companies to recruit diverse directors...................................4

   A. Investors need information about the diversity of corporate boards to make important investment decisions, especially in light of the risks that non-diverse boards pose. .......................................................................................5

   B. Although the SEC is not limited to the disclosure of "material" information, board diversity disclosures clearly meet that test, regardless of whether the correlation between board diversity and financial performance is deemed conclusive.....................................................................................8

   C. The Rule does not impose a diversity quota. ..............................................15

II.  The Rule does not compel speech in violation of the First Amendment. ........18

   A. Disclosure is the lifeblood of securities regulation and suppressing it via the First Amendment will harm investors and the markets. .......................18

   B. The Court should, at most, treat the disclosures as compelled commercial speech and evaluate them accordingly.......................................................19

   C. The Rule survives scrutiny under the First Amendment because it involves purely factual and uncontroversial information that is reasonably related to a substantial government interest. ..............................................................21

III.  The Rule does not impose an unnecessary or inappropriate burden on competition. ........................................................................................................25

    A.  The SEC need not conduct a cost-benefit analysis to find that the Rule does not impose an unnecessary or inappropriate burden on competition..........25

    B.  The Rule has substantial benefits for investors. ..........................................27

CONCLUSION .......................................................................................................28

CERTIFICATE OF COMPLIANCE ........................................................................29

CERTIFICATE OF SERVICE .................................................................................30

# TABLE OF AUTHORITIES

**Page**

## Cases

*Chamber of Commerce v. SEC*, 85 F.4th 760 (5th Cir. 2023).................................24

*CTIA-The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832 (9th Cir. 2019)..........22

*Express Oil Change, LLC v. Miss. Bd. of Licensure for Prof'l Eng'rs & Surveyors*,
    916 F.3d 483 (5th Cir. 2019) ................................................................................20

*Intercontinental Indus., Inc. v. Am. Stock Exchange*,
    452 F.2d 935 (5th Cir. 1971) ...............................................................................18

*MD/DC/DE Broadcasters Association v. FCC*,
    236 F.3d 13 (D.C. Cir. 2001)......................................................................... 16, 17

*Nat'l Elec. Mfrs. Ass' v. Sorrell*, 272 F.3d 104 (2d Cir. 2001).......................... 20, 21

*Nat'l Inst. of Family and Life Advocates v. Becerra*,
    138 S. Ct. 2361 (2018)................................................................................... 21, 22

*NetChoice, LLC v. Paxton*, 49 F.4th 439 (5th Cir. 2022).........................................24

*Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294 (1st Cir. 2005)..........................21

*R.J. Reynolds Tobacco Co. v. FDA*, 96 F.4th 863 (5th Cir. 2024) ................... 23, 24

*Riley v. Nat'l Fed. of the Blind of N.C., Inc.*, 487 U.S. 781 (1988).................. 19, 20

*SEC v. Mayhew*, 121 F.3d 44 (2d Cir. 1997)................................................. 9, 10, 12

*SEC v. Texas Gulf Sulpher Co.*, 401 F.2d 833 (2d Cir. 1968).......................... 10, 12

*SEC v. World Tree Financial, LLC*, 43 F.4th 448 (5th Cir. 2022) ............................8

*Tcherepnin v. Knight*, 389 U.S. 332 (1967)..............................................................5

*TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438 (1976)..........................................9

*Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991) ...............................22

*Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*,
    471 U.S. 626 (1985)...................................................................................... 20, 22

**Rules**

Fed. R. App. P. 29(c)(5)..............................................................................................1

**Other Authorities**

Akshaya Kamalnath, *Strengthening Corporate Boards Through Diversity: A Two-
    Sided Market That Can Be Effectively Serviced By Intermediaries*,
    40 MINN. J.L. & INEQ. 155 (2022) .........................................................................13

Atinuke O. Adediran, *Disclosing Corporate Diversity*,
    109 VA. L. REV. 307 (2023)..................................................................... 14, 15, 17

Better Markets, *Setting the Record Straight on Cost-Benefit Analysis and Financial
    Reform at the SEC* (July 30, 2012) ................................................................ 26, 27

Cindy A. Schipani et al., *Women in Power: Clearing Pathways for Women to Rise
    to Positions of Organizational Leadership*, 26 U. PA. J. BUS. L. 138 (2023).......13

Cindy A. Schipani, *Improving Board Decisions: The Promise of Diversity*,
    39 MINN. J.L. & INEQ. 295 (2021) .........................................................................11

Hillary A. Sale, *Disclosure's Purpose*, 107 GEO. L.J. 1045 (2019)........................18

Ido Baum et al., *Gender and Corporate Crime: Do Women on the Board of
    Directors Reduce Corporate Bad Behavior?* 29 MICH. J. GENDER & L. 291
    (2022)......................................................................................................................7

Jill E. Fisch, *Promoting Corporate Diversity: The Uncertain Role of Institutional
    Investors*, U. PA. CAREY L. SCH. INST. FOR L. & ECON., Working Paper No. 23-11
    (2022)......................................................................................................................6

Jill Fisch, *Promoting Corporate Diversity: The Uncertain Role of Institutional
    Investors*, 46 SEATTLE U. L. REV. 367 (2023) ......................................................11

