No. 21-60626

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

ALLIANCE FOR FAIR BOARD RECRUITMENT,
NATIONAL CENTER FOR PUBLIC POLICY RESEARCH,

*Petitioners*,

v.

SECURITIES & EXCHANGE COMMISSION,

*Respondent*.

---

On Petition for Review of an Order of the
Securities & Exchange Commission, No. 34-92590

---

## EN BANC REPLY BRIEF FOR PETITIONER
## NATIONAL CENTER FOR PUBLIC POLICY RESEARCH

---

Margaret A. Little
Senior Litigation Counsel
Sheng Li
Litigation Counsel
NEW CIVIL LIBERTIES ALLIANCE
1225 19th St. NW, Suite 450
Washington, DC 20036
Telephone: 202-869-5210

*Attorneys for National Center
for Public Policy Research*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1. Petitioner National Center for Public Policy Research is a non-profit corporation and has no parent corporations or subsidiaries.

2. Margaret A. Little and Sheng Li of The New Civil Liberties Alliance—*Counsel* for Petitioner National Center for Public Policy Research.

3. Petitioner Alliance for Fair Board Recruitment is a non-profit membership corporation and has no parent corporations or subsidiaries.

4. Jonathan Berry, R. Trent McCotter, Michael Buschbacher, Jared M. Kelson, and James R. Conde of Boyden Gray PLLC—*Counsel* for Petitioner Alliance for Fair Board Recruitment.

5. The Securities and Exchange Commission is a federal agency.

6. Daniel E. Matro, Vanessa Ann Countryman, Tracy A. Hardin, and John Robert Rady of the Securities and Exchange Commission—*Counsel* for Respondent Securities and Exchange Commission.

7. Allyson Newton Ho, Seth D. Berlin, Bradley G. Hubbard, Stephen J. Kastenberg, Paul Lantieri, III, Paulette Miniter, Joanne Pedone, Amir C.

Tayrani, John Yetter, John Zecca, and Amalia E. Reiss of Gibson, Dunn & Crutcher LLP; John Zecca, Jeffrey S. Davis, John Yetter, and Joanne Pedone of The Nasdaq Stock Market L.L.C.; and Burt M. Rublin, Stephen J. Kastenberg, Paul Lantieri III, Peter F. Andrews, and Seth D. Berlin of Ballard Spahr LLP—*Counsel* for Intervenor Nasdaq Stock Market, L.L.C.

8. The States of Arizona, Alabama, Alaska, Arkansas, Florida, Georgia, Idaho, Indiana, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Ohio, Oklahoma, South Carolina, Tennessee, Texas, Utah, Virginia, and West Virginia.

9. Drew C. Ensign, Joseph A. Kanefield, Brunn ("Beau") W. Roysden III, Wilson C. Freeman, James Rogers, Sean D. Reyes, Stanford E. Purser, and Christopher A. Bates—*Counsel* for *Amici* States

10. The Financial Industry Regulatory Authority, Inc. ("FINRA")

11. Aaron M. Streett, Bridget Moore, and Elisabeth C. Butler of Baker Botts L.L.P.—*Counsel* for *Amicus* FINRA.

12. Nonpartisan Group of Academics and Practitioners in the Field of Corporate Governance.

13. Mark Wolinsky, Elaine P. Golin, Carrie M. Reilly, Kevin S. Schwartz, Jeohn Salone Favors, Getzel Berger of Wachtell, Lipton, Rosen & Katz—*Counsel*

for *Amici* Nonpartisan Group of Academics and Practitioners in the Field of Corporate Governance.

14. Ad Hoc Coalition of Nasdaq-Listed Companies.

15. Pratik A. Shah and Juliana C. DeVries of Akin Gump Strauss Hauer & Feld L.L.P.—*Counsel* for *Amici* Ad Hoc Coalition of Nasdaq-Listed Companies.

16. Investors and Investment Advisers.

17. Steven M. Shepard, Arun Subramanian, and Neal S. Manne of Susman Godfrey L.L.P.—*Counsel* for *Amici* Investors and Investment Advisers.

18. American Civil Liberties Union.

19. Brian Hauss and Sandra S. Park—*Counsel* for *Amicus* American Civil Liberties Union.

20. Academic Experts in the Fields of Business, Management, and Economics.

21. Jeffrey Dubner and Aman T. George of Democracy Forward Foundation; Peter C. Renn and Karen L. Loewy of Lambda Legal Defense and Education Fund, Inc.—*Counsel* for *Amici* Academic Experts in the Fields of Business, Management, and Economics.

22. Professor Sean J. Griffith.

23. Heather Gebelin Hacker of Hacker Stephens L.L.P.—*Counsel* for *Amicus* Professor Sean J. Griffith.

24. The Buckeye Institute.

25. Jay R. Carson, David C. Tryon, and Alex M. Certo of the Buckeye Institute; John J. Park Jr.—*Counsel* for *Amicus* the Buckeye Institute.