Joseph W. Yockey, *The Fiduciary Duty of Dissent*, 69 VILL. L. REV. 157 (2024)...6

*Order Approving Proposed Rule Changes, as Modified by Amendment No. 1, To
    Adopt Listing Rules Related to Board Diversity and To Offer Certain Listed*

*Companies Access to a Complimentary Board Recruiting Service*, 86 Fed. Reg. 44,424 (Aug. 12, 2021) ................................................................................. passim

Paul G. Mahoney, *Equity Market Structure Regulation:  Time to Start Over*, 10 MICH. BUS. & ENTREPRENEURIAL L. REV. 1 (2020) .........................................25

Richard W. Painter, *Board Diversity:  A Response to Professor Fried*, 27 STAN. J.L. BUS. & FIN. 173 (2022)........................................................... passim

S. Rep. No. 94-75 (1975) .................................................................................. 26, 27

## STATEMENT OF INTEREST OF *AMICUS CURIAE*

**Better Markets, Inc. ("Better Markets")** is a nonprofit, nonpartisan organization that promotes the public interest in the financial markets through participation in the rulemaking process at the financial regulatory agencies, Congressional testimony, *amicus curiae* briefs, independent research, and public advocacy.[1]  It advocates for reforms that stabilize our financial system, prevent financial crises, and protect investors and consumers from fraud and abuse.  Its goals include strong investor protections and disclosure requirements to ensure that our securities markets foster fair, transparent, and efficient capital formation.

Better Markets has a strong interest in this case because petitioners seek to invalidate the SEC's approval of an important disclosure rule ("Rule") that serves the interests of investors and promotes transparency in the securities markets.  *See Order Approving Proposed Rule Changes, as Modified by Amendment No. 1, To Adopt Listing Rules Related to Board Diversity and To Offer Certain Listed Companies Access to a Complimentary Board Recruiting Service*, 86 Fed. Reg. 44,424 (Aug. 12, 2021).  The Rule provides investors with information to facilitate their evaluation of companies in which they might invest by requiring that Nasdaq-listed companies disclose information regarding the diversity of their boards of

---

[1]    No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money to fund the preparation or submission of this brief; and no person—other than Better Markets, its members, or its counsel—contributed money to fund the preparation or submission of this brief.  FED. R. APP. P. 29(c)(5).

directors. *Id.* at 44,424. It also requires that listed companies either have at least two directors who qualify as "diverse" as defined in the Rule or simply disclose, in whatever manner they choose, why they do not have two such directors. *Id.*

Petitioners' central claim is that the SEC lacked the authority to approve the Rule because, they say, it furthers social policy goals rather than provides investors with material information. Neither this claim nor any of petitioners' other arguments predicated on the First Amendment or the Rule's effect on competition have merit. Most importantly, the SEC has broad authority to require the disclosure of information that helps investors make investment decisions and vote their proxies, and that is what the Rule does. It does not require that any company change the composition of its board of directors; it only requires companies to disclose information about their existing boards.

However, if accepted, petitioners' attempt to cast the Rule as somehow at odds with the purposes of the Securities Exchange Act of 1934 ("Exchange Act")—which was written above all to promote full and fair disclosure to investors—would strike a major blow against investor protection and transparency in the securities markets. It would not only deprive investors of the specific disclosures in the Rule that investors clearly want and need to inform their decisions but also substantially restrict the SEC's ability to adopt further disclosure rules, across a broad range of topics, that it deems necessary and appropriate for

the benefit of investors.    Better Markets therefore seeks to defend the SEC's approval of the Rule as well its authority more generally to establish appropriate disclosure requirements.

## SUMMARY OF ARGUMENT

The SEC had the authority to approve the Rule because the Rule does precisely what the securities laws were written and intended to accomplish: provide investors with information to facilitate their evaluation of companies in which they might invest.  That is one of the fundamental purposes of the securities laws.  A rule that requires companies to disclose information about the diversity of their boards and provide an explanation if they do not have at least two diverse board members protects investors by enabling them to make investment and voting decisions with a full understanding of the composition of a company's board. Some investors may consider a company's explanation for not having at least two diverse directors as a reason *to not invest* in the company.  Other investors may consider a company's explanation for not having at least two diverse directors as a reason *to invest* in the company.  Whatever course of action investors choose, there is no basis for setting aside a Rule that helps investors make investment decisions.

Nor does the First Amendment provide a basis for invalidating the Rule. Even if it were applicable here—and it is not—the Rule would be treated as compelled commercial speech.  The Rule thus survives scrutiny so long as it

compels factual and uncontroversial information. The Rule compels factual information because the diversity disclosures are all facts. The Rule compels uncontroversial information because a company's explanation for not having at least two diverse directors is not an inherent part of a national political debate.

Finally, the Rule does not impose an unnecessary or inappropriate burden on competition. Despite petitioners' argument that it does so because the costs of the rule outweigh the benefits, the SEC was not required to conduct a cost-benefit analysis. In any case, the Rule has substantial benefits that justify any costs.

## ARGUMENT

### I. The rule provides investors with important information and does not impose a quota or pressure companies to recruit diverse directors.