26. Advancing Academic Freedom et al.

27. J. Marc Wheat and Timothy Harper of Advancing American Freedom, Inc.; Ilya Shapiro and Tim Rosenberger of Manhattan Institute—*Counsel* for *Amici* Advancing American Freedom et al.

28. Cory R. Liu.

29. Daniel I. Morenoff and Joseph A. Bingham of American Civil Rights Project; Devon Westhill of Center for Equal Opportunity—*Counsel* for *Amicus* Cory R. Liu.

30. Interfaith Center on Corporate Responsibility

31. Beth-ann Roth, Richard A. Kirby of R/K Invest Law PBC and ESG Legal Services, Inc.—*Counsel* for *Amicus* Interfaith Center on Corporate Responsibility.

32. Better Markets, Inc.

33. John Paul Schnapper-Casteras of Schnapper-Casteras P.L.L.C.—*Counsel for Amicus* Better Markets, Inc.

34. Joseph A. Grundfest, Esq.

35. Steven M. Shepard of Susman Godfrey L.L.P.—*Counsel for Amicus* Joseph A. Grundfest, Esq.

36.NAACP Legal Defense & Educational Fund, Inc.

37.Jin Hee Lee, Michaele N. Turnage Young, Jennifer A. Holmes, Amber M. Koonce, Molly M. Cain, Janai S. Nelson, Samuel Spital, and Elizabeth G. Caldwell—*Counsel for Amicus* NAACP Legal Defense & Educational Fund, Inc.

*/s/ Margaret A. Little*
Counsel of Record for Petitioner

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .......................................................... i

TABLE OF CONTENTS .......................................................................... vi

TABLE OF AUTHORITIES .................................................................... vii

ARGUMENT ON REPLY ........................................................................1

   I.   SEC AND NASDAQ FAIL TO DEMONSTRATE THAT SEC HAS AUTHORITY TO APPROVE THE DIVERSITY RULES ......................................................1

   A.   THE DIVERSITY RULES ARE DESIGNED TO REGULATE MATTERS UNRELATED TO THE EXCHANGE ACT'S PURPOSES THROUGH IMPERMISSIBLE QUOTAS .........1

   B.   SEC'S BOUNDLESS INTERPRETATION OF § 6(b)(5) MUST BE REJECTED ...........4

   II.   THE DIVERSITY RULES ARE STATE ACTION UNDER CIRCUIT PRECEDENT ........9

   A.   SEC'S INTIMATE INVOLVEMENT WITH NASDAQ'S ENACTMENT OF THE DIVERSITY RULES ESTABLISHES STATE ACTION ..............................................9

   B.   STATE ACTION IS NEEDED TO AVOID A VIOLATION OF THE PRIVATE NONDELEGATION DOCTRINE ...........................................................14

   III.  THE DIVERSITY RULES FLUNK THE 'PURELY FACTUAL AND UNCONTROVERSIAL' TEST ...............................................................15

CONCLUSION .....................................................................................18

CERTIFICATE OF SERVICE ...............................................................20

CERTIFICATE OF COMPLIANCE .......................................................21

CERTIFICATE OF ELECTRONIC COMPLIANCE ...........................................21

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Austin Mun. Sec., Inc. v. NASD,*
757 F.2d 676 (5th Cir. 1985) ..................................................................12

*Barbara v. N.Y. Stock Exch.,*
99 F.3d 49 (2d Cir. 1996) ........................................................................12

*Basic Inc. v. Levinson,*
485 U.S. 224 (1988)....................................................................................7

*Blount v. SEC,*
61 F.3d 938 (D.C. Cir. 1995).....................................................................14

*Bostock v. Clayton Cnty.,*
590 U.S. 644 (2020)....................................................................................18

*Brown v. Hill,*
No. 21-7116, 2023 WL 3563076 (D.C. Cir. May 19, 2023) .................9

*Burton v. Wilmington Parking Auths.,*
365 U.S 715 (1961).......................................................................................9

*Chamber of Com. v. SEC,*
85 F.4th 760 (5th Cir. 2023) .......................................................................1

*Cremin v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
957 F. Supp. 1460 (N.D. Ill. 1997).........................................................13

*D.L. Cromwell Invs., Inc. v. NASD Regul., Inc.,*
279 F.3d 155 (2d Cir. 2002) ......................................................................13

*Dep't of Com. v. New York,*
139 S. Ct. 2551 (2019)................................................................................3

*Desiderio v. NASD,*
191 F.3d 198 (2d Cir. 1999) ......................................................................13

*Duffield v. Robertson Stephens & Co.,*
144 F.3d 1182 (9th Cir. 1998) ..................................................................13

*First Nat. Bank of Bos. v. Bellotti,*
435 U.S. 765 (1978).....................................................................................7

*Frazier v. Board. of Trustees*,
    765 F.2d 1278 (5th Cir. 1985) .............................................................10

*Free Speech Coal., Inc. v. Paxton*,
    95 F.4th 263 (5th Cir. 2024) .............................................................16

*Graman v. NASD*,
    1998 WL 294022 (D.D.C. 1998) ......................................................13

*Hamilton v. Dallas Cnty.*,
    79 F.4th 494 (5th Cir. 2023) .............................................................17