The information about board diversity required to be disclosed under the Rule is important to investors in many ways. For example, as the evidence suggests, board diversity has a correlation with the degree to which companies pursue strategies that contribute to market instability and financial crisis. In addition, as the evidence further suggests, board diversity may also enhance the financial performance of companies. Whether or not the evidence supporting these effects of board diversity is conclusive or air-tight is beside the point: These are issues that investors want to *consider* as they make investment and proxy voting decisions, and to do so, they need the reliable, consistent, and comparable information that the Rule supplies. Clearly, the information is important, and

indeed material, to investors. And the Rule serves these investor protection purposes through a pure disclosure requirement, not a quota.

> **A.**    **Investors need information about the diversity of corporate boards to make important investment decisions, especially in light of the risks that non-diverse boards pose.**

A rule that better equips investors to make investment decisions serves a primary goal of the Exchange Act. One of the central purposes of the Exchange Act is to "protect investors through the requirement of full disclosure by issuers of securities." *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967). A rule that requires companies to disclose information about the diversity of their boards and provide an explanation if they do not have at least two diverse board members protects investors by allowing them to make investment and voting decisions with a full understanding of the composition of a company's board—the primary body responsible for establishing corporate priorities and determining the success of the venture.

A prime example is the role of board diversity in relation to systemic risk. The SEC approved the Rule because it found that the Rule would "contribute to the maintenance of fair and orderly markets." 86 Fed. Reg. at 44,425. There is good reason to think that requiring companies to disclose information about the diversity of their boards will help investors judge whether their companies are likely to contribute to systemic instability and market turmoil. "Historically, systematic

failures in corporate governance have resulted in major economic downturns and massive negative impact on shareholder value," and a "phenomenon observed repeatedly in these economic calamities is extreme homogeneity among the corporate actors whose conduct precipitated economic crisis." Richard W. Painter, *Board Diversity: A Response to Professor Fried*, 27 STAN. J.L. BUS. & FIN. 173, 211 (2022). These events contributed to the view that corporations make better decisions when they consider "'a range of viewpoints,'" that "diverse groups with a variety of skills, experiences, and perspectives are more innovative and less susceptible to groupthink and confirmation bias," and that as a result the best way for corporations to hear different viewpoints "'is to give voice to different groups.'" Joseph W. Yockey, *The Fiduciary Duty of Dissent*, 69 VILL. L. REV. 157, 207 (2024) (quoting Jill E. Fisch, *Promoting Corporate Diversity: The Uncertain Role of Institutional Investors*, U. PA. CAREY L. SCH. INST. FOR L. & ECON., Working Paper No. 23-11, at 12 (2022)). So the importance of the information that the Rule requires is "based in part on our historical experience with non-diverse corporate boards, including two catastrophic economic collapses beginning in 1929 and in 2008 that can be blamed in part on corporate malfeasance that might have been prevented by more assertive board monitoring of managers' conduct and greater attention paid to psychological studies showing the value of diversity in group decision making." Painter, 27 STAN. J.L. BUS. & FIN. at 222.

6

Indeed, a historical context is crucial to understanding the importance of the Rule. "The 1929 market crash and banking collapse caused massive economic disruption, devastating investors in both equity and debt markets. At the largest corporations, boards of directors, corporate management, and corporate law firms were almost exclusively White, male, and Protestant. These were the people who made the decisions about corporate management, securities offerings, and corporate lending. Their decisions may have protected shareholder value in the 1920's but not so in the 1930's." Painter, 27 STAN. J.L. BUS. & FIN. at 211-12.

Unfortunately, and despite the passage of almost 80 years, a lack of board diversity remained a problem at the time of the 2008 financial crisis.

> What would have happened if there had been more women on corporate boards in 2008 is a counterfactual question. Christine Lagarde, currently President of the European Central Bank and former chairwoman of the International Monetary Fund, was serious when she remarked: "As I have said many times, if it had been a Lehman Sisters rather than Lehman Brothers, the world might well look a lot different today."

Painter, 27 STAN. J.L. BUS. & FIN. at 213-14. This "Lehman Sisters Hypothesis" argues that "a higher representation of women in U.S. boardrooms would have prevented the 2008 financial crisis." Ido Baum *et al.*, *Gender and Corporate Crime: Do Women on the Board of Directors Reduce Corporate Bad Behavior?* 29 MICH. J. GENDER & L. 291, 308 (2022). That greater board diversity would have prevented the 2008 financial crisis cannot be said with certainty. What can be

said with certainty is that both the 1929 crash and 2008 financial crisis coincided with a lack of diversity on corporate boards. The Rule gives investors information about the diversity of corporate boards so they can evaluate the risks themselves.

**B.**     **Although the SEC is not limited to the disclosure of "material" information, board diversity disclosures clearly meet that test, regardless of whether the correlation between board diversity and financial performance is deemed conclusive.**

Petitioners National Center for Public Policy Research ("NCPPR") and Alliance for Fair Board Recruitment ("AFBR") argue that the SEC may only compel disclosures of "material" information. *See, e.g.*, NCPPR Br. at 25. According to NCPPR, the requirement that companies have at least two diverse directors or provide an explanation why they do not constitutes "mandatory disclosure of decidedly *immaterial* information that falls outside the Exchange Act's purpose." NCPPR Br. at 26 (emphasis in original). However, as the panel made clear, the SEC is not limited to requiring disclosures of material information. And even assuming the Exchange Act authorized the disclosure of only "material" information, the information that the Rule requires to be disclosed is material.