*Hardman v. Colvin*,
    820 F.3d 142 (5th Cir. 2016) ...............................................................5

*Intercontinental Indus., Inc. v. Am. Stock Exch.*,
    452 F.2d 935 (5th Cir. 1971) ............................................... 9, 10, 11, 13

*J.I. Case Co. v. Borak*,
    377 U.S. 426 (1964) ...........................................................................7

*Jackson v. Metro. Edison Co.*,
    419 U.S. 345 (1974) .........................................................................10

*Jason v. Am. Arb. Ass'n, Inc.*,
    62 F. App'x 557 (5th Cir. 2003) ........................................................12

*NAM v. SEC*,
    800 F.3d 518 (D.C. Cir. 2015) ............................................................3

*Perpetual Sec., Inc. v. Tang*,
    290 F.3d 132 (2d Cir. 2002) .............................................................13

*R J Reynolds Tobacco Co. v. FDA*,
    96 F.4th 863 (5th Cir. 2024) ......................................................... 16, 17

*SEC v. Blackburn*,
    15 F.4th 676 (5th Cir. 2021) ...............................................................7

*SEC v. World Tree Fin., L.L.C.*,
    43 F.4th 448 (5th Cir. 2022) ...............................................................7

*Sparta Surgical Corp. v. NASD*,
    159 F.3d 1209 (9th Cir. 1998) ..................................................... 11, 12

*Sunshine Anthracite Coal Co. v. Adkins*,
    310 U.S. 381 (1940) ................................................................... 14, 15

*Zauderer v. Off. of Disciplinary Couns.*,
  471 U.S. 626 (1985) ..................................................................................... 15, 18

**STATUTES**

15 U.S.C. § 78f(b) ................................................................................. 7, 8, 13

15 U.S.C. § 78m(a) ................................................................................................6

15 U.S.C. § 78s(b) ...............................................................................................13

15 U.S.C. § 78s(c) .............................................................................................8, 13

15 U.S.C. § 78y(a)(4) ...........................................................................................5

**OTHER AUTHORITIES**

Derrick Bryson Taylor,
  *George Floyd Protests: A Timeline*, New York Times, (Nov. 5, 2021) ...............16

Emily Peck,
  *'The backlash is real': Behind DEI's rise and fall*, Axios (April 2, 2024) ..........17

## ARGUMENT ON REPLY

I.  **SEC AND NASDAQ FAIL TO DEMONSTRATE THAT SEC HAS AUTHORITY TO APPROVE THE DIVERSITY RULES**

SEC and Nasdaq falter out of the gate by misconstruing the standard of review that applies to NCPPR's statutory claims. The substantial evidence review they seek applies to SEC's finding of fact that the Diversity Rules facilitate disclosure of race, gender, and sexuality information to certain investors who want to make decisions based on those characteristics. SEC Br. 17–18; Nasdaq Br. 47. NCPPR's § 6(b)(5) claim challenges SEC's determination that: (1) satisfying investors' demand for information to help them discriminate based on race, gender, and sexuality information serves the purposes of the Exchange Act, and (2) the Rules' quota-or-explain requirements are not quotas that are prohibited by the Act. These conclusions of law are subject to de novo review, *Chamber of Com. v. SEC*, 85 F.4th 760, 767 (5th Cir. 2023) (standard of review for legal and constitutional issues is de novo), which SEC fails.

### A. The Diversity Rules Are Designed to Regulate Matters Unrelated to the Exchange Act's Purposes Through Impermissible Quotas

Section 6(b)(5) explicitly requires SEC to reject any Nasdaq rule that is "designed" to regulate matters unrelated to the Exchange Act. Nasdaq admitted that the Diversity Rule is a "listing rule *designed* to encourage listed companies to increase diverse representation on their boards[.]" JA692 (emphasis added); *see also*

JA274 (admitting that the Diversity Rules are "designed to encourage listed companies to increase diverse representation on their boards"). SEC Commissioners approving the Rules agree they did so based on their desire for "enhanced diversity." Commissioners Lee and Crenshaw, *Statement on Nasdaq's Diversity Proposals—A Positive First Step for Investors* (Aug. 6, 2021), JA24. Because increasing diverse representation is not related to the purposes of the Exchange Act, § 6(b)(5) requires SEC to reject Nasdaq's rules designed to achieve that impermissible purpose.

The most direct way that the Diversity Rules seek to increase diverse representation is by requiring each company to have at least one director who is either a racial or sexual minority, or who identifies as such, JA265, and at least one director who is female, or who identifies as such, JA264. SEC and Nasdaq contend that these requirements are not quotas because companies that fail to have the minimum number of "diverse" directors must explain why. SEC Br. at 25; Nasdaq Br. at 48. Whether compelled explanation for non-compliance transforms otherwise unlawful quotas into permissible disclosures is a question of law subject to de novo review. The answer is "no" because compelled explanation is simply the penalty for not meeting quotas.