"A statement is '"material" if there is a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest.'" *SEC v. World Tree Financial, LLC*, 43 F.4th 448, 459 (5th Cir. 2022) (citation omitted). "To be material, the information need not be such that a reasonable investor would necessarily change his investment decision based on the

information, as long as a reasonable investor would have viewed it as significantly altering the 'total mix' of information available." *SEC v. Mayhew*, 121 F.3d 44, 52 (2d Cir. 1997) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). There is a substantial likelihood that a reasonable investor would consider the Rule's required disclosures about board diversity important and as altering the "total mix" of information available given the "diverse collection of commenters who expressed interest in board diversity information." 86 Fed. Reg. at 44,430.

The information is material not because investors necessarily want to increase board diversity but because investors want to *know about* board diversity. As the SEC stated, "the proposed disclosures would contribute to investors' investment and voting decisions regardless of their views on whether board diversity is desirable or beneficial." 86 Fed. Reg. at 44,430-44,431. "For example, for investors who support board diversity, the proposed disclosures could inform their decision on issues related to corporate governance, including director elections, and company explanations as to why they do not meet the diversity objectives could better inform those investors as to the risks and costs of increased board diversity." *Id.* at 44,431. "And for investors who do not believe that having additional 'Diverse' directors would be beneficial for a company, the proposed disclosures could inform their decision to vote to preserve the existing board composition in a company." *Id.* So the information is material to both investors

who favor board diversity and those who do not; the Rule does not take sides in that debate but provides investors with information "'which may affect the desire of investors to buy, sell, or hold the company's securities.'" *Mayhew*, 121 F.3d at 52 (quoting *SEC v. Texas Gulf Sulpher Co.*, 401 F.2d 833, 849 (2d Cir. 1968) (en banc)).

Petitioners object to the conclusion that the Rule requires the disclosure of material information on several grounds, but none of their objections have merit.

1.    AFBR argues that the SEC's failure to find that diverse boards improve financial performance is "fatal." AFBR Br. at 56. This is wrong. It may be that "*[s]tatistical* evidence that board diversity increases or decreases stock prices is thin," but "there are other reasons to believe that board diversity increases long-term firm value." Painter, 27 STAN. J.L. BUS. & FIN. at 223 (emphasis added).

These reasons include "interviews with board members, management, and investors," and "relevant findings in management science, economics, and psychology," that all point "in the same direction: Board diversity is good for shareholders as well as for the economy and society as a whole." *Id.* at 176-77. Board diversity improves a company's "reputation, ability to market products and services to customers, recruiting of employees, regulatory compliance, relations with regulators and firm culture." *Id.* at 223. Studies also show that "diversity in multiple characteristics, such as 'age, nationality, gender, [and] racial diversity'

can all help increase innovation, encouraging the company to consider doing things differently." Cindy A. Schipani, *Improving Board Decisions:  The Promise of Diversity*, 39 MINN. J.L. & INEQ. 295, 307 (2021).  Despite these factors, it may be that studies do not show a link between diversity and financial performance due to "reverse causation": "diversity does not cause better firm performance; rather, diverse corporate leadership signals management quality, and it is the higher management quality that increases economic performance."  Jill Fisch, *Promoting Corporate Diversity:  The Uncertain Role of Institutional Investors*, 46 SEATTLE U. L. REV. 367, 378 (2023).  But this relationship between diversity and performance would still justify investors seeking greater information about corporate diversity and incorporating that information into their investment decisions.  *Id.*

For these reasons, there is "strong empirical evidence as well as strong legal arguments supporting the conclusion that boardroom diversity . . . has an impact on corporate operations and that this impact is in many instances positive for investors."  Painter, 27 STAN. J.L. BUS. & FIN. at 223.

> "This is more than sufficient reason for courts to uphold the SEC's approval of Nasdaq's rule requiring listed companies to disclose to investors information about reasons for a company being in the increasingly atypical situation where its board does not include at least two directors who are not straight White men.  Then the ball is in the investors' court.  They can decide what they think about the relationship between the disclosed information about board diversity and company profits."

*Id.* Regardless of studies linking board diversity to financial performance, the Rule requires the disclosure of material information because information about board diversity are facts "'which in reasonable and objective contemplation *might* affect the value of the corporation's stock or securities.'" *Mayhew*, 121 F.3d at 52 (quoting *Texas Gulf Sulpher*, 401 F.2d at 849) (emphasis in original).