A quota enforced with a penalty—no matter how slight—is a quota. Here, being compelled to speak about a controversial subject such as racial and gender representation is anything but slight. It is a significant, government-compelled public

2

self-incrimination penalty with foreseeable consequences—including the potential to damage stock performance—the very opposite of investor protection. It is of no moment that "companies are not required to utter [specific] government-dictated language," SEC Br. 53, because any explanation must at least convey that the company is not "diverse." *Cf. NAM v. SEC*, 800 F.3d 518, 556 (D.C. Cir. 2015) (rejecting SEC's "argu[ment] that issuers can explain the meaning of 'conflict free' in their own terms"). Nasdaq need not "assess the substance of the company's explanation," Nasdaq Br. 48, because the substance is not the point. Rather, the point is to "[r]equir[e] a company to publicly condemn itself" for not meeting the Rules' diversity goals and thereby "stigmatize and shape behavior." *NAM*, 800 F.3d at 530.

The Court should "not … exhibit a naiveté from which ordinary citizens are free." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575 (2019). Such naiveté is especially inappropriate here because Nasdaq openly admitted the Diversity Rules are "designed to encourage listed companies to increase diverse representation on their boards[.]" JA692. It does so by stigmatizing companies that fall short of the Rules' quotas, thereby encouraging companies to hire based on race, gender, and sexuality. SEC's approval of the Diversity Rules violates § 6(b)(5) because the quota-or-explain requirements regulate demographic matters unrelated to the Exchange Act's purposes. The very fact that the identity of AFBR's member(s) had to be filed under seal—recognized by all parties *and the court* as necessary to protect

3

them from harassment and reputational and/or financial harm—tells the story. *See* AFBR's Motion for Protective Order, Doc 63-2; Decl. of Abigail Fisher, Doc. 63-4; Affidavit of Edward Blum, Doc. 63-3; and Order Granting Protective Order, Doc. 70.

### B. SEC's Boundless Interpretation of § 6(b)(5) Must Be Rejected

Nasdaq states that "[t]he Commission reasonably concluded that the Board Diversity Rules are 'designed' to" serve § 6(b)(5)'s objectives. Nasdaq Br. at 54–55. But SEC's interpretations of § 6(b)(5)'s objectives are conclusions of law subject to de novo review. Thus, the question is not whether the SEC's conclusions are "reasonable," but rather whether they are correct. SEC's conclusions are incorrect because they rest on an indefensible interpretation of § 6(b)(5) to mean whatever a group of investors whom SEC endorses wants it to mean.

SEC interprets § 6(b)(5) to permit mandatory disclosure of any "information that contributes to informed investment and proxy voting decisions." SEC Br. 17–18. But that simply raises the question of what type of information contributes to "informed" decisions. On this point, SEC states that "conclusive empirical evidence" of a relationship between diversity and investment performance is not needed. SEC Br. 22. SEC's evidentiary threshold is actually far lower. SEC did not ask whether "conclusive evidence" supports such a relationship when approving the Rules. Rather, it evaluated Nasdaq's claim "that there is substantial evidence that board

4

diversity promotes investor protection" and corporate governance. JA8; *see also* 15 U.S.C. § 78y(a)(4) (requiring SEC approval of exchange rules to be "supported by substantial evidence."). SEC rejected Nasdaq's claim that diversity improves governance. *See* JA9 ("Studies of board diversity mandates, in any event, do not provide a reliable basis for evaluating the likely overall effects of the Board Diversity Proposal, which does not mandate any particular board composition.").[1]

SEC's approval of the Rules despite rejecting this claim necessarily implies it believes "substantial evidence" of a relationship to investment performance is not needed for information to contribute to "informed" investment decisions, and thus to be the subject of mandatory disclosure under § 6(b)(5). *See* SEC Br. 19. SEC further states that mandatory disclosure is appropriate so long as a "broad array" of investors seek it. SEC Br. 22. And the administrative record is devoid of any

---

[1] SEC's and Nasdaq's supplemental briefs downplay SEC's rejection of Nasdaq's governance-improvement evidence. *See* SEC at 35; Nasdaq at 56. Nasdaq's proposal repeatedly claimed that a positive relationship between diversity and corporate governance is supported by "substantial evidence," *see* JA284, 382, 385, 416–17, 542, 550–51, 693, 715, 717, meaning "such relevant evidence as a reasonable mind might accept to support a conclusion," *Hardman v. Colvin*, 820 F.3d 142, 147 (5th Cir. 2016). If the evidence had been genuinely mixed, such that a reasonable mind might agree with Nasdaq, SEC would have accepted Nasdaq's claims under the substantial evidence standard. *See* JA8. SEC's refusal to accept Nasdaq's claim under that standard implies that, despite calling the evidence "mixed," *id*., it concluded that the evidence Nasdaq presented does not allow a reasonable mind to accept that diversity improves corporate governance.

principled reasoning as to how any of this is designed to meet the purposes of the '34 Act.