2.    NCPPR attempts to distinguish between the "surface-characteristic diversity of the sort that would be mandated under" the Rule, which does not, in its view, enhance company performance, and the "viewpoint diversity" that it says "increases financial, governance, and other relevant performance." NCPPR Br. at 9. But this argument actually supports the Rule, since surface-characteristic diversity tends to increase viewpoint diversity. With respect to "viewpoint diversity," NCPPR finds it relevant that such diversity improves not just "financial" performance but "governance" and "other relevant performance" too. Yet one of purposes of the "surface-characteristic diversity" NCPPR impugns is to "bring into the group decision makers who . . . may sometimes actually have a different viewpoint." Painter, 27 STAN. J.L. BUS & FIN. at 215. And "increasing the variety of perspectives in decision making" by diversifying the corporation's board of directors "improves corporate governance." Akshaya Kamalnath, *Strengthening Corporate Boards Through Diversity: A Two-Sided Market That*

12

*Can Be Effectively Serviced By Intermediaries*, 40 MINN. J.L. & INEQ. 155, 156 (2022).

The potential for board diversity to reduce "groupthink" itself establishes the materiality of the information in the Rule. Groupthink is a "'mode of thinking that people engage in when they are deeply involved in a cohesive in-group, when the members' strivings for unanimity override their motivation to realistically appraise alternative courses of actions.'" Cindy A. Schipani et al., *Women in Power: Clearing Pathways for Women to Rise to Positions of Organizational Leadership*, 26 U. PA. J. BUS. L. 138, 144 (2023) (citation omitted). The "prevention of groupthink is significant because it can lead to serious errors on even the most competent boards." *Id.* "Board diversity is by no means the only solution to groupthink, but it probably can help, not only in introducing new viewpoints but in giving other directors practice conducting discussions with colleagues who have different viewpoints." Painter, 27 STAN. J.L. BUS & FIN. at 215. Indeed, studies find that "diversity is critical for reducing groupthink, innovation, and enhancing decision-making." Schipani, 26 U. PA. J. BUS. L. at 144 (citing studies).

As relevant here, the point is not that the diversity disclosures in the Rule will indubitably lead to improved corporate governance. The point is that the "surface-characteristic diversity" at issue in the Rule furthers the "viewpoint diversity" that NCPPR itself suggests is relevant to overall corporate performance.

13

For this reason, there should be no question that diversity disclosures are important, and also material, to investors making investment and voting decisions.

3.     AFBR argues that investor demand cannot render the diversity disclosures material because investor "'demand' for board diversity information is not related" to the goal of maximizing profits; instead, it "comes from their extraneous social goals." AFBR Br. at 56. AFBR bases this argument on the SEC's conclusion that studies into diversity and corporate financial performance are inconclusive. But this does not mean that investors' desire for the information in the Rule is due to extraneous social goals. As noted above, the SEC determined that the information would help investors make investment and voting decisions. Those are goals that are essential to investors.

Indeed, the Rule is designed to increase transparency rather than increase diversity on corporate boards. That is because the Rule "merely requires companies to explain why they lack diversity" and does not "actually increase board diversity." Atinuke O. Adediran, *Disclosing Corporate Diversity*, 109 VA. L. REV. 307, 348 (2023). The Rule does not require that any company modify the composition of its board in response to the Rule. It does require that companies explain why they do not have at least two diverse directors. Today, the lack of at least minimal board diversity is important to investors, and "[s]hareholders are entitled" to this information. Painter, 27 STAN. J.L. BUS & FIN. at 219. The Rule

"shows that disclosure is an end in and of itself rather than a means to a separate social or racial justice end."  Adediran, 109 VA. L. REV. at 349.

In other words, the Rule "is essentially a disclosure rule."  Painter, 27 STAN. J.L. BUS & FIN. at 219.  As with most disclosure rules, the Rule is designed to "help investors have all available information to determine investment decisions." Adediran, 109 VA. L. REV. at 349.  The goal of the Rule is not "to increase diversity"; it is "for companies to disclose some information to investors."  *Id.*  In this case, the Rule enables investors to gain a better understanding of the diversity of a company's board, which helps them make investment and voting decisions. 86 Fed. Reg. 44,425.  This shows that the goal is "transparency for investors and not to advance social justice."  Adediran, 109 VA. L. REV. at 349.

### C.    The Rule does not impose a diversity quota.

NCPPR argues that the rule is inconsistent with the Exchange Act's purposes because it pressures companies to recruit diverse directors.  NCPPR Br. at 20.  According to NCPPR, the requirement that companies either have at least two diverse directors or explain why they do not have at least two diverse directors establishes a quota for diverse directors and imposes a penalty for noncompliance by requiring companies that do not meet that quota to either apologize or be delisted.  *Id.* at 21.  So NCPPR argues that the problem with the Rule is not that it

"*mandates* hiring directors based on [diverse] characteristics" but that it "pressures or encourages companies to do so." *Id.* (emphasis in original).

The problem with this argument is that the rule does not pressure or encourage companies to do anything. Companies are free to recruit diverse or non-diverse directors, and if they do not have at least two diverse directors they must explain why not. Companies are free to provide whatever explanation they want; the explanation simply provides more relevant information to investors.

NCPPR attempts to analogize this case to *MD/DC/DE Broadcasters Association v. FCC*, 236 F.3d 13 (D.C. Cir. 2001). There, the D.C. Circuit found that a rule requiring regulated broadcasters to report "the race, sex, and source of referral for each applicant" created "pressure to focus recruiting efforts upon women and minorities in order to induce more applications from those groups." *Id.* at 19. NCPPR says that the Rule "is likewise designed to pressure companies to recruit directors based on their race, gender, and sexuality." NCPPR Br. at 21.