Under this view, if SEC decides a broad array of investors wants disclosures of greenhouse gas emissions, then § 6(b)(5)'s statutory objectives must include such mandatory disclosures, even if linkage between emissions and financial performance is not supported by "substantial evidence." Similarly, if a broad array wants information about companies that do business with Israel or any controversial company or country, then such government-sanctioned disclosures must serve § 6(b)(5)'s supposedly subjective statutory purposes. SEC's interpretation of § 6(b)(5) would lack a fixed meaning—when investors' whims change (or the Commission's perception of those whims), so would the statute's requirements.

The Exchange Act does not authorize mandatory disclosures for the purpose of satisfying investor *demand*, which is an incoherent and boundless regulatory principle. Griffith Amicus Br. 16. Rather, such disclosures must be grounded in investor *protection* to be consistent with the Act. *See* 15 U.S.C. § 78m(a) (authorizing mandatory disclosures that are "necessary or appropriate for the proper protection of investors and to insure fair dealing in the security."). Mandatory disclosures must protect investors, not as citizens who "do not share a common set of political or social views," but rather as shareholders of *for-profit* companies who "are united by a desire to make money, for the value of their investment to increase."

6

*First Nat. Bank of Bos. v. Bellotti*, 435 U.S. 765, 805 (1978) (White, J., dissenting); *See also* Buckeye Amicus Br. 7–10. Because there is no "substantial evidence" that board diversity increases investment returns, the Diversity Rules' disclosure requirements fall outside of the Act's investor-protection purpose and thus may not be approved by SEC. *See* 15 U.S.C. § 78f(b)(6).

The cases cited by SEC and Nasdaq only underscore petitioners' point that disclosures must relate to the purposes of the Exchange Act. *Basic Inc. v. Levinson*, 485 U.S. 224, 246 (1988) (*material* misrepresentations that affect stock price); *J.I. Case Co. v. Borak*, 377 U.S. 426, 431 (1964) (deceptive or inadequate disclosure in proxy solicitation that impedes "fair corporate suffrage."). SEC's contention that information beyond just "balance-book" issues is important to investors cites cases that address market *integrity*. SEC Br. 21, 29. *SEC v. World Tree Fin., L.L.C.*, 43 F.4th 448, 465 (5th Cir. 2022) (conflicts of interest); *SEC v. Blackburn*, 15 F.4th 676, 681 (5th Cir. 2021) (criminal history of individuals influencing management). Likewise, Nasdaq's citation of its rules requiring a majority independent board, disclosures of waivers of the exchange's code of conduct, and disclosure of third-party compensation of board members, Nasdaq Br. 11–12, clearly implicate integrity of governance directly relevant to the Exchange Act's core purposes of honest markets and investor protection.

Nothing like that is presented by these Rules. No reasonable argument can be made that the Diversity Rules' disclosures involve deception, misrepresentation, conflicts of interest, or questions about management integrity that would bear upon company performance. Each of these cases *refutes* SEC and Nasdaq's argument that there is no "materiality" requirement because all of the disclosures in the cases they cite have direct relevance to the purposes of the Act—namely honest markets; just and equitable principles of *trade*; fostering cooperation and facilitation of transactions in securities; removing impediments to the mechanism of a free and open market and a national market system; and to protect investors and the public interest. 15 U.S.C. § 78f(b)(5). SEC Br. 28, Nasdaq Br. 60–63.

SEC thus confirms NCPPR's characterization of the agency's argument positing that, under their view, SROs "could compel the disclosure of any information so long as some investors want it." NCPPR Br. 26. Such power untethered to the Exchange Act's purposes would not be limited to SROs. Because SEC can add to or amend an SRO's rules "as the Commission deems necessary or appropriate," 15 U.S.C. § 78s(c), SEC could also compel such disclosures through SROs it supervises. The Court must reject this boundless interpretation that

eviscerates the prohibition against SEC's approval of rules not designed to serve the purposes of the Act.

## II.   THE DIVERSITY RULES ARE STATE ACTION UNDER CIRCUIT PRECEDENT

### A. SEC's Intimate Involvement with Nasdaq's Enactment of the Diversity Rules Establishes State Action

This Court should follow its own precedent in *Intercontinental Indus., Inc. v. Am. Stock Exch.*, 452 F.2d 935, 941 (5th Cir. 1971), to hold that "intimate involvement" between Nasdaq and SEC brings the Diversity Rules within the Constitution's purview. SEC and Nasdaq contend that *Intercontinental* is no longer good law because it cited *Burton v. Wilmington Parking Auths.*, 365 U.S 715 (1961), which they in turn say has been narrowed. SEC Br. 40–41; Nasdaq Br. 44–45.

SEC and Nasdaq overstate *Intercontinental*'s reliance on *Burton*.[2] The *Intercontinental* panel merely cited that case as one of "numerous court decisions" finding state action. 452 F.2d at 941. It did not cite *Burton*'s reasoning to conclude that the SEC has "intimate involvement" with an exchange's de-listing decisions. Rather, that conclusion rests on Exchange Act provisions requiring that: (1) an exchange must register with the Commission, (2) its "rules must be submitted to the

---

[2] They also overstate the narrowing of *Burton.* It is not limited to the "lessee" context as SEC suggests. SEC Br. at 40. Rather, it still stands for the proposition that state action occurs where the government is in "a position of interdependence" with the nominally private entity. *Brown v. Hill*, No. 21-7116, 2023 WL 3563076, at *4 (D.C. Cir. May 19, 2023) (quoting *Burton*, 365 U.S. at 725).