This argument ignores the reason why the D.C. Circuit found that the rule in *MD/DC/DE* exerted pressure on broadcasters to recruit applications from women and minorities. In that case, the rule provided that the FCC would *investigate* the broadcaster's recruitment efforts if it reported "'few or no' women and minorities in its applicant pool." 236 F.3d at 19. The D.C. Circuit found that "[i]nvestigation

16

by the licensing authority is a powerful threat, almost guaranteed to induce the desired conduct." *Id.*

Nothing of the sort is at issue here. The Rule does not threaten a Nasdaq or SEC investigation if a company does not have at least two diverse directors, or if the SEC does not like a company's explanation for not having at least two diverse directors, or indeed for any other reason. *See* Adediran, 109 VA. L. REV. at 348 (noting that the rule "expressly eschews any enforcement by the SEC because the SEC would not assess the substance or merits of a company's explanation"). The requirement that a company either have at least two diverse directors or explain why it does not is nothing like a rule requiring a company to either have at least two diverse directors or face an investigation if it does not.

No more persuasive is NCPPR's claim that the explanation requirement opens "companies up to unfair discrimination by investors and activists." NCPPR Br. at 34. The fact that investors may find a company's diversity explanation useful hardly means that the company will thereby suffer "unfair discrimination." Certainly, some investors may use the company's explanation to determine that they do not want to invest in that company. But some investors may believe that companies should not have diverse boards. Companies that do not have diverse boards may provide an explanation that resonates with these investors, and these investors may use the company's explanation to determine that they do want to

17

invest in that company. It is neither unfair nor discriminatory for the SEC to approve a rule that provides investors with material information to facilitate their investment decisions.

## II.   The Rule does not compel speech in violation of the First Amendment.

Petitioners argue that the Rule compels speech in violation of the First Amendment. As the SEC correctly argues, the First Amendment does not apply here because Nasdaq is not a state actor. But even assuming the First Amendment applies, the Rule survives First Amendment scrutiny.

### A.   Disclosure is the lifeblood of securities regulation and suppressing it via the First Amendment will harm investors and the markets.

Petitioners' argument that the Rule's required disclosures violate the First Amendment threatens the foundation of securities regulation in the United States. "The United States' approach to securities regulation focuses on disclosure and is not merits based." Hillary A. Sale, *Disclosure's Purpose*, 107 GEO. L.J. 1045, 1047 (2019). Disclosures provide investors with information so they may develop their own views as to the merits of a security. *Id.* As a result, the "requirement of full disclosure of all corporate information which might influence investment decisions is the very heart of the federal securities regulations." *Intercontinental Indus., Inc. v. Am. Stock Exchange*, 452 F.2d 935, 940 (5th Cir. 1971).

As discussed above, the purpose of the Rule is to provide investors with information to help their decision-making. The diversity disclosures and the

explanation for not having at least two diverse directors enable investors to gain a better understanding of the diversity of a company's board. Some investors may determine that a company's explanation for a lack of diversity is a reason not to invest in the company. Other investors may determine that a company's explanation for a lack of diversity is a reason to invest in the company. The Rule provides investors with the relevant information, and investors are left to decide for themselves what to do with the information. The disclosure of this information thus furthers the goal of the federal securities laws to require the disclosure of all corporate information which might influence investment decisions.

Petitioners claim that the First Amendment forbids requiring these disclosures. Accepting this argument would jeopardize the Commission's ability to require disclosures about all sorts of information that might influence investment decisions. For this reason, the Court should reject petitioners' argument.

## B.    The Court should, at most, treat the disclosures as compelled commercial speech and evaluate them accordingly.

The Supreme Court has said that required disclosures in the field of securities are not normally subject to heightened scrutiny because "[p]urely commercial speech is more susceptible to compelled disclosure requirements." *Riley v. Nat'l Fed. of the Blind of N.C., Inc.*, 487 U.S. 781, 796 n. 9 (1988). That statement indicates that the framework applicable to commercial speech should apply, which makes sense here because commercial speech is expression "'related

19

solely to the economic interests of the speaker and its audience.'" *Express Oil Change, LLC v. Miss. Bd. of Licensure for Prof'l Eng'rs & Surveyors*, 916 F.3d 483, 487 n.2 (5th Cir. 2019) (citation omitted). The disclosure of information about board diversity is speech that is related solely to the economic interests of the speaker (the corporation) and its audience (existing and potential shareholders), since whether to purchase shares in a company—for whatever reason—is a quintessentially economic decision.

Although the First Amendment protects commercial speech, that protection is more limited than for other speech. *Express Oil Change*, 916 F.3d at 487. And regulations that "compel 'purely factual and uncontroversial' commercial speech" are subject to even "more lenient review than regulations that restrict accurate commercial speech." *Nat'l Elec. Mfrs. Ass' v. Sorrell*, 272 F.3d 104, 113 (2d Cir. 2001) (quoting *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626, 651 (1985)).