Commission and are subject to alteration or supplementation by the Commission," (3) an exchange's "members are closely regulated by the Commission," (4) "[a] security may not be delisted without application to the Commission," and (5) an exchange "may be suspended or its registration withdrawn by the Commission." *Id.* at 941 n.9 (citing 15 U.S.C. §§ 78f, 78i, 78k, 78l, 78q, 78s).

*Intercontinental*'s reasoning fits the state-action standard recognized by SEC's and Nasdaq's own cases that purport to narrow *Burton*. In *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 358 (1974), cited at SEC Br. 41 and Nasdaq Br. 44, the Court held that being "heavily regulated" was not enough to establish a private actor's decisions as state action. Instead, there must be a "symbiotic relationship [like the one] presented in *Burton*" between the private actor and the government. *Id.* at 357. Likewise, *Frazier v. Board of Trustees*, 765 F.2d 1278, 1287–88 (5th Cir. 1985), cited at SEC Br. 40 and Nasdaq Br. 45, recognized that state action is established by "[a] symbiotic relationship … [that] denotes a level of functional intertwining whereby the state plays some meaningful role in the mechanism leading to the disputed act."

SEC clearly "plays a meaningful role in the mechanism" of Nasdaq's listing rules and decisions. *See id*. An exchange's "rules govern[ing] its decision to list, not to list, or to de-list an offering" are "issued pursuant to the Exchange Act's directive that self-regulatory organizations adopt rules and by-laws in conformance with the

10

Exchange Act." *Sparta Surgical Corp. v. NASD*, 159 F.3d 1209, 1212 (9th Cir. 1998) (citing 15 U.S.C. § 78o-3(b)). Additionally, "SEC must approve the rules" before they take effect and "'may abrogate, add to, and delete from' rules of a self-regulatory organization as it 'deems necessary or appropriate[.]'" *Id*. (citing 15 U.S.C. §78s(b), (c)). The Exchange Act provisions on which *Sparta Surgical* relied to conclude that SROs' delisting decisions are subject to absolute immunity are the same ones that *Intercontinental* relied upon to conclude that SEC has "intimate involvement" with such delisting decisions. *Compare Sparta Surgical*, 159 F.3d at 1214, *with Intercontinental*, 452 F.2d at 941 n.9.

*Intercontinental*'s conclusion that an SRO's delisting activity is subject to constitutional scrutiny is entirely consistent with the post-*Burton* state-action standard, which requires symbiosis between private and governmental actors. Such symbiosis is why SROs are immune from civil liability when they carry out regulatory functions on behalf of SEC. *Sparta Surgical*, 159 F.3d at 1213 (holding "that a self-regulatory organization is immune from liability based on the discharge of its [delisting] duties under the Exchange Act."). The same symbiosis is at issue here.

SEC argues that "SRO regulatory immunity has nothing to do with SROs' 'state-actor status'" because "[c]ases recognizing such immunity all start with the premise that SROs are '*private* actors.'" SEC Br. 49 (citing *Barbara v. N.Y. Stock*

11

*Exch.*, 99 F.3d 49, 58–59 (2d Cir. 1996)). But all state-action analysis starts with that premise—otherwise such analysis would be unnecessary. The question is whether the relevant private actor performs governmental functions with respect to the issue in question. SEC's own cited case answers in the affirmative: "Although the Exchange is a private, rather than a governmental entity, immunity doctrines protect private actors when they *perform important governmental functions*." *Barbara*, 99 F.3d at 58 (emphasis added).

Nasdaq's argument that state action and immunity are not "coextensive" likewise fails. Nasdaq Br. 32. To be sure, immunity *might* be granted for reasons unrelated to state action, such as "to protect [arbitrators] from undue influence and the [arbitration] process from reprisals by dissatisfied litigants." *Jason v. Am. Arb. Ass'n, Inc.*, 62 F. App'x 557, 557 (5th Cir. 2003), cited at Nasdaq Br. 31 (citation and quotation marks omitted). Here, however, SROs are granted absolute immunity precisely because they are "entrusted [by the Exchange Act] with the authority to preserve and strengthen the quality of and public confidence in its market," *Sparta Surgical*, 159 F.3d at 1214 (citation omitted). When an SRO delists a company for not satisfying listing standards, it "is performing a regulatory function cloaked in immunity." *Id*. at 1215; *accord Austin Mun. Sec., Inc. v. NASD*, 757 F.2d 676, 690–91 (5th Cir. 1985) ("NASD disciplinary officers serve as surrogates for the SEC, and should receive the same immunity their principles [sic] possess.")