This is so because the First Amendment interests implicated by disclosure requirements are "substantially weaker" than when speech is suppressed. *Zauderer*, 471 U.S. at 652 n.14. Compelled commercial speech disclosures do not implicate the "individual liberty interests guarded by the First Amendment, which may be impaired when personal or political speech is mandated by the state." *Sorrell*, 272 F.3d at 114 (citing *Riley*, 487 U.S. at 796 n.9). The required

20

"disclosure of accurate, factual commercial information presents little risk that the state is forcing speakers to" convey a message with which they disagree. *Id.* In other words, compelled speech "raise[s] a serious First Amendment concern" only "where it effects a forced association between the speaker and a particular viewpoint." *Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 316 (1st Cir. 2005).

The Rule effects no such forced association between the speaker and a particular viewpoint. The requirement that companies without at least two diverse directors explain why that is so means they must provide only *their own reasons* for their board composition. Accordingly, the Rule should be subject at most to the more lenient scrutiny applicable to compelled commercial disclosure requirements.

### C. The Rule survives scrutiny under the First Amendment because it involves purely factual and uncontroversial information that is reasonably related to a substantial government interest.

As discussed above, with respect to commercial speech, the Supreme Court applies "more deferential review" to laws that require the disclosure of factual and uncontroversial information. *Nat'l Inst. of Family and Life Advocates v. Becerra*, 138 S. Ct. 2361, 2372 (2018) ("*NIFLA*"). "[T]he government may compel truthful disclosure in commercial speech as long as the compelled disclosure is 'reasonably related' to a substantial government interest and involves 'purely factual and uncontroversial information.'" *CTIA-The Wireless Ass'n v. City of Berkeley*, 928

21

F.3d 832, 842 (9th Cir. 2019) (quoting *Zauderer*, 471 U.S. at 651 and *NIFLA*, 138 S. Ct. at 2372).  At the most, that is the test that should apply here.

That test is certainly met in this case.  The government's interest in providing investors with information that would help them in making investment decisions is undoubtedly substantial, as reflected in the Exchange Act and its primary focus on ensuring full and accurate disclosure to investors.  And the rule is reasonably related to that interest as it provides investors with information about the composition of the boards of Nasdaq-listed companies.  So the disclosures need only involve factual and uncontroversial information to survive scrutiny under the First Amendment.  As discussed below, the Rule compels only the disclosure of factual and uncontroversial information.  The diversity of a company's board of directors, whether it has at least two diverse directors, and its explanation if it does not have at least two diverse directors are factual statements.  These facts are also uncontroversial as they are not an inherent part of a national political debate.

1.    The requirement that companies disclose information about the diversity of their boards and provide an explanation if their board does not have at least two diverse directors involves a factual disclosure.  The Supreme Court has long recognized that statements of reasons, opinions, or beliefs of a company's directors are statements of fact for purposes of the securities laws.  In *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1092 (1991), the Court held that the

22

directors' statements of reasons or belief "are factual . . . as statements that the directors do act for the reasons given or hold the belief stated."  *Id.*

     2.    The requirement that companies disclose information about the diversity of their boards and provide an explanation if their board does not have at least two diverse directors also involves an uncontroversial disclosure.  "A factual statement is 'controversial' under *Zauderer* where the truth of the statement is not settled or is overwhelmingly disproven or where the inherent nature of the subject raises a live, contentious political dispute."  *R.J. Reynolds Tobacco Co. v. FDA*, 96 F.4th 863, 881 (5th Cir. 2024).  There is nothing unsettled about the explanation a company chooses to make for not having at least two diverse directors; as discussed above, the SEC will not question the explanation provided.  Nor does the explanation inherently involve a subject that raises a live, contentious political dispute.  The reason for not having at least two diverse directors could be anything, and the demographics of a specific company's board of directors is not, as discussed below, an "inherent part" of a political dispute.

     AFBR contends that "requiring companies to proffer an explanation for not meeting quotas is hardly 'non-ideological'—it is designed to brand those companies as unfaithful to 'diversity' or not 'doing the work' of achieving it."  AFBR Br. at 29-30.  According to AFBR, the disclosure causes companies to face "moral opprobrium."  *Id*. at 30.  AFBR concludes that the "topic is thus

controversial." *Id.* But it is not sufficient for disclosures to be "emotion-inducing and ideological." *R.J. Reynolds*, 96 F.4th at 882. This Court has recognized that "bankruptcy warnings, disclosure of stock buyback rationales, and explanations of social media censorship decisions may induce emotions or be related to ideological or political issues while remaining uncontroversial." *Id.* Indeed, this Court has held that "forcing social media platforms to explain their reasons for removing content compelled 'disclosures that consist of factual and uncontroversial information.'" *Chamber of Commerce v. SEC*, 85 F.4th 760, 770 (5th Cir. 2023) (quoting *NetChoice, LLC v. Paxton*, 49 F.4th 439, 485 (5th Cir. 2022)). This is so even though it is "hard to think of a more controversial topic in current public discourse than content moderation and social media censorship." *Id.* So it is not sufficient for there to be a "mere connection to a live, contentious, political issue." *R.J. Reynolds*, 96 F.4th at 881.

Instead, the disclosure itself must be "an inherent part of a national political debate." *R.J. Reynolds*, 96 F.4th at 882. This is not the case with respect to a company's explanation as to why it does not have at least two diverse directors. Diversity may be a national political issue, but the reasons why a company may not have two diverse directors are not an inherent part of a national political debate.