*Intercontinental*'s state-action analysis focused on symbiosis between SEC and SROs. 452 F.2d at 941. Its conclusion that SEC's "intimate involvement" in SROs' delisting decisions results in state action applies with equal force to Nasdaq's enactment of a listing rule that requires SEC's approval based on its determination that the rule serves the Exchange Act's regulatory purposes and that SEC "may abrogate, add to, and delete from" it as it "deems necessary or appropriate," 15 U.S.C. §§ 78f(b)(5), 78s(b), (c), subject to SEC approval and amendment. *Id.*

Both SEC and Nasdaq cite a litany of out-of-circuit cases finding no state action in an SRO's adoption and agency approval of rules for mandatory arbitration or SRO rules that require testimony. SEC Br. 42–43, Nasdaq Br. 27 n.2, 42.[3] But unlike here, in each of those cases, the record was devoid of any encouragement or even mention of requiring arbitration of disputes or taking of testimony by the SEC, and accordingly those courts found no participation by the government in the adoption of the later-approved exchange rules. Whereas here, Nasdaq explicitly relied on "recent calls from SEC commissioners" for diversity disclosures.[4] JA689-690.

---

[3] *Perpetual Sec., Inc. v. Tang*, 290 F.3d 132, 138–39 (2d Cir. 2002); *D.L. Cromwell Invs., Inc. v. NASD Regul., Inc.*, 279 F.3d 155, 161–62 (2d Cir. 2002); *Desiderio v. NASD*, 191 F.3d 198, 207 (2d Cir. 1999); *Duffield v. Robertson Stephens & Co.*, 144 F.3d 1182, 1202 (9th Cir. 1998); *Graman v. NASD*, 1998 WL 294022, at *2–3 (D.D.C. 1998); *Cremin v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 957 F. Supp. 1460, 1467–68 (N.D. Ill. 1997).

[4] *See* Commissioner Allison Herren Lee, *Regulation S–K and ESG Disclosures: An Unsustainable Silence* (Aug. 26, 2020), available at: *https://www.sec.gov/news/public-statement/lee-regulation-*

Accordingly, the mandatory arbitration and similar out-of-circuit cases are wholly inapposite. This Court should follow its own precedent in *Intercontinental* and the far more relevant *Blount* decision, especially because the Rules serve as a government-approved condition for continued listing on the exchange, subjecting noncompliant persons to legal sanctions. *Blount v. SEC*, 61 F.3d 938, 941 (D.C. Cir. 1995).

### B. State Action Is Needed to Avoid a Violation of the Private Nondelegation Doctrine

SEC and Nasdaq rely on *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381 (1940), to argue that Nasdaq's listing rules do not violate the private nondelegation doctrine. SEC Br. 47; Nasdaq Br. 46. But *Adkins* establishes that Nasdaq rules subject to SEC approval *are* attributable to SEC and thus are subject to constitutional scrutiny.

---

s-k-2020-08-26#_ftnref15 (''There is ever-growing recognition of the importance of diversity from all types of investors … [a]nd large numbers of commenters on this [SEC] rule proposal emphasized the need for specific diversity disclosure requirements.''); *see also* Commissioner Caroline Crenshaw, *Statement on the* ''*Modernization*'' *of Regulation S–K Items 101, 103, and 105* (August 26, 2020), available at: *https://www.sec.gov/news/public-statement/crenshaw-statement-modernization-regulation-s-k* (''As Commissioner Lee noted in her statement, the final [SEC] rule is also silent on diversity, an issue that is extremely important to investors and to the national conversation. The failure to grapple with these issues is, quite simply, a failure to modernize.''); Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), available at: *https://www.sec.gov/news/speech/chair-white-icgn-speech.html* (''Companies' disclosures on board diversity in reporting under our current requirements have generally been vague and have changed little since the rule was adopted … Our lens of board diversity disclosure needs to be re-focused in order to better serve and inform investors.''). JA689 n.7.

*Adkins* concerned a statute that permitted a private entity to propose price regulations that would not take effect until approved by a supervising federal agency. 310 U.S. at 388. The Supreme Court held that the private nondelegation doctrine was not offended because the enactment of a regulation is attributed to the approving agency rather than the private entity. *Id.* at 399 ("The members of the [private entity] function subordinately to the Commission. It, not the [private] authorities, determines the prices."). Listing rules work in the same way. Nasdaq proposes rules, and SEC approves them. If Nasdaq were a purely private entity—as it and SEC insist—then under *Adkins*, any private nondelegation defect is avoided because it is SEC that functionally enacts rules proposed by Nasdaq. State action is the unavoidable logical and legal conclusion of such an arrangement. Unlike Schoedinger's Cat, SEC's approval of Nasdaq's Diversity Rules cannot simultaneously provide governmental involvement needed to avoid a private nondelegation violation while lacking sufficient governmental involvement to constitute state action.