24

## III. The Rule does not impose an unnecessary or inappropriate burden on competition.

Petitioners argue that the Rule must be vacated because it imposes an unnecessary and inappropriate burden on competition.  *See* AFBR Br. at 67; NCPPR Br. at 32.  According to petitioners, the requirement that exchange rules not impose an unnecessary or inappropriate burden on competition means that the benefits of the rule must outweigh the costs.  ABRB Br. at 68; NCPPR Br. at 33. They then say that, because the SEC did not find a conclusive link between diversity and improved financial performance, it did not establish that the Rule has benefits.  *Id.*  Petitioners are wrong on both counts.  The requirement that exchange rules not unduly burden competition does not require a cost-benefit analysis.  And even if it did, the SEC found that the Rule confers substantial benefits on investors.

### A. The SEC need not conduct a cost-benefit analysis to find that the Rule does not impose an unnecessary or inappropriate burden on competition.

Petitioners' view that the SEC had to conduct a cost-benefit analysis to find that the Rule does not impose an unnecessary or inappropriate burden on competition is mistaken.  In the Securities Act Amendments of 1975, Congress amended the Exchange Act to add several references to competition.  *See* Paul G. Mahoney, *Equity Market Structure Regulation:  Time to Start Over*, 10 MICH. BUS. & ENTREPRENEURIAL L. REV. 1, 10 (2020).  But those amendments were intended to prevent anticompetitive behavior that was harming investors and not to

25

minimize the costs of regulation. *See* Better Markets, *Setting the Record Straight on Cost-Benefit Analysis and Financial Reform at the SEC*, at 22 (July 30, 2012), https://bettermarkets.org/sites/default/files/Setting%20The%20Record%20Straight.pdf.

Congress's "focus on 'competition' was unrelated to concerns—real or imagined—about regulatory burdens"; the 1975 amendments "were not written to curb 'costly,' 'overzealous,' or 'burdensome' rulemaking, but to break down anticompetitive industry practices and Self-Regulatory Organization ('SRO') rules *that were harming investors*." *Id.* (emphasis in original). The legislative history noted that the impetus for the amendments was the fact that "'*the securities industry* has caused misallocation of capital, widespread inefficiencies, and undesirable and potentially harmful fragmentation of trading markets.'" *Id.* at 22-23 (emphasis in original) (quoting S. Rep. No. 94-75, at 1 (1975)). So "the anticompetitive and undesirable conduct of the private sector was the focus of the Report and the basis for the law, not the rulemaking process of the SEC." *Id.* at 23.

It is true that Congress also directed the SEC to consider the anticompetitive effects of securities industry rules. But in so doing it said the obligation to weigh "'the competitive implications of self-regulatory and Commission action should not be viewed as requiring the Commission to justify that such actions be the least anti-competitive manner of achieving a regulatory objective.'" *Id.* at 23 (quoting

S. Rep. No. 94-75, at 13 (1975)). Again, there is no indication that Congress was motivated by a "desire to spare industry any alleged 'burdens' or 'costs' of regulation." *Id.* The conclusion is "inescapable" that the Securities Act Amendments of 1975 "provide no support for the notion that Congress intended the SEC to conduct cost-benefit analyses in its rulemakings." *Id.* at 24.

### B.    The Rule has substantial benefits for investors.

Regardless, petitioners are also mistaken that the SEC did not find any benefits to the Rule because it did not conclude that diversity necessarily improves a company's financial performance. The SEC found that the Rule benefits investors notwithstanding the fact that it considered the studies into diversity and financial performance to be "mixed." 86 Fed. Reg. at 44,432. Indeed, the SEC found that the Rule benefits investors precisely because "[i]nvestors and companies have different views regarding board diversity and whether board diversity affects company performance and governance." *Id*. at 44,425. The SEC found that "a broad array of investors" indicated "an interest in board diversity information" and that "regardless of their views" on the connection between diversity and performance, the Rule "would provide investors with information to facilitate their evaluation of companies in which they might invest." *Id.* Providing investors with information to facilitate their evaluation of companies in which they might invest is undoubtedly a substantial benefit of the Rule.

## CONCLUSION

For the foregoing reasons, the Court should deny the petition for review.

Respectfully submitted,

*/s/ John Paul Schnapper-Casteras*

JOHN PAUL SCHNAPPER-CASTERAS
  *COUNSEL OF RECORD*
SCHNAPPER-CASTERAS PLLC
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 630-3644
jpsc@schnappercasteras.com
*Counsel for Amicus Curiae*

Dated:  May 6, 2024

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because it contains 6,498 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Times New Roman font.

*/s/ John Paul Schnapper-Casteras*
JOHN PAUL SCHNAPPER-CASTERAS
*Counsel for Amicus Curiae*

Dated: May 6, 2024

## CERTIFICATE OF SERVICE

I certify that on May 6, 2024, I served a copy of the foregoing brief on all counsel of record through this Court's electronic filing system.

*/s/ John Paul Schnapper-Casteras*
JOHN PAUL SCHNAPPER-CASTERAS
*Counsel for Amicus Curiae*