## III. THE DIVERSITY RULES FLUNK THE 'PURELY FACTUAL AND UNCONTROVERSIAL' TEST

SEC argues that the Diversity Rules pass First Amendment scrutiny because they compel disclosure of only "purely factual and uncontroversial information." SEC Br. at 51 (quoting *Zauderer v. Off. of Disciplinary Couns.*, 471 U.S. 626, 651 (1985). To start, that standard applies only with respect to commercial

advertisement. *See R J Reynolds Tobacco Co. v. FDA*, 96 F.4th 863, 881 (5th Cir. 2024). Moreover, the Diversity Rules' compelled speech is not uncontroversial. This Court recently explained that "a compelled statement is 'uncontroversial' for the purposes of *Zauderer* where the truth of the statement is not subject to good-faith scientific or evidentiary dispute *and* where the statement is not an integral part of a live, contentious political or moral debate." *Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 281–82 (5th Cir. 2024).

Representation in positions of prestige and leadership based on race and sex is a clearly live and contentious issue. This Court granted AFBR's motion for a protective order precisely because this issue is "highly sensitive and contentious, especially when it concerns high-profile positions and obligations in the corporate and securities world." AFBR Mot. for Protective Order, Doc. 63-2, at 5; Doc. 70. Moreover, Nasdaq's decision to propose the Diversity Rules was explicitly motivated by "the social justice movement" that in 2020 "heightened attention to the commitment of public companies to diversity and inclusion," JA689, and resulted in widespread protests and riots, *see* Derrick Bryson Taylor, *George Floyd Protests: A Timeline*, New York Times, (Nov. 5, 2021).[5]

---

[5] Available at: https://www.nytimes.com/article/george-floyd-protests-timeline.html (last visited May 4, 2024).

Those same concepts of "diversity and inclusion" have become even more divisive and controversial in the years since. *See Hamilton v. Dallas Cnty*., 79 F.4th 494, 509 (5th Cir. 2023) (en banc) ("[O]ur decision today will help restore federal civil rights protections for anyone harmed by divisive workplace policies that allocate professional opportunities to employees based on their sex or skin color, under the guise of furthering diversity, equity, and inclusion.") (Ho, J., concurring); *see also, e.g.,* Emily Peck, *'The backlash is real': Behind DEI's rise and fall*, Axios (April 2, 2024).[6] The Diversity Rules' compelled speech regarding race, gender, and sexuality representation flunks this test because "the inherent nature of the subject raises a live, contentious political dispute." *R J Reynolds*, 96 F.4th at 881.

In addition to disclosure, the Diversity Rules also compel companies to *ask* director candidates about their race, gender, and sexual preferences. How else could companies disclose a "diversity matrix" or know whether they must explain non-compliance with the Rules' quota requirements?[7] It would be an understatement to say that interrogating job candidates' racial identity, gender identity, or sexual preferences is controversial. Every competent HR manager instructs interviewers to *avoid* such questioning—not only is it incredibly offensive to most Americans but it

---

[6] Available at: https://www.axios.com/2024/04/02/dei-backlash-diversity (last visited May 4, 2024).
[7] While directors have the option not to answer, the companies must still ask.

could be the basis for state or federal employment lawsuits. *See, e.g.*, *Bostock v. Clayton Cnty.*, <u>590 U.S. 644</u> (2020); States Amicus Br. 16–17.

Yet, the Diversity Rules compel companies to ask director candidates a series of invasive questions about their personal lives, including the type of individual with whom each candidate prefers to have sexual relations. Mandatory speech of this sort falls far outside the "purely factual and uncontroversial information" allowed under *Zauderer*, <u>471 U.S. at 651,</u> even assuming without conceding that that case applies outside the commercial advertising context. And all such inquiries—whether on race, gender or sexual preference—fall far outside the purposes of Congress when it passed the '34 Act.

## CONCLUSION

For the foregoing reasons, the Court should hold that SEC's Order approving Nasdaq's Diversity Rules was issued without statutory authority and violates the First Amendment. The Court should vacate the Order and set aside the Rules.

May 7, 2024                    Respectfully submitted,

*/s/ Margaret A. Little*
Margaret A. Little
Sheng Li
NEW CIVIL LIBERTIES ALLIANCE
1225 19th St. NW, Suite 450
Washington, DC 20036
Telephone: 202-869-5210

*Attorneys for National Center for Public Policy Research*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 7, 2024, an electronic copy of the foregoing brief was filed with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/EFC filing system and that service will be accomplished using the appellate CM/ECF system.


*/s/ Margaret A. Little*
Margaret A. Little

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), I hereby certify that this document complies with Federal Rule of Appellate Procedure 32(a)(7)(B)(ii). It is printed in Times New Roman, a proportionately spaced font, and includes 4,297 words, excluding items enumerated in Federal Rule of Appellate Procedure 32(f) and Fifth Circuit Rule 32.2. I relied on my word processor, Microsoft Word, to obtain the count.

*/s/ Margaret A. Little*
Margaret A. Little

**CERTIFICATE OF ELECTRONIC COMPLIANCE**

I hereby certify that in the foregoing brief, filed using the Fifth Circuit CM/EFC filing system, all required privacy redactions have been made pursuant to Fifth Circuit Rule 25.2.13, any required paper copies to be submitted to the Court are exact copies of the version submitted electronically, and the electronic submission was scanned for viruses with the most recent version of a commercial virus scanning program, and is free of viruses.

*/s/ Margaret A. Little*
Margaret A. Little